UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94




DETENTION HEARING
Wednesday, July 27, 2016
Burlington, Vermont




BEFORE:

        THE HONORABLE JOHN M. CONROY
           Magistrate Judge



APPEARANCES:

        HEATHER E. ROSS, ESQ., Assistant United States
            Attorney, Federal Building, Burlington, Vermont;
            Attorney for the United States

        MICHAEL J. STRAUB, ESQ., Law Office of Michael J.
            Straub, 19 Church Street, Suite 9, Burlington,
            Vermont; Attorney for Defendant Folks

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# <u>I N D E X</u>

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **CHRISTOPHER DESTITO** | | |
| Redirect by Ms. Ross | 13 | 10 |
| Cross by Mr. Straub | 16 | 25 |
| **MARILYN EPP** | | |
| Direct by Ms. Ross | 21 | 15 |
| | 36 | 10 |
| | 45 | 9 |
| Voir Dire by Mr. Straub – Re: Exhibit 5 | 31 | 13 |
| – Re: Exhibit 4 | 43 | 14 |
| – Re: Exhibit 2 | 50 | 3 |
| Cross by Mr. Straub | 53 | 17 |
| **CASSANDRA H. FOLKS** | | |
| Direct by Mr. Straub | 56 | 15 |
| Cross by Ms. Ross | 62 | 19 |

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 1 | Burlington Police Department reports | 7 |
| 2 | Video recording of Folks Facebook page | 51 |
| 4 | Audio CD of Provost interview | 44 |
| 5 | Video recording of Folks interview | 35 |

**DEFENDANT'S**

| A | Jennifer Baker letter | 62 |

1    WEDNESDAY, July 27, 2016

2    (The following was held in open court at 3:37 p.m.)

3              COURTROOM DEPUTY:  Your Honor, the matter

4    before the Court this afternoon is criminal action

5    16-CR-94-1, United States of America versus Brian Folks

6    who is present in the courtroom today with attorney

7    Michael Straub.  Representing the government is

8    Assistant United States Attorney Heather Ross.  And we

9    are here for the purpose of a continuation of the

10   detention hearing.

11             THE COURT:  Is the government prepared to go

12   forward?

13             MS. ROSS:  It is, your Honor.

14             THE COURT:  You may proceed.

15             MS. ROSS:  Thank you, your Honor.  Before we

16   call our next witness, I did just want to take care of a

17   couple of housekeeping matters that arose the last time

18   we were in court on Monday.

19        During the examination of Agent Destito, there was

20   an incident report discussed on numerous occasions.  It

21   was an incident report from the Burlington Police

22   Department about the nine millimeter Beretta handgun

23   found in the vehicle in -- on December 25th, 2015, in

24   which Mr. Folks was the lone occupant.

25        Couple of things about that:  We referred to an

officer.  I wanted to be able to -- it's an Officer
Beliveau who did the stop, and I wanted to make sure the
record was clear on that.  But I was also going to
suggest that since both the government and the defendant
referred to that incident report, we are happy to submit
it to the Court as an exhibit, if that would make it
easier for the Court, and the defense has no objection.

THE COURT:  Are you making an offer of
admission?

MS. ROSS:  I am, your Honor.

THE COURT:  Any objection?

MR. STRAUB:  It's full of -- the document that
I have been provided as a copy of the Government's
Exhibit 1 is actually a packet of various reports.  It
includes the initial call information, including all
sorts of dispatch narratives.  It apparently includes
four or more narrative reports written by various
officers relating to the incident.  It does not include,
as far as I can tell, any actual information regarding
the search of the vehicle.

What it does include is information regarding the
stop of my client, not even an arrest, as the vehicle
was seized but he was released.  It includes what appear
to be property information entries into what I'm going
to assume is the Valcour system as maintained by the

1    Burlington Police Department for case information.  It

2    contains -- so as such, it contains a lot of information

3    which was not testified about.

4        It's probably irrelevant as well as -- while I

5    understand hearsay is admissible at these proceedings,

6    it contains enumerable -- well, it contains a lot of

7    reports from other officers which we haven't heard any

8    testimony about.  So I would object on the grounds of

9    relevance.

10            THE COURT:  I thought the offer of admission

11   was the report of Officer Beliveau with regard to the

12   traffic stop.  That's what my understanding is.  Is that

13   the offer of admission?

14            MS. ROSS:  It is, your Honor.  It is a series

15   of reports.  They start with -- it's the incident report

16   for this incident.  It starts with Officer Beliveau's

17   traffic stop.  It talks about the search warrant.  It

18   does not say that Mr. Folks was arrested, but it does

19   talk about -- it says there's a traffic stop, they

20   obtained a search warrant, they talked to Lori Crawford

21   and she said, "I -- that's not my vehicle.  I got it

22   from" -- or "It was put in my name at Mr. Folks'

23   direction."  And then it talks about the property that

24   was found during the execution of the search warrant,

25   namely the nine millimeter Beretta.  All those things

1   were talked about by Agent Destito.

2        So, you know, for purposes of completeness, I would

3   suggest that the Court should be entitled to see all the

4   reports related to this incident, and that's what it

5   covers.

6             THE COURT:  Let me inspect the report, the

7   document.

8             MS. ROSS:  Sure.

9             THE COURT:  It's marked as an exhibit?

10            MS. ROSS:  It is, your Honor.  It is marked as

11  Exhibit 1.  And if I may approach, I will bring a copy

12  to the Court.

13            MR. STRAUB:  Your Honor, I'd just like to make

14  sure that while we are talking about admission of this

15  exhibit, we were in the middle of the Agent Destito's

16  testimony, and I'd like to just be sure that he is about

17  to take the stand so I can question him about this

18  exhibit, if that's the government's intention to

19  introduce it.

20            THE COURT:  Okay.  Let me take a moment.

21            (Brief pause.)

22            THE COURT:  All right.  Because hearsay is

23  permissible in these proceedings, the government's offer

24  of admission, Government Exhibit No. 1, is received with

25  the understanding that Mr. Straub can cross examine

1    Agent Destito about this report.

2              (Government's Exhibit 1 was received in

3    evidence.)

4              THE COURT:  So -- are there other housekeeping

5    matters that you wish to address?

6              MS. ROSS:  Yes, there are just a couple,

7    your Honor.  The next was going to be that, as we

8    discussed at the last hearing, we did on Monday provide

9    Mr. Straub with Agent Destito's notes from his interview

10   of Cassandra Harris Folks.  I wanted to know -- we do

11   have Agent Destito here if the defense wishes to cross

12   examine him about those notes.  They reserved their

13   right to do so.  So we do have him here if they choose

14   to do that.

15             THE COURT:  Okay.

16             MS. ROSS:  The last thing, your Honor, is that

17   you -- the Court had brought up on Monday, in terms of

18   the source of information, the source's criminal

19   history.  We did provide the criminal history of the

20   source to Mr. Straub.  The criminal history for the

21   source shows that the source has no convictions.  She

22   does, however, have a series of misdemeanor arrests, the

23   disposition of which has -- is either pending or unknown

24   but are not showing up as convictions.  Those

25   misdemeanor arrests include for things like possession

1    of a small amount of heroin --

2              THE COURT:  When was that?  What's the date of

3    that arrest?

4              MS. ROSS:  If you will give me just a moment,

5    your Honor.

6              (Brief pause.)

7              MS. ROSS:  Okay.  So I have -- on July 8th,

8    2016, heroin possession.  I also have on that same date

9    false information to a law enforcement officer,

10   misdemeanor.  On December 15th of 2015, we have a

11   misdemeanor, unlawful trespass.  On July 6 of 2015, we

12   have a heroin possession of less than 200 milligrams.

13             THE COURT:  I'm sorry.  What's the date of

14   that heroin possession?

15             MS. ROSS:  July 6th, 2015.  So there was one

16   this July and one last July.  Also on that -- that same

17   date there's a shoplifting, retail theft, of a hundred

18   dollars or less.  There are also retail theft of a

19   hundred dollars or less, so shoplifting, on May 8th of

20   2015, April -- and April 26th of 2015.

21             THE COURT:  Okay.

22             MR. STRAUB:  Your Honor, regarding that

23   proffer, I'd like to clarify that it appears that the

24   charge of false information to a police officer was for

25   reporting something where there was no crime, given the

1    entry in the criminal record which says "false

2    information to a police officer, no crime."

3                THE COURT:  That's the July 8th, 2016, arrest?

4                MR. STRAUB:  Yes, Judge.

5                THE COURT:  Thank you.

6                MS. ROSS:  Your Honor, just to clarify, there

7    are not -- the facts are not on this.  It does just say

8    that, "false information to a law enforcement officer/no

9    crime."

10               THE COURT:  Okay.

11               MS. ROSS:  Your Honor, I also wanted to

12   clarify with respect to the source of information, you

13   had asked the government on Monday whether any promises,

14   inducements, et cetera, were made to her.  I answered

15   there were none.  I still believe there were none, but I

16   want to make clear that with this individual, as with

17   many individuals with whom we are now dealing who have

18   heroin addiction problems, we offered this individual,

19   through our witness victim coordinator, assistance

20   getting into drug treatment, and that is something we

21   are doing routinely, regardless of whether somebody

22   wants to talk to us or not.  When we are dealing with

23   heroin addicts, we are often trying to connect them with

24   services as a matter of course.

25               THE COURT:  So implicit in that is that the

1    individual is either an active or recent heroin user?

2              MS. ROSS:  Absolutely, your Honor.  And I did

3    make that clear on Monday, and we did provide

4    information in the full report that -- that was made

5    available to Mr. Straub that this source of information

6    was -- using heroin was part of the drug trafficking

7    scheme at issue, implicated herself in that.  So all of

8    that information was made available to Mr. Straub.  I

9    just wanted to be clear with the Court.

10             THE COURT:  Okay.  And just so I am clear on

11   that, Agent Destito testified about that information but

12   he was not present.  Am I correct?

13             MS. ROSS:  You are correct, your Honor.

14             THE COURT:  Okay.

15             MS. ROSS:  You are correct.

16             THE COURT:  Okay.

17             MR. STRAUB:  Judge, along those lines, and

18   since Ms. Ross is not quite testifying but making a

19   lengthy proffer, I'd like to clarify that, again, as

20   Agent Destito was not present, I don't see -- I don't

21   know whether Special Agent Chetwynd is present in the

22   courtroom?  I don't see Officer Estes, and obviously I

23   can't call Ms. Ross, but my question is whether the

24   officer -- the government spoke with this source of

25   information in the generalized terms, as they often do,

1  which is, "We haven't made any charging decisions yet,

2  but if you speak to us, it would probably go a long way

3  toward our consideration of what our charging decision

4  is going to be, without making any promise"?

5          MS. ROSS:  Your Honor, again, this is a

6  detention hearing, and the rules of evidence don't

7  apply.  I was at that proffer meeting.  That was made --

8  or it's not a proffer meeting.  That interview.  And as

9  Agent Destito testified on Monday, no charging decisions

10  have yet been made.  No statements were -- and, you

11  know, no statements were made by the AUSAs with respect

12  to what might happen in the future.

13          THE COURT:  Okay.  My question that I posed

14  the other day was whether any offers, promises, rewards

15  or inducements had been extended to the source of

16  information.  So that's a pretty broad term to inquire

17  about, not only offers and promises but rewards or

18  inducements, so that's -- Mr. Straub's point is a

19  legitimate one.

20      Were any inducements made to this individual to sit

21  down and speak with the government?

22          MS. ROSS:  No inducements were made to this

23  individual to sit down and speak with the government on

24  December 15th.  She was asked to -- as I said, what was

25  done is that she was provided access to services, told

1     that she could get assistance to get into drug

2     rehabilitation.  We tried to give her that assistance.

3     She was connected with other services as she was

4     homeless at the time.

5          So those things definitely happened, although,

6     again, I don't characterize those as inducements because

7     they were in no way conditioned on "first you have to

8     talk to us" or "if you're going to talk to us."  It was

9     just this is a person who's in trouble and needs some

10    connections to assistance, regardless.

11                  THE COURT:  Okay.

12                  MS. ROSS:  That being said, your Honor, if the

13    best way to proceed at this point -- if Mr. Straub would

14    like to question Agent Destito about Exhibit 1, I can

15    put him back on the stand to question him about that and

16    then turn him over to the defense for questions about

17    that and if he wants to ask questions about Agent

18    Destito's notes.

19                  THE COURT:  Okay.  Mr. Straub, what would be

20    your preference?  I can either proceed in the fashion of

21    permitting the government to conclude its, for lack of a

22    better term, case-in-chief, the government rests, and

23    then you can call whatever witness you might think

24    appropriate to include any agents of the government, or

25    we could have Agent Destito called back to the stand

1    presently.

2              MR. STRAUB:  Judge, I would prefer the latter.

3    If we could just have the agent resume his testimony.

4              THE COURT:  Sure.  Okay.

5              MS. ROSS:  Okay.  The government calls Agent

6    Destito.

7                    CHRISTOPHER DESTITO,

8         having been duly sworn by the courtroom deputy,

9         was further examined and testified as follows:

10                   REDIRECT EXAMINATION

11   BY MS. ROSS:

12   Q    Good afternoon, Agent Destito.

13   A    Good afternoon.

14   Q    We are resuming your testimony from Monday, and do

15   you have in front of you what's been admitted as

16   Government's Exhibit 1?

17   A    I do.

18   Q    And what do you understand the Government's Exhibit

19   1 to be?

20   A    An incident report from a traffic stop on December

21   25th in which Mr. Folks was stopped driving a vehicle.

22   Q    And do you have an understanding of who initiated

23   that traffic stop?

24   A    Officer Beliveau from Burlington Police Department.

25   Q    Now, with respect to this incident report, have you

1    had an opportunity to talk to Officer Beliveau?

2    A    Yes.

3    Q    And in talking with Officer Beliveau, can you share

4    with us what he told you about this particular incident

5    report?

6    A    He recalled the incident, was familiar with it, and

7    he just walked us through what happened.  He remembered

8    that the initial stop was conducted for the license

9    plate lights malfunctioning, and when he approached the

10   vehicle, he knew Mr. Folks, and Mr. Folks did not have a

11   valid driver's license at the time of the stop.  He

12   applied for a search warrant because of some of the

13   things he saw in the vehicle to include a plastic bag, a

14   rubber band, and knew of previous history of Mr. Folks

15   being involved with illegal narcotics, and he requested

16   a K-9 do a sweep of the vehicle.

17        The K-9 swept the vehicle, alerted on a portion of

18   the vehicle, so they asked for consent to search the

19   vehicle, and Mr. Folks advised that the vehicle was not

20   his, and he couldn't grant consent.

21        Mr. -- Officer Beliveau advised him that he could

22   because he was driving the vehicle and he was the only

23   one in it, but Mr. Folks declined that and said that

24   he'd have to get consent from the registered owner,

25   which was Ms. Crawford.

1    Officer Beliveau had officers go and question Miss

2    Crawford and asked for consent to search the vehicle.

3    She denied consent, so they secured the vehicle and

4    obtained a search warrant for it.

5    Q    Okay.  And do you know from your conversation with

6    Officer Beliveau what, if anything, was found during the

7    search warrant?

8    A    In the glove compartment of the vehicle they found

9    a nine millimeter handgun.

10   Q    And do you know whether or not that handgun was

11   loaded?

12   A    Yes, it was.

13   Q    And when agents asked Burlington Police Department

14   to provide reports related to this incident, is Exhibit

15   1 what was received?

16   A    To the best of my knowledge, yes.

17   Q    By the way, Agent Destito, I believe the Court

18   asked on Monday whether there had been any discussion or

19   follow-up with Lori Crawford about the gun being found.

20   A    Yes.

21   Q    Do you recall that?

22   A    I do.

23   Q    Following the hearing on Monday, do you know

24   whether agents had an opportunity to inquire of Miss

25   Crawford about that?

```
1    A    They did.

2    Q    And what information did Miss Crawford provide?

3    A    Miss Crawford reaffirmed that Mr. Folks asked her

4    to register the vehicle in her name for him and that it

5    was his vehicle.  And the day that she actually

6    registered it, he took her to DMV and left her there and

7    didn't give her a ride home after she registered the

8    vehicle in his name, and she advised that she does not

9    have a gun, and the gun was not hers.

10              MS. ROSS:  I have no further questions.

11              THE COURT:  Who talked to Miss Crawford?

12              THE WITNESS:  Agent Chetwynd and task force

13   officer Estes.

14              THE COURT:  You didn't?

15              THE WITNESS:  No, your Honor.

16              THE COURT:  How do you know what Miss Crawford

17   told them?

18              THE WITNESS:  I was outside waiting for them

19   to finish the interview.

20              THE COURT:  Okay.  Do you know anything about

21   Miss Crawford, whether or not she's a prohibited person

22   under the Gun Control Act?

23              THE WITNESS:  I do not know if she is

24   prohibited to have firearms, your Honor.

25                        CROSS EXAMINATION
```

1    BY MR. STRAUB:

2    Q    Sir, you are familiar with the Government's Exhibit

3    1?

4    A    Yes, sir.

5    Q    The exhibit does not actually include any narrative

6    description or other description of where the gun was

7    found, does it?

8    A    It says in the glove box.

9    Q    Where does it say that?

10   A    On page 125, the top of the page, image photo, "gun

11   in glove box," dated 12/28/2015.

12        THE COURT:  I'm sorry, what's the Bates stamp

13   number down in the right-hand corner of the page you are

14   referring to?

15        THE WITNESS:  000125.

16   BY MR. STRAUB:

17   Q    Okay.  And that is actually referring to an

18   attachment of an image that is in the case file,

19   correct?

20   A    I don't know where it's located.

21   Q    Well, I'm sorry.  Do you have Exhibit 1 in front of

22   you?

23   A    Yes.

24   Q    Okay.  And on page 125, what you are reading from,

25   where it says "gun in glove box," is actually a

1    description of an attachment --

2    A    Yes.

3    Q    -- to this case file.

4    A    Correct.

5    Q    The attachment is an image or photo.  The

6    description is "gun in glove box."  Correct?

7    A    Yes.

8    Q    In fact, there are -- it's two images that says

9    "gun in glove box," correct?

10   A    Yes.

11   Q    And there are then four other images labeled "gun,"

12   correct?

13   A    Yes.

14   Q    The description doesn't say where the glove box

15   was, does it?

16   A    No.

17   Q    So there's nothing in this report that actually

18   says this gun came out of the vehicle in question,

19   correct?  There's words "gun in the glove box," but it

20   doesn't say "gun in the glove box in the car in

21   question."

22   A    It's referring to the stop that took place of this

23   vehicle.

24   Q    Well, it's all --

25   A    It's clearly implied.

1    Q    -- part of this --

2    A    It's like if you have a pair of pants, the pockets

3    associated with that pants are part of that.

4    Q    All right.  So you are inferring that.  It doesn't

5    say it in the document, though, right?

6    A    It's intuitively obvious.

7              THE COURT:  I understand the point.  Let's

8    move on.

9    BY MR. STRAUB:

10   Q    So then regarding your testimony regarding Ms.

11   Crawford, isn't it true that Ms. Crawford advised that

12   she would not consent to the search of the vehicle

13   because she did not want officers to infringe upon her

14   constitutional rights?

15   A    Yes.

16   Q    So she was asserting a privacy interest in the

17   vehicle?

18   A    Yes.

19   Q    Have you looked at the case reports regarding the

20   charge of false information to a police officer that was

21   just discussed regarding that source of information?

22   A    I have not.

23   Q    Isn't it true that when you interviewed Mr. Folks'

24   wife, Cassandra Folks, relating back to your testimony

25   the other day, that she told you that she and Brian had

1    arguments, that he sometimes stayed away from home but

2    that he -- he did sometimes sleep at home?

3    A    She said over the past six months, since March,

4    they have been having marital problems, and he has been

5    home to see the kids, and he has slept there on a couple

6    of instances, and -- a couple being -- I don't have a

7    number, but not very frequently.  Now what's not very

8    frequently?  Two, three, four.  I don't have a number,

9    but it's not frequently.

10   Q    Well, and apparently he comes home every day to see

11   the kids, according to your recollection of her --

12   A    No.

13   Q    What did you -- sorry.  I misunderstood your

14   testimony then.

15   A    He has been home to see the kids occasionally, his

16   son in particular.

17             MR. STRAUB:  Thank you, Judge.  Nothing

18   further.

19             THE COURT:  I'm sorry.  Can you just clarify

20   what the information was from Miss Crawford most

21   recently with respect to the firearm?

22             THE WITNESS:  That she does not own a firearm,

23   your Honor.

24             THE COURT:  Presently.

25             THE WITNESS:  That she hasn't owned a firearm.

1          THE COURT:  Where is the firearm now?

2          THE WITNESS:  At Burlington Police Department.

3          THE COURT:  Any follow-up?

4          MR. STRAUB:  No.  Thank you, Judge.

5          THE COURT:  Any further inquiry?

6          MS. ROSS:  No, your Honor.

7          THE COURT:  Okay.  Thank you.  You are

8   excused.

9          (Witness excused.)

10          MS. ROSS:  Your Honor, the government calls

11  analyst Marilyn Epp.

12                     MARILYN EPP,

13      having been duly sworn by the courtroom deputy,

14      was examined and testified as follows:

15                  DIRECT EXAMINATION

16  BY MS. ROSS:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    Miss Epp, will you please identify yourself for the

20  record by stating your name and where you currently

21  work.

22  A    I am an intelligence analyst -- Marilyn Epp -- at

23  the Burlington resident office for DEA.

24  Q    Okay.  And how long have you held that position?

25  A    In Burlington?

1    Q    Yes.

2    A    Since March of 2015.

3    Q    I'm just going to ask you to move a little bit

4    closer to the microphone so we can hear you a little

5    better.

6         And prior to holding that position in March of

7    2015, had you been an analyst anywhere else?

8    A    Yes.

9    Q    And just briefly, tell us where else you had been

10   an analyst.

11   A    El Paso, Texas, southern New Mexico, and I was also

12   at headquarters in Arlington, Virginia.

13   Q    Are you familiar in your role at DEA with an

14   investigation into the defendant, Brian Folks?

15   A    Yes.

16   Q    And as part of that investigation, are you aware of

17   whether Mr. Folks has any nicknames?

18   A    Yes.

19   Q    And what are those?

20   A    Moe, Moet, Moet Hart and Animal.

21   Q    All right.  Now, can you tell us, on what date was

22   Mr. Folks arrested in the instant case?

23   A    July 19th, 2016.

24   Q    And do you know whether he made any statements

25   following his arrest?

1    A    He did.

2    Q    Where did those statements take place?

3    A    At Essex Police Department.

4    Q    And were his statements recorded?

5    A    Yes.

6    Q    If you know, who interviewed Mr. Folks?

7    A    Resident agent-in-charge Brian Villella, Essex

8    detective Chris May, U.S. Marshal Max Galusha, and there

9    was also a DEA intern present.

10   Q    You were not present for the interview; is that

11   correct?

12   A    Correct.

13   Q    You have, however, reviewed the post-arrest

14   statement recording that was made.

15   A    Yes.

16   Q    Is that correct?  And how did DEA get a copy of

17   that recording?

18   A    From Essex Police detective Chris May.

19        MS. ROSS:  Your Honor, at this point in time

20   we would like to play excerpts from the recording.

21   Before I do that, I do have one other question, though.

22   BY MS. ROSS:

23   Q    Analyst Epp, are you aware of whether Mr. Folks was

24   given his Miranda warnings prior to making post-arrest

25   statements?

1  A    Yes, he was.

2  Q    Okay.  And did he, in fact, agree to make

3  statements after being given that -- those warnings?

4  A    Yes, he did.

5       MS. ROSS:  Your Honor, with that follow-up, I

6  would at this time like to play excerpts, selected

7  excerpts from the post-arrest statements.

8       There was a discussion on Monday in which the

9  defendant, in its motion, talked about -- or said that

10  the government's motion, in which he stated in the

11  post-arrest that he was "the muscle," was incorrect, and

12  the government would like to introduce statements --

13  post-arrest statements by Mr. Folks in which he talks

14  about being "the muscle" or "the violent one" in -- in

15  terms of the conduct.

16       THE COURT:  Is there an exhibit being offered

17  for admission?

18       MS. ROSS:  We can offer the exhibit.  We are

19  not able to just take out the excerpts.  I am happy to

20  give the Court the entire hour-plus recording, which we

21  have given to the defense, but we're not able to -- our

22  IT is not able to just pull out excerpts of this

23  video/audio and only those excerpts, so that's why I was

24  going to go to just a few select areas for a couple of

25  minutes to show the Court, but I am also happy to

1    provide the Court with the copy of the full interview.

2              THE COURT:  Well, I think you better lay a

3    better foundation as to what we are going to listen to.

4    How does this witness know it's even Mr. Folks talking?

5    What's the basis for her testimony?

6         I mean, I understand that hearsay is permissible

7    here, but there has to be some foundation upon which the

8    Court can make a finding that, first of all, it's

9    Mr. Folks even talking.

10             MS. ROSS:  Okay.  Well, your Honor, there --

11   it is a -- I can do -- I can ask the agent some

12   follow-up -- the analyst some follow-up questions about

13   that.

14   BY MS. ROSS:

15   Q    Analyst Epp, you mentioned the law enforcement

16   officers in the room.  Who else is in the room?

17   A    A DEA intern.

18   Q    Yes.  And the intern.  And anybody else?  Who is

19   being interviewed?

20   A    Brian Folks.

21   Q    And this particular recording, what kind of

22   recording is it?

23   A    It's audio and video.

24   Q    And how do you know that the person being

25   interviewed is Mr. Folks?

1    A    He looks like Mr. Folks and he responds to being

2    called Brian Folks.

3    Q    Okay.  And prior to him being brought to the Essex

4    Police Department, how did -- how did Mr. Folks get to

5    the Essex Police Department?

6    A    He was arrested by DEA officers in Burlington.

7    Q    And how was he arrested?  Pursuant to what?

8    A    An indictment.

9    Q    Okay.  And did the agents have an arrest warrant

10   for him?

11   A    Yes.

12   Q    And do you know whether the agents -- there are

13   five -- that the person that they arrested was, in fact,

14   Brian Folks?

15   A    I was not on that scene so I cannot say yes or no.

16   Q    Do you -- are you familiar with what Mr. Folks

17   looks like, as part of your role in this investigation?

18   A    Yes.

19   Q    And you have reviewed the video of the post-arrest

20   statements?

21   A    Yes.

22   Q    And based on your knowledge of this case, who do

23   you believe is the person that's being interviewed by

24   agents?

25   A    Brian Folks.

1    Q    And you said that the RAC for DEA conducted the

2    interview, correct?

3    A    Yes.

4    Q    Did he talk about who he conducted an interview of?

5    A    Yes.

6    Q    Who did he say he interviewed?

7    A    Brian Folks.

8    Q    Now, in reviewing the video, does -- is there

9    reference by Deputy Marshal Max Galusha to some prior

10   interactions that Deputy Galusha has had with the

11   defendant?

12   A    Yes.

13   Q    What, if anything, did Deputy U.S. Marshal Galusha

14   indicate as to who he was interviewing?

15   A    Brian Folks.

16   Q    Now, with respect to the interview or the

17   statements made, are you aware of any statements in your

18   review that -- what, if anything, did Mr. Folks say

19   about violence or firearms?

20   A    In reviewing the audio and video from the

21   post-arrest interview?

22   Q    Yes.

23   A    He described himself as "the violent one" and

24   related that he robs people and beats them up.

25              MS. ROSS:  Your Honor, at this point in time

1    the government moves to introduce, again, excerpts from

2    the post-arrest statements relating to those statements

3    that agent -- Analyst Epp has just discussed.

4            THE COURT:  Okay.  I am going to show my

5    ignorance in the age of digital recordings.

6        Is there some tangible object that can become part

7    of the record should there be further review of the

8    Court's decision in this matter?

9            MS. ROSS:  There is, your Honor.  We have a CD

10   of the interview, which is the entire interview, even

11   though -- and I can submit that to the Court as -- we

12   have that marked as Exhibit 5, and I can move for the

13   admission of that entire interview even though we are

14   only going to play excerpts of it today.

15           THE COURT:  All right.  Is there a transcript

16   available of what you wish to play?

17           MS. ROSS:  There is not, your Honor.

18           MR. STRAUB:  Judge, I am concerned that

19   that -- the government's proposal is to submit an

20   hour-long interview but only play excerpts but the

21   hour-long interview winds up in the evidence, you know,

22   admitted into this matter.

23           THE COURT:  Okay.

24           MR. STRAUB:  And that if that's what's going

25   to happen -- and I really don't want to be taking up too

1    much time with this -- I think that the government

2    should put the whole recording -- play the whole

3    recording.

4        My concern also is that the other day, Monday, I

5    understood the government to be wanting to play four,

6    five minutes, maybe the number is a little bit longer,

7    but a single excerpt.

8        Now, I understand that there are several excerpts

9    and that I think we could have pretty easily agreed to

10   the -- what I think was the important -- the excerpt

11   that they were referring to, but if they're looking to

12   play other portions of it, that just increases my need

13   to request that the entire thing be played; otherwise

14   I'm put on the spot of needing to go back and pick

15   through whatever they don't play to illustrate any

16   points which -- again, because the government intends to

17   move for -- is moving for the admission of the entire

18   disk, I believe the Court would need to know what

19   evidence is -- see the evidence as being admitted.

20        THE COURT:  Okay.  Well, one of my goals here

21   is to make sure that the record is clear as to what

22   evidence is being before the Court in the event there is

23   some type of further review of the magistrate judge's

24   decision.  So that's why I inquired about the entirety

25   of the exhibit.

1          Based on Mr. Straub's comments, it appears there's

2     no objection to the admission of the entire exhibit.  I

3     don't think it's necessary for -- it's up to the

4     government to decide what parts of that particular

5     exhibit it wants to play, and, Mr. Straub, you are

6     certainly welcome to present other parts of that

7     particular exhibit.  But at this time, if there is a CD

8     or some other digital media, if I am using the right

9     term, to be offered as an exhibit -- or more precisely,

10    is there such a thing?

11          MS. ROSS:  There is, your Honor.

12          THE COURT:  Okay.  And is it marked?

13          MS. ROSS:  It is marked as Government's

14    Exhibit 5.

15          THE COURT:  5, okay.

16          MS. ROSS:  A copy has been provided to the

17    defense in advance of this hearing.

18          THE COURT:  So 5 is admitted.

19          MR. STRAUB:  Judge, I'm sorry, while we were

20    discussing the -- you know, the duration of the exhibit,

21    I would like to voir dire this witness along the lines

22    as your Honor questioned about her basis of knowledge

23    for this exhibit and the information it contains --

24          THE COURT:  Okay.

25          MR. STRAUB:  -- before I --

1          THE COURT:  I see.  Okay.  And once again, let

2     me just clarify, this is both an audio and a video

3     depiction?

4          MS. ROSS:  That's correct, your Honor.

5          THE COURT:  Okay.  All right.

6          MS. ROSS:  That's correct.

7          THE COURT:  All right.  So I am going to let

8     Mr. Straub inquire about this witness's knowledge about

9     this exhibit.

10          MS. ROSS:  Okay.

11          THE COURT:  Mr. Straub.

12          MR. STRAUB:  Thank you.

13                    VOIR DIRE EXAMINATION

14     BY MR. STRAUB:

15     Q    As I understand it, you did not observe the

16     creation of this AV material, correct?

17     A    Correct.

18     Q    You didn't listen to the contemporaneous -- this

19     interview while it was happening?

20     A    Correct.

21     Q    So that some -- somehow you later viewed it as part

22     of your job?

23     A    Yes.

24     Q    And you -- how do you know it's Brian Folks in the

25     video?

1     A     Because he looks like Brian Folks and he responds

2     to being called Brian Folks.

3     Q     How do you know what Brian Folks looked like before

4     seeing that video?

5     A     Because I have been part of this investigation

6     since it began.

7     Q     So you have seen pictures of Brian Folks?

8     A     I have seen pictures of Brian Folks and I have seen

9     him on -- walking in -- on the street.

10    Q     I'm sorry.  You have seen him on what?

11    A     I have seen him in the community.

12    Q     After having seen photos of him?

13    A     Yes.

14    Q     And those photos of him that you have seen, where

15    did those photos come from?

16    A     DMV records and social media.

17    Q     Now, the social media, how do you know that that

18    was Brian Folks on the social media?

19    A     It matched his DMV photo.

20    Q     How do you know that -- well, nonetheless, how do

21    you know that -- well, so you have seen the picture of

22    some man on social media, and how did that social media

23    tell you that that was Brian Folks?

24    A     By matching the photographs and also asking sources

25    to identify the person that -- of the photo that was

1    shown.

2    Q    And who were those people that were identifying the

3    photo?

4         MS. ROSS:  Your Honor, I am going to object.

5    You know, it is -- this isn't trial.  It is a detention

6    hearing.  If there is some reason to believe that the

7    Essex Police Department failed to provide an authentic

8    copy of a video recording, you know --

9         THE COURT:  Well, the problem is you have

10   created this problem by putting on a witness who didn't

11   participate in the interview.  It could have been just

12   as easy to put on any one of the four agents who were

13   present to say, "I spoke to Brian Folks, that guy over

14   there."  But instead, you have opted to put on an

15   individual who was not present, and that's why this line

16   of inquiry is permissible.

17        MS. ROSS:  Well, your Honor, we are trying to

18   not call -- we are putting on a number of pieces of

19   evidence, and because hearsay is permissible, we are not

20   calling every agent who played a role.

21        Now, I could call the RAC, but it did not seem -- I

22   did not think that this was going to be challenged as

23   not the defendant's post-arrest statement, that it was

24   not the defendant that we -- that was arrested by DEA on

25   July 19th and taken to --

1          THE COURT:  I understand that, but this was

2    all avoidable by calling a witness who was present at

3    the interview.  You have got professional law

4    enforcement officers who could have testified to this,

5    but instead you have chosen the analyst who was not

6    present.  So the objection's overruled.

7    BY MR. STRAUB:

8    Q    So I imagine that some of the individuals who have

9    identified that photo are somehow involved in some

10   ongoing investigations and so there might be a

11   confidentiality issue?

12   A    Yes.

13   Q    So that leaving out names and specifics of the

14   investigation, were the individuals who identified those

15   photos involved in criminal investigations?

16   A    Didn't you just imply that they are involved in a

17   criminal -- ongoing criminal investigation?

18   Q    I am asking you if they were.

19   A    They are involved, yes.

20   Q    And do you know those individuals' criminal

21   histories?

22   A    Not word for word.

23   Q    And do you know those individuals' drug habits or

24   lack thereof?

25   A    Not at this present moment.

1    Q    Do you know whether any of those individuals are

2    known to have provided false information in any

3    investigations?

4    A    Not to my knowledge.

5    Q    So setting aside the social media identifications

6    by various witnesses, it sounds like the only photo that

7    you -- you have is from the DMV?

8         MS. ROSS:  Your Honor, if I may short-circuit

9    this, I will call Detective Chris May, who is present

10   and is in the courtroom.

11        THE COURT:  Is your voir dire concluded or do

12   you wish to inquire further?

13        MR. STRAUB:  I am finished.  Thank you, Judge.

14        THE COURT:  Okay.  All right.  Thank you.  The

15   exhibit is -- has been offered.  The exhibit is

16   admitted.  The intelligence analyst has testified

17   credibly that she has observed the Department of Motor

18   Vehicles photo of Mr. Folks, she has compared that to

19   the individual depicted in the video, and they are one

20   and the same.

21        MS. ROSS:  Thank you, your Honor.

22        (Government's Exhibit 5 was received in

23   evidence.)

24        MS. ROSS:  At this point in time I would like

25   to play the video at 16:47:30.

1          THE COURT:  Is that a time reference?

2          MS. ROSS:  It is a time reference, your Honor.

3          UNIDENTIFIED MALE VOICE:  16:37 --

4          MS. ROSS:  30.

5          THE COURT:  Why don't you ask the witness what

6     we are looking at here.

7          MS. ROSS:  Yes.

8     So just pause once you get to the correct time

9     before we start playing.

10                CONTINUED DIRECT EXAMINATION

11    BY MS. ROSS:

12    Q    Analyst Epp, can you describe for us what we are

13    seeing?

14              (A video recording was played in open court.)

15    A    Yes.  The gentleman at the bottom of the screen in

16    the pinkish shirt is resident agent-in-charge Brian

17    Villella.  The gentleman to his left in the black shirt

18    and blue jeans is detective -- Essex detective Chris

19    May.  The individual in the white tank top and red

20    shorts is Brian Folks.  The man at the top of the table,

21    at the, say, 12 o'clock position, is U.S. deputy marshal

22    Max Galusha.  And the fellow in the corner is a DEA

23    intern.  This is at the Essex Police Department

24    interview room.

25              MS. ROSS:  If we could move to 16:47:30.

1          (A video recording was further played in open

2     court.)

3               MR. STRAUB:  {Unintelligible.}

4               THE COURT:  Will you stop it.  I'm sorry.  Is

5     there an objection?

6               MR. STRAUB:  Well, if we are going to create a

7     clear record, I am hearing -- we are not starting at the

8     number that Ms. Ross is saying.  So I don't know --

9               THE COURT:  Okay.

10               MR. STRAUB:  Is it 16 or 15?

11               MS. ROSS:  You are correct.  It's 16:47:30.

12               MR. STRAUB:  Thank you.

13               THE COURT:  I understand it's difficult to

14     line these up.  If we are going to hear a few seconds

15     before --

16               MR. STRAUB:  Very good.

17               THE COURT:  -- that's fine.

18               MS. ROSS:  Okay.  Go ahead.

19               (A video recording was further played in open

20     court.)

21               MS. ROSS:  I'd like to have you stop there.

22     BY MS. ROSS:

23     Q    So, Analyst Epp, the person who was asking the

24     questions, who was that?

25     A    Resident agent-in-charge Brian Villella.

1    Q    And the person who was answering the questions, who

2    is that?

3    A    Brian Folks.

4              MS. ROSS:  Just for purposes of saving time, I

5    am going to ask if we can move on to 16:50.

6              MR. STRAUB:  Judge, for efficiency, I know

7    that I am going to have go back and play, you know, a

8    minute or two in the middle here, and so, you know, I

9    think that it would make sense if we play a few minutes

10   in a row here.  There's a -- some words that come up

11   after a couple of minutes that would satisfy my interest

12   in playing.  I don't think it's going to extend things

13   further --

14             THE COURT:  Okay.

15             MR. STRAUB:  -- if we could do it that way.

16             THE COURT:  Yes.  That makes abundant sense to

17   me.  So, Mr. Straub, what -- do you know what you want

18   to have presented?

19             MR. STRAUB:  Judge, it's the next couple of

20   minutes, up to the words "Robin Hood."

21             THE COURT:  Okay.

22             MR. STRAUB:  Yes.

23             THE COURT:  So, Miss Ross, can you play this

24   tape?

25             MS. ROSS:  Yes.  So if -- I actually would

1  have the -- about the place that Mr. Straub is talking

2  about, which is 16:52.  So I'd like to go to 16:50, and

3  we can play it straight through from there.

4          THE COURT:  Okay.

5          MR. STRAUB:  Can we just keep playing the next

6  couple minutes?  I think it's all one discussion, and it

7  would make sense if it all came in at once.  Otherwise I

8  can go back and fill it in.

9          THE COURT:  All right.

10          MS. ROSS:  No.  That's fine.

11          THE COURT:  Okay.

12          MS. ROSS:  The government's fine with that.

13          THE COURT:  Yes.  All right.  So let's hear

14  from 16:48:45 on.

15          MS. ROSS:  On.

16          (An video recording was further played in open

17  court.)

18          MS. ROSS:  I think we can stop it there.

19          THE COURT:  Mr. Straub, is that acceptable to

20  stop?

21          MR. STRAUB:  Yes, Judge.  Thank you.

22          THE COURT:  Okay.

23          MS. ROSS:  That is the entire excerpt that I

24  was going to play from the interview.

25          THE COURT:  Okay.

1      MS. ROSS:  So we can pull that down, please.

2   BY MS. ROSS:

3   Q    I'd like to direct your attention, Analyst Epp, as

4   part -- to your investigation, and as part of your

5   investigation, do you know whether the DEA conducted an

6   interview of Mary Provost?

7   A    Yes.

8   Q    And when did that interview take place?

9   A    February 11th, 2016.

10  Q    How was it that DEA came to interview Miss Provost?

11  A    Miss Provost had gone to her parents' home, and

12  they called Grand Isle Police Department saying that she

13  had been attacked, and one of the Grand Isle police

14  officers contacted the Burlington resident office.  We

15  in turn contacted her parents and agreed to meet Mary

16  Provost and her parents.

17  Q    And did that, in fact, happen?

18  A    It did.

19  Q    And where did the interview take place?

20  A    Essex Police Department.

21  Q    Who was present for that interview?

22  A    In the interview room, it was TFO Robert Estes and

23  Special Agent Adam Chetwynd, Mary Provost and her

24  mother, and I don't know if the gentleman is her father

25  or her stepfather, but parental male figure.

1    Q    And did you view that interview contemporaneously?

2    A    I did.

3    Q    So you were in a position to observe that interview

4    as it occurred?

5    A    Both audio and video.

6    Q    So you were present at the Essex Police Department

7    that day as well?

8    A    Yes.

9    Q    And the -- with respect to the proceedings today,

10   what, if anything, was discussed by Miss Provost with

11   respect to firearms and the defendant?

12   A    Mary Provost stated that the day before, on

13   February 10th, 2016, Brian Folks, who she referred to as

14   Moe, his moniker, called her to a location and

15   confronted her about some drugs that had been stolen.

16   She was pushed against a corner and a gun was pulled on

17   her and held to her head.

18   Q    And did she say who held the gun to her head?

19   A    Moe, she described.

20   Q    And who do you understand Moe to be?

21   A    Brian Folks.

22   Q    Did she talk about -- what, if anything, did she

23   say about whether other physical violence had occurred

24   involving this defendant?

25   A    She said that after he held a gun to her head,

1    he -- she was kept there.  She was told she could not

2    leave.

3         Later that same day, they began arguing again, and

4    he slammed her onto the ground and put his hand up

5    against her throat and threatened her.

6    Q    And have you obtained -- what kind of recording was

7    done of the Mary Provost interview?

8    A    An audio recording.

9    Q    Was there also video or just audio?

10   A    I don't know.  I was able to see it live in

11   realtime, but I don't know if the video was actually

12   recorded or not.

13   Q    Okay.  Have you since listened to the audio

14   recording?

15   A    I have.

16   Q    And was the audio recording that you listened to

17   consistent with what you observed in realtime?

18   A    Yes.

19   Q    And did you provide a copy of that audio'd -- of

20   that audiotaped interview to our office?

21   A    Yes.

22        MS. ROSS:  Your Honor, at this time I move the

23   admission of what the government has labeled as Exhibit

24   4, which is the interview of Mary Provost, with the same

25   caveat as before, which is the government's exhibit does

1    contain the entire interview, which is almost two hours.

2    The government was only intending to play excerpts of a

3    couple of minutes consistent with Analyst Epp's

4    testimony.

5         So we can admit the whole CD to the Court or we

6    could simply move for admission of the excerpts and play

7    them in court.

8                   THE COURT:  There's been an offer of

9    admission.  What's your position?

10                  MR. STRAUB:  Judge, I would object and ask for

11   a moment to voir dire on this witness's knowledge base

12   for the name "Moe" being applied to Mr. Folks.

13                  THE COURT:  Okay.  I'll permit that.

14                  VOIR DIRE EXAMINATION

15   BY MR. STRAUB:

16   Q    So how did you come to -- who told you that

17   Mr. Folks' name -- nickname is Moe, or alias?

18   A    The first person?  I don't recall the very first

19   person who told me that.

20   Q    Okay.  Which -- which person -- name any person

21   that you think has told you that his name was Moe.

22   A    Every person that we have talked to about this --

23   in this case that -- who's interacted with him refers to

24   him as Moe.

25   Q    Every person, meaning suspects and witnesses?

1    A    Yes.

2    Q    So do you know those suspects' or witnesses'

3    criminal records?

4    A    I don't know anyone's criminal record by heart, no.

5    Q    Do you know those suspects' or witnesses' drug use

6    or habits?

7    A    I don't know their current drug use or habits, no.

8    Q    Do you know whether any of those suspects or

9    witnesses had provided false information in any

10   investigation?

11   A    Not to my knowledge.

12   Q    Do you know the -- when these individuals provided

13   the name of Moe to police officers?

14   A    I don't know exact dates, no.  The investigation's

15   been going on for months.

16        MR. STRAUB:  Thank you.  No further questions,

17   Judge.

18        THE COURT:  Okay.

19        MR. STRAUB:  Judge, I would object on the

20   grounds of relevance.

21        THE COURT:  Based on the testimony of the

22   intelligence analyst, the Exhibit 4 is admitted.

23        (Government's Exhibit 4 was received in

24   evidence.)

25        MS. ROSS:  Thank you, your Honor.

1    I would like to, if we could, go to the time stamp

2    of 16:28.

3    Oh, I'm sorry, I'm going to ask you to go back to

4    the very beginning, and we're just going to have the --

5    start the tape and have the witness identify the

6    speakers.  So if we could start at the beginning.

7                (An audio recording was played in open court.)

8                MS. ROSS:  I'm going to stop it there.

9                CONTINUED DIRECT EXAMINATION

10   BY MS. ROSS:

11   Q    The person who was just speaking, do you know -- do

12   you recognize that person's voice?

13   A    Yes.

14   Q    Who is that?

15   A    Mary Provost.

16   Q    Okay.

17                MS. ROSS:  If we could continue.

18                (An audio recording was further played in open

19   court.)

20                MS. ROSS:  Okay, stop it there.

21   BY MS. ROSS:

22   Q    The person who was just speaking, who was that?

23   A    Task force officer Robert Estes.

24                MS. ROSS:  I'm going to go to the next area

25   where they pick up on discussing "the gun" again, which

1   is at 16:30.

2                (An audio recording was further played in open

3   court.)

4                MS. ROSS:  I'm going to have it stopped there

5   just because that's the end of the conversation related

6   to the gun.

7   BY MS. ROSS:

8   Q    You heard two voices there, a male and a female.

9   Will you identify those voices for us?

10  A    The female was Mary Provost and the male was

11  Special Agent Adam Chetwynd.

12               MS. ROSS:  Again, just so we're moving ahead

13  to the areas to which Analyst Epp has already testified,

14  I'd like to direct us to 18:30.

15               (An audio recording was further played in open

16  court.)

17               MS. ROSS:  I'm going to go ahead and stop it

18  there.

19      Your Honor, those are the excerpts that are

20  pertinent to these proceedings that we intend to

21  introduce at this time.

22      I'm sorry, did your Honor wish us to introduce the

23  full CD to the Court or simply the excerpts as

24  presented?

25               THE COURT:  Well, like a trial, the full

1    recording is admitted into evidence, and the government

2    is free to make argument through excerpts, so I see the

3    excerpts as an offer or offered as an aid to the Court,

4    but the actual exhibit is the entirety of the recording.

5              MS. ROSS:  Yes.  Your Honor, the government

6    has no problem with that whatsoever.  The -- we were

7    limiting it only out of fairness to the defendant who

8    may not want things that are not relevant to what's

9    before the Court in this proceeding to be submitted.  If

10   the defense has no objection, the government submits the

11   full --

12             THE COURT:  So just for clarity of the record,

13   the Court is admitting the entirety of the recording,

14   but in its determination on the question of release or

15   detention, I am only taking into account the evidence

16   presented in the form of excerpts.

17             MS. ROSS:  Thank you, your Honor.

18        If I may approach at this time, I will submit

19   Government's Exhibit 4 to the Court, which is the full

20   interview.  A copy of this has been provided to the

21   defense in advance of today's proceedings.

22   BY MS. ROSS:

23   Q    At this point in time we are going to -- I'd like

24   to, Analyst Epp, direct your attention to another

25   subject.

1         As part of your investigation -- and I believe you

2    may have mentioned this, but do you know whether the

3    defendant has a Facebook page?

4    A    Yes.

5    Q    And did you -- have you reviewed information that

6    was contained on the defendant's Facebook page?

7    A    Yes.

8    Q    Did you provide our office with a video that you

9    obtained from the defendant's Facebook page?

10   A    Yes.

11   Q    Who -- who is speaking in the video?

12   A    Brian Folks.

13   Q    And who is the subject of the video?  What is the

14   video about?

15   A    Hannah Ackley.

16   Q    Okay.  And have you reviewed this video?

17   A    Yes.

18   Q    Now, in particular, what is the defendant saying

19   about Hannah?

20   A    That she worked for him, that she had a drug habit,

21   and that they had a falling-out.

22   Q    And according to the video and the defendant's

23   statements, what was the falling-out about?

24   A    That she was speaking ill of him around the

25   community.

Q    Was there a reference to "getting handsy"?

A    Yes.  That she -- that she was getting handsy in her work for him, and -- yes.

Q    And what -- if you can, give us a sense of what -- does the defendant describe things -- what, if any, action he is going to take, has taken, with respect to Hannah getting handsy, if you will?

THE COURT:  That's a compound question.  Do you think you could rephrase that?

BY MS. ROSS:

Q    What, if anything, did the defendant state about he did --

What, if anything, did the defendant say he did in response to Hannah getting handsy?

A    He made her wear an apron, and a photo was shown of the back of Hannah Ackley with just an apron on and nothing else.

Q    Okay.  So how does Hannah appear under the apron?

A    Nude.

MS. ROSS:  Your Honor, at this point in time we move to introduce the Facebook video.  It will be -- we will play it in its entirety.  It is not an excerpt like the previous admissions.  It is approximately 10 minutes long.

THE COURT:  Mr. Straub?

1    MR. STRAUB:  If I may voir dire, Judge?

2    THE COURT:  Yes.

3                    VOIR DIRE EXAMINATION

4    BY MR. STRAUB:

5    Q    You referenced the name of a woman that's mentioned

6    in this video.  What's the name?

7    A    She's not mentioned by her name, but her photograph

8    is shown, and the photograph is of Hannah Ackley.

9    Q    The video is presented as a song, a bit of a rap,

10   isn't it?

11   A    No.

12   Q    It's a satire?

13   A    I wouldn't describe it as satire.

14               MR. STRAUB:  Nothing further, Judge.

15   Objection on the grounds of relevance.

16               THE COURT:  What is the relevance?

17               MS. ROSS:  Your Honor, the relevance is that

18   this defendant is talking about what he forces this

19   woman to do when -- because he believes she has gotten

20   handsy, i.e., stolen something from him.  So it goes to

21   his level of dangerousness and retaliation against

22   people who think -- he thinks have wronged him.

23               THE COURT:  There's been no testimony on what

24   "handsy" even means.  I have no idea what it means.  Is

25   there something in the video that shows that this was

1  not a consensual act by Miss Ackley?  This is where I am

2  getting lost, because there's been no testimony that

3  this was not a consensual act.

4          MS. ROSS:  The defendant's statement in the

5  video is, "She got handsy with things.  I had to make

6  her walk around in a F'ing apron because she got

7  handsy."

8      The context, when you see the video, handsy -- the

9  context is suggesting that she stole something from him.

10  So it is the defendant's own statements that he made her

11  appear like this that the government's relying on.

12          THE COURT:  Okay.  We'll receive the exhibit

13  into evidence for what it's worth.

14          MS. ROSS:  Okay.

15          (Government's Exhibit 2 was received in

16  evidence.)

17          MS. ROSS:  The government, if I may approach,

18  will submit to the Court Government's Exhibit 2.

19      And if at this time we could play that from the

20  beginning.

21          (A video recording was played in open court.)

22          MS. ROSS:  I'm going to ask you if you can

23  stop it there.

24  BY MS. ROSS:

25  Q    Analyst Epp, do you recognize the photograph that

1  we saw just prior to this?

2  A    Yes.

3  Q    And who is depicted in that photograph?

4  A    Hannah Ackley.

5         MS. ROSS:  If we could continue.

6         (A video recording was further played in open

7  court.)

8         MS. ROSS:  If you could stop it there.  If you

9  could stop it there, please.

10  BY MS. ROSS:

11  Q    The phrase that Mr. Folks used, if -- "if he was

12  G'd up like I am," in your training and experience, do

13  you have any knowledge of what "G'd up" means?

14  A    Yes.  Generally refers to having to do with gangs

15  or being a gangster.

16         MS. ROSS:  Okay.  Could we continue.

17         (A video recording was further played in open

18  court.)

19         MR. STRAUB:  Your Honor, let me pose an

20  objection and ask for a pause.

21         THE COURT:  Would you pause -- pause it,

22  please.

23         MR. STRAUB:  There's -- I am not -- I wanted

24  to point it out while it's happening so that the Court

25  could observe that it appears that the audio is not

1    synced with the video.  That's fairly obvious.  I

2    certainly plan to ask some questions about this video

3    when it comes, but I didn't want to have to go back and

4    point it out later.

5              THE COURT:  Okay.

6              MR. STRAUB:  Thank you.

7              THE COURT:  No, I noticed that as well.

8         Do you wish to resume playing?

9              MS. ROSS:  Yes, please.

10             (A video recording was further played in open

11   court.)

12             MS. ROSS:  We can conclude that.

13        Those are all the questions I have for this

14   witness.

15             MR. STRAUB:  Briefly, Judge.

16             THE COURT:  Yes.

17                       CROSS EXAMINATION

18   BY MR. STRAUB:

19   Q    As I understand it, you obtained this video off of

20   a Facebook page?

21   A    Yes.

22   Q    What evidence do you have of Mr. Folks posting that

23   on that Facebook page?

24   A    I did not watch him post this on his Facebook page.

25   Q    Nor did you obtain any of the IP information about

1  from where it was posted, did you?

2  A    No.

3  Q    And regarding the -- well, thank you.

4        MR. STRAUB:  Nothing further, Judge.

5        THE COURT:  Okay.  Thank you.

6        MR. STRAUB:  Well, if I may, Judge?

7        THE COURT:  Of course.

8             CONTINUED CROSS EXAMINATION

9  BY MR. STRAUB:

10 Q    Regarding the lack of sync in the AV material, do

11 you know where that came from or was that part of the

12 video when you copied it?

13 A    That was part of the video when I first viewed it

14 on the Facebook page.

15       MR. STRAUB:  Thank you, Judge.  Nothing

16 further.

17       THE COURT:  All right.  Any further inquiry of

18 this witness?

19       MS. ROSS:  No, your Honor.

20       THE COURT:  You are excused.  Thank you.

21       (Witness excused.)

22       THE COURT:  Does the government have any other

23 evidence it wishes to present?

24       MS. ROSS:  Your Honor, if -- if it's

25 necessary, if the defendant is challenging that he goes

1    by the nickname Moe, I can recall Agent Destito to

2    testify that when he spoke with the defendant's wife,

3    she said that he goes by the nickname Moe.  If that's

4    necessary, we will do that.

5         THE COURT:  That's up to you whether or not

6    anything's necessary.  It's not up to the Court.  It's

7    up to you.

8         MS. ROSS:  I'm sorry, your Honor, I was

9    directing the question to --

10         THE COURT:  Okay.

11         MS. ROSS:  Does the defense counsel stipulate

12    that he goes by the nickname Moe, or is defense

13    challenging the use of that nickname?

14         MR. STRAUB:  We will stipulate, your Honor.

15         THE COURT:  Okay.

16         MS. ROSS:  Thank you.  Other than argument,

17    the government has no further evidence to present.

18         THE COURT:  Okay.  Mr. Straub, do you wish to

19    present any evidence or do you wish to rely on argument?

20         MR. STRAUB:  Judge, the evidence I would

21    intend to present would be very brief testimony of

22    Cassandra Folks, my client's wife, who would testify to

23    the effect that they have marital arguments and issues

24    that they are working on, that my client stays at their

25    home not every night but frequently, and visits with the

```
 1    children at the home -- his son and others that
 2    reside -- and her children -- on a frequent, you know,
 3    nearly daily basis, I believe.  So that that would be
 4    the only testimony that I would seek to introduce.
 5            THE COURT:  Okay.  So the defendant has made a
 6    proffer with respect to the testimony of the defendant's
 7    spouse.  Any objection to the Court receiving that
 8    proffer?
 9            MS. ROSS:  Yes, your Honor.
10            THE COURT:  I guess you should probably call
11    her.
12                   CASSANDRA H. FOLKS,
13        having been duly sworn by the courtroom deputy,
14        was examined and testified as follows:
15                   DIRECT EXAMINATION
16    BY MR. STRAUB:
17    Q    Would you please state your name for the record.
18    A    Cassandra Heather Folks.
19    Q    And your relationship to Brian Folks?
20    A    I am his wife.
21    Q    How long have you been married?
22    A    December 28th we got married, of 2015.
23    Q    And has Brian lived with you before that date?
24    A    Yes.
25    Q    How long have you all lived together?
```

1    A    He moved in with me about February 11th of 2013.

2    Q    And how many children do you have together?

3    A    We have no biological children together.

4    Q    Okay.  Do any of Brian's children live in your

5    household, yours and Brian's house?

6    A    Yes.

7    Q    How many of Brian's children live there?

8    A    One.

9    Q    How many of your children live there?

10   A    Five.

11   Q    Could you describe Brian's relationship with his

12   child and then your children.

13   A    There isn't really a difference.  He treats all the

14   children the same.  He interacts with them as his fiend,

15   takes care of them as if they -- he would Junior.

16   Q    And you heard some discussion -- you heard the

17   testimony of the agent regarding -- he says you said --

18   about your relationship with Brian.  Could you

19   describe -- well, does Brian stay at your home every

20   night?

21   A    No.

22   Q    Could you describe generally, you know, the state

23   of your relationship since about December?

24   A    In December we were living together, and March I

25   found a video that Brian had took of him cheating on me,

1   and he moved out.  We talked and we were agreeing that

2   he wasn't going to move directly back in.  That way it

3   was less strain and less focus and we could focus more

4   on whatever -- we did get a marriage counselor.  We went

5   a couple times.  He still spends the night.  We still

6   have marital functions.

7       We just went to see a movie together at the

8   drive-ins a couple weeks ago.  I can't remember the

9   exact date but I'm sure I can access it on my Facebook

10  if necessary.

11      Brian -- even when me and Brian do not talk and

12  like we get in an argument, and if I won't answer his

13  calls or he won't answer mine, he waits for me to go to

14  work and he socializes daily with our children.

15  Q    Where does he socialize daily with the children?

16  A    At our home.

17  Q    And --

18  A    I still do his laundry.  I still cook his dinners.

19  He doesn't eat unless he eats at home.  He calls me and

20  tells me he's starving and hasn't eaten in a day or --

21  he hasn't had breakfast or lunch, and I still cook his

22  dinners, and then he still comes home and eats with the

23  children.

24  Q    When you cook his dinners, do you and Brian -- are

25  you at home when --

1   A    Yes.

2   Q    -- you are serving the dinner?

3   A    Yes.

4   Q    Does Brian stay at your home, the house, and --

5   does he sometimes?

6   A    Yes.

7   Q    About how often?

8   A    Usually when one of us wants to -- whatever.  Or if

9   I get on him about spending time with me.

10  Q    Can you say about an average about how often a week

11  Brian spends the night?

12  A    He has spent the night -- since we split in March,

13  I would say that he has spent at least 30 nights of 'em

14  in the house with me at night, not including the nights

15  that I wasn't home and he had to go stay with the kids.

16  Q    Okay.  Thank you.

17       And does Brian contribute to the household

18  expenses?

19  A    Yes.  That is one thing that I wanted fixed.

20       My husband receives SSI benefits for an injury that

21  was before me and him have got together.  He gets

22  seven-eight before a month.  Brian pays the electric and

23  he -- not the electric.  He pays the phone and he pays

24  the cable.  The cable rounds to about $160 a month and

25  the phone rounds to about a hun- -- two hundred forty to

1    four -- sixty dollars a month.  Like last month's was

2    244 and this month is 260.  Brian usually pays both

3    those bills.  It leaves him about $300, and if I needed

4    it and if I came to him and said I need that money, he

5    would give it to me, but I don't ask him for it.

6    Q    Now, I'd like to show you -- show you what's been

7    marked as Defendant's Exhibit A for identification.  Do

8    you recognize that?

9    A    Yes.  It's a -- it's a letter that my aunt,

10   Jennifer Baker -- well, she's not really my aunt, but I

11   call her one.  She babysits our children.  She has

12   day-to-day -- socializes with them.  She actually lives

13   inside my home.

14   Q    And what's the -- the gist of the note?

15   A    It's a letter --

16          MS. ROSS:  Objection.  Your Honor, may I see a

17   copy of the exhibit?

18          MR. STRAUB:  Certainly, Judge.  If it hadn't

19   arrived at the beginning of the hearing, I certainly

20   would have gotten it in advance.

21          THE WITNESS:  It was something that I asked --

22          THE COURT:  Wait.  Hold on.  Hold on.

23          (Brief pause.)

24          MS. ROSS:  Thank you.

25          MR. STRAUB:  Thank you.

```
 1              MS. ROSS:  Thank you.
 2    BY MR. STRAUB:
 3    Q    And what's the basic point of this note?
 4    A    It's basically just a letter stating that she is at
 5    my house and takes daily -- {unintelligible} is daily,
 6    and Brian does participate as a full-time father even
 7    while being out of the house.  He has -- he does all
 8    sports, parent/teacher conferences, anything to do with
 9    them emotionally.  He comes to the house.  He watches
10    movies with them.  He plays games with them.  And he
11    makes sure to socialize with them daily.
12              MR. STRAUB:  Your Honor, I move for the
13    admission of Exhibit A.
14              THE COURT:  Any objection?
15              MS. ROSS:  No, your Honor.
16              THE COURT:  So received.
17              MR. STRAUB:  Thank you.
18              (Defendant's Exhibit A was received in
19    evidence.)
20    BY MR. STRAUB:
21    Q    Miss Folks, turning to the subject of handguns,
22    have you ever seen Brian --
23    A    No.
24    Q    -- in possession --
25         Question first.
```

1          THE COURT:  Let --

2          THE WITNESS:  Oh, sorry.

3          THE COURT:  Let the lawyer finish the

4     question.

5          THE WITNESS:  Sorry.

6          THE COURT:  Okay?

7     BY MR. STRAUB:

8     Q    Have you ever seen Brian Folks in possession of a

9     handgun?

10    A    No.

11    Q    Have you ever found any handguns in your home?

12    A    No.

13         MR. STRAUB:  Thank you.  Nothing further,

14    Judge.

15         MS. ROSS:  I have some cross examination, but

16    if I could have a moment, your Honor?

17         THE COURT:  Of course.

18         (Brief pause.)

19                    CROSS EXAMINATION

20    BY MS. ROSS:

21    Q    Now, at the time of Mr. Folks' arrest, he was not

22    living at your house, correct?

23    A    He was -- we were supposed to be moving back in,

24    and I explained this to you -- the detective.  Me and

25    Brian have been trying to work things out.  His clothes,

1   most -- some of his clothes have already been moved back

2   in.  He was supposed to be in the midst of moving back

3   into the home.

4   Q    Okay.  So the answer to my question is no --

5   A    Was he fully --

6   Q    -- he was not living there.

7   A    -- moved back in?  No.

8   Q    Okay.  So -- and you told Agent Destito that he had

9   not been living at your home since about March of this

10  year, correct?

11  A    Yes.

12  Q    Now, it's correct, isn't it, Mrs. Folks, that a

13  search warrant was executed at your home?

14  A    Yes.

15  Q    Okay.  And during the execution of the search

16  warrant, the agents gathered certain evidence; isn't

17  that correct?

18  A    Yes.

19          MS. ROSS:  Your Honor, may I approach the

20  witness?

21          THE COURT:  Why don't you tell us what you

22  have in your hand.

23          MS. ROSS:  Well, I was going to ask her to

24  identify -- if she recognizes this.  It is journals of

25  Mrs. Folks.

1           THE COURT:  Okay.

2           MS. ROSS:  May I approach?

3           THE COURT:  Yes.

4           MR. STRAUB:  They look voluminous, Judge, and

5   I'm not quite sure where we're going with this and how

6   much time it is going to take me to review the journals

7   and field up this question.

8           MS. ROSS:  Well, your Honor, it is cross

9   examination, and they did put forward information in her

10  direct testimony that, for example, she stated he treats

11  the children the same, the five stepchildren and his

12  children.  In fact, in her contemporaneous journal she

13  says he treats the children very differently, that the

14  five stepchildren he does not treat the same as his own

15  child, that --

16          THE COURT:  We're getting into a family court

17  proceeding here.  It really isn't relevant to the

18  question of release or detention.  Quite frankly, what I

19  would like to know from the witness is where has

20  Mr. Folks been living when he is not --

21          MS. ROSS:  Your Honor --

22          THE WITNESS:  The majority of it, he -- he

23  hasn't been sleeping at night in the home.  What he does

24  is he stays out all night and then he comes home and he

25  will sleep during the day.  Or he will sit for two,

1    three days and he will come to my house and he'll crash.

2         He -- I yell and I complain that he doesn't sleep

3    at home and that if he is not sleeping at home, that

4    means he's sleeping with somebody else.  We do have a

5    lot of problems in our marriage, but I'd really like to

6    keep them between my marriage.

7              THE COURT:  Is it -- do we need to go into the

8    journals?

9              MS. ROSS:  Your Honor, they are putting

10   forward the basis of release as this is a family home

11   that he has been residing in -- that is not true -- and

12   that he can return to.  And that is not clear either,

13   given that he has a long history, as the journals also

14   document, of being unfaithful to Mrs. Folks.

15        She advised Agent Destito she didn't know where he

16   was at the time that he was arrested.  So this is a very

17   different picture from what's being put forward by the

18   defense to this Court as a basis for where he can live

19   and what his strong family ties are really like.

20             THE COURT:  I don't see the relevance of this

21   inquiry, and I'm going to ask you to move on to another

22   matter.

23   BY MS. ROSS:

24   Q    Now, Mrs. Folks, are you -- have there been -- are

25   you aware that Brian Folks, Jr., suffered from burns?

1    A    You mean --

2                MR. STRAUB:  Relevance, Judge?

3                THE COURT:  What's the relevance?

4                MS. ROSS:  Again, we're being presented with

5    strong family ties and the familial home, and, in fact,

6    there are reports about Mr. Folks -- reports to DCF

7    about his treatment of his son.

8                THE WITNESS:  I'll actually answer that, I

9    should like.

10               THE COURT:  Mr. Straub, we will take the

11   answer.

12   A    Junior had fell on asleep in the living room, and

13   DCF also -- we did get a call because the school had

14   reported that he had cigarette burns.  We offered to

15   bring Junior to the doctors.  They were not cigarette

16   burns.  Junior had fell asleep in the doorway of his

17   room watching TV, and the heater -- and Mr. Folks was

18   not home.  I was.  The heater -- his arm had touched it

19   because it was missing the end cap.  When Junior burnt

20   himself on it, I did replace the end cap and it is

21   replaced now.

22   BY MS. ROSS:

23   Q    That wasn't the only time that the school reported

24   you or Mr. Folks, or Mr. Folks in particular --

25   A    No.  I have been having --

```
1    Q    -- to DCF?

2    A    I have been having a lot of problems with the

3    school.

4              MR. STRAUB:  And so how many times people --

5    {unintelligible}.

6    A    I have also had reports made that --

7              THE COURT:  Hold on, hold on.  Let me address

8    the objection that's been made, okay?

9         Again, I think the witness has credibly testified

10   that this is a marriage that's quite rocky and they're

11   going through difficulties.  To the extent it's being

12   turned into how good a parent Mr. Folks is, it's really

13   going beyond the relevance of what I need to decide

14   here.

15             MS. ROSS:  Your Honor, may I have a moment?

16             THE COURT:  Yes, of course.

17        The objection is sustained.

18             (Brief pause.)

19             MS. ROSS:  Your Honor, we have no further

20   questions for this witness.

21             THE COURT:  Okay.

22             MR. STRAUB:  Nothing further.

23             THE COURT:  Okay.  Thank you.

24             (Witness excused.)

25             THE COURT:  Any further evidence?
```

```
 1              MR. STRAUB:  No, Judge.
 2              THE COURT:  Okay.  All right.  It is now 5:30.
 3     We can hear argument but I am concerned that argument
 4     will extend on; then the Court has to announce its
 5     findings.  I'd like the opportunity to consult with the
 6     probation officer, so -- and all of this has collateral
 7     consequences to the United States Marshal Service, and I
 8     have to be conscious of their service.  So we are going
 9     to continue the matter.
10          And let me inquire of Mr. Jarvis about Thursday or
11     Friday?  Today's Wednesday.
12              (Brief pause.)
13              THE COURT:  Tomorrow afternoon is available
14     for me.  Counsel?
15              MS. ROSS:  Yes, your Honor.
16              MR. STRAUB:  I'm sorry, Judge, I am pulling up
17     my schedule.
18              THE COURT:  Yes.  Take your time.
19              MR. STRAUB:  Judge, I have a -- it's a long
20     story -- a speedy trial issue in a case in state court
21     and some depositions, but would the Court have time
22     tomorrow at -- at two o'clock?
23              THE COURT:  Yes.
24              MR. STRAUB:  Thank you.
25              THE COURT:  Okay.  So we will schedule this
```

1  for further proceedings at two o'clock tomorrow.  And at

2  this time the Court will stand in recess.

3              (Court was in recess at 5:30 p.m.)

4                      *** ** ***

5

6

7              C E R T I F I C A T I O N

8       I certify that the foregoing is a correct
   transcript from the audio record of proceedings in the
9  above-entitled matter.

10

11  May 5, 2017                    _____
    Date                           Anne Nichols Pierce
12

13

14

15

16

17

18

19

20

21

22

23

24

25