UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
              V             *
                            *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94




DETENTION HEARING
Thursday, July 28, 2016
Burlington, Vermont




BEFORE:

        THE HONORABLE JOHN M. CONROY
           Magistrate Judge



APPEARANCES:

        HEATHER E. ROSS, ESQ., Assistant United States
           Attorney, Federal Building, Burlington, Vermont;
           Attorney for the United States

        MICHAEL J. STRAUB, ESQ., Law Office of Michael J.
           Straub, 19 Church Street, Suite 9, Burlington,
           Vermont; Attorney for Defendant Folks




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

1   THURSDAY, JULY 28, 2016

2   (The following was held in open court at 2:05 p.m.)

3            COURTROOM DEPUTY:  Your Honor, the matter

4   before the Court this afternoon is criminal action

5   16-CR-94-1, United States of America versus Brian Folks,

6   who is present in the courtroom today with attorney

7   Michael Straub.  Representing the government this

8   afternoon is Assistant United States Attorney Heather

9   Ross.  And we are here for a continuation of the hearing

10  on detention.

11           THE COURT:  Miss Ross, I'll hear you.

12           MS. ROSS:  Thank you, your Honor.

13       The government would like to start with the bail

14  report because even though there are factors that this

15  bail report does not address -- and as I understand from

16  conversations with the probation office, there are

17  factors or areas that the bail report cannot address --

18  there's still enough to hold Mr. Folks if we just look

19  at the bail report alone.  So I'll start there.

20       Obviously we have the very serious nature of the

21  charges.  It's an ongoing drug-trafficking conspiracy,

22  and it involves mandatory minimum quantities of drugs in

23  this multiple-count indictment.

24       There is also the significant criminal history of

25  this defendant which shows that he has been interacting

1    with law enforcement since at least -- at least the age

2    of 17.  In 1993, he was convicted of manslaughter for

3    killing a man by shooting him in the chest.  He stays in

4    jail for 13 years.  He is released on parole from New

5    York in 2006, February of 2006, and five months later he

6    incurs his first arrest in Vermont while he is clearly

7    still on parole in New York.

8         With respect to that arrest, which was for the

9    marijuana possession charge, he also incurs a failure to

10   appear, and that's on September 26th of 2006.  He goes

11   back to jail for an additional two years, starting in

12   2007, and is released again in 2009.

13        Gonna hold for a moment on talking about the time

14   period between 2009 and 2012.

15        For his next arrest in -- January 25th, 2012, he --

16   what's indicated in the bail report is a fugitive from

17   justice with no further information.  The government has

18   obtained further information --

19             MR. STRAUB:  Your Honor, I would like to pose

20   an objection to what I'm starting to notice in the

21   government's argument, referring to an awful lot of

22   information that's not in evidence, that's not in the

23   bail report, and apparently we are about to hear some

24   more information that's not in evidence and not in the

25   bail report.  So I'd like -- I hope this is a good

1    moment to raise that objection.  I can certainly, you

2    know, point that out during my argument.

3            THE COURT:  Okay.  I don't know what the

4    evidence is, so --

5            MS. ROSS:  So, your Honor, we did obtain

6    further information about this January 25th, 2012,

7    incident.  We obtained it from the United States Marshal

8    Service.  I provided it to Mr. Bendzunas.  He suggested

9    that I submit it to the Court.

10           Prior to being able to submit it to the Court, I

11   had to make sure that the Marshal Service was okay with

12   me submitting it to opposing counsel, and Chief Hall

13   told me today that that was permissible, and I have

14   turned it over to defense counsel, Mr. Straub.

15           So the January 25th, 2012, incident, which is

16   entitled on the bail report "Fugitive from Justice," it

17   involved the U.S. Marshal Service asking the Colchester

18   Police Department for assistance in arresting Mr. Folks

19   on a warrant out of New York by the New York parole

20   department, and during that arrest, which was conducted

21   by Deputy U.S. Marshals Max Galusha, John Curtis and

22   Mike Barron, among others, they found Mr. Folks hiding

23   under a couch at the location where they arrested him.

24           Again, I got permission to submit the report itself

25   both to the Court, of course, but also to opposing

1    counsel, and I am happy to share the report with the
2    Court if the Court wants something beyond what I have
3    just explained.
4              THE COURT:  So is there an offer for
5    admission?
6              MS. ROSS:  Yes, there is, your Honor.
7              THE COURT:  Okay.  Mr. Straub, the government
8    says your client was found hiding under a couch.
9              MR. STRAUB:  Yes, Judge.  You know, for the
10   formality of it, I must object.
11             THE COURT:  Okay.
12             MR. STRAUB:  The evidence is disclosed.  If
13   the Court is going to accept that evidence, then I would
14   certainly make a proffer of testimony from the
15   individual in whose home he was found on that occasion
16   and what his purpose of being there was.
17             THE COURT:  Okay.  All right.  So I -- I'll
18   permit the government to make the proffer that he was
19   found hiding under a couch at a residence in Colchester
20   in 2012.  Mr. Straub, I will permit you to provide any
21   other explanatory evidence or proffer with regard to
22   that.
23             MR. STRAUB:  Thank you.
24             MS. ROSS:  Thank you, your Honor.
25        I will note as well that -- and this information

1    Mr. Straub has had -- that at 17:14 on the post-arrest

2    statement, Deputy U.S. Marshal Max Galusha says to

3    Mr. Folks, "The last time I saw you, you were hiding

4    under a couch," and Mr. Folks acknowledged that.  So

5    that was also in the post-arrest statement.

6         From there we have the marshal's report indicating

7    that the next arrest for the -- for a parole violation,

8    Mr. Folk -- Mr. Folks was arrested in Wilkes-Barre,

9    Pennsylvania.  That's where he was arrested on September

10   6th, 2013.  There was a -- his parole was revoked.

11        Then on December 27th, 2013, the physical arrest is

12   noted as being in Wilkes-Barre, and he was arrested by

13   the New York/New Jersey fugitive task force.

14        MR. STRAUB:  I'd object as well to that

15   information as I don't know where that's coming from.

16   It's not been in evidence thus far.  I have not seen any

17   reference to that in any of the other materials, and my

18   client is sitting here going he doesn't know anything

19   about Wilkes-Barre.  Wilkesboro.

20        THE COURT:  Well, there was a probation

21   violation sustained on December of 2013, which seems to

22   me to be the relevant factor for the Court's

23   consideration, so.

24        MS. ROSS:  Again, it is in the same report

25   that -- the marshal's report that I have provided, the

details about this arrest, and, again, we're trying to make sure the Court has accurate information.

So he went back to jail and is -- in 2013, and is released in 2014, and he picks up charges again in September of 2014. He then picks up two more -- more charges in July of 2015.

So we have a criminal history of somebody with constant interaction with law enforcement and not complying with court orders while on conditions of release or parole, as the case may be.

Now, I can't --

THE COURT: Of course you are referring to the -- two of the three charges were dismissed. Correct?

MS. ROSS: Yes, but while he was on conditions for those charges -- for the July 2015 charge, he committed the instant crime.

THE COURT: I'm sorry, say that again?

MS. ROSS: So, just to be clear, July 2015, one of the two charges was dismissed. One was maintained. But the instant conduct took place during the summer of 2015, when he picked up those instant charges.

THE COURT: Is it not important to distinguish the fact that -- particularly with regard to the

1    aggravated sexual assault charge, that was dismissed?

2    So when you say "picked up," he was accused of these

3    offenses but never convicted.

4                    MS. ROSS:  Yes.  That's correct, your Honor.

5                    THE COURT:  Okay.  So --

6                    MS. ROSS:  The 2014 charge he was not -- that

7    charge was dismissed.

8                    THE COURT:  So, okay.

9                    MS. ROSS:  Now, Mr. Folks -- this was in the

10   government's motion for detention originally, and

11   Mr. Folks -- it came from the post-arrest statement.

12   Mr. Folks described his role as -- the role that he has

13   been playing, as he described it, as "the violent one,"

14   to -- to the agents in the post-arrest statement.

15       At 17:09 on that post-arrest statement, he does

16   clarify that he has been playing that role, he has been

17   engaged in this conduct since January of 2014 when he

18   got released and moved back to Vermont.  And the

19   government did make that point in its -- in its motion.

20       So, your Honor, I said that I wanted to come back,

21   if you will, to the three-year time period from 2009

22   until 2012, the fugitive situation, January of 2012.  We

23   have done work to understand, with our New York

24   counterparts, as they indicated, that this defendant had

25   two arrests during that time, one in May 2009 and one in

1    July 2010, and that they were both related to arrests

2    for violent crimes.

3        Now, I was trying to determine whether -- why that

4    wasn't showing up on the criminal history that the

5    probation office was able to obtain from New York since

6    this was information that we were seeing from our New

7    York counterparts, and we have been able to determine

8    that the reason that they're not showing up on the

9    criminal history is that they are still under seal.  I

10   can't provide any more information than that because I

11   don't know any more what being under -- what the

12   disposition was, but I do alert the Court to that.  And

13   just for purposes of a full record, if it were important

14   to the Court that we unseal them, get that information,

15   we could do so.  But I wanted to fill the Court in on

16   that status because that was a bit of a mystery to us as

17   to why things were showing up through our channels but

18   not for probation.

19       MR. STRAUB:  Your Honor, I object.  The

20   government's referring to some information that I have

21   no record of.  If the government's got some record of

22   it, might they share it?

23       MS. ROSS:  Your Honor, I have asked the New

24   York police department through our agents what are we

25   allowed to share.  We are only allowed to share the

1    unsealed records, which we could get if that were an

2    important matter to this Court.

3              THE COURT:  It's up to the government to

4    present the evidence it thinks is appropriate to meet

5    its burden here.  It's not up to me to tell you what you

6    should be offering into evidence.

7              MS. ROSS:  Okay.  We are not in a position to

8    offer that today.  We have just sorted out and gotten to

9    the bottom of why are -- are we getting information that

10   is not showing up for the probation office.

11             THE COURT:  So, Mr. Straub, I have no

12   information or evidence before me concerning what Miss

13   Ross is referring to, so to the extent you are making a

14   argument as to the weight to be accorded to it, I have

15   nothing before me.  So I --

16             MR. STRAUB:  Understood, Judge.

17             THE COURT:  Yes.

18             MR. STRAUB:  And I certainly don't want to

19   delay this proceeding any further chasing that

20   information.  Thank you.

21             THE COURT:  Okay.

22             MS. ROSS:  Your Honor, so in addition to the

23   lengthy period of time that this individual has spent in

24   jail and his failures to comply with court orders when

25   he is not in jail, when he is released on parole, we

have also shown that he doesn't have a stable or
consistent living situation.  In fact, at the time of
his arrest, his wife had no idea where he was living.

Of course that -- so we think that that information
alone that's covered by the bail report should be enough
to hold this defendant, but of course the government has
spent a lot of time showing that there is far more and
that this defendant has a history of violence and one
that -- one that continues to date.

By his own admission, he is an enforcer.  He has
described himself as "the violent one."  He has stated
that he robs and beats people.  He has stated that --
when asked, could -- if he was "the muscle" for drug --
for drug dealers, he said, "Pretty much."

Now, in addition to that, we have put on evidence
that he was found -- despite being found a convicted
felon, BPD found him in a vehicle with a nine millimeter
Beretta, and he was the lone occupant of that vehicle.

The government has introduced evidence that he
threatened Mary Provost with a loaded gun and threatened
to kill her and put her -- put his hands on her neck, or
threatened to snap her neck.

In addition, the government put on the Facebook
evidence showing what I would characterize as -- as
threatening behavior to an individual he thought had

1    stolen things from him.

2        We also have the source of information who

3    described him as having firearms.  The firearms has come

4    up in a number of different contexts in the evidence we

5    put on.

6        Your Honor, I did check, because you asked a

7    question yesterday about -- of the agent, of the nature

8    of the sources, the false information to law enforcement

9    charge, if he knew about that.  He did not, but we

10   followed up, and I have -- we did determine that the

11   source gave a fake name to law enforcement when she

12   was -- when they interacted with her on the heroin

13   possession and -- charge of that date.

14       Lastly, I would say that with the level of danger

15   that has been introduced to the -- in terms of the

16   evidence that has been put forward, that is also a

17   grounds to hold this defendant.  We would say that he is

18   unwilling to comply with conditions, and that makes him

19   a risk of flight.  He told this Court that he was in

20   the -- though the government's motion described him as

21   "the muscle," he said he didn't say that; in fact, he

22   did.  He did agree to that.

23       So for all of those reasons, the government

24   believes that this defendant should be detained.

25            THE COURT:  Okay.

1       MS. ROSS:  Oh, your Honor, I'm sorry.  If I

2  may?  I think the last issue that was in the bail report

3  was the -- was the medical issue.

4       Of course this defendant was fully ambulatory at

5  the time he was arrested on July 19th, not walking with

6  a cane, not in a wheelchair.  That's not to say -- I

7  don't think that the defense is contesting that, so the

8  medical issue is -- if it exists, should be -- easily be

9  able to be accommodated by the Marshal Service since,

10  you know, just a little over a -- a week ago he was

11  fully ambulatory.

12       Thank you, your Honor.

13       MR. STRAUB:  Thank you, Judge.

14       Your Honor, we'd ask the Court to release Mr. Folks

15  in large part on the strength of the probation report

16  which does find that there are conditions of release

17  that can ensure his appearance and public safety.

18       The -- the government's provided quite a bit of

19  information, I think, in their summation here that

20  should have been presented to the probation office at

21  the time of the preparation of the report or presented

22  in evidence.  We have had several days of opportunities

23  to work -- to get the evidence together.  So we'd ask

24  the Court to take that new information and give it no

25  weight.

1          THE COURT:  Specifically, which information

2    are you referencing?

3          MR. STRAUB:  Well, Judge, the information, in

4    particular, I think about Wilkes-Barre, I think that is

5    referencing to Pennsylvania.  I'm looking at the Marshal

6    Service report that says that the subject was arrested

7    by New York/New Jersey fugitive task force at

8    Wilkes-Barre.  It doesn't say he was arrested at

9    Wilkes-Barre.  It says he was arrested by some agency at

10   Wilkes-Barre.  I don't know what that means.  I don't

11   know why a New York/New Jersey task force would be in

12   Pennsylvania or really how that all adds up, but I don't

13   believe that we have information that he has been out

14   wandering around Pennsylvania.

15        We proffered early in the proceeding that his

16   fugitive charge in 2012 and other parole violations

17   related to his trips to Vermont to visit with his

18   children, and we do have, should we need to present

19   testimony, the mother of Mr. Folks' child, Danielle

20   Dagenhart, who is present and was present at the time of

21   that arrest, and would testify that he was, in fact,

22   there to visit his kids.

23        Now, may have been --

24        MS. ROSS:  Your Honor, I will interpose an

25   objection to that.  We won't accept the proffer,

1    although we would allow Mr. Straub to put forth that

2    evidence if he wished.

3          THE COURT:  I will receive Mr. Straub's

4    proffer.  I think it's a satisfactory basis.  The Court

5    can take a proffer of information, and there's no reason

6    not to believe that one of the reasons Mr. Folks was in

7    Vermont was to visit his children.

8          MR. STRAUB:  And so I would note that that

9    fugitive-of-justice charge was resolved promptly.  At

10   his first appearance, Mr. Folks waived extradition back

11   to New York and was processed promptly back to New York

12   in 2012.

13      Now, the government presented quite a bit of

14   evidence which, I think, failed to connect the dots that

15   it was seeking to connect.  The government provided

16   testimony regarding an individual who provided

17   information.  This source of information's testimony --

18   information provided to -- during some sort of

19   discussion with the U.S. Attorney's Office and law

20   enforcement indicated that Mr. Folks was engaged in drug

21   distribution and otherwise controlling several women.

22      That source of information is unidentified and is

23   known to have been charged with a false-information

24   charge.  Now, the government offers today some

25   additional information that has not been shared with me

1    that indicates that that charge related to giving a

2    false name.  My understanding of the charge, the way

3    it's written in the criminal record, is that it was

4    charged under a section of the statute related to

5    reporting a crime that didn't occur.

6        Be that as it may, false information to a police

7    officer should bear on the credibility of that source of

8    information, particularly at this remote -- this -- the

9    remote -- the several layers of hearsay through which

10   her information has been presented to the Court.

11       She -- the best the government could say in citing

12   to that individual is that individual believed that

13   various guns that she saw were somehow belonging to

14   Mr. Folks, without any indication of information as to

15   what formed the basis of that belief.  So that

16   information should be discounted.

17       More pointedly, that individual told the government

18   that she was present at a straw purchase set up by

19   Mr. Folks.  However, the government doesn't present any

20   information showing that any such purchase occurred at

21   any time up at the known gun shop in Milton.  There is a

22   reference in the report to the location where the

23   purchase was made.  It would seem that the government

24   could have readily presented this information.

25       So the source of information lacks credibility,

1    firsthand knowledge of some of the information provided,

2    and should be discounted.

3        The government also presented some testimony from

4    an analyst with the DEA, I believe is her agency, in

5    which the analyst was also providing information second-

6    and thirdhand.  But I think the Court allowed the

7    admission of some of the evidence, so I --

8        I would note that the recording of a statement by a

9    Mary Provost referenced an individual name Moe.  We

10   stipulated that my client is known as Moe.  However, I

11   don't believe there was any testimony from the

12   government that tied that person named Moe, that was

13   being discussed by Mary Provost, to my client.  I can't

14   begin to guess the number of individuals in the state of

15   Vermont named Moe.  So I don't believe that the

16   government sufficiently established that that individual

17   was stating that she was in any way assaulted by my

18   client.

19       We also don't have any information about that

20   individual, under what circumstances she provided that

21   information, whether it was in some way related to any

22   inducements to provide information or any threats of

23   prosecution in any way or a -- or her background, her

24   criminal history and whether or not she's known to

25   provide reliable information on past occasions.

1      So I'd ask the Court to dis- -- discount that

2      statement by Mary Provost as it was played into the

3      court.

4      The government today doesn't really cite to the

5      video that we saw of a Facebook post presumably by

6      Mr. Folks.  He was identified by the agent analyst as

7      being Mr. Folks.  I think the video itself makes

8      clear -- well, it looks like a joke, and we don't have

9      any information that would support that anything that

10     was said in that really had anything to do with anything

11     in reality, and, in fact, it seems that the worst thing

12     that was said on that video is that the MC in the video

13     may have required that individual to walk around in an

14     apron.

15     The analyst testified that the individual was nude

16     under the apron, but given the style of women's

17     undergarments these days, I don't know that I could see

18     if that individual was naked on that video, so -- I

19     don't know whether the Court could, but it does not

20     appear that that should be considered relevant to this

21     proceeding in any way.

22     The Court heard testimony on perhaps two sides of

23     the issue as to whether Mr. Folks has a stable home to

24     return to.  Obviously the testimony from all sides is

25     that there -- it's a marriage working through

1   difficulties, but the clear testimony from Mrs. Folks

2   was that they're working on their issues, and again, I

3   proffer that.  I don't think she testified directly on

4   this point, but I think her presence speaks amply that

5   he is welcome to return to stay at the home during the

6   course of these proceedings.  So he does have a stable

7   residence in Vermont.

8          He has many children -- six children, and he's

9   engaged with them.  I know the Court's not looking for

10  perfect parenting but simply ties to the community, and

11  so he does have those ties to the community, a 10-year

12  history of residence in the community.  In fact, his New

13  York parole was transferred up here, as I could tell

14  from the record.  If I -- let me just double check on

15  that.

16          (Defense counsel and defendant confer

17  briefly.)

18          MR. STRAUB:  All right.  Well, so he was

19  getting passes from New York to come on up during the

20  tail end of his parole, and then parole finally

21  concluded down there.  So at the end of his parole

22  period, New York State was trusting him to come up here

23  and stay in touch with them and that he successfully

24  concluded his parole for a charge, which I should note,

25  again, he picked up at the age of 17 in New York City.

1        I think that the knowledge base of the judiciary

2   regarding the development of juvenile brains is such

3   that the Court doesn't need an expert to come on in and

4   testify that something that someone did at 17, while a

5   very serious crime, of course, manslaughter, you know,

6   is -- should be considered in light of the age of the

7   individual and, furthermore, the passage of time.

8        Mr. Folks is now 40.  He has not been convicted of

9   any further serious crimes, and although he has been

10  charged, I'm sure the Court is not looking at

11  unconvicted conduct in terms of assessing my client and

12  his risk of harm to the community or risk of flight.

13       A single failure to appear does show up.  I believe

14  Mr. Bendzunas noted that it probably had something to do

15  with the fine, and, in fact, I would note that, from

16  what I can tell, the date of the failure to appear, of

17  September 26th, 2006, comes after the date of sentencing

18  and disposition on page three of the report, and so that

19  does support the notion that it had something to do with

20  failure to appear to pay a fine as the state court was

21  want to do back in 2006, having been practicing there

22  myself.  Set show cause hearings after a fine has been

23  imposed to check in with the defendant, see if they can

24  pay the fine, make the payment plan with them, and keep

25  an eye on the process of the payment of that fine.  So,

1   you know, he did not fail to appear for -- in a pending

2   criminal case.

3        Turning to Mr. Folks' health.  We certainly

4   acknowledge that he is able to walk when he is able to

5   take proper care of himself.  While he has been

6   incarcerated, he has been having difficulty with the

7   diets that have been made available to him.  He has --

8   he shouldn't eat meat.  It doesn't -- his body doesn't

9   accept it well.  He primarily -- he subsists on a

10  vegetarian diet when he can choose his foods.  And

11  furthermore, it's the level of activity that he needs to

12  do to maintain his muscle tone after having been shot in

13  the back.

14       He is prone to experience -- his leg is trying to

15  atrophy given the damage done to his nervous system, and

16  so he needs to maintain that through therapy,

17  stretching, exercises, moving around.  Constantly

18  sitting in chairs or being confined causes difficulty

19  and reduces his mobility.

20       So whether he would be detained in a facility that

21  would provide him with adequate opportunities to

22  maintain his physical condition, you know, it's

23  possible, and certainly if he is held and starts

24  suffering further deterioration, we would bring that to

25  the attention of the Court, but I believe that, you

1    know, it's something that should be considered at this

2    time, that he does have a serious physical condition

3    that requires daily attention on his part and self-care,

4    which is obviously better -- easier to take care of

5    yourself when you are able to take care of yourself as

6    opposed to being locked up where you are on someone

7    else's schedule.

8         So, your Honor, we'd ask the Court to consider, as

9    suggested by the presentence report, that there are

10   conditions of release which could assure Mr. Folks'

11   appearance in the community; that this Court addresses

12   defendants with these charges of conspiracy and

13   distribution far too routinely, regularly hears these

14   cases, and I don't want to stay routinely, but often

15   does release individuals with these very charges and

16   probably worse criminal records into the community, and

17   so that it would be consistent with that; as well I

18   would note to the Court, I think as the Court questioned

19   earlier in this proceeding, that Mr. Folks was taken

20   into custody without incident in this matter, was not

21   found to be in possession of any firearms, which reminds

22   me to go back to speak about the firearm that was

23   allegedly testified -- well, it was testified that it

24   was found in the glove box.

25        The presumption being presented by the agent

1       testifying is from fact that it appeared on that

2       incident report the BEKLÄ box had to do with the car

3       that Mr. Folks was driving in.  Accepting that for a

4       second, the car was owned, titled in another

5       individual's name, registered in that individual's name;

6       and she, in fact, told officers that she would not give

7       consent for the search and thereby did exercise control

8       over the vehicle, demonstrated that she controlled the

9       vehicle.

10          The testimony and, I think, as -- yes, as admitted

11      into evidence in the incident report, one of the

12      narratives there notes that that individual stated that

13      Mr. Folks was regularly known to use the car.  There's

14      nothing that says he exclusively controlled the car and

15      that it can't be stated clearly that that weapon found

16      in the car -- that was found in the car was there, that

17      it was his or that he even knew about it.

18          I should note that also in that incident report

19      there's reference to Mr. Folks asking that he be allowed

20      to remove several bags of toys that were in the back of

21      the vehicle.  I mention that, your Honor, because I

22      think it's consistent with what was put into evidence

23      regarding his statement to the police.

24          There was some joking about him being Robin Hood,

25      but in seriousness, he had told the police that the

1   money that he robbed from drug dealers coming up or

2   individuals coming up from New York he gave to the

3   community in the form of various assistances and toys so

4   the kids would have something at Christmas.  I note this

5   was -- that event was about Christmastime.

6       Now, the government is looking to take a statement

7   at the beginning of this narrative interview and -- and

8   say that's the end of it, that he was the muscle, that

9   he was the violent one, but I think if you look at the

10  entire record, he's not saying that he was doing

11  anything in aid of the conspiracy but, rather, that he

12  was discouraging other individuals.

13      I know that that can be spun to say he was trying

14  to protect turf, but I think that what he was -- what he

15  said in the record was that he was discouraging other

16  individuals.  He has -- from coming on up and was

17  thereafter doing something useful with the community.

18      I don't think either of my client or myself are

19  saying that those sorts of behaviors are a good idea.

20  They obviously create, you know, a situation that could

21  get out of hand, but I don't believe that it could be

22  taken that those behaviors were made in aid of his -- of

23  the alleged conspiracy.  The --

24      So we'd ask the Court to consider that Mr. Folks

25  has not been convicted of any serious charges beyond

1    misdemeanor marijuana possession and a disorderly

2    conduct charge since the conviction at the age of 17.

3        Not being familiar with the laws of manslaughter in

4    New York State, I would note that the charge was

5    reduced -- well, I think it was originally charged as

6    homicide but eventually convicted as manslaughter.  I

7    think that that would bear some -- and I can assume that

8    it had something to do with the state of mind and

9    intentions of the act; and so, again, referring to the

10   fact that he was 17, Mr. Folks has not been convicted

11   since then of anything serious.

12       These charges are serious, but he can safely be

13   released into the community.  He has a good record of

14   appearance at court proceedings, and whenever he did

15   violate his parole, he was found visiting his children

16   in Vermont, it seems.  So we'd ask the Court to consider

17   those facts and order him released on the conditions

18   proposed by the pretrial services.

19       THE COURT:  Okay.  With regard to your

20   argument concerning the post-arrest statement, is there

21   a particular statement you wish to call my attention to,

22   or --

23       MR. STRAUB:  Well, Judge, we heard several

24   minutes, and the -- in the middle of that portion of the

25   statement that was played, Mr. Folks said he was

1    discouraging individuals.  That's where I think the

2    conversation turned into "I was discouraging individuals

3    from being here."  And then the police brought up the

4    word "rob," and my client didn't object to that -- that

5    word.

6              THE COURT:  I think he said blind.  When the

7    police suggested rob, he interjected the word "blind."

8              MR. STRAUB:  Blind?

9              THE COURT:  It was --

10             MR. STRAUB:  Rob blind, okay.

11             THE COURT:  Yeah.

12             MR. STRAUB:  So -- well, I think we can assume

13   that means the common parlance there.  So, yes, he

14   acknowledged that he was taking money from individuals,

15   but he also said it was to discourage them from being in

16   the community.

17        I think that he has personal experience of the drug

18   problem in the community impacting his family, and I

19   would note that the charges that he has been presented

20   with here today haven't been proved.  We would hope to

21   work through that going forward but that it -- I think

22   the statement as made at the time of his arrest was to

23   the effect that he was discouraging individuals from

24   being in the community and taking their -- their

25   possessions.

1          THE COURT:  Okay.  Thank you.

2          In connection with this matter, we have heard a

3     great deal of evidence, so I think it's important that

4     the Court makes some factual findings with regard to the

5     government's motion.

6          First and foremost, the Court has before it the

7     report of the pretrial services officer, and the

8     information that's set forth in that report is adopted

9     as the Court's factual findings.  I understand that

10    counsel for both parties have advanced some clarity with

11    regard to the assertions set forth within the report,

12    but the pretrial service officer's report is thorough

13    and provides some fundamental facts upon which the Court

14    can base its findings.

15         In addition, the government has presented evidence,

16    as has Mr. Folks.  That evidence came in the form of

17    testimony from Special Agent Destito, DEA Intel Analyst

18    Epp, and then we heard from the spouse of the defendant.

19         With regard to the testimony of Agent Destito,

20    Agent Destito's testimony establishes that on December

21    25th, 2016, the Burlington Police stopped a motor

22    vehicle driven by Mr. Folks.  That motor vehicle was

23    registered in the name of another, one Lori Crawford.

24         As a consequence of some events that unfolded

25    there, the Burlington Police Department secured a search

warrant and recovered a nine millimeter pistol in the

glove box of the vehicle, together with some ammunition.

Miss Crawford has denied owning the firearm. She

has also indicated to law enforcement that although the

vehicle was registered in her name, it was a vehicle

used by Mr. Folks. So there's some construct- -- there

is some evidence that Mr. Folks was in constructive

possession of that firearm on Christmas Day of 2015.

Agent Destito described some information from an

anonymous source of information, and quite frankly, I

found the testimony with regard to the source of

information not to be persuasive. The source of

information, again, is anonymous. We know nothing about

him or her other than the fact that he or she -- I

believe the feminine pronoun was used -- she is a user,

an active user of opiates, and has been for some time,

has a criminal record to include making false

information to a police officer. The source of

information has had numerous interactions with the

criminal justice system.

In light of the fact that this individual remains

anonymous, remains an active opiate user, I just don't

find the information that was presented with regard to

the source of information to be persuasive, and I do not

take that into account in my findings.

1      Similarly, with regard to some vague information

2 about New York arrests, I have nothing before me upon

3 which to base any factual findings.  I agree with

4 Mr. Straub that the evidence or the information is vague

5 at best, and again I find that not to be persuasive and

6 plays no role in my decision.

7      With regard to the testimony of DEA Intel Analyst

8 Epp, Miss Epp testified primarily as a witness to

9 authenticate certain recordings.  She authenticated an

10 audio and video recording of Mr. Folks's post-arrest

11 interview.  And it's clear in the course of that

12 recording that Mr. Folks made some very damaging

13 statements.  It is clear in that recording that he made

14 the statement that he was "the violent one."

15      When it was suggested by the DEA -- interviewing

16 DEA agents that Mr. Folks had been robbing people, it

17 was my recollection that Mr. Folks responded he had been

18 robbing people blind.  It is argued that he has been

19 robbing these individuals, whoever they may be, in order

20 to keep the community safe.  I can't draw that same

21 conclusion.  It seems to me that in that post-arrest

22 interview Mr. Folks has admitted to using violence or

23 threats of violence to advance his own private concerns.

24      In addition, Intel Analyst Epp authenticated a

25 recording of one Mary Provost.  Miss Provost described

an assault with a gun by an individual she identified as
Moe, a name that Mr. Folks himself uses later on in the
Facebook page recording.  She described a vicious
physical assault committed by Moe.  It is argued that
there is no evidence that Mr. Folks is the Moe referred
to by Mary Provost, so Mr. Straub is correct in
advancing that argument.  So I give that testimony
limited weight.

Finally, there is the Facebook page recording in
which Mr. Folks made derogatory statements about a
particular woman.  I didn't find those statements to be
particularly relevant to questions facing the Court with
regard to release or detention.  I think the value of
the Facebook page is that Mr. Folks's physical
impairments are perhaps not as severe as he has
projected them.  He appeared to me to be moving with
relative ease and comfort in that Facebook page
recording.

Finally, we have the testimony of Mr. Folks's
spouse.  Significantly in her testimony, she indicated
that Mr. Folks had only resided approximately 30 nights
since March of 2016 at the residence.  She had no
indication or did not know where he had been on those
other nights.  Mr. Folks disclosed no other address to
the interviewing pretrial service officer other than the

1    241 West Canal Street address.  So there is ample

2    concern about where Mr. Folks has been living during

3    this period of time.

4        The government has moved for the detention of

5    Mr. Folks making the assertion he presents a risk of

6    flight or, alternatively, a danger to the community.

7    The government bears the burden to show that an

8    individual is a risk of flight by the standard of a

9    preponderance of the evidence, and it bears the burden

10   to show Mr. Folks is a danger to the community by clear

11   and convincing evidence.

12       And really, the government's burden with regard to

13   this is twofold:  It must show by clear and convincing

14   evidence that Mr. Folks is a danger to the community and

15   also by the same standard that there are no conditions

16   or combination of conditions the Court could employ to

17   protect the community.

18       At this stage of the proceedings, the defendant is

19   of course presumed to be innocent of the offenses that

20   are alleged in the indictment; however, a -- by virtue

21   of the grand jury's finding of probable cause, a

22   presumption arises that there's no conditions the Court

23   could set to address the twin concerns of risk of flight

24   or danger to the community.  More precisely, though,

25   with regard to this presumption, a defendant bears a

1    limited burden of production to rebut that presumption.

2         The ultimate burden of persuasion remains with the

3    government throughout these proceedings.  In the event

4    that presumption is rebutted, it doesn't disappear; it

5    remains one of the factors for the Court to consider.

6         The Court does not make these decisions in a

7    vacuum.  It's guided by the statutory factors set forth

8    in 18 USC, section 3142(g).  Those factors include the

9    following:  In general terms, the nature of the offense

10   charged, the strength of the evidence, the history and

11   characteristics of the individual whose release or

12   detention is under consideration, and, finally, the

13   specific danger that would be posed by the individual's

14   release to the community as a whole or any particular

15   person in the community.

16        Looking at these factors both individually and

17   collectively, with regard to the nature of the offense

18   charged, the indictment in this case charges Mr. Folks

19   with engaging in a very serious conspiracy lasting

20   approximately 10 months here in Vermont and elsewhere

21   and that the object of the conspiracy was the

22   distribution of 28 grams or more of cocaine and 100

23   grams or more of heroin, narcotic substances.  This

24   indictment is a very serious one.

25        And moreover, the offense behavior alleged by the

1    grand jury also involves the constructive possession of

2    a firearm.  The evidence also shows that Mr. Folks has

3    employed in order to achieve the goals of the charged

4    conspiracy violence or threats of violence.  So that

5    first factor is a very serious one and weighs in favor

6    of detention.

7         With regard to the second statutory factor, the

8    strength of the evidence, the grand jury found probable

9    cause exists to believe Mr. Folks has committed these

10   offenses, but perhaps more significantly, with regard to

11   the analysis of this factor, Mr. Folks has made

12   post-arrest statements which would suggest that he has

13   engaged in the behavior described in the indictment.

14        With regard to Mr. Folks's history and

15   characteristics, there are several sub-factors the Court

16   must consider with regard to this factor.  Those include

17   such factors as community ties, employment history,

18   family ties, history related to drug or alcohol abuse,

19   criminal history, history while under court supervision,

20   and several other sub-factors.

21        In looking at the bail report, Mr. Folks has not

22   been convicted of any serious offenses in the last 20 --

23   20-plus years.  He was convicted at age 17.  He is now

24   41.  He was convicted at age 17 of the serious crime of

25   manslaughter.  For that offense he received a very

1  serious penalty of 90 months to 21 years of

2  incarceration.  In 2006 he was released on parole.

3      Given the age of this offense, the Court would not

4  place great weight on this offense; however, of great

5  concern to me is the fact that Mr. Folks violated parole

6  on two occasions.  It is advanced that Mr. Folks

7  violated his paroles for the purpose of visiting his

8  children, but I note that New York parole authorities,

9  in revoking his parole, resentenced him to a period of

10  incarceration.  Clearly his violations were of a serious

11  nature, in view of parole authorities' actions in this

12  case.

13      He does have family ties.  Everything before me

14  indicates that Mr. Folks is a very dedicated and

15  committed parent to his children and his stepchildren --

16  his child and his stepchildren, but clearly it is

17  disturbing to me that Mr. Folks -- his whereabouts have

18  been unknown for several months.

19      His wife testified that he has been around

20  approximately 30 nights since March of 2016.  No one

21  knows where he has been, suggesting that the family ties

22  are not that strong as projected -- as initially

23  projected.

24      He has no history of drug or alcohol abuse.  With

25  regard to employment, he is collecting SSDI as a result

1    of his injuries.

2          I am also concerned over the fact that Mr. Folks

3    failed to disclose whatever other addresses he may have

4    been utilizing during this period of time.

5          And, finally, with regard to danger to be posed to

6    the community by the release of Mr. Folks, credible

7    evidence exists to believe that he has engaged in

8    violence or threats of violence to achieve the object of

9    the conspiracy.

10         And, finally -- well, given the nature of the

11   offense charged, given the presence of a firearm, given

12   his admissions about his role in the offense, given the

13   fact that a presumption applies here, and the lack of

14   clarity as to where he has been living, I find that the

15   defendant has failed to rebut the presumption and that

16   the government has met its burden to show by clear and

17   convincing evidence that Mr. Folks is a danger to the

18   community and no conditions can be set to address that

19   danger, and the government has met its burden to show by

20   a preponderance of the evidence that Mr. Folks is a risk

21   of flight.

22         I will state for the record that I have given

23   consideration to the possibility of electronic

24   monitoring as a way to monitor Mr. Folks's behavior, but

25   that would be insufficient to address the danger to the

1    community that has been posed by Mr. Folks's behavior.

2         Accordingly, the motion is granted.  Mr. Folks is

3    ordered remanded to the custody of the United States

4    Marshal pending further proceedings in this matter.

5         The Court will stand in recess.

6              (Court was in recess at 3:03 p.m.)

7                        *** ** ***

8

9

10                 C E R T I F I C A T I O N

11        I certify that the foregoing is a correct
     transcript from the audio record of proceedings in the
12   above-entitled matter.

13                        _Anne Nichols Pierce_

14   May 5, 2017          _____
     Date                      Anne Nichols Pierce

15

16

17

18

19

20

21

22

23

24

25