UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA,   )
                Plaintiff,  )     Case No:
                            )     5:16-cr-94-01
        vs.                 )
BRIAN FOLKS,                )
                Defendant.  )


MOTION FOR HEARING
REGARDING VIOLATION OF DISCOVERY
PROTECTIVE AGREEMENT
Monday, February 26, 2018
Burlington, Vermont

BEFORE:
    THE HONORABLE GEOFFREY W. CRAWFORD
    Chief Judge

APPEARANCES:
    ABIGAIL E. AVERBACH, ESQUIRE
        U.S. Attorney's Office
        P.O. Box 570
        Burlington, VT  05402
        Attorney for the Government

    JARED FISHMAN, ESQUIRE
        Civil Rights Division Criminal Section
        U.S. Department of Justice
        601 D Street, N.W., 5th Floor
        Washington, DC  20530
        Attorney for the Government

CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  info@capitolcourtreporters.com

1   Appearances continued:

2        DAVID J. WILLIAMS, ESQUIRE
                JARVIS, McARTHUR & WILLIAMS
3                95 St. Paul Street
                P.O. Box 902
4                Burlington, VT  05402
                Attorney for the Defendant
5
         WILLIAM E. KRAHAM, ESQUIRE
6                15 Grove Street
                P.O. Box 447
7                Brattleboro, VT  05302-0447
                Attorney for the Defendant
8
    Lisa Wright, Operations Specialist
9   Kim U. Sears, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MONDAY, FEBRUARY 26, 2018

(The following was held in open court at 2:02 p.m.)

MS. WRIGHT:  Your Honor, this is Criminal Number 16-94, Defendant Number One.  United States of America versus Brian Folks.  The Government is present through Assistant United States Attorney Abigail Averbach and Jared Fishman.  Attorney Fishman is participating by telephone.  Present for the Defendant is Attorney David Williams and William Kraham; Attorney Kraham participating by telephone.

The matter before the Court is an emergency motion regarding violation of discovery protective order.

THE COURT:  All right.  Good afternoon. Good to see everybody.

MS. AVERBACH:  Good afternoon, Your Honor.

THE COURT:  Ms. Averbach, do you have an unredacted copy of the Facebook filing that I can see? Because mine is blacked out.  It's hard to understand what we are looking at.

MS. AVERBACH:  Certainly, Your Honor.  I do have a black and white copy which I'll --

THE COURT:  That's all right.  All right. For the record it's Exhibit 4.  And I'll make it a sealed exhibit, but that way we will have a complete account of what's going on.

1          I'll turn things over to you, Ms. Averbach.

2  Do you want to add anything to your papers?

3          MS. AVERBACH:  I would, Your Honor.  Thank

4  you.  Would you prefer that I'm back here or at the

5  podium?

6          THE COURT:  I think it's fine.  Since we

7  have two people on the phone, it might be easiest if you

8  sit and speak sort of directly into the mic.  I'll bet

9  they will pick up better.

10          MS. AVERBACH:  May I stand and speak

11  directly into the mic?

12          THE COURT:  You may.

13          MS. AVERBACH:  I'm an attorney, so I'm used

14  to being on my feet.

15          THE COURT:  All right.  If the people on

16  the phone can't understand this, let me know.  Okay?  Can

17  you hear all right, Mr. Kraham?

18          MR. KRAHAM:  Yes, I can hear fine.

19          THE COURT:  Mr. Fishman.

20          MR. FISHMAN:  Yeah, sounds good.

21          THE COURT:  Good.  All right.  Thanks.

22          MS. AVERBACH:  Well thank you, Your Honor.

23  Thank you for your indulgence in granting the emergency

24  hearing.  As Your Honor is aware, we had a protective

25  order agreement in this case.  That was signed on June

1st, 2017 by Mr. Kraham and on February, I believe, 13th,
2018 by Mr. Williams.  The protective order agreement
applied to counsel.  It applies to the investigators and
staff in the lawyers' offices who are working on the case.
And it applied also to the Defendant.  It covers all the
discovery, and it specifically covered by reference in the
letters disclosing our witness list the witness names,
those testifying at trial in this case.  That list was
provided to counsel, to two people, to Mr. Williams, and
Mr. Kraham, on February 2nd this year.

The order agreement -- effective order
agreement specifically states that:  The names of
witnesses in the case are being protected from public
disclosure with the following language, Your Honor.
"Discovery victim and witness names shall not be
disseminated to anyone outside defense counsels' firm and
its investigators and contractors who are working on this
matter, including but not limited to the press, any such
investigator or contractors are bound by the same
restrictions.  Defense counsel may share summaries and
excerpts with anyone, provided the victim and witness
names are redacted.  Defense counsel must refrain from
using any victim's full or actual name in any publication,
document or filing as well as making reference to victim's
full or actual name in any public hearing, and counsel

1  should adhere to the name convections in the governing

2  indictment or upon further agreement in any other manner

3  acceptable to the Government."

4          It also specifically requires "That the

5  Defendant not be left alone with any of the documents,

6  including the witness list.  The Defendant may review the

7  discovery in the presence of defense counsel, other

8  members of counsels' firm, or counsels' investigators,

9  contractors working on this matter, but may not otherwise

10  access these materials and may not retain even temporarily

11  the materials."

12          And also specifically requires -- rather it

13  excludes spouses, et cetera, from the limited universe of

14  people who are allowed access to these documents.  It says

15  "For purposes of these restrictions, investigators and

16  contractors shall not include spouses, significant others,

17  friends, or associates of the Defendant."

18          And finally, it notes that "A copy of this

19  letter shall be provided by defense counsel to the

20  Defendant, and then if either counsel or the Defendant

21  decline to accept any of the terms, we know that we will

22  make discovery available for an inspection at our office

23  in compliance with our constitutional mandates."

24          On Friday of last week, Your Honor, the

25  Government learned that our witness list was posted to

Facebook, publicly on the Internet.  We had a screen shot

of this witness list that shows that somebody took a cell

phone picture of every single page of our witness list

that was provided to counsel by discovery letter, and it's

clear that the screen shot was taken during the review of

discovery, because there is a redacted DEA-6 behind the

picture of the witness list.

So there are serious ramifications to this

in a criminal case, Your Honor.  Not only do we have

extraordinary safety concerns in this particular case,

given the Defendant's prior conviction for manslaughter as

well as the nature of the violence inherent in this

particular case and privacy concerns with respect to the

fact that many of the people on that list are victims of

sex crimes and human trafficking, but there is also

serious impacts with the Government's ability to move

forward.  The only purpose of disseminating the list such

as this is to quiet these witnesses, to intimidate them,

to harass them, and to not cooperate with the Government

and not be able to testify at trial.

The Government's been successful in getting

Facebook's help to identify public postings of this

document, and they agreed to take them down by treating

our protective order agreement as if it were a court

order.  But what we can't do is account for anyone who

does a screen shot of a posting of their cell phone and
then texted it to another person, which I just learned
recently, and it still is happening, people are emailing
it from one to another privately without using Facebook or
any other means.  So this is a bell that can't be unrung,
and the damage has been done.

The Government wishes that the Court treat
this agreement as if it were a court order and violation
of the agreement as if it were a violation of its own
order.  In this district we enter into these agreements
because we rely in good faith on counsel for the defense
to honor the parties of the agreement as if it were a
contract.  And if we can't rely in good faith on that
document, on that agreement, we have to enter into an
order of the court.

The Government asks the Court adopt the
agreement that we had in this case as an order, and we can
file a document and motion for protective order if that's
preferable to Your Honor.  We believe that counsel should
be obligated to tell this Court what happened, how this
happened, who had access to this document.  We need a list
of names of who had access and when they accessed it and
what connection the people had to Defendant.

If this was an act of negligence on the
part of counsel or counsels' team, there should be an

adequate response.  If this was a knowing and intentional act on the part of anyone within the defense team, there should also be an adequate response to that too.

In the Government's view there are two parts to this.  There is the breach of the information, and then there is the posting on the Internet of the information.  Somebody deliberately posted this on the Internet, on Facebook, in an effort to intimidate, harass, embarrass and implicitly threaten the safety of the witnesses, the Government's witnesses.  That's the obstruction of justice, Your Honor.  The Government's undertaking its own investigation.

We ask that this Court take all necessary steps to ensure that this doesn't happen again, and to address this seriously, and to let the defense team know that this Court takes any breach of these agreements seriously.  We note we did reach out to counsel today before the hearing.  Spoke to Mr. Williams, spoke briefly with Mr. Kraham, who has suffered a recent loss of his father, and who I believe hadn't yet even read the motion papers.  So we don't have substantive answers from Mr. Kraham.  We have asked these questions of Mr. Williams. We ask the Court to make its own inquiry and satisfy itself that all parties have acted in good faith and that all negligence and future breaches of the agreement will

1    not be tolerated.  Thank you.

2                  THE COURT:  All right.  Mr. Williams, how

3    do you see it?

4                  MR. WILLIAMS:  Your Honor, I met with Mr.

5    Folks once here in the court building for the January 31

6    arraignment on the superseding indictment, the

7    arraignment.  At that time I gave him a copy of that

8    indictment.  Nothing else.

9                  THE COURT:  Right.

10                  MR. WILLIAMS:  I received a copy of his

11    letter.  For whatever reason I kept the mailer; on Monday,

12    February 5.  I have the original copy in a folder.  It's

13    never left this folder.  It's always been in my

14    possession.  It hasn't been photographed by anyone.

15                  And I have not been to Springfield to visit

16    with Mr. Folks nor have I corresponded with him.

17                  THE COURT:  Okay.  So from your perspective

18    you got the witness list when?

19                  MR. WILLIAMS:  If I read this mailer

20    correctly --

21                  THE COURT:  Right.

22                  MR. WILLIAMS:  -- it was sent out on the

23    2nd, which looks like a Friday.  I'm not sure, because it

24    said Monday, February 5 at 3 p.m. it was going to be

25    delivered to my office.

1    THE COURT:  Okay.  And you haven't shown it

2    to Mr. Folks or been down to see him?

3    MR. WILLIAMS:  No.  I haven't seen him

4    since the 31st.  I've got the original copy of the letter.

5    I've shown it to Ms. Averbach, and I have no explanation

6    for what happened.

7    THE COURT:  All right.  And anybody in your

8    office that has been involved in --

9    MR. WILLIAMS:  The only paralegal in my

10   office, my wife, Karen Andresen, as you know she works

11   with me on these cases.  She has access to this file, and

12   she did not -- it didn't leave our possession.  It wasn't

13   photographed.  It wasn't sent around to anybody.  So I

14   don't know what happened.

15   THE COURT:  Mr. Kraham?

16   MR. KRAHAM:  Yes, Your Honor.  First, thank

17   you for allowing me to participate by telephone.  I wanted

18   to correct something in the Government's motion.  Exhibit

19   1 is not the letter that I signed.  I believe that letter

20   was signed by Kevin Henry on behalf of Donald McFarlan.  I

21   signed the letter on June 1.  And I just sent a copy to

22   Ms. Averbach by email just prior to the hearing.

23   THE COURT:  She has corrected that, and I

24   have a copy of the letter that bears your signature.

25   MR. KRAHAM:  Okay.  Now ordinarily I would

1  respectfully decline to provide any information regarding

2  any communications with my client on the ground of

3  attorney/client privilege.  However, the privilege does

4  not apply, in my view, if my client is involved in

5  criminal acts or I need to respond to allegations

6  concerning my representation of Mr. Folks.

7  So let me provide the Government and the

8  Court with the information that I have.  My last face-to-

9  face visit with Mr. Folks at the Southern State

10  Correctional Facility was on Saturday, February 3d, for

11  about three hours.  I received this discovery letter on --

12  by Fed Ex on Monday, February 5, 2018.  I scanned it, and

13  I made a copy, and I likely stamped it with my copy stamp.

14  It arrived during the week where I was

15  working on the Folks' case sometimes past midnight,

16  conducting legal briefs search and write motions in order

17  to meet the deadline of February 9.  I sent Mr. Folks a

18  copy of the letter either separately or in an envelope

19  along with copies of one or more of the motions responding

20  in this case.

21  Now I have sent him copies of discovery

22  letters in the past because they contained an index

23  listing the discovery materials produced by date, Bates

24  number and description.  So that he knows, in general, the

25  kind of material that I am receiving, and then he can tell

me what he wants to review, and I go to the correctional

facility with my notebook, my laptop, and review the

discovery with him.  And I have been very careful to abide

by the terms of the protective order and not provide any

of the discovery material.

The letter of February 5 was different from

the other discovery letters because it not only contained

updates regarding discovery and indices regarding new

discovery material, but also has a list of trial witnesses

embedded inside.  That absolutely should not have been

sent to the Defendant.  It was a mistake, and I regret my

error and my carelessness.

My last contact with Mr. Folks was on

Monday, February 12, on the attorney telephone line, and

he did not discuss this discovery letter at all.  I was

calling in to tell him that I was leaving the next day for

Maryland to take care of my dad, and I would be back in

touch with him when I returned.  Now I learned today that

Mr. Folks sent the discovery letter to his wife, Cassandra

Folks.  I do not know how it came to be posted on

Facebook.  And Ms. Averbach mentioned that in the Facebook

posting there is a DEA-6 in the background.  It appears to

me that in the lower right-hand corner that has a

Government exhibit sticker on it.  So that may be a

document from Mr. Folks's detention hearing which he would

1   have obtained from prior counsel before I entered the

2   case.  I don't know what that document is.

3            That's the only information I have about

4   the letter, Your Honor.

5            THE COURT:  And how would Mr. Folks have

6   access to a cell phone or a photocopier to send this on to

7   his wife?

8            MR. KRAHAM:  He doesn't.  He actually had a

9   physical copy of the letter.  Because I sent it to him.

10  And he sent it to his wife.

11           THE COURT:  Okay.  But your physical copy

12  of the letter didn't have the DEA exhibit attached to it,

13  right?

14           MR. KRAHAM:  No, no.  Not at all.

15           THE COURT:  Oh, I see.  So that's something

16  that he must also have sent to his wife?

17           MR. KRAHAM:  That must have been some other

18  document that he sent his wife on some other occasion.

19  Totally unconnected to the letter as far as I know.

20           THE COURT:  All right.  I think that brings

21  the first step to a conclusion.  We know how Mr. Folks got

22  it, and we know how it got out into the public.  So that

23  takes us to a second step which is, Ms. Averbach, what

24  would you like to do about it?

25           MS. AVERBACH:  Well I certainly appreciate

1 counsels' candor in responding to the questions.  Your

2 Honor, it saves us quite a bit of work.  And we can fully

3 investigate what is, in our view, the more serious breach

4 here which is the intentional act of posting it on the

5 Internet.

6                    THE COURT:  Right.

7                    MS. AVERBACH:  That said, we are loath to

8 turn over Jencks material, Giglio material in an

9 environment where we can't be certain that we can protect

10 the identity and anonomity and statements of our

11 witnesses.  So we will undertake a case-by-case review of

12 our discovery, and by case-by-case I mean document-by-

13 document review of our discovery, and likely make fewer

14 documents -- likely disclose fewer documents and make more

15 documents available for review in our office.

16                    THE COURT:  So the same set of documents as

17 seen by defense counsel, just some of them they will see

18 in your office.

19                    MS. AVERBACH:  Correct.

20                    THE COURT:  Got it.  Anything else?

21                    MS. AVERBACH:  Your Honor, I would ask that

22 you enter the protective agreement as an order.  And I

23 don't believe that sanctions are necessary in this case.

24 It sounds inadvertent; with serious ramifications.  But if

25 Your Honor sees any other solution, or remedy, as

1    appropriate, happy to hear it.

2                    THE COURT:  All right.  Mr. Williams, what

3    should we do about it?  This is how people get killed;

4    right?  I mean it's not a trivial matter.

5                    MR. WILLIAMS:  I was dismayed to learn that

6    this had happened.  I don't know what to do.  I take my

7    obligations as a defense lawyer, as you know, very

8    seriously, and I don't take any risks that might affect

9    somebody's health and well-being.

10                    THE COURT:  Right.

11                    MR. WILLIAMS:  And I don't know what to

12   say.

13                    THE COURT:  Any objection to the entry of

14   your letter agreement as a protective order?

15                    MR. WILLIAMS:  No, not at all.

16                    THE COURT:  Any objection to in this case

17   going forward viewing sensitive Brady and similar material

18   at the U.S. Attorney's office?

19                    MR. WILLIAMS:  Well, you know, I have been

20   thinking about it over the weekend.  Ms. Averbach or --

21   the Government's motion indicated that they were going to

22   require us to review all of Jencks and Giglio at their

23   office.  At some point we are going to have physical

24   control over those documents at the trial.  There is no

25   way I can cross examine a witness without having the

1  physical document in my control.

2  More importantly, I don't see how I can

3  adequately prepare witness cross examinations without

4  having those documents with me.  As you know, I'm very

5  busy, and I work at nights and on the weekends and

6  especially getting ready for trial.  We tried a case

7  together last year.  You know how --

8  THE COURT:  Right.  Yeah, no.  I totally

9  respect you.  That goes without saying.

10  MR. WILLIAMS:  You know how organized I

11  was.  I had a witness notebook for everyone of those

12  witnesses that was called, cross referenced statements

13  made by the witness and by other witnesses, and without

14  having the documents in front of me when I need them, I

15  don't know -- you know, there is a lot of witnesses, and

16  some are less important than others.

17  THE COURT:  Right.

18  MR. WILLIAMS:  As I say, I take --

19  MR. FISHMAN:  It's difficult to hear Mr.

20  Williams.  Can you get closer to the microphone?

21  MR. WILLIAMS:  I take my obligations

22  seriously.  Nothing that is going to be given to me is

23  going to go anywhere.  And when it has -- I don't know

24  whether you're familiar with the Aguiar litigation.

25  THE COURT:  No.

1          MR. WILLIAMS:  I had a client that was

2     sending threatening letters to co-defendants based on my

3     conversations with him pretrial.  And I cut him off from

4     even reviewing Jencks and Giglio material in jail, and

5     that was litigated on a post-conviction relief.  And my

6     decision to cut him off because of his behavior was

7     affirmed by Judge Conroy and later by Judge Sessions.  So

8     I don't put up with it.  There is no reason to.  But I've

9     got an obligation to prepare the best I can to cross

10    examine important witnesses, and I don't think I can do it

11    if I'm locked in a room up here.  I don't know whether

12    they are going to make the room available on the weekends

13    and nights.  I don't know.

14          THE COURT:  Yeah.  All right.

15          MR. WILLIAMS:  I certainly will abide by

16    any order Your Honor gives to me, so  -- and I have been

17    doing this for a very long time.  And I've never violated

18    a court order.

19          THE COURT:  All right.  Thank you.  Mr.

20    Kraham?  Same question.  You know how serious this is.

21    This is how people are harassed and killed.  How are we

22    going to prevent this going forward?

23          MR. KRAHAM:  Well based on what's happened

24    I think I am required to file a motion to withdraw, and

25    I'll put my reasons in the motion.

1          THE COURT:  All right.  I guess that would

2    answer the question.  Are you able to go forward, Mr.

3    Williams, on your own?

4          MR. WILLIAMS:  Not in April.  There is no

5    way.  I'm the copilot.  I got involved just a few weeks

6    ago.

7          THE COURT:  Yeah.

8          MR. WILLIAMS:  The discovery on -- in this

9    case is -- Mr. Kraham sent to me on a computer hard drive,

10   and we are going through it.  But --

11         THE COURT:  Yeah.

12         MR. WILLIAMS:  I can't get this case ready

13   for trial in April.

14         THE COURT:  Well we will take Mr. Kraham's

15   motion up.  Setting aside that issue, Mr. Kraham, how are

16   we going to protect against this in the future?

17         MR. KRAHAM:  Well I agree with Mr.

18   Williams, it would be extremely difficult to prepare the

19   case for trial if we were forced to review discovery in

20   the U.S. Attorney's office, because I would need a

21   considerable amount of time with the documents in my

22   office in order to adequately prepare.  And if the Court

23   denies my motion to withdraw, which I will file tomorrow,

24   then I'm not going to send my client anything.

25         THE COURT:  Well that's not what I'm

asking, only that you not do the -- I won't raise it with
an adjective, but you won't do the action of sending him
what's obviously confidential information in such a way
that he can send it out into the broader community.  I
mean so -- an appalling breach of your professional
obligation.  He doesn't owe those obligations to the
Court, but you do.

I guess that's as much as we can do at this
point.  Ms. Averbach, you're set with Facebook?  In other
words, there is no further order from the court, no show
cause contempt hearing that you want to conduct?

MS. AVERBACH:  Your Honor, with respect to
Facebook, we will be in touch if we need further orders
from Your Honor.

THE COURT:  Right.

MS. AVERBACH:  I believe that Facebook is
operating under the theory that our agreement is --

THE COURT:  Yeah, you explained that.

MS. AVERBACH:  -- in the order, so they are
fine.  You know, to the degree we will continue to
investigate this, you may hear from us further on out.
What I think would be in order, is that we have a hearing
with Defendant where Your Honor imparts the seriousness of
the protective order to Defendant and issues a no-contact
order directly to the Defendant so that he understands the

1  ramifications of this as obstruction of justice, as

2  witness tampering, as any number of different things he

3  could face now.

4  　　　　THE COURT: Yeah. That's fair. I'll see

5  him anyway if Mr. Kraham moves to withdraw because that's

6  a motion that requires presence.

7  　　　　MS. AVERBACH: Okay.

8  　　　　THE COURT: I don't -- his actions concern

9  me less than the attorney's. I mean we expect something

10  different from the lawyers that appear here. And this is

11  as disappointing as anything I've seen in my three

12  and-a-half years in this court. I just -- it had not

13  occurred to me that a lawyer would do this, but it's live

14  and learn. And we will have to figure out a way forward.

15  　　　　So when the motion's filed, Mr. Kraham,

16  I'll set a hearing and have Mr. Folks brought to attend.

17  Good enough. Thank you. Thank you both.

18  　　　　(Court was in recess at 2:28 p.m.)

19

20

21

22

23

24

25

*****

C E R T I F I C A T I O N

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

