UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

UNITED STATES OF AMERICA          )

          VS                      )   CASE NO: 5:16-cr-94-1

BRIAN FOLKS                       )

_____)          MOTION HEARING


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          SENIOR DISTRICT JUDGE



APPEARANCES:   ABIGAIL E. AVERBACH, ESQUIRE
                    Assistant U.S. Attorney
                    P.O. Box 570
                    Burlington, Vermont   05402
                    Representing The Government




               EMILY M. SAVNER, ESQUIRE
               JARED FISHMAN, ESQUIRE
                    United States Department of Justice
                    Patrick Henry Building, Room 5018
                    601 D Street N.W.
                    Washington, DC   20004
                    Representing The Government

                    (Appearances Continued:)



DATE:          March 20, 2018



          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

1                    APPEARANCES CONTINUED:

2


3          CRAIG S. NOLAN, ESQUIRE
                Sheehey, Furlong & Behm, P.C.
4               P.O. Box 66
                Burlington, Vermont   05402
5               Representing the Defendant

6


7          DAVID J. WILLIAMS, ESQUIRE
                Jarvis, McArthur & Williams, LLC
8               P.O. Box 902
                Burlington, Vermont   05402
9               Representing the Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   WITNESS:                                    PAGE:

 3   CHRIS MAY
     Direct Examination by Mr. Fishman              7
 4   Cross Examination by Mr. Williams             21
     Further Examination by Mr. Fishman            34
 5

 6   KYLE BROUILLETTE
     Direct Examination by Ms. Savner              36
 7   Cross Examination by Mr. Nolan                74
     Further Examination by Ms. Savner            117
 8   Further Examination by Mr. Nolan             128

 9

10   BRIAN FOLKS
     Direct Examination by Mr. Williams           137
11   Cross Examination by Mr. Fishman             138

12

13   MICHAEL BELIVEAU
     Direct Examination by Mr. Fishman            154
14   Cross Examination by Mr. Williams            170
     Further Examination by Mr. Fishman           187
15   Further Examination by Mr. Williams          189
     Further Examination by Mr. Fishman           190
16   Further Examination by Mr. Williams          191

17

18   ADAM CHETWYND
     Direct Examination by Ms. Averbach           193
19   Cross Examination by Mr. Nolan               227
     Further Examination by Ms. Averbach          256
20

21   GOVERNMENT EXHIBITS:                        SHOWN:

22   1 - 7-19-16 Miranda Waiver                    15

23   2 - 7-19-16 Folks Interview                   11

24   3A - Transcript of 7-19-16 Interview      12, 145

25   4 - 1-20-16 Body Camera Videos                52
```

INDEX CONTINUED:

GOVERNMENT EXHIBITS:                                SHOWN:

11 - Photo of Bag & Drugs Seized                      69

14 - 12--28-15 Search Warrant                    165, 190

16 - Pictures re: Car Stop & Search                  166

17 - 7-14-16 Application for Search Warrant 197, 228, 215

19 - 7-19-16 Video of Search Ethan Allen             219

21 - Inventory Ethan Allen                           210

22 - Map                                              48


DEFENSE EXHIBITS:

A. - Robenstein Criminal Record                       94

B. - 3-16-18 Letter Savner to William & Nolan        103

C. - 1-20-16 Incident Detail                     115, 121

D. - Search Warrant Application West Canal            233

1          (The Court opened at 9:00 a.m.)

2          THE CLERK:  Your Honor, the matter before the

3  Court is criminal number 16-94-1, United States of America

4  versus Brian Folks.  Present on behalf of the government are

5  Assistant United States Attorney Abigail Averbach.  Jared

6  Fishman, Special Litigation Counsel and Emily Savner, Trial

7  Attorney.  Present on behalf of the defendant are David

8  Williams and Craig Nolan.

9          And we are here for hearings on motions to

10  suppress evidence, motion to suppress statements, motion to

11  dismiss count two, motion to construe 18 U.S.C., Section

12  1591 as to count 15, motion to compel discovery and motion

13  to withdraw as attorney.

14          THE COURT:  All right.  Morning.  Good to see

15  everybody.  I think I've met everybody, but perhaps not

16  Mr. Fishman.  Welcome.  It's good to have you here.

17          MR. FISHMAN:  Good morning, Your Honor.

18          THE COURT:  I met Miss Savner last week, right?

19          MS. SAVNER:  Yup.

20          THE COURT:  Okay.  Let's take up the motion to

21  withdraw first because we can excuse Mr. Kraham.

22          Anything to add, Mr. Kraham, to your motion?

23          MR. KRAHAM:  No, Your Honor.

24          THE COURT:  Anything from the government's

25  perspective?

         MS. AVERBACH:  No, Your Honor.

         THE COURT:  Mr. Folks, do you understand that
Mr. Kraham is moving to withdraw on account of the
publication of some discovery material on Facebook or on the
internet?

         MR. FOLKS:  Yes.

         THE COURT:  And that we've arranged for him to be
replaced by Attorney Craig Nolan so that you still have two
attorneys?

         MR. FOLKS:  Yes.

         THE COURT:  All right.  And do you have any
objection yourself to the withdrawal of, of Attorney Kraham?

         MR. FOLKS:  No.

         THE COURT:  All right.  I'll grant the motion.
Mr. Kraham, I'll let you go, okay?

         MR. KRAHAM:  Thank you, Your Honor.

         THE COURT:  From the government's perspective,
which of the motions have witnesses waiting outside?
Probably all of them.

         MS. AVERBACH:  No, Your Honor.  We have, let's
see, a motion to suppress statements involves a witness and
the motion, that's number 128.  We have number --

         THE COURT:  127?

         MS. AVERBACH:  Is it 127?  No, I think that's the
ping warrant.  The GPS ping warrant, which the government

1  will not use.  So that one is mute.

2          So I may be wrong, but I thought the motion to

3  suppress the statement was 128.

4          THE COURT:  It is.  I don't, oh, I see it.  It's

5  hiding down below.  Got it.  All right.  Thank you.

6          MS. AVERBACH:  So that one involves a witness.

7  The 130 does not.  132 should be mute.  133 does.  137 does.

8  And that's connected to 141.  142 does not.  143 does.  And

9  144 does not.  145 does not.  And we've done 167.

10          THE COURT:  All right.  So you want to get the

11  motions with witnesses done first?

12          MS. AVERBACH:  I think that makes the most sense.

13          THE COURT:  Totally.  So shall we just take them

14  in order, 128?  That's the first one.

15          MR. FISHMAN:  Your Honor, the government will call

16  Chris May to the stand.

17          THE COURT:  Does that work for the defense?

18          MR. WILLIAMS:  Yes, Your Honor.

19          MR. NOALN:  Thank you, Your Honor.

20          C H R I S   M A Y,  The Witness, after being duly

21  sworn, was examined and testified as follows:

22          THE COURT:  Good morning.

23          THE WITNESS:  Good morning.

24          THE COURT:  Thanks for coming in.

25          THE WITNESS:  Thank you, Your Honor.

DIRECT EXAMINATION BY MR. FISHMAN:

Q.   Good morning, Detective May.

A.   Good morning.

Q.   How are you currently employed?

A.   I'm employed by the Essex Police Department.

Q.   And how long have you been so employed?

A.   I've been employed by the Essex Police Department since 2009.

Q.   And what is your current rank?

A.   Detective.

Q.   And over the course of your career, what different positions have you had at Essex PD?

A.   Police officer, patrol officer and a detective.

Q.   And my understanding, as of this week, you will be taking on a new position as well?

A.   It's indetermined.  Through this week or the next week I'll be transferring over to the DEA Task Force.

Q.   Can you tell us, just generally, what your role as a detective has been with Essex PD?

A.   Initially, when I was, started as a detective I did general investigations.  That covered everything from embezzlements to burglaries to assaults.  More recently I transferred over into drug investigations.

Q.   And during the course of your time as a detective with Essex PD, did you have occasion to work on the investigation

1  into Brian Folks?

2  A.    Yes.

3  Q.    I would like to draw your attention to July 19, 2016.

4  Did you have an occasion to work on the arrest of Brian

5  Folks?

6  A.    Yes.

7  Q.    Could you please explain to the Court your involvement

8  on that day?

9  A.    During that course we decided that the investigating,

10  main investigating agency was DEA, and it was decided at

11  that time that Mr. Folks would be taken into custody.

12       I was not on the arrest team.  An arrest team

13  actually took him into physical custody.  I then came to

14  that location on Ethan Allen Parkway and I transported

15  Mr. Folks, at first to a parking lot in the immediate

16  vicinity, then we regrouped and then I headed back to Essex

17  Police Department.

18  Q.    And during the time that you drove Mr. Folks to Essex

19  PD, was there any questioning between you or him in the

20  vehicle?

21  A.    Not that I can remember.

22  Q.    Now, when you arrived at Essex PD tell us what happened

23  with respect to the interview of Brian Folks?

24  A.    Mr. Folks was brought into our detective interview.

25  It's a secured area in the Essex Police Department.  Myself,

Brian Villella, Max Galusha and an intern were present
during this interview.

Q.   And just to be clear, Brian Villella, what was his role
at that time?

A.   He's a special agent in charge of the Burlington office
at that time.

Q.   Of the DEA?

A.   Yes, sir.

Q.   And Max Galusha, what was his position at that time?

A.   He is a, was in the position of task force agent.

Q.   And who was he assigned to, generally?

A.   U.S. Marshals Office.

Q.   And so when Mr. Folks went into the detective interview
what happened?  Can you explain just generally how the
recording system works?

A.   Sure.  The recording system is always monitored by
video.  To initiate the audio you need to leave that room
and turn on a separate button, which is located inside the
detective offices.

Q.   And in this particular case, about five minutes into
the interview, what did you do?

A.   From there um, my recollection is I'd have to go on
what my consistent actions were.  I left the interview
initially briefly.  And I can be seen on video going around
the side where the button would be.

1    My belief that it's consistent that I want to make

2 sure that the audio was recording.  And that it seems

3 consistent with me leaving the room and then the audio

4 turning on.

5 Q.   And so the audio, that is not -- there is no audio for

6 the first five minutes of the interview, but after you exit

7 the interview room and then return the audio goes back on;

8 is that correct?

9 A.   Yes.

10    THE COURT:  It goes on for the first time?

11    THE WITNESS:  For the first time with respect to

12 this interview, yes.

13 BY MR. FISHMAN:

14 Q.   Now, I'm going to show you what's been previously

15 marked as Government's Exhibit 2.

16    MR. WILLIAMS:  Yeah, no problem.

17 BY MR. FISHMAN:

18 Q.   Would you identify that?

19 A.   This is a CD that contains the video file of the

20 interview at the Essex Police Department with Brian Folks.

21 Q.   And have you had a chance to review that disk with me

22 yesterday?

23 A.   Yes, I did.

24 Q.   And how do you know that that's the same disk?

25 A.   I initialed this with a, kind of pinkish color

1  yesterday and I put my initials and the date on it.

2     MR. FISHMAN:  Your Honor, we would move to

3  introduce Exhibit 2 into evidence at this time.

4     MR. WILLIAMS:  No objection.

5     THE COURT:  Admitted.

6     MR. FISHMAN:  Additionally, at this time, we would

7  move to introduce Government's Exhibit 3A, which is your

8  version of the transcript that has been previously filed as

9  an attachment in this case as document 128-1.  So we'd move

10 that into evidence at this time.

11    MR. WILLIAMS:  No objection.

12    THE COURT:  3A is admitted.  It's an addition to

13 the sheet to the exhibit list?

14    MR. FISHMAN:  Yes, Your Honor.  It was added late

15 last night.

16    THE COURT:  Got it.

17 BY MR. FISHMAN:

18 Q.   How did the interview with Brian Folks begin?

19 A.   The interview started off questioning by Brian

20 Villella.  He first gave an initial speech on how the

21 federal system worked in regards to Mr. Folks' current

22 situation in the investigation that occurred.

23    THE COURT:  I'm sorry, I missed the name.

24    THE WITNESS:  Brian Villella.

25    THE COURT:  Brian who?

1                THE WITNESS:  Villella.

2                THE COURT:  Got it.  And he's the DEA agent?

3                THE WITNESS:  Yeah.  At time he was a special

4      agent in charge.

5                THE COURT:  Thanks.

6      BY MR. FISHMAN:

7      Q.   And just to be clear, the person that you've spoken

8      about -- identified as Brian Folks, do you see him here in

9      the courtroom here today?

10     A.   Yes, I do.

11     Q.   Can you identify him?

12     A.   He's wearing a dark blue shirt with a gray undershirt.

13               MR. FISHMAN:  Let the record reflect that the

14     witness has identified the defendant.

15               THE COURT:  Yup.

16     BY MR. FISHMAN:

17     Q.   After Resident Agent in Charge Villella discussed the

18     possibility of cooperating, did there come a point when it

19     was discussed that before they could speak in detail about

20     the events there would need to be waivers signed?

21     A.   Yes.

22     Q.   And can you tell us what happened?

23     A.   After that speech, Mr. Folks waived those rights and

24     agreed to speak with us.

25     Q.   And if I could just draw your attention to page 12 of

the transcript, lines 15 to 18 --

MR. FISHMAN:  Your Honor, do you have a copy of this transcript?

THE COURT:  No.  You got an extra?

MR. FISHMAN:  Yes.

THE COURT:  Okay.  Thanks.

BY MR. FISHMAN:

Q.   And pointing your attention to page 12, lines 15 through 18, as Agent Villella was beginning to explain that they would need to read the statements, did there come a point where the defendant interjected with respect to the need to have a waiver signed?

A.   No, he did not interject.

Q.   You see on page, sorry, looking at page 15, line 15, do you see the part where RAC Villella says, before you do that, as you know, you've been arrested before.  And then Mr. Folks interjects, I have to sign some waivers and all that.

A.   Yes.

Q.   And shortly thereafter did the defendant read his own Miranda Rights aloud?

A.   Yes, he did.

Q.   And could you explain how that happened?

A.   Um, he read them out loud.  Um, and I was able to view that when I went over the video.

1    Q.    And I would just point your attention to page 15, lines

2    one to 11.  Did Mr. Folks acknowledge that he understood the

3    rights as he had just read them?

4    A.    Yes, he did.  He answered, of course, I do.

5    Q.    And did he suggest that he wished to speak with the

6    agents that were in the room?

7    A.    Yes.

8    Q.    And did there come a point where he signed a waiver

9    waiving his Miranda Rights?

10   A.    Yes, he did.

11   Q.    I'm going to show you what's been previously marked as

12   Exhibit 1.  And did, in fact, Mr. Folks sign a waiver of

13   rights with respect to Miranda?

14   A.    Yes.

15   Q.    Now, at any point during the course of the questioning

16   of Mr. Folks, did the defendant unequivocally state to you

17   that he wanted to assert his right to remain silent?

18   A.    No.

19   Q.    During the interview did the defendant suggest that

20   there were some questions that he would not answer while

21   there were other questions that he would answer?

22   A.    Yes.

23   Q.    I'd like to draw your attention to page 15, lines four

24   to six where RAC Villella says, are you willing to answer

25   some questions?  How did Mr. Folks respond to that?

1    A.    He said he would answer some of the questions maybe.

2    Q.    And as the interview continued, did Mr. Folks continue

3    to answer some questions, but not others?

4    A.    Yes.

5    Q.    At any point did he suggest that he wanted to remain

6    silent?

7    A.    No.

8    Q.    Now, I want to point your attention to page 41, line 25

9    through page 42 line two.  Was there a specific individual

10   that the agents wanted to ask Mr. Folks about?

11              THE COURT:  I'm sorry, which page are we on?

12              MR. FISHMAN:  Page 41, line 25, continuing to page

13   42, line two.

14              THE COURT:  Thank you.

15              THE WITNESS:  Yes.  This was the subject in

16   custody, I believe Victor.  He did not wish to speak about

17   him.

18   BY MR. FISHMAN:

19   Q.    But at no point during that point did he seek to end

20   the interview?

21   A.    No.

22   Q.    Only with respect to that specific question?

23   A.    Yes.

24   Q.    And pointing your attention to page 116, lines three

25   through four, was that another instance where the defendant

1  did not want to answer a specific question, but was willing

2  to continue?

3  A.    Yes.  It states, I'm not answering no questions about

4  that.

5  Q.    But the defendant continued to speak with you after

6  that?

7  A.    Yes.

8  Q.    At any point during any of these instances, where the

9  defendant didn't want to answer specific questions, did he

10  assert his right to remain silent with respect to the

11  entirety of the interview?

12  A.    No.

13  Q.    Now, at any point in the interview did the defendant

14  ever unequivocally state that he wished to have a lawyer

15  present during the questioning?

16  A.    No.

17  Q.    Were there contexts in which the defendant mentioned

18  lawyers?

19  A.    Yes.

20  Q.    And what were the contexts in which he mentioned

21  lawyers?

22  A.    In, what I recall is in regards to a cell phone that

23  Mr. Villella was asking about, Brian Folks said, you'd have

24  to get my lawyer for that.

25        In regards to cooperation and deals he again

mentioned having a lawyer.  At the end of the interview

Mr. Folks asked, when do I get my lawyer.

Q.   But at any point did he suggest, during this interview,

that he was unwilling to speak without a lawyer present?

A.   No.

Q.   And just to draw your attention to specific parts of

the transcript, if you could turn to page 56, lines 11

through 15.  Is this one of the mentions of the lawyer that

you spoke about?

A.   Yes.

Q.   If you could just read starting from page, from line

10?

A.   This is from Mr. Folks.  Okay.  That sounds great.  I

would love to help you out unfortunately the only way I will

be able to do that is through a lawyer.  I would have to

have a lawyer sit down and I will give him whatever

information he needs to give it all to you and we'll work it

out that way.

Q.   Did you understand that statement to mean that he was

unwilling to proceed further in discussions without a lawyer

present?  I'm sorry.  Let me rephrase the question.

     Did you understand that statement to mean that he

did not want to continue in the interview without a lawyer

present?

A.   No.

1   Q.    And if I could draw your attention to page 82, lines 12

2   through 13.  And this is in the context of Agent Villella

3   asking about consent to search Mr. Folks' phone.  Was that

4   one of the other mentions of a lawyer?

5   A.    Yes.

6   Q.    And what did he say in that context?

7   A.    You can get it from my lawyer.  He'll give it to you.

8   Q.    And did you understand that mention of a lawyer that

9   Mr. Folks no longer wanted to participate in the interview

10  and was asserting his right to counsel?

11  A.    No.

12  Q.    And also on page 83, lines 12 to 14, is that another,

13  sorry, let me correct that.  Line, the Court's indulgence.

14  83, lines 12 to 24, does he mention that he had a lawyer in

15  New York but that he would probably be getting an additional

16  attorney for this case?

17  A.    From that office, yes.

18  Q.    And did you understand his mention of a lawyer from New

19  York as an assertion of his desire to have counsel present

20  for the current interview?

21  A.    No.

22  Q.    Overall, how would you describe the tone of the

23  interview with Mr. Folks?

24  A.    The interview with Mr. Folks was a relaxed interview.

25  There were some points where there was more of a raised

1   voice.  But it seemed to be that Mr. Folks was willing to

2   give us some information about our investigation.  And then

3   an investigation I had in regards to an OD, an overdose

4   death, but unwilling to answer some questions and consent

5   for the phone.

6   Q.   At any point did any of the agents or officers in the

7   room threaten Mr. Folks in any way for his statement?

8   A.   No.

9   Q.   Is there anything that took place during that interview

10  that could be described as coercive in any way?

11  A.   No.

12  Q.   Did the defendant show any evidence that his will was

13  overborn about any of the discussions about possible

14  cooperation?  Specifically, I want to point your attention

15  to page 89, lines 17 to 19.

16          In that discussion, was he talking about whether

17  or not any of the discussions of cooperation had any affect

18  on him and his willingness to give incriminating evidence?

19  A.   From what I understand from this is that he wants it in

20  more concrete or in writing.

21  Q.   But in terms of his will being overborn by the

22  possibility of cooperation, did he give any indication that

23  the talk of cooperation was compelling him to give

24  statements against his will?

25  A.   No.

1           MR. FISHMAN:  Thank you, Detective May.  No

2   further questions at this time.

3           THE COURT:  Whose going to take the lead?

4           MR. WILLIAMS:  I've got it, Your Honor.  Thank

5   you.

6           I should have brought this up before, Your Honor,

7   but I was double scheduled.  I have a phone conference with

8   Orleans Superior Court at 11 o'clock if you could take that

9   into consideration?

10          THE COURT:  Yeah.  When we get to that point we'll

11  work with Mr. Nolan, make sure that we're doing something

12  that he's on top of.

13          MR. WILLIAMS:  Yes.

14          THE COURT:  Good.

15          MR. WILLIAMS:  I appreciate that.  Thank you.

16          CROSS EXAMINATION BY MR. WILLIAMS:

17  Q.   Good morning, detective.  How are you?

18  A.   Good morning.  How are you, sir?

19  Q.   I'm good.

20          Do you have a copy of the transcript?

21  A.   I have a copy of the transcript right here.

22  Q.   Okay.  So I want to work with you with that transcript

23  if that's okay?

24  A.   That's fine.

25  Q.   All right.  Now, you indicated that the audio wasn't

1  turned on in the room for five minutes?

2  A.    Yes.

3  Q.    Were you in the room when the audio was off?

4  A.    Yes.

5  Q.    What was said?

6  A.    I, I don't remember.

7        THE COURT:  Don't look at me.  I wasn't there.

8        MR. WILLIAMS:  I know.

9  BY MR. WILLIAMS:

10  Q.    Who else was in the room?

11  A.    Brian Villella, Max Galusha and an intern.

12  Q.    And you don't remember anything that happened in that

13  five minutes when the audio was not on?

14  A.    No.

15        MR. WILLIAMS:  Your Honor, it's critical.  I mean,

16  we have a transcript and we have a video and we have an

17  audio of everything but the first five minutes.  And now

18  this witness is telling us he doesn't remember a thing about

19  what happened.

20        I think perhaps a phone-call could be made to one

21  of these other witnesses to get here today to let you know,

22  more importantly, what happened in that first five minutes.

23  I don't know, he doesn't know.

24        THE COURT:  Do I understand the government's

25  position correctly that you aren't going to offer any

1    statements made prior to the time when Mr. Folks read the

2    Miranda Warning aloud?

3           MR. FISHMAN:  Yes, Your Honor.

4           THE COURT:  So that's the beginning of our story.

5    And even, even if he confessed to a crime it's, it's not

6    coming in.  And I think it's off the table, right?

7           MR. WILLIAMS:  Well, no, because he could have

8    said something in there unequivocally, I don't want to talk.

9    And then they start this discussion, as you heard, about

10   cooperation, et cetera.

11         THE COURT:  Right.

12         MR. WILLIAMS:  That's the point.  I mean, there

13   is, as you'll see, 12 pages of transcripts where questions

14   were being asked of my client, and I'll go through those in

15   a minute, before he was advised of his rights, before we ask

16   specific questions.  And the rule under Miranda is not, I'll

17   read you your rights when I start asking specific questions

18   about what you may have been up to, but it's any questions.

19   And I really think it's critical that we know what, what

20   happened and what was said in that first five minutes.

21        THE COURT:  Well, here's how I see it.  You have

22   the right to call witnesses here as well.  It comes after

23   the government's turn.  If there's something to this, and

24   you have some kind of proffer that his will was overborn or

25   that he refused to speak with the investigators, we'll give

1    a chance to prove it.

2             MR. WILLIAMS:  Okay.  That's fine.  Thank you.

3    BY MR. WILLIAMS:

4    Q.   So, detective, can you turn to page five of the

5    transcript?  Were you in the room when Agent Villella was

6    discussing a third way you can help yourself?

7    A.   Yes.

8    Q.   Okay.  So let's talk about that.

9             Agent Villella talks about several different ways

10   that Mr. Folks could help himself.  The first one is called

11   a Rule 35 motion.  Did you hear that comment on page 3?

12   A.   Yes.

13   Q.   Okay.  So Agent Villella tells Mr. Folks, there's three

14   ways to cooperate.  Rule 35 is one of them.  Do you know

15   what Rule 35 is?

16   A.   No, I don't.

17   Q.   Okay.  So then there's a second way he can help himself

18   and that's called a safety valve debriefing.  Do you see

19   that at the top of page four?

20   A.   Yes.

21   Q.   Do you know what that is?

22   A.   No.

23   Q.   And then Agent Villella talks about a third way that

24   you can help yourself, and this is the most important way,

25   because this is today, all right.  Do you see that?

A.    Yes.

Q.    And this is the section where Agent Villella tells

Mr. Folks that you can help yourself by cooperating with us?

A.    Yes.

Q.    Right?  You remember that?

A.    Yes.

Q.    And then there's a long discussion about what it means

to cooperate.  You said that Agent Villella told Mr. Folks

how the federal system worked when you were on direct,

right?

A.    Yes.

Q.    And then he says, and if you're truthful, if you can

order up a kilo from New York City, or where ever you're

getting your heroin, and you can put it together, then maybe

we can do that.  But it all starts with you telling me the

truth, okay?  Because I've got to trust you.  Do you see

that?

A.    Yes.

Q.    So that's a discussion specifically about cooperation?

A.    Yes.

Q.    All right.  Whether Mr. Folks is going to agree to

cooperate with you and the other agents in the investigation

that you had undertaken that led to his arrest?

A.    Yes.

Q.    All right.  Now, can you turn to page six?  Line 18,

this is where the questioning begins, generally, the general questions.

I mean, are you really going to sit there and tell me you weren't trafficking heroin or selling heroin, question mark.  Do you see that?

A.    Yes.

Q.    That's a question directed to Mr. Folks, right?

A.    Yes, that is a question.

Q.    It wasn't directed to you or anybody else in the room?

A.    No, it wasn't.

Q.    Had Mr. Folks, when he was asked that question, been advised of his right to remain silent, his right to a lawyer, et cetera, et cetera?

A.    No.

Q.    All right.  Then he continues.  Whether it was through this guy or through other guys or directly yourself, I mean, are you going to sit there and tell me that?  That's another question, right?

A.    Yes.

Q.    And he hadn't been advised of his Miranda Rights?

A.    No.

Q.    Then there's a question -- Mr. Folks says to him, from what I know about trafficking, I mean, you keep using this charge trafficking.  From what I know and understand about trafficking, no, I haven't.  Right?  I haven't been involved

1  in drug trafficking.  Right?

2  A.    That's correct.

3  Q.    That's an answer that Mr. Folks gave to you folks, to

4  you people in the room in response to the question he had

5  been asked about whether he was going to tell them about

6  drug trafficking.  Right?

7  A.    Yes.

8  Q.    And he hadn't been read Miranda by that point?

9  A.    Yes.

10  Q.    So there's a discussion about the very accusations that

11  led to his arrest and answers by my client to those

12  questions before he was read Miranda?  There's no doubt

13  about that, right?

14  A.    No doubt, sir.

15  Q.    Then there's more questions about, I'm talking about

16  you selling heroin on the streets of Winooski and Burlington

17  and that's it.  That's what I'm talking about.  Right?  So

18  there's more discussion about the very accusation that led

19  to his arrest, right?

20  A.    Yes.  And for further on, the questions you ask me if

21  you could just cite the line because sometimes you're

22  skipping and I'm on --

23  Q.    I apologize.  I don't mean to confuse you.

24  A.    No problem, sir.

25  Q.    That would be page seven, line 16 through 20.

1    A.    Yes.

2    Q.    Then there's discussions about -- from Mr. Folks

3    discussing -- and you say you've seized drugs from me

4    personally, question mark.  And Mr. Folks -- the answer, it

5    says Mr. Folks, but I believe this is one of the

6    investigators, we seized drugs that you have sold to people,

7    yes?  Right?  So there's more discussion about the very

8    accusation that led to his arrest?

9    A.    Yes.

10   Q.    And then Mr., Mr. Folks says something about -- there's

11   a discussion about what may have happened.  And Mr. Folks

12   says, the information that you have may be corrupted.

13   That's information that led to his arrest, right?  On page

14   eight, line 21, 22?

15   A.    Yes.

16   Q.    And Agent Villella says, what do you mean by,

17   corrupted?  That's a question?

18   A.    It is a question.

19   Q.    And he hadn't been read Miranda yet by this point?

20   A.    No, he had not.

21   Q.    Then Agent Galusha chimes in on page nine, line 10 when

22   Mr. Folks says, and whoever is giving you that information

23   they are fucking it up bad.  Agent Galusha says, that's for

24   you to fix right now.  And he says it several different

25   times, right?

1  A.   Yes.

2  Q.   Then he asks a question on line 16, I'm saying, if

3  you're saying it's wrong what is it?  You know what I'm

4  saying?  Tell me what it is.  Right?  Do you see that on

5  page 9, line 16 through 20?

6  A.   Yes.  Line 19 he says that comment.

7  Q.   Right.  So now we've been discussing questioning that's

8  gone on for seven, eight, nine pages of the transcript.  And

9  then on page 11 you jump into the, to the discussion.  Do

10 you see that on line 22, 23?

11 A.   Yes.

12 Q.   Mr. Folks is talking about your investigation.  And you

13 indicate to him that we're all kind of working together, all

14 the agents are working together.  Right?

15 A.   Yes.

16 Q.   Now, it's not until the next page that Agent Villella

17 says at line 19, I mean, all this is your, it's just, it's

18 just advisement of rights.  We're required to do it before

19 we ask you specific questions.  Right?

20 A.   Yes.

21 Q.   But you know that's not the law?  You know that you

22 can't question a suspect about anything until you've advised

23 them of their rights, correct?

24 A.   I mean, before questioning, I mean, for it to hold up

25 in court.  And then in regards to specific questions, I

1    guess there could be some discussion on what an actual

2    specific question is versus a general question.

3    Q.    You've just -- we've just spent the last few minutes

4    talking about very specific questions about the very

5    conduct, the alleged conduct that led to Mr. Folks' arrest,

6    right?

7    A.    I mean, they are general questions in the scheme of our

8    investigation.

9    Q.    So you are allowed to ask general questions, that's

10   your understanding of Miranda?

11   A.    I mean, then those answers might not be withheld for

12   trial.

13   Q.    Oh, so you know that if you ask general questions

14   before Miranda that they may be withheld from trial, so you

15   guys were making a what, a strategic decision to get him to

16   talk about the investigation generally so that you could ask

17   something specific, right?  That was your -- that was your

18   tactic that day?

19   A.    We hadn't discussed a tactic.  I mean, the general work

20   in drug investigations is to explain to the defendant, you

21   know, that you'd wish for their cooperation so you can

22   further go forward with your investigation to find, you

23   know, the source of supply of the drugs.

24   Q.    Right.  All right.  So let's talk about that.  Page,

25   page 53 to 56, this question of cooperation came up, right?

1    Mr. Galusha said on page 53, line 12, because it's

2 so we can bring everything to the prosecutor.  Right?  You

3 don't see no -- there ain't -- you don't see no attorney out

4 there, out here now because they are playing golf.  Right?

5 A.   He said that.

6 Q.   Yeah.  So that was the beginning of the discussion

7 about cooperation, right?  That was a discussion about

8 cooperation?

9 A.   I wouldn't say it was the beginning of the discussion

10 about cooperation.

11 Q.   Well then, on page 56, while you're discussing

12 cooperation and what he would need to do to help himself,

13 right?  That's the idea of cooperation, correct?

14 A.   Yes.

15 Q.   That was the third way that Agent Villella had talked

16 about at the beginning of the interview.  You remember that?

17 A.   Wait.  I recall the methods in which he can cooperate,

18 but is it in regards to each method?  As I told you before,

19 I don't know those specifics.

20 Q.   Well, let's go back to page five, line five.  The third

21 way that you can help yourself, and this is the most

22 important way, because this is today.  That's cooperation,

23 the third way, right?

24 A.   Yes.

25 Q.   Mr. Folks says on page 56 when he's being asked to help

out, to cooperate, line 10, okay, that sounds great.  I

would love to help you out.  Unfortunately, the only way I

will do -- I will be able to do that is through a lawyer.

You see that?

A.    Yes.

Q.    Is there any other way to interpret that than he was

going to cooperate with the investigation through a lawyer?

            THE COURT:  What page are we on?

            MR. WILLIAMS:  Page 56, line 10 through 12, Your

Honor.

            THE WITNESS:  Really this is in regard to him

making the deal is that he'd like a lawyer um, to hash that

out.

BY MR. WILLIAMS:

Q.    But it didn't stop there.  The questioning continued

about cooperation because a few lines later Agent Villella

says, you know what you know today isn't necessarily going

to be true tomorrow.  And so by the time you gone by that

route, that route meaning lawyer, people like me, whatever

you can do for me is going to be old and it's probably not

going to be worth.  You see that?

A.    Yes.

Q.    In other words, after Mr. Folks told you investigators

that he was going to cooperate, but he was going to do it

through people like me, defense lawyers, the discussion

1  continued?  You would agree with me?

2  A.    Yes.

3  Q.    And, in fact, Agent Galusha, just to make sure

4  Mr. Folks got the message, you'll see on page 57, line 21,

5  but I'm saying you know what an attorney is going to tell

6  you as soon as you talk to an attorney.

7  A.    Yes.

8  Q.    They are going to -- they are going to say, forget step

9  three that he explained to you.  Right?

10  A.    I mean, that's an interpretation of what -- I mean, I

11  can't speak for what Max Galusha said.

12  Q.    You're in the room and you know what step three is.

13  Step three is cooperation, right?

14  A.    As I said earlier, I'm not familiar with those steps of

15  cooperation, only initially from what we've spoken about.

16  Q.    And then Mr. Folks says, if you want me to cooperate

17  talk to a lawyer, I want to talk to my lawyer, I'll do it

18  through him, I'll be happy to.  Right?

19  A.    Yes.

20  Q.    And then Galusha says, hey, forget about that because a

21  lawyer's going to tell you to forget step three.  Right?

22  A.    He said, what I'm saying you know what an attorney is

23  going to tell you as you talk to an attorney.

24  Q.    Yeah.  Line 25, they are going to say, forget step

25  three that he explained to you?

1    A.    Yes.

2    Q.    And then he continues.  Galusha says, I'm telling you

3    I'm being straight.  I got no reason to bullshit you.  You

4    know what I mean.  I'm just telling you that that's what an

5    attorney is going to say.  An attorney is going to say let's

6    worry about a guilty plea then we'll talk about it.  You

7    know what I mean?  Right?

8    A.    He said that, yes.

9    Q.    And then the questioning continued in an effort to

10   obtain Mr. Folks' cooperation and then there's another three

11   pages of discussion?

12   A.    Yes.

13            MR. WILLIAMS:  Thank you.

14            THE COURT:  Anything further?

15            FURTHER EXAMINATION BY MR. FISHMAN:

16   Q.    Just briefly.  Your testimony about the first five

17   minutes of unrecorded conduct, do you recall anything

18   different happening than what happened in the subsequent

19   recorded moments with audio?

20   A.    No.

21   Q.    Do you recall any threats that took place during that

22   first five minutes?

23   A.    No.

24   Q.    Do you recall the defendant making any unequivocal

25   statement that he wished to remain silent?

A.    No.

Q.    Do you recall the defendant making any statement that he wouldn't speak without an attorney?

A.    No.

Q.    Based on your review of the video, and the subsequent parts, was there anything inconsistent in that five minutes that you recall from what happened in the subsequent audio recorded portion of the video?

A.    No.

         MR. FISHMAN:  And, Your Honor, my understanding is I hadn't previously moved in the Miranda Waiver, which is Exhibit 1.  We'd move that in at this time.

         MR. WILLIAMS:  No objection, Judge.

         THE COURT:  Admitted.

         MR. FISHMAN:  Nothing further.

         MR. WILLIAMS:  Nothing further, Your Honor.  Thank you.

         THE COURT:  All right.  Detective May, thanks for coming in.  I appreciate it.

         THE WITNESS:  Thank you, Your Honor.

         THE COURT:  Anything more from the government on this motion?

         MR. FISHMAN:  In terms of witnesses?

         THE COURT:  Yes.

         MR. FISHMAN:  No, Your Honor.

1        MR. WILLIAMS:  Nothing further, Your Honor.  I

2    have to talk to my client, but I think we're okay.

3        THE COURT:  Okay.  Do you think you need another

4    hearing or no?

5        MR. WILLIAMS:  No.  If there's additional evidence

6    we'll hear it today, about the first five minutes only.

7    That's the only --

8        THE COURT:  All right.  So we'll hold docket 128

9    open so that you get a chance to speak over the break.

10        And why don't we take up the next one.  Which,

11    Mr. Fishman, what would you like to take up next?

12        MS. SAVNER:  Motion 133, the Winooski car stop.

13        THE COURT:  Got it.

14        MS. SAVNER:  The government calls Kyle

15    Brouillette.

16        K Y L E   B R O U I L L E T T E,  The Witness,

17    after being sworn, was examined and testified as follows:

18        THE COURT:  Good morning.  Thanks for making the

19    trip down.

20        THE WITNESS:  Thank you, Your Honor.

21        DIRECT EXAMINATION BY MS. SAVNER:

22    Q.   Good morning, Officer Brouillette.

23    A.   Good morning.

24    Q.   Can you tell us where you work?

25    A.   I currently am employed by the Burlington Police

1  Department.

2  Q.    And what position do you hold there?

3  A.    I'm a police officer.

4  Q.    How long have you been with Burlington PD?

5  A.    Um, almost two years.

6  Q.    What did you do prior to that?

7  A.    Prior to that, I was a police officer with the city of

8  Winooski.

9  Q.    How long did you hold that position?

10  A.    About a year and a half.

11  Q.    Were you a police officer with Winooski PD as of

12  January 20th of 2016?

13  A.    Yes, I was.

14  Q.    What were your responsibilities or what was your

15  assignment as a police officer with Winooski?

16  A.    I was assigned to patrol as a patrol officer.  My

17  responsibilities included responding to calls for service,

18  investigating violations of motor vehicle law or motor

19  vehicle statutes, as well as criminal statutes and enforcing

20  those if violations were discovered.

21  Q.    Did you work in law enforcement prior to your time with

22  Winooski PD?

23  A.    Yes, I did.

24  Q.    Where did you work?

25  A.    I worked for South Burlington Police Department.

```
 1   Q.    How long did you work for South Burlington?

 2   A.    About three years.

 3   Q.    And what was your position there?

 4   A.    Police officer, uniform patrol.

 5   Q.    What did you do before becoming a police officer?

 6   A.    Before that I was in the United States Army.

 7   Q.    How long did you serve?

 8   A.    About four years.

 9   Q.    And what was the highest rank you achieved in the Army?

10   A.    I was a sergeant.

11   Q.    What's your highest level of education?

12   A.    I have a degree in criminal justice from Champlain.

13   Q.    An Associate's Degree?

14   A.    That's correct.

15   Q.    Bachelor's?  Associate's.

16         Have you done specialized training, in your time

17   in law enforcement, related to how to conduct a traffic

18   stop?

19   A.    Yes, I have.

20   Q.    Can you describe that briefly?

21   A.    Yup.  In addition to the generalized training we

22   received at the police academy I went through a three day

23   specialized training course that was put on by Desert Snow

24   pertaining specifically to conducting motor vehicle stops,

25   surrounding criminal interdiction and drug interdiction.
```

1   Q.   Was that prior to January 20, 2016?

2   A.   Yes, it was.

3   Q.   How about dealing with confidential informants or

4   sources of information?  Have you had specific training with

5   respect to those duties?

6   A.   Yes, I have.

7   Q.   Can you describe that, generally?

8   A.   I went through a two day training course.  It was a

9   street crimes training that dealt with recruitment and

10  handling of SOI's or confidential informants.

11  Q.   What are SOI's?

12  A.   Sources of information.

13  Q.   And was that prior to January 20, 2016?

14  A.   Yes, it was.

15  Q.   And how about narcotics investigations, do you have any

16  specialized training with respect to those?

17  A.   Yes, I do.

18  Q.   Can you explain that?

19  A.   I went through a four day training course on general

20  narcotics investigations.  They focused on parcel

21  interdiction as well as conducting surveillance in general

22  investigation pertaining to structures, hotels, motels,

23  residences, that sort of thing.

24  Q.   And was that training also prior to January 20, 2016?

25  A.   Yes, it was.

1    Q.    I would like to draw your attention to work in the

2    field that you've done.  Prior to January 20, 2016, had you

3    personally handled narcotics investigations?

4    A.    Yes, I did.

5    Q.    Can you describe that work?

6    A.    I took a proactive approach um, to narcotics

7    investigations.  I like to initiate my own investigations

8    based off information that I had received.  I had conducted

9    traffic stops, other various investigations, which resulted

10    in the seizure of narcotics and criminal charges being

11    filed.

12    Q.    And in those investigations, did you work with sources

13    of information or confidential informants before?

14    A.    Sometimes, yes.

15    Q.    About how many sources of information or confidential

16    informants would you say you've worked with?

17    A.    Um, several.  I can't put a specific number on it.

18    Q.    Now, I'd like to turn your attention to January 20,

19    2016.

20            Were you working that day?

21    A.    Yes, I was.

22    Q.    What shift were on, if you remember?

23    A.    I believe I was on the evening shift.

24    Q.    And at that time were you working with a partner?

25    A.    No, I was not.

1  Q.    Did you have occasion to make a traffic stop on

2  January 20, 2016 that led to the seizure of narcotics?

3  A.    I did.

4  Q.    What led you to make that traffic stop?

5  A.    I received information, at some point during my shift,

6  that a large quantity of narcotics would be transported from

7  a specific location in Burlington to another location within

8  Burlington.

9  Q.    Who did you receive that information from?

10 A.    I received it from an SOI.

11 Q.    And what was her name?

12 A.    Mary Robenstein.

13 Q.    Had you worked with Miss Robenstein before?

14 A.    Yes, I had.

15 Q.    In what capacity?

16 A.    A similar capacity.  SOI.

17 Q.    Do you have an estimate of how many times Miss

18 Robenstein had provided information to you?

19 A.    Um, I don't have an estimate, no.

20 Q.    More than once before?

21 A.    Yes.

22 Q.    And in previous instances of working with

23 Miss Robenstein in this, in the role as an SOI, had the

24 information she provided been actionable?

25 A.    Yes.

1  Q.    Had it led to seizures or arrests?

2  A.    Yes.

3  Q.    What type of criminal activity did Miss Robenstein

4  normally provide information on to you?

5  A.    Most often it was narcotic related.

6  Q.    So you said on the day of January 20th you received

7  some information from Miss Robenstein.

8        Can you tell us what specifically she told you, to

9  the best of your memory?

10 A.    Yes.  Again, to the best of my recollection, it was

11 that she was asked to provide transport to an individual who

12 she referred to as Moe from a location up on North Ave. to

13 another location within Burlington.

14       I believe she said somewhere's around North Union

15 or Loomis Street.  And in addition to that, that Moe would

16 be traveling with a large quantity of narcotics.

17 Q.    I would like to break that down.  Did you know who Moe

18 was?

19 A.    I knew Moe to be the street name for Brian Folks.

20 Q.    And how did you know that?

21 A.    From prior law enforcement investigations.

22 Q.    Had you personally ever been involved in any law

23 enforcement investigation involving Brian Folks?

24 A.    Prior to that date, no.

25 Q.    So how did you become familiar with him as a, as a

1  subject of law enforcement investigation?

2  A.   I was aware that there was an active investigation into

3  sale of narcotics involving Brian Folks that was being

4  conducted by the DEA.

5  Q.   So you never --

6        THE COURT:  You knew this before the day of the

7  stop?

8        THE WITNESS:  Yes, Your Honor.

9        THE COURT:  This is sort of background info?

10       THE WITNESS:  Yes, Your Honor.

11 BY MS. SAVNER:

12 Q.   Just to be clear, you had never personally stopped or

13 arrested Brian Folks previously?

14 A.   That's correct.

15 Q.   Miss Robenstein told you that she would be transporting

16 Mr. Folks between two locations in Burlington from North

17 Ave. to an area around Loomis Street or North Union Street;

18 is that correct?

19 A.   To the best of my recollection, yes.

20 Q.   And did she provide, at that time, addresses for the

21 origin or destination?

22 A.   She did not provide numerical addresses, no.

23 Q.   Did she tell you what sort of vehicle that they would

24 be driving in?

25 A.   She had told me that she would be driving her vehicle.

1   Q.    And did you know or did you learn what that was?

2   A.    I knew her vehicle to be a white Mercedes.

3   Q.    How did you know that?

4   A.    Prior involvements, basic background information of an

5   SOI that I acquire prior to working with that person.

6   Q.    What sorts of things do you do to get yourself familiar

7   with an SOI when you begin working with them?

8   A.    I generally will conduct a background check, criminal

9   history check, things of that nature, to familiarize

10  ourself.  We'll also conduct a personal interview with the

11  individual.

12  Q.    And did anything that you researched regarding

13  Miss Robenstein give you cause to question her voracity in

14  general?

15  A.    No.

16  Q.    Did Miss Robenstein give you any information about what

17  was at the destination you would be traveling to?

18  A.    She had believed that it was a flop house or a location

19  where narcotics were either going to be stored or sold from.

20  Q.    You also said that Miss Robenstein told you that Moe

21  would be traveling with narcotics.

22          Did she give you any specifics about what type of

23  narcotics he would be carrying?

24  A.    She told me she believed it would be up and down.

25  Q.    And what did you understand that to mean?

A.    I understood the street name of up and down to be
referred to as crack cocaine for up and heroin for down.
Q.    What did you understand Miss Robenstein's source of
information to be about this intended travel?
A.    Um, from what I recall, I believe it was either
firsthand from Moe himself, or from somebody in the close
inner circle.
Q.    When you're working with sources of information, like
Miss Robenstein, what steps do you take to protect their
identities?
A.    Um, generally our concern is protecting their name.  We
generally will not refer to them by name unless forced to do
so in a setting such as this.  We'll refer to them as SOI
and by the pronoun, it.

        We take steps, especially if we are conducting an
investigation with them in a similar nature to this, so as
not to reveal that we know each other or that they are
actively cooperating with law enforcement.
Q.    You said when you discuss them you refer to them as SOI
and it.  Where are you talking about?  In what context would
you do that?
A.    In a general police report or in an affidavit.
Q.    What are your concerns if an SOI's identity is
revealed?
A.    Depending on the nature of what sort of or crime that

they are involved in um, it could be up to including their

death.  I mean, these crimes are very serious in nature at

times.  And my concern would be their safety.

Q.   What concerns did you have in this specific context

with regard to Miss Robenstein and Mr. Folks?

A.   I was aware that Mr. Folks had a violent background.

Q.   So fair to say then you were concerned for Miss

Robenstein's safety if her identity were to become known?

A.   Yes, it is.

Q.   What did you do with the information that you got from

Miss Robenstein?

A.   At that point I contacted Detective Nease with the

Winooski Police Department.  I shared the information with

him.  As I was aware that there was an active investigation,

federal investigation ongoing, we reached out -- I believe

it was Detective Nease who reached out to DEA to sort of

coordinate and see if we were going to be able to act on

this information.

Q.   And what did you learn from Detective Nease having

those conversations?

A.   He then reported back to me that we had been given the

go ahead to go forward with our operation.

Q.   And was DEA going to be involved directly in the

operation?

A.   No, they were not.

1   Q.   So explain for me the plan, the interception plan that

2   you developed?

3   A.   Um, so the plan was to -- we discussed Miss Robenstein

4   and I discussed a route that she would, that she believed

5   she would be taking.  And then with Detective Nease we

6   discussed that he would attempt to intercept her vehicle at

7   some point along that route and maintain observation of that

8   vehicle as it traveled to a predetermined location where I

9   was going to be sitting.

10   Q.   And how did you know when she would be leaving the

11   house on North Ave. with Mr. Folks?

12   A.   It was established that she would contact me.

13   Q.   And did she, in fact, do so?

14   A.   Yes, she did.

15   Q.   Do you remember about what time that was?

16   A.   Prior to when the stop took place, just prior.

17   Q.   Okay.

18         THE COURT:  So she sent you a text or something

19   like that?

20         THE WITNESS:  I don't recall if it was a text or a

21   phone-call, Your Honor.  But it was some sort of electronic

22   communication.

23         THE COURT:  Okay.

24   BY MS. SAVNER:

25   Q.   You mentioned that you had worked out with her a route

1    she was going to take.  Would it help to describe that route

2    if you had a map in front of you?

3    A.   Yes, it would.

4         MS. SAVNER:  If Your Honor would like, we can mark

5    this as Exhibit, I believe, 22 for identification.  May I

6    approach?

7         THE COURT:  Yes, please.

8    BY MS. SAVNER:

9    Q.   Do you have a pen?

10   A.   I do not.

11   Q.   Okay.

12   A.   Thank you.

13   Q.   Do you recognize this area?

14   A.   Yes, I do.

15   Q.   So describe for me, if you will, and can you mark on

16   the map with a line, the route that you discussed with

17   Miss Robenstein that she would take?

18        THE COURT:  You want to throw it on the Elmo?

19   I'll look too.

20        MS. SAVNER:  Yeah, if I can have him mark it and

21   then I can put it up or --

22        THE COURT:  Yeah, of course.

23        THE WITNESS:  The route that we discussed was that

24   she would come down the Beltline, otherwise known as Route

25   27 in Burlington.  And that she would come over and connect

onto Manhattan Drive and then at some point there make her

way down to Loomis, North Union Street where she believed

that she was going to be heading.

BY MS. SAVNER:

Q.    And can you just draw a line along that route?

A.    Absolutely.  (So indicated)

Q.    You mentioned that Detective Nease followed her along

that route; is that correct?

A.    Yes.

Q.    Okay.  How did you know that Detective Nease had

spotted the car and was following her?

A.    We were in cell phone communication during that time.

Q.    Okay.  Where were you parked?

A.    I was parked at the intersection of Manhattan Drive and

Spring Street in a parking lot.

Q.    Can you put an X. on the map where you were worked?

A.    Absolutely.  (So indicated)

Q.    And at some point did you see the white Mercedes

driving past that point as expected?

A.    Yes, I did.

Q.    Okay.  What did you see?

A.    I observed, as the white Mercedes approached the

intersection of Manhattan Drive and Spring Street, which is

the intersection that I was observing, there was a stop

sign.  The Mercedes stopped at the stop sign and made a

1    right-hand turn without signaling.

2    Q.   What did you do next?

3    A.   I recognized that to be a violation of a motor vehicle

4    statute in Vermont so I effected a traffic stop for that

5    violation.

6    Q.   Where did you pull the Mercedes over?

7         THE COURT:  I'm sorry, I missed what you said.

8    What was the motor vehicle violation?

9         THE WITNESS:  Signals requirement, Your Honor.

10   Failure to signal

11   BY MS. SAVNER:

12   Q.   And turning on to what street did Miss Robenstein fail

13   to signal?

14   A.   It was turning from Manhattan Drive onto Spring Street.

15   Q.   What did you do when you noticed the traffic violation?

16   A.   I pulled out of the parking lot that I was in, pulled

17   behind the vehicle, and effected my -- the traffic stop by

18   activating my emergency lights.

19   Q.   Where did you stop the car?

20   A.   I believe it was by Archibald and Walnut Street.

21   Q.   Can you put two X's at that location?

22   A.   Absolutely.  (So indicated)

23   Q.   Thank you.

24   A.   Here's the X. where I was.  And here's the two X.'s.

25   Q.   So can you just mark for me, if you can, where the

1  intended destination was?

2  A.   (So indicated)

3  Q.   Can you circle that?   Thank you.   And I will put an

4  exhibit sticker on this.

5          Did you have a plan to stop the car if you didn't

6  happen to see a motor vehicle violation?

7  A.   Yes, I did.

8  Q.   What was that plan?

9  A.   I knew that the registration tags on the vehicle did

10  not match the registration certificate that was assigned to

11  the vehicle.

12  Q.   And did you know that to be a violation of Vermont law?

13  A.   Yes, it is.   The violation is PNA or plates not

14  assigned to the vehicle.

15          THE COURT:   You knew this because you had stopped

16  her before?

17          THE WITNESS:   No, Your Honor.   Like I said, I was

18  familiar with her vehicle from the interview portion of the

19  SOI.

20          THE COURT:   Okay.

21  BY MS. SAVNER:

22  Q.   Were you wearing a body worn camera that day?

23  A.   Yes, I was.

24  Q.   Did you activate it at any point?

25  A.   Yes, I did.

1  Q.   And since the stop have you had a chance to view the
2  video that you recorded?
3  A.   Yes, I have.
4  Q.   I am approaching with what's been marked as
5  Government's Exhibit 4.  Do you recognize this?
6  A.   Yes, I do.
7  Q.   What is it?
8  A.   It's the video of my body worn camera.
9  Q.   How do you know?
10 A.   Because I initialed and dated the CD after watching it.
11 Q.   Okay.  And did you have a chance to watch the videos on
12 this disk?
13 A.   Yes, I did.
14 Q.   And did you compare them to the videos in the U.S.
15 Attorney's Office file of this same event?
16 A.   Yes, I did.
17 Q.   And were the videos that you saw true and accurate
18 copies of the body camera footage that you took on
19 January 20, 2016?
20 A.   As best I could tell they were.
21       MS. SAVNER:  At this time the government moves to
22 admit Government's Exhibit 4.
23       MR. NOALN:  No objection, Your Honor.
24       THE COURT:  Admitted.
25 BY MS. SAVNER:

1    Q.    How many files make up that body worn camera footage

2    from that traffic stop?

3    A.    I believe it's two separate files.

4    Q.    And do you know why that is?

5    A.    I don't.

6    Q.    Okay.  Did you have a chance to view the end of the

7    first one and the beginning of the second one?

8    A.    Yes, I did.

9    Q.    And based on your memory of the stop, how much time

10   elapsed between when the first video ended and the second

11   video started?

12   A.    It seemed as if it was instantaneous.

13   Q.    Thank you.  I would like to play from Government's

14   Exhibit 4 starting at the beginning.

15              So in this initial portion there's no sound.  Can

16   you explain why that is?

17   A.    Yes.  We have the -- from my knowledge the way our

18   cameras work, they are continuously recording in what they

19   call a buffer mode.  When you activate the camera by pushing

20   the event button it begins recording 30 seconds prior to

21   when the activation was started except that 30 seconds --

22              (Video playing and stopped)

23   Q.    Keep going.  I'm sorry.

24   A.    -- that 30 seconds is without sound.  The sound then

25   picks up at the time of the activation.

1    Q.    And you could see that you were using the radio in that

2    30 seconds where we couldn't hear any sound.  Do you

3    remember what you were doing?

4    A.    I believe at that point I was calling out the stop

5    location and the vehicle registration and the, essentially

6    what I was doing.

7    Q.    Calling it out to whom?

8    A.    To dispatch in Winooski.

9    Q.    You can keep playing.

10          (Video playing then stopped)

11    Q.    What type of car was this?

12    A.    It appears to be a white Mercedes.

13          (Video playing then stopped)

14    Q.    Can you describe who was in the car?

15    A.    Yes.  There were two females in the front seat and then

16    a female and a male in the rear seat.

17    Q.    And did you recognize the driver of the car?

18    A.    Yes, I did.

19    Q.    Who did you recognize her to be?

20    A.    Mary Robenstein.

21    Q.    Had you met her before?

22    A.    Yes, I had.

23    Q.    And you said that there was a male sitting in the back

24    seat?

25    A.    Yes.

1   Q.   Was he on the left side of the vehicle or the right

2   side?  The driver's side or the passenger side?

3   A.   It was the rear passenger side of the vehicle.

4   Q.   And can you describe the male?

5   A.   Yes.  It was a male that I had recognized um, who I had

6   seen before in photographs to be Brian Folks.

7   Q.   And do you see that person in the courtroom here today?

8   A.   Yes, I do.

9   Q.   Can you describe him by an article of clothing he's

10   wearing?

11   A.   Um, he's wearing a dark gray shirt with a gray

12   undershirt.

13         MS. SAVNER:  May the record reflect that the

14   officer's identified the defendant?

15         THE COURT:  Yes.

16         MS. SAVNER:  Can you keep playing?

17         (Video playing then stopped)

18   Q.   Why did you ask her to come back to your cruiser?

19   A.   It's something that I do on my stops when there's more

20   than one person in the car.  It's more of a privacy feature.

21   The violation that occurred is between me and the operator.

22   And I like to give them the opportunity to have privacy

23   while we discuss that.

24   Q.   Okay.

25         THE COURT:  She was expecting you to stop her

1    because that's why she had given you the tip, right?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Yeah.  Okay.

4              (Video playing then stopped)

5    Q.   Can you jump ahead to four minutes and 40 seconds?

6              (Video playing and stopped)

7    Q.   So in the interaction with Miss Robenstein you made no

8    reference to the fact that she had provided you a tip

9    before, right?

10   A.   That's correct.

11   Q.   And why, why did you do that?

12   A.   It's one of the things to protect her anonymity.  I

13   chose to treat this as what we call a cold stop as opposed

14   to a stop where I'm going to make it known that there's a

15   source of information in the vehicle.

16             THE COURT:  You do that sometimes as well?

17             THE WITNESS:  Yes, Your Honor.  As a way to

18   protect anonymity we'll treat it as a cold stop, just a cold

19   interdiction stop and we go based on the information that we

20   have beforehand, as well as information that we gather

21   during the real stop.

22             THE COURT:  Yeah, I got that, but then you do it

23   the opposite way as well?

24             THE WITNESS:  When certain situations allow us to,

25   yes.

1  THE COURT:  Okay.

2  BY MS. SAVNER:

3  Q.   And you felt this situation, the circumstances didn't

4  allow you to make Miss Robenstein's identity known?

5  A.   I did not, no.

6  Q.   And why was that?

7  A.   At this point I had no way of knowing how many people

8  were aware of where, what was going on, where they were

9  heading to.  And I felt that if I had treated this as,

10 differently than a cold stop it could potentially put her in

11 jeopardy.

12 Q.   Miss Robenstein provided a, she said that she was

13 driving her passengers home.  She said from somewhere on

14 North Ave. to 103 North Union was the address she gave; is

15 that correct?

16 A.   I believe that's what she said, yes.

17 Q.   And how did that compare with the information she had

18 provided you earlier on the phone?

19 A.   It seemed consistent with what she had told me before.

20 Q.   She also said that she only knew the first names of her

21 passengers, Moe, Mandy and Mary.  And she described them as

22 friends.

23      What did that signal to you, based on your

24 training and experience, if anything?

25 A.   It was atypical to that which I see with the general

1  motoring public.

2  Q.   How so?

3  A.   Generally, when people regard somebody as a friend,

4  they can at least tell me something about them.  They at

5  least know their last name and can usually tell me, hey, how

6  long, you know, I've known this person for this long, you

7  know, this is where we met.  You know, more information than

8  what, what she was able to provide me with.

9  Q.   So what suspicions, if any, did it generate that she

10  only knew her passengers' first names?

11  A.   It was a common theme that I see through, when I

12  conduct investigations like this um, that people are only

13  able to provide first names of people that they regard as

14  friends.

15       And the reason they do that is because they really

16  don't know the other person's last name.  It's easier for

17  them to say, oh, this person is my friend.  And some law

18  enforcement officers may just take that at face value and

19  just kind of move on with the investigation as opposed to

20  saying, I really don't know who this person is that is in my

21  car.

22  Q.   Based on your training and experience, what do you know

23  about how drug traffickers transport their stash?

24  A.   Um, I know based on, again, my training and experience,

25  that drug traffickers will often utilize people who have

1  vehicles and the ability to transport them.  They do this to

2  distance themselves from the product should an investigation

3  actually begin.

4          THE COURT:  Why don't we take 10 minutes off.

5  It's 10:30.  Catch you then.

6          (The Court recessed at 10:30 a.m. and resumed at

7  11:45 a.m.)

8          THE COURT:  Maybe it would save time if I made

9  sure I was properly oriented towards the government's

10  position in the case.  From your perspective, the initial

11  stop could have been justified either by the failure to

12  signal or by the reliable information that there were drugs

13  in the car, right?

14          MS. SAVNER:  Yes, Your Honor.

15          THE COURT:  And then do you agree that at some

16  point the time needed under Martinez to issue a written

17  warning had come and gone so that if it were only the

18  failure to signal the stop probably lasted too long?

19          MS. SAVNER:  Yes, Your Honor.

20          THE COURT:  And that it's your position that it's

21  really, we don't often get cars stopped for drug

22  interdiction purpose right off the bat, but it does happen,

23  and that the time to call the dog and obtain consent and all

24  that sort of thing were justified because the crime was not

25  the traffic violation but the longer, more serious offense?

1          MS. SAVNER:  Yes, Your Honor.  It's the

2     government's position that the officer had probable cause to

3     stop the car based on the tip because it was corroborated by

4     what Detective Nease saw as he was driving.  Or, in the

5     alternative, that the officer had at least reasonable

6     suspicion when he spotted the car to stop it based on the

7     informant's tip and then took reasonable investigative steps

8     thereafter.

9          THE COURT:  Good.  Thank you.  That's helpful.

10          MS. SAVNER:  And as a threshold matter, Your

11     Honor, the government also argues that the defendant doesn't

12     have standing to challenge the --

13          THE COURT:  As a passenger?

14          MS. SAVNER:  Yes.

15          THE COURT:  Yeah.

16          MS. SAVNER:  Thank you.  I neglected to move in

17     Government's Exhibit 22.  I would like to do that now.

18          MR. NOALN:  No objection, Your Honor.

19          THE COURT:  Admitted.

20          MS. SAVNER:  Thank you.

21          EXAMINATION CONTINUED BY MS. SAVNER:

22     Q.   Can we play the video again from, starting at eight

23     minutes and 25 seconds?

24          (Video playing and stopped)

25     Q.   So, officer, you mentioned to Miss Robenstein that

1   her -- the registration doesn't match the plate.  And I

2   believe you mentioned this, but just remind us, is that also

3   a violation of Vermont law?

4   A.   Yes, it is.  It's a plate that's not assigned to

5   vehicle.

6         THE COURT:  That would support seizure of the car?

7   You can't just go on with mismatched plates, right?

8         THE WITNESS:  Not necessarily seizure of the

9   vehicle, Your Honor.  Definitely further investigation to

10   determine, as you'll see here later, I checked the vin

11   number to verify that they match.

12         THE COURT:  Right.

13         THE WITNESS:  But definitely further investigation

14   to figure out where that comes from and potentially seizure

15   of at least the plates and grounding of the vehicle.

16         THE COURT:  Yeah, right.  That's what I'm trying

17   to say.  It would have to go to impound?

18         THE WITNESS:  Yes.  Yes, Your Honor.

19         THE COURT:  Yes.  That's what I was trying to say.

20   All right.

21   BY MS. SAVNER:

22   Q.   What did you do in this case to further investigate the

23   mismatched registration number?

24   A.   Again, because the -- what was showing on the

25   registration plate was not matching the registration

1    certificate.  I checked the vin number on the registration

2    certificate with that of the vehicle to see if those at

3    least matched up.

4    Q.    And where is this vin number located on the vehicle?

5    A.    Several spots.  Usually the most accessible spot is up

6    on the dash portion, usually on the driver's side.

7         THE COURT:  A little tin plate that you find

8    there?

9         THE WITNESS:  Yes, Your Honor.

10   BY MS. SAVNER:

11   Q.    When you checked the vin number on the vehicle were you

12   outside the car or inside the car?

13   A.    I was outside the vehicle.

14   Q.    And you didn't impound or seize the plates in this case

15   even though there was a mismatch.  Why was that?

16   A.    Based on what she had said, that DMV was aware of that,

17   I gave her the benefit of the doubt.  I did give her a

18   warning for the plates not assigned to the vehicle, but if

19   it was, in fact, a misnomer on DMV's part, I wasn't going to

20   penalize, penalize her for that.

21   Q.    Okay.  When you went up to the car to check the vin

22   number, what, if anything, did you tell the passengers?

23   A.    When I approached I wanted to at least let them know

24   what I was going to be doing, specifically because I would

25   have to put myself at a disadvantageous position in order to

check the vin number, which is in front of them, which is

generally something that we don't do from a safety

standpoint.

Q.   Can we start the recording again at 10 minutes and 30

seconds?

(Video playing and stopped)

Q.   Why did you ask the passengers about their origin and

destination?

A.   It's an interview tactic that we use to try and

determine whether or not everybody in the vehicle has the

same story.

Q.   And what did you find here?

A.   There were discrepances of what I was being told from

the operator of the vehicle compared with that with which I

was being told from the passengers.

Q.   What did that indicate to you, if anything?

A.   It was definitely an indicator of deception.  Um,

generally, if people are giving me two different stories

somebody's not telling the truth.

Q.   And how about the defendant's demeanor in the car?  How

would you describe his demeanor?

A.   I believe that I describe it as hostile.

Q.   And how does that compare to other passengers who you

encounter in motor vehicle stops?

A.   It's atypical.

1    Q.    What did that indicate to you, if anything?

2    A.    Um, that it's, it's abnormal.  It's not what I normally

3    see or normally encounter on a stop.  In similar situations,

4    where I have encountered behavior like this, I have

5    generally uncovered criminal activity.

6    Q.    After you checked the vin number what did you do?

7    A.    Um, --

8    Q.    If you are not sure we can -- the tape will refresh

9    your memory.

10   A.    Yes, it would.

11   Q.    Can we go to 14 minutes and 30 seconds?

12              (Video playing and stopped)

13   Q.    What did you just say in that?

14   A.    I asked the Burlington Police Officer to call for a

15   dog, a K9.

16   Q.    And what, why was it that Burlington PD was on scene?

17   A.    It was in their city in the, I guess in the -- I mean,

18   it was in their city, so basically to allow, you know, them

19   to partake in the investigation because it was in their

20   city.  It was basically -- what's the word I'm looking for?

21   Q.    Their jurisdiction?

22   A.    Yeah.  What mutual understanding, so to speak.  Because

23   I had notified them prior to this happening and had

24   requested that if they had an additional unit to assist me

25   on this, because we only typically run Winooski with one or

two officers on a shift.  So I didn't want to tie up both

officers from our city.  Burlington typically has more

resources.

Q.    And as a Winooski Police Department Officer at the

time, did you have jurisdiction to operate in Burlington?

A.    Yes.  Police officers have statewide jurisdiction.

Q.    Did any other officers from Winooski respond to the

scene?

A.    No, they did not.

Q.    You called for a K9 unit to respond.  Did one, in fact,

respond?

A.    Yes.

Q.    And what police department was that K9 unit with?

A.    It was with Burlington.

Q.    Do you remember the name of the officer who responded?

A.    Yes.  It was Corporal Trent Martin.

Q.    And does he generally work with one dog or multiple

dogs?

A.    I've known him to work with just one dog.

Q.    And do you know that dog's name?

A.    It's K9 Capone.

            THE COURT:  Capone?

            THE WITNESS:  Yes, Your Honor.

BY MS. SAVNER:

Q.    Had you had experience with working with them on

1  previous traffic stops or investigations before?

2  A.   Yes, I had.

3  Q.   Had you had any issues working with them before?

4  A.   No.

5  Q.   I would like to move ahead to 24 minutes and, I'm

6  sorry, 23 minutes and 35 seconds.

7              (Video playing and stopped)

8  Q.   So at this point, 23 minutes and around 40 seconds, the

9  dog is conducting the exterior sweep of the vehicle,

10 correct?

11 A.   Yes, it appears to be.

12 Q.   Okay.  And you made a note to yourself that everyone in

13 the car had just lit up cigarettes?

14 A.   Yes.

15 Q.   Why did you note that?  Why was that important to you?

16 A.   Um, in situations like this we have so many things

17 going on.  Um, sometimes it's hard to catch everything the

18 first time.  So I find it's helpful if I pick up on

19 something I just kind of talk to myself because I have my

20 camera.  This way I can review it later.  And for whatever

21 reason, if I don't remember it, when I'm writing my report I

22 can try and go back to my video at a later date and sort of

23 refresh my memory based on what I'm seeing on the video.

24 Q.   And why did you want to make note of the fact that the

25 people in the car had lit up cigarettes?

A.   It's a significant indicator to me.

Q.   Of what?

A.   Um, typically people will light up fresh cigarettes or cigars as a, sort of a calming effect.  The nicotine helps to calm them in the presence of law enforcement.  And also the smell um, they believe can sometimes detract from the dog smelling a narcotic odor from within the vehicle.

Q.   Can we move ahead to 24 minutes and 15 seconds?

        (Video playing and stopped)

Q.   Who was that that was talking to you?

A.   That was Corporal Trent Martin.

Q.   The K9 handler?

A.   Yes.

Q.   And what did he tell you, just briefly, because it was a little bit hard to hear?

A.   He revealed to me that K9 Capone had alerted to the presence of a narcotic odor coming from the vehicle.

Q.   What did you proceed to do?

A.   I believe at that point I re-approached the vehicle and directed all four occupants to exit the vehicle.

Q.   I want to jump ahead to 27 minutes and 25 seconds.

        (Video playing and stopped)

Q.   So when you asked who owned the vehicle what was the communal response?

A.   That Mary owned the vehicle.

Q.    Okay.  Did Mr. Folks, at any point, assert any
ownership interest in the vehicle?

A.    At that time, no.

Q.    At any time during the stop?

A.    I believe later he asked about, I think it was a camera
or something that was in the vehicle, which I ended up
retrieving for him.  But aside from that, no, no ownership.

Q.    And in this clip we just saw you asked the occupants if
they had personal belongings in the car.  Aside from the
camera that Mr. Folks asked about, did any of them say they
had any personal belongings in the car?

A.    No.  They all claimed they didn't have any personal
belongings in the vehicle.

Q.    Do you remember where the camera was located?

A.    I believe it was in the rear seat.

Q.    Where Mr. Folks had been sitting?

A.    In that area.

Q.    Miss Rubenstein provided you consent to search, and you
let her know that at any point she could withdraw her
consent and you'd stop searching; is that right?

A.    That's correct.

Q.    After you received that consent what did you do?

A.    Um, I believe at that point we went up to the vehicle
together.  This way she could see what I was doing.

Q.    Did you proceed to search the vehicle?

A.    Yes, I did.

Q.    At any point did she withdraw her consent?

A.    No, she did not.

Q.    Did you seize any contraband from the vehicle?

A.    I did.

Q.    What did you seize?

A.    I seized a small cloth purse-type bag with a large quantity of narcotics in it.

Q.    And where was the bag located when you found it?

A.    It was up in the, I believe it was either under or just on the side of the front driver's seat, kind of like between the center console area.

Q.    Showing you what's been marked as Government's Exhibit 11.  Can you take a look at those?  Do you recognize those photographs?

A.    Yes, I do.

Q.    What are they?

A.    These are the photographs that I took of the items that were seized from within the vehicle.

Q.    Is it a fair and accurate representation of the way those items looked?

A.    Yes, it is.

        MS. SAVNER:  The government moves to admit Government's Exhibit 11.

        MR. NOALN:  Your Honor, we would not object to

Bate's 9787 and 9788.  We're here for a suppression motion
about the stop of the vehicle and the search of the vehicle.
Those two pictures do depict a purse and the alleged
narcotics.  So they provide perhaps some, some, some
relevance here.

The rest of the photographs are completely
ill-relevant.  What was found in the vehicle really isn't
the issue here.  The issue is, was it searched
constitutionally after a constitutional stop of the vehicle.

MS. SAVNER:  I'm happy to limit it to the first
two pages.

THE COURT:  Fine.  I'll admit the first two pages
bearing Bate's Number 9787 and 9788.

BY MS. SAVNER:

Q.   The photograph on the first page that's marked 9787 at
the bottom, what is that?

A.   It appears to be the cloth bag that was recovered from
the vehicle.

Q.   That you recovered from the vehicle?

A.   Yes.

Q.   And you said this was recovered from the front driver's
seat area of the car; is that right?

A.   That's correct.

THE COURT:  Like a little purse that a woman might
carry on the street?  Is that what it is?

1    THE WITNESS:  Yes, Your Honor.  That's -- it's

2  similar to that.

3  BY MS. SAVNER:

4  Q.  Could you turn to the next page?  What do you see there

5  in 9788?

6  A.  This would be the same cloth bag only it's opened up

7  revealing the contents.

8  Q.  And what were the contents that you observed?

9  A.  I don't have the specific count, but it was heroin and

10 crack cocaine.

11 Q.  What did you do at the scene when the search was

12 complete?  What did you do with respect to Miss Robenstein?

13 A.  At that point, once the contents were recovered, is

14 that what you're referring to?

15 Q.  Yes.

16 A.  Again, in order to -- in the interest of protecting her

17 anonymity her arrest was staged in the presence of the

18 others because based on state law I could only show that she

19 was in possession of the bag.

20 Q.  Okay.  And you said her arrest was staged.  How did you

21 stage her arrest?

22 A.  She was handcuffed and placed in the rear of the police

23 cruiser.  Um, she was transported back to the police

24 department.

25 Q.  What, at the police department, did you do to continue

1   staging her arrest, if anything?

2   A.    At that point she was issued a citation to appear in

3   court for possession of narcotics.

4   Q.    Was it a valid citation?

5   A.    No, it was not.

6   Q.    How so?

7   A.    No paperwork or affidavit was submitted to the Court.

8   The only copy of the citation that she was given was just to

9   show that she had been issued paperwork from the police

10  should anyone else on the street ask her about the outcome

11  of the stop.

12  Q.    Why do you do that?

13  A.    Again, to protect her anonymity.  It would be very

14  awkward if people saw her driving away or taken away in a

15  police cruiser yet no formal charges would -- resulted from

16  it.

17  Q.    What did you do with her vehicle after the search was

18  completed?

19  A.    Again, in order to stick with the staging of the

20  arrest, and to protect her anonymity, the vehicle was towed

21  by, I believe it was Handy's Towing, I believe, to a

22  predetermined location in Winooski where it was dropped off

23  and then returned to her.

24  Q.    Thank you.

25          THE COURT:  And the other three people just walked

1  home, whatever they did?

2          THE WITNESS:  Yes, Your Honor.  They were released

3  from the scene.

4          MS. SAVNER:  Nothing further at this time.

5          THE COURT:  All right.  Mr. Nolan?

6          MR. NOALN:  Thank you, Your Honor.

7          THE COURT:  A question I had for the government,

8  do you want to just kind of orient me to the critical

9  constitutional violation that you are pursuing?

10         MR. NOALN:  A stop, the search.

11         THE COURT:  Well, I guessed that much.

12         MR. NOALN:  I guess I'd ask if I could do my

13  cross-examination first.  I mean, we, you know, the motion

14  argues, we believe it's an unlawful, it's an unlawful stop.

15         THE COURT:  Right.

16         MR. NOALN:  It's also an unlawful detention there.

17  It's an unlawful search of the vehicle.  And I think we'll

18  gather some evidence in support of that.

19         We also, and just the threshold question, we do

20  believe there's standing.  And there certainly is law that

21  there is standing for a passenger in a motor vehicle that

22  does not belong to that passenger to challenge the stop of

23  that vehicle at the very least.

24         We also believe that under the Constitution a

25  passenger has the right to challenge a search of a vehicle

1    in which he or she is riding.

2              THE COURT:  All right.  And were you satisfied

3    that all of that was adequately briefed by your predecessor?

4              MR. NOALN:  I actually don't think so.  We may

5    want to submit a memorandum dealing with some of the

6    standing issues, especially once we have sort of a factual

7    basis on the record.

8              THE COURT:  Yeah.  I thought it might be a little

9    thin.  So that would be helpful.

10             MR. NOALN:  All right.  Great.  We're on the same

11   page.

12             CROSS EXAMINATION BY MR. NOLAN:

13   Q.    Detective?

14   A.    It's officer.

15   Q.    Officer, okay.  Officer Brouillette, we don't know each

16   other, correct?

17   A.    That's correct.

18   Q.    Okay.  So, Officer Brouillette, I just want to get a

19   little background on you.  You are now with Burlington?

20   A.    Yes.

21   Q.    You left Winooski?

22   A.    Yes.

23   Q.    After leaving South Burlington, correct?

24   A.    Yes.

25   Q.    So that's three departments, what, in the past seven,

1   oh, five, six, seven years?

2   A.   About that.

3   Q.   About one department every two years?

4   A.   I suppose you could say.

5   Q.   And you hold the officer rank, right?

6   A.   Yes.

7   Q.   You are at the lowest rank at this point?

8   A.   Um, define lowest rank.

9   Q.   Are you a corporal?

10  A.   No.

11  Q.   Do you have corporals at Burlington?

12  A.   Yes.

13  Q.   And so a corporal is above you?

14  A.   I suppose you could say that, yes.

15  Q.   And then there's a sergeant?

16  A.   Yes.

17  Q.   And we work our way up to chief?

18  A.   Yes.

19  Q.   Is there anyone below you who is a police officer in

20  rank at Burlington?

21  A.   I have fellow officers who are all the same rank, but

22  no, there's nobody -- I guess unless you would consider

23  probationary officers below us.

24  Q.   Right.  But that's really about what other -- whether

25  they have permanent status in the department or not, right?

1    A.    Right.

2    Q.    Okay.  So you are at the entry level rank at BPD,

3    correct?

4    A.    Sure.

5    Q.    Okay.  You described some of your training.  Have you

6    ever been a detective?

7    A.    No.

8    Q.    Have you ever been assigned to a Vermont drug task

9    force?

10   A.    No.

11   Q.    Have you ever been assigned to the DEA Task Force?

12   A.    No.

13   Q.    The ATF Task Force?

14   A.    No.

15   Q.    A task force with Homeland Security?

16   A.    Yes.

17   Q.    Okay.  And what kind of investigations did you do

18   there?

19   A.    Specifically pertaining to human trafficking mostly.

20   Q.    Okay.  All right.  You're aware that the state of

21   Vermont has what they call a highway safety traffic team?

22   A.    Yes.

23   Q.    Run by Vermont State Police?

24   A.    Umhum.

25   Q.    Is that a yes?

1  A.    Yes.

2  Q.    Once upon a time Eric Albright used to run that team,

3  correct?

4  A.    I don't know.

5  Q.    Do you know Eric Albright?

6  A.    I know of him.

7  Q.    Okay.  He's been one of the Vermont State Police

8  troopers whose sort of led the efforts with interdiction,

9  correct?

10  A.    Yes.

11  Q.    All right.  You're aware of that?

12  A.    I am aware of that, yes.

13  Q.    He's probably responsible for thousands of interdiction

14  stops on 91, correct?

15  A.    I couldn't say.

16  Q.    You ever been to any of his trainings?

17  A.    No.

18  Q.    Have you ever -- have you ever gone to the FBI Academy?

19  A.    Nope.

20  Q.    All right.  BPD has a narcotics unit, correct?

21  A.    That's correct.

22  Q.    And it's run by a sergeant typically, right?

23  A.    That's correct.

24  Q.    And then it has some officers of your rank, right?  At

25  a junior, at least less senior than a sergeant, correct?

1   A.    That is correct.

2   Q.    All right.  Have you ever served on it?

3   A.    No.

4   Q.    Have you ever participated in any of the Vermont State

5   Police interdiction events with the Highway Safety Traffic

6   Team?

7   A.    Nope.

8   Q.    So you've done some local interdiction work.  You said

9   you like to take the initiative; is that correct?

10  A.    That's correct.

11  Q.    Training.  Have you been trained as a K9 officer?

12  A.    No.

13  Q.    Have you ever -- I take it then you've never had a

14  narcotics K9?

15  A.    Nope.

16  Q.    Have you worked, you said you worked with Capone, K9

17  Capone at some point in the past?

18  A.    Yes.

19  Q.    Do you know what his error rate is?

20  A.    No.

21  Q.    Have you been -- have you witnessed his training?

22  A.    No.

23  Q.    Do you know whether he barely passed for certification

24  or whether he's at the top of his class, if you will?

25  A.    No.

1    Q.    You worked with him maybe once before this?

2    A.    Several times.

3    Q.    Two, three?

4    A.    I can't put a number on it.

5    Q.    Not 10, correct?

6    A.    I don't know.  I can't put a number on it.

7    Q.    Is the source of information, Mary Robenstein?

8    A.    That's correct.

9    Q.    Is that how you pronounce it?

10   A.    Yes.

11   Q.    You've worked with her, I think you said you don't know

12   how many times in the past, but I think you testified on

13   direct once or at least once, correct?

14   A.    In, can you rephrase that?  What do you mean?

15   Q.    You've worked with her as a source of information prior

16   to this event?

17   A.    Yes.

18   Q.    Okay.

19   A.    I have.

20   Q.    And I think the government asked you on direct how many

21   times and you said you didn't know, right?

22   A.    Yeah.  Again, I can't put a specific number on the

23   number of times that I've worked with her.

24   Q.    Right.  The government asked you once at least?

25   A.    At least once, yes.

1   Q.   And on this particular occasion, Mary was, she had

2   tipped you off, right?

3   A.   Yes.

4   Q.   And she called -- the two of you communicated before

5   the event?

6   A.   Yes.

7   Q.   And how many -- did you actually have a physical

8   meeting?

9   A.   No.

10   Q.   You were already familiar with her car however, right?

11   A.   Yes.

12   Q.   Is that from your prior work with her or prior meeting

13   with her?

14   A.   Yes.

15   Q.   So you had seen her car before?  Yes?

16   A.   That's correct.

17   Q.   And, in fact, you testified earlier that before this

18   event, you knew that car had a mismatched tag, right?

19   A.   That's correct.

20   Q.   All right.  You knew that tag did not, was not

21   registered to that particular vehicle?

22   A.   That's correct.

23   Q.   And I think you also testified that on this event, or

24   leading up to the stop, you and Mary planned the route,

25   correct?

A.    Yes.

Q.    All right.  So the two of you made sure you were on the same page that evening, right?

A.    As best as we could, yes.

Q.    All right.  Did you give her any other direction on what she should do?

A.    No.

Q.    Did you, did you give her any direction about how she should act when stopped?  Because it was supposed to be by surprise, right?

A.    That's correct.

Q.    Right.  You wanted it to look like a surprise to Brian Folks, right?

A.    That's correct.

Q.    So you had a bit of a secret with Mary about what was going on?

A.    Um, I suppose you could say that, yes.

Q.    There was a -- fair to say there was some playacting, right?

A.    Yes.

Q.    And, in fact, if you watch the video, do you remember a couple instances -- well, do you remember her saying to you just a couple minutes into the stop after you brought her back to your cruiser, they found that very odd?  You remember her making that, sort of under her breath, you can

1  hear it on the video, do you remember?

2  A.   I'd have to watch the video again.

3       MR. NOALN:  All right.  Could we watch the video?

4  You had offered it before.

5       MS. SAVNER:  Yup.

6       MR. NOALN:  Could we see it at about two minutes

7  15 seconds?  And sort of boost the volume as best you can?

8       (Video playing and stopped)

9  Q.   Did you hear that?

10 A.   I did.

11 Q.   And she said something to the effect, they found that

12 very odd?

13 A.   That's what it sounded like to me, yes.

14 Q.   Right.  Because the two of you, this was a plan that

15 the two of you had hatched, right?

16 A.   Yes.

17 Q.   The two of you orchestrated that she would drive a

18 certain way, that eventually you would stop her vehicle, you

19 told her that ahead of time, correct?

20 A.   She knew that there, take there would be a stop, yes.

21 Q.   Correct.  And she knew the reason you were stopping the

22 vehicle was that she had given you information about

23 narcotics and you wanted a further investigation into that

24 information, right?

25 A.   I was acting on the information that she had provided

1    to me.

2    Q.    Do you remember a little later she actually said to

3    you, want me to pull attitude and you respond, no?

4    A.    Again, I'd have to review it on the video.

5          MR. NOALN:    Do you mind showing us at five

6    minutes?    Thank you.

7          (Video playing and then stopped)

8    Q.    Did you hear her she said, do you want me to pull

9    attitude?

10   A.    Yes, I did.

11   Q.    And you say no?

12   A.    I did.

13   Q.    Essentially the two of you are engaging in some

14   playacting for the benefit of Mr. Folks and the other

15   occupants in the vehicle throughout this stop, right?

16   A.    The playacting is to protect her anonymity throughout

17   this encounter.

18   Q.    I'm not accusing you of doing anything wrong, but you

19   were engaging in playacting with her, perhaps for her

20   protection, in your view?

21   A.    Yes.

22   Q.    But that's what was going on?

23   A.    Yes, it was.

24   Q.    You weren't really writing her a warning ticket, you

25   weren't really stopping her for motor vehicle violations,

1  you were investigating her drug tip, right?

2  A.    No.   That's incorrect.

3  Q.    What?

4  A.    She did get a written warning issued.   You can actually

5  see me filling it out on the video.

6  Q.    That's true.   You didn't write her a ticket?

7  A.    I did not.

8  Q.    And although you told the judge earlier that a vehicle

9  should be impounded with mismatched plates, you didn't

10 impound her vehicle, right?   You towed it to a location to

11 give it back to her, correct?

12 A.    That's correct.

13 Q.    And leading up to this event, you told her that you

14 were going to stop her, right?

15 A.    Yes.

16 Q.    And that you must have given her some instructions on

17 what to do?

18 A.    No.

19 Q.    You just left it to chance?

20        MS. SAVNER:   Objection.   Argumentative.

21        THE COURT:   No, I'll allow it.

22        THE WITNESS:   I did not leave it to chance.   Um,

23 as I already stated, I knew that there was an existing

24 violation on the vehicle that I was already aware of.

25 BY MR. NOALN:

1    Q.    Did you discuss the fact that you were going to stop

2    her and you expected her to stop?

3    A.    That was -- I don't believe that was discussed, no.

4    Q.    No?  I'm sorry?

5    A.    I don't believe that was discussed, no.

6    Q.    And you said earlier that your communications with her

7    were electronic?

8    A.    Yes.

9    Q.    All right.  Over the course of your relationship had

10   the two of you exchanged any text messages?

11   A.    Yes.

12   Q.    Did you exchange any text messages in connection with

13   this event?

14   A.    Um, perhaps.  I can't recall if it was through voice or

15   text communication.  I mean, this was over two years ago,

16   but it was some sort of electronic communication.

17   Q.    If you engaged in text communications you would have

18   preserved those communications, correct?

19   A.    No.

20   Q.    So you didn't then look for them to provide to the U.S.

21   Attorney's Office?

22   A.    I don't even have the same phone that I had back then.

23   So, no.

24   Q.    So you just didn't preserve them?

25   A.    No.

1  Q.   And you mentioned earlier that you had once interviewed

2  Mary when she became your source of information.  You, I

3  think you called it background investigation?

4  A.   Yes.

5  Q.   Do you use a standard form with informants or sources

6  of information?

7  A.   Typically, yes, we do.

8  Q.   Did you use one with her?

9  A.   Yes.

10 Q.   And how do you go about the interview?  Do you ask her

11 questions and you write down answers or take notes?

12 A.   Generally, yes.  The form is several pages long.

13 Q.   And did you, did you do that in this case?

14 A.   Yes.

15 Q.   Did you provide them to the U.S. Attorney's Office?

16 A.   No, I did not.

17 Q.   Were you asked to provide your writings relating to

18 your testimony today?

19 A.   Yes.

20 Q.   But you didn't provide that to the U.S. Attorney's

21 Office?

22 A.   No.

23          MR. NOALN:  Your Honor, that's clearly Jencks.

24 It's his writing, not her writing.  We're here today.  We've

25 started cross-examination.  Through no fault of the U.S.

1    Attorney's Office, it hasn't been provided to me.  Of

2    course, this officer has an obligation, when asked by the

3    government, to collect his writings and turn them over.  I

4    mean, it's actually a federal statute.

5              THE WITNESS:  Would you like me to explain

6    further, counsel?

7    BY MR. NOALN:

8    Q.    Do you have any other writings?

9    A.    I provided the U.S. Attorney with all the writings that

10   I currently have.

11   Q.    Was the packet destroyed?

12   A.    Yes, it was.

13   Q.    Why was it destroyed?

14   A.    Because it's, it contained sensitive information.  And

15   in compliance with the, our department regulations, I no

16   longer had an interest in that SOI once I stopped working

17   with that individual.  And as such, the information is

18   destroyed.  I don't take that with me or carry it along to

19   my next agency.

20   Q.    When did you destroy it, approximately?

21   A.    When I left Winooski.

22   Q.    You never turned it over to DEA, or anyone else, even

23   though there was an open investigation into Mr. Folks?

24   A.    Nobody ever asked for it.

25   Q.    Okay.  Do you have any e-mails or text messages that

1  you exchanged with your source of information?

2  A.    No.

3  Q.    All destroyed or gone?

4  A.    Yes.

5  Q.    On this night you said you contacted DEA and they gave

6  you the green light to engage in the investigation?

7  A.    Detective Nease contacted DEA.  But, yes, we were, we

8  were given permission to go ahead.

9  Q.    And they did not, they did not participate?

10  A.    No.

11  Q.    Did you feel like you were playing by state rules or

12  federal rules on that particular evening?

13  A.    On that particular evening, state rules.

14  Q.    Okay.  So you were trying to comply with state law on

15  that occasion?

16  A.    Yes.

17  Q.    Okay.  You saw the video, you actually, you ordered

18  Mary out of her car.  You didn't ask her, you actually

19  ordered her out of her car?

20  A.    I asked her if she would mind stepping out of her car.

21  Q.    The Judge can look at the video again.

22         So you felt you complied with Sprague?

23  A.    Yes.

24  Q.    And you were trying to comply with the rest of, the

25  rest of state law, correct?

A.    Yes.

Q.    And you understand that under state law you can't search a vehicle without a warrant or consent, right?

A.    That's correct.  There are other exemptions but, yes, generally that's correct.

Q.    And you knew here, of course, Mary was working for you, so you knew you were going to get the consent, correct?

A.    No.

Q.    You expected she might give you a tip, plan on the route, know that you're going to stop her because she's told you there are narcotics that are going to be in her car, engaged in a subterfuge playacting with her to protect her and that then she would decline to give you consent?

A.    I can't presume to know what she's going to -- what she's going to do.  She easily could have refused.

Q.    At that point you would have applied for a warrant?

A.    Yes.

Q.    At the beginning of your testimony, when asked about this, this night, the government said, you effected a motor vehicle stop.  And you testified, yes, I did.  And the government asked you what led you to do that.  And you testified, I got a tip that there were going to be narcotics in it, or words to that effect, correct?

A.    Yes.

Q.    Let's talk a little bit about Mary.  How many times had

1  you worked with her, to the best of your recollection,

2  leading up to this stop?

3  A.   Several times.  Again, I can't put a specific number on

4  it.

5  Q.   Could you give me a range or an approximation?

6  A.   More than one, less than a hundred.

7  Q.   Hum.  So you're thinking it could be as many as 80 or

8  90?

9  A.   Again, I'm not going to sit up here and testify to

10 something that I can't accurately say.

11 Q.   So you conducted a background investigation of Mary,

12 right?

13 A.   Yes.

14 Q.   When was that done, approximately, in relation to this

15 stop?

16 A.   Um --

17 Q.   Ballpark; three weeks, three months, three years?

18 A.   Six months, give or take, maybe longer.

19 Q.   Okay.  Six plus months.  And is that when you first met

20 her?  Whenever you did that background check, that was your

21 first or the first time you began to work with her started

22 with that?

23 A.   Um, that would, that would be accurate.

24 Q.   And she told you she was a drug user at the time?

25 A.   Um, former.

1  Q.    She told you she was a former drug user?

2  A.    Yes.

3  Q.    Okay.  During, during the time that you knew her,

4  leading up to the stop, were you aware of any drug use?

5  A.    Not to my knowledge.

6  Q.    Did you do any investigation to determine whether she

7  actually was a former drug user as opposed to a present drug

8  user?

9  A.    As best I could.

10 Q.    So what was that?

11 A.    I have to take her testimony, whatever she tells me.

12 How do you want me to conduct an investigation as far as

13 whether or not she uses drugs in her own house.

14 Q.    Did you do any surveillance of her?

15 A.    No.

16 Q.    So you didn't follow her to see if she was going to

17 known drug houses?

18 A.    No.

19 Q.    You didn't do surveillance of her residence to see if

20 perhaps sales were being made out of her residence?

21 A.    No.

22 Q.    I mean, you can detect, you know when someone is

23 selling drugs, right?  People come, stop by real quickly,

24 leave, and there's that pattern.  That's evidence of drug

25 deals, right?

A.    Sometimes, yes.

Q.    Did you talk to other officers in the county about her?

A.    Yes.

Q.    How many?

A.    Several.

Q.    And did you ask specific questions about her drug use?

A.    Um, not necessarily her drug use.  It was more pertaining to her reliability as an informant.

Q.    Had she been used by others as an informant?

A.    Yes.

Q.    How many successful prosecutions did she lead to for you?

A.    Several.

Q.    Were they drugs?

A.    Yes.

Q.    And did you -- you never knew her to use any drugs?

A.    Not to my knowledge.

Q.    Did you ever give her a UA?

A.    No.

Q.    You know they have those quickie UA's where, boom, you have an officer watch her pee into a cup and instantaneously you have a presumptive result?  You're aware of that, right?

A.    Sure.  Yeah.

Q.    You never did that?

A.    Nope.

1   Q.   Did you run her criminal record check?

2   A.   Yes.

3   Q.   What was it on?

4   A.   I don't recall without it being right in front of me.

5   Q.   Do you recall that she had charges or criminal history

6   in three states?

7   A.   Again, without it being directly in front of me I can't

8   testify what was on her criminal history.

9         THE COURT:  You just recall that she had one?

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  Got it.

12        MR. NOALN:  So, I'm going to hand you, may I

13   approach?

14        THE COURT:  Please.

15   BY MR. NOALN:

16   Q.   I'm going to hand you what's been marked as Defendant's

17   A..

18   A.   Thank you.

19   Q.   Take a quick peak at that.  Just let me know when you

20   are done?

21   A.   Okay.

22        MR. NOALN:  Would Your Honor like a copy?

23        THE COURT:  Sure.

24        MR. NOALN:  I'm going to write A. on it.

25        THE COURT:  I appreciate it.  Thank you.

BY MR. NOALN:

Q.   Have you ever seen this document before?

A.   Just now, yes.

Q.   Okay.  But before that you haven't?

A.   Um, most of the charges on there seem to be after the date that --

Q.   Let me stop you.  Just ask you to stick to my question. Have you ever seen this document before?

A.   This particular document?  No.

Q.   Do you recognize it to be a criminal record check for Mary Robenstein?

A.   That's what it appears to be, yes.

          MR. NOALN:  I'm sure the government would stipulate this is what was produced as a criminal record check.

          MS. SAVNER:  Yes.

          MR. NOALN:  Your Honor, we'd move this into evidence.

          THE COURT:  Any objection to A.?

          MS. SAVNER:  Yes, Your Honor.  The government objects on the basis of relevance as Officer Brouillette stated, most of what is in here was not -- hadn't occurred by the time that he used Miss Robenstein in the stop and has little bearing on her reliability.

          THE COURT:  Oh, all right.  Were there any

1   convictions prior to the stop?

2           MS. SAVNER:  From this it appears that there was a

3   1988 marijuana possession that has a disposition date in

4   1989.  It is unclear to me looking at this what the

5   disposition was.  But that is on page, Bate's 9111 to 9112.

6           And after that it appears that all of the offenses

7   occurred after January 20, 2016.

8           THE COURT:  So what would be the relevance of 1998

9   marijuana possession charge?

10          MR. NOALN:  So the relevance, a couple things,

11  Your Honor.  The government, in our view, has to prove it

12  had probable cause to stop and search this vehicle.  There

13  are no traffic infractions here that, that are actually,

14  actually being invoked.  Sure, you can make a pre-textural

15  stop.  I'm not going to argue with that.

16          This woman is the government's agent.  She can

17  just as soon be an undercover officer.  It was planned.

18  She's working for the government.

19          THE COURT:  No, I get that.  I don't think anybody

20  is disputing that.

21          MR. NOALN:  So basically the basis for this stop

22  has got to be the reliability of this informant.

23          THE COURT:  Right.

24          MR. NOALN:  And whatever the police did to

25  corroborate that.  And so her criminal history, I think

1    before and after, goes to her reliability.  Certainly

2    before.  Also this, we don't have everything on here, but we

3    do have evidence on the front page that she has New Jersey,

4    Texas and Vermont.  So I --

5             THE COURT:  A conviction after can't have anything

6    to do with our case, right?  Because the officer couldn't

7    have known about it because it hadn't happened.

8             MR. NOALN:  I think it would still go to her

9    credibility.

10            THE COURT:  Yes, but she's not on the stand.

11            MR. NOALN:  I know, but he trusted her.  And he

12   used her.  But in any case, so there's some stuff before.

13   There's also some unknown, unknown events because, because

14   it says New Jersey, Texas and Vermont.  Maybe it's my eyes.

15   I don't see the Texas entries in here.  They could be in

16   here.  I see the Vermont and I think I see a New Jersey.

17            And, unfortunately, the police officer destroyed

18   the investigation packet which would have had the background

19   check he had access to.  I only have access to whatever the

20   government gives me.  This is what they gave me.

21            THE COURT:  Right.

22            MR. NOALN:  If he had retained the background

23   investigation packet, the CI packet, we would have that or

24   have access to that, but unfortunately he destroyed it.

25            THE COURT:  So your position is the 1988 marijuana

possession in, what I assume to be Plainfield, New Jersey,

though I can't quite figure it out, can't tell us anything

20, 30 years later about her reliability?

MS. SAVNER:  Yes, Your Honor.  Nor can the

subsequent convictions for non-related offenses.

THE COURT:  Right.  I think you're right.  I'll

exclude A..

BY MR. NOALN:

Q.    Officer Brouillette, do you remember what her criminal

history was on the date you ran it in connection with your

background check?

A.    I do not.

Q.    Do you know whether she -- we just saw there's a New

Jersey criminal conviction preceding your background check,

correct?

A.    I believe it was actually dismissed.

Q.    It was a conditional discharge actually.

Did you make any inquiries to New Jersey

authorities about her?

A.    No, I did not.

Q.    Do you recall if the criminal record check you ran had

indicated that there was criminal history in any other

states other than Vermont?

A.    No, I believe it was the states you had just mentioned.

Q.    So you recall there was some Texas history as well?

A.    Again, without the actual criminal history packet in

front of me, I can't say one way or the other what was

actually on there.

Q.    Fair to say that if it indicated Texas you didn't make

a call to Texas?

A.    That's true.

Q.    All right.

        THE COURT:  You're just glad to have somebody

talking to you basically.

        MS. SAVNER:  I'm sorry, Your Honor, I didn't hear

the question.

        THE COURT:  You were just grateful to have

somebody talking to you?

        THE WITNESS:  Essentially, Your Honor, we're just

trying to get people who are willing to cooperate who are

trying do the right thing.

        THE COURT:  Right.  I get it.

BY MR. NOALN:

Q.    In terms of corroboration, you knew her, right?  So you

knew her vehicle, correct?

A.    I was familiar with her, yes.

Q.    And she told you she was going to be driving that

night.  And obviously she was driving that night, right?

A.    Yes.

Q.    What other specific information did she give you?

1  A.    She had discussed the route that she was planning to

2  take.

3  Q.    Well, you agreed upon that, right?

4  A.    She -- yes.  She had told me the route that she was

5  going to take.

6  Q.    What else did she tell you?

7  A.    I'm not quite sure what you are looking for.

8  Q.    Well, I'm asking for anything she told you.  This is,

9  this is the basis for your stop, her tip to you?

10  A.    So as I had already explained, she told me that she was

11  going to be driving from a location on North Ave. to a

12  location in the area of Loomis or North Union Street.

13        Again, she didn't give me actual numerical

14  addresses.  She told me that she was going to be driving

15  Moe, who at the time I knew to be Brian Folks, and he was

16  going to have a large quantity of narcotics on him.

17  Q.    Did you -- until you approached that vehicle, you

18  didn't -- after you had stopped her, you didn't identify Moe

19  as a passenger, correct?

20  A.    I'm not sure, what do you mean?

21  Q.    Did you follow the vehicle?

22  A.    For a brief period of time, yes.

23  Q.    All right.  And prior to your turning on your blue

24  lights and stopping the vehicle --

25  A.    Yes.

1    Q.    -- you couldn't tell who was in the back seat, right?

2    A.    That's correct.

3    Q.    All right.  You didn't know whether it was Moe or

4    someone else, right?

5    A.    That's correct.

6    Q.    In fact, you didn't know exactly how many people were

7    in the vehicle until you stopped it, right?

8    A.    That's also correct.

9    Q.    And Detective Nease didn't identify Moe as being in the

10    vehicle prior to you turning on the blue lights, correct?

11    A.    No, he did not.

12    Q.    In fact, no law enforcement officer identified Moe as

13    being in the vehicle until you turned on your blue lights,

14    stopped the vehicle and approached it, right?

15    A.    Yes.

16    Q.    In fact, Detective Nease, he's a detective, right?

17    A.    Yes.

18    Q.    Detective Nease didn't identify -- didn't identify that

19    there was a male in the vehicle prior to -- at any time,

20    right?

21    A.    Right.

22    Q.    And, in fact, prior to you turning on the blue lights

23    and stopping that vehicle you didn't identify whether there

24    was a male in that vehicle, correct?

25    A.    Correct.

Q.   We got a disclosure from the U.S. Attorney's Office on

March 16th telling us for the first time that Mary

Robenstein, the driver of the car, was the source of

information who provided the tip to you.  Said she signed an

agreement to work as a CI with the Winooski Police

Department back in October of 2013.  Does that sound about

right?

A.   It could be.  I wasn't working for them back then.

Q.   Okay.  So she might have worked for someone else?

A.   That's correct.

Q.   Do you know who she was working for?

A.   Um, I believe it was either Detective Nease or

Detective Ben Adams.

Q.   Who?

A.   Either Detective Nease or Detective Ben Adams.  But,

again, I can't testify as far as to who she was working

with.

Q.   So you don't know who she worked with previously at

Winooski?

A.   I know -- I do know that she worked with Detective

Nease and Detective Ben Adams, but I cannot testify as to

the timeline in which she worked with them.

Q.   And you can't testify as to what she did with the two

of them, correct?

A.   Aside from -- other than what they just told me, no,

1   not specifics.

2   Q.   All right.  It said that she was compensated at times

3   by the Winooski Police Department, correct?

4   A.   I don't know.

5   Q.   So you don't know?

6   A.   I don't know.

7   Q.   All right.  Did you know that she had a history of

8   compensation for tips?

9   A.   Not really, no.

10   Q.   That's not something you asked your colleagues when

11   using someone who had previously been their informant?

12   A.   I was aware that she had been paid in the past, but I

13   wasn't aware that it was a regular thing.  Again, I wasn't

14   working there back then.  I don't have the knowledge of the

15   operations that they conducted with or without pay.

16   Q.   Were you aware whether she had any criminal infractions

17   that were not charged, but due to her work in the past?

18   A.   Not to my knowledge.

19   Q.   But did you inquire?

20   A.   No.

21   Q.   So you don't know?

22   A.   No.

23   Q.   Did you continue to work with her afterwards?

24   A.   For a brief period.  Um, yes.

25   Q.   Did you make any payments to her?

1   A.    No.

2   Q.    She was just doing it out of the goodness of her own

3   heart?

4   A.    I guess you could call it that.

5   Q.    Yeah.  Okay.

6           MR. NOALN:  Your Honor, this witness doesn't know

7   anything about this, but I'm going to move into evidence the

8   March 16, 2018 letter sent to us, disclosure a couple days

9   ago, a few days ago, four days ago, of the source of

10   information and her prior history with the Winooski Police

11   Department because this witness isn't that knowledgeable

12   about it and this relates directly to this case.

13           THE COURT:  Any objection?

14           MS. SAVNER:  No objection.

15           THE COURT:  What's it marked as?

16           MR. NOALN:  It's B. as in boy.

17           THE COURT:  B. is admitted.

18   BY MR. NOALN:

19   Q.    You took, you took video footage with your Axon camera

20   that night, correct?  We've seen some of that today?

21   A.    Yes.

22   Q.    And you testified there are two files, for some reason

23   there's a break, two separate files for one incident.  We

24   don't have one single file, correct?

25   A.    It appears that way, yes.

1  Q.   And you don't know what happened between the two files,

2  correct?

3  A.   No.

4  Q.   You have no recollection, as you sit here today?

5  A.   No.

6  Q.   Except at the most general level?  That you were out

7  there at a car stop, right?

8  A.   Right.

9  Q.   There are other officers who took Axon video?

10  A.   Yes.

11  Q.   Or cruiser video?

12  A.   I believe it was Axon.

13  Q.   All right.  And that included Officer -- well, Officer

14  Martin, Officer Martin was out at the stop?

15  A.   Yes, he was the K9 officer.

16  Q.   Okay.  He didn't -- did he take any video?

17  A.   I don't know.

18  Q.   Okay.  You're aware that none has been found for around

19  the time of the stop, correct?

20  A.   That was the last I knew, yes.

21  Q.   And then Officer Osilka?

22  A.   Yes.

23  Q.   He or she was at the stop?

24  A.   He.  Yes, he was.

25  Q.   And you're aware that he uploaded four video files that

would appear to be related to this incident given their

timestamps?

A.    I didn't know that --

MS. SAVNER:  Objection, Your Honor.  Foundation.
This witness has no personal knowledge of this.

MR. NOALN:  I just asked.  I mean, there were the
people at the stop and his investigation.

THE COURT:  Sure.  I'll allow the question.

THE WITNESS:  All right.  So the U.S. Attorney's
Office made me aware that there was video from Burlington,
but I didn't know the specifics or the number of videos that
were uploaded.

BY MR. NOALN:

Q.    All right.  Are you aware that Officer Osilka's four

video files, that appear to be related to this incident,

were not preserved?  They were, they were deleted?  Are you

aware of that?

A.    No.

Q.    Okay.  Did you ask the officers who were out there

assisting you that night to preserve evidence, such as

videos, in connection with your investigation?

A.    No.

Q.    Isn't that something that you would normally do as the

lead on an investigation, ask the people playing supporting

roles to preserve evidence and then, and at some point

1    provide it to you?

2    A.    No.

3    Q.    No?

4    A.    Nope.

5    Q.    You don't bother to preserve evidence related to your

6    investigations if someone else has possession of that

7    evidence?

8    A.    I preserve my own evidence.  And being that it was a

9    different department they followed their own rules and

10   procedures regarding preservation of that evidence or video

11   in this case.

12   Q.    You did not arrest Brian Folks on that night?

13   A.    That's correct.

14   Q.    You never arrested him, correct?

15   A.    That's correct.

16   Q.    And he was never charged with a state offense, correct?

17   A.    That's correct.

18   Q.    So you engage in this investigation, and what did you

19   do with the, with the results of the investigation?

20   A.    What do you mean by, results?

21   Q.    Well, you got some drugs?

22   A.    Yes.

23   Q.    You got some video?

24   A.    Yes.

25   Q.    You have your own observations, right?  Yes?

1   A.    Yes.

2   Q.    That's evidence, right?

3   A.    Yes.

4   Q.    What did you do with that evidence?  Did you give it to

5   DEA?  Did you just sit on it?  I mean, did you call Adam

6   Chetwynd the next day and say, hey, guess what happened?  I

7   mean, you knew that they were investigating Brian Folks,

8   right?

9   A.    Yes.

10  Q.    What did you do with it?

11  A.    So at that point our standard procedure, the evidence

12  was transported back to the Burlington or to the Winooski

13  Police Department.  It was photographed and logged into our

14  evidence room.  The video was preserved via a video request.

15  And then DEA was notified, I believe, by Detective Nease, of

16  the results of the investigation.

17  Q.    You wrote a report?

18  A.    Yes.

19  Q.    What did you do with the report?

20  A.    I saved it on the computer.

21  Q.    How soon after this event did you give the evidence to

22  DEA?

23  A.    I, I don't know.  I wasn't the one who personally

24  handed it over.

25  Q.    So you had no direct communication with DEA?

A.    Not directly related to this, no.

Q.    Did you -- in you report, you did not reveal that you got a tip, correct?

A.    That's correct.

Q.    You indicated -- I mean, you really played this off as just a routine motor vehicle stop, right?

A.    That's correct.

Q.    And you stated that the basis for your stop on that night was her failure to use a turn signal, correct?

A.    Yes.

Q.    You were going to stop her, turn signal or no turn signal, you testified to that earlier, correct?

A.    Yes.

Q.    And you were going to stop her because of that tip, correct?

A.    No.

        MS. SAVNER:  Objection.  Misstates the testimony.

        THE COURT:  I'll allow the question and I'll take an answer.

        THE WITNESS:  No.  I was going to stop based on a motor vehicle violation.

BY MR. NOALN:

Q.    Okay.  And you knew that you had a motor vehicle violation because you allowed her to drive a vehicle that's not permitted to be driven under Vermont law, correct?

1  A.    Yes.

2  Q.    You could have prevented her from driving that vehicle,

3  correct?

4  A.    Yes.

5  Q.    In fact, since you knew she was going to be driving the

6  miss, mis-registered Mercedes you actually could have told

7  her, by the way, you can't drive that car, it's illegal,

8  correct?

9  A.    Well, not necessarily I can't tell her she can't drive

10  the car.  I can take action when I observe the violation.

11  Q.    You could have told her that it's unlawful to drive

12  that vehicle in the, based on its registration status --

13  A.    Yes.

14  Q.    -- at that point in time?

15  A.    Yes.

16  Q.    But you didn't do that?

17  A.    That's correct.

18  Q.    Your report, you talk about questioning her about where

19  she's going and then questioning them and comparing the two,

20  typical interdiction cop stuff, right?

21  A.    Yes.

22  Q.    But you knew where she was going, right?  She told you

23  before she ever got in that car?

24  A.    I had a general idea of where she was going.

25  Q.    Right.  And you continue, during the course of this

1    stop, I mean, it just takes you a few minutes to write her a

2    warning ticket, right?

3    A.    More than just a few.

4    Q.    Well, it's on there, right?  It's on the video?

5    A.    Umhum.

6    Q.    Is that correct?

7    A.    Yes.

8    Q.    All right.  And then you say you extended the stop to

9    check the vin, right?

10   A.    Yes.

11   Q.    But you already knew that car was not properly

12   registered, correct?

13   A.    I had never checked the vin number prior to that date,

14   so, no.

15   Q.    Earlier in your testimony you said that you had run the

16   registration and determined that that car was not the car

17   the plate was registered to, right?  You did that before the

18   stop?

19   A.    The plate that's on the vehicle did not match what was

20   showing on the registration certificate.

21   Q.    And you knew that before, before the stop, correct?

22   A.    I had never seen her registration certificate prior to

23   that, but I knew DMV records showed a different, a different

24   registration tag than what was showing on the vehicle.

25   Q.    And car registrations come from DMV?

1  A.    Yes.

2  Q.    Right.  So you knew before the stop that that car was

3  not registered with that plate, correct?

4  A.    Yes.

5  Q.    All right.  And you didn't have to check the vin number

6  to confirm that, correct?  You knew it?

7  A.    No, I didn't.

8  Q.    But the DMV information made clear that that was not --

9  that plate was not registered to that vehicle, correct?

10 A.    Yes.

11 Q.    All right.  And, in fact, did you print that out

12 before, before the event that night?

13 A.    That night?

14 Q.    Yeah.

15 A.    No.

16 Q.    Did you print it out eventually?

17 A.    I don't recall if I did.

18        MR. NOALN:  May I have one moment, Your Honor?

19        (Attorneys conferring off the record.)

20 BY MR. NOALN:

21 Q.    Earlier in your testimony on direct you were asked

22 about the basis of your informant's knowledge about drugs,

23 that drugs would be transported in her vehicle, right?

24 A.    Yes.

25 Q.    All right.  And you said that you didn't know, you

1  thought it came from Moe or it came from someone else who

2  knows Moe, right?

3  A.    I don't -- yes.

4  Q.    Did you ask your informant what the basis of her

5  knowledge was?

6  A.    I don't recall.

7  Q.    Did you -- so I know we've got this report that is sort

8  of sanitized, it keeps her covered, it doesn't talk about a

9  tip.  Did you, did you write another report or any sort of

10  document about the real story, about the tip, the informant,

11  the details that might be useful here today or for the

12  government down the road?

13  A.    Um, I believe I took notes regarding locations or times

14  on my notepad at the time that we had the conversation.

15  Q.    Where are those notes?

16  A.    They are destroyed.

17  Q.    Did you ever turn them over to the DEA?

18  A.    No.

19  Q.    Did you ever turn them over to the U.S. Attorney's

20  Office?

21  A.    No.

22  Q.    They asked you for your notes, your writings, et

23  cetera, right?

24  A.    I turned over everything that I still currently had.

25  Q.    Right.  But those were destroyed?

```
 1   A.    Yes.
 2   Q.    You were aware at the time of the destruction that
 3   there was an ongoing DEA investigation into Mr. Folks,
 4   right?
 5   A.    Umhum.   Yes.
 6   Q.    You were aware at the time you destroyed the CI packet
 7   or background investigation that there was an ongoing DEA
 8   investigation into Mr. Folks, correct?
 9   A.    Yes.
10   Q.    Yet you destroyed both?
11   A.    Yes.
12   Q.    Did you call DEA and ask, should I keep these for you,
13   should I send them, should I destroy them?
14   A.    No.
15   Q.    You just destroyed them?
16   A.    Yes.
17            THE COURT:  They were destroyed when you left the
18   Winooski Police Department as part of your --
19            THE WITNESS:  Yes, Your Honor, in conjunction with
20   our department policies.
21   BY MR. NOALN:
22   Q.    Was there any discussion with supervisors, colleagues,
23   Detective Nease, about, hey, this file's related to
24   Mr. Folks and DEA has an investigation into him, what should
25   I do with it?
```

```
1    A.    No.

2    Q.    You didn't inquire?

3    A.    No.

4    Q.    Did Detective Nease, or anyone at Winooski, say to you,

5    hey, I know you're normally supposed to destroy all your

6    records as you exit, but you've got one or more things that

7    relate to a bigger investigation, we need to preserve those,

8    pass them along, do something other than destroy?

9    A.    No.

10   Q.    So you don't recall, as you sit here today, what Mary

11   Robenstein told you about how she gathered this information?

12   A.    Not specifically, no.

13   Q.    You just know she told you there were going to be --

14   she was going to drive drugs in the car with Moe?

15   A.    That's the gist of what she told me, yes.

16   Q.    Did she tell you what kind of drugs?

17   A.    Yes.

18   Q.    Oh, you said ups and -- uppers and downers?

19   A.    Up and down.

20   Q.    Ups and downs?

21   A.    Up and down.

22   Q.    Up and down.  Okay.

23          I just want to give you your report.

24          THE COURT:  We'll take an hour off for lunch.  You

25   getting started on a new topic?
```

1    MR. NOALN:  No.  I actually just wanted him to

2  identify his report and then I want to admit that into

3  evidence.

4         THE COURT:  Oh, okay.  Let's do it.

5  BY MR. NOALN:

6  Q.    When did you leave Winooski?

7  A.    Oh, I believe it was August of that same year.

8         THE COURT:  August of '16?

9         THE WITNESS:  Yes, Your Honor.

10 BY MR. NOALN:

11 Q.    If I can just borrow a sticker from Pam.  I think we're

12 about ready to conclude.  So officer --

13 A.    Yes.

14 Q.    -- I would like to hand you three pages.

15        MR. NOALN:  May I approach, Your Honor?

16        THE COURT:  Yes.

17 BY MR. NOALN:

18 Q.    I'm going to hand you what's been marked as C..  I'm

19 going to represent to you this is three pages double-sided

20 provided to us by the government.  It appears to be your

21 report relating to this stop.  And the Bate's numbers on

22 that version are cut off.

23        Can you just look at that and confirm whether or

24 not that's your report relating to that night?

25 A.    It appears to be, yes.

```
1   Q.    Is there any question in your mind?

2   A.    No.

3   Q.    Take as much time as you want.  You can have the lunch

4   hour and the Judge will bring you back and let you answer

5   that question after lunch.

6   A.    No.  I'm comfortable saying this is my report.

7              MR. NOALN:  Your Honor, we'd move that into

8   evidence.

9              MS. SAVNER:  No objection.

10             THE COURT:  C. is admitted.

11             MR. NOALN:  Thank you.  No further questions, Your

12  Honor.

13             THE COURT:  All right.  We'll take our break.

14  Before I lose you, docket 128, is there any need for

15  additional evidentiary hearing time?

16             MR. WILLIAMS:  Your Honor, just about 10 minutes.

17             THE COURT:  We'll get it in at some point today.

18  From witnesses who are here?

19             MR. WILLIAMS:  Yes.

20             THE COURT:  Good.  Thanks.  See you in an hour.

21             (The Court recessed at 12:05 p.m. and resumed at

22  1:10 p.m.)

23             THE CLERK:  Your Honor, we are back on the record

24  in criminal number 16-94 United States of America versus

25  Brian Folks.
```

1          MS. SAVNER:  Thank you, Your Honor.

2          FURTHER EXAMINATION BY MS. SAVNER:

3    Q.   Off Brouillette, the defense asked you about your

4    position.  You've been a patrol officer in three

5    departments; is that correct?

6    A.   Yes.

7    Q.   And during that tenure, about how many traffic stops

8    would you say you've conducted over your approximately seven

9    years in law enforcement?

10   A.   Um, again, it's hard to put a number on it.  Numerous,

11   numerous traffic stops.

12   Q.   Do you have an estimate on how many you do on a typical

13   week?

14   A.   Um, a few a week.  Three maybe a week.

15   Q.   And have you worked with other CI's or SOI's besides

16   Mary Robenstein?

17   A.   Yes.

18   Q.   Have you won any awards for your work as a patrol

19   officer?

20   A.   Yes, I have.

21   Q.   Can you describe those for us?

22   A.   Yes.  When I was with South Burlington I won two

23   awards.  The first, I believe, was called Gallantry Star

24   Award.  The second was a distinguished service award, I

25   believe is what it was called.  And then, I'm sorry, the

third was, basically it was a certificate.  It wasn't

actually an award, but it was a certificate of achievement

for efforts.

Q.    Thank you.  This interdiction that you ran on

January 20, 2016, you consulted DEA and Burlington Police

Department about it, correct?

A.    Yes.

Q.    And what was the word you heard back from them about

whether you should go forward or not?

A.    The word that was relayed to me, directly from

Burlington, was essentially, okay, like, we'll give you

whatever assistance we can.  And then the word that was

relayed to me through Detective Nease from DEA was that we

had the go ahead.

Q.    And you just mentioned Detective Nease.  He is a

detective with the Winooski Police Department or was at that

time, correct?

A.    That's correct.

Q.    And he was directly involved in this operation?

A.    That is correct.

           THE COURT:  How do I spell his last name?

           THE WITNESS:  I believe it's N-E-A-S-E, Your

Honor.

           THE COURT:  I think I know him.  And his first

name?

THE WITNESS:  It's David.

BY MS. SAVNER:

Q.    I want to just touch on, again, the tip that you got from Mary Robenstein.  How did you know it was her who was giving you the information?

A.    Um, at the time there was two numbers that we would generally correspond through that I was aware that she was using.  And I believe, like I said, I believe we spoke on the phone at some point during that night.  I can't recall exactly which set of correspondence when we spoke on the phone.  But I do recognize her voice when I hear it.

Q.    And based on what she told you, you've testified that you understood her source of information to be Brian Folks or someone close to him; is that right?

A.    That was the way I understood it, yes.

Q.    And can you explain why?

A.    Based on the information that she had, it would have been reasonable to believe that it would have come from either Mr. Folks himself or someone within his immediate circle.  As I know that, again, based on my training and experience, people who are involved in elicit narcotic sales or trafficking generally have a very small group of people that they share information with because they are in the business of not getting caught.  And they are trying to protect their unanimity as well.

1  Q.   And this was information you got about the travel plans
2  of Brian Folks himself, right?
3  A.   Yes.
4  Q.   You were asked by defense counsel about whether you
5  took notes.  And you said you might have written a couple of
6  things down?
7  A.   Yeah.  I believe I may have written a few things down
8  as far as, like, maybe a possible timeline or possible
9  locations, things like that.
10 Q.   Do you remember, sitting here today, anything you might
11 have written down that we haven't talked about in your
12 testimony here today?
13 A.   Not that I can recall offhand, no.
14 Q.   You talked about with defense counsel how you destroyed
15 your notes and any documents that you would keep with regard
16 to your CI's or SOI's when you left the department; is that
17 right?
18 A.   That's correct.
19 Q.   What was your understanding about Winooski Police
20 Department's preservation rules on that topic?
21 A.   As far as individual officer notes, I don't believe
22 they had a policy as far as whether or not you have to
23 destroy them or whether or not you can keep them.  It is my
24 understanding that there was -- that's an officer discretion
25 call.

1    I have handled my notes the same way for my entire

2  career.  When I am done with the notebook it gets destroyed

3  usually through Secure Shred or through a paper shredder.

4    THE COURT:  You use like a little spiral notebook

5  or something?

6    THE WITNESS:  Yes, Your Honor.  A small notepad.

7  BY MS. SAVNER:

8  Q.    Do you have a copy of Defense Exhibit C., your police

9  report, up there?  If you don't I'll hand you one.

10  A.    I don't believe I do.  Thank you.

11  Q.    So I've just handed you what was previously admitted as

12  Defense Exhibit C..  If you look at the top of that page can

13  you explain what those entries are where it says,

14  attachment, description, uploaded at, those lines at the

15  very top of the first page?

16  A.    Yes.  So the first one of the line um, it's listed as

17  attachment report, description DMI initiative.  That was

18  uploaded by Scott McGivern whose the lieutenant at the

19  Winooski Police Department.

20    That documents the chain of custody regarding the

21  drugs, the evidence that was seized as far as being

22  transported from, like, the lab or from our custody to the

23  lab.

24  Q.    Sorry.  Let me just back up one second.  So can you

25  just tell us generally what those lines mean on the report?

1    A.    Oh, yes.  I'm sorry.  So any, any time an outside

2    documentation is uploaded to the computer it shows up as an

3    attachment, whether it's a photograph or a report or

4    something of that nature.

5    Q.    Okay.  And you mentioned that the first one was the

6    sort of chain of custody report.  What was the second one?

7    A.    The second one was the written warning that was issued

8    to Mary Robenstein from that traffic stop.

9    Q.    Okay.  And what was the third?

10   A.    The third was the images or the photographs that I took

11   of the seized contraband and then uploaded to the computer.

12   Q.    The photos that we looked at today?

13   A.    Yes, those are the photos.

14   Q.    Was there any policy at Winooski PD at the time that

15   you had to upload handwritten notes you took?

16   A.    No.

17   Q.    Was there any policy at Winooski PD at the time that

18   you had to upload your CI file or SOI file?

19   A.    No.

20   Q.    You were asked about the body worn camera footage of

21   the other officers who were on scene.  Which department were

22   the other officers with?

23   A.    Burlington Police Department.

24   Q.    And at the time you were with Winooski, correct?

25   A.    Yes.

Q.   Officer Osilka was mentioned as being someone who was
on scene whose body worn camera footage we don't have right
now.  Do you remember Officer Osilka being on scene?
A.   Yes, I do.
Q.   Can you describe for us what his role was?
A.   Officer Osilka was acting, kind of a two part role.  He
was acting as the backup officer, but I believe he had a
trainee with him.  He's also a field training officer for
Burlington.  So I believe he had a trainee with him at the
time, which is why there was three officers instead of just
two.  Normally, from my understanding, they run single
officer units.  So he was acting in that capacity as the
backup officer.
Q.   Was that Training Officer Ross?
A.   Yes, I believe it was.
Q.   Did any of the Burlington Police Department Officers
have any interaction with the defendant or with any of the
passengers while they were still in the vehicle?
A.   I don't believe they did, no.
Q.   Do you remember what the -- when the first time was
that Burlington Police Department Officers had any
interaction with the passengers of the car?
A.   I believe it wasn't until the, after the K9 alert, at
which point all four occupants were ordered out of the
vehicle at that point.  And I believe that was the first

1    time they had interaction with the other occupants.

2    Q.    You were asked some questions about your due diligence

3    with respect to investigating Miss Robenstein's credibility.

4    Do you remember that?

5    A.    Yes.

6    Q.    So you were asked about whether you knew if she was a

7    current drug user or not.  If she were a current drug user

8    at that time how would that have affected your use of her as

9    an SOI, if at all?

10   A.    Um, typically it's our policy to require cooperating

11   individuals or a SOI to abstain from drug use during the

12   cooperation agreement, if you will.

13   Q.    And, to be clear, did you have any information that she

14   was using drugs at the time of this stop?

15   A.    No.

16   Q.    You were asked if you surveilled her before using her

17   as a source of information and you said you didn't, correct?

18   A.    That's correct.

19   Q.    Is that typical?

20   A.    As far as the way I was trained to conduct and to

21   handle sources of information that's correct, that is

22   typical.

23   Q.    You were asked about her criminal history.  And I know

24   you said you reviewed it at the time or previous to your

25   using her as a source of information.

1          Do you remember anything sticking out in your mind

2    from her criminal history as directly relating to her

3    propensity for truthfulness?

4          MR. NOALN:  Objection, Your Honor.  He's already

5    testified he doesn't recall her criminal history from back

6    then.

7          THE COURT:  Are we going around in a circle here?

8          MS. SAVNER:  I'm sorry?

9          THE COURT:  Are we going around in a circle here?

10         MS. SAVNER:  I'll leave it.

11         THE COURT:  All right.

12   BY MS. SAVNER:

13   Q.    You said you did ask other law enforcement officers

14   about Miss Robenstein's credibility or reliability; is that

15   right?

16   A.    Yes.

17   Q.    Okay.  And did you learn anything negative about her

18   reliability?

19   A.    No.

20   Q.    You mentioned Detective Nease had also worked with

21   Miss Robenstein directly, right?

22   A.    That's correct.

23   Q.    And he was the one that worked this operation with you,

24   right?

25   A.    That is correct.

1   Q.    Did he ever give you any cause to question

2  Miss Robenstein's reliability?

3   A.    No, he did not.

4   Q.    You mentioned Miss Robenstein was not paid for this tip

5  she provided on January 20th; is that right?

6   A.    That is, to my knowledge that is correct.

7   Q.    Are you aware of her receiving any other benefit from

8  providing this tip?

9   A.    Not directly related to this tip, no.

10   Q.    Do you know why she provided the tip?

11   A.    I do not.

12   Q.    When you stopped the car did you believe you had

13  probable cause to stop the car?

14   A.    Yes, I did.

15   Q.    Based on what?

16   A.    The motor vehicle violation that I observed.

17   Q.    Okay.  And that was a failure to signal?

18   A.    Yes.

19   Q.    When you observe traffic violations do you have

20  discretion about how you handle them?

21   A.    Yes, we do.

22   Q.    And what are sort of the bounds of that discretion?

23   A.    Um, generally whether or not we're going to address it

24  right there, issue a written warning, a ticket, up to and

25  including removal of the vehicle from the roadway, seizure

1 of plates, so forth.

2 Q.   So is that discretion available to you with respect to

3 an observed violation for failure to signal?

4 A.   Yes.

5 Q.   And how about with misuse of plates?

6 A.   Yes.

7 Q.   At the time that you stopped Miss Robenstein, in your

8 mind had you corroborated what you could from her tip?

9 A.   As best I could up to that point, yes.

10 Q.   The route that she had told you she was going to take

11 was the route Detective Nease had followed her on, right?

12 A.   That's correct.

13 Q.   And she was driving in the car she said she was going

14 to be driving in, right?

15 A.   That's correct.

16 Q.   And it was on the date and around the time she had

17 provided to you, correct?

18 A.   Yes.

19 Q.   And when you observed the occupants of the car, the

20 individual who she said would be in the car was in the car,

21 correct?

22 A.   That is correct.

23 Q.   When you were on scene with Miss Robenstein, defendant,

24 the defense counsel described what you were -- you and she

25 were doing as playacting.  How would you describe it?

A.    Um --

MR. NOALN:  Object.  I think this is sort of argumentative.  I mean, I don't think there's any relevance to that.  He's already testified to what happened.  There's a report about what happened.  He's characterized what happened.  He agreed with me.

THE COURT:  Well, I'll take an answer.

THE WITNESS:  Um, I guess, I mean, it's, you can call it what you want.  I look at it is I am attempting to put on sort of a ruse that we don't know each other in order to protect her unanimity.

MS. SAVNER:  Thank you.  Nothing further.

MR. NOALN:  Just a few questions, Your Honor.

FURTHER EXAMINATION BY MR. NOLAN:

Q.    Just to be clear, officer, the government just asked you about the source of the tip, but you don't know who gave the information to your source of information that led to this event, correct?

A.    That's correct.

Q.    You said you've always, you've always destroyed notes, that's been your approach, right?

A.    That's correct.

Q.    And other officers destroy notes, right?

A.    To my knowledge, yes.

Q.    And isn't it typical --

1    THE COURT:  Specifically when you change

2 employment?  You destroy your notes sort of at the end of

3 the day or --

4    THE WITNESS:  Typically, Your Honor, the way it

5 works, if, when my notebook becomes full and I go on to

6 another notebook that current notebook goes in the shredder.

7    THE COURT:  Got it.  Thank you.

8 BY MR. NOALN:

9 Q.    And isn't it typical that notes get destroyed at some

10 point in time because with regard to any sort of

11 investigation or official police work, you convert those

12 notes to a report, an affidavit, to something in writing,

13 right?  Isn't that typical?

14 A.    That's correct.

15 Q.    Here you did, you did create a report.  It's in

16 evidence.

17 A.    Yes.

18 Q.    But your report omitted anything about the information

19 from the source of information, correct?

20 A.    That is correct.

21 Q.    And you never documented that or its circumstances or

22 her source or anything that might be useful to us here today

23 in any written report, correct?

24 A.    That's correct.

25 Q.    And I take it, not in any e-mails or text messages to

1  DEA or anyone else?

2  A.   Other than spoken conversations between myself and

3  Detective Nease, that's correct.

4  Q.   Okay.  You indicated that Mary didn't get any

5  compensation directly from this, as a result of this event.

6  Did she end up getting some indirect compensation or benefit

7  down the line for work she was doing for your department or

8  you?

9  A.   Yes.

10  Q.   What kind of compensation was she getting?

11  A.   I believe she had a ticket or two that were dismissed.

12  Q.   Okay.  And so she got tickets dismissed for a

13  collection of work on your behalf or the department's

14  behalf, correct?

15  A.   More or less, yes.

16  Q.   You didn't do anything to verify whether or not Mary

17  was using drugs during the period that she assisted you with

18  this operation, correct?

19  A.   That's correct.

20  Q.   And, in fact, she was useful because she provided

21  information about drugs because she was hanging out with

22  people you believed and DEA believed to be drug dealers,

23  correct?

24  A.   That's correct.

25  Q.   And, in fact, she was in the car with my client whom

1   you and DEA believed at the time was a drug dealer, correct?

2   A.   That's correct.

3   Q.   And she was hanging out with him and that's why he was

4   useful, she was useful in this investigation of yours and

5   the connection to DEA, right?

6   A.   Yes.

7   Q.   And, in fact, she was hanging out too with Mandy

8   Latulippe, another drug dealer or drug user, correct?

9   A.   I am not -- whose Many Latulippe?

10  Q.   She was in the car that night.

11  A.   Okay.  I'd have to refer to the report to see that, but

12  if that's what the report says, then, yes.

13  Q.   Thank you.

14          THE COURT:  Anything further?

15          MS. SAVNER:  Nothing further.

16          THE COURT:  All right.  Appreciate it.  Thank you

17  very much.

18          Anything further from the government on this

19  motion?

20          MS. SAVNER:  No, Your Honor.

21          THE COURT:  Anything from the defense?

22          MR. NOALN:  Your Honor, just one thing.  So we

23  would like to leave the record open on this motion for a

24  very specific purpose.  The officer came in and testified.

25  He testified about information and statements, hearsay

statements provided by Mary Robenstein.

THE COURT:  Right.

MR. NOALN:  Critical to the Court's determination about whether there is probable cause here.

THE COURT:  Right.

MR. NOALN:  What we haven't yet been provided, and I made a request at lunch, and certainly don't expect it now, is that not only is this witness' credibility at issue, and we're entitled to Giglio on him, but we're entitled to Giglio on Mary Robenstein because her credibility is directly at issue, her reliability, but also too because she is a hearsay declarant in the context here.  And the rules and the law allow us to impeach a hearsay declarant just as we could a live witness.

In fact, the Vermont Supreme Court recently issued a ruling adopting the majority approach on that explicitly. We don't have those materials yet.  And certainly those could be critical to some further determination about that person.

THE COURT:  These are materials which the officer is completely ignorant of?

MR. NOALN:  No.  No.  Not necessarily.  I mean, for instance, we've requested CAD or Spillman or Valcour, I didn't mention Valcour, but Valcour, that's, as you know, the analogous system largely in Chittenden County because

those records are in the possession, custody and control of
that officer and that law enforcement.  In fact, the report
you see is a Valcour report.  That happens to be what they
use.

I don't know what they'll find.  But certainly we
think we're entitled to it since she was a hearsay declarant
who was at the root of the testimony today.

And so we'd ask, you know, we've made the request.
I'm going to follow-up in writing with the government.  But
we asked for reasonable time to review whatever the
government produces, and if appropriate, to submit it to the
Court.  And obviously the government could oppose whatever
we submit, argue that it's irrelevant.  We're going to ask
for post-hearing briefing on this motion anyway.

THE COURT:  All right.  How do you see it?

MS. SAVNER:  I would just note that we did turn
over a Giglio disclosure with respect to Mary Robenstein,
which has been admitted as Defendant's Exhibit B..  It's a
letter disclosure.  And we've obviously turned over her
criminal history.

THE COURT:  Right.

MS. SAVNER:  When we receive the written request
that defense counsel has, you know, just stated that they
provide -- they'll provide us with respect to other
materials they think are relevant and that we are obligated

1   to produce we will respond.

2           THE COURT:  All right.  So that the logical result

3   of that is holding the record open so they can have a look

4   at it and make some use of it if it's useful and tell me

5   that there's nothing further to do if there isn't?

6           MS. SAVNER:  Yes, Your Honor.

7           THE COURT:  So I'm trying to think how long, I

8   just don't want to kind of lose track of it.  So would the

9   government be able to provide this stuff within a week,

10  right?

11          MS. SAVNER:  Yes, Your Honor.  I believe so.

12          THE COURT:  So if I give you another week to

13  review it and make up your mind and submit any other

14  post-hearing briefing at that same two week point, would

15  that be fair?

16          MR. NOALN:  That would be great, Your Honor.  And

17  as we are running her name through Valcour and Spillman,

18  that's quick.

19          THE COURT:  Right.

20          MR. NOALN:  And certainly we'll move it along as

21  quickly as possible after we get what we get from the

22  government.

23          THE COURT:  All right.  But when I get your

24  post-hearing brief I'll find in it indication that, yes, you

25  want a further hearing or, no, you're done?

1          MR. NOALN:  Yes.  And you might find something in

2    between that we're just submitting it and ask that it be

3    moved into evidence.  And the government can state their

4    position on that.  We might not need to reconvene.

5          THE COURT:  Sure.  Yeah, okay.

6          MS. SAVNER:  That's fine, Your Honor.  As an act

7    of good faith Miss Averbach is currently reviewing the

8    material that defense counsel is requesting.

9          THE COURT:  Oh, that he hasn't seen yet?

10         MS. SAVNER:  Yeah.  So we presume that we can get

11   it to the defense.

12         THE COURT:  Like today, okay.  Good.

13         Did you want to call your witness in the previous

14   motion?

15         MR. WILLIAMS:  Sure.  We'd call Brian Folks, Your

16   Honor.  Would the Court accommodate him by letting him sit

17   in front of the witness stand?  He's in a wheelchair.

18         THE COURT:  Oh, of course.  I'm sorry.  I had

19   forgotten that.  I did know that Mr. Folks and it had gotten

20   away from me.

21         MR. WILLIAMS:  While he gets up there, we wanted

22   to check with the Court.  This is, you know, obviously if

23   the case goes to trial, he can't stand and I don't know

24   how --

25         THE COURT:  We'll deal with it.  Don't worry about

1     it. We'll sort it out. All right.

2         Mr. Folks, why don't you come on up. You guys

3     have some understanding about the scope of

4     cross-examination? I only did this once. It was a

5     traumatic experience for me with Tom Anderson on the other

6     side. It was that long ago. So I never did it again. But

7     I'll step aside and let you go forward.

8         MR. WILLIAMS: I've called my client, my clients

9     on very discreet issues like this.

10         THE COURT: Right.

11         MR. WILLIAMS: Obviously, the government gets a

12     chance to cross-examine him on impeachment issues, but --

13         THE COURT: Sure.

14         MR. WILLIAMS: -- it's limited to that, not what

15     did you do.

16         THE COURT: Right. Right. Right. Do you see it

17     the same way? Whose going to take charge of this one?

18         MR. FISHMAN: I am, Your Honor. Without knowing

19     the full scope of what Mr. Folks has to say I'll reserve my

20     right to cross-examine him on the contents as is appropriate

21     under the circumstances.

22         THE COURT: But I think we're concerned with the

23     missing five minutes, right?

24         MR. WILLIAMS: That's all.

25         THE COURT: Yeah, got it.

          MR. WILLIAMS:  What happened during the, before
the audio went on.

          THE COURT:  Got it.  All right.  Mr. Folks, come
on up.

          B R I A N   F O L K S, the Witness, after being
duly sworn, was examined and testified as follows:

          THE COURT:  Can you swing yourself so you can see
your attorney as well as me?  Why don't you turn sort of
sideways towards us both.  It will be a little easier for
you.

          DIRECT EXAMINATION BY MR. WILLIAMS:

Q.   And the microphone's here, Brian.

          Can you just keep your voice up?  Would you state
your name for the record, please?

A.   Brian Folks.

Q.   Sir, we heard testimony this morning that five minutes,
the first five minutes of the session you had with these
investigators was not recorded.  Do you remember that?

A.   Yes.

Q.   Could you, in your own words, tell Judge Crawford what
happened during that five minutes?  Who said what to whom?

A.   I don't know exactly who the officers are, like who
their names, I only know the one that was sitting up here.
But um, when we first went in there they asked me -- they
was talking to me about drug trafficking.  And I kept

1    denying that I don't traffic drugs.

2            And um, they said that they had been watching me

3    for a while and they had some sales, I was making a sale of

4    some sort in my house.  And I told them -- I asked them what

5    date.  I told them that was false.  And I told them I knew

6    something was going on because I kept getting harassed, I

7    kept getting pulled over.  So that's why I tried to get

8    counsel before just in case something happened.

9            And they asked me, where my lawyer's at.  I told

10   him my lawyer's in New York and I would have to get in touch

11   with him.  And --

12   Q.    Thank you.  Nothing further.

13           CROSS EXAMINATION BY MR. FISHMAN:

14   Q.    Now, Mr. Folks, good afternoon.

15   A.    Good afternoon.

16   Q.    This interaction that you had with the police that day

17   was not the first time you had been arrested, correct?

18   A.    Correct.

19   Q.    You had been arrested on a murder charge back in 1992,

20   correct?

21   A.    Yes.

22   Q.    And at that time you were Mirandized, correct?

23   A.    Yes.

24   Q.    And ultimately you plead guilty to first degree

25   manslaughter in that case?

1   A.   Yes.

2   Q.   Now, in addition to that particular arrest, you had

3   numerous other arrests and interactions with police,

4   correct?

5   A.   Um, not when I had to be Mirandized.

6   Q.   But were you arrested in 2006 for marijuana possession?

7   A.   Yes.

8   Q.   Were you Mirandized upon that arrest?

9   A.   I believe so.

10   Q.   And in 2013 you were arrested, I believe, as a fugitive

11   as well as for providing false information to a police

12   officer.  Do you recall that arrest?

13   A.   Yes.

14   Q.   And you were Mirandized on that situation?

15   A.   No.

16   Q.   You were not Mirandized at that time?

17   A.   Not to my knowledge, no.

18   Q.   In the July 2015 arrest for having assault with a

19   weapon were you Mirandized on arrest?

20   A.   Assault with a weapon?  I don't really remember that

21   one.

22   Q.   What about 2014 arrest on sexual assault aggravated

23   with a weapon, were you Mirandized on that time?

24   A.   2014.  What month?

25   Q.   Um, you know, I didn't write that one down in my notes,

1    other than that it was in 2014.

2    A.    I'm not really sure of the situation.

3    Q.    Do you recall being arrested in 2014?

4    A.    Yeah, I was transferred to New York on that time I

5    believe.

6    Q.    And were you Mirandized upon that arrest?

7    A.    When they were -- I was arrested a couple of times for

8    parole violation.  When they arrest me for parole violation

9    they don't Mirandize me.

10   Q.    But needless to say, when you had your interview on

11   July 19, 2016 you were familiar with your rights under

12   Miranda?

13   A.    Yes.

14   Q.    That included the right to remain silent, correct?

15   A.    Yes.

16   Q.    And it included the right to consult with an attorney

17   if you so wished?

18   A.    Yes.

19   Q.    And would you agree that in the audio recorded portion

20   of the two hour interview that you had with DEA and others,

21   you at no point specifically asked for a lawyer?  Would you

22   agree with that?

23   A.    No.

24   Q.    You believe you specifically asked for a lawyer during

25   your interview with the DEA?

A.   Well, I don't, I don't know if I specific asked for him
or just mentioned him, but I know we spoke about a lawyer a
couple of times.

Q.   Right.  You mentioned a lawyer, you had some lawyer in
New York?

A.   Yes.

Q.   And is it your testimony that you specifically said you
did not want to have further conversations with them without
that lawyer present?

A.   No, I didn't say that.

Q.   You didn't specifically say you didn't want to speak
unless your lawyer was present, correct?

A.   No.

Q.   And you didn't specifically tell the investigators that
you wanted to assert your right to silence; is that correct?

A.   I wanted -- I said -- I said I'll speak to them about
certain things that I knew of.

Q.   Right.  And, in fact, you did answer some of the
officer's questions that day, correct?

A.   Yeah.

Q.   And there were certain topics that you didn't want to
talk about, correct?

A.   Yeah.

Q.   For example, the gentleman who was arrested alongside
you that day, you didn't want to give any information about

1  him, correct?

2  A.   Correct.

3  Q.   And you didn't give any information about him, correct?

4  A.   Correct.

5  Q.   And you just went on with the interview?

6  A.   Correct.

7  Q.   And with respect to information about the location of

8  your storage unit, you didn't want to tell them information

9  about that, correct?

10  A.   Correct.

11  Q.   And you didn't tell them information about that?

12  A.   No, but they kept asking.

13  Q.   But you didn't tell them?

14  A.   No.

15  Q.   And you never sought to end the interview with them on

16  that day?

17  A.   I just changed the subject.

18  Q.   Right.  Which was within your right, correct?

19  A.   Yeah.

20  Q.   But the question is, did you specifically tell them

21  that you wanted to end the interview at any point during

22  that two hour interview?

23  A.   I never used those words, no.

24  Q.   Would you agree that the tone of the interview was

25  conversational in nature?

1   A.    To a degree.

2   Q.    And they weren't yelling at you, correct?

3   A.    On that one officer, the one that stepped outside the

4   room, I don't know his name, what it was, he got agitated.

5   And he stepped outside the room and picked up the phone.

6   And I heard him say, he's talking to us, but he's

7   bullshitting us.

8   Q.    He didn't threaten you did he?

9   A.    Not directly, no.

10  Q.    Did you feel threatened when he said, he's bullshitting

11  us?

12  A.    Yeah.

13  Q.    What exactly was it that you found so threatening?

14  A.    His whole demeanor had changed at that point.  And it

15  kept going all the way until we got outside the parking lot

16  when he told me, don't get in the box because they forgot to

17  swab you for a DNA.  And I was actually, why are you

18  swabbing me for a DNA.  He caught an attitude, like, if you

19  don't want to do it we'll write a summons or something he

20  said and we'll put it in the Court.

21  Q.    This is after the statement that we're talking about?

22  A.    Yes.  When he was pulling me out, yeah.

23  Q.    Okay.  But now specifically I want to understand what

24  it is that you are claiming happened during the five minutes

25  that were not recorded.

1    You stated, I believe, and let me just make sure

2  I'm summarizing this right, first of all, you're saying you

3  denied participating in drug trafficking, correct?

4  A.   Excuse me, yes.

5  Q.   You questioned whether or not there was any recording

6  of a sale that you had participated on the record?

7  A.   No.  I said that there would be a recording if -- they

8  said I made a sale in my house.  And I said if I did that

9  there would be a recording of it.

10  Q.   Okay.  And you also said that these allegations against

11  you were false?

12  A.   Yes.

13  Q.   Now, is it your testimony that during that five minutes

14  you specifically said I want to assert my right to silence?

15  A.   I didn't say that exactly, no.

16  Q.   And during the five minutes that were -- where there's

17  no audio recording, you did not say, I won't speak to you

18  further without my lawyer present?

19  A.   I didn't say that neither, no.

20  Q.   And as you continued with the interview you were

21  eventually read aloud your Miranda Rights, correct?

22  A.   I believe so.  I'm not sure.

23  Q.   They gave you a paper with the different Miranda

24  Warnings written out on them, correct?

25  A.   I believe so.

```
1   Q.    Have you reviewed the video of your interview in
2   preparation for today?
3   A.    No.
4   Q.    Have you reviewed the transcripts of your testimony for
5   today?
6   A.    No.
7   Q.    Let me get Government's Exhibit 3A, which is the
8   transcript that we already admitted.  This was provided to
9   the government by defense counsel.
10        If you could turn to page 15.  And I believe the
11  part where you're reading the testimony actually starts a
12  little bit before that.  If you could look at 14, line 16?
13  A.    On page 15?
14  Q.    Sorry.  On page 14, line 16.
15  A.    Yes.
16  Q.    You would agree that you read the rights provided to
17  you aloud?  Would you agree with that?
18  A.    Um, yes.  It says that's me.
19  Q.    And you understood those rights?
20  A.    Yeah.
21  Q.    Correct?  Because this was not the first time you had
22  been read those rights before, correct?
23  A.    Yeah.
24  Q.    And you agreed that you were willing to answer some of
25  the officer's questions?
```

A.    Some.

Q.    And after the reading of Miranda Warnings, you spoke to the officers, in part, about the allegations of the heroin trade, correct?

A.    I'm not sure.  I don't know.

Q.    Well, do you recall that you admitted to them that you were involved in the heroin sales quote, in some way?  Do you remember telling that to them?

A.    No.

Q.    If I could point your attention to page 18, lines 24 to 25?

A.    Okay.

Q.    Right.  You agree that you told them that you were involved in the drug trade in some way, correct?

A.    Not like -- but not like they think.

Q.    Okay.  And later on in that interview you acknowledge to the investigators that you were the violent one, do you recall that?

A.    Yeah.

Q.    And that was a truthful statement that you made to them?

A.    Excuse me?

Q.    That was a truthful statement that you made to the officers?

A.    On my arrest was violent.

```
1    Q.    Violent.  And if I'm not mistaken you referred to your

2    arrest as a murder, correct?

3    A.    Who?

4    Q.    To murder?

5    A.    No.

6    Q.    You don't recall telling the officers that your

7    conviction was for murder?

8    A.    If I did I don't recall talking about that.

9    Q.    I would like to draw your attention to page 84, lines

10   20 to 25?

11   A.    What line?

12   Q.    84, lines 20 to 25.

13   A.    Okay.

14   Q.    You're being asked -- the officers are talking about

15   your criminal history.  You say you don't have a criminal

16   history.  Then you say you only have one conviction.  They

17   say, for what?  And your answer was at the bottom of page

18   84?

19   A.    Murder.

20   Q.    Murder.  That was what you told them, correct?

21   A.    Yes.

22   Q.    And that's what -- that's how you described the

23   conviction that you had back in New York to others, correct?

24   A.    No.

25   Q.    You've never described your conviction as being for
```

1  murder?

2  A.    No.

3  Q.    You describe it as what?

4  A.    I don't describe my convictions period.

5  Q.    Okay.  You -- and after your Mirandized portion

6  statement you acknowledge to the officers that you are able

7  to get respect from people because you had been a member of

8  a gang; is that correct?

9        MR. WILLIAMS:  Your Honor, I'm going to object at

10 this point.  I'm not sure what the purpose of the

11 cross-examination is.

12       THE COURT:  Well, I understand what the purpose

13 is, but I think, aren't we beyond the scope of the direct?

14       MR. FISHMAN:  Well, in part, Your Honor, he's

15 challenging the voluntariness of his statement.  And I'm

16 inquiring as to the specifics of the statement itself to

17 see, A., whether or not he made that statement and whether

18 or not it was true and whether or not it was, in fact, a

19 voluntary statement that he made at that time.

20       MR. WILLIAMS:  Your Honor, we're not challenging

21 the voluntariness of the statement.  My client, according to

22 what he just testified to, during the five minutes while

23 this statement was not being recorded, he told the

24 investigators that he had a lawyer in New York and he wanted

25 to talk to the lawyer.

1      That's when the questioning should have ended.

2 It's not a question of voluntariness that they put pressure

3 on him to talk.  They just didn't listen to his invocation

4 of his right to counsel.

5      THE COURT:  Yeah, I'll sustain the objection.

6      MR. FISHMAN:  If I may, Your Honor?  It is a

7 portion of their argument, unless they are withdrawing a

8 component of their argument, that Mr. Folks was compelled by

9 the promises of leniency and thus it somehow corrupted even

10 the Mirandized portion of the statement.

11      I don't know if they are now withdrawing that

12 argument as a bases for their motion, but that is currently

13 as the motion stands one of the basis.

14      MR. WILLIAMS:  Right.  That's one of the bases.

15 The other bases is a violation of the right to counsel.

16 Those two are not intertwined.  One is, they should have

17 listened to his invocation of his right to counsel.  And

18 then, two, they did these other things.

19      And the only thing we're focusing on with my

20 client's testimony today right now is whether he invoked his

21 right to counsel.  And he says he did.  The officer doesn't

22 remember what happened.

23      MR. FISHMAN:  And, Your Honor, I would note, in

24 looking at the three specific memories that Mr. Folks has

25 testified about, all three of those things are reflected in

the transcript of the interview.

So, in part, his memory of the event, and what he recalls saying at which particular time, is, in fact, relevant for assessing his credibility for his ability to remember this very specific five minute period.

THE COURT:  All right.  I'll sustain the objection.  We'll try and focus on the five minute gap and see if we can bring this to a conclusion.

MR. WILLIAMS:  Thank you.

MR. FISHMAN:  The Court's indulgence?

BY MR. FISHMAN:

Q.   Is it your testimony today that you specifically asked, during that five minute period, that you wanted to call your lawyer in New York?

A.   I don't think I specifically asked like that, no.

Q.   No.  You may have mentioned that you had a lawyer in New York, correct?

A.   Yeah.  Well, we was talking about the time and everything.

Q.   Okay.  Was there anything about the discussion of cooperation that made you feel that you had to continue speaking with them?

A.   I don't -- say that again?

Q.   Well, during the course of your interview, the agents talked about how you could cooperate with the drug

1  investigation, correct?

2  A.    Correct.

3  Q.    And they mentioned there were different ways, you could

4  do it after you plead guilty, correct?

5  A.    Correct.

6  Q.    You could cooperate by talking right now, correct?

7  A.    Correct.

8  Q.    And there were no promises that if you talk right now

9  you're definitely going to get leniency, correct?

10 A.    I was told I could help myself by talking to them right

11 now, right then and there.

12 Q.    But they didn't tell you what that promise would be or

13 that leniency would be, correct?

14        MR. WILLIAMS:  Your Honor, again, this isn't part

15 of the five minutes.

16        THE COURT:  I understand.  But I'll -- I think

17 it's fair enough.

18 BY MR. FISHMAN:

19 Q.    They didn't, they didn't tell you if you plead guilty

20 you will get this, correct?

21 A.    No.  Actually, he said they would write a letter and

22 give it to the judge and the judge would consider everything

23 that I said was factual and that I helped you all.  And then

24 they would down -- I can't remember the exact way they put

25 it, but downplay my sentence.

Q.   Downward departure, correct?  Does that sound familiar?

A.   That's -- I don't know.  I guess.

Q.   And this didn't compel you to keep talking to them, correct?

A.   In a way.  It made me want to -- I wanted to get out of there.  So if they told me talking to them was going to help me get out of there I wanted to get out of there.

Q.   Let me draw your attention to page 52 after you had discussed the process that the agents had talked to you, you said, I understand the process.  I understand essentially how it works to cooperate.  Page 52, lines one to 24.  And then you acknowledge that you understood the process on page 53, line 16.

A.   I don't --

Q.   You see on 53 page line 16, after you had been discussing the different ways that you could cooperate, you said, I understand the process, correct?

A.   Yeah.  I said, I understand the process, but you are not understanding what I'm saying.  What does, what does it, what does it benefit me to help you in that sense because the only thing it's going to do, the end result is if I help you out in that way, like I know for a fact if I did get on board and helped you out in that way like this nobody in Burlington or Winooski or Essex that I can't get to.

Q.   Right.  So you were making an assessment about whether

1   or not to cooperate or not, correct?

2   A.   I think so.

3   Q.   And you chose not to, correct?

4   A.   No, I was helping them.

5   Q.   Right here.  You were helping them by, how so?

6   A.   By answering the questions they was asking me.

7   Q.   Okay.  Later on, as you get to page 89, line 17 to 19,

8   you express that the efforts that they were making in trying

9   to convince you to incriminate yourself weren't working on

10   you; is that right?  In terms of cooperation?

11   A.   Okay.  What's your question again?

12   Q.   My question is, you were telling them, I understand

13   what you're saying about the benefits of cooperation, and

14   maybe this would work on someone who hadn't been arrested

15   before, but it's not working on me?  I don't see the benefit

16   of that, correct?

17   A.   No.  Basically I just said I'm -- I didn't understand

18   what I was getting out of it.

19   Q.   Right.  And so you didn't say incriminating statements

20   because they were telling you you may get some benefit?

21   A.   No.  They was asking me to say more than what was

22   already said.  And I was trying to explain to them you're

23   asking me to say this stuff what am I getting out of all

24   this.

25   Q.   And so you didn't say anything more, correct?

A.    I tried not to, no.

Q.    Because the effects of this discussion of leniency
wasn't having its effect on you?  It wasn't working?

A.    I didn't see benefits for me helping them any further
than I had already done.

Q.    All right.

        MR. FISHMAN:  Thank you, Your Honor.

        THE COURT:  All right.  Anything further?

        MR. WILLIAMS:  No.  Thank you.

        THE COURT:  All right.  Appreciate it.  We'll
return Mr. Folks to his spot.  Take up the next motion.

        MR. FISHMAN:  Your Honor, the next motion that we
would take up is 137 and 141, both relate to the same stop
and the same witness.  The government would call Michael
Beliveau to the stand.

        M I C H A E L   B E L I V E A U,  The Witness,
after being duly sworn, was examined and testified as
follows:

        THE COURT:  Good afternoon.  Good to see you.

        THE WITNESS:  Good afternoon, Your Honor.

        THE COURT:  Chittenden County must be a little
under policed today.

        THE WITNESS:  A little bit.  Yes, sir.

        DIRECT EXAMINATION BY MR. FISHMAN:

Q.    Good afternoon, detective.  How are you currently

1 employed?

2 A.   Full-time police officer with the Burlington Police

3 Department.

4 Q.   And what is your current title?

5 A.   My current assignment?

6 Q.   Yes.

7 A.   It's a detective with the Burlington Police Department.

8 Q.   How long have you been with the Burlington PD?

9 A.   I graduated the academy May of 2013, but I've been

10 employed there since January of 2013.

11 Q.   And when did you get promoted to detective?

12 A.   Last month.

13 Q.   Congratulations on your promotion.

14 A.   Thank you.

15 Q.   As of December 25, 2015, what was your assignment at

16 that time?

17 A.   I was on patrol.

18 Q.   And could you just briefly explain what your typical

19 duties are as a patrol officer working the Christmas shift?

20 A.   Sure.  We're assigned one of the districts in the city

21 of Burlington.  There's five different districts.  And they

22 were just to patrol, respond to calls, look for crime, help

23 people.

24 Q.   The evening of December 25, 2015, do you recall what

25 shift you were working?

1  A.   The evening shift, which begins at 4:45 p.m. and then

2  ends at 2:45 a.m..

3  Q.   And were you working alone or with a partner that day?

4  A.   I believe I was doubled up that day.

5  Q.   And who were you working with?

6  A.   Officer Ethan Czyzewski.

7  Q.   And I know the court reporter is going to want you to

8  spell it so take your best stab at it.

9  A.   C-Z-Y-Z-E-W-S-K-I.

10 Q.   Did, during the course of your working on that evening,

11 did you make a traffic stop that ultimately led to a seizure

12 of a handgun?

13 A.   Yes.

14 Q.   What led to you make that traffic stop?

15 A.   There were no functioning plate lights on the vehicle,

16 on the rear of the vehicle.

17 Q.   Is that a violation of a Vermont traffic law?

18 A.   Yes.

19 Q.   And so after observing -- do you recall what kind of

20 vehicle we're speaking about?

21 A.   A Dodge Durango.

22 Q.   And what happened after you pulled over the Dodge

23 Durango?

24 A.   I approached the driver's side of the vehicle and my

25 partner approached the passenger's side of the vehicle.

1   Q.   Who did you observe inside the vehicle?

2   A.   I made contact with the driver, there was only one

3   person in the car, and identified him as Brian Folks.

4   Q.   How did you identify him as Brian Folks?

5   A.   Verbally.

6   Q.   Did he provide you a license?

7   A.   No, he said he didn't have it.

8   Q.   And did he provide you other identifying information

9   that allowed you to run him in the system?

10  A.   Date of birth.

11  Q.   And so he gave you his name as Brian Folks, correct?

12  A.   Yes.

13  Q.   And the person that we're talking about, do you see him

14  in the courtroom here today?

15  A.   Yes.

16  Q.   And could you identify him by some clothing or his

17  location in the courtroom?

18  A.   He's sitting right over there to your left there in

19  the, like the dark blue.

20        MR. FISHMAN:  Let the record reflect this witness

21  identified the defendant.

22        THE COURT:  Shirt blue?

23        THE WITNESS:  Dark blue or gray.

24        THE COURT:  Okay.  Fair enough.

25  BY MR. FISHMAN:

Q.    He's not wear wearing a tie, correct?

A.    No tie.  Maybe a gray undershirt, white undershirt.

        THE COURT:  It's the two lawyers that are truly in dark blue.

        MR. NOALN:  The two old bald guys with the glasses.

        THE COURT:  Yeah, right.  Fair enough.

BY MR. FISHMAN:

Q.    Did the name Brian Folks mean anything to you once you heard it?

A.    Yes.  I had prior knowledge of him.

Q.    How did you have prior knowledge of the defendant?

A.    Just various briefings in role-calls.  I also had responded to assist an officer with one of his incidents pertaining to Mr. Folks.

Q.    Had you ever spoken to Mr. Folks before?

A.    I don't believe I actually spoke to him before.

Q.    So in addition to asking for a license, did you ask for registration, proof of insurance?

A.    Yes.

Q.    And what did the defendant respond with respect to those two items?

A.    He couldn't find the insurance, but he provided registration.

Q.    Did you ask him -- well, who was the car registered to?

A.    Miss Lori Crawford.

Q.    Was there any discussion about whether or not the defendant owned this vehicle or not?

A.    He said that he was borrowing her car, Lori's car.

Q.    But that the car did not belong to him, correct?

A.    I don't recall the specific statements.

Q.    After getting this information, what did you do?

A.    I queried his name and date of birth in Vermont DMV database through my dispatch center.

Q.    And what did you notice after you had run his name in the system?

A.    He had a suspended license, civilly suspended license in Vermont.

Q.    Did you have any discussions with Officer Czyzewski, am I saying that right?

A.    Yes, sir.

Q.    While you were in the vehicle running his name?

A.    Yes.

Q.    And what was that discussion?

A.    I asked him if he saw anything in the vehicle.  And he told me he did.  He said he saw a small plastic baggie on the floor of the car as well as a small rubber band.

Q.    Were there any additional items that you either saw at that time or you later observed in the vehicle?

A.    Yes.  An alcohol swab pad.

1    Q.    And why was that alcohol swab pad significant?

2    A.    Just from my prior experience and some prior trainings

3    I've learned that it's frequently used by IV drug users

4    often to clear an injection site, as well as the plastic

5    baggie and the rubber band could be packaging materials,

6    just from prior experience or trainings.

7    Q.    So as a result of these observations what did you do?

8    A.    I requested a K9 to the scene through my dispatch

9    center.

10   Q.    And did a K9 officer ultimately arrive?

11   A.    Yes.

12   Q.    And who was that?

13   A.    Corporal Dave Dewey and K9 Tazor.

14   Q.    And which departments are they associated with?

15   A.    Colchester Police Department.

16            THE COURT:  What's the dog's name?

17            THE WITNESS:  Tazor.

18            THE COURT:  Tazor.

19   MR. FISHMAN:

20   Q.    And for the record, that's T-A-Z-O-R, not to infringe

21   on the copyright, correct?

22   A.    Yes, I believe so.

23   Q.    About how long did it take for the police K9 to arrive

24   at the scene, if you recall?

25   A.    I think it was approximately eight minutes.

1  Q.   And were you familiar with Corporal Dewey and K9 Tazor?

2  A.   Yes.

3  Q.   What was your experience with them previously?

4  A.   I think we've called them to the scene for various

5  investigations prior to this one, but I can't recall a

6  specific incident.

7  Q.   Had you had positive alerts after having K9 Tazor

8  respond to the scene?

9  A.   Prior to this?

10  Q.   Yes.

11  A.   I don't recall.

12  Q.   Okay.  What did Corporal Dewey and K9 Tazor do after

13  arriving at the scene?

14  A.   Corporal Dewey took his K9 out of the vehicle and

15  conducted a sniff of the vehicle we had stopped.  So he

16  walked his K9 around the vehicle.

17  Q.   And did Corporal Dewey tell you whether or not there

18  was an alert by the K9 in this matter?

19  A.   Yes.  He said that his K9 alerted to the rear passenger

20  side door of the vehicle.

21  Q.   And do you know about how long that whole process took?

22  A.   I don't recall specifically.  I could estimate.

23  Q.   If you could just briefly estimate?

24  A.   A couple minutes.

25  Q.   Now, once you had the K9 alert, did you explain to the

1  defendant what his options were moving forward?

2  A.   Yes.

3  Q.   And what did you explain to him?

4  A.   I explained -- I requested for his permission to search

5  his vehicle.  I was seeking consent to search the car.  I

6  explained he didn't have to let me search his car, I can

7  send a request, I can apply for a search warrant which may

8  or may not be granted by a judge.

9  Q.   And what did he say with respect to granting consent?

10 A.   He didn't want to make a decision because it wasn't his

11 vehicle.

12 Q.   And so who did he say he would need to consent?

13 A.   Lori.  He said if Lori consented he would be okay with

14 it, which was the registered owner of the vehicle.

15 Q.   And what did you say in response with respect to his

16 ability to consent?

17 A.   Well, I believe I told him he was in control of the

18 vehicle and, therefore, he had the ability to consent to the

19 vehicle or make a decision.

20 Q.   But he did not consent to a search of the vehicle,

21 correct?

22 A.   Correct.

23 Q.   And did you have another officer reach out to Lori

24 Crawford to see whether or not she would consent?

25 A.   Yes.

Q.    And what did you learn as a result of that inquiry?

A.    I learned that she did not want us to search the vehicle and had told us that Mr. Folks had her register the car for him, but otherwise he was typically the one driving it.

Q.    And as a result of not getting consent from Miss Crawford, and not getting consent from the defendant, what happened next?

A.    I requested Spillane's Tow Truck Company to the scene to tow the vehicle back to the Burlington Police Department, to seize the vehicle essentially.

Q.    And your plan was then to seek a search warrant for the search of the vehicle, correct?

A.    Yes.

Q.    Now, prior to the towing of the car, what happened in the back of the car?

A.    In the rear of the car?

Q.    In the rear of the car.

A.    Mr. Folks exited the vehicle.  Consented to a search of his person.  We didn't find anything illegal on his person. We noted he had two cell phones and it seemed like a large sum of money, which I did not count.

        He said he wanted to retrieve the presents out of the rear of the vehicle.  He had some gifts, I think, due to the holiday season.  And he consented to have me retrieve

1  those presents out of the trunk of the vehicle.

2  Q.   And could you briefly describe what you retrieved?

3  A.   I believe there were a couple of garbage bags full of

4  wrapped and unwrapped presents.

5  Q.   And did you look inside the bag?

6  A.   Yes.  He allowed us to look inside the bag.  I didn't

7  open all the wrapped presents, but I didn't find anything

8  suspicions or illegal inside the bags.

9  Q.   Did you unwrap any of the presents?

10  A.   I don't recall if we unwrapped anything.  I think we

11  looked in whatever was open, like maybe a gift bag or

12  something like that.

13  Q.   And did you then return those packages with the

14  presents to Mr. Folks?

15  A.   Yes.

16  Q.   And did Mr. Folks remain on the scene until the tow

17  truck came?

18  A.   I don't recall specifically when he left.  I know he

19  had requested a ride come pick him up.

20  Q.   Did, in fact, the tow truck show up?

21  A.   Yes.

22  Q.   And what happened next?

23  A.   Mr. Folks secured his vehicle and left with the keys to

24  the vehicle.  And then the tow truck towed the vehicle to

25  the Burlington Police Department where it was secured in a

1    secure sallyport.

2    Q.    Did there come a point where you applied for a search

3    warrant?

4    A.    Yes.

5    Q.    I'm going to show you what's been previously marked as

6    Government's Exhibit 14.  If you could just identify

7    Government's Exhibit 14 for the record, please?

8    A.    So identify this?

9    Q.    Yes, please.

10   A.    This is the search warrant that I applied for for the

11   vehicle Mr. Folks was driving.

12          MR. FISHMAN:  At this time the government would

13   move to introduce Government's Exhibit 14 into evidence.

14          MR. WILLIAMS:  No objection, Your Honor.

15          THE COURT:  Admitted.

16   BY MR. FISHMAN:

17   Q.    In fact, the warrant was signed, correct?

18   A.    Yes.

19   Q.    And did there come a point on December 28, 2015 when

20   you searched the vehicle?

21   A.    Yes.

22   Q.    And what did you find when you searched the vehicle?

23   A.    We found a loaded handgun in the glove box of the

24   vehicle.

25   Q.    As a result your search, did you take any photographs?

```
1    A.    Yes.

2    Q.    I'm going to show you what's been marked as

3    Government's Exhibit 16.  Are those the photographs that

4    were taken during the search of Mr. Folks', sorry, rather,

5    the 2002 Durango on December 28, 2015?

6    A.    Yes.

7    Q.    Do they appear to be true and accurate copies of those

8    photographs?

9    A.    Yes.

10             MR. FISHMAN:  The government would admit

11   Government Exhibit 16 into evidence at this time.

12             MR. WILLIAMS:  No objection.

13             THE COURT:  Admitted.

14   BY MR. FISHMAN:

15   Q.    Now, with respect to video, did Burlington Police

16   Department have dash camera video at that time?

17   A.    No.

18   Q.    Does it have dash camera video today?

19   A.    No.

20   Q.    Were officers outfitted with body cameras?

21   A.    I was.

22   Q.    You were that day?

23   A.    Yes.

24   Q.    And did you, in fact, make recordings of portions of

25   the stop?
```

1    A.    Yes.

2    Q.    Could you just briefly describe how that took place?

3    A.    How I activate the recordings?

4    Q.    Yes.  Just generally.

5    A.    I was wearing a body camera.  And typically when we're

6    about to encounter someone we would activate the body camera

7    by double tapping the camera.  And then when we're

8    conversing with other officers at the time, if we were in

9    our cruiser discussing tactics or how we were going to

10   proceed, we would turn the cam off until we would then

11   re-approach whoever we were dealing with.

12   Q.    So as a result of turning the camera on and off, that

13   created separate digital files; is that correct?

14   A.    Yes.

15   Q.    My understanding is that's not how Burlington Police

16   does it any more?

17   A.    Correct.

18   Q.    Now, is it correct to say that you have some sort of

19   mute function on your video?

20   A.    Yes.  In the newer model of the body cameras that just

21   came out.

22   Q.    But that wasn't the case in 2015 on December 25th?

23   A.    Correct.

24   Q.    Did you review records to see whether or not Officer

25   Czyzewski recorded any video?

A.     I don't recall.

Q.     How did you mark the five separate video files in this case, in terms of, in terms of how is it stored generally in the BPD system?

A.     Like how did I label it or --

Q.     Exactly.  If you could just describe generally how videos can be labeled in your system and what effect that would have on their retention policy for Burlington Police Department?

A.     Sure.  There's a few different labels depending on the type of video, whether it's a traffic stop, whether you use force or if an arrest was made or if it's just an incident under investigation.  And each category would retain the video for a certain period of time depending on what you label it as.

Q.     And do you recall how you labeled this specific video?

A.     I labeled this as an investigation.

Q.     And are you aware how long videos labeled investigation are retained under Burlington's retention policy?

A.     I learned one year.

Q.     Do you recall whether or not you ever reviewed the videos that you took?

A.     I believe I did when I was drafting my affidavit and search warrant applications.

Q.     Did you observe anything in the videos inconsistent

1   with what you ultimately documented in your police report?

2   A.    No.

3   Q.    Your understanding, if I'm correct, is that the five

4   digital video files from the stop no longer exist; is that

5   correct?

6   A.    Yes.

7   Q.    And what is your understanding of why they no longer

8   exist?

9   A.    Because of the label that I assigned the videos as

10  investigation, after the year had lapsed the videos were

11  automatically deleted from the system.

12  Q.    Did you intentionally destroy the video of this traffic

13  stop?

14  A.    No.

15  Q.    Are you aware if any other person intentionally

16  destroyed it for a reason other than the retention policy?

17  A.    No.

18  Q.    And just, if you know, do you know other ways that a

19  video can be indexed in terms of other, other labels that

20  you could give to a video in your system?

21  A.    Like traffic stop or arrest or --

22  Q.    Exactly.

23  A.    Yeah.

24  Q.    So if you were to label something traffic stop, for

25  example, what is the retention policy, if you know?

1   A.   I believe it's, it was either 90 or 180 days.  A new

2   policy just came out and so --

3   Q.   But less than the year that it would have been

4   preserved under the way that you had marked the video?

5   A.   Yes.

6   Q.   And are you aware whether or not Brian Folks was ever

7   arrested in connection to this specific traffic stop within

8   a year of the event?

9   A.   I don't recall.

10  Q.   You certainly never arrested him within that year

11  period, correct?

12  A.   No, I did not.

13        MR. FISHMAN:  The Court's indulgence?  Thank you

14  officer, detective.

15        THE WITNESS:  Thank you.

16        CROSS EXAMINATION BY MR. WILLIAMS:

17  Q.   Good afternoon, detective.  How are you?

18  A.   Good afternoon.  I'm well.  How about yourself?

19  Q.   Good.  Thank you.  Thank you for coming in today.

20        You said there were five sectors in Burlington?

21  A.   I'm sorry, could you repeat that?  I couldn't hear you.

22  Q.   You said there were five sectors in Burlington for

23  patrolling purposes?

24  A.   Yes.

25  Q.   What sector were you assigned to on Christmas day,

1  2015?

2  A.   I don't recall.

3  Q.   Well, when you first encountered the 2002 Dodge Durango

4  was at the corner of North Street and Elmwood?

5  A.   I don't recall.

6  Q.   And then you followed the vehicle up to the Beltway?

7  A.   Yes.  I did see, yeah, I was behind the vehicle on the

8  Beltline.

9  Q.   Right.  But the first time you encountered the vehicle

10  was in the city of Burlington before you got out to the

11  Beltway, right?

12  A.   I don't recall.

13  Q.   What, what's your best recollection of the first time

14  you saw the Dodge Durango?

15  A.   As I was behind it on the Beltline.

16  Q.   But everything before that is sort of lost in space,

17  lost in memory?

18  A.   Yeah, I don't recall.  I'm sorry.

19  Q.   And were you following the vehicle on the Beltway?

20  A.   Yes.

21  Q.   Which direction were both vehicles going when you first

22  recall seeing the Durango?

23  A.   Northbound.

24  Q.   Okay.  Towards Colchester?

25  A.   Yes, sir.

1    Q.    All right.  How did you get to the Beltway?

2    A.    Yeah, I'm sorry, I don't recall my specific route prior

3    to being on the Beltline.

4    Q.    Okay.  Now, you stopped the vehicle, right?

5    A.    Yes.

6    Q.    And your -- you activated your body camera when you

7    went up to the vehicle, correct?

8    A.    Correct.

9    Q.    Your body camera was activated and your interactions

10   with the driver, as it turned out to be Mr. Folks, was

11   recorded on that body camera, right?

12   A.    Yes.

13   Q.    All right.  And you left the body camera on while you

14   were talking to Mr. Folks, right?

15   A.    Yes.

16   Q.    And then you went back to your cruiser, as I understand

17   it, after talking to Mr. Folks you went back to your

18   cruiser; is that right?  You have to say yes or no.

19   A.    Yes.  Sorry.

20   Q.    Where you talked to your fellow Officer Czyzewski,

21   Czyzewski?

22   A.    Yes.

23   Q.    Okay.  And this was at night, right?

24   A.    Yes.

25   Q.    And Officer Czyzewski was on the passenger side of the

1    Dodge Durango; is that right?

2    A.    Yes, I believe so.  Yup.

3    Q.    Well, that's what you testified to a little while ago?

4    A.    Yeah.

5    Q.    All right.  And he was in there looking around inside

6    the vehicle with his flashlight on because it's night,

7    correct?

8    A.    Yes.

9    Q.    And when you got back to your cruiser you turned off

10   the body camera, correct?

11   A.    That's our common practice when we're conferencing with

12   another officer.  I couldn't tell you the specific moment

13   that I turned it off.

14   Q.    Well, your policy is that a Burlington recorder may be

15   paused or stopped during on scene conferences between

16   officers, supervisors or others discussing investigative

17   strategy and methodology, the disclosure of which would

18   compromise future investigations, right?  That's your

19   department's policy?

20   A.    Yes.

21   Q.    What was it about the discussion that you had with your

22   fellow officer that was going to compromise any future

23   investigation?

24   A.    You're asking me what specifically we talked about that

25   was going to compromise our investigation?

1  Q.    No.  You made a deliberate decision to turn off your

2  body camera, right?

3  A.    Yes.

4  Q.    And the policy is that they are to stay on unless

5  discussions that you've had were going to compromise future

6  investigations.  That's your policy.  You know what it is,

7  right?

8  A.    Right.  Yes.

9  Q.    What was it about the discussion that you had with

10 Officer Czyzewski that was going to compromise any future

11 investigation?

12 A.    Well, I didn't know what he was going to tell me or

13 discuss with me before he said it.  So during that

14 conference, we were discussing our tactics or how we were

15 going to proceed with the investigation.

16 Q.    Yeah, but that's not good enough under your, under your

17 policy.  You have to know that your discussion was going to

18 compromise future investigations.  And right now all you had

19 was a traffic stop with a license plate light out and a

20 suspended license, right?

21 A.    Yes.

22 Q.    What future investigation were you thinking about when

23 you clicked off that camera?

24 A.    We were investigating a possible drug related crime at

25 the time.

Q.   Ah.  You turned the camera off before you talk to
Czyzewski, right?

A.   Yes.

Q.   But in your own mind, you were already thinking that
this traffic stop for a license plate out was related to a
future drug investigation, right?

A.   Yes.  Possibly.  Yeah.

Q.   Czyzewski hadn't told you what he had seen in the car
when he was looking around it with the flashlight yet?

A.   Correct.

Q.   Right.  So what was it about that traffic stop that led
you to believe that there was going to be a future drug
investigation related to this stop?

A.   Well, I didn't know specifically that there was
evidence of a drug crime in the vehicle.  I did have prior
knowledge that Mr. Folks was involved in drug related crimes
in the past.

Q.   Right.  But all you had him on was a taillight out, I
mean, a license plate out, and I think it was DLS, right?
That was it?

A.   Yes.  Just civilly suspended, yeah.

Q.   So then Officer Czyzewski told you, while I was looking
around in the car I spotted, let's get this right, a small
rubber band and plastic baggie consistent with what is used
to package heroin and other illegal drugs or narcotics,

1 right?

2 A.   Yes.

3 Q.   He told you that while your body camera is off?

4 A.   Correct.

5 Q.   During that traffic stop, did you personally observe

6 these items in that car?

7 A.   I don't recall.

8 Q.   Is there anything in your report that might refresh

9 your recollection about whether you saw -- now this is,

10 you've already turned your camera off because you're

11 thinking about a future drug investigation, right?

12 A.   Just during the conversation with Officer Czyzewski,

13 yeah.

14 Q.   No, but you had already turned off your camera before

15 he mentioned the baggie and the elastic band, right?

16 A.   Correct.  Yeah.

17 Q.   Now he says, I saw these things in the car confirming

18 your suspicions, right?

19 A.   Yes.

20 Q.   So you must have gone back to that car with your

21 flashlight out to confirm what your fellow officer told you

22 he had seen in it?  You must have done that?

23 A.   That's possible.  I did see the swab, the alcohol swab,

24 but I can't recall at this moment if I saw the rubber band

25 and the plastic bag on scene or if I just took Officer

1   Czyzewski's word for it.

2   Q.   And you refer this to property that's consistent with

3   packaging heroin, right?

4   A.   Yes.

5   Q.   The stuff Czyzewski claims he saw, but you don't

6   remember seeing?

7   A.   Correct.

8   Q.   But you saw an alcohol swab that's consistent with drug

9   use, right?

10  A.   Yes, it can be.

11  Q.   And you saw that because you were peering into the

12  vehicle with your flashlight, right?

13  A.   Yes.

14  Q.   Where did you see that?

15  A.   I don't recall specifically in the vehicle where that

16  was.

17  Q.   Well, Mr. Folks told you that there was nothing drug

18  related in the car didn't he?

19  A.   I believe so, yeah.

20  Q.   And it was based on this information that you had

21  gotten from Officer Czyzewski and your own observation of

22  the alleged alcohol swab that you then called for the K9,

23  right?

24  A.   Yes.

25  Q.   Because you knew that in order to keep Mr. Folks there

1  to extend his stop you needed information related to

2  something other than a broken license plate light and a DLS,

3  right?

4  A.   Potentially, yeah.

5  Q.   Right.  You knew you needed that?

6  A.   Yeah.

7  Q.   Yeah.  Do you have a copy of the warrant?

8  A.   Yes.  I think they gave me a copy of the warrant.

9  Q.   All right.  Let's go through, this is a search warrant

10  that you applied for to the Vermont Superior Court.  Let's

11  just go through that.

12       MR. WILLIAMS:  Your Honor, do you have a copy of

13  it?

14       THE COURT:  I do.  Right in front of me.

15       MR. WILLIAMS:  All right.

16  BY MR. WILLIAMS:

17  Q.   Let's go to page two, officer.  This is the warrant

18  itself.  Did you fill out the search warrant itself?  Page

19  two of the --

20  A.   Page two of the packet?

21  Q.   It says search warrant.

22  A.   Search warrant.  Yes.

23  Q.   To Michael Beliveau, that's you?

24  A.   That's me, yup.

25  Q.   All right.  Did you fill this out?

1 A. Yes.

2 Q. I, I suspect there's some things that are already there

3 and you filled in your name, right?

4 A. Yes.

5 Q. Michael Beliveau?

6 A. Yes.

7 Q. You are hereby commanded to search the following

8 object, which is the 2002 Durango, right?

9 A. Yes.

10 Q. You filled that in, right?

11 A. Yes.

12 Q. And then you filled in the area for the following

13 described property or objects, right?

14 A. Yes.

15 Q. That's all your work, correct?

16 A. Yes.

17 Q. Okay.  So you were -- you got a search warrant from

18 Judge Crucitti to search for any and all forms of illegal

19 drugs or narcotics, right?

20 A. Yes.

21 Q. Any and all forms of drug paraphernalia, including

22 packaging materials, scales and user paraphernalia, right?

23 A. Yes.

24 Q. And you already agreed with me that the plastic bag and

25 the rubber band were packaging materials, correct?

1  A.    Correct.

2  Q.    And that the alcohol swab that you claim you saw was

3  user paraphernalia, right?

4  A.    Yes.

5  Q.    All right.  And this form says you are hereby commanded

6  by the Court to search this vehicle, right?

7  A.    Yes.

8  Q.    This is a directive now from a judge, correct?

9  A.    Yes.

10  Q.    And the judge told you that when you make the search,

11  if the property or object is found in the vehicle, you were

12  ordered to seize it and prepare a written inventory of it,

13  right?

14  A.    Yes.

15  Q.    Okay.  You weren't given any discretion about what you

16  might overlook or what you might take into your possession,

17  right?  You were ordered to seize the packaging material and

18  the user paraphernalia, right?

19  A.    Yes.

20  Q.    All right.  Let's take a look at what your warrant

21  return says.  If you could turn to the last page?  Did you

22  seize the bag?

23  A.    No.

24  Q.    Did you seize the elastic band Officer Czyzewski

25  allegedly saw in the car?

1   A.   No.

2   Q.   Did you seize the alcohol wipe, the user paraphernalia

3   that you allegedly saw?

4   A.   No.

5   Q.   Because it wasn't in the car, right?

6   A.   That's not correct.

7   Q.   Well, what, you disregarded the Court order that you

8   seize it?

9   A.   Yes, I made a mistake.

10  Q.   Did you -- so when you searched the vehicle you saw,

11  you saw the bag and you picked it up and you looked at it?

12  A.   Yes.  I believe you can see in one of the photos too.

13  Q.   One of the photos of what?

14  A.   Of the handgun in the glove box, you can see one of the

15  plastic bags.

16  Q.   No, the glove -- Officer Czyzewski told you that that

17  bag, that bag was on the passenger side front seat floor,

18  not in the glove box?

19  A.   Yes.  I took like an overview shot and it captured that

20  in the photo.

21  Q.   Of what?

22  A.   From the passenger side of the vehicle into the front

23  passenger compartment.

24  Q.   This white object?  I'm not sure exactly what you are

25  pointing to.  What are you talking about?

1    A.    This, sir.  (So indicated)

2    Q.    That looks gold.

3    A.    That's where the bag was.

4    Q.    But there was a plastic bag not -- that's gold.

5    A.    Yeah.  I don't know if it's just poor lighting, but

6    that's what it was.

7    Q.    Well, the heroin bags are the size of a postage stamp.

8    A.    The wax bullets you're referring to?

9    Q.    The what?

10   A.    The wax folds you're referring to?

11   Q.    Heroin bags are the size of a, smaller than a postage

12   stamp.

13   A.    Sometimes, yes.

14   Q.    So you had this large plastic object in the front seat

15   of the car that you were ordered to seize by Judge Crucitti

16   and you didn't take it into your possession, right?

17   A.    That's correct.

18   Q.    You know that if it really was there, and you took it

19   into your possession, you might find drug residue, right?

20   A.    That's possible.

21   Q.    Right.  And that in itself would be a crime, possession

22   of whatever amount of drugs, whether it's heroin or cocaine

23   or crack, right?

24   A.    Depending on the amount, yes.

25   Q.    So you just left this drug paraphernalia in the car and

1  you gave it back to Lori Crawford?

2  A.   Yes.

3  Q.   What about the rubber band, where would I find that on

4  the search warrant return?

5  A.   I didn't seize it.

6  Q.   Any picture of the rubber band?

7  A.   I don't believe so.

8  Q.   What about the alcohol swab, where would I find that?

9  A.   I didn't seize it.

10 Q.   So the -- let me get this right.  The evidence that you

11 were told to seize you didn't seize?

12 A.   Correct.

13 Q.   You know the evidence -- if you had already thought

14 before you turned the body camera off that Mr. Folks might

15 be involved in drug dealing, but you left the evidence of

16 drug related activity in the car, and you gave it back to

17 Crawford, that's what you want us to believe, right?

18 A.   Yes, that's what happened.

19 Q.   Oh, okay.

20         Now, where on this warrant would I see a directive

21 from the Court to seize a gun?

22 A.   There was none.

23 Q.   Okay.  So you seize property that you weren't

24 authorized to seize under the warrant and you left property

25 that you were authorized to seize in the car, right?

A.    Correct.

Q.    All right.  What was the authority you had to seize that handgun depicted on the second to the last page of the photographs?  What was the authority?

A.    We learned that Mr. Folks was prohibited from possessing a firearm.

Q.    When?

A.    I don't recall specifically when.

Q.    Well, in order to have the authority to seize something in plain view you know that it has to be unlawful, right?

A.    Yes.

Q.    But you say some time I learned somewhere something about Mr. Folks being prohibited from having a gun?

A.    Correct.

Q.    You know what the, what it was that prohibited him from having a gun?

A.    I don't recall as I sit here, no.

Q.    Okay.  So you take this gun into, into evidence but you don't know what it's evidence of, right?  You don't recall today what it's evidence of, what crime it might be evidence of, right?

A.    Correct, yeah.

Q.    And then it's tagged on December 28, 2015 after you seized it from the car, right?

A.    Yes.

Q.    And then it's kept in the main evidence room at
Burlington PD December 30, 2015, right?

A.    I don't recall.

Q.    Did you forward to the State's Attorney's Office any
affidavit alleging a state criminal offense related to that
gun?

A.    No.

Q.    Who told the Burlington Police to keep it in the
evidence room?

A.    I don't recall.

Q.    Who told the ATF about this gun on December 29, 2015?

A.    I don't know who made the phone-call to ATF.

Q.    Did you?

A.    No.

Q.    Who did you talk about at the -- who did you talk about
seizing the gun with after you seized it on the 28th of
December?  Who did you talk about that seizure with?

A.    It may have been Sergeant Paul Petralia.

Q.    Okay.  And what did Sergeant Petralia and you talk
about?

A.    I don't recall.

Q.    And you don't know what -- you don't know how the ATF
got word that this gun was now in your evidence room?

A.    I don't specifically know how, no.

Q.    Did you learn that Mr. Folks had been indicted in

1    federal court in July of 2016?

2    A.    I believe I -- I don't know.

3    Q.    All right.  But you said that you marked those, you

4    said, five separate video files, right?

5    A.    Yes.

6    Q.    So we know of two.  One was created before you went

7    back and talked to the fellow officer in the car.  You shut

8    it off.  And you must have turned it back on, right?

9    A.    Yes.

10   Q.    So that's two video files.  Where do we get the other

11   three?  You must have turned off the video camera three more

12   times during this traffic stop?

13   A.    Yeah.  I don't recall the specific moments I activated

14   or deactivated my camera, but I conferenced with Officer

15   Czyzewski and Corporal Dewey a couple of times on scene.

16   But I would be guessing if I told you specifically when I

17   turned it off.

18   Q.    Officer Lopez was involved in this investigation?

19   A.    Yes.

20   Q.    Whose he?  Burlington PD?

21   A.    He used to be, yeah.

22   Q.    Yeah.  He's no longer there?

23   A.    Correct.

24   Q.    Why?

25   A.    He resigned due to an investigation, I believe, yeah.

Q.    He turned his video off and was heard saying something

in the car about a traffic stop?

A.    I believe so, yeah.  It was --

Q.    Making up a story?

A.    I, I don't know.

Q.    Well, Burlington Police Department was sued over this.

You guys must have been talking about it.

A.    Yeah, I -- just rumors.  I don't know the specifics of

it.

Q.    All right.

        MR. WILLIAMS:  Nothing further, Your Honor.  Thank

you.

        MR. FISHMAN:  Just briefly, Your Honor.

        FURTHER EXAMINATION BY MR. FISHMAN:

Q.    As a part of the warrant that you were granted, you

were authorized to look in any locked or unlocked containers

and/or safes in the viewing of their contents, correct?

A.    Yes.

Q.    So that's what permitted you to go into the glove box,

correct?

A.    Yes.

Q.    And when you opened the glove box you viewed a handgun,

correct?

A.    Yes.

Q.    And at some point during your investigation you learned

that the defendant had been convicted of a felony in New

York, correct?

     MR. WILLIAMS:  Objection.  Leading.  He says he

doesn't remember.

     THE COURT:  I'll sustain the objection as to

leading.

BY MR. FISHMAN:

Q.  At some point you testified, I believe, that you became

aware he was unauthorized to carry a weapon, correct?

A.  Yes.

Q.  When was that that you -- that you learned that?

A.  I don't recall specifically, but it was close in time

to the search warrant, yeah.

Q.  Did you, did you investigate this case beyond December

of 2015?

A.  I don't believe I did, no.

Q.  So is it correct to say that your involvement in the

search of this car and this stop was limited to the days

immediately following the stop?

A.  Yes.

Q.  Is it my understanding that you understand that ATF

was, in fact, notified about this handgun, correct?

A.  Yes.

Q.  But you don't know what channels through which ATF was

contacted?

A.    Correct.

Q.    Okay.

          FURTHER EXAMINATION BY MR. WILLIAMS:

Q.    So, officer, as I understand it, you don't know when you learned that Mr. Folks was a prohibited person?

A.    Yeah, I don't recall specifically when I learned that.

Q.    So you could have seized this gun before you learned that he was a prohibited person?

A.    Possibly.

Q.    Okay.  Thank you.

          MR. FISHMAN:  Nothing further, Your Honor.

          THE COURT:  All right.  Appreciate you making the trip.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Why don't we take 10 minutes off.  You got one more witness; is that right?

          MS. AVERBACH:  That's correct, Your Honor.

          THE COURT:  We'll start again at 3.

          (The Court recessed at 2:45 p.m. and resumed at 3:00 p.m.)

          MR. FISHMAN:  Your Honor, if we could recall Officer Beliveau for a few quick questions?

          THE COURT:  Of course.  Just a reminder that you are still under oath.

          THE WITNESS:  Yes.

1     FURTHER EXAMINATION BY MR. FISHMAN:

2 Q. During your testimony before you were uncertain as to

3 when you had learned that the defendant was not authorized

4 to carry a firearm.

5     Have you reviewed anything that has refreshed your

6 memory as to the timing of when you learned about that?

7 A. Yes. My affidavit.

8 Q. I'm going to show you your affidavit, which has been

9 previously admitted as Government Exhibit 14, the page that

10 is Bate's mark stamped 31, paragraph number three at the

11 bottom.

12     Does that refresh your recollection as to when you

13 learned Mr. Folks was not authorized to carry a handgun?

14 A. Yes.

15 Q. And when was that?

16 A. When we ran him through the Vermont DMV, when we ran

17 his name, date of birth, they checked his conditions of

18 release as well.

19 Q. And that was before you seized the handgun that you saw

20 in plain view after opening the car pursuant to the search

21 warrant, correct?

22 A. Yes.

23     THE COURT: What, was he on state court conditions

24 of release?

25     THE WITNESS: Yes.

1          THE COURT:  And those said no possession of a

2    handgun?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  So from your perspective he had

5    committed a state offense as well as the underlying federal

6    offense?

7          THE WITNESS:  Yes, Your Honor.

8          MR. FISHMAN:  Thank you, Your Honor.  No further

9    questions.

10         FURTHER EXAMINATION BY MR. WILLIAMS:

11   Q.   Sir, did you ever cite Mr. Folks for violating his

12   conditions of release?

13   A.   No.

14   Q.   Did you have any evidence, other than the fact that the

15   gun was in the closed glove compartment, that Mr. Folks

16   possessed it as opposed to someone else?

17   A.   No.

18   Q.   And as I understand it, the glove compartment was

19   closed when you and your fellow officer were checking out

20   the vehicle with your flashlights?

21   A.   Yes.

22   Q.   Okay.

23         MR. WILLIAMS:  Thank you.

24         THE COURT:  Now is this the stop where when you

25   approached the, either you or your partner approached the

car, you said something about, Brian, did you bring your gun

tonight?

THE WITNESS:  Yes, Your Honor.

THE COURT:  What was that about?

THE WITNESS:  I believe I had prior knowledge that

he had a firearm.  So I wanted to ask if he was, in fact,

carrying a gun.

THE COURT:  Okay.  Thanks.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  So for your own safety and security?

THE WITNESS:  Yes.  Yes, sir.

THE COURT:  All right.  Appreciate it.

MR. WILLIAMS:  If I may follow-up?

FURTHER EXAMINATION BY MR. WILLIAMS:

Q.    Did you ask Mr. Folks if there was a gun in the car?

A.    I believe I did, yes.

Q.    What did he say?

A.    No.

MR. WILLIAMS:  Okay.  Thank you.

THE COURT:  All right.  I appreciate it.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  That's helpful.  I had not realized it

was a state offense as well.  All right.  This is kind of a

march.  We've got one more.  Which motion are we up to?

MS. AVERBACH:  We are up to motion 143, Your

1   Honor.  It's the residential search warrant.

2              THE COURT:  Okay.

3              MS. AVERBACH:  And the government calls Special

4   Agent Adam Chetwynd.

5              A D A M   C H E T W Y N D, The Witness, after

6   being duly sworn, was examined and testified as follows:

7              THE COURT:  Thanks for coming in.  I didn't make a

8   note of how to spell your name correctly.

9              THE WITNESS:  It's Chetwynd.  C-H-E-T-W-Y-N-D as

10  in David.

11             THE COURT:  Thank you.

12             DIRECT EXAMINATION BY MS. AVERBACH:

13  Q.   Good afternoon, Agent Chetwynd.

14  A.   Good afternoon.

15  Q.   Would you tell us what you do for a living, please?

16  A.   I am a special agent with the Drug Enforcement

17  Administration.

18  Q.   What is the Drug Enforcement Administration?

19  A.   It's a federal entity responsible for enforcing the

20  controlled substance laws of the United States.

21  Q.   And how long have you been so employed?

22  A.   Approximately 14 years.

23  Q.   And what is your educational background, please?

24  A.   I have a Bachelor of Science in Criminal Justice and a

25  Master of Science in Criminal Justice Administration.

1  Q.   And what, if any, special training have you received

2  with respect to being a special agent charged with

3  investigating the narcotics laws of the United States?

4  A.   I've attended a 16 week intensive basic academy down in

5  Quantico, Virginia, DEA's academy, where we learn all, all

6  things related to drug investigations.

7         We do drug identification.  We do mock

8  surveillances.  We conduct mock controlled purchases.  We do

9  courtroom testimony.  And basically anything to do with

10 criminal investigations during that time.

11        I've also, through my 14 years, learned a

12 tremendous amount of experience on the job from other senior

13 agents and from -- and from my own investigations and from

14 their investigations.

15 Q.   Tell us a little bit about your experience, if you

16 will, with respect to your involvement with search warrants?

17 A.   I personally participated in, at this stage of my

18 career, probably hundreds of search warrants and hundreds of

19 controlled purchases.

20 Q.   How about being the affiant on a search warrant

21 application, have you done that?

22 A.   Yes, I have.

23 Q.   Approximately how many times?

24 A.   Under a hundred.  Probably under 50.

25 Q.   If you could estimate, how many of the search warrants

1  that you've participated in the execution of have been

2  residences of suspected drug traffickers?

3  A.   I would say the majority of them were residences.   Some

4  were storage units and other buildings.

5  Q.   What about debriefings, approximately how many

6  debriefings of civilian witnesses and confidential sources

7  and confidential informants have you participated in?

8  A.   Probably close to a thousand.

9  Q.   And what about the preparation of witnesses for the

10  grand jury and for trial with respect to narcotics

11  investigations, have you done that?

12  A.   Yes, I have.

13  Q.   Approximately how many times over the course of your 14

14  year career?

15  A.   I mean, numerous.   I would say right along hundreds.

16  Q.   And, just generally speaking, what kinds of things have

17  you discussed with the witnesses in the drug cases you've

18  interacted with?

19  A.   Um, debriefing them, talking about their, their

20  knowledge of the particular, you know, target of the

21  investigation.   And, you know, learning their, their

22  intimate knowledge of that person.

23  Q.   How the drug trafficking organization under

24  investigation operates, for example?

25  A.   Yes.

1   Q.    And what they've used in order to operate --

2   A.    Yes.

3   Q.    -- the organization?  Okay.

4         What, if any, experience and training have you had

5   in the investigation of human trafficking organizations?

6   A.    Um, very little until this investigation.  I haven't

7   had any specialized training in it, per se.

8   Q.    What was your exposure, during the course of this

9   investigation, to human trafficking?

10  A.    I've been intimately involved in numerous debriefings

11  of witnesses and analyzing evidence.

12  Q.    And did you also have the opportunity to consult with

13  former FBI Agent Christopher Destito about the topic?

14  A.    I did.

15  Q.    What specific roles have you played at DEA over the

16  course of your 14 years?

17  A.    Um, I've been responsible with numerous collateral

18  duties.  One of them being the non-drug custodian for

19  probably 13 years, which is the handling and processing of

20  every piece of evidence that comes into our office.

21  Assigning it, you know, finding -- setting up an area where

22  it's secured and logging it into our computer system, as

23  well as manually logging it in.

24  Q.    And what about the Acting RAC, weren't you that as

25  well?

A.    I have been the Acting RAC.

Q.    What is the Acting RAC?

A.    It's the Assistant or Acting Resident Agent in Charge

which is, you are the supervisor for our office in

Burlington.  So I was for a period of a little over four

months.

Q.    Was that recently?

A.    Yes.  It just ended.

Q.    And what role, if any, did you have in the

investigation of Brian Folks?

A.    I am the case agent.

Q.    Drawing your attention now to July 14 of 2016, did you

have the opportunity to swear out a search warrant?

A.    I did.

Q.    I'm going to show you what's been previously marked

Government's Exhibit 17 for identification.

        MS. AVERBACH:  May I, Your Honor?

        THE COURT:  Yes, please.

BY MS. AVERBACH:

Q.    Do you recognize that?

A.    I do.

Q.    What do you recognize it to be?

A.    An application for a search warrant for 96 Ethan Allen

Parkway, Burlington, Vermont.

Q.    And how do you recognize it?

1    A.    It has my signature as the applicant's signature.

2    Q.    And who wrote the affidavit?

3    A.    I did.

4    Q.    Who prepared the attachments, A. and B.?

5    A.    The AUSA assigned to the case.

6    Q.    Is that a fair and accurate copy of the warrant as it

7    was when you swore it out in July of 2016?

8    A.    It appears to be.

9            MS. AVERBACH:   I offer Government's 17.

10           MR. NOALN:   No objection.

11           THE COURT:   Admitted.

12   BY MS. AVERBACH:

13   Q.    Drawing your attention now, Agent Chetwynd, to the 19th

14   of July, 2016 at approximately 2:40 p.m., did you observe

15   your fellow DEA agents effect an arrest?

16   A.    I did.

17   Q.    Who were those agents?

18   A.    Those agents were Special Agent Tim Hoffman, Task Force

19   Officer Matt Cannon, Task Force Officer Bennett Adams, Task

20   Force officer Rob Estes and myself.

21   Q.    And what was the name of the person who you guys

22   arrested?

23   A.    Brian Folks.

24   Q.    And what was the location at the time he was placed

25   under arrest?

A.   At that time it was on the sidewalk of Ethan Allen

Parkway, just a couple driveways south of 96 Ethan Allen

Parkway.

Q.   And looking around the courtroom today, if you

recognize him, would you please point to him and indicate an

article of clothing that he's wearing?

A.   I do.  He's seated at the table there and he's wearing

a blue outer garment seated in what appears to be a

wheelchair.

Q.   Indicating the defendant?

          THE COURT:  He's wearing a sweater, right?  Not a

suit?

          THE WITNESS:  He's wearing a pullover, yes, with

gray sweatshirt.

          THE COURT:  Got it.

BY MS. AVERBACH:

Q.   I'm going to draw your attention now to approximately

seven minutes later, 2:47 p.m., would you tell the Court

what happened, please?

A.   At approximately 2:47 p.m. we gathered, after the --

following the arrest we gathered to execute the search

warrant at 96 Ethan Allen Parkway unit number 8.

Q.   Why did you want to search that particular location?

A.   Because through the course of this investigation we had

identified it as a place that Brian Folks was frequenting

1    during that time of the investigation.

2    Q.    What do you mean by, frequenting?

3    A.    We had done a controlled purchase on July 11th.  And we

4    had observed an individual that was with Brian Folks walk to

5    and from the direction of 96 Ethan Allen Parkway.

6    Q.    Where did that controlled purchase occur?

7    A.    That, excuse me, it occurred in a park.  I got to watch

8    my A.'s here.  It occurred in a park which is attached, it's

9    right off of Ethan Allen Parkway in Burlington.  So I think

10   it's called Ethan Allen Park.

11   Q.    Park, correct?

12   A.    Yes.  On the back side of the Rite Aid.

13         THE COURT:  This is the old military housing in,

14   with the brick buildings in, just past St. Michaels College

15   in Colchester?

16         THE WITNESS:  No.  This is actually down in

17   Burlington off of North Ave.  North Ave. parallels Ethan

18   Allen Parkway.

19         THE COURT:  Okay.  I know where you mean.  Sure.

20   BY MS. AVERBACH:

21   Q.    And in, during that controlled purchase on July 11,

22   2016, were you surveilling, you and other DEA agents

23   surveilling via audio and video surveillance?

24   A.    Yes.

25   Q.    And what, if anything, did you hear over the wire that

contributed to your understanding of why that then unknown

male was returning to the area of 96 Ethan Allen Parkway?

A.   Well, we had set up a controlled purchase to purchase

three bundles of heroin from Mr. Folks.  And when the

informant got to the meeting spot, which was in the park, at

Ethan Allen Park, Mr. Folks only had one bundle of heroin.

And I don't think he understood that the informant wanted

more.

          And so at that point he placed a call to what we

believed to be the unknown male who we also heard answer a

call.  And he instructed that male to go get some more,

basically go get some additional drugs.

          That male then was observed, by surveillance

units, leaving the park.  If I'm just allowed to back up a

little bit just to set the stage?  When the, when the

informant first arrived Mr. Folks instructed the informant

to leave all cell phones with the other unknown male at that

time who stayed down in the lower part of the park.

          The informant, along with Mr. Folks, walked up and

disappeared up a walkway that leads up into where I believe

is a tower up at the top of Ethan Allen Park.  So all this

conversation is occurred up this pathway.

          One of those devices was an audio and video

recording device that the unknown male was holding onto.

The unknown male actually looked down at the device at one

1    time.  So we captured his face.  And we could hear his

2    voice.

3           So when this direction was made to go get

4    additional stuff, at that point the male was observed

5    leaving the park, walking down the sidewalk in the direction

6    of 96 Ethan Allen Parkway.  A short time later that male was

7    observed returning to the park.  And we could hear over the

8    recording device on the informant that it appeared that that

9    male had brought back crack cocaine instead of heroin, which

10   is what we wanted to buy.

11          At that point the male left again, was observed

12   again walking down the sidewalk in the direction of 96 Ethan

13   Allen Parkway.  And returned a short time later, and then

14   met at that time, both Mr. Folks and the informant had come

15   down from the pathway and they were kind of in the, where

16   the swing sets and the monkey bars are.  At that point the

17   unknown male met the informant and the hand to hand was done

18   there.

19          MR. NOALN:  Your Honor, I would move to strike

20   that testimony.  This motion really has two components to

21   it.  One, we've challenged probable cause for the issuance,

22   the issuance of it for this residence.

23          THE COURT:  Right.

24          MR. NOALN:  That's a four corners analysis.  Agent

25   Chetwynd is now providing testimony that essentially is

seeking to supplement the evidence that would --

THE COURT:  I'm with you.

MR. NOALN:  -- that could establish PC.  And I
know we do have one issue that, that is appropriate for
evidence.  And that's the second issue.  The second issue is
whether the government agents exceeded the scope of the
warrant when they seized a computer and a tablet from a
residence because it's not in attachment B.  So, and
granted, the government argues about the meaning of
attachment B.  That's proper for evidence.  But we're not
here to rewrite the affidavit to establish --

THE COURT:  Yeah, yeah, yeah.

MR. NOALN:  PC.

THE COURT:  Is he right?

MS. AVERBACH:  No, Your Honor.  I think they did
make two challenges.  One is to the nexus between the crime
charged, the crimes as listed in the affidavit and the place
to be searched, which goes to the probable cause in the
affidavit, which is incorporated by reference into the
warrant.

THE COURT:  That makes no sense to me at all.
Don't we just look at the information presented to the judge
and decide if it was sufficient?

MS. AVERBACH:  Yes, Your Honor.

THE COURT:  So why would the narrative that the

1   judge who signed the search warrant never heard, why would

2   that matter?

3           MS. AVERBACH:  Well, this is in the affidavit.

4   These facts are in this affidavit, Your Honor.  He's --

5           THE COURT:  That's where they are supposed to be

6   in the affidavit.

7           MS. AVERBACH:  Yes.

8           THE COURT:  I haven't looked at it closely.

9   Either they are there or they are not.  That's for, you

10  know, another day.  But we don't tell the story a second

11  time and hope to improve on the affidavit.

12          MS. AVERBACH:  We are not improving on the

13  affidavit.  I mean, I don't think he's using exactly the

14  same language, but he's telling you why he wanted to search

15  and what he was hoping to search.  I can move on.  We don't

16  need to go into --

17          THE COURT:  Let's get straight to the computer

18  issue because that one does sound as if we need testimony.

19          MS. AVERBACH:  Okay.  Absolutely, Your Honor.

20  BY MS. AVERBACH:

21  Q.   So what other agents were involved in the search

22  warrant execution with you on that day?

23  A.   Task Force Officer Rob Estes, Task Force Officer Dan

24  Merchand, Task Force Officer Ben Adams, United States Border

25  Patrol Agent Michael Grindle, Franklin County Sheriff's

1    Department Will Ruprecht, myself, and Special Agent Tim

2    Hoffman who was seeing security.

3    Q.   Now, could you --

4    A.   And, I'm sorry, one other additional agent was Task

5    Force Officer John McGarghan.

6    Q.   And what, if any, pre-operation meetings did you all

7    have to discuss the parameters of the search?

8    A.   We had, we had an initial op briefing several days

9    before the actual op was planned.  And then we had a smaller

10   operation briefing from my search warrant location team.

11   Q.   Now, could you walk us through the execution of the

12   search warrant as you approached the door?

13   A.   Yes.  As we approached the door we had to wait because

14   of the, the unknown male that was seen earlier um, which I

15   described on the 11th, was present on the, on the 19th.  He

16   was being taken into custody in the walkway.  So once Agent

17   Grindle and Deputy Ruprecht took him into custody, we

18   scooted by them and we approached the door.

19        We waited until we all were in line and ready to

20   make entry.  At that time Task Force Officer Cannon noted

21   that the door to the residence was open halfway.  At that

22   point, I heard him articulate, police with a search warrant.

23   And then we made entry.

24   Q.   And could you describe what you saw when you first

25   entered the apartment?

A.    I immediately, when I made entry, I noticed that there

were several individuals in there um, later identified as

Danielle Degenhardt, Arial Otero and an elderly white

female.  As I made my approach into the residence I noticed

that Daniel Degenhardt was exiting a small bathroom that was

on the first floor.  And at that point I could also hear

that the toilet was flushing.  And she had said she had just

used the restroom.

Q.    And what was the first thing you did once you were

inside the residence?

A.    After we made the residence secure, after we did a

safety sweep, then we assigned Task Force Officer Dan

Merchand as the evidence custodian for the search warrant.

Q.    Can you describe for the Court the layout of the

apartment, please?

A.    Sure.  As you enter the door there's a closet

immediately to your left.  Then you walk into the apartment.

Immediately to your right is a kitchen area which shares

like a dining room slash living room area where a double

slider is at the end of the living room.

In between those rooms is a half bath.  If, as you

come in the entrance, if you didn't go into the main living

area, there's a stairwell right to your left that leads up

to landing.  At the top of the landing where, was a bedroom

off to the left, a full bath in the middle and then another

1  bedroom at the other end.

2  Q.   What was the area of the apartment that you chose to

3  search?

4  A.   Um, I initially chose to search this um, it looked like

5  a little hutch area that had coats and bags hanging on it.

6  It looked like there might have been a key bowl or

7  something.  It was right on your left as you come in the

8  door.

9  Q.   And what area, if you know, did Task Force Officer Rob

10 Estes choose to search?

11 A.   He was more in the dining room area, living room area.

12 Q.   And you mentioned that Task Force Officer Dan Merchand

13 was charged as the evidence custodian?

14 A.   Yes.

15 Q.   What was he doing during the very beginning of the

16 search?

17 A.   He went around and took some still photos and took a

18 couple videos of the interior of the residence, started from

19 the outside and then made his way through the residence.

20 Q.   Did you have the opportunity to speak with the resident

21 of unit 8?

22 A.   I did.

23 Q.   And what is that resident's name?

24 A.   Danielle Degenhardt.

25 Q.   And what relationship, if any, does she have to Brian

1    Folks?  Do you know?

2    A.    She told me that she used to be romantically involved

3    with him and that they had a son together.

4    Q.    Did she tell you the name of the son?

5    A.    I believe it's Adon.  I don't know if she told me that

6    that night.

7    Q.    Okay.  Do you know Adon's last name?

8    A.    It, some birth records that we uncovered from the city

9    of Burlington listed it as Folks.

10   Q.    And what, if anything, did she say about where Brian

11   Folks was staying at that time?

12   A.    She told me that he was currently staying on the couch

13   in the living room.

14   Q.    And what, if anything, did she say about where his

15   personal property was located?

16   A.    She said it was downstairs in the dining room, living

17   room area.

18   Q.    And did she specifically make reference to any of the

19   items that were seized during the course of the search?

20   A.    Yes.

21   Q.    What, if anything, did she tell you?

22   A.    She did not tell me.  I was told by Task Force Officer

23   Estes, who was searching that area, that um, he asked Miss

24   Degenhardt if the computer -- whose computer was this.  And

25   she said it was Mr. Folks'.

1          MR. NOALN:  Objection, Your Honor.  That's two

2     levels of hearsay here.  So she, a civilian, is supposedly

3     telling Estes something who is supposedly telling this

4     witness something.

5          THE COURT:  Hearsay is admissible here.  Is there

6     a rule that only one level is admissible, but two rules it

7     out?

8          MR. NOALN:  It makes it less reliable.  I mean,

9     the Court's got to make a reliability determination.  And

10    obviously the government has the ability to bring Estes in

11    or Degenhardt.

12         THE COURT:  I'll overrule.

13    BY MS. AVERBACH:

14    Q.   And what, if anything, did Miss Degenhardt say about

15    drug packaging materials?

16    A.   I located some drug packaging materials downstairs in

17    the area I was searching.  And there was some other items

18    that were located.  And I asked her what did she know about

19    that.  And she said that she knew nothing about drug

20    trafficking, but she has seen Mr. Folks with drugs in the

21    past and that he would keep them up high in the residence

22    away from the kids so the kids couldn't get at them.  And

23    that sometimes he would often store them in her bedroom

24    closet.

25    Q.   Now, if you could just tell the Court in fairly broad

strokes, if you will, what items were seized during the execution of the search warrant and by whom?  If you need something to refresh your recollection?

A.    If I could.  I would like to.

Q.    What would help?

A.    A detailed itinerary that you and I put together.

MS. AVERBACH:  Excuse me, Your Honor.  Just one moment.

MS. AVERBACH:

Q.    I'm handing, with the Court's permission, what's been marked Government Exhibit 21 for identification.  If you could just identify what that is, if you know, for the Court?

A.    Yes.  This is an itemized inventory of the evidence bags that were taken out of 96 Ethan Allen Parkway.

Q.    And who prepared this list?

A.    You did.

Q.    And how was that prepared?

A.    In my presence at the U.S. Attorney's Office.

Q.    What were we doing as I was typing it?

A.    We were taking each individual exhibit and opening the bags and physically going through every item that was in the bag and notating that.

MS. AVERBACH:  I offer Government's 21.

MR. NOALN:  Oh, no objection.

THE COURT: Admitted.

BY MS. AVERBACH:

Q. Could you please tell the Court what items were seized during the course of the search warrant execution, please, from 96 Ethan Allen Parkway, unit 8?

A. Sure. Exhibit N-46 which was seized by Deputy Ruprecht from a table to the right of the stairs in the kitchen, were some undetermined amount of U.S. currency and several receipts.

Exhibit N-47 was seized by TFO Estes from a black box in the living room area. Inside the black box was a Kay Jewelers receipt with Folks' name on it for a March 29, 2016 purchase of, for $769.32. And there was a piece of paper in there with some handwriting, handwritten notes on it which read, Elegant And Bootiful Little Secrets.

And there was also a handgun bore cleaning brush which had the imprint of a 38 caliber stamp on the, on the spindle.

Exhibit N-48 was seized by Task Force Officer Estes from the living room area. And it was a First National Pawn receipt.

Exhibit N-49, which was seized by the TFO Estes from on top of the hutch in the living room, was a, it was a plastic bag, shopping bag that had the wording Rue 21 on it. It contained, within that bag was a biscuit tin which

1  contained drug packaging paraphernalia consisting of green,

2  blue and orange small ziplock bags, some folded playing card

3  and a, and some folded cardboard.

4        There was some broken bobby pins.  There was some

5  razorblades with some reside on them, brown reside.  There

6  were cut straws.  There were dark colored rubber bands.

7  There was a red digital gram scale with some brown reside on

8  it, some scotch tape, and a cardboard box which contained

9  numerous wax bags.

10        Exhibit N-50, which was seized by myself from a

11  coat hook at the bottom of the stairs off of the kitchen,

12  was a dark colored bag which contained miscellaneous

13  electronic equipment consisting of four phones, a Trio

14  Stealth Tablet, an MP3 player, a thumb drive, a silver

15  digital scale, some stickers, a folding knife and blue

16  ziplock baggies, and one orange ziplock baggy.

17  Q.   I'm just going to stop you right there.  Would you

18  describe for the Court where you found that dark colored bag

19  when you first saw it?

20  A.   It was located just before you go up the stairs on the

21  left on this, you know, it was like a coatrack, like I

22  explained, like a hutch, that had some hooks on it.

23  Q.   And what was the bag doing in relationship to the

24  hooks?

25  A.   It was just hanging there.

1   Q.   And do you remember the condition of the bag, whether

2   it was open or closed at the time you first saw it?

3   A.   I don't.  I know that I opened it or it was open and I

4   took the photo of what I saw was in there.

5   Q.   And what was inside?

6   A.   There was -- I immediately saw a silver digital scale.

7   And you could see numerous small plastic ziplock bags.

8   Q.   And all of the rest of the other electronic devices

9   that you've previously described for us?

10  A.   Yes.

11  Q.   Moving on now to N-52.

12  A.   N-52 was seized TFO Ben Adams from on top of the

13  kitchen cabinet.  And it was a GNC bottle of Inositol and a

14  white coffee grinder which was in a plastic bag.

15  Q.   What is Inositol?

16  A.   Inositol is a dietary supplement that we have, we

17  have -- that I have seen, through my investigations and

18  experience, to be used as a cutting agent with cocaine.

19  Q.   And what is the significance, just very briefly, of the

20  items that were contained inside the biscuit tin?

21  A.   They are all indicative of packaging and sales.

22  Q.   Of drug packaging?

23  A.   Yes, of heroin and crack.

24  Q.   And N-53, please?

25  A.   N-53 was seized by TFO Dan Merchand from on top of a

cupboard above the fridge area. And it was a brown Aveda

bag. And inside this Aveda bag there were two cardboard

boxes which also contained empty wax baggies.

Q.    And when you say, empty wax baggies, can you describe

exactly what you mean for the Court?

A.    It's commonly what we see street level heroin sold in.

Q.    And you're doing something with your hand?

A.    Yeah. They are about that long. And they are folded

over three or four times. And then there's drugs added to

it and then they are taped and sold and put in stacks of 10

to make a bundle of heroin and sell them.

        THE COURT:  Is there a legitimate purpose?

        THE WITNESS:  I don't know what they are. I think

they are probably sold as stamps, to hold stamps maybe.

        THE COURT:  Yeah, right.

        THE WITNESS:  I really -- I wish I knew because

I'm in the wrong business.

BY MS. AVERBACH:

Q.    Indicating, for the record, a moment ago the witness

was holding his fingers apart in the distance of

approximately three inches; is that fair to say?

A.    More or less, yes, three inches.

Q.    So they are about two inches, or three inches long,

rather, each wax baggie?

A.    Yes. And probably a half inch maybe, no more than an

1    inch wide.

2    Q.   And you said there were approximately 1,200 of those

3    that you found?

4    A.   Yes.  We counted -- I personally counted, you know, one

5    of the stacks in there and it was about 600.  The one box

6    contained 600 so, yes, 1,200 total.

7    Q.   And what about N-54?

8    A.   N-54 was seized by TFO Rob Estes from the living room

9    area from inside a brown bag.  It was a brown bag.  Within

10   the bag was a blue journal which was embossed with the

11   words, Good Things Come To Those Who Hustle.  There also was

12   a black leatheresk or leatherette daily planner with 17

13   photographs.  And that includes, there was also a photograph

14   on the top, on the front of the planner of Mr., Mr. Folks

15   wearing a suit.

16   Q.   And did you look inside the journal, Good Things Come

17   To Those Who Hustle?

18   A.   I did.

19   Q.   And what, if anything, did you notice inside?

20   A.   Um, there were a few pages that had handwritten

21   notations in there that appeared -- they looked to be like

22   times.  There was, you know, for an example, 1.03 or

23   something.  And then there was a, a statement next to it, a

24   handwritten statement.

25   Q.   What was the nature of the statements?

1    A.    They were sexual in nature.

2    Q.    Okay.  And did you have an occasion to look at the 17

3    photographs that were seized in connection to the daily

4    planner?

5    A.    I did.

6    Q.    And could you describe for the Court, in general terms,

7    what those looked like?

8    A.    They were photographs of women in various poses.  And

9    several, several of the photographs of them were wearing

10   what appeared to be lingerie.

11   Q.    And what else was seized from this brown Aveda bag?

12   A.    A Tom-Tom GPS device, a black holster rig carrier style

13   carrier.

14   Q.    Could you describe what you mean by that for the Court?

15   A.    It was a -- it was a -- almost like a device that you

16   had to put your -- it almost looked like a shoulder holster

17   like an old school detective would wear, only this one

18   didn't have access for a firearm.  It looked like it was

19   carrying maybe a cell phone or a wallet or something.

20            THE COURT:  Oh, I see, it wasn't a gun holster?

21            THE WITNESS:  No.  No.

22            THE COURT:  Okay.

23            THE WITNESS:  There was some money order receipts.

24   There was some paperwork that was in the name of Mandy

25   Latulippe for a, looked like a city of Burlington paperwork

1    for a hearing, trying to get a security deposit back for a

2    location at 31 Hyde Street.  And it was dated June 6, 2016.

3            There also was another piece of paper for a, it

4    looked like a receipt for a or a hearing receipt for a

5    Ballston Spa, New York ticket for an unlicensed driver for

6    April 18, 2016.  And it was for Brian Folks.  There was also

7    a Newburgh, New York similar piece of paper for an

8    unlicensed driver for Brian Folks.

9            There was a vehicle title for a 2002 Honda Accord

10   in Brian Folks' name.  There was an oil change receipt from

11   Handy's Service Center for a 2004 Saturn.  There was a

12   rental application for Cassidy Properties in both Folks and

13   Latulippe's name for 31 Hyde Street, unit 8.  And it

14   depicted that the rent was 1,500 and it was dated May 7,

15   2016.

16           There also was an envelope with some writing on

17   it.  And there was a registration card in the name of Brian

18   Folks, junior for a Saturn.  And there was some undetermined

19   amount of U.S. currency which was later returned to

20   Cassandra Folks.

21   Q.   What was not assigned an N number by DEA, but was

22   seized during the execution?

23   A.   A black HP computer tower.

24   Q.   What is a computer tower?

25   A.   Um, it's the floor kind that you would commonly find

1   under a desk, a black tower that you're often --

2   Q.    It contains a hard drive with it?

3   A.    Yes.  You often hit with your feet when you are at a

4   desk, yes.

5            THE COURT:  It's what I call the box?

6            THE WITNESS:  Yes.

7   BY MS. AVERBACH:

8   Q.    And who seized that?

9   A.    TFO Rob Estes.

10  Q.    And where did he seize that from?

11  A.    It's listed as in the living room area.

12  Q.    And what did he tell you about where he seized that

13  from?

14  A.    He didn't.  He just -- it's from the dining room,

15  living room area.

16  Q.    And how do you know that?

17  A.    Because I saw it sitting on the floor with the rest of

18  our evidence that we were taking.

19  Q.    How do you know it came from the coffee table?

20  A.    I've watched the um, the initial walk through video

21  that was taken by TFO Dan Merchand.

22  Q.    And it's visible to you in that video?

23  A.    Yes.

24  Q.    What, if anything, did TFO Rob Estes ask of Danielle

25  Degenhardt with respect to that particular computer?

A.   He asked if it belonged to her and she said it was

Mr. Folks'.

Q.   I'm going to show you what's been previously marked

Government's Exhibit 19.

          MS. AVERBACH:  If I may, Your Honor?

          THE COURT:  Sure.

BY MS. AVERBACH:

Q.   Do you recognize this?

A.   I do.

Q.   What is it?

A.   It is a CD containing photos and videos from the search

warrant.

Q.   And how do you recognize it?

A.   Because it has my initials and the date on it.

Q.   Is it a fair and accurate depiction of the way 96 Ethan

Allen Parkway, unit 8 looked before and during the very

beginning of the search warrant?

A.   Yes.

          MS. AVERBACH:  I offer Government's Exhibit 19,

Your Honor.

          MR. NOALN:  No objection.

          THE COURT:  Admitted.

BY MS. AVERBACH:

Q.   With the Court's permission I would like to play,

please, the file entitled M2U00126.mpg.

```
1          THE COURT:  Sure.

2              (Video playing and stopped)

3   Q.    Whose voice is that?

4   A.    That's TFO Dan Merchand's voice.

5   Q.    And what are we looking at?  Just orient us, please.

6   A.    It's the kitchen area.  There was a dishwasher in the

7   middle of the floor right there.

8              (Video playing and stopped)

9   Q.    And did you hear Dan Merchand say, we just came in?

10  A.    Yes.

11             (Video playing and stopped)

12  Q.    And what, if anything, do you see here?  And, for the

13  record, we're at second 26 in this file.

14  A.     I see a black computer tower with a keyboard on top of

15  it.

16  Q.    Where do you see that?

17  A.    On the left of the screen.

18             MS. AVERBACH:  Are these touch screens, Your

19  Honor?  If the witness touches it will it make a mark?

20             THE COURT:  Yeah, sure.

21  BY MS. AVERBACH:

22  Q.    Can you take your finger please and put a circle around

23  the black computer tower?

24  A.    (So indicated)

25  Q.    You are indicating, for the record, the left-hand side
```

of the picture.  And at 26 seconds it's almost directly
centered on the left-hand side sitting on what appears to be
a brown wooden coffee table.

         And what's on top of the computer tower?

A.   It appears to be a keyboard.

         MS. AVERBACH:  Would you play it, please?

         (Video playing and stopped)

         THE COURT:  Who is that person you can see?

         THE WITNESS:  That initial person you saw is Miss
Degenhardt.

         THE COURT:  Got it.

         MS. AVERBACH:  And with the Court's permission,
I'd like to play file M2U00125, please?

         (Video playing and stopped)

Q.   Whose voice is that?

A.   TFO Dan Merchand.

Q.   And he's date and time stamping that in the beginning?

A.   Yes.

         (Video playing and stopped)

Q.   What are we looking at here?  And we stopped at sort of
a blurry moment at second 24.  Maybe we could go one or two
more seconds?

         What are we looking at there at second 25, Agent
Chetwynd?

A.   This is the hutch area.

1    Q.   And this is the area that you previously described

2    finding the bag that contained the various electronic

3    devices, including the tablet?

4    A.   Yes.

5    Q.   And could you draw a circle around the part of this

6    hutch where you found that dark colored bag?

7    A.   It's, you can't see it.  It's over here.  (So

8    indicated)

9    Q.   Is it on the side of that hutch?

10   A.   Yes.

11   Q.   Okay.  Can we keep playing?

12        (Video playing and stopped)

13   Q.   So it's fair to say, based upon the way the apartment

14   appears, and also TFO Merchand's time stamp, that the second

15   video was taken after the search was underway, correct?

16   A.   Yes.

17   Q.   Now, could you tell the Court please why the tablet

18   computer and the computer tower were seized as part of the

19   search warrant execution?

20   A.   Um, they were taken um, because um, in my experience

21   and training, I know those electronic devices often store

22   evidence of distribution of controlled substances.

23   Q.   What types of evidence do they commonly contain, in

24   your experience, digital storage devices such as computers

25   and tablets?

A.    They can contain customer names, contact lists, dates.

They contain receipts for other properties that are involved

in the drug distribution.  They can, like I said, they

contain, could contain names and addresses of drug

trafficking associates.  They can contain photos of drugs,

large amounts of currency.  They can contain photos of the

target with drugs or large amounts of money.  Um, they can

contain a lot of stuff, a lot of digital stuff.

Q.    What about things like banking records?

A.    And, I mean, they can also have financial records.  Um,

transactions, bank account information, names of banks that

we haven't uncovered where we could go investigate.

Q.    What about evidence of gang affiliation?

A.    Again, that would -- that would probably come under

looking for photos of the individuals to see their

associates.

Q.    And what about correspondence with different kinds of

individuals?

      MR. NOALN:  Objection, Your Honor.  She's simply

now leading him suggesting types of records that could be

found that relate to drug --

      THE COURT:  I'll sustain the objection.

BY MS. AVERBACH:

Q.    When you laid eyes on the computer tower, and the

tablet computer in this search what, if anything, did you

think about what they might contain that would be relevant

to your investigation here?

THE COURT:  That we haven't already discussed.

THE WITNESS:  They would also contain evidence of

human trafficking, photos of potential victims, IP

addresses, ad, pictures of ads and um, names of those

individuals.

BY MS. AVERBACH:

Q.    With respect to the computer tower and the tablet

computer and other devices, did you look inside them while

you were executing the search at 96 Ethan Allen Parkway?

A.    No.

Q.    What did you do?

A.    Those items were brought back to the DEA office and

secured.

Q.    And did you later -- did you and your colleagues later

secure a search warrant for those devices?

A.    Yes.

Q.    A separate search warrant?

A.    Yes, we did.

Q.    And now what paperwork, if any, was completed with

respect to this particular residential search warrant?

A.    At the completion of the search warrant TFO Merchand

drafted up a DEA-12, which is a receipt that is left behind.

And listed on the receipt are the items that we have taken

```
 1   from the scene.
 2   Q.    And did you have a look at?
 3   A.    I did.
 4   Q.    And were there any mistakes that you noticed on that?
 5   A.    Um, no, not on -- not on the 12.
 6   Q.    And did you yourself prepare any report of the search
 7   warrant?
 8   A.    I did a report.
 9   Q.    And what was that report called?  What's the kind of
10   report called?
11   A.    It would have been titled, Execution of Federal Search
12   Warrant at 96 Ethan Allen Parkway.
13   Q.    And is that commonly referred to as a DEA-6?
14   A.    Yes, it is.
15   Q.    And have you reviewed that prior to your testimony
16   here?
17   A.    I have.
18   Q.    And did that report contain some corrections with
19   respect to the processing of evidence?
20   A.    Yes.
21   Q.    And what, if any, mistakes did you notice that you
22   fixed in the DEA-6?
23   A.    Yes.  And it was in regards to N-50 and N-52.  TFO Rob
24   Estes processed all the evidence seized from this location.
25   I documented the narrative portion of the DEA-6.  And when I
```

was looking at the 7A.'s, which when we see something, we

fill out a 7A. and itemize it and describe what it is and

when we seized it, I noticed that there were two errors.

There was an error noted by TFO Rob Estes on his 7A. of the

locations of those items or who found what um, for N-52 and

N-50.

Q.   And what did you do to correct those errors?

A.   I noted it in the 6.

Q.   And did you yourself inadvertently omit anything from

your DEA-6?

A.   Yes.

Q.   And what did you inadvertently omit?

A.   The HP tower.

Q.   And why is that?

A.   Because those items were turned over to the FBI who

were going to help with the forensic analysis of the

electronics devices.

Q.   What other paperwork, if any, did you prepare in

connection with the search warrant?

A.   Um, I prepared a search warrant return.

Q.   And did that search warrant return include mention of

the HP tower and the tablet computer --

A.   It did.

Q.   -- that the DEA-6 had omitted?

A.   It did.

1        MS. AVERBACH: Nothing further, Your Honor.

2        THE COURT: All right. Thanks.

3        CROSS EXAMINATION BY MR. NOLAN:

4 Q. So, Adam Chetwynd, we're getting old, aren't we?

5 A. The gray is coming in.

6 Q. You are now the most senior agent, right, in the

7 Burlington Resident Office of DEA, correct?

8 A. I am.

9 Q. Yeah. You were just a baby when I got to the U.S.

10 Attorney's Office, fair to say?

11 A. That is true.

12 Q. They were all these old guys like Doud and O'Connor and

13 Carter?

14 A. True.

15 Q. But now you're the guy with all the experience.

16        So, you started your testimony, let me just get to

17 it, by, I think, telling the prosecution, after we got

18 through your experience, you've done lots of search

19 warrants, correct? You've applied for them in front of the

20 judges of this Court, but mostly, mostly Judge Conroy since

21 he took the bench quite some years ago?

22 A. It would have been Judge Neiedermeier and Conroy, yes.

23 Q. Right. Right. But most of your search warrants go

24 before Judge Conroy, fair to say?

25 A. Correct.

1   Q.   And you've applied for at least dozens of search

2   warrants with Judge Conroy?

3   A.   Yes.

4   Q.   You mentioned that you wrote the affidavit that is, I

5   think, did you mark that?

6          MS. AVERBACH:  I did.

7          MR. NOALN:  What number is that?

8          MS. AVERBACH:  Seventeen.

9   BY MR. NOALN:

10   Q.   You wrote the affidavit that is marked as Exhibit 17,

11   right?

12   A.   Yes.

13   Q.   And when you say, you wrote it, I mean, you drafted it

14   initially and then you sent it off to the AUSA in Microsoft

15   Word format?

16   A.   Correct.  Yes.

17   Q.   And who was the AUSA who handled -- was there just one

18   AUSA who handled this search warrant?

19   A.   Well, yes.  It would have been Heather Ross, Assistant

20   U.S. Attorney Heather Ross.

21   Q.   Who at the time was a fairly senior AUSA, correct?

22   A.   Um, I don't know how many years she had on.  I think

23   she had been there for a while.

24   Q.   All right.  So you shipped off your affidavit, your

25   draft affidavit to Heather Ross.  And AUSA Ross, she,

1  undoubtedly it's a collaborative process, right?  You both,

2  you both work on these things, correct?

3  A.    Sure.  Yes.

4  Q.    And she made changes to your affidavit, right?

5  A.    I'm sure she did.

6  Q.    Right.  The AUSA's, they are lawyers, they always make

7  changes to the agent's affidavits, right?

8  A.    Yes, they do.

9  Q.    Because the lawyers think they know better than the

10 officers or agents, right?

11 A.    I wouldn't say that.

12 Q.    Okay.  But when it comes to drafting these affidavits

13 they make changes?

14 A.    I would say that they at times can have better wording.

15 Q.    Right.  Wording.  Great.  And so AUSA Ross made some

16 changes to your affidavit, you, of course, reviewed those

17 changes before you went up to visit with Judge Conroy with

18 AUSA Ross in tow, correct?

19 A.    Yes.

20 Q.    So by the time you got to see Judge Conroy you knew

21 what was in there, it was accurate, it was truthful and you

22 could swear to it and get your warrant, right?

23 A.    Yes.

24 Q.    You also testified that you did not prepare attachments

25 A. or B., correct?

A.    That is correct.

Q.    And attachments A. and B. -- attachment A. is the,

identifies the property to be searched, right?

A.    Attachment A., correct.

Q.    In this case, 96 Ethan Allen Parkway, unit 8, right?

A.    Correct.

Q.    And attachment B. lists the type of evidence that you

are authorized to take from the location identified in

attachment A., right?

A.    Correct.

Q.    All right.  So I'm not sure, let's see, can we mark

the --

          THE COURT:  It's part of 17.

          MS. AVERBACH:  The entire thing.

          MR. NOALN:  Oh, 17 also has the warrant and the

attachments?  Okay.

          THE COURT:  They are right at the front.

          MR. NOALN:  All right.

BY MR. NOALN:

Q.    So, did you have any input into attachment B.?

A.    No.

Q.    Now, these attachments can be fairly standard, right?

Attachment B.'s in drug cases?

A.    Yes.

Q.    Yeah.  And when we're talking today, we're just talking

1  about drug cases done by DEA.  You know, I'm not talking

2  about FBI cases or, you know, ATF cases, but the cases you

3  work on, day in day out you work on drug cases that may have

4  some other components, right?

5  A.    Correct.

6  Q.    And attachment B. is fairly standard, fair to say?

7  A.    It appeared to, yes.

8  Q.    Yeah.  But it does change from case to case, correct?

9  A.    It can, I assume.

10  Q.    Did you read attachment B. before you went up to see

11  Judge Conroy?

12  A.    I did.

13  Q.    Okay.  Did you note at that time that attachment B. did

14  not list computers explicitly as something you could seize?

15  A.    I did not notice it, no.

16  Q.    So, is it fair to say, that you and the AUSA had no

17  discussion about that then?

18  A.    That is correct.

19  Q.    All right.  Did the AUSA say anything to you about her

20  drafting of attachment B.?

21  A.    Not that I recall.

22  Q.    All right.  Did she say anything to you, did she ask

23  you any questions that seemed to be seeking information that

24  might relate to what she was going to put into attachment

25  B.?

1  A.    No.

2  Q.    All right.  So AUSA Ross did the attachment.  No

3  discussion about it, that you can recall.  I take it there

4  was no rough drafts going back and forth for revisions by

5  one or the other with regard to attachment B.?

6  A.    No.

7  Q.    She assembled the package or it was assembled for her

8  and then you show up at the office, there's a package, and

9  you two walk up to the fourth floor and visit with Judge

10 Conroy to get your search warrant signed, right?

11 A.    That's correct.

12 Q.    All right.  On that same day you also got a search

13 warrant for Brian Folks' residence, right?

14 A.    Yes.

15 Q.    And that was -- what address was that?  Was that on

16 Canal Street?

17 A.    241 West Canal, unit 1 alpha in Winooski.

18 Q.    And you -- with regard to, with regard to that, you

19 used the same exact affidavit of probable cause, correct?

20 A.    I did.

21 Q.    Did you only sign it once?

22 A.    Um, yes.

23 Q.    Okay.  Did you have input into the -- in the drafting

24 of attachment B. for that, for that premises, Canal Street?

25 A.    I did not.

1    Q.    Was that, once again, done by AUSA Ross?

2    A.    Yes.

3    Q.    Was there any discussion about that?

4    A.    No, there was not.

5    Q.    Did you, did you read it before you went up to Judge

6    Conroy?

7    A.    Yes.

8    Q.    Okay.  Did you note that attachment B. to that warrant

9    explicitly listed computers as an item that the search

10   warrant team was authorized to take?

11   A.    I didn't.  I don't recall specifically reading

12   computers.

13   Q.    Okay.  Have you, have you, have you read that in

14   preparation for today?

15   A.    I've read 96 Ethan Allen attachment B..

16   Q.    I'm sorry, bad question.  Have you read -- have you

17   read the search warrant application and search warrant

18   itself with attachments A. and B. for 241 West Canal Street,

19   apartment 1A Winooski, Vermont?

20   A.    Not in preparation for today.

21   Q.    All right.  Now, I'm going to mark, what are we up to,

22   D. as in dog?

23              THE CLERK:  Yes.

24              MR. NOALN:  I'm going to mark as D. a document.

25   May I approach?

1    THE COURT:  Yes.

2    BY MR. NOALN:

3    Q.   All right.  So, Agent Chetwynd, I'm just going to keep

4    things moving here.  You're not going to need these are you?

5    I didn't think so.  I didn't think so.

6    THE COURT:  They are actually there for you

7    Mr. Nolan.

8    MR. NOALN:  Trust me, not yet, right?  Later.  All

9    right.

10   BY MR. NOALN:

11   Q.   So Exhibit D., I'll let you look through it, but I'm

12   just going to direct you, it's Bate's Stamped.  And at 1428

13   there's the search and seizure, the actual warrant itself.

14   There's, there's A., it's got a couple pictures and then

15   there's B..  So B. is actually 1433 attached to the warrant.

16   I'm going to give you that to ask you if you can just

17   briefly identify that.  I don't think there's any dispute

18   from the government on what that is.

19   A.   No dispute.  It's attachment B..

20   Q.   And is the whole thing your application on, your

21   application on July 14, 2016 to Judge Conroy for a search

22   warrant for 241 West Canal Street in this case?

23   A.   Yes.

24   Q.   And it contains not only application, but also the

25   warrant issued by Judge Conroy, it may even have an

inventory on the back, right?

        MR. NOALN:  We move D. into evidence, Your Honor.

        MS. AVERBACH:  No objection.

        THE COURT:  Admitted.

BY MR. NOALN:

Q.    So take a peak at attachment B., the one that's

actually attached to the warrant I pointed out?

A.    1433?

Q.    Yeah, 1433.  And two things.  In paragraph one it

authorizes you DEA to seize evidence of crimes in violation

of, of drug crimes in violation of the Controlled Substances

Act, right?  But also, also violate -- evidence of

violations of 18 U.S.C., 1591 human trafficking, right?

A.    Correct.

Q.    And in paragraph 1B, as in boy, can you just read the

first three lines, for the record?

A.    Paragraph 1B says, any and all documents, records, and

items of personal property relating to the purchase,

possession or distribution of controlled substances, or

relating to sex trafficking, including the following:

Computers, telephones, and cellular telephones, smart

phones, pagers, --

Q.    That's okay.  I just wanted you to read the first four

lines.  It goes on and identifies other things, right?

A.    Correct.

1  Q.    But this warrant contains an attachment B. that

2  explicitly states you could seize computers, right?

3  A.    Umhum, yes.

4  Q.    Judge Conroy authorized that, correct?

5  A.    Yes.

6  Q.    At the request of you and the U.S. Attorney's Office,

7  correct?

8  A.    Yes.

9  Q.    And here, as part of the gathering and seizing of

10 evidence of human trafficking and drug crimes, correct?

11 A.    Correct.

12 Q.    All right.  So if we turn back to Government's Exhibit

13 17 and we look at attachment B., do you find attachment B.

14 in there somewhere?

15 A.    I have it.

16 Q.    Up at the top what, for what crimes is evidence

17 permitted to be seized pursuant to that warrant?

18 A.    The attachment B. that's attached to 96 Ethan Allen

19 Parkway says, any and all evidence and/or instrumentalities

20 of violations of Title 21, United States Code, Section

21 841(a)(1) and 846, distribution of controlled substances and

22 conspiracy to distribute controlled substances, including

23 the following.

24 Q.    Okay.  So fair to say, that this attachment B., which

25 means this search warrant for Ethan Allen Parkway, is a

1   straight drug warrant, correct?

2   A.   That's what it's saying, yes.

3   Q.   And no where in there, including the analogous

4   paragraph 1B., are computers listed as something that Judge

5   Conroy said you could take, correct?

6   A.   It doesn't specifically say the word computers,

7   correct.

8   Q.   Right.  In fact, it doesn't say computers on there

9   anywhere, right?

10  A.   It doesn't say computers, no.

11  Q.   And it doesn't say -- it doesn't authorize -- it

12  doesn't use another word for computers, correct?

13  A.   It uses electronic devices down below.

14  Q.   It uses electronics, right?

15  A.   Yup, which a computer is an electronic.

16  Q.   Now, that paragraph where it says, electronics, to be

17  fair, is really talking about electronics as, as part of the

18  proceeds of drug trafficking, right?  Because it talks about

19  jewelry, it talks about cash, it talks about securities, it

20  talks about electronics, because sometimes you guys like to

21  grab the plasma TV's, right.

22  A.   That's incorrect.  I wouldn't agree with that

23  assessment.

24  Q.   Sometimes you grab expensive electronics, correct?

25  A.   That's not correct.

Q.    You --

A.    I have never grabbed an expensive electronic like a TV
like you're saying.

Q.    Did you participate in the Brooker case, United States
v. Brooker?

A.    I was probably in an assisting role.

Q.    Was that a DEA led case, correct?

A.    I don't know.  Um, I don't remember actually if it was
DEA or ATF.

Q.    Okay.  The search warrant return in that case would be
a matter of, well, public record?  It would be a judicial
record, correct?

A.    Again, I'm not familiar with that case.  I said I was
assisting in there probably in a search as a custodian or
something.

Q.    Would it surprise you that DEA seized, among other
things, some large screen TVs?

A.    It wouldn't surprise me.  I'm just saying, based on my
experience, we don't set out to seize televisions because
their value is, is, the value, it's like a used car, it goes
down.

Q.    So the Ethan Allen Parkway case had the word
electronics.  And the Judge will see where that is in the
search warrant attachment.  It's one of the lower paragraphs
that includes things like jewelry and cash and securities,

1  correct?

2  A.   Um, and that specific one, which is 1E. it says, any

3  and all passwords necessary to access data contained within

4  the cellular telephones, smart phones and other electronic

5  items being seized.

6  Q.   So that actually, that paragraph, I'm glad you brought

7  that up, that paragraph authorizes the seizure of passwords

8  that would unlock electronics or other items being seized,

9  right?  For instance, every cell phone nowadays just about

10 has a password, right?

11 A.   Umhum.

12 Q.   If you don't get that password it makes it a lot more

13 difficult to get into it, correct?

14 A.   The majority of them, yes.

15 Q.   So that paragraph doesn't authorize anything but the

16 seizure of passwords, correct?

17 A.   Yes.  Um, and other electronic items being seized.  In

18 my interpretation you have to seize an electronic item to

19 find a password for it.

20 Q.   Okay.  The Judge can read that paragraph for himself?

21 A.   Sure.

22 Q.   While you have, while you have Exhibit 17, the Ethan

23 Allen Parkway exhibit in front of you, let me get you to

24 turn to, again to your affidavit.  All right.  If you, if

25 you look at paragraph two in your affidavit you are, you

1  specify that this affidavit is for two search warrants,

2  right Canal, West Canal and Ethan Allen?

3  A.    Yes.

4  Q.    And a second one is Ethan Allen, right?

5  A.    Listed here, yes.

6  Q.    I mean, you wrote this, right?

7  A.    Yes.

8  Q.    And you identified the purpose of the second warrant

9  was to seek, seeks to search an apartment that he uses for

10 his drug distribution operation at Ethan Allen Parkway for

11 drugs and evidence as further described in attachment B.,

12 correct?

13 A.    Correct.

14 Q.    And just above, the purpose of the first warrant, the

15 Canal Street warrant is, is to grab evidence that's

16 described, you just say in attachment B., right?

17 A.    Yes.  That's right.

18 Q.    Of that warrant, right?

19 A.    Yes.

20 Q.    So the purpose of the Ethan Allen Parkway warrant was

21 to get drug evidence, correct?

22 A.    And items associated with drug distribution.

23 Q.    Yeah.  And anything associated with drug distribution,

24 right, that was permitted by the Court?  Your hope was to

25 get anything associated with drug distribution, right?

A.    Yes.

Q.    And, in fact, in fact, as we walk through this two paragraphs in this warrant, you state in paragraph 40 that Mr. Folks' residence was 241 West Canal Street, right?

A.    I'm saying that that was what the -- when the phone number was entered into the database is what it listed as.

Q.    Yeah.  I mean, you note that the commercial database, I think Max Galusha identified West Canal Street as his residence.  Vermont DMV database identified that as his residence.  And later in paragraph 59 you note that Valcour identified West Canal Street as his residence, okay.  All correct?

A.    Um, that is correct.

Q.    And so his connection to West Canal Street was, in your view, and what you told the judge, was that it was his residence and you and your colleagues were looking for all sorts of drug evidence as well as human trafficking evidence, correct?

A.    Correct.

Q.    And your warrant, proposed warrant and proposed attachment B. was consistent with that, correct?

A.    For 241?

Q.    For West Canal Street?

A.    Yes.

Q.    All right.  And then later in the affidavit, around

1  paragraph 56, you start to talk about the controlled buy on

2  July 11, 2016.  The next few paragraphs talks about what you

3  believe is the nexus between the Ethan Allen Parkway

4  residence and Mr. Folks' drug distribution activities,

5  right?

6  A.    Correct.

7  Q.    And nowhere in this affidavit do you connect the Ethan

8  Allen Parkway residence with the alleged human trafficking,

9  correct?

10  A.    Correct.

11  Q.    In fact, you say a couple times in this affidavit,

12  including paragraph 66, that based on what you knew and what

13  you were telling Judge Conroy that you believed 96 Ethan

14  Allen Parkway was Mr. Folks' quote, new trap house, unquote,

15  right?

16  A.    Correct.

17  Q.    And that's -- and by, trap house, you mean a house

18  where he stores drugs or engages in drug activities,

19  correct?

20  A.    Yes, sales.

21  Q.    All right.  And so your focus with regard to Ethan

22  Allen Parkway was drug evidence, right?

23  A.    That's correct.

24  Q.    Sometimes, when you apply for a search warrant from

25  Judge Conroy, you seek computers and sometimes you don't,

1  right?  You don't always seek computers in drug cases,

2  correct?

3  A.    I would have assumed we did, yes.  To seize them, yes.

4  Q.    Were you involved in the Aguilar case?  You remember

5  that case?  That was a big case.  Actually, I think Mr.

6  Williams handled that, right?  Were you involved in that?

7  A.    As a member of the office and surveillance and stuff,

8  yes.

9  Q.    Would it surprise you that in doc 209-cr-90, document

10 18-2, attachment B. to a search warrant in that case for a

11 drug residence, that there's no mention of computers?

12         MS. AVERBACH:  Objection.  I think the attachment

13 B. in this case is what we should be focused on, not what

14 the attachment B. said in other cases and what their

15 understanding of what attachment B. was in other searches.

16         MR. NOALN:  Sometimes they seek out computers,

17 sometimes they don't.  And he just testified, oh, I thought

18 we, we saw them in, get them in every case.

19         THE COURT:  I'll allow it.  I mean, I think you're

20 contradicting what he told you a few minutes before.

21 BY MR. NOALN:

22 Q.    So would you be surprised?

23 A.    Having not authored that and read that I wouldn't know

24 what you are reading to me and what that attachment B.

25 states.

MR. NOALN:  Okay.  So I think we're going to ask
the Court to take judicial notice of its own records, that
being one of them.  I think maybe the easiest, most
efficient way would be for us to submit that to you.  I can
read those numbers off later if you like.

THE COURT:  That would be fine.

MR. NOALN:  I don't want to waste a lot of time
doing that.

MR. NOALN:

Q.    Were you involved in U.S. v. Delima?

A.    Yes.

Q.    Okay.  Would it surprise you that in that case,
5:15-cr-27, document 129-2, which is an attachment B. for a
drug search warrant, no computers were sought?

A.    Again, I don't -- I've never seen these search warrants
and --

Q.    Were you involved in U.S. v. Nazer?

A.    I am a member of the Burlington RO so, yes, I was, I
participated in those investigations.

Q.    How about U.S. v. Biaz-Garcia?

A.    The name's familiar.

Q.    And U.S.v. Callender?

A.    I don't know that name.

Q.    We'll submit the numbers to you later.  I don't want to
spend time going through them.  But would it surprise you

1    that there are many, many search warrants by DEA, the

2    Burlington RO, your office, that don't seek authorization

3    to take computers?

4    A.    Would it surprise me?  I mean, having read this one it

5    doesn't have it in it.  I can't attest to the other ones.

6    Q.    So you just don't know either way?

7    A.    No, I don't, not having seen those.

8    Q.    You've been going in front of Judge Conroy for quite a

9    time now.  And are you familiar with the fact that to get a

10   search warrant, at least a drug search warrant, that

11   authorizes the taking of computers, that the affiant needs

12   to link, not just with boilerplate, but needs to link

13   assertions of fact in the affidavit with the existence or

14   use of computers at that location?

15             MS. AVERBACH:  Objection.

16             MR. NOALN:  Well --

17             THE COURT:  What's the objection?

18             MS. AVERBACH:  I think that mischaracterizes the

19   state of affairs, frankly.

20             MR. NOALN:  I mean, I think it's a fair question.

21   If he thinks that's wrong, I mean now the answer's been

22   suggested to him.

23   MR. NOALN:

24   Q.    But are you aware that Judge Conroy --

25             THE COURT:  Overruled.

BY MR. NOALN:

Q.   -- requires a showing, factual assertions, not
boilerplate, at some showing that if you want to grab
computers from a house you got to show me something that
that house has computers that would contain evidence?
You're aware that he requires that, right?

A.   Um, I would -- I would believe so, yes.

Q.   Okay.

A.   I mean --

Q.   And you would agree with me that in this search warrant
application you didn't make any such showing relating to
computers in this house, correct?

A.   Not in this attachment B..

Q.   Right.  And not in your affidavit, correct?

A.   I don't list computers in there, but there's --

Q.   You don't make any factual allegations that link elicit
uses of a computer at that residence for elicit purposes,
correct, for drug purposes?

A.   Not that residence, but in the investigation.

Q.   Yeah.  You talked about the other residence, his
residence, right?  And you talk about -- you sort of link
human trafficking to his residence on West Canal Street,
right?

A.   Correct.

Q.   And you seek from Judge Conroy in that warrant

1  authorization to take computers, right?

2  A.   Listed in that attachment B., yes.

3  Q.   So you did that for West Canal Street, but not for --

4  not for Ethan Allen Parkway, correct?

5  A.   Again, I didn't write attachment B. um, for those

6  warrants.

7  Q.   Fair to say --

8  A.   I, I -- that's what they say.

9  Q.   Fair to say, frankly, that the AUSAs would be even more

10  in tune or more knowledgable about what Judge Conroy might

11  specifically require than the agents, right?

12  A.   I felt that the attachment B.'s were the same for the

13  locations.

14  Q.   All right.  But ultimately it was the AUSA that made

15  the call, correct?

16  A.   They wrote it.

17  Q.   Yeah.  Okay.  Just real basic.

18        You showed us a picture of the tower, a video of

19  the tower.  It's, you know, it's sizeable, right?  It's not

20  the size of a laptop, correct?  It's not something that

21  people walk around with, right?

22  A.   That's correct.

23  Q.   You will usually have it on your desktop or just under

24  your desk, and you don't move it around like you might a

25  tablet or a laptop or today a Phablet or a phone, right?

1  Yes?

2  A.   Yes.

3  Q.   You testified that you had a team meeting, two team

4  meetings, an op meeting and then a search warrant meeting

5  for execution at Ethan Allen Parkway, right?

6  A.   We had a briefing beforehand.

7  Q.   Did you go over the warrant for Ethan Allen Parkway

8  with your colleagues?

9  A.   We went over it, yes.  We went over the basics of the

10  investigation and what we were looking for.

11  Q.   Did you read the search warrant attachment B. to your

12  colleagues to let them know what they could take or not

13  take?

14  A.   I did not.

15  Q.   I'm sorry, you did not?

16  A.   I did not read attachment B.

17  Q.   So what -- and so you had read attachment B., right,

18  before it went up, you walked up to Judge Conroy's chambers?

19  A.   Yes.

20  Q.   But, to be honest, you had an all star team there,

21  right?  I mean, every name you mentioned I recognized as

22  being pretty senior experienced narcotics agents, right, or

23  task force officers, right?

24  A.   Several of them, yes.

25  Q.   Yeah.  And so isn't it normal to actually let the team

1  know what they are allowed to take before you enter into a

2  premises and seize stuff?

3  A.    Our training and experience, I mean, we kind of know

4  what items typically contain the evidence we're looking for.

5  And that's, again that's, in my experience, has been found

6  on smartphones, tablets, computers, you know, they've

7  contained evidence of distribution of controlled substances.

8  Q.    Right.  But my, my question is, don't you and your

9  colleagues read, you know, it could be out loud or read to

10 yourselves, the search warrant attachment B. before you go

11 into a house and take stuff?

12 A.    No.

13 Q.    You don't?

14 A.    No.

15 Q.    And here no one read it but you, and the last time you

16 had read it was before Judge Conroy signed it, right?

17 A.    Yes.

18 Q.    And you didn't know whether or not it authorized the

19 taking of computers because you didn't read it closely

20 enough to know that computers was omitted, right?

21 A.    I did not pick up on that.

22 Q.    The computer tower itself was seized by Estes, right?

23 A.    Correct.

24 Q.    So you gave some testimony earlier that when seizing it

25 you believed it would contain evidence of drug, drug

1  dealing, right, but you are not actually the person who

2  seized it.  Estes seized it.  And when he seized it he took

3  it -- well, does he number it and ask Dan Merchand to go get

4  it as the custodian or does he take it to Dan Merchand and

5  then Dan has to deal with the paperwork?

6  A.   I wasn't -- I mean, I was not present for that

7  exchange.

8  Q.   So you weren't even there when it was actually seized

9  and pulled into the pile, if you will?

10  A.   I did not see it being removed from the coffee table

11  into the pile of things to be taken.

12  Q.   And you didn't have a conversation with the person who

13  seized it about, about seizing it, correct?

14  A.   No.

15  Q.   So you didn't tell that person, in your training and

16  experience, these things often have drug evidence in them,

17  right?

18  A.   Are you -- who are you referring to?

19  Q.   Whoever seized it.

20  A.   You mean TFO Rob Estes?

21  Q.   Yeah.

22  A.   Did I have a conversation with him what, what his

23  mindset -- I mean, did I know what his mindset was in

24  seizing it?

25  Q.   You don't?

A.    Right.

Q.    And you didn't inform him about your training and experience that you just gave us in your earlier testimony, right?

A.    No.

Q.    All right.  So you could only speculate about his reason for seizing it, correct?

A.    I would -- his experience, yes.

Q.    Right.  And he hadn't -- as far as you know, he had not read the search warrant, correct?

A.    Um, I mean, he was part of this investigation, you know.  I probably -- he did not read the entire search warrant, correct.

Q.    Okay.  You didn't seize the tablet, right?  Someone else seized the tablet?

A.    The tablet was in the black bag, the dark colored bag that was on the coat hook.

Q.    And who seized that?

A.    Myself.

Q.    So you did seize that?

A.    Yes.

Q.    Okay.  At the time you seized the black bag, did you see that there was a tablet in it?

A.    No.

Q.    So when you seized the black bag, what did you do with

1  the black bag?

2  A.   The black bag was brought over to Dan Merchand.

3  Q.   And you gave it to Dan Merchand and then he dealt with

4  it from there on?

5  A.   He logged it.

6  Q.   Okay.  So is it fair to say that if anyone made

7  decisions about whether to seize everything in the black bag

8  it was Dan Merchand, correct?

9  A.   Initially, what I saw in the black bag looked like drug

10  packaging items.  So the whole bag was taken.  I gave the

11  whole bag to Dan Merchand.

12  Q.   You didn't even see the tablet?

13  A.   No.

14  Q.   And so then you didn't make a conscience decision about

15  seizing a tablet or not, right?

16  A.   At that moment I saw the digital scale, the baggies and

17  some Tracfone, you know, some small phones in there.

18  Q.   You saw drug evidence that you, that was clearly within

19  the scope of the warrant, a bag that you gave to Dan

20  Merchand and you let him deal with whatever was in there,

21  right?

22  A.   Yes, he decided -- he just put it on the 12 receipt.

23  Q.   All right.  And you didn't have any discussion with him

24  about whether or not to seize the tablet, correct?

25  A.   I didn't know the tablet was in there.

Q.   Okay.  You testified on direct that in your experience
computers often have evidence of drug dealing in them,
correct?

A.   Yes.

Q.   All right.  How many times have you seized a computer
tower in a drug case?

A.   Um, a couple.

Q.   Two maybe?

A.   A few.

Q.   Two or three?

A.   I can't put a number on it.

Q.   Okay.  All right.  So you are not sure?

A.   I'm not sure.

Q.   Best estimate is two or three?

A.   That's just a guesstimate.

Q.   Can you think of any specific cases in which you seized
a computer in a drug case?

A.   Specific cases?

Q.   Yeah.  U.S. v. blank?

A.   Um, are we -- we're listing those cases here then?

Q.   Well, I'm just asking if you can think of any of them.

A.   Jacob Berino.

Q.   Berino?

A.   Yes.

Q.   Jacob Berino.  We both had involvement in that, right?

1  A.    We did.

2  Q.    So you seized one in Berino's case?

3  A.    Two.

4  Q.    Two computers in his case?

5  A.    Correct.

6  Q.    Do you know whether it was authorized, the computers?

7  A.    We later got search warrants for them, I believe.

8  Q.    Okay.  Did you -- can you think of any other cases?

9  A.    Not off the top of my head.

10       MS. AVERBACH:  Objection, Your Honor.  We're

11  getting far afield of what was within the parameters of this

12  attachment B..

13       MR. NOALN:  The government elicited from him that

14  he seized it because in his training and experience he

15  seized computers and they are fruitful in terms of having

16  drug evidence.  I mean, that's got to be their theory here.

17       THE COURT:  I think you've established that it's

18  rare.

19  BY MR. NOALN:

20  Q.    So in those rare instances, have you always had those

21  computers analyzed?

22  A.    Yes.

23  Q.    And how many times have they actually produced evidence

24  of drug crimes?

25  A.    The one I just mentioned.

Q.   So one?

A.   That I recall.

Q.   Mr. Berino's case?

A.   That I recall.

        THE COURT:  Can we look for an end because I should give Miss Averbach five minutes and I got to get these people home.

BY MR. NOALN:

Q.   One more question.  You testified that eventually you got a search warrant to actually forensically search the computer and the tablet, right?

A.   One was obtained, yes.

Q.   One warrant to search both those things and some other things, right?

A.   Yes.

Q.   Do you know when you got that?  Ballpark; one week later, maybe 10 days?

A.   It wasn't myself that got that search warrant.

Q.   All right.  So are you aware that DEA and the government waited approximately six months until January 27, 2017 to get a search warrant to search that computer, that tablet and some other devices?

A.   If that's the date you're referring to then I will concede that.

Q.   And that's just a matter of record in this case.  I

1   mean, there's no real dispute about that.

2          So fair to say DEA seized the computer, seized the

3   tablet, not you, but your brethren, held it for six months

4   before getting a warrant from this Court to search those

5   items, right?

6   A.   Yes.

7   Q.   All right.  Thank you.

8          FURTHER EXAMINATION BY MS. AVERBACH:

9   Q.   Agent Chetwynd, you were asked on cross-examination

10  about what you and your fellow agents did to prepare for the

11  search so that you -- in an effort to understand the

12  parameters of what was allowed during the search and seizure

13  in 96 Ethan Allen Parkway.  So could you tell the Court

14  please what you discussed at the operational meeting before

15  the search warrant execution relative to the parameters of

16  the search?

17  A.   Basically we described to everyone at the briefing that

18  we're looking for items and evidence associated with the

19  distribution of narcotics.  This, this investigation also

20  entailed the human trafficking side of it, so we were also

21  looking for items that were indicative of that activity.

22  Q.   And who participated in that operational meeting?

23  A.   Usually it's, it's everyone whose partaking in the, in

24  the, you know, in the separate search warrant.  So you mean

25  as far as what, agencies?

1   Q.   Was TFO Rob Estes there, for example?

2   A.   Yes.

3   Q.   And do you know how many years of involvement with

4   narcotics investigations he has, approximately?

5   A.   Probably close to 15 years.

6   Q.   And he's spent approximately how many years as a TFO

7   for DEA doing exclusively narcotics investigations?

8   A.   Probably close to 13 or, 12, 13 years.

9   Q.   And, in fact, who was your fellow case agent in this

10   particular case, the case of Brian Folks?

11   A.   TFO Rob Estes.

12   Q.   And who supervised all of the controlled purchases in

13   the case of Brian Folks?

14   A.   TFO Rob Estes and myself.

15   Q.   And who put the wire on the confidential informants in

16   connection with the controlled purchases in this case?

17   A.   TFO Rob Estes.

18   Q.   And who was the one who documented and searched the

19   CS's before they prepared to make controlled purchases from

20   the targets in this case?

21   A.   TFO Rob Estes.

22   Q.   And is it fair to say TFO Rob Estes had as good or even

23   better understanding of the investigation in this case as

24   you?

25   A.   We were jointly doing the investigation, yes.

Q. Okay. Now, when you prepared the affidavits for the
two search warrants that were conducted and executed
simultaneously, one at 96 Ethan Allen Parkway and one at 241
West Canal Street, what, if any, difference was there in
your mind with respect to the items that you sought to seize
in both places?

A. In my mind, like I explained, --

MR. NOALN: Objection, Your Honor. I mean, he saw
what he saw. It's on paper. What's it matter at this
point? What's the relevance?

MS. AVERBACH: The officer's good faith reliance,
Your Honor, on what he believed he was looking for is
certainly relevant to the seizure of the items under a good
faith exception to the search warrant.

THE COURT: No, I'll sustain the objection. I
mean, everybody knows that computers got not included in the
relevant exhibit B. and there's no dancing around it. It's
a fact. So we got to move on because we're almost out of
time and I want to get to your high points.

MS. AVERBACH: Your Honor, they spent a lot of
time on cross-examination about what --

THE COURT: Everybody's had a lot of time today,
but I got to get you out in five minutes. That's it.

MS. AVERBACH:

Q. I'm going to ask you to look at, do you have

1  Government's Exhibit 17 in front of you?

2  A.    I do.

3  Q.    I'm going to ask you to look at page 19, please?  And

4  refer you to paragraph 67.

5  A.    Yes.

6  Q.    What, if anything, does it say, the first two lines in

7  paragraph 67?

8  A.    It says, based on my knowledge and experience and

9  direct participation in numerous investigations into the

10  distribution of controlled substances, I know that.

11  Q.    Could you read subsection E. please?  What did you

12  know?

13  A.    Traffickers in controlled substances commonly maintain

14  names and contact information in books, ledgers, --

15        MR. NOALN:  Your Honor, we'll stipulate that the

16  document says what the document says.  He doesn't to have

17  read his boilerplate --

18        THE COURT:  I know.  I know.  I promise I'll read

19  it.  I've looked it over.  I'll read it in depth.

20        MS. AVERBACH:  Your Honor, I appreciate you

21  wanting to finish up, and I'm done, but I did want Your

22  Honor to hear that it does say computers in subsection E. --

23        THE COURT:  No, that's a good point.

24        MS. AVERBACH:  -- of paragraph 67 of the affidavit

25  in connection with the investigation of controlled

1　substances.  I think that's, that's relevant to this

2　hearing.

3　　　　　　THE COURT:  Yeah.

4　　　　　　MR. NOALN:  Your Honor, I don't have any further

5　questions.  I would like to, for efficiency purposes, submit

6　something promptly asking the Court to take judicial notice

7　of a few, a few of its own records, including some records

8　in United States v. Berino, which was referenced by Agent

9　Chetwynd.  I mean, they reside right there.  They are your

10　records.  You can take judicial notice of them.

11　　　　　　THE COURT:  All right.  Anything further?  How

12　about you get, did you get your Giglio material today at the

13　lunch break?

14　　　　　　MR. NOALN:  So I got -- I'll let the government

15　revise its characterization if they want.  I got, I think,

16　what is a preview.  So, they started going through it.  I

17　don't have any documents yet.  I've got information about

18　one of the documents, but I know that they are well into it.

19　Miss Averbach was, was working hard today to do it.  So I

20　think I'm going to get it pretty promptly, whatever further

21　they want to give me.

22　　　　　　THE COURT:  All right.  So how about you submit a

23　post-hearing brief in two weeks?

24　　　　　　MR. NOALN:  Two weeks, yes.

25　　　　　　THE COURT:  And that will include one week which

will be the deadline for the production of any exculpatory

material.  The whole, whatever else needs to come in you

should have in a week, and then you got a week to write it.

I know time is short, and I know you want to press along,

but I don't want to be unreasonable about your response

time.  How much time would you like to reply?

MS. AVERBACH:  Well, Your Honor, if it makes any

difference to you, we did disclose the entirety of the

substance of the Giglio disclosure that we will make with

respect to Mary Robenstein today at lunch.

I have no more information to give.  I'm happy to

provide counsel with a copy of the page that I relayed the

substance to Mr. Nolan earlier.  And I will do that.  But

the two items that I relayed are not going to be expanded

upon.  That's all there is.  So I'm not sure we need two

weeks for post-hearing briefing for them.

THE COURT:  How little time can you do it?

MR. NOALN:  So, Your Honor, just looking at my

calendar.

THE COURT:  Right.

MR. NOALN:  This week's completely shot.

THE COURT:  Two weeks will be on us before we know

it.  How much time would you like?

MS. AVERBACH:  One week would be fine, Your Honor.

THE COURT:  One week.  That's helpful.  Thank you.

1    MR. NOALN:  And, Your Honor, when would you
2  like -- that's in that one particular motion?
3         THE COURT:  No.  No.  The whole shooting match.
4         MR. NOALN:  Everything?
5         THE COURT:  Everything.  And I know you'll do this
6  anyway, I would welcome a more focused, I think Attorney
7  Kraham put his papers together at an early stage, threw lots
8  of things up on the wall.  Now we can get kind of a more
9  focused argument.
10        MR. NOALN:  That's always the goal with the
11 post-hearing.
12        THE COURT:  Yeah.  Yeah.  No criticism intended at
13 all, but now we have the advantage of the record.
14        MR. NOALN:  Now we know the facts.
15        THE COURT:  Yes, exactly.  All right.  So two
16 weeks for you.  One week for the government.
17        Any movement at all in your civil case that's sort
18 of standing in the middle of our trial period?
19        MR. WILLIAMS:  We've got that mediation on the
20 10th.
21        THE COURT:  The 10th of April.
22        MR. WILLIAMS:  As soon as I know I'll let your
23 office know.
24        THE COURT:  All right.
25        MR. WILLIAMS:  And, of course, the U.S. Attorney's

Office.

        THE COURT:  Good enough.

        MR. WILLIAMS:  We'll know by the end of the day on the 10th.

        THE COURT:  All right.

        MS. AVERBACH:  Your Honor, I wanted to raise one issue that came up during the cross-examination of Special Agent Chetwynd.  And that was, that we had not anticipated calling another witness for this particular motion --

        THE COURT:  Right.

        MS. AVERBACH:  -- today, but we would like to, with the leave of Court, present very brief testimony by TFO Rob Estes with respect to the seizure of the --

        THE COURT:  Oh, you mean another hearing day?

        MS. AVERBACH:  -- the computer tower.  And it will be quick.

        THE COURT:  All right.  Well, we'll have to find you an hour.  That will do it?

        MS. AVERBACH:  That will do it.

        MR. NOALN:  You know, just for the record on the defense side, we oppose that.  I mean, they, they know, they know what happened much better than we do.

        THE COURT:  Right.

        MR. NOALN:  We weren't there.  All that evidence and knowledge is within their, their control.  And, frankly,

they knew what the arguments were.  I didn't come up with

any new arguments.  I just asked questions to further the

arguments made by, some of the arguments made by Attorney

Kraham.  And I can't remember if Attorney Williams was on

that.

THE COURT:  What is he going to say, that he also

thought computers were included in the, in the attachment B.

even though they weren't?

MS. AVERBACH:  We'd be happy to do it by

stipulation if that is the preference of counsel.

MR. NOALN:  You know, what we know right now is he

didn't read it.  The state of the record is he didn't read

it.  It wasn't read to him.  I mean, that's, they're

supposed to bring in their evidence.  And --

THE COURT:  I think we have to close it here.  I

can't believe he's got something different to say than Agent

Chetwynd who was very candid about the problem.  And I've

got to wrestle with the problem, which is there's either a

drafting error or there's a more narrowly drawn request.

And I got to sort of figure out what it is.  But the legal

problem isn't going to go away by bringing in another agent

who says that he thought he was doing the right thing in

exceeding the literal scope of the attachment.

MS. AVERBACH:  Your Honor, respectfully, the

government's position is I think three-fold.  One is that

1  computers are covered by attachment B. as it was written,

2  but in the alternative --

3          THE COURT:  And if I can interrupt, that's just

4  what the words mean?

5          MS. AVERBACH:  Correct.

6          THE COURT:  No testimony is necessary on that?

7          MS. AVERBACH:  Correct.  Correct.

8          THE COURT:  Right.

9          MS. AVERBACH:  But with respect to the plain view

10 doctrine, what was in TFO Rob Estes' experience going to be

11 an item of obvious evidentiary value is relevant to the

12 analysis under the plain view doctrine.  We would call him

13 today but we're out of time and I don't have time to get him

14 here.

15         THE COURT:  You have the plain view case.  Whether

16 it works or not is a legal question.  But you have the photo

17 and he circled the thing.  I can see the computer's not

18 hidden.  It's sitting out in the open.  It's not, I mean,

19 nobody says that it's under a bed or had to be -- it was

20 sitting on the table.

21         MS. AVERBACH:  Right.  But to make the case that

22 it was of obvious evidentiary value to the experienced drug

23 investigator.  That's something --

24         THE COURT:  We've got the RAC.  And he said that.

25 Okay.  I mean, I think it's duplicative.  All right.  Good

1   enough.

2            You'll let me know as soon as you can about the --

3   what I'm conscience of it's a lot of people tied up, and

4   particularly these people from DC, who I'm sensitive to not

5   messing up your other obligations.  And I've got everybody

6   frozen now because we've got a trial date, but I've got this

7   other case in the way that everyone tells me is going to go

8   away.

9            MR. WILLIAMS:  The mediator just got back from

10  Hawaii.

11           THE COURT:  Yeah, I understand.

12           MR. WILLIAMS:  And there was an entry fee, as it

13  were.  We weren't going to show up unless they came up with

14  a certain figure.  That was what we stipulated to.

15           THE COURT:  Okay.

16           MR. WILLIAMS:  Before we were going to go back to

17  mediation I want to make sure that that happens.  And if we

18  get the answer, we're not going to meet the entry fee, then

19  we'll be going on the 30th.  I mean, I'll be going on the

20  16th in Judge Reiss' chambers, in Judge Reiss' courtroom.

21           THE COURT:  I thought your defense attorney had an

22  ill parent or something?

23           MR. WILLIAMS:  No.  We -- that was one of the

24  issues.

25           THE COURT:  Right.

1          MR. WILLIAMS:  But I haven't heard anything about

2     that.

3          THE COURT:  Right.

4          MR. WILLIAMS:  We're trying to settle the case.

5     And we've got to get beyond the state, that reserve to talk

6     to the insurance adjustor.  And if they say no we're going

7     to go to trial.  That's the bottom line.

8          THE COURT:  All right.

9          MR. WILLIAMS:  But we may know that soon.

10          THE COURT:  The one thing I don't want to have

11     happen is neither case to get tried this spring.  That would

12     be truly -- that would be truly silly.  All right.  So I'll

13     keep being difficult with you and you'll keep letting me

14     know where you get.

15          MR. WILLIAMS:  I'll let the mediator know exactly

16     what's going on so that --

17          THE COURT:  That's all I can ask.

18          MR. WILLIAMS:  So that everybody understands --

19          THE COURT:  Right.  Good enough.

20          MR. WILLIAMS:  -- this case is on for the 30th and

21     if we can't settle the other one this will be postponed.

22          THE COURT:  Right.  Good.  Thank you.

23          MR. WILLIAMS:  Thank you.  I'll let them know the

24     urgency of that.  Thank you.

25          THE COURT:  All right.

1          (The Court recessed at 4:48 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          C E R T I F I C A T E

2

3          I, Anne Marie Henry, Official Court Reporter for

4     the United States District Court, for the District of

5     Vermont, do hereby certify that the foregoing pages are a

6     true and accurate transcription of my shorthand notes taken

7     in the aforementioned matter to the best of my skill and

8     ability.

9

10     _____

11              Anne Marie Henry, RPR
              Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25