U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 APR 17 PM 2: 36

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          Case No. 5:16-cr-94-1
                                  )
BRIAN FOLKS,                      )
                                  )
        Defendant.                )

## OPINION AND ORDER ON MOTIONS TO SUPPRESS
### (Docs. 128, 133, 137, 143)

Defendant Brian Folks is charged with conspiracy to distribute cocaine and heroin,

convicted felon in possession of a firearm, distribution of heroin, possession with intent to

distribute heroin and cocaine base, and multiple counts of sex trafficking, including one count

concerning an alleged minor victim, and prostitution.  (Doc. 124.)

Folks has filed multiple motions seeking the suppression of the result of searches carried

out in the course of a lengthy investigation.  (*See* Docs. 127, 128, 130, 132, 133, 137, 143, 144.)

On March 20, 2018, the court held an evidentiary hearing concerning four of these motions—

Documents 128, 133, 137, and 143.  (Doc. 185 (hearing transcript).)[1]  The parties have submitted

post-hearing memoranda (Docs. 189, 190, 191, 192) and all four motions are ready for decision.

## I.  Motion to Suppress Evidence Re: 1/20/16 Car Stop (Doc. 133)

### A.  Background

On January 20, 2016, Winooski police officer Kyle Brouillette received a tip from Mary

Robenstein who had previously provided information to him about drug trafficking in the

Burlington area.  (Tr. 41.)  Her tips had previously led to seizures and arrests.  (Tr. 42.)

Ms. Robenstein told him that she had been asked to transport an individual named "Moe" from a

---

[1] The hearing transcript is cited below as "Tr."

location on North Avenue in Burlington to a location near the intersection of North Union and Loomis Streets. (*Id.*) Moe would be travelling with a large quantity of narcotics. (*Id.*) Ms. Robenstein would be driving her own vehicle, which was a white Mercedes. (Tr. 43-44.) She believed that heroin and crack cocaine ("up and down") would be transported to an address where the drugs would be stored or sold. (Tr. 44.) She did not know the exact address.

Officer Brouillette knew that Moe was a street name used by Folks and that Folks was the subject of an active investigation conducted by the Drug Enforcement Administration (DEA). (Tr. 42–43.) Officer Brouillette enlisted the help of Winooski police detective David Nease, who contacted the DEA. The DEA gave permission to the Winooski officers to intercept the narcotics. (Tr. 46–47.) The two officers discussed the route Robenstein would follow and made a plan to stop the car. (Tr. 48–49.) Ms. Robenstein expected that her car would be stopped. (Tr. 56.) Detective Nease followed the Mercedes from North Avenue. Officer Brouillette waited in a parking lot at the intersection of Manhattan Drive and Spring Street.

At about 9:00 p.m., Officer Brouillette stopped the Mercedes on the pretext that the driver had turned right without signaling in violation of 23 V.S.A. § 1064. (Tr. 50; Def's Ex. C.) He also knew that the registration certificate for the vehicle and the license plates did not match. (Tr. 51.) He approached the car and found two women in the front seats and a woman and a man in the rear. The man was Brian Folks. (Tr. 54–55.) Officer Brouillette asked Robenstein to join him in his cruiser. He did not disclose her role as an informant to the other passengers.

In the cruiser, Robenstein identified her passengers as friends. She knew only their first names. Officer Brouillette interpreted this as additional confirmation that the group was involved in the drug trade since real friends, traveling together, frequently know one another's

full names and can describe how they know each other. (Tr. 58.) The lack of information made Robenstein's tip more likely to be true.

Officer Brouillette returned to the car to make note of the Vehicle Identification Number. For his safety, he asked the passengers to show their hands. Folks's demeanor was hostile and resistant. (Tr. 63.)

Officer Brouillette then called the Burlington Police Department to request the assistance of a drug dog. K9 Capone arrived with his handler. The dog alerted to the presence of narcotics in the vehicle. (Tr. 67.) Robenstein gave permission for a search of her vehicle. Officer Brouillette asked whether anyone had any personal belongings in the car. No one claimed any belongings except for Folks who had a camera in the back seat. The officer proceeded to search the car and found a "small cloth purse-type bag with a large quantity of narcotics in it." (Tr. 69.) The drugs included heroin and crack cocaine. (Tr. 71.)

Officer Brouillette then staged an arrest of Robenstein. She was transported to the Burlington police station and released. She was given a false citation to appear in court on state charges of possession of narcotics and released. The citation was never filed with the state court. Its purpose and the purpose of her staged arrest were to shield her status as an informant. (Tr. 71–72.) The Mercedes was towed to a service station lot and returned to Robenstein. (Tr. 72.)

Folks and the other passengers were not arrested.

Since the date of the traffic stop, Officer Brouillette has left the Winooski police department and is now employed by the Burlington police department. When he left Winooski, he destroyed his notes and records concerning contact with informants, including those related to Robenstein. (Tr. 87–88.)

3

**B. Analysis**

The defense objects to the search on the ground that the stop was not supported by sufficiently reliable information. In his view, because Robenstein was unreliable, her information could not form the basis for a determination of probable cause justifying a traffic stop. The Government contends that Robenstein's bona fides were established through her previous work with Officer Brouillette as well as the consistency between her tip and the actual movements of the Mercedes. In addition, the Government claims that as a passenger, Folks lacks standing to object to the search of the vehicle.

**1. Standing**

Folks's objection to the search in this case is based on a claim that the police lacked probable cause to stop the vehicle because of the unreliability of their informant. Passengers have standing to object to the stop of a vehicle in which they are traveling as much as the operator. Both operators and passengers are equally subject to seizure when the car is stopped. *See Brendlin v. California*, 551 U.S. 249, 251 (2007) ("We hold that a passenger is seized as well [as the driver when a police officer makes a traffic stop] and so may challenge the constitutionality of the stop."); 6 Wayne LaFave, Search and Seizure § 11.3(e) (5th ed. 2017). Passengers may lack standing to object to the scope of searches of an area such as a glove compartment in which they lack any reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128 (1978).

Folks does not complain about the scope of the search which followed Robenstein's grant of permission. He and the other passengers were given an opportunity to remove any personal items from the car before it was searched. He was seated in the back seat. He claimed his camera. Because Folks objects only to the basis for the traffic stop and its duration –seizures

which affected him as much as the driver -- the court concludes that he has standing to assert that the stop violated the Fourth Amendment. *See* Doc. 190, Defendant's Post-Hearing Memo., p. 2 (identifying the grounds for the motion to suppress as the basis of the stop and its duration).

## 2. Basis for the Stop

The stop in this case was supported by probable cause to believe that the Mercedes contained evidence of drug offenses. Here, because probable cause was based on information supplied by an informant, the "core question" is whether the information is "reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Factors bearing on reliability include the informant's track record of providing reliable information, and corroboration by independent evidence. *Id.* Both factors are present here.

Robenstein was an informant previously known to officer Brouillette as the source of reliable information about drug trafficking in the past. Previous tips from Robenstein had resulted in arrests and seizures. She had worked directly with Brouillette who had first-hand knowledge of her access to accurate information about drug sales.

Robenstein was directly involved in the movement of the drugs she described. In contrast to a rumor from a third-party, Robenstein advised that she would be transporting "Moe" and a substantial quantity of drugs in her own car. She gave specific information about her route and approximate destination. Detective Nease was able to confirm the accuracy of her route by following her prior to the stop.

Officer Brouillette was unaware of Robenstein's work as an informant for the DEA and other police departments. (Tr. 101–02.) He was unaware that she had received money and lenient treatment by providing information. (Tr. 102.) He knew that she had a history of drug use but did not inquire about current use. Had he known more about these facts, it may have

altered his view as to her reliability. It may have increased her reliability since these facts demonstrate her access to information about drug trafficking. It may have decreased it since active drug use may have made her a less reliable observer and narrator. What is significant for the present motion is that none of this information was necessary for the officer to form a reasonable belief that he was dealing with a reliable informant.

Officer Brouillette knew that Folks used the street name "Moe." Through his contact at the DEA, Detective Nease learned that Folks was the subject of an active drug investigation.

The pretext of the turn signal violation is largely irrelevant. *See United States v. Dhinsa*, 171 F.3d 721, 724 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."). Officer Brouillette conducted the stop as if he had no prior information about Folks's plans in order to protect his informant from possible harm. In fact, he knew about the purpose and route of the trip in advance from a source which had previously demonstrated her reliability. With this information in hand, Officer Brouillette had probable cause to believe that Moe was making use of the Mercedes to transport drugs. He had a sufficient constitutional basis for stopping the car and calling for a drug dog.

Similarly, the duration of the stop was not unduly extended beyond the time needed to carry out the purpose of the stop. Generally, the "tolerable duration" of a routine traffic stop is determined by the "mission," which is "to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Here, however, the purpose of the stop was to develop a basis for a potential search for drugs. The purpose was not to issue a warning or a traffic ticket for the absence of a right turn signal.

The car and its occupants were seized long enough to permit the officers to call for a drug dog and develop a basis for impounding the vehicle and obtaining a warrant. The warrant became unnecessary because the operator consented to the search. The encounter included a certain amount of "playacting" between Robenstein and officer Brouillette designed to cause Folks and the other passengers to believe that Robenstein was not an informant. (Tr. 83.) But the detention of Folks at roadside was not unduly extended when viewed from the perspective of a stop intended to investigate possible drug trafficking. Folks was held no longer than necessary to allow the drug dog to arrive and for Robenstein to give consent.

The court DENIES the motion to suppress the results of the search of the Mercedes in Winooski on January 20, 2016 (Doc. 133).

## II.     Motion to Suppress Evidence Re: 12/25/15 Car Stop (Doc. 137)

The defense has also filed a suppression motion concerning a car stop in Burlington on the Beltline (Route 127) on December 25, 2015. The court heard testimony concerning this motion on March 20, 2018.

### A.     Background

On the evening of December 25, 2015, Burlington police officers Michael Beliveau and Ethan Czyzewski were on patrol in Burlington. They observed a Dodge Durango at the intersection of North Street and Elmwood and turned to follow it. They saw that the Dodge had no working license plate illumination at the rear of the car. (Tr. 156.) They stopped the vehicle for this violation on the Beltline. The driver identified himself as Brian Folks. He stated that he had no driver's license with him. (Tr. 157.) He was unable to provide proof of insurance. He provided a registration in the name of Lori Crawford. (Tr. 158–59.) A records check showed

7

that he had a civilly suspended license. (Tr. 159.) Officer Beliveau knew that Folks had been involved in drug crimes in the past. (Tr. 175.)

Officer Czyzewski informed Officer Beliveau that he had seen a small plastic baggie on the floor of the car as well as small plastic baggies, a small rubber band, and an alcohol swab pad. Officer Beliveau recognized these items as potential IV drug paraphernalia. (Tr. 160.) He called for a drug dog who arrived about eight minutes later. (Tr. 161.) The dog alerted to the rear passenger side door of the vehicle.

The officers requested permission to search the vehicle. Permission was not given, either by Folks or by the registered owner Lori Crawford whom they reached by telephone. The officers seized the vehicle and called for a tow truck to take the vehicle to the police station while they sought a warrant.

Folks exited the vehicle. He consented to a search of his person which revealed no contraband. He asked to retrieve several plastic bags of Christmas presents from the rear of the car. The officers inspected the bags with his permission, found no contraband, and permitted him to take the bags with him. Mr. Folks was not arrested. He left the scene after someone came to pick him up. The Dodge Durango was towed to the Burlington police lot.

Following issuance of a state court warrant, the officers found a loaded handgun and an extra clip in the glove box. Gov't Hearing Ex. 16 (3/20/18). They learned that Folks was subject to a state court order forbidding him from possessing a firearm. (Tr. 184.) Someone other than Officer Beliveau contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to advise them about Folks's possession of the firearm. (Tr. 185.)

The warrant which Officer Beliveau obtained identified the object of the search as evidence of drug crimes. It does not reference firearms.

**B.    Analysis**

The defense seeks to suppress the search on the ground that the stop was not supported by probable cause to believe that a violation had occurred and that the seizure was unreasonably extended beyond the time required to respond to the minor traffic violation.

The basis for the stop was the lack of license plate illumination. Under Vermont law, license plates are required to be illuminated. 12 V.S.A. § 1248(b). Credible testimony established that the license plate was not illuminated. The stop was justified by the officers' observation of these violations.

The duration of the stop was extended from the few minutes needed to write a ticket or administer a warning concerning the missing lights to the eight minutes required for the drug dog to travel to the scene and the time required for the dog to sniff the car. The greater duration of the seizure was justified by the reasonable suspicion of drug violations which developed when Officer Czyzewski caught sight of possible drug packaging materials. The scope of the investigative stop and seizure of the vehicle and its occupant increased to a possible drug crime. The increased scope justified the longer duration which was no more than ten or fifteen minutes. *See United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) (continuation of detention justified where officers acquired an independent basis for investigation).

Folks was released within ten or fifteen minutes. The car was seized pending issuance of a search warrant. The warrant which issued was tailored to a search for drugs. The officers had no reason to suspect that there was a gun in the car and did not ask for permission to search for firearms. When the firearm turned up, however, they were justified in seizing it as evidence of possible state and federal crimes. ATF accepted responsibility for the investigation of the

firearms charge and Folks was indicted on the federal charge of being a felon in possession of a firearm.

The facts concerning the December 25, 2015, stop show no constitutional violation. The original traffic stop developed into a *Terry* investigative stop founded on reasonable suspicion of drug dealing. The *Terry* investigation included a sniff by a drug dog. When the drug dog alerted to the possible presence of narcotics, the officers seized the car and towed it to a police lot pending issuance of a search warrant. This further seizure of the car—but not of Folks who was never arrested—was justified by the dog's alert.

At the evidentiary hearing, the defense advanced the argument for the first time that the search was excessively broad because a handgun was discovered and the officers had no authority to search for guns. The record contains no evidence that the officers searched for guns. Opening the glove box would be a normal step in any search for drugs. The officers were specifically authorized to view the contents of "[a]ny locked/unlocked containers and or safes." (Ex. 14.) Instead of drugs, they found a gun. No constitutional violation occurs when a search conducted by a warrant turns up evidence of a crime which is different from the criminal activity described in the warrant. *See Taylor v. United States*, No. 95 CIV. 2636 (LLS), 1995 WL 714354 (S.D.N.Y. Dec. 4, 1995) ("Although the warrant does not mention guns, it is clear that the gun was found as a natural part of the legitimate search for drugs.").

The defense also seeks to suppress the evidence of the gun and dismiss the count of felon in possession because the officers did not preserve the video of the traffic stop. To prevail on a motion for sanctions for the loss or destruction of evidence, a defendant must show that (1) the government acted in bad faith by destroying the evidence, (2) the evidence possessed an exculpatory value that was apparent before it was destroyed, and (3) the defendant was unable to

10

obtain comparable evidence by other reasonably available means." *United States v. Lopez*, 553

Fed. App'x 10 (2d Cir. 2014)(internal citations and quotations omitted). The defense has made

no showing of intentional destruction of evidence or of its exculpatory value. Officer Beliveau

testified that the video files taken from his body camera were automatically deleted after one

year. Tr. 169. While it is desirable to have video evidence available, this evidence will not

always be available to the court. In this case, the officers were credible in their account of

stopping the car for defective equipment, catching sight of suspected drug packaging, and calling

for a drug dog. These facts are sufficient to defeat the claim of an unlawful stop.

The motion to suppress regarding the Burlington traffic stop (Doc. 137) is DENIED.

### III. Motion to Suppress Evidence Re: Search Warrant for 96 Ethan Allen Parkway, Unit # 8 (Doc. 143)

On July 19, 2016, the DEA executed a search warrant at 96 Ethan Allen Parkway,

Burlington, Vermont. A laptop and a computer tower were among the items seized. The defense

seeks to suppress the results of the search on two grounds. Folks contends that the warrant

issued without a sufficient showing of probable cause. He also contends that the agents

exceeded the scope of the warrant in seizing the computers when there was no reference to

computers in the application.

### A. Basis for the Search

The application for a federal search warrant in this case was supported by a lengthy

affidavit (22 pages) detailing drug trafficking activities involving Folks over the course of

18 months. The same affidavit was used to support a request at the same time for a search of

Folks's residence at 241 West Canal Street in Winooski, Vermont.

The affidavit includes the following information:

In December 2015, a confidential informant advised members of the Vermont Drug Task Force that Folks was a heroin and crack dealer in Chittenden County and that he employed her and other women in bagging these drugs for resale. (Chetwynd Aff., ¶ 12.) In addition to drug sales, Folks persuaded women to prostitute themselves in exchange for heroin. (*Id.* ¶ 16.) Agents linked Folks to a series of controlled purchases in the vicinity of North Union Street in Burlington. (*Id.* ¶¶ 26-36, 41-47.)

On July 11, 2016, agents arranged for a controlled purchase in the area of the Rite Aid pharmacy on North Avenue in Burlington. (*Id.* ¶ 56.) Folks and an unknown male met an informant in a nearby park. He provided her with one bundle of heroin. When she asked for two more, Folks sent the unknown male in the direction of 96 Ethan Allen Parkway. The unknown male returned with two more bundles. After the sale was completed, Folks and the unknown male walked back to 96 Ethan Allen Parkway. They stood near Unit 8. Folks then left the area in a Jeep Cherokee registered to Danielle Degenhardt, who lives at 96 Ethan Allen Parkway, Unit 8. (*Id.* ¶¶ 56–58.) Folks has a long history of association with Ms. Degenhardt and 96 Ethan Allen Parkway, Unit 8. (*Id.* ¶¶ 60–62.)

On July 12, 2016, agents arranged a meeting between Folks and an undercover agent posing as a woman willing to join a prostitution ring. (*Id.* ¶ 62.) The meeting took place. It was inconclusive. (*Id.* ¶ 65.) Afterwards, Folks was observed returning to 96 Ethan Allen Parkway, Unit 8.

On the basis of these observations, Agent Chetwynd concluded that Folks was using Unit 8 "as his new trap house, after 103 North Union became unavailable." (*Id.* ¶ 66.) On the basis of Agent Chetwynd's affidavit, Magistrate Judge Conroy issued search warrants for 96 Ethan Allen Parkway, Unit 8 and Folks's home at 241 West Canal Street, Winooski.

Whether the warrant is supported by sufficient information establishing probable cause is an issue determined by reviewing the supporting affidavit and without regard to subsequent developments or other information not presented to the magistrate judge. *See United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) ("All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." (quoting *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006)). "A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)).

In this case, the information in the affidavit describes Folks as a person engaged in drug sales and prostitution. The affidavit describes specific incidents of both types of activities. The information linking Folks to Unit 8 and identifying the apartment as his new base for operations is sufficient to support a search warrant. This information includes a hand-to-hand drug sale on July 11, 2016, conducted in a nearby park as well as Folks's return to the vicinity of Unit 8 immediately after the sale. He was then seen driving a car registered to Ms. Degenhardt who lives at Unit 8. He was previously arrested at Unit 8 by U.S. Marshals and has a longstanding intimate relationship with Ms. Degenhardt. Chetwynd Aff., ¶ ¶ 60-61. The information also includes Folks's return to Unit 8 the next day following a meeting with a person he believed wished to work as a prostitute.

These facts are sufficient to support probable cause to believe that evidence of drug trafficking or prostitution could be found at Unit 8 because by mid-July 2016, there was strong

evidence that Folks was present at that location on a daily basis and that he used the apartment as a place to store heroin which he sold in the vicinity.

**B.    Scope of the Search**

Although the search warrant issued by Judge Conroy covered Unit 8 and the West Canal Street location in Winooski, only the warrant issued regarding the Winooski address included "computers" in the list of items to be seized. The warrant which issued for Unit 8 omits "computers" from an otherwise comprehensive list of cell phones and business records of all types. The defense contends that the omission of computers requires the suppression of any records found on the laptop and the computer tower seized at Unit 8.

The court DENIES the motion to suppress based on the actions taken by the agents following the seizure. They did not access the computer or the tablet. Both of these are listed on the search inventory. Instead, they returned to court and obtained a second warrant authorizing the review of the contents of these devices. Accordingly, they entered the residence under the authority of the first search warrant. They seized a variety of materials which were subject to that warrant. They saw the computer and the tablet sitting in plain view. Lacking authority to search this new potential evidence, they seized it and obtained a second warrant. This process was specifically approved by the Second Circuit in *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017).

The motion to suppress the results of the July 19, 2016 search at Unit 8 (Doc. 143) is DENIED.

**IV.    Motion to Suppress Statements (Doc. 128)**

On July 19, 2016, immediately prior to execution of the two search warrants, Folks was arrested in Burlington. He was taken to the Essex Police Department for a post-arrest

interrogation, which was conducted by DEA Resident Agent in Charge (RAC) Brian Villella, Detective Christopher May of the Essex Police Department, and Task Force Officer (TFO) Max Galusha. (Doc. 128-1 (transcript of recorded interview).) At the March 20, 2018 hearing, Detective May testified about his involvement with the interrogation. He credibly testified that he transported Folks to the Essex Police Department and did not question him while in the vehicle. (Doc. 185 at 9.)

Law enforcement did not provide *Miranda* warnings until 20 minutes into the interrogation. Folks seeks to suppress the statements that follow the *Miranda* warnings on the ground that the initial remarks by law enforcement concerning the advantages of cooperation included inaccurate legal advice and rendered his subsequent admissions involuntary. He also contends that his rights to counsel and to remain silent were violated.

### A.    Background

#### 1.    Unrecorded First Five Minutes

The audio recording and interview transcript begins five minutes into the interrogation. Detective May testified that he did not remember what was said during that time period. (Doc. 185 at 22.) The defense suggested that the content of the first five minutes could be relevant to the analysis. (*See id.*) The court advised the defense that it would have a chance to prove any relevant facts about the first five minutes of the interview. (*Id.* at 23–24.)

Later at the hearing, the defense called Folks to testify about the first five minutes of the interrogation. (*Id.* at 137.) He testified as follows:

> [W]hen we first went in there they asked me—they was talking to me about drug trafficking. And I kept denying that I don't traffic drugs.
>
> And um, they said that they had been watching me for a while and that they had some sales, I was making a sale of some sort in my house. And I told them—I asked them what date. I told them that was false. And I told them I knew something was going on because I kept getting harassed, I kept getting

15

pulled over. So that's why I tried to get counsel before just in case something happened.

And they asked me, where my lawyer's at. I told him my lawyer's in New York and I would have to get in touch with him.

(*Id.* at 137–38.) On cross-examination, Folks agreed that he was familiar with his rights under *Miranda*, including his right to consult with an attorney. (*Id.* at 140.) He further testified that he mentioned his lawyer in New York, but that he did not specifically refuse to have further conversations without the lawyer present. (*Id.* at 141, 144, 150.)

### 2. Pre-*Miranda* Interrogation

The course of the 20-minute portion of the interrogation before any *Miranda* warnings were given can be summarized as follows. RAC Villella explained the general nature of the federal sentencing guidelines. (Doc. 128-1 at 2–3.) He stated that the guidelines calculation depended in part on Mr. Folks's cooperation. (*Id.* at 3.) He went on to describe three ways to cooperate: "Rule 35," "safety valve departure," and being "truthful" during the interrogation. (*Id.* at 3–5.) RAC Villella emphasized that the third way to cooperate was the most important. (*Id.* at 5.)

Folks asked a question to clarify what RAC Villella meant about cooperating, and the agent responded, "Yeah, you're following." (*Id.* at 5–6.) RAC Villella then stated:

[T]he fact of the matter is you're definitely not the biggest drug trafficker in Winooski or Burlington or in Vermont. We're always trying to go up the chain. So you know, we've been investigating you. You'[re] significant enough that you've come up on our radar and we put a case together on you. But that doesn't mean we're not always looking for the next guy, because the next guy is your source of supply. Right? I mean, are you really going to sit there and tell me that you weren't trafficking heroin or selling heroin?

(*Id.* at 6.) Folks responded: "[F]rom what I know and understand about trafficking, no, I haven't." (*Id.* at 7.) After RAC Villella clarified that he meant "drug dealing" when he was talking about "trafficking," Folks asked, "you say you seized drugs from me personally?" (*Id.*)

RAC Villella advised Folks that law enforcement had seized drugs that Folks had personally sold to other people. (*Id.* at 7–8.) RAC Villella explained:

> I'm not saying that you actually handed dope to somebody. I'm saying that you are the person that people talk to. You are the person that holds the dope. You're the person that controls the trap house. You're the person that tells this guy or this guy, hey, go out to the corner of X and Y and meet a dude in a Volkswagen or whatever.

(*Id.* at 8.) RAC Villella advised Folks that he had been indicted by a grand jury in Vermont for distribution of drugs. (*Id.* at 10.)

Folks replied that he understood that he had been indicted, and suggested that he would be willing to talk and to answer specific questions. (*See id.* at 10–12.) RAC Villella then said that "before we do that, as you know, you've been arrested before—," and Folks interrupted saying, "I have to sign some waivers and all that." (*Id.* at 12.) RAC Villella confirmed that he would be advising Folks of his rights and that "[w]e're required to do it before we ask you specific questions." (*Id.*) RAC Villella assured Folks that "the way we operate is very discretely." (*Id.* at 13.) RAC Villella then proceeded to have Folks read the *Miranda* warnings out loud and confirm that he understood his rights. (*Id.* at 14–15.)

### 3.  Post-*Miranda* Interrogation

The interrogation proceeded for more than an hour after the *Miranda* warnings were administered. Immediately after stating that he understood his rights, Folks expressed his willingness to answer "[s]ome questions, maybe." (*Id.* at 15.) Continuing to read the printed form, he stated that he was "willing to freely and voluntarily answer questions without a lawyer present." (*Id.*) Proceeding to specific questions, RAC Villella asked Folks how he was involved in selling heroin. (*Id.* at 19.) Folks was reluctant to admit "to doing something else that I'm going to get charged for," but RAC Villella stated that Folks had already been indicted for dealing heroin, so Folks would not really be incriminating himself by admitting to that. (*See id.*

at 19–20.) Folks offered that he was not the "drug dealer" but was instead the "violent one," meaning the "problem solver" or the "muscle." (*Id.* at 20–21.)

After some additional questioning, RAC Villella asked: "[S]o where do we go from here? I mean, like I said, you're not the biggest fish in the sea, you know? But if you want to help yourself, you have to tell me something that I don't know." (*Id.* at 39.) RAC Villella suggested that Folks tell him "someone who's sitting on a stash of dope" or "[h]ow your little business empire is working." (*Id.*) Folks went on to describe how he "taxed" heroin dealers, requiring payments and directing where they could go. (*Id.* at 43, 46–47.)

TFO Galusha continued with some additional questions, asking "[i]s there anything you want to do for me?" (*Id.* at 50.) Folks said he had to "mull that over" because he has a family and he was thinking about the "spiel" that RAC Villella had given him about cooperation. (*See id.* at 50–52.) Folks expressed his understanding that "[t]he thing now is how long are you going to go to jail. That's what this whole thing is about." (*Id.* at 52.) RAC Villella replied: "You got it right." (*Id.*) TFO Galusha reiterated that the "third" way of cooperating that RAC Villella had described earlier—i.e., telling the truth at the interrogation—"is the one we're doing now." (*Id.* at 53.) He said "that can make that middle piece [of the guidelines calculation] go from here to here." (*Id.*)

Folks replied: "This is the thing. That's just what you say or what's what he say or he say or he say. I can't see that on paper. The judge will look at me and go, yeah, he's stupid." (*Id.*) TFO Galusha replied: "No. Because it's—so we bring everything to the prosecutor, right? . . . [Y]ou don't see no attorney out here now because they're playing golf, right?" (*Id.*) Folks pressed: "I don't see how that helps me, just on your word saying that I'm going to do this and I'm going to do that." (*Id.* at 54.)

TFO Galusha asserted that he was from the U.S. Marshal's office, and that having

attended court hearings for fifteen years, he knew "what judges are going to say before they

know what they're going to say." (*Id.* at 54–55.) TFO Galusha told Folks that, based on his

experience, "the more important thing to a judge in Vermont is, from the time those handcuffs

went on you, what did you do." (*Id.* at 55.) According to TFO Galusha:

> [F]rom the time you were confronted by law enforcement, what did you do to
> change your future. And if—and you can tell the judge I did A through Z to
> change my future and it was for the better, then they're going to say good for you.
> The U.S. Attorney's Office is going to write a 5K1.1 letter. . . . Which is a
> downward departure saying all this stuff this man told us, from the minute those
> handcuffs went on him, he didn't say one lie. He was a gentleman. He told us
> everything we wanted to know and he did everything he could to change—to
> make up for, so to speak, things that he had done in the past. You know what I
> am saying? So the U.S. Attorney's Office is going to write that letter on your
> behalf.

(*Id.*) TFO Galusha said it was not up to him whether to write the 5K1.1 letter, but that it was up

to him to tell the prosecutor what happened. (*Id.* at 56.) Folks replied:

> Okay. That sounds great. I would love to help you out. Unfortunately, the only
> way I will be able to do that is through a lawyer. I would have to have a lawyer
> sit down and I will give him whatever information he needs, to give it all to you
> and we'll work it out that way.

(*Id.*)

RAC Villella then said "that's fine" but said that "[t]he problem is, is, you know, in the

drug business . . . what you know today isn't necessarily going to be true tomorrow." (*Id.*)

According to RAC Villella, "by the time you go through that route [i.e., through a lawyer] . . .

whatever you can do for me is going to be old and it's probably not going to be worth [much]."

(*Id.* at 57.) TFO Galusha chimed in, asserting that a lawyer would say "forget step three

[cooperation]" and would advise "[l]et's get through a guilty plea and then we'll talk to them."

(*Id.* at 57–58.) Folks said he understood. (*Id.* at 58.) RAC Villella then turned the discussion to

Folks's collection of phones, asking him why he had ten phones. (*Id.*) Folks gave his explanation and the questioning continued.

Later in the interrogation, Folks again said that "[a]ll I got is your word or his word saying that these [5K1.1] letters are going to get written for you and you're going to get lenience." (*Id.* at 73–74.) RAC Villella said that "[t]he only guarantee that I can give you is . . . whatever you do for us, we would tell the prosecutor." (*Id.* at 75.)

Later, RAC Villella asked Folks for consent to search his phone, Folks replied: "You can get it from my lawyer. He'll give it to you." (*Id.* at 82.) RAC Villella said "Okay," and asked Folks if he would tell him where his storage unit was. (*Id.* at 82.) Folks had previously indicated that he kept his phone in a safe in his storage unit. (*Id.* at 38.) Folks suggested that RAC Villella should "have fun" if he thought he could find it. (*Id.* at 82.) RAC Villella then said "I don't know what else to talk about" and that "the next step is you're going to go to the lockup." (*Id.* at 82–83.) He advised Folks that "you'll see a federal judge tomorrow," and Folks asked "[w]hen will I see a lawyer?" (*Id.* at 83.) RAC Villella advised, "Well, you'll have access to a phone there, right?" and TFO Galusha confirmed, "Yeah. When you get to the jail, they'll let you make a call." (*Id.*)

The conversation continued, with the agents discussing the process of getting a court-appointed attorney for the arraignment, the cost of a private attorney, and their predictions that Folks would probably not be released on bail. They also discussed the fact that pretrial services would be visiting with Folks. They answered Folks's questions about how his property would be handled while he was detained. (*Id.* at 83–87.) RAC Villella then said "I think we're pretty much done here," but then returned to the issue of the phone, saying, "I would want you to sign a

consent form to allow me to search your phone, but we can get a warrant, if you don't want to do that." (*Id.* at 87.) Folks replied: "[Y]ou're going to have to get a warrant." (*Id.* at 88.)

Folks then insisted on saying more: "You got to let me finish." (*Id.* at 89.) He returned to his uncertainty about the benefits of cooperating, saying, "So me doing all this—all this help, help, help, I'm not seeing the benefit from it. Why am I going to benefit you and I'm not going to benefit from it. . . . Alls I'm seeing is your word." (*Id.*) Folks told the agents that they hadn't told him any particular names that they wanted, and they explained that that was not the way that cooperation worked. (*See id.* at 90.) Folks suggested that they "[g]o get Nate," and the conversation continued, with Folks saying that is where the "stash house" was. (*Id.* at 91–95.) Later, when RAC Villella asked Folks about the individual who was arrested with him, Folks said, "I'm not answering no questions about that." (*Id.* at 116.)

**B.    Analysis**

The Government does not seek to admit any of Folks's statements made during the pre-*Miranda* portion of the interview. (Doc. 138 at 2.) The court accordingly focuses on the grounds that Defendant advances for suppressing his post-*Miranda* statements.

**1.    Statements Regarding Benefits of Cooperation**

First, Defendant argues that the agents' exposition of the advantages of cooperation rendered the interrogation involuntary. The Second Circuit has held "that a federal agent's 'unsolicited statement informing the defendant[] that any cooperation would be brought to the attention of the [prosecutor] constituted interrogation.'" *United States v. Rommy*, 506 F.3d 108, 134 (2d Cir. 2007) (quoting *United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992)). Here, there was no evidence about whether RAC Villella's statements about the benefits of cooperation were "unsolicited." Detective May testified that he could not remember what was said during

the unrecorded first five minutes at the police department, and Folks did not testify that he had asked any questions about how to obtain leniency or what penalties he faced.

But assuming that the pre-*Miranda* "cooperation speech" was interrogation, Folks's statements *after* he received the *Miranda* warnings need not necessarily be suppressed. *See Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) ("[I]t does not follow that these later [Mirandized] statements must be suppressed as 'fruit' of the original *Miranda* violation."). The court's analysis focuses on whether Folks's subsequent, Mirandized statements were knowingly and voluntarily made. *See id.* To do that, the court looks at the "totality of circumstances." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014).

Here, many of the relevant circumstances weigh towards concluding that Folks's statements were knowing and voluntary. As noted above, he was already familiar with his rights. He signed the waiver form. (Doc. 138-1.) He acknowledged orally that he was familiar with his rights. The tone of the interrogation was conversational, and the agents never directly threatened Folks. He drew boundaries during the interrogation, refusing in several cases to divulge certain information. (*See, e.g.*, Doc. 128-1 at 38; 41–42; 82; 116.) Folks maintains, however, that the "cooperation speech" was coercive and rendered his later *Miranda* waiver involuntary.

The Second Circuit has held that the "mere mention" of the benefits to be derived from cooperation does not "convert[] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience." *United States v. Bye*, 919 F.2d 6, 9–10 (2d Cir. 1990). In this case, as described above, Folks said that he understood how cooperating could potentially help him. Moreover, in several instances he expressed skepticism that he would benefit from cooperating. He specifically used the lack of any "guaranteed" benefit to refuse to give the agents his own "guarantee." (Doc. 128-1 at 75.) The agents' discussion of the

benefits of cooperation did not convert the interrogation into a coercive and overbearing experience.

Folks concedes that a confession is not involuntary just because a suspect is advised of the potential benefits of cooperation, but he asserts that the promises were coercive because they were combined with false or misleading statements. (Doc. 128 at 8.) Specifically, he asserts that the agents gave him "specific and incorrect legal advice," made "material misrepresentations by claiming that they had the power to reduce his sentence," and "told him that he would not be incriminating himself by admitting to heroin trafficking." (*Id.* at 9.) It is true that a *Miranda* waiver may be involuntary where the agents use "deceptive stratagems such as giving false legal advice." *United States v. Anderson*, 929 F.2d 96, 101 (2d Cir. 1991). For the reasons below, the court cannot conclude that the circumstances that Folks highlights undermined the voluntariness of his waiver.

Before giving the *Miranda* warnings, RAC Villella did mention the "safety valve" as one method of cooperation. (Doc. 128-1 at 4.) The defense says the agents knew that the safety valve was not actually available to Folks. (Doc. 128 at 3 n.2.) Any confusing suggestion about that form of cooperation was not harmful, however, because RAC Villella made it clear that the cooperation that was important at the time of the interrogation was Folks's truthfulness (not the safety valve). (Doc. 128-1 at 5.) The post-*Miranda* discussion of a 5K1.1 letter was somewhat inartful, especially with respect to whether the letter would definitely be written. But at the end of the discussion on that topic TFO Galusha made it clear that it was not up to him whether to write the 5K1.1 letter, and that it was instead up to him to tell the prosecutor what happened. (Doc. 128-1 at 56.)

After Folks had waived his *Miranda* rights, he said that he was trying not to incriminate himself. (*Id.* at 19.) RAC Villella told Folks that, by saying he was dealing heroin, Folks would "not really [be] incriminating himself" because a grand jury had already indicted Folks based on evidence that the agents already had. (*Id.* at 20.) RAC Villella told Folks that he already knew that Folks was "involved in selling heroin." (*Id.*) RAC Villella's suggestion that admitting to dealing heroin would not "really" be incriminating was incorrect. The fact that Folks was under indictment for the alleged conduct did not make admissions of such conduct any less incriminating. On the other hand, Folks carefully avoided admitting to personally selling heroin. Nothing about Folks's response to RAC Villella's inaccurate statement suggests that he was deceived. This is confirmed by all of the other circumstances of the interrogation discussed above.

## 2. Rights to Counsel and to Remain Silent

Folks also argues that the agents violated his rights to counsel and to remain silent. The applicable rule comes from *Miranda* itself: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966). In short, an individual under custodial interrogation has a "right to cut off the questioning." *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)).

"For a suspect to invoke his *Miranda* right to counsel, he must at a minimum make 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation.*'" *United States v. Oehne*, 698 F.3d 119, 122–23 (2d Cir. 2012) (per curiam) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178

(1991)(emphasis in original.)) "Statements such as: 'Maybe I should talk to a lawyer'; 'Do you think I need a lawyer?'; and a suspect's statement that he 'was going to get a lawyer,' have been found to be insufficient to constitute an unambiguous request for counsel." *Id.* at 123 (internal citations omitted). "Similarly, the Supreme Court has held that an accused who wants to invoke his or her right to remain silent must do so unambiguously." *Id.* at 123.

Here, the court finds no basis to conclude that Folks invoked his right to cut off the questioning, either by insisting on remaining silent or by demanding an attorney. As described above, Folks made reference to his New York lawyer on a few occasions during the encounter, but none of his remarks could reasonably be construed as an expression of desire for the assistance of counsel in dealing with the custodial interrogation.[2] Indeed, at the March 20, 2018 hearing, Folks testified the he "mentioned" his New York lawyer, but agreed that he never specifically refused to speak without his lawyer present, and never sought to end the interview. (Doc. 185 at 141–42, 144, 150.)

Similarly, the court finds no unambiguous statement by Folks that he was invoking his right to remain silent. He testified that he never specifically said that he wanted to assert his right to silence. (*Id.* at 144.) The transcript reflects several occasions where Folks refused to answer certain questions, but he never told the agents that he refused to say anything more. *See United States v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996) (suspect may "selectively" waive his Fifth Amendment right, but "failure to respond to one question, after he had responded to others, does not constitute invocation of the right to remain silent"). Indeed, at one point he

_____

[2] In context, Folks's inquiry "When will I see a lawyer?" was not a request for a lawyer to assist in the custodial interrogation, but instead was an inquiry about seeing a lawyer to assist with the upcoming arraignment.

insisted that the agents let him finish speaking. There is no basis to conclude that the agents violated Folks's rights to counsel and to remain silent.

The Motion to Suppress Statements (Doc. 128) is DENIED.

## Conclusion

Defendant's Motion to Suppress Statements (Doc. 128) is DENIED.

Defendant's Motion to Suppress Evidence Re: Winooski Car Stop (Doc. 133) is DENIED.

Defendant's Motion to Suppress Evidence Re: Burlington Car Stop (Doc. 137) is DENIED.

Defendant's Motion to Suppress Evidence Re: Search Warrant for 96 Ethan Allen Parkway Unit #8 (Doc. 143) is DENIED.

Dated at Rutland, in the District of Vermont, this 17th day of April, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court