UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA

      V.              CASE NO: 2:16-CR-94-wks-1

BRIAN FOLKS          **STATUS CONFERENCE**


BEFORE:  HONORABLE WILLIAM K. SESSIONS, III
          DISTRICT JUDGE


APPEARANCES:  WILLIAM DARROW, AUSA
            EMILY M. SAVNER, AUSA
            MATTHEW T. GRADY, AUSA, by telephone
              U.S. Attorney's Office
              P.O. Box 570
              Burlington, Vermont, 05402
              Representing the Government

            MARK A. KAPLAN, ESQ.
            Kaplan and Kaplan
            95 St. Paul Street
            Suite 405
            Burlington, Vermont 05401
              and
            NATASHA SEN, ESQ.
            P.O. Box 193
            Brandon, Vermont, 05733-0193
            Representing the Defendant.


DATE:         March 18, 2019


         TRANSCRIBED BY:  Cynthia Foster, RPR
                       P.O. Box 1250
                       New London, NH  03257

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          CLERK:  This is Case number 16-94, United
2     States of America versus Brian Folks.  The
3     government is present through Assistant United
4     States Attorneys William Darrow, Emily Savner,
5     and Matthew Grady who is present via telephone.
6          The defendant is present in the courtroom
7     with his attorneys, Mark Kaplan and Natasha Sen.
8          The matter before the court is a pretrial
9     conference.
10         THE COURT:  All right.  Mr. Grady?  Can you
11    hear us?
12         MR. GRADY:  Yes, your Honor.  I can hear
13    very well, thank you.
14         THE COURT:  Okay.  Great.  All right.  This
15    is a pretrial conference.  The parties have
16    submitted items to discuss, and I'm certainly
17    open to discuss any other items that the parties
18    wish to present at this point, but perhaps I
19    could go through some of the issues that have
20    been raised and give you my initial response.
21         The trial of course begins on Tuesday,
22    April 23rd, and the government has requested
23    that the openings not begin on that particular
24    date.  Frankly, I think that jury selection may
25    take longer than one day, and we can talk about

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1         the jury selection process in a short while, but
2         I just don't think with the nature of these
3         charges and the quantity of the charges that
4         jury selection could be completed within one day
5         so that I don't believe opening statements would
6         follow on the following day.
7             The question is whether to postpone the
8         opening statements to the following Monday, and
9         that I'll ask the counsel at this point.  First
10        of all, Mr. Kaplan, do you anticipate that jury
11        selection would be completed within a day?
12            MR. KAPLAN:  You know, Judge, I really
13        don't know.  One of the motions we were going to
14        file was, at least we are giving some
15        consideration to requesting individual voir dire
16        in this case.  I don't know how the court feels
17        about that.  We haven't fully developed our
18        thoughts on that.
19            THE COURT:  Okay.  Let me give you -- I
20        have thought about that.
21            MR. KAPLAN:  Okay.
22            THE COURT:  I just don't think individual
23        voir dire of the jurors is necessary.  On the
24        other hand, I certainly would be willing to
25        extend the time that you have to talk with

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          jurors in a case of this magnitude so that you

2          would have sufficient time to question jurors

3          about their particular perspectives from both

4          sides really.  I just don't think it's necessary

5          to have individual jurors segregated and

6          questioned, but the resolution would be to

7          extend the period of time to give you sufficient

8          time to be able to question jurors.

9               I also thought about a process, and I'm not

10         sure it could actually work in this courtroom,

11         of having more than four rows so that you have a

12         larger pool and you begin to make, you know,

13         questions of the larger pool so that it's

14         expedited to some extent, but that I haven't

15         fully resolved in my own mind, but my reaction

16         is to extend the period of time for the

17         selection of the jury.

18              MR. KAPLAN:  Would that be unlimited time,

19         Judge, without going to excess?

20              THE COURT:  No, it wouldn't be unlimited

21         time, but it would be sufficient time, and

22         assuming that two days are assigned for the

23         selection of the jury as opposed to one, I think

24         adequate time for both sides to be able to

25         question jurors would be sufficient.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MR. KAPLAN:  Okay.  Thank you, Judge.

2          THE COURT:  All right.  Mr. Darrow, your

3     response to that?

4          MR. DARROW:  Thank you, your Honor.  That's

5     a little bit of a guessing game, of course, but

6     my guess would be that we don't need -- Tuesday,

7     Wednesday, I don't think it's going to take that

8     long, but I'd be interested in hearing why you

9     think it would take a long time.

10          THE COURT:  I think you'll find many jurors

11     who will say they're unable to sit on a jury

12     with these kinds of charges, and so I think that

13     adequate questioning will bring that out.  You

14     don't think there's going to be a lot of jurors

15     who are going to say I can't be fair in a case

16     of this sort?

17          MR. DARROW:  I may be optimistic, Judge, I

18     don't know, but, you know, our view of the case

19     generally is drug trafficking and human

20     trafficking is sort of intermixed, dovetailed in

21     this case.  I mean, the drug trafficking is

22     relatively, that piece of it is not that

23     unusual, and we see a lot of, we draw juries all

24     the time for cases like that in half a day.  So

25     the other which is the human trafficking and I

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     hadn't thought that, you know, essentially

2     prostitution with some federal jurisdictional

3     pieces was so unusual that the jury would be

4     like oh, that's too emotional or inflammatory

5     for me to consider.

6         THE COURT:  Well, then you're adding

7     pornography.

8         MR. DARROW:  Right.

9         THE COURT:  So you have a drug

10    distribution, you have pornography questions,

11    you have prostitution questions.  You have aside

12    from prostitution human trafficking issues.

13    Those are the kinds of offenses which create

14    pretty emotional responses in a lot of people,

15    and my guess is that there are going to be a

16    number of people who feel that they cannot be

17    fair and impartial in this kind of case, and

18    that's why assigning two days as opposed to one

19    I think may be in order, especially if you're

20    talking about preparing your opening statements

21    and also calling your first witnesses.  So it

22    would be much more realistic to suggest that on

23    Thursday, as an example, rather than Wednesday.

24         MR. DARROW:  That's fine.  I was, I was

25    concerned about maybe pushing openings off for a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      week, and the case has been so delayed I just

2      wanted to --

3           THE COURT:  No, I mean, I don't think that

4      would happen.  It could very well happen, but I

5      think the jury selection could happen in two

6      days, but I am sensitive to both sides being

7      able to ask probing questions of the jury to

8      make sure that we get a fair and impartial one.

9           MR. DARROW:  Of course.  That sounds good.

10     Tuesday, Wednesday, voir dire, tentatively

11     openings Thursday?

12          THE COURT:  Okay.  What do you think about

13     that, Mr. Kaplan?

14          MR. KAPLAN:  Judge, I think that certainly

15     makes sense.  I mean, if we finish early on

16     Wednesday the court can decide what it wants to

17     do at that point.

18          THE COURT:  Well, if I tell you that

19     opening statements are going to be on Thursday

20     and we end up closing the voir dire early, I'm

21     not so sure it would be fair to say okay, let's

22     begin with the opening statements.

23          MR. KAPLAN:  That's certainly fine.

24          THE COURT:  Okay.  All right.  So that's

25     the first thing.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          The second thing is that I wanted to do

2     trial days four days a week as opposed to five.

3     And tell me if you have significant objections

4     to that.  It would be Monday through Thursday.

5     Of course, the first week probably if we begin

6     opening statements on Thursday we would go to

7     Friday.  But then after that, if you start on

8     Thursday and Friday, then seems to me three

9     weeks of going Monday through Thursday would be

10    appropriate.  Tell me if you have any objection

11    to that.

12          MR. KAPLAN:  The defense does not object to

13    that, your Honor.

14          MR. DARROW:  No, your Honor.

15          THE COURT:  All right.  Deadline for

16    pretrial motions.  The government suggests the

17    29th of March.  It seems to me that that would

18    be appropriate.  We also scheduled arguments for

19    Wednesday, the 10th of April.  Tell me if that's

20    objectionable to either side.

21          MR. KAPLAN:  Judge, that's acceptable.  We

22    also spoke with the government before today's

23    hearing just briefly, and we have agreed on some

24    other dates that might be helpful to the court.

25          THE COURT:  Oh, all right.  Go ahead.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MR. KAPLAN:  The government would provide

2     Giglio by April 5th.  We would provide our

3     expert disclosure by April 3rd.  We've given a

4     disclosure that was not quite up to par from the

5     government's perspective, but our computer

6     expert is coming back on Tuesday, and we think

7     within a week of that or so he'll be able to

8     provide a full --

9          THE COURT:  Okay.  So that's April 3rd

10     you're going to make a disclosure of your expert

11     witnesses.  The Giglio material will be

12     transferred by the government on the 5th.  Okay.

13     What else?

14          MR. KAPLAN:  I think that was, well, we

15     already agreed on the pretrial motions March

16     29th.

17          THE COURT:  Okay.

18          MR. KAPLAN:  Also there's two other motions

19     that the government indicates were outstanding,

20     number 221 and 223, and we're going to review

21     those so there's no need for the government to

22     respond to those and the court to rule on them.

23     We're going to take a second look at them.

24          THE COURT:  Okay.  Then on the 29th of

25     March you either will reframe those arguments or

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     drop them.

2          MR. KAPLAN:  That's correct.  Thank you,

3     Judge.

4          THE COURT:  Okay, then so the process by

5     which experts are disclosed and objected to.

6     Generally speaking, with experts being disclosed

7     as of the 3rd or even before that, if either

8     side has an objection to the qualifications of

9     that expert or to the testimony of the expert

10    under Daubert, it seems to me that a motion in

11    limine would be the best way of resolving this

12    because I'm going to be really dedicated to this

13    case really after the middle of the month.  So

14    if there really is a Daubert concern, then a

15    motion in limine would bring that forward, and

16    we could have the hearing in advance.  The

17    question, of course, is whether that's going to

18    require the testimony of any of the experts.  It

19    would be helpful to know that if the objection

20    is raised that objecting party thinks that the

21    expert should testify in a motion in limine, but

22    that's the way I really would like to address

23    qualifications of the experts.  Is there any

24    objection to that?

25          MR. DARROW:  No.  There isn't, your Honor,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          and I appreciate that.  As I understand it the

2          defense has, I think, one expert on the digital

3          devices, and the government has an expert on the

4          digital devices, and that's the matter that

5          counsel was referring to is not really ripe yet.

6          I don't think we need court intervention.  By

7          the government's view, you know, the expert, it

8          doesn't really give opinions.  Pretty much just

9          click on the icon and there are these files and

10         in the files are these images.  And we're a

11         little uncertain of what their expert is up to,

12         but we'll find out at some point.

13              THE COURT:  So you haven't designated any

14         expert to testify about the nature of drug

15         conspiracies, the nature of human trafficking

16         conspiracies, et cetera.

17              MR. DARROW:  Well, that was one of the

18         things I wanted to mention.  We haven't

19         designated an expert as to, for example, lingo

20         used in heroin trafficking.  So, for example,

21         partly it's because a number of witnesses, lay

22         witnesses, will testify to the familiar things

23         of there's bags of individual dosage; bundles,

24         ten bags; sleeves, ten bundles; so we're hoping

25         that that's not expert testimony.  It's more

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    just language.

2         We do have an expert as to, for the human

3    trafficking side as to what withdrawal is.  What

4    the human body goes through when it's accustomed

5    to using heroin and that heroin supply is

6    interrupted, and the expert can basically say

7    this is what happens.  But that's, Mr. Higgins

8    is that expert.  We also have the firearms

9    expert.  There's a 922(g)(1) felony in

10   possession count in there, and you're familiar

11   with this testimony.

12        THE COURT:  Yes.

13        MR. DARROW:  The gun passed over a state

14   line before coming into possession of the

15   defendant because it was manufactured over here

16   and it was possessed over here.

17        And then we have where, we're talking with

18   the defense about a possible maybe stipulation

19   as to the chain of custody for the drug evidence

20   and possibly dispensing with the necessity of a

21   chemist, but if that doesn't work out, another

22   expert is a chemist who will say I've tested

23   this white substance that was sent down in this

24   bag, and I've determined that it was this drug

25   or that drug.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1         Pardon me for just a moment.  I'm advised

2    by more knowledgeable counsel that we did notice

3    someone as to the drug lingo, but I think we're

4    maybe hoping that we don't need someone to say

5    I'm an expert and a sleeve means a hundred bags.

6         THE COURT:  All right.  That sounds like

7    that could be worked out frankly since everybody

8    is going to be using the drug lingo, both

9    witnesses perhaps being called by the defense

10   but also the government.

11        MR. DARROW:  Thank you.  Lastly, your

12   Honor, one stipulation the parties have agreed

13   to is that there was, as to the gun charge,

14   there was, the defendant does have a prior

15   conviction for an offense punishable by a term

16   in excess of one year so we don't have to bring

17   in a fingerprint expert or probation officer to

18   prove up the prior conviction so that might

19   smooth things a little bit.

20        THE COURT:  Okay.  Mr. Kaplan?  Do you

21   anticipate any problems in getting any of these

22   expert witnesses qualified?

23        MR. KAPLAN:  I don't, your Honor.  I'm very

24   familiar with Dr. Higgins.  I've used him in the

25   past.  So I don't anticipate that as being an

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          issue.
2              THE COURT:  Okay.  All right.  So that's
3          not, that apparently is not going to create any
4          difficulty.  So the admission of --
5              MR. KAPLAN:  Judge, could I have one
6          minute, please?
7              THE COURT:  Sure.
8              MR. KAPLAN:  One second.
9              We're all set, Judge.  Thank you.
10             THE COURT:  Okay.
11             MR. DARROW:  Your Honor, I apologize.  If I
12         may, one of us had one more question about
13         experts, and that is if it's possible that the
14         parties can agree to perhaps to qualifications
15         as to expertise in particular areas, but if not
16         does the court envision just qualifying the
17         expert in front of the jury?
18             THE COURT:  Yes.  Let's talk about
19         self-authenticating documents.  Apparently
20         there's some documents that the government
21         wishes to introduce, and, obviously, Rule 902 is
22         changed just recently, and it's a procedure that
23         I particularly like.  So you have a document
24         which is self-authenticating, and there's a
25         process you'll see in the notes by which the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          person who wishes to introduce a document which

2          is self-authenticating notifies the other side

3          in writing of the intention to introduce this,

4          and the government or the other side then has

5          the burden to object to that.  If they object to

6          that, then we have a hearing in regard to

7          whether or not this particular exhibit is

8          self-authenticating.  It's Rule 902.  Yes?

9              MS. SAVNER:  Yes, your Honor.  So we have

10         availed ourselves of that process.  The

11         government has notified defense counsel of our

12         intent to use various 902 self-authenticating

13         records in a couple letters, and we also put one

14         of the letters on the docket as DCF 327.

15             So what we've noticed thus far include

16         various phone records, motel and hotel records,

17         a couple birth and death certificates that

18         aren't 902(11) records, some of which are just

19         certified copies of things, but we have noticed

20         them out of an abundance of caution.  And then

21         also records from Backpage and Facebook.

22             So it's my understanding that defense

23         counsel has objections to the Backpage and

24         Facebook records, and they are planning to file

25         a motion on those specific records, but we have

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          not received any specific objections related to

2          any of the phone records, motel or hotel

3          records.

4               THE COURT:  Did you ask for a date by which

5          you would be notified?

6               MS. SAVNER:  We did, and that date has come

7          and gone.

8               THE COURT:  Okay.

9               MR. KAPLAN:  I think, Judge, the government

10         is correct about our objections to the Backpage,

11         and we were anticipating doing that at the same

12         time we file our pretrial motions which would be

13         March 29th.

14              THE COURT:  Okay.  So you'll file a motion

15         in limine to exclude the introduction of the

16         Backpages.

17              MR. KAPLAN:  For different reasons but yes,

18         we'll do that by the 29th.

19              THE COURT:  All right.  But in regard to

20         all of the other self-authenticating requests

21         for documents, you've had no objection to that?

22              MR. KAPLAN:  We don't have any objections

23         but, I guess we would ask for a few days just to

24         go back and review them one more time, but I

25         think initially they look fine to us.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1                THE COURT:  Okay.  All right.  Any

2       objection to giving them a few more days?

3                MS. SAVNER:  No, your Honor.  If we could

4       have maybe a date certain for any objections?

5                THE COURT:  How about March 29th?

6       Everything seems to be due on March 29th.

7                MR. KAPLAN:  That's fine with us, Judge.

8                MS. SAVNER:  And just in terms of counsel's

9       response on the Backpage records, he seemed to

10      indicate his objections would not be related to

11      authenticity perhaps which is the basis of the

12      written notice and the written certification so

13      if I may just inquire what the basis would be.

14               THE COURT:  You're going to get that, I

15      think.  He's going to file a motion or she's

16      going to file a motion.  Ms. Sen, are you going

17      to file a motion or is Mr. Kaplan going to file

18      the motion?

19               MS. SEN:  I think we will file it together,

20      your Honor, but it will deal with both the

21      authenticating issues and any objections whether

22      it's relevant or other evidentiary issues or

23      technical issues as to the introduction of

24      records from Backpage and Facebook.

25               THE COURT:  All right.  You also referred

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          to other business records, phone records, hotel,

2          summary charts in particular.  How do you intend

3          to use the summary charts?

4               MS. SAVNER:  We have previously disclosed,

5          and again, this was also part of that same

6          notice on the docket at DCF 327, a summary chart

7          of hotel records given that they are, the hotel

8          records themselves are voluminous in nature.  We

9          also intend to create a summary chart related to

10         results of some of the view of one of the

11         defendant's cell phones which has not been, a

12         draft hasn't been provided to defense counsel

13         yet.  So I think at this point we would propose

14         that any summary charts we plan to offer would

15         maybe fall on the same deadlines, the March 29th

16         deadline to be turned over to defense and could

17         be decided at that pretrial if necessary.

18              THE COURT:  Okay.  Well, you filed, you

19         noticed, since you haven't notified them yet

20         over certain records that are in summaries, you

21         notify them as to all summary charts by the

22         29th, and then, of course, they have some time

23         to respond which I haven't set yet.  So we have

24         a hearing on the 10th which means that probably

25         we need responses to the motions in a week?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          What's the week after the 29th of March?
2                CLERK:  April 5th.
3                THE COURT:  By April 5th.  All right.  So
4          you notify the defense of the summary charts
5          that you wish to use.  If they have any
6          objection they should file that by the 5th, and
7          we'd address that at the hearing on the 10th.
8                All right.  Confirming the vitality of
9          prior trial-related rulings, what I've seen in
10         the record is Judge Crawford's voir dire.
11         That's just his initial voir dire to the jury.
12         I didn't see anything else aside from that, and
13         the jury charge is a first draft.  So I don't
14         think he's adopted or ordered what the charge
15         would be, and, frankly, the voir dire order I'd
16         probably do under my own style anyway.
17               So are there other orders that Judge
18         Crawford had rendered that you think would be
19         applicable?
20               MR. DARROW:  Those are the two that we want
21         to draw the court's attention to.
22               THE COURT:  Okay.  So I do a very brief
23         initial voir dire in situations like this where
24         I'm giving lawyers a lot of time to ask
25         questions so standard questions.  And of course

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          of the charge to the jury is, that is a draft.
2          So nothing has been ordered.
3               MR. DARROW:  With regard to the latter,
4          your Honor, could we propose maybe any
5          objections to Judge Crawford's draft by a
6          certain point?  In other words, sort of use that
7          as a starting point and move on from there?
8               THE COURT:  That sounds fine to me.  What
9          do you think about that, Mr. Kaplan?
10               MR. KAPLAN:  So the government is
11          suggesting that we respond at a certain time to
12          Judge Crawford's rulings?
13               THE COURT:  So you've got a draft from
14          Judge Crawford.
15               MR. KAPLAN:  Right.
16               THE COURT:  By let us say the 10th of
17          April, by the hearing date, if you've got any
18          objections to the way he has couched the charge,
19          you should file those.
20               MR. KAPLAN:  That would be preliminary, I'm
21          assuming.
22               THE COURT:  It's all preliminary.  I
23          haven't done the research.  It's preliminary.
24               MR. KAPLAN:  That's fine, judge.  Thank
25          you.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           THE COURT:  All right.  The use by the

2      government during opening statements of certain

3      documents which it anticipates will be

4      introduced during trial.

5           My standard practice is to allow lawyers to

6      use documents in opening statements that they

7      reasonably anticipate will be introduced in

8      trial.  Of course, the lawyers are running the

9      risk if all of a sudden those documents are not

10     introduced, then there could be commentary on

11     that, depending upon how relevant the documents

12     are.  But if a lawyer reasonably anticipates

13     that those documents, that document is going to

14     be introduced during the course of the trial,

15     then I think he should be able to use that in

16     opening statement.

17          Now, I suppose that only becomes unfair if

18     there is a significant objection to that

19     document so that perhaps the fairest thing to do

20     in a case like this would be to require the

21     person who wants to use a document in opening

22     statement to notify the other side that they're

23     going to use the document in opening statement

24     and give them some time to object.  Would you

25     disagree with that?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MS. SAVNER:  That sounds fine, your Honor.
2     Just for your reference, we don't plan to use
3     anything that I would classify as arguable.
4     What we're planning to use in this point in
5     opening is DMV photos or other just face-only
6     photos of some of the witnesses and photos of
7     the outside of some of the locations at issue.
8          THE COURT:  All right.  Mr. Kaplan, do you
9     have any objection to that?
10          MR. KAPLAN:  No your Honor, that's fine.
11     Thank you.
12          THE COURT:  Okay.  Procedures as to the
13     publication of pornographic images.  First,
14     obviously, pornographic images are broadcast to
15     the jury.  No question about that.  The only
16     question is whether the pornographic images are
17     broadcast to the back of the courtroom, and that
18     raises really significant constitutional
19     questions.  The people who come into the
20     courtroom, especially if they happen to be
21     associated with the press, have a First
22     Amendment right to see what's going on in a
23     trial, and if I was to shut off access to those
24     images just so that the jury gets the images but
25     the press or the people in the back do not,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          there's a question about access to the judicial

2          process.  So my inclination, frankly, although I

3          don't know what these images reveal, would be to

4          allow them broadcast to the back of the

5          courtroom.  Now, that's the first question.

6               And then the second question is whether

7          those can be copied or whether they're sealed

8          after they're used, and my gut impression would

9          be that they should be sealed.  They're

10         broadcast, they would be broadcast for people in

11         the jury box, to the people in the back of the

12         courtroom, but then they would be sealed.

13         That's my initial reaction.  Tell me whether you

14         disagree with that.

15              MR. GRADY:  Good morning, your Honor.  This

16         is Matthew Grady on the phone, and I'll be able

17         to answer a couple of your questions.  The one

18         about the broadcasting I just wanted to flag for

19         the court that minor Victim E will be involved

20         in at least one of these images and in one of

21         the images it technically would constitute child

22         pornography because she was under the age of 18

23         and would involve lascivious exhibition of her

24         genitals.  So at least for that particular image

25         I'm not sure if the court has a preference for a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          shutting off of the galley view because it is

2          contraband, but outside that particular

3          photograph there are no other concerns that the

4          government has.

5                    THE COURT:  Okay.  All right.  Victim E,

6          you referred to Victim E.  She has died at this

7          point; is that correct?

8                    MR. GRADY:  That is correct, your Honor.

9                    THE COURT:  Mr. Caplan, you want to respond

10         to that?

11                   MR. KAPLAN:  Judge, I think that's an issue

12         that maybe we can address at the point the

13         government wants to introduce that particular

14         picture because my understanding of those

15         pictures may not coincide with what the

16         government just said.  So if we could reserve, I

17         don't have a problem sealing it at some point.

18         Certainly I don't have a problem not disclosing

19         child pornography, but I would like to know what

20         pictures we're talking about.

21                   THE COURT:  All right.  We can address that

22         on the 10th.  But as a general process, do you

23         have any objection to the broadcast of the

24         images to the jury, obviously, the jury should

25         see the images, but also broadcasting it to the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     back of the courtroom?

2          MR. KAPLAN:  No, your Honor.

3          THE COURT:  Okay.  All right.  And we'll

4     leave that one image of Victim E for further

5     discussion.

6          Disposition of the pending pretrial

7     motions.  21 and 23 is essentially withdrawn by

8     the defense.  It may be substituted on the 29th

9     of March.  202 and 203 I have not reviewed.

10          MS. SAVNER:  Your Honor, we did have a

11     hearing related to 202 and 203 and so, one

12     issue, so 202 is the previous defense counsel's

13     motion in limine, and you ruled on, it was sort

14     of a laundry list of things they wanted to

15     exclude.

16          THE COURT:  Right.  I remember ruling.  I

17     granted some, I denied some, and I left under

18     advisement some.

19          MS. SAVNER:  Yes.

20          THE COURT:  But I don't remember, frankly,

21     I don't remember the specifics of it at this

22     point.

23          MS. SAVNER:  And we weren't planning to

24     discuss them substantively today.  What we were

25     wondering is how the court wanted to handle the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      ones on which your Honor reserved judgment on,

2      and we'd obviously like those things decided in

3      advance of trial, if possible.  I think your

4      Honor was concerned that you couldn't rule on

5      the 403 issue until you knew the context in

6      which these more inflammatory perhaps pieces of

7      information might come into play in terms of the

8      testimony.

9          THE COURT:  Logically, I should take this

10     up on the 10th.  I mean, once all of the other

11     motions are filed and addressed, I can certainly

12     look at 202 and 203 and put that as a part of

13     the discussion on the 10th.

14         MS. SAVNER:  Okay.  Just so your Honor at

15     that point has the context he needs to make

16     those decisions, would it be helpful for us to

17     provide basically written proffers of how we

18     envision the evidence being relevant to our

19     case?

20         THE COURT:  Okay, and giving the defense a

21     response time?

22         MS. SAVNER:  Yes, so along the same

23     schedule as the others?

24         THE COURT:  Yes, would be helpful.  So by

25     the 29th, if you can submit how you intend to

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        use those particular pieces of evidence, giving

2        the defense a weak to respond, and then we can

3        address it on the 10th.

4            MS. SAVNER:  Okay.  Thank you, your Honor.

5        And if I may with respect to 203 so that's the

6        government's motion in limine, and the one I

7        believe outstanding piece of that is the

8        statements of coconspirator Mandy Latulippe.  We

9        had moved in limine that they be admitted as

10       either coconspirator statements or statements of

11       an agent.  Your Honor had asked for a written

12       proffer.  Basically the issue is that while Ms.

13       Latulippe will testify at trial she will likely

14       testify after her statements have been

15       introduced.  So we submitted a written proffer

16       which is document 337.  So to my understanding

17       that's now been fully briefed and you have the

18       proffer available.

19            THE COURT:  So I'll take a look at that.

20            MS. SAVNER:  Thank you.

21            THE COURT:  All right.  Mr. Kaplan.  Any

22       response?

23            MR. KAPLAN:  No, your Honor.  I think we

24       have a copy of that.  So far it looks acceptable

25       to us.  My understanding has always been if

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          you're going to put on a witness who's going to

2          talk about something that might not be

3          admissible until later but they do a decent

4          proffer, I think the court usually allows the

5          witness to talk about it.

6                    THE COURT:  Right.

7                    MR. KAPLAN:  Sounds like that situation.

8                    THE COURT:  All right.  Finalizing

9          transcripts of the audio/video exhibits.  I

10         mean, according to the government, they have

11         indicated that they've given you the transcripts

12         of these various exhibits for you to review.

13         Obviously, the transcripts are used while the

14         videos are being shown or audio is being played.

15         So have you reviewed those and do you have any

16         objections to those?

17                    MR. KAPLAN:  So we received them.  It's

18         extensive.  We haven't reviewed them all at this

19         point, but my guess would be that we'll probably

20         agree with 90 percent of the translation or more

21         and anything that we don't agree with I'm sure

22         we can sit down and iron out, and if there's one

23         or two issues that we can't figure out what the

24         word is, we can come to the court.

25                    THE COURT:  Let's say by the 10th we'll

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        also deal with those transcripts.  And if you've

2        got any objections to the transcripts, then you

3        need to let me know on the 10th and we can

4        resolve that.  If there is nothing objected to,

5        then it's just assumed that the transcripts are

6        accurate and will be used to assist the jury

7        when the videos or audios are played.

8                MR. KAPLAN:  Thank you, Judge.

9                THE COURT:  Juror questionnaire.  And tell

10       me what you mean by the juror questionnaire.

11               MR. KAPLAN:  We had given some thought --

12       this may have as much success as the individual

13       voir dire -- but we had given some thought to

14       doing --

15               THE COURT:  You know, that's a great way of

16       starting your argument, don't you think,

17       Mr. Kaplan?  I mean, let's face it.  I'm not

18       going to win this but, you know, maybe --

19               MR. KAPLAN:  You never know, Judge.

20               THE COURT:  You never know.

21               MR. KAPLAN:  We had thought given the

22       nature of the case and maybe it's been resolved

23       by more extensive voir dire, but that we would

24       send out a more, request if we could send out a

25       more extensive jury questionnaire that would

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          deal with a lot of the issues that are going to

2          come up at trial and might help us weed out

3          people initially without spending time in court

4          doing it, but --

5                    THE COURT:  You know, I just --

6                    MR. KAPLAN:  We could present to the court

7          and government and then the court can decide at

8          that point.

9                    THE COURT:  Why don't you present it to the

10         court.  I agree with Mr. Darrow that this is,

11         when you break these down, these are human

12         trafficking, these are drug-related offenses,

13         they're pornography offenses.  And I am not so

14         sure any of those would be benefited by a jury

15         questionnaire.  I mean, I always wonder what do

16         you learn from a jury questionnaire on those

17         kinds of offenses.  Obviously, there are certain

18         kinds of cases that are benefited by jury

19         questionnaire, and I think most honestly about

20         capital punishment.  When you talk about whether

21         you believe in capital punishment.  I mean, that

22         provides a benefit to both sides in that

23         response because people have feelings and they

24         respond to that.

25                    I frankly don't see how you benefit from a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      jury questionnaire.  I do see how you benefit by

2      a more rigorous examination of the jury on those

3      particular issues, but I'd be glad to review a

4      jury questionnaire if you want to submit one.

5      Okay?

6           Process for voir dire.  You've heard my

7      thoughts.  If we, say, take two days and give

8      people up to four hours of examination.  That

9      may be a little excessive.  I have to think

10     about that.  But I think we could draw a jury in

11     two days, and that would be fair.

12          So any objection to that?

13          MR. KAPLAN:  No, your Honor.

14          MR. DARROW:  No, your Honor, that sounds

15     sensible.  The only thought that went through my

16     mind was if we were going have multiple hours of

17     each party voir diring a group whether it could

18     be broken down by, I don't know, a half hour,

19     half hour, half hour, half hour somehow so that

20     one party didn't get the jury alone for three or

21     four hours.

22          THE COURT:  I would certainly be willing to

23     consider something like that.  So perhaps both

24     of you or all of you can communicate between

25     teams and come up with a thought.  I just want,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     I don't think segregated voir dire is necessary.

2     I don't think the jury questionnaires are

3     necessary.  I think the best way of trying to

4     determine whether people are biased in any

5     particular way in light of the nature of the

6     offense is to allow more rigorous voir dire

7     questioning.  If you want to break it up, hour

8     at a time, half hour at a time, that's fine.

9     I've never seen that done before, but that's

10    fine.

11         MR. DARROW:  Judge, if I'd just note on the

12    written questionnaire issue, I'm still so

13    scarred by the six hearings and dozen some-odd

14    filings we have on the written questionnaire in

15    the Fell case that I couldn't even think clearly

16    about it.  That does end up being somewhat of a

17    rabbit hole you can go into with both parties

18    refining the verbs used in certain questions and

19    adding on additional questions, it gets

20    extensive.

21         THE COURT:  Well, in capital punishment you

22    can really see the advantage of a questionnaire

23    because people have strong feelings and they

24    react to the question of --

25         MR. DARROW:  Sure.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1              THE COURT:  -- capital punishment.  Here

2       when you're talking about drug cases or talking

3       about pornography or human trafficking in

4       particular, what does that mean to people.  And

5       it seems to me like the best responses from

6       individual jurors is in response to a question

7       in court.

8              Anyway, that's my thought.  Okay.  So I've

9       gone through the government's list of

10      suggestions that they wanted resolved.  I've

11      given a number of answers.  Is there anything

12      else from the government first?

13             MR. DARROW:  No, it's been very helpful,

14      and we're grateful to you, your Honor.  Thank

15      you.

16             THE COURT:  Well, you should know that I've

17      really dedicated most of my time from the middle

18      of April on.  So we'll be especially, I assume

19      that there will be a number of motions filed on

20      the 10th so this is going to take a lot of

21      effort.  Okay?  Mr. Kaplan?  Or Ms. Sen?  Do you

22      have any?

23             MR. KAPLAN:  I think we're all set.  Thank

24      you, Judge.

25             THE COURT:  All right.  Thank you.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MR. DARROW:  Thank you, your Honor.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           C E R T I F I C A T E

2       I, Cynthia Foster, Registered Professional

3   Reporter, do hereby certify that the foregoing pages

4   are a true and accurate transcription of my shorthand

5   notes taken in the aforementioned matter to the best

6   of my skill and ability.

7

8

9                                   *Cynthia Foster*
                                    Cynthia Foster, RPR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Cynthia Foster, RPR, LCR**
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157