UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
          V.          *    Case No: 2:16-cr-94-1
BRIAN FOLKS        *


TRIAL BY JURY - DAY SIX - VOLUME I
MAY 1, 2019
BURLINGTON, VERMONT


BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William Darrow, Esq. and Emily M. Savner, Esq. and Matthew T. Grady, Assistant United States Attorneys, P.O. Box 570, Burlington, VT  05402-0570; Attorneys for the Plaintiff.

    Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street, Burlington, VT  05401; Attorney for the Defendant.

    Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733; Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Stephen Higgins, Ph.D | 4 |
|   Direct Examination by Mr. Grady | 4 |
|   Cross Examination by Mr. Kaplan | 24 |
|   Redirect Examination by Mr. Grady | 28 |
|   Recross Examination by Mr. Kaplan | 33 |
| Katelynn C. | 34 |
|   Direct Examination by Mr. Darrow | 34 |
|   Cross Examination by Mr. Kaplan | 76 |

| Exhibits | Admitted |
|---|---|
| Government | |
| 52A | 54 |
| 56A | 56 |
| 121 | 57 |

1  [TUESDAY, MAY 1, 2019 - 9 A.M.]

2  [The following was held in open court with the jury present]

3             THE COURT:  Good morning.

4             DEPUTY CLERK:  This is case number 16-94 United

5  States of America versus Brian Folks.  The Government is

6  present through Assistant United States Attorneys Emily Savner,

7  Matthew Grady, and William Darrow.  The defendant is present in

8  the courtroom with his attorneys Natasha Sen and Mark Kaplan.

9  The matter before the Court is Trial by Jury day six.

10            THE COURT:  Okay.  Good morning again and I want to

11 express my appreciation for you being on time.  I know some of

12 you come from long distances.  I actually come from a long

13 distance and I really appreciate you being on time.  Has anyone

14 spoken with you or have you spoken with anyone about this case

15 at all?  Have you learned anything about the case from outside

16 of the courtroom?  Have you communicated among yourselves about

17 this case at all?  Everybody says no so I appreciate that.  I

18 think we're ready to proceed.  Government want to call the next

19 witness.

20            MR. GRADY:  Yes, Your Honor.  The United States calls

21 Dr. Stephen Higgins.  Good morning, Dr. Higgins, please enter

22 the courtroom and you can go in front of the podium where the

23 clerk will swear you.

24 STEPHEN HIGGINS, Ph.D.,

25      Having been duly sworn, testified as follows:

                    Stephen Higgins, Ph.D                    4

1          THE COURT:  Good morning, Dr. Higgins.

2          DR. HIGGINS:  Good morning.

3                    DIRECT EXAMINATION

4  BY MR. GRADY:

5  Q.     Good morning, Dr. Higgins.  Can you state your name

6  please?

7  A.     Stephen Higgins.

8  Q.     Dr. Higgins, what do you do for a living?

9  A.     I'm a professor at the University of Vermont where I

10 direct the Vermont Center on Behavior and Health.

11 Q.     Can you tell the jury a little bit about your

12 educational background?

13 A.     I am trained as a psychologist.  I have a Ph.D. in

14 psychology and postdoctoral training in addictions.

15 Q.     Are you a licensed psychologist?

16 A.     I am.

17 Q.     Where at?

18 A.     In Vermont.

19 Q.     Would you primarily characterize yourself as a

20 researcher?

21 A.     I am.  Yes indeed.

22 Q.     How long have you been a researcher here at the UVM

23 School of Medicine?

24 A.     33 years.

25 Q.     What do you do on a day-to-day basis as a researcher

Stephen Higgins, Ph.D                    5

1  here?

2  A.     We do studies supported by the National Institutes on

3  Health focused on how lifestyle can increase risk for chronic

4  disease and premature death and addictions.  Cigarette smoking

5  and opioid addictions are a primary feature of lifestyle that

6  can do those things.

7  Q.     Have you produced and reviewed scholarly articles

8  throughout your many years?

9  A.     I have, yeah.

10  Q.     How many would you estimate?

11  A.     More than 350.

12  Q.     Do the majority of the articles that you have written or

13  reviewed do they focus on understanding and in treating

14  addiction?

15  A.     They do, yes.

16  Q.     Can you also briefly describe what your teaching

17  responsibilities are here at the University of Vermont?

18  A.     I mentor graduate students, people working on their

19  doctorate degrees and postdoctoral Fellows, people who have

20  their doctorates and are seeking additional training in

21  addictions research.

22  Q.     Dr. Higgins, I believe you testified a little bit ago

23  that you're the Director of Vermont Center for Behavior and

24  Health.  How long have you been the director?

25  A.     We started that center in 2013.  Prior to that I

Stephen Higgins, Ph.D                          6

1  directed what was known as the Human Behavioral Pharmacology

2  Lab that was focused exclusively on addictions, and with the

3  new center we expanded into other lifestyle issues like poor

4  food choices, physical inactivity, that also increases risk for

5  chronic disease.

6  Q.     Have you testified before in either state or federal

7  court?

8  A.     I have.

9  Q.     How many times?

10  A.     Oh not so many.  I don't know exactly.  I would say --

11  estimate maybe five to ten times.

12  Q.     What types of cases were those that you testified in?

13  A.     Always addictions.

14  Q.     Have you been qualified before as an expert in the

15  behavior and psychological component of drug dependence and

16  addiction?

17  A.     Yes.

18  Q.     Are you being paid for your consulting services in this

19  case?

20  A.     I am not.

21       MR. GRADY:  Your Honor, at this time the Government

22  tenders Dr. Higgins as an expert in medical, psychological, and

23  behavior science of drug dependence and addiction.

24       THE COURT:  Any objection?

25       MR. KAPLAN:  Judge, I actually had him qualified in a

Stephen Higgins, Ph.D                    7

1   federal case that I had so I don't have any objections.  Thank

2   you, Judge.

3            THE COURT:  All right.  So qualified.

4   BY MR. GRADY:

5   Q.     Dr. Higgins, I would like to first focus on opioids.

6   Can you give the jury a background on opioids starting with

7   what they are derived from?

8   A.     So opioids are derived from the opium poppy plant, and

9   so the ones -- opium is the classic substance, but the

10  medications we're more familiar with are the primary one's

11  morphine and so it's derived from the -- from that plant, and

12  used to produce analgesis.  So that's its medical indication,

13  pain relief, and it's very effective in that regard, but it

14  also has other -- other effects some of which are known as

15  euphoria, makes you feel very happy and gives you pleasurable

16  feelings, but it also along with those activate a process in

17  your body where your body recognizes it as producing effects

18  that aren't typical and so it starts trying to produce what we

19  call homeostasis.  It tries to start countering the effect of

20  the medication.  So your body is trying to get back to normal

21  and eventually if that goes on for long enough you develop what

22  we know as a physical dependence so that if you don't have the

23  medication you go into withdrawal.

24  Q.     Let's try to break a few of those different concepts

25  down, Dr. Higgins, and I first want to backtrack.  Do chemists

Stephen Higgins, Ph.D                        8

1   sometimes experiment with the different properties in morphine

2   or opioids generally?

3   A.      That's correct.  So the holy grail has been to find a

4   medication, an opiate or a morphine-like medication, that

5   doesn't produce the physical dependence and doesn't have the

6   positive mood effects that make it an addictive substance.

7          Unfortunately this has been going on for a very long

8   time and the pain relief and those other effects are so tightly

9   bonded that no one has succeeded, but in the process of trying

10  to discover this ideal medication they have discovered many

11  variations of morphine and many of which we're familiar with.

12  The classic would be heroin, but there's oxycontin, there's

13  percodan, percocet.  There's a whole list of derivatives and

14  they have purposes.  Some are shorter acting.  Some are longer

15  acting.  So most of them, with the heroin is the exception I

16  can think of, have medical indications.  So it hasn't been a

17  completely useless endeavor to find these medications, but the

18  one that they would love to find -- we would love to find has

19  never been found and that's one that doesn't produce addiction.

20  Q.      Dr. Higgins, do these different opioids that you mention

21  have different relative potencies?

22  A.      They do, yes.

23  Q.      And I believe you mentioned earlier that opioids are

24  generally used to treat pain?

25  A.      Correct.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Stephen Higgins, Ph.D                            9

Q.      Can you explain a little bit more about how opioids

physically affect the body?

A.      Well the one good thing to know about them is they mimic

natural endogenous substances that we all have.  So in that

regard they are not particularly toxic to take.  They have the

effects I described earlier.  In terms of physiological effects

the one that stands out most in terms of danger is they

suppress respiration, and that's when you hear about all the

overdoses that's what happens, that people just start --

breathing becomes so shallow that it can't sustain

consciousness and eventually people -- people die, and the

medications cross the blood brain barriers so they go into the

central nervous system and that's where the measurable effects

that I mentioned occur.

        So there are these receptors in the brain that are

there not for these medications but for the natural endogenous

chemicals that we all produce that have mild effects along the

same lines, and so the opioids attach to these receptors and

then they have what we call downpath effects which they -- most

of those that -- or all of those that have addiction potential,

which is the majority but not all of them, they excite what we

call dopamine receptors, and those are -- that's the

neurotransmitter that makes us feel like we just accomplished

something good, something positive just happened, and that is

the source of the euphoria I would like to take that medication

Stephen Higgins, Ph.D                    10

1   again sense.  There's a term for that.  It's called

2   reinforcement and that's -- that's the source of addiction

3   potential.  So that's why so many different drugs that, aside

4   from that effect, pharmacologically are distinct.  Say cocaine

5   and morphine.  They are pharmacologically very distinct except

6   that common effect of influencing dopamine which gives them --

7   both compounds really powerful addiction potential.

8   Q.    Do some of the other physical effects of opioids include

9   sedation or drowsiness and also constipation?

10  A.    All three of those, yes.

11  Q.    Before we go any further does opioid usage affect

12  someone's memory?

13  A.    Not so much.

14  Q.    What does physical dependence mean in the context of

15  opioids?

16  A.    Well I was anticipating this question.  I was trying to

17  think of how to describe it.  So I mentioned already the body's

18  efforts to sustain homeostasis.  So your body -- we're very

19  adapt -- well adapted to trying to keep everything balanced

20  and, you know, keep us able to function and survive, and so you

21  might picture if somebody's taking opiates on a regular basis,

22  I was thinking you might picture having to push really hard so

23  your body is trying to push back against the medication, and

24  what it will do is it -- it pushes back in the opposite

25  direction.

Stephen Higgins, Ph.D                    11

1           So you mentioned drowsiness or constipation.  So the

2    body is pushing against those effects.  So then if there's an

3    instance where you've been taking it for weeks or months or

4    years and then the medication is not there, that push back is

5    sort of like if you were ever pushing really hard against

6    somebody and then all of a sudden they step to the side and you

7    go flying, well that's what happens to your body.  So it

8    overshoots in all these directions.  So instead of being sleepy

9    you're hyperactive.  Instead of having constipation you have

10   diarrhea.  Instead of feeling euphoric you're feeling very

11   depressed.  So it produces an extremely uncomfortable state of

12   affairs, and the best way to understand it or a general

13   description that we use is it's like a terrible flu.  It's not

14   lethal.  There are some -- some withdrawal symptoms drug

15   related for alcohol or barbiturates, sedatives, that

16   potentially will be fatal.  Opioid withdrawal is not fatal.

17   It's extremely uncomfortable.

18   Q.     And when you describe the body kind of goes into

19   overdrive and pushes again those symptoms is that sometimes

20   called or known as withdrawal?

21   A.     That's exactly what it's known as, yes.

22   Q.     Dr. Higgins, let's now focus a little bit more

23   specifically on heroin and can you give the jury a little bit

24   more of a background on heroin starting with perhaps what it is

25   derived from?

Stephen Higgins, Ph.D                    12

A.    So it's derived from that same poppy plant as morphine,
and the way that it came to be was morphine produces nausea and
vomiting just as a side effect of its ability to produce the
effect that we're looking for, which is the analgesia, and so
working on medications in a pharmaceutical company in Germany
they realized that they could tweak the morphine molecule in a
manner that reduced the amount of nausea and vomiting.  So that
looked like a great advance.  Their -- by messing with the
molecule then it's no longer a purely opiate product.  It's
just a natural product, if you will, but it's also now
synthesized, but the important feature of it was that indeed it
produced less nausea, but it also penetrated the blood brain
barrier more rapidly than morphine, and so this process that I
talked about with regard to pleasure, and in the technical term
reinforcement, the sooner a drug reaches the brain the more
potential it has to activate that reinforcement process in a
way that really is salient and powerful.

       So heroin in that regard is -- has a greater
addiction potential than morphine even though they both produce
very serious addiction, but because of that rapidity with which
it crosses the blood brain barrier heroin, its addiction
potential, is considered to be greater than morphine, and so
that's -- that difference is strong enough that the medical
community and the law enforcement community came to the
conclusion that heroin has no medical utility because we can

Stephen Higgins, Ph.D                    13

1   achieve the same level of analgesia with morphine or other
2   derivatives, and there's no sense in having this medication
3   that has this additional addiction potential above and beyond
4   medications that we already know have problems in that regard.
5   There's no medical indication for that.  So at this point in
6   the United States heroin is not used medically.
7   Q.     Is heroin also more potent than morphine?
8   A.     To some extent, but I don't think in a meaningful way.
9   Q.     You mentioned before that it has an immediate impact on
10  the brain.  Is that impact or does that impact vary by how
11  heroin is consumed?
12  A.     Absolutely.
13  Q.     Can you describe the various ways heroin can be consumed
14  and the impact on the brain?
15  A.     Sure.  So it ties back to that how rapidly does it get
16  to the brain, and so the more rapid it reaches -- rapidly it
17  reaches the brain then the greater the addiction potential even
18  within the same -- the same medication, and so there are
19  different ways that you can take it.  You can take it orally.
20  You can swallow it.  You can snort it.  You can inject it into
21  the vein, or you can smoke it, and the smoking route would be
22  the most rapid way to reach the brain.
23         In the past people in the United States didn't
24  usually smoke heroin just because you also when you're smoking
25  it you're not taking all of it in.  So some of it is just lost

Stephen Higgins, Ph.D                    14

1    in the ether so to speak.  So it's kind of inefficient, but if

2    the heroin is of really high quality and not too expensive,

3    then you could smoke it and achieve that more rapid brain entry

4    compared to intravenous administration.  So of late there is

5    smoking going on in the United States where in the past 10, 15

6    years ago you rarely ever heard of that, and so I think it's

7    still more common that people would be taking intravenously,

8    but they could take -- they could either smoke it or take it

9    intravenously.  Those are the preferred methods because of the

10   speed with which it reaches the brain, and of course if you're

11   in withdrawal or something like that, you would also more

12   rapidly get immediate relief from withdrawal, whereas, if you

13   take it intranasally or orally it takes longer to reach the

14   brain, and also you lose some of the medication when you take

15   it orally because the stomach acids and it has to go through

16   the liver and so it gets processed by the body before it gets

17   to the brain, and so from -- well from a medical perspective or

18   from a perspective of a person who's addicted it's just not a

19   very efficient way to take it.

20   Q.    You mentioned, Dr. Higgins, that there's no recognized

21   use for heroin in the United States and it is safe to say that

22   any heroin that is present in the U.S. is outside of any

23   regulatory system?

24   A.    Correct.

25   Q.    Can somebody experience these withdrawal symptoms after

Stephen Higgins, Ph.D                    15

1    the first few times of using heroin?

2    A.      They can.  The actual -- that effort by your body to

3    sustain homeostasis starts with the first time you take an

4    opiate.  So most of us have taken an opiate for a tooth

5    extraction or some other medical condition.  So we've all had

6    that process begin with us, and the way that we have learned

7    scientifically when the physical dependence process begins is

8    there are what we call opioid antagonists.  They are molecules

9    that will attach to those same receptors that morphine or

10   heroin attach to, and they actually now compete those drugs and

11   knock them off the receptor and get on and occupy the receptor

12   except when they get on there they have no activity.  They

13   don't stimulate the receptor, and so what you can do is -- if I

14   do that into a -- with a person who's chronically using opiates

15   it would produce a really unpleasant withdrawal syndrome.  If I

16   -- if we do it with somebody who just had their first shot of

17   morphine, you will get the early signs of withdrawal syndrome.

18   You will get goose flesh, you will get some sweating, and so it

19   just indicates that your body -- and once you think about it,

20   it makes sense -- your body recognizes that this

21   pharmacological agent is taking us out of our normal space of

22   homeostasis and starts pushing back immediately.

23   Q.      You mentioned before, Dr. Higgins, that there was a

24   positive reinforcement to heroin use and that you get these

25   feelings of euphoria.  Is there also a negative reinforcement

Stephen Higgins, Ph.D                    16

1  component of heroin?

2  A.     There is eventually.  So it doesn't take too long of

3  daily or repeated use of opiates to start developing this

4  physical dependence syndrome that I have been talking about or

5  what we loosely refer to as physical addiction, and so -- I'm

6  sorry.  Repeat.

7  Q.     Sure.  Yes, Dr. Higgins.  I would just like you to

8  explain the concept of negative reinforcement.

9  A.     I'm sorry.

10  Q.     We talked about positive reinforcement.

11  A.     I'm showing my bias.  I think the positive reinforcement

12  is a much more robust influence on its addiction potential, but

13  because that's what it shares with cocaine and all the other

14  drugs, but opiates the negative reinforcement plays a special

15  role.  So as you develop the physical dependence, if you don't

16  have medication and this is -- cigarettes do the same thing,

17  you start feeling uncomfortable.  So if you're using heroin

18  regularly, that would take maybe six hours since your last

19  injection.  You start the medication, it's pretty rapidly

20  metabolized, you start feeling uncomfortable.  If you take the

21  medication -- if you take the drug again, you will get

22  immediate relief from those negative feelings, and so depending

23  on how negative you're feeling that's a valued relief and

24  that's negative reinforcement.

25            So positive reinforcement makes you feel terrific and

Stephen Higgins, Ph.D                    17

1   you would like to do it again.  Negative reinforcement would

2   also encourage you to do it again, but it's because it relieves

3   this discomfort that you are experiencing.

4   Q.     From a psychological perspective, Dr. Higgins, are

5   humans wired to end feelings of discomfort or prolong feelings

6   of discomfort?

7   A.     End.  So these are natural processes and I think it's

8   important -- that's an important thing to understand.  So these

9   -- these processes are in place to help us navigate everyday

10  life; where do we find food, where do we not find food.  So if

11  we're hungry and we find food, dopamine is activated just like

12  heroin activates dopamine, but in the case of the food that's a

13  good thing.  That's adaptive.  That's why it's part of our

14  biology and the drugs sort of -- not sort of, but they act on

15  those same processes but to unproductive means or ends.

16  Q.     Dr. Higgins, how does the concept of addiction differ

17  from physical dependence?

18  A.     Well that's where that positive reinforcement thing is

19  pretty -- pretty important.  So the physical dependence can be

20  managed.  So if you have a cancer, for example, that's

21  associated with a lot of pain, you will receive typically these

22  same medications and you'll receive them chronically, and for

23  most cancer patients when the disease state is resolved we can

24  discontinue the medications with a little bit of care over a

25  week or two tapering the dose and the patient moves on and

Stephen Higgins, Ph.D                    18

1   that's the end of it, but there's a subset of the population

2   who when they experience the medication -- typically it's when

3   they experience it through recreational non-medical use, but it

4   can occur with medical use as well -- when that medication is

5   tapered they nevertheless have this urge that they should use

6   it again, and I want to emphasize that it's much, much more

7   common when the use of the medication is -- occurs under

8   recreational purposes.  Not under controlled medical use or

9   prescribed medical use, but it can occur under both

10  circumstances.

11          So it's that -- that continued desire to use the

12  medication even though there's no medical indication.  Either

13  your cancer is resolved, your disease has resolved, or there

14  was never any medical indication to begin with.  So the opioids

15  do that, but there are other drugs that we're all familiar

16  with, cocaine, that produce those same effects and it's through

17  that positive reinforcement system.

18  Q.     Dr. Higgins, I want to turn next to treatment and is it

19  fair to say that it's difficult to treat either heroin or crack

20  cocaine dependence and addiction?

21  A.     Yes.  Terribly difficult.  Enough to keep people in the

22  job, yes.  So it's very challenging.

23  Q.     Why is it so challenging?

24  A.     Well I think it's a combination of conditions.  So I

25  mentioned the situation where the cancer patient experiences

Stephen Higgins, Ph.D                    19

1  the morphine and yet when the reason for taking the morphine is
2  resolved they move on and they are not seeking that medication
3  again, and it usually has to do with lifestyle circumstances or
4  environmental circumstances and also with your biology.  So
5  there's genetic predisposition to addictions.  There's
6  environmental predisposition which is usually fairly deprived
7  social circumstances; poverty, low educational attainment, and
8  so there are a lot of factors that come into play, and when you
9  experience the euphoria that's associated with these drugs
10  because they are acting on that dopamine system, if you're
11  coming from a deprived set of circumstances where you don't
12  really experience that very often or you have certain genetic
13  characteristics that may predispose to being particularly
14  sensitive to those conditions, you want it again and it's a --
15  that want it again is there to help our species survive.  So
16  it's not a minor process.  This reinforcement process is very
17  powerful.  It operates in all of our daily lives, but it's
18  recognition.  So it can be especially salient for certain
19  individuals and so salient that it just keeps them coming back
20  to the drug, and then yeah and so with the opiates the process
21  you mentioned, the physical dependence and the negatively
22  reinforcement, adds just that additional feature that if you --
23  if you're feeling terrible because you haven't had the
24  medication and you know that there's instant relief.
25  Q.    Have you heard the term before quitting cold turkey?

Stephen Higgins, Ph.D                    20

1  A.     Yes.

2  Q.     Does that commonly happen with opioid dependence?

3  A.     No.  The reason it's interesting the turkey comes from

4  the goose flesh so it looks like something you would see in a

5  plucked turkey, but it's the juxtaposition.  So I was

6  mentioning before that the withdrawal syndrome is not faint.

7  It's not absolutely terrible, and we can all relate to it

8  because we've -- all of us have had a terrible flu, and what

9  you have to keep in mind about it with that terrible flu is

10 suppose there was something immediately next to you when you're

11 in the worst state of that flu that if you -- if you pushed the

12 button you would have immediate relief.  I mean within seconds

13 you would feel just perfect.  Well the opiate dependent

14 individual knows that very well, and so that just creates a

15 terrible challenge for them and for the treatment provider to

16 prevent relapse.

17         Unfortunately relapse is notoriously high with opiate

18 dependent individuals enough that now most of us probably heard

19 of medication assisted treatment finally coming to recognize

20 that to treat opiates -- opiate dependence effectively in the

21 vast majority of cases you need to provide an opiate like

22 medication on a chronic basis.

23 Q.     Dr. Higgins, one final subject area to talk with you

24 about and that is in your research that's been done as far as

25 decision making by opiate dependent individuals can you tell

Stephen Higgins, Ph.D                    21

1  the jury a little bit about what that research shows?

2  A.     Yes.  So we have done at the University of Vermont, but

3  we started it many years ago and now it's been extended

4  throughout the -- it's been extended globally, throughout the

5  U.S. and also internationally, and that is one of the

6  individual characteristics that makes somebody susceptible to

7  addiction is what we call -- it's a form of impulsivity that we

8  call delayed discounting, and so a simple way to think about

9  this is if I said to you would you like a thousand dollars now

10 or would you like a thousand dollars a month from now, I think

11 most of us would say I would take it now.  Why would I wait for

12 a month.

13        Then there's a way of then continuing with those

14 questions where I say to you what about would you take $950 now

15 versus a thousand dollars a month from now.  I think many of us

16 in this courtroom would probably say I may take $950 rather

17 than wait a month.  That doesn't seem like too much to give it,

18 and I continue what about $900 now versus a thousand dollars a

19 month from now.  I think I would guess that some of us might

20 start saying I think I could wait for a month to not lose that

21 $100.  So if you do that, then I know that you discount one

22 month delay of a thousand dollars by about 10 percent because

23 at 900 earlier you were not.

24        So we can repeat that question.  What about the same

25 thing but a six-month delay or one-year delay, and what we

Stephen Higgins, Ph.D                    22

1   discovered is if you do that, you find -- and you can fit a

2   curve then to the -- to the amount that someone discounts.  I

3   mentioned that 10 percent.  You can continue to do that and

4   each of us would have a curve, and there are certain

5   individuals who have what we call a very steep discounting

6   curve.  That is they are not good with waiting and so that it's

7   come to be known as a bias for the presence.  So I need it

8   sooner rather than later, and we all are biased in the

9   direction if things are -- all things being equal we would

10  rather have it now than later.  That's when I say a thousand

11  dollars now or later I'm guessing all of us would say why would

12  you wait.  So that's the bias in that direction.  Makes perfect

13  sense, but we also differ in terms of those more nuanced

14  delays.  What about $950 or what about $850, and so we have

15  found that this -- having a steeper delayed discounted curve is

16  associated with vulnerability to all types of addictions, and

17  tobacco and opioids are the first types of addictions where we

18  discovered that, and now we extend it to -- have extended it to

19  all types of addictions as well as other kinds of problems like

20  gambling that have addictive features.

21          So then we have done other studies with the same

22  concept.  So if you ask -- if you compare an opiate -- let me

23  begin by saying if you compare an opiate dependent individual's

24  discounted curve to a comparable group of individuals in terms

25  of age and education and sex who do not have a substance use

Stephen Higgins, Ph.D                    23

1    disorder, you will find striking differences in that

2    discounting curve, and so if you look to find a delay at which

3    someone would be willing to take half of that one thousand

4    dollars, they would take $500 to have it now rather than to

5    have to wait, for people without opiate addiction you have to

6    go out almost five years, but with someone with opiate

7    addiction you only have to go out a couple months.  So it's

8    striking differences in that regard.

9           So then you can start asking those same questions of

10   an opiate dependent individual regarding heroin.  What amounts

11   -- you start out with a large amount of heroin now or a large

12   amount of heroin later, and of course they do the same thing we

13   do with the thousand dollars.  I want it now.  Well what you

14   find is there's almost no amount of heroin later that's worth

15   waiting for.  So they always want it now, and so that you asked

16   about the challenge of treating them.  That's the challenge

17   that the heroin I want it now is always right there, and then

18   we've taken it further.  What about individual differences, do

19   all opiate dependent individuals discount the same way, and

20   they don't.  They are -- as a group they stand apart from those

21   without substance use disorder, but if you look within the

22   opiate dependent population, you will find that those who

23   engage in riskier behavior like sharing needles unclean needles

24   which puts them at risk for HIV infection and different types

25   of hepatitis, very serious diseases that they know about, those

Stephen Higgins, Ph.D                    24

1   who have the steep discounted function will -- are more likely

2   to share the needles or engage in risky behavior.

3         So it shows us this discounting is a pretty central

4   process in addictive behaviors.  So then we take it one step

5   further and we said well what about if you go into withdrawal.

6   You already are a very steep discounter.  Do you discount even

7   more if you are in a withdrawal state, and we have documented

8   that indeed that's the case, and so someone who -- an opiate

9   dependent individual who is in the state of withdrawal their

10  discounting function for either money or for heroin is just

11  about -- they are not willing to wait for any delay.

12         MR. GRADY:  One moment, Your Honor.

13         THE COURT:  Yes.

14         MR. GRADY:  No further questions.

15         THE COURT:  Okay.  Any cross examination?

16         MR. KAPLAN:  Yes, Judge.  Thank you.

17                     CROSS EXAMINATION

18  BY MR. KAPLAN:

19  Q.    Good to see you again, Doctor.

20  A.    Same.

21  Q.    So I read some of the articles that you provided.  I

22  think Dr. Bickel -- you used to work for or with Dr. Bickel?

23  A.    That's correct, yes.

24  Q.    And now I realize why I didn't go into psychology, but I

25  want to see if I understand what you're saying.  There's this

Stephen Higgins, Ph.D                    25

1   negative reinforcement aspect where if you haven't had it for a

2   while you start feeling uncomfortable and then if you take it,

3   you feel better.  Like, for example, with heroin?

4   A.     Correct.

5   Q.     And so you've described that as sort of impulsivity

6   versus waiting for a larger reward?  In other words, exercising

7   more self control?

8   A.     Correct.

9   Q.     Is that ability to not be so impulsive but wait for the

10  larger reward does everyone have the ability to make that

11  decision?

12  A.     There are individual differences.

13  Q.     In terms of the level of ability to do that?

14  A.     Correct.

15  Q.     So if -- and people who are, for example, heroin addicts

16  you said within that group there's different levels of

17  impulsivity?

18  A.     Correct.

19  Q.     So there may be individuals in that group who would be

20  more inclined to wait for the larger reward like going to rehab

21  and some that would want it -- no matter what would just take

22  it immediately?

23  A.     That's correct.

24  Q.     So not all heroin addicts discount at the same rate, in

25  other words?

Stephen Higgins, Ph.D                    26

1    A.      Correct.

2    Q.      And so it sounds to me like there is an element of

3    choice here.  I mean you have heard the expression you hit rock

4    bottom?

5    A.      I have.

6    Q.      That's frequently when people who do go to rehab and are

7    successful that's frequently when they go?

8    A.      When they hit rock bottom?

9    Q.      Yes.  It's not a scientific term, but --

10   A.      Yeah I think as you anticipated we're not thrilled with

11   that concept, but I think, you know, it developed as an

12   expression because it's true in some reasonable amount of

13   circumstances, but it's not something you have to wait for.

14   There are people who seek treatment before they hit rock bottom

15   and --

16   Q.      So someone could be a heroin addict and say to

17   themselves I don't want to do this any more I'm going to rehab?

18   A.      I think all things being equal that is certainly an

19   option available, but unfortunately the situation isn't always

20   -- the treatment availability hasn't always been as we would

21   like it.  So there are factors that would operate; do they know

22   how to access treatment.  So I don't think it's quite that

23   simple, but I think largely I agree with you.  Yes.

24   Q.      And hasn't Vermont sort of come up with a treatment

25   method where they are putting more and more people on suboxone

Stephen Higgins, Ph.D                    27

1    or something comparable to that to help them control their

2    urges?

3    A.     That is the case.  It took us a long time to get there.

4    We're doing much better than we did in the past.  I've been

5    active in those efforts, and we still could do better and we're

6    doing much better as a state than most other rural states just

7    that we haven't had -- rural states in the United States have

8    not really had opiate addiction problems in the past.  It's

9    very rare, but over the last say 10 or 15 years they have

10   really grown and so we have the epidemic that you're familiar

11   with now.

12   Q.     So for someone who is a serious heroin addict there's

13   much better prospects in today's world in Vermont for them to

14   get treatment, be placed on a maintenance program where they

15   get suboxone everyday?

16   A.     Yes.

17   Q.     And they no longer need to go out on the street and buy

18   heroin that way?

19   A.     Yes.  That's true.  Most are not -- most -- not only in

20   rural settings, but in just generally most people who have

21   addiction are not in treatment and that includes opiate

22   addiction.  So that's an unfortunate state of affairs.  I think

23   that a lot of times people who have addictions aren't the most

24   aware people in terms of recognizing that in fact I'm addicted

25   and I should go do something about it.  Others recognize that

Stephen Higgins, Ph.D                      28

1    they are, but have concerns about legal issues or other kinds

2    of issues.  So there are just a lot of factors that enter into

3    a decision.

4    Q.    Of course people who are in treatment were addicts,

5    right?

6    A.    Pardon me.

7    Q.    People who do enter treatment have been addicts in the

8    past?

9    A.    Well --

10   Q.    Otherwise they wouldn't be in treatment?

11   A.    -- to enter treatment you have to have an addiction.

12            MR. KAPLAN:  Right.  Thank you.

13            THE COURT:  All right.  Any redirect?

14            MR. GRADY:  Just briefly, Your Honor.

15            THE COURT:  Okay.

16                      REDIRECT EXAMINATION

17   BY MR. GRADY:

18   Q.    Dr. Higgins, there's a couple questions about rehab.  In

19   your experience is it people -- well let me ask it this way.

20   If people do not have a good support network such as parents

21   supporting them to get out of the lifestyle, are they more

22   likely to seek rehab?

23   A.    Without the support -- well with or without the support

24   the majority do not seek rehab or they seek it very late in the

25   experience after things are pretty bad, and what you describe

Stephen Higgins, Ph.D                    29

1    would be -- is pretty accurate.  It's going to depend on

2    whether you have people who can help you navigate the system on

3    how to access treatment, help you recognize that in fact you

4    are really in the terrible state and that you're no longer able

5    to manage it.

6         MR. GRADY:  Hold on, Dr. Higgins.  A juror left the

7    courtroom, Your Honor.

8         THE COURT:  Let's hold testimony.  I think she's sick

9    so why don't we take a quick break.  Let's take a quick break

10   and be back when she is ready to return.

11   [The jury leaves the courtroom at 9:50 a.m.  Recess]

12   [The following occurred in open court with the jury present at

13   10:45 a.m.]

14        THE COURT:  Okay.  The juror who left has been

15   excused.  She's actually suffering from a preexisting medical

16   condition.  It's not contagious.  She's not ill so there's no

17   concern, but I really thought it would be wise for her to get

18   checked out at the hospital so an ambulance has come and she's

19   been taken up to the hospital, and you should know that the

20   federal government is going to pay for it because she's on jury

21   duty.  So as a result if all of a sudden you get ill, you have

22   free medical care.  So she has been excused and it's not --

23   obviously it's not contagious.  Nothing to be concerned about.

24   The jury room has been cleaned and I think we're set to go

25   until noon, but we'll go for the rest of the day, but we are

Stephen Higgins, Ph.D                    30

1   ready to go until noon and Dr. Higgins.

2            MR. GRADY:  Yes, Your Honor.  The Government will

3   resume with Dr. Higgins.  Dr. Higgins will go back to the

4   stand.

5            THE COURT:  Welcome back, Dr. Higgins.

6            DR. HIGGINS:  Thank you.

7            THE COURT:  I appreciate that you're a psychologist,

8   but I was almost thinking of calling on you to see if you could

9   help with the juror.

10           DR. HIGGINS:  Glad you didn't.

11           THE COURT:  I guess that's a broad definition of

12  doctor.

13           DR. HIGGINS:  True.

14  BY MR. GRADY:

15  Q.    Thank you, Dr. Higgins.  I'm sure you're aware.  I just

16  want to remind you.  You remain under oath of course.  When we

17  last left, Dr. Higgins, I believe you agreed with the general

18  proposition that a severe heroin addict that does not have an

19  extensive support network with loved ones, maybe has a lower

20  socioeconomic status, has lower educational level, is less

21  likely to seek rehab?

22  A.    That's true.

23  Q.    And, finally, as far as better awareness and better

24  treatment options of opioids here in Vermont does opioid and

25  heroin abuse remain a big problem here in Vermont?

Stephen Higgins, Ph.D                    31

1   A.     Yes.  Major problem.

2   Q.     Has it increased over the years even with these

3   increased treatment options?

4   A.       Increased dramatically, and as I mentioned before the

5   majority of opiate dependent or opiate addicted individuals are

6   not in treatment, are not seeking treatment, so we need to

7   encourage it, and it is simply not an easy choice for many

8   reasons for someone to come forward to admit that they have an

9   addiction to an illicit substance and have been able to

10  purchase it, and that often involves all kinds of unsavory

11  activities and so there's just a lot of stigma associated with

12  it.  So a lot of factors that enter into decisions about

13  treatment.

14              MR. GRADY:  Thank you.  Nothing further, Your Honor,

15  with Dr. Higgins.

16              THE COURT:  Okay.  Mr. Kaplan, any questions?

17              MR. KAPLAN:  I have nothing further, Your Honor.

18              THE COURT:  All right.  Doctor, I just have one

19  question.

20              DR. HIGGINS:  Sure.

21              THE COURT:  What you said was the proneness to

22  addiction is related to impulsivity?

23              DR. HIGGINS:  Right.

24              THE COURT:  The more impulsive a person is the more

25  they are subject to -- the more likely they are subject to

Stephen Higgins, Ph.D                    32

1    being an addict?

2              DR. HIGGINS:  Correct.

3              THE COURT:  And I'm wondering if that means

4    essentially young people who are associated with impulsivity

5    become more likely to be addicted than persons of older age?

6              DR. HIGGINS:  Absolutely on target.  That's an

7    accurate characterization.  Most of the addictions we're

8    familiar with include an opiate addiction start pre 20, so

9    while people are in adolescence, and then there's also an

10   additional feature to an age related which many times they will

11   what we call too is age out and that's usually in 40's or 50's.

12   So unfortunately there might be a 30-year period of opiate

13   addiction, but there is an age of vulnerability, and as you say

14   we know in terms of brain development that the frontal lobes

15   that are important for self control are not fully developed

16   until approximately age 25.

17             THE COURT:  Interesting.  The recent studies about

18   impulsivity suggest exactly that, that at age -- I thought it

19   was 26, but up until that point you are very impulsive which

20   means you are subject much more to addiction.

21             DR. HIGGINS:  Correct.

22             THE COURT:  And the other question, which is not

23   related to this case but it's related to something I dealt with

24   earlier in my professional life, crack cocaine versus powder

25   cocaine, and one of the differences between crack and powder is

Stephen Higgins, Ph.D                    33

1    the speed at which the drug gets to the brain.  Crack cocaine

2    is faster than powder cocaine, and what I would have thought

3    there was no pharmacological difference between crack and

4    powder, but what you're suggesting is the faster it gets to the

5    brain the more addictive it is; is that right?

6              DR. HIGGINS:  That's correct, yes, and so that's why

7    heroin is thought that have no medicinal use because it gets to

8    the brain more rapidly than morphine or other similar kinds of

9    medications, and so it has the higher addiction potential and

10   we can get similar analgesia with these morphine like

11   medications that don't get to the brain so rapidly.

12             THE COURT:  Okay.  All right.

13             MR. KAPLAN:  I do have one question, Judge.

14             THE COURT:  Okay.

15                       RECROSS EXAMINATION

16   BY MR. KAPLAN:

17   Q.    You talked about young people being more susceptible,

18   but isn't it true that even among that group there's different

19   levels of impulsivity?

20   A.    Correct.

21   Q.    Someone might be more inclined to keep going as opposed

22   to someone else who might seek treatment?

23   A.    Correct.

24             MR. KAPLAN:  Okay.  Thank you.

25             THE COURT:  That was two questions I thought.

Katelynn C.                          34

1              MR. KAPLAN:  Well it was a question and a statement.

2              THE COURT:  Oh right.  Okay.  Any other questions,

3    Mr. Grady?

4              MR. GRADY:  No, Your Honor.

5              THE COURT:  All right.  Thank you, Doctor.

6              DR. HIGGINS:  Thank you.

7              THE COURT:  All right.  Government want to call the

8    next witness.

9              MR. DARROW:  Thank you, Your Honor.  We call Katelynn

10   C.

11             COURTROOM DEPUTY:  Please come forward to be sworn.

12   Right up to the podium is fine.

13   KATELYNN C.,

14       Having been duly sworn, testified as follows:

15             THE COURT:  All right.  Good morning.

16                       DIRECT EXAMINATION

17   BY MR. DARROW:

18   Q.    Good morning.

19             THE COURT:  Could I ask you to move your chair up to

20   the microphone and just speak right into the microphone.  You

21   have to speak fairly loud.  This is a big room.  Just to make

22   sure that everybody hears you.  Okay.

23   BY MR. DARROW:

24   Q.    Can we start with you please stating your first name and

25   your first initial of your last name?

Katelynn C.                                    35

1   A.      Katelynn C.

2   Q.      Okay and, Katelynn, forgive me if I refer to you by your

3   first name.  That's all we're going to use and if we talk about

4   other women we're just using first names.  Okay?

5   A.      Okay.

6   Q.      Can you tell us what month and year you were born?

7   A.      3/11/95.

8   Q.      I'm sorry.

9   A.      March '95.

10  Q.      Okay, and tell us a little bit about growing up between

11  the ages of say 5 and 10.

12  A.      I was going home to home in state custody and then

13  family members.

14  Q.      In state custody.  Do you mean foster care?

15  A.      Yes.

16  Q.      All right, and which family members?

17  A.      Aunts, cousins, mom, dad.

18  Q.      Okay.  When did you first meet your father?

19  A.      I was 5.

20  Q.      Why is that?

21  A.      He was in jail and that's about all I know.

22  Q.      Okay.  Tell us a little bit about the ages of say 10 to

23  15.

24  A.      I was home to home.  Homeless sometimes.

25  Q.      Okay.  In DCF custody?

Katelynn C.                                    36

1   A.    Yes.

2   Q.    About how many DCF foster homes have you been in?

3   A.    A lot.

4   Q.    Okay.  Did something happen when you were 13 years old?

5   A.    Yes.

6   Q.    What was that?

7   A.    I got raped by my cousin.

8   Q.    All right.  Did you want to pursue that in the criminal

9   justice system?

10  A.    Yes.

11  Q.    And what happened?

12  A.    My dad didn't think I was ready to go to court and he

13  got away with it.

14  Q.    He your cousin?

15  A.    My cousin got away with it.

16  Q.    So it was not pursued?

17  A.    It went to court.  Just my dad didn't want me to go.

18  Q.    Okay.  How far did you go in school?

19  A.    I finished eighth grade.

20  Q.    All right.  Did you spend a little time at BHS?

21  A.    Like a month.

22  Q.    But dropped out?

23  A.    Yes.

24  Q.    Okay.  When did you start using drugs?

25  A.    13.

Katelynn C.                                    37

1    Q.      What drugs did you start with?

2    A.      I went to marijuana and then I got from there.

3    Q.      Okay.  Katelynn, I notice you're smiling sometimes when

4    you're answering these questions.  Do you smile when you feel

5    uncomfortable?

6    A.      Yes.

7    Q.      Okay.  After marijuana what drugs did you take?

8    A.      It went from pills to crack.

9    Q.      And about how old were you when you started using crack

10   cocaine?

11   A.      I was 13.

12   Q.      Did you get addicted --

13   A.      Yes.

14   Q.      -- at some point?

15   A.      Yes.

16   Q.      Did you at some point meet a fellow named that you knew

17   as Moet?

18   A.      Yes.

19   Q.      When was that?

20   A.      I was 17.

21   Q.      Do you remember what time of year it was?

22   A.      It was spring.  Spring.

23   Q.      So your birthday was in March.  Does early 2012 sound

24   about right?

25   A.      Yes.

Katelynn C.                                    38

1   Q.     Do you remember how you met him?

2   A.     I was working for somebody else.

3   Q.     Okay and when you say you were working can you tell us

4   what you mean?

5   A.     I was selling my body for somebody else.

6   Q.     Okay and why were you doing that?

7   A.     To support my drug habit.

8   Q.     Under what circumstances did you meet Moet?

9   A.     I met him as a trick.

10  Q.     Okay.  Tell us what happened in that first meeting?

11  A.     He acted like a regular trick and I had sex with him and

12  then he made working for him sound better.

13  Q.     Did he recruit you?

14  A.     Yes.

15  Q.     How did he do that?  What did he tell you?

16  A.     I would make more money.  The drugs were always there.

17  Q.     Tell us what conversation you had with him in that first

18  meeting about drugs?

19  A.     He said that they would always be there.  He supplied

20  them.

21  Q.     And what drugs were you talking about?

22  A.     Crack.

23  Q.     Did he show you anything?

24  A.     He showed me pictures of other girls.

25  Q.     What did he say about those other girls?

Katelynn C.                                         39

1    A.      That they made a lot of money and like they were wearing

2    lingerie and it just seemed a lot better.

3    Q.      What was the connection, if any, between the other girls

4    and Moet?

5    A.      He worked -- they worked for him.

6    Q.      Okay.  So what did you think about this offer?

7    A.      Seemed a lot better.

8    Q.      Why did you think it was better?

9    A.      Because I was having money pretty much for drugs before

10   I worked for him.

11   Q.      Why did you think working for him would be better than

12   the circumstances you were in?

13   A.      Because I would be making a lot of money.

14   Q.      You would be making money and anything else?  How about

15   the supply of drugs did that sound attractive?

16   A.      Yes.

17   Q.      Have you been having trouble getting a steady supply of

18   drugs before?

19   A.      Yes.

20   Q.      All right.  So what was your decision?

21   A.      I ended up going to work for him.

22   Q.      All right.  Now around this time where were you living?

23   A.      I was living with my mom and in hotel rooms.

24   Q.      Was there a time around then when you got in an argument

25   with your mom?

                        Katelynn C.                        40

1    A.    Yes.

2    Q.    What happened?

3    A.    She found out I was using drugs.

4    Q.    And what was the consequence?

5    A.    She kicked me out.

6    Q.    So let's talk about how it began with Moet.  After that

7    conversation in which you agreed to work with him tell us what

8    happened?

9    A.    I ended up going with him to a hotel room where there

10   was other girls.

11   Q.    Did he take you there?

12   A.    Yes.

13   Q.    Do you remember the hotel?

14   A.    I think it was the Econolodge.

15   Q.    Do you remember the names of the other women?

16   A.    There was a girl named Nikki there.

17   Q.    Anyone else you remember?

18   A.    Not at this moment.

19   Q.    So he takes you to another hotel or motel.  There's

20   someone there named Nikki.  Did you spend time with Nikki as

21   the weeks went on?

22   A.    Yes.

23   Q.    What was Nikki doing?

24   A.    She was working too.

25   Q.    Working meaning?

Katelynn C.                                    41

1    A.      Prostituting.

2    Q.      With Moet or not?

3    A.      Yes.

4    Q.      All right.  When he takes you to the motel where Nikki

5    is what happens?

6    A.      She pretty much taught me everything.

7    Q.      Was Moet there when that happened?

8    A.      Yes.

9    Q.      Tell us what you were taught.

10   A.      Like how to pose for pictures.  How to post up.

11   Q.      What does it mean to post up?

12   A.      To put the ad on Backpage.

13   Q.      Were any photos taken of you?

14   A.      Yes.

15   Q.      Who took the photos?

16   A.      Moet.

17   Q.      Tell us how that happened.  You were in a motel room?

18   A.      He used his phone and took pictures of me.

19   Q.      Did he say anything about what you should be wearing or

20   how you should be posing?

21   A.      Yes.

22   Q.      What?

23   A.      Put on lingerie and just pose like sexually.

24   Q.      Had you been using Backpage before?

25   A.      No.

Katelynn C.                    42

1    Q.     So this was something new?

2    A.     Yes.

3    Q.     Is Backpage an internet site?

4    A.     Yes.

5    Q.     Do you know whether or not you were posted at that same

6    day?

7    A.     I was.

8    Q.     How do you know?

9    A.     I remember him taking the pictures.

10   Q.     All right.  What happened after you were posted?

11   A.     I got a couple calls about an hour after.

12   Q.     All right.  Now you say you got calls.  Did -- how did

13   you get a phone?

14   A.     I was using another girl's phone at the time because I

15   didn't have a cell phone.

16   Q.     Whose phone were you using?

17   A.     Another girl's.  I think it was Nikki's.

18   Q.     One of the girls working in this business?

19   A.     Yeah.

20   Q.     So you were at, you think, the Econolodge.  As this work

21   went on did you -- were you moved to different motels?

22   A.     Yes.

23   Q.     Tell us which motels?

24   A.     Motel 6, the Anchorage, North Star, and the Ho-Hum.

25   Q.     Is there one or two Ho-Hums in town?

Katelynn C.                                43

1   A.      There's two.

2   Q.      Which one were you using?

3   A.      Both of them.

4   Q.      All right.  Ever at the LaQuinta?

5   A.      I don't know.

6   Q.      Okay.  The ones you mentioned; Anchorage Inn, Motel 6,

7   North Star, Econolodge, and the two Ho-Hums under what

8   circumstances would you move from one to another?

9   A.      When dates would start -- when dates would start getting

10  hot.

11  Q.      Sorry.  Who decided when things started getting hot?

12  A.      Moet.

13  Q.      And what would happen when you changed motels?

14  A.      The same thing we -- I would just post another ad.

15  Q.      Okay.  Who got you from one motel to another?

16  A.      Moet did.

17  Q.      Now when you start out in these -- in this early time

18  what was the deal you had with Moet about the income you

19  earned?

20  A.      It would be 50/50.

21  Q.      And does that mean 50 for him 50 for you?

22  A.      Yes.

23  Q.      Did that change over time?

24  A.      Yes.

25  Q.      How so?

                        Katelynn C.                        44

1    A.      He would start taking more and more.

2    Q.      And so after a couple months what was the percentage?

3    A.      I didn't really have a percentage.

4    Q.      So it was a hundred percent him zero percent you?

5    A.      Yes.

6    Q.      Early in the relationship how did Moet treat you?

7    A.      Kind.

8    Q.      Excuse me.

9    A.      He was kind.

10   Q.      Tell us about it.  What did he do?

11   A.      He was just charming.

12   Q.      Did you start having romantic feelings?

13   A.      Yes.

14   Q.      Tell us about the conversations or things you did with

15   him that made you feel that way?

16   A.      I don't know.  He just made me feel special like I was

17   the only one.

18   Q.      Did he tell you things?

19   A.      Yes.

20   Q.      Like what things did he tell you?

21   A.      I don't remember right now.

22   Q.      Did you fall in love with him?

23   A.      Yes.

24   Q.      Did he buy you things?

25   A.      Yes.

Katelynn C.                              45

1   Q.    What sort of stuff did he buy you?

2   A.    Clothes, lingerie, and stuff.

3   Q.    Was he bringing you food too?

4   A.    Yes.

5   Q.    Did you think that he loved you?

6   A.    Yes.

7   Q.    Did he ever say that?

8   A.    Yes.

9   Q.    Now how old were you at this point?

10  A.    What?

11  Q.    You say you were 17?

12  A.    Yes.

13  Q.    Did there come a time when you had a conversation with

14  Moet or something happened about how old you were?

15  A.    Yes.

16  Q.    Tell us what happened.

17  A.    His girlfriend at the time ended up finding my birth

18  certificate.

19  Q.    All right, and what happened?

20  A.    And she said I was 17.

21  Q.    She said that to who?

22  A.    To Moet.

23  Q.    Were you there?

24  A.    Yes.

25  Q.    Why -- where had your birth certificate been that she

Katelynn C.                                    46

1   would find it?

2   A.      I gave it to him and he put it in his car.

3   Q.      Why did you give him your birth certificate?

4   A.      Because I didn't want to lose it.

5   Q.      Tell us what were your -- at this point in your life

6   what were your possessions?  What did you have with you?

7   A.      I had two pillow cases full of clothes.

8   Q.      Okay.  Did you have any identification?

9   A.      No.

10  Q.      When you were posted the first time how long was it

11  before customers started calling?

12  A.      About an hour.

13  Q.      When you first start and it's 50/50 what did you do with

14  the 50 percent of the money that you had?

15  A.      I bought drugs.

16  Q.      From whom?

17  A.      From Moet.

18  Q.      When you first met Moet what was your habit like?  How

19  much crack cocaine were you using daily?

20  A.      It was an every -- like couple times a week.

21  Q.      Oh so you were only using crack a couple times a week?

22  A.      And then when I started working for him I started more

23  and more and it became everyday.

24  Q.      Tell us why you started using more and more crack

25  cocaine?

                    Katelynn C.                          47

1   A.      It was easy to get.

2   Q.      And how did it make you feel?

3   A.      Numb.

4   Q.      Did you want to feel numb?

5   A.      Yes.

6   Q.      Why?

7   A.      Because I felt disgusted.

8   Q.      When you -- thinking at the time you get the drugs is it

9   after you do a job?

10  A.      Before and after.

11  Q.      What did you get before?

12  A.      I would take a couple hits and then I would buy some

13  after.

14  Q.      Okay.  When did he bring you drugs when you were working

15  at these motels?

16  A.      Whenever I called him.

17  Q.      About how often was that?

18  A.      After every call.

19  Q.      About how many calls a day were you having?

20  A.      Depending on the day.

21  Q.      All right.  Well tell us how that worked.  What do you

22  think you're averaging?

23  A.      On a good day about a thousand to 1500 and then on a bad

24  day a couple hundred.

25  Q.      So you're talking money now?

Katelynn C.                                    48

1  A.      Yeah.

2  Q.      What were the rates -- well did somebody tell you how

3  much you should be charging for the work?

4  A.      Yes.

5  Q.      Who told you that?

6  A.      Moet.

7  Q.      And what were the rates?

8  A.      100 for 15 minutes, 150 for a half hour, 250 an hour.

9  Q.      And what hours were -- or days were you working?

10  A.      Seven days a week.

11  Q.      How about hours?

12  A.      There were certain times where people would come.

13  Q.      How did that work?

14  A.      Before guys would go to work, before -- or around lunch

15  time, and then when they were heading home.

16  Q.      Okay.  Did Moe develop a term that he used to refer to

17  you?

18  A.      Huh?

19  Q.      What name were you using?

20  A.      Pinkie.

21  Q.      Who gave you that name?

22  A.      Moet.

23  Q.      Do you know why he called you Pinkie?

24  A.      I don't remember.

25  Q.      Did he call you something else?  Is Main something?

Katelynn C.                                    49

1   A.      Oh I was his main girl.

2   Q.      Do you know did you have any conversations with him

3   about what it meant to be his main girl?

4   A.      Once.

5   Q.      I'm sorry.

6   A.      Once.

7   Q.      What was said?

8   A.      Like the main makes the most money.

9   Q.      Okay.  Did he call you his main?  All right.  Now I know

10  you're trying to be polite in court, but tell us what he called

11  you?

12  A.      Main bitch.

13  Q.      And did he ever have a term to refer to himself?

14  A.      Yes.

15  Q.      What?

16  A.      He was a gorilla pimp.

17  Q.      Did he say or did you have an understanding of what it

18  means to be a gorilla pimp?

19  A.      I had an understanding.

20  Q.      What was that based on.

21  A.      I gorilla pimp is somebody who protects you, but they

22  will also do like whatever.  Like if you cross paths like he

23  will hit you and stuff.

24  Q.      Did he ever hold back drugs from you?

25  A.      Yes.

Katelynn C.                                    50

1    Q.      Tell us about that.

2    A.      I was losing too much weight and I needed to gain weight

3    so he wanted me to get sober.

4    Q.      Who said you were losing too much weight?

5    A.      Moet did.

6    Q.      Was this related to your work?

7    A.      Yes.

8    Q.      What did he say about it?

9    A.      I wasn't making as much money.

10   Q.      So did you not get drugs for a while?

11   A.      Yes.

12   Q.      And after that did it change back?

13   A.      Slowly.

14   Q.      Okay.  Was there another time that he withheld drugs

15   from you?

16   A.      Yes.

17   Q.      Tell us about that.

18   A.      He found out I was doing drugs again.  I tried to buy

19   some and he wouldn't let me.

20   Q.      Okay.  Wouldn't let you buy some from whom?

21   A.      From him.

22   Q.      Okay.  At some point, however, did you resume your crack

23   habit -- crack addiction?

24   A.      Yes.

25   Q.      And this is while you're working?

                    Katelynn C.                        51

1   A.      Yes.

2   Q.      Okay.  Were you ever asked by Moet to go to the U Mall

3   with him with new recruits?

4   A.      Yes.

5   Q.      Tell us what happened.

6   A.      There was a guy that worked in a store that we would

7   have sex with to get clothes and he would take pictures of us.

8   Q.      So did you go to the U Mall with Moet and a new young

9   woman once?  More than once?

10  A.      More than once.

11  Q.      Did Moet ask you to help train new recruits?

12  A.      Yes.

13  Q.      Tell us about that.

14  A.      He would have us show them the ropes.

15  Q.      And what were the ropes?  What sort of things would he

16  ask you to teach?

17  A.      Like how to post up.  How to talk on the phone.  I would

18  sit in with them a couple times.

19  Q.      You would sit what?

20  A.      I would sit with them a couple times while they did what

21  they had to do.

22  Q.      Okay.  Was Moet ever violent with you?

23  A.      He threatened it.

24  Q.      Tell us what happened.

25  A.      He would threaten to hit me because I would be very

Katelynn C.                                        52

1    mouthy.

2    Q.    Tell us what he would say when he was threatening to hit

3    you.

4    A.    That he would violate me.

5    Q.    Okay.  What did you understand violate to mean?

6    A.    He was going to hit me.

7    Q.    Okay.  Did he ever lay hands on you?

8    A.    He grabbed me by my face one time like this.

9    Q.    What was happening that led him to do that?

10   A.    I was mouthing towards him and kind of out of control at

11   the time.

12   Q.    Did he say something to you?

13   A.    Huh?

14   Q.    Did he say something to you when this is happening?

15   A.    I don't remember.

16   Q.    You don't remember?  Okay.  Did you ever see him with

17   guns?

18   A.    Yes.

19   Q.    Tell us what did you see?

20   A.    He would always have a gun on his hip.

21   Q.    Did he ever ask you to do anything with guns?

22   A.    He asked me to hold it in my purse a couple times.

23   Q.    Any idea -- did he say why he wanted you to hold a gun?

24   A.    So he wouldn't get in trouble.

25   Q.    Did he ever use a gun with you?

Katelynn C.                                53

1   A.      Yes.

2   Q.      What happened?

3   A.      He held a gun up to me and I was ready to die and I put

4   the gun in my mouth to show him I wasn't scared.

5   Q.      Why -- do you know why he held a gun up to you?

6   A.      I don't remember.

7   Q.      Okay.  You say you wanted to die.  Were you feeling

8   suicidal?

9   A.      Yes.

10  Q.      Did you ever see him violent with others?

11  A.      Yes.

12  Q.      What did you see?

13  A.      He grabbed a girl by her hair and hit her.

14  Q.      What girl was that?

15  A.      Nikki.

16  Q.      Did you know Nikki's real name?

17  A.      No.

18          MR. DARROW:  May I approach?

19          THE COURT:  Yes.

20  BY MR. DARROW:

21  Q.      Showing you two photographs marked 52A.  Could you look

22  at them please?

23  A.      That's her.

24  Q.      Do you recognize her?

25  A.      Yes.

```
                      Katelynn C.                         54
 1    Q.      Who is that?

 2    A.      Nikki.

 3    Q.      Okay.  Now 52A has two photos on it and you pointed out

 4    the second one.  Can you tell whether they are pictures of the

 5    same girl?

 6    A.      I can't tell.

 7    Q.      You can't tell so you're not sure about the first page

 8    but you're sure about the second?

 9    A.      Yes.

10            MR. DARROW:  Your Honor, why don't we just mark as

11    52A the second picture.

12            THE COURT:  Okay, and are you offering 52A?

13    BY MR. DARROW:

14    Q.      I apologize.  Does -- the second picture of that woman

15    does that fairly and accurately depict Nikki as you knew her at

16    the time?

17    A.      Yes.

18            MR. DARROW:  Yes we are, Your Honor.

19            MR. KAPLAN:  No objection.

20            THE COURT:  All right.  So admitted.

21    [Government exhibit 52A admitted]

22            MR. DARROW:  May I publish, Your Honor?

23            THE COURT:  Yes.

24    BY MR. DARROW:

25    Q.      So we're looking at 52A.  Is that the young woman you
```

Katelynn C.                                    55

1    knew as Nikki?

2    A.    Yes.

3    Q.    Now let's go back to what happened to her.  You say Moet

4    grabbed her hair and then what happened?

5    A.    He put her around him and then he ended up hitting her.

6    Q.    I'm sorry.

7    A.    He ended up hitting her.

8    Q.    Where did this happen?

9    A.    At the -- oh what is it called -- the Econolodge.

10   Q.    One of the motels the two of you were working out of?

11   A.    Yes.

12   Q.    Okay.  What happened after he hit her?

13   A.    She got in a car with all her stuff and her son's stuff

14   and left with this guy and he ended up getting in his car and

15   chasing after her.

16   Q.    Okay.  Is he Moet?

17   A.    Yes.

18   Q.    So he pursued her when she tried to leave?

19   A.    Yes.

20   Q.    Did you have any interaction during this time with a

21   woman named known as Shorty?

22   A.    Yes.

23   Q.    Who was Shorty?

24   A.    She was a girl that was working.

25   Q.    Doing the same things you and Nikki were doing?

                    Katelynn C.                        56

1   A.      Yes.

2   Q.      Was she doing this with the two of you?

3   A.      Yes.

4   Q.      At the same motels?

5   A.      Yes.

6   Q.      Did you know her name?

7   A.      I only knew her as Shorty.

8   Q.      Okay.  I'm showing you what's marked for identification

9   as 56A which is two photographs.  Can you look at those please?

10  Do you recognize that woman?

11  A.      Yes.

12  Q.      Who is that?

13  A.      Shorty.

14  Q.      Do those two photographs fairly and accurately depict

15  Shorty?

16  A.      Yes.

17          MR. DARROW:  Your Honor, we move for admission of

18  56A.

19          THE COURT:  Any objection?

20          MR. KAPLAN:  No objection, Judge.

21          THE COURT:  So admitted.

22  [Government exhibit 56A admitted]

23          MR. DARROW:  Publish Your Honor.

24          THE COURT:  Yes.

25  BY MR. DARROW:

Katelynn C.                                    57

1  Q.     And the second picture -- was so there's you, Nikki, and

2  Shorty.  Was there another women working with the three of you

3  around this time?

4  A.     Yes.

5  Q.     What name did you know her as?

6  A.     Ava.

7  Q.     Approaching you with Government 121, single photograph,

8  do you recognize this person?

9  A.     Yes.

10  Q.     Who is that?

11  A.     Ava.

12  Q.     Does that photograph fairly and accurately depict the

13  woman you knew of as Ava?

14  A.     Yes.  Ava

15           MR. DARROW:  Thank you.  Your Honor, we move for

16  admission.

17           THE COURT:  Any objection?

18           MR. KAPLAN:  No objection.

19           THE COURT:  So admitted.

20  [Government exhibit 121 admitted]

21           MR. DARROW:  Publish.

22  BY MR. DARROW:

23  Q.     Is that picture we're looking at Government 121 a

24  picture of Ava?

25  A.     Yes.

Katelynn C.                                    58

1  Q.     Okay.  You mentioned Folks laying hands on you and on

2  Nikki.  Were there -- was there any incident with Shorty that

3  you remember?

4  A.     Yes.

5  Q.     What happened?

6  A.     He punched her in her butt.

7  Q.     And what did Shorty do?

8  A.     She was -- she had attitude towards him and she was

9  running her mouth.

10 Q.     Okay, and after she got struck what did she do?

11 A.     She cried.

12 Q.     You mentioned the term violation.  Was that a term that

13 Moet used back then?

14 A.     Yes.

15 Q.     What did he used to say about violations?

16 A.     He didn't like them.

17 Q.     Pardon.

18 A.     He didn't like them.

19 Q.     Did he ever say if you violate me I violate you?

20 A.     Yes.

21 Q.     Did he just say that to you or did you hear him say that

22 other times?

23 A.     He said it to the other girls.

24 Q.     What effect did it have on you, Katelynn, to see -- when

25 he grabbed you and to see him strike Nikki and Shorty?

Katelynn C.                                59

1    A.    I was scared of him.

2    Q.    You were a crack cocaine addict at this time?

3    A.    Yes.

4    Q.    Tell us what it feels like when you don't get crack

5    cocaine when you're an addict?

6    A.    All you want to do is sleep.  You have no energy.  You

7    don't even want to get out of bed.

8    Q.    Okay.  Is there an emotional component to crack

9    addiction?

10   A.    Yes.

11   Q.    Tell us about that.

12   A.    You cry about everything and if you're not crying you're

13   angry.

14   Q.    Let's return to guns for a moment.  Besides the time

15   that Moet held a gun to you did you see him use a gun with

16   anyone else?

17   A.    He threatened a guy with it.

18   Q.    Okay.  What were the circumstances?  Well, first of all,

19   were you there to see this?

20   A.    Yes.

21   Q.    What were the circumstances?

22   A.    It had to do with Ava.

23   Q.    Okay.  How so?  What did it have to do with Ava?

24   A.    I guess Ava used to work for this person and there was

25   problems.

Katelynn C.                                    60

1    Q.      Who is this person?

2    A.      C Rock.

3    Q.      Was there -- there was a problem in what regard?   What

4    caused Moet to come out with a gun if you know?

5    A.      We ended up calling him because C Rock was threatening

6    her.

7    Q.      So the women called Moet?

8    A.      Yes.

9    Q.      And how did Moet respond?

10   A.      He was pissed.

11   Q.      And what did he do?

12   A.      He went into the hotel room with C Rock and he held a

13   gun to him.

14   Q.      So staying with guns for a moment you say -- you saw

15   Moet with a gun at his waist?

16   A.      Yes.

17   Q.      You saw him a couple times with a gun in his hand?

18   A.      Yes.

19   Q.      With C Rock?

20   A.      Yes.

21   Q.      Sometimes he asked you to carry a gun for him?

22   A.      Yes.

23   Q.      Where were other places he would carry guns?

24   A.      He would keep the clip in the center console and the gun

25   in the trunk.

Katelynn C.                                    61

1   Q.      I'm sorry.

2   A.      He would keep one part of the gun in the trunk and one

3   part of the gun in the glove box.

4   Q.      One part of the gun in the trunk?

5   A.      Yes.

6   Q.      And one part in the glove box?

7   A.      Yes.

8   Q.      Which part would be in the trunk?

9   A.      The gun.

10  Q.      And which part would be in the glove box?

11  A.      The clip.

12  Q.      Okay.  Do you remember talking about this before?

13  A.      Yes.

14  Q.      Did you tell me it was the other way around?

15          MR. KAPLAN:  Objection, Your Honor.

16          THE COURT:  Objection overruled.  You can answer.

17  BY MR. DARROW:

18  Q.      You can answer the question.  I'm just trying to press

19  you on the clip and the gun and was pressing you as to how you

20  described that the last time we talked.

21  A.      I don't remember.

22  Q.      You don't remember.  Okay.  Now when you're meeting with

23  clients when you're in this escort business what was the

24  expectation as to what you would be willing to do with a

25  client?

Katelynn C.                                62

1    A.      Anything.

2    Q.      Okay.  Had you received instructions from Moet along

3    these lines?

4    A.      Yes.

5    Q.      What did he tell you?

6    A.      He talked to me about fetishes and stuff.

7    Q.      Well I mean I'm going to get to that, but you started

8    out saying you were expected to do anything.  Was there a

9    conversation about that?

10   A.      Pretty much whatever the client wanted.

11   Q.      Okay.  Was that something you were told?

12   A.      Yes.

13   Q.      Who told you that?

14   A.      Moet.

15   Q.      All right.  At some point were you asked to wear

16   costumes or masks, things like that?

17   A.      Yes.

18   Q.      Whose idea was that?

19   A.      Moet's.

20   Q.      Did he say -- what conversation did you have with him

21   about it?

22   A.      It would make us more money to change things up.

23   Q.      All right, and what did he ask you to do?

24   A.      He asked me to wear a mask.  There was an elephant -- an

25   edible elephant and then there was a couple others.

Katelynn C.                          63

1    Q.      Did he ever ask you to wear a pair of horns?

2    A.      Yes.

3    Q.      Were you ever photographed with these things on?

4    A.      Yes.

5    Q.      Who photographed you?

6    A.      Moet.

7    Q.      Approaching you with 51B.  Can you please take a look at

8    these photographs?  There's several of them.  Do you recognize

9    those photos?

10   A.      Yes.

11   Q.      Are those photos of you and other young women?

12   A.      Yes.

13   Q.      Who took the photos?

14   A.      Moet.

15   Q.      Are there photos in 51B showing you with wearing horns

16   on your head?

17   A.      Yes.

18   Q.      Posing in various ways?

19   A.      Yes.

20   Q.      And photos of you wearing masks?

21   A.      Yes.

22   Q.      In some of these photos there's someone with you.  Do

23   you recognize who is with you?

24   A.      I'm pretty sure it's Tori.

25   Q.      Who is Tori?

Katelynn C.                                    64

1   A.      Another girl that was working.

2   Q.      Okay, and how about there, is that you and Tori?

3   A.      Yes.

4   Q.      And then the pictures of two young women both wearing

5   masks is that you and who else?

6   A.      Nita.

7   Q.      Nita.  What was Nita's role in this business?

8   A.      She was another girl working.

9   Q.      Working for whom?

10  A.      Moet.

11          MR. DARROW:  Your Honor, we're not moving that yet,

12  but we'll seek its introduction later.

13          THE COURT:  Okay.

14  BY MR. DARROW:

15  Q.      I'm sorry to press you through this stuff.  Were you

16  ever asked to make a video?

17  A.      Yes.

18  Q.      Who asked you to make a video?

19  A.      Moet.

20  Q.      What did he say he wanted you to do?

21  A.      He wanted me to say my prices and act like I was talking

22  to a client on the phone.

23  Q.      Did you rehearse the video?

24  A.      Yes.

25  Q.      At his request?

                       Katelynn C.                          65

1   A.      Yes.

2   Q.      Who told you what to say?

3   A.      Moet.

4   Q.      Do you know what happened to that video?

5   A.      It got put on YouTube.

6   Q.      How do you feel about that?

7   A.      It's embarrassing.

8   Q.      I just want to show you a still from the video not the

9   video itself, but let's see if you recognize 44B.  What is

10  that?

11  A.      It's me.

12  Q.      Is that a still image of you from that video that Moet

13  made of you?

14  A.      Yes.

15  Q.      Thank you.  Your Honor we move 44B.

16          THE COURT:  Any objection to 44B?

17          MR. KAPLAN:  Could I see what it is, Judge?

18          MR. DARROW:  I withdraw the motion.  We'll link it up

19  later.

20          THE COURT:  Okay.  You're not proffering the exhibit

21  at this point?

22          MR. DARROW:  Correct.

23          THE COURT:  Okay.

24  BY MR. DARROW:

25  Q.      Did Moet make other videos of you?

Katelynn C.                              66

1  A.    Yes.

2  Q.    Please tell us of the other videos?

3  A.    He recorded us having sex.

4  Q.    Sex with who?

5  A.    With him.

6  Q.    Did he make videos of you giving him oral sex?

7  A.    Yes.

8  Q.    When -- you say your addiction was such you would get

9  sick everyday?

10  A.    I would need it to crawl out of bed.

11  Q.    Okay.  Did he ever ask you to do something when you were

12  sick and you needed drugs?

13  A.    Yes.

14  Q.    What did he ask you to do?

15  A.    To have sex with him.

16  Q.    What kind of sex?

17  A.    Oral sex and natural sex.

18  Q.    Did you have to do that when you were sick?

19  A.    Yes.

20  Q.    Had you asked him for drugs and said I'm sick I need

21  drugs?

22  A.    Yes.

23  Q.    And that was his response do this first?

24  A.    Uh-huh.

25  Q.    Did he give you the drugs afterwards?

Katelynn C.                                    67

1    A.     No.

2    Q.     About how long did this go on for this work you describe

3    with you and Moet and the other females?

4    A.     A couple months.

5    Q.     A couple months.  Do you remember when it stopped?

6    A.     It was the end of summer/early fall.

7    Q.     Of what year?

8    A.     2012.

9    Q.     Okay.  That same year?  It didn't go over to the next

10   spring?

11   A.     I don't remember.

12   Q.     Okay.  Did he ever use those photographs or images that

13   he had taken of you to send to you or anybody else if you know?

14   A.     I don't recall.

15   Q.     Did you ever say no when he asked you to do something?

16   A.     No.

17   Q.     Why not?

18   A.     I was scared of him.

19   Q.     Did you come to know a man named Brady Folks?

20   A.     Yes.

21   Q.     Who was Brady Folks?

22   A.     His cousin.

23   Q.     And what role did Brady Folks have in this business?

24   A.     He did whatever he asked him to do.

25   Q.     Whatever who asked him to do?

Katelynn C.                                    68

1   A.     Moet.

2   Q.     And what did you see Brady Folks do?

3   A.     He would get us hotel rooms.  He would carry drugs and

4   he was with us most of the time.

5   Q.     Did Brady Folks sometimes make trips to New York at

6   Moet's direction if you know?

7   A.     Yes.

8   Q.     Did you go with him?

9   A.     Yes.

10  Q.     Was Brady kind to you?

11  A.     Yes.

12  Q.     Did you develop feelings for him?

13  A.     Yes.

14  Q.     At some point did something happen when Moet found out

15  about that?

16  A.     He got mad.

17  Q.     What did he say?

18  A.     He told me I could go work for Brady.

19  Q.     I'm sorry.

20  A.     He told me I could go work for Brady.

21  Q.     Do you know whether there was any rule about whether you

22  were allowed to have relations with another man?

23  A.     We weren't allowed to.

24  Q.     So if we understand your testimony, Katelynn, this goes

25  on for some months.  How did you get out?

Katelynn C.                                      69

1   A.      I ended up going to New York.

2   Q.      Why did you go to New York?

3   A.      To get away from him and that's where I ended up going

4   to his mom's.

5   Q.      How did you end up going to his mom's if you're trying

6   to get away from him?

7   A.      When I went to New York with Brady I ended up meeting

8   his mom.

9   Q.      Okay, and did you -- who did you live with in New York?

10  A.      Moet's mom.

11  Q.      And what happened with your crack addiction?

12  A.      It got worse.

13          MR. DARROW:  Your Honor, may I approach?

14          THE COURT:  Yes.

15

16

17

18

19

20

21

22

23

24

25

Katelynn C.                         70

1  [Bench conference].

2          MR. DARROW:  We had a discussion about -- before the

3  trial about what happens next and the defense had objected to

4  testimony she was a prostitute in New York and after the

5  assault she quit.  The defense said that was prejudicial or

6  lack of proof of value.  The Government took the position it

7  explains how she got out of the business and it was probative,

8  and before going there I wanted to just check in with you.

9          THE COURT:  Okay.  So if I understand, she was in New

10  York with Brady who is related to Brian.  Stays at the mom's

11  house.  Gets engaged in prostitution.

12          MR. DARROW:  I think she will testify that she was

13  still a crack addict and the mom was a crack addict so she

14  prostituted to support both their habits.  She says she was in

15  contact with Folks in Vermont by phone, and while she was

16  working as a prostitute down there she got struck by a john and

17  decided to quit the life and gets out.

18          MR. KAPLAN:  That's an inappropriate question.  She

19  did get back into it.

20          THE COURT:  So she not working for the defendant when

21  she's down there?

22          MR. DARROW:  I'm not sure.  I mean she's with his

23  mother supporting the mother's habit and her own, but it's

24  different, of course, up in Vermont.

25          THE COURT:  I would skip over it completely.  It's

Katelynn C.                    71

not important as to why she stopped and clearly she's not

working for the defendant any more and it's confusing to a jury

as to whether because it's the mother and because it's Brady

there's a connection.  So unless you have some connection I

would skip it.

          MR. DARROW:  Can I check in with counsel because I

think I'm about to wind up?

          THE COURT:  Okay.

[End of bench conference]

                    Katelynn C.                        72

1    BY MR. DARROW:

2    Q.    Okay.  Katelynn, we're almost done.  You testified

3    earlier that you never said no because you were afraid.  Why

4    were you afraid?

5    A.    Because I saw him hit other girls.

6    Q.    And the guns?

7    A.    Yeah.

8              THE COURT:  Sorry.  Did you respond to that?

9              THE WITNESS:  Yes.

10             THE COURT:  Yes.

11   BY MR. DARROW:

12   Q.    How tall are you?

13   A.    5'2".

14   Q.    Do you know how tall he is?

15   A.    6 something.

16   Q.    Did Moet ever say anything about what might happen to

17   you if you got caught by police?

18   A.    I would end up going to jail.

19   Q.    Did he tell you that?

20   A.    Yes.

21   Q.    Were you told that on more than one occasion?

22   A.    Yes.

23   Q.    Did you hear him tell other girls that too?

24   A.    Yes.

25   Q.    So a number of years have gone by since then?

Katelynn C.                                73

1   A.      Yes.

2   Q.      Did you manage to clean up?

3   A.      Yes.

4   Q.      How did you do that?

5   A.      I ended up getting clean by myself.

6   Q.      About how long have you been clean?

7   A.      About eight months.

8   Q.      Was that a struggle?

9   A.      Yes.

10  Q.      Do you remember when law enforcement officers first

11  approached you about this?

12  A.      Yes.

13  Q.      Perhaps an FBI interview?

14  A.      Yes.

15  Q.      Were you completely truthful with them?

16  A.      No.

17  Q.      Why is that?

18  A.      I was scared I was going to go to jail.

19  Q.      Were you scared of Moet too?

20  A.      Yes.

21  Q.      Now after that at some point you testified in the Grand

22  Jury, right?

23  A.      Yes.

24  Q.      Was there a part of the story that you testified falsely

25  about?

Katelynn C.                                    74

1   A.      Yes.

2   Q.      What part was that?

3   A.      About me working for him.

4   Q.      Okay.  Did you not tell the truth about the fact that

5   you had been working as a prostitute before you met him?

6   A.      Yes.

7   Q.      Now during the process of getting clean have you

8   relapsed on occasion?

9   A.      Yes.

10  Q.      What does it mean to relapse?

11  A.      You end up doing drugs again.

12  Q.      Do you remember whether or not you did drugs before your

13  Grand Jury testimony?

14  A.      Yes.

15  Q.      You're off drugs now?

16  A.      Yes.

17  Q.      Are you in treatment?

18  A.      Yes.

19  Q.      Just give us a brief explanation of what programs you're

20  in.

21  A.      I am going back to school.  I'm in drug and alcohol

22  treatment.  I'm in parenting classes.

23  Q.      Okay.  You testified that when all this started out you

24  had romantic feelings for Moet?

25  A.      Yes.

                    Katelynn C.                        75

1   Q.    Did that change over time?

2   A.    Yes.

3   Q.    Okay, and by the time it was finished up what were your

4   feelings?

5   A.    I hated him.

6   Q.    And looking back on it now what do you think happened?

7   A.    I noticed he was telling the same thing to every girl.

8   Q.    I'm sorry.

9   A.    I noticed he was telling every girl the same thing.

10  Q.    But in terms of you and your experience falling in love

11  with him at the beginning what do you think happened?

12  A.    I don't remember.

13  Q.    Do you think he played you?

14  A.    Yeah.

15  Q.    Now have you been receiving funds from the U.S.

16  Attorney's Office?

17  A.    The what?

18  Q.    Do you remember how much?  I had thought -- do you think

19  you were?

20  A.    I don't know if I was.

21  Q.    Okay.  You have been getting help from a program in the

22  Burlington area that helps young mothers with problems; is that

23  right?

24  A.    Yes.

25        MR. DARROW:  Just a second?  Thank you.

```
                    Katelynn C.                      76
 1              THE COURT:  Okay.  Cross examination.
 2                      CROSS EXAMINATION
 3   BY MR. KAPLAN:
 4   Q.      So do you know who Tim Galloway is?
 5   A.      Who?
 6   Q.      Tim Galloway?
 7   A.      No.
 8   Q.      I want to explore a little bit what you were doing when
 9   you met Brian.  You said you were with Brian for about two
10   months?
11   A.      I was with him longer.
12   Q.      A little longer, okay, and I guess you went to New York
13   in 2013?
14   A.      I thought it was 2012.
15   Q.      Okay.  Sometime between 2012 and 2013 you went to New
16   York City?
17   A.      Yes.
18   Q.      And you said you met Brian because he was one of your
19   tricks?
20   A.      Yes.
21   Q.      And so you were working as a prostitute at the time?
22   A.      Yes.
23   Q.      And I think you said you were working for someone else?
24   A.      Yes.
25   Q.      Who was that?
```

Katelynn C.                                77

1    A.      I don't remember.

2    Q.      Can you describe the person?

3    A.      He was a junkie.  That's all I remember.

4    Q.      And were you living with him?

5    A.      No.  I was living with my mother.

6    Q.      And you were working for this person or with this

7    person?

8    A.      Yes.

9    Q.      And would you give him money?

10   A.      We would both end up getting drugs.

11   Q.      So you would sort of split the money with him?

12   A.      We were buying drugs.

13   Q.      How long did you do that for?

14           MR. DARROW:  Objection, Your Honor.  We went over

15   this subject before trial and I had understood that we weren't

16   going to be going very deep into this on cross.

17           THE COURT:  Well, but it's a matter of degree.  It

18   seems to me that he can ask certain questions prior to her

19   connection with Mr. Folks.  So objection overruled, but I would

20   not focus at length upon that relationship.

21   BY MR. KAPLAN:

22   Q.      So do you recall how long you did that for?

23   A.      About a month.

24   Q.      And when you did that did you advertise?

25   A.      No.

Katelynn C.                                    78

1   Q.    How did Brian meet you?

2   A.    He knew the person.

3   Q.    He knew the person that you were working with?

4   A.    Yes.

5   Q.    And in fact didn't Brian help that person like give you

6   rides and stuff on a few occasions?

7   A.    No.

8   Q.    I mean had you met Brian a few times before you started

9   working with him?

10  A.    I met him once.

11  Q.    So he knew the person that you were working with and do

12  you know how he ended up with you?

13  A.    Huh?

14  Q.    Do you know how Brian ended up seeing you?

15  A.    He came as a trick.

16  Q.    So the person you were working with referred Brian to

17  you?

18  A.    Yes.

19  Q.    And had you advertised pictures at that time?

20  A.    No.

21  Q.    You didn't have any pictures?

22  A.    No.

23  Q.    So sort of a word of mouth thing?

24  A.    Yes.

25  Q.    And I think you testified a little while ago that you

                    Katelynn C.                          79

1    went before the Grand Jury?

2    A.      Yes.

3    Q.      You have to answer?

4    A.      Yes.

5    Q.      And that was on March 23rd of 2017?

6    A.      I think.

7    Q.      And you wouldn't know the exact date, but around that

8    time?

9    A.      Yes.

10   Q.      And do you recall that you were pretty clear that you

11   told the Grand Jury that you were the one that asked Brian if

12   you could make money?

13   A.      I was trying to cover myself.

14   Q.      So you did say that to the Grand Jury?

15   A.      Yes.

16   Q.      And then you were asked did you know what that meant and

17   you said yes it meant that I was going to be in prostitution?

18   A.      Yes.

19   Q.      And so at least as far as the Grand Jury knew you were

20   the one that asked Brian?

21   A.      Yes.

22   Q.      You talked about videos, but you had had videos done

23   before with other people, hadn't you?

24   A.      Huh?

25   Q.      Didn't you have videos taken with you with other

Katelynn C.                                    80

1   individuals before Brian?

2   A.    No.

3   Q.    When you were 16 in a motel room didn't your boyfriend

4   take a video of you in the bathtub?

5   A.    Yes.

6   Q.    And you were nude?

7   A.    Yes.

8   Q.    And you did that voluntarily?

9   A.    Yes.

10  Q.    So the video that Brian took that wasn't the first time

11  you did that?

12  A.    No.

13  Q.    And the first time that you did do that you didn't have

14  a problem doing that?

15  A.    No.

16  Q.    Because that was someone that you thought you liked?

17  A.    Yes.

18  Q.    So you understand today that you're testifying under

19  oath?

20  A.    Yes.

21  Q.    What does that mean?  What does that mean to you?

22  A.    That if I lie, I can go to jail for perjury.

23  Q.    And I think you just said a few minutes ago that you

24  went to the Grand Jury.  Were you under oath then?

25  A.    Yes.

                    Katelynn C.                         81

1    Q.     And did you understand back then what it means to be

2    under oath like I just said today?

3    A.     No.

4    Q.     So when you raised your right-hand and said you swear to

5    tell the truth you didn't know what that meant?

6    A.     I didn't.

7    Q.     Okay.  Isn't it fair to say that you sort of picked and

8    chose what you told the Grand Jury?

9    A.     Yes.

10   Q.     Isn't it fair to say that you lied extensively under

11   oath?

12   A.     Not extensively.  I lied about some things.

13   Q.     Well isn't it fair to say that you lied about most

14   things?

15   A.     Not most.  Only some.

16   Q.     Well didn't you tell the Grand Jury that the way you met

17   Brian when you saw him downtown you thought he was kind of neat

18   and struck up a conversation with him.  Didn't you say that?

19   A.     Yes.

20   Q.     And that wasn't true?

21   A.     No.

22   Q.     And didn't you tell the Grand Jury that you two flirted

23   with each other for a while, you would go out for dinner, he

24   would pay for the dinner and give you gifts?

25   A.     Yes I did say that.

Katelynn C.                                    82

1    Q.      And that's not true?

2    A.      No.

3    Q.      And you lied to Brian when you said you were 18 when you

4    weren't?

5    A.      Yes.

6    Q.      And when -- is it fair to say when you first met Brian

7    you weren't in love with him?

8    A.      When I first met him, no.

9    Q.      And when you asked him if you could work for him you

10   weren't in love with him then?

11   A.      I didn't ask him to work.

12   Q.      Pardon me.

13   A.      I didn't ask him to work.

14   Q.      Well that's what you told the Grand Jury.

15   A.      That's what I told the Grand Jury, yes.

16   Q.      So how do we know if what you're saying today is true or

17   what you said back then is true?

18   A.      I'm sober now.

19   Q.      So when you went to the Grand Jury you had been using

20   crack cocaine?

21   A.      Yes.

22   Q.      But that didn't really affect your ability to tell the

23   truth, did it?

24   A.      I was scared I was going to go to jail.

25   Q.      And isn't that the same reason you're here today because

Katelynn C.                                    83

1    you're afraid you could go to jail if you don't testify?

2    A.     No.

3    Q.     Didn't you tell the Grand Jury and the prosecutor that

4    you were very afraid about going to jail?

5    A.     I am.  I was afraid of going to jail, yes.

6    Q.     Same as you are today?

7    A.     Yes, but that's not why I'm here.

8    Q.     You were subpoenaed, right, by the prosecutors?

9    A.     I think so.  I don't know.

10   Q.     And do you recall telling the Grand Jury that you had

11   never worked as a prostitute before?

12   A.     Yes.

13   Q.     And that wasn't true?

14   A.     No it wasn't.

15   Q.     And I know we went over this slightly, but you told the

16   Grand Jury that you asked Brian if you could make money, you

17   knew what that meant, and do you recall when they asked you

18   what Brian's response was he said he was okay with that.  Do

19   you recall that?

20   A.     Yeah, but I was lying.

21   Q.     Well either way when Brian and you had a conversation

22   about you working with him he agreed to it and you agreed to

23   it?

24   A.     Yes.

25   Q.     And I guess your testimony is that you agreed to it the

Katelynn C.                                84

1    first time you had the conversation?

2    A.    Yes.

3    Q.    And one of the reasons was that you would have a steady

4    supply of drugs?

5    A.    Yes.

6    Q.    And you pretty much did for the period that you were

7    there?

8    A.    Yes.

9    Q.    And so your expectation that you would have those

10   available turned out to be true?

11   A.    Yes.

12   Q.    And another reason you agreed to it was Brian said he

13   would act as a bodyguard for you?

14   A.    Yes.

15   Q.    And that did happen?

16   A.    Yes.

17   Q.    So that -- that met your expectation?

18   A.    Yes.

19   Q.    And I think -- do you recall saying that you pretty much

20   got -- like if you made a thousand dollars, you would give

21   Brian five hundred, then you had the other five hundred to do

22   whatever the -- whatever you wanted with?

23   A.    Yes.

24   Q.    And frequently you would buy the drugs from Brian?

25   A.    Yes.

Katelynn C.                                          85

1   Q.     And that you got what you were entitled to?

2   A.     Yes.

3   Q.     And the only time that I think you said that Brian

4   withheld drugs from you was when he thought you were just too

5   addicted?

6   A.     When I was getting too small, yes.

7   Q.     And it turns out was that in your best interest to not

8   use as much?

9   A.     Yeah.

10  Q.     You told the Grand Jury that you had been sober for four

11  years.  Do you recall that?

12  A.     The longest I've been sober is five years.

13  Q.     When you went to the Grand Jury you said you were sober

14  for four years?

15  A.     At the time I was sober for four years, yes.

16  Q.     But I thought you testified that you actually used drugs

17  that morning?

18  A.     I did.

19  Q.     So does that make you sober or not?

20  A.     I was using at the time.

21  Q.     You told the Grand Jury that you had only used crack one

22  time, but that wasn't true, right?

23  A.     No.

24  Q.     I think you testified on direct that you had been using

25  drugs for a long time?

Katelynn C.                                    86

1    A.    Yes.

2    Q.    When you were in that motel room with your boyfriend

3    when you were 16 both of you were smoking weed and using drugs?

4    A.    Yes.

5    Q.    So is it fair to say you did a lot of things when you

6    were using drugs that as you look at yourself today you

7    wouldn't do?

8    A.    Yeah.

9    Q.    Is that a fair statement?

10   A.    Yes.

11   Q.    And you have been through a lot because of your drug

12   use?

13   A.    Yes.

14   Q.    It goes without saying, right.  How old are you now?

15   A.    24.

16   Q.    And how long have you been clean?

17   A.    Eight months right now.

18   Q.    And you must notice the difference?

19   A.    Yes.

20   Q.    I think I recall you told the Grand Jury that Brian had

21   never hit you?

22   A.    Yes I did say that.

23   Q.    And I believe you stated previously that Brian had a gun

24   and sometimes he asked you to carry it?

25   A.    Yes.

Katelynn C.                                 87

1   Q.      But is it fair to say that you never said before today

2   in court that Brian ever pointed a gun at you?

3   A.      In court I never said it, no.

4   Q.      And you had several interviews with police before today?

5   A.      Yes.

6   Q.      And you never told any of them that Brian pointed a gun

7   at you?

8   A.      No.

9   Q.      Is that something you just remembered today in court?

10  A.      No.

11  Q.      And you never said before today that Brian pointed a gun

12  at someone else, have you?

13  A.      No.

14  Q.      So you went to the Grand Jury and you never said that.

15  You were interviewed several times by the police and the

16  prosecutors after that.  In the police reports you never said

17  any of those things before?

18  A.      I only said it to my prosecutor, the one I had been

19  talking to.

20  Q.      And is that Mr. Darrow?

21  A.      Yes.

22  Q.      And so the only time you have said that was preparing

23  for today's testimony?

24  A.      Yes.

25  Q.      So after three years, or actually more like seven years,

Katelynn C.                                            88

1  after seven years it dawned on you these two things had taken
2  place?
3  A.     I had always known they had taken place.
4  Q.     So it just occurred to you to say it at this point?
5  A.     I got asked and I told the truth.
6  Q.     Is it fair to say that you were free to come and go as
7  you please?
8  A.     I really don't know.
9  Q.     I mean you left, right?
10 A.     Yes.
11 Q.     You went to New York City?
12 A.     Yes.
13 Q.     And you haven't seen Brian since?
14 A.     No.
15 Q.     That was in 2012/2013?
16 A.     Yes.
17 Q.     And there weren't any repercussions from Brian about
18 that?
19 A.     What do you mean?
20 Q.     I mean he didn't come down and look for you and try to
21 drag you back?
22 A.     No.
23 Q.     So you said you were -- well let me back up.  So when
24 you figured you had done this long enough and you wanted to
25 leave you left --

1   A.      He wasn't around when I left and I pretty much ran away.

2           MR. KAPLAN:  Can I have a moment, Judge?

3           THE COURT:  Yes.

4           MR. KAPLAN:  Judge, would this be a good time to

5   break?

6           THE COURT:  All right.  It is 12 o'clock.  Let's take

7   our break at this point and I think the jury room is fine for

8   you to return and we will return to court at 1:15.

9   [Recess]

10

11                  C E R T I F I C A T I O N

12

13       I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16                                   _____

17

18                                   _JoAnn Q. Carson_

19   May 1, 2019

20   Date                            _____

                                     JoAnn Q. Carson, RMR,CRR

21

22

23

24

25