UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94



JURY TRIAL
Wednesday, May 1, 2019
Burlington, Vermont



BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge



APPEARANCES:

    WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
        MATTHEW T. GRADY, ESQ., Assistant United States
        Attorneys, Federal Building, Burlington,
        Vermont; Attorneys for the United States

    MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
        Suite 405, 95 St. Paul Street, Burlington,
        Vermont; Attorney for the Defendant

    NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
        Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

## **I N D E X**

### **E X A M I N A T I O N**

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **KATELYNN C.** | | |
| Cross by Mr. Kaplan | 4 | 11 |
| Redirect by Mr. Darrow | 21 | 5 |
| Recross by Mr. Kaplan | 38 | 7 |
| **DANIEL MERCHAND** | | |
| Direct by Mr. Darrow | 42 | 23 |
| | 56 | 8 |
| Voir Dire by Ms. Sen - Re: Exhibits 66, 81, 87, 85 | 54 | 8 |
| Cross by Ms. Sen | | |
| **JASMINE L.** | 57 | 25 |
| Direct by Ms. Savner | 60 | 1 |
| | 91 | 23 |
| Voir Dire by Ms. Sen - Re: Exhibit 46 | 90 | 11 |
| Cross by Ms. Sen | 104 | 23 |
| **DANIELLE M.** | | |
| Direct by Mr. Grady | 108 | 19 |

### **E X H I B I T S**

| GOVERNMENT'S EVIDENCE | DESCRIPTION | IN |
|---|---|---|
| 45 | Photographs of multiple girls | 93 |
| 46 | Photographs of Hannah A. | 91 |
| 59 | Video from search warrant execution at 96 Ethan Allen Parkway, #8 | 45 |
| 60 | Video from search warrant execution at | 45 |

96 Ethan Allen Parkway, #8

# I N D E X

**E X H I B I T S**

| GOVERNMENT'S EVIDENCE | DESCRIPTION | IN |
|---|---|---|
| 60A | Video from search warrant execution at 96 Ethan Allen Parkway | 48 |
| 61 | Photographs from search warrant execution at 96 Ethan Allen Parkway | 48 |
| 66 | Bag containing rue21 and contents | 56 |
| 79 | Hitachi hard drive from HP computer | 57 |
| 81 | Bag containing silver digital scale, stickers, baggies, zip and razor blade | 56 |
| 85 | Bag containing bottle of Inositol and coffee grinder with residue | 56 |
| 86 | Bag containing brown paper Aveda bag and two cardboard boxes of wax baggies | 52 |
| 87 | Bag containing holster, leatherette planner, Tom Tom and other items | 56 |
| 97 | Photograph of 53 East Spring Street, Winooski | 114 |
| 100 | Photographs of Motel 6 and interior of room | 137 |
| 101 | Photograph of North Star Motel | 123 |

```
1    WEDNESDAY, MAY 1, 2019
2    (The following was held in open court with the jury
3    present at 1:20 p.m.)
4              THE COURT:  Okay.  Good afternoon.
5         All right, Mr. Kaplan?
6              MR. KAPLAN:  Thank you, Judge.
7                   KATELYNN C.,
8         having previously been sworn by the courtroom
9         deputy, was further examined and testified as
10         follows:
11              CONTINUED CROSS EXAMINATION
12    BY MR. KAPLAN:
13    Q    So I want to explore with you for a minute how all
14    this started, and you understand you are under oath?
15    A    Yes.
16    Q    Just like you were with the grand jury?
17    A    Yes.
18    Q    Except today you decided to tell the truth; is that
19    your testimony?
20    A    Yes.
21    Q    So I am a little concerned that -- I shouldn't say
22    that.
23         When I asked you what the name of the person was
24    that you were prostituting for, buying drugs for him, I
25    am assuming you had a relationship with him, you said
```

1    you didn't remember his name?

2    A    No.

3    Q    When I asked you to describe him, you weren't able

4    to describe him?

5    A    I don't remember.

6    Q    But you -- you are not having a problem remembering

7    everything about Brian that the prosecution has asked

8    you?

9    A    Right.

10   Q    So you don't remember who this former boyfriend

11   was; is that a fair statement?

12   A    I know who the person was; my boyfriend.

13   Q    Did you have relations with him?

14   A    No.

15   Q    So Tim Galloway is a witness in this case, and you

16   understand that he was arrested by the Burlington Police

17   Department?

18   A    I didn't know.

19   Q    And that you were listed as a witness and a

20   conspirator?

21        You have to answer yes or no.

22   A    I don't know.

23   Q    So -- and you were living at his house?

24   A    No.

25   Q    So as you sit here in court today, under oath,

```
1    you're sure that you were not living at Tim Galloway's
2    house?
3    A    I wasn't.  I don't even know who you are talking
4    about.
5    Q    And when I asked you who is C-Rock, you are telling
6    me you don't know who that is?
7    A    I do know who C-Rock is.
8    Q    And wasn't C-Rock one of a group of people that you
9    were working with?
10   A    No.
11   Q    Who was C-Rock?
12   A    He was -- he -- I know another girl that worked for
13   him.
14   Q    As a prostitute?
15   A    Yes.
16   Q    And who was that?
17   A    It was Ava.
18   Q    Ava?
19   A    I don't know her first name.  I know her as Ava.
20   Q    So Ava worked for C-Rock?
21   A    Yes.
22   Q    And then you are saying that Ava left C-Rock and
23   came to work for Brian?
24   A    Yes.
25   Q    And you knew Ava before Brian?
```

```
1    A    No.

2    Q    You knew her when she was working for C-Rock?

3    A    No, I didn't.

4    Q    You knew Tori before you met Brian?

5    A    (Witness shakes head.)

6    Q    You have to answer yes or no.

7    A    No.

8    Q    Wasn't Tori working for C-Rock before she -- before

9    she worked with Brian?

10   A    I don't even know who Tori is.

11   Q    And -- and Shorty, the same thing.  Wasn't Shorty

12   working for C-Rock before she was with Brian?

13   A    No.  I met Shorty with him.  With Brian.

14   Q    You said that -- you were talking about Brian

15   pointing a gun at someone.  You said that Brian was

16   upset that -- what did you say, that Brian was upset

17   because this person -- this person being -- this person

18   took someone away from --

19   A    He never took her away.  There was problems because

20   she worked for C-Rock before Brian, and there was

21   problems.

22   Q    Isn't the real truth, though, that C-Rock sent

23   someone over to where Brian and you were, and it was you

24   that -- that C-Rock was upset with, that you had left

25   him, you still owed him money?
```

```
1    A    No.  That was Ava.

2    Q    And isn't it true that Brian called C-Rock and

3    said, "What do you want me to do with this guy that's

4    over here threatening me," and Brian just let him go?

5    A    No.

6    Q    Do you remember that phone call?

7    A    There was no phone call.

8    Q    And your testimony is that it was not you that was

9    working for C-Rock.  It was -- it was Brian -- it was

10   Ava?

11   A    Yes.

12   Q    And how do you know that?

13   A    I had --

14   Q    Like how do you know Ava was working --

15   A    Because I was there during the argument.

16   Q    If you knew C-Rock, when did you meet him?

17   A    I met him through somebody else.

18   Q    Who?

19   A    One of my family members.

20   Q    Who was that?

21   A    Selena, because her husband and him are friends.

22   Q    So you met C-Rock before you met Brian?

23   A    Yes.

24   Q    And you spent time with C-Rock before you met

25   Brian?
```

1    A    I have never spent time with him.

2    Q    But you were associated with him and several other

3    people that were with him?

4    A    No.

5    Q    Tell me -- tell me how -- how you were introduced

6    to him, please.

7    A    How was I introduced to him?  Because he had been

8    to my house --

9         MR. DARROW:  I'm going to impose an objection.

10   I don't understand what all these questions about C-Rock

11   have to do with either the direct or credibility, and I

12   think they are just confusing and --

13        THE COURT:  Well, it's related to credibility.

14   It's related to the initiation of the relationship

15   between the witness and Brian, so objection overruled.

16        You can answer the question.

17   BY MR. KAPLAN:

18   Q    I mean, here's what I am asking, which is, you are

19   working for someone as a prostitute.  You are buying

20   them drugs.  You have a relationship with them.  And you

21   want this jury to believe that you don't know his name?

22   A    I don't remember the person's name.

23   Q    And you want this jury to believe that -- that you

24   can't describe him?

25   A    All I remember is that he was skinny and black.

```
1    That's all I remember.

2    Q    And --

3    A    I don't remember the person's name.  I never lived

4    with the person.

5    Q    And did you go over to where C-Rock was living?

6    A    I never knew where C-Rock lived.

7    Q    Where did you see him?

8    A    At my cousin's house, because her husband and

9    C-Rock were friends.  I only seen him two or three

10   times.

11   Q    And had you met other people that are friends with

12   C-Rock?

13   A    No.

14   Q    And is it your testimony that the police never

15   questioned you about Tim Galloway?

16   A    They never questioned me.

17   Q    When you first met Brian, how was he dressed?

18   A    He was in regular street clothes.

19   Q    Can you describe him?

20   A    He was wearing jeans and a T-shirt.  I don't

21   remember the color of the T-shirt, but I remember he was

22   wearing jeans and a T-shirt.

23   Q    And you are saying that before you met Brian when

24   you were working as a prostitute, you never used

25   Backpage?
```

1    A    Huh?

2    Q    You said -- you testified you never used Backpage

3    before you met Brian?

4    A    Right.

5    Q    Let me show you what's been marked as Defendant's

6    Exhibit 078-2, Bates No. 002381.

7              MR. DARROW:  Your Honor, I don't think we have

8    a copy of that.  May we take a look?

9              THE COURT:  Okay, but as soon as she

10   identifies it and you offer it.

11             MR. KAPLAN:  I am going to let him look at it.

12             THE COURT:  All right?  You going to give it

13   to the government?

14             MR. KAPLAN:  Sure.

15   BY MR. KAPLAN:

16   Q    So let me show you what's been marked 078-2 and ask

17   you, is that you in that -- in that picture?

18   A    Yes.

19   Q    Okay.  And is that a screenshot -- would you say

20   that represents a screenshot of a Backpage ad?

21   A    I don't know.

22   Q    Well, do you recognize this -- this ad?

23   A    I remember those pictures.

24   Q    And do you remember the ads?

25   A    (Witness shakes head.)

1    Q    Wasn't this taken before you ever met Brian?

2    A    I don't think so.

3    Q    Isn't it fair to say these pictures were taken

4    before you ever met Brian?

5    A    I never worked on Backpage before Brian.

6    Q    Well, you said you didn't recognize this as a

7    Backpage.  I am just asking you, isn't it true that

8    those pictures were taken before you ever met Brian?

9    A    I don't think so.

10   Q    You are not sure?

11   A    Uh-uh.

12   Q    So these pictures and what you just indicated was a

13   Backpage ad, you don't know if those were taken before

14   or after you met Brian.  Is that right?

15   A    Right.

16   Q    And you don't know -- do you know who took the

17   pictures?

18   A    I -- honestly, I don't remember those pictures,

19   honestly.  Like I don't remember them.  Like they look

20   familiar.

21   Q    So you can remember how Brian was dressed seven

22   years ago when you met him, but you can't describe the

23   person you were with?

24   A    All I remember is the person was black and skinny,

25   like that's literally all I remember.

```
1    Q    And where was he from?
2    A    I don't know.
3    Q    What did you guys talk about?
4    A    We were both addicts, and I did what I wanted --
5    like what I needed to do to get drugs.
6    Q    So whatever you had to do to get drugs, that's what
7    you did?
8    A    Yes.
9    Q    And that didn't change even when you were with
10   Brian; isn't that right?
11   A    Right.
12   Q    And isn't it true that it wasn't Brian that gave
13   you the name Pinky?  That you had that name before you
14   ever met Brian?
15   A    No.
16   Q    Do you recall what you said in the grand jury
17   testimony as to how you got that name Pinky?
18   A    I don't recall.
19   Q    Did you ever -- while you were working with Brian,
20   did you ever leave him and come back?
21   A    No.
22   Q    And what dates were you with Brian?
23   A    I don't exactly remember.
24   Q    Generally?
25   A    I don't.  They know it was spring to maybe fall.  I
```

1      really don't remember.

2      Q      So fall of 2012?

3      A      Yeah.  Like I really don't remember.

4      Q      And how long were you with him?

5      A      I know it was a couple months.

6      Q      So let me show you what's been marked as

7      Defendant's Exhibit 0781 and ask you if you recognize

8      the picture that's on the bottom.  Do you recognize

9      that?

10     A      Yeah.

11     Q      That's -- that's a picture of you and Nikki?

12     A      Nita.

13     Q      Nita?  Okay.

14            MR. KAPLAN:  Your Honor, I would move to admit

15     Defendant's Exhibit 0781.

16            THE COURT:  Any objection?

17            MR. DARROW:  I haven't seen it.

18     Your Honor, our concern is only that the photo that

19     counsel is referring to is about one inch by three

20     quarters of an inch on a page with a lot of computer

21     information and metadata and other things.  And we don't

22     object to the picture coming in.  I think it's actually

23     one of the pictures that's in a government exhibit she

24     already looked at, but it's all the rest of the material

25     on it that -- there's no explanation --

1          THE COURT:  So what is the metadata that's on

2    there, Mr. Kaplan?  And she -- this is not being offered

3    to relate to the metadata at all.

4          MR. KAPLAN:  Actually, I can -- I can

5    certainly block out what's above the picture.

6          THE COURT:  Okay.

7          MR. KAPLAN:  But what I am interested in is

8    the dates that are associated with the picture.

9          THE COURT:  All right.

10          MR. KAPLAN:  So I will admit this with the

11    understanding I'm going to block out, before it goes to

12    the jury, everything except what's below here.

13          THE COURT:  Okay.

14          MR. DARROW:  And I don't understand what's --

15    what he means by below here, whether metadata and other

16    computer information is going in or not.

17          THE COURT:  Well, apparently there's some

18    reference to the date of the photograph.

19          MR. DARROW:  In which case I would think he

20    should just ask her about the date, not show her

21    metadata that she's not -- there's not foundation to.

22          MR. KAPLAN:  Well, I tend to like to

23    introduce --

24          THE COURT:  Well, right.  He is not going to

25    be showing the metadata.  He is going to be crossing it

```
1    out in the exhibit, but at least as to the date of the

2    photograph, the linkage between the date and the

3    photograph, have you established that?

4              MR. KAPLAN:  Yes.

5              THE COURT:  How have you established that?

6              MR. KAPLAN:  I can as soon as it's introduced.

7    My preference is to ask questions of a document that's

8    been introduced into evidence.

9              THE COURT:  Well, okay.  But can --

10             MR. KAPLAN:  I can do it beforehand.

11             THE COURT:  Yeah, if you can just establish

12   the date so then you get the date and the photograph in.

13             MR. KAPLAN:  All right.

14             MR. DARROW:  And, your Honor, I apologize.  I

15   can follow up.  When counsel said he will only show her

16   the things below here, below there is where all the

17   metadata is.  So, I mean, he -- that's what he proposes

18   to show her.

19             MR. KAPLAN:  Judge, may I show you this?

20             THE COURT:  Okay.

21             MR. KAPLAN:  It's just the information next to

22   the picture that I am interested in.

23             THE COURT:  All right.  The exhibit that's

24   being proffered by the defense is the photograph and

25   also the date which is on this Bates 2370, nothing above
```

1    that.  The other material is relevance.

2         So what you are offering is just the photograph and

3    the date, and everything else should be removed.  All

4    right?

5              MR. KAPLAN:  Well, the photograph and what's

6    to the right of it, but nothing above it.

7              THE COURT:  Well, what is relevant to the

8    right of it?  It says title, add a title; authors, add

9    an author.

10             MR. KAPLAN:  You're right, Judge.  It's just

11   the date I care about.

12             THE COURT:  All right.  So it's not offered

13   yet, but it's -- the offer, as I understand it, is

14   limited to the photograph and a date, which is right

15   next to the photograph, and everything else would be

16   removed.

17             MR. DARROW:  And I don't understand what

18   foundation there is for the date that appears on that.

19             THE COURT:  Well, that's what I asked him, and

20   he was going to establish that.

21             MR. DARROW:  A foundation for the date?

22             THE COURT:  Yes.

23             MR. DARROW:  Okay.

24             MR. KAPLAN:  Well, Judge, the witness

25   testified that this is a photograph of her.

```
1                    THE COURT:  Yes.
2                    MR. KAPLAN:   Okay.
3      BY MR. KAPLAN:
4      Q     And isn't it fair to say that that photograph was
5      taken on July 14th of 2013?
6      A     2013 I was in New York City.  That's why I don't
7      understand why that says 2013.  I worked with him in
8      2012 and I was 17.
9      Q     Okay.  So if -- if there's a photograph and next to
10     it there's metadata, and the photograph you just
11     testified to is you and your boyfriend --
12     A     Yes.
13     Q     -- and if it says "date taken 7/14/2013," you are
14     saying that that can't be correct?
15     A     Exactly.
16     Q     Because -- so when did you leave Brian?
17     A     It was in the fall of -- I'm pretty sure it was the
18     fall of 2012, because I was already in New York City
19     with my child's father in 2013.
20     Q     Before -- before you ever worked for Brian,
21     wouldn't he take you different places to buy crack?
22     A     What?
23     Q     Didn't he take you to different places to buy crack
24     when you needed it, before you actually began working
25     for Brian?
```

1    A    No.

2    Q    Have you ever used heroin?

3    A    I tried it once when I was 13.

4    Q    You testified that the split between Brian and you

5    was 50/50?

6    A    Yes.

7    Q    And would you agree that that's standard on the

8    street?

9    A    Huh?

10   Q    That's a standard arrangement?

11   A    I don't know.

12   Q    How much did you charge Brian when you met him for

13   the first time?

14   A    A hundred.

15   Q    A hundred.  For how long?

16   A    I don't remember how long it was.

17   Q    I think your testimony was that Brian put the gun

18   in the trunk and the clip in the glove compartment?

19   A    I'm pretty sure it was the other way around.

20   Q    Well, you first testified that it was -- the gun

21   was in the trunk and the clip was in the glove

22   compartment; do you recall that?

23   A    No.

24            THE COURT:  Well, so your testimony is the gun

25   was in the glove compartment or the clip was in the

1   glove compartment?

2           THE WITNESS:  It was the gun, and the clip was

3   in the trunk.

4   BY MR. KAPLAN:

5   Q    Do you recall this morning saying that the gun was

6   in the trunk and the clip was in the glove compartment?

7   A    I'm pretty sure I said different.

8   Q    Isn't it fair to say there was never a video of

9   Brian and you having sex?

10  A    That's a lie.

11  Q    And is there a video of you wrestling with a dog?

12  A    I don't know.

13  Q    And did you do that?

14  A    There was a dog.

15  Q    And were you not dressed when you were doing that?

16  A    I don't know.

17  Q    Why is it that you don't know?  You don't remember?

18  A    There was a dog, and I used to walk around naked,

19  and, yeah, I played with the dog, but I didn't know

20  there was a video.

21  Q    And you didn't -- your testimony is pretty clear

22  that you did not know Tori before you met Brian?

23  A    Right.

24           MR. KAPLAN:  Could I have a moment, Judge?

25           THE COURT:  Yes.

```
1              (Brief pause.)
2              MR. KAPLAN:  I have nothing further, Judge.
3              THE COURT:  Okay.  Any redirect?
4              MR. DARROW:  Yes, thank you.
5                    REDIRECT EXAMINATION
6   BY MR. DARROW:
7   Q    Katelynn, you were asked a lot of questions about
8   your testimony in the grand jury and whether you were
9   lying or whatnot?
10  A    Yes.
11  Q    I want to follow up with a couple questions about
12  your grand jury testimony, okay --
13  A    Go ahead.
14  Q    -- two years ago.  The transcript indicates it was
15  March 23rd, 2017; does that sound about right?
16  A    Yeah, something similar to that.  Yeah.
17  Q    All right.  Do you recall being asked why you
18  agreed to work with Folks as a -- doing escort work?
19  A    I don't really remember, but --
20  Q    Would the transcript refresh your recollection?
21  A    Sure.  I don't know.
22             MR. DARROW:  May I approach?
23             THE COURT:  Yes.
24  BY MR. DARROW:
25  Q    Drawing your attention to the top of page 17,
```

1   question -- well, if you just read those top few top

2   lines.

3        Does that refresh your recollection as to what you

4   told the grand jury when you were asked that question?

5   A    A little bit.

6   Q    I'm sorry?

7   A    A little bit.  Not much.

8   Q    Okay.  What's your memory of what you told the

9   grand jury when you were asked why you agreed to do this

10  work for Folks?

11  A    I only remember a little bit.  I don't really

12  remember all of it.

13  Q    What do you remember about what you told the grand

14  jury when you were asked?

15  A    About like I remember what I said.

16  Q    What did you say?

17  A    And that was true.  I needed a roof over my head

18  and food on the table.

19  Q    Okay.  Do you remember being asked whether someone

20  took pictures of you when you first agreed to work with

21  Folks?

22  A    Yeah.

23  Q    And do you remember what you answered?

24  A    No.

25  Q    No?  Can I draw your attention to the bottom last

1   few lines of page 17 down here.

2   A    Where?

3   Q    Sorry.  Right down there.

4   A    Yeah.

5   Q    Okay.  Does that refresh your memory?

6   A    Yes.

7   Q    What did you tell the grand jury?

8   A    That Brian took a picture.

9   Q    And do you remember whether you were asked about

10  the types of pictures he took and what he told you at

11  the time?

12  A    Yes.

13  Q    What did you say?

14  A    That I was on -- I don't know the exact words, but

15  I was supposed to pose like in sexy positions.

16  Q    In your underwear?

17  A    Yeah.

18  Q    And do you remember being asked what happened with

19  those pictures at the time?

20  A    Yes.

21  Q    And what was your answer?

22  A    They got posted.

23  Q    And who posted them?

24  A    Brian.

25  Q    Do you remember being asked who wrote the

```
1    description of you in the Backpage post?

2    A    Yes.

3    Q    And what was your answer?

4    A    Brian.

5    Q    Turning to page 19 -- well, do you remember being

6    asked whether you and Brian discussed money and how it

7    was going to be divided?

8    A    Yes.

9    Q    And do you remember how you answered?

10   A    50/50.

11   Q    And do you remember being asked whether that

12   changed over time?

13   A    Yes.

14   Q    Do you remember how you answered?

15   A    No.

16   Q    Can you please take a look at page 19, the bottom

17   half.

18   A    Yes.

19   Q    Does that refresh your memory?

20   A    Yes.

21   Q    How did you answer?

22   A    That he -- it was 50/50 at first, and then he

23   started taking more and more.

24   Q    And how did it end up?

25   A    I wasn't getting anything.
```

1    Q    Do you remember being asked who you bought your

2    drugs from when you were working for Folks?

3    A    Yes.

4    Q    And what was your answer?

5    A    Folks.  Brian.

6    Q    Okay.  Do you remember being asked the names of --

7    or the street names of other young women that you were

8    working with Folks?

9    A    Yes.

10    Q    And what was your answer?

11    A    Nikki, Shorty and Ava.

12    Q    Do you remember being asked whether you had a

13    street name that you were using back then?

14    A    Yes.

15    Q    And what was your answer?

16    A    Pinky.

17    Q    Do you remember who gave you that name?

18    A    Yes.

19    Q    And what was your answer?

20    A    Brian.

21    Q    Do you remember being asked whether you started

22    using quite a lot of crack cocaine at that time?

23    A    Yes.

24         MR. KAPLAN:  Judge, I think this is beyond the

25    scope of cross.

1          THE COURT:  No.  You raised inconsistencies in

2     the grand jury testimony, so the government then has the

3     right to come back and say these are the consistencies

4     with the grand jury testimony and her testimony today.

5     And so to that extent, you raised that issue.

6          Objection overruled.  Go ahead.

7          MR. DARROW:  Thank you.

8     BY MR. DARROW:

9     Q    Do you remember being asked whether your use of

10    crack cocaine increased significantly?

11    A    Yes.

12    Q    And what was your answer?

13    A    Yes.

14    Q    Do you remember being asked why?

15    A    It was an everyday -- I was there all the time.

16    Q    Okay.  When you testified earlier, you said that it

17    made you numb?

18    A    It did make me numb.

19    Q    Do you remember telling the grand jury that two

20    years ago?

21    A    Yes.

22    Q    Okay.  Do you remember testifying on direct that

23    looking back on this, Brian played you?

24    A    Yes.

25    Q    Do you remember testifying to that to the grand

1    jury?

2    A     Yes.

3    Q     Do you remember being asked how much money you were

4    making Folks, approximately, on a good day back then?

5    A     1500.

6    Q     That's what you told the grand jury?

7    A     (Witness nods head.)

8    Q     Okay.  Do you remember being asked what your rates

9    were back then?

10   A     Yes.

11   Q     And do you remember what your answer was?

12   A     150 a half hour and 250 an hour.

13   Q     Do you remember being asked about the names of the

14   motels that Folks had you working out of?

15   A     Yes.

16   Q     Do you remember what you told the grand jury?

17   A     Econo Lodge, the Anchorage, and the Ho Hum.

18   Q     Okay.  You mentioned a couple other motels.  Would

19   it refresh your memory to see the grand jury transcript?

20   A     I think one of them was the Motel 6.

21   Q     Yes.  And the North Star?

22   A     Yes.

23   Q     Do you remember being asked if you ever saw Folks

24   hit other girls?

25   A     Yes.

1    Q    Do you remember what you answered?

2    A    Yes.

3    Q    What?

4    A    I told 'em that he hit Nikki and Shorty.

5    Q    Do you remember being asked if you were scared of

6    him?

7    A    Yes.

8    Q    Do you remember what you answered?

9    A    Yes.

10   Q    What?  Oh, yes, you were scared of him.  Sorry.

11        Do you remember being asked about whether you --

12   whether your -- whether you became emotionally involved

13   with him?

14   A    Yes.

15   Q    Do you remember what you said?

16   A    Yes.

17   Q    What?

18   A    I fell in love with him.

19   Q    You said -- you described it in a little more

20   detail in the grand jury.  Do you remember?

21   A    I don't know.

22   Q    Would the transcript refresh your recollection?

23   A    Sure.

24   Q    Drawing your attention to the bottom half of page

25   27.  Let me see.  Just read that section there.  Sorry.

```
1    A    (Witness nods head.)

2    Q    Does that refresh your memory?

3    A    Yes.

4    Q    What did you tell the grand jury two years ago?

5    A    That he seemed like a different kind of person,

6    like he was the type that made you believe that he loved

7    you.

8    Q    And that he manipulated you?

9    A    Yeah.

10   Q    Do you remember being asked if he had a gun?

11   A    Yes.

12   Q    Do you remember how you answered?

13   A    Yes.

14   Q    What?

15   A    I thought I answered yes.

16   Q    Yeah, okay.

17        Do you remember being asked how you knew he had a

18   gun?

19   A    Because I carried it.

20   Q    Yes.

21        Do you remember being asked how often Folks brought

22   you drugs back at that time?

23   A    Every day.

24   Q    Do you remember being asked if at some point --

25   sorry -- if at some point he just started taking all of
```

1    the money?

2    A    Yes.

3    Q    And how did you answer?

4    A    Yes.

5    Q    And that -- remember being asked if he just left

6    you drugs?

7    A    Yes.

8    Q    And how did you answer?

9    A    Yes.

10   Q    Do you remember being asked if he wouldn't give you

11   drugs until you made him money?

12   A    Yes.

13   Q    How did you answer?

14   A    Yes.

15   Q    Remember being asked if he would try -- sorry.

16        Remember being asked if he tried to come up with

17   ways to have you make more money?

18   A    Yes.

19   Q    Do you remember how you answered?

20   A    He wanted me to do fetishes.

21   Q    And you testified on direct about the masks and the

22   posing and all that?

23   A    Yes.

24   Q    Remember being asked whose idea it was to start

25   doing fetishes and go with two girls and things like

1     that?

2     A     Brian.

3     Q     Remember being asked if you ever said no to him?

4     A     Huh?

5     Q     Do you remember being asked if you ever said no to

6     a directive from Brian Folks?

7     A     I never said no.

8     Q     Remember being asked if you ever went down to New

9     York for him?

10    A     Yes.

11    Q     And do you remember how you answered?

12    A     Yes.

13    Q     Remember being asked how often you did this work?

14    Was it every day?

15    A     Yes.

16    Q     And how did you answer?

17    A     Yes.

18    Q     Remember being asked if he ever -- if you ever made

19    a video for him?

20    A     Hmm?

21    Q     Do you remember being asked in the grand jury a

22    couple years ago if you ever made a video for Folks?

23    A     Yes.

24    Q     And do you remember describing that video?

25    A     No.

1    Q    All right.  We talked about a video earlier on
2    direct.  Do you remember that?
3    A    Yes.
4    Q    You remember being asked about that in the grand
5    jury?
6    A    Yes.
7    Q    What did you say about it?
8    A    That he made -- that he had me do a video.
9    Q    The video that we talked about?
10   A    Yes.
11   Q    Remember being asked if you role played, if you
12   practiced the video in advance, and who told you what to
13   say in it?
14   A    Yes.
15   Q    And do you remember how you answered?
16   A    Brian had me say it.
17   Q    Remember being asked if he filmed you doing other
18   things?
19   A    Yes.
20   Q    Do you remember how you answered?
21   A    Yes.
22   Q    How?
23   A    He took a video of me giving him oral.
24   Q    Remember -- well, strike that.
25        Katelynn, do you recall that this matter was

1    originally scheduled for trial about a year ago?

2    A    Yes.

3    Q    Do you remember you didn't want to testify?

4    A    Yes.

5    Q    Do you remember what happened?

6    A    I went to jail.

7    Q    Remember you refused to come in?

8    A    Yes.

9    Q    And a warrant was issued for you to make sure you

10   attended the trial?

11   A    Yes.

12   Q    Okay.  In connection with that, about a year ago,

13   did you obtain the representation of an attorney?

14   A    Yes.

15   Q    All right.  He -- you didn't have counsel while you

16   were in the grand jury, did you?

17   A    What's that?

18   Q    An attorney.

19   A    No.

20   Q    Okay.  Did you have -- can you tell us whether

21   working with your attorney you have a better

22   understanding of what perjury is?

23           MR. KAPLAN:  Objection, your Honor.

24   A    Yes.

25           THE COURT:  Objection overruled.  She can

1    answer that question.

2    A    Yes.

3    BY MR. DARROW:

4    Q    You gave a good answer to -- on cross examination

5    about your duties when you were under oath.  Did you --

6    did it help you to have an attorney to talk about that?

7    A    Yes.

8    Q    You testified on direct that there was a time when

9    you were doing escort work for the defendant that he

10   started withholding drugs because he told you you were

11   getting too skinny?

12   A    Yes.

13   Q    Did he say why that was a concern for him?

14   A    I wasn't going to make as much money.

15   Q    You were asked on cross examination about whether

16   you ever tried to run away, something along those lines.

17   Do you remember that?

18   A    I only ran away once.

19   Q    Okay.  That was the time you went to New York?

20   A    Yes.

21   Q    If I remember your cross correctly, you said, "And

22   that was when Folks was off the scene"?

23   A    Yes.

24   Q    Okay.  It was correct that he was off the scene and

25   you didn't expect to see him in Vermont?

1    A    Yes.

2    Q    Before that, would you have been frightened to try

3    to run away?

4    A    Yes.

5    Q    Because you saw what happened to Nikki when she

6    tried to run away?

7    A    Yes.

8    Q    Counsel crossed you about the fact that you had

9    made a video with your boyfriend when you were young?

10   A    Yes.

11   Q    Was that because you were in a relationship with

12   your boyfriend and it was a private matter?

13   A    Yes.

14   Q    Do you know what happened to that video?

15   A    I know it was in a nonworking cell phone.

16   Q    Did Folks somehow obtain that video?

17   A    Yes.

18   Q    How?

19   A    He went through my phone.

20   Q    With your permission?

21   A    I handed him my phone, so --

22   Q    Did he take that video of you with your permission?

23   A    No.

24   Q    Was that video a private matter between you and

25   your boyfriend?

1    A    Yes.

2    Q    Okay.  What did -- do you know what Folks did with

3    the video that he took of you?

4    A    No.

5    Q    Well, you testified on direct that he put it on --

6    A    What video are we talking about?

7    Q    I apologize.  The one you -- you looked at a

8    photograph, and you say you took a video when you were

9    talking about rates, and -- that video.

10        Okay.  Do you remember what he did with that?

11   A    He put it on YouTube.

12   Q    Is there a difference in your mind between putting

13   a video like that on YouTube on the one hand and having

14   a private video with you and your lover on the other?

15   A    There's a huge difference.

16   Q    Fair to say -- there was some conversations about

17   dates.  Fair to say you don't know the exact dates?

18             MR. KAPLAN:  Objection, your Honor.

19             THE COURT:  Objection sustained.  That's a

20   leading --

21             MR. KAPLAN:  She testified as to the dates.

22             THE COURT:  That's a leading question, so ask

23   an open-ended question.

24   BY MR. DARROW:

25   Q    Do you know the specific dates when you left

```
1     working because of -- in the escort business for Folks?

2     A     When I left?

3     Q     Did you know the exact dates when you stopped

4     working?

5     A     Not the exact date, but I know the year.

6     Q     Okay.

7     A     I stopped working 2012.

8     Q     Okay.  When counsel showed you a photograph of you

9     and another woman wearing masks, do you know, was that

10    taken -- do you know whether that was taken when you

11    were working with Folks or not?

12    A     It was.

13    Q     You testified on cross that Folks would keep the --

14    his firearm sometimes in the glove box and the clip in

15    the trunk?

16    A     Yes.

17    Q     Did he ever tell you why he did that?

18    A     Because, I guess, you can't go to jail if they are

19    separated.

20    Q     We appreciate your patience with us and going

21    through this.  We have talked about -- I don't think I

22    have asked you this question.  Why have you agreed now

23    to come in when last time we had to go out and arrest

24    you to bring you in?

25    A     Because I don't want somebody doing this kind of
```

1    stuff to my little girl.

2    Q    You have a daughter now?

3    A    Yes.

4    Q    Okay.  Thank you.

5         THE COURT:  Okay.  Recross?

6         MR. KAPLAN:  Thank you, Judge.

7                    RECROSS EXAMINATION

8    BY MR. KAPLAN:

9    Q    So the prosecutor in this case just went through

10   your entire grand jury testimony, do you remember, a few

11   minutes ago?

12   A    Yes.

13   Q    And he pointed out all the things you said?

14   A    Yes.

15   Q    But didn't you testify that you lied frequently at

16   the grand jury?

17   A    Yes, I did.

18   Q    And a lot of the things you said weren't true?

19        MR. DARROW:  Judge, this has already been

20   asked and answered.

21        THE COURT:  Objection overruled.  Go ahead.

22   BY MR. KAPLAN:

23   Q    Isn't that true?  A lot of things you said --

24   A    There was so many other things.  Not everything.

25   Q    For example, how you met Brian, you lied about

1   that?

2   A    Yes.

3   Q    You lied about -- you told the grand jury that --

4   under oath, that you had never done this before, and

5   that was a lie?

6   A    Yes.

7   Q    And, by the way, when you raise your right hand and

8   take the oath -- I think you are fairly intelligent --

9   don't you know -- you know what that meant?

10   A    No.

11   Q    You know when you swore to tell the truth that you

12   were supposed to go in and tell the truth, right?

13   A    Yes.

14   Q    You didn't need a lawyer to tell you that?

15   A    I didn't understand it as much.

16   Q    You didn't understand it as much that you are not

17   supposed to lie under oath?

18   A    Yeah.  I didn't know.

19   Q    And when you testified at the grand jury, you never

20   told the grand jury that Brian pointed a gun at you?

21   A    It was never asked.

22   Q    And you never told -- well, you were asked if Brian

23   had a gun just like you were in court today.

24   A    Yes.

25   Q    And then you answered that, yes, you saw it and

1    that he pointed it at you and someone else, but you

2    never told the grand jury that?

3    A    Because nobody asked me.

4    Q    Okay.  And so would anyone reading this grand jury

5    know when you were telling the truth and when you

6    weren't?  How would you know?

7    A    What do you mean?

8    Q    I mean, if someone reads a statement from your

9    grand jury, do we know if it's true or not?

10   A    Because I'm telling the truth.

11   Q    As opposed to when you were at the grand jury?

12   A    Yes.

13   Q    You talked about Brian posting your Facebook ad.

14   A    My what?

15   Q    I'm sorry.  Not your -- your Backpage ads?

16   A    Yes.

17   Q    So when you were getting ready for trial with the

18   prosecutor, did he show you any Backpage ads?

19   A    Who?

20   Q    Mr. Darrow.

21   A    He showed me some of the ads.  They wasn't ads.

22   They were pictures.

23   Q    Pictures of ads, right?

24        So someone went onto Backpage and took a picture of

25   it; is that what you are saying?

```
1    A    I don't know.  I got showed pictures of when I used
2    to be on Backpage.
3    Q    But you never saw an actual Backpage ad?
4    A    That they --
5    Q    That they got from Backpage.
6    A    No.
7    Q    You never saw that?
8    A    No.
9    Q    So there wouldn't be any way of telling, at least
10   as you sit in court today, when your Backpage ads were
11   posted or by whom because you never saw them and the
12   government hasn't introduced them; isn't that right?
13   A    I'm confused.
14   Q    Yeah.  That was confusing.
15        So your testimony was that you were never shown any
16   Backpage ads?
17   A    I was shown the pictures of --
18   Q    But you weren't shown the part of the Backpage ad
19   that tells you when it was posted, what e-mail was used,
20   and the date?
21   A    No.
22   Q    You weren't shown that.  So if, for example, this
23   guy that you were with before you met Brian posted you
24   on Backpage, we don't have that ad, do we?
25   A    I never went on Backpage before.
```

1      MR. KAPLAN:  I have nothing further,

2   your Honor.

3          THE COURT:  Okay.  All right.  Thank you.  I

4   think you're all done.

5          THE WITNESS:  Okay.

6          (Witness excused.)

7          THE COURT:  Okay.  The government want to call

8   the next witness?

9          MR. DARROW:  Yes.  Call Dan Merchand.

10                   DANIEL MERCHAND,

11      being first duly sworn by the courtroom deputy,

12      was examined and testified as follows:

13          THE COURT:  Good afternoon, Detective.

14          THE WITNESS:  Good afternoon.

15          THE COURT:  Are you still "detective" or --

16          THE WITNESS:  Detective sergeant.

17          THE COURT:  Detective sergeant.  You also have

18   new glasses.

19          THE WITNESS:  Yes, your Honor.

20          THE COURT:  It doesn't mean you play baseball.

21          THE WITNESS:  I have been told it makes me

22   look smarter, but I don't know.

23                 DIRECT EXAMINATION

24   BY MR. DARROW:

25   Q    Sir, can you please for the record state your full

1  name?

2  A    Daniel Merchand, M-E-R-C-H-A-N-D as in David.

3  Q    Where do you work?

4  A    The Burlington Police Department.

5  Q    How long have you been with BPD?

6  A    For almost 20 years.

7  Q    All right.  And what are your current duties and

8  responsibilities?

9  A    I am currently the detective sergeant assigned to

10 supervise the narcotics unit.

11 Q    All right.  Sometime in July 2016, did you assist

12 in executing a federal search warrant at 96 Ethan Allen

13 Parkway in Burlington?

14 A    I did.

15 Q    Can you describe that location, please.

16 A    It's a condo complex on the New North End of

17 Burlington, out past the Right Aid on Ethan Allen.

18         MR. DARROW:  Can we pull up 58, please.

19 BY MR. DARROW:

20 Q    Does this look familiar?

21 A    Yes.

22         MR. DARROW:  Can we go to the next page.

23 BY MR. DARROW:

24 Q    Is that the location you are talking about?

25 A    Yes.  That's the door that goes to the apartment.

1   Q    And can you give us a brief overview of what's --

2   what the apartment was.

3   A    You go inside that door and there's a closet to

4   your left, and then as you take the right and go in,

5   there's stairs that lead upstairs, and to the right

6   there's a kitchen and kind of a dining room area, and

7   then living room, bathroom, and then there's a couple

8   bedrooms upstairs.

9   Q    What was your role in the search?

10  A    I was the evidence custodian.

11  Q    What's an evidence custodian?

12  A    When items are found during the course of a search

13  warrant, they're then pointed out to me, and I end up

14  tagging them, and that way they're seized as evidence.

15  Q    You keep a list of what's recovered with a

16  description of each item?

17  A    Correct.

18  Q    What did you do upon entering the apartment?

19  A    I took a video of the interior of the apartment.

20  Q    Excuse me.

21       What was the purpose of taking a video?

22  A    Take a video before and after that we document what

23  the apartment looked like beforehand and then what it

24  looked like after you are done searching.

25  Q    Approaching you with Government 59 and 62, CDs.  Do

1    you recognize these?

2    A    Yes.

3    Q    How do you recognize them?

4    A    Because my signature with my badge number is on

5    each CD.

6    Q    Did you review them?

7    A    I have.

8    Q    What's on the CDs?

9    A    Video.

10   Q    Are the videos -- I take it your video is broken

11   into two pieces?

12   A    I think it was actually even broken into three.

13   Q    Okay.  Well, the video on these disks, is it a fair

14   and accurate depiction of the video you took at the

15   search scene?

16   A    Yes.

17           MR. DARROW:  We move the admission of 59 and

18   60, your Honor.

19           THE COURT:  Any objection to 59 and 60?

20           MS. SEN:  No, your Honor.

21           THE COURT:  So admitted.

22           (Government's Exhibits 59 and 60 were received

23   in evidence.)

24           MR. DARROW:  Thank you, your Honor.  May we

25   publish 59?

```
1              THE COURT:  Yes.

2                   (A video recording was played in open court.)

3              THE WITNESS:  That's the closet area I

4    described on the left as you walk in the entryway.

5         Those are the stairs that lead upstairs.

6         That's one of the bedrooms.

7         That's the bathroom that's upstairs.

8         And then the other bedroom that's upstairs.

9    BY MR. DARROW:

10   Q    Okay.  Is that the end of 59?

11   A    Yes.

12             MR. DARROW:  Can we please publish 60.

13                  (A video recording was played in open court.)

14   BY MR. DARROW:

15   Q    Where are we now?

16   A    That's right when you come in through the door to

17   the right.  That's the kitchen area.

18        That's the kitchen cabinets, fridge, stuff above

19   the cabinets.

20        It's the living room area.  That's a hutch with

21   stuff on top of the hutch.

22             MR. DARROW:  Can we freeze that for a moment.

23   Can we go back for a second or two.

24        Okay.  There.  You had it a moment ago.  No, we're

25   all right.
```

1    BY MR. DARROW:

2    Q    Do you recognize that black rectangular item on

3    what looks like a piece of wood there?

4    A    Yes.  It's a computer tower.

5            MR. DARROW:  I'm sorry.  Go ahead.

6            (A video recording was further played in open

7    court.)

8            THE WITNESS:  It's the living room, and there

9    was a door that went outside through the back, and

10   there's a bathroom right there on the first floor.

11   BY MR. DARROW:

12   Q    Okay.  So what happened after you took the video?

13   A    After I took the video, different officers that

14   were present started searching the residence.

15   Q    Were photographs taken at the scene as well as the

16   video?

17   A    Yes.

18   Q    Approaching you with 61.  Do you recognize these?

19   A    Yes.  These are pictures of items that were

20   recovered within the residence, and actually one of the

21   pictures looks like with stuff that the defendant had on

22   at the time of his arrest.

23   Q    Okay.  Do those pictures fairly and accurately

24   depict what you just described?

25   A    Yes.

1          MR. DARROW:  Okay.  Your Honor, we move that

2    exhibit.

3          THE COURT:  Any objection?

4          MS. SEN:  No objection, your Honor.

5          THE COURT:  So admitted.

6          (Government's Exhibit 61 was received in

7    evidence.)

8    BY MR. DARROW:

9    Q    How about 60A, do you recognize this?

10   A    Yes.  That's a still frame from the video that we

11   just watched of the computer tower.  It's in the living

12   room area.

13   Q    Okay.

14         MR. DARROW:  Your Honor, we move for the

15   admission of that as well.

16         THE COURT:  Any objection to 60A?

17         MS. SEN:  No objection.

18         THE COURT:  So admitted.

19         (Government's Exhibit 60A was received in

20   evidence.)

21         MR. DARROW:  Okay.  Can we please look through

22   61.

23   BY MR. DARROW:

24   Q    So, Detective, looking to the first picture in 61,

25   what are we looking at here?

1    A    That is a brown Aveda bag that I actually located

2    up on top of the kitchen cabinets.

3    Q    Do you remember what was in that bag?

4    A    Yes.  There were some boxes with small wax-style

5    baggies that are typically used to package heroin.

6    Q    All right.  Go to the next page.  And what's this?

7    A    It's a plastic bag, and inside of it was a grinder

8    as well as a bottle of Inositol, which is a cutting

9    agent.

10   Q    What's the significance of a grinder?

11   A    Grinder's typically used to take bulk drugs and you

12   grind it up so it's in a more pure form so you can use

13   it for packaging; and Inositol is used sometimes as a

14   cutting agent to cut in with drugs.

15   Q    What do you mean cutting agent?

16   A    Basically when you have drugs, you add things to it

17   to maximize the amount of drugs that you can sell, so

18   you will cut it with other things to knock down the

19   purity of it and make more of it so you can sell more of

20   it.

21   Q    And let's go to the next page.  What significance

22   does this photograph have to you?

23   A    That's a picture from on top of the hutch where a

24   rue21 bag was located.

25   Q    Can you show us, by putting a mark with your finger

1    on the screen, where the rue21 bag is.

2    A    (Witness complied.)

3    Q    And can we go to the next picture.  What's this?

4    A    That's the rue21 bag.

5    Q    And what are we looking at in the bag?

6    A    There's some Scotch tape, a, like, cookie canister,

7    as well as some small rubber bands.

8    Q    And what about that cardboard box?  Does that look

9    familiar?

10   A    Yes.  I believe there was additional packaging in

11   there as well.

12   Q    And going to the next page, is that the cardboard

13   box with the top off?  Should be on the screen.

14   A    Yes.

15   Q    All right.  And what do we see there?

16   A    That's the -- similar packaging that was found up

17   on top of the cabinets.  It's the wax-style baggies that

18   are typically used to package heroin.

19   Q    And the next page, please.  What are we seeing

20   here?

21   A    Open bag, but it's tough to tell from that

22   photograph.

23   Q    Okay.  Let's go to the next page.  How about this

24   one?

25   A    That's -- looks like a scale.

1    Q    Digital scale?

2    A    Yes.

3    Q    In a bag?

4    A    Correct.

5    Q    All right.  Let's go to the next page.  What's

6    this?

7    A    It's a bunch of small, individual ziplock-style

8    baggies that are blue in color, as well as another

9    scale.  Those baggies are typically used to package

10   narcotics.

11   Q    And going to the next page.  You mentioned -- was

12   this material seized not at the search but at the

13   arrest?

14   A    Correct.  I believe that's the items that were

15   taken from his person.

16   Q    Okay.  Let's go to the next page.  How about this?

17   A    Some currency that was located.

18   Q    And the next page?  Just some paperwork found at

19   the scene?

20   A    Correct.

21   Q    All right.  And the next page.

22        And I think the next photo after this shows -- you

23   tell us what it shows.

24   A    I believe that shows the contents of the box.

25   That's a bore brush cleaner for a gun.

```
1    Q    Is this the item you were describing as a bore

2    brush -- can you circle with your finger where the bore

3    brush cleaner is?

4    A    (Witness complied.)

5    Q    And just let's skip down to the -- on the

6    next-to-the-last page.  We don't have to go through all

7    of these.

8         Can you -- do you recognize this item?

9    A    Yes.  It's a rental agreement.

10   Q    More paperwork seized at the scene?

11   A    Yes.

12   Q    Okay.  Detective, let me show you some items.

13   Approaching you with Government 86.  Do you recognize

14   this?

15   A    Yes.

16   Q    What is it?

17   A    That's the brown Aveda bag with the cardboard boxes

18   with the small wax-style baggies that was located on top

19   of the kitchen cabinets.

20             MR. DARROW:  Your Honor, we move that exhibit.

21             THE COURT:  Any objection?

22             MS. SEN:  No, your Honor.

23             THE COURT:  All right.  So admitted.

24             (Government's Exhibit 86 was received in

25   evidence.)
```

```
1                    MR. DARROW:  Maybe I will wait till the end of
2       them.
3                    THE COURT:  Okay.
4                    MR. DARROW:  May I publish, your Honor?
5                    THE COURT:  Yes.
6       BY MR. DARROW:
7       Q    Approaching you with 85.  Can you tell us what this
8       is?
9       A    It's the grinder with the bottle of Inositol from
10      the plastic bag that was in that previous picture that
11      was located on top of the kitchen cupboard.
12      Q    And approaching you with 66.  Can you tell us what
13      that is?
14      A    That is the rue21 bag that was located on the top
15      of the hutch in the living room.
16      Q    And the contents of it?
17      A    The rue21 bag as well as what we talked about in
18      the photographs.
19      Q    Okay.  Thank you.
20           And 81, do you recognize that?
21      A    I have documented on the bag that it was -- it was
22      at the bottom of the stairs hanging by a shelf.
23      Q    Okay.  And 87, can you take a look at this.
24      A    This came from a canvas bag that was located in the
25      living room.
```

1    Q    All right.

2              MR. DARROW:  Your Honor, we move for the

3    admission of 66, 81, 87 and 85.

4              THE COURT:  All right.  Any objection to those

5    exhibits?

6              MS. SEN:  May I just inquire, your Honor?

7              THE COURT:  Yes.

8                   VOIR DIRE EXAMINATION

9    BY MS. SEN:

10   Q    Detective Merchand, are all of those items in the

11   same condition as when you collected them?

12   A    No.  The bag has been opened and resealed based on

13   the seal that's on that now.

14   Q    All of them?

15   A    If you want to bring them back over, I can take a

16   look real quick.

17        Exhibit 87 has been resealed by Agent Chetwynd, and

18   it looks like there's some sub-exhibits that are now

19   documented within that bag.

20   Q    Sorry.  Do you know what came out of that bag?

21   A    I don't know.

22   Q    So Agent Chetwynd removed the items there and then

23   resealed?

24   A    That's what's documented on the bag, yes.

25   Q    Okay.

1    A     And then Exhibit 81 also has a seal on it.  Again,

2    that looks like Agent Chetwynd's signature on there, so

3    he would have opened that up, and it looks like there's

4    sub-exhibits in there.

5        Exhibit 66, same thing.  Also has a tag that's been

6    resealed by Agent Chetwynd.

7        And then this bag actually has no other seals

8    listed, so this would have been the way it was put into

9    the bag.

10            THE COURT:  Is that 66?

11            THE WITNESS:  81.  I'm sorry, your Honor.  Or

12   85.  I'm sorry, your Honor.

13            MS. SEN:  And have all of the items that came

14   out of the bag by Agent Chetwynd -- have those all been

15   introduced already?

16       I was going to ask actually Mr. Darrow if he knew.

17            MR. DARROW:  No.

18            MS. SEN:  Okay.  And so Agent Chetwynd will be

19   back on to describe what those are?

20            MR. DARROW:  We recalling him again?  No, we

21   weren't planning on it.

22            MS. SEN:  Okay.

23            MR. DARROW:  There's an inventory, more

24   detailed inventory, that Detective Merchand prepared

25   describing the contents.

 1          MS. SEN:  Okay, that's fine, your Honor.  No

 2     objection.

 3          THE COURT:  Okay.  So admitted.

 4          (Government's Exhibits 66, 81, 85 and 87 were

 5     received in evidence.)

 6          MR. DARROW:  Okay, let's get those out of your

 7     way.

 8              CONTINUED DIRECT EXAMINATION

 9     BY MR. DARROW:

10     Q    Sir, showing you 66A --

11          MR. DARROW:  And can we pull this up, please.

12     Q    Do you recognize these items?

13     A    Those are the contents from the rue21 bag.

14     Q    All right.  Is that the exhibit right in front of

15     you?

16     A    Yes.

17     Q    And I apologize.  Can you just remind me the number

18     of that exhibit?

19     A    66.

20          MR. DARROW:  May I have a moment, your Honor?

21          THE COURT:  Yes.

22          (Brief pause.)

23     BY MR. DARROW:

24     Q    Detective Merchand, you also described a computer

25     there.  Did you seize that computer?

1    A    Yes.

2    Q    Sorry.  Just give me a sec.

3         Oh, there it is.  I apologize.

4         Approaching you with 79.  Do you recognize this

5    item?

6    A    Yes.

7    Q    How do you recognize it?

8    A    Because I initialed the back of the hard drive in

9    preparation for the trial that that was the same

10   computer tower serial number that matched that on the

11   inventory that was taken the day of the search warrant.

12   Q    Okay.  Thank you.

13            MR. DARROW:  Your Honor, we move for admission

14   of 79.

15            THE COURT:  Any objection to 79?

16            MS. SEN:  No, your Honor.

17            THE COURT:  All right.  So admitted.

18            (Government's Exhibit 79 was received in

19   evidence.)

20            MR. DARROW:  Nothing further.  Thank you, your

21   Honor.

22            THE COURT:  Okay.  Cross examination?

23            MS. SEN:  Just a couple of questions,

24   your Honor.

25                          CROSS EXAMINATION

```
 1   BY MS. SEN:
 2   Q    Detective Merchand, what happened to the computer
 3   after you seized it?
 4   A    Went back to the office, and then I think the FBI
 5   ended up taking custody of it.
 6   Q    Is there any -- so you don't know when that
 7   happened?
 8   A    I do not know.
 9   Q    Would there be paperwork that you would have that
10   would reflect that?
11   A    Not that I would have.  I dealt with the specific
12   acquiring of it on that particular date.
13   Q    So the only thing that your -- the only thing you
14   did in the chain with that computer is that you seized
15   it from the house on July 16th?
16   A    Correct.
17   Q    Or July 19, 2016.  And you took it to the police
18   department?
19   A    It went back to DEA.
20   Q    Oh.  So you took it to DEA?
21   A    I transported some of the items back, and TFO Estes
22   I believe transported some of the items back, but I was
23   responsible for everything that was collected, and I
24   inventoried all of that, and then all of that was
25   brought back to the DEA office.
```

1   Q    Okay.  So from you it went to the DEA office?

2   A    Correct.

3            MS. SEN:  I don't think I have anything

4   further, your Honor.

5            THE COURT:  Okay.  All right.  Any redirect?

6            MR. DARROW:  No, thank you, your Honor.

7            THE COURT:  Okay.  Thank you, Detective.

8            THE WITNESS:  Thank you, your Honor.

9            (Witness excused.)

10            THE COURT:  The government want to call the

11   next witness.

12            MS. SAVNER:  We are prepared to, your Honor.

13   Given that it's close to 2:30, does your Honor want to

14   take --

15            THE COURT:  Well, it usually goes to quarter

16   of three.

17            MS. SAVNER:  Okay.  That's fine.  We can call

18   our next witness.

19            THE COURT:  Okay.

20            MS. SAVNER:  The government calls Jasmine L.

21                    JASMINE L.,

22        being first duly sworn by the courtroom deputy,

23        was examined and testified as follows:

24            THE COURT:  Okay.  Good afternoon.

25            THE WITNESS:  Good afternoon.

```
1                        DIRECT EXAMINATION
2    BY MS. SAVNER:
3    Q    Good afternoon.  Jasmine --
4              THE COURT:  I'd ask that you adjust that
5    microphone, get that fairly close, and speak right into
6    it so people can hear you.
7              THE WITNESS:  Okay.
8    BY MS. SAVNER:
9    Q    Good afternoon, Jasmine.  Just so you know, we are
10   just going with first names today, okay?
11   A    (Witness nods head.)
12   Q    All right.  Where did you grow up?
13   A    I grew up in Vermont.
14   Q    And till when did you live in Vermont?
15   A    I lived in Vermont until I was about 13 years old.
16   Q    Where did you go after that?
17   A    To Arizona.
18   Q    At some point did you come back to Vermont?
19   A    Yes.
20   Q    When was that?
21   A    I believe it was 2006.
22   Q    Did you stay there for a few years?
23   A    Yes.
24   Q    How old are you now?
25   A    27.
```

```
 1    Q    Do you have any kids?

 2    A    I do.  One boy.  He is six years old.

 3    Q    Do you know the month and year he was born?

 4    A    October 27th.

 5    Q    Of what year?

 6    A    2012.

 7    Q    So he was born in October of 2012.  What were you

 8  doing for money that fall?

 9    A    I was escorting.

10    Q    That mean prostituting?

11    A    Yes.

12    Q    Were you on your own or were you working with

13  someone?

14    A    At that time I was by myself.

15    Q    Had you previously worked with someone in the past?

16    A    Yes.

17    Q    Who is that?

18    A    C-Rock.

19    Q    Why did you go out on your own?

20    A    I was -- it wasn't working for me.  There was

21  just -- it wasn't a trustworthy relationship.

22    Q    Okay.  How old were you when you started escorting?

23    A    18 years old.

24    Q    Are you familiar with a person named Brian Folks?

25    A    Yes.
```

1    Q    How did you meet him?

2    A    It was through a mutual friend.

3    Q    About when was this?

4    A    This was --

5    Q    Before or after your son was born?

6    A    This was after my son was born.

7    Q    Do you remember how old he was?

8    A    He was only a couple of months old.

9    Q    You met him through a mutual friend; is that right?

10   A    Correct.

11   Q    Do you remember how he reached out to you?

12   A    I believe it was social media.

13   Q    Okay.  And what did he reach out about?

14   A    Potentially working for him.

15   Q    In what capacity?

16   A    Can you rephrase the question?

17   Q    How did he want you to work for him?  What did he

18   want you to do?

19   A    He wanted me to give him all of my money with the

20   dates.

21   Q    Okay.  So --

22   A    I would continue to be escorting at this time.

23   Q    So prostitute, but just instead of working on your

24   own you would work under him?

25   A    Correct.

1   Q    And you mentioned you would give him all your

2   money?

3   A    Correct.

4   Q    What would he give you in return?

5   A    Transportation, security.  He would post my ads.

6   Q    Did this sound like a good deal to you?

7   A    Yeah.  You know, working by myself, it was -- I

8   needed transportation, things like that.  So it was an

9   appropriate time, I guess, for that.

10  Q    You mentioned also security?

11  A    Um-hum.

12  Q    What did that mean?  What was Brian Folks offering

13  in terms of security?

14  A    Well, just the fact that I could call him if

15  anyone -- anything happened.  A sense of security that

16  somebody was there.

17  Q    Okay.  In case something bad happened with one of

18  the clients?

19  A    Correct.

20  Q    Did you agree to work for Brian Folks?

21  A    Yes.

22  Q    You sort of explained why it seemed like a good

23  deal at the time, right?

24  A    Yes.

25  Q    Were you using heroin or crack at this time in your

```
1    life?
2    A    No.
3    Q    So escorting was a way for you to make money?
4    A    Correct.
5    Q    Did you meet Brian Folks?
6    A    Yes.
7    Q    Do you remember that first meeting with him?
8    A    Yes, I do.
9    Q    What happened?
10   A    I was at the Motel 6 in Colchester.  He came to
11   talk to me about his proposal, just what I had just
12   said, him wanting to -- wanting me to work for him.
13   Q    The person that you met who identified himself as
14   Brian Folks, do you see him in the courtroom today?
15           MS. SEN:  We will stipulate that she's talking
16   about our client, your Honor.
17           THE COURT:  Okay.  So stipulated.
18   BY MS. SAVNER:
19   Q    Okay.  He told you about the job, the setup, and
20   you have already told us that you agreed to work for
21   him, right?
22   A    Correct.
23   Q    And how did it go working for him in the beginning?
24   A    There wasn't any problems.  It was -- there wasn't
25   any problems.
```

```
 1    Q    How did he treat you in the beginning?
 2    A    Fine.  There wasn't anything that stuck out.  It
 3    was a typical arrangement in that industry.
 4    Q    About how many calls a day were you doing when you
 5    were working with Mr. Folks?
 6    A    It would vary, but average about five.
 7    Q    Who posted the ads?
 8    A    He did.
 9    Q    Sometimes did you post your own ads too?
10    A    Yeah, occasionally.  The majority, he posted a lot
11    of them.
12    Q    Did you have to -- did it cost money to post on
13    Backpage all the time?
14    A    Yes, it did.  I don't remember exactly the cost,
15    but we always had prepaid cards.
16    Q    Who provided those?
17    A    Brian did.
18    Q    Who took the pictures that went in the ads?
19    A    I took some of them, but any additional photos were
20    taken by Brian.
21    Q    How often would he take pictures?
22    A    I remember a few times him taking pictures.  A lot
23    of the time it was just saved pictures that I had also.
24    Q    Did you ever post ads or okay Brian to post ads
25    that used your face?
```

```
 1    A    Yes.

 2    Q    Why was that?

 3    A    I personally okay'd that, just because it was -- I

 4    didn't look like the typical clientele.  Clientele liked

 5    that, so I had better success with that.

 6    Q    When you say you didn't look like the typical

 7    clientele, you mean the other women --

 8    A    Yeah.

 9    Q    -- who were advertising?

10    A    Correct.

11    Q    And how did you look different than the others?

12    A    I wasn't using drugs at the time, so that -- I

13    think that was a big thing.

14    Q    Looked healthier?

15    A    Yes.

16    Q    And using your face in the ads, that got you more

17    money?

18    A    Yes.

19    Q    Were there other girls around working for Mr. Folks

20    when you worked with him?

21    A    There was.

22    Q    Do you remember any of their names or what you knew

23    them as?

24    A    Sure.  The woman who I worked most closely with was

25    Pinky.
```

```
 1              MS. SAVNER:  Could we call up 51A.
 2    BY MS. SAVNER:
 3    Q    Do you recognize her?
 4    A    Yep.  That's Pinky.
 5    Q    Okay.  Anyone else you remember working with?
 6    A    There was a woman named Shorty.
 7              MS. SAVNER:  Can we pull up 56A.
 8    A    Yep, that's --
 9    BY MS. SAVNER:
10    Q    Do you recognize her?
11    A    Yes.
12    Q    Is that Shorty?
13    A    That's Shorty.
14    Q    Did you use any fake names when you were working
15    during this time?
16    A    Yeah.  I always used a fake name.  There was a lot
17    of nicknames that I went by.
18    Q    Okay.  Is one of them Nikki?
19    A    Yes.
20    Q    You said you worked most closely with Pinky.  Is
21    that right?
22    A    Correct.
23    Q    Okay.  And did you know Pinky's real name?
24    A    No.
25    Q    All right.  Explain how it worked with you and
```

1    Pinky.  Why were you together so often?

2    A    I don't know if it was a convenience thing.  We

3    typically shared a dual room that had kind of two

4    separate areas, so when one was in a call, the other was

5    right next door.

6    Q    And how about Shorty; where was she?

7    A    Typically in the same hotel but not in the same

8    room.  So maybe a couple rooms down.

9    Q    Do you remember what hotels you worked out of

10   during this time?

11   A    A lot at the Econo Lodge, Motel 6.

12   Q    Do you know whose names the rooms were rented

13   under?

14   A    Yeah.  Either my name or Pinky's name.

15   Q    Did Folks ever say anything about that, about

16   putting rooms in your names versus his name?

17   A    No, not directly.  No.

18   Q    Who told you to get the hotel rooms in your names?

19   A    Well, Brian did.  Yeah.

20   Q    Explain how it worked with the money.  You said

21   that you gave him all the money --

22   A    Yes.

23   Q    -- that you earned?

24   A    Yes.

25   Q    Okay.  How would you pay for things you needed?

1    A    I'd have to ask him for what I needed.

2    Q    And to put the deposit down and pay for the hotel

3    rooms, how did you get that?

4    A    He would give that to me.

5    Q    You have mentioned some prepaid phone cards?

6    A    Yeah.  Prepaid, like Visa cards, yes.

7    Q    Okay.  It's for posting the ads?

8    A    Yes.

9    Q    Who provided those?

10   A    Brian did.

11   Q    How would he collect the money from you?  How

12   often?  When would he do that?

13   A    He would come every couple -- couple times a day

14   and pick up.  I would have to call him before and after

15   calls so he knew when and how much money I had.

16   Q    How frequently did he expect you to check in with

17   him?

18   A    He expected before and after every call.

19   Q    And then he would come by to pick up the money you

20   earned?

21   A    Yes.

22   Q    What did you wear in the photos that he took of you

23   or that you took for the Backpage ads?

24   A    Typically in lingerie.

25   Q    Do you remember a time going to a lingerie store in

```
1    the mall?

2    A    Yes.

3    Q    What do you remember about that?

4    A    It was Brian, Pinky and I.  We each got a couple of

5    outfits.  Brian paid, and then we left.

6    Q    Were you allowed to have friends or other men over

7    at the hotels?

8    A    No.

9    Q    Did Brian ever say anything about that?

10   A    Yeah.  It was just a very known thing that we were

11   not to have company that was not paying.

12   Q    Were there ever times when Brian got mad at you?

13   A    Yes.

14   Q    What kind of things would he get mad about?

15   A    That's a -- that's an open-ended question.  I mean,

16   I feel like he got mad about a lot of things.

17   Q    Do you remember anything in particular?

18   A    One time I had a conversation with his girlfriend,

19   Cassandra, over the phone.  He overheard all that

20   conversation and got mad at me for talking with her.  I

21   don't exactly remember the conversation Cassandra and I

22   had, but after that Brian got mad.

23   Q    Did Brian tell you how he heard that conversation

24   between you and Cassandra?

25   A    Yes.
```

```
 1    Q    What did he tell you?
 2    A    He had an app on a phone that recorded all of the
 3    conversations that he could pull back up.
 4    Q    Did he ever put his hands on you when he was mad?
 5    A    Yes.
 6    Q    How did he touch you?
 7    A    There was an incident at the Econo Lodge when he
 8    grabbed me by my throat, and that was --
 9    Q    That was at the end?
10    A    Yes.
11    Q    Okay.  I want to get to that.
12         Were there other times before then when he put his
13    hands on you?
14    A    There was one other time in the Econo Lodge.  Pinky
15    was there as well.  Yeah, he slapped me at that time.
16    And that was it except for that last time.
17    Q    Did you ever see him be violent with Pinky?
18    A    Yeah.
19    Q    What do you remember?
20    A    If either of us were in a violent situation, the
21    other just kind of went into the other room.  I don't
22    know if that was just easier for us or easier for Brian,
23    but --
24    Q    But you knew what was going on?
25    A    Yeah, most definitely.
```

1    Q    Was Pinky, based on what you observed -- was she

2    doing drugs at the time she was working with Brian?

3    A    Yes.

4    Q    What drug was she using?

5    A    Crack.

6    Q    Do you remember the extent of her drug use at the

7    time?

8    A    Just what I saw.

9    Q    What did you see?

10   A    She used frequently, every day.

11   Q    And who provided her the drugs?

12   A    Brian.

13   Q    How would he get them to her?

14   A    He would bring them or she would go with him and we

15   would go with him.

16   Q    Did you ever go with Pinky and Brian somewhere else

17   to get drugs?

18   A    I did.

19   Q    Where was that?

20   A    I don't know the street name.  It was in

21   Burlington.  It's a white house.

22   Q    Okay.  You went there, and what happened?

23   A    I went in the house with Pinky.  We left when Brian

24   had the drugs, and we went back to the Econo Lodge.

25   Q    Other times Brian brought crack to Pinky at the

```
 1    hotels you were staying at?
 2    A    Correct.
 3    Q    You said that your son was about three months old
 4    or so, a few months old, when you started working for
 5    Brian; is that right?
 6    A    Correct.
 7    Q    What did you do with him while you were working?
 8    A    Either he would be in the other room or I would get
 9    a baby-sitter to -- to take him.
10    Q    Who did you use as a baby-sitter?
11    A    My friend Hannah.
12             MS. SAVNER:  Can we pull up 47A.
13    BY MS. SAVNER:
14    Q    Do you recognize this person?
15    A    Yes.
16    Q    Who is it?
17    A    That's Hannah.
18    Q    So Hannah would sometimes babysit your son?
19    A    Yes.
20    Q    How did you know Hannah?
21    A    I went to high school with her.  I was good friends
22    with her sister.
23    Q    Was she older or younger than you?
24    A    She was two years younger than me.
25    Q    And where would she babysit him?
```

1   A    Typically at her house.

2   Q    At any point were you aware of Hannah meeting Brian

3   Folks?

4   A    Yes.

5   Q    Explain what you remember about that.

6   A    Hannah came to pick up my son.  At that time Brian

7   was there.  So they were in the same room.  That's when

8   the first meeting happened.

9   Q    Okay.  And where did she come to pick up your son

10  when Brian was there?

11  A    I believe this was at the Motel 6 at that time.

12  Q    Okay.  And what happened when you and Hannah and

13  Brian were all there?

14  A    I simply just introduced her as my baby-sitter.

15  Q    What did Brian do?

16  A    Brian, no matter who it was, always wanted to know

17  if they were willing to work.

18  Q    As prostitutes?

19  A    Yes.

20  Q    And did he do that with Hannah?

21  A    Yes.

22  Q    What do you remember about that?

23  A    He asked how old she was, if she was willing to

24  work, what her situation was.

25            MS. SEN:  Objection, your Honor.  Can we

1   approach for a moment, please?

2           THE COURT:  Yes.  Okay.

3   (The following was held at the bench.)

4           MS. SEN:  This is the first time this witness

5   has ever said this, at least that we are aware of, and

6   from her statement, it's not clear if she is going to be

7   saying statements that Hannah said -- that would be

8   hearsay in response to this -- or if she actually

9   overheard this conversation.

10          THE COURT:  Okay.

11          MS. SAVNER:  And I can --

12          THE COURT:  Make a proffer.

13          MS. SAVNER:  -- clarify as -- with the witness

14  as to whether she was present at the time and heard

15  these statements directly from Mr. Folks.

16          THE COURT:  Heard the statements from Mr.

17  Folks.  The question about statements from Hannah, in

18  particular, in regard to her, number one, age, or,

19  number two, her wish to participate in prostitution?

20          MS. SAVNER:  As those would be hearsay

21  statements, I will not plan to elicit anything along

22  those lines.

23          MR. KAPLAN:  Does she know that?

24          MS. SEN:  Does she know that?

25          MS. SAVNER:  I don't know.

1          MR. KAPLAN:  I am wondering if the witness

2   should be told she can't say what --

3          THE COURT:  Yeah.  I think maybe it's a good

4   time for a break at this point.  So what's your -- you

5   want to make sure that the witness does not say any --

6          MS. SAVNER:  I understand.

7          THE COURT:  -- statement from Hannah that goes

8   to the heart of Count 15.  Okay, so you can talk with

9   her.

10          MS. SEN:  And, your Honor, this is the first

11   time that this has ever been stated by this witness.

12          THE COURT:  The first time this has ever been

13   stated by this witness?

14          MS. SEN:  Yes.

15          THE COURT:  What has been stated by the

16   witness?

17          MS. SEN:  That she's overheard these

18   conversations between our client and Hannah.  I mean,

19   the only report of investigation that we have, that has

20   been produced by the government to date, which was an

21   interview with her a year ago where, if asked -- when

22   asked directly if she knew if Hannah actually

23   prostituted, her response was, "I don't recall."

24          THE COURT:  Okay.  So let's excuse the jury,

25   and I'd like to speak with the lawyers.  Okay?

1          All right.

2     (The following was held in open court.)

3          THE COURT:  All right.  It's quarter of, so I

4     am going to excuse you at this point.  I am going to

5     stay and talk with the lawyers.  We'll see you -- it's

6     going to be a little bit more than 15 minutes because we

7     are going to have a conversation here, so -- not much

8     more, but a little bit more.  Okay.

9     (The jury was excused after which the following was held

10    in open court at 2:45 p.m.)

11         THE COURT:  Okay.  You are excused for this

12    period.

13              (Witness temporarily excused.)

14         THE COURT:  All right.  So, Miss Sen, tell me

15    your objection.  I mean, the government has indicated

16    that they would instruct the juror -- or the witness not

17    to say anything that Hannah would have said if it

18    involves hearsay.  So what other objections you were

19    never disclosed?

20         MS. SEN:  Well, your Honor, she is testifying

21    to information that was -- for the first time, and the

22    reason we had filed the motion *in limine* regarding the

23    statements and the issue of hearsay and the entire we

24    raised that motion beforehand was for exactly this kind

25    of a reason, that you have someone who comes on the

1    stand and all of a sudden is going to say these hearsay

2    statements.

3        I am not sure that this witness was clear that she

4    wasn't to talk about those statements with Hannah.  And

5    I understand that the prosecutor can direct her, but for

6    this to be occurring today while this woman is on the

7    stand, you know, we have had no notice of it.

8        I just wanted to raise it with the Court because

9    it's concerning in terms of responding to it.

10            THE COURT:  Well, all right.  So in terms of

11   your objection to Hannah making hearsay statements, or

12   the hearsay statements of Hannah being introduced, I

13   mean, that's going to be resolved.  The Court sustained

14   your objection, and the government is going to actually

15   speak with the witness to make sure she doesn't describe

16   at all what Hannah would have said.

17       Now, then the other issue is statements made by the

18   defendant.  Of course that's not hearsay.  Were you

19   raising objection to that or was this just a general

20   objection that you haven't received adequate discovery?

21            MS. SEN:  Well, your Honor, if this -- I mean,

22   and I don't know.  And maybe I will have to get into it

23   on cross with her, but if she has had interviews with

24   law enforcement, other -- or with the prosecutor, other

25   than what we have been provided, I think we should have

1    been provided that.

2        Of course at this point anyone can say anyone --

3    anything, you know, when they're sitting in a courtroom

4    and it often is different from what their previous

5    statements are.  But I just wanted to clarify that there

6    were no other statements that the government had

7    reflecting this version of events from this witness.

8        THE COURT:  Okay.  All right.  Do you have any

9    other statements?

10        MS. SAVNER:  Well, I will point out that the

11    one report of investigation that defense counsel is

12    referencing, that was produced from a February 6, 2018,

13    interview.  In the section concerning Hannah, you know,

14    she describes that she was present when the two met, and

15    she -- she says, as she just did on the stand, that Moe

16    preyed upon weak girls, especially those who hung around

17    girls he already owned.

18        So I think that's what she was describing was that

19    any time a new girl would be around, he would ask, you

20    know, if she was up for prostitution.  I don't have

21    any -- I have never spoken with this witness and

22    obtained any other statements by the defendant that --

23    that she remembers.

24        So it's very possible that upon thinking about it

25    over the last, you know, year since she was first

interviewed in this case, February 6th, 2018, she's remembered more than she did originally, but I don't have any other statements of the defendant that I am aware of.

THE COURT:  So you have got a disclosure in discovery to the defense in which she said she remembers a conversation between the defendant and Hannah.  She was there.  She heard it.  She remembers the defendant saying that he was -- well, she remembers the defendant encouraging her to participate.

MS. SAVNER:  That's not correct, actually.  In the previous disclosure, based on this prior interview -- which I will say I was not a part of it; it was just an interview with the agents -- there was no discussion in this report of her remembering the specifics of the conversation between Mr. Folks, Hannah, that she witnessed.

THE COURT:  Okay.  Well, are there any other reports indicating that she remembers some version of the exchange between the defendant and Hannah?

MS. SAVNER:  No.  She remembers them all being there.  She remembers the pictures being taken, pictures that are the basis for the count, and that's why the government intended to call her.  I was not aware until she began speaking about it that she remembered

1    specifics of the conversation.

2            THE COURT:  Okay.  You know, this is

3    problematic because that -- I could get into

4    statements -- defendant's statements that were not

5    disclosed --

6            MS. SAVNER:  They weren't in the possession of

7    the government.

8            THE COURT:  Right.

9            MS. SAVNER:  I didn't know of them.  The

10   prosecution team didn't know of the statements.  As I

11   just said, this is the first time that she has

12   remembered those statements and been able to testify

13   about them.

14           THE COURT:  Well, do you know what statement

15   she is going to say?

16           MS. SAVNER:  I do not.

17           THE COURT:  Okay.

18           MS. SEN:  Your Honor, I would just like to

19   point out that -- this report of investigation, which is

20   based on an interview by Marilyn Epp and Adam Chetwynd

21   from February 6th of last year, "When asked if Hannah

22   Ackley had ever prostituted for Moe, Liljeholm could not

23   recall."

24        Further down that paragraph, it says, "Liljeholm --

25   she did not remember introducing them."

1     That's the only information we have had with

2     nothing about any statement that our client has made.

3                THE COURT:  All right.  This is -- this could

4     be an important piece of evidence, and in light of the

5     fact that there was no disclosure of a defendant's

6     statement, I'd ask that you not get into any statements

7     that the defendant may have made during this brief

8     exchange with Hannah because, you know, frankly, if --

9     if she says that the defendant said something which is

10    very significant, well, then we are going to have to

11    explore what did the other agents, Ms. Epp as well as

12    Agent Chetwynd, know, were there any notes, et cetera.

13    And we could go off into, you know, a tangent.

14                MS. SAVNER:  Yes, your Honor.  We can exclude

15    the statements.

16                THE COURT:  Just exclude the statements and

17    exclude Hannah's statements, and then just move along.

18                MS. SAVNER:  Yes, your Honor.

19                THE COURT:  Okay.  All right.  Thank you.

20                MS. SEN:  Your Honor, could I just raise one

21    point?

22        I think that she responded to the question and

23    started talking about the conversation that she

24    overheard, and so I wonder if the Court would move to

25    strike that.

```
1              THE COURT:  Well, do you want me to instruct
2     the jury that you just not think about what she said in
3     the answer?  My -- my reaction is just leave it the way
4     it is.  She did not say anything about what Mr. Folks
5     said, so let's just leave it at that.
6              MS. SEN:  That's fine, your Honor.
7              THE COURT:  Okay.  All right.  Thank you.
8              MS. SAVNER:  Your Honor, just for clarity
9     purposes, do I have permission to speak with the
10    witness --
11             THE COURT:  Yes.
12             MS. SAVNER:  -- and inform her of --
13             THE COURT:  Absolutely.  Yes.
14             MS. SAVNER:  Thank you.
15    (Court was in recess at 2:53 p.m.)
16    (The following was held in open court with the jury
17    present at 3:10 p.m.)
18             THE COURT:  Okay.  Miss Savner, you ready?
19             MS. SAVNER:  Yes, your Honor.
20                 CONTINUED DIRECT EXAMINATION
21    BY MS. SAVNER:
22    Q    You understand you are still under oath?
23    A    Yes.
24    Q    Okay.  I want to go back to where we were talking
25    about Pinky for a minute.  When you started working for
```

1    Mr. Folks, was Pinky already working for him at the
2    time?
3    A    Yes.
4    Q    How about Shorty?
5    A    I don't -- I don't remember.
6    Q    All right.  So we were talking about a day at the
7    Motel 6 when Hannah came over and she was there with Mr.
8    Folks.  You remember that?
9    A    Yes.
10   Q    Okay.  What happened -- what happened that day?
11   A    Hannah came over to pick my son up.  I introduced
12   them.  And then Hannah left with my son.
13   Q    Okay.  At any point were photographs taken?
14   A    Yes.
15   Q    Was that a different day or the same?
16   A    It was a different day.
17   Q    Okay.  Tell us about that day.
18   A    Hannah came over and Pinky and Shorty were there
19   also, and we all four took pictures together, and Brian
20   was taking them.
21   Q    Okay.  Did you see photos being taken of Hannah by
22   herself?
23   A    Yes.
24   Q    By whom?
25   A    What was that?

1    Q    By whom?

2    A    Brian.

3    Q    I'm showing you what's been marked as Government's

4    Exhibits 46 and 45.  Take a look at those and see if you

5    recognize them.

6    A    Yeah, that was that day.

7    Q    Okay.  So you are looking at 46?  Those fairly and

8    accurately depict the photos of Hannah that were taken

9    that day that you saw?

10   A    Yes.

11   Q    Okay.  And how about 45?

12   A    Yes.  This is the day that I was referring to.

13   Q    Okay.  And do those fairly and accurately depict

14   the photos of multiple girls taken by Mr. Folks that

15   day?

16   A    Yes.

17             MS. SAVNER:  The government moves to admit

18   Exhibits 45 and 46.

19             THE COURT:  Any objection?

20             MS. SEN:  Yes, your Honor.  Can we please

21   approach?

22             THE COURT:  Yes.

23   (The following was held at the bench.)

24             MS. SEN:  Your Honor, these are photos that

25   there's no foundation laid for where these photos came

1    from, so they may be photos of this woman and she may be

2    able to identify it, but the photos are from our

3    client's computer.  There's been no foundation laid for

4    how those photos got onto our client's computer.  I

5    mean, we haven't even gotten a chain of custody yet for

6    the computer itself, which is what I was asking

7    Detective Merchand about.

8            THE COURT:  Okay.

9            MS. SAVNER:  And if I may, your Honor:  These

10   are just the photographs themselves, and the witness has

11   said these were -- these fairly and accurately depict

12   what she saw in the photographs that were taken that

13   day.  I don't know -- we're not intending to offer

14   through this witness where they came from.

15           MS. SEN:  But, your Honor, I think in order to

16   offer them, they have to show they don't know when --

17   they're claiming -- they're trying to link up that this

18   witness knew when they were taken and that these photos

19   were found on our client's computer, and --

20           THE COURT:  They may be found, but she was

21   there.  She observed the women there.  She observed the

22   photographs being taken.  She knows what the image was.

23   Isn't -- why isn't that a sufficient foundation without

24   necessarily having to show a link to his computer?

25           MS. SEN:  Because, your Honor, it's possible

1    that these photos were modified.  It's possible that

2    these aren't the same photos.  They may be similar but

3    not the same.  It's possible that they were taken with

4    other devices.  And there's no foundation that's been

5    laid to link that up.

6            THE COURT:  Okay.  So tell me about the

7    foundation about -- about the defendant's computer.  Are

8    you ultimately going to get into evidence images that

9    were taken from the defendant?

10           MS. SAVNER:  We intend to through other

11   witnesses who examined and extracted data from the

12   computer, and these photos don't contain any metadata.

13   I don't intend to ask her where these photos came from.

14   She was there when these photos were taken.  They

15   include her.

16           THE COURT:  Okay.

17           MS. SAVNER:  And she says they fairly and

18   accurately depict what happened.

19           THE COURT:  Would you go in a little bit

20   greater depth of the foundation of those particular

21   photos.  Why does she know that this was the same day

22   which she is describing, and how does she know that

23   these are, in fact, the images that were protected on

24   that particular day?  But you are not going to use the

25   computer.  You are not going to use his computer to

1   constitute the foundation.  How does she know that

2   that's exactly what she has seen?

3           MS. SAVNER:  I can ask her more questions, but

4   the standard for the admission of the pictures is does

5   it fairly and accurately represent what happened that

6   day.

7           THE COURT:  Yeah, but you have to lay the

8   foundation as to when and where, et cetera, as well as

9   show that the images are --

10          MS. SAVNER:  Okay.

11          THE COURT:  -- fairly representative.

12          MS. SAVNER:  Okay.

13          THE COURT:  So if you can just ask a few more

14  questions about what she knows about those photographs,

15  when, where, et cetera.

16          MS. SAVNER:  Yes, your Honor.

17          THE COURT:  Okay?

18          MS. SEN:  Thank you, your Honor.

19  (The following was held in open court.)

20          THE COURT:  Okay.  Go ahead.

21          MS. SAVNER:  Okay.

22  BY MS. SAVNER:

23  Q    I want to talk to you about -- ask you a couple

24  more questions about this first exhibit, Exhibit 46.  Do

25  you know who the person is in these pictures?

```
 1    A    Yes, I do.

 2    Q    Who is it?

 3    A    That's Hannah.

 4    Q    Do you know where these photos were taken?

 5    A    Motel 6.

 6    Q    How do you know?

 7              THE COURT:  I'm sorry.  Motel 6, okay.  And

 8    how do you know that?

 9              THE WITNESS:  I can tell by the bedspread and

10    the paint on the wall.

11    BY MS. SAVNER:

12    Q    Is Motel 6 a place you have been to before or after

13    this day that these pictures were taken?

14    A    Yeah.  I would frequently be there.

15    Q    Okay.

16              THE COURT:  Well, how do you know that they

17    were taken on the day that you have described?

18    BY MS. SAVNER:

19    Q    Were you there when these pictures were taken?

20    A    Yeah, I was there.

21    Q    Did you see Mr. Folks taking these pictures?

22    A    Yes.  This is the same -- the same day.

23    Q    And did you see Hannah doing these poses like she

24    is doing in these pictures?

25    A    Yeah.  I was right here in the same room.
```

```
 1   Q    Okay.
 2              THE COURT:  Okay.
 3   BY MS. SAVNER:
 4   Q    And there's a --
 5              THE COURT:  You offering that?
 6              MS. SAVNER:  Yes, your Honor.  46.
 7              THE COURT:  You have an objection, Miss Sen?
 8              MS. SEN:  Can I ask a few questions,
 9   your Honor, please?
10              THE COURT:  Yes.  Okay.
11                    VOIR DIRE EXAMINATION
12   BY MS. SEN:
13   Q    Miss Liljeholm, you say that you --
14              THE COURT:  You want to make sure you don't
15   use last names.
16              MS. SEN:  Sorry.
17   BY MS. SEN:
18   Q    You said that you could identify these photos based
19   on the -- you said it was the bedspread?
20   A    And the photo -- the paint on the wall.  The
21   colors.
22   Q    How do you know it was taken on the same date?  Do
23   you actually know that in your memory?
24   A    Yeah.  I do.  I was there.  I know what she was
25   wearing.  I know what we were all wearing.
```

1    Q    Isn't it possible that she could have been wearing

2    that on another day?

3    A    It is possible that she was wearing it on the same

4    day -- or on a different day, although I remember this

5    picture specifically being taken and Brian telling her

6    to position her hands that way.  So it seems like a lot

7    of things would have to be the same at a different date.

8    Q    But just looking at this photo, you don't know from

9    your memory that it was taken on the same date?

10   A    That's correct.

11   Q    And these photos, the same thing?

12   A    I -- that's possible that they weren't taken on

13   that same day, but I was saying that they were.

14        MS. SEN:  Your Honor, I would still object to

15   the introduction of these photos, I think that -- for

16   the same reasons that I stated.

17        THE COURT:  They are admitted.

18        (Government's Exhibit 46 was received in

19   evidence.)

20        THE COURT:  Okay.

21        MS. SAVNER:  And I am just going to go

22   through, before we publish, Exhibit 45.

23              CONTINUED DIRECT EXAMINATION

24   BY MS. SAVNER:

25   Q    So here we have got some photos, and tell us what

1    we are seeing here, just generally.

2    A    So that is the four of us, and Brian is taking that

3    picture.

4    Q    Do you see yourself depicted in these pictures?

5    A    I do.

6    Q    How do you know it's you?

7    A    I have a tattoo on my side.

8    Q    And do you see that tattoo picture here?

9    A    Yes.

10   Q    Okay.  And do you see the girl second from the

11   left?

12   A    Yes.

13   Q    Okay.  And can you see what she's wearing?

14   A    I can see what she's wearing.

15   Q    And what is she wearing?

16   A    Teal bottom and a black kind of tube top.

17   Q    Do you know who that girl is?

18   A    I do.

19   Q    Who is it?

20   A    That's Hannah.

21   Q    And is that the same teal bottom and black top that

22   she's wearing in Government 46 that we just looked at?

23   A    It is, yes.

24            MS. SAVNER:  The government moves to admit 45.

25            THE COURT:  I thought you offered both before,

1    but -- any objection to 45?

2              MS. SEN:  Same objection, your Honor.

3              THE COURT:  All right.  So admitted.

4              (Government's Exhibit 45 was received in

5    evidence.)

6              MS. SAVNER:  Permission to publish 46?

7              THE COURT:  Yes.

8    BY MS. SAVNER:

9    Q    Okay.  Who are we looking at?

10   A    That's Hannah.

11   Q    All right.  And you just testified, when Miss Sen

12   was asking you questions, that you remember Mr. Folks

13   telling Hannah to put her hands like that?

14   A    Yes.

15   Q    Which picture were you referring to?

16   A    The one on the left.

17   Q    Put her hands in her underwear like that?

18   A    Correct.

19             MS. SAVNER:  Can we go to the next page.

20   BY MS. SAVNER:

21   Q    All right.  These are also of Hannah?

22   A    Correct.

23   Q    Okay.  And you mentioned the bedspread and the wall

24   are memorable to you?

25   A    Correct.

1    Q    Where do you see those?

2    A    So on the right picture, the bedspread and also the

3    wall are in view.

4    Q    Bright orange?

5    A    Bright orange.  Very memorable.

6              MS. SAVNER:  Okay.  Go to the third page.

7    BY MS. SAVNER:

8    Q    Is that also a picture of Hannah?

9    A    That is a picture of Hannah.

10   Q    Same bedspread?

11   A    Same bedspread.

12             MS. SAVNER:  Can we turn to 45, please.

13   BY MS. SAVNER:

14   Q    All right.  And photos of multiple girls, correct?

15   A    Correct.

16   Q    Do you see the -- do you see Hannah in these

17   photos?

18   A    I do.

19   Q    Can you tell us which one she is?

20   A    She is wearing the teal bottoms and the black top.

21   She is to the right.

22   Q    The one to the right?

23   A    Yes.

24   Q    Are you in these two photos?

25   A    I'm not.

1    Q    Were you there when these two photos were taken?

2    A    Yes.  Same day.

3    Q    You mentioned that the other women who were there

4    with you that day -- one of whom was Shorty; is that

5    right?

6    A    Correct.

7    Q    Which one is Shorty?

8    A    The one in the pink.

9    Q    Okay.  And do you know for sure who the other one

10   is?

11   A    I don't.  I do not.

12          MS. SAVNER:  Okay.  Can we go to the next

13   page, please.

14   BY MS. SAVNER:

15   Q    All right.  And same day?

16   A    Same day.

17   Q    Same photo shoot?

18   A    Yes.

19   Q    Do you see yourself in these two photos?

20   A    Yes.

21   Q    Which one are you?

22   A    With the tattoo, in the middle.

23   Q    Okay.  Is this one, second from the right, you?

24   A    Yes.

25   Q    And same on the bottom?

```
 1    A    Correct.

 2    Q    Okay.  And who's to your left?

 3    A    Hannah.

 4    Q    Who took these pictures?

 5    A    Brian.

 6    Q    Who told you how to pose?

 7    A    Brian.

 8         MS. SAVNER:  Can we turn to the last page.

 9  BY MS. SAVNER:

10    Q    All right.  Are these the same four girls?

11    A    Yes.

12    Q    Do you see yourself?

13    A    Yes.

14    Q    And you all have your faces turned or covering your

15  faces.  Why is that?

16    A    He didn't want our faces being shown.

17    Q    He being --

18    A    Brian.

19    Q    Do you know what Mr. Folks did with these photos?

20    A    He posted them on Backpage.

21    Q    How do you know?

22    A    We would have calls referring to the ad with the

23  four picture -- the four women in the picture.

24    Q    Do you remember ever -- do you remember any

25  involvement in prostitution that Hannah had after these
```

1    photos were taken?

2    A    No.

3    Q    Did you ever do any dates with Hannah?

4    A    No.

5    Q    Okay.  You remember though getting calls based on

6    this ad?

7    A    Yes.

8    Q    Do you remember seeing this ad yourself?

9    A    Yes.

10   Q    Where did you see it?

11   A    Backpage.

12   Q    Why would you look on Backpage?

13   A    I always checked just to make sure that the ad was

14   up or where in the lineup the ad was.

15   Q    How did it work in terms of what do you mean where

16   in the lineup it was?

17   A    It was just a similar layout to Craig's List.  All

18   the ads would be up for that day.  Depending on how many

19   people posted, my ad would be further down the list.

20   Q    So you wanted to make sure you had an ad visible at

21   all times?

22   A    Right.

23   Q    Do you remember anything else about what happened

24   next after these photos were taken --

25   A    No.

1    Q    -- that happened that day?

2    A    No.

3    Q    Did there come a point when you wanted to stop

4    working for Mr. Folks?

5    A    There was.

6    Q    Can you explain what happened.

7    A    When I decided I wanted to stop working for him?

8    Q    Yes.

9    A    Yeah, that -- are you referring to the day that I

10   left?

11   Q    No.  Well, was there a day before then when you

12   decided that you wanted to leave prior to you actually

13   leaving?

14   A    Yes.  So he got violent during sex, and that was

15   kind of the fall for me.  I lost whatever trust that I

16   had in him, and I started tying up my ends, getting

17   where I needed to go after, getting rides away, getting

18   a place to stay, things like that.

19   Q    Had you had sex with him before?

20   A    Yes.

21   Q    Okay.  And it was not violent?

22   A    No.

23   Q    Okay.  But there's one time when it was?

24   A    Yes.

25   Q    Can you explain what he did.

1    A    Yes.

2         So I was at the Econo Lodge.  He got extremely --

3    extremely aggressive during anal sex.  I had to go to

4    the other room.  I told him to stop.  I finished.  I

5    went straight to the bathroom, and he left.

6    Q    Were you bleeding?

7    A    Yes.

8    Q    Was anyone else there?

9    A    Pinky was there.

10   Q    How did your feelings about Mr. Folks change after

11   that?

12   A    I despised him.  I couldn't be really in the same

13   room as him.  I tried to keep my feelings as nonvisible

14   as possible to get all of those things put into place

15   just for the safest exit for me and my son.

16   Q    What were you worried about happening?  Why did you

17   need to have a plan in place?

18   A    I was worried about him getting violent or doing

19   something to my son or me, preventing me from

20   stopping -- or from leaving.  All of those things ran

21   through my head.

22   Q    During this time after he was violent with you

23   during sex while you were working on this plan to leave,

24   did you begin using drugs?

25   A    Yes.

```
1    Q    What drugs did you use?

2    A    Crack.

3    Q    Why?

4    A    I felt like I was stuck.  I didn't really have an

5    escape route at that time.  Also I was with Pinky 90

6    percent of the time, so that was readily available to

7    me.

8    Q    And how did the crack make you feel?

9    A    It was a distraction more so.

10   Q    Did you ever do heroin during this time?

11   A    No.

12   Q    Okay.  So did you ultimately come up with a plan to

13   get out of there?

14   A    Yes.

15   Q    And what did your plan involve?

16   A    Taking me and my son out of that situation.  I

17   called a friend to come pick me up, and they brought me

18   to a different hotel out of town.

19   Q    Okay.  And before you left -- well, tell us about

20   the day you left.  What happened?

21   A    Sure.  So the day that I left, he came while I was

22   packing all of my things.  I kind of had --

23   Q    He -- he being?

24   A    Brian came while I was packing all of my things.  I

25   had my son's bouncy and stuff like that outside of the
```

1    room.  And I think that he thought that I was going to

2    have him, like, set up, so he -- he -- he's told me

3    that, and he opened all of the doors to the hotel.  And

4    I was waiting for my ride to come.  He got violent with

5    me.  My son was on the bed.  Brian choked me.  Lifted me

6    up by my neck.

7    Q    Were you standing or sitting?

8    A    So I was sitting -- or I was standing at the time

9    he put his hand on my throat.  He lifted me up and then

10   put me down in the chair.

11   Q    Held you up by your neck?

12   A    Yes.

13   Q    Did he put his hands on you in any other way?

14   A    There was a lot of pushing, a lot of commotion, but

15   at that time my biggest concern was to get me and my son

16   out of there.

17   Q    Were you able to do that?

18   A    Yeah.  So he had opened all the doors, so I could

19   see when my ride got there.  So after this incident, I

20   grabbed my son and ran right outside.  I worried about

21   getting my son buckled in, and my friend worried about

22   getting all the other stuff in.  Brian was still in the

23   room with Pinky.  When I left, I went up to the -- I

24   drove up to the hotel lobby, got the deposit for my room

25   back, and at this time Brian hit our car with my son as

```
 1        I was going in.
 2     Q     He was in a car?
 3     A     He being Brian?
 4     Q     Yes.
 5     A     Yes.  So he was in a car, came, hit our car while I
 6     was getting in.  I drove away, down Shelburne Road.
 7     Q     Did he follow you?
 8     A     He did.
 9     Q     For how long?
10     A     So maybe midway through Shelburne Road.  I was on
11     the phone with the police.  I was frantic.  I was
12     scared.  My son was in the car, so I was just trying to
13     get as fast away as I could.
14     Q     Did the police respond?
15     A     No, they didn't.  I had -- there was a lot of
16     commotion during this, so I just kind of hung up.  It
17     was a general dispatch, so --
18     Q     And you were driving at the time?
19     A     Correct.
20     Q     Did you leave Vermont?
21     A     Yes.
22     Q     Where did you go from there?
23     A     So I left to Arizona.
24     Q     Did you continue your work as an escort?
25     A     Yeah.  There was a time after that I went to Vegas
```

1    in the middle.

2    Q    Okay.  Have you been back to Vermont since then,

3    besides for this case?

4    A    No.

5    Q    Why not?

6    A    I don't ever want to run into anybody that he --

7    that Brian is associated with or Brian -- I haven't seen

8    him since that day.

9    Q    Are you employed now?

10   A    Yes.

11   Q    Full or part time?

12   A    Full time.

13   Q    Are you raising your son?

14   A    Yes.

15   Q    Not in Vermont?

16   A    Not in Vermont.

17   Q    The day you left Mr. Folks at that hotel, when he

18   chased you in the car, you mentioned Pinky was there?

19   A    Yes.

20   Q    So Pinky was still working for Mr. Folks when you

21   left?

22   A    Yes.

23   Q    Do you remember the day -- the date that you left?

24   A    Not the specific date.  I do -- I do know the date

25   only because I posted a picture of my son that day, and

1    it was memorable where we were and what we were doing at

2    that time.

3    Q    Would it refresh your memory as to the date if I

4    showed you that picture?

5    A    Yes.

6    Q    Take a look at that and let me know if that

7    refreshes your memory about the date.

8    A    Yes.  This was the picture I was referring to.

9    June 30th, 2013.

10   Q    This picture refreshed your memory?

11   A    Yes.

12   Q    And you left Mr. Folks on June 30th, 2013?

13   A    Correct.

14   Q    And you mentioned this picture was memorable to

15   you?

16   A    Yes.

17   Q    Why is that?

18   A    It was a stressful time, for one, so being safe was

19   a blessing.  So, yeah, I remember that.

20              MS. SAVNER:  Thank you.  Nothing further.

21              THE COURT:  Okay.  Cross examination?

22              MS. SEN:  Yes, your Honor.

23                     CROSS EXAMINATION

24   BY MS. SEN:

25   Q    You said that before you met Mr. Folks, that you

1    were working for C-Rock?

2    A    Correct.

3    Q    Who is C-Rock?

4    A    That was a friend of mine that I met through mutual

5    friends that also had women escort for him.

6    Q    Did you know his actual name?

7    A    No.

8    Q    No?  Where did he live?

9    A    I knew him to be in Burlington.

10   Q    And so were you working with other women with him?

11   A    No.

12   Q    Okay.  You were just working with him?

13   A    Correct.

14   Q    And did he have other women associated with him?

15   A    I'm not sure.  This was a short span, and I only

16   know my business with him.

17   Q    And did C-Rock -- when you were working with him,

18   were you posting on Backpage?

19   A    Yes.

20   Q    And had you met the woman you referred to as Pinky

21   before you met Mr. Folks?

22   A    No.

23   Q    So you only met her after -- through Mr. Folks; is

24   that your testimony?

25   A    Correct.

1    Q    Okay.  And it's your testimony today that she was

2    already working with Mr. Folks at the time that you met

3    her?

4    A    Correct.  As far as I know, yes.

5    Q    Now, you said that you -- when the prosecutor asked

6    you why you decided to work for Mr. Folks and you said

7    that you worked for him -- that you gave him all your

8    money, and then that was a better deal than what you had

9    before, how is that a better deal than what you had

10   before?

11   A    Well, it wasn't strictly about giving him all of my

12   money.  It was about travel and transportation and

13   having convenience and things like that.  Not having to

14   go out and find a ride to get even just a prepaid card.

15   That was the service he provided, not just handing all

16   of my money over to him.

17   Q    So you got some benefit out of this arrangement, it

18   sounds like?

19   A    Yeah.

20   Q    And you mentioned the photos that we talked about a

21   little bit earlier that were taken at the Motel 6.  Do

22   you remember what device was used to take those photos?

23   A    I don't remember.

24   Q    You don't?  You don't know if it was a camera or

25   cell phone?

```
1    A    No.

2    Q    Now, this incident when you left, wasn't it true

3    that one of the reasons you left is that Brian had told

4    you that he didn't want you associating with a man named

5    Mecca because Mecca was rumored to have HIV?

6    A    I don't remember this.  Yeah.  No, that was not my

7    reason for leaving at all.

8    Q    So it doesn't -- you don't remember him telling you

9    that you had to -- that he didn't want you to keep

10   working with that person because of a concern for

11   people's health?

12   A    Yeah.  No.  So, in fact, we weren't allowed to hang

13   out with anybody that was not paying me, and that was

14   Brian's rules, so.

15   Q    So you mentioned --

16            MS. SEN:  Your Honor, may I have a moment,

17   please?

18            THE COURT:  Yes.

19            (Brief pause.)

20            MS. SEN:  I have nothing further, your Honor.

21            THE COURT:  Okay.  All right.  Any redirect?

22            MS. SAVNER:  No, your Honor.

23            THE COURT:  Okay.  Thank you.

24            THE WITNESS:  Thank you.

25            THE COURT:  You are all set.
```

1            (Witness excused.)

2            THE COURT:  All right.  The government want to

3    call the next witness.

4            MR. GRADY:  Yes, your Honor.  The United

5    States next calls Danielle M.

6        All right.  Danielle, come on into the courtroom,

7    and if you want to go in front of the podium, the clerk

8    will swear you.  You can stay there or you can go in

9    front, whatever you want to do.

10                        DANIELLE M.,

11        being first duly sworn by the courtroom deputy,

12        was examined and testified as follows:

13            THE COURT:  Okay.  Good afternoon.

14            THE WITNESS:  Good afternoon.

15            THE COURT:  Just ask that you get that

16    microphone up close and speak right into it.

17            THE WITNESS:  Okay.

18            MR. GRADY:  Perfect.

19                    DIRECT EXAMINATION

20    BY MR. GRADY:

21    Q    Danielle, is your first name Danielle, last

22    initial -- or, excuse me, initial of your last name M?

23    A    Yes.

24    Q    Thank you.  We are just going to use first names

25    today.

1    A    Okay.

2    Q    How old are you?

3    A    31.

4    Q    Are you from Vermont originally?

5    A    I am.

6    Q    What towns did you live in growing up?

7    A    All over.  Burlington, Winooski, South Burlington,

8    Colchester.

9    Q    Why did you move around -- why did you bounce

10   around so many times?

11   A    I grew up in state's custody, and I was in tons of

12   foster homes and different facilities up until 18.

13   Q    How many foster homes did you live in, if you had

14   to guess?

15   A    Roughly 23.

16   Q    What ages did you live in foster homes?

17   A    I'd say roughly probably between the ages of 13 on.

18   13 to 18.

19   Q    Who raised you growing up?

20   A    Myself.

21   Q    Can you tell the jury a little bit about your

22   parents.

23   A    My mother and father were addicts.  My father still

24   is.  My mother's now sober.  I -- my mother didn't raise

25   me.  She was always locked in her room.  I took care of

1    myself and my brother.  And when I would go over to my

2    father's, he didn't raise me either.  It was my

3    stepmother that tended to me when he was out doing

4    drugs, so --

5    Q    Danielle, did you experience sexual abuse growing

6    up?

7    A    I did, from the ages of seven to -- even into my

8    adulthood.

9    Q    Who was that from?

10   A    My sister's father, my mom's boyfriend, and then I

11   would go over to my dad's house, and his best friend.

12   Q    As a result of this abuse growing up, have you been

13   diagnosed with anything?

14   A    Yes, I have.

15   Q    What have you been diagnosed with?

16   A    I have severe PTSD, OCD, bipolar, major depression,

17   panic disorder.

18   Q    Was there a period in your life when you would cut

19   yourself?

20   A    I did.  For many years.  From 11 until about three

21   years ago.

22   Q    What would you cut?

23   A    My arms.

24   Q    Was there a time, Danielle, that you got addicted

25   to drugs?

1    A    Yes.

2    Q    When did that start?

3    A    That started around age 21.

4    Q    How did it start?

5    A    A boyfriend of mine that I was dating at the time

6    came home with a pill and introduced me to Vicodin.

7    Q    Do you remember that boyfriend's name?

8    A    His name was Bruce.

9    Q    How often did you start using Vicodin?

10   A    I used Vicodin for only literally a couple days,

11   and then it quickly moved up to OxyContin.

12   Q    How did you feel when you were using either Vicodin

13   or OxyContin?

14   A    I felt at ease, comfortable.  I didn't have to feel

15   the emotions of my past.

16   Q    Why did you continue to use these pills?

17   A    At first it actually felt good, but then Bruce was

18   very abusive with me, so it also helped me cope, and

19   then my emotions and the abuse.

20   Q    Did you ultimately try heroin?

21   A    I did.

22   Q    How old were you when you tried heroin?

23   A    I was around 23.

24   Q    Did you become addicted to heroin?

25   A    I did.

1   Q    Let's talk about the -- the first time that you

2   went to rehab.  Did you complete the first time that you

3   went to rehab?

4   A    I did.

5   Q    What happened when you got out of rehab the first

6   time?

7   A    I found out that my mom had given up my son to his

8   father, and he was living out of state in Massachusetts,

9   and that was done behind my back.

10  Q    How did you feel when you found this out?

11  A    I felt horrible and felt like the one and only

12  thing I had in my life was taken from me.

13  Q    What did you turn to when you found this out?

14  A    Drugs, of course.

15  Q    Did you begin using intravenously at this time?

16  A    I did.  That was the very first day.

17  Q    What did you use intravenously?

18  A    Percocet.

19  Q    Did you eventually start using heroin again?

20  A    Of course.  It was cheaper.

21  Q    Did you get addicted to heroin?

22  A    I did.

23  Q    Danielle, do you know a person by the name Brian

24  Folks?

25  A    I do.

1    Q    What name do you know him as?

2    A    Moe.

3    Q    Do you see him in court today?

4    A    I do.

5    Q    Can you identify Moe by a --

6              MR. KAPLAN:  Your Honor, we will stipulate, as

7    we always do, she is referring to our client.

8              THE COURT:  Okay.  So stipulated.

9    BY MR. GRADY:

10   Q    How did you first come to know Moe?

11   A    Through his cousin, Hector.

12   Q    How did you learn about Moe through Hector?

13   A    Through the drug scene.  That is where Hector

14   brought me over to get drugs.

15   Q    Are you saying that Hector brought you to a house?

16   A    Yes.

17   Q    Do you remember where that house was?

18   A    East Spring Street.

19             MR. GRADY:  Your Honor, may I have continuing

20   permission to approach the witness?

21             THE COURT:  Yes.

22   BY MR. GRADY:

23   Q    Danielle, I am showing you what's been marked for

24   identification Government Exhibit 97.  Take a minute.

25        Do you recognize that photograph?

1   A    I do.

2   Q    What is shown in that photograph?

3   A    That's the house I would go to.

4   Q    Does that fairly and accurately reflect the house

5   you would go to to get drugs from Moe?

6   A    Yes.

7          MR. GRADY:  Your Honor, at this time the

8   government moves to admit and publish Exhibit 97.

9          THE COURT:  Any objection?

10          MR. KAPLAN:  No, your Honor.

11          THE COURT:  So admitted.

12          (Government's Exhibit 97 was received in

13   evidence.)

14   BY MR. GRADY:

15   Q    Now, at this time when you are getting drugs at

16   this house, do you have a primary drug dealer?

17   A    I did.  It was two different people, but then it

18   ended up turning into Brian.

19   Q    Who is the other person that you would get drugs

20   from at this time?

21   A    Hector.

22   Q    How did you know Hector?

23   A    Through Facebook and mutual friends.

24   Q    How did you -- how did you pay for heroin when you

25   were getting it through Hector?

1   A    Most of the time I didn't.  The guy that I was

2   staying with, Travis Wells, would cover my addiction and

3   my habit every day.

4   Q    How many times did you see Moe when you would go

5   over to this house to get drugs?

6   A    You mean how many times did I go over there or how

7   many times was he present when I went there?

8   Q    How many times was he present when you would go

9   there?

10   A    Every time.

11   Q    And let me back up for a minute.  Before you got

12   into everything with Moe, how many times did you go over

13   and see him at this house to get drugs?

14   A    It was a handful of times.

15   Q    Did Moe actually hand drugs to you?

16   A    No.  Never.

17   Q    How did it work?

18   A    He would always go in, and he would always -- he

19   referred to them as his boys.  He would tell them

20   that -- to take care of me, and they would bring me into

21   the bathroom, and they would hand me the drugs.  He

22   would wait in the kitchen.

23   Q    How do you know that they were Moe's drugs?

24   A    He said -- he said so.  They were his boys, and

25   they were his drugs.

1   Q    Would he sometimes -- would he, as in Moe,
2   sometimes give you deals on drugs?
3   A    Yes.  Because a lot of times I was short on money.
4   Q    What did you obtain for drugs on these few handful
5   of occasions?
6   A    It was always crack.
7   Q    Let me go ahead and take down 97.
8        Did there come a time when you owed money to a
9   different drug dealer?
10  A    I did.
11  Q    Who did you owe money to?
12  A    Stress.
13  Q    How much did you owe Stress?
14  A    $300.
15  Q    Why?
16  A    He allowed me to rack up a bill.  I fronted a bunch
17  of crack cocaine from him.
18  Q    Was anybody else aware of your debt to Stress?
19  A    Brian was.
20  Q    How did he learn about this?
21  A    Through Stress and Hector.
22  Q    Did either Hector or Moe offer a solution to this
23  drug debt?
24  A    Yes.
25  Q    How did -- tell us -- tell the jury what happened.

1    A    I got a message randomly out of the blue from
2    Hector asking me if I needed to make extra money.
3    Coincidentally at that time I did.  I wasn't sure how he
4    knew, but I said yes, I do.  And he said he had a way
5    for me to make money and that his cousin would be
6    contacting me and if that would be okay, and I said
7    absolutely.  And that is when I heard from Brian.
8    Q    What did Brian tell you?
9    A    Just asked where my address was and he could come
10   pick me up, and he was there within -- less than an
11   hour.
12   Q    Were there any other details told to you at this
13   time?
14   A    No.
15   Q    What did you think you would be doing for Brian
16   when he came and showed up?
17   A    I thought I was going there because -- the only
18   detail that I did get told, that I would be staying in a
19   hotel room with a woman -- her name was Mandy -- and I
20   thought I was going to be helping them sell drugs to
21   support my habit but also help put money in their
22   pockets as well.
23   Q    Why did you think you would be -- you'd be helping
24   out selling drugs?
25   A    I had no idea that he did anything else other than

1    sell drugs.

2    Q    What was going on in your life when Moe made this

3    offer to you?

4    A    I was worried, dope sick.  I was going through

5    withdrawals.

6    Q    Can you describe to the jury what it feels like

7    when you are dope sick and going through withdrawals?

8    A    It feels absolutely horrible.  It feels 10 times

9    worse than the flu.  You have body aches.  You vomit.

10   You have diarrhea.  Your chest hurts.  Your head hurts.

11   Every joint in your body aches.  You have a one-track

12   mind.  You can't focus on anything besides how you are

13   going to get your next fix.  You have added anxiety that

14   wouldn't be present without the withdrawals.  You even

15   go through suicidal ideation.  You have thoughts of

16   killing yourself to escape.  Restless legs, cramping in

17   your legs, cramping in your stomach.  Watery eyes.

18   Sneezing, coughing.  It's definitely a horrible feeling.

19   Q    What's the one way to end all these horrible

20   feelings you just described?

21   A    To get your next fix.

22   Q    How instantaneously do all these symptoms go away?

23   A    Intravenously, within a second.

24   Q    Besides being dope sick, what was your financial

25   situation like?

```
 1   A     So there was no way to make money on Travis.  He
 2   relied on hustling and making money with his mother's
 3   vehicle -- and his mother was gone to rehab -- with
 4   Ireland Transportation, and he had lost his job.  He
 5   didn't have a job, so -- he was also dope sick.  And we
 6   had no way of making money.
 7   Q     Did you tell Travis about possibly going with --
 8   with Moe?
 9   A     I did.  And he told me it wasn't a good idea not to
10   go, and of course I didn't listen.
11   Q     So did you ultimately agree to go with Moe?
12   A     I did.
13   Q     Okay.  Did he pick you up?
14   A     He did.
15   Q     Where were you living at the time?
16   A     On Platt Street in Swanton.
17   Q     Where did he drive you after he picked you up?
18   A     The North Star hotel on Shelburne Road.
19   Q     Did all this happen in the summer of 2015?
20   A     Yes.
21   Q     What did you talk about with Moe on the way from
22   Swanton to North Star?
23   A     My sexual abuse history.  He asked me about the
24   cuts and the scars on my arms, if I was a cutter.  Kind
25   of what I had gone through as a child.  And me
```

```
 1    continually asking for drugs.
 2    Q    How did he see the cuts on your arms?
 3    A    I had a T-shirt on.  It was summertime.
 4    Q    Danielle, would it be okay if I asked you to show
 5    your arms to the jury?
 6    A    Okay.
 7    Q    Okay.  Hold on.
 8           MR. GRADY:  Your Honor, do I have permission
 9    to have the witness step down?
10           THE COURT:  Yes.
11           MR. GRADY:  Okay.
12    BY MR. GRADY:
13    Q    Danielle, if you want to step down from the witness
14    box.
15    A    Okay.
16    Q    And you can take your time.  We are not in a hurry.
17    And if you want, I will hold your shirt for you, and if
18    you want to put your arms out for the members of the
19    jury, and you can just come right along here.  And if
20    you want to, you can come down here towards the end.
21           Thank you.  You can have your shirt back.  Feel
22    free to put that back on.
23           Danielle, how did those scars appear four years ago
24    in the summer of 2015?
25    A    They were worse.
```

1    Q    Did the -- did Moe seem caring about you during

2    this car ride?

3    A    Surprisingly, yes.

4    Q    How so?

5    A    He seemed very caring and concerned and told me

6    that I didn't deserve to treat myself like that, and I

7    didn't deserve what happened to me as a child, and it

8    made him feel sad to see that I felt the need to harm

9    myself like that.

10   Q    When Moe was telling you these things, how did you

11   feel?

12   A    I felt like he was a friend, someone who showed

13   concern, someone who cared about me, and someone who was

14   actually being legit and honest with me.

15   Q    At some point during this car ride, did you find

16   out that Moe knows Stress?

17   A    Not during the car ride.

18   Q    When did you find out that Moe knew Stress?

19   A    When we got to the hotel.

20   Q    Let's go back to the car ride though.  Did Moe say

21   anything about carrying protection during the car ride?

22   A    Yes.

23   Q    What did you -- what did that mean --

24   A    Carrying --

25   Q    -- as far as -- let me ask it a better way.

1      What did you think he was talking about when he

2  said protection?

3  A    Carrying a firearm of some sort.

4  Q    Did you ultimately ever see a firearm?

5  A    I did.

6  Q    Was that also at the hotel?

7  A    Yes.

8  Q    Okay.  We will get to that in a minute too.

9      Going back to the car ride, did you tell Moe that

10  you were dope sick?

11  A    Oh, plenty of times.

12  Q    How many times had you told him this?

13  A    Close to -- probably 50.  I kept asking him for

14  drugs, so --

15  Q    What was his response?

16  A    "When we get back to the hotel, I got you," were

17  his exact words.

18  Q    Did you ultimately show up at the North Star?

19  A    I'm sorry.  What did you say?

20  Q    Did you -- did the two of you, Moe and you,

21  ultimately end up at the North Star?

22  A    Yes.

23  Q    Danielle, I am going to show you what's been marked

24  as Government Exhibit 101 for identification.  Take a

25  minute and look at that photo.

1      Do you recognize what's shown in that photo?

2    A    Of course.

3    Q    What is it?

4    A    It's the North Star hotel -- motel.

5    Q    Is that the motel that you and Moe arrived at?

6    A    Yes.

7    Q    Thank you.  Does it fairly and accurately depict

8    the North Star?

9    A    Yes.

10          MR. GRADY:  Your Honor, at this time the

11   government moves to admit and publish 101.

12          MR. KAPLAN:  No objection, your Honor.

13          THE COURT:  So admitted.

14          (Government's Exhibit 101 was received in

15   evidence.)

16   BY MR. GRADY:

17   Q    Who did you meet when the two of you showed up at

18   the North Star?

19   A    That's when I met Mandy.

20   Q    At this time, showing you what's been previously

21   admitted as 48A, who is shown in 48A?

22   A    That's Mandy.

23   Q    That's Mandy.  What else did you observe about the

24   motel room when you first showed up?

25   A    I knew exactly why I was there at that point when I

1    walked in because there was a roll of paper towels, a

2    list, and condoms on the bedside nightstand.

3    Q    What did you think when you saw all of these

4    materials?

5    A    My heart dropped and I went to turn around to

6    leave.

7    Q    How did you feel in that moment?

8    A    Scared.

9    Q    Why did you turn around to leave?

10   A    Because I didn't want to be there.  That's not what

11   I wanted to do.

12   Q    What happened when you turned around to leave?

13   A    Brian was standing in front of the door, and he

14   wouldn't let me leave.

15   Q    What do you mean he wouldn't let you leave?

16   A    He just stood up really tall and kind of lifted up

17   his shirt a little bit, and that's when I first spotted

18   the firearm.

19   Q    Did Moe also tell you at this time that he had

20   stabbed someone in the past?

21   A    Yes.

22   Q    At that moment, did you have anyone else you could

23   turn to for help?

24   A    No.

25   Q    What about Travis?

1   A    No.

2   Q    Why not?

3   A    Even Travis, who I lived with, had hurt me, and I

4   was told not to tell anybody where I was.

5   Q    Who told you that?

6   A    Brian.

7   Q    Did you actually try to reach out to your mom --

8            MR. KAPLAN:  Your Honor, may we approach for a

9   minute, please?

10            THE COURT:  Yes.

11   (The following was held at the bench.)

12            THE COURT:  Okay?

13            MS. SEN:  I didn't hear this but Natasha did.

14   Was the question, Did Moe tell you that he had stabbed

15   someone in the past?

16            THE COURT:  Yes.

17            MR. GRADY:  Yeah, in --

18            MR. KAPLAN:  I thought we agreed that it

19   wasn't coming in.

20            THE COURT:  No.  We had agreed the conviction

21   for manslaughter was not going to come in.

22            MR. KAPLAN:  But what he actually --

23            THE COURT:  The fact that he was -- he

24   actually made a statement that he was convicted of

25   murder, that wasn't coming in.

1          MR. KAPLAN:  And that he was a gang member.

2          THE COURT:  There's nothing about this

3     stabbing and -- never was told that he had made a

4     statement to one of the witnesses that he had stabbed

5     somebody.

6          MR. KAPLAN:  I could be wrong, but I thought

7     the transcript said, when she was talking about it, she

8     said, "He told me he was a gang member."  He said he was

9     a member of the Bloods, that Bloods kill people.  But I

10    don't think she ever said that he said that "I'll stab

11    you" or something.  That's not in the transcript.

12         MR. GRADY:  I don't know what transcript you

13    are talking about, but I know --

14         MR. KAPLAN:  When she went to the grand jury.

15         MR. GRADY:  I don't know if she was asked that

16    specific question, but I will say that during prep, we

17    talked about, and I focused on it, did he specifically

18    say he stabbed someone as opposed to hearing it from

19    someone else, and she said, "Yes.  He told me that he

20    stabbed someone," and my understanding is if it came

21    directly from the defendant, it's certainly relevant,

22    and the reason --

23         THE COURT:  Actually I never addressed the

24    question of stabbing.

25         MR. KAPLAN:  Because it was never --

1          THE COURT:  It was murder.

2          MR. GRADY:  Right.

3          THE COURT:  He told people he was convicted of

4    murder.  He told people he was a member of the Bloods,

5    but those were excluded.  I don't ever remember the word

6    "stabbing."

7          MR. KAPLAN:  It's not in anything, Judge.

8    That's why.  I mean, we talked about what she said in

9    the grand jury, which was Bloods, gang member, they

10   shoot people, stuff like that.  Never anything about he

11   said he was going to stab you on the way over.

12         THE COURT:  What are you seeking at this

13   point?

14         MR. GRADY:  This was also -- it was within the

15   same discussion about gang member, things of that

16   nature.  I specifically made leading questions -- it was

17   in the same discussion of being a gang member, but I

18   made it a leading question because I knew that was

19   excluded, to focus just exactly on the fact he told her

20   that --

21         THE COURT:  If it is to be excluded, so --

22         MR. KAPLAN:  If I had known that, I would have

23   moved to exclude that just like I did the gang member,

24   just like we did that he -- he was violent or she didn't

25   like black people.  You know, at least we would've filed

1   a motion *in limine* about that, but we never had -- it's

2   not anyplace in the discovery, and I know witnesses come

3   in, they tell a different story than they told before,

4   but this is pretty significant, and it seems to me if he

5   met with her and prepared her for trial and she says

6   something like this, that we should have been put on

7   notice of this issue.

8           THE COURT:  First of all, do you know if there

9   was discovery on this particular statement?

10          MR. GRADY:  I can't remember right now at this

11  point, your Honor, there was specific discovery or not.

12          THE COURT:  Let's move along and look for

13  discovery, see if there was any discovery.

14          MR. GRADY:  Sure.

15          THE COURT:  And then show it to the defense

16  that this statement was made.  I never heard of it.

17  Obviously there was no effort to exclude it.

18      The question is whether they knew about it.  And

19  then second question is, okay, so if there had been no

20  disclosure, then the question is what the impact is.

21          MR. KAPLAN:  Because they can use that now to

22  argue to the jury that that's why she did it, because

23  she was afraid of being stabbed.

24          THE COURT:  Well, I -- we're going to take a

25  look at exactly what was said --

```
1                    MR. KAPLAN:  I am just saying --
2                    THE COURT:  -- and what the remedy is.
3                    MR. KAPLAN:  I am saying that's my concern.
4                    THE COURT:  I appreciate that, but -- so let's
5        move along and we can --
6                    MR. GRADY:  Okay.
7                    THE COURT:  -- take that up at the end of the
8        day.
9             How long do you expect her testimony to last?
10                   MR. GRADY:  It will last -- I'm not sure what
11       it is, but it will last definitely a little bit longer,
12       probably another 45 minutes or so.  I don't know if you
13       want to break for the day?
14                   THE COURT:  We will break for the day at the
15       end, at 4:30, and then --
16                   MR. GRADY:  Okay.
17                   THE COURT:  Okay.  Now that I have got you up
18       here, I am supposed to tell the jury how long to
19       anticipate staying.  My question is Wednesday still --
20       is that the day?
21                   MR. GRADY:  I think so, your Honor.  We would
22       finish our case if not tomorrow, certainly Monday.
23                   THE COURT:  Okay.
24                   MR. KAPLAN:  Probably.
25                   THE COURT:  Okay.  So we'll say Wednesday, as
```

1    late as Thursday.  You are going to get the case this

2    week, and we'd extend into Friday as well for

3    deliberations.  Okay?

4                MR. GRADY:  Okay.

5                THE COURT:  All right.

6    (The following was held in open court.)

7    BY MR. GRADY:

8    Q    All right.  Danielle, I think where we last left is

9    I had asked a question if you had reached out to your

10   mom a few days later?

11   A    Yes, I did.

12   Q    What happened when you did that?

13   A    She did not care.  She told me at least I can

14   support my habit, and I have to do what I need to do.

15   Q    Going back to that moment at the North Star, did

16   anyone explain the rules to you?

17   A    Mandy did, for the most --

18   Q    Who was around when Mandy explained the rules?

19   A    Brian.

20   Q    Did Brian approve of the rules in any fashion?

21   A    Yes.

22   Q    How so?

23   A    He would just nod his head when Mandy would go over

24   the rules, or if Mandy forgot and left something out, he

25   would fill it in.

1    Q    Do you remember some of the rules?

2    A    Yes.

3    Q    What were they?

4    A    You were to do everything that the client wanted

5    you to do.  You can't just stop in the middle of sex

6    even if it's hurting you.  You have to do what they want

7    you to do.  And you have to finish until they're done.

8    If you get a call at two or three o'clock in the

9    morning, it doesn't matter what time, doesn't matter if

10   you are tired; you are to fulfill the need of that

11   client.  You are to -- there was prices on half hours,

12   quickies, overnights, hour.  You were to fulfill those

13   prices.  And you were also to -- you could keep half and

14   then give the other half to Brian.  You were not to

15   allow anybody to know where you were except for the

16   clients, of course.  You were not to talk to anybody on

17   the outside.  Even if there was another trick going on

18   at North Star, we were not allowed to talk to anybody.

19   Nobody was allowed over, no friends or anything, for

20   that matter.

21   Q    Did Moe use any specific app on phones, if you

22   remember?

23   A    It was a text-me-now app.

24   Q    How did that work?

25   A    So that you -- you get assigned a telephone number

```
 1    that's kind of private.  Obviously it's not your actual
 2    cell phone number itself, so you get another number
 3    assigned to you so that when clients would text you,
 4    they wouldn't text your actual cell phone number but the
 5    app and number.
 6    Q    Did you -- you testified before that you were dope
 7    sick on the way to the North Star, and you showed up at
 8    the North Star and these rules were told to you.  Did
 9    you get drugs then?
10    A    No.
11    Q    What had to happen first?
12    A    I had to take pictures first.
13    Q    Who took pictures of you?
14    A    Brian.
15    Q    Why did he take pictures of you?
16    A    He told me to post them up on Backpage.
17    Q    Had you heard of Backpage before?
18    A    Never.
19    Q    Did Brian give you anything to wear in these
20    pictures?
21    A    I had Mandy's underwear he said to put on.
22    Q    Did Moe direct any poses?
23    A    Yes.  He told me exactly how to pose.
24    Q    Did -- was your face shown in these photos?
25    A    In some of them they were shown, but when the
```

1    pictures were taken, the rule, he said, there were

2    supposed to be no face, no tattoos, nothing that was

3    obvious that people could know who I was.  I'm not sure

4    how they were posted on the internet once they got on

5    there.

6    Q    Do you recall what Moe used to take these pictures?

7    A    Just his cell phone.

8    Q    Danielle, I am showing you what's been marked 53C

9    for identification.  It's a two-page document.  I just

10   want to focus on the first page right now.

11        First of all, who is shown in those photos?

12   A    Myself.

13   Q    Who took those photos?

14   A    These current photos, I don't remember that they

15   were taken.

16   Q    Okay.  How about the second page of 53C; who is

17   shown in those photos?

18   A    Myself.

19   Q    Do you recall who took those photos?

20   A    Moe took these photos.

21   Q    Do you know where those photos were taken at?

22   A    Motel 6.

23   Q    Okay.  Thank you.  I will retrieve 53C.

24        Do you know what Moe used to post the ads on

25   Backpage?

1    A    I have no idea.

2    Q    Was Moe on his phone a lot?

3    A    All the time.

4    Q    Did you finally get drugs after these pictures?

5    A    Yes.

6    Q    What did you get?

7    A    Crack.

8    Q    Why crack as opposed to heroin?

9    A    Well, that's what he sold.  That's what he had.

10   And even when someone is dope sick, crack will make them

11   feel a little better because it will speed them up and

12   it takes their mind off of the withdrawal symptoms.

13   Q    Is that what happened to you at that time?

14   A    Yes.

15   Q    Did you ever get heroin?

16   A    I did after my first client.

17   Q    When did your first client show up in relation to

18   when these pictures were taken?

19   A    Within an hour.

20   Q    Where did Moe and Mandy go when this first client

21   showed up?

22   A    I don't know.  They left the room.

23   Q    How were you feeling when the first client showed

24   up?

25   A    Scared.  Nervous.

1   Q    Did you do anything to get you through this first

2   date?

3   A    I smoked the crack, and I just purposely

4   disassociated.

5   Q    You use the term "disassociate."  What does that

6   mean?

7   A    It's when you escape from your body.  It's how you

8   physically numb yourself and your emotions.  Somebody

9   typically that goes through any kind of trauma can do it

10  on their own, and sometimes they do it even not on

11  purpose; subconsciously they will do it.

12       I was able to completely numb my body and my

13  emotions and escape reality as if I was floating on top

14  of my body just looking down watching myself but not

15  feeling anything inside.

16  Q    Have you been through therapy after all of your

17  experiences?

18  A    From 11 till currently.  I am still in therapy,

19  yes.

20  Q    Is that how you know some of the -- these terms

21  such as disassociate?

22  A    Absolutely.  And I have done research.

23  Q    At some point did you leave Moe?

24  A    Yes.

25  Q    When was that in relation to this first day at the

```
1    North Star?

2    A    When I -- I left him completely?

3    Q    Yes.

4    A    That was within a week.

5    Q    So I want to focus on this week period that you are

6    with Moe.

7    A    Okay.

8              MR. GRADY:  I don't know if you want -- okay,

9    never mind, your Honor.

10   BY MR. GRADY:

11   Q    Did you stay at the North Star that entire week?

12   A    No.

13   Q    Where did you go next?

14   A    The Ho Hum on Shelburne Road.

15   Q    Why did you go to the Ho Hum?

16   A    Because the cops came to North Star, and we just

17   barely escaped them.

18   Q    Did you stay at the Ho Hum or did you go somewhere

19   else?

20   A    We left the Ho Hum within -- within two days, to

21   Motel 6.

22   Q    Danielle, I am showing you what's been marked as

23   Government Exhibit 100 for identification.  It's a

24   multi-page document.  Take your time and look through

25   some of those photos.
```

1        Do you recognize what's shown in 100?

2    A    Of course.

3    Q    What's shown in 100?

4    A    That's Motel 6.  That was the last room I was in.

5    Q    Okay.  Is this the Motel 6 in Colchester?

6    A    Yes.  Behind McDonald's.

7    Q    Do these photos fairly and accurately show the

8    Motel 6 in Colchester?

9    A    Absolutely.

10        MR. GRADY:  Your Honor, the government moves

11   to admit and publish 100.

12        THE COURT:  Any objection?

13        MR. KAPLAN:  No, your Honor.

14        THE COURT:  So admitted.

15        (Government's Exhibit 100 was received in

16   evidence.)

17        MR. GRADY:  And actually if we could go to the

18   final page first.

19   BY MR. GRADY:

20   Q    Is that the outside of the Motel 6?

21   A    Yes.

22   Q    Okay.  And we will go through the inside photos.

23        Go to the next photo.  I notice this orange

24   bedspread.  Is that sort of unique to the Motel 6 in

25   Colchester?

1    A    Yes.

2    Q    Okay.  We will go through the remaining pictures.

3         And that wall, is that orange wall also unique to

4    the Motel 6 in Colchester?

5    A    Yes.

6    Q    During this one-week period, Danielle, how many

7    clients a day did you see on average?

8    A    About 10.

9    Q    Who paid for these hotel rooms?

10   A    Well, Brian did, but initially it was coming out of

11   our pockets.

12   Q    When during the day would clients show up?

13   A    Any time of the day.  Doesn't matter what time.

14   Q    How did you feel after seeing all these clients?

15   A    I often cried and felt very emotional.

16   Q    Did you do anything to help you see these clients?

17   A    Of course I did my -- I did my drugs.  I would

18   always, either before or after a client -- my getaway

19   was in the bathroom with the door closed, just being by

20   myself getting high.

21   Q    Did Moe ever pressure you to see clients?

22   A    Yes.

23   Q    How so?

24   A    He wanted me to see as many clients as I could, and

25   he even tried telling me that the one day I -- I saw a

1    lot of clients, and I did end up bringing in a lot of
2    money for him, and he even told me that if I had brought
3    in any more clients after that, I could keep all of the
4    money.  I didn't even have to give him any.
5    Q    Speaking of money, I think you previously testified
6    that you would give half to Moe.  Why did the defendant
7    want half?
8    A    He said because he had to pay for fuel and out
9    calls, which is considered having to leave the hotel and
10   go to where they are, and he had to pay for the room.
11   Q    What did you use your half on?
12   A    Getting drugs from him.
13   Q    Did you meet anyone else besides Mandy while you
14   were either at the North Star or the Ho Hum?
15   A    Yes.  Keisha.
16   Q    Showing you what's been marked previously as --
17             MR. KAPLAN:  I wonder if the witness could put
18   in perspective the date we are talking about, the time
19   frame, because I don't think that's been brought out.
20             THE COURT:  I thought it was the summer of
21   2015.
22             THE WITNESS:  Um-hum.
23             MR. KAPLAN:  I mean more specifically than
24   that.  Is that possible?
25             THE WITNESS:  You think I can remember that?

1    It's been so long ago.

2              MR. GRADY:  Danielle --

3              THE WITNESS:  I couldn't remember a month.

4              THE COURT:  Well, is it the summer of 2015?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.

7    BY MR. GRADY:

8    Q    So we left off, Danielle, I think we were talking

9    about Keisha, and I will show you what's been previously

10   admitted as 50A.

11   A    Yes.  That's Keisha.

12   Q    Where had Keisha come from when you met her?

13   A    Valley Vista.

14   Q    What did Moe say about Keisha?

15   A    That she was just getting out of rehab, which is

16   Valley Vista; she needed help getting on her feet, and

17   he was going to take care of her, and we needed to take

18   care of her.

19   Q    How was he going to take care of her?

20   A    By getting her clients to put money in her pocket.

21   Q    Did Keisha use drugs?

22   A    Obviously that's why she went to rehab, but

23   apparently she was clean and sober at the time, so he

24   said.

25   Q    Did you see her using drugs at either the Ho Hum or

1    the North Star?

2    A    Yes.

3    Q    Who gave her the drugs?

4    A    Brian did.  And a lot of times she would get them

5    from one of her clients that she would see.

6    Q    Did you see Moe taking pictures of Keisha?

7    A    Yes.

8    Q    How many days was Keisha around?

9    A    Not very long.  Just a couple.

10   Q    What happened?

11   A    She would not follow the rules and the directions

12   and did not listen to Brian at all, so she ended up

13   leaving.

14   Q    What rule did she break?

15   A    You're not supposed to leave with the client, and

16   you are supposed to update Brian on what clients you

17   have and when and how much money you are making, and you

18   are supposed to go through him to get drugs, and she

19   didn't follow any of that.

20   Q    How do you know this?

21   A    Mandy told him.

22   Q    Did you see Moe upset with Keisha?

23   A    Yes.  He -- he screamed at her.

24   Q    What was he screaming at her?

25   A    Just letting her know that she was breaking the

1    rules and that he would make it so that she couldn't go

2    out on her own.

3    Q    Was this scary for you when you saw him yelling at

4    her like that?

5    A    Of course, yes.

6    Q    How?  Or why?

7    A    I -- I get terrified of any man yelling because of

8    my past.  But for the fact that Brian is very tall and I

9    knew that he had previously stabbed someone, and the

10   predicament I was already in, why wouldn't I be scared?

11   Q    Do you know if Moe did anything to Keisha's

12   Backpage ads?

13   A    I know that he took them down and told them -- told

14   her that he was going to take them down.

15   Q    Did Moe ever test you to see if you were following

16   his rules?

17   A    Yes.

18   Q    Can you tell the jury about that?

19   A    At the Ho Hum, I had a man show up with a set

20   amount of money.  It was $300.  He said he was only

21   going to take a half hour of my time and to pocket

22   any -- you know, the remainder of my money and not to

23   tell Brian that he was only going to be there for a half

24   hour.  So I did such that.  I did not tell Brian.

25        When Brian came, I just handed him as if the man

1   was only there for a half hour.  And that's when Brian

2   had informed me that he gave the man the $300, and that

3   he has eyes everywhere, and I was not to do that again.

4              MR. KAPLAN:  Judge, may we approach again,

5   please?

6              THE COURT:  Yes.  Okay.

7   (The following was held at the bench.)

8              MR. KAPLAN:  So, Judge, apparently she just

9   said again that she was afraid because he said --

10             THE COURT:  I'm sorry?

11             MR. KAPLAN:  Didn't she just say she was

12  afraid because he stabbed someone?

13             THE COURT:  No.

14             MR. KAPLAN:  She didn't say that again?

15             THE COURT:  No.  I thought it was actually the

16  word "shot."

17             MR. KAPLAN:  Shot?

18             MR. GRADY:  No.  It was stabbed.

19             THE COURT:  Oh, was it?

20             MR. GRADY:  Yeah.  Um hum.

21             THE COURT:  I thought it was shot.

22             MR. KAPLAN:  This is the second time.  You

23  know, it's going to be kind of hard -- I mean, I have

24  her grand jury transcript, and it's not in there

25  anyplace.

1    THE COURT:  Okay.  Well, what I want is a

2    description of the discovery that you gave to the other

3    side.  Frankly, if there's nothing about stabbed, in

4    light of the fact that I excluded a number of this

5    stuff, the question is whether I exclude the stabbed.

6    MR. GRADY:  Well, I understand --

7    THE COURT:  The question --

8    MR. GRADY:  Oh.

9    THE COURT:  Then the question is whether the

10   defense wants me to instruct the jury not to consider

11   the word "stab" or whether just make sure that nobody

12   argues that in summation.

13   MR. GRADY:  Your Honor, my understanding of

14   your pretrial ruling is that, to the extent a witness

15   doesn't know about the stabbing from someone else that

16   said, you know, they heard it through hearsay, that

17   certainly is not going to come in.  But I thought the

18   ruling was if the witness was told by the defendant that

19   he stabbed someone, that certainly would be --

20   THE COURT:  I would have to take a look at

21   that ruling.

22   MR. GRADY:  That's what my understanding is.

23   THE COURT:  Was that in writing?

24   (The judge confers with law clerk.)

25   THE COURT:  Okay.  Let's just continue on and

```
1    go right to 4:30, and then I will take a look at this.
2    Okay?
3              MR. KAPLAN:  I mean, there's also a balancing
4    test.  If we had known about it, we would have been
5    arguing that the --
6              THE COURT:  Yeah.  I am asking the government
7    to disclose --
8              MR. KAPLAN:  But how do we know it's not going
9    to come out again?  Maybe we should break so they can --
10   so we can deal with this before it comes out for the
11   third time.
12             THE COURT:  Okay, let me see this.
13             (The judge confers with law clerk.)
14             MR. KAPLAN:  It's also a prior statement of
15   our client, Judge.
16             THE COURT:  Pardon me?
17             MR. KAPLAN:  It's also a prior statement of
18   our client that we --
19             THE COURT:  That's a discovery issue, but
20   they -- I issued a ruling excluding the Bloods, the
21   murder, and it does appear that the ruling that I made
22   was based upon whether or not other people told persons.
23   So I want to take a look at that.
24             MR. KAPLAN:  But there's also another --
25             THE COURT:  I don't think we need to go over
```

```
1     this at this point.
2               MR. GRADY:  Sure.
3               MR. KAPLAN:  Okay.
4               THE COURT:  So you will check the discovery.
5               MR. GRADY:  Yes, your Honor.
6               THE COURT:  I am going to excuse them at this
7     point, and we will address whether it should be
8     excluded, and if it is, then what's the remedy.
9               MR. KAPLAN:  Thank you, Judge.
10              MR. GRADY:  Okay.
11              THE COURT:  That would be tomorrow.  But if
12    you could actually go back through the discovery, find
13    out what you told the defendant --
14              MR. GRADY:  Yes, your Honor.
15              THE COURT:  -- that would be helpful.
16              MR. GRADY:  Yes, your Honor.
17              THE COURT:  Okay.
18    (The following was held in open court.)
19              THE COURT:  All right.  We are at 4:30.
20         Now I did say that I would give you an estimate as
21    to how long the trial is to last.  And we are moving
22    along very swiftly apace.  My expectation is that
23    summations -- and you will get the case next Wednesday
24    probably.  It could be Thursday.  But it certainly is
25    going to be next week.  That's first.
```

1          And then the second thing is once you get the case,

2     the schedule is yours, and I would anticipate that once

3     you begin deliberations, you would continue on with the

4     deliberations, and that may very well include going into

5     Friday even though Friday was -- you were to be off on

6     that Friday.  But once the deliberations start, you

7     continue with the deliberations.

8          So that's a week shorter than what you had

9     anticipated.  So we are talking next Wednesday is the

10    best estimate as to when summations will be conducted,

11    the charge will be given to you, and you begin

12    deliberations.  Could be Thursday, but it certainly is

13    going to be next week.  All right?  That's based upon

14    the best estimate that I have at this point.

15         So that -- let's see.  So the 3rd -- it's the 8th,

16    the 8th when you probably get the case.

17         So with that, I'd ask that you not communicate with

18    anyone about it.  We will see you tomorrow morning.  I

19    am going to stay on the bench to talk with the lawyers.

20    (The jury was excused for the day after which the

21    following was held in open court at 4:28 p.m.)

22              THE COURT:  Okay.  My best notes are as

23    follows:  First, evidence relating to the shooting of

24    people, I excluded that.

25         Evidence related to the defendant's acquittal for

1   attempted murder in New York City -- that's what was

2   told to me -- I excluded that, although the government

3   indicated that they did not intend to introduce such

4   evidence.

5        And then in regard to defendant's violence and

6   threats against women and girls as an integral part of

7   how he exercised control over his enterprises, I

8   permitted that.  Evidence that the defendant used

9   violence and threats against women is integral to the

10  government's case-in-chief concerning Counts 10 through

11  13.  And witnesses may testify to the violence and/or

12  threats that they experienced or personally witnessed.

13  However, witnesses may not testify to what others have

14  said even for -- even for describing their state of

15  mind.

16       Now this evidence is too speculative.  All right,

17  so the distinction I was drawing was if someone had said

18  something which is threatening to you, then clearly that

19  was admissible.  If these are statements from others,

20  they're speculative.  They're not admissible.

21       Now, that doesn't directly answer the question

22  about standing because I didn't know anything about a

23  stabbing and it was never raised.  I do tend to think

24  that that's prejudicial.  I'm really interested to know

25  whether the government disclosed those statements to the

1    defense.  If not, frankly, I would be inclined to, you

2    know, strike reference to stabbings, because it -- the

3    defense could not have known about them, could not have

4    filed a motion *in limine* and probably received the same

5    kind of order that they received in regard to the

6    murder, et cetera.

7              MR. GRADY:  Yes, your Honor.  As far as notice

8    was provided, I am looking at a DEA 6 that was drafted

9    back in -- it was drafted in January of 2019.  It's

10   Bates number 14117, and it talks about an interview with

11   Danielle McGuire where she talks about how the defendant

12   told Danielle that he had stabbed someone.

13             THE COURT:  And that has been disclosed to the

14   defense?

15             MR. GRADY:  I will have to double check,

16   your Honor.  I assume with the Bates number on it -- I

17   don't know exactly what day.

18             THE COURT:  Well, it's a DEA 6.  I'm sure you

19   would have disclosed all of the DEA 6s.

20             MR. GRADY:  I'm sure it was, your Honor, and

21   also it's redacted, which leads me to believe it has

22   been disclosed.  I cannot give the exact date that it's

23   been disclosed, not right now.  I need to do a little

24   bit additional research, but the government's view is it

25   has been disclosed; and, number two, the way the

1   government took the ruling is that if the defendant told

2   the person specifically, then that was admissible

3   because it impacts their state of mind and their

4   potential fear.

5              THE COURT:  Sure.  In general, that's true.

6              MR. GRADY:  Right.

7              THE COURT:  When a -- when the defendant said

8   to a particular witness something which is threatening,

9   something which is violent, then that's certainly

10  admissible.  I guess there's a more delicate question

11  about whether describing a stabbing or saying that you

12  stabbed someone would be treated differently than a

13  threat.

14      I suppose -- I am just thinking off the top of my

15  head, but I am supposing that if you are actually -- if

16  Mr. Folks is actually talking with a witness, using this

17  particular language, "I stabbed someone," the purpose of

18  that is to threaten or intimidate, which makes the

19  relevance higher.

20      But similarly to that, to the higher relevance, is

21  the prejudicial impact of a stabbing.  I mean, there's a

22  403 analysis that you have to go through.  But the most

23  important thing right now is did the government disclose

24  that DEA 6, which included the stabbing incident, to the

25  defense.  That's step one.  And then we will address the

1    second question.

2              MR. GRADY:  So it appears this was disclosed

3    on April 5th, 2019.  The other thing I would mention to

4    your Honor, the government's understanding is that the

5    broader context for the stabbing is in relation to the

6    gang member, so as part of this conversation where "I'm

7    a gang member.  Sometimes we kill.  I stab people."  So

8    that's why the government narrowly parsed this area and

9    excluded the full context because we -- certainly from

10   the Court's pretrial ruling we could not introduce that

11   evidence based on the Court's ruling.

12             THE COURT:  So now the government has

13   disclosed they have disclosed this report to you.  You

14   want to take a look at that?

15             MR. KAPLAN:  We will.  Just as of right now,

16   we are not finding it, but we didn't update our

17   discovery.

18        The other thing is they had it in January, I guess,

19   apparently, and we would have -- if we had gotten it --

20   is that when we -- they didn't send it until April 5th.

21   We probably would have filed a motion *in limine* if we

22   received it in January when we were getting ready for

23   trial.

24             THE COURT:  I appreciate that.  Let's take it

25   step by step.

1           MR. KAPLAN:  Sure.

2           THE COURT:  First of all, did you get the

3    discovery of that material?

4           MR. KAPLAN:  We will figure that out, Judge.

5           THE COURT:  Okay.  Well, anyway.  You know,

6    what remedies are you talking about at this particular

7    point?  You seeking a remedy of excluding the government

8    from mentioning a stabbing in summation?  That's one

9    possibility.  Next possibility is to give the jury an

10   instruction that the reference to a stabbing should be

11   stricken from the record.  You know, that would

12   generally be an extraordinary remedy, bringing it up

13   again.  What are you asking?

14          MR. KAPLAN:  Well, I think it depends on

15   whether or not we received notice, but in the event we

16   did not, I would have to consult with Miss Sen, but I

17   would think we would want both -- both remedies.

18       The problem is that we have her grand jury

19   transcript.  We have everything she said about -- about

20   being afraid of Brian.  We filed motions *in limine*.  The

21   Court granted it.  So none of that stuff came in.  And

22   now we have got something that's extremely similar to

23   what the Court excluded because it was overly

24   prejudicial, and -- and maybe we got notice in April.  I

25   have never seen this document.

1          THE COURT:  Well, if you got notice on April

2     5th, that's really key, seems to me.

3          MR. KAPLAN:  Pretty close to trial date

4     though.

5          THE COURT:  Well, but still you would have the

6     opportunity to file a motion *in limine*.

7          MR. KAPLAN:  Sure.

8          THE COURT:  And so then you certainly would be

9     prepared.  If you received the notice on that -- on that

10    date, I'd like to know that.  If not, I'd like to know

11    that as well.  We can talk about it at quarter of nine

12    tomorrow.

13        Now, you anticipate direct examination going with

14    her for another 15 minutes or so?

15         MR. GRADY:  I'd say, your Honor, probably go a

16    little bit past that.  More -- more like a half hour

17    maybe.

18         THE COURT:  Okay.  And then cross, and then

19    you have Ayla?

20         MR. GRADY:  We are calling Ayla next,

21    your Honor, and then Mr. Frank Thornton, and final

22    witness -- I don't know if we will get to or not -- is

23    Marilyn Epp.

24         THE COURT:  Great.  And Amanda is not going to

25    be called?

1          MR. GRADY:  Correct.  Amanda S. is not being

2     called.

3          THE COURT:  Okay.  Great.  We will see you

4     tomorrow morning.

5          (Court was in recess at 4:35 p.m.)

6                      *** ** **

7

8

9

10               C E R T I F I C A T I O N

11        I certify that the foregoing is a correct
      transcript from the record of proceedings in the
12    above-entitled matter.

13                         _Anne Nichols Pierce_

14    May 1, 2019          _____
      Date                      Anne Nichols Pierce
15

16

17

18

19

20

21

22

23

24

25