UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
          V.            *    Case No:  2:16-cr-94-1
BRIAN FOLKS            *


TRIAL BY JURY - DAY SEVEN - VOLUME I
MAY 2, 2019
BURLINGTON, VERMONT


BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

     Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

     Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Danielle M. | 7 |
|   Direct Examination by Mr. Grady | 7 |
|   Cross Examination by Mr. Kaplan | 28 |
|   Redirect Examination by Mr. Grady | 56 |
|   Recross Examination by Mr. Kaplan | 60 |
| Frank Thornton | 61 |
|   Direct Examination by Mr. Grady | 61 |
|   Voir Dire by Ms. Sen | 65 |

| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 82 | Facebook Msg. Danielle and Moet | 17 |
| Defense | | |
| C9 | Facebook Msg with Danielle M. | 31 |
| C4 | Trial Ex. Binder Danielle M. | 33 |

3

1  TUESDAY MAY 2, 2019.

2  [The following was held in open court.  Jury is not present.

3  8:55 a.m.]

4          THE COURT:  Good morning.

5          DEPUTY CLERK:  This is Case Number 16-94 United

6  States of America versus Brian Folks.  The Government is

7  present through Assistant United States Attorneys Emily Savner,

8  Matthew Grady, and William Darrow.  The defendant is present in

9  the courtroom with his attorneys Mark Kaplan and Natasha Sen.

10  The matter before the Court is Trial by Jury day seven.

11          THE COURT:  All right.  What is the status of the

12  discovery in regard to the stabbing?  Mr. Grady.

13          MR. GRADY:  Yes, Your Honor.  The defense informed us

14  yesterday that they did in fact receive it on April 5th.

15          THE COURT:  Okay.  Mr. Kaplan, is that right?

16          MR. KAPLAN:  Judge, I'm going to have the resident

17  scholar respond to this.

18          MS. SEN:  Hardly.  Your Honor, there's no question we

19  did receive it and the only issue is that we would ask the

20  Court at this point given that had we been more aware of it

21  clearly we would have moved to exclude it and we would ask the

22  Court to go through the probative versus the prejudicial test

23  at this point.

24          THE COURT:  The problem is not only are you asking me

25  to exclude it based upon the Rule 403 analysis, but that you're

4

```
1   asking that I do that retroactively, and that of course adds a
2   prejudicial element to the Government.  They delivered you the
3   statement.  To actually go and instruct the jury that they are
4   to exclude any reference to stabbing, if that's what you're
5   asking for, or to restrict the Government from mentioning the
6   stabbing when in fact it's already been admitted into evidence
7   I think would be very prejudicial to the Government's position,
8   and in light of the fact that the statement in fact was given
9   to the defense I'm going to deny the defense's request to limit
10  use of that stabbing incident.  All right.
11          MS. SEN:  Okay, Your Honor.
12          THE COURT:  Now I'll go and I think the jury will be
13  ready in about five minutes.  Okay.  So we've -- any change in
14  the witnesses?
15          MR. GRADY:  Yes, Your Honor.  After Danielle the
16  Government's intent was to call Ayla.  However, it appears this
17  morning that she is not feeling well and I'm not sure if we'll
18  get her this morning.  We may try to get to her this afternoon.
19  So because of that what the Government was thinking is after
20  Danielle to call Mr. Frank Thornton, but I think the issue is
21  the defense's computer expert was not going to get here until
22  around noon based upon our previous schedule we were planning
23  yesterday and last night, and I believe the defense expert
24  wants to be present while Mr. Frank Thornton testifies.  So I
25  just want to make the Court aware of that issue.  Certainly
```

1   we'll have our victim witness coordinators continue to try to

2   get information about Ayla's status while Danielle is on the

3   stand.  I'm just not sure if she will make it here in time.  My

4   understanding is that her stomach is upset.  I won't go into

5   any other symptoms at this time and leave it at that.

6           THE COURT:  Okay.  Well in regard to whether or not

7   the defendant's expert is in the courtroom you are getting

8   daily transcript, are you not?  I mean both sides are getting

9   daily transcript?

10          MS. SEN:  Yes, Your Honor.

11          THE COURT:  So if the expert was able to read the

12  transcript of the testimony of some of the direct examination

13  that was missed, would that be prejudicial?

14          MS. SEN:  I don't think that would, but, Your Honor,

15  our expert is driving from Utica and is on his way here and I

16  had asked him to be here by noon thinking that between Ms. M.

17  and Ms. L. that it would take that long to get through their

18  testimony this morning.  Why don't we see where we are at once,

19  you know, Ms. M. finishes testifying.  Sorry.

20          THE COURT:  But you could start the direct

21  examination knowing that your expert could actually read the

22  transcript at noon.

23          MS. SEN:  Yes.  I think that's right, Your Honor, and

24  if we can start the direct and if I could have time to allow --

25  as long as we could get a transcript so that my -- our expert

1    could review it and I could review it with him prior to cross,

2    that would be helpful.

3              THE COURT:  Well I can ask if we can get a rough

4    transcript.  All right.  So I'll wait for the jury to come out.

5    [Judge Sessions leave the courtroom at 9:01 a.m.]

6    [Jury returns at 9:03 a.m.  Judge Sessions returns at 9:04 a.m.

7    The following was held in open court with the jury present]

8              THE COURT:  Good morning.

9              DEPUTY CLERK:  This is Case Number 16-94 United

10   States of America versus Brian Folks.  The Government is

11   present through Assistant United States Attorneys Emily Savner,

12   Matthew Grady, and William Darrow.  The defendant is present in

13   the courtroom with his attorneys Mark Kaplan and Natasha Sen.

14   The matter before the Court is Trial by Jury day seven.

15             THE COURT:  Has anyone spoken to you about this case?

16   Have you learned anything about this case from outside of the

17   courtroom or have you communicated among yourselves about the

18   facts of this case?  Everybody is consistently no.  Thank you.

19       Now I've received a note from the jury and let me read the

20   note.  We, the jury, are having difficulties hearing the

21   defense counsel.  This is at the podium and at the witness box.

22   Thank you.  Signed the jury.  All right.  I think that's just

23   notice to defense they need to speak up because the jury is

24   having difficulty hearing you both at the witness box -- the

25   witness box and also at the podium.  All right.  Government

                    Danielle M.                          7

1    want to call the witness?

2            MR. GRADY:  Yes, Your Honor.  The Government will

3    resume with Danielle M.  Good morning, Danielle.  You can come

4    on into the courtroom and you can resume your seat at the

5    witness chair.

6            DEPUTY CLERK:  Please come forward, Danielle, just to

7    be sworn again.  Thank you.

8    DANIELLE M.,

9        Having been duly sworn, testified as follows:

10           THE COURT:  Good morning.

11           THE WITNESS:  Good morning.

12                      DIRECT EXAMINATION

13   BY MR. GRADY:

14   Q.    Good morning, Danielle, and feel free to adjust the

15   microphone and bring it to you as needed.  Okay.

16   A.    Okay.

17   Q.    You mentioned yesterday that you saw Moe with a firearm,

18   right?

19   A.    Yes.

20   Q.    Where did Moe keep the firearm, if you know?

21   A.    On his side.

22   Q.    Did he keep it in a vehicle as well?

23   A.    Yes.

24   Q.    How do you know that?

25   A.    He told me.

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Danielle M.                         8

1   Q.      Were you afraid of Moe in part because he had a firearm?

2   A.      Of course.

3   Q.      Did Moe ever pitch you against Mandy and vice versa?

4   A.      Can you explain more what you mean by that?

5   Q.      Sure.  Sure.  Did Moe ever ask you to report on things

6   that Mandy was doing?

7   A.      No.

8   Q.      Did Moe ever tell Mandy to report on things that she saw

9   of you and, if so, is this based on what Moe said to you?

10  A.      Yes.

11  Q.      Can you explain that?

12  A.      Brian always told me that no matter what I did or said

13  that he would always have eyes on me and ears, and Mandy would

14  always go back and tell him because Mandy was working with him.

15  Q.      Did there come a time, Danielle, that you were injured

16  by a rough client?

17  A.      Yes.

18  Q.      Can you explain that?

19  A.      There was a time where I was forced to have oral sex.

20  Q.      With a client?

21  A.      Oh I thought you meant Brian.  With a client there was

22  times, yes, where I got really hurt.

23  Q.      Let's just focus on the time with the client and then

24  we'll turn to Moe.  What about this time that you were hurt by

25  a client?

Danielle M.                                    9

1   A.      That was an out call which was at the client's house.

2   Brian and I drove over there.  I drove.  Brian was in the

3   passenger seat.  Right before we pulled up to the client's

4   house Brian laid in the back seat of his vehicle when I went

5   in.  I was in there for a little over an hour and I walked out

6   and I was hurting.  I had tears in my eyes.  I go to the car.

7   As we pulled away Brian then got in the front seat.  He asked

8   me if I was okay.  I said I was hurting.  He asked me if I did

9   everything that the client wanted me to do and I said yes, and

10  I did tell him that I couldn't see another client because I was

11  indeed hurting and he said it didn't work that way.

12  Q.      Sounds like Brian was not very sympathetic to how you

13  were feeling at the time?

14  A.      Not at all.

15  Q.      Did Moe have sex with you?

16  A.      Yes.

17  Q.      How many times?

18  A.      Three.

19  Q.      Let's talk about the first time that he had sex with

20  you.  Was this voluntary on your part?

21  A.      No.

22  Q.      Where did it happen?

23  A.      There was two locations it happened.  One in North Star

24  hotel and the other on East Spring Street.

25  Q.      Describe what happened the first time.

Danielle M.                              10

1   A.      The first time was at North Star.  I had to give him

2   oral sex and he kept forcing my head down to the point of me

3   gagging and vomiting and I was crying.

4   Q.      When you say he forced your head down how did that

5   happen?

6   A.      He put both his hands on my head.

7   Q.      He put both of his hands on your head?

8   A.      Yes.

9   Q.      When you're crying and gagging did you ask to stop?

10  A.      Of course.

11  Q.      Did Moe let you stop?

12  A.      No.

13  Q.      Was he saying anything when this was happening?

14  A.      No.  Just keep going.  Take it all.

15  Q.      Why did he want to have sex with you, if you know, at

16  that time?

17  A.      I don't know.

18  Q.      Were you supposed to receive anything afterwards?

19  A.      Yes.  I was supposed to get more drugs afterwards.

20  Q.      Anything else from that first time that you remember?

21  A.      Not that I remember.

22  Q.      Let's go to the second time.

23  A.      Okay.

24  Q.      Where was this at?

25  A.      On the back steps of the house on East Spring Street.

Danielle M.                          11

1  Q.     What happened leading up to this?

2  A.     Basically he told me if I wanted my drugs then I had to

3  give him oral sex.

4  Q.     Did you want to give him oral sex?

5  A.     No.

6  Q.     What happened during this second time?

7  A.     He came out the back and again I gave him oral sex.

8  Again he put both his hands on my head and I kept going.  He

9  wouldn't let me stop, and literally it was about an hour had

10 passed.  He finally like let me stop.

11 Q.     Did Moe say anything to you when this was going on?

12 A.     Just take it all.  Same thing.  Take it all and I got

13 you Ma he would say afterwards.

14 Q.     Do you recall him referring to you by any names when

15 this was going on?

16 A.     Always called me Ma.

17 Q.     Okay.  What about the third time?

18 A.     Same instances on East Spring Street.  Same way.

19 Q.     What happened leading up to this third time?

20 A.     Same thing.  Said if I wanted drugs that I would have to

21 do that.

22 Q.     And again did you want to do that with Moe?

23 A.     No.

24 Q.     What happened this third particular time?

25 A.     Same thing.  I gave him oral sex, but the third time I

                    Danielle M.                    12
 1  did not receive drugs.
 2  Q.     Again --
 3              THE COURT:  Could you move the microphone just really
 4  up close or move right up close to the microphone?
 5  BY MR. GRADY:
 6  Q.     This third time did Moe say anything to you while you
 7  were performing oral sex?
 8  A.     Not that I remember.
 9  Q.     And again where were his hands during this?
10  A.     On my head.
11  Q.     Did -- besides oral sex did the defendant have any
12  vaginal sex with you?
13  A.     Anal.
14  Q.     When did this happen?
15  A.     North Star.
16  Q.     Did you want to do anal sex?
17  A.     Absolutely not.
18  Q.     Danielle, let's next go to the day that you left the
19  defendant.  How were you feeling that day?
20  A.     I was scared, drained, exhausted, and emotionally
21  unstable.
22  Q.     How did you look at the time?
23  A.     I looked very unhealthy.  I was skinny.  My face was all
24  picked up.  I had a very bad habit of picking my face when I
25  was very anxious or was under the influence a lot.  So my face

Danielle M.                                13

1  was very broken out covered in acne.  I had bags over my eyes.

2  I was definitely tired.

3  Q.     Did you run into anybody that you knew around this time?

4  A.     I did.  My father.

5  Q.     Where did you run into him at?

6  A.     He was a couple doors down from me in Motel 6.

7  Q.     When was the last time you had seen your dad prior to

8  this day?

9  A.     Probably five or six years.

10  Q.     Were you excited to see your dad?

11  A.     I was.

12  Q.     Did you use your dad as an excuse to leave Moe?

13  A.     I did.

14  Q.     How did that work?

15  A.     I came back to the motel room.  I actually used two

16  different excuses.  I also had a friend of mine who he caught

17  on to what I was doing because he saw online the pictures of

18  me.  So I said that my father was a couple doors down, that I

19  wanted to leave with my dad, and I wanted to go over to my

20  friend's house, and I wanted to do my laundry and I wanted to

21  stay there and needed a break.  My dad knows where I am, my dad

22  knows what room number I'm in, and Brian actually let me go

23  easy.

24  Q.     Did he say anything to you before you left?

25  A.     He just said that, you know, he would make it that I

Danielle M.                              14

1   couldn't get any clients on my own and I said well you don't

2   have to worry about that.  I don't want any clients and he also

3   said that -- and I was no good for him any more because the

4   very last client I had turned me down.

5   Q.     How much money did you have with you at the time?

6   A.     When I left I actually had 20 bucks.

7   Q.     What did you use that 20 bucks on?

8   A.     I got a bag of dope off my father.

9   Q.     What happened when you did the dope?

10  A.     I overdosed.

11  Q.     Where did you go when you overdosed?

12  A.     The hospital.

13  Q.     Did anybody visit you at the hospital?

14  A.     Brian and Mandy.

15  Q.     Did you ever reach out to Moe again after you left the

16  hospital?

17  A.     I did.

18  Q.     When did you do that?

19  A.     There was a couple times I did.  I couldn't tell you

20  exactly what day it was, but yes.  There was a couple times.

21  Once when I lived -- actually I believe both times is when I

22  was staying in Milton.

23  Q.     Why did you reach out to Moe of all people?

24  A.     Well it was very common with people that have been

25  abused their whole life to reach back out to their comfort

                          Danielle M.                        15

1    zone.  That was my comfort zone.  That was the only way I knew.

2    That was the only way I had been treated my whole life so of

3    course I reached out to him.  I had urges to use.  I was under

4    a lot of stress and I reached out to him again for drugs.

5    Q.     Did you also reach out for a place to live?

6    A.     I did.

7    Q.     Did that actually happen?

8    A.     It did happen.

9    Q.     Can you explain about that?

10   A.     Yes.  So I was without a place.  I was without income,

11   and I asked Brian -- because I remember Brian specifically

12   stating in the hospital if I needed him don't be afraid to ask.

13   I reached out and he allowed me to stay with a girlfriend of

14   his named Victoria.

15   Q.     Showing you what's been previously admitted as

16   Government exhibit 55A, and is that Victoria you're referring

17   to?

18   A.     Yes.

19   Q.     How did that arrangement work out?

20   A.     That did not work out.

21   Q.     Did you leave a few days after living with her?

22   A.     I did.

23   Q.     Why is that?

24   A.     Her and I were not getting along.  We got along at

25   first, but I was there to babysit her because she used a lot of

Danielle M.                          16

1    dope and I had to sit there with Narcan.  Brian told me to keep

2    an eye on her to make sure that it was going to be available so

3    she wouldn't die because she did a lot, and she had a huge

4    settlement and had a lot of money and she literally had a brick

5    of heroin and would always go to the bank probably five, six

6    times a day just for money for crack.

7    Q.     Did you also exchange messages with Moe on Facebook?

8    A.     Yes I did.

9    Q.     Approaching you again -- permission to approach the

10   witness, Your Honor?

11          THE COURT:  Yes.

12          MR. GRADY:  Thank you.

13   BY MR. GRADY:

14   Q.     Danielle, showing you what's been marked for

15   identification as Government exhibit 82 for identification and

16   take a moment to page through that if you would like.  Do those

17   appear to be messages between you and Brian?

18   A.     Yes they do.

19   Q.     And I believe that those messages were exchanged some

20   time in 2015?

21   A.     Yes.

22          MR. GRADY:  At this time the Government moves to

23   admit and publish 82.

24          THE COURT:  Okay.  Any objection to 82?

25          MR. KAPLAN:  No objection, Your Honor.

                    Danielle M.                          17

 1          THE COURT:  All right.  So admitted.

 2  [Government exhibit 82 admitted]

 3          MR. GRADY:  Thank you.

 4          THE WITNESS:  You're welcome.

 5  BY MR. GRADY:

 6  Q.     All right.  Danielle, I'm going to focus you on the

 7  bottom of the first page of 82 and the last entry by Moet Hart

 8  appears to be July 19th, 2015 and it goes on to page 2, the top

 9  of page 2, it looks like Moet Hart asked you what's up; is that

10  right?

11  A.     Yes.

12  Q.     Okay.  We're going to turn to page 3, and on page 3 it

13  appears in the middle of the page that Moet Hart wants to ask

14  about a ride to where; is that correct?

15  A.     Yes.

16  Q.     Okay.  Let's go ahead and move to page four.  Would I be

17  correct in thinking -- or I see the word NY.  Do you believe

18  that Moe wanted you to drive him to New York?

19  A.     Yes.

20  Q.     Why do you believe that?

21  A.     Because he had previously asked Travis and I -- Travis

22  was the guy I was staying with in Swanton.  When Brian picked

23  me up originally he asked us to go get a car -- to pick up a

24  car in New York and drive it back that was full of drugs and

25  that if we had did that, he would either pay us cash or with

```
                    Danielle M.                    18
 1   drugs.
 2   Q.      Did you actually do that?
 3   A.      No.
 4   Q.      Then a few passages later it appears that Moe is asking
 5   you for a ride to Wal-Mart?
 6   A.      Yes.
 7   Q.      Did you drive him to Wal-Mart?
 8   A.      I did.
 9   Q.      Let's move to page 5, and at the top I believe you ask
10   what motel and I believe this is the 6 right here.  Where was
11   Moe at the time?
12   A.      Motel 6.
13   Q.      And going to page 6 it appears that you show up?
14   A.      Yes.
15   Q.      And appears you also asked to borrow money?
16   A.      I did.
17   Q.      Why?
18   A.      I wanted drugs.
19   Q.      A few passages below you mention the police station.
20   Why are you at the police station?
21   A.      Because the friend that I was with -- I'd actually say
22   more of an acquaintances, we hung out twice, his name was
23   Letto, I did not realize -- Letto was the one that was driving
24   the vehicle and brought me over to pick up Brian and the
25   vehicle was stolen.  He didn't tell me that.  We ended up
```

                    Danielle M.                        19

1    getting pulled over.

2    Q.     Going to page 7 it appears that this conversation ends

3    on July 19th, 2015?

4    A.     Yes.

5    Q.     Turning to page 8 am I correct that the messages pick up

6    again in September of 2015?

7    A.     Yes.

8    Q.     A few passages below or in these passages it looks like

9    you're at the ER?

10   A.     Yes.

11   Q.     Do you remember that?

12   A.     I do.

13   Q.     Why were you at the ER?

14   A.     A friend of mine that I was staying with -- more like he

15   was like family -- he burnt his hand on some grease.

16   Q.     Turning to page 9 it appears that in the middle of this

17   passage you talk about how the friend spilled oil on his hand?

18   A.     Yes.

19   Q.     Let's go to -- I'm going to go to the bottom of that

20   page.  There's a passage here where Moet Hart on September 6,

21   2015 asked you if everything good with stretch?

22   A.     Yes and it was supposed to be Stress, but auto correct

23   changed it to stretch.

24   Q.     Okay.  Is that the same Stress that you referred to

25   earlier yesterday?

Danielle M.                           20

1    A.      Yes.

2    Q.      Is that the person that you owed the drug debt to?

3    A.      Yes.

4    Q.      We're going to turn to page 10 and in response to that

5    what did you say?

6    A.      I was trying to make it right and then I couldn't come

7    up with the money and he was pissed.

8    Q.      What are you referring to in that passage?

9    A.      The money that I owed Stress which got me involved in

10   this whole situation to begin with.

11   Q.      Did you eventually satisfy this debt to Stress?

12   A.      I did not actually.

13   Q.      How did it get resolved?

14   A.      Pam and Travis ended up paying it because Stress went to

15   their house and confiscated their TVs and Travis's computer

16   until the money was paid.

17   Q.      Danielle, next turn to page 11.  Now am I correct in

18   this passage on July 23rd, 2015 that you say I want to come

19   back to work as of tomorrow?

20   A.      Yes.

21   Q.      What are you referring to in that message?

22   A.      I wanted drugs.

23   Q.      Are you saying you wanted to run drugs for Moe?

24   A.      Yes.

25   Q.      Why after all you have been through go back and run

Danielle M.                              21

1  drugs for Moe?

2  A.    I was so stressed out that I just wanted to get high.

3  There was no other means at the moment that I could think of to

4  come up with money.

5  Q.    Turning to page 12 it appears that Moet Hart sent you

6  some pictures or a picture with a bunch of alcohol in it

7  December 29, 2015?

8  A.    Yes.

9  Q.    And below that he invites you to a party; is that

10  correct?

11  A.    Correct.

12  Q.    And going to page 13 was it in fact a bachelor party?

13  A.    It was.

14  Q.    Does Moe invite you to the party?

15  A.    He does.

16  Q.    And did you actually attend this party?

17  A.    I did not.

18  Q.    And finally returning to the 14th page it appears that

19  your conversation ends in December 2015.  Did you have much to

20  do with Moe after these messages?

21  A.    No.

22  Q.    Danielle, how much drugs -- we'll break it down between

23  heroin and cocaine -- did you use on average before meeting Moe

24  in a given day?

25  A.    Sure.  No more than a bag and a half of heroin a day on

Danielle M.                          22

1    a given day.

2    Q.    What about cocaine?

3    A.    Usually no more than a gram because I would always be

4    sharing it with other people.

5    Q.    Did it increase the week that you were with Moe?

6    A.    Absolutely.  That week I did the most drugs I had ever

7    used.

8    Q.    Can you give an example of how much heroin you used in a

9    given day?

10   A.    Sure.  I would use as much as three bags of heroin and I

11   would smoke up to at least three to four grams of crack a day.

12   Q.    Why did your usage increase so much?

13   A.    I had to numb my emotions because I was so emotionally

14   unstable and I felt so dirty with what I was doing.  I felt

15   ashamed and alone because I couldn't reach out to anybody and

16   the one person I did didn't care.

17   Q.    Are you referring to your mother?

18   A.    Yes.

19   Q.    Who provided you the heroin and the cocaine?

20   A.    Every time Brian did minus two times.

21   Q.    What are the two times you're talking about?

22   A.    One time is when I took his vehicle, and he didn't

23   realize it, over to the East Spring Street location without

24   him.  He was home, but I had his vehicle with Mandy.  We went

25   over.  I met Mark at the house.  He was there every time Brian

Danielle M.                          23

1    and I went over and I got drugs off of him that one time.
2    Brian never did find out about that.

3            The other time was when Keisha was with me and Mandy
4    at the Ho-Hum.  Travis and our regular dealer, we went through
5    JD, met me at McDonald's.  Brian was not there.  Keisha and I
6    had an agreement that nobody would say anything as long as I
7    gave Keisha drugs when I got back.  So I did run with Travis
8    and I got some drugs.  I was gone probably 20 minutes.

9    Q.    Did there come a time when Moe only made drugs available
10   after you had seen a client?

11   A.    Yes.

12   Q.    Can you tell the jury how that came about?

13   A.    Yes because I turned down a client at the Hilton.

14   Q.    Tell us about that incident.

15   A.    He got very angry.  We had just left the East Spring
16   Street location where I got crack.  I was driving of course.
17   Whenever we went anywhere I always drove his vehicle.  He
18   didn't explain why.  He just always had me drive.  We parked
19   right across the courthouse on the left side and he then told
20   me that I would go see this guy.  This guy had been calling
21   Brian numerous times saying where is she, where is she, where
22   is she.  I explained to him that I did not feel comfortable
23   going into a hotel.  I didn't want to be hurt.  There's no
24   escape in a hotel.  There's one way out and that's it.  He got
25   very -- he said this is a lot of money.  You can't say no.

Danielle M.                                24

1   You're turning down a lot of money.  That's taking money out of

2   my pocket and your pocket, and I said I'm sorry I don't feel

3   comfortable.

4        He then proceeded to yell and get angry because he

5   felt like the only reason why I was turning it down was because

6   I had crack and I wanted to hurry up and get back to the room

7   to smoke the crack.  While I can't deny that part of that was

8   true, I absolutely did want to smoke the crack, but the other

9   part was that I was very scared.  I heard about, you know,

10  things on tv with the Craigslist killer and going in a hotel is

11  a completely different story when you don't know their number,

12  and then if you're in a car, there's no escape out.  I didn't

13  want to get murdered or anything happen to me.  So I refused

14  to.

15  Q.    Was this going to be your first out call at a hotel

16  where there was not access from the outside?

17  A.    Yes.

18  Q.    Is that why you were nervous?

19  A.    Absolutely.

20  Q.    What were you -- what were you thinking as the defendant

21  was -- I think to use your terms -- yelling at you?

22  A.    Well I was scared and I was shooken up.  I had my whole

23  body was shaking.

24  Q.    Did you turn down a client again after that experience?

25  A.    I did.

                    Danielle M.                    25

1    Q.      I'm sorry.  You did?

2    A.      I did.

3    Q.      How did -- how did Moe react to that?

4    A.      He didn't know about it.

5    Q.      If he had known about it, what would have happened?

6    A.      I have no idea.  I know only for certain that I would

7    have gotten yelled at.

8    Q.      When did Moe typically provide access to the drugs?

9    A.      After I saw a client.

10   Q.      Danielle, how did that week with Moe affect you?

11   A.      It affected me greatly.

12   Q.      How so?

13   A.      I now have endometriosis.  I don't know if anyone's

14   familiar with that, but it's scar tissue on fallopian tubes.

15   Sex is not the same with me.  My sex drive is shot.  I have

16   lost six kids since then.  Sex is painful to have.  I have

17   nightmares.  I look over my shoulder everywhere I go,

18   especially since I knew this was going to come up and happen.

19   I got very sick, very stressed out.  I have been suffering with

20   bleeding ulcers, bleeding gastritis, duodenitis.  I lost 30

21   pounds.  I was pretty much on my death bed which is why I

22   relocated and moved.

23   Q.      At one point were you able or had you moved past this

24   experience at one point?

25   A.      I did.  I was actually able to tuck it away and I have

Danielle M.                              26

1   no idea how I was able to.  I think it's just when you deal

2   with the issues that I have dealt with and the circumstances

3   some things you can tuck away and put in the back of your mind

4   and don't think about them.  I was able to not completely

5   forget about it, but not think about it.  I tucked it in the

6   back of my head and it was something that I didn't think about.

7   I didn't dream about.  It was okay up until the morning the

8   detective knocked on my door at 6 o'clock in the morning.

9   Q.      Who knocked on your door at 6 o'clock in the morning?

10  A.      Chris.

11  Q.      Are you referring to FBI Special Agent Chris Destito?

12  A.      Yes.

13  Q.      Did that cause you distress?

14  A.      It did.  He actually tricked me.  He came 6 o'clock in

15  the morning and I was kind of in awe that he was there because

16  at that time I didn't get in trouble.  My life was already

17  pulled together so I wasn't sure what he was doing there.  He

18  told me he wanted me to meet with him the next day to meet with

19  a therapist who specialized in human trafficking and helped

20  victims.  So I told him --

21  Q.      And then when you showed up did you actually testify in

22  the Grand Jury?

23  A.      I did.  I never met with a therapist like he said so --

24  Q.      Have you received any funds from the Government to help

25  you after you met Special Agent Destito?

Danielle M.                    27

1    A.    I have because since then with my health issues and then

2    my living situation where I was living, the airport was buying

3    out the house, so I had to find a different place.

4    Q.    Has testifying today weighed heavily on your mind since

5    you met Agent Destito?

6    A.    Very much so.

7    Q.    Why?

8    A.    This was a part of my past that I wanted to forget.  I

9    have moved on and ever since Chris came into my life it's

10   almost like everyday I have relived that whole week over and

11   over and over again.

12   Q.    Danielle, are you currently using heroin?

13   A.    No.

14   Q.    When did you stop?

15   A.    I've been sober almost four years.

16   Q.    How did you get clean?

17   A.    I bought suboxone off the street and I detoxed myself at

18   my friend's house for a week.

19   Q.    Was there an incident that caused you to want to get

20   clean?

21   A.    Yes.  Travis overdosed.

22   Q.    Do you currently work?

23   A.    I do.

24   Q.    What do you do?

25   A.    I'm a home health aide and I'm also a certified nurse

                     Danielle M.                        28

1  assistant.

2           MR. GRADY:  May I have a moment, Your Honor?

3           THE COURT:  Yes.

4           MR. GRADY:  Nothing further.

5           THE COURT:  Okay.  Cross examination.

6           MR. KAPLAN:  Thank you, Judge.

7                        CROSS EXAMINATION

8  BY MR. KAPLAN:

9  Q.     I want to make sure that I understand the sequence of

10 events because you have testified to quite a bit.  As I

11 understand it, in this case you had a significant heroin

12 addiction?

13 A.     Yes.

14 Q.     And the date that you overdosed was on June 20th of

15 2015?

16 A.     Yes.

17 Q.     And so the week you spent with Brian was the week before

18 that?

19 A.     Correct.

20 Q.     And as I understand it the way you met Brian was that

21 you went with a friend and bought drugs from him three or four

22 times?

23 A.     Yes.

24 Q.     It wasn't more than that?

25 A.     No.

Danielle M.                          29

1    Q.    And who was the friend?

2    A.    Hector.

3    Q.    Pardon me.

4    A.    Hector.

5    Q.    And the next thing that you testified about with respect

6    to Brian was Hector told you that Brian would be contacting

7    you?

8    A.    Yes.

9    Q.    And did Brian contact you?

10   A.    Yes.

11   Q.    And how did he do that?

12   A.    By phone.  He called me.

13   Q.    Okay, and so he contacted you and the next thing that

14   happened was he drove you to the motel?

15   A.    He picked me up and then drove me to North Star,

16   correct.

17   Q.    And as I understand your testimony that was the only

18   contact you had with Brian before you went to the motel?

19   A.    No.  I met up with Brian three times prior to that.

20   Q.    I'm sorry.  That's what I meant, the three times prior

21   to that plus the drive to the motel?

22   A.    Yes.

23   Q.    That's the only contact you had with Brian?

24   A.    Yes that I can remember.

25   Q.    Well you remembered quite a bit on direct.  Don't you

Danielle M.                          30

1   think if you had had contact with him beforehand you would

2   remember that?

3   A.      Well when you buy drugs so many times I don't think

4   you're going to remember every single time.

5   Q.      Well let me ask you this.  Did you ever meet with Brian

6   alone before the ride to the motel?

7   A.      The very first time I had to meet him at his house on

8   Canal Street and that is when I rode over with him in his

9   vehicle to East Spring Street to get drugs because nobody else

10  was allowed at the house besides me.

11  Q.      So let me show you what's been marked as Government's

12  exhibit -- actually it's been introduced as Government's

13  exhibit 52 and I think you looked at some of those Facebook

14  messages on the screen?

15  A.      Yes.

16  Q.      And would you agree that these start in July of 2015?

17  A.      Yes.

18  Q.      And that would be after you overdosed?

19  A.      Yes.

20  Q.      It was after the week you spent in the motel?

21  A.      Yes.

22  Q.      And my question to you is did you e-mail Brian prior to

23  going to the motel?

24  A.      I don't remember.

25  Q.      Did you ever send Brian pictures of yourself before you

                    Danielle M.                    31

1    went to the motel?

2    A.     No.

3    Q.     And if you had sent Brian pictures of yourself, for

4    example, through Facebook before you went to the motel, isn't

5    that something you would remember?

6    A.     You would think that was something I would remember.

7    Q.     And wouldn't you think that?

8    A.     Yes, but I know I did not.

9    Q.     Let me show you what's been marked as defendant's

10   exhibit C9, and would you agree that this is the same thing

11   that the prosecutor showed you except it starts earlier.  It

12   starts in May of 2015?

13   A.     Yes this one starts earlier.

14          MR. KAPLAN:  Your Honor, I would move to admit

15   defendant's exhibit C9.

16          THE COURT:  All right.  Government have any

17   objection, Mr. Grady?

18          MR. GRADY:  No objection, Your Honor.

19          THE COURT:  So admitted.

20   [Defendant exhibit C9 admitted]

21          MR. KAPLAN:  Joanne, is this on?  Thank you.

22   BY MR. KAPLAN:

23   Q.     So you see the Facebook message dated May 24, 2015?

24   A.     Yes.

25   Q.     That's from you, right?

                         Danielle M.                          32

1   A.      Yes.

2   Q.      And does it look to you like you sent a picture to

3   Brian?

4   A.      It says image.  Whether that's a picture or not could be

5   debated.

6   Q.      Why is that?

7   A.      Well it also shows messaging attachment.  So even if I

8   was to send a sticker on Facebook or anything else it would

9   still pop up as an image.

10  Q.      Is it fair to say that if that represented a nude

11  picture of yourself that you sent to Brian you would remember

12  that?

13  A.      I would remember and I did not send any nude pictures.

14  Q.      Let me show you what's been marked as defendant's

15  exhibit C4 and ask you to look through this please, and I've

16  taken the liberty of highlighting the dates on those.

17  A.      Okay.

18  Q.      Those are all pictures of you, are they not?

19  A.      Yes.

20          MR. KAPLAN:  Your Honor, I would move to admit the

21  defendant's exhibit C4.

22          THE COURT:  Any objection to B4?

23          MR. GRADY:  C4, Your Honor, if I can see them.  I'm

24  not sure what dates we're talking about.  No objection, Your

25  Honor.

```
                    Danielle M.                    33
```

1           THE COURT:  So admitted.

2    [Defendant exhibit C4 admitted]

3    BY MR. KAPLAN:

4    Q.    So I -- rather than my putting these on the screen I'm

5    going to hand them back to you and ask you if you can look at

6    the first picture please.

7    A.    Yes.

8    Q.    What's the date on that?

9    A.    June 16, 2015.

10   Q.    I'm sorry.  That's when you were in the motel with

11   Brian?

12   A.    This picture was not when I was in the motel.

13   Q.    Okay, but you said you were with Brian -- you said that

14   you overdosed on June 20th?

15   A.    I overdosed the day I left Brian.

16   Q.    That was June 20th?

17   A.    Okay.

18   Q.    And you were with him for a week you said?

19   A.    Yes.  I don't remember the exact dates that I was with

20   him.  I couldn't even tell you what I wore last week.

21   Q.    So what does that mean you don't know that you were with

22   him.  I thought you testified that the day you left Brian was

23   the day you overdosed?

24   A.    Yes.

25   Q.    So doesn't that mean that the week you spent with him

                    Danielle M.                       34

1   was the week before that?

2   A.      Yes.

3   Q.      And wouldn't this June 16th picture be within that time

4   frame?

5   A.      I never sent him that picture on June 16th.

6   Q.      When did you send it to him?

7   A.      I never did send him those pictures.  Those pictures are

8   on Facebook.

9   Q.      They are Facebook messages to him from you?

10  A.      I don't recall ever sending those pictures to him.

11  Q.      Do you remember I asked you about the attachment that

12  was sent to Brian on May 24th?

13  A.      Yes.  This one that I have up, right?

14  Q.      Yes, and this is -- these are pictures that you sent to

15  Brian on May 24th through the Facebook messaging app?

16  A.      Actually one of them was taken at the hotel that he took

17  and the other two one was when I lived at Travis's which was me

18  fully dressed with just my face.

19  Q.      Okay.  So that was on May 24th, right?

20  A.      These pictures don't date May 24th.

21  Q.      They were uploaded on May 24th, weren't they?

22  A.      No.  These couldn't have been uploaded on May 24th.

23  Q.      What does the highlight say?

24  A.      June 17th.

25  Q.      Okay.  So that's when they were sent?

Danielle M.                        35

1    A.     I guess so if that's what it means.  If I overdosed on

2    June 20th and that picture was taken the week before, that's

3    when I was with Brian.

4              MR. KAPLAN:  May have a moment, Judge?

5              THE COURT:  Yes.

6    BY MR. KAPLAN:

7    Q.     So I'm going to show you this exhibit again and ask you

8    to look at the lower left picture.

9    A.     Yes.

10   Q.     That's a picture that you took?

11   A.     That's a picture that I took that got taken from my ex

12   and uploaded on the internet.

13   Q.     Well it's a picture that was taken from Brian Folks'

14   Facebook text messages with you.  That's where it came from

15   which means that you sent that to him?

16   A.     Okay.  I don't recall ever sending him any pictures.

17   Q.     What's the date on that?  Isn't it May 24th, 2015?

18   A.     Yes.

19   Q.     So you sent Brian Folks a nude photograph of yourself on

20   May 24th, 2015, isn't that right?

21   A.     By the looks of it, yes.

22   Q.     And you didn't say that on direct examination, did you?

23   A.     No I don't remember doing it.

24   Q.     Okay, and when you were meeting with the prosecutors

25   preparing for trial did they show you any Facebook text

                    Danielle M.                    36

1    messages that occurred prior to you going to the motel?

2    A.    Well no because we're here because of what took place in

3    the hotel.

4    Q.    Okay, but don't you think it's relevant the nature of

5    your relationship with Brian before you went to the motel?

6    A.    No because we did not have a sexual relationship and I

7    was not held against my will.

8    Q.    Well you said over and over again that you met Brian

9    three times to buy drugs and really the next thing that

10   happened was you went to the motel?

11   A.    Yes.  We had conversations and we had talked, but the

12   times I actually saw him and met up with him was three times.

13   Yes.

14   Q.    And before you went to the motel you're sending him nude

15   photographs of yourself?

16   A.    I guess apparently I did.

17   Q.    Okay, and if I were to tell you in this exhibit that's

18   been admitted there are at least eight, nine, ten other

19   photographs of you nude that you sent to him prior to the day

20   that you overdosed, would you agree with that?

21   A.    Well from the packet that you showed me most of those

22   were from the hotel or I was dressed.

23   Q.    But not all of them?

24   A.    Yes.  The naked ones were in the motel besides that one

25   that was in Winooski that I took.

Danielle M.                              37

1   Q.      And why did you send him a naked picture of yourself on

2   May 24th?

3   A.      I don't even remember sending it so what makes you think

4   I'm going to remember why I sent it.

5   Q.      Well because you remembered quite a bit on direct

6   examination so I assumed you would remember this.

7   A.      Well absolutely because I'm going to remember traumatic

8   experiences.

9   Q.      And you don't think it's traumatic that you sending

10  someone naked photographs of yourself or is that sort of

11  acceptable?

12  A.      When you've gone through sexual abuse trauma and

13  physical abuse trauma I don't think it's very out of character

14  for anybody to do that.

15  Q.      So --

16  A.      And they are an addict.

17  Q.      So your testimony is there are a number of things that

18  happened that you just don't remember because you were an

19  addict?

20  A.      No.  Actually there's quite a bit I remember.  There's

21  very few that I don't remember.

22  Q.      And one of the things you don't remember is sending nude

23  photographs to my client?

24  A.      That's the only thing I don't remember.

25  Q.      Okay.  So if we -- by the way when you sent Brian a

Danielle M.                              38

1   Facebook text message or Facebook message in September of 2015

2   that was like three months after you had been with him, right?

3   A.    Yes.

4   Q.    And you said I want to come back to work tomorrow?

5   A.    Yes.

6   Q.    And you had never sold drugs for him?

7   A.    No I did not.

8   Q.    You had never distributed drugs for him?

9   A.    No I did not.

10  Q.    The only relationship you had with him with respect to

11  drugs was he gave you drugs?

12  A.    Correct, but in the drug scene work means drugs.  That

13  is the code word for drugs is work.

14  Q.    Well you said I want to come back to work?

15  A.    Yes as in I want to go back on drugs.  I wasn't using at

16  that time.  I wanted to use.  I wanted to buy drugs.  Whatever

17  I needed to do to make the drugs, I would sell drugs, whatever

18  is what I meant.

19  Q.    Well let me -- you said the photograph that you took

20  yourself on May 24th was before you went to the motel?

21  A.    Yes.

22  Q.    And if you look at these Facebook messages I've

23  introduced, there's like six or seven on May 24th, May 25th

24  where you sent pictures to Brian, isn't that right?

25  A.    What you showed me?  The packet you mean?

Danielle M.                                                    39

1   Q.      Yes.

2   A.      Yes.

3   Q.      Okay.  So it wasn't just that one photograph on May

4   24th.  Before you ever got in Brian's car and went to the motel

5   you had sent him numerous photographs; some dressed, some

6   undressed?

7   A.      It was common for me to do that not just with him, but

8   other people as well.

9   Q.      Okay and how is it you remember doing it with other

10  people, but you didn't remember doing it with Brian?

11  A.      I don't remember doing it with other people.  I just

12  know that it was a common thing that I did.

13  Q.      And wouldn't you agree that if you look at the

14  photographs that were taken prior to June of 2015 they all have

15  to have been at your house or someplace else but not in a motel

16  with Brian because you didn't get to the motel?

17  A.      Correct.  Some of those were taken somewhere else and

18  some were taken in the hotel.

19  Q.      But all the ones in May were taken someplace else?

20  A.      Yes, but the naked ones besides one were taken at the

21  motel.  There's only one naked photo on there that I recall

22  seeing in the packet you showed me that was not taken in the

23  hotel.

24  Q.      So how do you explain all these pictures that you sent

25  him on May 25th?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Danielle M.                              40

1   A.      I guess I was just sending him pictures.  He probably

2   asked me for them.

3   Q.      And --

4   A.      It was either that or Hector told me to send them to

5   him.

6   Q.      And they were nude pictures?

7   A.      A nude picture, yes.

8   Q.      No.  There was more than one nude picture that you sent

9   him?

10          MR. GRADY:  Objection, Your Honor, to the extent that

11   we're talking about facts not in evidence.

12          MR. KAPLAN:  It is in evidence, Judge.  I've

13   introduced the package.

14          THE COURT:  Objection overruled and it is cross

15   examination.  So go ahead.

16          MR. KAPLAN:  Can I have a minute, Judge?

17          THE COURT:  Yes.

18   BY MR. KAPLAN:

19   Q.      Let me show you Bates number 011108 which is four

20   pictures on June -- loaded on June 16th.  Would you agree that

21   those are photographs of you at your house or someplace other

22   than the motel?

23   A.      Two of them are taken at Travis's, two of them were

24   taken at Victoria's house.

25   Q.      Okay, and you sent those to Brian?

Danielle M.                                    41

1    A.      I guess so, but those are fully dressed besides one.

2    Q.      But isn't it your testimony that on June 16th you were

3    at the motel with Brian?

4    A.      Yes.

5    Q.      But you left to go visit Victoria or go visit Travis and

6    you sent those pictures while you were gone?

7    A.      Those pictures were not taken -- okay.  So just because

8    those pictures got sent that day doesn't mean that's the day

9    they were taken.  They were not taken that day.

10   Q.      So you could have taken -- you remember now when you

11   took them?

12   A.      I remember taking the pictures.  I don't remember them

13   -- me sending them to him.

14   Q.      Okay, but your testimony is that those pictures are of

15   you, they were taken before you were in the motel with Brian,

16   is that what you're saying?

17   A.      Yes before I was in the room.

18   Q.      They were taken at other people's houses?

19   A.      Yes.  It's not very uncommon for a woman who is an

20   addict to not take naked pictures of herself and send them to

21   other men to support her habit.  I'm not claiming that I didn't

22   make mistakes and that I was innocent and never sent dirty

23   pictures or nude pictures to anybody because I did.  Brian's

24   not the only one.

25   Q.      But how does sending him nude pictures or pictures of

Danielle M.                                    42

1    yourself in bra and underpants or whatever prior to being in

2    the motel with him, how does that help you?

3    A.    I get free drugs.

4    Q.    Oh so you're saying now you remember you sent these nude

5    pictures to Brian before you got in the car with him and went

6    to the motel and he gave you drugs for the pictures?

7    A.    When Brian showed up at the hotel I didn't realize

8    that's who was picking me up and I didn't realize that's who I

9    was having the conversation with until Brian got in the car.  I

10   didn't recognize his voice over the phone.  I didn't realize

11   who he was picking me up until I got in the vehicle with him

12   and I looked at him and said oh it's you.  That's why I felt

13   comfortable going with him.

14   Q.    You never told anyone before that you didn't know it was

15   Brian was going to pick you up, did you?

16   A.    Yes.  My lawyer knows.  Yes.

17   Q.    Well I thought you testified on direct that you were

18   told Brian was going to give you a call?

19   A.    Correct, but Brian and Moe are two different people in

20   my eyes.  I never knew Brian as Brian.  I knew Brian as Moe.

21   Q.    And you were never told that it was the person you

22   bought drugs from that was going to pick you up?

23   A.    No.  I got told it was Hector's cousin.  That is what I

24   got told.

25   Q.    So you knew Moe better than you testified to on direct

Danielle M.                                43

1  because you were sending him these pictures?

2  A.      I didn't really know him.

3  Q.      And I guess my question to you is did you get drugs for

4  sending him these pictures?

5  A.      Yes.  I always got them cheaper.  That's why sometimes I

6  would get away with $30 as opposed to $40.

7  Q.      So you were sending Brian nude pictures of yourself

8  because you would then get drugs cheaper?

9  A.      Yes which many women do when they are addicts.  Yes.

10 Q.      Well why would you sending him a picture of you fully

11 clothed enable you to buy drugs cheaper?

12 A.      That didn't.

13 Q.      So when you got in the car with Brian you knew who he

14 was?

15 A.      The moment I saw his face, yes.

16 Q.      And you knew it was someone you had sent these nude

17 photographs to?

18 A.      Yes.

19 Q.      Then your testimony is that you were there for a week?

20 A.      Give or take.  I don't remember exactly how many days,

21 but yes roughly a week.

22 Q.      Could have been less?

23 A.      I don't know if it could have been less.

24 Q.      And your testimony is that while you were in that motel

25 -- by the way that was in kind of a commercial area, wasn't it?

Danielle M.                         44

1   Which motel was it?

2   A.      Three different ones; two on Shelburne Road, one in

3   Colchester.

4   Q.      And there are a lot of other businesses around?

5   A.      Yes.

6   Q.      So if you had walked out the door you would have been in

7   a fairly heavily populated area?

8   A.      Yes.

9   Q.      And in fact you did do that.  For example, you walked

10  out and went to McDonald's?

11  A.      Yes when Brian wasn't there, correct.

12  Q.      And you met a drug dealer?

13  A.      Correct.

14  Q.      Why did you go back?

15  A.      Why would I not go back?  I was scared.  He knew where I

16  lived.  Where did I have to go?  I had to go back to Travis's.

17  That's where I lived.  He picked me up from Travis's.  He knew

18  where I lived.  I was scared.  I felt like I had to go back.

19  Q.      Well when you told Brian that you were going to go visit

20  your father and not do this he said okay, right?

21  A.      Well yeah he didn't need me any more because I was such

22  a mess that the last client turned me away and said they didn't

23  want nothing to do with me because I was a mess.

24  Q.      Didn't Brian have a rule that you had to use a condom?

25  A.      No.

Danielle M.                                    45

1   Q.      And isn't it true that you did not use condoms?

2   A.      There was times there was condoms not used.  It was

3   whatever the client wanted you had to do.

4   Q.      And you're saying that Brian didn't have a strict rule

5   that you had to use a condom?

6   A.      No.

7   Q.      And weren't there times when you went with a client and

8   just took off and didn't come back for a long time?

9   A.      I never took off with a client.  So that's false.

10  Q.      And weren't there times that you took drugs from a

11  client -- a client gave you drugs to use?

12  A.      No.  That's false.  That's Keisha not me.

13  Q.      Do you recall when you overdosed and you went to the

14  hospital you had received those drugs from your father?

15  A.      Yes.

16  Q.      And apparently the drugs were not what they were

17  supposed to be?

18  A.      Oh they were.  They were just very potent.

19  Q.      And who was the first person that you called?

20  A.      Mandy and Brian.

21  Q.      Okay and they came up to see you immediately?

22  A.      Yes.

23  Q.      This was within a day of when you left Brian?

24  A.      Yes.

25  Q.      And I think you told the agents in your prior meetings

Danielle M.                          46

1   that they really seemed concerned about you?

2   A.      Mandy seemed concerned about me.  Brian did too.

3   Q.      Okay, and I'm assuming you appreciated that?

4   A.      Well yeah I appreciated it.  Brian stuck around for ten

5   minutes and then took off in the car.  Mandy stayed with me the

6   whole time.

7   Q.      And I think you said Mandy and Brian were very close?

8   A.      Yes.  They were like boyfriend and girlfriend.  Yes.

9   Q.      And what is your point about the 10 minutes?  Are you

10  suggesting Brian wasn't concerned about you?

11  A.      He said that he couldn't stand being around because the

12  nurses were looking at him very awkwardly and he felt very

13  awkward being there so he waited out in the car.  He was

14  uncomfortable.

15  Q.      Okay, and then after that you engaged in Facebook

16  messages with him constantly all the way up to December of

17  2015?

18  A.      Off and on, randomly, yes.

19  Q.      Well several times a week for sure?

20  A.      Okay.

21  Q.      And at one point he indicated that he needed a ride to

22  Wal-Mart or something?

23  A.      Yes.

24  Q.      And did you give him a ride?

25  A.      Yes.  I stated I did.

Danielle M.                          47

1  Q.      And you asked him if you could borrow money?

2  A.      Yes for drugs.

3  Q.      And he gave you money?

4  A.      Yes.

5  Q.      And he didn't ask for anything in return?

6  A.      Well no I gave him a ride and so he gave me 20 bucks.

7  Q.      Okay, and when you needed a place to stay he found a

8  place for you to stay?

9  A.      Yes.

10  Q.      And he didn't ask for anything in return for that, did

11  he?

12  A.      No.

13  Q.      And he never pressured you to engage in prostitution

14  again?

15  A.      Not again, no.

16  Q.      And wouldn't you agree that if someone that didn't know

17  anything about this case were to read these messages between

18  Brian and yourself from July through December that they would

19  not get the impression that you were afraid of Brian, wouldn't

20  you agree with that?

21  A.      Yes I guess it comes across as that, but that's because

22  you will get that impression with me with anybody that's

23  previously abused me.  I mean I've reached out to every guy

24  that's ever abused me again because that's what was in my

25  comfort zone.  That's all I ever knew.

Danielle M.                              48

1   Q.      Do you remember when you were asked by the agents at one

2   point in this investigation why you didn't leave Brian?  For

3   example, when you went to McDonald's why you didn't just keep

4   going and you said that you had nowhere else to live, you had

5   no money, and you didn't want to leave Mandy?

6   A.      Actually I had money because I left to go to McDonald's

7   to score drugs which means I had to have money in order to do

8   so.

9   Q.      So that wasn't a reason you stayed there?

10  A.      I stayed because I was scared and I felt like if I was

11  going to run away I was going to come up missing just like

12  Mandy's sister did.

13  Q.      But you didn't tell them that?

14  A.      Tell who that?

15  Q.      You told the agent that because you had nowhere else to

16  live and you also said that one of the reasons you didn't leave

17  was because you didn't want to leave Mandy there?

18  A.      I did have a place to live.  I lived with Travis.  I

19  could have went back with Travis at any time.  I didn't have a

20  place to live when I moved in with Victoria, but in that hotel

21  I had a place to live.  I didn't leave because I was simply

22  scared.  That was it.  Same reason I stayed in abusive

23  relationships for four or five years.

24  Q.      So do you remember that you testified at the Grand Jury

25  on January 26th of 2017?  You might not remember the exact day.

Danielle M.                                    49

1    A.      I remember testifying before the Grand Jury, yes.

2    Q.      And do you remember telling the Grand Jury when they

3    asked you why you didn't leave you said I felt trapped.  I had

4    nowhere else to live.  I had no means of transportation.  I had

5    no money, no way to support myself, and Mandy, had I left, I

6    would have felt guilty for leaving her behind?

7    A.      Absolutely because at that time I thought Mandy was my

8    friend and then found out she was not.

9    Q.      Well you had known Mandy for, what, a few days?

10   A.      That's okay, but her and I shared lots and lots of

11   stories and we grew to know each other very well because we

12   spent everyday all day together.

13   Q.      But those were the reasons that you told the Grand Jury

14   under oath as to why you didn't leave?

15   A.      Yes.  I did feel trapped and I was scared and I felt

16   guilty for leaving Mandy behind.  Absolutely.  Yes.

17   Q.      And you didn't -- all right.  As I understand it you had

18   a drug debt?

19   A.      Yes.

20   Q.      And it was for $300?

21   A.      Yes.

22   Q.      What was that person's name?

23   A.      Stress.

24   Q.      And he had said to you that if you don't pay it you

25   could end up dead?

```
                        Danielle M.                      50
1   A.      Correct.
2   Q.      And didn't you tell the Grand Jury that was one of the
3   incentives that you had to stay at the motel for that week?
4   A.      I knew that I needed to make up that money.  I was
5   already there and I was already stuck being there so my intent
6   was to use the money I was at least making and being forced to
7   make to pay Stress off which didn't happen because I needed the
8   drugs to numb the emotions of doing what I was doing.
9   Q.      So when you walked out of the motel and went to
10  McDonald's you're still saying you were forced to go back?
11  A.      I didn't have a gun pointed to my head and saying -- you
12  know I didn't have a gun pointed at my head saying oh you have
13  to stay here, but I'm sorry emotionally and mentally I felt
14  trapped.
15  Q.      And did you -- well can I have a minute, Judge?
16          THE COURT:  Yes.
17  BY MR. KAPLAN:
18  Q.      And your testimony still is that when you said I want to
19  come back to work you were talking about selling drugs?
20  A.      I wanted to sell drugs.  I wanted to get high because I
21  had urges, yes.  I did not mean back to work with anything to
22  do sexually.
23  Q.      And apparently you weren't afraid of Brian to the extent
24  that you were willing to go back and work?
25  A.      Oh believe me I was afraid, but when you're an addict
```

Danielle M.                              51

1    and you're struggling with an addiction you see past that fear.

2    Anything to support your drug habit at that time.

3    Q.      So it didn't take really any encouragement.  Whatever

4    you had to do you were willing to do to support your habit?

5    A.      Yes.

6    Q.      And you're aware -- I mean you were in that -- in the

7    environment for a long time.  Brian wasn't the only one selling

8    drugs that you knew?

9    A.      No.  I had many people that I got drugs from.

10   Q.      So there were lots of people you could have gone and

11   asked if you could work for them and it didn't have to be

12   Brian?  I mean why did you pick Brian out of all of the drug

13   dealers that you knew particularly after the experience that

14   you had with him?

15   A.      Because the other drug dealers wouldn't have allowed

16   that.  They had their -- the other drug dealers sold their own

17   drugs.  Brian was the only person that I knew that had other

18   people sell drugs for him.

19   Q.      Really?  You're saying --

20   A.      Yes.

21   Q.      -- someone who is experienced in buying drugs that you

22   never met a drug dealer who had people that would take the

23   drugs back and forth that were runners?  You never met anyone

24   like that?

25   A.      The people that I knew went and scored the drugs

Danielle M.                              52

1    themselves and handed out the drugs themselves unlike Brian

2    where I would go to a house and he would have three, four guys

3    that dealt with the drugs and didn't touch the drugs himself at

4    that house.

5    Q.      But I'm having difficulty understanding how it is that

6    you never, for example, when you bought drugs from someone had

7    a runner bring you the drugs, for example?  Do you know what I

8    mean when I say runner?

9    A.      No.  Please explain.

10   Q.      All right.  So if someone is selling drugs and they have

11   someone -- maybe it was an addict and they say to that person

12   bring the drugs to so and so on the corner of North Union or

13   whatever?

14   A.      Yeah I never really liked that because half the time you

15   wouldn't get your drugs and when you did it would -- the bag

16   would be pinched.

17   Q.      But you understand what I'm talking about?

18   A.      Yes.

19   Q.      And you didn't -- you didn't think about going to any of

20   those other drug dealers who would use someone like yourself to

21   help deliver drugs?  You went to Brian instead?

22   A.      Correct because I figured that he would allow me to be

23   not one of his boys because I'm a woman, but one of those

24   people that would help him sell the drugs.

25   Q.      And that he would treat you decently?

Danielle M.                              53

1    A.    I don't think he would treat me decently, but I didn't

2    care at that point because I didn't care about myself whether I

3    was dead or alive so --

4              MR. KAPLAN:  Could I have a minute, Judge?

5              THE COURT:  Yes.

6              MR. KAPLAN:  Can I have a minute, Judge?

7              THE COURT:  Yes.

8              MR. KAPLAN:  Thank you.  Judge, do you think we could

9    take a break?  I think the witness might need a break.

10             THE COURT:  You're asking for a break at this point?

11             MR. KAPLAN:  Yes please.

12             THE COURT:  Okay.  All right.  It's 10 after.  Why

13   don't we take an early recess.  15 minutes and ask you to come

14   back in roughly 15 minutes.

15   [Recess 10:18 - 10:40 a.m.]

16             THE COURT:  Mr. Kaplan.

17   BY MR. KAPLAN:

18   Q.    I believe you testified on direct examination that Brian

19   asked you to go to a bachelor party and you said no?

20   A.    I said I was tempted to go, but I didn't end up going.

21   Q.    Weren't you the one -- so you did say that you would

22   like to go and Brian said okay if you want to?

23   A.    He asked me if I wanted to go.  I said it was tempting.

24   Q.    Well let me show you page 93373 of the Facebook -- it's

25   Government's exhibit 082 that's been admitted.  Do you see

                    Danielle M.                    54

1  where Brian says --

2           THE COURT:  Are you sure this is admitted?

3           MR. KAPLAN:  Yes.  It's the Government's exhibit.

4           THE COURT:  And what is --

5           MR. GRADY:  That's correct, Your Honor.

6           THE COURT:  Facebook messages.  Pardon me, but what's

7  the marking?

8           MR. GRADY:  82, Your Honor.

9           THE COURT:  All right.

10 BY MR. KAPLAN:

11 Q.    So Brian says to you do you know any girls who dance.

12 I'm paying.  Do you see that?

13 A.    Yes.

14 Q.    And then he said plus tips and you said I'll find some.

15 LOL.  You want me to come through.  Do you see that?

16 A.    Okay.  Yes.

17 Q.    So you were offering to do it?

18 A.    Coming through and offering to dance are two separate

19 things.

20 Q.    Okay, and then Brian says it's a bachelor party?

21 A.    Yes.

22 Q.    And you said oh man.  I can try.  Laugh out loud?

23 A.    Yes as in I can try to go there.  The thought of getting

24 drunk was nice.  It was tempting.

25 Q.    So certainly Brian didn't pressure you into doing that?

Danielle M.                                    55

1    A.      Never said he did.  No he did not.

2    Q.      You said that you didn't want to come up missing like

3    Mandy's sister.  What are you talking about when you said that?

4    A.      Mandy forewarned me when I was in the hotel not to try

5    to leave or I would come up missing just like her sister did.

6    Q.      Okay.  So Mandy said that to you?

7    A.      Correct.

8    Q.      Okay, and isn't it true that Brian drove you to a

9    client's house as opposed to a hotel at one point?

10   A.      Yes.

11   Q.      And you weren't afraid to do that?

12   A.      I wasn't afraid to go to the house because Brian was in

13   the car and there was many escapes in a house.  There's many

14   doors, many windows.  Yes.

15   Q.      And who are the four guys that you saw at Brian's house

16   that were dealing drugs?

17   A.      I don't know their names.

18   Q.      And you said you have been clean for four years?

19   A.      Almost, yes.

20   Q.      Back in 2015 -- was it 2016?

21   A.      It was --

22          THE COURT:  Mr. Kaplan, your voice is going down and

23   I'm not sure the jurors can hear you.

24   BY MR. KAPLAN:

25   Q.      Do you recall when it was that you were clean?

                    Danielle M.                    56

1  A.     I got sober after Travis passed away.

2            MR. KAPLAN:  Okay.  I have nothing further, Your

3  Honor.  Thank you.

4            THE COURT:  Okay.  All right.

5                    REDIRECT EXAMINATION

6  BY MR. GRADY:

7  Q.     Danielle, first I'm going to start with pictures that

8  defense counsel asked you many questions about pictures, right?

9  A.     Yes.

10  Q.     I'm handing you what's been admitted as C9.  Take a

11  minute and look through C9 and let me know if you see any

12  pictures in there?

13  A.     Is this where it says images?

14  Q.     Let me know if you see actual images of anybody or

15  anything in C9.

16  A.     No I don't.

17  Q.     You can keep going.  We'll make sure we cover the whole

18  exhibit.  Take your time.  There's no rush.

19  A.     No I do not.

20  Q.     So it's fair to say there's no images contained within

21  C4?

22  A.     Correct.

23  Q.     I'm sorry, Your Honor.  I misspoke.  That was C9.

24  A.     Okay.

25            THE COURT:  Okay.

                    Danielle M.                          57

1  BY MR. GRADY:

2  Q.    I'll next go to C4 and, Danielle, this is the only one

3  that I'm going to put underneath the Elmo, okay?

4  A.    Okay.

5  Q.    These images that we see at the top are those the type

6  of images that may be on your Facebook page?

7  A.    Yes.

8  Q.    Now I'm going to show you a couple of pages from C4

9  starting with Bates 11112 and 11113.  Do those eight pictures

10 appear to be in a hotel?

11 A.    Yes they were in the hotel.  Those were the pictures

12 Brian took.

13 Q.    And of the one that shows your face would I be correct

14 that you're not smiling?

15 A.    Correct.

16 Q.    And the remaining pictures 11115 to 11118 take a minute

17 and look at those.  Do those appear to have been taken at a

18 hotel?

19 A.    All of them are taken in the hotel, yes.

20 Q.    And one final question is am I correct that the dates on

21 these are June 20, 2015 as far as upload date?

22 A.    Yes.  June 20.  Yes.

23 Q.    Danielle, there was questions about the last client and

24 you testified on direct how you appeared for that last client.

25 What did that last client do when he saw you?

Danielle M.                          58

1   A.     The moment he walked in he looked at me and he said
2   you're not what I was hoping you to be and I'm not paying to be
3   with you and he walked right out.
4   Q.     Do you know if Moe found out about that?
5   A.     He did.  Mandy came in, asked me what happened.  I said
6   he turned me down and Mandy said are you sure about that and I
7   said yes I'm positive.  Shortly after Brian showed up and asked
8   me what happened and I explained it to him.
9   Q.     Would it be fair to say that at that particular time you
10  were not making any money for Moe?
11  A.     Correct.  I was very tired, out of it, and like I said
12  my face was all broken out.  I was unrecognizable.
13  Q.     During this time period about how much did you weigh?
14  A.     Probably I would say roughly between 97 and 100 pounds.
15  Q.     Was Moe significantly bigger than you?
16  A.     Very much so.
17  Q.     There were questions on cross examination about Moe
18  showing up at the hospital after you overdosed.  Do you
19  remember those?
20  A.     Yes.
21  Q.     Did you try getting in touch with your father before you
22  called Moe and Mandy?
23  A.     I did.  I contacted my father and begged him to come
24  over, that I was OD'ing, I was alone, and he shut his phone off
25  and left me to die.

Danielle M.                                    59

1  Q.    How did that make you feel?

2  A.    I was very alone.  I didn't know who else to call.  I

3  was scared.

4  Q.    You mentioned before reaching out to your mother that

5  week and it seems like she was not real responsive?

6  A.    Correct.  I didn't really have anybody.

7  Q.    Fair to say you did not have an extensive support

8  network at that time?

9  A.    I had none.

10 Q.    There were questions about you going to McDonald's.  Do

11 you remember those?

12 A.    Yes.

13 Q.    Did Moe know where Travis lived?

14 A.    Yes.

15 Q.    Did Stress know where Travis lived?

16 A.    Absolutely.

17 Q.    Were you afraid of going to Travis's because they could

18 find you there?

19 A.    Absolutely.

20 Q.    To your knowledge, Danielle, is prostitution illegal?

21 A.    Yes.

22 Q.    Is possessing and using heroin or crack cocaine illegal?

23 A.    Yes.

24 Q.    Were you afraid to go talk to the police because of

25 these illegal activities?

Danielle M.                                60

1   A.     Correct.   I wasn't afraid that I would get in trouble

2   for prostitution because I knew I was being forced to do so,

3   but, however, I was afraid because I was an addict that I

4   wouldn't be taken seriously and I had drugs and paraphernalia

5   on me.

6   Q.     Danielle, have you ever heard the phrase snitches get

7   stitches?

8   A.     Yes.

9   Q.     Did that also enter into your mind about not seeking

10  help?

11  A.     Yes.

12         MR. GRADY:  No further questions, Your Honor.

13         THE COURT:  Okay.  Recross, Mr. Kaplan.

14         MR. KAPLAN:  Thank you, Judge.

15                     RECROSS EXAMINATION

16  BY MR. KAPLAN:

17  Q.     You looked through Facebook messages and isn't it true

18  that it showed that attachments were sent it just did not show

19  the attachment?

20  A.     Correct.

21  Q.     And the pictures that were sent were uploaded on May 24,

22  May 25, June 16, and June 20.  Do you remember we went over

23  that?

24  A.     Okay.

25  Q.     And when you called your father did you call him at the

                    Danielle M.                         61

1   scene or from the hospital?

2   A.     I called him at the scene.

3   Q.     And then you were taken to the hospital?

4   A.     Yes.  I walked across the street and I got picked up at

5   the Howard Center.

6   Q.     And then you went -- then you called Brian?

7   A.     Yes.  Actually I talked to Mandy and then Brian.

8            MR. KAPLAN:  I have nothing further, Your Honor.

9            THE COURT:  Okay.  Thank you.  I think you're done.

10           THE WITNESS:  Okay.  Thank you.

11           THE COURT:  All right.  Government want to call the

12  next witness.

13           MR. GRADY:  Yes, Your Honor.  The United States calls

14  Mr. Frank Thornton.  Good morning, Mr. Thornton.  Come on into

15  the courtroom and proceed to the podium where the clerk will

16  swear you in.

17  FRANK THORNTON,

18               Having been duly sworn, testified

19           as follows:

20           THE COURT:  Good afternoon -- or good morning, Mr.

21  Thornton.

22           THE WITNESS:  Good morning, Your Honor.

23      MR. GRADY:  Joanne, if we can switch from the Elmo.  Thank

24  you.

25                        DIRECT EXAMINATION

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

                        Danielle M.                    62

1   BY MR. GRADY:

2   Q.     Good morning, sir.  Can you please state your name?

3   A.     My name is Francis Thornton.

4   Q.     What do you do for a living?

5   A.     I'm a digital forensic examiner.

6   Q.     Who do you work for?

7   A.     Myself.

8   Q.     How long have you owned your own company?

9   A.     22 years.  23 years.

10  Q.     Are you located here in Vermont?

11  A.     Yes I am.

12  Q.     Can you summarize what you did prior to opening your own

13  company as a digital forensic examiner?

14  A.     Well a number of things.  Primarily I was a police

15  officer, investigator, and then I worked for the State doing

16  major crime scenes.

17  Q.     How long have you been a digital forensic examiner?

18  A.     It's hard to really say, but the better part of at least

19  a decade.  I concentrated on that work.

20  Q.     Can you tell the jury what a digital examiner does on a

21  day-to-day basis?

22  A.     Yes.  Basically what I do is I take things like

23  computers and cell phones and I look for evidence on them

24  that's going for court presentation.

25  Q.     Did you receive any training prior to becoming a digital

                    Danielle M.                        63

1  examiner?

2  A.     Yes I did.

3  Q.     Can you summarize briefly a little bit of that training?

4  A.     Basically it's a lot of stuff having to do with

5  computers, how they work internally.  I've got some background

6  going back to high school if you can believe that.

7            THE COURT:  Did they have computers back then?

8            THE WITNESS:  Yes, sir, they did.  Big main frames.

9            THE COURT:  No.  We're about the same age.

10           THE WITNESS:  Yes I know.

11           THE COURT:  So nothing personal.

12  A.     So my -- I focused in on how all that applies pertaining

13  to presenting it in court.

14  Q.     Have you taken any classes on digital forensics?

15  A.     Yes I have.

16  Q.     Do you have to be certified to be a digital examiner?

17  A.     You don't have to be certified, but there are a number

18  of certifications out there and I have some.

19  Q.     What are some of the certifications that you have?

20  A.     Well I've got one, for instance, for seizing cell phones

21  on crime scenes and I've got one for doing in-depth

22  examinations on computers as a certified computer examiner.

23  Q.     Who certifies you as this?

24  A.     That's through the International Society of Computer

25  Forensic Examiners.

                    Danielle M.                    64

1   Q.      Do they recertify you every year?

2   A.      Every two years.

3   Q.      What do you have to do every two years to get

4   recertified?

5   A.      Usually submit a list of cases that I have worked on and

6   how they have been determined, kind of summary of cases, that

7   type of thing, and also what I have done for continuing

8   education.

9   Q.      Are you a member of any professional associations?

10  A.      Yes.  I'm a member of the -- well the International

11  Society for Computer Forensic Examiners and also a member of

12  the High Technology Crime Investigators Association.

13  Q.      Since you have gone full time as a digital examiner how

14  many devices would you estimate that you have examined

15  throughout your time?

16  A.      It's well into the hundreds.  Probably into the

17  thousands at this point.

18  Q.      Does that include cell phones?

19  A.      Yes it does.

20  Q.      Computers?

21  A.      Yes.

22  Q.      Have you been involved in any publications related to

23  digital forensics?

24  A.      Yes I have.

25  Q.      Can you tell the jury about that?

Danielle M.                          65

1   A.      Well I've published a number of books through Syngress

2   Elsevier.  Most of it had to do more with kind of the broad

3   area of information security, but some has gone to digital

4   forensics.

5   Q.      Have you testified before as an expert in court in

6   digital forensic examinations?

7   A.      Yes I have.

8   Q.      How many times?

9   A.      I think seven prior times.

10          MR. GRADY:  At this time, Your Honor, the Government

11  tenders Mr. Thornton as an expert in digital forensic

12  examinations.

13          THE COURT:  Okay.  Any objection?

14          MS. SEN:  Your Honor, may I voir dire please?

15          THE COURT:  Yes.

16                          VOIR DIRE

17  BY MS. SEN:

18  Q.      Mr. Thornton, you were a forensic specialist at the

19  Vermont Forensics Laboratory, right?

20  A.      Yes I was.

21  Q.      And this work related to fingerprint examination and

22  crime scene work generally, right?

23  A.      Generally, yes.

24  Q.      It was not in the field of digital forensics, was it?

25  A.      No.

Danielle M.                                    66

1   Q.      In fact, the many years of your forensic experience is

2   really not in the area of digital forensics, is it?

3   A.      About half at this point.

4   Q.      So you passed the test to become a certified computer

5   examiner in May of 2010, about then?

6   A.      Yes.

7   Q.      So you have actually been working as a computer examiner

8   after being certified for less than ten years?

9   A.      After being certified, yes.

10  Q.      And you currently have no degree in digital computer

11  forensics, do you?

12  A.      No I do not.

13  Q.      In fact, you're a student, isn't that correct?

14  A.      I'm suspended currently due to I took time off from

15  college.

16  Q.      So does that mean you have to start all over again?

17  A.      Well I have to, I suspect, submit some paperwork for the

18  college to start over.

19  Q.      So just to be clear you have no degree in digital

20  forensics at this point?

21  A.      I do not.

22  Q.      Do you have a bachelor's or master's?

23  A.      No.

24  Q.      Okay.  Now you've talked about taking a number of online

25  courses --

Danielle M.                               67

1   A.      Yes.

2   Q.      -- in forensic computer examination, but these are not

3   certifications like, for example, you list a number of things

4   that are self assessments.  So those are things that you are --

5   what they say they are self assessments?

6   A.      I have had some self assessments.  I have also had some

7   where you take an exam.

8   Q.      But the only certificate you have is the computer

9   examination from May of 2010, isn't that correct?

10  A.      Yes.  Well I also have another one for, as I said,

11  current one for seizing cell phones and I have had past

12  certifications that I have let go.

13  Q.      But seizing a cell phone isn't the same thing as

14  examining one, isn't it?

15  A.      It's part of the process.

16  Q.      But it doesn't -- well it doesn't deal with computer

17  examination, does it?

18  A.      That's separate.

19  Q.      And you talk about attending conferences, but a lot of

20  these conferences are really what would be described in the

21  trade as hacker conferences.  Would that be fair to say?

22  A.      Some of them are.

23  Q.      You don't get certified for that kind of thing, do you?

24  A.      Usually not.

25  Q.      And would it be fair to say that most of your

Danielle M.                              68

1  certifications involve using technical tools in order to

2  extract information from devices?

3  A.    A fair amount of it is via tools, yes.

4  Q.    So, for example, with the mobile phone seizing it's

5  focusing on how to properly seize cell phones and other

6  devices?

7  A.    Yes.

8  Q.    That isn't about how to examine them, is it?

9  A.    No.

10  Q.    And the access mobile examiner that's a certification

11  you list as one of yours?

12  A.    That's one I have let go.

13  Q.    So that's one you're not current with?

14  A.    No.

15  Q.    Okay.  So you used Cellebrite to conduct an exam in this

16  case, didn't you?

17  A.    Yes.

18  Q.    You don't list any certification for that program on

19  your CV?

20  A.    I'm not certified with Cellebrite.

21  Q.    Okay, and you also used Forensic Explorer in this case?

22  A.    Yes.

23  Q.    And you're not certified in that either?

24  A.    No I'm not.

25  Q.    So you just use those tools without being certified to

Danielle M.                             69

1  use them?

2  A.     Yes.

3  Q.     Okay.  So let me talk a little bit with you about your

4  prior experience as an expert.  Your CV actually was nine prior

5  cases in which you have previously testified.  Is that fair to

6  say?

7  A.     Yes, but some of those I think I've been a witness of

8  fact only.

9  Q.     And I was going to get to that.  You qualified as an

10  expert witness in about five cases?

11  A.     Okay.  I thought it was more, but --

12  Q.     And all of those cases involved mobile phone systems or

13  cell phone technology, didn't they?

14  A.     Yes.

15  Q.     And, in fact, as I was looking through your CV only one

16  of your prior cases involved a laptop computer.  Is that fair

17  to say?

18  A.     For testimony, yes.

19  Q.     And that was a business litigation in Vermont Superior

20  Court?

21  A.     Yes.

22  Q.     And, in fact, you didn't even testify you just provided

23  an affidavit to the court?

24  A.     Yes.

25  Q.     So it's fair to say that you have actually never been

Danielle M.                                70

1    qualified as an expert in the field of computer forensics, have

2    you?

3    A.    Well the fact of the matter is that cell phones nowadays

4    are basically computers internally anyway.  So a lot of this is

5    crossover between what they are internally.

6    Q.    Isn't examining a cell phone very different from

7    examining a computer?

8    A.    Not particularly.  It varies in the techniques, but the

9    data that you're looking for and what you're trying to dig

10   through is much the same internally as far as the computer and

11   the cell phones are.

12   Q.    So, for example, on a lot of the cell phone examinations

13   that you have done you have used a software program that you

14   plug the phone into and it spits out a report.  Would that be

15   fair to say?

16   A.    In some cases, yes.

17   Q.    That's not the same thing that you do with a computer

18   for a forensic examination, is it?

19   A.    Well in a computer case what you do typically is you

20   plug in a hard drive much the same way and you plug it into a

21   program that also extracts data.

22   Q.    Actually with a computer you have to have specialized

23   knowledge and skills, don't you, to determine where information

24   is stored within a computer?  It's a totally different animal

25   from a cell phone.  Wouldn't you agree with me?

                         Danielle M.                        71

1    A.      I disagree with that.  I think they are very similar in

2    the organization and the way they are set up and the way the

3    data is stored within the computer and a cell phone.

4    Q.      But in a cell phone you would never be looking to see

5    how that information came on a cell phone, would you?

6    A.      I'm not following.

7    Q.      So in a computer one of the things that you have to

8    identify is how data arrived on the computer, isn't that fair

9    to say?

10   A.      Yes.

11   Q.      You haven't done that in this case, have you?

12   A.      No.

13   Q.      It's fair to say that in prior cases in which you have

14   worked those cases involve extracting data from a device,

15   computer, a cell phone, very technical, is that fair to say?

16   A.      Yes.

17   Q.      And you would just turn that information over to

18   prosecutors, isn't that fair to say?

19   A.      Prosecutors or the case agent.

20   Q.      So, in other words, the prosecutor or the case agent

21   asked you to look for information and you identify or try to

22   locate it on a device?

23   A.      Well typically what happens is they will bring me a

24   device.  I'll examine it.  We'll talk to some degree as to what

25   they are looking for.  A lot of cases I turn over what I have

Danielle M.                          72

1   extracted to them so they can then go forward and look and see

2   what's in there.

3   Q.     But you're not conducting complete forensic examinations

4   of every piece of information on the device, are you?

5   A.     Usually that's not what I'm tasked to do, no.

6   Q.     And, in fact, based on your CV you don't have any

7   experience in performing comprehensive and advanced forensic

8   examinations on Microsoft Windows based computers, do you?

9   A.     I would say that I do based on my past experience.  I've

10  done a fair amount of that.

11  Q.     You haven't ever testified as an expert on that issue,

12  have you?

13  A.     I've testified about, as you pointed out, internal stuff

14  on computers before, specifically that laptop you mentioned.

15  Q.     You haven't indicated on your CV that you have any

16  experience in analyzing data that proves or disproves the user

17  attribution for specific users, isn't that fair?

18            THE COURT:  Sorry.  I couldn't hear you.  What was

19  that?

20            MS. SEN:  For to prove or disprove user attribution

21  for specific activities on a computer, for example.

22  A.     User attribution usually is outside what I'm doing.

23  Q.     Okay, and you haven't had any experience conducting

24  comprehensive analyses, for example, of internet history

25  activities.  Is that fair to say?

Danielle M.                                    73

1  A.      I've done some of that.

2  Q.      Have you described how people visit web sites?

3  A.      Usually not.  No.

4  Q.      Downloading files?

5  A.      Somewhat downloading.

6  Q.      Uploading files?

7  A.      Yes.

8  Q.      Filling out online forms?

9  A.      Somewhat.

10  Q.      So wouldn't you agree that as we've discussed really

11  your experience, your skill, and your knowledge and your

12  expertise is limited to that of someone who is kind of a

13  technician who extracts the data and turns it over to the

14  Government?

15  A.      Well a lot of times I have to work with the agents and

16  the prosecutors to determine where something or when something

17  was placed on the computer.  So it's a little bit deeper than

18  that.

19  Q.      But that's not reflected in your experience or your

20  education or your training or anything else.  Is that fair to

21  say?

22  A.      I would say it's certainly reflected in my experience.

23          MS. SEN:  Your Honor, I would agree that Mr. Thornton

24  could be qualified to the extent that he's a technician who

25  extracts data and that's always what the Government has

Danielle M.                    74

1    represented that his work was, but the actual examination of

2    the computer itself I don't believe that he's qualified to do

3    that.

4            THE COURT:  Well so are you suggesting that he's not

5    qualified to testify about attribution, about how a particular

6    set of data got on the computer and who it came from?  Is that

7    what you're suggesting?

8            MS. SEN:  I am suggesting that, Your Honor, because,

9    A, he hasn't done it in this case, and, B, he has not --

10   there's nothing in his experience or his education or his

11   skills that shows that he's done that kind of work, and the

12   representation that examining a cell phone is the same thing as

13   examining a computer is just -- it's just not accurate, Your

14   Honor.

15           THE COURT:  So are you -- are you suggesting that

16   he's being proffered by the Government just to extract the

17   information and return -- and turn over the information to the

18   Government?

19           MS. SEN:  That was my understanding.

20           THE COURT:  In which case you don't have any --

21           MS. SEN:  I don't have any objection to that, but my

22   objection would be to limit his testimony to that activity.  My

23   concern is that the breadth with which it is suggested that he

24   has expertise is not fully represented.

25           THE COURT:  Well are you suggesting the Government

Danielle M.                          75

1    intends to question him above and beyond what you think the

2    Government is going to be questioning him about, that's the

3    extraction of the information and to turn over the information

4    to the Government?

5              MS. SEN:  That's my understanding, Your Honor, so

6    that's why I was asking to limit his testimony or maybe I'm not

7    understanding your question.

8              THE COURT:  Well if in fact you would anticipate that

9    his testimony is limited to the extraction of information and

10   data and turning that over to the Government and you have no

11   objection to that, then you should have no objection.  If

12   you're thinking that he's going to be testifying about other

13   things which have not been revealed to you and subject of an

14   expert's testimony has to be revealed to you, then that's a

15   totally separate matter, but it seems like you don't anticipate

16   that.

17             MS. SEN:  I don't know at this point, Your Honor, and

18   I just wanted to ensure that the qualification at this point

19   would be limited to --

20             THE COURT:  Well you have an expert report.

21             MS. SEN:  Right.

22             THE COURT:  And that's limited to the extraction and

23   the surrender of that information to the Government.

24             MS. SEN:  Exactly, Your Honor.

25             THE COURT:  Okay.  All right.  Well let me ask him,

Danielle M.                              76

1   Mr. Grady, do you anticipate asking this witness questions

2   above and beyond the extraction of data out of the cell phone

3   or the computer and then the surrender of all of that

4   information to you?

5          MR. GRADY:  That's exactly what the Government was

6   intending on doing is that this expert received devices,

7   extracted data from that device, provided it to the case agent,

8   and then the case agent will talk about things found in that

9   extraction.  There may be topics such as metadata with certain

10  images that were extracted from devices, but that's pretty much

11  the extent of what the Government intends to do with Mr.

12  Thornton.

13         THE COURT:  All right, and in regard to the metadata

14  which highlights when and by whom, et cetera, the image is put

15  on the computer, that requires just a reading of the return of

16  the data from the computer or from the cell phone; is that

17  correct?

18         MR. GRADY:  Exactly right, Your Honor.

19         THE COURT:  All right.  So with that understanding he

20  is qualified as an expert.  The Government's proffering him

21  only to extract the information, to turn it over to the case

22  agent, perhaps to talk about what metadata might be reflected

23  in the data that's extracted, and if you question him above and

24  beyond that, then we'll address it when it comes up.

25         MR. GRADY:  Certainly, Your Honor.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Danielle M.                                    77

1            THE COURT:  Okay.

2            MR. GRADY:  Thank you.

3    BY MR. GRADY:

4    Q.     Mr. Thornton, before we go on do you have a subcontract

5    to do work for the U.S. Attorney's Office here in Vermont?

6    A.     Yes I do.

7    Q.     Can you explain that subcontract?

8    A.     Well a friend of mine who is also a forensic examiner

9    has that contract with the Government, the U.S. Attorney's

10   Office here, and I subcontract to him.

11   Q.     All right.  What are you paid under the subcontract?

12   A.     Works out to $135 an hour.

13   Q.     Mr. Thornton, I want to focus on a specific slice of

14   your career.  Did you receive an assignment to extract data

15   from various electronic devices relating to this case United

16   States versus Folks?

17   A.     Yes I did.

18   Q.     How did that come about?

19   A.     I believe the case agent on this, Special Agent Epp,

20   contacted me back in February of 2017, said that they had a

21   computer and some other devices that they were going to look at

22   in relation to this case.

23   Q.     What types of devices beyond the computer were you asked

24   to take a look at?

25   A.     Cell phones, tablets, there was a device similar to an

Danielle M.                          78

1   iPod music player, that type thing.

2   Q.     Was there also a GPS?

3   A.     Yes there was.

4   Q.     How many devices overall were you asked to take a look

5   at?

6   A.     I believe the total was 12.

7   Q.     Did you have legal authority to examine these 12 devices

8   or were you just doing this on your own?

9   A.     No I have search warrants to do this.

10  Q.     Did you receive these devices in two separate batches?

11  A.     Yes.

12  Q.     Let's start with the first batch of devices that you

13  received.  When did you receive them?

14  A.     As I said, early February 2017.  I believe it was the

15  third.

16  Q.     You mentioned the agent -- or excuse me.  You mentioned

17  Agent Epp before.  Is she the one that delivered the devices to

18  you?

19  A.     Yes.

20  Q.     Do you recall what devices she gave to you in February

21  2017?

22  A.     I believe the first batch was the tower computer, three

23  cell phones, and a tablet.

24  Q.     When did you begin analyzing or extracting data from

25  these devices?

Danielle M.                                    79

1    A.     Well typically my process I try to start it within 24

2    hours because we're under a limit for search warrant and I at

3    least start documenting the devices.

4    Q.     How long did it take to extract data from these devices?

5    A.     Overall I think it was around several week period.

6    Q.     Why does it take several weeks to extract data from

7    devices?

8    A.     Well the extraction itself can take anywhere from

9    several hours to several days depending upon the device and

10   what you're doing and how you're extracting, and then kind of

11   digging through and seeing what might be of interest then

12   becomes a long process sometimes.

13   Q.     Mr. Thornton, I'm going to hand you what's been admitted

14   as exhibit 78.  Take a minute to look at exhibit 78.  Do you

15   recognize 78?

16   A.     Yes I do.

17   Q.     How do you recognize 78?

18   A.     Well this was one of the cell phones that I examined.

19   It's a Nokia Windows phone and it -- I had to disassemble this

20   particular one to get into it and extract the data.

21   Q.     Why did you have to disassemble it to extract data?

22   A.     The program that we use normally, Cellebrite program as

23   previously mentioned, doesn't particularly work well with

24   Windows devices, and in order to get the data from these

25   particular devices you have to do a process which is known as

Danielle M.                                    80

1    ISP, In Service Programming.  To do In Service Programming you

2    actually have to get down to the chip level and motherboard on

3    the phone.  You have to solder in extremely fine wires, smaller

4    than a human hair, and then the data has to be extracted from

5    the cell phone into another device for analysis.  It's not

6    quite plug and play.

7    Q.    And if you hold up 78, is that sort of reflected into

8    what you did with that particular cell phone?

9    A.    Yeah.  It's extremely hard to see, but there's extremely

10   fine wires still left on this device.  They are soldered in

11   place where I put them.

12         MR. GRADY:  Your Honor, can I go ahead and publish

13   that part of 78 to the jury?

14         THE COURT:  Yes.  Okay.

15         MR. GRADY:  It's probably hard to see on that

16   particular vantage point.

17         THE COURT:  Okay.  Has that been admitted into

18   evidence?

19         MR. GRADY:  My understanding 78 has been admitted

20   into evidence.

21         MS. SEN:  My understanding was it was, Your Honor.

22         THE COURT:  Yes.  Okay.

23         MR. GRADY:  Thank you, Your Honor.

24         THE COURT:  It is admitted.

25         MS. SEN:  Your Honor, I think one of the issues,

1    though, is there a chain of custody for this device?  My

2    understanding is the Government -- that was going to be subject

3    to having a chain of custody.  So I didn't hear Mr. Thornton

4    testify that he had sealed it on such and such date and opened

5    it.

6              THE COURT:  No he didn't do that.  So it is true that

7    this was accepted into evidence tentatively based upon the

8    chain of custody being completed?  I guess it has not been

9    completed at this point.  Do you have another witness

10   eventually to connect up the chain of custody to that

11   particular --

12             MR. GRADY:  I believe this witness can, Your Honor.

13   I'll ask Mr. Thornton.  Take back exhibit 78.

14   BY MR. GRADY:

15   Q.    How do you know that this is one of the devices that you

16   were asked to extract data relating to this case?

17   A.    Well I recognize my work for one thing.  I've also

18   looked at this phone enough at this point and my initials are

19   on the back and date for the last time I looked at it.

20   Q.    And when you initialed that did you compare the IMEI

21   number for that particular phone with any reports you

22   previously generated?

23   A.    Yes I did.

24   Q.    Did they match?

25   A.    Yes.

                        Danielle M.                          82

1              MR. GRADY:  Your Honor, at this time I believe there

2       is no chain of custody issues with respect to this phone.

3              MS. SEN:  Actually, Your Honor, he hasn't answered

4       the question what date he received it.

5              THE COURT:  I'm sorry.

6              MS. SEN:  The question of when he actually received

7       the phone has not been answered.

8              THE COURT:  Well and he hasn't gone through the

9       analysis of opening up the bag and taking out the phone, et

10      cetera.  Do you have him removing the phone from an evidence

11      bag that was -- used to have the phone?

12      BY MR. GRADY:

13      Q.     Mr. Thornton, you testified, I believe, that you

14      received 78 along with four other devices on February 3rd,

15      2017?

16      A.     That's -- yes I believe it was the 3rd.

17      Q.     Did you receive that from the DEA?

18      A.     Yes I did.

19      Q.     When you were finished performing your exam of the phone

20      who did you give it back to?

21      A.     It was Special Agent Epp.

22      Q.     And is she employed by the DEA at that time?

23      A.     Yes.

24      Q.     And the phone that you're looking at right now 78 is

25      that in similar condition as to when you gave it back to Agent

<pre>
                    Danielle M.                       83
 1   Epp?
 2   A.     It's in exactly the same condition.  It was disassembled
 3   at that point.
 4             THE COURT:  Did it come by way of an evidence bag?
 5             THE WITNESS:  Yes, Your Honor.
 6             THE COURT:  Okay.  Okay and did you open up the
 7   evidence bag?
 8             THE WITNESS:  Yes.
 9             THE COURT:  Did you seal it again?
10             THE WITNESS:  I typically seal all bags.
11             THE COURT:  And then it was given to Special Agent
12   Epp; is that correct?
13             THE WITNESS:  Yes, Your Honor.
14             THE COURT:  Well I'm going to let him testify to the
15   contents of the exhibit.  Technically Special Agent Epp then
16   would have to complete the chain of custody.
17             MR. GRADY:  That's fine, Your Honor.
18             THE COURT:  Tentatively it's admitted so that he can
19   testify to what he did to the phone.
20             MR. GRADY:  Thank you.  I'll go ahead and retrieve
21   78.  Thank you.
22             MS. SEN:  Actually, Your Honor, may we please
23   approach?
24             THE COURT:  Okay.
25
</pre>

Danielle M.                              84

1    [Bench conference].

2              MS. SEN:  Your Honor, the chain of custody is a huge

3    issue in this case.  Maybe not as much with respect to the cell

4    phones, but, for example, there's no evidence yesterday when

5    Dan Merchand testified that he had seized a computer, for

6    example, which was also apparently turned over to Mr. Thornton

7    on the same day he said that he had given it to the DEA and

8    that he didn't know what happened to it after that.  In fact he

9    wasn't even sure that he was the one after seizing it from the

10   house that delivered it to DEA.

11       There is no documentation in this case regarding chain of

12   custody between what happened to that computer and these

13   devices between the time that they were removed from our

14   client's house and the date that Frank Thornton received them.

15   Not only that, this is incredibly significant for purposes of

16   the computer because the computer was powered on, on February

17   2nd which was apparently the day before Frank Thornton received

18   it.

19              THE COURT:  Okay.

20              MR. GRADY:  Well, Your Honor, I mean all of this goes

21   to the weight.  There's ways to authenticate an item.

22   Certainly one of the ways is by the characteristics of it.  We

23   have certainly done that with the IMEI number and it was

24   received from the DEA.  He did extract the data from it.  He

25   gave it back to them.  There's nothing to presume any

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Danielle M.                          85

1    irregularity with chain of custody.  So all of these arguments

2    go to weight and certainly cross examining about what could

3    have happened theoretically to the phone and it goes to weight

4    not admissibility.

5              THE COURT:  What we're talking about at this

6    particular point is the cell phone?

7              MR. GRADY:  Yes, Your Honor.

8              THE COURT:  The cell phone apparently was in a bag,

9    an evidence bag, which he identified he removes it, takes it

10   out, does the analysis and returns it.  That's not the

11   computer.  There may be some different argument with regard to

12   the computer.  I don't know that, but at least at this point

13   what is the problem with him being able to testify about what

14   he did in light of the chain of custody right now going up to

15   him?

16             MS. SEN:  It's not clear when it was taken from DEA

17   and given to Mr. Thornton.

18             MR. KAPLAN:  There's no evidence bag where the seal

19   has been broken or something so we can see sealed on this date,

20   broken on this date.

21             MS. SEN:  Maybe I misheard him, but my understanding

22   of his testimony right now is that he was testifying about the

23   date that he initialed it the last time he reviewed it which

24   was not obviously the same day he received it, Your Honor.

25             THE COURT:  Okay.  So what you're asking for is a

Danielle M.                              86

1    detailed hearing as to whether or not they can prove chain of

2    custody in regard to his testimony.  That is when he got it

3    from DEA.

4           MS. SEN:  And my assumption -- yesterday I had raised

5    that issue with Detective Merchand and I thought the Government

6    was going to put on an agent to sort of establish it.  So I

7    didn't realize we needed a detailed hearing for it, Your Honor.

8           MS. SAVNER:  These cell phones are not items seized

9    by Agent Merchand.  They were seized by Special Agent Chetwynd.

10          THE COURT:  Okay.  So he puts them in a bag.

11   Apparently there is a demarcation from him that he put them in

12   a bag on a particular date.  It's true you haven't gone through

13   the bag and unsealing and identifying when he received it and

14   what he did with it and what he did in return.

15          MS. SAVNER:  But, Your Honor, the unique chain of

16   custody is just one way of proving authenticity of something

17   and it's just a preponderance of the evidence standard.

18   Another way -- excuse me.  Another way to prove authenticity is

19   through unique identifiers.  Special Agent Chetwynd documented

20   the IMEI number on the phone -- the phones that he seized and

21   the serial number.  Dan Merchand testified that he documented

22   the serial number on the computer tower that he received, and

23   this witness will testify that he checked those IMEI numbers

24   and did an analysis and those are the items.

25          THE COURT:  Okay, but what's at issue is whether in

Danielle M.                          87

1  fact somebody else had access to that and could have messed up

2  the -- messed up the data.  So ordinarily this witness would --

3  Chetwynd saying he put it in the bag.  If this witness then

4  testifies that I'm showing you the bag, et cetera, then there's

5  -- it's clear that nobody has touched it between Agent Chetwynd

6  and this witness.

7            MR. KAPLAN:  Same thing they did with the drugs.

8            MS. SAVNER:  Because there's no unique identifiers on

9  drugs.  Drugs have to be introduced through custody.

10            THE COURT:  This is a separate question.  You're

11  talking about identifying compared numbers from one to the

12  other.  The question is whether someone else had access to that

13  and could have doctored it in any particular way.  That's what

14  they are asking about, and the question is you just go through

15  this simple chain of custody that is the bag, nobody opened it

16  up, and nobody had access to it that they could doctor it.  I

17  appreciate the fact that you can identify by comparing the

18  serial numbers, but that's not what's at issue.  What's at

19  issue is whether somebody else had access to it that they could

20  have impacted the phone.  So how is this difficult to go

21  through the bag and have him identify what he did.  I'm sure he

22  put the initials on the bag when he opened it up.

23            MR. GRADY:  I'll have to look at the original bag

24  that it was in.  I have to take a look at it, Your Honor.

25            THE COURT:  Okay.  I mean what you're trying to

Danielle M.                                  88

 1    establish is nobody else had access to the phone, right?

 2            MR. GRADY:  Right.

 3            THE COURT:  You can identify the phone clearly, just

 4    match the numbers, but whether someone else had access to the

 5    phone just want to show that.  So you need some time to take a

 6    look at that?

 7            MR. GRADY:  Yes.  We can take a look at it.

 8            THE COURT:  Okay.  All right.

 9            MS. SAVNER:  Permission in the interim to consult

10    with the witness?

11            THE COURT:  You need to ask him about what he did?

12            MR. GRADY:  It might be helpful.

13            THE COURT:  Okay.  Fine.  Go ahead.

14    [End of bench conference].

15

16

17

18

19

20

21

22

23

24

25

Danielle M.                                89

1          MR. GRADY:  Do you want us to proceed in the

2    meantime, Your Honor?

3          THE COURT:  Yes.  Do you want to talk with your

4    witness just for a second?

5          MR. GRADY:  Sure.  We might need a little bit of

6    time, Your Honor.

7          THE COURT:  I'm going to ask the jury be excused just

8    for a couple of minutes because I would like to talk to lawyers

9    about something.  So we'll see you back in a few minutes.

10   [Jury leaves at 11:29 a.m.  The following occurred in open

11   court without the jury present]

12         THE COURT:  So let me just boil this issue down.  So

13   Agent Chetwynd secured all of these cell phones.  I don't know

14   about the computer.  That's separate.  Put them in a bag.

15   Sealed the bag with his initials.  The bag then either -- well

16   the bag went to this particular witness, I assume, and the

17   witness would have taken it out, but also the witness could

18   testify that there's no other persons who would have access to

19   the cell phone that could have doctored the data.  That's all

20   I'm asking about, and so do you want to speak with him

21   privately or -- or just I would be glad to have an in camera or

22   a questioning here just to make sure that it's all set.

23         MR. GRADY:  Yes.  What I understand, Your Honor,

24   certainly the phones in Mr. Thornton's possession he can

25   certainly talk about, you know, how he secured it and how no

Danielle M.                              90

1    one else had access to the phone while it was in his

2    possession.  What I'm trying to figure out from the Court is

3    all of this stuff either before or after it was in his

4    possession.

5            THE COURT:  Well you got a bag.  It's in an evidence

6    bag.  The evidence bag is not opened up in any way until he

7    opens it up.

8            MR. GRADY:  Right.

9            THE COURT:  So that unto itself is sufficient to

10   establish chain of custody.

11           MR. GRADY:  Right.  So if Mr. Thornton received it,

12   opens it up, he can talk about how it was in an unopened

13   position when he received it.  He did his examination, put it

14   back, sealed it up, gave it back to the agent.

15           THE COURT:  Right.  That's what they are objecting to

16   because they are saying that those cell phones could very well

17   have been doctored possibly.

18           MR. KAPLAN:  Judge, our client has to go to the men's

19   room.

20           THE COURT:  Okay.  All right.  Why don't you take

21   him.  Let's take a five-minute break.

22   [Recess 11:32 - 11:39 a.m.  The following was held in open

23   court.  The Jury is not present]

24           THE COURT:  All right.  Mr. Grady, do you have the

25   bags in which these cell phones were kept?

Danielle M.                                  91

1           MR. GRADY:  We have -- I think we have -- I think so,

2  Your Honor.  They were in a bag.

3           THE COURT:  So what I'm looking for really is not the

4  identification.  You can get the identification very simply.

5  It's just proof that through the chain of custody nobody got to

6  take possession of that phone and doctored it in any particular

7  way.  That's what's -- that's what they are objecting to.  So

8  is there proof that it came from Detective or Agent Chetwynd to

9  this witness then back to DEA?

10           MR. GRADY:  Not on this particular bag, Your Honor.

11           THE COURT:  Okay.  Was that bag in another bag?

12           MR. GRADY:  I assume it is, Your Honor, but we would

13  have to pull the 7A custody forms to try to find out exactly,

14  but for this particular witness he can testify as to what --

15  how it was secured when he received it, and then the process

16  and procedures for what he did when he had it in his possession

17  and then what it was like when he gave it back to DEA Agent.

18           THE COURT:  Okay.  All right.  So I suggest that he

19  testify to that to make sure that there's no manipulation of

20  the exhibit while he's in charge of it, and its ultimate

21  admission is postponed or decision to admit it is postponed

22  until you've got the complete chain of custody.  Is there any

23  objection to that?

24           MS. SEN:  Well, Your Honor, I don't know how he will

25  be able to testify as to what he finds on it if we don't have

Danielle M.                                    92

1   the entire chain of custody knowing that this device hasn't

2   been tampered with.  I mean I just assume that the Government

3   had the bag that it came in from, you know, the agent.  I mean

4   at this point my understanding is that this device went from

5   Agent Chetwynd, maybe to Agent Epp, then to Mr. Thornton.  I

6   mean I think that they have to establish the chain before you

7   can testify as to the contents of the device.

8              THE COURT:  Well no he can testify to this material

9   subject to its linkage up in the chain of custody.  If they

10  can't show the appropriate chain of custody, then the Court

11  makes a determination as to whether his testimony is stricken.

12  That's simple.  I mean right now we have the jury here.  I'm

13  concerned about moving the case along.  The Government is

14  certainly suggesting that they have a chain of evidence

15  document and bag which can establish the appropriate chain of

16  custody; is that correct?

17             MR. GRADY:  One moment, Your Honor.

18             THE COURT:  Yes.

19             MR. GRADY:  So, Your Honor, perhaps the best thing to

20  do is because -- well here's what would happen.  Assuming 78

21  cell phone is in evidence, then Mr. Thornton will talk about

22  the data that was extracted from the evidence and we would show

23  information that was extracted from that evidence.

24        Perhaps what we do in the limited time remaining is that I

25  just lay a foundation for the various pieces of evidence that

Danielle M.                         93

1   Mr. Thornton handled as to what he did when he received them

2   and how they were secured.  Put that part of the chain of

3   custody in play.  Over the lunch hour we can look back, try to

4   find the additional bags or DEA 7 chain of custody forms to

5   look at that.  In the meantime we do expect Ayla to be here

6   ready to testify at 1.  So perhaps we put her on the stand to

7   begin the afternoon and move things along.  She may take most

8   of the afternoon, and then we can return to Mr. Thornton.

9              THE COURT:  Okay.  Any objection to that process?

10             MS. SEN:  That's fine, Your Honor.

11             THE COURT:  Okay.  Great.  Let's bring the jury in.

12   [Jury returns to the courtroom 11:45 a.m.]

13             THE COURT:  Okay.  Mr. Grady, are you ready?

14             MR. GRADY:  Thank you, Your Honor.

15   BY MR. GRADY:

16   Q.    Mr. Thornton, we last left things you were talking about

17   exhibit 78 which was one of the cell phones you examined,

18   right?

19   A.    Yes.

20   Q.    When you received the cell phone from Agent Epp what was

21   it in?

22   A.    An evidence bag.

23   Q.    Had that evidence bag been altered or ripped or torn or

24   were there any holes in it to your knowledge?

25   A.    Not that I recall.

Danielle M.                                94

1   Q.      Did it appear to be sealed like all the other evidence

2   bags you have received?

3   A.      Yes.

4   Q.      When you received the evidence bag what did you do with

5   the phone?

6   A.      Well typically I cut open the bag, I extract the phone

7   or whatever device I'm looking at at the time, and I document

8   it, photograph it, and then do the actual examination.

9   Q.      Where do you keep the phone or any other device when

10  it's in your possession?

11  A.      I have a locked office that I work in, in my house.

12  Q.      In your locked office.  Can anyone access it other than

13  yourself?

14  A.      No.  Well my wife technically, but she never goes down

15  there.

16  Q.      Sure.  Did anyone access 78 to your knowledge?

17  A.      No.

18  Q.      When you were done extracting data from 78 what did you

19  do?

20  A.      I put it back in -- excuse me -- the evidence bag,

21  sealed it back up, and I keep that stuff in a locked evidence

22  office -- or locked evidence locker and I'm the only person who

23  has a key to that.

24  Q.      Is it fair to say that 78 was -- when it was within your

25  possession could not have been accessed by anybody else?

Danielle M.                            95

1   A.      No.

2   Q.      Mr. Thornton, I'm showing you 77.  Do you recognize 77?

3   A.      Yes I do.

4   Q.      Is that another cell phone that you tried to extract

5   data from?

6   A.      Yes.

7   Q.      Did you -- I know there's a serial number listed on the

8   back of that.  If you saw your report would you be able to

9   compare the serial number on that phone with your report to

10  determine if it was the same?

11  A.      Yes.

12          MR. GRADY:  Your Honor, at this time I am retrieving

13  what's been marked currently exhibit 133 for identification.

14  BY MR. GRADY:

15  Q.      Mr. Thornton, what is 133 for identification?

16  A.      It's a copy of my report.

17  Q.      Okay.  If you turn to page 6 of your report, did you

18  list out devices that you examined?

19  A.      Yes I did.

20  Q.      And would you mind comparing the serial number on the

21  back of 77 with your report.

22  A.      It's the same device.

23  Q.      Okay.  Thank you.  I'll retrieve 133 for identification

24  and 77, and did you receive 77 at the same time you received

25  78?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Danielle M.                               96

1   A.     Yes I did.

2   Q.     Fair to say that you followed the same procedures?

3   A.     Yes.

4   Q.     Any chance someone could have accessed 77 and 78 and put

5   stuff on them while it was in your control?

6   A.     No.

7   Q.     When you were done examining either the cell phone or

8   any other device in this case did you put the data on anything?

9   A.     Yes.

10  Q.     What did you put it on?

11  A.     I put it on a drive for handing off to the case agent.

12  Q.     Was that drive in your possession and control before you

13  gave it to the agent?

14  A.     Yes.

15  Q.     Was it similarly locked away in your office?

16  A.     Yes and I also retained copies.

17  Q.     Any chance someone could have put information on the

18  thumb drive?

19  A.     No.

20  Q.     Retrieving exhibit 87 which has been admitted in

21  evidence, if you would, Mr. Thornton, can you open 87 and if

22  you need assistance there's scissors for you, and after you

23  open 87 can you pull out 87D?

24  A.     D.

25  Q.     Okay.  Do you see 87D?

Danielle M.                                    97

1   A.      Yes.

2   Q.      What is 87D as in delta?

3   A.      This is a -- excuse me -- Tom Tom GPS.

4   Q.      Did you examine the Tom Tom GPS?

5   A.      Yes I did.

6   Q.      When you received the Tom Tom GPS did you lock it away

7   in your office?

8   A.      Yes.

9   Q.      Was it in your entire custody and control the entire

10  time period that you had it?

11  A.      Yes it was.

12  Q.      Any chance someone could have inserted data on that Tom

13  Tom GPS?

14  A.      No.

15  Q.      And what did you do when you were done with your

16  examination of the Tom Tom GPS?

17  A.      It was put back in the evidence bag.

18  Q.      How did you examine the Tom Tom GPS?  Did you take

19  photos from it?

20  A.      Yes.  In this case I couldn't extract any data using any

21  special tools so what I did was scrolled through all the

22  difference screens on the GPS and took photographs of each one.

23  Q.      Thank you.  You can go ahead and put the Tom Tom back in

24  the 87 bag along with anything else that might have come out.

25  Thank you, Mr. Thornton.  At this time the Government is

                    Danielle M.                      98

1   retrieving what's been admitted as 79.  Mr. Thornton, handing

2   you exhibit 79.  Help you put it on the desk here so we don't

3   drop it.  Do you recognize 79?

4   A.      Yes I do.

5   Q.      Who gave you 79?

6   A.      Also Agent Epp.

7   Q.      When it was in your custody and control did you have it

8   locked away in your office?

9   A.      Yes.

10  Q.      Any chance someone could have accessed it while it was

11  in your custody and control?

12  A.      No.

13  Q.      When you were done examining 79 who did you give it to?

14  A.      I returned it to the DEA.

15  Q.      Now is there anything inside of 79?

16  A.      Yes.

17  Q.      What's inside 79?

18  A.      Specifically the hard drive.  This is the computer.  The

19  hard drive is contained internally.

20  Q.      Let's go ahead and open 79, if you will, and we'll see

21  if the hard drive is inside.

22          THE COURT:  When you returned it to the DEA did you

23  return it to Special Agent Epp?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.

Danielle M.                          99

1    A.      This is it.

2    Q.      Is that marked exhibit 80 for identification?

3    A.      Yes it is.

4    Q.      Is that the hard drive that goes with the tower?

5    A.      Yes.

6    Q.      How do you know you have examined the hard drive?

7    A.      I initialed it again the last time I looked at it and

8    also from the serial number.

9    Q.      Did you verify the serial number with your report to

10   make sure it was one and the same?

11   A.      Yes I did.

12   Q.      What did you do when you extracted data from 80?

13   A.      Again the same process was followed; put data on drives

14   -- excuse me -- for the agents to examine.

15   Q.      Any chance someone could have accessed the data on the

16   drives?

17   A.      No.

18   Q.      Was it all locked away in your office without anyone

19   having access to it?

20   A.      Yes.

21   Q.      Mr. Thornton, when the phones were delivered to you were

22   they in any phone cases?

23   A.      You mean a physical carrying case for the phone?

24   Q.      Exactly.

25   A.      I believe some of them were, yes.

1  Q.     Take a look at what's been marked Government exhibit 134

2  for identification.  Does that -- I know you analyze or you

3  look at many different cell phones.  Does any of that look

4  familiar?

5  A.     Some of it does.  I see the outer cases a lot however.

6  I would have to double-check my notes to verify.

7  Q.     Okay.  Thank you.

8           THE COURT:  So is that the last physical exhibit he

9  analyzed?

10          MR. GRADY:  Yes, Your Honor, it is.

11          THE COURT:  Why don't we take our break at this

12  point.  I'm going to stay and talk with the lawyers.  It's just

13  about 12 o'clock and we'll see you at 1:15.

14 [Jury leaves the courtroom at 11:58 a.m.  The following

15 occurred in open court without the jury present.]

16          THE COURT:  All right.  So as I understand the chain

17 of custody it went from Special Agent Chetwynd to Special Agent

18 Epp who then brought all of these exhibits to Mr. Thornton.

19 Mr. Thornton testified that they were not impacted in any way

20 so as a result he gave them back to Detective Epp, and that

21 assuming that or Special Agent Epp testifies, then that

22 resolves the chain of custody, doesn't it?

23          MS. SEN:  Not for the computer, Your Honor.

24          THE COURT:  Pardon me.

25          MS. SEN:  Not for the computer, Your Honor.

Danielle M.                                    101

1          THE COURT:  Well how not?

2          MS. SEN:  We know that computer was powered on the

3    day before Frank Thornton received it.  So we need to know in

4    whose custody it was, who did that, and Mr. Thornton didn't

5    identify that in his report.

6          THE COURT:  Well you're talking about something that

7    happened to the computer before Mr. Thornton had it?

8          MS. SEN:  Exactly.

9          THE COURT:  Right.  So he would not have access to

10   that information.  So I guess that's Special Agent Epp or --

11         MS. SEN:  Well actually, Your Honor, the issue is

12   that Mr. Thornton examined that computer, but he didn't

13   identify the fact that the computer had been turned on.  We

14   don't know who turned that computer on as of right now, and

15   according to our expert over 1700 files on that computer were

16   modified on the day it was turned on which is from our expert's

17   analysis was February 2nd, and that was contained in our

18   expert's report that we turned over to the Government in early

19   April, and so we have a huge concern with the chain of custody

20   you had for this computer and we would object to anything from

21   that computer coming in until the chain of custody is

22   established.

23         THE COURT:  Okay.  All right.  Do you want to respond

24   to that?

25         MR. GRADY:  Yes, Your Honor.  It's the Government's

Danielle M.                              102

1    understanding that the computer was in the DEA custody prior to

2    going to Mr. Thornton, and that I believe Special Agent Epp

3    will testify that it was powered on, and certainly it seems

4    that would have impacted 1700 out of the 20,000 files that are

5    on the computer.  That was certainly prior to Mr. Thornton

6    receiving the computer, and if I may have a moment, Your Honor.

7    So we believe that there is not an issue with chain of custody.

8    Certainly it's a matter for cross examination and weight, but

9    again chain of custody will have been established through Mr.

10   Thornton and Ms. Epp as far as what they have done with it.

11           THE COURT:  Okay.  So she turned on the computer the

12   day before she brought the computer to Mr. Thornton?

13           MR. GRADY:  That's our understanding is her or

14   someone in the DEA turned it on and that is why 1700 files were

15   probably modified as of February 2nd, 2017.  Again that's 1700

16   files as opposed to the full 20,000 files, and certainly what

17   the Government is focusing on is none -- I don't believe any of

18   the ones that we'll be talking about have any sort of date

19   modified on February 2nd, 2017.

20           THE COURT:  Well so do you know or can you identify

21   the 1700 files that were modified?

22           MR. GRADY:  I believe the defense has a list of the

23   ones that were modified through their expert.  This is all

24   matters that certainly can be fodder for cross examination.

25           THE COURT:  Well, right, so are you relying upon any

Danielle M.                                      103

1   of those modified 1700 data points?

2            MR. GRADY:  No not for any of that related to named

3   victims or witnesses in this particular case.

4            THE COURT:  Okay.  Well --

5            MR. GRADY:  In other words, there was 20,000 images

6   found in the computer.  We're only going to focus on a very

7   small subset.

8            THE COURT:  And how many?

9            MR. GRADY:  They weren't impacted by anything that

10  may have happened on February 2nd.

11           THE COURT:  How many images are you going to rely

12  upon?

13           MR. GRADY:  Well they are on our exhibit list.  It's

14  tough to say off the top of my head, but probably no more than

15  a hundred images throughout the various women will be admitted

16  into evidence.

17           THE COURT:  Okay.  Well so right now you're going to

18  have Ayla testify?

19           MR. GRADY:  Yes.  Our plan is when we resume after

20  the lunch hour, since Ayla will be here ready to go, our intent

21  is to call Ayla.  She may take a good chunk of the afternoon.

22           THE COURT:  Okay.  All right.  So I really would like

23  to address this after Ayla's testified, but I appreciate that

24  you want to get preparing for that examination so we'll take a

25  break at this point and be back in one hour and 15 minutes.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Danielle M.                                104

1    [Recess at 12:03 p.m.]

2                    C E R T I F I C A T I O N

3

4

5

6         I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9                                        _____

10

11                                       *JoAnn Q. Carson*

12   May 2, 2019                         _____

13   Date                                JoAnn Q. Carson, RMR,CRR

14

15

16

17

18

19

20

21

22

23

24

25

**Capitol Court Reporters, Inc. (800/802) 863-6067**