UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
             V               *
                             *
BRIAN FOLKS                  * CRIMINAL FILE NO. 16-94



JURY TRIAL
Thursday, May 2, 2019
Burlington, Vermont



BEFORE:

     THE HONORABLE WILLIAM K. SESSIONS III
        District Judge



APPEARANCES:

     WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
        MATTHEW T. GRADY, ESQ., Assistant United States
        Attorneys, Federal Building, Burlington,
        Vermont; Attorneys for the United States

     MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
        Suite 405, 95 St. Paul Street, Burlington,
        Vermont; Attorney for the Defendant

     NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
        Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **AYLA L.** | | |
| Direct by Mr. Grady | 5 | 5 |
| Voir Dire by Mr. Kaplan - Re: Exhibit 36 | 52 | 13 |
| Cross by Mr. Kaplan | 59 | 13 |
| Redirect by Mr. Grady | 93 | 7 |
| Recross by Mr. Kaplan | 95 | 15 |
| **FRANK THORNTON** | | |
| Direct by Mr. Grady | 99 | 9 |
| | 105 | 18 |
| Voir Dire by Ms. Sen - Re: Exhibit 72 | 103 | 21 |

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 36 | "Bad Girl Practices" Backpage ad | 54 |
| 41 | Photograph of Lori C. | 16 |
| 57A | Photograph of Victoria S. | 18 |
| 63 | Photograph of Violet G. | 12 |
| 71 | Thornton visual for 003 Microsoft Lumina | 101 |
| 72 | Photographs from Microsoft Lumia phone | 105 |
| 73 | Pictures from Tom Tom GPS | 114 |
| 77A | SIM card information from Samsung Edge cell phone | 113 |
| 99 | Photographs of Ho Hum Motel | 29 |

# I N D E X

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| D4-1 | Backpage ad | 69 |
| D4-3 | Backpage ads posted by Bradley | 70 |

```
1   THURSDAY, MAY 2, 2019
2   (The following was held in open court with the jury
3   present at 1:21 p.m.)
4           THE COURT:  All right.  Does the government
5   intend to call a witness out of turn?
6           MR. GRADY:  Yes, your Honor.  The government
7   intends on calling Ayla L. right now.
8           THE COURT:  Okay.  So we are going to delay
9   the remainder of Mr. Thornton's testimony, and Ayla L.
10  will be called by the government.
11          MR. GRADY:  Thank you, your Honor.
12          THE COURT:  The defense has no objection to
13  taking Ayla L. out of order?
14          MR. KAPLAN:  No, your Honor.
15          THE COURT:  Okay.
16          MR. GRADY:  Ayla, come on into the courtroom,
17  and if you want to go next to the podium stand and wait
18  there, she will wear you in.  You want to go in front of
19  this podium, the clerk will swear you in.
20                      AYLA L.,
21      having been duly sworn by the courtroom deputy,
22          was examined and testified as follows:
23          THE COURT:  Okay.  Good afternoon.
24          MR. GRADY:  And, Ayla, if you want to get
25  close to the microphone, and you can -- you can feel
```

```
1     free to move the microphone, so however it's comfortable
2     for you, and to speak into it so that way everyone can
3     hear.
4                   THE WITNESS:  Okay.
5                         DIRECT EXAMINATION
6     BY MR. GRADY:
7     Q    Am I correct your first name is Ayla?
8     A    Yes.
9     Q    Does the first initial of your last name start with
10    L?
11    A    Yes.
12    Q    Ayla, we are just going to refer to people by first
13    names together unless I ask otherwise, okay?
14    A    Okay.
15    Q    Great.
16         How old are you, Ayla?
17    A    26.
18    Q    Where are you from?
19    A    Burlington.
20    Q    Did you graduate high school?
21    A    No.
22    Q    When did you drop out?
23    A    11th grade.
24    Q    Why did you drop out at 11th grade?
25    A    I was pregnant with my son.
```

1    Q    What's the first name of your son's father?

2    A    Bradley.

3    Q    Where did you live after your son was born?

4    A    At my mom's house in Milton.

5    Q    Did Brad live with you as well?

6    A    Yes.

7    Q    Did you eventually start working to support

8    yourself?

9    A    Yes.

10   Q    Where did you work at?

11   A    Dollar General.

12   Q    At some point did you begin using drugs?

13   A    Yes.

14   Q    When did that begin?

15   A    Right around when I was 19.

16   Q    Why did you start using drugs?

17   A    To party and have fun.

18   Q    Which drugs did you start with?

19   A    Cocaine and Molly to start.

20   Q    Did you ultimately start using heroin?

21   A    Yes.

22   Q    When did that begin?

23   A    Right around when I was 19, 20.

24   Q    How often were you using heroin in the beginning?

25   A    Once in a while.  Nothing -- nothing crazy.

1    Q    Did your heroin use get progressively worse?

2    A    Yes.

3    Q    Did you lose custody of your son at some point?

4    A    Yes, I did.

5    Q    When did that happen?

6    A    When I lost my apartment, they didn't let me sign

7    another lease.

8    Q    Do you remember generally when that occurred as far

9    as years or --

10   A    My son was two and a half when that happened.

11   Q    Would that have been 2014?

12   A    Yes.

13   Q    How did you feel once you lost custody of your son?

14   A    Horrible.

15   Q    Did you turn to heroin to help deal with that?

16   A    To numb the pain, yeah.

17   Q    How much were you using at that time?

18   A    Probably about 10 bags a day.

19   Q    How were you affording your habit?

20   A    Well, Bradley was still working at the time, and I

21   was working at McDonald's when that happened.

22   Q    Did you eventually lose this job at McDonald's?

23   A    Yes, I did.

24   Q    Did you ever ask any family members for help with

25   your addiction?

1    A    Yes, I did.

2    Q    Who did you ask?

3    A    My father.

4    Q    How did he respond to that?

5    A    He told me to pack my things, take my kid and sleep

6    in my truck and get everything out of his house.

7    Q    Did your family tend to shun you because of your

8    addiction?

9    A    Completely wrote me off.

10   Q    What about Brad's family?

11   A    Not so much.  They still talked to him and

12   associated with him, but they wouldn't have anything to

13   do with me.

14   Q    You mentioned before that one of the ways that you

15   afforded heroin was through Brad's job as well, right?

16   A    Yes.

17   Q    Did Brad end up losing his job?

18   A    Yes, he did.

19   Q    When did that happen?

20   A    About four, five months after we lost our home.

21   Q    Would this be around the summer of 2015?

22   A    Close.

23   Q    With both of you not working, did you have any

24   money that you were making?

25   A    No.

1  Q    And am I correct that you started living in his

2  truck?

3  A    Yes.

4  Q    What's it like to live out of a truck?

5  A    It sucks.  No bathroom, no water.

6  Q    So as a heroin addict living out of a truck, do you

7  sometimes have to lie and cheat to get by in life?

8  A    And steal.

9  Q    In fact, have you lied to law enforcement about

10 your identity at a couple points in time?

11 A    Yes.

12 Q    Let's talk about a few of those briefly.  Did you

13 get stopped for shoplifting at a Hannaford's in May 2015

14 and claimed to be Kayla?

15 A    Yes, I did.

16 Q    Why did you do that?

17 A    Because I knew I had a warrant out.

18 Q    Didn't want to get arrested?

19 A    No.

20 Q    And who was Kayla, by the way?

21 A    A friend I went to school with in middle school,

22 8th grade.

23 Q    What about in July 2016?  Did you tell Burlington

24 PD that you were Amanda White after an incident on North

25 Winooski?

1   A    Yes, I did.

2   Q    Again, why did you do that?

3   A    Because I had a warrant and I didn't want to get

4   arrested.

5   Q    And who is Amanda?

6   A    She is my cousin.

7   Q    Same in November 2017, did you get pulled over by

8   law enforcement and claim to be Amanda?

9   A    Yes, I did.

10   Q    And were you similarly trying not to get arrested

11   on a warrant?

12   A    Correct.

13   Q    Did you also tell the officer that you had a brain

14   tumor?

15   A    Yes, I did.

16   Q    Did you actually have a brain tumor?

17   A    No.

18   Q    Why did you tell him that?

19   A    To make him feel bad and hope that I get let go,

20   and some kind of sympathy.

21   Q    And, finally, Ayla, in December 2018, did you call

22   the police and say you were Amanda once again?

23   A    Yes, I did.

24   Q    And why did you do that?

25   A    Because I had a warrant.

1    Q    Ayla, let's go back to the summer 2015 when you are

2    living out of Brad's truck.  Did you consider that to be

3    a low point in your life?

4    A    Extremely.

5    Q    Why is that?

6    A    Because I felt like I had absolutely nothing, and I

7    felt like it couldn't get any worse.

8    Q    Did you meet the defendant shortly after this in

9    the summer of 2015?

10   A    Yes.

11   Q    What names do you know him by?

12   A    Moe and Brian.

13   Q    How did you meet Moe?

14   A    Through a friend.  I just -- I needed some help

15   making money and finding a way to get by.  She said she

16   knew this guy that could help me out and get me back on

17   my feet.

18         MR. GRADY:  Your Honor, continuing permission

19   to approach the witness?

20         THE COURT:  Yes.

21   BY MR. GRADY:

22   Q    Ayla, I am showing you what's been marked as

23   Government Exhibit 63 for identification.

24   A    Yes.  That's her.

25   Q    Do you recognize that?

```
 1    A    Um-hum.

 2    Q    Is that the friend who put you in touch with Moe?

 3    A    Yes.

 4    Q    Do you remember her name?  First name?

 5    A    Violet.

 6    Q    Violet.  Thank you.

 7         Does that fairly and accurately show Violet?

 8    A    Yes.

 9         MR. GRADY:  Your Honor, the government moves

10    to admit and publish 63.

11         THE COURT:  Any objection?

12         MR. KAPLAN:  No objection, your Honor.

13         THE COURT:  So admitted.

14         (Government's Exhibit 63 was received in

15    evidence.)

16    BY MR. GRADY:

17    Q    Where did you first meet Moe?

18    A    Off of Barlow Street in Winooski, by a little white

19    church.

20    Q    Did you meet him in a car?

21    A    Yes.

22    Q    Did you -- did you tell Moe that you were homeless?

23    A    Yes.

24    Q    Did you tell him that you needed money?

25    A    Yes.
```

1    Q    Did he offer to help you out?

2    A    He said we could figure something out.

3    Q    What was his offer?

4    A    He just wanted me to help him bag up and move his

5    stuff.

6    Q    When you say bag up and move his stuff, what are

7    you referring to?

8    A    Heroin.

9    Q    What would you receive in exchange for bagging up

10   his heroin?

11   A    He would keep me well.

12   Q    What did you think of this offer?

13   A    Fair.

14   Q    Did you agree to?

15   A    Yep.

16   Q    Was this the first time that you met Moe?

17   A    Yes.

18   Q    Did he also offer to give you a place to live?

19   A    Yes.

20   Q    Would that be for both you and Brad?

21   A    Yep, in the beginning.

22   Q    Showing you what's been previously admitted as

23   Exhibit 97.  Do you recognize what's shown in

24   Exhibit 97?

25   A    Yes, I do.

```
1    Q     What is it?

2    A     It is the place on Spring Street in Winooski where

3    me and Bradley stayed together.

4    Q     Was that the first place that you stayed at with

5    Moe?

6    A     Yes.

7    Q     Was it nice to have a place to stay?

8    A     Yes.

9    Q     How often did you bag drugs at the residence shown

10   in 97?

11   A     Not so much there.  We just moved it from there.

12   Q     Did you do any hand-to-hand sales out of the house

13   reflected in 97?

14   A     Not in the house.  Mostly around the local area,

15   down the street, across the road at the parking lot.

16   Q     Who would be doing those hand-to-hand sales?

17   A     Me or Bradley.

18   Q     Did Moe ever touch the drugs and sell them hand to

19   hand?

20   A     No.

21   Q     Did Moe provide an incentive to sell more heroin?

22   A     Yes.

23   Q     Can you tell us about that?

24   A     We -- the more we sold, the more we got.

25   Q     What do you mean the more you got?
```

```
1    A    I mean, we'd make more off of what we sold.  If I
2    sold 10 bags, for instance, I'd get four to five in
3    return.
4    Q    So the more that you sold, the more heroin you
5    would receive for your own personal use?
6    A    Exactly.
7    Q    How long did you stay at the house at 97?
8    A    A month or two max.
9    Q    Okay.  We'll take down 97.
10        Where did you go next?
11   A    To Lori's on Spring Street in Burlington.
12   Q    Ayla, I am showing you what's been marked as
13   Government's Exhibit 41 for identification.  Do you
14   recognize who's shown in 41?
15   A    Yes, I do.
16   Q    Who is that?
17   A    Lori Crawford.
18   Q    And does that fairly and accurately show Lori?
19   A    Yes, it does.
20   Q    Thank you.
21            MR. GRADY:  Your Honor, at this time the
22   government moves to admit and publish 41.
23            THE COURT:  Any objection?
24            MR. KAPLAN:  No objection, your Honor.
25            THE COURT:  So admitted.
```

```
 1              (Government's Exhibit 41 was received in
 2    evidence.)
 3    BY MR. GRADY:
 4    Q    And I'm also going to show you now at this time
 5    what's been previously admitted as Exhibit 96.  Is that
 6    Lori's house?
 7    A    Yes, it is.
 8    Q    Did you continue to bag and sell drugs from Lori's
 9    house?
10    A    Yes.
11    Q    Where did you bag the drugs when you were living at
12    Lori's?
13    A    In the living room on the little coffee table.
14    Q    How much did you bag in an average day if you had
15    to estimate?
16    A    Probably about a hundred bags in the beginning.
17    Nothing too large, but still enough.
18    Q    What was the daily routine like at the beginning at
19    Lori's house?
20    A    We would wake up in the morning and wait for Brian
21    to arrive so we could get well, because we'd wake up
22    sick when you are addicted to opiates.
23    Q    What does it mean to get well?
24    A    To do dope.  To get rid of opiate detox.  To not
25    feel achy and sweaty and crawling out of your own skin.
```

1   Q   Is that what it feels like when you're withdrawing

2   from heroin?

3   A   Yes.

4   Q   How soon do you feel better after receiving heroin?

5   A   Immediately.

6   Q   Did anybody else help you bag drugs when you were

7   living at Lori's?

8   A   Yes.

9   Q   Do you remember some of the first names of some of

10   those folks?

11   A   Yes.

12   Q   Who were they?

13   A   There was two Ashleys, a girl named Amanda, Mandy,

14   Hannah.

15   Q   And let me show you -- we'll start with what's been

16   previously admitted as 48A.

17   A   Yes.

18   Q   Who is that?

19   A   That's Mandy Latulippe.

20   Q   You also mentioned an Ashley.  Let me show you

21   what's been previously admitted as 93.

22   A   Yep.

23   Q   Is that Ashley?

24   A   Yes.

25   Q   And you mentioned Hannah.  Let me show you what's

1   been previously admitted as 47A.

2   A    Yes.

3   Q    That's Hannah?  Okay.

4        Let me show you what's been marked as Government

5   Exhibit 57A for identification.  Does that girl look

6   familiar?

7   A    Yes.

8   Q    Who is that?

9   A    Victoria.

10  Q    Did she also help bag drugs at Lori's?

11  A    No, not that I remember.  She was there.

12  Q    She was there at Lori's sometimes?

13  A    Yes.

14  Q    Does that fairly and accurately show Victoria?

15  A    Yes.

16           MR. GRADY:  Your Honor, the government moves

17  to admit 57A.

18           MR. KAPLAN:  No objection.

19           THE COURT:  So admitted.

20           (Government's Exhibit 57A was received in

21  evidence.)

22           MR. GRADY:  But we will move on instead of

23  publishing Victoria.

24  BY MR. GRADY:

25  Q    What were you wearing while you were bagging up

1    drugs at Lori's?

2    A    At most, bra and panties, if that.

3    Q    Why did you have to bag in bra and panties at the

4    most?

5    A    So we couldn't steal nothing, tuck nothing away

6    or -- like put whatever we could slip away into our

7    pockets.

8    Q    Who directed you to bag like that?

9    A    Brian.

10   Q    At Lori's house, who typically did the hand-to-hand

11   sales?

12   A    Me, Lori, Amanda, Ashley.

13   Q    What did you receive in exchange for helping sell

14   the drugs out of Lori's?

15   A    Same as -- as before.  Whatever I sold, I made off

16   of.

17   Q    Did you get heroin in return?

18   A    Yes.

19   Q    What about food?

20   A    Food, shelter, clothes if I needed them.

21   Q    Is Brad still hanging around and living with you

22   when you first go to Lori's?

23   A    Yes.

24   Q    Do you know who supplied Moe with the drugs that

25   you were selling out of Lori's?

```
1    A    Not right off.

2    Q    What about a person named Ghost?

3    A    Yes.

4    Q    Let me show you what's been previously admitted as

5    64.  Is that Ghost?

6    A    That's him.

7    Q    When did he enter the picture?

8    A    About three months in is when I met him the first

9    time.

10   Q    What was his role in all this?

11   A    Well, he was just one of the guys hanging at the

12   house, but he was the one who dropped it off.

13   Q    What do you mean who dropped it off?

14   A    Dropped the heroin off.

15   Q    Okay.  Ayla, did there come a time when Moe began

16   reducing the amount of heroin that he provided to you?

17   A    Yes.

18   Q    When did this happen in relation to moving in and

19   living at Lori's?

20   A    About a month and a half, two months in.

21   Q    Okay.  And if I could just ask you to get a little

22   closer to the microphone, Ayla.  I just want to make

23   sure we can hear everything.

24   A    Um-hum.

25   Q    Did Moe say why he was cutting back in this
```

1    fashion?

2    A     Because I wasn't making as much as I was doing.

3    Q     What impact did it have on you physically as you

4    got less and less heroin?

5    A     I was getting sick quicker.  I would start detoxing

6    earlier, and I wouldn't have enough to do any -- to keep

7    myself well when I started getting sick.

8    Q     How were you feeling mentally as less and less

9    heroin was provided?

10   A     Worried, anxious, sick.  Just -- I was sad, really.

11   Q     Did Moe have any ideas of what you could do to get

12   more heroin?

13   A     Yes.

14   Q     What was his idea?

15   A     Well, I could sell more or I could do dates.

16   Q     What do you mean do dates?

17   A     Prostitution.

18   Q     How did you initially feel when he said do

19   prostitution?

20   A     No, never.  It was never a thought that crossed my

21   mind.  It was never something that I wanted to do.  I

22   just -- I was in awe really about it because I had seen

23   it in movies, but I never really put much thought to it

24   and just seemed like one of the most horrible things to

25   do.

1    Q    Did Moe continue to bring up this idea of

2    prostitution?

3    A    Yes.

4    Q    How often?

5    A    It wasn't an everyday thing.  It was mostly when I

6    complained a lot that I wasn't feeling good, that I was

7    sick, that I wasn't getting enough.

8    Q    What happened to Brad around the same time that Moe

9    had this idea about prostitution?

10   A    He ended up having to leave.  Brad didn't -- Brad

11   was mad about the entire situation and the thought of me

12   doing that, and he didn't like how close me and Moe were

13   getting, and --

14   Q    Why did Brad have to leave or who made Brad live?

15   A    Moe.

16   Q    How were you feeling as the days went by and your

17   heroin access was dwindling?

18   A    Like shit.

19   Q    Did you have any other way to -- to make money?

20   A    I could steal stuff.  That's about it.

21   Q    Did you have anybody who would supply you with

22   heroin for free?

23   A    No.

24   Q    Anywhere else to go at that time?

25   A    No.

1    Q    Anybody you could talk to for help?

2    A    No.

3    Q    What was your number one priority in life at that

4    time?

5    A    To stay well, stay alive.

6    Q    Did Moe know that was your number one priority?

7    A    Yes.

8    Q    How?

9    A    Because that's all I asked for from him really.

10   Q    Did you ultimately agree to go on a prostitution

11   date?

12   A    Yes.

13   Q    Why?

14   A    Because I was sick of being sick and just wanted to

15   feel numb and normal again.

16   Q    Who made arrangements for that first date?

17   A    Moe.

18   Q    Who took pictures of you for that first date?

19   A    Victoria and Mandy.

20   Q    Do you know why pictures had to be taken?

21   A    For people to see who they were seeing.

22   Q    Ayla, I am going to show you what's been marked as

23   54B for identification.  And turning to the second page

24   of 54B for identification, who's shown in the second

25   page of 54B?

1    A    Me.

2    Q    Is that -- where were those pictures taken, the top

3    two pictures on 54B?

4    A    Lori's house.

5    Q    Turning to page three of 54B, who is shown in the

6    third page of 54B?

7    A    Me and Brittany.

8    Q    Do you know where those pictures were taken?

9    A    At Mark's house off of North Ave.

10   Q    And finally the fifth page of 54B, who's shown in

11   that?

12   A    Me.

13   Q    Okay.  Thank you.

14        Retrieving 54B, I am going to show you now 54D for

15   identification.  Who is shown in 54D for identification?

16   A    Me.

17   Q    Turning to the second page of 54D for

18   identification, is there an e-mail address associated

19   with this ad?

20   A    Yes.

21   Q    Whose e-mail address is that?

22   A    Mandy's.

23   Q    And then finally in 54E for identification, who is

24   shown in that first page?

25   A    Me.

1    Q    If you could turn to the second page of 54E, who's

2    shown in the second page of 54E?

3    A    Me and Victoria.

4    Q    Do you recall who took those photos?

5    A    Moe.

6    Q    Thank you.

7         In all of those -- at least the photos in 54D,

8    which was the Backpage ad, and 54E, were those taken

9    when you were working for Moe?

10   A    Yes.

11   Q    Going back to the first date, Ayla, where did that

12   take place?

13   A    My very first date was in a car.

14   Q    Who drove you to that location?

15   A    Moe.

16   Q    Did you have sex with that first client?

17   A    Yes.

18   Q    How did you feel afterwards?

19   A    Undescribable.  I couldn't scrub the feeling off of

20   me.  I just -- I felt like biohazardous waste.  I was

21   just disgusted with myself.

22   Q    I know this is hard, Ayla, and I just ask you to

23   get a little bit closer to the microphone.

24   A    All right.

25   Q    Did you continue to prostitute for Moe after that

1    first date?

2    A    Yes.

3    Q    When did you stop?

4    A    Two years later.

5    Q    So from at least -- with Moe, did it go in the

6    summer of 2015 until maybe sometime early in 2016?

7    A    Yes.

8    Q    Who set up these dates in the beginning?

9    A    He did.  Or, sorry, Brian did, all on his own.

10   Q    How did it work?

11   A    The dates would text him from the ad, they'd get

12   the number, and he would respond pretending to be

13   female, and he would figure out what they wanted and

14   give them the price, which goes by how long they want to

15   spend with the person they're seeing.

16   Q    When you say ad, are you referring to Backpage?

17   A    Yes.

18   Q    Who drove you to these dates?

19   A    Brian.

20   Q    Up to how many clients would you see in a day?

21   A    At first, two or three.

22   Q    What was the most amount of clients you saw in a

23   day?

24   A    Sometimes 15, 20.

25   Q    How many days a week did you have to see clients?

1    A    Every day.

2    Q    Ayla, before we go any further, have you spoken

3    with law enforcement a couple of times in reference to

4    Brian?

5    A    Yes.

6    Q    I want to talk about a time that you spoke with

7    Sergeant Mike Warren from the Chittenden Unit of Special

8    Investigations.  Do you remember talking to him in

9    December 2015?

10   A    Yes.

11   Q    Do you remember much from that interview?

12   A    No, not really.

13   Q    Why not?

14   A    I was extremely high when they had picked me up.

15   Q    Were you still in this lifestyle working for Moe?

16   A    Yes.

17   Q    Do you recall telling Sergeant Warren that you saw

18   one or two clients per day?

19   A    Yes.

20   Q    Do you remember telling him that you saw maybe 20

21   clients tops overall?

22   A    Yes.

23   Q    Do you remember telling him that you don't actually

24   have sex with anybody?

25   A    Yes.

1  Q    Do you remember telling him that you started
2  robbing clients?
3  A    Yes.
4  Q    Were any of those statements true?
5  A    No.
6  Q    Why not?
7  A    Because I didn't want to look as bad as I was, and
8  I just wanted to be let go.
9  Q    Were you ready to get sober or seek treatment at
10  that time?
11  A    No.
12  Q    Is talking about prostitution even easy to do,
13  Ayla?
14  A    No.
15  Q    Why not?
16  A    It's uncomfortable.  It's a memory I like to
17  forget.
18  Q    Ayla, going back, where would some of these dates
19  occur?
20  A    In cars or hotels.
21  Q    What type -- what kinds of hotels, if you remember?
22  A    Like the Quality Inn, Motel 6, the Ho Hum.  Places
23  like that.
24  Q    Okay.  Showing you what's been previously admitted
25  as Exhibit 100.  And if we could go to the final page of

1    100.  I believe it's 100-008.  What's that?

2    A    Motel 6.

3    Q    Is that the Motel 6 in Colchester?

4    A    Yes, it is.

5    Q    Let's go to -- I am showing you Exhibit 101.

6    What's that?

7    A    The North Star.

8    Q    Had you been to the North Star?

9    A    Yes.

10   Q    I'm also showing you what's been marked as

11   Government Exhibit 99 for identification.  Do you

12   recognize that hotel?

13   A    Yep.  That's the Ho Hum on Williston Road.

14   Q    Is that another hotel that you would see clients

15   at?

16   A    Yes.

17   Q    Does it fairly and accurately show the hotel?

18   A    Yes.

19          MR. GRADY:  Your Honor, at this time the

20   government moves to admit and publish 99.

21          THE COURT:  Any objection?

22          MR. KAPLAN:  No objection, your Honor.

23          THE COURT:  All right.  So admitted.

24          (Government's Exhibit 99 was received in

25   evidence.)

```
 1    BY MR. GRADY:
 2    Q    Ayla, I think you also mentioned Uncle Marty's
 3    house on North Avenue.  I want to show you what's been
 4    previously admitted as Exhibit 98.  Is that the house
 5    you were referring to where the pictures were taken?
 6    A    Yes.
 7    Q    Who would rent hotel rooms?
 8    A    Mandy, Victoria mostly.
 9    Q    Do you remember what the rates were that were
10    charged?
11    A    For the mo- --
12    Q    For the dates.
13    A    It was a hundred bucks for a quick visit, which is
14    15 minutes; 150 for a half hour, and 200 for an hour.
15    Q    Who set those rates?
16    A    Brian did.
17    Q    How much of the money did you have to give to
18    Brian?
19    A    Half.
20    Q    What did you spend your half on?
21    A    Drugs.  Heroin.
22    Q    Is it fair to say that all of your money would go
23    to Brian then?
24    A    Every last penny.
25    Q    Was Moe your sole supplier of heroin at this time?
```

1    A    My only, yes.

2    Q    Is it -- would it be fair to say that the more you

3    made, the more heroin you could receive?

4    A    Yes.

5    Q    Now, did you know that Brian was using Backpage to

6    advertise you at first?

7    A    No.

8    Q    How did you find out he was using Backpage?

9    A    I had seen what he was posting, and -- when he was

10   making the post for Backpage.  I had been in a room and

11   seen what him and Mandy were typing down on the phone,

12   and I had seen the little thing on the top of the page

13   that said Backpage.

14   Q    Do you need an e-mail address to post on Backpage?

15   A    Yes, you do.

16   Q    Would Moe use his e-mail address to post ads for

17   girls?

18   A    No, not that I know of.

19   Q    Whose e-mail addresses would be typically used?

20   A    Normally Mandy's, Victoria's, basically anybody

21   else's.

22   Q    And you mentioned Mandy's.  Is that the one

23   you identified on 58D for identification which was the

24   Backpage ad that you looked at?

25   A    Correct.

1    Q     Do you know if Moe ever advertised four women, for

2    example, in Backpage ads?

3    A     Yes.

4    Q     How do you know that?

5    A     There had been a few times where I was in those

6    posts myself with two to three girls at a time.  It was

7    to keep each other safe.

8    Q     Did Moe have any rules?

9    A     We weren't allowed to see any other drug dealers.

10   We weren't allowed to have sex for drugs.  We weren't

11   allowed to see black men.  That was about it.

12   Q     Did there come a time when Moe expected you to

13   arrange for your own dates?

14   A     Yes.

15   Q     When did that occur in relation to starting up with

16   him?

17   A     A few months in.

18   Q     Why did he want you to schedule your own dates?

19   A     So he could deal with whatever he had to deal with,

20   and I was taking care of my own business, and I was

21   making my money on my own, so I could do it more

22   frequently, and he didn't have to oversee it, and I

23   could make more money that way.

24   Q     Are you aware of other women who prostituted for

25   Moe?

```
 1    A    Yes.

 2    Q    Do you remember some of their names?

 3    A    Yes.

 4    Q    Can you tell us some of them?

 5    A    Amanda, Ashley Palmer, the other Ashley.  She went

 6    by Red.  Victoria.  And Mandy very seldomly.  Brittany

 7    Barber.  And I think that's it.

 8    Q    What about Keisha?

 9    A    Oh, Keisha Willard.  Yes.

10    Q    And, again, just tell us first names, if you can

11    remember.

12    A    Okay.

13    Q    Thank you.

14         Showing you what's been previously admitted as 50A.

15    Who's that?

16    A    Keisha.

17    Q    Showing you what's been previously admitted as 83.

18    Who's that?

19    A    Amanda.

20    Q    Showing you what's been previously admitted as 93.

21    Who's --

22    A    Ashley.

23    Q    Is that Ashley referred to as Red?

24    A    Yes.

25    Q    And finally showing you what's been previously
```

```
 1    admitted as 89.  Is that the other Ashley?
 2    A    Yes.
 3    Q    Ayla, did you have anywhere else that you could
 4    stay when you were living at Lori's?
 5    A    No.
 6    Q    Did Brian make any comments about that?
 7    A    Yes.
 8    Q    What did he say?
 9    A    That he -- he took care of me.  He put a roof over
10    my head, food in my belly, clothes on my back if I
11    needed 'em.
12    Q    Did Brian claim that he owned you because of this?
13    A    When I wanted to leave, yes.
14    Q    Did you want to rely on Brian for your needs?
15    A    No.
16    Q    Why not?
17    A    Because it -- it was harder that way.  It's not
18    comfortable having to ask somebody for everything you
19    want.  It makes you feel incapable and kind of like a
20    leach really.
21    Q    Was Moe unreliable at times in providing heroin?
22    A    Yes.
23    Q    Were there times that heroin depended on his mood?
24    A    Yes.
25    Q    Were you in a position to argue when he didn't
```

```
1    provide you with heroin?
2    A    No.
3    Q    Why not?
4    A    Because he ran the show.
5    Q    Did Moe kick you out of Lori's house sometimes?
6    A    Yes.
7    Q    Why?
8    A    If I did anything wrong or disrespected him or
9    violated him and his terms.
10   Q    He specifically used the term "violated"?
11   A    Yes.
12   Q    What would he say when he is kicking you out?
13   A    "You -- you did me dirty," or you -- I'm keeping
14   lies or I am doing things behind his back.  If I'm not
15   going to stay true or -- or try to hide things from him,
16   that he ain't going to -- he's not going to take care of
17   me, he's not going to help me out, I have to leave.  If
18   I want to run my own show, then I can run it by myself.
19   Q    Where did you go when you were -- well, when you
20   were kicked out of Lori's, would you go across the
21   street?
22   A    Sleep on the stairs of the school.
23   Q    I am going to show you what's been previously
24   admitted as 96.  And we'll go to the final pages of 96.
25        Is that the school that's across from Lori's house?
```

1    A    Yes, it is.

2    Q    Is that where you would sometimes go and sleep?

3    A    Yes.

4    Q    Did you fear being kicked out of Lori's house?

5    A    Yeah.

6    Q    Why?

7    A    Because it was cold outside, and it's not fun being

8    on the streets.  It's a lot harder living.  There's

9    no -- even indoors on the floor is better than sleeping

10   on cold dirt or concrete and having to worry about

11   police coming and telling you you're trespassing or

12   moving you or, worse, arresting you.

13   Q    Did you stay in line with Brian's rules in part

14   because you didn't want to get kicked out of the house?

15   A    Yes.

16   Q    Did you see Brian kick other people out of the

17   house?

18   A    Yes.

19   Q    Who did you see him kick out?

20   A    Jerricka Maynard.  I have seen him kick out Ashley,

21   Amanda.

22   Q    Why would he kick these women out?

23   A    They'd either be dates on their own or they would

24   be seeing other dealers.

25   Q    How did your heroin use during this time at Lori's

```
1   compare with what you had used previously?
2   A   Quadrupled in amount.  I was only using maybe a bun
3   a day, which is 10 bags.
4   Q   Why did it -- why did it quadruple?  Why did it
5   grow so much?
6   A   Because the more I made, the more I did, and when
7   you do more, you build up a tolerance to more and your
8   body needs more.
9   Q   Did it also help you deal with what you were doing?
10           MR. KAPLAN:  Objection, your Honor.
11  A   Yes.
12           THE COURT:  Objection sustained.  It's a
13  leading question.
14           MR. GRADY:  Yes, your Honor.
15  BY MR. GRADY:
16  Q   Were you using heroin intravenously?
17  A   Yes.
18           MR. KAPLAN:  Your Honor, may we approach for a
19  moment, please?
20           THE COURT:  Yes.  Okay.
21  (The following was held at the bench.)
22           THE COURT:  Okay?
23           MR. KAPLAN:  So I haven't said anything, but
24  to me the questions are pretty leading and not
25  open-ended enough, you know, and then some of them are
```

```
 1    obviously -- but there's a lot of questions that suggest
 2    the answer, and, like, did he ever kick you out because
 3    he was angry with you.  I mean, just -- just say did you
 4    have a problem with him?  What was it? rather than did
 5    you ever get kicked out.
 6              THE COURT:  So if you raised an objection, I
 7    sustain the objection.
 8              MR. KAPLAN:  I just don't want to do it every
 9    time, that's all.
10              THE COURT:  Right.
11              MR. KAPLAN:  Because then I look bad.
12              THE COURT:  Okay.  You are on notice.
13              MR. GRADY:  I am just trying to cut to subject
14    areas and then ask open-ended questions.
15              THE COURT:  She obviously is an intelligent
16    person.
17              MR. GRADY:  Right.
18              THE COURT:  She can just describe what
19    happened with her.  So I'd ask that you --
20              MR. KAPLAN:  Always say and then what
21    happened?  What happened next?
22              THE COURT:  Welcome to being a defense lawyer.
23              MR. GRADY:  Exactly.  Thank you, your Honor.
24    (The following was held in open court.)
25    BY MR. GRADY:
```

1    Q    Ayla, I think when we last left it, you were

2    discussing heroin --

3    A    Yes.

4    Q    -- and the amount you were using compared to what

5    you were using before, right?

6    A    Yes.

7    Q    What was the daily routine like at this point with

8    heroin?

9    A    I'd wake up, get well in the mornings, and start to

10   figure out my first -- my first date.

11   Q    When would Moe bring heroin over?

12   A    When he -- the first time he came to the house.

13   The morning.

14   Q    When would you receive it in the day after that?

15   A    Whenever I finished a job and I had money.

16   Q    If you didn't see a client, could you receive

17   heroin?

18   A    No.

19   Q    Did Moe say anything about that?

20   A    If I wanted to -- if I wanted more, I had to make

21   money to get it.

22   Q    How was -- how was this quadruple level of heroin,

23   as you termed it -- how did this impact you over time?

24   A    It made me feel like crap.  If I craved more, I

25   need more.  I struggle harder to -- to make more money

```
 1    and do more things to impress him and -- and keep him
 2    happy so I was well and I felt taken care of.
 3    Q    What happened to your appearance over time?
 4    A    It fell drastically.
 5    Q    Why was it falling off drastically?
 6    A    Well, drugs deteriorate your body.  It's like a
 7    piece of fruit.  It rots and spoils.
 8    Q    Let's change topics, Ayla.  And did Moe ever put
 9    his hands on you?
10    A    Yes.
11    Q    How many times?
12    A    Three.
13    Q    Let's talk about the first time.  When did this
14    happen?
15    A    I was buying something for Brad from Moe, and Brad
16    wasn't allowed around.  Moe didn't want him anywhere
17    near wherever we were.  And I had come in with Brad's
18    money and Moe found out that Brad was outside and that
19    it was for Brad, and he lost it.
20    Q    Was this at Lori's house?
21    A    Yes, it was.
22    Q    What happened?
23    A    Well, Moe had freaked out and told me, "You know I
24    don't want him around.  He's not allowed around.  I told
25    you I wouldn't sell to him.  I told you I wouldn't give
```

```
 1    him nothing, not to bring him here."  He had gotten into
 2    my face, drawn his finger in my face repeatedly,
 3    cornering back towards the bathroom.
 4    Q    Did anything happen in the bathroom?
 5    A    Yes.
 6    Q    What happened in the bathroom?
 7    A    He had slapped me in the face because I had said
 8    I -- "I'm sorry, I'm sorry.  I was just trying to make
 9    money."  And I was scared.  And he towered over me and
10    he told me not to bring him there.  I think he -- I know
11    better and there's consequences for this stuff.
12         He had pushed me back by my chest and I had landed
13    in the bathtub on my back.
14    Q    What's going on through your mind when you are
15    experiencing this?
16    A    That I was terrified.  I don't know what's going to
17    happen to me.  He's a lot larger than me, and I -- I
18    don't know what to do.
19    Q    Were you crying during this experience?
20    A    Hysterically.
21    Q    Is it safe to assume that you're the same size as
22    you are today as you were back in 2015?
23    A    No.  No, I was a lot thinner.
24    Q    How much bigger was Moe in relation to you?
25    A    Three, four times my size.
```

```
 1    Q     Ayla, let's turn to the second time that Moe put
 2    his hands on you.  When did this occur?
 3    A     I had found out that I was able to fight for
 4    custody of my child back and get sober and get my life
 5    back, my family, and I had told him about it, told him I
 6    wanted to go to rehab, I wanted to leave and I was done.
 7    Q     When you say you told him about it, who are you
 8    referring to?
 9    A     Brian.
10    Q     What was his reaction?
11    A     He was upset.  He didn't want me to go anywhere.  I
12    made too much money.  I was too big an asset.
13    Q     Did you actually leave after this conversation?
14    A     I tried to.
15    Q     How did you try to?
16    A     There was a man that I had met through Brian; his
17    name was Rico.  I had set up a date and he would give me
18    a ride and I would leave with him, and instead of going
19    to a date, I would just leave.
20    Q     Did that happen?
21    A     Yes.
22    Q     Was Moe able to track you down?
23    A     Yes, but it took a while for him to actually catch
24    up to me.
25    Q     How many days did it take for him to catch up?
```

1    A    About -- almost a week.

2    Q    How did he find you after a week?

3    A    Through Backpage.

4    Q    Explain how it happened.

5    A    Basically I was out of money.  I was sick, and I

6    needed money.  I needed supplies as well if I was going

7    to go to rehab, so I was trying to get a date even

8    though I knew the risks because normally he was the one

9    who set up our Backpage.  He'd know what I post.  He

10   knew my pictures, how I looked, but I didn't really have

11   much of a choice.  I had to do something.

12   Q    So it sounds like you set up an ad.  And what

13   happened in response to this ad?

14   A    I had gotten a response, somebody who wanted to do

15   a date.  It was off of a number I didn't know, so I felt

16   safe with it.  The guy was going to pick me up.  It was

17   supposed to be a car date.  I was still with Rico at the

18   time, and he would sit close by.

19        I had gone out to meet the person in the car, and

20   there was no one there and no car driving by, nobody

21   parked, and -- and then I had seen this -- almost

22   grayish-gold color small car, older, and when it had

23   pulled up, I seen Jen and Fam in the car, two people I

24   had met through Moe, and the next thing I know they're

25   charging at me, and they pulled over and got out of the

1   car like trying to get me.  "There you are," they said.
2   "You need to come with us."  And I started running.  I
3   slid right over the top of the car and ran as fast as I
4   could across the road to Rico's car.
5   Q    What happened when you got to Rico's car?
6   A    I got in and we left.  And they tried to follow us
7   but we got lucky and got away.
8   Q    When's the next time you saw Moe?
9   A    Moe had found me himself walking down the road in
10  the middle of the night four or five days after I left.
11  He had pulled up on the side.  I don't even know how he
12  knew it was me; I had my hood up.  And I was supposed to
13  be seeing a date, but I was going to be walking down the
14  road.  I was going to -- I said I wasn't going to meet
15  for anything.  It just -- I was on the side of the road,
16  and he had pulled up and picked me up and brought me in
17  the back of his SUV, brought me back to Lori's.
18  Q    Did anything happen when he put you in the SUV and
19  brought you to Lori's?
20  A    Yes.  He had hit me repeatedly in the face.
21  Q    What's going on through your mind when he is
22  hitting you like this?
23  A    I was -- I was -- had basically -- in my mind, he's
24  going to either beat the hell out of me -- I didn't -- I
25  was afraid of what was going to happen, and then I'm

```
1    also stuck back at that house and I am not going to be
2    able to get away.  He caught up to me.  He didn't want
3    me to leave in the first place.
4    Q    Let's go to the third incident.  When did this
5    happen?
6    A    The last time I had gotten away.
7    Q    How did it come about?
8    A    I had regained trust to leave, and I had -- sorry.
9    Q    That's okay.
10   A    I had left and got away, thought I actually made it
11   this time, and I was gone for a couple weeks.  I
12   thought I lost him and he was just going to let me go.
13   And, again, he caught up to me the side of the road
14   middle of the night, dragged me in the back of the truck
15   and beat the hell out of me.
16   Q    Do you know where this happened?
17   A    Somewhere in Burlington.  I was unconscious when I
18   was found.
19   Q    Did you ever see Moe hit anybody else?
20   A    Yes.
21   Q    Who did you see him hit?
22   A    Victoria.
23   Q    What happened leading to this?
24   A    Well, she had set up a -- a date for me.  I was
25   staying with her basically as punishment.  I had done
```

1     something wrong.  I had lied to him and -- about a date.
2     I had had money of my own that I kept aside so I could
3     spend it on drugs later.  I was staying with her to do
4     work, not far from Lori's house, at her house, off of
5     North Street.  She had told me she had a job for me and
6     set me up with this black guy who just so happened to be
7     one of her dealers, and I went in, done the date, and
8     she was supposed to be collecting all the money to give
9     to him to pay off my debt, and when I'd gotten out of
10    the date, I received a half gram of cocaine and that was
11    it, and she said, "Thank you for paying off my debt."
12    Q    I'm going to show you 55A.  Is that the Victoria
13    that you are talking about?
14    A    Yes, it is.
15    Q    Okay.  We'll bring down 55A.
16         What did you do after this?
17    A    I freaked out.  I called Brian and told him what
18    had happened, that she had had me do a date to pay off a
19    debt she owed one of her dealers, and told him what she
20    had given me, how long I had seen the person, and he
21    came right over to get me.  He was furious with her.
22    Q    Did he say anything to her?
23    A    "You know better than to see other dealers.  You
24    are not supposed to see black people.  She is supposed
25    to be paying off her debt to me, not taking care of

```
1    debts for you."
2    Q    What did he do -- did Moe do anything physically to
3    Victoria?
4    A    Yeah.  He slapped her across the face.
5    Q    What's going through your mind as you see him slap
6    her across the face?
7    A    In all honesty, I kind of was happy what he did
8    because I kind of felt degraded for what she did to me.
9    Q    Did you ever see Brian with firearms?
10   A    Yes.
11   Q    Can you tell us about that?
12   A    He had a few small handguns.  One tiny little
13   pocket pistol.  He had a Smith & Wesson nine millimeter,
14   chrome and black.  And I'm pretty sure it was a .22; it
15   was a revolver, black gun.
16   Q    Going back for a minute.  Besides Victoria, do you
17   remember if Brian hit anybody else?
18   A    Yes.
19   Q    Who?
20   A    Ashley.
21   Q    Do you remember why?
22   A    She was hiding money, doing dates behind his back.
23   And she was what he would consider violating him.
24   Q    What did you think about when you saw -- did you
25   see this happen?
```

1  A    Yes.

2  Q    What did you think about when you saw this?

3  A    I stayed right out of it.  I wasn't going to be

4  in -- I knew what she had done.  I had been there, done

5  it.  I wasn't going to get into the middle of it.

6  Q    Did Moe have any pictures of you engaged in sexual

7  acts with him?

8  A    Yes.  Videos, too.

9  Q    Going back for a minute.  I want to show you what's

10  been previously admitted as Government Exhibit 92.

11  A    Um-hum.

12  Q    Do you recognize who's shown in that?

13  A    Yes.

14  Q    Who is that?

15  A    Her name is -- not Casey.

16  Q    Regardless of what the name is --

17  A    Yeah.

18  Q    -- is she somebody that hung around in the circle

19  with Moe?

20  A    She stayed with us at Lori's for a little while.

21  Q    Do you recall how Moe treated her?

22  A    In the beginning, he was very kind to her, took her

23  in like she was family.

24  Q    What about at the end?

25  A    At the end, she was -- she wasn't doing too much.

```
1    She was -- she didn't make any money.  All she did was
2    run for him really, and she didn't have hardly anybody
3    on -- of her own that she had brought in to sell to or
4    really anything.  She wasn't an asset much at all.  She
5    was just there to make what she could and get by.
6    Q    Did you know if there was any sort of sexual acts
7    between Moe and this particular person?
8    A    No.
9    Q    Okay.  Was there ever a time that you engaged in a
10   sexual act with Moe and you didn't want to?
11   A    Yeah.
12   Q    Can you tell us about that.
13   A    When I was detoxing -- I mean, nobody really wants
14   to be touched when they're covered in sweat and they're
15   crawling out of their own skin, and if I was sick and I
16   had no -- no dates lined up or anything and I -- I
17   needed to get well, I would do something for him to --
18   as in a sexual act, so I could get dope in return and
19   not feel like crap anymore.
20   Q    Do you remember if Moe ever set up any challenges?
21   A    Yes.
22   Q    What's the challenge that you can think of?
23   A    He had a -- a walnut contest.
24   Q    What was the walnut contest about?
25   A    It was different obstacles for us girls to do.
```

```
 1      They were all sexual acts.  One of 'em was taking a
 2      banana that was half unpeeled and putting it in our
 3      vagina and trying to squeeze the banana out.
 4          One of 'em was being shot in our rear with an
 5      airsoft gun, a little handgun, repeatedly.
 6          Another one was sticking walnuts in our rectum to
 7      see how many we could fit in.
 8          And then there was a giant acorn that was like a
 9      Russian doll on the inside that kept getting smaller.
10      And that's -- and that's it.
11  Q   Did you participate in the walnut challenge?
12  A   Yes.
13  Q   Did you receive anything for it?
14  A   Yes.
15  Q   What?
16  A   Dope.
17  Q   Has that impacted you in any fashion, participating
18      in this walnut challenge?
19  A   Yeah.  It was humiliating.
20  Q   Did Moe -- you mentioned before that Moe had
21      pictures of you.  Did Moe ever tried to blackmail you
22      with pictures?
23  A   Yes.
24  Q   What did he say with respect to that?
25  A   "Don't forget what I have got of you."  Basically
```

```
 1    if I do anything to really go over his boundaries,
 2    he's -- he's got ways to take care of me.  He'll make
 3    sure that people know who I am and what I have done
 4    wrong and that I'm -- I'm not -- I'm not good money, so
 5    nobody will deal with me, so I will have no way to
 6    survive on the streets without him.
 7    Q    Had you seen Moe post other information about other
 8    girls?
 9    A    Yes.
10    Q    Where would this be at?
11    A    In Lori's, in the living room.  It's normally where
12    we hung out.
13    Q    What he posted on the internet --
14    A    Was on Backpage.
15    Q    Ayla, I am showing you what's been marked as
16    Government Exhibit 36 for identification.  Take a minute
17    and look at that and also the pictures and the other
18    pages of 36.
19         Do you recognize what's shown in Government Exhibit
20    36 for identification?
21    A    Yes, I do.
22    Q    What is it?
23    A    It is an ad about Jerricka, a girl I had grown up
24    with.
25    Q    How do you recognize that ad?
```

```
1    A    I was in the room when this was being posted.

2    Q    Where were you in the room in relation to Moe?

3    A    I was sitting next to Moe on the couch.

4    Q    Did you see him actually typing up information for

5    that ad?

6    A    Yes.

7              MR. GRADY:  Your Honor, at this point the

8    government moves to admit and publish Exhibit 36.

9              THE COURT:  Any objection?

10             MR. KAPLAN:  Could I have a moment,

11   your Honor?

12             THE COURT:  Yes.

13                     VOIR DIRE EXAMINATION

14   BY MR. KAPLAN:

15   Q    So as I look at Government's Exhibit 36, this was

16   posted on June 30th of 2015?

17   A    Yes.

18   Q    But I don't see any of the data that's supposed to

19   go with these ads that explains whose e-mail address it

20   was sent through.  You understand how that worked,

21   right?

22   A    Yes.

23   Q    Okay.  For example, Bradley Bordeaux used his

24   e-mail when he posted for you, right?

25   A    Yes.
```

```
 1    Q    So there's no indication on this who posted this?
 2    A    No.
 3              MR. KAPLAN:  I would object, your Honor.
 4              THE COURT:  Pardon me?
 5              MR. KAPLAN:  I would object to the admission
 6    of this.
 7              THE COURT:  Okay.  Counsel approach the bench.
 8              MR. GRADY:  Sure.
 9    (The following was held at the bench.)
10              THE COURT:  Okay.  She identified the exhibit,
11    right?  Exhibit doesn't have a date.  Is a date
12    necessary if --
13              MR. KAPLAN:  It does have a date.  It actually
14    has a date.  It was posted on June 30th, 2015.
15              THE COURT:  Right.  But when was it taken and
16    submitted?  Which posting are you saying that it is
17    submitted to Backpage on?
18              MR. KAPLAN:  Well, you know --
19              THE COURT:  June 30th.
20              MR. KAPLAN:  It's probably admissible.  I was
21    just curious why they don't have the extra page that
22    goes with this.
23              MR. GRADY:  We do.  That's 36A.  The reason I
24    redacted it for this copy, that witness can't
25    authenticate information that's from Backpage from her
```

1    own personal knowledge, so I have 36A, if you want 36A

2    in.

3                MR. KAPLAN:  All right.  I will withdraw my

4    objection.

5                THE COURT:  All right.

6    (The following was held in open court.)

7                THE COURT:  Okay.  Defense withdraws the

8    objection.  36 is admitted.

9                (Government's Exhibit 36 was received in

10   evidence.)

11               MR. GRADY:  36 is admitted.  I ask to publish

12   36, your Honor?

13               THE COURT:  Yes.

14   BY MR. GRADY:

15   Q    Looking at the first page of 36, do you know who is

16   shown in this?

17   A    Yes.

18   Q    Again, first name is fine.

19   A    Jerricka.

20   Q    And, again, Jerricka is one of the ones you

21   previously testified worked for the defendant?

22   A    Yes.

23   Q    And am I correct that the ad says essentially,

24   "Jerricka is bad news.  Don't trust her.  She will rob

25   you"?

1      A      Yes.

2      Q      Is this the example of what you are talking about

3      when Brian posted ads about people?

4      A      Yes.

5                    MR. KAPLAN:  Objection, your Honor.

6                    THE COURT:  Objection overruled.  You can

7      answer that.

8      A      Yes, it was.

9      BY MR. GRADY:

10     Q      Has Moe ever posted derogatory information about

11     you?

12     A      Yes.

13     Q      Can you give an example?

14     A      When I had done a date behind his back to have more

15     money for my habit, he had put up a post saying I was

16     robbing people and not to see me, basically that I'd

17     just burn them, take their money and leave.

18     Q      How did Brian have so many pictures of you?

19     A      All my Backpage photos were taken by either him or

20     Mandy on his phone.

21     Q      Ayla, you previously mentioned that you ended your

22     time with Moe I think sometime the beginning of 2016.

23     Why did you stop associating with him at that time?

24     A      He wasn't the person I met in the beginning

25     anymore.  He was rude and mean.  He was unfair the way

1    he treated me.  And the deal wasn't the same as the

2    beginning.  He didn't take care of me like he said he

3    would, and I was working harder and I was getting more

4    disrespect, and more bad things had happened the longer

5    I was with him.  It wasn't worth it anymore.

6    Q    Ayla, are you currently still using heroin?

7    A    No, I am not.

8    Q    When did you get clean?

9    A    About eight months ago.

10   Q    How did you become clean?

11   A    I had overdosed, and it scared the hell out of me.

12   I ended up in jail for a couple of days over a warrant,

13   and when I had gotten out, I used.  It had been four or

14   five days, I think, so my tolerance wasn't up.  I hadn't

15   done anything, no opiates in my system, and I did a

16   small amount and fell out from it.

17        And when the paramedics woke me, I -- my head was

18   throbbing.  I was throwing up everywhere.  My clothes

19   were cut up.  My son's father, Bradley, was over me

20   crying hysterically and just --

21        I had known what happened when I come back to,

22   obviously.  It just -- it really made me realize how

23   quick everything can disappear and you don't even know

24   it because I don't remember anything from when I went

25   out.  I don't remember him throwing water on me like he

1     told me he did.  He thought I was gone.  And seeing

2     how -- how scared and hurt he was, I could only imagine

3     what he had gone through.

4     Q     Has it been a struggle to put your life together

5     since your time using heroin and your time with Moe?

6     A     Every day.

7     Q     How so?

8     A     Well, to start, I -- placement for living has been

9     hard.  I mean, in the beginning I had to move around all

10    over because I didn't have a place to stay, and when you

11    are trying to be clean, you don't want to stay with

12    people who are still using.  It doesn't help.  I was

13    trying to stay away from anybody that was associated to

14    him in the past, because he had gotten arrested and a

15    lot of people blamed me for it.  There was a lot of

16    people that hated me, so I tried to stay in, away, and

17    off the streets.  I didn't want to run into anybody I

18    had bought stuff from either.  I didn't want to take the

19    risk of running into a friend who wanted to get high or

20    share.  Basically anything that could drag me back down

21    I tried to stay away from.

22    Q     Is it difficult to relive what you have had -- what

23    you have experienced with Moe in the course of this

24    investigation?

25    A     Not all of it, but, yes.

1    Q     Is testifying here easy today?

2    A     No.

3    Q     Has it been a source of anxiety for you?

4    A     Extremely.

5    Q     Have you been helped by the government in trying to

6    get settled and stay sober?

7    A     Yes.

8    Q     How?

9    A     They have provided me money for food.  I have had

10   help with my rent, which has been a lifesaver.  If I

11   needed help for placement, it was offered to help me

12   find sober living if I couldn't myself.  And it's been,

13   honestly, the biggest steppingstone in my sobriety.

14   It's helped me stay away from town.  And I have had safe

15   living areas to be in the last two places I have been in

16   for long stays, sober in both.  My rent was paid, and, I

17   mean, what I got for food was fair, kept me fed all week

18   long.

19         It also helped me stay in my child's life because I

20   had a stable place to be where my son could come see me

21   and visit, and that was the biggest drive I had to stay

22   sober, was my -- for my child.

23   Q     Are you actually going to start a job later on this

24   month?

25   A     Yes, I am.

```
 1                  MR. GRADY:  Okay.  One moment, your Honor?
 2                  THE COURT:  Yes.
 3                  (Brief pause.)
 4                  MR. GRADY:  Nothing further, your Honor.
 5                  THE COURT:  Okay.  Cross examination?
 6   Mr. Kaplan?
 7                  MR. KAPLAN:  Judge, would this be a good time
 8   to take our break or you want to do it later?
 9                  THE COURT:  I would like to do it a little bit
10   later.
11                  MR. KAPLAN:  Okay.
12                  THE COURT:  After another 20 minutes or so.
13                         CROSS EXAMINATION
14   BY MR. KAPLAN:
15   Q    So as I understand your testimony, you met Brian
16   like in May or June of 2015?
17   A    Correct.
18   Q    And you were introduced to him by a friend of
19   yours, Violet Guerra (phonetic)?
20   A    Yes.
21   Q    And you had told Violet that you needed to make
22   money?
23   A    Yes.
24   Q    And she suggested to you that you meet Brian?
25   A    Yes.
```

1    Q    And at the time that you met Brian, you were
2    addicted to heroin?
3    A    Yes.
4    Q    I think you said previously you had been using it
5    for like four years?
6    A    Yes.
7    Q    And at that point you were actually using heroin
8    with a needle?
9    A    Yes.
10   Q    So you had a fairly serious need for heroin every
11   day?
12   A    Yes.
13   Q    And you were also, as you testified -- you were
14   very friendly with -- I say friendly.  Bradley Bordeaux
15   is the father of your child?
16   A    Yes, he was.
17   Q    And you two had really been hanging around together
18   for like 10 days?
19   A    Me and Bradley were together 13 years at the time.
20   Q    Okay.  And he was with you through this entire
21   period we are talking about?
22   A    Yes.
23   Q    In fact, you had spent a lot of time at Lori's
24   house and he would be sitting outside in the truck,
25   right?

```
1    A     Yes.

2    Q     Is that right?

3    A     Yes.

4    Q     And you would bring him drugs or whatever?

5    A     Yes.

6    Q     And he had a serious drug habit also?

7    A     Yes.

8    Q     So you would work as a prostitute, get money, and

9    then buy drugs for both him and you?

10   A     Yes.

11   Q     And he wasn't working at the time?

12   A     No.

13   Q     But he would post you on Backpage?

14   A     Not in the beginning, no.

15   Q     But at some point he did?

16   A     Much later, yes.

17   Q     And he posted you and you went out and made the

18   money and then he got drugs for it?

19   A     Yes.

20   Q     And this was the same Bradley Bordeaux that

21   introduced you to heroin?

22   A     Yes.

23   Q     And when you met Brian, you said you had been

24   living in a truck for about two years?

25   A     Yes.
```

```
 1    Q    And how did -- when you met Brian, how were --
 2    before that, like for the two years before that, how
 3    were Bradley and you getting money to support your
 4    habits?
 5    A    Through his jobs, through his family, his parents,
 6    my parents until they cut me off.  I was stealing after
 7    a while and selling the clothes, like Plato's Closet,
 8    for money.
 9    Q    And weren't you also robbing people?
10    A    No.
11              THE COURT:  I'm sorry, I didn't hear that
12    question.
13              MR. KAPLAN:  I said, weren't you also robbing
14    people?
15              THE COURT:  Oh.
16    BY MR. KAPLAN:
17    Q    When you were prostituting, at some point you, in
18    fact, did rob people?
19    A    I told -- toward the end, I have once or twice,
20    yes.
21    Q    Okay.  And that was Bradley and you?
22    A    Yes.
23    Q    And you did it on occasion when you were with Brian
24    also?
25    A    I --
```

1    Q    Not without Brian knowing?

2    A    No, I did not rob people while I was with Brian.

3    Q    Well, didn't you tell the detective on December

4    10th of 2015, which is like six months after you met

5    Brian, that you robbed a lot of the people that you --

6    that you were with because you figured they'd never go

7    back and tell anyone because they were doing something

8    illegal?

9    A    I did say that, but I said that because I did not

10   want them thinking that I was actually doing the dates

11   because I was worried about getting arrested for doing

12   the dates.

13   Q    Isn't it true that even after you left Brian, you

14   still would rob people?

15   A    I wasn't robbing.  Like I said, I had robbed

16   somebody once or twice, but it was not something I did

17   constantly.

18   Q    Well, do you recall that on July 7th of 2017, the

19   person that you were with who responded to one of your

20   ads called the police and said you were robbing him?

21   A    Yes.

22        MR. GRADY:  Objection, your Honor, to the

23   extent it doesn't involve the defendant.  Relevance.

24        THE COURT:  Objection overruled.  Impeachment.

25   So go ahead.

```
1    BY MR. KAPLAN:

2    Q    Isn't that right?

3    A    Yes.

4    Q    And Bradley was with you?

5    A    Yes.

6    Q    And it -- was another guy there also?

7    A    Yes.

8    Q    And Bradley actually threatened the guy and he

9    ended up paying even more than he had planned on

10   originally?

11   A    No, that is not what happened.

12   Q    What did happen?

13   A    What happened was I had done a date with a guy.  He

14   had come up to the room I was using.  We spent a little

15   over an hour together on the agreement that he would

16   give me $250 for a little over an hour.  I had gotten

17   half of the money up front, and when his hour's up, I

18   told him it was time to either go or -- if he wanted to,

19   he could pay me what he owed me, or he could leave.  And

20   he told me he wasn't going to give me any more money, he

21   wasn't done; and I told him that wasn't how it worked.

22   If he didn't want to pay me, he had to go.  He had to

23   give me my money and he had to go.  And he wouldn't.

24        He told us -- told me, sorry, he wasn't leaving,

25   that he is not going nowhere, he wants more, he is not
```

1    finished.  And I had Bradley and the other man in the

2    house sit in the back room in case something had

3    happened or if I needed help.  And I had hollered to the

4    guys when he wouldn't leave and he wouldn't pay me.

5         And the guys came out and told him he owed me

6    money, to pay me, and to leave.  And the guy refused to

7    give me what he had owed me.

8         After arguing about that for a few minutes, the

9    guys realized he wasn't going to give me what he said he

10   would give me, and they were trying to make him leave

11   the house.  They had not put their hands on him though

12   or gotten in his face.  They had sternly told him to

13   leave.

14   Q    But that wasn't the only person you ever -- was

15   it -- that wasn't the only person you ever accused of

16   robbing, is it?

17   A    I'm sorry.  Ask the question again.

18   Q    Yeah, I will withdraw that question.

19        So do you recall on December 10th of 2015, when you

20   were talking with Detective Warren, you said you had

21   never prostituted before you met Brian?

22   A    Correct.

23   Q    And you said the same thing in court here today.

24   A    Yes.

25   Q    And is that still your position, that you never

1    prostituted before you met Brian?

2    A    Never.

3    Q    Okay.  Do you know who -- you mentioned Brittany

4    Barber a couple of times?

5    A    Yes.

6    Q    And I think when you went to the grand jury, or

7    speaking with Detective Warren, you said you met a woman

8    named Brittany, but you acted like you didn't really

9    know her that well.  Did you know her?

10   A    Yeah.  We went to school together in Milton.

11   Q    And before you met Brian, what did she -- what was

12   she doing?  Was she doing anything with Brian?

13   A    That was the first time I found out that she was

14   even associated with Brian.

15   Q    And before you met Brian, had you ever been in a

16   hotel room with Brittany Barber?

17   A    I had slept in a motel room with her.  Brad was

18   there, yes.

19   Q    And Bradley Bordeaux was there, you said?

20   A    Yes.  It was me, him, her and her boyfriend.

21   Q    And at some point did you go next door to see

22   someone that night?

23   A    No.

24   Q    This was before you met Brian?

25   A    Yes.

```
1     Q     And do you know a woman named Emily Loselle?

2     A     Yes, I do.

3     Q     And how do you know her?

4     A     We went to school together as well.

5     Q     And before you met Brian, were you ever in a hotel

6     room with her?

7     A     No.  She stayed at my apartment with me.

8     Q     And did Emily Loselle and you have dates together?

9     A     No.  We had a threesome with my son's father when I

10    lived in Essex, and I wasn't doing drugs at the time.

11    Q     But you never engaged in prostitution with her?

12    A     No.

13    Q     And you were never in a hotel room with her?

14    A     No.

15    Q     You talked today about -- about Brian -- you said

16    this earlier -- hitting you in the face?

17    A     Um-hum.

18    Q     You have to say yes or no.

19    A     Sorry.  Yes.

20    Q     And that was the time that you told everyone you

21    went to the hospital?

22    A     Yes.

23    Q     And when you -- you said when you went to the

24    hospital, that you were Amanda White?

25    A     Yes.
```

1    Q    And you know now that there are no hospital records

2    indicating that you ever went there?

3    A    Yes, I know.  We have looked for them.

4    Q    Okay.  So you think the hospital lost your record?

5    A    I -- I have no idea what happened to them.  I know

6    I was there though.

7    Q    And you were saying you went there because Brian

8    hit you?

9    A    Yes.

10   Q    But there's no evidence of that?

11   A    Not that we could find.

12   Q    And you also told the victim's advocate in the U.S.

13   Attorney's Office that you had brain cancer?

14   A    Yes, I did.

15   Q    And you lied to the advocate who works in the U.S.

16   Attorney's Office about that?

17   A    Yes, I did.

18   Q    You also told the victim's advocate who works at

19   the U.S. Attorney's Office that you worked at the

20   Northwest Hospital, right?

21   A    Yes, I did.

22   Q    And that was a lie?

23   A    Yes.

24   Q    And on a number of occasions when the police

25   tracked you down for one reason or another, you lied

1    about your name?

2    A    Yes.

3    Q    So do you recall telling the detective in December

4    of 2015 that you hadn't seen Brian for quite a while?

5    A    Yes.

6    Q    And let me show you -- I think you said previously

7    that Bradley posted pictures for you on Backpage?

8    A    Yes.

9    Q    Let me show you what's been marked as Defendant's

10   Exhibit D4-1 and ask you if this is one of the ads that

11   he posted for you?

12   A    I had used pictures and -- yes, this is his.  His

13   e-mail's on this.

14            MR. KAPLAN:  Your Honor, I would move to

15   introduce Defendant's Exhibit D4-1.

16            THE COURT:  Any objection?

17            MR. GRADY:  I would like to see it,

18   your Honor.

19            THE COURT:  Okay.

20            MR. GRADY:  No objection, your Honor.

21            THE COURT:  So admitted.

22            (Defendant's Exhibit D4-1 was received in

23   evidence.)

24   BY MR. KAPLAN:

25   Q    Let me also show you what I have marked as

1    Defendant's Exhibit D4-3 and ask you just to look
2    through there and see if these are all similar posts
3    that Bradley posted for you.
4    A    Okay.
5         Yes, but there are multiple copies of the same
6    posts.
7    Q    But they're posted at different times, correct?
8    The time's different?
9    A    The same day.
10   Q    Yes, but different times?
11   A    On some of them but not all of them.  Yes.
12              MR. KAPLAN:  Your Honor, I would move to admit
13   Defendant's Exhibit D4-3.
14              THE COURT:  Any objection?
15              MR. GRADY:  I'd like to take a look at them
16   first, your Honor.
17              THE COURT:  All right.
18              (Brief pause.)
19              MR. GRADY:  No objection, your Honor.
20              THE COURT:  So admitted.
21              (Defendant's Exhibit D4-3 was received in
22   evidence.)
23   BY MR. KAPLAN:
24   Q    Do you recall --
25              THE COURT:  Are you going to change the topic

1    at this point?

2              MR. KAPLAN:  Yes.

3              THE COURT:  All right.  It is quarter of.  Why

4    don't we take a break at this moment.  I am going to

5    stay on the bench to speak with the lawyers, and we'll

6    see you in a little over 15 minutes.

7    (The jury was excused after which the following was held

8    in open court at 2:47 p.m.)

9              THE COURT:  All right.  I am concerned about

10   the schedule today.  So will her testimony be over with

11   today?

12             MR. KAPLAN:  I don't have an awful lot more,

13   Judge.

14             THE COURT:  Okay.  So we would be bringing up

15   the issue of Mr. Thornton taking the stand again; is

16   that correct?

17             MR. GRADY:  We could, your Honor.  Could I

18   have a moment?

19             THE COURT:  Yes.

20             (Brief pause.)

21             MS. SAVNER:  I can give you an update on the

22   Frank Thornton chain of custody issue if you like.

23             THE COURT:  Okay.  Well, first let me just

24   read this.  We just got another note from the jury.  "We

25   are still having a hard time hearing the defense

1    counsel."

2        Okay.  So I don't know if you want me to remind you

3    to speak up?

4            MR. KAPLAN:  Sure.  That would be helpful,

5    Judge.  Thank you.

6            THE COURT:  You want me to remind you?

7        All right.  Okay.  Miss Savner?

8            MS. SAVNER:  Yes, your Honor.

9        So three different sort of sets of electronics:

10   The two phones were grouped together, 77 and 78, and

11   then there's the GPS device, and then there's the hard

12   drive.  So I'll take them one at a time.

13       In terms of the two phones, they were taken into

14   custody after the search warrant -- well, excuse me,

15   after they were seized from the defendant's person, same

16   day as the search warrant.

17       In January of 2017, Marilyn Epp, who is scheduled

18   to testify, removed them from the vault and delivered

19   them to Frank Thornton, as he testified that she did.

20           THE COURT:  And then he delivered them back to

21   her?

22           MS. SAVNER:  Yes, but --

23           THE COURT:  And --

24           MS. SAVNER:  -- the pertinent content is the

25   extraction that he gave her.

```
 1                THE COURT:  Right.

 2                MS. SAVNER:  I mean, yes, the physical pieces

 3     were also delivered back.

 4                THE COURT:  And the extraction was given to

 5     her.

 6                MS. SAVNER:  Correct.

 7                THE COURT:  Okay.

 8                MS. SAVNER:  As to the GPS device, it was

 9     captured in DEA's Exhibit No. N-54.  This was an

10     item seized during the search warrant of the 96 Ethan

11     Allen Parkway address, as testified to by special

12     agent or -- Special Agent or TFO -- I don't remember at

13     this point -- Dan Merchand.  It came in in that bag of

14     evidence, including -- including multiple things, among

15     them that GPS.

16         It was sealed and put in evidence by DEA and

17     delivered from the DEA evidence vault to Frank Thornton

18     by an agent named Kevin Kadish.  He was not on the

19     government's witness list.

20         If your Honor wants us to complete that chain of

21     custody, you know, a hundred percent, we can call him on

22     Monday.

23                THE COURT:  Okay.

24                MS. SAVNER:  But Mr. Thornton has testified

25     that he received the -- the GPS device, and I think he
```

1    can talk a little bit more about what he remembers about

2    the circumstances of receiving it.

3          And lastly, again as to -- and again as

4    Mr. Thornton testified earlier today, what he did with

5    the GPS was just take pictures of the contents of it.

6                THE COURT:  He just scrolled through the phone

7    and took pictures of each screen?

8                MS. SAVNER:  GPS device, but yes.

9                THE COURT:  Okay.

10               MS. SAVNER:  Not phone.

11         And lastly was the HP Pavilion computer which was

12   seized as part of the search warrant at 96 Ethan Allen,

13   as Dan Merchand has testified to.  It went into FBI

14   custody immediately thereafter, on 7 -- on July 21st,

15   2016, so two days after the search warrant was executed.

16         Agent Chetwynd transferred custody to FBI Agent

17   Destito.  The search warrant was obtained to search the

18   computer on January 27th of 2017, so about six months

19   later.  And three days after that, on January 30th of

20   2017, DEA Intelligence Analyst Marilyn Epp, again on the

21   government's witness list, went and -- well, she

22   received the computer back from Special Agent Destito --

23   or, excuse me, FBI Agent Destito on January 30th.

24         On February 3rd, she then gave the computer to

25   Frank Thornton to analyze.  So from January 30th of

1    2017, to February 3rd, 2017, about a four-day period,
2    and the period that the defense is -- is suggesting
3    something happened to it in terms of it being turned on
4    or something like that -- because that's when there's a
5    date-modified issue with respect to a thousand plus
6    files -- it was in DEA custody.
7         It had been delivered to Marilyn Epp at that point,
8    and it was before Marilyn Epp then transferred it to
9    Frank Thornton on February 3rd.
10              THE COURT:  Okay.  So Epp turned it on?
11              MS. SAVNER:  She will be here to testify, and
12   the defense can cross examine her about that.
13              THE COURT:  Okay.  Well, all right.
14        So let me ask the defense:  It seems to me from
15   what you said that the focus of your objection is on the
16   1700 files in the hard drive that were exposed and/or
17   compromised by the turning on of the hard drive.  That's
18   the first significant objection that you have.  And you
19   have an expert to testify that 1700 images were
20   compromised.  Is that correct?
21              MS. SEN:  Your Honor, actually it goes kind of
22   to the integrity of the entire exam because there's no
23   way that -- well, first of all, based on what Miss
24   Savner just said, it is not clear to me at all that it
25   was Agent Epp who turned on the computer because it

1    sounds like from what she just said that Agent Epp -- it

2    was in DEA custody, and that Agent Epp transferred it to

3    Mr. Thornton, I believe, on the 3rd, but at some point

4    someone else powered it on for hours.

5         And my expert is here in the courtroom, and I can

6    put him on to testify about the significance of turning

7    on a computer and how the -- that has huge

8    ramifications --

9              THE COURT:  Okay.  No, I appreciate that this

10   is a significant issue, but that's not a significant

11   issue if there does not appear to be a significant issue

12   in regard to whether or not the cell phones and the GPS

13   were compromised in any particular way.

14        Apparently the government is able to show through

15   witnesses that those cell phones and the GPS were in the

16   custody of government agents and were not exposed to a

17   compromising activity by anyone.  So they can tie up the

18   chain of custody in regard to those particular issues.

19   I am looking at what we are going to do today.

20             MS. SEN:  No, I understand, your Honor.

21             THE COURT:  So the question is whether we

22   could go forward with Agent Thornton's -- or

23   Mr. Thornton's testimony today in regard to the cell

24   phones and the GPS, leaving aside the whole issue of the

25   computer, because, frankly, I would be interested in a

1    memorandum, disclosure by your expert witness, and then

2    the government's response, as to whether the

3    compromising of the 1700 images suggests a compromise of

4    everything on the computer or just those 1700 images,

5    and that the images that the government seeks to

6    introduce was not compromised, or was compromised, by

7    the turning on of the computer.

8         I mean, I understand your argument is turning on

9    the computer compromises the whole process, but at least

10   I want to know what impact the turning on of the

11   computer and also what happened -- I'd like to know what

12   happened.

13        I wonder to what extent that turning on of the

14   computer impacted the images that the government seeks

15   to introduce.  Right?

16             MS. SEN:  Sure.  And I can respond a little

17   bit to that, your Honor, to the extent -- and I would be

18   happy to brief the issue, but from speaking with Mr.

19   Martino, our computer expert, the issue is that he can

20   see through his -- so he is only able to examine a

21   forensic image of the computer provided by the U.S.

22   Attorney's Office, and that tool is not a very powerful

23   tool.

24        So, for example, we don't know which of -- so there

25   are files that were modified and files that were created

1    on the computer from his report.  And this is all

2    disclosed in his report that he provided to -- you know,

3    we provided to the government.

4         So it's not just the issue -- and I can have -- I

5    can put him on to testify to exactly what happens,

6    because it is very technical, and it compromises the

7    integrity of the entire exam of the computer, and I

8    think it is extremely significant for two reasons:

9         One is that the government's expert, Mr. Thornton,

10   that they're putting on to talk about this computer,

11   didn't even identify that it had been turned on before

12   he received it it, which is an enormous failure to begin

13   with.

14        The second piece of this is that -- and I

15   understand that the Court appreciates this and this is

16   why you want briefing on it.  You know, this is not like

17   cocaine evidence where, you know, you say okay, they got

18   the cocaine and then we'll sort of link up the custody

19   later and, you know, you allow the jury to see it.

20        The pictures on this computer are, from our

21   understanding, the absolute heart of the government's

22   case against our client, are not -- in addition to all

23   the witness testimony, but it is corroborating evidence

24   that the government has been talking about and

25   discussing, and apparently there are over a hundred

1    images that they want to introduce.  And there were

2    videos that were taken off our client's computer that

3    the government has been referring to throughout this

4    trial.

5        So the issue, I think, goes beyond that, and I am

6    certainly happy to brief it.  I am also happy to put Mr.

7    Martino on to kind of very technically describe the

8    enormous impact --

9            THE COURT:  Yeah, I don't think it's necessary

10   at this point to put him on.  I really would like

11   briefing on the material.  But the first question is,

12   does that impact the cell phones and does that impact

13   the GPS, in which case, if it doesn't, we can go forward

14   for the rest of the afternoon and have him introduce the

15   cell phones and the GPS, and then reserve discussion of

16   the computer, which you are relying upon so

17   significantly, on Monday.

18           MS. SEN:  And, your Honor -- Mr. Kaplan, I

19   think wants to consult with me for a second, but I would

20   just add that the issue with the cell phone and the GPS

21   is that I think, again, just like any other evidence

22   that comes into court -- and I understand the government

23   says it can link it up, but why -- for example, there

24   were sealed evidence bags that today Mr. Thornton, you

25   know, unsealed and took out the device and looked at the

1    serial number and all of that.  Where are the bags for

2    the other evidence?

3        I mean, it doesn't sound like the government has

4    them.  And it's not clear to me from what the government

5    has said they can document that there was this chain,

6    but -- there's no evidence that that actually occurred.

7              THE COURT:  Okay.  Well, let me get the

8    representation.  Miss Savner or Mr. Grady?

9              MS. SAVNER:  Yes, your Honor.

10             THE COURT:  Do you have bags which were sealed

11   by Detective Chetwynd, or Agent Chetwynd, and also went

12   through the process, to be opened up by Mr. Thornton,

13   then closed, and given to Ms. Epp?  I mean, is there

14   that chain, just like the chain in any other case, drug

15   case?

16             MS. SAVNER:  Understood, your Honor.

17        So as to the cell phones, Agent Chetwynd has

18   testified that he reviewed them when they were brought

19   in as items seized from the defendant's person at the

20   time of his arrest.  They were logged as evidence.  And

21   I am looking at the DEA 7 here.  They were sealed in an

22   evidence bag by DEA TFO Rob Estes, as witnessed by TFA

23   John McGarghan, and processed as evidence.

24        They were then removed on January 24th of 2017, the

25   cell phones, Exhibit N-45.  That bag, the sealed bag,

1     was removed from the evidence vault by IA Epp --

2     Intelligence Analyst Epp and Rob Estes, and transferred

3     custody to Frank Thornton.  And as Mr. Thornton has

4     described and as Miss Epp can describe when she takes

5     the stand, that bag was cut open in the presence of

6     Mr. Thornton, and the phones were given to him as the

7     bag contained other items, and --

8                 THE COURT:  And do you have that bag?

9                 MS. SAVNER:  Yes, and it was shown to

10    Mr. Thornton earlier today.

11                THE COURT:  Okay.  It's not the small inside

12    bag, but I thought there was a larger bag --

13                MS. SAVNER:  Yes.

14                THE COURT:  -- that the cell phones were kept

15    in.

16                MS. SAVNER:  Yes, the larger bag is here.  The

17    cell phones came in the silver bag --

18                THE COURT:  Okay.  All right.

19                MS. SAVNER:  -- and the larger bag is here,

20    and the --

21                THE COURT:  It seems to me, based upon that

22    proffer, that Mr. Thornton should be able to testify

23    conditionally about what he found on cell phones because

24    with Agent Epp's testimony, that would link up the chain

25    of custody.  And you have got the bags to prove the

1       chain of custody.  So that's fine.

2           So how about the GPS?

3               MS. SAVNER:  Yes, your Honor.

4           The GPS device was -- let me pull out the right

5       pieces of paper.

6           The GPS device was seized and logged into DEA's

7       evidence as N-54 -- or as part of N-54.  It was -- and

8       we have the property receipts here and happy to give a

9       copy to defense counsel if they weren't already

10      provided.  That GPS device was delivered by Kevin Kadish

11      with DEA to Frank Thornton on October 20 -- 20th or

12      26th, 2017.

13          And then we have one documenting that the -- that

14      same GPS device was delivered back from Frank Thornton

15      to Marilyn Epp on December 12th, 2017.

16              THE COURT:  Okay.  So there's a preliminary

17      showing here that they can establish chain of custody.

18      That ordinarily is enough to permit the expert to

19      testify upon what he found on the exhibits.  And then of

20      course you have the agent testify to link up the chain

21      of custody, and that should be -- that should not be a

22      problem unless you have got some evidence to suggest

23      that that was done improperly.

24              MS. SEN:  I don't have any evidence of that.

25      I just wanted to ensure the chain of custody because

1    it -- it wasn't clear to me, your Honor.

2          THE COURT:  Okay.  I think that if we go

3    forward, after this witness has been completed, with

4    Mr. Thornton, he should be able to testify about the

5    cell phones, about the GPS, about what he recovered from

6    the cell phones and the GPS.  I thought we would leave

7    the question about the computer for memoranda and

8    submit -- tell me what happened here, and, in

9    particular, a disclosure from the government's -- or the

10   defendant's expert and why the compromise of the 1700

11   images would necessarily compromise the other images

12   that the government seeks to introduce.

13        I mean, I -- I appreciate the fact that there might

14   be a -- a broad-based attack on the procedures that

15   Mr. Thornton used.  Much of that could be used in cross

16   examination.  But are the images that the government

17   seeks to rely upon compromised by the turning on of the

18   computer?  And I'd be interested to know that.

19          MS. SEN:  Well, I think one of the issues that

20   Mr. Martino kind of explained to the Court and I will

21   brief for the Court is that you can see when you turn it

22   on the number of images that were modified and deleted,

23   but you actually don't know -- because of the way the

24   computer stores memory -- it gets very technical,

25   your Honor.

1        Because of the way the computer overrides this
2    memory and keeps acquiring data and deletes that
3    automatically -- it goes on sort of in the background as
4    a function -- you actually can't tell, even with the
5    forensic expertise and tremendous forensic tools -- you
6    can't tell how many images are actually affected, and
7    for our expert to go through and look and compare what
8    was modified, what was deleted, what was added to the
9    computer, it would take -- he hasn't been able to do it
10   given the tools that we had, so that would take quite a
11   significant amount of time.
12       It's a huge number of files.  It would take quite a
13   bit of time for him to determine what those files are,
14   and I think here, having identified those issues for the
15   government, that it's the government's burden if it
16   wants to introduce all this.
17           THE COURT:  It seems to me there's two
18   potential attacks on the exhibits which are being
19   introduced by the government.  One is the first attack,
20   that is those images they want to introduce were
21   impacted in some particular way by the turning on of the
22   computer.  That's probably unlikely.
23       The second approach that you have is to attack the
24   entire analysis of the computer, and there, what you are
25   likely to say, I would think, is that you have no idea

1     how many images were deleted or compromised.  And, I

2     mean --

3                MS. SAVNER:  If I may?

4                THE COURT:  I think that's what you are

5     suggesting; is that correct?

6                MS. SEN:  To some extent, your Honor, but with

7     some nuance.

8                THE COURT:  Pardon me?

9                MS. SEN:  With some -- I think it --

10               THE COURT:  With some nuance.

11               MS. SEN:  Yeah, exactly.

12               THE COURT:  Well, I would really like briefing

13    on the issue.  In particular, I mean, if there are

14    images on the computer which are being introduced which

15    are not being compromised by anything that the

16    government did, I mean, facially those should be

17    introduced, but then I suppose you argue that those

18    should be in context of other images which may have been

19    compromised or deleted.  But I can't see how that works.

20         Anyway.  So we can deal with the cell phones.  We

21    can deal with the GPS today.  And then we will leave

22    this computer.

23               MR. GRADY:  Just one note for your Honor as

24    far as the schedule.  The majority of Mr. Thornton's

25    testimony was going to be on the hard drive.  It was

1   only a few images from one of the cell phones that the
2   government intends.  The GPS we'll admit, but we will go
3   over that with IA Epp.
4                 THE COURT:  Okay.
5                 MR. GRADY:  So as far as efficiency for the
6   Court, it's probably just to leave that for Mr. Thornton
7   on Monday until the hard drive is resolved because
8   that's going to be the majority of his testimony.
9                 THE COURT:  Don't you think you can go through
10  the -- may be short, but go through his preliminary GPS
11  and phones?
12                MR. GRADY:  Right.  I am saying that's
13  probably maybe five, 10 minutes at the most, your Honor.
14                THE COURT:  Well, it's still helpful.
15                MR. GRADY:  Okay.  Sure.  Fine.
16                THE COURT:  All right.  Let's take a 10-minute
17  break for everyone here, and we'll start again.
18  (Court was in recess at 3:09 p.m.)
19  (The following was held in open court with the jury
20  present at 3:23 p.m.)
21                THE COURT:  Okay.  Sorry for the delay.  We
22  had issues to address.  And is the witness here?
23                MR. GRADY:  Yes, your Honor.
24                THE COURT:  Okay.
25            Okay.  I just want to remind you you are still

1  under oath.

2                 THE WITNESS:  Yes.

3                    CONTINUED CROSS EXAMINATION

4  BY MR. KAPLAN:

5  Q    So at one point you told the police -- or you told

6  the agents that Brian had sent you to the hospital

7  because he hit you?

8  A    Yes.

9  Q    Which of the three incidents was that?

10  A    The last one.

11  Q    And what was the last one?

12  A    Where he had pulled up and taken me into the back

13  of the car the second time and hit me in the face

14  repeatedly.  It was when I was trying to get away from

15  him and leave so I could get my life back.

16  Q    And so you are saying he hit you in the face a lot,

17  you went to the hospital, but there's no records?

18  A    Yes.

19  Q    And did you ever take a picture of your face?

20  A    No.

21  Q    So there's no evidence of that happening?

22  A    No, not that I would have a phone from three years

23  ago either.

24  Q    Okay.  And where were you in the car?  Where was

25  the car?

1    A    Driving while this was happening.  The car was
2    moving while this was happening.
3    Q    Who was driving?
4    A    I don't know.  Can you look at a driver while you
5    are being hit in the face?
6    Q    And then the first time was when you were slapped
7    in the bathroom?
8    A    Yes.
9    Q    And then the next time you took off with Rico?
10   A    Yes.
11   Q    Rico's a crack addict?
12   A    Yes.
13   Q    And you said you were gone with him for a week?
14   A    Four or five days, almost a week.
15   Q    And Brian wasn't involved in that?  He wasn't with
16   you?
17   A    No.
18          THE COURT:  I wonder if you could speak up
19   just a little bit.  I got another note from the jury
20   that they could not hear you, so -- if you can speak up,
21   that would be helpful.
22          MR. KAPLAN:  Thank you, Judge.
23   BY MR. KAPLAN:
24   Q    So you are with Rico for a week, and when's the
25   next time you see Brian?

```
 1    A    Four to five days later when he had picked me up
 2    and brought me back to Lori's.
 3    Q    Four or five days -- I thought you said you were
 4    gone a week.
 5    A    I said almost a week.
 6    Q    Oh.  So at some point near the end of that week
 7    Brian picks you up --
 8    A    Yes.
 9    Q    -- on the side of the road?
10    A    Yes, walking down the road.
11    Q    And was this at night?
12    A    Yes.
13    Q    Why were you walking down the road at night by
14    yourself?
15    A    Because I figured that was the safest time when I
16    couldn't be seen out in the light.  You can't see my
17    face.  I had my hood up.  I had baggy pants on, dressed
18    more like a boy.
19    Q    And you never told anyone about that before today,
20    did you?
21    A    Yes, I did.
22    Q    The second incident?
23    A    Yes, I did.
24    Q    Who did you tell?
25    A    The defense on my side and Aimee Sterns.
```

1   Q    You mean while you were getting your testimony
2   ready?
3   A    Yes.
4   Q    But the other times that you were interviewed or
5   you went to the grand jury, you never said that?
6   A    No.
7   Q    Okay.  And you never told them about the third
8   either?  The only thing you ever told them was about the
9   time you said you went to the hospital; isn't that
10  right?
11  A    Yes.
12  Q    And, in fact, when you were talking with Detective
13  Warren in December, you said you went to the hospital to
14  be examined for different diseases and stuff.  You never
15  said anything about being hit; isn't that right?
16  A    Yes.
17  Q    Okay.  Is it fair to say that -- I feel like I'm
18  yelling.  But is it fair to say that Brian insisted that
19  you -- that the folks wear a condom when you were
20  engaging in this activity?
21  A    Yes.
22  Q    And you always did?
23  A    Yes.
24  Q    And he would get upset if a woman would not?
25  A    Extremely.  With good reason.

1    Q    Because it wasn't safe for them or anybody else?

2    A    Yes.

3    Q    And you agreed with that?

4    A    Yes.

5    Q    And is it fair to say that Brian provided

6    protection for you?

7    A    Yes.

8    Q    And you appreciated that?

9    A    Yes.

10   Q    It made you feel safe?

11   A    Made me feel like what I was doing was safer than

12   it was, yes.

13   Q    Okay.  And if it wasn't Brian when you -- near the

14   end, like in November or whatever, Bradley was providing

15   protection for you?

16   A    Yes.

17   Q    Okay.  And Brian -- isn't it fair to say that

18   Brian -- or even Bradley, for that matter, probably

19   wanted to know where you were all the time to make sure

20   you were safe?

21   A    Yes.

22   Q    Okay.  And he provided clothes to you and condoms

23   and whatever else you needed?

24   A    For the most part, yes.

25   Q    Is it fair to say when you left Brian and you were

1    doing this on your own, it was more difficult for you to

2    take care of yourself?

3    A    Yeah.  I was living out of a vehicle, not in a

4    home.

5    Q    And Brian, I think you said, also provided rides?

6    A    Yes.

7    Q    Okay.

8              MR. KAPLAN:  Could I have a moment, Judge?

9              THE COURT:  Yes.

10             (Brief pause.)

11             MR. KAPLAN:  Just one last question.

12   BY MR. KAPLAN:

13   Q    When you eventually left Brian, did he leave his

14   car in the hotel parking lot for Bordeaux and yourself

15   to sleep in?

16   A    Yes, he did.

17   Q    And that was because you didn't have a place to

18   stay?

19   A    Yes.

20   Q    So he provided his vehicle for you for that -- at

21   least that was better than nothing?

22   A    Yes, he did.

23   Q    And did you appreciate that?

24   A    Yes.  He was very helpful at times.

25   Q    And did you thank him for that?

```
 1    A     Yes, I did.
 2    Q     All right.
 3              MR. KAPLAN:  I have nothing further,
 4    your Honor.
 5              THE COURT:  All right.  Redirect?
 6              MR. GRADY:  Yes, your Honor.
 7                    REDIRECT EXAMINATION
 8    BY MR. GRADY:
 9    Q     Ayla, the defense showed you what had been admitted
10    as D4-1 and D4-3, which were some Backpage ads.  Do you
11    remember those?
12    A     Yes.
13    Q     Were you also working for Moe at the time of those
14    ads?
15    A     Yes.
16    Q     And were some of those --
17    A     Some of them were.
18    Q     So was --
19    A     I was still with -- working with Moe, but we were
20    using Bradley's phone, yes.
21    Q     Some of those ads were used to attract clients, and
22    when you received money, that would have to go to Moe?
23    A     Yes.
24    Q     Did you ever interact with someone named Danielle?
25    A     Yes.  I know the name.  I just can't put a face to
```

1    it.  I'm sorry.

2    Q    Do you know what rules -- do you know if Moe

3    applied the same rules to other girls if you weren't

4    there for their conversations?

5    A    Yes.  It was expected that no matter who it was, if

6    we were all a part of the same group, the rules were the

7    same:  use protection, who not to see, who to see,

8    and -- yes.

9    Q    If you were -- you were not present, though, you

10   wouldn't know necessarily what Moe was saying to that

11   particular --

12             MR. KAPLAN:  Objection, your Honor.  I think

13   the question was asked and answered.

14             THE COURT:  Yeah.  Objection sustained.

15             MR. GRADY:  I'll move along anyway,

16   your Honor.

17   BY MR. GRADY:

18   Q    Who told you that prostitution would be a good way

19   to make money?

20   A    Brian.

21   Q    Who withheld drugs from you if you didn't see a

22   client?

23   A    Brian.

24   Q    Who cooked you -- who kicked you out of Lori's if

25   you violated a rule?

1     A     Brian.

2     Q     Who beat you when you tried to leave him?

3     A     Brian.

4     Q     Who threatened to post pictures or videos on the

5     internet to humiliate you?

6     A     Brian.

7     Q     How did all this make you feel about Brian?

8     A     Hateful.

9               MR. GRADY:  One moment, your Honor?

10              THE COURT:  Yes.

11              (Brief pause.)

12              MR. GRADY:  Nothing further, your Honor.

13              THE COURT:  Okay.  Any recross?

14              MR. KAPLAN:  Yes, Judge.

15                      RECROSS EXAMINATION

16    BY MR. KAPLAN:

17    Q     Do you recall saying to the grand jury that Brian

18    withheld drugs from you?

19    A     Yes.

20    Q     And you said for a three-week period?

21    A     Yes.

22    Q     And finally --

23              MR. GRADY:  I will just object.  This is

24    outside the scope of redirect.

25              THE COURT:  Well, actually you opened it up by

1    asking the consequences in general of her violating

2    rules.  So objection overruled.  You can ask the

3    question.

4    BY MR. KAPLAN:

5    Q    And you said he withheld drugs for a three-week

6    period, and then finally you gave in?

7    A    Yes.

8    Q    And you said that when he first suggested that to

9    you, you were disgusted?

10   A    Yes.

11   Q    And -- and then you recall telling Detective Warren

12   that he withheld drugs from you for two days or three

13   days, not three weeks?

14   A    Yes.

15   Q    So on one occasion, six months after you meet

16   Brian, you say it's two or three days, and a year or two

17   later you are saying it's three weeks?

18   A    A lot of the things I said in my past, a lot of the

19   things when I was talking to legal figures, was lies.

20   Q    So what you are saying is we don't know when you

21   said something whether it's true or not?

22   A    Not when I wasn't sober.

23   Q    Do you recall saying, when Brian first suggested

24   that you do that, you shot it down immediately?

25   A    Yes.

1    Q    And that's because that's something that you had
2    never done before?
3    A    And I was with a man for 14 years and believed my
4    body belonged to him.
5    Q    Is this the same man that posted you on Backpage
6    and took half the profits for drugs?
7    A    No.  That was Brian.  I am talking about Brad.
8    Q    Didn't Brad post you on Backpage?
9    A    Yes.
10   Q    And didn't you -- the money you made by working off
11   of Backpage, you bought drugs for Bradley?
12   A    Our money was shared, whether it was mine or his,
13   yes.
14   Q    But he profited from you doing what you were doing?
15   A    Yes, but he didn't take anything from me.  I gave
16   it.
17   Q    Okay.  And the arrangement you had with Brian was,
18   when you started, he would keep half and you would keep
19   half?
20   A    Yes.
21   Q    And so you only gave Brian what it was you agreed
22   to give him?
23   A    Yes.
24   Q    And you thought that was fair?
25   A    Yes.

1    Q    In fact, isn't that sort of the standard going rate

2    on the street, that you -- half and half?

3    A    Yes.

4    Q    So Brian wasn't doing anything unusual in that

5    respect?

6    A    No.

7                THE COURT:  Isn't this way beyond the scope --

8                MR. KAPLAN:  Same objection, Judge?

9                THE COURT:  -- of redirect?

10               MR. KAPLAN:  Yes, it is.

11               THE COURT:  All right.

12               MR. KAPLAN:  Thank you, Judge.

13               THE COURT:  Okay.  Are you all done?

14               MR. KAPLAN:  Yes, Judge.  Thank you.

15               THE COURT:  All right.  Thank you.  You are

16   all set.

17               THE WITNESS:  Thank you.

18               (Witness excused.)

19               THE COURT:  Okay.  All right.  The government

20   want to recall Mr. Thornton?

21               MR. GRADY:  Yes, your Honor.  The United

22   States recalls Mr. Frank Thornton.

23               COURTROOM DEPUTY:  Please come forward,

24   Mr. Thornton, to be resworn.

25                         FRANK THORNTON,

1    having been duly sworn by the courtroom deputy,

2    was further examined and testified as follows:

3         THE COURT:  All right.  Good afternoon again,

4    Mr. Thornton.

5         THE WITNESS:  Good afternoon.

6         THE COURT:  Mr. Thornton has already been

7    qualified, and I think you can proceed.

8         MR. GRADY:  Thank you, your Honor.

9              CONTINUED DIRECT EXAMINATION

10   BY MR. GRADY:

11   Q    Mr. Thornton, I think when we last left things, you

12   had been talking about Government Exhibit 78; is that

13   right?

14   A    Yes.

15   Q    Okay.  You can hang on to that and we will just

16   leave it up there for the time being.

17        And that was the phone that you received from -- I

18   believe was it Intelligence Analyst Epp?

19   A    Yes.

20   Q    And again, when you received it, it had not been --

21   or the bag you had received had not been altered in any

22   fashion?

23   A    No.

24   Q    Did you extract data from Exhibit 78?

25   A    Yes, I did.

```
1    Q    And how do you know that?
2    A    Well, during processing, you can see some kinds of
3    data pretty plain, such as photographs.  It's obvious
4    that they came off that particular device because of the
5    way it was extracted.  Other things you can start to
6    collate and put together and you can realize that they
7    are things like contact lists and that type of
8    information.
9    Q    Before we go any further, Mr. Thornton, were you
10   able to determine the phone number for that particular
11   phone, Government Exhibit 78?
12   A    Yes.
13           MR. GRADY:  Okay.  At this time I am -- oh,
14   continuing permission to approach, your Honor?
15           THE COURT:  Yes.
16   BY MR. GRADY:
17   Q    Mr. Thornton, I am handing you -- actually I will
18   hand you a stack of -- folder with several exhibits.  If
19   you open the first page of the folder, I believe
20   Government Exhibit 71 for identification should be the
21   first item that you see.
22   A    Yes.
23   Q    Do you recognize Exhibit 71 for identification?
24   A    Yes, I do.
25   Q    How do you recognize it?
```

1    A    Well, this is part of the SIM -- SIM card, which is

2    contained in the phone, contains the telephone number

3    and some other information, and this is part of that

4    extracted information from the SIM card from this phone.

5    Q    Did you, in fact, create Exhibit 71?

6    A    Yes, I did.

7            MR. GRADY:  Your Honor, at this time the

8    government would move to admit and publish 71.

9            THE COURT:  Any objection?

10           MS. SEN:  No, your Honor.

11           THE COURT:  So admitted.

12           (Government's Exhibit 71 was received in

13   evidence.)

14   BY MR. GRADY:

15   Q    And so looking at Government Exhibit 71, what is

16   the phone number associated with that -- with that

17   phone?

18   A    It's on the first line that's marked "number index

19   zero," and it's (802) 825-4614.

20   Q    In fact, is that the row that I highlighted in

21   yellow?

22   A    Yes.

23   Q    Okay.  Perfect.

24        How can you tell that that's the phone number for

25   this phone?

1   A    Only one number's assigned.  You can have multiple

2   numbers on some phones, but in this particular case, the

3   MSISDN is essentially what's known as a phone number.

4   Q    Okay.

5          MR. GRADY:  We can go ahead and take down 71.

6   BY MR. GRADY:

7   Q    I think you mentioned that you took photos of the

8   phone?

9   A    Yes.

10  Q    What photos did you take?

11  A    I took a number of photos because, as I said

12  earlier, Windows phones don't necessarily work very well

13  sometimes with the Cellebrite software, if at all.  And

14  you have to do some advance techniques.  So as a

15  precaution, what I typically do is I will start taking

16  photographs of information that's plainly visible on the

17  phone, and so I went through and I did exactly that.  I

18  took pictures of things like the contact lists and so

19  forth.

20  Q    Were you able to get into the phone just by turning

21  it on?

22  A    Yes.

23  Q    Was it password protected or anything like that?

24  A    Not that I recall.

25  Q    If you look in your folder, you should see what's

1   been marked as Government Exhibit 72 for identification?

2   A    Yes.

3   Q    Do you recognize 72?

4   A    Yes, I do.

5   Q    What is it?

6   A    72 is the photographed area of the phone, or the

7   photos gallery, what have you, whatever you want to call

8   it.

9   Q    Did you, in fact, take photos -- those photos that

10  are shown in 72?

11  A    Yes, I did.

12  Q    Do they fairly and accurately show the phone as you

13  went through the photo gallery, as you said?

14  A    Yes.

15          MR. GRADY:  Your Honor, at this time the

16  government moves to admit and publish 72.

17          THE COURT:  Any objection to 72?

18          MS. SEN:  Your Honor, can I ask a few

19  questions, please?

20          THE COURT:  Yes.

21                VOIR DIRE EXAMINATION

22  BY MS. SEN:

23  Q    Mr. Thornton, was the -- what condition was the

24  phone in when you received it?  Was it on or off?

25  A    I don't particularly recall.

1    Q    Well, wouldn't you handle a phone differently if it

2    was -- if you received it when it was on versus when it

3    was off?

4    A    Well, typically it's off.  You have to charge it.

5    That's usually the -- by the time I get them, they're

6    not charged anymore.

7    Q    Well, and did you take special precautions to

8    ensure that when you turned the phone -- so is your

9    testimony that you turned the phone on?

10   A    Probably did at that time, yes.

11   Q    And was that in a protected area with protective

12   casing so that you could ensure that the phone wasn't

13   interacting with any cellular networks at the time?

14   A    Depends on what is going on with a particular

15   phone, but I try to do it inside a Faraday bag, or I

16   will remove the SIM card so it's not being connected to

17   the network.

18   Q    And so when you took these photos, I see the phone

19   was in airplane mode?

20   A    Yes.

21   Q    And you put it in airplane mode?

22   A    I believe I did, yes.

23   Q    Did you document what you did?

24   A    That would be on my notes, yes.

25   Q    What -- do you know specifically whether you

1    indicated whether the phone was on or off and whether

2    you powered it on, how you examined it, in terms of

3    protecting it from interacting with cellular networks

4    and all that?

5    A    Yeah.  It would be on my notes, yes.

6    Q    Okay.  And then when you were going through the

7    phone, weren't you manually manipulating the phone

8    yourself?

9    A    Yes.

10   Q    And so these photos are based on your manual

11   manipulation of the phone while it was powered on?

12   A    Yes.

13              MS. SEN:  No objection, your Honor.

14              THE COURT:  All right.  So admitted.

15              (Government's Exhibit 72 was received in

16   evidence.)

17              MR. GRADY:  We'll go ahead and publish 72.

18                 CONTINUED DIRECT EXAMINATION

19   BY MR. GRADY:

20   Q    Looking at this first photo, Mr. Thornton, is

21   that how the phone appeared as when it was on in your

22   possession?

23   A    Yes.  When I started taking photographs of the

24   gallery.

25   Q    Sure.  The photo album, if you will --

```
1    A     Yes.

2    Q     -- if some people use different terms.

3          Let's go to page two of 72.  Does that appear to be

4    a photograph of money being spread out?

5    A     Yes, it does.

6    Q     We will turn to page three.  Does that appear to be

7    a picture of a person holding multiple $20 bills or some

8    U.S. currency?

9    A     Yes.

10   Q     Turning to page four of 72, is it fair to say that

11   that appears to be stacks of U.S. currency on some sort

12   of desk?

13   A     Yes.

14   Q     Going back to page one of 72, does it appear that

15   those pictures that we looked at, at least in any way

16   appear to be dated in May of 2016?

17   A     Yes, they were.

18   Q     I am going to go now to page five of 72.  What is

19   being shown in page five?

20   A     This is the contacts area within the phone.

21   Q     Essentially a contact list of people?

22   A     Contact list, yes.

23   Q     Okay.  Let's go to page six, the next page.  Am I

24   correct that there appears to be an entry at the

25   beginning?  It says "A" space and then a person's name
```

1    that begins with "L"?

2    A    Yes.

3    Q    Let's go ahead and move to page 13 of 72.  Looking

4    at page 13, is there a contact or at least a person by

5    the name of Keisha?

6    A    Yes, there is.

7    Q    And below Keisha, am I correct that there is a

8    Krissy?

9    A    Yes.

10   Q    We are going to turn to page 14 of 72.  Am I

11   correct there's a contact labeled Mandy?

12   A    Yes.

13   Q    Going to page 15, another contact named Nikki?

14   A    Yes.

15   Q    And finally on page 16, there appears to be a

16   contact for someone who went by Shorty?

17   A    Yes.

18   Q    Now, after --

19              MR. GRADY:  We can take 72 down.

20   Q    After you took photos of the phone, what did you

21   do?

22   A    At that point I disassembled it.  I actually did

23   some research on what was going to have to happen with

24   this particular phone.  I disassembled it, hooked it up

25   to a -- what's known as a breaker box or a phone box --

1    they're little electronic devices that you connect to

2    the phone via those wires that I explained earlier --

3    offloaded the materials that I could from the phone, and

4    then started digging through and trying to analyze to

5    see what was on there.

6    Q    Is that why the phone resulted in the fashion it

7    did earlier when we published it to the jury?

8    A    Yes.  You have to do a fair amount of disassembly

9    and pull off internal covers just to get to the chips

10   area where you are going to solder the wire.

11   Q    Did you use any other software during this

12   examination?

13   A    At that point, no.  I used some basic forensic

14   tools but wasn't going to take anything special.  Later

15   on I did use some further analysis and used some extra

16   tools that have been published.

17   Q    Do you remember anything about the SD card

18   associated with that phone?

19   A    I believe it was fractured and I couldn't look at

20   it at all.  I tried to read it, and it was just -- it

21   had some very fine cracks across it, and I couldn't get

22   anything to read on it.

23   Q    Would that impact or could that impact the -- any

24   data that you might be able to recover from the phone?

25   A    Yeah.  Unfortunately if there was data on that SD

1    card, I couldn't get whatever it was, if it was on it.

2    Q    And remind us again, why is it difficult to extract

3    data from Microsoft phones?

4    A    It's just a peculiarity of the Microsoft phones.

5    For whatever reason, the standard tools don't work very

6    well with them.

7    Q    And as I remember your testimony from earlier, this

8    first batch of electronics you reviewed, there was three

9    cell phones, one tablet and a hard drive?

10   A    Yes.

11   Q    Let's put the hard drive aside for a minute.  As to

12   the remaining two phones and the tablet, is it fair to

13   say that you were not able to extract any data from

14   those devices or, if you were able to extract data, any

15   of that was determined to be irrelevant to this case?

16   A    That's correct.

17   Q    All right.  Let's turn, Mr. Thornton, to the second

18   batch of electronic devices that you examined.  When did

19   you examine those?

20   A    I believe that was October 20th of 2017.

21   Q    Do you recall who delivered these devices to you?

22   A    I believe it was Agent Epp again.

23   Q    And same thing as before.  Were they secured, in

24   that if there was anything about the bag that led you to

25   believe it could have been tampered with, I would assume

1    you would have noted that in a report?

2    A    If there's an open bag or something like that, then

3    I will so note it, but --

4    Q    Would that be a red flag for you if something had

5    been tampered with?

6    A    It's not necessarily a red flag.  It depends on the

7    different agency.  Sometimes they have different -- all

8    the agencies seem to have different requirements for

9    securing evidence and sometimes they just place it in a

10   bag; sometimes it's secured with multiple bags.

11   Q    To your knowledge, nothing had looked awry with the

12   bag you received from Agent Epp?

13   A    No.

14   Q    When did you begin -- or do you recall what you

15   received of this second batch of electronics?

16   A    I believe it was another micro tablet, some other

17   phones.

18   Q    Was there also a GPS receiver that I think you

19   actually looked at earlier?

20   A    Yes, there was.

21   Q    When did you begin examining those devices?

22   A    Again, it probably would have been in the next 24

23   hours or so of -- because of the search warrant

24   requirements.

25   Q    Mr. Thornton, I want to show you what's been marked

1    as Government's Exhibit 135 for identification.  Take a

2    minute and review 135 for identification.

3         Do you recognize 135 for identification?

4    A    Yes, I do.

5    Q    Okay.  Is that something that you received from the

6    DEA?

7    A    Yes.  It's their custody sheet.

8    Q    Okay.  Who -- who do you -- does the custody sheet

9    refresh your recollection as to who delivered the second

10   batch of electronics to you?

11   A    Yes.

12   Q    Who actually was the one that delivered the devices

13   to you?

14   A    I forget the agent's name, but --

15   Q    Would having 135 for identification refresh your

16   recollection?

17   A    Oh, it is.  It's Kevin Kadish.

18   Q    Okay.  He is also employed by the DEA here in

19   Burlington, Vermont?

20   A    Yes, he is.

21   Q    And actually before we go any further with the Tom

22   Tom, I want to return to Government Exhibit 77.  And

23   again I will show this to you.

24        Again, I believe you previously identified that as

25   a cell phone that you had tried to extract data from?

1    A     Yes.

2    Q     Were you able to determine what the cell phone

3    number was for that number?

4    A     Yes.

5    Q     I'm showing you what's been marked as Government

6    Exhibit 77A for identification.  Do you recognize 77A?

7    A     Yes.

8    Q     What is 77A?

9    A     This is, again, a portion of a SIM card dump from

10   that particular phone.

11   Q     Similar to the SIM dump that you did for the 4614?

12   A     Yes.

13   Q     And did you create 77A?

14   A     Yes, I did.

15          MR. GRADY:  Your Honor, the government moves

16   to admit and publish 77A.

17          THE COURT:  Any objection?

18          MS. SEN:  I have to see it for a moment,

19   your Honor?

20          THE COURT:  Yes.

21          MR. GRADY:  Sure.

22          (Brief pause.)

23          MS. SEN:  No objection, your Honor.

24          THE COURT:  So admitted.

25          (Government's Exhibit 77A was received in

1    evidence.)

2           MR. GRADY:  So we will go ahead and publish

3    77A.  Okay.  And perhaps let's focus in on the very top

4    part of 77A.

5    BY MR. GRADY:

6    Q    Can you tell the members of the jury what the phone

7    number is for this phone, Government Exhibit 77?

8    A    Yes.  Again, if you look at the "number index zero"

9    line, which is the -- yes.  Thank you.  It's

10   (802) 825-9174.

11   Q    Thank you, Mr. Thornton.

12        Okay.  Again showing you 87D.  Is 87D a GPS unit

13   that you took a look at as part of examining this second

14   batch of electronics?

15   A    Yes, it is.

16   Q    And how can you tell it was?

17   A    Well, again, I noted the serial number, and the

18   last time I looked at it, I marked it with my initial.

19   Q    How did you examine 87D again?

20   A    Because I could not do anything with this

21   particular device with any specialized software, I

22   was -- basically went through and took photographs once

23   again, scrolled through everything.

24   Q    Essentially did you turn it on and then scroll

25   through and take photos?

```
 1      A    Yes.

 2      Q    I believe you should have Government Exhibit 73 for

 3      identification in front of you in that folder?

 4      A    Yes.

 5      Q    Do you recognize 73?

 6      A    Yes.

 7      Q    What is 73?

 8      A    It's a series of photographs that I took of the Tom

 9      Tom device.

10      Q    Do they fairly and accurately show the Tom Tom as

11      you took the pictures of it?

12      A    Yes.

13               MR. GRADY:  Your Honor, at this time the

14      government moves to admit 73.

15               THE COURT:  Any objection?

16               MS. SEN:  No, your Honor.

17               THE COURT:  All right.  So admitted.

18               (Government's Exhibit 73 was received in

19      evidence.)

20               MR. GRADY:  And, your Honor, we will publish

21      the -- we can publish the first one now, but we are

22      going to publish the additional photos through the next

23      witness.

24               THE COURT:  Okay.

25      BY MR. GRADY:
```

1   Q    So, Mr. Thornton, going back to the other devices

2   you received in this second batch of electronics such as

3   other cell phones, tablets that you received, is it fair

4   to say that you were either able not to extract data

5   from them or any data that was extracted was determined

6   to be irrelevant?

7   A    Yes.  That's correct.

8   Q    For example, can you tell the jury why you were

9   unable to extract data from the tablet?

10  A    I believe in the case of the tablet -- you are

11  speaking of the micro tablet, the small, four-inch --

12  Q    Yes.

13  A    In that particular case, I attempted the same kind

14  of extraction as I did with the other phone by

15  disassembly, pulling the chips off, looking through

16  that, and what I came up with was basically encoded data

17  that could not be determined to be any particular data.

18  It was probably encrypted.

19          MR. GRADY:  One moment, your Honor?

20          THE COURT:  Yes.

21          MR. GRADY:  Nothing further at this time,

22  your Honor.

23          THE COURT:  Okay.  All right.  So we are going

24  to stop at this point.  We are going to excuse you

25  early.  We will start again on Monday.

1              Again, the expectation is that the case will be

2      yours to decide Wednesday or latest Thursday.  That

3      still is true.  I just want to remind you not to say

4      anything or learn anything about this case while on the

5      extended weekend.

6          I am going to stay here and just speak with the

7      lawyers for a second.  So we will see you on Monday, and

8      have a lovely extended weekend.

9      (The jury was excused after which the following was held

10     in open court at 3:58 p.m.)

11             MR. GRADY:  Your Honor, can Mr. Thornton step

12     down?

13             THE COURT:  Yes, you can step down.

14             THE WITNESS:  Thank you.

15             (Witness temporarily excused.)

16             THE COURT:  All right.  We will take a break

17     at this point, but I really want to address the computer

18     at the beginning of the day on Monday.  That means it

19     would be really helpful for memoranda of law, which

20     would include I guess expert reports from the expert

21     witnesses if they're relevant to the computer to be

22     submitted as well.  The question is whether they -- you

23     can submit that, you know, by Sunday so I can at least

24     read it before Monday morning.

25             MR. KAPLAN:  I'm sure we can, Judge.

1          THE COURT:  Yeah.  That the royal "we"?

2          MS. SEN:  Your Honor, whenever you want it

3    submitted, I will have something for you.

4          THE COURT:  Okay.  So if you can submit it on

5    Sunday morning -- we will give you an address, I really

6    would like to have it to prepare.

7          MS. SEN:  Sure.

8          THE COURT:  And the government want to file a

9    response as well?

10         MR. GRADY:  Certainly, your Honor.

11         THE COURT:  Okay.  And I don't know if you

12   have expert disclosures that are relevant, the defense

13   has expert disclosures which are relevant, that would be

14   very helpful.  I would like to really understand the

15   significance of, you know, the issue that's been raised

16   by the defense.

17       Now, is there anything else we need to talk about

18   at this point?  You are left with -- there's only two

19   witnesses.  Now, there is a chain of custody witness.

20   You certainly can call that witness if you wish unless

21   you get a stipulation from the defense that you don't

22   need to call the witness.  Anyway.

23         MR. GRADY:  Yeah, that said, to give away

24   ahead, your Honor, is Mr. Thornton will introduce the

25   hard drive, and then Ms. Epp will talk about receiving a

1    mirror image of the hard drive and some relevant photos

2    and videos to the case that were obtained off the hard

3    drive, plus other electronic evidence such as Facebook

4    search warrant return from Moet Hart that we have seen a

5    few passages from, things along those lines.

6            THE COURT:  And those are all on the hard

7    drive; is that right?

8            MR. GRADY:  Well, that's separate, your Honor.

9    So the hard drive is one thing.  Anything that was

10   obtained by search -- search warrant from Facebook,

11   that's from a different agency.

12           THE COURT:  Oh.  Oh, that would come from Epp.

13   Epp's the next one.

14           MR. GRADY:  Exactly, your Honor.

15           THE COURT:  All right.

16           MR. GRADY:  So she will have a few other

17   things in addition to the hard drive, is what I'm trying

18   to say, if that makes sense.

19           THE COURT:  Okay.  Well, we are going to have

20   to address the legal issue at the first -- at the start

21   of the day.  Do you anticipate you would be completed

22   with the witnesses --

23           MR. GRADY:  Yes, your Honor.

24           THE COURT:  -- by the end of the day or even

25   early -- earlier on?

1          MR. GRADY:  I would certainly say by the --

2     by the end of the day.  There's a lot of exhibits with

3     Ms. Epp, but I certainly -- I think we would end on

4     Monday.  It's certainly my expectation.

5          THE COURT:  Yes.  Okay.

6          MS. SEN:  Your Honor, I was just listening to

7     the description of Miss Epp's testimony, and as I

8     understand it -- I mean, I have been made to understand

9     that -- so Miss Epp is a DEA intelligence analyst.  She

10    has no training -- she has training and she can be

11    qualified as an expert in a lot of things, but not in

12    digital forensics.  And it sounds to me -- and when I

13    asked the government about Ms. Epp, she was just going

14    to testify sort of within the scope of -- I was assuming

15    within the scope of her reports and grand jury

16    testimony.

17         Now, I am hearing that all of these images are now

18    going to be coming in through her and that she received

19    a mirror image of our client's hard drive.  This is the

20    first time I am hearing that.  And if she's going to be

21    testifying about those things, (a) it's not clear to me

22    that she is qualified to, and (b) I'm not sure -- I

23    don't understand why the government hasn't provided a

24    report that describes exactly -- I mean, she has

25    testified as to some images that she has reviewed, but I

1    had -- it was not clear at all that she had been

2    provided the entire mirror image.

3              MR. GRADY:  Well, let me clarify, your Honor.

4              THE COURT:  Yes.

5              MR. GRADY:  It may help things.

6              THE COURT:  Yes.

7              MR. GRADY:  So the process is that

8    Mr. Thornton extracted the data from the hard drive, so

9    he made a mirror image copy, and it's the same mirror

10   image copy that's been provided to the defense that they

11   have looked at from -- with their expert.

12        Within this mirror image, Mr. Thornton provided a

13   subset of this data relevant to the case.  He worked

14   with Agent Epp about the case, and, in particular, a

15   lineup folder that has a bunch of women's names, some of

16   them involving women in this case:  Keisha, Katelynn, et

17   cetera.

18        So Miss Epp will say, "I got this information from

19   Frank Thornton.  I looked through it," and then she will

20   be able to talk about different things that were found

21   in the computer based upon Mr. Thornton's extraction of

22   that data.

23        So it's not like she is requiring any special

24   tools.  She is just going to say, "I went through the

25   information that Frank extracted," and I'm just going to

1    admit relevant information that was found on the hard

2    drive that Ms. Epp found because Mr. Thornton doesn't

3    know, you know, Adam from Eve, so he doesn't know

4    exactly who is relevant in this case or not.

5        Obviously the people that were involved in the

6    case, in the investigation, that's why it's up to them

7    to look through and determine what may or may not be

8    relevant.

9            THE COURT:  Well, he doesn't have to know

10   what's relevant.  Frankly, you can show him images --

11           MR. GRADY:  Sure.

12           THE COURT:  -- that he extracted from the

13   computer --

14           MR. GRADY:  Sure.

15           THE COURT:  -- and then introduce it that way,

16   and then the jury makes the determination, so --

17           MR. GRADY:  Sure.

18           THE COURT:  Is it that important as to who

19   introduces the photographs and the videos?

20           MR. GRADY:  Well, Miss Epp has more knowledge

21   about the case because she was involved in it, and so

22   she will be able to tie different pieces of things

23   together.

24       So, for example, you know, something that may have

25   been found in the search warrant to Facebook may be the

1   same image as something that was found on the hard

2   drive, and certainly Mr. Thornton wouldn't be able to

3   talk about that because Mr. Thornton didn't receive the

4   return from Facebook.

5           THE COURT:  Well, yeah.  No, I appreciate

6   that, but it -- it seems to be a little bit of an

7   argument over nothing.

8       You essentially, having reviewed what was extracted

9   from the computers, can approach Mr. Thornton and say,

10  "Did you take this off the computer?"  And you show what

11  was taken off the computer, and he said, "Yes, I took it

12  off the computer," and that's essentially it.

13          MR. GRADY:  Somewhat, your Honor.  I would say

14  Ms. Epp did more of taking things off the computer.  She

15  went into more detail looking through -- I would say

16  it's very voluminous.  We are talking about 50 gigabytes

17  of information, which is essentially 50 pickup trucks

18  full of bankers box of information.  She was able -- she

19  will be able to talk -- she was able to go through it a

20  little bit easier because she knew the case and knew

21  different connections in the case than Mr. Thornton

22  probably did.

23          THE COURT:  All right.

24          MS. SEN:  Well, your Honor, one of the issues

25  is that -- I mean, I -- you know, we had moved to

1    exclude all photos of women who were not sort of the

2    main women related to Counts 10 to 15, and my

3    understanding of the Court's ruling is that in order for

4    those sorts of pictures to come in, you would have to

5    lay a foundation or at least show some -- maybe not

6    foundation but have to show some relevance to how those

7    women were part of this pattern or something else.

8                THE COURT:  Yes.

9                MS. SEN:  Now, all of the women have testified

10   and very few pictures have come in through them,

11   somehow.  But now I don't understand how photos of all

12   these people who have testified, and maybe those who

13   haven't -- how are those going to come in through her?

14               MR. GRADY:  Well, I guess the argument is we

15   didn't introduce it --

16               THE COURT:  Well, they're -- go ahead.

17               MR. GRADY:  Okay.  I was just going to say the

18   women who testified, they can't necessarily authenticate

19   pictures found inside the defendant's hard drive.

20   That's what we are seeking to introduce.  And I will

21   give you another example of why the government's

22   planning on doing it through Agent Epp.

23        There's a few pictures that are linked to Backpage

24   subpoena returns that Ms. Epp received, and the

25   government intends, based upon where it was found in the

1    hard drive and the metadata associated with those images

2    on the hard drive -- and compare them to the Backpage

3    return, making a link in that fashion which, again,

4    Mr. Thornton -- Mr. Thornton would not be able to do

5    because he didn't receive the Backpage.

6            THE COURT:  And obviously the relevance of

7    those photographs are not necessarily in the photographs

8    themselves.  The relevance is the fact that they were on

9    his computer.

10           MR. GRADY:  That is timing, your Honor, as far

11   as --

12           THE COURT:  And the time.  Right.

13           MR. GRADY:  -- the picture was taken at this

14   time, and --

15           THE COURT:  Anyway.

16           MR. GRADY:  -- then 10 minutes later --

17           THE COURT:  We will take that -- we'll take

18   that step by step.  But at least as to this turning on

19   the computer and the impact that that would have on the

20   images on the computer, I really would like to review

21   memoranda.

22       All right.  Is there anything else at this point?

23           MR. GRADY:  No, your Honor.

24           THE COURT:  Okay.  I think we are all set.

25           MS. SEN:  No, your Honor.

1          THE COURT:  All right.  Thank you.

2             (Court was in recess at 4:09 p.m.)

3                      *** ** ***

4

5

6

7              C E R T I F I C A T I O N

8       I certify that the foregoing is a correct
   transcript from the record of proceedings in the
9  above-entitled matter.

10

11  May 3, 2019                    _____
   Date                           Anne Nichols Pierce
12

13

14

15

16

17

18

19

20

21

22

23

24

25