UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
        V.           *   Case No:  2:16-cr-94-1
BRIAN FOLKS         *




TRIAL BY JURY - DAY EIGHT - VOLUME I
MAY 6, 2019
BURLINGTON, VERMONT


BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William Darrow, Esq. and Emily M. Savner, Esq. and Matthew T. Grady, Assistant United States Attorneys, P.O. Box 570, Burlington, VT  05402-0570; Attorneys for the Plaintiff.

    Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street, Burlington, VT  05401; Attorney for the Defendant.

    Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733; Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Marilyn Epp | 13,90 |
|   Examination by the Court | 13 |
|   Direct Examination by Mr. Grady | 18,24,90 |
|   Cross Examination by Ms. Sen | 19 |
| Anthony Martino | 25 |
|   Examination by the Court | 25 |
|   Direct Examination by Mr. Grady | 32 |
|   Cross Examination by Ms. Sen | 34 |
| Adam Chetwynd | 39 |
|   Direct Examination by Ms. Savner | 39 |
| Frank Thornton | 42 |
|   Con't Direct Examination by Mr. Grady | 43 |
|   Cross Examination by Ms. Sen | 73 |
|   Redirect Examination by Mr. Grady | 87 |


| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 69 | Hard Drive File Tree Exmples | 57 |
| 74 | Meta Data Displays for Photos | 68 |
| 75 | Internet Search History | 72 |
| 139 | FBI Receipt | 41 |
| Defense | | |

3

1   [MONDAY, MAY 6, 2019 - 8:58 A.M.  The following was held in

2   Chambers with all parties present]

3           THE COURT:  So all the lawyers are present.  This is

4   Monday morning and obviously there's a dispute in regard to the

5   admission of the contents of the computer.  In particular, the

6   Government seeks to introduce a portion of what was recovered

7   on the defendant's computer.  Defense has an objection.

8       Preliminarily it seems to me there are a couple of

9   questions.  The first is bad faith on the part of Ms. Epp.  The

10  Government has indicated that she was merely executing a search

11  warrant, that she turned on the computer, it impacted some of

12  the preliminary files, but that did not impact other files.

13  She was acting in good faith.  She was essentially executing a

14  search warrant.  The defense I don't think necessarily

15  suggested she's acting in bad faith, but left open the

16  question.  So if you leave open the question, then it seems to

17  me that you have to have evidence to make a determination as to

18  whether she was acting in bad faith.  If she's acting in bad

19  faith, there's a different standard essentially than if she was

20  not.

21      So my question is do we need a hearing in regard to DEA

22  Analyst Epp as to whether she was exercising bad faith or

23  whether this was just, as the Government suggests, her

24  executing a search warrant.  Let me turn to the defense because

25  if we do need testimony, then my question is when do we do

1   that?  Do we do it immediately before the jury comes out in

2   which case the jury sits around for quite a while, or do we do

3   that perhaps after Mr. Thornton's testimony, et cetera?

4         MS. SEN:  Well, Your Honor, I don't know if this is

5   going to help answer the question or not, but I went back and

6   looked at the actual search warrant and the warrant that

7   authorized the search of the computer here, and I did not

8   attach it to my memo because I only looked through this later

9   on, it authorizes a law enforcement officer to conduct the

10   search.  Now in this case I understand that Ms. Epp is an

11   intelligence analyst.  I don't know -- I mean I would have to

12   ask her or someone from DEA -- as to whether she's actually

13   considered a law enforcement officer because, if not, I don't

14   think she was authorized to conduct the search.

15         THE COURT:  Well that's amazing.  She's a DEA

16   analyst.  That is at the really heart of the enforcement of a

17   search warrant.  I mean that's who you go to, to figure out

18   what is on a search warrant.  She is a law enforcement officer.

19   I mean I don't think there's any question that she would be

20   considered a law enforcement officer.

21         MS. SEN:  Well, Your Honor, her training -- she

22   didn't do the law enforcement academy.  She did the

23   intelligence analyst training with DEA.  I think she's a

24   civilian employee of the DEA.  I don't think she's a law

25   enforcement officer.

1          THE COURT:  Okay.  So I would reject that argument.

2          MS. SEN:  Okay.

3          THE COURT:  But the issue it seems to me is whether

4    she was exercising bad faith because you left that as an open

5    question, and it seems to me that there needs to be testimony

6    from her describing exactly what she was doing as opposed to

7    just representing or relying upon representation made by the

8    Government in its pleading if you really have some concerns as

9    to whether she was not exercising good faith.

10          MS. SEN:  Can I consult with Mr. Kaplan for a moment?

11          THE COURT:  Sure.  Do you want to go outside and

12    consult?

13          MR. KAPLAN:  Well I think what Natasha is getting at

14    is she turned on the computer, looked at it for six hours,

15    never told anybody that, and so there's no report that says she

16    did that.  It was like she hid it.  Now I don't know if that

17    was -- she didn't know what she was doing or didn't know she

18    wasn't supposed to turn it on, but you can't turn on a computer

19    -- apparently this is what our expert says.  You can't turn on

20    a computer because you're going to start damaging what's in

21    there.  You're going to lose files.  You're going to alter

22    files.

23       So did she know that will happen when she turned it on

24    because if she did, I think that's in bad faith.  Why didn't

25    she do a report?  She intentionally didn't disclose that to

6

1   anyone.  I think that's in bad faith.

2          THE COURT:  Okay.  So then we need her to testify.

3   Okay.  So when does it happen?  Do we hold off the jury to have

4   her testimony in regard to that issue?

5          MR. KAPLAN:  The other issue, Judge, should we put on

6   our expert before the jury comes in to talk about what Epp did

7   to demonstrate --

8          THE COURT:  Well if you want to I think that's -- you

9   should have the right to do that, but the second issue frankly

10  is what your expert would say in regard to contamination by the

11  computer being turned on.  So there's the destruction of 58

12  images and there's modification of -- I can't remember the

13  number.  Obviously the Government responds that any of the

14  images that are being projected to the jury were not impacted

15  in any way and I think that your expert agrees with that.  The

16  only objection would be whether in fact there is some

17  exculpatory images which may have been destroyed.

18         MR. KAPLAN:  I don't think our expert had the time to

19  look to see what was corrupt and what wasn't.

20         MS. SEN:  Yeah I think our expert would tell the

21  Court that, you know, we were looking at the computer for a few

22  hours at a time using a very -- for lack of a better word --

23  primitive forensic tool to look at the hard drive.  He did not

24  -- you know, as Mr. Thornton testified, it took him months to

25  do his imaging and his work on that computer.  Our expert just

1   didn't have access to it so I don't think that he can say with

2   certainty.  I think what he can say is that there's certainly

3   the possibility that by powering it on, unallocated space was

4   overwritten with new files, files were modified, and I don't

5   think that he can say with certainty.  I think that he would

6   say that the Mac time data that's on those files that the

7   Government wants to introduce is still the same, but I think,

8   you know, in the case that I cited to the Court I think they

9   are very cognizant to the fact that files are not sort of

10  discretely kept as separate individual items like in a file

11  cabinet to use that analogy and they are interspersed across

12  digital storage media.

13      So the question if you're looking to see -- for example,

14  one of the Government's arguments here is that there are

15  pictures on our client's computer that were then uploaded to

16  Backpage.  Are they the same picture?  When were they uploaded?

17  When were they downloaded?  I mean that's really significant

18  and who knows.  There's no way to say whether or not, and what

19  our expert would say is that just by looking and comparing two

20  pictures to the naked eye you may not be able to tell those

21  kinds of differences and that's why you go through the process

22  of doing these digital forensic exams with these kinds of

23  devices.  So I mean he would be happy to answer the Court's

24  questions and explain his reasoning and processes and I would

25  very much like to put him on before the Court makes a decision.

1          MR. KAPLAN:  The other issue, Judge, he spent a half

2     hour on the computer and realized it had been turned on and no

3     one from the Government ever told us that.  It's not in any

4     reports.  Thornton never said that.

5          THE COURT:  All right.  I appreciate that.  So what's

6     the Government's reaction as to whether in fact we should have

7     a hearing in which -- is it Ms. Epp -- testifies on bad faith.

8     Second, exactly what she did -- describing exactly what she

9     did, and then also having the defendant's expert testify

10    quickly in which case I'm concerned about when we do that.

11         MR. GRADY:  I think, Your Honor, there's a few

12    things.  So Ms. Epp did turn on the computer.  That's obviously

13    been established.  I think I'll make a proffer this was the

14    first time that she was -- had a search warrant for a computer

15    and she had not received appropriate training and best

16    practices on what to do with the computer so she certainly

17    turned that on.  She did tell Mr. Thornton.  Mr. Thornton

18    remembers her telling him that she turned it on, and Mr.

19    Thornton -- stuck out in Mr. Thornton's mind because he was

20    going to look -- he was going to look to see if there was any

21    impact on his extraction of data to see if it had any impact on

22    it, and the bottom line is that no.  For the images that the

23    Government intends to introduce the Mac data, modified access

24    created, or even the date taken none of that had been impacted

25    by the events on 2/2/17.

1          THE COURT:  I know that.  I know that's your

2     position.  It was all in the brief.  What I'm interested to

3     know is whether you agree that there should be a hearing in

4     which case do we do that right now?  Do we let the jury sit --

5          MR. GRADY:  I disagree, Your Honor, that a hearing is

6     necessary.  It seems like anything that the defense is looking

7     to talk about can be brought out on cross examination.  They

8     can certainly cross examine that no report has documented that

9     you told anybody, you didn't follow appropriate procedures, et

10    cetera, and things of that nature.  She's also going to testify

11    that she didn't, you know, insert any incriminating files on

12    it.  She didn't download and inject things into, you know, the

13    defendant's computer.  It was just a mistake for lack of

14    training.

15          MR. KAPLAN:  Why did she hook up a keyboard to it?

16          MR. GRADY:  Because, as you see, exhibit 28 is just a

17    stand alone tower.  So in order to access it you have to hook

18    up a keyboard and mouse to be able to turn it on and monitor

19    what's on there.  You're not going to be able to just look at

20    it.

21          THE COURT:  Assuming we're going to have a hearing --

22          MR. GRADY:  Okay.

23          THE COURT:  -- do we do that now?

24          MR. GRADY:  I guess apparently you would have to,

25    Your Honor, because if you find that it was in bad faith, then

1    the jury shouldn't be exposed to information if it's not going

2    to be allowed into evidence.

3             THE COURT:  All right.

4             MR. DARROW:  One other thought, as the Government

5    understands it, the chain of custody on the phones and the Tom

6    Tom GPS is no longer an issue, but the defense has indicated

7    they want the Government to recall Agent Chetwynd to say that

8    he brought -- if memory serves, he brought the tower computer

9    to the FBI.  Is that something that is sort of a 104A type

10   issue that we could also do in this hearing just have him get

11   on the stand and say we brought the computer over?

12            THE COURT:  I think that should be presented in front

13   of the jury actually.  Chris Destito is in California?

14            MR. DARROW:  He's retired and is out in San Diego.

15            THE COURT:  What's he doing out there?

16            MR. GRADY:  Twitter.

17            THE COURT:  He's with Twitter?

18            MR. GRADY:  Working with Twitter, Your Honor.

19            THE COURT:  Okay.  Do you have --

20            MR. GRADY:  Ms. Epp is here.  We can get her set up.

21            THE COURT:  So do you mind if I begin the questioning

22   to try to move this along because the jury is sitting and this

23   is not a good situation?

24            MR. DARROW:  Is it okay if the Judge begins

25   questioning of Marilyn?

1            MR. GRADY:  You want to conduct the questioning?

2            THE COURT:  I will conduct the questioning and give

3    both sides the opportunity to examine

4            MR. KAPLAN:  No objection, Your Honor.

5    [Chambers conference ended at 9:10 a.m.  The following occurred

6    at 9:12 a.m. in open court without the jury present.]

7            THE COURT:  Good morning.

8            DEPUTY CLERK:  This is Case Number 16-94 United

9    States of America versus Brian Folks.  The Government is

10   present through Assistant United States Attorneys Emily Savner,

11   Matthew Grady, and William Darrow.  The defendant is present in

12   the courtroom with his attorneys Mark Kaplan and Natasha Sen.

13   The matter before the Court is Trial by Jury day eight.

14           THE COURT:  All right.  The defense has filed a

15   motion to exclude introduction of any exhibits taken from

16   search of the defendant's computer by law enforcement officers.

17   I brought both counsel for the defense, counsel for the

18   government into Chambers to discuss whether a hearing is

19   necessary and I determined that in fact a hearing was

20   necessary, first, on the issue of good faith or bad faith on

21   the part of the investigating officer when she turned on the

22   computer and perhaps modified or eliminated some files or

23   created some new temporary files; second, the defense has also

24   objected to the introduction of various exhibits taken from the

25   computer based upon perhaps a corruption of those particular

1  exhibits, and so the Court feels it is necessary to have

2  evidence in regard to Ms. Epp's testimony as to what exactly

3  happened when these files were theoretically deleted or

4  modified and that -- for a determination as to whether she was

5  acting in good faith or bad faith.

6       Second, the defense expert may be called to describe

7  exactly what impact the turning on of the computer had and, in

8  particular, what impact it had in regard to the exhibits that

9  the Government seeks to introduce.  So can we have the

10  testimony of Ms. Epps?

11            MR. GRADY:  Yes, Your Honor.  One housekeeping matter

12  first.  The defense's expert is in the courtroom and we would

13  ask that the Government be allowed to have Mr. Thornton in the

14  courtroom as well, especially if he's going to testify.

15            THE COURT:  Yes.

16            MR. GRADY:  Thank you.

17            THE COURT:  Now you're going to, I have no doubt,

18  hear an objection from the defense in his testimony if he is to

19  testify about the impact of turning on the computer because, of

20  course, you introduced him and caused him to be qualified as an

21  expert in regard to the extraction process and they cross

22  examined him with regard to that's exactly what you're being

23  introduced for.  You're not being introduced for anything else,

24  and so now if you call him to testify about something else,

25  they may have an objection.  Would that be correct, Ms. Sen?

1          MS. SEN:  That would be very correct, Your Honor.

2          THE COURT:  Right.  Anyway we can deal with that at

3     the time that the expert testifies.  So I think Mr. Thornton

4     should be able to be in the courtroom, and Ms. Epp.

5          MR. GRADY:  Yes.  The Government calls Ms. Marilyn

6     Epp.

7          THE COURT:  All right.  In light of the fact that

8     I've also told the jury that we expect this hearing to last for

9     an hour so they are free to move about, so is there any

10    objection to me asking the preliminary questions of the experts

11    and then you can follow up?

12         MR. GRADY:  No objection, Your Honor.

13         MS. SEN:  No objection, Your Honor.

14         THE COURT:  All right.

15         MR. GRADY:  Ms. Epp, can you go in front of the

16    podium and wait for the clerk to swear you in.

17    Marilyn Epp,

18        Having been duly sworn, testified as follows:

19         THE COURT:  Good morning.

20         MS. EPP:  Good morning, Your Honor.

21         THE COURT:  Would you state your name?

22         MS. EPP:  Marilyn Epp.

23         THE COURT:  And your position?

24         MS. EPP:  I'm currently a professor the University of

25    Maine, but I was an intel analyst for the Drug Enforcement

Marilyn Epp                                14

1  Administration.

2          THE COURT:  Okay, and how long were you an intel

3  analyst for the Drug Enforcement Administration?

4          MS. EPP:  Just over six and a half years.

5          THE COURT:  And what was your training?

6          MS. EPP:  Well my education background is in forensic

7  biology and intelligence and national security.  Of course I

8  went to the DEA academy for a 12-week intel analyst program and

9  I received well over a dozen subsequent continuing education

10  trainings on social media, intelligence tradecraft.

11          THE COURT:  How about computer analysis?

12          MS. EPP:  My specialty was phone analysis and social

13  media analysis.

14          THE COURT:  Okay.  So can you tell me what happened

15  in this particular case?

16          MS. EPP:  In this instance we received a search

17  warrant for five devices on January 27, 2017, one of which was

18  the computer hard drive.  At that time it was in FBI custody

19  and Agent Destito -- Chris Destito brought that to me at the

20  DEA office after we received the warrant.  I signed for it and

21  I -- when I would extract from a phone -- do a forensic

22  extraction from a phone the common practice was to make sure it

23  was on airplane mode so it was not connected to the cellular

24  data or any wifi, and look in the phone to see if there was any

25  immediate evidentiary value to determine whether or not an

Marilyn Epp                          15

1   extraction could take place or should take place, and in which

2   case we would then start an extraction.

3        In this instance I turned on the computer.  I got a

4   keyboard and a monitor and a mouse and turned on the computer.

5             THE COURT:  And why was it important to get a mouse

6   and keyboard?

7             MS. EPP:  Otherwise it's just a stand alone tower.

8   It wasn't a laptop.  It was one of those big block towers so

9   there was no way to see what was on it without -- or to turn it

10  on really and look.

11            THE COURT:  Okay.  So what was your purpose in

12  turning on the computer?

13            MS. EPP:  To see if there was anything readily

14  evident that would be of evidentiary value.

15            THE COURT:  Okay, and so you were executing the

16  warrant; is that correct?

17            MS. EPP:  Yes, sir.

18            THE COURT:  Okay, and is that what you did for DEA as

19  an analyst --

20            MS. EPP:  Yes.

21            THE COURT:  -- in general?

22            MS. EPP:  Yes, on phones especially.

23            THE COURT:  Pardon me.

24            MS. EPP:  On phones especially, yes.

25            THE COURT:  Okay.  You were trained for that?

Marilyn Epp                                16

1              MS. EPP:  For phones, yes.

2              THE COURT:  Okay.  So your purpose was to extract

3    evidence to see if there's anything of value?

4              MS. EPP:  Yes.

5              THE COURT:  And what happened?

6              MS. EPP:  My purpose actually turning on the computer

7    was to see if there was anything.  I realized once I turned it

8    on the computer powered up and I saw the regular blue screen

9    that you would see where somebody would log on and there was a

10   number of user profiles all of which were password protected

11   except for a guest profile.  So the only one I accessed was the

12   guest profile and I just looked at the files inside.  I didn't

13   insert any drive or any disk.  I didn't take any data off of

14   it.  I just saw some pictures and I realized I had -- didn't

15   have the capability to get into the other profiles at which

16   time we set up for -- we set up a forensic specialist to take

17   the computer.

18             THE COURT:  Okay.  So you looked in the guest

19   profile?

20             MS. EPP:  Yes.

21             THE COURT:  There's some reference to the computer

22   being on for about six hours.  Is that right?

23             MS. EPP:  It may have been.  It booted up.  It was in

24   my office which was a locked room within our locked facility at

25   DEA.  I powered it up.  I probably powered it down at the end

Marilyn Epp                                    17

1   of the day after -- I didn't go through it for six hours, but

2   it was just sitting off to the side and before I went home I

3   just shut it all down knowing it was going to Mr. Thornton.

4            THE COURT:  You turned it on in the beginning of the

5   day.  You went through the guest profiles?

6            MS. EPP:  The guest profile.  One.  Yes.

7            THE COURT:  One guest profile and that's it because

8   all the others were password protected?

9            MS. EPP:  Yes.

10           THE COURT:  And then you shut it down?

11           MS. EPP:  Yes.

12           THE COURT:  Okay, and did you receive any training in

13  regard to computers of this sort suggesting that you should not

14  or the impact of what would happen if you turned on a computer?

15           MS. EPP:  No.  No.  I was just following my phone

16  training and the practices established with -- I thought of it

17  as an electronic storage device just like a phone and so I went

18  into my training for that, looked to see if there's anything of

19  evidentiary value in which case an extraction would be

20  performed, but seeing all the passwords protected I knew that

21  this was beyond my training and experience.

22           THE COURT:  Okay.  Was there any intention on your

23  part to destroy or delete or modify any existing user profiles?

24           MS. EPP:  Absolutely not.

25           THE COURT:  Okay.  All right.  First the Government.

```
                    Marilyn Epp                          18
1    Do you have any additional questions?
2              MR. GRADY:  A few, Your Honor.
3              THE COURT:  Yes.
4                         DIRECT EXAMINATION
5    BY MR. GRADY:
6    Q.    Ms. Epp, had you ever encountered a desktop computer
7    like you did in this case?
8    A.    No.
9    Q.    When you -- did you tell anybody that you turned on the
10   computer?
11   A.    Yes.
12   Q.    Who did you tell?
13   A.    Adam Chetwynd, the other people working the case with
14   me, Matt Benoit, and then I told Frank Thornton when I gave him
15   the computer.
16             MR. GRADY:  One moment, Your Honor.
17             THE COURT:  Okay.
18             MR. GRADY:  A few other additional questions, Your
19   Honor.
20   BY MR. GRADY:
21   Q.    Ms. Epp, did you even know who Mr. Thornton was at the
22   time?
23   A.    I did not.
24   Q.    How did you find out about Mr. Thornton?
25   A.    I called the prosecutor at the time, Abigail Averbach,
```

Marilyn Epp                              19

1    and told her that I didn't have the capability to get into this

2    computer, and she said that there was a forensic specialist in

3    the area that we would turn -- we can turn it over to because

4    Chris Destito, FBI, said it was going to be a six-month wait

5    with the FBI forensic capabilities and that they would have to

6    ship it away.  So once we found out there was a local person

7    she referred me to Frank.

8    Q.    Did you follow up with Mr. Thornton the next day?

9    A.    Yes.

10   Q.    And is that when you provided the laptop -- or, excuse

11   me, the hard drive to Mr. Thornton?

12   A.    Yes and four other devices.

13            MR. GRADY:  One more moment, Your Honor.

14            THE COURT:  All right.  Just while you think about

15   that did you write a report or did not write a report?

16            MS. EPP:  I did not write a report because I wasn't

17   taking anything of evidence off of the computer.

18            THE COURT:  All right.

19            MR. GRADY:  Nothing further at this time, Your Honor.

20            THE COURT:  Okay.  Ms. Sen.

21            MS. SEN:  Thank you, Your Honor.

22                        CROSS EXAMINATION

23   BY MS. SEN:

24   Q.    Ms. Epp, are you aware that there are DOJ guidelines for

25   handling digital forensic evidence?

Marilyn Epp                          20

1    A.      I did not know that until yesterday.

2    Q.      And you worked as a DEA analyst for over six and a half

3    years and you weren't aware of guidelines for handling

4    evidence?

5    A.      Not for digital computer evidence, no.

6    Q.      Wasn't part of your training, though, that when you are

7    handling evidence that you treat it carefully?  For example, if

8    it were drugs wouldn't you treat it carefully?

9    A.      Of course.

10   Q.      You wouldn't handle it before you turned it over to a

11   lab technician, would you?

12   A.      Drugs are always field tested unless there's a presence

13   of fentenyl suspected in which case they aren't, but otherwise

14   all drugs are opened, manipulated, and tested before they are

15   turned over to the lab.

16   Q.      And don't you document every step of that?

17   A.      If a field test was conducted, yes.

18   Q.      You write a report about it, don't you?

19   A.      You don't write a report about a field test, no.

20   Q.      But there is a report that discusses your handling of

21   drugs, is there not?

22   A.      Of course.

23   Q.      You have written many of them in this case, isn't that

24   correct?

25   A.      I have written reports in this case, yes.

1  Q.     You did not write a report about turning on this

2  computer, did you?

3  A.     I did not.  I didn't collect evidence from the computer.

4  Q.     Wouldn't turning on the computer -- well once you told

5  Adam Chetwynd, once you told Matt Benoit, once you told the

6  prosecutor in this case, don't you think somebody should have

7  written a report once you told Frank Thornton?  He was the

8  computer examiner.

9  A.     We write reports to document gathering evidence.

10  Q.     So if you turn on a computer in the course of attempting

11  to search it because -- I mean you describe what you did as a

12  search, isn't that correct?

13  A.     Correct.  I tried to conduct a search and realized I

14  couldn't.

15  Q.     So why wouldn't you write a report?

16  A.     Because I didn't collect any evidence from the computer

17  at that time.

18  Q.     But don't you write reports all the time about when you

19  go out and you look for things and you don't find things and

20  then you document what you did because it's for exactly the

21  reason -- well go ahead.

22  A.     No.  If there's no evidence collected, we don't write

23  reports because there wouldn't -- we would never get anything

24  done if all we did was write reports about not collecting

25  evidence.

                         Marilyn Epp                        22

1   Q.     So isn't it fair to say that you have written numerous

2   reports in this case?

3   A.     Yes.

4   Q.     Down to incredibly detailed levels?

5   A.     Yes all pertaining to evidence.

6   Q.     Documenting everything that you did?

7   A.     No.  I did not document everything that I did.  There

8   would be thousands of pages if I documented every piece --

9   everything that I did.

10  Q.     Well when you go out and you talk to witnesses if you

11  don't get any evidence that's relevant you still document it,

12  don't you?

13  A.     Depends on the parameters of the interview.

14  Q.     So you have no digital forensics training; is that

15  correct?

16  A.     I do for phones.

17  Q.     Okay, but we're not talking about phones, are we?

18  A.     No.

19  Q.     We're talking about a computer?

20  A.     Correct.

21  Q.     So it didn't occur to you that this is something very

22  different and that you might need to treat it differently and

23  you might want to ask someone before you just turn it on?

24  A.     I had a search warrant and I tried to execute it and

25  using my phone training I was working to the best of my

Marilyn Epp                        23

1    ability.  I realize now that was not the best practice, but I

2    didn't know at the time that there was another option until I

3    called the prosecutor and said I can't do this.

4    Q.    Are you aware that DEA actually has its own digital

5    forensics labs?

6    A.    No I was not.

7              MS. SEN:  Your Honor, may I have a moment please?

8              THE COURT:  Yes.

9    BY MS. SEN:

10   Q.    I just have one more question.  You said when you turned

11   on the computer that you actually did see pictures, isn't that

12   correct.

13   A.    I did see two photographs in the guest profile.

14   Q.    And you didn't feel a need to document that?

15   A.    No I didn't.  I didn't know who those people were.

16   Q.    Well isn't it fair to say once you got the computer and

17   you received that hard drive or the extraction from the hard

18   drive that you claimed to have gotten from Mr. Thornton that

19   there was still lots of people that you didn't identify?

20   A.    Correct.

21             MS. SEN:  I don't think I have anything further at

22   this point, Your Honor.

23             THE COURT:  Okay.  Any further questions, Mr. Grady?

24             MR. GRADY:  Just one, Your Honor.

25             THE COURT:  In my many years of experience I've

Marilyn Epp                         24

1    always noted that whenever a lawyer says I have one more

2    question it never happens.

3            MR. GRADY:  I know, Your Honor.  That's usually my

4    practice too, but I think it's only one question, but we'll

5    find out.  Put it to the test, Your Honor.

6            THE COURT:  Right.

7    BY MR. GRADY:

8    Q.    Ms. Epp, did it take several months to identify all the

9    women that were found in the hard drive?

10   A.    I never identified all of the women that were found in

11   the hard drive.  I probably identified between two and three

12   dozen, but that was it.  There was well over a hundred.

13           MR. GRADY:  Just one more question, Your Honor.

14           THE COURT:  Sorry.

15   BY MR. GRADY:

16   Q.    And did it take several months to identify the dozen or

17   two dozen women that you noticed on the hard drive?

18   A.    Yes.

19           THE COURT:  All right.

20           MR. GRADY:  Nothing further, Your Honor.

21           THE COURT:  Anything further from the defense?

22           MS. SEN:  Nothing further, Your Honor.

23           THE COURT:  All right.  Thank you.

24           MS. EPP:  Thank you, Your Honor.

25           THE COURT:  Okay.  Now the second witness is the

                    Anthony Martino                    25

1  defense expert.

2            MS. SEN:  Yes.  Anthony Martino, Your Honor.

3            DEPUTY CLERK:  Please come forward, sir, to be sworn.

4  Anthony Martino,

5        Having been duly sworn, testified as follows:

6            THE COURT:  Good morning, Mr. Martino.

7            MR. MARTINO:  Good morning, Your Honor.

8            THE COURT:  Let me begin with asking you some

9  preliminary questions.  Can you give me an idea of your

10 background?

11           MR. MARTINO:  Yes, sir.  My background, as it applies

12 to this case, includes a Master's degree from Utica College

13 which included case work, independent research, and a capstone

14 thesis project in the field of cyber security and digital

15 forensics.  I'm a retired 20-year employee of the City of Utica

16 Police Department.  I held the rank of Sergeant upon my

17 retirement.  Approximately ten years of my tenure at the police

18 department I was in charge of the department's computer crime

19 unit, management information systems unit, IT department, and

20 their digital forensics laboratory.

21           THE COURT:  And what did you do in regard to this

22 particular computer?

23           MR. MARTINO:  In regards to this particular case I've

24 reviewed reports that were provided to me by defense counsel

25 that were provided to them by the Government.  I've also had

Anthony Martino                        26

1    two opportunities to conduct a forensic preview of a forensic

2    image of the HP computer that's been discussed this morning.

3           THE COURT:  All right, and in that review, in that

4    analysis of the computer, what did you discover in regard to

5    whether or not it had been turned on, on February 2nd, 2017?

6           MR. MARTINO:  I discovered that the computer had

7    indeed been powered on, on February 2nd, and my knowledge from

8    reading the reports was that was post seizure by law

9    enforcement.  So obviously that raised a concern about the

10   evidence that does not comport with standard forensic

11   protocols.

12          THE COURT:  And as a general matter turning on the

13   computer violates protocol?

14          MR. MARTINO:  It does.

15          THE COURT:  Why?

16          MR. MARTINO:  Because whenever a computer is powered

17   on or even if a computer is left running changes are constantly

18   being made by the computer even if the user is not initiating

19   those changes.  There are extenuating circumstances where this

20   is a known risk.  As one example if you had an abducted child

21   who had been communicating with a person online, clearly time

22   is of the essence.  You don't have time to bring that computer

23   to the laboratory, et cetera, but there are irreversible

24   changes happening to a computer at every moment that that

25   computer is running, and that is the reason why every forensic

Anthony Martino                    27

 1   protocol, including the ones by the federal government, by

 2   state governments, law enforcement training, et cetera, is that

 3   minus those extenuating circumstances the computer is to be

 4   forensically imaged so that the evidence being analyzed is a

 5   true and accurate reflection of the data that was present when

 6   the computer was seized.

 7            THE COURT:  What is the nature of the changes that

 8   are being made when you set up -- when you start a computer?

 9   Are they creating temporary files?  Are they modifying existing

10   files?  And if that is the case, can you identify the files

11   that are being modified?

12            MR. MARTINO:  Yes and no.  It's almost like a lawyer

13   answer.

14            THE COURT:  Right.

15            MR. MARTINO:  No offense.

16            THE COURT:  Right.

17            MR. MARTINO:  So to an extent, yes.  We can

18   forensically identify files that have been modified.  The

19   challenge is we can't identify data that's been overwritten.

20   As I think most people know when you delete items from a

21   computer or even when a computer deletes items itself a certain

22   amount of information remains on that hard drive for a period

23   of time, and that information from a forensic examination

24   standpoint can oftentimes be very important.  It tends to

25   reflect activities that maybe the user performed but didn't

Anthony Martino                    28

1    want known by others so they deleted information.  It also

2    tends to reflect information about the computer's actions in

3    recent time.  When new information is saved to that computer,

4    like powering it on, by user activity, by system activity, some

5    of that old information will be overwritten.  They will delete

6    it.

7                    THE COURT:  So it will disappear?

8                    MR. MARTINO:  It will disappear beyond our

9    capabilities as forensic examiners.

10                   THE COURT:  Okay, and you determined a certain number

11   of files were deleted as a result of the turning on of this

12   computer?

13                   MR. MARTINO:  No, sir.  My ability through the tools

14   that were made available by the U.S. Attorney's Office allowed

15   me to show the number of files that were created and the number

16   of files that were modified.  I would not have the capability

17   of telling you how much information was actually overwritten.

18                   THE COURT:  Okay.  All right.  So how many files were

19   created?

20                   MR. MARTINO:  To memory it was just over 800.  It was

21   about 824, in that vicinity approximately.

22                   THE COURT:  All right.  So those are new files

23   created at the time of the computer being turned on?

24                   MR. MARTINO:  That's correct.

25                   THE COURT:  And you can identify those.  Do you know

Anthony Martino                          29

1    what the content of those was?

2            MR. MARTINO:  I did not have the opportunity to

3    examine them all.  Time -- time with the U.S. Attorney's Office

4    didn't permit that, but most of them are system related files.

5    Some of them are user settings and configurations and user

6    activity files where we would forensically look for information

7    about how a user had their environment set up and what actions

8    they may have taken with certain programs.

9            THE COURT:  So it's process?  It's all process?

10           MR. MARTINO:  It's primarily all process, yes.

11           THE COURT:  All right, and so how about the modified?

12           MR. MARTINO:  The modified are largely similar.  They

13   are files that have already existed on the computer, but

14   changes have been made to them.  We have forensically no

15   capability of rewinding those changes.  So I can't tell you

16   what it looked like prior.  I can tell you what it looks like

17   now.

18           THE COURT:  Okay.  So how many of those files were

19   modified?

20           MR. MARTINO:  There was a little over a thousand.

21           THE COURT:  Okay, and apparently the proffer has been

22   made that those thousand files that have been modified are not

23   the files that the Government seeks to introduce.  Is that your

24   understanding?

25           MR. MARTINO:  That's my understanding.  Obviously I

Anthony Martino                                30

1   don't know the minutiae of what the Government seeks to

2   introduce, but --

3              THE COURT:  Okay.  So tell me what impact turning on

4   the files would have to the various exhibits that were not

5   modified?

6              MR. MARTINO:  From a -- from a forensic examination

7   standpoint the impact is the integrity of the overall

8   container, the integrity of the whole machine.  Since we can't

9   truly identify everything that was done during that time period

10  that the computer was powered on we just simply don't have that

11  capability.

12             THE COURT:  Okay.  So what you're suggesting is

13  because there was a computer being turned on it really

14  compromises the integrity of the entire program?

15             MR. MARTINO:  Yes.

16             THE COURT:  The entire research or extraction of

17  evidence?

18             MR. MARTINO:  Yes, sir.  It interferes with our

19  ability as a forensic examiner to testify that this was the

20  state of the device when it was seized from a defendant or from

21  a search warrant.

22             THE COURT:  Let's go beyond the state of the device.

23  The device is not being introduced.  What's being introduced

24  are particular exhibits like photographs or videos, and

25  assuming that there's a showing that those photographs were not

Anthony Martino                           31

1    modified by the turning on of the computer what other impact is

2    there from the turning on of the computer to those exhibits?

3             MR. MARTINO:  My preview, again admitting that it was

4    limited in scope and time and capabilities by the tools that

5    were made available, did not show any modification to videos or

6    phones.  So I can't testify to what changes did or did not

7    happen to those.

8             THE COURT:  Okay.  So the subject of your testimony

9    is you are -- you are making a systemwide analysis of the

10   protocols not being followed and compromising the entire unit,

11   but at least as to the individual exhibits which are being

12   offered you can't say that those are modified by the turning on

13   of the computer?

14            MR. MARTINO:  No, sir, I cannot.

15            THE COURT:  Okay.  All right.  So the Government want

16   to ask questions?

17            MR. GRADY:  Yes, Your Honor.

18            THE COURT:  Do you want to ask one or do you want to

19   ask more than one?

20            MR. GRADY:  Your Honor, I'll ask permission to ask

21   more than one question if that's okay.

22            THE COURT:  Right.

23            MR. GRADY:  I won't give a specific number or maybe

24   err on the side of more questions.

25            THE COURT:  I think brevity would be -- you should

Anthony Martino                          32

1   err on the side of brevity.

2            MR. GRADY:  Yes, Your Honor.  I will err on the side

3   of brevity.

4                        DIRECT EXAMINATION

5   BY MR. GRADY:

6   Q.     Just a couple of subject areas to talk about, Mr.

7   Martino.  If a photograph's modified date precedes 2/2/17,

8   would you agree that it hadn't been impacted by the powering on

9   of the computer?

10  A.     Largely yes I would.

11  Q.     Same for if the date access preceded 2/2/17, you would

12  agree that the powering on had no impact on that photo?

13  A.     Yes.

14  Q.     Same with date taken?

15  A.     Yes.

16  Q.     Date created?

17  A.     Yes.

18  Q.     Now I want to go back for a moment to the 800 files that

19  you said --

20            THE COURT:  Let me ask you, Mr. Grady, are you

21  proffering that all of the exhibits that you seek to introduce

22  have metadata which preceded February 2nd, 2017?

23            MR. GRADY:  Yes, Your Honor.  Yes.  I mean metadata

24  is a word of art, but all of the time stamps for our exhibits,

25  whether it was date taken, date modified, date accessed, date

Anthony Martino                            33

1    created, all of the information predates 2/2/17 and it sounds

2    like Mr. Martino has agreed that powering on of the computer

3    has no impact with respect to those images or videos.

4             THE COURT:  Okay.

5    A.    Yes, sir.

6    Q.    All right.  Let's go back for a moment to the 800 files

7    that were created by powering on of the computer, and I believe

8    you agreed with the Court's questions that it all had to do

9    with systems files, natural rebooting of the computer, checks

10   that go on, or just sort of typical user manipulation.  Is that

11   fair to say?

12   A.    Yes it is.

13   Q.    Now when 800 files are created it's my understanding

14   your testimony is that there's some impact on unallocated

15   space?

16   A.    That is correct.

17   Q.    Would you agree with the proposition that if there is an

18   impact on unallocated space, would the oldest files be written

19   over first as opposed to newer files?

20   A.    No, sir.

21   Q.    Well would you agree that a hard drive goes outward and

22   that data starts -- there's a cluster of data in the inside of

23   a hard drive and other data goes outward from there?

24   A.    No, sir.  It's actually well known and documented that

25   files saved and read from hard drives tend to happen in a

Anthony Martino                           34

1    defragmented manner.

2    Q.     Happens in a defragmented manner, and what you're saying

3    is that there is no -- that older files are not necessarily

4    written over first?

5    A.     That's absolutely correct.  They are not.

6    Q.     Did you see any indications or evidence of Facebook in

7    the hard drive?

8    A.     Yes I did.

9    Q.     What I'm asking is did you see any specific folders

10   labeled Facebook as in you would potentially save Facebook

11   messages in a folder labeled Facebook?

12   A.     I don't recall.

13          MR. GRADY:  One moment, Your Honor.

14          THE COURT:  Yes.

15          MR. GRADY:  Nothing further, Your Honor.

16          THE COURT:  Okay.  Ms. Sen.

17          MS. SEN:  Thank you, Your Honor.

18          THE COURT:  You want to let Mr. Kaplan do the cross?

19          MS. SEN:  Mr. Kaplan, do you want to do the cross?

20          MR. KAPLAN:  It would be one question, Judge.

21          THE COURT:  I should put on the record, of course,

22   the jury is not here.  So go ahead.

23                    CROSS EXAMINATION

24   BY MS. SEN:

25   Q.     In your forensic lab if you received a computer that's

Anthony Martino                          35

1  been turned on -- that you realize once you start examining it

2  that it's been turned on, what do you do?

3  A.      That has happened more than one time.  We stop the

4  examination immediately, consult with both the case agent and

5  the prosecutor to decide whether or not we will continue our

6  examination.  We make notice to both the case agent and the

7  prosecutor that, first of all, there should be an investigation

8  as to why and how that happened, by whom, a complete

9  documenting of all steps that led to that happening, and the

10 result.  We also make notice to prosecution that we will, as

11 the forensic laboratory, be incapable of testifying as to the

12 integrity of the evidence prior to our receipt of it.  So

13 really at that point the chain of integrity has been broken and

14 it begins again with our receipt.

15 Q.      So, for example, with this computer can you certify the

16 integrity of this computer beyond the date of February 3rd,

17 2017?

18 A.      No.

19 Q.      So any representation as to what was on this computer

20 could only stand as of February 3rd, 2017?

21 A.      Yes.  On February 3rd Mr. Thornton made a forensic image

22 of the computer.  By his accounting within his reports, which

23 I've reviewed, it appears to be well within the standards --

24 industry accepted standards for doing so, and so I would be

25 confident that subsequent to February 3rd we can be confident

Anthony Martino                          36

1  in the integrity of that forensic image.

2  Q.    Are you familiar with the kind of resources that DEA has

3  in your work as the digital forensic examination?

4  A.    I'm generally familiar.  I'm certainly not a specialist

5  in DEA procedures or their facilities.

6  Q.    Have you worked with DEA forensic labs before?

7  A.    I've worked with DEA agents and I've worked for and with

8  numerous federal agencies and I'm familiar with the amount of

9  forensic capabilities that federal law enforcement has in

10  general.

11  Q.    And would you expect that someone in this chain would

12  have documented the fact that the computer was turned on?

13  A.    Absolutely.

14          MS. SEN:  I don't think I have anything further, Your

15  Honor.

16          THE COURT:  Okay.  All right.  Anything further from

17  the Government?

18          MR. GRADY:  No, Your Honor.

19          THE COURT:  Okay.  All right.  Thank you.

20          MR. MARTINO:  Thank you, Your Honor.

21          THE COURT:  All right.  Well I'm actually going to

22  write an opinion in the introduction of this series of images,

23  but the Court's findings, first, are that Analyst Epps was

24  negligent in turning on the computer.  She was not aware that

25  analysis of computers are different than analysis -- analyses

Anthony Martino                           37

1    of phones.  It was clearly a mistake.  It was not in bad faith.

2    She was executing a search warrant which was part of her job.

3    So anyway there's no bad faith in this mistake.

4        Second, it seems to me that there is a systems violation

5    and the defense can clearly address that in cross examination,

6    but the Government is seeking to introduce images.  All of the

7    images were created prior to the turning on of the computer,

8    but more importantly those images are all identified with dates

9    and stamps, et cetera, which create authenticity.  There's no

10   suggestion that turning on of the computer would have

11   necessarily compromised the integrity of those particular

12   images, and as a result, assuming that the Government can

13   actually show that the images that it seeks to introduce were

14   created prior to February 2, 2017 and that there are sufficient

15   date stamps, et cetera, to authenticate those particular

16   exhibits, they can be introduced.  The defense certainly can

17   attack the systems-wide approach that the Government has taken,

18   but essentially the question is when an image that the

19   Government seeks to introduce is to be introduced, if there's

20   really no evidence to suggest that turning on the computer

21   modified that particular image, these images are not modified,

22   then they are as legitimate as they were prior to the turning

23   on of the computer.  Part of the turning on of the computer had

24   no impact upon those particular images.  That's evidence before

25   and after the computers were turned on, and as a result

Anthony Martino                        38

1    assuming that there's authentication as to the timing of those

2    particular -- the creation of those particular images and that

3    there's no evidence to suggest that they were modified by the

4    turning on of the computer, those images are admissible and

5    I'll write an opinion in regard to that.

6         So as a result let's take a break at this point and we

7    will start again at a little after 10 o'clock.

8    [Recess 9:52 a.m. - 10:07 a.m.]

9    [The following was held in open court with the jury present]

10             THE COURT:  Good morning.

11             DEPUTY CLERK:  This is Case Number 16-94 United

12   States of America versus Brian Folks.  The Government is

13   present through Assistant United States Attorneys Emily Savner,

14   Matthew Grady, and William Darrow.  The defendant is present in

15   the courtroom with his attorneys Mark Kaplan and Natasha Sen.

16   The matter before the Court is Trial by Jury day eight.

17             THE COURT:  All right.  Welcome back.  Has anyone

18   spoken to you about this case or have you talked among

19   yourselves about the case or have you learned anything about

20   this case from outside of the courtroom? (Jurors respond no).

21        All right.  Thank you.  I appreciate your patience.  We

22   had a hearing this morning and as is oftentimes the case as you

23   get fairly close to the end there may be small breaks to deal

24   with issues which come up.  So I would ask that you be patient,

25   but we're continuing on.  We should have the case to you soon.

Adam Chetwynd                                    39

 1  All right.  Now is it Mr. Thornton who is on the stand?

 2          MS. SAVNER:  The United States of America plans to

 3  call Special Agent Adam Chetwynd briefly before Mr. Thornton

 4  resumes.

 5          THE COURT:  All right.

 6  Adam Chetwynd,

 7      Having been duly sworn, testified as follows:

 8          THE COURT:  Good morning, Agent.

 9          AGENT CHETWYND:  Good morning, Your Honor.

10          THE COURT:  In light of your last malady I won't ask

11  if there's any changes in your health.

12          AGENT CHETWYND:  I was prepared for it.  Still hurts.

13                          DIRECT EXAMINATION

14  BY MS. SAVNER:

15  Q.    Good morning, Special Agent Chetwynd.  You have spoken

16  to us before about some actions that took place on -- with

17  respect to this investigation on July 19th, 2016.  Remind us

18  what happened that day.

19  A.    We executed a search warrant.

20  Q.    Okay.  I'm sorry.  Go ahead.

21  A.    And seized a bunch of evidence.

22  Q.    And the search warrant locations were where?

23  A.    At 96 Ethan Allen Parkway Unit 8 in Burlington, and 241

24  West Canal Street, Apartment 1A, Winooski, Vermont.

25  Q.    And 96 Ethan Allen Parkway was the location where the

Adam Chetwynd                           40

1   defendant had been staying at the time?

2   A.    Yes.

3   Q.    You talked to us about two phones taken off the

4   defendant's person last time you were on the stand.  At some

5   point back at the DEA office did you have any interaction with

6   other pieces of evidence, specifically the electronic evidence

7   seized from those two search warrants?

8   A.    I did.

9   Q.    Tell us what that was.

10  A.    It had been determined early on that the Federal Bureau

11  of Investigation would help with the forensic analysis of any

12  electronics if we had seized any in this case.  So on July 21,

13  2016 Christopher -- FBI Special Agent Chris Destito came to our

14  office to retrieve this electronic evidence that we spoke

15  about.

16  Q.    And who interacted with Special Agent Destito there?

17  A.    I did.

18  Q.    And what did you do?

19  A.    As part of my collateral duties with the DEA office I am

20  one of the non-drug evidence custodians.  So I removed the

21  electronic evidence which was seized on the July 19th search

22  warrant at the Ethan Allen Parkway and I transferred custody to

23  Special Agent Destito.

24        MS. SAVNER:  May I approach, Your Honor?

25        THE COURT:  Yes.

                        Adam Chetwynd                    41

1  BY MS. SAVNER:

2  Q.     I'm showing you what's been marked as Government's 139.

3  Do you recognize that?

4  A.     I do.

5  Q.     What is it?

6  A.     It is the FBI's version of a receipt for items.

7  Q.     Documenting this transfer that you just described?

8  A.     Yes.

9  Q.     Does it bear your signature?

10  A.     It does down at the bottom.

11  Q.     And what's the date on it?

12  A.     7/21/2016.

13  Q.     And does that comport with your memory when the

14  transfers of the electronic evidence from DEA to FBI occurred?

15  A.     It does.

16          MR. GRADY:  Government moves to admit Government's

17  139.

18          THE COURT:  Any objection to 139?

19          MS. SEN:  No objection, Your Honor.

20          THE COURT:  All right.  So admitted.

21  [Government exhibit 139 admitted]

22  BY MS. SAVNER:

23  Q.     And if I might take that back from you, this is your

24  signature here at the bottom; is that right?

25  A.     That is correct.

Adam Chetwynd                                    42

1  Q.     And this list of items that were turned over from DEA to

2  FBI; is that correct?

3  A.     Yes.

4  Q.     And listed the last one here states computer HP Pavilion

5  and then am I correct that's a serial number?

6  A.     I believe so, yes.

7  Q.     And it reads MXU13503TA; is that correct?

8  A.     That's what it -- yes.

9  Q.     Excuse me.  It might be TA or T4.  Is that your

10  understanding that's the serial number on the computer?

11  A.     Yes.

12          MS. SAVNER:  Nothing further.

13          THE COURT:  Okay.  Any cross examination?

14          MS. SEN:  No, Your Honor.

15          THE COURT:  All right.  Thank you, Agent.

16          AGENT CHETWYND:  You're welcome.

17          THE COURT:  Okay, and Government want to call next

18  witness.

19          MR. GRADY:  Yes, Your Honor.  The United States of

20  America recalls Mr. Frank Thornton.  Mr. Thornton, you can come

21  up in front of the podium and get sworn by the clerk again.

22  Frank Thornton,

23      Having been duly sworn, testified as follows:

24          THE COURT:  Good morning, Mr. Thornton.

25          MR. THORNTON:  Good morning, Your Honor.

```
                         Frank Thornton                        43
 1                   CONTINUED DIRECT EXAMINATION
 2   BY MR. GRADY:
 3   Q.    Good morning, Mr. Thornton.  Your Honor, can I have
 4   continuing permission to approach the witness?
 5              THE COURT:  Yes.
 6   BY MR. GRADY:
 7   Q.    Mr. Thornton, when we last left things on Thursday I
 8   believe you had taken a look at Government exhibit 79 and at
 9   that time you also removed Government exhibit 80 for
10   identification which I believe was the hard drive inside of the
11   tower; is that correct?
12   A.    Yes.
13   Q.    Did you do anything with the hard drive, Government
14   exhibit 80 for identification?
15   A.    Did I do anything?
16   Q.    Did you extract data from it?
17   A.    Oh yes I did.
18   Q.    And again is the hard drive inside of the tower?
19   A.    Yes it is.
20   Q.    How is the -- what's the relationship between the hard
21   drive and the tower?
22   A.    The hard drive is the storage medium for a PC in this
23   case.
24   Q.    Is it fair to say that a hard drive contains the
25   contents of the PC?
```

Frank Thornton                                    44

1   A.      For the most part, yes.  Obviously you can write out to

2   other devices such as CDs or floppy disks even if you have one

3   of those, but for the most part nowadays 99.9 percent is on the

4   hard drive.

5   Q.      Can you explain to the jury the process of extracting

6   data from a hard drive?

7   A.      Sure.  Basically what happens is you take the hard drive

8   and you plug it into another device.  It's called an imaging

9   device, and that creates an one-to-one image on to another hard

10  drive and then that second copy is what is used for actual

11  analysis.  You don't work off the original evidence.  That's

12  put back and returned to the agent, and then what I do is I

13  then work from -- excuse me -- the copy that I made and that's

14  the forensic copy.

15  Q.      Do you do something called write blocking?

16  A.      Yes.  The part of the device that is used functions as a

17  write block so you're not writing any additional new data to

18  the original hard drive.  It's -- all the data is only being

19  written to the copy.

20  Q.      In other words, is it an one-way street that it goes

21  from the hard drive on to what it's being extracted to?

22  A.      Yes.

23  Q.      Did you do anything to verify that the extraction was

24  done correctly?

25  A.      Yes.  As part of the process the devices specifically do

Frank Thornton                              45

1    what are known as hashing.  They basically determine that the

2    copy is correctly made and you get an alert if it's not for

3    some reason.

4    Q.    And this particular hard drive was it correctly made?

5    A.    Yes.

6    Q.    What did you do with the data that you extracted from

7    Government exhibit 80 for identification, the hard drive?

8    A.    I then started an analysis basically to see if in fact

9    there was any files on there of interest.

10   Q.    Were you able to see if there was files on the hard

11   drive?

12   A.    Yes.

13   Q.    Did you also pass along data to the DEA?

14   A.    Yes I did.

15   Q.    What did you pass along?

16   A.    Essentially a subset of the files that were on the

17   computer.  It was the user area files for the most part.  That

18   was specifically what they were interested in.  They didn't

19   care about things like the Windows system files.

20   Q.    Who did you pass along this information to?

21   A.    Special Agent Epp.

22   Q.    Let's go back for a minute, Mr. Thornton, and talk about

23   when you received the computer and I think you testified on

24   Thursday you received it from Intelligence Analyst Marilyn Epp?

25   A.    Yes.

Frank Thornton                              46

1    Q.    Did she say anything to you when she gave you the hard

2    drive?

3    A.    Well we talked about the case in general.  She said this

4    has been seized as part of a search warrant.  She said they had

5    looked at it initially and they couldn't get into it and that

6    they should -- they had then consulted with the U.S. Attorney's

7    Office and were put in contact with me.

8    Q.    Was there any mention about turning the computer on?

9    A.    I don't know if it was specifically that morning or at

10   some point in the next few days, but it was mentioned, yes.

11   Q.    What impact did that have on you when you heard that it

12   was powered on?

13   A.    Well I knew it could change some files and was -- kept

14   that in the back of my mind during the analysis.

15   Q.    Did you notice any files of evidentiary value that had

16   been changed in your review?

17   A.    No I did not.

18   Q.    What is the best practice with respect to a computer

19   hard drive?

20   A.    Well best practice is you seal it up in some sort of

21   evidence container and then you don't touch it until it gets to

22   the forensic examiner.

23   Q.    Generally speaking what type of data did you see in the

24   hard drive, Government exhibit 80 for identification?

25   A.    Well there was kind of the normal types of files that

                         Frank Thornton                    47

 1   you typically see in a computer, but the Government was
 2   particularly interested mainly in the photographs and the
 3   videos that were contained in the files.
 4   Q.     How much data would you estimate that you gave to Ms.
 5   Epp?
 6   A.     I believe there was a count of over 19,000 photographs.
 7   I don't recall the number of videos.  All told it was something
 8   in the order of about 50 gigabytes of data.
 9   Q.     Can you tell the jury what or how much data 50 gigabytes
10   really is?
11   A.     Well it's hard to quantify if you don't deal with
12   computers.  However, I have heard comparisons that I use
13   routinely that a gigabyte is about a banker's box worth of data
14   and -- or rather a pickup truck rather full of banker boxes
15   full of data.  So in this case you're talking about something
16   in the order of 50 pickup trucks full of banker boxes.
17   Q.     Did you find any user profiles on the hard drive?
18   A.     Yes I did.
19   Q.     Can you explain to the jury what a user profile is?
20   A.     A user profile is when you log into the computer under
21   given user name and then that's broken down into areas so that
22   I would have an area, for instance, Mr. Grady would have an
23   area, you all would have different areas as you walk in.
24   Q.     Is that something the user sets up on the hard drive?
25   A.     Typically yes.  The administrative user would set that

```
                    Frank Thornton                      48
 1   up.
 2   Q.    I want to focus your attention on two user profiles
 3   found in the hard drive.  Did you find a user profile by the
 4   name of Pam Scott?
 5   A.    Yes I did.
 6           MS. SEN:  Objection, Your Honor.  Can I approach
 7   please?
 8           THE COURT:  Yes.  Okay.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Frank Thornton                           49

1  [Bench conference]

2          MS. SEN:  Your Honor, my understanding is that he's

3  really not qualified to go into discussing the setup of the

4  computer and the user profiles.  I mean he extracted that, but

5  I think this is beyond his qualification.

6          THE COURT:  Okay.  So are you getting him to testify

7  that he extracted from Pam Scott?

8          MR. GRADY:  Right.

9          THE COURT:  Not get into the details?

10         MR. GRADY:  Right.  I'm just saying he noticed this

11 user and he extracted information -- various bits of

12 information from these user profiles which he testified he

13 extracted data from and extracted data from the hard drives.

14         THE COURT:  He's limited to extraction, right?  He's

15 not going to get into analysis?

16         MS. SEN:  I hope not.  That would be my objection.

17         MR. GRADY:  One of the things he would do he's going

18 to show the jury exactly basically a snapshot of the hard drive

19 that here's the user profile, here's different folders that are

20 in the user profile, subfolders within that user profile, an

21 example of pictures that contain date created, date modified,

22 just so they can see hypothetically --

23         THE COURT:  So that's part of extraction.

24         MR. KAPLAN:  Can he do that, Judge, if they haven't

25 been admitted and start showing photographs?

Frank Thornton                              50

1          MR. GRADY:  He's going to admit exhibits through

2     himself what he did as far as the full files.

3          MS. SEN:  I think two issues, Your Honor.  One is

4     that the extent to which there are folders on the computer.

5     So, for example, our client has folders related to his family

6     members and other -- you know other people who are totally

7     unrelated to the case and so the Government -- the exhibit that

8     they have offered is sort of unredacted and it has like, you

9     know, 30 folders on it, some of whom appear to be related to

10    women who have testified, many of which are not, and so I don't

11    see how those would be relevant.

12         THE COURT:  But he's trying to show how he winnowed

13    down -- reduced exactly what this is, just the process by which

14    he approached figuring out what files --

15         MR. GRADY:  Two other things, Your Honor.  Pam Scott

16    -- no one in this case is related to Pam Scott.  So to the

17    extent that he has pictures of himself and his family that

18    shows his user profile, that's one.

19         THE COURT:  I thought there wasn't much coming from

20    the Pam Scott files.  I thought it was all from Cassandra.

21         MR. GRADY:  They are from both.  I would say the

22    majority came from Pam Scott and other women exist.  We do have

23    accounts that show the continuing prostitution business and to

24    the extent that he has other women in his lineup it goes

25    directly to that count in the indictment.

Frank Thornton                              51

1          MS. SEN:  What I'm concerned about is that Marilyn

2     Epp is going to testify and I think it's complicated, Your

3     Honor, because the issue is they are going to try to show, for

4     example, that there's this library of women, but the majority

5     of women haven't testified.  Some of these folders contain

6     pictures of women who sent him photos.  Some of them contain

7     photos that were downloaded from different web sites, and so to

8     show this lineup and then to have Marilyn Epp use it as an

9     exhibit in its entirety I think is problematic because it

10    suggests something beyond what I think the Government -- what's

11    relevant in the case.

12         MR. GRADY:  A lot of the photos involving women who

13    testified were within this lineup folder.

14         THE COURT:  Do you really have to introduce the

15    photos of people who are not testifying?

16         MR. GRADY:  No and we're not -- we don't intend to be

17    introducing it.  For example, there's 125 different women

18    listed in this lineup.  We're not going to go through 125.

19    We're just going through the ones that involve the women who

20    testified in this case.  Now we'll show the jury his Pam Scott

21    was organized just to show he's using it, but we're not going

22    to go through women.

23         THE COURT:  Isn't it prejudicial to actually, as

24    you're going through this analysis of what he did, showing the

25    list of 125 women?

Frank Thornton                          52

1          MR. GRADY:  No, Your Honor, it's not showing them.

2    It's actually just showing file folder.  It's 125 and I'm not

3    going to show 125.  I'm just going to show a snapshot of it.

4    It's just a folder name with various names, Matt Grady or

5    whoever else.  That's all you're going to see.

6          THE COURT:  The question is whether the jury sees it

7    as an offer of 125 names and then they think oh my gosh 125

8    women are involved.  That is pretty prejudicial.

9          MR. GRADY:  Your Honor, it also goes to -- I would

10   say it goes to the Travelodge account, we have to show this as

11   a continuing course of conduct and he didn't just offer people

12   for prostitution for one day.

13         THE COURT:  Is there a way that you can have him

14   describe what he did and exclude reference to all -- to this

15   particular set of files?

16         MR. GRADY:  I think so, Your Honor.  I would have to

17   look.  For this witness I just have a four-page exhibit that

18   shows how the Pam Scott user was organized because I think that

19   it is beneficial for the jury to see.  There may be one page

20   that involves the lineup.  I would have to look at it, Your

21   Honor.  I don't have it in front of me so I can't talk about

22   it.

23         THE COURT:  I'm concerned about the prejudicial

24   impact of listing 125 women because that -- the logical

25   response to that from the jury is oh my goodness there were 125

Frank Thornton                              53

1    women.

2              MR. GRADY:  Sure.  I mean if the Court wants, I can

3    remove that page from the exhibit and then just not show it and

4    publish it.

5              THE COURT:  Good.  Okay.

6              MR. KAPLAN:  Do you want to show us the exhibit?

7              MR. GRADY:  Yes.  Natasha has it.

8              MS. SEN:  It's kind of the entire exhibit because you

9    take screenshots as you scroll down.  So those are several

10   pages.

11             MR. GRADY:  The first one just shows the Pam Scott

12   and Cassandra and then it shows how it was organized within Pam

13   Scott.  So I think the lineup one isn't until the very end.

14             THE COURT:  That's fine as long as you don't get into

15   the prejudicial impact.

16             MR. GRADY:  Sure.

17             MR. KAPLAN:  Judge, I had thought any picture he

18   wanted to introduce they have to show it's relevant, and I

19   believe what the Court said it is relevant if he had said he

20   was going to use picture against someone.

21             THE COURT:  Against someone?  No.

22             MR. KAPLAN:  If he was going to threaten to expose

23   some of these pictures.

24             THE COURT:  I thought authenticity.  You're not

25   talking about the authenticity foundation?

Frank Thornton                              54

1          MR. KAPLAN:  No.

2          THE COURT:  They have to show --

3          MR. KAPLAN:  I'm talking about whether it's relevant

4    -- whether a particular picture is relevant.

5          THE COURT:  That goes without saying.

6          MR. KAPLAN:  So they have this witness start talking

7    about pictures and showing a mess of pictures.  How do we know

8    that's relevant to the charges?

9          THE COURT:  Well it's not being offered to introduce

10   those photographs.  It's being offered to show what he did and

11   how he did it.

12         MR. KAPLAN:  Can he talk about what he did without

13   showing pictures?

14         THE COURT:  As I said 125 -- list of 125 women is

15   prejudicial.  I don't know what else you're going to show.

16         MR. GRADY:  I'm going to show pictures related to

17   people who have already testified that he found in the hard

18   drive.

19         MR. KAPLAN:  So what?  Why is that relevant?

20         THE COURT:  Oh I think that's relevant.  That ties up

21   Ms. Epp's testimony.

22         MR. KAPLAN:  Didn't we have a motion on this and the

23   Court issued a ruling about how those pictures would come in?

24         THE COURT:  I don't know frankly, but they are not

25   being introduced at this point.  You're just talking about a

Frank Thornton                         55

1   lineup of images and how they are used in the course of Epp's

2   testimony.  We can have this fight again.

3          MS. SEN:  There may be a continuing objection, Your

4   Honor.

5          THE COURT:  Okay.  All right.  So go ahead.

6          MR. GRADY:  May I have a moment?

7          THE COURT:  Okay.

8   [End of bench conference]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Frank Thornton                           56

1          MR. GRADY:  One moment, Your Honor?

2          THE COURT:  Yes.

3    BY MR. GRADY:

4    Q.    Okay.  Mr. Thornton, I think when we last left it we

5    were talking about user accounts and I believe we were talking

6    about two of them, Pam Scott and Cassandra?

7    A.    Yes.

8    Q.    Turning to the Pam Scott user profile can you give the

9    jury a sense of how many photos were found in that user

10   profile?

11   A.    The majority of the photos that were found on the

12   computer were --

13          MS. SEN:  Objection, Your Honor.

14   BY MR. GRADY:

15   Q.    Just the total number of images.

16          THE COURT:  Okay.  Just the total number of images.

17   A.    About 19,000 I believe.

18   Q.    Was there a folder within Pam Scott labeled me?

19   A.    I believe so, yes.

20   Q.    Mr. Thornton, how would you describe the organization of

21   the Pam Scott user profile?

22   A.    It was fairly well organized, especially in the area of

23   the pictures.

24   Q.    Approaching you, Mr. Thornton, with a folder.  Several

25   different exhibits.  What I want you to do is take a look at

Frank Thornton                              57

1  exhibit 69 for identification.  Do you recognize 69?

2  A.     Yes I do.

3  Q.     What is it?

4  A.     It's screenshots that I made based upon the hard drive

5  under examination.

6  Q.     Does that show basically the folders within the Pam

7  Scott user profile?

8  A.     Well the initial one shows the user organization and

9  then from there it's broken down.

10          MR. GRADY:  Your Honor, at this time the Government

11  moves to admit and publish 69.

12          THE COURT:  Any objection?

13          MR. GRADY:  Subject to the fourth and final page.

14          THE COURT:  Yes.

15          MS. SEN:  That's fine, Your Honor.

16          THE COURT:  Okay.  Admitted.

17  [Government exhibit 69 admitted]

18  BY MR. GRADY:

19  Q.     And, Joanne, if you can switch from Elmo to counsel

20  table, all right.  Let's try to focus on blowing up the top of

21  the page.  Okay.  Great.  Can you tell the jury essentially

22  what they are looking at in the screenshot?

23  A.     Yes.  This is an organization view of the main hard

24  drive that is being looked at under examination.  Specifically

25  we're looking at the second partition which is what most users

Frank Thornton                                    58

1   would call their C drive, and from there you can see it's
2   broken down into various folders, and the users folder has been
3   expanded out so you can see the various user accounts that are
4   under that.
5   Q.    And I see the number 49 next to users if I look here on
6   the left.  What does that 49 indicate?
7   A.    It indicates from that point on that at that level
8   there's something on the order -- excuse me -- of 49 folders or
9   files.
10  Q.    And I take it we see some of those on the right and
11  we've mentioned about number one which is the Cassandra profile
12  and number 7 which is the Pam Scott profile; is that right?
13  A.    That's correct.
14  Q.    If I look back on the left, I see that there's a 100
15  next to Cassandra and under Pam Scott there's 103.  What does
16  that indicate?
17  A.    Again it's an indication on number of files and folders
18  you're going to start to see at the next level below on each of
19  those profiles.
20  Q.    Okay.  If we can turn to page 2, Government exhibit 69,
21  we'll focus in --
22          MS. SEN:  Actually, Your Honor, may we please
23  approach again and have the exhibit taken down for a moment?
24          THE COURT:  I'm sorry.
25          MS. SEN:  Can we please approach again?

Frank Thornton                                    59

1            THE COURT:  Yes.  Okay.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Frank Thornton                          60

 1  [Bench conference].

 2           MS. SEN:  Mr. Kaplan and I were looking through this

 3  more carefully and as we go through it, you know, there's

 4  references to, for example, Marie and other places and on this

 5  -- I'll let the Court look through it, but the names of the

 6  folders I think will be highly prejudicial.  If they are just

 7  putting Mr. Thornton on for the purpose of these photos, I

 8  don't think that we have to go through this entire lineup.  It

 9  seems highly prejudicial.  The photos that are called, you

10  know, stripper, other things that you can read that I don't

11  want -- the Court can read that I think are very, very

12  prejudicial.

13           MR. KAPLAN:  If you look on the left-hand column,

14  it's even worse I think.  There's all kinds of suggestive stuff

15  listed there.  I just don't see the relevancy.

16           MR. GRADY:  Your Honor, we could redact that

17  information out.  What I'm trying to do is a lot of the photos

18  of the victims and people who testified are in the lineup

19  folder.  So I'm just trying to give the jury the picture of the

20  organization of the Pam Scott user profiles so they know it

21  actually is his Pam Scott as opposed to Brian Folks and just

22  give them an indication of the hard -- where in the hard drive

23  these images were found.

24           THE COURT:  Okay, but do you need to put in -- let's

25  see -- a number of what appears may be prejudicial portions.

Frank Thornton                          61

1   For instance, 24 standing ass shots.  26 called tight shorts.

2   I mean there's a number of things here.

3            MR. GRADY:  Sure.

4            THE COURT:  How can we expedite this --

5            MR. KAPLAN:  Judge.

6            THE COURT:  -- to describe exactly what he did in

7   regard to Pam Scott without getting into all of this?

8            MR. GRADY:  Sure.  What we can do, Your Honor, is

9   just blow up and publish the part that goes to 15 which is the

10  lineup folder.  This can be redacted at some break or

11  something.

12           MR. KAPLAN:  Judge, can I make a suggestion?

13  Ultimately what they want to do is introduce some videos and

14  some pictures so I understand why we're going through this.

15  This particular witness found those, took them off, and gave

16  them to Epp.  So why don't they say what he did and then go to

17  Epp.

18           THE COURT:  I think there's some simple way --

19           MR. KAPLAN:  We don't need any of this.

20           MR. GRADY:  Well then I just want to preempt the

21  argument defense will make at closing well this wasn't his

22  computer because --

23           MR. KAPLAN:  I'm not going to say it wasn't his.

24           MR. GRADY:  All right.

25           THE COURT:  So just it can be all he did was take off

Frank Thornton                          62

 1  the photos and --

 2          MR. GRADY:  I'll have him talk about a handful of

 3  photos and some things in the history and he can be off.

 4          THE COURT:  Fine.

 5          MS. SEN:  Publish to the jury.

 6          MR. GRADY:  Yes, the ones he pulled off because he's

 7  going to talk about dates modified, dates accessed, dates

 8  taken.

 9          THE COURT:  Well he can testify about that because

10  that's important that you establish those facts, but are you

11  going to use images which are inflammatory?

12          MR. GRADY:  No.  I would say there's probably a dozen

13  images that are coming in through him, but they are all

14  relevant to the case.  They involve the victims.  They are on

15  the hard drive.

16          THE COURT:  Why do you have to go through 12?  I

17  understand it would be important to show the image and then

18  show exactly -- I call it metadata, but I mean it's important

19  for him to say -- aside from that he isn't testifying about

20  what he found.

21          MR. KAPLAN:  How can he testify to what's relevant

22  and what isn't?

23          THE COURT:  Just one or two and move on.

24          MR. GRADY:  We'll do that because there's some things

25  that file names have changed and dates created and modified are

Frank Thornton                              63

1   different for some pictures, but appear to be the same.  I was

2   going to have him explain that.

3              THE COURT:  All right.

4              MS. SEN:  I think that's beyond his qualification,

5   Your Honor.  I don't think he's qualified to testify about -- I

6   mean he said that he didn't have training to talk about how

7   pictures arrived on the computer, dates they are modified or

8   access to anything else.  I mean he really only is here to

9   testify, is my understanding, based on what he extracted and I

10  don't think he can testify --

11             THE COURT:  Don't you think he should be able to

12  testify.  It was pretty obvious.  I mean the dates and images

13  were taken, the dates that they were downloaded, just to

14  explain to the jury what that is.

15             MR. KAPLAN:  Judge, what I would suggest instead of

16  introducing the pictures show him the picture as an exhibit and

17  we'll allow him to say when it was modified, when it was taken,

18  but not introduce it through him and introduce it through Epp.

19  I don't think he can say a picture is relevant or not.

20             THE COURT:  No, but you know that it's coming in

21  through Epp.

22             MR. KAPLAN:  Not necessarily because I think Epp has

23  to know it's relevant.

24             THE COURT:  I think you should be able to testify

25  about the background data that supports it.

Frank Thornton                    64

1            MR. GRADY:  Okay.

2            THE COURT:  I don't see it's particularly prejudicial

3    to use as an example, a photograph, so if you do one or two,

4    that's fine.

5            MR. GRADY:  I'll probably admit the photos, but just

6    focus on a couple of them.

7            THE COURT:  They are admitted tentatively.

8            MR. GRADY:  Right.

9            THE COURT:  That's fine.

10            MR. KAPLAN:  Can the pictures just be admitted

11    because he found them?

12            THE COURT:  They are being admitted tentatively and

13    he can use them to describe that metadata.

14            MR. GRADY:  And it could be displayed to the jury to

15    have him show it?

16            MR. KAPLAN:  Someone has to show it's relevant at

17    some point.

18            THE COURT:  Yes, right, and if they don't, all that

19    testimony will be stricken.

20            MR. KAPLAN:  I look forward to that.

21    [End of bench conference]

22

23

24

25

Frank Thornton                                    65

1          THE COURT:  Okay.

2   BY MR. GRADY:

3   Q.      Mr. Thornton, did you find any telephone calls that

4   appeared to have been recorded and placed on the hard drive?

5   A.      Yes I did.

6   Q.      How did you find these recordings?

7   A.      That was through a process known as carving.

8   Q.      Where did you find them on the hard drive?

9   A.      It would have been in the unallocated space.

10  Q.      What does unallocated space mean?

11  A.      It would have -- unallocated space would be the area

12  where files that basically have been abandoned and there's

13  chunks of them left behind.  They don't necessarily have file

14  names any more.  Depends on what has happened to them, the

15  pieces -- they are pieces of files and when we do carving we

16  essentially put pieces of files back together and see if it

17  comes up with a viable file.

18  Q.      Could you determine when these calls were made or when

19  they had been recorded?

20  A.      You can't because of the fact that the file names and

21  the time stamps, all that have been removed.

22  Q.      Did you point out these recordings to anybody?

23  A.      I believe I pointed them out to Analyst Epp.

24  Q.      Next topic area, Mr. Thornton, is can you explain to the

25  jury what MAC time data is?

Frank Thornton                              66

1   A.     Yes.  Mac is the acronym for the modified access and

2   created times, that are time stamps that are put on files.

3   Most files under the Windows systems have all three of those.

4   A lot of times they are the same because the file is created

5   and it's modified and it's also accessed all at the same time,

6   but those time stamps tend to get modified as the file system

7   does something to a given file.  For instance, if it gets

8   copied or moved to a different place, those file stamps will

9   get modified.

10  Q.     What about dates taken?  If the photo has a date taken,

11  what does that signify?

12  A.     Well that's a little bit different in that that's

13  usually internal to the file itself.  It's what we call

14  metadata which is data about data.  Usually there's a separate

15  time stamp for a camera device that records it within the file

16  itself that says that given picture was taken at a given time

17  and date.

18  Q.     Does this information exist for all files?

19  A.     The Mac files it does.  It does not necessarily for

20  other files.

21  Q.     Why not?

22  A.     It depends really on the file.  For instance, as I said

23  pictures a lot of times have that based on the fact that the

24  camera's got that information built in.  Other files don't

25  necessarily have anything that really relates to that kind of

```
                         Frank Thornton                        67
 1    thing.
 2    Q.     Would the copy of the hard drive that you gave to Ms.
 3    Epp -- would it contain any Mac time data or dates taken if it
 4    exists for a given photo?
 5    A.     Yes.
 6    Q.     See if we can walk through just a couple of examples to
 7    see what you're talking about.  I would like for you to take a
 8    look at Government exhibit 74 for identification.  Do you
 9    recognize exhibit 74 for identification?
10    A.     Yes.
11    Q.     What is it?
12    A.     This is a series of photographs that I found in part on
13    the hard drive and it's notations made according to each
14    photograph for information pertaining to when it was taken, the
15    model of camera if it was used, and so forth.
16           MR. GRADY:  Your Honor, at this time the Government
17    moves to admit and publish 74.
18           THE COURT:  And you are admitting those for the
19    purpose of describing to the jury at this point what metadata
20    is?
21           MR. GRADY:  Yes, Your Honor.
22           THE COURT:  Is that correct?
23           MR. GRADY:  Yes.  Mac time data.
24           THE COURT:  Mac time data, okay, for that limited
25    purpose.
```

Frank Thornton                              68

1            MS. SEN:  The picture itself is not being published;

2    is that correct, Your Honor?

3            THE COURT:  Well the picture is being published.  I

4    assume that you have to publish the picture with the notations.

5            MR. GRADY:  Yes, Your Honor.  It makes it easier to

6    see exactly what we're talking about.

7            THE COURT:  So it is, but also the Government is

8    proffering that this would be coming in anyway by a different

9    witness; is that correct?

10           MR. GRADY:  Yes, Your Honor.

11           MS. SEN:  My understanding based on our discussion is

12   that this would not be all of the photos it would just be a

13   selection?

14           MR. GRADY:  Yes.

15           THE COURT:  Just a very few?

16           MR. GRADY:  Yes, Your Honor.  I'm going to go 74-004.

17           THE COURT:  All right.  With those limitations any

18   objection?

19           MS. SEN:  No, Your Honor.

20           THE COURT:  Okay.  So admitted.

21   [Government exhibit 74 admitted]

22   BY MR. GRADY:

23   Q.    Mr. Thornton, we're going to show you 74-004 and let's

24   just highlight the information on the bottom of the page if we

25   can blow that up.  Okay.  So can you walk the jury through what

Frank Thornton                                    69

1   this information shows?

2   A.     Yes.  This information shows the file name under the

3   Windows system which is My Cars 34292.JPG.  JPG is indicative

4   that it is a photographic type picture.

5   Q.     Let me stop you right there, Mr. Thornton.  Who labels a

6   file name My Cars 3492?

7   A.     Well the information to the left of the period is

8   usually something that the user has some control over.

9   Sometimes this is manually entered by the user.  Sometimes it's

10  a madeup name that is generated by the camera or the device.

11  It can be either way.

12  Q.     Okay.

13  A.     The information to the right side is usually assigned by

14  the computer or the device that's creating the file.

15  Q.     Next what does file location mean?

16  A.     File location is where it's located within the hard

17  drive.

18  Q.     What about date taken?

19  A.     Date taken this is information that is metadata that's

20  put in by the device.

21  Q.     And I see the final item says camera make/model and it

22  says Samsung-SM-G920A; is that correct?

23  A.     Yes that is.

24  Q.     Was there a phone that was seized as part of this case

25  along those same lines?

```
                    Frank Thornton                        70
```

1    A.    Yes.   There was a Samsung G920.

2    Q.    Can you say with a hundred percent certainty if that

3    particular phone took this picture?

4    A.    I cannot.

5    Q.    Why not?

6    A.    As I recall we were not able to get in any detailed

7    information from that phone and couldn't make a determination

8    if any photographs had been taken and transferred to the

9    computer.

10   Q.    If I remember your testimony from Thursday, I believe

11   you tried to extract data from the phone but you were unable to

12   do so?

13   A.    That's correct.

14   Q.    Are you aware if members of the DEA were able to extract

15   data from that phone?

16   A.    My understanding is they were able to extract some

17   limited data.

18   Q.    Do you know why they would be able to extract data but

19   you would not be able to?

20   A.    They use what is known as a media transfer function

21   that's built into a lot of devices and I try and avoid that

22   because it's not necessarily forensically sound.

23   Q.    And the final example I would like to use is -- let me

24   take 74 back for a minute, Mr. Thornton.  I want to go to

25   74-007, and again we'll just focus on the information that is

Frank Thornton                                    71

 1  on the bottom of the page and blow that up for you.  I just

 2  want to focus on the third line, date modified.  Could you

 3  describe what occurs that would make the date modified?

 4  A.    The date modified indicates that the file was

 5  manipulated in some way at that time.  It depends completely

 6  upon what might have manipulated it; could have been a copying

 7  process, could have been a writing process where it was looked

 8  at in a given program or application and written back to the

 9  hard drive.  It's hard to tell exactly.

10  Q.    All right.  We'll go ahead and close out 74.  The final

11  topic area, Mr. Thornton, is were you able to locate any

12  internet browser history from the hard drive?

13  A.    Yes I was.

14  Q.    Can you describe for the jury how you were able to do

15  that?

16  A.    The program that I used, Forensic Explorer, has a

17  capability to go through and pull out different pieces of data,

18  one of which is browser histories.

19  Q.    I would like for you to take a look at Government

20  exhibit 75 for identification.  What is 75?

21  A.    75 is a table of some selected pieces of browser history

22  from Chrome which is a particular processor.

23  Q.    Do you remember the particular user profile that you

24  found that internet history from?

25  A.    I believe this was also under the Pam Scott, but I'm not

Frank Thornton                          72

1  sure.

2  Q.    Is it fair to say 75 is a subset of total number of web

3  sites that were visited?

4  A.    Yes.

5        MR. GRADY:  Your Honor, at this time the Government

6  moves to admit and publish 75.

7        THE COURT:  Any objection?

8        MS. SEN:  No, Your Honor.

9        THE COURT:  All right.  So admitted.

10 [Government exhibit 75 admitted]

11 BY MR. GRADY:

12 Q.    We'll see if we can make the information on 75 a little

13 larger.  First of all, can you just describe for the jury what

14 the columns mean; last time visit, URL, and title?

15 A.    Yes.  The last time visit or last visit time is when the

16 history recorded that a given site or given URL was visited by

17 the browser.  The URL is the resource locator and it's what

18 commonly people would call the web site or the web address, and

19 then the title, title is what's embedded in that page for the

20 title, and that is typically what would -- someone on the

21 browser would see on the top of the page.

22 Q.    I just want to focus on a couple of these entries,

23 particularly the second one from the top and also the third one

24 from the top.  Does it appear that payments to Backpage

25 occurred in those URLs?

                    Frank Thornton                          73

1   A.      Yes it does.

2   Q.      And on the fourth entry from the top I believe there is

3   something about yougotposted.com web page and appears a jpeg is

4   being uploaded?

5   A.      Yes.

6   Q.      I also notice URL touch of a classy woman; is that

7   correct?

8   A.      Yes.

9   Q.      And then below another Backpage.  Is the rest of the web

10  sites are visits to Burlington Backpage?

11  A.      Yes.  That's correct.

12          MR. GRADY:  Thank you, Your Honor.  The Government

13  has no further questions at this time.

14          THE COURT:  All right.  We're going to take just a

15  10-minute break at this point, give you a break, and so we'll

16  come back at 5 after and we can begin cross examination -- do

17  you have cross examination?

18          MS. SEN:  Yes, Your Honor.

19          THE COURT:  Okay.  So let's take our break at this

20  point.  Be back in just 10 minutes and we'll go until 12.

21  [Recess 10:54 a.m. - 11:08 a.m.  The following occurred in open

22  court with the jury present]

23          THE COURT:  Okay.  Ms. Sen.

24                      CROSS EXAMINATION

25  BY MS. SEN:

Frank Thornton                              74

1   Q.      Mr. Thornton, when you testified on Thursday you talked
2   about how you had taken a certified computer examiner
3   certification and you had been certified as a computer
4   examiner; is that correct?
5   A.      Yes.
6   Q.      And isn't one of the core competencies tested by that
7   examination maintaining the integrity of evidence?
8   A.      Yes.
9   Q.      And one way that you document the integrity of evidence
10  is by documenting the chain of custody?
11  A.      Yes.
12  Q.      So your digital forensic report of five devices, which
13  is your report that covers the computer here, that covers your
14  examination of the computer, isn't that correct?
15  A.      Yes.
16  Q.      The report doesn't indicate when you received the
17  computer, does it?
18  A.      It was in my notes.
19  Q.      Actually could I have you take a look at that?
20  A.      Sure.
21  Q.      I'm going to show you -- I think the Government's
22  already marked it as an exhibit.  Does it indicate the date you
23  actually received the computer along with the date you examined
24  it?
25  A.      This is not the notes, but this indicates when I

                    Frank Thornton                           75

1  examined it.

2  Q.     But the report itself doesn't indicate when you received

3  the computer, does it?

4  A.     No.

5  Q.     So your report lacks one of the key pieces of

6  information that a digital forensic report should have, doesn't

7  it?

8  A.     It lacks the date.

9  Q.     The date that you received the computer, isn't that

10  correct?

11  A.     Yes.  Yes.

12  Q.     And based on your training and certification you

13  understand that powering on a computer seized as evidence

14  violates all industry accepted standards for examining -- for

15  handling a computer, isn't that correct?

16  A.     Yes.

17  Q.     Because the integrity of the computer is at issue?

18  A.     Yes.

19  Q.     You can't certify, for example, knowing that the

20  computer has been powered on that it's in the same state that

21  it was on when it was seized, isn't that correct?

22  A.     That's correct.

23  Q.     And that's because when you power on a computer whether

24  inadvertently or intentionally it creates changes to the

25  computer, isn't that correct?

```
                        Frank Thornton                      76
```

1   A.     Yes.

2   Q.     And it compromises the integrity of the entire device,

3   right?

4   A.     I wouldn't say it compromises the entire device, but it

5   is certainly something that you want to be aware of.

6   Q.     And wouldn't it be a red flag to you if you were aware

7   that a computer was powered on before you received it for

8   examination?

9   A.     Yes.

10  Q.     But you didn't document that in your report, did you?

11  A.     No I did not.

12  Q.     And you were aware of it because the agent who powered

13  it on told you that, right?

14  A.     Yes.

15  Q.     And in fact the prosecutor was aware of it to your

16  knowledge?

17  A.     Yes.

18  Q.     And the case agents were aware of it?

19  A.     Yes.

20  Q.     But you didn't bother to disclose that in your report,

21  did you?

22  A.     No.

23  Q.     And one of the reasons that there's a concern with

24  powering on a computer is because of what happens to the

25  unallocated space on the hard drive, isn't that correct?

Frank Thornton                              77

1    A.     Yes.

2    Q.     So, for example, if a computer is powered on and files

3    are created they will get written to that unallocated space on

4    the hard drive?

5    A.     Yes.

6    Q.     And oftentimes there can be evidence on the unallocated

7    space on the hard drive that has evidentiary value; is that

8    correct?

9    A.     Yes.

10   Q.     And, in fact, you testified that you found evidence of

11   value in the unallocated space on this computer, didn't you?

12   A.     Yes.

13   Q.     So if files were created when that computer was powered

14   on, it certainly is possible that other files were deleted that

15   may have had evidentiary value?

16   A.     It's possible.

17   Q.     And, in fact, even with some of the best forensic tools

18   that are available you don't know what was deleted, isn't that

19   correct?

20   A.     That's correct.

21   Q.     So in your analysis you noted that the end user of this

22   computer visited various web sites?

23   A.     Yes.

24   Q.     And I'm going to show you what's been marked as

25   Government exhibit 75.  It's already been admitted.

Frank Thornton                                    78

1              THE COURT:  Do you want to shift that to the Elmo?

2   BY MS. SEN:

3   Q.      So you talked about this web site here yougotposted.com.

4   What is yougotposted.com?

5   A.      I have no idea.

6   Q.      So you have no idea what happens on that web site?

7   A.      I do not.

8   Q.      And you noted that you said that there were payments

9   made to Backpage based on these entries?

10  A.      That's what it appears to be, yes.

11  Q.      Well isn't it just that a user visited those Backpage

12  web sites?  You don't actually know that a payment was made, do

13  you?

14  A.      No.  I can only tell that they went to the payment page.

15  Q.      Okay, but you can't tell that a payment was actually

16  made, isn't that correct?

17  A.      The transaction is not shown.

18  Q.      And, in fact, you don't know whether these visits to

19  Backpage here, these entries, you don't know whether that was

20  someone just visiting the web site, downloading files or

21  unloading files, isn't that correct?

22  A.      That's correct.

23  Q.      All it shows was that Backpage was visited on those

24  dates?

25  A.      Yes.

Frank Thornton                              79

1   Q.      And, in fact, this information that you extracted from

2   the computer this wasn't contained in any report, was it?

3   A.      No.

4   Q.      So this is just something you created free form and

5   provided to the prosecutor?

6   A.      That's correct.

7   Q.      Let me ask you this.  When you received the computer

8   what did the prosecutor ask you to do?

9   A.      I was asked to examine it for any potential evidence and

10  then I would then discuss it with Miss Epp to determine what

11  might be evidence for her and extract data for her to further

12  look at.

13  Q.      Did the prosecutor ask you to look for exculpatory

14  evidence?

15  A.      No they did not.

16  Q.      You didn't look for any exculpatory evidence on this

17  computer?

18  A.      I keep it in mind.

19  Q.      But keeping it in mind and looking for it are two

20  different things?

21  A.      Well I wouldn't say that it's necessarily two different

22  things.  You're looking for evidence and in the past when I

23  found exculpatory evidence I would point it out.

24  Q.      Well let me ask you this.  You didn't do a complete

25  forensic examination of every piece of this computer, did you?

Frank Thornton                          80

1   A.      No I did not.

2   Q.      So there's certainly areas of this computer that could

3   have exculpatory evidence that you did not examine, isn't that

4   fair to say?

5   A.      That's correct.

6   Q.      So Mr. Grady went over with you something that I think

7   you described as a report and it is Government's exhibit 74.

8   Would you like me to show it to you?

9   A.      Yes please.

10  Q.      I think this is your report.

11  A.      This seems to be two, but yes.  Okay.

12  Q.      And it's fair to say that the exhibits in Government's

13  exhibit 74 are taken from that report?

14  A.      Yes.

15  Q.      So you're familiar with them?

16  A.      Yes.

17  Q.      Now that report sitting in front of you it's undated; is

18  that correct?

19  A.      Appears to be.

20  Q.      It contains no case summary?

21  A.      No.

22  Q.      It contains no description of what tasks you were asked

23  to perform?

24  A.      No.

25  Q.      It doesn't contain an evidence list?

Frank Thornton                          81

1   A.     No.

2   Q.     It does contains no description of the actual work that

3   you did?

4   A.     No.

5   Q.     It has no explanation of your findings?

6   A.     No.

7   Q.     It contains no conclusions?

8   A.     No.

9   Q.     Wouldn't you agree that doesn't even meet the minimum

10  standards for a forensic report?

11  A.     I wasn't asked for -- in this particular piece for a

12  full forensic report.

13  Q.     Well don't you call it that on the cover, sir?

14  A.     It's just a cover page.

15  Q.     Okay.  So the report or not report, as you call it, it

16  contains a number of images that you extracted from the

17  computer?

18  A.     Yes.

19  Q.     And it appears that you identified some metadata in some

20  of these images?

21  A.     In some, yes.

22  Q.     Can you identify any images that were taken from devices

23  that were actually seized in this case?

24  A.     No I could not.

25  Q.     So you don't know whether any of those pictures were

Frank Thornton                                   82

1    taken by phones that were seized from Mr. Folks; is that

2    correct?

3    A.      No I do not.

4    Q.      And your report it doesn't contain any information about

5    when these files were either saved or modified on the computer?

6    A.      No.

7    Q.      And you can't identify whether these images were

8    downloaded from a web site or uploaded from a camera or cell

9    phone?

10   A.      No I cannot.

11   Q.      Now you also conducted an examination.  You testified

12   about -- on Thursday about the Samsung SMG 920A cell phone

13   seized in this case?

14   A.      Yes.

15   Q.      And when you received the phone you were aware that DEA

16   had already conducted an examination of the phone, isn't that

17   correct?

18   A.      I'm not sure I was aware at that point, but I was made

19   aware at some point.

20   Q.      And your own report related to that phone indicates that

21   you were not able to access the phone --

22   A.      That's correct.

23   Q.      -- because it was locked, but you were able to obtain a

24   phone book and contact list?

25   A.      Yes.

                        Frank Thornton                        83

1   Q.      How?

2   A.      That was contained within the sim card in that phone and

3   that's a separate sub examination, if you will, where the sim

4   phone or the sim card is extracted from the phone, plugged into

5   a forensic piece of software, and that information is

6   extracted.

7   Q.      And were you eventually able to conduct an examination

8   of this phone?

9   A.      I was not.

10  Q.      And, in fact, you failed to find evidence on the phone

11  that the DEA found?

12  A.      As I said previously, they did a different type of

13  examination which I usually try and avoid.

14  Q.      And because it's not forensically sound?

15  A.      Correct.

16  Q.      And you also testified about a Nokia cell phone?

17  A.      Yes.

18  Q.      And that you testified that you could not forensically

19  examine it using traditional forensic tools?

20  A.      That's correct.

21  Q.      And you described a process by which you powered on the

22  phone and you took pictures of various items of interest on the

23  screen, isn't that correct?

24  A.      Yes.

25  Q.      Didn't that process create changes to the phone?

Frank Thornton                                     84

1   A.     It does.  It's usually accepted practice with phones

2   that you're allowed to turn them on knowing that some changes

3   will take place.

4   Q.     And did the pictures you take reflect all of the user

5   data present on the phone?

6   A.     I believe the pictures I took were of all the available

7   data that I could see at that point.

8   Q.     So you described the process by which you disassembled

9   the phone, you soldered wire onto it, and then in order to

10  extract data.  Does that sound right?

11  A.     Yes.

12  Q.     What risks to the data does that kind of disassembling

13  and soldering of the phone create?

14  A.     Well potentially you can destroy all the data.

15  Q.     And you didn't find any data on that phone, did you?

16  A.     Yes I did.

17  Q.     Well at this point if anyone else wanted to examine that

18  phone you have essentially destroyed that evidence, isn't that

19  correct?

20  A.     No.  They could still hook up the wires and conduct the

21  same type of examination.

22  Q.     Isn't that the kind of examination that's done only with

23  very specific training?

24  A.     Yes.

25  Q.     And you have -- have you undergone such training, Mr.

Frank Thornton                                      85

1   Thornton?

2   A.      I have had some online training in that and I have a

3   long history of disassembling electronics and working with them

4   down right to the transistor level.

5   Q.      Is it possible that your examination destroyed evidence

6   on that phone?

7   A.      No.

8   Q.      You're -- you want to certify that in your testimony

9   then?

10  A.      Yes.

11  Q.      Okay.  So you talked about hash values and how you know

12  the integrity of a device that you correctly copied something

13  is based on the hash value?

14  A.      Yes.

15  Q.      You take a hash value before you copy it and then you

16  take a hash value after you copy it?

17  A.      Yes.

18  Q.      And isn't a hash value basically a number that's created

19  from sort of a mathematical number that's assigned to all of

20  the ones and zeros that make up all the data on a hard drive?

21  A.      Yes.

22  Q.      So that if it's one number off, it means you haven't

23  correctly copied it?

24  A.      That's correct.

25  Q.      But the hash values that you obtained through the

Frank Thornton                            86

1   examination of this computer weren't contained in the report,

2   were they?

3   A.    No.

4   Q.    Wouldn't that be important to document?

5   A.    It's contained in the notes.

6   Q.    Well the notes aren't part of your report, are they?

7   A.    No.

8   Q.    And, in fact, given your training wouldn't that kind of

9   information need to be put into a report, Mr. Thornton?

10  A.    I believe it's optional.

11  Q.    Mr. Thornton, in criminal cases you have generally only

12  testified for the prosecution, isn't that fair to say?

13  A.    Generally.

14  Q.    In fact, you see yourself pretty closely aligned with

15  the prosecution as a former law enforcement official, isn't

16  that fair?

17  A.    Somewhat.

18  Q.    Fair to say that you're a professional prosecution

19  witness?

20  A.    I wouldn't say that.  I have had some things go to

21  criminal defense.

22  Q.    What?

23  A.    There was a case last year I worked on where the

24  defendant was charged both criminally and civilly and in that

25  situation I was able to extract some data that showed he was

Frank Thornton                          87

1   not in the area that was claimed and the police were incorrect

2   in determining that.  Charges were dropped.

3   Q.    Now during the Government shutdown in January of this

4   year it appears that you offered to assist anyone at the U.S.

5   Attorney's Office or law enforcement who might need help

6   because of the failure to pay -- the Government's inability to

7   pay their salaries?

8   A.    Yes.

9   Q.    Did anyone take you up on that offer?

10  A.    No.

11  Q.    If they had, wouldn't that have been a significant

12  conflict of interest for you to testify in any federal case?

13  A.    Potentially and I discussed it with the U.S. Attorney,

14  but I had also made that same offer to several other law

15  enforcement agencies.

16  Q.    Did you make the same offer to Federal Defender's

17  Office?

18  A.    No.  Don't know anybody there.

19          MS. SEN:  May I have a moment please, Your Honor?

20          THE COURT:  Yes.

21          MS. SEN:  Nothing further, Your Honor.

22          THE COURT:  Okay.  Any redirect?

23          MR. GRADY:  Yes, Your Honor.

24                     REDIRECT EXAMINATION

25  BY MR. GRADY:

Frank Thornton                          88

1    Q.    Mr. Thornton, I want to ask you a few questions related

2    to the turning on of the computer first.  Is it your

3    understanding that the computer was powered on in early

4    February 2017 before it was in your possession?

5    A.    Yes.

6    Q.    To your knowledge has that modified any of the dates

7    that the Government seeks to introduce?

8    A.    No.

9    Q.    Has it impacted any of the dates that the files were

10   accessed prior to February 2017?

11   A.    Could you repeat that?

12   Q.    Sure.  I'll try to simplify it.  Maybe this is an easier

13   way to talk about it, Mr. Thornton.  What sort of files were

14   impacted or created when the computer was turned on in February

15   2017?

16   A.    It appeared to be all temporary files or files that were

17   pertaining to the system startup.

18   Q.    In other words, if there was a file that predated

19   February 2017 and the Mac time data predates February 2017,

20   have those files been impacted by the turning on of the

21   computer?

22   A.    No.

23   Q.    There was questions about whether a file that was found

24   on the computer can be matched to a phone device.  Do you

25   remember those questions?

Frank Thornton                          89

1    A.     Yes.

2    Q.     Is it safe to say unless you have a matching metadata in

3    the phone you can't say with a hundred percent certainty

4    whether that's the same image on the computer hard drive?

5    A.     There's been some work done and there are some tools

6    available that might be able to do it to some extent under some

7    circumstances, but generally no you cannot.

8    Q.     And unless you have those tools you're not going to be

9    able to tell one hundred percent if they do or do not match the

10   ones on the hard drive?

11   A.     That's correct.

12   Q.     Were you able to get internet browser histories from the

13   phones that you examined?

14   A.     I believe so.  I believe there was some data, but I

15   don't believe -- I don't remember it being significant.

16   Q.     Were you tasked with extracting data from the hard

17   drive, Government exhibit 80 for identification?

18   A.     Yes.

19   Q.     Were you asked to provide a copy of that data to the DEA

20   to analyze?

21   A.     Yes.

22   Q.     Did you do exactly that?

23   A.     That's exactly what I did.

24   Q.     Were you asked to do anything else?

25   A.     No.

                   Frank Thornton/Marilyn Epp                    90

1   Q.     Did the hash values match when you extracted the data

2   from the hard drive?

3   A.     Yes.

4           MR. GRADY:  Nothing further, Your Honor.

5           THE COURT:  Okay.  Any recross?

6           MS. SEN:  No, Your Honor.

7           THE COURT:  All right.  Thank you, Mr. Thornton.

8           MR. THORNTON:  Thank you, Your Honor.

9           THE COURT:  All right.  Government want to call the

10  next witness.

11          MR. GRADY:  Yes, Your Honor.  United States calls

12  Miss Marilyn Epp.  Ms. Epp, good morning.  If you can enter the

13  courtroom and go in front of the podium for the clerk to swear

14  you in.

15  Marilyn Epp,

16      Having been duly sworn, testified as follows:

17          THE COURT:  Good morning, Ms. Epp.

18          MS. EPP:  Good morning, Your Honor.

19                     DIRECT EXAMINATION

20  BY MR. GRADY:

21  Q.     Good morning, ma'am.  Can you go ahead and state your

22  name and spell it for the court reporter?

23  A.     Marilyn Epp.  M-A-R-I-L-Y-N.  Last name is E-P-P.

24  Q.     Miss Epp, what do you currently do for a living?

25  A.     I've a professor at the University of Maine.

Frank Thornton/Marilyn Epp                    91

1    Q.     How long have you been a professor up there?

2    A.     Since August of 2018.

3    Q.     What did you do prior to August 2018?

4    A.     I was an intelligence analyst for the DEA.

5    Q.     How long did you -- how long were you an intel analyst

6    for the DEA?

7    A.     Just over six and a half years.

8    Q.     Can you describe some of the duties and responsibilities

9    you had as an intel analyst at the DEA?

10   A.     A lot of what I did was analyzing evidence.  I would

11   analyze phones, social media, I helped find people, I conducted

12   witness interviews, supported investigations.

13   Q.     Where did you serve as an intel analyst in the DEA?

14   A.     I got on with DEA at their headquarters in Washington,

15   D.C. for a short time.  I -- then I went down to the southwest

16   border of Mexico and Texas and El Paso, and then I finished in

17   Burlington, Vermont.

18   Q.     As part of your intel analyst duties do you use

19   Facebook?

20   A.     Yes.

21   Q.     Did you actually have an undercover Facebook profile?

22   A.     Yes.

23   Q.     Why?

24   A.     To surveil people within the Facebook application.

25   Q.     Can you describe to the jury some of your training that

Frank Thornton/Marilyn Epp                    92

1  you went through to become a DEA analyst?

2  A.    Every intel analyst for the DEA has to attend a 12-week

3  training at the DEA academy where you go over a lot of phone

4  analysis, of course, legal standards, intelligence tradecraft,

5  social media exploitation, use of commercial and law

6  enforcement databases to establish patterns of life, and

7  subsequent to that there's ongoing continuing education,

8  training, and similar disciplines.  A lot of intel

9  communications and social media analysis.

10 Q.    Can you tell the jury about your educational background

11 prior to becoming a DEA agent -- analyst?

12 A.    I have a Bachelor's degree in forensic biology and my

13 Master's degree is in intelligence and national security.

14 Q.    Ms. Epp, how many investigations would you estimate you

15 have been involved with when you were a DEA intel analyst?

16 A.    How many investigations?

17 Q.    Overall, yes, that you were part of throughout your six

18 and a half years.

19 A.    At least a couple hundred.

20 Q.    Now I want to turn back to your time when you were here

21 in the Burlington office.  Did you become involved in

22 investigation into Brian Folks?

23 A.    I did.

24 Q.    When did you become involved in that?

25 A.    December 2015.

Frank Thornton/Marilyn Epp                    93

1   Q.    What was your role in the investigation?

2   A.    I was the intelligence analyst for the investigation.

3   Q.    What sort of things did you do for the investigation?

4   A.    A lot of witness interviews and social media

5   exploitation research, identifying potential witnesses, helping

6   to track them down.

7   Q.    Did you also look at -- analyze phones and analyze

8   electronic evidence?

9   A.    Yes.

10  Q.    Has part of your role in the investigation been to

11  review a Facebook account of a Moet Hart?

12  A.    Yes.

13  Q.    How did you become aware of this Facebook account?

14  A.    It was brought up by witnesses that we interviewed early

15  on in the investigation and I -- we were told that his -- Brian

16  Folks moniker was Moet Hart or Moe or Moet, and I was able to

17  locate a profile by that name with a matching profile picture

18  on Facebook.

19  Q.    Who were the pictures of?

20  A.    Brian Folks.

21  Q.    Was all of the information on this Facebook page

22  publicly available?

23  A.    No.

24  Q.    Did you friend Moet Hart?

25  A.    I did.

Frank Thornton/Marilyn Epp                          94

1   Q.      How does that work?

2   A.      You click a button, it says friend request or add

3   friend.  It's changed over the years, but you just click a

4   button and then the Facebook automatically generates a request

5   to that person and they choose to accept or deny it.

6   Q.      Did you do this from your undercover Facebook profile?

7   A.      I did.

8   Q.      Why did you friend Moet Hart?

9   A.      To gain access to other pictures that weren't publicly

10  available if there were any.

11  Q.      Do you recall when you did this?

12  A.      It would have been early 2016.  Maybe as late as late

13  December 2015.

14  Q.      Did you monitor this account for a period of time?

15  A.      I did the entire investigation.

16  Q.      Did law enforcement obtain a search warrant for the Moet

17  Hart Facebook account?

18  A.      Yes.

19  Q.      Was that served upon Facebook in March 2016?

20  A.      It was.

21  Q.      And did the warrant order Facebook to provide

22  information from May 2015 until when you received it in March

23  2016?

24  A.      Correct.

25  Q.      Did Facebook comply with it?

1  A.    Yes.

2  Q.    Can you describe for the jury the amount of information

3  that you received back from Facebook?

4  A.    When Facebook gives you a warrant -- returns your search

5  warrant they give it to you in a PDF format.  So it was over

6  26,000 pages of PDF -- it was a 26,000 page PDF with user

7  information, friend lists, pictures, correspondence between

8  that profile and other profiles all in PDF format.

9  Q.    Do they provide any videos as part of this return?

10  A.    No.  They only provide PDF.

11  Q.    Did you review the information that Facebook returned

12  with respect to Moet Hart?

13  A.    Yes.

14         MR. GRADY:  Your Honor, continuing permission to

15  approach the witness?

16         THE COURT:  Yes.

17  BY MR. GRADY:

18  Q.    Ms. Epp, I'm handing you a folder of exhibits we may use

19  during your testimony here today.  If you can look at an

20  exhibit labeled 107B for identification.

21  A.    I see it.

22  Q.    What is 107B?

23  A.    It's a packet of pages from the Facebook warrant return,

24  the PDF, and the front page is page 1 of that return.

25  Q.    And have you reviewed this return before today?

Frank Thornton/Marilyn Epp                              96

1    A.    Yes.

2    Q.    Is there information about Brian Folks listed through in

3    some of the passages of this Facebook return?

4    A.    Yes.

5    Q.    Is it fair to say that 107B is a small subset of the

6    26,000 pages that you received back from Facebook --

7    A.    Yes.  Very small.

8    Q.    -- throughout this time?  The Government moves to admit

9    and publish 107B.

10              THE COURT:  Any objection?

11              MS. SEN:  Your Honor, I will object and I will ask to

12   approach please.

13              THE COURT:  Okay.

14

15

16

17

18

19

20

21

22

23

24

25

1            MS. SEN:  Your Honor, there is so much irrelevant

2    material contained in this Facebook record and I don't think

3    that even if she went on as an undercover profile as a friend

4    on this account she cannot authenticate photos, who posted

5    them, or anything else about the content.  She might be able to

6    testify that she served the search warrant and that she looked

7    at these things, but in terms of the actual content she's not

8    in a position to say, for example, some of these are pictures

9    that were taken by other people at other times that got posted

10   and she can't verify any of that.

11           THE COURT:  Well I don't know that and more than that

12   I have no idea what's in the exhibit so --

13           MR. KAPLAN:  Judge, there's so much inflammatory

14   stuff.  There's naked pictures of our client.  I mean there's

15   naked pictures of random women.  There's emails.  There's

16   Facebook messages between our client and people that aren't in

17   the case.  I mean --

18           MR. GRADY:  Well, Your Honor, here's the response

19   trying to put them into different categories.  As far as

20   messages to other people a lot of messages, for example, talk

21   about violating, and so we heard testimony from victims and

22   women who talked about threats to violate and those are shown

23   from defendant's Facebook account.  So that's certainly used to

24   corroborate shared details about violating.  Now we're not

25   admitting the other side of the conversation for the truth of

Frank Thornton/Marilyn Epp                              98

1    the matters.  It's the content full of the defendant's

2    admissions as to violating.

3         Now as far as these photos, some of the photos of the

4    defendant match what's in the hard drive again to show that the

5    hard drive -- to show that he is the user of the hard drive.

6    Now absent a signed stipulation they are going to concede the

7    hard drive is all the contents on Mr. Folks, we certainly have

8    a right to make that connection for the jury as to user

9    attribution because as it stands with Mr. Thornton's testimony

10   it's the user profile.  As far as the jury can know anybody can

11   access this computer, and it was brought out on cross somebody

12   can scrub web sites.  We don't know who it is we're trying to

13   attribute information to the defendant, and as far as

14   connections you see here on the first page the 4614 is listed

15   as the contact number.  That was the phone that was used for

16   all the controlled buys.

17        So certainly when you add everything up, and there's other

18   discussions about the Dodge Durango that the Government found,

19   we're certainly going to use all of that in this particular

20   case.  There's another discussion related to drugs and go see

21   Chrissy.  Again it all relates to parts of the case.  We're not

22   seeking to introduce the whole 26,000 pages, but have probably

23   less than 50 percent that are relevant and that match to other

24   things in the case that the jury needs to consider.

25                THE COURT:  But the difficulty is I have to figure

Frank Thornton/Marilyn Epp                    99

1   out whether you have got material in here which is irrelevant

2   or is prejudicial, et cetera, without going through each one of

3   these pages.  Is there a way that you can approach these

4   exhibits by breaking them down so that the Court can actually

5   review what you're offering?  My only suggestion here is that

6   if you really want to offer 107B, then I've got to spend the

7   lunch hour going through each page to try to determine its

8   relevance or its prejudicial impact.  I'm really concerned when

9   you start talking about 26,000 pages, when you start talking

10  about any large exhibits like this, this is more than 50 pages,

11  how is it workable to introduce this into evidence.

12          MR. KAPLAN:  Judge, it's not the right way to do it.

13  Like with Danielle the Government both had Facebook messages

14  that were relevant just to her in a time frame and they showed

15  them and said yes those are my Facebook messages.  There are a

16  myriad of people and there are allegations that there's talk in

17  there about violating.  How do we know that?

18          MS. SEN:  There's a photo of a hand with a gun.  How

19  do you know whose hand it is?  Whose gun it is?  Where it's

20  from?  I mean -- and the thing is this witness isn't qualified

21  to testify about those things.  The Government had all of its

22  lay witnesses testify and it didn't bring out any pictures.  It

23  brought no Backpage.  It introduced nothing and I don't think

24  they should be allowed now through Ms. Epp to introduce all

25  that.  How can she authenticate the Backpage and authenticate

Frank Thornton/Marilyn Epp                    100

1   this is a picture that I recognize, I was there when the photo

2   was taken, I was there when it was posted?  She can't.

3            THE COURT:  So what you're suggesting is that the

4   Government has put in this exhibit, a hodgepodge of material,

5   which is not connected?

6            MR. GRADY:  Your Honor, it's from his Facebook

7   account.

8            THE COURT:  Well, no, I understand that.

9            MR. GRADY:  And all we're saying is that there's a

10  picture of a handgun that was uploaded on that particular date.

11  She's not going to say like of course nobody knows whose hand

12  it is, who was able to trace the specifics.

13           MR. KAPLAN:  Well what's the relevance?

14           MR. GRADY:  The relevance he posted a picture --

15  uploaded a picture on this page at a specific time relevant to

16  Count II.

17           THE COURT:  I have no idea what's in this exhibit

18  frankly and when you post a potential exhibit which is a

19  compendium I have to go through this exhibit to determine

20  whether it's relevant or not relevant.  Is there any way you

21  could shift the focus of this examination?

22           MR. GRADY:  This is going to be a continuing problem,

23  Your Honor, because, for example, the hard drive -- there's

24  general things that were found in the hard drive that are in --

25  to use the term -- combination similar to this.  So it's going

Frank Thornton/Marilyn Epp                    101

1  to be a continuing issue I'm going to run into.

2          MR. KAPLAN:  I think, Judge, each page is a different

3  exhibit, has to be marked as a different exhibit, and each page

4  has -- of each different exhibit has to be shown.

5          THE COURT:  I'm not so sure each page.  You're

6  talking about each topic?

7          MR. KAPLAN:  Like if there's 10 pages of Facebook

8  messages between him and someone else, mark it, show it to her.

9  If we have an objection, we'll make it.

10          MS. SEN:  I think the other issue, Your Honor, we

11  objected to the introduction of Facebook and Backpage records

12  and the Government says well we have these certificates of

13  authenticity, and I've always -- we've always maintained that

14  we would not object to their admission as the underlying

15  document came from Facebook or Backpage, but we've always

16  maintained the objection to whatever was in the contents of

17  those documents, and I just don't see -- this is exactly why I

18  raised the issue -- I'm not sure how they authenticate the

19  contents of these Facebook records.  Just because it came from

20  his account after serving a subpoena on Facebook doesn't make

21  it admissible or relevant for purposes of this case.

22          MR. GRADY:  It relates to other information that's

23  brought up by the witnesses.  So, for example, Mandy L. talked

24  about being contacted by James Porter.  There's going to be

25  pictures within this Facebook return that Ms. Epp found Jimmy

Frank Thornton/Marilyn Epp                    102

1    Porter's Facebook account that linked it.  So there's

2    information in here that links to other pieces of evidence that

3    we're going to use to authenticate.  Backpage is another good

4    example.  I can't remember if it's in this one or not, but

5    there's pictures on the hard drive that has date taken like,

6    for example, from 7:30 at night and on the Backpage ad that's

7    posted the same date a half hour later, and of course depending

8    on the witness, Keisha will say the defendant was the one that

9    took that picture, and so we have to put those chains together

10   to authenticate the Backpage.

11          MR. KAPLAN:  You're asking her to do something right

12   now that isn't relevant.

13          THE COURT:  There may be pages in here that aren't

14   particularly relevant.  What they are asking you to do is break

15   down exhibits like this to understandable topics.

16          MR. GRADY:  Sure.

17          THE COURT:  Then I can address them so --

18          MR. GRADY:  We've turned over these exhibits.  We've

19   turned over the remaining exhibits that I intend to use through

20   Ms. Epp.  I gave Natasha copy of everything.

21          THE COURT:  I'm going to let the jury go at this

22   point.  Let's talk about this for a little.

23   [End of bench conference]

24

25

```
 1                THE COURT:  All right.  Okay.  I'm going to break at
 2       this point and speak with the lawyers more.  So give you an
 3       early lunch.  It is a lovely day out so we will be -- we'll be
 4       back and start at 1 o'clock and I'm going to stay on the bench
 5       and speak with the lawyers and we'll see you at 1 o'clock.
 6       [Jury leaves at 11:28 a.m.  The following occurred in open
 7       court without the jury present]
 8                THE COURT:  All right.  I'm meeting with the lawyers
 9       at this point.  We're still in open court.  Jury is gone.  So
10       exhibit 107B is essentially a compilation of Facebook and a
11       number of topics are covered.  I have really no clue as to what
12       all of the topics may be included within this exhibit.  So
13       let's talk about a better way of approaching this so that
14       defense is on notice of what exactly the Government is seeking.
15       Actually you can actually be excused at this point because
16       we're talking and be back at one if you can.
17                MS. EPP:  Thank you.
18                THE COURT:  Okay.  You know rather than have a
19       massive compilation, some of which may be relevant some of
20       which may not be relevant, is that extraordinarily difficult
21       for the Government to do, that is divide these into relevant
22       topics and then submit them piecemeal as opposed to all of the
23       Facebook records?
24                MR. GRADY:  If I may have a moment, Your Honor?
25                THE COURT:  Sure.
```

1          MR. GRADY:  For purposes of the Facebook return, Your

2     Honor, it could be broken down into different topic areas, if

3     you will.

4          THE COURT:  Okay.

5          MR. GRADY:  But then the issue is we go to publish

6     them.  It's already been -- I don't know if the Court wants it

7     broken into sub exhibits, but it's not -- obviously hasn't been

8     loaded into the trial laptop or anything like that.  So I don't

9     know if the Court wants us to redo all the exhibits.  I'm not

10    sure the feasibility of that if that's what's required.

11         Part of the difficulty, Your Honor, if I may, is that, for

12    example, on page 8 of 107B, which is Bates 11312, there's an

13    exchange with the defendant between Hector Copeland, and he

14    provides a phone number on December 17, 2015.  Now the reason

15    that's relevant is there's going to be a Backpage ad that the

16    Government intends on introducing later on through Ms. Epp

17    where the phone number is exactly the one listed 310-8797 and

18    that Backpage ad is dated 15 or 14 days after the exchange with

19    Hector Copeland.  It might not be blindingly obvious to the

20    Court on first blush, but it connects to other things in Ms.

21    Epp's testimony later on which is why it's hard to break out

22    because I haven't outlined where the specific pages are that

23    connect it all for the jury.

24         THE COURT:  Okay.  Well just going through the

25    photographs is an example.  I mean you start with photographs I

 1    assume are the defendant or perhaps --

 2              MR. GRADY:  We believe, Your Honor.

 3              THE COURT:  -- somebody else?

 4              MR. GRADY:  Our belief is that they are photographs

 5    of the defendant on his Facebook page and then, for example, on

 6    page 3, Bates 11226, these photographs were found on the Me

 7    Folder on the hard drive.  So again we're going to make that

 8    connection that, you know, part of it is that this is his

 9    Facebook account because he has photos in the hard drive that

10    match what's uploaded on Facebook and also shows the user

11    attribution for the hard drive that he's in fact the one who

12    uses it and not Pam Scott or anybody else who is theoretically

13    possible based on what the jury has seen so far.

14              THE COURT:  Okay.  So just looking at the photographs

15    you have first some initial photographs.  I don't know if

16    that's the defendant or not.  Then you have a number of

17    photographs which I assume are the defendant and including a

18    number of nude photographs.  If you're introducing these

19    photographs to establish the fact that this is the defendant's

20    Facebook account, that can be done with a very simple

21    photograph; 011244 just as an example.  Why do you necessarily

22    have to do the nude photographs of the defendant?

23              MR. GRADY:  Yes, Your Honor, and I think you're

24    referring to Bates 11426.  Well the relevance of those

25    particular photographs is again they were found in the hard

1    drive, but also Ms. Epp, because of her involvement in the

2    case, knows these photographs were taken at 96 Ethan Allen

3    Parkway which is where the search warrant was executed and

4    where drug paraphernalia was found.  So again to the extent it

5    establishes the defendant in that residence so that we can say

6    these -- the drugs that were found there those were his as

7    opposed to any evidence the defense --

8              THE COURT:  Is that controversial?  Is it

9    controversial that he had that particular home?

10             MR. GRADY:  Not necessarily.

11             THE COURT:  I haven't seen them dispute the fact that

12   he used that address.

13             MR. GRADY:  Well, Your Honor, absent a stipulation,

14   though I don't know what's to come in the defense case or what

15   their strategy is or anything of that nature or what evidence

16   they are going to present as to who used 96 Ethan Allen Parkway

17   and whose drugs -- else those could have been, that's why the

18   Government believes this has probative value.

19             THE COURT:  Okay.  Well that's just an example.  Then

20   there's the photograph of the gun.

21             MR. GRADY:  Yes, Your Honor.

22             THE COURT:  So I suppose that you're arguing that's

23   relevant because he would put -- he would put a picture of a

24   gun on his Facebook account.  Does that become character

25   evidence?  Is that 404B -- 404 evidence, not B, exception or

1    are you suggesting that that is the defendant's hand?

2         MR. GRADY:  There's a couple things to that, Your

3    Honor.  Based upon other -- there may be other pictures that

4    have -- I believe actually 49D, which was the evidence

5    involving Mary P. where there was him taking a picture of her

6    buttocks, you might see a similarity in the fingernails.  So

7    the Government could point that out.  Now, of course, we can't

8    say that's the defendant's hand unless you have the entire

9    picture or anything like that, but you can circumstantially

10   make an argument based on other pieces that are in play from

11   electronic evidence.

12        THE COURT:  Then --

13        MR. GRADY:  It corroborates with what the witness has

14   said about the defendant possessing a firearm on different

15   occasions that they know him.  For example, Danielle M.

16   testified that she saw the defendant with a firearm, and of

17   course she was with him in June of 2015.  Then if you look at

18   the dates, it was June 30, 2015 that this was posted to his

19   Facebook account.  So again you have to make those links that

20   aren't going to be blindingly obvious from just looking at

21   Bates 11253, but you can put all those together and that's why

22   the Government believes they are relevant.

23        THE COURT:  So then the vehicles.

24        MR. GRADY:  Yes, Your Honor.  The vehicle, if you

25   remember, Lori C. testified she registered a Durango and she

 1    actually identified the Durango in her testimony as one that

 2    she registered in her name, and I believe in the defense's

 3    opening argument they stated that the car wasn't registered in

 4    his name.  The fact that Moet Hart is offering it for sale less

 5    than a couple months after the traffic stop the Government

 6    believes is evidence that he possessed that car and that's

 7    where the relevance is.

 8              THE COURT:  Okay, and how about the nude images of

 9    various women, are all of those -- are all of those photographs

10    of women who have either testified or the subject of the

11    indictment?

12              MR. GRADY:  No, Your Honor.  So I believe you're

13    referring to the passages that start at Bates 14898.  The

14    purposes of these passages is that Amanda Elizabeth is asking

15    for photos, the defendant responds, and there's passages in

16    there, for example, like on 14902 Bates where the defendant

17    says, you know, I'm not beefing, that's why I'm hesitant about

18    this, and there's also additional conversations with Jen

19    Francis where he talks about, you know, violating, and we're

20    going to get -- we're going to point out the specific parts to

21    the jury about, you know, don't post these pictures I'm going

22    to violate you, and there's a message from Moet Hart where he

23    says I'm going to put your ass on full blast, a direct quote of

24    the defendant.

25              So the Government's view this corroborates what the

 1    victims have testified about being afraid of being violated and

 2    this whole notion of if you violate me I'm going to violate

 3    you.  So, again, the Government is introducing it in that

 4    standpoint and then the other people's responses, Jen Francis,

 5    it's not -- we're not seeking the truth of the matter asserted

 6    just to put the defendant's words in context.

 7                THE COURT:  Okay.

 8                MR. GRADY:  And similar with the conversation with

 9    Sophie Smith -- actually I don't even believe the Government

10    will go into that.  There was a discussion about drugs.  I

11    don't think that that's really an issue in this trial so the

12    Government will probably just plan on skipping that altogether.

13                THE COURT:  Okay.  So I guess what I suggest is that

14    you go through the exhibit during the break, you break it down

15    into various topics.  I mean I've just mentioned a couple of

16    topics which you have responded to, and if you break down the

17    exhibits, you can submit an exhibit, we'll get the defense's

18    response, and then I can rule, but as far as a block of must be

19    a hundred pages here including a lot of text, you know, it's

20    literally impossible for me to be able to say this is relevant,

21    this is not relevant.  Really so can you break it down?

22                MR. GRADY:  We can break it down into chunks, Your

23    Honor.

24                THE COURT:  Okay.  All right.  Let me ask for the

25    defense, your reaction to that.

1          MS. SEN:  I think that would be the first step, Your

2     Honor, but I would just raise with the Court this was an issue

3     we raised before trial about these images coming in, and you

4     know my understanding of the Court's ruling is obviously the

5     Court would look at each image that's coming in and reserve

6     judgment in the order on the motion in limine and --

7          THE COURT:  If they are overly prejudicial, but I

8     also said in my ruling that the Government should be afforded

9     an opportunity to prove its case, and oftentimes that is going

10    to be requiring them to introduce photographs of, you know,

11    young women who may be abused or coerced, et cetera.  It's all

12    relevant to coercion, and that's the difficult balance.

13         MS. SEN:  Well I think one of the things -- well

14    there are two issues, Your Honor.  One is that with respect --

15    because we had raised this issue with respect to the women who

16    are not named in Counts X to XV and at that point why are

17    photographs of these other women necessarily relevant to

18    anything related to force or -- force, coercion of the named

19    women, and my understanding of the Court's ruling on that is

20    that the women whose photographs they were attempting to

21    introduce testified, or if there was evidence that these women

22    somehow feared the defendant or, you know, there was a pattern,

23    you know, you would certainly allow the Government to establish

24    that pattern through those photos, but I don't think there's

25    been that testimony in this case.  I haven't heard witnesses --

1    I mean the only ones that have -- that are outside the women in

2    Counts X to XV are Mary P., Chrissy T, and I don't believe

3    there are any photos related -- there may be, I don't know, and

4    I'm trying to think, and Jasmine A. and Mandy, but aside from

5    those four women I don't see how pictures -- and I think that

6    we would sort of have to look to see each picture because I

7    would have to go back and review their testimony to determine

8    what they said about photos being taken.  I don't know -- I

9    just don't know how photos -- I'm not certain how those photos

10   are relevant.  I'm not certain how photos of anyone outside the

11   women who testified are relevant.

12           THE COURT:  You saw this exhibit.  Are there

13   photographs of women who are not included in the indictment or

14   the four others that you have just noticed who had testified,

15   aside from those are there photographs of other people?

16           MS. SEN:  I would have to go through it more

17   carefully, Your Honor.  I think you have my copy of it so I'll

18   certainly look at it.

19           THE COURT:  Oh really.

20           MS. SEN:  But -- and the other issue, Your Honor, is

21   we have always maintained that the contents of these photos

22   have to be authenticated, and I do not understand how -- I've

23   never understood how Marilyn Epp could authenticate these

24   photos.  I mean she has no personal knowledge of any of them.

25   I don't see how anyone just scrolling through Facebook can

1 verify that this is a photo of such and such person taken on

2 such and such a date in that place.  I just don't understand

3 that and maybe I'm missing something and I don't know the

4 evidence rules that well, but from what I understand, Your

5 Honor --

6    THE COURT:  But she's testified that she was a part

7 of the investigation more than just looking at the downloads

8 from the computer.  In fact, she testified that she's

9 interviewed a number of witnesses during the course of her

10 functioning as an analyst and investigator.  So I think

11 assuming that she is -- participated actively in the

12 investigation she may very well be able to identify people.

13    MS. SEN:  Well I don't know that she will be able to

14 identify anything that was posted on Backpage.  I don't

15 understand how she could authenticate a Backpage ad, Your

16 Honor.

17    MR. GRADY:  Your Honor, what she's going to testify

18 to law enforcement subpoenaed Backpage, they received these

19 results back from Backpage, and we're not going to introduce

20 all of the Backpage ads.  We're just going to introduce ads --

21 for example, an ad of Keisha of January 2nd, 2016 where the

22 images that are in the ad appear to be the same or similar to

23 images that were found on the defendant's hard drive, and that

24 actually that if you look at the data, the pictures were taken

25 at like 7:30 p.m. and the ad was posted at 8 p.m.  So it was

1    taken within a half hour of being posted.  So you have to put

2    those things together, which again she can do as being part of

3    the investigation to introduce that Backpage ad.

4                THE COURT:  Okay.

5                MR. GRADY:  If I may, Your Honor, again she is going

6    to testify and she met many of the women.  The fact is that the

7    critical part of the testimony is that she found -- she went

8    through all of the data from the defendant's hard drive and

9    then she found pictures of Katelynn or Danielle, et cetera, and

10   then the time -- the Mac time stamp will be what it is as far

11   as that, but it connects to the defendant's hard drive.  Then

12   I'll change topics, the final one about Facebook, the images of

13   other women.  It's related to the defendant talking about

14   violating people or hesitating to violate people because he

15   doesn't have a beef with them.  Now again the point or the

16   relevancy of that information is to corroborate the victims'

17   accounts of being violated or this reputational harm they

18   didn't want such images being blasted like the image of Hannah

19   performing oral sex on the defendant.

20               THE COURT:  I appreciate that, but the difficulty is

21   that when you actually talk about threats to other people who

22   are not involved in the litigation directly you then have to be

23   able to show that the people who are impacted by that, that's

24   the victims as you call them, victims in this particular case,

25   knew that this happened, and knew that the Facebook issue, knew

1    the commentary about them being violated was related.  That's

2    why I had generally made a demarcation between threats that

3    were made to the people who are witnesses in this particular

4    case as opposed to the others because you have to make that

5    other link and it becomes more tenuous.

6           MR. GRADY:  Sure and the final point I would say

7    that, for example, Ayla talked about, you know, those threats

8    and she -- we introduced exhibit 36 which was the Backpage ad

9    referencing negative information about Jerrika and what this

10   information does is it corroborates Ayla A.'s account of that

11   being a well rounded fear because here's an example of the

12   defendant's own words, you know, talking about it with other

13   people.

14          THE COURT:  Well in regard to the statements that

15   were made to Ayla that obviously is relevant.  If in fact Ayla

16   was Rebecca who never testified and there's no evidence to

17   suggest that Rebecca would have told other people, and even if

18   that's the case, that becomes much more tenuous, that's --

19   that's much more problematic.

20          MR. GRADY:  Yes, Your Honor.

21          THE COURT:  And I'm wondering whether there is a more

22   logical way of addressing this.  For instance, the photographs.

23   They may be photographs of some of the witnesses.  If you can

24   divide up logically everything related to Ayla and everything

25   related to Jasmine or everything related to whatever --

1          MR. GRADY:  And we have done that, Your Honor.  We've

2   broken it out between the different witnesses.  I would say of

3   the bulk exhibits, 107B is one of them, probably the other one

4   I can think of off the top of my head is 68 which is going to

5   be another set of information extracted from the defendant's

6   hard drive more about a general overview or a general focus

7   other than specific.

8          THE COURT:  So maybe the logical way of approaching

9   this is you've got this bulk exhibit.  You could divide this up

10  into 10, 12, 15 topics, and if you let me know what the topics

11  are and what the pages are which are relevant to the topic, let

12  the defense know what the pages are that are relevant to the

13  topic, then we can take them one by one and, you know, that

14  would suggest I would have a more manageable approach to

15  figuring out what's relevant and what isn't.  This is what's in

16  that 107B and we're going to go through 1, 2, 3, 4, 5, et

17  cetera, that would be really helpful.

18         MR. GRADY:  Okay.

19         THE COURT:  All right.  So I've asked you to do that

20  at lunch.  You don't need to eat, do you?

21         MR. GRADY:  It's optional sometimes, Your Honor.

22         THE COURT:  Right.  Okay, and then can we meet here

23  at 1 o'clock.  The jury will have to start a little while and

24  you tell me what you're going to have to go through here and

25  this is your copy, Miss Sen.  So do you have another copy?

```
1           MR. GRADY:  Yes, Your Honor.  Would you want one,
2    Your Honor?
3           THE COURT:  Yes and I'll just give that to Ms. Sen
4    and I'll spend the noon reading it as well.  Okay.  Let's be
5    back at 1.
6    [Recess at 12:12 p.m.]
7
8                  C E R T I F I C A T I O N
9
10
11
12       I certify that the foregoing is a correct transcript
13    from the record of proceedings in the above-entitled matter.
14
15
16
17
18   May 6, 2019
19   Date                          JoAnn Q. Carson, RMR,CRR
20
21
22
23
24
25
```

**Capitol Court Reporters, Inc. (800/802) 863-6067**