UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
           V                 *
                             *
BRIAN FOLKS                  * CRIMINAL FILE NO. 16-94



JURY TRIAL
Monday, May 6, 2019
Burlington, Vermont



BEFORE:

     THE HONORABLE WILLIAM K. SESSIONS III
        District Judge



APPEARANCES:

     WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
        MATTHEW T. GRADY, ESQ., Assistant United States
        Attorneys, Federal Building, Burlington,
        Vermont; Attorneys for the United States

     MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
        Suite 405, 95 St. Paul Street, Burlington,
        Vermont; Attorney for the Defendant

     NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
        Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

<u>**I N D E X**</u>

**E X A M I N A T I O N**

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **MARILYN EPP** | | |
| Direct by Mr. Grady | 28 | 2 |
| Voir Dire by Ms. Sen - Re: 50D | 70 | 22 |

**E X H I B I T S**

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 34C | Hard drive file path screenshot of My Cars 2530 | 126 |
| 36A | "Bad Girl Practices" Backpage ad | 85 |
| 44 | "A Touch of Classy Women" video | 63 |
| 44B | Screen shot of "A Touch of Classy Women" video | 61 |
| 44C | Hard drive file path screenshot of "A Touch of Classy Women" video | 62 |
| 47B | Hard drive N-66 exhibits: Hannah A. | 96 |
| 48D | Backpage records exhibits: Mandy L. | 125 |
| 49A | DMV photo of Mary P. | 113 |
| 50C | Facebook record exhibits:  Keisha W. | 66 |
| 53B | Hard drive N-66: Danielle M. | 76 |
| 53C | DMV photo of Danielle M. | 77 |
| 54B | Hard drive N-66 exhibits: Ayla L. | 79 |
| 54D | Backpage records exhibits: Ayla L. | 80 |
| 67 | Screenshots of Jimmy Porter Facebook profile page | 32 |
| 87C | Photographs of black leatherette daily planner | 55 |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 90 | AT&T subscriber information for (802) 825-4614 | 118 |
| 90A | (802) 825-4614 Summer 2015 - January 2016 frequency list | 120 |
| 102 | Chart of hotel records | 116 |
| 104 | Anchorage Inn records | 68 |
| 105 | Ho Hum Motel records | 68 |
| 106 | Sprint subscriber information re: (203) 738-9434 | 103 |
| 107B.1, B.3, B.7, B.12 | Moet Hart Facebook extracts | 34 |
| 108 | Motel 6 records | 68 |
| 109 | North Star Motel records | 68 |
| 110 | Quality Inn records | 68 |
| 111 | Quality Inn records | 68 |
| 117D | Hard drive file path screenshot re: video of Hannah A. | 129 |
| 118 | Carved call:  Carved_3GP_25843376 | 123 |
| 119 | Carved call: Carved_3GP_70118528 | 124 |
| 124 | Walnut video preamble - My Cars 3431 | 131 |
| 124B | Hard drive file path screenshot of walnut video preamble My Cars 3431 | 130 |
| 125 | Walnut video - IMG-0105.wav | 133 |
| 125B | Hard drive file path screenshot of walnut video - IMG_0105.wav | 132 |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 126B | Hard drive file path screenshot of My Cars 3314 video (KW urination video) | 134 |
| 126C | Still photograph from Exhibit 126 video | 134 |
| 127C | Still photograph from Exhibit 127 video | 133 |

1    MONDAY, MAY 6, 2019

2    (The following was held in open court without the jury

3    present at 1:05 p.m.)

4              THE COURT:  Okay.  This is a hearing outside

5    the presence of the jury.

6         I have had a chance to go through 107B.  I have

7    divided that up into 13 different sections, and I want

8    to tell you what my initial reaction is to the various

9    submissions made by the government.  Then I will -- and

10   the reason I do that is we have to move along since the

11   jury is waiting, and they have waited quite a bit of

12   time today.

13        First, the introduction page, which is right -- the

14   first page on 107B.  I think that should be admitted.

15        Second, there's a whole series of pictures.  I

16   assume that they're all pictures of the defendant.

17   Purpose of the exhibits goes to show that the Facebook

18   account is his.  I will permit the introduction of the

19   photograph in the lower section of 011244.  I think

20   that's sufficient to establish his identity.  The rest I

21   am going to exclude as essentially overly prejudicial.

22        Then the next section is what I call random pages.

23   And it's the -- I mean, I can't figure -- the baseball

24   caps, I just can't figure what Hector Copeland has.  I

25   am going to ask for an explanation from the government

1   in that regard.

2       Next, the gun.  The problem with the introduction

3   of the gun is that he is charged with a gun count, and

4   there's a hand there, and there's no showing that this

5   is his hand.  It becomes extraordinarily prejudicial,

6   and because there is a gun count in this particular

7   case, and, in fact, the gun's a Beretta, so I am going

8   to exclude that.

9       The cars, in particular, the Durango, is clearly

10  relevant.  That's -- we have had a chance to look at

11  Natalie Oxox's messages with the defendant, and this all

12  relates to him taking ownership of the Dodge Durango,

13  which is relevant because the gun's found in the glove

14  compartment and in the trunk, split between the

15  bullets -- or the clip.  So anyway, that's relevant.

16      The other two cars -- and I assume that this is not

17  particularly prejudicial, but I don't know what the

18  other two cars are about, so I was going to ask for

19  explanation about that.

20      Then there's a picture of 11372 and there's also

21  two pictures at 11271 and 272.  I think, you know, those

22  are irrelevant.  Unless there's some linkage to the

23  picture on 11372, it seems to me irrelevant.  Then

24  Natalie Oxox's testimony seems admissible because it

25  establishes his ownership of the car.

1       Then there's messages from Amanda Elizabeth, and

2   essentially it -- she -- of course Amanda never

3   testified, and so this is -- and she was not a subject

4   of a charge, and this talking about photographs being

5   shown or transferred from the defendant to Amanda at

6   Amanda's request, I just don't understand the relevance

7   of that, frankly, so exclude that.

8       I read all of Jean Francis's testimony.  There's

9   two middle sections toward the end about threats --

10  well, she actually said, "I'm concerned about you

11  violating me," et cetera.  That's showing these

12  pictures.  I don't know who Jen Francis is, and I just

13  think that is extraordinarily tenuous at best, and so I

14  would exclude that.

15      I have to ask about Tyler and Nicola messages.

16  Again, there seems to be women asking for photographs.

17  This is not the defendant trying to violate people, so

18  my initial reaction was not to admit that.

19      Then there's some photographs of people I don't

20  recognize.  365 and 314 and 315, I don't -- unless those

21  are linked to somebody who is a part of the indictment

22  or who testified, I just don't think that that's

23  relevant.

24      316, I want to ask about the Tyler and Nicola

25  messages, and also Sophie Smith is a name that I've

1    never heard before, and I don't know what in the -- what

2    the relevance is.  Anyway.  So I would exclude that.

3        That's my initial reaction.  I am going to ask for

4    the government's response to these various divisions of

5    the exhibit, but I also want to say that the story is,

6    you know, pretty much out there, and this is where, you

7    know, people start reaching for the kitchen sink, and I

8    just don't know that it's necessary.  But that's for you

9    to decide.

10        Okay.  All right.  Mr. Grady, you want to go

11    through these various --

12            MR. GRADY:  Yes, your Honor.  I will just

13    focus in on a few pieces of information.

14            THE COURT:  Okay.  Can I just go through the

15    introduction page.  That's -- you really want that.

16            MR. GRADY:  Yes, your Honor.  The changes that

17    you have -- that you have made, the government tracks

18    all that, and I was going to bring up a few areas that

19    sounds like the Court is -- is not including, and I am

20    just going to mention the relevance of those.

21            THE COURT:  Okay.

22            MR. GRADY:  And so the first one I was going

23    to focus on is Bates number 11312, which is a

24    conversation I believe with -- if I can find it here.

25    It was the one with Hector Copeland.

```
1              THE COURT:  Okay.
2              MR. GRADY:  And the reason why that phone
3    number is particularly relevant is, again, the
4    government plans on introducing a Backpage ad involving
5    photographs of Keisha, because again, our understanding
6    is that the defendant is telling Hector Copeland, "This
7    is my phone number," and then two weeks later it's in
8    the Backpage ad of who to contact for --
9              THE COURT:  So that's all you are introducing
10   that for.
11             MR. GRADY:  Exactly, your Honor.
12             THE COURT:  Have you introduced his phone
13   number from other sources?
14             MR. GRADY:  Not this particular phone number.
15   We have certainly introduced the 461 phone.
16             THE COURT:  Right.
17             MR. GRADY:  4614.  But this (802) 310-8797,
18   that has not been talked about by anybody, and that's
19   why this Facebook --
20             THE COURT:  Okay.
21             MR. GRADY:  -- return will link it to a
22   Backpage ad involving Keisha --
23             THE COURT:  Okay.
24             MR. GRADY:  So we would ask it to be admitted
25   for that purpose, and we have --
```

1          THE COURT:  It's a very short exhibit.  Right.

2     Okay.

3          MR. GRADY:  And we have relabeled that 107B.3,

4     because we have also done it in different chunks.

5        The next one 11311.  It's the 4614 phone number.

6     And again, that's the phone number that all the

7     controlled buys were used to, so it's just more

8     ownership of 4614.

9          THE COURT:  Yeah, I don't -- that duplicates

10    what you have got many times.

11         MR. GRADY:  Okay.  That's fine, your Honor.

12         THE COURT:  Okay?

13         MR. GRADY:  Yes, your Honor.

14       The next area that I want to focus on is Bates

15    11372, and it appears to be a screenshot of a Burlington

16    Backpage ad.  You will notice, your Honor, that it was

17    uploaded on June 18th, 2015, and why that's important is

18    that is the same time period that Danielle was working

19    for the defendant from the Ho-Hum Motel, and she talked

20    about how the defendant took pictures of her and posted

21    her on Backpage.

22       We believe that is relevant to show that usage of

23    Backpage by the defendant occurred during the time that

24    Danielle was working for the defendant.

25         THE COURT:  Okay.  Well, it's 11372.

1          MR. GRADY:  Yes, your Honor.  It's the bottom

2     one.  We blacked out the top part, which was, I think, a

3     photograph of -- of someone's butt.  I don't know

4     because we have actually blocked it out and we have

5     relabeled it 107B.6, and again, the only part that is

6     relevant is that bottom Backpage screenshot on June

7     18th, 2015, because it connects to Danielle.

8          THE COURT:  All right.  So that --

9        Okay.  I will look for 11 -- or 372.  Okay.

10          MR. GRADY:  Okay.  The next set is 11271 and

11     11272, which we have --

12          THE COURT:  Right.

13          MR. GRADY:  So these are pictures that --

14        Okay, can you show them?

15          THE COURT:  Yeah, there's 271, 272.

16          MR. GRADY:  Yes.

17          THE COURT:  There's two sections --

18          MR. GRADY:  Yes.  There's two pages of

19     photographs, and what we --

20          THE COURT:  Okay.  I did have -- can I go

21     back.

22          MR. GRADY:  Sure.

23          THE COURT:  372 I have.

24          MR. GRADY:  Okay.

25          THE COURT:  What is the relevance of this

1    bottom, should I say?

2             MR. GRADY:  It's not, your Honor.  We have

3    redacted it.

4             THE COURT:  Oh, all right.

5             MR. DARROW:  Here's a set of the government's

6    relabeled exhibits which he is working off of.

7             THE COURT:  Okay.

8             MR. DARROW:  May be easier for reference.

9             THE COURT:  Okay.

10            MR. GRADY:  So, yes, your Honor, referring to

11   107B.6, and the copy that you have should have a

12   redacted -- the top picture, which, again, the

13   government's not seeking to introduce.

14            THE COURT:  Okay.

15            MR. GRADY:  What we are seeking is the bottom

16   screenshot of Backpage, and next to it you will see an

17   uploaded date of June 18th, 2015.  That corresponds with

18   the week that Danielle M. was in the employ of the

19   defendant, and that's why we seek the relevance there

20   because she will -- she talked about being photographed

21   by the defendant and put on Backpage, and we believe

22   this supports that testimony.

23            THE COURT:  This is pre- -- oh, I'm sorry.

24        This is -- I'm sorry.  This is 372?

25            MR. GRADY:  107B.6, Bates 11372.  And I think

1    the version that your Honor should be looking at is, in

2    the Facebook record page -- I think it's 1805.  There's

3    a screenshot of Burlington Escort's Backpage titled

4    "Good Girl Gone Sexy."

5              THE COURT:  Right.  So it's not for the

6    purpose of the telephone number, which of course is

7    not -- which must be blocked out, at least in part; it's

8    the fact that you had on his Facebook account a screen

9    copy of Backpage.

10             MR. GRADY:  Yes.  If you go to the right side,

11   page 1806, of the Facebook business records, you will

12   see an uploaded date of 20150618.  So basically June

13   18th, 2015.  It's all part of the same page, your Honor.

14             THE COURT:  Okay.

15             MR. GRADY:  And again, it's our understanding

16   that was uploaded on June 18th, 2015.  So the fact that

17   a Backpage ad was found on the defendant's Facebook

18   records corresponding with the week that Danielle M.

19   testified she was working for the defendant is relevant

20   to both Danielle's count and to Count 16, which is the

21   Travel Act violation.

22             THE COURT:  Okay.  What's 11271 relevant for?

23   And 272?

24             MR. GRADY:  Yes, your Honor.

25        You are referring to 107B.7.  We anticipate Ms. Epp

1    will testify that as part of her duties, she had an
2    undercover Facebook account, and that these photos are
3    exact matches of a Facebook account belonging to a Jimmy
4    Porter, and you may remember the testimony of Mandy
5    Latulippe who talked about how Jimmy Porter is the one
6    who put her in touch with the defendant, and there
7    should be also Backpage records that come back to Jimmy
8    Porter, and based upon also evidence that was found on
9    the hard drive, we believe or at least the government's
10   view is that Jimmy Porter is just an alias used by the
11   defendant.
12            THE COURT:  And so you want to --
13            MR. GRADY:  That's to connect it --
14            THE Court:  -- to introduce these photographs
15   to say that because it was on Ginny Porter's -- or
16   compared to Ginny Porter, that connects Ginny Porter to
17   the defendant?
18            MR. GRADY:  Yes.  And there's also evidence on
19   the hard drive of the defendant having fake -- it's the
20   defendant's photo but essentially a fake ID in the name
21   of Jimmy Porter that, again, also establishes that link,
22   and you will see Jimmy Porter --
23            THE COURT:  Where is that photo?
24            MR. GRADY:  That's going to be --
25            THE COURT:  Which is that photo?

1           MR. GRADY:  That's going to be in Government

2    Exhibit 68.  So it's not in 107 --

3           THE COURT:  All right.  So you will be able to

4    show that by that linkage.  Okay.

5           MR. GRADY:  Yes.

6           THE COURT:  All right.

7           MR. GRADY:  Or further links.

8           THE COURT:  Yes.

9           MR. GRADY:  And then the only other thing I

10   would mention, your Honor, is that Jen Francis is

11   actually a defense witness, and the photo of, you know,

12   some of the women in 11313 after hers is Tori Jackson,

13   which is another defense witness.  So I guess to the

14   extent that they testify, the government reserves the

15   right to --

16          THE COURT:  Call them.  Okay.  All right.  So

17   you agree not to introduce Sophie Smith's texts.  You

18   agree that --

19          MR. GRADY:  We do agree about Sophie Smith,

20   and I just want to go back, your Honor, one moment to

21   the exchange involving Tyler and Kayla Herd.

22        There was a photo that was sent of Hannah

23   performing oral sex, which is the same photo that Keisha

24   had already identified.

25          THE COURT:  It's already been introduced.

1          MR. GRADY:  Yes.

2          THE COURT:  Right.  That photo has already

3    been introduced.  That's the same photo that you have --

4          MR. GRADY:  Yes.

5          THE COURT:  -- here so you don't need that.

6    Okay?

7          MR. GRADY:  Okay.

8          THE COURT:  All right?

9       Okay.  All right?

10          MS. SEN:  Your Honor, the only thing I would

11    say is that the 107B.3, which is the phone number and

12    the exchange with someone named Hector Copeland, you

13    know, when Keisha Willard was on the stand, the Court --

14    I'm sorry, I said her last name.  There was -- I think

15    the government at that time had shown her a Backpage ad

16    and said, you know, was this a picture -- you know, the

17    defendant take it?  And she admitted she posted it, and

18    the Court kept it out.

19       So I don't know why -- unless the Backpage ad is

20    actually posted by our client, and when we have

21    testimony from witnesses who have said that our client

22    did not post those ads, I am not sure about the linking

23    up here.

24          THE COURT:  Well, the importance is that

25    there's a photograph of the Backpage ad which is in his

1    Facebook.  Isn't that the relevance of what they are

2    suggesting?

3           MS. SEN:  Well, I don't know that there's a

4    photograph in the Backpage ad.  I think it's the

5    Backpage ad -- I mean, my understanding, and I could not

6    be understanding this correctly, but my understanding

7    for the introduction of this particular record is to

8    link it to a Backpage ad that the Court previously

9    excluded.

10          THE COURT:  Okay.  So --

11          MR. GRADY:  If I could?

12          THE COURT:  Go ahead.

13          MR. GRADY:  I think it's easier just to lay it

14   out because there's a few different links, so it may

15   just be easier to lay it out.

16       So the one link is this phone number.  So this

17   phone number appears in a Backpage ad that the

18   government will seek to introduce.

19       The second link is there are photos in the Backpage

20   ad of Keisha.  The third link is that these photos are

21   similar to photos found on the defendant's hard drive,

22   and if you look at the time -- or the time taken of the

23   photo, it says essentially 7:30 p.m.  And then the

24   fourth link is that the Backpage ad is at eight p.m.,

25   about a half hour later.

1    So if you put it all together, the government
2    intends on making the argument that the photo found on
3    the defendant's hard drive, which was taken at 7:30, was
4    then used a half hour later to -- in this -- post this
5    Backpage ad and tells people to call this phone number,
6    310-8797, which we believe is relevant to Keisha -- she
7    was not solid on the actual dates, but too, also
8    relevant to the Travel Act, which is again the use of a
9    facility of interstate commerce such as Backpage to run
10   the prostitution business.
11             THE COURT:  Okay.  So let me go to the cars.
12             MR. GRADY:  Yes.
13             THE COURT:  I understand the Dodge Durango.
14   What is the relevance of the two other photographs of
15   cars?
16             MR. GRADY:  Oh, yes, your Honor.  107B.12.
17        So in this exchange, the recollection is that
18   Natalie is asking -- or there's, basically, Do you have
19   cars to sell?  And on 11304, the defendant responds, a
20   Saturn and Dodge Durango, even though it's spelled
21   Gurango.  So he is basically offering two cars for sale,
22   the Durango and the Saturn.
23             THE COURT:  Okay.
24             MR. GRADY:  So that's why you have that --
25             THE COURT:  Okay.  So you are linking that up

```
1     to Ox -- Oxum?  Oxis?
2               MR. GRADY:  To this discussion about selling
3     the cars.
4               THE COURT:  Okay.  Okay.
5               MS. SEN:  Sorry, your Honor.  I just would
6     like to go back to this Backpage ad with Keisha Willard.
7          So the government is representing that because the
8     photo was taken on a particular time and date, and then
9     it was posted on Backpage -- and she admits that she
10    posted it -- that that somehow links to our client.
11         The problem is that the government isn't
12    establishing when that photo arrived on our client's
13    computer because it's -- it could have arrived, based on
14    the metadata, or the math data in the computer, that
15    photo could have been downloaded at a different time.
16    It wasn't necessary that -- it doesn't prove -- there's
17    no direct link between the fact that there's a photo on
18    our client's computer and there's a photo on Backpage.
19         And, in fact, the time that the photo was taken is
20    going to stay the same wherever that photo lands.  So if
21    it's on a tablet, a computer, a phone, because of the
22    way the file is, it's the file -- it's the data within
23    the picture itself that always is going to stay the same
24    as in the picture was taken at such and such time.
25              THE COURT:  So why is the linkage of time --
```

1    why is the time so important?  I mean, the fact is you

2    have got a Backpage ad, and you have got it on his

3    Facebook.  Isn't that -- isn't that relevant?

4            MS. SEN:  Well, your Honor, actually it's not

5    a Backpage ad.  It's pictures.  So you can't prove that

6    our client uploaded the pictures to Backpage just

7    because they're on his computer.  You have to show the

8    timing.  The timing is important, because he could have

9    down- -- and he has, in fact, in many cases downloaded

10   photos from Backpage.

11           THE COURT:  Okay.  Well, let me just go -- let

12   me go through the exhibits that the government has

13   raised.

14       All right.  First in 107B.1.  The page is

15   admissible.  The photographs -- there's one photograph

16   which is admissible, and that's page Bates 11244,

17   bottom -- the section; otherwise they are denied.

18       107B.2 is also denied.

19       The Hector Copeland statement, 107B.3 -- let me

20   just read this.

21       All right.  It's relevant for the telephone number,

22   and that is admissible.

23       107B.4, that's also Copeland and admissible.

24       107B.5 is the gun, and that is denied for the

25   reasons said.

1        10B.6 *[sic]*, I have got further questions on that.

2        10B.7, can you tell me again the linkage of these

3   photographs through this other person, because you have

4   got other evidence to suggest that he would have used

5   the existence of this name.

6               MR. GRADY:  Sure, your Honor.

7        So there's -- so this photo on the top of Bates

8   11271 -- in the yellow shirt, and this is photo bottom

9   right of 11272, those were in a profile of Jimmy Porter

10  that Miss Epp saw on Facebook.  So that's one linkage.

11  But the other linkage is on the hard drive.  There is a

12  picture of the defendant, and there's several -- that

13  picture was used in several fake IDs in the name of

14  Jimmy Porter.  So the second link is found on the hard

15  drive.  And of course the third link is that Mandy

16  Latulippe testified as to Jimmy Porter being the one who

17  introduced her via Facebook to the defendant.

18               THE COURT:  How are you going to get the image

19  out that is linked, that second approach that you just

20  mentioned?

21               MR. GRADY:  Are you talking about the ones on

22  the Jimmy Porter Facebook page?

23               THE COURT:  Yes.

24               MR. GRADY:  So the testimony is that Ms. Epp

25  is -- as part of her role, she testified before about

1    her undercover Facebook account, and that she went in

2    and saw this Facebook profile of Jimmy Porter, and that

3    these photos are the same as the photos on the Moet Hart

4    Facebook account, and that she printed off a screenshot

5    while she was conducting this activity.

6              THE COURT:  Okay.

7              MR. GRADY:  It's a fair and accurate

8    representation of --

9              THE COURT:  All right.  I will permit you to

10   introduce those.

11             MR. GRADY:  Okay.

12             THE COURT:  The Amanda photographs and

13   dialogue:  She never testified.  She was not a part of

14   the indictment, so I am going to exclude that.  Jen

15   Francis:  I am going to exclude that as well, although

16   if she testifies, then it could be used by the

17   government.

18        107B.10, I don't know who this is.

19             MR. GRADY:  Yes, your Honor.

20        I don't think the government knows either.  We were

21   just presenting it as more evidence of the defendant

22   violating people, but based upon your ruling with Jen

23   Francis and Amanda Smith --

24             THE COURT:  All right.

25             MR. GRADY:  -- it sounds like it's not coming

1     in.

2              THE COURT:  Yeah, I -- that's an excellent

3     judgment on your part.

4              MR. GRADY:  Thank you, your Honor.

5              THE COURT:  Right?

6         All right.  107B.11, it gets into all of the

7     dialogue.  First of all, I don't know who these pictures

8     are.  Do you know who these are?

9              MR. GRADY:  Your Honor, it's a -- basically an

10    exchange back and forth where Tyler and Kayla Herd ask

11    for various pictures of women, and the defendant

12    responds with various pictures, you know, some of which

13    the government knows, but they haven't been actively

14    talked about as part of this trial.

15        Later on, Tyler and Kayla Herd, for example, on

16    Bates 11322, ask about pictures referencing a Hannah

17    Wavington, and after that, that is when Moet Hart sends

18    pictures that we have seen before, the same picture of

19    Hannah performing oral sex and also Hannah wearing the

20    red apron that the jury saw in Exhibit 117 --

21             THE COURT:  Well --

22             MR. GRADY:  -- as part of that video that

23    Mandy Latulippe introduced.

24             THE COURT:  Okay.  So I am going to exclude

25    that.  You have got the red apron photograph in.  You

1   have got the oral sex coming in.  These -- they are

2   asking for photographs.  This is not evidence of

3   violation, and as a result, I am going to exclude that.

4        And 12 is the conversation with Oxix, and that has

5   to relate -- that relates to the vehicles, and that's

6   admissible.

7        And is that it?

8             MR. GRADY:  I think so, your Honor.  The only

9   one I had clarification about is 107B.6, Bates 11372.

10  This was the screenshot of the Backpage ad on June 18th,

11  2015.  It's not clear to the government whether that's

12  in or not.  So that's why I just wanted to clarify.

13            THE COURT:  Okay.  So tell me why -- why an

14  image, a screenshot of what appears to be a Backpage ad

15  on his Facebook, is not relevant.

16            MS. SEN:  Your Honor, there's no evidence that

17  he posted it.  I mean, this is just a screenshot of any

18  Backpage ad.  It's not -- it doesn't mention any woman's

19  name.  It's not --

20            THE COURT:  No, I understand that --

21            MS. SEN:  But it's --

22            THE COURT:  -- but he is on Facebook.  It's

23  his Facebook account.

24            MS. SEN:  Sure.  But he --

25            THE COURT:  That's where it is.

1          MS. SEN:  But he can download all kinds of

2     things off of Facebook.  It doesn't mean he is posting.

3     Or he can post things to Facebook that he has downloaded

4     from other areas of the internet, and I don't think this

5     shows anything about him posting Danielle M.  There's

6     just nothing in this.  It's just -- in fact, it doesn't

7     really even look like a regular Backpage ad.  There's no

8     picture.  There's a description.  I don't see how it

9     relates to anything.

10         THE COURT:  And the fact is, you're going to

11    try to link this up to Danielle M.?

12         MR. GRADY:  Yes, your honor.  A few different

13    ways.  Obviously her testimony is that she worked for

14    the defendant until his overdose on June 20th.  She

15    worked at various hotels.  She testified that the

16    defendant posted her on Backpage.  So again, we believe

17    that circumstantially supports her testimony.  And then

18    simply that it was found on his Facebook account.  We

19    believe it's relevant to the --

20         THE COURT:  All right.

21         MR. GRADY:  The defendant can argue that

22    they --

23         THE COURT:  I -- I appreciate that relevance,

24    but it -- it doesn't necessarily suggest that he would

25    have downloaded it on his Facebook account because

1    there's no timing, and as a result, I am going to

2    exclude it.

3         All right.  I think that's it.  Am I correct?

4              MR. GRADY:  Yes, your Honor as far as 107B.  I

5    don't know if your Honor wants to talk about 68 and just

6    do this all in one, but we have -- we have broken up 68

7    into chunks, and if you want to do that --

8              THE COURT:  Yeah.  Can you give me -- I mean,

9    I read this stuff, and if you can give me that, when we

10   have a break I will do 68.

11             MR. GRADY:  Okay.

12             THE COURT:  That would be helpful.  All right,

13   so let's call the jury in, and we'll start up.

14             MR. GRADY:  Your Honor, just to clarify, is

15   all of 11244 coming in?

16             THE COURT:  You want to just hold the jury for

17   a second.

18             MR. GRADY:  Sorry, your Honor.  I thought --

19   my understanding is all of 11244, but other members of

20   the -- and it's within 107B.1.

21             THE COURT:  It's -- okay.  You want to give me

22   back the --

23             COURTROOM DEPUTY:  Um-hum.

24             MR. GRADY:  So there's two photos in 11244.

25             THE COURT:  Yes, and I excluded all the

1    photos, including 222, 226.  I -- 244, the bottom one,
2    was being --
3              MR. GRADY:  The bottom one, okay.
4              THE COURT:  Right?
5              MR. GRADY:  Because it hasn't been redacted,
6    should we just highlight the bottom one --
7              THE COURT:  Yes.
8              MR. GRADY:  -- and we can publish it?
9              THE COURT:  Yes, you can publish it.  You can
10   just put a paper over the top side and you can use the
11   ELMO.
12             MR. GRADY:  Okay.  That's fine, your Honor.
13             THE COURT:  Okay.  Ready to go.
14   (The following was held in open court with the jury
15   present at 1:38 p.m.)
16             THE COURT:  All right.  I asked your patience
17   for the stop and the start.  That oftentimes happens at
18   the end, and, you know, most of that is caused actually
19   by me.  So if you have to blame somebody for the long
20   delays, you can blame me.
21        Okay, I think we are ready to go, and you are still
22   under oath.
23             MARILYN EPP:  Yes, your Honor.
24                      MARILYN EPP,
25             having been previously duly sworn, was further

1          examined and testified as follows:

2                  CONTINUED DIRECT EXAMINATION

3    BY MR. GRADY:

4    Q    Good afternoon, Ms. Epp.

5    A    Hello Mr. Grady.

6    Q    When we last left things, we were talking about

7    107B?

8    A    Yes.

9    Q    And I'm going to show you 107B.1, which has been

10   admitted into evidence, which is Bates 11221.

11   A    Okay.

12          MR. GRADY:  Oh, I'm sorry.  Can you switch

13   from the ELMO to the counsel table.

14          THE WITNESS:  And you are using this?

15          MR. GRADY:  Yes, that's fine.  You can put

16   that to the side.

17       And it should appear in front of you.

18          THE WITNESS:  Not yet.

19          MR. GRADY:  Okay, there we go.  Go ahead and

20   zoom in on that and make it a little larger for you.

21   BY MR. GRADY:

22   Q    Now, I want to focus first on the vanity names, the

23   vanity name for this account, to a Moet Hart one?

24   A    Yes.

25   Q    Is the current city listed as Burlington, Vermont?

```
1    A    It is.

2    Q    What about the phone number?

3    A    (802) 825-4614.

4    Q    Thank you.

5         MR. GRADY:  I am going to go next to Bates

6    11244 and, actually, if I could -- I'm sorry.  If we

7    could switch to the ELMO, please.

8    BY MR. GRADY:

9    Q    Is that -- does that also appear to be a photograph

10   that was part of this Facebook return?

11   A    Yes.

12        THE COURT:  And that is actually 107B.2, a

13   part of B.2; is that right?

14        MR. GRADY:  Ah, no.  It's actually part of

15   107B.1.

16        THE COURT:  Oh, B.1.  Okay.

17        MR. GRADY:  Yes, your Honor.

18        THE COURT:  Okay.

19        MR. GRADY:  Okay.  Thank you.

20       If we could switch off the ELMO back to the counsel

21   table.

22   BY MR. GRADY:

23   Q    Miss Epp, I am going to show you what's been

24   admitted as 107B.3 which is Bates 11312.  And we're

25   going to zoom in on the conversation.
```

1      Who is that conversation between?

2   A    Facebook profile Moet Hart and Facebook profile

3   Hector Copeland.

4   Q    Is there a discussion about a phone number?

5   A    Yes.

6   Q    Does Hector Copeland appear to ask for a phone

7   number?

8   A    Yes.  And Moet Hart says that he has the same math,

9   and he never changed it, and he sends it on the bottom,

10  number (802) 310-8797.

11  Q    Okay.  Thank you, Ms. Epp.  We will talk more about

12  that phone number in a little bit.

13      I am going to move next to what's been admitted as

14  Government 107B.7, and it is Bates 11271.

15      Do you recognize this first picture up on top?

16  A    I do.

17  Q    And let's move to the next page of 107B.7, which is

18  11272.

19      Do you recognize this photograph?

20  A    I do.

21  Q    How do you recognize these photos?

22  A    Both of those photos were used as profile or

23  background photos in -- for a Facebook profile for a

24  Jimmy Porter.

25  Q    When did you notice this on Jimmy Porter's page?

1    Or, I'm sorry, let me rephrase it.

2         Did you capture a screenshot of this Jimmy Porter

3    Facebook page you referred to?

4    A    I did.

5    Q    Can you describe how you did that?

6    A    I brought up my undercover Facebook profile onto

7    the phone that I had for the government, and I took a

8    screenshot of the Facebook profile for Jimmy Porter.

9    Q    Did you print out that captured screenshot?

10   A    I did.

11   Q    If you can pull out Government Exhibit 67 for

12   identification.  It should be in the packet in front of

13   you.

14   A    I have it.

15   Q    Does that fairly and accurately reflect the

16   printout of the screenshot you have from the Jimmy

17   Porter Facebook page?

18   A    It does.

19            MR. GRADY:  Your Honor, the government moves

20   to admit and publish 67.

21            THE COURT:  Any objection to 67?

22            MS. SEN:  Your Honor, if I could just see it,

23   please?

24            THE COURT:  Okay.

25            MR. GRADY:  I will retrieve 67.

```
1              MS. SEN:  No, your Honor.
2              THE COURT:  So admitted.
3              (Government's Exhibit 67 was received in
4       evidence.)
5              MR. GRADY:  Okay.  We will go ahead and
6       publish 67.
7       BY MR. GRADY:
8       Q    And again, looking at this screenshot, the photos
9       up here at top and the one here, those are the ones that
10      we just noticed in 107B.7?
11      A    Yes.  Those pictures correspond with those found in
12      the Moet Hart Facebook profile, the warrant return.
13      Q    At this time I am going to turn your direction,
14      Agent -- excuse me, Intel Analyst Epp, to 107B.12, and
15      that is Bates 11303.  And we'll expand that out.
16             In the middle of the page, am I correct that Moet
17      Hart asked if Natalie Oxox wants to buy a car?
18      A    He is asking Natalie Oxox if someone she knows
19      wants to buy a car.
20      Q    Okay.  And let's turn to the next page, which is
21      11304.
22             What does Moet Hart say in this passage on March
23      24th, 2016?
24      A    After Natalie asks what kind of cars, Moet Hart
25      replies to Natalie, "A Saturn 300L and a Dodge Durango."
```

1    Q    Does Natalie ask for Moet Hart to send pics?

2    A    She does.

3    Q    How does he respond?

4    A    "Let me see if I still got some."

5    Q    Let's turn to the next page, 11305.  Is that one of

6    the images that Moet Hart sends?

7    A    It is.  He sent her that image on March 24th, 2016.

8    Q    Turning to 11306, is that another image that was

9    provided?

10   A    Yes.

11   Q    And now I want to jump ahead to 11308.  Does

12   Natalie ask a question relating to the Dodge?

13   A    Yes.  Natalie asks Moet, how -- "How much do you

14   want for Dodge?"

15   Q    And then going to 11309, how does Moet Hart

16   respond?

17   A    Moet Hart responds, "Right now 500 because I gotta

18   move them."  And he says, "Well, if he brings it up

19   tomorrow, that is."

20              THE COURT:  I'm sorry, what was that last --

21              THE WITNESS:  "If he brings it up tomorrow,

22   that is."  The 500.

23              THE COURT:  All right.

24              MR. GRADY:  All right.  Thank you.

25   BY MR. GRADY:

1    Q    Ms. Epp, I am now going to turn and direct your

2    attention to Exhibit 73, which has been previously

3    admitted as Exhibit 73, which are photos that Frank

4    Thornton found in the Tom Tom GPS, which is Exhibit 87D.

5             THE COURT:  All right, before you transition,

6    107B.1, B.3, B.7, B.12 are admitted.  They were admitted

7    outside the presence of the jury, so now they're all

8    admitted.

9         Okay.  Go ahead.

10            (Government's Exhibits 107B.1, 107B.3, 107B.7

11   and 107B.12 were received in evidence.)

12            MR. GRADY:  Okay.  Thank you, your Honor.

13   BY MR. GRADY:

14   Q    Ms. Epp, I am going to direct your attention to

15   Exhibit 73, and -- let's actually go to 73-003.  Can you

16   tell the jury about the location that is shown in

17   73-003?

18   A    The position of the car in the photograph is

19   approximately the position of 241 West Canal, which

20   is -- I don't know if it still is, but during the course

21   of the investigation was the primary residence of

22   Cassandra Harris.

23   Q    Okay.

24            MS. SEN:  Objection, your Honor.  I don't

25   think the actual address is indicated from the face of

1   the exhibit.

2            THE COURT:  No, but she can testify from her

3   investigation.  So objection overruled.

4   BY MR. GRADY:

5   Q    Ms. Epp, if I can ask you just maybe move a little

6   closer to the microphone --

7   A    Yes.  I'm sorry.

8   Q    -- or you can bring the microphone closer to you.

9   I want to make sure we hear everything.

10  A    Okay.

11  Q    But if I heard you correctly, you have been to that

12  residence as part of a search warrant execution?

13  A    Correct.  July 2016.

14  Q    Let's move to 73-005.  What is the jury seeing in

15  this photograph?

16  A    This is a list of favorites found within the Tom

17  Tom GPS.  The Anchorage Motel, Danielle, Delaney, G.ma

18  and Jess grams are some of the favorites listed in the

19  Tom Tom.

20  Q    Sure.

21           If we go to the next pages, six and seven, are

22  those additional favorites that have been programmed

23  into the Tom Tom such as Mandy and Motel 6?

24  A    Correct.

25  Q    Okay.  I want to jump ahead to 73-009.  What is the

1    significance of that address?

2    A    Danielle Degenhardt lives on 96 Ethan Allen

3    Parkway, which is the approximate location of the star

4    on the screen there and where a search warrant and

5    arrest warrant were executed on July 19th, 2016.

6    Q    Going to 73-014, does that appear to be an address

7    for Mandy?

8    A    Yes.

9    Q    And finally going to 73-016, what's showing in that

10   address?

11   A    The location for Motel 6 in Colchester.

12              MR. GRADY:  All right, we want to take that

13   down.

14   BY MR. GRADY:

15   Q    I want to shift gears for a moment, Ms. Epp, and

16   talk about Exhibit 79, which is the computer.  When was

17   the computer transferred to your control?

18   A    On January 30th, 2017.

19   Q    Who delivered it to you?

20   A    FBI Christopher Destito.

21   Q    What did you do with it when you received it?

22   A    I -- nothing right away.  A couple days later I

23   powered it up.  I attached a monitor, a mouse and

24   keyboard, and powered on the computer after we had

25   received a search warrant to do so.

1          When I powered up the computer, once the start --

2     it booted up and the start screen showed up, there were

3     a number of profiles, all of which were password

4     protected except for one guest profile, which I then

5     accessed, saw a few pictures, and then also realized I

6     didn't have the capability to enter the other remaining

7     profiles, and I contacted the prosecutor for this case

8     at that time, Abigail Averbach, and she told me that

9     there was a forensic examiner in the area named Frank

10    Thornton, and that he -- this is the sort of thing that

11    he did.

12    Q     Why did you turn on the computer and attach the

13    keyboard and the mouse and the monitor when you received

14    it?

15    A     Because I was executing the warrant.

16    Q     Did you receive any training specific to computers

17    prior to that time?

18    A     I had not.

19    Q     Did you know what the best practices for computers

20    were at that time?

21    A     I did not.  I treated it how I would have treated a

22    cellular phone.

23    Q     Now, when you received the -- you mentioned

24    that Mr. -- you gave it to Mr. Thornton and he extracted

25    data from it; is that right?

```
1    A    Correct.
2    Q    Did he give you some of the data that he extracted
3    from the hard drive, which is Exhibit 80 for
4    identification?
5    A    Yes.
6    Q    What did you do with that data?
7    A    He gave it to me on a tera -- a big terabyte drive,
8    which I had to return to him, so I took it to the DEA
9    office, into the office, and copied those files onto our
10   servers so that I would have a working copy.  From that,
11   I made a copy for our evidence vault and then later a
12   copy from that, of those disks, for the U.S. Attorney's
13   Office.
14   Q    Was there a user profile named Pam Scott?
15   A    There was.
16   Q    Did you research the name Pam Scott?
17   A    I did.
18   Q    Why?
19   A    I was trying to find any individual with that name
20   who was associated with the defendant.
21   Q    Did you discover anything related to that?
22   A    I did not.
23   Q    Mr. Thornton also testified that he gave roughly 50
24   gigabytes of data from his examination of the hard
25   drive, which he used the analogy was like 50 pickup
```

```
1   trucks full of bankers box information, to you.  What
2   did you do with all that data?
3   A    Slowly and systematically began sorting through it
4   folder by folder creating a spreadsheet to keep notes of
5   which folders we had gone through.  Myself, the case
6   agents in the case, and then analyst Matt Benoit, the
7   four of us divvied up the contents, the majority of
8   which Matt Benoit and I sorted through.
9   Q    Did you find a folder under the Pam Scott profile
10  by the name of "me"?
11  A    I did.
12  Q    Can you tell a little bit -- can you tell the jury
13  a little bit about the photographs that you saw in this
14  "me" folder?
15  A    There were dozens of photographs of Brian Folks in
16  the "me" folder.
17  Q    Was there also a folder named "family"?
18  A    Yes.
19  Q    Was there a folder named "me solo"?
20  A    Yes.
21  Q    What did that contain pictures of?
22  A    Photographs of Brian Folks.
23       MR. GRADY:  Your Honor, at this time we may go
24  into pictures of 68, but I could skip that and come back
25  to it later.
```

```
 1              THE COURT:  Yeah, can you do that?
 2              MR. GRADY:  Yes, your Honor.  Let's go and do
 3    that.
 4    BY MR. GRADY:
 5    Q    Okay, Ms. Epp, showing you what's been previously
 6    admitted as Exhibit 51A.
 7              MR. GRADY:  Oh, I'm sorry.  Could we switch
 8    off the ELMO to counsel table.
 9    BY MR. GRADY:
10    Q    Okay.  Do you recognize who's shown in 51A?
11    A    I do.  Katelynn Charbonneau.
12    Q    Okay.
13    A    Oh.
14    Q    And we will just use first names, Ms. Epp, if
15    that's okay, unless I specifically ask for a last name.
16    A    Okay.
17    Q    Have you met Katelynn?
18    A    Yes, I have.
19    Q    Did you find images and videos of Katelynn in the
20    hard drive?
21    A    I did.
22    Q    And generally speaking, we don't need an exact
23    number, but how many images did you find of Katelynn?
24    A    Hundreds.
25    Q    If you look in your packet in front of you and find
```

1    what's been labeled Government's Exhibit 51B for

2    identification.

3    A    I have 51C.

4    Q    It might be in front of 51C.  If not, I will get

5    another copy of 51B.

6        Handing you 51B for identification --

7    A    Yes.

8    Q    -- do you recognize the -- do you recognize

9    Exhibit 51B for identification?

10   A    I do.

11   Q    What is it?

12   A    These are images found within the hard drive in a

13   folder titled "Katelynn."

14   Q    C?

15   A    C.

16   Q    Are those pictures that were found from the data

17   that was extracted from Mr. Thornton?

18   A    Yes.

19            MR. GRADY:  Your Honor, at this time the

20   government moves to admit and publish 51B.

21            THE COURT:  Any objection?

22            MS. SEN:  Your Honor, I do have an objection.

23   May I please approach?

24            THE COURT:  Yes.  Okay.

25   (The following was held at the bench.)

1          MS. SEN:  Your Honor, she has no idea if these

2     are photos that were sent to Mr. Folks by Katelynn

3     Charbonneau, whether he downloaded them from other

4     sources, because we have independent information that

5     she was actually advertising on Backpage before she met

6     our client.  She wouldn't admit to it on the stand, but

7     that's actually the way my client met her.

8          And so all of these photos, it's completely

9     unclear -- and Miss Epp, as she said, has no

10    qualification for talking about computers, digital

11    forensics.  She can't describe when these photos came

12    onto the computer, how they got there, whether they have

13    been modified.  Nothing.  She has no basis to understand

14    them.

15         THE COURT:  But she hasn't been offered for

16    that.  What she has been offered to testify to is the

17    fact that there were these images on the computer, on

18    the computer which the defendant had access to.  That's

19    it.  And, you know, I appreciate you might be able to

20    attack the reliability of any impression that he would

21    have accessed these photographs, but the fact is she is

22    being offered to show that the photos were on the

23    computer.  That's it.

24         MS. SEN:  Well, your Honor, I mean, I think

25    that they have to show -- my understanding of the

1    Court's ruling is that the photos that come in have to

2    go -- have to go to coercion, force or some other

3    element.  And Katelynn Charbonneau was on the stand.

4    The government did not ask her about any of these

5    photos, or very few of them.  The fact -- just the fact

6    that they found them on our client's computer doesn't

7    make him guilty of coercing Katelynn Charbonneau.

8                   THE COURT:  I appreciate that.

9                   MS. SEN:  And I think that --

10                  THE COURT:  I appreciate that.

11                  MS. SEN:  And I'm not sure how every single

12   one of these photos -- frankly, some of these photos

13   have no faces; they're bodies.  I don't know how Agent

14   Epp could possibly identify them.

15                  MR. GRADY:  Your Honor, I am just saying they

16   were found in the Katelynn C. folder, and some of them

17   go to corroborate Katelynn when she testified.  She

18   talked about having to dress up in a mask and other

19   things of that nature.  There are photos of her in a

20   mask, photos that were found on, you know, Backpage

21   advertisements, again found within the folder, and just

22   to make that connection.

23                  THE COURT:  All right.  So these photographs

24   were found in the Katelynn C. file.

25                  MR. GRADY:  Exactly.

1          THE COURT:  And in addition, she is able to

2      identify many of them as --

3          MR. GRADY:  She is.

4          THE COURT:  So I am going to permit the --

5          MS. SEN:  But there are also photos here of

6      other women who haven't testified that were with

7      Katelynn.

8          MR. GRADY:  Well, there's other -- so what

9      happened is he has Teams, and so it would be Katelynn

10     and somebody else, who she testified -- again, she

11     testified on direct.

12         THE COURT:  Let me see the exhibit.

13       Which are the exhibits that have people that --

14         MS. SEN:  Towards the end.

15         THE COURT:  This last page, 11670?

16         MS. SEN:  Before that there are some photos

17     with multiple women in them, and not all of those women

18     have been in -- have testified.

19         MR. GRADY:  If I may, your Honor:  There was a

20     journal that was found at the 96 Ethan Allen Parkway.

21     That journal contained photographs of Katelynn with

22     other women, and these pictures match those pictures

23     that were found as part of the journal.  It's actually

24     87C is the journal that's been admitted into evidence.

25         MR. KAPLAN:  Who put them in the journal?

1           MR. GRADY:  Well, they are in the journal at

2      the time the journal was seized.  You know, I have

3      actual hard copies.  I think 61 is the exhibit actually

4      of the -- well, our view is that it's your client's

5      journal.

6           THE COURT:  So pages 84, 86, 89, 94 are all

7      Katelynn C.'s; is that correct?

8           MR. GRADY:  Yes, your Honor.  Unless noted

9      specifically on the top of the file path, they are found

10     in the Katelynn C. folder.

11          THE COURT:  And in regard to the multiple --

12     pictures of multiple persons --

13          MR. GRADY:  Yeah, like that one right there, I

14     think it says "prost" -- oh, I'm sorry, your Honor.  I

15     can't exactly see.

16          MS. SEN:  There's no file path on that one.

17          MR. GRADY:  There should be ones that start

18     prost, P-R-O-S-T.  Those were the same pictures that

19     were found in the defendant's journal.

20          THE COURT:  Okay.  The last page, who is this?

21          MR. GRADY:  That's actually Katelynn, and

22     Marilyn knows that's taken at the North Star Motel

23     because she has been inside that North Star Motel.

24          THE COURT:  And Katelynn is in each one of

25     these photographs; is that correct?

1          MR. GRADY:  Yes, your Honor.

2          THE COURT:  Okay.  Well, I am going to permit

3    introduction.

4          MS. SEN:  Even the ones with other women,

5    your Honor?

6          THE COURT:  Pardon me?

7          MS. SEN:  Even the ones with other women --

8          THE COURT:  Yes.

9          MS. SEN:  -- that have not testified in the

10   case?

11         THE COURT:  Yes.

12         MS. SEN:  Okay.

13   (The following was held in open court.)

14   BY MR. GRADY:

15   Q    All right.  Ms. Epp, when we last left this, we

16   were talking about what's now been admitted as 51B, and

17   we will go ahead and show the first page of 51B.  And I

18   want to focus on the very top.  And I will take it down

19   for a minute now.

20        What does that indicate, that top sort of file

21   path, if you will?

22   A    That top file path, the N-66 was the DEA evidence

23   number when Mr. Thornton gave us back the -- he analyzed

24   five devices which were all included in N-66.  There

25   were three phones, a tablet and this computer.  The

1    fifth device was the computer, so you see 05HP.  That's

2    the HP hard drive.

3         Within that HP hard drive, now you are getting into

4    the files within the computer.  Within the users of this

5    hard drive, there was a Pam Scott user.  This was in the

6    Pam Scott folder.  This was in the Picture folder within

7    the Pam Scott user.  Within Pictures, there was Bulk

8    File folder -- Bulk Files folder.  Within that folder

9    was a Lineup folder, and then subsequently in that

10   folder there was a Katelynn C. folder.

11        So these are folders within folders.  And so within

12   Katelynn C., there were a variety of photographs, like

13   some of which are pictured there.

14   Q    And at the very bottom, if we can expound upon the

15   date modified, date acquired, date taken, is it fair to

16   say that that is any time data that's associated with

17   the pictures that are shown in 51B?

18              MS. SEN:  Objection, your Honor.  This witness

19   has no foundation to be able to describe this kind of

20   data in the computer.

21              THE COURT:  Okay.  You want to lay the

22   foundation as to whether she can testify about this kind

23   of metadata.

24              MR. GRADY:  Sure.

25   BY MR. GRADY:

1    Q    Ms. Epp, what are we looking at when we are looking

2    at the information?  If we go back to the big screen of

3    the 51B, what is contained at the bottom of 51B?

4    A    So each photograph pictured has -- is named.  Its

5    name is underneath it.  So, for instance, the top left

6    photo is Web Portfolios 564.  And the first line of data

7    on the bottom is for Web Portfolios 564.  These are the

8    dates that show -- that appear either when you go into

9    the properties of the photograph or when you --

10   depending on the level of detail you have presenting on

11   a computer.  So you can show it's the same in anyone's

12   computer when it -- it's the various time stamps

13   associated with that file.

14   Q    Who created the Exhibit 51B?

15   A    Who physically created this?

16   Q    What you are looking at.  Yes.

17   A    It was either myself or Matt Benoit.  We did all of

18   these.

19   Q    Where -- the ones that you've dated, where did you

20   get the time --

21        The information on the bottom that pertains to Web

22   Portfolios 564, where does that come from?

23   A    Within the -- the extraction from Frank Thornton.

24   Q    So you took that from the information extracted

25   from Frank Thornton directly?

1    A    It's just what showed up on the screen and we did a

2    snip.

3    Q    You didn't change it or anything like that?

4    A    No.

5              THE COURT:  So you transposed the information

6    about when the images were taken to this other document?

7              THE WITNESS:  Correct.  I used a snipping

8    tool, and all it does is take an image of whatever's

9    appearing on the screen.  You just -- it's just a

10   picture of what you see here, and then I pasted it onto

11   a Word doc.

12   BY MR. GRADY:

13   Q    So to boil all this down, is it fair to say that

14   you just copied this information from Mr. Thornton's

15   extraction onto Exhibit 51B?

16   A    Correct.

17   Q    And looking at the bottom of 51B, were the dates

18   taken for these photos in April of 2013?

19   A    It shows date taken as April 30th, 2013, over a

20   couple minutes.

21             THE COURT:  And did you do the same in regard

22   to each of the photographs that is included within 51B?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.

25   BY MR. GRADY:

```
 1    Q    And, in fact, did you do the same for all of the
 2    photographs in subsequent exhibits relating to various
 3    people involved in this case?
 4    A    Yes.
 5    Q    All right.  Let's go to page two of 51B.  Were
 6    these additional images that were found in her folder?
 7    A    Yes.  These are everything in the Katelynn C.
 8    folder.
 9    Q    Same with page three?
10    A    Yes.
11    Q    It appears that -- images appear to be in a motel
12    room?
13    A    Yes.
14    Q    Let's go to pages four and five.
15    A    Yes.  All of those were from the Katelynn C.
16    folder.
17    Q    Let's go to page six of 51B.  Now, where did you
18    find the image in 51B-006?
19    A    This image was found within a different user
20    profile on the hard drive.  So if you look at the file
21    path up at the top, you will see our -- the DEA evidence
22    number, the HP hard drive, and you go into users.  This
23    was the Cassandra user, and this was in her picture
24    file; and within that Picture folder there was another
25    folder with the date stamp of June 18th, 2013, and this
```

1      image was found in there.

2      Q    Miss Epp, as part of your duties as an intel

3      analyst, have you been on backpage.com?

4      A    I have.

5      Q    How many times?

6      A    More than I can count.

7      Q    Are you familiar with Backpage as it existed back

8      in 2015 and 2016?

9      A    Yes.

10     Q    Does 51B-006 appear to be an ad consistent with a

11     Backpage ad back in that time period?

12     A    Yes.

13     Q    Now, at this time I would like to split the screen,

14     and on the other side we will pull up 51B-001.  And on

15     the left side we will return to 51B-006.

16          Now, is it fair to say that the picture labeled

17     "Web Portfolios 561" appears to be similar to pictures

18     in this Backpage ad on 51B-006?

19     A    Yes.  When you are within Backpage, you were able

20     to click and enlarge the photo, and it would show

21     similar to the images found on Bates 11584.

22     Q    Okay.  And we will continue and have 51B-006 on the

23     left, but on the right, let's move to 51B-002.

24          And is it safe to say that file labeled "CVVCVC

25     991" appears to be similar to a picture shown on

1    51B-006.

2    A    Yes.

3    Q    All right.  On the right, let's go to 51B-007.

4    What is the jury looking at in 51B-007?

5    A    Appears to be another screenshot from Backpage

6    that's consistent with the ad style during that time

7    frame with -- on Backpage.  The file path at the top has

8    us back in the Pam Scott user profile.  Again, under

9    Pictures and Bulk Files, in the Bulk Files folder there

10   was another folder called bp research.  BP is a

11   shorthand for Backpage.

12   Q    And on the left, let's go to 51B-005.  And am I

13   correct that the file labeled "My Cars 2609" appears to

14   be similar to a photo that is in the Backpage ad on

15   51B-007?

16   A    Yes.  And 2611 as well.

17   Q    All right.  Let's go on the right to 51B-008.  Can

18   you tell the jury about that file path?

19   A    This was another folder within the Lineup folder.

20   Under the Pam Scott user there was a folder called

21   "Keisha and Pinky."

22   Q    Are you familiar with the nickname Pinky?

23   A    Yes.  It was a nickname used for Katelynn C.

24   Q    And if we look at the bottom of 51B-008, when does

25   it appear these photos were taken?

1    A    The date indicated under that heading is July

2    30th -- 31st, 2013.

3    Q    Okay.  Let's move to 51B-010 on the right.  Do

4    these photos look familiar, Ms. Epp?

5    A    Yes, they do.

6    Q    Did you see them anywhere else in the case?

7    A    Yes.  At the time of Brian Folks' arrest, there was

8    a planner or journal seized at 96 Ethan Allen Parkway,

9    and it had hard copies.  Some of -- these four photos

10   were some of the photos found in that journal in hard

11   copy.

12   Q    Okay.  One moment, Ms. Epp.

13        Take a look at what's been admitted as 87B.  You

14   can hang on to that bag if you need to.

15   A    Yes.

16   Q    Is that the journal you are talking about?

17   A    This is the exhibit.  I think it's a planner, but

18   yes.

19   Q    And I believe you should have 87C in front of you,

20   which is a series of photographs.  And if not, we can

21   get you another copy.

22   A    Within the packet?

23   Q    Yes.  All of the exhibits that you -- have been

24   handed to you, you will see an 87C.

25   A    Oh, it's right before me.  Yes.

1    Q    Okay.  Take a moment.  Do the photographs in 87C

2    fairly and accurately represent the photos that were in

3    87B?

4    A    There's a photo on the cover which matches.  You

5    want me to check the hard copy folders against the 87B?

6    Q    Well, the question is does 87C -- do those pictures

7    fairly and accurately show pictures that were found in

8    87B?

9    A    Yes.

10             MR. GRADY:  Your Honor, I believe 87C has been

11   admitted into evidence, but to the extent it hasn't

12   been, the government will move to admit and publish

13   pictures from 87C.

14             THE COURT:  All right.  Any objection?

15             MS. SEN:  Your Honor, I am not sure that some

16   of these are relevant.  May we please approach?

17             THE COURT:  Well, it has been -- I think you

18   have said it's already been introduced.

19             MS. SEN:  I think that the journal has, but

20   there are specific pictures in it that haven't been.

21             MR. GRADY:  I am only going to focus on three

22   pictures, your Honor.  I don't know if those are the

23   ones of concern to defense counsel.

24             THE COURT:  Well, why don't you ask and see if

25   you can agree --

1           MR. GRADY:  Okay.

2           THE COURT:  -- to those three photographs --

3           MR. GRADY:  Sure your Honor.

4           THE COURT:  -- or if she has some objection to

5    other photographs, but --

6           MR. GRADY:  Yes, your Honor.

7           (Brief pause.)

8           MR. GRADY:  Okay.  Your Honor, we have come to

9    an agreement as to the three photographs.

10          THE COURT:  Okay.  Is that correct, Miss Sen?

11          MS. SEN:  Yes, your Honor.

12          THE COURT:  All right.  They are admitted.

13          (Government's Exhibit 87C was received in

14   evidence.)

15          THE COURT:  Okay, go ahead.

16          MR. GRADY:  All right.

17   BY MR. GRADY:

18   Q   On the left, Ms. Epp, I am going to show you

19   87C-009, and that is an actual picture that is found in

20   the planner, correct, 87B?

21   A   Yes.

22   Q   Does it appear that similar picture was found in

23   the hard drive which I believe is labeled "prost 072"?

24   A   Correct.

25   Q   On the left, I am going to show you, Ms. Epp,

1    87C-010, and again is a similar picture shown as prost

2    066?

3    A    It is.

4    Q    And, finally, Ms. Epp, we are going to go on the

5    left, 87C-017.  And it appears that photograph is

6    similar to one labeled "prost 067"?

7    A    Yes, it is.

8    Q    All right.  Let's go ahead on the right, move to

9    51B-011.  Explain to the jury what they are seeing in

10   page 11 of 51B.

11   A    We're again in the Pam Scott user profile.  Within

12   the Lineup folder there was another folder called "Nita

13   and Pinky."

14   Q    And if we could go on the left to 51B-007, is it

15   fair to say that My Cars 1388 and My Cars 1390 are

16   similar to photos found in 51B-007?

17   A    Yes.

18          MR. GRADY:  You can go ahead to one screen

19   now.  And let's go to 51B-013.

20   BY MR. GRADY:

21   Q    What is the jury seeing in 51B-013?

22   A    Within the Lineup folder there was also a folder

23   called Teams, which had subfolders with multiple names

24   on those folders, and this is a folder named "Bri,

25   Jasmine and Pinky."

1    Q    Now, I am going to jump ahead to 51B-015.  Who is

2    shown in these photos?

3    A    This is Katelynn C.

4    Q    Do you know where these photos were taken?

5    A    The mirror and the bedspread, the mirror in the

6    three photos, and then the bottom right photo, are all

7    consistent with the North Star Motel.

8    Q    Have you been to the North Star Motel?

9    A    I have.

10   Q    Have you been inside and seen these items?

11   A    I have been inside the North Star.

12   Q    All right.  Shifting gears for a moment, Ms. Epp,

13   have you found images of Katelynn in the Moet Hart

14   Facebook return?

15   A    I have.

16   Q    If you could take a look at what's been marked 51C

17   for identification.

18   A    I see it, yes.

19   Q    Okay.  Are those pictures of Katelynn that you

20   observed during the review of Moet Hart?

21   A    Yes.

22        MR. GRADY:  Your Honor, the government moves

23   to admit and publish 51C.

24        THE COURT:  Any objection?

25        MS. SEN:  Your Honor, we would object to these

1    particular photos.  Can we please approach?

2              THE COURT:  Okay.

3    (The following was held at the bench.)

4              THE COURT:  Someone got the photos?

5              MS. SEN:  So, your Honor, these photos were

6    apparently uploaded in 2015, so Katelynn C. testified

7    that she had nothing -- in fact, she testified that she

8    lost all of the defendant in 2012, which is actually

9    contrary to other evidence that's coming in in the case,

10   but I don't see how uploading photos of her in 2015 is

11   relevant to anything that occurred with her in 2012 to

12   2013.

13             MR. GRADY:  Your Honor, these actually, when I

14   do split screens, show they're the exact same photos of

15   what's been introduced in 51B.  So apparently the

16   defendant has kept these photos from 2013 and uploaded

17   them in 2015.  But the relevance value is that it's the

18   same photo both in his hard drive and in his Facebook.

19             THE COURT:  All right.  Objection overruled.

20   You can introduce those.

21   (The following was held in open court.)

22   BY MR. GRADY:

23   Q    Okay, Ms. Epp, I am going to show you 51C-001.  And

24   if we can split the screen, on the right side I will

25   show you 51B-004.

1        Is it fair to say that the photo labeled "SMH 013"

2   and "SMH 014" are similar to photos found in the Moet

3   Hart Facebook account?

4   A    Yes.

5   Q    And looking at 51B-004, again, when was the date

6   taken of those photos?

7   A    Let's see.  If I could have just a moment.

8   Q    It would actually be highlighted for you up in the

9   right side of the screen.  SMH 014 and SMH 013.

10  A    Date taken indicates September 17th, 2013.

11  Q    Okay.  And if we go to the left side, 51C, when

12  does it appear that these photos were uploaded onto

13  Facebook?

14  A    May 4th, 2015.

15  Q    Okay.  The left side, we'll go with 51C-002, and on

16  the right side, let's go to 51B-003.  What do you

17  understand about the file "Web Portfolios 716"?

18  A    716 matches the lower Facebook photo.

19           MR. GRADY:  Let's go ahead and unsplit the

20  screen, and we can go ahead and turn those pictures off.

21  BY MR. GRADY:

22  Q    Ms. Epp, are you familiar with YouTube?

23  A    I am.

24  Q    Can you explain what YouTube is for those who may

25  be unfamiliar?

1   A     It is a website where anyone can create a profile
2   and upload videos for public consumption.
3   Q     Did you become aware of a video on YouTube
4   involving Katelynn?
5   A     I did.
6   Q     How did you become aware of this?
7   A     Early in the investigation in 2016 I was just
8   googling things like Moet Hart, once I knew that that
9   was his Facebook profile name, and I found a profile on
10  YouTube called "Moet Hart," and they had posted a video
11  that appeared to be an ad for commercial sex.
12  Q     Did you capture screenshots of this activity that
13  you found on YouTube?
14  A     I did.
15  Q     How did you do that?
16  A     I paused the video while it was playing and just
17  snipped the -- again, just snipped what was on the
18  screen.
19  Q     Did you print out the screenshots that you snipped?
20  A     I did.
21  Q     Take a look at 44B for identification.
22  A     Yes.
23  Q     What is that?
24  A     That is -- those are two screenshots of the video
25  on YouTube, and I subsequently downloaded that video

1    from the internet, and the right image is the video and

2    a still.

3    Q    Does 44B fairly and accurately reflect the images

4    of the screenshot of the printouts you made?

5    A    Yes.

6          MR. GRADY:  Your Honor, the government moves

7    to admit and publish 44B.

8          THE COURT:  All right.  Any objection?

9          MS. SEN:  No objection, your Honor.

10          THE COURT:  So admitted.

11          (Government's Exhibit 44B was received in

12    evidence.)

13          MR. GRADY:  All right.  Let's try to make 44B

14    a little bit larger.

15    BY MR. GRADY:

16    Q    And first of all, I see "Moet Hart" at the top.

17    What does that mean?  What does that signify?

18    A    That was what I searched.

19    Q    Okay.  And what is the name of the video?

20    A    "Atouchofclassywomen.com."

21    Q    When was this video uploaded on YouTube?

22    A    Says it was published on August 3rd of 2013; said

23    "Escort Girl Ashley's Commercial."

24    Q    Did you also find this same video within the hard

25    drive?

```
1    A     I did.

2    Q     Take a look at 44C for identification.

3    A     Yes, that's it.

4    Q     When you say that's it, what do you mean?

5    A     This is a screenshot I took of the video found

6    within the hard drive after Frank Thornton gave me back

7    the forensic extraction, and it was found, again, within

8    the Pam Scott user profile, the Bulk Files folder, but

9    this was in a folder entitled "Commercials."

10            MR. GRADY:  Your Honor, at this time the

11   government moves to admit and publish 44C.

12            THE COURT:  Any objection?

13            MS. SEN:  No, your Honor.

14            THE COURT:  So admitted.

15            (Government's Exhibit 44C was received in

16   evidence.)

17   BY MR. GRADY:

18   Q     And you mentioned before that you found it in

19   Commercials under Bulk Files, Pictures, within Pam

20   Scott?

21   A     Yes.

22   Q     Within the stack in front of you, Ms. Epp, can you

23   find 44 for identification?

24   A     Yes.

25   Q     Do you recognize 44?
```

1    A    I do.

2    Q    What is it?

3    A    It's a disk containing a copy of this commercial.

4    Q    How do you know that that's contained on that disk?

5    A    I reviewed it on May 1st and initialed it and dated

6    it.

7    Q    Is that a true and accurate copy of what you found

8    on the defendant's hard drive or relating to this

9    commercial?

10   A    It is.

11             MR. GRADY:  Your Honor, at this time the

12   government moves to admit and publish 44.

13             THE COURT:  Any objection?

14             MS. SEN:  I thought it had already been

15   admitted, your Honor, but no objection.

16             THE COURT:  Okay.  So admitted.

17             (Government's Exhibit 44 was received in

18   evidence.)

19             THE COURT:  You are talking about the video?

20             MR. GRADY:  Exactly.

21             THE COURT:  Right.

22             MR. GRADY:  This particular video has not been

23   played.

24             THE COURT:  Right.

25             MR. GRADY:  And 44A I believe is the

```
1    transcript, your Honor.
2              THE COURT:  Okay.
3              (A video recording was played in open court.)
4    BY MR. GRADY:
5    Q    Ms. Epp, let's go ahead and shift gears, and I am
6    going to show you what's been previously admitted as
7    50A.  Who's shown in 50A?
8    A    Keisha.
9    Q    How do you know?
10   A    I have met her.
11   Q    Did you find images and videos of Keisha on the
12   hard drive?
13   A    I found images of Keisha, yes.
14   Q    Take a look actually --
15   A    No.  And videos.  I'm sorry.  Images and videos.  I
16   apologize.
17             THE COURT:  I'm sorry, I couldn't hear you.
18             THE WITNESS:  Images and videos.  I misspoke.
19             THE COURT:  Okay.
20             MR. GRADY:  Just clarifying:  Videos and
21   images of Keisha that she found on the hard drive.
22             THE COURT:  Right.
23   BY MR. GRADY:
24   Q    And I'm going to show you what's already been
25   admitted as 50B.  What does the jury see in the first
```

1    page of 50B?

2    A    Four photographs that were found within the Pam

3    Scott user profile, in the Lineup folder, in the Keisha

4    W. folder.

5    Q    And turning to page two of 50B.  So were all these

6    found in the Keisha folder?

7    A    They were.

8    Q    Page three, same?

9    A    Same.  Yes, all of those were in the Keisha W.

10   folder.

11   Q    Turning to page four of 50B-004 and specifically

12   with image 3027, when was that particular photograph

13   taken?  And perhaps we will expand it so it's a little

14   bit easier for you to see.

15   A    It indicates the date taken was July 11th, 2013.

16   Q    Turning to page five of 50B, am I correct that all

17   of these were found in the Keisha folder?

18   A    Yes.

19   Q    Now, I want to focus on My Cars 3900, and there

20   appears to be a tattoo in that picture.  Would you

21   agree?

22   A    Yes.

23   Q    And going back to or thinking about the page

24   before, 50B-004, I believe there was no tattoo on Keisha

25   at that time.  Would you agree?

```
1    A    Yes.

2    Q    And what is the date taken of 3900?

3    A    If we can --

4    Q    And again, we can expand it out for you.

5    A    Indicates September 21st, 2015.

6    Q    All right.  Turning to page six of 50B, were these

7    pictures found within a folder called "bp research"?

8    A    Yes.

9    Q    Ms. Epp, did you find information related to Keisha

10   in the Moet Hart Facebook return?

11   A    I did.  There were images of Keisha.

12   Q    Take a look at 50C for identification in front of

13   you.

14   A    I have it.

15   Q    What are those images of?

16   A    There are four images all of which feature Keisha

17   W.

18           MR. GRADY:  Your Honor, at this time the

19   government moves to admit and publish 50C.

20           THE COURT:  Any objection?

21           MS. SEN:  No objection.

22           THE COURT:  All right.  So admitted.

23           (Government's Exhibit 50C was received in

24   evidence.)

25   BY MR. GRADY:
```

1   Q    And we will show you the first page of 50C, and we

2   will try to expand upon the dates that these were

3   uploaded to make it easy for you to see.

4        If you could tell the jury when those were uploaded

5   onto Facebook?

6   A    They were uploaded on June 18th, 2015.

7   Q    And if we could go ahead and split the screens, and

8   on the other side we will bring up 50B-005.  Am I

9   correct that the tattoo in My Cars 3900 -- maybe if we

10  make that a little bit larger -- appears similar to the

11  tattoo on the bottom picture of 50C?

12  A    Yes.

13  Q    Okay.  Now, what is significant about June 18th,

14  2015?

15  A    June 18th, that -- during that week, in interviews

16  with Keisha Willard and Danielle McGuire, it was learned

17  and substantiated by hotel records that they were at --

18  with Mandy Latulippe.  Also, Mandy Latulippe, Keisha

19  Willard, Danielle McGuire were all with Brian Folks at

20  the North Star Motel, the Ho Hum Motel and the Motel 6

21  that week.

22            THE COURT:  So I just remind you not to use

23  the last names.

24            THE WITNESS:  Oh, I'm sorry.

25            THE COURT:  Okay?

1           THE WITNESS:  I apologize.  Sorry.

2           MR. GRADY:  I know it goes counter to all of

3    your normal --

4           THE WITNESS:  Sorry.

5           MR. GRADY:  -- process when you testify in

6    court.

7           THE WITNESS:  Yes.  Sorry.

8           MR. GRADY:  At this time, your Honor, the

9    government moves to admit 104, 105, 108, 109, 110, and

10   111.

11          THE COURT:  All right.

12          MR. GRADY:  These are all hotel records, and

13   we move them under 902(11).

14          THE COURT:  Okay.  Any objection to the hotel

15   records?

16          MS. SEN:  No, your Honor.

17          THE COURT:  So admitted.

18          (Government's Exhibits 104, 105, 108, 109, 110

19   and 111 were received in evidence.)

20   BY MR. GRADY:

21   Q    Now, on the right side, Ms. Epp -- we are going to

22   leave 507C on the left.  On the right side I am going to

23   show you 109-012.  Am I correct that it appears to be a

24   record of Mandy renting a hotel room from the North Star

25   on June 15th, 16th and 17th, checking out -- that's hard

1   to see from that date, but that appear to be what's

2   contained in 108-012?

3   A    Yes.

4   Q    Sorry, I misspoke.  It's 109-012, not 108.

5        As part of this investigation, Ms. Epp, did you or

6   other law enforcement officers subpoena Backpage

7   records?

8   A    Yes.

9   Q    Do you have to use specific search criteria when

10  you subpoena Backpage?

11  A    I always have.

12  Q    Why?

13  A    Because there's hundreds of thousands if not

14  millions of posts nationwide to look through, so they

15  need criteria to search.

16  Q    What is your understanding of how long Backpage

17  return records -- retained records back in 2016?

18  A    In speaking with their -- their retention person, I

19  was told 18 to 24 months max.

20  Q    At this time, Ms. Epp, please take a look at 50D

21  for identification.

22  A    Yes, I see it.

23  Q    And while you are looking at 50D for

24  identification, I want to pull up what's been admitted

25  as 107B.3, which is Bates 11312.  And, again, we'll make

1    it larger, that exhibit.

2         Correct me if I am wrong, but it appears that Moet

3    Hart provides (802) 310-8797 to Hector Copeland on

4    December 17th, 2015?

5    A    Correct.

6    Q    Do you see that same phone number in 50D for

7    identification?

8    A    I do.

9    Q    What is the date of that Backpage ad?

10   A    January 2nd, 2016, eight p.m.

11   Q    Who is shown in 50D for identification?

12   A    Keisha W.

13   Q    The photos that you are seeing in 50D for

14   identification, do they seem similar to photos that

15   we -- that you saw in 50B?

16   A    Yes.  These photos were in the hard drive.

17        MR. GRADY:  Your Honor, at this time the

18   government moves to admit and publish 50D.

19        THE COURT:  Any objection to 50D?

20        MS. SEN:  May I voir dire, please, your Honor?

21        THE COURT:  Yes.

22                    VOIR DIRE EXAMINATION

23   BY MS. SEN:

24   Q    Ms. Epp, if you would take a look at the third page

25   of this exhibit, please?

 1    A    50E?

 2    Q    50D.   Whose e-mail address is that that was used to

 3    post?

 4    A    I was told that it was Mandy Latulippe's.

 5    Q    Do you know who actually posted --

 6    A    I'm sorry.

 7         Do I know who actually posted this ad?  I do not.

 8              MS. SEN:  Your Honor, I would object to the

 9    introduction of this ad.

10              THE COURT:  And the basis of the objection?

11              MS. SEN:  Because it was not posted by our

12    client, and, in fact --

13         May I approach, actually, your Honor?

14              THE COURT:  Okay.

15    (The following was held at the bench.)

16              MS. SEN:  Your Honor, we objected to the

17    introduction of this ad when we asked Keisha Willard

18    about it because the whole idea is that with the

19    Backpage ads that we had objected to prior to trial --

20    is that they would have to show that our client is the

21    person who posted them.  And she testified that she

22    actually posted the ad; and now, you know, just because

23    she's gotten a Backpage return, she can't verify -- she

24    doesn't know who posted it.  I don't understand how this

25    comes in.  I mean, you kept it out with the person who

1    is the subject of this ad.

2              THE COURT:  Okay.  The relevance is that he is

3    in possession of it.

4              MR. GRADY:  Your Honor, there's a couple of

5    things that make it relevant.  Number one, the phone

6    number, it's the same as the phone number that he gave

7    Hector Copeland two weeks earlier, and the government's

8    recollection of the testimony is not that the defendant

9    himself posted every ad, but he directed the women to

10   also post ads.  So it's completely consistent with that.

11        And then also the photos in the ad are the same as

12   photos that are in 50D, and if you look at -- or, excuse

13   me, 50B, and if you look at the time, the time that the

14   photos were taken, it was taken a half hour before the

15   ad was posed.  And certainly Keisha talked about how the

16   defendant posted the pictures.

17             THE COURT:  Remind me, 50D --

18             MR. GRADY:  50B is hard drive photos of Keisha

19   found on his computer.

20             MS. SEN:  And, your Honor, I would also note

21   that when Keisha testified, she said that she

22   finished -- she left sometime when they were at Lori's

23   house, which we know that they -- Ms. Crawford went to

24   rehab in November of 2015, and, in fact, I just reviewed

25   her testimony.  She wasn't working for the defendant,

1    and, in fact, she testified that she posted the ad and

2    that she wasn't working with him, so I don't understand

3    how this ad comes in.

4              MR. KAPLAN:  This is the one, Judge, where she

5    said --

6              THE COURT:  The pictures in the ad are the

7    same pictures which are included on his computer.

8              MS. SEN:  And when I get a chance to cross

9    Miss Epp, the issue is that the pictures didn't arrive

10   on our client's computer until a year or two years after

11   they were posted in the Backpage ad.

12             THE COURT:  Okay.

13             MR. GRADY:  I think it was the next month it

14   was --

15             THE COURT:  Okay.  I am going to permit the

16   exhibit.  You can cross examine when you call her.

17   Okay?  Let's go forward.

18   (The following was held in open court.)

19             THE WITNESS:  May I clarify my response?

20             MR. GRADY:  Sure.  Go ahead, Ms. Epp.

21             THE WITNESS:  Because I realized I misspoke.

22   And that was actually Keisha W.

23             MR. GRADY:  Okay.

24             THE WITNESS:  I'm sorry.  I remembered

25   interviewing Keisha, and I spoke about the wrong e-mail.

1            MR. GRADY:  Sure.

2     BY MR. GRADY:

3     Q    All right, Ms. Epp, we are going to show you what's

4     been admitted as 50D, and we are going to put that on

5     one side of the screen, and on the other side of the

6     screen we are going to put 107B-008, which exactly --

7     which is Bates 11312.

8           Okay.  So again, as you mentioned, the same phone

9     number provided to Hector Copeland in December 2015 is

10    contained in 50D?

11    A    Correct.

12    Q    And on the right side, I want to show you 50B -- as

13    in bravo -- 003.  And I want to focus on picture My Cars

14    3508.  Is it fair to say that My Cars 3508 appears to be

15    the same or similar to the picture in 50D -- as in

16    delta -- the Backpage ad?

17    A    Yes, it is.

18    Q    And looking at My Cars 3508, am I correct that the

19    date taken was January 2nd, 2016, at 7:28 p.m.?

20    A    Can you enlarge that, please?

21    Q    Sure.

22    A    Yes.  7:28 p.m. on January 2nd.

23    Q    That's the date taken.  And when was the ad on

24    50D -- as in delta -- posted?

25    A    January 2nd, at eight p.m.

1    Q    And, again, going back to 50B -- as in bravo -- are

2    all of those images found in the Keisha folder?

3    A    Yes, they are.

4    Q    On the left, let's go to 50D -- as in delta --

5    -003, and on the right we will go into 50B-002.  Fair to

6    say that My Cars 3503 is similar to the picture shown in

7    50D -- as in delta -- 003?

8    A    Yes.

9    Q    All right.  Let's shift gears again.  We will leave

10   the screens split, and on one of them I want to show you

11   what's been previously admitted as 53A.  Who's shown in

12   53A?

13   A    Danielle McGuire.

14   Q    Again --

15   A    Danielle M.

16   Q    Had you met her?

17   A    Yes.

18   Q    Did you find image or images of Danielle on the

19   hard drive?

20   A    I found one image.

21   Q    Take a look at 53B for identification.

22   A    That's the image.

23            MR. GRADY:  Your Honor, the government moves

24   to admit and publish 53B.

25            THE COURT:  Any objection?

```
1            MS. SEN:  No, your Honor.
2            THE COURT:  All right.  So admitted.
3            (Government's Exhibit 53B was received in
4    evidence.)
5    BY MR. GRADY:
6    Q    That's the image that you found in the Danielle
7    folder?
8    A    Yes.
9            MR. GRADY:  Okay.  You can go ahead and take
10   53B off.
11   BY MR. GRADY:
12   Q    I am going to direct your attention to 53C for
13   identification.  What is 53C for identification?
14   A    Eight images found in the Facebook search warrant
15   return of Danielle McGuire -- Danielle M.
16   Q    When you said Danielle, do you mean in the Facebook
17   return of Moet Hart?
18   A    I'm sorry.  Yes.  Within the Moet Hart Facebook
19   return, these eight images were found.
20           MR. GRADY:  Your Honor, the government moves
21   to admit and publish 53C.
22           THE COURT:  All right.  Any objection to 53C?
23           MS. SEN:  None, your Honor.  And I believe
24   those have already been admitted as part of a
25   defendant's exhibit.
```

1          THE COURT:  Okay.  Are they admitted?

2          COURTROOM DEPUTY:  No.

3          THE COURT:  Well, they are --

4          MR. GRADY:  I'm not sure, your Honor --

5          THE COURT:  They are admitted now.

6          MR. GRADY:  -- but I think now they are

7     admitted for sure.

8          THE COURT:  Yes, they are admitted.

9          (Government's Exhibit 53C was received in

10    evidence.)

11    BY MR. GRADY:

12    Q    So we will pull up on one screen 53C-001.  And when

13    were those images uploaded onto Facebook?

14    A    June 16th, 2015.

15    Q    Okay.  On the other screen, I want to go to

16    109-012.  And, again, is that when Mandy rented a room

17    at the North Star?

18    A    Correct.

19    Q    The photos that we're looking being at in 53C, do

20    you recognize the background in those photos?

21    A    The bedspread is consistent with the North Star

22    during that time.

23    Q    All right.  Next I want to go to 53C-002.  Do you

24    know where those photos were taken?

25    A    The background, bedspread, the orange wall are all

1    consistent with Motel 6 in Colchester.

2    Q    Have you been inside the Motel 6 in Colchester?

3    A    Yes.

4    Q    And on the right side, I want to bring up 108-015,

5    but first of all, going back to 53C-002, when were those

6    images uploaded on Facebook?

7    A    June 20th, 2016 -- 2015.

8    Q    Looking to the right on 108-015, am I correct that

9    Mandy rented a hotel room at the Motel 6 in Colchester

10   June 19th to June 20th, 2015?

11   A    Correct.  These photos were uploaded in the early

12   morning hours.

13   Q    Ms. Epp, I am going to show you what's been

14   previously admitted as 54A.  Who is shown?

15   A    Ayla.

16   Q    How do you know Ayla?

17   A    I have met her.

18   Q    Did you find images of Ayla on the hard drive?

19   A    I did.

20   Q    Take a look at 54B for identification.

21   A    Those are some of the photos I found of Ayla on the

22   hard drive.

23            MR. GRADY:  Your Honor, the government moves

24   to admit and publish 54B.

25            THE COURT:  All right.  Any objection to 54B?

```
1            MS. SEN:  No objection, your Honor.

2            THE COURT:  All right.  So admitted.

3            (Government's Exhibit 54B was received in

4    evidence.)

5    BY MR. GRADY:

6    Q    And again, the top of 54B, it appears that Ayla's

7    folder was within the Lineup folder inside of Bulk

8    Files, inside of Pictures inside of Pam Scott user?

9    A    Yes.

10   Q    Let's go to page two of 54B.  Again, were these

11   photos found in the Ayla folder?

12   A    Yes.

13   Q    Let's go to page three.  And I see this is found in

14   a folder titled "Ayla and Brit"?

15   A    Correct.

16   Q    Do you know who else is with Ayla in these photos?

17   A    Only through social media.

18   Q    Who do you recognize it to be through social media?

19   A    Brittany Barber.

20   Q    Turning to page four; were these pictures found in

21   a folder titled "Ayla and Mandy"?

22   A    Yes, they were.

23   Q    Going to page five; these pictures again were found

24   in a specific phone number under bp research?

25   A    Correct.
```

1    Q    Ms. Epp, take a look at 54D -- as in delta -- for

2    identification in front of you.

3    A    I have it.

4    Q    What is in 54D?

5    A    It is a subpoena return from Backpage.

6    Q    What do you notice about the pictures in 54D?

7    A    The photos featuring breasts have some sort of tape

8    over the nipples.

9    Q    Is that similar to what we just saw in 54B -- for

10   bravo -- involving Ayla and Mandy?

11   A    Correct.

12            MR. GRADY:  Your Honor, the government moves

13   to admit and publish 54D -- as in delta.

14            THE COURT:  Any objection?

15            MS. SEN:  No, your Honor.

16            THE COURT:  All right.  So admitted.

17            (Government's Exhibit 54D was received in

18   evidence.)

19   BY MR. GRADY:

20   Q    Again, 54D, first of all, where is this found in

21   Backpage?

22   A    In Burlington Escorts, in Burlington Adult

23   Entertainment.

24   Q    And you can tell that by the very top of the

25   exhibit?

1    A    Yes.  That would be the file path you would follow

2    to get to that portion of the website.

3    Q    What date was the ad posted?

4    A    November 25th, 2015, at 3:12 a.m.

5    Q    Okay.  If we can put this to one side of the

6    screen.  What I want to do on the other side of the

7    screen is go to 54B-004.  And, again, is that the

8    similar style tape that you referenced before earlier,

9    Ms. Epp?

10   A    It is.

11   Q    Going to 54D, if we go to page three of that

12   exhibit -- or, excuse me, page two of that exhibit, the

13   next page, is there an e-mail address as listed for that

14   ad?

15   A    Yes.

16   Q    Is that consistent with Mandy's name?

17   A    It is.

18   Q    Ms. Epp, take a look at 36A for identification.

19           MR. GRADY:  We can go ahead and clear the

20   screen.

21   A    This is a subpoena -- or a Backpage ad that we

22   received by subpoena -- return of subpoena from

23   Backpage.

24           MR. GRADY:  Your Honor, at this time the

25   government moves to admit and publish 36A.

```
 1              THE COURT:  Any objection?
 2              MS. SEN:  Yes, your Honor.
 3              THE COURT:  Okay.  Let's -- we've gone a
 4    little bit past when we take a break, so let's take a
 5    break, and we will stay here and talk with the lawyers,
 6    and we'll see you in approximately -- a little bit more
 7    than 15 minutes because people here need a break as
 8    well.  Okay.
 9    (The jury left the courtroom after which the following
10    was held in open court at 2:52 p.m.)
11              THE COURT:  Okay.  You can actually go in the
12    back.
13              (Witness temporarily excused.)
14              THE COURT:  Okay.  This is a return on
15    Backpage, and what's your objection?
16              MS. SEN:  Your Honor, it's not related to any
17    woman in this case.
18              MR. GRADY:  Your Honor, 36 was the Backpage
19    exhibit that Ayla testified to that she saw the
20    defendant type out on the couch -- she was next
21    to him -- about Jerricka.  It relates to her fear of
22    reputational harm and the defendant doing similar things
23    to her.  It's the same exact ad except it has the
24    administrative data that obviously Ayla couldn't testify
25    about it.
```

1        THE COURT:  And was that admitted into

2   evidence at the time of Ayla's testimony?

3        MR. GRADY:  36 was admitted into evidence,

4   your Honor, which is the same ad minus the

5   administrative data.  36A is the same ad that has the

6   administrative data, and it's connected to Jimmy Porter,

7   which again we have to circle back to 68 to make that

8   connection for the jury.

9        THE COURT:  Okay.

10        MS. SEN:  There are additional photos here,

11   though.  I mean, they're not Backpage, but there are

12   just additional photos.  It's not clear to me that it's

13   actually part of the ad.

14        MR. GRADY:  It was part of the return of the

15   ad, your Honor.  They're deleted photographs, and

16   sometimes Backpage returns deleted photographs as part

17   of a particular ad.

18        THE COURT:  Those should be struck from the

19   exhibit.

20        MR. GRADY:  Well, actually, I think if I

21   remember correctly -- could I take a moment to look,

22   your Honor?

23        THE COURT:  Yes.

24        (Brief pause.)

25        MR. GRADY:  We would object, your Honor,

1 because the deleted photos is the same pictures of

2 Danielle on -- at the North Star hotel.  So they

3 actually are connected to the -- to the case.

4    THE COURT:  Well, can I see it?

5    MR. GRADY:  Yes, your Honor.

6    MS. SEN:  And actually, your Honor, I was

7 objecting to the photos that are behind the first page,

8 not the last -- I actually didn't even realize there was

9 a photo of Danielle attached there.

10    (Brief pause.)

11    THE COURT:  Well, let's go back to step one.

12 The purpose of 36A is what?

13    MR. GRADY:  The purpose of 36A, it is the

14 return from Backpage as to this particular ad.  36 was

15 admitted through Ayla, but of course she can't talk

16 about administrative data, but she did say that it was

17 the defendant who was typing out this ad that she saw.

18  The administrative data says that it belonged to an

19 e-mail address jimmyporter380@gmail.com.  Now, again,

20 the government believes we can establish a link between

21 the defendant and Jimmy Porter.

22    THE COURT:  Right.  No, I understand that.

23    MR. GRADY:  Yes.

24    THE COURT:  But what's the purpose of page

25 14930, 931, with various individuals' photographs, 32

1   and 33 and 34?

2               MR. GRADY:  Sure, your Honor.

3        So Bates number 14930, 931, 932, and actually the

4   photo in 933, those were all admitted as part of 36 to

5   show that it's the same ad to the jury except it has the

6   administrative data tying it to the defendant.

7               THE COURT:  So all of those have already been

8   admitted; is that correct?

9               MR. GRADY:  That is correct, your Honor.

10              THE COURT:  And you are just introducing this

11  to put in the metadata?

12              MR. GRADY:  To -- exactly.  Put in the

13  administrative data.  And all these photos were

14  connected to this ad.  It's just on different pages.

15  But it's all -- all these photos were connected to this

16  Backpage ad.

17              THE COURT:  Okay.  All right?  Are they

18  already -- Ms. Sen, are these already introduced into

19  evidence?

20              MS. SEN:  I hadn't realized that the

21  in-between photos had already been admitted, your Honor,

22  so if so, then I guess it's been admitted.

23              THE COURT:  All right.  So they are admitted.

24              (Government's Exhibit 36A was received in

25  evidence.)

1          THE COURT:  All right.  So 68, you have --
2     well, let me just ask you more broadly, where are we
3     going from here?
4          MR. GRADY:  Yes, your Honor.  So --
5          MS. SAVNER:  May I approach?
6          THE COURT:  Yes.
7          MS. SAVNER:  So this is 68 broken down into
8     subject lists.
9          THE COURT:  Okay.
10          MR. GRADY:  So the government has broken down
11    68 into five different sub-exhibits, your Honor.  And
12    so -- and we have kind of categorized them accordingly
13    so your Honor can see, and so the government would like
14    to circle back to 68, and then after 68, we will
15    continue to highlight specific charged victims such as
16    Hannah -- we haven't gotten to Hannah yet -- found in
17    the hard drive and Facebook, et cetera.  And then we
18    will also -- we will hit on a few other people such as
19    Mandy and Mary since they have testified at the trial,
20    and then get to a couple of recorded calls that were
21    found on the hard drive, and then a couple of videos,
22    and that should be it for Ms. Epp.
23          THE COURT:  And will you be done today?
24          MR. GRADY:  I believe so, your Honor.  We will
25    try to be done today.

1       THE COURT:  Okay.  The 68 is divided into five

2  subcategories, and, Miss Sen, do you have objections to

3  all five?

4       MS. SEN:  Your Honor, I am going to have to

5  take just a moment to look through it more carefully.

6       THE COURT:  Well, we can take a break at this

7  point.  I haven't seen these before, so -- and we'll

8  come back, and I will ask you the same question.  Try to

9  remember that question so -- in case I forget it at this

10  point.  But anyway, I will ask you the same question:

11  Any objection to any of these?

12       MS. SEN:  No.

13       THE COURT:  Okay.

14  (Court was in recess at 2:59 p.m.)

15  (The following was held in open court at 3:14 p.m.)

16       THE COURT:  Okay.  I have received a copy of

17  Exhibit 6, and I have questions of the government.

18     First -- or 68-1, who is --

19       MR. GRADY:  Yes, your Honor.  I think I can

20  hopefully simplify things for the Court.  All the

21  government is seeking to introduce now is just 68-2 and

22  68-3.  It will no longer seek 68-1 or 68-5.

23       THE COURT:  Okay.  You want to use all of the

24  identifications of Jimmy Porter?

25       MR. GRADY:  Yes, your Honor.

1           THE COURT:  Okay.  That's 2.  And number 3 is

2      the money.

3           MR. GRADY:  Yes, your Honor.

4           THE COURT:  Why do you need to introduce the

5      money in light of the fact you introduced the money last

6      week?

7           MR. GRADY:  I don't recall us ever introducing

8      any money, but I will check with our colleagues.

9           I think, to our knowledge, your Honor, it's just

10     the one picture of -- one picture of money.

11          THE COURT:  But you introduced the money last

12     week.

13          MR. GRADY:  That is correct, your Honor.  One

14     picture.

15          THE COURT:  Right.

16          MR. GRADY:  And we would be thinking of one

17     more picture, that would be great.

18          THE COURT:  That would be two, but you only

19     need one, right?

20          MR. GRADY:  Yes, your Honor.  Duly noted.

21          THE COURT:  Okay.  So what's the defense's

22     reaction to two?

23          MS. SEN:  I'm not sure -- I am just looking at

24     the first page of that multi-page exhibit, your Honor,

25     and I am not sure what the relevance of the picture on

1     the right as looking towards us.  I'm not exactly sure

2     who that is.

3               THE COURT:  Yeah, I thought this was just the

4     identification of Jimmy Porter.

5               MS. SEN:  Well, there are multiple pages with

6     the identification, and we would just argue it's

7     duplicative, but the government wants to put it all in.

8     I don't think --

9               THE COURT:  That's fine.

10              MS. SEN:  The first page of that exhibit has

11    one photo that I'm not sure how this woman in the photo

12    is relevant.

13              THE COURT:  Well, what I imagine is that the

14    picture on the left is of the defendant, and if you look

15    at one of the cards, which is on the first -- well,

16    actually the first page of both pictures -- in fact, all

17    the pictures, I guess, are the same picture.  So I could

18    understand that one on the left.  The one on the right,

19    I don't understand.

20              MR. GRADY:  Yes, your Honor.  We can -- we can

21    take that out.

22              THE COURT:  Okay.  All right.

23              MR. GRADY:  It's just a picture of the

24    defendant's wife.

25              THE COURT:  All right.  So I am going to admit

1    2.  I'm going to deny the money.  You have already got

2    the money in.  And I think we are set.

3        Shall we get the jury in?

4            MS. SEN:  Your Honor, there's just one other

5    issue that our client has raised that he wanted us to

6    raise with the Court --

7            THE COURT:  Yep.

8            MS. SEN:  -- regarding one of the exhibits

9    that was shown, which was -- it's actually an exhibit

10   that was previously admitted.  And it is photos -- it's

11   50B.

12           THE COURT:  It's 60?

13           MS. SEN:  50B, your Honor.

14           THE COURT:  50B, okay.

15           MS. SEN:  And there are multiple photos of the

16   same photo, but two of the photos -- two of those copies

17   are taken on two different dates, but they're the exact

18   same photo.  So our client wants to -- is asking to

19   renew the challenge to the general issue of files being

20   corrected on his computer that we issued, because

21   it's -- and I have consulted with our expert.  It would

22   be very unlikely that you could have two of the

23   identical photo taken on two -- I mean, one is taken on

24   July 11th of 2013, and the other is taken on September

25   17th, 2013.

```
1              THE COURT:  All right.  So the jury's waiting.
2   I will take this up at the end of the day, take a look
3   at exactly what you're addressing, and rule upon that,
4   but --
5              MS. SEN:  Of course, your Honor.
6              THE COURT:  -- we don't need to do that at
7   this moment.  So the jury's ready to come in.  Okay.
8              MS. SEN:  And I guess, just to clarify, so the
9   only exhibit that's coming in out of 68 is 68 --
10             THE COURT:  2.
11             MS. SEN:  -- -2?  Okay.
12             THE COURT:  Is your witness all set?
13             MR. GRADY:  I believe we had someone get the
14  witness, your Honor.
15             THE COURT:  Okay.
16             MR. GRADY:  She should be on her way.
17  (The following was held in open court with the jury
18  present at 3:19 p.m.)
19             THE COURT:  Okay.  I want to remind you,
20  Professor, that you are still under oath.
21             THE WITNESS:  Yes, your Honor.
22             THE COURT:  Okay.
23                 CONTINUED DIRECT EXAMINATION
24  BY MR. GRADY:
25  Q    All right.  Ms. Epp, we're going to shift gears for
```

1     a minute.  I am going to show you on the ELMO what's

2     been admitted as Government Exhibit 68-02.

3     A     I see it.

4     Q     Okay.  And would I be correct in that this is a

5     picture found from the defendant's hard drive?

6     A     Correct.

7     Q     And found within a folder under Bulk Files and

8     Pictures under the Pam Scott user?

9     A     Yes.

10    Q     Now, have you seen this photograph in other images

11    on the defendant's hard drive?

12    A     Yes.  This image, the face image, New Word 167, was

13    seen -- a likeness of it was seen in numerous false

14    identification cards on the hard drive.

15    Q     All right.  If we switch to the ELMO to counsel

16    table, let's go to one example, and go to Bates 12440.

17    Is that the same photograph in a passport?

18    A     Yes.  And a New York driver's license mockup.

19    Q     Let's focus on the passport for a minute.

20    A     Yes.

21             MR. GRADY:  And if we could blow that up.

22    BY MR. GRADY:

23    Q     All right.  What is the name given in the passport?

24    A     Jimmy Porter.

25    Q     And I see a date of birth of October 18th.  Do you

1    recognize that date of birth?

2    A    Yes.  That's the defendant's date of birth.

3    Q    And if we go to --

4    A    October 18th, not 1980.

5    Q    1980.  But the defendant was born on October 18th,

6    is that what you are saying?

7    A    Yes.

8    Q    And then we go to Bates 12442.  And would you agree

9    that there's several images of the defendant under the

10   name Jimmy Porter found in the defendant's hard drive?

11   A    Yes.

12   Q    Thank you.

13        Now, I am going to return, Ms. Epp, to what's been

14   admitted as 36A.

15   A    Yes.

16   Q    And I believe you testified right before the break

17   that you received this in return --

18        Ms. Epp, where did you receive 36A from again?

19   A    It was a subpoena return from Backpage.

20   Q    Let's turn to the second-to-last page of 36A.  And

21   I see there's an e-mail associated with this Backpage

22   ad.  Whose e-mail is that?

23   A    Yes.  Jimmyporter380@gmail.

24   Q    Ms. Epp, I am going to show you what's been

25   admitted as 47A.  Do you recognize who's shown in 47A?

1    A    Yes.  That's Hannah.

2    Q    How do you recognize Hannah?

3    A    Through her drivers's license and photographs.

4    This driver's license photograph and social media.

5              MR. GRADY:  Your Honor, at this time the

6    government moves to admit and publish Exhibit 116.

7              THE COURT:  Has this photograph been admitted

8    before?

9              MR. GRADY:  My understanding is it has been,

10   your Honor.

11             THE COURT:  It has been?

12             MR. GRADY:  Yes, it has been.

13             MS. SEN:  It has been, your Honor.

14             THE COURT:  Okay.  No objection.  It's so

15   admitted, but has been admitted before.  Are you going

16   to publish it?

17             MR. GRADY:  Yes.  Oh, I am talking about 116.

18             THE COURT:  Oh, I'm sorry.  What are you

19   talking -- so 116 --

20             MR. GRADY:  116 is the birth certificate.

21             THE COURT:  Oh, right.  Okay.

22             MR. GRADY:  So we are moving to admit and

23   publish 116.

24             THE COURT:  There's no objection.  So

25   admitted.

1           MR. GRADY:  Okay, let's go ahead and publish

2      116.

3      BY MR. GRADY:

4      Q     Is this the birth certificate of Hannah?

5      A     Yes, it is.

6      Q     And if we could blow up date of birth.  Is it

7      correct it was November 12th of 1995?

8      A     Yes.

9      Q     Did you find images and videos of Hannah on the

10     defendant's hard drive?

11     A     I did.

12     Q     How many images, again, if you had to estimate?

13     We're not holding you to a specific number.

14     A     Dozens.

15     Q     Take a look at 47B for identification.

16     A     I have it.

17     Q     What's contained in 47B?

18     A     There is photos of Hannah found on the hard drive

19     in a variety of locations.

20           MR. GRADY:  Your Honor, the government moves

21     to admit and publish 47B.

22           THE COURT:  All right.  Any objection?

23           MR. KAPLAN:  May I have a moment, Judge?

24           THE COURT:  Yes.

25           (Brief pause.)

```
 1              MR. KAPLAN:  Judge, could we have a moment,
 2    please?
 3              THE COURT:  Could you have a moment?
 4              MR. KAPLAN:  Yes.  I just want to ask --
 5              THE COURT:  Yes.  Fine.
 6              (Brief pause.)
 7              MS. SEN:  No objection, your Honor.
 8              THE COURT:  All right.  So admitted.
 9              (Government's Exhibit 47B was received in
10    evidence.)
11    BY MR. GRADY:
12    Q    All right.  Ms. Epp, I am showing you 47B.  Now,
13    again, with the final path, am I correct that these were
14    found under a Hannah folder in the Lineup, Bulk Files,
15    Pictures, Pam Scott, on the defendant's hard drive?
16    A    Yes.
17    Q    Now, let's focus on the dates associated with these
18    four images at the bottom of this page.  Am I correct
19    that all of the dates taken were on May 17th, 2013,
20    between 11:42 and 11:44 p.m.?
21    A    That's what that indicates.
22    Q    All right.  We are going to move -- actually,
23    before we go further, page one, what do you notice about
24    where those pictures were taken?
25    A    The bedspread, wall and background are all
```

1    consistent with Motel 6 in Colchester.

2    Q    Let's go to page two of 47B.  I want to focus

3    specifically on the file titled "Han5."  Again looking

4    at the information on the bottom of 50 -- excuse me,

5    47B-002, when was that picture taken?

6    A    That indicates May 17th, 2013, 11:41 a.m. -- p.m.,

7    rather.

8    Q    And again appears to be that same Motel 6 bedspread

9    in Colchester?

10   A    Yes.

11   Q    Let's go to page three, and I want to focus

12   specifically -- if we can blow up My Cars 2417.  What is

13   the significance of this picture to this case?

14   A    Similar image on a video posted on the Moet Hart

15   Facebook profile in March of 2016 where the defendant

16   was discussing Hannah and being wronged by her and

17   posted shameful pictures of her, including this.

18   Q    It appears Hannah is dressed in a red apron with

19   nothing else on?

20   A    Correct.

21   Q    Okay.  Let's go to page four of 47B, and I want to

22   focus on a picture of My Cars 2489.  If we can expand

23   that.  Explain the significance of this photo to the

24   jury.

25   A    A photo very similar to -- similar likeness to this

1    was also in that video posted on Facebook.

2    Q    Okay.  Let's go to page five.  And same question

3    for My Cars 2494.

4    A    That was also featured in the video.

5    Q    Let's go to -- let's bring that down, and I want to

6    go to page six of 47B and focus on two photos, My Cars

7    2878 and My Cars 3068.  Have you seen those photos

8    before as part of this investigation?

9    A    I have.

10   Q    Where?

11   A    In Facebook conversations between the Moet Hart

12   profile and some other user's Facebook profile.

13   Q    Let's turn to page seven of 47B.  Tell the jury

14   where these photos were found.

15   A    Again, within the Pam Scott user, the Pictures

16   folder, the Bulk Files folder within the Lineup folders

17   and then the Teams, there was a Brandi, Hannah and

18   Shorty folder that had these two photographs.

19   Q    Now, I want to focus on Brandi and Shorty.  Do you

20   know who those refer to?

21   A    I do.

22   Q    How do you know that?

23   A    Through the course of investigation, I spoke with

24   both of them.

25   Q    Who is Shorty?

1    A    Svetlana.

2    Q    Does her last name begin with N?

3    A    It does.

4    Q    How about Brandi?

5    A    Brandi is S.

6    Q    All right.  Let's move next to page eight.  Where

7    were these three photos found?

8    A    These were within the Teams folder as well, in a

9    folder entitled "Brandi, Hannah, Jasmine and Shorty,"

10   and the photos appear to be Motel 6 again.

11   Q    We just mentioned Brandi and Shorty.  Who is

12   Jasmine?

13   A    Jasmine L.

14   Q    Did you -- have you met her as part of this

15   investigation?

16   A    Several times.

17   Q    And I want to focus specifically on the date taken

18   of these pictures.  Can you tell the jury when all three

19   of the pictures were taken?

20   A    That indicates May 17th, 2013, at 11:45 and 11:46

21   p.m.

22   Q    Thank you, Ms. Epp.

23        We are going to turn to page nine of 47B.  Where

24   was this particular file found?

25   A    This image was found in the Cassandra user profile

```
 1    in a Picture folder within that profile and another
 2    folder dated June 18th, 2013.
 3    Q    What does it appear to be a photograph of?
 4    A    A screenshot of a Backpage ad on a cellular device.
 5    Q    Can you tell what exact location within Backpage
 6    this ad may have been posted?
 7    A    The adult entertainment midsection -- I'm sorry.
 8    It's very small on my paper copy.  About halfway down
 9    there's some blue writing, and then to the right it says
10    "Adult Entertainment Escorts."
11    Q    And, in fact, up here at the top, the --
12    A    Oh, yes.
13    Q    -- section I have highlighted, does that appear to
14    be Burlington Escorts?
15    A    Correct.
16    Q    Now, let's go ahead and put this particular photo
17    on one screen.  Before we do that, can we also highlight
18    the advertisement of the ad?
19    A    The date of the ad?
20    Q    The date and the time and also have you read the ad
21    itself, Ms. Epp.  I think you should be able to make it
22    out now.
23    A    Just below the URL in the blue box it says, "Posted
24    Saturday, May 18th, 2013, at 12:06 a.m.," and the ad
25    reads, "Rainbow purple five-foot-one-and-a-half, 120 --
```

```
 1    15 pounds, cosmetologist; Natalia, full pink,
 2    five-foot-one, 110 pounds, nurse; Diamond, baby blue,
 3    five-foot-two, 115 pounds, vet; Candy, pink and white,
 4    five-foot-seven, 140 pounds, teacher.  Tomorrow is our
 5    graduation party, so we are celebrating now.  Come help
 6    us party.  Get the college girl special.  Choose one,
 7    two, three or four.  You won't believe what college has
 8    taught us to do.  Please, absolutely no blocked calls or
 9    texts.  Phone number is (203) 738-9434.  You won't be
10    sorry."
11    Q    Okay.  Ms. Epp, we are going to put that on one
12    side of the screen.  And while we are doing that, of
13    those four pictures, again, where do those pictures
14    appear to have been taken?
15    A    Motel 6 in Colchester.
16    Q    On the right side we are going to put up 47B-002.
17    Does it appear that the picture labeled "Han5" on
18    47B-002 is actually similar to the second picture from
19    the top on 47B-009?
20    A    Yes.
21    Q    And, again, am I correct that Han5 was taken on May
22    17th, 2013, at 11:41 p.m.?
23    A    Correct.
24    Q    And, again, looking at the date on 47B-009, it
25    appears to be about 25 minutes later on May 18th at
```

1    12:06 a.m.?

2    A    Yes.

3    Q    Ms. Epp, let's go ahead and I'm going to put on the

4    right side of your screen 47B-008.  I want to direct

5    your attention, and we may blow -- there we go.

6         I am going to direct your attention to the file

7    labeled "Web Portfolios 642."

8    A    Yes.

9    Q    Would you agree that Web Portfolios 642 appears to

10   be the same or similar to the picture third from the top

11   in 47B-009?

12   A    Yes, they appear the same.

13   Q    And again Web Portfolio 642 was taken at May 17th,

14   2013, at 11:46 p.m. --

15   A    Correct.

16   Q    -- exactly 20 minutes before the ad was posted at

17   12:06 a.m.?

18   A    Yes.

19   Q    All right.  Finally, let me direct your attention

20   to Web Portfolios 643 on 47B-008.  Does it appear to be

21   the same or similar to the final picture at the bottom

22   of 47B-009?

23   A    Correct.

24   Q    Now, we'll still keep 47B-009 on the left, and I

25   want to talk more about the phone number that's listed

1    in the ad.

2            MR. GRADY:  At this time, your Honor, the

3    government moves to admit and publish Exhibit 106.

4            THE COURT:  All right.  Any objection to 106?

5            MS. SEN:  Your Honor, it may take -- I might

6    need a moment to locate it.

7            THE COURT:  Okay.  Do you have a copy of that

8    exhibit?

9            MS. SEN:  Oh, I have it.

10           THE COURT:  I guess Miss Savner does.

11           MS. SEN:  No objection, your Honor.

12           THE COURT:  So admitted.

13           (Government's Exhibit 106 was received in

14    evidence.)

15   BY MR. GRADY:

16   Q    All right.  On the right, Miss Epp, I am going to

17   publish 106.  First of all, what is 106 for the members

18   of the jury?

19   A    106 is a subpoena return for a subscriber

20   information from Sprint telephone company.

21   Q    Who is the subscriber -- first of all, what is the

22   subscription -- what phone number is the subscriber

23   information for?

24   A    The subject number is in the third line down in the

25   main body of the subpoena, the subscriber number

```
1    (203) 738-9434.
2    Q    Is that the same number as the phone number that's
3    listed in the ad in 47B-009?
4    A    Correct.
5    Q    Who is the subscriber of that phone number?
6    A    Came back to a Lana Newman.
7    Q    Who do you know Lana Newman as?
8    A    Svetlana Newman.
9    Q    Does she also go by a nickname?
10   A    She goes by Shorty.  She went by Shorty.
11   Q    Is that the same Shorty that's been referred to in
12   this investigation?
13   A    Yes.
14   Q    Do you know if she performed commercial sex acts
15   for the defendant as part of the investigation?
16            MS. SEN:  Objection, your Honor.
17            THE COURT:  Well, it's a hearsay response.
18            MR. GRADY:  I can rephrase, your Honor.
19            THE COURT:  Sustained.  All right.
20   BY MR. GRADY:
21   Q    Is there a recording that the jury will listen to
22   between Shorty and the defendant?
23   A    Yes.
24   Q    What is discussed in that particular --
25            MS. SEN:  Objection, your Honor.  Same
```

1    objection.

2              THE COURT:  Objection sustained.  Assuming

3    that you are talking about what Shorty had to say, but

4    if you get that in through statements made by the

5    defendant, that's fine.

6              MR. GRADY:  Okay.  Yes, your Honor.

7    BY MR. GRADY:

8    Q    Ms. Epp, did you -- let me ask this question,

9    Ms. Epp:  Did you find information relating to Hannah in

10   the Moet Hart Facebook account?

11   A    I did.

12   Q    Take a look at 47C for identification.  Do you see

13   47C?

14   A    I do.

15   Q    Are those messages exchanged between Moet Hart and

16   Hannah?

17   A    Yes.  Hannah -- profile is Hannah Wavy.

18             MR. GRADY:  Your Honor, at this time the

19   government moves to admit and publish 47C.

20             THE COURT:  Any objection?

21             MS. SEN:  Your Honor, I would have an

22   objection to this, to at least the last page of this

23   exhibit.

24             THE COURT:  All right.  Would you bring the

25   exhibit up.  I am going to turn the husher on so you are

1     free to stretch.

2     (The following was held at the bench.)

3              MS. SEN:  I think the second -- what I am

4     objecting to, your Honor, are the Facebook messages on

5     the last page between our client and Hannah, who is an

6     out-of-court declarant, who is not available to be cross

7     examined.  I understand that these were not under oath,

8     but they're hearsay statements.  They are incredibly

9     prejudicial, and I have no way of curing this once this

10    comes in.

11             MR. GRADY:  Your Honor, if I may, they're

12    actually statements of the defendant.  They're not

13    hearsay statements.  The first three -- the first three

14    messages is what the government would focus on, and it's

15    all by Moet Hart, not by Hannah.

16             THE COURT:  Well, I am looking at the

17    Facebook -- you are looking at the third page, which is

18    11460, author Moet Hart, recipient Hannah Wavy.  All

19    three authors seem to be Moet Hart.

20             MS. SEN:  Your Honor, but the fact that she's

21    not here to be able to cross examine her about what

22    the -- because the whole idea of this -- our client is

23    violating people -- depends on what the recipient

24    interpreted or took it as, and so to the extent that I

25    can't put her on the stand to say, How did you interpret

1    this?  How did you take this? you know, they were -- the
2    evidence is apparently that they were having some kind
3    of feud going back and forth, and so it's also very -- I
4    think that there are additional messages between the two
5    of them, but I would just ask the Court to keep them out
6    because I have no way of doing anything with these
7    messages.
8            MR. GRADY:  And, your Honor, if I can give a
9    little more for context:  You remember Keisha testified
10   that she saw the image on the second page of 47C and
11   that she felt fear based upon receiving that, and the
12   reason that she felt fear is presumably because of --
13   you know, the defendant would do the same thing to her,
14   and that's kind of reflected on page three of the
15   defendant's statements to Hannah.
16           THE COURT:  So technically the defense has no
17   objection to pages one and two.
18           MR. GRADY:  Right.
19           MS. SEN:  And, your Honor, with respect to --
20   the government raised the issue of Keisha W.  Based on
21   the totality of her testimony, it is very clear that the
22   defendant apparently showed that picture to her after
23   she finished working for the defendant.  So it had no
24   impact on -- I mean, she said it did, but she wasn't
25   working for him at the time.

1          MR. GRADY:  And of course that doesn't matter,

2    your Honor, because 5091 is structured in the future.

3    It's would be caused, not actually did cause.  So we

4    don't have to make that link.

5          THE COURT:  How about if I read this?

6          MR. GRADY:  Oh, I'm sorry.  Yes, your Honor.

7    I apologize.  I will be quiet.

8          THE COURT:  Right.  All right.

9          (Brief pause.)

10         THE COURT:  All right.  This is -- this is

11   really suggesting that Hannah obviously had sex with him

12   and was violated.  It's putting words in her mouth.  The

13   problem is, obviously, she can't testify.  So I think it

14   really is prejudicial.

15         MR. GRADY:  But, your Honor, again, just to

16   clear this up, it's his statements, not Hannah's

17   statements.

18         THE COURT:  Oh, I understand, but it's in the

19   context of the conversation with Hannah.  I mean, it is

20   basically assuming that she is going to be saying

21   certain things and that she knows certain things, and

22   there's no way obviously they can contest the fact or

23   rebut that, and so then you are raising a very

24   significant confrontational problem because you are, by

25   implication, suggesting that Hannah might have this

1   particular knowledge.

2             MR. GRADY:  Well, I think she would know

3   because he sent her those Facebook messages, right?

4             THE COURT:  Yes.

5             MR. GRADY:  So --

6             THE COURT:  I am going to exclude the third

7   page.  First two pages are --

8             MR. KAPLAN:  The second page is already in

9   evidence.

10            THE COURT:  Pardon me?

11            MR. KAPLAN:  The second page is already in

12   evidence.

13            THE COURT:  Oh, okay.  So I will exclude the

14   third page.

15            MR. GRADY:  Okay.

16            MS. SEN:  Thank you, your Honor.

17   (The following was held in open court.)

18   BY MR. GRADY:

19   Q    Ms. Epp, before we go any further, let me go back

20   to the picture that was shown in 47B, the Backpage ad

21   with Hannah and other women.  Again, I believe the date

22   was May 18th of 2013?

23   A    Yes.

24   Q    And showing you 116, what's been previously

25   admitted as 116.  If Hannah was born in November of

1    1995, am I correct that Hannah would have been 17 years
2    old at the time that that ad was up on Backpage?
3    A    Correct.
4    Q    All right.  Let's go to -- and I am only going to
5    focus on the first two pages of 47C, Ms. Epp.  And I am
6    going to show you what's been admitted as the first
7    page, 47C.  I want to direct your attention to the very
8    bottom of 47C where there appears to be a message from
9    Moet Hart to Hannah Wavy on January 2nd, 2016.  Is that
10   correct?
11   A    Correct.
12   Q    Okay.  If I turn to the second page of 47C, am I
13   correct that Moet Hart had sent that image to Hannah?
14   A    Correct.
15            MR. GRADY:  Thank you.  We can go ahead and
16   close the image.
17   BY MR. GRADY:
18   Q    Ms. Epp, a couple of -- did you find images of
19   Mandy L. on the defendant's hard drive?
20   A    I did.
21   Q    What about Victoria L.?
22   A    Yes.
23   Q    What about Shorty?
24   A    Yes.
25   Q    Otherwise known -- her real name is Svetlana?

```
1              MS. SEN:  Objection, your Honor.

2              THE COURT:  Yes?

3              MS. SEN:  Your Honor, these are people who

4    have not testified in this case.

5              THE COURT:  Well, right, but he is just asking

6    the preliminary question as to whether she's -- they

7    found images of these particular persons.  There's been

8    testimony about these people.  That's something

9    different than actually introducing statements.  So

10   objection overruled.

11   BY MR. GRADY:

12   Q    What about -- did you find images of Jasmine L.?

13   A    Yes.

14   Q    Amanda S.?

15   A    Yes.

16   Q    Ashley P.?

17   A    Yes.

18   Q    I want to  -- if you can look in your stack and

19   find 47A for identification.

20   A    I don't know that I have 47A.

21   Q    Okay.  If not -- I'm sorry, 49A.  If I said 47A, I

22   misspoke.

23        I will also give you another copy of 49A if you

24   need one.

25   A    I have it.
```

1    Q    Okay.  Who is shown in 49A?

2    A    Mary P.

3    Q    Are you familiar with Mary P.?

4    A    I am.  I have met her.

5    Q    I want to show you what's been previously admitted

6    as 47B.  I'm sorry, 49B.  What is shown in 49B?

7    A    These are four photographs found within the Mary P.

8    folder in the Lineup folder within Pam Scott.

9    Q    And focusing on the dates taken, when were the

10   dates -- when were these photos taken?

11   A    According to the data, the first one, the top one,

12   is December 30th, 2015, at 8:59 p.m.  The second one was

13   January 3rd, 2016, at 4:40 p.m.  And the following two

14   were January 4th, 2016, at 1:26 p.m.

15   Q    And going to the second page of 49B, does that

16   appear to be similar photos that were found in the Mary

17   folder?

18   A    Correct.

19            MR. GRADY:  And if I could go ahead and

20   introduce and publish 49A, your Honor?

21            THE COURT:  Any objection to 49A?

22            MS. SEN:  I think it was just introduced and

23   published, your Honor.

24            THE COURT:  I thought that was -- is that A,

25   the one that's being published at this point?

1          MR. GRADY:  This is B.

2          THE COURT:  I thought it was B.

3          MR. GRADY:  I have been told that 49A has not

4    been admitted, but I thought it was.

5    BY MR. GRADY:

6    Q    We can take a look at 49A.  Is that Mary P.?

7    A    Yes, it is.

8          MR. GRADY:  If it hasn't been admitted, the

9    government moves to admit and publish 49A.

10         THE COURT:  All right.  Any objection?

11         MS. SEN:  No objection.

12         THE COURT:  So admitted.

13         (Government's Exhibit 49A was received in

14    evidence.)

15    BY MR. GRADY:

16    Q    Miss Epp, during the course of this investigation,

17    did you or other law enforcement officers subpoena

18    various hotels for records?

19    A    Yes.

20    Q    Did they respond to those subpoenas?

21    A    Yes.

22    Q    Were the records voluminous?

23    A    Yes.

24    Q    And I believe we have previously introduced 104,

25    105, 108, 109, 110, 111?

```
 1    A     Yes.

 2    Q     Were those some of the records you reviewed?

 3    A     Yes.

 4    Q     In order to make those records more easily

 5    readable, did you or law enforcement compile a chart of

 6    the relevant records?

 7    A     Yes.  It was me.

 8    Q     Directing your attention to 102 for

 9    investigation --

10    A     I have it.

11    Q     -- is that the spreadsheet that you just mentioned?

12    A     Yes.

13              MR. GRADY:  Your Honor, the government moves

14    to admit and publish 102.

15              THE COURT:  Any objection to that summary

16    chart?

17              MS. SEN:  Could we just have one moment,

18    your Honor, please?

19              THE COURT:  Yes.

20              (Brief pause.)

21              MS. SEN:  Your Honor, my understanding is

22    there's actually records referenced in this summary

23    chart that haven't yet been admitted as part of the

24    previous records?

25              THE COURT:  Well, I thought that summary chart
```

1    combined the various entries that you have admitted.

2    Are there other -- others that you have not admitted?

3              MR. GRADY:  That was our understanding,

4    your Honor.  I am not quite sure -- I know we provided

5    it in advance of trial.  I haven't reviewed that summary

6    chart in -- in -- recently, so I can't say one way or

7    the other.

8              THE COURT:  Well --

9              MR. GRADY:  So if you could give me a minute,

10   your Honor?

11             THE COURT:  You don't know if the summary

12   chart includes records which have not been admitted?

13             MR. GRADY:  My understanding it includes all

14   of the records that were in the exhibits that have been

15   admitted.  I don't know if an errant one got introduced

16   or not.  If so, we can probably redact that from the

17   records chart at a break.  I am not aware of any at this

18   time, your Honor.

19             THE COURT:  So, Miss Sen?

20             MS. SEN:  Your Honor, I am holding on to an

21   exhibit.  My understanding 109 has not yet been

22   introduced or admitted.  And there's a name reflected on

23   109.

24             MR. GRADY:  109 has been admitted, your Honor.

25             THE COURT:  I remember 109.  Anyway.  109's

```
1    been admitted.  But is that the one?
2              MS. SEN:  I thought it had not been admitted,
3    your Honor.  I may have misheard that, so if it has been
4    admitted, then I think every one that's listed on here
5    is related to the records.
6              THE COURT:  All right.  Good.  So 102 is
7    admitted.  You can publish it.
8              (Government's Exhibit 102 was received in
9    evidence.)
10   BY MR. GRADY:
11   Q    All right.  So publishing 102, Ms. Epp -- and
12   actually, I am going to focus on a couple of returns in
13   the middle of it, specifically this time period in June
14   of 2015.  Does it appear that Brian Folks rented a hotel
15   at the North Star on June 15th?
16   A    Yes.
17   Q    And then the three entries underneath that, Mandy
18   rented rooms at the North Star, Ho Hum and Motel 6?
19   A    Correct.
20   Q    All within a five-day period, June 15 to June 20th,
21   2015?
22   A    That's correct.
23   Q    Okay.  Ms. Epp, I believe at the beginning of your
24   testimony you mentioned that you also conduct phone
25   analyses?
```

1   A    Yes.

2   Q    As part of the investigation, did you or other law

3   enforcement officers subpoena various cell phone

4   providers for phone records related to this

5   investigation?

6   A    Yes.

7   Q    Did any of those subpoenas involve the phone number

8   (802) 825-4614?

9   A    Yes.

10  Q    Do they cover the time period from summer of 2015

11  to the end of January of 2016?

12  A    Yes.

13  Q    Do you recall who the provider was for that

14  particular phone number?

15  A    It was an AT&T phone.

16  Q    Ms. Epp, if you can take a look at what's been

17  marked as Exhibit 90 for identification.

18  A    Yes.

19  Q    What is Exhibit 90?

20  A    Subscriber information from a subpoena return from

21  AT&T for phone number (802) 825-4614.  The subscriber is

22  listed as Jimmy Porter.

23          MR. GRADY:  Your Honor, the government moves

24  to admit and publish Exhibit 90.

25          THE COURT:  Any objection?

1        MS. SEN:  None, your Honor.

2        THE COURT:  So admitted.

3        (Government's Exhibit 90 was received in

4    evidence.)

5    BY MR. GRADY:

6    Q    And I think you mentioned Jimmy Porter.  It looks

7    like -- I don't have my glasses with me, but is that

8    Jimmy Eorter?

9    A    At the top, underneath the financially liable

10   party, says Jimmy Eorter.  The user information, bottom

11   third of the file, has Jimmy Porter as the name of the

12   user.

13   Q    I see that now.

14   A    It shows the service started on that phone on July

15   30th, 2015.

16   Q    And if we back out to show the entire 90, it

17   appears -- what does this March 7, 2016, date represent?

18   A    That would have been the date that AT&T created the

19   subpoena return.

20   Q    Now, what information is typically contained in

21   toll records that you receive back from AT&T?

22   A    It will show a from number and a to number, so the

23   caller and the recipient of the call, those two numbers;

24   the date of that call, or text, anything that's sent

25   over cellular data.  So you will have the -- the

1    originating number, the terminating number, and the date

2    and time of that call, and the duration of that

3    interaction, that communication.

4    Q    Ms. Epp, is it fair to say that the toll records

5    for this 4614 number were voluminous?

6    A    Yes.

7    Q    What format did you receive them in from AT&T?

8    A    AT&T returns tolls in a text file, so it's just

9    a -- line after line of originating number, terminating

10   number, date, time, duration, over just thousands of

11   lines in a text file.

12   Q    Do you do anything to make them more easily

13   reviewable?

14   A    Yes.  DEA uses an application called PenLink, which

15   is a telephone analysis application software, and

16   PenLink enables you to take phone records, toll records,

17   from different phone companies and uploads them into

18   this software and put them into -- takes the data -- you

19   don't touch it.  You take it from the company.  You

20   upload it into this software, and then you are able to

21   analyze the various -- the data in various ways.

22   Q    Does it -- what's the final output look like?

23   A    Depending on what you are looking for, you can

24   create all kinds of summary charts.  The most frequently

25   used chart or analysis tool is a call frequency

```
1    analysis, so it's your top callers.
2    Q    Please take a look at Exhibit 90A for
3    identification.
4    A    I have it.
5    Q    What is 90A?
6    A    It is a -- the top of a frequency report.
7    Q    Who generated that report?
8    A    I generated many of these, yes.
9    Q    And to be fair, does 90A include every phone number
10   that had contact with 4614?
11   A    No.  There are hundreds.
12            MR. GRADY:  Your Honor, at this time the
13   government moves to admit and publish 90A.
14            THE COURT:  Any objection to 90A?
15            MS. SEN:  No, your Honor.
16            THE COURT:  So admitted.
17            (Government's Exhibit 90A was received in
18   evidence.)
19   BY MR. GRADY:
20   Q    And if you will, Ms. Epp, let's just talk about the
21   first columns:  dialed, frequency, dialed name and date.
22   A    So this is all for the 4614 number that was
23   subscribed to Jimmy Porter.  And the number dialed, the
24   contact between the 4614 number, underneath the dialed
25   chart you have a number that would have been in contact
```

1    with the 4614 number.  The frequency is number of times

2    those two phones were in contact.  The dialed name is

3    the person who belongs to the dialed number.  And then

4    the date parameters would be the first time in the

5    records that were uploaded into PenLink that phone --

6    those two phones contacted each other, and, then the

7    last date would be the last time those two phones

8    contacted each other within the files available.

9    Q    So putting it all together, Ms. Epp, are you saying

10   that there was 16,771 contacts between 4614 and Mandy on

11   those particular dates?

12   A    Yes.

13   Q    And, similarly, over 10,000 with Hannah in those

14   particular dates?

15   A    Correct.

16   Q    Similarly with Mary P.?

17   A    Correct.

18   Q    And a Donald McFarlan?

19   A    Correct.

20   Q    Christina T.?

21   A    Yes.  About a thousand.

22   Q    Lori Crawford?

23   A    Yes.

24   Q    And even this Motel 6 down here on those dates?

25   A    Yes.  For -- that's only about an eight-day

1    stretch, but correct.

2    Q    Right.  Okay.

3         Changing topics, Ms. Epp, Mr. Thornton previously

4    testified about recordings that he found in the file

5    card folder of the hard drive.  Did you listen to those

6    recordings?

7    A    Yes, I did.

8    Q    I am going to direct your attention to two of the

9    recordings, and if you could take or find Exhibit 120

10   for identification.

11   A    I have it here.

12   Q    What is -- I'm sorry.  I meant 118.

13   A    I have that one.

14   Q    What is 118 for identification?

15   A    It's a disk including a phone call found in the

16   card files between --

17   Q    Who is in -- who is one of the parties to that

18   conversation?

19   A    Brian Folks.

20   Q    How do you know it's Brian Folks?

21   A    I recognize his voice.

22   Q    How do you recognize his voice?

23   A    I have listened to hours and hours of jail calls,

24   and I have seen Facebook videos that he has posted.

25   Q    Is 118 a true and accurate copy of a recording that

1    you found on defendant's hard drive?

2    A    It is.

3            MR. GRADY:  Your Honor, the government moves

4    to admit and publish 118.

5            THE COURT:  Any objection to 118?

6            MS. SEN:  No objection.

7            THE COURT:  So admitted.

8            (Government's Exhibit 118 was received in

9    evidence.)

10            MR. GRADY:  We are actually going to play

11   118A, which is just a clip of the recording, and the

12   transcript is 118B, your Honor.

13            THE COURT:  Okay.

14            (A digital recording was played in open

15   court.)

16   BY MR. GRADY:

17   Q    Ms. Epp, if you can find Government Exhibit 119 for

18   identification.

19   A    I have it.

20   Q    What is on 119 for identification?

21   A    It's another recorded call between Brian Folks, and

22   this time he is talking to Svetlana N.

23   Q    How do you know who the defendant is talking to?

24   A    Because I have talked to Svetlana for hours

25   cumulatively.

```
1    Q    Is it -- 119 a true and accurate copy of the
2    recording that you found on the defendant's hard drive?
3    A    It is.
4               MR. GRADY:  Your Honor, the government moves
5    to admit and publish 119.
6               THE COURT:  Any objection to 119?
7               MS. SEN:  No, your Honor.
8               THE COURT:  So admitted.
9               (Government's Exhibit 119 was received in
10   evidence.).
11              MR. GRADY:  Your Honor, we are going to play
12   two clips, 119A with a transcript of 119B, and the other
13   clip is 119C with the transcript 119D.
14              (A digital recording was played in open
15   court.)
16              MR. GRADY:  We will play the second clip now,
17   your Honor.
18              (A digital recording was played in open
19   court.)
20   BY MR. GRADY:
21   Q    Ms. Epp, we have one final area to talk about,
22   which are videos that you found on defendant's hard
23   drive, but before we do that, one -- one -- a few
24   questions for you.
25         If you can find 48D -- as in delta -- for
```

1    identification.  And if it's easier, I actually have a

2    copy of 48D for identification right here.

3    A    I just found it.

4    Q    Sure.  So turn to -- first of all, the e-mail

5    address that was used for that particular ad, what was

6    that e-mail address?

7    A    Jimmyporter308@gmail.com.

8    Q    Turning to the second page, who is shown in the

9    second page on that ad?

10   A    Mandy L.

11   Q    Did you find similar pictures of Mandy L. in either

12   the defendant's hard drive or the Moet Hart Facebook

13   return?

14   A    In both.

15   Q    And what was the date of this particular ad?

16   A    October 22nd, 2015.

17             MR. GRADY:  Your Honor, the government moves

18   to admit and publish 48D -- as in delta.

19             THE COURT:  Any objection to 48D?

20             MS. SEN:  No objection.

21             THE COURT:  So admitted.

22             (Government's Exhibit 48D was received in

23   evidence.)

24   A    It was October 22nd at 12:21 a.m., specifically.

25   BY MR. GRADY:

1    Q    Sure.  And we will go to a split screen here,

2    Ms. Epp, and on the other screen, I would like to bring

3    up 108-006.  Does that appear to be a motel record for

4    Brian Folks on October 20th to October 22nd, 2015?

5    A    It does.

6    Q    Thank you.

7         All right.  Final topic, Ms. Epp.  Did you find

8    video -- well, let me just ask you this:  Can you find

9    34C for identification?

10   A    Yes.

11   Q    What's shown in 34C?

12   A    A still from a video file found on the hard drive

13   in the Lineup folder of the Pam Scott user.

14        MR. GRADY:  Your Honor, the government moves

15   to admit and publish 34C.

16        THE COURT:  Any objection to 34C?

17        MS. SEN:  No objection, your Honor.

18        THE COURT:  All right.  So admitted.

19        (Government's Exhibit 34C was received in

20   evidence.)

21   BY MR. GRADY:

22   Q    And does that -- first of all, does this video

23   reference a car stop on January 20th, 2016?

24   A    It does.

25   Q    Okay.  And I just want to focus a couple of places.

1    Is it correct that it was found in the Lineup folder

2    under Bulk Files under Pictures under the Pam Scott

3    folder in the defendant's hard drive?

4    A    It was.

5    Q    What was the name of this particular file?

6    A    My Cars 2530.

7    Q    I believe earlier, Ms. Epp, you testified that you

8    found videos involving Hannah on the defendant's hard

9    drive?

10   A    Yes.

11   Q    Take a look at 17 -- 117C for identification.

12   A    I see it.

13   Q    Did you receive that back as part of the Moet Hart

14   Facebook return?

15   A    I did.

16         MR. GRADY:  Your Honor, the government moves

17   to admit and publish 117C.

18         THE COURT:  Any objection?

19         MS. SEN:  Can I have a moment, please,

20   your Honor?

21         THE COURT:  Yes.

22         (Brief pause.)

23         MS. SEN:  Your Honor, just to be clear, 117C

24   is just this Facebook business record; is that correct?

25         MR. GRADY:  That's correct.  It's from the

1    Moet Hart Facebook return.

2              MS. SEN:  Well, I would object to the extent

3    that it contains messages from people that are not

4    related at all to the case, so I'd object on the grounds

5    of relevance.

6              THE COURT:  All right.  Are there parts of

7    that exhibit which are hearsay statements from people

8    not involved in this case?

9              MS. SEN:  There appear to be some, your Honor.

10             MR. GRADY:  That's correct, your Honor.

11             THE COURT:  Well, what about striking those

12   references and admitting the remainder?

13             MR. GRADY:  Your Honor, and actually, to make

14   it easier, I won't even publish 117C.  I will --

15   actually, I'll just move on, your Honor.

16             THE COURT:  Okay.

17   BY MR. GRADY:

18   Q    Ms. Epp, can you find 117D -- as in delta -- for

19   identification?

20   A    Yes.

21   Q    What's 117D?

22   A    It is a still from a -- I recognize it.  It's an

23   image file found within the hard drive under the Lineup

24   folder in a folder that was dated "3/15/2016 clear," and

25   it is a still from a video that I saw on Facebook on the

```
1    Moet Hart Facebook profile.
2              MR. GRADY:  Your Honor, the government moves
3    to admit and publish 117D.
4              THE COURT:  Any objection?
5              MS. SEN:  No objection, your Honor.
6              THE COURT:  So admitted.
7              (Government's Exhibit 117D was received in
8    evidence.)
9    BY MR. GRADY:
10   Q    And you just mentioned that, but up top is the file
11   path where this video was found?
12   A    Yes.
13   Q    And what is the name of it?
14   A    "Clear 014."
15   Q    And the jury's previously seen this as Exhibit 117.
16             MR. GRADY:  One moment, your Honor?
17             THE COURT:  Yes.
18             (Brief pause.)
19   BY MR. GRADY:
20   Q    Okay.  Ms. Epp, did you find any videos related to
21   the walnut challenge?
22   A    I found two.
23   Q    Were these found on the defendant's hard drive?
24   A    Yes.
25   Q    Take a look at 128B for identification.  Excuse me,
```

```
 1    124B.  Sorry.

 2    A    I see it.

 3    Q    What's 124B?

 4    A    It is a still from the video which was found within

 5    the Lineup folder in the Pam Scott user group file.

 6             MR. GRADY:  Your Honor, I --

 7    A    My Cars 3335.

 8             MR. GRADY:  Your Honor, the government moves

 9    to admit and publish 124B.

10             THE COURT:  Any objection?

11             MS. SEN:  None, your Honor.

12             THE COURT:  All right.  So admitted.

13             (Government's Exhibit 124B was received in

14    evidence.)

15    BY MR. GRADY:

16    Q    And, again, you just mentioned where you found it

17    and the actual file name.  So at this time, Ms. Epp, I

18    will have you take a look at 124 for identification.

19    A    I have it.

20    Q    What's 124?

21    A    It's a disk with a copy of the My Cars 3335 file on

22    it.

23    Q    Is it a true and accurate copy of that file?

24    A    It is.

25    Q    Did you review and initial that disk?
```

1    A    I did.

2            MR. GRADY:  Your Honor, the government moves

3    to admit and play 124.

4            THE COURT:  All right.  Any objection?

5            MS. SEN:  No, your Honor.

6            THE COURT:  So admitted.

7            (Government's Exhibit 124 was received in

8    evidence.)

9            (A video recording was played in open court.)

10           MR. GRADY:  We can pause it right there.

11   BY MR. GRADY:

12   Q    Do you recognize the woman who was just shown?

13   A    In the white?

14   Q    In the white.  Yes, Ms. Epp.

15   A    Yes.

16   Q    Who is that?

17   A    Victoria L.

18   Q    What about the still that we are looking at right

19   now with the dark gray shirt; do you recognize who that

20   person is?

21   A    That's Krissy P.

22   Q    Thank you.

23           MR. GRADY:  We will go ahead and play it.

24           (A video recording was further played in open

25   court.)

1    BY MR. GRADY:

2    Q    Ms. Epp, let's turn to the second video that you

3    found involving the walnut challenge.  Can you take a

4    look at 125B for identification.

5    A    Yes.

6    Q    Is that a screenshot of where you found it in the

7    defendant's hard drive?

8    A    Yes.  It was within the Pam Scott user profile, in

9    the Lineup folder under another folder called Videos.

10              MR. GRADY:  Your Honor, the government moves

11   to admit and publish 125B.

12              THE COURT:  Any objection?

13              MS. SEN:  No, your Honor.

14              THE COURT:  All right.  So admitted.

15              (Government's Exhibit 125B was received in

16   evidence.)

17   BY MR. GRADY:

18   Q    And, again, this is the file path where you found

19   it and looks like this one was named IMG_0105?

20   A    Correct.

21   Q    Ms. Epp, if you can take a look at 125.

22   A    I have it.

23   Q    What is 125?

24   A    It is a copy of the IMG_0105 video on the disk.

25              MR. GRADY:  Your Honor, the government moves

1    to admit and publish 125.

2              THE COURT:  Okay.  Any objection?

3              MS. SEN:  No objection.

4              THE COURT:  All right.  So admitted.

5              (Government's Exhibit 125 was received in

6    evidence.)

7    BY MR. GRADY:

8    Q    Ms.  Epp, again, who was shown in 125?

9    A    Brian Folks and Victoria L.

10   Q    The final subject -- final topic on the subject of

11   videos, did you find any videos of the defendant

12   urinating on women?

13   A    I did.

14   Q    How many videos did you see?

15   A    Two of them.

16   Q    Let's talk about the first one.  And can you take a

17   look at 126B for identification?

18   A    Yes.

19   Q    What is it?

20   A    It is a still of a video titled "My Cars 3314"

21   found in the Lineup folder in the Pam Scott user

22   profile.  The still shows the backside of Keisha W.

23   and --

24              MR. GRADY:  Your Honor at this time the

25   government moves to admit and publish 126B.

1          THE COURT:  Any objection?

2          MS. SEN:  No, your Honor.

3          THE COURT:  All right.  So admitted.

4          (Government's Exhibit 126B was received in

5    evidence.)

6    BY MR. GRADY:

7    Q    And, again, would you just mention the file path at

8    the top where you found it, and I believe you said it

9    was My Cars 33 --

10   A    14.

11   Q    -- 14 is the actual name of that?

12   A    Correct.

13   Q    And we're not going to show the actual video, but

14   take a look at 126C.

15   A    Yes.

16   Q    Is that an accurate still from the video of the

17   defendant peeing on Keisha W.?

18   A    Yes, it is.

19         MR. GRADY:  Your Honor, the government moves

20   to admit and publish 126C.

21         THE COURT:  All right.  Any objection?

22         MS. SEN:  No, your Honor.

23         THE COURT:  All right.  So admitted.

24         (Government's Exhibit 126C was received in

25   evidence.)

1      MR. GRADY:  We will take down 126C.

2   BY MR. GRADY:

3   Q    Ms. Epp, I would like you to take a look at 127B

4   for identification.

5   A    I have it.

6   Q    What is 127B?

7   A    It's also a still from the second urination video

8   with Mary P., and it's titled "My Cars 3148."  It's also

9   within the Lineup folder in the Pam Scott user profile.

10  Q    And, finally -- or look at 127C for identification.

11  Instead of playing that particular video, is that an

12  accurate still from that video?

13  A    Yes.  It shows the defendant urinating on Mary P.

14      MR. GRADY:  Your Honor, at this time the

15  government moves to admit and publish 127C.

16      THE COURT:  Okay.  Any objection?

17      MS. SEN:  No objection to the photo,

18  your Honor.

19      THE COURT:  So admitted.

20      (Government's Exhibit 127C was received in

21  evidence.)

22  BY MR. GRADY:

23  Q    Finally, Ms. Epp, did you ever find a video of the

24  defendant discussing peeing on women?

25  A    I did.

```
 1    Q    Take a look at 128 for identification.

 2    A    Yes.

 3    Q    What's contained on 128?

 4    A    A copy of the video I found where the defendant

 5    discusses -- or talks to the camera about peeing on

 6    women.

 7              MR. GRADY:  Your Honor, at this time the

 8    government moves to admit and play 128.

 9              THE COURT:  Any objection?

10              MS. SEN:  Can I have just a moment,

11    your Honor?

12              THE COURT:  Yes.

13              (Brief pause.)

14              MS. SEN:  Your Honor, I think that we have a

15    couple of concerns about this particular video.  This is

16    not one of the ones that the Court reviewed previously,

17    so --

18              THE COURT:  Correct.

19              MR. GRADY:  -- it is not one of the ones that

20    was admitted.

21              MR. GRADY:  Your Honor, it is one of the

22    videos that you reviewed previously.

23              THE COURT:  Well, okay.  So let's -- it's

24    4:30, so let's stop at this point.  Do you have -- is

25    this it for your --
```

1           MR. GRADY:  This is it, your Honor.  I was

2     going to rest after this particular video.

3           MS. SEN:  I think Mr. Kaplan and I were just

4     unclear.  Are you going to play the video at this point?

5           MR. GRADY:  Yes, your Honor.  The government

6     intends on playing the video if it's admitted.

7           THE COURT:  All right.  Well, would counsel

8     approach the bench.

9     (The following was held at the bench.)

10           THE COURT:  Okay.  I reviewed the two

11     urination videos.  I reviewed the diatribe, in

12     particular, about Hannah.  Is this another?

13           MR. GRADY:  This is a video where he discusses

14     that he -- it's 30 seconds long, your Honor, and he

15     discusses peeing on bitches and things of that nature.

16           THE COURT:  I don't recall seeing that one

17     actually.

18           MR. GRADY:  We're pretty sure that we provided

19     it.

20           MR. KAPLAN:  Are you introducing the video of

21     Mary?

22           MR. GRADY:  No.  Just showing this --

23           MR. KAPLAN:  Just showing this --

24           MR. GRADY:  Just showing this.  Yeah.  We just

25     showed the still photos, the Mary and the Keisha.

1          THE COURT:  Okay.  I have to see it.

2          MR. GRADY:  Okay.

3          THE COURT:  So let's break at this point --

4          MR. GRADY:  Okay, your Honor.

5          THE COURT:  -- and I will take a look at it.

6   Okay.

7   (The following was held in open court.)

8          THE COURT:  All right.  We are going to call

9   it a day.  It's been a long day.  We're still on pace.

10       So I just want to remind you not to conduct your

11  investigation, talk to anybody about this.  We will see

12  you tomorrow at nine o'clock.

13       And I'm going to stay on the bench to speak with

14  the lawyers.  Okay.

15  (The jury was excused after which the following was held

16  in open court at 4:34 p.m.)

17         THE COURT:  All right.  It's coming back to

18  me.  There were, in effect, three separate videos, and,

19  yes, I did review it, but I'd like to see it again in

20  light of the fact that you are going to play the video.

21  So I think it has been submitted.  I think we may still

22  have a copy of it in chambers.  If not --

23         MR. GRADY:  We can play it right now,

24  your Honor.  It's 30 seconds.

25         THE COURT:  Okay.  Why don't you do that.

1          (A video recording was played in open court.)

2          THE COURT:  All right.  Okay.  And I did

3   review that and permit it to be introduced.

4      Now, the defense has an issue that they wanted me

5   to consider --

6          MS. SEN:  Yes, your Honor.

7          THE COURT:  -- raised by the defendant?

8          MS. SEN:  This is related to Exhibit 50D, and

9   in reviewing it when it was up on the screen today, my

10  client, with our expert, noticed that there are -- and

11  would the Court like a copy of it?

12         THE COURT:  Well, this is a much broader

13  attack, as I thought.

14         MS. SEN:  Well, the issue is that there are

15  identical photos, and the metadata for the photo,

16  according to -- so this is -- these documents, these are

17  basically created by DEA pretty much.  So this isn't

18  what you would actually see if you were on our client's

19  hard drive.

20     And the information they have put in here is that

21  the same photo was taken on two completely different

22  dates, which our expert says is just -- very difficult

23  to account for.

24         THE COURT:  Okay.

25         MS. SEN:  So our client is renewing the issue

```
 1    of the fact that it's impossible to detect with
 2    certainty what sorts of files were corrupted when the
 3    computer was powered on.
 4              THE COURT:  Okay.  And can you submit that?  I
 5    will take a look at it tonight.
 6              MS. SEN:  Okay.  Thank you, your Honor.
 7              THE COURT:  What's the schedule for tomorrow?
 8    I guess you are done with this witness?
 9              MR. GRADY:  Yes, your Honor.  Actually, could
10    Ms. Epp step down if you don't have anything further?
11              THE COURT:  Yes, you can step down.
12              MR. GRADY:  Thank you.
13              (Witness temporarily excused.)
14              THE COURT:  And --
15              MR. GRADY:  Yes.  I will double check tonight,
16    but we will admit and play 128, and then the government
17    has no further questions of Ms. Epp.
18              THE COURT:  Okay.
19              MR. GRADY:  I assume the defense may have some
20    cross examination.
21              THE COURT:  Right.  And how long do you
22    anticipate your cross to last?
23              MS. SEN:  I don't know, your Honor.  Probably
24    at least an hour.
25              THE COURT:  Okay.  And then you have witnesses
```

```
1    to call?
2              MS. SEN:  Yes, your Honor.
3              THE COURT:  And how long do you anticipate
4    your presentation to be?
5              MS. SEN:  Your Honor, can I defer to
6    Mr. Kaplan on that?
7              THE COURT:  Yes.
8              MR. KAPLAN:  Assuming they all come back
9    today -- tomorrow after today, probably take -- with our
10   computer expert, probably take the rest of the day.
11             THE COURT:  Okay.  And you anticipate
12   completing your testimony Tuesday?
13             MR. KAPLAN:  That would be decided by Tuesday,
14   I would think.
15             THE COURT:  Okay.  All right.  And rebuttal?
16   You can't anticipate that, I suppose.
17             MR. DARROW:  Hard to anticipate, but could we
18   ask you to inquire as to defense, as you did with the
19   government, who their witnesses are?
20             THE COURT:  Sure.  Okay.
21             MR. KAPLAN:  Well, I don't mind doing that.  I
22   sent Mr. Darrow a list of them Sunday.  It hasn't
23   changed.
24             MR. DARROW:  Oh, all right.
25             MR. KAPLAN:  It could be one less, and I will
```

1    know that tonight or so.

2              THE COURT:  And how many witnesses do you

3    have?

4              MR. KAPLAN:  Probably around four or five at

5    the most.

6              THE COURT:  Okay.

7              MR. KAPLAN:  And they're brief witnesses.

8              THE COURT:  Right.  Okay.  All right.  So it

9    looks like summations, and they'll get the case on

10   Wednesday, Wednesday morning; is that -- well, not

11   Wednesday morning.  You got the charge.  So Wednesday

12   morning would be summations, unless the government has

13   some rebuttal evidence, and then they get the case early

14   in the afternoon.  Is that expected?

15             MR. KAPLAN:  I don't know for sure, Judge, but

16   certainly this week.  I mean, you know, things can

17   happen, so --

18             THE COURT:  Oh, sure.  Okay.  Well, I'm

19   concerned about your trip to Houston.  That's on Friday?

20             MR. KAPLAN:  Yes.

21             THE COURT:  Right?

22             MR. KAPLAN:  Yes.  If I don't go, I can stay

23   here for the next year and not have to go home, Judge.

24             THE COURT:  Yes?  Well, all right.

25        So I also want to make sure that you are prepared

1    to go on --

2              MR. KAPLAN:  We will be prepared.

3              THE COURT:  -- Wednesday morning.

4              MR. KAPLAN:  I'm sure we will both be prepared

5    to do closing.

6              THE COURT:  On Wednesday morning?

7              MR. KAPLAN:  Whenever we do them, we will be

8    prepared, certainly.

9              THE COURT:  Okay.  And, Mr. Darrow, is that

10   correct?

11             MR. DARROW:  I think that is correct,

12   your Honor.

13             THE COURT:  All right.  So you anticipate -- I

14   anticipate Wednesday morning.

15             MR. DARROW:  It sounds -- it sounds very

16   likely.

17             THE COURT:  And if they start deliberating on

18   Wednesday afternoon, then there's a good day and a half

19   before you have to make your trip to Texas.  And then

20   what do we do if you have to make a trip to Texas?

21             MR. KAPLAN:  Just come back on Monday.

22             THE COURT:  Come back on Monday.  And there

23   are some jurors -- one juror in particular who has a

24   conflict into that following week.  Is that right?

25             COURTROOM DEPUTY:  I don't know about that,

1    Judge.

2              THE COURT:  Well, I am going to check that out

3    to make sure that -- there's some -- I had heard there

4    was some conflict in going into the following week, but

5    we will see.

6              MR. KAPLAN:  Thank you, Judge.

7              THE COURT:  All right.  Anything else?

8         Okay.  Thank you.  Okay, we'll see you tomorrow.

9              (Court was in recess at 4:41 p.m.)

10                      *** ** ***

11

12

13

14                 C E R T I F I C A T I O N

15         I certify that the foregoing is a correct
     transcript from the record of proceedings in the
16   above-entitled matter.

17                              _Anne Nichols Pierce_

18   _May 6, 2019_              _____
     Date                       Anne Nichols Pierce
19

20

21

22

23

24

25