UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
            V.              *    Case No:  2:16-cr-94-1
BRIAN FOLKS             *




TRIAL BY JURY - DAY NINE - VOLUME I
MAY 7, 2019
BURLINGTON, VERMONT


BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

     Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

     Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Marilyn Epp | 4 |
|   Continued Direct Exam by Mr. Grady | 4 |
|   Cross Examination by Ms. Sen | 4 |
|   Redirect Examination by Mr. Grady | 39 |
| Ariel Otero | 69 |
|   Direct Examination by Mr. Kaplan | 70 |
|   Cross Examination by Ms. Savner | 76 |
|   Redirect Examination by Mr. Kaplan | 87 |
| Brittany Barber | 88 |
|   Direct Examination by Mr. Kaplan | 88 |
|   Cross Examination by Ms. Savner | 98 |
|   Redirect Examination by Mr. Kaplan | 103 |
| Emily Lasell | 104 |
|   Direct Examination by Mr. Kaplan | 104 |
|   Cross Examination by Mr. Grady | 111 |

| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 48C | Facebook-Mandy L. | 4 |
| 128 | Video my cars 3373 | 41 |

**Capitol Court Reporters, Inc. (800/802) 863-6067**

3

```
 1  TUESDAY, MAY 7, 2019 - 9:05 A.M.
 2  [The following was held in open court with the jury present]
 3          THE COURT:  Good morning.
 4          DEPUTY CLERK:  This is Case Number 16-94 United
 5  States of America versus Brian Folks.  The Government is
 6  present through Assistant United States Attorneys Emily Savner,
 7  Matthew Grady, and William Darrow.  The defendant is present in
 8  the courtroom with his attorneys Natasha Sen and Mark Kaplan.
 9  The matter before the Court is Trial by Jury day nine.
10          THE COURT:  Okay.  I think this is day 10, isn't it?
11          DEPUTY CLERK:  No, Your Honor.  It's day nine.
12          THE COURT:  Oh I was wrong.
13          DEPUTY CLERK:  With all due respect.
14          THE COURT:  All right.  Has anyone spoken to you
15  about the case?  Have you learned anything about this case from
16  outside the courtroom or have you spoken among yourselves with
17  regard to this case?  Okay.  Everybody is saying no.  I
18  appreciate that.  I think we are ready to continue and, Mr.
19  Grady, do you have your witness?
20          MR. GRADY:  Yes, Your Honor, we do.  Professor Epp,
21  would you go ahead and retake the stand?
22          THE COURT:  Actually would you approach for the oath
23  again?
24          MS. EPP:  Yes, Your Honor.
25  Marilyn Epp,
```

                         Marilyn Epp                         4

1          Having been duly sworn, testified as follows:

2                THE COURT:  Good morning.

3                MS. EPP:  Good morning, Your Honor.

4                THE COURT:  Do you think of yourself as agent or

5     professor?

6                MS. EPP:  I'm just Marilyn.

7                THE COURT:  Oh I see.  Okay.

8                     CONTINUED DIRECT EXAMINATION

9     BY MR. GRADY:

10    Q.    Ms. Epp, when we last left we were talking about

11    Government exhibit 128 which I believe you describe as a video

12    of the defendant talking about urinating on women?

13    A.    Yes.

14               MR. GRADY:  Your Honor, the Government moves to admit

15    and publish 128.

16               THE COURT:  It is admitted.

17    [Government exhibit 128 admitted and published]

18               MR. GRADY:  Thank you, Your Honor.  No further

19    questions.

20               THE COURT:  All right.  Cross examination, Ms. Sen.

21               MS. SEN:  Yes, Your Honor.

22                          CROSS EXAMINATION

23    BY MS. SEN:

24    Q.    Miss Epp, as a DEA intelligence analyst you had an

25    civilian position with the DEA; is that correct?

                        Marilyn Epp                              5

1  A.      Yes.

2  Q.      And you received training on intelligence issues for 12

3  weeks at the DEA Academy?

4  A.      I did.

5  Q.      And that was not law enforcement training; is that

6  correct?

7  A.      It is through the DEA Academy so there's law enforcement

8  training involved.

9  Q.      But isn't the actual -- if you're an actual agent you

10 would go for like a six-month course at Quantico, Virginia?

11 A.      18 weeks, but it's longer, yes.

12 Q.      So you didn't do that one, right?

13 A.      No.

14 Q.      So you're an analyst?

15 A.      Uh-huh.

16 Q.      Civilian analyst, and you worked as an civilian

17 intelligence analyst with the resident office here in

18 Burlington, Vermont; is that correct?

19 A.      I did.

20 Q.      So you also said that you received training on using

21 social media web sites; is that correct?

22 A.      Yes.

23 Q.      And, for example, you would learn how to use web sites

24 or platforms like Facebook, Instagram, Twitter?

25 A.      Yes.

Marilyn Epp                                    6

1    Q.      And you would create fake profiles for those and go

2    undercover?

3    A.      Yes.

4    Q.      When did that training actually take place?

5    A.      I had a couple different trainings in social media

6    exploitation.  It was discussed at the academy.  The last stand

7    alone training I had I think was in the summer of 2017.

8    Q.      And wouldn't that be after most of the work on your case

9    -- on this case?

10   A.      That training took place while I was doing this.  In

11   fact the last training took place during this investigation.

12   Q.      And in fact we know that Mr. Folks was actually arrested

13   a year earlier in July 2016, correct?

14   A.      Yes.

15   Q.      So just to talk a little bit about these web platforms,

16   taking Facebook as an example, this is an internet platform

17   that allows users to post information about themselves; is that

18   right?

19   A.      Yes.

20   Q.      And it allows people who have accounts to comment on

21   things that are posted, isn't that correct?

22   A.      It is.

23   Q.      And so there's a public area where whatever is posted is

24   visible to anyone --

25   A.      Yes.

Marilyn Epp                                    7

1   Q.      -- is that correct?  And there's also a private side to

2   Facebook where people can exchange messages privately?

3   A.      Correct.

4   Q.      And in that private area it's only people who are

5   designated by the account owner who can exchange messages?

6   A.      Some profiles are set up so they can be messaged by

7   another user who is not their friend.  So it depends on how you

8   set up your profile.

9   Q.      But it's fair to say then for sending messages through

10  Facebook that the account owner has to give permission?  They

11  have -- sorry.  Let me go back a second.  When you have a

12  Facebook account you control the settings for who contacts you

13  and how they contact you?

14  A.      Yes.

15  Q.      So it's the account owner who determines who is able to

16  send them messages; is that right?

17  A.      Yes.

18  Q.      So you talked about, and we've discussed, that you

19  created fake profiles in order to do your undercover

20  investigations?

21  A.      In order to, yes, aid the investigations.

22  Q.      And so was that -- did that allow you to access the

23  private areas of people's Facebook accounts?

24  A.      No.

25  Q.      So you were only looking at public areas?

Marilyn Epp                                        8

1   A.      Yes unless that person friended me -- friended that

2   profile.

3   Q.      In which case you could actually look at private

4   information on the account?

5   A.      I could look at whatever someone's friend list could

6   look at.

7   Q.      And some of that would not be available to other people

8   in the public, isn't that correct?

9   A.      Correct.

10   Q.      So when you create a Facebook or -- I'm using Facebook

11   as an example.

12   A.      Sure.

13   Q.      But any other sort of social media account are you

14   required to use your real name and address in order to create

15   the account?

16   A.      No.

17   Q.      And so do operators of media web sites like Facebook

18   require other kinds of methods of identification in order to

19   open an account?

20   A.      They do.

21   Q.      So what kinds of methods do they use to verify who

22   people are?

23   A.      E-mail.

24   Q.      But the e-mail account could be fake, right?

25   A.      Correct.

Marilyn Epp                                                        9

1    Q.      And without going into too much confidential detail

2    that's part of what you did, right, creating a fake profile?

3    A.      Yes.

4    Q.      And I'm going to assume that the fake accounts that you

5    created did not contain any personal identifying information of

6    yourself?

7    A.      No.

8    Q.      So it's pretty easy to create a social media account

9    using someone else's name and an alias?

10   A.      You can do it, yes.

11   Q.      You can actually post pictures that are completely

12   unrelated to you on your Facebook page, isn't that correct?

13   A.      People can do that, yes.

14   Q.      And do your social media web sites like Facebook create

15   -- have security mechanisms that ensure that only the

16   legitimate account holder can log in?

17   A.      They do have mechanisms.  It doesn't always work.

18   Depends on if there's certain flags that appear or people

19   report suspicious activity.

20   Q.      But it's possible that a person who has the user name

21   and password for an account can access the account?

22   A.      Yes.

23   Q.      Without the legitimate account holder's knowledge?

24   A.      There's often two step verification where they will send

25   an e-mail or a code to an e-mail to verify or if you have a

Marilyn Epp                              10

1  phone number associated with the account.  So if you have -- if

2  you're using a device to access an account and that device

3  hasn't been used to access that account before, quite often

4  there will be a two step verification where they are going to

5  send a code to an e-mail or phone and ask that that code be

6  input before you can gain access.  It's becoming more and more

7  common.

8  Q.    And it's the account user who sets up whether two step

9  verification occurs, isn't that right?

10 A.    Sometimes the web sites just require it.  It depends on

11 which platform.

12 Q.    And social media platforms.  So, for example, I'm using

13 Facebook, Instagram, the defunct Backpage, they have certain

14 standards for what can be publicly posted, isn't that correct?

15 A.    I don't know that Backpage would be considered a social

16 media platform.

17 Q.    It was a web site, right?

18 A.    Right, but it wasn't considered social media.  It was

19 more like a Craigslist.  Like a buying and selling more than a

20 social media.

21 Q.    Fair enough.

22 A.    Yes.

23 Q.    But they would have certain community standards and

24 guidelines for what could be posted on the public areas where

25 people could view and access them, isn't that fair?

Marilyn Epp                            11

1   A.      Yes.

2   Q.      And, for example, Facebook wouldn't prevent nudity --

3   pictures of nude women or men to be posted, isn't that correct?

4   A.      Nude pictures do get posted, but they can be flagged

5   either by -- on the administrative side or if another user were

6   to flag it and make the administrative side aware of it, but

7   nude pictures can be posted, but they usually get taken down.

8   Q.      Right because they have community guidelines that

9   actually --

10  A.      Right.

11  Q.      -- require -- say that if you post a nude photo we'll

12  take it down, right?

13  A.      Yes.

14  Q.      So if there are a lot of nude pictures of nude women or

15  men in Facebook typically those photos would be showing up in

16  private messages, isn't that correct?

17  A.      Private messages or private photo albums.

18  Q.      And those are not available publicly obviously, right?

19  A.      Those aren't available publicly and you can also make

20  them not available to anyone.  It can just be a stand alone

21  album for yourself within your profile.

22  Q.      So you testified for quite a long time yesterday about

23  the photographs and the videos that you reviewed from the

24  computer that was seized at 96 Ethan Allen Parkway?

25  A.      Yes.

Marilyn Epp                               12

1    Q.      Do you remember that?

2    A.      Yes.

3    Q.      And you were aware that Agent Chetwynd had transferred

4    that computer -- or, I'm sorry, that, yes, Agent Chetwynd had

5    transferred that computer on July 21st to Agent Destito at the

6    FBI?

7    A.      Yes.

8    Q.      And you were aware that one of the reasons that that

9    computer was transferred to FBI is because the FBI intended to

10   send it to its digital forensic lab for analysis?

11   A.      That was the hope.

12   Q.      And that's why Agent Destito placed the computer in the

13   evidence vault, right?

14   A.      Yes.

15   Q.      And one of the reasons you place evidence in a vault is

16   to ensure its integrity, is that fair to say?

17   A.      Maintain chain of custody, yes.

18   Q.      Because you want to make sure that evidence that comes

19   into court isn't tampered with, right?

20   A.      Yes and to ensure the chain of custody is intact.

21   Q.      Right, and in fact you document the chain of custody

22   very closely, don't you?

23   A.      We do.

24   Q.      Because otherwise you don't know whose accessed a piece

25   of evidence, where it's been, isn't that correct?

                    Marilyn Epp                        13

1    A.      Correct.

2    Q.      And in fact in this case when there are drugs seized

3    agents have come on and testified about how those drugs were

4    passed from one to the other until it got to the lab and was

5    tested, isn't that fair to say?

6    A.      Correct.  I wasn't in the courtroom, but that's common

7    practice.

8    Q.      You were aware that occurred -- sorry.  You were aware

9    that that occurred in this case though, right?

10   A.      When we were investigating and seizing drugs, yes.

11   Q.      And one of the reasons that you want to ensure the chain

12   of custody is because once evidence is tainted there's some

13   question about its integrity, isn't there?

14   A.      I don't know what you mean by taint.

15   Q.      If someone touches -- well let me give you an example.

16   You seize a firearm when someone's arrested and you carefully

17   -- the firearm goes from the seizure to the vault at the police

18   department and then the police department is supposed to send

19   that firearm to a technician who is going to test it for

20   fingerprints.  Okay.

21   A.      Okay.

22   Q.      I'm just giving you a hypothetical.

23   A.      Right.

24   Q.      If someone were to touch that gun in the middle and then

25   send it to the lab, wouldn't that be kind of a problem?

                           Marilyn Epp                        14

1    A.      The gun is going to be touched to transfer it.

2    Q.      But aren't there ways to handle it?  You would use

3    gloves, for example?

4    A.      Uh-huh.

5    Q.      You would be careful to document you are actually

6    handling a firearm?

7    A.      I don't know.  I don't know what firearm chain of

8    custody entails.

9    Q.      Wasn't -- well let me ask you the same question about

10   drugs.  Would the same process occur?

11   A.      Somebody is going to open up a packet of drugs and take

12   a portion out of it and conduct a field test.  So they are

13   breaking into the packaging and they are taking out a portion

14   of it and they are going to field test it to see whether or not

15   it proves positive for the substance that you believe it to be

16   and then you repackage it up and then you send it to the lab.

17   Q.      And you seal it, isn't that correct?

18   A.      Yes.  Repackage it.

19   Q.      As was done in this case, and then you sign it to

20   indicate that it was sealed and this is what happened on that

21   date, correct?

22   A.      Yes.

23   Q.      And the reason you do that is because you want to make

24   sure that no one has affected the integrity of what was seized,

25   isn't that correct?

                        Marilyn Epp                          15

1    A.      Correct.

2    Q.      And one of the very common ways that you ensure that

3    there's a chain of custody for a device is that you document

4    it, right?

5    A.      The chain of custody with receipts, yes.

6    Q.      Exactly.  So every person who touches that piece of

7    evidence creates a document saying -- or there's some record,

8    whether it's on the item itself or in a separate report,

9    talking about how that item went from one person to the other

10   until it got to its final destination, right?

11   A.      Yes.  It's usually by entity.  Like when the FBI gave it

12   to us Adam probably -- Agent Chetwynd came in the room, we

13   talked about the computer, he didn't sign off on the receipt.

14   I had already signed the receipt for DEA.  So it's entity to

15   entity, yes.

16   Q.      Okay.  Fair enough.  So the warrant to search this

17   computer was issued on January 27, 2017?

18   A.      Yes.

19   Q.      And three days later on January 30th Agent Destito

20   transferred that computer to you?

21   A.      Yes.

22   Q.      I'm going to ask you to look at what I have been -- what

23   has been marked as defendant's ZZ7 which is the search warrant

24   return for the computer.  Now if you look at the first page

25   this is the actual search warrant, right?

Marilyn Epp                             16

1   A.     Yes.

2   Q.     And it says that an authorized law enforcement officer

3   is authorized to search the computer, right?

4   A.     And four other devices.

5   Q.     Right and four other devices including the computer?

6   A.     Uh-huh.

7   Q.     Were you an authorized law enforcement officer at the

8   time that you conducted the search of this computer?

9   A.     Yes.  I'm allowed to be a part of executing search

10  warrants, yes.

11  Q.     So were you deputized in order to do that?

12  A.     No, but it was part of my job.

13  Q.     So on the second page it looks like it appears from your

14  signature that you filled this out?

15  A.     I did.

16  Q.     And do you see the top line there?

17  A.     Yes.

18  Q.     It says the date and time the warrant was executed was

19  on January 27, 2017 at 2:30?

20  A.     Correct.

21  Q.     And it says the copy of the warrant and inventory was

22  left with Frank Thornton?

23  A.     Yup.

24  Q.     So I'm just confused.  Agent Destito says that you

25  transferred this computer -- that he transferred the computer

                        Marilyn Epp                        17

1    to you on January 27th?

2    A.      No.  On January 30th.

3    Q.      30th, sorry, and your return says that you executed the

4    warrant on January 27th and that you left a copy of the warrant

5    and inventory with Frank Thornton?

6    A.      Yes.

7    Q.      Can you explain that?

8    A.      Yes.  On January 27th after the warrant was signed --

9    because it was signed that morning.  We had some of the devices

10   with us, three of the phones, and so I started executing this

11   warrant with the phones on January 27th at 1430 hours.  So I

12   had to put down when I started because there was five different

13   devices.  So I had started executing the warrant at that time

14   and then I -- as you know on February 3rd I took all of the

15   inventory and a copy of the warrant and left it with Frank

16   Thornton when I realized that we didn't have the capabilities

17   at DEA to access the computer in a way that it needed to be.

18   Q.      Well yesterday on direct you testified that you hadn't

19   even heard of Frank Thornton until after you turned on the

20   computer and tried to search it on February 2nd; is that

21   correct?

22   A.      Correct.  This was filled out on April 24, 2017.

23   Q.      So you're saying that you're mistaken about providing

24   those devices to Frank Thornton on January 27th?

25   A.      At the time that I filled this out I was saying that I

Marilyn Epp                        18

1  had taken the evidence and a copy of the warrant and taken it

2  to and left it with Frank Thornton and he still had -- he still

3  had all those items at that time.

4  Q.    But these reports don't indicate that he received those

5  items on January 27th?

6  A.    He didn't, but at the time that I filled this out he had

7  them.  So I was saying that I began executing the warrant on

8  January 27th in the afternoon and at the time I filled this out

9  all of those items and a copy of the warrant were with Frank

10 Thornton.

11 Q.    It's not exactly clear from the face of this that that

12 is what occurred, is it?

13 A.    I guess not, no.  I just filled out the form.

14        THE COURT:  When did you fill out that form?

15        MS. EPP:  April 24, 2017.  At that point we had

16 gotten back the forensic -- most of the forensic extraction

17 from Frank so I was able to fill out what was the inventory

18 that was seized.

19 BY MS. SEN:

20 Q.    So just going back to you receiving this computer, Agent

21 Destito transferred the computer to you on January 30th?

22 A.    Yes.

23 Q.    And that computer sat with you until February 3rd --

24 February 2nd; is that correct?

25 A.    It did.

Marilyn Epp                                    19

1   Q.    And on -- and who made the decision not to send that

2   computer to the FBI to conduct a digital forensic investigation

3   of it?

4   A.    Destito -- sorry.  Agent Destito had asked the FBI lab

5   and they said the turnaround was at least six months for any

6   sort of work to be done on computers.  So we knew that wasn't a

7   reasonable option.

8   Q.    So then when you learned that you decided that you were

9   going to try to search the computer?

10  A.    I did.

11  Q.    And you have no digital forensics training whatsoever,

12  isn't that correct?

13  A.    Not for computers.

14  Q.    Well isn't searching a computer a little different than

15  searching a phone?

16  A.    I know that now, yes.

17  Q.    Well before that time you had never attempted to search

18  a computer, had you?

19  A.    I had not attempted to search a computer.  I had the

20  forensic extractions given to me before, but I had never had a

21  computer tower that needed to be searched.

22  Q.    And even as you sit here today you have no idea how you

23  would extract a forensic image or create a mirror image of a

24  hard drive, do you?

25  A.    No idea.

Marilyn Epp                           20

1    Q.      You wouldn't know how to examine the contents of a hard

2    drive?

3    A.      Not without the report given to me, no.  I don't know

4    how to create a mirror image.

5    Q.      And, in fact, you testified yesterday that when you

6    started searching the computer that it didn't even occur to you

7    that searching a computer was a specialized skill that you

8    needed specialized training for, isn't that correct?

9    A.      Creating a sort of mirror image I didn't know that that

10   -- yeah I didn't know there was a specialized -- I didn't -- I

11   was ignorant of the available resources for doing such a thing,

12   yes.

13   Q.      So you received DEA training and you said you received

14   law enforcement training, right?

15   A.      I don't know what you mean by law enforcement training.

16   We had to learn laws and how they apply to our jobs.

17   Q.      Maybe I can ask you a better question.  You received

18   training on how to handle evidence, right?

19   A.      Yes.

20   Q.      Okay.  How to seize it?  How to preserve it?

21   A.      Yes.

22   Q.      Maintain its integrity, isn't that correct?

23   A.      Yes.

24   Q.      And you weren't aware -- and so this all took place in

25   early 2017.  Fair enough?

                    Marilyn Epp                        21

1    A.      This?

2    Q.      Yes.  Search of this computer?

3    A.      Yes.

4    Q.      For at least the last decade the Department of Justice

5    has had guidelines, very specific guidelines, on how to handle

6    digital forensic evidence and you're saying that you weren't

7    aware of any of that?  In all of your training you weren't

8    aware?

9    A.      I did not know there was specific DOJ guidelines before

10   this last Sunday.

11   Q.      Before Sunday?

12   A.      Before this -- what was that day?  The 5th.

13   Q.      How did you learn that?

14   A.      Understanding that I went into the computer that it was

15   an issue.  I didn't know before that.

16   Q.      Who did you learn that from?

17   A.      Talking with the prosecutor.

18   Q.      What else did you talk about?

19   A.      What I talked about yesterday.

20   Q.      What did you talk about with respect to your handling of

21   the computer before it was turned over to Frank Thornton?

22   A.      That there were DOJ guidelines and I was asked if I knew

23   that and I said no.

24   Q.      And I don't remember if you testified about this or not

25   yesterday, but you didn't write a report about your attempts to

Marilyn Epp                              22

1   search the computer, right?

2   A.      I did not.

3   Q.      Even if you didn't obtain any evidence from the computer

4   as you maintain, wouldn't it have been important for you to

5   document the chain of that computer?

6   A.      The chain of custody was documented for that computer.

7   Q.      Not clearly.

8   A.      There's a receipt from us -- from DEA to Agent Destito,

9   FBI, and there's a receipt with Destito giving it back to me at

10  DEA.

11  Q.      Wouldn't it have been important before last Sunday to

12  have some information about what happened to that computer

13  while it was in -- while it was in your custody?  It wasn't in

14  a evidence vault, for example, was it?

15  A.      It was in a locked office within a locked facility.

16  Q.      And it was turned on?

17  A.      I did turn it on, yes.

18  Q.      And you weren't supposed to turn it on?

19  A.      I was executing a search warrant.  I -- there was -- I

20  turned on evidence that is electronic to search it.  That's

21  what I was doing.

22  Q.      So you didn't write a report about this turning on the

23  computer?

24  A.      No because I didn't gain any evidence from turning on

25  the computer.

Marilyn Epp                                    23

1   Q.      Right, and you handled -- you handled evidence, but you

2   didn't document that you did so, isn't that correct?

3   A.      It's documented by me signing for the computer.

4   Q.      You didn't document that you turned it on though?

5   A.      No.

6   Q.      No, and in fact you told the case agents that you turned

7   the computer on, didn't you?

8   A.      Yes.

9   Q.      And they didn't document that you powered on the

10  computer?

11  A.      No because no evidence was gained from me powering on

12  the computer.

13  Q.      And then you told Frank Thornton that you powered on the

14  computer?

15  A.      Yes.

16  Q.      And he did not identify -- he didn't even identify that

17  the computer had been turned on if he was aware of it?

18  A.      I don't know.  Okay.

19  Q.      And he didn't put it in his report either?

20  A.      Okay.

21  Q.      You reviewed his reports because he gave you all of

22  everything that he found, right?

23  A.      I did.

24  Q.      Okay, and you even told Abigail Averbach, the former

25  AUSA on this case, the prosecutor, that you turned on the

                        Marilyn Epp                        24

1    computer?

2    A.    I did.

3    Q.    And not one of the those people on the prosecution team

4    ever disclosed that that computer was turned on?  If it were

5    standard operating procedure for someone like you to turn on a

6    computer to search it, why not document it?

7    A.    I didn't document every time that I turned on a phone to

8    search it unless there was evidentiary value found within that

9    phone.  So I don't think it occurred to anyone to document not

10   gathering evidence.

11   Q.    You have written lots of reports where you talked to

12   witnesses where you don't gain evidence that you eventually

13   use, isn't that correct?

14   A.    If there's information that is pertinent at the time of

15   that interview, I document it.  It may not end up at trial, but

16   it is considered relevant to the case as evidence.

17   Q.    And no one on the prosecution team in this case decided

18   that turning on a computer was a big deal, right?

19   A.    I don't -- I can't speak for everyone on the prosecution

20   team.  I know I didn't understand that there was any detriment

21   to powering on the computer.

22   Q.    And no one disclosed it because no one realized it that

23   the defense team would actually discover that you turned it on?

24   A.    I can't say what was on the minds of the prosecution

25   team.

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

Marilyn Epp                          25

1   Q.      You were part of the prosecution team, weren't you?

2   A.      I don't know whether or not anyone knew that it was

3   important.

4   Q.      Well isn't that part of your job?

5   A.      Isn't what part of my job?

6   Q.      Figuring out what's important in a case and bringing

7   that to agents' and prosecutors' attention?

8   A.      Absolutely and when I didn't find any evidence in the

9   computer when I turned it on and I realized that our

10  capabilities at DEA were going to be limited I passed it on to

11  somebody who had the ability to gain access to the computer.

12  Q.      So Frank Thornton extracted information from the hard

13  drive when you passed it on to him, isn't that correct?

14  A.      Yes.

15  Q.      And you reviewed the information that he extracted?

16  A.      Yes.

17  Q.      Which is primarily photographs and videos?

18  A.      Yes primarily.

19  Q.      So can you explain what metadata is as it relates to a

20  digital picture?

21  A.      I'm not a computer -- as we've established pretty well

22  at this point I'm not a computer digital forensic expert.  I

23  understand it to be data that's embedded into a file that

24  provides information about that file.

25  Q.      Can you explain what MAC times are as they relate to

Marilyn Epp                         26

1   files that are found on a computer?

2   A.     I believe that stands for modified access or created and

3   they are date stamps associated with one of those headings.

4   Q.     And have you learned all this information because Frank

5   Thornton told it to you?

6   A.     I've learned some of this information over the years

7   because you deal with similar data when you pull images off of

8   a phone or other electronic storage devices.

9   Q.     And so you understand that metadata and MAC times are

10  two totally different things?

11  A.     Yes.

12  Q.     Do major social media web sites scrub metadata from

13  images that are uploaded to their sites?

14  A.     Most of them do.

15  Q.     So if a digital picture is present on a computer or a

16  cell phone and that image doesn't contain any metadata, are

17  there any inferences that you can make as an investigator about

18  the source of that image?

19  A.     If there's no meta or MAC data associated with the photo

20  -- repeat the question.

21  Q.     Can you tell how the computer -- how -- can you draw any

22  inferences from where that picture came from if you don't have

23  any metadata or MAC data?

24  A.     You can look at what is in the photograph.

25  Q.     But you don't have any data behind the photograph to

Marilyn Epp                           27

1   talk about when it was taken, when it came on to the device

2   that you're looking at, or anything else, isn't that correct?

3   A.     Regarding the information that would normally be

4   embedded to the file, no.  Obviously if it's been stripped off

5   you won't have any of that, but you would be able to use

6   context included in the picture.  It's totally subjective.  It

7   would depend on what the image is.

8   Q.     Would a digital image taken with a cell phone and then

9   saved to a computer still contain the same metadata?

10  A.     I don't know.

11  Q.     So would a digital picture downloaded by a user from

12  Facebook have any metadata?

13  A.     You're asking if somebody pulled a photo from someone

14  else's Facebook profile would there be any metadata associated

15  with that photo?  I don't know if metadata would be created in

16  the copying of that photo from the online application on to a

17  device.  I'm not sure how that would change the information

18  that is in the photo.

19  Q.     Basically you don't have the skills or experience to

20  answer that, do you?

21  A.     I'm not sure what you're asking.

22  Q.     I'm asking you whether a digital picture --

23  A.     Would there be information embedded into a photograph

24  that you pull off of online?  There will be some sort of

25  information.

Marilyn Epp                                    28

1    Q.      Even if Facebook scrubs it?

2    A.      I don't know.  I don't know if what is embedded into a

3    photograph when you pull it off of the internet.  That would be

4    probably a case-by-case basis I would imagine.

5    Q.      You don't have the training or experience to be able to

6    analyze how a photograph arrived on a device, do you?

7    A.      I know basic ways to look at data attached to a

8    photograph.

9    Q.      You can't determine whether a photo was downloaded from

10   the internet, can you?  Doesn't that take specialized forensic

11   training to figure that out?

12   A.      To get information that's embedded from a -- on a photo

13   to determine whether or not it was downloaded from the

14   internet?  Probably.

15   Q.      Well wouldn't that information be on the computer?

16   A.      I imagine this is a case-by-case basis.  It would depend

17   on the device that took it, where you got it off of the

18   internet.  There's a number of -- there's so many factors in

19   this question that it's hard to answer.

20   Q.      Fair enough, and you can't tell from looking at a

21   photograph or a video who actually took it, can you?  You need

22   additional information, don't you?

23   A.      Unless you can hear the person's voice who is filming or

24   see them in the video.

25   Q.      Okay.  Based on the extractions of the computer that Mr.

Marilyn Epp                                  29

1   Thornton provided you, you identified photographs of women from

2   the hard drive.  Isn't that fair to say?

3   A.      Yes.

4   Q.      You didn't identify how many of those photographs were,

5   for example, selfie photographs which would be fairly obvious

6   from the photograph?

7   A.      I didn't do a numerical count, no.

8   Q.      And you didn't identify in all cases what devices those

9   photographs were taken with?

10  A.      No.  There's so many photos, no.

11  Q.      And you didn't do an analysis as to how those photos

12  actually arrived on the computer, right?

13  A.      No.  That wasn't part of the investigation.

14  Q.      Wouldn't it be significant to know whether a photo is

15  downloaded later on from a web site or whether it's uploaded

16  from a device like a camera?

17  A.      If it's pertinent to what you're investigating.

18  Q.      Well wouldn't it be pertinent to knowing whether

19  somebody posted something on Backpage whether an image was

20  uploaded or whether it was downloaded after the ad was posted?

21  A.      Clarify the question.  Give me an example perhaps.

22  Q.      Well wouldn't it be important to know, for example, if

23  someone is uploading a photo to Backpage versus --

24  A.      I don't know that you would find that information

25  embedded in a photograph on the hard drive.

Marilyn Epp                                    30

1    Q.     You would find it on the hard drive, though, wouldn't

2    you?

3    A.     You would find the photo.  I don't know it attaches --

4    data attaches to a photograph to say whether or not it was

5    uploaded.

6    Q.     There would be data on the computer if something was

7    uploaded, wouldn't it, or is that just beyond your skill set

8    right now?

9    A.     I looked at the photo files themselves and I didn't see

10   any.  In my purview of the photos I did not locate any

11   information that had to do with whether or not it was uploaded

12   or downloaded.

13   Q.     But that would be a significant issue to look at,

14   wouldn't it?

15   A.     It depends on the parameters of what you're looking for.

16   When I find a photo in a Backpage ad and then with a date stamp

17   on that Backpage ad and then I find a photo in the hard drive

18   and it's the same photo and there's date information associated

19   that lines up with that timeline you have two independent

20   sources of information.  That's the basis of intelligence work.

21   You never rely on a single source of information.  You

22   corroborate.

23   Q.     But if you don't know when the photograph from the

24   Backpage ad arrived on the computer, isn't that kind of a

25   missing piece of information?

Marilyn Epp                                    31

1   A.      It would depend if there is a date associated with the

2   image on the hard drive and it corroborates the date it's

3   posted online on Backpage, you're drawing -- that's

4   investigating right there.  You're drawing connections.

5   Q.      But if the date of the Backpage ad is let's say January

6   1 and the date that the picture is downloaded on the computer

7   is February 15, that's a little different, isn't it?

8   A.      If it's -- it depends on which date are you talking

9   about.  Are you talking about taken?  Accessed?  Created?  I

10  mean those dates can change.

11  Q.      We'll go through some of these.

12  A.      Those dates can change when you transfer a photo from

13  one device to another.

14  Q.      So the photo is now in the computer.  You didn't take

15  the picture with the computer.  It got there somehow.  Right?

16  A.      Right.

17  Q.      We're going to go through that.  How do you determine

18  who created a Backpage ad?

19  A.      Well you can't say for certain.  You can just say what

20  phone number and what e-mail addresses are associated with the

21  Backpage ad --

22  Q.      And let me show you something.

23  A.      -- unless somebody has a permanent user profile on or

24  had on Backpage.

25  Q.      Sorry.  Can I ask you to turn on the Elmo please?  So

Marilyn Epp                                    32

1   this is exhibit 50B that was admitted yesterday that you talked

2   about.  Does that look familiar?

3   A.      Yes.

4   Q.      So that's the first page of it and I'm going to turn to

5   the last page, and you see here there is an email address for

6   the Backpage ad which we're talking about?

7   A.      Uh-huh.

8   Q.      There's also an IP address for that ad, isn't that

9   correct?

10  A.      There is.

11  Q.      So what does that indicate to you?

12  A.      An IP address is going to be an address associated with

13  the device that was used to create the ad.

14  Q.      So if you wanted to figure out who actually posted the

15  ad, wouldn't you figure out who owned that IP address?

16  A.      That's not how IP addresses work necessarily especially

17  if you're on a shared network or if you're using cellular data

18  on a cellular device.  It's not going to come back to a

19  specific user.

20  Q.      Well sometimes in a lot of cases don't you send a

21  subpoena to collect information from the IP address?  For

22  example, from Verizon, they will send you subscriber

23  information to the IP address and that way you connect up who

24  it's connected to, isn't that correct?

25  A.      You can.

                        Marilyn Epp                        33

1   Q.      You didn't do that in this case though, did you?

2   A.      Did not.

3   Q.      So I'm going to show you what was admitted yesterday as

4   Government's 51B which are photos of Katelynn and I'm going to

5   draw your attention to the bottom portion here.  Were those

6   columns created by you or were they created by Mr. Thornton?

7   A.      Well I snipped those myself and Matt Benoit snipped

8   those from a computer.  We didn't create them.  That's just

9   data that's on the computer.

10  Q.      What's the date acquired mean?

11  A.      Again I'm not a specialist, but it's my understanding

12  that it designates when a photo is transferred from one device

13  to another --

14  Q.      Okay.

15  A.      -- or uploaded.

16  Q.      Do you know whether that's the same date as when the

17  picture is created on the computer?

18  A.      I don't know.  I know it can change if you copy it from

19  one place to another.

20  Q.      I'm going to show you the same picture at the bottom

21  here.  So I'm looking at this photo SMH 012 and here it says

22  that the photo was taken -- if you go down to this line that

23  talks about the data for that phone -- it was taken on

24  September 17, 2013?

25  A.      That's what the data says.

Marilyn Epp                                    34

1    Q.      Do you know when that picture was saved to the hard

2    drive?

3    A.      I don't.

4    Q.      You can't explain how these pictures arrived on the

5    computer, can you?

6    A.      No.

7    Q.      You don't know whether they were downloaded from a web

8    site?

9    A.      I don't know.  No.

10   Q.      I'm going to ask you some similar questions for photos

11   in exhibit 50D that you talked about yesterday.  So this is the

12   Backpage ad I had shown you earlier.  So it looks like this

13   Backpage ad was posted on January 2nd of 2016?

14   A.      Yes.

15   Q.      And you testified that these photos were found on the

16   hard drive?

17   A.      Yes.

18   Q.      And exhibit 50B, that was the photo My Cars 3508?

19   A.      Bears a great resemblance to it, yes.

20   Q.      Do you know when that photo was saved to the hard drive?

21   A.      I don't know when it was saved to the hard drive.  No.

22   Q.      And you don't know how that photo arrived on the hard

23   drive in this case, do you?

24   A.      I do not know how it was transferred there.

25   Q.      I'm going to show you another page from 50B that has

Marilyn Epp                                35

1  photos.  Can you look at these two photos IMG 3027 and KK 137?

2  A.     Yes.

3  Q.     They look identical, don't they?

4  A.     There's some shading differences like there's a filter

5  on one not the other, but they are clearly basically the same

6  image.  One has been altered.

7  Q.     So what's the date taken of the 3027 photo?

8  A.     July 11, 2013.

9  Q.     And what's the date taken of the KK 137 photo?

10 A.     September 17, 2013.

11 Q.     How do two identical pictures have different dates

12 taken?

13 A.     I've asked that question before because I've come across

14 this before, and I was told that date taken indicates an on or

15 before date; that it can be modified by a transfer perhaps or

16 changing some fundamental aspect of a picture like a filter,

17 but a date taken indicates on or before this picture -- this

18 photo was taken on or before whatever the date is.

19 Q.     Who told you that?

20 A.     Oh I was told that in various trainings over the years

21 dealing with photographic images on phones and things.

22 Q.     Do you know if that is actually digital forensic

23 analysis of why two photos would be shown to be taken on two

24 separate dates?

25 A.     You would have to ask an expert.  I asked an expert and

Marilyn Epp                          36

1    that's the question I got and the training so --

2              THE COURT:  So if it's on a photo, is on or before,

3    and if there's some modification, then the date would

4    necessarily change on that modified --

5              MS. EPP:  It can change.  That's what I was told that

6    a date taken date can change, which is why I was told to say

7    taken on.  If you're referencing that date, you should always

8    say that photo was taken on or before and then you list the

9    date taken.

10             THE COURT:  I see.

11   BY MS. SEN:

12   Q.    So this is a photo that you discussed yesterday exhibit

13   53B.

14   A.    Yes.

15   Q.    And it appears to be a selfie photo of Danielle M?

16   A.    It does.

17   Q.    She's smiling in the photo?

18   A.    She is.

19   Q.    Can you tell us when this photo arrived on the hard

20   drive?

21   A.    I cannot.  I also see that the headings are missing on

22   the -- above the data.

23   Q.    And do you know what date it arrived on the computer?

24   A.    I don't know what date it arrived on the computer.

25   Q.    I'm going to show you what the Government admitted

Marilyn Epp                                     37

1    yesterday as 48D.  This is a Backpage ad.  So when was the ad

2    posted?

3    A.      Thursday, October 22nd at 12:21 a.m. in 2015.

4    Q.      And when does that say it was created?

5    A.      It says user was created on Wednesday, June 3rd, 2015.

6    Q.      And when was the e-mail verified for it?

7    A.      Monday, March 21, 2016.

8    Q.      Why are all those dates different?

9    A.      I would assume that a user profile source to use

10   Backpage was created on June 3rd of 2015, but there was no

11   e-mail verification until March.

12   Q.      So --

13   A.      But the ad was posted on October 22nd.  That's what the

14   data is saying.

15   Q.      And on the second page of this ad there are three

16   deleted images.  What does it mean when they are deleted images

17   with an ad?

18   A.      My understanding is those images are associated with

19   that user profile, but they are not going to be used in that

20   ad.

21   Q.      So you don't know whether those pictures were actually

22   posted with that ad?

23   A.      No.  It appears they were not.  They are just associated

24   with that user.  So that e-mail and that phone number.

25   Q.      So were these photos found on the hard drive?

                    Marilyn Epp                        38

1    A.      The one to the far right was found.  Something a lot
2    like it.
3    Q.      So you don't know whether it was the same photo or not?
4    A.      I would have to look through all the photos of Mandy L.
5    Q.      And you wouldn't know what actual -- when it actually
6    arrived on the computer, would you?  On the hard drive is what
7    I mean.
8    A.      No.  I wouldn't know when it arrived on the hard drive.
9    Q.      So you conducted some research on Facebook as well and
10   we talked a little bit about Facebook?
11   A.      Yes.
12   Q.      You accessed various users' profiles; is that correct?
13   A.      Meaning I visited their pages?
14   Q.      Yes.
15   A.      Yes.
16   Q.      And in some cases you've testified that you downloaded
17   videos posted on users' Facebook accounts?
18   A.      Yes.
19   Q.      Just by looking at a Facebook account you don't know who
20   actually posted those videos, do you?
21   A.      No.
22   Q.      And isn't the only way to actually identify how
23   something has been posted on Facebook is to subpoena Facebook
24   for the records?
25   A.      Ask the question again.

                        Marilyn Epp                           39

1   Q.      In order to determine who might have posted something is

2   one way to subpoena records from Facebook?

3   A.      I still don't think you're going to get information as

4   to who posted it.  You'll know whether or not it was posted on

5   that user's profile, but you're not going to get -- they

6   couldn't tell you what individual did that.

7   Q.      So lots of different people can post things to a

8   Facebook user's account in a public area, isn't that fair?

9   A.      If they were -- if they have access and the password to

10  get into that user's account.

11  Q.      But other users can post things on someone's wall, for

12  example?

13  A.      They can, yup.

14          MS. SEN:  Your Honor, may I have a moment?

15          THE COURT:  Yes.

16          MS. SEN:  Nothing further, Your Honor.

17          THE COURT:  Okay.  Any redirect?

18          MR. GRADY:  Yes, Your Honor.

19                      REDIRECT EXAMINATION

20  BY MR. GRADY:

21  Q.      If we could switch from the Elmo back to counsel table,

22  Professor Epp, I'm going to start by showing you 50B-008 -- I'm

23  sorry.  50B-004.  Okay.  These are the photos that you received

24  questions about on cross examination specifically comparing IMG

25  3027 versus KK 137?

                         Marilyn Epp                        40

1    A.     Yes.

2    Q.     Do you know if KK 137 had been tagged or would anything

3    refresh your recollection as to whether KK 137 had been tagged?

4    A.     I believe I saw it in the properties, but I need to look

5    at the properties.

6    Q.     Sure.  I'm showing you what's been marked as Government

7    exhibit 140 for identification.  Take a minute and look at

8    that.

9    A.     Yes.

10   Q.     And if it refreshes your recollection, I'll take 140

11   back from you.  Do you recall if KK 137 had been tagged?

12   A.     Yes it was.

13   Q.     What had been tagged?

14   A.     It was tagged KK and it was also tagged SMH.

15   Q.     And if I can show you 47D as in delta -- I'm sorry 48D,

16   okay, you received some questions about this particular ad on

17   cross examination.  Now when you received questions about user

18   created on June 3rd, 2015 is that the user that's reflected in

19   the e-mail address jimmyporter380@gmail.com?

20   A.     Yes that's the identifier.

21   Q.     If we can turn to page 2 of 48D, you received some

22   questions about the photograph, particularly the one all the

23   way on the right?

24   A.     Yes.

25   Q.     I'm going to hand you what's been marked Government

Marilyn Epp                          41

1    exhibit 48C for identification.  Take a minute and look at 48C.

2    Does 48C appear to be pictures of Mandy that were recovered

3    from the Moet Hart Facebook return?

4    A.     They are.

5               MR. GRADY:  Your Honor, the Government moves to admit

6    and publish 48C.

7               THE COURT:  Any objection to 48C?

8               MS. SEN:  If I could just look at it briefly, Your

9    Honor.

10              THE COURT:  Yes.

11              MS. SEN:  No objection, Your Honor.

12              THE COURT:  All right.  So admitted.

13   [Government exhibit 48C admitted and published]

14   BY MR GRADY:

15   Q.     All right.  We're going to go ahead and split the

16   screens, Ms. Epp, and on the right side I'm going to show you

17   48C-002.  Is it fair to say that the photograph that I'm

18   circling in 48C-002 bears a remarkable resemblance to the

19   photograph in 48D-002?

20   A.     It does.

21   Q.     And remind me again 48D-002, if we go back to page 1 of

22   48D, that photograph is associated with the Backpage account of

23   jimmyporter380@gmail.com?

24   A.     Correct.

25   Q.     Ms. Epp, we had -- you had a few questions related to IP

                        Marilyn Epp                         42

1   addresses.  Do you recall those?

2   A.      Yes.

3   Q.      In your experience is the commercial sex industry

4   somewhat transient?

5   A.      Yes.

6   Q.      Do users change hotels?

7   A.      They change hotels.  They change phones.  Yes.

8   Q.      And what impact, if any, does that have on IP addresses?

9   A.      The IP address associated with a phone would change if

10  the phones change -- if the user switches out phones, of

11  course.  The IP address that would come back on a return like

12  this if someone were using a phone would be the parent company.

13  If somebody is using wifi -- if somebody is using wifi, the IP

14  address is going to change depending on the locations of the

15  wifi, what motel they are at.

16  Q.      Speaking of wifi we're losing power, Your Honor, but --

17          THE COURT:  All right.  Why don't we take a little

18  bit of a break here and wait for the power to come on.  Those

19  are obviously emergency lights so -- and the computers are off

20  as well.  So all right.  Let's take a recess and we'll call you

21  back when the power is established.

22  [Recess.  Jury leaves at 10:05 a.m. and returns at 10:22 a.m.]

23          THE COURT:  Well apparently there's work being done

24  in the courthouse on the electricity and the question is

25  whether we have sufficient light to continue on and the

Marilyn Epp                          43

1   consensus at least as came to me is that we could proceed.  So

2   it's a little dark, but I think we can proceed.  Is does anyone

3   object to that?

4           MR. GRADY:  No, Your Honor, not from the Government.

5           THE COURT:  Okay, and from the defense?

6           MR. KAPLAN:  That's fine, Judge.  Thank you.

7           THE COURT:  Okay.  All right, and if there's any

8   objections from any jurors stand up or forever hold your peace.

9   Okay.  All right.  So I think we're ready to go.

10          MR. GRADY:  Thank you, Your Honor.

11  BY MR. GRADY:

12  Q.    Ms. Epp, I believe you mentioned on cross examination

13  that you look at pieces of information or evidence from other

14  than a single source.  Was that correct?

15  A.    Yes.  That's a foundation of intelligence work and both

16  in military intelligence, which I did before, and as a civilian

17  intelligence analyst you have to verify multiple sources of

18  information.

19  Q.    You don't look at anything in isolation, is that what

20  you're saying?

21  A.    Correct.

22  Q.    So would you take the electronic evidence that we've

23  been talking about the last couple of days and also compare it

24  to what Mandy might have said?

25  A.    Of course.  Yes.

Marilyn Epp                                    44

1    Q.    Mary?

2    A.    Yes.

3    Q.    Ayla?

4    A.    Yes.

5    Q.    Danielle?

6    A.    Yes.

7    Q.    Keisha?

8    A.    Yes.

9    Q.    Katelynn?

10   A.    Yes.

11   Q.    Jasmine?

12   A.    Yes.

13   Q.    Final area, Professor Epp, there was some questions

14   relating to Facebook and I wanted to ask simply about the Moet

15   Hart Facebook return.  Did you see pictures of the defendant in

16   the Moet Hart Facebook return?

17   A.    I did.

18   Q.    How many if you had to guesstimate?

19   A.    At least dozens.

20   Q.    Did some of those pictures -- did you also find some of

21   those pictures on the defendant's hard drive?

22   A.    I did.

23   Q.    Do you remember which folder within the hard drive you

24   saw some of those pictures in?

25   A.    Folders titled things like Me or Me Solo.

                     Marilyn Epp                         45

1   Q.      Do you recall seeing anything about the defendant's
2   wedding invite in the Moet Hart Facebook return?
3   A.      I did see a wedding invite.
4           MS. SEN:  Objection, Your Honor.  I don't think these
5   things are in evidence that are being discussed.
6           THE COURT:  Well in fact I think that they were
7   excluded.
8           MR. GRADY:  I'm just responding to the cross
9   examination, Your Honor, about questions of how things can get
10  on Facebook and who puts things on Facebook, things of that
11  nature.  I'm not going to show any of the exhibits, Your Honor.
12          THE COURT:  All right.
13          MR. GRADY:  Just general.
14          THE COURT:  Objection overruled.  Go ahead.
15          MR. GRADY:  Thank you.
16  BY MR. GRADY:
17  Q.      And finally, Professor Epp, did you see any discussions
18  on the Moet Hart Facebook return about drugs?
19          MS. SEN:  Objection, Your Honor.  That calls for
20  hearsay.
21          THE COURT:  Well it's unclear as to whether it's a
22  statement of the defendant.  Is that your proffer?
23          MR. GRADY:  I can clarify, Your Honor.
24          THE COURT:  You want to rephrase the question to make
25  sure it's not a hearsay response, but link to the defendant.

                    Marilyn Epp                          46

1              MR. GRADY:  Yes, Your Honor.

2    BY MR. GRADY:

3    Q.    Professor Epp, I just want to focus on statements that

4    Moet Hart may have made in the Facebook return that you viewed.

5    Did you see any statements by Moet Hart referencing selling the

6    narcotics?

7    A.    I did.

8              MS. SEN:  Your Honor, may we please approach?

9              THE COURT:  Yes.  Okay.  All right.  I'm going to

10   turn the husher on.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Marilyn Epp                          47

1  [Bench conference]

2          THE COURT:  So first if it's a statement of the

3  defendant, it's not coming in as a recognition of the agent

4  activity.  It's being used, I assume, to validate the linkage

5  between the defendant and Facebook.  So what's your objection?

6          MS. SEN:  Well on a couple of levels, Your Honor.

7  One is that I think it's beyond the scope of my cross -- of my

8  cross because I wasn't asking her specifically about my

9  client's Facebook page.  I was asking her about her undercover

10 investigative techniques and the things that she uses for

11 Facebook on a very general level.  In fact, I very specifically

12 did not discuss my client's Facebook account, and in fact I was

13 referencing other Facebook accounts and I was speaking very

14 generally and asking her very generally about how things get

15 posted, how to verify things and other things like that, and

16 this discussion about drugs I think is incredibly prejudicial

17 because you know it leaves the jury with the impression that my

18 client is sort of using the drugs -- and I have to look at the

19 pages that are being referenced because this is a huge return.

20 Who he was talking to about these conversations and all the

21 content comes in and the jury is going to take it as --

22          THE COURT:  All right.  So as I interpret what you're

23 saying the Government is trying to show the linkage to Facebook

24 and the return being a valid return.  What you're suggesting is

25 that to get into issues with regard to drug dealing it opens up

Marilyn Epp                          48

1   a Pandora's box because you don't know with whom he was

2   speaking, et cetera, and it leaves the impression, which is

3   prejudicial to you, that he's bragging about the fact that he's

4   selling drugs on Facebook.

5            MS. SEN:  Yes.  That's an accurate --

6            MR. GRADY:  And, Your Honor, what I was specifically

7   referencing to is one of the Facebook exhibits we were trying

8   to introduce yesterday was a conversation with Sophie Smith.

9   In that conversation she asked about getting up, which is

10  cocaine, and the defendant directs her to Lori's, things of

11  that nature, and what the Government is intending on doing is

12  the impression that the cross left is that people can put stuff

13  on Facebook and we don't know who or where that comes from, and

14  so we're just trying to respond at least as to the Moet Hart

15  return that that was his.  He was not -- other people weren't

16  inserting information on to that.

17           THE COURT:  I think this could be really prejudicial.

18           MR. GRADY:  Sure.  That's fine, Your Honor.

19           THE COURT:  I'm going to sustain the objection.

20           MR. GRADY:  Yes, Your Honor.

21  [End of bench conference]

22

23

24

25

                    Marilyn Epp                          49

1          THE COURT:  Let there be light.  Okay.

2          MR. GRADY:  Your Honor, nothing further.

3          THE COURT:  Okay.  Any recross?

4          MS. SEN:  No, Your Honor.

5          THE COURT:  All right.  Thank you, Professor.

6          MS. EPP:  Ms. Sen, do you want your exhibit back?

7          MS. SEN:  Thank you.

8          THE COURT:  All right.  Government call your next

9   witness.

10         MR. GRADY:  Your Honor, before the Government rests

11  we just wanted to clarify the status of exhibit 78.  We believe

12  that it has been admitted.  I just want to double-check because

13  I don't know if that was affirmatively in the exhibit list when

14  I checked that.

15         THE COURT:  Is 78 in?  All right.  78 is in as an

16  exhibit.

17         MR. GRADY:  With that, Your Honor, the United States

18  of America rests.

19         THE COURT:  All right.  I'm going to stay on the

20  bench and speak with the lawyers just for a few minutes.  I'm

21  going to ask that you go back to the jury room.  The Government

22  has now rested its case so we'll be calling you back in just a

23  matter of -- well probably 15 minutes.  Okay.

24  [Jury leaves the courtroom at 10:33 a.m.  The following was

25  held in open court without the jury present.]

                     Marilyn Epp                        50

1            THE COURT:  All right.  Turn to the defense.  First
2    we need to resolve the issue that the objection that was made
3    by Mr. Folks and that is to review admission of computer
4    testimony.  Is there anything else that you want to say about
5    that, Ms. Sen?
6            MS. SEN:  Well, Your Honor, the issue is there were
7    two photos taken and they were apparently taken -- they are
8    identical.  They were taken on two separate dates, and I mean I
9    think that I would proffer that our computer expert will say
10   that one of the reasons that there are two different dates on
11   that, unlike what Ms. Epp testified to, is that the data has
12   been corrupted.  So that won't come in until our case, but I
13   think it's a concern and my client would like to revisit it.
14           THE COURT:  All right.  Well, first of all, obviously
15   this witness just testified that it is possible that you can
16   have different dates on the same photos because she has been
17   taught that the photo date is on or before, and that in fact if
18   one of those photographs is modified in any particular way, it
19   creates a different date.  So as a result it's quite logical to
20   have different dates.  Regardless you're asking for a review of
21   the Court's ruling.  I'm going to deny that.  I think clearly
22   it is admissible and now do you have a motion at close of the
23   evidence?
24           MS. SEN:  Yes, Your Honor.
25           THE COURT:  Okay.

Marilyn Epp                          51

1        MS. SEN:  We would like to move under Rule 29 for

2   three counts not to go to the jury; Count XI, Count XII, and

3   Count XV.  Counts XI and XII are the counts related to Keisha

4   W.  Count XV is the count related to Hannah A.  So with respect

5   to Count XI Keisha W. was on the stand.

6        THE COURT:  Yes.

7        MS. SEN:  And that count relates to conduct that

8   occurred during 2013 and the only thing that she testified to

9   was that she met Mr. Folks, she talked to him about

10  prostituting, she tried it once, it didn't work, and she left.

11  There is no evidence that has come in at this trial that shows

12  in 2013 she was forced or coerced in any way to prostitute.  I

13  would also say with respect to Count XII, which is the count

14  related to her alleged forced prostitution in 2015, that her

15  testimony -- well, first of all, she remembered very little,

16  but the basics of her testimony is that she may have pros --

17  she went to rehab, she came out, she called Mr. Folks, asked

18  him for help.  She prostituted for a couple of weeks and then

19  she left and she took off and came back.  She basically said

20  that after they left Lori C's house, which we know is

21  established by the date Lori C. went to rehab which is November

22  11th of 2015, that she wasn't really involved with this and she

23  would come and go.  She would ask Mr. Folks for help if she

24  wanted to post on Backpage.  There is a Backpage ad that came

25  in from January 2nd.  She testified that she herself posted it.

Marilyn Epp                              52

1    Her testimony was sometimes I would do it, but I asked for help

2    if I didn't have a phone or anything else.  The defense

3    believes there's simply not enough evidence that she was forced

4    and anything that she testified to regarding -- there was no

5    testimony that she offered, even though she did testify about

6    events that she -- were uncomfortable and that were -- like

7    participating in the walnut challenge I think that she said --

8    I think she called it the acorn challenge, but there was no

9    testimony suggesting that anything in those events forced her

10   or coerced her in any way to continue prostituting and it's

11   pretty clear that she came and went as she pleased.  I'm sorry.

12   Mr. Kaplan is correcting me that the evidence is she basically

13   prostituted for -- with Mr. Folks for two days in June of 2015.

14          THE COURT:  Okay.  Those are the arguments related to

15   Counts XI and Count XII.  Okay.  I'm interested in Count XV --

16          MS. SEN:  Your Honor --

17          THE COURT:  -- in regards to Hannah.

18          MS. SEN:  -- there has not been a single witness who

19   has testified in this case that they observed, saw, Hannah act

20   like prostituting.

21          THE COURT:  Okay.  So it was generally asked of

22   witnesses as to who other people were engaged in the commercial

23   sex act.  Nobody said Hannah did.  So the Government has a

24   number of photographs and they have a linkage of a couple of

25   photographs -- I think a couple -- involving multiple

Marilyn Epp                           53

1  individuals, either between two and four, and they have it

2  linked to the Backpage ad.  You have said that there's a change

3  in the law in 2015 and prior to 2015 of course this was --

4  involving Hannah this was 2013.

5       What you're suggesting is the advertisement is not a

6  commercial sex act unto itself.  That you have to actually show

7  that there is a commercial sex act and there's no testimony

8  that Hannah engaged in a commercial sex act other than the

9  advertisement, and what you're suggesting is prior to 2015 the

10 only commercial sex act theoretically in a large sense they

11 would have Hannah engaged in is the taking of photographs and

12 the advertising on Backpage.  I mean is that essentially your

13 argument?

14        MS. SEN:  Yes, Your Honor, and I would also point out

15 that the one witness who was in that series of photos with

16 Hannah is Jasmine L. and when asked directly by the prosecutor

17 did you ever see Hannah act -- Hannah A. go out on a date?  Did

18 she prostitute?  She said no and she was the woman who was in

19 that photo with her.

20        THE COURT:  Right, and I listened to all of the

21 witnesses who described other people who were engaged in a

22 commercial sex act and Hannah was never mentioned, and so

23 there's no technical direct evidence of her engaging in

24 prostitution.  All right.  So, okay, let me ask the Government

25 for your response.  First in regard to Counts XI and XII.

Marilyn Epp                        54

1  That's Keisha.

2              MR. GRADY:  Yes, Your Honor.

3              THE COURT:  What's your position?

4              MR. GRADY:  Yes.  Our position is that there is some

5  evidence of force and coercion.  I will start with Count XI

6  that is Keisha's time period in the summer of 2013.  She stated

7  that she was engaged in prostitution to keep well, as in to not

8  keep sick, but also more importantly she said she had to have

9  sex with the defendant and she said that was part of his

10 control in order to show that he's the boss.  So we are -- we

11 believe that is some evidence to support force as it applies --

12 force and coercion as to Count XI.

13      Now as to Count XII not only do we have again how Keisha

14 testified that heroin was her biggest problem and led her to

15 come back to the defendant, but we have also reputational harm.

16 She testified that she saw the picture of Hannah and that

17 caused fear in her mind, and she also talked about the

18 humiliation of the walnut challenge and being urinated on by

19 the defendant.  Again two of the probably most horrific things

20 in the world that can show someone controls another person.

21      Now the fact that -- and also I should remind the Court

22 that she also took bags of heroin from Chrissy and there was

23 this whole bounty that was put out on her and Hannah helped

24 bring her in, and afterwards the defendant, as Keisha said,

25 raped her behind a dumpster in a cemetery and then said you

Marilyn Epp                          55

1   work for me now.  So the important thing to keep in mind, Your

2   Honor, is that 1591 looks at the means that were used and not

3   the actual result.  It doesn't matter whether Keisha actually

4   engaged in commercial sex act or not.  The statute says would

5   be cause and that's why it's focused on the mean, and certainly

6   in the Government's view that's some evidence of coercive means

7   applied against Keisha as for Count XI and for Count XII.

8        If you have further questions, Your Honor, I'm going to

9   move to Count XV which is the Hannah account.

10            THE COURT:  Yes.  That's fine.  I'm interested in

11   your theory in regard to Hannah.

12            MR. GRADY:  Sure.  So I'll remind the Court of the

13   four elements that are necessary to sustain a conviction for

14   Count XV.  The first one is a litany of seven verbs that the

15   defendant recruited, enticed, harbored, transported, provided,

16   uptained, maintained.  Certainly a posting of the Backpage ad

17   the Government would suggest is indication that he was

18   providing Hannah for commercial sex because if anything in this

19   trial everyone has talked about Backpage and that's how you

20   recruit and solicit clients.  So the Government believes that

21   one of the seven verbs in that first element has been met.

22        Going to the second element, the second element requires

23   that the defendant know that Hannah was 18 or below, recklessly

24   disregard or reasonable opportunity to observe.  The testimony

25   of Jasmine was that it was the defendant who was taking these

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Marilyn Epp                         56

1   pictures for this advertisement.  So the Government believes

2   that is evidence showing that the defendant has a reasonable

3   opportunity to observe Hannah.

4           THE COURT:  Let me ask you about your indictment.

5           MR. GRADY:  Yes, Your Honor.

6           THE COURT:  I know the "and" "or" about is an issue

7   that I've addressed before, but if you look at the statute it's

8   disjunctive, it's "or", right?

9           MR. GRADY:  Yes.

10          THE COURT:  And charge "and".  You charge "and".  The

11  logical reading of that would be that you have to prove all

12  three.  Okay.  So do you have case law to suggest that when you

13  charge by way of an indictment and that it really is

14  established by "or"?  That is you just prove one of the three?

15          MR. GRADY:  Yes, Your Honor.  So a couple of

16  responses.  One, I don't have the case off the top of my head,

17  but there is a case Robinson out of the 2nd Circuit --

18          THE COURT:  Ms. Savner has a case on the top of her

19  head.

20          MR. GRADY:  Exactly.  There's a case Robinson in the

21  2nd Circuit that says you can prove minor sex trafficking in

22  any of those three matters, and of course that was briefed

23  before Judge Crawford, but more to your point, Your Honor --

24          THE COURT:  No.  I understand that it's "or", but

25  when you charge "and" in the indictment is that a mistake

Marilyn Epp                              57

1  without significance?

2         MR. GRADY:  No, Your Honor, that was an intentional

3  move.  It's all of -- I think I have to look at the DOJ

4  guidelines, but the DOJ practice is to charge in the

5  conjunctive prove in the disjunctive because if we have "or"

6  for everything, then we don't know exactly what the jury would

7  decide upon; whether they find that he knew, did they find that

8  he recklessly disregard, did he have a reasonable opportunity

9  to observe.  That's why we put "and" in there, and if you want,

10 Your Honor, what we can do is do a special verdict form where

11 we say okay if count so -- excuse me.  If element two has been

12 met, which one do you find beyond a reasonable doubt, and going

13 back to the Rule 29 motion, Jasmine's testimony that it was the

14 defendant taking the pictures certainly leaves some evidence

15 that he had reasonable opportunity to observe her.

16        THE COURT:  All right.  You have case law which says

17 that you can -- you can charge in the conjunctive but all you

18 have to prove is the disjunctive; that is just one as opposed

19 to all three?

20        MR. GRADY:  Yes, Your Honor.

21        THE COURT:  Okay.  So go ahead.

22        MR. GRADY:  The third element is that --

23        THE COURT:  Let me go back to the next question.

24        MR. GRADY:  Sure.

25        THE COURT:  You've seen in the request for a jury

Marilyn Epp                              58

1    charge made by the defense that the law essentially changed in

2    2015.  The defense is arguing that the mere advertising,

3    broadcasting availability for services is not a commercial sex

4    act.  It became a commercial sex act in 2015.  This was 2013.

5    At that point the actual advertising or broadcasting her

6    availability on Backpage is not a commercial sex act.

7              MR. GRADY:  Your Honor, the Government disagrees and

8    for a few reasons.  Number one, if you look at the seven verbs

9    that are in the indictment and that existed in 2013, we believe

10   that advertising someone for commercial sex is contained within

11   any of those seven verbs.  Most obviously providing, right,

12   because if you're going to provide someone to a client, there

13   has to be a way to advertise their services or solicit services

14   from clients.  So in the Government's mind the addition of

15   advertising and soliciting in 2015 is essentially unnecessary,

16   but I'm not going to comment on what Congress can and can't do

17   with their statute.

18        The other thing that's interesting about advertising, Your

19   Honor, is even though it was added in 2015 the mens rea is

20   different for that as opposed to the remaining nine verbs that

21   we now have in 1591.  The mens rea for advertising is knowing,

22   you cannot reckless disregard advertising, and so frankly in a

23   lot of the indictments that the Government seeks we just keep

24   advertising out because it's confusing to have one mens rea

25   with advertising and different -- a different mens rea for all

Marilyn Epp                                    59

1    the other nine verbs in 1591.  So in the Government's view the

2    whole thing about advertising being added in 2015 really is a

3    red herring and does not apply to the facts of this case and

4    whether the facts of this case can meet the elements of a law

5    as it existed in 2013.

6              THE COURT:  All right.  So are you acknowledging that

7    your theory is in regard to Hannah that the commercial sex act,

8    the gravamen of the offense here is in the advertising?

9              MR. GRADY:  Yes, Your Honor, but I would also say the

10   gravamen also could be, as we heard from Jasmine, recruiting

11   and enticing because think about the circumstances.  This is a

12   picture that's going on, you know, very late at night.  Also

13   remember the context of it being in a hotel room, and of course

14   in hotel rooms that's where commercial sex activities operate.

15   The defendant is taking pictures of her is also indicia under

16   Rule 29 of recruiting and enticing someone.

17             THE COURT:  So your argument then is forget

18   advertising.  If he is enticing her or encouraging her in any

19   way to participate in prostitution, that is the offense and

20   doesn't make any difference whether she engages in a sex act,

21   it is the enticement to engage in a sex act which is the

22   gravamen of the offense?

23             MR. GRADY:  Exactly, Your Honor.  You think back to

24   Jasmine's testimony.  She said that the defendant was the one

25   who, you know, instructed Jasmine -- or, excuse me, instructed

Marilyn Epp                              60

1   Hannah to, you know, put her thumbs on the scantily clothes

2   that she had on.  So again we believe that those facts support

3   that theory.

4              THE COURT:  Okay.

5              MR. GRADY:  And if Your Honor wants, I can hit the

6   third and fourth elements of minor sex trafficking if you want.

7   The third one is that Hannah would be caused to engage in

8   commercial sex act.  So unlike the defense's view we don't have

9   to show that Hannah actually followed through and saw a client.

10  Again it's the future tense would be cause and that's in the

11  statute.  You don't have to find an effect, and I believe

12  there's a 2nd Circuit case called Alvarez to that effect, and,

13  finally, the fourth element in and affecting interstate

14  commerce, we have evidence of a Backpage ad, but also this

15  certainly occurred at the Motel 6 in Colchester which is a

16  hotel that serves out-of-state customers.  Any one of those is

17  sufficient to meet the interstate commerce connection.  So for

18  those reasons we believe it should go to the jury.

19             THE COURT:  All right.  Do you want to respond?

20             MS. SEN:  With respect to the idea that you can now

21  -- that somehow we should just forget about the fact that

22  Congress has changed the statute to now prohibit advertising is

23  very clear that under the 2013 law advertising is not an

24  offense, and in fact the Government made that argument in

25  response to our request related to the Backpage records prior

Marilyn Epp                              61

1    to trial, and in fact that language that I have offered in the

2    jury charge is taken directly from the Government's response,

3    and the Government at that point is saying well, you know, we

4    don't have to show, you know, advertising wasn't illegal so it

5    doesn't really matter.  That was basically their position with

6    respect to why when we moved to exclude Backpage records.

7         Now the Government is suggesting that they can simply

8    prove this charge by showing that there was this ad created and

9    it's not even clear.  The Government hasn't actually -- the

10   Government subpoenaed all these Backpage records, Your Honor.

11   They didn't actually get a return from Backpage on this

12   particular ad, and that was one of the issues that was raised

13   by prior counsel which is that there's no evidence and in fact

14   there's no evidence at all that that Backpage ad was actually

15   live.  Every single witness who was asked, every single woman

16   who was involved in prostitution who testified in this

17   courtroom testified -- no one of them testified that Hannah was

18   involved in prostituting.  There was plenty of evidence that

19   she was involved in drug dealing.  There was plenty of evidence

20   that she had a sexual relationship with our client.

21        THE COURT:  Okay.  So what about the Government's

22   argument that enticement is the gravamen of the offense, that

23   -- and the offense is completed when, by argument, the

24   defendant made an effort to take photographs and to entice her

25   to engage in prostitution.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Marilyn Epp                          62

1          MS. SEN:  Your Honor, I just don't -- I guess I just

2     don't see the facts as showing that at all, and I would

3     disagree with -- I mean the one person who responded who is

4     here -- the one live witness that they had said that she

5     responded to that ad, she never saw Hannah respond to that ad.

6     I mean there's no indication that she was enticed to do

7     anything.  I mean she's not here obviously to testify as to

8     whether she was or not, but there is that one picture is what

9     that entire count is based on, and I think it would be highly

10    prejudicial based on the absolute lack of evidence for that to

11    go to the jury.

12         THE COURT:  Why would it necessarily be prejudicial

13    to other counts?  You know I appreciate that this is a -- this

14    is a complicated issue.  I listened carefully because I knew

15    obviously Count XV is a matter that's -- that is controverted

16    and I agree with you completely that nobody has said that she

17    engaged in a sex act.  So there's no testimony about that, but

18    then the Government brings up this enticement, and the argument

19    is that this change in the law in 2015 was not necessary.  That

20    engaging in this kind of advertisement is -- in fact is a sex

21    act essentially.

22         MS. SEN:  Well I completely disagree with the change

23    in the law.  The law is the law, Your Honor, and the Government

24    can argue -- I mean the Government previously argued that there

25    was a change in the law and it had some effect.  Today it wants

Marilyn Epp                                63

1   to argue that the change in the law has no impact.  I mean

2   that's the Government's position.  I understand that.  With

3   respect to this idea of enticing, even if that is all it takes

4   to have a criminal conviction involving a mandatory minimum

5   sentence, I mean I just think it would be outrageous in this

6   case given the evidence.  The idea is that now the Government

7   -- sure the Government can argue to the jury anything it wants,

8   but there is not any evidence in this case that our client

9   enticed her.  None.

10           THE COURT:  Well she engaged in pictures being taken.

11   It had to be fairly obvious to her, who had been around for

12   quite a while, that these other women who were engaging in

13   these photographs had been engaged in prostitution.  Is there

14   not some circumstantial evidence that she may have at least

15   thought that she was being enticed into engaging in

16   prostitution?

17           MS. SEN:  She's not here to say that she thought

18   that.

19           THE COURT:  I appreciate that.

20           MS. SEN:  That's part of the problem, Your Honor.  I

21   mean, you know, we're sort of ascribing all of the responses

22   and reactions to someone whose picture -- whose photo was

23   taken.  It is not clear at all.  It is very clear that she had

24   a sexual relationship with Mr. Folks and is that enticing

25   someone to cause someone to engage in prostitution?  I don't

Marilyn Epp                              64

1    think so.  I don't think just because you have naked photos,

2    and of course there are plenty in this case, that that amounts

3    to prostitution.  There has to be something else and I don't

4    think that there's -- I mean clearly the defense --

5             THE COURT:  Let me ask both sides do you have

6    research to indicate that either advertising was or was not a

7    gravamen of the offense prior to 2015?  In other words, if -- I

8    mean what Congress usually does is react to particular

9    decisions that are made by courts, and if they then now say

10   advertising is a part of the commercial sex act, are they

11   reacting to decisions from other courts or from courts which

12   said that in fact posting for photographs and advertising is

13   not a commercial sex act.  Were there cases out there which

14   said that in which case you would have a fairly close nexus to

15   the defense argument that advertising was not considered a sex

16   act when the charges were brought.

17            MR. GRADY:  Your Honor, I would have to look, but my

18   recollection is there is no case out there holding that

19   advertising alone is insufficient and so we're going to throw

20   out this conviction because it was just posted on Backpage.

21        What I would -- what I would say, Your Honor, is, for

22   example, a lot -- in some cases like there's this Jungers

23   (phonetic) case out of the 8th Circuit where it was an

24   fictitious minor that the client was going to see and that

25   person was still convicted and upheld on appeal, but that's

Marilyn Epp                          65

1    where Congress said well maybe we should get solicit in there,

2    but the Court -- the 8th Circuit said with these seven verbs

3    what the John did is criminal and it is appropriate, and I

4    would just like to make three last points, Your Honor, just to

5    respond.

6        First about the Backpage ad, Jasmine testified that she

7    remembered seeing the Backpage ad; that it went out there.

8    Number two, the phone number in that Backpage ad was subscribed

9    to by Svetlana.  If the remember the recording yesterday of

10   Svetlana, she talked extensively with the defendant about

11   posting a girl and she's not getting posted and she's not

12   getting money in her pockets then she doesn't need to be here,

13   which again is circumstantial evidence that the reason you're

14   posting someone is to make money engaging in commercial sex act

15   and all that stuff, and we would say that is some indicia of

16   being provided; and then finally number three, as far as

17   enticement or whether she consented, all of that is irrelevant

18   because 17 years old under federal law cannot consent to sexual

19   activity much less prostitution.

20            THE COURT:  But then you have to -- that's the

21   interesting part of your argument.  What you're suggesting is

22   the enticement itself morphs into a commercial sex act.  So if

23   you don't have advertising, there's no advertising as a

24   commercial sex act and she's not engaged in any commercial sex

25   act, you have no evidence to suggest that she's engaged in a

Marilyn Epp                        66

1   commercial sex act, then the only commercial sex act that you

2   claim the defendant engaged in, this all of a sudden becomes --

3   well this is interesting because then you're shifting this to

4   the defendant engaged in a commercial sex act.  He is enticing

5   her.

6            MR. GRADY:  Your Honor, perhaps an example may help

7   flush this out again just using the four elements.  So say that

8   the defendant goes up to someone on the street and starts

9   recruiting them saying hey if you come work for me, prostitute

10  for me, I'll give you x amount of money and so that is the

11  recruitment pitch, and he sees this person, has a reasonable

12  opportunity to see them in person, and they are actually 16

13  years old and he tells them hey I can post you on Backpage, I

14  can get you -- I'll put you in a hotel room at Motel 6 and, you

15  know, this goes on for half of a day, but ultimately the

16  16-year-old changes her mind and never goes through with

17  anything.  Under 1591, and again Robinson talks about how it is

18  essentially a strict liability offense that is sufficient for a

19  conviction under the law because he's recruiting, had

20  reasonable opportunity to observe the victim, intending -- or

21  knowing there would be cause to engage in sex act, and of

22  course if there's Backpage -- using Backpage or hotels, that is

23  an interstate commerce connection.  So that's an example of how

24  recruiting alone is criminally liable under the law.

25            THE COURT:  Right, but you're arguing that she's

Marilyn Epp                          67

1    being enticed.

2              MR. GRADY:  Well one of seven verbs, Your Honor.

3              THE COURT:  Enticed into a commercial sex act.  The

4    commercial sex act then has to be prostitution and she's being

5    enticed into prostitution.

6              MR. GRADY:  We would say, Your Honor, that can be

7    based upon the view of the facts.  Whether it's recruiting,

8    enticing, providing, we believe the facts fit any one of a

9    number of those seven verbs that the first element prohibits.

10   At least there's some evidence under Rule 29.

11             THE COURT:  All right.  Well you should know that I

12   have support staff out conducting research at this point back

13   into 2015.  The change -- whether the change is based upon

14   existing law which is advertising is not a commercial sex act.

15        At this point -- obviously this motion can be raised at

16   the close of the evidence -- I'm going to deny the motions.

17   We'll proceed to the defense's case at this point, and I would

18   like -- I'm going to be conducting further research and ask

19   counsel as well.  This whole idea of enticement I had thought

20   advertising.  This is what the Government's theory is so that

21   she is participating in the advertising which is a commercial

22   sex act.  So then by encouraging her to participate in this

23   commercial sex act, i.e. advertising, that was sufficient.  Now

24   if the commercial sex act or the advertising is not a

25   commercial sex act, that shifts the Government's theory to say

Marilyn Epp                                68

1  that the commercial sex act has to be the prostitution.  So

2  then you shift to not just advertising but to enticement;

3  enticement to engage in a commercial sex act.  Well is the

4  taking of photographs with other people who are known by her to

5  be prostitutes and known that it was going to go to Backpage

6  theoretically is that enticing her to engage in commercial sex

7  act.  Right.  So that, as I think about this off the top of my

8  head, is where we're headed.

9       MR. GRADY:  Yes, Your Honor, and one final thing to

10  point out in the advertisement itself you notice how you can

11  pick 1, 2, 3, or 4.  We again, just based upon that language

12  within there, that indicates some indicia evidence of

13  providing.  He's going to provide 1, 2, 3, 4; the teacher, I

14  can't remember exactly the specifics, but if you look closely

15  at that language, we would say that suggests providing.

16       THE COURT:  Okay.  All right.  So I'm going to be

17  conducting the research.  We'll go through this discussion

18  again.

19       MS. SEN:  Would you like briefing on it from the

20  parties, Your Honor?

21       THE COURT:  Yes I would love briefing from the

22  parties on it.  Yes.  I mean you've got a very brief memorandum

23  in support of your instruction on Count XV, but I would like

24  much more.

25       MS. SEN:  I'm happy to do that, Your Honor.

Marilyn Epp                              69

1              THE COURT:  Because this is -- this may be a shift in

2     theory, right.  If you're talking about enticement or

3     encouraging her to engage in commercial sex act, the commercial

4     sex act is not the photograph because their theory was the

5     photograph is the commercial sex act, right?  So now it's to

6     engage in prostitution.  They are encouraging her to engage in

7     prostitution by obviously taking the photographs, but also

8     there was other evidence of enticement.  So somewhat of a

9     change of theory I think.  All right.  Do we need a break of

10    just a couple minutes before you start?

11             MR. KAPLAN:  Two minutes, Judge.

12             THE COURT:  Two minutes.  Okay.

13    [Recess 11:05 a.m - 11:10 a.m.  The following was held in open

14    court with the jury present]

15             THE COURT:  Okay.  Welcome back.  The Government has

16    rested.  Now it's the defense's opportunity if they choose to

17    put on witnesses and, Mr. Kaplan.

18             MR. KAPLAN:  Thank you, Judge.  The defense would

19    call Ariel Otero to the stand.

20             DEPUTY CLERK:  Please come forward to be sworn, Ms.

21    Otero.  You can come right upfront here.

22    ARIEL OTERO,

23        Having been duly sworn, testified as follows:

24             THE COURT:  Good morning, Ms. Otero.

25             THE WITNESS:  Good morning.

```
                          Ariel Otero                          70
 1                      DIRECT EXAMINATION
 2   BY MR. KAPLAN:
 3   Q.     Ariel, can you sit close to the microphone?  You're kind
 4   of soft spoken.
 5   A.     Yeah.
 6   Q.     Would you state your full name please?
 7   A.     Ariel Lauren Otero.
 8   Q.     How do you spell your last name?
 9   A.     O-T-E-R-O.
10   Q.     And do you live in Burlington?
11   A.     Yes.
12   Q.     Where were you born?
13   A.     In Bronx, New York.
14   Q.     And did you come to Vermont at some point?
15   A.     Yes.
16   Q.     And when was that?
17   A.     When my daughter was five months about almost five years
18   ago.
19   Q.     And you have children?
20          THE COURT:  Okay.
21   A.     Yes.
22          THE COURT:  Would you move that microphone closer to
23   you.  You have to speak right into the microphone so that
24   people can hear you.  There you go.  Just think you're a rock
25   star.
```

                        Ariel Otero                          71

 1              MR. KAPLAN:  That's what I told her, Judge.

 2              THE COURT:  Right.

 3    BY MR. KAPLAN:

 4    Q.      So how old are your children?

 5    A.      5 and 9 months.

 6    Q.      And what are you doing now besides taking care of two

 7    small children?

 8    A.      I'm going to school to become a phlebotomist.

 9    Q.      Where are you going to school?

10    A.      Vermont Adult Learning.

11    Q.      Okay.  Do you know Brian Folks who is sitting in the

12    courtroom here?

13    A.      I do.

14    Q.      Could you tell us please how you met him?

15    A.      About around the end of 2015 downtown.

16    Q.      And what happened?

17    A.      Me and one of his sister-in-laws got into like a dispute

18    and like he intervened and stopped our argument and stuff like

19    that so --

20    Q.      And how did you end up meeting him?  Did he give you a

21    phone number or something?

22    A.      Yeah.  We chatted a little and then we exchanged

23    numbers.

24    Q.      And at some point did you have contact with him again?

25    A.      Yes.

Ariel Otero                                                72

1  Q.      Could you please tell us what that was?

2  A.      My ex was very abusive and he fractured my nose and I

3  was going through my phone deciding who I was going to call.  I

4  need to get away from my situation so I called him up and --

5  Q.      When you say you called him you mean Brian?

6  A.      Yes.

7  Q.      And tell us about the conversation please.

8  A.      I just told him like I needed to get away from my

9  situation.  I told him what my ex had did to me and I needed a

10  place to stay for a little while until I could get on my feet.

11  Q.      Did you consider it an emergency?

12  A.      Yes.  In that situation, yes.

13  Q.      So what happened as a result of that phone call?  What

14  did Brian say to you, if anything?

15  A.      He told me that he had a friend who had a place and she

16  was living by herself, and if I didn't mind living with

17  somebody, I can stay there.

18  Q.      Was that on North Union Street?

19  A.      Yes.

20  Q.      Who was the friend?

21  A.      Mandy.

22  Q.      Did you go there?

23  A.      Huh?

24  Q.      Did you stay there?

25  A.      Yes.

                        Ariel Otero                        73

 1   Q.      And how long did you stay there for?

 2   A.      Up until the lease was over.

 3   Q.      That's in June of 2016?

 4   A.      Yeah around June/July.  Around there.

 5   Q.      Did you pay rent?

 6   A.      I didn't have to.  He told me I didn't have to pay rent

 7   because I was homeless and didn't have anything much to me.  So

 8   he told me I didn't have to, but I didn't feel comfortable

 9   staying somewhere that I didn't contribute a little bit too so

10   --

11   Q.      And how did he treat you?

12   A.      Fine.  Like a normal house guest.

13   Q.      And was he respectful toward you?

14   A.      Yeah.

15   Q.      And how did he treat Mandy from your observations?

16   A.      Fine as well, you know.

17   Q.      Were you working as a prostitute at that point?

18   A.      Yes.

19   Q.      And how long had you been doing that?

20   A.      Quite a while.  Way before I met him.

21   Q.      And did he speak to you about that?

22   A.      He did.

23   Q.      Tell us about that conversation please.

24   A.      He said that I was very pretty and I didn't have to do

25   any of that.

                        Ariel Otero                        74

 1              MS. SAVNER:  Objection, Your Honor.  This is hearsay.

 2              THE COURT:  No.  Hearsay it's the defendant.

 3              MS. SAVNER:  Yes, but the rule is that a party

 4      opponent can elicit the statement of the party opponent -- the

 5      party can't elicit their client's statement.

 6              THE COURT:  That's true, but then the second point

 7      isn't this being offered not necessarily to prove the truth of

 8      the matter asserted therein.  She is describing conduct

 9      essentially in the way he treated others.

10              MS. SAVNER:  Well he's asking specifically what was

11      said.

12              THE COURT:  Well that's -- that's how you do it.

13      That's how you establish that.  So objection overruled.  It all

14      is relevant to conduct.

15      BY MR. KAPLAN:

16      Q.      So you were encouraged to get out of prostitution?

17      A.      Yes.

18      Q.      And you were working in that field while you lived at

19      North Union Street?

20      A.      Yes.

21      Q.      And did Brian require that you pay him anything that you

22      made?

23      A.      No.

24      Q.      Did you eventually stop doing that?

25      A.      Yes.

Ariel Otero                                    75

1   Q.     Do you recall a time around February 10th of 2016 when

2   Mary was at the house?

3   A.     Yes.

4   Q.     You know who Mary is?

5   A.     Uh-huh.

6   Q.     You have to say yes or no.

7   A.     Yes.

8   Q.     And could you tell the jury please what you observed?

9   Did you see Brian and Mary interact?

10  A.     They were just talking.

11  Q.     Where were they talking?

12  A.     They talked in the bedroom with the door open.

13  Q.     The door was open?

14  A.     Uh-huh.  Yes.

15  Q.     Could you hear what they were saying?

16  A.     No.  They were whispering to each other.

17  Q.     And were you sitting on the couch with Mandy?

18  A.     I was.

19  Q.     If something like an assault had taken place in that

20  bedroom, do you think you would have heard it?

21  A.     Yes.  It's a very, very small house.

22  Q.     And what would you have done if you had heard something

23  like that?

24  A.     I would have intervened.  I would have done something.

25  Probably kicked the door.

Ariel Otero                                76

1   Q.      Did the federal agents come speak to you the other day?

2   A.      They did.

3   Q.      And how did you feel about that conversation?

4   A.      A little intimidated.

5   Q.      And why was it intimidating?

6   A.      Well one of their first questions to me was, was I going

7   to court and was I going to testify, and then every other

8   question on top of that was pretty much I felt badgering.

9              MR. KAPLAN:  I have nothing further, Your Honor.

10             THE COURT:  All right.  Any cross examination, Ms.

11  Savner?

12             MS. SAVNER:  Yes, Your Honor.

13                      CROSS EXAMINATION

14  BY MS. SAVNER:

15  Q.      Good morning, Miss Otero.

16  A.      Good morning.

17  Q.      We haven't met before, have we?

18  A.      No.

19  Q.      Okay.  You mentioned that some agents came over to your

20  house and talked to you the other day?

21  A.      Yes.

22  Q.      You let them in?

23  A.      Yes.

24  Q.      Let them sit down?

25  A.      Uh-huh.

                       Ariel Otero                        77

1   Q.      You talked to them about an hour?

2   A.      Yes.

3   Q.      They told you, you weren't in any trouble?

4   A.      Yes.

5   Q.      Told you, you didn't have to talk to them?

6   A.      No they didn't say that.

7   Q.      Well they did tell you, you weren't in any trouble,

8   right?

9   A.      Yes.

10  Q.      So you didn't know Mr. Folks at all before the end of

11  2015; is that right?

12  A.      Yes.

13  Q.      Okay.  So you met him that one time as you described,

14  correct?

15  A.      Yes.

16  Q.      And then it was when something bad happened to you with

17  an ex that you got in touch with Mr. Folks again in mid 2016,

18  right?

19  A.      Yes.  In the beginning, yes.

20  Q.      In the beginning of what?

21  A.      February.

22  Q.      Okay, and you stayed at the house on North Union from

23  February until when the lease was up in June, right?

24  A.      Yes.

25  Q.      And that's when the drug business out of the house was

                        Ariel Otero                         78

1   slowing down, right?

2   A.      I wouldn't know.

3   Q.      Well you were in the house, right?

4   A.      I was in the house, but as a guest.  I would leave in

5   the morning and appear again at night.

6   Q.      Okay and that's because you worked on Backpaging?

7   A.      Yes.

8   Q.      You had a sexual relationship with Brian Folks, correct?

9   A.      A couple times.

10  Q.      And he was the one that gave you permission to stay at

11  the house on North Union, right?

12  A.      Yes.

13  Q.      Okay.  That was his place as you understood it?

14  A.      He shared it, yes, with Mandy.

15  Q.      He wasn't living there, right?

16  A.      No.

17  Q.      He was just in and out?

18  A.      Yes.

19  Q.      And you knew Mandy was in love with him, right?

20  A.      She spoke on that, yes.

21  Q.      She referred to him as her Prince Charming?

22  A.      Yes.

23  Q.      Okay, and you stopped living there when the lease ended

24  at 103 North Union, and from there you went to the house of the

25  mother of his child Danielle Degenhardt, right?

```
                       Ariel Otero                        79
```

1   A.     Yes.

2   Q.     At 96 Ethan Allen?

3   A.     Yes.

4              MR. KAPLAN:  Objection, Your Honor.  This is outside

5   --

6              THE COURT:  Objection overruled.  Explore that on

7   cross.

8   BY MS. SAVNER:

9   Q.     You so followed Mr. Folks from 103 North Union to where

10  he was at his -- the house of his baby's mother, correct?

11  A.     Yes.

12  Q.     And you were at that house in fact when Mr. Folks was

13  arrested?

14  A.     Yes.

15  Q.     And the search warrant was executed there?

16  A.     Yes.

17  Q.     And you stayed close to him for a while even after he

18  went to jail, right?

19  A.     A little while, yes.

20  Q.     Called him a few times when he was in jail?

21  A.     Yes.

22  Q.     Had a conversation?

23  A.     He had called me.

24  Q.     You talked on the phone multiple times when he was in

25  jail?

                        Ariel Otero                          80

1    A.    Yes.

2    Q.    You weren't a heroin user --

3    A.    No.

4    Q.    -- when you were Backpaging, right?

5    A.    No.

6    Q.    You weren't -- have you ever used heroin?

7    A.    No.

8    Q.    Crack?

9    A.    No.

10   Q.    How old are you?

11   A.    26.

12   Q.    Okay.  So you were around 23 when you knew Mr. Folks in

13   2016?

14   A.    Yes.

15   Q.    And in all that time you had never done heroin or crack?

16   A.    Nope.

17   Q.    So you weren't prostituting doing Backpage to support a

18   heroin or crack addiction?

19   A.    No.

20   Q.    You said he was respectful of you; is that right?

21   A.    Yes.

22   Q.    Did you know that he took videos of the two of you

23   having sex?

24   A.    Yes.

25   Q.    He recorded those videos and made logs of them in a

Ariel Otero                                      81

1   notebook.  Did you know about that?

2   A.     Yes.

3   Q.     Along with all the other women he was having sex with?

4   A.     I didn't know about the other women, but I knew me.

5   Q.     You knew about Mandy, right?

6   A.     What?  That she had tapes too with him?

7   Q.     That she was also sleeping with him?

8   A.     Oh yes.

9   Q.     And when you were posting yourself on Backpage you

10  started doing that before you met the defendant, right?

11  A.     Yes.

12  Q.     So you already knew how it worked?

13  A.     Yes.

14  Q.     You were posting yourself?

15  A.     Yes.

16  Q.     You had money for phones and you did that all yourself?

17  A.     Yes.

18  Q.     You didn't need help from him to do that?

19  A.     No.

20  Q.     And you were making about five hundred dollars a day

21  from Backpaging when you were working at North Union, right?

22  A.     Yes.

23  Q.     You didn't do the dates in the house, you left the house

24  and did them at hotels?

25  A.     Yes.

                          Ariel Otero                         82

1   Q.      Okay, and while you were staying at Ethan Allen you were

2   also Backpaging, right?

3   A.      Yes.

4   Q.      And with some of that money, although he didn't require

5   you, in your words, to pay you did pay to help support his

6   house at 103 North Union, right?

7   A.      Yes.

8   Q.      And you did pay to help support his house at 96 Ethan

9   Allen, right?

10  A.      Yes.

11  Q.      You said that you don't -- you didn't know that drugs

12  were being sold out of the house on North Union.  Is that your

13  testimony?

14  A.      Yes.

15  Q.      Well you have had experiences being around other

16  individuals involved in drug trafficking before, right?

17  A.      Yes.

18  Q.      Your ex-boyfriend is Kevin Takerose (phonetic); is that

19  right?

20  A.      Yes.

21  Q.      And in January 2017 he was convicted federally for

22  dealing heroin?

23  A.      That's what I was told, yes.

24  Q.      And you used to hang out with him?

25  A.      Uh-huh.  Yes.

                    Ariel Otero                          83

1    Q.     Is that yes?  And Daniel is another one of your ex's; is
2    that right?
3    A.     He's my daughter's father.
4    Q.     Is he one that broke your nose?
5    A.     No.
6    Q.     Okay.  Well Daniel put you in the same kind of
7    situation, right?  Did you mean a trap house?
8    A.     At the time it wasn't and then it became one, yes.
9    Q.     Okay.  So you knew what living in a trap house looked
10   like?
11   A.     Yes.
12   Q.     So sometimes you went out with Mandy from the house on
13   103 North Union when she did hand to hands, right?
14   A.     No.
15   Q.     Well you left the house together, right?
16   A.     Uh-huh.
17   Q.     Is that a yes?
18   A.     Yes.
19   Q.     You would go for a little walk?
20   A.     Yes.  I would go one way, she would go another, and meet
21   back up.
22   Q.     Okay.  You described it as you would slow walk while she
23   did her thing?
24   A.     Yes.
25   Q.     Okay, and you knew it was better if you didn't have

                        Ariel Otero                        84

 1   questions, right?

 2   A.      Yes.

 3   Q.      Because in case you were in a situation just like this

 4   you didn't want to have to testify about what you did or didn't

 5   see, right?

 6   A.      Not only that, but it's none of my business to be asking

 7   questions in a house that I do not -- I can get kicked out any

 8   time so --

 9   Q.      So you didn't ask Mandy questions about what she was

10   doing?

11   A.      No.

12   Q.      You didn't ask Mr. Folks questions about what he was

13   doing, right?

14   A.      No.

15   Q.      You didn't want to know?

16   A.      No.

17   Q.      You saw him do the same kind of trips in and out of the

18   house on Ethan Allen Parkway when you guys moved in there

19   though, right?

20   A.      Yes, but he was going to see his child and his wife.  He

21   had a wife so --

22   Q.      That's what he told you?

23   A.      He does have a wife.

24   Q.      Well yes, but that's what he told you as to where he was

25   going?

Ariel Otero                                    85

1   A.      To go pick up his kid and bring him back over which is

2   what he used to do.

3   Q.      Okay, and you weren't keeping an eye on him all the

4   time?

5   A.      He's not my boyfriend.

6   Q.      You went on multiple trips with Mr. Folks and Mandy to

7   New York; is that right?

8   A.      Yes.

9   Q.      You drove down with the two of them?

10  A.      Yes.

11  Q.      You would drive the car?

12  A.      Sometimes, yes.

13  Q.      He told you he would want to see family or something

14  like that?

15  A.      Yes.

16  Q.      You two would split up?

17  A.      Yes.

18  Q.      Meet back up?

19  A.      Yes.

20  Q.      Drive back?

21  A.      Uh-huh.  Yes.

22  Q.      And you don't know what he was doing when you weren't

23  there, right?

24  A.      No.

25  Q.      So you never knew Mr. Folks in 2015 when he was

Ariel Otero                              86

1   operating out of a different house before the North Union

2   house, right?

3   A.      No.

4   Q.      So you didn't see anything that happened at that house?

5   A.      No.

6   Q.      Did you ever go to his Uncle Marty's house?

7   A.      No.

8   Q.      So you don't know what happened there?

9   A.      No.

10  Q.      You testified that on February 10th you were in the

11  house and Folks and Mandy discovered that the stash had been

12  stolen out of the car, right?

13  A.      No.

14  Q.      You don't remember that?

15  A.      No.

16  Q.      You just remember a time when Mary came over?

17  A.      Yes.

18  Q.      Okay, and shortly after that you left the house with

19  Mandy and Q, right?

20  A.      No.  Just Mandy.

21  Q.      You didn't leave with Q?

22  A.      No.

23  Q.      Q was another guy that hung out at the house, right?

24  A.      Yes.

25  Q.      Guy from New York?

```
                          Ariel Otero                        87
 1  A.      Uh-huh.  Yes.

 2  Q.      Friend of Mr. Folks?

 3  A.      Yes.

 4  Q.      So you did leave the house and you actually left in one

 5  of Mr. Folks' cars, right, the blue Dodge Durango?

 6  A.      No.

 7  Q.      Do you remember what car you were in?

 8  A.      I walked.

 9  Q.      You didn't get into a car?

10  A.      No I did not.  Me and Mandy left the house.  We went to

11  go grab something to eat and then came back.

12  Q.      Okay.  How long were you gone?

13  A.      30 minutes.  Almost an hour.

14  Q.      So you don't know what happened in that house when you

15  were out of it?

16  A.      No.

17              MS. SAVNER:  Nothing further.

18              THE COURT:  Okay.  Any redirect?

19              MR. KAPLAN:  Just one question, Judge.

20                       REDIRECT EXAMINATION

21  BY MR. KAPLAN:

22  Q.      Have you heard the street slang word violate?

23  A.      Yes.

24  Q.      What does that mean?

25  A.      Disrespect.
```

Ariel Otero                                88

1    Q.      And did you consider Brian a friend?

2    A.      Yes.

3    Q.      Did you consider him a friend back then?

4    A.      Yes.

5    Q.      Did he force you to do anything you didn't want to do?

6    A.      No.

7            MR. KAPLAN:  I have nothing further, Your Honor.

8            THE COURT:  Okay.  Anything further?

9            MS. SAVNER:  No, Your Honor.

10           THE COURT:  All right.  Thank you, Ms. Otero.  You're

11   free to go.

12           THE WITNESS:  Thank you.

13           THE COURT:  Okay.  Defense want to call the next

14   witness.

15           MR. KAPLAN:  Your Honor, I would call Brittany Barber

16   to the stand.

17           DEPUTY CLERK:  Please come forward, Miss Barber, to

18   be sworn.

19   BRITTANY BARBER,

20       Having been duly sworn, testified as follows:

21           DEPUTY CLERK:  You may take the stand.

22           THE COURT:  Good morning, Ms. Barber.

23           THE WITNESS:  Good morning.

24                          DIRECT EXAMINATION

25   BY MR. KAPLAN:

```
                        Brittany Barber                    89
 1    Q.    Brittany, would you state your full name please?
 2    A.    Brittany Marie Barber.
 3    Q.    And do you live in Jericho?
 4    A.    Correct.
 5    Q.    And how long have you lived in Vermont?
 6    A.    My whole life.
 7    Q.    Where were you born?
 8    A.    Burlington.
 9    Q.    And where did you attend high school?
10    A.    Milton.
11    Q.    And did you graduate?
12    A.    Yes.
13    Q.    When did you graduate?
14    A.    2012.
15    Q.    Did you ever meet Ayla Lang in high school?
16    A.    Correct.
17    Q.    So you have known her since then?
18    A.    Yes.
19    Q.    So at some point were you using drugs?
20    A.    Yes.
21    Q.    Was it heroin?
22    A.    Yes.
23    Q.    And at some point were you working as a prostitute?
24    A.    Yes.
25    Q.    Let me just add you're pregnant now?
```

```
                    Brittany Barber                    90
1    A.     Correct.

2    Q.     And when are you due?

3    A.     July 21, 2019.

4    Q.     And do you have plans to be married?

5    A.     Yes.

6    Q.     When are you -- when is that?

7    A.     We're getting married next year.

8    Q.     So you were working as a prostitute prior to the spring

9    of 2015?

10   A.     Correct.

11   Q.     And how bad was your heroin addiction?  Was it an

12   addiction?

13   A.     Yes.

14   Q.     And how bad was it?

15   A.     It was to the point where I couldn't even get out of bed

16   without it.  So it was pretty severe.

17   Q.     How long had you been doing that before the spring of

18   2015?

19   A.     Probably about two years prior.

20   Q.     And did you ever see Ayla while you were doing that?

21   A.     Yes.

22   Q.     Where would you see her?

23   A.     She would be either at the houses that I was at or I

24   would just see her on the street.

25   Q.     Would you see her in any hotels?
```

```
                          Brittany Barber                      91
```

1    A.      Yes.

2    Q.      Which ones?  Do you remember?

3    A.      Motel 6, the LaQuinta off of Williston Road, and I

4    believe I've seen her one time at the Marriott.

5    Q.      And that was before the spring of 2015?

6    A.      Correct.

7    Q.      And she was there frequently?

8    A.      Yes.

9    Q.      And were any of those the hotels where you used to meet

10   dates?

11   A.      Yes.

12   Q.      All of them?

13   A.      Not all of them.

14   Q.      Okay.  Which ones did you go to?

15   A.      I would have people -- I would go work out of people's

16   houses as well not just hotels.

17   Q.      At some point did you meet Brian Folks?

18   A.      Yes.

19   Q.      Tell us please how that came about.

20   A.      He messaged me on Facebook and I went over to the

21   address he had given me and that's basically how I met him.

22   Q.      Do you recall what the message was that he sent to you?

23   A.      I believe he said hey what's up.  That's how the

24   conversation started.

25   Q.      And was there very much conversation before you decided

Brittany Barber                           92

1    to go over to his house?

2    A.     Not really.

3    Q.     So tell us what happened, if anything?  Was his house on

4    Spring Street?  Is that where it was?

5    A.     Yes.

6    Q.     Or North Union?  Do you remember?

7    A.     By Pearl Street Beverage.

8    Q.     North Union.

9    A.     So yeah.

10   Q.     So tell us what happened -- excuse me -- if anything,

11   when you went over there?

12   A.     I bought drugs and I would use drugs there.

13   Q.     And how often did you do that?

14   A.     I was only there for two weeks -- going on two weeks.

15   Q.     So did you end up living at that house for two weeks?

16   A.     A house, yes, but not that one.  I did stay at that

17   house for the first two nights I was with him and then I moved

18   to a different house, but he was still with me.

19   Q.     Where did you move to?

20   A.     I was off of North Avenue.

21   Q.     And did Brian make arrangements for you to go there?

22   A.     Yes.

23   Q.     Who else was there with you?

24   A.     I believe her name is Mandy.

25   Q.     Okay, and what did you do -- did you have a room at that

Brittany Barber                        93

1   house where you could stay in?

2   A.    Yes.

3   Q.    Did you sleep there?

4   A.    Yes.

5   Q.    And did you see dates there?

6   A.    Yes.

7   Q.    And did Brian know that you were prostituting?

8   A.    Yes.

9   Q.    How did he know that?

10  A.    I told him.

11  Q.    And --

12  A.    I offered to work with him to put money in his pocket

13  because he was supplying me with the drugs so I obviously

14  wanted to make a business offer with him.

15  Q.    He was giving you the drugs for free?

16  A.    No.

17  Q.    But he was supplying you.  Was it a reasonable price?

18  A.    Yes.

19  Q.    And so what was the -- what is it that you said to him?

20  What was the business proposal you made?

21  A.    I told him what I did which was prostitution.  I told

22  him how much I charged an hour and my hourly rate, and I told

23  him I would give him 50/50 as long as he took care of me and I

24  would put money in his pocket and that was the arrangement that

25  we had.

                        Brittany Barber                      94

1   Q.     And he agreed to that?

2   A.     Yes.

3   Q.     And why -- and so he let -- he suggested you stay out of

4   Unc's house on North Avenue?

5   A.     Yes.

6   Q.     And why is it that you only did that for two weeks?

7   A.     Because I was trying to get sober.  I didn't want to

8   live that lifestyle any more.

9   Q.     And did Brian ever stand in your way of trying to get

10  sober?

11  A.     No.

12  Q.     Did he talk to you about getting sober?

13  A.     I would talk to him about it.

14  Q.     What would you say?

15  A.     I would tell him that I wanted to stop and that I wanted

16  -- obviously wanted to get the health that I needed, and you

17  know he told me he was -- would be my friend and would be there

18  for me if I ever wanted to and -- but eventually I just chose

19  drugs over getting sober at that time.

20  Q.     And eventually did you get sober?

21  A.     Yes.

22  Q.     When did that happen?

23  A.     I got sober March 4, 2018.

24  Q.     So you remember that date?

25  A.     Very well.

Brittany Barber                                95

1    Q.    And while you -- how often did you see Brian during that

2    two-week period?

3    A.    Not very.  I didn't really do much transaction with him.

4    It was always Mandy.

5    Q.    Okay.  Who would you give the money to?

6    A.    Mandy.

7    Q.    Did you ever give the money directly to Brian?

8    A.    No.

9    Q.    And how did Brian treat you during the period of time

10   that you were with him?

11   A.    Respectful.

12             MS. SAVNER:  Objection, Your Honor.  May we approach?

13             THE COURT:  Yes.  Okay.  I'll turn the husher on.

14

15

16

17

18

19

20

21

22

23

24

25

                    Brittany Barber                    96

1    [Bench conference].

2              MS. SAVNER:  Your Honor, she's testified she's a drug

3    customer and that she was prostituting, but she's not

4    testifying about the way he treated the other women.  She was

5    testifying about specific acts and about the way he treated

6    her.

7              THE COURT:  I thought she made a deal with him

8    through Mandy -- actually with him 50/50.  She's going to

9    engage in prostitution.  Going to split the proceeds.  She

10   becomes just like everybody else I thought.  Isn't that --

11             MR. KAPLAN:  I mean every Government witness

12   testified how Brian treated them.  I don't know why this

13   witness can't do that.

14             THE COURT:  Well right, but she is in fact a -- she

15   is in fact an employee or working --

16             MR. KAPLAN:  Working for him as a prostitute.  They

17   split 50/50.

18             THE COURT:  All right

19   [End of bench conference]

20

21

22

23

24

25

```
                    Brittany Barber                      97
 1   BY MR. KAPLAN:
 2   Q.      I think you testified that he was respectful toward you?
 3   A.      Uh-huh.
 4   Q.      You have to say yes or no.
 5   A.      Yes.
 6   Q.      Did you ever see him be abusive to anyone?
 7   A.      No.
 8   Q.      Did you see him interact with the other women at all who
 9   were working as prostitutes?
10   A.      Not really, no.
11   Q.      Did you see him interact with Mandy?
12   A.      Yes.
13   Q.      How was he with her?
14   A.      Very respectful.  He treated her like a queen.
15   Q.      So you said you got clean like a year later?
16   A.      Uh-huh.
17   Q.      What did you do in the year in between?  Did you just
18   continue on doing what you were doing?
19   A.      Yes.
20   Q.      And then obviously you stopped working as a prostitute?
21   A.      Yes.
22   Q.      At the same time you got clean?
23   A.      Yes.
24   Q.      Do you know if you're having a boy or a girl?
25   A.      I'm having a boy.
```

```
                    Brittany Barber                    98
 1              MR. KAPLAN:  I have nothing further, Your Honor.
 2              THE COURT:  Okay.  All right.  Any cross examination?
 3              MS. SAVNER:  Yes, Your Honor.  Just one moment.
 4              THE COURT:  Yes.
 5                         CROSS EXAMINATION
 6   BY MS. SAVNER:
 7   Q.    Good morning, Miss Barber.
 8   A.    Good morning.
 9   Q.    We haven't met before, have we?
10   A.    Uh-uh.
11   Q.    Okay.  I'm just going to ask you a few questions.  You
12   testified that you met Brian Folks on Backpage -- or, excuse
13   me, on Facebook; is that right?
14   A.    Yes.
15   Q.    Okay.  So you hadn't met him in person before?
16   A.    No.
17   Q.    He must have seen your profile, your picture, on
18   Facebook and decided to approach you?
19   A.    I believe so.
20   Q.    Do you know why?
21   A.    No.  I'm just assuming that it had to do with the type
22   of work I did.
23   Q.    Okay.  He knew you worked as a prostitute?
24   A.    Probably yes.
25   Q.    So he contacted you, asked you to come over that very
```

Brittany Barber                           99

1   same day?

2   A.      Yes.

3   Q.      Yes?

4   A.      Yes.

5   Q.      And did you go over?

6   A.      Yes.

7   Q.      You bought drugs from him there?

8   A.      Yes.

9   Q.      And this was at the house on North Union Street; is that

10  right?

11  A.      Correct.

12  Q.      Okay.  You bought drugs from him or Mandy at that house?

13  A.      Yes.

14  Q.      You understood them to be his drugs, right?

15  A.      Right.

16  Q.      Okay.  Did he take pictures of you there?

17  A.      No.

18  Q.      Did he take pictures of you later?

19  A.      Not that I recall.

20  Q.      Okay.  Well pictures of you were taken at Unc's house,

21  right, on North Avenue?

22  A.      Yes.  Pictures, yes.

23          MS. SAVNER:  May I approach?

24          THE COURT:  Yes.

25  BY MS. SAVNER:

```
                    Brittany Barber                      100
 1   Q.     I'm approaching you with what we will mark as
 2   Government's 141.  Can you take a look at these?  Are these
 3   pictures of you --
 4   A.     Yes.
 5   Q.     -- as best you can tell?
 6   A.     Yes.
 7   Q.     Okay, and the pictures we're looking at on page 1, 2, 3,
 8   4, these pictures were taken at Uncle Marty's house on North
 9   Avenue, right?
10   A.     Yes.  Correct.
11   Q.     Were these for Backpage?
12   A.     Yes.
13   Q.     Did you know that the defendant kept a folder with your
14   name on it in his computer --
15   A.     No.
16   Q.     -- full of these pictures of you?
17   A.     No.
18   Q.     So you were Backpaging at the time you started hanging
19   out with the defendant, right?
20   A.     Yeah.
21   Q.     And you were doing drugs?
22   A.     Yes.
23   Q.     And you were buying your drugs from him, right?
24   A.     Correct.
25   Q.     You saw him with a large quantity of drugs?
```

                       Brittany Barber                    101

1   A.      Not large quantity, but with drugs on hand, yes.

2   Q.      He was a steady supplier for you?

3   A.      Yes.

4   Q.      And he was in charge of what was going on at Unc's

5   house, right?

6   A.      Yes.

7   Q.      You talked about a deal you worked out with him when you

8   started kind of joining forces with him and you were

9   prostituting for him, right?

10  A.      Not really so much for him.  It was mainly for my

11  addiction.  That -- I mean so to speak.  So it was mainly for

12  myself because I did it.  I'm the one that brought it up to

13  him.  So it was all on me.

14  Q.      Okay.  So you needed drugs to support your addiction?

15  A.      Correct.

16  Q.      You described yourself as having a severe heroin

17  addiction?

18  A.      Correct.

19  Q.      Okay.  Describe what it feels like to be sick -- dope

20  sick?

21  A.      You're sweaty, you get cramps in your abdomen, it feels

22  like your back is breaking, you puke, you're constantly going

23  to the bathroom.  It's just a ridiculous cycle.

24  Q.      Do whatever you could to avoid those symptoms, right?

25  A.      Yes.

                    Brittany Barber                          102

1    Q.      You would prostitute --

2    A.      Yes.

3    Q.      -- as you described?  And Brian Folks was the one that

4    gave you the heroin you needed to get well, right?

5    A.      Correct.

6    Q.      Okay, and you split your profits with him 50/50?

7    A.      Correct.

8    Q.      What did you do with your 50 percent?

9    A.      Normally it would all go to him because I would

10   obviously hold on to my 50, but I would end up buying more

11   drugs with it at the end of the night so he ended up getting

12   all my profit.

13   Q.      And you talked to him about your desire to get sober,

14   right?

15   A.      Uh-huh.

16   Q.      Is that a yes?

17   A.      Yes.

18   Q.      Okay.  He was your drug dealer at the time, no?

19   A.      Yes.

20   Q.      And getting sober didn't work out, right?

21   A.      No.

22   Q.      Not at that time?

23   A.      Not at all.

24   Q.      Despite the fact that he seemed supportive?

25   A.      Correct.

            Capitol Court Reporters, Inc. (800/802) 863-6067

                    Brittany Barber                    103

1            MS. SAVNER:  Nothing further.

2            THE COURT:  Okay.  Anything further?

3            MR. KAPLAN:  Just one question.

4                    REDIRECT EXAMINATION

5   BY MR. KAPLAN:

6   Q.    Brittany, do you know if Ayla was a heavy drug user

7   before the spring of 2015?

8   A.    Yes.

9   Q.    And how do you know that?

10  A.    I was using with her in a hotel room.  I was staying at

11  Motel 6 and she stayed with me one time and she was getting

12  high with me.

13  Q.    Would you see her with guys in that room?

14           MS. SAVNER:  Objection, Your Honor.

15           THE COURT:  This is beyond the scope of cross

16  examination.

17           MR. KAPLAN:  Actually it isn't, Judge.  Well okay.  I

18  have nothing further.

19           THE COURT:  All right.  Anything further from the

20  Government?

21           MS. SAVNER:  No, Your Honor.

22           THE COURT:  All right.  Thank you, Ms. Otero.

23           THE WITNESS:  Thank you.

24           THE COURT:  All right.  Defense want to call the next

25  witness.

Emily Lasell                                104

 1              MR. KAPLAN:  Your Honor, the defense would call Emily

 2   Lasell.

 3              DEPUTY CLERK:  Please come forward to be sworn.

 4   Emily Lasell,

 5        Having been duly sworn, testified as follows:

 6              THE COURT:  Good morning, Miss Lasell.

 7              THE WITNESS:  Good morning.

 8                        DIRECT EXAMINATION

 9   BY MR. KAPLAN:

10   Q.    Is it okay if I call you Emily?

11   A.    Yes.

12   Q.    I'm not sure you're going to need this microphone, but

13   I'm going to make sure it's in front of you.  Okay.  Would you

14   state your full name please?

15   A.    Emily Rose Lasell.

16   Q.    And what town do you live in?

17   A.    Colchester, Vermont.

18   Q.    And what is your educational background?

19   A.    Some college.  Not a whole lot.

20   Q.    You graduated from high school?

21   A.    Yes.

22   Q.    What high school?

23   A.    Milton.

24   Q.    Did you know Ayla in high school?

25   A.    Towards the end of high school.

                      Emily Lasell                    105

1   Q.    And you saw her on occasion after high school?

2   A.    Yes.

3   Q.    In fact, you spent some time with her?

4   A.    Yes.

5   Q.    Tell the jury -- you have a criminal record?

6   A.    Yes I do.

7   Q.    It's a federal conviction?

8   A.    Yes it is.

9   Q.    And what was that for?

10  A.    Conspiracy with intent to distribute.

11  Q.    Okay and did you do some time on that?

12  A.    I did.

13  Q.    How long did you do?

14  A.    18 months.

15  Q.    Glad to be home?

16  A.    Absolutely.  A hundred times better than I have ever

17  been in my entire life.

18  Q.    So right now you're sober?

19  A.    Absolutely.

20  Q.    Clean?

21  A.    It feels great.

22  Q.    You can remember the difference?

23  A.    The difference from when I was using to now?

24  Q.    Right.

25  A.    I don't remember a whole lot of my using days.

Emily Lasell                                106

1    Q.      So you were using -- was it heroin?

2    A.      Yes.

3    Q.      Was it after high school?

4    A.      Yes.

5    Q.      And did you have an addiction?

6    A.      Yeah.

7    Q.      How serious was it?

8    A.      Serious enough to put me in holding for 18 months and

9    send me to six different rehabs.

10   Q.      And eventually it was successful?

11   A.      Yes.  You got to want it.  It's not something that just

12   comes to you.  You have to want it.

13   Q.      Did you make decisions to go to rehab over and over

14   again and just didn't take for a while?

15   A.      At first I would want to go and then after a couple days

16   I would leave and that obviously doesn't work.  I went to

17   Valley Vista I think it was three times and every time I would

18   leave.

19   Q.      What did you think of the Valley Vista program?

20   A.      I think it's a good program from what I saw.  I wasn't

21   there for very long any of the times, but the program seemed to

22   have worked for the other girls that were there so --

23   Q.      And did you feel like at the time that you were addicted

24   that you had a choice whether to keep using or to stop using?

25   A.      No.

                          Emily Lasell                    107

1    Q.    That's because the addiction was so bad?

2    A.    Yes.

3    Q.    And were you working as a prostitute then?

4    A.    I was kind of.  I was kind of doing my own thing.  I was

5    working for Solid Gold.

6    Q.    The dancing group?

7    A.    Yes.

8    Q.    But were you actually taking money for sex?

9    A.    For sexual acts, but not sex specifically.

10   Q.    And this was before the spring of 2015?

11   A.    I went to jail May 2015.

12   Q.    Okay, and was Ayla doing sex acts for money prior to the

13   spring of 2015?

14   A.    I have reason to believe that she might have been, but I

15   never physically saw it myself.  I never saw any exchange.  I

16   never saw her with no clothes on, et cetera.

17   Q.    Do you recall that you met with Jennifer Martin, an

18   investigator for the defense, on April 29th of 2019?

19   A.    You mean when she came to my work?

20   Q.    Served you with a subpoena?

21   A.    Yes.

22   Q.    And do you recall she said to you that Ayla is saying

23   that she didn't prostitute --

24              MR. GRADY:  Objection, Your Honor.  Hearsay.

25              THE COURT:  Okay.  Would counsel approach the bench?

Emily Lasell                                    108

1    I'll put the husher on.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Emily Lasell                      109

 1  [Bench conference]

 2          THE COURT:  Is this to impeach?

 3          MR. KAPLAN:  What happened was the investigator goes

 4  out there and says Ayla is saying she never prostituted when

 5  she met Brian.  This woman said that's bullshit, and Jennifer

 6  said -- who I'm going to put on next -- how do you know that.

 7  Because I used to do it with her.  So it's impeachment.  Setup

 8  so I can put Jennifer Martin on the stand.

 9          MR. GRADY:  This can't be admitted for the truth of

10  the matter asserted.

11          THE COURT:  It's being offered to impeach.

12          MR. GRADY:  They can't argue --

13          THE COURT:  They can't argue it as the fact.

14          MR. GRADY:  Right.

15          THE COURT:  So it's admitted for purposes of

16  impeachment.  Okay.

17  [End of bench conference]

18

19

20

21

22

23

24

25

Emily Lasell                              110

1  BY MR. KAPLAN:

2  Q.     So I'll repeat my question.  Do you recall meeting with

3  Jennifer Martin I think you said?

4  A.     Yup.

5  Q.     And do you recall her saying to you that Ayla is saying

6  that she did not engage in prostitution before she met Brian?

7  A.     I do recall her saying that.

8  Q.     And do you recall that you said that's bullshit?

9  A.     Yes I did.

10  Q.     And do you recall Jennifer saying to you how do you know

11  that and you said because I used do it with her?

12  A.     I may have misinterpreted what she was asking me or just

13  not necessarily done it with her -- no with her.

14  Q.     But you knew she was doing it?

15  A.     But I knew she was doing it.

16  Q.     Okay.

17  A.     But I don't really have any solid -- you know what I

18  mean.  I know you want solid stuff.  I don't really have that.

19  Q.     But you knew her in high school?

20  A.     Yup.

21  Q.     You saw her frequently after high school?  Yes?

22  A.     Yes.

23  Q.     You would see her around?

24  A.     Yes.

25  Q.     And you knew what she was up to?

                    Emily Lasell                      111

1   A.    Yes.  She was an addict.  She was getting what she

2   needed for herself.

3   Q.    And who would understand that better than yourself,

4   right?

5   A.    Nobody, well, unless you have been there.

6   Q.    Right, and where did you do your time on the federal

7   level?

8   A.    I did some here in Burlington.  Not very much.  I did a

9   whole bunch at Cheshire County, New Hampshire.

10  Q.    So you didn't do the five hundred hour drug program?

11  A.    I'm sorry.

12  Q.    How did you stop using?

13  A.    Maine General.  It's a rehab program; nine-month

14  program.

15  Q.    Is that after you got out?

16  A.    Yes.

17          MR. KAPLAN:  All right.  I have nothing further,

18  Judge.

19          THE COURT:  Okay.  Cross examination, Mr. Grady.

20          MR. GRADY:  Thank you, Your Honor.

21                      CROSS EXAMINATION

22  BY MR. GRADY:

23  Q.    Good morning, ma'am.

24  A.    Good morning.

25  Q.    As I understand it, it was July 17, 2017 when you

Emily Lasell                          112

1    pleaded guilty to conspiracy to distribute?

2    A.     It could very well be.  I don't remember the day, sir.

3    Q.     Sure.  No problem, but that was here in federal court?

4    A.     Yes.

5    Q.     And you previously mentioned you served 18 months in

6    prison?

7    A.     Yes.

8    Q.     And you received three years of supervised release?

9    A.     Yes.

10   Q.     Are you still on supervised release?

11   A.     No.

12   Q.     That part is done?

13   A.     Yes.

14   Q.     I'm going to direct your attention to May 1st of 2015.

15   I don't know if you recall May 1st offhand.  Do you recall -- I

16   would say that's no?

17   A.     No.

18   Q.     Just making it clear for the court reporter.  Do you

19   recall meeting at Manhattan Pizza?

20   A.     No.

21   Q.     Do you remember being at Manhattan Pizza with Ayla?

22   A.     I'm sure I went there.  Oh is this when I OD'd?

23   Q.     When you passed out at the Manhattan Pizza's rest room.

24   A.     Yes.  Yes.  I don't recall exactly what happened, but I

25   do know she was there with me.

Emily Lasell                                    113

1   Q.      Ayla was there and also Eric Ballard was there as well?

2   A.      I don't even know who that is.

3   Q.      But you mentioned you passed out and were taken to the

4   hospital?

5   A.      Yes.

6   Q.      And do you recall telling Officer Kalig of the

7   Burlington Police Department that Ayla stole your wallet?

8   A.      Yes.

9   Q.      Did you in fact believe that Ayla stole your wallet?

10  A.      I know she did.

11  Q.      And you also said she took your sunglasses?

12  A.      My sunglasses, my wallet, and all the drugs out of my

13  wallet.  So when I got my wallet back it had no money or drugs

14  in it.

15  Q.      Fair to say you were a little upset with Ayla?

16  A.      Oh boy I was upset all right.  Yes.  Like you just

17  watched your friend die and now you want to take off everything

18  I had.

19  Q.      And to make sure I understand your testimony you never

20  saw Ayla actually engaging in sex with a client.  Is that what

21  you're saying under oath?

22  A.      Correct.

23  Q.      And you mentioned that she had a heroin addiction,

24  right?

25  A.      Yes.

                    Emily Lasell                    114

1   Q.      And I believe you mentioned that you went to jail in May

2   of 2015, right?

3   A.      Yes.

4   Q.      Never saw Ayla after May of 2015 then?

5   A.      I haven't seen her since.

6           MR. GRADY:  No further questions, Your Honor.

7           THE COURT:  Okay.  Any redirect?

8           MR. KAPLAN:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  Thank you.  Okay.  Let's take

10  our break.  I'm going to stay and talk with the lawyers.  We'll

11  be back at 1:15.

12  [Jury leaves at 12 p.m.  The following occurred in open court

13  without the jury present]

14          THE COURT:  Okay.  So from the defense do you have

15  additional witnesses this afternoon?

16          MR. KAPLAN:  We do, Judge.  I will probably call

17  Jennifer Martin.  We have our expert.  Maybe Chrissy and who

18  knows.

19          THE COURT:  And who knows?

20          MR. KAPLAN:  Who knows.

21          THE COURT:  Okay.  So you're calling your

22  investigator.  You call your expert witness and you may be

23  calling one additional witness.  Is that Chrissy?

24          MR. KAPLAN:  Possible, yes.  That's possible.

25          THE COURT:  Okay.

1          MR. KAPLAN:  Not everyone has shown up either so --

2          THE COURT:  Pardon me.

3          MR. KAPLAN:  Not everyone has come that said they

4    would either so --

5          THE COURT:  Okay.  All right, and does the Government

6    anticipate -- well Government anticipate rebuttal?

7          MR. DARROW:  We need to talk about that depending on

8    how the defense case comes in.  Probably not, but we would

9    appreciate hearing from the defense what witnesses they are

10   calling.  It's pretty late in the day.  We rested.  They should

11   know and in the past the Government has given them notice at

12   least a day before.  Actually we pretty much told them all our

13   witnesses.

14         THE COURT:  Let me see if I can interpret Mr.

15   Kaplan's comments.  He probably subpoenaed a number of

16   witnesses and you have that list -- witness list.  So

17   scratching the three there may be some other witnesses whom --

18   who received subpoenas and did not show.  That's a possibility.

19   Then there's Chrissy and obviously the investigator and the

20   expert and that's it.

21         MR. KAPLAN:  Judge, I would like to be clear about

22   this because this is the second time Mr. Darrow has said this.

23   Sunday we sent him an e-mail and we pared our witness list down

24   to like six or seven people.  Then Monday after court I pared

25   it down more to like four or five people.  So I think he's got

1    a pretty good idea, and then I told him this morning who we're

2    calling and in what order pretty much.  So I feel like I've --

3    believe me we appreciate the Government telling us who they are

4    calling the next day because otherwise it would be -- and I

5    tried to do the same.  Now if I messed up I apologize, but I'm

6    pretty sure that we have been pretty conscientious.

7            THE COURT:  Right and I think Mr. Darrow's taking

8    your comments about whoever else shows up.  Right.

9            MR. DARROW:  Exactly.  The defense witness list has

10   been an evolving and changing thing.  We have new names.  All

11   we're saying at this late point we think it's fair the

12   defendant tell us who his witnesses are.

13           THE COURT:  Oh I think that's true and in fact it

14   says that he has done that.

15           MR. KAPLAN:  I'm not calling anyone, Judge, that I

16   haven't told him about either Sunday or Monday.

17           THE COURT:  Okay.

18           MR. KAPLAN:  Probably not anyone that I haven't told

19   him about yesterday.

20           THE COURT:  Well so you have already called three of

21   the witnesses.  If you gave him notice of five, at least you

22   got two left.  There must be just a couple of others whom you

23   subpoenaed and they may not have shown.

24           MR. KAPLAN:  That's right.

25           MR. DARROW:  So the one exception between Your

 1   Honor's description of the defense list and Mr. Kaplan's is

 2   that no mention of the defendant.  Is he going to testify?

 3            MR. KAPLAN:  Well, Judge, this is another

 4   conversation I had with the prosecutor and probably five times

 5   that I have said I never ever disclose if I intend to call my

 6   client, but if I were you, I would be ready for it just in case

 7   I do, and Mr. Darrow acknowledged that I said that and I don't

 8   make that decision until the very last minute and everybody

 9   knows that.  Mr. Darrow knows that.  The whole office knows

10   that.  Van de Graaf is still angry about it from a previous

11   trial.  That's where we are.

12            THE COURT:  Does he talk to you?

13            MR. KAPLAN:  He came up to me and said are you going

14   to call your client.  I said I would have to be crazy to do

15   that and I ended up doing it because that's the way it worked

16   out.

17            THE COURT:  Okay.  Obviously it's a whole lot

18   different when you're talking about the testimony of the

19   defendant.  What I'm concerned about is you being noticed of

20   the various witnesses that they are likely to call, and

21   obviously a decision as to whether a defendant testifies is in

22   many ways made between the defendant and the defense counsel

23   and it's made at the end.  So I'm not -- I don't think it's

24   problematic that he's not disclosing that at this particular

25   point, although he has disclosed that you should be prepared,

```
 1    but as practical matter the witnesses whom the defense intends

 2    to call are obviously the investigator, the expert witness,

 3    perhaps -- this is Chrissy T?

 4              MR. KAPLAN:  Yes, Judge.  We wanted to play a tape

 5    recording.

 6              THE COURT:  All right.  So you identified that to the

 7    Government?

 8              MR. KAPLAN:  Yes.

 9              THE COURT:  And there's others.

10              MR. KAPLAN:  I think they almost said they would play

11    it for me.

12              MR. DARROW:  We oppose the playing of the tape

13    recorder in court, but we -- at counsel's request we asked

14    Chrissy T. to be here at one o'clock in case he wanted to call

15    her.

16              THE COURT:  Okay and is there -- there's no one else

17    that you know of?

18              MR. KAPLAN:  No, Judge.

19              THE COURT:  Okay.  Then all right.  I think I

20    understand.  So I'm going to go see how the research is going

21    on Count XV.  Okay.

22    [Recess at 12:05 p.m.]

23

24

25
```

C E R T I F I C A T I O N

      I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


May 7, 2019                          _____

Date                                 JoAnn Q. Carson, RMR,CRR