UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94




JURY TRIAL
Tuesday, May 7, 2019
Burlington, Vermont



BEFORE:

        THE HONORABLE WILLIAM K. SESSIONS III
            District Judge



APPEARANCES:

        WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
            MATTHEW T. GRADY, ESQ., Assistant United States
            Attorneys, Federal Building, Burlington,
            Vermont; Attorneys for the United States

        MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
            Suite 405, 95 St. Paul Street, Burlington,
            Vermont; Attorney for the Defendant

        NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
            Attorney; Attorney for the Defendant




                ANNE NICHOLS PIERCE
            Registered Professional Reporter
        United States District Court Reporter - Retired
                Post Office Box 5633
                Burlington, Vermont  05402
                    (802) 793-9080

## I N D E X

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **JENNIFER MARTIN** | | |
| Direct by Mr. Kaplan | 7 | 16 |
| **CHRISSY T.** | | |
| Direct by Mr. Kaplan | 9 | 23 |
| Cross by Ms. Savner | 16 | 24 |
| Redirect by Mr. Kaplan | 27 | 11 |
| Recross by Ms. Savner | 28 | 25 |
| **ANTHONY MARTINO** | | |
| Direct by Ms. Sen | 31 | 12 |
| Cross by Mr. Grady | 76 | 13 |

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| Z55 | Audio recording of Detective May interview with Chrissy T. | 14 |

1    TUESDAY, MAY 7, 2019

2    (The following was held in open court without the jury

3    present at 1:15 p.m.)

4            THE COURT:  Okay.  The attorneys wanted to

5    speak with me; is that correct?

6            MR. KAPLAN:  Well, Judge, I just had one brief

7    issue.  I was going to call Chrissy to the stand -- we

8    had subpoenaed her -- or Detective May, who we

9    subpoenaed, to play a tape of when Detective Mann --

10   Detective May and Chrissy and one other law enforcement

11   officer interviewed her in December sometime.  And --

12   but the thing I can't do up front is have them

13   authenticate it because they haven't listened to it.

14        So, I mean, we got it from the government, so we

15   have listened to it.  So I can either have them listen

16   to it now before the jury comes in so they can say, yes,

17   that's the tape, or I can -- the government can just be

18   gracious and let us introduce it into evidence.

19           THE COURT:  Is there a motion for a gracious

20   response by the government?  Okay?

21           MS. SAVNER:  We don't object to the

22   authentication, but, your Honor, this is an audio

23   recorded interview with one of the government's

24   witnesses that was available to the defense when that

25   government witness testified.

1    They now want to introduce her prior out-of-court

2    statement, and now they seem to want to do it without

3    even having her on the stand and subject to cross

4    examination on the statement, because they want to do it

5    through the agent.

6    So we object to the audio recording being played at

7    all given that it's hearsay and it's clearly being

8    offered for its truth.  They want to play the whole

9    interview, and we object to it coming in through Chris

10    May and not having the witness whose statement it is be

11    available for cross examination.

12    THE COURT:  Okay.  So, first of all, was this

13    set up during Ms. Tatro's cross examination?

14    MR. KAPLAN:  No, but she is now our witness,

15    and I can certainly call her and put her on the stand.

16    And this tape recording has conversations that are

17    directly related to things she said when she testified

18    for the government.

19    MS. SAVNER:  Not inconsistent.

20    MR. KAPLAN:  Yes.  She only has some

21    inconsistent statements in it, for sure.

22    THE COURT:  Well, I am going to let you put

23    the statement on, but I would call her.

24    MR. KAPLAN:  Okay.

25    THE COURT:  She is here?

1     MR. KAPLAN:  Yes, she is here.

2     THE COURT:  Okay.  You can call her, put her

3   on.  I don't think it requires authentication.

4     MR. KAPLAN:  All right.

5     THE COURT:  Just play the tape, and the

6   government has the opportunity to cross examine.

7     MR. KAPLAN:  Okay.  And we have an exhibit

8   number for it?

9     THE COURT:  Okay.  Then who else do you have?

10    MR. KAPLAN:  I am going to call Jennifer

11  Martin first.

12    THE COURT:  Okay.  And then --

13    MR. GRADY:  Your Honor, if I may, just about

14  Jennifer Martin.  I think that relates to Emily Lasell.

15  She admitted that she said the statement to Jennifer

16  Martin, so I am not sure why we have to call Jennifer

17  Martin.

18    THE COURT:  Right, yeah.  She did say that.  I

19  mean, I was wondering the same thing, frankly.  She

20  acknowledged that the statement was made.

21    MR. KAPLAN:  Well, I asked her if she knew

22  whether or not Ayla was prostituting, and she said yes,

23  but she -- I think she said she didn't know how.  And

24  what she told Jennifer was that she was doing it with

25  her -- that this witness was doing it with -- with --

1    Ayla.

2              THE COURT:  Oh, so that's the difference?

3              MR. KAPLAN:  That's the significant

4    difference, I think.  It's not left out there that she

5    sort of heard it or somebody had -- it was common

6    knowledge the fact that she said to our investigator

7    that she was doing it with Ayla.

8              THE COURT:  All right.

9              MR. GRADY:  But that's what counsel asked her

10   if she said that to Jennifer Martin, and she said, "Yes,

11   I did," and then she clarified it.  I don't have it in

12   front of me, but not -- you know, she qualified what she

13   said to Jennifer Martin with what she said in her

14   testimony.

15             MR. KAPLAN:  It's not the same.

16             THE COURT:  So -- but if -- I am going to let

17   you call the -- it's going to be a two-minute witness, I

18   assume.

19             MR. KAPLAN:  Yes.

20             THE COURT:  If that -- if that is

21   inconsistent -- yeah, I suppose it is inconsistent.

22        Okay.  And your expert?

23             MR. KAPLAN:  Yes.  Hopefully he will go on

24   today at some point.

25             THE COURT:  Okay.  Right.

```
 1          Okay, so ready for the jury?
 2               MR. KAPLAN:  Yes, Judge.
 3               THE COURT:  Okay.
 4     (The following was held in open court with the jury
 5     present at 1:24 p.m.)
 6               THE COURT:  Okay.  Mr. Kaplan, you want to
 7     call your next witness.
 8               MR. KAPLAN:  Your Honor, I would call Jennifer
 9     Martin to the stand.
10                         JENNIFER MARTIN,
11          having been duly sworn by the courtroom deputy,
12          was examined and testified as follows:
13               THE COURT:  Good afternoon, Ms. Martin.
14               THE WITNESS:  Hi.
15                       DIRECT EXAMINATION
16     BY MR. KAPLAN:
17     Q    Miss Martin, would you state your full name,
18     please.
19     A    It's Jennifer Martin.
20     Q    And you live in Chittenden County?
21     A    Yes.
22     Q    And what is your profession?
23     A    I am a private investigator.
24     Q    And were you retained by the defense to work on the
25     Brian Folks case that we're involved in right now?
```

```
1    A    Yes.

2    Q    And as part of your responsibilities, were you

3    asked to meet with Emily Lasell?

4    A    Yes.

5    Q    And did you meet with her?

6    A    I did.

7    Q    And you served her a subpoena?

8    A    I did.

9    Q    And did you memorialize your conversation in a --

10   in a report?

11   A    I did.

12   Q    Let me show you what's been marked as Defendant's

13   Exhibit Z56 and ask you if that's the report?

14   A    That is my report.

15   Q    Where was it that you had this conversation with

16   her?

17   A    At Emily's workplace in Colchester.

18   Q    And she told you that she knew that Ayla was

19   prostituting before she met Brian?

20   A    Yes, she told me that.

21   Q    And did you ask her how she knew?

22   A    Yes.

23   Q    And what did she say?

24   A    She said she knew because she was doing it with

25   Ayla.
```

1    Q    And this was before she met Brian?

2    A    And she clarified that it was before she met Brian,

3    before 2015.

4              MR. KAPLAN:  I have nothing further.

5              THE COURT:  Okay.  Any questions from the

6    government?

7              MR. GRADY:  No, your Honor.

8              THE COURT:  Okay.  Thank you, Miss Martin.

9              THE WITNESS:  Thank you.

10              (Witness excused.)

11              THE COURT:  All right.  The government call

12    the next witness.

13              MR. KAPLAN:  Your Honor, I would call Chrissy

14    to the stand.

15              THE COURT:  Is that Chrissy Tatro?

16              MR. KAPLAN:  Yes.

17                        CHRISSY T.,

18         having been duly sworn by the courtroom deputy,

19         was examined and testified as follows:

20              THE COURT:  Good afternoon, Miss Tatro.

21              THE WITNESS:  Good afternoon, Judge.

22                     DIRECT EXAMINATION

23    BY MR. KAPLAN:

24    Q    Would you state your full name, please.

25    A    Chrissy Tatro.

1    Q    And you were just out sitting with Detective May?

2    A    Yes.

3    Q    And you heard the conversation about you and

4    Detective May having a conversation in his car?

5    A    I believe so, yes.

6    Q    And you remember that conversation?

7    A    No.

8    Q    Okay.  So I'm going to play defense Exhibit Z55 for

9    you and see if you -- if this refreshes your memory.

10   Okay?

11   A    Okay.

12            THE COURT:  All right.  So actually, are you

13   broadcasting this --

14            MR. KAPLAN:  We may have to do it outside the

15   presence of the jury if it's just to refresh her memory.

16   I wasn't going to play it so everyone could hear it.

17            THE COURT:  I thought you were suggesting that

18   this was an inconsistent statement, you set up that as

19   an inconsistent statement.  Then you'd play the video.

20            MR. KAPLAN:  Well, actually she is our witness

21   at this point, and I want to play a statement that she

22   made that's consistent with some of her statements and

23   inconsistent with others statements that she has

24   previously done, but I --

25            THE COURT:  Oh, all right.  So --

1          MR. KAPLAN:  I think we can ask her -- play a

2     tape where she was -- had a conversation with the police

3     about her involvement in this matter.

4          THE COURT:  Okay.  So how long is the tape?

5          MR. KAPLAN:  16 minutes.

6          THE COURT:  Okay.  Does the government have

7     any objection to just playing the tape and moving along

8     at that point?

9          MS. SAVNER:  The government does not object to

10     the authentication -- the authenticity of the tape.

11     However, as stated, the government does object.  This is

12     hearsay.  This is this witness's prior out-of-court

13     statements being offered for their truth, and they are

14     identifying specific things that they are using to

15     impeach her prior testimony.

16          THE COURT:  Okay.  Would counsel approach the

17     bench.

18     (The following was held at the bench.)

19          THE COURT:  Okay.  Let me just make sure I

20     understand exactly the purpose.  I thought you were

21     calling her to testify that she had made statements

22     perhaps inconsistent with what she said.

23          MR. KAPLAN:  She definitely -- there are

24     definite misstatements on that disk that we do --

25          THE COURT:  Okay.  And that's to impeach her

1    credibility --
2              MR. KAPLAN:  Yeah.  Just not --
3              THE COURT:  -- when she testified for the
4    government.
5              MR. KAPLAN:  Yes.
6              THE COURT:  Right?  So you certainly can
7    introduce those statements.
8              MR. KAPLAN:  But I want to play the tape,
9    because she says -- for example, she says that she is
10   not afraid of our client and all of that, he would never
11   hurt her, and she said the opposite when she was
12   testifying.  And there's other statements she made about
13   her relationship to people, and since she is my witness,
14   I think I ought to be able to play a --
15             THE COURT:  Well, those are inconsistent
16   statements.
17             MR. KAPLAN:  Yeah, I --
18             THE COURT:  Those are a series of inconsistent
19   statements, right?  You're --
20             MR. KAPLAN:  Maybe not everything's an
21   inconsistent statement, but --
22             THE COURT:  Well, then I would think the
23   government would want to introduce, I suppose, things
24   which are --
25             MR. KAPLAN:  I suppose -- that's fine.

1          THE COURT:  So then my simple question is, if

2     you can put in the inconsistent statements by way of the

3     tape -- right?  That's what you want to do?

4          MR. KAPLAN:  Yes.

5          THE COURT:  And the government would want to

6     say -- introduce consistent statements consistent with

7     her truth in response to your introducing

8     conflicting statements --

9          MR. KAPLAN:  That's fine.

10          THE COURT:  -- why don't we just play the

11     tape?

12          MS. SAVNER:  And the government will have the

13     opportunity to cross examine her?

14          THE COURT:  Oh, afterwards.  Absolutely.

15     Okay?

16          MR. KAPLAN:  Okay.  Thank you, Judge.

17          THE COURT:  I think that's logically the way

18     the evidence rules work.  Okay.

19     (The following was held in open court.)

20          THE COURT:  So you are proposing to play the

21     tape; is that correct?

22          MR. KAPLAN:  Yes.

23          THE COURT:  And do you have it marked?

24          MR. KAPLAN:  I do.  It's marked as Defendant's

25     Exhibit Z55.

1          THE COURT:  Okay.  I am going to admit that

2     tape, the simplest way of addressing both parties'

3     concerns, and then you can play the tape and then the

4     government has the opportunity to cross examine.

5          MR. KAPLAN:  Thank you, Judge.

6          THE COURT:  Okay.

7          (Defendant's Exhibit Z55 was received in

8     evidence.)

9          MS. SAVNER:  Your Honor, we have it.  We can

10    play it.

11         THE COURT:  So no objection.  All right.  And

12    I bet you have a running commentary underneath?  Do you?

13         MS. SAVNER:  We actually do not have that, no.

14         THE COURT:  Oh, you don't?

15         MS. SAVNER:  No.

16         THE COURT:  Oh, all right.  Okay.

17       So is the government -- the government can play the

18    tape.

19         MR. KAPLAN:  Thank you, Judge.

20         (A digital recording was played in open

21    court.)

22    BY MR. KAPLAN:

23    Q    So in that conversation, you are talking with two

24    police officers, right?

25    A    Yes.

1    Q    And you are speaking with two police officers who

2    you were working for?

3    A    Yes.

4    Q    And they were paying you for your work?

5    A    Yes.

6    Q    And you had an interest of being honest with them,

7    right?

8    A    Yes.

9    Q    And you told them that Brian never used force.  You

10   never saw him hit anyone.  Didn't you say that?

11   A    I must -- I said it on the tape, yes.

12   Q    And you said that -- that you were not afraid of

13   Brian?

14   A    Yes.

15   Q    And, again, as you just testified, these were --

16   these were police officers who you wanted to be on their

17   good side.  They were paying, you right?

18   A    Yes.

19   Q    And you had an interest in being honest with them?

20   A    Yes.

21   Q    And you also said that if some of the young girls

22   were sick because they needed drugs, Brian would give

23   them drugs so they would no longer be sick?

24   A    Yeah.

25            THE COURT:  I'm sorry, no longer what?

1          MR. KAPLAN:  Be sick.

2          THE COURT:  Okay.

3     BY MR. KAPLAN:

4     Q    And is it fair to say that you said all these

5     things to the police officers before you prepared your

6     testimony for trial that you gave the other day?

7     A    It was a long time ago.

8     Q    Way before you sat down with the prosecutors in

9     this case and figured out what you were going to say at

10    trial?

11    A    Yes.  It was a long time ago.

12         MR. KAPLAN:  Could I have a moment, Judge?

13         THE COURT:  Yes.

14         (Brief pause.)

15         MR. KAPLAN:  I don't have anything further,

16    Judge.  Thank you.

17         THE COURT:  Okay, cross examination?

18         MS. SAVNER:  Yes, your Honor.  May I have one

19    moment?

20         THE COURT:  Yes.

21         MS. SAVNER:  Thank you.

22         (Brief pause.)

23                    CROSS EXAMINATION

24    BY MS. SAVNER:

25    Q    Hi Chrissy.

1    A    Hi.

2    Q    Sorry you have to be here again.

3    A    Yes.

4    Q    I just want to ask you a few questions about what

5    we heard.

6    A    Okay.

7    Q    So a lot of what you said in there is -- same as

8    what you said last week on the stand, right?

9    A    Yes.

10   Q    Okay.  So in that interview with Chris May,

11   Detective May, you said that the girls posted

12   themselves, right?

13   A    Yes.

14   Q    And that's what you saw.  Sometimes the girls would

15   post their ads on their own?

16   A    Correct.

17   Q    And Folks oversaw the ads, right?

18   A    Yes.

19   Q    He -- you saw the girls go to him and ask him for

20   his approval --

21   A    Yes.

22   Q    -- on pictures?

23   A    Yes.

24   Q    How many times did you see that?

25   A    A lot.

1    Q    Okay.  And that's why Folks paid for their cell

2    phones, right?

3    A    Correct.

4    Q    So they could post?

5    A    Correct.

6    Q    He didn't like to dirty up his own phone, right?

7    A    Right.

8    Q    He didn't want criminal stuff on his own phone?

9    A    Correct.

10   Q    And they used the phones that he provided the money

11   for to post Backpage ads, correct?

12   A    Correct.

13   Q    And they used those phones to get the prostitution

14   dates, right?

15   A    Correct.

16   Q    And you said you knew that -- in that interview

17   that V and Ayla were working for him?

18   A    Yes.

19   Q    You also testified that Amanda S., Ashley P., Red

20   and Jerricka, all these people were working for him?

21   A    Correct.

22   Q    And we talked about this last week.  If the girls

23   didn't have phones, then they couldn't post, right?

24   A    Correct.

25   Q    And Folks knew that?

1    A    Right.

2    Q    And if they couldn't post, they couldn't make any

3    money?

4    A    Correct.

5    Q    You said in that interview with Chris May that

6    they -- they paid -- the girls paid Folks for overhead,

7    right?

8    A    Yes.

9    Q    So that included hotels?  Is that a yes?

10   A    Yes.  Sorry.

11   Q    That's okay.  Transportation?

12   A    Correct.

13   Q    Condoms?

14   A    Correct.

15   Q    And the phones?

16   A    Correct.

17   Q    They paid him certain amount of their earnings,

18   right?

19   A    Correct.

20   Q    And with their part of their earnings, they'd buy

21   drugs from him, right?

22   A    Correct.

23   Q    And it was a big no-no to buy drugs from anyone

24   else, right?

25   A    Correct.

1    Q    You said in that interview that there would be

2    trouble if they tried to buy drugs from someone else?

3    A    Correct.

4    Q    And you testified last week about what happened

5    when Red, one of the women who had been prostituting for

6    Folks, went over to that rival drug dealer, Black,

7    right?

8    A    Correct.

9    Q    Folks got really upset about that?

10   A    Right.

11   Q    He went up to the North Ave. house and got some

12   guns for him and Hightower?

13   A    Correct.

14   Q    So you knew that the women who were prostituting

15   for Folks would get in trouble if they bought drugs from

16   other people?

17   A    Correct.

18   Q    That was obvious?

19   A    Yes.

20   Q    And all of these girls were severely heroin

21   addicted, right?

22   A    Yes.

23   Q    And they were buying their drugs from him with

24   their portion of their earnings?

25   A    Correct.

1    Q    Earnings from prostitution?

2    A    Yes.

3    Q    And you testified last week and you said in this

4    interview that we just heard that sometimes he'd give

5    them a little something to get them well just so they

6    could go on the dates, right?

7    A    Correct.

8    Q    But sometimes he even had you do that, right?

9    A    Correct.

10   Q    But then they were expected to come back and pay

11   him with their earnings?

12   A    Correct.

13   Q    And buy drugs from him with their earnings?

14   A    Correct.

15   Q    And if they didn't pay him back, there would be

16   more trouble, right?

17   A    Correct.

18   Q    Let's talk about Ayla.  You said in that interview

19   that Folks actually felt bad because he was the one that

20   got her into prostitution in the first place?

21   A    Yes.

22   Q    And you said in that interview that you can't

23   believe Ayla.  You knew Ayla when she was heavily using

24   heroin, right?

25   A    Correct.

1    Q    And at that time, she was lying and stealing to get
2    by?
3    A    Correct.
4    Q    She stole from you, as you testified about?
5    A    Correct.
6    Q    And you haven't spent significant time with her in
7    the last year or so?
8    A    No.
9    Q    Since you left Lori's house in November before
10   2015?
11   A    Correct.
12   Q    And when you left, she was still there working out
13   of Lori's, right?
14   A    Correct.
15   Q    Prostituting for Folks?
16   A    Correct.
17   Q    You said in this audio recording that you weren't
18   scared of him anymore.  Did you used to be scared of
19   him?
20   A    Yes.
21   Q    And when you said that, you were in a car with two
22   law enforcement agents, right?
23   A    Correct.
24   Q    That you weren't scared of him anymore?
25   A    Yes.

1    Q    Were you, in fact, scared of him, as you testified,

2    on January 12th when he showed up at the Cottage Grove

3    house and you realized he was there?

4    A    Correct.

5    Q    You texted Chris May, "Moe is here.  I'm scared.

6    OMG," or something like that, right?

7    A    Yes.

8    Q    You told the interviewers in the interview we just

9    heard that you never saw him hit any of the girls.  And

10   that's consistent with what you testified last week,

11   right?

12   A    Correct.

13   Q    And you just started working with Moe in mid 2015,

14   right?

15   A    Yes.

16   Q    So you didn't see anything that happened with him

17   before that, right?

18   A    No.

19   Q    Okay.  And let's talk about what you did see when

20   you were at Lori's house working with Moe, because --

21   you don't know what the legal definition of force is,

22   right?  Or threats of force?

23   A    No.

24   Q    Okay.  So let's talk about what you did see.  You

25   did see him being physically intimidating, right?

```
1    A    Yes.

2    Q    Most of these women who worked for him were small

3    and thin?

4    A    Yes.

5    Q    He towered over them?

6    A    Yes.

7    Q    He would step up to them and get in their face?

8    A    Yes.

9    Q    You saw him with guns?

10   A    Yes.

11   Q    You knew he kept a stash of guns at the North Ave.

12   house?

13   A    Yes.

14   Q    And you mentioned in that recording we just heard a

15   machine gun too?

16   A    Yes, I believe so.  Yes.

17   Q    You saw him put a bounty out for Keisha when she

18   stole from you?

19   A    Yes.

20   Q    And you don't know what happened to Keisha after

21   that?

22   A    No.

23   Q    He did things that were humiliating to you, right?

24   A    Yes.

25   Q    And humiliating to the other women?
```

```
1    A    Yes.

2    Q    Sometimes he filmed those things?

3    A    Yes.

4    Q    He kicked girls out when they made him mad?

5    A    Yes.

6    Q    Did they have anywhere else to go?

7    A    No.

8    Q    He took their phones back?

9    A    Yes.

10   Q    And, Chrissy, you said you didn't see him hit any

11   of the other girls, but he put his hands on you, right?

12   A    Yes.

13   Q    Okay.  There was an incident with Folks that you

14   have never wanted to talk about, right?

15   A    Yes.

16   Q    And I have asked you about it a few times and you

17   have never wanted to say.

18   A    Correct.

19   Q    Can you tell us now what happened?

20   A    No.

21   Q    Am I correct that he tried to have sex with you?

22   A    Yes.

23   Q    Am I correct that you didn't want him to?

24   A    Can we -- yes.  Can we --

25   Q    Just --
```

1    A    Yes.  Can we please --

2    Q    Just a few more questions.

3        He kept going even though you didn't want him to.

4    A    Yes.

5    Q    You ended up with bruises?

6    A    Yes.

7    Q    Who was there when this happened?

8    A    No one.

9    Q    Did you tell any of the girls in the house about

10   it?

11   A    No.

12   Q    So is it possible that he took other girls alone

13   and hurt them and you didn't know about it?

14   A    Yes.

15          MS. SAVNER:  Nothing further.

16          THE COURT:  Okay.  Any redirect?

17          MR. KAPLAN:  Just a minute, Judge.

18        (Brief pause.)

19          THE WITNESS:  I can't take it anymore.  I'm

20   done.  I'm done.  I'm done here.

21          MS. SAVNER:  Your Honor, can we -- I think the

22   witness needs a break.

23          THE COURT:  Yes.  Do you --

24          MS. SAVNER:  Maybe if we can inquire of

25   Mr. Kaplan is he is going to have anything?

1          MR. KAPLAN:  I do have some questions.

2          THE WITNESS:  I can't.

3          THE COURT:  Okay.  Let's -- let's just take a

4    five-minute break.  Okay.  And the jury can go back in

5    the jury room.

6    (Court was in recess at 2:01 p.m.)

7    (The following was held in open court with the jury

8    present at 2:11 p.m.)

9          THE COURT:  Okay.  Mr. Kaplan?

10                    REDIRECT EXAMINATION

11   BY MR. KAPLAN:

12   Q    Do you remember on the tape when the police

13   officers asked you who was prostituting, you said there

14   were two, Ayla and V?

15   A    Yes.  Among others.

16   Q    But you said there were two, Ayla and V, and then

17   you said the others were acting somewhat independently.

18   Do you recall that?

19   A    Yes.

20   Q    Okay.  And do you recall when you testified last

21   time you gave some context to why you were nervous when

22   you saw Brian at Unc's house, because you had stolen

23   drugs from him, right?

24   A    Yes.

25   Q    And he had asked you to leave?

```
 1    A    Yes.
 2    Q    And then you recall saying that you kept e-mailing
 3    him or texting him telling him you wanted to come back,
 4    that you were sorry?
 5    A    Because I felt wanted or needed.  Yes.
 6    Q    And you weren't so afraid of Brian at that point
 7    that -- that you didn't want to come back and work with
 8    him?
 9    A    Yes.
10    Q    And wasn't that around the same time that you had
11    this conversation with the police, or this -- the
12    conversation a little bit after that?
13    A    I don't recall.
14    Q    But it was after that?
15    A    I don't recall.
16    Q    Okay.  You don't recall being in the police car --
17    A    I do, but -- yes.
18              MR. KAPLAN:  Okay.  I have nothing further,
19    your Honor.
20              THE COURT:  Okay.  Anything further from the
21    government?
22              MS. SAVNER:  Very briefly, your Honor.
23              THE COURT:  Yes.  Okay.
24                    RECROSS EXAMINATION
25    BY MS. SAVNER:
```

1   Q    Miss Tatro, do you remember giving a written

2   statement when you signed up to work with Essex?

3   A    Yes.

4   Q    And that was back in November of 2015?

5   A    Yes.

6   Q    And you said in that statement, "Recently one of

7   the guys tried to have sex with me.  I said no, and got

8   out of there when" --

9            MR. KAPLAN:  Objection, your Honor.  This goes

10   beyond the scope of --

11            THE COURT:  Isn't that beyond the scope of

12   cross examination?

13            MS. SAVNER:  It's a prior consistent

14   statement.  He has just attacked -- it's a prior

15   consistent statement.

16            THE COURT:  About a sexual assault?

17            MS. SAVNER:  Well, I --

18            THE COURT:  I don't think that was raised in

19   the cross examination.

20            MS. SAVNER:  The defense counsel --

21            MR. KAPLAN:  May we approach, Judge?  If we

22   are to discuss this, I think we should --

23            THE COURT:  Okay.  All right.

24   (The following was held at the bench.)

25            MR. KAPLAN:  I don't know why I asked to

1    approach because I didn't know what was going to be said

2    next, but --

3              THE COURT:  What do you want to ask?

4              MR. KAPLAN:  I don't want to ask anything.  I

5    don't want her to ask anything either.

6              THE COURT:  Well, okay.  So the reason that I

7    was about ready to sustain the objection is I didn't

8    think that he went in at all into the sexually --

9              MS. SAVNER:  Well, he went into the basis for

10   her fear.

11             MR. KAPLAN:  Well, she testified that she

12   stole drugs.

13             THE COURT:  Well, but there's still an issue

14   of timing.  I just don't think we want to go down that

15   route again.

16             MS. SAVNER:  Okay.

17             THE COURT:  So you made your point.

18             MS. SAVNER:  Okay.

19             THE COURT:  All right.

20   (The following was held in open court.)

21             MS. SAVNER:  Chrissy, I don't have any more

22   questions for you.  You can go.

23             THE WITNESS:  Thank you.

24             THE COURT:  Okay.

25             (Witness excused.)

```
1              THE COURT:  Okay.  The defense have the next
2    witness?
3              MS. SEN:  Yes, your Honor.  We call Anthony
4    Martino.
5              THE COURT:  Okay.
6                        ANTHONY MARTINO,
7         having been duly sworn by the courtroom deputy,
8         was examined and testified as follows:
9              THE COURT:  Good afternoon.
10             THE WITNESS:  Good afternoon, your Honor.
11                       DIRECT EXAMINATION
12   BY MS. SEN:
13   Q    Could you please state your name and spell it for
14   the record.
15   A    My name is Anthony, A-N-T-H-O-N-Y, Martino,
16   M-A-R-T-I-N-O.
17   Q    Can you describe your formal educational
18   background, where you went to school.
19   A    I have a bachelor's degree from the State
20   University of New York at Geneseo, and I have a master's
21   degree in economic crime management from Utica College.
22   Q    What did you do after college?
23   A    After college, I joined the Utica Police Department
24   in the City of Utica, New York.
25   Q    And what were your duties during your time in the
```

1    Utica Police Department?

2    A    In the early part of my career, I went through a

3    large myriad of typical police duties including routine

4    patrol, et cetera, street-level policing.  About four

5    years into my career I became a member of the crime

6    scene unit.  I spent nearly four years doing crime scene

7    investigation and evidence collection.  I was promoted

8    to the rank of sergeant in my seventh year on the

9    department, and then I became the supervisor of the

10   management information systems unit, which was in charge

11   of all of the IT assets of the department.  I was also

12   in charge of the computer crime unit and started and

13   then was the director of the department's computer

14   forensics laboratory.

15   Q    So what kind of training did you receive with

16   respect to digital forensics?

17   A    I have received extensive training in digital

18   forensics.  I have received training in basic,

19   intermediate and advanced computer forensics by the

20   National White Collar Crime Center.

21        I have received training in intermediate forensics

22   from Guidance Software, which is the maker of forensic

23   software called EnCase.

24        I received training in basic computer forensics as

25   well as two separate courses in advanced computer

1    forensics for Microsoft Windows systems from Access

2    Data, Incorporated, which is the maker of another large

3    forensics software package.

4        I have received training specifically in the

5    forensic examination of cellular telephones from a

6    company called BK Forensics and also a company called

7    Paraben Forensics, both who make products designed to

8    forensically examine cellular telephones.  And I have

9    also been trained by the United States Secret Service

10   both in basic and advanced computer forensics.

11   Q    Do you have any specialized training in

12   investigating the use of the internet in crimes against

13   children?

14   A    Yes, I do.

15   Q    Can you describe it a little bit for the jury,

16   please.

17   A    I was actually one of the officers who was part of

18   the initial Internet Crimes Against Children Task Force

19   in Upstate New York.  As part of that task force, I

20   received training on multiple occasions from the

21   Internet Crimes Against Children National Task Force

22   specifically in conducting investigations on the

23   internet, investigations primarily aimed at

24   investigating the exploitation of children.  And I also

25   received training in conducting undercover operations

1    online.

2    Q    Can you just give a brief definition, down to

3    earth, of what digital forensics is?

4    A    Sure.

5        Digital forensics is the examination of items that

6    contain digital data, traditionally things we think of

7    such as user -- commercial, consumer items:  computers,

8    like laptops and desktops, cellular telephones, external

9    media like thumb drives and CDs, but it can also be some

10   nontraditional devices such as gaming systems like

11   Xboxes and PlayStations, hand-held gaming systems, et

12   cetera.

13       The forensics part of this discipline is applying

14   scientific principles and procedures to the examination

15   of those devices in order to identify and extract

16   information of interest to an investigation.

17       One of the key tenets of digital forensics is that

18   the -- that process of examining, identifying and

19   extracting happens in a manner that is both forensically

20   sound, meaning that the integrity of that process can be

21   proven, and then it's also conducted in a manner that's

22   repeatable so that another digital forensics examiner

23   should be able to examine the same media, the same

24   device, and arrive at the same conclusions.

25   Q    Approximately how many digital forensic

1    examinations did you do while you were at the Utica

2    Police Department?

3    A    Hundreds.

4            THE COURT:  I'm sorry, I couldn't quite here

5    you.

6    BY MS. SEN:

7    Q    Approximately how many digital forensic

8    examinations did you conduct while you were at the Utica

9    Police Department?

10   A    Hundreds.  By the time I retired, I was conducting

11   nearly a hundred examinations a year.

12   Q    And during this time you mentioned that you got

13   some training from the Secret Service.  Did you have any

14   special position?

15   A    I did.  For nine years I was a deputized member of

16   the United States Secret Service Electronic Crime Task

17   Force.

18   Q    And as part of that task force, what did you do?

19   A    I performed computer crime investigations and

20   computer forensic examinations in support of the Secret

21   Service's mission.

22   Q    And in addition, while you were on the police

23   force, did you also begin teaching?

24   A    I did.

25   Q    Could you describe what kind of teaching you did.

1    A    Yes.

2         I've developed and taught courses in cyber security

3    and computer forensics both at the bachelor's and

4    master's degree levels.

5    Q    And where did you do that?

6    A    At Utica College in Utica, New York.

7    Q    Now, at some point did you retire from the police

8    department?

9    A    Yes, I did.

10   Q    What did you do next?

11   A    When I retired from the police department, I took a

12   full-time position at Utica College.  I am still in that

13   position.  I am the director of the college's Northeast

14   Cyber Security and Forensic Center.  The center at the

15   college is designed to operate a computer forensics

16   laboratory environment that allows for not only the

17   examination of digital evidence but also research and

18   development related to computer forensics in a manner

19   that assists both the academic environment but also

20   private and government sectors as well.

21   Q    Do you have a top-level government security

22   clearance?

23   A    Yes.  I currently hold a top secret government

24   clearance.

25   Q    And is that connected to your work in digital

1    forensics?

2    A    That's actually connected to -- in addition to

3    working at the Northeast Cyber Security and Forensics

4    Center, I am a founder and current partner in a private

5    cyber security firm, and our firm has government

6    contracts specifically with the United States Air Force,

7    so that clearance is related to that work.

8    Q    Have you ever testified in a case before?

9    A    Yes, I have.

10   Q    How many times have you been qualified as an expert

11   in digital forensics?

12   A    I would say at least a half a dozen, maybe a few

13   more.

14   Q    And have you testified in both federal and state

15   court?

16   A    Yes, I have.

17   Q    And have you been qualified as an expert in the

18   federal court?

19   A    Yes, I have.

20           MS. SEN:  Your Honor, I would offer Mr.

21   Martino as an expert qualified in the area of digital

22   forensics, both computers and cell phones.

23           THE COURT:  Okay.  Anyone --

24           MR. GRADY:  No objection, your Honor.

25           THE COURT:  Okay.  So qualified.

1    BY MS. SEN:

2    Q    Could you please walk the jury through what happens

3    from the time that a computer is seized until it's

4    examined?

5    A    So as I testified, one of the key tenets of

6    computer forensics is to ensure the integrity of the

7    examination process, and that truly begins prior to its

8    arrival in a laboratory environment.

9         Like any evidence, digital evidence has the

10   opportunity to become damaged, corrupted, et cetera.  So

11   it's actually very fragile, although the devices

12   themselves are not.  The evidence contained within them

13   can be extremely fragile.  So from the time that a

14   device is seized, the expectation is that, number one,

15   that device be protected in a manner which will ensure

16   that the data on that device remains in its state.

17        So as a couple examples of external influences,

18   computers and water don't get along.  So certainly we

19   would expect that when a device is seized, whether it be

20   a cell phone or a computer, et cetera, it be kept clean,

21   dry.

22        A number of different media that data can be stored

23   on, including our traditional hard drives, are magnetic,

24   so there are actually steps that have to be taken to

25   ensure that those media stay away from strong magnetic

1    fields, because it could actually destroy the data.

2        The key component of preserving digital evidence

3    up -- from seizure until examination is really the same

4    as physical evidence, is that there's a solid chain of

5    custody that can describe the exact movements and

6    handling of a piece of evidence at every moment and at

7    every transfer or transition of it and steps in place to

8    ensure that the data on those devices, when they are

9    seized, remains intact, uncorrupted and unaltered until

10   the device can be examined.

11   Q    So when you receive a piece of digital -- a digital

12   device to examine, what are some of the first things

13   that you look for?

14   A    One of the first things we look for is to ensure

15   that the device is intact and in the same manner that it

16   was seized.  Small devices commonly that are submitted

17   to our laboratory via law enforcement agencies come in

18   evidence bags.  So they're sealed bags.  Seals are

19   initialed by seizing officers.  So when we receive

20   evidence in that manner, we expect it to be sealed and

21   initialed properly.  If those seals are broken for any

22   reason, we would make note of that in our report.

23       Larger items that don't regularly fit into an

24   evidence bag, like a computer tower or gaming systems,

25   et cetera, we expect to at least be properly labeled so

1    that we can identify the device.

2         It's also common in some law enforcement agencies

3    with the larger devices that they will seal certain

4    portions of the device with evidence tape since the

5    entire device won't fit in a normal evidence bag.  So it

6    is common that we will receive, for instance, a computer

7    tower with evidence tape over the power, where the power

8    plug would plug in, and over -- sometimes over the power

9    button, and that evidence tape would be initialed so

10   that when those security mechanisms are in place, one of

11   the first things we do is check that they are intact and

12   there's no sign of damage or tampering to the device

13   before we received it.

14   Q    So if you determined that a computer has been

15   powered on after it was seized by law enforcement before

16   you receive it, what do you do?

17   A    If that's determined during an investigation, we

18   will stop our forensic examination at that point.

19   Notifications would be made to the case agent or the

20   case agency that submitted that piece of evidence.  This

21   tends to be a bigger issue in criminal cases.  It's a

22   little more uncommon in private cases that don't involve

23   litigation.

24        In a criminal case, we would also notify the

25   prosecutor or the defense, depending on who submitted it

1    to our laboratory, because we do do work for both

2    prosecution and defense, and then wait for direction on

3    whether or not our examination should continue.

4         We will, though, make notice to whoever submitted

5    the evidence that at that point we can only attest to

6    the integrity of the data that's present on any -- on

7    that particular device from the time it came into our

8    possession, and we cannot make statements or testify

9    about it prior to that point.

10   Q    Why not?  What are the implications of a device

11   being powered on before you receive it?

12   A    The implication, as with pretty much any computer

13   device, modern computer device, powering on that device

14   necessarily causes changes to the memory of that device.

15   So in the case of a computer, it necessarily causes

16   irreversible changes to the hard drive; in the case of a

17   cellular telephone, irreversible changes to the memory

18   present in the cell phone.  And we cannot forensically

19   undo those changes.  So we cannot testify in any way as

20   to the state of that device prior to us receiving it.

21        With computers, in particular, the challenge is in

22   the way that computers save data and then -- and then

23   delete data.  There's been testimony in this case about

24   unallocated space, which is the area of -- on the

25   computer, for instance, the area of the hard drive where

1    files that have been deleted reside.

2        The example I have used before is think of it as an

3    apartment building.  If one of the tenants in one

4    apartment is moving out, you are going to put that

5    apartment up for rent, and you may allow that tenant to

6    stay until the new tenant arrives.  But before that, you

7    put a "for rent" sign on the door so everyone knows that

8    apartment is available.  It's kind of how computers save

9    data.

10       When either a user or the system deletes a file,

11   which both happen regularly, the area that file occupies

12   on the hard drive has marked it as available for rent,

13   essentially.  That data does not immediately disappear

14   from the hard drive.  The user may no longer be able to

15   see it, but it's still there.  And one of the key

16   functions and capabilities of computer forensics is the

17   ability to read and analyze that data.  It is often, in

18   many cases, critically important to understand the files

19   that the person operating the device deleted but also to

20   be able to examine the files that the device itself

21   deleted.

22       So in your question, if a computer is powered on

23   and changes are being made, the system will, all on its

24   own, create new files as part of its process of powering

25   on that computer.  Those -- and it will also modify

1    files as that process.

2         All of that has to go somewhere, and the place it

3    goes, in the case of a computer, is the unallocated

4    space.  And it is now taking over space that was

5    previously occupied by other data.  From a forensic

6    standpoint, we can't peel those layers back and tell you

7    what used to be there.  We can just tell you what's

8    there now.

9         So one of the key pillars of forensic integrity of

10   computers or any electronic device is that we don't want

11   that device powered on, and from a forensic standpoint,

12   we want to be able to control the access to data on that

13   computer or that device at all times.

14   Q    So once you have a computer and you begin examining

15   it, what exactly do you do?

16   A    So the examination of a computer would begin with

17   the removal of the hard drive from the computer where

18   possible.  A lot of modern computers don't have

19   traditional hard drives, so there are other steps for

20   those, but where possible, the hard drive is removed.

21        The hard drive is then connected to a device called

22   a forensic write blocker.  That device is like a one-way

23   valve.  It allows data to be read but does not allow

24   data to be written, deleted or in any other way changed

25   in any form.

1    Once the hard drive is connected to that device, a

2    complete what we call bit copy is made, otherwise known

3    as a forensic image.  And what that means is the data

4    stored on a hard drive -- a thumb drive, a CD, or any

5    other electronic media -- is really just ones and zeros.

6    At its heart, all computing devices are binary.  They

7    can only work in ones and zeros.  So that forensic image

8    of that hard drive or that bit copy is a copy of every

9    single one and zero from the evidence in its exact

10   position, in its exact state, all the way from the very

11   beginning to the very end with no alteration whatsoever.

12       That is step one, is to create that forensic image,

13   because all further examination will happen on that

14   forensic image, not on the original device.

15   Q    Is there a particular way of documenting what you

16   are examining as you are doing it?

17   A    There's -- there's several ways of examine -- of

18   documenting items of interest or items of evidence

19   during a forensic examination.  One of the most -- most

20   of the common forensic software packages provide

21   mechanisms for either tagging or bookmarking items of

22   interest and then later a mechanism for combining all of

23   those tags or all of those bookmarks into an outputtable

24   report.

25       Certainly many times there are handwritten notes

1    that go along with that process and then eventually get

2    compiled into a final report of findings.

3    Q    Is there a difference between conducting a forensic

4    examination of a cell phone and a forensic examination

5    of a computer?

6    A    Yes.  They're actually dramatically different.

7    Q    Can you just briefly sort of describe what the

8    differences are?

9    A    Although as users we think of cell phones as just

10   little tiny computers because we can do the same

11   things -- we can browse the internet, we can send and

12   receive an e-mail, it feels a lot like the computer

13   feels -- they do not operate the same way at their core.

14        The way they store data is different.  The format

15   the data's stored in is radically different, and the way

16   we can examine them is different.  So back to my

17   testimony a few minutes ago:

18        On the computer, we talked about removing the hard

19   drive and write protecting that hard drive so you could

20   read data from it and would be prevented from moving any

21   data into it.  With cell phones, we don't have that

22   capability.  There is no removable hard drive in a cell

23   phone.  Memory in a cell phone is stored on chips that

24   are soldered to circuit boards.  Removing those are --

25   is extremely difficult, takes very specialized tools,

1  very specialized training, and presents great risks to

2  the integrity of the data.

3      So the tools we use to examine cell phones have to

4  interact with the cell phone directly.  Rather than

5  the -- the storage being removed from the device, we

6  interact with the phones in their native environment.

7  Right off the bat, that requires the phone to be powered

8  on.

9      So in the computer world, where at all costs we

10  expect not to have the evidence powered on, in the cell

11  phone forensics world, traditionally it's -- it's an

12  expectation and a realization that that phone will need

13  to be powered on.  It's also an expectation and a

14  realization that changes will be made to that phone

15  during that process.  It's -- we can't avoid that.  It's

16  unavoidable.  And it's also an expectation that we

17  will -- we will insert data into that cellular phone as

18  part of the forensic process.

19      Whereas in computers, we simply read data out

20  almost as if we're listening to something without ever

21  speaking, with cell phones we actually have to make

22  requests.  So by way of forensic software and hardware,

23  we actually send requests into the cell phone and then

24  wait for responses to come back.

25      So the examination of those two devices are -- is

1    very different.  The mechanisms of ensuring integrity is

2    very different, and the acceptance of certain risks to

3    the changing of data is different.

4    Q    Do you ever need to take a cell phone apart in

5    order to examine it?

6    A    Yes.  There are extreme examples of cases where a

7    device needs to be -- a cellular device needs to be

8    disassembled in order to read the data from it.

9    Q    You are aware that Mr. Thornton testified about

10   tearing apart a cell phone here because he couldn't

11   examine it.  Do you think that that was, in your

12   opinion, based on your experience -- was that something

13   that was necessary?

14   A    No.  From listening to Mr. Thornton's testimony, I

15   don't agree with that path of action.  Mr. Thornton

16   testified that he was able to power the phone on and see

17   items that he felt were of evidentiary importance to his

18   investigation.  He was able to use a camera to capture

19   images of those items.

20       He was asked the question of whether or not there

21   was additional items on the phone other than what was

22   captured, and his answer was that he was able to capture

23   everything that was -- all the user content that was on

24   the phone, which then indicates to me that there's no

25   reason to -- to disassemble the phone.

1      The disassembly of the phone, as I mentioned,

2   requires very significant training and equipment, and

3   even with the best training and equipment environments,

4   laboratory environments, still creates a significant

5   risk of the destruction of data.

6   Q    So in your experience with -- doing online

7   investigations and internet crime investigations, how

8   have you -- well, maybe you could describe for the jury,

9   do you use IP addresses in the course of those

10  investigations?

11  A    Yes.

12  Q    And maybe you can describe briefly how you use

13  them.

14  A    Yeah, I think we probably first have to describe

15  what an IP address is because I don't think there's been

16  testimony -- at least to my knowledge there has not been

17  testimony in this case.

18  Q    Sure.  So if you could briefly describe what an IP

19  address is?

20  A    So the term "IP address" is short for -- IP is an

21  acronym for internet protocol.  An IP address is the way

22  that devices on the internet or any network find each

23  other.  Every -- simplified, every single device that

24  talks on the internet has to have an IP address.  And

25  every device in the whole world can only possess --

1    any -- any one IP address can only be possessed by one

2    device at any given time.  That's a little simplified,

3    but -- and there are some exceptions and exclusions,

4    ways that multiple devices can hide behind one address,

5    but in a simplified manner, every device needs one IP

6    address.

7    Q    So how do you find an IP address?

8    A    So IP addresses are not unique to a specific

9    device.  They generally come from the provider that is

10   providing internet access to that device.  So in the

11   example of a cellular telephone, if you have a Verizon

12   account, Verizon actually provides your cellular

13   telephone with an IP address.  And that IP address does

14   not stay with your phone for any great length of time.

15        It stays with your phone for the short period of

16   time that your phone needs to talk on the internet while

17   you are actively browsing.  When you stop actively

18   browsing, that IP address will be returned to the

19   Verizon system, and it will be assigned to another user

20   by Verizon.

21   Q    So is it -- is it possible to figure out what IP

22   address was being used to access the internet at a

23   particular point in time?

24   A    Yes.  So as -- there's been multiple exhibits

25   admitted so far in this case that include responses from

1    internet service providers such as social media like

2    Facebook and websites such as Backpage.  And many of

3    those exhibits have included IP address information,

4    because this is the way that devices on the internet

5    identify each other.  And this is the way that service

6    providers, like Facebook or Backpage, keep track of the

7    devices that access their systems.

8        So in a typical investigation involving internet

9    crime or any other investigation on the internet, the

10   investigation usually begins at the end.  So, for

11   instance, if there is a question of who posted something

12   to a particular place on the internet -- maybe a

13   specific post to Facebook -- the investigation will

14   usually begin at Facebook and say, well, there's an

15   account name but that account name is not necessarily

16   uniquely identifying of a human -- one particular human

17   being, and so the question to Facebook, which is usually

18   in the form of a court order, is what device connected

19   to this account on a specific date at a specific time

20   when that posting or that change or that update was

21   made.

22       And then the response back from that service

23   provider will typically be an IP address.  That IP

24   address then has to be traced to the owner, which is

25   public record.

1    Q    How do you do that?

2    A    You can look it up on the internet.  It's actually

3    called a WHOIS search.  So you would actually query a

4    WHOIS database and say who is the IP address?

5    Q    And what information would you get back from that

6    query?

7    A    You'd get back the owner.  So like I mentioned,

8    most individuals don't own an IP address.  They're using

9    one that their service provider -- their internet

10   service provider is providing for them, so most likely

11   what you would get back is Verizon Wireless, Charter

12   Communications, Comcast Cable, et cetera, et cetera.  So

13   you get back the owner of the IP address.

14   Q    And then what do you do?

15   A    Then you send a court order to that owner.  So, for

16   instance, you send a subpoena to Verizon Wireless and

17   you say on this date at this time when this certain

18   event of interest happened, which one of your customers

19   possessed this IP address?  And then the response back

20   will be all -- and then, of course, you ask for the

21   subscriber information as well.

22        So what you would get back or what you expect to

23   get back from a company like Verizon, or the others,

24   would be specific customer information:  a name, an

25   address, bill information, potentially e-mail address,

1    potentially phone numbers, et cetera, of the specific

2    customer who has the service that was used.

3    Q    Earlier today Ms. Epp had testified about how -- I

4    had asked her about how she didn't trace IP addresses in

5    this case, and there was some discussion and testimony

6    about how, given the fact that what they were

7    investigating is prostitution and it was being conducted

8    in hotels and people were transient, that using IP

9    addresses is not very helpful.  And could you provide an

10   opinion about that based on your experience in

11   investigations?

12   A    Well, from Ms. Epp's testimony, that appeared to be

13   an assumption, not a state of fact based on

14   investigation.  She is correct in so much that a place

15   like a hotel that provides guest wireless access -- many

16   hotels do not, but many.

17        Another good example might be a public library.

18   Those places would become a data end of the

19   investigation because it might show that the Hilton

20   Hotel in Burlington, Vermont, is the -- was the user of

21   that particular IP address on that stated date and time,

22   and most public access, like hotels, restaurants, et

23   cetera, have no mechanism of getting you any further, of

24   being able to tell you which one of their customers was

25   using that IP on that date and time.

1          The issue in this case in particular is that from

2     all of the material I have reviewed, I didn't see any

3     attempt to try to check those IP addresses, and some of

4     the work that I did as part of this case was to at least

5     WHOIS a sampling of the IP addresses that were found

6     within some of the materials and the exhibits, and I

7     actually found that the majority that I checked came

8     back to cellular telephone companies, particularly

9     Sprint and T-Mobile.  And cellular telephone companies

10    are usually pretty good about keeping track of who their

11    customers are and so provide a mechanism -- pretty clear

12    mechanism for tracking an IP address down to a specific

13    customer who was using it on a specific date at a

14    specific time.

15    Q     So we talked about the fact, and you are obviously

16    aware of the fact, that Mr. Thornton examined the hard

17    drive in this HP computer?

18    A     Yes, I am.

19    Q     And you are aware that the computer was powered on

20    before he received it by Miss Epp?

21    A     Yes, I am.

22    Q     And what does his failure to indicate that computer

23    was powered on indicate about his reporting and

24    examination of the computer, in your opinion?

25    A     I would certainly have expected his reports to

1    identify the fact that the computer had been powered on

2    prior to his examination.  It is a key point in

3    identifying the integrity of the data that was examined.

4        I was present for Mr. Thornton's testimony, and he

5    testified that he knew it had been powered on but didn't

6    find that relevant.  I personally -- my opinion is I

7    disagree with that.  I think it's highly relevant and

8    should have been documented and brought to the attention

9    of the case agents and the prosecutor.

10   Q    Mr. Thornton also submitted a number of reports

11   based on his examination.  In your opinion, do those

12   reports meet industry accepted standards of digital

13   forensic reports?

14   A    No, they do not.

15   Q    And why not?

16   A    The reports Mr. Thornton have -- has as exhibits in

17   this case are missing several components that are

18   expected as an industry accepted standard.  A forensic

19   report should have a description of the case itself.  It

20   should have a description of the tasks that were

21   assigned to the forensic examiner.  For the reader of

22   the report to be able to discern whether or not the

23   forensic examiner found all the evidence he or she was

24   supposed to be looking for, they have to know what they

25   were looking for first.

1          On its face, Mr. Thornton's report doesn't explain

2     what his assigned task was.  So it's impossible to

3     determine if his reports are complete or if his

4     examination was complete.

5          There's also an expectation that the forensic

6     examiner will create a conclusion of findings.  What --

7     so based on the tasks assigned, based on the actions

8     taken, based on the evidence found, what's the

9     conclusion?  And Mr. Thornton's reports do not contain

10    that.

11    Q    And you are aware that Mr. Thornton used a tool to

12    examine the hard drive called the Forensic Explorer?

13    A    Yes, I am.

14    Q    What does using that tool -- does that have any

15    implications for the results of his examination of a

16    hard drive?

17    A    The Forensic Explorer tool is not considered a

18    comprehensive forensic tool in this industry.  It is

19    forensically sound, and it is one -- most forensic

20    examiners and most forensic laboratories have an entire

21    suite of tools that they use at their disposal.  Not

22    every tool is good at every task.  It's much like having

23    tools in a literal physical tool box.  One screwdriver

24    won't fix everything.  You need different sized

25    screwdrivers, different sized wrenches, for example.

1    And forensics is the same.

2         Certainly that tool has uses.  It is not generally

3    considered to be highly comprehensive.  There are

4    components of forensic examination that -- that it is

5    not capable of performing.

6    Q    So what impact did using that tool have on this

7    examination of the computer in this case?

8    A    I think the biggest impact was that his examination

9    appeared to be limited to essentially cursory searches

10   of the hard drive rather than an in-depth analysis of

11   the computer itself:  the system, the data stored by the

12   system, how the system operated, when certain events

13   took place.  It appeared as though his -- his analysis

14   would -- was much more high level.

15   Q    And one of the things that it appears that

16   Mr. Thornton did is he used screenshots from the

17   Forensic Explorer tool in order to create -- to document

18   what he was looking at on the computer.  Is that an

19   appropriate way to document what you find on a computer?

20   A    There are times where screenshots are used to

21   document evidence.  They are more the exclusion than

22   rule.  It is -- they're usually used in circumstances

23   where the evidence cannot be forensically displayed in a

24   humanly acceptable manner.  There's a lot of data in a

25   computer that is not meant for human consumption and

1    does not look like what we as humans need to understand

2    the impact of that information.

3        So there are circumstances where the only and best

4    way of documenting evidence is through a screen capture

5    of a user interface where that data has been

6    interpreted.  But like I mentioned, that is more the

7    exception than the rule.  As a rule, we prefer to use

8    the forensic tool reporting mechanisms that are built

9    into the tools.

10       Part of the concern with screen captures is that

11   they are digital pictures, and then as someone who has

12   to sit here and testify about the integrity of evidence,

13   you have to worry about answering the question, well,

14   isn't it possible that picture was manipulated, edited,

15   altered, even to the extent that if the picture is not

16   the same -- if the screenshot is not the same resolution

17   as the picture itself that might be being displayed,

18   could that lend itself to a different interpretation of

19   the evidence?

20       So our preference is to use the tools built into

21   our forensic software to create reports.  When we do

22   that, those reports also come out with an extensive

23   amount of information about the evidence that's being

24   presented.

25       You know, in particular, during testimony earlier

1    today, Miss Epp couldn't testify to the time that a

2    certain image was created on the computer because that

3    exhibit lacked any headings above the dates and times.

4    So there was no way for her to understand what the dates

5    and times meant.  That shouldn't happen, right?  And

6    using the tools in forensic software to create reports

7    ensures that all of the information relevant to a

8    particular file that's -- that's of evidentiary value is

9    also reported on.

10   Q     So Mr. Thornton identified a number of photographs

11   that were found on the hard drive.  Aside from

12   identifying those photographs, though, is there any

13   indication in any of his reports about how those

14   pictures arrived on the computer?

15   A     No, there is not.

16   Q     And can you please explain to the jury what the

17   various ways are that a picture could arrive on a

18   computer?

19   A     There's long list of reasons why a particular

20   picture or any file, for that matter, is present on the

21   computer.

22         The most obvious, of course, is that the picture is

23   downloaded from a website, which is probably one of the

24   more common ways that pictures end up on computers.  It

25   could also be transferred from external media such as a

1    thumb drive or an external hard drive or a CD or a DVD.

2    The picture could also be there because it was

3    transferred from a cloud location.

4        For instance, commonly Apple devices like

5    iPhones -- many users of iPhones also use Apple's cloud

6    service, which is called iCloud.  One of the nice things

7    about iCloud is it synchronizes the pictures you take

8    with your phone to your computer for you so that they're

9    on -- they're present on the computer.  There's -- a

10   phone or a digital camera could be connected directly to

11   the computer and images could be transferred.

12       So there's really a long list of different ways

13   that a picture could come to be saved on a computer.

14   Q    And is one of those ways also being sent to the

15   user of the computer within an attachment, through a

16   message as an attachment?

17   A    Sure.

18       A user could receive a picture as an attachment to

19   an e-mail, as an attachment to an instant messenger

20   makes, and then choose to -- to save it to the computer.

21   Q    And what kinds of information can you learn about

22   pictures that may be found on the hard drive?

23   A    There's three main sources of information about a

24   picture that's located on a hard drive.  The first

25   source is the picture itself.  Beyond the content, that

1      visual -- visual content that we can see, many but not

2      all digital images can contain what we call metadata,

3      which is information stored inside the picture that is

4      not part of the visual representation of the picture.

5          Metadata is placed into the picture by the device

6      that takes the picture.  Which portions of metadata are

7      present in that picture is dependent on the device that

8      takes that picture.  With few exceptions, that metadata

9      will not be changed within that picture, no matter --

10     even if the picture is transmitted, if it's received, if

11     it's copied and pasted, if it's resized, printed,

12     metadata will largely remain the same with a few

13     exceptions.

14         So that's the first place where we could find

15     information about the picture.  That metadata

16     information typically will tell us the make and model of

17     the device that took the picture, the date the picture

18     was taken, and sometimes will tell us some information

19     about the camera settings of the device, dependent on

20     the device.

21         The second place where we find information about a

22     picture that's saved on a computer is in the file system

23     information.  And this has been previously testified to

24     as MAC times, MAC being an acronym for modified,

25     accessed and created.  The file system of the computer

1    tracks when a file is created, when a file is modified,

2    and when a file is accessed, bearing in mind, though,

3    that that is unique to the device that the file is

4    sitting on.  So when a particular computer marks a file

5    as created on a certain date, that means it's saved to

6    this device on that date.  Doesn't mean it's the date

7    the picture was taken.  That comes on the metadata.  So

8    the date created means on this device.

9        File system data, the MAC times, are influenced by

10   the movement of files, and they are influenced by the

11   changing of files.  If a picture were altered, resized,

12   copied, pasted, printed, those settings can be changed.

13   And those settings are readily visible to the user.

14       The third place that information about a picture on

15   a computer can be found is from the computer itself.

16   Whenever files are saved to a computer, sent from a

17   computer to another location, copied, pasted, edited,

18   altered, opened, viewed, played, there are certain

19   artifacts created on that computer about that occurrence

20   and about that activity.  They're not there forever, and

21   they are not -- not every single event that happens

22   related to a file is recorded and kept in a manner that

23   can be found later.

24       But to a great extent, to your question, one of the

25   key places to find out information about a picture on a

1    computer would be from the computer itself to try to

2    find artifacts that indicate how that picture got here,

3    possibly where it came from, and potentially what's been

4    done with it while it was here, how many times it was

5    opened, saved, edited, et cetera.

6              THE COURT:  All right.  It is three o'clock.

7    This is a good time for our break.  So let's take a

8    15-minute break and be back a little after quarter after

9    three.

10   (Court was in recess at 3:04 p.m.)

11   (The following was held in open court with the jury

12   present at 3:25 p.m.)

13             THE COURT:  Okay.  Miss Sen?

14             MS. SEN:  Thank you, your Honor.

15                  CONTINUED DIRECT EXAMINATION

16   BY MS. SEN:

17   Q    So before our break, you were describing to the

18   jury the kinds of information that you can learn from a

19   picture once it's arrived on a computer, right?

20   A    Yes.

21   Q    So I wanted to show you some of the photos that

22   came in as exhibits during Miss Epp's testimony

23   yesterday.  I am going to show you a -- the Exhibit 51B,

24   which is photos of Katelynn C.

25        And actually, in order to assist you, I'm going to

1    hand you what's been marked as Defendant's Exhibit ZZ8.

2         Can you describe what that is, Mr. Martino?

3    A    Yes.

4         Defendant's ZZ8 is printout of a spreadsheet that I

5    created.  The spreadsheet has one, two -- approximately

6    nine rows.  This was created as a summary of the file

7    system export that I received from the government.  The

8    export we requested from the government was all of the

9    file system information for all of the files on the HP

10   computer, so inclusive of things like the file name, the

11   path to the location on the hard drive where the file

12   was stored, the date the file was modified, created,

13   accessed, et cetera.

14        That spreadsheet, as expected, is quite lengthy.

15   It's approximately 400,000 rows long, so it was

16   impractical to print out and bring to court.  So I took

17   certain entries from that spreadsheet that were of

18   relevance to my testimony and put them on a single

19   spreadsheet that could be printed out in two pages.

20   Those two pages are what are Defendant's ZZ8.

21   Q    And just to be clear, this is just information --

22   descriptive information about files that exist on the

23   hard drive?

24   A    That's correct.  It's descriptive information from

25   the file system.  It is not the files themselves.

1    Q    So I am going to show you what was marked as -- or

2    admitted yesterday as Government's Exhibit 51B.  And I

3    am going to show you this photo on the -- on the lower

4    right, which has the name SMH 012.

5        So this exhibit indicates that the photo was

6    taken -- well, can you describe what information you

7    have here about this photo.

8    A    So the information provided in this exhibit

9    relative to the photo SMH 012 includes the name of the

10   file which is present in the left-most column; the date

11   modified, which is expected to be the date modified from

12   the MAC times of the computer; the type of file, which

13   for this particular file is a JPEG image; the size of

14   the file.

15       There's information titled "date acquired."  I

16   don't know what that information is based on the

17   terminology used here.

18   Q    Is that a term that is used within digital

19   forensics to refer to anything that you are aware of?

20   A    It would normally be a term used to describe the

21   imaging process, when a device is acquired or imaged,

22   but that isn't relevant to this exhibit, so I am not

23   clear -- during Ms. Epp's testimony, she testified as to

24   what she believed that date was, but it did not, to me,

25   make sense.

1       And then last column all the way to the right is

2   the date taken.  This is presumed to be metadata from

3   the image.  JPEG images, as this one is, are capable of

4   storing metadata, and so the expectation -- it's not

5   possible to get the date taken from the file system, so

6   the expectation is that that column contains information

7   that was extracted from the metadata off this picture.

8   Q    And what does it show that the date taken was?

9   A    The date taken for this picture is 9/17/2013.

10  Q    Have you been able to learn from the file system

11  data that you have referenced that's in front of you

12  when that photo actually arrived on the computer?

13  A    Yes.  This exhibit did not contain a create date,

14  so it was not possible to determine from the exhibit.

15  So using the file system export provided by the

16  government, I was able to show that the picture SMH 012

17  was saved to the computer or created on 7/22/14.

18  Q    And that's based on information from the hard drive

19  itself that you were able to find?

20  A    That's correct.

21  Q    What's the significance of the fact that the photo

22  was taken on September 17th of 2013, but wasn't created

23  on the computer until July 22nd, 2014, almost a year

24  later?

25  A    I think your question is, is the significance is

1    just the point in understanding the amount of time that

2    elapsed between the time that the picture was actually

3    taken and the time that it was saved to this computer.

4    Q    I'm going to show you another exhibit that was

5    admitted yesterday.  So the bottom image -- this was a

6    Backpage ad.  It's Government's Exhibit 50D.  And Ms.

7    Epp, during her testimony, referenced the fact that the

8    bottom photo here from this ad was found on the hard

9    drive.  Do you remember that?

10   A    I do.

11   Q    So now I am going to refer you to Government's

12   Exhibit 50B, which are apparently photos from the hard

13   drive.  There's a photo there on the left.  Is that

14   similar to the photo in the Backpage ad that we just

15   looked at?

16   A    Yes.  The photo here with the label "My Cars 3508"

17   is visually similar to the photo from the Backpage ad.

18   Q    So -- I'm sorry.  I need to go back to the Backpage

19   ad for a second.

20        Do you remember what date the Backpage ad was

21   posted?

22   A    It was January 2nd -- I'm going to need to

23   reference it again.

24   Q    Sure.

25   A    I don't want to do it from memory.

1          So the posted date is actually present in the ad at

2     the top.  Posted January 2nd, 2016.

3     Q    So as we were discussing, Miss Epp had testified

4     that they found the same photo in this hard drive, this

5     photo My Cars 3508.  Do you have any information when

6     that photo was actually created in the hard drive?

7     A    Yes.  The photo My Cars 3508 was saved to the

8     computer and created on 2/1/2016.

9     Q    And what's the significance of that?

10    A    The significance is that the Backpage ad was

11    created nearly a month prior to the presence of this

12    image on the computer.  So this computer logically would

13    not have been part of or used in the creation of that

14    Backpage ad.

15    Q    Now I am going to show you again the same Backpage

16    ad, 50D, but it has a second page.  I am going to ask

17    you to look at the photo at the bottom.  And Miss Epp

18    had testified that this image also was found on the hard

19    drive?

20    A    Yes.

21    Q    So I'm going to turn back to the extract of

22    pictures from the hard drive.  I'm going to ask you to

23    look at the top right photo called "My Cars 3507."  Is

24    that similar to the same picture in the Backpage ad?

25    A    Yes, it is visually similar to the picture in the

1   Backpage ad.

2   Q    And when was that photo created on the computer?

3   A    That photo was created on the computer on 2/1/2016.

4   Q    And we'd already talked about the fact that this

5   was part of a Backpage ad that was actually posted on

6   January 2nd of 2016.

7   A    That's correct.

8   Q    So it arrived on the computer a month later?

9   A    Yes, it did.

10  Q    So we'd also talked about earlier these two

11  pictures that were found on the hard drive, image 3027

12  and KK 137.  Can you tell us anything about when

13  these -- what -- so -- sorry.

14       Earlier today Miss Epp had testified that these are

15  nearly identical photos, and she testified -- we talked

16  about how the date taken for these photos differs.

17  A    Yes, that's correct.

18  Q    And she provided some testimony about how that's

19  possible because, based on her training and experience,

20  it's the last -- the photo was taken at least on the

21  latest date, and it couldn't have been any earlier than

22  that.

23       Based on your forensic analysis, what is the

24  significance of having the same picture with two

25  different dates for which it was taken?

1    A    I personally -- my opinion is I disagree with Miss

2    Epp's testimony.  The date taken is designed -- as part

3    of metadata, it's designed to permanently reflect the

4    date that that device took that picture.  It does not

5    change when the photo is altered, with the exclusion of

6    if the photo was, for example, sent through a social

7    media, many times social media providers will scrub the

8    metadata out of it entirely, in which case it would be

9    totally absent.

10        I agree with Miss Epp's visual look and belief that

11   one of these pictures is brighter than the other; and

12   why, I don't know.  Forensically we can't tell you why.

13   But that -- for instance, if someone were to have

14   altered this photo in order to brighten it, or change

15   the contrast or any other editing that would affect the

16   photo, the visual parts of the photo, the date taken,

17   would not be changed because that picture has not been

18   taken again.

19        The date -- metadata is inserted by the device that

20   takes the picture.  Changing the contrast, the

21   brightness, et cetera, is not taking the picture.

22        My concern with this picture is that the two

23   pictures are obviously identical.  I don't believe that

24   it would be possible to bring a human being to a

25   location and pose them in such a perfectly identical

1    manner with the same background, even with the same hair

2    in the same spots, on two different dates that are

3    months apart from each other; it seems impossible.  So

4    from a forensic standpoint, I question the -- the data.

5    I question that the data is accurate and correct and

6    don't -- this tells me I can't rely on that information.

7    Something has corrupted that information.

8    Q    Because the date taken of the image would never

9    change given the way you described metadata; isn't that

10   correct?

11   A    Unless it's intentionally changed.  The date taken

12   does not change.  Metadata -- the whole reason metadata

13   exists is to prevent what Miss Epp testified to from

14   happening.  The idea was -- of creating metadata was

15   that this information about the photo would travel with

16   it, in theory, forever.  So you would always be able to

17   know the date it was actually taken.  You would always

18   be able to know the camera that took it and possibly

19   even the settings of the camera for certain devices.

20   The whole tenet of metadata is that it's static.

21   Q    And we also looked at earlier today with Miss Epp

22   this ad, 48D, which is a Backpage ad.  So when was this

23   ad created?

24   A    Well, there's -- there's two dates here related to

25   this ad.  So the ad itself is in the top portion of this

1    exhibit, above that.  That is the advertisement itself.

2    Below that is what's called administrative data.

3         So the administrative data is neither created

4    nor -- most of it is -- nor is it viewable to the user.

5    This was what was kept by Backpage.  So this

6    administrative data at the bottom was provided when the

7    government either subpoenaed or sent a search warrant to

8    Facebook.  So the ad itself states that the ad was

9    posted October 22nd, 2015.  However, the

10   administration -- administrative data states that the ad

11   was created on June 10th, 2015.

12   Q    And then there's also some other data on the

13   right-hand side that -- the "user created" and the

14   "e-mail verified"?

15   A    Yes.  Well, that's unique to the user.  So

16   certainly a user -- the expectation, of course, and it

17   makes sense, the user was created before the ad was

18   created, before the ad was posted.  The e-mail gets

19   verified later than all of this, which basically just

20   means that Backpage didn't send a verification to

21   whatever e-mail was on record for this account at the

22   time this was created.  Backpage didn't send one of

23   those, you know, "click here in the e-mail so we know

24   you're really you."  So that didn't happen until the

25   following year in 2016.

1    Q    So what does it mean that the ad was created on

2    Wednesday, June 10th, and it was posted on October 22nd?

3    A    It -- we don't know for certain because there's not

4    enough information here, but the likely cause is that

5    either the ad was created in draft and not posted to the

6    internet until many months later, or the ad was edited

7    over time and reposted, essentially.  So the content was

8    changed over time, and what we're looking at at the top

9    may be the final iteration of it rather than what it was

10   when it began.  But there is not enough information to

11   know for certain which of those scenarios is true.

12   Q    I'm going to show you, after I clear this, what the

13   second page of this ad -- where there's some photos that

14   we also discussed earlier today.

15        And there are three images present.  Did you look

16   for the third image on the hard drive?

17   A    I did.

18   Q    What did you find?

19   A    I found the third image, the one all the way to the

20   right, is present on the HP hard drive.

21   Q    And did you -- were you able to find out when that

22   photo was actually created on the computer?

23   A    Yes, I was.

24   Q    And what did you learn?

25   A    That image was created on the computer on

1    3/10/2016.

2    Q    So that's almost six months after the ad was

3    posted?

4    A    That is correct.

5    Q    So Mr. Thornton talked about a number of websites

6    that he had accessed -- that he had identified were

7    accessed through the computer, and he had developed this

8    Exhibit 75 that was admitted yesterday.  And you were

9    here in the courtroom when Mr. Thornton was testifying.

10   Is there some information missing from this exhibit?

11   A    There is.

12        So Mr. Thornton testified, and the title of the

13   exhibit correctly indicates, that this exhibit is the

14   history from the Google Chrome internet browser from the

15   HP computer, and Mr. Thornton testified the title does

16   indicate that it is, as it states, "select sites."

17        My concern with this exhibit is it doesn't give a

18   full picture of the internet browsing history that was

19   occurring on the computer.

20   Q    Did you have an opportunity to do some

21   investigation into that?

22   A    Yes.  So as part of my investigation, we requested

23   the complete output, complete export of all of the

24   internet history from the computer, keeping in mind that

25   computers don't keep internet history forever.  It's

1    kept for a finite period of time.  That amount of time

2    is set -- can be altered by the user.  Also keeping in

3    mind that the internet history file is not the sole

4    location on a computer where evidence or artifacts of

5    internet activity can be found.

6         However, we did request and were given by the

7    government a complete export of the internet history for

8    the computer.

9    Q    And what did you find?

10   A    So some of the findings are very similar to

11   Mr. Thornton's findings.  Mr. Thornton did find and

12   correctly identify that there are visits to the

13   backpage.com website, and some of those are visible

14   here.  There's -- there's actually numerous in this

15   exhibit.

16        Looking at the complete Chrome history actually

17   shows quite a few more visits to the backpage.com

18   website.  What's interesting in the rest of the history

19   is the nature of the visits.

20        Mr. Thornton testified yesterday that to an extent,

21   just from this limited amount of information, you can

22   get an idea of where in a certain website a user is and

23   what content they're viewing.  So the URL in the center

24   column shows us the actual website address, and the

25   title shows us, you know, presumably the title of the

1   material being viewed.

2        So one of the things found when you look at the

3   entirely available internet history is that a large

4   number of visits to the backpage.com website are to the

5   downloads page.  You would see a URL very similar, for

6   instance, for instance, to this one except instead of

7   "/payment" you see "/download" and then a file name.

8   And there were a very large quantity of those.

9   Q    And based on your examination, what can you infer

10  from that?

11  A    The inference is that the user of the computer is

12  downloading individual pictures from the backpage.com

13  website to the hard drive of the computer.

14  Q    And would you be able to identify if there are

15  photos that are uploaded to Backpage?

16  A    There are artifacts that can be present on the

17  computer when files are uploaded to -- to a particular

18  website.  Yes.

19  Q    And were you able to find any of those?  Or did you

20  have the tools to find those on this -- when you did

21  this examination?

22  A    No.  The examination that I performed was limited

23  both in scope, time and also by the tools that were

24  available.  It was really what we would call a forensic

25  preview, not a forensic examination.  But in the limited

1    amount of data that we were given from the government,

2    or able to access on our own, I did not see any

3    indication of uploads to the backpage.com website.

4         MS. SEN:  Your Honor, may I have just a

5    moment, please?

6         THE COURT:  Yes.

7         (Brief pause.)

8         MS. SEN:  Your Honor, we don't have anything

9    further at this time.

10        THE COURT:  Okay.  Any cross examination?

11        MR. GRADY:  Yes, your Honor.

12                        CROSS EXAMINATION

13   BY MR. GRADY:

14   Q    Mr. Martino, you covered lots of -- give me a

15   minute to get organized.

16   A    Yes, sir.

17        MR. GRADY:  And if we could switch from the

18   ELMO, Joanne, to the government counsel.  Thank you.

19   BY MR. GRADY:

20   Q    Mr. Martino, I first want to show you 47B.  Now,

21   you talked earlier in your testimony today about the

22   impact that powering on the computer had on February

23   2nd, 2017.  Right?

24   A    Yes.

25   Q    Now, would you agree that powering on the computer

1   did not have an impact on photos shown in 47B?

2   A    Yes.  The analysis that I did showed that these did

3   not appear to be affected.

4   Q   If they were affected, the date modified, the date

5   created, the date accessed would be 2/2/17 or later?

6   A    Yes.

7   Q   And we can be certain that the photo was taken on

8   May 17th, 2013?

9   A   To the extent that we trust the data in the

10  exhibit.

11  Q    Yes, sir.  And let's go to the next page.

12       Same thing as it relates to the file name Han5;

13  there's no indication that powering on the computer

14  impacted the data that's contained in 47B-002?

15  A   That's correct.

16  Q   And by the way, who -- does the user have to rename

17  the file Han5 or My Cars 2415 or My Cars 2416?

18  A    Most likely.  Or it was named that.  It went up to

19  the location it came from, and when it got copied,

20  downloaded, et cetera, it came with that name, one or

21  the other.  That is not typical nomenclature for a

22  camera or a phone.

23  Q   Sure.

24       Would you agree, Mr. Martino, that the files that

25  were created on February 2nd, 2017, are system operating

1   files?

2   A    They are predominately system files, but not

3   exclusively.

4   Q    But consistent with what you would expect to see

5   when one powers on a computer?

6   A    It's consistent with both powering on and a level

7   of user activity.

8   Q    You're not disagreeing -- well, let me ask it this

9   way:  There's no indication that the government inserted

10  any files such as the files in 47B onto the hard drive?

11  A    No, there is not.

12  Q    Because if that was the case, you would see a

13  create date of 2/2/17 or later?

14  A    It depends if the person doing it knew what they

15  were doing or not.  There are certainly mechanisms to do

16  so without causing that to happen, but there's -- there

17  was no evidence in what I could see that that occurred.

18  Q    Now, I want to talk a little bit about the websites

19  that you -- we talked about in Exhibit 75.  And I

20  believe your testimony is that the information that you

21  saw was consistent with someone searching on Backpage.

22  Correct?

23  A    It was actually that I saw multiple indications of

24  someone downloading files from Backpage.

25  Q    And to download, you have to go to Backpage to view

```
1    different ads in order to download files or download

2    pictures?

3    A    Presumably.

4    Q    So you don't know if that person was perhaps

5    checking on someone's ad to see if they were -- what

6    they were doing?

7    A    No.  This data does not allow me to know what the

8    person's intention was.

9    Q    And to be clear, the data was -- the data that was

10   on 79 -- which is the hard drive --

11   A    Correct.

12   Q    -- in that computer tower?

13   A    Yes.

14   Q    So if, for example, the user was at a hotel and

15   they wanted to post from the computer tower, they'd also

16   have to bring presumably a keyboard?

17   A    Yes.

18   Q    A mouse?

19   A    Yes.

20   Q    A monitor?

21   A    Yes.

22   Q    Quite a bit to lug around in a hotel to connect,

23   would you agree?

24   A    I would.

25   Q    So if the user is using a cell phone or an iPad,
```

1    that's not going to show up from the data that was in

2    79?

3    A    No, it is not.

4    Q    Mr. Martino, I take it you are not an employee of

5    backpage.com?

6    A    No, sir, I am not.

7    Q    You don't know quite exactly what their policies

8    are as far as retaining information from users or

9    records?

10   A    No, I do not.

11   Q    You don't know why they might keep deleted photos

12   as part of advertisements?

13   A    No, I do not.

14   Q    There was some mention about IP addresses earlier

15   in your testimony, I believe.  Am I correct?

16   A    Yes, you are.

17   Q    And I believe you agreed with the proposition that

18   if an IP address is owned by the hotel, the hotel isn't

19   going to be able to go further and say that IP address

20   was used in Room 102 to Mr. Martino; is that correct?

21   A    That is correct.

22   Q    And the IP address is not going to tell you if

23   force was used?

24   A    No.

25   Q    An IP address is not going to tell you if fraud was

1    used?

2    A    No.

3    Q    It's not going to tell you coercion was used?

4    A    No.

5    Q    I want to return to -- or I am going to show you

6    50 -- 50D.  We talked a little bit about the photos in

7    this Backpage advertisement, and I want to go to 50B.

8              MR. GRADY:  And if we could go to the next

9    page.  Okay, this page is fine.  If we can go ahead and

10   split the screen.  And on the right side I would like to

11   pull up Government Exhibit 74, Bates 12163.

12   BY MR. GRADY:

13   Q    Now, on 74, am I correct, Mr. Martino, that

14   according to the metadata associated with this photo,

15   that a Samsung SM-G920A was used to take this photo

16   presumably January 2nd, 5:26 p.m.

17   A    74 is the image to my right, correct?

18   Q    That is correct.  Hopefully you can see the

19   highlights that I --

20   A    Yes, I can.  I just wanted to verify.

21        Yes.  The metadata that's present in the exhibit

22   does indicate that.

23   Q    And to your knowledge there was a Samsung SM-G920A

24   involved as part of this case, correct?

25   A    That is correct.

1   Q    In fact, I am holding up Exhibit 77.  Would you

2   agree this is a Samsung SM-G920A?  If you want to look

3   at it --

4   A    From a distance, I would say probably.

5   Q    Yeah.  You can go ahead and move that around and

6   confirm whether that's a Samsung SM-G920A.

7   A    Yes, I would agree.

8   Q    Okay.  So would you agree, Mr. Martino, that -- and

9   I know we can't say for sure, that perhaps this camera

10  took this picture on January 2nd, 2016?  It's possible.

11  A    It's possible.

12  Q    Okay.  Assuming that that is possible, would you

13  say then that -- from what it appears in 50B-002, that

14  if this picture was taken on here, it was not perhaps

15  saved to the hard drive until February 1st, 2016?

16  A    I don't believe the created date is present on --

17  Q    Sure.  Well, I think -- I think it's in

18  Exhibit ZZ8, is the defense -- the spreadsheet that you

19  created?

20  A    You're referring to the picture bottom left of this

21  exhibit, labeled "My Cars 3504"?

22  Q    Yes.  The question is, is looking -- we can scroll

23  through 50B a little bit further.  There's some --

24       So would you -- would you agree that it appears

25  that the picture -- and let's just use My Cars 3508 as

1    an example.  And actually it's listed in your

2    spreadsheet in ZZ8.  It appears that My Cars 3508 is

3    similar to what is shown in 74, Bates 12163?  And that

4    appears to be the same room, the same bedspread, TV

5    behind it?  The setting seems similar?  Would you agree?

6    A    Partially, yes.

7    Q    Well, there's a brown door to the top right?  I

8    mean, I know the lighting's a little bit different,

9    but --

10   A    Yeah, there are visual similarities.  Yes.

11   Q    Visual similarities?

12   A    Sure.

13   Q    According to ZZ8, you say that My Cars 3508 was

14   created on February 1st, 2016.  Do you want to look at

15   it again?

16   A    No.  I have it right here.  That is correct.

17   Q    Okay.  Again, going back to the hypothetical:

18   Assuming this Samsung took the picture that is shown, is

19   it possible that the picture could have gone from this

20   phone to the hard drive on February 1st, 2016?

21   A    Well, no.  You have connected three disparate dots.

22   So there is evidence to my right, to the exhibit to my

23   right, that could have potentially been taken with a

24   phone of the same make and model.

25   Q    Sure.

```
 1    A    However, 3508, we don't -- we are not looking at
 2    metadata to support what took that picture.
 3    Q    Sure.  Well, let's assume for the moment that
 4    there's a series of pictures taken of this person on
 5    February 2nd, 2016, by this phone.  With me so far?
 6    A    Yes, yes.
 7    Q    Okay.  Let's say the cluster of those pictures were
 8    then saved onto the hard drive in 79 all on February
 9    1st, 2016.  Is that possible?
10    A    Hypothetically, sure.
11    Q    Well, if it was created on the hard drive, 3508 was
12    created on the hard drive on February 1st, 2016, right?
13    A    Yes.
14    Q    And that tells you that it was transferred onto the
15    hard drive February 1st, 2016?
16    A    Yes.
17    Q    It's not a hypothetical.  If -- if --
18    hypothetically speaking, if this 74 is one and the same,
19    perhaps it could have gotten there on February 1st,
20    2016, at the same time?
21    A    Okay, you just said it's not a hypothetical, but
22    hypothetically speaking.
23    Q    Well, we can just disregard it.  I don't think we
24    need to go around in circles anymore about this but
25    other than it's possible that the picture taken by this
```

1    phone was saved onto the computer on February 1st?

2    A    That is possible.

3    Q    Now, I want to go back for a minute.  You talked

4    about image --

5              MR. GRADY:  And if we could go to 50D-004.

6    I'm sorry, 50B-004.

7    BY MR. GRADY:

8    Q    Okay, we talked a little bit about the images IMG

9    3027 versus KK 137.  Are you aware if KK 137 has been

10   tagged in any fashion?

11   A    No.  I only have the information that's present and

12   the information that I was provided from the hard drive.

13   Q    Okay.  Is it possible for a user to photoshop

14   images?

15   A    Yes, it is.

16   Q    Could that impact metadata?

17   A    It should not.

18   Q    But it is possible for the user to make changes and

19   manipulate photos and data?

20   A    Yes.

21   Q    And to be fair, Mr. Martino, there are other

22   devices in this case, such as, oh, a tablet, a mini

23   tablet, that have not been accessed, correct?

24   A    That is correct.

25              MR. GRADY:  We can go ahead and put 50B down.

BY MR. GRADY:

Q    And, in fact, sometimes metadata doesn't always exist for a certain picture or an image?

A    Yes, that is true.

Q    Mr. Martino, I assume you are not doing this for free?

A    No, sir, I am not.

Q    You are being paid?

A    I am.

Q    What is your hourly rate?

A    $150 an hour.

Q    Do you get paid more for trial testimony as opposed to consultation?

A    Actually, yes.  Trial.

Q    What's your trial testimony?

A    Trial I believe is 225.

Q    And been here all week?

A    This is day three.

Q    Finally, Mr. Martino, I want to talk to you a little bit about Michael J. Piznarski.  Do you remember that name?

A    I do not.

Q    Is it a case you worked on?

A    Not that I recall, but it's possible.  I have worked on a lot of cases.

1    Q    Possible you were the digital examiner in that

2    case?

3    A    Possible.  I'm not recalling that name.

4    Q    Do you recall someone who recorded sex acts with --

5    without a person's consent or their knowledge?

6    A    I have done several cases like that, but I do

7    recall cases --

8    Q    Sure.

9    A    -- of that nature.

10   Q    This one happened about six years ago.

11   A    Again, I'm in the police department at that time.

12   I'm working dozens of cases simultaneously.

13   Q    Do you recall searching the defendant's laptop and

14   finding videos that he recorded of sexual encounters

15   with the victim without her knowledge?

16   A    I don't recall this name, so I really am not

17   comfortable saying anything.

18   Q    Do you recall being in the grand jury when the

19   victim testified?

20            MS. SEN:  Objection, your Honor.

21            THE COURT:  Well --

22            MS. SEN:  I think this is getting a little far

23   afield.

24            THE COURT:  Yeah.  Can you give him some clue

25   to identify the case in which he worked, if he worked on

1    this.

2                    MR. GRADY:  Sure.

3    BY MR. GRADY:

4    Q    Do you remember there being an appellate decision

5    about irregularities in the Michael Piznarski case?

6    A    I don't remember Mike -- the name Michael

7    Piznarski, so I can't talk about the case.

8    Q    Is it a rule that you should not be present in a

9    grand jury when someone else is testifying?

10   A    Yes.

11   Q    Do you remember violating that rule?

12   A    No.

13   Q    You don't recall an appellate opinion, People

14   versus Piznarski, New York opinion, where it said that

15   Examiner Anthony Martino should not have been present in

16   the grand jury room when the victim was testifying?

17   A    No.

18   Q    So are you saying that did not happen at all?

19   A    No, I am saying I don't know anything about -- I --

20   I don't get involved in appellate court decisions.  I'm

21   a forensic examiner.

22   Q    Sure.

23   A    I have been present in courtrooms and even grand

24   jury testimony, you know, in order to provide technical

25   expertise on many cases.

```
1    Q    You don't recall if that's ever been an issue?

2    A    No.

3    Q    You don't recall an appellate court criticizing you

4    for being present in a grand jury when a person is

5    testifying?

6    A    I --

7              MS. SEN:  Objection, your Honor.  This

8    testimony here has nothing to do with being the

9    examiner --

10             THE COURT:  Yes.

11             MS. SEN:  I don't think that --

12             THE COURT:  Objection overruled.  You can

13   answer it, and then I think that should be the final

14   answer, and you can move on to the next topic.

15             MR. GRADY:  Okay, your Honor.  No further

16   questions.

17             THE COURT:  Oh, okay.

18       All right.  Ms. Sen, do you have any further

19   questions?

20             MS. SEN:  No, your Honor.

21             THE COURT:  Okay.  Thank you, Mr. Martino.

22             THE WITNESS:  Thank you, your Honor.

23             (Witness excused.)

24             THE COURT:  All right, defense call the next

25   witness?
```

1          MR. KAPLAN:  Judge, may we approach?

2          THE COURT:  Yes.

3     (The following was held at the bench.)

4          MR. KAPLAN:  What do you want to talk about,

5     Judge?

6          THE COURT:  Want to talk about whether you are

7     going to call your client?

8          MR. KAPLAN:  Well, can we talk about that in

9     the morning?  It's been a long day.

10         THE COURT:  Huh?

11         MR. KAPLAN:  It's been a long day.  Your law

12    clerk's tired.

13         THE COURT:  I see.  Well, tell me what -- you

14    have to talk to him?

15         MR. KAPLAN:  I do have to spend some time with

16    him.  We had an issue come up with the Tatro matter that

17    needs to be resolved before we can go any further, so --

18    not -- just between him and me, not between anybody

19    else.

20         It's only -- if he were to testify, you'd have to

21    ask the jury to leave anyway so he could get on the

22    stand because he doesn't want to be --

23         THE COURT:  No, I appreciate that.  But it

24    is -- you know, this is -- this is a little unfair to

25    the government because on the one hand, I understand

1    that you don't have to tell them whether you are going

2    to call your client in general, but now we are going to

3    the eve of the summations.  But are you telling me --

4    you telling me you don't know the answer as to whether

5    he is going to testify?

6              MR. KAPLAN:  No, no, I am not saying that.

7              THE COURT:  Oh.  Okay.  What are you saying?

8              MR. KAPLAN:  I'm saying that I thought it

9    would be a good time to break.  It's only like 20

10   minutes early.

11             THE COURT:  Okay.  All right?

12             MR. DARROW:  So would it -- I infer from what

13   Mr. Kaplan just said that he has decided whether or not

14   he is going to call his client.  I think the government

15   should be informed.  It's the day before closing

16   arguments and summations.  We have been waiting day

17   after day.

18             THE COURT:  You know, in general, I really

19   appreciate that you don't have to tell the government as

20   to whether --

21             MR. KAPLAN:  I don't mind saying that as it

22   looks right now, I am going to call him.  I could come

23   in in the morning and not do it, I suppose.  I have

24   gotta spend some time with him, but I have always told

25   Mr. Darrow, "You should be ready to cross him," you

1   know.

2           THE COURT:  Okay.  So what you are saying

3   right now, to the best of your ability, you think --

4           MR. KAPLAN:  I would like to call him.

5           THE COURT:  That he's going to testify?

6           MR. KAPLAN:  Right.

7           THE COURT:  Okay.  All right?  I guess we'll

8   call it a day, and I'll speak with you a little bit

9   more.  Okay.

10          MR. DARROW:  Thanks.

11          THE COURT:  But you are on notice that he

12  is -- okay.  Thanks.

13  (The following was held in open court.)

14          THE COURT:  All right.  It's -- before the

15  next witness, we should call it a day.  So I am going to

16  let you go at 10 after.  We'll begin at nine o'clock.

17  In general, it may very well be that you will get the

18  case tomorrow or maybe not.  It's unclear at this point.

19  So if it's possible and you do get the case, then you

20  will have the ability to impact the schedule, so if we

21  go past 4:30, you can call that.  So if any way you can

22  make alternative arrangements for your personal

23  responsibilities so that you would be free after 4:30,

24  that would be helpful, but I am not suggesting one way

25  or another as to whether you will get the case tomorrow

1    or not.  You may, or it may be the following day.

2          All right.  And again, I want to remind you not to

3    say anything about this case to anyone, and we will see

4    you tomorrow morning.  And I am going to stay and talk

5    with the lawyers.

6    (The jury was excused after which the following was held

7    in open court at 4:13 p.m.)

8              THE COURT:  All right.  If the defense calls

9    additional witnesses, then we will continue with

10   additional witnesses.  If the defense does not call

11   witnesses but rests, will there be rebuttal evidence

12   from the government?

13         Frankly, I only ask because if there is no rebuttal

14   evidence and no one testifies from the defense, we're

15   heading for summation.

16             MR. DARROW:  If the defense closes in the

17   morning, we are not calling anyone following.

18             THE COURT:  All right.  So you should be

19   prepared for summations.  Okay.

20             MR. DARROW:  Yes, your Honor.

21             THE COURT:  That's the first thing.

22         The second thing is, again, on Count 15, we have

23   begun the research.  It's -- and we'll continue on.

24   There are, in fact, Fifth Circuit case -- actually,

25   what's sort of helpful is the research into the

1    congressional background into the change in 2015.

2         Apparently Congress was concerned not with

3    situations like this in which young people are called to

4    have photographs taken and Backpage used.

5         Apparently the motivation for the change was to

6    address all the money that was being made by Backpage.

7    In fact, Backpage sued Congress for violation of the

8    First Amendment, and lost essentially.  So the focus is

9    less about protecting young women, or girls; it's more

10   about making sure that companies were not profiting

11   large amounts in advertising.  So as a result, if one is

12   aiding and abetting by getting women to have pictures

13   taken and then posted on Backpage, then they could be

14   prosecuted for that.

15        There are a number of cases before that.  In fact,

16   there's obviously a Second Circuit case, which is not a

17   reported case; there's also an Eleventh Circuit case,

18   not reported case; a four -- Fifth Circuit case as well,

19   all of which suggests that in situations like this when

20   minors are used for photographs to post on something

21   like Backpage, that that actually can be conceived of as

22   aiding and abetting.  It's under an aiding and abetting

23   theory, but also, I think, slightly confirms the

24   government's position that the law in 2015 was not

25   significantly changed in regard to advertising when you

1    are talking about young persons participating in

2    advertising and that being related to aiding and

3    abetting a commercial act, or maybe even the

4    photographing and posting being a commercial act.

5        So my question initially was this:  You know, what

6    is -- in particular, Hannah -- is actually posting

7    photos that were of her with these other persons a

8    commercial act?  Or was it not?  If the commercial act

9    is just the actual act of prostitution, well, there's

10   very little evidence that she participated in

11   prostitution.

12       If the commercial act is actually posting her

13   image, then it's a stronger argument to say that she

14   participated in a commercial act as a result of enticing

15   or force or coercion from others.  I mean, that was

16   essentially the debate in my mind.

17       You know, it seems that there are cases out there

18   prior to 2015 which address this issue, and they add

19   this element of aiding and abetting.  So then I went

20   back to the indictment, and indeed aiding and abetting

21   is included within Count 15.  So the question is whether

22   aiding and abetting others in prostitution would satisfy

23   the statute.  Anyway.  And I'm telling you this because

24   I'd like a memorandum on either these cases or this

25   issue in general, and you should know what we found.

1          So I'd ask that -- you know, that both of you --
2     both sides submit briefing as to whether the status of
3     the evidence that she had these images taken from
4     photographs and posted on Backpage -- and there's very
5     little evidence to suggest that she was engaged in
6     prostitution, is that sufficient to meet the statute?
7          Any questions at all?
8               MR. DARROW:  Perhaps if the parties had the
9     citations to those cases, your Honor, it would move us
10    along in the analysis.
11              THE COURT:  Yes.  I would be glad to get the
12    citations from the person who has the citations.  I just
13    have the summaries.  Okay.
14         All right.  Anything from the defense?
15              MS. SEN:  No, your Honor.  I will brief it for
16    you.
17              THE COURT:  All right.  Okay.
18         All right.  So the decision is made whether we have
19    more testimony or not tomorrow.  If not, we go into
20    summations.
21         Now, when would you like a copy of the charge?  I
22    can get that prepared in half an hour.  Would you like a
23    copy?  There have been some minor changes, and I'm
24    reviewing now the three requests that you have made.
25              MR. KAPLAN:  You want us to review it with the

1    Court today or just e-mail it to us and we will get it
2    in the morning?
3              THE COURT:  We will e-mail it to you.  I mean,
4    you have already reviewed it and said there are no
5    objections, but there are a couple of changes, frankly.
6    For instance, immunized witnesses; were there any
7    immunized witnesses?  I didn't remember any.
8              MS. SAVNER:  Well, Keisha Willard did have
9    letter immunity, but that was not, I believe, raised.
10             THE COURT:  It was never mentioned.
11             MS. SAVNER:  No.
12             THE COURT:  So the question is whether you
13   want an instruction on immunized witnesses, and I
14   just --
15             MS. SAVNER:  We don't think it's necessary
16   given that it wasn't a fact at issue.
17             THE COURT:  Okay.  All right.
18             MS. SAVNER:  And another question, your Honor:
19   In terms of a copy of the indictment, I don't know what
20   your practice is.
21             THE COURT:  Yes.  So -- maybe Judge Crawford
22   does this.  Ordinarily I don't do that, and the reason I
23   don't do it is because there's a lot of, some would say,
24   extraneous material in a Count 1 conspiracy indictment.
25   And so generally the charge has -- the charge includes

1    the charges, and I take actually the first two

2    paragraphs of the conspiracy count, and then the other

3    counts, they're grouped into sections.  3, 5, 7, 8 and 9

4    I think are all grouped in one particular -- and we go

5    through all of those.  And actually they're read in the

6    charge.  So I don't actually submit the indictment

7    itself -- anyway -- in case there's any objection.  And

8    10 through 15, I go through each one of those charges in

9    the charge and read actually the charge and then define

10   it.  And the same with 16.

11              MS. SAVNER:  So obviously as charged, and I

12   don't remember how it stands in the last version of the

13   jury charge, but we charged Victim A, Victim B --

14              THE COURT:  Oh, no, that's all been modified

15   to the names, the first name and the second initial --

16   or first initial.

17              MS. SAVNER:  Thank you.

18              THE COURT:  I can get this to you fairly

19   quickly, and you can take a look at it and we can talk

20   about it tomorrow.  All right?

21         Is there anything else at this point?

22              MS. SAVNER:  Not from the government.

23              MR. KAPLAN:  No, your Honor.  Thank you.

24              THE COURT:  All right.  Okay.  We'll see you

25   tomorrow.

1    And we will e-mail you the charge.  How about that?

2            MS. SAVNER:  Your Honor, one more question.

3            THE COURT:  Yes.

4            MS. SAVNER:  Would you like the briefing

5    e-mailed as well or just filed?

6            THE COURT:  If you get it done tonight, I

7    would love to have the -- have it e-mailed, but if not,

8    I will just read -- I will get here tomorrow early and

9    read it.

10            MS. SAVNER:  Okay.

11            THE COURT:  Okay.  Thank you.

12            (Court was in recess at 4:24 p.m.)

13                    *** ** ***

14

15

16            C E R T I F I C A T I O N

17       I certify that the foregoing is a correct
     transcript from the record of proceedings in the
18   above-entitled matter.

19                              _Anne Nichols Pierce_

20   May 7, 2019                _____
     Date                       Anne Nichols Pierce

21

22

23

24

25