UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
          V.           *   Case No:  2:16-cr-94-1
BRIAN FOLKS         *




TRIAL BY JURY - DAY TWO
APRIL 25, 2019
BURLINGTON, VERMONT


BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

    Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

    Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

I N D E X

| Witness | Page |
|---|---|
| Adam Chetwynd | 3 |
|   Con't. Direct Exam by Ms. Savner | 4 |
|   Cross Examination by Mr. Kaplan | 21 |
|   Redirect Examination by Ms. Savner | 43 |
|   Recross Examination by Mr. Kaplan | 46 |
| Michelle N. | 47 |
|   Direct Examination by Ms. Savner | 47 |
|   Cross Examination by Mr. Sen | 74 |
|   Redirect Examination by Ms. Savner | 85 |
|   Recross Examination by Ms. Sen | 88 |
| Mandy L. | 91 |
|   Direct Examination by Mr. Darrow | 91 |
|   Voir Dire by Mr. Kaplan | 108,123 |

| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 18 | N-25 Recorded Call | 6 |
| 20 | N-25 CS Video | 10 |
| 21 | Photo Drug Exh 9 | 18 |
| 22 | Drug Exhibit 9 | 20 |
| 9 | N-8 Photo Calculator | 65 |
| 58 | Photos of 96 Ethan Allen Parkway #8 | 104 |
| 114 | Photo of Delaney M. | 108 |
| 89 | DMV photo of Ashley P. | 114 |
| 50A | Photos of Keisha W. | 114 |
| 53A | DMV photo of Danielle M. | 114 |
| 48D | Backpage Records-Mandy L. | 124 |
| 96 | Photos 71-73 Spring St. | 129 |
| 54A | DMV photo of Ayla L. | 139 |
| 93 | DMV photo of Ashley T. | 139 |
| 113 | DMV photo of Jerrika M. | 139 |
| 83 | DMV photo of Amanda S. | 141 |
| 98 | Photos of 80 Cottage Grove | 145 |
| 64 | DMV photo of Donald McFarlan | 181 |
| 115 | Photo of Cayman Hightower | 181 |
| 30 | Photos of bag and contents Seized by Winooski PD | 207 |
| 66A | Photo of Contents of Rue 21 Bag N-49 | 210 |
| 117 | N-29 Folks "Moet Hart" Facebook video | 235 |

3

1   [THURSDAY, APRIL 25, 2019 - 9 A.M.]

2           THE COURT:  Good morning.

3           DEPUTY CLERK:  This is Case Number 16-94 United

4   States of America versus Brian Folks.  The Government is

5   present through Assistant United States Attorneys Emily Savner,

6   William Darrow, and Matthew Grady.  The defendant is present in

7   the courtroom with his attorneys Mark Kaplan and Natasha Sen.

8   The matter before the Court is Trial by Jury day two.

9           THE COURT:  Okay.  Welcome back this morning.  This

10  is in fact my courtroom.  Has anyone spoken to you about the

11  case or have you learned anything about this case from outside

12  the courtroom?  [No verbal response.]  Okay.  Great.  Thank

13  you.  All right.  Ms. Savner, are you ready to proceed?

14          MS. SAVNER:  Yes, Your Honor.  Bring up Special Agent

15  Chetwynd again.

16  ADAM CHETWYND,

17      Having been duly sworn, testified as follows:

18          THE COURT:  Good morning, Agent.

19          SPECIAL AGENT CHETWYND:  Good morning.

20          THE COURT:  Is your cold improving?

21          SPECIAL AGENT CHETWYND:  Took some Sudafed.  We'll

22  see.

23          MS. SAVNER:  May I proceed?

24          THE COURT:  Yes.

25                  CONTINUED DIRECT EXAMINATION

Adam Chetwynd                                    4

1  BY MS. SAVNER:

2  Q.    Good morning, Special Agent Chetwynd.

3  A.    Good morning.

4  Q.    We've gone through the first three controlled purchases

5  that DEA did with Michelle yesterday and we were up to the

6  fourth which is the last one; is that right?

7  A.    That's correct.

8  Q.    All right.  So tell us when did this fourth controlled

9  purchase occur?

10  A.    The next purchase occurred on February 10, 2016.

11  Q.    How was this buy arranged?

12  A.    Telephonically.

13  Q.    Between whom?

14  A.    I'm sorry.  Between the CS and Mr. Folks.

15  Q.    All right, and were you present when some of this

16  telephonic communication was taking place?

17  A.    Yes I was.

18  Q.    All right.  Where were you?

19  A.    With TFO Estes and the CS making the calls.

20  Q.    Was anyone else there?

21  A.    Not on the first one.

22  Q.    Okay.  So explain what happened.

23  A.    The day before the purchase, which would have been

24  February 9th, we met with the CS and had the CS place a

25  recorded call to Mr. Folks.

Adam Chetwynd                                    5

1    Q.      What happened on that call?

2    A.      Basically during the call the CS asked if she could meet

3    up again and provided that it was available on Friday to meet

4    up, and at that point Mr. Folks said okay.

5    Q.      And was Friday the 9th or the 10th?

6    A.      The 9th.

7    Q.      Okay and what happened after that?

8    A.      We met up again on the 10th and -- myself and TFO Estes

9    met up again on the 10th and we made plans to conduct another

10   purchase of heroin from Mr. Folks.

11   Q.      Okay.  So just to make sure I understand so on February

12   9th you met with the CS.  CS placed a recorded call to the

13   defendant arranging for a meet to happen the next day on the

14   10th?

15   A.      Correct.

16   Q.      Okay.  All right.  So bring us to the 10th.  What

17   happened that day?

18   A.      Myself, TFO Estes, and Intelligence Analyst Epp met with

19   the CS and I directed the CS to place a recorded call to Mr.

20   Folks's phone that I have already identified in previous

21   testimony.

22   Q.      Just tell us again what's that phone number?

23   A.      Sure.  802-825-4614.

24   Q.      And could you hear at least her side of that phone

25   conversation?

                        Adam Chetwynd                          6

1   A.      Yes.

2   Q.      You mentioned the call was recorded; is that right?

3   A.      Yes.

4   Q.      Have you had a chance to review that recording?

5   A.      Yes.

6   Q.      Can you pull out exhibit 18 please?  Do you recognize

7   what's been marked as Government's exhibit 18?

8   A.      I do.

9   Q.      What is it?

10  A.      It's a CD marked U.S. exhibit 18 N25 recorded call

11  between Folks and CS dated 2/10/16.

12  Q.      And have you had a chance to review the file on that

13  disk?

14  A.      I have.

15  Q.      How do you know?

16  A.      It's my initials on the CD after I reviewed it.

17  Q.      And when you reviewed it did you find it to be a true

18  and accurate recording of that telephone call you mentioned?

19  A.      It was.

20          MS. SAVNER:  We move to admit exhibit 18.

21          THE COURT:  Yes.  Any objection?

22          MR. KAPLAN:  No objection.

23          THE COURT:  So admitted.

24  [Government exhibit 18 admitted]

25          MS. SAVNER:  Permission to publish along with 18A of

                        Adam Chetwynd                          7

1    the transcript?

2               THE COURT:  Yes.

3    BY MS. SAVNER:

4    Q.      While we're getting that set up, Special Agent Chetwynd,

5    just generally describe for us the content of that phone call.

6    What did you hear?

7    A.      The CS asked if she could meet up and Mr. Folks asked,

8    you know, when and the CS said about 15 to 20 minutes, and Mr.

9    Folks responded that he would have to get dressed and same

10   place as before.

11              MS. SAVNER:  Can we confirm that the computer is set

12   to the Government's table?

13   BY MS. SAVNER:

14   Q.      Okay.  The call confirmed that the CS was -- that Mr.

15   Folks was available to meet with Michelle at that time?

16              THE COURT:  Can we just hold for just a second to see

17   if we can connect the -- well we need to get a technical person

18   in.  Can you just proceed to the end of your examination and

19   then we'll take a break and have the folks come in?

20              MS. SAVNER:  Yes, Your Honor.

21              THE COURT:  They are on their way.

22              MS. SAVNER:  I can proceed.

23   BY MS. SAVNER:

24   Q.      All right.  After this phone call Michelle and Folks

25   again agree to meet at the same location.  What happens next?

Adam Chetwynd                                      8

1   A.      At that time the CS was searched by TFO Estes.  The CS

2   got in our vehicle with myself and IA Epp and TFO Estes where

3   TFO Estes searched the CS.

4   Q.      Did you witness that search?

5   A.      I did.

6   Q.      Did TFO Estes find anything on Michelle?

7   A.      No we did not.

8   Q.      Okay.  What happened next?

9   A.      Then TFO Estes exited.  The CS's vehicle was parked

10  right next to ours and he went out to search the CS vehicle.

11  Q.      And did you see that take place?

12  A.      I saw him go out.

13  Q.      All right.  Did he report back anything being found?

14  A.      He did and he did not find anything in the vehicle.

15  Q.      Okay.  Just make sure I have a clear answer to my

16  question.  Did he find -- did he report back that anything of

17  note was found?

18  A.      No.

19  Q.      What steps were taken next?

20  A.      Next the CS was outfitted with an audio and video

21  recording device.  The CS was provided some official funds to

22  be used to purchase the anticipated narcotics.  Surveillance

23  was set up in the area of where the last three transactions had

24  taken place at the intersection of Loomis and North Union.

25  Q.      And that surveillance was done by other DEA agents; is

Adam Chetwynd                                              9

1    that right?

2    A.      Whoever was available, yes.  There were multiple agents

3    partaking in the surveillance.

4    Q.      And the surveillance that's set up it's agents are

5    obviously watching what's happening.  Are they also recording

6    what's happening in any way?

7    A.      Yes.  We had video surveillance set up that day on

8    Apartment 2 at 103 North Union.

9    Q.      All right, and after all the preliminary steps are taken

10   to set up Michelle and search her car and all of that what

11   happened next?

12   A.      At that point we gave the green light for the CS to

13   proceed to a meet location.  She was followed by myself, TFO

14   Estes, and IA Epp, and shortly thereafter she arrived and

15   parked out front of 103 North Union.

16   Q.      All right, and did you maintain a visual on her the

17   whole time?

18   A.      We did.  We parked, again, several spaces in front of

19   her.

20   Q.      All right.  What happened when she got there?

21   A.      She placed a call to -- we could hear it over the audio

22   transmitter her placing a telephone call saying that she was --

23   she was there.

24   Q.      And just to go back to that transmitter was that just

25   audio that day or audio and video?

Adam Chetwynd                          10

1  A.      It was audio and video.

2  Q.      Okay.  Did you see and hear what was happening live?

3  A.      Yes.

4  Q.      And was that audio and video recording transmission

5  recorded in any way?

6  A.      It was recorded.

7  Q.      Okay.  Can you take a look at Government's exhibit 20?

8  Do you recognize what's been marked as exhibit 20?

9  A.      Yes.

10 Q.      What is it?

11 A.      It is a CD labeled U.S. exhibit 20 and 25 CS video from

12 2/10/16.

13 Q.      Okay and have you had a chance to review the file on

14 that disk?

15 A.      I have.

16 Q.      And is it a true and accurate recording of the audio and

17 video feed from Michelle's recording device that day?

18 A.      Yes.

19         MS. SAVNER:  The Government moves to admit exhibit

20 20.

21         THE COURT:  Any objection?

22         MR. KAPLAN:  No objection.

23         THE COURT:  All right.  So admitted.

24 [Government exhibit 20 admitted]

25 BY MS. SAVNER:

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Adam Chetwynd                    11
1   Q.      Okay.  So you could see her car through your own eyes

2   and you could see also what was happening inside her car

3   through that video monitoring; is that right?

4   A.      Yes.

5   Q.      What did you see happen?

6   A.      We just waited.

7   Q.      Okay.  How long did you wait?

8   A.      More than 10 minutes.  Maybe 15 minutes, 20 minutes.

9   Q.      Okay.  What happened then?

10  A.      At that point the other surveillance units that were in

11  the area broadcast they had observed the tan Ford Explorer

12  arrive on Loomis Street and Special Agent Doud noticed Mr.

13  Folks exiting the Explorer and broadcast that on the radio.

14  Q.      Okay.  At some point did you see Mr. Folks with your own

15  eyes?

16  A.      I did.

17  Q.      Where was that?

18  A.      That was he approached the CS vehicle.

19  Q.      Okay.  What did he do once he approached it?

20  A.      He just waited outside of it.

21  Q.      All right, and then what happened?

22  A.      At that point the CS exited her vehicle.

23  Q.      Okay, and could you hear the discussion?

24  A.      Yes.

25  Q.      What did you hear?

Adam Chetwynd                          12

1  A.     I recall hearing the CS comment you look tired and then

2  I heard the car door close.

3  Q.     Okay.  Did you see where they went?

4  A.     They walked towards the driveway of 103 North Union then

5  out of my sight.

6  Q.     All right.  Were you still able to see what was going on

7  through the -- excuse me -- through the video transmitter?

8  A.     Yes.

9         THE COURT:  The machine is fixed at this point.

10        MS. SAVNER:  Thank you.  I think I'll just keep

11 moving.  Thank you.

12        THE COURT:  Okay.

13 BY MS. SAVNER:

14 Q.     All right.  What did you see through the video

15 transmitter?

16 A.     I saw Mr. Folks walking down the driveway.  You know I

17 could see that part of it and hear footsteps walking.

18 Q.     Okay, and then what?

19 A.     And they approached the door to Apartment 2 and at that

20 point the CS returned to her vehicle.

21 Q.     Did you hear anything indicating why she did that?

22 A.     I believe she forgot the money -- the buy money.

23 Q.     In the car?

24 A.     Yes.

25 Q.     Okay.  What did she do after that?

Adam Chetwynd                                    13

1    A.      So I observed her go back into the driver side door and

2    then, you know, briefly retrieve something -- appear to

3    retrieve something and then return down the driveway.

4    Q.      At some point did she enter the house?

5    A.      Yes.

6    Q.      All right.  Tell us what you saw and heard on the

7    recording when she was inside?

8    A.      Leading up to this before we had -- myself and TFO Estes

9    had instructed the CS to engage Mr. Folks in conversation as a

10   continuation from their January 12th meeting to see what he --

11   what she could develop or elicit out of him about sending

12   people up to where she lived to sell narcotics.

13   Q.      That was the discussion he had started on January 12th?

14   A.      Correct.

15   Q.      Okay, and what -- were you just instructing her to try

16   to continue that conversation?

17   A.      Yes.

18   Q.      And did she in fact do that?

19   A.      Yes.

20   Q.      What did you hear?

21   A.      The CS advised that it had found a place that might work

22   for Mr. Folks, however, it was kind of out in the country and

23   that if he was to send somebody out there that they couldn't be

24   flashy, and he, Mr. Folks, replied I'll see who I got that fits

25   that type of person.

Adam Chetwynd                              14

1    Q.     Okay.  Did you also hear discussion of the CS requesting

2    to buy heroin on that date?

3    A.     I did.

4    Q.     What did you hear in regard to that?

5    A.     Eventually the CS advised Mr. Folks that she had 900 and

6    asked if he had a sleeve.  I heard Mr. Folks say yeah and he

7    then explained to the CS that he was doing his sleeves

8    differently and that he was now -- he explained that he was

9    putting a bundled quantity -- a bundle into one bag is what he

10   explained.

11   Q.     Okay, and remind us how the suspected narcotics had been

12   packaged in the previous three purchases?

13   A.     In the previous purchases they were in bags wrapped in

14   bundled quantities.  So they were in what they call a bag or a

15   ticket.

16   Q.     And how many tickets were in the bundle?

17   A.     There are 10 bags or tickets in a bundle.

18   Q.     Okay, and this time he was explaining that he put a

19   whole bundle in one bag; is that right?

20   A.     Yes.

21   Q.     All right.  What happened next in the conversation?

22   A.     I heard Mr. Folks utter she needs a sleeve.

23   Q.     Okay.  Could you hear or see who he was talking to?

24   A.     No.

25   Q.     What happened next?

Adam Chetwynd                            15

1    A.      I heard over the radio surveillance had explained that

2    Miss L. had exited the apartment.

3    Q.      Okay.

4    A.      And that she had gone to a silver sedan that was parked

5    in the driveway of 103.

6    Q.      What did you hear after that?

7    A.      I heard surveillance say that now Miss L. returned to

8    the apartment.

9    Q.      Okay, and did you pick up Miss L.'s voice back on the

10   audio recording that you --

11   A.      I heard her voice in there, yeah.

12   Q.      Okay.  What did she say just generally?

13   A.      I think she just called Mr. Folks.

14   Q.      What happened after that?

15   A.      After that I again heard on the -- through the radio

16   surveillance had said now Miss L. and Mr. Folks were outside in

17   the driveway.

18   Q.      And then what happened?

19   A.      Then the two of them returned to the surveillance

20   broadcast that they then returned to the Apartment 2.

21   Q.      Okay, and did either Mr. Folks or Miss L. interact with

22   Michelle that you could hear or see on the recording?

23   A.      Yes.  At that point I heard Miss L. say I only have

24   four.

25   Q.      What happened after that?

Adam Chetwynd                              16

1   A.     There was -- there was a discussion about the money and

2   I heard the CS say so 80 and then I heard the CS say there's

3   three.

4   Q.     Okay.  What did you understand her to mean by 3?

5   A.     I understood that to mean 300.

6   Q.     All right, and what happened after you heard that

7   conversation?

8   A.     I heard the CS ask if Mr. Folks would have any more

9   available and then I heard them say their goodbyes.

10  Q.     And did you pick up Michelle again visually after that?

11  A.     I did.  Surveillance had broadcast over the radio that

12  they had saw the CS exit the apartment, and then shortly after

13  that I picked her up visually on the street where I watched her

14  enter her vehicle.

15  Q.     What did she do when she entered her vehicle that you

16  could see?

17  A.     She traveled to where we had predetermined our after

18  meet location was going to be.

19  Q.     What did you and she do once there?

20  A.     Once there she entered our vehicle, which again was

21  occupied by myself, TFO Estes, and IA Epp, and she surrendered

22  or immediately surrendered these orange colored tied -- elastic

23  band tied bags to TFO Estes.

24  Q.     Okay, and did you see that happen?

25  A.     Yes.

                        Adam Chetwynd                        17

 1  Q.     Did you get a look at those bags?

 2  A.     I did.

 3  Q.     At that time or after?

 4  A.     I did then and I did after following.

 5  Q.     Okay.  What did you see, to the best that you could,

 6  they contained?

 7  A.     They appeared to contain a tan powdery substance.

 8  Q.     What did you do with those baggies or what did TFO Estes

 9  do with those baggies once he received them from Michelle?

10  A.     He maintained custody of those and ultimately gave them

11  to me and then I secured them -- well I took photos of them on

12  a scale at the office and then I processed them and secured

13  them in the DEA drug vault.

14  Q.     Can you take a look at exhibit 21?  Do you recognize

15  what's been marked as Government's 21?

16  A.     I do.  It's a photograph that I took of the purchase

17  from that day on 2/10/16.

18  Q.     Two pages to that one?

19  A.     Yes.

20  Q.     Recognize both of them?

21  A.     Yes.

22  Q.     Of the same thing?

23  A.     Correct.

24  Q.     Do they fairly and accurately depict the way that the

25  suspected narcotics looked on the day that you received them?

Adam Chetwynd                              18

1    A.      Yes.

2              MS. SAVNER:  Government moves to admit exhibit 21.

3              THE COURT:  Any objection?

4              MR. KAPLAN:  No objection.

5              THE COURT:  All right.  So admitted.

6    [Government exhibit 21 admitted]

7              MS. SAVNER:  Permission to publish?

8              THE COURT:  Yes.

9    BY MS. SAVNER:

10   Q.      Can we zoom in?  All right.  So describe what we're

11   seeing here, Agent -- excuse me -- Agent Chetwynd?

12   A.      We're looking at the package that the CS turned over to

13   TFO Estes on 2/10/16.  It's an orange -- appears to be an

14   orange ziploc bag that's wrapped with a rubberband containing

15   what appears to be a tan powdery substance.

16   Q.      Okay, and can we pull up page 2?  Can we zoom in on

17   those?  What have we got here?

18   A.      This is just a picture of -- after I removed the elastic

19   band to spread them out to show there was four of them.

20              MS. SAVNER:  May I approach the witness?

21              THE COURT:  Yes.

22   BY MS. SAVNER:

23   Q.      I hand you what's been marked Government's exhibit 22.

24   Do you recognize that?

25   A.      Yes.

Adam Chetwynd                                    19

1   Q.      What is that?

2   A.      It's one of DEA's substance sealing evidence bags and it

3   is filled out for exhibit 9 which would have been this purchase

4   from February 10, 2016 and it's filled out by myself.  I am --

5   the sealed by has my name and my signature on it dated 2/10/16

6   and witnessed by Rob, TFO Estes, with the same date and his

7   signature.

8   Q.      All right, and it lists you on the sticker there as the

9   one processing or securing the evidence?

10  A.      Yes.

11  Q.      Okay.  Is that top seal still intact?

12  A.      It appears to be.  Yes.

13  Q.      All right, and can you take a look at the contents of it

14  and how do the contents of the bag compare to, for example, the

15  photographs we saw of the evidence when you got it from

16  Michelle?

17  A.      It is not in the same condition that it was sent to the

18  DEA lab in.  This bag inside here it appears that the four

19  orange baggies inside appear to be empty and there appears to

20  be an additional bag inside here that's containing all the

21  brown powder inside.

22  Q.      All right, and are there indications on that bag that it

23  was processed by the DEA drug lab and tested?

24  A.      Yes.  The bottom of the bag has been cut and placed

25  inside with writing and signatures on there, and the bottom

Adam Chetwynd                          20

1    portion of the evidence label on the front has been filled out

2    for the laboratory use only section.

3    Q.    And do you remember who mailed that evidence bag from --

4    took it out of the DEA vault and sent it to the DEA lab?

5    A.    I did.  I do.

6    Q.    Who was that?

7    A.    It was myself.  I mailed it.

8          MS. SAVNER:  Government moves to admit Government's

9    exhibit 22 subject to connection.

10         MR. KAPLAN:  No objection.

11         THE COURT:  All right.  So admitted.

12   [Government exhibit 22 admitted]

13   BY MS. SAVNER:

14   Q.    Is that all the four buys that you did with Michelle for

15   this investigation?

16   A.    It was.

17   Q.    And you've testified that you recognized the voice on

18   the recorded calls to the phone number ending in 4614 as that

19   of Brian Folks and recognized the male you saw and heard on

20   January 12th and February 10th as being Brian Folks.  Do you

21   see that person in the courtroom here today?

22   A.    I do.

23   Q.    And can you identify him by an article of clothing he's

24   wearing or where he's sitting?

25   A.    Yes.  He is located at the defense --

Adam Chetwynd                          21

1              MR. KAPLAN:  We'll stipulate that it's our client.

2              THE COURT:  Okay.  So stipulated.

3              MS. SAVNER:  No further questions at this time.

4              THE COURT:  Okay.  All right.  Cross examination, Mr.

5    Kaplan.

6                         CROSS EXAMINATION

7    BY MR. KAPLAN:

8    Q.     So, Mr. Chetwynd, as I understand it you are the lead

9    agent in this case?

10   A.     Now I am, yes.

11   Q.     Pardon me.

12   A.     I am now.

13   Q.     Who was the lead agent?

14   A.     Well there was two of us.

15   Q.     Okay.  So you're one of them?

16   A.     Yes.

17   Q.     So I was half right?

18   A.     Yes.

19   Q.     And as one of the two lead agents what were your

20   responsibilities and what are your responsibilities in this

21   case?

22   A.     To be abreast of all the aspects of the case.

23   Q.     So that involves reading all of the material in the case

24   to the extent that you can do that?

25   A.     Yes.

Adam Chetwynd                                      22

1   Q.     You read all the police reports?

2   A.     I can't say I have read every police report that is

3   involved in this case.

4   Q.     You made an effort to?

5   A.     I did.  Yes.

6   Q.     Okay, and you were the one that helped organize, for

7   example, the four buys that took place?

8   A.     Yes.

9   Q.     And you understand that the prosecutors in this case

10  subpoenaed quite a few emails from Facebook?

11  A.     Yes.

12  Q.     And you read those?

13  A.     No I haven't read all of those.

14  Q.     You read some of them?

15  A.     A few.

16  Q.     Okay, and you understand they are important because they

17  describe the relationship at one point between our client and

18  the particular witness?

19  A.     Which witness?

20  Q.     For example, Keisha W. emails?

21  A.     I haven't read any of her emails.

22  Q.     Why is that?

23  A.     I haven't.

24  Q.     Did you read any?

25         MS. SAVNER:  Your Honor, objection.  I think the

Adam Chetwynd                              23

1  defense is misstating the evidence.  No emails were ever

2  subpoenaed.

3          MR. KAPLAN:  That's not accurate, Judge.  We have a

4  number of emails from Facebook that the prosecution subpoenaed.

5          THE COURT:  Well I guess my question is how is this

6  relevant to his testimony.  He's testified about these four

7  buys.  How are those emails particularly relevant?

8          MR. KAPLAN:  Because the -- I'm going to get into

9  them later, and you're right it's not a big part of his

10 testimony, but he testified that he's the lead agent, that he

11 makes -- along with another agent that he made the decisions in

12 the case, and I think it's important that the jury understand

13 what it is he based his decisions on, what was the discovery he

14 relied upon in making these decisions.  Whether or not someone

15 like Mandy L. said something to him that he had an opportunity

16 to review opportunities that might say what she was saying was

17 not true or not, and the emails would go to that point.

18         THE COURT:  Do you want to respond to that?

19         MS. SAVNER:  Yes, Your Honor.  I believe that this

20 line of questioning thus far is outside the scope of the direct

21 and the Government has informed defense counsel that it intends

22 to call Special Agent Chetwynd again later in this trial on

23 other matters, and if those matters concern the topics the

24 defense wishes to cross him on at that time, it can do so.

25         THE COURT:  Okay.

Adam Chetwynd                                24

1          MS. SAVNER:  Additionally, you know, this witness I

2     believe will testify that he did not, you know, have a part in

3     deciding which charges to bring or which individuals to name as

4     victims in any sort of official sense.  That it was not part of

5     his case agent obligations.

6          THE COURT:  All right.  So I'm going to sustain the

7     objection.  I think this is beyond the scope of the direct

8     examination if he's going to be testifying later or you can

9     call him as well.

10          MR. KAPLAN:  So I'm going to make sure he's available

11     so we can call him later.

12          THE COURT:  Yes.  As case agent he will be available.

13     BY MR. KAPLAN:

14     Q.     So you testified that you have been involved in hundreds

15     of buys?

16     A.     Yes.

17     Q.     And you've investigated, I'm assuming, over the last 18

18     years dozens of drug cases?

19     A.     I've been employed for 15 years.

20     Q.     15 years, and did you understand the question though?

21     A.     Can you say the first part again?

22     Q.     You have been involved in investigating numerous drug

23     cases?

24     A.     Yes.

25     Q.     I mean dozens of them?  Hundreds of them?

Adam Chetwynd                          25

1   A.     Yes.  That's our job.

2   Q.     Okay, and is it fair to say that you have seen a number

3   of cases where the person selling drugs was far more involved

4   than Mr. Folks was?  Substantially more drugs involved?

5   A.     I don't understand the --

6   Q.     Well you're aware of the fact that Mandy L. met Brian

7   Folks around May 23rd of 2015?

8   A.     I can't recall exactly the date that she met him as I

9   sit here.

10  Q.     Did you read anything to suggest to you when she met

11  him?

12  A.     Have I read anything?

13  Q.     So you're testifying as one of the lead agents in this

14  case and you don't recall when one of the main witnesses in the

15  case met Brian Folks?

16  A.     I mean I know I wrote a report -- an interview of her.

17  Q.     Do you have that with you?

18  A.     I don't.  I would be happy if I could reflect on that.

19  Q.     Is it fair to say, if you think about it, it was around

20  the spring of 2015?

21  A.     That would only be a guess.  Haven't been able to review

22  it.

23  Q.     Do you recall her telling you that she met him at a

24  certain point and it wasn't until three or four months later

25  around November that she realized that Brian Folks was dealing

                    Adam Chetwynd                          26

1   with drugs?

2           MS. SAVNER:  Objection, Your Honor.  Again this is

3   veering outside the scope of the direct.

4           THE COURT:  Objection overruled.  I think this is

5   actually within the scope of the testimony.  Go ahead.

6   BY MR. KAPLAN:

7   Q.    Do you recall that?

8   A.    Vaguely.

9   Q.    Okay.  So what did you do to prepare for today's

10  hearing?  What did you read?

11  A.    I prepared on the controlled purchases.

12  Q.    So you didn't read about any of the witnesses'

13  statements?

14  A.    I have -- I have read the reports, but to sit here and

15  recall off the top of my head from the numerous reports I don't

16  know the exact timing that you're asking for.

17  Q.    Well assuming for a minute that -- and that Mandy L. met

18  Brian Folks around May of 2015 and spent a lot of time with him

19  between then and November of 2015, in fact you know they were

20  living together for a period of time?

21  A.    Yes.

22  Q.    Okay.  Wouldn't you think that if Brian Folks was a big

23  time drug dealer, was dealing a lot of drugs, that Mandy L.

24  would know that?

25          MS. SAVNER:  Objection, Your Honor.  Calls for

Adam Chetwynd                              27

 1  speculation.

 2           THE COURT:  Objection overruled.

 3  BY MR. KAPLAN:

 4  Q.     Wouldn't you think?

 5  A.     Yes.  If someone was daily with a person, they should

 6  know what they are up to.

 7  Q.     But she never told you that, did she?  She never told

 8  you that Brian Folks was dealing in substantial quantities of

 9  drugs?

10  A.     She eventually told us, yes.

11  Q.     But didn't she in fact tell you that she started dealing

12  with him in November of 2015 and it wasn't very long after

13  that, that they started losing their customer base?

14  A.     Again without referring to the report I wouldn't be able

15  to say exactly what was said by Miss L.

16  Q.     Did she tell you by January and February 2016 there were

17  really only one or two customers left?

18  A.     I don't recall that.

19  Q.     Okay.  Why is it that you don't recall that?

20  A.     Again I would have to refer to my report.

21  Q.     Do you have your report?

22  A.     I don't.

23  Q.     Where is your report?

24  A.     I don't know.  I mean I don't have it with me up here on

25  the stand.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Adam Chetwynd                                28

1          MR. KAPLAN:  Do you have a report that he can look

2    at?

3          MS. SAVNER:  Not handy.

4    BY MR. KAPLAN:

5    Q.     Well you -- as I understand it Chrissy T. was CI number

6    one.  I'm sorry.  So CI number one was N.  Right?

7    A.     Correct.

8    Q.     And you instructed her, when she was making these phone

9    calls to our client, that she should ask for a sleeve?

10   A.     Yes.

11   Q.     And how many bags are in a sleeve?

12   A.     A hundred.

13   Q.     And during -- there were four sales, right?  Only four

14   sales?

15   A.     Yes.  You're correct.

16   Q.     You didn't do any more sales than that?

17   A.     Four using Michelle.

18   Q.     By the way besides Michelle, who apparently was one of

19   Mandy L.'s customers based on you paying her, who else was a

20   customer of Brian Folks?

21   A.     A customer?

22   Q.     Yes.

23   A.     That we know of?

24   Q.     Yes.

25   A.     I mean I'm only -- I can report what the other witnesses

Adam Chetwynd                                    29

1    had said from interviewing them.

2    Q.      So do you have any firsthand knowledge of who he was

3    selling to?

4    A.      No.

5    Q.      Do you have any firsthand knowledge of who Mandy L. was

6    selling to other than your paid informant?

7    A.      No.

8    Q.      And you paid her $500 for each sale?

9    A.      I believe it was either $500 or $600.

10   Q.      In fact, you paid her $500 for making two phone calls

11   when the deal never went through?

12   A.      I believe she was paid for her service -- for services,

13   yes.

14   Q.      Okay, and you don't know of any other customers that

15   Brian Folks had other than your paid informant?

16   A.      Correct.

17   Q.      And don't you think if Brian Folks was a drug dealer, a

18   significant drug dealer, and you were investigating him with

19   your experience and all the people apparently you had doing

20   surveillance and sitting outside his house all hours of the day

21   that you would know someone else he was selling to?

22   A.      We didn't -- on the dates that we were there we didn't

23   see any of that activity, no.

24   Q.      But those weren't the only dates -- okay.  Let me back

25   up.  So the dates that you were there how many -- however many

Adam Chetwynd                                30

1    times that was you didn't see a lot of drug activity?

2    A.      Surveillance was some individuals coming and going, but

3    you know we didn't see, you know, there might have been a time

4    when we saw Mandy or another female go meet somebody, but to

5    answer your question with Mr. Folks, no.

6    Q.      So N. asked for a sleeve which you said is a hundred

7    bags?

8    A.      Yes.

9    Q.      And she didn't get a hundred bags when she went into the

10   apartment on January 12th to complete the drug deal with Mandy

11   L., did she?

12   A.      No she did not.

13   Q.      She got half that -- half that plus five bags?

14   A.      Five, yes.

15   Q.      And why do you think that is?

16   A.      I don't know.

17   Q.      Wouldn't it make sense if she only got half because

18   that's all he had?

19   A.      I can't answer that question.

20   Q.      Well every time you sent your paid informant in to buy

21   drugs you instructed her to ask for a sleeve and she never got

22   a sleeve, did she?

23   A.      That's correct.

24   Q.      And in fact the last time Brian said he didn't have any

25   drugs left; that was the March 10th deal?

Adam Chetwynd                              31

1   A.      February 10th.

2   Q.      February 10th.  Right?

3   A.      That's correct.

4   Q.      And he said he would see if he could get some; is that

5   right?

6   A.      No.  I mean he said she needs a sleeve.

7   Q.      He said he didn't have any drugs?

8   A.      He didn't say that.  He said she needs a sleeve and

9   then, as I testified to, the activities had happened after that

10  comment.

11  Q.      Let me show you what's been marked as defendant's K35

12  and a little embarrassing to say this is defendant's ZZ7.  Will

13  you look at those two documents please?  Do you recognize those

14  two reports?

15  A.      Just going to take a second to -- just let me take a

16  second to read.

17  Q.      Sure.  So you have had a chance to read those?

18  A.      Uh-huh.

19  Q.      Will you tell the jury please what's going on.  You were

20  involved in those reports, as I understand it, one way or

21  another?

22  A.      Yes.

23  Q.      Could you tell the jury please what's going on in those

24  reports?

25  A.      It appears in one report --

Adam Chetwynd                                      32

1    Q.      You say it appears.  That's what happened, right?  Who

2    wrote the report?

3    A.      Yes.  We met with a person who we were trying to get

4    back in to Mr. Folks.

5    Q.      That would have been N.?

6    A.      I believe so.  I'm just trying -- I'm not sure on the

7    number.

8    Q.      Is it fair to say --

9    A.      CS number.

10   Q.      Is it fair to say that on March 9th you had the CI call

11   Mr. Folks trying to arrange a drug deal and you cancelled it on

12   the 10th because he said he didn't have any drugs?

13   A.      Yes.  Yes that's what it says.

14   Q.      Thank you.  So my question to you is does that strike

15   you as someone who's a big time drug dealer that doesn't have

16   any drugs?

17   A.      That would just be speculation.  I mean people go in ups

18   and downs.  I mean there's many reasons why someone doesn't

19   have drugs available.

20   Q.      But in all the four buys that you did there was

21   significantly small quantities?

22   A.      That's what we purchased, yes.

23   Q.      And you weren't able to purchase any larger quantities

24   because every time someone said they didn't have them?

25   A.      That's correct.

Adam Chetwynd                           33

1   Q.      And you have been involved in cases where maybe a drug

2   dealer doesn't have a particular quantity because they all go

3   out and get it for you and come back with a kilo or whatever.

4   You have seen that happen?

5   A.      I have seen that.

6   Q.      But that didn't happen in this case?

7   A.      Not in this case.

8   Q.      Okay.  Is it fair to say that by the time you did the

9   four controlled buys that McFarlan and Brian Folks were not

10  working together if they ever did?

11  A.      We didn't see him again after the 12th.

12  Q.      Didn't Mary P. tell you they had split up?

13  A.      Some of the people we interviewed indicated that he

14  wasn't coming up here any more.

15  Q.      So are you aware of the fact that on January 12th, 2016

16  when N. was doing an undercover buy with Mandy L. in Burlington

17  that Chrissy T. did one, an undercover buy, with McFarlan in

18  Winooski?

19  A.      On January 12th, correct.

20  Q.      That was a completely separate deal?

21  A.      Yes.

22  Q.      And you have nothing to suggest that either one of those

23  deals were connected to each other?

24  A.      Well the vehicle Mr. McFarlan was in that did the deal

25  with Chrissy arrived up -- arrived at the residence while we

                    Adam Chetwynd                    34

1   were doing our deal with Mr. Folks.

2   Q.    And so if you saw that and you were hearing -- at that

3   point when the vehicle arrived Mr. Folks was in the vehicle

4   with Chrissy, right, T.?

5   A.    No not with Chrissy T.

6   Q.    With N.?

7   A.    With Michelle, yes.

8          MS. SAVNER:  Your Honor, may we approach?

9          THE COURT:  All right.  We'll turn on the husher.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Adam Chetwynd                                      35

1    [Bench Conference]

2            MS. SAVNER:  Your Honor has permitted the CS in this

3    case to go solely by her first name and her last initial for

4    security reasons and defense counsel has repeatedly referred to

5    her last name.

6            MR. KAPLAN:  I didn't realize that.  I thought it was

7    just the women --

8            THE COURT:  I think all of the women.

9            MS. SAVNER:  It was part of Government's --

10           THE COURT:  So can we make sure?

11           MR. KAPLAN:  Yes.

12   [End of bench conference].

13

14

15

16

17

18

19

20

21

22

23

24

25

Adam Chetwynd                          36

 1  BY MR. KAPLAN:

 2  Q.      So when Michelle was doing that January 12th sale and

 3  she went to the apartment Mandy L. was there?

 4  A.      Yes.

 5  Q.      Before that she was in her vehicle outside and Brian

 6  Folks got into the car with her?

 7  A.      Correct.

 8  Q.      And you heard Brian -- and then Brian Folks saw McFarlan

 9  drive up in the car you were just speaking about?

10  A.      Well I heard a reference.

11  Q.      Okay, and the reference was that McFarlan's going into

12  the wrong apartment, but he didn't know where Brian was living?

13  A.      That's what I interpreted it to mean.

14  Q.      Does that strike you Brian and McFarlan were close when

15  McFarlan didn't even know where Brian was living -- which

16  apartment?

17  A.      No.

18  Q.      Do you recall that one night Chrissy called you and said

19  McFarlan had asked her to come out to Cottage Grove and help

20  bag a shipment of drugs?

21  A.      She didn't call me personally, no.

22  Q.      Who did she call?

23  A.      She called Chris May.

24  Q.      So you're aware of that conversation?

25  A.      I'm aware that that happened, yes.

Adam Chetwynd                                    37

1  Q.     And you're aware that she said those drugs belonged to

2  McFarlan not to Brian Folks?

3  A.     That's what she said, yes.

4  Q.     And you're aware that she said McFarlan brought up

5  people from New York, a couple of women and some other people,

6  to help him bag?

7  A.     Yes.

8  Q.     And I guess it was Detective May who told her that she

9  should not do that -- that she's not authorized to do that?

10  A.     Correct.

11  Q.     And why is that?  Why wasn't she authorized to do that?

12        MS. SAVNER:  Your Honor, again I believe we're

13  veering off the scope of direct.

14        THE COURT:  What is the relevance of that to the

15  subject matter?

16        MR. KAPLAN:  It has to do with the relationship

17  between McFarlan and my client and whether or not he was

18  dealing drugs and involved in a major conspiracy, and this is

19  the lead agent in the case who dealt with the drug conspiracy.

20        MS. SAVNER:  And the defense has referenced numerous

21  witnesses who are on the Government's witness list who will

22  testify about that relationship from their firsthand knowledge

23  not secondhand as Special Agent Chetwynd is being forced to do.

24        THE COURT:  I will give you some leeway here, but in

25  light of the fact that various other witnesses will be

Adam Chetwynd                                    38

1    testifying that have direct knowledge as opposed to the Agent,

2    I would ask that you be brief.

3              MR. KAPLAN:   Okay.

4    BY MR. KAPLAN:

5    Q.    So why is it, based on your experience, that you would

6    tell someone don't go help bag unless you know the whole deal

7    is set up?  Is it because you don't want to be putting drugs on

8    the street?

9    A.    It's because it wouldn't -- we weren't there to -- to,

10   you know, to observe this and we didn't want her doing an

11   illegal thing without our permission.

12   Q.    But she did it anyway?

13   A.    She did.

14   Q.    And you found out not only did she do it, but she was

15   paid drugs?

16   A.    Yes.

17   Q.    So while she was working for you she went and committed

18   an illegal act, got paid in drugs, and then used the drugs as

19   far as you know?

20   A.    I'm not aware about using the drugs.  I do know that she

21   was paid in drugs.

22   Q.    Well you do know that -- were you involved in searching

23   her apartment with respect to the cereal box?

24   A.    I was not.

25   Q.    Were you aware of the fact that drugs were -- for her

Adam Chetwynd                          39

1   own personal use were found in the apartment?

2   A.      I am.

3   Q.      And was that not a breach of her agreement with you?

4   A.      It wasn't an agreement with us.  She was working for

5   Essex PD.

6   Q.      And she signed an agreement with them?

7   A.      Yes.

8   Q.      And are you familiar with the terms of the confidential

9   informant agreement that Essex uses?

10  A.      Not their verbiage, but I know from our verbiage that

11  using drugs is against the contract.

12  Q.      So you -- well Michelle signed a federal cooperation

13  agreement, right?

14  A.      Correct.

15  Q.      And tell the jury please what the terms of that are in

16  terms of committing other crimes, being involved in something

17  that's not authorized; that's what it says, right?

18  A.      Verbatim -- I mean there are many things on there, yes,

19  but you are not to commit any crimes while you are working for

20  the Government.

21          MR. KAPLAN:  So could I have a moment, Judge?

22          THE COURT:  Yes.

23  BY MR. KAPLAN:

24  Q.      So as I understand your testimony there's no question

25  that Chrissy violated her agreement with the Essex Police

Adam Chetwynd                          40

1   Department at least in your opinion?

2   A.     On that incident, yes.

3   Q.     Well more than one incident.  She went and bagged when

4   she wasn't supposed to, when she used drugs, and when you found

5   drugs in her apartment, right?  Those are all violations, are

6   they not?

7   A.     Yes.

8   Q.     And what -- I would be interested in knowing what

9   consequences did she suffer from doing that?  At this point you

10  now knew she was using drugs while she was working for you?

11  A.     I didn't partake in any disciplinary actions with her.

12  Again she was an Essex Police informant.

13  Q.     Well you said that at the beginning that you're familiar

14  with police reports in this case -- the important ones?

15  A.     There are many police reports in this investigation.

16  Q.     Are you aware of any report that indicates she was

17  disciplined in any way?

18  A.     Again I don't recall one off the top of my head.

19  Q.     Wouldn't you know if she was, being one of the two lead

20  agents?

21  A.     If it was -- if it was relayed to me, yes.

22  Q.     And so even though she was using drugs, even though she

23  went and helped bag drugs and helped put drugs back on the

24  street, she didn't suffer any consequences of that?

25  A.     Not that I'm aware of.

Adam Chetwynd                                    41

1   Q.     You knew before she was even working for you that she

2   was really heavily involved with McFarlan and dealing with

3   drugs?

4   A.     I knew that she had -- was working for both of them.

5   She had mentioned both of them.

6   Q.     And was she ever charged with drug dealing?

7   A.     No.

8   Q.     Why not?

9   A.     I don't know.

10          MS. SAVNER:  Your Honor, at this point I feel like we

11   have gone beyond the summary.

12          THE COURT:  I agree.  So objection sustained.  Can we

13   move on to testimony in regard to what he offered in his direct

14   examination at this point?

15   BY MR. KAPLAN:

16   Q.     So the four buys that you are involved in Mandy L. was

17   involved in?

18   A.     Yes.

19   Q.     And you got to observe her at least from a distance?

20   A.     Yes.

21   Q.     And you heard her talking over the wire?

22   A.     Yes.

23   Q.     And are you aware of the fact that Mandy L. did not use

24   drugs?

25   A.     Yes.

Adam Chetwynd                          42

1  Q.     And did you see any evidence at all that she was

2  involved in this but didn't want to be?

3  A.     No.

4  Q.     It's fair to say that she was really knowledgeable about

5  distributing drugs about the cost, the weights, things like

6  that, how much a sleeve -- what's involved in a sleeve?

7  A.     No.

8  Q.     That's not fair to say?

9  A.     On most of the deals she had had the price wrong and

10 asked for a calculator.  You know different things to indicate

11 to us she really didn't know the ins and outs of the trade as a

12 seasoned distributor.

13 Q.     She had only been doing it for a short time?

14 A.     I don't know.

15 Q.     Is that something you should know?

16 A.     I'm just relaying what I heard during the four buys.

17         MR. KAPLAN:  Can I have a moment, Judge?

18         THE COURT:  Yes.

19 BY MR. KAPLAN:

20 Q.     Just one last question, Mr. Chetwynd.  When we talked

21 about that March 9th-March 10th attempted buy that didn't take

22 place -- do you recall that?

23 A.     Yes.

24 Q.     Do you recall Brian Folks saying that he would try and

25 find some someplace else?

Adam Chetwynd                              43

1    A.     I remember seeing that, yes.

2              MR. KAPLAN:  I have nothing further, Your Honor.

3              THE COURT:  Okay.  Any redirect?

4              MS. SAVNER:  Yes, Your Honor.

5              MR. KAPLAN:  Actually, Judge, I do have one question.

6              THE COURT:  Okay.

7    BY MR. KAPLAN:

8    Q.     Sorry.  You testified about -- did you testify about the

9    cereal box?

10   A.     I did not.

11   Q.     All right.  I have nothing further, Judge.

12             THE COURT:  Okay.  All right.  Redirect.

13                        REDIRECT EXAMINATION

14   BY MS. SAVNER:

15   Q.     Defense counsel asked you many questions about a woman

16   named Chrissy who you have testified was signed up as an Essex

17   PD CS.  Do you remember those questions?

18   A.     Yes.

19   Q.     Is that a different person than the CS used to conduct

20   the four controlled purchases that you and I discussed?

21   A.     She is.

22   Q.     Okay, and Michelle, the one who did conduct the

23   controlled purchases that we discussed, she was operating under

24   an agreement with the DEA, correct?

25   A.     Yes.

Adam Chetwynd                            44

1  Q.     All right, and can you just generally explain the terms
2  of that agreement?
3  A.     Again there's numerous things on there, but they are not
4  to engage in any illegal activity, and if they do engage in
5  illegal activity, they were supposed to report it to us.
6  Q.     Okay, and during the time period that Michelle was doing
7  the buys that you and I discussed between January 2016 and
8  February 2016 are you aware of Michelle engaging in any conduct
9  that would violate her CS agreement at the time?
10 A.     No.
11 Q.     Did you see her do anything either prohibited or not
12 recommended in terms of the procedures of the buy on each of
13 those four occasions?
14 A.     No.
15 Q.     And on each of the four occasions of those drug buys;
16 January 6th, January 12th, January 22nd, and February 10th, who
17 did Michelle contact to set up the buys to buy heroin?
18 A.     Mr. Folks.
19 Q.     Okay, and who did she meet with on each of those buys?
20 A.     Mandy L., but on two of them she met with Mr. Folks.
21 Q.     And after each of those buys did Michelle surrender some
22 quantity of heroin to the DEA?
23 A.     Yes she did.
24 Q.     You mentioned that you had surveillance up on 103 North
25 Union for at least some of the buys; is that right?

Adam Chetwynd                                45

1   A.      Correct.

2   Q.      Okay, and you had a chance to review that?

3   A.      Yes.

4   Q.      All right, and what did you see in that surveillance in

5   terms of people coming and going from the house?

6   A.      Again there were individuals that did come and go.

7   Q.      Okay, and for -- did you see, you know, how long a time

8   they would spend in the house?

9   A.      I don't remember.

10  Q.      What did those comings and goings indicate to you?

11          MR. KAPLAN:  Objection, Your Honor.  Speculative.

12  There's no basis.

13          THE COURT:  Objection overruled.  You can answer

14  that.

15  A.      There were a lot of people visiting the apartment.  I

16  mean activity.

17  Q.      From your work as a case agent on this case you were

18  asked about whether you were aware of any customers of Brian

19  Folks.  Are you aware of Brian Folks selling drugs to Keisha

20  W.?

21  A.      Yes.

22  Q.      Are you aware of him selling drugs to Danielle M.?

23  A.      Yes.

24  Q.      Are you aware of him selling drugs to Ayla L.?

25  A.      Yes.

                        Adam Chetwynd                        46

 1   Q.      Are you aware of him selling drugs to Katelynn C.?

 2   A.      Yes.

 3   Q.      Are you aware of him selling drugs to Lori C.?

 4   A.      Yes.

 5   Q.      Mary P.?

 6   A.      Yes.

 7              MS. SAVNER:  Thank you.  Nothing further.

 8              THE COURT:  Okay.  All right.  Mr. Kaplan.

 9                        RECROSS EXAMINATION

10   BY MR. KAPLAN:

11   Q.      I meant to ask you who was the other lead agent with you

12   on the case?

13   A.      TFO Rob Estes.

14   Q.      Okay.  So do you know that Chrissy was paid over $5,000

15   by the DEA as of April 2018?

16   A.      I am not.

17   Q.      Do you know how much she was paid either by Essex or

18   yourself?

19   A.      I do not.

20   Q.      Why don't you?

21   A.      I don't know the admin portion of that.

22   Q.      Who gave her the money actually?  Who would hand it to

23   her?

24   A.      I don't know.

25   Q.      So other than the prosecution's witnesses who are going

Adam Chetwynd                              47

1  to testify they worked with Brian Folks as prostitutes and

2  Michelle, you don't know of any other customers?

3  A.     No.

4            MR. KAPLAN:  I have nothing further, Your Honor.

5            THE COURT:  Okay.  All right.  Thank you, Agent, and

6  Government want to call the next witness.

7            MS. SAVNER:  Yes, Your Honor.  The Government calls

8  Michelle N.

9            DEPUTY CLERK:  Please come forward, ma'am, to be

10  sworn.

11  MICHELLE N.,

12       Having been duly sworn, testified as follows:

13            THE COURT:  Good morning.

14            MS. NADEAU:  Good morning.

15                      DIRECT EXAMINATION

16  BY MS. SAVNER:

17  Q.     Good morning.

18  A.     Good morning.

19  Q.     Can you please state your first name and just your last

20  initial for the Court?

21  A.     Michelle W.

22  Q.     Okay.  Did you previously go by a last name starting

23  with N?

24  A.     Yes.

25  Q.     And are you familiar with a person named Brian Folks?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Michelle N.                          48

1   A.      Yes.

2   Q.      How is that?  How do you know him?

3   A.      I bought drugs off him.

4   Q.      In what context?

5   A.      Through the DEA.

6   Q.      I'm going to ask you to speak up a little bit.

7           THE COURT:  I wonder if you could actually move up a

8   little bit.  Move the microphone in front of you so people can

9   hear you.

10  A.      There.

11  Q.      Explain again for us how you're familiar with Brian

12  Folks.

13  A.      Through the DEA.

14  Q.      Explain how -- what your involvement was with him.

15  A.      I bought drugs off him for the DEA.

16  Q.      Okay.  Controlled purchases?

17  A.      Yes.

18  Q.      All right.  How long have you worked for the DEA as a

19  confidential source?  When did you start?

20  A.      10 years ago.

21  Q.      Okay.  Have you worked as a CS with other agencies as

22  well?

23  A.      Yes.

24  Q.      Which ones?

25  A.      Essex.

Michelle N.                                    49

1   Q.      Essex Police Department?

2   A.      Yes.

3   Q.      And how many different investigations would you say you

4   have worked on?

5   A.      There's been a few.  I don't know the number.

6   Q.      How many controlled purchases have you been involved in

7   as the source -- confidential source?

8   A.      For this case?

9   Q.      Well how many for this case?

10  A.      Four.

11  Q.      Okay, and do you remember how many for other cases?

12  A.      No.

13  Q.      Was it many?

14  A.      There's been many.

15  Q.      Okay.  How does or how did the DEA compensate you for

16  your time and work?

17  A.      Money.

18  Q.      And how much did you receive for each of the buys that

19  you conducted as part of this investigation if you remember?

20  A.      A few hundred.

21  Q.      Were you receiving any other benefit from the

22  Government?

23  A.      No.

24  Q.      And have you done any work as a confidential source

25  doing these kind of drugs buys over the last couple of years?

                    Michelle N.                    50

1    A.      Not recently, no.

2    Q.      Are you employed currently?

3    A.      Yes.

4    Q.      Full time?  Part-time?

5    A.      Full time.

6    Q.      And you don't have to tell us exactly the place, but

7    what type of place do you work in?  What kind of industry?

8    A.      Retail.  Retail.

9    Q.      How long have you had your current job?

10   A.      It will be five years.

11   Q.      So why were you doing the work on the Brian Folks

12   investigation that you did?

13   A.      Extra money.

14   Q.      Did you know or know of Brian Folks before this

15   investigation?

16   A.      No.

17   Q.      And you have mentioned that you did four controlled

18   purchases from him?

19   A.      Yes.

20   Q.      What were you supposed to be buying on each occasion?

21   A.      Heroin.

22   Q.      Do you remember how much?

23   A.      I was supposed to get a sleeve which is a hundred bags.

24   Q.      And did you get suspected narcotics on each of those

25   four occasions?

Michelle N.                           51

1    A.    Yes.

2    Q.    So explain -- explain to us how it worked when the DEA

3    would contact you and say hey we want you to go be part of this

4    controlled purchase.

5    A.    I would meet up with them at a store, certain spot, and

6    we would put in a phone call to set up to meet him.  Then they

7    would search my car, search me, search my purse to make sure I

8    didn't have anything on me.  I would go down and meet him and

9    come -- we would have a setup spot afterward.  After meeting

10   him I would go back and hand over the drugs.  They would search

11   the car, search me, search my purse.  Sorry.  Before that they

12   would put recording devices on me to meet him and come back and

13   they would turn them off and then search me.

14   Q.    Did you get instructions from the DEA agents before you

15   went out or just generally about what to do and what not to do?

16   A.    Yes.

17   Q.    What -- do you remember some of those?

18   A.    Well they told me not to go in the house because they

19   were -- they could see me.  Obviously not touch the drugs and

20   each time we would have a setup spot so each time I knew where

21   I was going.

22   Q.    And you said one of the rules was don't go inside.  If

23   you were asked to go inside, was there a procedure you were

24   supposed to follow?

25   A.    There's a certain word I would say if I felt I was in

Michelle N.                                    52

1    trouble.

2    Q.      A safe word?

3    A.      A safe word.

4    Q.      All right.  When you were out on these buys did you use

5    your real name?

6    A.      No.

7    Q.      What name did you use?

8    A.      Nikki.

9    Q.      Why did you not use your real name?

10   A.      I didn't want him to know me.

11   Q.      Why?

12   A.      I didn't feel safe with him knowing me.

13   Q.      All right.  I want to talk to you about the first buy on

14   January 6, 2016.  Do you remember how you first got in touch

15   with the defendant?

16   A.      Yes.  Another -- a guy named Rome put me in contact with

17   him.

18   Q.      Okay.  Did you yourself talk to Rome?

19   A.      No.

20   Q.      Okay.  That was the story?

21   A.      Yes.

22   Q.      Okay.  All right.  How did that first communication

23   between you and Mr. Folks happen?

24   A.      I called him and he didn't answer and then he ended up

25   calling me back.

Michelle N.                                53

1   Q.      And at some point did he tell you where you could go to

2   purchase drugs?

3   A.      Yes.

4   Q.      All right, and do you remember where that was?

5   A.      It was in Burlington.  I don't remember the name of the

6   street.

7   Q.      Okay, and did you go to that spot?

8   A.      Yup.

9   Q.      All right, and before you went did the DEA agents follow

10  the procedures that you talked about to set you up?

11  A.      Yes.  Yup.

12  Q.      All right.  What happened when that -- on that first buy

13  when you got to the spot?

14  A.      He sent out Mandy.  I didn't meet him.  He sent out

15  somebody else to sell his drugs.

16  Q.      And had he told you in advance he was going to do that?

17  A.      Yes.  There was a three way phone call.

18  Q.      Do you remember what happened on that phone call?

19  A.      Yup.  He told me to hold on, and he like did the three

20  way to Mandy, and Mandy got on the phone and he told me where

21  to go and meet her and she got in my car.

22  Q.      Had you interacted with Mandy before this?

23  A.      No.

24  Q.      So you only know it was Mandy now after the fact?

25  A.      Right.

                    Michelle N.                        54

1   Q.     You had an audio recorder when you were -- with you,

2   correct?

3   A.     Yes.

4   Q.     Can we play -- permission to publish what's been marked

5   as 3C which is a clip from about 14 minutes 18 seconds along

6   with the transcript?

7               THE COURT:  Okay.

8   {Exhibit 3C published}

9   BY MS. SAVNER:

10  Q.     Okay, and on that segment the woman who identifies

11  herself as Mandy says make sure there's six and a half there.

12  What was she referring to?

13  A.     Bundles of heroin.

14  Q.     What did she give you?

15  A.     Six and a half bundles.

16  Q.     Can we pull up exhibit 5 please?  Is that consistent

17  with what Mandy gave you that day?

18  A.     Yes.

19  Q.     Can you pull up exhibit 48A?  Who is that?

20  A.     Mandy.

21  Q.     That's the person you met with in the car whose voice we

22  just heard?

23  A.     Yes.

24  Q.     What did you do with the bundles of heroin that Mandy

25  gave you once you received them?

                    Michelle N.                        55

1    A.      I put them in my purse and drove to meet at our spot the

2    DEA.

3    Q.      Okay, and after that what did you do with them?

4    A.      Handed them over.

5    Q.      Okay.  Let's move to the second buy January 12th.  Do

6    you remember going to that same location on that date for that

7    buy?

8    A.      Yup.  The same house.

9    Q.      Okay, and what happened when you got there?

10   A.      He got into -- I met Moe.  He got into my car and we

11   talked.

12   Q.      Okay, and had you met him before?

13   A.      Never.

14   Q.      Can we pull up 8G please?  All right.  What are we

15   looking at here?

16   A.      Passenger seat.  Moe is in my passenger seat.  My car.

17   Q.      Do you know how this image was created?

18   A.      Through my video.

19   Q.      You were carrying a video recording device that day?

20   A.      Yes.  Yes.

21   Q.      Okay, and who is the gentleman we see?

22   A.      Moe.  Brian.

23   Q.      And that's a photograph from inside your car that day?

24   A.      Yes.

25   Q.      Can we go to the second page?  Can we zoom in?  Who is

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

Michelle N.                         56

1   that?

2   A.      Moe.

3   Q.      Can we play, please, 8A?

4   [Exhibit 8A published]

5   BY MS. SAVNER:

6   Q.      Okay.  So it looked like the sound in the video got a

7   little out of sync there in the end.

8   A.      Yup.

9   Q.      But you asked -- you told Moe or Brian Folks that you

10  needed a sleeve; is that right?

11  A.      Yes.

12  Q.      And did he tell you that he didn't have a sleeve's worth

13  of heroin?

14  A.      Yes.  Well he needed -- he didn't have any bags.  He

15  needed to bag it up.

16  Q.      Okay.  So what was he missing, the heroin or the bags?

17  A.      Bags.

18  Q.      And did he offer that you could stick around until he

19  could get the bags and bag it up?

20  A.      Yes.

21  Q.      All right.  We saw him get out of the car.  Did you see

22  what prompted him to get out of the car?

23  A.      There was two other men walking up, one in a big fur

24  coat, and said they were walking the wrong direction to the

25  wrong apartment.

Capitol Court Reporters, Inc. (800/802) 863-6067

                    Michelle N.                           57

1   Q.      Did you recognize either of those two men?

2   A.      No.

3   Q.      Did you see what happened after he got out of the car?

4   A.      I just saw him go up and speak to them.

5   Q.      At some point did he get back in your car?

6   A.      Yes.

7   Q.      All right.  Can we play 3C please?

8   [Exhibit 3C published]

9   BY MS. SAVNER:

10  Q.      All right.  So at the beginning of that he mentioned

11  that you can take whatever he's got inside the house because he

12  says I leave stuff with these girls in here?

13  A.      Yup.

14  Q.      Okay, and did you eventually meet up with a girl inside

15  the house --

16  A.      Yes.

17  Q.      -- who provided you the drugs?

18  A.      Yes.

19  Q.      And who was that?

20  A.      Mandy.

21  Q.      All right, and he says whatever he's got you're welcome

22  to grab?

23  A.      Yeah.

24  Q.      All right, and then he starts asking you about your boy

25  was talking to me about coming up and making some money up

            Capitol Court Reporters, Inc. (800/802) 863-6067

Michelle N.                             58

1    there with you.  Did you know what he was talking about at the

2    time?

3    A.    I have no clue.  I was lost.

4    Q.    Did you eventually figure it out?

5    A.    Way -- yeah.

6    Q.    What did you eventually understand he was talking about?

7    A.    He wanted to set two people up --

8            MS. SEN:  Objection, Your Honor.  I don't think

9    there's any foundation laid for this witness to talk about at

10   this point.

11           THE COURT:  I'm sorry.

12           MS. SEN:  Lacking in foundation, Your Honor.

13           THE COURT:  Why?  What's your argument?

14           MS. SEN:  Because she didn't know about it at the

15   time.  She only learned about it later, Your Honor.

16           THE COURT:  But then she can testify to her knowledge

17   later and then the basis of that.  So objection overruled.  You

18   can answer the question and perhaps you should lay a foundation

19   as to how she concluded exactly what she's testifying to.

20           MS. SAVNER:  Yes, Your Honor.

21   BY MS. SAVNER:

22   Q.    After the part in this video after we paused it did he

23   continue to talk about what his plans were?

24   A.    Yes.

25   Q.    And did you have a conversation about what his plans

Michelle N.                                    59

1  were on a subsequent interaction when you talked to him in

2  person?

3  A.    Yes.

4  Q.    Okay.  So tell us what you came to understand about what

5  he was proposing?

6  A.    He wanted to set his -- two of his guys up at my

7  brother's place or an apartment of mine and sell drugs up there

8  and I would get a cut of the money and we would all make money.

9  Q.    Okay, and whose idea was this, yours or his?

10 A.    His.

11 Q.    Can we keep playing?

12 [Exhibit 3C published]

13 BY MS. SAVNER:

14 Q.    All right.  So he said a few seconds ago that -- I

15 believe he was referring to Rome and tell me if that's not your

16 understanding, came and met up with him at one of his other

17 traps.  Did you hear that?

18 A.    Yes.

19 Q.    Okay, and then he says his plan is to send one, maybe

20 two, of my peoples up towards with you.  You set them up, get

21 them weight, and then I make money and you get broke off?

22 A.    Yup.

23 Q.    What did you understand that to mean?

24 A.    To bring people to the place he could sell more drugs

25 and I would get money for bringing the people up there.

                    Michelle N.                        60

1    Q.     You can keep going.

2    [Exhibit 3C published]

3    BY MS. SAVNER:

4    Q.     All right.  He just said what I just did for you 75 a

5    joint is what I do for everybody.  What did you understand him

6    to be referring to?

7    A.     Heroin.

8    Q.     And when he said the 75 a joint I just did for you?

9    A.     Yeah he's talking about how much he sells his heroin for

10   and that I can sell it at a higher price and make my own money.

11   He doesn't care.  He's like giving me a deal.

12   Q.     And did you specifically understand him to be referring

13   to the last time you bought drugs through his people?

14   A.     Yes.

15   Q.     How much did you buy the drugs for on that first

16   occasion?

17   A.     75.

18   [Exhibit 3C published]

19   BY MS. SAVNER:

20   Q.     All right.  He says he has some dudes that are just

21   sitting around doing nothing that he really wants to get out of

22   his face like my brother.  Did you understand the person he was

23   referring to?

24   A.     The guy in the fur coat.

25   Q.     And how did you understand that?

Michelle N.                          61

1    A.     I think because when he first got out of the car when he

2    first got there these two idiots he pointed, and then when he

3    was talking again about it he referred to them these two idiots

4    that are in the house.

5    Q.     All right, and he was saying that his brother, this

6    person in the fur coat, is someone who he might send up?

7    A.     To go stay at the house and sell drugs to give him work

8    to do.

9    Q.     I'm sorry.

10   A.     To give them work to do because they are not doing

11   anything.  He wants to get them out of his face and do

12   something.

13   [Exhibit 3C published]

14   BY MS. SAVNER:

15   Q.     Okay.  You said I got to make a call real quick?

16   A.     Yes.

17   Q.     Who did you call?

18   A.     The DEA.

19   Q.     Why?

20   A.     To let them know that he wanted me to go inside to ask

21   if it's okay and if it's safe for me to go.

22   Q.     And what did they tell you?

23   A.     They -- they asked me if I felt comfortable I can.  They

24   told me -- provided me with a safe word and if anything happens

25   say that word and they would be there in a second.

Michelle N.                                    62

1            THE COURT:  All right.  It's just a little bit past

2    10:30.  So let's take our 15-minute recess and be back when

3    that's complete.

4    [Recess 10:32 - 10:52 a.m.]

5    BY MS. SAVNER:

6    Q.    So we had just talked about how you placed a phone call

7    back to DEA to ask if it was okay for you to go inside the

8    house.  Do you remember that?

9    A.    Yes.

10   Q.    All right.  What happened after that phone call?

11   A.    They gave me the okay to go in and so I went and met Moe

12   in the driveway and followed him to the house.

13   Q.    Okay.  So describe what the house looked like when you

14   got inside?

15   A.    You walk on a porch.  You walk inside this small room.

16   To the right is the small kitchen and a bathroom and then to

17   the left is the bedroom.

18   Q.    Did you see anyone inside the house when you went in?

19   A.    Yes.  There was Mandy and the two guys I saw in the

20   street that he went and talked to the guy with the fur coat.

21   Q.    What were they doing?

22   A.    They were smoking weed hanging out.

23   Q.    All right.  Where did you go once you were inside?

24   A.    They brought me into the bedroom.

25   Q.    Were you still video recording?  You brought your

                     Michelle N.                          63

1    recording device inside?

2    A.      Yup.

3    Q.      Can we play 8B please?

4    [Exhibit 8B published]

5    BY MS. SAVNER:

6    Q.      All right.  So where was the video recorder at this

7    time?

8    A.      I put it on the bed -- put it down.

9    Q.      All right, and who do you see in this image?

10   A.      That's me.

11   Q.      Keep going.

12   [Exhibit 8B published]

13   BY MS. SAVNER:

14   Q.      Can we pause there?  So Mandy says I have to go in the

15   kitchen to get them.  Did you see who she was talking to?

16   A.      Moe.

17   Q.      Did you hear what he said?

18   A.      So go get them.

19   Q.      Did you see what was going on between where you were in

20   the bedroom with Mandy and the kitchen?

21   A.      She was going -- I can -- I don't remember.

22   Q.      Okay.  You can continue playing.

23   [Exhibit 8B published]

24   BY MS. SAVNER:

25   Q.      All right.  So Mandy comes back in the room and she says

Michelle N.                        64

1    I have five?

2    A.      She thought she only had four and she shut the door and

3    then looked around the room and found another one so that she

4    had five.

5    Q.      Okay, and you had asked for more than that, right?

6    A.      I wanted a full sleeve.

7    Q.      Which would have been 10 buns?

8    A.      Yes.

9    Q.      Okay, and do you know why she only had five and not ten?

10   A.      No.

11   [Exhibit 8B published]

12   BY MS. SAVNER:

13   Q.      Okay.  What did you do next after this video cut off?

14   A.      I walked right to my car.  I called them saying --

15   telling them I was out and drove to the spot to meet them and

16   hand over everything.

17   Q.      Okay.  All right.  So when you were inside Mandy asked

18   you if you had a calculator?

19   A.      Yes.

20   Q.      And did you give her one?

21   A.      I pulled a calculator up on my phone.

22           MS. SAVNER:  May I approach the witness?

23           THE COURT:  Yes.

24   BY MS. SAVNER:

25   Q.      I've handed you what's been marked as Government's

                    Michelle N.                          65

1   exhibit 9.  Do you recognize that?

2   A.      Yes.

3   Q.      What is it?

4   A.      It's my calculator.  It's an app I get on my phone.

5   Q.      What did you do with the calculator?

6   A.      I just exited out of the app and saved it there for them

7   to see.

8   Q.      Who is them?

9   A.      Sorry.  The DEA.

10  Q.      And they photographed it?

11  A.      Yes.

12          MS. SAVNER:  Government moves to admit exhibit 9.

13          THE COURT:  Any objection?

14          MS. SEN:  No objection, Your Honor.

15          THE COURT:  So admitted.

16  [Government Exhibit 9 admitted.]

17          MS. SAVNER:  Permission to publish?

18          THE COURT:  Yes.

19  BY MS. SAVNER:

20  Q.      All right.  So this is a photograph of your phone with

21  the math trying to figure out how much she owed you?

22  A.      Yes.

23  Q.      Fair to say she was not the best at math?

24  A.      Not at all.  She said she owed me 15, but she owed me

25  75.

Michelle N.                                66

1    Q.    So you gave her 500?

2    A.    Yes.

3    Q.    All right.  What did the stuff Mandy give you look like?

4    A.    Same as before; the waxed bags, little paper baggie,

5    whatever.

6              MS. SAVNER:  May I approach?

7              THE COURT:  Yes.

8    BY MS. SAVNER:

9    Q.    I've handed you what's been marked as Government's

10   exhibit 10.  Do you recognize that?

11   A.    Yes.

12   Q.    All right, and is that consistent with what Mandy gave

13   you that day?

14   A.    Yes.

15   Q.    All right.  When you left Mandy's -- the bedroom with

16   Mandy you talked to Folks for a second?

17   A.    Yes.

18   Q.    Outside the door; is that right?

19   A.    Yes.

20   Q.    All right, and what did he ask you?

21   A.    We're all set, if I got what I needed -- well we are all

22   set.

23   Q.    And you said?

24   A.    Yes.

25   Q.    All right.  So even though he didn't have a full sleeve

Michelle N.                                67

1  you didn't say I'm going to want the rest of my order filled,

2  right?

3  A.     Right.

4  Q.     All right.  Let's move to the third buy.  For this one

5  who did you contact to set it up?

6  A.     Moe.

7  Q.     All right, and how did you do that?

8  A.     I called him or -- yes, either call or text.

9  Q.     All right, and what happened on this buy?

10  A.     I met up with Mandy again.

11  Q.     Where was that?

12  A.     Same place.  She was with another girl.  I don't know

13  who the other girl was.

14  Q.     Okay, and where specifically did you meet Mandy and the

15  other girl?

16  A.     I pulled up to the apartment, I don't remember the

17  street name, and they got into my car.

18  Q.     Can we play 13C please?

19  [Exhibit 13C published]

20  BY MS. SAVNER:

21  Q.     Okay.  So in that car ride you said two girls got into

22  the car.  One of them was Mandy, right?

23  A.     Yes.

24  Q.     What seat did Mandy sit in?

25  A.     She sat in the front seat.

Michelle N.                                68

1  Q.     And the other girl?

2  A.     In the back.

3  Q.     Did you recognize her?  Did you know who she was?

4  A.     No clue.

5  Q.     Can you describe her generally?

6  A.     Another white female in her 20's I would say.

7  Q.     Okay.  All right, and once you're in the car and driving

8  Mandy says all we have is only six buns or something like that?

9  A.     Yup.

10 Q.     And she says that's all we have left?

11 A.     Yes.

12 Q.     The we who did you understand to be referring to?

13 A.     Her and Moe.

14 Q.     And you paid her for the buns she provided you?

15 A.     Yes.

16 Q.     All right.  Can we pull up 14A please?  All right.  You

17 had a video recorder with you that day too, right?

18 A.     Yes.

19 Q.     All right.  So can we zoom in and back up a little bit?

20 All right.  What are we seeing in this picture?

21 A.     I'm handing Mandy cash and she's holding the heroin.

22 She's doing the exchange.

23 Q.     Okay.  The part I've just circled there what's that?

24 A.     That's the heroin.

25 Q.     What did you do with those bags of heroin after Mandy

                    Michelle N.                        69

1    gave them to you?

2    A.      Put them away.  I counted them and put them away.

3    Q.      And then what?

4    A.      I dropped her off, drove and met the DEA, and handed

5    them over.

6    Q.      Okay, and we can take that down.  All right.  I want to

7    take you to the -- one other thing.  You mentioned to Mandy in

8    that car ride that next time she sees Moe tell him you want to

9    talk to him because he had asked me about bringing people up to

10   my place.  What was that about?

11   A.      The first time I met Moe he talked -- he was talking

12   about bringing people up to the house.  The DEA spoke to me and

13   told me to tell him I have a spot set up for him, for him to

14   send his people up and we can start making money.  I wanted to

15   discuss that with him.

16   Q.      All right.  Now let's turn to the last buy and again for

17   this one who did you contact to set it up?

18   A.      Moe.

19   Q.      Where did you go for this one?

20   A.      Same place.

21   Q.      Okay.

22   A.      The house or the apartment.

23   Q.      All right, and what happened when you got there?

24   A.      I went inside actually -- yeah I went inside and met

25   Moe.  This one was kind of an awkward --

Michelle N.                                70

1    Q.    Yeah how was it awkward?

2    A.    There -- Mandy and Moe just seemed off.  Wasn't as

3    talkative and it was an uncomfortable feeling for me.

4    Q.    Okay.  Did you pick up on that when you first walked

5    into the house?

6    A.    No -- well yes because Moe was being really quiet.  He

7    wasn't very talkative this time.

8    Q.    Okay.  All right.  Can we play 20B?

9    [Exhibit 20B published]

10   BY MS. SAVNER:

11   Q.    All right.  So where are you during this conversation?

12   A.    We're standing in the kitchen.

13   Q.    All right, and is there anyone -- well whose voice are

14   we hearing?

15   A.    Moe.

16   Q.    Is anyone else in the kitchen with you two?

17   A.    No just the two of us.

18   Q.    All right, and is this you continuing that conversation

19   he had started about the new trap house?

20   A.    Yes.

21   Q.    Okay.

22   [Exhibit 20B published]

23   BY MS. SAVNER:

24   Q.    Stop there.  All right.  So you've explained to him your

25   brother has a place in Lyndonville and he's welcome to go up

                    Michelle N.                        71

1    and use it; is that right?

2    A.     Yes.

3    Q.     All right, and what's his response?

4    A.     He's going to try to find the right person that's going

5    to not be flashy and fit the bill who he thinks is good -- will

6    work good for him.

7    Q.     All right, and then we'll work it out?

8    A.     Yup.  Yes.

9    Q.     All right, and then you asked him at the end of that

10   part of the conversation for a sleeve; is that right?

11   A.     Yes.

12   Q.     Okay, and does he suggest to you that he doesn't believe

13   he has a full sleeve?

14   A.     He says he does and that he's -- he bags it up

15   differently now.

16   Q.     All right.  So let's get into that part.

17   [Exhibit 20B published]

18   BY MS. SAVNER:

19   Q.     Pause it there.  At some point when you were in the

20   room, and maybe we didn't hear it on this because it's a little

21   jumpy, did you hear him ask somebody to go get the drugs for

22   you?

23   A.     He asked Mandy to go get the sleeve.

24   Q.     Did you see that happen?

25   A.     I saw him ask her, yes, and she left the room.

                    Michelle N.                          72

1    Q.      All right, and then what happened next?

2    A.      She came back in and said she didn't have a full sleeve

3    and he looked really pissed off, and then he got up and left

4    the room.  They went outside -- like outside of the house.

5    Q.      Okay.  At some point did they come back?

6    A.      They did.  They came back in and she let me know she

7    didn't have a full sleeve and she just seemed like I would say

8    a hurt dog.  Someone that's in trouble.  My sense is something

9    was up.  There was -- the whole demeanor of the two of them

10   something wasn't right.

11   Q.      Can you --

12   A.      He was angry.

13   Q.      How could you tell?

14   A.      I could see the look in his eyes and just she was very

15   quiet and she was uncomfortable.

16   Q.      All right.  Can we start playing again around minute

17   4:17?

18   [Exhibit 20B published]

19   BY MS. SAVNER:

20   Q.      So Mandy comes back and says she only has four.  What do

21   you give her in exchange for those just generally?

22   A.      Cash.

23   Q.      Okay, and she describes that they are treated -- that

24   they are packaged differently this time.  How are they packaged

25   this time?

                    Michelle N.                          73

1   A.      Instead of the bundles being separated into 10 bags it's

2   all of it in one bag.  I would go and break it up myself into

3   drug quantity.

4   Q.      Okay, and when you were talking to Folks earlier he said

5   he had started doing his buns differently?

6   A.      Yes.

7   [Exhibit 20B published]

8   BY MS. SAVNER:

9   Q.      Okay.  So in that last bit of it at the end was focused

10  on someone's sneakers.  Whose sneakers were those?

11  A.      That was Moe.

12  Q.      Who did you ask will you have more later?

13  A.      Moe.

14  Q.      Did he respond?

15  A.      Yes.  He said he would.

16  Q.      Okay.  What did you do -- well let me ask you this.  You

17  were sitting in the kitchen for a while waiting for Moe and

18  Mandy to come back in?

19  A.      Yes.

20  Q.      All right, and you were looking around?

21  A.      Yes.

22  Q.      What did you see, if anything, hanging on the -- hanging

23  up in the kitchen?

24  A.      It was a red apron.

25  Q.      Can you pull up 20D please?  Is that the apron you saw?

Michelle N.                                74

1    A.     Yes.

2    Q.     What did you do when you left the house?

3    A.     Called, let them know I was getting in my car, and drove

4    and met the DEA and handed everything over.

5    Q.     All right.  Did you make any other purchases through

6    Brian Folks?

7    A.     No.

8    Q.     Did you ever talk to Brian Folks again?

9    A.     No.

10   Q.     Well was there an occasion when you contacted him a

11   couple months later?  If you don't remember, that's okay.

12   A.     I don't remember.

13   Q.     Did you do any more controlled purchases through Brian

14   Folks?

15   A.     No.

16   Q.     Did you ever see him in person again?

17   A.     No.

18   Q.     Did you ever see Mandy again?

19   A.     Nope.

20          MS. SAVNER:  Nothing further.

21          THE COURT:  Okay.  Cross examination, Ms. Sen.

22          MS. SEN:  Thank you, Your Honor.

23                    CROSS EXAMINATION

24   BY MS. SEN:

25   Q.     As a confidential source you worked with DEA to make

Michelle N.                                75

1    controlled purchases of drugs from a number of different

2    people, right?

3    A.    Yes.

4    Q.    And in fact with Mr. Folks you attempted to buy drugs

5    from him five times, didn't you?

6    A.    Yeah.

7    Q.    Now before you made the first controlled buy on January

8    6th of 2016 you had never met him before, right?

9    A.    Correct.

10   Q.    You had never seen him before?

11   A.    Yes.

12   Q.    Didn't know what he looked like?

13   A.    No.

14   Q.    In fact, you didn't meet him until the second time that

15   you tried to buy drugs, isn't that true?

16   A.    Yes.

17   Q.    And even though you tried to buy drugs from him five

18   times you were only able to make four controlled purchases,

19   isn't that correct?

20   A.    Yes.

21   Q.    So on January 6th you tried to buy a sleeve of heroin?

22   A.    Uh-huh.  Yes.

23   Q.    And that's a hundred bags?

24   A.    Yes.

25   Q.    And you only got 65 bags, right?

Michelle N.                               76

1   A.      Yes.

2   Q.      A lot less than what you were looking for?

3   A.      Yes.

4   Q.      And when you first called Mr. Folks he told you that he

5   could only meet you later?

6   A.      Yes.  He was going to bail somebody out of jail.

7   Q.      Okay, but you insisted that you wanted to get something

8   as soon as possible, right?

9   A.      Yes.

10  Q.      And that person -- and he arranged to have Mandy L. to

11  come sell you drugs?

12  A.      Mandy, yes.

13  Q.      And she didn't have the quantity you were looking for,

14  right?

15  A.      No.

16  Q.      Now on January 12th you set up another controlled buy

17  with the assistance of the DEA agents?

18  A.      Yes.

19  Q.      And you tried to buy a sleeve of heroin, isn't that

20  correct?

21  A.      Yes.

22  Q.      A hundred bags?

23  A.      Yes.

24  Q.      And Mr. Folks told you that he couldn't get it to you

25  because he didn't have the bags to put the heroin in?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Michelle N.                        77

1   A.    Yes.

2   Q.    Does that sound like a drug dealer to you?

3              MS. SAVNER:  Objection, Your Honor.  Argumentative.

4              THE COURT:  Objection overruled.  You can answer the

5   question.

6   A.    Yes.

7   Q.    Okay, and he told you that you would have to wait a

8   while?

9   A.    Yes.

10  Q.    But instead of waiting he offered that you could take

11  whatever he had at the time?

12  A.    Yup.  Yes.

13  Q.    And whatever he had at the time was only 40 bags?

14  A.    Yes.

15  Q.    So that was less than half of what you were looking to

16  buy?

17  A.    Yes.

18  Q.    On that occasion on January 12th when you were trying to

19  buy drugs from Mr. Folks this is the time when he met you in

20  your car, isn't that correct?

21  A.    Yes.

22  Q.    And as he was sitting in the car he observed two men,

23  one in a fur coat, walking along?

24  A.    Yes.

25  Q.    And he said wait a second those guys are going into the

```
                        Michelle N.                          78
```

1    wrong place?

2    A.    Yes.

3    Q.    Didn't seem like those people who were approaching had

4    any idea what they were doing.  They didn't know where they

5    were going, isn't that correct?  Fair to say?

6    A.    Yes until he got out and told them where to go.

7    Q.    Right, but until he got out and told them where to go

8    they didn't know where they were going; is that correct?

9    A.    Yes.

10   Q.    And on that occasion you said that Mr. Folks asked you

11   to come up into the apartment, isn't that right?

12   A.    Yes.

13   Q.    And that you had to check with DEA to make sure that it

14   was safe for you to do so?

15   A.    Yes.

16   Q.    And didn't you tell the DEA that you felt comfortable

17   and you felt fine?

18   A.    Yes.

19   Q.    So you went up?

20   A.    Yes.

21   Q.    And that -- in fact that wasn't the only time you went

22   up, is it?

23   A.    No.

24   Q.    You went up again.  The next time, just from the videos

25   we saw, that you went into the house several times?

Michelle N.                                    79

1    A.    Twice.

2    Q.    Fair to say you felt comfortable going into the house?

3    A.    Yes.

4    Q.    And on January 22nd you tried to buy a hundred bags of

5    heroin?

6    A.    Yes.

7    Q.    All that was available was six bundles?

8    A.    Yes.

9    Q.    60 bags?

10   A.    Yes.

11   Q.    On February 10th you again tried to buy a hundred bags

12   of heroin?

13   A.    Yes.

14   Q.    And all that was available was 40 bags again?

15   A.    Yes.

16   Q.    So it's fair to say that every time you tried to buy

17   drugs from Mr. Folks he never had the quantity you were looking

18   for, isn't that correct?

19   A.    Yes.

20   Q.    Now you have also contacted Mr. Folks on March 9th of

21   2016.  Do you remember that?

22   A.    No.

23   Q.    Do you remember trying to set up a controlled purchase

24   on March 10th of 2016?

25   A.    I'm sure I did.

Michelle N.                                    80

1    Q.      Would it help to refresh your recollection if I showed

2    you a report?

3    A.      Yes.

4    Q.      I'm going to show you what's been marked as defendant's

5    exhibit K35.  Why don't you read that.

6    A.      Okay.

7    Q.      Does that refresh your recollection?

8    A.      Yeah.  Sorry.

9    Q.      Now the prosecutor didn't ask you about those calls, did

10   she?

11   A.      No.

12   Q.      No, and in fact during those calls -- so it looks like

13   you contacted Mr. Folks on March 9th trying to set up another

14   controlled buy?

15   A.      Yes.

16   Q.      And then you arranged to meet him the next day, isn't

17   that correct?

18   A.      Yes.

19   Q.      And then when you were trying to contact him on March

20   10th he kept telling you that he didn't have any drugs, isn't

21   that correct?

22   A.      Yes.

23   Q.      And he kept saying -- didn't he tell you at one point

24   that he was trying to buy it -- get drugs from someone else?

25   A.      That's what it looked like, yes.

Michelle N.                              81

1   Q.     Is that accurate with your recollection?

2   A.     Yeah.

3   Q.     And based on those conversations you and -- the DEA

4   agents instructed you to postpone trying to set up a buy on

5   that day?

6   A.     Yes.

7   Q.     Now the prosecutor also didn't ask you about the fact

8   that you actually made calls to Mr. Folks in July of 2016.  Do

9   you remember that?

10   A.     No.  Well no.  Sorry.

11   Q.     Do you remember being paid by the DEA on August 1st?

12   A.     I'm sure I was.  I don't remember.

13   Q.     On July 19th you made three phone calls to Mr. Folks?

14   A.     I'm sorry.  It was three years ago.  I'm --

15          MS. SEN:  Your Honor, can I just have a moment?

16          THE COURT:  Yes.

17   BY MS. SEN:

18   Q.     Before you started working as -- for the DEA as a

19   confidential source you worked as a confidential informant for

20   the Essex Police Department as well, isn't that correct?

21   A.     Yes.

22   Q.     And you worked as a confidential informant with the

23   Essex Police Department from about November 2010 to August

24   2017?

25   A.     Yeah.

Michelle N.                              82

1  Q.      The Essex Police Department paid you over $16,000 as a

2  confidential informant during that time?

3  A.      Yes.

4  Q.      Is that accurate?

5  A.      Yes.  I don't -- I didn't keep track, but yes that's

6  what -- what it says.

7  Q.      So do you remember you signed an agreement to be a

8  confidential source with the DEA on June 25th of 2014?

9  A.      Yes.

10 Q.      And you renewed that agreement several times after that?

11 A.      Yes.

12 Q.      Do you remember that?

13 A.      Yup.

14 Q.      And as a DEA confidential source you worked on about six

15 different cases?

16 A.      Yes.

17 Q.      And in connection with your work the DEA paid you over

18 $9,000?

19 A.      Yes.

20 Q.      And you were paid every time you made a controlled buy

21 from Mr. Folks, isn't that correct?

22 A.      Yes.

23 Q.      So on January 6th you were paid $500?

24 A.      Yes.

25 Q.      On January 12th you were paid $500?

Michelle N.                                83

1   A.    Okay.

2   Q.    On January 22nd you were paid $600?

3   A.    Okay.

4   Q.    And on January -- on February 10th you were paid $600.

5   So I'm going to ask you again about July 19th, 2016 and I would

6   ask you to read defendant's exhibit 037 please.

7   A.    Okay.

8   Q.    Does that refresh your recollection?

9   A.    Yeah.

10  Q.    So you made phone calls to Mr. Folks on July 19th, 2016?

11  A.    Yes.

12  Q.    Three phone calls?

13  A.    Yup.

14  Q.    And when you called you didn't speak to him; is that

15  correct?

16  A.    Correct.

17  Q.    And you left you a voice mail message?

18  A.    Yes.

19  Q.    And then a couple of weeks later you were paid $600 --

20  I'm sorry -- $500 for making those phone calls?

21  A.    Yes.

22  Q.    Who paid you when you made -- when you got paid?

23  A.    The DEA.

24  Q.    Who specifically at the DEA would actually pay you?

25  A.    It was either Rob or Adam or Marilyn.

Michelle N.                                      84

1   Q.     Would they pay you in cash?

2   A.     Yes.

3   Q.     Is it fair to say as an informant that you had pretty

4   frequent contact with Agent Chetwynd and Detective --

5   A.     First name.  Sorry.

6   Q.     Sorry.

7   A.     Say the first name.  I don't --

8   Q.     Adam.

9   A.     Yup.  Sorry.

10  Q.     And would it be Chris May?

11  A.     Chris.

12  Q.     And do you remember contacting Chris May and asking him

13  that you were looking for work?

14  A.     Uh-huh.

15  Q.     You would tell him that you needed to pay the rent so

16  did he have any work for you?

17  A.     Yup.

18  Q.     And you continued to talk with him back and forth about

19  how you needed money for your deposit, you needed money for the

20  kids?

21  A.     Yup.

22  Q.     So -- and when you were asking for work you meant that

23  you were asking to make controlled buys in order to earn money,

24  isn't that correct?

25  A.     Yup.

Michelle N.                        85

1    Q.      Fair to say that you're a professional paid informant?

2    A.      Yeah if that's the way you want to put it.  Yes I do

3    good work.

4            MS. SEN:  Can I have a moment please, Your Honor?

5            THE COURT:  Yes.

6            MS. SEN:  Nothing further, Your Honor.  Thank you.

7            THE COURT:  Okay.  Any redirect?

8            MS. SAVNER:  Yes, Your Honor, briefly.

9                     REDIRECT EXAMINATION

10   BY MS. SAVNER:

11   Q.      Miss Sen asked you -- asked you about an occasion in

12   March 2016 when you placed calls to the defendant asking to buy

13   drugs and he said he didn't have any more -- he didn't have

14   drugs, right?

15   A.      Yes.

16   Q.      Okay, but he did say he would try to get more?

17   A.      Yes.

18   Q.      And fair to say you got paid several thousand dollars

19   for your work as a confidential source; is that right?

20   A.      Yes.

21   Q.      How long have you been working as a confidential source?

22   A.      I would say ten years.

23   Q.      Why do you do this work?

24   A.      11, 10 years ago I got in trouble myself.  I was using

25   drugs and I got clean.  I have two kids that are growing, and

Michelle N.                                    86

1  seeing what Vermont is coming into is very sad, and I think my

2  little part helps clean up the street and get the drugs away in

3  my -- that's how I view it.  I'll be 10 years sober May 5th so

4  it's sad to see these girls that are run by these men.  It just

5  breaks my heart.

6  Q.    Did the DEA ever tell you that your payment was

7  conditional on you actually getting suspected narcotics?

8  A.    No.

9  Q.    In fact, they paid you sometimes even when you didn't go

10  through with the buy because the defendant didn't have drugs,

11  right?

12  A.    Correct.

13  Q.    Are you being paid for your testimony here today?

14  A.    No.

15  Q.    Miss Sen asked you about the first time you met the

16  defendant.  You went inside the house because you informed DEA

17  that you felt comfortable; is that right?

18  A.    Yes.

19  Q.    Okay.  Defendant was nice to you, right?

20  A.    Yes.

21  Q.    Okay.  He made you feel comfortable?

22  A.    Yes.

23  Q.    And even in that first meeting he talked about wanting

24  to go into business with you, right?

25  A.    Correct.

Michelle N.                                    87

1          MS. SEN:  Objection, Your Honor.  Leading.

2          THE COURT:  Objection sustained.  You want to

3    rephrase the question?

4          MS. SAVNER:  Yes, Your Honor.

5    BY MS. SAVNER:

6    Q.    Remind us of the discussion that you had with the

7    defendant that first time you met him.

8    A.    He wanted to set his people up with my brother or with

9    me to help me make money up at the house to sell drugs.  He

10   felt that comfortable with me.

11   Q.    And the second time you met him in person was on the

12   last buy; is that right?

13   A.    Yes.

14         MS. SEN:  Objection.  Leading.

15         THE COURT:  Well that's a preliminary question so are

16   you going to follow that up with --

17         MS. SAVNER:  Yes, Your Honor.

18         THE COURT:  -- what you talked about?

19         MS. SAVNER:  Something else, but yes.

20         THE COURT:  All right.  Okay.

21   BY MS. SAVNER:

22   Q.    That was the next time you met the defendant, is that

23   right, the last buy?

24   A.    Yes.  Yes.

25   Q.    Okay, and how did he make you feel during that buy?

Michelle N.                    88

1  A.     Very uncomfortable.

2  Q.     Why?

3  A.     Like I said when I was using I was put in uncomfortable

4  situations myself so I can just sense.  It's hard to explain

5  it, but his whole demeanor and the way Mandy was acting I could

6  feel something was off in his whole -- just looking at him.  It

7  was way off.

8           MS. SAVNER:  Nothing further.

9           THE COURT:  Okay.  Ms. Sen, any further questions?

10          MS. SEN:  Briefly, Your Honor.

11                    RECROSS EXAMINATION

12  BY MS. SEN:

13  Q.     So you got in trouble in May of 2010?

14  A.     Yup.

15  Q.     What happened to that charge?

16  A.     I got a misdemeanor possession.

17  Q.     And were you cooperating in that case?

18  A.     In that case no.  I mean that's where I met the DEA,

19  Rob, so I worked with them.

20  Q.     As a result of your cooperation in that case did your

21  charges get reduced?

22  A.     Yes I think.  I also paid for a lawyer and did exactly

23  what I was supposed to do and stayed clean for my kids and for

24  myself.

25  Q.     You were initially charged with a felony?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Michelle N.                         89

1   A.     Sorry I don't know how it works.  Yes it went to a
2   misdemeanor.  It was a felony drug charge, yes.
3   Q.     And so because of the cooperation you did you got your
4   charges reduced to a misdemeanor?
5   A.     Yes and also working and staying clean.
6              MS. SEN:  Thank you.  Nothing further, Your Honor.
7              THE COURT:  Thank you.  All right.  Government want
8   to call next witness.
9              MR. DARROW:  Yes.  Your Honor, our next witness is
10  Mandy L. and we're trying to track her down right now.
11             THE COURT:  Okay.  Is she outside?
12             MR. DARROW:  I think so.  We went a little faster
13  than we had anticipated.  We projected her to lead off after
14  lunch and so we're trying to pull it together and get her in
15  now.  If we could have a minute to see where we are?
16             THE COURT:  All right.  We'll take a minute.
17             MR. DARROW:  Thanks.
18             THE COURT:  All right.  I'm going to turn the husher
19  on so that you're free to stretch and stand.  Just ask that you
20  stay here.
21
22
23
24
25

Michelle N.                                    90

1    [Bench conference]

2            THE COURT:  All right.  Is Ms. L. here or should we

3    take a break at this point and come back a little early?  Start

4    the lunch break at this point?

5            MR. DARROW:  That sounds sensible, Your Honor.  Agent

6    Chetwynd went upstairs to find her about five minutes ago and I

7    don't know what's going on up there.  I apologize.

8    [End of bench conference]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mandy L.                                          91

1           THE COURT:  Okay.  Well how about if we take our

2    recess at this point and be back at 1.  All right.  That's the

3    same hour and a quarter except we're starting 15 minutes

4    earlier and you're leaving 15 minutes earlier, and according to

5    my calculation that is even Steven.  So all right.  Let's take

6    our recess at this point and we'll see you at 1 o'clock.

7    [Recess 11:40 a.m. - 1:05 p.m.]

8           THE COURT:  Thank you for being on time and I think

9    we're ready to go.  Mr. Darrow, call your next witness.

10          MR. DARROW:  Thank you, Your Honor.  We call Mandy

11   L..

12          DEPUTY CLERK:  Please come forward, ma'am, to be

13   sworn.  That's fine.

14   MANDY L.,

15       Having been duly sworn, testified as follows:

16          THE COURT:  Good afternoon, Ms. L.

17                        DIRECT EXAMINATION

18   BY MR. DARROW:

19   Q.    Good afternoon.  Can we please start by having you spell

20   your last name for the court reporter?

21   A.    L.

22   Q.    Thank you.

23          THE COURT:  Okay.  Can I ask you just to move forward

24   and to take that microphone and put it -- stretch it so it's

25   right in front of you and speak -- if you can speak right into

                        Mandy L.                              92

1   the phone -- right into the microphone, that will be very

2   helpful.  People will want to hear you -- what you have to say.

3   Okay.

4              MR. DARROW:  Thank you.

5   BY MR. DARROW:

6   Q.    Let's begin with your background.  Can you please tell

7   the jury where you were born?

8   A.    Connecticut.

9   Q.    Did you move at some point from Connecticut?

10  A.    Yes.

11  Q.    Where did you move to?

12  A.    Providence, Rhode Island.

13  Q.    And at some point did you move after that?

14  A.    Yes, to Vermont.

15  Q.    All right.  Can you tell us what you remember about your

16  early childhood?

17  A.    Abusive.

18  Q.    Okay.  Let me be more particular.  Did your parents

19  separate at some point?

20  A.    Yes.

21  Q.    And when did that happen if you know?

22  A.    I was still a baby.

23  Q.    Okay.  At some point were you -- did you go into the

24  custody of your grandmother?

25  A.    Yes.

Mandy L.                                        93

1    Q.     And your grandmother was in Vermont?

2    A.     Yes.

3    Q.     You mentioned abusive when you were a child.  What do

4    you mean?

5    A.     Sexual abuse.

6           THE COURT:  Okay.  I don't think people can hear you,

7    so if you can just move up a little bit and bring the

8    microphone down and I would ask you to speak up if you can

9    please.  Thank you.

10   BY MR. DARROW:

11   Q.     When you were 5 or 6 years old did something happen?

12   A.     Yes.

13   Q.     And just very briefly what happened?

14   A.     I was molested.

15   Q.     By whom?

16   A.     My mom's husband.

17   Q.     Okay.  Was your father in the picture then?

18   A.     No.

19   Q.     So you were in the custody of your mother?

20   A.     Yes.

21   Q.     She remarried?

22   A.     Yes.

23   Q.     And that man sexually molested you?

24   A.     Yes.

25   Q.     Was there a court proceeding that resulted?

Mandy L.                                              94

1   A.      Yes.

2   Q.      What role did you have in that?

3   A.      I had to testify to obviously tell them what happened --

4   how it happened.

5   Q.      And this is when you were about how old?

6   A.      I was 5 or 6.

7   Q.      Okay.  How did your mother respond to this?

8   A.      My mom took his side.

9   Q.      And how did you respond to this?

10  A.      Can you --

11  Q.      Well did you -- did you blame him or did you blame

12  yourself?

13  A.      I blamed myself.

14  Q.      Did you have a problem with sleeping pills not long

15  after that?

16  A.      Yes.

17  Q.      What happened?

18  A.      I tried to kill myself.

19  Q.      How old were you when that happened?

20  A.      6 or 7.

21  Q.      About when was it when your grandmother got custody?

22  A.      I was little.  My grandmother had custody of me when I

23  was 2.

24  Q.      Okay.  So let's move up to going to school.  Did you go

25  to school in Burlington?

Mandy L.                                    95

1    A.      Yes.

2    Q.      Still in your grandmother's custody?

3    A.      Yes.

4    Q.      What do you have for siblings?

5    A.      I have three sisters.

6    Q.      Okay, and are they of the same parents that you have?

7    A.      We have the same mom.

8    Q.      And fathers?

9    A.      Different fathers.

10   Q.      Each of the four of you?

11   A.      Yes.

12   Q.      Was there -- was there a time when you got to spend some

13   time with your dad?

14   A.      Yes.

15   Q.      When did that happen?

16   A.      I was 10.

17   Q.      Okay, and what were the circumstances?

18   A.      I went to Connecticut to spend a summer with him.

19   Q.      Okay.  Is that -- do you have memories of him from

20   before that?

21   A.      No.

22   Q.      Okay.  So you're 10 years old?

23   A.      It's the first time I ever met him.

24   Q.      Okay, and that was the summer when you were 10?

25   A.      Yes.

Mandy L.                                      96

1   Q.      And how long were you down there for?

2   A.      The whole summer.

3   Q.      How did it go?

4   A.      Good.

5   Q.      Okay.  Did you make plans to spend another summer with

6   your dad?

7   A.      Yes.

8   Q.      What happened?

9   A.      I was 16.  I was going to go spend it with him and found

10  out that he had passed away.

11  Q.      How did he pass away?

12  A.      In a car accident.

13  Q.      At some point when you were a teenager did you start a

14  relationship with a man?

15  A.      Yes.

16  Q.      And who was that?

17  A.      Dusty.

18  Q.      Dusty.  Did you -- how much time did you spend with him?

19  A.      We were together 11 and a half years.

20  Q.      How would you characterize that relationship?

21  A.      The beginning was good.  Then as we got further out it

22  just became abusive.

23  Q.      And what do you mean by abusive?

24  A.      Hitting me.  Calling me names.  He almost choked me.

25  Like almost killed me in front of my daughter.

Mandy L.                                          97

1   Q.     Were there legal proceedings?

2   A.     There was a restraining order.

3   Q.     You obtained a restraining order?

4   A.     Yes.

5   Q.     Did you have children with Dusty?

6   A.     Yes.

7   Q.     You had a son with Dusty?

8   A.     Two; my oldest, my daughter and my son.

9   Q.     How are they?

10  A.     Good.

11  Q.     So did you separate with Dusty after this problematic

12  stuff?

13  A.     Yes.

14  Q.     Okay, and did you meet another man?

15  A.     Yes.

16  Q.     Who was that?

17  A.     Raymond.

18  Q.     I'm sorry.

19  A.     Ray.

20  Q.     What was his last name?

21  A.     Edwards.

22  Q.     Did you spend time with Ray Edwards?

23  A.     Yes.

24  Q.     How did that turn out?

25  A.     Not so good.

Mandy L.                                  98

1    Q.     Okay.  Was that relationship abusive?

2    A.     Yes.

3    Q.     Where is Ray Edwards today?

4    A.     In jail.

5    Q.     Do you know how long a sentence he's serving?

6    A.     He has a 12-year sentence.

7    Q.     About when was it that your relationship with Ray ended?

8    A.     2014.

9    Q.     Okay.  Did you -- were you charged with an offense

10   around that time?

11   A.     Yes.

12   Q.     Did you plead guilty to an offense?

13   A.     Yes.

14   Q.     What was the offense?

15   A.     Voyeurism.

16   Q.     What was your sentence?

17   A.     10 days in jail two years probation.

18   Q.     All right, and was that late 2014/early 2015?

19   A.     Early 2015 -- wait.  No.  Trying to think.  My case

20   ended in 2016.

21   Q.     Okay, and I'm wondering when.  More around the time you

22   were resolving the case?

23   A.     2015.

24   Q.     Okay.  Early 2015?

25   A.     April.  Yes.

Mandy L.                                      99

1    Q.     What result did your conviction in that case have on

2    your custody of these children?

3    A.     Losing my kids.

4    Q.     What happened to the kids?

5    A.     They -- my oldest two went to their dad and my

6    8-year-old went to foster care.

7    Q.     All right, and if we come up to the spring of 2015,

8    what's your situation then?

9    A.     How do you mean?

10   Q.     With your children?  I'm sorry.

11   A.     I wasn't allowed to see my oldest, my daughter, but the

12   two youngest I had visitation with.

13   Q.     Visitation?

14   A.     Uh-huh.

15   Q.     Were they in DCF custody?

16   A.     My 8-year-old were.  My visits were supervised by DCF.

17   Q.     At some point around that time, and we're in the spring

18   or middle of 2015, did you meet a fellow named Brian Folks?

19   A.     Yes.

20   Q.     How did that come about?

21   A.     Facebook.

22   Q.     You met him on Facebook?

23   A.     Yes.

24   Q.     You had a Facebook account?

25   A.     Yes.

Mandy L.                                        100

1    Q.      And you got communications on that from him?

2    A.      Yes.

3    Q.      Okay.  Can you tell us generally what those

4    communications were about?  This is before you met him?

5    A.      Started out as me meeting his cousin Jimmy Porter

6    talking to him, and then eventually Moe started messaging me

7    trying to ask what my intentions were with him, where it was

8    going.

9    Q.      So you're having Facebook communications with a Facebook

10   entity or someone using the name Jimmy Porter?

11   A.      Yes.

12   Q.      And then a man named Moe starts contacting you.  Do you

13   know Moe's name?

14   A.      His real name?

15   Q.      Yeah.

16   A.      Brian Folks.

17   Q.      Okay.  You call him Moe?

18   A.      Yes.

19   Q.      Like M-O-E?

20   A.      Uh-huh.

21   Q.      Moe communicates with you over Facebook asking you about

22   your communications with this Jimmy Porter person?

23   A.      Yes.

24   Q.      At some point did he ask to meet you?

25   A.      Yes.

                        Mandy L.                          101

1    Q.      Did that take place?

2    A.      Yes.

3    Q.      About when was that you first met Moe?

4    A.      In April.

5    Q.      April.  All right, and can you tell us generally where

6    that was?

7    A.      He picked me up on West Canal Street and we drove to a

8    complex apartment out in Essex -- Colchester.

9    Q.      Okay, and what did the two of you do out there?

10   A.      Talked.

11   Q.      Okay.  Sitting in his car?

12   A.      Yes.

13   Q.      About how long did you talk to him?

14   A.      Hour or two.

15   Q.      Did he -- was there any talk about a way that you might

16   be able to make money in that?

17   A.      Yes.

18   Q.      I apologize.  Let me just finish my question.  In that

19   first conversation?

20   A.      Yes.

21   Q.      All right.  Tell us what happened?

22   A.      He said he had a web site online that he would take

23   pictures -- sell pictures to disabled veterans.

24   Q.      All right.  What kind of pictures?

25   A.      Pictures in like your underwear and bra.

Mandy L.                                      102

1    Q.    So sort of sexy pictures?

2    A.    Yeah.

3    Q.    What did he want you to do?

4    A.    Sign a consent form.

5    Q.    And do what?

6    A.    Let him take pictures so he can sell them.

7    Q.    And what was your response to that?

8    A.    I was kind of skeptical at first so I said no.

9    Q.    At first?

10   A.    Yes.

11   Q.    Okay and did that change?

12   A.    Yes.  I ended up signing the consent form.

13   Q.    All right.  Now did you have a place to live around that

14   time?

15   A.    I was pretty much in and out of places.

16   Q.    In and out of places?

17   A.    Yes.

18   Q.    Is that kind of like being homeless?

19   A.    Yes.

20   Q.    All right.  Did Moe have some suggestions about how he

21   could help you out?

22   A.    I went to Moe, asked him if he knew of a place I could

23   stay.

24   Q.    All right.  What was the outcome?

25   A.    He said I could stay at his youngest son's mom's house.

Mandy L.                                        103

1    Q.      Okay.  Who is that?

2    A.      Danielle.

3    Q.      Danielle?

4    A.      Yes.

5    Q.      Where did she live?

6    A.      Ethan Allen Parkway.

7    Q.      All right.  Do you know the address out there?

8    A.      I don't remember.

9    Q.      Okay.  Let me show you what's been marked as Government

10   exhibit 58.  May I approach?

11          THE COURT:  Yes.

12   BY MR. DARROW:

13   Q.      Two-page exhibit consisting of two photographs.  Can you

14   take a look at those please?

15   A.      That is Danielle's house.

16   Q.      Do those two pictures fairly and accurately depict the

17   place -- Danielle's place where Moe arranged for you to stay?

18   A.      Yes.

19          MR. DARROW:  Your Honor, we move those.

20          THE COURT:  What exhibit are those?

21          MR. DARROW:  I apologize.  58.

22          THE COURT:  Any objection to 58?

23          MR. KAPLAN:  If I can look at it, Judge.  No

24   objection.

25          THE COURT:  All right.  So admitted.

                    Mandy L.                              104

1    [Government Exhibit 58 admitted]

2              MR. DARROW:  Do we need to mark these as we go along?

3    No.  Thanks.

4    BY MR. DARROW:

5    Q.    About how long did you stay there?

6    A.    Two weeks.

7    Q.    What happened after that?

8    A.    I moved in with my gram.

9    Q.    Where did your gram live?

10   A.    72 East Allen Street in Winooski.

11   Q.    And as we go forward we're going to refer to most people

12   by just their first name and we're not going to mention

13   addresses unless I ask you.  Okay.

14   A.    All right.

15   Q.    Thanks.  During this early part of your relationship

16   with Moe how did he treat you?

17   A.    Good.

18   Q.    Okay.  Can you tell us a little bit about some of the

19   things he did and said to make you comfortable?

20   A.    He made sure I had a place to stay, food, cigarettes,

21   paid my gram.

22   Q.    He paid your gram?

23   A.    Uh-huh.

24   Q.    All right.  Did a romantic -- did romantic feelings

25   develop in you?

                Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                                        105

1   A.      Yes.

2   Q.      Okay.  How did you start feeling?

3   A.      I fell in love with him.

4   Q.      Okay, and why did you fall in love with him?

5   A.      He would tell me.  Just the way he made me feel and

6   stuff.  He would tell me.

7   Q.      What stuff did he tell you?

8   A.      Tell me that we would eventually be together, he would

9   take care of me, and that he loved me.

10  Q.      Okay, and did you respond with feelings of love back?

11  A.      Yes.

12  Q.      Did a sexual relationship develop between the two of

13  you?

14  A.      Yes.

15  Q.      Now at some point did the subject of prostitution come

16  up?

17  A.      Yes.

18  Q.      When did that first come up?

19  A.      It was in June.

20  Q.      What happened?

21  A.      We drove to Poultney to pick up someone he knew.

22  Q.      Poultney or Putney?

23  A.      Putney.

24  Q.      Okay.  Who drove?

25  A.      He did.

Mandy L.                                    106

1   Q.      All right, and who else is in the car?

2   A.      It was me and him at first.  Then we went and picked up

3   a girl named Delaney.

4   Q.      Okay.  So you and Moe drive south to Putney?

5   A.      Uh-huh.

6   Q.      Is that about two and a half hours --

7   A.      Yes.

8   Q.      -- one way?  Okay, and in Putney you say a girl named

9   Elanie?

10  A.      Delaney.

11  Q.      Delaney was picked up and tell us about -- we got here

12  by wondering how prostitution first came up.  Was there a

13  conversation in the car on the ride back?

14  A.      Yes.

15  Q.      Okay, and can you characterize that for us?

16  A.      It was between Delaney.  She said do you work for Moe

17  too.

18          MR. KAPLAN:  Sorry, Judge, I can't hear the answer.

19          THE COURT:  You're going to have to try to speak up

20  if you can.

21          THE WITNESS:  It was about she said do you work for

22  Moe too.

23          MR. KAPLAN:  Objection, Your Honor.

24  BY MR. DARROW:

25  Q.      Let me just -- we don't at this point at least want you

                        Mandy L.                          107

1   to say what she said, but can you say what the conversation was

2   about as the two -- as the three of you drove north?

3   A.      Prostitution.

4   Q.      Okay, and by the time you got back to Vermont had you

5   learned a lot about that subject?

6   A.      Yes.

7   Q.      When the three of you get back to Vermont where do you

8   go?

9   A.      I went back to my gram's.

10  Q.      Well what happened with Delaney?

11  A.      We dropped her off at the Travelodge.

12  Q.      Where is the Travelodge?

13  A.      On Shelburne Road.

14          MR. DARROW:  Excuse me just a second.  Your Honor,

15  may I have a moment?

16          THE COURT:  Yes.

17          MR. DARROW:  Your Honor, may I approach?

18          THE COURT:  Yes.

19  BY MR. DARROW:

20  Q.      Showing you 117.  It's a photograph of a young woman.

21  Do you recognize that?

22  A.      Yes.

23  Q.      Who is that?

24  A.      Delaney.

25  Q.      Does that photo fairly and accurately depict the young

                          Mandy L.                          108

1    woman you met that day named Delaney?

2    A.     Yes.

3               MR. DARROW:  I offer --

4               THE COURT:  Are you going to introduce it?

5               MR. DARROW:  I apologize.

6               MR. KAPLAN:  Can I voir dire?

7               THE COURT:  Yes.

8                          VOIR DIRE

9    BY MR. KAPLAN:

10   Q.     Can you tell me please when was the last time you saw

11   her?

12   A.     She was up here for not even a month.

13   Q.     So did you see her more than one time?

14   A.     Yes.

15   Q.     And this was how long ago?

16   A.     June of 2016.

17   Q.     '16.  So three years ago and you remember what she looks

18   like?

19   A.     Yes.

20              MR. KAPLAN:  Okay.  No objection, Judge.

21              THE COURT:  Okay.  So admitted and you can publish.

22              MR. DARROW:  That's 114.

23   [Government Exhibit 114 admitted]

24   BY MR. DARROW:

25   Q.     Now let me just follow up with one of the questions

                        Mandy L.                          109

1    counsel asked you.  Counsel asked you when that was and you

2    said June 2016 if memory serves.  We had been talking about

3    June 2015.  Can you please think again about when this

4    happened?

5    A.     You're right.  2015.

6    Q.     Okay.  So after this drive up from Putney was Delaney

7    dropped off somewhere?

8    A.     Yes.

9    Q.     At the Travelodge?

10   A.     Yes.

11   Q.     What happened at the Travelodge

12   A.     What happened?

13   Q.     Yes.

14   A.     That day or --

15   Q.     Well was there anything that day that was -- that you

16   remember?

17   A.     No.

18   Q.     Okay.  Did something happen afterwards at the

19   Travelodge?

20   A.     Yes.

21   Q.     What?

22   A.     I went there to meet with them to hang out.

23   Q.     With Moe?

24   A.     Moe and Delaney.

25   Q.     Okay, and what happened that day?

                          Mandy L.                          110

1    A.    Can you --

2    Q.    I'm sorry.  Delaney is dropped off at the Travelodge and

3    at some point you go back and meet with Delaney and with Moe?

4    A.    Yes.

5    Q.    And what's going on in that meeting?

6    A.    Me and Moe sat in the car and had a conversation.

7    Q.    What was that conversation about?

8    A.    Making money.

9              MR. KAPLAN:  Objection, Your Honor, to the extent

10   that it involves anything other than what my client said.

11             THE COURT:  Well this is a conversation between your

12   client and her.  That's all who was there.

13             MR. KAPLAN:  I understood she was talking about a

14   conversation between her and the other woman.

15             THE COURT:  Well can you clarify as to whether in

16   fact this is a conversation between Mr. Folks and her?

17             MR. DARROW:  Thank you, Your Honor.

18   BY MR. DARROW:

19   Q.    When you're having this conversation in the car who is

20   present?

21   A.    Moe.

22   Q.    And?

23   A.    Me.

24   Q.    Just the two of you?

25   A.    Yes.

Mandy L.                                    111

1   Q.      Okay.  What happened in that conversation?

2   A.      We were talking about my -- how I was living my

3   lifestyle.

4   Q.      Okay.  Did the subject of prostitution come up?

5   A.      Yes.

6   Q.      Who raised that subject?

7   A.      Moe.

8   Q.      And what was the suggestion?

9   A.      He said that you're giving it away for free why not make

10  money.

11  Q.      All right, and how did you respond to that?

12  A.      I agreed.

13  Q.      All right, and what happened after that?

14  A.      We took pictures and they were posted on Backpage.

15  Q.      Okay.  When you say we took pictures who took the

16  pictures?

17  A.      Me.

18  Q.      You did?

19  A.      No.  Moe.

20  Q.      Moe did.  Where were the pictures taken?

21  A.      At the Travelodge.

22  Q.      That day?

23  A.      Yes.

24  Q.      What's Backpage?

25  A.      Girls post pictures, you get dates and make money.

Mandy L.                                    112

1  Q.      Okay.  Pictures of girls are posted?

2  A.      Yes.

3  Q.      All right.  Is that in the escort section?

4  A.      Yes.

5  Q.      All right.  Did you spend some time -- well as a result

6  of that post on Backpage what happened?

7  A.      Got calls around dates.

8  Q.      About how long did that go on for?

9  A.      Two, three weeks.

10 Q.      Okay.  Did you meet any other young women who were

11 involved in that?

12 A.      In that time frame, yes.

13 Q.      Who?

14 A.      There was a girl named Ashley, Keisha, Danielle.

15 Q.      Ashley, Keisha, and Danielle?

16 A.      Uh-huh.

17 Q.      Excuse me just a moment please.  What were Ashley,

18 Keisha, and Danielle doing?

19 A.      Prostituting.

20 Q.      Same place?

21 A.      This was not the travel -- it was between the Ho-Hum and

22 the North Star.

23 Q.      Did Moe have any involvement in this?

24 A.      Yes.

25 Q.      What was he doing in connection with this?

Mandy L.                                    113

1  A.      Posting them.

2  Q.      Sorry.

3  A.      He would post them.

4  Q.      And when you say post them can you tell us specifically

5  what you mean?

6  A.      Take pictures, post them on Backpage.

7  Q.      All right.  Like you just described with you?

8  A.      Yes.

9              MR. DARROW:  May I?

10             THE COURT:  Yes.

11 BY MR. DARROW:

12 Q.      Showing you three photographs marked for identification

13 as Government 89, Government 50A, and Government 53A.  Do you

14 recognize the young women depicted in those three photographs?

15 A.      Yes.

16 Q.      Who are they?

17 A.      Ashley, Keisha, and Danielle.

18 Q.      The three women you were just describing?

19 A.      Yes.

20 Q.      And the photo in exhibit 89 who is that?

21 A.      That's Ashley.

22 Q.      And the photo in exhibit 50A who is that?

23 A.      Keisha.

24 Q.      50A is actually a two-page exhibit.  Can you please look

25 at the second page?  Who is that?

```
                      Mandy L.                        114
1    A.      Keisha.

2    Q.      Are those two pictures of Keisha?

3    A.      Yes.

4    Q.      And exhibit 53A who is that?

5    A.      Danielle.

6            MR. DARROW:  Okay.  Your Honor, we move these.

7            THE COURT:  Any objection?

8            MR. KAPLAN:  Can I see them, Judge?  No objection,

9    Judge.

10           THE COURT:  All right.  So admitted.

11   [Government exhibits 89, 50A, 53A admitted]

12           MR. DARROW:  Can we post them, Your Honor?

13           THE COURT:  Yes.

14   BY MR. DARROW:

15   Q.      Who is that on the screen?

16   A.      Ashley.

17   Q.      Who is that?

18   A.      Keisha.

19   Q.      Can we get the second page of that please?  That's 50A.

20   That's the second picture of Keisha?

21   A.      Yes.

22   Q.      And 53A?

23   A.      Danielle.

24   Q.      Thank you.  During this time period I understand that

25   you and these three other young women are engaged in the same
```

Mandy L.                                              115

1    activities.  Can you describe for the jury a little bit what

2    that was like on a day-to-day basis?

3    A.     We would sit in the hotel all day waiting for phone

4    calls for dates or they would come to us.

5    Q.     Okay, and by dates what do you mean?

6    A.     Like they would call, arrange like certain amount of

7    time with you, you get paid.

8    Q.     All right.  What were the time periods and the payments

9    -- pay amounts that you're talking about?

10   A.     An hour was -- half hour would be a hundred dollars --

11   no.  Okay.

12   Q.     Just take your time.

13   A.     Like it would be an hour is a hundred.  Two hours is two

14   hundred.

15   Q.     All right, and what -- for the customer who was paying

16   that money what were they getting?

17   A.     Anything they wanted.

18   Q.     Are you talking about sexual acts?

19   A.     Yes.

20   Q.     Okay.  Were the four women that you described, you and

21   these three others, essentially selling sex for money?

22   A.     Yes.

23   Q.     And what about Moe?  What was his piece of this besides

24   posting you already mentioned?

25   A.     They would give half their profit to him.

                    Mandy L.                         116

1    Q.      The other three would?

2    A.      Yes.

3    Q.      And how but --

4    A.      Yes.

5    Q.      You gave half your profits to him?

6    A.      Yes.

7    Q.      And how often would he come around?

8    A.      Everyday.

9    Q.      Did you have more than one room at the motel?

10   A.      No.

11   Q.      All in one room?

12   A.      We all would share a room.

13   Q.      So when -- what would happen when a customer showed up?

14   A.      If a customer showed up for one of the other girls,

15   we'll leave the room.

16   Q.      Okay.  So who's paying for the room?

17   A.      Moe.

18   Q.      Do you know how much the rooms at the Travelodge cost?

19   A.      No.

20   Q.      So he's paying for one room and he's got four women?

21   A.      The Travelodge -- we weren't at the Travelodge.

22   Q.      I apologize.

23   A.      That was Delaney's room.

24   Q.      Where was Delaney's room?

25   A.      At the Travelodge.  That wasn't where the other three

Mandy L.                                    117

1   were.

2   Q.     Okay.  Where were they?

3   A.     Between the North Star and the Ho-Hum.

4   Q.     Oh so it would go back and forth?

5   A.     Yes.

6   Q.     Why would the group occasionally move?

7   A.     Because he would say it was too hot and the cops were

8   coming so we would have to switch hotels.

9   Q.     Who is he?

10  A.     Moe.  Sorry.

11  Q.     That's all right.  So Delaney is at the Travelodge?

12  A.     Yes.

13  Q.     And the other three of you are working together?

14  A.     Wait you're confusing me.  This was Keisha, Danielle,

15  and Ashley were after Delaney -- after she had left.

16  Q.     Okay and I apologize.  So when you first come up from

17  Putney Delaney starts working out of the Travelodge?

18  A.     Yes.

19  Q.     For a time?

20  A.     Yes.

21  Q.     And that's when you have that conversation with Moe?

22  A.     Yes.

23  Q.     At some point Delaney leaves?

24  A.     Yes.

25  Q.     Okay, and then --

Mandy L.                                          118

1           MR. KAPLAN:  Objection, Your Honor.  Leading.

2           THE COURT:  Well --

3           MR. KAPLAN:  Sounds like the Government is

4    testifying.

5           THE COURT:  No.  He's getting to the ultimate

6    question so we'll get through this and then ask a more open

7    question.

8           MR. DARROW:  Thanks.

9    BY MR. DARROW:

10   Q.    Delaney leaves and there are three of you?

11   A.    Yes.

12   Q.    And where do the three of you work out of?

13   A.    The North Star -- between the North Star and the Ho-Hum.

14   Q.    Okay.  So after Delaney you're not back at the

15   Travelodge?

16   A.    No.

17   Q.    Okay.  All right.  Change motels when Moe said they got

18   hot?

19   A.    Yes.

20   Q.    So you mentioned the posting, the calls, the sex, the

21   money.  Were there other parts of this that were -- other

22   things involved with this?  Was there a supply of condoms,

23   lube?

24          MR. KAPLAN:  Objection, Your Honor.

25          THE COURT:  Objection sustained.  That's --

Mandy L.                                    119

 1            MR. DARROW:  All right.  I apologize.

 2   BY MR. DARROW:

 3   Q.    Tell us a little bit more about the business when the

 4   three of you had this -- were doing this work.

 5   A.    It was pretty much just sexual activity.  Like making

 6   sure you were protected, had the stuff you needed.

 7   Q.    Okay.  Talking about protection are you talking about

 8   protection from johns or protection from pregnancy?

 9   A.    Just condoms.  You had condoms.

10   Q.    How about phones?

11   A.    Yes.

12   Q.    Who supplied the phones?

13   A.    Moe.

14   Q.    Who supplied the condoms?

15   A.    Moe.

16   Q.    Now at some point did your participation in this change?

17   A.    Yes.

18   Q.    What changed you?

19   A.    I stopped doing it.

20   Q.    You stopped doing prostitution?

21   A.    Yes.

22   Q.    Did you keep working with the women -- other women?

23   A.    Yes.

24   Q.    Okay and what was your job?

25   A.    Sit in the hotel and supervise them, make sure that they

Mandy L.                              120

1  weren't ripping Moe off, collecting the money.

2  Q.    Okay.  So about how much time went by between -- well

3  about how long was it when you stopped prostituting and started

4  supervising?

5  A.    I pretty much stopped prostitution and like two or three

6  weeks later I was doing that.

7  Q.    Okay.  How did the -- how did that new job come up?

8  A.    It was just a conversation me and Moe had.

9  Q.    Okay.  What did Moe say?

10  A.    It was pretty much based on one of the girls who would

11  say that one of the girls we work with was saying she didn't

12  make the money so that her date never showed up, but then she

13  was making the money.

14  Q.    And what did Moe have to say about that?

15  A.    He wanted me to be in the room with them to make sure

16  that he wasn't getting ripped off.

17  Q.    Okay.  So your job was to -- you used the word

18  supervise.  You would stop prostituting, but you would keep an

19  eye on the others, alright, to make sure Moe got his money?

20  A.    Yes.

21  Q.    What else did you do at that time besides just watch the

22  money?

23  A.    That was pretty much it.

24  Q.    Pretty much it?  Okay.  When the young women had jobs

25  what would you do?

Mandy L.                                    121

1    A.      I would step out of the room.

2    Q.      Did you -- were you ever given the job of keeping an eye

3    on the clock?

4    A.      What do you mean?

5    Q.      Okay.  Just a moment.

6            MR. DARROW:  Your Honor, may I approach?

7            THE COURT:  Yes.

8    BY MR. DARROW:

9    Q.      I'm showing you 48D which is a two-page document.  Can

10   you please take a look at that?  What is that?

11   A.      Pictures of me.

12   Q.      In what context?

13   A.      That's Backpage.

14   Q.      Okay.  You mentioned earlier Backpage posts when Moe

15   would put pictures up on Backpage and is that a Backpage post?

16   A.      Yes.

17   Q.      Okay, and what does it say up here?

18   A.      Where?

19   Q.      Well actually before we read that can you tell us about

20   what time -- is that you in the Backpage post?

21   A.      Yes.

22   Q.      And about when did that happen?

23   A.      In June.

24   Q.      June 20 --

25   A.      '15.

                         Mandy L.                          122

1    Q.     Okay.  All right.  Drawing your attention to the three

2    photographs on the second page do you know who took those

3    pictures?

4    A.     Yes.

5    Q.     Who?

6    A.     Moe.

7    Q.     All right, and was that back --

8    A.     Except for this one.

9    Q.     Except for the third one?

10   A.     Uh-huh.

11   Q.     What about that one?

12   A.     That's one of the pictures I sent him.

13   Q.     Okay.

14            THE COURT:  I'm sorry.  I didn't hear that.

15   A.     The third picture is one I sent.

16   Q.     Are those three pictures each of you?

17   A.     Yes.

18   Q.     Two taken by Moe one taken by you?

19   A.     Yes.

20   Q.     Okay, and is this a fair and accurate Backpage post from

21   that time period?

22   A.     Yes.

23            MR. DARROW:  Show it to counsel.  We're going to move

24   it.

25            THE COURT:  Yes.

                    Mandy L.                          123

1                          VOIR DIRE

2  BY MR. KAPLAN:

3  Q.     Who took this photograph?

4  A.     Two of them Moe took.

5  Q.     Pardon me.

6  A.     Two of them are Moe's pictures he took.

7  Q.     Okay, and are you saying that this was posted on

8  Backpage?

9  A.     Yes.

10 Q.     And do you know when it was posted?

11 A.     In June.

12 Q.     Of 2016?

13 A.     '15.

14         THE COURT:  2015.

15 A.     '15.

16 BY MR. KAPLAN:

17 Q.     Let me show you what's been marked as Government's

18 exhibit 48D and see where it says it was created on June 3rd,

19 2015 but the e-mail was verified on March 21, 2016.  Isn't that

20 when it was posted?

21 A.     Created.

22         MR. DARROW:  This is just cross I think.

23         THE COURT:  Well it's actually he's questioning the

24 veracity of the exhibit so --

25 BY MR. KAPLAN:

                          Mandy L.                          124

1   Q.      I mean is this really the photograph that was posted in

2   2015?

3   A.      Yes.

4   Q.      And how do you know that?

5   A.      Because I was there when they were posted.

6   Q.      And who posted it?

7   A.      Moe posted them.

8           MR. KAPLAN:  Okay.  No objection, Your Honor.

9           THE COURT:  Okay.  So admitted.

10  [Government exhibit 48D admitted]

11          MR. DARROW:  Can we publish this?

12          THE COURT:  Yes.

13          MR. DARROW:  Publish the first page of 48D.

14  BY MR. DARROW:

15  Q.      Can you zoom in, Kat, on the top paragraph?  I apologize

16  for dragging you through this unpleasantness, but we've got a

17  ways to go.  Can you please read what it says there?

18  A.      Says hey guys this weekend here and I know you're ready

19  to relax and unwind from the work week but you wanna be wild

20  and exotic.  If that's the case, then Samantha is the girl for

21  you.  Let's have a blast and enjoy each other's company.  Call

22  me.

23  Q.      All right.  Who is Samantha?

24  A.      That's the name that was posted on Backpage.  You don't

25  go by your real name so names are made up.

                    Mandy L.                           125

1    Q.      The female that's being described here is?

2    A.      Is me.

3    Q.      Thank you.  Can we pull up the second page?  All right.

4    Now you said two of these pictures were taken by Moe?

5    A.      Yes.

6    Q.      Which two?

7    A.      The first two.

8    Q.      The two in which you're wearing a bra?  See on the left.

9    A.      Yes.

10   Q.      And the third picture?

11   A.      I took.

12   Q.      Okay, and what did you do with that picture?

13   A.      Sent it to Moe.

14   Q.      All right.  Do you know if -- was there any practice

15   with the group of you doing the work at the time to try to keep

16   your faces out of Backpage posts?

17   A.      This was just the way the pictures were taken.

18   Q.      Okay.  All right.  You can pull that down.  Thanks.  Did

19   you ever rent any motel rooms?

20   A.      Yes.

21   Q.      Why?

22   A.      Because I had ID.

23   Q.      Okay.  I'm sorry.  Did somebody ask you to rent motel

24   rooms?

25   A.      Yes.

Mandy L.                                    126

1   Q.      Was it part of this enterprise we've been describing?

2   A.      Yes.

3   Q.      Who asked you?

4   A.      Moe.

5   Q.      Did he say why he wanted you to rent motel rooms?

6   A.      At first I didn't know.

7   Q.      I'm sorry.

8   A.      At first no.

9   Q.      And later?

10  A.      I knew why we were renting them.

11  Q.      Okay.  Why were you renting them?

12  A.      To work out of them.

13  Q.      To do?

14  A.      Prostitute out of them.

15  Q.      Okay, but you're saying Moe asked you to do it?

16  A.      Yes.

17  Q.      Do you know why he just didn't rent the rooms himself?

18  He didn't say?

19  A.      No.

20  Q.      You mentioned earlier around this time meeting and

21  working with Danielle, Ashley, and Keisha.  Subsequently as the

22  summer went on did you meet other young women working for Moe?

23  A.      Yes.

24  Q.      Who?

25  A.      Eventually down the line I met Ayla, another girl named

                        Mandy L.                          127

1  Ashley, Victoria, Amanda, and Hannah.

2  Q.     Sounds like there were several?

3  A.     Yes.

4  Q.     Okay.  Were they all working that summer?

5  A.     Which summer are you talking about?

6  Q.     I apologize.  The summer of 2015 that we've been talking

7  about.

8  A.     No.

9  Q.     Okay.  Who did you meet young women doing this work for

10  Moe?

11  A.     It was still pretty much the same ones I just named.

12  Q.     So the others come later?

13  A.     Yes.

14  Q.     Okay.  At some point did you become aware that there

15  were drugs involved in this business?

16  A.     Yes.

17  Q.     About when was that?

18  A.     I don't remember dates.

19  Q.     Okay.  At some point was there another location in

20  Burlington that you started spending time at?

21  A.     Yes.

22  Q.     Where was that?

23  A.     Spring Street.

24  Q.     Okay.  Did somebody have a house at Spring Street?

25  A.     Yes.

Mandy L.                                    128

1    Q.    Who brought you to Spring Street?

2    A.    Who brought?

3    Q.    I'm sorry.

4    A.    What was that?

5    Q.    Who brought you to Spring Street?

6    A.    Moe.

7    Q.    All right, and whose place was that?

8    A.    Lori's.

9    Q.    And what was happening at Spring Street?

10   A.    Girls were prostituting out of there.  There were drugs

11   being sold out of there.

12             MR. DARROW:  May I approach?

13             THE COURT:  Yes.

14   BY MR. DARROW:

15   Q.    Showing you Government's 96, which is a set of four

16   photographs, do you recognize those photographs?

17   A.    Yes.

18   Q.    Could you please look at all of them?  Okay, and the

19   first photograph what does that depict?

20   A.    That's Lori's house.

21   Q.    The one you've described on Spring Street?

22   A.    Yes.

23   Q.    And do the second, third, and fourth photographs show

24   the area around Lori's house?

25   A.    Yes.

                        Mandy L.                        129

1    Q.      Do you know what this building is?

2    A.      Is an elementary school.

3    Q.      Okay.  That's the large brick building?

4    A.      Yes.

5    Q.      Where was that in relation to Lori's house?

6    A.      Right across the street.

7    Q.      Do these four pictures fairly and accurately depict

8    Lori's house and the scene around it?

9    A.      Yes.

10            MR. DARROW:  Your Honor, we move that.

11            THE COURT:  Any objection?

12            MR. KAPLAN:  No objection.

13            THE COURT:  The exhibit number is what?

14            MR. DARROW:  96.

15            THE COURT:  All right.  96 is admitted.

16   [Government exhibit 96 admitted]

17   BY MR. DARROW:

18   Q.      Can we pull up the first photo and what is in this

19   picture?

20   A.      Lori's apartment building.

21   Q.      Okay.  Is that the gray building on the right with the

22   blue door?

23   A.      Yes.

24   Q.      Let's go to the next picture.  What's that?

25   A.      The school.

                        Mandy L.                        130

1    Q.      The brick building across the street?

2    A.      Yes.

3    Q.      And the next picture do you recognize that?

4    A.      That's her street.

5    Q.      Okay, and the last picture?

6    A.      The school again.

7    Q.      All right.  Thank you.  So you mentioned at Lori's house

8    on Spring Street there was prostitution going on?

9    A.      Yes.

10   Q.      And drugs?

11   A.      Yes.

12   Q.      Okay.  Let's start with the drugs.  What do you mean

13   there was drug activity there?  What was happening?

14   A.      They were selling drugs out of Lori's house.

15   Q.      Okay.  At some point did you take on a role in the drug

16   dealing business?

17   A.      Yes.

18   Q.      Okay.  Around when was that?

19   A.      November.

20   Q.      Okay.  So was this at Lori's house?

21   A.      Yes.

22   Q.      All right.  What was the job you took on?

23   A.      Running.

24   Q.      I'm sorry.

25   A.      Running.

Mandy L.                                    131

1    Q.      And when you mean running can you tell us what that

2    means to you?

3    A.      Meeting people to do deals.

4    Q.      To do deals like?

5    A.      Drugs.

6    Q.      To distribute drugs?

7    A.      Yes.

8    Q.      Okay.  Who gave you that job?

9    A.      Moe.

10   Q.      What was the -- what did he ask you to do?

11   A.      Pretty much just hold the stuff and make runs when

12   people call for it.

13   Q.      All right, and this is happening at Lori's house on

14   Spring Street?

15   A.      Yes.

16   Q.      All right.  Was there a time when you moved in there for

17   a while?

18   A.      Yes.

19   Q.      And you were living there?

20   A.      Yes.

21   Q.      About how many times a day were you doing these drug

22   sales?

23   A.      It was 10, 20 times a day.

24   Q.      Sorry.

25   A.      Pretty much all day long.

Mandy L.                                      132

1   Q.     Okay.  Actually I apologize.  I should have asked you

2   that about the -- when back in the summer the prostitution

3   activities at the motel what were the hours and days of the

4   week that that was happening?

5   A.     All day everyday.

6   Q.     Seven days a week 24/7?

7   A.     Yes.

8   Q.     How were you compensated for your work as a runner?

9   A.     I would get paid.

10   Q.     Sorry.

11   A.     We would get paid.

12   Q.     We would get paid?

13   A.     Well two people that were doing it, yes.

14   Q.     Okay.  Who is the other person?

15   A.     Hannah.

16   Q.     Hannah.  All right.  So was she doing the same things

17   you were doing?

18   A.     The running, yes.

19   Q.     And running is when an order comes in and you bring the

20   drugs out to meet them?

21   A.     Yes.

22   Q.     What drugs were you distributing?

23   A.     Heroin and crack.

24   Q.     Crack cocaine?

25   A.     Yes.

Mandy L.                                    133

1   Q.    So you were being paid how?

2   A.    In cash.

3   Q.    Sorry.

4   A.    $500 a week.

5   Q.    Okay.  Who promised to pay you that?

6   A.    Moe.

7   Q.    All right.  Did he pay that to you?

8   A.    Yes.

9   Q.    For how long?

10  A.    Maybe two, three times.

11  Q.    And how long were you acting as a runner?

12  A.    November -- pretty much from November to June.

13  Q.    Okay.

14          THE COURT:  I'm sorry.  I didn't hear that.

15  A.    November until -- November up until June.

16  Q.    Okay.  So from November 2015 into early 2016, but he

17  only paid you two or three times?

18  A.    Yes.

19  Q.    So why did you keep doing it when you weren't getting

20  the money?

21  A.    I loved him.

22  Q.    I apologize.  So you weren't getting anything out of

23  this?  Now did you take drugs?

24  A.    No.

25  Q.    Did most of the others?

                          Mandy L.                          134

1    A.     Yes.

2    Q.     How did you manage to stay out of the taking drugs

3    yourself?

4    A.     Guess it's just my childhood I grew up in making that

5    promise to myself that I wouldn't turn out like my family.

6    Q.     Was there drug use in your family?

7    A.     Yes.

8    Q.     So let's take a typical running transaction or drug

9    transaction back from that time at Lori's house on Spring

10   Street.  It sounds like there were hundreds or thousands of

11   them, but just a typical transaction how would it -- what would

12   happen?

13   A.     They would call, Moe would let us know where to go to

14   meet them, what they wanted.

15   Q.     Okay.  They would call.  We start out with that.  Okay.

16   Is this a customer?

17   A.     Yes.

18   Q.     Drug customer would call who?

19   A.     Moe.

20   Q.     Okay, and what happened next?

21   A.     He would let us know where we were to meet them, what

22   they were wearing, what they wanted.

23   Q.     Okay, and you say he would let us know.  Who is that?

24   A.     Me or Hannah.

25   Q.     You or Hannah.  He would let you know what the customer

                         Mandy L.                          135

1   wanted and what else?

2   A.      And where to meet them.

3   Q.      Okay, and what would you or Hannah do?

4   A.      We would go to where they are at.

5   Q.      And do what?

6   A.      Make the sale.

7   Q.      Okay.  Of which drugs?

8   A.      It was either heroin or crack.

9   Q.      How much were you selling them for?

10  A.      A bundle was 75.

11  Q.      What's a bundle?

12  A.      10 bags.

13  Q.      Okay.  Can you describe for us generally what a bundle

14  looked like?  No?

15  A.      It came in little white baggies.  It was 10 of them all

16  rubberbanded up.

17  Q.      Okay.  That's a good description and what drug was that?

18  A.      Heroin.

19  Q.      Okay, and how about the crack, what did the crack look

20  like?

21  A.      25, 50 bags was just little chunks.

22  Q.      Okay and, Mandy, I apologize to keep pressing you, but

23  try and speak into the microphone and go slowly and I'm trying

24  to remember only to call people by their first name so forgive

25  me.  Go ahead describing what the crack looked like.

Mandy L.                                    136

1   A.      It was all -- it was like big chunks of it.  Like 25

2   bags.  50 bags.  Like it was in a little baggie.

3   Q.      A little baggie?

4   A.      Yes.

5   Q.      Is it a plastic baggie or paper?

6   A.      Little plastic baggie.

7   Q.      How was the little plastic baggie sealed?

8   A.      Ziplocked.

9   Q.      What color was it?

10  A.      Green or blue.

11  Q.      Okay.  Now this -- we're still in the Spring Street

12  house that Lori -- it was Lori's house.  You also described

13  prostitution activities out of that house?

14  A.      Yes.

15  Q.      Earlier when I asked you about other women you said

16  later.  Okay.  Did you learn that there were other women

17  prostituting out of the Springfield -- Spring Street house?

18  A.      Yes.

19  Q.      And what women were those?

20  A.      There was Ashley, Amanda, and Ayla.

21  Q.      Excuse me.

22          MR. DARROW:  Your Honor, may I approach?

23          THE COURT:  Yes.

24  BY MR. DARROW:

25  Q.      I'm showing you three single page documents each with a

                        Mandy L.                          137

 1   photo on them marked 54A, 93, and 113.  Can you look at them

 2   please?

 3   A.     Ayla, Ashley, and that's Jerrika.

 4   Q.     Who is Jerrika?

 5   A.     She came in late.

 6          MR. KAPLAN:  Judge, I can't hear this conversation.

 7          THE COURT:  I can't quite hear you so you want to

 8   describe the first two mentioned who they are and then the

 9   third one.

10   BY MR. DARROW:

11   Q.     Let's start -- you're not doing anything wrong.  Let's

12   start with 54A.

13   A.     That's Ayla.

14   Q.     Okay.  Is that a picture that fairly and accurately

15   depicts the young woman you knew as Ayla?

16   A.     Yes.

17   Q.     And which one was Ashley?  You're referring to 93?

18   A.     Yes.

19   Q.     Is 93 a photograph that fairly and accurately depicts

20   the young woman you know as Ashley?

21   A.     Yes.

22   Q.     All right.  Now the other woman was Amanda, but I

23   grabbed a different photograph.  What is this photograph?

24   A.     Her name is Jerrika.

25   Q.     Sorry.  113.

                        Mandy L.                        138

1    A.      Jerrika.

2    Q.      Okay.  Did you know Jerrika?

3    A.      Yes.

4    Q.      Did she have any role in this?

5    A.      Prostitution.

6    Q.      Okay.  Was this at the Spring Street house?

7    A.      Yes.  I met her first at a hotel.

8    Q.      Earlier that summer?

9    A.      Yes.

10   Q.      And she was prostituting?

11   A.      Yes.

12   Q.      Was anyone else involved in her prostitution?

13   A.      No.

14   Q.      You mentioned --

15           MR. KAPLAN:  Judge, maybe it would help if the

16   prosecutor didn't stand right in front of her so we could hear

17   better.

18           THE COURT:  Well no.  Objection overruled.  Get

19   through the question.  You're going to then introduce the

20   photographs.

21           MR. DARROW:  Hoping to.  Thanks.

22           THE COURT:  All right.

23   BY MR. DARROW:

24   Q.      Tell us when you met Jerrika what she was doing?

25   A.      I've known Jerrika.

            Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                                    139

1   Q.      I'm sorry.

2   A.      I've known her.

3   Q.      Did you run into Jerrika in the summer of 2015?

4   A.      Yes.

5   Q.      How?

6   A.      She was in Moe's car.

7   Q.      She was in Moe's car?

8   A.      Yes.

9   Q.      Was she involved in the activities you described

10  earlier?

11  A.      Yes.

12  Q.      Okay.  At the motels?

13  A.      Yes.

14  Q.      Prostituting?

15  A.      Yes.

16  Q.      Do you know if she was working for Moe or was

17  independent?

18  A.      Working for Moe.

19          MR. DARROW:  Thanks.  Your Honor, we move 54A, 93,

20  and 113.

21          THE COURT:  Okay.

22          MR. KAPLAN:  No objection, Judge.

23          THE COURT:  All right.  So admitted.

24  [Government exhibits 54A, 93, 113 admitted]

25  BY MR. DARROW:

                        Mandy L.                          140

1    Q.      Can we look at 54A please?  Who is that person?

2    A.      Ayla.

3    Q.      Can we look at the next one?  Who is that?

4    A.      Ashley.

5    Q.      That's Ashley.  Okay, that's 93, and can you pull up 113

6    please?  We're looking now at 113.  Who is that?

7    A.      Jerrika.

8    Q.      Now you mentioned when we were talking just before we

9    looked at the photographs about a woman named Amanda, okay, and

10   what was Amanda's piece of this?

11   A.      Prostitute.

12   Q.      This is during the summer of 2015?

13   A.      Yes.

14   Q.      Do you know if she was working for Moe or not?

15   A.      Yes.

16   Q.      How do you know that?

17   A.      She was working out of Lori's house.

18   Q.      Oh this is the Spring Street house?  Showing you

19   Government's 83.  Do you recognize that woman?

20   A.      Yes.

21   Q.      Who is that?

22   A.      Amanda.

23   Q.      Is that a fair and accurate depiction of Amanda as you

24   know her?  Yes?

25   A.      Yes.

                        Mandy L.                        141

1              MR. DARROW:  Your Honor, we move 83.

2              THE COURT:  All right.

3              MR. KAPLAN:  No objection.

4              THE COURT:  All right.  So admitted.

5    [Government exhibit 83 admitted]

6    BY MR. DARROW:

7    Q.    That's Amanda?

8    A.    Yes.

9    Q.    Okay.  Thank you.  Now when you say that these young

10   women were prostituting out of the Springfield house of Lori

11   can you describe how that was working because we've now moved

12   from the motel rooms you talked about to an apartment in

13   Burlington.  So what happened there in connection with the

14   prostitution?

15   A.    They would get calls, but they would be out calls.  They

16   would go meet them.

17   Q.    Okay and they would get calls.  So as with the motel

18   they would have phones and the phones would ring?

19   A.    Yes.

20   Q.    And what's an out call?

21   A.    Like they would go to the people's hotel or car date.

22   Q.    Okay.  Is an out call when the woman who is working goes

23   to the customer?

24   A.    Yes.

25   Q.    Okay.  How would they get to the customer?

                        Mandy L.                          142

1    A.      Someone to drive them.

2    Q.      Who drove them?

3    A.      Usually Moe.

4    Q.      Did other people sometimes drive them?

5    A.      Yes.

6    Q.      Who?

7    A.      This is when I first -- Lori was doing it.

8    Q.      Okay.  Do you know Lori's last name?

9    A.      Yes.

10   Q.      What is it?

11   A.      C.

12   Q.      Now you mentioned earlier in connection with the

13   prostitution at the motels that one of your jobs as kind of

14   supervisor was to keep an eye on the money?

15   A.      Yes.

16   Q.      Did that job continue into the Spring Street work?

17   A.      This was actually after Spring Street.

18   Q.      I apologize.

19   A.      Yes.

20   Q.      Okay and what did you say about after Spring Street?

21   A.      I'm confused.

22   Q.      All right.  I'm sorry.  My understanding is that motels

23   in the summer of 2015, and then at some point late in that year

24   activities moved to Lori's C.'s apartment on Spring Street?

25   A.      Yes.

                    Mandy L.                          143

1   Q.      Okay, and I had asked you did your job keeping an eye on

2   the money coming in from the prostitution did that continue at

3   Spring Street?

4   A.      No.

5   Q.      Okay.  Did somebody look after the money?

6   A.      No.

7   Q.      How was the money handled?

8   A.      At that time I don't know.

9   Q.      Okay.  So you don't know what the individuals who were

10  working did with it?

11  A.      No.

12  Q.      Okay.  Have you ever heard of a term called bagging up?

13  A.      Yes.

14  Q.      What's bagging up?

15  A.      You sit in a room, divide the heroin, and put it into

16  baggies.

17  Q.      Okay.  Was that the only drug that was put in baggies at

18  bagging up parties?

19  A.      No.

20  Q.      What other?

21  A.      The crack cocaine.

22  Q.      Okay.  When did you first see or participate in bagging

23  up about?

24  A.      I'm -- I don't recall dates.

25  Q.      Okay.  About how many times did you see or participate

Mandy L.                                    144

1   in a bagging up session?

2   A.      A lot.

3   Q.      A lot.  Okay.  Was there someone who supervised the

4   bagging up?

5   A.      Yes.

6   Q.      Who was that?

7   A.      Moe.

8   Q.      Okay.  So, sorry, all right.  Where did the bagging up

9   take place?

10  A.      Marty's house.

11  Q.      Who?

12  A.      Marty.

13  Q.      Who is Marty?

14  A.      He lives off North Avenue.

15  Q.      Do you know what his -- did he have a relationship with

16  anyone in the case?

17  A.      He was Moe's wife's uncle.

18          MR. DARROW:  May I, Judge?

19          THE COURT:  Yes.

20  BY MR. DARROW:

21  Q.      Showing you three photographs marked as 98.  Do you

22  recognize the building depicted there?

23  A.      Yes.

24  Q.      What is it?

25  A.      Marty's house.

                     Mandy L.                          145

1    Q.      Is that the house you were just referring to?

2    A.      Yes.

3    Q.      And is that a brick house?

4    A.      Yes.

5    Q.      And what do the other photos show?  Just different

6    angles of the same house?

7    A.      Different angles.

8            MR. DARROW:  Your Honor, we move 98.

9            MR. KAPLAN:  No objection.

10           THE COURT:  All right.  So admitted.

11   [Government exhibit 98 admitted]

12   BY MR. DARROW:

13   Q.      Is the picture now on the screen is that what's depicted

14   the house you were just describing?

15   A.      Yes.

16   Q.      Same place?

17   A.      Yup.

18   Q.      Same place?

19   A.      Yes.

20   Q.      Okay.  Now I think we got on the subject of that house

21   when I asked you when you first saw or participated in a

22   bagging up session, right?  Okay.  I want you to try to

23   describe to the jury what was going on there, what happens in a

24   bagging up session, and give it as much detail as you can?

25   A.      You sit in a room at a table and -- it's hard to

Mandy L.                                146

1  explain.  It's just a little room you sit in.  There's a table.
2  Usually like the stuff is there, you cut it up, divide it, put
3  it in a bag.
4  Q.     Okay.  The stuff is there.  What stuff?
5  A.     Heroin.  The crack.
6  Q.     Okay, and how about the other things you mentioned?
7  A.     The baggies, the rubberbands.
8  Q.     Okay.  Were the baggies used for crack different from
9  the baggies used for heroin?
10  A.     Yes.
11  Q.     Can you describe the difference?
12  A.     The heroin baggies were white wax paper type stuff and
13  the crack baggies were just little baggies.
14  Q.     All right, and the stuff is you're talking about heroin
15  and crack cocaine?
16  A.     Yes.
17  Q.     At a bagging session where does the stuff come from?
18  A.     Moe.
19  Q.     So Moe comes with it sounds like a bulk amount of each
20  drug?
21  A.     Yes.
22  Q.     And at the beginning of a bagging up session about --
23  can you describe generally how much let's say heroin was on the
24  table to be bagged?
25  A.     I don't even --

                        Mandy L.                          147

1   Q.      I mean just think of it in terms of comparing it to an

2   object like the size of a cookie, slice of toast, brick,

3   whatever it might be.

4   A.      Smaller than that.

5   Q.      Smaller than that.  Golf ball?

6   A.      Yeah.

7   Q.      Okay, and how about the crack cocaine what did that look

8   like?

9   A.      I don't even think no bigger than this.

10  Q.      Golf ball?

11  A.      Yeah pretty much.

12  Q.      So for those of us that have never seen a golf ball

13  sized amount of heroin what's bulk heroin like that look like?

14  What do you see?

15  A.      It's powder.

16  Q.      It's powder.  What color is it?

17  A.      Brownish.

18  Q.      Okay.  Now starting with just the heroin you're sitting

19  around a little table.  About how many people are there?

20  A.      Usually two or three.

21  Q.      Two or three.  Are they male or female?

22  A.      Female.

23  Q.      What do they do to get the process from getting the

24  heroin from that golf ball sized bulk amount into the little

25  tickets or bags?

                    Mandy L.                        148

1    A.     Razor blade to cut it up and usually there's something

2    to scoop it up with and pour it in the bag.

3    Q.     A razor blade to cut it up?

4    A.     To divide it, yes.

5    Q.     To divide it.  To divide it into what?

6    A.     Little lines.

7    Q.     You use a razor blade to divide up lines of the heroin

8    and what would happen to the lines?

9    A.     It would be scooped into like a card or straw to put

10   into the baggie.

11   Q.     Scooped into a card?

12   A.     Card or like a cut straw you can put into the baggie.

13   Q.     When you say a card?

14   A.     Playing card folded up.

15   Q.     Like what?

16   A.     A playing card just folded in half.

17   Q.     Okay or a straw?

18   A.     Yes.

19   Q.     So the playing card you -- would be used to slide the

20   drug into the baggie?

21   A.     Yes.

22   Q.     And how was the straw used?

23   A.     Pretty much the same way.

24   Q.     Okay.  You get some heroin in the straw and pour it in

25   the bag?

Mandy L.                                         149

1    A.    Yes.

2    Q.    Okay.  How did you know how much -- still on heroin how

3    much heroin to put in a little single baggie?

4    A.    It gets weighed out.

5    Q.    It's weighed out.  So there's scales there?

6    A.    Yes.

7    Q.    All right.  So you've described this bagging up session

8    this first one you saw at -- is it Marty's?

9    A.    Yes.

10   Q.    Did I -- I think I asked you how many of them you

11   thought you have done and what was your answer?

12   A.    A lot.

13   Q.    Okay, and can you just help us a little?  Is a lot like

14   half a dozen?  15?  Give us an idea.

15   A.    20.  30.  A lot.

16   Q.    All right.  About how often were bagging up sessions

17   taking place?

18   A.    Pretty much whenever we ran out.

19   Q.    And about how often was that?

20   A.    Every night almost.

21   Q.    I'm sorry.

22   A.    Everyday.  Every other day.

23   Q.    Everyday or a few days?

24   A.    Yes.

25   Q.    All right.  Who was at that first bagging up session at

                        Mandy L.                         150

1   Marty's?

2   A.     It was me, Moe, Mary P.  Sorry.

3   Q.     Mary?

4   A.     Mary and her cousin Selena.

5   Q.     Okay, and what were Mary and Selena doing?

6   A.     Bagging up the heroin and crack.

7   Q.     Okay and what were you doing?

8   A.     I would put the buns together.

9   Q.     And what was Moe doing?

10  A.     Just supervising.

11  Q.     Okay.  Where else did you have these bagging up

12  sessions?

13  A.     Lori's, North Union Street.

14  Q.     Okay, and just how long was the group operating out of

15  Lori's house in Spring Street?

16  A.     Not even -- when I started it wasn't even a month.

17  Q.     Okay.  At some point did the group move?

18  A.     Yes.

19  Q.     Where did they move to?

20  A.     To North Union Street.

21  Q.     Okay, and so you're saying bagging up sessions were at

22  both Spring Street and North Union?

23  A.     Yes.

24  Q.     Okay.  Same general activity at other bagging up

25  sessions?

                         Mandy L.                          151

1    A.     Yes.

2    Q.     Other participants?

3    A.     There would be new ones, yes.

4    Q.     Okay.  Like who?

5    A.     There's a girl named Amber.

6    Q.     All right.

7    A.     That's pretty much --

8    Q.     In terms of the actual bagging of the drugs were those

9    always young women?

10   A.     Yes.

11   Q.     Okay.  Were the young women who were bagging in these

12   bagging up sessions were they ever asked to strip?

13   A.     Yes.

14   Q.     Tell us about that.

15   A.     They would be made to bag up naked.

16   Q.     Excuse me.  Who made them bag up naked?

17   A.     Moe.

18   Q.     Any idea why?

19   A.     So that he knew they weren't stealing from him.

20   Q.     Stealing?

21   A.     The drugs.

22   Q.     Okay.  Because there would be nowhere to hide?

23   A.     Yeah.

24   Q.     Okay.  At some point in late 2015 -- well back up.  You

25   mentioned earlier that when you first started working at Lori's

                        Mandy L.                          152

1   house Lori was there because she would sometimes drive?

2   A.      No.   That's when I first found out about it.

3   Q.      When you first found out about it.   Okay.   At some point

4   did Lori disappear?

5   A.      Yes.

6   Q.      Did she go to rehab?

7   A.      Yes.

8   Q.      For about how long?

9   A.      She came back the end of November.

10  Q.      Okay.   So she left or came back?

11  A.      She came back at the end of November/beginning of

12  December.

13  Q.      All right.   So she's gone about a month?

14  A.      Yes.

15  Q.      In late 2015.   Okay.   When she's away what's happening

16  at her place?

17  A.      Pretty much the same; prostitution, selling drugs.

18  Q.      Okay, and it sounds like the group kind of took the

19  place over?

20  A.      Yes.

21  Q.      And if I understand correctly, she's about -- away for

22  about a month so your group has the run of the place for about

23  a month?

24  A.      Yes.

25  Q.      Do you know where the drugs that Moe was bringing to

Mandy L.                                          153

1    these bagging up sessions came from?

2    A.      Somewhere -- yes.

3    Q.      I'm sorry.

4    A.      Yes.

5    Q.      Okay.  Where?

6    A.      New York.

7    Q.      How do you know that?

8    A.      Because I've been on a few trips.

9    Q.      You have been on --

10   A.      I've been with him when he's got them.

11   Q.      Okay.  About how many times did you do that?

12   A.      Three.

13   Q.      Three.  Who went on those trips?

14   A.      Me, Moe, and another person.

15   Q.      Who?

16   A.      Ariel.

17   Q.      Okay.  What happened on those trips?

18   A.      He would -- he would get drugs and we would bring them

19   back.

20   Q.      Okay.  Let's just go slowly through this.  The three of

21   you were in Burlington?

22   A.      Yes.

23   Q.      Okay, and you would get in the vehicle?

24   A.      Yes.

25   Q.      Okay.  Who would tell you that it was time to go to New

Mandy L.                                    154

1   York?

2   A.     Moe.

3   Q.     All right.  Do you remember the vehicles he had?

4   A.     Yes.

5   Q.     What vehicles?

6   A.     He had a tan Mercury, a blue Dodge Durango, and a silver

7   Saturn.

8   Q.     All right, and which vehicle did he use on these New

9   York trips?

10  A.     The first time I went down was the tan Mercury.  The

11  other times was the silver Saturn.

12  Q.     All right.  Who drives?

13  A.     The first time was Moe and then after that it would be a

14  different driver.

15  Q.     Okay.  A different -- you mean --

16  A.     Ariel.

17  Q.     Okay, and when -- were the three trips similar?

18  A.     Yes.

19  Q.     Okay.  When the three of you get to New York what

20  happens?

21  A.     He would go to the place he gets his drug -- we would go

22  to where he got them from and --

23  Q.     Do you have any idea where in New York that was?  What

24  borough?  Address?

25  A.     It was different places.

                    Mandy L.                          155

1    Q.     And you're down somewhere in the big city?

2    A.     Yeah.

3    Q.     All right.  Now when you say he would go and get his

4    drugs what did you see?

5    A.     We would just stand out in a different room or he would

6    go in another room.

7    Q.     All right, and when he came out of the other room did he

8    have something?

9    A.     Yes.

10   Q.     And what did the three of you do then?

11   A.     Me and Ariel would pack it and then we would leave.

12   Q.     What does pack it mean?  I'm sorry.  Just --

13   A.     Putting it inside of you.

14   Q.     All right.  How?  Are the drugs first put in something

15   else?

16   A.     Wrapped in a condom and then, yeah.

17   Q.     So the drugs -- and what kind of drugs are we talking

18   about?

19   A.     Heroin and crack.

20   Q.     Heroin and crack?

21   A.     Yes.

22   Q.     So the drugs would be placed inside a condom?

23   A.     Uh-huh.

24   Q.     And what would happen to the condom?

25   A.     We would place it inside of us.

              Capitol Court Reporters, Inc. (800/802) 863-6067

                    Mandy L.                          156

1    Q.      In your vagina?

2    A.      Yes.

3    Q.      You and --

4    A.      Ariel.

5    Q.      How did you know Ariel was doing that?

6    A.      I've seen it.

7    Q.      Did somebody ask you to do that?

8    A.      Yes.

9    Q.      Who?

10   A.      Moe.

11   Q.      What would the three of you do then?

12   A.      We would leave and head back to Vermont.

13   Q.      Same car?

14   A.      Yes.

15   Q.      Long drive.  You've got the drugs inside you?

16   A.      Yes.

17   Q.      You get back to Vermont.  What happens?

18   A.      Take them out and we would cut it up and it would be cut

19   up and bagged.

20   Q.      At one of those bagging sessions?

21   A.      Yes.

22   Q.      Do you know -- I know you earlier said you're weak

23   generally on dates, but do you know about when these trips to

24   New York were?

25   A.      No.

Mandy L.                                    157

1  Q.      Okay.  Was there another trip to New York early on in

2  the summer of 2015 when you're not sure what was going on?

3  A.      Yes.

4  Q.      When was that?

5  A.      July of 2015.

6  Q.      What happened then?

7  A.      We had drove his son down.

8  Q.      Okay, and it sounds like whatever else may have happened

9  in New York you're not too sure because that trip seemed

10 different from the later?

11 A.      Yes.

12 Q.      Do you remember when the last trip down like that was?

13 A.      April.

14 Q.      For drugs?

15 A.      Oh it was before I went to jail.

16 Q.      When did you go to jail?

17 A.      April 17.

18 Q.      Of?

19 A.      2016.

20 Q.      Okay.  So it was before April.  Any idea where?

21 A.      Don't recall.

22 Q.      Okay.  Thank you.  At some point -- well let me back up.

23 You've described the activities at Lori C.'s Spring Street

24 house?

25 A.      Yes.

Mandy L.                                    158

1   Q.      At some point you move to?

2   A.      North Union Street.

3   Q.      Do you remember where on North Union?

4   A.      Pretty sure it was 103 North Union.

5   Q.      103 North Union.  I think that building has several

6   apartments in it?

7   A.      Yes.

8   Q.      Was it one of the apartments in the back?

9   A.      Yes.

10  Q.      Okay.  Describe what goes on at 103 North Union while

11  you were staying there?

12  A.      It was really just sold drugs out of at first.

13  Q.      Sold drugs at first, and when you say --

14  A.      Yes.

15  Q.      And when you say sold drugs who is selling the drugs?

16  A.      Me and Hannah.

17  Q.      You and Hannah and are you acting as, you said before,

18  runners?

19  A.      Yes.

20  Q.      Previously when you described running at the Spring

21  Street house you said customers would call Moe?

22          MR. KAPLAN:  Objection, Your Honor.

23          THE COURT:  This is a preliminary part of the

24  question so finish that and ask the open ended question.

25          MR. DARROW:  Thank you, Your Honor.

Capitol Court Reporters, Inc. (800/802) 863-6067

                         Mandy L.                         159
1   BY MR. DARROW:
2   Q.    You described the general process of when you would act
3   as a runner.  Was it the same or different when you got over to
4   North Union?
5   A.    It was the same.
6   Q.    You described earlier about how many drug deliveries you
7   thought you made a day.  Was that about the same?
8   A.    Yes.
9   Q.    Prices about the same?
10  A.    Yes.
11  Q.    Now when you're doing that, delivering these bagged up
12  drugs, who provided the drugs to you to distribute?
13  A.    Moe.
14  Q.    Okay, and about how often would he do that?
15  A.    Whenever he ran out.
16  Q.    Do you remember -- do you remember how many he would
17  give you at a time?
18  A.    10 bundles.
19  Q.    10 bundles, and how about the other woman working with
20  you?
21  A.    Hannah, the same.
22  Q.    So when he supplied you he would give you each 10
23  bundles?
24  A.    Yes.
25  Q.    And you say when you ran out.  So would those be sold?

Mandy L.                                    160

1    A.      Yes.

2    Q.      And then he would give you another?

3    A.      Yes.

4    Q.      Okay.  Backing up to Spring Street, if you have got that

5    much heroin, 10 bundles or maybe 20, if the woman working with

6    you also has 10, where would you keep them when you weren't

7    going out?

8    A.      There was a little lock box.

9    Q.      A little?

10   A.      A lock box.

11   Q.      Where?

12   A.      In the house.

13   Q.      Whose house?

14   A.      Lori's.

15   Q.      I'm sorry.

16   A.      Lori's.

17   Q.      The house on Spring Street?

18   A.      Yes.

19   Q.      So you would keep your 10 bundles in a lock box and when

20   you got an order you would take some out?

21   A.      Yes.

22   Q.      Okay.  How about at 103 North Union?

23   A.      It would be kept in the bureau or we would hide them in

24   the blinds.

25   Q.      Okay.  Did you ever hide them in the car?

Mandy L.                                        161

1    A.      Yes.

2    Q.      Where?

3    A.      Under -- in the driveway of North Union Street.

4    Q.      So it sounded like you tried to conceal your main supply

5    just bring out what the customer needed?

6    A.      Yes.

7    Q.      Did you learn at some point that in January of 2016 a

8    woman working with the -- with law enforcement made drug buys

9    from you guys?

10   A.      Yes.

11   Q.      Okay.  How did you learn that?

12   A.      She was just buying.

13   Q.      She was buying?

14   A.      Yes.

15   Q.      What was she buying?

16   A.      She would buy heroin.

17   Q.      Okay.  Do you know how much she was looking for?

18   A.      I don't remember.

19           MR. DARROW:  All right.  Your Honor, can we play an

20   exhibit that's already in evidence?

21           THE COURT:  What's the exhibit?

22           MR. DARROW:  It's 3C, recording from the January 6th

23   buy.

24           THE COURT:  Okay.

25           MR. DARROW:  Play the first third of that please.

Mandy L.                                    162

1   [Government exhibit 3C published]

2   BY MR. DARROW:

3   Q.      Do you recognize either of those voices?

4   A.      Yes.

5   Q.      Who are they?

6   A.      One is mine.

7          MR. DARROW:  Okay, and can -- Your Honor, may we also

8   play another exhibit in evidence 8E from the January 12th buy

9   if we can play from 21 to 52.

10          THE COURT:  Okay.

11   [Government exhibit 8E published]

12   BY MR. DARROW:

13   Q.      Do you recognize one of those voices?

14   A.      Yes.

15   Q.      Who is that?

16   A.      Mine.

17          MR. DARROW:  Your Honor, same drill as to 14A from

18   the January 22th buy.

19          THE COURT:  Okay.

20   [Government exhibit 14A published]

21   BY MR. DARROW:

22   Q.      This is a photograph that's already in evidence.  Do you

23   recognize that person?

24   A.      Yes.

25   Q.      Who is that?

                          Mandy L.                          163

1    A.     Me.

2    Q.     Okay, and can you see what you're holding in your two

3    hands?

4    A.     Yes.

5    Q.     What's that?

6    A.     Cash and heroin.

7           MR. DARROW:  Okay.  Thank you, and, Your Honor, we

8    would also like to play from the exhibit that's in evidence

9    from the February 10th buy 20B if we can play 4:17 through

10   4:36.

11          THE COURT:  Yes.

12   [Government exhibit 20B published]

13   BY MR. DARROW:

14   Q.     Do you recognize one of those voices?

15   A.     Yes.

16   Q.     Who is that?

17   A.     Me.

18   Q.     Now do you recall a time when you discovered that the

19   stash had been stolen out of the car in the driveway?

20   A.     Yes.

21   Q.     What happened?

22   A.     She had come to the house.  Pretty much that video.

23   Q.     She being the buyer?

24   A.     Yes.

25   Q.     The person using the name Nikki?

Mandy L.                                    164

1  A.     Yes.

2  Q.     Okay.  What happened?

3  A.     So I went out to the car to get the stuff, but it wasn't

4  there.

5  Q.     Okay.  Was she looking for a sleeve?

6  A.     Yes.

7  Q.     And why did you go out to the car?

8  A.     To get it.  That's where the drugs were kept.

9  Q.     And you had that much or more?

10  A.     Yes.

11  Q.     And what did you find when you got to the car?

12  A.     It was a smashed window and drugs gone.

13  Q.     What did you do?

14  A.     Went back in and told Moe.

15  Q.     And did Moe want to go see for himself?

16  A.     Yes.

17  Q.     Can we play 23A, Your Honor?  Yes -- oh I apologize.

18  Let's not play 23A.  It's not in yet.  Your memory is you went

19  back into the house.  What did you say to Moe?

20  A.     I said that we needed to talk and he said -- I said the

21  window is broke, I said, and the stuff is gone.

22  Q.     What was his reaction?

23  A.     At first he wanted to see for himself so he walked out

24  to the car.

25  Q.     All right, and then?

Mandy L.                                    165

1   A.      He seen it.  He was upset.

2   Q.      Okay.  How did he express being upset?

3   A.      Yelling.  Being mad.  He was like I want to know who did

4   this.

5   Q.      Was he mad at you?

6   A.      He said we should have kept an eye on the car better.

7   Q.      I'm sorry.

8   A.      He said that I should have -- we should have kept an eye

9   on the car better.

10  Q.      So it was your fault?

11  A.      Yes.

12          MR. KAPLAN:  Objection, Your Honor.

13          THE COURT:  Objection sustained.

14          MR. DARROW:  Withdrawn.  Sorry.

15  BY MR. DARROW:

16  Q.      Do you know who got blamed for that?

17          MR. KAPLAN:  Objection, Your Honor.  Leading.

18  There's no evidence that anyone was blamed for it.

19          THE COURT:  Well you could say that -- did anyone get

20  blamed.  I think you can answer the question.  That's not a

21  leading question so --

22  A.      Yes.

23  Q.      Who got blamed?

24  A.      Mary.

25  Q.      Who blamed her?

Mandy L.                                        166

1    A.    Moe.

2    Q.    That afternoon were you in the apartment the whole time?

3    A.    No.

4    Q.    Where did you go?

5    A.    I went to Rite Aid.

6    Q.    When you got back did you find someone else in the

7    apartment?

8    A.    Yes.

9    Q.    Who?

10   A.    It was Ayla and Mary.

11   Q.    Back during this time did you ever hear use of the term

12   violate?

13   A.    Yes.

14   Q.    How was it used?

15   A.    If you violate me, I will violate you.

16   Q.    Who said that?

17   A.    Moe.

18   Q.    Did you hear him say that more than once?

19   A.    Yes.

20   Q.    Who did he say that too?

21   A.    Mary.  Amber.  He said it to all of us.

22   Q.    Did you ever get violated?

23   A.    At that time?

24   Q.    Well let me ask you --

25             MR. KAPLAN:  Your Honor, may we approach, please?

                    Mandy L.                              167

1              THE COURT:  Yes.

2              THE WITNESS:  Can I talk to my attorney?

3              MR. DARROW:  You want to talk to your attorney.  Your

4  Honor, is that all right?

5              THE COURT:  Yes.

6              MR. KAPLAN:  That's okay in the middle of testimony?

7              THE COURT:  Yes.  Okay.  Husher is on.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mandy L.                              168

1  [Bench conference]

2          MR. KAPLAN:  I understood the Court ruled she can't

3  talk about an assault that she says took place just before she

4  was arrested in 2016.

5          MR. DARROW:  I wasn't asking about that.

6          MR. KAPLAN:  He asked an opening question like that.

7  Does she know she's not supposed to?

8          MR. DARROW:  I have told her that it's a Judge's

9  ruling.

10          MR. KAPLAN:  What's she going to say?

11          MR. DARROW:  But I'm only asking her about things

12  that happened during this time period which is Spring Street

13  and 103 North Union before they left.

14          MR. KAPLAN:  Make sure she doesn't say that.

15          MR. DARROW:  I'll try.

16          THE COURT:  Okay, and by the way any time a witness

17  wants to talk to the lawyer usually I allow that.

18          MR. KAPLAN:  I don't think they should in the middle

19  of testimony, Judge, but I can't point to any rule on that and

20  you're the Judge.

21          THE COURT:  There's constitutional rights people

22  have.  You always should have access to your lawyer.

23          MR. KAPLAN:  Like the prosecutor can't talk to the

24  witness in between, right?

25          THE COURT:  Actually in Briggs that's not true, but

Mandy L.                                    169

1    in general I've never seen a prosecutor actually ask a witness

2    to have a conversation during the course of testimony.

3    Regardless, but if she needs to talk to the lawyer --

4                MR. DARROW:  It might have been my mistake.  I told

5    her, her attorney would be here and I said if you get

6    uncomfortable at any point, just tell us.

7                THE COURT:  I think you should always have access to

8    your attorney.  Tell me if you know of any case law which

9    prevents a witness from talking to their lawyer, especially in

10   light of the fact that she's facing criminal charges.  She's

11   pled guilty anyway.

12               MR. KAPLAN:  I would think --

13               THE COURT:  Well there's the Fifth Amendment, but

14   there may be other issues as well.  So regardless.  Okay.

15   [End of bench conference]

16

17

18

19

20

21

22

23

24

25

Mandy L.                                    170

1  BY MR. DARROW:

2  Q.     Are you okay?

3  A.     Yeah.

4  Q.     Okay.  You're still under oath.  Okay.  Do you want a

5  glass of water?  There's some water just there.  Where we left

6  off you had talked about how frequently Moe told people you

7  violate me and I'll violate you, and I think I had asked you if

8  you had ever been violated and I'm just talking about the time

9  before things -- before mid 2016 when I understand you go your

10 separate ways.  I'm talking about in the 103 North Union and

11 Lori's place on Spring Street during that time.

12 A.     Yes.

13 Q.     Okay.  Can you please tell us what happened?

14 A.     I was made to wear a red apron.

15 Q.     I'm sorry.  Can you lean forward please?

16 A.     I had made to wear an apron.

17 Q.     Okay.  What's the apron?

18 A.     It's a red apron.  You walk around naked underneath.

19 Q.     What color was the apron?

20 A.     Red.

21 Q.     Was there a red apron that was kept somewhere?

22 A.     Yes.

23 Q.     Where was that?

24 A.     On the back of the bathroom door at North Union Street.

25 Q.     And what significance did the red apron have to this --

Mandy L.                                171

1  these activities you were talking about?

2  A.     What do you mean?

3  Q.     Well let's stick with what happened to you.  What

4  happened with you with the red apron?

5  A.     I had to wear it.

6  Q.     Okay.  Who made you wear it?

7  A.     Moe.

8  Q.     And when you had to wear the red apron what goes along

9  with that?  Do you have to take your clothes off?

10 A.     Yes.  Completely naked under it.

11        MR. KAPLAN:  Objection.

12        THE COURT:  Objection overruled.  You can answer that

13 question.

14 A.     You would have to be completely naked.

15 Q.     All right.  So you have an apron you're talking about is

16 a kitchen apron you wear?

17        MR. KAPLAN:  Your Honor, objection.

18        THE COURT:  Well that's just describing the apron,

19 that's fine, but if you can get into the open-ended question

20 following that, that's fine.  Do you understand what an apron

21 is, right?

22        THE WITNESS:  Yes.

23        THE COURT:  So would you then ask your next question.

24        MR. DARROW:  Thank you.

25 BY MR. DARROW:

Mandy L.                                        172

1    Q.    When you wear the apron are parts of your body exposed?

2    A.    Yes.

3    Q.    What parts?

4    A.    Your butt.

5    Q.    And you're not wearing anything else?

6    A.    No.

7    Q.    Okay.  So how long did you have to wear the apron?

8    A.    As long as he told you to.

9          THE COURT:  I'm sorry.  I couldn't hear you.

10   A.    As long as he told you to.

11   Q.    And this is while you're at the, you said, 103 North

12   Union place?

13   A.    Yes.

14   Q.    Even if there are other people around?

15   A.    Yes.

16   Q.    All right.  How did you feel about that?

17   A.    Disgusted.

18   Q.    So let's back up.  I asked you if you had ever been

19   violated and you said you had to wear the red apron?

20   A.    Yes.

21   Q.    What happened that led you to have to wear the red

22   apron?

23   A.    The drugs being stolen.

24   Q.    I'm sorry.

25   A.    The drugs being stolen.

Mandy L.                              173

1   Q.      What about the drugs being stolen?

2   A.      That's what led to me having to wear the apron.

3   Q.      Okay.  Was there a problem that came up that Moe faulted

4   you for?

5   A.      Yes.  The drugs being stolen.

6   Q.      What about the drugs being sold caused him to, if you

7   know, make you wear the red apron?

8   A.      Wait what?

9   Q.      I'm trying to understand why you had to wear the red

10  apron.

11  A.      The drugs that came up missing.

12  Q.      Oh missing?

13  A.      Yes.

14  Q.      I apologize.  Was that a theft or a mistake or what

15  happened?

16  A.      A theft.

17  Q.      A theft.  Okay.  Now you've described the theft from the

18  car when Nikki was looking for a sleeve?

19  A.      Yes.

20  Q.      Is that what you're talking about?

21  A.      Yes.

22  Q.      Okay.  Now earlier you testified that I think Mary P.

23  was faulted for that?

24  A.      Yes that day.

25  Q.      It was your fault first?

Mandy L.                                    174

1    A.     Because I didn't watch the car.

2    Q.     After.  Okay.  Now you've described that red apron

3    episode.  Was there any other time that you got violated?

4    A.     In that time period?

5    Q.     In that time period.

6    A.     No.

7    Q.     Okay.  Thank you.  Have you ever heard of something

8    called a walnut challenge?

9    A.     Yes.

10   Q.     What is it?

11   A.     Make the girls -- where girls shove walnuts in their

12   ass.

13   Q.     Okay.  Is this something that happened?

14   A.     Yes.

15   Q.     Where?

16   A.     At Lori's house.

17   Q.     On Spring Street?

18   A.     Yes.

19   Q.     Okay.  Have you seen this happen?

20   A.     I won't get into that.

21   Q.     I'm sorry.

22   A.     I wasn't there personally.

23   Q.     Did somebody show you a video?

24   A.     A video, yes.

25          MR. KAPLAN:  Objection, Your Honor.

Mandy L.                                    175

1          THE COURT:  That is video.  This is her recollection

2    from viewing a video; is that correct?

3          MR. DARROW:  That I will show her.

4          THE COURT:  All right.  I'll sustain the objection.

5    She was not there at the time.

6          MR. DARROW:  All right.

7    BY MR. DARROW:

8    Q.    Do you know which females were subjected to this?

9          MR. KAPLAN:  Objection, Your Honor.  There's been no

10   --

11         THE COURT:  That again would be led by -- it would be

12   determined by the video and so objection sustained.

13         MR. DARROW:  So I can't even ask who showed her a

14   video of this?

15         THE COURT:  Unless -- counsel approach the bench.

16

17

18

19

20

21

22

23

24

25

Mandy L.                              176

1  [Bench conference]

2      THE COURT:  If it is an act of the defendant, the

3  defendant showing this video, that's fine, but anybody else

4  it's essentially hearsay.

5          MR. DARROW:  It's different.  The walnuts happened

6  during the time that the group was operating out of the Spring

7  Street house.  We'll introduce later the video that Moe kept of

8  him preparing for the third woman that went through this.

9  Mandy will testify that they were all videotaped and that Moe

10 showed her the videos.

11         MR. KAPLAN:  But I don't think the videos show that

12 happening.  It just shows preparation.

13         MR. DARROW:  They recovered these from Moe, but the

14 testimony would be it was filmed.  The video was being done.

15 It's like showing someone a photograph if she recognized what

16 was happening.

17         THE COURT:  I'm not understanding what you're

18 suggesting.  He videotaped her as well as all of the others?

19         MR. DARROW:  No.  There are three females that went

20 through this; Keisha, Ayla, and Victoria.  The video that was

21 recovered is Victoria.  The videos of it actually happening

22 were never recovered.  We think it's because they are in the

23 tablet that was encrypted we couldn't get into and that's where

24 they are, but back during the time -- I don't intend to go on

25 at length about it.

Mandy L.                                   177

1          THE COURT:  He would have showed her what happened in

2     the walnut challenge?

3          MR. DARROW:  The video that was made of the walnut

4     challenge.  So it's like if he showed her a photograph of

5     somebody.

6          THE COURT:  And in fact you don't have the video of

7     the walnut challenge?

8          MR. KAPLAN:  And Victoria is not alive any more.

9          MR. DARROW:  No, but we have Keisha who will testify

10    she went through it and was videotaped, and we have him about

11    to do it on Victoria.  So it's not like there's no evidence and

12    it never happened.

13         MR. KAPLAN:  I can't cross.

14         THE COURT:  That's a real difficulty.  First of all,

15    she's not involved in the walnut challenge.  She's not asked

16    necessarily to participate; is that correct?

17         MR. DARROW:  That's correct.

18         THE COURT:  Okay.  I think that you should deal with

19    that with other witnesses and so I'll exclude the testimony.

20    [End of bench conference]

21

22

23

24

25

                    Mandy L.                           178

1    BY MR. DARROW:

2    Q.     Did you participate or were you present for any of these

3    walnut challenges?

4    A.     No.

5    Q.     Okay.  We're going to change the subject then.  Did

6    Folks ever ask you to engage in degrading activities?

7              MR. KAPLAN:  Objection, Your Honor.

8              THE COURT:  Objection overruled.  You can answer

9    that.

10   A.     What do you mean by that?

11   Q.     Well you've described the red apron business which you

12   said was very unpleasant.  Was there anything else that you

13   were asked to do?

14   A.     No.

15   Q.     Okay.  You have mentioned in the bagging up sessions

16   mostly young females involved.  Were there ever any other adult

17   males on the scene besides Moe?

18   A.     Yes.

19   Q.     Who were they?

20   A.     G.

21   Q.     Who is G?

22   A.     Ghost.

23   Q.     Ghost.  Did you ever know his real name?

24   A.     No.

25   Q.     Anybody else?

Mandy L.                                    179

1  A.      Hightower.

2  Q.      Hightower.  Did you ever know Hightower's real name?

3  A.      No.

4  Q.      When did you see Ghost and Hightower?

5  A.      Between Lori's and Marty's.

6  Q.      Between Lori's?

7  A.      Lori's and Marty.

8  Q.      Are you saying you saw them in both places?

9  A.      Yes.

10 Q.      What were they doing?

11 A.      They were bagging -- other people were bagging up.  They

12 were in the room.

13 Q.      They were in the room during bagging up sessions?

14 A.      Yes.

15 Q.      Do you know if they had any role in the drug trafficking

16 organization?

17 A.      Yes.

18 Q.      What role?

19 A.      They would bring it up.  They would be participating in

20 it.

21 Q.      Okay.  When you say they would bring it up what do you

22 mean?

23 A.      They would bring it to Moe.

24 Q.      They would bring what to Moe?

25 A.      The drugs.

Mandy L.                                    180

1    Q.      From where?

2    A.      New York.

3    Q.      May I approach, Your Honor?

4            THE COURT:  Yes.

5    BY MR. DARROW:

6    Q.      Showing you Government's 64 and 115.  Let's start with

7    64.  Do you recognize that person in that photo?  Do you

8    recognize the person in that photograph?

9    A.      Yes.

10   Q.      Who is that?

11   A.      G.

12   Q.      Is that a fair and accurate depiction of G?

13   A.      Yes.

14   Q.      G was sometimes called Ghost?

15   A.      Yes.

16   Q.      Any idea why?

17   A.      No.

18   Q.      Okay and how about 115?

19   A.      That's Hightower.

20   Q.      Is that a fair and accurate depiction of Hightower?

21   A.      Yes.

22   Q.      And you don't know his name either?

23   A.      No.

24           MR. DARROW:  Your Honor, we move these two.

25           THE COURT:  Any objection?

```
                   Mandy L.                        181
 1           MR. KAPLAN:  No objection.
 2           THE COURT:  So admitted.
 3    [Government exhibits 64 and 115 were admitted]
 4    BY MR. DARROW:
 5    Q.     Can we publish?  Who is that?
 6    A.     Ghost.  G.
 7    Q.     That's 64 on the screen?
 8    A.     Is G.
 9    Q.     That's G?
10    A.     Yes.
11    Q.     Who is also known as Ghost?
12    A.     Yes.
13    Q.     Okay, and how about 115?
14    A.     That's Hightower.
15    Q.     Okay.  Now how do you know that those two men brought
16    drugs up from New York?
17    A.     I've been there.
18    Q.     I'm sorry.
19    A.     I've been there.
20    Q.     Been where?
21    A.     Lori's.  Marty's.
22    Q.     Okay, and what did you see?
23    A.     They would have it on them.  Like them and Moe combined
24    it, separate it for their portion and his portion.
25    Q.     Okay.  So you would see them with the bulk drugs?
```

Mandy L.                                          182

1   A.      Yes.

2   Q.      And what drugs were those?

3   A.      Heroin and crack.

4   Q.      And are these drugs that would -- is this in connection

5   with the bagging up party?

6   A.      Yes.

7   Q.      Okay, and were those drugs that would be bagged up?

8   A.      Yes.

9   Q.      Okay.  Did they have any other role other than bringing

10  up drugs from New York?

11  A.      What do you mean?

12  Q.      Did they do anything else in connection with the

13  activities that we've been talking about?

14  A.      Just the drug role.

15  Q.      Just the drug -- bringing up drugs?

16  A.      Yes.

17  Q.      Do you recall a time in early 2016 when you were in a

18  car with Moe and some others that the police stopped?

19  A.      Here?

20  Q.      In Burlington?

21  A.      When was the date?

22  Q.      January 20, 2016.

23  A.      I'm pretty sure, yes.

24  Q.      I'm sorry.

25  A.      Yes.

Mandy L.                                      183

1    Q.    Do you remember who was -- whose car it was?

2    A.    A lady named Mary.

3    Q.    A lady named Mary?

4    A.    Yes.

5    Q.    And again I'm going to need you to speak up just a

6    little bit.  May be my problem.  I don't know.  I know you're

7    trying.  So you're in a car that Mary is driving.  Who else is

8    in the car?

9    A.    Moe and another Mary and me.

10   Q.    The Mary that you referred to earlier?

11   A.    Yes.

12   Q.    All right.  So where are you sitting?

13   A.    In the front seat.

14   Q.    With the woman who owns the car driving?

15   A.    Yes.

16   Q.    That's the other Mary?

17   A.    Yes.

18   Q.    And then who is in the back?

19   A.    Moe and Mary.

20   Q.    Moe and Mary P., the young woman you described earlier?

21   A.    Yes.

22   Q.    Okay, and where are you driving from?

23   A.    Marty's house off of North Avenue.

24   Q.    Do you remember what had been going on at Marty's house?

25   A.    We had just got done bagging up.

Mandy L.                                184

1  Q.     Okay, and where are you driving to?

2  A.     North Union.

3  Q.     The apartment you have been describing?

4  A.     Yes.

5  Q.     How -- we've got some familiarity with you and Mary and

6  Moe.  Who is this woman who is driving the car?  What

7  connection does she have?

8  A.     She buys crack.

9  Q.     Okay.  Do you know how she came to be driving you three

10 between the two trap houses?

11 A.     No.

12 Q.     All right.  Did you have something with you?

13 A.     Yes.

14 Q.     What was in the car?

15 A.     Heroin and crack.

16 Q.     Do you remember how it was -- what kind of container it

17 was in?

18 A.     In a black bag.

19 Q.     In a black bag.  All right.  What happens on that drive?

20 A.     Cops pulled us over.

21 Q.     Okay.

22 A.     Mary -- they asked Mary to step out of the car.

23 Q.     Okay.  Cops pull you over.  Do you remember just

24 generally what happens after the car -- the cops pull you over,

25 Mary the driver steps out, and what's happening in the car?

Mandy L.                                          185

1   A.     We're just sitting there.

2   Q.     You're sitting there?

3   A.     At first.

4   Q.     Does the policeman come and ask you to do things?

5   A.     They asked us questions.

6   Q.     Do you remember any of the questions that he asked?

7   A.     What our names were.  Where we were going.

8   Q.     What?

9   A.     What our names were and where we were heading.

10  Q.     Okay, and did you answer the questions?

11  A.     Yes.

12  Q.     Okay.  At some point did a canine show up?

13  A.     Yes.

14  Q.     What happened inside the car when the canine starts

15  walking around it?

16  A.     The drugs were hidden under a seat.

17  Q.     The drugs were hidden.  Are you talking about the drugs

18  in the black bag?

19  A.     Yes.

20  Q.     Okay.  Where were they hidden?

21  A.     Under the driver's seat.

22  Q.     Whose drugs were those?

23  A.     Moe's.

24  Q.     Was there any kind of recording made of what happens

25  inside the car while it was going on?

Mandy L.                                              186

1   A.      Yes.

2   Q.      How did that happen?

3   A.      Moe was recording with his phone.

4   Q.      With his cell phone?

5   A.      Yes.

6           MR. DARROW:  May I have a moment, Your Honor?

7           THE COURT:  Yes.

8   BY MR. DARROW:

9   Q.      So you're in the front seat alone because Mary the

10  driver has stepped out?

11  A.      Yes.

12  Q.      And Moe and Mary P. are in the back seat?

13  A.      Yes.

14  Q.      And you say a recording was made?

15  A.      Yes.

16  Q.      Have you looked at that recording?

17  A.      Yes.

18  Q.      Do you remember also what was happening at the time?

19  A.      Yes.

20  Q.      Okay.  I'm showing you what's been marked as 34A.  Have

21  you seen that before?

22  A.      Yes.

23  Q.      What is it?

24  A.      That's the video of the car stop.

25  Q.      Okay.  How do you know that's what it is?

Mandy L.                                    187

1   A.      I viewed it.

2   Q.      You viewed it?

3   A.      And I initialed it.

4   Q.      Okay, and is this a video that you were describing of

5   what was going on inside the car?

6   A.      Yes.

7              MR. DARROW:  Okay.  Your Honor, move that.

8              THE COURT:  Any objection?

9              MR. KAPLAN:  Yes.  I would object, Your Honor.  May

10  we approach?

11             THE COURT:  Yes.  Actually it's now time for a recess

12  so I'm going to meet with the lawyers and we'll be back in a

13  little after 15 minutes.  So --

14  [At 2:45 p.m. jury returns to the jury room.  The following

15  occurred in open court without the jury present]

16             THE COURT:  Okay.  So first, Mr. Kaplan, your

17  objection with regard to this particular exhibit.

18             MR. KAPLAN:  Judge, this is a video that contains, as

19  I understand it, more than one person speaking.  This

20  particular witness didn't take it.  I think it's hearsay on it.

21  I just don't know if you can introduce a video of a stop that

22  there are a lot of different things happening, the police

23  officer is talking, people in the car are talking, and to me it

24  contains hearsay.  This is not a suppression hearing.

25             THE COURT:  It's not being offered to prove the truth

Mandy L.                                    188

1   of the matter asserted therein.  It's being offered to show

2   exactly what happened during the course of this stop, isn't it?

3          MR. KAPLAN:  I'm having trouble with the distinction

4   on that, Judge, Your Honor, because once a jury listens to that

5   and watches it they are going to think that's what happened,

6   right?

7          THE COURT:  Well the statements that are being made

8   perhaps by a police officer, perhaps by one of the occupants of

9   the car, are not being offered to prove the truth of what the

10  officer is saying or what the person is saying.  This is

11  actually a physical display that's being offered to show

12  exactly what happened during the course of a stop, and so

13  that's not hearsay.

14         MR. KAPLAN:  I would suggest that they are being

15  offered for the truth of the matter, that the Government wants

16  the jury to hear exactly what everyone says and what happened.

17  I mean what good is the video if the only thing that the

18  Government's intent is just to have people see.

19         THE COURT:  Well that's very interesting because of

20  course that if the Government is introducing this to show what

21  a person said, that's not necessarily to offer the truth of the

22  matter of what the person said.  It is just to describe

23  physically what happened.

24      Now if there's somebody who made a statement and the

25  Government wants to offer the proof of that in relationship to

Mandy L.                                     189

1  the proof of what the person said, that's hearsay, but my sense

2  is that this is not being offered to prove the truth.  It's

3  being offered to show what happened, what statements were made.

4           MR. KAPLAN:  Why would the prosecution even have to

5  bother to try to prove the statement if it's already played to

6  the jury.  The burden sort of shifts to me to somehow --

7           THE COURT:  Okay.  So tell me what the statements

8  are.

9           MR. DARROW:  Your Honor, they are mostly the

10  defendant who is narrating his video as he's making it.  So

11  those come in as opponent admissions.

12           THE COURT:  Those are the statements, the statements

13  of the defendant.  There's -- you're not offering the

14  statements of anyone else to prove the truth of the matter

15  asserted within those statements.  You're just being -- you're

16  essentially offering this in regard to what the defendant said

17  as he narrated the video.

18           MR. DARROW:  Yes.  Yes.  There are some statements by

19  the only other two people in the car at the front end of this

20  who are Mandy L., the present witness, and Mary P.  Both of

21  them are going to be witnesses, one already is, who can be

22  cross examined, and they make a few statements that are

23  essentially contextual in nature, but it's another video like

24  some other videos that will be come in where the defendant is

25  holding forth about what's happening.  So he will say we're

Mandy L.                                    190

1    sitting in the car and the drugs -- the dog's going around the

2    car and this, that, and the other, and at some point he

3    whispers put the drugs under the seat.  That's the essence of

4    why we want this.

5             THE COURT:  That's what you're offering it for his

6    commentary and then his statement put the drugs under the seat?

7    Okay.  How is that hearsay?

8             MR. KAPLAN:  I don't think it is, Judge.

9             THE COURT:  Okay.  All right.  So it can be

10   introduced, but there are two things that I also want to talk

11   to you about.  First, I received a note from juror number four

12   and I guess I would ask that the witness be excused.

13            MR. DARROW:  Mandy, you can come down.  I'm sorry.  I

14   should have thought about that earlier.  Thank you.

15            THE COURT:  So I have two things to mention in regard

16   to communications written or verbal through officers who have

17   jurors.  First, this is juror number four who sent a note "I'm

18   worried that six or seven years ago I saw Mandy on public

19   transport on occasion.  Her face and voice resonate."  This is

20   juror number four.  That does not sound even close to a problem

21   at this point, but having said that, does either side wish to

22   have him examined about what he remembers and how that would be

23   prejudicial?

24            MR. KAPLAN:  So I think we should question her,

25   Judge.

                    Mandy L.                          191

1              THE COURT:  Him.

2              MR. KAPLAN:  Him.

3              THE COURT:  Okay.  That's the first.  The second is

4    Mr. Francis told a court officer that he did not disclose this,

5    was not asked this, but his mother a number of years ago first

6    worked for the U.S. Attorney's Office in Burlington, left that,

7    worked for the U.S. Marshals for a period of time -- for a

8    short period of time, and then moved into a private job or a

9    different job with the government.  I'm not sure where he went

10   -- where she went, and meanwhile she died.  Soon thereafter she

11   died.  Anyway that's what he said.  So his mother many years

12   ago, I think probably in the early 2000s, would have worked for

13   the U.S. Attorney's Office here and also the Marshal Service in

14   an administrative capacity.  Okay.  Ms. Francis.  Do you

15   remember Miss Francis?

16             MR. DARROW:  I don't.  I was going to note that that

17   juror is so young now, I think he's the youngest one on the

18   panel, he must have just been a kid then.  Let me check on Miss

19   Francis.

20             THE COURT:  Yes.  Okay.

21             MR. KAPLAN:  Judge, anyone who works for the U.S.

22   Attorney's Office is not okay.  So we don't have a problem with

23   that.

24             THE COURT:  All right.

25             MR. DARROW:  Those of us with a better memory

```
                    Mandy L.                         192
```

 1  remember a woman named Cassandra Francis.

 2          THE COURT:  That's correct.  It's Cassandra Francis.

 3          MR. DARROW:  Who had a son.

 4          THE COURT:  And she used to work for the U.S.

 5  Attorneys and her son was named Theo and he's now sitting as

 6  juror number -- so I guess the defense has no problem with

 7  that.  Tell me if you have a problem with that?

 8          MR. DARROW:  May I confer for just a moment?

 9          THE COURT:  Sure.

10          MR. DARROW:  Your Honor, it might be a good idea if

11  you examined him a little bit about this.  I'm recalling this

12  employee now and she did some work for me and we essentially

13  let her go.  She didn't do well.  I remember she was on

14  probation for a time and then she -- I think she got a job at

15  another agency and sort of transferred, but it wasn't in good

16  -- it wasn't a good situation, and so if you would be willing

17  to just examine him a little bit --

18          THE COURT:  So how about at 4:30 I ask these two

19  jurors to stay longer and have them come in at 4:30 so

20  everybody here can get a break and we'll have them at 4:30.

21          MR. DARROW:  That would be great.

22          THE COURT:  Any objection to that?

23          MR. KAPLAN:  No, Your Honor.

24          MR. DARROW:  Are we going to start right back up

25  again?  I was hoping just for a couple minutes to confer with

Mandy L.                          193

1    my colleagues about the witness and where we're going.

2            THE COURT:  No.  I'm going to take a break and

3    everybody else is entitled to a break so it will be at least 10

4    minutes.

5            MR. DARROW:  Thank you, Your Honor.

6    [2:54 p.m. - 3:10 p.m. recess]

7    [The following was held in open court with the jury present]

8            THE COURT:  Okay.  Your witness.

9            MR. DARROW:  We have gone to get her, Your Honor.

10   Sorry.  Your Honor, if we could approach, we might be able to

11   use this time on an issue that might come up.

12           THE COURT:  Sure.  I'll turn the husher on.  Would

13   counsel approach.

14

15

16

17

18

19

20

21

22

23

24

25

                        Mandy L.                          194

1    [Bench conference]

2              MR. DARROW:  I want to follow up on an issue of this

3    witness being able to talk about videos.  We have had the

4    walnut video stuff come up.  I didn't know about that.  It was

5    a surprise to everyone, however, this witness also is one of

6    the witnesses that saw the Hannah video that was put up by the

7    defendant posted on the Facebook page.  So I just wanted to

8    make sure that was okay so we didn't end up having to come back

9    up and argue about videos.

10             THE COURT:  Okay.

11             MR. KAPLAN:  I don't see that's relevant.  That

12   happened after the conspiracy was complete and she told the

13   Government -- originally she said she hadn't seen Brian for

14   several months since April of 2015 --

15             MS. SEN:  March.

16             MR. KAPLAN:  So she was pretty much gone by then.

17             MR. DARROW:  That's not right.  First of all, we're

18   long past the time for motions in limine which I think was

19   March 29th.

20             MR. KAPLAN:  That was March.

21             MS. SEN:  We did move to exclude that.

22             MR. DARROW:  I thought the Judge ruled it was

23   admissible.

24             THE COURT:  Yeah it was, but I'm not so sure about

25   this timing.

Mandy L.                                   195

1              MR. DARROW:  My memory of the timing of it is in

2    March while there are still activities going on.

3              THE COURT:  Must be if she's arrested in April.

4              MR. DARROW:  Right.  July.

5              THE COURT:  Oh I thought she was arrested --

6              MR. DARROW:  That was a state arrest to do her eight

7    days or whatever it was.

8              THE COURT:  Okay.

9              MR. DARROW:  Your Honor, would that cause you to

10   reconsider her -- the violation that she received in July?

11   When he raped her you said it was too far outside the arrest --

12             THE COURT:  It wasn't because of the arrest just

13   outside the conspiracy.

14             MR. DARROW:  Okay.

15             THE COURT:  Okay.  So you got the video of him

16   talking about Hannah?

17             MR. DARROW:  Exactly.

18             THE COURT:  Why would you bring it in through her?

19             MR. DARROW:  You mentioned that you didn't want

20   evidentiary rulings.  You didn't want hearsay, heard stuff from

21   other people, even though we thought it might go to state of

22   mind being afraid of the defendant.  Several people heard about

23   it.  Mandy saw it at the time.  It was posted again in March.

24   So I mean it's live on his Facebook feed.  She saw it and so

25   she will say on the CD -- we're not going to play the whole

                    Mandy L.                         196

1    thing, but the first five minutes or something she will say I

2    saw something at the time I looked at it, and this is the CD

3    which is the video.

4              THE COURT:  Okay and so now tell me the timing.  It's

5    March of 2016?

6              MR. DARROW:  I think so.  They are still living at

7    the North Union Street house.  They don't move out until June.

8              MR. KAPLAN:  She said she stopped seeing him around

9    April.

10             MR. DARROW:  No.  She said she went to jail on the

11   state charge in April.

12             MR. KAPLAN:  She said when police first interviewed

13   her she separated from him like two months before July and she

14   hadn't had any more contact with him and that she went her

15   separate way and got her job and was away from him.

16             MR. DARROW:  I thought she said she moved out in

17   June, but irregardless even if it's April, the video is a month

18   earlier.

19             THE COURT:  Well, well in advance.

20             MR. KAPLAN:  Why are you introducing it?

21             THE COURT:  The question is whether she is still

22   seeing him at the time that she sees this video.  The video is

23   coming in.  It's an admission.  You're clearly going to get

24   that in.  I have already ruled it's coming in.  Now the

25   question is whether that is particularly relevant to something

Mandy L.                                    197

1   about her fears.  I suppose -- what are you offering it for?

2              MR. DARROW:  The same purpose as we discussed

3   earlier, whether it was admitted it's essentially coercion.  It

4   intimidates them.  It is exposing them.

5              THE COURT:  That's not intended to hurt.  I mean if

6   he intended to make the video with the idea that he was going

7   to actually impact her, I suppose it's much more relevant.  Of

8   course he didn't do that.

9              MR. DARROW:  I think the video, yes it's to damage

10  Hannah and ruin her reputation, however, the whole point of

11  exposing is so people will see it.  He's putting it out there

12  so people will watch it and Hannah watched it.

13             MR. KAPLAN:  It doesn't have any effect.

14             THE COURT:  Oh I actually think you're probably right

15  if he's putting it out on Facebook at a time when he is still

16  involved with Mandy.

17             MR. KAPLAN:  I don't think he's --

18             MR. DARROW:  He was subjecting both the women on the

19  prostitution side and the other side based on the same regime.

20             THE COURT:  Well you have some evidence to suggest

21  what you believe to be true that he was still engaged in

22  prostitution or the drug distribution and that this would be

23  relevant to impact the people he was working with?

24             MR. DARROW:  My best understanding, I will check with

25  counsel, is the business is petering off in the spring of 2016,

Mandy L.                                    198

1    that Mandy doesn't move out of the house until June.  First I

2    heard it was April but after the video, and it's also probative

3    we think because women will testify they were concerned about

4    him having all these pictures because he could expose them.  Lo

5    and behold that's exactly what he does when he gets angry at

6    one of them.  So I mean I think it's pretty probative.

7             MR. KAPLAN:  Judge, there isn't any prostitution

8    going on in March or April.  Keisha W. is the last charge and

9    that's January of 2016.

10            MR. DARROW:  Hannah is one of them.

11            THE COURT:  Well when is the end of the conspiracy?

12   When is the end of the literal charges here?

13            MR. DARROW:  I would have to pull the indictment.

14            THE COURT:  Could you do that because that becomes

15   relevant.  If this is -- I don't have the indictment here.

16            MR. KAPLAN:  But she says customers disappeared and

17   maybe one or two customers in January and then in March they

18   didn't have any drugs.

19            THE COURT:  How about the prostitution?

20            MR. KAPLAN:  That stopped I think January or

21   February.

22            THE COURT:  Well that's what I would like to know.

23   If this is post criminal behavior, I think that's probative.

24            MR. KAPLAN:  Well the last charge is it January?

25            MS. SEN:  February 2016.

                         Mandy L.                           199

1              THE COURT:  February 2016.

2              MR. DARROW:  The last of the trafficking victims.

3              MS. SEN:  Yes, and in fact previous witness Michelle

4    N. testified that he didn't have any drugs any more.

5              THE COURT:  You're going to get the video in anyway.

6    I'd just as soon not have her introduce the video if in fact

7    she learned about this after her engagement in criminal

8    activity -- after anybody's engagement in criminal activity.

9    It seems to me that becomes much less relevant at that point.

10   So at this juncture I would ask that you not introduce it.

11   We'll talk about that at a later time if you establish the fact

12   that there's something continuing on which enhances or

13   introduces the probative value.

14             MR. DARROW:  I should have brought counsel up with

15   me.  Well can she at least talk about her feelings upon seeing

16   it and the reaction she had?

17             MR. KAPLAN:  She went into prostitution.

18             THE COURT:  But this may be after her engaging in

19   criminal activity.

20             MR. DARROW:  She's still living at his trap house and

21   I'm not sure about the criminal activity.  I can go check with

22   my associates.

23             THE COURT:  Well if you can establish the fact that

24   she is engaged in criminal activity still and that that would

25   have some impact on criminal activity, it's relevant.  She can

                 Capitol Court Reporters, Inc. (800/802) 863-6067

```
                    Mandy L.                              200
```

1    testify about that, but what they are suggesting is that

2    criminal activity has stopped.  This is post criminal activity

3    and so that seems to be a factor which reduces the evidentiary

4    value.

5             MR. DARROW:  Let me confer with counsel.

6             THE COURT:  Okay.

7             MR. DARROW:  I thought that we had had that argument

8    about the probative value of the video a month ago and it was

9    resolved.  I feel a little bit blindsided by having to deal

10   with this again now.  I thought you had ruled on it and we were

11   all good.

12            THE COURT:  Well right, but I'm concerned about the

13   timing.  I'm concerned about the timing.

14            MR. DARROW:  Okay.  Let me check with my counsel on

15   that.  May I have a moment to confer with them right now?

16            THE COURT:  Yes.

17            MR. DARROW:  Thanks.

18            THE COURT:  All right.  Would counsel approach?

19   Okay.  Do you have the time?

20            MR. DARROW:  They indicated Mandy has already

21   testified she was selling drugs later in the spring.

22            THE COURT:  Later in the spring.

23            MR. DARROW:  Into April and May I thought.  We can

24   look back in the record or I can ask her again.

25            MR. KAPLAN:  That's not true, Your Honor.  The

Mandy L.                                      201

1   indictment goes to March of 2016.  She said she left by April

2   or May of 2016.  She never prostituted after the summer.

3            THE COURT:  Okay.  I'm just -- at this particular

4   point I'm going to exclude it.  We'll talk about that later.

5   The fact is this does not blindside you because you have the

6   video which is an admission by the defendant.  You can

7   absolutely bring that in through law enforcement agents.  You

8   can bring it in through the examination of his computer

9   records.  There's no question you're going to be able to get

10  that in.  The only question is whether it comes in through this

11  particular witness, and if she's not engaging in criminal

12  activity, this becomes a little less probative seems to me.

13           MR. DARROW:  And our concern is if we introduce it

14  later we're coming through one of the people that were viewing

15  the contents of the defendant's digital devices.

16           THE COURT:  Yes.

17           MR. DARROW:  And, you know, our feeling is instead of

18  coming in cold by an investigator long after the fact finding

19  in there I think it should come in through someone who saw it

20  at the time contemporaneously when it was up in Facebook, had a

21  reaction, was intimidated, and explained why the defendant was

22  violating.

23           THE COURT:  And my reaction to that frankly is if

24  she's going to engage in criminal activity, the fact that she's

25  intimidated by those post criminal acts that video becomes less

                        Mandy L.                          202

1    relevant on her.  What is relevant about the video in January

2    is his admission that he used this kind of approach to

3    intimidate her.

4              MR. DARROW:  I'll give you my best shot.  Can I ask

5    her how long she was selling drugs in 2016 and see what she

6    says?

7              THE COURT:  Okay.

8              MR. KAPLAN:  All right.  Well she's going to say she

9    never -- it's too easy for her to say yes I sold in the spring.

10   The DEA was stopped --

11             THE COURT:  Okay.  So let's -- is your examination

12   longer than an hour?

13             MR. KAPLAN:  Yes.

14             THE COURT:  How much longer do you have?

15             MR. DARROW:  Not very much.

16             THE COURT:  Let's hold off on that.  You can do your

17   cross examination.  You can actually try to establish the fact

18   she sold drugs well into April, but I wouldn't get into the

19   video at this point.

20             MR. DARROW:  I won't, but I can ask her how long she

21   sold drugs?

22             THE COURT:  Yes.

23   [End of bench conference]

24

25


              Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                                  203

1            THE COURT:  All right.  I appreciate your patience

2     and we're ready to go.

3            MR. DARROW:  Thank you.  I think we left off when the

4     witness was describing a car stop in January and what was going

5     on inside the car.

6            THE COURT:  Yes.

7            MR. DARROW:  And the Government proposed to introduce

8     the CD as she identified.

9            THE COURT:  And that is introduced.

10           MR. DARROW:  It is introduced in which case we would

11    like to publish it.

12           THE COURT:  Okay.

13           MR. DARROW:  Thank you.  That's 34A.

14    [Government exhibit 34A published]

15           MR. DARROW:  Your Honor, is there any way we can

16    increase the volume?

17           THE COURT:  Is the jury having trouble hearing that?

18    Okay.

19           MR. DARROW:  Our computer is all the way up.  If

20    that's the best we can do, we're okay.  I think the talk is

21    paused for a moment anyway.

22           THE COURT:  Okay.

23    BY MR. DARROW:

24    Q.    Ms. L., you're seeing on the screen the video image and

25    the transcript?

Mandy L.                                    204

1    A.    Yes.

2    Q.    Is the transcript accurately identifying who is talking

3    so far?

4    A.    Yes.

5    Q.    Okay, and who is in the picture there?

6    A.    Moe.

7    Q.    Okay, and just now has the driver who you identified as

8    Mary did she just get back in the car?

9    A.    Yes.

10   Q.    Okay.

11   [Government exhibit 34A published]

12   BY MR. DARROW:

13   Q.    Was perfume sprayed in the car at this point?

14   A.    Yes.

15   Q.    Thank you.

16   [Government exhibit 34A published]

17   BY MR. DARROW:

18   Q.    Ms. L., do you know what that odd noise is that we're

19   hearing?

20   A.    Someone's phone going off.

21   Q.    Okay.  Thank you.

22   [Government exhibit 34A published]

23   BY MR. DARROW:

24   Q.    Pause that for a second.  Are you remembering what's

25   going on here?

Mandy L.                                      205

1   A.      Yes.

2   Q.      Someone had gotten out of the car?

3   A.      Yes.

4   Q.      Do you remember who got out?

5   A.      Mary P. --  Mary P.  Sorry.

6   Q.      And who is still in the car you?

7   A.      And Moe.

8   Q.      And Moe.  Okay.  You mentioned earlier that what was in

9   the car with you guys?

10  A.      Drugs.

11  Q.      Okay, and what kind of package were the drugs in?

12  A.      In a black bag.

13  Q.      Okay.  Where were the drugs?

14  A.      In the front seat.

15  Q.      Okay.  I was having trouble hearing that audio, but at

16  some point were you asked to do something with the drugs?

17  A.      Yes.

18  Q.      Who asked you?

19  A.      Moe.

20  Q.      What did he ask you?

21  A.      He said put them under the seat.

22  Q.      Under what seat where?

23  A.      The driver's seat of the car.

24  Q.      Mary, not Mary P but the other Mary's seat?

25  A.      Yes.

Mandy L.                                    206

1   Q.    Did you do that?

2   A.    Yes.

3          MR. DARROW:  Can we back that up and play it one more

4   time please?

5   [Government exhibit 34A published]

6   BY MR. DARROW:

7   Q.    Okay.  The four of you get out of the car?

8   A.    Yeah.

9   Q.    Where were the drugs when you got out of the car?

10  A.    Under the seat.

11  Q.    Under -- where under the seat?

12  A.    Under the driver's seat.

13  Q.    Is that where you put them?

14  A.    Yes.

15  Q.    Approaching you with Government exhibit 30, Your Honor.

16  May I?

17          THE COURT:  Yes.

18  BY MR. DARROW:

19  Q.    This is several photographs.  Will you take a look at

20  that please?  Do you know whether the police when they searched

21  the car found the package?

22  A.    Yes.

23  Q.    What's depicted in those photographs?

24  A.    The bag that it was in.

25  Q.    The bag that?

Mandy L.                                      207

1    A.      The drugs were in.

2    Q.      Okay, and I think there's several pages here, but just

3    so we're clear what's in the first picture?

4    A.      The bag -- the black bag.

5    Q.      Okay, and what's in the second picture?

6    A.      The bag open with the drugs in it.

7    Q.      And what do we see here in the third picture?

8    A.      The packaged drugs.

9    Q.      Okay.  Taken out of the bag?

10   A.      Yes.

11   Q.      Do these three photographs fairly and accurately depict

12   the bag and the drugs that were in it?

13   A.      Yes.

14   Q.      That night?

15   A.      Yes.

16           MR. DARROW:  Your Honor, we move this.

17           THE COURT:  Any objection?

18           MR. KAPLAN:  No objection.

19           THE COURT:  So admitted.

20           MR. DARROW:  May we publish?

21           THE COURT:  Yes.

22   [Government exhibit 30 admitted]

23   BY MR. DARROW:

24   Q.      We're looking at the first page of exhibit 30.  What's

25   that?

                     Mandy L.                          208

1    A.     The bag the drugs were in.

2    Q.     That's like a black cloth bag?

3    A.     Yes.

4    Q.     Look at the second page please.  Do -- what do we see

5    here?

6    A.     The drugs inside the bag.

7    Q.     All right, and the third page, can we zoom in on that a

8    little bit please?  Can you tell us in a little more detail

9    what we're looking at in this third picture from 30?

10   A.     Bags of heroin and crack.

11   Q.     Okay.  I see two and a half sets of looks like banded up

12   baggies.  What are those?

13   A.     That's the heroin bundles.

14   Q.     Is each one of those rubber banded packages a bundle?

15   A.     Yes.

16   Q.     Okay, and then it looks like a -- what's the baggie with

17   the red color in it?

18   A.     The baggies for the crack.

19   Q.     So is that crack cocaine there?

20   A.     Yes.

21   Q.     Are you uncertain?

22          MR. KAPLAN:  Objection, Your Honor.  Speculative.

23          THE COURT:  Well objection overruled if she can

24   identify based upon her experience what crack looked like to

25   her.

Mandy L.                                      209

1   BY MR. DARROW:

2   Q.      And I think also, Your Honor, she would testify, Your

3   Honor, they were just coming from a bagging up party.  So crack

4   and what's in the blue package there?

5   A.      That's the unbagged -- unpackaged drugs.

6   Q.      Do you know what drugs there are?

7   A.      The crack cocaine.

8   Q.      Okay.  So these drugs were all in the black bag --

9   A.      Yes.

10  Q.      -- in the car that night that we've just seen the video

11  of?

12  A.      Yes.

13  Q.      Whose drugs were those?

14  A.      Moe's.

15  Q.      You testified earlier about these many bagging up

16  sessions that you participated in.  Do you remember that?

17  A.      Yes.

18  Q.      And I asked you for details about how it was done.  Let

19  me show you 66A.  May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MR. DARROW:

22  Q.      Are you okay?

23  A.      Tired.

24  Q.      Please take a look at that.  Do you recognize that

25  photo?

                        Mandy L.                           210

1   A.      Yes.

2   Q.      What does it depict?

3   A.      Stuff we used to bag up with.

4   Q.      How do you recognize it?

5   A.      The tin can, the scale, the baggies, the rubberbands.

6   Q.      Was that used at those bagging sessions?

7   A.      Yes.

8   Q.      Does that photograph fairly and accurately depict the

9   paraphernalia you used in the bagging sessions for Moe?

10  A.      Yes.

11          MR. DARROW:  Your Honor, we move this.

12          THE COURT:  Any objection?

13          MR. KAPLAN:  Can I see it?  No objection.

14          THE COURT:  All right.  So admitted.

15  [Government exhibit 66A admitted]

16  BY MR. DARROW:

17  Q.      All right.  Ms. L., in the upper left there are two

18  bluish circles.  Do you see those?

19  A.      Yes.

20  Q.      Can you tell us what that is?

21  A.      The tin can that holds the plastic baggies.

22  Q.      Okay.  What's inside the tin can?

23  A.      Plastic baggies, the wax paper, and straws.

24  Q.      Okay.  You testified earlier that crack was packaged in

25  colored little plastic baggies.  Is that what you're talking

Mandy L.                                    211

1   about?

2   A.      Yes.

3   Q.      Okay, and you say the white rectangle is a?

4   A.      Wax paper for --

5   Q.      Sorry.

6   A.      Wax paper.  The baggies for the heroin.

7   Q.      Okay, and then what are the two cylindrical objects?

8   A.      The what?

9   Q.      In the open can, you mentioned straws that -- what the

10  two cylindrical objects, yellow and red, are?

11  A.      Yes.

12  Q.      And moving to the right of that what do we see to the

13  right of the open can with all the baggies and straws in it?

14  A.      A folded card and a straw.

15  Q.      Okay.  Were those for what you testified earlier about

16  packaging up -- I apologize.  Go ahead.

17  A.      Yes.

18  Q.      What are they for?

19  A.      Package the heroin.

20  Q.      Okay, and to the right of the straw what's over there?

21  A.      Razor blades.

22  Q.      And you described those earlier for separating the drugs

23  into lines?

24  A.      Yes.

25  Q.      And moving down to below the card there's a reddish

                    Mandy L.                              212

1   rectangle.  What's that?

2   A.      A scale.

3   Q.      What kind of scale?

4   A.      To weigh the drugs out.

5   Q.      Is that a digital scale?

6   A.      Yes.

7   Q.      And moving to the left of the scale we see little green

8   and blue things.  What are those?

9   A.      Those are the plastic baggies for the crack.

10  Q.      Down in the lower left-hand corner what are those --

11  what's that -- those two rectangles down there?

12  A.      Where?

13  Q.      There.

14  A.      That's the wax paper for the heroin.

15  Q.      Okay.  Is that a cardboard box?

16  A.      Yes.

17  Q.      All right.  Kat, can you pull that back?  Okay, and on

18  the right-hand side of the open box those are what?

19  A.      Rubberbands.

20  Q.      I'm sorry.

21  A.      Rubberbands.

22  Q.      To the right of the box are little black rubberbands?

23  A.      Yes.

24  Q.      And inside the box?

25  A.      Those are the last baggies.

Mandy L.                                    213

1   Q.      That are used for?

2   A.      Heroin.

3   Q.      And to the right in the lower right-hand corner what's

4   that?

5   A.      Tape.

6   Q.      What's tape used for?

7   A.      To tape the bag shut.

8   Q.      The heroin bags?

9   A.      Yes.

10  Q.      Okay.  You've described for us earlier attending a

11  multitude of bagging up sessions.  Is this the stuff that was

12  used?

13  A.      Yes.

14  Q.      Okay.  Now let me ask you some other questions.  You

15  described one time that someone stole the stash out of the car

16  parked outside 103 North Union.  Do you remember that?

17  A.      Yes.

18  Q.      Were there other times that the drug supply was stolen?

19  A.      There was a time prior to that.

20  Q.      Can you tell us about that?

21  A.      It was another car that was robbed.

22  Q.      Same deal then a car with a stash in it?

23  A.      Yes.

24  Q.      Where was that?

25  A.      On North Union too.

                        Mandy L.                        214

1    Q.      Okay.  Do you remember a time when you were present when

2    someone -- there was like a robbery at the actual apartment?

3    A.      Yes.

4    Q.      What happened that time?

5    A.      Someone knocked on the door saying it was the cops so I

6    answered it and it was a guy in a mask with a gun.

7    Q.      What happened after that?

8    A.      He told us to get on the floor and wanted the drugs.

9    Q.      Who is us?

10   A.      Me and Mary.

11   Q.      Was anyone else in the apartment that night?

12   A.      No.

13   Q.      Just the two of you?

14   A.      Yes.

15   Q.      How did you respond to that?

16   A.      Told him there was no drugs in the house.

17   Q.      Okay.  Did you do what you were told to do?

18   A.      Yes.

19   Q.      All right.  Where were the drugs?

20   A.      We flushed them.

21   Q.      When did you flush them?

22   A.      Well we called Moe said the cops -- said it was the cops

23   so he said get rid of them.  So we flushed them before we

24   opened the door.

25   Q.      Okay.  So knock on the door, make the phone call, flush

              Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                                          215

1    them, answer the door?

2    A.      Yes.

3    Q.      All right.  Do you remember when that was?

4    A.      No.

5    Q.      So it sounds like three times the stash got hit, twice

6    in the car outside 103 North Union and once at 103 North Union

7    someone came in the door with a mask and gun?

8    A.      Yes.

9    Q.      You testified earlier about the red apron.  Were there

10   any bad repercussions for you as a result of the other two

11   thefts?

12   A.      No.

13   Q.      Okay.  I want to jump back for a moment to the

14   prostitution activities when you were at the motel and I'm

15   sorry to go back in time, but there are a couple more questions

16   I want to ask you about that.  Okay.  First of all, when your

17   group was operating out of motels do you know where Moe was?

18   A.      At his house.

19   Q.      I'm sorry.

20   A.      At his house.

21   Q.      At his house.  Okay.  So he's not at the motel?

22   A.      No.

23   Q.      Okay.  Do you know if there was any way to keep track of

24   the young women working as prostitutes by way of texts?

25   A.      Yes.  Most of the texts would be -- would go to his

Mandy L.                                    216

1    phone.

2    Q.     So that allowed him to keep track of it?

3    A.     Yes.

4    Q.     All right.  With regard to the photos that were taken

5    that were posted on Backpage were you present during any of

6    those photo sessions?

7    A.     Yes.

8    Q.     Were the girls -- were the young women given any

9    instructions as to how to pose?

10   A.     How to pose.  How to cover themselves.

11   Q.     Who was giving those instructions?

12   A.     Moe.

13   Q.     Now you testified earlier that you did not take drugs?

14   A.     Yes.

15   Q.     The women that you identified as participating in the

16   prostitution do you know whether they took drugs?

17   A.     They were addicts, yes.

18   Q.     Okay.  What kind of drugs?

19   A.     Heroin.  Crack.

20   Q.     Do you know how the -- their addiction and drugs how

21   that was -- how that worked with prostitution?

22            MR. KAPLAN:  Objection, Your Honor.

23            THE COURT:  Worked with prostitutes?

24            MR. DARROW:  I was trying to figure out a way to get

25   the interaction.  Let me back up.

```
                       Mandy L.                          217
 1           THE COURT:  All right.
 2  BY MR. DARROW:
 3  Q.      Do you know where they were getting their drugs?
 4  A.      Yes.
 5  Q.      Where?
 6  A.      Moe.
 7  Q.      Do you know how much they were being charged?
 8  A.      Pretty much the same price as normal that was being sold
 9  for.
10  Q.      Okay.  Did you ever see those young women in withdrawal?
11  A.      Yes.
12  Q.      What did you see?
13  A.      Sweats, puking, shaking.
14  Q.      Was seeing that was that a fairly regular occurrence or
15  was it unusual?  Sorry.
16  A.      I don't understand.
17  Q.      I apologize.  You say you saw them in withdrawal and I'm
18  trying to find out whether that was a rare thing to see or
19  whether it was not unusual or common?
20  A.      Stuff that was going on?
21  Q.      Yeah.
22  A.      I see it everyday.  Almost everyday.
23  Q.      Okay.  Was there a time in, well, either winter of
24  2015/2016 when you were wrong in counting out drugs that were
25  being delivered to somebody?
```

                    Mandy L.                              218

1   A.    Yes.

2   Q.    What happened?

3   A.    I messed up.  There were, I guess, baggies I was selling

4   was already bundled and I didn't know so I sold them as like

5   obviously a bundle.  I got each individual bag, put them

6   together as one bundle, and sold it for one price.

7   Q.    Okay.  See if I can understand you.  You say baggies

8   were put together or a bundle was put together so all the

9   baggies were together instead of separate?

10  A.    And one baggie was a bundle this time.  I didn't know so

11  I had combinded them all to put them together to make 10 bags

12  for a bundle.

13  Q.    So somebody -- some customer got -- wanted a bundle and

14  ended up getting a sleeve essentially?

15  A.    Yes.

16  Q.    And after you made that mistake what happened?

17  A.    I called Moe up to find out and I was explaining to him

18  and he said no they were single bundles.  He's like you need to

19  get them back or figure out how to get the money.

20  Q.    Okay, and how did that work itself out?

21  A.    I ended up prostituting myself.

22  Q.    He said you need to figure out how to get the money so

23  you had to make it up?

24  A.    Yes.

25  Q.    And you prostituted yourself to make up the money?

                         Mandy L.                          219

1    A.    Yes.

2    Q.    And what did you do with the money?

3    A.    Gave it to him.

4    Q.    I'm sorry, Your Honor.  Let me catch up with my notes

5    here.  I'm close to being done.  Did you ever run across a

6    woman during this period of your life named Chrissy T.?

7    A.    Yes.

8    Q.    Who was she?

9    A.    One of the baggers.

10   Q.    All right.  Can you tell us what role she had in the

11   organization?

12   A.    She was bagging or selling.

13   Q.    So she bagged and she sold?

14   A.    Yes.

15   Q.    And when you say sold are you talking about --

16   A.    She was running.

17   Q.    Running?

18   A.    Yes.

19   Q.    Like you were doing?

20   A.    Yes.

21   Q.    So you've described the activities at Spring Street in

22   late 2015 and then the move to North Union.  About how long

23   were you selling drugs out of North Union?

24   A.    The beginning of December up until June.

25   Q.    Right through to June.  Is that around the time that you

                    Mandy L.                          220

1   moved out?

2   A.      Yes.

3   Q.      And were those activities sort of, as you've described,

4   orders and deliveries?

5   A.      Yes.  Slowed down a lot, but yeah.

6   Q.      Okay.  What was down a lot?

7   A.      It slowed down.

8   Q.      It slowed down?

9   A.      But we still were selling.

10  Q.      And who is we?

11  A.      Me and Ariel.

12  Q.      Who is Ariel?

13  A.      Aerial is the girl that was there on North Union.

14  Q.      Okay.  You mentioned someone earlier who made the three

15  trips --

16  A.      Yes.

17  Q.      Let me just finish.  I'm sorry.  On the three trips to

18  New York.  Is this the same person?

19  A.      Yes.

20  Q.      Okay.  So the two of you are still at North Union for

21  the first half of 2016?

22  A.      Yes.

23  Q.      Involved in the drug trafficking?

24  A.      Yes.

25  Q.      Ms. L., at some point did you register -- at some point

Mandy L.                                221

1   during the time period you're describing did you register a

2   vehicle?

3   A.      No.

4   Q.      Okay.  You mentioned earlier that one of the vehicles

5   that Moe used was a blue Durango?

6   A.      Yes.

7   Q.      Do you remember something about the blue Durango

8   registering it?

9   A.      I didn't register it.

10  Q.      All right.  I apologize.  Was it registered in your

11  name?

12  A.      No.

13  Q.      Okay.

14  A.      No.  You got this -- you got mixed up.

15  Q.      All right.  I'm sorry.  Your Honor, may I have a moment?

16          THE COURT:  Yes.

17  BY MR. DARROW:

18  Q.      I apologize.  That was my error.  You do recall a blue

19  Durango?

20  A.      Yes.

21  Q.      That was used by Moe?

22  A.      Yes.

23  Q.      Do you know who registered that for her?

24  A.      Yes.

25  Q.      Who was that?

                          Mandy L.                        222

1    A.      Lori.

2    Q.      I'm approaching you with two photographs from 107B just

3    for identification.  Let me show you these two pictures.  Do

4    you recognize the vehicle depicted there?

5    A.      Yes.

6    Q.      What is it?

7    A.      The blue Durango.

8    Q.      That you described Moe using?

9    A.      Yes.

10          MR. DARROW:  I'm sorry.  Do you need to go to the

11   bathroom right now?

12          THE WITNESS:  Yes.

13          MR. DARROW:  Your Honor, may we take a break?

14          THE COURT:  All right.  Let's just take a few minute

15   break.  You're free to go back into the jury room and I'll call

16   you back in a few minutes.

17   [Jury returns to the jury room.  Witness is excused.  The

18   following occurred in open court without the jury present.]

19          THE COURT:  All right.  So she testified that she

20   continued to use and sell drugs, running drugs, until June; is

21   that correct?

22          MR. DARROW:  Yes.

23          THE COURT:  Okay.  I would be interested when she

24   comes back to ask her a couple of questions about the impact of

25   this particular video on Facebook to her decision to continue

Mandy L.                                    223

1   to work in the conspiracy.  So when she returns I'll ask her a

2   couple questions before the jury comes back.

3            MR. DARROW:  Okay.  So I had understood from our

4   discussions earlier that if the video -- if she saw the video

5   and it went up while she was still involved in illegal activity

6   then it could come in, but it sounds like you're taking a

7   narrower view of it now.

8            THE COURT:  No.  I'm asking about the impact that it

9   had.  You have made a representation that she was really

10  intimidated by that video and what I want to find out if that

11  is in fact accurate, if that's exactly what she testified to in

12  which case the probative value increases.  I thought if she is,

13  number one, no longer dealing with drugs, probative value goes

14  down.  Now she says she's dealing with drugs.  Now I want to

15  see a representation as to what impact that video had.

16           MR. DARROW:  Okay.

17           THE COURT:  Okay.

18           MR. DARROW:  And she's also capable of -- able to

19  testify about why it was posted and, you know, the Hannah

20  problem.

21           THE COURT:  Okay.

22           MR. DARROW:  Okay.

23           MS. SAVNER:  She's ready.

24           THE COURT:  Okay.  Can she come back in?

25  [Witness returns.  The following occurred in open court without

                    Mandy L.                      224

1  the jury present.]

2           THE COURT:  Perhaps you can question her about

3  exactly what you're proffering in regard to her testimony about

4  this video.

5           MR. DARROW:  Sort of did you see it and how did it

6  affect --

7           THE COURT:  How did it happen, did you see it, how

8  did you come to see it, and what impact did it have.

9           MR. DARROW:  Thank you.

10          THE COURT:  That's what I understood.  All right.  Do

11 you want to ask her the questions?  This is in camera.  This is

12 without the jury.  This is in camera.  This is a proffer.

13          MR. DARROW:  Oh I understand.

14          THE COURT:  Okay.

15 BY MR. DARROW:

16 Q.    I want to ask you a few questions about what's been

17 called the Hannah video.  Do you recall at some point seeing a

18 video about Hannah?

19 A.    Yes.

20 Q.    Hannah the young woman you described being involved in

21 this organization?

22 A.    Yes.

23 Q.    All right.  How did you come to see that video?

24 A.    On Facebook.

25 Q.    Whose Facebook?

Mandy L.                                    225

1    A.      Moe's.

2    Q.      Okay.  What was Moe's Facebook name?

3    A.      Moet Hart.

4    Q.      M-O-E-T?

5    A.      Yes.

6    Q.      H-A-R-T?

7    A.      Yes.

8    Q.      Okay.  Do you remember around when this was?

9    A.      No.

10   Q.      All right, and do you know why this -- why the video was

11   put up or what circumstances preceded the video?

12   A.      What do you mean by that?

13   Q.      I mean this -- well, first of all, let me ask you to

14   just briefly characterize the video?

15   A.      It was pictures of Hannah of her in an apron.

16   Q.      Wearing the red apron?

17   A.      Yes.

18   Q.      Okay.  You saw it on the Moet Hart Facebook account?

19   A.      Yes.

20   Q.      You think this was around the time it was posted?

21           MR. KAPLAN:  Objection, Your Honor.  The witness has

22   said she doesn't know when she saw it.  That was her testimony.

23           THE COURT:  Well that's true, but I want to find out

24   the whole background here.  Is this what she's talking about,

25   she's talking about the video of Hannah in the apron or is she

Mandy L.                                226

1    talking about the other video in which she's describing his

2    relationship?

3              MR. DARROW:  Those are one and the same, Your Honor.

4    The Hannah video he's narrating it and he puts up photos of

5    Hannah as he goes along and in one of them she's wearing the

6    red apron.

7              THE COURT:  Okay.  So is that -- is that exactly what

8    the video you're talking about is?

9              THE WITNESS:  Yes.

10             THE COURT:  Just tell me what do you remember of that

11   video.

12             THE WITNESS:  It was called the rise and downfall of

13   a friend, and it was just pretty much a bunch of pictures of

14   Hannah that he had taken over -- during the period of time he's

15   worked with her.

16             THE COURT:  Okay, and what else was on that video?

17             THE WITNESS:  There was a picture of her nude in just

18   the red apron.

19             THE COURT:  Okay, and what else?

20             THE WITNESS:  Pictures of her with her legs spread,

21   her high, like dozing out and like not aware.

22             THE COURT:  Okay, and how did you know or did you

23   know that this video was on his Facebook account?

24             THE WITNESS:  I was -- I was friends with him on

25   Facebook.

                      Mandy L.                              227

1              THE COURT:  Okay.  So that went automatically to you?

2              THE WITNESS:  Once you post something it shows up on

3     your news feeds.

4              THE COURT:  Okay and that went to you?

5              THE WITNESS:  It didn't go to me.  It was just posted

6     pretty much directly to Facebook.

7              THE COURT:  All right, but then you got notice of it?

8              THE WITNESS:  No.  That's not how Facebook works.

9              THE COURT:  All right.  So tell me how Facebook

10    works.

11             THE WITNESS:  If you're friends with somebody, you

12    see whatever they post.  It comes on like your main home page.

13    You can see all your friends' posts.  So pretty much everybody

14    he's friends with can see everything he posts so that's how you

15    come across the video.  You don't get notified of it.  It just

16    shows up.

17             THE COURT:  Okay.  All right.  So it shows up on your

18    Facebook, right?

19             THE WITNESS:  Yes.

20             THE COURT:  And what's your reaction to that?

21             THE WITNESS:  My reaction I laughed out loud in the

22    comments, but at the time I wasn't thinking right, but then at

23    the end of the day that's just violation -- violating somebody.

24             THE COURT:  Okay and what did that mean to you?

25             THE WITNESS:  Violating?

Mandy L.                                    228

1          MR. KAPLAN:  Judge, can I interrupt and indicate that

2     when you asked her what that meant to her she said nothing.

3     She thought it was funny or something along those lines.

4          THE COURT:  No, but then she explained what she

5     thought after thinking about it.  Her immediate reaction was

6     she must have posted something, laugh, and then she said that

7     after a short period of time she's thinking about what that

8     meant and she said that violated.  So the question is what she

9     meant by violating and that's what I'm trying to explore is the

10    impact of this particular video on her, what did it mean to

11    you.

12         THE WITNESS:  What it meant to me to pretty much I

13    felt that that could have been -- if I didn't abide by what he

14    wanted, that could be me or anybody, but it's also downgrading.

15         THE COURT:  Okay, and were you still dealing with

16    him?  Were you still selling for him at that point?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  All right.  So either counsel can

19    question her, ask any questions you wish.

20    BY MR. DARROW:

21    Q.    When you say it's downgrading can you tell us what you

22    meant by downgrading?

23    A.    Clearly you put someone's pictures on Facebook you're

24    going to make them feel bad about themselves like they did

25    something wrong.

                        Mandy L.                          229

1   Q.      Like degrading?

2   A.      Yes.

3   Q.      Okay.  I thought she was pretty --

4           THE COURT:  Okay.  All right.  Mr. Kaplan, do you

5   want to ask her any --

6           MR. KAPLAN:  Sure.

7   BY MR. KAPLAN:

8   Q.      Do you know why that video was posted?

9   A.      No.

10  Q.      Didn't she steal drugs from Brian?

11  A.      No, not that I know of.

12  Q.      You knew that she had stolen drugs from Brian?

13  A.      No I didn't.

14  Q.      And when you saw the video the -- your first reaction

15  was that it was humorous?

16  A.      I put laugh out loud, yes.

17  Q.      And you thought it was humorous because you knew Hannah

18  and the way Brian did it you found to be amusing?

19  A.      I guess.

20  Q.      And your immediate reaction wasn't that could happen to

21  me?

22  A.      Not my immediate reaction, no.

23  Q.      And Brian had never done anything like that to you?

24  A.      No.

25  Q.      And he never has?

Mandy L.                                         230

1    A.      What do you mean never has?

2    Q.      And you've never stolen drugs from him?

3    A.      No.

4             MR. KAPLAN:  Okay.  I have nothing further, Judge.

5             THE COURT:  Okay.  All right.  So the Government is

6    going to proffer this particular Facebook showing, right, and

7    the defense objects?

8             MR. KAPLAN:  Yes, Your Honor.

9             THE COURT:  And your grounds for objection?

10            MR. KAPLAN:  First of all, she doesn't know when she

11   saw it, although she did say she was still dealing, but I have

12   a statement from her where she says that she stopped seeing

13   Brian at least two or three months before she was arrested.

14   Her immediate reaction when she saw the video was it was

15   humorous, and I don't see how you go from thinking something is

16   humorous to thinking that that could be me when Brian has never

17   done anything like that before.  Never threatened her with it.

18   She just something -- it may occur.  She testified maybe that

19   could happen to me, but it's unlikely that forced her to keep

20   dealing drugs.

21            THE COURT:  All right.  I'm going to permit use of

22   the video.  The fact is she's, number one, continuing to deal

23   so her motivation for continuing to deal is at issue here.

24   Second, she described this as intimidating and threatening as

25   she reflected upon those -- that video.  So as a result it goes

                        Mandy L.                        231

 1   right to the question of coercion, and in light of the fact

 2   that she continues to operate it becomes that much more

 3   relevant so --

 4           MR. KAPLAN:  Of course, Judge, the conspiracy is over

 5   at that point.

 6           THE COURT:  The fact is it's all -- she's continuing

 7   to do the activity.  Her incentive or motivation continues on

 8   despite the fact there's a technical end to the conspiracy.  So

 9   as a result because she continues to distribute drugs it is

10   relevant and more relevant than I had thought before because I

11   thought everything had ended from her perspective, but

12   obviously it had not.  So as a result the video should be

13   introduced.  So let's get the jury back.

14           MR. KAPLAN:  Judge, could I just ask her one more

15   question?

16           THE COURT:  Okay.  Go ahead.

17   BY MR. KAPLAN:

18   Q.    So you indicated that you continued to sell drugs?

19   A.    Yes.

20   Q.    After March of 2016?

21   A.    Yes.

22   Q.    And who did you sell to?

23   A.    Same -- pretty much the same people.

24   Q.    Who?

25   A.    I don't know names.  I don't abide by them.  I just meet

Mandy L.                                    232

1   these people and give them what they want.

2   Q.      And didn't you say that the drug -- the drugs ran out?

3   A.      Slowed down.

4   Q.      In February -- January or February?

5   A.      Slowed down.

6   Q.      To almost nothing you said?

7   A.      Yes.  We still had a few.

8   Q.      So it's those few that you were still selling to that

9   you felt you had to keep selling to those one or two people?

10  A.      They kept coming for them.

11          MR. KAPLAN:  Okay.  I just I don't see it, Judge.  I

12  just don't.

13          THE COURT:  I do actually.

14          MR. KAPLAN:  Well that's what counts.  I think so.

15  Okay.

16          MR. DARROW:  Thanks.  I just --

17          THE COURT:  Just put it on the record.  The

18  distinction to me is that when she's testifying about the

19  impact upon her the question is whether she continues to act in

20  this conspiracy.  Although the conspiracy charge ends on a

21  particular date in March of 2016, she continues the operation

22  and as a result the motivations that go into her continued

23  activities become very relevant to her.  That's why if she had

24  stopped selling drugs, everything is past tense, it becomes

25  less relevant.  Now when she says she's continuing on it

                         Mandy L.                        233

1    becomes more and more relevant, especially since her motivation

2    is so key to this particular case.  So as a result let's bring

3    the jury back.

4              MR. DARROW:  Thank you, Your Honor.

5    [Jury returns to the courtroom 4:15 p.m.]

6              THE COURT:  Okay.  We've resolved the issue so let's

7    continue on for another 15 minutes and we'll let you off by

8    6:30 (sic).  Okay.

9              MR. DARROW:  Thank you, Your Honor.

10   BY MR. DARROW:

11   Q.    Ms. L., at some point during your activities that you

12   have been describing during this late 2015/early 2016 time

13   period did you see a video about the young woman you identified

14   as Hannah?

15   A.    Yes.

16   Q.    Where did you see this video?

17   A.    Facebook.

18   Q.    Tell us how you happened to see it on Facebook?

19   A.    Moe posted it.

20   Q.    Okay.  Moe we're talking about Mr. Folks?

21   A.    Yes.

22   Q.    He had a Facebook account?

23   A.    Yes.

24   Q.    And what name was the Facebook account under?

25   A.    Moet Hart.

Mandy L.                                    234

1   Q.      How do you know that was Mr. Folks's Facebook account?

2   A.      I was friends with him.

3   Q.      All right.  Did he -- is the name Moet familiar to you?

4   A.      Yes.

5   Q.      Is that a name he used sometimes?

6   A.      Yes.

7   Q.      Okay.  So you say Moe posted it on his Facebook account

8   and how did you happen to see it?

9   A.      Being friends with someone on Facebook you see what they

10  post.

11  Q.      Okay.  So you're on Facebook as well and his post comes

12  up on your feed?

13  A.      Yes.

14  Q.      Okay.  What do you remember seeing in the video?

15  A.      Pictures of Hannah.

16  Q.      I'm sorry.

17  A.      Pictures of Hannah.

18  Q.      All right.  Do you recall what pictures?

19  A.      Yes.

20  Q.      What?

21  A.      There was pictures of her dozing off after getting high,

22  pictures of her with her legs spread, a picture of her walking

23  around in an apron.

24  Q.      What do you mean walking around in an apron?

25  A.      The red apron.

Mandy L.                                    235

1    Q.      The red apron that you had to walk around in?

2    A.      Yes.

3    Q.      Okay.  So you watched this video at the time --

4    A.      Yes.

5    Q.      -- when you saw it come up in your feed?

6    A.      Yes.

7    Q.      Approaching you with 117, which is a CD, is that a video

8    that you have looked at?

9    A.      Yes.

10   Q.      Did you put your initials on it?

11   A.      Yes.

12   Q.      And what's on that CD?

13   A.      It's the video Moe posted of Hannah.

14           MR. DARROW:  Your Honor, we move this.

15           THE COURT:  All right.  It is admitted.

16   [Government exhibit 117 admitted]

17           MR. DARROW:  All right.  I'm going to post, Your

18   Honor.

19           THE COURT:  Yes.

20   [Government exhibit 117 published]

21   BY MR. DARROW:

22   Q.      Miss L., what effect did that -- seeing that video

23   posted on a Facebook page have on you?

24   A.      Upsetting.

25   Q.      How so?

Mandy L.                                         236

1   A.      Just to know that someone could do that to somebody.

2   Q.      Those pictures that we saw put up during Mr. Folks --

3   well, first of all, do you recognize the man in the red shirt?

4   A.      Yes.

5   Q.      Who is that?

6   A.      Moe.

7   Q.      All right.  Mr. Folks?

8   A.      Yes.

9   Q.      All right.  The stills of a young woman that went up

10  including one showing her face who was that?

11  A.      Hannah.

12  Q.      Okay, and the other stills showing her -- showing a

13  woman naked in the red apron who was that?

14  A.      Hannah.

15  Q.      And the two stills showing a young woman with her legs

16  spread who was that?

17  A.      Hannah.

18  Q.      In terms of the impact on you what did you think on

19  seeing this video?

20  A.      I was just saying could have been me.  What if that was

21  me.  Like I would hate myself for it.  Like if that was me in

22  the video like it would make me hate myself.

23  Q.      Okay.  Ms. L., you testified earlier that for some

24  period during the beginning of your relationship with the

25  defendant you were in love?

Mandy L.                                    237

1    A.      Yes.

2    Q.      And I think you testified that one of the reasons why

3    you did some of the things you did was because you were in

4    love?

5    A.      Yes.

6    Q.      At some point did your feelings change?

7    A.      Yes.

8    Q.      How did they change?

9    A.      I was more scared of him than in love with him.

10   Q.      Okay, and just talking about the time when you were

11   still living at North Union and during that winter and spring

12   why were you scared of him?

13   A.      The stuff I witnessed.  Stuff I witnessed.

14           MR. KAPLAN:  Objection, Your Honor.

15           THE COURT:  Okay.  Would counsel approach the bench?

16   [Bench conference]

17

18

19

20

21

22

23

24

25

Mandy L.                                    238

 1              THE COURT:  Okay.  Do you want to make a proffer as
 2    to what she's going to say?
 3              MR. DARROW:  When you were talking with her she said
 4    it could happen to me and I was hoping she was going to say
 5    that again.  One more time and I'll ask it one more time and
 6    move on.
 7              MR. KAPLAN:  I wouldn't ask her.
 8              THE COURT:  I thought you were asking her for her
 9    fear of him.
10              MR. DARROW:  Right.  I moved on from that.  I
11    apologize.
12              THE COURT:  You moved on from that and then I was
13    interested to know what you expect her to say, and the question
14    is whether that's going to be overly prejudicial.
15              MR. DARROW:  I think -- okay.  I think the only thing
16    -- and I think I can ask a more pointed question -- is she
17    heard him threaten one of the females once.
18              THE COURT:  Oh okay.  I would exclude that at this
19    point.  I mean that's a statement -- that's a statement about
20    the relationship between he and somebody else.
21              MR. DARROW:  Well it's also how he treated the women
22    she witnessed.
23              THE COURT:  If this is all you're talking about is
24    this one threat --
25              MR. DARROW:  That's the one I was asking her to

                    Mandy L.                          239

1  explain.

2          THE COURT:  I think --

3          MS. SEN:  Your Honor, you excluded it.

4          THE COURT:  I may have excluded it, but I'm going to

5  exclude it at this point.  I just think we should move on.

6          MR. KAPLAN:  Judge, I'm assuming I'm not going to

7  cross examine today.

8          THE COURT:  No you're not going to cross examine

9  today unless you want to limit your cross examination to five

10 minutes.

11 [End of bench conference]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mandy L.                                          240

1  BY MR. DARROW:

2  Q.    Ms. L., thank you for your patience.  I'll try to wrap

3  up my piece of this.  At some point did you move out of the

4  North Union Street apartment?

5  A.    Yes.

6  Q.    And part ways with Moe?

7  A.    Yes.

8  Q.    Okay.  Moved back to your grandmother's?

9  A.    Yes.

10  Q.    All right, and is that around mid 2016?

11  A.    Yes.

12  Q.    Do you know where Moe moved at that time?

13  A.    To his youngest son Danielle -- his youngest son's

14  mom's, Danielle.

15  Q.    Danielle Degenhardt?

16  A.    Yes.

17  Q.    We looked at a photograph of her place?

18  A.    Yes.

19  Q.    First thing we did maybe?

20  A.    Yes.

21  Q.    Okay.  All right.  Now you were charged in this case?

22  A.    Yes.

23  Q.    You retained counsel?

24  A.    Yes.

25  Q.    What's the status of that charge -- the federal charge

Mandy L.                                    241

1  against you?

2  A.     What do you mean by status?

3  Q.     Well what became of the charge?

4  A.     It hasn't --

5  Q.     Did you plead guilty?

6  A.     Yes.

7  Q.     Are you awaiting sentencing?

8  A.     Yes.

9  Q.     By Judge Sessions?

10  A.     Yes.

11  Q.     And at some point did you enter into a cooperation

12  agreement with the Government?

13  A.     Yes.

14  Q.     All right.  Now let me just wrap up by asking you to

15  describe a little bit your present circumstances.  You got a

16  full time job?

17  A.     Yes.

18  Q.     Okay.  How about your kids?  Do you have one of them

19  living with you?

20  A.     Yes.

21  Q.     Trying to get custody of another?

22  A.     Yes.

23  Q.     Negotiating with DCF?

24  A.     Yes.

25           MR. DARROW:  All right.  I think that's all we have.

                        Mandy L.                         242

1              THE COURT:  All right.  Let's end today.  We'll begin

2    cross examination tomorrow.  Just I've received a couple of

3    notes and, Mr. Cross, I wonder if you would go back with the

4    jury, would you come back and I would like to speak with you,

5    and also, Mr. Francis, can I have for you to come back as well,

6    just one after another.  I would like to talk with you as well.

7    So I'm going to stay here.  You're excused for the day.  We'll

8    see you at 9 o'clock.  I just want to remind you not to say

9    anything about this case or read anything about it.  Mr.

10   Francis, would you stay right there and I'll ask you some

11   questions.

12   [Jury leaves for the day at 4:30 p.m.  Mr. Francis remains in

13   the courtroom.]

14             DEPUTY CLERK:  Please be seated.

15             THE COURT:  Mr. Francis, I have heard you indicated

16   to court staff that your mother used to work for the U.S.

17   Attorneys, then for the U.S. Marshal, and then left and has

18   since died; is that right?

19             MR. FRANCIS:  Yes.

20             THE COURT:  So do you know when she worked at the

21   U.S. Attorney's Office?

22             MR. FRANCIS:  I don't know the exact dates.  I want

23   to say like when I was maybe 11 or 12.

24             THE COURT:  Okay.  Do you know how long she worked

25   with them?

Mandy L.                                      243

1              MR. FRANCIS:  I don't know.  I don't know really the

2     details of how long she was at each place.  I was younger back

3     then so I wasn't really paying attention to what her jobs were

4     necessarily.  I just know --

5              THE COURT:  I guess at age 11 and 12 you really don't

6     -- aren't concerned about that.

7              MR. FRANCIS:  Yeah.  I remember her -- I believe she

8     switched before I entered high school I think.  So that would

9     be like 2008.

10             THE COURT:  Okay, all right, and did she ever talk

11    about her work at the U.S. Attorneys?

12             MR. FRANCIS:  No.

13             THE COURT:  Never did or her reason for leaving?

14             MR. FRANCIS:  No.  I didn't really -- I know I mean I

15    remember it was -- I mean she -- based off our home life she

16    never really explained much to me because of our reasons for

17    coming to Vermont and whatever issue she had at work.  She just

18    tried to keep all that at work.

19             THE COURT:  So you didn't hear any of that?

20             MR. FRANCIS:  No.

21             THE COURT:  And she also worked with the Marshals for

22    a while?

23             MR. FRANCIS:  Yes I believe so.

24             THE COURT:  And then she moved on some other place?

25             MR. FRANCIS:  Immigration I believe.

Capitol Court Reporters, Inc. (800/802) 863-6067

```
                      Mandy L.                           244
```

 1          THE COURT:  Okay.  She worked at Immigration?

 2          MR. FRANCIS:  Yes.

 3          THE COURT:  So I appreciate you disclosing the fact

 4   that she did work before the U.S. Attorneys, but you really

 5   don't know anything about her service there?

 6          MR. FRANCIS:  Some sort of processing of I think when

 7   people were taken to holding maybe.  Something -- I was shown

 8   the holding cell when I was really young.  I think it had

 9   something to do with just the computer work then.

10          THE COURT:  Because she worked with the U.S.

11   Attorneys and left, the Marshals then left, does that impact

12   your ability to be fair here?

13          MR. FRANCIS:  No.  No.

14          THE COURT:  So you really have no idea what she

15   experienced in one place or another?

16          MR. FRANCIS:  No.

17          THE COURT:  Okay.  All right.  Do either counsel wish

18   to ask any questions of Mr. Francis?

19          MR. DARROW:  No, Your Honor.

20          MR. KAPLAN:  No, Your Honor.

21          THE COURT:  Okay.  All right.  Thank you.  We'll see

22   you tomorrow morning.

23          MR. FRANCIS:  Sounds good.  Have a good night.

24   [Mr. Francis leaves the courtroom.  Mr. Cross enters the

25   courtroom.]

```
                    Mandy L.                          245
 1              THE COURT:  Good night.  Okay.  Please take a seat,
 2    Mr. Cross.  Either place.  Any place is fine.  You sent me a
 3    note.
 4              MR. CROSS:  Yup.
 5              THE COURT:  You indicated that maybe six or seven
 6    years ago you may have seen the last witness?
 7              MR. CROSS:  Yeah Miss L. on public transport perhaps.
 8              THE COURT:  Okay.  Do you know if that's true or, I'm
 9    sorry, it's a long time ago.
10              MR. CROSS:  Her manner of speech was fairly -- stuck
11    out to me.
12              THE COURT:  Did you talk with her six or seven years
13    ago?
14              MR. CROSS:  No.  No.
15              THE COURT:  You just would have heard her speaking
16    with other people?
17              MR. CROSS:  Her face and voice is familiar to me.
18              THE COURT:  Okay, and so how many times would you
19    have seen her?
20              MR. CROSS:  I don't know how often I would have seen
21    her.  It was a long time ago.  I do use the buses as my primary
22    method of transportation.
23              THE COURT:  Okay.
24              MR. CROSS:  So back then I guess 10 times a week
25    total, but not seeing her 10 times a week.  I don't know how
```

                    Mandy L.                           246

 1   often I would have.  I just have -- she's in my memory

 2   somewhere from that time.

 3              THE COURT:  All right, but you don't know exactly how

 4   many times you saw her or --

 5              MR. CROSS:  No.

 6              THE COURT:  -- in what connection and you didn't have

 7   any communication with her directly?

 8              MR. CROSS:  No.

 9              THE COURT:  All right.  So does the fact that you

10   think you had that contact with her impact your judgment in

11   terms of weighing her testimony?

12              MR. CROSS:  No I don't think so.  I see a lot of

13   people everyday, of course, and this was six or seven years

14   ago.  I just wanted to alert somebody as soon as I realized I

15   recognized her or that I did recognize her.

16              THE COURT:  Okay.  All right.  Any questions from

17   either side?

18              MR. DARROW:  No, Judge.  Thanks.

19              MR. KAPLAN:  No, Your Honor.

20              THE COURT:  Okay.  All right.  Mr. Cross, thank you.

21   You've indicated that this would not necessarily impact your

22   assessment of her testimony.  I accept that and we'll see you

23   tomorrow morning at 9 o'clock.

24              MR. CROSS:  Thank you, Your Honor.

25              THE COURT:  All right.  Thank you and I really

                    Mandy L.                          247

 1   appreciate you just telling us this.  Okay.

 2   [Mr. Cross leaves the courtroom.]

 3          THE COURT:  Okay.  I just want to read into the

 4   record "I'm worried that six or seven years ago I saw Mandy on

 5   public transport on occasion.  Her face and voice resonate.

 6   Richard Cross, number four."  I don't think that has any impact

 7   on his ability to serve here and if anyone does, tell me, but

 8   anyone --

 9          MR. DARROW:  We agree, Your Honor.

10          MR. KAPLAN:  We agree, Judge.

11          THE COURT:  Okay.  All right.  So he will continue to

12   serve.  Now so we begin cross examination tomorrow, right?  Do

13   you have any idea of the rough length of your cross

14   examination?

15          MR. KAPLAN:  Probably two days.

16          THE COURT:  Probably two days?

17          MR. KAPLAN:  No.  I would think two hours at the

18   most.

19          THE COURT:  Okay.  So I mean assuming late in the

20   morning you'll be called upon to call another witness.  Who do

21   you have coming in?

22          MR. DARROW:  Mary P.

23          THE COURT:  Pardon me.

24          MR. DARROW:  Mary P.

25          THE COURT:  Okay.  Anyone else?

                         Mandy L.                        248

 1                MR. DARROW:  We'll have another witness after her.

 2       We have a -- the police officer that seized the drugs during

 3       the car stop that was described.  He's told us he will be here

 4       by 1 o'clock, but if we think we need him earlier, we can try

 5       to get him earlier.

 6                THE COURT:  Don't you think her testimony would take

 7       the rest of the morning for sure?

 8                MR. DARROW:  I think so.  I think we're safely in the

 9       afternoon.

10                THE COURT:  All right.  Now any legal issues that you

11       anticipate?

12                MR. DARROW:  Can we back up for a sec?

13                THE COURT:  Sure.

14                MR. DARROW:  I had understood the last juror to be

15       here Mr. Cross -- was it Mr. Cross?

16                THE COURT:  Yes.

17                MR. DARROW:  That you didn't see any issues with him,

18       but we didn't talk about the juror before him.

19                THE COURT:  Well right.  I didn't see any issues in

20       regard to him either.

21                MR. DARROW:  Okay.

22                THE COURT:  I thought I had mentioned that.  Maybe I

23       didn't mention that.

24                MR. DARROW:  And I apologize.  I couldn't see his

25       face and I couldn't hear everything he said, but you asked him

Mandy L.                              249

1    about his experience -- what he knew about his mother's

2    experience at the USAO and you didn't see any problem?

3           THE COURT:  He never talked to his mother about what

4    work she did.  He was 11 or 12 years old he said.  At that

5    particular point he had no discussions with his mother about

6    what she did.  He thought there was some sort of processing

7    that she did.  He had no idea why she left and she went -- he

8    knew she went to the Marshals, but he has no idea about her

9    reaction to the work at the U.S. Attorney's Office or what she

10   did and has no -- has had no impact upon his ability to be

11   fair.

12          MR. DARROW:  Sounds good, Your Honor.  I appreciate

13   it.  I just didn't hear everything, but that sounds like good

14   news.

15          THE COURT:  All right.  Okay.  Any issues that you

16   anticipate?

17          MR. KAPLAN:  No, Your Honor.

18          THE COURT:  Okay.  All right.  We'll see you then

19   tomorrow morning.

20   [Adjourned at 4:40 p.m.]

21

22

23

24

25

Mandy L.                                    250

1                     C E R T I F I C A T I O N

2

3

4

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8                                    _____

9

10

11    May 28, 2019                   _____

12    Date                           JoAnn Q. Carson, RMR,CRR

13

14

15

16

17

18

19

20

21

22

23

24

25