UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
              V.             *    Case No:  2:16-cr-94-1
BRIAN FOLKS           *




TRIAL BY JURY - DAY THREE
APRIL 26, 2019
BURLINGTON, VERMONT


BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

     Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

     Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Mandy L. | 10,17 |
|   Examination by Mr. Kaplan | 12 |
|   Examination by Mr. Darrow | 13 |
|   Continued Direct Exam by Mr. Darrow | 18 |
|   Cross Examination by Mr. Kaplan | 21 |
|   Redirect Examination by Mr. Darrow | 73 |
|   Voir Dire by Mr. Kaplan | 94 |
|   Recross Examination by Mr. Kaplan | 97 |
| Mary P. | 106 |
|   Direct Examination by Mr. Darrow | 106 |
|   Voir Dire by Mr. Kaplan | 163 |
|   Cross Examination by Mr. Kaplan | 168 |
|   Voir Dire by Mr. Darrow | 198 |
|   Redirect Examination by Mr. Darrow | 205 |
|   Recross Examination by Mr. Kaplan | 210 |
| Kyle Brouillette | 211 |
|   Direct Examination by Ms. Savner | 212 |

| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 108A | Motel 6 Records | 95 |
| 55A | Photos of Victoria L. | 144 |
| 47A | Photo of Hannah A. | 146 |
| 123 | Photo of Brittany B. | 149 |
| 49B | Hard Drive N-66 Exh. | 164 |
| Defendant | | |
| H19 | Facebook Msgs.w/Mandy | 34 |
| H5 | L. Plea Agreement Ltr. | 39 |
| H6 | Plea Agreement of M.L. | 39 |
| H21 | 2nd Superceding Indictment | 39 |
| H20 | Photos re: M.L. | 41 |
| H | Photo Mary P. and Mandy | 190 |
| QQ3 | Facebook Msgs. M.P. | 194 |
| QQ5 | Apartment Diagram | 200 |

3

1  [FRIDAY, APRIL 26, 2019 9 A.M.]

2  [The following was held in open court without the jury present]

3          THE COURT:  Good morning.

4          DEPUTY CLERK:  This is Case Number 16-94 United

5  States of America versus Brian Folks.  The Government is

6  present through Assistant United States Attorneys William

7  Darrow, Emily Savner, and Matthew Grady.  The defendant is

8  present in the courtroom with his attorneys Mark Kaplan and

9  Natasha Sen.  The matter before the Court is Trial by Jury day

10  three.

11          THE COURT:  So I was told that the lawyers want to

12  speak with me.

13          MR. KAPLAN:  Your Honor, we -- the defense has --

14  would like to raise an issue with the Court.

15          THE COURT:  Okay.

16          MR. KAPLAN:  And it has to do with Mandy's voyeurism

17  conviction.  The Court had previously ruled that all we were

18  allowed to do was indicate that she was convicted, the date she

19  was convicted, and her sentence.

20          THE COURT:  Correct.  That's the high points of the

21  conviction.  You're using the conviction to impeach.  That

22  means that's what you use for the conviction.

23          MR. KAPLAN:  And I understand that's pretty standard,

24  but we think the Government's opened the door on that issue and

25  that we should be allowed to get behind the conviction and talk

4

1    about what actually took place.

2         THE COURT:  Why?  What -- what did they do about

3    opening the conviction?  They actually mentioned the

4    conviction.  She indicated that she was convicted of voyeurism.

5    They went through the high points, the sentence, et cetera.

6    What did they do to open up the door in the first place, and

7    the second is how is it particularly relevant?

8         MR. KAPLAN:  All right.  So the conviction involved

9    Mandy L. along with her boyfriend at the time Edwards

10   surreptitiously filming her I think 13-year-old daughter, and

11   when the police found -- took the electronics from the -- from

12   her apartment they had numerous videos of that taking place and

13   that was the basis for the charge to which she pled guilty.  So

14   that shows someone who doesn't have a great concern for their

15   children.  In fact, that's probably why she lost -- her

16   children were taken away.

17       At trial the Government made a very specific point in

18   trying to convince the jury that she was sad about having lost

19   -- having her children taken away, that she cried about it,

20   that she is trying to get them back, and they created I think a

21   sense of sympathy for her because she no longer had her

22   children, and I think that the jury has a right to know why she

23   doesn't have them.  If she's going to take the stand and come

24   to tears about the fact that she no longer has her children,

25   the jury is left thinking well maybe she didn't deserve to have

5

1    her children taken away and that it's really sad that she

2    doesn't have her children.

3            THE COURT:  Well, first of all, there's no link

4    between the voyeurism conviction and the loss of children or is

5    there?

6            MR. KAPLAN:  I believe there is.

7            THE COURT:  She lost the children because of the

8    voyeurism?

9            MR. KAPLAN:  Maybe we could ask her that before the

10   jury comes in, but I think -- but even so, even if that's not

11   the case, this is how she treated her children and for her to

12   take the stand and act as if -- now maybe she's a changed

13   person, but to act as if, you know, she comes to tears because

14   she doesn't have her children any longer and she engages in

15   this kind of conduct with them in the past, I think the jury

16   should know both sides of the story.

17           THE COURT:  Well here's a difficulty in this factual

18   analysis that you're presenting.  I would bet that the other

19   side would in some respects even want this evidence in because

20   the actual facts of the voyeurism suggest that strong sort of

21   abusive guy gets the pictures from her.  So you get this image

22   of this guy behind this whole thing telling her to do things

23   which she may not necessarily want to do, and that's a --

24   that's an image, you know, which may be relevant to this

25   particular case, and I really don't want to go down these

6

1  rabbit holes here on issues which are not particularly

2  significant, but if you start -- you start this examination,

3  you are opening up -- I mean you're opening up a very difficult

4  area it seems to me.

5           MR. KAPLAN:  Well if the Government wants this in, we

6  can stipulate.  We certainly would be agreeable to that.

7  Secondly, she wasn't an unwilling participant.  There's nothing

8  in the police affidavits to suggest she was forced or abused.

9  In fact, she was right there with her own cell phone taking

10  pictures and recording things, and there isn't any evidence

11  that she was -- if she wants to say she was abused, that's

12  fine, I can deal with that, but --

13           THE COURT:  All right.  Mr. Darrow.

14           MR. DARROW:  Thank you.  Your Honor, this matter was

15  brought up to the Court before trial.  All the circumstances

16  cited by the defense other than my direct exam of Ms. L. were

17  brought up.  You ruled on it.  We thought the ruling was

18  correct.  You held that the essential facts, namely the

19  conviction, the sentence, could come in and we limit our direct

20  on the direct -- on the examination to those facts.

21      Now the only thing new here is defense claim -- claims

22  that we opened the door by getting in the fact that in the

23  spring of 2015 Ms. L. lost custody of her children.  I don't

24  know why that happened.  I know -- remember the Jencks case.  I

25  think Jencks' wife lost custody of the younger daughter for a

7

1    time because DCF was just suspicious about what had been going

2    on in the house.  You know DCF takes custody of kids for all

3    kinds of reasons.  It may have been related to or a collateral

4    consequence of the 2004 offense, the voyeurism offense.  I

5    don't know, but I agree with you that if we get into that we're

6    going down a rabbit's hole, and further it would be pure

7    character assassination on Ms. L. on something that happened

8    five years ago, and I don't think -- she obviously made a

9    mistake in 2014 and she feels -- I'm sure she feels bad about

10   it, and when she appeared emotional yesterday saying she was

11   trying to get back custody of a different kid that she didn't

12   have then, a baby, you know, I thought that was, you know,

13   intrinsic to being a parent, a mother particularly, and I just

14   don't see how forcing her to relive her -- what happened back

15   in 2014 helps the jury understand things, and I think it would

16   be --

17           THE COURT:  Well I mean in some -- you're in some

18   respects making the defense's point.  You're suggesting that

19   she looked like a really sensitive caring parent and this would

20   be evidence that she was not a sensitive caring parent.

21       The problem is the conviction is admissible under 609 to

22   impeach because it carries over to -- or carries.  Okay.  So

23   you can impeach with a conviction.  I said you can impeach with

24   a conviction.  The question is whether you can get into the

25   facts because it has been raised tangentially by the Government

8

1    in regard to her being a sensitive parent, and, you know,

2    frankly if I was to permit this examination, it's inconsistent

3    with what I decided before, but more than that it opens up an

4    incredible door to exploring what her relationship was with

5    this guy who was being given these pictures, and the question

6    is whether that's at the direction of the -- of the guy.  I

7    just think that is a detour from this case on very minimal

8    relevance -- a showing of very minimal relevance.

9              MR. KAPLAN:  Judge, I think it's extremely relevant.

10   First of all, this conduct is alleged to have occurred on

11   November 20 -- well some time around November of 2014.  She

12   pled in 2015 and went to jail on the charge in April of 2015.

13   So when the prosecutor talks about ancient history everything

14   she said on the stand is ancient history then I would assume,

15   but they went out of their way to create the impression that

16   she's a caring, loving mother and doing everything she can to

17   get her children back, and she lost her children about the same

18   time she went to jail on this charge.

19        So I think there's -- the -- I think the jury is entitled

20   to know because if the prosecutor creates a sympathetic image

21   of the witness with respect to the children, then I have -- I

22   think I should have the right to let the jury know that in fact

23   she's not the person she says she is with respect to her

24   children.

25              THE COURT:  Okay.  So what do you want to do when she

9

 1  suggests that all of these pictures were at the direction of

 2  this guy?

 3          MR. KAPLAN:  Well I've cross examined witnesses

 4  before.  I think I can deal with that, Judge.  I'm not worried

 5  about it.

 6          THE COURT:  Okay.

 7          MR. DARROW:  Your Honor, counsel suggests that we

 8  made a big thing out of her loving her kids and whatnot.  My

 9  final question was to draw out her current circumstances and

10  she was basically -- it was very short at the end of, I don't

11  know, a three-hour examination and she said you know

12  essentially I'm working, one of my kids is staying with me, and

13  I'm trying to get custody of the other.  Now when she said

14  that, you know, she looked emotional, but I just don't see how

15  -- we limited our examination to the essential facts when we

16  were talking about it pursuant to the Court's instruction and

17  in order to, you know, respond because we knew it would be

18  coming through the defense otherwise.  I don't think we did

19  anything wrong and I don't think we're belaboring the point --

20          THE COURT:  Okay.  Is your witness here?

21          MR. DARROW:  I believe so.

22          THE COURT:  I would like to ask her some questions.

23          MR. DARROW:  Okay.

24          THE COURT:  Okay.  Could you approach please and take

25  the oath?

```
                    Mandy L.                        10
 1   MANDY L.
 2       Having been duly sworn, testified as follows:
 3               THE COURT:  Good morning.
 4               THE WITNESS:  Good morning.
 5               THE COURT:  I want to ask you just a couple of
 6   questions and take your seat.  You had a voyeurism
 7   conviction --
 8               THE WITNESS:  Yes.
 9               THE COURT:  -- in 2014?  Can you tell me what
10   happened?
11               THE WITNESS:  It was the guy I was with and me were
12   -- I knew about him recording my oldest daughter.
13               THE COURT:  I'm sorry.  You knew about him --
14               THE WITNESS:  Recording.  Making video recording of
15   my oldest -- my oldest daughter.
16               THE COURT:  Okay.
17               THE WITNESS:  Like changing.  Like he had videos of
18   her being nude.  He was molesting her.
19               THE COURT:  Okay.  When did you learn this?
20               THE WITNESS:  A few months before he was arrested.
21               THE COURT:  Okay, but you were arrested for that as
22   well?
23               THE WITNESS:  Yes.
24               THE COURT:  So what happened in regard to your
25   involvement?
```

                          Mandy L.                           11

1                 THE WITNESS:  Me knowing about it and I was involved.

2                 THE COURT:  Well how were you involved?

3                 THE WITNESS:  Like I said I knew about him recording

4    her and not doing anything about it.

5                 THE COURT:  Okay.  Did you record?

6                 THE WITNESS:  Yes.

7                 THE COURT:  You recorded your children as well?

8                 THE WITNESS:  Yes.

9                 THE COURT:  And what happened?

10                THE WITNESS:  What do you mean what happened?  Like

11   --

12                THE COURT:  Well what did you do and why did you do

13   it?

14                THE WITNESS:  I was afraid of the man.  He had

15   threatened if I didn't do what he wanted me to do that I would

16   never see my children again so I did what he wanted.

17                THE COURT:  Okay, and what exactly did you do?

18                THE WITNESS:  Recorded my daughter changing.  Sent it

19   to him.

20                THE COURT:  How many times did you do that?

21                THE WITNESS:  Once.  It was an one count so --

22                THE COURT:  Okay, and then what happened as a result

23   of that?  He was convicted of molesting your daughter?

24                THE WITNESS:  Yes, and then in April of 2015 I had

25   lost my kids because of my involvement and then obviously my

                        Mandy L.                          12

 1   kids went for a year.  So as of April 2016 I was -- I pled

 2   guilty.

 3            THE COURT:  Okay and the charges were -- the charges

 4   were you videoed your child?

 5            THE WITNESS:  Yes.

 6            THE COURT:  Okay.  All right.  Do either counsel have

 7   any preliminary questions to ask her?

 8            MR. KAPLAN:  Yes, Your Honor.

 9            THE COURT:  Okay.

10                        EXAMINATION

11   BY MR. KAPLAN:

12   Q.    So, Miss L., you had an opportunity to read the police

13   report before you pled guilty?

14   A.    Yes.

15   Q.    And the police report indicates that when your boyfriend

16   was videotaping your daughter dressing and undressing and so on

17   you were in the room with your phone and you were also at the

18   same time videotaping her?

19   A.    Yes.

20   Q.    And you were seen brushing her hair before -- before the

21   video was taken?

22   A.    Yes.

23   Q.    Actually it's on the video and you never told the police

24   that you were forced to do that?

25   A.    At first no.

              **Capitol Court Reporters, Inc. (800/802) 863-6067**

Mandy L.                                    13

1   Q.      And you went into court and you pled guilty and you

2   admitted that you had on your own voluntarily taken these

3   videos?

4   A.      No.

5   Q.      You did plead guilty?

6   A.      I pled guilty.  Yes.

7                MR. KAPLAN:  Okay.  I have nothing further.

8                THE COURT:  Okay.  Mr. Darrow, do you have any

9   questions?

10               MR. DARROW:  Well maybe a couple things.

11                            EXAMINATION

12  BY MR. DARROW:

13  Q.      Your daughter at the time was what?  14?

14  A.      At the time of the recordings?

15  Q.      Yes.

16  A.      She was 13.

17  Q.      13, okay, and the child that you're trying to get

18  custody back of now -- from now how old is that child?

19  A.      She's 18 months.

20  Q.      Okay.  So what's her birth date?

21  A.      October -- October 18, 2017.

22  Q.      Okay.  Thank you.

23               THE COURT:  Okay.  Thank you and would you go outside

24  just for a brief time.

25  [Mandy L. exits the courtroom]

                Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                              14

1           THE COURT:  Okay.

2           MR. DARROW:  So I asked that last question because at

3    the close of the direct yesterday that child, who wasn't even

4    born until 2017, is the one that made her feel emotional she's

5    trying to get back.  I think that's very different from

6    counsel's theory that -- I don't know -- she's faking being a

7    good mom or something.

8           THE COURT:  Okay.  All right.  Mr. Kaplan.

9           MR. KAPLAN:  Actually, Judge, the prosecutor asked

10   her about all her children and she got emotional talking about

11   all her children, the fact that they were taken away from her,

12   and she's doing the same thing in that case that she's doing in

13   this case which is blaming everyone else for her conduct.  I

14   think the jury should hear that in fact she did these things

15   and she's not the mother that she claims to be and that -- and

16   that she's trying to blame her boyfriend for her own conduct,

17   and it's extremely relevant to the kind of image that the

18   prosecutor attempted to create with the jury.  This is an

19   important aspect of her character I believe.

20          THE COURT:  Okay.  I'm going to allow you to ask her

21   questions about that.  I think the interesting question then is

22   whether that opens up the door to her being persuaded by a man

23   to do things that she necessarily would not want to do, and my

24   guess is that if you open up the door by asking her questions

25   about what she did, then that opens up the whole relationship

Mandy L.                              15

1  between this guy, what this guy said to her, her responses to

2  this guy, and anyway I'm going to let you ask the question if

3  you really want to go down that road.  Okay.

4           MR. KAPLAN:  Thank you.

5           MR. DARROW:  We feel a little ambushed now because

6  you reversed the course you ruled before trial.

7           THE COURT:  Wait a second.  That is not ambushed.

8  The fact is you asked questions which created an image of her

9  as a parent.  The only reason this is coming in now is because

10 of that particular image and quite frankly maybe I've got a

11 wrong assessment, but -- well I'll strike that.

12          MR. DARROW:  Well we asked her now in 2019 what's her

13 current status.  She said she's emotional -- she didn't say

14 that, but she displayed emotional about trying to get back her

15 18-month-old baby which wasn't even born until 2017.  I can't

16 imagine how that's opening the door as to something that

17 happened in 2014 with a different child.  Had we known that

18 this was going to be coming up we would have talked about it on

19 direct and now it's going to look like she was hiding it and

20 she's a bad person in that regard too.

21          THE COURT:  Well I don't think that you are

22 snuckered.  I think there was an image left of her that she was

23 a strong parent.  I frankly -- well I won't go into my

24 assessment of the case, but as a practical matter in light of

25 the fact that it is left out there I'm going to let the defense

Mandy L.                                16

1    cross examine on that and you can then redirect.

2           MR. DARROW:  Okay, and our concern is, you know, we

3    had a March 29th deadline for pretrial motions exactly so we

4    wouldn't be in this situation not knowing what evidence was

5    coming in or not and counsel keeps basically relitigating --

6           THE COURT:  Mr. Darrow, this is the second time we've

7    been in a situation in which you feel like you have been

8    snuckered is the word that I would suggest you're suggesting,

9    and the fact is when you're in a trial things come out and when

10   things come out then there are responses to those.  So you

11   can't necessarily predict all the things that are going to come

12   out.  So anyway the ruling is the way it is and let's bring the

13   jury in.

14          MR. KAPLAN:  Judge, I think our client would like to

15   talk to us for about two minutes.

16          THE COURT:  Pardon me.

17          MR. KAPLAN:  Can we just talk to our client for about

18   two minutes?

19          THE COURT:  Okay.  We'll take a break, two minutes,

20   then the jury comes in.

21          MR. DARROW:  How about would it be possible for us to

22   reopen the direct so I can go into a couple things and maybe

23   bring this out at the time?

24          MR. KAPLAN:  I would object to that.

25          THE COURT:  I will let you do that.

Mandy L.                                    17

1           MR. DARROW:  Thank you.

2           THE COURT:  Okay.

3    [Recess at 9:27 a.m.  Jury enters the courtroom at 9:30 a.m.]

4           THE COURT:  Good morning.  You want to call the case.

5           DEPUTY CLERK:  This is Case Number 16-94 United

6    States of America versus Brian Folks.  The Government is

7    present through Assistant United States Attorneys William

8    Darrow, Emily Savner, and Matthew Grady.  The defendant is

9    present in the courtroom with his attorneys Mark Kaplan and

10   Natasha Sen.  The matter before the Court is Trial by Jury day

11   three.

12          THE COURT:  I apologize for starting late.  We had

13   issues which needed to be addressed.  Has anyone talked to you

14   about this case or have you learned anything about this case

15   from outside the courtroom or have you talked among yourselves

16   at all about the facts of this case?  [Jurors respond no.]  All

17   right.  Everyone is consistently saying no.  All right.

18   Government's witness.

19          MR. DARROW:  Thank you, Your Honor.  Can we get Ms.

20   L. back in?

21          THE COURT:  I permitted the Government to question

22   Ms. L. a little bit further before cross examination begins.

23   Okay.

24   MANDY L.,

25       Having been duly sworn, testified as follows:

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                        Mandy L.                         18

1            THE COURT:  Good morning, Miss L.

2            THE WITNESS:  Good morning.

3                    CONTINUED DIRECT EXAMINATION

4    BY MR. DARROW:

5    Q.    Good morning.  Thanks for coming back in.  Today should

6    be the last day.  Ms. L., I want to return to the spring or mid

7    2015 when you met Moe.  Okay.  Do you have any understanding as

8    to whether or not he was aware of your personal issues at the

9    time?

10   A.    At that time I didn't.

11   Q.    And did that change?

12   A.    Yes.

13   Q.    What did you learn?

14   A.    I was staying at his son's mom's house and her kid's

15   father had brought up my charge.  So she had messaged Moe and

16   there was conversation I should have told you ahead of time of

17   her charge.

18   Q.    Okay.  Were there conversations between you and Moe?

19   A.    After knowing that we had discussed it, yes.

20   Q.    Okay, and this was a discussion about what?

21   A.    About what happened to my children and what my

22   involvement --

23   Q.    And you talked with Moe about that?

24   A.    Yes.

25   Q.    And about when was that?  Was this early on in your

Mandy L.                                    19

1  adventures?

2  A.     Yes.

3  Q.     Okay.  Was this around the time that you started

4  prostituting or before then?

5  A.     It was before.

6  Q.     All right.  Now let's talk about that for a second.  So

7  you had conversations with the defendant about what you

8  described yesterday as your voyeurism conviction?

9  A.     Yes.

10  Q.     Okay, and did you tell him a little more about it?

11  A.     I didn't get into too much detail, no.

12  Q.     Okay.  Can you tell us please briefly -- well let's back

13  up for a second.  You told us yesterday.  Who was the man you

14  were with at the time?

15  A.     His name is Ray.

16  Q.     Ray, and is this the fellow that is now serving a

17  lengthy term of imprisonment?

18  A.     Yes.

19  Q.     Why is he in jail?

20  A.     He has -- he's got 12 years.  He was charged with

21  voyeurism, lewd and lascivious conduct with a child under the

22  age of 14, and selling her pics online.

23  Q.     Okay.  Is it correct that actually he's serving child

24  exploitation, similar like that, actually in federal prison?

25  A.     Yes.

Mandy L.                              20

1   Q.     Okay.  Now I think you mentioned that he was abusive to
2   you, but I don't really remember what you said yesterday.  How
3   were you treated by this fellow?
4   A.     It was more mental abuse than physical.
5   Q.     What's that mean?
6   A.     Telling me I was worthless, I'll never amount to
7   nothing.
8   Q.     Did he use particular names in referring to you?
9   A.     I was a whore.  I am a slut.  I was a worthless mother.
10  Q.     Okay.  Now the trouble that he got into that landed him
11  in jail was that trouble with your children?
12  A.     Yes.
13  Q.     Okay.  Was there one child in particular that he was
14  interested in?
15  A.     Yes.
16  Q.     Who is that?
17  A.     My oldest.
18  Q.     Okay.  What's her name?
19  A.     Hailey.
20  Q.     Sorry?
21  A.     Hailey.
22  Q.     Okay.  I'm sorry to put you through this.  Your
23  voyeurism conviction what was it based on?
24  A.     Recording my daughter.
25  Q.     Tell us what you did.

                         Mandy L.                        21

1   A.      I video recorded her and sent him the video.

2   Q.      Was that video recording her when she was changing her

3   clothes?

4   A.      Yes.

5   Q.      Why did you do that?

6   A.      Because he would threaten me if I didn't do what he

7   wanted me to do.  I would never see my kids again.

8            MR. DARROW:  Nothing further.

9            THE COURT:  Okay.  All right.  Mr. Kaplan.

10                       CROSS EXAMINATION

11  BY MR. KAPLAN:

12  Q.      Ms. L., as I listen to your testimony I get the

13  impression that your position is this was not your fault?

14  A.      No.

15  Q.      Do you recall the recorded conversation that you had

16  with your daughter while you were voluntarily filming her

17  undressing?

18  A.      No.

19  Q.      Do you recall that you called her dumb on several

20  occasions?

21  A.      I don't exactly remember everything.

22  Q.      Do you recall when she said to you she didn't want to be

23  filmed she said I'm not a porn star and you said just shut up?

24  A.      No.

25  Q.      Did Edwards make you say those things to your daughter?

Mandy L.                                22

1    A.      I guess I don't remember saying that.

2    Q.      Let me show you what's been marked as defendant's

3    exhibit H2 and ask you to read to yourself the conversation

4    that you had with your daughter from there onto the next page

5    please.

6    A.      It says this is so noticeable --

7    Q.      Just read it to yourself.

8    A.      Sorry.

9    Q.      Does that refresh your memory?

10   A.      Yeah.

11   Q.      That was a conversation that you recorded on your cell

12   phone, isn't that right?

13   A.      Yes.

14   Q.      And what you said was first you were talking to Edwards

15   about the fact that the camera was noticeable and you wanted

16   him to do something about that, and then you said if you're

17   standing here in the mirror you can see it, and Edwards said if

18   you're looking for it, sure, and then you said I don't know why

19   she has a bureau she doesn't put any clothes in here.  So you

20   were actively working with him to get the camera set up

21   properly?

22   A.      No.  He put the camera -- hid the camera in a box.  Yes

23   I was in the room when he did it.

24   Q.      So then your daughter says to you aren't you supposed to

25   be folding clothes.  You said I am.  I'm waiting for you to get

                    Mandy L.                          23

1   dressed.  I'm going to tell whether or not you're on Facebook.

2   She says oh and you said you're so dumb.  Did Edwards tell you

3   to say that to her?

4   A.     No.

5   Q.     And then she said -- your daughter said the camera's

6   facing me.  How old was your daughter at the time?

7   A.     13.

8   Q.     And you said well yeah I have it on my knee, stupid.

9   I'm not recording.  You don't worry.  You are not worth it.  So

10  did Edwards tell you to call your daughter stupid?

11  A.     No.

12  Q.     And when you were interviewed by the police is it fair

13  to say that you lied to them on several occasions?

14  A.     At first, yes.

15  Q.     You told them that you only did it once and that you

16  deleted the video?

17  A.     Yeah.

18  Q.     And that wasn't true?

19  A.     No.

20  Q.     Did you understand at the time that it's a crime to lie

21  to law enforcement?

22  A.     Yeah.

23  Q.     And then you eventually ended up telling the Detective

24  that you did it four times.  Do you recall that?

25  A.     No.

                        Mandy L.                        24

1   Q.     Let me have you read to yourself the last page of the

2   police officer's affidavit.  See if that refreshes your memory.

3   Does that refresh your memory?

4   A.     No.

5   Q.     So you don't remember telling the police officer you

6   only did it once?

7   A.     I recorded my daughter once.

8   Q.     And when it was four times?

9   A.     No.

10          MR. DARROW:  Asked and answered, Your Honor.  I

11   object.

12          THE COURT:  Objection sustained.  You can ask her to

13   refresh her recollection.  If she has a recollection, she can

14   testify about that, but you can't use that for cross

15   examination if she does not remember it.

16  BY MR. KAPLAN:

17  Q.     So you don't remember any of this?

18  A.     No.

19  Q.     And reading this doesn't refresh your memory?

20  A.     No.

21  Q.     But you do remember being forced into it?

22  A.     That part I do, yes.

23          MR. KAPLAN:  Okay.  I have nothing further on that,

24   Judge.

25          THE COURT:  Okay.

                        Mandy L.                          25

 1              MR. DARROW:  Thanks.

 2              THE COURT:  Are you not cross examining any more on

 3     this?  I mean this was only part of the cross examination or is

 4     this the whole --

 5              MR. KAPLAN:  I thought we were still on direct.

 6              THE COURT:  Oh I'm sorry.

 7              MR. KAPLAN:  Actually I got confused, Judge.  What

 8     are we on?

 9              THE COURT:  So his direct is completed then it goes

10     to your cross examination.  You started with this cross

11     examination.

12              MR. KAPLAN:  All right.  Okay.

13              THE COURT:  I thought it was your cross examination.

14              MR. DARROW:  I thought counsel was all done.

15              THE COURT:  You thought he was all done?

16              MR. DARROW:  I was hoping and I'm sure the witness

17     was too.

18              THE COURT:  I'm sure that's right.  I think that you

19     had finished your direct examination.  Now he's on cross.

20              MR. DARROW:  Thank you.

21              THE COURT:  Okay.

22     BY MR. KAPLAN:

23     Q.    Miss L., I would like to ask you, you testified

24     yesterday, right?

25     A.    Yes.

                         Mandy L.                      26

1    Q.     And I would like to ask you what it is that you did to

2    prepare for your testimony.  Did you meet with the prosecutor

3    to prepare your testimony?

4    A.     Yes.

5    Q.     And when did you do that?

6    A.     A long period of time.

7    Q.     How many times did you meet with them to prepare your

8    testimony?

9    A.     I don't remember exact how many times.

10   Q.     Yes.

11   A.     I said I don't remember exactly how many times.

12   Q.     Well can you approximate?  5?  10?

13   A.     10 maybe.

14   Q.     And the result of what you -- the result of all those

15   meetings, those 10 meetings with the prosecutors, was what you

16   said in court yesterday?

17   A.     Telling them what I knew, yes.

18   Q.     And when you met with the prosecutors or before did you

19   review any previous statements that you had made?

20   A.     Yes.

21   Q.     What did you review?

22   A.     My statement when I was first arrested.

23   Q.     The one on July 19th of 2016?

24   A.     Yes.

25   Q.     And did you read the two police reports about

                Capitol Court Reporters, Inc. (800/802) 863-6067

                        Mandy L.                        27

1    conversations with you?

2    A.      Not sure.

3    Q.      And when you were talking with the prosecutors and

4    reviewing -- preparing your testimony did they tell you that

5    some of the things you were saying to them and you said in

6    court yesterday are very inconsistent, for example, with your

7    July 19, 2016 testimony?

8    A.      No.

9    Q.      They didn't point that out to you?

10   A.      That I don't know.

11   Q.      Pardon me.

12   A.      No.

13   Q.      But you know that a lot of the things you said in court

14   yesterday are not consistent with what you previously told

15   them?

16   A.      I don't know.

17   Q.      Would you agree that the events that took place in 2015

18   and 2016 were fresher in your mind in July of 2016 and in 2017

19   than they are today?

20   A.      No.

21   Q.      So why did it take you 10 meetings then to prepare your

22   testimony?

23   A.      Because there was a lot to go over.  A lot that I knew.

24   Q.      And the prosecutor never asked you why your testimony

25   was so inconsistent?

                        Mandy L.                        28

1              MR. DARROW:  Objection.  Asked and answered, Your

2     Honor.

3              THE COURT:  Objection sustained.

4     BY MR. KAPLAN:

5     Q.      Would you agree that you said you reviewed the July 16th

6     -- July 19, 2016 statement that you gave the police?

7     A.      Yes.

8     Q.      And do you remember that transcript was over 200 pages?

9     A.      Yes.

10    Q.      And wouldn't you agree that in that discussion that went

11    on for a long time you never told the police that Brian asked

12    you to prostitute?

13    A.      Not that I recall.

14    Q.      In fact, you were very clear in that statement, weren't

15    you, that he never asked you to prostitute?

16    A.      Yes.

17    Q.      Yes.

18    A.      I was scared, but yes.

19    Q.      Well if you were so -- what were you scared about?

20    A.      I have never been arrested before.  It was scary.  I

21    didn't know what I was supposed to do.

22    Q.      Well didn't they tell you that all you had to do was

23    tell the truth?

24    A.      Yeah.

25    Q.      Okay, and you weren't too afraid to tell them that Brian

Mandy L.                                    29

1    was working with prostitutes and that Brian sold drugs or that

2    you sold drugs.  You told them all that?

3    A.    Yes.

4    Q.    And do you recall back in July 19th you told them that

5    you never bagged any drugs for anyone?

6    A.    Back when I was arrested?

7    Q.    Yes.

8    A.    In the beginning, yeah I didn't.

9    Q.    And you also told them that in several statements in

10   2017, a year -- almost a year after you were arrested?

11   A.    I don't recall writing it like that, but --

12   Q.    Do you recall telling the prosecutor -- I mean the

13   agents that you never saw Brian -- you hadn't seen Brian for

14   like two months before July?

15   A.    Yeah.

16   Q.    You did tell them that?

17   A.    I didn't tell them, no.  That didn't come out that I

18   haven't seen him two months prior to that.

19   Q.    But you were no longer --

20   A.    Involved.

21   Q.    And was that true?

22   A.    Yes.

23   Q.    So by April or May of 2016 Brian and you were no longer

24   together?

25   A.    We were no longer in a sexual relationship, no.

Mandy L.                                          30

1  Q.     And do you recall saying in some of the police
2  interviews previous to your testimony that the reason that you
3  decided to prostitute was because you saw women were making so
4  much money and you could use the money?
5  A.     No.  That did not come out of my mouth.
6  Q.     Do you recall that you never mentioned before yesterday
7  that Brian Folks accused you of the drugs -- for being
8  responsible for the drugs that were stolen?
9  A.     I'm pretty sure that was mentioned way before yesterday.
10 Q.     And where was that mentioned?
11 A.     Over a period of time when I was -- when the times my
12 attorney and I were discussing things.
13 Q.     During the 10 meetings or so, but you never said that to
14 the police in July or your other statements in 2017?
15 A.     When I was first arrested, no.
16 Q.     You never told them before you said it in court
17 yesterday that you saw the Hannah video?
18 A.     Yeah that was mentioned.  Not when I was first arrested,
19 no, but it was mentioned.
20 Q.     And it wasn't mentioned in the two longer interviews
21 that you had with the police in 2017?
22 A.     Interviews with the police.
23 Q.     The first time you ever said it was in court yesterday
24 other than maybe to the prosecutor privately?
25 A.     No.  I was not -- yeah when I was arrested it was not

Mandy L.                                    31

1    discussed because it was never brought up.

2    Q.     And you never mentioned, for example, when you were

3    arrested or other times that you were made to wear an apron?

4    A.     No.

5    Q.     The first time any of us heard about that was yesterday

6    in court?

7    A.     That's not true.

8    Q.     You're saying you told the prosecutors about that during

9    the meetings?

10   A.     Yes I did.

11   Q.     And did they ask you about that first?

12   A.     They questioned me about everything.

13   Q.     So which times were you telling the truth, back in July

14   of 2016 or yesterday in court?

15   A.     Back in July of '16 I did tell the truth.  Maybe not all

16   of it, but that was the truth that to my knowledge I didn't

17   admit to everything, no.

18   Q.     So if something you said in court yesterday was

19   inconsistent with what you said back in July, your testimony is

20   the July 2016 statements are more accurate?

21   A.     I never said that.

22   Q.     Well how are we supposed to know which statements are

23   accurate and which ones are not?

24   A.     I said back in July 2016 I didn't admit to everything,

25   no.

Mandy L.                           32

1   Q.     Well are you saying the things you did admit to some of

2   that's not true?

3   A.     Everything back then -- everything I said was -- I said

4   I did admit to everything I was involved in, no, but everything

5   I said that day was true.

6   Q.     Okay.  So when you said that day that Brian Folks never

7   asked you to participate on Backpage that was true?

8   A.     That part was not.

9   Q.     Well you just said that everything you said back then

10  was true?

11  A.     Back then I was saying what I thought was -- I was just

12  trying -- yes, okay, I lied on certain things.  I had to figure

13  out ways to word them the right way.

14  Q.     Why?

15  A.     Because that's how I am.  If I don't word them the right

16  way, they don't come out the right way.

17  Q.     So before you met Brian, as I understand your testimony,

18  you had two previous relationships that weren't so good?

19  A.     Yes.

20  Q.     And you have three children?

21  A.     I have four.

22  Q.     Four, okay, and it was because of the voyeurism

23  conviction that the State took some of your children?

24  A.     All of my children.

25  Q.     So do you recall that -- saying yesterday that when you

Mandy L.                                    33

1  first saw the Hannah video you thought it was amusing?

2  A.     Back then, yes.

3  Q.     And so you looked at that video -- you found the video

4  on Facebook?

5  A.     Yes.

6  Q.     And you looked at it and your first reaction was I think

7  that's funny?

8  A.     I just shook it off and laughed, yes.

9  Q.     Okay, and then you said you thought about it for a while

10 and then you were concerned that maybe that could happen to

11 you?

12 A.     Yes.

13 Q.     But as I understand your testimony you didn't have any

14 concern for Hannah?

15 A.     I said that it was downgrading to her.  Humiliating.

16 Q.     But you didn't say that you were concerned -- that you

17 were more concerned about yourself than anyone else?

18 A.     It could happen to me.  Anyone.  If he could do it to

19 her, it could pretty much be me or anyone else.

20 Q.     But he never did that to you?

21 A.     No.

22 Q.     And if you were so worried -- let me show you what's

23 been marked as defendant's exhibit H19, ask you if you

24 recognize that?

25 A.     Yes.

                        Mandy L.                          34

1   Q.      Those were -- they are Facebook messages between Brian

2   and you?

3   A.      Yes.

4   Q.      And they took place on July 12th of 2016?

5   A.      Yes.

6           MR. KAPLAN:  Your Honor, I would move to admit

7   defendant's exhibit H19.

8           THE COURT:  Any objection?

9           MR. DARROW:  May I see it please, Your Honor?

10          THE COURT:  Yes.

11          MR. DARROW:  No objection, Your Honor.

12          THE COURT:  All right.  So admitted.

13  [Defendant exhibit H19 admitted]

14  BY MR. KAPLAN:

15  Q.      So in this -- in these Facebook messages on July 12th of

16  2016 you're exchanging conversations, messages with Brian about

17  sex?

18  A.      Yes.

19  Q.      And you're sending him nude pictures of yourself?

20  A.      Yes.

21  Q.      So wouldn't you agree that doesn't sound like someone

22  who would be afraid of Brian publishing something about her?

23  A.      He asked for the pictures.

24  Q.      And could you have said no?

25  A.      I was afraid.  I feared him.  If I didn't do what he

Mandy L.                                        35

1   wanted, then he would come after me or my family.

2   Q.      Well you said you hadn't had a relationship with him

3   since spring?

4   A.      We hadn't had a sexual relationship.

5   Q.      What I wanted to ask you about this picture can you --

6   it looks like when you sent a message there's two people in

7   your picture.  Can you tell me who that is?

8   A.      Yes, that is my daughter.

9   Q.      Your daughter?  I'm sorry.

10  A.      Yes my daughter.

11  Q.      So you're sending pornographic pictures to Brian on July

12  12th of 2016 and next to each one of your messages is a picture

13  of your daughter?

14  A.      Me and my daughter.  My profile picture.

15  Q.      And that didn't concern you?

16  A.      She wasn't in my custody.

17  Q.      So that made it all right?

18  A.      To have my kid on my Facebook, yeah.

19  Q.      When you're sending nude photographs of yourself?

20  A.      What does she have to do.  She's not seeing them.

21  Q.      So as I understand it -- just a minute, Judge -- you

22  were arrested on July 19th, 2016?

23  A.      Yes.

24  Q.      And eventually you were indicted?

25  A.      Yes.

                         Mandy L.                          36

1    Q.      Do you know what I mean when I say indicted?

2    A.      No.

3    Q.      Well let me show you what's been marked as defendant's

4    exhibit H21.  Your attorney is in the courtroom today, right?

5    A.      Yes.

6    Q.      And is that the indictment -- didn't you review that

7    with her?

8    A.      Yes.

9    Q.      So you understand just how serious these charges are?

10   A.      Yes.

11   Q.      You understand that in this indictment you were charged

12   with being involved in a conspiracy to distribute drugs and

13   then you had one, two, three, four; four other federal charges

14   of distributing drugs?

15   A.      Yes.

16   Q.      And you understood that you could be facing up to 20

17   years in prison?

18   A.      Yes.

19   Q.      Okay.  So you decided to cooperate?

20   A.      Yes.

21   Q.      And let me show you what's been marked as defendant's

22   exhibit H5 and ask you if you recognize that document?  Is that

23   your cooperation agreement?

24   A.      Yes.

25   Q.      And you signed it?

                    Mandy L.                        37

1   A.      Yes.

2   Q.      And then under the terms of this agreement you agreed to

3   tell the prosecutor everything you knew and to be truthful?

4   A.      Yes.

5   Q.      And then the next thing you did was on August 31, 2017,

6   just a couple of months after you were arrested, you signed a

7   plea agreement with the prosecutor?

8   A.      Yes.

9   Q.      And let me show you what's been marked as defendant's H6

10  and ask you if that's a copy of the plea agreement with your

11  signature on the last page?

12  A.      Yes.

13  Q.      So under the terms of the plea agreement you agree to

14  plead guilty to Count I to the conspiracy charge?

15  A.      Yes.

16  Q.      And in exchange the prosecutors agree to dismiss all the

17  other counts?

18  A.      No.

19  Q.      Well paragraph 1 indicates that you're agreeing to plead

20  guilty to Count I.  Do you remember that?

21  A.      Yes.

22  Q.      And then do you remember -- you might not remember the

23  exact paragraph, but in paragraph 11B it says the Government

24  moved to dismiss the remaining counts against her in the second

25  superseding indictment at the time of sentencing.  Does that

                        Mandy L.                          38

1    refresh your memory?

2    A.     Yes.

3    Q.     So you agreed to plead guilty to the conspiracy and they

4    are going to dismiss all the other counts?

5    A.     Yes.

6    Q.     And is it fair to say that the reason that you entered

7    into a plea agreement and entered into a cooperation agreement

8    is you want to receive a lower sentence?

9    A.     No.

10   Q.     So as you sit here in court today testifying under oath

11   you want the jury to believe that you don't expect to receive a

12   lower sentence because of your cooperation?

13   A.     That is not why the signed the plea agreement.

14   Q.     But isn't it your expectation that you will receive a

15   lower sentence if the prosecutors are happy with your

16   testimony?

17   A.     Yes.

18   Q.     Okay, and you also understand -- and it says this in the

19   cooperation agreement -- that if they don't think you're

20   telling the truth, if they are not happy with your testimony,

21   then they cannot give you a lower sentence?

22   A.     Yes.

23   Q.     So you know if you testify that you need to say what

24   they want you to say?

25   A.     No.

                         Mandy L.                        39

1            MR. KAPLAN:  Your Honor, at this point I would move

2    to admit defendant's exhibit H6, H5, and H21.

3            THE COURT:  Okay.  Any objection?

4            MR. DARROW:  Just so that we're clear that's the plea

5    agreement and the cooperation agreement --

6            MR. KAPLAN:  Plea agreement, cooperation agreement,

7    and second superseding indictment.

8            MR. DARROW:  That's fine.  Thank you.  No objection.

9            THE COURT:  All right.  So admitted.

10   [Defendant exhibits H5, H6, and H21 admitted]

11   BY MR. KAPLAN:

12   Q.    Do you recall on July 16 -- July 19th, 2016 when you met

13   with the agents you said you first met Brian on May 24th of

14   2015?

15   A.    Yes.

16   Q.    And subsequently like on May 19th of 2017 when you were

17   interviewed again by the agents and by the prosecutors you said

18   the same thing?

19   A.    Yes.

20   Q.    And isn't that in fact when you did meet him?

21   A.    No.

22   Q.    So maybe less than a year or about a year after you met

23   Brian and -- about a year and a half after you met Brian you're

24   saying that your memory wasn't as good then as it was yesterday

25   in court?

                     Mandy L.                      40

1    A.    I had the dates mixed up.

2    Q.    With what?

3    A.    Because in May something else had happened and I had it

4    confused of -- from April and May.

5    Q.    So what else happened in May?

6    A.    Personal stuff that I do not care to discuss in court.

7    Q.    Well didn't you tell the prosecutors that the first

8    meeting you had with Brian wasn't to discuss drugs or anything

9    it was to discuss whether or not you could give him pictures of

10   you naked?

11   A.    That was not the full discussion.

12   Q.    But that was part of the discussion?

13   A.    Yes.

14   Q.    And in fact you agreed to do that?

15   A.    At first no, and then yes I agreed afterwards.

16   Q.    In May -- like around May 22nd of 2015 you had all these

17   photographs taken of you naked in a car?

18   A.    Yes.

19   Q.    And originally that was the date you said you met him?

20   A.    Yes.

21   Q.    Let me show you what's been marked as defendant's

22   exhibit H20 and ask you if this represents some of the pictures

23   that were taken in the car?

24   A.    Yes.

25         MR. KAPLAN:  Your Honor, I would move to admit

                        Mandy L.                           41

1    defendant's exhibit H20.

2              THE COURT:  Okay.

3              MR. DARROW:  May we see it, Your Honor?  No

4    objection.

5              THE COURT:  So admitted.

6    [Defendant exhibit H20 admitted]

7    BY MR. KAPLAN:

8    Q.    So on the first day that you met Brian or close to the

9    first time that you met Brian you allowed a series of

10   photographs to be taken of you nude in the vehicle?

11   A.    Yes.

12   Q.    And he told you that that was for the purpose he had a

13   business going where he was selling them to different people?

14   A.    Yes.

15   Q.    And that didn't concern you?

16   A.    At that time no.

17   Q.    You testified yesterday that you did all these things

18   for Brian because you were in love with him?

19   A.    Yes.

20   Q.    So -- but this wasn't love at first sight, was it?

21   A.    No.

22   Q.    You weren't in love with him when you allowed all these

23   naked photographs to be taken?

24   A.    No.

25   Q.    So why did you do it?

Mandy L.                                    42

1    A.      At that time I was at my lowest.  I was homeless.  I

2    hated myself for what I had -- what I did to my kids.  I had

3    just lost them so I was not in the right state of mind.

4    Q.      Okay.  So if you're in the right state of mind you don't

5    do any of these things?

6    A.      No unless I'm actually in love with the person and I

7    care.

8    Q.      As I understand it you weren't using drugs at the time?

9    A.      No.

10   Q.      And is this something you were in the habit of doing?

11   A.      Can you rephrase that or explain that better?  Pardon

12   me.  What do you mean by that?

13   Q.      I mean did you have people take naked photographs of you

14   on a regular basis?

15   A.      No.

16   Q.      But you have had it done in the past?

17   A.      No.

18   Q.      You said that some of the reason -- one of the reasons

19   you did all these things was because you fell in love with

20   Brian and he promised to take care of you?

21   A.      Yes.

22   Q.      And didn't he take care of you for over a year?

23   A.      Gave me a place to live, yes.

24   Q.      He gave you a place to live, he paid all your expenses,

25   spent a lot of time with you?

Mandy L.                                        43

1    A.      He didn't pay all my expenses.

2    Q.      What expenses did you have that he didn't take care of?

3    A.      I had no expenses so he didn't have to take care of

4    them.

5    Q.      You didn't have an expense.  He provided you a place to

6    live for well over a year?

7    A.      That is it.

8    Q.      So at the time that you first met Brian you were

9    homeless?

10   A.      Yes.

11   Q.      And why were you homeless?

12   A.      I had lost my apartment -- my Section 8.

13   Q.      And you lost your Section 8 because of the voyeurism

14   charge?

15   A.      Yes.

16   Q.      So you contacted Brian again and asked him if he could

17   help you find housing?

18   A.      Yes.

19   Q.      And in fact he did that?

20   A.      Yes.

21   Q.      And did he ask for anything in return?

22   A.      No.

23   Q.      Did he ever ask for anything in return for help

24   providing housing for you?

25   A.      In the beginning, no.

Mandy L.                                    44

1   Q.      And so about a week later Brian found you a place to

2   live?

3   A.      Yes.

4   Q.      And that was with Danielle M.?

5   A.      Yes.

6   Q.      And he made arrangements for you to stay there?

7   A.      Yes.

8   Q.      And then two weeks later you move into your

9   grandmother's?

10  A.      Yes.

11  Q.      And Brian paid the rent for you at your grandmother's?

12  A.      The first few times, yes.

13  Q.      And then at some point you moved into North Union Street

14  where you -- where you lived with Brian?

15  A.      Yes.

16  Q.      And he paid all those expenses?

17  A.      Yes.

18  Q.      Is it fair to say that between May or June of 2015 and

19  November of 2015 when you moved into North Union you saw Brian

20  a lot?

21  A.      Yes.

22  Q.      You saw him almost everyday?

23  A.      Yes.

24  Q.      If not everyday?

25  A.      Yes.

                              Mandy L.                          45

1    Q.      And you learned a lot about him?  You got to know him?

2    A.      Yes.

3    Q.      And you two had a very close relationship?

4    A.      Not always.

5    Q.      So by April of 20 -- I think you said in April or May of

6    2016 you were no longer in a relationship with Brian?

7    A.      We were never in a relationship.  It was a sexual

8    relationship.

9    Q.      And you were no longer selling drugs?

10   A.      No.  I said it slowed down around that time.

11   Q.      Well yesterday you testified that you did not remember

12   when you first learned that Brian was selling drugs?

13   A.      Yes.

14   Q.      But isn't it true that it was around November of 2015

15   when you first learned that?

16   A.      November 20 -- November of 2015 is when I got involved.

17   Q.      But that's when you found out that he was selling drugs?

18   A.      No.  It was prior to that.

19   Q.      So let me show you page 9 of your July 19th, 2016

20   interview and where I have underlined it didn't you say you

21   found out in November?

22   A.      Yes that is what I said.

23   Q.      Okay, and then you said that you reviewed later reports

24   and wouldn't you agree in the later reports you said the same

25   thing that you first found out Brian was selling drugs in

                 **Capitol Court Reporters, Inc. (800/802) 863-6067**

Mandy L.                                    46

1   November of 2015?

2   A.      No that was not how I recall it.

3   Q.      That's not how you recall it today or back when you were

4   meeting with the police?

5   A.      Back when I was meeting with them I'm sure I said I was

6   involved in November.

7   Q.      So this is defendant's exhibit N9.  It's an interview of

8   you on or about January 5, 2017.  So not too long after you

9   were arrested.  Maybe six months.  I'm going to direct your

10  attention to page 5 where I have highlighted it.  Isn't it

11  pretty clear there that at least the agent thinks you told him

12  that you didn't find out about drugs until November of 2015?

13  A.      I said I believe that's when.

14  Q.      Okay.  So back on the day you were arrested in July of

15  2016 and on or about January 5, 2016, like six months after you

16  were arrested, you're saying your recollection then was worse

17  than it is yesterday, four years later?

18  A.      I'm not saying that.

19  Q.      But you are saying that in fact you did tell both -- on

20  both those occasions you told them you didn't know about drugs

21  until November 2015?

22  A.      Yes.

23  Q.      So why did you say something different in court

24  yesterday?

25  A.      I don't recall.  I didn't say anything different in

                         Mandy L.                         47
1    court yesterday.
2    Q.     I think you indicated during the interview when you were
3    arrested that you delivered drugs for Brian?
4    A.     Yes.
5    Q.     And they were small quantities?
6    A.     Yes.
7    Q.     And always to the same people?
8    A.     Yes.
9    Q.     That he did not have a big customer base?
10   A.     It was pretty much the same people that would always
11   come.
12   Q.     And you indicated that not too long after you started
13   the business started to slow down?
14   A.     Yes.
15   Q.     And you said at some point it got down to like two or
16   three people?
17   A.     Yes.
18   Q.     And then eventually there really wasn't anyone?
19   A.     No.
20   Q.     And during all this time what you saw was small
21   quantities?
22   A.     Yes.
23   Q.     And when did it wind down to where there wasn't anyone?
24   A.     April/May.
25   Q.     About the time that you stopped seeing him --

                              Mandy L.                           48

1    A.      Yes.

2    Q.      -- romantically?  So do you recall saying in the July

3    19th, 2016 statement that you went to Marty's house -- that's

4    the one you were shown a picture of yesterday -- about four

5    times?

6    A.      Yes.

7    Q.      One time was for Brian's bachelor party?

8    A.      Yes.

9    Q.      And do you recall saying that on one occasion you went

10   there with Brian Folks and G was there?

11   A.      Yes.

12   Q.      That's McFarlan, right?

13   A.      Yes.

14   Q.      And G was there with two women he had brought up from

15   New York and another guy?

16   A.      Yes.

17   Q.      And they were all bagging drugs?

18   A.      Yes.

19   Q.      And you said those drugs belong to McFarlan not Brian?

20   A.      I said McFarlan brought them up.

21   Q.      You also said they belonged to him?

22   A.      Yeah.

23   Q.      They didn't -- in fact, you said they did not belong to

24   Brian?

25   A.      I don't recall saying they never belonged to him.

Mandy L.                                    49

1    Q.     So I'm going to read to you what you said and tell me if
2    you remember that or not.  You were asked by --
3              MR. DARROW:  Objection.  Your Honor, shouldn't this
4    be along the lines of refreshing recollection rather than
5    reading to her from documents.
6              THE COURT:  Yes it should be.  So if you ask the
7    question, if that refreshes her recollection, she can testify
8    to what was said.  Otherwise, if she doesn't remember, then you
9    have to call the person who took the statement.
10   BY MR. KAPLAN:
11   Q.     You did say the drugs belonged to McFarlan?
12   A.     Yes.
13   Q.     So on the issue of you saying they did not belong to
14   Brian I'm just going to have you read to yourself, please, the
15   bottom of this.  Does that refresh your memory?
16   A.     Yes.
17   Q.     So you were pretty clear that you told the police
18   officers on July 19th, 2016 that those were not Brian's drugs?
19   A.     Yes.
20   Q.     And you recall also telling them that it was McFarlan
21   who brought all the drugs to Vermont?
22   A.     Yes.
23   Q.     Yesterday you testified that -- didn't you say yesterday
24   under oath that you made three or four drug trips with Brian to
25   New York?

Mandy L.                                    50

1   A.      We took trips to New York to bring them back, yes.

2   Q.      Do you recall telling the prosecutor on July 19th of

3   2016 that that was not the case, that you only made one trip

4   that you know where drugs were --

5   A.      I was also on probation and was trying to avoid getting

6   in trouble.

7   Q.      Did you understand my question?

8   A.      I understand.

9   Q.      So you're telling me why you lied about it?

10  A.      I said I -- yes.

11  Q.      Did you understand it's a crime to lie to a police

12  officer?

13  A.      Yeah.

14  Q.      Okay.  So when you made those trips to New York you were

15  on probation?

16  A.      Yes.

17  Q.      Is that a violation of your probation?

18  A.      Leaving the state without permission, yes.

19  Q.      Or being involved in drugs?

20  A.      Yes.

21  Q.      So when you told the agents on July 19th that you only

22  made one trip where drugs were involved and you didn't know how

23  many drugs were brought back, you never saw them, is that not

24  true?

25  A.      Yes.

Mandy L.                                      51

1    Q.     So how do we know what's the truth of what you said

2    yesterday or what you said then?

3    A.     Yesterday is the truth.  Back then, yes, I kind of lied

4    about that because I was avoiding getting in trouble from

5    probation.

6    Q.     So is it fair to say that if you think something will

7    help you, you'll lie about it to your advantage?

8    A.     No.

9    Q.     Isn't that what you just said?

10   A.     No.  I said I was protecting myself from getting in

11   trouble on probation not lying is going to be the right thing

12   to do.

13   Q.     So then tell me again, please, how many trips did you

14   make?

15   A.     Three.

16   Q.     So when you said one you were lying?

17   A.     Yes.

18   Q.     Do you understand that when you talk to police officers

19   or when you come into court like yesterday that based on what

20   you say someone is either going to be convicted or charged or

21   arrested?

22   A.     Yes.

23   Q.     And so when you sit there and you tell these lies to

24   police officers you understand the possible consequences of

25   that?

Mandy L.                                    52

1   A.      Yes.

2   Q.      And that didn't concern you?

3   A.      No.

4   Q.      Sort of like the video what you're concerned about is

5   what happens to you?

6   A.      Like I was saying it could happen to anybody.

7   Q.      Did -- do you recall telling the agents on July 19th of

8   2016 that you had never bagged any drugs for Brian?

9   A.      Yes I recall that.

10  Q.      And then you came into court yesterday and said you did

11  it multiple times?

12  A.      I said I was in the room while others bagged.

13  Q.      Okay.  So you still stand on your statement that you

14  never bagged?

15  A.      Yes.

16  Q.      Okay, and that wasn't anything that Brian asked you to

17  do or made you do?

18  A.      Like what do you mean?  He didn't ask me to do it.  He

19  asked for me to be in the room with them while they were

20  bagging, yes.

21  Q.      But he didn't force you to bag?

22  A.      No.

23  Q.      So would you agree that every time you were asked about

24  your role in prostitution your story changed?  You never told

25  the same story twice?

Mandy L.                                    53

1   A.      In the beginning I prostituted on my own, yes.

2   Q.      And it wasn't with Brian?

3   A.      He posted me.

4   Q.      Well you testified yesterday that in June of 2015 you're

5   in a hotel room with Brian and Delaney?

6   A.      Yes.

7   Q.      And you and Delaney, and you said Brian asked you to

8   prostitute?

9   A.      No.  His exact words were if you're giving it away for

10  free why not make money.

11  Q.      And so what you're saying is it was Brian that was

12  asking you to prostitute?

13  A.      Yes.

14  Q.      But that isn't true, is it?

15  A.      Yes it is.

16  Q.      Well didn't you on several other occasions say something

17  different?

18  A.      At that time -- the first time I posted he had mentioned

19  if you're going to give it away for free why not make money.

20  So I figured okay so I'll do it.

21  Q.      So you're saying Brian said if you're going to give it

22  away for free you might as well get paid for it, and you said

23  okay?

24  A.      Yes.

25  Q.      But didn't you tell the prosecutors back in July of 2016

                        Mandy L.                        54

1    that when they asked you if he took the pictures for Backpage

2    you said no you took your own picture?

3              MR. DARROW:  If I may, Your Honor, I think counsel

4    means did you tell the police officers at that time.  The

5    prosecutors weren't present for that interview.

6              MR. KAPLAN:  Did I say prosecutors?

7              THE COURT:  Is that correct?  You did say

8    prosecutors.  You are talking law enforcement?

9              MR. KAPLAN:  Sorry.

10             THE COURT:  Okay.

11   BY MR. KAPLAN:

12   Q.    Isn't that true?

13   A.    I don't recall that.

14   Q.    Well let me show you page 201 of the transcript of that

15   and ask you if you can just read that page to yourself.

16   A.    Yeah that's not how I worded it and this is not --

17   because I did take pictures of myself, yes.

18   Q.    And you said -- the agent said did you take pictures for

19   -- you said no I took my own pictures in the mirror, and then

20   the agent said further down I'm surprised that he didn't try to

21   -- try to do that, in other words, get you to become a

22   prostitute, and you said no he actually never asked me about

23   doing Backpage for him.  Is that true?

24   A.    That is what I said in the beginning when I first found

25   out, yes, but eventually he did ask.

Mandy L.                                    55

1  Q.      Well show me here where it says that he never asked you

2  to do Backpage, but then eventually he did?

3  A.      That was in the beginning when I was arrested.  Not -- I

4  didn't admit to everything.

5  Q.      Why would you say that if it's not true?  I'm sorry.

6  You said all these other things about Brian that could get him

7  into all kinds of trouble; prostitution, drugs, and yet you're

8  going to lie about whether or not he asked you to do Backpage?

9  A.      At that time I was scared and I didn't know what to say

10  and, no, not everything came out.

11  Q.      Is it difficult to understand that you're supposed to

12  tell the truth?

13  A.      Obviously it's not that difficult and I know that.

14  Q.      And isn't the truth that he never did ask you?

15  A.      That's not the truth.

16  Q.      So when you testified yesterday that Brian posted it

17  that wasn't true; the fact of the matter was you took your own

18  pictures?

19  A.      At that time he did take two of the pictures that were

20  shown to me.

21  Q.      Isn't it a truer statement you actually posted pictures

22  for other girls on the Backpage?

23  A.      No.

24  Q.      Pardon me.

25  A.      I never posted other girls.

Mandy L.                                    56

1  Q.     But how do you explain the fact that your e-mail address

2  is on several of the posts for the other women?

3  A.     Like I had told everybody else some of the girls didn't

4  have an e-mail so they used my account.

5  Q.     So you were fine with that?

6  A.     Yeah.

7        THE COURT:  All right.  It is 6:30 -- I mean 10:30.

8  It is time for our break at this point.  Is this a good place

9  to stop?

10        MR. KAPLAN:  Sure.

11        THE COURT:  Okay.  All right.  Let's take a 15-minute

12  recess.  Be back at quarter of.

13  [Recess 10:30 - 10:50 a.m.]

14        THE COURT:  Okay.  Mr. Kaplan, are you ready to

15  proceed?

16        MR. KAPLAN:  I am, Judge.  I need a witness.

17        THE COURT:  I think you do.  Okay.  Welcome back.

18  All right.

19        MR. KAPLAN:  Thank you, Judge.

20  BY MR. KAPLAN:

21  Q.     I think when we left off you had said that you were in

22  the hotel room or motel room with Brian and Delaney, and Brian

23  suggested to you that you prostitute and you said okay?

24  A.     Yes.

25  Q.     Isn't it true that on May 19th of 2017 when you were

Mandy L.                                    57

1  interviewed by the agents you said that you went with Brian in

2  June of 2015 to pick up Delaney, but you never said -- and you

3  said that's when you learned about prostitution, but you never

4  said Brian asked you to prostitute?

5  A.     They asked about that day.  That's the day that he

6  didn't ask.  No, it was after that.

7  Q.     So you haven't yet told us when that was, is that true?

8  A.     I have talked about it.

9  Q.     You said that he asked you -- so it wasn't when Delaney

10 was there it was some other time?

11 A.     It was when -- it was a few days after Delaney got up

12 here.

13 Q.     So then you said -- do you recall this -- the next thing

14 you said was you decided to engage in prostitution after you

15 met?

16        MR. DARROW:  Your Honor, may I object?  Counsel is

17 just reading information from a document to the witness.  Again

18 he should ask a question, see if she remembers.  If she doesn't

19 remember, refresh her.

20        THE COURT:  All right.  So --

21        MR. KAPLAN:  First of all, even if I was reading the

22 document I think it would be okay, but it's not.  I'm reading

23 the questions that I wrote out.

24        THE COURT:  Oh.  All right.  Okay.  So go ahead and

25 ask the question.

                    Mandy L.                         58

1   BY MR. KAPLAN:

2   Q.     Do you recall telling the police on May 19th -- the

3   agents May 19th of 2017 that the reason you first became

4   involved in prostitution was because you met Ping M.  I can't

5   pronounce her name.  Do you remember saying that?

6   A.     No.

7   Q.     So let me show you defendant's exhibit K72 and ask you

8   to read --

9           MR. DARROW:  I apologize to jump up again.  That's

10  the last name of Delaney and if we could just use the first

11  name and leave out the last name, that would be great.

12          THE COURT:  Okay.  That's the name you couldn't

13  pronounce.

14          MR. KAPLAN:  So I probably didn't get it right

15  anyway.

16          THE COURT:  Right.

17  BY MR. KAPLAN:

18  Q.     I'm going to ask you to read what I have highlighted,

19  please, to yourself.

20  A.     I don't recall saying that.

21  Q.     So this was a proffer session on May 19th, 2017.  So

22  it's here in this building in the U.S. Attorney's Office, and I

23  assume the prosecutor was there and your lawyer was there and

24  what -- what the agent wrote down what you said was after --

25          MR. DARROW:  Your Honor, same deal.

Mandy L.                                    59

1          THE COURT:  Objection sustained.

2          MR. KAPLAN:  Judge, I think I have -- it doesn't

3    refresh her memory I think I have a right to call it to her

4    attention.

5          THE COURT:  You have a right to an open-ended

6    question.  She doesn't remember.  Then you have a right to show

7    her the document.  If she still says she doesn't -- that

8    doesn't refresh her recollection, you can't then ask the

9    question because she's read it and it's a statement of another

10   person.  That can't be introduced by way of cross examination.

11   BY MR. KAPLAN:

12   Q.     Well who is Ping?  You don't know who she is?

13   A.     No.

14   Q.     You never had a conversation with her?

15   A.     I don't know anyone by that name.

16   Q.     Well let me show you this again and read the name to

17   yourself and tell me whether or not you know anybody by that

18   name?

19          MR. DARROW:  And, Your Honor, we have already done

20   this.  It's been asked and answered.

21          THE COURT:  Well it wasn't actually asked in that

22   particular way.  So if you can take a look at this and see if

23   this refreshes your recollection about the --

24   A.     I don't recognize that name.

25   Q.     Okay, and the other time that you did it was because you

Mandy L.                                    60

1  knew someone named Otero who was making money and you thought

2  you could make money?

3  A.     No.

4  Q.     Let me show you what's been marked as defendant's

5  exhibit N9 and have you just read this paragraph to yourself

6  please.

7  A.     That's not how I recall wording that.

8          THE COURT:  I'm sorry.  What was the answer?

9          THE WITNESS:  I said I don't remember wording it like

10 that.

11 BY MR. KAPLAN:

12 Q.     So you don't recall saying that you became -- get

13 involved in prostitution because you saw she was making money

14 and you thought you could make money?

15 A.     No.

16 Q.     And I've been informed that when I asked you about Ping

17 that's really Delaney.  So fair to say that you decided to

18 become a prostitute because Delaney talked to you about it?

19 A.     No.

20 Q.     So you knew someone named Hannah?

21 A.     Yes.

22 Q.     And she was involved in the drug distribution with

23 Brian?

24 A.     Yes.

25 Q.     And you told the agents, didn't you, on May 19th of 2017

Mandy L.                                      61

1    that you were not aware that she was involved in prostitution?

2    A.    Yes.

3    Q.    And do you know the term switch and bait?

4    A.    No.

5    Q.    It's sometimes pictures are posted on Facebook with

6    someone's picture on that, that was not actually the person

7    that was going to show up?

8    A.    I don't know what you're talking about.  I don't

9    understand.

10   Q.    So you were aware -- I mean you were very involved --

11   when you weren't prostituting yourself you were very involved

12   in the operation?

13   A.    Yes.

14   Q.    Well you spent time in the hotels?

15   A.    Yes.

16   Q.    And you helped take care of the women that were involved

17   in prostitution?

18   A.    You mean helped take care of them?

19   Q.    Well you watched what they were doing?

20   A.    Yes.

21   Q.    You collected the money from them?

22   A.    Yes.

23   Q.    You made sure that they paid you what they were supposed

24   to pay you?

25   A.    Yes.

Mandy L.                                    62

1    Q.     If they needed anything and you could help, you would

2    help out?

3    A.     No.

4    Q.     But you knew what was going on?

5    A.     I knew what was going on, yes.

6    Q.     And you understood that the arrangement was that Brian

7    would keep half and they would keep half?

8    A.     Yes.

9    Q.     And that most of the women wanted Brian there for

10   protection?

11   A.     I don't recall.

12   Q.     Well wasn't Brian -- you said Brian would never leave

13   because he was there when the girls were there?

14   A.     I said he would be there everyday to get the money.

15   Q.     You said that he would -- on one occasion don't you

16   recall saying that he would not leave them alone?

17   A.     That would be when they go on out calls like a car date

18   or they had to go somewhere he would transport them.

19   Q.     So that they would have some protection?

20   A.     Yes.

21   Q.     And isn't it true he would frequently be in a hotel room

22   next door and they could knock on the wall if they needed to?

23   A.     Not always.

24   Q.     And didn't you say at one point that the women who were

25   prostituting were doing it because they wanted money for drugs

Mandy L.                                    63

1   and they would do anything to get money for drugs?

2   A.      I don't recall saying that.

3   Q.      Is that your feeling about it?

4   A.      They were obviously supporting their habit, yes.

5   Q.      That video that you watched of Hannah you said you had

6   seen it before?

7   A.      No.  I said Facebook was the first time I seen it.

8   Q.      And you know then the whole thing -- the prosecutor

9   didn't play the whole video, they only played a portion of it?

10  A.      Yeah.

11  Q.      And would you agree that the part the prosecutors didn't

12  play was more favorable towards Brian?

13  A.      No.

14  Q.      So your testimony is that you never posted for any of

15  the other girls you just let them use your e-mail?

16  A.      Yes.

17  Q.      Is there a difference?

18  A.      You have to have an e-mail in order to post on Backpage.

19  Q.      And do you recall saying that Ayla lies a lot?

20  A.      I don't recall saying that.

21  Q.      Let me show you page 181 of the July 9 -- I should have

22  identified it as the defendant's exhibit H16.  Let me show you

23  page 181 and ask you if that refreshes your memory?

24  A.      Considered hearsay so I don't know these -- what she was

25  saying.

                    Mandy L.                          64

1   Q.      I'm sorry.  She was saying she lies a lot?

2   A.      No.  She was telling me stuff and I was saying I don't

3   know if I should believe her or not.

4   Q.      Well you --

5   A.      You can't believe everything you hear from people.

6   Q.      Essentially what you were saying you don't know what to

7   believe because she lies a lot?

8   A.      It wasn't how -- that's not how I was meaning to word

9   it, but that's how it came out.

10  Q.      Okay.  So it is what you said?

11  A.      Yes.

12  Q.      And, in fact, didn't she have a reputation in the

13  community for not being truthful?

14  A.      I don't know.

15  Q.      Is it fair to say that when women who are addicted would

16  wake up in the mornings that they would sort of have the shakes

17  until they got their first hit?

18  A.      Yes.

19  Q.      And you saw that?

20  A.      Yes.

21  Q.      So you've heard the name Danielle M.?

22  A.      Yes.

23  Q.      Not Danielle?

24  A.      Danielle.

25  Q.      Okay.  So you were in the room at the hotel the first

Mandy L.                                    65

1  time she prostituted?

2  A.     Yes.

3  Q.     And I think your statement was that you actually rented

4  the room?

5  A.     Yes.

6  Q.     And this was in June of 2015?

7  A.     Yes.

8  Q.     And I think your statement was that she was nervous?

9  A.     Yes.

10  Q.     So you spent time explaining to her what the fee

11  arrangement should be?

12  A.     She had questions.  I answered her.

13  Q.     She wanted -- she asked you how she could make anal sex

14  easier?

15  A.     She asked that, yes.

16  Q.     And what did you tell her?

17  A.     To use lube because it makes it easier.

18  Q.     And is it fair to say that Brian Folks was insistent

19  that everyone use a condom?

20  A.     Yes.

21  Q.     And is it fair to say that she wouldn't do that?

22  A.     Yes.

23  Q.     And that upset Brian?

24  A.     Yes.

25  Q.     And that she would go off with a date and not come back

                         Mandy L.                          66

1    for hours?

2    A.     No.  She would always come right back.

3              THE COURT:  Let me interrupt for a second.  You used

4    the last name when you introduced this particular --

5              MR. KAPLAN:  I'm sorry.

6              THE COURT:  -- witness and so I would order that last

7    name be stricken and replaced with a first initial.  Okay.  Go

8    ahead.

9    BY MR. KAPLAN:

10   Q.     Is it fair to say that in all of the paperwork in this

11   case there's never any reference to you being forced to wear an

12   apron?

13   A.     Yes.

14   Q.     You have never seen that before?

15   A.     What?

16   Q.     You have never seen that in any of the paperwork before?

17   A.     About me wearing it?

18   Q.     Yes.

19   A.     I have talked about this multiple times.

20   Q.     While you were preparing your testimony for trial?

21   A.     Yes.

22   Q.     But not before that?

23   A.     No.

24   Q.     Okay.  So after four years it suddenly dawned on you

25   that's what happened?

              Capitol Court Reporters, Inc. (800/802) 863-6067

                        Mandy L.                        67

1   A.      No.  I -- it's not even what happened.  I was told to

2   tell the truth so I was giving all of the truth.

3   Q.      But you didn't say who was there?

4   A.      No.

5   Q.      You didn't say that Brian took pictures?

6   A.      No.

7   Q.      Do you have any pictures of that?

8   A.      No.

9   Q.      Didn't Brian take pictures of everything?

10  A.      Usually, yes.

11  Q.      And you would say that's not something he would take a

12  picture of?

13  A.      That day we had cameras in the house.  I'm sure there's

14  pictures.

15  Q.      He took a picture of Hannah like that, right?

16  A.      Yeah that was because Hannah had left that he --

17  obviously he had issues with her.

18  Q.      Is it true that you have had visits with your -- while

19  you were with Brian you had visits with your children?

20  A.      What does my kids have to do with this?

21  Q.      Is that true?

22  A.      Yes.

23  Q.      Who drove you to those visits?

24  A.      I took a bus sometimes, but a few times he drove me.

25          MR. KAPLAN:  Could I have a minute, Judge?

                    Mandy L.                            68

1              THE COURT:  Yes.

2              MR. KAPLAN:  May I have a minute?

3              THE COURT:  Yes.  Okay.  All right.  I'm going to

4    turn the husher on.  You're free to stretch.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mandy L.                                    69

1   [Bench conference]

2           MR. KAPLAN:  I can't imagine that I would want to do

3   this, but it turns out the prosecutor didn't play the whole

4   video so I need to watch -- we need to watch it and if I decide

5   I want to play it, I don't want to have to call her back to do

6   that.

7           THE COURT:  Okay, but you can't stop the trial here

8   for --

9           MR. KAPLAN:  I'm not asking to stop the trial.  I'm

10  just saying if at some point I decide I want to play the whole

11  thing, I don't want to have to get her back here to introduce

12  it.

13          MR. DARROW:  We think it's in evidence.

14          MR. KAPLAN:  The whole thing is in evidence?

15          THE COURT:  Yes.  You can admit it.  Also I would

16  have thought -- anticipated the video would come in by way of

17  law enforcement, but regardless --

18          MR. DARROW:  One of our witnesses will introduce it.

19  I don't want -- it turns into rattling on about his credit

20  cards and just less interesting.

21          THE COURT:  Okay, but you're able to do that.

22          MR. KAPLAN:  Thank you.

23          MR. DARROW:  May I add something and I would be

24  asking to come up before -- Your Honor, before -- I moved

25  before trial that this witness testimony that in June and July

1  after she and Folks separated he was displeased with her

2  because she had a boyfriend and he raped her.  You ruled that

3  was inadmissible because it was outside the scope.  Counsel has

4  opened the door to July by asking her multiple questions about

5  what was going on in July, whether she was seeing him in July.

6  He introduced exhibits, Facebook chats and photographs, that

7  she sent him from July.  We think he's opened the door to what

8  happened in July and we would like to introduce it.

9          THE COURT:  I read that case.  We're talking very

10  prejudicial testimony.

11          MR. DARROW:  That's why she was afraid.

12          THE COURT:  Yeah, but it's not impacting her judgment

13  while she is doing acts with him.  That's why there's that

14  distinction if she stops selling drugs, then what she knows

15  about him becomes much less relevant and I'm really concerned

16  that, first of all, that violates the principle.  Once she

17  stops dealing with him then anything that he does from that

18  point forward has nothing to do with why she makes the decision

19  to do something.

20          MR. DARROW:  Your Honor, we think it does have

21  something to do with what she did.  Counsel introduced the

22  Facebook exchanges and two obscene photographs that she sent to

23  him which are dated mid July and we would like to examine why

24  would you do this, your daughter is on the profile with obscene

25  pictures.  She would say she did that, even though they

Mandy L.                                   71

1    separated, she was scared to death with him.

2            MR. KAPLAN:  No.  July 12th her allegation was three

3    days before -- it was three days before she was arrested not

4    after that July 16th.

5            MR. DARROW:  She'll also testify that he had sexually

6    -- he had sex with her repeatedly throughout.  It wasn't

7    consented and she was scared of him.

8            THE COURT:  I think she kept saying as of April or

9    beginning of May she stopped having a sexual relationship with

10   him.

11           MR. DARROW:  I think she was -- that was a little

12   confusing.

13           MR. KAPLAN:  No it didn't confuse me.

14           MR. DARROW:  I think she said on the one hand -- I

15   forget the word -- she wasn't seeing him or something like

16   that, but I think she meant she wasn't romantically involved

17   with him, but there was just a sexual relationship that was

18   still going.

19           THE COURT:  She actually defined it as a sexual

20   relationship that ended, but does she continue to feel --

21   that's what she testified.

22           MR. DARROW:  She consistently said he raped her in

23   July.

24           THE COURT:  That is extraordinarily prejudicial.

25   Unless you can actually link it to something she did as a

                         Mandy L.                          72

1    result of that level of coercion, it's outweighed by its

2    prejudicial value.

3              MR. DARROW:  Thank you, Judge.

4              THE COURT:  That testimony would be explosive.

5              MR. DARROW:  I can't imagine how that testimony can

6    be worse than a lot of other stuff that's coming in, in this

7    case.  The walnut challenge.

8              THE COURT:  Okay.  All right.

9    [End of bench conference]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Mandy L.                          73

1                    THE COURT:  Okay.  Mr. Kaplan, do you have anything

2       further?

3                    MR. KAPLAN:  I have nothing further.

4                    THE COURT:  All right.  Redirect.

5                    MR. DARROW:  Yes, Your Honor.  Thanks.

6                              REDIRECT EXAMINATION

7       BY MR. DARROW:

8       Q.    Hello.  You're close to the end.  I want to jump around

9       a little bit and touch on some of the areas that counsel asked

10      you about on cross.  First of all, early on in the cross he

11      asked you how many times you have been interviewed and it was a

12      lot.  Do you know if the trial in this case has been repeatedly

13      delayed?

14      A.    Yes.

15      Q.    Over a period of a year or two?

16      A.    Yes.

17      Q.    And each time you have come in and prepared to testify

18      and then the trial was delayed again?

19      A.    Yes.

20                    MR. KAPLAN:  Objection, Your Honor.

21                    THE COURT:  Objection overruled.

22      BY MR. DARROW:

23      Q.    So were those some of the interviews you're talking

24      about?

25      A.    Yes.

Mandy L.                                    74

1   Q.      And, in addition, do you remember the prosecutor who did

2   all those interviews with you up until, I don't know, maybe a

3   month ago?

4   A.      Yes.

5   Q.      Who was that?

6   A.      Abigail.

7   Q.      Do you know whether she left the office?

8   A.      Yes she has.

9   Q.      Okay, and I then asked to meet with you?

10  A.      Yes.

11  Q.      And did we meet twice?

12  A.      Yes.

13  Q.      Okay.  May we have the Elmo?  Counsel introduced this

14  exhibit.  It's H19 which is a July 12 -- July 12th

15  communication between you and you mentioned earlier that Moe's

16  Facebook page was under Moet Hart?

17  A.      Yes.

18  Q.      So this was the defendant?

19  A.      Yes.

20  Q.      What's he asking you to do there?

21  A.      Suck his dick.

22  Q.      Is that the first time he asked you to do that?

23  A.      No.

24  Q.      Have you heard that many times?

25  A.      Yes.

Mandy L.                                    75

1   Q.      And the prosecutor asked you about your Facebook profile

2   pic.  Is that your baby that you're trying to get custody of?

3   A.      No.

4   Q.      Which child is that?

5   A.      That is my 8 year old.

6   Q.      What about the defendant's Facebook profile pic?  What's

7   that?

8   A.      Picture of him.

9   Q.      Is he holding his finger -- middle finger up to whoever

10  is looking at it?

11  A.      Yes.

12  Q.      All right.  So that's on the first page.  Eat my dick,

13  suck until I cum, and what's he say on the next page there?

14  A.      Go in the bathroom and pop a finger in ya butt hole.

15  Q.      What did you understand him to be asking to do?

16  A.      To take a picture of my finger in my ass.

17  Q.      And then did you do as you were instructed and send him

18  that picture?

19  A.      Yes.

20  Q.      Miss L., were you in the habit of doing what the

21  defendant told you to do?

22  A.      Yes.

23  Q.      Did you ever say no to him?

24  A.      I don't know how to answer that.

25  Q.      I'm sorry.

Mandy L.                                      76

1    A.      I don't know how to answer that.

2    Q.      You were in the habit of doing what he wanted, right?

3    A.      Yes.

4            MR. KAPLAN:  Objection, Your Honor.

5            THE COURT:  Objection overruled.  Go ahead.

6    BY MR. DARROW:

7    Q.      Now let's talk about some of the interviews.  Counsel

8    asked you a lot of questions about your post arrest interview

9    back from July of 2016 --

10   A.      Yes.

11   Q.      -- right?  Coming up on three years ago?

12   A.      Yes.

13   Q.      Did you have an attorney with you at that interview?

14   A.      No.

15   Q.      Do you remember what time of day it took place?

16   A.      It was nighttime.

17   Q.      Were you tired?

18   A.      Yes.

19   Q.      Okay.  Do you recall discussions about trips to New York

20   in that interview?

21   A.      Yes.

22   Q.      Counsel asked you a leading question about whether you

23   didn't tell the investigators that you only went --

24           MR. KAPLAN:  Objection, Your Honor.  It

25   characterizes.  This is cross examination.

                         Mandy L.                         77

1              THE COURT:  Right.  This is a preliminary to the

2    question which is to be followed by an open-ended question; is

3    that correct?

4              MR. DARROW:  Yes.

5              THE COURT:  Okay.  So go ahead.  Announce the area

6    and then ask the open-ended question.

7              MR. DARROW:  Thank you.

8    BY MR. DARROW:

9    Q.    Counsel asked whether it wasn't true that you only

10   described one trip to New York with Moe.  Do you remember that?

11   A.    Yes.

12   Q.    Do you remember what your answer was?

13   A.    That I went three times.

14   Q.    On your direct testimony yesterday you said you went

15   three times?

16   A.    Yes.

17   Q.    But I thought you assented to counsel's question isn't

18   it true you only went one time?

19   A.    Yes.

20   Q.    Do you recall whether or not you actually described

21   several trips to New York in each of your interviews?

22   A.    Yes.

23             MR. KAPLAN:  Objection, Your Honor.  It's leading.

24             THE COURT:  Objection overruled.  Are you going to

25   ask her to describe what she said in regard to the three -- the

Mandy L.                                78

1  one or three trips?

2          MR. DARROW:  Yes.

3  BY MR. DARROW:

4  Q.    What did -- you described yesterday the term that's

5  called body packing drugs at Moe's request.  Do you remember

6  that?

7  A.    Yes.

8  Q.    Do you recall whether or not you said that -- something

9  about having done that also back at your first interview back

10 in July?

11 A.    I don't remember.

12         MR. DARROW:  Counsel, can you refresh my memory?

13 What exhibit is her transcript of 2016?

14         MR. KAPLAN:  I had it marked as H16.  I have it here

15 if you want to use this.

16         MR. DARROW:  Thanks.

17 BY MR. DARROW:

18 Q.    I'm showing you that transcript, and drawing your

19 attention to page 175 can you read that and then I have a

20 question for you?

21 A.    Right there --

22         THE COURT:  Should read that to yourself and then he

23 will ask an open-ended question.

24 BY MR. DARROW:

25 Q.    Now do you remember whether or not you told the police

Capitol Court Reporters, Inc. (800/802) 863-6067

Mandy L.                                    79

1   officers who first interviewed you nearly three years ago about

2   trips to New York?

3   A.      Yes.

4   Q.      What did you tell them?

5   A.      That we went down -- the first time I ever went -- I

6   first time or --

7   Q.      Well do you recall whether or not you told them you went

8   one time or multiple times?

9   A.      Multiple.

10  Q.      Do you recall whether or not you told them you body

11  packed?

12  A.      Yes.

13  Q.      Now counsel asked you questions about another question.

14  He said -- was something along the lines of isn't it true that

15  Ghost, McFarlan, was the only one to bring drugs to Vermont.  I

16  may not have this exactly right, but something like that and I

17  thought you had assented to that.  Do you remember that?

18  A.      Yes.

19  Q.      So is McFarlan the only one that brought drugs to

20  Vermont?

21  A.      No.

22  Q.      Because you brought some drugs to Vermont --

23  A.      Yes.

24  Q.      -- with Moe?  Do you recall whether you were able to

25  name the females that -- young women involved in the

Mandy L.                                    80

1    prostitution that you mentioned yesterday do you recall being

2    asked to identify those women back in July?

3    A.      Yes.

4    Q.      And did you?

5    A.      Yes.

6    Q.      And do you recall yesterday identifying the various

7    motels in the Burlington area that the prostitution enterprise

8    was operated out of?

9    A.      Yes.

10   Q.      Do you recall whether or not you also identified those

11   back in July?

12   A.      Yes.

13   Q.      Do you recall testifying yesterday that when you were

14   working as a runner for Mr. Folks you were distributing about

15   10 bundles a day?

16   A.      Yes.

17   Q.      That he provided to you?

18   A.      Yes.

19   Q.      Do you recall being asked about that -- what answer you

20   gave back in July 2016?

21   A.      Can you refresh my memory?

22   Q.      Sure.  Drawing your attention to defense H16, at the

23   bottom of page 117 your last answer, is your memory refreshed?

24   A.      Yes.

25   Q.      What did you tell the police as to how much dope -- how

Mandy L.                                      81

1   many bundles of heroin you were selling for Moe everyday?

2   A.      10.

3   Q.      10 what?

4   A.      Bundles a day.

5   Q.      Do you recall counsel asking you about the January 20th

6   car stop when the police retrieved that black cloth bag of

7   drugs from the car?

8   A.      Yes.

9   Q.      And you remember him asking you whether or not you had

10  earlier said that those were not Moe's drugs?

11  A.      Yes.

12          MR. KAPLAN:  Objection, Your Honor.  I did not

13  inquire on that subject.

14          THE COURT:  I don't recall whether that specific

15  question was asked.  Do you?

16          MR. DARROW:  Okay.  I thought it was.  If not, I

17  apologize.  I'll put it away.

18          THE COURT:  Okay.

19  BY MR. DARROW:

20  Q.      Do you recall being asked by the police officers that

21  interviewed you in July 2016 whose drugs those were in the car?

22  A.      Yes.

23  Q.      Do you recall what your answer was?

24          MR. KAPLAN:  Your Honor, this is not -- this is not

25  part of the cross.  She testified yesterday that they were our

Mandy L.                                    82

1   client's drugs.

2           THE COURT:  Well I don't remember that specifically

3   so I'm going to let the Government ask the question.  Go ahead.

4   You can show her the transcript.

5           MR. DARROW:  And the gist -- I'm trying to be

6   responsive to the cross, but there were a lot of suggestions

7   that she wasn't telling the story so I'm --

8           THE COURT:  Right.

9   BY MR. DARROW:

10  Q.    So drawing your attention to defense H16 on page 149 --

11          THE COURT:  Essentially what you're suggesting is the

12  cross established inconsistencies between the July 2016

13  interview and the testimony and you are raising consistency.

14          MR. DARROW:  Our thesis is the bulk of it was.

15  Correct.

16          THE COURT:  Okay.  Go ahead.

17  BY MR. DARROW:

18  Q.    So drawing your attention to that page when you're asked

19  whose drugs were those, does this refresh your memory?

20  A.    Yes.

21  Q.    Okay, and what is your memory?

22  A.    I said they were Moe's.

23  Q.    Now counsel asked you about page 181 of the transcript

24  where you made a statement about Ayla.  Can you give us the

25  context?  Do you remember the context of that statement?

                         Mandy L.                              83

1    A.     No.

2    Q.     Okay.  If I showed you the transcript, would it refresh

3    your memory?

4    A.     Yes.

5    Q.     Starting at the top of page -- you can go back a page if

6    you want to.

7    A.     Which one?  Here?

8    Q.     Was that -- was what you were talking about there

9    related to --

10          MR. KAPLAN:  Excuse me.  Is she being asked to have

11   her memory refreshed?

12          THE COURT:  She was asked that.  Can you rephrase the

13   question as to whether she remembers the context in which that

14   comment about Ayla was made.

15          MR. DARROW:  Thank you.

16   BY MR. DARROW:

17   Q.     Do you remember now the context in which that statement

18   about Ayla was made?

19   A.     Yes.

20   Q.     Was that related to what happened shortly after --

21          MR. KAPLAN:  Objection, Your Honor.

22          THE COURT:  Objection sustained.  That's a leading

23   question.

24          MR. DARROW:  Okay.

25   BY MR. DARROW:

                        Mandy L.                        84

1    Q.    Okay.  What was the context?

2    A.    That question -- it was about --

3    Q.    You had -- counsel asked you about a time when you said

4    that you weren't sure you could always believe Ayla.  Is it

5    pronounced Ayla?

6    A.    Ayla.

7    Q.    And I asked you for the context.  You then wanted to

8    refresh your memory.  You looked at it.  Is your memory

9    refreshed?

10   A.    Not really.

11   Q.    Let's move on.  Never mind.  Do you recall whether you

12   were asked by the police back in 2016 how much Moe sold bundles

13   of heroin for?

14   A.    Yes.

15   Q.    Okay.  What was it?

16   A.    $75.

17   Q.    Now you testified generally under cross, if I understood

18   you correctly, that it sounded like you were minimizing on some

19   things during this interview?

20   A.    Yes.

21   Q.    Like how the prostitution began, things like that.  Can

22   you tell us why?

23   A.    Between being on probation and being scared that if I

24   told the full truth that Moe would have people come after me.

25   Q.    Moe would what?

                       Mandy L.                              85

1   A.      Have people come after me.

2   Q.      Why would you be scared?

3           MR. KAPLAN:  Objection, Your Honor.  May we approach?

4           THE COURT:  Yes.  Okay.  I'm going to turn the husher

5   on so please stretch.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Mandy L.                              86

1   [Bench conference]

2            THE COURT:  Okay.  This is -- she has said people or

3   Moe would have people come after me.  Why is that.  She may

4   very well get into his membership --

5            MR. DARROW:  I'm not looking for that.

6            THE COURT:  I know you aren't, but you may get that

7   and then why not leave the question or the answer the way it is

8   and not get into a risky question about who he could call upon

9   to enforce things against her.

10            MR. KAPLAN:  Judge, it doesn't make any sense.  She

11   told him she was in prostitution.  She told them he was a drug

12   dealer.  She said she made a trip to New York.  She told them

13   everything so --

14            MR. DARROW:  That's not the way it sounded on the

15   cross.

16            MR. KAPLAN:  Well --

17            MR. DARROW:  May I respond?

18            THE COURT:  Yes.

19            MR. DARROW:  She had been told that I've got people

20   who will come find you if you mess with me.  That's what she

21   was afraid of.  So the question is why were you afraid, why

22   were you minimizing about Moe on the front end, and that was he

23   raped her twice.  We're not allowed to talk about that.

24   Another part he would have people come find her.

25            MR. KAPLAN:  She didn't minimize it.  How could she

Mandy L.                                    87

1    minimize it?

2                THE COURT:  You have got the answer.  You have

3    already got the answer that she's afraid that he will have

4    people come over and get her.  That's it unless she wants to

5    start describing things that he said and including membership

6    in gangs.

7                MR. DARROW:  We don't want that and I can tell her

8    not to mention anything about gangs.

9                THE COURT:  But she already answered the question.

10               MR. DARROW:  But unless -- unless she can say that it

11   was a well founded fear he told me that was going to happen, it

12   sounds like paranoia.

13               THE COURT:  Okay.

14               MR. KAPLAN:  I mean I have never heard before that he

15   told her that.  She never said that before.  It's not in

16   anything.  She never told the police that.  She didn't testify

17   to that yesterday.  I don't know.  Have you spoken with her

18   since she testified?

19               MR. DARROW:  No.

20               MR. KAPLAN:  So I don't know why all of a sudden

21   she's going to say Moe told her that.  I have never heard that

22   before.  I think it's dangerous because she's just trying to

23   get out of the situation she's in.

24               THE COURT:  You have got her making a statement that

25   she thought that he had people who would come get her.  I don't

Mandy L.                                88

1  think there's a line that has been crossed at this particular

2  point, but if all of a sudden you ask a question and she starts

3  talking about things that he may have said which were just

4  overly prejudicial, then we have a problem.

5          MR. KAPLAN:  It's very prejudicial.  It's really

6  prejudicial, particularly if you go beyond this point.

7          THE COURT:  Beyond this point it may be prejudicial,

8  but I'm trying to persuade Mr. Darrow --

9          MR. DARROW:  I appreciate that, Judge, and maybe I

10  can do that.  My concern is the Government's whole theory of

11  this case, at least, is that he intimidated her to do, and one

12  of the ways was -- she was scared of him in a lot of ways, but

13  one of the ways she was scared was because he made these

14  threats to her.

15          THE COURT:  You remember goose versus gander, but

16  anyway you remember Judge Billings would sustain objections

17  based upon I think the line -- I think you established the line

18  and if you go into this a little further you're likely to --

19          MR. DARROW:  Thank you for your concerns.

20  [End of bench conference]

21

22

23

24

25

                        Mandy L.                         89

1                MR. DARROW:  Let me just regroup just for a moment.

2    Sorry.

3                THE COURT:  Yes.

4    BY MR. DARROW:

5    Q.    Let's pick up moving to a different subject.  Counsel

6    asked you questions about how his client took care of you early

7    in your relationship.  Early in your relationship with him did

8    you think that's what he was doing?

9    A.    Yes.

10   Q.    Okay.  Did your view of that change?

11   A.    Yes.

12   Q.    What did it change to?

13   A.    To like no one takes care of me.  I was taking care of

14   myself.

15   Q.    I apologize.

16   A.    Sorry.  He really wasn't taking care of me.

17   Q.    He wasn't taking care of you?

18   A.    No.

19   Q.    Do you think by having you prostitute and sell drugs

20   that he wasn't taking care of you?

21   A.    Yes.

22   Q.    Do you recall --

23                MR. KAPLAN:  Object, Judge, that wasn't -- that

24   wasn't the testimony that my client had her prostitute.  That

25   was not the testimony.

                          Mandy L.                              90
1              THE COURT:  Well objection overruled.  The jury makes
2     the determination as to what the testimony was.  Go ahead.
3     BY MR. DARROW:
4     Q.    Do you recall that when counsel was asking you about
5     early in the relationship with Folks whether he asked you for
6     anything in return upfront?
7     A.    Yes.
8     Q.    And what was your answer to that?
9     A.    No.
10    Q.    Okay.  Was he having sex with you at that time on a
11    regular basis?
12    A.    Yes.
13    Q.    Was that something you were giving to him?
14    A.    At that time, yes.
15              MR. KAPLAN:  Objection, Your Honor.
16              THE COURT:  Objection overruled.  Go ahead.
17    BY MR. DARROW:
18    Q.    Counsel asked you about prior statements you had made
19    about when you first learned about the drug trafficking
20    organization and you had said, if memory serves, around
21    November 2015?
22    A.    Yes.
23    Q.    Yesterday you testified that it was -- you thought it
24    was around November 2015 when the group got a hold of Lori C's
25    apartment on Spring Street and started operating out of there?

```
                        Mandy L.                        91
 1   A.      Yes.
 2   Q.      Do you recall whether or not that was what you were
 3   thinking of?
 4   A.      Yes.
 5   Q.      Do you recall counsel asking you questions about
 6   Danielle M.?
 7   A.      Yes.
 8   Q.      Okay.  Do you recall counsel asking you questions about
 9   you answering Danielle's questions?
10   A.      Yes.
11   Q.      Questions about anal sex?
12   A.      Yes.
13   Q.      What did Danielle ask you about that?
14   A.      She asked how -- what ways to make it so it didn't hurt
15   as much.
16   Q.      Okay.  Did she mention who was having it with her?
17   A.      Yes.
18   Q.      Who?
19   A.      Moe.
20   Q.      Counsel asked you some questions about that Hannah video
21   and I think you testified at some point that it was -- if
22   memory serves, it was because she left?
23   A.      Yes.
24   Q.      What do you mean she left?
25   A.      Hannah up and left the night of Moe's bachelor party.
```

Mandy L.                                    92

1    Hannah had just up and left with no word.  Nothing.

2    Q.    And how do you associate that with the video?

3    A.    She did him wrong and just left without word so that was

4    his way of getting back at her.

5              MR. DARROW:  Your Honor, may I have a moment?

6              THE COURT:  Yes.

7    BY MR. DARROW:

8    Q.    Do you recall counsel asking you questions about

9    something like when you first met Moe or when things started

10   and you had -- previously had said I think May 25, 2015?

11   A.    Yes.

12   Q.    Do you recall the Government a couple weeks ago showing

13   you a motel record that was from before then?

14   A.    Yes.

15             MR. KAPLAN:  Objection, Your Honor.

16             THE COURT:  What's the objection?  You're asking for

17   -- leading question.

18             MR. KAPLAN:  Leading.

19             THE COURT:  Pardon me.

20             MR. KAPLAN:  It's leading.

21             THE COURT:  Well you're going to follow this up with

22   an open-ended question?

23             MR. DARROW:  Right.  Yes.

24             THE COURT:  So objection overruled.  Go ahead.

25   BY MR. DARROW:

                        Mandy L.                        93

1   Q.      A motel record.  Did I show that to you?

2   A.      Yes.

3   Q.      And did that change your view?

4   A.      Yes.

5   Q.      How?

6   A.      I realized it was pretty much a couple weeks after I

7   lost my children that I had met Mr. Folks.

8   Q.      How did that work?  Why did the motel record change your

9   memory?

10  A.      Because I remember that's the first time I rented a room

11  for him.

12          MR. DARROW:  May I just show this to counsel?

13          THE COURT:  Yes.

14          MR. KAPLAN:  I would like to voir dire.

15          THE COURT:  Yes.  Okay.  Is the Government seeking to

16  introduce this particular exhibit?

17          MR. DARROW:  It's the records of -- the motel record

18  we showed her and I was just going to show it to her and ask

19  her about it.

20          THE COURT:  But you intend to introduce it because

21  the voir dire is only if you're intending to introduce a

22  particular document.

23          MR. DARROW:  It's one of the motel records the

24  parties have agreed to come in, but it hasn't been introduced

25  yet, but it's coming.

Mandy L.                                    94

1           THE COURT:  All right.  So you can voir dire.

2                           VOIR DIRE

3    BY MR. KAPLAN:

4    Q.    So I notice, Ms. L., that the date on this is May 7,

5    2015?

6    A.    Yes.

7    Q.    So it's not April?

8    A.    Yes.

9    Q.    And I thought you testified -- are you saying this room

10   was rented for prostitution purposes?

11   A.    Yes.

12   Q.    But I thought you testified that you didn't find out

13   about the prostitution until June when you picked up the money?

14   A.    Yeah.

15   Q.    So now you're saying --

16   A.    I found out about it all together.  When I first went to

17   the room Moe had came to me and said he needed a room because

18   he and Cassandra were fighting and he couldn't stay there.

19   Q.    Okay, and where were you living at the time?

20   A.    Me?

21   Q.    Yes.

22   A.    I was staying with my grandmother at that time.

23   Q.    So then this room wasn't for prostitution purposes?

24   A.    At the time I didn't know.  So no.

25   Q.    So instead of meeting him on May 24 --

Mandy L.                                        95

1            MR. DARROW:  Your Honor, I object.  This is outside

2     the scope of voir dire.

3            THE COURT:  So how is that related to the

4     introduction of that exhibit?

5            MR. KAPLAN:  Well I think they are trying to

6     introduce it to show when she met our client, and so she's

7     always said it was May 24th.  So now I'm assuming you're saying

8     it's May 5th.

9            THE WITNESS:  We discussed that I had the dates mixed

10    up.

11           MR. KAPLAN:  I have no objection, Your Honor.

12           THE COURT:  All right.  So admitted.

13    [Government exhibit 108A admitted]

14    BY MR. DARROW:

15    Q.    So we have this marked as Government 108A.  Is this the

16    -- do you recall whether or not this is the record that we

17    looked at with you when we were trying to figure out when this

18    all started?

19    A.    Yes.

20    Q.    Okay, and the date counsel referred to here, May 6th,

21    does this help you remember around when you first met him?

22    A.    Yes.

23    Q.    Was it earlier than May 25th?

24    A.    Yes.

25    Q.    There were some questions about the other females

Mandy L.                                    96

1  working.  What did you witness Moe do with the other females to

2  get them to do what he wanted?

3  A.      Withheld drugs.

4  Q.      Tell us how that happened?

5  A.      If they didn't do what he wanted, he would refuse to

6  give them the drugs that they needed to make themselves better.

7  Q.      And are you talking about the addicted young women?

8  A.      Yes.

9  Q.      Like who?

10 A.      Ayla.  I've seen it with Keisha.  Jerrika.

11 Q.      Okay.  So -- and others that you identified yesterday?

12 A.      Yes.

13 Q.      Did you see during the time that those women were

14 working in 2015 into early 2016 any changes in their

15 appearance?

16 A.      Yes.

17 Q.      What?

18 A.      For example, you want me to example one person?

19 Q.      Sure.

20 A.      When I first met Ayla she had long blond hair, she was

21 beautiful, she had weight on, and then as time went she just

22 let herself go like she was skinny, like not sleeping, not

23 eating, not taking care of herself.  Even her hygiene went

24 down.

25 Q.      Okay and that's just an example?

                        Mandy L.                        97

1    A.     Yes.

2    Q.     Do you have a tattoo?

3    A.     Yes.

4    Q.     What is it?

5    A.     Moe's name.

6    Q.     Who asked you to get that?

7    A.     He did.

8    Q.     Who are you living with now?

9    A.     Myself and my 18-year-old daughter.

10   Q.     Hailey?

11   A.     Yes.

12   Q.     You have made up with her?

13   A.     Yes.

14          MR. DARROW:  May I have a moment?

15          THE COURT:  Yes.

16          MR. DARROW:  Thank you, Your Honor.

17          THE COURT:  Okay.  Recross.

18          MR. KAPLAN:  Thank you, Judge.

19                      RECROSS EXAMINATION

20   BY MR. KAPLAN:

21   Q.     So I'm curious about something you said.  You said that

22   you wouldn't say no to Brian Folks.  You were in the habit of

23   saying yes?

24   A.     What was that?

25   Q.     You testified just a minute ago that you would not say

                        Mandy L.                        98

1   no to Brian Folks?

2   A.    Yes.

3   Q.    But I mean you saw the pictures that were introduced

4   that were taken around May 22nd, right?

5   A.    Yes.

6   Q.    According to your testimony just now that was 17 days

7   after you met him?

8   A.    Yes.

9   Q.    And you could have said no then?

10  A.    Yes.

11  Q.    But you didn't?

12  A.    No.

13  Q.    In fact, you sent pictures like that to other people?

14  A.    No.

15  Q.    You have never done that?

16  A.    They are not -- not prior to this, no.

17  Q.    But after?

18  A.    Yeah.  I was on private web sites on Facebook where you

19  post pictures, yeah.

20  Q.    And so just talking about that one and you only knew him

21  for like 17 days at the most you could have said no and walked

22  away?

23  A.    Yes.

24  Q.    And isn't that true of the drug dealing you could have

25  said no and walked away?

                          Mandy L.                          99

1    A.      Yes.

2    Q.      And you made a lot of -- you weren't an addict?

3    A.      No.

4    Q.      And you know -- the prosecutor asked you whether what

5    Moe got from it was sex from you?

6    A.      Yes.

7    Q.      But didn't you have sex also at the same time?

8    A.      With him.

9    Q.      It was two of you, right?

10   A.      Yeah.

11   Q.      And didn't Ms. M. ask you about how to make sex easier

12   because she was going on a date?

13   A.      No.

14           THE COURT:  Again I would ask you to not mention last

15   names.

16   BY MR. KAPLAN:

17   Q.      You said -- oh yeah.  Right.  Sorry.  You said you were

18   arrested on July 19th and you were nervous?

19   A.      I was arrested.  I was scared.

20   Q.      And that's why you lied?

21   A.      No.

22   Q.      You have been arrested before?

23   A.      No I haven't.

24   Q.      Well you went to the police on the voyeurism charge?

25   A.      I wasn't arrested for it.

                        Mandy L.                          100

1    Q.      You were charged?

2    A.      I was charged and I had a week to turn myself into the

3    police department, the jail.

4    Q.      And you testified earlier that you lied during that

5    interview too?

6    A.      I lied in the beginning, yes.

7              MR. KAPLAN:  I have nothing further.

8              THE COURT:  Okay.  All right.  Thank you.  You're

9    excused at this point and Government call the next witness.

10             MR. DARROW:  Yes.

11             MR. KAPLAN:  Judge, we have an issue.  We would like

12   to approach.

13

14

15

16

17

18

19

20

21

22

23

24

25

1   [Bench conference].

2          MR. KAPLAN:  So, Judge, up until last Monday all the

3   reports that we were given about her she said when the drugs

4   were stolen that Brian blamed her and held a gun to her head.

5   So last Monday we get a report where she now said -- and that's

6   what she said when in a long interview too.  So now we get a

7   report last Monday that says he thought she stole the drugs so

8   he went there, he dragged her all around the apartment, beat

9   her up, threw her on the bed, and he and someone else raped

10  her, and then he held a gun to her head later on.  So this

11  seems like late notice to us to be telling us that's what she's

12  saying.

13         THE COURT:  Why is that late notice?

14         MR. KAPLAN:  Last Monday.

15         THE COURT:  Yeah, but that was -- I mean the notice

16  that you got was she was -- he thought she was the person who

17  stole the drugs, right?

18         MR. KAPLAN:  But the Government had that for

19  months --

20         THE COURT:  Okay.

21         MR. KAPLAN:  -- and didn't turn it over.

22         THE COURT:  What you're saying you didn't know

23  anything about this assault?

24         MR. KAPLAN:  Until last Monday.

25         THE COURT:  Okay.

1           MR. KAPLAN:  We're not blaming the Government because

2    we were told it was an error, but you know we just didn't get

3    it and to get it a week before trial now -- wait a minute -- we

4    never knew about this.

5           THE COURT:  Okay.  So what's the story?

6           MR. DARROW:  Mary's testimony -- she's here to

7    describe generally about she meets him not until December 2015,

8    and I think is the one person who walked away besides Hannah in

9    February 2016.  So she's just talking about a few months.  He

10   hires her to bag.  She does that.  He then hires her to sort of

11   run with Mandy.  That's why she shows up in that bust.  After

12   the stash was stolen out of the car outside Moe decided that it

13   was her who was responsible for it, but anyway he summons her

14   to the apartment.  At the time Mandy had gone to the store.

15   This is why I asked her.  She walked off to the store.

16       Mary -- what happened to her is upsetting to her enough

17   she went to the police and her family and with her aunt and met

18   with Essex PD where she made a statement about what was going

19   on, and she said that he held a gun to her head, blamed her.

20   She did not say that he raped her.  When she was interviewed

21   again about it she's asked -- she's also at the Essex PD then,

22   and one of the guys in the department and she was asked why

23   didn't you say anything about that.  She said because my aunt

24   was with me and I didn't want her to know what happened.  Now I

25   know the second report went out to counsel more recently.  I

1    don't know if in the past several years it's been sent to prior

2    attorneys.

3              MR. KAPLAN:  We never had it.

4              MR. DARROW:  Even if that's true, of course when a

5    witness testifies our practice is to give it out a week or two

6    in advance.  They have had it for a week.  I don't think she

7    should be barred from testifying about it.

8              THE COURT:  Okay.

9              MR. KAPLAN:  It's overly prejudicial even if it's

10   relevant, but we never -- we weren't able to investigate it.

11   You know we're trying to get ready for trial, this pops up,

12   you're working on a million other things, and this interview

13   took place I think a long time ago and they just never sent it

14   to us.

15             MS. SEN:  They didn't send it to me.

16             THE COURT:  This is Essex PD?

17             MR. KAPLAN:  Yes.

18             MS. SEN:  No I think this is the first interview she

19   gave was recorded and transcribed by the Essex Police

20   Department, and this second one I think was a proffer report by

21   law enforcement with the U.S. Attorneys.

22             THE COURT:  When was that?

23             MR. DARROW:  I think Ms. Sen is correct.  I don't

24   know.  It was, I'm guessing, 2017/18, somewhere in there.  I

25   wasn't present for it.

```
 1                THE COURT:  All right, and so the disclosure was not
 2       made until last week?  Okay.  I'm going to let the jury go and
 3       --
 4                MR. DARROW:  I can check with my team whether that
 5       was the first time.
 6                MR. KAPLAN:  Can we do it right after lunch?
 7                THE COURT:  All right, and can you check to see if
 8       you have any disclosures to the defense back with the initial
 9       statement?
10                MR. KAPLAN:  We actually got an e-mail from U.S.
11       Attorney saying sorry there was a mistake and we didn't get
12       this to you.
13                MS. SEN:  It was --
14                MR. DARROW:  Was it from Karen?
15                MS. SEN:  Yes.
16                THE COURT:  How about keep going for 10 minutes?
17       You're not going to get into this for 10 minutes?
18                MR. DARROW:  No.  I'm hoping she's here, but I think
19       she probably is.
20                THE COURT:  Okay.
21                MR. DARROW:  Do you want me to find out before we
22       resume?
23                THE COURT:  You need to find her, get her on the
24       stand and start and let them go at 12.  Then you got a period
25       of time to figure out exactly what happened.
```

1             MR. DARROW:  Okay.  Thank you, Judge.

2    [End of bench conference]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Mary P.

 1              THE COURT:  Okay.  Government want to call the next

 2    witness.

 3              MR. DARROW:  Yes.  We call Mary P. and can we switch

 4    from the Elmo back to the digital please?  Thanks.

 5              DEPUTY CLERK:  Please come forward, ma'am, to be

 6    sworn.  You can come right up to the podium, and would you

 7    raise your right-hand.

 8    MARY P.,

 9         Having been duly sworn, testified as follows:

10              THE COURT:  Okay.  Good morning.  Thank you for being

11    here and if you could take your seat right there.  Okay.

12                        DIRECT EXAMINATION

13    BY MR. DARROW:

14    Q.    Good morning.

15    A.    Hello.

16    Q.    You don't look too happy to be here.

17              THE COURT:  Can I just -- all right.  Are you all

18    right?  Just it's really important that you speak up and speak

19    right into the microphone.  Okay.

20    BY MR. DARROW:

21    Q.    Okay.  Is your name Mary?  Does your last name start

22    with P?

23    A.    Yes.

24    Q.    Let's just try and go along slowly here, okay.  Mary,

25    we're on a first name basis with other young women involved so

             Capitol Court Reporters, Inc. (800/802) 863-6067

                    Mary P.

1    don't mention any last names.  Okay?

2    A.    Okay.

3    Q.    All right.  Let me start by asking you to introduce

4    yourself to the jury and tell them where you were born and

5    raised?

6    A.    I was born in Burlington, Vermont.  I was raised in

7    Fairfax.

8    Q.    Okay, and were you raised by your parents?

9    A.    I was raised by my aunt and my father was able to share

10   custody.  I have visitations towards my real mother Tracy.  We

11   got taken away from her -- me and my sister both did.  She was

12   abusive.

13   Q.    I'm sorry.  I apologize for interrupting, but I'm just

14   going to -- we're going to take this in pieces.  Okay.  So you

15   were born in Burlington raised in Fairfax?

16   A.    Yes.

17   Q.    So you were raised by your aunt and your dad?

18   A.    Yes.  They both shared custody.

19   Q.    Okay, and then you were just saying that visitation and

20   your mother -- there was a problem?

21   A.    Yeah.  She left us.  She was highly abusive.  Left us in

22   an abandoned building.

23   Q.    So did she lose custody?

24   A.    Yes.

25   Q.    Okay, and was it your Aunt Tammy that had an important

                    Mary P.

1  role in raising you?

2  A.     Yes.  She's like my mother, yes.

3  Q.     Okay.  Now how long were you with your dad?

4  A.     Until I was 7.

5  Q.     Okay.  Where is your dad?

6  A.     He's in prison for 145 years for four counts for first

7  degree murder.

8  Q.     When is the last time you saw him?

9  A.     20 years ago.

10  Q.     Okay.  How about your mom?

11  A.     I don't speak to her.  I want nothing to do with her.

12  Q.     Okay.  At some point when you were young, Mary, did you

13  start taking drugs?

14  A.     Yes.

15  Q.     About how old were you?

16  A.     I was 13.

17  Q.     Okay.  What drugs did you start out with?

18  A.     Started out as pills, pot, and then it raised up until

19  heroin and crack.

20  Q.     Okay.  Around when was it that you started taking heroin

21  and crack?

22  A.     In my early 20's.

23  Q.     Early 20's?

24  A.     Yes I believe so.

25  Q.     All right, and how far did you get in school?

Mary P.

1   A.      11th grade.

2   Q.      How old do you think you were -- at some point did you

3   become addicted to heroin?

4   A.      First time I ever tried it, yes.

5   Q.      So that happened pretty quickly?

6   A.      Yes.

7   Q.      And about how old were you then?

8   A.      I was in my 20's.  I really wouldn't -- I don't remember

9   the age.  I just know it was in my 20's.

10  Q.      All right.  At some point did you meet a man named Brian

11  Folks?

12  A.      Yes.

13  Q.      What name did he use when you knew him?

14  A.      Moet Hart.

15  Q.      Moet?

16  A.      Moet Hart, yes.

17  Q.      Around when was that?

18  A.      December.  Early December.

19  Q.      Of what year?

20  A.      I want to say 2016 or so.

21  Q.      Okay.  I think the things we're talking about were all

22  over by mid 2016 so it might have been before that.  Do you

23  remember whether it was the year before that?

24  A.      Honestly it's hard to remember.  I just know it was cold

25  out.  It was snowy so --

Mary P.

1   Q.      Okay.  Do you remember what time of year it was?

2   A.      December.  I really do believe it was December.

3   Q.      December?

4   A.      December, yes.

5   Q.      All right, and who introduced you to him?

6   A.      Selena.

7   Q.      Who is Selena?

8   A.      My cousin.

9   Q.      Your cousin?

10  A.      Yes.

11  Q.      Okay.  Where did you first meet Moet?

12  A.      Selena knew I had -- I was withdrawing from heroin so

13  she called him, and him and Mandy came over to her house on

14  North Avenue and I got in the car with him and met him in the

15  car.

16  Q.      You're doing fine.  Did you say you were withdrawing

17  from heroin?

18  A.      Yes.

19  Q.      What's that feel like?

20  A.      The worst thing to go through.  You're puking, you have

21  -- you're puking, you're shaking, you're cold, you feel like

22  you're going to die.

23  Q.      All right.  Where -- you gave the address of the

24  meeting.  Was this near your cousin's house?

25  A.      I met him at my cousin's house because she called him

Mary P.

1    and they drove over there.

2    Q.    And he came over?

3    A.    Yes, but he stayed out in the car.

4    Q.    I'm sorry.

5    A.    He stayed out in the car and Mandy went up in the house.

6    Q.    Okay.  So what did you do?

7    A.    Selena explained everything.

8    Q.    I apologize.  Just backing up for a moment as I

9    understand correctly Moet's in the car --

10   A.    Yes.

11   Q.    -- out on the street?  Mandy goes up to see Selena.

12   What do you do?

13   A.    I'm sitting in the house.

14   Q.    Okay.  When did you meet Moe?

15   A.    When I went outside.  After they were done talking I

16   went outside, got in the car.

17   Q.    Okay.  So you and Moet were in the car?

18   A.    Yes.

19   Q.    Did you have a conversation with him?

20   A.    Yes.

21   Q.    Was this while you were still in the withdrawal you were

22   talking about?

23   A.    Yes.

24   Q.    Did he offer you a job?

25   A.    Yes.

Mary P.

1   Q.     Okay.  What job did he offer you?

2   A.     At first it was to go over bag up for him and do stuff

3   like that.  Everything was going good, and then --

4   Q.     And I apologize.  I'm sorry to interrupt, but I just

5   want to take a little step at a time.  Okay.  So he offered you

6   a job you said bagging, bagging up?

7   A.     Yes.

8   Q.     What does that mean?

9   A.     I would have to cut up the heroin and the crack, put

10  them in their bags, everything like that, and then after I was

11  done he would throw me a couple hundred dollars, a few buns,

12  and a couple of pieces of crack.

13  Q.     You say you would get that after you were done?

14  A.     After I was done.  Yes.

15  Q.     Okay.  So what about if you're in withdrawal?

16  A.     Like I said at first, you know, beginning of me doing

17  this stuff with him everything was going great and then --

18  Q.     And then --

19              THE COURT:  All right.  It is a little bit past 12.

20  Why don't we take a break at this point.

21              MR. DARROW:  Thank you.

22              THE COURT:  All right.  We take a break, take our

23  noon break, and let's reconvene at 1:15 and I would like to see

24  counsel at 1 o'clock.  All right.

25  [Recess 12 p.m. - 1:05 p.m.]

Mary P.

1  [The following occurred in open court without the jury present]

2       THE COURT:  Okay.  This is the afternoon.  The

3  defense had raised an objection to parts of the testimony of

4  the current witness.  The Government was going to look into

5  disclosures of an alleged sexual assault.  Can you tell me what

6  was disclosed to the defense?

7       MR. DARROW:  To the best of my understanding, Your

8  Honor, when the trial was scheduled for about a year ago, I

9  think it was April or May in front of Judge Crawford, during a

10  prep session with Mary P. she said that in addition to being

11  threatened with a gun when the defendant suspected her of

12  stealing the drugs from the car she was raped.  She was asked

13  well why didn't you say that when you were interviewed earlier,

14  and she said because my aunt was there and another family

15  member and I didn't want them to know what happened to me.  So

16  even though it was a prep session because it was a

17  contradictory story it was written up in a sense.  Trial was

18  then continued, the matter was transferred to you, and it

19  appears that by Government oversight that 6 was not disclosed

20  until, as counsel mentioned, fairly recently.  So that's the

21  facts.

22      I took a look at the Jencks Act 3500 and Federal Rule

23  Criminal Procedure 26.2, both having to do with the production

24  of witness statements and the timing thereof, and they both say

25  after a witness other than defendant has testified on direct

Mary P.

1  examination there has to be this disclosure.  Now of course

2  it's the practice in Vermont for the U.S.A.O. to make those

3  disclosures well before that; you know, a week, sometimes two

4  weeks before trial depending.  So we regret the late disclosure

5  of the -- that second DEA 6 in which that matter is discussed,

6  however, you know we were not obligated by law to make that

7  disclosure early.

8       Counsel has had Mary P. on the witness list for a long

9  time and also counsel could have brought this up before, you

10 know, Mary P. is actually on the stand so that we could have,

11 you know, maybe reshuffled her in the order or something.  It's

12 sort of brought up at the very last minute.  We don't think the

13 testimony should be excluded.  Part of the reason for that is,

14 you know, the testimony of Mandy about a rape has been

15 excluded.  Now there's testimony by Mary about a rape.  It's

16 our impression that the defendant had essentially weaponized

17 rape and used it to penalize the young women who displeased

18 him, and we think that's pretty core evidence for our case so

19 we hope you won't also exclude this.

20          THE COURT:  All right.  Mr. Kaplan.

21          MR. KAPLAN:  Judge, regardless of what the Jencks Act

22 says this Court issued an order and the order was that all

23 Jencks be disclosed by April 5th and the Government agreed.  I

24 mean they never said well the Jencks Act says something

25 different we're going to go with the Jencks Act.  That was the

Mary P.

1  order.  We got the order, we filed motions in limine, and this

2  interview took place on March 27, 2018.  So we received it this

3  Monday, like one day before trial, and I understand maybe we

4  could have raised this earlier, but we had other things to do.

5  We had the jury draw that took two days and then we had a very

6  complicated witness in Mandy L. getting ready to testify.  You

7  sort of get to these things when you can during trial.  So I

8  don't think that we delayed this by any means, and this is

9  extremely, extremely incriminating evidence and we should have

10  had time to think about it, prepare, maybe send out an

11  investigator, talk to other people, there were two other people

12  in the room, and so even if the Court finds that it should be

13  allowed, I think the probative value of it is outweighed by the

14  prejudice to our client.  She's already testifying he held a

15  gun to her head and she waits well over a month to disclose

16  this to the Government.  It's disclosed in another proffer

17  session in this case.  It's always more and more added every

18  time there's a proffer session, and I just think that it's

19  overly prejudicial, but I just think if the Court is going to

20  issue an order, that it should mean something and in this

21  particular case the order was April 5th.

22          THE COURT:  Okay.  So tell me again when was the

23  actual disclosure of this testimony?

24          MR. KAPLAN:  Monday.

25          MR. DARROW:  I think counsel is right.

Mary P.

1          THE COURT:  It arrived on Monday.

2          MR. DARROW:  Yes and also as to the suggestion we're

3    violating an order we're trying to -- we thought we got a

4    giglio order.  It is the case?

5          MS. SAVNER:  It's docket number 342 was that all

6    giglio material be disclosed by April 5th not Jencks.

7          MR. DARROW:  I think you know everything about it.

8          THE COURT:  Okay.  So that's giglio material.  It's

9    not Jencks Act material?

10         MS. SEN:  Correct.

11         THE COURT:  Okay.  Well I appreciate that defense has

12   been put in a really difficult spot here, although, you know,

13   frankly the Jencks Act didn't require under the terms of the

14   Act for disclosure until after the witness testified.  Next

15   there is no intentional violation here by the Government.  This

16   case involved the transfer of the prosecution from an assistant

17   who left and replaced by another assistant fairly recently.

18   There is no suggestion that this material was omitted

19   intentionally in the transition to new counsel.  In fact, the

20   new counsel is the person who is interviewing this particular

21   witness.  It was not disclosed by -- it was not understood by

22   the Government until this Monday when all of a sudden that

23   material was promptly sent to the defense.

24         The Court is going to permit the testimony.  It is highly

25   probative, extraordinarily probative, and it outweighs the

Mary P.

1   prejudicial impact.  Now if the defense needs some additional

2   time for the conduct of cross examination, I would listen to

3   that request, but in light of the significance of this

4   testimony and the lack of it being deliberately kept from the

5   defense, I'm going to permit the introduction of the alleged

6   assault -- sexual assault of Mary P.  Now I'm going to take a

7   recess at this point.

8            MR. KAPLAN:  Judge, if you could just note our

9   objection, and I think I will need some time after she

10  testifies to discuss this with my client.

11           THE COURT:  Okay.

12           MR. KAPLAN:  Thank you.

13           THE COURT:  How long was she going to testify?

14           MR. DARROW:  She's not a very long witness, Your

15  Honor.  We were trying to sort that out.  I'm thinking maybe --

16  well I'm hoping she will pick up a little bit.  We're kind of

17  dragging at the outset, but an hour maybe on direct.

18           THE COURT:  Okay.  All right.  We'll take a brief

19  recess at the close of her testimony.  Defendant should have an

20  opportunity to speak with Mr. Kaplan, and okay.

21  [Recess 1:14 - 1:17 p.m.  The following occurred in open court

22  with the jury present]

23           THE COURT:  All right.  Witness want to return to the

24  witness stand?

25           MR. DARROW:  Yes, Your Honor.  Your Honor, may I go?

                        Mary P.
1              THE COURT:  Yes, that's fine.
2    BY MR. DARROW:
3    Q.    Mary, welcome back.  You're still under oath.  Okay.
4    We're going to pick up where we left off.  You had told us that
5    when you first started working for -- is it Moe or Moet?
6    A.    It's either/or Moe or Moet.
7    Q.    Okay.  When you first started working for him it was
8    bagging?
9    A.    Yes.
10   Q.    And I think you were telling us about the first time
11   that you bagged?
12   A.    Yes.
13   Q.    Okay.  Did you say where that was?
14   A.    That was I think Marty's.
15   Q.    Marty's house?
16   A.    Yes.
17   Q.    Is that the brick house?
18   A.    Yes.
19              MR. DARROW:  Your Honor, may I have a moment?
20              THE COURT:  Yes.
21   BY MR. DARROW:
22   Q.    We're going to pull up Government's 98 which is a
23   photograph.
24   A.    Yes.
25   Q.    Can you tell us if you recognize that?

Mary P.

1  A.      That is Marty's house -- Uncle Marty's house.

2  Q.      Is that the place you're talking about?

3  A.      Yes.

4  Q.      Okay.  So you go over to Marty's house and tell us what

5  happens over there?

6  A.      We went into a room and Brian pulls out the drugs, the

7  heroin, breaks off some, puts it on a scale.

8  Q.      Okay and let's pause right there for a second.  You said

9  you go into a room?

10 A.      Yes.

11 Q.      At Marty's house?

12 A.      Yes.

13 Q.      And Moe or Moet or Brian what does he come out with?

14 A.      A brick of heroin.  He breaks off a piece, he put it on

15 the scale, and then we start cutting it up until it's fine.

16 Q.      Okay.  So is it just heroin or were you going --

17 A.      Yes.  There was crack as well.

18 Q.      Okay.  Crack cocaine?

19 A.      Crack, yes.

20 Q.      So comes out with some heroin, puts it on the scale, and

21 then where does it go?

22 A.      We leave it on a round -- it was like a cutting board

23 type of thing and it was round and we cut it up with a blade

24 and everything and then we separate everything and then we put

25 them in the tickets, we folded them up, wrap them up,

Mary P.

1   rubberbands, and then we leave them off to the side, and then

2   the tiny little blue bags or green bags that would be crack and

3   we would cut that up into, you know, pieces where we could fit

4   them into the bag.

5   Q.     Okay.  That was a good description, but I'm going to ask

6   you a couple followups.  You used the word ticket?

7   A.     A ticket is just a long piece of white paper that

8   honestly looks like a ticket.  You fold it out.  We fill the

9   bottom of the bag about this much and then we just fold it up

10  and it looks like a small ticket.

11  Q.     Okay, and so is a ticket or is that the baggie that's

12  being used for heroin?

13  A.     Yes.

14  Q.     And the crack bags, as you say, are colored?

15  A.     Well you can get tickets in white or they can come in

16  square little white little plastic bag things.

17  Q.     Okay.  Can we pull up 66A please?  Do you have a

18  photograph in front of you?

19  A.     Yes, sir, I do.

20  Q.     Okay.  Let's -- I want to ask you what we have here.

21  There are lots of things in the picture so let's go through it

22  slowly.  Okay?

23  A.     Okay.

24  Q.     Why don't we start with it looks like in the upper

25  left-hand corner a blue colored -- what's that?  A cookie tin

Capitol Court Reporters, Inc. (800/802) 863-6067

Mary P.

1    or something?

2    A.      Yeah.  When you buy it in a store it has cookies in it.

3    Q.      Have you ever seen that tin before?

4    A.      Yes I have.

5    Q.      Where?

6    A.      At 103 North Union.  That's what we kept everything in.

7    Q.      Okay, and the open tin there on the right -- just to the

8    right of the top can you tell us piece by piece what we're

9    looking at in there?

10   A.      So at the top white long thing that you see -- sorry --

11   Q.      You can see your finger on that screen I think.

12   A.      That right here, what I just circled, that is a ticket

13   when we put heroin inside.

14   Q.      Okay.

15   A.      The little baggies that you see as of right here those

16   are the bags that we use for crack.

17   Q.      All right.

18   A.      If any -- if Moet said we could do a line after

19   everything is done, that's the reason why the straw is right

20   here to be honest with you.

21   Q.      And I apologize.  I didn't understand the last sentence.

22   A.      The straws that you see is any of the girls or even me

23   at the time if we could get a small line out of the heroin,

24   those are tooters.  You know we use those as tooters.

25   Q.      As?

                         Mary P.

1   A.      Tooters.

2   Q.      Tooters?

3   A.      For us to put it up our nose.

4   Q.      Oh to snort?

5   A.      Yes to snort.

6   Q.      You didn't use them as like little spoons?

7   A.      No.  No.  The thing we used for a spoon would be this

8   card thing right here.  So when we have the ticket open that's

9   what we put the heroin into that.

10  Q.      Okay.

11  A.      And the heroin would be in that.

12  Q.      And what's over to the right of the folded card?

13  A.      That would be honestly another tooter.

14  Q.      Another?

15  A.      Another tooter.

16  Q.      Is it tooter?  Oh tooter.  T-O-O-T-E-R?

17  A.      Yes.

18  Q.      I apologize.  How about to the right of that tooter?

19  A.      Those are the blades that we used to cut up heroin and

20  crack.

21  Q.      All right, and if we go down to the rectangular object

22  below the card, what's that?

23  A.      Do you mean the scale?

24  Q.      That's what I'm asking.

25  A.      Yes.  That is the scale that we would -- you can

                Capitol Court Reporters, Inc. (800/802) 863-6067

Mary P.

1  obviously see the residue on it and that would be heroin mixed

2  with crack.

3  Q.    All right, and then to the left of the scale looks like

4  are those little green bags like the ones in the can?

5  A.    So are you talking about this right here?

6  Q.    Yes.

7  A.    Yes.  Those are crack bags.

8  Q.    Okay, and to the left of those?

9  A.    So these are the bags I'm talking about.  These as of

10  right here if we can't get tickets or anything like that, we

11  would put the heroin in those bags.

12  Q.    All right, and how about just above that here and here?

13  A.    Well like I said the little baggies they come in those.

14  Q.    Okay.

15  A.    So -- but if we didn't have tickets, we would take the

16  little baggies out of crack that we would use in those small

17  bags.

18  Q.    Okay, and can we slide down a little and enlarge it?

19  There we go.  Thank you.  We've got these marks on here, but

20  starting to the right what's over on the right in this picture?

21  A.    The tape?

22  Q.    Yes.

23  A.    Honestly I really never used tape.  It's always been --

24  Q.    Have you seen tape used?

25  A.    Not when I was doing it to be honest, no.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Mary P.

1   Q.     Okay.  To the left of the tape what's that?

2   A.     Those are rubberbands that we would do because a bundle

3   is 10 tickets and after doing the 10 tickets we would tie them

4   up, wrap a rubberband around them to keep them together.

5   Q.     Okay, and to the left of the tickets what's over there

6   in the lower left corner?

7   A.     These are all the tickets we would use for heroin when

8   we would buy them.  Like when we go to -- it's a place near

9   downtown, shooting stars or northern stars or something like

10  that.  It's just a store, yeah.  That's where we would buy the

11  boxes of tickets.

12  Q.     Now -- thank you -- another thing that we were getting

13  into just before the lunch break was you talked about getting

14  your payment for bagging after the bagging?

15  A.     Yes.

16  Q.     Okay.  Did you sometimes bag sick?

17  A.     Most of the time, yes.

18  Q.     Okay.  So -- and you said you were -- some of your

19  payment was drugs?

20  A.     Yes.

21  Q.     Okay.  Do you have an estimate -- after the first

22  bagging session that you talked about did you have other

23  bagging up sessions?

24  A.     I would sit in a room for hours cutting this stuff up

25  and bagging them so --

Mary P.

1 Q.      Okay.  Where did you do that?

2 A.      Most of the time it was at Marty's.

3 Q.      Was it ever elsewhere?

4 A.      And we done it once -- or a couple of times we have done

5 it at 103 North Union.

6 Q.      Okay.  Who was involved in bagging up or who was present

7 when it was happening?

8 A.      Mandy was there with me.  Brian was there.  Sometimes

9 there would be a girl named Ashley.  She would be there

10 helping.  I'm sorry.  It's so long ago I really can't think of

11 all the people.  I apologize for that.

12 Q.      Okay.  You mentioned Moe being there?

13 A.      Yes.  Brian.

14 Q.      Was he always there?

15 A.      Yes.

16 Q.      Who was in charge?

17 A.      Brian, but if Brian wasn't there, then me and Mandy

18 would be in charge.

19 Q.      Okay.  So was he always there or was he not?

20 A.      Most of the time he would be there, but sometimes -- the

21 few times that he couldn't then that would be me and Mandy

22 would be in charge of everything.

23 Q.      Okay.  At some point after you had worked for a while as

24 a bagger did your work change?

25 A.      Yes.  He actually offered me a $500 paycheck every

Mary P.

 1  Sunday, but for me to go live at the house with Mandy, keep her
 2  company, you know, sell the drugs that we had to -- we could
 3  only do it on School Street -- School Street and -- I really
 4  can't think of the other street, but it would be where 103
 5  North Union was we would have to do it across from that street.
 6  Q.     You would have to do what?
 7  A.     For -- if somebody called one of the phones and they
 8  needed something, we could only leave 103 North Union, go
 9  across the street, and I'm thinking that is School Street to
10  sell the drugs there if anybody wanted anything.
11  Q.     Okay.
12  A.     We weren't allowed to leave to go downtown to go to any
13  of that.  It literally had to be right there in that area.
14  Q.     Okay.  You say in the area of 103 North Union?
15  A.     Yes.
16  Q.     Do you have that picture?  I apologize.  What exhibit is
17  this?  49.  So you have 94 on the screen.  Do you recognize
18  that building?
19  A.     Yes.  That was the house we stayed and that would be all
20  the way in the back.  Yup.  Right there.  That was where me and
21  Mandy were staying.  Yes.
22  Q.     Okay.  So you started talking about your job taking on
23  added responsibilities?
24  A.     Yes.
25  Q.     And you said he asked you to do this?

Mary P.

1    A.      Yes.

2    Q.      Who is he?

3    A.      Brian Folks or Moe, Moet.  I don't know what I'm

4    supposed to be calling him.

5    Q.      Any of them are fine.

6    A.      Okay.

7    Q.      And you say you moved into that place?

8    A.      Yes I did.  I moved in with Mandy, yes.

9    Q.      Around when was that?

10   A.      I want to say maybe a month after me bagging for him or

11   it could have been possibly sooner than that.

12   Q.      Okay, and at that place you were, if I understand what

13   you're saying, you were distributing to customers, but you had

14   to stay right -- you had to stay right around the house, you

15   couldn't leave?

16   A.      Right.  Right.

17   Q.      You were doing that and was Mandy doing that as well?

18   A.      Yes.  Me and her both did.

19   Q.      What prices were you selling heroin for?

20   A.      A bun would be $75 and was $10 a ticket.

21   Q.      All right.  So a bun is one of those rubberband packages

22   of 10 tickets?

23   A.      A bun is $10 -- is 10 tickets all in one.  Yes.  That is

24   what a bundle is called of heroin.  A ticket is just a single

25   one which is $10, but the full bump would be 75.

Mary P.

1  Q.     And what were the time periods that you were

2  distributing these drugs for?

3  A.     It could be like hours.  Like people called us all the

4  time on the phones all the time so --

5  Q.     So are you talking about 24 hours a day?

6  A.     About so or maybe it could be like a little less than

7  that, but it was an all day thing.

8  Q.     All right.  Everyday?

9  A.     Uh-huh.

10 Q.     Now you testified earlier that when you met the

11 defendant you were already addicted?

12 A.     Yes I was already addicted to heroin.  Yes.

13 Q.     How much were you -- how much heroin were you using

14 before you met him?

15 A.     Before I met him I had it very much under control.  It

16 wasn't bad, but then when I met Brian Folks it got worse

17 because it was always around.  I was touching it and it just

18 proceeded, and so I can say before I met him I had it down to

19 maybe keep two buns and that could last me for about a month,

20 and then when I met Brian Folks it went to like three, four

21 buns a day that I was going through and it just got bad.

22 Q.     Okay.  The drugs that you were distributing out of 103

23 North Union whose drugs were those?

24 A.     Brian Folks.

25 Q.     And what became of the money that you would get when you

                    Mary P.

 1  were selling them or distributing them?

 2  A.      Can you ask that again?

 3  Q.      Sure.  When a customer would buy a bundle for $75 or a

 4  couple bundles for $150 what became of the money?

 5  A.      What became the money?

 6  Q.      What did you do with it?

 7  A.      Well first in the beginning Mandy was with me.  So Mandy

 8  would take the money until Brian Folks could like have that

 9  trust in me to hold on to the money myself instead of handing

10  it to Mandy, and you know -- but then me and him had a couple

11  downfalls.

12  Q.      Okay.  I want to get to that in a minute.  So at the

13  beginning the money that you got for running would go to Mandy?

14  A.      Yes.

15  Q.      And at some point Folks trusted you enough so that you

16  didn't have to give it to Mandy?

17  A.      Right.

18  Q.      But at the end of the day --

19  A.      I would always go back in the house, put the money where

20  it needs to go.  Like I never took it from him or anything like

21  that because like I said in the beginning everything was fine,

22  and so when I got it, got the money, it went into the house

23  into the bedroom where that hutch thing was where Mandy kept

24  her clothes and where we kept the clothes and everything.

25  Q.      After the money was collected and would go where you put

                          Mary P.

 1   it who got the money?

 2   A.     He would come to 103 North Union and he would take the

 3   money.

 4   Q.     How often would he come by?

 5   A.     Almost everyday.

 6   Q.     All right.

 7   A.     Yeah.

 8   Q.     And is he the defendant Brian Folks?

 9   A.     Yes.

10   Q.     Okay.  Did he ever hit you?

11   A.     Yes.

12   Q.     I want you to tell us about the first time that

13   happened.  What were the circumstances?

14   A.     It's hard.  I'm sorry.  I'm all nerved up.  I don't want

15   to be here.

16             MR. KAPLAN:  Judge.  I'm sorry I can't hear.

17             THE COURT:  She was saying she did not want to be

18   here.

19             THE WITNESS:  I'm all nerved up so it's really hard

20   to remember.

21             THE COURT:  Sure.  I understand.

22             THE WITNESS:  I'm scared.

23   BY MR. DARROW:

24   Q.     We apologize for putting you through this.  Let me put

25   the question to you with a little more direction on it.  Was

Mary P.

1  there a time when you were bagging that something happened?

2  A.    Yes.  I was sick and Brian -- me and him were arguing.

3  I asked him please can I get some heroin.  I don't want to do

4  this sick.  He was being a jackass towards me and when he left

5  the room I didn't think he saw me and I took a line of heroin

6  and he side-swiped me with his fist.

7  Q.    So you were asking him if you could have some heroin

8  because you were sick and his response was?

9  A.    No.

10 Q.    All right.  You then thought he left the room?

11 A.    I didn't think he was looking at me.  I thought he left

12 the room and I did a line and I just got side-swiped.

13 Q.    Okay.  Tell us what you mean by sideswiped?

14 A.    He punched me in the side of the head.  I didn't see him

15 coming from behind me so he hit me.

16 Q.    Okay.

17        MR. KAPLAN:  Judge, I'm sorry, but we simply can't

18 hear back here.

19        THE COURT:  Okay.  So just wonder if you can actually

20 pull that microphone a little bit closer to you and if you can

21 get up very close to the microphone, speak right into it

22 please.

23        THE WITNESS:  I don't want to see him.

24        THE COURT:  Pardon me.

25        THE WITNESS:  I don't want to see him.

Mary P.

1          THE COURT:  Right.  Well just you can have the

2   microphone come right over and right up to you.

3          THE WITNESS:  Like this?

4          THE COURT:  That's fine.

5          MR. KAPLAN:  Judge, may we approach?

6          THE COURT:  Yes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mary P.

1    [Bench conference].

2         MR. KAPLAN:  So a couple issues.  One is we just

3    can't hear her back there.  Second she's --

4         THE COURT:  I'll try to get her to speak louder.

5         MR. KAPLAN:  She's intentionally sitting where we

6    can't see her and I think she just said that.

7         MS. SEN:  She testified to that.

8         THE COURT:  I'm not so sure she's talking about --

9         MR. KAPLAN:  Well but I can't see her.  That's a

10   problem for me.  I can't see her actions.  I can't judge her

11   emotions.  I can't hear her.

12        MR. DARROW:  I can go faster.

13        THE COURT:  She is avoiding eye contact with the

14   defendant.  Now is there any way both of you, particularly you

15   have to cross examine her, moving in such a way that you can

16   actually see her?  And I can ask her to move over just a little

17   bit.

18        MR. KAPLAN:  I can sit next to her.

19        THE COURT:  Yeah wouldn't you like that.

20        MR. KAPLAN:  Where would I sit?  Where could I sit?

21        THE COURT:  Well you can sit at the Government's

22   table.

23        MR. DARROW:  Are you crossing her how about if I just

24   came --

25        THE COURT:  Just move over a little bit.  I'm going

Mary P.

1   to move her just a little bit.

2   [End of bench conference]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mary P.

1          THE COURT:  I appreciate your concern.  Could you
2    move over just a little bit?  The lawyers want to be able to
3    see you and hear your testimony and they have a right to do
4    that.  So if you can just move over a little bit, you don't
5    have to move over a lot, but just a foot.  Okay.  Is there any
6    problem with the witness sitting there?

7          MR. KAPLAN:  No.  That's fine, Judge.

8          THE COURT:  Okay.  Good.  All right.  Thank you and
9    just put that microphone right up close and speak right into it
10   because people want to hear what you have to say.
11   BY MR. DARROW:
12   Q.     Mary, when he hit you on your head what impact did that
13   have on your body?
14   A.     Made me see stars.
15   Q.     Okay.  Did you stay in your chair?
16   A.     No.  I went out of my chair.  I flew out of my chair
17   when he did that.
18   Q.     And where did you wind up?  Did you fall on the floor?
19   A.     Yes.
20   Q.     Is that the last time you tried to do a line during
21   bagging?
22   A.     Yeah.
23   Q.     So that's one time he hit you.  Were there any other
24   times that he hit you?
25   A.     Yes.

Mary P.

1  Q.      Tell us about it.

2  A.      There was the car being robbed and everything like that.

3  He called me over to the house saying that he had some new

4  product that he wanted me to taste and everything like that.  I

5  said okay I'll be over, and I got into the house.  I said I had

6  to go to the bathroom first before I walked into the room.

7  Next thing I know after I'm going to the bathroom I go in the

8  room and being shoved around like I'm a rag doll.  He's hitting

9  me.  Everything.  He threw me into the corner and he cocked

10  back the gun and he put it right to my head.

11  Q.      Okay.  Let's back up for a moment.  Did we understand

12  you to say that this was connected to the theft of the drugs

13  from a car?

14  A.      Yes.

15  Q.      Okay.  Where did you guys keep the stash at 103 North

16  Union?

17  A.      In the car.

18  Q.      In a car?

19  A.      In the car.  There was drugs in the car.  There was like

20  stuff in the house.  Like I said in the hutch.

21  Q.      Was the stash in the car stolen by somebody at some

22  point?

23  A.      Yes.

24  Q.      Okay, and is that when the defendant told you to come

25  over because he wanted you to try some new product?

                          Mary P.

1    A.      Yes.

2    Q.      Okay, and did you go over there?

3    A.      Yes.

4    Q.      Okay.  Now tell us, just going slowly, what happens?

5    You go in the bathroom?

6    A.      I went to the bathroom and came out.

7    Q.      Okay.

8    A.      And went into the room.  I got hit.  Thrown around like

9    I was a rag doll.

10   Q.      Who is doing that?

11   A.      Brian Folks.

12   Q.      Is he saying anything?

13   A.      Not at first, no.  He's just doing that.  Next thing I

14   know he cocked back the gun.  He threw me in the corner of the

15   room.  Where you walk into the room there's the bed, the hutch,

16   and then there was a corner right here.  I got side thrown into

17   the corner.  He jumped on top of me, cocked back the gun, and

18   he put the gun on me, and he said what makes you think I won't

19   kill you right here right now, and then he -- I kept crying.  I

20   kept screaming I don't know what you're talking about.  I don't

21   know what's going on.

22   Q.      Okay.  When you refer to a gun -- do you know anything

23   about guns?

24   A.      I don't like guns because of my father's situation so I

25   stay away from guns.

                Capitol Court Reporters, Inc. (800/802) 863-6067

Mary P.

1   Q.      Okay.  Do you know the difference between a long gun

2   like a rifle or shotgun?

3   A.      It was a handgun.

4   Q.      It was a handgun.  What did he do with the handgun?

5   A.      Cocked it right back, put it right here, and then went

6   to right here.

7   Q.      When you say it went right here what do you mean?

8   A.      He put the gun here to my head.

9   Q.      He pressed the barrel against your skin?

10  A.      Yes.  My head, yes.

11  Q.      Okay.  What happened after that?

12  A.      He sat down and said what makes you think I won't shoot

13  you and kill you right here right now, and I kept crying and

14  telling him I don't know what you're talking about.  I don't

15  know what's going on.

16  Q.      Okay, and next?

17  A.      And then afterwards then that's when I found out the car

18  was robbed and --

19  Q.      Take your time, but we need to know what happened.

20  A.      Then his friend --

21  Q.      Sorry.  May I approach, Your Honor?

22          THE COURT:  Yes.

23  BY MR. DARROW:

24  Q.      Let's get a glass of water.  Okay.  Mary.

25          THE COURT:  All right.  Would you like a break of a

Mary P.

1   few minutes?  Would you like a break?

2           THE WITNESS:  Yes please.

3           THE COURT:  Okay.  Let's just take a five-minute

4   recess.  Ask that you go back in the jury room, I'll go back as

5   well, and be back in 5 to 10 minutes.

6   [Recess 1:44 - 1:54 p.m.  The following occurred in open court

7   with the jury present]

8           THE COURT:  Okay.  Mr. Darrow.

9   BY MR. DARROW:

10  Q.    Mary, Mary, what happened after the incident with the

11  gun?

12  A.    Him and his friend started beating me senseless.

13  Q.    I'm sorry.

14  A.    Him and his friend started beating me senseless after

15  that.

16  Q.    Who else?

17  A.    He was Puerto Rican.  I can't remember his name.  I just

18  know he was Puerto Rican.

19          MR. KAPLAN:  Your Honor, we just can't hear this.

20          THE COURT:  Okay.  I know this is difficult.  Can you

21  just put that microphone up close, okay, and do you want to

22  repeat what your last statement was?

23  A.    Okay.  Him and his friend started beating me.  I don't

24  remember his friend's name.  I just know he was either Puerto

25  Rican or Mexican.

Mary P.

1   Q.      Okay.  So there was another man in the apartment?

2   A.      Yes.

3   Q.      And he started joining in?

4   A.      Yes.

5   Q.      Okay.  What happened after that?

6   A.      They raped me.

7   Q.      Where did that happen?

8   A.      At 103 North Union.

9   Q.      So you're talking about after this beating you were

10  raped?

11  A.      With his friend, yes.

12  Q.      Okay.  Who was it?

13  A.      I don't remember the guy's name.  Like I said I know

14  he's Puerto Rican or he's Mexican.

15  Q.      Okay and I apologize.  I'm just trying to make

16  everything very clear.  When you say they or his there were two

17  men?

18  A.      Yes.  It was Brian Folks and his friend that was staying

19  at the house after Brian kicked me out --

20  Q.      All right.

21  A.      -- of the house, but kept having me come over --

22  Q.      All right.

23  A.      -- to do everything.  Yes.

24  Q.      Thank you.  Now when you say they raped you are you

25  talking about intercourse?

Mary P.

1    A.    Yes.

2    Q.    Both of them?

3    A.    Yes.

4    Q.    All right.  Mary, we're going to leave that episode.

5    Were there any other times that you were struck or hit?

6    A.    Yes.  It's hard to remember.

7    Q.    Do you remember the circumstances that would cause that

8    to happen?

9    A.    Because I think one of them were because when his

10   friends came from New York I wasn't like Mandy.  I wouldn't

11   walk around with a t-shirt with like no bra and underwears and,

12   you know, like stuff like that.  I wouldn't do stuff like that.

13   I'm not a prostitute.  I'm sorry I'm not.

14   Q.    Okay, and how does this connect up to whether you were

15   hit or not?

16   A.    Because he was mad because I wasn't doing like stuff

17   like Mandy.  You know what I mean?  Having sex with any of

18   them, you know, doing that stuff.  When I first came involved

19   with Brian Folks I told him I'm here to make my money, get

20   high, and go work with you like you wanted.

21   Q.    Okay.  Were there other young women in the area that

22   were involved in prostitution?

23   A.    Yes.

24   Q.    Okay.  Who were some of the other young women you

25   remember?

Mary P.

1   A.      Ayla, Britt Barber, one of my cousins.  I'm sorry.

2   Q.      What was your cousin's first name?

3   A.      Katelynn.

4   Q.      Okay.  Can we pull up 54A please?

5   A.      That is Ayla.  Ayla Lang.

6   Q.      Okay.  Can we pull up 55A please?  I apologize.  I'm

7   approaching you with 55A.  Can you tell us if you recognize

8   this person?

9   A.      That is Victoria.

10  Q.      Okay.  How do you recognize her?

11  A.      She called our phone one night.  She wanted some dope.

12  I went out, I walked down to her, and everything like that.

13  She tried handing me a card and I said no.  Either you have the

14  money or you don't.  She wanted -- went to go put her hand in

15  my pocket where I had the bundle on me.  Me and her -- I got

16  physical with her and everything like that.  I walked back up

17  to the house.  She was begging me for it and I said if you

18  don't have the money you don't get it.  That's when she put her

19  hand in my pocket to try to grab it.  I got physical with her

20  and then I left and I walked back to 103 North Union.

21  Q.      Okay.

22  A.      And she -- she did pay for stuff.  She is a prostitute.

23  Q.      I wanted to ask you about your experiences with

24  Victoria.  Was it just as her being a drug customer or was she

25  involved in other aspects of the situation?

Mary P.

1    A.     It was both the prostitution and I don't think -- I've

2    never seen her bag.  I haven't.

3    Q.     Never seen her?

4    A.     Never seen her like bag up drugs or anything.  I have

5    not, but I know her as a customer buying drugs and she is a

6    prostitute and those are two things I do know.

7    Q.     Okay.  Now do you know whether she's a prostitute that

8    was working with this group or is she doing something else?

9    A.     I would say with the group.  That's how I met her.

10            MR. KAPLAN:  Objection.  That's speculative.

11            THE COURT:  Well do you want to clarify as to how she

12   would know that?

13            MR. DARROW:  Exactly.  Yes.

14            MR. KAPLAN:  Can she indicate who she's talking

15   about, Judge?

16            THE COURT:  She's talking about Victoria.

17            MR. KAPLAN:  Okay.  Thank you.

18            THE COURT:  And I'm asking about a foundation for her

19   conclusion that she was involved in prostitution.  Okay.

20   BY MR. DARROW:

21   Q.     Mary, why do you think that Victoria was involved in

22   prostitution?

23   A.     Because I was close with Ayla, and her and Ayla would

24   get -- do their story on Backpage and everything and that's how

25   I met Victoria.

                         Mary P.

1   Q.      So she was working with Ayla?

2   A.      Yes.

3   Q.      Okay.  Can you tell us whether these two photographs in

4   55A fairly and accurately depict the woman you knew as

5   Victoria?

6   A.      Can I see that?  I know this is Victoria.

7   Q.      Okay.

8   A.      I know this is Victoria.  The first page.  This is real

9   blurry.  I mean --

10  Q.      Okay.  The first page fairly and accurately depicts

11  Victoria?

12  A.      Yes.

13          MR. DARROW:  So we move 55A as a single page exhibit.

14          THE COURT:  Okay.

15          MR. KAPLAN:  No objection.

16          THE COURT:  So admitted.

17  [Government exhibit 55A admitted]

18  BY MR. DARROW:

19  Q.      So Ayla and Victoria and who else?

20  A.      Keisha.  Keisha was the girl that stole for Brian Folks.

21  Like if she needed drugs or anything like that she would go in

22  the stores, buy us jackets because it was wintertime and, well,

23  not buy, steal them, you know what I mean, and I would pay her

24  in drugs for that.

25  Q.      All right.  Can we look at 50A please?  Who is that?

                        Mary P.

1    A.      That was Keisha -- that is Keisha.

2    Q.      All right, and is there a second page to that?

3    A.      Yup.  That's Keisha.

4    Q.      Okay.  Now did Keisha -- you mentioned that she's an

5    addict?

6    A.      Yes.  She's a heroin addict.

7    Q.      All right -- or she was at the time?

8    A.      I haven't seen her in years, but yes she used to shoot

9    up heroin in her hand.

10   Q.      All right, and you're saying that you talked about her

11   boosting or shoplifting clothes?

12   A.      Yes.

13   Q.      Did she have any other involvement in the group?

14   A.      That's all I knew that Keisha did.  She would steal

15   stuff, whatever Brian wanted her to steal, and everything like

16   that.  She got paid in drugs.

17   Q.      Okay.  All right.  Can we pull up 47A please?  It's not

18   in.  Sorry.  Showing you another photograph of a young woman.

19   Do you recognize her?

20   A.      Yes.  That's Hannah.

21   Q.      Okay.  Is that a fair and accurate depiction of her?  We

22   move 47A.

23              THE COURT:  All right.  Any objection?

24              MR. KAPLAN:  No objection, Your Honor.

25              THE COURT:  So admitted.

Mary P.

1  [Government exhibit 47A admitted]

2  BY MR. DARROW:

3  Q.    Any other girls or young women do you remember being in

4  the -- working with this group in the time you were there

5  December and January 2015/2016?

6          MR. KAPLAN:  Your Honor, may we approach?

7          THE COURT:  Yes.  Okay.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Mary P.

 1   [Bench conference].

 2           MR. KAPLAN:  I heard her identify Hannah as someone

 3   she knew and then --

 4           THE COURT:  Correct.  She was -- whether she knew

 5   whether Hannah was engaged in drugs or prostitution, et cetera.

 6           MR. KAPLAN:  I have no problem with her answer, but

 7   then Bill says is she someone that was also working with this

 8   group.

 9           THE COURT:  Oh no, no he didn't say that.  He asked

10   whether there's any other young women who are working with this

11   group.

12           MR. KAPLAN:  To me that implies nobody knows what

13   Bill means by that, is Hannah working.

14           MR. DARROW:  I backed away because she was so

15   emotional.  I went on to other material.

16           THE COURT:  Right, but when you suggested you're

17   going to go back to this at some time what are you going to ask

18   her and what foundation do you have for her to testify about

19   Hannah?

20           MR. DARROW:  I would just ask her, as I will each of

21   the women she identifies, what -- how did you know her?  How is

22   she involved in the group?  With that reaction maybe I

23   shouldn't because why she feels so strongly about it, but I

24   would like to come back to what she knows about her.

25           MR. KAPLAN:  What would she say?

        **Capitol Court Reporters, Inc. (800/802) 863-6067**

Mary P.

 1              MR. DARROW:  Hannah is an integral member of that

 2    group.  I don't know what contact she had with her.

 3              MR. KAPLAN:  Are you going to ask her?

 4              MR. DARROW:  I probably have but --

 5              THE COURT:  I would stay away from it at this point.

 6    You're going -- if she's not going to say something with regard

 7    to Hannah's death.

 8              MR. DARROW:  Well she did see the video.  You're

 9    right, the danger.

10              THE COURT:  Absolutely.  If in fact you start having

11    her testify about Hannah's participation, again we're limited

12    to what she observed Hannah doing and I'm afraid that you're

13    going to end up with some really prejudicial material.

14              MR. DARROW:  Thanks.

15    [End of bench conference]

16

17

18

19

20

21

22

23

24

25

Mary P.

1    BY MR. DARROW:

2    Q.     Mary, do you recognize this woman?  If you're not sure,

3    that's okay.

4    A.     I'm not sure.

5    Q.     Okay.  Can we please pull up 123?  I'm showing you a

6    single page exhibit marked for identification as Government

7    123.  Do you recognize the person depicted there?

8    A.     This is Brittany Barber.

9    Q.     Okay.  How do you know Brittany Barber?

10   A.     I used to date her ex-boyfriend and before Brian offered

11   me the job to stay at the house and everything like that she

12   was there, but she causes a lot of problems and I didn't expect

13   me to get caught up in all of this type of stuff so I told him

14   that, you know, she's a very big snitch.  She would cause a lot

15   of problems for you and --

16   Q.     Okay.  When you say she was there did she have some role

17   in this group working out of 103?

18   A.     Prostitute.

19   Q.     Okay.  Is that a fair and accurate depiction of her?

20   A.     Yes.

21          MR. DARROW:  Move Government 123, Your Honor.

22          THE COURT:  Any objection?

23          MR. KAPLAN:  No objection.

24          THE COURT:  All right.  So admitted.

25   [Government exhibit 123 admitted]

                        Mary P.
1   BY MR. DARROW:

2   Q.      How do you know she was working as a prostitute?

3   A.      When I started dating her ex.

4   Q.      Okay.  So you got it on the word of somebody else?

5   A.      Yes and then Ayla knew her very, very well.  They went

6   to school together.  They grew up together and she told me

7   herself.

8           MR. KAPLAN:  Objection, Your Honor.

9           MR. DARROW:  Let's leave out what she said.

10          THE COURT:  Objection sustained.

11  BY MR. DARROW:

12  Q.      I'm sorry.  We call that hearsay.

13  A.      Okay.  Okay.

14  Q.      Thanks.  Mary, I'm going to show you another picture 56A

15  for identification.  Actually two pictures of a young woman.

16  Let me ask you if you recognize her?  Can you look at the

17  second page?

18  A.      She does look very familiar, but I can't give you a name

19  right now.

20  Q.      Not at all.  That's all right.  Thank you.

21  A.      I'm sorry.

22  Q.      Were you ever asked to prostitute?

23  A.      Yes.

24  Q.      By whom?

25  A.      Brian Folks.

Mary P.

1    Q.      Tell us what he asked?  How did he put it?

2    A.      Would you go and sleep with this person, that person.

3    Q.      Go and --

4    A.      Like would you sleep with this person, do you

5    prostitute, do you do this.

6    Q.      What language did you use and please just tell us what

7    he said?

8    A.      Will you fuck this person for such and such because we

9    need the money and all that, and I said no I don't lay on my

10   back for anybody.

11   Q.      Okay.  What was his reaction to that if you remember?

12   A.      He got mad.  He literally told me that I'm no fun.

13   Q.      Did you have sex with the defendant?

14   A.      Willingly?

15   Q.      Well let's start with did you have sex with him?

16   A.      I'm going to say no.

17   Q.      Well did you unwillingly have sex with him?

18   A.      When I -- when me and Brian ever had sex it was not

19   willing and that's the way I'm saying it.

20   Q.      So you did have sex with him?

21   A.      Clearly, but it wasn't willing.

22   Q.      Okay.  Was it intercourse or oral sex?

23   A.      There was one time that it was oral and the other times

24   was intercourse.

25   Q.      Okay.  Did you ever say no to him?

Mary P.

1    A.      Yes.

2    Q.      Did that stop things?

3    A.      No.

4    Q.      Did he ask you to prostitute just one time?

5    A.      I think there was a couple of times, but I continually

6    said no.

7    Q.      Okay.  Did you ever hear the word violation or violate

8    when you were working for the defendant?

9    A.      I can't remember.  I'm sorry.

10   Q.      That's all right.  Did you at some point when you were

11   working for the defendant get a boyfriend?

12   A.      Yes I did.  I had a boyfriend.

13   Q.      Dustin?

14   A.      Dustin.  Yes.

15   Q.      Did you have conversations with the defendant about

16   that?

17   A.      I knew that after I started dating Dustin there was -- I

18   guess Brian and him had ran into some issues.  I think it was

19   about Dustin robbing him.

20   Q.      Okay.  Let's leave it aside.  Did you have any --

21           MR. KAPLAN:  Objection, Your Honor.  I think that the

22   witness should be allowed to answer the question.

23           MR. DARROW:  I was anticipating a hearsay objection.

24   She can go ahead if she wants to.

25           THE COURT:  All right.  Go ahead.

Mary P.

1    A.      I just know that when I was dating Dustin I didn't know

2    that those two had issues, and then I was told that -- by Brian

3    Folks that he did try helping him but Dustin robbed him, and so

4    those two had like a big head-to-head thing with each other.

5    Q.      Okay.  I'll leave that alone.  Did you ever see Folks

6    hit any of the other young women working for him?

7    A.      Yes.

8    Q.      What did you see?

9    A.      I saw when we were at Marty's there was a big fight.

10   Him forcing another girl in the room.  I said something and --

11   I said something.  I can't remember what I said.  I think it

12   was that's fucking disgusting and like he said something to me.

13   Just --

14   Q.      All right.  Mary, look at me.  Okay.  Let's leave that

15   aside.  Did you see him hit any of the other young women?

16   A.      He and Ayla went at it a lot.

17   Q.      What did you see?

18   A.      Ayla got really cocky and he smacked Ayla.

19   Q.      I'm sorry.  Ayla what?

20   A.      Ayla got cocky towards him, like fighting back with him,

21   and he hit Ayla.

22   Q.      Okay.  When you say he hit Ayla is this something that

23   you saw?

24   A.      Yes.  I saw him hit Ayla.

25   Q.      Tell us what you saw.

Mary P.

1    A.      He -- they got into a fight.  It was over the kind of --

2    trying to get the bugs out of her hair and stuff like that and

3    the fight was over that she wasn't going to go and sleep with

4    the -- like the guy that he wanted her to sleep with.  She said

5    she wasn't going to do anything sick.  They got into it and

6    then I don't know what Ayla did, but I just saw Brian just

7    coldcock her like.

8    Q.      When you say he coldcocked her can you tell us what he

9    did?

10   A.      Backhanded her.

11   Q.      Swung the back of his hand and hit her where?

12   A.      Yes, in the face.

13   Q.      And what impact did that have on her body?

14   A.      What do you mean impact?  He hit her in the face.

15   Q.      Did she just absorb that?  Did she move?  Did she fall

16   over?

17   A.      No she fell over.

18   Q.      Okay.  All right.  Now you say that the context of that

19   was she didn't want to work sick?

20   A.      Yes.

21   Q.      Was Ayla a heroin addict?

22   A.      Yes, bad and a crack head.

23   Q.      All right, and did she do prostitution work?

24   A.      Yes.  All the time she worked for Moe.

25   Q.      So do we understand you correctly that she was saying I

Mary P.

1  don't want to do that work when I'm sick I need heroin?

2  A.      Yes.  Yes.

3  Q.      And that's when she got struck?

4  A.      Yes.

5  Q.      Do you recall a burglary while you were at 103 North

6  Union?

7  A.      Yes.

8  Q.      Okay.  Would this be in or around mid January 2016?

9  A.      I'm not really familiar with the months, but I do know

10 that me and Mandy were in the home, a guy came up to the door,

11 banging on the door.  He actually put a whole crack through the

12 door.  He kept saying it's the police, it's the police.  I told

13 Mandy not to open up that door.  I said look out the window.

14 She did not do that and I tried telling her.  I'm like Mandy

15 don't open up the door.  She was stupid enough to open up the

16 door.  So the drugs that we had on us I was flushing down the

17 toilet.  I was in the bathroom and I was flushing stuff down

18 the toilet.  The guy he grabbed me, threw me out of the

19 bathroom, he pulled down my pants and everything looking for

20 the drugs, had -- he had me put my hands on my head, Mandy is

21 in the living room crouched down on the side of the couch, kept

22 crying and screaming saying we don't have anything here, we

23 don't have anything here.

24        The 103 North Union house is a very small home.  When

25 you walk in the living room you walk just two feet you're into

                    Mary P.

1    a very small kitchen and the bathroom door is right there.

2    When you come through the front door, like I said, the living

3    room, the one bedroom is right there on the left-hand side.  He

4    kept staying inside the living room between that bedroom.  He

5    kept opening up the hutch which we had the drugs in, but we had

6    nothing in there because I took everything and I was flushing

7    it.  He got away with a couple of 50 pieces.  He did tear the

8    house apart.  He left.  He ran out of the house and left, but

9    he had a gun pointed at us.

10   Q.     All right.

11   A.     The gun went to the back of my head and the side of my

12   head.

13   Q.     Okay.  After he left -- was he wearing anything unusual?

14   A.     He -- everything was black.  He was a black man.

15   Everything was black.  He had a black bandanna across his face

16   like this.  His arms and everything were completely covered.

17   So after everything was done we called Mr. Folks.  Told him

18   everything.  Brian got over to the house.  We told him

19   everything that happened.  He hugged us both and he said that

20   everything is going to be fine and we're going --

21   Q.     When he came over did he have anyone with him?

22   A.     Yes and I don't -- I think it was either G -- if it

23   wasn't G it was Marty.

24   Q.     Okay.  Did the man you refer to as G -- did he have any

25   other names that you knew of?

                          Mary P.

1    A.      Ghost.

2    Q.      Excuse me, Your Honor.  We want you to take a look at --

3    A.      That is G.

4    Q.      Okay.  You're looking at --

5    A.      That's G.

6    Q.      I apologize.  You're looking at a photograph which is

7    exhibit 64.  Do you recognize that man?

8    A.      That is G.

9    Q.      Okay.  What role did G have in this business?

10   A.      I personally don't know that.  I know that he lived --

11            MR. KAPLAN:  Objection, Your Honor.  I think she

12   answered the question.

13            THE COURT:  Well you want to clarify to see if

14   there's a foundation for anything that she intends to say other

15   than what she said initially.

16            MR. DARROW:  Yes.

17   BY MR. DARROW:

18   Q.      Mary, you said you personally don't know and we want to

19   know if you actually have personal knowledge of any involvement

20   G had in this business?

21   A.      I just know that those two were really good friends and

22   he -- that they both help each other.  G came down with a whole

23   bunch of drugs and me and Mandy were in the room.  G was acting

24   very snarky towards me and Mandy, and I got rude back with G

25   and I said I don't work for you I work for Brian.

Mary P.

1    Q.    Okay.  You said something like he came in with some
2    drugs.  Who is that?  G?
3    A.    G.
4    Q.    All right.  Do you know how the drugs that you were
5    selling with Mandy for the defendant got to Vermont?
6    A.    They came from New York.
7    Q.    Do you know who was bringing them up from New York?
8    A.    Two black guys with a white Benz or something like -- it
9    was a really nice big car.
10   Q.    Okay.  Do you know if Mandy ever went on trips to New
11   York?
12   A.    Yes she did.
13   Q.    How do you know that?
14   A.    Because once I have done it with her and I didn't know
15   that we were doing that.  That was the beginning of everything
16   and I wasn't really like pulled into the loop to know what was
17   really going on at first.
18   Q.    Okay.  Do you remember a time when you were in a car
19   that was stopped by the police and Mandy and Folks and another
20   woman were in the car?
21   A.    Yes.
22   Q.    All right.  Where were you coming from that night?
23   A.    We were coming from Marty's.
24   Q.    And what had you been doing at Marty's?
25   A.    Cutting up heroin.

Mary P.

1   Q.      Where were you going?

2   A.      We were -- we -- the other woman's name was Mary.  We

3   went to Marty's.  We did everything.  We brought back a small

4   bag with us, and something about her not doing a turn signal

5   and the police officer pulled us over.

6   Q.      Okay.  Let's pause there for a moment.

7   A.      Okay.

8   Q.      You had been bagging at Mandy -- Marty's?

9   A.      No.  Marty.

10  Q.      And who is in the car?

11  A.      Me, Brian, and Mandy, and the other woman named Mary.

12  Q.      Who is driving?

13  A.      The woman Mary is.

14  Q.      And where are the three of you sitting?

15  A.      Mandy was upfront with the woman -- with the woman Mary,

16  and me and Brian were in the back seat of the car.

17  Q.      And tell us again what you had in the car?

18  A.      We had a bag filled with heroin and crack that we just

19  got done bagging.

20  Q.      Police officer pulls you over?

21  A.      Yes.

22  Q.      At some point do you recall a canine showing up and

23  going around the car?

24  A.      Yes.

25  Q.      Did that concern you?

Mary P.

1    A.    Yes.

2    Q.    Have you seen the video of this?

3    A.    Yes.

4    Q.    At one point you said -- did you say we're all going to

5    jail?

6    A.    I said I'm going to go to jail and I'm never going to

7    see my kids again.  That's great.

8    Q.    Why did you say that?

9    A.    Because we had drugs in the car.  There was cops there

10   and the dog came out circling the car.

11   Q.    You were afraid the drugs were going to get seized?

12   A.    Yes.

13   Q.    Can we pull up exhibit 30 please?

14   A.    That was the bag.

15   Q.    What bag?

16   A.    That's the bag that we had the heroin and crack in.

17   Q.    That night you were pulled over?

18   A.    Yes.

19   Q.    Can we look at page 2 please?

20   A.    Yes.  That is the heroin and crack.

21   Q.    That was inside the bag?

22   A.    That was inside the bag.

23   Q.    And can we go to the next page?

24   A.    And that's what was in the bag, yes.

25   Q.    And can you -- just because some of us aren't that

Mary P.

1    familiar with what that shows, can you tell us -- can we zoom

2    in a little bit and can you tell us what's in the picture

3    there?

4    A.      Can we have the pictures -- so this right here --

5    Q.      I apologize, Mary.  Remember the microphone if you can.

6    A.      Can you hear me?  Okay.  So all of this right here it is

7    all heroin.  That right there.  This right here in that small

8    bag was crack so we didn't get enough crack to bring back.  The

9    stuff that's right in here, if my memory is right, that is

10   heroin as well.

11   Q.      All right.

12   A.      Most of this is heroin with a little bit of crack.

13   Q.      Okay, and you testified earlier that when you bagged

14   heroin it would be in little tickets and 10 tickets would make

15   a bundle with a band around them?

16   A.      Right, and I also stated that if we couldn't get the

17   tickets, the baggies that are right here where I circled with

18   like a square we would put heroin in those packages as well.

19   Q.      Okay, and the white bags here are those individual buns

20   or bundles of heroin?

21   A.      These are bundles; that have the rubberbands on them,

22   these are all single bundles.

23   Q.      You testified earlier, Mary, that when Folks hired you

24   for running for the job at 103 North Union he paid you $500 a

25   week?

Mary P.

1    A.     Every Sunday.

2    Q.     Okay.  Were you paid every week?

3    A.     Yes.

4          MR. DARROW:  I apologize, Your Honor.  Just almost

5    done.

6          THE COURT:  Yes.

7    BY MR. DARROW:

8    Q.     Mary, I got a couple more tough questions for you then

9    we're done, all right.  Did you ever ask Moe for cigarettes?

10   A.     Every time we had -- every time we asked him for a

11   cigarette, we would have to pull down our pants for him to take

12   a photo of our butt.

13   Q.     Mary, can you take a quick look at this?  I'm showing

14   you Government 49B and tell us if you know what those pictures

15   are?

16   A.     Those pictures are --

17   Q.     Excuse me.

18   A.     Those are the pictures of me.

19   Q.     That he asked for in exchange for a cigarette?

20   A.     Yes.

21   Q.     Can you go to the next page please?

22   A.     Yes.

23   Q.     And the next page?

24   A.     Yes.

25   Q.     Okay.  Are those the pictures that were taken because

Mary P.

1   you wanted a cigarette?

2   A.      Yes.

3           MR. DARROW:  Okay.  Your Honor, we move 49B.

4           THE COURT:  Any objection?

5           MR. KAPLAN:  Can I question, Judge?

6           THE COURT:  Yes.

7                         VOIR DIRE

8   BY MR. KAPLAN:

9   Q.      So is it your testimony that these pictures were done

10  but were not voluntary?

11  A.      They were voluntary.

12  Q.      You could have gone out and bought cigarettes, right?

13  A.      I had no money.  I had none.

14  Q.      Okay, and I'm just curious about this one.  It says date

15  acquired February 23rd, 2016.  Is that when that was taken?

16  A.      That part I wouldn't know.

17  Q.      Can you look at it please?  Right there does it say

18  that's the date it was acquired?

19  A.      I'm assuming so, sir.  I truthfully don't know.

20  Q.      And that's after the date you said you were sexually

21  assaulted?

22  A.      Yes.

23  Q.      So you were still doing that?

24          MR. DARROW:  Well objection, Your Honor.  She says

25  she didn't know when this happened and I didn't ask her about

Mary P.

1    the various dates printed out on these.  I just asked her about

2    the photographs.

3                THE COURT:  Well she responded she didn't know about

4    these -- about the dates.  So go ahead.

5                MR. KAPLAN:  I think she did say that that date was

6    after the date she was sexually --

7                THE COURT:  No.  You asked the question, but she

8    didn't know the actual date of that February demarcation.  Well

9    she didn't know what that means basically.

10               MR. KAPLAN:  No objection, Your Honor.

11               MR. DARROW:  Thank you.  May we have the Elmo for a

12   second?

13               THE COURT:  So admitted.

14   [Government exhibit 49B admitted]

15   BY MR. DARROW:

16   Q.    Mary, lower left-hand picture there, whose hand is that?

17   A.    That's Brian's.

18   Q.    Thank you.  Mary, did he ever urinate on you -- let me

19   ask you a question.  All these terrible things are happening.

20   At some point you left, right?  Why didn't you leave sooner?

21   A.    I had nothing.

22   Q.    Okay.

23   A.    I'm --

24   Q.    I'm sorry.

25   A.    I was living outside in the snow.  I was cold because I

Mary P.

1  didn't have anything.

2  Q.     All right.

3         THE COURT:  Can you just say that again?  I'm sorry,

4  but I can't --

5  A.     I was living outside in the snow.  I was homeless.  I

6  didn't have anything and I wanted to sleep in a warm house.

7  Q.     Mary, after the episode you told us about where you were

8  beaten and raped did you go to the police?

9  A.     No.

10        MR. KAPLAN:  I'm sorry, Judge, I can't hear.

11 A.     I was with my mother and my uncle because then the night

12 he did keep me in the house for several hours after the rape

13 and everything like that, that's when I met Officer Adam.  They

14 had me go there, but I had never told them about the rape.  I

15 just told them about the gun thing.

16 Q.     Okay.  So at some point after that episode with the gun,

17 the rape, you went -- did you go to law enforcement or did they

18 come to you?

19 A.     They had -- I was pretty much by my mom and my uncle.

20 Q.     You went to your family?

21 A.     So what happened was after everything that happened

22 Brian -- I fell asleep in the room after everything happened

23 with the gun and the rape thing.  Brian kicked me in the face,

24 woke me up, told me to go out to the living room because they

25 kept me in the room.

Mary P.

1   Q.      Did he give you some money?

2   A.      He sat down, he talked to me and he threw me $2, and he

3   looked at me and he's like I don't care whether you think you

4   can hide or anything like that.  I will find you and I will

5   kill you if I find out you have anything to do with that car

6   break-in, and then after that he gave me the $2.  I ran out of

7   there.  I got on the bus, went back to Selena's house, I packed

8   up my things, I told my mom everything that had happened, not

9   the rape part, just I didn't want to hurt my mom or make her

10  upset, and they came and got me later on that night and I

11  stayed away for months.

12  Q.      Who came and got you?

13  A.      My mother and my uncle.

14  Q.      Okay.  Did they take you to the police?

15  A.      The next day they did.

16  Q.      All right.  Did you talk to the police?

17  A.      I talked to Adam.

18  Q.      To Agent Chetwynd?

19  A.      Adam.

20  Q.      The man who just raised his hand?

21  A.      Yes.

22  Q.      When you talked with him did you have family members

23  with you?

24  A.      I had my mother and my uncle with me.

25  Q.      Okay.  Did you mention the rape part of the assault?

Mary P.

1  Why?

2  A.     I was embarrassed.

3  Q.     Okay.

4  A.     I felt disgusted and belittled.

5  Q.     Mary, are you clean today?

6  A.     I am.  I'm three years sober.

7  Q.     How long?

8  A.     Three years.

9  Q.     Sorry.

10  A.     Three years.

11  Q.     How did you get off?

12  A.     After talking with Adam he introduced me to Amy Sterns

13  and pretty much I needed to get clean.  I didn't want to live

14  that lifestyle any more and they helped me get into the program

15  and I've been clean ever since.

16  Q.     What program?

17  A.     The pain clinic program.  I'm on Subutex.

18  Buprenorphine.  It's an opiate blocker.

19  Q.     Okay, and what's your -- what are your present

20  circumstances?  You're in the program?

21  A.     Yeah.

22  Q.     Not using drugs?

23  A.     No.

24  Q.     Do you have a job?

25  A.     No I do not.

                        Mary P.

1  Q.     Are you taking care of your kids?

2  A.     Yes I am.

3  Q.     Okay, and have you received some assistance from my

4  office to try to get you on your feet?

5  A.     Yes I have.

6          MR. DARROW:  All right.  May I have a moment, Your

7  Honor?

8          THE COURT:  Yes.

9          MR. DARROW:  Thank you.

10          THE COURT:  All right.  Mr. Kaplan, do you wish to

11  speak with your client before you begin cross examination?

12          MR. KAPLAN:  I do, Judge.  Thank you.

13          THE COURT:  Okay.  Let's -- we're fairly close to the

14  time that we would take a break.  Let's take our break at this

15  point, 15-minute break, and I would ask you to come back oh

16  somewhere in the vicinity of 10 of.

17  [Recess 2:35 - 2:50 p.m.]

18          THE COURT:  Okay.  Mr. Kaplan.

19          MR. KAPLAN:  Thank you, Judge.

20                    CROSS EXAMINATION

21  BY MR. KAPLAN:

22  Q.     So I wanted to ask you -- the prosecutor in this case

23  touched briefly on what you have been paid by the prosecution.

24  Do you know what the exact figure is?  You have to answer yes

25  or no.

Mary P.

1   A.      No.

2   Q.      Okay.  If I were to tell you that between April of last

3   year and April of this year you were paid $6,856.23, would that

4   sound right to you?

5   A.      I wouldn't know.  I'm sorry.

6   Q.      So has the prosecution been paying your living expenses?

7   A.      They have helped me with certain things, yes.

8   Q.      And what is it that they pay for?

9   A.      Like if I needed help with diapers or anything like that

10  and food money to get food in my house, yes, they have done

11  that.

12  Q.      So they are giving you cash on a regular basis?

13  A.      Not on a regular basis, no.

14  Q.      But when you wanted money was it cash that they gave

15  you?

16  A.      No.  They are on cards.

17  Q.      They are on cards?

18  A.      Yes.

19  Q.      And who was it that would give you those cards?

20  A.      I would ask Amy Sterns.

21  Q.      Pardon me.

22  A.      I would ask Amy Sterns.

23  Q.      Okay, and so whenever you needed something you would

24  just call them?

25  A.      No.  I would try my hardest to find it first, and if it

Mary P.

1   was to the point where I couldn't do it, then yes I would ask

2   her.

3   Q.     And do you know what that $6,800 was spent on?  Was that

4   money that you spent from the cards they gave you?

5   A.     It was on cards, yes.  I don't really understand what

6   you're asking me.  I'm sorry.

7   Q.     And is it fair to say that the year before that they

8   also provided benefits to you?  For example, they provided

9   transportation, taxis to doctors' appointments, toiletries,

10  Subway gift cards, McDonald's gift carts, cell phone, program

11  referrals.  Did they do all that for you?  Pardon me.

12  A.     Yes.  I didn't have a vehicle at the time.  I didn't

13  have anything at the time.

14  Q.     You mentioned that Katelynn C. was one of the people

15  working with Brian Folks; is that right?

16  A.     Yes.

17  Q.     But that wasn't while you were there?

18  A.     No.

19  Q.     In other words, you never saw Katelynn C. and Brian

20  Folks together?

21  A.     No, but Brian told me --

22         MR. DARROW:  Your Honor, could you please direct Mr.

23  Kaplan to stop mentioning the last names.

24         THE COURT:  Yes.  Okay.  It's important not to

25  mention the last name.  Okay.  So there's a pending question.

                        Mary P.

 1   You were saying that the defendant said to you something.

 2   BY MR. KAPLAN:

 3   Q.     You never saw Katelynn --

 4          THE COURT:  I think she was responding to your

 5   question.  What was your response?

 6   A.     Brian Folks did tell me that he -- he used to call her

 7   Pinkie, that -- she is my cousin and yes that he -- that she

 8   worked for him, that she was a prostitute, and she told Moe the

 9   same exact thing that Brian Folks told me.

10   Q.     But when you testified about that, that wasn't something

11   that you saw yourself?

12   A.     No, but I don't think he has a reason to lie nor my

13   cousin does.

14   Q.     You said that Brian Folks hit Ayla?

15   A.     Yes.

16   Q.     Who else was there?

17   A.     It was me, Mandy, Ayla, and Brian.

18   Q.     So that's something that Mandy would have seen?

19   A.     Yes.  She was right there.

20   Q.     And was that the same day that Mandy and you cut her

21   hair?

22   A.     Yes.

23   Q.     And was it the same day that you gave her a shower

24   because she hadn't done that for a while?

25   A.     Yes.

Mary P.

1    Q.      And did you cut her hair at Brian's request?

2    A.      Yes.

3    Q.      Did Brian go out and buy the things that you needed to

4    do that?

5    A.      He handed me money and she went out to Rite Aid right

6    over there by the house and she bought everything that needed

7    to be bought.

8    Q.      And at the time she had these big cornrows and

9    everything?

10   A.      It was literally a rat's nest.  It had like bugs in it.

11   Q.      And you were in agreement that that was something that

12   should be done?

13   A.      Yeah she needed help.  She stunk.  She was -- she was a

14   really bad heroin addict.

15   Q.      And Brian was the one that arranged for all that to

16   happen?

17   A.      Yes.

18   Q.      And you're saying if Brian actually had assaulted Ayla

19   that Mandy would have seen it?

20   A.      We were all there.  He hit her.

21   Q.      All right.  You said that Brian hit you because you were

22   snorting heroin while you were --

23   A.      He would not let me -- I was really sick and I asked him

24   for just a small line so I can get the stuff done.

25   Q.      But weren't you using a needle at the time?

Mary P.

1    A.      I have never used needles.

2    Q.      Okay.

3    A.      I snort my heroin.

4    Q.      So you also indicated -- I remember you talked about the

5    robbery when Mandy and you -- excuse me -- when Mandy and you

6    were there?

7    A.      With the guy breaking into the home.

8    Q.      When he broke into the home.

9    A.      Can you say that again please?

10   Q.      One second.  You testified earlier that when -- one time

11   when Mandy and you were home some person broke in and robbed

12   you?

13   A.      Yes.

14   Q.      And did I hear you correctly you testified today that

15   when that happened you were the one that gathered up all the

16   drugs and flushed them down the toilet?

17   A.      Yes.  I grabbed everything and I flushed it down the

18   toilet.

19   Q.      But do you recall when you were interviewed on February

20   11th of 2017 -- 2016 you actually said it was Mandy that did

21   that?

22   A.      No.  Me and Mandy both grabbed the drugs.  She --

23   whatever she was doing with them I don't know, but I grabbed

24   what I grabbed and I was flushing them down the toilet.

25   Q.      So I'm going to read to you what you said -- well let me

Mary P.

1    show you what's been marked as defendant's exhibit K281 on page

2    17.  Just have you please --

3            MR. DARROW:  Your Honor, we've been over this

4    procedure several times.  Defendant should ask if she remembers

5    something.  If she doesn't, then show it to her.  I didn't hear

6    the question.

7            THE COURT:  She's already testified on this issue.

8    You can now show her the document.  She should read the

9    document herself.  Does that refresh her recollection.  Okay.

10   A.     The whole thing down?

11   Q.     Just the bottom part that I have highlighted from right

12   there.

13   A.     Okay.  So that right there.

14   Q.     Speak up a little bit please.

15   A.     She was grabbing stuff.  If I remember correctly, she

16   was grabbing stuff where the curtain rod things were and you

17   can shove stuff in there.  I never knew there was drugs there.

18   She was grabbing that.  The stuff that I grabbed out of the

19   bedroom were crack pieces.  So 50 pieces, 100 pieces, 25

20   pieces.  I had bundles with me too.  I was flushing everything

21   down the toilet.  Like I said she was out in the living room.

22   I told her not to open up that door.  I said look out the

23   window.  She said she wouldn't even look out the window.  I

24   don't know what she was doing.  I was too busy flushing stuff.

25   The guy got in the house.  She got out.  He made her get down

Mary P.

1  with her hands like this crouched down.  He grabbed me, pulled

2  me out of the bathroom, pulled down my pants and everything,

3  patted me down looking for the drugs.  I told him that we

4  didn't have anything.  He put the gun to the back of my head.

5  Like I said he was right there.  After that he went between the

6  living room and the bedroom.  He tore the whole living room

7  apart and then he went into the -- he went to the bedroom, went

8  in the hutch, tore that whole room apart.  He got away with a

9  couple pieces -- I don't know if he got away with bundles, but

10 I know he got away with a couple 50 pieces of crack and then he

11 left.

12 Q.     You would agree when you explained to the police

13 officers on February 11, of 2016 what happened you indicated

14 this was Mandy that was flushing everything down the toilet and

15 you put drugs in your shirt and your pants?

16 A.     That was the cop thing.

17 Q.     Isn't that what you said, though?

18 A.     From us being pulled over.  You have me so confused

19 right now like please repeat that and please do it slow.

20 Q.     You were talking about the robbery that took place when

21 someone broke into the apartment?

22 A.     Yes.

23 Q.     And when I look at what you said back in February 11,

24 2016, and I think you testified about this briefly, that it was

25 Mandy who was flushing everything down the toilet?

Mary P.

1    A.     No.  I was flushing stuff down the toilet.  It was me.

2    Q.     But you didn't tell the police officer that at the time?

3    A.     I don't remember even telling the police officer that.

4    I'm sorry.  I'm not sure.

5    Q.     So let me just show this to you again.  Maybe we can get

6    through this.  What I want you to look for is who did you say

7    was flushing drugs down the toilet?

8    A.     I was flushing.

9    Q.     I want you to please look at the transcript and see if

10   it refreshes your memory as to what you told the police

11   officer.  Go to the next page also.

12   A.     This right here that you are talking about is when he

13   put the gun to my head about the car being broken into.  That's

14   what that is about because after everything when he put the gun

15   to me and after being beaten with all that, I came out of the

16   room.  Like I got out of the room.  He slammed me, he grabbed

17   me by my throat, and he slammed me down.  Ayla was there for

18   that, Mandy was there for that, and he's like you better start

19   talking like you have some fucking sense.

20   Q.     That was after the drugs were flushed down the toilet?

21   A.     The drugs were flushed down the toilet when the house

22   got broken into.  What you're having me read has nothing to do

23   with that break-in.

24          THE COURT:  She's actually indicating that what you

25   have shown her must relate to the assault that she describes

                     Mary P.

 1   that the defendant committed.

 2          MR. KAPLAN:  No that's not what this refers to,

 3   Judge.

 4          THE WITNESS:  That is what it refers to.

 5          THE COURT:  That's what you're saying.  So you're

 6   obviously both on different pages here, is that correct?  What

 7   you're saying is that particular part of your transcript

 8   relates to the assault?

 9          THE WITNESS:  With the gun.

10          THE COURT:  Pardon me.

11          THE WITNESS:  Yes.  It relates to when the car got

12   broken into when I got the beating and the rape by his friend

13   and everything like that me and him were still yelling and

14   fighting with each other.  He grabbed me by my throat.  He

15   slammed me down right in front of the television.

16          THE COURT:  All right.  Without going into that all

17   again, so you want to clarify what question you're asking.  All

18   right, Mr. Darrow.

19          MR. DARROW:  I was just going to object to the extent

20   -- may I finish what I'm saying?

21          THE COURT:  Okay.

22          MR. DARROW:  Mr. Kaplan is trying to refresh the

23   witness's memory.  He showed her the document twice and it

24   appears that it's not helping her.  I'm concerned at some point

25   this becomes argumentative.

           **Capitol Court Reporters, Inc. (800/802) 863-6067**

Mary P.

1           THE COURT:  Yeah I appreciate that.

2           MR. KAPLAN:  Mistakenly I had shown her the wrong

3    page.  I'm going to try it one more time.

4           THE COURT:  Oh you actually showed her the wrong

5    page.

6    BY MR. KAPLAN:

7    Q.    Would you please read page 17 from here down?

8    A.    Okay.  This is all backwards.  I'm telling Mandy -- I'm

9    the one that's flushing stuff down the toilet.  I'm telling

10   Mandy not to open up the door.  Anything like that.  Stupid

11   enough Mandy opens the door.  The guy got in.  I'm the one he

12   ripped me out of the bathroom and like I said --

13   Q.    And you're saying --

14          THE COURT:  All right.  So can we just clear --

15   there's not a question pending so you want to ask your

16   question.

17   BY MR. KAPLAN:

18   Q.    So you're saying this transcript is incorrect?

19   A.    That is incorrect.  She was not flushing nothing.  I was

20   flushing.

21   Q.    So if the transcript of your conversation with the

22   police on February 11, 2016 says --

23          MR. DARROW:  Objection, Your Honor.

24          THE COURT:  The best procedure is to then call the

25   agent who took the statement.  So objection sustained.

Mary P.

1    BY MR. KAPLAN:

2    Q.    From what you said you're saying that's incorrect?

3    A.    Yes.  I'm the one -- I told her not to answer the door,

4    don't do anything.  I grabbed the drugs and I was the one that

5    was throwing them down the toilet flushing everything.  They

6    wouldn't all flush.  Like I said he got away with a couple 50

7    pieces or however many pieces he got of crack and he left, but

8    he still destroyed the house because he was looking for the

9    money.  He was looking for the drugs.

10   Q.    At least that's your memory today as you testify in

11   court?

12   A.    That's what it is.

13   Q.    So as I understand it you met Brian Folks on November

14   2017 -- November of 2015?

15   A.    I just know it was snowing outside.  I thought it was

16   December, sir.

17   Q.    So you were with him for a couple of months?

18   A.    Yes.  Only a couple months, yes.

19   Q.    And it was your cousin Selena that introduced you to

20   him?

21   A.    Yes.

22   Q.    And at the time that you met Brian Folks you were a

23   heroin addict?

24   A.    Yes.

25   Q.    Apparently your former boyfriend Hendy had introduced

Mary P.

1  you to heroin?

2  A.     Yes.

3  Q.     And was he still your boyfriend at the time?

4  A.     No.  When I first did -- when I first started heroin my

5  boyfriend at the time was Dustin's best friend and that was

6  Jeremy which is Britt Barber's ex-boyfriend Jeremy.  Dustin had

7  it on him.  He gave me a small little piece of it and then

8  after I just got hooked to it, and then when I was with Brian

9  Folks working with him that's when me and Dustin Hendy started

10 dating.

11 Q.     And Brian Folks paid you so much every week?

12 A.     Yes.

13 Q.     And your job was to help with the drugs?

14 A.     Yes.  Bagging, selling.

15 Q.     And as it turns out you were involved in the robbery

16 that he accused you of?

17 A.     Me and Hannah were.

18 Q.     You and Hannah and Hendy stole the drugs?

19 A.     Me and Hannah.

20 Q.     Okay, and did it occur to you that it might not be a

21 good idea to do that?

22 A.     I was in a bad place in my life, sir.

23 Q.     I mean Brian Folks is giving you a place to live.  He's

24 paying you.

25 A.     While he's also beating me and raping me.

Mary P.

1   Q.      Okay.  So at that time -- because you never said that

2   before.

3              MR. DARROW:  I'm sorry.  Never said what?

4              THE COURT:  Well that he was beating and raping her

5   at the time that you're talking about.  So you want to ask

6   another question because that was not really --

7              THE WITNESS:  Can I please say something?

8              THE COURT:  Well no.  You have to respond to the

9   questions that are asked.  Okay.  All right.  Go ahead.

10  BY MR. KAPLAN:

11  Q.      Were you concerned when you stole the drugs from Brian

12  Folks that if he found out there might be repercussions?

13  A.      Yes.

14  Q.      And at the time that you stole the drugs Brian wasn't

15  withholding drugs from you.  You were making money and you were

16  buying your own drugs?

17  A.      No.  As I said in the beginning when I came and

18  testified earlier everything was going great.  A man named

19  Hightower became involved, came from New York, and then that's

20  when everything went south for me and Moe.

21  Q.      Everything went south for Brian and you?

22  A.      Yes.

23  Q.      And that was because?

24  A.      Of Hightower.

25  Q.      McFarlan, G, brought Hightower to Vermont?

Mary P.

1    A.    Yes.  I don't know if G brought Hightower into Vermont.
2    I don't know that.  I just know that Hightower was there.
3    Q.    And Hightower was really -- mistreated the women?
4    A.    Hightower was just -- I don't have words for that man.
5    I don't.  Like --
6    Q.    And so because of Hightower that's why you stole the
7    drugs?
8    A.    Like he -- he wouldn't help me.  He started making me go
9    sick and he wanted me to work sick.
10   Q.    Hightower?
11   A.    No.  Hightower -- Hightower made it worse.  I don't
12   know.  Him and Brian always had their talks and then Brian just
13   stopped helping me and just started treating me like some type
14   of way, and that's when the gun thing happened and that's when
15   just all this horrible and just nasty shit just started going
16   wrong.
17   Q.    And this was in December of 2015?
18   A.    I don't remember the days or the months.  I just --
19   Q.    Didn't you say at one point that you never saw Brian
20   force anyone to advertise on Backpage?
21   A.    I'm -- I don't remember that.
22   Q.    You said they were doing it willingly because they
23   wanted the drugs?
24   A.    A lot of girls did it willingly, yes.
25   Q.    Okay, and you told him that you were not interested in

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Mary P.

1  being on Backpage?

2  A.     No.

3  Q.     And you earlier -- at least some of your statements

4  before today said that that was fine with him.  He just said to

5  you you're no fun?

6  A.     No.  We got into fights about it and then he's like

7  you're absolutely no fun and that he wanted Hannah back.

8  Q.     So let me show you what's been marked as defendant's

9  exhibit ZZ5 and showing you page 4 and just have you read this

10  paragraph to yourself please.

11  A.     Yes.  I always stayed in the room when his friends came

12  over.

13  Q.     Pardon me.

14  A.     I always stayed in the room when his friends came over.

15  Q.     When you told Brian you weren't interested he said

16  you're no fun?

17  A.     Yes, but we always had arguments because I would not do

18  it.

19  Q.     But at least as far as these reports go you never told

20  them that you had arguments with Brian about it?

21  A.     Yes I have.  Me and Brian have got in plenty of

22  arguments, plenty of blowouts with each other and everything.

23  Q.     And everything.  Well I think what you told Brian was

24  that that's not something you were interested in.  You just

25  wanted to make money and buy drugs?

Mary P.

1   A.      I'm here to -- to help him make money, get my own money,

2   and get high.  That's the exact words I said.

3   Q.      So you were interviewed on February 11, 2016.  We've

4   spoken about that by the Essex Police Department.

5   A.      Are you talking about the time with Adam?

6   Q.      The time you went to the police department in Essex.  Do

7   you recall that discussion?

8   A.      If you're referring to me going to talk to Adam that

9   time, yes.

10  Q.      Yes.  Do you recall that?

11  A.      Yes.

12  Q.      Okay, and then you came to this building on March 27th

13  of 2018.  You may not remember the exact -- you came here in

14  March of 2019 and sat down and spoke to the prosecutors and the

15  agents again.  Do you recall that?

16  A.      Uh-huh.

17  Q.      You have to answer yes.

18  A.      Yes.

19  Q.      And you had an opportunity during both those occasions

20  to tell them anything that you knew about what Brian did or

21  what he had done to you.  You understood that?

22  A.      Yes and I have.

23  Q.      Pardon me?

24  A.      Yes and I have.

25  Q.      Okay, but you never told anyone before today in court

Mary P.

1  that when you were helping to bag that Brian hit you, isn't
2  that true?
3  A.    When I was helping him bagging when he hit me?
4  Q.    Yes.
5  A.    Because he wouldn't help me out with heroin and I was
6  sick.
7  Q.    Who did you tell that to before today?
8  A.    I have told Ayla.  I told -- I -- literally everything I
9  am saying is the truth.
10  Q.    But you didn't tell anyone?
11  A.    And I told them.
12  Q.    You didn't tell anyone that on February 11th of 2016
13  which was right after the event --
14  A.    Do you know how belittling this is?
15  Q.    Pardon me.
16  A.    Do you understand how like disgusting and scary and
17  belittling this stuff is?  It's not something that people want
18  to talk about, sir.
19  Q.    You talked about quite a bit on direct when the
20  prosecutor was asking you questions.  You spoke about all this,
21  didn't you?  Would you like to take a break?
22  A.    You're getting me confused, sir.
23  Q.    Well let me ask you if you understand my question.
24        THE COURT:  So would you like to take a break at this
25  point or are you able to respond to the questions?

Mary P.

1          THE WITNESS:  I'm not understanding his questions.
2          THE COURT:  Okay.  Then just explain I don't
3     understand your question.  So you want to rephrase the
4     question.
5     BY MR. KAPLAN:
6     Q.     You testified earlier today that while you were helping
7     to bag drugs Brian hit you?
8     A.     Yes.
9     Q.     Okay.  I'm not saying to you that's true or not.  I'm
10    not passing judgment.  I'm just wondering why you didn't say
11    that to the police on February 11, of 2016?
12    A.     Like I said I was scared.  My mother was there.  I
13    didn't want my mother to know certain things.
14    Q.     Okay.  So on March 28th of 2018 you were there without
15    your mother, right?
16    A.     Speaking with --
17    Q.     In this building?
18    A.     Speaking with them?
19    Q.     Yes.
20    A.     Yes.  I told them this stuff.  My mother's not here.
21    Q.     Why didn't you tell them at that time that Brian had hit
22    you when you were bagging?
23    A.     Sir, I just told you that five times already.  More than
24    five times.
25    Q.     You told me why you didn't tell the prosecutor that.

Mary P.

1   A.     No.  I told them everything.  When I came here I told
2   them everything.  You're asking -- are you saying when I went
3   for the first time to the police with talking to Adam the
4   reason why I didn't say that.
5   Q.     I'm talking about when you came here for the first time
6   and met with them and did a proffer session I'm wondering why
7   you didn't mention that Brian hit you?
8   A.     Because I didn't know I needed to say every little
9   detail.  I thought it was just mainly about --
10  Q.     And you considered that a small detail?
11  A.     Yes.  I don't like talking about stuff like that.
12  That's belittling.  It's disgusting.
13  Q.     You didn't have a problem talking about telling them
14  that Brian held a gun on you?
15  A.     That's a gun.  That's not being held down and brutally
16  raped either.  Can I please take a break?
17         THE COURT:  Okay.  All right.  Let's take -- let's
18  take a five-minute break and we'll come -- you'll go back in
19  the jury room and I'm going to return in about five minutes.
20  [Recess 3:25 - 3:30 p.m.  The following was held in open court
21  with the jury present]
22         THE COURT:  Okay.  Ready to proceed?  Okay.  All
23  right.  Mr. Kaplan.
24  BY MR. KAPLAN:
25  Q.     So I think before the break you indicated that you

Mary P.

1  didn't tell the prosecutors on March 28th of 2018 about the

2  fact that Brian hit you when you were bagging and you said it

3  was because you didn't think it was important?

4  A.    It wasn't important.  We weren't -- it wasn't stuff

5  being talked about. I didn't think I had to go into so much

6  detail of every little thing that happened to me, and I was --

7  just the main stuff of the prostitutes, the drugs, the

8  trafficking.  I just thought it was the main thing that you

9  guys were looking at.  I didn't know I had to go through --

10  Q.    You also said today for the first time that Brian hit

11  you because you wouldn't wear certain clothes or something?

12  A.    No.  That was already said.

13  Q.    When did you say it?

14  A.    When I was talking to them up in the room before we had

15  court and everything like that.  I did state that Brian got

16  upset because I wouldn't wear a t-shirt with no underwears, no

17  bra to walk around to impress his friends, to sleep with his

18  friends, and do stuff like that.

19  Q.    Didn't you say something about that in court today?

20  A.    Yes.

21  Q.    And did you say he hit you because of that?

22  A.    Yes.

23  Q.    But you didn't tell anybody that before today, did you?

24  A.    Like I just said I didn't think everything was going to

25  be so much details about what was going on with me.

Mary P.

1  Q.    So you think it's important to say it today in front of
2  the jury but not when you're being asked by the police what
3  happened?
4  A.    It's not that I didn't think it was important.
5  Q.    Let me show you what's been marked as defendant's
6  exhibit H.  See if you can tell me what that is?
7  A.    That is me and Mandy.  I was extremely high.  We were
8  just taking photos after --
9            THE COURT:  Okay.  I think that he's actually asking
10  you to read it to yourself.
11           MR. KAPLAN:  No.  It's just a picture, Judge.
12           THE COURT:  Pardon me.
13           MR. KAPLAN:  It's just a picture.
14           THE COURT:  Oh it's a picture.  Oh okay.
15           MR. KAPLAN:  I would move to admit defendant's
16  exhibit H.
17           THE COURT:  So I'm sorry.  Then I didn't understand.
18           MR. KAPLAN:  It's a picture of her and Mandy.
19           THE COURT:  Oh okay.  Any objection?
20           MR. DARROW:  Could counsel show it to us please, Your
21  Honor?
22           THE COURT:  Yes.
23           MR. DARROW:  We have no objection.
24           THE COURT:  So admitted and what is that exhibit?
25           MR. KAPLAN:  It's defendant's exhibit H.

Mary P.

1          THE COURT:  Okay.

2    [Defendant exhibit H admitted]

3    BY MR. KAPLAN:

4    Q.     You said you were extremely high in that picture?

5    A.     Yes.

6    Q.     Were you high most of the time for those two months?

7    A.     The first two months, yes, I was high every day, every

8    night, everything.

9    Q.     Do you recall telling the police on January -- February

10   11th of 2016 that you have never seen Brian hit any of the

11   girls or hit Mandy?

12   A.     I've never seen him hit Mandy, but yes he has hit the

13   girls -- other girls, yes.

14   Q.     Do you recall telling the police on February 11th that

15   you have never seen him hit any of the girls?

16   A.     No.  I don't recall saying that.

17   Q.     Let me show you what's been marked as defendant's

18   exhibit K281 page 28, which is the transcript of when you met

19   with the police, and ask you just to read the highlighted

20   portion to yourself please.

21   A.     So the thing is about this --

22   Q.     Let me just ask you first before I get in trouble does

23   that refresh your memory?  Do you recall saying that?

24   A.     Like I said him and Mandy had this thing going on, but

25   like I said I didn't think it was a big thing at first.  I

Mary P.

1   didn't really know what was going on, and then when I started

2   doing this, when I started having to come here and be a witness

3   and, you know, I was like well I'm going to start telling what

4   really happened to those girls and everything like that.  So --

5   Q.     So let me see if I understand what you're saying.

6   You're sitting in a room with several police officers.  They

7   ask you if you ever saw Brian hit any of the girls and you say

8   no, right?

9   A.     Right.

10  Q.     And the reason you say no is because you didn't

11  understand that it was important?

12  A.     Not that it was not important.  I just didn't think all

13  of this -- you know what I mean.  Like just everything, all of

14  this, and now that I see I should have said something I'm wrong

15  about that.  I should have said something.  I should have stuck

16  up for those girls.  I should have said something and I feel

17  awful about it.

18  Q.     But on March 28th of 2017 -- 2018 over a year later

19  other than you saying you saw Brian hit Ayla you never said

20  that you saw him hit anyone else.  Why is that?

21  A.     Like I said, sir --

22  Q.     You never said that he hit you?

23  A.     Because at the time it wasn't -- like I said I was wrong

24  in the beginning.  I should have stuck up for the girls.  I

25  should have told them.

Mary P.

1    Q.     How does someone determine when you're telling the truth

2    back then when you say you never saw Brian hit anyone or today

3    in court?

4    A.     I was scared.  I didn't -- I have kids, okay.  I was

5    scared.

6    Q.     Well but you weren't so scared that you didn't tell the

7    police that Brian held a gun to your head?

8    A.     In the beginning when I got out of everything yes I did.

9    I went right to the police and told them that he put a gun to

10   my head.

11   Q.     That day I'm talking about where you said -- in that

12   interview where you said Brian held a gun to your head when you

13   were asked if Brian ever -- if you ever saw Brian hit any of

14   the girls you said no?

15   A.     Yes, but I'm saying that I'm wrong about -- I should

16   have stuck up for the girls.  I should have said all that.

17   Q.     Well then a year and a half later when you're

18   interviewed and you're talking about that issue the only person

19   you say you saw Brian hit is Ayla and no one else?

20        MR. DARROW:  Your Honor, object.  We've been going

21   around and around and around on this.  It's asked and answered.

22        THE COURT:  This is cross examination.  He's got

23   leeway to do this.  So objection overruled.  Go ahead.

24   BY MR. KAPLAN:

25   Q.     I'm just wondering you haven't really given an answer as

Mary P.

1    to why?

2    A.    I have been giving you answers, sir.

3    Q.    Okay.

4    A.    Like I said I was wrong for not sticking up for the

5    other girls.  I was wrong about that.

6    Q.    But my question is how does someone know which time

7    you're telling the truth back on February 11th of 2016?

8    A.    Well because I didn't say everything it doesn't mean --

9    Q.    When you say Brian didn't hit anyone or today in court

10   when you give a whole laundry list about it how are we supposed

11   to know which is the truth?

12   A.    Well because I didn't say the whole entire truth, sir,

13   doesn't make me out to be a liar.

14   Q.    You didn't say anything?

15   A.    That's what I'm apologizing for.

16   Q.    So your apology should be sufficient for us to believe

17   you today but not back then?

18   A.    I don't know what to say to that.  I'm sorry.

19   Q.    Let me show you what's been marked as defendant's

20   exhibit QQ3 and ask you if you can identify what that is?  Are

21   those Facebook messages between Brian and you?

22   A.    I don't know what the whole conversation was about

23   because it doesn't really say much.

24   Q.    My question to you is --

25   A.    But, yes, these are Facebook messages.

Mary P.

1          MR. KAPLAN:  Your Honor, I would move to admit
2     defendant's QQ3.
3          THE COURT:  Well has she identified sufficiently that
4     exhibit?  In other words, she recognized that?
5          MR. KAPLAN:  She said yes it was Facebook messages.
6          THE COURT:  I'm sorry.
7          MR. KAPLAN:  She said yes it was Facebook messages.
8          THE COURT:  Okay.  Any objection?
9          MR. DARROW:  May we see it, Your Honor?  No
10    objection.
11         THE COURT:  So admitted.
12    [Defendant exhibit QQ3 admitted]
13    BY MR. KAPLAN:
14    Q.    I'm going to put this up on the screen.  Can you see it
15    on your screen?
16    A.    It's blurry, but yeah.
17    Q.    So you send Brian a Facebook message on December 25,
18    2015 and you say Merry Christmas?
19    A.    Yup.
20    Q.    Do you see that?  And then Brian in return says Merry
21    Christmas?  Do you see that?
22    A.    I see.
23    Q.    Pardon me?  Do you see the second entry where --
24    A.    Oh okay.  Okay.  Yes.
25    Q.    And Brian says Merry Christmas to you.  Are you still

                    Mary P.

1  living at North Union at that time?

2  A.     Am I still living there?  No, sir.

3  Q.     Okay.  Where were you living at that point?

4  A.     Oh at this time?

5  Q.     Yes.

6  A.     I was at Selena's house for that night, but I was living

7  at 103 North Union, yes.

8  Q.     And then you say to Brian how are you doing.  He says --

9  A.     Wait can I change that?  I apologize.  I'm not a hundred

10  percent sure, but I think that -- I am sure I think at the time

11  of this was the beginning and I was actually still staying at

12  Selena's and I just started bagging for him.  So I do believe

13  this is the beginning of me bagging for him and that's the

14  reason why I asked are you working.

15  Q.     So you started pretty much Christmas or after and then

16  stopped like on February 10th?

17  A.     Yeah.  That seems more than anything.

18  Q.     So like you were living for like a month and 15 days,

19  something like that, approximately?

20  A.     Say that -- the month?

21  Q.     You were with Brian for about a month and 15 days from

22  start to finish?

23  A.     I would probably say about two months.

24  Q.     Well --

25  A.     I would think two months.  Maybe you're right.  Honestly

Mary P.

1  maybe you're right.

2  Q.     You don't remember?

3  A.     Right.

4  Q.     And then you tell Brian that you had a bad Christmas?

5  A.     Yeah.

6  Q.     Because of your mother?

7  A.     Yup.

8  Q.     And how long had you known Brian at that point?

9  A.     I'm unsure.  About like maybe for like a couple weeks at

10  that point.  Maybe two.

11  Q.     I'm sorry.  How long?

12  A.     I'm unsure, but maybe just like a couple weeks.

13  Q.     Okay, and then on the next page you say are you working

14  tonight.  Do you see that?  You say no it's not.  You working

15  tonight though, question mark?

16  A.     Yes.

17  Q.     And then Brian says yes and you say can I possibly work

18  tonight too.  What are you referring to?

19  A.     I'm sick.  It's beginning.  I'm sick, can I work for

20  you, do you have some bags so I can get a couple bundles, some

21  cash.

22  Q.     So you never expected Brian to just give you the drugs.

23  You expected to have to work for them?

24  A.     No I have to work for them.

25  Q.     Then on the next page do you see where you say if you

Mary P.

1 can stop for me and get me a Cricket phone card, 60 dollars, I

2 will have the money for you when you get here?

3 A.     That's when I was living at 103 North Union.  That's

4 when I got the job to stay there and everything.

5 Q.     And you were asking Brian to give you a hand with

6 getting --

7 A.     Getting the phone call -- the phone card for me, but we

8 -- Brian ended up getting -- like gave me the money and we put

9 it on like a Visa gift card type of thing for me to do it that

10 way.

11 Q.     All right.  Is it fair to say that Mandy and you became

12 good friends?

13 A.     At first.  I thought we were.

14 Q.     Let me show you what's been marked as defendant's

15 exhibit QQ5 and ask you -- it's an attempt we made to diagram

16 the apartment and could you look at that and see if that seems

17 accurate to you?

18 A.     What apartment are we talking about?

19 Q.     North Union.  This is the living room.  This is the

20 kitchen.

21 A.     Can I put it like this please?  Okay.  So I remember you

22 walk into the door.

23 Q.     Right here, right?

24 A.     Right.  There's a couch here.

25 Q.     Here's the couch right here?

                         Mary P.

1    A.     And then there's a couch facing the tv.  There would be

2    a tv stand.  The bedroom is literally right here.

3    Q.     So here's the bedroom right here, right?

4    A.     Right.

5    Q.     Small?

6    A.     Very small bedroom, but there would be a hutch right

7    there and then you have the bed and then you have the window

8    there.  A window behind the hutch.  Like I said everything was

9    very small.

10   Q.     So does that look like an accurate depiction of it?

11   A.     Well when I was there, there was absolutely no table in

12   that place.  There was a tv stand.  Maybe a very small coffee

13   table if that's what you mean by table.

14   Q.     Other than that is it accurate to the extent you can do

15   it unprofessionally of the apartment?

16   A.     Yeah.

17          MR. KAPLAN:  Your Honor, I would move to admit

18   defendant's exhibit QQ5.

19          THE COURT:  Okay.  Any objection?

20          MR. DARROW:  May we see it?  May I inquire.

21          THE COURT:  Yes.

22                      VOIR DIRE

23   BY MR. DARROW:

24   Q.     So, Mary, it looks like someone's hand drawn floor plan

25   showing furniture in the apartment?

Mary P.

1   A.      Can I explain the way I know what it is?  Me looking at

2   that is --

3   Q.      Let me just ask you what this is?

4   A.      That's, I guess, the house at 103 North Union.

5   Q.      Is it a hand drawn sketch of the layout of the

6   apartment?

7   A.      Yes.

8   Q.      Okay.  Is it completely accurate?

9   A.      It's been so long I --

10  Q.      Okay.  So are you not sure?

11          THE COURT:  I didn't quite hear it.

12  A.      It's been so long.

13  Q.      So fair to say you don't know whether this is an

14  accurate depiction of the layout or not?

15  A.      I'm going to say it's mostly accurate.

16  Q.      What are the parts that are not accurate?

17  A.      Like I said when you walked in that was the living room.

18  You had a small couch here and then you had another couch going

19  this way with a tv stand.  You take -- when you open up the

20  door you can take a left.  That right there was the bedroom.

21  Q.      Okay and I apologize.  I'm losing you.  What here is

22  inaccurate?

23  A.      Okay.  So door --

24  Q.      And I apologize.  Just keep that microphone there.

25  Thank you.

Mary P.

1   A.      So the door, like I said, is right there.

2   Q.      Okay.

3   A.      The tv stand, the couch, the other couch was here, the

4   bedroom is right there.  You go into the kitchen.  So yes this

5   is accurate.

6   Q.      So the living room, kitchen.

7   A.      Bedroom.

8           MR. DARROW:  Okay.  No objection.

9           THE COURT:  All right.  So admitted.

10  [Defendant exhibit QQ5 admitted]

11          MR. KAPLAN:  Thank you, Judge.

12  BY MR. KAPLAN:

13  Q.      So this is the apartment we're talking about and this

14  right here is the bedroom?

15  A.      Yes.

16  Q.      And it's about two feet with a bed in there?

17  A.      Yes.

18  Q.      So are you aware of the fact that when you talk about

19  the sexual assault that you've told at least three different

20  versions of what happened?

21  A.      I told three different versions of what happened?  Is

22  that what you said?

23  Q.      Yes.  Do you realize that?

24  A.      No.

25  Q.      In the June 11 -- I keep saying June 11, but it's

Mary P.

1    February 11th, 2016 interview when you were interviewed by the

2    police the only thing you told them was Brian accused you of

3    stealing drugs and held a gun to you.  Do you remember that?

4    A.       Uh-huh.  Like I said I told little by little.

5    Q.       That's all you said, right?

6    A.       Yes.

7    Q.       Then -- and you said that you were in the bathroom when

8    he held the gun to you?

9    A.       I never said I was in the bathroom when he held the gun

10   to me.  I had a gun on me when the break-in happened.  That's

11   how I got out of the bathroom.

12   Q.       Then on March 27th -- March 27th what you said was Brian

13   called you -- this is when you were in the building upstairs

14   with the prosecutors, do you recall that when you came here to

15   do a proffer session with the prosecutors and the agent?

16   A.       And who called me?

17   Q.       Do you recall you came -- I think we talked about this.

18   You came to this building and they asked you a lot of questions

19   in March of 2018?

20   A.       Like I said I don't know the months, but yes I have come

21   here times and talked.

22   Q.       And you told them at that time that Brian called you to

23   come over so you came over and he almost immediately grabbed

24   you, dragged you around the apartment, then dragged you into

25   the small bedroom, and you were assaulted, and then you said

Capitol Court Reporters, Inc. (800/802) 863-6067

Mary P.

1    before you left the apartment -- this was quite a while later
2    -- Brian and you got into another argument.  So you were still
3    there.  You told them on March 27th that Brian and you got into
4    another argument and that's when he pulled the gun on you.  Is
5    that what happened?
6    A.    No.  When you were talking about the car being robbed
7    what happened was --
8    Q.    Yes.  Let me just let -- let you read page 3 to yourself
9    because this is your second version.  I would like to have you
10   tell me whether you think that's accurate or not.
11         THE COURT:  I think the question pending is, is that
12   accurate.
13   A.    This isn't.  Most of it, yes, is accurate, but none of
14   that stuff happened in the bathroom.  When I walked in the
15   house I said I had to use the bathroom.  Then I walked into the
16   bedroom and everything happened in the bedroom, and then Mandy
17   and Ariel were out in the living room laughing at me because
18   all of it was happening.  That's what happened.
19   Q.    So let me see if I understand.  When did he hold the gun
20   on you?  In here you said it was after all this, right?  Is
21   that right?  Is that correct?
22   A.    After the car was broken into it was the next morning.
23   Q.    No I'm not asking you that, but -- and I'm sorry to keep
24   raising this issue with you, but on March 27th you said that
25   you were assaulted and later on in the day you got in an

                    Mary P.

1    argument with Brian and he held a gun to your head.  Is that

2    true?

3    A.      No.  No one is listening to me.  No.

4    Q.      Okay.  So today you testified in court to something

5    different, right?

6    A.      Can I please say what happened all over again so

7    everybody knows?

8    Q.      No.

9    A.      Because I've been saying it.

10   Q.      We're going to do it this way.  Today in court you said

11   that you walked in and instead of Brian holding a gun to your

12   head after you said you walked in and the first thing Brian did

13   was hold a gun to your head, then he dragged you into the

14   bedroom.  So what I would like to know is --

15   A.      I didn't say that at first.

16   Q.      What did you say today?

17   A.      What I said was after the car being broken into he

18   called me and he said he had product that he wanted me to

19   taste.  I walked into the house.  I walked in.  I said I had to

20   go to the bathroom.  After I was done using the bathroom I

21   walked into the room.  I got thrown from one side to the other.

22   I got beaten.  His friend raped me, but before that rape part

23   yes he checked me into the corner of the room, cocked back the

24   gun, and he put the gun to my head.

25   Q.      So when you told them on March 27th that it happened

Mary P.

1  differently that was incorrect?

2  A.    Oh my God.

3  Q.    Let me just show you again --

4  A.    No.  Can I just please rephrase it?

5  Q.    Let me just ask you to read to yourself defendant's

6  exhibit ZZ5, the last paragraph, and tell me if that is

7  accurate or is what you said today more accurate?

8  A.    That right there is what happened in the bedroom when he

9  threw me across the room and that's when he got on me after the

10  other stuff, but when he got me pinned into the corner in the

11  bedroom he kept asking me where is my drugs.  I said I don't

12  know what the fuck you're talking about.

13  Q.    Why did you say then he held a gun to your head after

14  the assault some time later in the day?

15  A.    No.  He held a gun to me first when I went into the room

16  and got to the fight and then afterwards when his friend Q came

17  in.

18  Q.    Oh so now you're saying he held a gun to your head

19  twice?

20  A.    I've been saying that, sir.

21  Q.    And you're saying that Mandy -- that Mandy and Ariel

22  were in the living room laughing?

23  A.    And they were laughing at me.

24        MR. KAPLAN:  Can I have a minute, Judge?

25        THE COURT:  Yes.

Mary P.

1  BY MR. KAPLAN:

2  Q.     Do you know a Brittany Barber?

3  A.     Yes.

4  Q.     Is she one of the people that was there, not that day,

5  but associated with Brian?

6  A.     Yes.  She worked for him as a prostitute.

7  Q.     And you actually knew her?

8  A.     Yes.

9           MR. KAPLAN:  Can I have a moment please, Judge?

10          THE COURT:  Yes.

11          MR. KAPLAN:  I don't have anything else, Judge.

12  Thank you.

13          THE COURT:  Okay.  Any redirect?

14          MR. DARROW:  Not much.  A couple questions.  Thank

15  you, Judge.

16                    REDIRECT EXAMINATION

17  BY MR. DARROW:

18  Q.     Mary, we've gone around and around on exactly what

19  happened that night that you were raped and threatened.  If

20  memory serves, you testified on direct that when you first got

21  to the apartment having been summoned --

22          MR. KAPLAN:  Objection, Your Honor.  May be

23  preliminary, but it seems to be a long question.

24          THE COURT:  Well objection overruled.  Ask a question

25  and she can respond.

                         Mary P.

1            MR. DARROW:  Thank you.

2    BY MR. DARROW:

3    Q.    I think you testified that what happened first was you

4    used the bathroom; is that right?

5    A.    Yes.

6    Q.    And counsel asked if that wasn't -- counsel implied that

7    the gun was put on you when you were in the bathroom?

8    A.    Yes and that didn't happen.

9            MR. KAPLAN:  Judge, I didn't imply anything.  I was

10   asking her.

11           THE COURT:  Yeah and I also don't remember him

12   actually saying that, but well why don't you ask -- you should

13   be able to ask the question.

14           MR. DARROW:  Okay.  Thank you.

15           THE COURT:  My memory may not be accurate.

16           MR. DARROW:  Maybe mine too.

17           THE COURT:  Okay.

18   BY MR. DARROW:

19   Q.    When you met with the prosecution team at the time in

20   April 2018 did you tell the story the same way?

21   A.    What do you mean when I met?

22   Q.    When you first got there you went to the bathroom and

23   when you came out is when you were attacked?

24   A.    Yes.

25   Q.    Okay.  Thank you, and did you testify on direct that you

Mary P.

1  were working 24/7 around the clock for Folks in this enterprise

2  for a couple months?

3  A.    Yes.

4  Q.    Is it sometimes hard to remember everything that

5  happened?

6          MR. KAPLAN:  Objection, Your Honor.

7  A.    Yes it is.  It really is.

8          THE COURT:  Objection overruled.  He can ask the

9  question and your answer is yes.  Okay.

10  A.    Yes.

11  Q.    Counsel --

12  A.    It was years ago.  I mean I'm trying to remember as best

13  as I can for you guys.

14  Q.    You're doing fine.

15          THE COURT:  Okay.  There is no question so go ahead.

16  BY MR. DARROW:

17  Q.    Do you remember counsel asking you about the time that

18  you and Mandy tried to clean up Ayla?

19  A.    Yes.

20  Q.    And counsel asked you whether Folks had kindly supplied

21  the money to get some shampoo?

22  A.    Yes.  He went out, gave Mandy the money to get combs,

23  hair picks, the stuff that you have to use in the hair to get

24  it like -- I don't know -- greasy or something to try to pick

25  it out.

                        Mary P.

1    Q.      Appreciate it.  What was Ayla's role in Folks's

2    organization?

3    A.      Prostitute.

4    Q.      Was she working as a prostitute then?

5    A.      Yes.

6    Q.      Was Folks getting money from her prostitution?

7    A.      Yes.

8    Q.      Okay.  Did Folks say why he wanted her to be cleaned up

9    and looking better?

10   A.      To be honest she looked like --

11           MR. KAPLAN:  Objection, Your Honor.

12   A.      -- a whore.  Like the worst --

13           THE COURT:  Okay.  She's answering an open ended --

14   she's taking it as an open-ended question.  Go ahead.  You can

15   answer the question.

16           THE WITNESS:  So continue?

17           THE COURT:  You can go ahead and finish your answer.

18           THE WITNESS:  She looked like a train wreck.  Like it

19   was literally a rat's nest.  She had bugs coming out of her

20   hair.  She stunk.  She had horrible clothes.

21           THE COURT:  Okay.

22           THE WITNESS:  It was bad.

23           THE COURT:  All right.  We have gone over this all.

24   BY MR. DARROW:

25   Q.      Yup.  You testified on cross examination that when Folks

Mary P.

1  tried to get you to prostitute you would have arguments and you

2  described them as blowouts about it?

3  A.      Yeah.  Like me and him like --

4  Q.      Can you tell us an example of a blowout when he was

5  trying to get you to prostitute?

6  A.      In each other's faces screaming, yelling.

7  Q.      What was he screaming and yelling?

8  A.      Because he wants me to have sex with his friends, make

9  money, entertain his friends.

10 Q.      Was he yelling at you?

11 A.      Yes.

12 Q.      You testified on cross examination that another reason

13 why you maybe didn't say everything each time you were

14 interviewed was that you were scared of him?

15 A.      Yeah I am.  I'm petrified of him.  Okay.  I'm petrified

16 of the man.

17 Q.      Why are you so frightened of him?  Is it the way he

18 treated you and others?

19          THE COURT:  Okay.  Objection sustained.  She has a

20 question so --

21 A.      I'm scared of him.  He's mean.  He was controlling.  He

22 was abusive.  I had a heroin problem.

23 Q.      Mary, I want to show you the defense exhibit with the

24 Facebook exchanges between you and Folks, okay.  Do you see

25 here where the orange sticker is?  Is that you asking him did

                         Mary P.

1   you say this guy can come in, Ayla let him in, and I don't want

2   to get in trouble.  Do you see that?

3   A.      I don't remember who the guy was.

4   Q.      I didn't ask you that.

5   A.      Okay.

6   Q.      Do you see you're asking him that question?

7   A.      Yes.

8   Q.      You just mentioned that he was controlling.  Did you

9   need permission for someone to come into the 103 North Union

10  house?

11  A.      Yes.  We needed permission to have anybody go in that

12  house.  Anyone.

13  Q.      Or you would get in trouble with Moe?

14  A.      Yes.

15          MR. DARROW:  Can I have a moment?

16          THE COURT:  Yes.

17          MR. DARROW:  Nothing further.

18          THE COURT:  Okay.  Any recross?

19          MR. KAPLAN:  Briefly.

20                    RECROSS EXAMINATION

21  BY MR. KAPLAN:

22  Q.      You know you're saying that you were afraid to say

23  everything because you're afraid of Brian; is that right?

24  A.      Yes.

25  Q.      But that confuses me because on February 11th of 2016

Mary P.

1  you went voluntarily, you met with the police, and you said

2  Brian was involved?

3  A.    That was not a voluntary thing.  My mother and my uncle

4  made me go there.

5  Q.    And when you went in there you said that Brian was

6  involved in prostitution, that he was selling drugs, that you

7  were selling drugs with him, that he held a gun to your head.

8  So am I wrong in thinking that you weren't so afraid that you

9  couldn't say those things?

10  A.    Was he there next to me, sir?  No he wasn't.  My mom was

11  there.  My uncle.

12  Q.    Did you say all those things about him?

13  A.    Yes.  I said he held a gun to my head.

14        MR. KAPLAN:  I have nothing further, Your Honor.

15        THE COURT:  Okay.  All right.  Thank you.  You're all

16  done.

17        THE WITNESS:  Thank you.

18        THE COURT:  Okay.  Government want to call next

19  witness.

20        MS. SAVNER:  Yes, Your Honor.  The Government calls

21  Officer Kyle Brouillette.

22        COURTROOM DEPUTY:  Please come forward, sir, to be

23  sworn.  Would you raise your right-hand?

24  KYLE BROUILLETTE,

25      Having been duly sworn, testified as follows:

Kyle Brouillette

1        DEPUTY CLERK:  You may take the stand, sir.

2        THE COURT:  Good afternoon, Officer Brouillette.

3        OFFICER BROUILLETTE:  Good afternoon, Your Honor.

4                    DIRECT EXAMINATION

5   BY MS. SAVNER:

6   Q.    Good afternoon, Officer.  Do you mind saying your name

7   and spelling your last name for the court reporter?

8   A.    Yes.  It's Kyle Brouillette.  My last name is spelled

9   B-R-O-U-I-L-L-E-T-T-E.

10  Q.    Thank you.  Where do you work?

11  A.    I'm currently employed with the Burlington Police

12  Department.

13  Q.    What's your assignment there?  What's your role?

14  A.    I'm a police officer.

15  Q.    How long have you been there?

16  A.    About three years.

17  Q.    Where did you work previously?

18  A.    Prior to that I worked at the Winooski Police Department

19  also in Vermont.

20  Q.    How long were you at Winooski?

21  A.    A little over a year and a half.

22  Q.    Also police officer there?

23  A.    Yes.

24  Q.    Did you have prior law enforcement experience before

25  that?

Kyle Brouillette

1   A.      Yes I did.  Prior to that I actually began my law

2   enforcement career at the South Burlington Police Department

3   where I spent about three years working there.

4   Q.      What did you do before becoming a police officer?

5   A.      Before that I served in the United States Army for

6   approximately four years.

7   Q.      What's the highest rank you obtained?

8   A.      I was a sergeant.

9   Q.      When you were with Winooski PD -- that's what I want to

10  talk to you about today -- what were your responsibilities and

11  your duties?

12  A.      While I was working with Winooski Police I was assigned

13  as a patrol officer.  My duties involved responding to calls

14  for service, conducting appropriate investigations, enforcing

15  state laws, and generally just mediating any sort of issues

16  that arose within the public or the community.

17  Q.      I want to bring your attention to January 20, 2016.  On

18  that day did you have occasion to make a traffic stop that led

19  to the seizure of suspected narcotics?

20  A.      Yes I did.

21  Q.      All right.  Tell us what led you to make that traffic

22  stop?

23  A.      I had received information from a confidential source or

24  a source of information that an individual was going to be

25  traveling with a large quantity of narcotics from one location

                    Kyle Brouillette

1    in Burlington to another location.

2    Q.    Okay, and who was that source?  What was her name?

3    A.    Her name is Mary Robinstein.

4    Q.    What did you do with the information you got from Ms.

5    Robinstein?

6    A.    I contacted Detective Dave Nease who worked for the

7    Winooski Police Department.  I shared the information with him.

8    I was aware that there was an active federal investigation

9    ongoing into the person who was to be transporting the

10   narcotics.

11   Q.    Who was that?

12   A.    I knew him to be Brian Folks.

13   Q.    All right, and once you shared the information and knew

14   that there was the federal investigation what did you do?

15   A.    At that point Detective Nease contacted DEA.  The -- we

16   didn't want to have any sort of conflict of interest or we

17   didn't want to step on their toes so to speak, so we contacted

18   DEA to see if they would give us the go ahead to proceed with

19   the information we received.

20   Q.    Did you get the go ahead?

21   A.    Yes we did.

22   Q.    All right.  What did you do?

23   A.    At that point we were contacted -- made contact again

24   with Ms. Robinstein to get more clarifying information as far

25   as where she was going to be coming from, where she was going

                    Kyle Brouillette

1    to be going to, what vehicle she was going to be driving, and

2    so on.  At that point it was determined that she was coming

3    from a location on North Avenue in Burlington and that she was

4    going to be driving to a location in the area of Loomis or

5    North Union Street also in Burlington.  The route she

6    anticipated taking was the beltline, Vermont Route 127, in

7    Burlington.  She at that point thought she would go down along

8    Manhattan Drive and proceed to one of those locations that she

9    had initially told me.

10   Q.    What did you do with that information?

11   A.    Again I conferred with Detective Nease and we had set up

12   a plan that he would try to intercept her vehicle on the

13   beltline and then maintain close observation of it from an

14   unmarked vehicle.  I would then set up in a different position

15   in the area of Manhattan and Spring Street where I could then

16   intercept her vehicle, myself being in a fully marked police

17   cruiser.

18   Q.    All right, and did you set up at that intersection you

19   mentioned?

20   A.    Yes I did.

21   Q.    Okay, and once there at some point did you spot the car?

22   A.    Yes I did.

23   Q.    All right.  Tell us what happened next?

24   A.    So I observed her white Mercedes pull up to the

25   intersection.  It was a three way intersection.  There was a

Kyle Brouillette

1   stop sign.  Vehicle came to a stop.  They proceeded to make a

2   right-hand turn without signaling.  I recognized that to be a

3   violation of Vermont statute, signaling is required, and I

4   effected a motor vehicle stop based on that violation.

5   Q.     Okay.  At some point did you walk up to the car?

6   A.     Yes I did.

7   Q.     All right, and what could you see in terms of the driver

8   and the passengers?

9   A.     I observed that there was two female occupants in the

10  front of the vehicle and there was a male and a female seated

11  in the rear of the vehicle.

12  Q.     Okay, and were any of those people Ms. Robinstein?

13  A.     Yes they were.

14  Q.     Which one?

15  A.     Ms. Robinstein was the operator of the vehicle.

16  Q.     Did you recognize the other two females?

17  A.     Not at the time, no.

18  Q.     All right.  How about the male?

19  A.     I did.

20  Q.     How did you recognize him?

21  A.     Again I was aware of Mr. Folks through prior

22  investigations that were ongoing.  I had seen photos of him in

23  law enforcement databases.

24  Q.     Had you personally interacted with him before?

25  A.     No.

Kyle Brouillette

1    Q.      And do you see the person that you identified as Mr.

2    Folks in that car on January --

3            MR. KAPLAN:  Your Honor, we'll stipulate that it's

4    our client.

5            THE COURT:  Okay.  So stipulated.  Go ahead.

6    BY MS. SAVNER:

7    Q.      Okay.  What did you do once you got to the car?

8    A.      I notified the operator the reason for the stop.  I

9    requested the necessary information; driver's license,

10   registration, proof of insurance, and I asked if she would be

11   willing to step back to my police cruiser while I talked to her

12   about the violation.

13   Q.      Okay, and what happened next?

14   A.      She agreed to step back to my cruiser and speak with me.

15   She brought her necessary information; license, registration,

16   and proof of insurance back with me.  While back at the vehicle

17   I asked her several basic questions that I ask on all my stops

18   such as purpose of travels, where are you coming from, where

19   are you going to, relationship to people in the vehicle, that

20   sort of thing.

21   Q.      Just to be clear she's the one that had been providing

22   -- provided you the tip for the stop in the first place, right?

23   A.      That is correct.

24   Q.      Okay.  Did you take a look at her registration?

25   A.      Yes I did.

Kyle Brouillette

1    Q.      What did you notice about it?

2    A.      I noticed that the registration on the certificate did

3    not match the registration plates that were on the vehicle.

4    Q.      And what did you do with that information?

5    A.      In order to verify that the plates were actually

6    supposed to be on the vehicle I wanted to compare the VIN

7    number that's listed on the registration certificate to the VIN

8    number that belonged to the vehicle to see if the two were the

9    same.

10   Q.      Okay.  What did you do next?

11   A.      After I finished speaking with her I approached the

12   vehicle, began speaking with the occupants, again asked them

13   the same basic questions; purpose of travels, where you coming

14   from, where you going to, relationship to people in the

15   vehicle.  I informed them that I was going to be going to the

16   front of the vehicle to check the VIN number, and I asked them

17   to place their hands in a visible location.  I believe I asked

18   them either on the headrest or the roof of the vehicle while I

19   did so for my safety.

20   Q.      Do you remember where -- if the defendant answered the

21   question of where he was coming from?

22   A.      I believe he eventually did, yes.

23   Q.      What was his answer?

24   A.      He told me he was coming from his uncle's house on North

25   Avenue.

Kyle Brouillette

1  Q.     When you asked them to put their hands on the headrest

2  what was the defendant's response?

3  A.     He was a little defensive in nature.  Initially he

4  didn't want to comply.  He began -- he began asking me what

5  that has to do with the stop, why do they need to put their

6  hands on the headrest, that sort of thing.

7  Q.     Okay.  At some point did you go and check the VIN

8  number?

9  A.     Yes.  I did explain this is nothing personal just for my

10  safety.  Eventually they did comply.  I believe at that time

11  the defendant also had his cell phone out and was recording the

12  interaction.  Once the hands were placed in a safe location

13  where I felt safe to move forward I went up and verified the

14  VIN number on the front of the vehicle.

15  Q.     Just to be clear the VIN number is not something you had

16  to go inside the car to look at, right?

17  A.     That's correct.  It's visible from the outside.

18  Q.     All right.  What did you do after you checked the VIN

19  number?

20  A.     After I checked the VIN number I noticed it did match

21  the registration.  It matched the VIN number on the

22  registration certificate.  At that point I believe the

23  discrepancy in the license plate was due to an error at DMV.

24  At that point I went back and spoke with Miss Robinstein I

25  believe.

Kyle Brouillette

1   Q.      Okay.  At some point did you call for a K-9 unit?

2   A.      Yes I did.

3   Q.      All right, and the K-9 unit arrived?

4   A.      Yes it did.

5   Q.      What did the K-9 unit do when they arrived?

6   A.      When Corporal Martin and his K-9 partner arrived on

7   scene I spoke to him briefly, made him aware of the situation,

8   asked him to conduct an exterior sweep of the vehicle.

9   Q.      Who was in the car when the dog was conducting the

10  sweep?

11  A.      All four occupants.

12  Q.      At some -- well after that -- after the K-9 did the

13  sweep -- what happened?

14  A.      After that Corporal Martin notified me that his K-9

15  partner had alerted to the presence of narcotic odor coming

16  from the vehicle.

17  Q.      What did you do next?

18  A.      At that point I directed all four occupants to exit the

19  vehicle.  Had them stand over to the side while I spoke with

20  Ms. Robinstein.

21  Q.      What did you speak to her about?

22  A.      I explained the probable cause consent to search card

23  that we had.  Essentially I explained that I had probable cause

24  to seize her vehicle and apply for a search warrant.  Judge may

25  or may not grant that search warrant, and that she was also

Kyle Brouillette

1  free to grant the consent to search the vehicle if she so chose

2  at that time.

3  Q.    I'm sorry if you said this.  Did the other occupants get

4  out of the car as well?

5  A.    Yes they did.

6  Q.    Okay.  The two other women in the car do you know their

7  names now?

8  A.    I do.

9  Q.    What are their names?

10  A.    It's Mary P. and Mandy L.

11  Q.    Okay.  When they get out of the car were either of them

12  carrying purses or any personal belongings?

13  A.    Not that I remember seeing, no.

14  Q.    You asked Mary Robinstein for consent to search her car

15  and what was her response?

16  A.    She consented to the search.

17  Q.    Okay.  Did you ask the occupants anything before you

18  then proceeded to search the car?

19  A.    Yes.  I asked the occupants if they had any personal

20  belongings or personal interest inside the vehicle.

21  Q.    What was their response?

22  A.    Initially the response was no.  I believe Mr. Folks made

23  claim to get a camera in the vehicle which was then recovered

24  for him.

25  Q.    Was that before or after the search began?

Kyle Brouillette

1   A.      I don't recall that.

2   Q.      What did he say was his?

3   A.      It was a camera that was in the back of the -- back seat

4   of the vehicle.

5   Q.      What procedures were taken before the passengers in the

6   car; Mandy, Mary P, and Mr. Folks were allowed to leave?

7   A.      Because they were in the vehicle at the time the K-9

8   alerted to the presence of narcotic odor, I was unable to say

9   if the odor was from their person or from the vehicle.  As such

10  it was explained that if they subjected to a search of their

11  person, they would be free to leave.  Otherwise, they would be

12  detained pending a search warrant application.

13  Q.      And what was the extent of that search?

14  A.      I wasn't the one who conducted the search, but typically

15  it's going into pockets, as thorough of a search we can be

16  while respecting a person's privacy.

17  Q.      Did you find anything on -- well I won't ask you because

18  you didn't perform the search.  Did you ask the occupants of

19  the car to provide identification?

20  A.      Yes I did.

21  Q.      Okay, and I want to ask you specifically what was the

22  defendant, Mr. Folks, response to that request?

23  A.      Initially I don't believe he provided me with anything.

24  Eventually he said the only thing I'll give you is my first

25  name Brian.

                    Kyle Brouillette

1   Q.      Refused to give you any last name?

2   A.      Yes.

3              THE COURT:  It is just about 4:30.  How long do you

4   anticipate the direct examination?

5              MS. SAVNER:  Five more minutes.

6              THE COURT:  Okay.  Do you anticipate a long cross

7   examination, Ms. Sen or Mr. Kaplan?

8              MS. SEN:  No, Your Honor.

9              THE COURT:  Okay.  Do you want --

10             MS. SAVNER:  Yes, Your Honor.

11             THE COURT:  Wrap up.

12  BY MS. SAVNER:

13  Q.      Did you proceed to search the vehicle?

14  A.      Yes I did.

15  Q.      And that was with Mary Robinstein's consent?

16  A.      Yes it was.

17  Q.      All right.  Did you find anything?

18  A.      Yes I did.

19  Q.      What did you find?

20  A.      I found a small black handbag under the driver's side

21  seat of the vehicle which contained a large quantity of

22  narcotics.

23  Q.      Can we have exhibit 30 please?  Okay.  Describe what

24  we're seeing here?

25  A.      This looks to be the bag that we recovered from the

Kyle Brouillette

1  vehicle.

2  Q.    Tell us again where you recovered it from exactly?

3  A.    It was from the front driver's side.  Like kind of

4  tucked underneath the front driver's side seat against the

5  center console area.

6  Q.    Okay.  So closer to the center console than to the door?

7  A.    Yes it was -- yes definitely toward the center console.

8  Q.    Okay.  Go to the next picture.  Did you take these

9  pictures?

10 A.    Yes I did.

11 Q.    Okay.  What are we looking at?

12 A.    This is the contents of the bag that was seized.

13 Q.    Go to the next one.  Did you lay these suspected

14 narcotics out on the table?

15 A.    Yes I did.

16 Q.    All right.  What did you do with them once you seized

17 the bag and the contents?

18 A.    I field tested both the suspected heroin and suspected

19 crack cocaine.

20 Q.    I don't want you to tell me what the results were, but

21 what did you do next?

22 A.    After they were field tested they were sealed in an

23 evidence bag and placed in our evidence locker.

24 Q.    Okay, and who has access to that locker?

25 A.    I believe at the time it was Lieutenant McGivern, Scott

                    Kyle Brouillette

1   McGivern.

2   Q.      When you say our evidence locker which department is

3   that?

4   A.      Sorry.  The evidence locker at Winooski Police

5   Department.

6   Q.      At some point was DEA informed of the results of the

7   stop?

8   A.      Yes they were.

9   Q.      Until that point did Winooski PD maintain complete care

10  and control of the items seized?

11  A.      To my knowledge they did.

12  Q.      You didn't make any arrests that day, correct?

13  A.      That's correct.

14  Q.      Why not?

15  A.      In an effort to protect the anonymity of my source of

16  information we elected to stage the arrest of her so she could

17  be removed from the scene and safely taken away.

18  Q.      Why did you think it was important to protect her

19  anonymity?

20  A.      I was aware that Mr. Folks had a violent past.

21              MR. KAPLAN:  Your Honor, may we approach?

22              THE COURT:  Objection sustained.

23              MS. SAVNER:  No further questions.

24              THE COURT:  Okay.  Mr. Kaplan, are you asking the

25  questions?

Kyle Brouillette

1           MR. KAPLAN:  No.  I'm sorry, Judge.

2           THE COURT:  All right.

3           MS. SEN:  No questions, Your Honor.

4           THE COURT:  All right.  Officer, thank you.  Okay.

5    That's the end of the day.  Now it's really important -- you're

6    going home for the weekend.  It's really important that you not

7    talk with anyone.  You not conduct any investigation.  You

8    really go over this with no one because I'm going to ask you

9    when you come back here if in fact you've learned anything or

10   talked with anyone about this case.  So we'll start again on

11   Monday morning at 9 o'clock.  Hopefully the breakfast will

12   improve and I'm going to stay and talk with the lawyers just

13   for a second.  So have a nice weekend.

14   [Jury leaves at 4:35 p.m.  The following occurred in open court

15   without the jury present]

16           THE COURT:  All right.  Just want to ask a scheduling

17   question from the Government.  Where do you go from here?

18           MR. DARROW:  Your Honor, are we on for Monday?

19           THE COURT:  Yes.

20           MR. DARROW:  Okay.  You're asking who our witnesses

21   will be?

22           THE COURT:  Yes.

23           MR. DARROW:  Lori C., police officer Beliveau --

24   Beliveau, witness Chrissy T., and if we get past that, Scott

25   Murray.

Kyle Brouillette

1        THE COURT:  Pardon me.  Scott Murray?

2        MR. DARROW:  Yeah.

3        THE COURT:  Okay.  As an expert witness?

4        MR. DARROW:  Yeah.  Just to do the interstate.

5        THE COURT:  All right.  Now do you still anticipate

6   completing the case well maybe not Thursday, but Monday?

7        MR. DARROW:  May I have a moment?  You said next week

8   or Monday?

9        THE COURT:  Well next week or Monday, right.  So what

10  you said before was really anticipated being almost complete

11  next week, but you had one witness whom you asked to come on

12  Monday.  I just want to make sure that we're still on schedule.

13        MR. DARROW:  And I apologize.  You're saying if we go

14  through next week we'll be -- wrap up by Friday or Monday?

15        THE COURT:  Well we won't be -- we won't have court

16  on Friday.

17        MR. DARROW:  Right.  So Monday would be the final

18  day.  I think we're still on.  We still project that.

19        THE COURT:  Okay.  All right.  From the defense is

20  your perspective the same?

21        MR. KAPLAN:  Yes.

22        THE COURT:  Okay.  All right.  Okay.  Is there

23  anything that you anticipate coming up Monday that needs my

24  reflection?

25        MR. DARROW:  I can't think of a problem, however, I

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Kyle Brouillette

1  do have in mind when we were last in chambers you asked us,

2  both parties, if there were any other motions in limine that we

3  anticipated and I think we said no at the time.  There's one

4  that I have emailed counsel about to see whether we can

5  streamline it without a motion and depending on how that goes

6  we may have a small one.

7          THE COURT:  Okay.

8          MR. KAPLAN:  Judge, the only other issue for us is we

9  would like -- I could do this privately, we would like at least

10 two days notice as to when Thorton is going to be testifying so

11 our expert can be here and listen.  You can do that?

12         MR. DARROW:  I think we can do that.

13         THE COURT:  Yes.  Good.  All right.  Well have a nice

14 weekend and see you Monday.

15 [Adjourned at 4:40 p.m.]

16              C E R T I F I C A T I O N

17     I certify that the foregoing is a correct transcript

18 from the record of proceedings in the above-entitled matter.

19

20

21

22 May 29, 2019

23 Date                              JoAnn Q. Carson, RMR,CRR

24

25

**Capitol Court Reporters, Inc. (800/802) 863-6067**