UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
           V.          *   Case No:  2:16-cr-94-1
BRIAN FOLKS        *




TRIAL BY JURY - DAY FOUR
APRIL 29, 2019
BURLINGTON, VERMONT


BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

    Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

    Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

I N D E X

| Witness | Page |
|---|---|
| Lori C. | 12 |
|    Direct Examination by Mr. Grady | 12 |
|    Cross Examination by Mr. Kaplan | 51 |
|    Redirect Examination by Mr. Grady | 64 |
|    Rebuttal by Mr. Kaplan | 67 |
| Michael Beliveau | 69 |
|    Direct Examination by Mr. Grady | 70 |
|    Cross Examination by Ms. Sen | 78 |
| Scott Murray | 80 |
|    Direct Examination by Mr. Darrow | 80 |
|    Cross Examination by Ms. Sen | 84 |
| Donald McFarlan | 89 |
|    Direct Examination by Mr. Darrow | 89 |
|    Cross Examination by Mr. Kaplan | 141 |
|    Redirect Examination by Mr. Darrow | 172 |
|    Recross Examination by Mr. Kaplan | 176 |
| Christina T. | 179 |
|    Direct Examination by Ms. Savner | 179 |

| Exhibits | Description | Admitted |
|---|---|---|
| Government | | |
| 92 | DMV Photo Chrissy T. | 23 |
| 37 | Photos of Beretta | 76 |
| 38 | Gun Found in Durango | 77 |
| 130 | Stipulation | 79 |
| 50A | Photos of Keisha W. | 112 |
| 24 | N-13 Recorded Call T., McFarlan, Folks | 132 |
| 26 | Photos of N-12 Froot Loops | 137 |
| 35 | Texts T. and Folks | 228 |
| 26A | Photos of N-12 Froot Loops | 265 |

| Defendant | | |
| G7 | Proffer Ltr. McFarlan | 154 |
| G8 | Plea Agreement Letter -McFarlan | 154 |
| G9 | Plea Agreement-McFarlan | 154 |

3

1    [MONDAY, APRIL 29, 2019.  IN CHAMBERS 9 a.m.]

2            THE COURT:  Okay.  All counsel are present.  We

3    received another note from juror number 4.  It says in quotes

4    "I did not know that corrections is a branch of law

5    enforcement.  I need to correct my written questionnaire and

6    voir dire immediately.  My father-in-law why I have known --

7    who I have known for seven years is a retired corrections

8    officer."  Okay.  That's the note.

9            MR. DARROW:  Boy they are so careful now.  You wish

10   looking back around the time of the Fell trial they had been as

11   careful.

12           THE COURT:  "I need to correct my written

13   questionnaire and voir dire immediately."  So, first of all, I

14   don't know whether, frankly, a corrections officer is a law

15   enforcement officer.  Regardless the question is whether his

16   relationship with his father-in-law impacts his ability to be

17   fair, and to respond to the question about law enforcement I

18   suggest that I talk with him briefly in open court.  So any

19   objection to that?

20           MR. KAPLAN:  No.

21           MR. DARROW:  No.

22           THE COURT:  Okay.  Second, two motions in limine.  I

23   don't think I need to address them immediately, although the

24   defense's request is that I deal with this immediately.  It

25   obviously doesn't have to be done until your next cross

4

1    examination, and does the Government want to respond to this?

2              MR. DARROW:  Briefly, Judge.  We appreciate the

3    defense trying to get some clarity on this, but it was our

4    understanding that the rub when Mr. Kaplan was examining the

5    witness was when he was trying to refresh the recollection not

6    when I was trying to introduce extrinsic evidence of a prior

7    statement.  So I didn't quite understand -- I thought there

8    might have been a mis --

9              MR. KAPLAN:  I wasn't trying.

10             MR. DARROW:  Can I just finish?  Thanks, and then the

11   second point is our understanding is if you do want to use

12   extrinsic evidence the way he proposed there, like if the

13   investigative report is inconsistent with the testimony, I

14   think they have to call the agent who wrote the investigative

15   report.  It's not the witness's report.  It's hearsay.

16             MR. KAPLAN:  That's just not right.  That's not true.

17   You know you can read a witness's prior statement to that

18   witness and say isn't that what you said.  Now I'm required to

19   show it to you, for example, if you want to see it.  I don't

20   have to show it to the witness.  I can read it to the witness.

21   I can say isn't that what you said and I can read it word for

22   word right from the transcript.  I'm not trying to refresh her

23   memory.

24             THE COURT:  Although that's not my understanding of

25   the law, I'm going to research that.  My understanding is that

1    you open up the question by saying didn't you tell somebody

2    else without introducing the statement itself; didn't you tell

3    the agent x, and if the person says either I did not or I don't

4    remember and you don't remember, then you show them what was

5    exactly in the statement, and then they can respond by then

6    saying I don't remember, or if that refreshes their

7    recollection, then they say yes I did say that and this is what

8    I meant.  That witness cannot introduce the statement.  The

9    statement is in fact a written statement by a law enforcement

10   officer.  That's who introduces the statement.

11            MR. KAPLAN:  That actually wasn't the statement,

12   though.  I have transcripts of interviews from law enforcement

13   and I believe I can read verbatim from the transcript what that

14   particular person said to law enforcement and then ask them

15   didn't you say that.

16            THE COURT:  Oh well that may be a different issue.

17   So if you're talking about transcripts that she said --

18            MR. KAPLAN:  That's right.

19            THE COURT:  Didn't you say this and then you read a

20   transcript.

21            MR. KAPLAN:  I wasn't showing her a law enforcement

22   report that someone else did about what she said.  I was

23   reading a transcript.

24            THE COURT:  Okay.  So what about that distinction,

25   prior inconsistent statement literally taken from her?

6

1             MR. DARROW:  Right.  Was that statement under oath?

2             MR. KAPLAN:  I don't think it matters.

3             MR. DARROW:  Okay.  Well it seems to me if he's

4   essentially reading from a transcript -- well not a question.

5   Do you precede the prior recorded recollection with a refresh

6   and if she doesn't refresh --

7             MR. KAPLAN:  I don't have to do that.

8             MR. DARROW:  But then you're in a situation of

9   reading a transcript that's not in evidence.

10            THE COURT:  You have to set up the proper

11  inconsistent statement.  Did you say dah, dah, dah?  So that's

12  a little different than the --

13            MR. KAPLAN:  It's probably my fault for not making

14  myself clear what I was doing.

15            THE COURT:  Anyway there's a distinction between if

16  something is in a report of a law enforcement officer, you

17  can't then introduce the statement of the law enforcement

18  officer.  You have to get the law enforcement.  So then there's

19  a question about whether a statement made by a witness can be

20  introduced as a prior inconsistent statement, I mean a literal

21  statement of the witness, and I would like to think about that.

22            MR. KAPLAN:  Okay.

23            THE COURT:  Anyway okay.  So we get juror number four

24  out and so now your issue is limited to that particular

25  inconsistent statement.  That is a transcript.

7

1          MR. KAPLAN:  Never done it that way before even with

2    Your Honor.  Maybe you didn't catch it.

3          THE COURT:  Maybe I didn't catch it.

4          MS. SEN:  Your Honor, just to clarify on one point,

5    if you have an inconsistent statement, witness has testified to

6    A on the stand, prior statement in a transcript says B, witness

7    says I don't remember, I think you can -- at that point you

8    would also be able to read from the transcript, isn't that

9    correct?

10          THE COURT:  I think that is right.  I had thought we

11   were talking about reports of officers and then clearly you

12   have to get the officer to introduce the report.  The subtle

13   question is do you have to get the officer to introduce the

14   transcript and make sure that the transcript is in fact

15   accurate and I just don't know the answer.

16          MR. KAPLAN:  The witness could say no he didn't.  The

17   witness can always say that's correct I didn't say that.

18          THE COURT:  Okay.  Well true, but you have to go

19   through the refreshing.

20          MR. KAPLAN:  Yes.

21          THE COURT:  All right, and the other thing that I

22   just wanted to clarify is that there had been sexual assaults

23   talked about by the first two witnesses.  One sexual assault

24   was -- or it did occur after she had stopped working, and the

25   reason that I sustained the objection to the sexual assault at

1  that point is that becomes essentially character evidence,

2  right.  It's not related to any decisions that she had to make

3  in the course of the conspiracy.  As a result what it's offered

4  to do is to show he is of such character that he would go off

5  and do this again.  So under 404 I excluded that.

6      Earlier in regard to the second witness the sexual assault

7  was during the whole course of activity, and as a result that

8  sexual assault is admissible because that relates to what

9  decisions that witness may have made for the future.  That was

10  the thinking.  That's why some sexual assaults were admitted.

11  One was not okay.

12      Actually I should raise the other question.  So if the --

13  this is what I'm thinking.  This is just stream of

14  consciousness.  If the defense is right they can introduce all

15  of this testimony from people who say good things about him, is

16  that character evidence, and if it is, does that permit the

17  Government to then respond to bad character evidence in

18  response to the good character evidence; i.e. the sexual

19  assault of Miss L.?  That becomes --

20          MR. KAPLAN:  You know we're not trying evidence --

21  character evidence though.

22          THE COURT:  I know you're not going to call this

23  character evidence.  You're going to call this basically

24  patterns of activity.

25          MR. KAPLAN:  Fact witnesses really and pattern.

1           MS. SEN:  Your Honor, we have briefed a very short

2     opposition to the Government's motion.

3           THE COURT:  Okay.

4           MS. SEN:  But I think, you know, we're calling the

5     witnesses on a direct issue which is they are women who

6     actually observed Mr. Folks interact with these other women;

7     Ariel, Brittany Barber, they were actual -- and I don't think I

8     misrepresented in my opening that they were going to testify

9     about what they actually observed and I don't see how that

10    falls into character evidence.

11          THE COURT:  Well conduct which would be considered --

12    which at least arguably could be considered character evidence.

13          MR. KAPLAN:  Of course that's true of everything they

14    introduced too really.  I mean --

15          THE COURT:  All right.  Well let's go with the juror

16    and then we'll start immediately thereafter.

17    [Chambers conference ends at 9:10 a.m.  The following was held

18    in open court without the jury present at 9:15 a.m.]

19          THE COURT:  Good morning.

20          DEPUTY CLERK:  This is case number 16-94 United

21    States of America versus Brian Folks.  The Government is

22    present through Assistant United States Attorneys William

23    Darrow, Emily Savner, and Matthew Grady.  The defendant is

24    present in the courtroom with his attorneys Mark Kaplan and

25    Natasha Sen.  The matter before the Court is Trial by Jury day

10

1    four.

2            THE COURT:  All right.  I would ask that Richard

3    Cross, juror number four, be brought out here.

4    [Juror number four enters the courtroom]

5            THE COURT:  Okay.  Mr. Cross, good morning and thank

6    you for returning.

7            MR. CROSS:  Good morning.

8            THE COURT:  I received a note this morning and I'll

9    read that into the record.  "I did not know that corrections is

10   a branch of law enforcement.  I need to correct my written

11   questionnaire and voir dire immediately," and it's signed by

12   you and then you put a note here "My father-in-law, who I have

13   known for seven years, is a retired corrections officer."

14   Okay.

15           MR. CROSS:  Yes.

16           THE COURT:  Is that your note?

17           MR. CROSS:  Yes.

18           THE COURT:  All right.  So tell me what relationship

19   you have with your father-in-law, whether it's positive or

20   negative, and whether you have talked about work that he's

21   done.

22           MR. CROSS:  So we don't talk about his work at all.

23   I feel like we have a good relationship.  I like him.  He's my

24   father-in-law.

25           THE COURT:  Okay.  Well whether a corrections officer

1   is a law enforcement officer or not the issue really is because

2   of your relationship with your father-in-law you think you

3   would have difficulty applying the standard that you should not

4   give the testimony of a law enforcement greater or lesser

5   weight based upon their law enforcement experience?

6           MR. CROSS:  So for me nothing has changed in my

7   thoughts in regard to that.  I will give them no greater

8   weight.

9           THE COURT:  Okay.

10          MR. CROSS:  I just realized I had answered

11  incorrectly and needed to correct it.

12          THE COURT:  All right.  Well I really appreciate that

13  and so it's on record that your father-in-law is a corrections

14  officer.

15          MR. CROSS:  Was.  Retired.

16          THE COURT:  Was, right, but that you have not talked

17  about his work and that would not impact your judgment in

18  anyway; is that correct?

19          MR. CROSS:  That is correct.

20          THE COURT:  I really appreciate your honesty and I

21  would ask that you return to the jury room.

22          MR. CROSS:  Yes, sir.

23          THE COURT:  We'll be starting promptly.  Okay.

24  [Juror number four returns to the jury room.  The following was

25  held in open court without the jury present]

                        Lori C.                        12

1              THE COURT:  Okay.  Does anyone wish to question the

2       juror any further?  I can't imagine there would be anything.

3              MR. KAPLAN:  No.  We have no issue, Judge.  Thank

4       you.

5              MR. DARROW:  Same with us.

6              THE COURT:  All right.  So let's bring the jury in.

7       [Jury enters courtroom at 9:18 a.m.]

8              THE COURT:  Good morning.  Welcome back.  Have you

9       learned anything about this case from outside the courtroom?

10      Have you talked with anyone about this case or have you talked

11      among yourselves about the facts of this case?  [Jurors respond

12      no]  Okay.  Well thank you and I think we're ready to proceed.

13      Government call the next witness.

14             MR. GRADY:  Yes, Your Honor.  The United States calls

15      Miss Lori C.  Miss C., enter the courtroom and you will proceed

16      to the front of the podium where the clerk will swear you in.

17      LORI C.,

18          Having been duly sworn, testified as follows:

19             THE COURT:  Good morning, Miss C.

20                        DIRECT EXAMINATION

21      BY MR. GRADY:

22      Q.     Good morning, ma'am.  Can you please state your name?

23      A.     Lori C.

24      Q.     Now before we go any further, Miss C., do you use

25      hearing aids?

                Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                                    13

1    A.    Yes.

2    Q.    Do you have them in today?

3    A.    I have one.

4    Q.    Why do you use hearing aids?

5    A.    I was in the military and was a mechanic so when we did

6    high time we had to wear earplugs and earmuffs.  It wasn't

7    enough so I lost my hearing due to that.

8    Q.    What branch did you serve in?

9    A.    Navy.

10   Q.    Did you receive an honorable discharge?

11   A.    Yes.

12   Q.    Will you promise to let me know if you can't hear any

13   questions?

14   A.    I will.

15   Q.    Thank you.  How old are you?

16   A.    I'm 47 -- 48 in a couple months or next month.  So 47.

17   Q.    Are you married?

18   A.    Divorced.

19   Q.    Do you have any children?

20   A.    Two boys.

21   Q.    How old are they?

22   A.    17 and 20 -- he's also going to be 21 next month.

23   Q.    Where are you from originally?

24   A.    I came from Oregon to here.

25   Q.    When did you move to Vermont?

                        Lori C.                            14

1   A.      April Fool's Day of 2007.

2   Q.      Why Vermont?

3   A.      I had a friend here.  She was going to be here today

4   with me, but she -- she had to work so --

5   Q.      Was there something happening back in Oregon that caused

6   you to move to Vermont?

7   A.      Yeah.  My ex-husband started hitting me and I didn't

8   think that that was his nature and so I left.

9   Q.      When -- where did you ultimately live when you came to

10  Vermont?

11  A.      Sorry.

12  Q.      Where did you end up living when you moved here to

13  Vermont?

14  A.      The first four or five months I stayed in hotels and

15  stuff, but then they got -- I got Section 8 and got the

16  apartment that I'm at now.

17  Q.      I'm showing you exhibit 96.  It will be on the screen

18  right to your right.

19  A.      The blue door.

20  Q.      The blue door and I'm going to highlight this door right

21  in the middle.  That's the apartment you lived at?

22  A.      I still live there.

23          THE COURT:  Has that been introduced into evidence?

24          MR. GRADY:  It has, Your Honor.

25  BY MR. GRADY:

                **Capitol Court Reporters, Inc. (800/802) 863-6067**

Lori C.                                    15

1    Q.      Did you begin using drugs at some point after you moved

2    here to Vermont?

3    A.      Yeah.  I was working and the guy I was dating before

4    kept asking me to do his back pills.  He said his back hurt so

5    I kept telling him no, but I lost my job and for some reason I

6    said okay because he would always ask.  I guess he thought he

7    was being nice.

8    Q.      When you say he who are you referring to?

9    A.      Ed Grimes.

10   Q.      When did you meet Ed?

11   A.      2009.  I think November.

12   Q.      Did you begin a relationship with Ed?

13   A.      Yeah.  We were together for six years.

14   Q.      Did you ultimately start using heroin?

15   A.      Yeah.  Oxycontins were hard to come by.  They changed

16   the pill form.  Since I don't shoot up we -- you know by

17   sniffing it.  He thought heroin would be fine and I thought it

18   was gross, but when you're already addicted to opiates it's not

19   really your choice, you know.

20   Q.      Did you want to stop using heroin at some point?

21   A.      I did, but having young kids you can't get help without

22   getting for fear they will be taken from you and I need my

23   boys.  They are the only thing that matter to me.  So I just --

24   I was afraid for them to be somewhere where I couldn't be near

25   them.

Lori C.                              16

1   Q.     Was Ed using heroin as well?

2   A.     He was the one that was using and mostly I was using it

3   so I could get to work.

4   Q.     Did --

5   A.     Go to PTA meetings.

6   Q.     Sounds like you were using it to function?

7   A.     Right.

8   Q.     Did something happen to Ed?

9   A.     He went to prison.

10  Q.     When did that happen?

11  A.     2015.

12  Q.     What did he go to prison for?

13  A.     For trafficking.

14  Q.     When you say trafficking do you mean drugs?

15  A.     Yes.  Apparently the FBI Agent that I met said that --

16  when I talked to him on the phone when he was in prison he said

17  he had nothing, but the FBI Agent I spoke to said he had a

18  duffel bag full of crack and heroin.

19  Q.     Who was your heroin source between when you met Ed and

20  when Ed went to prison?

21  A.     The guy that he got it from in New York.

22  Q.     Let me ask it this way.  Who gave you heroin on a daily

23  basis?

24  A.     Ed did.  Ed.

25  Q.     Ed.  Okay.  How much heroin did you typically use at the

                      Lori C.                          17

1    time of Ed's arrest per day?

2    A.    I think about five tickets a day.  Maybe less.  It would

3    differ.  There were times when, you know, we would try to quit

4    and we would stay sick for like three days and, yeah, we would

5    give in.

6    Q.    Were you working at the time of Ed's arrest?

7    A.    I don't know -- I don't think so.  I think I just lost

8    my job.

9    Q.    Are you currently using heroin today?

10   A.    No.

11   Q.    When did you stop using heroin?

12   A.    It was Veterans Day in 2015.

13   Q.    Does Veterans Day occur in November?

14   A.    Yeah.

15   Q.    So fair to say November 2015 is when you stopped?

16   A.    I think so, yeah.  That's -- I get the dates mixed up.

17   Q.    Sure.  Do you know the defendant?

18   A.    Yeah.

19   Q.    Can you identify the defendant by an article of clothing

20   that he's wearing?

21   A.    The white shirt.

22         MR. GRADY:  Let the record reflect Ms. C. has

23   identified the defendant.

24         THE COURT:  Yes.

25   BY MR. GRADY:

Lori C.                                      18

1   Q.      What name do you know the defendant as?

2   A.      Moe.

3   Q.      When did you meet Moe?

4   A.      The summer of 2015 I think.

5   Q.      And you just mentioned that you believed you lost your

6   job when Ed was arrested --

7   A.      2016 then.  I'm sorry because it was winter when I went

8   to rehab.  So it must have been -- see I can't remember.

9   Q.      Well let's see if we can help you out.  You mentioned

10  that you stopped using heroin in November of 2015?

11  A.      But that was when I went to rehab because of Moe.

12  Q.      Right.  So did you meet Moe prior to going to rehab?

13  A.      Yes.  He's the reason why I was able to get there.  He

14  got me a ride there.

15  Q.      When did you first meet Moe?

16  A.      In the summer.

17  Q.      Summer of 2015?

18  A.      I guess or '16.  I'm kind of confused.

19  Q.      Well let's say November -- I just mentioned November

20  2015 Moe took you to rehab?

21  A.      Maybe it was '16.  I'm not sure.  Yeah it was three

22  years ago.  It had to be '16 because I was working at Vermont

23  For Women in 2015.

24  Q.      Regardless of whether it was 2015 or 2016 did you meet

25  him in the summertime?

Lori C.                                    19

1   A.      I met him in the summer.  It was just for needing

2   someone to drive him because he didn't have a license to see

3   his family.

4   Q.      How did you first meet him?

5   A.      A friend introduced me to him.

6   Q.      Do you know the friend's name?

7   A.      Red.

8   Q.      I'm showing you what's been admitted as exhibit 93.  Do

9   you recognize whose shown in 93?

10  A.      Yeah.

11  Q.      Who is that?

12  A.      Ashley.

13  Q.      Does she also go by Red?

14  A.      Yeah.

15  Q.      Where did you first meet the defendant at?

16  A.      At my house.

17  Q.      What did you guys discuss?

18  A.      Just driving to New York.  He said he would pay me $200.

19  Actually wanted half because -- and so I said sure.

20  Q.      Why did he want you to drive -- why did he want you to

21  drive him to New York?

22  A.      Because he didn't have a license and I guess he didn't

23  really know anybody else that could do it at that time.

24  Q.      Did you end up driving Moe to New York?

25  A.      Yup.

                    Lori C.                        20

1   Q.      Did he give you anything during this trip?

2   A.      I'm sorry.

3   Q.      Did he give you anything during this trip?

4   A.      I don't think so.  I think that I just -- he just gave

5   me money which I ended up buying drugs with, but --

6   Q.      Do you know what Moe did while you were in New York?

7   A.      No.  There was another girl with us and she and I hung

8   out in another room when he talked to his family.

9   Q.      When you -- when you came back from that trip how often

10  did you see Moe in the days after that?

11  A.      Pretty frequently I guess.

12  Q.      How often did you see him between that period and when

13  you went to rehab?

14  A.      Off and on.  I guess he -- there was a lot of people at

15  my house and he would stop by, you know, around nighttime.

16  Q.      You mentioned that people were in your house.  When did

17  -- or did Moe ask if people could stay in your house?

18  A.      He asked if Ayla could stay there and I said yeah, and

19  that was supposed to be for two weeks, and that's what I

20  understood, but then it became -- you know this girl showed up

21  at 6 o'clock in the morning with her backpack with another girl

22  and they needed a place to stay and they said that he told them

23  to come there, and I was like no and they were like you need to

24  call him so I did later on when it was so early, and he just

25  asked me to do it.  So you know --

Lori C.                                    21

1  Q.      Was Ayla the first person to move into your apartment?

2  A.      I guess you could say that.

3  Q.      When did that happen in relation to driving Moe to New

4  York?

5  A.      Within a week or so.

6  Q.      Showing you what's been previously admitted as exhibit

7  54A who is that?

8  A.      That's Ayla.

9  Q.      Why did -- why did Moe want Ayla to stay at your house?

10 A.      I suppose because it was a place for her to be.  I mean

11 he's married, he has children, he is -- he doesn't want them at

12 his house.

13 Q.      Did you receive anything in exchange for letting Ayla

14 stay in your house?

15 A.      I think so.  I got some tickets for that.

16 Q.      When you say tickets are you referring to heroin

17 tickets?

18 A.      Yeah.

19 Q.      How many women overall would you say stayed in your

20 apartment at one time or another during this time period with

21 Moe?

22 A.      Four or five that were there all the time, but then, you

23 know, many that came and went.

24 Q.      Do you remember some of their names besides Ayla?

25 A.      Wavy, Red, and Chrissy.  That's -- and Mandy, but she

                         Lori C.                        22

1   didn't really live there.  That's --

2   Q.    Okay.  You mentioned Wavy.  I'm showing you what's been

3   previously admitted at exhibit 47A.  Who is that?

4   A.    I think that's her.  She usually has lots more makeup so

5   I'm not sure that's her.

6   Q.    When you say you think that's her who do you think that

7   may be?

8   A.    Wavy.

9   Q.    Wavy.  Okay.  Your Honor, continuing permission to

10  approach this witness?

11          THE COURT:  Yes.

12  BY MR. GRADY:

13  Q.    Miss C., I am showing you what's been marked Government

14  exhibit 92 for identification?

15  A.    That's Chrissy.

16  Q.    That's Chrissy.  Does that fairly and accurately show

17  Chrissy when she was around your house?  Is that a yes?

18  A.    Yes.  Sorry.  I'm sorry.

19  Q.    That's okay.  We have to note it for the court reporter.

20  A.    Got you.

21          MR. GRADY:  Your Honor, at this time the Government

22  moves to admit exhibit 92 and also publish 92.

23          THE COURT:  Okay.  Any objection to 92?

24          MR. KAPLAN:  No, Your Honor.

25          THE COURT:  So admitted.  You can publish.

                          Lori C.                          23

1    [Government exhibit 92 admitted and published]

2    BY MR. GRADY:

3    Q.    And again the person shown in 92 that is Chrissy?

4    A.    Yes.  She was my friend before.  She wasn't part of that

5    before.

6    Q.    Are you saying you knew Chrissy before?

7    A.    I knew her when Ed and I, you know, were together I

8    guess.

9    Q.    Okay.  You mentioned Mandy.  I'm showing you what's been

10   previously admitted as 48A.  Is that Mandy?

11   A.    Yes.

12   Q.    I'm showing you what's been previously admitted as

13   exhibit 83P.  Do you recognize that person?

14   A.    Yeah.  That's Amanda.

15   Q.    Did Amanda stay in your apartment as well?

16   A.    Yeah.  She was one of the ones that came early right

17   after Ayla.

18   Q.    Showing you what's been previously admitted as exhibit

19   55A who is that?

20   A.    Looks like Victoria.

21   Q.    Is Victoria another person who stayed in your apartment?

22   A.    No.  She had an apartment down on North Street so --

23   Q.    Would she stop by from time to time?

24   A.    She -- I heard she stayed in my room while I was in

25   rehab.

                        Lori C.                        24

1   Q.    And finally I show you what's been previously admitted

2   as exhibit 50A.  Do you recognize who is shown in 50A?

3   A.    Yeah I just don't know her name.  I can't remember.

4   Q.    Okay.

5         THE COURT:  I'm sorry I couldn't hear that.  Who is

6   that?

7   A.    I can't remember her name, but I do recognize her.

8   Q.    Is she another person who would come by the apartment?

9   A.    Yeah.

10  Q.    Okay.  Thank you.  Miss C., you previously testified

11  that prior to meeting Moe you used up to five tickets a day of

12  heroin.  Did your heroin use increase while you were around

13  Moe?

14  A.    I used up to five tickets before Ed went to prison, but

15  then after I was down to maybe two a day, and yes it did

16  increase because I couldn't say no when I was given --

17  Q.    First of all, what did it increase to at the height?

18  A.    It got up to about 10 tickets a day instead of 2.  So

19  yeah.

20  Q.    Why did it increase from 2 to 10 tickets?

21  A.    Because before I didn't have money and then I didn't

22  have, you know, anybody over living with me and I guess it, you

23  know, just having it around you that you do it.

24  Q.    Who provided the heroin tickets to you?

25  A.    I mean Moe did, but I would have found it, you know.

        Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                           25

1   Q.     Is it fair to say there was heroin like around the

2   apartment -- your apartment?

3   A.     I'm sorry.

4   Q.     Is it fair to say --

5              MR. KAPLAN:  Objection.  Leading, Your Honor.

6              THE COURT:  Objection overruled.  It's just asking

7   whether heroin was in the apartment.

8   A.     Yeah it was there.

9   Q.     Did you have a job during this time period that you knew

10  Moe and that you were housing these women?

11  A.     I tried to work.  He -- actually his wife worked at the

12  Waterworks and I would walk there.  I worked for about a month,

13  but I ended up getting really sick because I walked home really

14  -- when it was really cold and rainy out and sleety, and I

15  couldn't make it the next day and then they said not to bother

16  coming in ever again.

17  Q.     Did your apartment ultimately become known as Moe's

18  house?

19  A.     Yeah.

20  Q.     Why?

21  A.     I was in rehab and people didn't think I was coming back

22  and I mean that's just what they thought.

23  Q.     How did you feel about the fact that your apartment was

24  being used by Moe to house all these women?

25  A.     I wanted to kill myself.  I couldn't provide the home I

Lori C.                          26

1   wanted for my children.  I had it planned out.  I was going to

2   see my boys back to Oregon with their dad and buy heroin and

3   shooting up for the first time in a large amount and just die.

4   That was my plan.

5   Q.    Did --

6   A.    It was either that or rehab and rehab worked so --

7   Q.    Fortunately you chose rehab over your alternative.  Did

8   Moe sell drugs from your apartment?

9   A.    I didn't hear that.

10  Q.    Sure.  Did Moe sell drugs from your apartment?

11  A.    I mean he didn't, but, you know, it was provided.

12  Q.    Explain that.

13  A.    At first I was given, you know, an amount of -- I don't

14  know -- just people would come by and grab, you know, whatever

15  they wanted and I would keep the money for him in the safe, but

16  then being a user I started messing up the bags.  It was not

17  really good to have somebody that's using to do that.  So he

18  passed it off to somebody that he thought was more trustworthy,

19  and they carried on that which I couldn't so -- which I'm glad

20  because I didn't want to be around it like that, you know.

21  Q.    You mentioned safes.  Were there multiple safes in your

22  apartment?

23  A.    I guess.  A couple.  Two maybe.

24  Q.    What was kept in the safes?

25  A.    Drugs and money and that's it.

                         Lori C.                         27

1   Q.    Do you know who supplied Moe with drugs?

2   A.    I guess, but I don't want to say for sure because I

3   don't know for certain.

4   Q.    Well let's talk about a person named Ghost and I'll show

5   you an exhibit what's been previously admitted as exhibit 64.

6   Is that Ghost shown in 64?

7   A.    That's who I -- yeah that's Ghost.

8   Q.    What was Ghost's role?

9   A.    I guess to provide drugs.  I don't know.  I stayed in my

10  room and tried to close myself up and put a board up against

11  the doorknob so people couldn't come in my room.

12  Q.    But you were saying you were guessing, Miss C.  Did you

13  ever see Ghost with drugs?

14  A.    I mean, yeah, the day before I went to rehab I did.

15  Q.    What about a person named Hightower?

16  A.    Yeah.  He was -- I think he was given a job to watch --

17  to do something because he was getting in trouble back home and

18  --

19  Q.    I'll show you what's been previously admitted as exhibit

20  115.  Who is that?

21  A.    That's Hightower.

22  Q.    What was his role?

23  A.    Like I said I think he was just given a job to be there

24  at all times so that he would be in less trouble back home.

25  Q.    Was he supposed to watch anything?

                    Lori C.                        28

1    A.      The girls I guess.  I don't know.

2    Q.      Did he stay in your apartment?

3    A.      Yeah.

4    Q.      How long did he stay there?

5    A.      Probably couple months at least.

6    Q.      Going back to the safes earlier it seems like you had

7    access to safes at one time?

8    A.      Just a brief time.  Maybe a week.

9    Q.      Why did you lose access to the safes?

10   A.      What?

11   Q.      Why did you lose access to the safes?

12   A.      Because I would tap the bags out cause -- and then sell

13   them instead of giving him his product the way he wanted it.

14   So I messed it up.

15   Q.      When you say his product who are you referring to?

16   A.      I mean well Moe's I guess, but whoever had, you know,

17   got -- I don't know.  I don't know if it was Ghost's or Moe's.

18   Q.      Do you know who bagged the drugs?

19   A.      The girls.

20   Q.      Do you know what they were wearing when they would bag

21   drugs?

22   A.      The day I went -- the day before rehab they were just

23   wearing bras.

24   Q.      Do you know why they were just wearing bras?

25   A.      So they wouldn't steal any.

```
                      Lori C.                         29
```

1    Q.     You mentioned -- it seems like you mentioned that you

2    bagged the day before you went to rehab.  Who did you bag with?

3    A.     Ghost made me bag and it started making me really dizzy

4    and sick and I screwed it up and he got really mad at me.

5    Q.     Why did you get real dizzy and sick?

6    A.     Because there was all this heroin there and there's no

7    masks or anything so it was too much, and I started messing up

8    the bags and he said he had to redo them all because I screwed

9    it up.

10   Q.     Do you remember who else was bagging with you that day?

11   A.     Chrissy, Amanda I guess.  I can't remember.  There's a

12   lot of people, but I don't know for certain.

13   Q.     How much heroin did you -- all of you bag up that day?

14   A.     I don't know.  I cut out early because he told me -- I

15   just know it was a lot.

16   Q.     When you say a lot can you give any estimate?  Like a

17   softball size?

18   A.     Yeah.

19   Q.     Okay.  Let's shift gears for a minute, Miss C.  Did Moe

20   run a second business from your apartment?

21   A.     I mean from my own deductive reasoning I would say yeah,

22   but I didn't really get involved with that aspect.  I drove

23   Ayla a couple times to places that he asked me to drive her to,

24   but then I pretty much lost all -- you know they didn't want me

25   to do anything so --

```
                        Lori C.                        30
 1   Q.     Let's break this down a little bit, Miss C.  First I'll
 2   start out by showing you what's been previously admitted as
 3   54A.  Who is that again?
 4   A.     Ayla.
 5   Q.     That's Ayla.  What was Ayla like at the very beginning
 6   when she moved into your apartment?
 7   A.     She was young and naive and very pretty.
 8   Q.     Did she have anyplace else she could stay at the time?
 9   A.     I don't think so.
10   Q.     Did she have a boyfriend when she first moved into your
11   apartment?
12   A.     Yeah.  His name was Brad.  He stayed there too.
13   Q.     What happened to Brad over time?
14   A.     He went to rehab.  I think his family sent him to rehab
15   in Florida.  He came back, tried to get her out of the scene,
16   and I didn't hear from them any more.
17   Q.     Back when Ayla was living in your apartment who was she
18   dependent upon?
19   A.     Moe I guess.
20   Q.     Why was she -- what was she dependent on Moe for?
21   A.     Work.
22   Q.     What kind of work?
23   A.     Prostitution I guess.  I don't know.
24   Q.     Did she stay in your apartment the entire time from when
25   she moved in until you went to rehab?
```

                          Lori C.                        31

1    A.      She started doing like she got really -- no she didn't.

2    She had a hard time.

3    Q.      What did she have a hard time about?

4    A.      Well she got really skinny and her hair, you know, it

5    was one big dread on top of her head and she was -- she wasn't

6    staying there any more.  She -- I don't know where she was

7    staying.  I would see her sometimes sitting on the side of the

8    road -- the other side just sitting there.

9    Q.      Let's back up for a minute, Ms. C.  You mentioned

10   prostitution.  Did you ever drive Ayla to see prostitution

11   clients?

12   A.      Prostitution what?

13   Q.      Did you ever drive her to prostitution dates?

14   A.      I did a couple times.

15   Q.      Why?

16   A.      I was asked.

17   Q.      What would you receive in exchange for driving her to

18   these dates?

19   A.      She would give me some tickets after.

20   Q.      Where would these dates take place?

21   A.      Any time.  It could be the middle of the day.  Mostly

22   middle of the day.

23   Q.      Where would they take place?

24   A.      One was in Essex, I know that, and another was in

25   Williston.

                        Lori C.                              32

1    Q.      Were there times when Ayla was sick?

2    A.      Yes.

3    Q.      As a former heroin addict can you explain to the jury

4    what it is like when you're experiencing heroin withdrawal?

5    A.      It feels like you have pneumonia.  You're sweaty and

6    clammy and you don't want to do anything.  You just want to get

7    the next fix so you can be normal again.

8    Q.      Did you see Moe withhold heroin from Ayla?

9    A.      I was told that he did.

10           MR. KAPLAN:  Objection, Your Honor.

11           THE COURT:  Objection sustained.  That would be

12   hearsay.

13   BY MR. GRADY:

14   Q.      Did you ever hear anything from Moe's mouth about

15   withholding heroin from Ayla?

16   A.      She stole which she did frequently.

17           MR. KAPLAN:  Objection, Your Honor.  I don't think

18   the foundation has been laid for this.

19           THE COURT:  The question is whether the defense said

20   anything to you about withholding drugs from Ayla.  Can you

21   respond to that?

22           THE WITNESS:  Yeah.  I guess so.

23           THE COURT:  Okay.  What -- what's your answer?

24           THE WITNESS:  Yes.

25           THE COURT:  Okay.

```
                        Lori C.                          33
 1   BY MR. GRADY:
 2   Q.    Did Moe ever withhold heroin from you?
 3   A.    Yeah.
 4   Q.    Why?
 5   A.    I really can't remember a lot of it now, but I know
 6   there were times I was sick and I was told by the girls that
 7   they were told by Moe not to give me any.
 8              MR. KAPLAN:  Objection, Your Honor.
 9              THE COURT:  Objection sustained.
10   BY MR. GRADY:
11   Q.    Miss C., I just want to focus on anything from Moe
12   himself.  Did he himself withhold heroin from you?
13   A.    Yes.
14   Q.    And why did he himself withhold heroin from you?
15              MR. KAPLAN:  Again, Judge, if she knows, not what
16   someone else said to her.
17              THE COURT:  Right.  So this -- the question is asking
18   you for comments that were made by the defendant in regard to
19   withholding drugs from you, and do you remember statements that
20   he would have made, not what statements were made by other
21   witnesses.
22              THE WITNESS:  This is three years ago and I'm having
23   a hard time remembering.
24              THE COURT:  Sure.  I appreciate that.  The question
25   is whether you remember any statements that were made by the
```

Lori C.                                    34

1  defendant.

2          THE WITNESS:  I believe so.  Once I remember

3  something about I upset somebody and upset him and basically I

4  wasn't allowed to have anything until, you know, the time was

5  up or whatever.

6          THE COURT:  Do you want to clarify -- lay a

7  foundation to see if she is actually speaking about a statement

8  that was made by Mr. Folks or --

9          MR. GRADY:  I think it might just be easier to move

10  on, Your Honor.

11          THE COURT:  Okay.

12          MR. GRADY:  I'll just move on.

13          THE COURT:  All right.

14  BY MR. GRADY:

15  Q.    One last question on this topic, Miss C.  Did you used

16  to call it anything when drugs were being withheld from you?

17  A.    I felt like we were being punished I guess.

18  Q.    And would that happen to more than just you?

19  A.    No.

20  Q.    Would it happen to others?

21          MR. KAPLAN:  Objection, Your Honor.  The question has

22  been asked and answered.

23  A.    Yes.

24          THE COURT:  I'm sorry.  Objection overruled.  What is

25  your answer?

                         Lori C.                              35

1   BY MR. GRADY:

2   Q.      Want me to repeat the question, Ms. C.?

3   A.      Yes.

4   Q.      Did it happen to other people besides yourself?

5   A.      Yes.

6           MR. KAPLAN:  Judge, may we approach please?

7           THE COURT:  Yes, okay, I'll put the husher on.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         Lori C.                          36

1    [Bench conference]

2            MR. KAPLAN:  Judge, this witness is clearly having

3    difficulty remembering and so I would have thought she would

4    have been prepared for the questions because when he says to

5    her did he withhold from anyone else I don't know what her

6    basis is, did she see it herself.

7            THE COURT:  He's got to lay a foundation before she

8    testifies to someone withholding drugs based upon her

9    observation.  Has to be based upon her personal observation.

10   She hasn't answered that so objection will be sustained, but

11   she's a very difficult witness because her memory seems to be

12   --

13           MR. KAPLAN:  I don't have a problem with her.  I just

14   don't want her talking about things she doesn't know like if

15   someone told her.

16           THE COURT:  If you really want to --

17           MR. GRADY:  I'll move on.

18           THE COURT:  She doesn't have much to offer.

19           MR. GRADY:  Right.

20           THE COURT:  Okay.

21   [End of bench conference]

22

23

24

25

                          Lori C.                           37

1    BY MR. GRADY:

2    Q.     Miss C., we're going to move on to a different topic.  I

3    still want to ask a few more questions about Ayla.  Did her

4    heroin addiction increase over the time that you saw her in

5    your apartment?

6    A.     Yes.

7    Q.     How much was she using at the end compared to how much

8    she was using at the beginning?

9    A.     She always had it and I don't -- I mean -- it just

10   seemed like she always had it with her.  That means she was

11   able to do as much as she wanted.

12          THE COURT:  I'm sorry.  I couldn't quite hear you.

13   Could you speak right into the microphone?

14   A.     She was able to do as much as she wanted towards the end

15   I guess because she had a lot.

16   Q.     Physically you mentioned earlier that I believe her hair

17   became matted.  Did you notice any other physical changes?

18   A.     She was very skinny.

19   Q.     Did you ever notice any bruises on Ayla?

20   A.     Yes, but she also had track marks and stuff so I don't

21   -- yeah she had bruises on her arms.

22   Q.     How many bruises would you say?

23   A.     Quite a few.

24   Q.     What parts of her body were they on?

25   A.     The arms.

                        Lori C.                        38

1              MR. KAPLAN:  Objection, Your Honor, to relevancy.

2              THE COURT:  Objection overruled.  I assume Ayla will

3      be testifying?

4              MR. GRADY:  Yes, Your Honor.

5              THE COURT:  Okay.

6      BY MR. GRADY:

7      Q.    Did Ayla ever confide in you who caused some of those

8      bruises?

9              MR. KAPLAN:  Objection, Your Honor.

10             THE COURT:  Objection sustained.

11     BY MR. GRADY:

12     Q.    Do you remember what her demeanor was like when she was

13     telling you about the bruises?

14     A.    Yes.  She was crying.

15     Q.    Did it seem as if the bruises just occurred?

16             MR. KAPLAN:  Objection.

17             THE COURT:  Objection sustained.

18     BY MR. GRADY:

19     Q.    Did Moe ever kick Ayla out of your apartment?

20             MR. KAPLAN:  Objection, Your Honor.

21             THE COURT:  What's the objection?

22             MR. KAPLAN:  I'm not sure.  I withdraw it.

23             THE COURT:  Okay.  I'm not sure either.  All right.

24     BY MR. GRADY:

25     Q.    I'll ask the question again, Ms. C.  Did Moe ever kick

                Capitol Court Reporters, Inc. (800/802) 863-6067

                         Lori C.                          39

1    Ayla out of your apartment that you personally know of?

2    A.     I believe so, but because she wasn't allowed in.

3    Q.     Who told you she was not allowed in?  Was it Moe?

4    A.     She did --

5              MR. KAPLAN:  Objection, Your Honor.

6              THE COURT:  Objection sustained.

7    BY MR. GRADY:

8    Q.     Were you ever -- did Moe ever prohibit you from talking

9    to Ayla?

10   A.     No.  I don't think we were really supposed to talk to

11   her so I would have her come to my window and sleep over.

12   Q.     Ms. C., let's move on and talk about Keisha and I'll

13   show you what's been admitted as 50A.  Do you recognize that

14   person?

15   A.     Yup.

16   Q.     Is that in fact Keisha?

17   A.     I think so.

18   Q.     In any event was Keisha another woman who had come by

19   your apartment?

20   A.     Yes.

21   Q.     Did she stay from time to time?

22   A.     Not for long.  She didn't spend the night I don't think.

23   Q.     Did anything ever happen between Keisha and Chrissy?

24             THE COURT:  That you observed.

25   A.     Yeah.  She jumped her and took her drugs from her.

                         Lori C.                          40

1    Q.     I'm sorry.

2    A.     She jumped her.  She took her drugs from her.

3    Q.     Who took drugs from who?

4    A.     Keisha took Chrissy's -- the stuff she was given to

5    sell.

6    Q.     Did the -- did Moe do anything after this happened?

7    A.     He just said whoever finds her he would give them some

8    money and she was found within five minutes, and when I drove

9    him to her -- to where the boys were he gave her a hug and that

10   was -- at least it appeared -- someone said something about it

11   might not have been a hug, but it looked like a hug.

12   Q.     Let's bring this -- break this down a little bit, Miss

13   C.  You said when you drove him to her.  Who is the him you're

14   referring to?

15   A.     Moe to the boys that called so that they had her.

16   Q.     When you showed up did you drive the defendant to where?

17   A.     To his house in Winooski.

18   Q.     What did you see when you showed up?

19   A.     The two young guys had her one arm in each arm and Moe

20   just walked up and put his arm around her like.

21   Q.     Did you see anything after that?

22   A.     No.

23   Q.     Where did you go after that?

24   A.     I probably went back home.

25   Q.     I'm sorry.

                    Lori C.                              41

1    A.     I probably went back home.

2    Q.     Okay.  Shifting gears again, Miss C., did Moe ever take

3    naked pictures of you?

4    A.     But the -- yeah.

5    Q.     Why?

6    A.     I was told I could make money with that.

7    Q.     Who told you that?

8    A.     Moe did.

9    Q.     Where did he take these pictures?

10   A.     My house.

11   Q.     What -- do you recall what he used to take the pictures?

12   A.     His phone.

13   Q.     Did you have to pose certain ways?

14   A.     Yeah.

15   Q.     Who directed that?

16   A.     Moe did.

17   Q.     What was he going to do with these pictures?

18   A.     There was something to do with a book that prisoners get

19   with thumbnails and if they like -- just I mean it's like

20   really small of the girl.  If they like that, they can buy the

21   package and then I get money for that.

22   Q.     What were you going to receive in exchange for these

23   pictures?

24   A.     Money.

25   Q.     Did you ever receive any money?

                Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                                    42

1   A.      No.

2   Q.      Miss C., it seems from what you testified earlier that

3   you were not happy with your apartment being used in a fashion

4   that it was?

5   A.      That's correct.

6   Q.      Did you ever try to get Moe out of your apartment?

7   A.      Yes.

8   Q.      What did you do?

9   A.      I would complain and he said he would be out of there

10  tomorrow, but, you know, then he wouldn't help me any more.  So

11  I always felt like I was stuck in a hard place because I

12  couldn't --

13  Q.      What do you mean when you say he wouldn't help you any

14  more?

15  A.      With drugs.

16  Q.      Did you try to not pay the hot water bill?

17  A.      Yeah.

18  Q.      Why is that?

19  A.      I thought that it would get the girls to leave because

20  they couldn't take showers.

21  Q.      What about same for electricity?

22  A.      Yup.  That kind of worked for a little bit until I

23  finally put it back on.

24  Q.      Was there an occasion when the defendant got upset

25  because a friend came over to visit you?

1    A.      Yeah.

2    Q.      Can you explain that?

3    A.      This other guy that I knew from Ed's time came to visit

4    and I was busy getting a car registered or something.  I can't

5    remember exactly if I was there at first, and then anyway the

6    guy came over and they got very upset about it.  All three,

7    Ghost and Hightower and Moe, they were upset that the guy came

8    over because he was also from New York or a dealer or whatever,

9    and they knew, they could tell, and he just really was

10   wondering how I was doing because of Ed going to prison and

11   stuff.  So --

12   Q.      What race was this friend who came over?

13   A.      Jamaican.

14   Q.      And was Moe upset because of another Jamaican or Black

15   guy came over?

16           MR. KAPLAN:  Objection, Your Honor.

17   A.      I don't think that was the issue.  It was just he was

18   selling drugs.

19           THE COURT:  You have to ask the question in terms of

20   what the witness said -- what did Mr. Folks say about his

21   reaction to this.

22   A.      Do I have to answer things I'm not sure because I don't

23   remember word for word.  I kind of remember the gist of it, but

24   I don't -- I just remember being told when I got back from the

25   car.

Lori C.                              44

1          MR. KAPLAN:  Objection, Your Honor.

2          THE COURT:  Well she can actually testify to the

3    gist.

4          MR. KAPLAN:  It's not clear to me who told her.

5          THE COURT:  Okay.

6    BY MR. GRADY:

7    Q.    Ms. C., who told you anything when you came back?  Was

8    it Moe?

9    A.    Moe did, yeah.

10   Q.    What did Moe say?

11   A.    That I couldn't be having those guys over here, you

12   know, guys like that over there.

13   Q.    During this time period, Miss C., did you even want to

14   be in your own apartment?

15   A.    I'm sorry.  I didn't hear that.

16   Q.    Did you -- were there times you didn't even want to be

17   in your own apartment?

18   A.    Yeah.  I would go walk around town all night because I

19   didn't want to be there.

20   Q.    What about your kids?

21   A.    I had their friends -- one's grandmother and one's

22   mother -- I went over to their houses and asked if they could

23   stay there.  I've known these moms ever since the boys were in

24   kindergarten and they understood.  They knew what was, you

25   know, happening at my house and they -- I didn't have much

Lori C.                              45

1    money, but I gave them $40 to just please let my boys stay here

2    where it's safe and they did.

3    Q.    Did you ultimately succeed in getting Moe out of your

4    apartment?

5    A.    He agreed with me when I went to rehab.  He said that he

6    would be gone when I got back because I asked him could you

7    please have everybody gone when I get out of rehab and he said

8    yes and he did.

9    Q.    Miss C., we have one more final topic.  Did you ever

10   register a car in your name for Moe?

11   A.    Yeah.

12   Q.    How did that come about?

13   A.    I was asked to go -- Ghost dropped me off at the DMV to

14   register a car and I did it because I thought it was just

15   because I had a license.  So --

16   Q.    Why did Moe want you to register a car?

17   A.    Because he didn't want it in their name I guess.

18   Q.    Well did Moe say anything to you exactly that you

19   remember?  No?  Okay.

20   A.    Not that I remember.

21   Q.    When did you register this vehicle?

22   A.    Probably like a month before I ended up going to rehab.

23   Q.    Do you remember which DMV you went to?

24   A.    Yeah.  The one in South Burlington.

25   Q.    Off Dorset Street and Barnes & Noble?  Yes?

                        Lori C.                        46

1    A.     Yeah.

2    Q.     Did Ghost stay with you or did he just drop you off?

3    A.     He dropped me off and that was that.

4    Q.     Did anybody come back to pick you up?

5    A.     No.  I walked home.

6    Q.     How did you get home?

7    A.     I walked.  I called, but no -- they --

8    Q.     Who did you call?

9    A.     Moe.

10   Q.     How many times did you call Moe?

11   A.     Just the once.

12   Q.     How were you feeling when you walked home?

13   A.     I was pretty upset.

14   Q.     Did you ever get any money or tickets for registering

15   this vehicle?

16   A.     No.  I didn't get anything for that I don't think.

17   Q.     Do you remember what kind of car it was?

18   A.     It was like one of those smaller SUV types I guess or

19   it's not quite a truck or a van, but it's the boxy --

20   Q.     Miss C., at this time I am showing you what's been

21   labeled exhibit 107B for identification pages 13 and 14 which

22   are Bates 11305 and 11306.  Do you recognize the vehicle?

23   A.     Yeah that's it.  Yeah that's it.

24   Q.     Is that the vehicle you registered for the defendant?

25   A.     I think so.

                         Lori C.                        47

1    Q.      Thank you.  I will take back 107B for identification.

2    Did you ever use that vehicle as your own car?

3    A.      Not really, no.

4    Q.      Did you ever store any personal property in there?

5    A.      No.

6    Q.      Who usually drove the vehicle?

7    A.      Chrissy or somebody else.  Not me.

8    Q.      Did you register any other cars that you remember?

9    A.      It seems like I did, but I can't remember.

10   Q.      Did you ever get a call to pick up a car?

11   A.      Yeah.  The police actually came to my house.

12   Q.      Why?

13   A.      They said that I needed to come.

14   Q.      Where did you have to go?

15   A.      To the police station on -- by the park.

16   Q.      Do you remember roughly when that happened?

17   A.      After rehab.

18   Q.      Was anything located in this car?

19   A.      There was a gun.

20   Q.      Was that gun yours?

21   A.      No.

22   Q.      Speaking of firearms did you ever see Moe with a

23   firearm?

24   A.      I think so.

25           MR. KAPLAN:  Objection, Your Honor.

```
                        Lori C.                        48
 1              THE COURT:  Well can you lay a foundation?
 2              MR. GRADY:  Sure.
 3   BY MR. GRADY:
 4   Q.     During the time period -- well let's go back for a
 5   second.  How many times did you see Moe from when you met him
 6   until when you went to rehab?
 7   A.     Maybe once or twice.  I saw Mandy more because she was
 8   the in-between person.
 9   Q.     When you say once or twice do you mean once or twice a
10   day?  A week?
11   A.     No.  Once or twice period.  Like after rehab you mean?
12   Q.     No.  I'm sorry, Miss C.  Let me go back.  I'm talking
13   about the day that you met Moe until the day you went to rehab
14   how many times do you think you saw Moe?
15   A.     Probably more than I saw my kids.
16   Q.     Daily?
17   A.     About that.
18   Q.     And the times that you saw him during this daily
19   interaction with him did you ever see him with a firearm?
20   A.     I think so, yes.
21              MR. KAPLAN:  Objection, Your Honor.
22   BY MR. GRADY:
23   Q.     Yes or no, Miss C.  Do you remember?
24              THE COURT:  It's a yes or no.  Did you see him or did
25   you not or do you not know?
```

                        Lori C.                              49

1   A.      They had an air gun too so --

2                MR. KAPLAN:  May I approach?

3                THE COURT:  Yes.  I'll put the husher on.

4   [Bench conference]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lori C.                                    50

1          MR. KAPLAN:  Judge, I've got three statements she

2     gave where she said she never saw him with a gun, never, and

3     she said it several times.  So now I don't know how she was

4     prepared, but when she was prepared did she say --

5          MR. GRADY:  She did.  I met with her a couple weeks

6     ago.  I asked did you ever see a firearm.  She says she

7     remembers one time she saw him with a firearm in her apartment.

8     Clearly she's not saying that today so --

9          THE COURT:  Right, and what is this air --

10          MR. GRADY:  Well she will also talk about airsoft

11     guns, but then she will probably say that too, but I'm talking

12     about an actual firearm; 9 millimeter firearm.

13          THE COURT:  She's really tentative and the question

14     is, is she tentative because she's always tentative or whether

15     she's really tentative saying firearm.  If there are in fact

16     three statements about her not seeing a firearm, that really

17     raises --

18          MR. KAPLAN:  Every time she was asked she said no.

19          THE COURT:  You want to move on.

20          MR. GRADY:  I'm just move on, Your Honor.  It's not

21     worth it.

22     [End of bench conference]

23

24

25

                    Lori C.                        51

1  BY MR. GRADY:

2  Q.     Ms. C., just a couple last questions.  When you went to

3  the police station and picked up the vehicle what did you do

4  with it?

5  A.     I don't remember.  I remember that I had to ask the

6  police for a jump.

7  Q.     Maybe a better way to put the question --

8  A.     I can't remember.  I honestly don't know if I drove it

9  somewhere or -- I must have drove it -- I was with Mandy.

10 Q.     Perhaps an easier --

11 A.     I think I picked it up and then she ended up taking it

12 or something.  I don't -- I can't remember.

13 Q.     Did you have anything to do with either Moe or the car

14 after you picked this up from the police?

15 A.     No.

16          MR. GRADY:  One moment, Your Honor.

17          THE COURT:  Okay.

18          MR. GRADY:  Nothing further, Your Honor.

19          THE COURT:  Okay.  Cross examination.

20          MR. KAPLAN:  Yes.  Thank you, Judge.

21                   CROSS EXAMINATION

22 BY MR. KAPLAN:

23 Q.     Miss C., you have been clean for how long?  Three years?

24 A.     Three years.

25 Q.     How does that feel?

                       Lori C.                              52

1    A.    It feels good.

2    Q.    How does it feel compared to when you were using drugs?

3    A.    It's good to have my sons' respect again.  So it feels

4    good.

5    Q.    And your son's living with you now?  Is your son living

6    or he's 21?

7    A.    They both live with me, yes.

8    Q.    Oh they do, and you don't have anything to do with that

9    world that you lived in before at this point?

10   A.    I can't hear you.

11   Q.    You don't have anything to do with that world that you

12   lived in before?

13   A.    No.  No.

14   Q.    And was it Moe or Brian Folks that encouraged you to go

15   to rehab?

16   A.    I wanted to go to rehab.  He said he would help me get

17   there.

18   Q.    Okay, and did he tell you that he thought that was a

19   good idea?

20   A.    When you talk down I can't hear.

21   Q.    Did he tell you that he thought that was a good idea?

22   A.    Yes.  He wanted -- yeah he definitely wanted me to go.

23   Q.    Is it fair to say that it was Ghost or G or McFarlan

24   that brought all the drugs up from New York?

25   A.    I would say yes.

              Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                                       53

1   Q.     And do you remember him telling you that he was there

2   for one reason and that was to make money from selling drugs?

3   A.     Yeah.  I remember him saying that.

4   Q.     And is it fair to say that you thought McFarlan was a

5   scary person?

6   A.     What was that?

7   Q.     Is it fair to say you thought McFarlan was a scary

8   person?

9   A.     That Moe thought that?

10  Q.     No.  That you thought that?

11  A.     I definitely thought that.

12  Q.     Okay, and did you have a reason for thinking that?

13  A.     Yeah.  I woke up to a knife in my face accusing me of

14  stealing his drugs.

15  Q.     So you were sleeping and what happened?

16  A.     He had a knife to my throat.

17         MR. GRADY:  Objection, Your Honor, as to relevance.

18         THE COURT:  Objection overruled.  Go ahead.

19  A.     And --

20  Q.     This was McFarlan?

21  A.     I don't know him like that.  Ghost.

22  Q.     Or Ghost.  You know him as Ghost?

23  A.     Yeah.

24  Q.     And he was holding a knife to your throat?

25  A.     Yes.

Lori C.                                    54

1   Q.      And so like how did you feel?  This might sound like a

2   stupid question, but --

3   A.      Actually it was a weird question because I already

4   wanted to die, but it was like I was half scared and half not

5   and it was like I just wanted him to leave me alone, and I said

6   I don't have your money, I don't steal, and I didn't -- just

7   saying that put me in a -- everything gets twisted, and people

8   if you say you don't steal obviously they are thinking it's

9   some kind of con that you're doing and no one takes your word

10  for it.  So I said I don't steal and I don't have your money,

11  and Moe ended up paying him what he was accusing me of

12  stealing.

13  Q.      Did you actually feel like at the time that you might

14  die?

15  A.      I thought if I crossed this guy enough that he wouldn't

16  have any problem doing that.  Yeah.

17  Q.      So this is not the first time you've said that Ghost

18  held a knife to your throat.  You told the agents and the

19  prosecutors that before, isn't that right?

20  A.      Just the knife incident and he shoved me up against the

21  tv speakers.

22  Q.      And he hit you in the chest one time?

23  A.      That's what I'm talking about.  He shoved me.  Hit me in

24  the chest.

25  Q.      This was -- this was Ghost?

Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                                          55

1    A.      With his hands.  Yeah Ghost.

2    Q.      And that's in several interviews that were being

3    transcribed when you were talking to the police?

4    A.      Yup.

5    Q.      And did it leave bruises when you were hit?

6    A.      It left a red mark.

7    Q.      Okay, and wasn't there another time that you said he

8    would kill you if you ever talked about him?

9    A.      Probably.

10   Q.      So when you were preparing your testimony for today's

11   testimony with the prosecution did they ask you about these

12   threats the way Ghost had treated you?

13   A.      Yeah I think so.

14   Q.      And did you tell them when you were preparing your

15   testimony that he held a knife to your throat?

16   A.      Yeah.

17   Q.      And what did they say?

18   A.      I don't know.

19   Q.      Do you know why they didn't ask you about that in court

20   today?

21           MR. GRADY:  Objection, Your Honor.

22           THE COURT:  Sustained.

23           THE WITNESS:  I don't know where you're going.

24           THE COURT:  You don't need to answer that.

25           THE WITNESS:  Okay.

Lori C.                                    56

1  BY MR. KAPLAN:

2  Q.    Let me show you what's been marked as plaintiff's --

3  defendant's exhibit F6 and ask you to look at page 7.  Just

4  read this to yourself please.  This is an interview that you

5  gave to the police on July 25th of 2016.  This is a transcript

6  of it.  I want to see if this refreshes your memory.  If you

7  could just read the first part here please?

8  A.    Out loud?

9  Q.    No.  Just to yourself.

10  A.    I must have remembered a lot more back then.

11  Q.    Does that refresh your memory?

12  A.    A little bit.

13  Q.    Okay.

14  A.    Yeah I remember that.

15  Q.    So tell me please a little bit that you do remember

16  about that?

17            THE COURT:  About what?

18  BY MR. KAPLAN:

19  Q.    So the question is did Ghost ever tell you that he would

20  kill you if you ever mentioned his name, and I asked you to

21  read that.  If you don't remember, that's fine.

22  A.    Yeah.  I can't remember and I don't want to say anything

23  that's a definite -- I know the Court doesn't want gray areas

24  so I can't remember.

25  Q.    I think you said at one point that Hightower was only

Lori C.                                    57

1   there for a month?

2   A.     I'm sorry.

3   Q.     I think you said at one point that Hightower was only

4   there for one month?

5   A.     It felt like it was two months now, but I don't know.

6   Q.     And was it McFarlan that brought Hightower up from New

7   York?

8   A.     I'm really having a hard time hearing you.

9   Q.     Was it McFarlan that brought Hightower up?

10  A.     I believe so.

11  Q.     Okay.  Do you recall saying that at some point Brian was

12  coming over less and less?

13  A.     Yes.

14  Q.     And do you know why that was?

15  A.     No.  I didn't get involved.  I tried to stay away from

16  everything.

17  Q.     Do you recall saying that one of the reasons was that it

18  was too confusing for him over there?  Too many people?

19  A.     For Moe?

20  Q.     For Brian.  Yes, for Moe.

21  A.     I just assumed he was spending more time with his

22  family.

23  Q.     Okay, and do you recall when it was that he started

24  coming over less and less?

25  A.     I don't know.  He did come over less and less.

                          Lori C.                         58

1   Q.     You testified about the day before you went to rehab you
2   were forced to bag drugs?
3   A.     Yes.
4   Q.     And that was McFarlan that forced you to do that?
5   A.     Yes.
6   Q.     Brian wasn't there?
7   A.     No.
8   Q.     And you told McFarlan you didn't feel good, you didn't
9   want to do that?
10  A.     I did tell him that.
11  Q.     And you got sick while you were doing it?
12  A.     Yes.
13  Q.     And let me -- and do you recall what he said to you?
14  A.     He said I had to do it.  I can't remember exactly, but I
15  remember him sitting me down and making me do it.
16  Q.     And did he -- was he rough with you?
17  A.     He just took me and sat me down like a parent would a
18  little kid.
19  Q.     So he knew that you were going to rehab the next day?
20  A.     Uh-huh.
21  Q.     And did he say anything to you about that?
22  A.     I don't think he cared about that stuff.  We were all
23  just junkie whores to him so --
24  Q.     And was it fair to say that those were his drugs not
25  Brian's?

                 **Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Lori C.                          59

1    A.      That's fair to say.

2    Q.      In fact, isn't it -- isn't it true that McFarlan took

3    over the whole drug business by himself?

4    A.      Yeah.

5    Q.      And at that point Brian wasn't even involved in it?

6    A.      That's right.

7    Q.      And McFarlan would brag to you about the fact that he

8    was in charge of everything and it was his business?

9    A.      That's true.

10   Q.      Isn't it also -- if you remember, the young women that

11   were there they were free to come and go as they wanted?

12   A.      I don't know.

13   Q.      Well didn't you say, for example, that Chrissy would

14   come and go?

15   A.      She was always there.

16   Q.      Wouldn't she leave?

17   A.      Mandy was the one that would come and go.  Like she

18   never stayed though.

19   Q.      Okay.  So let me show you your Grand Jury testimony from

20   August 11, 2016 and ask you to read this section about Keisha

21   and see if that refreshes your memory.  See where it says right

22   there, just that paragraph please.

23   A.      Out loud?

24   Q.      No.

25             MR. GRADY:  Objection.  There's no question.

                        Lori C.                         60

1               THE COURT:  You're asking a question as to what she

2    said.

3               MR. KAPLAN:  Well I asked her if she remembered the

4    women going -- being free to go back and forth by themselves

5    and it was unclear to me so I thought this might refresh her

6    memory.

7               THE COURT:  All right.  So you can go ahead.

8    BY MR. KAPLAN:

9    Q.     Does that refresh your memory?

10   A.     Yeah.

11   Q.     So is it fair to say that Keisha -- for example, someone

12   like Keisha would come and go as she pleased?

13   A.     Yeah.

14   Q.     And no one stopped her from doing that?

15   A.     No.

16   Q.     And is it also fair to say that the young women that

17   were there if Moe didn't have any drugs they would go some

18   place else and buy them?

19   A.     More than likely.

20   Q.     Do you remember saying that you did not think that the

21   young women that were there were afraid of Moe?

22   A.     No none of the girls were afraid of him.

23   Q.     Were they afraid of McFarlan or Hightower?

24   A.     What?

25   Q.     Were they afraid of McFarlan or Hightower?

                        Lori C.                          61

1    A.      Hightower.

2             MR. GRADY:  Objection, Your Honor.  Calls for

3    speculation.

4             THE COURT:  You want to ask -- well you wouldn't ask

5    a foundational question.  Objection overruled.  You can --

6    based upon your observations can you answer that?

7    A.      Hightower was the one that was living there so he would

8    get --

9    Q.      So we don't get in trouble just yes or no.  Were they

10   afraid of Hightower --

11   A.      Yes.

12   Q.      -- or McFarlan?

13   A.      Some girls were.

14   Q.      So, Miss C., do you remember saying that Brian said to

15   you that he thought he had something going that was fair to him

16   and fair to the girls?

17            MR. GRADY:  Objection, Your Honor.  Calls for

18   hearsay.

19   A.      I don't remember.

20            THE COURT:  That's a statement from the defendant.

21            MR. GRADY:  Right, but counsel is asking --

22            THE COURT:  Pardon me.

23            MR. GRADY:  That's party opponent for us.  That's

24   party for the defense.

25            THE COURT:  Well that is in response to many of the

Lori C.                        62

1    previous statements so she can answer that.

2    BY MR. KAPLAN:

3    Q.     Do you recall him telling you that?

4    A.     I can't remember what the question is now.

5    Q.     Do you remember Brian telling you why he thought what he

6    was setting up was fair?

7    A.     I believe so.  Yes.

8    Q.     And was part of that, that he would get them off the

9    streets?

10   A.     I don't know.

11   Q.     Is it fair to say that you never saw Brian bring any

12   drugs into the house?

13   A.     Just a few tickets here and there.  Nothing like

14   production wise.

15   Q.     You said it was -- it was Ghost who drove you to the

16   motor vehicle department?

17   A.     Yeah.

18   Q.     And that several different people drove that vehicle?

19   A.     I don't know.  I never got to have any -- I don't know.

20   Q.     So you don't know who drove the car?

21   A.     I'm not really hearing the whole question.  I'm sorry.

22   Q.     Is it fair to say that you do not know who actually

23   drove that vehicle?

24   A.     Yeah.

25   Q.     That's true?

                         Lori C.                        63

1    A.      That's true.

2    Q.      Okay.  So if there was something found in the glove

3    compartment, you wouldn't know who put that in there?

4    A.      No.

5              MR. KAPLAN:  Could I have a moment, Judge?

6              THE COURT:  Yes.

7    BY MR. KAPLAN:

8    Q.      Did McFarlan bring a couple of dogs to your house?

9    A.      What was that?

10   Q.      Did McFarlan bring dogs to your house at one point?

11   A.      A girl from New York did that, was one of his family

12   brought a couple dogs.

13   Q.      Did Brian?

14   A.      Dogs.

15   Q.      Dogs, yeah.  Nice subject for today, right?  Did Brian

16   do anything about the dogs?

17   A.      I can't remember.  I took care of them for a couple

18   days.

19   Q.      Do you recall a time when was it your son that was lost

20   -- one of your children was missing?

21   A.      We thought he was missing.

22   Q.      And who found him?

23   A.      Moe did.

24   Q.      Moe did.  He went out and looked for him?

25   A.      Yup.  He was out with a guy that I trusted, but I didn't

                         Lori C.                          64

1    know he was with him and he just took him without telling me.

2    It was late at night and I just went running around all over

3    town.

4    Q.    Was there another time that Brian stopped Ghost from

5    hitting you with a piece of wood?

6    A.    If it's the time that he paid him so that he wouldn't

7    hurt me --

8    Q.    Yes.

9    A.    -- that's -- yes.

10   Q.    So he was going to hit you and Brian paid him?

11   A.    Yeah.

12         MR. KAPLAN:  Okay.  I have nothing further, Your

13   Honor.

14         THE COURT:  Okay.  Is there any redirect?

15         MR. GRADY:  Briefly, Your Honor.

16         THE COURT:  Okay.  Why don't -- we'll finish with

17   this witness and then we'll have our recess.

18         MR. GRADY:  Thank you, Your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. GRADY:

21   Q.    Miss C., just a couple areas to ask you about.  The

22   first relate to the drug business.  Who was in charge of the

23   day-to-day access of the drugs?

24   A.    I would go to Chrissy to get anything I needed so she

25   held on to it.

                              Lori C.                          65

1    Q.      Who -- who did the money go to?

2    A.      I mean Moe came in to get the money, but I'm not even

3    sure now who it went to.

4    Q.      Who did you see more of Moe or Ghost?

5    A.      I would say equally there for a while.  I would see them

6    both the same amount.

7    Q.      Do you know where Ghost lived?

8    A.      No.

9    Q.      The final area, Miss C., is questions related to coming

10   and going from your house.  As I understand your testimony it

11   sounds like this period of your life negatively impacted your

12   relationship with your children.  Is that a yes?

13   A.      Yes.  Sorry.

14   Q.      And I believe you mentioned that your sons respected you

15   now that you were clean?

16           MR. KAPLAN:  Objection, Your Honor.

17           THE COURT:  That's a preliminary question.  You're

18   going to ask something about that?

19           MR. GRADY:  Yes, your Honor.

20           THE COURT:  Objection overruled.  You can answer

21   that.

22   A.      Yes.

23   Q.      And I believe you mentioned before that I think to use

24   your words you were suicidal if you didn't go to rehab?

25   A.      It was that or rehab.

                        Lori C.                          66

1   Q.     And I believe you also mentioned that you asked Moe
2   repeatedly to leave the house?
3             MR. KAPLAN:  Your Honor, object.
4             THE COURT:  Are you going to follow this up with an
5   open-ended question?
6             MR. GRADY:  I am.  Yes.
7             THE COURT:  Objection overruled.  Go ahead.
8   A.     Yeah I did.
9   Q.     Why didn't you just call the police?
10  A.     The police were at my house everyday.
11  Q.     Did you ever approach one?
12  A.     No.
13  Q.     Why not?
14  A.     Are you serious?
15  Q.     Yes.  Just explain if you were suicidal and you wanted
16  Moe out of the house, why not just tell somebody?
17  A.     I didn't want to get hurt.  Simple as that.
18  Q.     Why would you get hurt?
19  A.     That's like you just don't do that.  You just don't.  I
20  don't know maybe I just think that.
21            MR. GRADY:  Nothing further, Your Honor.
22            THE COURT:  Okay.  Anything further -- any further
23  questions?
24            MR. KAPLAN:  No.  Nothing further, Your Honor.
25            THE COURT:  All right.  Thank you.  All right.  Let's

                         Lori C.                            67

1    take our recess and get back in 15 minutes.

2    [Recess 10:35 a.m. - 10:55 a.m.]

3              THE COURT:  Good afternoon.  Want to call the next

4    witness.

5              MR. KAPLAN:  I realized after speaking with my client

6    that I had a few more questions to ask Miss C. so I asked her

7    to wait.  She's prepared to come back in.

8              THE COURT:  Okay.  This is in rebuttal?

9              MR. KAPLAN:  Yes.

10             THE COURT:  Okay.  All right.  I just want to remind

11   you, you are still under oath.

12                         REBUTTAL

13   BY MR. KAPLAN:

14   Q.    Miss C., were there occasions -- you mentioned being

15   afraid just before you left the courtroom and that's why you

16   didn't call the police or talk to the police?

17   A.    Just something you don't do.

18   Q.    Do you remember asking --

19   A.    Plus the cops were there everyday.  They saw everything.

20   They knew what was going on.

21   Q.    Do you remember asking Brian on occasion to speak to

22   your boys?

23   A.    Yeah.  I needed a male figure to talk to them.

24   Q.    And like did one of them say at one point he didn't want

25   to go to school and Brian was encouraging him to do that?

                Capitol Court Reporters, Inc. (800/802) 863-6067

Lori C.                          68

1   A.      Yup.

2   Q.      And did Brian find a job for them?

3   A.      He got -- he let them babysit his kids.  Yeah.

4   Q.      And he paid them for that?

5            THE COURT:  You actually have to respond.

6   A.      Yes.  Yes.  Sorry.

7   Q.      And was he trying to encourage them not to smoke

8   marijuana?

9   A.      I don't know about that.  I mean maybe.  I don't know.

10  Q.      When you went to rehab and came back did Brian check on

11  you?

12  A.      He did.

13  Q.      And how many times?

14  A.      Once.

15  Q.      And was someone there that he asked to leave when he

16  came over?

17  A.      Ayla.

18  Q.      Ayla and her boyfriend?

19  A.      I don't know if her boyfriend was there.

20  Q.      And Brian told her she had to leave?

21  A.      I don't know.  I can't remember.  Maybe it was Keisha.

22  I don't know.  I really can't remember.

23  Q.      That's fine.  You mentioned a safe.  Is it fair to say

24  it was a lockbox -- a small lockbox not --

25            MR. GRADY:  Objection, Your Honor.  That's outside

Lori C.                                    69

1   the scope of the redirect.

2            THE COURT:  Objection overruled.  You can answer that

3   question.

4   A.     It was one of those black safes.

5   Q.     How big was it?

6   A.     Like that.  (Demonstrates)

7   Q.     With a key on the top of it?

8   A.     I think.

9   Q.     You had to use a key?

10  A.     I don't know.

11           MR. KAPLAN:  All right.  Can I have a minute, Judge?

12           THE COURT:  You can.

13           MR. KAPLAN:  Nothing further.  Thank you, Judge.

14           THE COURT:  All right.  Thank you.

15           THE WITNESS:  I'm really done this time?

16           THE COURT:  You're done.  Okay.  Government want to

17  call the next witness.

18           MR. GRADY:  Yes, Your Honor.  The Government calls

19  Michael Beliveau.  Good morning, sir.  Please enter the

20  courtroom and proceed to the podium where you will get sworn.

21  MICHAEL BELIVEAU,

22       Having been duly sworn, testified as follows:

23           THE COURT:  Good morning, Officer Beliveau.

24           OFFICER BELIVEAU:  Good morning, Your Honor.

25                         DIRECT EXAMINATION

             Capitol Court Reporters, Inc. (800/802) 863-6067

Michael Beliveau                    70

1  BY MR. GRADY:

2  Q.    Good morning, sir.  Please state your name and spell it?

3  A.    Good morning.  My name is Michael Beliveau.

4  B-E-L-I-V-E-A-U.

5  Q.    What do you do for a living?

6  A.    I'm currently a detective with the Burlington Police

7  Department here in Vermont.

8  Q.    How long have you been with Burlington Police

9  Department?

10  A.    A little over six years now.

11  Q.    How long have you been a detective?

12  A.    A little over a year.

13  Q.    What are your -- generally speaking what are your duties

14  and responsibilities as a detective?

15  A.    We investigate some of the more major crimes which

16  include serious assaults, homicide, robberies, burglaries.

17  Q.    Do you know the defendant?

18  A.    Yes.

19  Q.    Can you please identify the defendant by an article of

20  clothing?

21        MR. KAPLAN:  Your Honor, we'll stipulate that he's

22  referring to our client.

23        THE COURT:  Okay.  All right.  So stipulated.

24  BY MR. GRADY:

25  Q.    How do you know the defendant?

Michael Beliveau                        71

1    A.      I had a traffic stop involving the defendant back in

2    2015.

3    Q.      Do you remember the date of that traffic stop?

4    A.      December 25, 2015.

5    Q.      What was your position or your assignment back on

6    December 25, 2015?

7    A.      At the time I was a patrol officer.

8    Q.      Can you tell the jury what are your duties and

9    responsibilities as a patrol officer?

10   A.      I would respond to calls as needed, conduct patrols to

11   include traffic stops, things of that nature.

12   Q.      Going back to December 25, 2015 what shift were you

13   working?

14   A.      I was working the evening shift which is it starts at

15   about 4:45 p.m. and it goes until 2:45 a.m. in the morning.

16   Q.      Was anybody else working with you?

17   A.      I was riding as a double unit with Officer Czycewski.

18   Q.      Is Czycewski spelled C-Z-Y-C-E-W-S-K-I?

19   A.      Yes.

20   Q.      Can you explain what led you to stop the vehicle on

21   December 25, 2015?

22   A.      I observed a green Dodge Durango traveling north on the

23   beltline or Route 127 in Burlington.  It was about 10:30 p.m.

24   and it had no functioning plate lights or license plate lights.

25   Q.      Where did you ultimately stop the car?

Michael Beliveau                              72

1    A.      I followed the vehicle up the beltline and we initiated

2    the car stop on North Avenue just south of Plattsburgh Avenue.

3    Q.      What did you do when you pulled this Durango over?

4    A.      I approached the vehicle and identified the operator.

5    Q.      What about Officer Czycewski?

6    A.      He approached the passenger side of the vehicle.

7    Q.      How many people were in the Durango?

8    A.      Just one.

9    Q.      Who did the driver identify himself as?

10   A.      Brian Folks.

11   Q.      Did you ask the defendant for the Durango's

12   registration?

13   A.      Yes.

14   Q.      Did he provide it to you?

15   A.      Yes.

16   Q.      Who was it registered to?

17   A.      It was a Lori C.

18   Q.      Did you ask the defendant who Lori C. was?

19   A.      He said it was his friend.

20   Q.      Did you ask the defendant where he was going that night?

21   A.      Yes.

22   Q.      Where was he going?

23   A.      He said he had a flight to go to a funeral.

24   Q.      Now if I recall correctly, Detective Beliveau, you

25   mentioned this stop happened at 10:30 p.m.?

                        Michael Beliveau                        73

1    A.      Yes.

2    Q.      Do any flights leave at 10:30 at night?

3    A.      No.  His flight was at 6 a.m.

4    Q.      Did you ultimately seize the Durango?

5    A.      Yes.

6    Q.      Why did you do that?

7    A.      Officer Czycewski observed some items in the vehicle

8    that are consistent with packaging for drugs to include plastic

9    baggy, a small rubberband, and then an alcohol swab pad.  After

10   seeing those items we requested a K-9 to the scene.  Corporal

11   Dewey and K-9 Taser from Colchester Police Department

12   responded, conducted a drug sniff of the vehicle, and I was

13   informed by Corporal Dewey that his K-9 alerted to the presence

14   of illegal drugs inside the car.

15   Q.      Was the defendant allowed to leave the scene that night?

16   A.      Yes.

17   Q.      Did you ask to search him before he left?

18   A.      Yes.

19   Q.      Did he agree to be searched?

20   A.      He did.

21   Q.      Did you actually search him?

22   A.      Yes.

23   Q.      Did you notice anything?

24   A.      Yes.  He had two cell phones and two bundles of cash.  I

25   didn't count the cash.

Michael Beliveau                               74

1   Q.      Did you allow the defendant to take anything with him

2   that night before he left?

3   A.      Yes.  He said he had some Christmas presents in the back

4   of the vehicle which were in garbage bags.

5   Q.      Earlier it seemed that the defendant indicated he had a

6   flight the next morning.  Did you find any luggage in the

7   vehicle?

8   A.      I don't recall seeing any luggage in the vehicle.

9   Q.      Where did the Durango go that night?

10  A.      It went directly to the police department which is One

11  North Avenue in Burlington, Vermont.

12  Q.      Was it secured at the police department?

13  A.      Yes in a secure garage that only is accessed by police

14  vehicles.

15  Q.      Did you also seal the vehicle?

16  A.      Yes with evidence tape.

17  Q.      Did you ultimately search the Durango?

18  A.      Yes after getting a search warrant.

19  Q.      When did you search it after getting a search warrant?

20  A.      December 28th.

21  Q.      Any chance somebody would get into the Durango between

22  December 25th and December 28th?

23  A.      No.

24  Q.      Why not?

25  A.      The evidence tape was still intact and it was in the

Michael Beliveau                     75

1  secure garage or sally port area.

2  Q.    When you searched the Durango did you find any drugs?

3  A.    No.

4  Q.    Did you find anything?

5  A.    Yes.

6  Q.    What did you find?

7  A.    I found a loaded Beretta 9 millimeter handgun in the

8  glovebox.

9  Q.    You mentioned -- what type of handgun was it again?

10 A.    A Beretta.

11       MR. GRADY:  Continuing permission to approach the

12 witness, Your Honor?

13       THE COURT:  Yes.

14 BY MR. GRADY:

15 Q.    Handing you what's been marked as Government's exhibit

16 37 for identification take a moment to review those pictures,

17 Detective Beliveau.  Do you recognize those pictures?

18 A.    Yes.

19 Q.    Do they fairly and accurately show the Durango as you

20 searched it back on December 28th, 2015?

21 A.    Yes.

22       MR. GRADY:  Your Honor, at this time the Government

23 moves to admit and publish exhibit 37.

24       THE COURT:  Any objection?

25       MS. SEN:  No objection, Your Honor.

                    Michael Beliveau                    76

1              THE COURT:  So admitted.

2    [Government exhibit 37 admitted and published]

3    BY MR. GRADY:

4    Q.     All right.  Seeing the first page of exhibit 37 what's

5    the jury looking at, Detective Beliveau?

6    A.     That is the Beretta handgun that we found in the

7    vehicle.

8    Q.     Okay.  Let's move to page 2.  Am I correct that's a

9    closeup of the Beretta and I'll go ahead and circle -- is that

10   the serial number?

11   A.     Yes.

12   Q.     We'll go ahead and move to page 3.  Is that an opposite

13   view of the firearm?

14   A.     Yes.

15   Q.     Let's go to page four.  What's shown in page four?

16   A.     That is the ammunition from the magazine.

17   Q.     Moving to page five is that a picture of where you found

18   it in the glovebox?

19   A.     Correct.

20   Q.     And, finally, the sixth page is that a broader view of

21   the Durango and the glovebox where you found the Beretta?

22   A.     Yes.

23   Q.     Let's go ahead and go back to page 2 of 37 and in the

24   meantime retrieve Government exhibit 38 for identification.

25   Detective Beliveau, I've handed you exhibit 38 for

                    Michael Beliveau                      77

1    identification.  Do you recognize what that is?

2    A.     This is --

3    Q.     You can go ahead and open it if you need to.

4    A.     Yes.  This is the gun that's shown in the pictures here.

5    Q.     How do you know that's the gun that you seized from the

6    Durango?

7    A.     There's property tags affixed to the box which include

8    the serial number from the firearm as well as the make and

9    model, and then within the box is the firearm itself and the

10   serial numbers are the same.

11   Q.     Did you in fact tag that into evidence?

12   A.     I did.

13          MR. GRADY:  Your Honor, at this time the Government

14   moves to admit and -- moves to admit 38.

15          THE COURT:  Any objection?

16          MR. KAPLAN:  Can I have one moment, Judge?

17          MR. GRADY:  And, Your Honor, just to let you know it

18   is unloaded and inoperable.  Just want to put that --

19          THE COURT:  That's to let all of us know that it is

20   inoperable.

21          MS. SEN:  No objection, Your Honor.

22          THE COURT:  Okay.  So admitted.

23   [Government exhibit 38 admitted]

24          MR. GRADY:  Thank you, Your Honor.  If I can go ahead

25   and publish it under the Elmo just briefly?

          **Capitol Court Reporters, Inc. (800/802) 863-6067**

Michael Beliveau                              78

1               THE COURT:  Yes.

2    BY MR. GRADY:

3    Q.    Detective Beliveau, am I correct that the firearm is

4    located in the box and we have the magazine to the right of it

5    and then below it are the 10 rounds that you found within it?

6    A.    Yes.

7    Q.    Thank you.  One moment, Your Honor.

8               THE COURT:  Okay.

9               MR. GRADY:  Nothing further, Your Honor.

10              THE COURT:  Okay.  Any cross examination, Ms. Sen?

11              MS. SEN:  Briefly, Your Honor.  Thank you.

12                        CROSS EXAMINATION

13   BY MS. SEN:

14   Q.    Detective Beliveau.

15   A.    Good morning.

16   Q.    The car was not registered to Mr. Folks, was it?

17   A.    Correct.

18   Q.    And based on your testimony it doesn't sound like you

19   saw him put anything into the glove compartment; is that

20   correct?

21   A.    That's correct.

22   Q.    You don't know who put the firearm in that glove

23   compartment, do you?

24   A.    No.

25   Q.    And were you aware that there were many different

                    Michael Beliveau                    79

1    drivers of this vehicle?

2    A.     No.

3              MS. SEN:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5              MS. SEN:  Nothing further, Your Honor.  Thank you.

6              THE COURT:  Okay.  Any redirect?

7              MR. GRADY:  No, Your Honor.

8              THE COURT:  All right.  Thank you, Detective.

9              OFFICER BELIVEAU:  Thank you, Your Honor.

10             THE COURT:  Want to call the next witness?

11             MR. GRADY:  Yes, Your Honor.  At this time the

12   Government moves to admit and publish exhibit 130 which is a

13   stipulation agreed to between the parties, and if I may

14   approach, I will hand it to the courtroom deputy.

15             THE COURT:  Okay.  All right.  130.  Any objection to

16   the stipulation?

17             MR. KAPLAN:  No, Your Honor.

18             THE COURT:  All right.  It is admitted.  Our process

19   is that usually the Government attorney who is proposing this

20   particular exhibit read it to the jury.

21   [Government exhibit 130 admitted]

22             MR. GRADY:  Yes, Your Honor.  "It is stipulated by

23   defendant Brian Folks and United States of America for purposes

24   of the allegation in Count II that as of December 2015 Brian

25   Folks had previously been convicted of a crime punishable by a

         **Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Scott Murray                          80

1  term of imprisonment exceeding one year."

2           THE COURT:  Okay.  All right.  Want to call your next

3  witness?

4           MR. DARROW:  Yes, Your Honor.  The United States of

5  America calls Scott Murray.

6           DEPUTY CLERK:  Please come forward, sir, to be sworn.

7  SCOTT MURRAY,

8       Having been duly sworn, testified as follows:

9           THE COURT:  Good morning, Agent Murray.

10          AGENT MURRAY:  Good morning.

11                       DIRECT EXAMINATION

12  BY MR. DARROW:

13  Q.     Good morning, sir.

14  A.     Good morning.

15  Q.     Can you please state your name and tell -- also tell the

16  jury what you do for a living?

17  A.     Sure.  My name is Scott Murray M-U-R-R-A-Y.  I'm a

18  Special Agent with the Bureau of Alcohol, Tobacco, Firearms &

19  Explosives known as ATF.

20  Q.     How long have you been with ATF?

21  A.     17 years.

22  Q.     Where are you stationed now?

23  A.     Here in Burlington.

24  Q.     How long have you been in Vermont?

25  A.     17 years -- just over.

Scott Murray                          81

1    Q.      Okay.  Can you summarize for the jury what your duties
2    and responsibilities are as an ATF Agent in Vermont?
3    A.      Sure.  I do case investigations related to firearms,
4    explosives, and arsons violations.
5    Q.      All right.  Have you got a special position within ATF
6    regarding firearms?
7    A.      Yes.  Within ATF I'm a firearms interstate nexus expert.
8    Q.      All right.  Let's -- I want to ask you about your
9    training, but let's start with the general training that an ATF
10   agent has.  Can you tell the jury about that?
11   A.      Sure.  I was a police officer prior to working for ATF.
12   Most people come from somewhere else before.  Came to ATF and
13   you do six months of training in Georgia at a training facility
14   for different federal agencies, and then worked for over eight
15   months with a training agent one-on-one here in Vermont.
16   Q.      All right.  Now how about the special position that you
17   hold, was there additional training related to that?
18   A.      Yes.  The training is just that I worked with, for about
19   eight months, directly he was an interstate nexus expert
20   himself and so part of that training was on interstate nexus
21   which has to do with identifying a firearm, that is who made a
22   particular firearm, and the location of where they would
23   manufacture those types of firearms.
24   Q.      So I was going to ask you what interstate nexus means.
25   Could you explain that a little different way?

                              Scott Murray                          82

1    A.     Sure.  Some statutes require that a firearm is traveled

2    in or affected interstate commerce.  So if we can identify a

3    firearm, where it was manufactured, it will help us.  So if a

4    firearm was recovered in the State of Vermont and we determine

5    it was manufactured in Massachusetts, we know that at some

6    point in time it has traveled in interstate commerce.  So

7    interstate nexus has to do with the traveling across state

8    lines and traveling in interstate commerce.

9    Q.     Have you testified in courts before as an interstate

10   commerce nexus on firearms?

11   A.     I have.

12          MR. DARROW:  Your Honor, we move that Agent Murray be

13   recognized as an expert in that subject.

14          THE COURT:  Any objection?

15          MS. SEN:  No objection, Your Honor.

16          THE COURT:  All right.  He is so recognized.

17   BY MR. DARROW:

18   Q.     Agent Murray, did you examine a firearm in this case

19   United States versus Brian Folks?

20   A.     It is Beretta model 92FS 9 millimeter semi-automatic

21   pistol.

22          MR. DARROW:  Your Honor, may I approach?

23          THE COURT:  Yes.

24   BY MR. DARROW:

25   Q.     Showing you what's come into evidence as exhibit 38 do

              Capitol Court Reporters, Inc. (800/802) 863-6067

                         Scott Murray                        83

1    you recognize this?

2    A.      Yes I do.

3    Q.      What is it?

4    A.      This is the Beretta model 92FS.  It's a 9 millimeter

5    semi-automatic pistol, serial number is BER441412, and this is

6    the firearm that I had examined back in March of 2018.

7    Q.      Okay.  Your marking on that box reflects your

8    examination?

9    A.      Yes on the box and on this package for the ammunition,

10   yes.

11   Q.      What can you tell us about the examination that you made

12   of that firearm?

13   A.      Sure.  Basically I will look at it, look at the markings

14   on the firearm, determine who the manufacturer of that firearm

15   is, look and see if the markings are similar to the way the

16   markings on that firearm would be.  Beretta 92 is a very common

17   pistol that we, you know, come in contact with many times

18   previously, and then on this particular firearm they actually

19   print on the top slide of the firearm where it was made.  Says

20   Beretta U.S.A. Corporation Accokeek, Maryland, which they

21   abbreviate, and then made in U.S.A.

22   Q.      Did you determine where that firearm was manufactured?

23   A.      Yes.  I do a determination on them regardless whether it

24   was said on there where it was made, and this one -- particular

25   one I determined was made in Accokeek, Maryland.

                              Scott Murray                        84

1    Q.    And recovered in Vermont.  So is it your conclusion that
2    it moved interstate?
3    A.    Yes.  What generally firearm companies will do they will
4    make them at that location, Beretta has a warehouse location in
5    Virginia, and then they will ship them to gun shops from there
6    and a person will go in and purchase them from a gun shop in
7    another state.  Other than that -- and then that's one of the
8    ways they could be recovered in somewhere like Vermont.
9    Q.    Did you also examine that firearm to determine whether
10   it was operable and operated as it was designed?
11   A.    I did.  I test fired the firearm just to make sure that
12   it was functioning and it did function properly as designed.
13   Q.    I'll retrieve the exhibit and with that I think we're
14   done.  Thank you.
15               THE COURT:  Okay.  Any questions?
16               MS. SEN:  Just a few, Your Honor.
17                          CROSS EXAMINATION
18   BY MS. SEN:
19   Q.    Mr. Murray, are you aware of whether that firearm was
20   tested for fingerprints?
21   A.    I believe it was by Burlington Police Department.  I
22   wasn't part of that, but when I have looked at it, it did
23   appear that it had been fingerprinted, yes, and they will use
24   fuming -- glue fuming and you can tell there's a glaze on it
25   and it did appear to have that glaze, but I wasn't involved in

                     Scott Murray                           85

1    that part of it.

2    Q.    And the fingerprints didn't match Mr. Folks, did they?

3    A.    I'm not aware of whether there was or was not

4    fingerprints recovered off of that firearm.  Generally in

5    handguns you generally do not recover fingerprints on there at

6    all; probably less than 10 percent of the time in my training

7    and experience, although I'm not sure on this because I wasn't

8    involved in that part of the case.

9              MS. SEN:  Can I have just a moment, Your Honor?

10             THE COURT:  Yes.

11   BY MS. SEN:

12   Q.    Mr. Murray, by any chance do you have your report that

13   you wrote of your examination with you?

14   A.    I don't have it with me, but the prosecutor would have a

15   copy of the interstate nexus determination and the test fire.

16   Q.    Yes.  Your Honor, may I take a moment to look at that?

17             THE COURT:  Yes.

18             MS. SEN:  I have nothing further, Your Honor.

19             THE COURT:  Okay.  Any redirect?

20             MR. DARROW:  No, Your Honor.  Thank you.

21             THE COURT:  Okay.  Thank you, Agent.  All right.

22   Government want to call the next witness.

23             MR. DARROW:  We call Donald McFarlan.

24             THE COURT:  Okay.  Actually I want to speak with the

25   lawyers just for a second so I'm going to ask just for a couple

1    of minutes that you be recessed into your jury room.  You will

2    be coming back within just a short few minutes and we'll see

3    you then.

4    [Jury leaves the courtroom at 11:20 p.m.  The following

5    occurred in open court without the jury present]

6             THE COURT:  All right.  I've received a note.  The

7    Marshals have asked that Mr. McFarlan be in restraints when

8    he's testifying.  I haven't actually spoken to the Marshals

9    about that, but I think there's no prejudice assuming that Mr.

10   McFarlan is brought down, seated at the witness table before

11   his oath is administered, and then he would -- and then the

12   jury would be returned.  I assume that the restraints are foot

13   restraints not hand restraints and is there a Marshal here?

14            MARSHAL TUFTS:  Good morning, Your Honor.  Normal --

15   our common practice if the defendant is in custody, then we try

16   to keep him in full restraints.

17            THE COURT:  Okay.  I don't -- he's got to take the

18   oath.  Obviously if he's in restraints, he has difficulty

19   raising a hand.  The question is whether the foot restraints

20   are adequate and we certainly -- if he's sitting here, it

21   doesn't appear to the jury that he's in restraints at all.  So,

22   first of all, from the Government what's your reaction to this?

23            MR. DARROW:  I don't think he should have to be in

24   hand and foot restraints, Your Honor.  I mean he could either

25   be in foot restraints or in other cases the Marshals have put a

1    belt on someone.  They could control the belt.  The defendant's

2    not in restraints.  He should be able to take an oath.

3              THE COURT:  Okay.  From the defense?

4              MR. KAPLAN:  I don't think we have an opinion, Judge.

5    Whatever the Court thinks is appropriate.

6              THE COURT:  Okay.  So I would ask that you speak with

7    the Marshals to get him in foot restraints because then he can

8    just raise his hand and nobody would know that he's got

9    restraints on, and then bring him right down and we'll sit him

10   here and then we can start examination.

11             MR. DARROW:  Your Honor, may I bring up one other

12   point related to this witness?

13             THE COURT:  Yes.

14             MR. DARROW:  As regards his criminal history we want

15   to make sure or try to get some clarity before the cross on

16   him.  McFarlan has several misdemeanor possession of marijuana

17   convictions which we understand those misdemeanors are not --

18             THE COURT:  That's correct, not relevant.

19             MR. DARROW:  Right.  He has one felony marijuana

20   conviction sale or possession.  I was going to ask him about

21   that.

22             THE COURT:  Okay.

23             MR. DARROW:  He has an older robbery conviction from

24   when he was a teenager which we understand to be way outside

25   the 10 year 609 rule, and also we have not received notice from

```
 1    the defendant which didn't respond to an e-mail I sent over
 2    last week, and then he has a pending charge 2016 which appears
 3    to be unresolved.  So our view is the felony marijuana within
 4    10 years is fair game, but the others are not.
 5              THE COURT:  Okay.  So Mr. Kaplan.
 6              MR. KAPLAN:  We agree with that, Your Honor.
 7              THE COURT:  Okay.  All right.
 8              MR. DARROW:  Thank you.
 9              THE COURT:  So let's see.  So can he be brought down?
10              MARSHAL TUFTS:  He's right out back, Your Honor.  Do
11    you want him now?
12              THE COURT:  Yes if he's just in restraints on his
13    ankles.
14              MARSHAL TUFTS:  Yes, Your Honor.
15              THE COURT:  Okay.  Does the Government anticipate
16    this is the last witness today?
17              MR. DARROW:  I wouldn't have thought so, Your Honor,
18    but let me confer with my colleagues.
19              THE COURT:  Who else do you have in reserve.
20              MR. DARROW:  Chrissy T.  I suspect we will be getting
21    to her.
22              THE COURT:  Okay.  Good morning, Mr. McFarlan.
23              THE WITNESS:  Good morning.
24              THE COURT:  You can take a seat.  All right.  Bring
25    the jury out.
```

Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1   [Jury returns to the courtroom at 11:25 a.m.]

2            THE COURT:  All right.  Government call the next

3   witness.

4            MR. DARROW:  Thank you, Your Honor.  We call Donald

5   McFarlan.

6            THE COURT:  Okay.  Good morning, Mr. McFarlan.

7            THE WITNESS:  Good morning.

8            THE COURT:  Would you swear Mr. McFarlan?

9   DONALD McFARLAN,

10       Having been duly sworn, testified as follows:

11                        DIRECT EXAMINATION

12  BY MR. DARROW:

13  Q.    Good morning, Mr. McFarlan.

14  A.    How are you?

15  Q.    Can you please tell the jury a little bit about your

16  background, where you're from, where you grew up?

17  A.    Grew up in Brooklyn.  Coney Island.

18            THE COURT:  All right.  Mr. McFarlan, could you pull

19  that microphone very close and try to speak right into it so

20  everybody can hear you.

21  A.    Yes.  Grew up in Brooklyn, Coney Island.

22  Q.    Who raised you?

23  A.    Grandmother.

24  Q.    What happened to your parents?

25  A.    My mother passed away and my father was incarcerated.

Donald McFarlan

1  Q.    Okay.  So we understand you grew up in Coney Island.

2  Your grandmother is your primary caregiver?

3  A.    Yes.

4  Q.    How far did you go in school?

5  A.    10th grade.

6  Q.    All right.  What first brought you to Vermont?

7  A.    A friend -- a cousin of mine.

8  Q.    Is that Steven?

9  A.    Yes.

10 Q.    When did you come to Vermont first?

11 A.    It was the summertime of around June -- June or July.

12 Q.    Is that 2015?

13 A.    Yes.  First time.

14 Q.    And why did you come to Vermont?

15 A.    Just to drop him off.

16 Q.    Excuse me.

17 A.    I was just dropping him off.

18 Q.    You were dropping off your cousin Steven?

19 A.    Yes.

20 Q.    Why was he coming to Vermont?

21 A.    He lives up here.  He was living up here.

22 Q.    Is he married to a Burlington woman?

23 A.    Yes.

24 Q.    Judy Harris?

25 A.    Yes.

                    Donald McFarlan

1            MR. KAPLAN:  Your Honor, objection.  May I approach

2    for a minute?

3            THE COURT:  Okay.  I'll turn the husher on.

4    [Bench conference]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Donald McFarlan

1    MR. KAPLAN:  This may seem a little preliminary, but
2  --
3         THE COURT:  Very.
4         MR. KAPLAN:  But the prosecutor has already said
5  2015.  He's already given the name of the person he lives with.
6  He's already answered all the questions he's going to ask this
7  guy.  I think the witness should be the one saying which year
8  he came up not the prosecutor.  The witness should be saying
9  who Steven is married to not the prosecutor.
10        THE COURT:  So your objection is leading questions?
11        MR. KAPLAN:  Well just -- yes because we're just
12  starting it.
13        THE COURT:  But this is all preliminary stuff.
14        MR. KAPLAN:  I'm concerned.
15        THE COURT:  You get some leeway when you're
16  introducing somebody.  I appreciate it.  So you're making your
17  point that Mr. Darrow is not to be testifying.  I agree with
18  that.  Try to make questions open ended.
19        MR. DARROW:  I just hope Mr. Kaplan will allow me to
20  examine this witness.  The last witness we couldn't get the
21  question out before an objection.
22        THE COURT:  Okay, but it would be a lot smoother if
23  you were to ask questions which were open ended as opposed to
24  leading.
25        MR. DARROW:  I just didn't want to --

                    Donald McFarlan

1              THE COURT:  Okay.  You both made your preliminary

2    statements.

3    [End of bench conference]

Donald McFarlan

1   BY MR. DARROW:

2   Q.      So your cousin that caused you to come to Vermont

3   Steven, what's his connection with Vermont?

4   A.      He lives here.

5   Q.      He's married to a Burlington woman?

6   A.      Yes.

7   Q.      Okay.  So you come up in the summer of 2015 to bring up

8   your cousin?

9   A.      Yes.

10  Q.      All right.  Did you meet someone up here?

11  A.      Yes.

12  Q.      Who did you meet?

13  A.      Folks, but I known him.  I've always known Folks from

14  previous.  Met him up here.  Yes.

15  Q.      Known him for years?

16  A.      Previous.  Yes.

17  Q.      Okay, but you see him in Vermont?

18  A.      Yes.  Been a long time.  Yes.

19  Q.      I'm sorry.

20  A.      I haven't seen him in a long time, but yes then I

21  finally seen him.  Yes.

22  Q.      All right.  Did the two of you have a conversation?

23  A.      Yes.

24  Q.      Did he tell you a little bit about what he had been up

25  to?

Donald McFarlan

1    A.    Yes.

2    Q.    What did he say?

3    A.    He was getting money.

4    Q.    Excuse me.

5    A.    He was getting money.

6    Q.    By doing what?

7    A.    Selling -- selling drugs.

8    Q.    And?

9    A.    Prostitution and everything.

10   Q.    Excuse me.

11   A.    The prostitution.

12   Q.    Okay.  What did you understand him to be talking about

13   or did he explain to you?

14   A.    I understood -- I understood what he was saying.

15   Q.    What did you understand it to mean?

16   A.    That he had girls and he was selling drugs.

17   Q.    Okay.  Did he ask you to do anything?

18   A.    Yes.

19   Q.    What?

20   A.    To bring stuff up here so I can -- so he could fuel his

21   operation.

22   Q.    What stuff did he want you to bring up?

23   A.    Crack and -- well heroin at first.

24   Q.    Heroin at first.  Did that change at some point or

25   expand?

Donald McFarlan

1   A.    A few times I brought him crack.  Yes.

2   Q.    Where did he want that to be brought from?

3   A.    Excuse me.

4   Q.    You say he wanted you to bring stuff up from where?

5   A.    New York.

6   Q.    From New York to?

7   A.    Vermont.

8   Q.    To him in Vermont?

9   A.    Yes.

10  Q.    All right.  How did you respond to his proposal?

11  A.    I agreed.

12  Q.    Why?

13  A.    My finances was messed up at the time and I just -- just

14  made a foolish mistake.

15  Q.    Now you're in custody today; is that right?

16  A.    Yes.

17  Q.    Were you charged in this case?

18  A.    Yes.

19  Q.    Did you plead guilty?

20  A.    Yes.

21  Q.    What did you plead guilty to?

22  A.    Of a conspiracy to sell narcotics.

23  Q.    With Folks?

24  A.    Yes.

25  Q.    What's the status of your case right now?

Donald McFarlan

1    A.    I'm waiting for sentencing.

2    Q.    Okay.  Sentencing by Judge Sessions?

3    A.    Yes.

4    Q.    So that will be sometime in the future?

5    A.    Yes.

6    Q.    As a result of your agreement to Folks' request to bring

7    drugs to Vermont what did you do?

8    A.    I'm sorry.

9    Q.    You say you agreed to bring drugs to Vermont?

10   A.    Yes.

11   Q.    Tell us what you did?

12   A.    I came up here around five times and I had drugs on me

13   and I blessed them and he gave me money in return.

14   Q.    You what him?

15   A.    I'm sorry.  I gave it to him and he gave me money.

16   Q.    All right.  You say about five times and what are you

17   bringing up?

18   A.    Heroin.

19   Q.    All right, and was there another drug at some point?

20   A.    Yes.

21   Q.    Okay.  What were the weights you were bringing up on

22   these trips?

23   A.    It was 50, 50 grams.

24   Q.    Of?

25   A.    Heroin.

Donald McFarlan

1    Q.    And how about crack?

2    A.    It was -- it would vary.  It wasn't a lot.  I would say

3    a total like 20 something grams.  I'm not sure.  I don't

4    remember exactly, but 20 something grams.

5    Q.    Okay.  How were you being compensated for this?

6    A.    Cash.

7    Q.    From?

8    A.    Folks.

9    Q.    Okay, and when you were bringing the drugs up to Vermont

10   how were they packaged?

11   A.    It was just a plastic bag wrapped up.  Tied up.

12   Q.    So like a bulk amount of heroin or crack just tied up in

13   plastic bags?

14   A.    Yes.

15   Q.    Sort of bulk?

16   A.    Yes.

17   Q.    Not packaged for street sale?

18   A.    No.  No.

19   Q.    Okay.  After you got to Vermont with a load of drugs

20   what did you do?

21   A.    I would meet up -- I would meet up with him and I would

22   give him -- I would give him 10 -- 10 grams at a time, he would

23   give me the money for it, I would give him another 10 grams at

24   a time.  I was only up here for like five days each time.

25   Q.    So you come up about five times.  Each time you stay for

Donald McFarlan

1    about five days so you think a total of 25 days or so?

2    A.     Probably a little more because next to last time

3    something happened and I stayed longer that next to last time.

4    Q.     All right.  So do I understand that you sort of parcel

5    out amounts to him and wait until you got the money then you

6    would get more?

7    A.     Yes.

8    Q.     Okay.  Do you know how these drugs were packaged for

9    street resale in Vermont?

10   A.     Yes.

11   Q.     How?

12   A.     It was they call them tickets.  Buns.  They wrap them up

13   in 10 tickets is a bun and the crack I think it was -- I think

14   it was 25.  Wrapping up 25's.

15   Q.     Were you ever present while the drugs were being

16   packaged in this way?

17   A.     Yes.

18   Q.     Where did that take place?

19   A.     Majority of the time was at a place her name was Lori.

20   I don't know the exact address, but it's Lori's house.

21   Q.     Okay.  Can we look at 96 please?  Sorry.  Can we switch

22   off the Elmo?  Do you see that photograph in front of you?

23   A.     Yes.

24   Q.     And do you recognize it?

25   A.     Yes.

Donald McFarlan

1    Q.    What is it?

2    A.    That's -- that's Lori's house right there.

3    Q.    Okay, and were there other places where the bagging up

4    took place?

5    A.    Yes.

6    Q.    Where?

7    A.    I'm not really familiar with the area, but if I see it

8    --

9    Q.    Just tell us what you remember.

10   A.    It was a place that we walked upstairs.  It was a little

11   house.  It was always little houses.

12   Q.    Do you remember whose house it was or anything about it?

13   A.    Oh what's his name?  Uncle something.

14   Q.    Uncle's house?

15   A.    Uncle, yeah.  Unc.  I forget his name, yeah.

16   Q.    Can we look at 98 please?  Do you recognize that?

17   A.    Yes.

18   Q.    Is that Unc's house?

19   A.    Yes.

20   Q.    So some bagging took place there?

21   A.    Yes.

22   Q.    Any other locations?

23   A.    I would say one other place.  If I seen it, I would

24   know.

25   Q.    Do you remember anything about it?

Donald McFarlan

1  A.     It was just -- I think it was an one bedroom apartment.

2  We walked upstairs.  No I'm not really familiar with the

3  neighborhood.

4  Q.     Can we look at 94 please?

5  A.     No.  I seen that place before though, but that's not one

6  of the spots we did anything at.

7  Q.     Okay.  So these bagging up sessions at the two locations

8  that you identified, Lori's and Unc's, who bagged the drugs?

9  A.     It would be some girls.  A few girls.

10 Q.     They would be young women doing that?

11 A.     Yes.

12 Q.     Okay.  Did you get to know any of their names?

13 A.     Yeah.  T. was one of the girls.

14 Q.     Chrissy T.?

15 A.     Chrissy T.  Lori.

16 Q.     Lori.

17 A.     I'm not familiar with the names, but if I see them I

18 know them.

19 Q.     So there were several young women?

20 A.     Yes.

21 Q.     Who would be bagging up?

22 A.     Yes.

23 Q.     Tell us what bagging up was?  What were these women

24 doing?

25 A.     Just weighing out the drugs and putting them into

Donald McFarlan

1   plastic cellophane, putting a rubberband on them, and putting

2   them to the side.

3   Q.     Okay.  So is that -- you mentioned earlier a bun of

4   heroin was 10 little tickets?

5   A.     Yes.

6   Q.     How was the crack being packaged?

7   A.     As in 25's.

8   Q.     What's a 25?

9   A.     25 worth.

10  Q.     That's like a little chip of crack?

11  A.     Yeah.

12  Q.     Did Folks give you any job in relation to the bagging

13  up?

14  A.     Not really a job.  I just was always present so I guess

15  my presence was no one to steal.  It was a lot of people

16  stealing.

17  Q.     All right.  You talking about the young women?

18  A.     Yes.

19  Q.     So you're saying that by being present you were maybe

20  inhibiting theft?

21         MR. KAPLAN:  Objection, Your Honor.

22         THE COURT:  Objection overruled.  You can answer

23  that.

24  A.     Yes.

25  Q.     Who else was present besides the young women and you?

Donald McFarlan

1   A.      Folks and I guess there's a couple other people, but I
2   don't know their names though.
3   Q.      Do you know a fellow named Hightower?
4   A.      Yeah.
5   Q.      Incidentally what was your -- did you use a straight
6   name when you were in Vermont?
7   A.      Yes.
8   Q.      What was that?
9   A.      G.  Ghost.
10  Q.      Ghost or G?
11  A.      Yes.
12  Q.      Where did you get that name?
13  A.      It was -- that was the whole plan.  I was supposed to be
14  a Ghost.  Nobody's supposed to know me.  I'm supposed to come
15  and leave come and leave.  So that was I guess the nickname.
16  Q.      Okay.  So you brought drugs up to Folks.  Do you know if
17  anyone else was bringing drugs up to Folks or if he had other
18  sources?
19          MR. KAPLAN:  Your Honor, I think from what I have
20  read that there should be a foundation laid for this rather
21  than a yes or no.
22          THE COURT:  Well I think he can respond yes and then
23  you go into the foundation.  So objection overruled.  Your
24  question calls for a yes or no answer.  Do you know if there
25  were other people?

Donald McFarlan

1            THE WITNESS:  Yeah.

2            THE COURT:  Okay and then --

3    BY MR. DARROW:

4    Q.    What do you know about other people bringing up drugs?

5    A.    I don't know none of the people.  I never met the people

6    before.

7    Q.    So you don't know their names?

8    A.    No.

9    Q.    So how do you know other people are bringing up drugs to

10   Folks?

11   A.    Because it was obvious --

12           MR. KAPLAN:  Your Honor, objection.

13           THE COURT:  Because it was obvious.

14           MR. DARROW:  Well he was in mid answer when he got

15   cut off.

16           THE COURT:  Right.  Objection overruled.  You can

17   answer the question.

18   A.    It was obvious because it would have a different

19   rubberband on it -- on the buns.

20   Q.    But I thought they were packaged already.  I thought

21   they were packaged in Vermont?

22   A.    Yeah, but it would be -- if it was mine, it would be a

23   certain color rubberband and I would know, but if other

24   rubberbands that's --

25   Q.    So it sounds like you don't know much about other

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Donald McFarlan

1    sources.  You thought maybe there were, but you're not sure?

2    A.    Yeah no I'm not -- I know there is, but I'm not sure

3    about who they was or how -- you know their procedure or how it

4    was going down, no.

5    Q.    All right.  Let me ask you about another location.

6    You've looked at three now.  There's Unc's place, the brick

7    house, and there's Lori's place on Spring Street, those two

8    places where the bagging was going on.  You said the third

9    place you looked at up there, but you didn't -- you weren't --

10   didn't know what was going on there it sounds like?

11   A.    I guess when I leave I come back it would be a whole

12   different situation going on.

13   Q.    Okay.  I'm just -- is it correct that you didn't know

14   what was going on in the third place?

15   A.    I wouldn't say that because it was obvious that it was

16   drugs being sold there, yeah.

17   Q.    All right.  Do you remember -- at some point in the

18   winter of 2015/2016 did you have a fur coat?

19   A.    Yes.

20   Q.    Did you wear that up here in Vermont?

21   A.    Yes.

22   Q.    Did Folks ever tell you about another location where

23   Danielle was?

24   A.    Danielle.  No I'm not -- I don't know a Danielle.

25   Danielle?

Donald McFarlan

1   Q.      Yeah.  Danielle Degenhardt?

2   A.      No.

3   Q.      Can we look at 58?  This is another apartment in

4   Burlington behind that door with the red trim around it.  It

5   doesn't look familiar to you?

6   A.      I don't think -- I think I seen that place.  Yeah I

7   think I've seen that place before.

8   Q.      Do you remember anything about it?  Were you with Folks?

9   A.      Yeah.  I think it's -- his child lives there.  His kid

10  lives there.  I think that's the place.  It looks like it.

11  That is --

12  Q.      All right.  Did you ever go to a place in Winooski?

13  A.      Yeah -- well he lived in Winooski.

14  Q.      He lived in Winooski?

15  A.      Yeah.

16  Q.      Who did he live with there?

17  A.      With his wife and kids.

18  Q.      Okay.  So what about this kid at the other place you

19  just looked at?

20  A.      That's a different child.  Different mother.

21  Q.      Okay.  Have you been to the Winooski house?

22  A.      Yes.

23  Q.      Was there any illegal activity there?

24  A.      No.

25  Q.      All right.  So these young women that were doing the

Donald McFarlan

1   bagging up who were they working for?

2   A.     Folks.

3   Q.     How do you know that?

4   A.     Because these are the girls that he has.  This is his --

5   this is his -- his -- how can I say -- these are the girls

6   whose hookering for him.

7   Q.     Who are what?

8   A.     Hookering.

9   Q.     Hookering.  Is that like prostituting?

10   A.     Yes.

11   Q.     All right.  Look at 92.  Do you recognize this woman?

12   A.     Yes.

13   Q.     Who's that?

14   A.     That's -- last name is T.  Chrissy.  Chrissy.

15   Q.     That's Chrissy T.?

16   A.     Yes.

17   Q.     Okay.  You say these young women that you would see at

18   these places bagging were hookering and prostituting.  How do

19   you know that?

20   A.     Because they just say they were going on dates.  They

21   just say it.

22   Q.     In front of you?

23   A.     Yeah.

24   Q.     Did you hear conversations with Folks about that?

25   A.     Yeah I have.  I was really not interested in that, but

Donald McFarlan

1  yeah I have.

2  Q.    What were those conversations?

3  A.    Just about them talking about his cut and their cut as

4  in their profits in the prostitution thing.

5  Q.    Did you hear any talk about Backpage --

6  A.    Yes.

7  Q.    -- from Folks?

8  A.    Mainly the girls, but yeah.  Not really Folks, but

9  mainly the girls, yeah.

10 Q.    Do you know if any of those young women working for

11 Folks were using drugs themselves?

12 A.    Pretty much all of them were.

13 Q.    How do you know that?

14 A.    Because they used to have -- after they handled their

15 business they would purchase drugs.

16 Q.    From whom?

17 A.    Folks.

18 Q.    Have you ever seen any of them sick?

19 A.    Yes.

20 Q.    What did you see?

21 A.    It was -- they would always run in the bathroom, but I

22 did see them sick and just looking -- just looking sick, aching

23 and, you know, when you're on heroin you need that fix in the

24 morning.  If not, you're going to -- obviously you're going to

25 get sick.

Donald McFarlan

1    Q.    When you were bringing drugs up for Folks and seeing the

2    things that you have been talking about did you ever hear of

3    something called the walnut challenge?

4    A.    Yes.

5    Q.    What was it?

6    A.    It was a -- how can I say -- it was just something that

7    was recorded with females.

8    Q.    Excuse me.  You say it was something.  What is it?

9    A.    A video recording with females putting walnuts in their

10   anus.

11   Q.    Okay.  Whose idea was that?

12   A.    Folks.

13   Q.    All right.  Was there someone supervising that activity?

14   A.    Supervising?  I won't say supervising.  I want to say

15   orchestrating.

16   Q.    Orchestrating then?

17   A.    Yes.

18   Q.    Who was that?

19   A.    Folks.

20   Q.    Do you know what females participated in that?

21   A.    I don't know their names, but when I see them I know

22   them.

23   Q.    Okay.  Can we look at 54A please?  Recognize that woman?

24   A.    Yes.

25   Q.    Did she participate?

Donald McFarlan

1   A.      Yes.

2   Q.      Were you there?

3   A.      Yes.

4   Q.      Can we look at 55A please?  Recognize that woman?

5   A.      Yes.

6   Q.      Do you know her name?

7   A.      I don't know her name, but I remember her.

8   Q.      Excuse me.  I'm sorry.

9   A.      I remember her and yes she was there.

10  Q.      Did she participate in the walnut challenge?

11  A.      Yes.

12  Q.      And can we look at 50A?  Do you know her name?

13  A.      Yes.

14  Q.      What?

15  A.      No.

16  Q.      Can we look at the second picture?  There's another

17  picture of the same woman if it helps.

18  A.      I forgot her name.

19  Q.      Did that woman participate?

20  A.      I think so.  Yeah I think so.  Yes.

21  Q.      So you're saying -- you described what was happening and

22  you're saying there's -- did you say it was memorialized

23  somehow?

24  A.      Sorry.

25  Q.      Were these -- was this activity, the walnut challenge,

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Donald McFarlan

1  were there pictures or video taken?

2  A.    Yes.  It was a video.  There was a video being recorded.

3  Once I walked in it was already being done and it was already

4  cameras filming.

5  Q.    Okay.  Did you have a role in this?

6  A.    Once I walked in they did say oh here's security.

7  Here's security.  So I was like yes here's the security.  Yes.

8  Q.    Do you know -- so you see this going on?

9  A.    Uh-huh.

10  Q.    Do you know if the women got anything for this?

11  A.    I'm not sure.

12  Q.    Do you remember whether one of the young women around at

13  the time was called Red?

14  A.    One of the girls, yeah, that was there, yes.

15  Q.    Did she have another name?

16  A.    There was two girls named Red.

17  Q.    There were.  Let's look at -- may I approach, Your

18  Honor?

19        THE COURT:  Yes.

20  BY MR. DARROW:

21  Q.    Showing you does this woman look familiar to you?

22  A.    Yes.

23  Q.    Was she present for some of these activities you were

24  talking about?

25  A.    Yes she was there.

                    Donald McFarlan

1    Q.     Did you have a name for her?

2    A.     Red.

3    Q.     Okay.  Do you know if she had another name?

4    A.     I think her name was Hannah.  Hannah.

5    Q.     Okay.  Is that a picture of Red or Hannah?

6    A.     Yes.

7              MR. DARROW:  May we move that in please?

8              THE COURT:  Any objection?

9              MR. KAPLAN:  No, Your Honor.

10             THE COURT:  So admitted.

11   [Government exhibit 50A admitted]

12             MR. DARROW:  May we publish, please?

13             THE COURT:  Yes.

14   BY MR. DARROW:

15   Q.     So that's Red or Hannah?

16   A.     Yes.

17   Q.     How about a woman named Mandy?  Did you mention her

18   before?

19   A.     Mandy that name sounds familiar.  Mandy yeah.  Actually

20   yeah she's one of our co-defendants actually.

21   Q.     Can we pull up that exhibit please?

22   A.     Yeah.

23   Q.     This is 48A.  Do you recognize her?

24   A.     Yes.

25   Q.     Is that Mandy?

Donald McFarlan

1   A.      Yes.

2   Q.      Is she another one of these women involved at the time?

3   A.      Well when I came up the last time that's when I seen

4   her.  She was all in the mix and previous to that I never

5   really -- she was just a girlfriend.

6   Q.      Okay.

7   A.      She wasn't really -- the last time I came when I had the

8   fur that's when she was all in the mix doing this doing that.

9   Q.      And just help us understand what being in the mix means?

10  A.      Selling drugs.

11  Q.      Selling drugs.  All right.  During your time in Vermont

12  back around -- this sounds like most of the winter -- well when

13  did you first come to Vermont?

14  A.      I would say July; June, July.

15  Q.      July.  Do you remember when your last trip was?

16  A.      January was the last time I ever came back to Vermont.

17  Q.      Okay.  So you're talking about from roughly July or

18  middle of 2015 up to some time in January 2016?

19  A.      Yes.

20  Q.      During that roughly six-month time period did you ever

21  see Folks with a firearm?

22  A.      Yes.

23  Q.      What did you see?

24  A.      He had a firearm on his -- I guess to protect him and

25  his -- his girls.

Donald McFarlan

1    Q.     And I'm sorry I didn't understand you.  Did you see him

2    with a firearm?

3    A.     Yes.

4    Q.     Okay.  Where did he have the firearm?

5    A.     It was in the house one time.  Lori's house.

6    Q.     Just one firearm or more than one?

7    A.     I saw different -- different.  Not all at one time, but

8    I saw different firearms, yes.

9    Q.     How did you come to see firearms?

10   A.     He would have it on him or just place it on the table.

11   Q.     Okay.  Are you saying that he would have it on him or

12   place on the table different firearms?

13   A.     Yeah.

14   Q.     Do you know anything about what kind of firearms they

15   were?

16   A.     One was a 9 millimeter and a 380.

17   Q.     How do you know the calibers?

18   A.     I just -- just from growing up I know the caliber.

19   Q.     Okay.  Now what kind of firearms are we talking about?

20   Are they rifles?  Shotguns?  Pistols?

21   A.     Handguns, yes.

22   Q.     Handguns.  Are they semi-autos or revolvers?

23   A.     Automatic.

24   Q.     So semi-automatic?

25   A.     Yes.

Donald McFarlan

1  Q.     Do you know what vehicle Folks was using during the time

2  you were up here?

3  A.     I think it was a Durango and another burgundy truck.

4  What do you call it?  Expedition.

5  Q.     What do you remember about the Durango?  Do you remember

6  the color?  Anything about it?

7  A.     It was blue I think, blue, and on the fender it was --

8  it had some -- it wasn't blue.  It was like an used part that

9  was put on the side fender.

10  Q.     So one of the fenders was a different color?

11  A.     Yes.

12  Q.     Do you know who that vehicle was registered to?

13  A.     Not for sure, no.

14  Q.     Okay.

15  A.     I can assume probably Lori, but I'm not sure.

16  Q.     All right.  You talked about your last trip to Vermont

17  some time in January?

18  A.     Yes.

19  Q.     Do you remember that trip?

20  A.     Yes.

21  Q.     Did you bring -- let me back up on vehicles for a

22  moment.  Before we go there what did you use for a vehicle in

23  Vermont?

24  A.     I always had a rental Yukon Denali truck or a Cadillac

25  truck.  It was always rentals.

Donald McFarlan

1   Q.    Do you recall being pulled over by the police in one of

2   those vehicles?

3   A.    Yes.

4   Q.    Were you wearing your fur coat?

5   A.    Yes.

6   Q.    We showed you a picture from that stop?

7   A.    Yes.

8   Q.    And that was one of those rentals you had?

9   A.    Yes.

10  Q.    Where did you usually spend the night when you were up

11  here?

12  A.    I would be in a Holiday Inn.  Both of the Holiday Inns

13  or a friend -- a girlfriend.

14  Q.    You had a girlfriend up here?

15  A.    Yes.

16  Q.    Was she any of the women that you have talked about?

17  A.    No.  She has nothing to do with none of this.

18  Q.    All right.  So your last trip to Vermont what happened

19  on that trip?  Did you bring something up with you?

20  A.    Yes.

21  Q.    What did you bring up?

22  A.    I brung up crack, some heroin, and it was bath salts.  I

23  didn't know it was bath salt.

24  Q.    What did you think it was?

25  A.    Molly.

Donald McFarlan

1   Q.     Okay.  So you brought up crack, heroin, and you thought
2   you were bringing Molly, but it turned out it was bath salts?
3   A.     Yeah.
4   Q.     All right.  How about the weight on that trip?  Similar
5   to the other trips or was it more or less?
6   A.     No.  It was more.  Previous -- you know my previous trip
7   a whole bunch of stuff happened and I didn't recoup -- some
8   things got missing I didn't recoup and that was supposed to be
9   my last trip.  So I was -- I wasn't doing it no more after
10  that.  So I actually had a hundred and some change of heroin
11  and like 70 something grams of crack and the Molly, I'm not
12  sure, it was a few hundred grams of bath salt.
13  Q.     Oh of the bath salts?
14  A.     Yes.
15  Q.     All right.  You testified that something had gone wrong
16  with some of the prior drugs you brought up.  Were there some
17  thefts or burglary?
18  A.     Theft.
19  Q.     A theft?
20  A.     Yes.
21  Q.     So you're bringing more this time and you're saying --
22  also you're saying it's going to be your last trip?
23  A.     Yeah.
24  Q.     Why was it going to be your last trip?
25  A.     I was never -- this was not -- it's not my thing and I

Donald McFarlan

1  kept -- always said this is my last trip, but I was serious

2  about it that time.  It was just over.  It was -- I did it

3  because I needed money pretty much.  So I'm like I don't --

4  this ain't no career.  So I said to myself I'm serious this is

5  my last time doing this.

6  Q.     Okay.  Did you ever get in arguments with Folks about

7  your involvement in this?

8  A.     Yeah.

9  Q.     Tell us what those were about?

10  A.     Just about the girls.  Like had all these girls around.

11  These girls are going to be a problem for you.  Just mind your

12  business.  You get paid shit mind your business, and me saying,

13  you know, I'm not going to keep on doing this and keep on doing

14  this.

15  Q.     And what would he say?

16  A.     Got to get this money.

17  Q.     Were you earning money in this business?

18  A.     Yes.

19  Q.     Okay.  What kind of money were you earning?

20  A.     I was -- I would say six, seven grand.

21  Q.     Total?  So you would buy wholesale in New York?

22  A.     Uh-huh.

23  Q.     Sell to Folks for a certain amount and then he would pay

24  you and you would go back?

25  A.     Yes.

Donald McFarlan

1    Q.      And come back again?

2    A.      Pretty much.

3    Q.      All right.  On this last trip you come up with, as you

4    say, more drugs?

5    A.      Than normal, yes.

6    Q.      Than normal?

7    A.      Yes.

8    Q.      And when you get up with the drugs what happens?  Was

9    there any bagging of the drugs you brought up?

10   A.      Oh yes, but that wasn't my situation.  That was somebody

11   else's situation.

12   Q.      Okay, and, I'm sorry, what situation are you talking

13   about?

14   A.      Those wasn't my drugs.

15   Q.      So there was bagging after you got up?

16   A.      Yeah.

17   Q.      But you're saying it wasn't the drugs you just brought?

18   A.      Yeah.  Yeah.

19   Q.      Now when you say they are my drugs have you brought

20   those drugs up for Folks like the other ones?

21   A.      The last time?

22   Q.      Yeah.

23   A.      Yes.

24   Q.      So in what sense were they your drugs because you hadn't

25   sold them to him yet?

Donald McFarlan

1   A.      Mine.  Actually get paid for them.

2   Q.      All right.  So you come up with those drugs.  There's

3   some bagging of other drugs.  Do you remember where that

4   bagging took place?

5   A.      It's one of them houses.

6   Q.      Was it Lori's house or Unc's house?

7   A.      It wasn't Lori's house.  It had to be Unc's house.  Yes.

8   Q.      The brick house?

9   A.      Yes.

10  Q.      Okay, and what happens with the drugs that you had just

11  brought up on that trip?

12  A.      Actually -- I actually gave them to someone and Chrissy

13  T.

14  Q.      Why did you give them to Chrissy T.?

15  A.      Everything -- I didn't do nothing what I normally do.

16  Everything was different this -- the last time I came up here.

17  Q.      Why are things different?

18  A.      It was is all.  It was new places, new people, and I

19  thought I could trust her.

20  Q.      Had she been involved in this?

21  A.      Involved with what?

22  Q.      Chrissy involved in what you have been talking about?

23  A.      The whole conspiracy?

24  Q.      Yeah.

25  A.      Yes.

Donald McFarlan

1  Q.     All right.  Are we talking about the drug trafficking

2  conspiracy?

3  A.     Yes.  Well trafficking, yeah.  Yeah, the selling.

4          THE COURT:  All right.  It is 12.  Is this a good

5  place to stop?

6          MR. DARROW:  Yes, Your Honor.

7          THE COURT:  Are you close to the end?

8          MR. DARROW:  Got a little bit more.

9          THE COURT:  Okay.  Let's take our break at this point

10  and we'll see you at 1:15.  Okay.  I'm going to stay and just

11  talk with the lawyers.

12  [Jury leaves at 12 p.m.  The following occurred in open court

13  without the jury present]

14          THE COURT:  Just want to remind the Marshals to have

15  Mr. McFarlan down before -- just before 1:15 so he can be

16  seated, and is it the expectation of both sides that we will go

17  into another person's testimony, Chrissy T.'s testimony, today?

18          MR. DARROW:  Unless the defense has a lot more cross

19  of Mr. McFarlan then we would guess yes.

20          THE COURT:  Okay.  Do you anticipate cross being for

21  the rest of the day?

22          MR. KAPLAN:  I don't know how much longer the

23  Government has, Judge.

24          MR. DARROW:  Maybe half hour, 20 minutes.

25          THE COURT:  Oh okay.

                        Donald McFarlan
1            MR. KAPLAN:  Probably wouldn't be.

2            THE COURT:  All right.  So Miss T. you're on notice

3    will be here as well.  All right.  Let's take our break at this

4    point and be back at 1:15.

5    [Recess 12:04 p.m. - 1:15 p.m.  The following was held in open

6    court with the jury present]

7            THE COURT:  Okay.  Good afternoon.  All right.  The

8    Government ready?  Mr. McFarlan, you are still under oath.

9    BY MR. DARROW:

10   Q.     Mr. McFarlan, when we were talking this morning you

11   identified several locations in the Burlington and Winooski

12   area --

13   A.     Yes.

14   Q.     -- that this group was working out of.  Do you remember

15   that?

16   A.     Yes.

17   Q.     And I think you mentioned a place or two that I didn't

18   show you a photo of.  So initially I want to show you what's

19   been marked for identification as 95 and ask if you recognize

20   this as one of the locations that this crew worked out of, and

21   if it doesn't look familiar that's fine?

22   A.     No.  I don't remember.

23   Q.     It doesn't look familiar?

24   A.     No.

25   Q.     Thank you, and let me also show you what's been marked

          Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1   for identification as Government 97 and ask you if this one is

2   familiar?

3   A.      Yeah this look familiar.  I don't recall exactly, but

4   look familiar, yes.

5   Q.      What do you remember about that location?

6   A.      Vaguely.  I don't --

7   Q.      Sounds like you're not too sure?

8   A.      Yeah no, but I remember it though.

9   Q.      Okay.  Now you talk about Lori's on Spring Street?

10  A.      Yes.

11  Q.      Unc's.  There was the new place?

12  A.      Yes.

13  Q.      And you testified that things were always changing?

14  A.      Yes.

15  Q.      When you came to Burlington how did you find out where

16  to go?

17  A.      I would call him.

18  Q.      Who?

19  A.      Folks.

20  Q.      All right.  Do you recall a time when -- as to the new

21  place when you didn't know which apartment to go to in the new

22  place?

23  A.      That was the last time I came.

24  Q.      Okay.  When you had your fur coat on?

25  A.      Yes.

Donald McFarlan

1    Q.    Who showed you which place to go to?

2    A.    Folks.

3    Q.    All right.  Did you know a guy named Shay working up

4    here at the time?

5    A.    I don't know -- I know who -- I don't know -- I know

6    him, but I don't know him.  You understand what I mean by that?

7    I know of him.  I know of him.  He was in the video with us,

8    but do I really know him?  No I don't.

9    Q.    Well I'm not trying to find out if you really know him,

10   but was he working with you and Folks at the time?

11   A.    No.

12   Q.    Okay.  Do you know what he was doing up here?  Why he

13   would have been at the building?

14         MR. KAPLAN:  Objection.  I would hope that a

15   foundation would be laid before he can answer.

16         THE COURT:  Well he can answer yes or no and then --

17   then you go into the foundation as to how he knows that and

18   then what he was doing here.

19   A.    The question please.

20   Q.    Yeah you mentioned he's in the video.  What video are

21   you talking about?

22   A.    The walnut challenge.

23   Q.    Do you remember which place that was filmed at?

24   A.    That was at Lori's house.

25   Q.    At Lori's house?

Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1    A.    Yes.

2    Q.    So was Shay at Lori's house at that time?

3    A.    Yes.  Yes.

4    Q.    So what did Shay have to do with this crew?

5    A.    He didn't have nothing to do with me and Folks.  I don't

6    know what him and Folks was really doing.

7    Q.    Okay.  Good.  Thanks.  Now let's talk about Lori's house

8    for a little bit.  When you first start going there was Lori on

9    the scene?

10   A.    Yes.

11   Q.    And at some time did she disappear?

12   A.    I think she went to rehab one time, yeah.

13   Q.    She went to drug rehab?

14   A.    Yeah.

15   Q.    Any idea how long she was away for?

16   A.    It wasn't long.  It wasn't long at all.

17   Q.    Like weeks?  A month?

18   A.    I wouldn't really know exactly because I'm only there

19   five days and I'm gone.  So I came there she wasn't there and

20   the next time I came back she was though.

21   Q.    When she left did the crew stop operating out of her

22   house?

23   A.    No.  No.

24   Q.    So when she left to go to rehab the crew just kept on

25   using her house?

Donald McFarlan

1   A.      Yes.

2   Q.      Okay.  Now did she have kids there?

3   A.      Yes.

4   Q.      And what did she have for kids if you remember?

5   A.      She had two sons I think it was.  It was two sons.  Yes.

6   Q.      All right.  Did you have some bad blood with Lori?

7   A.      Not bad blood.  It was she was -- they said she was

8   stealing.  She walked past.  I blocked her.  Did I ever put my

9   hands on her?  No, but I did block her like answer the

10  question.  That's what I told Lori that is.

11  Q.      Okay.  You talking about stealing money or drugs or

12  what?

13  A.      I think it was drugs.  Yeah.  There was no money.  It

14  was drugs.

15  Q.      Now you mentioned earlier that a bunch of the women

16  working here were addicts?

17  A.      Yes.

18  Q.      Was she an addict?

19  A.      Yes.

20  Q.      So there's a suspicion someone said something about her

21  stealing some drugs?

22  A.      Uh-huh.

23  Q.      And you said you blocked her so you got physical with

24  her?

25  A.      Yes.  I held my arm up.  That's it and she just stopped.

                         Donald McFarlan

1   Q.     Okay.  Did your arm hit her chest?

2   A.     No.  It hit her arm, her elbow, when she was going by

3   us.

4   Q.     Okay.  Now, Mr. McFarlan, was there a time when you

5   thought that she had stolen drugs or money and you held a

6   weapon on her?

7   A.     Never.

8   Q.     Like a knife?

9   A.     Never.

10  Q.     That didn't happen?

11  A.     Never.

12  Q.     You were telling us about your last trip to Vermont.

13  This is -- when was that?

14  A.     January.

15  Q.     Okay.  When you brought the large quantities of drugs

16  up?

17  A.     Yes.

18  Q.     And was that your last trip?

19  A.     Yes.

20  Q.     Okay.  You told us that you brought up heroin?

21  A.     Yes.

22  Q.     Crack cocaine?

23  A.     Yes.

24  Q.     And what you thought was Molly?

25  A.     Yes.

                    Donald McFarlan

1    Q.    Who were you bringing the heroin up to?

2    A.    Folks.

3    Q.    Who were you bringing the crack cocaine up to?

4    A.    Folks.

5    Q.    What about the Molly?

6    A.    Folks.

7    Q.    Did you bring the Molly to Folks?

8    A.    Yeah I had actually -- I'm not going to move it.

9    Q.    Well do you remember talking to us about this a couple

10   weeks ago?

11   A.    Yeah.

12   Q.    I thought you were bringing the Molly up --

13            MR. KAPLAN:  Objection, Your Honor.

14            THE COURT:  Objection what?

15            MR. KAPLAN:  I'm objecting to the prosecutor.

16            THE COURT:  Crossing his own witness.

17            MR. KAPLAN:  I don't know how that's going to work.

18            THE COURT:  Okay, but the leading question is the

19   problem so if you can ask it --

20            MR. DARROW:  Thank you.

21   BY MR. DARROW:

22   Q.    Do you remember what you told us about the Molly or bath

23   salts last time we talked?

24   A.    I would have given him some, but if I can get it off

25   some other way, yeah, I would have got it off.

            Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1    Q.    Got it off?

2    A.    As in sold it, yes.

3    Q.    Sold it yourself?

4    A.    Yes.

5    Q.    Okay.  Was that the first time or had you brought up

6    Molly before?

7    A.    No.  That was actually the first time I ever done it.

8    Q.    Okay.  What about the heroin and crack?

9    A.    That wasn't the first time, no.

10   Q.    Right, but would you have sold those yourself or were

11   you bringing those up for Folks?

12   A.    I wasn't selling nothing -- none of that.  That was for

13   Folks, yes.

14   Q.    Now those drugs on that last trip, these are the larger

15   amounts?

16   A.    Yes.

17   Q.    Did something happen to those drugs?

18   A.    Yes.

19   Q.    Okay.  Before we broke for lunch you said you placed

20   them with somebody.  Who did you place them with?

21   A.    Christina T.

22   Q.    Chrissy T.?

23   A.    Chrissy T.

24   Q.    You called her T. before?

25   A.    Yeah.

Donald McFarlan

1  Q.     How were they packaged?

2  A.     They was in a plastic bag wrapped up into knots like

3  twice.

4  Q.     Talking about each of the three drugs?

5  A.     Yes.

6  Q.     Were they in some kind of box?

7  A.     Yes.

8  Q.     What box?

9  A.     A cereal box.

10  Q.     Okay.  Where did you put the drugs or the box?

11  A.     I think I put the drugs -- you mean in T.'s home?

12  Q.     Well I'm asking you is that where you put them?

13  A.     Yeah.

14  Q.     You put them in T.'s home.  Do you remember where in

15  T.'s home you put them?

16  A.      It was underneath the bed and she told me to put them in

17  the closet I think.  It was a while ago.  I think it was --

18  yeah it was underneath the bed, then it was I think put in the

19  closet.

20  Q.     Okay.  So they are in T.'s home either a closet or

21  underneath the bed or something?

22  A.     Yeah.

23  Q.     This is the cereal box with three drugs in it?

24  A.     Yes.

25  Q.     You said something happened to those drugs?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Donald McFarlan

1   A.    Yes.

2   Q.    How did you first find out something had happened?

3   A.    T. told me.

4   Q.    How did she tell you?  Was it face-to-face or a phone

5   call?

6   A.    It was a phone call -- I think it was a phone call,

7   yeah.  I don't think she told me to my face.  I think it was a

8   phone call.

9   Q.    You got a phone call from her?

10  A.    Yeah.

11  Q.    And what did she tell you about the drugs?

12  A.    She said her -- her father found them and he did

13  something with them.

14  Q.    Okay.  When you received this phone call were you with

15  Folks?

16  A.    The first time no.

17  Q.    Was there another call?

18  A.    Yes.

19  Q.    And then?

20  A.    I was with.

21  Q.    And then did you talk to Chrissy?

22  A.    Yes.

23  Q.    And did Folks talk to Chrissy?

24  A.    Yes.

25  Q.    I'm approaching you with a CD which is Government 24 and

Donald McFarlan

1  ask you if you recognize this?

2  A.    Yes.

3  Q.    How do you recognize it?

4  A.    It's my signature.

5  Q.    Is this a CD that you listened to?

6  A.    Yes.

7  Q.    What's on it?

8  A.    It's a conversation with me and T.

9  Q.    And?

10  A.    Folks.

11  Q.    This is the conversation you were just telling us about?

12  A.    Yes.

13  Q.    Is that conversation fairly and accurately recorded on

14  this CD?

15  A.    Yes.

16        MR. DARROW:  Your Honor, we move for its admission.

17        THE COURT:  Any objection?

18        MR. KAPLAN:  No objection, Your Honor.

19        THE COURT:  So admitted.

20  [Government exhibit 24 admitted]

21        MR. DARROW:  Can we play the CD?

22        THE COURT:  Yes.  Do you have the exhibit number?

23        MR. DARROW:  Yes, Your Honor.  That's 24.

24  [Government Exhibit 24 published]

25  BY MR. DARROW:

Donald McFarlan

1    Q.     Pause that for a moment please.  Mr. McFarlan, do you

2    recognize the three voices we're listening to?

3    A.     Yes.

4    Q.     Who is that?

5    A.     Me, T., and Folks.

6    Q.     Okay.  This is where T. is telling you that -- what did

7    you say she was saying happened to the drugs?

8    A.     No.  This is not that conversation, but this is the

9    conversation of.

10   Q.     Afterwards?

11   A.     Yes.

12   Q.     Okay.  So when she's talking about her paperwork what

13   did you understand her to mean?

14   A.     The paper saying that she got arrested and what she got

15   arrested for.

16   Q.     Police paperwork?

17   A.     Yes.

18   Q.     Okay.  Go ahead.

19   [Government Exhibit 24 published]

20   BY MR. DARROW:

21   Q.     Pause that for a second.  Do you know what she's talking

22   about when she's talking about her pictures going through the

23   phone?

24   A.     Not really.

25   Q.     Okay.  Go ahead.

                    Donald McFarlan

1    [Government Exhibit 24 published]

2    BY MR. DARROW:

3    Q.      So that's the conversation?

4    A.      Yes.

5    Q.      When this call came in to you did it come in -- were you

6    on a cell phone?

7    A.      Yes.

8    Q.      How did Moe end up on the call?

9    A.      He was with me.

10   Q.      And did he take the cell phone?

11   A.      Yes.

12   Q.      Now when you're listening to this story from Chrissy

13   about what happened to those drugs did you believe that story?

14   A.      No.

15   Q.      Were you suspicious?

16   A.      Yes.

17   Q.      Why?

18   A.      I wanted to believe her, but something told me it wasn't

19   -- it just didn't -- it didn't feel right.

20   Q.      Did you take steps?

21   A.      Excuse me.

22   Q.      Did you take steps because you weren't -- you didn't

23   really believe her?

24   A.      Yeah.

25   Q.      What did you do?

Donald McFarlan

1   A.      We went to go check out her house.

2   Q.      Who?

3   A.      Me and a friend.

4   Q.      Who is the friend?

5   A.      He's not -- he's not around.

6   Q.      Was it a friend of yours?  Someone just you knew?

7   A.      Yeah.

8   Q.      Okay.  One guy or two guys?

9   A.      Two guys.

10  Q.      Are these -- how did you know these people?

11  A.      I know them from, you know, they are my boys.

12  Q.      They are your boys.  Okay.  What did you do with these

13  two guys?

14  A.      We went to see if -- if she had it hidden in her house.

15  Q.      Okay.  Was she there?

16  A.      No.

17  Q.      How did you get in?

18  A.      Door.  Just went in.

19  Q.      So you and two other fellows go in her house when she's

20  not there?

21  A.      No.  No.  No.  I'm sorry.  It was one other fella not

22  two other fellas.

23  Q.      You and another guy go in her house when she's not

24  there?

25  A.      Yes.

Donald McFarlan

1   Q.      And what do you do in there?

2   A.      I search.  I went in the closet and I went under the

3   bed.

4   Q.      What did you find?

5   A.      There was nothing there.

6   Q.      No drugs?

7   A.      No.

8   Q.      What did you later learn about what was going on with

9   Chrissy and your drugs?

10  A.      That the police had her call and everything -- do

11  everything.

12  Q.      She was cooperating?

13  A.      Yes.

14  Q.      Okay.  Excuse me.  I'm approaching you with 26, some

15  photos for identification.  Can you please look through those?

16  Do you recognize those pictures?

17  A.      Yes.

18  Q.      What are those pictures of?

19  A.      These are the drugs I brung up here.

20  Q.      Are those the pictures of the drugs in the cereal box

21  you're talking about?

22  A.      Yes.

23  Q.      Do those pictures fairly and accurately depict the

24  cereal box and its contents?

25  A.      Yes.

Donald McFarlan

1          MR. DARROW:  We move the exhibit, Your Honor.

2          THE COURT:  Any objection?

3          MR. KAPLAN:  No objection.

4          MR. DARROW:  That's 26.

5          THE COURT:  So admitted.

6    [Government exhibit 26 admitted]

7          MR. DARROW:  May we publish please, Your Honor?  Was

8    that a yes to publishing?

9          THE COURT:  Yes.

10   [Government exhibit 26 published]

11   BY MR. DARROW:

12   Q.    Mr. McFarlan, what's that in the first picture there?

13   A.    Froot Loops box.  Kellogg's cereal.

14   Q.    Is that the cereal box you were just telling us about?

15   A.    Yes.

16   Q.    Is that looking inside the cereal box from the top --

17   opening from the top?

18   A.    Yes.

19   Q.    The next picture please.  What's that?

20   A.    I think that's a -- the cover of a bed sheet.

21   Q.    Is that where you put the drugs inside?

22   A.    Yeah.  I guess.  Yeah.  Yeah.

23   Q.    Can we go to the next picture please, and is that the

24   cover that the bed sheets came in?

25   A.    Yeah.

Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1    Q.    Is that what you're saying it was?

2    A.    Yeah.

3    Q.    You go to the store and buy bed sheets they come inside

4    a little pocket?

5    A.    Yeah.

6    Q.    Okay.  Let's go to the next picture please and what do

7    we see here?

8    A.    That's it wrapped in aluminum foil, the drugs.

9    Q.    This is looking inside that bed sheet case?

10   A.    Yes.

11   Q.    And three packages of aluminum foil?

12   A.    Yes.

13   Q.    Okay.  Can we go to the next picture please, and what do

14   we see here?

15   A.    That's the drugs.

16   Q.    Is that one of the packages?

17   A.    Yes.

18   Q.    I don't know if you can tell by looking at which of the

19   three drugs it is?

20   A.    I can't really tell which one it is.  It's probably --

21   I'm not sure.

22   Q.    Can we go to the next one please?  Does that look like

23   another package of drugs?

24   A.    Yes.

25   Q.    And the next one?

Donald McFarlan

1   A.      Yes.

2   Q.      Those look like the drugs you brought up to Vermont?

3   A.      Yes.

4   Q.      Now -- you can take that down -- you said this was your

5   last trip to Vermont?

6   A.      Yes.

7   Q.      You had planned it to be your last trip before you came

8   up and it was your last trip.  Okay.  Did you have some

9   conversation with Moe about you not coming up not doing this

10  any more?

11  A.      I always used to say it, but -- I would always say it

12  this is my last time.  This is my last time.

13              THE COURT:  Mr. McFarlan, could you move up a little

14  bit and speak right into the microphone?

15  A.      Yeah.  No.  When I -- actually the last time he didn't

16  know that was going to be my last time, no.

17  Q.      Okay.  Did you have -- was it a falling out between you

18  guys or just you deciding you didn't want to do it any more?

19  A.      There wasn't no falling out.  I just -- it was too much

20  going on and I wasn't trying to make this no career anyway, you

21  know.  It was just too much going on and it was time for me to

22  step down.

23  Q.      Okay.

24  A.      Time step down.

25  Q.      When you say there was too much going on what do you

Donald McFarlan

1   mean by that?

2   A.      So much activity.  So many different people.  I didn't

3   trust none of the people.  I see a whole bunch of different

4   people I didn't trust.  I didn't know these people.  I get to

5   know them after I'm around them for a little bit, but I don't

6   know any of these people so I didn't -- I didn't divulge to

7   him, no, that I was, you know, this was going to be my last

8   time, no.

9   Q.      Okay.  Mr. McFarlan, you testified earlier that you pled

10  guilty?

11  A.      Yes.

12  Q.      You're awaiting sentencing?

13  A.      Yes.

14  Q.      Sentencing hasn't happened yet?

15  A.      Yes.

16  Q.      Do you know who's going to sentence you?

17  A.      Your Honor right here.

18          MR. DARROW:  May I have a moment, Your Honor?

19          THE COURT:  Yes.

20  BY MR. DARROW:

21  Q.      Mr. McFarlan, if I understand your testimony earlier you

22  said that before you got involved in this mess bringing drugs

23  up Folks told you he was also running girls?

24  A.      Yes.

25  Q.      And when you came up you saw that?

Donald McFarlan

1   A.    Yes.

2   Q.    Did you have a conversation with Folks about him running

3   girls?

4   A.    I told him that was a bad idea.  What are you doing?

5   You shouldn't be doing mixing the two.

6   Q.    And how did he respond to that?

7   A.    To mind my business.  That's not -- I don't have nothing

8   to do with me.

9   Q.    That's what he told you mind your own business?

10  A.    Kind of in words, yes.

11  Q.    What words did he use?

12  A.    It was so long ago I can't actually remember the exact

13  words, but it was I don't -- I don't get paid for that.  Don't

14  worry about that.  I'm getting paid for what I get paid for so

15  --

16  Q.    When you use the word I in those two sentences are you

17  talking about yourself?

18  A.    Yes.  Yes.  Yes.

19          MR. DARROW:  Thank you.

20          THE COURT:  Okay.  Any cross examination, Mr. Kaplan?

21          MR. KAPLAN:  Yes.

22                    CROSS EXAMINATION

23  BY MR. KAPLAN:

24  Q.    Mr. McFarlan, you just testified about what you did with

25  respect to drug distribution up here?

Donald McFarlan

1   A.      Yes.

2   Q.      And you testified under oath?

3   A.      Yes.

4   Q.      So you understand that means that you're required to

5   tell the truth when you testify?

6   A.      Of course.

7   Q.      And you talked about -- I mean you pretty much testified

8   to the effect that your involvement in all this was pretty

9   limited?

10  A.      Yes.

11  Q.      You brought up drugs on a few occasions and other than

12  that you didn't really do anything; is that right?

13  A.      Yes.

14  Q.      And that all of the drug activity that took place was

15  Brian doing it other than you bringing it up?

16  A.      No.  There was other people that was -- that was doing

17  stuff.  There was a lot of girls involved.

18  Q.      So you understand that Lori C. testified that you came

19  into her room one night while she was sleeping, held a knife to

20  her throat, and threatened her?

21  A.      That's a lie.

22  Q.      So if Lori C. testified to that effect, she was lying

23  and you're telling the truth?

24  A.      I never did that so yes if she says that, I never put no

25  knife to her neck.  I wouldn't have to put no knife to a

Donald McFarlan

1    female's neck.  That's not how -- that's uncalled for.

2    Q.    She also said that you threatened to kill her if she

3    mentioned your name to anybody?

4    A.    What do you mean mention her name?

5    Q.    If you ever told law enforcement about her name, you

6    were threatening to kill her.  Is that true?

7    A.    No I don't recall that neither.

8    Q.    Is it possible you did that and you just don't remember?

9    A.    I speak harsh like my demeanor, yes, but threaten to

10   kill I wouldn't do that.  I wouldn't tell no one I'm going to

11   kill you.

12   Q.    Do you know why she would say that if it's not true?

13   Maybe you don't know why, but do you know why she would if it's

14   not true?

15   A.    I would think that she was intimidated by me.  I guess

16   my whole demeanor, my whole -- like I just sit there on the

17   couch smoking weed making sure no one does nothing while I'm

18   there when I was there.  So it was like I was some sort of a --

19   not a watchdog, I won't put it like that, but making sure

20   everything was all right when I was there.

21   Q.    But you have to -- you would admit, wouldn't you,

22   there's a distinction between having her observe a watchdog and

23   having someone put a knife to her throat.  She would know the

24   difference, right?

25   A.    I never put a knife to her throat and if I did, I would

Donald McFarlan

1    divulge right now.  There's no reason for me to lie at this
2    point.
3    Q.    And if she said that you hit her and left a bruise on
4    her chest, are you saying she's lying about that?
5    A.    I never hit that woman.  I wasn't raised to hit no
6    woman.  So me hitting her -- she went past.  It was in the
7    living room.  I know exactly what happened.  It was in the
8    living room.  They was accusing her of stealing.  She walked
9    past and I went like this (demonstrates) so she won't go past
10   me.  Me I didn't even do this. (demonstrates) I just stood
11   right there and she went right -- she went right into my arm
12   with her arm and that was it.  Me touching -- me ever putting
13   hands on a female, that's not how I was raised.
14   Q.    Do you remember that -- I think you testified to the
15   effect that Lori C. went to rehab?
16   A.    I remember -- I remember her leaving, yeah.
17   Q.    And do you remember that the night before you were in
18   charge of bagging up some drugs?
19   A.    No I don't remember exactly.
20   Q.    She says that the night before she went to rehab you
21   brought drugs up and you were having them bagged and that you
22   made her do it even though she didn't want to do it?
23   A.    No.  Why would I make her bag up?  No.  Make her?  No.
24   I don't even actually remember what you're talking about.  I
25   know me.  Why would I make her do it.  I can get someone else

Donald McFarlan

1   to do it if I had to.  Like I wouldn't make nobody -- force
2   nobody to do anything, no.
3   Q.    So when Lori C. said that you forced her to do that she
4   was sick and not feeling good, but you made her do it anyway,
5   that's not true?
6   A.    Lori used to be sick a lot.  She used to be sick -- I
7   see her sick a lot, but me forcing her to do something, no.
8   Q.    Well so you're saying that you're not the type of person
9   that would threaten someone in the drug business?
10  A.    No.  No.  No.  I wouldn't threaten no female in that
11  nature as you're saying.  No I wouldn't.
12  Q.    Well didn't you threaten Chrissy?
13  A.    Yes I did.
14  Q.    So is that a little inconsistent with your prior
15  statement that you wouldn't threaten a female?
16  A.    I did threaten her, but in all actuality I wasn't going
17  to do nothing to Chrissy.
18  Q.    So how would Chrissy know that?
19  A.    She wouldn't know that.  It wasn't supposed to be for
20  her to know that, but I wouldn't actually do anything to her,
21  no.
22  Q.    So you're saying you could have held a knife to
23  Chrissy's throat, but you were never going to cut her throat?
24  A.    No.
25  Q.    This is a hypothetical.

Donald McFarlan

1  A.    I'm about to say you're mixing up words.  That's what
2  you're doing, but at the end of the day when I did threaten
3  Chrissy it was for her to bring back the drugs.  I was never
4  going to do nothing.  What I had in my head was I was -- when
5  the drugs are gone I'm leaving.  I never told nobody that.
6  Q.    So what you're saying is the only time you would
7  threaten a woman is if you needed to get something, if you
8  wanted something done?
9  A.    No.  I'm not saying that.
10 Q.    Well you just said that you threatened T. because you
11 wanted the drugs brought back?
12 A.    Yes.
13 Q.    Isn't it true that you accused Lori C. of stealing money
14 from you or stealing drugs?
15 A.    It wasn't actually from me, but it was from -- yeah, it
16 wasn't from me.
17 Q.    And didn't Brian pay you the money that you said she had
18 taken?
19 A.    I don't recall.  Elaborate because I don't understand
20 the question you're asking me.
21 Q.    Well I think you just testified that there was a time
22 when you accused Lori of stealing money or drugs.
23 A.    I actually wasn't.  I was there, yes.
24 Q.    And who paid you the money for that, that you had
25 accused her of taking or someone had?  Did Brian give you the

Donald McFarlan

1    money?

2    A.      I got paid for the drugs that I gave him, yeah.

3    Q.      Well so when you said to Lori T. you can't hide --

4    A.      Sorry.  You said when you say to Lori T.  That's two

5    different people.

6    Q.      You're right.  When you said to Chrissy you can't hide

7    what did you mean by that?

8    A.      Those was all threats, yeah.

9    Q.      What does that mean, though, you can't hide?  Does that

10   mean I'll find you and who knows what I'll do to you?

11   A.      That was bringing my property back to me.

12   Q.      And when you said to Chrissy you're going to get your

13   head blown off what did you mean by that?

14   A.      That was a part of threatening, yeah.

15   Q.      So you threatened Chrissy a number of times?

16   A.      Yes I did during that time.  Yes.

17   Q.      And you threatened her because you wanted her to bring

18   the drugs back?

19   A.      Yes.

20   Q.      So you're not violent with women unless you need

21   something?

22   A.      This was different.  I gave her something and she -- and

23   she said -- I didn't believe her so I said a lot -- a lot of

24   things, but was I actually going to blow her head off or -- or

25   do any of that that I said, no.

Donald McFarlan

1   Q.      But of course you said she wouldn't know that, right?
2   You are kind of a big scary guy?
3   A.      I'm not a big scary guy.
4   Q.      Well you're big.
5   A.      I'm 6'2", yeah, so I am, but like I told you in my head
6   if she don't give me those drugs, I'm gone.  That's what I said
7   to myself.
8   Q.      But you would agree the difference between saying
9   something to yourself and someone else knowing what's going on,
10  like Chrissy didn't know what you were saying to yourself?
11  A.      Yeah of course, you're right, yeah, but I want to say
12  one thing.
13  Q.      Sure.
14  A.      I have in the back of my head something dealing with
15  some police so if anything happens to T. why would I do
16  something to T.  That would have me in bigger trouble.  You
17  understand?
18  Q.      So you would be more inclined to do something with
19  someone?
20  A.      No you're saying that.  I'm telling you the logic of it
21  all like why would I harm T. and she has -- I'm questioning
22  myself she has something to do with police.  If something
23  happened to T. I'm -- that --
24  Q.      Of course.
25  A.      You understand what I'm saying, right?

Donald McFarlan

1    Q.     I understand what you're saying, but I think you would
2    know from your experience that in fact that's exactly why some
3    people get hurt because they are dealing with the police and
4    people who are in your business don't want them to, isn't that
5    right?
6    A.     I mean my best, yeah, I've done it for a couple of
7    months.  That's not really my business.
8    Q.     But when you say you have done it for a couple of months
9    you're not saying you have never been involved in drugs before?
10   A.     Sorry.
11   Q.     You're not saying you have never been involved in
12   distributing drugs before?
13   A.     Distributing drugs?
14   Q.     Yeah.
15   A.     No I don't -- this -- I did it this time.
16   Q.     Who is Hightower?
17   A.     Hightower is a guy that used to be hanging around.
18   Q.     And you brought him to Vermont?
19   A.     He came up here with me to Vermont.
20   Q.     What is his real name?
21   A.     I couldn't tell you.
22   Q.     How long have you known him?
23   A.     Not long at all.
24   Q.     So as I understand it you were arrested on July 16 of --
25   July 19th of 2016?

                    Donald McFarlan

1   A.      July -- no.  I wasn't arrested.

2   Q.      When were you arrested?

3   A.      I was arrested September 29th.

4   Q.      And it was -- it was based on an indictment that's dated

5   June 12, 2017.

6   A.      The indictment started in July or -- yeah.  Yeah.

7   Q.      So you were arrested.  There was an indictment out for

8   you pending?

9   A.      Sorry.

10  Q.      You were arrested based on an indictment that had been

11  issued?

12  A.      Yes.

13  Q.      And then eventually you were charged in the second

14  superseding indictment.  Do you remember that?

15  A.      Yes.

16  Q.      Let me show you what's been marked as -- actually it's

17  been entered into evidence as defendant's exhibit H21 and ask

18  you is that the indictment -- the second superseding indictment

19  that you were charged in?

20  A.      I wouldn't know about counts so I'm going to search the

21  counts.

22  Q.      Sure.  Yeah.

23  A.      It started off with seven counts or eight counts.  No I

24  think this was -- it was only five extra counts.  Yeah five

25  extra counts after that.  Yeah this looks like it.  Yes.

Donald McFarlan

1   Q.      Okay, and you were charged in three of the counts?

2   A.      Three of the counts, yes.

3   Q.      A conspiracy charge and then conspiracy to distribute

4   drugs and then some drug distribution.  You actually sold the

5   drugs or possessed them with the intent to sell?

6   A.      I gave T. something and it was a sale.

7   Q.      Right, and then at some point you decided to cooperate?

8   A.      I would say 18 months within the -- after I was arrested

9   8 months later -- excuse me.  18 months later.  It was like a

10  year and a half later.

11  Q.      Well let me show you what I have marked as defendant's

12  exhibit G7 which I believe to be a proffer agreement that you

13  entered into; is that correct?

14  A.      This was -- I don't think this was November 7, no.  This

15  was -- it was --

16  Q.      What's the date on the top of it?

17  A.      November 28.

18  Q.      Okay.

19  A.      No.  I think this was -- this is my lawyer's number,

20  yes, but I think it was February, January.

21  Q.      No, I understand that, but let me ask you this.  Is that

22  your signature on the last page?

23  A.      This one right here.

24  Q.      So you signed this agreement, right?

25  A.      Yeah.  Well that's my signature, but I didn't know it

Donald McFarlan

1   was -- I didn't know it was November.  I thought it was just

2   three months after that or two months after that.  Let's say

3   that looks like my signature.

4   Q.    Well actually what happened was you went and spoke with

5   the Government twice.  Here's another one G8 that was signed on

6   January 30, 2018.  Is that your signature also?

7   A.    January 30, yes.  This is my signature, yes.  That's my

8   handwriting too.

9   Q.    And under these agreements you were agreeing to go in

10  and speak with the prosecutors in the case and tell them what

11  you know, right?

12  A.    Yes.

13  Q.    And then eventually you signed a plea agreement?

14  A.    Yes.

15  Q.    And under the terms of the plea agreement you agreed to

16  plead guilty to Count I of the conspiracy count?

17  A.    Yes.

18  Q.    And the prosecutors agreed to dismiss the remaining

19  counts against you?

20  A.    Only when you cop out you're coping out to one charge.

21  Q.    And they were going to dismiss the rest of them, right?

22  A.    Not dismiss because a conspiracy is consisted of

23  everything.  So a conspiracy is everything that that man did,

24  everything that I have done is in the whole, and the reason why

25  I decided to do that is because when Folks got arrested

Donald McFarlan

1   initially he told the defense that a whole bunch of lies and
2   exaggerated about a whole bunch of things about me that is
3   about the red building, 400 grams of this, talking about this,
4   that, trying to get the picture off of him on to other people.
5   Q.    Is that why, while you have been in jail, you have been
6   telling everyone that Brian Folks is cooperating and you're
7   not?
8   A.    Excuse me.
9   Q.    Is that why you've been telling people that --
10  A.    Telling people what?
11  Q.    -- that Brian Folks is cooperating in this case?
12  A.    I said Brian Folks is cooperating?
13  Q.    Yes.
14  A.    I probably did say that, yeah.
15  Q.    Why would you do that when it's not true?
16  A.    What do you mean it's not true?  When you first get
17  arrested -- technically no, you're right it's not true, but --
18  Q.    Look at this --
19  A.    When you get arrested and you tell the officers this,
20  that, that, and a third and fabricating a whole bunch of extra
21  stuff, yeah it can't be a prosecuted against me, but at the end
22  of the day it's trying to take the focus off of him to me.
23  Q.    Is this the plea agreement that you signed?
24  A.    I would have to read it.
25  Q.    Well you can read it if you want to.  Is that your

Donald McFarlan

1  signature?

2  A.     Yes.

3  Q.     Okay.  So you signed this?

4  A.     Yes.

5         MR. KAPLAN:  Your Honor, I would move to admit

6  defendant's exhibit G9, G8, and G7?

7         THE COURT:  Any objection?

8         MR. DARROW:  Take a quick look.  No objection.

9         THE COURT:  So admitted.

10 [Defendant's exhibits G7, G8, and G9 admitted]

11 BY MR. KAPLAN:

12 Q.     So is it fair to say that you signed the plea agreement

13 because -- and agreed to cooperate because you wanted to get as

14 low a sentence as possible?

15 A.     No.  I needed for the truth to be out.  If I'm going --

16 if I'm going to have to go in front of the Judge, I want the

17 Judge to understand what's going on instead of all this other

18 things that's being said.

19 Q.     And the way he's going to understand that is based on

20 what you're saying?

21 A.     I have no reason to lie about anything.  I'm saying I'm

22 guilty so I have no reason to lie.

23 Q.     But don't you recall phone conversations -- who is Rosa?

24 A.     Rosa is a female that I know.

25 Q.     And don't you recall phone conversations with her where

Donald McFarlan

1  you're telling her you're going to cooperate to get as low as

2  sentence as possible?

3  A.    So you have to understand when you --

4  Q.    Just let me know --

5  A.    No.  Do I recall?  No, but I -- I don't recall exactly,

6  no, but I'm not saying it's not true neither.  I don't recall.

7  Q.    Well do you recall telling her that you wanted to do the

8  least amount of time possible?

9  A.    The least amount of time.  I probably did.  I probably

10 did.  I don't recall it, but I probably did.

11 Q.    How did you think that was going to happen?

12 A.    Me doing the least amount of time?

13 Q.    Yes.  Wouldn't cooperation be one way?

14 A.    Pretty much, yeah.

15 Q.    So you understand that if you cooperate that's your best

16 chance of getting a lower sentence that you might get

17 otherwise?

18 A.    See my whole thing in the beginning was getting a

19 separation.  That's why I put in for a motion to divide us.

20 Q.    Are you having difficulty understanding my questions?

21 A.    I'm -- can you repeat yourself?

22 Q.    Okay.  So I asked you -- you just acknowledged that you

23 wanted to get the lowest sentence possible and I said to you

24 wouldn't you agree that the best way to do that is to

25 cooperate?

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Donald McFarlan

1  A.     The best way to do?  No.  Figure out all your options

2  and then decide.  I can't say that's the best thing.

3  Q.     Well you did agree to cooperate so you would get a lower

4  sentence, didn't you?

5  A.     I tell you no.  I did what I did so the real can be

6  divulged.  You understand?  I don't -- there's a whole bunch of

7  stuff that was said.  Out of this 18 count indictment I have

8  three counts.  Three counts over -- over, what, 36 months

9  that's been going on and this conspiracy is since 2012.  I've

10  never been to Vermont in 2012.

11  Q.     Do you remember telling Rosa that you would take -- you

12  would take a deal if it was the right deal or do I have to play

13  that for you?  It's on a telephone call that you made from jail

14  to Rosa.

15  A.     I wouldn't -- another thing too is me before all this --

16  before any type of cooperation this is me reading in the law

17  library figuring out what's the best situation for me.  You

18  understand?

19  Q.     And didn't you tell her you would take a deal if it was

20  the right deal?

21  A.     I would take a deal if it made sense.

22  Q.     And didn't you also tell her that you were looking to do

23  22 to 24 months?

24  A.     No.  See I'm talking to a female too so I would

25  definitely try to encourage her to, okay, it's not going to be

Donald McFarlan

1   a long time, a long time.  You understand what I mean.

2   Q.     That's why you said you wanted 22 to 24 months?

3   A.     22 to 24 months.  There's no way in the world.  I've

4   been locked up for going on three years now.  So there's no way

5   in the world I'm going to get 22 to 20 whatever months you

6   said.  This is me and finding myself in a conspiracy that is

7   large.

8   Q.     So you're not -- you're not willing to acknowledge today

9   in court that you signed a cooperation agreement and you signed

10  a plea agreement and you went in and cooperated with the

11  expectation that if the prosecutors liked what you had to say

12  you would get a lower sentence?  You're not prepared to say

13  that?

14  A.     I'm not saying -- that's not the -- my focus.  That's

15  not the main reason why I did it though.

16  Q.     So are you saying that it is a reason?  One of the

17  reasons?

18  A.     It's a lot -- when you're facing time you have a lot of

19  options that you, you know, you're searching for.  I'm doing a

20  lot of reading everyday trying to figure out with my lawyer

21  what's the best situation for me, and in the beginning when

22  they got -- they got everything looking like I'm some type of

23  King Pin at this it's false.  This is not what I normally do

24  and if you ask anybody that know me, they know that.

25  Q.     So you decided, based on discussion with your lawyer and

                    Donald McFarlan

1    all your research and everything, that you wanted to cooperate?

2    A.    At the end of the day, yeah.  Like --

3    Q.    Why is it -- I mean like why is it so difficult for you

4    to acknowledge that you decided to cooperate so you could

5    receive a lower sentence?

6    A.    Because you're focusing on that, but in my mind it was

7    numerous things.  You understand?  I'm evaluating my whole

8    situation.  I'm not just worrying about that because in the

9    beginning I was saying I wasn't guilty.  So of course a lot of

10   my conversations with people would -- would say other things it

11   being true.

12   Q.    Is it fair to say that you were Brian Folks' drug

13   dealer?

14   A.    I had an arrangement with him.

15   Q.    Well the arrangement was you brought drugs up to him and

16   sold them to him?

17   A.    But his drug dealer?  No.

18   Q.    So you don't like that term?

19   A.    No because technically speaking I wasn't the only one.

20   So how am I -- you understand what I'm saying?

21   Q.    Not really.  So you sold drugs to Brian Folks?

22   A.    Yeah.  Technically, yeah.

23   Q.    What do you mean technically?  Did you bring drugs up

24   from New York?

25   A.    Yes.

Donald McFarlan

1  Q.     Bring them to Brian Folks and sell them some at a time?

2  A.     Yes.

3  Q.     Not technically, right, you did?

4  A.     Sometimes I gave them to him.  Sometimes I sold them to

5  him.  Sometimes I gave them to him.

6  Q.     And you frequently had some of the women pack drugs for

7  you when you brought them up from New York?

8  A.     I'm sorry.

9  Q.     You had women pack drugs when you came up from New York?

10  A.     Pack drugs?

11  Q.     Some -- well carry the drugs up from New York to

12  Vermont?

13  A.     I normally had the drugs on me pretty much.

14  Q.     But on occasion the women would have the drugs on them?

15  A.     I'm not -- did I have people in the car with me

16  sometimes?  Yes I did.

17  Q.     And sometimes those people had the drugs on them?

18  A.     I normally had the drugs on me because it wasn't -- it

19  wasn't that much of a drug so I normally had it on me, but was

20  women with me sometime, yes.  None of the women that have

21  anything to do to that situation over there though.  You

22  understand?

23  Q.     So you said you would bring up 50 grams at a time,

24  right?

25  A.     Yes.

                    Donald McFarlan

1    Q.      And that was heroin?

2    A.      Yes.

3    Q.      But you would only sell to Brian 10 grams at a time?

4    A.      I told you sometimes I would give it to him.  Sometimes

5    I would sell it to him.  Yeah.  Sometimes it would be 20.  It

6    would be 10.  It would be 20.  It wouldn't be no more than that

7    really, no.

8    Q.      Didn't you just testify it was always 10 grams and he

9    always had to pay for it upfront?  Isn't that what you said on

10   direct examination?

11   A.      No.  No.  It wasn't every time.  It was just 10 grams,

12   no.  It would be different occasions so it would be different

13   timings.  Sometimes it was only 5.

14           MR. KAPLAN:  Excuse me a minute, Judge.  Judge, I'm

15   having trouble locating something.  Can I have a minute to go

16   back to the desk please?

17           THE COURT:  Yes.

18   BY MR. KAPLAN:

19   Q.      Mr. McFarlan, I'm going to show you what's been marked

20   as defendant's exhibit P43 which is --

21           MR. DARROW:  May we see a copy of it, Your Honor?

22   Right now he's just showing it to him.  It's not a request to

23   refresh memory.

24           THE COURT:  I don't know what you're showing him for.

25           MR. KAPLAN:  This is a January 7, 2018 report about

        **Capitol Court Reporters, Inc. (800/802) 863-6067**

Donald McFarlan

1  what you told them about your drug dealing.  I'm going to ask

2  you to read this paragraph and ask you if it refreshes your

3  memory.

4          THE COURT:  All right.  So what is your objection?

5          MR. DARROW:  My objection evidently counsel is trying

6  to refresh memory.  He should ask a question first, ask if

7  there's something that would refresh his memory, then show him

8  that, then take it away and see if it's refreshed.

9          THE COURT:  You said --

10          MR. KAPLAN:  I had already asked him a question about

11  how much he sold my client and I suggested to him that it

12  wasn't -- that wasn't the case, that he sold him so much each

13  time and then he had to pay for it upfront.  I'm asking if this

14  refreshes his memory.

15          THE COURT:  Okay.  Did he say that he did not

16  remember?

17          MR. KAPLAN:  He said that he did it a different way

18  than I believe he had said previously.

19          THE COURT:  All right.  You can show it and see if it

20  will refresh his memory.

21  BY MR. KAPLAN:

22  Q.     Please read that to yourself.

23  A.     The highlighted?

24  Q.     That one down there.

25  A.     This part right here?

Donald McFarlan

1    Q.    So does that refresh your memory?

2    A.    I don't really remember exactly because it was so long

3    ago.

4    Q.    Well let me ask it this way.  Is it true that the most

5    frequent way you did it was to bring up 50 grams at a time and

6    you would sell Brian 10 grams at a time and then when that was

7    gone he would come back and buy another 10 grams?

8    A.    It wasn't like that all the time, no.  No.

9    Q.    Isn't that what you told the prosecutors previously?

10   A.    I'm not saying that I never done that.  Yes I have done

11   that, but it wasn't like that all the time, no.  It wasn't no

12   specific amount and it wasn't always me selling it to him.  No.

13   Q.    But specifically you brought up about 50 grams each

14   time?

15   A.    Yeah.

16   Q.    And you were selling these drugs to Brian?

17   A.    Technically yeah.

18   Q.    You weren't splitting any profits to him.  He would pay

19   you so much and then you would buy the drugs, then he would pay

20   you, then whatever the difference was between what he paid --

21   A.    No.  Sometimes I just gave it to him -- I just gave it

22   to him too.

23   Q.    And then he would give you the money later?

24   A.    Yes.

25   Q.    And the difference between what you paid in New York and

                    Donald McFarlan

1    what Brian paid you were your profit?

2    A.    I'm sorry.  Say that again.

3    Q.    If you paid so much in New York and then Brian paid you

4    so much in Vermont, the difference was your profit?

5    A.    Pretty much, yeah, including expenses and all that too

6    and sometimes this didn't come back right so it would vary.

7    Q.    And you testified earlier about a drug sale that took

8    place undercover on January 12th in Winooski in 2016.  You were

9    wearing your fur coat, you were in Winooski, you sold drugs to

10   Chrissy on January 12th?

11   A.    That's when the cops pulled me over, yeah.

12   Q.    And who was in the car with you?

13   A.    A friend of mine.

14   Q.    His name was Madera (phonetic)?

15   A.    I don't know his last name.

16   Q.    Do you know his first name?

17   A.    Jay.  I called him Jay.

18   Q.    And how long have you known him?

19   A.    Not a long time.  I don't know exactly.  No.

20   Q.    So the drugs that you sold to Chrissy it was like four

21   to five grams?

22   A.    No that's wrong.

23   Q.    How much -- how much drugs did you sell?

24   A.    It was .8.

25   Q.    And those were your drugs?

Donald McFarlan

1   A.      Yes.

2   Q.      You sold her your drugs not Brian's drugs?

3   A.      See I understand you're twisting it up.  Technically the

4   drugs that I bring are mine.  He's not giving me no money when

5   I purchase these drugs.  They are mine, but if I decide to give

6   them to him, they are his.

7   Q.      And what you don't give to him you sell yourself?

8   A.      No.  Actually that was the only time I really did that

9   type of shit and it wasn't even a sale it was for because I --

10  I had a soft spot for Chrissy because everybody used to bully

11  her.  So it wasn't like I was -- I just -- she needed it so I

12  gave it to her.

13  Q.      Do you recall telling Chrissy that Brian and you were no

14  longer working together?

15  A.      I did say that.

16  Q.      And that was before you did that sale in Winooski?

17  A.      That was to throw her off like nobody needed to know

18  what -- see I see what you're doing.

19  Q.      Maybe you do.

20  A.      Initially we was never supposed to have any type of

21  contact.  Nobody's supposed to know nothing about us anyway.

22  Q.      Well you didn't do that very well, did you, because you

23  spent a lot of time over on Spring Street?

24  A.      You could only go -- I'm here for five days.  You could

25  only go to the mall or go to the store and hang out in your

Donald McFarlan

1  room for so long.  So yes I find myself in the place at Lori's

2  house.

3  Q.     And when you did that sale with Chrissy didn't you tell

4  her that you would need help bagging that night?

5  A.     Yeah I believe I did, yeah.

6  Q.     And so you went out -- you picked her up and you went

7  out to North Avenue to Marty's house and you were bagging drugs

8  at that point and Chrissy helped you?

9  A.     No.  She was -- that was -- no.  No.  I think that was

10  -- was that -- that was at Marty's house.  This was at Marty's

11  house.  This was a long time ago so I'm trying to recap.

12  That's why I'm thinking before I speak, but it was somebody

13  else up there too that night.

14  Q.     Okay.  Well didn't you have a couple girls there from

15  New York?

16  A.     Yeah.

17  Q.     You had brought them up to help bag?

18  A.     I had a girlfriend of mine, yes.

19  Q.     And there was --

20  A.     Oh she wasn't there to help to bag I don't think.

21  Q.     And there was another guy that you had brought up from

22  New York to help bag?

23  A.     No.

24  Q.     Okay.  So Chrissy was there to help you bag and did your

25  girlfriend help bag?

Donald McFarlan

1  A.     No because it wasn't -- I think I gave him something

2  small just to test it.

3  Q.     But those were your drugs?

4  A.     No I don't think so.  No.  No.  I don't think so.

5  Q.     Mandy L. testified that those were your drugs not

6  Brian's?

7  A.     Mandy was there that night?

8  Q.     No.  She went off eventually, but she said they were

9  your drugs not Brian's.  Is that true?

10  A.     I don't recall.  No I don't recall.

11  Q.     Well this is on January --

12  A.     Well another thing too Mandy would never know whose

13  drugs was whose.  She was a yes girl.  His girl -- yes girl.

14  She would never know who they belonged to.  No one would ever

15  know who they belonged to.

16  Q.     But those drugs that you asked -- you asked Chrissy to

17  help you bag and you brought people up from New York those were

18  your drugs?  You brought them up?

19  A.     No I don't think so.  I don't think that time that we --

20  that time that we was doing -- I know I remember what time

21  where you was talking about, but I don't think that was my

22  stuff that time.  No, but another thing too once anything is

23  bagged up it's no longer mine.  You must understand this.  It's

24  no longer mine.  Once it's given to him it's no longer mine.

25  Q.     So Mandy L. said that Brian's drug business was really

Donald McFarlan

1    slowed up after Christmas of 2015.  By January and February it
2    was almost disappeared.  So weren't you the one that had the
3    drugs up here at that point?
4    A.    I don't -- I can't say it slowed up because after I left
5    around January 21st I never came back.  So I can't say it
6    slowed up, but in the indictment that you see it is a couple of
7    sale -- a few sales by Mandy -- whatever her name is -- and
8    Folks.  There's a few counts afterwards.  It's around three or
9    four counts after the cereal box.
10   Q.    So are you saying that Chrissy is the only person you
11   never sold drugs to beside Brian?  Is that your testimony under
12   oath that you never sold drugs to anyone else up here?
13   A.    I'm not going to say that because I have given -- no I'm
14   not saying that, but nothing large, no.
15   Q.    Well all the sales are small, right?
16   A.    What do you mean?
17   Q.    When you sell to an individual they are all small sales?
18   A.    I don't really take care of that part so I couldn't
19   really tell you exactly what, you know, some people come for a
20   bun, some people come for a few buns.  I'm not doing that.
21   When I -- after everything is done I come to Lori's house, I
22   sit on the couch, I smoke weed.  I go -- if someone needs
23   something to go, like someone needs something to eat, I go get
24   them some food.
25   Q.    So you did sell to other people, though, besides Brian

Donald McFarlan

1   and Chrissy?

2   A.      Yeah, yeah, I have.  I have.

3   Q.      So it took you a while to remember that?

4   A.      Because it's -- actually it's a long time ago and like I

5   said majority of the time when I came up here everything was

6   for him.

7   Q.      Okay.  So I think you testified that normally when you

8   brought up 50 grams of heroin, right?

9   A.      Give or take, yes.

10  Q.      And now on January 13th of 2016 you're really no longer

11  dealing with Brian at that point?

12  A.      Why not.  If I wasn't dealing with Brian, I would have

13  never came up here.

14  Q.      Well all of a sudden you have gone from 50 grams to 177

15  grams of heroin?

16  A.      Let me tell you my philosophy of that.

17  Q.      You have gone from almost no crack to 283.1 grams.

18  A.      That's wrong.  That's false.  They had the bath salt and

19  didn't know.  They thought that was crack so they put all that

20  together.  So whoever did the weighing to that was totally off,

21  and like I explained to you before, previous -- my previous

22  visit up here something happened.  Some funny business

23  happened.  So when I came up I said to myself I'm going to do

24  this last portion and I'm gone.  I'm done, and once that

25  happened with T. I automatically said in my head no not

Donald McFarlan

1   divulging to no one else that I'm with, but I automatically

2   said this is a sign, get your ass out of here.  Excuse my

3   French.

4            THE COURT:  I didn't know that was French.

5   A.    I don't want to laugh.

6   Q.    So when you brought the cereal box up you didn't give it

7   to Brian?

8   A.    I would never just give him all the stuff, no.

9   Q.    So you gave it to Chrissy to hold?

10  A.    I get it.  Yeah I did give it to her to hold.

11  Q.    And at that point they were your drugs they weren't

12  Brian's?

13  A.    Yes.

14  Q.    And then I think there's been some discussion that you

15  did not believe that she had actually been arrested.  You

16  thought something fishy was going on?

17  A.    In the beginning I thought, but then it just -- just

18  kept on going.  Something in the back of my head was like

19  something's up.  Something is funny.  Something is fishy, and

20  then when I'm listen to him talk to her I'm like he's like

21  ain't nobody going to give her no money.  So I knew something

22  -- I figured something was -- something wasn't right.

23  Q.    Do you recall that your car rental records indicate that

24  you rented cars from April of 2015 to March of 2016?

25  A.    I've been renting -- I'm an used car dealer.  I've been

Donald McFarlan

1  renting -- I rent 12 -- almost 12 months out of the year for

2  like five years now.  I don't -- I don't -- I purchase cars and

3  sell them, but I use rentals because I have a cheap -- I have a

4  platinum discount.

5  Q.     When you told -- when you were arrested and you told the

6  prosecutors that you came up five times but mostly in the fall

7  what did you mean?  Did you intend to include December and

8  January in that statement?

9  A.     I'm sorry.

10  Q.     When you said mostly in the fall is when you came up?

11  A.     No.  I came up in the summertime too.

12  Q.     So you came up in the summer of 2015 into January of

13  2016?

14  A.     January is my last time and before that I think it was

15  November or December.  That's when the alleged missing stuff

16  occurred.

17  Q.     And when you came up the first time is it true that

18  Steven McFarlan went into the house and saw Brian and you

19  stayed in the car initially?

20  A.     No.  No.  I think I first saw him he was -- I think he

21  was sitting on a car.  Yeah I think he was sitting on a car and

22  I started talking to him because I know him previously to all

23  this.

24  Q.     And you had drugs on you the first time you came to

25  Vermont?

                        Donald McFarlan
1    A.      No.

2                MR. KAPLAN:  Can I have a minute, Judge?

3                THE COURT:  Yes.

4    BY MR. KAPLAN:

5    Q.      I just want to explore with you for a minute the first

6    time you came up here.  Is it your testimony that Steven

7    McFarlan did not go in the house and speak with Brian and that

8    you stayed in the car or don't you remember?

9    A.      I don't remember, but I don't think so.  I don't

10   remember though, no.

11   Q.      And did you even know who Steven McFarlan was going in

12   to speak to?

13   A.      No.

14   Q.      You didn't know that?

15   A.      Actually hold on.  I don't think that's -- that's not

16   the first time I seen him though.

17   Q.      Not the first time you've seen him in Vermont.  I know

18   you knew him from before, but is that the first time you saw

19   him in Vermont when you came up with Steven?

20   A.      The time I -- it's been a while ago.

21   Q.      If you don't remember that's --

22   A.      I'm not really sure.

23   Q.      So you don't remember Steven going in the house first

24   and you sitting in the car?

25   A.      No.

                Capitol Court Reporters, Inc. (800/802) 863-6067

Donald McFarlan

1    Q.     But that might have happened that way?

2    A.     I think I would have remembered that.  Yeah I think I

3    would have remembered that.  I'm not sure.

4              MR. KAPLAN:  I don't have anything further, Judge.

5              THE COURT:  Okay.  Any redirect?

6              MR. DARROW:  Briefly, Your Honor.  Thanks.

7                      REDIRECT EXAMINATION

8    BY MR. DARROW:

9    Q.     So, Mr. McFarlan --

10   A.     Yes.

11   Q.     -- counsel asked you about the charges that were brought

12   in the indictment against you?

13   A.     Yes.

14   Q.     You said there were three of the 18 or something?

15   A.     Yes.

16   Q.     What were the charges?

17   A.     Conspiracy, the cereal box, and when I gave T. the nine

18   -- the .9 -- .8 grams.

19   Q.     So all three were drug charges?

20   A.     Yes.

21   Q.     Which of the charges carried the heaviest possible

22   sentence?

23   A.     The conspiracy.  That consists of everything he did.

24   Everything.

25   Q.     All right, and that's what you pled guilty to?

Donald McFarlan

1    A.    Yes.

2    Q.    Do you know the possible sentence you're facing?

3    A.    I don't even want to think about it.

4    Q.    Okay.  What's your understanding of it?

5    A.    Some months.

6    Q.    Some months?

7    A.    Yeah.

8    Q.    Do you remember in the plea agreement that sets forth

9    the possible plea -- possible penalty?

10   A.    I'm sorry.

11   Q.    Do you remember your plea agreement that counsel showed

12   you sets forth your possible maximum penalty?

13   A.    Yeah.

14   Q.    Do you not remember what it is?

15   A.    It's not exactly, but I know it's -- I know I had a

16   mandatory minimum and it's a lot of months.

17   Q.    How about a lot of years?

18   A.    Well, you know, in the Feds is months compared to years,

19   but yes.

20   Q.    Okay.  Well do you recall whether the plea agreement

21   says as a possible penalty of up to 40 years?

22   A.    Yeah.

23   Q.    That's the penalty that's hanging over you?

24   A.    Well no.  Actually no.

25   Q.    No?

Donald McFarlan

1  A.    Well, I'm sorry, I'm not really understanding the
2  question.  That's why I'm not answering it right.
3          MR. DARROW:  May I approach?
4          THE COURT:  Yes.
5  BY MR. DARROW:
6  Q.    Can you take a look at the plea agreement counsel marked
7  into evidence and I draw your attention to paragraph 2.
8  A.    Yes.
9  Q.    What's your possible maximum penalty?
10  A.    40.
11  Q.    40 years?
12  A.    Yes.
13  Q.    Who decides your sentence?
14  A.    I would suppose the Judge.
15  Q.    Now you entered into a cooperation agreement with the
16  Government, right?
17  A.    Yes.
18  Q.    And counsel showed you two of the proffer letters which
19  are given to you when you're interviewed by the Government?
20  A.    Yes.
21  Q.    What's your most important obligation under those
22  agreements?
23  A.    Not to lie and tell the truth.
24  Q.    Okay.  Do you realize that if you do lie you've got a
25  big problem?

Donald McFarlan

1    A.    Yes.

2    Q.    Mr. McFarlan, you said you were about 6'2"?

3    A.    Yes.

4    Q.    How tall is the defendant approximately?

5    A.    Probably an inch taller than me.

6    Q.    So 6'2" or 6'3"?

7    A.    Yeah.

8    Q.    You've described bringing bulk quantities of crack

9    cocaine and heroin to Vermont, right?

10   A.    Yes.

11   Q.    Did you bring bulk quantities of crack cocaine to

12   Vermont for anyone besides Brian Folks?

13   A.    Particularly for -- majority, yes.  Majority of it, yes.

14   Q.    What are the other bulk quantities that you brought to

15   Vermont for?

16   A.    No.  No bulk quantities.  Just --

17   Q.    My question was about bulk quantities.

18   A.    Oh yes.  Yes.

19   Q.    So I apologize.  Let me ask you again.  When you brought

20   bulk crack cocaine and heroin to Vermont who was it for?

21   A.    Folks.

22   Q.    Did you bring it for anyone else?

23   A.    No.

24   Q.    And that cereal box with the bulk heroin and crack in it

25   who was that for?

Donald McFarlan

1  A.      Folks.

2            MR. DARROW:  May I have a moment?

3            THE COURT:  Yes.

4            MR. DARROW:  Nothing further.  Thank you.

5            THE COURT:  Okay.  Any recross?

6            MR. KAPLAN:  Thank you, Judge.

7                       RECROSS EXAMINATION

8  BY MR. KAPLAN:

9  Q.      So it wasn't your intention just to hand over that

10 cereal box to Brian.  You were going to do it the same way you

11 always did before like 10 grams at a time?

12 A.      It all depends.  It all depends on the situation.

13 Q.      And when you said that you brought -- I understood from

14 your answer that you're saying the bulk went to Brian, but

15 apparently you brought up drugs for other people too?

16 A.      No.  No.

17 Q.      You didn't bring up any other drugs to sell to someone

18 else?  Didn't you say that when you answered the question?

19 A.      Well I have given to someone else something.

20 Q.      Like what does that mean?  Does it mean --

21 A.      Out of what I brung for Folks.

22 Q.      You gave some to other people?

23 A.      Yes.

24 Q.      And you brought up some separately on your own in case

25 you wanted to sell some yourself?

                        Donald McFarlan

1   A.      No.

2                MR. KAPLAN:  I have nothing further, Your Honor.

3                THE COURT:  All right.  Okay.  Thank you.  So we're

4   going to take our recess at this point and we'll be back in a

5   little over 15 minutes.

6   [Recess 2:35 p.m. - 2:55 p.m.]

7   [The following occurred in open court without the jury present]

8                THE COURT:  Okay.  I got word the attorneys want to

9   talk with me.

10               MR. KAPLAN:  I don't think they do, but we do, Judge.

11               THE COURT:  You don't think they do?

12               MR. KAPLAN:  Right.

13               THE COURT:  All right.  So you want to engage in a

14  monologue or --

15               MR. KAPLAN:  Wouldn't be the first time.  Judge,

16  Chrissy T. is going to testify for the prosecution.

17               THE COURT:  Right.

18               MR. KAPLAN:  And as it turns out after speaking with

19  our client and thinking about it we have some phone calls we

20  would like to play that we're not prepared to play today and I

21  don't even know if we would be prepared to play tomorrow.  So I

22  would like to have the Court, if the Court is willing, we would

23  like to call her in our case, in other words, and if the Court

24  could ask her to be available --

25               THE COURT:  Sure.

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

1              MR. KAPLAN:  -- so I don't have to subpoena her

2    again.

3              THE COURT:  Yes.  Absolutely.  So the question is

4    whether the Government will make her available for being called

5    by the defense.

6              MS. SAVNER:  I mean I don't have any means of making

7    her available besides providing defense counsel some contact

8    information for her.  I mean she's an civilian witness who is

9    under subpoena as a Government witness.  I will note that the

10   call -- you know the Government shared its witness list --

11   excuse me -- its exhibit list with defense counsel and defense

12   counsel could have seen from that exhibit list that the calls

13   it wishes to play were not on the Government's exhibit list and

14   to the extent they wanted to use them to cross examine this

15   witness they could have been prepared to play them.

16             MR. KAPLAN:  I guess the answer is no they are not

17   willing to.

18             THE COURT:  Well I certainly am willing to tell her

19   she should remain available.  It would be helpful if you had a

20   subpoena to give to her at this point, but regardless I will

21   make it known that she should be available.

22             MR. KAPLAN:  Thank you, Judge.

23             THE COURT:  Okay.  Are we set?

24             MS. SAVNER:  Yes, Your Honor.

25             THE COURT:  Now will she take the rest of the morning

Chrissy T.

1  -- rest of the afternoon?

2            MS. SAVNER:  I believe so.  We might get into cross

3  this afternoon.  I'm not sure, but --

4            THE COURT:  All right.

5            MS. SAVNER:  -- I don't intend to call any other

6  witnesses today.

7            THE COURT:  Okay.  Okay.  Let's bring the jury in

8  please.

9  [Jury arrives in the courtroom at 3 p.m.]

10           THE COURT:  Okay.  Ms. Savner, are you next?

11           MS. SAVNER:  Yes, Your Honor.  The Government calls

12 Christina T.

13           THE COURT:  Okay.

14 CHRISTINA T.,

15      Having been duly sworn, testified as follows:

16           THE COURT:  Good afternoon, Ms. T.

17           THE WITNESS:  Good afternoon.

18           THE COURT:  And I just want to remind you to take the

19 microphone and put it fairly close to you and speak right into

20 it.  Okay.

21           THE WITNESS:  Okay.

22                    DIRECT EXAMINATION

23 BY MS. SAVNER:

24 Q.    There's water there.  Good afternoon, Ms. T.  Can you

25 please tell the jury your name?

Chrissy T.

1   A.      Christina T.

2   Q.      And do you go by any other name?

3   A.      Chrissy.

4   Q.      Where did you grow up?

5   A.      Williston, Vermont.

6   Q.      You lived in Vermont your whole life?

7   A.      Yes.

8   Q.      How far did you go in school?

9   A.      High school.

10  Q.      Graduated?

11  A.      Yes.

12  Q.      And how old are you now?

13  A.      I'll be 35.

14  Q.      I want to talk to you about the summer of 2015.  Direct

15  your attention there.  What were you doing that summer for

16  work?

17  A.      I was at Chili's.

18  Q.      Were you a drug user then?

19  A.      Yes.

20  Q.      What was your drug of choice?

21  A.      Heroin.

22  Q.      How much were you using?

23  A.      About four to five bags a day.

24  Q.      Bags same as tickets?

25  A.      Yes.

Chrissy T.

1   Q.      How old were you when you started using drugs?

2   A.      26.

3   Q.      Tell us how that started.  Did you start with heroin or

4   did you get into that?

5   A.      No.  I started with Oxycontin and when Oxycontin went

6   away I did Opana.  When Opana went away I went to heroin.

7   Q.      What is Opana?

8   A.      It's a pain pill.

9   Q.      Okay.  So eventually you got into heroin?

10  A.      Yes.

11  Q.      How were you using heroin at the time?

12  A.      I snorted it.

13  Q.      Did you ever shoot heroin?

14  A.      No.

15  Q.      What happened to your job at Chili's that summer?

16  A.      I got fired.

17  Q.      For what?

18  A.      Having empty tickets in my wallet.

19  Q.      Boss found those?

20  A.      Yes.

21  Q.      Where were you living at the time?

22  A.      I was living at my dad's house.

23  Q.      Are you still using?

24  A.      No.

25  Q.      How long have you been clean?

Chrissy T.

1  A.    Almost six, seven months.

2  Q.    How did you get clean?

3  A.    I got arrested, pulled over, and I had to clean up my

4  act.

5  Q.    And how do you stay clean now?

6  A.    I go to the methadone clinic.

7  Q.    Is that working for you?

8  A.    Yes.

9  Q.    Are you currently employed?

10  A.    Yes.

11  Q.    Don't tell us exactly where you work, but what kind of

12  work do you do?

13  A.    I'm assistant manager of a store.

14  Q.    How long have you held that job?

15  A.    Almost three years.

16  Q.    I'm going to take you back again to the summer of 2015.

17  Some time during that summer did you meet someone named Brian

18  Folks?

19  A.    Yes.

20  Q.    Tell us how that happened?

21  A.    I was staying at Lori C.'s house.

22  Q.    What happened there?

23  A.    I was staying with her and I gave her money for drugs or

24  hanging out.

25  Q.    So you mentioned before that you had been living with

                    Chrissy T.
 1  your father?

 2  A.     Yes.

 3  Q.     How did it come to be that you were staying at Lori's?

 4  A.     I just ended up there.  She needed help and we just were

 5  friends.

 6  Q.     When you moved in -- well is it fair to say you moved

 7  into Lori's?

 8  A.     Yes.

 9  Q.     When you moved in there was Brian Folks already on the

10  scene?

11  A.     I did not know him then, but yes he would come in and

12  out of the house.

13  Q.     Okay.  When were you first introduced to him if you

14  remember?

15  A.     We were just hanging out in the living room.

16  Q.     What was he doing there?

17  A.     Selling drugs.

18  Q.     How do you know?

19  A.     Because I was -- I saw him handle the drugs and Lori.

20  Lori C.

21  Q.     Okay.  Was he -- meaning Brian Folks -- doing the

22  hand-to-hand sales with customers?

23  A.     Yes.

24  Q.     Was anyone else doing that with him?

25  A.     Lori.

         **Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Chrissy T.

1   Q.      She was doing the hand-to-hands?

2   A.      Yes.

3   Q.      How did that work in terms of payment to Lori if you

4   know?

5   A.      She was getting drugs to have them stay at her house.

6   Q.      Was anyone else staying at Lori's house when you got

7   there in the summer of 2015?

8   A.      Red.

9   Q.      Can we -- excuse me -- pull up 93 please?  Do you

10  recognize this person?

11  A.      Yes.  That is Red.

12  Q.      Okay.  So she was staying at Lori's too?

13  A.      Yes.

14  Q.      Anyone else when you first got there?

15  A.      Amanda.

16  Q.      Okay.  Can we pull up 83?

17  A.      Yes that's Amanda.

18  Q.      Okay.  She was staying at Lori's?

19  A.      Yes.

20  Q.      What were Red and Amanda doing at Lori's that you saw?

21  A.      They were staying there.  They were going out a lot.

22  They were having dates.

23  Q.      Okay.  What kind of dates?

24  A.      They would meet guys.

25  Q.      Okay.  Prostitution?

        **Capitol Court Reporters, Inc. (800/802) 863-6067**

Chrissy T.

1    A.    Yes.

2    Q.    Do you know who they were working for?

3    A.    Yes.

4    Q.    Who?

5    A.    Brian Folks.

6    Q.    How do you know?

7    A.    Because they gave him money and I -- they were talking.

8    Q.    Okay.  So you saw Red and Amanda give Folks money?

9    A.    Yes.  Yes.

10   Q.    What did you hear them talking about if the

11   conversations were with Folks?

12            MS. SEN:  Objection, Your Honor, hearsay.  It calls

13   for hearsay.

14            THE COURT:  Would counsel approach the bench?

15   [Bench conference]

16

17

18

19

20

21

22

23

24

25

Chrissy T.

1          THE COURT:  So this is an issue that I have thought

2   about and it's unclear to me.  Many of the statements were

3   among co-conspirators.  The conspiracy objective was the drugs

4   not the prostitution.  So does that mean either the

5   801(d)(2)(E) applies only to drug related statements or does it

6   apply to anything within the conspiracy that was unlawful

7   activity?

8          MS. SEN:  Well, Your Honor, I would argue there's no

9   conspiracy to engage in human trafficking in this case.

10  There's only related to the drugs, and what the prosecutors

11  specifically asked this witness, Your Honor, is what did you

12  hear them say about their work for prostitution.  I mean it's

13  very specific so I think that is outside the scope of

14  801(2)(D).

15         MS. SAVNER:  If I may, I think I added at the end of

16  that question to the extent Folks was involved in the

17  conversations.  So it was only intending to elicit comments and

18  conversations in which Folks was involved, but I would say,

19  Your Honor, even though the conspiracy to engage in

20  prostitution or trafficking hasn't been charged, Your Honor can

21  find by a preponderance of the evidence that a conspiracy did

22  exist for evidentiary purposes in order to admit statements of

23  co-conspirators.

24         THE COURT:  I could do that or else I could say that

25  any conversation among all of the people who are clearly

Chrissy T.

1    involved in the drug related conspiracy.  Anyway the reason I
2    called you up here is because I've been wrestling with that
3    particular question because any time you object to hearsay --
4    well it's not hearsay if it's within the exception of the
5    hearsay rule and 801(d)(2)(E) is an exception to the hearsay
6    rule, but anyway at least in regard to you connecting this up
7    to Folks would have heard or said it's related to him, and as a
8    result she could testify to anything that he was present to
9    hear and engage in.  Okay.
10           MS. SEN:  Just to clarify, Your Honor, my
11   understanding is these two witnesses were not involved on the
12   drug side.
13           THE COURT:  Which two witnesses?  Chrissy?
14           MS. SEN:  No.  The two women that are eliciting the
15   statements about what she heard them say that she's -- those
16   two are not involved in the drug sales and the drug piece of
17   it.
18           THE COURT:  Can you make a proffer as to what she's
19   going to testify to?
20           MS. SAVNER:  I don't actually know what she's going
21   to say, but I can ask her and I can rephrase to make it clear I
22   only intended to ask her about conversations she heard in which
23   Folks was a party.
24           THE COURT:  Okay.  Well can you rephrase the
25   question?

                      Chrissy T.

 1              MS. SAVNER:  I will.

 2              THE COURT:  And then it becomes relevant even if they

 3     weren't in the conspiracy.  So if you can rephrase the

 4     question.

 5              MS. SAVNER:  Yes, Your Honor.

 6     [End of bench conference]

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Chrissy T.

1  BY MS. SAVNER:

2  Q.     Miss T., do you ever remember Folks having a

3  conversation with either Red or Amanda about the prostitution

4  work?

5  A.     Yes.

6  Q.     What do you remember Mr. Folks saying about it?

7  A.     He asked if they had any dates.

8  Q.     I'm sorry.

9  A.     Anything lined up.

10  Q.     So --

11  A.     Dates.

12  Q.     Starting -- and tell us what you understood of the

13  conversation?

14  A.     That they were going to go have -- meet men and get them

15  lined up.

16  Q.     Okay and they would be discussing getting dates lined up

17  with Mr. Folks?

18  A.     Yes.

19  Q.     Anything else you remember about those conversations?

20  A.     Not right now.

21  Q.     Okay.  Eventually over your time at Lori's house did

22  other people move in?

23  A.     Yes.

24  Q.     Who are those other people?

25  A.     Ayla and V.

Chrissy T.

1  Q.    Okay.

2          THE COURT:  Ayla and who?

3          THE WITNESS:  Victoria.

4  BY MS. SAVNER:

5  Q.    You said V; is that right?

6  A.    Yes.

7  Q.    Do you know -- excuse me.  Do you know V's name?

8  A.    Victoria.

9  Q.    Okay.  Can we pull up 47D please?  Oh I'm sorry.  Take

10 that down.  54A.  Do you recognize this person?

11 A.    Yes.  That's Ayla.

12 Q.    Okay.  So she's one of the people that moved into

13 Lori's?

14 A.    Yes.

15 Q.    Do you remember about when she moved in, in relation to

16 when you moved in?

17 A.    A couple weeks.

18 Q.    After?

19 A.    Yes.

20 Q.    Okay and can you pull up 55A?  Who's this?

21 A.    Victoria.

22 Q.    Okay.  Also known to you as V?

23 A.    Yes.

24 Q.    All right, and do you remember when she moved in, in

25 relation to when you moved in?

                      Chrissy T.

1    A.      A little after Ayla.

2    Q.      All right, and we saw briefly another picture.  Can we

3    now pull up 47D?  Do you know who this person is?

4    A.      Hannah.

5    Q.      Okay.  At some point did Hannah move into Lori's house?

6    A.      Yes.

7    Q.      When was that?

8    A.      Like maybe a month or two months after I got there.

9    Q.      All right.  So this was in 2015.  Did you know Hannah in

10   2013?

11   A.      No.

12   Q.      When you first met Moe how did he present -- excuse me.

13   Mr. Folks did you know him by any other names?

14   A.      Moe.

15   Q.      When you first met him how did he present himself?

16   A.      Kind.  Generous.

17   Q.      Do you know what the nature of his relationship was with

18   V, Victoria, or Ayla?

19   A.      They were working for him.

20   Q.      Do you know if they also had a sexual relationship with

21   him?

22   A.      I know Victoria.

23   Q.      She did?

24   A.      Yes.

25   Q.      So you mentioned that at Lori's house Folks was selling

                    Chrissy T.

 1   drugs along with Lori when you showed up; is that right?

 2   A.     Yes.

 3   Q.     Where did Folks get his drugs if you know?

 4   A.     From G.

 5   Q.     Okay.  When did G show up?

 6   A.     Maybe two months after I started living in the living

 7   room.

 8   Q.     That was the first time you met G?

 9   A.     Yes.

10   Q.     Do you know who provided Folks drugs to sell before G?

11   A.     No.

12   Q.     What did you observe about the relationship between

13   Folks and G?

14   A.     They were like brothers.

15   Q.     They seemed close?

16   A.     Yes.

17   Q.     How frequently was G there once he did start coming up?

18   A.     Almost all the time except for here and there he was

19   gone.

20   Q.     Do you know where he stayed?

21   A.     Hotels.

22   Q.     What was your relationship with him like?

23   A.     He was like my friend.

24   Q.     How did he treat you?

25   A.     Like family.  Like I was his sister.

Chrissy T.

1    Q.    Can you describe some of the things he did that gave you

2    that impression?

3    A.    He made sure I was fed.  He made sure I was well.  He

4    looked out for me.  Made sure I was okay.

5    Q.    When you said he made sure you were not sick?

6    A.    I was not sick.

7    Q.    Sick from heroin withdrawal?

8    A.    Yes.

9    Q.    Did G have a nickname for you or something that he

10   called you?

11   A.    Little sis.

12   Q.    Did you know G to sell to people directly -- to do

13   street sales?

14   A.    No.

15   Q.    Did you know him to supply other people besides Brian

16   Folks with drugs when he was in Vermont?

17   A.    No.

18   Q.    At some point did other men start coming to Lori's house

19   too -- start staying there?

20   A.    Yes.  Tower and Shay.

21   Q.    Can we pull up 115 please?  Who is this?

22   A.    That is Tower.

23   Q.    What was his role?

24   A.    The enforcer.

25   Q.    What does that mean?  What did he do?

Chrissy T.

1   A.     He made sure the girls were not running amuck.  He made
2   sure we have -- we had the money.  We weren't doing all the
3   drugs.
4   Q.     What does it mean -- what do you mean he made sure you
5   had the money?
6   A.     Like if we did sales we weren't going and spending it
7   and made sure we had what we had.
8   Q.     You also mentioned Shay?
9   A.     Yes.
10  Q.     What was Shay's role?
11  A.     He brought drugs up.
12  Q.     How do you know?
13  A.     Because they were waiting when we were dry.  We were
14  waiting for Shay.  Brought them into the house.
15  Q.     How did it work between G and Shay both bringing drugs
16  up?
17  A.     It was when G didn't want to go down and Shay would go
18  down.
19  Q.     So they both brought drugs up?
20  A.     Yes.
21  Q.     And they gave them to Brian Folks?
22  A.     Yes.
23  Q.     What did Brian Folks do with them?
24  A.     We bagged it up.  We put it together.
25  Q.     And sold it to individual customers?

Chrissy T.

1   A.      Yes.

2   Q.      What did you observe about the relationship between

3   Shay, Hightower, G, and Folks?

4   A.      They were friends.

5   Q.      Could you tell who was in charge?

6   A.      Yes.

7   Q.      Who?

8   A.      Brian Folks.

9   Q.      How do you know?

10  A.      He was the most authoritative figure.

11  Q.      How so?  What kind of things did he do?

12  A.      He made sure that we had the money.  We had, you know,

13  -- we were on point.  Like we weren't going and spending the

14  money.  Made sure we had the money.

15  Q.      Did you see Folks interact with Hightower, G, and Shay?

16  A.      Yes.

17  Q.      What did you observe about those?

18  A.      They were friendly to each other.

19  Q.      So Lori was at the house too during this time, right?

20  A.      Lori was at the house, yes.

21  Q.      Tell us about what she was doing while all this was

22  going on?

23  A.      Basically in her bedroom because we had the living room.

24  Just living in her bedroom, being, hanging out.

25  Q.      What was her habit like at the time?

Chrissy T.

1  A.      A lot.  A least a bun a day.

2  Q.      She was doing heroin?

3  A.      Yes.

4  Q.      How often would she come ask you or someone else that

5  you saw for heroin?

6  A.      At least four or five times a day and she was doing

7  crack as well.

8  Q.      All right.  You've alluded to this, but at some point

9  while you were staying there did you start working in this

10 organization too?

11 A.      Yes.

12 Q.      Explain how that happened?

13 A.      I started off with one or two buns and when the money

14 came back I was supposed to come back.  I got more and more

15 responsibility.

16 Q.      Okay.  So let's break this down.  You got one or two

17 buns.  Who did you get them from?

18 A.      Moe.

19 Q.      All right.  What did you do with them?

20 A.      I sold them to customers.

21 Q.      How did you connect with the customers?

22 A.      I had a phone.

23 Q.      Who gave you the phone?

24 A.      Moe.

25 Q.      And customers would call that phone?

Chrissy T.

1    A.      Yes.

2    Q.      Where would the deals happen?

3    A.      In the kitchen.

4    Q.      Explain how it would work.  You would get a call, a

5    customer would want to come in, what would you do?

6    A.      I would get however many bags they wanted and go into

7    the kitchen or the bathroom and get the money from them.

8    Q.      Were there rules about how to do the deals?

9    A.      No one can go in the living room.  No one can do drugs

10   in the house.

11   Q.      Whose rules were those?

12   A.      Brian's.  Moe's.

13   Q.      He told you those rules?

14   A.      Yes.

15   Q.      Where would the drugs be kept around the house at Lori's

16   house?

17   A.      We had them on us, behind the bookshelf, and other

18   places in the house that were -- that no one would know so they

19   couldn't get stolen.

20   Q.      Did you also do some work doing errands for Folks?

21   A.      Yes.

22   Q.      Describe that?  What kind of stuff did you do?

23   A.      I went to bring Cassandra around.  Brian to and from the

24   house.

25   Q.      Who is Cassandra?

Chrissy T.

1   A.      His wife.

2   Q.      Keep going.

3   A.      I brought Cassandra to school to pick up the kids.  Went

4   back to the house.  Went to the bank to deposit money.

5   Q.      Was there ever a time you had to clean Cassandra's

6   house?

7   A.      Yes.

8   Q.      Who told you to do that?

9   A.      Moe.

10  Q.      Who told you to do all these errands that you're talking

11  about?

12  A.      Moe.

13  Q.      When you were doing the hand-to-hand exchanges with

14  customers do you remember the prices you were charging for

15  heroin and crack at the time?

16  A.      They were changing, but yes.

17  Q.      Tell us what the prices were that you remember?

18  A.      75, 65, and I believe it went to a hundred.

19  Q.      75, 65 and a hundred for how much?

20  A.      For a bun.

21  Q.      And that's heroin?

22  A.      Yes.

23  Q.      And you said that you were at first given, I think you

24  said, one to three?

25  A.      One or two first.

Chrissy T.

1   Q.     At a time?

2   A.     Yeah.

3   Q.     And who would you get those from?

4   A.     Moe.

5   Q.     Okay.  What would you do once you sold that quantity?

6   A.     I would give him the money.

7   Q.     And then what?

8   A.     And then I would get more.

9   Q.     Where did you keep the drugs when you were working?

10  A.     On me.

11  Q.     Okay.  Did you also have a safe or a lockbox at some

12  point?

13  A.     Yes.

14  Q.     Explain how that worked?

15  A.     It was a small safe that we had underneath the desk in

16  Lori's house.  I had the combination.  Hannah had the

17  combination.  Moe had the combination.  G had it.

18  Q.     What was kept in there?

19  A.     Heroin and crack.

20  Q.     And when you brought back the money from the sales that

21  you did, did you put it in a safe or did you give it directly

22  to Moe?

23  A.     Either.  He was there I would give it to him or put it

24  in the safe when he came.

25  Q.     How many sales would you say you were doing on a daily

Chrissy T.

1   basis?

2   A.      About 25 to 30.  Depends on payday -- paydays as well.

3   Q.      Payday for you or payday for customers?

4   A.      Payday for customers.

5   Q.      And that was a slow day?

6   A.      It was a busy day payday.

7   Q.      Got it.  So 25 to 30 sales on a regular day?

8   A.      Yes.

9   Q.      And more on payday?

10  A.      Yes.

11  Q.      What hours were you doing these sales?

12  A.      All hours of the night.

13  Q.      At some point did you start getting involved in bagging

14  up the drugs?

15  A.      Yes.

16  Q.      Tell us how that worked?

17  A.      We would close the living room off to anybody besides

18  the people who were supposed to be in the living room.  Trusted

19  people.  It was me and Hannah basically bagging up heroin and

20  crack.

21  Q.      Okay.  Explain how that would work.  What was the

22  process like?

23  A.      We had a backpack full of supplies.  We had a turn

24  table, we had razor blades, the baggies, and cards, playing

25  cards.

Chrissy T.

1   Q.      What were the cards used for?

2   A.      To dump the drugs in the bags.

3   Q.      And you said it was you and Hannah generally doing this?

4   A.      Yes.

5   Q.      How much -- what was the sort of bulk quantity of heroin
6  or crack you were bagging on a given day?

7   A.      Golf ball size.

8   Q.      How often would you do this?

9   A.      Once or twice a week.

10   Q.      So the golf ball size was that particularly heroin?

11   A.      Yes.

12   Q.      And how about crack?

13   A.      It was just in a bag and we would dump it on the table
14  and bag it up into different pieces.

15   Q.      And how often were you bagging crack?

16   A.      Once or twice a week.

17   Q.      How many buns would you say you bagged in a normal
18  bagging session?

19   A.      About three or four sleeves.

20   Q.      Three or four sleeves?

21   A.      Yes.

22   Q.      How many buns are in a sleeve?

23   A.      10.

24   Q.      Who would provide the raw material -- the raw drug
25  material that you were working with?

Chrissy T.

1  A.      Moe or G.

2  Q.      And who would provide the supplies that you needed to

3  bag it up with?

4  A.      We would get money to go get them.

5  Q.      Who would you get money from?

6  A.      Moe.

7  Q.      Where would you go to get the stuff you needed?

8  A.      Northern Lights or Rite Aid.

9  Q.      To get the bags and razor blades?

10  A.      Yes.

11  Q.      Do you remember the color bags that you all used to bag

12  up the crack?

13  A.      Normally they were blue, green, and I think red.

14  Q.      Did Ayla ever bag drugs?

15  A.      Yes.

16  Q.      What did she wear when she bagged drugs?

17  A.      A bra.

18  Q.      Why is that?

19  A.      Because she couldn't be trusted to have -- to take the

20  drugs.

21  Q.      Who told her she had to wear just a bra?

22  A.      Moe.

23  Q.      What did you do with the finished bags after you created

24  the buns and the sleeves?

25  A.      They would take them out of the house or put them in the

Chrissy T.

1  bookshelf.

2  Q.    So hide them around Lori's house?

3  A.    Yes.

4  Q.    Did you ever while -- during this period while you were

5  living at Lori's house did you ever bag anywhere else?

6  A.    No.

7  Q.    How were you paid for your work?

8  A.    Drugs.

9  Q.    Did you also get money?

10 A.    To eat with.

11 Q.    Explain how that would work.  How would you get food?

12 A.    I would have to ask to go to the store.

13 Q.    Who would you ask?

14 A.    Moe.

15 Q.    And would he --

16 A.    Or G.

17 Q.    Would Moe or G give you money to use?

18 A.    Yes or I would have to use it out of the money I had --

19 Q.    Okay.

20 A.    -- from sales.

21 Q.    So sometimes did you get paid in cash?

22 A.    No.  If I made a sale, I would get -- I would use the

23 money to eat.

24 Q.    So you asked permission before you used the money from

25 the sales?

Chrissy T.

1    A.    Yes.

2    Q.    You mentioned also you deposited -- you did some runs to

3    the bank; is that right?

4    A.    Yes.

5    Q.    Explain how that worked.

6    A.    I would get a text message of account to go put money

7    into.

8    Q.    A text message from who?

9    A.    Moe.

10   Q.    Is this money you had just collected from customers or

11   other money?

12   A.    Other money.

13   Q.    Who would give you the money to deposit?

14   A.    Moe.

15   Q.    Did you ever do that for G?

16   A.    No.

17   Q.    You've mentioned this, that there was another side to

18   this business too, right?  Some of the girls were involved in

19   prostitution; is that right?

20   A.    Yes.

21   Q.    Okay.  So in all the time that you were at Lori's which

22   girls did you know to be working as prostitutes?  You've

23   mentioned --

24   A.    Ayla, V, Red, and Ayla.

25   Q.    Okay.  How about Amanda?  We saw her picture before.

Chrissy T.

1   A.      Yes.

2   Q.      She was working as a prostitute?

3   A.      Yes.

4   Q.      Can we pull up 50A please?  Do you know who that is?

5   A.      That's Keisha.

6   Q.      Okay.  Was she working as a prostitute to your

7   knowledge?

8   A.      Yes.

9   Q.      Can we pull up 113?  Do you know who that is?

10  A.      Jerrika.

11  Q.      Was she working as a prostitute as well?

12  A.      Yes.

13  Q.      I want to talk about Keisha.  What do you know about --

14  and this is just from your own observations or from things that

15  Folks told you.  What do you know about Keisha's work as a

16  prostitute?

17  A.      She did Backpaging.  She came a couple times when she

18  was sick to get drugs so she would go on dates.

19  Q.      Explain how that worked.

20  A.      If she was really sick, she would come to the house or

21  -- and I would give her drugs.

22  Q.      Did you ask permission from anyone before you gave her

23  drugs?

24  A.      Yes.

25  Q.      Who?

Chrissy T.

1   A.      Moe.

2   Q.      Okay.

3   A.      I only give the girls drugs when he said it was okay.

4   Q.      Did you give all of the girls, that we just looked at

5   pictures of, drugs?

6   A.      Yes.

7   Q.      And for all of them you asked Moe first?

8   A.      Yes.

9   Q.      Did you ever ask G permission for giving these girls

10  drugs?

11  A.      Once or twice, but always Moe.

12  Q.      Was Keisha staying at the house on Spring Street?

13  A.      No.

14  Q.      Do you know where she was staying?

15  A.      No.

16  Q.      Okay.  So she would just come by sometimes, right?

17  A.      Yes.

18  Q.      Based on what you observed did she meet Moe during the

19  time you met him or did she know him from before?

20  A.      From their relationship before.

21  Q.      I want to talk about Jerrika.  At some point was there a

22  time when you were involved in helping her get what she needed

23  to work as a prostitute?

24  A.      Yes.

25  Q.      Explain what happened.

Chrissy T.

1    A.      She came to get money for a phone card.

2    Q.      Okay, and what did you do when she came asking for it?

3    A.      I asked Moe if it was correct.

4    Q.      And?

5    A.      He said yes.

6    Q.      So you gave her the money?

7    A.      Yes.

8    Q.      Were all these girls that were working as prostitutes;

9    Ayla, Red, Amanda, V, Keisha, Jerrika, were they all heroin

10   users to your knowledge?

11   A.      Yes.

12   Q.      And how did they take their heroin if you saw?

13   A.      They used a needle.

14   Q.      All of them?

15   A.      Yes.

16   Q.      How did their habits at the time compare to yours in

17   terms of how much they were using?

18   A.      They were at least a bun or two buns a day at least.

19   Q.      And remind us how much you were using at the time?

20   A.      Four or five.

21   Q.      Tickets?

22   A.      Tickets.

23   Q.      So multiples more than you?

24   A.      Correct.

25   Q.      And how does the effects of shooting heroin compare to

Chrissy T.

1    snorting it if you know?

2              MS. SEN:  Objection, Your Honor.  I don't know how

3    this witness would know that.

4              THE COURT:  Pardon me.

5              MS. SEN:  Foundation, Your Honor.

6              THE COURT:  Well from her own experience.  It goes

7    without saying.  So objection overruled.  You can answer that.

8    A.    So my symptoms would be bad, but their's would be

9    modified because their's was through their veins.

10   Q.    So explain the symptoms you experienced from snorting

11   when you didn't have enough heroin?

12   A.    Cold chills, sweats, leg pain.  Very, very bad leg pains

13   like your bones were going out of your body.  Your stomach

14   hurts.  You're shivering.  You're hot.  You're cold.  Your

15   anxiety is through the roof.  All you can think about is making

16   that feeling go away.

17   Q.    That's how you felt doing four or five tickets a day?

18   A.    Yes.

19   Q.    What did you observe about the other women when they

20   were in withdrawal?

21   A.    They were -- basically couldn't get out of bed.  They

22   were puking.  They basically were bedridden.

23   Q.    Did you ever see Moe there when the girls were in that

24   state?

25   A.    Yes.

Chrissy T.

1  Q.    How often?

2  A.    Daily.

3  Q.    So explain to us from what you observed being in the

4  house how did the prostitution side of the business work?  You

5  mentioned Backpage, right?

6  A.    Yes.

7  Q.    So who took the pictures of the women that were posted

8  on Backpage?

9  A.    They did.

10         MS. SEN:  Objection, Your Honor.  I think that she

11  needs to lay a foundation in terms of how she would know that.

12         THE COURT:  Well if she said that she knew -- she

13  called it Backpaging.  You're asking for a foundation as to how

14  she would know people were Backpaging?

15         MS. SEN:  No.  I think the question was who took the

16  photos and so I think that she should be asked foundation.

17         THE COURT:  All right.  Would you lay a foundation as

18  to how she would know who was taking the photos?

19         MS. SAVNER:  Yes, and I will say I did.  I do believe

20  I asked her from what you saw happening at Lori's house.

21         THE COURT:  Okay.

22  BY MS. SAVNER:

23  Q.    Did you see, when you were at Lori's house, photos being

24  taken of these girls?

25  A.    Yes.

Chrissy T.

1  Q.      Who did you see taking pictures?

2  A.      The girls took pictures and a couple times Moe took

3  pictures.

4  Q.      Okay.  Did you also take pictures sometimes?

5  A.      Yes.

6  Q.      At whose request?

7  A.      The girls.

8  Q.      When the girls took pictures did you see what they did

9  with them?

10  A.      They were posting online.

11  Q.      Are you familiar with how Backpage works?

12  A.      I know they had to post to get the dates.

13  Q.      Beyond that did you know the specifics of how you make

14  an ad?

15  A.      No.

16  Q.      Did Moe do anything with the pictures that the girls

17  took?

18  A.      Sometimes they would ask for like what he would think of

19  them.

20  Q.      Did you ever see Moe on Backpage?

21  A.      Looking at the girls?

22  Q.      Looking at the web site?

23  A.      Yes.

24  Q.      How often did you see that?

25  A.      Once or twice.

Chrissy T.

1    Q.    What would he be looking at it on?  What kind of device?

2    A.    iPad thing.

3    Q.    Like a tablet?

4    A.    Tablet.

5    Q.    Okay.  You've mentioned the phone credits and you

6    mentioned that there was at least one time when Jerrika asked

7    you to get phone credit for her?

8    A.    Yes.

9    Q.    And you asked Moe for permission?

10   A.    Yes.

11   Q.    Did you do that for other of the girls in other cases?

12   A.    Yes.

13   Q.    Explain that.

14   A.    We went to Rite Aid and got some cards.  Ayla, me, went

15   once or twice to get -- to Rite Aid to get minutes for their

16   phone.

17   Q.    Did you ask anyone permission before you did that?

18   A.    Yes.

19   Q.    Who?

20   A.    Moe.

21   Q.    And to the extent you know where did these prostitution

22   dates take place?

23   A.    Hotels, cars, people's houses.

24   Q.    How do you know?

25   A.    Because I've driven the girls.

Chrissy T.

1  Q.      How many times have you done that?

2  A.      At least 15.

3  Q.      Do you remember driving Ayla to a car date on one

4  occasion?

5  A.      Yes.

6  Q.      Explain what happened with that.

7  A.      Went down to the waterfront.  She told me to go outside

8  of the car because the date was going to happen in the car.  So

9  I hid behind a rock and waited for her to finish.

10  Q.      Sometimes the dates happened in hotels; is that right?

11  A.      Yes.

12  Q.      Do you know whose name the hotel rooms were rented in?

13  A.      Their's.

14  Q.      How do you know?

15  A.      Or the gentleman's.  They told me.

16  Q.      Did you ever rent a motel or hotel room in your name?

17  A.      Yes I believe so.  Once or twice.

18  Q.      For this activity for prostitution?

19  A.      Yes.

20  Q.      And at whose request did you do that?

21  A.      Moe's.

22  Q.      How did you get the money to rent the hotel room?

23  A.      He gave me money or I had the money from the sales from

24  the drugs to purchase the hotels.

25  Q.      So not only did you see this prostitution side of the

                    Chrissy T.

1    business going on you were also somewhat involved in it, right?

2    A.      Yes.

3    Q.      How did that work that, you know, eventually you started

4    doing things for the prostitution side of the business?

5    A.      Because I gained the trust and I wasn't messing up and I

6    shut my mouth.

7    Q.      Whose trust did you gain?

8    A.      Moe's.

9    Q.      Did you ever collect money from the girls after the

10   dates?

11   A.      Yes.

12   Q.      Explain how that worked.

13   A.      They were supposed to give him a percentage of the money

14   to me to give to Moe.

15   Q.      What percentage was that?

16   A.      Like 15, 20 percent I think it was.

17   Q.      Okay.  What happened with the other percentage of the

18   money?

19   A.      90 percent of the time they got drugs with it.

20   Q.      Okay.  So explain how that would work.  They would come

21   back to Lori's house from a date?

22   A.      Yes.

23   Q.      Okay, and they would give you some of the money to give

24   to Moe?

25   A.      Correct.

Chrissy T.

1   Q.      And what did they do with the rest of their earnings?

2   A.      They bought drugs with it.

3   Q.      From whom?

4   A.      From me and Hannah.

5   Q.      And whose drugs were those?

6   A.      Moe's.

7   Q.      Did Moe have rules about managing the girls on these

8   dates?

9   A.      Yes.  They were supposed to text me when they got into

10  the room and then 15 minutes after, if I didn't hear from them,

11  I would text them.

12  Q.      Okay.  So this is when they were doing out dates or

13  dates in hotels?

14  A.      Correct.

15  Q.      All right.  So 15 minutes after they got there?

16  A.      After when they get done their date.  So if it was a 45

17  minute date, 15 minutes after that they needed to come out or

18  text me.

19  Q.      What was the purpose of that?

20  A.      To make sure they were okay and they weren't doing

21  anything farther for free.

22  Q.      So that you could keep track of how much time they were

23  spending and how much money they should be earning?

24  A.      Correct.

25  Q.      And sounds like you gave the girls drugs when they were

                    Chrissy T.

1   done with the date, right?

2   A.      Correct.

3   Q.      Did Moe ever give you instructions about what to do if

4   the girls were too sick to work?

5   A.      To give them a couple tickets to make them well so they

6   can go out and make -- have dates.

7   Q.      And bring back more money?

8   A.      Correct.

9   Q.      Did he ever tell you give them everything they want

10  before they go out?

11  A.      No, not -- that would defeat the purpose of making

12  money.

13  Q.      Explain.

14  A.      They wanted him -- they wanted to be well enough to go

15  function, but not be high enough so they would nod out or can't

16  perform.

17  Q.      What would happen if the girls that you gave them a

18  couple tickets just to get well -- what would happen if they

19  then went out on a date and didn't give back money?

20  A.      They would get cut off.  No cell phone.

21  Q.      Did that happen?

22  A.      Yes a couple times.

23  Q.      To who?  Which girls?

24  A.      Ayla, V, and Mandy.  Amanda once.

25  Q.      Okay.  Amanda who we saw a picture of?

Chrissy T.

1    A.      Correct.

2    Q.      Do you know someone named Mandy?

3    A.      Yes.

4    Q.      Is that a different person?

5    A.      Yes.

6    Q.      Okay.  So you would give them a couple tickets, they

7    would go out on a date, and a couple times V and Amanda didn't

8    pay the money back right away?

9    A.      Correct.

10   Q.      All right.  So explain what you did?

11   A.      They had to get more dates and I was not allowed to give

12   them any more drugs until they got dates.

13   Q.      Did you report back to Moe they had come back and not

14   given you money?

15   A.      Yes.

16   Q.      And what did Moe tell you?

17   A.      To tell them to leave or make more money or go make

18   dates.

19   Q.      Leave Lori's house?

20   A.      Correct.

21   Q.      Did they have anywhere else to go that you knew of?

22   A.      No.

23   Q.      Did he ever tell you to take away their phones?

24   A.      Yes.

25   Q.      Did you do that?

Chrissy T.

1   A.      Yes.

2   Q.      Which girls do you remember taking away their phones?

3   A.      Ayla and V.

4   Q.      And what would happen when they didn't have phones?

5   A.      They couldn't make dates or get well or get high.

6   Q.      At night who was in the house?  Who slept there?

7   A.      Me and Hannah and Tower.  Sometimes Shay.

8   Q.      Lori and her kids too?

9   A.      Lori did.  Rowen would come home a couple times.

10  Jeffrey stayed away a lot of the time.

11  Q.      Rowen and Jeffrey are Lori's kids?

12  A.      Yes.

13  Q.      Explain what the requests for drugs were like during the

14  nighttime?

15  A.      Non-stop.

16  Q.      From who?

17  A.      Lori and V.  They would whine, come in the living room,

18  turn the tv on, turn the lights on, call Moe, and wake us up

19  constantly, and he would call us and say why are they calling

20  me and I'm sleeping and deal with it.

21  Q.      Deal with it as in give them more drugs?

22  A.      Or tell them to get the hell out -- excuse my -- get out

23  of the living room.

24  Q.      So it wasn't always just give them drugs?

25  A.      No.

Chrissy T.

1   Q.      Did you notice any changes in Ayla over the time she was

2   at Lori's house?

3   A.      Yes.

4   Q.      What did you notice?

5   A.      I noticed that she stopped taking care of herself less

6   and less.  She never showered.  Her hair became matted at one

7   point.

8   Q.      How about her weight?  Did her weight change?

9   A.      She got like -- almost like a toothpick.

10  Q.      Did you see her in withdrawal?

11  A.      Yes.

12  Q.      How often?

13  A.      Daily.

14  Q.      Did Moe see her in withdrawal?

15  A.      Yes.

16  Q.      Was there a time that you remember when some of the

17  girls helped Ayla clean up?

18  A.      Yes.

19  Q.      Explain what happened with that.

20  A.      They fixed her up like her hair because it was matted so

21  she had like almost a guy's haircut.

22  Q.      Did someone give you instructions to do that?

23  A.      Yes.

24  Q.      Who?

25  A.      Moe.

Chrissy T.

1    Q.    Do you know why?

2    A.    So she looked more attractive to guys.  So she didn't

3    look like a bum.

4    Q.    So she could make more money?

5    A.    Correct.

6    Q.    I want to talk about Keisha.  Do you remember a time

7    that Keisha stole drugs from the business?

8    A.    She -- yes.

9    Q.    Explain what happened.

10   A.    I went to meet her outside at nighttime.  I had the

11   drugs in my hand.  She knocked me down.  As I went down she

12   took the drugs out of my hand.

13   Q.    Do you remember how much -- how much drugs?

14   A.    I think it was one or two B's.

15   Q.    And a B is a bun?

16   A.    Yes.

17   Q.    Did you report what happened to Folks?

18   A.    Yes.

19   Q.    What was his response?

20   A.    What the -- like where is she.  Find her.

21   Q.    And I see you're being cautious about using swear words.

22   If he did in fact use swear words, I would ask you say what he

23   did say.  Okay.

24   A.    I believe he said what the fuck.

25   Q.    Did he ask you or anyone else to find her?

Chrissy T.

1    A.    They put a bounty out.

2    Q.    When you say they?

3    A.    Moe and I believe G was there.

4    Q.    How did they communicate that bounty?

5    A.    Through the phone.

6    Q.    Who did they contact?

7    A.    I think he put a message on his phone texting people.

8    Q.    Did you get that message?

9    A.    I was at the house so I didn't need the message.

10   Q.    Okay.  Moe told you in person?

11   A.    Yeah.  It was at the house, yes.

12   Q.    Do you remember how much the bounty was?

13   A.    $200.

14   Q.    What happened after that?

15   A.    Well hours later she showed up at the house with Hannah

16   I believe.

17   Q.    What happened after that?

18   A.    She apologized to me, downplayed it a little bit, and

19   then they left.

20   Q.    Who is they?

21   A.    Moe and Keisha.

22   Q.    Did they leave with anyone else?

23   A.    I can't remember.

24   Q.    Do you know where they went?

25   A.    No.

Chrissy T.

1   Q.      When Keisha showed back up how did Moe interact with

2   her?

3   A.      Days after when she got to the house.

4   Q.      When she came back to the house?

5   A.      Normal.

6   Q.      But they went somewhere after that?

7   A.      Yes.

8   Q.      Did Moe ever ask you to work Backpage for him?

9   A.      Yes.

10  Q.      How many times did he ask you to do that?

11  A.      A couple.

12  Q.      What did you say?

13  A.      No.

14  Q.      Why didn't you want to do that?

15  A.      Because I didn't feel comfortable with my body.  I

16  didn't want to demean myself, like put myself out there.  I

17  wasn't comfortable with my body.

18  Q.      And in terms of your habit at the time were you making

19  enough money or getting paid in enough drugs to keep you well?

20  A.      Yes.

21  Q.      And that was just through bagging and selling?

22  A.      Yes.

23  Q.      Are you aware of any of the men who were staying or

24  coming through Lori's house; G, Hightower, Moe, Shay, having

25  guns?

Chrissy T.

1  A.      Yes.

2  Q.      Who do you remember having guns?

3  A.      Hightower.  Moe.

4  Q.      What do you remember about that?

5  A.      We got into a car accident and I had to drop Tower off

6  on a different street because he was carrying a gun.

7  Q.      Is that the only time you were aware of Hightower having

8  a gun?

9  A.      No.  He had a feud with Black, another drug dealer.

10  Q.      Okay.  I want to ask you about that in a minute.  How

11  about G were you ever aware of him having guns?

12  A.      No.

13  Q.      How about Moe?

14  A.      Not until the Black incident.

15  Q.      Until the feud with Black?

16  A.      Correct.

17  Q.      Okay.  Explain how that worked -- what happened with

18  that?

19  A.      A couple of the girls went to Black and they found out

20  about it and Black said he was going to come in and break the

21  doors down and grab us.

22  Q.      Who is Black?

23  A.      Another drug dealer.

24  Q.      Okay.  So a couple of the girls.  Do you remember which

25  ones?

Chrissy T.

1   A.      Ayla, Red, and I believe V.

2   Q.      Okay.  So you said they went over to Black I think?

3   A.      They were hanging out.

4   Q.      Do you know what they were doing with Black?

5   A.      Just hanging out.  Like maybe working.  I wasn't there.

6   Q.      Okay, and how did that cause a feud?

7   A.      Because the fact there's another drug dealer.  You don't

8   mess with other drug dealers.

9   Q.      Okay.  So Black was another drug dealer.  Red, Ayla, V

10  all started hanging out over at his place?

11  A.      Yes.

12  Q.      And who found out about that?

13  A.      Moe.

14  Q.      How did you know he was mad?

15  A.      Because he said he was mad.

16  Q.      What did he say?

17  A.      He said that he would like -- something along fuck this.

18  I can't --

19  Q.      You were pretty clear that he was upset?

20  A.      Yes.

21  Q.      Okay.  What did he do about it?

22  A.      They left and came back with guns.

23  Q.      Who is they?

24  A.      Moe and him -- Moe and G.  Excuse me.

25  Q.      Moe and G?

Capitol Court Reporters, Inc. (800/802) 863-6067

Chrissy T.

1    A.      Yes.

2    Q.      Okay.  Did you see those guns?

3    A.      Yes.

4    Q.      Okay.  So a couple questions.  Before I asked you if you

5    had ever known G to have guns and this time you do remember him

6    having a gun?

7    A.      Yes.

8    Q.      Okay.  They came back with guns.  Did they tell you

9    where they got them?

10   A.      North Avenue house.

11   Q.      Who told you that?

12   A.      Moe.

13   Q.      Do you know --

14           THE COURT:  I'm sorry.  What did you say?

15           THE WITNESS:  The North Avenue house.

16   BY MS. SAVNER:

17   Q.      Have you been to that house?

18   A.      Yes.

19   Q.      Can we pull up 98?  Do you recognize what's marked as

20   Government 98?

21   A.      Yes.  That's the North Avenue house.

22   Q.      Had you been there before you heard about Moe going to

23   get drugs?

24   A.      Yes.  I would drive him to the house.

25   Q.      Okay.  How often would you do that?

Chrissy T.

1   A.     Once or twice a week he wanted to go there.

2   Q.     Did he tell you why he needed to go there?

3   A.     I -- obviously to get more drugs.

4   Q.     Okay.  How do you know that?

5          MS. SEN:  Objection, Your Honor.  I don't think -- I

6   think the answer was quite speculative.  Obviously.

7          THE COURT:  Well objection overruled.  Obviously

8   doesn't necessarily mean speculative.

9   BY MS. SAVNER:

10  Q.     How do you know that Moe would want to go out there to

11  get more drugs?

12  A.     Because we were out at Lori's house.

13  Q.     So explain how that would happen when you would run out

14  of Lori's.  How -- what would you do?

15  A.     We would go to North Avenue house.

16  Q.     And what would Moe come out with?

17  A.     Amount of drugs.

18  Q.     He would reup at Lori's house?

19  A.     Yes.

20  Q.     Did Moe ever say anything to you about keeping guns at

21  the North Avenue house?

22  A.     Yes.

23  Q.     What did he say?

24  A.     He had a safe at the North Avenue house with guns and

25  the extra drugs.

Chrissy T.

1   Q.     Okay.  So this time there was the feud with Black, this

2   rival drug dealer, Moe and G went up to the North Avenue house

3   and came back with guns.  Did you see the guns?

4   A.     Yes.  They were small.

5   Q.     Handguns?

6   A.     Handguns.

7   Q.     Are you familiar with guns?

8   A.     No.

9   Q.     You don't know what type they were?

10  A.     No.

11  Q.     Do you know what color?

12  A.     Black.

13  Q.     What did they do next?

14  A.     They just sat around just being prepared.

15  Q.     At Lori's house?

16  A.     Yes.

17  Q.     Are you aware of after that Ayla coming back and working

18  for Moe again?

19  A.     Yes.

20  Q.     Do you know how that happened?

21  A.     She just showed up again and, I don't know, she just

22  showed up.

23  Q.     Okay.  Did Moe ever tell you about the interaction

24  between -- any interaction between him and Ayla that led to her

25  coming back?

Chrissy T.

1  A.      I think they talked to each other, but she just showed

2  up at the house.

3  Q.      Was there also a time when you were aware of Mr. Folks

4  trading guns for drugs?

5  A.      Yes.

6  Q.      Explain about that.

7  A.      He -- Robbie was given drugs for a gun.

8  Q.      Were you there when this happened?

9  A.      Yes.  I had to give him the drugs.

10  Q.      So explain how it worked?

11  A.      Moe called me into the kitchen and told me to give him I

12  think it was three or four buns.

13  Q.      Three or four buns?

14  A.      Yes.

15  Q.      Okay and did you do that?

16  A.      Yes.

17  Q.      What did he do with the buns?

18  A.      He left.  I gave Robbie the buns.

19  Q.      Okay, and where did the gun come into play?

20  A.      It was in a backpack.

21  Q.      How do you know?

22  A.      Because he opened the bag to make sure it was in there.

23  Q.      Who did?

24  A.      Moe.

25  Q.      And did you see what was inside?

Chrissy T.

1    A.      A gun.

2    Q.      So Robbie brought over a gun in a backpack, left it with

3    Moe, and you gave Robbie three or four buns?

4    A.      Correct.

5            MS. SAVNER:  May I approach?

6            THE COURT:  Yes.

7    BY MS. SAVNER:

8    Q.      Handing you what's been marked as Government's exhibit

9    35.  Page through that and see if you recognize it?

10   A.      Yes.  That's a text message.

11   Q.      Okay.  It's a few pages so take a look.

12   A.      Yes.

13   Q.      Do you recognize exhibit 35?

14   A.      Yes.

15   Q.      What do you recognize it to be?

16   A.      My phone.

17   Q.      Photos of your phone?

18   A.      Yes.

19   Q.      And what do those photos show just generally?

20   A.      Texts between me and Moe.

21           MS. SAVNER:  Government moves to admit 35.

22           THE COURT:  Any objection?

23           MS. SEN:  No objection, Your Honor.

24           THE COURT:  So admitted.

25   [Government exhibit 35 admitted]

                     Chrissy T.
 1              MS. SAVNER:  Permission to publish?
 2              THE COURT:  Yes.
 3      BY MS. SAVNER:
 4      Q.    All right.  Can we zoom in on the top part?  These are
 5      photos of your phone; is that right?
 6      A.    Correct.
 7      Q.    And what's the number at the top that you're dialing out
 8      to?
 9      A.    Moe's.
10      Q.    Is that a number you contacted him before?
11      A.    Yes.
12      Q.    And he is saved in your phone as zombie; is that right?
13      A.    Yes.
14      Q.    Is there a reason why you gave him that name?
15      A.    I put nicknames in my phone so if I get pulled over or
16      something like that they would not know who it really is.
17      Q.    Is that something that Moe told you to do?
18      A.    No.  I just did it as --
19      Q.    You knew?
20      A.    Yes.
21      Q.    Okay.  Let's look at the text on this first page.  So
22      here Folks is texting you Rosa Delossantos and then a long
23      number there.  Do you see that?
24      A.    Yes.
25      Q.    Why did he text you that if you know?

Chrissy T.

1   A.      That's an account number he wanted me to deposit money

2   into.

3   Q.      Okay, and did you?

4   A.      Yes.

5   Q.      Can we turn to the next page?  All right.  So you say to

6   Moe here -- and this is, it looks like, October 3rd; is that

7   right?

8   A.      Yes.

9   Q.      Do you know what year that is?

10  A.      2015.

11  Q.      You say to him hey call me please.  We need the combo

12  please.  What are you asking for?

13  A.      Combination to the safe.

14  Q.      Did you not have the combination?

15  A.      Sometimes they changed it or I forgot it.

16  Q.      Okay.  Who would -- who would change it when it got

17  changed?

18  A.      Moe or we would all change it.

19  Q.      And he says can you bring me that cash from over there?

20  A.      Yes.

21  Q.      What is he talking about?

22  A.      To bring the cash over to his house -- from Lori's

23  house.

24  Q.      Cash from the drug sales?

25  A.      Yes.

Chrissy T.

1  Q.    Can we turn to page 3?  At the bottom there you say

2  Ashley is crying and she wants you to call her.  Do you

3  remember that?

4  A.    Yes.

5  Q.    Do you remember why Ashley was crying?

6  A.    Because Moe told her to leave the house.

7  Q.    Was this part of the feud with Black?

8  A.    I believe so.  Yes.

9  Q.    Was Ashley one of the girls that had gone over to Black?

10 A.    Yes.

11 Q.    Can we pull up the next page?  All right.  So we see

12 that text again Ashley is crying and she wants you to call her,

13 and he says for what, and you write she doesn't understand why

14 she's getting kicked out, and the reason why she doesn't have

15 money is Amanda took her dates along with Ayla's dates.  So

16 what had happened?

17 A.    Red wasn't allowed to get -- wasn't getting money for

18 dates.  She wasn't getting any dates.

19 Q.    Okay.  These are prostitution dates?

20 A.    Correct.

21 Q.    And Amanda had taken Ashley's prostitution dates and

22 Ayla's prostitution dates?

23 A.    Yes.  They were sharing the phone I believe at the time.

24 Q.    Can we go to the next page?  To that Mr. Folks responds

25 drive no one no place.  If Red ain't got some money, she can't

Chrissy T.

1   stay.  If Ayla staying with her father, she can stay there

2   permanently.  Do you see that?

3   A.    Yes.

4   Q.    So when he says drive no one no place what did you

5   understand him to be talking about?

6   A.    Take no one on dates no wheres.  Take them no dates no

7   wheres.

8   Q.    Did you know why?

9   A.    Because they weren't making any money.

10  Q.    Can we go to the next page?  All right.  Ashley just

11  called and told me that the house was going to be kicked in

12  very, very soon.  That's referring to Lori's house?

13  A.    Correct.

14  Q.    And Folks says okay?

15  A.    Yeah.

16  Q.    How did you take that okay?

17  A.    Like oh okay like sarcastically.

18  Q.    Can we go to the next page?  We see him sending you the

19  name Don McFarlan and then a long number.  Do you see that?

20  A.    Yes.

21  Q.    Why was he sending you that?

22  A.    To put money into a bank account.

23  Q.    What's that long number?

24  A.    Checking account number.

25  Q.    Did you deposit money into that account?

Chrissy T.

1    A.    Yes.

2    Q.    All right.  So you can confirm you're doing it there,

3    right?  Doing it now she's getting 1780.  Do you see that?

4    A.    Yes.

5    Q.    What are you talking about?

6    A.    It's supposed to be 1800 and the teller got 1700.

7    Q.    1780?

8    A.    Correct.

9    Q.    Go to the next page.  I made her count it.  I counted it

10   myself this time and Folks says no I counted it.  It's 1800,

11   Chrissy.  I'm starting to think you touching the damn money.

12   So he thought the count was off because you took 20?

13   A.    Correct.

14   Q.    Can we go to the next page?  So finally he says just

15   send it?

16   A.    Yes.

17   Q.    The next page.  Go to the next one and the next one, and

18   this text at the top people are calling.  Just need to know

19   what to tell them.  What does that mean?

20   A.    People were calling for drugs, but we didn't have any.

21   Q.    Customers?

22   A.    Correct.

23   Q.    And why are you telling Moe this?

24   A.    Because my phone was blowing up asking and he was

25   bringing the drugs over to Lori's house.

Chrissy T.

1  Q.     And he responds I'm not back yet.  Running late?

2  A.     Correct.

3  Q.     Can we go to the next page?  All right, and there's a

4  name listed and a Brooklyn, New York and a zip code it looks

5  like and a dollar amount.  A hundred dollars, right?

6  A.     Correct.

7  Q.     What's that?

8  A.     That I believe is a Western Union.

9  Q.     That he was asking you to wire money to someone?

10  A.     Correct.

11  Q.     And you did wire money to them?

12  A.     Correct.

13  Q.     So you knew that all of this stuff that you were doing

14  for Moe, all the stuff that you have been talking here about

15  was illegal, right?

16  A.     Correct.

17  Q.     But you were doing it anyway?

18  A.     Correct.

19  Q.     Why?

20  A.     Because I was sick and I was an addict and I didn't want

21  to be sick and I felt accepted and like I had friends.

22  Q.     Do you feel like Moe was your friend?

23  A.     Yes.

24  Q.     Did you feel G was your friend?

25  A.     Yes.

Chrissy T.

1   Q.      Hannah?

2   A.      Yes.

3   Q.      Did you ever get any instructions from Moe or G about

4   what to do if you encountered law enforcement?

5   A.      Yes.  Take the hit.

6   Q.      What does that mean?

7   A.      Say the drugs were mine.

8   Q.      Would that be telling the truth?

9   A.      No.

10  Q.      Because whose drugs were they?

11  A.      Moe's.

12  Q.      In November of 2016 I want to talk to you about an

13  incident where you did encounter law enforcement.  Do you

14  remember that?

15  A.      Correct.

16  Q.      Tell us what happened.

17  A.      I lied to the police.  I beat myself in the face.

18  Q.      Okay.  So explain the circumstances.

19  A.      I was hanging out with a friend and I was supposed to go

20  get suboxone with the money I had, but her and I smoked.  We

21  went and bought drugs with it.

22  Q.      What's suboxone?

23  A.      A medicine like --

24  Q.      Is it like methadone?

25  A.      Correct.

Chrissy T.

1  Q.      Heroin drug replacement therapy?

2  A.      Correct.

3  Q.      So whose money did you have that you were supposed to go

4  out and buy the suboxone?

5  A.      Stu Davidson's.

6  Q.      And instead of buying the suboxone with the money what

7  did you do?

8  A.      We bought crack with it.

9  Q.      What did you do with the crack?

10  A.      We smoked it.

11  Q.      All right.  What did you do next?

12  A.      I got really, really scared, really scared that he would

13  come and like beat me up so I made a lie.

14  Q.      Who did you tell the lie to?

15  A.      To Burlington PD.

16  Q.      Why didn't you just tell Burlington PD the truth?

17  A.      Because I wasn't in -- I was afraid that I would go to

18  jail.

19          THE COURT:  Could you move up a little closer to the

20  microphone?  Do you have difficulty hearing her?  Yes.  Can you

21  speak up please?

22          THE WITNESS:  Sure.

23  BY MS. SAVNER:

24  Q.      You mentioned before that you felt accepted by this

25  group?  By Moe?

Chrissy T.

1   A.      Correct.

2   Q.      By Folks, Hannah, all of you were friends?

3   A.      Correct.

4   Q.      So fair to say Folks was nice to you?

5   A.      Correct.

6   Q.      Did that change at some point?

7   A.      Yes.

8   Q.      Explain how.

9   A.      He became more angrier sometimes or if I didn't do the

10  right then and there, you know, he would snap.  Yell a little

11  bit.

12  Q.      Curse at you?

13  A.      Correct.

14  Q.      Did he ever do anything humiliating to you?

15  A.      Yes.

16  Q.      Explain.

17  A.      I was giving him a blow job in Lori's living room.

18  Q.      Take your time.

19  A.      I wasn't doing it right so he had Ayla come show me how

20  to give a proper blow job.

21  Q.      How did that make you feel?

22  A.      Humiliated.  Disgusted.  I wasn't good enough.

23  Q.      Did he do other humiliating things to you?

24  A.      No.  He shot a gun at my foot.  My leg.

25  Q.      A BB gun?

Chrissy T.

1  A.     Yes.

2  Q.     Did you see him shoot other people with that BB gun?

3  A.     Yes.

4  Q.     Who?

5  A.     Keisha.

6  Q.     What do you remember about that?

7  A.     She got I think a couple bags to have a BB gun shot at

8  her butt.

9  Q.     Bags of heroin?

10  A.     Correct.

11  Q.     Was she wearing clothes when the BB gun was shot at her?

12  A.     No.  No.  Her butt was bare.

13  Q.     At some point did you learn Folks had a nickname for

14  you?

15  A.     No.

16  Q.     Okay.  If I showed you some text messages, would that

17  refresh your memory?

18  A.     Yes.  I'm sorry.

19            MS. SAVNER:  May I approach?

20            THE COURT:  Yes.

21  BY MS. SAVNER:

22  Q.     Take a look at the bottom half of the page.  See if that

23  refreshes your recollection.

24  A.     Alpo.  Dog food.

25  Q.     So looking at this does that refresh your memory about

Chrissy T.

1   the nickname that Moe gave you?

2   A.      Yes.

3   Q.      What was that nickname?

4   A.      A brand of dog food.

5   Q.      Alpo?

6   A.      Yes.

7   Q.      Did you want to stay there at Lori's house while things

8   were getting worse with Moe?

9   A.      I really didn't have any place to go.

10  Q.      Were you also dependent on Moe for your drugs?

11  A.      Correct.

12  Q.      From what you saw how did Moe get people to keep working

13  for him?

14  A.      Drugs.

15  Q.      Explain how that worked.

16  A.      Once you find someone who you can depend on drugs, a

17  drug dealer, you want to keep that contact.

18  Q.      So how did Moe use that to his advantage?

19  A.      Kept supplying the drugs.  Like making sure you're not

20  sick.

21  Q.      And you mentioned before if the girls weren't bringing

22  back money there would be consequences, right?

23  A.      Correct.

24  Q.      And what were those consequences?

25  A.      They would not get any drugs.

Chrissy T.

1  Q.     How much involvement did Moe have in your day-to-day

2  activities?

3  A.     He was at the house most everyday besides in the

4  afternoon.

5  Q.     What kind of things would you have to ask Folks

6  permission for?

7  A.     To get something to eat, to go to the store get

8  something to drink.

9  Q.     To leave Lori's house?

10  A.     Correct.

11  Q.     Did you see him controlling the day-to-day activities of

12  the women who prostituted for him?

13  A.     Yes.  He made sure they were having dates and bringing

14  in money.

15  Q.     How did he do that?

16  A.     To make sure their cell phone was still on and to make

17  sure their Backpaging was up and running.

18  Q.     Okay.  Would he check in with you or them about it?

19  A.     Yes.

20  Q.     What did you -- what did you know about that?

21  A.     To see if I would -- if the girls were out of the house

22  making dates or doing anything like that.

23  Q.     He would ask you these questions?

24  A.     Correct.

25  Q.     And you would report back to him on the girls' behavior?

Chrissy T.

1   A.      Correct.

2   Q.      Were you there for what's come to be called the walnut

3   challenge?

4   A.      Yes.

5   Q.      Explain what happened with that.

6   A.      One night they decided to have some of the girls see how

7   many walnuts they could fit up their behind -- butt.

8   Q.      When you say they decided to do this, who is they?

9   A.      Moe and G, Shay, and the girls.

10  Q.      Okay, and was there a benefit to the girls for doing

11  this?

12  A.      Yes.  They would get either crack or heroin.

13  Q.      Who participated?

14  A.      Ayla, V, Keisha.

15  Q.      Were you in the house when this was going on?

16  A.      Yes.

17  Q.      Were you asked to participate?

18  A.      Yes.

19  Q.      What was your response?

20  A.      No.

21  Q.      Why did you say no?

22  A.      Once again I don't want to be naked in front of guys.  I

23  was uncomfortable.

24  Q.      You were making money and getting drugs through other

25  means?

Chrissy T.

1   A.      Correct.  Yes.

2   Q.      How did Moe react when somebody violated his rules?

3   A.      He got angry.  Cut them off.

4   Q.      What does that mean cut them off?

5   A.      No drugs.  You had to leave the house.

6   Q.      Lori's house?  They couldn't stay there?

7   A.      Correct.  Yes.

8   Q.      You also mentioned there were a couple of times you took

9   away some of the women's phones at Moe's direction?

10  A.      Correct.

11  Q.      At some point did you have a falling out with Moe and

12  leave?

13  A.      Yes.

14  Q.      Explain how that happened.

15  A.      I said I was going to the store and do laundry at my

16  brother's house, my friend's house, and I decided not to go

17  back.

18  Q.      Why did you decide to leave?

19  A.      Seeing what I saw with Tori, and the -- like being

20  called, being more and more restricted.

21  Q.      So Folks' behavior towards you changed; is that right?

22  A.      Correct.

23  Q.      Got worse?

24  A.      Yes.

25  Q.      And you mentioned what you saw with Tori?

                        Chrissy T.

1    A.      Correct.

2    Q.      Who is Tori?

3    A.      She is my friend who came to the house.

4    Q.      Okay.  Was she working for Moe do you know?

5    A.      No.

6    Q.      You don't know or --

7    A.      I do not know.  Sorry.  I do not know.

8    Q.      Okay, and what happened with her?

9    A.      She overdosed.

10   Q.      This was at Lori's house?

11   A.      Yes.

12   Q.      What did you see?

13   A.      Her and I were in Lori's room with Amanda.  Tori shot

14   up.  All of a sudden her breathing got shallow.  She was

15   slumped over.  She turned blue and I was screaming for the

16   Narcan.  I told Mandy get the Narcan.  I yelled to Moe and

17   Hannah.

18   Q.      What's Narcan?

19   A.      A life saving drug for over -- reverses the effects of

20   overdoses.

21   Q.      And you all kept some Narcan in the house?

22   A.      That was number one.  We had a number one rule everybody

23   to have that.

24   Q.      So which of the men were in the house at the time when

25   this happened?

Chrissy T.

1   A.      Moe and G.

2   Q.      What did they do when Tori OD's?

3   A.      I called 911 and then Mandy got on the phone.  Hannah,

4   G, and I left the house.

5   Q.      Did you bring anything with you?

6   A.      Yes.  We got all the stuff we had in the house.

7   Q.      When you say stuff?

8   A.      The drugs.

9   Q.      And?

10  A.      And the backpack, yes.

11  Q.      Who stayed behind?

12  A.      Moe and Amanda.

13  Q.      And did you see Victoria later that day?

14  A.      Yes.

15  Q.      What did you see?

16  A.      She was up, fine, high.

17  Q.      Okay.  Did you see anyone give her more drugs?

18  A.      Moe.

19  Q.      So you mentioned that is one of the reasons you wanted

20  to leave.  Was there also some tension between you and Moe from

21  some skimming off the bags?

22  A.      Yes.

23  Q.      Explain about that.

24  A.      He was out of town and Hannah and I were -- Hannah was

25  really sick, I was sick, so we decided to place some empty bags

                    Chrissy T.

1  inside so it would look like a full bun.

2  Q.     And someone found out?

3  A.     Yes.

4  Q.     Who was that.

5  A.     Moe and G.

6  Q.     What was Moe's reaction?

7  A.     He was pissed.  Sorry.

8  Q.     That's okay.  Do you remember what he said or did?

9  A.     Yes.  We went into Rowen's room and confronted us about

10 the bags.

11 Q.     When he confronted you do you remember anything he said?

12 A.     He was angry.

13 Q.     Did he say you have to do anything to make up for it?

14 A.     I had to bag up.

15 Q.     Work it off?

16 A.     Right.

17 Q.     How about G?  What was G's reaction?

18 A.     Disappointed.

19 Q.     Did he yell at you?

20 A.     No.

21 Q.     Did he tell you, you needed to do anything?

22 A.     No.

23 Q.     Did he ever lay hands on you, G?

24 A.     No.

25 Q.     Okay.  So things also got worse because Moe found out

Chrissy T.

1   you and Hannah were basically --

2   A.      Correct.

3   Q.      -- stealing drugs?

4   A.      Correct.

5   Q.      All right.  So you decide to leave?

6   A.      Correct.

7   Q.      What happened?  Did Moe -- at some point he found out

8   you didn't come back?

9   A.      He fired me.  Told me not to come back to the house.

10  Q.      How did he fire you?  Over the phone?

11  A.      Over the phone.

12  Q.      Told you, you weren't supposed to come back?

13  A.      Correct.

14  Q.      Did you go back to the house shortly thereafter?

15  A.      Yes because G told me to come back to the house.

16  Q.      And what happened when you went back?

17  A.      I was sick so G gave me something to make me well.

18  Hannah took my money and took out my -- made sure I had no

19  contacts, the customers' numbers, in my phone, and then I left.

20  Q.      So you couldn't go into business on your own?

21  A.      Correct.

22  Q.      What happened after that after you were out on your own?

23  A.      I went down a little bit.  I went to my brother's house.

24  Went to my mom's house.

25  Q.      Were you still using?

Chrissy T.

1  A.      Yes.

2  Q.      At some point did you begin cooperating with law

3  enforcement?

4  A.      Yes.

5  Q.      Explain how that came to be.

6  A.      I stole my mom's car and I called G.  I met Ayla back in

7  Lori's house.  I had a couple tickets and when I pulled over in

8  Essex my mom's OnStar stopped the car.

9  Q.      Okay.  So you took your mom's car to go back to Lori's

10  house to buy more drugs?

11  A.      Correct because I was sick.

12  Q.      And G knew you were there?

13  A.      Yes.

14  Q.      And was G mad that you had come back?

15  A.      No.

16  Q.      But you sort of went?

17  A.      Yeah.  I met Ayla out in back.

18  Q.      And who said you weren't allowed in the house?

19  A.      Moe.

20  Q.      All right, and you got drugs from them?

21  A.      Correct.

22  Q.      All right, but your mom's OnStar on the car went off

23  and --

24  A.      Correct.

25  Q.      -- the police found you?

Chrissy T.

1   A.      Yes.

2   Q.      Did you end up giving information to law enforcement?

3   A.      Yes.

4   Q.      Why did you decide to do that?

5   A.      Because, one, the weight of Tori's overdose was on me.

6   I was getting in trouble.  It was just my breaking point.

7   Q.      Okay.  Also some benefit to you, right?

8   A.      Correct.

9   Q.      You were facing criminal charges at the time?

10  A.      Correct.

11  Q.      How did you feel about giving information about G to law

12  enforcement?

13  A.      Bad.  Very bad.

14  Q.      Why?

15  A.      Because he never did anything wrong to me.  He was --

16  always made sure I ate.  Always made sure I was laughing.  I

17  was happy.

18  Q.      How about did you have the same feelings of sadness

19  about giving information to law enforcement about Moe?

20  A.      No.

21  Q.      Why not?

22  A.      Just the way -- his demeanor.  He was just nice in the

23  beginning.  Yes I messed up, but he got angrier and --

24  Q.      He treated you badly?

25  A.      Correct.

                        Chrissy T.

1    Q.     You worked with law enforcement for a couple months; is

2    that right?

3    A.     Correct.

4    Q.     Okay, and were you paid for that work?

5    A.     Yes.

6    Q.     Do you remember how much?

7    A.     I think 100 -- I can't really remember the exact amount,

8    but 50 or 100 dollars for everything.

9    Q.     Okay, and you also received some money from the U.S.

10   Attorney's Office; is that right?

11   A.     Correct.

12   Q.     Do you remember about how much you received?

13   A.     Roughly 150 I believe.

14   Q.     Okay.  Do you remember getting approximately $5,000 for

15   housing at some point?

16   A.     Yes.

17   Q.     Explain what that was for.

18   A.     I moved in with my manager and they paid the hotels

19   after.

20   Q.     About when was this?

21   A.     For my move.

22   Q.     When did you get this about $5,000 from the U.S.

23   Attorney's Office?

24   A.     A couple months ago.

25   Q.     A couple months ago?

Chrissy T.

1   A.      No.  When we did it -- sorry I can't --

2   Q.      It's okay if you don't remember.

3   A.      I don't remember.

4   Q.      Okay.  You're working now right?

5   A.      Yes.

6   Q.      How many hours a week do you work?

7   A.      55 to 60 hours a week.

8   Q.      Are you still receiving money from the U.S. Attorney's

9   Office?

10  A.      Yes.

11  Q.      From the prosecutor's office?

12  A.      Just came in a couple weeks ago -- the checks.

13  Q.      How much were the checks for?

14  A.      85 and 40.

15  Q.      Do you know what those were for?

16  A.      Witness vouchers.

17  Q.      So those were times you showed up to prepare for your

18  testimony?

19  A.      Correct.

20  Q.      Okay.  Any more than that?

21  A.      No.

22  Q.      Was there a time when you bought drugs from G as part of

23  a controlled purchase with DEA?

24  A.      Yes.

25  Q.      Okay.  Tell us about that.

Chrissy T.

1   A.      We met him at Subway and that was the first time I saw

2   him in a couple months.

3   Q.      Okay, and during that buy you told G you were selling to

4   other customers at that point, right?

5   A.      Correct.

6   Q.      Was that true?

7   A.      No.

8   Q.      Why did you say that?

9   A.      To make it sound like I had customers to get rid of the

10  drugs to.

11  Q.      Had you ever bought from G like that before?

12  A.      No.

13  Q.      Had he ever sold you drugs before?

14  A.      No.

15  Q.      And you've mentioned before you didn't know him to sell

16  to other people, right?

17  A.      Correct.

18  Q.      All right.  When the two of you were talking did he

19  mention an opportunity?

20  A.      Yes.

21  Q.      What did he mention?

22  A.      He wanted me to bag up for him.

23  Q.      Okay.  When did he want you to do that?

24  A.      He would let me know.

25  Q.      All right, and did he let you know?

Chrissy T.

1    A.    Yes.

2    Q.    When?

3    A.    That night.

4    Q.    All right.  So he wanted you to come bag that night?

5    A.    Correct.

6    Q.    What was your understanding about G's relationship with

7    Moe at the time?

8    A.    They were still together.

9    Q.    Okay.  As far as you knew things were still the same?

10   A.    Yes.

11   Q.    Okay.  Did you talk to your handlers at DEA or Essex PD

12   about going to this bagging party?

13   A.    Yes.  Yes.

14   Q.    And what did they tell you?

15   A.    They told me no.

16   Q.    And what did you do?

17   A.    I -- I did it anyways.

18   Q.    Why?

19   A.    So to make it look like it was good.  Still like being

20   on good terms with him still.

21   Q.    Thought you would be more valuable to them?

22   A.    Correct.

23   Q.    So tell us what happened that night when you went to the

24   bagging party?  How did you get there?

25   A.    G picked me up at Cumby's.

Chrissy T.

1  Q.    And drove you there?

2  A.    Yes.

3  Q.    Was there anyone else with him?

4  A.    A female.

5  Q.    Did you know her?

6  A.    No.

7  Q.    Where did you go?

8  A.    North Avenue house.

9  Q.    Pull up 98.  Is this the house you're talking about?

10  A.    Yes.

11  Q.    All right.  So you've mentioned this is the house where

12  you've taken Folks to reup and this is where you talked about

13  getting guns from.  Had you ever been inside before?

14  A.    Not until that night.

15  Q.    All right.  So what happened when you got there that

16  night?

17  A.    I didn't know Moe was going to be there and he opened

18  the door.  I hid behind G.

19  Q.    Why did you hide?

20  A.    Because I was afraid of Moe.

21  Q.    Was this the first time you had seen Moe since you left?

22  A.    Correct.

23  Q.    What happened after that -- after you hid behind G?

24  A.    They opened the door and I went into the room.

25  Q.    Okay.  Did you hear conversation between Moe and G about

Chrissy T.

1   whether you should be there?

2   A.    Yes.

3   Q.    What did you hear?

4   A.    Moe didn't want me there, but G said he wanted me there.

5   Q.    Okay, and Moe ultimately said fine let her in?

6   A.    Correct.

7   Q.    Okay.  What did you do when you were inside?

8   A.    I went into a room and started bagging.

9   Q.    Was the bagging already going on when you were there?

10  A.    Yes.

11  Q.    Who was doing the bagging?

12  A.    Three other girls I believe.

13  Q.    Okay.  So you came with G?

14  A.    Correct.

15  Q.    And there was already drugs on the table and girls were

16  bagging?

17  A.    Correct.

18  Q.    What did you do?

19  A.    I just started bagging.

20  Q.    What drugs were being bagged that night?

21  A.    Heroin and crack.

22  Q.    How much did you bag?

23  A.    Five sleeves -- five or six sleeves I believe.  It was a

24  lot.

25  Q.    You personally?

Chrissy T.

1    A.     Yes.

2    Q.     How about the other girls did you see how much they did?

3    A.     A lot.  I way paying attention to myself.  I was

4    nervous.

5    Q.     At some point did you switch from bagging heroin to

6    bagging crack?

7    A.     Correct.

8    Q.     Did you bag some crack that night?

9    A.     Yes.

10   Q.     How much did you bag?

11   A.     A lot.

12   Q.     Any idea how many bags?

13   A.     A hundred.  Maybe more than that.  I can't -- it was a

14   lot.

15   Q.     In text messages to Detective May you said four thousand

16   bags?

17   A.     Correct.

18   Q.     Is that accurate?

19   A.     No.  It was a lot though.  I stopped counting.

20   Q.     That was an exaggeration?

21   A.     Yes.  I stopped counting.

22   Q.     How long would you say you were bagging for?

23   A.     Almost two and a half hours, three hours.

24   Q.     And what was Moe doing this time when the girls were

25   bagging?

Chrissy T.

1    A.      In the other room.

2    Q.      Who was he with if you know?

3    A.      There was a girl there.  They were playing pool and I

4    was in that room.

5    Q.      Where was G?

6    A.      In the room and out of the room.  Mostly in the room.

7    Q.      At some point that night was there discussion that you

8    heard or were a part of between Moe and G about you bailing

9    someone out?

10   A.      Yes.

11   Q.      Explain about that.

12   A.      They were talking about how Shay was in jail and wanted

13   me to bail him out on bond.

14   Q.      Who wanted you to bail him out?

15   A.      G and Moe.

16   Q.      They both were there telling you about this?

17   A.      Yes.

18   Q.      Later that night did something happen?

19   A.      Yes.  They got a phone call.

20   Q.      Who is they?

21   A.      Moe got a phone call.

22   Q.      How do you know?

23   A.      Because he came in the room.

24   Q.      What did he say?

25   A.      That the house got -- someone is banging on the door and

Chrissy T.

1    they were putting drugs in the toilet.

2    Q.    Not the house you were in, right?

3    A.    No.

4    Q.    Another house?

5    A.    Correct.

6    Q.    Did you know which house it was?

7    A.    No.

8    Q.    Okay.  So he said someone was banging on the door and

9    someone was flushing drugs?

10   A.    Yes.  I think Mandy was flushing drugs down the toilet

11   because she was scared.

12   Q.    Okay.  What did you all do next?

13   A.    We went over to the house.

14   Q.    Where was that house?

15   A.    South Williams I believe.  I don't know the street.

16   Q.    Okay.  Was it --

17   A.    It was in Burlington though.

18   Q.    In Burlington.  All right.  Who went with you to the

19   house?

20   A.    Moe and G.

21   Q.    Okay.  Who went inside?  Anyone?

22   A.    They did, both Moe and G.

23   Q.    Did you?

24   A.    No.  I stayed in the car.

25   Q.    At some point did they get back in the car?

                        Chrissy T.

1    A.      Yes.

2    Q.      What did they say?

3    A.      They thought Hannah might have brought -- tried robbing

4    them.

5    Q.      Anything else that you remember them talking about?

6    A.      The -- they were going to bring Tower back up -- back up

7    to Vermont.

8    Q.      What do you remember about that part of the

9    conversation?

10   A.      They wanted to have Tower at the house to make sure

11   nothing would happen to the house or drugs or Mandy.

12   Q.      What did you understand Tower would be doing?

13   A.      Enforcing.  Making sure -- security.

14   Q.      Who did you hear talking about bringing Tower up to

15   provide security?

16   A.      G and Moe.

17   Q.      What happened after that?

18   A.      I was brought home.

19   Q.      By who?

20   A.      G.

21   Q.      Were you paid for your work bagging up?

22   A.      Yes.

23   Q.      How were you paid?

24   A.      G gave me crack.

25   Q.      Okay.  What did you do with the crack?

Chrissy T.

1   A.      I sold most of it and did a couple pieces.

2   Q.      You were working as a confidential source for Essex at

3   the time, right, Essex Police Department?

4   A.      Yes.

5   Q.      And you had signed a confidential source agreement with

6   them for your work, right?

7   A.      Yes.

8   Q.      And you knew that one of the terms of that agreement was

9   that you wouldn't be involved in any illegal or improper

10  activity, right?

11  A.      Yes.

12  Q.      Okay.  So when you did some crack and sold some crack

13  that was illegal, right?

14  A.      Yes.

15  Q.      Against your CS agreement?

16  A.      Yes.

17  Q.      Why did you do it?

18  A.      Because I was -- it was right in front of me and the

19  temptation was more than I could handle.

20  Q.      You were still addicted?

21  A.      I was.

22  Q.      Did you tell anyone that you had taken crack and sold

23  some of it?

24  A.      Not until later.

25  Q.      Who did you tell?

Chrissy T.

1  A.      Chris.

2  Q.      Who is Chris?

3  A.      Detective Mays, Officer, and Rob DEA.

4  Q.      Okay.  So law enforcement folks that you had been

5  working with?

6  A.      Yes.

7  Q.      Did you do any more controlled buys on this case after

8  the one you did from G in the Subway parking lot?

9  A.      Yes.

10  Q.      And to who?

11  A.      Ayla and Lori.

12  Q.      Is that before or after?

13  A.      After.  I believe after.  Sorry.  It's been so long.

14  Q.      That's okay.  There was a time you did a controlled buy

15  into Ayla?

16  A.      Yes.

17  Q.      What happened that night?

18  A.      She ran off with the drugs.  She said she wanted to see

19  Moe and I got to go to the house.  So she got out of the car

20  and left.

21  Q.      She took the money?

22  A.      Yeah.

23  Q.      All right.  You mentioned Mandy as being the one at that

24  other house that you and G and Moe drove to when he got the

25  call about banging on the door?

Chrissy T.

1   A.      Correct.

2   Q.      Did you know her from your time at Lori's?

3   A.      Yes.  She would come with Moe.

4   Q.      Okay.  What was her role at Lori's house?

5   A.      Just hanging out with Moe.

6   Q.      So you've done this work in the bagging party and bagged

7   up for Moe and G.  What was your understanding now of your

8   status in the group?

9   A.      I was back in.

10  Q.      How so?

11  A.      G said I was back in.  Like I didn't -- part of the

12  family.  The unit.

13  Q.      All right, and from what you saw that night was G still

14  working with Moe?

15  A.      Yes.

16  Q.      Did something happen the next day?

17  A.      Yes.

18  Q.      What was that?

19  A.      G called me.

20  Q.      What did he tell you?

21  A.      Asked if I could hold on to something.

22  Q.      Did you know what it was at the time?

23  A.      No, but I assumed.

24  Q.      Okay.  After you got that call what did you do?

25  A.      I called Chris -- Detective Mays.

Chrissy T.

1    Q.     Okay, and what did you tell him?

2    A.     That G was bringing over something to my house.

3    Q.     What happened after that?

4    A.     G came over with a girl.  They came in my house.  G and

5    the girl went into the bathroom, asked if I had a bag, and I

6    had just went to Wal-Mart so I had a Wal-Mart bag, and I gave

7    them the bag and they went and came out with it tied up and G

8    put it in my closet.

9    Q.     Did you see what was in the bag?

10   A.     No.

11   Q.     What shape was it?

12   A.     Like a cereal box.  Like a box.

13   Q.     Rectangle?

14   A.     Yes.

15   Q.     Okay.  So what did they do with the box wrapped up in

16   the Wal-Mart bag?

17   A.     G put it in my closet on the top shelf.

18   Q.     Okay.  Then what?

19   A.     G put the pizza on my bed and then they left.

20   Q.     And did G pay you somehow for --

21   A.     He gave me a tiny 20 piece, yes.

22   Q.     Okay, and let me just finish my question.  That was

23   payment for holding that package for him?

24   A.     Yes.

25   Q.     He gave you a 20 piece?

Chrissy T.

1   A.      Yes.

2   Q.      Crack?

3   A.      Yes.

4   Q.      What did you do with that?

5   A.      I broke it up and then I called Chris.  I did a little

6   bit.  I smoked a tiny piece of it and then I called Chris.

7   Q.      Okay.  Did you -- this is Detective May?

8   A.      Yes.

9   Q.      Did you ultimately tell Detective May that you had

10  smoked some of it?

11  A.      Correct.

12  Q.      What happened to the rest of it?

13  A.      I dumped it in my toilet and flushed it.

14  Q.      Okay.  So you told Detective May this package has been

15  dropped off?

16  A.      Correct.

17  Q.      What happens next?

18  A.      As soon as G leaves Chris pulls in my driveway and I got

19  the box down from my closet and ran to his car.

20  Q.      Okay and what happened?  Was it just the two of you in

21  the car?

22  A.      Correct.

23  Q.      What happened with the box then?

24  A.      We stopped by the bank, Detective Mays opened the box,

25  and then we went to the DEA building.

Chrissy T.

1   Q.    Who opened the box?

2   A.    Detective Mays.

3   Q.    At any point when you were alone with the box or when

4   you and Detective May were with the box did either of you take

5   anything out or put anything in?

6   A.    No.

7         MS. SAVNER:  May I approach?

8         THE COURT:  Yes.

9   BY MS. SAVNER:

10  Q.    I'm showing you what's been marked as Government's 26A.

11  Do you recognize that?

12  A.    Yes.

13  Q.    What is it?

14  A.    That is the bag that she gave me.

15  Q.    Okay.  It's a two-page document.  Do you recognize both

16  pages?

17  A.    Yes.

18  Q.    Both of them depicting the package that she gave you

19  that day?

20  A.    Correct.

21  Q.    Are they -- do they fairly and accurately depict the

22  package?

23  A.    Yes.

24        MS. SAVNER:  Government moves to admit 26A.

25        THE COURT:  Any objection?

Chrissy T.

1        MS. SEN:  No, Your Honor.

2        THE COURT:  All right.  So admitted.

3   [Government exhibit 26A admitted]

4        MS. SAVNER:  Permission to publish.

5        THE COURT:  Yes.

6   BY MS. SAVNER:

7   Q.    All right.  So what are we seeing here?

8   A.    That is the bag and the box.

9   Q.    Okay.  The Wal-Mart bag you gave G?

10  A.    Correct.

11  Q.    Can we go to the next page?  What are we looking at

12  here?

13  A.    That's the inside of the box.

14  Q.    Is that as far as you all went looking inside the box?

15  A.    Correct.

16  Q.    Okay.  You mentioned that from there you drove to the

17  DEA building?

18  A.    Correct.

19  Q.    What happened there?

20  A.    Three DEA agents came out, grabbed the box from Chris,

21  Officer Mays, and he took me down to the first floor.

22  Q.    Did you see the cereal box after that?

23  A.    No.

24  Q.    All right.  So once the box was in law enforcement's

25  hands you had to tell something to G, right?

Chrissy T.

1    A.      Correct.

2    Q.      So explain what happened from there?

3    A.      I told him that my dad -- their water heater was busted

4    in my room, my dad went into my closet and found the box and

5    called the cops.

6    Q.      Okay.  That wasn't true, right?

7    A.      No.

8    Q.      At whose direction did you tell that story to G?

9    A.      Rob.

10   Q.      DEA?

11   A.      DEA.

12   Q.      Okay, and this was over phone calls?

13   A.      Yes.

14   Q.      All right.  So the water heater was broken, your dad

15   found the box, and what happened to the box?  What did you tell

16   G had happened?

17   A.      My dad called the cops and the cops had the box and I

18   got arrested.

19   Q.      Okay, and how did G react when you told him this?

20   A.      He was mad.

21   Q.      Do you remember any of the things he said to you?

22   A.      Did it really happen.  Like it was so long --

23   Q.      That's okay if you don't remember, but he was mad?

24   A.      Yes.

25   Q.      All right.

Chrissy T.

1    A.      He told me to bring the box to him.

2    Q.      Do you remember him threatening you?

3    A.      No.

4    Q.      Okay.  Do you remember all the details of those calls?

5    A.      No.

6    Q.      Okay.  At some point -- there are multiple calls, right?

7    A.      Yes.

8    Q.      And at some point you called G on one of those recorded

9    calls and Folks got on the phone too, right?

10   A.      Correct.

11              MS. SAVNER:  Okay.  May I approach?

12              THE COURT:  Yes.

13              MS. SAVNER:  And I've just handed the witness exhibit

14   24A which is the demonstrative transcript that goes along with

15   that call that was just admitted as Government's 24.

16              THE COURT:  Okay.

17   BY MS. SAVNER:

18   Q.      So I want to go through some of the content of that call

19   with you.

20              THE COURT:  We're fairly close to 4:30.  Is this

21   going to take more than five minutes?

22              MS. SAVNER:  Yes.  This might be a good place to

23   stop.

24              THE COURT:  Okay.  All right.  Let's stop at this

25   point.  Again I just want to remind you not to learn anything

Chrissy T.

1    about this case or talk with anyone about the case.  We'll see

2    you tomorrow morning at 9 o'clock.  I'm going to stay on the

3    bench to speak with counsel.  See you tomorrow.

4    [Jury leaves at 4:30 p.m.  The following occurred in open court

5    without the jury present]

6              MS. SAVNER:  May the witness step down?

7              THE COURT:  Yes you may step down.  I would ask that

8    you be here tomorrow.  Okay.  All right.  So tell me the

9    schedule for tomorrow.

10             MS. SAVNER:  Your Honor, we obviously intend to

11   recall Chrissy T.

12             THE COURT:  Yes.  Right.

13             MS. SAVNER:  From there we will have a couple chain

14   of custody witnesses, agent -- or, excuse me, DEA TFO Ben Adams

15   and Agent Chetwynd, and then the chemist who analyzed the drugs

16   James DiSarno, and from there we plan to call Keisha Willard.

17             THE COURT:  And do you anticipate that she will

18   testify tomorrow?

19             MS. SAVNER:  Yes, Your Honor.

20             THE COURT:  Okay.  All right.  Now you have

21   overnight.  Is there any way that you could review the tape

22   recordings that you wanted to use in regard to this particular

23   witness?

24             MS. SEN:  Your Honor, we will attempt to do that

25   tomorrow during cross, but if we're unable to for technical

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Chrissy T.

1    reasons, we may -- we do have a subpoena prepared that we would

2    be able to serve her with it.

3              THE COURT:  But it would be a whole lot smarter just

4    to get it done as part of her testimony.  Right.  Okay.  So do

5    you have an expectation of Wednesday and Thursday witnesses

6    that you intend to call on those dates?

7              MS. SAVNER:  Yes, Your Honor.  We plan to continue

8    with Steven Higgins, expert on drug addiction.

9              THE COURT:  This is on Wednesday?

10             MS. SAVNER:  Yes.

11             THE COURT:  Okay.

12             MS. SAVNER:  Then Katelynn C.

13             THE COURT:  Yup.

14             MS. SAVNER:  Jasmine L. and Danielle M. and I think

15   that will be Thursday.

16             THE COURT:  Okay.

17             MS. SAVNER:  I'm sorry.  Wednesday.

18             THE COURT:  That's Wednesday.  Then Thursday.

19             MS. SAVNER:  Yes.  The last of the victims, Ayla L.

20   and then DEA Agent Dan Merchand for some physical evidence, and

21   then the electronic evidence through forensic examiner Frank

22   Thornton and Marilyn Epp.

23             THE COURT:  Okay, and what does that leave you with

24   on Monday?

25             MS. SAVNER:  Well it's possible we'll be done on

Chrissy T.

 1  Thursday, but I think the expectation is that Miss Epp's

 2  testimony may carry over into Monday.

 3          THE COURT:  Okay, but certainly you anticipate that

 4  the case shifts to the defendant's case by Monday?

 5          MS. SAVNER:  I think that's a fair assessment.  Yes.

 6          THE COURT:  All right.  Thank you and I have a rough

 7  idea how it's going.  You're right on schedule so we'll see you

 8  tomorrow morning.  Is there anything -- well, first of all, I

 9  guess the defendant has not submitted a memorandum in response

10  to the motion in limine to exclude your witnesses.

11          MS. SEN:  Your Honor, we will file that this evening.

12          THE COURT:  Okay.  Your argument I would -- well I've

13  read obviously the motion.  The question that I have are the

14  witnesses that you have called are they all involved in the

15  prostitution activity?

16          MS. SEN:  At least two of them are, Your Honor.

17          THE COURT:  Okay.

18          MS. SEN:  And possibly more and some -- so some of

19  them were involved in prostituting during this period of time

20  and have direct observations of Mr. Folks interacting with this

21  group of women.

22          THE COURT:  Okay.  So what you're saying is that at

23  least in regard, first of all, to the observations they can

24  testify to that, but more than that the way they would treat it

25  is not character evidence.  It is evidence about how members of

**Capitol Court Reporters, Inc. (800/802) 863-6067**

Chrissy T.

1   this particular criminal activity were being treated in

2   general.  Is that your argument?

3           MS. SEN:  Well exactly, Your Honor, and in fact if

4   the Court would recall, we had moved to exclude evidence before

5   trial of the testimony of these witnesses that the Government

6   was calling women who are not part -- the four charged women --

7   the four human trafficking women in counts 10 to 15, and at

8   that point the Court had suggested that they would be allowed

9   to put on those witnesses to show that -- to demonstrate that

10  this was a pattern of behavior, and so these witnesses that the

11  defense is calling are witnesses who were involved during the

12  same time period with observations directly related to -- I

13  mean if the Government can put in these other witnesses who are

14  not charged to talk about what they observed, I think that the

15  defense should be able to call its own witnesses.

16          THE COURT:  So as far as you know none of the

17  witnesses that you intend to call would be unrelated to the

18  prostitution activity.  They are talking about not character

19  evidence, but they are talking about how they were treated in

20  this particular criminal enterprise as well as how other people

21  were being treated.  Is that the distinction to it, the

22  character evidence motion that the Government had?

23          MS. SEN:  There's that and there are some witnesses

24  as well, Your Honor, who knew the witnesses were testifying

25  from beforehand and they would -- to the extent that the

Chrissy T.

1  Government's witnesses testified to things, for example, if

2  someone says that I was not doing Backpage before such and such

3  time, we have witnesses with direct knowledge who would say

4  that they knew that that person, for example, was involved in

5  prostitution.

6          THE COURT:  But that -- the motion relates

7  specifically to what they call character evidence and that is

8  that good conduct by the defendant.  What you're suggesting is

9  it's not coming in -- any of the evidence that's coming in is

10 good conduct evidence.  It is all reflective of how people

11 engaged in this criminal activity were being treated, and then

12 you might also have evidence to suggest that some of the

13 contradictory -- well you might offer contradictory evidence as

14 to what one or more of the witnesses did or reacted?

15         MS. SEN:  That is correct, Your Honor.

16         THE COURT:  Is that what you're saying?

17         MS. SEN:  Yes, Your Honor, and actually if I could

18 just consult with Mr. Kaplan for a minute?

19         THE COURT:  Okay.

20         MS. SEN:  Nothing else on that point.

21         THE COURT:  Okay.  Only reason -- you submit that.

22 The only reason I bring it up is, of course, when you read a

23 motion you always try to figure out what is the other side and

24 that's what I thought was the other side and that is correct I

25 guess.

Chrissy T.

1          MS. SEN:  Yes, Your Honor.

2          THE COURT:  It's not character evidence.  It's

3    description -- you call it a pattern of activity, but it's a

4    description of how he would relate to all of the other persons

5    who became workers for him.

6          MS. SEN:  I think that's correct, Your Honor, and if

7    Your Honor might recall that I think Mr. Kaplan had stated I

8    think very early on in jury selection that, you know, this is

9    not about giving our client a good citizenship award.  We're

10   not here to argue his character.  We're here to argue sort of

11   the facts and so these would be fact witnesses, Your Honor.

12         THE COURT:  Okay, and I don't know who wrote the memo

13   and the motion for the Government, but you can see that this is

14   a little bit of a shift from what has -- what is traditional

15   good character evidence to what the defense has said.  If you

16   want to add any supplementary memoranda to that, that may be

17   helpful.

18         MS. SAVNER:  Your Honor, will we have a chance to at

19   least be heard on the motion once it's been briefed by the

20   other side?

21         THE COURT:  Oh absolutely.  Right.  Absolutely, but

22   you should know that when I get -- I'm sure you know that --

23   well Mr. Darrow I'm sure would know that -- I mean I get the

24   motion, I read it, and then, you know, what is the whole

25   picture here.  Is this really character evidence or is it

Chrissy T.

1    really description of how people were being treated in response

2    to the testimony that you submitted from the various

3    participants as to how they were treated.  Anyway.

4              MS. SAVNER:  Thank you.

5              THE COURT:  Okay.  All right.  Thank you.

6    [Adjourned at 4:40 p.m.]

7

8                    C E R T I F I C A T I O N

9

10        I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13                                    _____

14

15                                    _JoAnn Q. Carson_

16    May 30, 2019

17    Date                           JoAnn Q. Carson, RMR,CRR

18

19

20

21

22

23

24

25