```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT



UNITED STATES OF AMERICA *
            V.              *    Case No:  2:16-cr-94-1
BRIAN FOLKS               *




                    TRIAL BY JURY - DAY FIVE
                        APRIL 30, 2019
                      BURLINGTON, VERMONT


BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     William Darrow, Esq. and Emily M. Savner, Esq. and Matthew
T. Grady, Assistant United States Attorneys, P.O. Box 570,
Burlington, VT  05402-0570; Attorneys for the Plaintiff.

     Mark Kaplan, Esq., Kaplan and Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.

     Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR



                    CAPITOL COURT REPORTERS, INC.
                           P.O. BOX 329
                   BURLINGTON, VERMONT  05402-0329
                        (802/800) 863-6067
                E-MAIL:  Info@capitolcourtreporters.com
```

2

I N D E X

| Witness | Page |
|---|---|
| Christina T. | 3 |
|   Continued Direct Exam by Ms. Savner | 4 |
|   Cross Examination by Ms. Sen | 14 |
|   Redirect Examination by Ms. Savner | 39 |
|   Recross Examination by Ms. Sen | 54 |
| Benjamin Adams | 59 |
|   Direct Examination by Ms. Savner | 59 |
|   Voir Dire by Mr. Kaplan | 67 |
| Adam Chetwynd | 69 |
|   Direct Examination by Ms. Savner | 69 |
|   Voir Dire by Mr. Kaplan | 73,82 |
| James DiSarno | 84 |
|   Direct Examination by Ms. Savner | 84 |
| Keisha W. | 112 |
|   Direct Examination by Mr. Darrow | 112 |
|   Voir Dire by Mr. Kaplan | 155,174,185 |
|   Cross Examination by Mr. Kaplan | 196 |
|   Redirect Examination by Mr. Darrow | 213 |
|   Recross Examination by Mr. Kaplan | 215 |

| Exhibits | Description | Admitted |
|---|---|---|
| **Government** | | |
| 25 | N-15 Recorded Call | 13 |
| 10 | Photo of Evidence Bag | 62 |
| 11 | Drug Exhibit 3 | 63 |
| 28 | Drug Exhibit 4 | 68 |
| 29 | Drug Exhibit 5 | 68 |
| 31 | Photos of Drug Exh 7&8 | 71 |
| 32 | Drug Exhibit 7 | 111 |
| 33 | Drug Exhibit 8 | 111 |
| 77 | Samsung Edge Cell Phone | 81 |
| 78 | Microsoft Lumia Phone | 83 |
| 6 | Drug Exhibit 1 | 95 |
| 17 | Drug Exhibit 6 | 95 |
| 22 | Drug Exhibit 9 | 95 |
| 51A | DMV Photo Katelynn C. | 122 |
| 47C | Facebook Record-Hannah A. | 155 |
| 42 | Photos of Dumpster | 169 |
| 50B | Hard Drive Exh-Keisha W. | 171 |
| **Defendant** | | |
| UU11 | Disk T. Interview-Threat | 15 |
| UU5 | Wns Disclosure-Chrissy | 22 |
| UU6 | CI iPhone Texts | 24 |
| S5 | Redacted Chris May Texts | 30 |
| B9 | Facebook Messages | 211 |
| | Keisha W. | |

3

1   [TUESDAY, APRIL 30, 2019 - 9 A.M.]

2   [The following occurred in open court with the jury present]

3           THE COURT:  Good morning.

4           COURTROOM DEPUTY:  This is case number 16-94 United

5   States of America versus Brian Folks.  The Government is

6   present through Assistant United States Attorneys William

7   Darrow, Emily Savner, and Matthew Grady.  The defendant is

8   present in the courtroom with his attorneys Mark Kaplan and

9   Natasha Sen.  The matter before the Court is Trial by Jury day

10  five.

11          THE COURT:  Good morning and welcome again.  Has

12  anyone spoken to you about this case?  Have you learned

13  anything about the case from outside the courtroom or have you

14  communicated among yourselves in regard to this particular

15  case?  Everyone uniformly is shaking their head right to left,

16  left to right.  Apparently the answer is in the negative.  So

17  great.  All right.  I think we're ready to proceed.  We're

18  still on direct examination and is the witness here?

19          MS. SAVNER:  Yes, Your Honor.

20          THE COURT:  Okay.  Is the breakfast okay?  Is it

21  improving?  (Jurors respond yes)

22  CHRISTINA T.,

23      Having been duly sworn, testified as follows:

24          THE COURT:  Good morning, Ms. T.

25          THE WITNESS:  Good morning, Judge.

          **Capitol Court Reporters, Inc. (800/802) 863-6067**

                        Chrissy T.                              4

 1              THE COURT:  Just want to remind you to speak right

 2      into that microphone so everybody can hear you.  Okay.

 3              THE WITNESS:  Sorry.

 4              THE COURT:  You didn't knock it over too much.  So go

 5      ahead.

 6                      CONTINUED DIRECT EXAMINATION

 7      BY MS. SAVNER:

 8      Q.      Good morning, Ms. T.

 9      A.      Good morning.

10      Q.      One thing that I want to follow up from yesterday G --

11      A.      Yes.

12      Q.      -- was he involved in the prostitution that was going on

13      out of Lori's house that you saw?

14      A.      Not that I know of.

15      Q.      All right.  So when we had broken -- broken yesterday we

16      were talking about the -- what happened in the aftermath of

17      that cereal box going missing and there were a series of

18      reported phone calls that were a part of.  Do you remember

19      that?

20      A.      Yes.

21              MS. SAVNER:  May I approach?

22              THE COURT:  Yes.

23      BY MS. SAVNER:

24      Q.      I've handed you what's been marked as exhibit 24A which

25      is the demonstrative transcript accompanying exhibit 24 which

Chrissy T.                              5

1   was admitted through the last witness as an exhibit, and I want

2   to walk through this transcript with you if I may.  So do you

3   remember -- take a look at this transcript.  Do you remember

4   this call?

5   A.     Yes.

6   Q.     Okay.  All right.  So in the beginning of the call you

7   tell the person known to you as G I have my paperwork.  What

8   were you referring to there?

9   A.     That I hadn't been arrested.  So I had paperwork saying

10  I went to jail.

11  Q.     Okay.  Paperwork from the court or from the police?

12  A.     Correct.

13  Q.     All right.  You tell him I'm getting hit with

14  everything.  Possession of heroin and crack.  It's on my

15  paperwork.  So again you're referring to the fact that you've

16  been charged; is that right?

17  A.     Yes.

18  Q.     All right, and at some point shortly thereafter Mr.

19  Folks gets on the phone.  Do you remember that?

20  A.     Yes.

21  Q.     Okay, and then how would you describe who does the

22  talking between him and G after that?

23  A.     Moe.

24  Q.     Moe does the talking?  Is that a yes?

25  A.     Yes.  Sorry.

```
                        Chrissy T.                               6
```

1   Q.      Okay.  You start crying in this phone call and Folks

2   says to you Chrissy, Chrissy, you know how I feel about that

3   crying shit.  Do you remember that?

4   A.      Yes.

5   Q.      Had you had conversations with Moe before about crying?

6   A.      Yes.

7   Q.      Explain that.

8   A.      When I cry he didn't like it so he told me to stop

9   crying.

10  Q.      He says -- and this says Mr. Folks says later on in the

11  call she says she's going to take it on the chin, and then he

12  continues on to say just make sure she got a little cash in her

13  pocket and she can get through this.  She ain't got no reason

14  to turn no face on nobody.  Do you remember that?

15  A.      Yes.

16  Q.      Okay.  What does he mean when he says she says she's

17  going to take it on the chin?

18  A.      To take the charge.

19  Q.      And do what with respect to Moe and G?

20  A.      Not talk about them.

21  Q.      And then you tell Mr. Folks -- you're talking about your

22  phone and you say you know my phone -- you know my pictures go

23  -- take a while to go through.  What are you referring to

24  there?

25  A.      I had sent him pictures before on my phone.

Chrissy T.                                    7

1    Q.    Of what?

2    A.    Of my butt.

3    Q.    At whose request?

4    A.    Moe's.

5    Q.    Sometimes did you want to send him pictures as well?

6    A.    Yes.

7    Q.    Why is that?

8    A.    To get affection.

9    Q.    Did that work?

10   A.    No.

11   Q.    Did he give you affection?

12   A.    Kind of, but no.

13   Q.    And you're saying your pictures take a while to go

14   through on your phone?

15   A.    Yes.

16   Q.    What were you trying to send pictures of that time?

17   A.    My paperwork.  The paperwork.

18   Q.    If you turn to page 2 at the top, Folks says when you

19   talk to -- he says listen, listen, when you talk to me you

20   already know how I feel about that crying shit.  Did you

21   understand that again to be a reference to him not liking when

22   you cried?

23   A.    Yes.

24   Q.    And he says I will beat on you in a fucking heartbeat.

25   Do you see that?

                        Chrissy T.                        8

1    A.      Yes.

2    Q.      What does that mean?

3    A.      Beat me.

4    Q.      He says all that crying shit.  Save that shit for the

5    judge.  Do you see that?

6    A.      Yes.

7    Q.      And about two-thirds of the way down on the line -- well

8    two-thirds of the way down Folks says we will figure out

9    something.  We will figure out a way to get through this.  What

10   is your pops doing about a lawyer.  So he's saying we there.

11   Who did you understand him to be referring to?

12   A.      Him and G and me.

13   Q.      So the three of you together?

14   A.      Yes.

15   Q.      He goes on to say you just can't put they name on no

16   paperwork.  What does that mean?

17   A.      Put their name on paperwork.

18   Q.      Whose names?

19   A.      Moe or G's.

20   Q.      Did you understand why?

21   A.      Because they would be implicated in the charges.

22   Q.      He goes on to say we -- nobody can put they name on no

23   paperwork because you already know what this is.  What did you

24   understand him to mean by that?

25   A.      It's -- it's go time.  It's ready to take the hit.

Chrissy T.                                         9

1   Q.    Is this something that you had talked about with Mr.

2   Folks during the course of your time working for him?

3   A.    Yes.

4   Q.    Explain those conversations.

5   A.    If I got hit with any drugs, driving, or delivering to

6   customers, that if I was hit it's mine and not implicate them.

7   Q.    Mr. Folks told you that?

8   A.    Yes.

9   Q.    He goes on to say so we can't go to no lawyer's office

10  and that court shit for you.  So only thing we gonna have to do

11  is give your pops a few dollars for the lawyer.  Right?

12  A.    Yes.

13  Q.    We will give you the money and you'll deal with your

14  pops because I don't even want nobody to see me.  Do you know

15  what he meant by that?

16  A.    He didn't want anybody with me.  He didn't want anybody

17  with him.

18  Q.    And on the last page he says and we gonna figure it out

19  and we gonna make up to you some type of way.  Fix you with the

20  bread.  What does that mean?

21  A.    To make sure I have money.  Bread is money.

22  Q.    Payment for taking this charge?

23  A.    Yes.

24  Q.    He says as long as you hold your head up, you keep your

25  mouth shut, you good money.  You see that?

```
                        Chrissy T.                       10
 1    A.      Yes.

 2    Q.      What does that mean?

 3    A.      If I keep my mouth shut, take the charge, and after it

 4    was done I could go back with them.

 5    Q.      Keep working for him?

 6    A.      Yes.

 7    Q.      He says this is your shot right here to make up for all

 8    the -- and then sort of inaudible section -- you did.  What

 9    does that mean?  What is he referring to?

10    A.      For stealing the drugs that me and Hannah took.

11    Q.      Okay.  Part of that falling out with him?

12    A.      Yes.

13    Q.      You had taken some of the drugs?

14    A.      Yes.

15    Q.      All right, and he says you taking this on the chin

16    that's the way to make up for it?

17    A.      Yes.

18    Q.      Then you tell him that your grandma is in the hospital.

19    Do you see that?

20    A.      Yes.

21    Q.      Was that true?

22    A.      No.

23    Q.      Okay.  Why did you say that?

24    A.      To make him feel bad.

25    Q.      Did it work?
```

                        Chrissy T.                          11

1    A.      No.

2    Q.      What does he say in response?

3    A.      It's not my problem.

4    Q.      Do you see where on the left it says 5 minutes and 27

5    seconds?

6    A.      Yes.  It's not his issue it's mine.

7    Q.      And then he goes on to say this right here is your shot

8    to make up for all the shit you did.  You do this -- you do

9    right this shot.  He brought you back.  He's dealing with you.

10   You do right this shot, then I'm a step in the picture and I'm

11   a deal with you.  Do you see that?

12   A.      Yes.

13   Q.      Okay.  He said you do right this shot he brought you

14   back.  Who is he referring to?

15   A.      G.

16   Q.      Okay, and if -- he says if you continue to do right I'm

17   a step in the picture.  I'm a deal with you.  Who is he

18   referring to?

19   A.      Moe.

20   Q.      Folks goes on to say the more we gonna do this and we

21   gonna put shit back in order the way it used to be.  What's he

22   referring to?

23   A.      To the -- back at Lori's house where we all hung out and

24   I work for him.

25   Q.      And he says right now is your time to show where it's

Chrissy T.                                    12

1    at.  What does that mean?

2    A.     To prove my loyalty.

3    Q.     All right.  There were more calls after this one as a

4    result?

5    A.     Yes.

6    Q.     Okay.  More calls to G, correct?

7    A.     Yes.

8    Q.     Okay.  Was there also a time you made a phone call

9    directly to Moe after this?

10   A.     Yes.

11          MS. SAVNER:  May I approach?

12          THE COURT:  Yes.

13   BY MS. SAVNER:

14   Q.     I'm showing you what's been marked as Government's

15   exhibit 25.  Do you recognize that?

16   A.     Yes.

17   Q.     What is it?

18   A.     The phone call.

19   Q.     The one to Moe?

20   A.     Yes.

21   Q.     How do you know?

22   A.     Because I listened to it.

23   Q.     Okay.  You signed your name on that disk?

24   A.     Yes.

25   Q.     And when you listened to it was it a true and accurate

Chrissy T.                              13

1    recording of that phone call between you and Mr. Folks?

2    A.    Yes.

3            MS. SAVNER:  The Government moves to admit exhibit

4    25.

5            THE COURT:  Any objection to 25?

6            MS. SEN:  No, Your Honor.

7            THE COURT:  So admitted.

8    [Government exhibit 25 admitted]

9            MS. SAVNER:  Permission to publish the transcript?

10           THE COURT:  Yes.  Yes.

11   [Government exhibit 25 published]

12   BY MS. SAVNER:

13   Q.    Okay.  That call that we just listened to, Government's

14   25, do you know how long after that call took place after the

15   first call we just went over?

16   A.    Maybe a couple days.

17   Q.    Okay, and how was what Moe was saying in this last call

18   -- how did that compare to what he was saying in the call

19   before?

20   A.    Totally different; that he wasn't going to help me at

21   all.

22   Q.    And in the first call he said he would help you, right?

23   A.    Yes.

24   Q.    And you brought the cereal box from G the day after the

25   bagging party you went to, right?

                        Chrissy T.                        14

1    A.      Yes.

2    Q.      And how did Moe and G seem at the bagging party?

3    A.      Friendly like they always were.

4    Q.      Like old times at Lori's?

5    A.      Yes.

6              MS. SAVNER:  Nothing further.

7              THE COURT:  Okay.  Any cross examination?

8              MS. SEN:  Yes, Your Honor.

9                      CROSS EXAMINATION.

10   BY MS. SEN:

11   Q.      Miss T., in 2015 you were selling drugs for Mr. Folks

12   and Mr. McFarlan, correct?

13   A.      Yes.

14   Q.      In order to support your own heroin habit?

15   A.      Yes.

16   Q.      You would do whatever you could to get heroin?

17   A.      Not stealing, but yes.

18   Q.      So, for example, in 2014 you and Jason Donnelly tried to

19   pass off some fraudulent checks?

20   A.      Yes.

21   Q.      And you were using heroin then, weren't you?

22   A.      Yes.

23   Q.      And you were basically doing that in order to get money

24   to get heroin?

25   A.      Yes, but it was his idea.

                    Chrissy T.                    15

1    Q.    So you just did it because he told you to do it?

2    A.    Yes.

3    Q.    So during the time that you were selling drugs for Mr.

4    Folks you exchanged a number of text messages with Mr. Folks?

5    A.    Yes.

6    Q.    So I am going to show you your text messages.  If you

7    could just take a look at them and see if that looks like --

8    A.    Yes.

9    Q.    This has been marked as defendant's exhibit UU11.  So

10   you recognize these messages between you and Mr. Folks?

11   A.    Yes.

12         MS. SEN:  I would like to introduce them.  Does the

13   Government have any objection?

14         THE COURT:  Okay.  Again what's the number?

15         MS. SEN:  It's UU11.

16         THE COURT:  Okay.  Any objection to UU11?

17         MS. SAVNER:  No, Your Honor.

18         THE COURT:  All right.  So admitted.

19   [Defendant exhibit UU11 admitted]

20         MS. SEN:  Thank you, Your Honor.

21   BY MS. SEN:

22   Q.    So I'm going to go through some of these text messages

23   with you, Miss T.  So this is a message here from -- this is

24   October 4, 2015 that you sent to someone called zombie.  Zombie

25   is the name that you gave Mr. Folks in your phone?

            Capitol Court Reporters, Inc. (800/802) 863-6067

                    Chrissy T.                    16

1    A.      Yes.

2    Q.      And you said hey you know I don't mind doing whatever

3    you tell me to do, right?  You like the fact that you can count

4    on me for anything that you need and I will always have your

5    back and look out for you.  You sent him that text message on

6    that day?

7    A.      Yes.

8    Q.      And that's because you were enjoying participating in

9    working with him?

10   A.      Because I felt wanted.  Yes.

11   Q.      And again here's another message to Mr. Folks from

12   October 22nd of 2015?

13   A.      Yes.

14   Q.      And you sent him a message you are going to wear

15   yourself out, B.  You are going to get sick again and now your

16   back is killing you.  I know you have a lot going on and a lot

17   to think about and you are stressed out.  That's why I'm here

18   to take care of whatever you need or try to.

19   A.      Yeah.  Yes.

20   Q.      That's how you felt at that time about Mr. Folks?

21   A.      Yes.

22   Q.      That was in October 22nd of 2015?

23   A.      Yeah.

24   Q.      A couple of days later on October 25th you sent another

25   message to Mr. Folks.  Good night, B.  Let me know.  Since G is

Chrissy T.                                17

1   doing his thing I have Tower and E with me.  So in that message

2   G you were talking about -- who you were talking about as

3   Ghost?

4   A.      Yes.

5   Q.      And he was doing his own thing at that point?

6   A.      He was out having a night out.

7   Q.      Okay, and another message you sent him on October 25th

8   you said I know I haven't been through stuff like you and

9   Hannah, but I still got you and would do anything for you

10  because of who you are and the way you took me in and how you

11  treat me.  Is that what you said to him on October 25th of

12  2015?

13  A.      Yes.

14  Q.      On November 1st of 2015 you sent him a message that said

15  I'm here if you need anything.  You need to rest.  You're doing

16  too much and you're stressed out partly because of me and I'm

17  sorry for that.  I don't like it that I'm stressing you out.  I

18  don't want to lose my spot because I love what I do and I like

19  working for you and G.  That was on November 1st, 2015 --

20  A.      Yes.

21  Q.      -- you sent that message?  Now you also exchanged some

22  messages with Mr. McFarlan?  Miss T.?

23  A.      Yes.

24  Q.      You also exchanged some messages with Mr. McFarlan?

25  A.      Yes.

                        Chrissy T.                          18

1    Q.     Actually I'll come back to that.  So your relationship

2    with Mr. Folks like this continued on into November of 2015

3    based on your text messages?

4    A.     Yes.

5    Q.     And at some point you indicated that you left Mr. Folks

6    because of a situation where he humiliated you?

7    A.     Partly.  It built up to that point, yes.

8    Q.     But isn't it the truth that you were asked to leave

9    because you were stealing drugs from him?

10   A.     No.

11   Q.     You and Hannah?

12   A.     Yes, but they told me I could still be there and work.

13   Q.     Okay.  I would like to show you some additional text

14   messages.  This is defendant's UU12.  Why don't you just take a

15   look through those and make sure they are yours.

16   A.     I don't remember these.

17            THE COURT:  I'm sorry.  I didn't quite --

18            THE WITNESS:  I don't remember these.

19            THE COURT:  You don't remember those?

20            THE WITNESS:  No.

21   BY MS. SEN:

22   Q.     Why don't I ask you a couple questions.  Would that help

23   you?

24   A.     Yeah.  I don't -- I don't remember -- no I don't

25   remember those.

            Capitol Court Reporters, Inc. (800/802) 863-6067

Chrissy T.                              19

1    Q.      So you sent text messages to your mother, didn't you?

2    A.      Yes.

3    Q.      Her cell phone is 802-370-8293?

4    A.      Yes.

5    Q.      So would it be fair to say that these might be messages

6    from your mother?

7    A.      Maybe.  I don't -- I don't have a clue.  I do not

8    remember these.

9    Q.      Well do you deny they came from your phone?

10   A.      I have no clue.  I do not remember.

11           MS. SEN:  Your Honor, may I have a moment?

12           THE COURT:  Yes.

13   BY MS. SEN:

14   Q.      Ms. T., I'll come back to that.  So around -- you left

15   working for Mr. Folks and you ended up moving out; is that

16   correct?

17   A.      Yes.

18   Q.      And around Thanksgiving -- you spent Thanksgiving with

19   your mother?

20   A.      Correct.

21   Q.      And you stole her car?

22   A.      Yes.

23   Q.      She told you not to take it and you insisted on doing so

24   and you did?

25   A.      Yes I was sick.

Chrissy T.                              20

1  Q.     Okay, and because you were sick it was okay to take the
2  car?
3  A.     No.
4  Q.     And she in fact called the police, didn't she?
5  A.     Yes.
6  Q.     And you were arrested for taking the car?
7  A.     Yes.
8  Q.     And when you were questioned by the police officers you
9  told them you were taking your mom's car to prove to your old
10 drug dealer that you weren't a snitch?
11 A.     Yes.  There was a rumor going around I was a snitch.
12 Q.     But you just made that up to tell the law enforcement
13 officers, didn't you?
14 A.     No.
15 Q.     You just said that you took the car because you were
16 sick and you needed to get drugs, isn't that right?
17 A.     Yes.
18 Q.     So what you told the law enforcement officers in that
19 statement wasn't exactly accurate, was it?
20 A.     No.
21 Q.     And you told -- in fact, you told the officers that if
22 you didn't make a drug sale the drug dealers were threatening
23 to hurt your family?
24 A.     Yes.
25 Q.     Okay.  So at that point you were arrested for taking

Chrissy T.                              21

1   your car -- your mother's car without her permission, isn't

2   that correct?

3   A.     Yes.

4   Q.     And the very next thing that you did is you sat down

5   with officers from the Essex Police Department and you decided

6   to sign up to be a confidential source, isn't that correct?

7   A.     Yes.

8   Q.     So I'm going to show you what's been marked as

9   defendant's UU5 page 10478A.  If you could please look at those

10  few pages and if you could let me know if this is your

11  signature on the last page -- the last two pages?

12  A.     Yes.

13  Q.     So in order to get yourself out of your jam with your

14  mom's car you decided to sign up to be a confidential source?

15  A.     Yes.

16  Q.     Because you figured that was one way you could get out

17  of this problem?

18  A.     Yes and --

19  Q.     So let me ask you.  So you reviewed the confidential

20  source code agreement with Detective May in detail before you

21  signed it, right?

22  A.     Yes.

23  Q.     So let me just show you -- that's just the first page.

24         THE COURT:  Is that introduced into evidence?

25         MS. SEN:  I'm sorry, Your Honor.  I would ask to

Capitol Court Reporters, Inc. (800/802) 863-6067

Chrissy T.                              22

1  introduce it.

2         THE COURT:  Okay.  Any objection to the introduction

3  of that confidential source document?

4         MS. SAVNER:  No, Your Honor.

5         THE COURT:  Okay.  So admitted.

6  [Defendant exhibit UU5 admitted]

7  BY MS. SEN:

8  Q.    So I would like to show you the second page of this

9  document.  So as part of this agreement on paragraph 11 said I

10  further understand that I may not engage in any illegal or

11  improper conduct so long as I'm assisting the Essex Police

12  Department.  Did you understand that at the time you signed

13  this agreement?

14  A.    Yes.

15  Q.    And did you also understand when you signed this

16  agreement that any violation arising from my actions in

17  violation of the aforementioned circumstances will result in an

18  investigation of the matter.  If the charges are substantiated,

19  appropriate action, to include the possibility of criminal

20  charges, will be taken?

21  A.    Yes.

22  Q.    So you read that before you signed this document?

23  A.    Yes.

24  Q.    So is it fair to say from that point forward you have

25  very frequent communications with Detective May?

```
                    Chrissy T.                      23
 1   A.      Yes.
 2   Q.      So I'm going to show you what's been marked as
 3   defendant's exhibit UU6.  These are Detective May's text
 4   messages with you.  Could you please take a look through that?
 5   A.      Yes these are text messages.
 6   Q.      Text messages that you exchanged with Detective May?
 7   A.      Yes.
 8           MS. SEN:  Your Honor, I would like to introduce these
 9   text messages.
10           THE COURT:  Okay.  Any objection?
11           MS. SAVNER:  Yes, Your Honor.  It's hearsay.  It's
12   the witness's prior out-of-court statement seemingly being
13   offered for its truth.
14           THE COURT:  It's actually being offered to impeach
15   credibility, isn't it?
16           MS. SAVNER:  Well she hasn't indicated what she's
17   impeaching, and if that were the case, I don't believe that the
18   extrinsic evidence would be admissible.  She can ask the
19   question and get the answer.
20           THE COURT:  All right.  Are you offering this for the
21   truth of the matter asserted or are you offering this to
22   impeach credibility?
23           MS. SEN:  For both reasons, Your Honor.
24           THE COURT:  All right.
25           MS. SEN:  They are her own statements, Your Honor.
```

                    Chrissy T.                    24

1              THE COURT:  Pardon me.

2              MS. SEN:  They are her own statements.

3              THE COURT:  They are her own statements and you then

4   would be following up with additional questions -- well

5   objection overruled.  It is admitted.  What is the exhibit

6   number?

7              MS. SEN:  UU6, Your Honor.

8              THE COURT:  UU6.  Okay.

9   [Defendant exhibit UU6 admitted]

10  BY MS. SEN:

11  Q.    So, Miss T., yesterday you testified that one of the

12  reasons that you wanted to cooperate is because it was just the

13  right thing to do?

14  A.    After seeing Tori, yes.

15  Q.    So do you remember trying to set up a controlled buy

16  around December 10th?

17  A.    No.  It's been so long.

18  Q.    You exchanged text messages with Detective May about

19  setting up controlled buys; is that correct?

20  A.    Yes.

21  Q.    And in one of those -- during one of those transactions

22  the deal fell through?

23  A.    Yes.

24  Q.    And so you texted Detective May at that point when the

25  deal was falling through I'm fucked, right, and he says why.

                        Chrissy T.                    25

1    You said I'm going to cry, and he said don't worry, and you

2    said -- this is on two pages, I'm sorry -- because I needed the

3    money you were going to pay me for doing this, and he said we

4    were going to pay you regardless?

5    A.     Yes.

6    Q.     And the reason you needed the money is because you

7    needed the money for drugs?

8    A.     No.  I needed my cell phone.

9    Q.     I'm going to refer to Bates number 9488 and you would

10   just text Detective May with whatever information you had as

11   often as you had it.  Fair to say?

12   A.     Yes.

13   Q.     So this is a message you sent him on December 23rd and

14   it starts that you're talking about so I'm in trouble with

15   other people -- from the 23rd -- I'm sorry -- and then the

16   message goes on and you say if you want G, I can get him.  He

17   just called me and said he is back in town and I think he's not

18   with Moe any more.  If I don't see him when he goes -- want to

19   meet me, it will be weird if I don't.  So at that point you

20   didn't think G and Moe were working together?

21   A.     I don't believe I didn't say he wasn't around him.

22   Q.     You said I think he's not with Moe any more?

23   A.     Correct.

24   Q.     So on January 12th you asked Detective May if you could

25   set up a controlled buy?

Chrissy T.                    26

1    A.      I believe so.

2    Q.      And that you might have to try the drugs?

3    A.      Yes.

4    Q.      And Detective May told you, you can't do that?

5    A.      Correct.

6    Q.      And when you asked May -- Detective May that you might

7    have to hold drugs if G gave them to you, he also told you to

8    tell him you couldn't do that, isn't that correct?

9    A.      Correct.

10   Q.      So on January 12th, as we've heard before, G calls you

11   and asks you to get involved in this bagging session?

12   A.      Yes.

13   Q.      And you weren't approved to go and do that, were you?

14   A.      No.

15   Q.      And you did it anyways?

16   A.      Correct.

17   Q.      And in fact not only did you do it, but you were paid in

18   drugs, isn't that correct?

19   A.      Correct.

20   Q.      And you used those drugs?

21   A.      Yes.

22   Q.      And that was all completely a violation of your

23   confidential source agreement, isn't that correct?

24   A.      Yes.

25   Q.      And then after that event when they found the cereal box

```
                    Chrissy T.                        27
 1   that you talked about --
 2   A.     Yes.
 3   Q.     -- and they played the phone call where you talked to
 4   McFarlan --
 5   A.     Yes.
 6   Q.     -- you told them that your little sister got into a car
 7   accident in Barre?
 8   A.     Yes.
 9   Q.     That was a lie?
10   A.     Yes.
11   Q.     She was badly hurt?
12   A.     Yes.
13   Q.     That also was a lie?
14   A.     Yes.
15   Q.     You said she was in a head-on collision?
16   A.     Yes.
17   Q.     That was a lie too, right?
18   A.     Yes.
19   Q.     And you told G that he was like your family?
20   A.     Yeah.
21   Q.     That was a lie?
22   A.     No.
23   Q.     Okay.  You told McFarlan that you had your paperwork
24   with you?
25   A.     Yes.
```

                    Chrissy T.                    28

1    Q.      That was a lie?

2    A.      Yes.

3    Q.      And you told -- you told G that your grandmother was in

4    the hospital because of all this, right?

5    A.      Yes.

6    Q.      And that too was a lie, wasn't it?

7    A.      Yes.

8    Q.      And you said that your grandmother had a panic attack

9    because her door was kicked in?

10   A.      My -- my parents' door was kicked in, yes.

11   Q.      Okay, and that was a lie too?

12   A.      No.

13   Q.      Okay.  All of those lies came really easily to you,

14   didn't they?

15   A.      No.

16   Q.      They just rolled right off your tongue, didn't they?

17   A.      No.

18   Q.      Didn't you say after one of those phone calls that you

19   thought you deserved the academy award?

20   A.      Yes.

21   Q.      So I would like to show you another set of phone calls.

22   They just came in two different batches -- I'm sorry -- text

23   messages with Detective May.  This is defendant's exhibit S5,

24   Your Honor.

25              THE COURT:  Okay.

                        Chrissy T.                      29

 1  BY MS. SEN:

 2  Q.     Some of them repeat from the other ones.  Go ahead and

 3  take a look please.

 4  A.     Yes these are mine.

 5         MS. SEN:  Your Honor, I would like to introduce

 6  defendant's S5.

 7         THE COURT:  Any objection?

 8         MS. SAVNER:  Yes, Your Honor.  A couple.  First of

 9  all, not all of these text messages are with this -- between

10  Detective May and this witness.  They include Detective May's

11  text messages with other witnesses, and even as to this witness

12  again they are hearsay, and as defense counsel stated she, I

13  assume as with the other ones, are offering them not only to

14  impeach, but for their truth.

15         THE COURT:  Well I guess, first of all, are there

16  text messages there between Detective May and some other

17  person?

18         MS. SEN:  I have removed the ones from the other

19  person.

20         THE COURT:  Pardon me.

21         MS. SEN:  I removed the messages from anyone else,

22  Your Honor.

23         THE COURT:  Okay.  So all of the messages that you

24  have offered in that exhibit are just between this witness and

25  Detective May?

            **Capitol Court Reporters, Inc. (800/802) 863-6067**

                         Chrissy T.                          30

1                MS. SEN:  Yes, Your Honor.

2                THE COURT:  Okay, and second what's the purpose of

3       the offering?

4                MS. SEN:  I think that these would be offered to

5       impeach her credibility, Your Honor.

6                THE COURT:  Okay.  Objection overruled.  They are

7       admitted.

8                MS. SEN:  Thank you, Your Honor.

9       [Defendant exhibit S5 admitted]

10      BY MS. SEN:

11      Q.     So you testified yesterday that you felt badly about

12      testifying against G; is that correct?

13      A.     Yes.

14      Q.     But in fact you were scared of G?

15      A.     After, yes.

16      Q.     So I'm going to show you a series of text messages

17      between you and Detective May.  So this is on April 6th of 2016

18      you say my dad is flipping out on me.  I have no idea who it

19      could be, and then Detective May says what kind of car were

20      they in, and you say same as G drives.  I didn't see them.  Now

21      he might kick me out because he can't have shit happen again.

22      You say they came right on to the lawn.  Didn't see my dad.  He

23      wants me out.  I have no idea what to do.  I thought they were

24      gone.  Did Moe tell them something, but Moe didn't know where I

25      live.  Someone came to the door late last night.  Didn't answer

                         Chrissy T.                        31

1    it.  It was at 1 a.m.  I just don't know what to do.  I told

2    you my dad is nuts.  Her phone is off just when things -- when

3    I think things are getting back to normal it has to do with G.

4    What if we do a phone call to Moe and tell him look this is

5    happening and that way I can leave for the night to let my dad

6    cool down.  Yeah I think it was G.  I don't think Moe would

7    come here.  He didn't know where I live and my dad isn't

8    calming down, and then further down you say I'm more scared of

9    my dad than the guys, and then Detective May says what was your

10   dad's description of the black male again, and you say tall, 6

11   something, big belly, wearing a big parka.  Sounds like G.  So

12   you were concerned G was coming to your house?

13   A.    Yes.

14   Q.    And in fact you also told Detective May -- and do we

15   know that there was G -- it has to be someone from his crew.

16   He's the only one who wants to hurt me.  Does that sound about

17   right?

18   A.    Yes.

19             THE COURT:  Do you just want to eliminate the yellow

20   lines there?

21             MS. SEN:  Sure, Your Honor.  I was realizing it was

22   getting distracting.

23   BY MS. SEN:

24   Q.    So you were continuing throughout this time to work as a

25   confidential source with the Essex Police Department, isn't

Chrissy T.                           32

1  that correct?

2  A.     Yes.

3  Q.     And at some point you explained to Detective May that

4  you were worried because you were in trouble because you had

5  written some checks that you weren't supposed to from your

6  sister's account?

7  A.     Yes.

8  Q.     And you blamed it on Moe.  You said that it was Moe and

9  Hannah who forced you to do that, isn't that correct?

10  A.     I don't believe so.

11  Q.     Okay.  Let me show you some text messages between you

12  and Detective May from June 24, 2016.

13         THE COURT:  That's a part of the exhibit which has

14  been introduced?

15         MS. SEN:  Yes.

16         THE COURT:  Okay.

17  BY MS. SEN:

18  Q.     And you write um I'm in trouble.  I messed up.  I did

19  something stupid to fix what Hannah and Moe made me do, but it

20  went wrong, Chris.  I'm so scared.  So this is June of 2016.

21  You had stopped working with Hannah and Moe and that whole crew

22  back in November of 2015; is that right?

23  A.     Yes.

24  Q.     So this is something that you're saying that somebody is

25  coming after you for something you did six months earlier?

Chrissy T.                                33

1    A.      I believe so.

2    Q.      So Detective May asked you what did you do and you

3    texted back to him.  You said I ran into people who wanted

4    their money -- money back that Hannah and Moe burned them so

5    they wouldn't leave my side until I got them their money.  So I

6    found my sister's old checkbook and wrote two checks and I --

7    the checks bounced and now the people want their money by today

8    or they are going to press charges.  I thought I would have

9    gotten my unemployment to pay them back, but IHOP is fighting

10   it.  I'm freaking out.  I don't know what to do.  Does that

11   sound about right?

12   A.      Yes.

13   Q.      That's what you told Detective May that you had written

14   these checks because people were coming after you from some

15   scheme that you were involved in with Hannah and Moe back in

16   November of 2015?

17   A.      Correct.

18   Q.      And that wasn't true, was it?

19   A.      No.

20   Q.      That was a lie.  So you were lying to Detective May; is

21   that correct?

22   A.      Yes.

23   Q.      While you were working as a confidential source?

24   A.      Yes.

25   Q.      And you continued having this discussion with him and

Chrissy T.                          34

1   finally you said I don't know what to do and he said you should

2   go to the South Burlington Police and confess before they reach

3   out to you?

4   A.     Yes.

5   Q.     You never went to the South Burlington Police and turned

6   yourself in, did you?

7   A.     No.

8   Q.     And then realizing that you were getting into another

9   jam here with this check charge you asked Detective May can we

10   try and do buys when Rob gets back, and he says no and he said

11   boss will not approve any buys with you right now.  Does that

12   sound about right?

13  A.     Yes.

14  Q.     And in fact Detective May told you, you can't do buys

15  when you were just involved in criminal activity.  Do you

16  remember him telling you that?

17  A.     Yes.

18  Q.     Miss T., isn't it fair to say that you used the cover of

19  being a confidential source in order to engage in criminal

20  activity with impunity?

21  A.     No.

22  Q.     You were buying and selling drugs to support your drug

23  habit all the while as working as a confidential source?

24  A.     Yes.

25  Q.     And lying to Detective May about it?

                        Chrissy T.                        35

1    A.      Yes.

2    Q.      You treated being a CI as a get out of jail for free

3    card, didn't you?

4    A.      No.

5    Q.      You continuously lied about your involvement in criminal

6    activity while you were working as a confidential source, isn't

7    that correct?

8    A.      I was sick.

9    Q.      So you're blaming it on the drugs?

10   A.      Yes.

11   Q.      Okay.  So isn't it true that you would do anything to

12   benefit you if you thought that it would help you?

13   A.      No.

14   Q.      You wouldn't lie to the police?

15   A.      Yes.

16   Q.      You'd disobey orders from the police while working as a

17   confidential source, wouldn't you?

18   A.      Yes.

19   Q.      You would use drugs while working as a confidential

20   informant?

21   A.      Yes.

22   Q.      You would steal checks from your family in order to get

23   money?

24   A.      Yes.

25   Q.      And isn't it true that based on -- you're not getting

                          Chrissy T.                      36

 1  charged with anything in this case, are you?

 2  A.     No.

 3  Q.     You don't even have a lawyer, do you?

 4  A.     No.

 5  Q.     Because you know that you're not getting charged?

 6  A.     Yes.

 7          MS. SEN:  Your Honor, may I have a moment please?

 8          THE COURT:  Yes.

 9  BY MS. SEN:

10  Q.     I would like to show you again defendant's exhibit UU11

11  which are your text messages with Mr. Folks, and I would like

12  to draw your attention to a message that you sent him after the

13  cereal box incident and after those controlled phone calls that

14  you had with him.  This would be on January 27th of 2016 and

15  what you said was hey I know you said you aren't talking to G

16  or whatever, but he's going after my family, running my dad off

17  the road, following my uncle.  Moe I have all my paperwork and

18  my federal paperwork.  I'm not talking.  I didn't take his

19  stuff.  My family has nothing to do with any of this.  He's

20  going to kill my grandmother with everything.  You sent that to

21  Mr. Folks?

22  A.     Yes.

23  Q.     And do you recall sending a series of text messages --

24  exchanging text messages with Mandy -- Mandy L. at the end of

25  November after you were kicked out of the house?

```
                    Chrissy T.                      37
 1   A.      I believe so.
 2   Q.      And you asked her to say -- you asked her to tell Moe
 3   that you were really sorry, that you know you messed up by
 4   stealing the drugs and you felt really bad about it?
 5   A.      Yes.
 6   Q.      And that you -- you -- in fact you sent her multiple
 7   messages telling her to tell Moe that you were really sorry and
 8   you apologize?
 9   A.      I don't remember.  I believe I did.  It was so long ago.
10   Q.      But that -- but that's something that you think you
11   might have done?
12   A.      I believe.  It's been so long.
13          MS. SEN:  One more moment, Your Honor.
14          THE COURT:  Yes.
15   BY MS. SEN:
16   Q.      So if you told Mandy I messed up but I'm not going to do
17   it again, it was to help Hannah out because she was tapping
18   from the bags too.  Does that sound about right?
19   A.      Yes.  Hannah and I both were.
20   Q.      And that was around November of 2015?
21   A.      Yes.
22   Q.      And weren't you replacing some of those bags with sugar
23   and selling it to customers?
24   A.      No.  No.
25   Q.      You were just taking the drugs out and using them for
```

                         Chrissy T.                        38

1    yourself?

2    A.      Yes.

3    Q.      And is it fair to say there were some customers who got

4    upset with you about that?

5    A.      Yes.

6    Q.      They sent you text messages threatening you?

7    A.      I don't recall.

8    Q.      But you had multiple of your own customers that you were

9    basically shorting drugs from, right?

10   A.      Moe's customers I saw, yeah.

11           MS. SEN:  One more moment, Your Honor.

12           THE COURT:  Yes.

13   BY MS. SEN:

14   Q.      One last set of text messages, Miss T.  This is the same

15   page from defendant's exhibit UU11 and these are text messages

16   that you exchanged with Mr. Folks.  Here this is after the

17   cereal box incident on January 14th and Mr. Folks writes what

18   are you sending me, and you say my paperwork to you and G, and

19   Mr. Folks says I don't need it send it to G, and you said K.

20   Meaning -- did that mean okay?

21   A.      I believe so.

22   Q.      And then you said -- you sent a text message on the 20th

23   of January that said thank you.  I'm just really scared and

24   feel alone.  I don't know what to do.  I know to keep my mouth

25   shut.  I know you don't like me.  I screwed up with you.  I

                         Chrissy T.                        39

1   won't have service until I come off the hill tomorrow.

2   A.     Yes.

3   Q.     And those are messages that you were sending to Brian

4   Folks, but really he was just telling you to deal with G, isn't

5   that correct?

6   A.     Yes.

7          MS. SEN:  I don't think I have anything further, Your

8   Honor.

9          THE COURT:  Okay.  All right.  Any redirect?

10         MS. SAVNER:  Yes, Your Honor.

11         THE COURT:  Want to eliminate the yellow line there

12   as you pass over to the Government?

13         MS. SEN:  There we go.

14                    REDIRECT EXAMINATION

15   BY MS. SAVNER:

16   Q.     Miss T., tell us again what happened with you taking

17   drugs out of the bag -- bags while Moe was out of town.  You

18   and Hannah doing that?

19   A.     Because Hannah was really sick and I was sick, but she

20   couldn't even move so I was helping her to make sure she got

21   well.

22   Q.     And you were taking some of the drugs for yourself too,

23   right?

24   A.     Correct.

25   Q.     Okay, and when Moe found out what did he say?

                        Chrissy T.                          40

1   A.      He was mad.

2   Q.      Told you, you would have to work it off?

3   A.      Yes.

4   Q.      Defense counsel mentioned some texts that you then sent

5   with Mandy about telling Moe that you were sorry.  Why did you

6   want Moe to know you were sorry?

7   A.      Because I wanted back in.  I wanted to fit in again.

8   Q.      You wanted to be working for him again?

9   A.      I wanted to fit in.

10  Q.      Miss Sen asked you about your customers.  Did you have

11  your own customers?

12  A.      No.

13  Q.      Whose customers were they?

14  A.      Moe's.

15  Q.      Whose drugs were you selling?

16  A.      Moe's.

17  Q.      Defense counsel brought up some statements you made as

18  part of the cover story in the aftermath of the cereal box

19  going missing?

20  A.      Yes.

21  Q.      So you said that your sister had gotten in a car

22  accident, your grandmother was in the hospital.  Were those

23  things true?

24  A.      No.

25  Q.      Why did you say those things?

Chrissy T.                           41

1  A.     Because they wanted me to meet up and I didn't have the

2  cereal box.

3  Q.     Okay, and this cover story that you explained to Moe and

4  to G who were you working on that cover story with?

5  A.     Rob and Chris.

6  Q.     Essex PD and DEA?

7  A.     Yes.

8  Q.     Miss Sen asked you about a reference to the door being

9  kicked in.  You texted Detective May about that.  Did that

10 actually happen?

11 A.     Yes.  It's still broken.

12 Q.     Explain what happened.

13 A.     Late at night someone tried kicking in the door.  They

14 kicked in my door to my dad's house to find the box -- to find

15 the drugs.

16 Q.     And in the text messages that we saw to Detective May

17 you said that you thought it was probably G, right?

18 A.     Yes.

19 Q.     You knew it would only be G, right?

20 A.     Yes.

21 Q.     Why didn't you think it would be Moe?

22 A.     Because he was never anywhere with it, but G dropped me

23 off at my house.

24 Q.     And what was your understanding of when G would get paid

25 for the drugs he brought up, before he gave them to Moe or

                         Chrissy T.                        42

1    after?

2    A.      After.

3    Q.      Defense counsel asked you about times you, in her words,

4    got into jams and asked DEA or Essex to help you.  Do you

5    remember that?

6    A.      Yes.

7    Q.      Did they help you?

8    A.      No.

9    Q.      Did they in fact tell you, you couldn't continue working

10   and doing buys for them?

11   A.      Yes.

12   Q.      Has the U.S. Attorney's Office ever promised you

13   anything in exchange for your testimony?

14   A.      No.

15   Q.      Do you have immunity from what you're saying here?

16   A.      No.  Sorry.  No.

17   Q.      I'm sorry.

18   A.      No.

19   Q.      Can we pull up UU6 please and I think we might need to

20   switch from the Elmo to the Government's computer.  So these

21   are some of the text messages between you and Chris May that

22   defense counsel showed you and I'll pull them up by Bates

23   number in a minute.  Okay.  Can we go to 9528, and this one

24   toward the bottom -- so this is Chris May's phone.  So he's the

25   green and you're the white.  You understand that?

Chrissy T.                                43

1    A.      Yes.

2    Q.      Okay.  So you text Chris May, Essex PD Detective, Moe is

3    here OMG.  Do you remember what that was about?

4    A.      Yes.  It was at the North Avenue house.

5    Q.      This is when you went to go back?

6    A.      Yes.

7    Q.      And what was your reaction again when Moe was there?

8    A.      Shocked.  Like scared.

9    Q.      Okay.  Can we go to the next page, 9529?  All right.  In

10   fact you tell Chris May you're scared.  You say now I'm scared,

11   but I'm okay?

12   A.      Yes.

13   Q.      A lot of people I don't know, but Moe and G, right?

14   A.      Yes.

15   Q.      You're explaining who was there?

16   A.      Yes.

17   Q.      All right.  Can we go to 9532, and you're describing to

18   Chris May the events that took place, and this is the bagging

19   party you went to even though police had told you not to,

20   right?

21   A.      Correct.

22   Q.      But you were still reporting to them what happened?

23   A.      Correct.

24   Q.      Why?

25   A.      Because I wanted them to know what was going on and I

                        Chrissy T.                        44

1    wanted to make sure that I was doing what I could do.

2    Q.      Okay, and you wrote to Chris May me and three girls

3    bagged up a lot both up and down.  What's up and down?

4    A.      Crack and heroin.

5    Q.      I did 25 grams of down myself and the other girl did the

6    same and that's not including what they did last night and the

7    up is over 4,000 bags.  At my house I got home at 3.  That's 3

8    a.m., right?

9    A.      Correct.

10   Q.      North Avenue has two people staying there, one black

11   male and young white girl.  Do you see that?

12   A.      Yes.

13   Q.      All right.  So you're explaining to Chris May how many

14   drugs were bagged up that night?

15   A.      Correct.

16   Q.      Okay, and can we go to 9534, and you report at the

17   bottom of there to Chris May they are going to bring Tower back

18   up to take care of the robbery.  Tell us what you're referring

19   to?

20   A.      The house that Mandy was at had issues so they were

21   bringing him back up to have security and make sure nothing

22   happened again.

23   Q.      And that was -- all of these statements to Chris May

24   about what was happening at the bagging party were those true?

25   A.      Yes.

Chrissy T.                           45

1    Q.     And you said on -- if we pull up 9539, there you say but

2    Moe is still in it, yeah, and I guess he has a case going on

3    because he had a gun in the car.  Do you see that?

4    A.     Yes.

5    Q.     That's something Moe told you and you reported it to

6    Chris May?

7    A.     Correct.

8    Q.     And can we go to 9541?  You wrote and Shay got busted in

9    New York so he's in jail, but Moe and G are going to bail him

10   out and the bail is $50,000 I assume?

11   A.     Yes.

12   Q.     And they want me to sign him out or whatever because I

13   guess they need -- whomever bails him out they need their name.

14   Do you see that?

15   A.     Yes.

16   Q.     And you talked about that with us yesterday, right?

17   A.     Correct.

18   Q.     All right, and you also reported to Chris May the times

19   that you got paid in drugs for your work from the bagging party

20   and for storing the package -- the cereal box from G, right?

21   A.     Correct.

22   Q.     Even though you did some of those drugs?

23   A.     Correct.

24   Q.     You were truthful about that to Detective May?

25   A.     Yes.

Chrissy T.                                    46

1   Q.     Can we switch to the Elmo?  So I want to show you again

2   some of the texts that defense counsel showed you between you

3   and Moe.  Do you see this one here where my finger is?

4   A.     Yes.

5   Q.     Hannah and I are dying.  Can you please bring some out

6   for us?

7   A.     Yes.

8   Q.     What are you referring to?

9   A.     Me and Hannah.

10  Q.     Dying.  What does that mean?

11  A.     Dying means we're sick.

12  Q.     Need drugs?

13  A.     Yes.

14  Q.     And who are you asking for drugs?

15  A.     Moe.

16  Q.     A couple lines down he says to you can we have a

17  threesome LMAO.  Do you see that?

18  A.     Yes.

19  Q.     And you say remember we can't do that?

20  A.     Yes.

21  Q.     Do you see right here where my finger is us girls wanted

22  to text you because Hightower is yelling at us for every sound

23  we make, like every sound and move, and we are purposefully --

24  I assume -- being really quiet so he doesn't hear us?

25  A.     Yes.

Chrissy T.                                    47

1    Q.    Okay.  Why were you reporting to Moe that Hightower was

2    not being nice to you?

3    A.    Because Hightower is with Moe.

4    Q.    Okay, and Moe responds tell Hightower I said to fall

5    back or tomorrow he will be in a hotel solo?

6    A.    Correct.

7    Q.    Was Moe in charge of Hightower?

8    A.    Yes.

9    Q.    At the bottom you say Hannah and I are running to

10   Shaw's.  The money didn't go into his account so she has to do

11   it over again.  So take your time.  We will be right back.

12   What are you talking about there?

13   A.    Hannah had the money on her boyfriend's account.

14   Q.    Okay.  Okay.  I want to point out this one to you.  This

15   is an incoming message from Folks and I assume he means if you

16   ain't past Cumby's yet can you get me another soda.  Do you see

17   that?

18   A.    Yes.

19   Q.    And you respond of course B.  What is B?

20   A.    A nickname.

21   Q.    Term of affection?

22   A.    Yes.

23   Q.    And Folks responds and water?

24   A.    Yes.

25   Q.    So he wants you to stop at the store and get him a soda

```
                    Chrissy T.                        48
 1   and water?
 2   A.      Grenadine and Sprite.
 3   Q.      And you say okay?
 4   A.      Yes.
 5   Q.      And then a couple lines down you say hey so can I take
 6   one too?
 7   A.      Yes.
 8   Q.      And he says go ahead.  This is the last time though.
 9   You're making money to buy your own.  What are you asking to
10   get that he says this is the last time?
11   A.      A bag of heroin.
12   Q.      All right.  If we look on this page, do you see this
13   one?
14   A.      Yes.
15   Q.      Tomorrow -- this is sent by you.  Tomorrow my goals are
16   getting the shit bagged and ready to go, making sure you are
17   taken care of, and making sure I'm not sick tomorrow.  So
18   you're telling him your goal is to bag up his drugs tomorrow?
19   A.      Correct.
20   Q.      And he writes back K?
21   A.      Yes.
22   Q.      At the bottom you say hey if you get a chance can you
23   bring the money over so I can get Hannah and I something to eat
24   please.  We haven't eaten all day since yesterday with the
25   bagels.  So you rely on him for money to buy food?
```

                         Chrissy T.                          49
1    A.      Correct.
2    Q.      And the last one on that page thank you, B, for telling
3    me that about the price and the money I should have gotten and
4    thank you for always looking out for me and everything you do
5    for everyone.  Do you see that?
6    A.      Yes.
7    Q.      Tell us what's going on there?
8    A.      For making sure we're not sick.
9    Q.      He tells you the price you should charge for the drugs?
10   A.      Correct.
11   Q.      And you say he's being nice and looking out for
12   everyone?
13   A.      To make sure the girls weren't sick.
14   Q.      On the next page I would point your attention here you
15   write thank you.  Tower needs to stop eating our food.  Hannah
16   and I don't like asking for stuff, and he responds then if you
17   can tell him and stop telling me.  Sit quiet when they around
18   and complain when they leave.  Fuck is you scared of.  Do you
19   see that?  How did he respond when you asked him to help make
20   sure you and Hannah had enough food?
21   A.      To take care of myself.
22   Q.      At the bottom here you say hey B do you think I can get
23   like five tickets to get well.  If not, it's okay.  Just
24   asking.  Not to try to make you mad.  Why would that make him
25   mad?

Chrissy T.                              50

1  A.     By taking the drug without asking.

2  Q.     At the bottom of there you say why is Tower my boss.  Do

3  you see that?

4  A.     Yes.

5  Q.     And he laughs, LOL, and you write dude is my boss or

6  not, and he responds no?

7  A.     Correct.

8  Q.     Who did you understand your boss to be?

9  A.     Moe.

10  Q.     At the bottom here it says hey B can you grab me another

11  one please.  I've got people calling.  He says yeah.  What are

12  you asking for?

13  A.     Another sleeve.

14  Q.     Where does he get it from?

15  A.     North Avenue.

16  Q.     And at the bottom you say 60 B's this round and Hannah

17  has 60 B's.  What does that mean?

18  A.     B's.

19  Q.     Buns of heroin?

20  A.     Correct.

21  Q.     What are you reporting to him?

22  A.     What we have on us.

23         THE COURT:  I think that actually says 80 B's.

24         MS. SAVNER:  I'm sorry.

25  BY MS. SAVNER:

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                    Chrissy T.                        51

1   Q.     You ask at the top here how long should I tell people
2   until I'm good and he says shortly.  What is that about?
3   A.     Because people wanted -- were calling us to see how much
4   longer we were out of drugs for.
5   Q.     You were out of drugs then?
6   A.     Correct.
7   Q.     He says shortly.  What do you understand that to mean?
8   A.     To be coming over soon.
9   Q.     With more drugs?
10  A.     Correct.
11  Q.     Here you say so Hannah wants me to go with her, but I'm
12  the one with the stuff.  If you don't want me to, I'll stay
13  here and I'm not wanted LOL, and you continue on she wanted me
14  to go with her and he responds back one of y'all need to be
15  there.  Do you see that?
16  A.     Yes.
17  Q.     You were asking him for permission to leave?
18  A.     Correct.
19  Q.     Leave where?
20  A.     To go with Hannah to probation.
21  Q.     To leave Lori's house?
22  A.     Correct.
23  Q.     And what did he respond?
24  A.     I had to stay because one of us had to be at the house.
25  Q.     This text message here he's saying -- these are incoming

                        Chrissy T.                      52
1    messages to you 300 U, 610 D, 500 H, 595 D.  What does that
2    mean?
3    A.      All the money and stuff I had on me.
4    Q.      These are incoming messages from him?
5    A.      Yes.
6    Q.      Do you know what U and D stand for?
7    A.      Up and down.
8    Q.      So he's talking about how much drugs one of you has?
9    A.      Correct.
10   Q.      At the top of here more talk.  So you're sending him the
11   message 20, right, and he says 125 up, 780 D, 345 D and 500 up.
12   Is that more talk between you and him about up and down
13   quantities of heroin and crack?
14   A.      Correct.
15   Q.      And here where it says -- here where it says hey can I
16   please take four tickets you can take it out of my paycheck I'm
17   dying, what are you asking for?
18   A.      More drugs.
19   Q.      And he says yes, but tell me where they came from,
20   right?
21   A.      Yes.
22   Q.      And he asks -- you ask him hey am I supposed to give
23   Lori five tickets this morning.  What's his response?
24   A.      No.
25   Q.      All right, and then at the bottom here -- this is again

Chrissy T.                                  53

1    in November 14th of 2015 -- are you on your way home or still

2    in New York.  Do you see that?

3    A.      Correct.

4    Q.      So this is when he was in New York?

5    A.      Correct.

6    Q.      And this is the time that you and Hannah had been

7    skimming from the bags?

8    A.      Correct.

9    Q.      Did he like when you called him B?

10   A.      No.

11   Q.      What did he tell you about that?

12   A.      Stop calling him that.

13   Q.      Here he texts you many or you text -- he texts you here

14   stop texting me Chrissy.  Do you see that right here?

15   A.      Yes.

16   Q.      And he writes to you and stop acting like you my bitch?

17   A.      Yes.

18   Q.      What did he mean by that?

19   A.      I'm not his girlfriend.  I'm nothing.

20   Q.      Stop calling him B?

21   A.      Correct.

22   Q.      And the last page the text messages that defense counsel

23   pointed out to you where you're talking about your paperwork,

24   are these before or after the phone call that we heard between

25   you, Moe, and G?

                        Chrissy T.                          54

1   A.      After.

2   Q.      After he says we'll help you out.  We'll get you a

3   lawyer?

4   A.      Yes.

5   Q.      And then he says in these text messages don't put it on

6   me.  It's the deals with G?

7   A.      Correct.

8   Q.      Did Moe like to talk on his phone about drug stuff?

9   A.      No.

10  Q.      Did he ever talk to you about that?

11  A.      Yes.

12  Q.      What did he say?

13  A.      We had to talk in code.  We had code names for stuff and

14  really short sentences and keep it short.

15  Q.      Those are rules he gave you?

16  A.      Yes.

17          MS. SAVNER:  Nothing further.

18          THE COURT:  Okay.  Any recross?

19          MS. SEN:  I do have some -- a few questions, Your

20  Honor.

21          THE COURT:  Okay.

22                      RECROSS EXAMINATION

23  BY MS. SEN:

24  Q.      Miss T., Ms. Savner just went through this exhibit UU11

25  with you and you identified messages that you had sent Mr.

                         Chrissy T.                        55

1   Folks in here?

2   A.     Yes.

3   Q.     So I'm going to hand you this document once again and

4   I'm going to ask you to take a look at these messages because

5   this is actually a larger extraction of your phone and I would

6   like to see if you recognize the same message that you just

7   talked about with Ms. Savner and if that would make you realize

8   that that's your phone?

9   A.     Yes.

10  Q.     So it's fair to say these are text messages from your

11  phone?

12  A.     Yes.

13         MS. SEN:  Your Honor, I would like to introduce

14  defendant's UU12 please.

15         THE COURT:  Okay.  Your reaction to UU12.

16         MS. SAVNER:  A couple.  First this is a multi,

17  perhaps hundred page, document that appears to be an entire

18  dump of this witness's phone to include not only text messages

19  with the defendant and others involved in the conspiracy, but

20  also, as Ms. Sen mentioned, text messages with her mom and

21  potentially others that are not seemingly relevant to any of

22  this.  Also this is outside the scope of the cross given that

23  it is a new exhibit that she's seeking to introduce that she

24  wasn't able to the first time.

25         THE COURT:  Well actually she's -- she has already

Chrissy T.                          56

1    identified one particular message which was included in your

2    cross, but what about that -- the response that this includes

3    text messages with people not related to this particular case

4    and are beyond really the scope of relevance?

5              MS. SEN:  Well, Your Honor, I thought I would

6    introduce the entirety of the exhibit for completeness, but I'm

7    only introducing certain pieces of it that are relevant

8    completely to only the people involved in this case.

9              THE COURT:  Okay.  So well then you would excise from

10   the exhibit all of those references which are not relevant to

11   this particular case?

12             MS. SEN:  Yes, Your Honor.

13             THE COURT:  Okay.  Does that respond to your

14   objection --

15             MS. SAVNER:  Well I would --

16             THE COURT:  -- partly?

17             MS. SAVNER:  I would believe there's still hearsay

18   statements to the extent they are out-of-court statements being

19   offered for their truth and I would ask that any portion of

20   this exhibit that is admitted just be those pages.

21             THE COURT:  Okay.  Well, first, I think you should

22   just question her on those particular references and the whole

23   exhibit would not be introduced.  Second, in regard to the

24   hearsay objection that you're making to all of these, this is

25   being offered in a broader perspective to impeach credibility,

                              Chrissy T.                        57

1    and whether in fact it's a statement being offered for the

2    truth of the matter it is being introduced and accepted by the

3    Court because it really relates to that broader concept of

4    impeachment of her testimony.  So as a result I'm going to

5    permit the introduction of the statements that you referred to

6    in the examination here and the others should be stricken, but

7    it's now 10:30.  How much time do you think you have for

8    redirect?

9              MS. SEN:  I have a few minutes, Your Honor.  I don't

10   think it will take more than 10 minutes.

11             THE COURT:  All right.  Well let's take our recess at

12   this point and be back in 15 minutes.

13   [Recess 10:30 a.m. - 10:50 a.m.]

14             THE COURT:  Okay.  Ms. Sen.

15   BY MS. SEN:

16   Q.    Miss T, I'm going to show you a few of your text

17   messages again.  These are with Mandy.  So this is November

18   25th and to Mandy and you say have G call me please.  She

19   writes back okay.  I told him.  He said thank you.  She writes

20   back YW.  You say I'm living in town and then she says please

21   tell -- you say please tell him I'm still telling people to go

22   see them and not going to other people because I do love them

23   still.  Didn't you mean by that, that even though you weren't

24   working with them directly you were still directing people to

25   go get their whatever they needed from G and from Moe?

Chrissy T.                              58

1    A.      And Hannah, correct.

2    Q.      And Hannah, and you continued to tell Mandy -- Mandy

3    said to you I will tell him when him and Moe are done talking,

4    and you say yeah I messed up but I'm still loyal to them, and

5    you said I always answered the door, and Mandy says yeah I pay

6    you are loyal to them, and you say to Mandy yeah I messed up

7    but I'm not going to do it again and it was to help Hannah out

8    too, but I'm not going to say that to them.  She tapped the

9    bags more than I did, and Mandy says oh I didn't even know what

10   happened, and this is continuation your conversation with Mandy

11   on the same day November 25th of 2015.  You said and the ones I

12   just got were really small and I know they didn't come like

13   that, but I'm not going to tell on her, and then you say again

14   -- you send another message to Mandy talk to Moe for me LOL.

15   Tell him I'm sorry and I know not to fuck up again.  So you

16   were trying to get back in and work with Moe again?

17   A.      Correct.

18   Q.      These events took place back in 2015/2016?

19   A.      Yes.

20   Q.      It's now 2019.  It's been four or five years?

21   A.      Correct.

22   Q.      You have not been charged with any crimes related to

23   this case, have you?

24   A.      No.

25   Q.      Fair to say you're probably not going to be charged with

                        Chrissy T.                        59
1    anything?

2    A.      I have no idea.

3    Q.      Didn't you say, Miss T., that you don't have a problem

4    lying if it would benefit you?

5    A.      No.

6            MS. SEN:  Your Honor, may I have just a moment?

7            THE COURT:  Yes.

8            MS. SEN:  Nothing further, Your Honor.

9            THE COURT:  Okay.  Thank you, Miss T.  All right.

10   Government want to call the next witness.

11           MS. SAVNER:  Yes, Your Honor.  The Government calls

12   DEA TFO Ben Adams.

13           COURTROOM DEPUTY:  Please come forward, sir, to be

14   sworn.

15   BENJAMIN ADAMS,

16       Having been duly sworn, testified as follows:

17           THE COURT:  Good morning, Agent Adams.

18           THE WITNESS:  Good morning.

19           THE COURT:  I don't think there's any destruction.

20           THE WITNESS:  I don't know what happened there, Your

21   Honor.

22                    DIRECT EXAMINATION

23   BY MS. SAVNER:

24   Q.    Good morning, Agent Adams.  Can you please tell us your

25   full name?

              Capitol Court Reporters, Inc. (800/802) 863-6067

Benjamin Adams                              60

1    A.      Yes.  Benjamin Adams.

2    Q.      Where do you work?

3    A.      I work as a full time law enforcement officer for the

4    City of Winooski.  I've been there since 2006 and I'm assigned

5    to the DEA as a task force officer and I've been in that

6    position since 2015.

7    Q.      What are your roles as the task force officer with DEA?

8    A.      To investigate primarily federal drug crime.

9    Q.      Are you also involved in the processing, handling of

10   evidence?

11   A.      Yes, ma'am.

12   Q.      Have you received training during your time at Winooski

13   or your time at DEA about how to process and handle evidence?

14   A.      Yes.  Both places.  With DEA there's a lot of on-the-job

15   training, but I also attended the New England Field Division

16   Task Force Officer Orientation School which is approximately

17   five days and during that five days they cover evidence

18   handling and process.

19   Q.      Did you assist with the processing of DEA investigation

20   of Brian Folks?

21   A.      Yes, ma'am.

22   Q.      All right.  I want to talk about one such instance.  On

23   January 12th of 2016 were you involved in processing or

24   securing evidence related to a controlled purchase?

25   A.      Yes, ma'am.

                    Benjamin Adams                    61

1    Q.     Okay.  Explain what your involvement was.

2    A.     I received the purchased narcotics in the field.  Myself

3    and John Magaro, who was also a task force agent, returned to

4    the office, placed the drugs into a DEA evidence bag, weighed

5    the bag, and secured it at the office for further processing.

6    Q.     Can you describe what it is that you received?

7    A.     Approximately 50 bags of heroin in five separate

8    bundles.

9    Q.     Who did you receive them from?

10   A.     Agent Chetwynd and TFO Estes.

11          MS. SAVNER:  May I approach?

12          THE COURT:  Yes.

13   BY MS. SAVNER:

14   Q.     Handing you what's been marked as Government's exhibit

15   10.  Do you recognize that?

16   A.     Yes I do.

17   Q.     What is it?

18   A.     It's a DEA evidence bag containing approximately five

19   bundles of heroin.

20   Q.     Is it related to what you were just talking about?

21   A.     Yes, ma'am.

22   Q.     How do you know?

23   A.     Because I put it in the bag.

24   Q.     Do you see your name and picture there?

25   A.     Yes.

                    Benjamin Adams                        62

1    Q.    Is it a fair and accurate depiction of the way the

2    bundles of heroin looked when you received them from Agent

3    Chetwynd and Estes?

4    A.    Yes, ma'am, it is.

5            MS. SAVNER:  The Government moves to admit exhibit

6    10.

7            THE COURT:  Any objection?

8            MR. KAPLAN:  Your Honor, may I look at the exhibit

9    please?

10           THE COURT:  Yes.

11           MR. KAPLAN:  So this is being introduced the way it

12   looked at the time the officer took it into evidence?

13           THE COURT:  Yes.

14           MR. KAPLAN:  All right.  No objection.

15           THE COURT:  So admitted.

16   [Government exhibit 10 admitted]

17           MS. SAVNER:  Permission to publish?

18           THE COURT:  Yes.

19   BY MS. SAVNER:

20   Q.    All right.  Can we zoom in on the baggie inside the bag?

21   Okay.  What are we seeing here?

22   A.    That's a separate -- separate bag provided by DEA to

23   hold the bundles.

24   Q.    Okay, and the white things in there those are the

25   bundles of heroin?

Benjamin Adams                          63

1   A.      Yes, ma'am.

2   Q.      Handing you what's been marked as Government's exhibit

3   11.  Do you recognize that?

4   A.      Yes, ma'am, I do.

5   Q.      What is it?

6   A.      It is the evidence bag.

7   Q.      Containing what?

8   A.      It's containing the individual glassine baggies as well

9   as the heroin, suspected heroin was extracted out of them, and

10  stored in a separate bag.  This is how the lab processes them.

11  Q.      How do you know those are the suspected narcotics

12  received that we also see on the screen?

13  A.      The bag is sealed with my name and the information from

14  the lab is also contained on the bag.

15  Q.      Okay.  Do you see a S number on that bag?

16  A.      Yes I do.

17  Q.      Does it match the S number on the screen from when you

18  processed them?

19  A.      Yes it does.

20          MS. SAVNER:  Government moves to admit exhibit 11.

21          THE COURT:  Any objection?

22          MR. KAPLAN:  No, Your Honor.

23          THE COURT:  So admitted.

24  [Government exhibit 11 admitted]

25  BY MS. SAVNER:

                         Benjamin Adams                        64

1    Q.     Is the top seal on that bag still intact?

2    A.     Yes, ma'am, it is.

3    Q.     You said it was consistent with how it looks when it

4    comes back from the lab?

5    A.     Yes, ma'am.

6    Q.     All right.  I want to talk to you about the next day.

7    On January 13, 2016 were you involved in processing evidence

8    obtained from a seizure of suspected narcotics?

9    A.     Yes, ma'am, I was.

10   Q.     Explain what it is you received.

11   A.     Task Force Officers Merchand and Estes brought in a

12   Froot Loop box that contained three packages of suspected

13   narcotics.  Those packages were individually wrapped in tin

14   foil.  They were contained within a cloth bag that's typically

15   used to hold bedding like sheets and stuff you buy from the

16   store, and then it was then put in the Froot Loop box.

17   Q.     Okay.  Can we pull up exhibit 26 please?  All right.

18   You see this?

19   A.     Yes, ma'am.

20   Q.     Is this what you were just talking about?

21   A.     Yes it is.  That's the Froot Loop box with a Wal-Mart

22   bag or some type of shopping bag with that.

23   Q.     This is looking inside the box.  Can we go to the next

24   one.  What's that pink thing?

25   A.     That's the sheet -- the sheet bag that I was trying to

Benjamin Adams                            65

1  describe.

2  Q.     Go to the next one and the next one.  What do we got

3  there?

4  A.     Those are the three packages of narcotics that were in

5  tin foil.

6  Q.     And the next one what are we looking at here?

7  A.     One of the packages of what at the time I believe was

8  crack cocaine.

9  Q.     Can you go to the next one?  Same thing?

10 A.     Yes, ma'am.

11 Q.     Suspected narcotics?

12 A.     Yes, ma'am.

13 Q.     And the next one.  Same thing?

14 A.     Yes, ma'am.

15 Q.     Next one.  All right.  So this is them out of the tin

16 foil?

17 A.     Yes, ma'am, it is.

18 Q.     All right, and two different bags are grouped together

19 there.  What did you think those were?

20 A.     Crack cocaine.

21 Q.     Can we go to the next page, and the next one, and the

22 last one -- well maybe there's one more.  All right.  What does

23 that appear to you to be?

24 A.     Heroin.

25 Q.     All of these photos of these suspected narcotics came

                        Benjamin Adams                          66

1    out of that cereal box?

2    A.      Yes, ma'am.

3    Q.      Okay.   What did you do once photographs -- these

4    photographs were taken?

5    A.      They were weighed then placed in individual evidence

6    bags and stored in our evidence vault until they were

7    processed.

8    Q.      How many evidence bags were these -- everything that

9    came out of the cereal box put into?

10   A.      I believe three, but I'm not sure.

11   Q.      Okay.

12   A.      I don't recall.

13   Q.      What did you think the cereal box contained?

14   A.      Two packages of crack cocaine and one package of heroin.

15   Q.      Would it be your normal process or habit to package what

16   you thought to be of the same type of drug together?

17   A.      Yes.

18   Q.      I'm handing you what's been marked as Government's 28

19   and 29.   Take a look at those and tell me if you recognize

20   them?

21   A.      Yes, ma'am, I do.

22   Q.      Both of them?

23   A.      Yes, ma'am.

24   Q.      What are they?

25   A.      They are the packages that were taken out of the cereal

                    Benjamin Adams                        67

1   box.

2   Q.     How do you know?

3   A.     Because I signed it as witnessing having the bags been

4   sealed.

5   Q.     Okay.  Is your name at the top on the seal?

6   A.     Yes, ma'am, it is.

7   Q.     On both?

8   A.     Yes, ma'am.

9   Q.     And are the top seals intact?

10  A.     Yes, ma'am, they are.

11         MS. SAVNER:  The Government moves to admit exhibits

12  28 and 29.

13         THE COURT:  Any objection to 28 and 29?

14         MR. KAPLAN:  One question.

15                      VOIR DIRE

16  BY MR. KAPLAN:

17  Q.     Have those packages been opened since you sealed them?

18  A.     Yes, sir, they have been opened.

19  Q.     How do you know that?

20  A.     Because on the bottom they are open, but then they are

21  resealed and another seal is placed on there to show they have

22  been opened, but they have been resealed.

23  Q.     So they are not -- and the seal that you put on it was

24  broken by the lab?

25  A.     No, sir.  The seal that I put on it is still intact.

                         Benjamin Adams                    68

1    They cut the bottom open and then reseal the bottom.

2              MR. KAPLAN:  All right.  No objection, Your Honor.

3              THE COURT:  All right.  So admitted.

4    [Government exhibits 28 and 29 admitted]

5    BY MS. SAVNER:

6    Q.    All right, and I want to talk to you about one last

7    piece of your involvement in this investigation.  Did you have

8    any involvement in retrieving evidence from a local PD?

9    A.    Yes, ma'am, I did.

10   Q.    When was that?

11   A.    January 25, 2016.

12   Q.    Explain what you did.

13   A.    On January 20th there was a seizure of narcotics.  I

14   went to the Winooski Police Department with Task Force Officer

15   Matt Hannon and I retrieved them from Winooski and then brought

16   them to DEA where they were stored until they were processed

17   and mailed out.

18   Q.    Who did you transfer custody to at DEA?

19   A.    Special Agent Chetwynd.

20   Q.    Did you examine what was inside?

21   A.    Not closely.

22             MS. SAVNER:  Nothing further.

23             THE COURT:  Okay.  Any questions?

24             MR. KAPLAN:  No, Your Honor.  Thank you.

25             THE COURT:  All right.  Thank you, Agent.  Thank you,

                    Adam Chetwynd                           69

1    Your Honor.  Okay.  Government want to call the next witness.

2              MS. SAVNER:  Yes, Your Honor.  The Government recalls

3    Special Agent Chetwynd.

4    ADAM CHETWYND,

5        Having been duly sworn, testified as follows:

6              THE COURT:  Good morning, Agent.

7              THE WITNESS:  Good morning, Your Honor.

8              THE COURT:  How is your cold?

9              THE WITNESS:  Cold is better and now I have an

10   injury.

11             THE COURT:  Now you have an injury?

12             THE WITNESS:  Yeah.

13                          DIRECT EXAMINATION

14   BY MS. SAVNER:

15   Q.    What happened?

16   A.    I sprained my ankle playing baseball so --

17             THE COURT:  Oh playing baseball.

18             THE WITNESS:  I'm a glutton.

19   BY MS. SAVNER:

20   Q.    Well thanks for coming in despite the sickness and the

21   injuries.  Agent Chetwynd, at some point were you involved in

22   processing suspected narcotics seized as part of the drug stop

23   by Winooski PD?

24   A.    I was.

25   Q.    Explain what your involvement was.

              **Capitol Court Reporters, Inc. (800/802) 863-6067**

Adam Chetwynd                                70

1   A.      I believe I requested TFO Ben Adams to go and retrieve

2   the drugs that were seized during the January 20, 2016 car stop

3   done by Officer Kyle Brouillette and those drugs were being

4   stored at the Winooski Police Department?

5   Q.      Did you ultimately get those drugs via Ben Adams?

6   A.      I did later on January 25, 2016 I received those drugs

7   from TFO Ben Adams and TFO Matt Hannon.

8   Q.      Did you take a look at them?

9   A.      I did.

10  Q.      Describe what you got?

11  A.      Basically I observed blue sandwich bag -- small ziploc

12  baggies containing what appeared to be crack cocaine, other

13  ziploc baggies that had like green aliens and apples on them,

14  there was different symbols on them, and then the majority of

15  it was -- the majority of the heroin was contained in bundles

16  of waxed glassine bags wrapped with elastic bags.

17  Q.      Can you pull up exhibit 30?  Go to the next page and the

18  next page.  What we're seeing on the screen here is this

19  consistent with what you received?

20  A.      Yes.

21  Q.      I'm handing you what's been marked as Government's 31.

22  Take a look at that.  Do you recognize that?

23  A.      I do.

24  Q.      What is it?

25  A.      It's a photograph that I took of -- during my processing

Adam Chetwynd                              71

1    of those drugs which TFO Adams and TFO Hannon brought to me.

2    Q.     Okay and does it fairly and accurately depict the drugs

3    as you received them?

4    A.     Yes it does.

5              MS. SAVNER:  The Government moves to admit 31.

6              THE COURT:  Any objection to 31?

7              MR. KAPLAN:  No, Your Honor.

8              THE COURT:  I'm sorry.

9              MR. KAPLAN:  No, Your Honor.

10             THE COURT:  Okay.  So admitted.

11   [Government exhibit 31 admitted]

12             MS. SAVNER:  Permission to publish?

13             THE COURT:  Yes.

14   BY MS. SAVNER:

15   Q.     Can we zoom in?  All right.  Describe what we're looking

16   at here and feel free to mark on the screen.

17   A.     As I described I observed right here is the small blue

18   ziploc baggies containing a white chunky substance which I

19   believe to be crack cocaine, and right here are those other

20   ziploc bags that I explained which appear to be green aliens

21   and red hearts on them containing a brown powdery substance,

22   and then the remaining bundles are also wax glassine bags which

23   are also containing a brown powdery substance believed to be

24   heroin.

25   Q.     And those are bundles of approximately 10 individual

Adam Chetwynd                          72

1  tickets or bags?

2  A.      Yes.

3  Q.      Can we go to the next page?  What do we see here?

4  A.      That -- excuse me.  That's another photograph I took of

5  the smaller blue ziploc bags just opened up and displayed out

6  so you can have a count.

7  Q.      And what's the suspected drug contained in these?

8  A.      Crack cocaine.

9  Q.      What did you do with the drugs after you laid them out

10  and photographed them?

11  A.      They were sealed in a self sealing evidence envelope and

12  secured in the drug vault -- DEA's drug vault.

13  Q.      I'm handing you what's been marked as exhibits 32 and

14  33.  Take a look at those and let me know if you recognize

15  them?

16  A.      I do recognize them.

17  Q.      What do you recognize them to be?

18  A.      The evidence bags that I placed the aforementioned

19  exhibits into.

20  Q.      How do you know?

21  A.      Because they contain -- it's my handwriting on the

22  labels themselves and they contain my signature and date that I

23  sealed it at the top.

24  Q.      And are the top seals on those two evidence bags still

25  intact?

Adam Chetwynd                              73

1   A.      They are.

2   Q.      Okay, and how does the condition of the contents compare

3   to when you processed it and photographed it?

4   A.      They are not in the original condition.

5   Q.      Explain how they are different.

6   A.      It appears to me that everything had been removed from

7   the bags, all the individual bags have been removed, and the

8   contents of those bags appear to be in separate bags within

9   here.

10  Q.      Same with the other one?

11  A.      Yes.

12          MS. SAVNER:  Government moves to admit exhibit 32 and

13  33.

14          THE COURT:  Any objection to 32 and 33?

15                      VOIR DIRE

16  BY MR. KAPLAN:

17  Q.      Are those in the same condition that they were before

18  other than having them taken out of the bags?

19  A.      I'm sorry.  Are they in the same condition?

20  BY MS. SAVNER:

21  Q.      Other than being taken out of the bags?

22  A.      Yes.  I mean they are not wrapped as they were in the

23  photograph.  No.

24  BY MR. KAPLAN:

25  Q.      How do you know that it's exactly the same?

                          Adam Chetwynd                        74

1    A.     Well I guess I don't, but all the items in here appear

2    to be the same items that were seen on the screen.

3    Q.     So you checked that?

4    A.     Would I what?

5    Q.     You checked that?

6    A.     No I have not checked it.  They were sealed and sent to

7    the lab.

8    Q.     You don't know, as you hold it in your hand today,

9    whether or not it's exactly the same as it was when it was

10   taken into custody or possession?

11   A.     No I couldn't say that it's the same inside there after

12   it's been opened.

13           MR. KAPLAN:  I'm going to object to its admission.

14           THE COURT:  All right.  So the package gets sent to

15   the lab.  Do you have evidence to suggest that the lab did what

16   the lab did and then --

17           MS. SAVNER:  Yes, Your Honor, that will be our next

18   witness.

19           THE COURT:  Okay.  All right.  Objection overruled.

20   It's introduced tentatively because the connection with the lab

21   needs to be established and that can be established in the next

22   witness.

23           MR. KAPLAN:  May I approach for a moment?

24           THE COURT:  Yes.  Okay.

25

Adam Chetwynd                          75

1   [Bench conference]

2            MR. KAPLAN:  Maybe I didn't need to do this.  So is

3   he saying that the lab that took everything out of the bags?

4            THE COURT:  Yes.

5            MR. KAPLAN:  Okay.

6            THE COURT:  That's the practice.  They send them to

7   the lab, the lab opens up the bottom, takes it out, tests it,

8   puts it into larger bags, not the small little glassine bags.

9            MR. KAPLAN:  I think on the first one I don't think

10  it doesn't sound like the lab did that.

11           THE COURT:  No.  I think in each one of the cases the

12  lab has done the same thing.

13           MR. KAPLAN:  Okay.  Thank you.

14           THE COURT:  Is that --

15           MS. SAVNER:  That is correct.

16  [End of bench conference]

17

18

19

20

21

22

23

24

25

Adam Chetwynd                              76

1    BY MS. SAVNER:

2    Q.    Agent Chetwynd, do you know who sent those exhibits 32

3    and 33 to the lab?

4    A.    Yes I do.

5    Q.    Who did?

6    A.    Myself as witnessed by Brandon Hope -- Special Agent

7    Brandon Hope.

8    Q.    All right.  I want to talk to you about another date in

9    this case.  Were you involved in a law enforcement activity

10   with respect to Brian Folks on July 19th of 2016?

11   A.    I was.

12   Q.    Explain what the moment was.

13   A.    I was part of an arrest team made up of members from the

14   DEA office that was responsible for arresting Brian Folks.

15   Q.    What was the basis for the arrest?

16   A.    We had indicted Mr. Folks.

17   Q.    Where was he arrested?

18   A.    He was arrested while walking on Ethan Allen Parkway in

19   Burlington, Vermont.

20   Q.    Is that near the home of somebody familiar to this case?

21   A.    Yes.

22   Q.    Who?

23   A.    Danielle Degenhardt.

24   Q.    And who is that in relation to Mr. Folks?

25   A.    I believe it's his baby -- baby's mother.

Adam Chetwynd                          77

1   Q.      You were involved in this arrest personally?

2   A.      Yes I was.

3   Q.      What did you observe?

4   A.      We were -- there was five of us involved in the arrest.

5   We were stationed in a van that was partially concealed behind

6   a fence.  I was in the front passenger seat and we had

7   surveillance out that morning and we had observed Mr. Folks

8   returning in the direction of 96 Ethan Allen Parkway on foot.

9   He was on a cell phone.  As he approached us we were -- we

10   waited until he got off the phone and because I was the closest

11   to his line of sight coming out the passenger door the other

12   members exited the rear of the van along with my driver and

13   they approached Mr. Folks.

14   Q.      What happened then?

15   A.      They placed him under arrest without incident.

16   Q.      What happened with respect to any personal property that

17   was on him at the time?

18   A.      It was all removed from his person.

19   Q.      Okay, and did you see what that personal property was?

20   A.      Yes.

21   Q.      What was it?

22   A.      In addition to the phone that he had in his hand there

23   was another cell phone retrieved from his person.  He also had

24   a wallet, set of keys, he had some miscellaneous jewelry on

25   him, and he did have some U.S. currency, I believe a pack of

                        Adam Chetwynd                      78
 1  cigarettes, and a few other little personal items.
 2  Q.     What became of those items?
 3  A.     They were brought back to the DEA office.
 4  Q.     At some point did you take a look at those phones back
 5  at the office?
 6  A.     Yes I did.
 7  Q.     What did you do when you looked at them?
 8  A.     I notated the make and model of them and I looked on the
 9  backs of the phone for -- annotated their unique identifier
10  which -- their IMEI number.
11  Q.     Okay, and where did you notate those things?
12  A.     At my desk.
13  Q.     Where?  What type of document?
14  A.     Oh I'm sorry.  They were notated in my report of
15  investigation, our DEA 6.
16  Q.     So in that DEA 6 you wrote down the make and model of
17  the phone and this IMEI number?
18  A.     Yes.
19  Q.     Where did you get the information?
20  A.     From the phones themselves.
21  Q.     You were looking at the phones themselves when you
22  recorded the information?
23  A.     Yes.
24  Q.     Okay.  Did you verify that you reported the IMEI numbers
25  accurately?

            Capitol Court Reporters, Inc. (800/802) 863-6067

```
                    Adam Chetwynd                    79
```

1  A.     Yes.

2  Q.     Do you remember those IMEI numbers now?

3  A.     No I do not.

4          MS. SAVNER:  The Government would move to permit

5  Special Agent Chetwynd to read the IMEI numbers from his report

6  as a past recorded recollection.

7          THE COURT:  Okay.  Any objection?

8          MR. KAPLAN:  No objection.

9          THE COURT:  All right.  So authorized.

10          MS. SAVNER:  Okay.  Well first may I approach?

11          THE COURT:  Yes.

12  BY MS. SAVNER:

13  Q.     Handing you a bag what's been marked as Government's 77

14  and 78, can you take those out?  Also handing you your -- well

15  do you recognize that document that I just handed you

16  Government's 112?

17  A.     Yes I do.

18  Q.     What is it?

19  A.     It's my report of investigation for the arrest of Brian

20  Folks.

21  Q.     Okay.  Is that where you documented the IMEI numbers of

22  those two phones that you just described?

23  A.     Yes.

24  Q.     Okay.  The first phone -- well what kind of phone was

25  it?

Adam Chetwynd                                    80

1    A.     Silver Samsung Galaxy S6.

2    Q.     Can you please read for us the IMEI that you recorded in

3    your DEA 6?

4    A.     Yes.  359652062439497.

5    Q.     Okay and if you take a look at Government 77 --

6    A.     Yes.

7    Q.     -- can you read the IMEI number from there?

8    A.     Yes.  359 -- excuse me -- 65202626 -- I'm sorry, Your

9    Honor.  I'm having a problem reading.

10   Q.     How is your eyesight compared to how it was in 2016?

11   A.     It's worse.

12   Q.     Okay.  Permission --

13          THE COURT:  Just thinking that people who need

14   reading glasses should not be playing baseball.

15          MS. SAVNER:  Permission to put the phone under the

16   Elmo and try to blow it up for him?

17          THE COURT:  That's fine.

18   BY MS. SAVNER:

19   Q.     Okay.  Can you see the IMEI number on the screen?

20   A.     Yes.

21   Q.     Can you read that?

22   A.     Yes.

23   Q.     Read the IMEI number from Government 77.

24   A.     359652062439497.

25   Q.     How does that compare to the IMEI on the 6?

                       Adam Chetwynd                        81

1   A.      It matches.

2             MS. SAVNER:  Government moves to admit 77.

3             THE COURT:  Any objection?

4             MR. KAPLAN:  No objection, Your Honor.

5             THE COURT:  So admitted.

6   [Government exhibit 77 admitted]

7   BY MS. SAVNER:

8   Q.      How about the second phone, can you read for us from

9   your 6 as a past recorded recollection the IMEI number that you

10  recorded from the second phone?

11  A.      Would you like me to describe it first?

12  Q.      Sure.

13  A.      It's a black Microsoft smart phone model RM1073 and the

14  IMEI is 357816060778576.

15  Q.      Okay.  Can you take a look at 78?  If you can't read

16  that one, let us know and we can put it back under the Elmo.

17  A.      Yeah.

18  Q.      Okay.  Describe what state the phone is in now?

19  A.      It's been taken apart.

20  Q.      Did you take it apart?

21  A.      No I did not.

22  Q.      I'll just take that piece.  All right.  Can you read

23  that IMEI number?

24  A.      Yes I can.

25  Q.      Go ahead.

Adam Chetwynd                                         82

1  A.      357816060778576.

2  Q.      How does that compare to the number you wrote down in

3  your report?

4  A.      It matches.

5  Q.      What happened to these two phones after you reported the

6  pertinent information about them?

7  A.      I turned them over to TFO Rob Estes.

8  Q.      Okay.  At some point were they examined?

9  A.      Yes they were.

10 Q.      All right.  Did you see them again?

11 A.      I did.

12 Q.      When was that?

13 A.      In around August when I retrieved them from the forensic

14 examiner.

15 Q.      Who is that?

16 A.      Frank Thornton.

17         MS. SAVNER:  The Government moves to admit exhibit

18 78.

19         THE COURT:  Any objection?

20                         VOIR DIRE

21 BY MR. KAPLAN:

22 Q.      Are they in the same condition they were when you --

23 when they went to Frank Thornton?

24 A.      One appears to be, the Samsung appears to be, but the

25 Microsoft one is taken apart.

Adam Chetwynd                               83

1           MS. SAVNER:  Your Honor, if I may proffer that Frank

2   Thornton will testify that he took them apart -- he took one

3   apart.

4           THE COURT:  Okay.  So apparently Mr. Thornton

5   actually took the phone -- took it apart, examined it, and will

6   testify to his link in the chain of custody.

7           MR. KAPLAN:  Just one last question, Judge.

8   BY MR. KAPLAN:

9   Q.    Do you know whether or not Mr. Thornton turned the phone

10  on before he took it apart?

11  A.    I do not.

12          MR. KAPLAN:  Nothing further.  No objection.

13          THE COURT:  So admitted subject to linkage with Mr.

14  Thornton's testimony.

15  [Government exhibit 78 admitted]

16          MS. SAVNER:  Nothing further.

17          THE COURT:  Okay.  All right.  Any cross examination?

18          MR. KAPLAN:  No, Your Honor.

19          THE COURT:  All right.  Thank you, Agent.

20          MS. CRAWFORD:  You're welcome.

21          THE COURT:  I'm sorry about the joke about baseball.

22          MS. CRAWFORD:  I deserve it.  I'm not 25 any more.

23          THE COURT:  Apparently not.  Okay.  Government want

24  to call the next witness.

25          MS. SAVNER:  Yes.  The Government calls James

James DiSarno                                    84

1    DiSarno.

2              DEPUTY CLERK:  Please come forward, sir, to be sworn.

3    JAMES DiSARNO,

4         Having been duly sworn, testified as follows:

5              THE COURT:  Good morning.

6              THE WITNESS:  Good morning.

7                         DIRECT EXAMINATION

8    BY MS. SAVNER:

9    Q.    Good morning, Mr. DiSarno.  Can you please state your

10   full name for us?

11   A.    James DiSarno.

12   Q.    How are you employed?

13   A.    I'm a senior forensic chemist for the Drug Enforcement

14   Administration.

15   Q.    Where do you work?

16   A.    I work in the Northeast Laboratory in Manhattan, New

17   York.

18   Q.    How long have you worked in the field of forensic

19   chemistry?

20   A.    I've worked for the DEA for 19 years and forensics 21

21   years.

22   Q.    Where did you work prior to DEA?

23   A.    The New York City Police Department Crime Lab and then

24   prior to that the Office of -- the Chief Medical Examiner's

25   Office in New York City.

James DiSarno                                        85

1  Q.     As a senior forensic chemist at DEA what are your

2  responsibilities?

3  A.     I analyze evidence for the absence or presence of

4  controlled substances.

5  Q.     Okay, and how far have you gone in school?

6  A.     I have a Master's degree in forensic science.

7  Q.     What training have you had related to your work as a

8  forensic chemist?

9  A.     With the DEA I completed a six-month training, in-house

10 training program, and then prior to that with the NYPD I

11 completed also I think it was a five-month training program on

12 how to analyze evidence.

13 Q.     Do you also have continuing training and educational

14 requirements?

15 A.     Yes.  Every year we have requirements at the DEA that we

16 have to complete 20 hours of training.  So that would include

17 various techniques in the different instrumentation we use or

18 new things -- new developments in the field.

19 Q.     Can you estimate for us how many times you have analyzed

20 potential controlled substances?

21 A.     In the thousands.

22 Q.     And have you been qualified as an expert in the field of

23 forensic chemistry in courts before?

24 A.     Yes I have.

25 Q.     In federal court?

                    James DiSarno                      86

1    A.      Yes.

2    Q.      In state court?

3    A.      Yes.

4    Q.      About how many times would you say?

5    A.      Over 50.

6            MS. SAVNER:  The Government tenders James DiSarno as

7    an expert in forensic chemistry.

8            THE COURT:  Any objection?

9            MR. KAPLAN:  No objection, Your Honor.

10           THE COURT:  He is so qualified.

11   BY MS. SAVNER:

12   Q.      Can you explain to us how it works at the lab where

13   you're currently employed when you receive a piece of evidence?

14   A.      Evidence enters our laboratory by one of two ways;

15   either it's hand delivered from an agent or a police officer or

16   it gets mailed into the laboratory.  Once a piece of evidence

17   enters the laboratory it's then entered by our evidence staff

18   and they will catalog it and enter it and put unique

19   identifiers on it, enter it into our computer system, and then

20   store it in our main vault.

21   Q.      When do you first touch it?

22   A.      My job everyday is to analyze evidence and I have a

23   supervisor who will assign me evidence to analyze.  So I'll get

24   a case assignment and then I will go to the main vault, sign it

25   out from an evidence technician, and then it's now in my

James DiSarno                                    87

1   possession.

2   Q.     And what's the evidence look like when you get it?

3   A.     It's in either a box or a plastic evidence envelope and

4   it's in a sealed condition.

5   Q.     Do you check that it's sealed?

6   A.     Yes.

7   Q.     What would you do if you found it wasn't sealed?

8   A.     The first thing I would do is I wouldn't accept it from

9   the evidence technician in our main vault if it wasn't in a

10  sealed condition.  There has been things where like maybe it

11  has come into the laboratory and then it got put on a shelf and

12  maybe it got compressed or something popped open, so I would

13  never accept a piece of evidence from the vault that was not in

14  a sealed condition, and then supervisor -- if it was,

15  supervisors are notified and then the agent gets notified and

16  then it goes from there.

17  Q.     Okay.  So assuming you get a sealed evidence bag or box

18  from the vault what do you do with it after you check that it's

19  still sealed?

20  A.     First thing I do is bring it back to my bench and I

21  would obtain something called a gross weight.

22  Q.     What is that?

23  A.     A gross weight is the entire contents -- the weight of

24  the entire contents that I receive when I take a piece of

25  evidence from the vault.

James DiSarno                                    88

1   Q.     Okay.  What do you do next?

2   A.     Next thing I would do is I would examine the -- well

3   I've already examined the seals, but I will examine the case

4   number to make sure it matches with what I actually -- the

5   paperwork that I have for it, and then I would open it up and I

6   would obtain a net weight of the substance.

7   Q.     Explain what that is.

8   A.     The net weight is just the amount of weight of the

9   powder or gel or liquid that is the actual evidence.  It

10  doesn't contain any of the bags or packaging that is involved

11  with the evidence.

12  Q.     Okay.  So do you have to -- if the evidence comes to you

13  packaged in individual little baggies, how do you obtain the

14  net weight?

15  A.     In that case what I would do is I would take the entire

16  weight of the packaging plus the substance and then I would

17  empty out the contents of the bags or envelopes or whatever it

18  is, and then I would weigh the packaging empty, and I would

19  subtract those two numbers, and then that's called indirect

20  weighing, and I would get a net weight of just the powder or

21  the liquid.

22  Q.     Do you also do what's called direct weighing?

23  A.     Yes.  I don't do it as frequently because when you do

24  something called direct weighing that would be emptying out and

25  then taking the powder and weighing the powder directly.

James DiSarno                                        89

1   That's a little bit more messy and so we don't -- I don't want

2   to contaminate myself or anybody else.  So we do indirect

3   weighing as opposed to direct weighing because it's just

4   cleaner.

5   Q.     Okay.  So once you have weighed it, taken the gross

6   weight and net weight of the product itself, what do you do?

7   A.     I will then start to analyze the evidence.

8   Q.     Okay, and how do you do that?

9   A.     At the DEA we have something called an evidence sampling

10  plan.  So depending on how many units we actually receive of

11  evidence, and what I mean units, if I received a hundred little

12  glassine bags or a hundred plastic bags, that would -- that

13  counts as one hundred, and then we have an evidence sampling

14  plan and I have to sample a portion of those and we call that

15  screening, and what screening does is screening identifies the

16  controlled substance in just the ones that we've segregated out

17  to screen.  So we're screening for a controlled substance.

18  Then once we have screened the units then what we'll do is we

19  will empty the total contents, grind it together, and make

20  what's called a composite sample.  A composite sample usually

21  is the entire contents of the sample.  We'll grind that all

22  together and then we'll analyze the composite also.  So there's

23  two types of testing.  There's screening testing and then

24  there's composite testing.

25  Q.     Okay.  So make sure I'm clear.  Look at a sample and

James DiSarno                                    90

1    test a sample to see what substance it contains according to

2    the sampling plan; is that right?

3    A.     Yes.

4    Q.     And then you also dump everything out, mix it together,

5    and test the whole thing?

6    A.     That's correct.

7    Q.     What kind of test do you perform to determine what the

8    substance is?

9    A.     At the DEA we have what we call a lot of tools in our

10   toolbox to test the substances.  The main test we use is

11   something called GCMS, which stands for gas chromatography mass

12   spectrometry, and basically in that test it's a molecular

13   confirmation meaning we're actually looking at the molecule at

14   the molecular level and we are separating.  Okay.  So the GCMS

15   test the way it works you have the GC portion which is a large

16   -- which is an often about the size of a microwave oven and

17   inside there there's a glass column.  It's 30 meters.  30

18   meters is really long, but it's very thin and it's coiled up on

19   a rod so it's not very big.  So what happens is the sample gets

20   introduced into the GC and what that does is it's a separation

21   technique.  What it will do is separate all the components in a

22   mixture.  Then once it gets separated through the GC portion it

23   goes into the mass spec detector, and what that does is

24   bombards the substance with electrons and then we can make an

25   identification of the substance from that fragmentation

James DiSarno                                    91

1   pattern.

2   Q.      How many tests do you have to perform on each substance?

3   A.      We have to perform one molecular confirmation and we

4   have to perform another test which does not have to be a

5   modular confirmation, and once we make a composite sample we do

6   further testing on that.  So I didn't finish with my regular

7   testing.  Can I continue with that?

8   Q.      Yes please.

9   A.      Okay.  So the other test -- there's other tests in your

10  toolbox.  Another test is a -- not confirmation, but it's

11  called a color test.  What a color test is you take a reagent

12  that we make in the laboratory and you add some of the unknown

13  substance to that reagent and it will form a color.  If a color

14  -- if the right color forms, that's indicative that a drug is

15  there, a certain drug.  We have many different color tests.

16  There's many different colors that form.  So depending on what

17  substance you're testing and what color test you're using will

18  lead you to an indication of what drug is there.

19          There's another test we use called gas chromatography

20  flame ionization detection.  Again same oven, same column, same

21  separation technique.  This time instead of bombarding the

22  sample with electrons we are actually burning the sample in a

23  flame.  That's why it's called flame ionization detection, and

24  when it sees a sample it will burn it.  We'll get a peak on our

25  instrument and then we can compare that peak to a known

James DiSarno                                    92

1   standard in the laboratory that we've run and then we can make

2   an identification that way.

3              There's one more test that I have used in this case

4   which is called the FTIR test, and what that does is you take a

5   portion of the sample and you hit it with an IR beam, Fourier

6   transform infrared spectroscopy, FTIR, we're hitting the sample

7   with an IR beam, and when you hit a compound with an IR beam

8   some of this light that's emitted from that IR beam will

9   scatter, some will get absorbed, some will cause the molecule

10  to vibrate, shift, shimmy they call it, does a little dance, if

11  you will, and then what it does is we're collecting, we're

12  reading how much light is absorbed, how much light is

13  scattered, and how much light is reflected, and then we can get

14  a pattern off of that and that takes us to an identification

15  also.

16  Q.    Okay.

17  A.    So those are the tests that I have run.

18  Q.    So the mass spectrometry?

19  A.    Close.

20  Q.    The flame ionization, and the FTIR, those are all

21  molecular level tests?

22  A.    The mass spec and the FTIR are both molecular level

23  meaning we're looking at the actual molecule.  The FT -- I'm

24  sorry.  The GCFID and the color test are not molecular

25  confirmations.  They are just other tests that we use.

James DiSarno                                    93

1  Q.     Okay, and the rule is you have to do one molecular test
2  and one other test?
3  A.     That's correct.
4  Q.     Okay.  What do you do once you perform those two tests?
5  A.     Once I performed the tests on the sample I will then do
6  what's called, if it's requested or if it's a purchase of a
7  sample, I'll do a quantification test and what that does is
8  that tests the purity of the substance.  So a lot of times we
9  get a sample and there's a whole pile of powder here, and if I
10 have identified a controlled substance, we like to know how
11 much of that sample is actually the controlled substance and
12 that's called a purity test or quantification, and then I will
13 perform a quantification on the evidence then.
14 Q.     At some point do you write up a report with your
15 findings?
16 A.     Yes I do.
17 Q.     Okay, and what do you do with the evidence itself once
18 you're done examining it?
19 A.     I will take the remaining portion and usually put it in
20 a substitute bag or maybe the original packaging if it warrants
21 it, and then I will seal it up in the original packaging and
22 then submit it back to the vault.
23 Q.     Okay.  So at this point you've dumped out all the
24 product out of the -- whatever original packaging it came in if
25 it was put in individual baggies.  How do you package those two

James DiSarno                                    94

1   types of things when you reseal the bag?

2   A.    I will take my composite sample, which is the remaining

3   powder, and I will place that in a bag, and then a lot of

4   times, if it warrants it, I will put the same -- all the

5   packaging in that bag and separate the two and then place those

6   substitute bags in the original packaging and then submit it --

7   close it up, weigh it, and submit it back to the vault.

8   Q.    Okay, and you said put it back in the vault when you're

9   done?

10  A.    Yes.

11  Q.    Is it removed from the vault after that?

12  A.    As far as I am concerned no, but once it's requested to

13  be destroyed or if the agent needs it back, then they would

14  request that from our evidence technicians or evidence

15  specialists, and then I'm not -- like we store a lot of

16  evidence, but then some evidence goes out to court, some

17  evidence gets destroyed, some evidence gets transferred to

18  another laboratory if it's necessary.  So once I'm done with it

19  I usually don't know what happens to it other than it's in the

20  vault.

21  Q.    Okay.  So did you examine evidence related to this case?

22  A.    I did.

23  Q.    All right.  I'll do this in groups.  I'm handing you

24  what has been marked as Government's 6, 11, 17, and 22.  Take a

25  look at these.  Do you recognize those?

James DiSarno                                    95

1   A.    Yes.  These are pieces of evidence that I analyzed in

2   the laboratory.

3   Q.    How do you know?

4   A.    My signature and name are on the evidence label itself

5   and also they are on the evidence -- we call this an evidence

6   sticker where I seal the evidence up and I place the sticker

7   and hand wrote my -- all the information that pertains and it

8   is -- I see it on all four pieces of evidence.

9           MS. SAVNER:  Okay.  At this time the Government moves

10  to -- I think the connection has been made with respect to

11  these four.

12          THE COURT:  Yes.  Any objection?

13          MR. KAPLAN:  No objection, Your Honor.

14          THE COURT:  All right.  So all four are admitted.

15  [Government exhibits 6, 11, 17, 22 admitted]

16  BY MS. SAVNER:

17  Q.    All right.  Let's go through each one.  Let's talk about

18  exhibit 6 first which is marked as DEA 1.  Yellow sticker on it

19  should say 6.  Okay.  You tested this one?

20  A.    Yes.

21  Q.    Okay, and did you check -- when you get the evidence do

22  you check the contents against anything?

23  A.    Yes.  I check the contents against what's called the DEA

24  7 form.  The DEA 7 form is something that's filled out by a

25  police officer or an agent or anybody who's actually submitting

James DiSarno                                    96

1   the evidence to our laboratory, and that has all the pertinent

2   case information on it and it will have a description of the

3   evidence that's actually contained.

4   Q.    Okay.  Do you remember what tests you performed on this

5   exhibit?

6   A.    On this exhibit I performed the GCMS test and the color

7   test as screening, and then I performed the mass spec and FID

8   on the composite, and I don't recall if I quanted it, but if I

9   had a report, if I could refer to a report, then I could tell

10  you if I quanted it.

11           MS. SAVNER:  Permission to approach?

12           THE COURT:  Yes.

13  BY MS. SAVNER:

14  Q.    Take a look at that and let us know if that refreshes

15  your recollection.

16  A.    Yes.

17  Q.    Go ahead tell us what you did.

18  A.    In this case I did perform a quantification test on it

19  and in this case I found heroin and quinine to be present and

20  the heroin was at 65 percent.

21  Q.    Okay --

22  A.    Sorry.  I made a mistake.  If I may refer to my report?

23  Q.    Please.

24  A.    The heroin was at 54 percent.

25  Q.    When you say 54 percent what does that mean?

James DiSarno                                    97

1   A.      That means the amount of the actual drug of heroin that

2   I identified in the system in this substance, the amount of

3   powder 54 percent of that was actually the heroin.

4   Q.      Okay.  So you found that the substance contained -- in

5   what you received contained heroin; is that right?

6   A.      Yes.

7   Q.      And that was both from the sampling you did and from the

8   composite?

9   A.      Yes.

10  Q.      Okay.  Can you explain what a controlled substance is?

11  A.      A controlled substance is something that is in the CFC

12  code of federal regulations as something that is illegal.  So

13  that's a controlled substance and there's different levels of

14  controlled substances.  They are called schedules.  So

15  controlled substances are in Schedules I through V and the way

16  they schedule things is medical usage and abuse potential.  So

17  if you have a -- if it's very high abuse potential and it has

18  no medical usage, then it would be a Schedule I.  If it's high

19  abuse potential and it has medical uses, it's a Schedule II.

20  If it's kind of we're getting into the gray area where it has a

21  medical usage but abuse potential is not so high, then we would

22  go a Schedule III.  Schedule IV is it has a very good medical

23  usage and then not so much abuse that would be a Schedule IV,

24  and Schedule V is medical usage and not so much abuse

25  potential.  So that is determined by people; not myself, but

                      James DiSarno                          98

 1    other government people.

 2                THE COURT:  Higher pay grade.

 3                THE WITNESS:  Yes exactly.  Higher paid grade.  Thank

 4    you.

 5    BY MS. SAVNER:

 6    Q.    So you told us that what you found in that which has

 7    been marked as Government's exhibit 6 was heroin.  Is heroin a

 8    controlled substance?

 9    A.    Yes it is.

10    Q.    What schedule?

11    A.    Heroin is a Schedule I meaning it has no medical usage

12    and it has a higher abuse potential.

13    Q.    Okay, and did you take the net weight of just the

14    product itself on that exhibit?

15    A.    The net weight would be the weight of the entire amount

16    of powder and yes I did.

17    Q.    What was it?

18    A.    1.0 grams.

19    Q.    That's rounding?

20    A.    That's rounding, right.  On my report it says 1.086

21    grams, but that goes out to four decimal points.

22    Q.    Keeping it simple.

23    A.    Keeping it simple would be one gram of powder.

24    Q.    Okay.  Can you take a look at what has the Government's

25    exhibit sticker number 11 on it which should be DEA number 3?

James DiSarno                                      99

1   A.    Yes.

2   Q.    Do you see that one?

3   A.    Yes.

4   Q.    Did you test that one?

5   A.    Yes I did.

6   Q.    How do you know?

7   A.    Again my signature is all over it and I see my

8   handwriting in the bag.

9   Q.    Okay, and you performed at least two tests like you

10  mentioned?

11  A.    Yes I did.

12  Q.    What did you find when you tested this one?

13  A.    Again if I may --

14  Q.    What substance was it in?

15  A.    There's heroin in this sample, but if I may refer to a

16  report, I can tell you exactly what it was.

17  Q.    Okay.  Please feel free to refresh your memory.

18  A.    I would need a report.

19  Q.    Oh I'm sorry.  Fair enough.

20  A.    In this sample I determined heroin was present.  The net

21  weight was 1.3 grams and the purity was 33 percent.

22  Q.    Okay.  Let's talk about exhibit number 17 which is DEA

23  number exhibit 6.

24  A.    Yes.

25  Q.    I will just preemptively hand you the remainder of your

James DiSarno                                    100

1    reports in the event you need them to refresh your memory.

2    A.      Thanks.

3    Q.      Let's talk about exhibit 17.  Did you analyze that one?

4    A.      Yes I did.

5    Q.      And what did you find the substance inside to be?

6    A.      Again I determined the substance to be heroin 1.4 grams

7    net weight and 54 percent heroin.

8    Q.      Okay, and let's look at exhibit 22 which is DEA 9.

9    A.      Yes.  I test drugs everyday for 20 years.  I've done

10   many reports.  There's no way I can remember every sample so I

11   do need to refer to my notes.

12   Q.      Why do you write a report?

13   A.      So that I don't have to memorize every sample that I do.

14   I determined heroin to be present in this sample .88 grams and

15   the purity was 22 percent heroin.

16   Q.      Okay.  All right.

17           THE COURT:  The drug quantity was what?

18   A.      I'm sorry .89 grams.

19   Q.      All right.  So that was four pieces of evidence all a

20   little bit over -- a little bit under one gram; is that right?

21   A.      That's correct.

22   Q.      All right.  I am now handing you what have been marked

23   as Government 28 and 29.  I'll trade you.  Take a look at those

24   and let me know if you recognize them?

25   A.      This is -- yes.  This is more evidence that I analyzed

James DiSarno                          101

1  in the laboratory.  They both have my signature on them.

2  Q.    Okay, and the seal -- the heat seal that you did and

3  signed is that still intact?

4  A.    Yes it is.

5  Q.    Okay.  Let's take a look at number -- exhibit 28.  Did

6  you test the contents of that bag?

7  A.    I did.

8  Q.    And what did you determine the contents to be?

9  A.    I determined heroin to be present.  The net weight was

10 128.3 grams and I did not do a purity test on this one.

11       THE COURT:  I'm sorry.  What was it again?

12 A.    128.3 grams.

13 Q.    Why is that?  Why didn't you do a purity test?

14 A.    In the laboratory we will do purity tests on any

15 purchases, meaning government funds were spent on purchasing

16 the sample, and in this case it was not a purchase so it was

17 not quanted.  Our laboratory policy is to only quant purchases

18 or things that are -- when the Court requests an actual net

19 weight -- aggregate weight of drugs not net weight of drugs,

20 meaning they get sentenced on the amount of pure drug and

21 heroin is not one of those drugs so this was not quanted.

22 Q.    Okay.  So when you looked at exhibit 28 you found it to

23 be 128 grams containing heroin?

24 A.    Yes.

25 Q.    Okay.  Let's take a look at exhibit 29, and did you test

                    James DiSarno                        102

1    this one?

2    A.     I did.

3    Q.     What did you find?

4    A.     In this one I found -- I had to split the sample.  What

5    a split sample means is I determined before I even analyzed it

6    that it looked like there were two different types of sample

7    contained in this evidence envelope.  So in this case I found

8    there was 129 little bags and I determined that cocaine base

9    was present in those 129 little bags, and then there were two

10   larger bags and I determined that a substance called dibutylone

11   was contained in those.  So it's -- we split the samples.

12   Basically I analyzed this portion as one unit.  I analyzed this

13   other portion as another unit.  They are totally separate.

14   Q.     Okay, and when you separated them out you gave them

15   separate numbers?

16   A.     Yes.  They become -- like in this case, it's for the

17   laboratory, it was exhibit 5.  So the first one became 5.01 and

18   then the second one became 5.02.

19   Q.     Okay, and when you looked at 5.01 it was 129 bags of a

20   substance that tested positive for cocaine base?

21   A.     That is correct.

22   Q.     And is cocaine base a narcotic on the schedule that you

23   described?

24   A.     Yes.  Cocaine base is a Schedule II drug.

25   Q.     All right, and you determined that the other bag that

James DiSarno                              103

1   came to you all together with exhibit 5 contained another

2   substance besides heroin or cocaine base?

3   A.    Yes.

4   Q.    All right.

5         THE COURT:  Did you get the total weight of -- of the

6   crack cocaine?

7         THE WITNESS:  I did.  It was 73.6 grams and I did not

8   do a purity on it.

9   BY MS. SAVNER:

10  Q.    Okay.  Last two exhibits.  I'm handing you up

11  Government's 32 and 33.  Take a look at those and let me know

12  if you recognize them?

13  A.    Yes I recognize them.  Again my signatures are all over

14  them.  The evidence seal that I placed on the bottom is intact,

15  and I see my initials on the bags on the inside.

16  Q.    Okay.  Let's talk about exhibit 32 first which is DEA 7.

17  Did you test this one?

18  A.    I did.

19  Q.    And when you tested it what did you find?

20  A.    In this case I found cocaine base to be present net

21  weight of 4.0 grams and I did not do a purity on it.

22  Q.    And the net weight again is just the substance itself

23  not the packaging?

24  A.    Correct.  Just the amount of powder that was received.

25  Q.    Okay.  Let's talk about exhibit 33 which is DEA 8.  This

James DiSarno                              104

1    one you had to break into sub exhibits?

2    A.    Yes.   I sub exhibited this one when I originally

3    received it because some of the bags were clear with hearts on

4    them, some of the bags were -- they had a green alien logo on

5    them, and some of them were these white glassine bags.   So with

6    my experience I -- instead of putting them all together and

7    realizing that there's different components in them, we have

8    the ability to split them as appearance dictates.   So in this

9    case the alien logo bags were one subject, the bags with the

10   hearts were another, and then the glassine bags were a third.

11   Q.    Okay.   So let's talk about -- let's go exhibit by

12   exhibit -- sub exhibit by sub exhibit as you identified them.

13   So sub exhibit 8.01 was the 250 glassine bags; is that right?

14   A.    Yes.   A glassine bag is one of these little white bags.

15   We call those glassine bags.

16   Q.    What did you find in terms of what substance it was when

17   you analyzed those?

18   A.    Heroin was present and the net weight was 5.22 grams.

19   Q.    Okay.   How about exhibit 8.02 what type of packaging was

20   that exhibit?

21   A.    That one was the clear bags with the hearts on it.

22   Q.    Okay, and what did you find when you tested the contents

23   of those bags?

24   A.    Heroin was present at 0.88 grams.

25   Q.    All right, and the last one 8.03 what was that?

James DiSarno                                        105

1  A.     That was 50 plastic bags with the alien logo on it and

2  that was -- I identified heroin at 0.87 grams.

3  Q.     Thank you.  Nothing further.

4            THE COURT:  All right.  Any cross examination?

5            MR. KAPLAN:  No, Your Honor.  Thank you.

6            THE COURT:  Okay.  All right.  Thank you.

7            THE WITNESS:  Thank you very much.

8            THE COURT:  Let's take our recess at this point.

9  It's just about 12 o'clock.  We'll start at 1:15.

10  [Recess 11:55 - 1:15 p.m.]

11  [The following occurred in open court without the jury present]

12            THE COURT:  Good afternoon.  All right.  Counsel are

13  present.  Defendant's present.  This is outside the presence of

14  the jury.  There are a couple of requests from the lawyers that

15  I have reviewed.  First one is a request from the defense and

16  that is for the Court to describe the procedure by which

17  impeachment is done with prior inconsistent statements.  We

18  have done -- I should say it's the royal we -- have done

19  research and there's a case in the 2nd Circuit called United

20  States versus Almonte which is 956 F.2d 27, 2nd Circuit case

21  1992, which reads in relevant part -- there's two separate

22  issues here.  The 2nd Circuit also noted that in quotes "a

23  third party's notes of a witness's statement may not be

24  admitted as a prior inconsistent statement."  So that

25  necessarily applies when a law enforcement officer has a note

James DiSarno                                106

1   as to what the witness said but it's not by way of a

2   transcript, and as a result what I have been ruling upon in

3   general is you confront the witness with the statement

4   reflected in the officer's notes.  If the witness says yes they

5   remember this, remember making this statement, then they can go

6   into the statement, but if not, then you cannot introduce the

7   statement, and by reading the statement that is introducing the

8   statement.  So as a result you can't read the statement.  You

9   need to call the officer later about the inconsistent

10  statement.  That's the first part.

11      The second part of what the 2nd Circuit determined was

12  unless they are "a verbatim transcript of the witness's own

13  words", what the 2nd Circuit is finding there is that if there

14  is a transcript of the defendant's words, then you can

15  introduce the transcript even if for some reason the witness

16  does not remember what the witness said.  As a result, when the

17  defense is asking for clarification as to whether you can

18  actually read the transcript of what the witness said, assuming

19  it is a verbatim transcript, that is permissible under 2nd

20  Circuit law.

21      So the distinction is this.  If the inconsistent statement

22  is made in a police report, a summary of which is presented by

23  the police officer, you cannot have that statement read, but if

24  it's a verbatim transcript, you can have that statement read.

25  In fact, what's interesting in Rule 613 is that in regard to

James DiSarno                                    107

 1   those kinds of verbatim transcripts you don't have to tell the
 2   witness or show the witness the statement.  All you have to be
 3   able to do is, number one, show the other side the statement,
 4   and, second, leave the witness an opportunity to explain the
 5   way -- the nature of the statement.  Anyway so that's the
 6   clarification and I think that answers the defendant's request.
 7           MR. KAPLAN:  Thank you, Judge.
 8           THE COURT:  That's right?
 9           MR. KAPLAN:  Yes, Judge.
10           THE COURT:  All right.  Now, second, I want to talk
11   in general about the ability of the defense to call witnesses
12   who are described in the opening statements.  If those
13   witnesses were not a part of the activity, the prostitution
14   activity, but were separate and apart from the activity, not
15   describing what was going on in the activity, then that
16   testimony would be character evidence and as a result would be
17   inadmissible.  Essentially character evidence has to come in by
18   way of reputation.
19      So as a result if those witnesses were not a part of this
20   illegal activity, then their statements are not admissible.
21   That's why I asked the question are these witnesses all part of
22   the prostitution activity because essentially their testimony
23   is not character evidence.  It is evidence of pattern of
24   conduct, which I raised before, but it's also evidence of
25   coercion, fraud, force, or no coercion, fraud, or force.  So as

James DiSarno                                   108

1    long as these witnesses were engaged in this activity and can

2    describe how they were themselves treated, but also how other

3    people were treated in the activity, then that is totally

4    relevant to fraud, coercion, et cetera, and, in fact, it's one

5    of the key issues obviously in this case.  So there's the

6    distinction.

7         If a witness is not engaged in this activity, not

8    describing the defendant's conduct in this activity, that's

9    character evidence and is not admissible unless it's by

10   reputation.  If it is in fact from a person engaged in this

11   activity, describing what exactly the defendant's behavior was,

12   at least in regard to coercion and fraud and threats, et

13   cetera, both regarding them as well as regarding others, then

14   it's admissible.

15        Now I've taken a really broad approach to describing the

16   defendant's conduct because it seems to me that the Government

17   has the ability -- should have the ability to call witnesses

18   who describe his pattern of conduct in the illegal activity

19   allegedly without that person necessarily being charged.

20   That's all -- it's all part of the same activity.  Now that

21   applies to the defense as well.  They can call witnesses who

22   were involved in this particular relationship with a defendant

23   and engaged in activity which may suggest that he was not

24   engaged in coercion, et cetera.  So that's the distinction.  Is

25   there anyone who disagrees with that distinction?  If so, state

James DiSarno                                109

1  it on the record.  If not, forever hold your peace.  Anyone

2  from the defense?

3              MR. KAPLAN:  No, Judge.  Thank you.  We certainly

4  agree.

5              THE COURT:  Okay.

6              MS. SAVNER:  Yes, Your Honor.  On the second motion

7  we agree that it's relevant any testimony from defense

8  witnesses about how they witnessed the defendant treating any

9  of the named sex trafficking victims as that would go to the

10 defendant's coercion or force used against those specific

11 people which is highly relevant, but to the extent that those

12 witnesses are going to describe how the defendant treated them,

13 any lack of coercion or lack of force used against those other

14 people is not relevant to how the defendant treated --

15             THE COURT:  All right.  So can I ask you if you have

16 called any witnesses to testify about the defendant's behavior

17 in regard to them, coercion, fraud, et cetera, who were not

18 charged?

19             MS. SAVNER:  Yes, Your Honor.  The Court's already

20 heard from Mary P. and Chrissy T., both of whom describe that.

21             THE COURT:  I mean you can obviously --

22             MS. SAVNER:  Yes I see where you're going.

23             THE COURT:  Yes.  You can understand that if I in

24 fact allowed you to call witnesses and have them testify about

25 how they were treated even though they are not in the

James DiSarno                              110

1    indictment, there's no charge of coercion, et cetera, but that

2    is -- that is the environment that they are describing, and so

3    it seems to me that if there are other people engaged in the

4    activity in the environment itself who can describe the

5    environment, whether or not they are charged, the defense

6    should be able to do that as well.

7            MS. SAVNER:  I understand and I would just -- I would

8    just point to paragraph 4 of Count I in the indictment which

9    specifically alleges that the defendant used force and threats

10   and force to maintain discipline among his drug workers, and

11   evidence going to that specific piece of the allegation in the

12   indictment is testimony that the two witnesses I mentioned

13   spoke to.

14           THE COURT:  Yes.  Absolutely, and they may have

15   witnesses to testify that in fact according to their

16   observations both in regard to their own behavior as well as

17   the behavior of others there was no coercion and as a result

18   they should be able to testify to that if they were engaged in

19   that activity.  Anyway that's -- that's the directive.  That's

20   the ruling.  That's the line that I'm going to draw in the sand

21   and I think we're ready to proceed.  Okay.  Want to bring the

22   jury out?

23           MS. SAVNER:  Your Honor, one administrative matter.

24   If I neglected to officially move in, now the connection has

25   been made with respect to the drug exhibits, I would do that

                    James DiSarno                    111

1    now given the testimony.

2             THE COURT:  I thought you did move those all in, but

3    --

4             MS. SAVNER:  I wanted to make sure the record is

5    clear.

6             THE COURT:  The 32, 33.

7             MS. SAVNER:  I can read them off.

8             THE COURT:  Okay.  Go ahead.

9             MS. SAVNER:  6, 11, 17, 22, 28, 29, 32 and 33.

10            THE COURT:  Okay.  Any objection?

11            MR. KAPLAN:  No, Your Honor.

12            THE COURT:  Okay.  So admitted.

13   [Government exhibits 28, 29, 32, 33 admitted]

14            MS. SAVNER:  Thank you.

15            THE COURT:  Can you give me the list again because I

16   have to tell the jury that in fact those exhibits have been

17   admitted.

18            MS. SAVNER:  Yes, Your Honor.  6, 11, 17, 22, 28, 29,

19   32 and 33.

20            THE COURT:  Good.  Okay.  Thank you.  All right.

21   Bring the jury in.

22   [Jury returns to the courtroom at 1:30 p.m.]

23            THE COURT:  Okay.  Starting a few minutes late

24   because I needed one issue resolved.  I do want to tell you

25   that there were the offering of exhibits which have been

                         Keisha W.                          112

1    admitted into evidence.  Now those are the bags of suspected

2    drugs that were analyzed.  So 6, 11, 17, 22, 28, 29, 32, and

3    33, those are the exhibits that were talked about by the

4    expert, those are all admitted into evidence.

5         All right.  Appreciate your patience and I think we're

6    ready to start with the next witness.

7              MR. DARROW:  Thank you, Your Honor.  We call Keisha

8    W.

9              DEPUTY CLERK:  You can come right upfront.

10   KEISHA W.,

11        Having been duly sworn, testified as follows:

12             THE COURT:  Good afternoon.

13             THE WITNESS:  Good afternoon.

14             THE COURT:  So if you can pull your chair up to that

15   microphone and put the microphone as close to you as possible

16   and speak right into it so people can hear you.

17             THE WITNESS:  All right.  Hello.

18   BY MR. DARROW:

19   Q.    Good afternoon.  Keisha, forgive me for just using your

20   first name.  We're only going to be using the first names for

21   the women we talk about this afternoon.  Okay?

22   A.    Okay.

23   Q.    So if I ask you who someone was, if it was a woman

24   involved in this, we don't want to hear the last name.

25   A.    Okay.

Keisha W.                                    113

1  Q.     Keisha, let me start by asking you some questions about

2  your life history.  What month and year were you born?

3  A.     July 14, 1995.

4  Q.     And where were you born and raised?

5  A.     I was born in Burlington and I was raised in Winooski.

6  Q.     Okay.  Let me start with some questions about your first

7  10 or 15 years of life.  Did your parents separate early?

8  A.     No.  They were together for a while.

9  Q.     Okay.  About until when?

10 A.     Until I was about -- when I went into foster care.

11 Q.     Okay.

12 A.     DCF.

13 Q.     What happened then?

14 A.     I had been in a relationship with an abusive boyfriend

15 and was in a very angry state of mind and couldn't handle it I

16 guess and needed extra support so I ended up there because of

17 charges I had gotten.

18 Q.     About how old were you then?

19 A.     I was probably about 15.

20 Q.     How was the boyfriend abusive?

21 A.     He would hit me all the time.  He almost knocked my

22 tooth out of my mouth.

23 Q.     When did your parents separate?

24 A.     They separated when I was probably about 14, 15.

25 Q.     Do you know why that happened?

                      Keisha W.                        114

1   A.    Yeah.  They weren't really getting along.  They haven't

2   in a long time.  They stayed together for us.

3   Q.    Was there a drug problem?

4   A.    My dad, yeah.  My dad was into drugs pretty heavy.  My

5   whole life almost.

6   Q.    Okay.  You mentioned going into foster care.  Did you

7   spend some time in several different places apart from your mom

8   and dad?

9   A.    Yeah.

10  Q.    Tell us where those were.

11  A.    So I went to -- first of all, I went to the juvenile

12  center Woodside.  I went to Brattleboro Retreat.  I went to

13  NFI.  I went to NFI DAP program which is a foster care program.

14  Q.    Were those institutions that you mentioned all

15  essentially foster care?

16  A.    Yeah.

17  Q.    Okay, and --

18  A.    DCF.

19  Q.    I'm sorry.

20  A.    It was DCF custody.

21  Q.    They were all different forms of DCF placement.  Okay.

22  About when did you start using drugs?

23  A.    17.

24  Q.    17 and tell us how that started?

25  A.    Well I used them before that, but it wasn't heavy until

                         Keisha W.                        115

1    17 into heroin.

2    Q.     Okay.  How were you using heroin initially?

3    A.     I was just snorting it and then I started IV drug using.

4    Q.     And then you?

5    A.     Started IV.

6    Q.     Started IV?

7    A.     Drug using, yup.

8    Q.     How were your relations with your father at that point?

9    A.     It was a friendship relationship more than a father

10   daughter relationship because he was getting high and he

11   introduced me to getting high with heroin.

12   Q.     Were you spending a lot of time with him then?

13   A.     Yeah.

14   Q.     This is when you're about 17?

15   A.     Yeah.

16   Q.     Okay.  Who first showed you how to inject heroin into

17   your body?

18   A.     My dad.

19   Q.     Okay.  How were you and your dad supporting your habits

20   at that time?

21   A.     Anyway possible.  Like I guess breaking into cars.  I

22   mean selling things.  Stealing.

23   Q.     Okay.  Were the two of you having trouble coming up with

24   enough money to support your habits?

25   A.     Yeah.

Keisha W.                                   116

1   Q.     At some point did you meet a man named Brian Folks or

2   Moet?

3   A.     Yes.

4   Q.     When was that?

5   A.     I met him with my father around 17.  I was riding around

6   with my dad a lot.

7   Q.     I missed the last few words you said.

8   A.     I was riding around with my dad a lot.  So I was pretty

9   much with him all the time.

10  Q.     Okay.  So you were spending a lot of time with your dad?

11  A.     Yeah.

12  Q.     Who is also -- you were both heroin addicts?

13  A.     Yes.

14  Q.     So you met him around the time you were 17.  Can you

15  narrow that down a little bit?

16  A.     I was going to be 18 soon.  I started using when I was

17  17.

18  Q.     Okay.  What month is your birthday in?

19  A.     In July.

20  Q.     Okay.  So would that have been I'm thinking July 2013?

21  A.     Yeah.

22  Q.     And did you meet Moet before or after your birthday that

23  summer?

24  A.     Before.

25  Q.     Okay.  Who introduced you to him?

```
                        Keisha W.                          117
 1  A.      My father.

 2  Q.      Did he say why he was introducing you to Moet?

 3  A.      Not really.  Like he just kind of introduced us I guess.

 4  Q.      Okay.  Do you know if your father -- well strike that.

 5  Tell us about your first conversation with Moet.

 6  A.      I don't know.  It was more about like what he was doing

 7  I guess, his lifestyle, what he was working with, with the

 8  girls and whatever.

 9  Q.      Where did that conversation --

10          THE COURT:  I wonder if you could concentrate on

11  speaking up so people can hear you.

12  BY MR. DARROW:

13  Q.      Keisha, if you move forward a little bit, that mike

14  would catch your voice better.  Thank you.  Do you remember

15  where that conversation took place?

16  A.      Yeah.  It was -- I can't remember the street.  Willard I

17  think.  I don't know exactly.

18  Q.      And were you in a car or street or an apartment?

19  A.      I was in the car.

20  Q.      Okay.  Who were you in the car with?

21  A.      Brian.  I was with myself, but with him, yeah.

22  Q.      Was there anyone else in the car besides you and Brian?

23  A.      The girls when I first got introduced to all of it.

24  Yes.

25          THE COURT:  I'm sorry.
```

Keisha W.                                    118

1  A.     When I was first introduced to all of them yes I was in

2  the car with him.

3  Q.     Okay.  That first conversation you had with him is it

4  just the two of you in the car?

5  A.     No.

6  Q.     Who else is in the car?

7  A.     A bunch of other girls.  I didn't know who they were.

8  Q.     Okay.  Did you --

9  A.     The first time with my dad when I first met him but --

10 Q.     Okay.  Your dad introduced you to him and then did your

11 dad leave or did he stay around?

12 A.     I don't remember the first time exactly.

13 Q.     Okay.  Tell us about the first conversation you had with

14 Moet or Brian.

15 A.     When I first started talking about that was in the car

16 and we drove down to the hotel.

17 Q.     Okay, and I'm curious about the conversation you had in

18 the car?

19 A.     We were just talking about the work like, you know,

20 prostitution and how it works and started more talking with it

21 when we got to the hotel.

22 Q.     Okay.  Were there subjects you talked about before

23 prostitution or did he just cut right into that subject?

24 A.     What was that?

25 Q.     Did you talk about things besides prostitution?

                    Keisha W.                          119

1   A.      Not really.  No.

2   Q.      That started right up?

3   A.      Yeah.

4   Q.      Okay.  What do you remember him telling you about

5   prostitution in that first conversation?

6   A.      I don't remember exactly.  Only when I got to the hotel

7   I remember more.

8   Q.      Okay.  So you get to a motel.  Do you remember which

9   motel?

10  A.      It was down -- I can't remember -- Econolodge.  I don't

11  remember.  It was down on Shelburne Road.

12  Q.      Okay.  When you get to the motel tell us about the

13  conversation you had with Mr. Folks then?

14  A.      It was with Pinkie and him and they just kind of like

15  were talking about how it works.  If I were to do it, like I

16  don't know, like if somebody came, the police came, like how it

17  worked.

18  Q.      Okay.  There was conversation about how it worked,

19  right?

20  A.      Yeah.

21  Q.      Okay.  Tell us what you remember about the conversation

22  about how it worked.

23  A.      I remember that it was just if somebody came like the

24  police like, you know, I guess just pretty much role play like

25  say it's your boyfriend instead of call.  So --

Keisha W.                                    120

1   Q.     Okay.  So one thing that was talked about was if the

2   police come during a prostitution job you're supposed to role

3   play?

4   A.     Yeah.

5   Q.     How would that work?

6   A.     It was just like -- I just said like he, you know, like

7   you just tell them that it's a relationship.  They were just

8   calling it a relationship thing like role playing with your

9   boyfriend.  I don't know.

10  Q.     All right.  So you talked about if the police come you

11  pretend the fellow you're with is your boyfriend.  What else --

12  what other conversation did you have about prostitution that

13  first time at the motel?

14  A.     I don't remember.

15  Q.     Was there any discussion about Backpage?

16  A.     Yeah.  Backpage that's where it was posted.

17  Q.     Tell us what you remember talking to the defendant about

18  Backpage.

19  A.     Just taking pictures pretty much and just describing

20  yourself.

21  Q.     And then you used the word posting?

22  A.     Yeah.

23  Q.     What's posting?

24  A.     Putting up on the internet as an ad.

25  Q.     Okay.  Putting up what on the internet as an ad?

Keisha W.                                  121

1    A.     Yourself.

2    Q.     The pictures?

3    A.     Yeah.

4    Q.     Do you know where those pictures are posted or put up?

5    A.     Just Backpage is all I know.

6    Q.     Is that Backpage an internet site?

7    A.     Yeah.

8    Q.     Who is in the motel with you this first time?

9    A.     Pinkie.

10   Q.     Okay.  You and the -- you and Folks and a woman named

11   Pinkie?

12   A.     Uh-huh.

13   Q.     I'm showing you a photograph marked 51A.  Do you

14   recognize that person?

15   A.     Yes.

16   Q.     Who is that?

17   A.     That's Pinkie.  I don't know her first name.

18   Q.     Okay.  Does that photograph fairly and accurately depict

19   the woman you knew as Pinkie?

20   A.     Yes.

21          MR. DARROW:  Your Honor, we move for the admission of

22   51A.

23          THE COURT:  Any objection?

24          MR. KAPLAN:  No objection, Judge.

25          THE COURT:  So admitted.

                      Keisha W.                          122

1    [Government exhibit 51A admitted]

2              MR. DARROW:  May we publish this?

3              THE COURT:  Yes.

4    BY MR. DARROW:

5    Q.    Is that a picture of Pinkie?

6    A.    Yes.

7    Q.    You didn't know her name at the time?

8    A.    No.

9    Q.    Okay.  Now staying with this first conversation you

10   talked about what to do if the police come?

11   A.    Yeah.

12   Q.    You talked about pictures on Backpage?

13   A.    Uh-huh.

14   Q.    Were there any pictures of you taken that first get

15   together at the motel?

16   A.    No I don't think it was the first time.

17   Q.    Okay.  When were pictures taken?

18   A.    When I got to the other hotel.

19   Q.    Excuse me.

20   A.    When I got to the other hotel.

21   Q.    Okay.  So you go to another hotel?

22   A.    Yeah.

23   Q.    Do you know what motel that was?

24   A.    Days Inn.

25   Q.    Okay.  Who were you with?

                         Keisha W.                      123

1   A.      Him, Pinkie, and some other girls.

2   Q.      All right.  What happened there?

3   A.      Took pictures and posted them.

4            THE COURT:  Can I ask you is this the same day that

5   you first met Folks?

6            THE WITNESS:  No this isn't the same day.  No.

7   Different time.  Yeah.

8            THE COURT:  How much time elapsed?

9            THE WITNESS:  It wasn't very far off.  It was like --

10  I don't know -- I don't remember exactly it's so long ago, but

11  --

12           THE COURT:  Right.  Okay.

13           THE WITNESS:  It was around that time.

14           THE COURT:  It was around that time, but not the same

15  day?

16           THE WITNESS:  Right.

17           THE COURT:  Okay.

18  BY MR. DARROW:

19  Q.      So what happened to this second hotel a day or few days

20  later?

21  A.      We just posted and it didn't really work out.  There

22  wasn't really any calls coming in.  There was no service.

23  Q.      Okay.  Who posted and who took pictures?

24  A.      Moet.

25  Q.      Moet.  What did he do?

                        Keisha W.                        124

1    A.     He posted that on the internet.  He took pictures and

2    posted them.

3    Q.     Okay.  Tell us about Moet taking pictures of you.  Did

4    he ask you to do particular things?

5    A.     Just, you know, like provocative, you know, manner to

6    obviously grab the attention of men.

7    Q.     Okay.  Did he ask you to remove your clothes?

8    A.     Yeah.

9    Q.     Okay.  Did he tell you how to pose?

10   A.     Yeah.

11   Q.     Okay.  Now you say on a Backpage post there's a little

12   description.  Who came up with that description?

13   A.     He did.

14   Q.     Now -- and how do you know he posted it?

15   A.     He showed me.

16   Q.     He showed you the post?

17   A.     Yeah.

18   Q.     Was there conversation in these early get togethers when

19   you first meet him and at the second get together at the motel

20   about drugs?

21   A.     Yeah.  Well I had a habit and it was a pretty high habit

22   so that was the reason why I was doing it in the first place.

23   So I told him that's the only way I could do it was to be high.

24   Q.     Okay, and what did he say about that?

25   A.     He said that I would be fine.  He would work with me on

                        Keisha W.                            125

1    that.

2    Q.      He what?

3    A.      He would work with me on it.

4    Q.      What did you understand that to mean?

5    A.      Him getting me heroin.

6    Q.      Did he tell you he would get you heroin?

7    A.      I don't remember exactly if it was like that because I

8    know definitely that I have gotten it a few times myself for me

9    really.

10   Q.      And I'm trying to focus your attention just on these --

11   at the beginning when everything started these early

12   conversations and what was said between you and Moet about

13   heroin?

14   A.      That he would give me -- give me it if he had it, yeah.

15   Q.      Okay.

16   A.      So I could stay well.

17   Q.      Did you need to do anything for him?

18   A.      Make sure that I'm getting calls.

19   Q.      Okay.  Was there any conversation about money and the

20   earnings that would come in?

21   A.      Half and half.

22   Q.      How would that work?

23   A.      Half the money is his, half the money is mine because

24   that's the way it works so that you can work together I guess.

25   Q.      Okay.  From the time that you spent with Pinkie did you

Keisha W.                                    126

1   gain any understanding of what her role in this was?

2   A.      She worked for him.

3   Q.      Doing what?

4   A.      Backpage ads.  She was doing it.

5   Q.      Do you know if Pinkie took drugs?

6   A.      All I knew is crack.

7   Q.      She took crack?

8   A.      Yeah.

9   Q.      Do you know if she was addicted?

10  A.      I don't know really.  I didn't really know her like

11  that.

12  Q.      Okay.  So as this is beginning the post goes up.  Tell

13  us what happened in the early stages of your involvement?

14  A.      It didn't really work out when I first started.  It had

15  no service in the place that we were at so just really didn't

16  work out.

17          THE COURT:  Okay.  I'm wondering can you move the

18  microphone up closer to you really, really close because I

19  think we're having trouble hearing you.  So try to speak up as

20  loud as you can.

21  A.      Yeah.

22  Q.      Okay, and I'm trying to drawing your attention to the

23  summer when you turned 18.  This is the summer of 2013?

24  A.      Uh-huh.

25  Q.      Do you remember going to the U Mall with Moe and Pinkie?

                        Keisha W.                          127

1    A.      Yeah.

2    Q.      What happened there?

3    A.      Well we went there to take pictures.  There was somebody

4    there that could take pictures of us for the posts on Backpage

5    so they would be better and get more calls from it.

6    Q.      Okay.  What happened at the U Mall?

7    A.      We went there.  They shut the shop down and we went

8    upstairs, took photos, me and Pinkie did, and I had to have sex

9    with the guy that did the pictures for payment.

10   Q.      Do you remember what shop this was?

11   A.      It was a lingerie shop.  I don't remember what it was

12   called.

13   Q.      And who is present?

14   A.      That guy, Moet.

15   Q.      The guy is -- who is the guy?

16   A.      The guy that was taking photos.  I don't know who he

17   was.

18   Q.      Is he someone that worked at the store?

19   A.      Yeah.

20   Q.      Okay, and so who arrives there?  You --

21   A.      Me, Pinkie, Moet, and myself -- myself, Pinkie and the

22   guy that was taking the photos.

23   Q.      Okay.  Do you remember whose idea it was to go to the

24   store?

25   A.      Moet's.  I didn't know him.

                 Capitol Court Reporters, Inc. (800/802) 863-6067

Keisha W.                                    128

1    Q.      Did the person at the store take pictures of you?

2    A.      Yes.

3    Q.      Were you told you needed to do something in exchange?

4    A.      Yes.

5    Q.      Okay.

6    A.      Not until after.

7    Q.      Was that a surprise?

8    A.      Kind of, yeah.

9    Q.      Did you ever see the pictures?

10   A.      No, not that I remember.

11   Q.      Did you ever have a conversation with Moe about the

12   pictures?

13   A.      I don't remember.  I think just to ask about if they

14   were posted.  I asked about if they were posted.

15   Q.      Do you remember what he said, if anything?

16   A.      I think he said they were up.  I'm pretty sure.  I don't

17   remember.

18   Q.      Do you remember when in this early stage those pictures

19   were taken?  Was it in the first few days?  A week later?  A

20   month later?

21   A.      I can't remember.

22   Q.      Okay, but it was back then when you were 17, 18?

23   A.      Yeah.  I was young.

24   Q.      All right.  Do you remember what motels you visited back

25   at that time?

                         Keisha W.                          129

1   A.      I know the Days Inn.  I can't remember the other one

2   that's on the other side.  The Econolodge I believe.  I can't

3   remember what it's called, and I don't remember.

4   Q.      Did you spend --

5   A.      North Star.

6   Q.      I'm sorry.

7   A.      The North Star.

8   Q.      The North Star.  Any others?

9   A.      Ho-Hum later on.

10  Q.      Okay.  Any others?

11  A.      Not that I can remember.

12  Q.      Motel 6 Colchester?

13  A.      Yeah, but not with him.

14  Q.      Okay.

15  A.      I don't remember anyway.

16  Q.      All right.  Why did you agree to do this?

17  A.      To get high really because I had no way of supporting my

18  habit.

19  Q.      During this early time back that summer did you have sex

20  with Moe?

21  A.      Yeah.

22  Q.      What did he tell you about that?

23  A.      Nothing really.  Just like it's normal I guess.  I don't

24  know.

25  Q.      How do you mean it's normal?

                 **Capitol Court Reporters, Inc. (800/802) 863-6067**

                         Keisha W.                          130

1    A.      I don't know.  As being like a pimp almost like, you

2    know what I'm saying?

3    Q.      No.  I need you to explain.

4    A.      More in charge I guess.

5    Q.      I'm sorry.

6    A.      Show that he's more in charge I guess.  I don't know.

7    Q.      Okay.

8    A.      What his intentions were.

9    Q.      What was your understanding?

10   A.      To work with him, you know.

11   Q.      Was it your understanding that sex with him was part of

12   prostituting with him?

13   A.      Yeah.

14   Q.      Okay.  About how long did this go on for that summer?

15   A.      I don't remember.

16   Q.      A week?  A month?

17   A.      I can't remember.  It was so long ago.

18   Q.      All right.  At some point did you break away from it?

19   A.      Yeah.

20   Q.      Okay.  What became of the 50/50 deal that summer?

21   A.      Nothing really because, like I said, it didn't really

22   work out at the motels.  I got no call at the motels.  It was

23   pretty much just a waste of time so I left.

24   Q.      Okay.  Keisha, you told us that you were at the Days

25   Inn, you were at the Ho-Hum?

                          Keisha W.                        131

1    A.      Yeah.

2    Q.      You were at the North Star?

3    A.      Yeah.

4    Q.      You were at the Motel 6?

5    A.      Yeah.

6    Q.      And I think you might have mentioned another one, the

7    Econolodge?

8    A.      I can't remember.  Something like that.

9    Q.      Okay.  You're at four or so motels back then?

10   A.      Yeah.

11   Q.      Are you saying you didn't do any work?

12   A.      I didn't do work at one when I first started.

13   Q.      You what?

14   A.      I didn't do it at one when I first started.

15   Q.      What happened after that?

16   A.      After that it was just over I guess.  I didn't see him

17   for a while.

18   Q.      Okay.  I'm sorry.  Did you go to all those four or five

19   motels back then when you were doing this or not?

20   A.      No, not all of them.  No.

21   Q.      Okay.  Which motels do you remember going to with Moe or

22   Pinkie back that summer when you were 17 and 18?

23   A.      I went to the Days Inn and then I can't remember the one

24   on the other side of it, and that was all that I can remember

25   of that summer.

Keisha W.                                    132

1    Q.    Okay.  What about the North Star?  I thought you told us

2    --

3    A.    The North Star later on.

4    Q.    Okay, and what about the Ho-Hum?

5    A.    The Ho-Hum was later on too.

6    Q.    Okay.  So let me ask you a simple question.  Back that

7    summer did you do prostitution work or not?

8    A.    Yeah, but it only was like one call and it didn't work

9    out so --

10   Q.    You only did one call that summer?

11   A.    I believe so.  Yeah.

12   Q.    And what do you mean it didn't work out?

13   A.    Just no calls.  Just never came about I guess.

14          MR. DARROW:  Your Honor, may I have a moment?

15          THE COURT:  Yes.

16   BY MR. DARROW:

17   Q.    So you think you only did one job at that one motel?

18   A.    I'm not sure, but yeah.  It was a long time ago.

19   Q.    Okay.  So you separate from Moe at some point?

20   A.    Yeah.

21   Q.    Okay.  Are you okay?

22   A.    I'm just a little overwhelmed.

23   Q.    All right.  Try to hang in there and if you need a

24   break, tell us and we can take a break.

25          MR. KAPLAN:  Judge, may we approach for a moment

                          Keisha W.                              133

1    please?

2              THE COURT:  Yes.

3    [Bench conference]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Keisha W.                                    134

1          MR. KAPLAN:  I'm concerned that she used drugs today,

2    that she has that demeanor and our client knows her really well

3    as you know and that's what he thinks and she's acting like it.

4    Maybe she's not.

5          THE COURT:  Well I would say that I have observed her

6    eyes moving up and down really slowly as if she has been doing

7    drugs.  My question is how do you want to approach that?

8          MR. DARROW:  How what?

9          THE COURT:  How do you want to address that?

10          MR. DARROW:  Well --

11          THE COURT:  Should we have a hearing outside the

12    presence of the jury to see if she --

13          MR. DARROW:  I mentioned the first time I met with

14    her she had also had that effect and she said it was because

15    she was on suboxone and it has that effect with her.  We

16    thought we noticed that when she had something to eat she was

17    better.  I thought okay she's had lunch now.  If you want to --

18    I'm fine if you want to ask her about it.  She's pretty scared.

19          THE COURT:  Okay.  I would like to ask her.  Okay.

20    [End of bench conference]

21

22

23

24

25

```
                 Keisha W.                        135
1              THE COURT:  Okay.  So I'm going to ask for a break at
2    this point, invite you to go back to your room, and I want to
3    just stay here and speak with the lawyers.  So just it will be
4    just a few minutes.  Okay.
5    [Jury leaves at 1:55 p.m.  The following occurred in open court
6    without the jury present]
7              THE COURT:  Okay.  I just want to ask you a couple
8    questions and ask that you really be candid and forthright.
9    You look like you're tired.  Have you been through treatment?
10             THE WITNESS:  Yeah.
11             THE COURT:  And are you receiving any medication,
12   either suboxone or methadone?
13             THE WITNESS:  I'm on suboxone, but I've been on it
14   for three years.
15             THE COURT:  Pardon me.
16             THE WITNESS:  I've been on suboxone for three years.
17             THE COURT:  All right.  Did you take suboxone today?
18             THE WITNESS:  Yeah.
19             THE COURT:  When did you take it?
20             THE WITNESS:  I take it early in the morning.  I took
21   it about 6 o'clock this morning.  I'm not getting much sleep at
22   night due to all this.
23             THE COURT:  Yeah I appreciate that.
24             THE WITNESS:  And I have an one-year-old too so --
25             THE COURT:  And you have an one-year-old as well?
```

Keisha W.                              136

1              THE WITNESS:  Yeah.

2              THE COURT:  Well then you're clearly not getting

3    sleep.  Okay.  So the suboxone is not necessarily impacting

4    your --

5              THE WITNESS:  Never.

6              THE COURT:  -- judgment at this point?  Okay.  Aside

7    from suboxone did you take any other drugs today?

8              THE WITNESS:  My normal prescriptions.

9              THE COURT:  Okay.  What are those prescriptions?

10             THE WITNESS:  Gabapentin.

11             THE COURT:  What does that do?

12             THE WITNESS:  It's for pain due to my neck and my

13   arm.  I just had surgery on my arm.

14             THE COURT:  Okay.  You just had surgery on your arm.

15   Is that --

16             THE WITNESS:  Just one.

17             THE COURT:  What kind of pain reliever is that?  Is

18   that an opiate?

19             THE WITNESS:  No.  It's none of that.  It's just for

20   nerve pain.  Nerve damage is what I have in my arm.

21             THE COURT:  Oh okay.  All right, and you took that

22   this morning?

23             THE WITNESS:  Yeah, but I take it throughout the day.

24   Like little bits throughout the day so --

25             THE COURT:  That is to deal with the neck pain that

                         Keisha W.                          137

1    you have?

2            THE WITNESS:  Yeah.

3            THE COURT:  Did you take any other medications?

4            THE WITNESS:  Lyrica, but I take that once in the

5    morning and once at night.

6            THE COURT:  What is that?

7            THE WITNESS:  For pain too.

8            THE COURT:  Okay.  Is that an opiate?

9            THE WITNESS:  No.

10           THE COURT:  And that's to deal with the pain that you

11   have in your neck?

12           THE WITNESS:  My neck and my arm, yup.

13           THE COURT:  Okay.  All right.  So -- and plus you're

14   not getting sleep as a result of this?

15           THE WITNESS:  Yeah.

16           THE COURT:  And you have an one-year-old child.

17   Okay.  So that may explain some of your reactions to the

18   questions.

19           THE WITNESS:  Well and I'm wicked upset and nervous.

20           THE COURT:  Okay.

21           THE WITNESS:  It's been rough.

22           THE COURT:  Yeah.  No I appreciate that this is going

23   to be -- this is very difficult.  I just want to make sure that

24   you haven't taken any drugs which could necessarily affect your

25   judgment at this point.

Keisha W.                                    138

1              THE WITNESS:  Not at all.

2              THE COURT:  All right.  So you think that perhaps the

3     fatigue may play a part in your reaction to the questions, but

4     you did not take anything other than the standard suboxone in

5     the morning and these pain relievers that you receive during

6     the day; is that right?

7              THE WITNESS:  Yeah.

8              THE COURT:  Okay.  Okay.  Does either party wish to

9     make -- ask her any questions in regard to her drug use this

10    morning or this afternoon?

11             MR. DARROW:  No, Your Honor.

12             MR. KAPLAN:  Judge, I would just be interested in

13    knowing when the last time was she took any heroin.

14             THE WITNESS:  That's been over three years.

15             MR. KAPLAN:  Okay.  That's fine.

16             THE COURT:  All right.  Okay.  I really appreciate

17    your responses so I think we're ready to proceed.  Do you have

18    any request at the bench or I think we can proceed.

19             MR. KAPLAN:  I think so, Judge.

20             THE COURT:  Okay.  Great.  All right.  Let's bring

21    the jury out.  Thank you for responding to the questions.

22             THE WITNESS:  Yeah.  No problem.

23             THE COURT:  Let me just read the note we've gotten

24    from the jury.  Please make sure mike is clearly picking up

25    voice.  All jury is having difficulties hearing.  All right.

Keisha W.                                139

1    So if you can speak right into that microphone, that would be

2    really helpful.  Okay.  All right.

3    [Jury returns to the courtroom at 2:05 p.m.]

4           THE COURT:  Okay.  I've received your note.  I read

5    it to the witness and also to the parties and you're having

6    trouble hearing her so we've moved the microphone over.  We've

7    asked the witness to speak directly into the microphone so I

8    think we're all set.

9           MR. DARROW:  Thank you, Your Honor.

10   BY MR. DARROW:

11   Q.    Keisha, are you tired today?

12   A.    Yeah.

13   Q.    Why is that?

14   A.    Just physically and mentally exhausted from all of this.

15   Q.    Okay.  Have you been nervous about the trial?

16   A.    Yeah.

17   Q.    And are you caring for a child too?

18   A.    Yeah.

19   Q.    How old is the child?

20   A.    One.

21   Q.    Missing out on some sleep?

22   A.    Yeah.

23   Q.    Okay.  Hang in there with us.  Let's shift gears.  At

24   some point in mid 2015 did you do drug rehab?

25   A.    Yeah.

Keisha W.                                    140

1    Q.      Where was that?

2    A.      Valley Vista.

3    Q.      What kind of program was it?

4    A.      It's a drug rehabilitation program.

5    Q.      Was it a 30-day residential program?

6    A.      It all depends on how bad you need treatment really

7    because it fluctuates.  Sometimes they will do longer stays if

8    need be.

9    Q.      How did that go?

10   A.      Not very well.

11   Q.      Why?

12   A.      Because they pulled me into the office and told me I

13   wasn't ready for it.

14   Q.      And looking back on it were they right?

15   A.      Yeah.

16   Q.      Okay.  When you got out of that program did you come

17   back to Burlington?

18   A.      Yeah.

19   Q.      How did you get here?

20   A.      I got here on a bus.

21   Q.      Okay.  Did you make arrangements for someone to pick you

22   up at the bus stop?

23   A.      Yeah, for Moet to pick me up.

24   Q.      You called him?

25   A.      Yup.

                        Keisha W.                         141

1    Q.      Where did he bring you?

2    A.      He brought me to the North Star.

3    Q.      Is that one of the motels you mentioned earlier?

4    A.      Yeah.

5    Q.      And what happened back at the North Star?

6            MR. KAPLAN:  Judge, excuse me, maybe I missed it, but

7    is there a date that she went to rehab?

8            THE COURT:  2015.

9            MR. KAPLAN:  Okay.  Thank you, Judge.

10   BY MR. DARROW:

11   Q.      When you get back to the North Star with Moet what

12   happens?

13   A.      I go there.  I was in a negative space and started

14   drinking and pretty much just hung out and talked about

15   reposting me and pretty much I was going to get high again.

16   Q.      Is that what happened?

17   A.      Yeah.

18   Q.      And when you say get high what does that mean?

19   A.      Start using heroin again, IV.

20   Q.      Where did you get the heroin?

21   A.      I can't remember where I got it.

22   Q.      Okay.  Did you get posted?

23   A.      Yeah.

24   Q.      Who posted you?

25   A.      Moet.

                Capitol Court Reporters, Inc. (800/802) 863-6067

                        Keisha W.                              142

1   Q.      Do you remember when in -- around when in 2015 this

2   happens?

3   A.      I'm not exactly --

4   Q.      Was it in the summer?

5   A.      I believe it was in the summer because it was nice out.

6   Q.      Okay.  Did you have the same arrangement that you had

7   before with the 50/50 and the drug supply?

8   A.      Yeah.

9   Q.      And did that -- did you prostitute for a while?

10  A.      Yeah.

11  Q.      Okay, and how did the 50/50 work out?

12  A.      Not well at the end.

13  Q.      How so?

14  A.      Just didn't work out.  I ended up taking extra money and

15  just ended up getting dropped off.

16  Q.      I'm sorry.  When you start out did you start keeping 50

17  percent of your earnings and giving 50 percent to Moet?

18  A.      Yeah, but I was spending it all on heroin so --

19  Q.      Okay.  You were spending what on heroin?

20  A.      My half.

21  Q.      Okay.  So were you earning any money from this?

22  A.      No.

23  Q.      Okay.  So who was getting the money?

24  A.      At that point I can't remember if it was him or not.  I

25  believe it was him some of the time, but I'm not sure.

                          Keisha W.                          143

1    Q.     Okay.  Was he giving you heroin?

2    A.     I believe so.  Yeah.

3    Q.     Okay.  Did you meet other women at this time who were

4    doing this work with him?

5    A.     Yeah.

6    Q.     Who?

7    A.     I met Mandy and Danielle or whatever -- I can't remember

8    who she is.  Didn't really know her.

9    Q.     Okay.  Was there a young woman named Danielle that you

10   met?

11   A.     I believe so.  I'm not sure.  I'm not good with names.

12   Q.     Can you please take a look at the woman pictured in 53A?

13   When this photo comes up off your left shoulder if you could

14   tell us if you recognize her?

15   A.     Yes that's her.

16   Q.     Who?

17   A.     Danielle.

18   Q.     Okay, and you mentioned someone named Mandy?

19   A.     Yeah.

20   Q.     Can we please look at 48A?

21   A.     Yes that's her.

22   Q.     Is that Mandy?

23   A.     Yeah.

24   Q.     What were Mandy and Danielle doing when you were with

25   them?

Keisha W.                                    144

1    A.      They were prostituting.

2    Q.      Okay.  For whom?

3    A.      For Moet.

4    Q.      Okay.  At some point did you start working on the drug

5    side of the business?

6    A.      Not really.

7    Q.      At some point did you move into Lori's house?

8    A.      Yeah.

9    Q.      Do you remember that?

10   A.      Yes.

11   Q.      What was going on at Lori's house?

12   A.      Drugs.

13   Q.      How do you mean?

14   A.      Prostitution sometimes.  It wasn't a whole lot then, but

15   --

16   Q.      When you said drugs were going on can you tell us what

17   you mean by that?

18   A.      Just selling a lot of drugs out of there.  It was known

19   for traffic.

20   Q.      Okay.  Who did you see at that house?

21   A.      Well who was there?

22   Q.      Yes.

23   A.      It was Moet, there was Lori, there was pretty much

24   everybody.  There was a lot of people that was using there too.

25   Q.      Okay.  Who is Lori?

Keisha W.                                    145

1    A.    Lori was the woman that was renting it I believe.

2    Q.    Okay.  Was she a user?

3    A.    Yeah.

4    Q.    All right.  Do you know where the drugs that you saw

5    there were coming from?

6    A.    Yes.  From Moet.

7    Q.    What kind of drugs were there?

8    A.    There was heroin.  There was cocaine.

9    Q.    And were drugs being sold?

10   A.    Yes.

11   Q.    How did that work?

12   A.    Just a lot of people would come for drugs.

13   Q.    Who was selling the drugs?

14   A.    Moet and there was also Hightower and G.

15   Q.    Were any of the young women helping?

16   A.    I don't remember who exactly.  Yes Chrissy.  Chrissy was

17   definitely there always.

18   Q.    All right.  Any of the other --

19   A.    No, not really.  None of them really ran with the drugs

20   besides Chrissy.

21   Q.    All right.  Why did you end up staying there?

22   A.    I had no place to go.

23   Q.    You were homeless at the time?

24   A.    Yeah.

25   Q.    Okay.  Were you posted there?

                         Keisha W.                        146

1    A.      Yes some of the time.  Not all the time.

2    Q.      Who posted you?

3    A.      Moet.

4    Q.      Did Moet ever ask you to steal?

5    A.      Yeah.  I went out to the store a lot.

6    Q.      Tell us about that.

7    A.      I would go shopping with whatever they wanted, a list of

8    whatever, and then I guess they needed and bring it back and

9    exchange either money or heroin or crack or whatever.

10   Q.      When you say that you would go shopping what do you

11   mean?

12   A.      I would go to steal clothes or toys or whatever.  Mostly

13   clothes and stuff like that.

14   Q.      For whom were you stealing clothes and toys?

15   A.      I was stealing for his kids, for him, for G, for

16   Hightower.

17   Q.      Did they give you lists of things they wanted?

18   A.      Yes.

19   Q.      And you would get them?

20   A.      Yeah.

21   Q.      And when you brought them back what did you get?

22   A.      I would get heroin most of the time.

23   Q.      Okay.

24   A.      That was my biggest problem.

25   Q.      Was this at Lori's house?

Keisha W.                                    147

1   A.     Yes.

2   Q.     Who was in charge there?

3   A.     Moet.

4   Q.     So we have had testimony about Lori's house from late

5   2015.  Was there a time when she left?

6   A.     Yes.  She went to rehab.

7   Q.     Okay, and did the group continue to operate out of her

8   house?

9   A.     Yes.

10  Q.     Okay.  As you just described?

11  A.     Yeah.

12  Q.     Okay.  During this time period do you know it as Lori's

13  house?

14  A.     Yes.

15  Q.     At Lori's house did Moet ever ask you to do degrading

16  things?

17  A.     Yes.

18  Q.     Okay.  What's one that comes to mind?

19  A.     I guess they call it the acorn challenge.

20  Q.     Okay.  How did that work?  Just briefly.

21  A.     We were supposed to put them in us and have it on film

22  for I guess Moe or whatever they used it for.

23  Q.     Okay.  Let's -- let me try and -- let me try and help

24  with this.  First of all, you say there was film?

25  A.     Yes.

1  Q.     Were you being filmed when this was happening?

2  A.     Yeah.

3  Q.     Okay.  Who asked you to do this?

4  A.     Moet.

5  Q.     All right, and did he have a bunch of nuts?

6  A.     Yeah.

7  Q.     What did he do with them?

8  A.     He puts them inside us.

9  Q.     Okay.  Who else went through this?

10 A.     Ayla.

11 Q.     Okay.  Was this very painful?

12 A.     Yeah.

13 Q.     Were you sick or well when this was happening?

14 A.     I was sick.

15 Q.     What did -- what were you promised if you did this?

16 A.     Heroin.

17 Q.     Okay.  Were you criticized afterwards?

18 A.     Yes.

19 Q.     Who criticized you?

20 A.     Everybody.  Him.

21 Q.     Is him Moet?

22 A.     Yes.

23 Q.     What did he say to you?

24 A.     That it looked horrible.  That I looked like I was being

25 raped.

Keisha W.                                    149

1   Q.      Why did you look like you were being raped?

2   A.      Because I didn't want to do it.

3   Q.      Were you crying?

4   A.      Yeah.

5   Q.      Did he give you heroin?

6   A.      Less than he told me.

7   Q.      Okay.  Were there other people there?

8   A.      A whole house full.

9   Q.      Okay.  Let's leave that, Keisha.  Were there other

10  degrading things that Moet asked you to do?

11  A.      Yeah.

12  Q.      What?

13  A.      Pissed on me.

14  Q.      Whose idea was that?

15  A.      Not mine.  That's for sure.

16  Q.      Who pissed on you?

17  A.      Moet.

18  Q.      Was that filmed or not?

19  A.      Yes.

20  Q.      Okay.  What did he offer to give to you if he let you

21  urinate on him?

22  A.      I can't remember exactly.  It was either crack or

23  heroin.

24  Q.      Drugs?

25  A.      Yeah.

                         Keisha W.                                150

1    Q.     Were there other degrading things he did to you?

2    A.     Yes.

3    Q.     What?

4    A.     I stole five bags of heroin.

5    Q.     Let's talk about that in a moment.  Do you remember

6    something with a BB gun?

7    A.     Oh yeah.

8    Q.     What happened there?

9    A.     If I got shot in the ass.

10   Q.     Did he give you something for that?

11   A.     Yeah.

12   Q.     Who shot you in the ass?

13   A.     Brian.  Moet.

14   Q.     Okay, and what did he give you in exchange?

15   A.     Dope.

16   Q.     Heroin?

17   A.     Yeah, heroin.

18   Q.     Okay.  Keisha, did you come to know a young woman named

19   Hannah?

20   A.     Yes.

21   Q.     I'm going to show you 47D and if you look at the picture

22   on the screen, do you recognize her?

23   A.     Yes.

24   Q.     Is that Hannah?

25   A.     Yeah.

Keisha W.                                        151

1    Q.      Did a problem develop between Moet and Hannah?

2    A.      Yes.

3    Q.      What happened?

4    A.      She robbed him.

5    Q.      Of what?

6    A.      His heroin and his crack.

7    Q.      Okay, and how did he react that you witnessed?

8    A.      He wasn't impressed.  He was upset.  He was out for

9    revenge pretty much.

10   Q.      Did he ask you to help him?

11   A.      Yes.

12   Q.      What did he ask you to do?

13   A.      He asked me to pretty much set her up so that he could

14   get to her.

15   Q.      Did he offer to give you anything if you brought her in?

16   A.      Yeah.

17   Q.      What?

18   A.      I can't remember, but it was definitely heroin.  I just

19   can't remember how much.

20   Q.      Okay.  Was there a time in connection -- when he was

21   looking for Hannah that you were going to go visit Hannah's

22   boyfriend?

23   A.      Yes.

24   Q.      Do you remember the boyfriend's name?

25   A.      I can't remember right now.

Keisha W.                                      152

1    Q.      Do you remember if you and Moet talked about you going

2    over to the boyfriend's house?

3    A.      Yes.

4    Q.      Okay, and did you go over to the boyfriend's house?

5    A.      Yes.

6    Q.      And what happened when you were there?

7    A.      I was hanging out with her boyfriend and I got a text

8    message with pictures of her doing degrading things.

9    Q.      Who did you get the text message from?

10   A.      From Moet.

11   Q.      May I have a moment, Your Honor?

12            THE COURT:  Yes.

13            MR. DARROW:  Excuse me just a moment.

14            THE COURT:  Yes.

15   BY MR. DARROW:

16   Q.      So when you had the conversation with Moet about you

17   going to visit Hannah's boyfriend --

18   A.      Yes.

19   Q.      -- was that something that was going to happen right

20   away?

21   A.      Yeah.

22   Q.      And then you did go visit Hannah's boyfriend?

23   A.      Yeah.

24   Q.      And, I'm sorry, when you were with Hannah's boyfriend

25   you got a text from Moe and what was the message that came from

Keisha W.                                        153

1  Moe?

2  A.      There were pictures of Hannah sucking his dick.  Walking

3  around the house with an apron on naked.

4  Q.      Okay.  What did you do with the pictures?  Did you show

5  them to anyone?

6  A.      I showed them to her boyfriend.

7  Q.      I want to have you look at 47C and just take a look at

8  that and see if you recognize it please?

9  A.      Yeah.

10  Q.      What is that?

11  A.      I don't know what this is.

12  Q.      Are you looking at the first page?  Let me just draw

13  your attention --

14  A.      Oh yeah.  I see it, yeah.  Yeah.  He sent me that.

15  Q.      He sent you that?

16  A.      Yeah.

17  Q.      Is that image in front of you a fair and accurate

18  depiction of what Moet sent you?

19  A.      That's the exact picture.

20  Q.      Okay.  This is the picture he sent you when you were

21  with Hannah's boyfriend?

22  A.      Correct.

23  Q.      That you showed Hannah's boyfriend?

24  A.      Correct.

25          MR. DARROW:  We move that in, Your Honor.

                         Keisha W.                          154

1            THE COURT:  Any objection?

2            MR. KAPLAN:  Judge, I'm not sure what's being

3    introduced.  May we approach please?

4            THE COURT:  Yes.  Well do you want to take a look at

5    the exhibit?

6            MR. KAPLAN:  There's emails or Facebook messages

7    attached to this which have nothing to do with her so I'm not

8    sure.  The exhibit seems to include everything.

9            THE COURT:  So are you introducing the photograph or

10   the photograph together with the e-mail?

11           MR. DARROW:  We're fine with just the photograph.

12   The associated texts just show who it's come from and whatnot,

13   but if we just want to use the photo, that's fine.

14           THE COURT:  Okay.  All right.  The photo is

15   introduced and the photo is -- perhaps you should mark it as A

16   -- the number with a A.

17           MR. KAPLAN:  So, Judge, actually thinking about this

18   could I ask the witness a question please?

19           THE COURT:  About the identification of the

20   photograph?

21           MR. KAPLAN:  Before it's admitted.

22           THE COURT:  Before it's admitted.  Okay.

23           MR. KAPLAN:  Yes.

24                          VOIR DIRE

25   BY MR. KAPLAN:

Keisha W.                                      155

1   Q.      So I just wanted to ask you, you had never seen that

2   photograph before?

3   A.      Not before he sent it to me.

4   Q.      And what you got was just the photograph?

5   A.      I got a couple of them.

6   Q.      And how do you know who sent them to you?

7   A.      Because he sent them to me.  We were talking right

8   before that.  I was at his house before that.

9   Q.      At Brian's house?

10  A.      Yes.

11  Q.      And how do you know that he actually sent you that

12  photograph?

13  A.      Because he told me it was him.  He laughed about it.

14  Q.      What did he say?

15  A.      He laughed about it when we talked about it again.

16  Q.      But it was after that, that you got the photograph?

17  A.      When I went -- when I went to her boyfriend's house is

18  when I got it.

19  Q.      Okay, and did it identify in any way that it came from

20  Brian?

21  A.      Yes from his phone number that I had saved in my phone.

22          MR. KAPLAN:  Okay.  I have no objection, Your Honor.

23          THE COURT:  Okay.  So admitted.

24  [Government exhibit 47C admitted]

25      MR. DARROW:  May we publish please?

                          Keisha W.                          156

1   BY MR. DARROW:

2   Q.    Is that the photo Moet sent you?

3   A.    Yes.

4   Q.    Is that Hannah?

5   A.    Yes.

6   Q.    Okay.  You can take it down.  Around the time that Moet

7   is mad at Hannah were there other pictures of her that he

8   posted that you saw?

9   A.    After the pictures he sent me that night?

10  Q.    Yes.

11  A.    Yeah.  They were posted on Facebook.

12  Q.    What did he post?

13  A.    Not all of them.

14  Q.    Okay.  Do you remember did you see the posts?

15  A.    Yeah.  It was a video.

16  Q.    Can you remember what the video was about?

17  A.    It was about Hannah.  It had her with the apron on that

18  he had sent me previously, and a couple others I believe, and

19  just talking about how degrading her because obviously he was

20  mad at her.  So it was clear as day he was mad about it.

21  Q.    What effect did this have on you seeing these pictures

22  of Hannah posted by Moet?

23             MR. KAPLAN:  Objection, Your Honor.  May I approach?

24             THE COURT:  Yes.  Okay.  You're free to stretch here.

25  [Bench conference]

```
                        Keisha W.                         157
 1              MR. KAPLAN:  My understanding is she left February of
 2   2016.  In fact, I don't even think she saw him in January 2016.
 3   So it is still irrelevant what effect it had on her.
 4              THE COURT:  Why is it irrelevant?  She's working with
 5   him at that time.
 6              MR. KAPLAN:  No she wasn't.  I think that video was
 7   posted in March.
 8              MS. SEN:  It was posted on March 4th.  It was after
 9   she left.
10              THE COURT:  But that doesn't make any sense because
11   she saying that she came right from his place.
12              MS. SEN:  That's the picture the Government just
13   admitted, Your Honor, but they are talking right now about the
14   video, but that video wasn't posted until March of 2016.  So
15   she --
16              MR. KAPLAN:  We have emails showing she hadn't seen
17   him for a long time in January of 2016.  I think by February
18   she was no longer with them.
19              THE COURT:  So I'm really confused.  What is the
20   video that you're talking about?
21              MS. SEN:  The one that the Government played earlier,
22   Your Honor, was submitted.  It was Mr. Folks talking about
23   Hannah.
24              THE COURT:  Right.
25              MS. SEN:  So that video was posted on Facebook -- on
```

Keisha W.                                   158

1  his Facebook account or the account attributed to him on March

2  4th, 2016 and Ms. W. here she left.  In her indictment she's

3  out by February 2016.

4          THE COURT:  Okay.  So remind me the question that you

5  asked.  I thought -- I thought the question was how did this

6  photograph -- these photographs by Hannah impact her.  Those

7  photographs were shown to her in a text message right from the

8  defendant within 24 -- at the same 24 hours.

9          MR. DARROW:  I think -- allow me to try to explain.

10 There's two different blasts of photos of Hannah at issue.  The

11 ones she said.  The other one that's one blast.  Then there's

12 the video and the video came afterwards.  Counsel is saying

13 that didn't happen until March.  So the argument is even though

14 she's working for him when the first photos are introduced

15 there hasn't been a foundation laid.  There hasn't been proof

16 she was working for him in March when the Hannah video was

17 posted.  So they are saying, as with Mandy, who after she

18 separated similarly she shouldn't be able to say the effect of

19 the Hannah video on her.

20         THE COURT:  But the question that you have asked is

21 what impact the photographs were that were shown to her when

22 she was at her boyfriend's.

23         MR. DARROW:  I think I used plural and let me

24 rephrase it so I'll just ask her about the photographs.  Okay.

25         MR. KAPLAN:  Judge, even then -- I forget the date of

Keisha W.                                    159

1    the photograph.  Did she say when it was sent to him?

2            MR. DARROW:  They are already in evidence.  You

3    didn't object to that.

4            MR. KAPLAN:  Because the indictment says for her

5    January 16th she was forced into prostitution, but after that

6    there's nothing about her.

7            MR. DARROW:  Well that's the trafficking.  I asked

8    her when she stopped work -- I actually don't know when she

9    stopped working for him.

10           THE COURT:  But the testimony she's at least given so

11   far is that she was with Moe.  He encouraged her to go over to

12   the boyfriend's.  Photographs were shown to her by text

13   message, those photographs which the Government is now asking

14   about as to its impact.

15           MR. KAPLAN:  Why don't you ask her when she left

16   Moe's house because those photographs may not have had an

17   impact on her as she was no longer involved.

18           MR. DARROW:  She said it was during the time he was

19   looking for Hannah.  He asked her to find Hannah.

20           MR. KAPLAN:  I don't know when she left.

21           THE COURT:  He also was joking about the photographs

22   which suggests that she went back and was joking about them so

23   --

24           MR. KAPLAN:  So what if she wasn't actually working.

25           THE COURT:  The point is she's still in the activity

Keisha W.                                    160

1   at least at that point.  Now the video is probably something

2   else, but you're going to exclude it.

3              MR. DARROW:  Yes.

4              MR. KAPLAN:  It's a different question, though, to

5   say what effect did the photographs have on you if she was no

6   longer working.  She might have gone over -- he might have sent

7   those to her.  She's no longer working for him.

8              THE COURT:  But this is all within 24 hours.

9              MR. KAPLAN:  I don't think so, but within that 24

10  hours she's still working for him.

11             THE COURT:  I don't think you need to fine tune to

12  that extent.  So anyway you can ask about the photographs.

13  Make sure the video is excluded.

14             MR. KAPLAN:  Judge Kupersmith said I was being hyper

15  technical.

16             THE COURT:  Yes I would think you are.

17             MS. SEN:  One thing she was actually describing the

18  video.  She wasn't describing the photograph.

19             MR. DARROW:  I'm going to ask her about the

20  photographs.

21             THE COURT:  All right.

22  [End of bench conference]

23

24

25

                         Keisha W.                            161

1    BY MR. DARROW:

2    Q.      Keisha, we're all sorry to put you through this, but

3    let's just move along.  Okay.  You say that Moet sent you these

4    two photographs or some photographs of Hannah?

5    A.      Yes.

6    Q.      There's the one that we just looked at?

7    A.      Yeah.

8    Q.      He also sent you, if I understand correctly, the picture

9    of her wearing the red apron but otherwise naked?

10   A.      Yeah.

11   Q.      Were there other pictures he sent you in that text

12   blast?

13   A.      Yeah I can't remember what they were.  They were more

14   just pictures like that.

15   Q.      Okay.

16   A.      Pretty much.

17   Q.      What effect did it have on you to have him send you

18   those pictures of Hannah?

19   A.      I mean it's always a thought.  Like he has plenty of

20   pictures of me and video now.  Like plenty of things that he

21   could use against me as well if he wanted to at any time and he

22   could easily pay somebody else to do the same thing if I ever

23   did the same thing.  So kind of put fear.

24   Q.      Okay.  Show you 54A.  Do you recognize this woman?

25   A.      Yes.

Keisha W.                                    162

1  Q.    Who is that?

2  A.    That's Ayla L.

3  Q.    Remember we're going to leave out last names.

4  A.    Sorry.  Ayla.

5  Q.    That's Ayla?

6  A.    Yeah.

7  Q.    What involvement, if any, did she have in this business

8  if you know?

9  A.    A lot.

10  Q.    Tell us.

11  A.    She was a prostitute mostly.  That's pretty much all she

12  did to earn money to get high.  I mean that's all I ever seen.

13  Q.    Do you know who she was working for?

14  A.    Moet.

15  Q.    Okay and I apologize if I interrupted.  What were you

16  about to say?

17  A.    I don't know.

18  Q.    Did you -- were you around her frequently back in late

19  2015 early 2016?

20  A.    When I was hanging out at Lori's, yeah.

21  Q.    You saw a lot of her?

22  A.    Yeah.

23  Q.    Did you ever see her interactions with Moet?

24  A.    I mean sometimes I would.  I mean there's a couple

25  occasions, but that was it.  You know it wasn't the greatest

                        Keisha W.                          163

1    thing.  He was upset with her and whatever happened.  I guess I
2    don't know what happened.
3    Q.    Were you around some time when he was upset with her?
4    A.    I have been.
5    Q.    Okay.  What do you remember seeing or hearing?
6    A.    I remember them going into the bathroom and her coming
7    out crying after.
8    Q.    Who brought her in the bathroom?
9    A.    Brian.
10   Q.    Okay.  Did you ever get in trouble with Moet?
11   A.    Yeah.
12   Q.    What got you in trouble with him?
13   A.    Five bags of heroin.
14   Q.    Excuse me.
15   A.    Five bags of heroin got me in trouble.
16   Q.    Did you steal heroin from him?
17   A.    Yeah.
18   Q.    Okay.  Who had the heroin when you stole it?
19   A.    Chrissy.
20   Q.    Okay, and what was Moet's reaction to that?
21   A.    He wasn't happy at all.
22   Q.    What did he do?
23   A.    He had me set up by a friend of mine that I thought was
24   a friend and Hannah.  They paid them to get me to go with them
25   so that they could get me to Brian so he could do whatever.

                              Keisha W.                        164

1    They just left me.

2    Q.     All right.  Did he sort of put out a bounty on you the

3    way he had on Hannah?

4    A.     Yeah.

5    Q.     And you said you were set up.  Did the girls who brought

6    you in did they lie to you?

7    A.     No.  There wasn't any -- yeah the girl and the guy,

8    yeah, they lied to me.  They told me they were going to see a

9    drug dealer and that they -- that I couldn't come because he

10   didn't know me and he would get sketched out so I had to wait

11   outside down the road a little.

12   Q.     So when you went with them did you know they were going

13   to bring you to Moet?

14   A.     No.

15   Q.     Okay.  What happened?  Did you get in the car with them?

16   A.     Yup.

17   Q.     And what happens?

18   A.     They drive me to Winooski down by the railroad tracks at

19   the deadend and they drop me off.  I got out of the car and

20   Moet was across the street and he was coming for me -- coming

21   towards me and he wrapped his arm around me and told me I had

22   to go with him.

23   Q.     Okay.  Let's take this step by step.  Okay.  So Moet was

24   waiting for you?

25   A.     Yeah.

Keisha W.                              165

1    Q.      You say he wrapped his arm around you.  Can you tell us

2    or show us what he did?

3    A.      He just kind of like had it like that you know.

4    (demonstrates)

5    Q.      Where was that on you?

6    A.      Around my neck.

7    Q.      So he put his arm around your neck?

8    A.      Yeah.

9    Q.      Okay, and what did he do with you?

10   A.      He told me to go with him and I was hesitant.  I told

11   him that I wasn't going into the dark with him because I didn't

12   know what he was going to do, and I knew what I had done so he

13   was like well just come with me and I won't hurt you, and so we

14   went across and into the car by his wife's house and I got in

15   the car, the vehicle, and the girls were in the car, Chrissy

16   and I think Ayla was in the car, and I don't remember if there

17   was somebody else.

18   Q.      Okay.  Where did you end up driving with Moet?

19   A.      He dropped off the girls down at Lori's.

20   Q.      Okay, and then what happened?

21   A.      And then we walked from Lori's house over to the

22   cemetery.

23   Q.      Okay.  Who is we then?

24   A.      Me and Moet.

25   Q.      What was he saying to you?

                        Keisha W.                           166

1    A.      He was just telling me if the boys were there that I

2    would be dead.

3    Q.      Was this about the theft of the heroin?

4    A.      Yeah.

5    Q.      What became of your phone?

6    A.      I didn't have my phone.  He had my phone.

7    Q.      He had your phone?

8    A.      Yeah.

9    Q.      When did he take your phone?

10   A.      When we went into the car and all that.

11   Q.      Back in Winooski?

12   A.      Yeah.

13   Q.      Okay.  What did that mean to you when he took your

14   phone?

15   A.      I didn't have no way of getting heroin and I was

16   prostituting so I had no clients.  So it was pretty much all my

17   money was on that phone, any way of getting high was on that

18   phone.

19   Q.      Was this nighttime?

20   A.      Yeah.

21   Q.      How did you feel about what was happening when he walked

22   you over to the cemetery?

23   A.      I was scared and I didn't know what he was going to do.

24   Q.      And what?

25   A.      And I didn't know what he was going to do.

Keisha W.                                    167

1   Q.     What were you afraid of?

2   A.     I don't know.  That he would hurt me.

3   Q.     Okay.  At some place over by the cemetery did he stop?

4   A.     Yeah.  He was talking about how it would all pretty much

5   go away if I had sex with him and reposted to pay him back.

6   Q.     Okay.  What did you say?

7   A.     I was sick and didn't want to do that.

8   Q.     Didn't want to do what?

9   A.     Have sex with him.

10  Q.     What did he say in response to that?

11  A.     Said he would give me bags after and it would all go

12  away and I wouldn't have to worry about anyone.

13  Q.     What happened?

14  A.     We walked over and he said that behind the dumpster

15  would be a perfect place to have sex and nobody would see.

16  Q.     Did he make you have sex?

17  A.     Yeah.

18  Q.     Okay.  Can you just tell us in one sentence what

19  happened?  What sex did he want you to do?

20  A.     He had me -- he wanted me to bend over and have sex with

21  him like that because we were outside.

22  Q.     Okay.  Is that what happened?

23  A.     He wanted me to suck his penis.

24  Q.     Did you comply with his requests?

25  A.     Yeah.

                        Keisha W.                              168

1    Q.     All right.  Did he get angry at you while this was

2    happening?

3    A.     No.

4    Q.     Okay.  You don't remember anything about saying you were

5    rushing him?

6    A.     Oh yeah I was rushing him and it wasn't going to work

7    and it would just take longer.

8    Q.     Is that what he said?

9    A.     Yeah.

10   Q.     Did he tell you anything to tell the other girls when

11   you got back?

12   A.     Yeah.  That he hit me.

13   Q.     He said to tell them that he hit you?

14   A.     Yeah so they wouldn't freak out and see that I was

15   punished I guess.

16   Q.     Okay.  Now you say he said something about Backpage

17   again or working again?

18   A.     Yeah.

19   Q.     What did he say about that?

20   A.     Said he would post me up so I can make some money and he

21   would get his money back.

22   Q.     Okay.  Did he say you were working for him then?

23   A.     He was the one posting me with everything, yup.

24   Q.     We're almost done with me at least.  I'm showing you 42

25   for identification.  Can you --

Keisha W.                                    169

1    A.    Yes.

2    Q.    Does that look familiar?

3    A.    Yes.

4    Q.    Another picture?

5    A.    Yes.

6    Q.    Too many pictures?

7    A.    Yeah.

8    Q.    What are those pictures of?

9    A.    The place where he had sex with me.

10           THE COURT:  I'm sorry I couldn't quite hear you.

11   A.    The place he had sex with me.

12   Q.    By the dumpster by the cemetery?

13   A.    Yeah.

14   Q.    Do those pictures fairly and accurately depict that

15   scene?

16   A.    Exact.

17           MR. DARROW:  We move 42, Your Honor.

18           THE COURT:  Any objection?

19           MR. KAPLAN:  No, Your Honor.

20           THE COURT:  All right.  So admitted.

21   [Government exhibit 42 admitted]

22   BY MR. DARROW:

23   Q.    Can we publish the first of those photos?  Is that where

24   that happened over behind the dumpster?

25   A.    Yes.

                              Keisha W.                          170

1    Q.     Keisha, I'm showing you what's marked for identification

2    as 50B which is a series of photographs.  Have you seen this

3    before?

4    A.     Yeah.

5    Q.     Are these pictures of you?

6    A.     Yes.

7    Q.     Are those -- who took these pictures?

8    A.     Moet.

9    Q.     Are these -- is this copy a fair and accurate depiction

10   of the pictures of you?

11   A.     Exact.

12          MR. DARROW:  Okay.  Your Honor, we move 50B.

13          THE COURT:  Any objection?

14          MR. KAPLAN:  Judge, I would object to the pictures

15   that don't have dates that they were taken and there's no

16   testimony to substantiate to put these in a time frame.

17          THE COURT:  All right.  Do you want to ask her when

18   these pictures were taken at least in relationship to when she

19   was working as part of the enterprise?

20   BY MR. DARROW:

21   Q.     Okay.  Keisha, did he take these pictures of you when

22   you were working for him as a prostitute?

23   A.     Yes.

24   Q.     So this would be --

25   A.     Some of them.  Some of them I wasn't working I think.

               Capitol Court Reporters, Inc. (800/802) 863-6067

                      Keisha W.                          171

1    Q.     Okay, but you say he took them?

2    A.     Yes.

3    Q.     So would this have been in some time between mid 2013

4    and whenever you stopped working with him?

5    A.     Yes.

6           MR. KAPLAN:  Objection, Your Honor.  Again these are

7    not -- these are not being put in a time frame and it's

8    particularly important with respect to when this all ended

9    whether or not these pictures were part of that.

10          THE COURT:  No.  He just asked the question as to

11   whether they were between the period of 2013 to 2015 when she

12   stopped working and I thought that was putting it in the time

13   frame that's relevant to this particular case.

14          MR. KAPLAN:  Some of these are taken in 2016.

15          THE COURT:  Well you want to clarify that because I

16   thought you just said 2015 and she said yes.

17          MR. DARROW:  All right.  I'm thinking -- well the

18   indictment I think has allegations from 2013, but from then up

19   through the time she stopped working for him some time in 2016.

20          THE COURT:  Okay.  All right.

21   BY MR. DARROW:

22   Q.     Are these pictures taken during that time frame?

23   A.     Yes.

24          THE COURT:  Okay.  They are admitted.

25   [Government exhibit 50B admitted]

              Capitol Court Reporters, Inc. (800/802) 863-6067

                        Keisha W.                          172

1                MR. DARROW:  Thank you, Your Honor.

2    BY MR. DARROW:

3    Q.    Sorry.  Excuse me.  Keisha, I'm showing you 50C and 50D.

4    Can you please take a look at these?

5    A.    Yes.

6    Q.    What are those?

7    A.    Pictures of me and Mandy and myself.

8    Q.    Okay.  Do you know who took those pictures?

9    A.    Yes.

10   Q.    Who?

11   A.    Moet.

12   Q.    Now you're just referring to --

13   A.    I think these ones are older ones.  These ones were

14   newer ones.

15   Q.    Are 50C the older ones showing you and Mandy?

16   A.    Yup.

17   Q.    When you say older would that be back during the time --

18   A.    In the motel.

19   Q.    Let me just finish.  Would that be back during the time

20   the summer that you were -- you had your 18th birthday?

21   A.    Yeah.

22   Q.    Okay, and drawing your attention to 50D what are those?

23   A.    Them are older.  They are by the Pearl Street Beverage.

24   Q.    I'm sorry.  What did you say?

25   A.    Them are older.  They are by the Pearl Street Beverage

                        Keisha W.                          173

1    apartment.

2    Q.     Those are older?

3    A.     Them are the newer pictures.  Them are the older

4    pictures that you have in your hand are older.  These ones are

5    the newer ones.

6    Q.     Okay, and these ones 50D are these -- do you know where

7    these pictures were taken?

8    A.     Yeah.

9    Q.     Where?

10   A.     I don't remember the street, but it's right by the Pearl

11   Street Beverage.

12   Q.     Is it a motel?

13   A.     No.  It's an apartment.

14   Q.     It's an apartment.  Was this taken in connection with

15   your work with Moet?

16   A.     Yeah.

17   Q.     Okay.  Do you know who took the pictures?

18   A.     Moet.

19   Q.     All right.  Are these, both of these, 50C and 50D

20   accurate pictures depicting you at the time?

21   A.     Exact.  Yes.

22          MR. DARROW:  Your Honor, we move 50C and 50D.

23          THE COURT:  Okay.  Any objection?

24          MR. KAPLAN:  If I may, Judge.

25          THE COURT:  Yes.  Okay.

Keisha W.                                            174

1                            VOIR DIRE

2    BY MR. KAPLAN:

3    Q.    So I'm going to show you what the Government has marked

4    as 50D.  Could you look at that photograph for me please?  Can

5    you tell me what that is?  Is that a Backpage ad?

6    A.    Yeah.

7    Q.    And if you turn to the second page -- third page does it

8    indicate whose e-mail was used to post it?

9    A.    Yeah.

10   Q.    Whose e-mail was it?

11   A.    That was mine.

12   Q.    Your e-mail?

13   A.    Yeah.

14   Q.    So that's something you posted yourself?

15   A.    Uh-huh, but he took the pictures.

16   Q.    You have to say yes or no.

17   A.    Yes.

18   Q.    So Brian didn't post that you did?

19   A.    Yes, but it was all his doing.  All his pictures.  He

20   took all of these.  I used his phone I believe, yeah, to do it.

21   Q.    And when I look -- when I look at this the date that it

22   was posted was -- or the date that it was created was January

23   2nd of 2016.  Does that seem right to you?

24   A.    Yeah.

25   Q.    And isn't it fair to say that by January 2nd back -- and

                         Keisha W.                          175

 1  it says the e-mail was verified on January 9th of 2016?

 2  A.     Yeah.

 3  Q.     Isn't it fair to say that at that point you were working

 4  by yourself and no longer with Moe?

 5  A.     No.  I was working with him still on and off.

 6  Q.     On and off?

 7  A.     Yeah.  I needed his help.  We had a lot of different

 8  things, the place, with posting, with phone because I didn't

 9  have a phone most of the time.  I was a drug addict.  I

10  couldn't afford it.

11  Q.     So in fact all of the postings in here were done on your

12  e-mail?

13  A.     Okay.

14  Q.     And you posted all these yourself?

15  A.     Okay.

16  Q.     And -- and are you saying you weren't really -- you were

17  or were not working with him?  If you needed something you

18  would call him and he would help you out; is that right?

19  A.     Yes.  He would come -- he would help me out with posting

20  or helping me with making that -- like it was always he was

21  right there when that one was made.

22  Q.     So whatever you needed he was there to help you?

23  A.     Yeah.

24         MR. DARROW:  Your Honor, this is just cross

25  examination.

Keisha W.                                    176

1        THE COURT:  What is being offered are the

2   photographs.  Those were photographs of her.  That's what the

3   Government is asking and/or did ask her.  Do you have an

4   objection?

5        MR. KAPLAN:  My objection is it doesn't appear to me

6   that these were -- I mean she's posted them herself.  It

7   doesn't look to me Brian posted them or I don't even know if he

8   took these pictures.

9        THE COURT:  Well no she said he took the pictures.

10  They are being offered as pictures of her.  That's what's being

11  offered. I didn't think the postings was being offered.  That

12  exhibit was not for the purpose of showing postings.  It was

13  for the purpose of showing the photograph.  Let me just make

14  sure that I'm correct that's what the Government is seeking.

15       MR. DARROW:  I think counsel has her Backpage ads and

16  this witness has testified the defendant --

17       MR. KAPLAN:  Can we approach?

18       THE COURT:  All right

19  [Bench conference]

20

21

22

23

24

25

                        Keisha W.                          177

1           THE COURT:  First of all, these were offered as

2    photographs of her not as necessarily postings, but is that

3    right?

4           MR. DARROW:  Well it may be.  I only asked about the

5    photographs, but one of the photographs in these ads are

6    embedded in Backpage, and in counsel's voir dire she's said yes

7    those are Backpage postings I did when working with Moet.  I

8    used his phone.  So I don't know what the problem is.

9           MR. KAPLAN:  That isn't what she said.  She said she

10   posted them.  Brian took some of the pictures and she knew she

11   could ask him for help, but this goes back to the issue I was

12   concerned about before which is when is it that she stopped

13   working with him because I have emails in September, October,

14   November, and January of 2015 where she's saying can you help

15   me post, I don't have a phone, and she said I haven't seen you

16   for a while where have you been.  So I'm not convinced when

17   this went on Backpage she was working for him.

18          MR. DARROW:  She says it was.

19          MR. KAPLAN:  She didn't say that.  She said if she

20   needs help, she will ask him.

21          THE COURT:  All right.  I'm going to excuse the jury

22   and open this up for discussion.

23   [End of bench conference]

24

25


              Capitol Court Reporters, Inc. (800/802) 863-6067

Keisha W.                                    178

1           THE COURT:  All right.  This is time for our break at

2    this point.  I'm going to stay and speak with the lawyers.

3    Let's take our recess and we'll see you back in a few minutes.

4    [Jury returns to jury room.  The following was held in open

5    court without the jury present].

6           THE COURT:  You are excused.  You can go out in the

7    back.

8    [Witness leaves the courtroom]

9           THE COURT:  Okay.  Let's begin with where I thought

10   this offer of an exhibit began.  The Government has a whole

11   series of photographs.  Some may be Backpage ads.  Some not.

12   The Government sought to introduce those photographs,

13   photographs of her.  Not arguing necessarily that they are part

14   of Backpage.  Apparently according to what's in the Backpage ad

15   this was early January of 2016.  The defense has some reason to

16   believe that she was not engaged with the defendant at that

17   time.  Of course if what the Government is seeking to introduce

18   are photographs of her, not necessarily arguing that those were

19   used in Backpage, although one logically could conclude that

20   it's engaged in prostitution if the photograph is a part of the

21   Backpage, but essentially the offer was just photographs which

22   were taken during the course of the relationship between this

23   witness and the defendant, this becomes confused with the

24   Backpage advertisement.  So tell me what your position is, Mr.

25   Kaplan.

                        Keisha W.                          179

1              MR. KAPLAN:  So a couple of things, Judge.  Would it

2    be helpful if the Court actually saw the ads?

3              THE COURT:  Sure.  There's two exhibits.  There's 50C

4    and 50D; is that right?

5              MR. KAPLAN:  This is really 50D is what I'm --

6              THE COURT:  D.  Okay.  Okay.

7              MR. KAPLAN:  To start with, Judge, when the Court

8    asked the Government what are they being introduced for, is it

9    just the picture, my impression of the response was no it was

10   both.  That wasn't said in that many words.  The Court can

11   inquire about that, but the fact of the matter is if you're

12   introducing that picture, then the Backpage ad is going with it

13   and everything in that Backpage ad is going with it.  The Court

14   ruled early on in these proceedings that if the prosecutors

15   want to introduce a photograph of someone, they have to relate

16   it to the charges, and if in fact she's no longer working for

17   the defendant, maybe she might have called up and said look I

18   don't have a phone can you help me post this, that's a little

19   different than her being involved.  It's pretty clear that no

20   one forced her.  She was working on her own.  In fact, one of

21   the things that prosecutors have failed to bring out is that

22   for a couple years she worked on her own.

23             THE COURT:  Okay.  Well if it's just the taking of

24   the photographs without any kind of linkage to Backpage, it

25   would be relevant obviously because these are essentially

                        Keisha W.                          180

1    pornographic images in these photographs and she's testifying

2    those photographs were taken by the defendant.  The problem

3    becomes with posting of the Backpage January 2nd.  Is January

4    2nd or when this was posted beyond the time in which she was

5    working for the defendant or was it not?

6              MR. KAPLAN:  I think -- I believe that it was and the

7    emails that we have -- the emails, the Facebook messages that

8    we have suggest that.

9              THE COURT:  Okay, and, Mr. Darrow, what proof do you

10   have that she's still working for him at that point?

11             MR. DARROW:  Your Honor, the indictment in Count XII

12   says -- alleges that he trafficked her from in or about June

13   2015 and in or about February 2016.  These fall right within

14   that and she testified under counsel's voir dire that she was

15   working with him.  So these are, you know, for the core

16   evidence.

17             THE COURT:  Okay.  Can you -- can you -- this is

18   January 2nd.  Can you clarify with her that she in fact was

19   working for him at the time of the posting of these images with

20   Backpage?

21             MR. DARROW:  Sure.

22             THE COURT:  Okay.  So I'm going to reserve judgment

23   on the admission of these exhibits until that question is

24   answered, is she still working for him at the point in which

25   they are posted with Backpage.

Keisha W.                                    181

1           MR. KAPLAN:  The thing is, Judge, the Government even

2     after all of our bench conferences and discussions about this

3     has never established when she stopped working with him, and if

4     the Government knows, I think that should be brought out.  Now

5     she said -- we have to make a distinction I think between her

6     working for Brian and her working on her own, but maybe Brian

7     -- like, for example, she says at one point I don't have a

8     phone can you help me post it.  She's not working for Brian

9     under those circumstances.

10          THE COURT:  So what I'm inviting the Government to do

11    to be able to post -- be able to include these images in

12    evidence of the Backpage posting that they establish the fact

13    that she's working past January 2nd, right?  That answers at

14    least the preliminary question as to her going to work with the

15    defendant up to the posting of these images and that's what's

16    relevant to this particular posting.  So to a large extent I'm

17    accepting what you're saying.  They have got to actually show

18    that she was working for Mr. Folks at the time of those

19    postings.

20          MR. KAPLAN:  And of course her testimony on voir dire

21    was exactly not that.  It was that I posted these myself.  He

22    took the pictures previously, and if I needed help, he would

23    help me.

24          THE COURT:  Okay.  Well I guess I'm interested to

25    know the timing and seems to me that we'll open up the evidence

Keisha W.                                   182

1  before these are admitted into evidence to find out if she's

2  working or if she's not.

3          MR. DARROW:  Thank you, and, Judge, I would just

4  mention we've been talking about 50D which are the photos

5  embedded in Backpage ads.  50D.  50B are not Backpage ads.

6  They are just photos.  So none of these arguments go to 50B.

7          THE COURT:  Do you have any objection to 50B?

8          MR. KAPLAN:  I think they were already admitted.  No.

9  Well I had raised an issue there's no date to when they were

10  taken, but the Court said well because the prosecutor said

11  between when you started and when you stopped, but my concern

12  would be we don't know when she stopped.

13          THE COURT:  All right.  We're going to get more

14  clarification as to when she stopped.  Okay.  We'll take a

15  break at this point be back in a few minutes.  10 minutes.

16  [Recess 3 p.m. - 3:15 p.m.]

17  [The following was held in open court with the jury present]

18          THE COURT:  Okay.  Mr. Darrow, do you want to

19  question the witness further in regard to 50D?

20          MR. DARROW:  Yes.

21  BY MR. DARROW:

22  Q.     Keisha, you don't have the exhibits up there with you?

23  A.     No.

24  Q.     Okay.  Let me show you again the exhibits we were

25  talking about.

                Capitol Court Reporters, Inc. (800/802) 863-6067

Keisha W.                                    183

1   A.      Yup.

2   Q.      50D and 50B.  Drawing your attention to 50D you told us

3   that those were photographs that Moet took of you?

4   A.      Yes.

5   Q.      Okay.  Were you working with him at that time?

6   A.      Yes.

7   Q.      In what capacity?

8   A.      On and off.

9   Q.      Okay.  Are we talking about prostitution here?

10  A.      Yes.

11  Q.      Okay.  Are those photographs in Backpage ads?

12  A.      Yes.

13  Q.      Now counsel asked you about the e-mail address

14  associated with those Backpage ads?

15  A.      Yeah.

16  Q.      Did Moet ever give you his e-mail address to post ads

17  with?

18  A.      Yeah.  He used his multiple times.  I used to not know

19  how to post.

20  Q.      All right.  Sometimes would your e-mail address be used?

21  A.      I don't remember exactly.

22  Q.      All right.  Now you say he took these photographs of

23  you?

24  A.      Yeah.

25  Q.      And I mentioned -- I know that some of the photographs

                          Keisha W.                          184

1    in 50D are the same photographs from --

2    A.     Yup.

3    Q.     -- 50B, but the 50D photographs are in Backpage ads?

4    A.     Yeah.

5    Q.     Okay.  When those Backpage ads went up the first few

6    days of January 2016 were you still working for Moet?

7    A.     Yeah.

8    Q.     Yes?

9    A.     Yes.

10   Q.     Okay, and you mentioned earlier he took the photographs

11   and you mentioned when you first started working for him he

12   would write the narratives?

13   A.     Right.

14   Q.     Who wrote the narrative on that one if you know?

15   A.     It probably was me.

16          MR. DARROW:  Okay.  Your Honor, so we move those.

17          THE COURT:  All right.  Do you want to examine?

18          MR. KAPLAN:  If I might, Judge.

19                          VOIR DIRE

20   BY MR. KAPLAN:

21   Q.     Do you recall when I was showing you these Backpage ads

22   and I asked you if that was your e-mail address you said yes?

23   A.     Yes.

24   Q.     Do you remember that?

25   A.     Yup.

              Capitol Court Reporters, Inc. (800/802) 863-6067

Keisha W.                                        185

1    Q.      And I asked you if you posted it yourself and you said

2    yes?

3    A.      Yes.

4    Q.      And I asked you something about working for Brian.  You

5    said well if I needed something he would help me out?

6    A.      Yup.

7    Q.      What did you mean by that?

8    A.      If I needed to be posted, he would help me with that.

9    If I needed dope, like he would find me -- like I would go out

10   and steal for him or whatever.

11   Q.      You mean get clothes and come back and sell them?

12   A.      Right and get dope for them -- from him, yeah.

13   Q.      But you weren't giving him any of the money that you

14   made from prostitution at that point?

15   A.      At that point I brought him a girl.

16   Q.      You mean Brittany?

17   A.      Yeah.

18   Q.      But you weren't -- if you made money --

19   A.      And I don't remember if I was working with him like that

20   exact time though.  It might not have been.

21   Q.      Do you know when the pictures were taken?

22   A.      No.  I don't know the exact time.  No.

23          MR. KAPLAN:  Could I have a minute, Judge, please?

24          THE COURT:  All right.  I want to ask some clarifying

25   questions.  All right.  Aside from the pictures there is a

                            Keisha W.                          186

1   posting on Backpage on the 2nd.  Comes from your e-mail.  All

2   right.  Did you -- well first the general question do you know

3   if you were working on your own at this point or were you

4   working for Mr. Folks?

5            THE WITNESS:  At this exact time I don't know exactly

6   what I was doing.  No.  I don't know exactly what I was doing,

7   but I know I was on and off with him.

8            THE COURT:  Was there a transition between working

9   for Mr. Folks and essentially working for your own?

10            THE WITNESS:  There was between both, yeah.

11            THE COURT:  And when did that happen approximately?

12            THE WITNESS:  I don't remember.

13            THE COURT:  Well when you were working for Mr. Folks

14   was there ever times when you used your own e-mail to post?

15            THE WITNESS:  Not very often unless I was working by

16   myself for the most part, yeah.

17            THE COURT:  Okay.  So the fact that you used your own

18   e-mail here does that suggest to you that you're working on

19   your own or does that suggest --

20            THE WITNESS:  I mean I was getting help from him

21   clearly because the pictures -- because I had him take pictures

22   and it was his idea to take the pictures so --

23            THE COURT:  Okay.  When was -- when were those

24   pictures taken in relation to when you submitted the posting?

25            THE WITNESS:  It was later on.  It was later on.  It

                 **Capitol Court Reporters, Inc. (800/802) 863-6067**

                        Keisha W.                        187

1    was when he was staying and he had an apartment next to the

2    Pearl Street Beverage.  That's when I was staying there.

3              MR. KAPLAN:  Sorry.

4              THE COURT:  I can't quite hear you.  What do you mean

5    the pictures were later on?

6              THE WITNESS:  These were taken when he was -- had the

7    apartment next to the Pearl Street Beverage.  So that was later

8    on.  It wasn't early when I first started.  So I don't

9    remember.

10             THE COURT:  All right.  So what you're saying is the

11   pictures were from the beverage street -- the Pearl Street

12   Beverage?

13             THE WITNESS:  Yeah.

14             THE COURT:  And that was later on in your

15   relationship with him, but was that after you worked for him or

16   was that still while you were working for him?

17             THE WITNESS:  It may have been after because I didn't

18   work with him a whole lot so --

19             THE COURT:  And did you have a pattern of actually

20   posting on Backpage sometimes when you were working for

21   yourself?

22             THE WITNESS:  I posted myself, yeah.

23             THE COURT:  Okay.  All right.  Okay.  Let's move it

24   along.  50B are just photographs.  That's not a posting; is

25   that correct?

```
                        Keisha W.                        188
 1           MR. DARROW:  Yes.
 2           THE COURT:  Those are admitted.  50D with the
 3  submissions to Backpage are excluded because that's all
 4  Backpage stuff and it could very well have been after she was
 5  no longer working for him.
 6           MR. DARROW:  Okay.  May I make one more effort to get
 7  a time period on this?
 8           THE COURT:  Sure.
 9  BY MR. DARROW:
10  Q.    Okay.  I want to show you some Facebook business
11  records.  Did you sometimes have Facebook communications with
12  Moet?
13  A.    Yeah.
14  Q.    And by communications I mean where you can send sort of
15  e-mail messages back and forth.  Can you look at this please
16  and tell me if these are Facebook communications between you
17  and Moet?
18  A.    Yeah this is our conversation.
19           THE COURT:  I'm sorry.  Can you speak up?
20  A.    Yes this is our conversation.  Yeah.
21  Q.    Okay, and this is marked for identification as 131.
22           THE COURT:  Okay.
23  BY MR. DARROW:
24  Q.    And drawing your attention to an exchange message that
25  you're sending him beginning on the bottom of page 9011, you
```

                         Keisha W.                          189

1    want her brought to you, do you see that?  Can you read that?

2    A.      Yes.

3    Q.      Do you know what you're referring to?

4    A.      Yeah.  Brittany.

5    Q.      Oh that's when --

6    A.      I think -- I didn't read it all.

7    Q.      Why don't you take a look.

8    A.      I don't remember.  I don't know.

9    Q.      I'm sorry.  What are you saying?

10   A.      I don't remember.  I don't know.

11   Q.      So when you said you want her brought to you, you don't

12   know --

13   A.      I don't know if I read it -- maybe all of it but --

14           THE COURT:  You don't remember.

15           THE WITNESS:  No not right now.  I didn't read the

16   whole thing so --

17           THE COURT:  All right.  I'm going to leave the ruling

18   as is.  If you want to go on to the next topic.

19           MR. DARROW:  Okay.

20           MR. KAPLAN:  Judge, may we approach on 50B please?

21           THE COURT:  Okay.  Okay.

22   [Bench conference]

23

24

25


           Capitol Court Reporters, Inc. (800/802) 863-6067

                         Keisha W.                              190

 1              MR. KAPLAN:  So --

 2              THE COURT:  You have to push over so they can hear

 3      you.

 4              MR. KAPLAN:  Except for this which is taken in July

 5      1, 2013 the other ones were taken -- well September, September,

 6      I guess the ones I was complaining about ones taken in January

 7      and -- in January of 2016.  It seems to me that she can't say

 8      she was working for him during that period of time.

 9              THE COURT:  She was on and off.  You know frankly the

10      reason I excluded the Backpage was that's highly prejudicial

11      the fact that it's included in the Backpage and it could very

12      well have been when she was working on her own.  These are

13      essentially additional photographs which frankly I don't know

14      it's prejudicial because you have a whole bunch of photographs

15      coming in.  So okay.

16      [End of bench conference]

17

18

19

20

21

22

23

24

25

                    Keisha W.                          191

1              MR. DARROW:  I apologize.  Can I ask the reporter for

2    my last question?

3     [The record was read as requested]

4              MR. KAPLAN:  Objection, Your Honor.  That has not

5    been introduced into evidence.

6              THE COURT:  No.  He's going on to the next topic.

7              MR. KAPLAN:  Oh I'm sorry.

8    BY MR. DARROW:

9    Q.    And I want to dip back a little bit.  You told us about

10   the cemetery -- the events next to the dumpster, right?

11   A.    Yeah.

12   Q.    Okay.  Do you remember when approximately that took

13   place?

14   A.    That was --

15   Q.    Was it when the group was still operating out of Lori's

16   house?

17   A.    Yeah they were still in Lori's house because he went

18   over to Lori's house and I went over to the other house that he

19   sent me to.

20   Q.    And do you remember when they stopped working out of

21   Lori's house?

22   A.    Not really.  I don't know exactly.

23   Q.    Do you remember that when Lori came back from rehab

24   everyone had to move out?

25   A.    Yeah I remember that.

            Capitol Court Reporters, Inc. (800/802) 863-6067

Keisha W.                                    192

1    Q.      Was that around the time they stopped working out of

2    there?

3    A.      Yeah because they had other houses too so --

4    Q.      Right.  If the time they moved out of Lori's was

5    December 2015, does that sound about right?

6    A.      Yeah.

7    Q.      Okay.  Do you know what buildings they moved into after

8    they left Lori's?

9    A.      The one next to the Pearl Street Beverage right there.

10   I don't remember the streets.

11   Q.      Okay.  Hold on just a moment.  We're going to show you

12   94.

13   A.      Yup.

14   Q.      Does that look familiar?

15   A.      Yup.

16   Q.      Were you still working during the time they were

17   operating out of here?

18   A.      No.

19   Q.      Okay.  So you're working -- when they are at Lori's

20   you're working?

21   A.      Yeah.

22   Q.      But when they move over to this place on North Union

23   you're not?

24           MR. KAPLAN:  Objection, Your Honor, that wasn't the

25   testimony.  The testimony was it was off and on and it wasn't

                        Keisha W.                          193

1    very often.

2              MR. DARROW:  I'm trying to find out --

3              THE COURT:  He can ask questions to explore this so

4    objection overruled.  Go ahead.  You can answer that.

5    A.     No I don't think I was working out of there because I

6    just brought Brittany over there and that's where he was

7    wanting to deal with Hannah.

8    Q.     Okay.  So you do recognize this place?

9    A.     Yeah.

10   Q.     Is this the place that you said was next to the Pearl

11   Street Beverage?

12   A.     Yes.

13   Q.     Okay.  Now when you say that this was the place where he

14   was trying to deal with Hannah what do you mean?

15   A.     That's where he was asking me to try to get in touch

16   with her, to try to see if he can get a hold of her because he

17   hadn't been able to see her.  He hasn't been able to get in

18   contact with her because she was obviously trying to stay away

19   from him.

20   Q.     Is this the -- you testified earlier about the time he

21   was trying to get people to bring her in?

22   A.     Yeah.

23   Q.     Is that what you're talking about now?

24   A.     Yeah.

25   Q.     How about the time you got in trouble was that here or

                          Keisha W.                          194

1    at the Spring Street house?

2    A.      That was the Spring Street.  It was at Lori's.

3    Q.      All right, and how about the time when you got those --

4    when he sent you those photographs of Hannah, was that --

5    A.      That was here.

6    Q.      Okay.  Now you testified that after the dumpster episode

7    you were supposed to start working for him again?

8    A.      Yeah.

9    Q.      Did you?

10   A.      No.  I took off.

11   Q.      Okay, and was that the time that he sent people to bring

12   you in?

13   A.      Yup.

14   Q.      Okay.  Were you ever drug sick when Moe was around?

15   A.      Yeah.

16   Q.      When?

17   A.      Multiple times.  I can't even count.

18   Q.      What's it like when you're a heroin addict and you're

19   drug sick?

20   A.      Horrible.

21   Q.      How so?

22   A.       It's like the flu times a thousand.  Nothing that I wish

23   upon my worst enemy that's for sure.  Vomiting, diarrhea, cold

24   shakes, shivering, hot, just so uncomfortable.

25            MR. DARROW:  Excuse me just a moment.

                         Keisha W.                          195

1              THE COURT:  Yes.

2    BY MR. DARROW:

3    Q.    After the dumpster episode, Keisha, when Moet told you

4    you had to start working again did he take you to a new

5    apartment?

6    A.    Yes.

7    Q.    Where was that?

8    A.    That was right there by the cemetery.

9    Q.    And did he want you to work there?

10   A.    Yup.  He posted me up for there.

11   Q.    All right.  Is that the place that you left and ran away

12   from?

13   A.    Yeah.

14   Q.    Why did you do that?

15   A.    It was gross there and I couldn't really get calls there

16   because it was so gross.  So I got an out call from a regular

17   and I left.  Didn't come back.  The door was kicked in the next

18   morning.

19   Q.    Sorry.

20   A.    The door was kicked in the next morning.

21   Q.    All right.  Did you finally get off heroin?

22   A.    No.

23   Q.    I'm sorry.  Did you finally stop using heroin?

24   A.    After a while, yeah.

25   Q.    After all this?

              Capitol Court Reporters, Inc. (800/802) 863-6067

                         Keisha W.                              196

1    A.      Yeah.  I got sick.

2    Q.      All right.  When did you get off?

3    A.      Three years ago.

4    Q.      Okay.  You have been clean for three years?

5    A.      Yup.

6    Q.      Are you on a treatment program now?

7    A.      Yeah.  I'm on suboxone.

8    Q.      How is that going?

9    A.      Great.  I've been clean for three years.  I have a

10   beautiful daughter.  Life is going good.

11   Q.      Okay.  You back together with your mom a little bit?

12   A.      Yeah.  My relationship is back with my mother.

13   Q.      Okay.  Do you recognize Moet in court today?

14           MR. KAPLAN:  Your Honor, we'll stipulate that it's

15   our client.

16           THE COURT:  Okay.

17           MR. DARROW:  Thank you.

18           THE COURT:  All right.  Cross examination.

19           MR. KAPLAN:  Thank you, Judge.

20                     CROSS EXAMINATION

21   BY MR. KAPLAN:

22   Q.      I wanted to try and get sort of a time frame so

23   everybody understands what you were doing when just generally

24   speaking.  So as I understand it in 2013 is when you met Brian

25   and your father introduced you to him?

Keisha W.                                    197

1   A.      Yup.

2   Q.      And then apparently you stayed with him for a very brief

3   period.  You told him you weren't making any money.  You said

4   you want to go home and he drove you home?

5   A.      At my home.

6   Q.      You went home?

7   A.      Yup.

8   Q.      And then you never really spent any time with him again

9   until 2015 --

10  A.      He left, yeah.

11  Q.      -- is that right?

12  A.      There was a period of time where he was gone.

13  Q.      And what you did was you went out on your own?

14  A.      Yes.

15  Q.      So you were working Backpage on your own without Brian's

16  help for a year and a half?

17  A.      After Lori's house I was doing it for about -- I would

18  say I was -- started doing it there by myself at Lori's house.

19  I started learning how.

20  Q.      And then you went to rehab like in 2015?

21  A.      Yup.  I've been in rehab multiple times.

22  Q.      Do you recall when that was -- the last time?

23  A.      The last time I went to rehab?

24  Q.      Yeah.

25  A.      I can't recall.  I don't remember.  It's been a long

                         Keisha W.                          198

1   time.

2   Q.      Valley Vista though?

3   A.      I have had Valley Vista, yeah.

4   Q.      So then you came back and hooked up with Brian again?

5   A.      Yup.

6   Q.      And started using the first day you came back?

7   A.      Well the next day.

8   Q.      And you had called him before you came back?

9   A.      Yeah.

10  Q.      And then after a short time he asked you to leave

11  because you had stolen or kept money or something?

12  A.      Yup.

13  Q.      So you weren't with him very long that time either,

14  right?

15  A.      No.

16  Q.      And then when you left that time you went back out on

17  your own?

18  A.      Yeah.

19  Q.      Okay.  Is that like generally correct?

20  A.      Yeah.

21  Q.      Okay, and I think you said that you worked with Moe off

22  and on, but it wasn't that frequent?

23  A.      Yeah.

24  Q.      Is it really true that it was your father who got you

25  hooked on heroin?

                          Keisha W.                          199

1    A.    Yes.

2    Q.    And it was your father who taught you how to use a

3    needle?

4    A.    Yes.

5    Q.    And do you still see him?

6    A.    Yes.

7    Q.    Is your relationship better now?

8    A.    Yes.  We're both sober.

9    Q.    Sober now?

10   A.    There's damage there, but we're both sober so --

11   Q.    How long has he been sober?

12   A.    For about as long as I have.

13   Q.    That's good.  So as I understand it when you were with

14   your father the way you've -- you two supported your habit was

15   you broke into vehicles and stole things?

16   A.    Yeah.

17   Q.    And it was your father who introduced you to Brian

18   Folks?

19   A.    Yes.

20   Q.    Because Brian wanted to take some pictures and your

21   father indicated that you would be a good candidate for that?

22   A.    I don't know how it works.  I don't know how the

23   transaction worked.

24   Q.    And if I understand your testimony, your 18th birthday

25   was on July 14th of 2013 --

```
                        Keisha W.                          200
 1   A.      Uh-huh.

 2   Q.      -- is that right?

 3   A.      Yes.

 4   Q.      Yes?

 5   A.      Yes.  Sorry.

 6   Q.      And was it a few days before that, that you first met

 7   Brian or how long before?

 8   A.      I don't really remember exactly the time frame on it,

 9   but it wasn't much -- it wasn't much longer after.

10   Q.      So let me show you what the prosecutor's introduced as

11   exhibit 50B and refer you to -- I'm going to give a Bates

12   number.  That's how we identify particular -- Bates number

13   011708 and this has already been introduced into evidence, but

14   do you see these pictures?

15   A.      Uh-huh.

16   Q.      And it indicates that it was taken on July 11, 2013.

17   A.      Uh-huh.

18   Q.      So my question to you is that's pretty close to when you

19   first met him, right?

20   A.      Yeah.

21   Q.      Okay.  In fact, it could have been on the same day that

22   you met him?

23   A.      No.  The same day I met him we didn't take pictures.

24   Q.      Okay.  Within two days or whatever?

25   A.      I don't remember.  Something like that.
```

Keisha W.                                    201

1    Q.      So at some point fairly soon after you met Brian, Brian

2    and you had a discussion about engaging in prostitution?

3    A.      Yup.

4    Q.      And after one or two discussions you decided to do it?

5    A.      Yeah.

6    Q.      And you did it because is it fair to say you wanted

7    money to buy drugs?

8    A.      Yeah.  Drugs, money.  Money for the drugs.

9    Q.      And do you remember saying you were asked -- you went to

10   the Grand Jury on March 9th of 2017 and you were asked okay did

11   you want to do it and you said I was curious because of my drug

12   habit.  Anything to supply it was how I was looking at it.  Is

13   that a fair statement?

14   A.      Yes.

15   Q.      And has that always been the case?  I mean, in other

16   words, if you hadn't been a serious heroin addict would you

17   have done this?

18   A.      No.

19   Q.      So that was the motivation?

20   A.      Yes.

21   Q.      And so when you started the first person you really met

22   besides Brian was who they refer to as Pinkie or Katelynn; is

23   that right?

24   A.      I met her with him.

25   Q.      Yes.

```
                        Keisha W.                        202
 1   A.      Yup.
 2   Q.      And she was the one that actually taught you sort of the
 3   business?
 4   A.      She was telling me, yeah.  He told me she could tell me.
 5   Q.      And I think -- do you remember saying that at the point
 6   that you met Pinkie and you first met Brian that he really
 7   wasn't into drugs at that point.  He was just -- for example,
 8   if you needed some he would have to go out and buy it for you?
 9   A.      Right.
10   Q.      He didn't have it himself?
11   A.      Right.  That I knew of anyway.
12   Q.      And of course so when you made money you gave him half
13   and you kept half --
14   A.      Yup.
15   Q.      -- is that right?
16   A.      That's how it worked typically, yup.
17   Q.      And you could buy drugs from him or you could buy them
18   from someone else?
19   A.      Yeah or just not give him money and then him give me
20   drugs or whatever.
21   Q.      So you were free to do whatever you wanted with the half
22   that you kept?
23   A.      Right.
24   Q.      And in fact isn't it true that you bought drugs with
25   your half, but you also kept some extra money just for personal
```

                    Keisha W.                           203

1    needs?

2    A.      Not very often.

3    Q.      I don't mean -- I mean of your half you didn't

4    necessarily use it all on drugs?

5    A.      Yeah all of it went to drugs.  All of it.  I was bad.

6    Q.      And I think you said at one point that you understood

7    the harder you work the more drugs you could buy?

8    A.      Yeah because the more money you make.

9    Q.      It wasn't your expectation when you started this that

10   anybody would be giving you drugs for free?

11   A.      No.

12   Q.      You didn't expect that?

13   A.      No.  That's not what I was told.  No.

14   Q.      And you never expected that?

15   A.      No.

16   Q.      And isn't it -- it seems -- when I listened to your

17   testimony I have the impression that you were free to come and

18   go as you wanted to?

19   A.      Yeah.

20   Q.      So like after you started in 2013 I think you said you

21   had one episode with someone, said to Brian I want to leave,

22   and he didn't make a fuss about that?

23   A.      Repeat that again.  Sorry.

24   Q.      That was kind of complicated.  Do you remember when you

25   first started and then you decided you wanted to leave?

                        Keisha W.                          204

1   A.      Yeah.

2   Q.      And you went home?

3   A.      Yup.

4   Q.      And Brian gave you a ride home?

5   A.      I don't know if he gave me a ride, but I'm sure, yeah.

6   Q.      And he didn't have a problem with you leaving?

7   A.      No.  It was a different -- it was never like that.  It

8   was never like a threat until the five bags came up.

9   Q.      That's pretty much it was your choice to do something or

10  not do it?

11  A.      Yeah, but no because the drug has a hold on you.  The

12  drug takes over.  That's -- you would do anything for that.

13  You know what I mean.  It takes over because today I would

14  never do anything like that.  I would never make the choices I

15  have on drugs.

16  Q.      Are you finding it a little bit easier everyday to put

17  that behind you?

18  A.      Yeah.  It's closure.  This is closure.

19  Q.      And so you went home in 2013.  Do you remember what

20  month it was?

21  A.      No.

22  Q.      And after that how long had you -- how long was it after

23  that, that you started working on your own?

24  A.      A while after that.

25  Q.      And how long did you work on your own -- when I say work

Keisha W.                                    205

1   on your own you were engaged in prostitution, right?

2   A.     I did that for a while on my own, yup.

3   Q.     Did you do that right up until the time that you went to

4   rehab?

5   A.     Right up until I pretty much got sick and almost died,

6   yeah.

7   Q.     So I think they say you hit rock bottom?

8   A.     That was mine, yup.

9   Q.     And so some time in 2013 after you left Brian until you

10  almost died that's when you were prostituting on your own?

11  A.     Yup.

12  Q.     And you were posting on your own?

13  A.     Yup.

14  Q.     Then I guess you went to rehab, right?  Was it at Valley

15  Vista?

16  A.     Yeah I guess.  I don't remember exactly which one.

17  Q.     I know you went to Maple Leaf once?

18  A.     I've been there a couple times.  That's why it's hard to

19  remember.

20  Q.     Why do you think it worked this time and it didn't work

21  the other times?

22  A.     I wasn't ready.  I wasn't ready at all.  The drug still

23  had a hold of me.  My dad was still using so having him around

24  didn't help either.  Having other people that were surrounded

25  that didn't want to stop, you know.

Keisha W.                              206

1    Q.      What did you think of Valley Vista?

2    A.      It's not my cup of tea I guess.  I don't know.

3    Q.      So you pretty much stopped on your own?

4    A.      Yeah.

5    Q.      You're going to the clinic and getting suboxone?

6    A.      I'm not in a clinic.  I have a private doctor.

7    Q.      Oh you do?

8    A.      I was there, but I moved up in the world.

9    Q.      Okay.  So after you got back from rehab you weren't

10   ready apparently to quit.  You called Brian from rehab and said

11   I'm coming back?

12   A.      Yeah.

13   Q.      And did he pick you up at the bus terminal?

14   A.      Yup.  Yes.

15   Q.      And you started using that day?

16   A.      The next day.

17   Q.      Next day, and then some time after that you left Brian?

18   A.      Uh-huh.

19   Q.      He asked you to leave because you withheld money or

20   something?  Yes.

21   A.      Yes.

22   Q.      Do you know how long you were there during that time

23   frame?

24   A.      I was there a little longer.  I was there for a couple

25   weeks.

                    Keisha W.                         207

1   Q.     So you were there a couple weeks and then you left and

2   you were working on your own again?  Do you remember saying I

3   don't mind leaving because I've saved a lot of money from some

4   of the jobs I have had?

5   A.     No.

6   Q.     No, but you were working on your own after you left?

7   A.     Yeah I think so.  I'm not sure.  I can't remember

8   exactly.

9   Q.     And between then and the end of December you were in and

10  out of Lori's house?

11  A.     Yeah.

12  Q.     You would stay there sometimes, sometimes you wouldn't?

13  A.     Yeah.

14  Q.     And you were bringing stolen items there on a regular

15  basis for the people to buy?

16  A.     Yeah because I got sick of doing prostitution.

17  Q.     You were sick of prostitution and you never really

18  worked for Brian again after that?

19  A.     No not really, no.

20  Q.     Last time you might have worked for Brian was when you

21  came back from rehab for a couple of weeks?

22  A.     Lori's house.  Lori's house was after that so --

23  Q.     All right, but was that during the time frame that you

24  needed something you would ask him for help?

25  A.     Yeah.  I went to him a lot of the time for help.

Keisha W.                                                 208

1    Q.      Pardon me.

2    A.      I went to him a lot of the time because I knew he knew

3    everything.  He had it to do it with.

4    Q.      So you trusted him?

5    A.      I wouldn't say trusted him, but --

6    Q.      But he was someone --

7    A.      He had a hold on me I guess because he had what I

8    wanted.

9    Q.      So if he had what you wanted, that's why you would go to

10   him?

11   A.      Correct.

12   Q.      He never -- he never withheld drugs from you that you

13   were entitled to?

14   A.      Yeah he did.

15   Q.      You mean when you got --

16   A.      When he made the video he withheld.

17   Q.      For a while?

18   A.      He withheld.  He gave me not what he was supposed to

19   give me for that and pretty much you have to work first.  You

20   have to earn it.

21   Q.      So I'm sorry to have to bring this up again, but there's

22   this thing that took place near the dumpster.  I don't mean to

23   minimize it, but you know what I'm referring to?

24   A.      Yup.

25   Q.      And you had stolen drugs from Brian?

Keisha W.                                        209

1    A.      Yeah.

2    Q.      So when you first met him after that didn't he ask you

3    why you did that?

4    A.      Did what?

5    Q.      Stole the drugs?

6    A.      When I met -- when he got caught up with me --

7    Q.      Yes.

8    A.      -- after all that?  Yeah he asked me why.

9    Q.      And do you remember him saying you're lucky that G or

10   Hightower are not here they would do something about that?

11   A.      Yeah.

12   Q.      Do you remember him saying that?

13   A.      Yes I do.

14   Q.      Do you agree with that?

15   A.      I don't really know because you never know what somebody

16   is really capable of, especially if you don't know them that

17   well.

18   Q.      And did Brian say to you he wasn't going to hurt you?

19   A.      Yup he said that.

20   Q.      And --

21   A.      Or his version of not hurting somebody.

22   Q.      Right, and he didn't want you to go back to Lori's house

23   because you didn't have any bruises on you or anything?

24   A.      Yeah I think so.

25   Q.      He didn't want people to see that he hadn't physically

                        Keisha W.                           210

1    like hit you or something?

2    A.      Yeah.

3    Q.      And so he said there's this other house you can go to if

4    you want to work there and you just give them half the money.

5    Do you remember that?

6    A.      Yeah some of the money, yup, and then pay me back he

7    said.

8    Q.      You didn't stay there?

9    A.      No I didn't stay there.

10   Q.      And you had had sex with Brian a number of times before

11   this?

12   A.      Yup.

13   Q.      And he had always paid you in either drugs or cash?

14   A.      Yup.

15   Q.      And that was one of the ways you made money because you

16   weren't working and didn't have any money?

17   A.      Right.

18   Q.      And that all took place -- you said that Chrissy was

19   still there when this happened?

20   A.      Yeah.

21   Q.      So that was before probably November 10th of 2015?

22   A.      I don't know exactly.

23   Q.      Well if Lori went to rehab on November 10th of 2015,

24   this was before that?

25   A.      Yeah because they were still there at the house.

                    Keisha W.                        211

1    Q.     So I want to show you some Facebook messages.  Can you

2    look at this please and tell me if these are Facebook messages

3    between Brian and you?

4    A.     Yup.  It shows, yup.

5    Q.     So those are between Brian and you?

6    A.     Yeah.

7           MR. KAPLAN:  Your Honor, I would move to admit

8    exhibit's defendant's B9.

9           THE COURT:  Any objection to B9?

10          MR. DARROW:  No.

11          THE COURT:  So admitted.

12   [Defendant exhibit B9 admitted]

13   BY MR. KAPLAN:

14   Q.     So I want to just have you look at a few of these just

15   to get some context of the time frame.  Is that okay?

16   A.     Uh-huh.

17   Q.     You have to say yes or no.

18   A.     Yes.  Sorry.

19   Q.     How old did you say your daughter is?

20   A.     She's a year old.

21   Q.     A year old.  So the first one is on August 17 -- the

22   first one is August -- I mean -- I'm sorry -- yeah August 16th

23   of 2015.  Do you see that right here?  Can you see that one?

24   A.     Yeah.

25   Q.     If I turn to the next page, at the bottom -- so this is

                        Keisha W.                          212

1    on September 13th of 2015.  So you're saying to Brian so I have

2    no phone or anything.  When can you post me?

3    A.      Yup.

4    Q.      So is it fair to say that if you had a phone you would

5    have done it yourself?

6    A.      Yeah.

7    Q.      But you didn't so you were asking Brian for assistance?

8    A.      Right.

9    Q.      But you weren't giving him any of the money that you

10   might have made from being posted?

11   A.      I don't remember.

12   Q.      Okay.

13   A.      It depended.

14   Q.      And then I'm going to show you one from December 21st of

15   2015 and Brian has asked you what you're doing and do you

16   recall saying same, bored as fuck, I miss you?

17   A.      Yeah.

18   Q.      Do you see that?

19   A.      Yes.

20   Q.      And what do you mean I miss you?  Were you telling him

21   that you wanted to spend some time with him?

22   A.      No.  Just, I don't know, I've known him forever so it

23   was just a normal thing I guess.

24   Q.      All right.  So then Brian says so why you ain't been

25   hitting me, right?

                          Keisha W.                          213

1    A.      Yeah.

2    Q.      What was your response?

3    A.      I don't know.  I can't see it.

4    Q.      You said I need your number?

5    A.      Yeah.

6    Q.      So at least at that point certainly Brian and you were

7    on speaking terms?

8    A.      Yeah.

9    Q.      In fact, you were always on speaking terms?

10   A.      For the most part, yup.

11   Q.      Pardon me?

12   A.      Yeah for the most part, yeah.  I was blinded by the

13   drugs.  Drugs and life I guess.

14           MR. KAPLAN:  Can I have a minute, Judge?

15           THE COURT:  Yes.

16           MR. KAPLAN:  Your Honor, I have nothing further.

17           THE COURT:  Okay.  Any redirect?

18           MR. DARROW:  Briefly.

19           MR. KAPLAN:  Thank you.

20                       REDIRECT EXAMINATION

21   BY MR. DARROW:

22   Q.      Keisha, when you first meet Folks when you're 17 or a

23   few days before your 18th birthday did he know that you were

24   dope sick?

25   A.      I don't remember.  Probably I'm sure.

                         Keisha W.                          214

1    Q.      All right.

2    A.      I was a lot.

3    Q.      You were a lot.  Okay.  Who taught you how to Backpage?

4    A.      He did.

5    Q.      All right, and who took those pictures of you?

6    A.      He did.

7    Q.      You've told us about how after the dumpster episode he

8    said you're working for me again then he put you up in an

9    apartment?

10   A.      Yup.

11   Q.      Was that one of the last events in your relationship

12   with him?

13   A.      Yeah.

14   Q.      So was that after the walnut episode you talked about?

15   A.      Yeah.

16   Q.      So at the time when he put you up in that apartment and

17   posted you was that after you knew he had a lot of pictures of

18   you?

19   A.      Yeah.

20   Q.      And counsel talked about a bunch of the things that

21   Brian did to help you.  Is that essentially getting you heroin

22   and posting you?

23   A.      Yes.

24            MR. DARROW:  Thank you.

25            THE COURT:  Okay.  Any recross?

```
                         Keisha W.                            215
 1                     RECROSS EXAMINATION
 2   BY MR. KAPLAN:
 3   Q.    I think you said several times that you didn't work for
 4   Brian very much.  It was off and on?
 5   A.    Yup.
 6   Q.    And when we talked about the postings in January you
 7   pretty much said you were doing that on your own.  You might
 8   have asked Brian for some assistance or something?
 9   A.    Yeah.
10   Q.    Okay, and by the time you left Lori's you no longer were
11   -- certainly weren't at that point working for Brian?
12   A.    When -- when he was at Lori's?
13   Q.    After you left Lori's.
14   A.    After I left Lori's, no.
15             MR. KAPLAN:  Okay.  I have nothing further.
16             THE COURT:  All right.  Thank you.  You're all done.
17             THE WITNESS:  Thank good.  I'm ready to get out of
18   here and get back to my daughter.
19             THE COURT:  Okay.  Does the Government have another
20   witness?
21             MR. DARROW:  We do.  We'll check and see if she's
22   here, but do you want to start with another young woman that
23   worked -- allegedly worked for the defendant?
24             THE COURT:  I think we might start in the morning.  I
25   think that might be preferable.  So all right.  That's -- your
```

 1    next witness is.

 2              MR. DARROW:  Katelynn.

 3              THE COURT:  Katelynn.  Okay.  Well let's call it a

 4    day at this point.  You're leaving at 4 o'clock.  I'm going to

 5    stay and talk with the lawyers.  By the end of tomorrow I might

 6    give you a really good estimate as to how long the trial is to

 7    be.  So we can talk about scheduling late tomorrow.  Again I

 8    just want to remind you not to talk with anyone, communicate

 9    among yourselves, and we'll see you tomorrow morning.

10    [Jury leaves at 4 p.m.  The following was held in open court

11    without the jury present]

12              THE COURT:  Okay.  Are there any legal issues that

13    either party anticipates in the next couple of days?

14              MR. KAPLAN:  Not for us, Judge.

15              MR. DARROW:  We're not -- we can't think of any legal

16    issues right now.

17              THE COURT:  Okay.

18              MR. DARROW:  There was just a question at this table

19    about whether we maybe should start with Higgins tomorrow

20    because Higgins needs to be gone by midday.  So we may make

21    that change.

22              THE COURT:  Okay.  All right.  Yeah I thought he was

23    -- Higgins was supposed to go next, but regardless is it

24    expected that the Government should be closing Thursday late or

25    maybe into Monday but not after that in which case do we

                Capitol Court Reporters, Inc. (800/802) 863-6067

1    anticipate that the evidence will be closed by Tuesday or

2    Wednesday at the latest?

3              MR. DARROW:  For the Government's part we think

4    Monday.

5              THE COURT:  You think going into Monday?

6              MR. DARROW:  Probably.

7              THE COURT:  Okay.

8              MR. KAPLAN:  I would think by the end of Tuesday we

9    would be done if not before that.

10             THE COURT:  Okay.  So we can aim for Wednesday.

11             MR. KAPLAN:  One thing I don't know, Judge, excuse

12   me, is we have these computer people.  I don't know how long

13   they are going to take so --

14             THE COURT:  Okay.  All right, but Wednesday?

15             MR. KAPLAN:  I would think the case would certainly

16   go to the jury on Wednesday.

17             THE COURT:  Good.  Okay.  So would you have any

18   objection, assuming that you're moving along tomorrow as you

19   did today, me telling the jurors that they can expect the

20   following schedule; that the Government may be done -- well

21   actually I probably would just say it looks like Wednesday

22   would be the day that they would receive the case.  A couple of

23   people who are concerned about the following week because they

24   have been listed as available through that following week and

25   in fact some of the week after.  So it would be helpful if we

1 | could tell them tomorrow, but we'll see how it goes tomorrow.

2 | All right.  So I'll be here early again and if there's anything

3 | that you want to talk about, let me know.  My understanding is

4 | that Judge Crawford had proposed a jury charge.  There were no

5 | objections to that; is that correct?

6 |         MS. SAVNER:  That is correct.

7 |         MS. SEN:  Your Honor, we hadn't objected to Judge

8 | Crawford's jury charge, but we may want some additional

9 | instructions.

10 |         THE COURT:  Okay.  Well just let's -- hopefully by

11 | the end of Thursday let me know what instructions you're

12 | looking for.

13 |         MS. SEN:  Thank you, Your Honor.

14 |         THE COURT:  Okay.  Thank you and we'll see you

15 | tomorrow.

16 | [Adjourned at 4:05 p.m.]

17 |                 C E R T I F I C A T I O N

18 |    I certify that the foregoing is a correct transcript

19 | from the record of proceedings in the above-entitled matter.

20 |

21 |

22 |

23 |

24 | May 31, 2019

25 | Date                              JoAnn Q. Carson, RMR,CRR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25