DAY 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
            V                *
                             *
BRIAN FOLKS                  * CRIMINAL FILE NO. 16-94



JURY TRIAL
Wednesday, April 24, 2019
Burlington, Vermont



BEFORE:

       THE HONORABLE WILLIAM K. SESSIONS III
          District Judge



APPEARANCES:

       WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
          MATTHEW T. GRADY, ESQ., Assistant United States
          Attorneys, Federal Building, Burlington,
          Vermont; Attorneys for the United States

       MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
          Suite 405, 95 St. Paul Street, Burlington,
          Vermont; Attorney for the Defendant

       NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
          Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

# I N D E X

## M I S C E L L A N E O U S

|                          | PAGE |
|--------------------------|------|
| Jury sworn               | 4    |
| Initial charge to jury   | 4    |

**OPENING STATEMENTS**

| Ms. Savner               | 14   |
| Ms. Sen                  | 35   |

## E X A M I N A T I O N

| WITNESS NAME                              | PAGE | LINE |
|-------------------------------------------|------|------|
| **ADAM CHETWYND**                         |      |      |
| Direct by Ms. Savner                      | 46   | 12   |
|                                           | 79   | 19   |
| Voir Dire by Mr. Kaplan - Exhibit 4       | 78   | 11   |

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION                                                  | IN EVIDENCE |
|--------------|-------------------------------------------------------------|-------------|
| 1            | N-1 recorded call between Folks and CS on 1/6/2016          | 59          |
| 2            | N-2 recorded call between Folks and CS on 1/6/2016          | 63          |
| 3            | N-3 CS audio dated 1/6/2016                                 | 66          |
| 4            | N-4 photograph of texts between CS and Folks from 1/6/2016  | 79          |
| 5            | N-4 photograph of Drug Exhibit 1 from 1/6/2016              | 73          |
| 6            | Drug Exhibit 1 from 1/6/2016                                | 77          |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 7 | N-6 recorded call beween Folks and CS from 1/12/2016 | 82 |
| 8 | N-7a CS video dated 1/12/2016 | 84 |
| 12 | N-16 recorded call between Folks and CS on 1/22/2016 | 96 |
| 13 | N-16 CS audio dated 1/22/2016 | 98 |
| 14 | N-16 CS video dated 1/22/2016 | 102 |
| 15 | N-16 photograph of texts bewteen CS and Folks on 1/22/2016 | 107 |
| 16 | Photograph of Drug Exhibit 6 from 1/22/2016 | 105 |
| 17 | Drug Exhibit 6 dated 1/22/2016 | 110 |
| 48A | DMV photograph of Mandy L. | 70 |
| 94 | Photographs of 103 North Union Street, #2, Burlington | 88 |

1  WEDNESDAY, APRIL 24, 2019

2  (The following was held in open court with the jury

3  present at 1:40 p.m.)

4         THE COURT:  Good afternoon.  Welcome back.

5  Before we begin, I'd ask the jury to stand and take the

6  oath.

7         (The jury was sworn.)

8         THE COURT:  All right.  Thank you for

9  returning.  I have some preliminary instructions.

10      First, the grand jury has returned a 16-count

11  indictment in this case.  Fourteen counts charge the

12  defendant, Brian Folks, with criminal offenses.

13      Count 1 charges that between or on or about May of

14  2015 to March of 2016, in Vermont and elsewhere, Mr.

15  Folks knowingly and willfully entered into a conspiracy

16  with others known and unknown to the grand jury to

17  distribute heroin, a Schedule I controlled substance,

18  and cocaine base, a Schedule II controlled substance,

19  and that it was reasonably foreseeable to members of the

20  conspiracy and to the defendant that the offense

21  involved 28 grams or more of cocaine base and 100 grams

22  or more of heroin.  That's Count 1.

23      Count 2.  The grand jury charges that on or about

24  December 25, 2015, Mr. Folks, having been convicted of a

25  felony, knowingly possessed, in and affecting commerce a

1    firearm, namely a Beretta model 92FS nine-millimeter
2    pistol.
3         Counts 3, 5, 8 and 9 charge that on or about
4    January 6, 12, 22 and February 10th, 2016, respectively,
5    Mr. Folks knowingly and intentionally distributed or
6    aided and abetted in the distribution of heroin.
7         Also, in Count 7, the grand jury charges that on or
8    about January 20, 2016, Mr. Folks knowingly and
9    intentionally possessed or aided and abetted in the
10   possession with the intent to distribute heroin and
11   cocaine base.
12        In Counts 10 through 14, the grand jury charges
13   that at times identified in the indictment, generally
14   between June of 2012 and February of 2016, in the
15   District of Vermont, Mr. Folks knowingly, in and
16   affecting interstate commerce, recruited, enticed,
17   harbored, transported, provided, obtained and maintained
18   by any means persons identified as Katelynn C., Keisha
19   W., Danielle M., and Ayla L., knowing and in reckless
20   disregard of the fact that force, threats of force,
21   fraud and coercion would be used to cause these
22   individuals to engage in a commercial sex act.
23        Count 15 charges that between in or about May 17,
24   2013, and May 18, 2013, in the District of Vermont, Mr.
25   Folks knowingly, in and affecting interstate commerce,

1   recruited, entitled, harbored, transported, provided,

2   obtained and maintained by any means Hannah A., knowing

3   and in reckless disregard of the fact, and having had a

4   reasonable opportunity to observe Hannah A., that Hannah

5   A. had not attained the age of 18 and would be caused to

6   engage in a commercial sex act.

7        Count 16 charges that between in or about June 2012

8   to February of 2016, Mr. Folks, together with others,

9   knowingly used and caused to be used one or more

10  facilities in interstate commerce, namely the internet

11  and cellular telephones, with the intent to promote,

12  manage, establish, carry on and facilitate the

13  promotion, management, establishment and carrying on of

14  an unlawful activity, a business enterprise, involving

15  prostitution offenses, in violation of the laws of

16  Vermont, and thereafter performed and caused to be

17  performed acts to promote, manage, establish, carry on

18  and facilitate the promotion and management,

19  establishment and carrying on of such unlawful activity.

20       Mr. Folks has entered not guilty pleas to all of

21  these charges.

22       Now, you should know the grand jury indictment is

23  not evidence.  It's not to be considered as evidence by

24  you.  It is the vehicle by which charges are brought

25  into court.  So ultimately it's not evidence.  This is

1    just a way to bring charges into court.

2         So let me describe to you the process that we will

3    follow during the course of this trial.

4         First, we begin with opening statements.  The

5    government has an opportunity to make an opening

6    statement to you.  The opening statement is not

7    argument.  It's not intended to be argument.  It's not

8    intended to persuade you.  It is a reflection of what

9    the government intends to offer by way of evidence

10   during the course of the trial.

11        Argument about what this evidence suggests comes at

12   the closing argument, the summation, at the end of the

13   trial.  This is just merely a statement about this is

14   what we are going to introduce by way of evidence.

15        So then the logical question is, what is evidence?

16   Evidence consists of, one, the testimony of live

17   witnesses under oath; second, the submission of

18   documents or physical evidence which is accepted by the

19   Court as evidence.  They admit these documents into

20   evidence.  And the third is the stipulation of the

21   parties.

22        Now, what does that mean in regard to other things

23   that you are likely to hear?  Number one, argument of

24   counsel.  Argument of counsel is not evidence.  You are

25   not to consider what a -- what a lawyer says about the

1    case as evidence in this particular case.  You are

2    deciding this case based upon the evidence which is

3    admitted into court.  That's the evidence by way of oral

4    testimony, the written documentary submissions to the

5    Court, as well as stipulations.

6        In addition, anything that I say is not evidence,

7    is not relevant.  And sometimes jurors may look to the

8    judge for an assessment of the credibility of a witness

9    or assessment of a particular fact at issue.

10       My assessment of the facts is totally irrelevant.

11   I rule on issues of law; you rule on issues of fact.

12   And it is your assessment of the facts which is

13   important, not mine.  So don't look to me for any way of

14   interpretation of evidence which is being introduced.

15   That is essentially your function.

16       Now, once the government has completed its opening

17   statement, the defendant has an opportunity to make a

18   statement as well, but that is optional.  I mean, the

19   fact is, in a criminal case, a defendant has no

20   obligation to prove anything.  In fact, the defendant

21   has no obligation to cross examine witnesses, to call

22   witnesses, to make statements, to make a final

23   summation, to testify, as we have talked about before.

24   The obligation is always placed upon the government to

25   prove the case beyond a reasonable doubt.

1          Now, the defense is afforded an opportunity to make

2      a statement to you at the beginning of the trial.  They

3      also have the option to postpone that statement to the

4      close of the government's case and the beginning of

5      their case, or they could just waive opening statement

6      entirely because they have no obligation to prove a case

7      to you.

8          Now, once the opening statements have been

9      completed, then we go to the evidence, and the evidence,

10     again, comes by way of the oral testimony of witnesses,

11     the written submissions accepted into evidence by the

12     Court, as well as stipulations of the parties.  The

13     government calls their first witnesses, and that will

14     begin either today or tomorrow.  And then you begin to

15     assess the evidence which comes in during the course of

16     the trial.

17         So the government has the first responsibility to

18     introduce witnesses.  At the close of the government's

19     case, when they've called all of their witnesses and

20     introduced all the evidence that they wish to introduce,

21     then the defense has an opportunity, if the defense

22     wishes, to introduce evidence or, in fact, can rest on

23     the record.  Again, the defense has no obligation to

24     offer evidence in this case.

25         Once -- if the defense does offer evidence, then at

1       the completion of the defense's case, the government has

2       an opportunity, because they have got the burden of

3       proof, to offer rebuttal evidence.  So they can

4       introduce testimony or they can introduce documents or

5       evidentiary offerings in response to what the defense

6       has submitted.

7             Once the government has completed the rebuttal,

8       then the evidence is closed.  Then it's my

9       responsibility to give you a charge.  And I want to

10      describe -- well, I take that back.  Go to the arguments

11      of counsel before I give you the charge.

12            The attorneys are afforded the opportunity to argue

13      not only what has been submitted by way of evidence but

14      also what it means and how to interpret this evidence.

15      The question is -- the government is going to -- would

16      assert that the evidence that they introduced proves

17      beyond a reasonable doubt the various elements of the

18      offenses that have been charged here.

19            Once the government has finished its summation --

20      and this is argument, right?  Once the government has

21      submitted its argument, then the defense has an

22      opportunity, if it wishes, to make a closing argument;

23      doesn't have to, because of course the defense has no

24      burden.  If the defense offers an argument, then the

25      government has an opportunity to rebut that argument

1    during the closing summation.

2        Once the summation is completed, then it's my

3    responsibility to give you a charge, and I want to tell

4    you what the charge generally is.  It's divided into two

5    parts.  You actually will be given a copy of the charge

6    as I read it to you.  Then you will be afforded an

7    opportunity to take the charge into the jury room so

8    that you can refer to that charge during your

9    deliberations.  It's divided into two parts.

10       The first is to give you some guidelines as to how

11   to interpret evidence.  There's some guidelines about

12   credibility of witnesses, as an example.  Just thoughts

13   about how -- how to approach your task.  And I want to

14   say clearly that there is nothing in the charge which

15   suggests and should suggest to you how you are going to

16   interpret this evidence, what you should find.  That is

17   not my function, and I will never suggest in any way

18   that you are to find facts in -- according to my

19   suggestion.

20       Anyway.  First part is general guidelines.  And

21   then the second is that I take each one of those

22   criminal offenses and highlight the elements of the

23   offense.  Each offense has certain elements that have to

24   be proven by the government beyond a reasonable doubt.

25   In fact, each element must be proven beyond a reasonable

1    doubt for you to find the defendant guilty.  So I will

2    highlight all the elements of each one of the offenses

3    so that you know exactly what the government has to

4    prove, and then you can assess the evidence in light of

5    those instructions and, in particular, those elements.

6         So once that has been completed, once the charge

7    has been given to you, then you take the case into the

8    jury room, and it's your responsibility to make a

9    determination.

10        I just want to remind you that you should, first of

11   all, not consider anything that's outside the record.

12   There is a general problem in the American judicial

13   system at this point with jurors who will go off and

14   conduct their own research or visit crime scenes or do

15   something in furtherance of what they want to know about

16   this particular case.

17        I mean, the fact is you have taken an oath that you

18   are going to decide this case based upon what you hear

19   in court and from no other source.  And if anybody ever

20   talks to you -- and whether that's in this courtroom or

21   outside the courtroom or at your home, if anybody

22   suggests anything or says anything about this case, I

23   need to know about that right away because that puts at

24   risk the very trial that we are beginning today.

25        So the first thing is that you decide the case

1    based -- based upon what you hear in the courtroom.

2         And, finally, I will begin each day asking you,

3    have you heard anything about this case?  Or have you

4    read anything about this case?  Or has anybody

5    approached you about this case?  And the answer really

6    has to be no, because if -- if someone has approached

7    you or if you have learned something about the case,

8    then that puts at risk your service on the panel so that

9    you need to answer that.

10        I guess, and finally, I would ask you to keep your

11   mind open.  As I have indicated to you earlier, you

12   can't talk among yourselves about this case until

13   deliberations begin, and the reason for that is that if

14   you start talking about the case as it's presented,

15   undue focus may happen upon the testimony of a witness

16   which may very well be refuted days later, and as a

17   result, if you focus in upon that early on, without

18   having the perspective of the entire trial, that leads

19   to an unfair verdict.

20        So I ask that you don't talk about this, but then

21   at -- finally, when you begin deliberations, the verdict

22   has to be unanimous.  And it's really important that

23   people understand that the jury system is made up of a

24   cross-section of the community, and each person has to

25   listen to the others and be honest and accepting of

1     opinions and judgments of others, so that ultimately you

2     come to a final determination.

3          You begin a trial -- many people begin trials

4     thinking that there's no way they can reach a unanimous

5     verdict.  It is a very rare thing indeed that there is a

6     conflict ultimately when jurors use their open-minded

7     judgment to arrive at a just verdict.

8          All right.  That's how we intend to proceed, and I

9     think we are ready for opening statements.

10         Does the government wish to make an opening

11    statement at this point?

12             MS. SAVNER:  Yes, your Honor.

13             THE COURT:  Okay.

14             MS. SAVNER:  Control and manipulation.  That's

15    how Brian Folks ran his intertwined businesses.  He sold

16    two things:  drugs and sex.  The drugs he sold were

17    heroin and crack cocaine.  He also ran a sex business,

18    and I want to talk to you about that first.

19         You will hear that the defendant prostituted and

20    sex trafficked Burlington area women for his financial

21    benefit.  How did he do it?  He sought out already

22    vulnerable, susceptible women.  He identified their

23    weaknesses, and he exploited them.  He manipulated their

24    drug addictions.

25         You will hear that many of the women that worked

1     for him were addicted to heroin and crack cocaine,

2     which, as you will hear, are extremely addictive drugs

3     with intense withdrawal symptoms.

4          When these women dared to step out of line or, in

5     his words, violate him, he violated them back.  He

6     kicked them out of the only shelter that they had.  He

7     denied them drugs.  He threatened to out them to their

8     friends and their communities.  He used physical

9     violence against them, and he used sexual violence

10    against them.

11         And sometimes, you will hear, he didn't have to do

12    any of those things.  Sometimes the mere threat of those

13    things was enough to keep these girls in line and to

14    keep them working for him.

15         That is how he forced four women -- Danielle,

16    Keisha, Katelynn and Ayla -- to work as prostitutes for

17    him.  And you will also hear that he used some of those

18    same tactics to control the women that worked for him in

19    his drug business who were selling his heroin and

20    crack cocaine for him.

21         Now, you are going to hear from some of the women

22    who worked for Brian Folks as prostitutes and you are

23    going to hear about even more of them.  I want to

24    introduce you to a few of them.

25         First, this is Ayla.  She was homeless and fiercely

1     addicted to heroin when she began working for the

2     defendant in his drug business as a drug runner.  She

3     worked for him bagging up drugs and selling it to

4     customers.  You will hear that the defendant's control

5     over her grew as her drug addiction grew.  He repeatedly

6     asked her to make more money for him by prostituting,

7     and she repeatedly refused.  But then the defendant

8     deliberately cut down on the supply of heroin he was

9     giving her until she was broken and dope sick.  It was

10    only then that Ayla agreed to prostitute for Mr. Folks.

11         Eventually she had the strength to decide she

12    wanted to get out of it.  She had a chance to go to

13    rehab, to regain custody of her child, to clean up her

14    life, and she left.  But you will hear that the

15    defendant found her, dragged her back, and beat her.

16         This is Keisha.  Her father shot her up with heroin

17    for the first time when she was 17 years old.  Her

18    father also introduced her to Brian Folks when breaking

19    into cars and stealing didn't get them enough money to

20    support their mutual heroin addiction.

21         She had never prostituted before when she met the

22    defendant, but as you will hear, he convinced her it

23    wouldn't be so bad.

24         For years, the defendant used Keisha, dangling

25    heroin over her head and compelling her to do

1   humiliating and degrading things, including

2   prostituting, to get that heroin.

3       Next is Danielle.  She grew up in foster home after

4   foster home.  She was sexually abused as a child, and

5   her arms bear the obvious scars of years of trauma.  She

6   was also addicted to heroin when she met the defendant,

7   and she was broke and in debt to another drug dealer.

8       You will hear that Brian Folks offered her relief

9   from that debt, but first she'd have to prostitute for

10  him.

11      Next is Katelynn.  She too is a product of the

12  foster system.  And she was prostituting for someone

13  else at age 17 when she met the defendant, who

14  approached her posing as a client.  You will hear that

15  the defendant convinced her to come work for him as a

16  prostitute.  And Keisha *[sic]* went because he promised

17  better quality drugs, but as you will hear, Katelynn

18  soon learned that although the defendant acted sweet, it

19  was all manipulation, and he could be violent when he

20  needed to be.

21      And last is Hannah.  She was only 17 years old when

22  the defendant took pictures of her to sell her for sex.

23      Now, these are not the only young women who worked

24  for Brian Folks as prostitutes.  He prostituted dozens

25  as part of his larger prostitution business, and you

1    will hear how that prostitution business operated from
2    2012 to 2016.
3        As I have mentioned, he'd find women, seek them
4    out, usually finding them online, on Facebook or on
5    online prostitution ads.  He convinced them to come work
6    for him.  He took photos of them and videos.
7        You are going to hear that some of these photos
8    were of the style used to advertise online for
9    prostitution, and they were all of the same type.  The
10   women's faces would be covered or their heads would be
11   turned; it would just be a picture of their bodies,
12   wearing lingerie and often in sexually suggestive poses.
13   He took those kind of pictures.
14       You will also hear that he had pornographic photos
15   and videos that he took of these women, too, or videos
16   and photographs that were otherwise sexually explicit.
17       These photos he used for his benefit, his personal
18   benefit, or to use against them as blackmail material if
19   he needed to.
20       You will hear that those first category of pictures
21   did end up in online prostitution ads often.  You will
22   hear that the -- that the defendant and the women that
23   worked for him used a website known as backpage.com to
24   advertise their services, to advertise prostitution.
25   You will see some of those ads that were posted on

backpage.com, and you will see some of them because the
defendant saved screenshots of them on his computer.

You will hear that the investigators who looked
into this case seized the defendant's computer as part
of their investigation, and on it they found thousands
and thousands of these pictures and videos, the
Backpage-style pictures and the sexually explicit,
pornographic pictures and videos, all carefully
organized and catalogued, organized in folders listed
with the girls' names on them.

The volume of material that the defendant kept on
his computer will show you that the defendant was indeed
operating a business.

Once the ads were posted, the women will explain to
you that the defendant, or one of the top women working
for him at the time, would tell them the rules, tell
them what prices to charge. One of those rules,
"Whatever the customer wants, the customer gets."

You will also hear that the defendant monitored
them, monitored the women working for him, made sure
they were coming back from every date and reporting all
of their earnings. And you will hear about those dates
themselves. They ranged from 15 minutes to an hour to
more. They involved various sex acts. They took place
in cars, motels, other people's houses. They involved

1    the exchange of sex for money multiple times a day, and

2    all for the defendant's financial benefit.

3        Now, his workers will tell you that sometimes the

4    defendant had to go further than other times to get his

5    workers to do what he wanted them to do, to get them to

6    prostitute.   In addition to running this prostitution

7    business, you will hear that the defendant is charged

8    with sex trafficking four adults:   Danielle, Keisha,

9    Katelynn and Ayla.

10        Now, as the judge will instruct you at the close of

11    all the evidence on the law, prostitution involves the

12    exchange of sex for something of value:   sex for money,

13    sex for drugs; but sex trafficking involves something

14    else.   Sex trafficking involves compelling someone to

15    engage in commercial sex or prostitution through the use

16    of force, fraud or coercion, or some combination of

17    those means.

18        So the dynamics of sex trafficking really come down

19    to the dynamics of control, or what the law calls

20    coercion.   And as the judge will explain, coercion in

21    this context means threats of serious harm against any

22    person, or any scheme, plan or pattern intended to cause

23    a person to believe that the failure to perform

24    commercial sex would result in them incurring that harm.

25        Now, that harm can be physical or nonphysical.   It

1    can be emotional, psychological, reputational,

2    financial.  That harm just has to be sufficiently

3    serious under all of the surrounding circumstances to

4    compel a reasonable person -- and this is key -- a

5    reasonable person of the same background and in the same

6    circumstances to perform or continue performing

7    commercial sex acts in order to avoid incurring that

8    harm.

9         You're going to hear a lot about the tactics of

10   control and coercion that the defendant used to compel

11   his workers to engage in commercial sex acts.  The

12   evidence will show that he used tactics designed to

13   break down Danielle, Keisha, Katelynn and Ayla until he

14   could control them and compel them to prostitute.

15        As I mentioned, he sought out these women who were

16   in debt, drug addicted, homeless.  He recruited them

17   with promises, promises of love and affection, of safety

18   and security, the promise of a steady stream of drugs,

19   drugs they needed to get through the day, and the

20   promise of a chance to maybe save up money one day and

21   get out of this life, promises that all turned out to be

22   false.

23        He also made them dependent on him for drugs.  As

24   you will hear, the way it worked was whenever they

25   returned from a prostitution date, they were supposed to

1    split their earnings with him 50/50.  50 percent would

2    go to him to cover the expenses of running this

3    prostitution business:  getting the hotels, posting the

4    ads, sometimes buying them lingerie to wear; and the 50

5    percent they were allowed to keep.  But you will hear

6    that they used their 50 percent to buy drugs from him,

7    drugs they needed to stay well.

8         They'll tell you what heroin withdrawal feels like.

9    They'll tell you about the pain, fevers, itching,

10   retching, cold sweats, vomiting, diarrhea, suicidal

11   thoughts.  They will tell you it's like the flu times

12   10.  And they will explain that the relief from those

13   symptoms with the next shot of heroin is instantaneous.

14        For some of them, this was enough, and the

15   defendant knew it.  They would do anything for drugs.

16   He told them, "Just one more date and then you'll get

17   your heroin," and by doing this, he got them to go out

18   on date after date after date just so that they could

19   have the drugs they needed to avoid feeling those

20   symptoms.  By doing this, he threatened these women with

21   the physical and psychological pain of withdrawal.

22        At times, when he needed to, he escalated his

23   tactics depending on the women and depending on the

24   circumstances.  He made them fear reputational harm,

25   blackmailing with the library of photos and videos he

kept on each one of them.  He had photos of the most

intimate parts of their bodies.  He had photos and

videos of them performing sex acts on him, with him, and

for him.

You will hear that he held one degrading contest

that he filmed where he had the women line up and see

who could fit the most walnuts in their anus.  The

winner would get a prize of heroin.  And he filmed it

all and saved it on his computer.

Sometimes the defendant threatened to post these

pictures and videos online for the world to see, and you

will hear that he, in fact, did post or share these

pictures and videos sometimes.

Now, these women were already working as

prostitutes and advertising their services online, but

remember, the ads they were posting didn't identify them

for the most part.  Their faces weren't visible.  They

covered their tattoos.  Many of them were doing this

work but didn't want their friends and families or their

communities to know what they were doing.  And the

defendant threatened to out them to everyone.

The defendant also threatened physical violence.

He hit some of them in front of others.  He let it be

known that he had guns.  And when he couldn't control

them with their drug addictions by making them fear

1    reputational harm or blackmail, when the threats of

2    violence weren't enough, he came through with actual

3    violence.  He used physical violence against them.

4         He hit them, smacked them and beat them.  And he

5    also used sexual violence and degradation as punishment

6    for rule breakers and just to assert his dominance.

7         This is how he succeeded in compelling Danielle,

8    Keisha, Katelynn and Ayla to prostitute.  This is how he

9    sex trafficked them.

10        And then there was Hannah, who was only 17 years

11   old in 2013 when she came to one of the hotels that the

12   defendant was operating his prostitution business out

13   of.  She was there with some of the other women who

14   worked as prostitutes for the defendant, and it was at

15   that hotel that the defendant took photos of her along

16   with the other girls.  You will see those photos.  They

17   were the same as all the other Backpage-style photos:

18   faces covered, in lingerie, in sexually suggestive poses

19   laid out on the motel room beds.

20        You will hear that these pictures did end up in a

21   Backpage ad advertising prostitution, and a screenshot

22   of that ad was found on the defendant's computer.

23        Now, as the judge will explain, the government does

24   not need to prove that the defendant used force on

25   Hannah because she was only a minor at the time.

1          That was the defendant's sex business.  He also ran

2     a drug-distrubution business, and as you will hear, the

3     two were deeply intertwined.  He fed his sex workers the

4     very drugs that his drug business peddled, and he fed

5     the larger Burlington, Vermont, community those drugs.

6          You will hear about this drug business from the

7     insiders who worked in it.  One of those people is

8     Donald McFarlan, who went by "G" or Ghost.  He will tell

9     you that he was responsible for bringing heroin and

10    crack cocaine up from New York to Burlington, Vermont,

11    delivering it to the defendant in bulk form.

12         They would then have some of the women who worked

13    for them, including some of the women who worked for

14    Brian Folks as prostitutes, bag up those drugs for

15    individual sale.  Once the drugs were sold, Brian Folks

16    would pay Donald McFarlan back for the drugs he brought

17    up, and he would do it all over again.

18         Donald McFarlan and another man you will hear

19    about, who went by the name High Tower, also acted as

20    the muscle.  They made sure the girls behaved.  They

21    kept an eye on the stash.  And they watched -- they kept

22    an eye on the customers too.

23         You will hear that to protect his business, Brian

24    Folks taught his workers to lie and deflect when law

25    enforcement came asking questions, to protect the

1    business.

2         This drug business operated out of various

3    locations.  One of them was Lori Crawford's house on

4    Spring Street, just a few blocks away from here and

5    across the street from an elementary school.  Lori found

6    the defendant in the fall of 2015 when she needed a new

7    drug dealer.  She was addicted too.

8         You will hear that the defendant moved his business

9    into her home and took it over, paying her in drugs to

10   keep her compliant.  He operated Lori's house on Spring

11   Street as a trap house, a place where drugs are

12   packaged, kept and sold.

13        You will hear that while they were working out of

14   this house, from one of the people that worked as a drug

15   runner, Chrissy Tatro, you will hear that she and her

16   friend, Hannah, who you have heard about, in 2015, when

17   they were at Lori's house, worked in the defendant's

18   drug business as runners, manning the drug phone,

19   handling the hand-to-hand exchanges with customers of

20   heroin and crack cocaine for money.

21        You will also hear that the defendant had Lori

22   Crawford register a car in her name, the defendant's

23   car.  You will hear that in December of 2015, the

24   defendant was pulled over by a Burlington PD officer.

25   He was alone driving in the car.  You will hear that the

1    Burlington officer got a search warrant to search that
2    car and in the glove box found a loaded nine-millimeter
3    handgun.
4         As the judge will explain, the defendant is
5    prohibited from having a gun because he has been
6    convicted of a felony.
7         Eventually, in November of 2015, Lori escaped to
8    rehab, and it was only there, once she was sober, that
9    she had the strength to get in touch with the defendant
10   and tell him to get out of her house or she'd call the
11   police, and he did.
12        Mandy Latulippe will tell you where they went next,
13   not too far away, just a few blocks, to a house on North
14   Union Street.  Same business, new trap house.  This
15   time, at this house, Latulippe was responsible for
16   manning the drug phone and doing the hand-to-hand
17   exchanges with customers.
18        You will hear that between the spring of 2015 and
19   early 2016, Brian Folks conspired with other people --
20   that is, agreed with other people, including Donald
21   McFarlan and Mandy Latulippe -- to sell heroin and
22   crack cocaine in the Burlington, Vermont, area.  And you
23   will hear he sold well in excess of the hundred grams of
24   heroin and 28 grams of cocaine that he is charged with.
25        You are going to hear about this conspiracy and the

1   drug business from insiders like Donald McFarlan, Mandy

2   Latulippe, but you are also going to hear about it from

3   the Drug Enforcement Administration, or DEA agents, who

4   investigated.

5       You will hear not only from them but also from a

6   few confidential sources that they had working for them

7   while this conspiracy was in operation.  One of those

8   people is Michelle.  The DEA sent Michelle in to buy

9   drugs from the defendant on four occasions in what's

10  known as controlled purchases.  These happened from

11  January 2016 to February 2016.  And Michelle and the DEA

12  agent will explain to you what a controlled purchase is.

13      It's when law enforcement sends in a regular,

14  non-law enforcement person, wearing a wire or otherwise

15  being monitored, to go in and buy drugs from a suspect.

16      You will hear that Michelle did this on four

17  occasions, and you will get to hear for yourself the

18  recorded calls she made to the defendant setting up

19  these buys.  You will hear and see videos of her going

20  to the house on North Union Street to buy those drugs

21  and meeting with the defendant or, in his words, his

22  peoples, this time Mandy Latulippe, who conducted the

23  hand-to-hand exchange of heroin for cash, all under

24  Folks's watchful eye at his direction and under his

25  control.

1    You will also hear from Chrissy, and you will hear
2    that she too became an informant for the government.
3    You might remember she was in the defendant's inner
4    circle working as a runner in his drug business, but she
5    left the drug business when she was sick and tired of
6    the way the defendant treated her.
7        While she was on the outs, she took her mom's car
8    without permission to go buy drugs and was arrested.
9    She ended up giving information to law enforcement,
10   agreeing to be an informant, sharing information with
11   them, about Brian Folks's operations.
12       She worked her way back into the operation, this
13   time sharing information with law enforcement.  She will
14   tell you about a bagging party she went to, an event
15   where young women, including herself, were bagging up
16   heroin and crack cocaine from the bulk form into
17   packages for individual sale for hours and hours on end.
18       You will hear that at the end of that night, the
19   defendant got a call from Mandy Latulippe.  She was at
20   the house on North Union Street, and she told the
21   defendant that the house had been burglarized, the whole
22   stash was gone.
23       Chrissy and Donald McFarlan will explain that after
24   that, McFarlan got spooked.  He had a big package of
25   heroin and crack cocaine with him that he was planning

1    to deliver to the defendant, but after the burglary, he

2    didn't want to hang on to it.  He gave those drugs to

3    Chrissy to hold.

4        Remember, Chrissy was working for the government at

5    the time, so she handed that package of heroin and

6    crack cocaine right over to the government.  You will

7    hear that that package, a cereal box full of drugs,

8    contained over 128 grams of heroin and 73 grams of

9    crack cocaine.

10       You will also hear about the aftermath, because now

11   the cereal box was missing, and Chrissy had to explain

12   it to Donald McFarlan and Brian Folks.  You will hear

13   that she came up with a cover story with the DEA.  She

14   said that she had been caught with the drugs, that she

15   was being arrested and was taking the hit.

16       You will hear a recorded call between Chrissy,

17   Donald McFarlan and Brian Folks where McFarlan and Folks

18   discuss how to handle Chrissy, and you will hear Brian

19   Folks say if Chrissy takes one for the team, if she

20   keeps his name out of it, she'll be welcome to come back

21   to work for him.

22       And lastly, on January 20th of 2016, you will hear

23   about a car stop that a Winooski Police Department

24   officer performed, a car that the defendant was riding

25   in with Mandy Latulippe and one of his other drug

1    runners at the time, Mary.  The Winooski officer

2    searched the car and found a bag full of drugs:  350

3    bags of heroin and 40 bags of crack cocaine.

4         Mandy and Mary will explain that they were driving

5    with Folks's drugs from one trap house to another trap

6    house when they were stopped and the drugs were found.

7         Eventually Folks's drug business lost steam, and in

8    July of 2016, he was arrested by the DEA.

9         The DEA also conducted a search warrant at the

10   place where he was living at the time, and you will hear

11   and see the evidence that they seized from that house,

12   including evidence of his drug business, all the tools

13   and supplies he needed to package drugs, heroin and

14   crack cocaine.

15        They also seized a number of electronic devices:

16   cell phones, tablets, a GPS device, and the computer

17   that I have mentioned before.  What came out of those

18   devices will echo the words that the witnesses will tell

19   you.  You will see -- we will tell you about and you

20   will see some of the thousands of videos and pictures on

21   that computer.  You will hear about and read the chats

22   found on his Facebook account, which law enforcement

23   also got a search warrant for, where he is discussing

24   selling drugs and selling women.  And that computer, as

25   I mentioned, contained nearly 20,000 pictures and

1    videos, Backpage-style pictures and also pornographic or

2    otherwise explicit pictures and videos, all of them that

3    he collected and maintained to maintain his control.

4        Now, we are going to show you some of those

5    pictures and videos, and we are not showing those to you

6    to upset you.  We are showing them to you so that you

7    can understand what made these young women do what they

8    did, how the defendant compelled them to prostitute.

9        Now, the judge explained that the defendant is

10   charged in 14 counts, and those include drug-trafficking

11   charges.

12       He's charged with one count of conspiracy to

13   distribute over 28 grams of crack and a hundred grams of

14   heroin.  That includes not just the drugs that law

15   enforcement seized, and that you will see in this

16   courtroom, but all the drugs, added together, that the

17   defendant and his business sold throughout the area.

18       He is charged with four counts of distribution of

19   heroin.  That's for each of the controlled purchases

20   that Michelle did into his business.

21       He is charged with one count of possession of crack

22   and heroin with the intent to distribute it.  That's for

23   the drugs that the Winooski Police Department officer

24   seized from the car that the defendant was riding in

25   with Mandy and Mary.

1    He is also charged with being a felon in possession

2    of a firearm.  That's for the firearm that the

3    Burlington Police Department officer seized from the car

4    that the defendant was in by himself, the car that he

5    had Lori register in her name.

6        And, as you know, he is charged with

7    sex-trafficking counts, five counts of sex trafficking

8    by force, fraud or coercion.  That's one count for

9    Katelynn, two counts for Keisha covering two different

10   time periods, one count for Danielle, and one count for

11   Ayla.  He is also charged with one count of sex

12   trafficking of a minor; that's for Hannah.

13       And, lastly, he is charged with one count of using

14   the facilities of interstate commerce, that is the

15   internet and cell phones, to manage, carry on and

16   operate his prostitution business.

17       That's 14 counts that the government will prove to

18   you beyond a reasonable doubt.  The evidence will paint

19   a picture of just three and a half years of what these

20   young women and the community suffered at the hands of

21   Brian Folks.  Many of the witnesses will get up here and

22   tell you about the pain that the defendant caused them.

23       Most of them were high at the time that they were

24   working for him.  Some of them have lied in the past to

25   protect themselves and to protect the defendant because

what they were doing, selling their bodies, selling drugs, is illegal.

You will hear that Folks left them just as broke and homeless and drug addicted as when he found them, and as a result, the government, the U.S. Attorney's Office, has given them money and services to try to help them get back on their feet.  None of these women want to be here in front of you to relive the experiences they went through, but they will explain and you will see in the pictures and videos and Facebook chats how the defendant lured them in, how he broke them down, how he held drugs over their heads until they performed, and they will explain to you what it was like to need drugs so badly that they agreed to do humiliating and degrading things just to get those drugs.

They will tell you what it was like to fear his anger, his violence, his threatened violations so badly.

At the close of all the evidence, you will know that the defendant picked these women, in particular, because they were vulnerable and easy to manipulate, and he exploited them as sex workers and drug workers all just to make money off of them.

At the close of all the evidence, you will have the opportunity to say that what the defendant did is illegal and find him guilty on all 14 counts charged.

1      Thank you.

2      THE COURT:  Does the defense wish to make an

3  argument at this point?  Or waive argument or postpone

4  argument?

5          MS. SEN:  We would like to make an opening

6  statement, your Honor.

7          THE COURT:  All right.  Okay.  Miss Sen.

8          MS. SEN:  This case involves a chaotic world

9  of prostitution and drug use that you probably find

10  uncomfortable and unfamiliar and upsetting.  Many of the

11  witnesses that you will hear testifying during the

12  course of this trial are people who have lived

13  marginalized lives at the edges of our society.  These

14  witnesses' decisions to use drugs, to prostitute, are

15  things that may be very difficult for you to understand.

16      Now, you have heard the prosecutor talk about their

17  view of how Mr. Folks coerced, forced women to

18  prostitute, to use drugs.  There is another side to this

19  story.

20      This is a story about people who were hustling to

21  do anything that they could to put food on the table, to

22  take care of their kids, to pay the rent, and, yes, to

23  get their next drug fix.  At the time what these

24  witnesses did was often the best, the most lucrative or

25  just the least bad option that they had to take care of

1    themselves and to take care of their families.

2        These witnesses used drugs, they prostituted, and

3    they often enlisted Mr. Folks' help in order to do so.

4    I submit to you that the evidence will show that Mr.

5    Folks and the witnesses in this case negotiated and

6    bargained with one another and that both sides got

7    something out of the deal that they struck.

8        You will hear the testimony of several women who

9    will tell you that when they were homeless and had

10   nowhere to go, it was Mr. Folks who helped them find a

11   place to live to get them off of the street.  One of

12   those women is Ariel Otero.  Ms. Otero will testify that

13   she was working as a prostitute, and the reason she was

14   working as a prostitute is because she had a young

15   daughter who needed special services.  Prostitution

16   earned her the money she needed in order to take care of

17   her daughter.

18       Ms. Otero will tell you that at some point she

19   became homeless, and it was Mr. Folks who helped her

20   find a place to live until she could get back on her

21   feet.  Ms. Otero will also tell you that she was not a

22   drug user and that Mr. Folks encouraged her not to use

23   drugs and to stay clean.

24       You will hear from another woman named Kayla

25   LaFevre.  She was also a woman who became homeless and

1    who will testify that it was Mr. Folks who eventually

2    helped her find a place to live.

3        I submit to you that you will hear the testimony of

4    other women who will talk about how Mr. Folks helped

5    them when they were down and out and sick and that he

6    did not ask anything in return from them.

7        For example, you will hear the testimony of a woman

8    named Shelby Simpson.  Miss Simpson knew Mr. Folks from

9    New York City.  She was living there with her own

10   sister.  During the time that she was in New York, she

11   developed a very serious kidney infection.  Her sister

12   left her in New York and returned to Vermont.  It was

13   Mr. Folks who helped her.  She was not even able to

14   stand, and Mr. Folks arranged for her to have a

15   wheelchair, would take her to appointments, and took

16   care of her.

17       Miss Simpson will also tell you that at the time

18   that she was having this infection and she was sick, she

19   was clean, and she was not using drugs, and that Mr.

20   Folks encouraged her to stay clean, and that he never

21   suggested to her to get involved in prostitution.

22       I submit to you that you will hear testimony from

23   women who were involved in prostitution and who asked

24   Mr. Folks for help.  One of those women was Brittany

25   Barber.  Brittany Barber was a woman who was working as

1    a prostitute, and she will tell you that when she met

2    Mr. Folks, she observed him interacting with other

3    women.

4        Miss Barber will tell you that she never saw Mr.

5    Folks using force or coercing people into doing

6    something that they didn't already want to do.  She will

7    describe an environment where people could come and go

8    as they pleased.

9        Miss Barber will tell you that when she was on a

10   date in a motel room, she felt comforted by the fact

11   that she knew Mr. Folks was in the room next door, and

12   that if she ran into any trouble, she could knock on the

13   wall, and she knew Mr. Folks would be right there

14   because she had given him the key to her room.  Miss

15   Barber describes Mr. Folks as a friend and someone who

16   looked out for her.

17       You will hear from a woman named Mona Anderson.

18   She was the mother of Mr. Folks' son -- or, I'm sorry, a

19   friend of the mother of Mr. Folks' son.  And she used to

20   be a drug user.  Miss Anderson will testify about what

21   she observed when she saw Mr. Folks interacting with

22   women, and she will tell you that women who were drug

23   addicts and who needed help were often, frequently

24   coming to Mr. Folks asking him for their -- for his

25   help, and that he was always there to help them, and

1    that she never observed any kind of coercion or force.

2         I submit that you will hear the testimony of women

3    who were actually supported by Mr. Folks when they were

4    seeking to get sober.  Two of those witnesses are the

5    prosecutors' witnesses.  One of them is Lori Crawford.

6         When Ms. Crawford was done with the drug life and

7    had had enough of it and wanted to go to rehab, she will

8    tell you that it was Mr. Folks who drove her to rehab.

9    The prosecutors' other witness, Danielle M., she

10   suffered from an overdose and she was in the hospital.

11   Who was there when she woke up in the hospital?  It was

12   Mr. Folks.

13        Now, the prosecutor talked to you about all the

14   evidence it believes it has to show that Mr. Folks

15   forced those women into prostitution, and I'd like to

16   take my time here to focus with you on some of those

17   allegations.  Two things I would ask you to please keep

18   in mind as you listen to the prosecutors' witnesses:

19   One, as the prosecutor even acknowledged, many of these

20   witnesses -- most of them, I would say -- have changed

21   their stories repeatedly; two, the prosecutors have paid

22   some of these witnesses hundreds if not thousands of

23   dollars over the past year and a half.

24        For one example is Katelynn C.  She is the woman

25   that the prosecutor was talking about Mr. Folks

prostituted between 2012 and 2015.  The first time she

sat down to talk with the investigators, she told them

she didn't ever prostitute for Mr. Folks.  She never

paid him any money.  The very next day she met with the

prosecutors again, and on this day she said that it was

Mr. Folks who actually introduced her to prostituting.

The next day, Katelynn C. testified before the

grand jury.  Under oath, under penalty of perjury before

the grand jury, Katelynn C. testified that it was Mr.

Folks who first introduced her to prostituting and drove

her to her first date.

Weeks ago we have now learned that Katelynn C. has

changed her story.  She now admits that she was

prostituting before she ever met Mr. Folks and that she

met him through prostitution, and that the day that she

testified before the grand jury, she had been using

drugs.

Keisha W. is another woman that the prosecutor

talked to you about.  Keisha W. first met Mr. Folks in

2013, and she told investigators that she was introduced

to prostitution because she thought that she could make

enough money from prostituting in order to support her

drug habit.

She talked with Mr. Folks about it, and she decided

to try it, but after a little while it became clear to

1    her that she couldn't make the money she thought she

2    could and she wanted to leave.  Who drove her home?  It

3    was Mr. Folks.

4        When she came back two years later, I submit to you

5    the evidence will show that she sent messages to Mr.

6    Folks asking for his help to post her.

7        I also submit to you that Keisha W. has told

8    investigators that Mr. Folks never withheld heroin from

9    her and that she always had the drugs that she needed to

10   feel well.

11       Danielle M. is another woman that the prosecutors

12   talked to you about.  She's a woman that the prosecutors

13   allege prostituted for Mr. Folks for one week in June of

14   2015.  Danielle M. is also the woman I was referring to

15   who said had overdosed.  Let me tell you a little bit

16   more about that.

17       She was homeless at the time, and it was Mr. Folks

18   who arranged for her to live in an apartment when she

19   was released from the hospital.  I submit to you that

20   the evidence will show that in September of 2015, so two

21   months later, Danielle M. sent messages to Mr. Folks

22   asking if she could work for him again.

23       The evidence will also show that the prosecutors

24   have paid Danielle M. over $11,000 since January of

25   2018.

1    Ayla L. is a woman that the prosecutors talked to
2    who prosti- -- who they allege Mr. Folks forced to
3    prostitute between June and December of 2015.
4        Now, Ayla L. spoke with investigators in December
5    of 2015, and during that interview she explained that
6    she and her boyfriend were heroin addicts and that
7    they -- she had made an arrangement with Mr. Folks
8    where, if she bagged drugs, he would give her heroin.
9        Ayla L. told investigators in 2015 that this went
10   on for a few weeks, and then at some point Mr. Folks
11   came back to her and said, "I don't have any more
12   drugs."  Ayla L. told investigators that Mr. Folks then
13   went out and purchased drugs from other people to give
14   to her.
15       At some point, Ayla L. says, Mr. Folks then came
16   back to her and said, "I can't keep just buying drugs
17   for you.  You might want to try making money one way,
18   you might want to think about it, is by prostituting."
19       Ayla L. told investigators that the way Mr. Folks
20   proposed this to her is that she could choose to do it
21   or she could not choose to do it.
22       Ayla L. told investigators she thought about it,
23   and she chose to try it out.  Ayla L. went on; she gave
24   quite an extensive interview in December of 2015.  She
25   told investigators that she started prostituting and

1    that she would take one or two dates a day, just enough

2    so that she could make the money she needed to get the

3    heroin that she wanted.

4        Ayla L. told investigators that after about three

5    weeks, she decided to, what she called, go out on her

6    own and that she developed a strategy for how she dealt

7    with this.  Ayla L. told investigators that she decided

8    that she would start to rob the men who responded to her

9    ads because she figured no one was going to call the

10   police to report their money stolen from someone that

11   they hired as a prostitute.

12       So that was Ayla L.'s story back in December of

13   2015.  By the time Ayla L. testified before the grand

14   jury in October of 2016, her story had changed.  In

15   October of 2016, Ayla L. testified before the grand jury

16   that Mr. Folks was providing her heroin, that he

17   withdrew heroin from her, that she became so sick that

18   she felt coerced to prostitute.  I would ask you to keep

19   in mind that the prosecutors have paid Ayla L. over

20   $10,000 since January of 2018.

21       The prosecutor also talked to you about Mandy

22   Latulippe.  Ms. Latulippe was a woman who had a romantic

23   relationship with Mr. Folks, and she sent him numerous

24   naked photos of herself.  Mandy Latulippe will tell you

25   that at some point she too found herself homeless and

1    that it was Mr. Folks who arranged to have her stay in

2    an apartment.  Not only did he find a place for her to

3    live, but he paid the rent for her until she could get

4    back on her feet.

5         Ms. Latulippe will tell you that she never observed

6    Mr. Folks withholding heroin from any of the women that

7    he worked with, and she will also tell you that Mr.

8    Folks discouraged her from prostituting.  Miss

9    Latulippe, at least she told investigators -- that when

10   she saw the money that other women were making from

11   prostituting, against Mr. Folks' advice, she posted

12   herself and tried to earn money prostituting.

13        As the prosecutors' witnesses testify, I would ask

14   you to pay very close attention to anything any of these

15   witnesses say about Hannah A.  I submit to you that the

16   evidence will show that Hannah A. was involved in

17   distributing drugs and very much involved in the drug

18   business, but the evidence does not show that she ever

19   worked as a prostitute.

20        The prosecutor also talked to you about the

21   evidence it believes shows that Mr. Folks was involved

22   in a conspiracy to distribute drugs.  Again, I would ask

23   you to listen very carefully to the testimony of Donald

24   McFarlan and Crissy Tatro.  The prosecutor will play you

25   calls between Mr. McFarlan and Miss Tatro, and I would

1    submit to you the evidence shows that they were very

2    much involved in their own scheme to distribute drugs

3    that had nothing to do with Mr. Folks.

4         As you sit through this trial, you will get a

5    glimpse of a very different world.  The activities you

6    will hear about, the images you see will be upsetting

7    and disturbing and off-putting, but what this evidence

8    does not amount to is proof beyond a reasonable doubt

9    that Mr. Folks forced women to prostitute or conspired

10   to distribute drugs.

11        At the end of this case, we will ask you to find

12   Mr. Folks not guilty of those charges.

13        Thank you.

14             THE COURT:  All right.  We have been going for

15   almost an hour and a half, so let's take our

16   midafternoon recess.  Be back in 15 minutes.

17   (Court was in recess at 2:51 p.m.)

18   (The following was held in open court with the jury

19   present at 3:10 p.m.)

20             THE COURT:  Okay.  The government want to call

21   its first witness?

22             MS. SAVNER:  Yes, your Honor.  The government

23   calls Special Agent Adam Chetwynd.

24                        ADAM CHETWYND,

25        being first duly sworn by the courtroom deputy,

```
1                was examined and testified as follows:

2                    THE COURT:  Good afternoon, Agent.

3                    THE WITNESS:  Good afternoon, your Honor.  I

4        apologize for my voice, your Honor.  I am just getting

5        over a cold, so --

6                    THE COURT:  Really.

7                    THE WITNESS:  Yeah.

8                    THE COURT:  It's spring.  You are supposed to

9        be feeling better.

10                   THE WITNESS:  It's backwards for me.

11                   THE COURT:  Really?

12                           DIRECT EXAMINATION

13       BY MS. SAVNER:

14       Q    Good afternoon, Agent Chetwynd.  Can you tell the

15       jury your name.

16       A    My name's Adam Chetwynd.

17       Q    And where do you work?

18       A    With the Drug Enforcement Administration assigned

19       to the Burlington, Vermont, resident office.

20       Q    What does the Drug Enforcement Administration do?

21       A    We enforce the controlled substances laws of the

22       United States.

23       Q    There's some water right there for you.

24       A    Yeah.

25       Q    How long have you been in that position?  See if
```

1    you can talk and pour at the same time.

2    A    I have been with the DEA for approximately 15

3    years.

4    Q    In the role as a special agent?

5    A    Correct.

6    Q    Have you served in any other roles at the DEA?

7    A    I have.  I have also been the acting resident

8    agent-in-charge for approximately four months when our

9    last boss left.

10   Q    Is that a supervisory position?

11   A    Yes.  He is in charge of the office.

12   Q    How far did you go in school?

13   A    I received a master's degree.

14   Q    In what subject?

15   A    Criminal justice administration.

16   Q    What are your responsibilities as a special agent?

17   A    To develop cases involving individuals that are

18   involved in selling illegal controlled substances.

19   Q    What kind of training do you go through to become a

20   special agent?

21   A    We attend a -- now, I think it's 18 weeks, but at

22   the time it was a 16-week basic academy down in

23   Quantico, Virginia, and there they teach you, you know,

24   how to conduct surveillances, how to perform search

25   warrants, how to perform tactical firearm training, and

1   everything involved in becoming a DEA agent.

2   Q    Is there continuing training once you become an

3   agent as well?

4   A    Yes.  There's always on-the-job training.

5   Q    At some point did you become involved in an

6   investigation into Brian Folks?

7   A    Yes.

8   Q    When was that?

9   A    Approximately December of 2015.

10  Q    What was your role in that investigation?

11  A    I was one of the two case agents.

12  Q    Who was the other?

13  A    TFO Rob Estes.

14  Q    What is TFO?

15  A    Sorry.  TFO is an abbreviation for task force

16  officer.  Sometimes they are referred to as agent as

17  well.  So task force agent or task force officer.

18  Q    So the two of you, TFO Estes and yourself, were the

19  co-case agents; is that right?

20  A    Correct.

21  Q    What did that investigation into Brian Folks

22  involve, just generally?

23  A    Selling drugs and alleged prostitution.

24  Q    I'm sorry.  What did your investigation involve?

25  What investigative steps did you take?

```
1    A     We -- our investigative steps were controlled
2    purchases.
3    Q     Explain what that is.
4    A     In laymen's terms, a controlled purchase is when an
5    individual purchases illegal controlled substances,
6    which is monitored by the police.
7    Q     How many controlled purchases have you been
8    involved in as a DEA agent, not just with Mr. Folks'
9    case but in other investigations?
10   A     Hundreds.
11   Q     Tell us, what's the normal procedure when DEA --
12   when you conduct a controlled purchase?  How does it
13   work?
14   A     Yep.
15         So basically you will either use an undercover
16   officer or you will use what we refer to either as a
17   confidential source or a confidential informant.  In
18   this instance, we used a confidential source.
19         Law enforcement, myself or -- will direct that
20   confidential source to arrange for a transaction to take
21   place.  Those arrangements are usually through texts or
22   phone calls.  Those texts and phone calls will be
23   documented by law enforcement, and that's usually in the
24   form of a photograph.  The source will be searched
25   before they leave to go -- to go meet this person and do
```

1    the transaction.

2    Q    Can I stop you there.  Why do you search the

3    person?

4    A    Yes.

5         We search individuals to make sure they don't have

6    any drugs on them before we send them out, they don't

7    have any large amounts of money, they're not carrying

8    any contraband or a weapon, to ensure the integrity of

9    the -- the future transaction or meeting.

10   Q    What happens next with the setup?

11   A    Then we will install or put on the source some type

12   of a transmitting device -- sometimes that is audio;

13   sometimes that's audio and video -- to capture the

14   meeting, the future meeting.

15        After that -- and that equipment's tested to make

16   sure it's working properly.

17        The informant will be followed by law enforcement

18   to wherever the -- wherever the transaction -- wherever

19   the parties agreed to meet.  The informant will be

20   followed there.  And we'll maintain surveillance on

21   the -- on the informant while they're there doing the

22   transaction.

23        And after the transaction is over, again, law

24   enforcement will follow the source back to -- usually

25   it's a location at the discretion of law enforcement,

1    where we pick for them to return to, and at that point

2    we will retrieve any evidence that was purchased by the

3    source, and then we'll again search the source for --

4    again, for the items, for any drugs, any money, any --

5    any weapons.

6         Also what I forgot to notate was that if the person

7    we're working with is -- drives, we will do the same

8    procedures to that person's vehicle:  search the vehicle

9    for the same items, drugs, money, contraband, weapons.

10        Then once back with us and the person has handed

11   over the contraband, or the purchased narcotics, and

12   they're searched, then we'll conduct a debriefing of the

13   source and hear in their words what took place during

14   the meeting.

15        I mean, we have heard it through the devices that

16   we put on them prior to them leaving, but we want to

17   hear from them what they saw and what happened during

18   the meet.

19   Q    Let me stop you there.  So you said you hear

20   from -- from not only them but from the recording

21   devices what happened.

22        Is that what you are hearing on the recording

23   devices live or you listen to it after the fact?

24   A    It depends on what the device is, but, yes, live.

25   Q    Okay.  And how about the controlled purchases you

1    did as part of this investigation?  Were you hearing the

2    audio and seeing the video of the transaction live?

3    A    Yes.

4    Q    How is the informant, the confidential source,

5    compensated?

6    A    With -- it depends.  There's several ways.  If you

7    have an informant who is not currently facing any

8    charges, then that person will be paid in cash.  But if

9    a person who is facing charges -- they will just be

10   working towards consideration of a reduction in those

11   charges.

12   Q    And is the payment an informant gets dependent on

13   whether they come out with a substance that tests

14   positive for drugs or not?

15   A    No.

16   Q    So once you get the suspected narcotics back from

17   the informant after the purchase is complete, tell us

18   about the procedure for handling them.  What do you do

19   with the suspected narcotics from there?

20   A    Yes.

21        So there's always two -- there's always two

22   individuals meeting with an informant.  It's DEA's

23   practice.  And those agents will maintain custody of

24   that evidence until they return to the DEA office where

25   we'll process it and secure it in our drug vault.

1    Q    What does it mean to process it?

2    A    Basically place it in an evidence bag and fill out

3    our label and seal the evidence bag and place that in a

4    vault.

5    Q    Where does it go from there?

6    A    Usually the next day it will be mailed to the DEA

7    lab in New York City.

8    Q    And who is the -- who's the person responsible for

9    processing the drugs?  Is it always the case agent?

10    A    No.

11    Q    Explain who does that.

12    A    It varies.  It depends on -- typically it is, but

13    it also can be other agents who are available to help

14    out and process it.

15    Q    So who is the confidential source that the DEA

16    chose to conduct the controlled purchases for this

17    investigation?

18    A    Michelle.

19    Q    And to your knowledge, did she have a prior

20    relationship or know Brian Folks before this?

21    A    No.

22    Q    Had she worked on previous cases with DEA or other

23    law enforcement agencies?

24    A    She did.

25    Q    And that was in the same capacity as a confidential

1    source?

2    A    Yes.

3    Q    And how was Michelle compensated for the buys that

4    she did?

5    A    Cash.

6    Q    Do you know about how much she was paid?

7    A    500 and 600.

8    Q    Per buy?

9    A    Yes.

10   Q    And were you personally involved in the decision

11   about how much to pay her?

12   A    No.

13   Q    Do you know if she was getting any other benefit

14   from the DEA for her work?

15   A    No, I do not.

16   Q    You are not aware of any, though?

17   A    No, I am not.

18   Q    How many buys did Michelle conduct for this

19   investigation?

20   A    Four.

21   Q    And tell us about what she was going to try and

22   buy.

23   A    Heroin or crack.

24   Q    Do you remember which one it was?

25   A    Heroin.

1    Q    Okay.  And how much was she looking to buy on each

2    occasion?

3    A    A sleeve.  So --

4    Q    Please explain what that is.

5    A    A sleeve is a hundred bags of heroin.  And the way

6    that they're typically packaged are 10 bags are wrapped

7    in an elastic band, and that's called a bundle.  So 10

8    bundles equal a sleeve.

9    Q    And before we talk about each buy one by one, are

10   the procedures -- the procedures that you have described

11   for us just now about how controlled purchases generally

12   worked, were those the same procedures that were

13   followed with all four of the buys that Michelle did?

14   A    Yes.

15   Q    And as you mentioned, you could see what was going

16   on and hear what was going on while she was out of your

17   sight?

18   A    Yes.

19   Q    Did she use her real name when she was interacting

20   with Brian Folks?

21   A    No, she didn't.

22   Q    What name did she use?

23   A    Nikki.

24   Q    And who else from DEA worked with you on these four

25   buys?

1    A    TFO Estes and DEA Intelligence Analyst Marilyn Epp.

2    Q    Were others from the DEA or other law enforcement

3    agencies involved in any way?

4    A    Yes.

5    Q    How?

6    A    They provided surveillance, a role in surveillance.

7    Q    All right.  Let's talk about the first buy.  When

8    did that first controlled purchase take place?

9    A    January 6th, 2016.

10   Q    And explain to us how this one was set up.

11   A    This one was set up -- we met with Michelle, and we

12   had obtained -- TFO Estes had obtained a number for --

13   for a person told to us that it was Moe.  And so when we

14   met with --

15   Q    I'm sorry.  Let me stop you there.

16        You mentioned Moe.  Who did you understand Moe to

17   be?

18   A    Brian Folks.

19   Q    Alias for him that law enforcement knew of?

20   A    Yes.

21   Q    Go on.

22   A    So TFO Estes had obtained this number from a source

23   of information whose name was Rome, R-O-M-E.  And we had

24   met with Michelle, and we directed Michelle to

25   conduct a -- a monitored phone call with this telephone

1   number, and the telephone number provided was

2   (802) 825-4673, and we made several attempts to call

3   that number, and it was unsuccessful.

4   Q    What happened next?

5   A    At that point TFO Estes reached out to Rome and

6   asked Rome to text Moe the -- Michelle's number.

7   Q    And what happened after that?

8   A    After that, Michelle received an incoming call from

9   (802) 825-4614.

10  Q    So where -- where were you when all this was going

11  on, these phone calls were being made?

12  A    We were in TFO Estes' government vehicle.

13  Q    Okay.  So it was you, TFO Estes, Michelle and --

14  A    Intel- --

15  Q    -- Intelligence Analyst Epp?

16  A    Yes.

17  Q    So you say you got an incoming phone call from a

18  phone number ending in 4614.  Whose phone did that call

19  come in on?

20  A    It came in to Michelle's.

21  Q    Could you hear the conversation?

22  A    I could hear talking, yes.  And I could hear her

23  side of the conversation.

24  Q    Could you hear the voice on the other end?

25  A    It was a male's voice.

1    Q    All right.  Did you recognize it at the time?

2    A    No.

3    Q    Did the male -- could you hear if he identified

4    himself in any way?

5    A    I heard the CS ask, "Is this Moe?"

6    Q    Did you hear his response?

7    A    I heard -- no, I didn't.

8    Q    And was this call recorded in any way?

9    A    It was.

10   Q    All right.

11   A    It was recorded.

12   Q    Can you pull out from that folder in front of you

13   what's been -- in the folder labeled 1, the CD with the

14   sticker 1 on it.

15   A    Yes.

16   Q    Do you recognize that?

17   A    I do.

18   Q    What is it?

19   A    It is the U.S. Exhibit 1, and it's N-1, recorded

20   call between Brian Folks and CS on 1/6/2016.

21   Q    Have you had a chance to review the file on that

22   disk?

23   A    I have.

24   Q    How do you know?

25   A    I have placed my initials on the disk after

1   reviewing it.

2   Q    All right.  And is the file on that disk a true and

3   accurate copy of that phone call you just described, the

4   incoming call from the 4614 number?

5   A    Yes.

6            MS. SAVNER:  At this time the government would

7   move to admit Government's Exhibit 1.

8            THE COURT:  Any objection?

9            MR. KAPLAN:  No objection, your Honor.

10           THE COURT:  All right.  So admitted.

11           (Government's Exhibit was 1 received in

12   evidence.)

13           MS. SAVNER:  And permission to publish that

14   recorded call and play it from the USAO's computer with

15   the transcript scrolling?

16           THE COURT:  Okay.  And the transcript has

17   been --

18           MS. SAVNER:  It's marked as 1A.

19           THE COURT:  Okay.

20           MS. SAVNER:  It's been provided to the

21   defense.

22           THE COURT:  All right.  Let me actually -- you

23   just hold it one second.

24       Let me just instruct you that when you hear a tape

25   and you see a transcript, the tape is what is admitted

1    into evidence.  The transcript is an aid for you to

2    listen to and interpret the tape.  So if there's a

3    conflict between the tape and the transcript, it's the

4    tape that's in evidence, not the transcript.  Okay?

5         And that's true of all of the publications that

6    we'll have during the course of the trial.  Okay.

7              (A digital recording was played in open

8    court.)

9    BY MS. SAVNER:

10   Q    So the male voice we heard on that call, you

11   couldn't hear it clearly at the time.  Having listened

12   to that recording since here in the courtroom, do you

13   recognize that voice sitting here today?

14   A    I do.

15   Q    And whose voice do you recognize it to be?

16   A    Mr. Brian Folks'.

17   Q    How do you know?

18   A    I have listened to other recordings from social

19   media, I have listened to his post-arrest interview, and

20   I have also been present when Mr. Folks has spoke before

21   in these judicial proceedings.

22   Q    And Mr. Folks tells Michelle, who goes by Nikki in

23   this, to come to Pearl Street Beverage.  Where is Pearl

24   Street Beverage in relation to where we are today?

25   A    It's only about three or four blocks to the east

1    from here.

2    Q    Did you know -- did DEA know where Mr. Folks was

3    operating out of at the time?

4    A    No.

5    Q    And Michelle says to Mr. Folks that her other guy

6    did a sleeve for eight.  What does that mean?

7    A    She was referring to -- that her other -- she was

8    alleging that her other source of supply sold her a

9    sleeve of heroin for $800.  So a hundred bags.

10   Q    What happened after this phone call was complete?

11   A    We conducted the procedures that I explained

12   earlier.  We -- you want me to explain?

13   Q    Sure.

14   A    We searched the informant.  TFO Estes searched the

15   informant.  TFO Estes searched the informant's vehicle.

16   The informant was provided with an audio recording

17   device.  The informant was provided with a quantity of

18   U.S. currency that was recorded to use for the purchase.

19   And then we were waiting to go.

20   Q    You said TFO Estes searched her and the car.  Did

21   you witness those searches?

22   A    I witnessed the search of the informant.

23   Q    Where did that take place?

24   A    Right inside our vehicle.

25   Q    And you were in the vehicle as well?

1    A    Yes.

2    Q    Did anything come off of her on that search?

3    A    No.  He did not find anything.

4    Q    All right.  What happened after you had gone

5    through those procedures to set her up?

6    A    Prior to us leaving, the -- the CS received an

7    incoming call.

8    Q    From what number?

9    A    From (802) 825-4614.

10   Q    The same number that that first call came in from?

11   A    Correct.

12   Q    And was this call recorded in any way?

13   A    It was.

14   Q    Could you hear this call?

15   A    I could hear portions of the CS's side of it.

16   Q    Okay.  Can you pull out from that folder the folder

17   marked 2, number 2, and the CD marked Exhibit 2.

18        Do you recognize Exhibit 2?

19   A    I do.

20   Q    What is it?

21   A    It is the U.S. Exhibit No. 2, N-2, recorded call

22   between Folks and CS on 1/6/16.

23   Q    And just to be clear, what's that N-2 number?

24   A    That's what DEA assigns to a piece of nondrug

25   evidence.

```
 1    Q    All right.  And how do you know that's what it is?

 2    A    Because it was -- it was made during that --

 3    Q    I'm sorry.  How do you know what's on the CD is

 4    that phone call?

 5    A    I'm sorry.  Because my initials are on the CD.

 6              MS. SAVNER:  Okay.  At this time we'd --

 7    BY MS. SAVNER:

 8    Q    Well, and have you had a chance to review it?

 9    A    I have reviewed it.

10    Q    And is it a true and accurate copy of that second

11    recorded call?

12    A    It is.

13              MS. SAVNER:  At this time the government would

14    move to admit Government's Exhibit 2.

15              THE COURT:  Any objection?

16              MR. KAPLAN:  No objection, your Honor.

17              THE COURT:  All right.  So admitted.

18              (Government's Exhibit 2 was received in

19    evidence.)

20              MS. SAVNER:  We move to publish that exhibit

21    along with 2A, which is the transcript.

22              THE COURT:  Okay.

23              (A digital recording was played in open

24    court.)

25    BY MS. SAVNER:
```

1    Q    Folks says on that call that he would send out --

2    that he wasn't going to be available, that she could

3    meet with his peoples.  Did you know who that would be

4    at the time?

5    A    No.

6    Q    He mentions that she should now come to North Union

7    and Loomis.  Where is that in relation to here?

8    A    Again, it's probably three or four blocks north --

9    northeast from here.

10   Q    What happened next after this call came in?

11   A    Having learned of a destination where Mr. Folks

12   wanted the CS to go to, we sent out surveillance units

13   from my office to set up in the area.

14   Q    And how were they surveilling?  What kind of tools

15   were they using?

16   A    They were using their in-car radios.

17   Q    What happened next?

18   A    We double-checked everything again with the CS to

19   make sure everything was working properly, and we began

20   to roll towards that -- that intersection of North Union

21   and Loomis Street following the CS.

22   Q    When you say you doubled-checked everything to make

23   sure it was working properly, what do you mean?

24   A    We just tested the equipment.

25   Q    The audio transmitter?

1    A    The audio transmitter, correct.

2    Q    And does that transmitter also record the audio --

3    A    Yes.

4    Q    -- that it picks up?

5    A    Yes.

6    Q    Who turns that audio recorder on, the CS or DEA?

7    A    DEA.

8    Q    And how about turning it off; who does that?

9    A    DEA.

10   Q    And you mentioned you were able to hear what was

11   going on live through this transmitter?

12   A    Yes.

13   Q    Can you pull out Exhibit 3, please, and the CD

14   marked number 3.

15        What do you do with the recording when the

16   informant gets back to you?

17   A    Would you -- we take the device off the informant.

18   Q    And do you recognize Exhibit 3?

19   A    I do.

20   Q    What is it?

21   A    It is the Government's Exhibit 3, and it says N-3,

22   CS audio from 1/6/16.

23   Q    And have you had a chance to review the file on

24   that disk?

25   A    I have.

1    Q    And is it a true and accurate copy of the audio

2    recording from the device you have been describing from

3    that first controlled purchase?

4    A    It is.

5            MS. SAVNER:  At this time the government would

6    move to admit Exhibit 3.

7            THE COURT:  Any objection?

8            MR. KAPLAN:  No objection, your Honor.

9            THE COURT:  All right.  So admitted.

10           (Government's Exhibit 3 was received in

11   evidence.)

12   BY MS. SAVNER:

13   Q    All right.  So you mentioned that you followed the

14   informant from where you were located setting her up to

15   North Union and Loomis; is that correct?

16   A    That's correct.

17   Q    Why do you follow her?

18   A    To make sure that they go and make no side tracks;

19   to keep it controlled.

20   Q    And did she make any side ventures?

21   A    She made no deviations from the intended

22   destination.

23   Q    Were you able to maintain a visual on her car the

24   whole way?

25   A    Yes.

1    Q    All right.  How did Michelle, once she arrived at

2    the location, alert Moe, or Mr. Folks, that she was

3    there?

4    A    She placed another call.

5    Q    Describe that call for us, generally.

6    A    Generally, during that call, the CS advised that it

7    was in the area of North Union and Loomis, and Mr. Folks

8    said to hold on, and all of a sudden an unknown female's

9    voice was on the recording, was speaking.  We could hear

10   another female on the call.  And Mr. Folks asked the CS

11   to "tell her where you're at."  And at that point the CS

12   told them that they were parked just around Loomis

13   Street.

14   Q    And I noticed when you described the CS, you said

15   "it."  Why did you do that?

16   A    It's -- in DEA, we refer -- in our reports, we

17   refer to the CS as either his or her or it.  We don't

18   use names.  So if I do that, it's -- I am just -- it's a

19   slip of the tongue.  I am just used to calling them not

20   by their name.

21   Q    Why do you use "it" or just say "he" or "she"?

22   A    It -- again, it's personal preference, I guess.

23              MS. SAVNER:  Can we play -- permission to

24   publish a clip from what's been admitted as Exhibit 3, a

25   clip from about 10 minutes and 49 seconds to 12 minutes

```
1    and 29 seconds?

2              THE COURT:  Yes.

3              MS. SAVNER:  And this will play with the

4    transcript, which has been marked as 3B.

5              THE COURT:  Okay.

6              (A digital recording was played in open

7    court.)

8    BY MS. SAVNER:

9    Q    Did you recognize at the time that second female

10   voice that gets on the call?

11   A    No.

12   Q    Do you recognize that voice now?

13   A    I do.

14   Q    Whose voice do you recognize it to be?

15   A    Mandy Latulippe.

16   Q    And how do you know?

17   A    Because I have listened to -- I was present for her

18   post-arrest interview.

19   Q    You met her in person too, right?

20   A    And I have met her in person several times.

21   Q    What happened after this call?

22   A    Shortly after the call ended, myself and TFO

23   Estes -- we observed a white female with brown hair,

24   blue jeans, and I believe a gray sweatshirt come off of

25   the west side of the sidewalk in the vicinity of 103
```

1    North Union and cross the street.  The CS was parked on

2    the west side of North Union, and this female walked

3    across to the east side and walked a little bit south on

4    the east side and eventually came over to the CS's

5    vehicle and entered the passenger front seat.

6    Q    What happened after that?

7    A    After that, I could hear the CS ask for a sleeve,

8    and I heard the unknown female reply that "he has six

9    and a half."

10   Q    "He"?

11   A    "He has six and a half."  Correct.

12   Q    Did you get a look at the -- that female that got

13   into the CS's car either before or after?

14   A    After, yes.

15   Q    Okay.  And did you recognize her by sight at the

16   time?

17   A    No.

18   Q    Do you recognize her now?  Are you able to identify

19   her now?

20   A    Yes.

21   Q    Who is she?

22   A    Mandy Latulippe.

23   Q    How do you know?

24   A    Because I have met her in person.

25               MS. SAVNER:  Okay.  Can we pull up

1    Exhibit 48 -- oh, I'm sorry.  This is for the witness.

2    BY MS. SAVNER:

3    Q    Can you take a look at 48A.

4    A    3A?

5    Q    48A.

6    A    Where is that?

7    Q    It should be in numerical order.

8         Do you recognize that photo?

9    A    I do.  It's a photo of Mandy Latulippe.

10   Q    Does that fairly and accurately depict Miss

11   Latulippe?

12   A    It does.

13        MS. SAVNER:  The government would move to

14   admit 48A.

15        THE COURT:  Any objection?

16        MR. KAPLAN:  No, your Honor.

17        THE COURT:  All right.  So admitted.

18        (Government's Exhibit 48A was received in

19   evidence.)

20        MS. SAVNER:  Permission to publish?

21        THE COURT:  Yes.

22   BY MS. SAVNER:

23   Q    All right.  So this is the woman, Mandy Latulippe,

24   who you saw get in and out of the informant's car; is

25   that right?

1    A    Yes.

2    Q    Okay.  After she got out of the car, after Miss

3    Latulippe got out of the car, what happened next?

4    A    We followed the CS back to a predetermined

5    location.  Myself, TFO Estes and IA Epp followed the CS

6    back to a predetermined location where the CS handed

7    Mr. -- Mr. Estes six and a half bundles of heroin -- six

8    and a half bundles of -- containing a brown, powdery

9    substance at that point.

10   Q    Is that what heroin looks like, in your experience?

11   A    Yes.  Heroin is typically a brown, powdery

12   substance.

13   Q    And on the way to North Union and Loomis to your

14   predetermined location where you met up back with her,

15   did you maintain a visual on Michelle and her car?

16   A    The entire way, yes.

17   Q    So she then turned over six and a half bundles of

18   heroin to TFO Estes.  Did you see that happen?

19   A    Yes.

20   Q    And is the amount she turned over consistent with

21   what you heard over the audio transmitter about the

22   exchange that was taking place?

23   A    It is.

24   Q    Can you take a look at Government's Exhibit 5.  Do

25   you recognize that?

```
 1    A     I do.

 2    Q     What is it?

 3    A     It's -- appears to be six and a half bundles of

 4    packaged heroin.

 5    Q     Does that fairly and accurately depict the drugs

 6    that -- or the suspected narcotics that Michelle turned

 7    in to DEA after that controlled purchase?

 8    A     Yes.

 9              MS. SAVNER:  The government moves to admit

10    Exhibit 5.

11              THE COURT:  Any objection?

12              MR. KAPLAN:  Your Honor, I do have an

13    objection.  Can we approach?

14              THE COURT:  Yes.  Okay.

15    (The following was held at the bench.)

16              MR. KAPLAN:  I am assuming the government has

17    to show chain of custody to introduce the drugs?

18              THE COURT:  Yes.  You have a chain of custody

19    here?  The drugs go to get checked and --

20              MS. SAVNER:  Yes.  And we will get into that

21    before I go to admit the drugs themselves.

22              THE COURT:  So --

23              MR. KAPLAN:  I thought you just moved to admit

24    them.

25              MS. SAVNER:  Just a photograph of them.
```

1          THE COURT:  Okay.  So tentatively they're

2     admitted.  And then it's subject to you providing the

3     chain of custody.

4          MS. SAVNER:  Okay.

5          MR. KAPLAN:  Okay.  Thank you.

6          THE COURT:  Thank you.

7     (The following was held in open court.)

8          THE COURT:  So this is actually the photograph

9     of the drugs that were given by Ms. Latulippe -- I'm

10    sorry, by the informant to the agent?  Is that correct?

11         MS. SAVNER:  Yes, your Honor.

12         THE COURT:  Okay.  It is admitted subject to

13    the chain of custody being established.

14         MS. SAVNER:  Thank you, your Honor.

15         (Government's Exhibit 5 was received in

16    evidence.).

17         MS. SAVNER:  May I publish it?

18         THE COURT:  Yes.

19    BY MS. SAVNER:

20    Q    All right.  Explain to us, Agent Chetwynd, what we

21    are seeing here.

22    A    Each one of the six bundles to the left are a full

23    bundle of heroin with 10 bags in each.  And the single

24    one that's to the right has five.

25    Q    Half bundle?

1    A    A half bundle, correct.

2    Q    Okay.  After you -- well, tell us about the rest of

3    the procedures that DEA went through to break down this

4    buy.

5         You took the suspected narcotics back from

6    Michelle.  What else?

7    A    We removed the recording devices, and then once

8    again Michelle's vehicle was searched and her person was

9    searched for any drugs, money or contraband.

10   Q    What happened next with the suspected narcotics?

11   Where did those go?

12   A    Those were secured at the DEA drug vault by Estes

13   and myself.

14   Q    Were you with the drugs the whole time, from when

15   Michelle handed them to TFO Estes to when they were

16   secured?

17   A    Yes.

18              MS. SAVNER:  May I approach the witness?

19              THE COURT:  Yes.

20   BY MS. SAVNER:

21   Q    I have handed you what's been marked as

22   Government's Exhibit 5.  Do you recognize it?

23   A    I do.

24   Q    What is it?

25   A    It is a DEA evidence bag; self-sealing evidence

1    envelope is what DEA calls them.

2    Q    Okay.  And is it related in any way to this case?

3    A    It is.  On here is a label which asks for a case

4    number, an exhibit number, a date acquired, and then the

5    person that acquired it, and the person who sealed it,

6    and the witness of that sealing.

7            MS. SAVNER:  And for the record, I might have

8    misspoke.  This is labeled Government's Exhibit 6, not

9    5.

10            THE COURT:  Okay.

11   BY MS. SAVNER:

12   Q    Okay.  And do you see your name anywhere on that

13   bag?

14   A    I do.

15   Q    Tell us where.

16   A    It is located up on the "sealed by" portion.

17   Q    Okay.  And did you write your name there yourself?

18   A    That is my name and my signature, correct.

19   Q    All right.  And the seal at the top, is it still

20   intact?

21   A    It is.

22   Q    All right.  And you are listed as the person who

23   processed or secured the drugs?

24   A    Yes.

25   Q    All right.  And how does the condition of that

```
1    evidence bag compare to when you secured the drugs and

2    then sealed them?

3    A    This is not in the same condition that it was when

4    we put it in it.

5    Q    How is it different?

6    A    On the bottom portion of the bag, where it says

7    "laboratory use only," the laboratory's all filled out,

8    all the portion, and it looks like it's been analyzed by

9    the lab.

10              MS. SAVNER:  At this time the government would

11   move to admit Government's Exhibit 6.

12              THE COURT:  Okay.  Any objection?

13              MR. KAPLAN:  I do object, Judge.  I don't

14   think the chain of custody's been established.  In other

15   words -- I don't know if you want us to approach or not,

16   but he put it in the bag, sealed it, and apparently it

17   went to the lab.  We don't know if the lab opened it up

18   or not, if the lab sealed it, then sent it back.

19              THE COURT:  Are you going to be --

20              MR. KAPLAN:  Anyone handling it --

21              THE COURT:  -- calling anyone from the lab who

22   can actually establish that they received it, analyzed

23   the drugs, put the drugs back in and sent it to the

24   agent?

25              MS. SAVNER:  Yes, your Honor.
```

```
 1              THE COURT:  Okay.  So at this particular
 2    point, I am going to admit it subject to that linkup
 3    with the lab.
 4              MR. KAPLAN:  Thank you.
 5              THE COURT:  Okay.
 6              (Government's Exhibit 6 was received in
 7    evidence.)
 8    BY MS. SAVNER:
 9    Q    On that day of the first buy on January 6, 2016,
10    what further communication did Michelle have, if any,
11    with Brian Folks?
12    A    Yes.  TFO Estes directed the CS to send a text
13    message to Mr. Folks.
14    Q    And was that text recorded in any way?
15    A    It was.
16    Q    How?
17    A    By photograph.
18    Q    Can you take a look at Exhibit 4.  Do you recognize
19    that?
20    A    I do.
21    Q    What is it?
22    A    It's a picture of the CS's phone and the text
23    message that we just described.
24    Q    And does it fairly and accurately depict that phone
25    and text message?
```

 1   A    It does.

 2             MS. SAVNER:   Government moves to admit

 3   Exhibit 4.

 4             THE COURT:   Any objection?

 5             MR. KAPLAN:   Could I look at it, Judge,

 6   please?

 7             THE COURT:   Yes.

 8             (Brief pause.)

 9             MR. KAPLAN:   If I could inquire, Judge?

10             THE COURT:   Yes.

11                    VOIR DIRE EXAMINATION

12   BY MR. KAPLAN:

13   Q    So did you take this photograph?

14   A    I did not.

15   Q    Who took it?

16   A    TFO Estes or IA Epp.

17   Q    So how do you know it's the same one that this

18   particular person took?

19   A    Because it was submitted into evidence.

20   Q    Submitted into evidence where?

21   A    Evidence at the DEA.

22   Q    You mean it ended up in the DEA someplace?

23   A    It's part of the -- that -- it's part of this day's

24   controlled purchase as a piece of nondrug evidence.

25   Q    You don't have any firsthand knowledge this is

1    actually what was on the phone?

2    A    I was present for the sending of the text.

3    Q    So were you present when the photograph was taken?

4    A    Yeah.  I was in the vehicle when the -- when the --

5    it was documented.  I just don't know which one of them

6    did it.

7    Q    I see.  But you recognize this particular --

8    messages?

9    A    Yes.

10   Q    At the time that you were there?

11   A    Yes.

12             MR. KAPLAN:  Okay.  I have no objections.

13             THE COURT:  All right.  So admitted.  Okay.

14             (Government's Exhibit 4 was received in

15   evidence.)

16             MS. SAVNER:  Permission to publish?

17             THE COURT:  Yes.

18             MS. SAVNER:  If we zoom in on the phone.

19                  CONTINUED DIRECT EXAMINATION

20   BY MS. SAVNER:

21   Q    So what's the number listed there at the top?

22   A    (802) 825-4614.

23   Q    All right.  And can you read for us the text

24   messages?

25   A    Yes.

1      The first blurb is "All set.  Thank you.  Can I see

2   you again?"

3   Q    And, I'm sorry, that one has "sent" under it,

4   correct?

5   A    Correct.

6   Q    And this is Michelle's phone you are taking a

7   picture of?

8   A    Yes.

9   Q    Okay.  What does the next one say?

10  A    "Sure, you can.  I wanted to talk to you and see

11  what we could work out."

12       And the bottom one says "When?"

13  Q    All right.  And did you know what Folks was

14  referring to when he said "I want to talk to you and see

15  what we can work out"?

16  A    No.

17  Q    All right.  When was the next controlled purchase

18  for this investigation conducted?

19  A    The next purchase was on January 12th, 2016.

20  Q    And did that one also involve Michelle?

21  A    It did.

22  Q    All right.  And how did Michelle and Brian Folks

23  connect on January 12th?

24  A    Through -- through a telephone call.

25  Q    All right.  Were you present when that call was

1   made?

2   A    Yes.

3   Q    And do you know what number was -- well, do you

4   know who placed the call?

5   A    Michelle did.

6   Q    What number was called?

7   A    (802) 825-4614.

8   Q    Was that -- could you hear the contents of that

9   call?

10   A    I could hear her side of it, yes.

11   Q    All right.  And was that call recorded in any way?

12   A    It was.

13   Q    Can you pull out Exhibit 7, please.

14        Do you recognize what's been marked as Government's

15   Exhibit 7?

16   A    I do.

17   Q    What do you recognize it to be?

18   A    It's a CD for U.S. Exhibit 7, N-6, recorded call

19   between Folks and CS on 1/12/16.

20   Q    All right.  And have you listened to the file on

21   that CD?

22   A    I have.

23   Q    And is it a true and accurate recording of at least

24   a portion of the call that you overheard one end of?

25   A    Yes.

1          MS. SAVNER:  Government moves to admit
2     Government's Exhibit 7.
3          THE COURT:  Any objection?
4          MR. KAPLAN:  No objection, your Honor.
5          THE COURT:  All right.  So admitted.
6          (Government's Exhibit 7 was received in
7     evidence.)
8          MS. SAVNER:  Permission to publish?
9          THE COURT:  Yes.
10         MS. SAVNER:  Along with 7A?
11         THE COURT:  Okay.
12         (A digital recording was played in open
13    court.)
14    BY MS. SAVNER:
15    Q    All right.  He says he'll meet her at the same
16    place as before.  What did you understand that to mean?
17    A    We understood that to mean in the intersection area
18    of North Union and Loomis.
19    Q    All right.  What happened next?
20    A    The same procedures were followed with the CS as
21    explained earlier.  We -- myself, Estes and Epp --
22    followed the CS to the area of North Union and Loomis,
23    and the CS parked basically right out front of 103 North
24    Union.
25    Q    Let me stop you there.

```
 1          Before she got there, did you go through the same
 2   procedures you described before to set her up for this
 3   one?
 4   A    Yes.  Yes, we did.
 5   Q    Okay.  So DEA searched her and her car; is that
 6   right?
 7   A    Yes.
 8   Q    And did you witness that?
 9   A    Yes.
10   Q    All right.  She was given cash to use on the
11   purchase?
12   A    She was.
13   Q    Okay.  And what kind of recording equipment did you
14   use for this controlled buy?
15   A    An audio and video recording device.
16   Q    So two different devices?
17   A    Yes.
18   Q    And were both of them transmitting live to where
19   you were?
20   A    Yes.
21   Q    Did the recordings that they made -- were they also
22   saved somewhere?
23   A    Yes, they were.
24   Q    Can you pull out Government's Exhibit 8.
25        Do you recognize Government's Exhibit 8?
```

1    A    I do.

2    Q    What is it?

3    A    It's -- it's a CD for U.S. Exhibit 8 for N-7a, CS

4    video dated 1/12/2016.

5    Q    And have you had a chance to review the file on

6    that disk?

7    A    I have.

8    Q    And is it a true and accurate copy of the video

9    recording made by the -- well, made on the recording

10   device that DEA outfitted Michelle with on that day?

11   A    It is.

12   Q    And how do you know that's what it is?

13   A    Because I reviewed this and these are my initials

14   on the CD.

15   Q    And it was transmitting live to you at the time,

16   the feed?

17   A    Yes.

18            MS. SAVNER:  The government moves to admit

19   Exhibit 8.

20            THE COURT:  Any objection?

21            MR. KAPLAN:  No objection, your Honor.

22            THE COURT:  All right.  So admitted.

23            (Government's Exhibit 8 was received in

24   evidence.)

25   BY MS. SAVNER:

1   Q    So we are not going to watch this video right now,

2   but it ends before the time she got back to you at the

3   predetermined location.  What does that -- why is that?

4   A    That because we can turn it off, the video.

5   Q    Is that what happened here?

6   A    That's what happened.

7   Q    All right.  And you mentioned she was with -- she

8   had two recording devices with her on that buy.

9   A    Correct.

10  Q    When was the other recording device turned off?

11  A    Once back with us.

12  Q    And did you have a chance to review the -- that

13  second full audio recording?

14  A    Yes.

15  Q    Did anything of note happen between the time that

16  the recording on Exhibit 8 ends and the time she gets

17  back to you?

18  A    No, nothing.

19  Q    All right.  So you mentioned Michelle drove to

20  North Union and Loomis again; is that right?

21  A    Correct.

22  Q    Where were you in relation to her?

23  A    We were behind her the entire way.

24  Q    Did you maintain a visual on her?

25  A    Yes.

1    Q    And what happened when she got there?

2    A    Like I said, she pulled up basically right in front

3    of 103 North Union.  We pulled up several spaces ahead

4    of her.  And she placed another telephone call to -- we

5    could hear her place a telephone call.

6    Q    What could you hear her say?

7    A    She advised that she was there.

8    Q    What happened next?

9    A    I observed a black male wearing a black hat and a

10   black puffy vest-type jacket come from behind the CS's

11   vehicle and approach the CS's vehicle and get in the

12   passenger side.

13   Q    Could you hear or see what was happening once that

14   male got inside?

15   A    Yes.

16   Q    What did you see or hear, just generally?

17   A    Generally.  Once the male got in, I could hear,

18   "What can I do for you?"  And I heard the CS ask for a

19   sleeve.

20   Q    Who said, "What can I do for you?"  The male or the

21   CS?

22   A    The male voice, correct.

23   Q    And you recognize that male's voice now?

24   A    Yes.

25   Q    Whose voice do you recognize it to be?

1    A    Mr. Folks'.

2    Q    What happened next?

3    A    Well, they engaged in conversation, and I

4    observed a -- a black SUV pull behind the CS's vehicle

5    and head towards -- into the driveway that was behind

6    the CS's vehicle at 103 North Union.

7    Q    What happened then?

8    A    Then we -- we heard -- shortly after that I could

9    hear Mr. Folks say, "He's going into the wrong

10   apartment."

11   Q    And then what happened?

12   A    And then I saw Mr. Folks get out of the passenger

13   side of the CS vehicle.

14   Q    Did you see where he went?

15   A    I could only see him walk towards the driveway and

16   disappear, of 103 North Union.

17   Q    Can we pull up -- or can you pull out Exhibit 94.

18   It should be at the back of that folder.

19        Take a moment to look through those pages.  It's a

20   multi-page document.

21   A    Yes.

22   Q    Do you recognize the -- that exhibit?

23   A    Yes.

24   Q    What is it?

25   A    They're photos in a -- in and around 103 North

1    Union, of 103 North Union, and from a distance.

2    Q    And do they fairly and accurately depict the

3    property of 103 North Union?

4    A    Yes.

5              MS. SAVNER:  Government moves to admit

6    Exhibit 94.

7              THE COURT:  Any objection?

8              MR. KAPLAN:  No objection, your Honor.

9              THE COURT:  All right.  So admitted.

10             (Government's Exhibit 94 was received in

11   evidence.)

12             MS. SAVNER:  Permission to publish?

13             THE COURT:  Yes.

14   BY MS. SAVNER:

15   Q    So describe what we are seeing here on page one.

16   A    Yep.  This is a picture from -- while you are on

17   North Union, facing north.  Looking at those barrels,

18   those trash barrels, the three red ones and the blue one

19   are near the driveway of 103 North Union.

20   Q    I am going to circle some barrels.  Are those the

21   trash cans you are talking about?

22   A    Yes.

23             MS. SAVNER:  Can we pull up the next page.

24   BY MS. SAVNER:

25   Q    What are we seeing here?

1    A    This is the driveway to 103 North Union.

2    Q    All right.  And 103 North Union is this house that

3    we are seeing?

4    A    The brown house, two-level house, yes.

5              MS. SAVNER:  All right.  Can we go to the next

6    page.

7    BY MS. SAVNER:

8    Q    And what is this depicting?

9    A    Apartment 2.

10   Q    All right.  Of 103 North Union?

11   A    Of 103 North Union, correct.

12             MS. SAVNER:  And the next page, please.  And

13   go to the next one.

14   BY MS. SAVNER:

15   Q    And what are we looking at here?

16   A    It's just another view from inside the driveway of

17   Apartment 2, 103 North Union.

18   Q    So sort of looking from the end of the driveway

19   back out toward the street?

20   A    Correct.

21   Q    And so is this the driveway where you saw this

22   black SUV pull into?

23   A    Yes.

24   Q    And you said the -- Mr. Folks got out of Michelle's

25   car.  At some point did he come back to the car?

1    A    Yes.

2    Q    Explain what happened then.

3    A    He engaged the CS in conversation about wanting to

4    send one or two people up to where the CS was from.

5    Q    Did he say what the purpose of that would be?

6    A    I understood it to mean selling narcotics.

7    Q    What happened next?

8    A    They -- Mr. Folks actually said, "Come on in and

9    grab what we have," and he disappeared again down the

10   same driveway.  And at that moment, the CS called us.

11   Q    Had she received instructions relative to this?

12   A    Yes.

13   Q    What were those instructions?

14   A    They're just general safety instructions.  The CS

15   had never met him before, and we always instruct our CSs

16   that if they don't feel comfortable doing something,

17   that they don't have to do it.  So the CS called and

18   said, "He wants me to go inside to get the drugs," and

19   we just -- TFO Estes asked her if she was comfortable

20   with going inside the residence, and she said she was.

21   Q    So she was comfortable, so you gave her the green

22   light to go in?

23   A    TFO Estes -- yes.

24   Q    Okay.  And what happened then?

25   A    Then the CS went into the residence.

1    Q    All right.  Was she still carrying one or both of

2    the recording devices with her?

3    A    She was.

4    Q    So you could see and hear what was going on inside?

5    A    We could.

6    Q    Did you hear discussion of the exchange of heroin

7    for money?

8    A    I did.

9    Q    What did you hear?

10   A    I heard the CS say, "I'll take whatever you got,"

11   and I heard a female voice, which I know now is Mandy

12   Latulippe's, advise that they only had five bundles.

13   Q    All right.  At some point -- well, did you hear

14   them discuss money as well?

15   A    Yes.

16   Q    At some point -- well, when did you next see

17   Michelle?

18   A    After the purchase was done.

19   Q    Where did you see her?

20   A    At her vehicle.

21   Q    Okay.  So she came out of the house, went to her

22   vehicle?

23   A    Yep.  I saw her enter her vehicle.

24   Q    All right.  And what happened after that?

25   A    We followed -- myself, Estes and Epp followed the

1  CS to a predetermined location where the CS surrendered

2  five -- five bundles and five bags.

3  Q    And who did she surrender the five bundles and five

4  bags to?

5  A    To myself.

6  Q    All right.  And what did you do with them?

7  A    I held on to them and eventually gave them to TFO

8  Estes.

9  Q    Did you have any involvement again with the -- the

10  drugs themselves, the narcotics themselves, the ones

11  purchased on this date?

12  A    Yes.

13  Q    What was that?

14  A    That was mailing them to our lab.

15  Q    Where did you get them from to mail them?

16  A    From the drug vault at the DEA's office.

17  Q    And in addition to Michelle surrendering those 55

18  bags of suspected narcotics to you -- well, let me ask

19  you, did you take a look at the bags?

20  A    Yes.

21  Q    Could you see generally -- well, describe what they

22  looked like.

23  A    They were wax glassine bags containing a brown,

24  powdery substance with a dark-colored elastic band on

25  them.

1    Q    Is the quantity of bags that she gave you
2    consistent with the discussion you heard inside the
3    house?
4    A    No, because I only heard five bundles.
5    Q    And she came out with five bundles and five extra
6    bags?
7    A    Correct.
8    Q    What other steps were taken to break down this buy
9    in addition to taking the suspected narcotics from her?
10   A    The CS again was searched by TFO Estes for money,
11   drugs, and any other contraband, and TFO Estes searched
12   the CS's vehicle again for the same items, and nothing
13   was located.
14   Q    You saw those searches take place?
15   A    Yes.
16   Q    All right.  And when was the next controlled
17   purchase conducted?
18   A    The next purchase was conducted on January 22nd,
19   2016.
20   Q    How was this one set up?
21   A    Same -- same way, with the CS making telephone --
22   telephonic contact with Mr. Folks.
23   Q    Were you with the CS when she placed that
24   telephonic contact?
25   A    No.

1    Q    Okay.  Were you with her on January 22nd?

2    A    I was.

3    Q    Explain what happened when you met up with her.

4    A    We -- we had instructed the CS to make a recorded

5    call to Mr. Folks.  We did several attempts, and there

6    was no answer, so at that point we decided to terminate

7    the operation and instructed the CS that if, in fact,

8    Mr. Folks reached out to her later on in the afternoon,

9    to let us know and that we would try to revisit setting

10   up a meet with him later on in the day.

11   Q    You mentioned that there were some communications

12   between the two of them that you weren't present for.

13   Did you give the CS any instructions relative to those?

14   A    The CS was instructed to always maintain any

15   communications between Mr. Folks and her on her phone

16   and not delete them.

17   Q    For what purpose?

18   A    So we could document them.

19   Q    And did you see the communications that she had

20   with Mr. Folks when she wasn't in your presence?

21   A    I did later.

22   Q    And were they documented?

23   A    Yes.

24   Q    How?

25   A    By photographs.

1    Q    All right.  So eventually on January 22nd, after a

2    few calls took place, there was a call when Michelle

3    connected with Mr. Folks; is that right?

4    A    Yes.

5    Q    And were you present for that call?

6    A    Yes.

7    Q    And did you hear at least her side of the

8    conversation?

9    A    Yes.

10   Q    Was that call recorded in any way?

11   A    It was.

12   Q    All right.  Can you pull out Exhibit 12, please.

13        Do you recognize Exhibit 12?

14   A    I do.

15   Q    What is it?

16   A    It's a CD labeled U.S. Exhibit 12, N-16, recorded

17   call between Folks and CS, dated 1/22/16.

18   Q    And have you had a chance to review the file on

19   that CD?

20   A    I did.

21   Q    And is it a true and accurate copy of the recording

22   of that phone call?

23   A    It is.

24             MS. SAVNER:  Government moves to admit

25   Exhibit 12.

```
 1              THE COURT:  Any objection to 12?

 2              MR. KAPLAN:  No objections, your Honor.

 3              THE COURT:  So admitted.

 4              (Government's Exhibit 12 was received in

 5      evidence.)

 6              MS. SAVNER:  Permission to publish along with

 7      the CD the transcript, which is 12A?

 8              THE COURT:  Yes.

 9              (A digital recording was played in open

10      court.)

11      BY MS. SAVNER:

12      Q    All right.  What did -- what happened after this

13      call was finished?

14      A    We performed our normal procedures with the CS.

15      The CS was -- the CS and its vehicle was searched for

16      money, contraband and weapons and drugs.  The CS was

17      provided a recording -- audio and video recording

18      device.  The CS again was provided a quantity of U.S.

19      currency that was recorded.  And surveillance was set up

20      in the area of 103 North Union.

21      Q    Did you witness the search of the CS and her

22      vehicle?

23      A    I witnessed the search of the CS, yes.

24      Q    And, again, is it TFO Estes that did the search of

25      the vehicle?
```

1    A    Yes.   TFO Estes did both searches.

2    Q    And you were present?  You saw the one of her

3    person?

4    A    Yes.

5    Q    Anything come out of it?

6    A    There were -- nothing come.

7    Q    What happened after she was set up?

8    A    We followed the -- the CS's vehicle to the area of

9    103 North Union and Loomis where she parked, and while

10   she was parked, we could hear over the transmitter her

11   make a call.

12   Q    And was that transmitter audio only or audio and

13   video?

14   A    Audio and video.

15   Q    The audio recording was transmitting live to you.

16   Was it also preserved in some way?

17   A    It was.

18   Q    Can you pull out Exhibit 13.

19        Do you recognize Exhibit 13?

20   A    I do.

21   Q    What is it?

22   A    It's -- it's a CD labeled U.S. Exhibit 13, N-16, CS

23   audio dated 1/22/16.

24   Q    And have you had a chance to review the file on

25   that disk?

```
1    A    I have.
2    Q    And is it a true and accurate copy of the recording
3    that was transmitting live during this buy and that you
4    preserved?
5    A    Yes.
6              MS. SAVNER:  Government moves to admit
7    Exhibit 13.
8              THE COURT:  Any objection to 13?
9              MR. KAPLAN:  No objection, your Honor.
10             THE COURT:  All right.  So admitted.
11             (Government's Exhibit 13 was received in
12   evidence.)
13   BY MS. SAVNER:
14   Q    So you followed the CS to North Union and Loomis;
15   is that correct?
16   A    Yes.
17   Q    All right.  And where did you park your car in
18   relation to where she parked her car?
19   A    We were pulled into a -- a driveway a few spots
20   down.
21   Q    All right.  Could you see by just eyesight her car?
22   A    No, we did not have a visual.
23   Q    Did other DEA agents?
24   A    Yes.
25   Q    Could you see and hear from the audio and video
```

1    transmitters what was going on in the car?

2    A    Yes.

3    Q    Describe for us generally what you heard once she

4    got there.

5    A    Once people --

6    Q    Once the --

7    A    I'm sorry.

8    Q    -- CS got there.  I'm sorry.

9    A    Yes.

10        Once the CS got there, we heard the CS place a

11   telephone call saying, "I'm here" and described where

12   she was parked on North Union Street.

13            MS. SAVNER:  Permission to play a clip from

14   Exhibit 13 from minutes about 17:17 to 17:50?

15            THE COURT:  Yes.

16            MS. SAVNER:  This will be with 13B scrolling.

17            THE COURT:  Okay.

18            (A digital recording was played in open

19   court.)

20   BY MS. SAVNER:

21   Q    All right.  Mr. Folks on that call says, "I'm about

22   to send her out right now."  At that time did you know

23   what person he was talking about sending out?

24   A    No.

25   Q    All right.  What happened next?

1   A    Surveillance -- I heard over the radio surveillance
2   had advised that two females were approaching the CS's
3   vehicle.
4   Q    And the audio and video was transmitting live from
5   inside the CS's vehicle.  Did that corroborate with what
6   surveillance told you?
7   A    Eventually, yes, we saw her -- one female get in
8   the front seat.
9   Q    Okay.  And do you know why you didn't see the
10  female in the back seat?
11  A    Because -- because the device was only facing the
12  passenger seat.
13  Q    What happened, from what you could see once the
14  female got in the car?
15  A    I heard over the transmitter Mandy Latulippe tell
16  the CS to loop the block.
17  Q    And did they do that?
18  A    They did.
19  Q    Did your car stay parked, or did you follow?
20  A    We followed, but we weren't the primary car
21  following them.
22  Q    There was another DEA surveillance unit that was
23  following her?
24  A    Yes.
25  Q    When did you pick the car back up next?

1    A    Once it got back on North Union.

2    Q    How long did that take?

3    A    Oh, a minute or two.  Just to loop the block.

4    Q    Once they were in the car, over the transmitter did

5    you hear a discussion of what sounded like an exchange

6    of heroin for money?

7    A    Yes.

8    Q    Describe generally what you heard.

9    A    The CS asked for a sleeve, and Mandy said she only

10   had six buns.  Six buns.

11   Q    Did they discuss cash for that as well?

12   A    Yes.  I heard the CS say, "There's four."

13   Q    And what did you understand that to mean?

14   A    I understood that to mean 400.

15   Q    And you have mentioned she had a video recorder

16   with her that day as well.  Have you had a chance to

17   watch that video since then?

18   A    Yes.

19   Q    What have you noticed about it?

20   A    That the video is choppy.

21   Q    Besides its choppiness -- well, let me ask you to

22   pull out 14, please.

23        Do you recognize what's been marked as Government's

24   Exhibit 14?

25   A    Yes.

1    Q    What is it?

2    A    It's a CD marked U.S. Exhibit 14, labeled N-16, CS

3    video dated 1/22/16.

4    Q    All right.  And have you had a chance to review the

5    contents of that video?

6    A    I have.

7    Q    And is it a true and accurate recording of the

8    video that was transmitting live to you from inside the

9    CS's car that day?

10   A    It is.

11        MS. SAVNER:  Government moves to admit Exhibit

12   14.

13        THE COURT:  Any objection?

14        MR. KAPLAN:  No objection.

15        THE COURT:  All right.  So admitted.

16        (Government's Exhibit 14 was received in

17   evidence.)

18   BY MS. SAVNER:

19   Q    All right.  What happened next after the CS looped

20   the block and you picked her back up?

21   A    There was an exchange in the vehicle.

22   Q    And what happened next?

23   A    Mandy Latulippe removed a bag and handed the bag to

24   the CS.

25   Q    And that's what you saw on that video?

```
 1    A    Yes.
 2    Q    Okay.  At some point did you meet back up with the
 3    CS?  With Michelle?
 4    A    We did.
 5    Q    Okay.  And where was that?
 6    A    A predetermined location.
 7    Q    And what happened there?
 8    A    We performed the same procedures.  At that point
 9    the CS handed -- got in our vehicle, handed TFO Estes
10    the purchased narcotics, and, again, TFO Estes searched
11    the CS in our vehicle, and he stepped out and went to
12    search the CS's vehicle.  The recording devices were
13    removed from the CS at that time.
14    Q    Okay.  And did you see what Michelle handed over to
15    TFO Estes?
16    A    Yes.
17    Q    And could you see what it was?
18    A    Yes.
19    Q    Describe what you saw.
20    A    Six bundles of -- what appeared to be six wrapped
21    bundles of heroin.
22    Q    And what happened to the suspected six bundles of
23    heroin after she handed off to TFO Estes?
24    A    Yes.  It was brought back -- myself and TFO Estes
25    brought it back to DEA, and we laid it out and
```

1    photographed it.

2    Q    Were you present for the processing of this

3    evidence?

4    A    Yes.

5    Q    Can you take a look at Exhibit 16, please.

6         Do you recognize what's been marked as Government's

7    Exhibit 16?

8    A    Yes.

9    Q    What is it?

10   A    That is the heroin from that day's purchase.

11   Q    Photograph of it?

12   A    I'm sorry.  It's a photograph of that day's

13   purchase.

14   Q    All right.  And when was that picture taken?

15   A    1/22/16.

16   Q    I'm sorry.  It's just when in the process of the

17   buy.

18   A    After the buy was complete back at DEA.

19   Q    And does that fairly and accurately depict what the

20   suspected narcotics looked like once you got them back

21   to DEA?

22   A    Yes.

23             MS. SAVNER:  Government moves to admit 16.

24             THE COURT:  Any objection?

25             MR. KAPLAN:  No objection, your Honor.

1          THE COURT:  So admitted.

2          (Government's Exhibit 16 was received in

3     evidence.)

4          MS. SAVNER:  Permission to publish?

5          THE COURT:  Yes.

6     BY MS. SAVNER:

7     Q    All right.  Agent Chetwynd, tell us what we are

8     looking at here.

9     A    We're looking at four individual bundles at the top

10    of the screen, each containing 10.  We're looking at --

11    what we got?  Four, eight, nine, 10, 11, 12 on the left

12    side; 13, 14, 15, 16, 17, 18, 19, 20 total.  And then

13    one extra one.  So we have a total --

14    Q    So how many bags total did you find?

15    A    Your total is 61.

16    Q    The purchase was for six buns, or bundles, so that

17    should have been 60 bags; is that right?

18    A    That's correct.

19    Q    All right.  And what did you do when you counted

20    them out and saw that there were 61 instead of 60?

21    A    TFO Estes directed the CS to send a text to Mr.

22    Folks.

23    Q    And did you have a chance to see that text?

24    A    I have.

25    Q    All right.  You saw Michelle's phone?

1    A    I saw a picture of it, yes.

2    Q    Okay.  Why did you tell Michelle to send a text?

3    A    So she --

4            THE COURT:  I thought it was TFO Estes who

5    said that.

6            MS. SAVNER:  I'm sorry.

7            THE COURT:  Send a text.

8    BY MS. SAVNER:

9    Q    Do you know what TFO Estes' intention was in

10   sending the text?  Instructing Michelle to send the

11   text?

12   A    To demonstrate the honesty on the part of the CS.

13   Q    How would it do that?

14   A    By letting him know that there was an extra bag

15   given during the transaction.

16           MS. SAVNER:  May I approach, your Honor?

17           THE COURT:  Yes.

18   BY MS. SAVNER:

19   Q    Handing you what's been marked as Government's

20   Exhibit 19.  Do you recognize that?

21   A    I do.

22   Q    I'm sorry.

23   A    It's the wrong one.

24           MS. SAVNER:  I apologize, your Honor.  Just a

25   moment.

```
 1    BY MS. SAVNER:
 2    Q    I'm sorry.  I handed you the wrong exhibit.  Coming
 3    up again with Exhibit 15.
 4         Do you recognize Exhibit 15?
 5    A    Yes.
 6    Q    What do you recognize it to be?
 7    A     This is a photograph of that text that the CS sent
 8    Mr. Folks.
 9    Q    All right.  And you saw a picture of Michelle's
10    phone after she sent those texts?
11    A    I did.
12              MS. SAVNER:  Government moves to admit
13    Exhibit 15.
14              THE COURT:  Any objection to 15?
15              MR. KAPLAN:  No objection, your Honor.
16              THE COURT:  So admitted.
17              (Government's Exhibit 15 was received in
18    evidence.)
19              MS. SAVNER:  Permission to publish?
20              THE COURT:  Yes.
21    BY MS. SAVNER:
22    Q    All right.  So these are the texts that TFO Estes
23    instructed Michelle to send after DEA realized that she
24    had received 61 bags of suspected heroin instead of 60,
25    correct?
```

1    A    Correct.

2    Q    Can you read the texts for me, starting with the

3    one that says "hey."

4    A    It says "Hey, I met her and I just want to let you

5    know there was one extra ticket.  I just wanted you to

6    know so we are straight up with each other."

7         The blurb below says "No doubt.  Thank you."

8         The next one says "Yeah, no problem.  I like to be

9    straight up with people -- or PPL -- people to keep a

10   good relationship."

11        And the next blurb says "You got an extra point

12   with me already."

13   Q    All right.  And just to back up, these are text

14   messages between Michelle and that 4614 number; is that

15   right?

16   A    That's correct.

17   Q    Number associated with Brian Folks?

18   A    Correct.

19             MS. SAVNER:  May I approach?

20             THE COURT:  Yes.

21   BY MS. SAVNER:

22   Q    I am handing you what's been marked as Exhibit 17.

23   Do you recognize that?

24   A    Yes.

25   Q    What is it?

1    A    It is, again, a DEA evidence bag that's labeled

2    Exhibit 6, acquired by TFO Estes on 1/22/16.

3    Q    Okay.  And you said it's labeled Exhibit 6.  That's

4    the DEA exhibit number, correct?

5    A    Yes.  I'm sorry.

6    Q    Okay.  And is your name on that bag?

7    A    It is.

8    Q    Where do you see?

9    A    It's up -- located up on the "sealed by" portion.

10   It's my name and my signature with the date of 1/22/16.

11   Q    All right.  And you have mentioned that when these

12   drugs came back to DEA, you processed them along with

13   TFO Estes; is that right?

14   A    Correct.

15   Q    And it's your name on the part that says "secured

16   by" or "processed by"?

17   A    "Sealed by," yes.

18   Q    Okay.  And take a look at the contents of the bag.

19   How do they compare to the contents when you received

20   the 61 tickets of heroin from Michelle?

21   A    It's not in the same condition that we submitted it

22   in.

23   Q    What -- how is it different?

24   A    And they're not in the bundles.  They're not

25   wrapped.

1    Q    So explain, if you can see how it's packaged in
2    there.
3    A    It appears that all the bags have been unwrapped
4    and placed in another bag, and then there's another bag
5    containing a brown, powdery substance.  So it would
6    appear that they had been emptied.
7    Q    And do you see on that exhibit bag indications that
8    it was sent to the DEA lab and processed?
9    A    Yes.
10            MS. SAVNER:  The government moves to admit
11   Exhibit 17, subject to connection through the chemist.
12            THE COURT:  All right.  Subject to connection,
13   any objection?
14            MR. KAPLAN:  None, your Honor.  Not under
15   those circumstances.
16            THE COURT:  So admitted.
17            (Government's Exhibit 17 was received in
18   evidence.)
19   BY MS. SAVNER:
20   Q    Okay.  Let's talk about the last buy you did --
21            THE COURT:  I am just looking at the time.
22   You have about two minutes to go.  Do you think you
23   might want to wait until tomorrow?
24            MS. SAVNER:  Yes, your Honor.
25            THE COURT:  Okay.  All right.  We are going to

1    close the evidence at this point.  I want to remind you

2    that, first, we start at nine o'clock.  You can be here

3    early, get a great breakfast.

4         Second, it's very important, first, that you not

5    read anything about this case or discuss this case with

6    anyone.  The first thing I am going to ask tomorrow

7    morning is whether you learned anything about this case

8    from outside the courtroom.

9         So if you turn on the news, you should make sure

10   that you don't listen to anything in regard to this

11   particular case.  Don't read anything about this case.

12   And don't discuss it with your family members or anyone

13   else.

14        So we will see you tomorrow morning.  We are

15   actually going to have the rest of the trial down in my

16   courtroom; it's on the first floor.  Obviously you have

17   all been there before.  That actually is now my

18   courtroom, although this was my courtroom for 20 years,

19   but now it's downstairs.

20        So we will see you tomorrow downstairs at

21   nine o'clock.

22        Actually I am going to stay and talk with the

23   lawyers just for a second, so you can be excused.

24   (The jury left the courtroom, after which the following

25   was held in open court at 4:30 p.m.)

1            THE COURT:  All right.  So my question is, do

2       you anticipate any issues tomorrow, evidentiary issues,

3       anything to be resolved in advance at this point?

4            MR. KAPLAN:  I don't.  Not at this point,

5       Judge.

6            THE COURT:  Okay.  Anything you anticipate

7       coming up?

8            MR. DARROW:  We don't see anything,

9       your Honor.  I mean, who knows?  We may think of

10      something tomorrow, but --

11           THE COURT:  Okay.  And so tomorrow you start

12      with Agent Chetwynd, and then where do you go from

13      there?

14           MR. DARROW:  The person -- the CS, as Agent

15      Chetwynd calls her, Michelle --

16           THE COURT:  Yes.

17           MR. DARROW:  -- will be the next witness.

18           THE COURT:  Okay.  All right.  And later on in

19      the day?

20           MR. DARROW:  Mandy Latulippe.

21           THE COURT:  Okay.  All right.  And that should

22      be the whole day?

23           MR. DARROW:  I think so.

24           THE COURT:  Okay.  Good.  All right.

25         Anything else that we need to talk about at this

```
 1    point?

 2              MR. KAPLAN:  No, Judge.

 3              THE COURT:  If there's -- I will be here

 4    early, so if there's anything to be raised, let me know

 5    in advance.  We can talk about it before nine o'clock.

 6    Okay.

 7              MR. DARROW:  Thank you, your Honor.

 8              THE COURT:  Thank you.

 9           (Court was in recess at 4:32 p.m.)

10                      *** ** ***

11

12

13              C E R T I F I C A T I O N

14      I certify that the foregoing is a correct
      transcript from the record of proceedings in the
15    above-entitled matter.

16

17    June 11, 2019        _____
      Date                    Anne Nichols Pierce
18

19

20

21

22

23

24

25
```