DAY 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94



JURY TRIAL
Wednesday, May 8, 2019
Burlington, Vermont


BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge


APPEARANCES:

    WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
        MATTHEW T. GRADY, ESQ., Assistant United States
        Attorneys, Federal Building, Burlington,
        Vermont; Attorneys for the United States

    MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
        Suite 405, 95 St. Paul Street, Burlington,
        Vermont; Attorney for the Defendant

    NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
        Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| BRIAN FOLKS, SR. | | |
| Direct by Mr. Kaplan | 17 | 8 |
| Cross by Mr. Darrow | 139 | 24 |
| Voir Dire by Mr. Kaplan - Re: Exhibit 141 | 188 | 12 |
| Redirect by Mr. Kaplan | 234 | 25 |

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 141 | List of sex acts with prices | 189 |
| 136 | Notes of what was happening in videos | 211 |

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| Z5555 | Sample of dollar pictures | 32 |

## M I S C E L L A N E O U S

| | PAGE |
|---|---|
| Defendant rests | 255 |
| Government rests | 256 |
| Defendant's Rule 29 motion renewed | 257 |

1  WEDNESDAY, MAY 8, 2019

2  (The following was held in chambers at 9:10 a.m.)

3         THE COURT:  Good morning.  So the lawyers have

4  requested to meet me in chambers.  The defendant is not

5  here.  All the lawyers are present.  So who wanted to

6  talk?

7         MR. KAPLAN:  It was myself, Judge.

8      I ran into a little issue this morning.  Brian is

9  prepared to testify, but before he does, he wants to

10  read McFarlan testimony.  So we had given him all the

11  transcripts to read, and I think he read them last

12  night, but apparently he didn't get that one.  And he is

13  insistent that he be allowed to read -- I just gave it

14  to him -- that he be allowed to read that before he

15  testifies.

16         THE COURT:  How many pages is it?

17         MR. KAPLAN:  Well, McFarlan droned on for a

18  long time.

19         THE COURT:  Pardon me?

20         MR. KAPLAN:  I don't know how long it is.

21  It's not, like, unusually long, I don't think.  I can go

22  check.

23         THE COURT:  Well, how long a delay would this

24  be?

25         MR. KAPLAN:  Probably take him 20 minutes,

1    half hour to read it.

2              THE COURT:  So why is it important that he

3    read McFarlan's testimony?

4              MR. KAPLAN:  I think he feels that to be

5    prepared for cross examination, he needs to understand

6    the whole case.

7              THE COURT:  Okay.  Okay, so what's the

8    government's -- thought for the government?

9              MR. DARROW:  Mr. Folks was sitting in court

10   when McFarlan testified, so he has heard all the

11   testimony.  We have consistently told the Court -- I

12   understand the Court's told the jury that they are going

13   to get the case today.  I mean, I defer to you on

14   whether it's worth delaying 20 minutes if it's only

15   going to be that, but --

16             THE COURT:  Okay.  So we will give him 20

17   minutes.

18             MR. KAPLAN:  Thank you, Judge.

19             THE COURT:  20 minutes to half an hour.

20             MR. KAPLAN:  Pardon me?

21             THE COURT:  So do you want to take him back to

22   his cell?

23             MR. KAPLAN:  I think he can sit right where he

24   is.

25             THE COURT:  Is he on the witness stand?

```
1              MR. KAPLAN:  Yes.

2              THE COURT:  All right.  So can we go tell the

3    jury that we will start at -- well, is that right?

4              COURTROOM DEPUTY:  Yes, yes.  This is now

5    right.  Isn't that amazing?

6              THE COURT:  Okay.  So we will start in, you

7    know, 20 minutes to half an hour.

8              COURTROOM DEPUTY:  Okay.

9              THE COURT:  And talking about schedules, since

10   you are all here -- is he reading now?

11             MR. KAPLAN:  Yes.  And I am putting my client

12   on the stand, in case Mr. Darrow wonders about that.

13             MR. DARROW:  I'm glad to finally know.

14             THE COURT:  I think he is already on the

15   stand, right?  And I heard there's a big crowd out

16   there; am I right?

17             MR. KAPLAN:  You think they are here to see

18   me?

19             THE COURT:  So my expectation, of course, is

20   that this is going to take a lot more than just this

21   morning.  So this pushes the summations back till

22   tomorrow.  Is that correct?

23             MR. KAPLAN:  Well, I mean, I think Bill could

24   start his cross this afternoon, probably, and it depends

25   on how long it is.
```

1          THE COURT:  He could -- so he won't start his

2     cross until this afternoon.

3          MR. KAPLAN:  Well, I don't know.  Probably

4     around one o'clock, I would think.

5          THE COURT:  So do you think his cross would be

6     done in 15 minutes?

7          MR. KAPLAN:  Well, don't we go till 4:30?

8          THE COURT:  Well, yeah, but, I mean, at least

9     in terms of --

10          MR. KAPLAN:  Yeah, that's fine, Judge.  I have

11     no idea, really.

12          THE COURT:  But you think that on his

13     direct --

14          MR. KAPLAN:  It could take the whole day.  I

15     mean, it could.

16          THE COURT:  Okay.  Well, my expectation is it

17     takes the whole day.  So I don't know who's doing the

18     summation for the government.

19          MR. GRADY:  We're ready, your Honor.

20          THE COURT:  But I think that what you are

21     being told is that if he takes the stand -- and you --

22     you expect all morning with him on direct?

23          MR. KAPLAN:  I would think two hours; between

24     two and three hours.

25          THE COURT:  There's no way you are going to

1    get summations today.  So it will be tomorrow.

2         And at the close of the evidence, then we can talk

3    about the charge.  You have been sent the charge.  Were

4    there any changes or things that you think are grossly

5    in error?

6              MS. SAVNER:  I'm still reading through it, but

7    not that I have noticed.

8              THE COURT:  It's not much of a change really

9    from what Judge Crawford did.  A couple of things.  Did

10   you see anything that you --

11             MR. KAPLAN:  Our team is --

12             THE COURT:  -- are objecting to?

13             MR. KAPLAN:  Our team is still --

14             THE COURT:  Your team was up writing a memo,

15   which arrived at, what, five o'clock in the morning?

16             MS. SEN:  Yes.

17             THE COURT:  Yours was 11 o'clock at night.

18             MS. SAVNER:  (Nods head.)

19             THE COURT:  Okay.  Really taskmaster.  So have

20   you looked at the charge?

21             MS. SEN:  Not in a lot of detail, your Honor.

22   I will look at it this morning, right now, while my

23   client is reading the transcript.  How is that?

24             THE COURT:  Okay.  Is there anything else we

25   need to talk about?

1          MR. KAPLAN:  I'm sure there will be, but I

2     don't know what it is right now.

3          MR. DARROW:  You are still thinking -- we

4     understand that the Court is still considering the

5     government's request for some fine-tuning of the "on or

6     about" date variance?

7          THE COURT:  Yeah.  I looked at the charges,

8     and you talk about the continuing offense, right?

9     That's what you want an instruction on.  I didn't see

10    that necessarily in the charges.  Am I confused about

11    that?  And I thought that the charges on or about,

12    between one date and another, covered the issue.  But

13    you wanted continuing offense, and I couldn't see where

14    it was charged in that way.  Am I mistaken about that?

15         MR. DARROW:  Well, one of the concerns -- and

16    I should defer to Miss Savner -- was, for example, there

17    were some alleged trafficking victims with a broad time

18    period of, you know, in or about and between, for what

19    happened.  And some of them would be, you know, only

20    within a certain time in there; Katelynn, for example.

21        So that was one of the reasons why we were hoping

22    that you could say something to -- so the jury could

23    understand that that alleged trafficking didn't go on

24    for -- didn't have to be proven for the full year that

25    was alleged, but if it was between 2013 and 2014 -- I

1    think with her, maybe it was 2012, 2013, somewhere in

2    there.

3            THE COURT:  Well, then I should talk to you

4    about that.  I think that that's satisfied, but did you

5    have something in the indictment alleging that it was a

6    continuing offense?

7            MS. SAVNER:  Well, just continuing in the

8    sense that it took place -- it was charged over, you

9    know, multiple months or year period in some instances,

10   and the evidence may, you know, establish that -- a

11   brief period, in fact, of trafficking and not

12   trafficking over the entire period, and we're concerned

13   that the jury may put too much weight on the dates in

14   the indictment, on the beginning and end dates of the

15   trafficking, and not know that they can find -- even if

16   they find a specific time period within that, that

17   would -- the government would have met its burden.

18           THE COURT:  If you haven't charged the

19   continuing -- at least this is what I thought of, if you

20   haven't charged continuing, then if we add that

21   particular instruction, am I then commenting upon your

22   theory of the case?  That's the difficulty always.  I

23   try to make sure that I don't in any instruction comment

24   or adopt a theory.  And the buyer/seller request on the

25   part of the defense was just another example of that.

1    That's my difficulty.

2              MR. GRADY:  I think by its very nature it's a

3    continuing offense, 15.1.  And we have it right now

4    within a broad date range, and of course the jury only

5    needs to find that it happened on one specific instance

6    or even one specific day.  It has to be within the time

7    charged period.  It can't vary outside.  But it's a

8    continuing offense.  So you have force, fraud or

9    coercion would be used to engage in a commercial sex

10   act.  So the very nature of the offense is a continuing

11   offense.

12             THE COURT:  But the instruction covers that.

13   The instruction suggests that anytime during this period

14   is the relevant period for the gravamen of the offense.

15   But if I start talking about continuing offenses, then I

16   am adopting a theory which is your theory.  And I try as

17   best I can not to do that because the jury will then

18   think that I'm thinking this is all a continuing

19   offense.  That's the concern always that I have in

20   adopting anything like a theory.

21             MR. GRADY:  And then shifting over to

22   buyer/seller, you have requested that instruction.

23             MS. SEN:  Yes.

24             THE COURT:  Now, I don't know what evidence

25   there's going to be of buyer/seller in the defendant's

```
 1    testimony, but there is no evidence of buyer/seller
 2    theory.
 3            MR. KAPLAN:  Really what we are speaking about
 4    is the buyer/seller relationship between Brian and
 5    McFarlan, because McFarlan was pretty clear that he saw
 6    himself as -- he said this -- he saw himself as Brian's
 7    dealer, and he would come up with, like, 50 grams, sell
 8    Brian 10 grams at a time.  In all of his statements he
 9    said that Brian paid for -- he didn't front it on the
10    stand.  He says something a little bit different than
11    that.  I think that's important because the government's
12    arguing that the drugs are, from the cereal box, part of
13    the conspiracy.
14        We are arguing at that point he was never really in
15    a conspiracy with McFarlan.  He had told McFarlan, "I'm
16    not dealing with that stuff.  Don't bring it up."
17            THE COURT:  Well, first of all, in the opening
18    statement not only did you not mention that particular
19    theory, but you didn't talk about drugs at all.  During
20    cross examination of McFarlan, you didn't necessarily
21    focus in upon this buyer/seller relationship --
22            MR. KAPLAN:  Actually, I think I did.
23            THE COURT:  -- that I remember.  I would like
24    to see that.
25            MR. KAPLAN:  Brian did, because he is reading
```

```
1    that right now.
2              THE COURT:  We can bring the defendant in and
3    ask him for his version of McFarlan's testimony?
4              MR. KAPLAN:  No, but I wanted to.
5         I think I asked, Did he front the drugs?  Did he
6    think of himself as Brian's drug dealer?  And he said
7    yes.  He said the drugs were never Brian's until he
8    actually handed them to him, things like that.
9              THE COURT:  Okay.  So let me take a look at
10   the transcript.  My memory was it was not focused in
11   on -- not in the opening statement, and I don't remember
12   any cross examination.  But McFarlan, what you are
13   suggesting is, he would be the only person that you
14   would be setting up that defense with?
15             MR. KAPLAN:  Yes.
16             THE COURT:  And so I need to see if that was
17   true.  But the second issue for me is, you know, when I
18   talk about buyer/seller, I am talking about your theory
19   of the case, and --
20             MS. SEN:  Well, that is an instruction that
21   you have provided before, your Honor, in a previous
22   case --
23             THE COURT:  Yes, I have.  Right.
24             MS. SEN:  -- which is one of the reasons we
25   are bringing it up.
```

1          MR. KAPLAN:  Our theory of the case is it's an

2    aspect of his relationship with McFarlan that the

3    government on direct brought out.

4          THE COURT:  But that case was clearly the

5    central issue as to whether it was conspiracy or whether

6    it was a buyer/seller relationship.  It became -- it was

7    very clear during the whole course of the trial -- this

8    is a little bit different, it seems to me.

9          MS. SAVNER:  And if I may just in terms of the

10   facts that were brought out at trial, you know, Chrissy

11   Tatro has testified as to the relationship, and

12   obviously McFarlan has and others, and the testimony

13   consistently has been that McFarlan would come up, he

14   would mete out bit by bit of drugs, wait till, you

15   know -- stay in Vermont, oversee the packaging of them

16   for individual sale.  He brought his own people to

17   assist with that bagging and oversaw the distribution,

18   hung out at the trap house where they were being --

19   where the drugs were being sold out of, and provided

20   security, helped monitor the young women who were

21   working in this business.

22        So I think it's --

23          THE COURT:  Yeah, you have got a lot of

24   evidence to suggest that this was a conspiracy between

25   McFarlan and the defendant and various others.  The

1    question, though, is at least in setting up this

2    buyer/seller construction, do you remember any

3    examination of McFarlan which focused in upon that

4    nature of the relationship?

5         MS. SAVNER:  I think Mr. Kaplan did ask him on

6    cross examination whether he was the defendant's drug

7    dealer, and I think McFarlan's answer is, "Yeah, I guess

8    you could say that."  I mean, he doesn't deny he was one

9    of the people supplying Mr. Folks with drugs, but --

10        THE COURT:  Well, I will just take a look at

11   the transcript.  Okay.

12        MR. DARROW:  Judge, one other thing we talked

13   about yesterday or the day before was the charging in

14   the conjunctive, proving in the disjunctive.  Are we --

15   we have got law on that.

16        THE COURT:  No, that's correct.  You have law

17   on that.  I remember that.

18        MR. DARROW:  Okay.

19        THE COURT:  I remember that in terms of the

20   "on or about."  In fact, you can tell Greg Waples I

21   remember him really highlighting this conjunctive and

22   disjunctive and what the government has chosen to do,

23   and you have got law which says that even though it's

24   written in -- it's alternatives.

25        MR. DARROW:  Right.

1          THE COURT:  And that the government has made

2     that decision.  I remember that.  That also has to be

3     applied then to the statute here, but -- I don't think

4     that's an issue at this point.

5          MR. DARROW:  Thank you.

6          THE COURT:  But I am really thinking about

7     Count 15.

8          MR. DARROW:  I'm sorry?

9          THE COURT:  I'm really thinking about Count

10    15, but of course the evidence is not over now.  We

11    have --

12          MR. DARROW:  Right.

13          THE COURT:  -- the defendant's testimony.

14          MS. SEN:  Well, with respect to that,

15    your Honor, would the Court reserve ruling on it and

16    defer ruling on -- because we made the motion at the end

17    of the government's evidence.  That's obviously what the

18    Court can do is defer ruling on it.

19          THE COURT:  Right.  I denied it tentatively; I

20    said I wanted the memoranda and at the close of the

21    evidence I would look at it again.

22          MS. SEN:  Okay.

23          THE COURT:  But of course he is going to be

24    testifying, so what he says on this particular issue

25    about Hannah's involvement has to be considered as well.

1    Okay, is there anything else?

2    Okay.  You can relax for 10 minutes.

3    MR. KAPLAN:  Relax?

4    (Chambers conference concluded at 9:30 a.m.)

5    (The following was held in open court with the jury

6    present at 9:40 a.m.)

7    THE COURT:  Okay.  Good morning.

8    COURTROOM DEPUTY:  This is case number 16-94,

9    United States of America versus Brian Folks.  The

10   government is present through Assistant United States

11   Attorneys William Darrow, Emily Savner and Matthew

12   Grady.  The defendant is present in the courtroom with

13   his attorneys, Mark Kaplan and Natasha Sen.

14   The matter before the Court is trial by jury day

15   10.

16   THE COURT:  Good morning.  Welcome back.  Have

17   you spoken among yourselves about this case, have you

18   spoken with anyone else outside of the courtroom about

19   this case, or have you learned anything about this case

20   from outside the courtroom?

21   (The jury all indicate in the negative.)

22   THE COURT:  All right.  I appreciate your

23   negative responses, and I think we are ready to proceed.

24   Mr. Kaplan, you want to call your witness?

25   MR. KAPLAN:  Your Honor, the defense would

```
 1     call Brian Folks to the stand.
 2                 THE COURT:  Okay.
 3                         BRIAN FOLKS, SR.,
 4          being first duly sworn by the courtroom deputy,
 5          was examined and testified as follows:
 6                 THE COURT:  Good morning, Mr. Folks.
 7                 THE WITNESS:  Good morning.
 8                     DIRECT EXAMINATION
 9     BY MR. KAPLAN:
10     Q    Brian, would you state your full name, please.
11     A    Brian Folks, Senior.
12     Q    And where were you born?
13     A    I was born in Brooklyn, New York.
14                 MR. KAPLAN:  Can you just move that a little
15     bit closer to you so you don't have to lean into it.
16                 THE COURT:  Yeah.  Can you speak right into
17     the microphone, Mr. Folks.  There you go.  And speak
18     right into it.
19                 THE WITNESS:  That's good.
20     BY MR. KAPLAN:
21     Q    And where were you raised, Brian?
22     A    I was raised in Manhattan, New York.
23     Q    And did there come a time when you relocated to
24     Vermont?
25     A    Yes.
```

1    Q    Tell the jury, please, when that was.

2    A    2006.

3    Q    And you have been in Vermont off and on since that

4    time?

5    A    Yes.

6    Q    Mostly where?

7    A    Burlington.

8    Q    Okay.  Do you know someone named Katelynn?

9    A    Yes.

10   Q    You heard her testify in this case?

11   A    Yes.

12   Q    Could you tell the jury, please, how you met her.

13   A    Katelynn was working for some guys that I knew, and

14   one of them wanted to borrow my car, and I used to lend

15   it to him.  He used to pay me to borrow it.

16   Q    Why did he want to borrow your car?  For what

17   purpose?

18   A    They used to drive around -- he used to drive

19   Katelynn to dates.  There was a group of them, and they

20   used to drive 'em to dates.

21   Q    So she was working as a prostitute at that time?

22   A    Yes.

23        And he called me over to Burlington one time to

24   borrow the car, and I lent -- lent him the car.  He was

25   supposed to give me a hundred bucks.

```
 1    Q    Is this the same person that she talked about being
 2    in the motel?
 3    A    Yes.
 4    Q    Okay.  Go ahead.
 5    A    He was supposed to give me a hundred bucks, but he
 6    gave me 50 bucks, and he told me he would give me the
 7    other 50 when they came back.
 8    Q    And what happened?
 9    A    Well, he showed me -- he said I could take the 50,
10    and he showed me some pictures, and he said, "I could
11    hook you up with her instead for the other 50."
12    Q    And who was "her"?
13    A    It was pictures of Katelynn.
14    Q    Okay.
15    A    So I told him -- I questioned him about it.  I
16    said, "So you just going to give me the 50 and then you
17    hook me up with her and then we even?"  He said yeah.
18         I said, "How about you just give me the pictures
19    and give me 30 more and we call it even like that."
20    Q    Is that what happened?
21    A    Yeah.  He gave me the extra 30 and the pictures.
22    Q    So what was the next thing that happened?
23         By the way, do you know who -- was Katelynn working
24    with anyone else at the time?  Any other women?
25    A    Yeah.  It was -- it was four of 'em.
```

1    Q    Who were they?  Just first names.

2    A    It was Svetlana.  It was Katelynn.  It was Tori.

3    And Jasmine.

4    Q    Okay.  So what happened next in your relationship

5    with Katelynn?

6    A    Well, that day -- I didn't actually meet Katelynn

7    on that day.  I just saw the pictures.  She was inside

8    the house.  I was outside the house.  I didn't want to

9    go inside the house.

10    Q    So then what happened?

11    A    I left after that.  After they brought me the car

12    back, I got the pictures.  He sent 'em to my phone.  He

13    gave me my 30 bucks, and I got in my car and left.

14    Q    Okay.  What happened next?

15    A    Next time I saw Katelynn, the girl that was

16    overseeing her, so to say, I guess watching her, called

17    me to the motel.  The girl was related to me somewhat

18    because she -- actually, she was related to my wife.

19    Q    Okay.

20    A    So she called me over and she said they were having

21    a problem.

22    Q    And did you find out what the problem was?

23    A    Yeah.  It was some guy didn't want to leave their

24    hotel room.

25    Q    So what did you do, if anything?

1    A    I went over there, and I made'm leave.

2    Q    All right.  And did you have to use any violence or

3    anything?

4    A    No.  He just saw me, I guess -- I mean, not to

5    sound racist or anything, he saw a black guy, and, oh,

6    yeah, I'm outta here.

7    Q    So then what happened?

8    A    Well, they started calling me over a lot after that

9    because they -- the guys that they were working for

10   wasn't always around.  They were back and forth.  They

11   were doing their own thing.  So it was a bunch of

12   females that was working together.  So they had no male

13   influence, so they kept calling me over.

14   Q    For protection kind of thing or --

15   A    Yeah.  Sit around with them.  I sit around with

16   them.  I talk.  And at one point I found out Kate- --

17   Katelynn was using crack.

18   Q    All right.

19   A    So they would tell me to drive her into town to get

20   some.

21   Q    Were you selling any drugs at that point?

22   A    No.

23   Q    Okay.

24   A    I would drive her into town, and we would go find

25   whoever had it, and we would buy it, but being as I was

1    with her, a lot of the guys knew me, so they would give

2    her extra and stuff like that because I was bringing

3    her.

4    Q    So then what happened?

5    A    So after a while she came up.  She was like, "Well,

6    you always taking me around" --

7         Wait.  Before that she started stealing money from

8    them, like she would get money --

9    Q    Stealing money from the people she was working for?

10   A    Yeah.

11   Q    Okay.

12   A    She would get the money, and instead of giving 'em

13   all the money, she would take some of it and hide it to

14   the side and sneak it to me, and I would hold it for

15   her.

16   Q    Okay.

17   A    And what she would do is she would tell them that

18   she wanted to get some crack, and they would say -- they

19   would tell her either yes or no.  Most of the time they

20   would tell her no, so she'll say, "I can get it for

21   free," and they'll go, "Okay, from who?"  She'll say, "I

22   can get it -- Moe can get it for me," and she will tell

23   them that she was doing a trick with me to get the

24   crack, but in reality I had her money, and she will just

25   come and go, "Gimme 50" or "gimme a hundred," and we'll

```
 1    just hang out while she did what she had to do.
 2    Q    So that's how you met Katelynn?
 3    A    That's how me and her -- yeah, that's how me and
 4    her eventually got close.
 5    Q    Did she end up working with you at some point?
 6    A    Yes.
 7    Q    How did that come about?
 8    A    Well, at one point, like, I took her out and we was
 9    hanging out, and she told me she -- like, "Well, you are
10    always taking me around, you always helping me out.  Why
11    don't you just do it for me and take me around.  You got
12    the car, and I'll just give you half of the money as
13    opposed to giving it to them."  And I was like --
14    Q    And what was your response?
15    A    I said, "All right, sounds good."
16    Q    What was it that she expected you to do, if you
17    know?
18    A    She wanted me to drive her around.  She wanted me
19    to sit with her in the hotels to make sure that these
20    dudes don't come back after her, and she wanted me to
21    just make sure that when she had dates, that nobody,
22    like, tried to hurt her or took advantage of her and
23    stuff like that.
24    Q    And did you do that?
25    A    Yeah.
```

```
1    Q    You heard Katelynn testify that she thought you
2    lived up to your promises.  Do you agree with that?
3    A    Yeah.
4    Q    So tell -- tell the jury, please, how you felt
5    about Katelynn.  Like, did you ever tell her that you
6    loved her?
7    A    No, I never told her that I loved her or anything
8    like that.
9    Q    Did she ever tell you that she loved you?
10   A    No.
11   Q    Did you think she did?
12   A    I think she liked -- I knew she liked me.  I knew
13   she was fond of me.  But love, we wasn't on that level
14   at all.
15   Q    In fact, did you know she was seeing Brandon also?
16   A    Say that again.
17   Q    Did you know that she was also seeing Brandon, your
18   cousin?
19   A    Brady.
20   Q    Brady.  I'm sorry.
21   A    Yeah, she started seeing Brady at one point.
22   Q    And did that bother you?
23   A    No, it didn't bother me, because I felt like, okay,
24   I'm with my wife, you're with Brady.  Like, when we're
25   together, we're together; when we're not, you're with
```

```
1    who you're with; I'm with who I'm with.  So you can't
2    complain about my wife; I can't complain about Brady.
3    Q    So during that period of time that you were
4    together, how would you describe -- did you -- did you
5    get along with her?
6    A    Yeah.
7    Q    Did you have any reason ever to threaten her or
8    assault her or do anything?
9    A    No.  We never had no arguments.  We never had
10   anything.  She had arguments with my wife, but me and
11   her personally, we never had no arguments.
12   Q    And do you recall she had testified about the
13   incident that took place in the motel where this guy --
14   she described him as a skinny black guy that came over.
15   Tell the jury what -- what you remember happening during
16   that episode, please.
17   A    Well, that day -- I remember she came and she
18   testified that he came over to the hotel for a girl,
19   another girl, Ava --
20   Q    Yeah.
21   A    -- but that wasn't true.  He --
22   Q    What is the truth, from your perspective?
23   A    He -- he came over to that hotel for her.  That
24   was -- that was the guy that she was working for.  She
25   came over -- he came over to the hotel for her.
```

1     Actually he was in the hotel, and he saw her, and
2     so he went into her room, and he was threatening her.
3     They went in the bathroom, and she called me and told me
4     to come get her out of there.
5          So while she was talking to me on the phone, I came
6     and -- Brady, my cousin, was driving.  He drove me over
7     there.  And we went to get her out of there.  When we
8     got there, the guy was outside the hotel room.
9     Q    So then what happened?
10    A    I approached him, and I asked him what the problem
11    was.  He told me that she owed him money, that she used
12    to work for him and she didn't pay him, because what I
13    found out later, they used to run up a bill with them.
14    Like, the guy used to run up a bill with the girls, so
15    they were like -- they were like, I don't want to say
16    contractual, but they were like -- they had no choice
17    but to stay there because they owed them money.
18    Q    Okay.
19    A    So that was -- that's what they held over them.  So
20    I asked her what was the problem, like, "Did you owe the
21    guy money?" and she was saying --
22    Q    What did you learn when you asked that?
23    A    She said no.  She said she didn't owe them money.
24    He is saying that he gave her a quota of how much money
25    she was supposed to make, and because she didn't make

1    it, he felt that she owed him.

2    Q    So then what happened?

3    A    So I told him it was nothing happening.  "She don't

4    owe you nothing.  Leave her alone.  She not billing with

5    you no more," and that's that.

6         He ain't like that too much.  He was talking real

7    crazy, as we say, and I offered to fight him.  But he

8    didn't want to fight me.  I'm known on the streets for

9    being a fighter.

10   Q    Did you have a gun?

11   A    No.

12   Q    Did you need one?

13   A    No.  I have been boxing all my life.  I have been

14   wrestling all my life, since I was a kid.  My father's

15   Golden Gloves.  My uncle's Golden Gloves.  I have been

16   training all my life to fight.  My father's also a

17   Marine.

18   Q    So you did not point a gun at him?

19   A    No.

20   Q    And what was his response?

21   A    His response, he didn't want to fight, so I called

22   another guy that I knew that was a part of him, that

23   they hung out together.

24   Q    And what happened then?

25   A    The guy told me -- I told him what was going on,

```
1    and the guy told me, he said, "Yo, just find this --
2    give 'im five minutes."  That's what we called it, five
3    minutes.  He said, "Just give him five minutes, and it's
4    over."  I said, "I got no problem with that," and I
5    asked him, I said, "You want five minutes?"  He said no.
6    And I told him, I said, "You hear it, right?  He don't
7    want five," so he said all right.
8         So because I did that, he was, like, ostracized
9    from everybody now, because he is from Brooklyn; I'm
10   from Harlem.
11   Q    What was the result of that?
12   A    The result of that, he couldn't go around his
13   friends and be the tough guy no more, because I just
14   called him out, and we say in the streets, we say a
15   call-out is mandatory, meaning if someone asks you to
16   fight, you have no choice but to fight.  If you don't,
17   you're soft, you're punk, or whatever the case may be.
18        So he didn't want to be considered as that, so what
19   he started telling people, "Oh, the only reason I didn't
20   fight him is because he had a gun."
21   Q    And that's where that came from?
22   A    Yeah.
23   Q    So you heard Katelynn testify that she went to New
24   York and stayed there?
25   A    Yeah.
```

```
 1    Q    Who drove her to New York?

 2    A    I did.

 3    Q    And why -- you were going to New York.  You had to

 4    be there for a while?

 5    A    Yeah.

 6    Q    And did Katelynn come back to Vermont?

 7    A    No.

 8    Q    Did she let you know that she wasn't coming back?

 9    A    Yeah.

10    Q    And what was your response to that?

11    A    I told her to stay if she wanted to stay.  I told

12    her if she wanted to stay, she could even stay at my

13    mom's house.

14    Q    Did she do that?

15    A    Yeah, from what I understood she did.

16    Q    And did you have a problem with her staying down

17    there?

18    A    No.  She didn't want to come back to Vermont.  Her

19    words was, "I don't want to go back to Vermont without

20    you."

21    Q    I want to show you what the government introduced

22    as Exhibit 44C and ask you, is this a shot of a YouTube

23    video?

24    A    Yes.

25    Q    Can you explain what that's all about, please.
```

```
1    A    I had a business idea.  I had a business idea, and
2    the business idea was, like -- it's kind of complicated.
3    It's like five steps in the business idea.  And in order
4    for me to get it started, I had to have, like, what do
5    you call it, not clientele but product to sell.
6         So I wanted -- it was -- it was in the porn
7    industry.  And this was a commercial that I was
8    shooting.  She agreed to be a part of the commercial,
9    and I shot the commercial.  I had a whole bunch of 'em,
10   and I was saving 'em up on the computers so when I
11   started the business, I would have the commercials
12   already ready.  I would have the pictures already ready.
13   I would have everything I need, because you can't start
14   a business and don't have what you are trying to sell.
15   Q    Now, I noticed in that -- in that still photograph
16   that she appears to be smiling?
17   A    Yes.
18   Q    Did she have a problem with any of that?
19   A    No.
20   Q    So did you -- did you meet someone by the name of
21   Keisha?
22   A    Yes.
23   Q    And tell the jury, please, how that came about.
24   A    Um, there was a house on Willard Street, North
25   Willard Street, that I used to hang out at.  Well,
```

1    actually me and Katelynn used to hang out there.

2    Q    Okay.

3    A    And there was a guy there that used to hang around.

4    He used to sell drugs.  His name was John.

5    Q    All right.

6    A    Me -- we was in there talking, and I ran my picture

7    business by him.  The picture business was -- it's --

8    well, people in prison -- a lot of people in prison

9    don't have, like, family members or girlfriends to send

10   them pictures and stuff like that, so what they do is

11   they invest in these pictures we call dollar pictures.

12   Q    Let me show you what's been marked as

13   Defendant's -- it's not marked.

14        Defendant's Exhibit Z5555.  Is that what you are

15   talking about?

16   A    Yeah.

17   Q    Could you explain to the jury, please, what that

18   is.

19   A    They're dollar pictures.  Like I said, when guys

20   don't have family or girlfriends to send 'em pictures,

21   they invest in these pictures, and some people, like,

22   they'll say -- they will show other people and say,

23   "Well, this is my girlfriend," or whatever the case may

24   be.  But these are the pictures they get.  And they

25   order them -- they cost a dollar per picture, and it's

1    pictures of a bunch of females that they don't know, but

2    you can get sets of them so you will have, like, 20

3    pictures of the same females, so forth and so on, and

4    this is the business that I was putting together.

5    Q    And then you are paid a dollar for each picture?

6    A    I'm paid a dollar for each picture, and plus

7    shipping and handling.

8    Q    Who put that exhibit together?

9    A    I did.  This one right here?

10    Q    Yes.

11    A    I did.  On the computer.

12                MR. KAPLAN:  Your Honor, I move to admit

13    Z5555.

14                THE COURT:  Any objection?

15                MR. DARROW:  No, your Honor.

16                THE COURT:  So admitted.

17                (Defendant's Exhibit Z5555 was received in

18    evidence.)

19    BY MR. KAPLAN:

20    Q    So what about this guy named John?

21    A    Okay.  I was explaining to him how the picture

22    business worked, and I was explaining to him the profits

23    that you can get from the pictures.  We did research in

24    this, and at the time I was only dealing with prisons in

25    New York, and there was 72 prisons in New York, and they

1    averaged about $2,000 a month on dollar pictures.  So I

2    was selling them, you know, at a profit.  It's a big

3    profit.

4    Q    So what happened as a result of speaking with John?

5    A    He told me he knew a girl that was -- that was good

6    for taking pictures, like she would fit perfect with the

7    business.

8    Q    Was John an addict?

9    A    Yeah.

10        So I said I --

11   Q    So then what?

12   A    I told him, "Okay, who?  Let's go meet her," and I

13   gotta add in that, okay, when you take those pictures,

14   you got a choice to take pictures from either models,

15   which you have to pay, like, a big amount because

16   they're professional models, or you can find regular

17   people to take 'em and you pay less.  I chose to find

18   regular people, because I can pay 50 bucks for 12

19   pictures and sell those 12 pictures a hundred times

20   each.  That's 120 bucks at least, you know.  But -- so

21   that was, like, you know -- it's better for me

22   businesswise.

23   Q    So did you go with John?

24   A    He took me to see this girl, to see Keisha,

25   actually.  When he pulled up on Keisha, she leaned in

1    the window.  We were in a car.  He was driving.  I was

2    in the passenger.  She leaned in the window on my side.

3    He introduced us.  He just said, "Keisha."

4         So I started talking to her, and I was explaining

5    to her that I wanted to take pictures and these are the

6    type of pictures.  She asked me what kind of pictures,

7    and I told her, "It's your choice, you know.  You can

8    have nude, semi-nude, fully dressed, you know, it's your

9    choice, but they have to be provocative," and I

10    explained to her where the pictures would go and what I

11    would be doing with the pictures.

12        While we were talking, she says something to him --

13    or he says something to her, and she says, "Okay,

14    Daddy."  I started laughing.  I said, "You got her

15    calling you daddy?"  He said, "No.  That's my daughter."

16    I said, "Wait" --

17    Q    What was your response?

18    A    I said, "Wait.  That's your real daughter?"  He

19    said, "Yeah."  And I looked at her.  I said, "That's

20    your father?  She said, "Yeah."  I said, "You sitting

21    here telling me how cute she is and what a nice body she

22    got, and she's your daughter?"  And he said, "Yeah."  I

23    turned around, I asked her, "How old are you?"  She

24    said, "17."  I said, "You're too young anyway."  I said,

25    "When you turn 18, maybe give me a call."  And I told

```
1    John, I said, "Take me home," and me and him was done at
2    that point.  I cursed him out, and I said a whole bunch
3    of other stuff to him, because I felt that was just --
4    that wasn't right.  That was -- that was crazy.
5    Q    All right.  So then what happened?
6    A    So he drove me back, and that was the last
7    interaction I ever had with him.
8    Q    And did you ever hear from Keisha?
9    A    Yeah.  On her 18th birthday she actually called me.
10   I'm assuming he got -- she got the number from him
11   because he did have my number.  So she got the number.
12   She called me.  I --
13   Q    And tell us about that conversation, please.
14   A    I didn't know who she was at first.  Then she
15   explained who she was.  I said, "What do you want?"  She
16   said -- was like, "Well, today's my birthday."  I didn't
17   catch it at first.  And I said, "So?"  And she said,
18   "I'm 18 today."  And I said, "Oh, all right."  And she's
19   like, "I still want to take some pictures."
20        And I explained to her, "I don't want to deal with
21   your father.  Me and him don't talk no more."  And she's
22   like, "All right.  It's just me and you."
23        So I said all right.  I actually asked, "You got
24   ID?"  She said, "Yeah."  So she told me to come pick her
25   up.
```

1          I met her in Burlington.  She had -- she showed me

2    her ID.  It was her birthday.  So I said, "Happy

3    birthday.  What do you want?"  She said -- um -- "I want

4    some weed."  I said, "Cool."

5          We drove around.  We found some weed.  I said

6    now -- what she said, "Let's roll it and smoke."  I

7    said, "I don't smoke."  So she was on me personally

8    because I'm a black guy from the city.  Every black guy

9    from the city smoke weed, but I don't, so --

10   Q    So then what happened?

11   A    So she said, "All right, forget the weed.  I'll use

12   it later."  And she like, "Let's just go take the

13   pictures."  So she took me to a house in South

14   Burlington to take the pictures.

15   Q    What happened when you got there, if anything?

16   A    When I got there, John was in the living room, so I

17   told her again, "We not dealing with this dude.  I can't

18   deal with him.  I don't like what he did."  So she said,

19   "Don't worry about him.  We're going upstairs."  So we

20   went upstairs and we took the pictures.

21   Q    And those were the pictures for something like the

22   exhibit we just introduced?

23   A    Yeah.

24   Q    Okay.  Did you have any contact with her after

25   that?

```
1    A    Yeah.  She started hanging out at -- on the Willard

2    Street apartment.  John was no longer allowed there.  He

3    couldn't come get a girl who owned the apartment.  I

4    explained to her what happened, and she ain't let him

5    come in no more because she had a daughter as well.

6    Q    So then what happened?

7    A    Keisha started coming there hanging out, and her

8    cousin was there as well.  And, um, she started getting

9    cool with Katelynn, and she was asking Katelynn -- like,

10   they discussed what Katelynn was doing, and that some --

11   Q    You mean prostituting?

12   A    Yeah.

13   Q    So those two had conversations?

14   A    Yeah.

15   Q    Do you know what the result of those conversations

16   were?

17   A    Yeah.  At one point she asked, because she asked --

18   because she -- should she get down with it.  She wanted

19   to be a part of it.  She wanted to make some money.

20   Q    And what was your response?

21   A    "So if that's what you want to do, that's what you

22   want to do.  I'll help you."

23   Q    So it was Keisha that asked you?

24   A    Yeah.

25   Q    And so did she -- so this was -- this was like in
```

1  2013?

2  A    Um, I guess.  I would -- yeah.  Around that, yeah.

3  Q    So what happened?  Did she work as a prostitute?

4  What took place?

5  A    She did but she didn't.  She -- okay, she tried,

6  let's say.  Um, she need -- I asked her did she have,

7  um, anything to take pictures in, because you have to

8  put up pictures when you do that.  So I asked her did

9  she have anything to take pictures in.  She told me no.

10      So I knew the guy in -- I knew a guy in the mall

11  that owned, um, a lingerie stop.

12  Q    So what happened?

13  A    So I called him, and I told him, "I have two people

14  that's coming through that needs to take -- get some

15  lingerie and stuff."  So he said okay.  He convinced me

16  to let him do the pictures, because he had a computer

17  program that changes the background and adds stuff to

18  the pictures.

19      So he said, "I can make the pictures more

20  professional if you let me do it."

21  Q    And where were you -- so did they go and have the

22  pictures taken?

23  A    Yeah.

24  Q    Where were you when the pictures were taken?

25  A    I was in the mall shop- -- I was in the lingerie

1    shop shopping.

2    Q    And where were they, Katelynn and Keisha?

3    A    Well, when Katelynn was in taking her pictures, I

4    was helping Keisha pick out lingerie.  When Keisha was

5    taking her pictures, I was helping Katelynn pick out

6    lingerie.

7    Q    So did you ever go in the back room?

8    A    No.

9    Q    And did you pay for the lingerie?

10   A    No.  When we got to -- when we got to -- the

11   lingerie comes in little -- little -- little packages,

12   little cardboard packages, and they have a picture of a

13   model on a package wearing the lingerie.  But they're

14   really small, so we had arm- -- like, literally armfuls

15   of 'em, like 15, 16 of them apiece, and when we went to

16   the counter with 'em, he said, "Don't worry about it."

17   I said, "Don't worry?"  He said, "Yeah, you're good."

18        So he packed it all up and put it in a bag.  I

19   don't argue with free.

20        So we left, but when we out in the parking lot, I

21   believe it was Katelynn told me nothing is free, and I

22   go, "What do you mean?"  And then she explained it to

23   me, and I just laughed, and I'm like, "Okay."

24   Q    So you said that Keisha had a -- was -- wanted to

25   give working as a prostitute a try, and what happened

1    that first time in 2013?

2    A    Well, she took pictures.  She went up on -- she

3    went up on Backpage, and she wasn't like -- how can I

4    say?  She wasn't -- to me, it didn't seem like she

5    was -- that's something she really wanted to do and be a

6    part of, so I told her, like, "You don't seem like

7    you're really into this," and she was like, "I'm really

8    not," and so she was like, "Yeah, I just want to leave."

9    So I said, "Where do you want to go?"  She said, "I want

10   to go to my" -- I think it was her grandmother's house.

11   Q    What did you do?

12   A    I drove her home.

13   Q    This was like after a day or so?

14   A    Yeah.

15   Q    Did you do anything to prevent her from leaving?

16   A    No.  I even let her keep the lingerie.  She wanted

17   to keep it.

18   Q    And did you -- did you try and encourage her to

19   stay?

20   A    No.

21   Q    And did you come to find out that she -- at some

22   point she went out and was working on her own as a

23   prostitute?

24   A    Yeah.

25   Q    So between -- let me ask you this:  Between when

1  she left in 2013 and June of 2015 when you saw her

2  again, did you ever see her?

3  A    Yeah.  I seen her around town a lot.  And not only

4  around town, like I would go to the beach with my kids

5  and she would be there.  In fact, we had an incident at

6  beach.

7  Q    What happened?

8  A    Because she ran up to me.  I was taking one of my

9  kids to the bathroom, and she ran up to me and hugged

10 me, and it was like, "Look at my bikini.  Look at my

11 bikini," but she couldn't see my wife.  I was looking

12 over her shoulder, and my wife was, like, drilling into

13 me, and she was coming, and I was like, "I gotta go.  I

14 gotta go."  And then me and my wife got into a big

15 argument over it.

16 Q    But you never had any issues with her during this

17 period of time?

18 A    No.  I would see her at different hotels.  Like all

19 these girls, when they were -- when they were on --

20 Backpaging, it was only a certain amount of hotels up

21 here that would allow them to go in there and use them.

22 So all of 'em stayed predominately at the same hotel, so

23 if you wanted to meet somebody that was Backpaging, you

24 would go to one of those four hotels, and they were in

25 there, because those were the only hotels in Vermont

1    that you could go to.

2    Q    So you would see her around at the hotels?

3    A    Yes.

4    Q    So when was the next time you saw her from a

5    business standpoint?

6    A    Like around 2 -- 2015 at some point -- at some

7    point.

8    Q    Was it when she called you from rehab?

9    A    No.  It was -- um, let me see.  Was it -- when was

10   it?  No, you're right.  It was when she called me.

11   That's the next time I see her.

12   Q    Tell us about that phone call.

13   A    She called me from -- she wasn't at rehab when she

14   called me.  She was at a bus station, I believe --

15   Q    Okay.

16   A    -- in Burlington, but she just came from rehab.

17   And she told me, she said, "I just came home from

18   rehab," and, um, she says, "I'm trying to make some

19   money."  So I was like, "What are you trying to do?" and

20   she said, "You know what I'm into."  So I said, "All

21   right.  What do you need me to do?"  And she said, "Come

22   pick me up."

23         At the time I was at, um, um -- I can't think of

24   the name of the hotel, but, um, it was one of them

25   little cheap motels.  I was at the motel, and I didn't

1   feel like driving.  So I told her, "Why don't you just

2   get in a cab?  Get in a cab and take it to the motel,

3   and I'll pay for it when you get here."

4   Q    So did she do that?

5   A    Yeah.

6   Q    And is it true that she was only with you for,

7   like, two days?

8   A    It wasn't even two days.  She left that same day.

9   Q    So tell -- tell the jury about how that came about.

10  A    She -- well, she had developed sort of a clientele

11  from when she was doing it on her own, so her thing to

12  me was, "Once I get -- once I get my, um, picture up

13  there and everybody see me, they're going to all come

14  running to me, so you don't gotta do anything.  You just

15  let me -- help me get my picture up."

16       So when I did that, she -- she wasn't lying.

17  People were coming to her, like flocking to her.  And

18  then --

19  Q    Did she ever pay you anything?

20  A    No.  And that's what the problem came, because I

21  asked her -- I said, "Look, I need gas money," and she

22  was like, "Well, I'll see you at the end of the night."

23  I was like, "But I need gas now.  If you gonna have me

24  taking you around and doing stuff, I need to keep gas in

25  the car," and she was like, "Well, right now I'm not

```
1    doing nothing.  I'm piling up my money.  I'm trying to
2    save buses."  "You know what?  I already see it's going
3    to be a problem.  Do what you gotta do on your own.  I'm
4    outta here," and I left her, and she like, "I don't
5    care."
6    Q    And that was her response?
7    A    Yes.
8    Q    Did you do anything to force her to stay?
9    A    No.  I left.
10   Q    And she said she was okay with that?
11   A    Yep.
12   Q    And did she ever work with you again?
13   A    Not like that.  No.  We had a different
14   arrangement.
15   Q    What was that?
16   A    Well, her boyfriend -- I didn't know it was her
17   boyfriend at the time, but he was selling clothes, and
18   he used to bring the clothes to the house, and we used
19   to buy clothes off him.
20        And one time we bought the clothes, he had a lot
21   of 'em, and she had to help him bring the clothes into
22   the house.  And when I seen it was her, like -- I's
23   like, "What's up?"  She's like, "What's up?"  And she
24   goes, "Oh, this my boy," and we started talking.  And
25   then -- like, he had ended up getting arrested.  I
```

1    didn't know that they were going together to steal the

2    clothes.

3    Q    Okay.

4    A    He got arrested, and she started bringing clothes

5    on her own.

6    Q    But she never worked with you again as a

7    prostitute?

8    A    No.  She's worked as a prostitute, but not with me.

9    Like, she would call me to ask me to do her little

10   favors.  Like, she would go, "I need a phone.  I don't

11   have a phone.  Could you give me a phone."  And I go,

12   "All right, here.  I'll give you a phone, and I want a

13   hundred bucks for the phone" or "I want 200 bucks for

14   the phone."

15        And later on she will give me the 200 bucks for the

16   phone, because she knows if she didn't, she couldn't ask

17   me for anything else again.

18   Q    So it was just kind of -- I think she testified, if

19   you recall, like in January or February of 2016, she

20   needed something, she would just call you?

21   A    Yeah.

22   Q    I want to show you what's been marked as

23   Defendant's Exhibit 90A.  It's been admitted as

24   Defendant's 90A.

25        So if you look down next to the next entry, there's

```
 1    68 phone calls between Keisha and you from January 12th,
 2    2016, to January 25th, 2016.  Do you see that?
 3    A    Yeah.
 4    Q    So you were on speaking terms with her at that
 5    point?
 6    A    Say that again.
 7    Q    You were on speaking terms with her at this time?
 8    A    I was always on speaking terms with her.
 9    Q    How would you describe your relationship with her
10    during that period of time?
11    A    Between January 2016 --
12    Q    Just in that general time frame, before and after.
13    A    It was normal relationship.  Like, again, if she
14    needed me, she called.  But that's the relationship I
15    had with everybody.
16    Q    All right.  So you heard Keisha talk about what
17    happened when she stole drugs from you -- or from --
18    from Chrissy?
19    A    Yeah.  In here?
20    Q    Yes.
21    A    Yeah.
22    Q    And did she steal drugs from Chrissy?
23    A    Yes, she did.
24    Q    And what was your reaction?
25    A    My reaction was why would you do that when you know
```

1    you could just call me and talk to me about it?  Why

2    would you knock the girl around?  And they did it for --

3    I believe it was five bags.  Like, why would you do

4    that?  And then I explained to her also, like, you

5    causing problems for everybody else over here because

6    now you going to have everybody coming and trying to

7    beat this girl up and doing the same thing you did.

8    Q    So did you end up meeting her in Winooski?

9    A    Yeah.

10    Q    Tell the jury about that, please.

11    A    Well, she was with -- she was with Hannah and a

12    guy.  I'm not sure who the guy was.  But she was with

13    Hannah and a guy.

14    Q    Okay.  And then what happened?

15    A    They told me -- Hannah told me that she was riding

16    around with her.  She had talked to me on the phone.  I

17    was on my way home.  I went home, which is in Winoo- --

18    I was living in Winooski at the time.

19    Q    Okay.

20    A    And I called Hannah when I got home, and I told

21    her, "I home," because she said she was in Winooski as

22    well.  So I said, "Where you at?"  She said, "I'm by

23    Chick's."  Now, Chick's Market is on the other side

24    of -- well, if you -- if you went through the streets to

25    get to Chick's Market, it's about one, two, three --

1    four blocks, approximately, from my house.

2    Q    Okay.

3    A    But if you just cut across the tracks, it's two

4    blocks from my house, right -- like, down the street.

5    Q    So what happened when you saw her?

6    A    I cut across the tracks, and when I came across the

7    tracks, she was getting out of the car.  So I texted,

8    like -- it was a small car, like a two-seater, and

9    she -- you had to lift the front seat up to get outta

10   the back.  Well, she was backing out of the car, and I

11   tapped her on the back, and when she looked up, she saw

12   me, she was, like, phew.  And I was like, "What?"  And

13   she was like, "Nothing."  So I hugged her.  I was like,

14   "Why would you do that?"

15        That's when we started talking, and then she's,

16   like, "Nah, I really needed it.  I was messed up.  I

17   will give you the money back."  I'm like, "It's not even

18   about that.  Like, you knocked the girl down.  You bust

19   her head all up up against the ground and all that."

20        And it was three of them.  It wasn't just Keisha.

21   It was three people that did it.  And, um, we started

22   talking, and we walked back towards my house.  When you

23   get to my house, there's a -- um, a parking --

24   parking -- parking garage.  It's not a garage.  It's an

25   open space, but that's where we park our cars at, and

1    it's right in front of my house.

2         So I was leaning up on my car door talking to her,

3    and she was like, "Well, I need to make anyway."  It's

4    like, "If you -- I'll pay you back.  If you want me to

5    pay you back, like, help me out."  So I do that.  "I

6    help you."

7         So she was like, "I need something to get right."

8    I started laughing, like, "You just beat the girl up and

9    robbed her, basically robbed me, and you want me to give

10   you something now?"  And she was like, "Yeah."  I'm

11   like, "No."  Then we -- it was funny to me because she's

12   bold like that and she will do stuff like that.

13   Q    So what happened then?

14   A    So she was like, "Whatever you want."  So I was

15   like, "What do I get out of it?"  So she's like, "Come

16   on, you know how we do," meaning, like, we -- from time

17   to time we messing around.  So I said, "All right, let's

18   go."

19        So we jumped in the car and we drove back to

20   Burlington.

21   Q    All right.

22   A    I took her to the house on -- on North Willard.

23   Q    What happened then?

24   A    I knew it was a bunch of girls in that house that

25   was doing Backpage, so I told --

```
 1    Q    But they weren't associated with you?

 2    A    No.

 3    Q    So what did you say to Keisha about it?

 4    A    I told her, "If you want, I can introduce you to

 5    them.  I can get you together and watch each other's

 6    back, because they're actually doing Backpage from that

 7    house.  They are not doing it from hotels, and you can

 8    make your money like that."

 9    Q    Why couldn't you bring her back to Spring Street?

10    A    Because what she did to Chrissy.  Everybody was

11    expecting something to happen to her.  Everybody

12    expecting me to handle it, to deal with it, because it

13    was, like, disrespectful.

14    Q    By the way, what does -- in street term, you heard

15    one of the witnesses say that the word "violate" means

16    disrespect?

17    A    Yeah.  Violate is like -- it's slang.  It's like

18    nothing that's, like, particular to one person.  It's

19    slang.  If you speak slang in the street and somebody do

20    something, somebody steal something from you, "Oh, you

21    violated."  Somebody smack you, "Oh, you violated.  You

22    just violated me.  You smacked me."

23    Q    You mean being disrespectful?

24    A    Yeah, it's -- that's all it means.  It means being

25    disrespected.
```

```
 1    Q    So you are in -- sitting in front of a house on
 2    North Willard, and you are having this conversation with
 3    Keisha.  What happens?
 4    A    She still wants something to get high, and so we
 5    agreed to have sex.  We did.  I gave her what she
 6    wanted.  I introduced her to the girls, and I left.
 7    Q    And then she never did work for you after?
 8    A    No.  I don't even think she stayed and worked with
 9    those girls.
10    Q    I think she testified she left that night.
11    A    Hmm.
12    Q    So then -- and then you still had a relationship
13    with her?
14    A    Yeah.  I just told her, I said, "If you get around
15    to other girls from the other house and they ask you
16    what happened, just lie to 'em.  Tell them that I
17    smacked you around or something," just so they can feel
18    like I did something, especially Chrissy, that she was
19    all boohooing and acting crazy.
20    Q    So let me ask you something about -- like, was it
21    common in your world on the street, like where you lived
22    and where these women operated -- was sex something that
23    was a more freer thing than it is maybe in most of
24    society?
25    A    It -- it is.  It's -- it's different for -- all
```

```
 1    right.  Up -- up here in Vermont, it's like -- how can I
 2    put it?
 3             THE WITNESS:  Can I just be blunt?
 4             THE COURT:  You can be blunt, yeah.
 5    A    It's -- it's really -- it's a real racial
 6    situation, because most guys come from the city, black
 7    guys, they never been with a white female before.  So
 8    when you come up to Vermont, it's like all the white
 9    females want to be with black guys, so they rush us,
10    like -- like, we's instant celebrities when we get up
11    here.
12    Q    So you'd seen that?
13    A    All the time, every day.  And this is how -- this
14    is what -- I don't know.  This is what made me stay in
15    Vermont, actually, because when I first came up here and
16    I seen that, I'm like, damn, you would think I played
17    basketball or something.
18    Q    You don't play basketball?
19    A    Not professionally.
20    Q    So was Danielle one of these people that acted like
21    that?
22    A    Yeah.
23    Q    So tell the jury, please, how you met Danielle.
24    A    Danielle.  How did I end up meeting Danielle?
25    Let's see, the first time we met?  Danielle.
```

1          Okay.  Danielle -- okay.  The first time I met

2     Danielle, she was -- she's from up this way somewhere,

3     or she's from up Swanton, rather.

4     Q    Okay.

5     A    And the first time I met her, she used to -- it was

6     common for when, like, people using drugs, to get

7     together, and if they find someplace, like -- okay, from

8     Swanton, they will get together.  They still got better

9     drugs in Burlington.  They will get together and put

10    all -- pool all their money together and come down and

11    buy all their drugs at one shot and go back.

12    Q    So then what happened?

13    A    So that's how I met her.  She was doing one of

14    those.  She was on one of those trips.  The place that

15    she was at, that she was going to buy the drugs, I was

16    visiting there because --

17    Q    Where was that place located?

18    A    That was in Winooski on --

19    Q    Okay.

20    A    I believe that's Spring Street as well.

21    Q    All right.

22    A    So the people that -- the people that lived -- that

23    owned that apartment, rather, they had some guys in

24    there that was working already.

25    Q    Is that where the four guys were that she had

```
 1   talked about?
 2   A    Yeah.  They had some guys in there working already,
 3   and I was speaking to her going, "Yo, let me help you
 4   out.  Let me" --
 5   Q    How did you --
 6   A    "Let me make a few" --
 7   Q    How did you know she was there?
 8   A    I seen her when I got there.
 9   Q    And how did you know it was her?
10   A    Because -- oh, we was talking on Facebook.  We had
11   a little Facebook thing going on.
12   Q    Did she send you nude photographs of herself?
13   A    Yeah.
14   Q    Was that before you ever met her in person?
15   A    Yeah.  She used to -- like, we used to talk on
16   Facebook, and, like, she used to ask questions, like
17   what do you do?  What are you around here for?  What're
18   you doing?  I didn't tell her.
19        At this point my business was starting to take off.
20   I was getting a lot of -- you know, a lot of jails that
21   was accepting me, because you have to be accepted in the
22   jails in order for them to -- to sell your pictures.  So
23   a lot of them were starting to accept -- accept me, so I
24   was getting good checks from them.  So I was explaining
25   to her what I did.  And she was --
```

1   Q    So -- so you recognized her at that house in

2   Winooski?

3   A    Yeah.

4   Q    Were you standing --

5   A    I recognized her --

6   Q    -- standing outside talking?

7   A    Say it again.

8   Q    Were you standing outside talking?

9   A    Yeah.  When they pulled up, when she got out of the

10  car, I walked right up to her and I hugged her, and she

11  turned around -- I hugged her from back, and she turned

12  around and looked at me, and she's like, "Oh, what's

13  up?"

14      And we started talking, and then I was like, "What

15  you trying to do?"  She said, "I'm trying to get

16  something here, but I'm short."  I said, "Come on.

17  Let's go up there."

18      So we went up there, and we went in there.  I told

19  the dude, I said, "Yo, hook her up," like that's my

20  peoples.  I think he -- "Whaa -- aah -- I got you.  I

21  got you."

22      And so they went in back.  They did whatever they

23  did, and she came back, and I was like, "All right, now,

24  when you go" -- 'cuz we's already talking about getting

25  together on Facebook.

1    Q    Okay.

2    A    So me and her ended up doing something, and that

3    was it.

4    Q    And was it voluntary on her part?

5    A    Yeah.

6    Q    Did you force her to have oral sex with you?

7    A    No.  And at this point I'm -- I'm off -- like, I'm

8    a video guy.  I'm a video freak.  Like, I have glasses

9    with cameras in 'em.  I have toys with cameras in them.

10   I have all types of cameras.

11       When that was happening, I asked, "Can I take

12   pictures?" and she said, "Yeah."

13       And I remember when she testified, she said that I

14   pushed her head down or something.  If you look at the

15   video, which the government has on my computer, I have

16   both hands on the camera, playing with the camera.

17   There's no way I could do that.

18   Q    All right.  Was there any reason for you to do

19   that?

20   A    No.

21   Q    So then did you see her again?

22   A    Yeah.

23   Q    So how did that come about?

24   A    Um, let's see.  Next time I seen her -- uuh --

25       Oh.  Um, she was messing with a guy, another guy

1  that I knew, and he -- he was connected to -- well, his

2  wife and my wife were good friends.

3  Q    Okay.

4  A    So he used to come to my house, and he has his --

5  it's funny.  He has a son that I -- he is really dark

6  like me, and his wife is Caucasian.  His son is

7  naturally mixed.  His son was small, but nobody could

8  babysit this kid if you wasn't black, and I used to

9  laugh because only a -- like, the kid was -- I used to

10  call the kid racist, like this a racist kid, because

11  nobody could pick him up unless they black.  So we used

12  to -- like I used to pick him up and babysit him for 'em

13  because I was dark like his dad.

14  Q    So what happened with his dad to --

15  A    So he -- me and him was talking while he was at my

16  house --

17  Q    Not you and the kid?

18  A    -- at one point.

19       No.  Me and his father.

20  Q    Okay.

21  A    And I was explaining to him that I wanted to go

22  down to the city and I needed a ride.  At this point I

23  didn't have a car, so I needed a ride.  He said, "I know

24  some people that can -- you know, that wouldn't mind

25  driving you there."

1    Q    So what happened?

2    A    He introduced -- he got Danielle, and when he

3    called Danielle and put her on, I said, "I know

4    Danielle."  So we started talking.  I told him thank

5    you, I didn't need him no more.  I'm talking to Danielle

6    now.

7         And she set it up -- so she wanted to set it up so

8    we could go down.  It supposed to be me, her and her

9    friend.

10   Q    Okay.

11   A    But then she started talking about, um, we could

12   take a baby -- we have a -- our friend has a baby.  We

13   can take the baby with us, because when people up here

14   drive people down to the city, a lot of times, as an

15   incentive, they will say, "Well, could you get me

16   something," meaning could I get them some drugs or

17   whatever, and I always say, "Yeah, because if I take 'em

18   down and they get the drugs at a -- at a lower -- like a

19   low price, real, like, extremely lower than what you get

20   in Vermont, they can come up here, and they'll be able

21   to make money, and they will be able to use more drugs,

22   whichever they decide to do with it.  So that was like

23   an incentive to want to drive somebody down to the city.

24   Q    When you met Danielle, this is like the spring of

25   2015, did you -- were you selling drugs at that point?

1    A    No.  I was, like -- at that point I was, like, off
2    and on.  Like, I wouldn't say I was -- I had drugs.  I
3    have, like, really small amounts of drugs, but that was
4    mainly for, like, the females that I was dealing with,
5    that I knew that used drugs, so I didn't have to drive
6    'em around to look for it.  So I would have it, but it
7    wasn't nothing -- like, it wasn't --
8    Q    And so what did you say about taking the baby with
9    you?
10   A    No.  I told her hell, no.  And she said we would
11   take the baby with us and we can hide the drugs near the
12   baby, less likely for us to get searched.  And I'm like,
13   "I'm not driving down there with no babies, and you want
14   to hide some drugs; nah, I'm not doing it."  So I just
15   deaded the trip.
16   Q    So you never went?
17   A    No.
18   Q    So when was the next time that you saw her?
19   A    Next time I saw her, this same individual she had
20   owed him some money.  I don't know why she owed them
21   money, but she owed them some money.  And he called me
22   and told me -- well, he contacted me on Facebook, and he
23   told me did I see Danielle, and I said no.
24        He said, "Well, next time you see her, hold her."
25   And I was like, "Hold her.  What do you mean?"  And he

1    was like, "She owe me money."  And I was like, "Well, I

2    ain't."

3         So I ended up seeing Danielle in Burlington --

4    Q    Did she --

5    A    -- so I called -- well, I hit him up on Facebook,

6    and I said, "Yo, Danielle's down here now."  So he was

7    like, "All right, I'm gonna holler at you."  So he did

8    never come down, so I talked to her and I kept -- like,

9    kept track of her, where she was at, kept talking to her

10   so when he come down, I can go, "Oh, she's over there,"

11   but he never cam.

12   Q    Okay.

13   A    So she -- like, we ended up talking about it, and

14   he told me that her boyfriend at the time was going to

15   take care of the bill, so it was okay.  But she told me

16   something totally different.

17   Q    So then what happened?

18   A    She told me that she still owed him the money, and

19   she says she -- I guess she took some from him or

20   something, and she said -- in a nutshell, she was saying

21   she knows she was wrong for doing it, and she wanted to

22   pay him back, so she needed to make some money, so,

23   again, she came to me for it.

24   Q    And what happened then?

25   A    She wanted to do -- she wanted to do Backpage.  So

```
 1      I told her, "Yeah, I'll -- I'll hook you up."
 2      Q    And so she knew about Backpage?
 3      A    Yeah.
 4      Q    And then how did you know where she lived to pick
 5   her up?
 6      A    She told me.  She told me, "I'm over here" --
 7   that's how I knew she was in Swanton.  She told me, "I'm
 8   over here in Swanton," because when we originally
 9   talked, we was in Burlington, but she left, and she -- I
10   guess she got prepared for it, and then she called me,
11   "Come pick me up," and I went and picked her up.
12      Q    Do you recall that she testified that when she got
13   in the car, she was surprised it was you?
14      A    I'm not sure I recall that.
15      Q    Did she know it was going to be you?
16      A    Yeah, she knew I was coming.
17      Q    So on the way to the motel, did she know what she
18   was getting into?
19      A    Yeah.
20      Q    How do you know that?
21      A    We spoke about it.  We spoke about it before we --
22   before I even got there to pick her up, we spoke about
23   it.
24      Q    Did you have any reason to threaten her?
25      A    No.
```

1    Q    Did you tell her you stabbed someone?

2    A    No.  But I do think I know where she got that from.

3    Q    Where?

4    A    There was a newspaper article -- up here, every --

5    well, everybody's from up here, so everything that

6    happens goes in the newspaper when it's dealing with a

7    guy from out of state.  My cousin was up here.  He got

8    stabbed in his neck.

9    Q    Okay.

10   A    And I got arrested that day because I took him to

11   the hospital and I left him there, whatever the case

12   was, and they said I didn't give them my right name or

13   something, and so I got arrested.  So in the newspaper

14   article, it says "man gets stabbed in the head" and has

15   my picture.  As opposed to my cousin's picture or --

16   or -- or the guy who stabbed him's picture, it had my

17   picture, so if you looked at that, you would think I'm

18   the stab- -- I'm the guy that stabbed somebody.

19   Q    So you think that's where she got that from?

20   A    Yeah.

21   Q    So tell the jury what happened when you got to the

22   motel.

23   A    Well, when we got to the motel, she was -- um, who

24   she was talking -- she was talking with Mandy.

25   Q    Had she ever met Mandy before?

1    A    She -- yeah, she met Mandy before.

2    Q    Okay.

3    A    She was talking with Mandy.  Her and Mandy was

4    talking about the pictures and what pictures needed to

5    be tooken, and then they had this thing -- I used to

6    always tell them, "When you taking pictures, I'm a guy,

7    so if you take pictures and you can't get me excited

8    from the pictures, your pictures are not good, because

9    I'm a guy.  So you want guys to see your picture, you

10   want to get, you know, judgment from a guy."

11        And the same thing when you are -- you are writing

12   the ads, if you write the ad and I read it and it's not

13   something that would appeal to me, it's not good.

14   Q    Did you tell all the girls that?

15   A    Yeah.  I tell them all, "Bounce it off of me.  I'm

16   like your sounding board because I am a guy."

17   Q    So what happened?  What did Danielle do when you

18   were down there?

19   A    She took pictures.  She took a bunch of pictures.

20   And -- um, she took two types of pictures.  She took

21   pictures for Backpage, and she took pictures also for

22   me.  That was one of the deals that I had with

23   everybody.  If I take your pictures, if I help you take

24   pictures, and, like, get you clothes and all that stuff,

25   you have to take pictures for me for free, and that's

```
1    the pictures I used for my business.
2    Q    Did they have a choice?
3    A    Excuse me?
4    Q    Could they have said no?
5    A    Yeah, they could have just took their own pictures,
6    which a lot of them did, and they could've, um, had
7    somebody else take their pictures.  In fact, what they
8    used to do is when they -- they'd take their own
9    pictures and have other people take 'em, they would send
10   'em to me anyway, and -- "Go ahead.  Look.  I got these.
11   What do you think?"  And I'd pick the ones I like.
12   Okay, I like those, and I'll pay 'em for 'em.
13        Or if we met, if we, like, in the same place,
14   they'll show me on the phone this one, this one, this
15   one, and I'll tell 'em, gimme that one, that one, that
16   one, that one, and they will send them to me and I'll
17   pay 'em for 'em.
18   Q    So what happened with Danielle at the motel?
19   A    Danielle was doing something that I didn't agree
20   with.
21   Q    What was that?
22   A    She was -- well, all right.  When you doing --
23   Q    Did she go out on dates?
24   A    Yeah, she did.
25   Q    And did she have any problem doing that, as far as
```

1    you know?

2    A    Yeah.  This is what I was referring to.  She did

3    stuff that I didn't agree with.

4    Q    What was that?

5    A    When you -- when you're doing that stuff, it's like

6    in the -- there's slang for everything.  Like in the

7    porn world, you have to know the slang to navigate

8    through the porn world.  And it's the same thing in the

9    Backpage world; you got to know the slang to navigate

10   through that.

11       I started noticing that on her, um, ad, she was

12   putting that she partied.  Now, in that particular --

13   Q    So she wrote her own ad?

14   A    Yeah.  She write whatever she gonna put in here,

15   and I would look at it, and, like I said, if I think it

16   was appealing, I'd say yeah.  Yeah, that's it.  That's

17   the one.

18       But I kept noticing that little part, and "Do you

19   party?" is a question that people would ask you.  It

20   means, Do you use drugs?  Would you take drugs as

21   opposed to money for sex?

22   Q    Okay.

23   A    And I always told them don't do that.  If you want

24   to buy --

25   Q    Why was that?

1    A    Because you don't know what you getting from these

2    people.  If you going to buy drugs, buy your drugs from

3    somebody you know what you're getting.  You gonna buy

4    something from these people, you don't know what you are

5    about to get, what's going to happen to you.  You don't

6    know anything about this.

7        So -- I mean, it's bad enough you are doing what

8    you are doing; why put more danger to -- why add more

9    danger to it?  So I was -- I said about that, and I told

10   her about use of condoms.  They had another thing on

11   there called BB.  It meant bareback, meaning they don't

12   use condoms.

13   Q    What was your feeling about that?

14   A    I told her no, because you are going to charge this

15   guy an extra 50 bucks not to use a condom, but that 50

16   bucks is not worth what you are going to get from this

17   guy if he got something crazy like HIV.  So, no, you

18   don't do BB, and you don't party, and I kept telling her

19   that, but she kept doing.

20   Q    Like, what was she doing?

21   A    She would, like, advertise the party thing, and she

22   would go out with guys -- guys would come get her, and

23   she would go out with them.  Now, if I'm sitting outside

24   and you pull off with guys, I don't know where you

25   going, so if something happens to you, what am I

```
 1    supposed to do?  If you call me and go, Oh, this guy
 2    just raped me or -- or he just cut my throat, what am I
 3    supposed to do?  I don't know where you at.
 4         So I told her, stop leaving with these people, and
 5    she kept saying, "These are my friends."  I'm just
 6    going, "You just met this guy."  And she kept doing it.
 7    I told her, "Yo, if that's what you are going to do, do
 8    it on your own.  I'm not responsible for you."
 9    Q    Was there something that took place at the -- was
10    it the Hilton on Battery Street?
11    A    The Hilton?
12    Q    Well, one of the hotels on Battery Street, with a
13    convention?
14    A    Where is Battery Street?
15    Q    Well, you know, there was a convention that she
16    went to?
17    A    Oh, oh.  By the, um, courthouse.
18    Q    Yeah.
19    A    Yeah.  There was a -- um, there was actually a
20    bunch of lawyers.
21    Q    I wasn't there, right?
22    A    No.  It was a bunch of lawyers, though, and her
23    another girl had went there, and it was -- it was -- I
24    parked -- well, they got this little -- this little
25    roundabout, like, I don't know what you call it.  When
```

```
 1    you go into the hotel, it's like you drive up on the
 2    sidewalk and you -- it's like a little U, and you --
 3    like you can get out and -- without an illegal park, and
 4    then you go park.
 5    Q    So you parked there?
 6    A    I parked right at the exit there, and then they
 7    went into there, and they started -- they did a date.  I
 8    didn't know who it was at first.  They did a date, and
 9    they came out.  Well, the other girl came out, and she
10    was counting, like she had, like, 800 bucks, and she was
11    counting off, and she was laughing, and she was like,
12    "Yeah, it was about four people.  I seen it."  And I was
13    like, "Who the hell was in there?"  And she said, "It
14    was a bunch of lawyers" dah-dah-dah, and then Danielle,
15    in the back seat, she was like, "Oh, yeah, I only made a
16    hundred bucks though," and I looked over, I looked at
17    her, and I looked at the other girl, and the other
18    girl's like -- like -- she made a face, like.  So I
19    really knew what was happening.  So, "Oh, my God.
20    Whatever."  And I drove 'em back, and that was it for
21    Danielle.
22    Q    Did she leave at some point?
23    A    Yeah.  She --
24    Q    Same day she overdosed?
25    A    Yeah.  She overdosed when she left.  She --
```

```
1    Q    Did she tell you she was leaving?

2    A    Yeah.  We --

3    Q    What was your reaction?

4    A    Say it again.

5    Q    What was your reaction?

6    A    I didn't care.  I want her to leave at that point,

7    because we got into an argument over -- I told her, "I

8    know you didn't go up in there and just -- with one and

9    just have a hundred bucks and this girl got 8, 900."  I

10   said, "You just don't wanna give me no money.  Cool.

11   Get lost," like you're not going to keep asking me to

12   help you and have me sitting here for nothing.  Like,

13   come on.  I'm wasting gas.  I am doing all this.  Do

14   what you said you are going to do.

15        So she didn't want to, so I said, "Go.  Get lost."

16   I have no problem saying that to people.

17   Q    Did she leave with her father?

18   A    She left with some guys.  It wasn't her father.

19   She said her father.  She left with some guys.

20   Q    And then what was the next thing that you heard?

21   Did you hear from her again?

22   A    Yeah.  She called me later on that day, and she

23   said, "I'm in trouble."  I said, "What happened?"  She

24   said, "I overdosed."  I said, "Where are you?"  She

25   said, "I'm in the hospital."  I said, "Which hospital?"
```

1    She told me.  I came.  I got -- me and Mandy got in the

2    car and went to the hospital.

3    Q    Why did you go up there?

4    A    I wanted to see if she was all right.  So we went

5    in there.  We talked to the nurses.  We asked her what

6    happened.  She told us what happened.  And she never

7    said that it was from her father.  That's something that

8    she said when this court proceeding started.  I knew it

9    was from the guys.

10        At that point -- the nurses also knew that it was a

11   situation with a bunch of guys, because -- I don't know

12   what the -- the ambulance, or whoever picked her up,

13   told them, but it was obviously a bunch of guys there.

14   So when I was there, they were all looking at me as if I

15   was one of those guys.

16   Q    Is that why you were uncomfortable?

17   A    Yeah.  I told them, "I don't feel right the way

18   they looking at me and they talking."  I said, "I'm

19   leaving.  I'm going to sit in the parking lot."  So

20   Mandy stayed with her while I sat in the parking lot.

21   Q    Then what happened?

22   A    She did whatever she had to do doctor-wise, they

23   signed out, and she came -- they both came down to the

24   car.  I said, "Now what?"  She said, "Just drive me back

25   to where I was at."  And I said, "You going to go back

1    to the same house you overdosed in?"  She said, "Yeah."
2    I said, "I'm gonna drive you there, but after this, lose
3    my number."  And I drove over there, and I left her.
4    Q    You were in court when the prosecutor introduced
5    some text messages -- some Facebook messages starting in
6    July between you and her?
7    A    Yeah.
8    Q    And do you recall one of them was -- she said, "I
9    want to come back to work with you tomorrow."  This was
10   in September.  "I want to start tomorrow"?
11   A    Yeah.
12   Q    Did you know what that was about?
13   A    Yeah.
14   Q    What was that about?
15   A    It was about prostitution.  She wanted to go and do
16   Backpage again.
17   Q    Did she ever sell drugs for you?
18   A    No.
19   Q    And this thing about the bachelor party, was it her
20   idea that she go?
21   A    Yeah.  She, um -- well, with the bachelor party, I
22   asked her did she know anybody that danced, any females
23   that danced, and that they would get paid for coming and
24   they would get tips, which is what you routinely do at a
25   bachelor party.  And she said she didn't know nobody

```
 1    offhand but she'd find somebody, and then she was like,
 2    "Can I come?"  And I was like, "If you going to dance,"
 3    and she said, "Well, I'll try."
 4    Q    But she didn't go?
 5    A    No.
 6    Q    You remember the discussion in court about a
 7    picture that Hannah was in?
 8    A    Say that again.
 9    Q    Do you remember the discussion in court about the
10    picture that Hannah was in?
11    A    Which picture?
12    Q    The one with the four girls.
13    A    Yeah.
14    Q    Do you know what happened with that?
15    A    What do you mean?
16    Q    Like, why was that picture taken?
17    A    That picture was taken -- well, they was -- they
18    was -- they had a -- um, what was it?  It had a -- they
19    had a theme they was doing.  I'm not sure if it was a
20    cheerleader thing or something.  They had a theme they
21    was doing, which is on -- on Backpage, a lot of times
22    you have themes, and that's -- like, attracts the person
23    that comes.  And what you do -- okay, when you post an
24    ad there -- like, me being a guy, I'm going on there
25    looking, the first thing I am going to do is I'm gonna
```

1 look for what's attractive to me.  Like, so if I'm --

2 like, if I like pretty girls, really pretty people, I am

3 going to look for a real pretty person.  If I like a

4 specific body type, I am going to look for that specific

5 body type.  So what these girls do a lot of times is

6 they do what they call a bait and switch.

7 Q What does that mean?

8 A They would take, like -- okay, if you have a less

9 attractive girl or a less attractive body, and she knows

10 that, if she puts her picture -- her direct picture up,

11 the -- she won't get the calls because she's less

12 attractive, or with a less attractive body, so she will

13 find somebody else, and she will put their picture up.

14 Q So what happened with -- with Hannah?

15 A That's what they did with Hannah, because Hannah

16 was really attractive, so they did a bait-and-switch job

17 with Hannah.  By using her picture and putting it up,

18 guys would call and say they wanted to come for a date,

19 and the average guy, once he wasted his time to come

20 from wherever he's at and go to the hotel to meet the

21 girl, if it's not her, the average guy's like, You know

22 what?  I'm already here.  And they'll do the date

23 anyway.

24 Q So did Hannah ever prostitute for you?

25 A No.  Hannah never prostituted.

```
1    Q    Was she involved in the drugs?

2    A    Yeah.

3    Q    So the purpose of that ad was not for Hannah to get

4    customers or clients?

5    A    No.

6    Q    So as I understand it, Brian, you knew someone

7    named Ayla?

8    A    Yes.

9    Q    How did -- how did you meet Ayla?

10   A    I met Ayla through, um, another person, um, another

11   female that I knew.  Her name was Violet.

12   Q    Tell the jury about the initial meeting that took

13   place.

14   A    Well, Violet called me, and she told me that she

15   had a friend that needed to make some money.  Like, I'm

16   basically the one that they call, because I know

17   everybody.  I've been up here for a while, and I have

18   met everybody.  So she said, "She needs to make some

19   money," and she called me.  We met up.  Ayla got in the

20   car with me.  We started talking.  I asked her, "What're

21   you trying?  Like, how are you trying to make some

22   money?"  And she was just going through different

23   things.

24        She said, um -- she got a -- she said she got a

25   customer base, which is what a lot of guys look for when
```

1    they come up here.  They sell drugs.  They look for a
2    girl who has a customer base that they can get off their
3    drugs.
4          So I told her -- I asked her, well, what kind of
5    drugs did she use.  She told me she used heroin.  And I
6    told her, "Well, you got a customer base for heroin.
7    I'm not going to -- I don't know anybody that's doing
8    that, that's selling heroin, and you are using it
9    because it's going to be counterproductive."
10         So she was like, "Well, I do a little Backpage.  I
11   dabble in Backpage."  I says, "You know Backpage?"  She
12   said, "Yeah."  I said, "I can help you with that."
13   So --
14   Q    So what happened?
15   A    She took me to a house in Winooski on LaFountain
16   Street, I want to say, and we took pictures there.  And
17   then when we took the pictures, I asked her if I could
18   take the pictures and use them for my -- to my own
19   picture business, and she was okay with it.  And then I
20   told her I'll take her -- introduce her to some more
21   people and we can get everything started.  And that's
22   what I did.
23   Q    And then what happened?
24   A    Um, I brung her over to Lori's house, and I
25   introduced her to a friend of mine that was over there,

1    and she started working.  She did Backpage off and on,

2    and she dabbled in drugs off and on, but she -- for the

3    most part, Ayla would come and stay for 10, 12 hours and

4    then leave.

5    Q    So she was in and out of the place?

6    A    Yeah.  I didn't know at the time, but she had --

7    her boyfriend was parked on the corner for, like, hours.

8    Q    Bradley Bordeaux?

9    A    Yeah.

10   Q    And did she pay you any of her profits?

11   A    Not really.  She did, but she didn't.  Like, okay,

12   in that world, there's also another average, like

13   it's -- everything is set.  When you dealing with that

14   Backpage stuff, everything is set in stone.  Like, all

15   the -- all the females that do it, like, there's a set

16   price for everything.  They all -- nobody sets a price

17   for you.  Like, they all have their own set prices

18   that -- that's like the normal.  And it's also set

19   arrangements, like if somebody's helping you, you give

20   'em half.  So that was, like, set in stone.

21        So what I used to do with them -- and this is

22   what -- this is why a lot of them used to call me,

23   because as opposed to me saying, "Okay, you get half and

24   I get half," I say, "Make sure I got gas in my car, and

25   give me whatever you want to give me."

1          So they'll say okay.  I come on with better words.

2     "With you working with this guy, you are making a

3     hundred bucks, all you are going to get is your 50 and

4     whatever else you got going on, however else that works;

5     whereas if you work with me, you can put $10 in gas in

6     my car for that hundred bucks, and you can give me $10,

7     and so now you got 80 bucks."

8     Q    And was that your relationship with Ayla?

9     A    Yeah.

10    Q    Did you ever hit Ayla?

11    A    No.

12    Q    Did she ever go to the hospital because you hit

13    her?

14    A    No.

15    Q    Did you have any reason to hit Ayla?

16    A    No.  I would never had no reason to hit Ayla.  And

17    not only that, Ayla was a really small girl.  And at the

18    time, like -- even now I'm a pretty big guy, but I lost

19    a lot of weight, so I was even bigger, like I was twice

20    this size.  Me hitting one of them would be traumatic.

21    Like, there's no way there wouldn't be bruises and cuts

22    and -- no way possible.

23    Q    You heard Chrissy testify on -- you heard her --

24    you listened to that conversation she had with the

25    police?

1    A    Yeah.

2    Q    And that was before she was preparing for trial

3    here?

4    A    Yes.

5    Q    And you heard her say that you would never abuse --

6    you never abused or hit any of the women.  Do you agree

7    with that?

8    A    Yeah.

9    Q    Why did -- why did Chrissy leave?

10   A    Chrissy left because she started stealing.  What

11   she was doing was she was, um, taking bags of heroin and

12   putting sugar in 'em and selling them to people, and

13   people was coming back to the other guy, and he would

14   call me, and they would call me, and I'd go over there,

15   and I had to be in the middle of it, and it was pissing

16   me off.

17   Q    So did you ask her to leave?

18   A    Yeah.

19   Q    Did she soon thereafter beg you to come back?

20   A    A number of times.  She texted me a bunch of times.

21   She tried calling me.  She called other people and

22   talked to them and tried to get them to talk to me.  I

23   just -- I just ignore her.

24        THE COURT:  All right, we have been going for

25   just about an hour and a quarter, so let's take our

```
 1    midmorning break and be back in 15 minutes.
 2              MR. KAPLAN:  Thank you, Judge.
 3    (Court was in recess at 10:45 a.m.)
 4    (The following was held in open court with the jury
 5    present at 11:05 a.m.)
 6              THE COURT:  Okay.  Mr. Kaplan?
 7              MR. KAPLAN:  Thank you, Judge.
 8                 CONTINUED DIRECT EXAMINATION
 9    BY MR. KAPLAN:
10    Q    Brian, we were talking about Ayla before the break.
11    Did you ever withhold drugs from her?
12    A    No.
13    Q    And would there be any reason for you to do that?
14    A    No.  I think withholding drugs from her would be
15    counterproductive to anything we were into.
16    Q    In your mind, is there a difference between
17    maintenance and getting high?
18    A    Yeah.
19    Q    Can you explain that difference, please.
20    A    Well, okay.  I was --
21    Q    You have to speak up a little bit, Brian.
22    A    All right.
23         With opiates -- with opiates, what I can't
24    understand is that some -- the opiate, they get, like,
25    a -- a physical addiction to them.  They get a physical
```

1    addiction to it, to the point where as in the morning,

2    in order to function, they -- they have to use this in

3    order to be normal and to carry on the everyday --

4    anything.  They need to just -- they call it a fix.

5    They need to do that.  And it's a difference between

6    that and getting high.  When they get high, then they

7    get loose and, you know, drowsy and -- I don't want to

8    be around that.  So I didn't support none of them

9    getting high.

10        If you needed maintenance, I would help you, and

11   the reason why I know the difference is because my son's

12   mom passed away from opiate use, and before she passed

13   away, like, I took custody of my son and we had to -- me

14   and my wife had to, like, help her see my son.  Like, in

15   order for her to see my son, we had to, like, search her

16   bags and do things like that.  So I had to understand

17   what -- what she needed as far as maintenance.

18        She needed a certain amount before she can be

19   around my son so she can be normal.  And --

20   Q    So that was your feeling.  And did you ever -- if

21   someone needed drugs for maintenance, did you ever deny

22   that?

23   A    No.  I would help them with maintenance.  I

24   wouldn't help them get high, but maintenance, yeah, I

25   would help them.

1   Q    So you heard some testimony about the women having

2   to be nude when they bagged drugs for you.  Is that

3   true?

4   A    No.  There was a situation with Ayla, because Ayla

5   is -- they call Ayla magician.  Ayla's like, what do you

6   call it, sleight of hand?  Ayla's like -- you put

7   something, and she'll go back to this and it will

8   disappear.  Ayla was one them.  So they made Ayla --

9   they told Ayla, if she wanted to do that, she had to be

10  in her panties and bra.  And --

11  Q    Was it McFarlan who told her that?

12  A    I can't say no names of who told, but --

13  Q    Oh, I'm sorry.  Was it someone else who told her

14  that?

15  A    Someone else told her that.

16  Q    But the other girls, women, didn't have to be naked

17  to --

18  A    No.  Never.  And when -- even when Ayla did it, it

19  was more joke than anything, because technically none of

20  them wanted Ayla around their stuff, because Ayla was

21  just too fast.  And it was, like, I had to speak up for

22  her a lot of times to say, "Okay, she -- well, she's in

23  her panties and bra.  Like, let her do what she gotta

24  do, like, help out."  But a lot of people didn't want

25  Ayla around them.  So it was just like for her.

```
 1      Q    Okay.
 2      A    And I think, to my knowledge, that that occurred
 3      one time.
 4      Q    Did that have anything to do with why she left
 5      the -- Spring Street?
 6      A    No.  Ayla -- okay, Spring Street was -- at one
 7      point became Ayla's primary residence, because she --
 8      that's where she had her bag of clothes at.
 9      Q    Was she living on the street before she went there?
10      A    Ayla was living everywhere.  Ayla's the type of
11      female that she -- she's -- like, she's gone with the
12      wind.  If you are over here and you got something for
13      her that she wants, she'll stay over here as long as she
14      can until that run out; then she'll go to the next one,
15      and she'll go to the next one.  And then Spring Street,
16      she was always -- that was her fallback.  When she
17      couldn't go nowhere else and do nothing else, she would
18      fall back to Spring Street.
19      Q    And that was okay with you?
20      A    Yeah.  I mean, I looked out for her.  So Ayla --
21      okay, Ayla's not a bad person.  Ayla's -- I don't
22      know -- well, I heard some of her circumstances when she
23      was up here.  Before that, I didn't really knew too much
24      about her circumstances.  I knew about her son, and she
25      had lost custody of her son.  But overall, Ayla's not a
```

1    bad person.  She got a problem with telling the truth,

2    but she is not a bad person.

3        So just sitting down with Ayla and talking to Ayla,

4    you want -- Ayla's real convincing.  You will want to

5    help her.  But she's not a bad person.

6    Q    So when Ayla didn't have a place to stay -- did you

7    hear her talk about the car you let her sleep in?

8    A    Yeah.

9    Q    What was that all about?

10   A    Well, they didn't want her around -- nobody wanted

11   her around no more on Spring Street, so I told her she

12   had to leave Spring Street.  She couldn't stay over

13   there because nobody wanted her because every time

14   people go to sleep or whatever, she was in pockets and

15   bags, and she was just stealing her way through the

16   whole house.

17       So she was beefing about she didn't have nowhere to

18   go, and she wanted to be with her baby father, Brad, so

19   I told 'em, best thing I can do is, like -- until you

20   get your money right, I can let you use my car.  So what

21   I would do is I would park the car inside the hotel's

22   parking lot, and I would give them the key -- well, I

23   wouldn't give 'em the key, because I didn't want them to

24   take it, but I would leave the doors open.  And she

25   would go in there.  She would sleep.  It would -- and

1    the car was big because it was -- it was my Explorer,

2    and the whole back seat go down, because I slept in it a

3    lot, so there was pillows and blankets and stuff, and

4    then when you put the back seat down between the back

5    trunk space and the back seat, it's like the size of a

6    queen-size bed.  It's, like, really big.  So they slept

7    in there, and they -- they -- they were there for a

8    while.

9         I stopped letting her sleep in it because she

10   started leaving it.  Like, instead of, like, getting up

11   in the morning -- I would say, "When you get up and you

12   ready to leave, call me so I can come get the car so it

13   won't be there, I won't get tickets and stuff."  She

14   would just leave the car there with the doors open and

15   bags of stuff inside there, and -- now, people go up

16   inside my car.  My car get towed.  And so I told her,

17   "If you going to keep doing this, I am not going to

18   leave it there for you."

19   Q    Do you know someone name Mary?

20   A    Yeah.

21   Q    How did you meet Mary?

22   A    Um, which Mary we talking about?  There's two

23   Marys.

24   Q    Mary P.

25   A    Oh, okay.  Um, Mary P.

        I met Mary -- um, I met Mary through a friend.  She
was -- she was at a house.  I was visiting a friend, and
she was at the house.  Mary has, like, some sort of skin
thing.  I don't know.  I guess it's like psoriasis or
something on her neck area, but from -- when I seen it,
the way it looked at that point, it looked like a big
burn, like her neck was burned.  So I was asking her
what happened to her, like she was in a fire or
something, and it's like, no, that's just her skin
flaring up.  So it was like, all right.  She was sick,
and when she got sick, I guess her skin messes up.

Q    Did you end up -- did she end up dealing with drugs
at some point?

A    Yeah.

Q    And how long was she around for?

A    Um, Mary was around for, like, maybe three months,
I want to say.

Q    Do you recall she testified about an incident where
you had drugs stolen and you called her over to the
house.  Can you tell us about that, please.

A    Okay.  There was a car parked out in front of the
house, and there was drugs in the car.  Nobody knew
about this stuff that was in the car except for the
people that was in the house.  At that point it was
Mary, Mandy -- Mary, Mandy, me -- Mary, Mandy, me, um,

```
1    Ariel -- Mary, Mandy, me and -- Mary, Mandy, me and
2    Ariel.  We were the four that knew.
3    Q    Did you ever know before court that actually Mary
4    was involved in stealing drugs?
5    A    No.  I found that out in court.
6    Q    Okay.  So why did you call her over?
7    A    To talk to her because -- I mean, logic know if
8    only four of us knew about it, three out of the four is
9    still here.  One of them's not.  I mean, that's basic
10   logic.  So Mary like, "What's going on" --
11   Q    So what happened?
12   A    I called her over, and I asked her -- I didn't say
13   anything.  I said, um, like, "If you needed something,
14   you know, you could just call me.  Like, why go through
15   this?  What's up?"
16        She --
17   Q    So when did this conversation take place?
18   A    It started -- we were in the living room.  We were
19   sitting on the couch in the living room.
20   Q    Who else was there?
21   A    Me, Mary -- me, Mary, Ariel, Mandy.  It was five of
22   us, rather.  There was another guy there too.
23   Q    All right.
24   A    Quentin.  He was there too.
25   Q    Okay.
```

1   A    So we started talking.  She started saying -- well,

2   swearing to her kids.  "Oh, I knew nothing about it.  I

3   didn't" -- dah-dah-dah.  I ended up going, "Well, the

4   room -- there's one room in the apartment, and the

5   room's technically my room."  Everybody else slept on

6   the couches.

7   Q    You mean the bedroom?

8   A    Yeah.  At first I didn't live there, but I got into

9   a thing with my wife, and we separated, and so I moved

10  in over there, and the room became my room.  So all my

11  stuff is in the room.  Everybody else -- there's two big

12  couches out in the living room.  Everybody else slept on

13  the couches, because Ariel and Quentin were dating, so

14  they slept on one couch.  Mandy slept on the other

15  couch.

16       So I went in the room.  She came in the room to

17  plead her case.  You know, "I'm serious.  I'm serious,"

18  we talked about it enough.  And I was like, "Yo, just

19  get -- get lost.  If I find out that you had something

20  to do with this -- me and you have nothing else to talk

21  about," like, we cool, but that's when we stop being

22  cool.

23  Q    Did you assault her?

24  A    No.  I didn't touch her.

25  Q    And did she leave right away or did she stay around

1  for a while?

2  A    No, she hung out.  She stayed.  She hung out.  She

3  talked to everybody.  And when she got ready to leave,

4  she left.

5  Q    So you heard Ariel -- Ariel's testimony that she

6  didn't hear any assault take place?

7  A    Yes.

8  Q    Does that make sense to you?

9  A    Yeah.  The house is tiny.  Like, for instance, I'll

10  give you a perfect example.  The government showed a

11  video of me talking, sitting in that room, and in that

12  video you can see wall to wall.  That's how small that

13  was.  You can see in that video how small that room was.

14  That --

15  Q    Okay.

16  A    That apartment is tiny.

17  Q    Tell the jury, please, how -- how you met Ariel.

18  A    I met Ariel -- um, I met her downtown.  She was,

19  um -- she had an argument with my -- my son's mother.

20      Okay, a lot of time you hear me say my son's

21  mother.  I have three sons' mothers, and then I have my

22  wife.  My son mother had passed away.  Her name was

23  Marie.  She has a couple of sisters; four sisters, I

24  believe.  One of them was downtown.  Her name is Megan.

25  We were all downtown celebrating.  I don't know what it

1    was we were celebrating, but we were all downtown

2    together, and her and Megan got into an argument.  I

3    guess Megan was trying to date her boyfriend at some

4    point or -- I don't know.  It was something along those

5    lines or something.

6    Q   So what happened?

7    A   I broke it up.  I started making Ariel laugh,

8    because -- I kept offering her drinks, and I started

9    making her laugh.  And Ariel's a really attractive girl.

10    I'm like, "Oh, marry me.  You wanna marry me?  Just

11    marry me.  I don't want your pretty face scratched up"

12    and stuff like that.  So she laughed.  She took my

13    number.  She gave me her number.  Everybody hung out

14    that night, and then we all left.

15    Q   Did you hear from her again?

16    A   Yeah.  I heard from her a little while later.

17    Q   How long after was that?

18    A   It was maybe a couple weeks.  Maybe two weeks

19    later.

20    Q   What happened?

21    A   She had called me -- at the time my mom was having

22    surgery on her neck, so I wasn't even in Vermont.  I was

23    in New York.  And, um, she called me.  She told me that

24    she had an incident with her boyfriend, and -- I guess

25    punched her in the face, and she needed to get away.  So

```
1    I told her, "Okay."  I said, "I'm going to give you an
2    address.  Go to the address, and when you get there,
3    call me before you knock on the door, and that way I can
4    speak to the people when they open the door."  So she
5    did that.
6    Q    Okay.
7    A    She went to North Union.
8    Q    How long did she stay there?
9    A    She stayed there until we moved out.
10   Q    And did you charge her rent for staying there?
11   A    No.  Actually, what I told her was -- I told her,
12   "If you want to do anything, help Mandy.  Like, if you
13   buy your -- if you buy yourself cigarettes, buy enough
14   for me.  If you buy yourself food, buy enough for me."
15   Q    Did you know that she was working as a prostitute
16   at the time?
17   A    Yeah.
18   Q    Did you encourage her to work with you?
19   A    No.  I didn't think she should've -- I told her --
20   like, she was a really, really attractive female.  I
21   told her, "You -- like, there's a thousand other things
22   you could be doing.  Like, come on."
23        And then she -- the way she is, like, she didn't
24   have a drug habit, so she wasn't -- she wasn't doing it
25   for a drug habit, and she kept saying that she had -- at
```

the time she only had her daughter with autism.  Her

daughter had autism.  And she -- her daughter was with

her mother, and she wanted to take care of her daughter.

So there's different things you can do, like there was

occasions where I would go out, like, for birthdays and

buy all the stuff for the party for her daughter and

ship it out to her mom, and we're watching the party on

FaceTime and stuff like that.  There's different things

she can do.  Like, she's a good -- she's a good person,

too.

Q    You heard Brittany Barber testify?

A    Yeah.

Q    Did you know her?

A    Yeah.

Q    Tell the jury about that, please.

A    Um, I met Brittany -- Brittany -- I seen Brittany

on Facebook.  That's when I met her.  And when I seen

her on Facebook, she had -- we had a couple friends in

common.  One of the friends we had in common was Keisha.

So I contacted Keisha, and I asked her, "You know this

girl?  How good do you know her?"  And she, like, "I

know her pretty well.  Why?"  "Like, I want to meet

her."  And she's like, "You want to meet her meet her,

or you want me to bring her to the house?  You wanna

call her?"  I said, "Well, bring her over to the house.

1    Let me introduce myself to her."  So she did that.

2        She came to the house.  We talked.  What it was is

3    she had a bunch of pictures.  I liked the pictures.  She

4    was -- again, she was real attractive.

5        I liked the pictures, and we just start talking,

6    and then I found out that she was into a whole bunch of

7    other stuff as well.

8    Q    And you mean she was into prostitution?

9    A    That, and drugs too.

10   Q    Did she ask if she could work with you?

11   A    Yeah.

12   Q    And what was your response?

13   A    Told her yeah.

14   Q    So what -- what arrangement did you make with her?

15   A    Well, with her, she wanted a -- she needed a place

16   to stay.  So at that -- at that time I didn't have an

17   extra place to stay.  I didn't know nobody that had

18   extra rooms except for my Uncle Marty, because he lived

19   by himself, and he had a four-bedroom house.

20       So I spoke to Marty.  He said he wouldn't mind if

21   she came and stayed over there.  And I told him what she

22   was into, and he says as long as she kept that on her

23   part of the house, it would be okay.

24   Q    Did she pay for her room?

25   A    Yeah.

1    Q    What was -- so you charged her for staying in the

2    room or --

3    A    No.  She paid Marty.  She didn't pay me.

4    Q    Oh, I see.

5    A    She paid Marty to stay in the room.

6    Q    Okay.  And did you share in any of her profits from

7    her work?

8    A    No.  If I needed something, like, if I needed a

9    couple dollars when I was -- because they had a pool

10   table in the living room, and I used to go over there

11   all the time and play pool.  I like to play pool.  So if

12   I needed something, I needed a couple dollars or

13   something, I could ask her for it, and she would give it

14   to me with no problem.

15   Q    She testified that she gave Mandy, like, half the

16   money she made.  Do you know about that?

17   A    No, I don't think she gave Mandy half the money.

18   If she -- if she gave Mandy money, she gave Many money

19   to help Mandy out, because I would tell everybody that

20   came around me to help Mandy out.  That would be -- that

21   would be my reason for helping every -- anybody.  If you

22   want to look out for Mandy, you're cool because there

23   are certain things I can't do with Mandy.  I can't --

24   Mandy was a different story.

25   Q    Did you ever encourage Mandy to prostitute?

1   A    No.  I stopped Mandy from prostituting.

2   Q    Tell the jury about that.

3   A    When I went to -- the time my mom had the operation

4   on her neck, I went to New York.  I -- a lot of times --

5   I knew everybody in Burlington, so when I come back --

6   on my way back up, I was fishing on Burlington -- I

7   mean, you know, on Backpage.  I'm looking to see who's

8   up there.  I seen Mandy's picture up there.  So --

9   Q    And you didn't know about that beforehand?

10  A    No.  I waited until I got into Burlington, and I

11  called -- I called the number, and -- she was up with

12  another girl, and the other girl answered the phone, and

13  I acted like I was, you know, trying to get a date, and

14  I asked for the other.  Actually I wanted a date with

15  the other girl.  And so she said okay, and they set it

16  up.  They told me what hotel they were at.  They were

17  at -- I believe it's called the Hampton Inn.

18  Q    Okay.

19  A    And it's like -- I guess that's Colchester, but

20  it's like you go through Winooski, and once you pass

21  the -- the ramp for the exit -- I believe that's Exit

22  6 -- 16, there's a hotel right behind it.  I believe

23  that's the Hampton -- Hampton Inn or something like

24  that.

25       But they were there.  And so I went to the parking

1     lot, and I called, and I told her to come down.  I said,
2     "Send the girl downstairs to pick me up."  I said, "I
3     don't want to walk through the lobby by myself."
4          So Mandy came down, and when she seen me, she
5     was -- she was surprised.  I told her to get in the car,
6     and I asked her, "What are you doing?"  And she's like,
7     "I'm not doing nothing."  She said, "I'm just doing the
8     switch and bait."  I said, "You can't be doing the
9     switch and bait because when I called, you came down, so
10    you were doing a date."
11    Q    And what did she say?
12    A    She said, "No.  I just tried to get a few extra
13    dollars.  I just -- I needed the money," whatever.  So I
14    told her get in the car, and we left, and she left --
15    she told me she had left some stuff up in the hotel
16    room, and I told her to leave it, and we left.
17    Q    Did she ever do it again?
18    A    Not to my knowledge, no.
19    Q    While she was staying on North Union, did she pay
20    rent or anything?
21    A    Who?
22    Q    Mandy.
23    A    No.  Mandy would -- like, anybody who would come to
24    North Union, like, that would bring me their product or
25    their drugs, whatever, to North Union, to get rid of

1    'em, they would either give them to Mandy or they would

2    give them to Mary, and they would get their portion of

3    whatever that was, and they would basically just take

4    care of each other.

5    Q    So did Mandy sell drugs for people other than you

6    two?

7    A    Yeah.

8    Q    Other people that would come up from the city?

9    A    Yes.

10   Q    So it wasn't just you that she was selling for?

11   A    No.

12   Q    So all those sales that they recorded, were those

13   necessarily drugs from you?

14   A    No.  It was -- I was -- I was playing the middleman

15   to a lot of things.  If guys came up from the city -- if

16   it was somebody I knew, okay, cool.  You can just stay

17   over here, because a lot of people didn't want to stay

18   in hotels or whatever the case may be.  So I tell 'em

19   you can stay over here.  So they'll stay over there, or

20   North Union.

21        That was the same situation with Lori's house.  I

22   would hook it up so that guys would come here and stay,

23   and they'll pay whoever's -- like whoever owns the

24   apartment, they'll pay.

25   Q    Some of those --

```
1    A    And they'll pay other people --

2    Q    Some of those sales you answered the phone, took

3    the information, then Mandy went and did the sale.  Were

4    those yours?

5    A    Well, that was -- no.  What that was, that was a

6    specific situation.  The guy that did that, he met me in

7    a club, and he was dating another female that I knew.

8    Q    Okay.

9    A    And he, from what I understand now, was trying to

10   set me up.  So he told me, "This is my friend.  I need

11   you to look out for her, make sure she get what she

12   need."  So I don't know what number -- like, going

13   through the stuff that the government gave us, they said

14   they called me and I didn't call back.  The number that

15   they said they called wasn't even my number.

16        So he -- I guess they called him and told him to

17   call me.  So he calls me and tell me, "Call this number.

18   This is my girl.  I want you to deal with her."

19        So being a friend of him, I called her.  And what

20   she said -- what she wanted, I said okay, cool.  I'll

21   deal with her.  I'll hook it up.  I'll deal with my

22   peoples.

23        Again, I am using slang.  When I say "my peoples,"

24   that don't necessarily mean that these people work for

25   me.  Like, if -- if I go -- I go, "Mark is my peoples,"
```

```
 1   like I know you.  We dealt --
 2   Q    Well, let's not get carried away here.
 3   A    But, you know, we -- if you dealt with anybody, you
 4   call 'em -- you consider 'em your peoples, if it's
 5   somebody you dealt with.
 6   Q    So you really helped people out?
 7   A    Yeah.  And I played the middleman in that, so I
 8   would call Mandy and would ask, Yo, do you have
 9   bu-bu-bu-bu, or this girl wants bu-bu-bu-bu, and she's
10   over here, go see her now.  Do the three-way call, and
11   they'll go, meet up.  And it was -- I did that for that
12   girl specifically because it was that -- that guy that
13   asked me to do it.
14   Q    So you knew someone named Lori Crawford?
15   A    Yeah.
16   Q    Tell -- tell the jury how you happened to meet Lori
17   Crawford.
18   A    I met Lori through, um, Ashley.  I met Lori through
19   Ashley because -- okay.  Um -- when, um -- when my --
20   um, when my son's mom overdosed, I was running through
21   the streets trying to find out what happened, who did
22   what because I wasn't here when it happened.  I was
23   trying to find out what happened.
24        Ashley was -- she knew what was going on.  So that
25   that's -- I met Ashley on Facebook, and me and her
```

```
1    started talking.  She explained to me what was happening
2    or what happened, and then we kind of got friend -- we
3    became friends.  So at that time I wanted to go back
4    down to the city again, and I told her I needed somebody
5    to drive me down because I didn't have a license.
6    Q    What happened?
7    A    She said she knew somebody that had a license and
8    had a car; they could drive me.  I told her, "Well, I
9    have a car, but I don't have a license," so she could
10   drive my car, but she -- you know, I don't have a
11   license.  She can if she have a license.
12        She went and got Lori.  She introduced me to Lori,
13   and we drove down together, me, Lori and, um, Victoria.
14   Q    Did you pay Lori?
15   A    Yeah.
16   Q    How did you pay her?
17   A    I gave her 200 bucks.
18   Q    Okay.  And how did it happen that all of you ended
19   up staying at her house off and on?
20   A    Well, when we got down to the city, Lori stayed in
21   a hotel, and me and Victoria left.  We went and we visit
22   with family, you know.  We took care of business.  We
23   came back.  Lori had -- went shopping on, like, the -- I
24   guess the -- the strip down in the city, all the stores
25   is at.  It's not like up here.  It's like a whole bunch
```

```
 1    of stores, like thrift shops and dollar stores and stuff
 2    like that.  I guess Lori had not experienced nothing
 3    like that, so she really got excited being down there.
 4    She had a couple bucks to spend, so she bought a bunch
 5    of little knickknacks and things like that to bring back
 6    with her.
 7         When we got up, she enjoyed herself.  She enjoyed
 8    going down there, so she was like, "Whenever you need to
 9    go down, I'll drive you," and so I just started hanging
10    out at the house with her.
11    Q    Was she using drugs?
12    A    Yeah.
13    Q    How serious was her habit?
14    A    At that time, I don't know how serious Lori's habit
15    was, because we wasn't really -- in the beginning, we
16    wasn't really conversant like that about that.
17    Q    Did it get worse while you were there?
18    A    I can't say if it got worse or it got better.  In
19    time, I came to realize what her habit was like, but at
20    that particular point, I can't tell you what her habit
21    was like.
22    Q    When you realized that, what did you do, if
23    anything?
24    A    Told her to get help, because Lori -- okay, they
25    explained to me about her boyfriend gone to jail and he
```

1    was the dude, he was doing whatever he was doing over

2    there, and that's what made me ended up staying over

3    there and dealing with her like that in that sense, but

4    Lori had -- like, Lori -- like, she really loved her

5    boys, and --

6    Q    Her boys?

7    A    -- she was having --

8         Her boys.  Her sons.

9         She was having problems with them.  And, you know,

10   she -- I don't know why, but at some point she started

11   looking at me, like looking towards me as, like, the

12   male figure in her kids' life.

13   Q    So what would she ask you to do?

14   A    They wouldn't go to school, so she'll ask me to

15   talk to 'em.  She'll ask me to come over and talk to 'em

16   and have conversation with 'em about different things.

17        And I found out one of them was smoking weed, and I

18   wanted to just get him off the streets, so I gave him a

19   job.  I told him -- like, they're the same ages as my

20   kids, and at the time, me and my wife had -- my -- my

21   wife's aunt didn't -- she didn't have a place to stay,

22   so we had her as a live-in babysitter.  You know, she

23   slept in our living room and she babysit for us all day.

24        So we didn't need a babysitter, but I paid those

25   boys to babysit anyway, just to get 'em off the street.

1    Just so they could -- all they did was go to my house
2    and play video games with my kids all day.
3         And then, um, Lori -- I got Lori a job with my
4    wife.  My wife worked in a restaurant in Winooski.  I
5    got her -- I got my wife to vouch for her and get her a
6    job.  So that was her job.  And she --
7    Q    Did stay with the job?
8    A    No.  She got fired because she went to work getting
9    high.  She had heroin in her locker, and they found it
10   in her locker.  My wife ended up getting fired as well
11   from that because my wife was the one that vouched for
12   her.
13   Q    How would you describe your relationship with Lori?
14   A    Well, we had a funny relationship, because we would
15   talk here and there about different things.  Like, I
16   knew the whole she-was-in-the-military thing, and I
17   found it funny that she can fix an airplane but she
18   can't fix a car.  And, you know, we would go do stuff
19   like that at her dog -- I couldn't stand her dog because
20   the dog bit everybody, and so we would have, like,
21   conversations about little things like that, and about
22   the boys, and as far as what was happening in her house,
23   Lori's biggest concern was that she wanted to be a part
24   of everything, and because I -- I kept telling her no
25   and I kept stopping her, and I wouldn't let -- like I

1   would tell everybody else, don't give her nothing.

2   Don't -- no, leave her alone.  I kept trying to tell

3   her, go to rehab.  Just chill.  Go to rehab.  Relax.

4   Q    Did she end up driving some of the girls to their

5   dates on occasion?

6   A    Yeah.  She tried to do that at one time, and I

7   stopped that too.

8   Q    Did she want to do Backpage?

9   A    She asked me about it, and she even sent me

10  pictures, going, "Look, my body don't look like my face

11  look like.  I have a young person's body."  I'd -- like,

12  "Lori, just relax.  Just let it go."

13  Q    I want to talk to you about -- by the way, are you

14  the one who drove her to rehab?

15  A    Yeah.

16  Q    Okay.  Where was it?  Was it in the southern part

17  of the state?

18  A    Yeah.

19  Q    I wanted to ask you about Chrissy.  You recall the

20  first time she testified, she said that you forced her

21  to have oral sex and that -- then you had Ayla show her

22  how to do it, and Ayla said it's not true?

23  A    Yeah.

24  Q    Did you ever do that?

25  A    No.

1    Q    And then she comes into court yesterday and says

2    that you sexually assaulted her.

3    A    Yeah.

4    Q    Do you know what she is talking about?

5    A    I have actually no clue what she was talking about.

6    Chrissy was always behind me.  She was always after me.

7    And I always -- I try to be nice to Chrissy, and I tell

8    her, "You're not my type.  No."

9         And at one point -- like, she would text me all

10   times of days, and I had this thing with all these

11   girls.  All these girls were sending me pictures, and

12   she used to say stuff like, "Oh, my butt look better

13   than hers.  Why don't you ask me for no pictures?"  At

14   one point I was like, "Okay, Chrissy, send me pictures,"

15   and she start sending me pictures, and I never cared

16   about the pictures.  I did nothing with the pictures.

17        Then she started acting like she was my girl.  Like

18   all this time she was like, "Are you okay?  I know you

19   in pain," or "Is this wrong?  You okay?  You stressed

20   out?  What you need?"  And I started telling her, "Stop

21   acting like you're my girlie.  We not going to have that

22   type of relationship."  And she wanted to take it to

23   that type of relationship, and I didn't want to.

24        At one point she called me on my birthday, and we

25   was drinking.  They bought me a bunch of Hennessy for my

1    birthday, so we was drinking, and at that point I

2    almost entertained it with her, but then I caught myself

3    because when I almost did it, she went and start telling

4    all these people that "me and Moe went to a hotel."  So

5    I was like, nah, nah, that's never going to happen.

6    It's over.

7         And then we was texting back and forth, and she

8    was -- I was telling her at one point -- I said, "Even

9    if I wanted to go there with you, I wouldn't because you

10   have a big mouth.  No.  We're not going to do that."

11   Q    So you never -- I think I asked you this before,

12   but you never physically assaulted her?

13   A    No.

14   Q    And she had said in that car that you didn't

15   assault anyone.

16   A    In the car?

17   Q    When she was talking with the police.

18   A    Oh, oh.  Oh, yeah.  Yeah.

19   Q    Did you used to look at pictures on Backpage and

20   then take a screenshot?

21   A    Yeah.  I used a screenshot.

22   Q    Tell us about that, please.

23   A    Well, like I said, I was doing -- I had the

24   business thing.  Like, I was trying to be a business

25   dude.  These girls were already on Backpage with their

1    pictures, and they wasn't getting paid for them, so I
2    would take their pictures off of there, if I knew who it
3    was, or I would try -- if I didn't know who it was, I
4    was trying to find out who it was, and then I would go
5    and introduce to 'em and try to get pictures.  And I
6    would take 'em and I would load them into my computer,
7    and there was a part of my computer that said they were
8    Backpage research.  I would look at them.  I would see
9    the pictures.  If I liked 'em, if I liked what I seen, I
10   would download the pictures.  I would screenshot 'em,
11   and I would chop them out, and I would put them in my
12   portfolio.
13       I had, um -- I had bulk files in my computer that I
14   used to store up pictures with, because in order to do
15   that type of business, you have to have at least six
16   catalogues ahead, and you put a catalogue out a month.
17   Each catalogue's like four to five pages, so you gotta
18   have at least six catalogues ahead in order to be
19   successful in that, because you gotta keep rotating the
20   pictures.  So I had to keep my stock updated.
21   Q    So were there a lot of pictures on your computer, I
22   think you said, the women sent you?
23   A    Yes.
24   Q    Let me show you two pictures that were introduced
25   as Government's Exhibit 87C.  These apparently were

```
 1    found on your computer.  Do you know who those women

 2    are?

 3    A    I know who one of 'em are.

 4    Q    And did you take that picture?

 5    A    No.  I wasn't even -- I wasn't even in Vermont when

 6    that -- can you hear me?  I wasn't even in Vermont when

 7    that picture was taken.

 8    Q    When was the first time you saw these pictures?

 9    A    I was in New York, and my cousin brought them to

10    me, and he gave 'em to me.

11    Q    And he said they were taken in Vermont?

12    A    Yeah.  Because I knew one person in there.

13    Q    Do you know who took them?

14    A    No.

15    Q    And that's how they ended up on your computer?

16    A    Yeah.

17    Q    So you heard Jasmine testify?

18    A    Yes.

19    Q    And she talked -- what was your relationship

20    with --

21         You want some water?

22    A    I have some right here.

23    Q    You can take some.

24         Tell the jury, please, what was your relationship

25    with Jasmine?
```

1    A    Um, Jasmine -- we had a -- a kind of crazy

2    relationship.  Um, okay.  She was dating a female.

3    Okay, she used -- she was dating a female that was

4    married to my wife's best friend, who's also a female.

5    And that's how I met her, through them.  We always -- we

6    always at the club, and we was all partying and

7    drinking, whatever the case may be, and I met her, and I

8    used to make fun of Jasmine because she actually looked

9    like the other --

10   Okay, the girl she was dating was married to my

11   wife's best friend.  She actually looks like my wife's

12   best friend.  They look like they can be sisters, twins.

13   So I used to -- one name is Sam, and her name is Ada.

14   So I used could call Jasmine Sam and call Sam Jasmine

15   just to piss 'em off because they didn't like each

16   other.

17   Q    So you heard her talk about a car chase.  Do you

18   know anything about that?

19   A    Yeah.

20   Q    Can you explain that, please.

21   A    We went in the Econo Lodge, and it's no longer the

22   Econo Lodge.  I believe it's called Harbor Place now,

23   but we were in the Econo Lodge, and Jasmine had started

24   messing with a guy that was rumored to be HIV positive.

25   Q    Did that concern you?

1    A    Yeah.

2    Q    Why?

3    A    Because me and Jasmine had a sexual relationship,

4    and, like, we were, like, on and off, so I wasn't -- I

5    didn't want to deal with her if she dealing with that

6    guy, for one; and for two, she's always -- she is always

7    around me and, like, in intimate space, so I'm not

8    taking them type of chances.  I'm just not going to do

9    it.  And I explained that to her, and I even brought

10   other people up to her to tell her.  "Ask 'em about this

11   guy."  And she wouldn't take -- she wouldn't listen to

12   me.  So she -- I told her, "If you going to deal with

13   him, you gotta get way away from me, like far away from

14   me.  Like, I don't want anything to do with you."

15   Q    What was her response?

16   A    She was pissed off, because she didn't want to

17   leave, but she was pissed off, and I ain't give her

18   no -- no ultimatum, like, um, no other choice like, "If

19   this guy -- you going to deal with that guy, you not

20   deal with me."  That's just how it went.

21   Q    So then what happened?

22   A    We had a room at the Econo Lodge -- it was a suite,

23   a double room -- and she -- the room was in her name,

24   but I paid for the room.  So when she -- when I came to

25   the Econo Lodge, she was -- the guy was there.  I walked

1    past the guy.  I didn't say nothing to him.  I went to

2    the room.  I told her, "Yo, I told you I don't want this

3    dude around me," and she -- "You want to get your stuff?

4    Go ahead."  She said, "I was doing it anyway."  I said,

5    "All right, go ahead.  You just now go."

6         So she packed all her stuff up, and she jumped in

7    the car with the guy.  I stood there.  We watched it.

8    Then -- I was there.  My cousin was there.  And, um,

9    Katelynn was there.

10   Q    So then what happened?

11   A    Something didn't feel right to me from the way they

12   drove out.  They didn't drove out towards the -- like,

13   going towards the road.  They drove towards the office.

14   So I'm sitting, I'm thinking, like, Well, what is she

15   possibly going to the office for?  Then it dawned on me:

16   She is going to get the -- what do you call it?  The --

17   when you get a hotel room with somebody's credit card,

18   they make you put, like, a retainer --

19   Q    A deposit?

20   A    A deposit.  Make you put a deposit, and when you

21   leave, you get the deposit, so I figured out she's going

22   to get the deposit.  So we got in the car.  We went up

23   to the office too, and I was right.  She was at the

24   office getting the deposit, and when I got there, she

25   came out.  The guy was standing outside the car.  She

1    came out and she seen us.  She jumped in the car, and

2    she said, "Get in the car.  Get in the car."  And I went

3    to grab the guy so he couldn't -- because he going to

4    jump in the driver's seat.  I went to grab him so he

5    couldn't jump in the driver's seat.  He jumped in

6    anyway, slammed the door.  I ran back to the car.  They

7    pulled out into traffic.

8        Now, if you know where this hotel is at, like, when

9    you come out of that hotel, it's -- it's a big two-way

10   street on Shelburne, but -- I guess that's southbound

11   traffic.

12   Q    Okay.

13   A    But it's a big intersection right there when you

14   come out, so it's, like, heavy because across the street

15   is another hotel and the traffic from that hotel is

16   coming out too, so you got four different outlets of

17   traffic.

18       He just -- whooom -- out in the middle of that, and

19   when he did, they're like -- we stopped and we looked,

20   and we waited, and I said go ahead, turn.  We drove

21   down -- my cousin was driving.  We drove down, um,

22   Shelburne.  He was doing like 80.  That's a

23   40-mile-hour -- 40-mile-hour street.  He's doing like

24   80.

25       We stopped at McDonald's and pulled in McDonald's,

```
 1    and it's like -- my cousin -- like, "Just don't -- don't

 2    worry about it.  We'll pay, and we'll give you

 3    different -- we'll put a different deposit.  We'll get

 4    another room."  So I said, "All right.  Cool."

 5         We sat in McDonald's and started eatin', and then

 6    the guy called us.

 7    Q    The guy she took off with called you?

 8    A    Yeah.

 9    Q    Why did he call you?

10    A    He said, "Yo, I don't know what's going on.  I

11    don't want no problems."  He said he -- my son at the

12    time went to school with his daughter, and he was like,

13    "They're friends."  He said, "I know your wife."  He

14    said, "I didn't know what was going on.  I don't know

15    what she's doing.  I don't want to get in the middle of

16    it," and I said, "You ain't in the middle of nothing.

17    That's between you and her.  Whatever you all got, stay

18    with her.  Just leave it.  Just don't come over here."

19    Q    And that was the end of it?

20    A    Yeah.

21         And can I say another thing?  She said she was

22    driving and talking to the police on the phone and she

23    hung up.

24    Q    Okay.

25    A    If -- from my knowledge of what happens on that
```

1   phone, when you dial 911, if you dial 911 and talk to

2   the police and say somebody's chasing you and hang up,

3   the police will call you right back, and they'll trace

4   your call.

5   Q    So at that point, Brian, were you -- well, why

6   don't you describe, like, the first time you met Ghost.

7   A    The first time I met him?

8   Q    I mean the first time up in Vermont.

9   A    Oh, in Vermont.

10       When I met him, um, I was at -- I was at Lori's

11  house, and, um, somebody else had called and told me

12  that they wanted to talk to me, so I told 'em okay.  I

13  told 'em where I was at, and he ended up knowing Lori.

14  So he's like, "Oh, I know Lori.  I know where you at.

15  I'm on my way."  So I sat there and waited for him.

16  When he came in, he started talking to me about -- he

17  said, "Yo, I got certain amount of material up here I

18  been trying to get rid of.  I can't get rid of it.  Why

19  don't you help me."

20       This particular individual, I knew him, but I

21  didn't too much like him.

22  Q    Do you recall about when this conversation took

23  place?

24  A    I want to say probably around June.  I met all

25  these people at the same time.

```
1    Q    Okay.
2    A    Around the same -- like, in a two-month span I met
3    all these people.
4    Q    So around June of 2015?
5    A    Yeah.
6    Q    Okay.
7    A    So I told -- I didn't really -- like I said, I
8    didn't really like him, so I wasn't going to help him
9    and, you know, setting nothing up with him.  So I told
10   him, "Well, if you want, you can sell me something," and
11   he said, "Ah, that's all right."  I said, "But you gotta
12   give me a decent price."  So he was like, "All right,
13   cool."  So he said, um, "My cousin's out in the car."
14   He said, "Everything is my cousin's.  I'm going to bring
15   him in and let him -- you know, you and him sit down and
16   discuss it."
17   Q    And did his cousin have drugs with him when he came
18   in?
19   A    Yeah.  So he came in --
20   Q    This was Ghost?
21   A    Yeah.  They came in.  When he came in, I looked at
22   him.  We started laughing.  I said, "I know this guy."
23   And, like, in actuality, we grew up together.  So I told
24   him, I said, "That's not your cousin," and he said
25   they -- "Yeah, we really cousins," and he showed me
```

1    his last name on his ID, because I knew his last name

2    already.  So I'm like, "Okay, you are cousins."

3        And then I told his cousin, I told -- I told this

4    dude, I said, "Listen, I don't really like your cousin,

5    so I'm not going to deal with him," I said, "but if you

6    need me to help you out -- you out."

7    Q    So what did you mean by that?

8    A    I told him, "Well, this house belongs to Lori, and

9    if you pay Lori, she'll let you stay here, and she got a

10   clientele list.  Also, there's other people in the house

11   that have clientele lists.  They all will bring their

12   clients to you, so all you have to do is sit here."  So

13   he's like, "All right."  I say, "And in return, when you

14   do bring your stuff back, like, sell me something."  And

15   he's like, "All right, I'll sell you something."

16   Q    You heard him testify that -- that he considered

17   himself to be your sole drug dealer.  Do you agree with

18   that?

19   A    Yeah.

20   Q    Okay.  Did you ever split profits with him?

21   A    No.

22   Q    Did you always have to pay up front for the drugs?

23   A    Yeah.

24   Q    And how many -- and did he ever tell you who to

25   sell it to or where to sell it?

1    A    No.

2    Q    Okay.  You just bought drugs from him, and then

3    whatever you did with it, he -- none of his business?

4    A    Yeah.  Whatever I did was my business; what he did

5    was his business.

6    Q    So was -- was he running a drug operation out of

7    Lori's?

8    A    He --

9    Q    How would you describe it?  Like, you wouldn't

10   describe yourself as partners, would you?

11   A    No, we wasn't partners.  Like, again, whatever he

12   did was his business; what I did was my business.  My

13   only connection with him was that he was giving me stuff

14   for real cheap price.  Like, he would give it to me for

15   cheaper than what he bought it for.  Like, if he bought

16   it for -- let's say if he spent $45, he'll give it to me

17   for 35 because --

18   Q    Why is that?

19   A    -- he is going to make the extra by being in Lori's

20   house and dealing with all those people.  So he was

21   going to make the extra and then some.

22   Q    So he was compensating you for helping him set that

23   up?

24   A    Yeah.

25   Q    When they had all those drug-bagging parties, were

```
1   those your drugs or --
2        When they had all those -- well, not -- I guess one
3   party.  They had all those meetings where they would bag
4   drugs, were those your drugs or his drugs?
5   A    No, they wasn't my drugs.
6        Can I express something?
7   Q    About the drugs?
8   A    No, about the way you -- it's about the drugs, but
9   it's the way you -- you phrasing it.  I don't want it --
10  I don't want it to be any mis --
11  Q    All right.
12  A    -- conceptions.
13  Q    We will go back, then.  Is it fair to say that when
14  you were -- actually bought the drugs, then they became
15  your drugs at that point?
16  A    Yeah.  If I bought 'em, they were mine.
17  Q    So I heard testimony about the fact that in January
18  of 2016 ghost brought up the cereal box?
19  A    Say that one more time.
20  Q    Ghost brought up a cereal box in January of 2016?
21  A    Okay.
22  Q    Do you remember that testimony?
23  A    Yeah.
24  Q    And there were drugs in the cereal box?
25  A    Yeah.
```

1    Q     Did you have anything to do with that?

2    A     I never even see that.

3    Q     So describe to the jury how you felt about that, or

4    did you have a conversation with Ghost about it before

5    he brought them up?

6    A     Yeah.  When he first told me he was coming through,

7    I told -- because at that point I got tired of this

8    nonsense.  Like, people -- he was supposed to been

9    paying people; they wasn't getting paid.  And when they

10   don't get paid, they call me because I am the one that

11   introduced them.

12        So they called me, and I end up having to go over

13   there, and I have to squash all the problems, and

14   sometimes I gotta come in my pocket to pay these people,

15   but he says pay them.  I didn't want to deal with it no

16   more.  So I told him that, and I told him, "If you come

17   back up and you deal with these people, let it be known

18   I'm not dealing with you.  Like, you do what you gonna

19   do.  Keep me out of it."  And I told him that before he

20   came up.

21   Q     And didn't you say something to that effect when

22   you were talking with Chrissy about that whole thing?

23   A     Yeah.  I explained that to Chrissy.

24   Q     What did you say to her in that phone call?

25   A     The one where she called me?

1    Q    Yeah.

2    A    Well, when she called me up, she started telling me

3    all about what he's not doing and about the lawyer money

4    and all that stuff, and I told her, "What that got to do

5    with me?"  And she said, "Because you say you gonna --

6    you gonna help."  I said, "No, I told you I'll talk to

7    him," and I talked to him, and that was the reason why I

8    was upset at that particular time, because she had

9    called before that, and she was talking to McFarlan, and

10   I was sitting -- I was in my car.  I was with somebody

11   else in my car, and he pulled up next to me, and he's

12   talking to her, and I snatched the phone.  I said,

13   "Gimme the phone," because he, like -- he ready to get

14   crazy with her.  Like, he ready to threaten and do

15   stupidity, so I took the phone and I asked, like, "What

16   happened?" and she's telling me --

17   Q    So that's why both of you were on that same phone

18   call?

19   A    Yeah.  So she is telling me about some paperwork,

20   and I'm just yessing her to death, and I'm showing

21   him -- I'm telling him, like, "Yo, if she told on you,

22   police would be here to get you already.  Like, your

23   house would be surrounded.  You would be locked up

24   already.  Like, she is not telling on you."

25        And then I'm reassuring her; I'm, like, "Yo,

```
1    listen.  He's gonna do what he gonna do.  Don't worry
2    about it," so she's, like, "Okay, I trust you."  And
3    then I'm like, "All right, listen."  I said, "Listen, we
4    are going to get you a lawyer."  I said, "2, $3,000 and
5    you should have a lawyer.  You should be okay."  And she
6    said, "Okay."  She agreed to all that.
7         And then when we hung up, I told her, I said, "I'll
8    get the money and give it to you myself."  When we hung
9    up, I tell him, "Gimme the money.  Let me give her the
10   money."  He don't wanna give her the money.  "I'm not
11   giving her nothing."  Excuse my language, but "Fuck her.
12   Nah."  I'm like, "All right, if that's how you want to
13   do it, keep me out of it.  You deal with it yourself.
14   Now, if she turn around and you get locked up on her,
15   don't call me," and that's why I was mad at that point,
16   like could you --
17   Q    Had you told Chrissy before that cereal box came up
18   to stop dealing with him?
19   A    I wasn't dealing with Chrissy period.  He started
20   dealing with Chrissy.  I wasn't dealing with Chrissy at
21   all, because Chrissy was getting into too much stuff.
22   So I stopped dealing with her period, and then --
23   Q    Was that pretty much after she -- she left Spring
24   Street because she was stealing drugs?
25   A    Yeah.  And so he decided to start dealing with her
```

1     and doing what -- they had their own business plans

2     going on.

3     Q     Do you have any idea -- how many times did you buy

4     from him when he would come up to Burlington?

5     A     Um, not a lot.  Like, every time he came up, I

6     would buy, like, once -- once or twice from him.

7     Q     And did you buy crack?

8     A     No.

9     Q     You never bought any crack?

10    A     No.

11    Q     Okay.  And so how would you describe your personal

12    drug business at that point?

13    A     Like, I had -- like, I kept a couple of bundles

14    on the -- not a lot, like on the side for, like, if a

15    female that I dealt with needed something -- and I was

16    always put in that position.  When they need something,

17    they call me.  Yo, I need this.  I need some ladies.  I

18    need this.

19          So as opposed to me running around with them all

20    the time and finding it, I would get it from him for the

21    cheap and put it together and let them buy it off me.

22    Q     So -- also, some of the drugs you had was sold on

23    the street?

24    A     Say that again.

25    Q     Some of the drugs that you had was sold on the

1    street, wasn't it?

2    A    Yeah.

3    Q    So one of the charges is that you possessed this

4    firearm that was in the glove compartment of a car?

5    A    Yeah.

6    Q    Whose car was that?

7    A    It was my car, but it was registered to Lori.

8    Q    And you asked her to buy it for you?

9    A    No.  I asked her to buy it from me.  My uncle --

10   okay, I explained he had a big house and his backyard

11   had, like -- you could put, like, 20 cars in it, so he

12   used to -- a part of -- like, he has his home -- a

13   painting business, and he do maintenance on houses and

14   stuff, but on the side he also buys junk cars and he

15   fixes them, and he parks them back there.  He sells

16   them.  So I would always buy, like, little cars off him,

17   and that was one of the cars I bought off him.  And --

18   Q    And so were you the only one that drove that

19   vehicle?

20   A    No.  I left that car at Lori's house, and

21   anybody -- she drove it.  All the guys that was there

22   drove it.  A lot of the females that was there drove it.

23   Q    Did Ghost ever drive it?

24   A    I don't think he ever drove it, but he rode in it.

25   He did ride in it.  He rode in it before.

```
1    Q    Do you have any --
2    A    I don't know if he was driving at that time, but he
3    rode in it before.
4    Q    Do you have any idea how many times he rode in it?
5    A    No, I don't know how many times nobody rode in it.
6    Q    And so what happened with that stop?  Was that your
7    gun?
8    A    No.  I have not even touched that gun.  I didn't
9    even know that gun was in there, but the way they did
10   that stop, it made me think something was wrong because
11   at that point I was having a problem with Burlington PD.
12   Every time they saw me in a car, they stopped me.  So I
13   started recording every time they pulled me over.
14   Q    Just for that fact, would you have kept the gun in
15   the car knowing that --
16   A    Absolutely not.  Anytime I'm in the car, whether I
17   am driving, in the passenger seat, the front, the back,
18   they see my face, I'm getting pulled over.  So for me to
19   have anything on me in a car, I'm stupid, and I'm not
20   that stupid.
21   Q    Well, there was drugs one time when you were pulled
22   over, right?
23   A    Yeah.  In a Mercedes.
24   Q    And that was Mary Robenstein's car?
25   A    Yeah.  That was also staged.  They -- like, the
```

1    government showed the video that I recorded from me.

2    They didn't show the video that the police recorded.

3    That was also staged.

4    Q    So what happened with the stop?

5    A    Well, which one?  Which one are you talking about?

6    Q    The one with the gun.

7    A    Well, um, you're familiar with Burlington?

8    Q    I should be, yeah.

9    A    Okay.  On North Street, there's a cemetery.  It's

10   maybe two -- two blocks away from the precinct.  I

11   pulled up to the light right there.  The cop car was

12   sitting there.  He was going to turn.  He had on his

13   blinkers.  He was going to turn, and then he turned his

14   blinkers off and stayed there.  I automatically knew

15   something's wrong.  He is about to do something.

16       I turned -- when the light changed, I turned, and

17   he got behind me.  He followed me all the way to the

18   belt park line.

19   Q    And then what happened?

20   A    I got on the belt.  I am observing all the laws of

21   the road.  I am using my blinkers, my turns -- I'm using

22   everything.  I am doing everything I'm supposed to do

23   'cuz I see him behind me, and I know he is running the

24   plates, but I -- I don't care.  I am not doing nothing

25   wrong.  The car's legal.  I'm legal.  It didn't matter

1    to me.

2         We driving, and, um, the road at some point splits

3    into two -- two-lane traffic.  Once it splits into

4    two-lane traffic, he pulled up alongside of me.  When he

5    pulled up alongside, he looked at me.  I waved at him.

6    He still -- he is still driving.  He turned and he

7    started messing with his computer.  So I'm driving --

8    Q    So then what happens?

9    A    I am watching him.  I know the road.  I know the

10   road is about to turn into a single road again, so I

11   slowed down.  When I slowed down, he had no choice but

12   to turn out in front of me.  The lanes merge.  So now

13   I'm behind him.  We get to the light, all the way on the

14   other side of North Avenue, and, um, I slow down again,

15   because the light looked like it's about to change, it's

16   yellow.  He goes through the light.  I stopped.  The

17   light is yellow.  I could have made it through the

18   light, but I just stopped anyway, just to let him go.

19   He drove off.  I stayed at the light and I waited.

20        When the light changed, I turned.  I could have

21   went straight to Colchester, but I say, aah, I'm not

22   messing with him.  I ain't doing nothing.  So I turned

23   and I went down the same road he went.  When I got down

24   the road, I seen him off to the side.

25   Q    So then what happened?

1    A    I kept driving past him.  He came out and cut

2    behind me again.  I got to the light -- he's still

3    behind me -- and waited.

4    Q    Now, were you worried because you had a gun in the

5    glove compartment at that point?

6    A    No.  I didn't know there was a gun in the glove

7    compartment.

8    Q    Right.

9    A    As soon as I turn onto North Street -- or North

10   Avenue, he flags me.  I pull over by the gas station.  A

11   car pulls up in front of me.  He pulls up behind me.  A

12   second car pulls up -- a third car, rather, pulls up

13   across the street, and I'm sitting and I'm looking at

14   all the cars.  I'm like, okay, this is nonsense.

15   Q    What was the reason for the stop?

16   A    He said that he was stopping me because my plate

17   light was out.  And I told him the plate light ain't

18   out.  I said, "We can get out of the car right now and

19   go look at the plate light.  It's not out."

20   Q    And what did he say?

21   A    He said, "Don't worry about it.  Don't get out of

22   the car."  And then he -- I rolled down the window when

23   he first walked up.  I say this:  The first thing he

24   said to me -- he didn't ask me my name or nothing.  He

25   said, "How you doing, Brian?"  I said -- he said, "You

1    got your gun on you today?"  I said, "What you talking

2    about?"  I said, "I don't got no gun."  I said, "I can't

3    carry a gun."

4         So he went into the -- um, the brake light thing,

5    talk about the brake light.  I said, "My brake light

6    ain't" -- at that time I started getting nervous, and I

7    told her -- I said, "Yo, they just pulled me over.  This

8    dude is asking if I got my gun on me."  So she like,

9    "What?"  So she's like, "Put it on speakers."  So I put

10   it on the speaker, and I got the phone while he's trying

11   to talk to me.  So he is like, um --

12   Q    So what did he say?

13   A    He says -- um, he asked for license, registration,

14   all that stuff.  I give him all the paperwork.  Then he

15   says -- no, the other cop comes on the other side, and

16   he is flashing the light through the window, so he goes,

17   "Is there any drugs or anything in the car?"  I go,

18   "No."  So he said, "Where you going?"  I said, "I'm on

19   my way to see my uncle; then I'm going to the airport.

20   I am heading to a funeral."  I had a suit on.

21        He said, "All right."  He said, "Just wait here for

22   a minute.  We are going to have somebody come to us."  I

23   said, "Who?"  He said, "The K-9 unit."  I said, "Why do

24   you have me sitting here waiting for a K-9 unit?" like

25   this stop is supposed to been about my brake light -- I

1     mean my plate light, and you have to wait for K-9 unit.

2     Q    So what happened then?

3     A    K-9 unit comes, and he -- he walks the dog around

4     the car, whatever, and he said the dog smells drugs in

5     the car.  I say, "There ain't no drugs in the car.  Dog

6     don't smell no drugs in the car."  I'm sitting here

7     watching the dog.  The dog's not making a move.  I said,

8     "I got little tricks I do with that."  I said, "I'm not

9     going for this."

10    Q    So he didn't believe that was true?

11    A    No.  So he says, "Can I search the car?"  I thought

12    about it.  My wife said no, "Tell 'em no."  So I said,

13    "No, you can't search the car."  And so my wife was

14    explaining to me, "He can't search the car without your

15    permission.  That's not your car."  So I said, "Okay."

16    I said, "Well, the car's registered to Lori Crawford."

17    I said, "This is her phone number.  So you call Lori,

18    and if Lori gives you permission to search the car, then

19    search the car.  I don't care."  So he says, "Okay."

20    Q    So then what happened?

21    A    Instead of calling Lori, they actually sent a car

22    to Lori's house, and they asked her, "Is this car

23    registered to you" or whatever; she say, "Yeah."  They

24    said -- they said, "Well, we pulled it over" on such and

25    such street.  Somebody else was driving.  Do you -- "he

1    said if you gave us permission, we could search the car.

2    Would you mind if we searched the car?"  She said, "No.

3    I don't want my rights violated."

4        I know that because they called it back over the

5    radio, with the car -- with the cop standing next to me.

6    And when I heard him --

7    Q    And so then what happened?

8    A    When I heard it, I said, "Well, she said no.  I'm

9    saying no."  So he said, "Well, we gonna have to take

10   the car."  I said, "Okay."  So I told my wife --

11   Q    What was the -- what was the reason?  Because

12   they -- the dog smelled drugs?

13   A    That's what he said, the dog smelled drugs.

14       So I told my wife to have my -- her grandfather was

15   at the house.  I told her, "Send him over to pick me

16   up."  I had --

17   Q    Were there any drugs in the car, that you know of?

18   A    No.  I had toys in the back seat of the car.

19       Her grandfather pulled up at the same time as the

20   tow truck.  They let me sit in it till the tow truck

21   came.  And, um, when her grandfather came, I told them,

22   "Those bags right there are mine.  Can I have them?"

23   They said, "If you let us search them, you can have

24   them."  I said, "Okay, search the bags."  So they

25   searched the bags.  They searched me.  They gave me the

```
 1    bags.  I got in the car and waited for her grandfather.
 2         They told me, "Gimme the key to the car."  I told
 3    'em, "No, I'm going to give 'em to the owner."  So they
 4    pulled the car up on the -- the tow truck, and he towed
 5    it off.  I left.  I wouldn't --
 6    Q    Did you know there was a gun in the car at that
 7    point?
 8    A    No.
 9    Q    Were you aware that there's been no evidence
10    introduced that your fingerprints were on it?
11    A    Yeah.  I told them, "If you fingerprint the gun, my
12    prints won't be on it.  If you fingerprint the bullets,
13    my fingerprints won't be on it.  You fingerprint the
14    clip" -- any part of the gun, you're not going to have
15    my fingerprints, DNA, anything, because I didn't know
16    the gun was in there.  I never saw it before, and I
17    never touched it.
18    Q    What did you --
19              THE COURT:  All right, it is a little past 12,
20    so why don't we take a break at this point.  Let's
21    reconvene at 1:15.
22    (Court was in recess at 12:03 p.m.)
23    (The following was held in open court with the jury
24    present at 1:17 p.m.)
25              THE COURT:  Okay.  Mr. Folks, I want to remind
```

1    you you are still under oath.

2                    THE WITNESS:  Okay.

3                    THE COURT:  Okay?  Mr. Kaplan.

4                    MR. KAPLAN:  Thank you, Judge.

5                         CONTINUED DIRECT EXAMINATION

6    BY MR. KAPLAN:

7    Q    So your testimony was that you did not put that gun

8    in the glove compartment?

9    A    No, not at all.

10   Q    And it was not yours?

11   A    No.

12   Q    Did you ever possess a firearm in Vermont?

13   A    No.  The only type of firearms I possessed in

14   Vermont were my kids' BB guns.  I had four boys, and we

15   go BB gun shooting.  We go on the tracks by the house,

16   set up bottles and cans and we shoot BB guns.

17   Q    You heard Katelynn testify that you had a

18   small-caliber handgun that you asked her to keep in her

19   pocketbook?

20   A    Yeah.  That made no sense to me.  Like, if I had a

21   small-caliber gun, why wouldn't I just keep it in my

22   pocket?

23   Q    And did you put a gun in, like, the trunk and the

24   clip in the glove compartment?

25   A    No.  That's not -- when that was said, it made no

1    sense to me, 'cuz why would I put the gun in the trunk

2    and the clip in the front?  If I'm using it -- if I had

3    a gun I needed for protection something, how is it going

4    to protect me in the trunk?

5    Q    Did you actually feel like you needed a firearm in

6    Vermont?

7    A    No.

8    Q    Why?

9    A    I been boxing all my life.  Like, I come from a

10   military family.  My father's Golden Gloves.  My uncle's

11   Golden Gloves.  I was wrestling since I was, what, 12

12   years old on the college level.  I didn't need -- I can

13   fight.

14   Q    You heard some testimony about Katelynn being

15   called Pinky.  Do you know how she got that name?

16   A    All I know she was Pinky when I met her.

17   Q    So you didn't give her that name "Pinky"?

18   A    No.

19   Q    And there was a picture introduced with some money

20   in it.  Can you explain that?

21   A    Oh.  Um, um, Victoria L., she -- we used to date,

22   and she had -- it was an unfortunate situation with her

23   before we met.  And something happened, so she sued the

24   company which she worked at, and she got a big lawsuit

25   around the time we were dating.  I didn't know about it.

```
 1    I didn't know about it until after the lawsuit had came
 2    through, because apparently she had been waiting for it
 3    for a while, and when it came through, that's what the
 4    money was in the picture.
 5         She had gave me a chunk of money twice, and --
 6    well, actually the first chunk of money she gave me, it
 7    was $10,000.  But she didn't actually give it to me.  I
 8    took it.
 9    Q    What did you do with that?
10    A    I ended up giving it to her uncle because her uncle
11    was taking care of her daughter, and I explained to her
12    that "you not going to have all this money and not give
13    none of it to your daughter," because she was blowing it
14    on everything.  So when I first took it, she got mad.
15    She actually called the police, and then after the
16    police contacted me, I went to the precinct, and she
17    came behind me and changed her story and told 'em, "No,
18    he didn't steal it from me," and she explained what I
19    was doing with it, and I actually gave her uncle the
20    $10,000.
21    Q    And then what about that money in the picture?  Was
22    that the same?
23    A    That was -- no, that was another.  She gave me an
24    additional 5,000.  That's what that came through.
25    And --
```

1    Q    And did you and her spend that together?

2    A    Yeah.  We were hanging out.  We were just spending

3    that.

4    Q    So on the telephone conversation that you were

5    having with Chrissy, you were telling her not to cry?

6    A    Yeah.

7    Q    Can you explain that issue?

8    A    Sure.

9         All right.  A, there was a point when we were on,

10   um, Spring Street that they used to literally sit in

11   that house and practice how to cry at will.  And I used

12   to sit there and watch them.  And at first I found it

13   funny, like, oh, she can cry at the drop of a dime, but

14   then I start, like, uh-oh, 'cuz there's a couple of

15   times you came to me and got stuff from me and used

16   those same tears.  So after that, I thought she meant --

17   I told all of 'em, "Do not come talk to me with that

18   crying stuff.  I watched the practices.  And that's why

19   on that tape, if you listen to the rest of that tape,

20   she stops at the drop of the dime.  She asked the

21   officer, "Oh, can I get an Academy Award now?"

22   Q    So there's been some discussion about a walnut

23   video?

24   A    Yes.

25   Q    Do you remember that discussion?

1    A     Yeah.

2    Q     Did you force anyone to be in that?

3    A     No.  That video -- um, it -- okay.  I was doing a

4    porn thing.  I was trying to -- I was -- had the picture

5    thing going on.  It just started getting good with the

6    picture stuff, and I was expanding it.  Like I said in

7    the beginning, it was a five-step program or situation

8    that I had blueprinted for a business idea.  And the

9    porn -- it's just all in the porn industry.  And the

10   porn industry, you, like -- you -- you take real-life

11   situations, like whatever's happening in -- in

12   mainstream media, you kind of take that and you do

13   spinoffs from it.

14        At the time when I did the Walnut Challenge, you

15   had the Planking Challenge and the, um, Ice Water -- Ice

16   Water Challenge.  And people -- like, it went viral.  So

17   because that went viral mainstream, you know, everybody

18   in the adult industry was trying to come up with their

19   own challenges.  And that was one of the challenges that

20   we came up with.

21   Q    What about the picture that was -- still picture

22   that was taken from so-called urination video?

23   A    It was the same thing.  At that time, when those

24   videos was being made, R. Kelly was in the news, and R.

25   Kelly was in the news for urinating on people.  So

```
1    everybody, every comedian, every show was doing
2    something like -- not attacking R. Kelly but making fun
3    of him, you know.  That was the number one that we just
4    did a spinoff.
5    Q    Did you ever make trips to New York to buy drugs?
6    A    I have made -- I make a lot of trips to New York,
7    but to specifically buy drugs, no.  Have I ever boughten
8    drugs in New York?  Yeah, I have bought drugs in New
9    York before.
10   Q    And did you buy some crack in New York before?
11   A    Yeah.
12   Q    And did you bring it back to Vermont?
13   A    Yeah.
14   Q    And did you do that on more than one occasion?
15   A    Yeah.
16   Q    So you listened to the two telephone conversations
17   between yourself and Svetlana?
18   A    Yes.
19   Q    And what about the first one, near the end of it?
20   A    The first one was -- which one was the first one?
21   Q    Well, tell me what you remember about them.
22   A    Well, I know one of 'em, she was calling me -- she
23   called me about -- um, she was having a date with some
24   guy, and the guy wanted to give her a house, and she was
25   discussing it with me, and I guess the guy was there
```

1    listening to the phone conversation.  I'm not sure if I

2    was on speakerphone or what.  But it sounded fishy to

3    me.  She was running it by me, and I was telling her

4    what to do to get it.  Like, I was telling her, "Make

5    sure you see the lease.  Make sure you sign the lease."

6         And then at some point she was telling me that she

7    can borrow his car, and she just -- do dates out of his

8    house so she won't have to pay for a hotel.  And at that

9    point I was like, "Okay, whatever, Svetlana."  No.

10   Shorty, I said.  I said, "Whatever, Shorty.  I'll see

11   you in a couple days," because I knew the routine.  When

12   you get a situation like that, I won't see them for

13   days.  Like, "I'll see you in a couple days."  And she,

14   like, "No, no.  I'm not gonna do it.  I'm not -- I'm not

15   staying there."  Then she changed her mind and said, ah,

16   she just going to use the car.

17        And if you listen to the rest of the video -- I

18   mean that phone call, at the end she started cussing,

19   like, "Bring your ass over here and see me," because I

20   was -- I was, like, hesitating on coming over there to

21   see her.  And she kept saying, "Come over and see me.

22   Bring my phone."  I was like, "I have to take a shower.

23   I have to take a shower, so I'll bring it" -- "Well,

24   I'll come over there."

25        I didn't want her to come to my house with my

1    wife -- so, "All right.  I'll come.  I'll come."

2         And we was discussing -- the second phone call, we

3    were discussing -- first she -- she called me for a

4    babysitter.  I set up the funds for a babysitter so at

5    one point the babysitter was calling me telling me that

6    she wasn't coming to get the kid and she was gone for

7    crazy hours.  And I was like, okay, okay.  Now I know

8    where she's been at.  I know what she'd been doing.  I

9    know what type of money she's gonna have now.  But I had

10   already paid the babysitter 50 bucks for her.  And I was

11   telling her, and on the phone call I tell her, "When she

12   come back, remind her that I already gave you 50 bucks,"

13   and she would -- then she start telling me about Pinky.

14   Oh, whoa.  I told her that Pinky and them was doing

15   hundred-dollar calls.

16        In the Backpage world, when you start bringing your

17   prices down to like a hundred dollars -- they call them

18   hundred dollar specials -- it's because you are not

19   making any money.  So when I seen it, I told her, "Pinky

20   and 'em is not making no money.  They're doing hundred

21   dollar specials."  And then she started explaining to me

22   they're not making any money because I told guys that

23   wanted to go see them that they're robbing people and

24   what they're doing to 'em.  And I go, "Oh, really."  And

25   she's like, "Yeah," so nobody wants to see them.

1    Q    What about the "my car" label that's on your

2    computer for some --

3    A    Oh, the "my car" things.  Okay, I had a bunch of

4    chips.  Like, my -- all my cameras take chips, and, um,

5    like the -- your phone -- my phones take chips, but you

6    take the little chip out and you put into a bigger chip

7    and they fit inside your cameras.  So I have a bunch of

8    digital cameras.  I have a camera collection, actually.

9        And, um, when I take a chip -- like, I have chips

10   in my car.  I have chips, like, in my house, or wherever

11   I'm at.  When I take a chip out when it's full and I

12   want to put it in my computer and upload it, I put it in

13   there and upload it, and for me to remember what that

14   chip is, I'll write the first thing that come to mind.

15       So the chip came out of my car, I'll put "my cars."

16   If -- sometimes you will see, I will put JJJJJJJ or

17   KKKKKKK.  I will just put something random and just

18   identify that particular chip, so everything that came

19   off that chip would be under that title.

20            MR. KAPLAN:  Judge, I have nothing further.

21            THE COURT:  Okay.  Any cross examination?

22            MR. DARROW:  Yes.

23                     CROSS EXAMINATION

24   BY MR. DARROW:

25   Q    Mr. Folks, good afternoon.

1    A    Good afternoon.

2    Q    Why don't we begin by seeing if we can agree on

3    anything, okay?

4    A    Sure.

5    Q    You remember the testimony of four undercover

6    heroin buys from early 2016?

7    A    The -- say that -- say that again.

8    Q    Recall that at the beginning of the trial --

9    A    Yes.

10   Q    -- there was testimony from several witnesses about

11   four undercover heroin buys in early 2016.

12   A    Yes.

13   Q    Okay.  Do you recall that Special Agent Adam

14   Chetwynd from the DEA described those four buys?

15   A    I believe so, yes.

16   Q    And do you recall that a woman named Michelle N.,

17   who was the undercover who used the name Nikki -- she

18   testified about the four buys?

19   A    Yes.

20   Q    Okay.  And do you recall that Mandy Latulippe also

21   testified about her role in the four buys?

22   A    Yes.

23   Q    She identified her voice on some of the recordings?

24   A    Yes.

25   Q    Okay.  Do you admit that you participated in

1   arranging those buys?

2   A    Yes.

3   Q    All right.  So those -- each of those buys was set

4   up in a recorded phone call to you, right?

5   A    Yes.

6   Q    And that phone that you were using when those calls

7   were put into you was the phone number ending in 4614?

8   A    Yes.

9   Q    That's your number?

10  A    That's the house number.  We call that the house

11  phone.

12  Q    Well, that's the phone you had on -- on you when

13  you were arrested, right?

14  A    At that point, yes.

15  Q    And it's the phone that that -- those four calls to

16  set up those -- multiple calls to set up those buys were

17  made to, and you answered each of those phone calls?

18  A    Initially it wasn't, but, yes, later it was.

19  Q    And that's the number of the Nokia Lumia that we

20  heard about that you carried at that time?

21  A    I'm not sure if that's the name of the phone, but

22  if you say.

23  Q    Well, Agent Chetwynd testified that when you were

24  arrested, you had a Nokia Lumia on you, and then Frank

25  Thornton testified that the number of that phone was the

1   4614 number.

2   A    I had a Microsoft phone on me and a Galaxy phone on

3   me.

4   Q    So are you denying that the phone -- the Nokia

5   Lumia ending in 4614 was your phone?

6   A    That number 4614 -- that was one of my phones.

7   Q    But --

8   A    It was the house phone.

9   Q    Thank you.

10  A    Yes.

11  Q    And Agent Chetwynd and Michelle N. testified that

12  they arranged the first of those buys on January 6th,

13  2016, with phone calls -- with you on that phone.

14  A    Yes.

15  Q    Do you remember that?  You remember that?

16  A    Yes.

17  Q    Okay.  So that was you arranging that buy?

18  A    Yes.

19  Q    All right.  And I don't have to play the clips for

20  you.  You would say that, yes, that is your voice

21  setting up that first undercover buy?

22  A    Yes.

23  Q    All right.  And on the third call into you setting

24  up that first January 6th buy, you brought Mandy on the

25  phone?

```
 1    A    Yeah.  At one point I brought Mandy on the phone.

 2    Q    That's a yes?

 3    A    Yes.

 4    Q    Okay, thanks.

 5         And -- okay.  And then Mandy went and did the hand

 6    to hand for the heroin to the undercover who was --

 7    A    I wasn't there when she did that.

 8    Q    Right.  But you arranged it?

 9    A    I introduced them.

10    Q    All right.  So you denying or admitting that you

11    arranged that first buy?

12    A    I introduced them.  I put them together, yes.

13    Q    Okay.  Are you saying that you did not arrange that

14    first buy?

15    A    I introduced them.

16    Q    All right.  Maybe we need to listen to some of the

17    clips played then, okay?

18    A    Yeah, sure.

19              MR. DARROW:  Okay.  Let's play Exhibit 1.

20              (A digital recording was played in open

21    court.)

22              MR. DARROW:  Okay.  That's fine.

23    BY MR. DARROW:

24    Q    Mr. Folks, you made a practice of not discussing

25    drug deals on the phone, right?
```

```
1    A    No, I didn't.

2    Q    Okay.  I thought you just said that you didn't want

3    to -- when she said, "I've got -- can you do a sleeve

4    for eight," and you said, "I don't want to discuss

5    things on the phone."

6    A    Because I can't give her somebody else's price.

7    Q    Okay.  So do you know -- can you concede that in

8    that conversation you were talking about getting

9    together for a drug deal?  You are saying, "You gotta

10   come to me"?

11   A    Yes.

12   Q    And the Pearl Street Beverage you are referring to

13   is next to the 103 North Union house that Mandy was

14   living in?

15   A    Yes.

16   Q    Okay.  And that was your voice?

17   A    Yes.

18   Q    Okay.

19             MR. DARROW:  Let's play Exhibit 2.

20             (A digital recording was played in open

21   court.)

22   BY MR. DARROW:

23   Q    Mr. Folks, so this is another call, the second

24   call, setting up the January 6, 2016, undercover drug

25   buy, right?
```

1    A    Yes.

2    Q    And you are again telling her to come to the

3    neighborhood and call you?

4    A    Yes.

5    Q    Okay.  And you know she is looking to buy heroin?

6    A    Yes.

7    Q    Okay.  So let's listen to the third call.

8         MR. DARROW:  Exhibit 3A.

9         (A digital recording was played in open

10   court.)

11        MR. DARROW:  Thanks.

12   BY MR. DARROW:

13   Q    So, Mr. Folks, that's the third call -- undercover

14   call to you to set up a heroin deal, right?

15   A    Right.

16   Q    And you are saying, you know, "Come on up and park

17   at North Loomis Street, by North Union Street," and you

18   get Mandy on the phone, and you arrange for her to go

19   out and do the hand to hand, right?

20   A    No.  I said, "Go over" not "come on up."  I wasn't

21   there either time.

22   Q    Okay.  So just so that we are clear and we can

23   leave this subject, are you denying that you arranged

24   that drug deal?

25   A    No, I didn't say I denied.  I said I introduced

1    them, yeah.

2    Q    Excuse me?

3    A    I said I introduced them, yeah.

4    Q    No.  I'm asking if you arranged the drug deal?

5    A    Yeah.  Through me, yeah.

6    Q    Okay.  So we can maybe speed things along, the

7    second one was the January 12th, 2016, drug deal.  Did

8    you arrange that?

9    A    The one she said, "Rome told me to call"?

10   Q    No.  Well, I don't remember if she said that or

11   not.

12   A    Yeah.

13   Q    The second buy --

14   A    She said, "Rome told me to call."

15   Q    We could shortcut this to all four of the

16   undercover buys if you would concede that, yes, you

17   arranged those heroin deals.

18   A    Yes, she called me, and I called through many of

19   them, yes.

20   Q    Okay.  So do you admit that you arranged all four

21   of those drug deals?

22   A    Yes.

23   Q    It's just a yes-or-no question.

24   A    Yes.

25   Q    Thank you.

1        Now, at one point on the -- on one of those drug

2   deals, did you have a conversation with the woman

3   Michelle, using the name Nikki, about setting up a trap

4   house up north where you thought she was from?

5   A    Yes.

6   Q    Okay.  And that was something you wanted to set up

7   as part of your drug organization?

8   A    No.

9   Q    Okay.  Well, you are setting that up for somebody

10  else?

11  A    It was other people that was trying to get up here

12  and spread out.  I didn't really want them around me, so

13  Rome had maybe an offer about it, and I was just

14  pitching an offer back to her, but she apparently didn't

15  know what I was talking about because Rome's lying.

16  Q    So you were doing that for somebody else?

17  A    Rome set it all up.

18  Q    Okay.  Excuse me a moment.

19           (Brief pause.)

20           MR. DARROW:  Why don't we play 8C.

21           (A digital recording was played in open

22  court.)

23  BY MR. DARROW:

24  Q    Okay.  Mr. Folks, we can stop that there.  So you

25  say there that you'll use your own prices, right?

1    A    Yes.

2    Q    And you said that "I'll send one, maybe two of my

3    peoples up there," right?

4    A    Yes.

5    Q    Okay.  So you are saying this was just all Rome's

6    business, not yours?

7    A    This was Rome's idea.  He set it up, and I'm

8    explaining the whole conversation what he told me.

9    Q    But you are saying, "You're going to use my prices

10   and your people"?

11   A    Right.

12   Q    Okay.  Now, on the final undercover buy, the

13   February 10th one, do you recall there was a problem

14   when the stash in the car outside the 103 North Union

15   Street apartment was missing?

16   A    Yes.

17   Q    This is -- someone had stolen the stash, right?

18   A    Yes.

19   Q    Because that's where you were keeping your drugs?

20   A    Yes.

21   Q    Okay.  And the sleeve that -- of heroin that Nikki,

22   or Michelle, was going to buy that day, Mandy went out

23   to get from the car?

24   A    Yes.

25   Q    Came back in, told you that -- what had happened,

1    someone had broken in and stolen the stash?

2    A    Yes.

3    Q    You went out with her and looked?

4    A    Yes.

5    Q    Okay.  Let's move over to the January 20th, 2016,

6    car stop.  This is the one in the white van belonging to

7    the other Mary?

8    A    Yes.

9    Q    Okay.  You recall multiple witnesses testified

10   about that?  Officer Brouillette from the -- then the

11   Winooski PD?

12   A    Yes.

13   Q    And Mandy Latulippe testified about it?

14   A    Yes.

15   Q    And Mary P. testified about it?

16   A    Yes.

17   Q    That was you in the car that night?

18   A    Yes.

19   Q    Okay.  Sitting in the back seat?

20   A    Yes.

21   Q    And you recalled you video'd part of it on your

22   cell phone, it looked like?

23   A    Yes.

24   Q    Now, do you recall that Officer Brouillette, Mandy

25   and Mary all testified that there was a bag of drugs

1    seized from the car that night?

2    A    Yes.

3    Q    Okay.  Was that your bag of drugs?

4    A    No.

5    Q    Well, was it Mandy Latulippe's bag of drugs?

6    A    I don't know whose bag of drugs it was, but it

7    wasn't mine.

8    Q    Did you know it was in the car?

9    A    Yeah.

10   Q    So what was the bag of drugs doing in the car?

11   A    It was with them.  It was in a purse.  I don't

12   carry a purse.

13   Q    Well, you might have someone else carry your drugs

14   for you?

15   A    No, I didn't.

16   Q    Okay.  So was it a complete surprise to you that

17   there were drugs in the car?

18   A    No.  I knew they brought them.

19   Q    Okay.  You just had no idea whose they were?

20   A    No.

21   Q    Weren't Mandy and Mary P. both working for you?

22   A    They was working with me, yes.

23   Q    It must have been one of their drugs, right?

24   A    It could have been Mary R.'s drugs.

25   Q    Well, isn't she the one that called the police and

1    reported that they could stop the car because there were

2    going to be a lot of drugs in it?

3    A    Yeah.  Mary makes a lot of false reports.

4    Q    Well, that wasn't false, was it?

5    A    I don't know.  I don't know exactly what she said

6    when she made the report.

7    Q    Officer Brouillette said that she had called and

8    said there was going to be a significant amount of

9    narcotics in that car, so they pulled it over, and there

10   were a significant amount of narcotics in that car, so

11   it seems unlikely that they would have been hers.

12   A    Well, she said they were hers at one point.

13   Q    So you don't know whose drugs those were?

14   A    No.

15   Q    Let's go to the Chrissy call.  You admitted on

16   direct, if I understand correctly, that Donald McFarlan

17   did bring drugs from New York up to Vermont for you to

18   sell?

19   A    I didn't say nothing about nobody's name.

20   Q    Well, why not?  Can we call him Donald McFarlan?

21   You want to call him Ghost?  We all know who we're

22   talking about.

23   A    I know who Ghost is, yeah.

24   Q    All right.  Let's call him Ghost.

25   A    Um-hum.

1   Q    Was Ghost one of the people that you got drugs from

2   brought up to you from New York City?

3   A    I bought drugs from him.

4   Q    Okay.  Did he bring them drugs -- the drugs up from

5   New York City to you?

6   A    How he got them here is -- I have nothing to do

7   with.

8   Q    So you don't know where he got the drugs?

9   A    No.  I don't know where he got them from, no.

10  Q    But he brought drugs to you?

11  A    He sold drugs to me.

12  Q    All right.  Bulk drugs?

13  A    Excuse me?

14  Q    Not like tickets and baggies of heroin and

15  crack cocaine, but bulk drugs that could be packaged up

16  for street sale?

17  A    Small amounts and bulks, yeah.

18  Q    Okay.  And do you remember that -- in early 2016,

19  some of the drugs that he had brought up were in a

20  cereal box that disappeared?

21  A    I remember an incident from paperwork.

22  Q    Okay.  You know what I am talking about?  Yes or

23  no?

24  A    Yes, I do.

25  Q    And Chrissy -- do you recall that Chrissy called

1    McFarlan to say that they had been seized by the police?

2    A    Yes.

3    Q    And you got on the phone call to talk about the

4    missing drugs?

5    A    Yes.

6    Q    All right.  And that's when you told her to -- that

7    you'd give her money for a lawyer and to take the hit

8    for the drugs?

9    A    I didn't get on the phone to talk about missing

10   drugs.  I got on the phone to mediate the situation that

11   was going on between the two of them.

12   Q    I apologize.  Did you get on the phone and tell her

13   that you'd pay for a lawyer and to keep your name out of

14   it --

15   A    I --

16   Q    -- and to take the hit for the drugs?

17   A    I told her that we'll get the lawyer.  I was just

18   talking in general.

19   Q    Okay.  And I apologize.  Could you just answer my

20   question?

21   A    I just thought I did.

22   Q    It's a yes-or-no question, actually.

23   A    Oh.  No --

24   Q    I'll break it down.

25        She calls McFarlan.  You get on the phone.  Right?

1    A    Yes.

2    Q    Did you tell her that you'd help pay for a lawyer?

3    A    Yes.

4    Q    If she'd take the hit for the drugs?

5    A    Yes.

6    Q    And -- but to keep your name out of it?

7    A    Yes.

8    Q    Thank you.

9         Now, you are familiar with Lori Crawford's place?

10   A    Yes.

11   Q    I don't have to show you a picture of that?

12   A    No.

13   Q    All right.  And you used Lori's apartment as a base

14   of operations in late 2015?

15   A    No.

16   Q    Okay.  Lori testified it was you -- you were there

17   with your crew so often it was called Moe's Place.  Do

18   you disagree with that?

19   A    I don't disagree they were saying that.

20   Q    Okay.  But you are saying you were not there with

21   your crew a lot of time?

22   A    I was -- I don't have a crew.

23   Q    You don't?

24   A    No.

25   Q    Well, you said Mary P. and Mandy worked for you.

1    A    No, I didn't.  I said I worked with them.

2    Q    Ah.  So were you like equals with them?

3    A    Yeah.

4    Q    A series of witnesses described drugs being sold

5    out of that location, and they testified that you were

6    in charge of the place, but you say you weren't?

7    A    Yes.

8    Q    Were they selling drugs on your own -- on their

9    own?

10   A    A lot -- there was a lot of people in there selling

11   drugs.  It was different drugs in there.

12   Q    Okay.  Was Hannah a runner that sold drugs out of

13   that house?

14   A    Yes, she was.

15   Q    Okay.  Was Mandy a runner that sold drugs out of

16   that house?

17   A    Yes, she was.

18   Q    Were they working for you?

19   A    No.

20   Q    So what was becoming of the drugs that Ghost was

21   bringing up to you, that you were buying from him in

22   bulk --

23   A    What he was doing with his drugs, I don't know.

24   That's --

25   Q    I thought you --

1    A    That's --

2    Q    -- said he was bringing drugs to you.

3    A    No.  I said he was selling drugs to me.  You said

4    he was bringing drugs to me.

5    Q    Well, if he is selling bulk drugs to you -- we can

6    use that term if you want.  When he sells bulk drugs to

7    you, what were you doing with the drugs?

8    A    My small amount, I used them for, like, when a

9    female that I was dealing with needed something, I would

10   have it on hand for her.  And a few times I sold to

11   other people as well.

12   Q    Okay.  So you didn't -- who -- how did you package

13   the drugs that were sold to you in bulk?

14   A    Put them in bags.

15   Q    And who did that?

16   A    I did.

17   Q    You did it yourself?

18   A    Yeah.  A lot of times.

19   Q    So of all --

20   A    I didn't --

21   Q    I apologize.

22        Of all those witnesses who testified about the

23   bagging parties that you were in charge of, that was all

24   false?

25   A    Yeah.  Nobody said I was in charge of parties.

1    They said I was there.

2    Q    No, they said you were in charge.

3    A    No.  I believe they said I was there.

4    Q    Okay.  Irrespective, you are saying you were not in

5    charge?

6    A    Yes.

7    Q    You were just hanging out?

8    A    I was there.

9    Q    And you --

10   A    I was definitely there.

11   Q    Okay.  Now, where did you live in late 2015?

12   A    I lived in Winooski.

13   Q    Okay.  Was there any drug trafficking or

14   prostitution operating out of there?

15   A    Absolutely not.

16   Q    Okay.  That only went on in the other places?

17   A    What happened in other places when I'm not there is

18   not my business.

19   Q    Well, you knew that was happening at the Spring --

20   A    I knew a lot things that what happening, but that

21   don't mean it's my business.

22   Q    So that was -- the drug trafficking and the

23   prostitution out of Lori Crawford's house on Spring

24   Street had nothing to do with you?

25   A    No.  I mediated some of the people because I

1    introduced everybody to each other.  And I made it
2    possible so this person can meet that person.
3    Q    You testified about Marty's place?
4    A    Yes.  Uncle Marty.
5    Q    Don't need to show you a picture of that place?
6    A    No.  I know where it is.
7    Q    Okay.  You said that -- I think, if memory serves,
8    on direct that you are familiar with the apartment at
9    103 North Union?
10   A    Yes.
11   Q    Because that's where the group that was dealing
12   drugs and prostituting out of Spring Street -- they
13   moved out of there after Lori got back from drug rehab?
14   A    No.  Only --
15   Q    They didn't?
16   A    No.  Only person that moved over there was Mandy
17   Latulippe.  Mandy and, um -- as a matter of fact, Mandy
18   and Hannah moved over there, and then shortly after --
19   later on, I moved over there.
20   Q    Right.  And Mandy and Hannah were delivering drugs
21   out of there?
22   A    Yeah, they were.
23   Q    And the floor plan of the apartment that was showed
24   to Mary, was that your floor plan?
25   A    Yeah.  I drew it.

1    Q    Okay.  So you are pretty familiar with that

2    apartment?

3    A    Yes.

4    Q    Is there a red apron in that apartment?

5    A    Yes, there is.

6    Q    Did you ever make women wear it to punish or

7    violate them?

8    A    Absolutely not.

9    Q    You had Lori Crawford register your Durango for

10   you --

11   A    Yes.

12   Q    -- under her name?

13   A    Yes.

14   Q    And you had -- your Facebook account was under Moet

15   Hart, correct?

16   A    Yes.

17   Q    And you had multiple forms of identification under

18   the name Jimmy Porter?

19   A    No.

20   Q    You didn't?

21   A    No.

22   Q    You don't remember seeing the pictures of those IDs

23   from your computer?

24   A    That was a computer program.  Each of those IDs

25   boldly says fake.  They're souvenirs.  You order the

1    souvenir program, and whatever picture you put in it, it

2    goes on every one of the cards.

3    Q    Okay.  Did you use a false name when you were --

4    that police incident you testified about on direct?

5    A    What police incident?

6    Q    You testified that the reason why someone thought

7    you were involved in something was because there was an

8    arrest, you had helped bring someone to the police

9    station, then your name -- or your picture was in the

10   paper?

11   A    I didn't bring nobody to no police station.

12   Q    Okay.  You don't know what I am talking about?

13   A    No.  I never brung nobody to no police station.

14   Q    Did you ever give a false name to police?

15   A    Yes, I did.

16   Q    In Burlington?

17   A    Yes.

18   Q    Do you remember what name you gave then?

19   A    Yes.

20   Q    What name you gave them?

21   A    Yes.

22   Q    What name?

23   A    Brady.

24   Q    So you used the name Brady?

25   A    Yes.

1    Q    You didn't -- the name Jimmy Porter was the

2    subscriber of one of your cell phones, wasn't it?

3    A    That's my cousin.

4    Q    Okay.  Wasn't that the -- one of the cell phones

5    you used was subscribed to Jimmy Porter?

6    A    I'm not sure.  If it was, it was.  If it wasn't, I

7    don't know.  I didn't set 'em up.

8    Q    Do you recall Detective Merchand's testimony about

9    the things that were seized from the apartment at 96

10   Ethan Allen Parkway when the search warrant was arrested

11   *[sic]* there in July 2016 and you were arrested?

12   A    I believe so, yes.

13   Q    Okay.  You remember that?

14   A    I believe so, yes.

15   Q    You were staying at that apartment at the time?

16   A    Yes.

17   Q    Okay.  You don't need to see a picture of the

18   apartment?

19   A    No.  I know the apartment.

20   Q    Okay.

21            MR. DARROW:  Can we see Exhibit 61, please.

22       Actually, hold on just a moment, your Honor.

23            (Brief pause.)

24            MR. DARROW:  Why don't we do this with the

25   ELMO.

```
1    BY MR. DARROW:

2    Q    And, Mr. Folks, drawing your attention to the first

3    photo.  Do you recognize the Aveda bag?

4    A    I see it.  I recognize it from these pictures,

5    yeah.

6    Q    Do you know what's in the bag?

7    A    I believe so.

8    Q    What was that?

9    A    I think it was drug paraphernalia.

10   Q    Yeah.  A couple bags of glassine baggies like used

11   to package heroin?

12   A    Yes.

13   Q    And this picture is taken of the top of the hutch

14   in the living room.  Does that look familiar?

15   A    Yes.

16   Q    And do you see up there is a plastic bag, says

17   rue21 on it, a shopping bag?

18   A    Yes.

19   Q    Do you remember that shopping bag?

20   A    Do I remember it?

21   Q    Do you remember what was in it?

22   A    From these pictures, I think so, yeah.

23   Q    That's looking down into the contents of the

24   shopping bag.  Does that look familiar?

25   A    Yeah, I seen that before.
```

1    Q    Okay.  Is that a cardboard box full of glassine

2    folds like used to package heroin?

3    A    I believe so.

4    Q    Okay.  And a bunch of rubber bands here?

5    A    Yes.

6    Q    Okay.  Ever seen that blue cookie tin before?

7    A    I have seen a couple of 'em.

8    Q    A couple of what?

9    A    Those blue cookie tins.  If you look in the videos,

10   there's a bunch of them in that house.

11   Q    Okay.  Here's more from inside the rue21 bag

12   showing the cardboard box of heroin tickets opened up?

13   A    Okay.

14   Q    And these items were recovered from the house.

15   A    No.

16   Q    No?

17   A    No.

18   Q    Oh, those were recovered from you when you were

19   arrested, right?

20   A    Yes.

21   Q    All right.  That was the cash -- some of the cash

22   in the house?

23   A    I don't even know what that is.

24   Q    You don't recognize that?

25   A    No.  What is it?

1    Q    Well, it's a bag with a bunch of currency in it.

2    A    Okay.

3    Q    Doesn't look familiar?

4    A    No.  It's not mine.  It's not one of mine.

5    Q    But most of your stuff was seized from the house,

6    right?

7    A    Yes.

8    Q    You've got receipts and --

9    A    The plastic bags were mine because I had moved out

10   of North Union, and I was going through some problems

11   with my wife, so I had a lot of my -- that's my son's

12   mom's house, so I had a lot of plastic bags stored in

13   her closet.

14   Q    Okay.  And how about the contents of some of the

15   bags?  Like that rue21 bag, was that --

16   A    Not mine.

17   Q    That was not yours?

18   A    No.

19   Q    Okay.  Well, is your -- the woman that stayed there

20   is the mother of one of your sons?

21   A    Yes.

22   Q    Danielle Degenhardt?

23   A    Yes.

24   Q    You think they were hers?

25   A    I don't know.  Her boyfriend was staying there

1    before me.

2    Q    Ah.  So it might have been the boyfriend's?

3    A    I am not going to put it on anybody, but it wasn't

4    mine.  I can say that for a fact.

5    Q    So would your testimony be that, yes, a lot of your

6    things were taken out of the house and were found in the

7    house, but is it your testimony that all of the drug

8    paraphernalia must have been somebody else's because

9    that wasn't yours?

10   A    To my knowledge, the only thing of mine that was

11   taken out of the house was a computer and a book.

12   Q    Okay.  So your answer to my question is?

13   A    To my knowledge, the only thing taken out of the

14   house that belonged to me was a computer and a book.

15   Q    I apologize.  I will ask it again.

16        Is it your testimony that all the drug

17   paraphernalia found in the house -- the rue21 bag with

18   the packaging paraphernalia, the Aveda paper bag from

19   the kitchen with the two additional boxes of glassine

20   envelopes, the grinder, the bottle of inositol cut --

21   none of those were yours?

22   A    None of it.

23   Q    And you recall Mandy and Mary P. both testifying

24   that the contents of that rue21 bag with the blue cookie

25   tin and all the packaging, the cards, the straws,

1    glassine envelopes, the little crack baggies -- that you

2    recall them testifying that all those were things that

3    they used to bag drugs for you?

4    A    They said that's stuff they used to bag drugs with.

5    That stuff everybody out there used to bag the drugs

6    with, so anybody that was dealing with any type of drugs

7    would have the same paraphernalia.

8    Q    Okay.  My question was, do you remember their

9    testimony that they used those things to bag drugs for

10   you, Brian Folks?

11   A    I don't specifically meaning -- hear -- remember

12   hearing 'em saying they used it to bag me -- I heard --

13   remember hearing 'em say they used that stuff to bag

14   drugs, but not saying they used it for me.

15   Q    Okay.  During 2012 to 2016, did you photograph the

16   women that we have heard testify?

17   A    Did I photograph the women?

18   Q    Do you want me to repeat the question?

19   A    Please.

20   Q    Okay.

21        During 2012 through early 2016, did you photograph

22   the women who came in and testified against you?

23   A    Some of them.

24   Q    Okay.  Well, Mandy testified that you photographed

25   her.  Did you?

1    A    I photographed her before.

2    Q    I'm sorry.  So you did photograph her?

3    A    Yes.  Before, yes.

4    Q    Before what?

5    A    There's hundreds of pictures in there of Mandy.  I

6    didn't take all those pictures.

7    Q    All right.  I am just asking if you photographed

8    her.

9    A    And I said I photographed her before.

10   Q    Okay.  During 2012 to 2016?

11   A    2000 -- no, absolutely not.  I didn't even know

12   Mandy in 2012.

13   Q    Mr. Folks, I am talking about a time period of

14   about four years, from 2012 to 2016.

15   A    Um hum.

16   Q    During that time period, did you photograph Mandy?

17   A    No.  I photographed Mandy -- I met Mandy in 2015.

18   Q    Okay.  2015 actually falls between 2012 and 2016.

19   A    You are saying between 2- -- correct me if I am

20   wrong.  You are saying did I photograph Mandy between

21   2012 and 2015.  In my mind that says from 2012 to 2016,

22   straight through I photographed Mandy.  No.  I didn't

23   know Mandy in 2012.

24   Q    Okay.

25   A    Now, did I photograph Mandy between 2015 and 2016?

```
1    Yes, I have taken photos of her.

2    Q    Okay.  How about Keisha; did you photograph her?

3    A    Yes.  I have taken photographs of her as well.

4    Q    And Katelynn; did you photograph her?

5    A    Yes, I have taken photographs of her as well.

6    Q    And Lori; did you photograph her?

7    A    No, absolutely not.

8    Q    She testified you did; was that false?

9    A    And she never showed any of those pictures.  I

10   never photographed her.

11   Q    She testified that you did; is that false?

12   A    I am testifying that she didn't.  That was false.

13   I never photographed her.

14   Q    Okay.  And Jasmine testified you photographed her?

15   A    Yes.

16   Q    You did?

17   A    Yes.

18   Q    Okay.  And Jasmine testified you photographed

19   Hannah?

20   A    Yes, she did.

21   Q    Did you?

22   A    Yes.

23   Q    All right.  And Danielle testified that you

24   photographed her?

25   A    Yes.
```

1    Q    You did?

2    A    Yes.

3    Q    Okay.  And did Ayla testify that you photographed

4    her?

5    A    Yes.

6    Q    You did?

7    A    Yes.

8    Q    All right.  Did you tell those women in photo

9    sessions how to pose for photographs?

10   A    No.  Sometimes I did.  Not always.

11   Q    Well, Keisha testified that you told her how to

12   pose.  Is that true?

13   A    I could have.  I don't --

14   Q    You don't remember?

15   A    -- particularly remember --

16   Q    Okay.

17   A    -- but I could have.  I told someone else

18   sometimes, yeah.

19   Q    Well, you testified earlier on direct that because

20   you knew what men liked, that you might have done that

21   sometimes?  Is that what I heard?

22   A    That's what I just said, yeah.  I said some -- I

23   done it sometimes.

24   Q    Okay.  Katelynn testified that you told her how

25   to pose.  Is that true?

1    A    I could have, yes.

2    Q    Danielle testified that you told her how to pose.

3    Is that true?

4    A    I could have, yes.

5    Q    Okay.  And Jasmine testified that you told Hannah

6    how to pose.  Is that true?

7    A    I could've.

8    Q    So you are saying you just don't remember.  In all

9    of those cases, you might have?

10   A    Yeah.  I telling people how to pose on different

11   occasions, but I'm sure I didn't do it every time.

12   Q    Okay.  Now, during 2012 to 2016 -- that's that

13   four-year time period we are talking about --

14   A    Yes.

15   Q    -- did you post any women on Backpage?

16   A    No.

17   Q    All right.  So Katelynn testified that you posted

18   her.  Is that false?

19   A    Yes.

20   Q    Mandy testified that you posted her.  Is that

21   false?

22   A    Yes.

23   Q    Keisha testified that you posted her.  Is that

24   false?

25   A    Yes.

```
1    Q    Jasmine testified that you posted her.  Is that
2    false?
3    A    Yes.
4    Q    Danielle testified that you posted her.  Is that
5    false?
6    A    Yes.
7    Q    Ayla testified that you posted her.  Is that false?
8    A    Yes.
9    Q    So they all lied?
10   A    Yes.
11   Q    Did you ask any of those women to prostitute?
12   A    No.
13   Q    Okay.  Well, Mandy testified that you taught her to
14   prostitute.  Was that false?
15   A    She also testified that --
16   Q    You can just answer the question.
17   A    Yeah, that was false.
18   Q    That was false?
19   A    Yes, it was false.
20   Q    All right.  And Keisha testified that you taught
21   her to prostitute.  Is that false?
22   A    Yes.
23   Q    Katelynn testified that you taught her to
24   prostitute on Backpage.  Was that false?
25   A    Yes.
```

1    Q    Jasmine testified that you took over prostituting

2    her.  Is that false?

3    A    That I took over?

4    Q    Yeah.  In other words, that she was working as a

5    prostitute before, but she started working with you when

6    you took over the prostitution activities.

7    A    I wouldn't say I took over.

8    Q    All right.  Let's not quibble.

9         Danielle testified that you taught her how to

10   prostitute.  Is that false?

11   A    False.

12   Q    False.  And Ayla testified that you taught her how

13   to prostitute?

14   A    I think you said Ayla already, but false.

15   Q    All right.  All right.  You testified that you did

16   have some involvement with these women who were

17   prostituting, right?

18   A    Yes.

19   Q    I think you testified that the usual rate on the

20   street was a 50-50 split between the woman doing the sex

21   work and the man assisting her, right?

22   A    Yes.

23   Q    But you testified that wasn't your deal?

24   A    Yes.

25   Q    Okay.  You just wanted a little gas money and --

1   A    Yes.

2   Q    Right?

3   A    And whatever they saw fit, yes.

4   Q    Okay.  So tell me if the following women testified

5   falsely, then:  Mandy testified that when she started

6   you took 50 percent of all her earnings.

7   A    False.

8   Q    Keisha testified that when she started you took 50

9   percent of all her earnings.

10  A    Well, Keisha, it would start out as 50 percent, but

11  she didn't actually do anything, so --

12  Q    So she was right; the deal was 50 percent?

13  A    That was the deal, but she didn't make any money,

14  so it was no taking anything.

15  Q    Katelynn testified that when she started you took

16  50 percent of her earnings.  Is that false?

17  A    Yeah, that's false.

18  Q    Jasmine testified that you got all of her earnings.

19  Is that false?

20  A    Definitely false.

21  Q    Danielle testified that you got 50 percent of her

22  earnings.  Is that false?

23  A    No.  Danielle was giving me half at a point.

24  Q    Okay.  Ayla testified that you got her earnings.

25  A    No.

```
1    Q    False?

2    A    False.  Yeah.

3    Q    All right.  And your own witness, Brittany Barber,

4    yesterday testified that you got all of her earnings.

5    A    No.  That's not what she said.

6              MR. KAPLAN:  Objection.

7    Q    Well, she said it --

8              MR. KAPLAN:  Objection.

9    Q    -- started out 50/50.

10             MR. KAPLAN:  Objection, your Honor.  That's

11   not what she said.  That was not the testimony.

12             THE COURT:  The jury can determine whether, in

13   fact, she said that.  On good faith in the question, it

14   can be asked on cross.  Go ahead.

15             MR. DARROW:  Thank you.

16   BY MR. DARROW:

17   Q    Did Brittany Barber not testify, when the defense

18   called her, that she started out 50/50 with you but she

19   ended up spending her 50 percent on drugs that she

20   bought from you so you got all her money?

21   A    That's not me getting all her money.  That's her

22   buying something off me with her half of the money.

23   Q    Okay.  So she did get -- you did get a hundred

24   percent of her earnings?

25   A    No.  I got --
```

1    Q    You just sold her more?

2    A    -- 50 percent of her earnings, which is what she

3    promised me, and then she bought something off me after

4    that.

5    Q    Now, you knew that Katelynn, Hannah, Chrissy, Lori,

6    Mary, Keisha, Danielle, Ayla, and Brittany were all drug

7    addicts, didn't you?

8    A    Run the names down again.

9    Q    Katelynn, Hannah, Chrissy, Lori, Mary P., Keisha --

10   A    Yes.

11   Q    -- Danielle --

12   A    Yes.

13   Q    -- Ayla --

14   A    Yes.

15   Q    -- and Brittany --

16   A    Yes.

17   Q    -- you knew they were all drug addicts?

18   A    Yes.

19   Q    And you know what it looks like when a drug addict

20   is in withdrawal or sick, right?

21   A    Yes.

22   Q    Because you had some personal experience with that?

23   A    Yes.

24   Q    They're constantly looking for drugs?

25   A    Yes.

```
 1   Q    And you know that heroin addicts and crack addicts
 2   need a regular supply of drugs to keep from feeling --
 3   going into withdrawal and feeling incredible pain?
 4   A    Heroin addicts, yes.  Not crack addicts.
 5   Q    No?
 6        Now, you supplied all those women with drugs,
 7   didn't you?
 8   A    Small amounts, yes, I did.
 9   Q    So that's a yes?
10   A    In small amounts, yes.
11   Q    Okay.  So if Chrissy testified that she was a crack
12   addict and you supplied her with crack?
13   A    I didn't have too much crack, but she -- well, we
14   found ways to get her some.
15   Q    So is that a yes or no?
16   A    I didn't personally supply it to her.  We found
17   ways to get her some.  We went out and got some from
18   people.
19   Q    Keisha testified that she was a heroin addict and
20   you supplied her with heroin.  Is that true?
21   A    Yes.  When she needed maintenance, yes.
22   Q    Katelynn testified that she was a crack addict and
23   you supplied her with crack.  Is that true?
24   A    She's another one that we went out and got it for
25   her.
```

1   Q    Okay.  Lori testified she was a heroin addict and
2   you supplied her with heroin.  Is that true?
3   A    Yes.  Small amounts.
4   Q    Mary testified that she was a heroin addict and
5   supplied her with heroin.  Is that true?
6   A    Yes.
7   Q    Danielle testified that she was a heroin addict and
8   you supplied her with heroin.  True?
9   A    Yes.
10  Q    And Ayla testified that she was a heroin addict and
11  you supplied her with heroin?
12  A    Yes.
13  Q    Now, you testified earlier that with Brittany you
14  had the 50/50 deal, and from her prostitution earnings
15  you'd take 50 percent off the top, she'd get 50 percent,
16  but then she'd use her 50 percent to buy heroin from
17  you, right?
18  A    Yes.
19  Q    Isn't that the way it all worked with many of those
20  females?
21  A    Not all -- not many of them.  Some of them, yeah.
22  Q    Okay.  Well, let's just look at specific ones.
23  A    Um hum.
24  Q    Keisha testified that she started out 50/50 but you
25  ended up getting all the money?

1   A     That's not true.

2   Q     Okay.  Katelynn testified that she started out

3   50/50 but soon you got all the money?

4   A     Not true.

5   Q     Ayla testified that she started out 50/50 but soon

6   you got all the money?

7   A     Not true.

8   Q     Okay.  Now, multiple witnesses also testified that

9   you paid for rooms at motels in which they prostituted.

10  Is that true?

11  A     Yes.

12  Q     Multiple witnesses testified that you provided cell

13  phones and cell phone minutes to them for use during

14  prostitution.  Is that true?

15  A     Yes.

16  Q     Multiple witnesses testified that when the

17  operation was based out of Lori Crawford's house on

18  Spring Street, that you drove women to prostitution

19  dates or directed others to do so.  Is that true?

20  A     No.

21  Q     You didn't do that?

22  A     No.

23  Q     Okay.  I thought you testified on direct that

24  sometimes you did that.

25  A     No.  Before we went to Mary -- Lori's house, that's

1    what I was doing.  At Lori's house, no, that's not what

2    I was doing.

3    Q    Well, before Lori's house, a lot of it was out in

4    motels, right?  Like Motel 6 and the North Star?

5    A    Yes.

6    Q    But at Lori's house on Spring Street, they weren't

7    doing outdates, outcalls?

8    A    Yes.

9    Q    Okay.  You weren't driving them to any of the

10   outcalls?

11   A    No.

12   Q    And you didn't direct anyone else to do it?

13   A    No.  That was the purpose for me buying a car for

14   them.

15   Q    Okay.  Let's talk about a few of the women a little

16   more closely.

17        You know Katelynn, right?

18   A    Yes.

19   Q    She was using the name Pinky?

20   A    Yes.

21        MR. DARROW:  Can we put up 51A.

22   BY MR. DARROW:

23   Q    Is that Katelynn?

24   A    Yes, it is.

25   Q    You recall she came into court and testified?

```
1    A    Yes, I do.

2    Q    Did you help her prostitute?

3    A    Yes, I did.

4    Q    You knew she was a drug addict?

5    A    Yes.

6    Q    Or she became one at some point?

7    A    She was when I met her.

8    Q    Did you ever -- you did transfer drugs to Katelynn?

9    You said that?

10   A    I took her to buy drugs.  She showed me where the

11   drugs was at, and I bought 'em.

12   Q    All right.  Now, you testified earlier that when

13   Katelynn left her work with you, that you were the one

14   that drove her to New York, right?

15   A    Yes.

16   Q    And that was a little different from Katelynn's

17   testimony, because she testified that you were off the

18   scene and elsewhere so that she felt safe enough to go

19   to New York.

20   A    Yes.

21   Q    Was that false?

22   A    Yes, that was.

23   Q    You know Mandy?

24   A    Yes, I do.

25   Q    Did you help her post the ad reflected in 48D?
```

1          MR. DARROW:  Let's pull that up.

2     A    No.

3     BY MR. DARROW:

4     Q    Now, you testified on direct that sometimes you'd

5     help the sex workers pose correctly so they would be

6     appealing, and sometimes you'd help them write the

7     narrative in the ad so that they'd know what to say.

8     But you didn't do any of that with this, did you?

9     A    Yeah.  They were writing.  They would write past

10    me, and I would tell them if it was good enough or not.

11    Q    Okay.  But did you have any involvement in this

12    post?

13    A    No.

14    Q    She testified that you did.  That was false?

15    A    Yeah.

16    Q    And -- well --

17         Multiple witnesses testified about other women that

18    prostituted for you besides the one that we have talked

19    about, including Delaney, Shorty, Jerricka, Ashley,

20    Amanda, Brittany and Victoria.  You know those women?

21    A    Yes, I know them.

22    Q    Did they all do prostitution work?

23    A    Yes, they did.

24    Q    Were you involved in that prostitution work?

25    A    No.

1    Q    You had nothing to do with it?

2    A    No.  I just know them.

3    Q    Okay.  Do you know if they were also drug addicts?

4    A    Shorty wasn't.  I believe Delaney used crack,

5    and -- who else did you say?

6    Q    Delaney, Shorty, Jerricka.

7    A    Jerricka was.

8    Q    She was a drug addict.

9         Ashley?

10   A    There was three different females on the name

11   Ashley.

12   Q    Really.  You knew three of them?

13   A    Yes.

14   Q    All right.  How about Amanda?

15   A    Amanda was a drug addict.

16   Q    Brittany?

17   A    Brittany used drugs, yes.

18   Q    She was a drug addict?

19   A    Yes.

20   Q    Victoria?

21   A    Victoria -- yes.

22   Q    There were two Victorias, right?

23   A    Yes.

24   Q    Were they both drug addicts?

25   A    Yes, they were.

```
 1   Q    As part of your involvement in their prostitution
 2   activities, did you sometimes supply cell phones to
 3   those women?
 4   A    Yes.
 5   Q    And I think you said you -- well, let me ask you,
 6   as part of your help, did you sometimes pay for motel
 7   rooms?
 8   A    Yes.
 9   Q    Did you sometimes drive them between motels, moving
10   from one to another when one motel got hot?
11   A    Yes.
12   Q    And you spent a fair amount of time at the hotels?
13   A    I wouldn't say that, no.
14   Q    Well, you were -- didn't you say you were helping
15   with security, making sure they were safe?
16   A    Yes.
17   Q    Wouldn't you have to be at the motel to do that?
18   A    No.
19   Q    Okay.  Now, Mandy testified that she fell in love
20   with you.
21   A    Yes.
22   Q    Do you recall that?
23   A    Yes, I recall that.
24   Q    All right.  Do you think that testimony's credible?
25   A    Yeah, I think she did at one point.
```

1    Q    All right.  And she testified that you sort of

2    romanced her, and that -- told her that you were going

3    to be together and that you loved her?

4    A    Absolutely not.

5    Q    That never happened?

6    A    No.

7    Q    Did you ever put together a -- sort of a love video

8    with Mandy, showing pictures of the two of you together,

9    captioned "We Ride Together"?

10   A    A love video?

11   Q    Well, let's set aside that characterization of it.

12   A video of you and her and lots of pictures of you two

13   together and pictures of her, and at the beginning it's

14   set to music, and at the beginning it says "We Ride

15   Together"?

16   A    I don't recall it, but I used to make a lot of

17   videos.

18   Q    So you are --

19   A    I don't recall that particular video.

20   Q    -- saying you don't recall?

21   A    I don't recall making that type of video with her.

22   I know I made one with my wife, but I don't recall

23   making one for her.

24   Q    Okay.  Mandy testified that she worked with you

25   from mid-2015 to mid-2016.  Is that true?

1    A    No.

2    Q    Now, Katelynn also testified that she fell in love

3    with you.  Do you think that testimony was credible?

4    A    No.  She didn't fall in love with me.

5    Q    And she also testified that you told her that you

6    loved her.  Did you tell her that?

7    A    No.

8    Q    That didn't happen?

9    A    No.

10   Q    All right.  Katelynn testified that when she met

11   you she was 17 years old, homeless, and carried all her

12   possessions in a couple pillow cases.  Do you remember

13   that?

14   A    Actually she said she lived with her mom when she

15   met me.

16   Q    Well, how about then a month in?  At some point did

17   you realize she was -- everything she had she carried in

18   two pillow cases?

19   A    No.  She stayed in hotels.  She didn't -- never

20   carried two pillow cases.

21   Q    Okay.  Do you remember that you knew she was 17

22   years old?

23   A    When I found out she was 17 years old, that was way

24   after we had met.

25   Q    Okay.  Because she testified that she gave you her

1    birth certificate and that you found out -- Cassandra

2    came and told you, "You know she's 17?"

3    A    That was false.

4    Q    Okay.  Katelynn testified that back at that time,

5    when she was working with you, you called her your main

6    bitch.  Did you call her that?

7    A    No.

8    Q    Now, you testified that -- on direct that you were

9    working on a photo business?

10   A    Um hum.

11   Q    Right?

12   A    Yes.

13   Q    It was part of the pornography industry?

14   A    Yes.

15   Q    And it sounded like you were saying, "Hey, I was in

16   the photo business trying to get photos.  I wasn't in

17   the pimping or prostitution business"?

18   A    That's not -- I don't like pimp.

19   Q    I'm sorry?

20   A    I don't like the phrase "pimps."

21   Q    And what phrase do you like?

22   A    Hey, you can call it whatever you want.  I'm not

23   one of those.

24   Q    Okay.  Well, let me try and rephrase the question

25   in a different way.  I don't want to offend your

1    sensibilities.

2         It sounded like you were distinguishing between,

3    you know, selling photographs on the one hand and the

4    sex business on the other hand.

5    A    Um-hum.  There was a --

6    Q    Fair to say?

7    A    There was a distinguished -- there was a separate

8    thing.

9    Q    Yeah.  And you were in the photo business?

10   A    Yeah, I was.

11   Q    Okay.  You were helping out a little bit, maybe,

12   with some sex workers, but you weren't in that line of

13   work?

14   A    Yes.

15   Q    That was not your business?

16   A    That's not -- my main business was porn.

17   Q    Okay.  So you were or were not in the commercial

18   sex business?

19   A    I helped them out.

20   Q    So is that a yes?

21   A    Yes, I helped them out.

22   Q    Okay.  Let me show you -- I'll put an

23   exhibit sticker on it -- something we have marked as

24   141, which is a single page, handwritten page.  See if

25   you recognize that.

1   A     Yes.

2   Q     Is that your handwriting?

3   A     Yes, it is.

4   Q     Okay.  And is that a list of sex acts with prices?

5   A     Yes, it is.

6             MR. DARROW:  Okay.  Your Honor, I move for

7   admission of this.

8             THE COURT:  Any objection?

9             MR. KAPLAN:  If I could voir dire?

10            THE COURT:  Yes.

11                   VOIR DIRE EXAMINATION

12  BY MR. KAPLAN:

13  Q     Brian, can you explain where this came from?

14  A     Yes.

15        That's scrap paper from my business portfolio.

16  When I started creating the business called Dirty Little

17  Secrets, it was -- I had -- I actually had investors for

18  that business, and that's scrap paper from it.  They

19  took the whole portfolio full of paperwork that I did on

20  it.  I spent months creating that.  And that's a price

21  list that I did from a -- the Dirty Little Secrets had a

22  porn company, and in the porn company, I figured out a

23  way to sell porn without paying porn -- porn stars to

24  star in it.

25        Instead, the people that wanted to star in it, they

```
 1    would pay and co-produce the videos, and those were the

 2    prices, depending on what they wanted to do.

 3    Q    So this had nothing to do with the prostitution

 4    business?

 5    A    No.  If he brought up all the stuff that was taken

 6    of that --

 7              MR. DARROW:  Your Honor, I apologize for

 8    interrupting.

 9    A    -- you will see the business production.

10              MR. DARROW:  I thought voir dire was going to

11    be limited to just foundation of the exhibit, not --

12              THE COURT:  For the authenticity and --

13              MR. DARROW:  Yeah.

14              THE COURT:  Yes.

15              MR. KAPLAN:  I mean, I think when you voir

16    dire, the jury should understand where this came from.

17              THE COURT:  Well, you are not -- you can do

18    that on cross examination.  The question is whether it's

19    to be admitted at this point.  So --

20              MR. KAPLAN:  No objection.

21              THE COURT:  Okay.  It is admitted.

22              (Government's Exhibit 141 was received in

23    evidence.)

24              MR. DARROW:  May I publish it, your Honor?

25              THE COURT:  Yes.
```

```
1                    CONTINUED CROSS EXAMINATION

2    BY MR. DARROW:

3    Q    So this is your handwriting, Mr. Folks?

4    A    Yes, it is.

5    Q    And it looks like a -- you got blow job, a hundred

6    dollars; pussy, 150; anal, 200 -- and it goes up from

7    there -- down to the no-limit soldier for 500?

8    A    Yes.

9    Q    You are saying this had nothing to do with the

10   prostitution that's involved in this case?

11   A    Absolutely not.

12   Q    This was something completely separate?

13   A    Yeah.  It says Dirty Little Secrets Startup on the

14   top.

15   Q    Okay.  So you -- okay.

16        Now, do you recall testimony about this still in

17   443?  Do you recognize that woman?

18   A    Yes.

19   Q    Now, this video, which you recall, you posted on

20   YouTube?

21   A    Yes.

22   Q    Okay.  And that's Katelynn?

23   A    Yes.

24   Q    She's advertising her body there.  Isn't she?  It's

25   not an advertisement for pictures.
```

1    A    She is advertising a date.

2    Q    A date?

3    A    Yes.

4    Q    In other words, a date to sell her body?

5    A    No.   That's part of my Dirty Little Secrets setup.

6    I was making commercials preparing for Dirty Little

7    Secrets because there's a computer part.   There's an

8    actual building like in a -- pictures I took.   There was

9    actual floor plans that I drew for the license --

10   Q    So at most she is advertising photos here, or is

11   she advertising for someone to engage in oral sex with

12   her?

13   A    She is advertising Dirty Little Secret dates.   If

14   you read the beginning of that proposal, it explains

15   what a Dirty Little Secret date is.

16   Q    I'm sorry.   Let me try the question again.

17        In this video which you took and posted -- right --

18   of Katelynn --

19   A    Yes.

20   Q    -- is she talking about selling her body or is she

21   talking about selling photographs?

22   A    She is talking about a Dirty Little Secret date.

23   It's neither photographs nor her body.

24        MR. DARROW:   Okay.   Can we play the tape, the

25   video, please, and shift to the digital.

```
 1              (A digital recording was played in open
 2   court.)
 3              MR. DARROW:  Cut.
 4   BY MR. DARROW:
 5   Q    So you took that video?
 6   A    Yes.
 7   Q    And you posted the video on YouTube?
 8   A    Yes.
 9   Q    Did you tell Katelynn what to say in the video?
10   A    Yes.
11   Q    And did you tell her how to move and how to pose?
12   A    I scripted it, yes.
13   Q    You scripted it?
14   A    Yes.
15   Q    Okay.  Do you recall being interviewed after your
16   arrest in July 2016?
17   A    Yes.
18   Q    And do you recall the DEA agent telling you that
19   they had recorded calls of you talking about dope deals
20   and undercover drug buys?
21   A    I don't recall that part.
22   Q    Okay.  So you don't recall saying that that was
23   impossible and those dope deals didn't actually go down?
24   A    I could have said it.  I don't recall it.  That
25   was --
```

1    Q    You don't remember being asked?

2    A    This is what, 2019?  That was 2016.  I don't recall

3    exactly what I said.

4    Q    You remembered a lot of details going way back to

5    2012 on direct.

6    A    Because y'all was discussing them and y'all was

7    showing them already.  Nobody showed me that.

8    Q    Okay.  Would it refresh your memory if I showed you

9    the transcript of your statement?

10   A    Sure.

11   Q    I'm approaching you with a transcript of your

12   post-arrest statement, and drawing your attention to

13   pages 19 and 20.

14   A    Which part you want me to read?

15   Q    Probably just those two pages.

16   A    Just those two pages?

17   Q    Whatever it takes to refresh your memory.

18   A    Yes, I remember this.

19   Q    Great, thanks.

20        Does that refresh your memory?

21   A    Yes, it does.

22   Q    Do you recall the DEA agent who was questioning you

23   asking you about the -- what we now know are the

24   undercover buys and saying that they had recorded phone

25   calls of you talking about the dope deals?

```
1    A    Yes.
2    Q    And do you remember that you were -- replied that
3    that was impossible?  The deals didn't actually go down?
4    A    I didn't know what they's was talking about at that
5    time, but yes, that's what I said.
6    Q    Okay.  But you didn't say that you didn't know what
7    they were talking about.  You told them that didn't
8    happen.
9    A    Yeah, because I didn't know what they were talking
10   about.
11   Q    Do you recall, when being pressed about that, you
12   said, "I'm not the drug dealer.  I'm the violent one"?
13   A    Yes, I remember that too.
14   Q    Okay.  Were you the violent one?
15   A    I'm the fighter.
16   Q    Okay.  They were talking about in connection with
17   the drug trafficking at the time.
18   A    They were talking about in general on the street.
19   Q    Okay.
20   A    My connection to everybody on the street.
21   Q    So are you the violent one?
22   A    I'm the fighter.
23   Q    Okay.  And then they pressed you whether that meant
24   that you were the muscle, the problem solver, and I
25   think you indicated yeah?
```

```
1   A    Right.  At first I said something different, and
2   then I said -- I agreed with them.
3   Q    Okay.  Now, do you remember telling the agents,
4   "I'm not a stupid person.  I study people"?
5   A    Yes.
6   Q    Okay.  And that's true, wasn't it?
7   A    Yes.
8   Q    Because before you get involved with someone, you
9   study them, size them up, correct?
10  A    No.
11  Q    Oh, you don't?
12  A    No.
13  Q    Okay.  Well, then what did you mean when you said,
14  "I study people"?
15  A    I am a chess player.  I watch movements on the
16  chess board, and I anticipate what's going to happen.  I
17  like to play chess.
18  Q    You didn't mention chess at the time, but let me
19  move on to a different question.
20       Fair to say, Mr. Folks, that you are smart enough
21  and attentive enough to know that the young women who
22  worked for you that we have been talking about were
23  desperate and needy?
24  A    No, I wouldn't say that.  I wouldn't say any of
25  them women were desperate and needy.  They were needy in
```

1   a sense of their drug habits, but they -- the picture

2   they gave here is totally different from the picture in

3   the streets.

4   Q    You figured out that many of them were abused,

5   homeless drug addicts; fair enough?

6   A    I didn't know anything about anybody being abused

7   until I heard it in here.

8   Q    Okay.  What about when Danielle showed you her

9   arms?

10  A    Danielle never showed me her arms.  I was looking

11  through pictures to see that myself.  Danielle never

12  showed me her arms like that.

13  Q    So she testified falsely?

14  A    Yes.

15  Q    You didn't know that Katelynn was homeless and

16  addicted to drugs?

17  A    No.

18  Q    You didn't know that Keisha's father was a heroin

19  addict and he brought Keisha to you?

20  A    Yes, I knew that.

21  Q    You did know that?

22       And you knew about Mandy's history of abuse and

23  losing her kids?

24  A    No.  I know Mandy had a situation which she had

25  just lost her kids not too long ago, but I didn't know

1    the whole situation.

2    Q    Okay.  You knew that Mary was a heroin addict?

3    A    Yes.

4    Q    And she was in withdrawal when you first

5    interviewed her, correct?

6    A    No, she wasn't.

7    Q    She testified she was, so that was false then?

8    A    Yes, that was false.

9    Q    All right.  You knew that Ayla was a homeless

10   addict living out of a pickup truck?

11   A    Yes.  That I knew.

12   Q    Okay.  Mr. Folks, isn't it true that you recruited

13   young, addicted females to work for you because you

14   could control them?

15   A    No.

16   Q    Do you recall testimony from several witnesses that

17   Ayla, during the time she worked with you, went from

18   her -- her appearance deteriorated?

19   A    Her appearance deteriorated not while she was

20   working with me.  While she was running the streets.

21   When she get bad, she'll come back to me to help her

22   pick herself back up.

23   Q    So you do remember that?

24        I apologize.  Let me ask you again.

25        Do you remember that Ayla, during the time that she

1    worked with you -- her appearance deteriorated?

2    A    Her appearance didn't deteriorate when she worked

3    with me.  Her appearance deteriorated when she started

4    running the streets on her own.

5    Q    Okay.

6    A    And when she would get bad, she will come back to

7    me to help her pick herself back up.

8    Q    So it wasn't anything to do with her work with you

9    that she started looking bad?

10   A    No.

11   Q    You were trying to help her and make her look

12   better?

13   A    Yeah.  Every time she came back, I washed her.  I

14   gave her a place to sleep.  I fed her.  I gave her

15   whatever she needed.  I gave her clothes and everything.

16   Q    And do you recall Danielle testifying that after

17   prostituting for you and getting drugs from you her

18   appearance became so bad that clients started turning

19   her down and she had to leave?

20   A    You asking me did that really happen or do I recall

21   her saying?

22   Q    That's a smart distinction.  Do you recall her

23   testifying to that?

24   A    Yeah, I recall her saying that.

25   Q    Was that dishonest?

1    A    Yes, it was.

2    Q    Do you recall Katelynn testifying that she never

3    said no to you?

4    A    I don't remember her saying that.

5    Q    Did she ever say no to you?

6    A    For --

7    Q    About when you asked her to do something.

8    A    Depends on what I asked her to do.  Like everybody

9    says no at some point.

10   Q    So you don't remember?

11   A    I don't remember her saying that, no.

12   Q    Okay.  Do you remember Mandy doing whatever you

13   asked?

14   A    Do I remember her doing whatever I -- absolutely

15   not.

16   Q    No?

17   A    No.

18   Q    But you do remember she was in love with you?

19   A    Yes, I do.

20   Q    And you know she has your name tatooed on her?

21   A    Against my wishes, yeah.

22   Q    Did you ever tell Mandy that she had to undress and

23   put the red apron on?

24   A    I didn't tell her she had to.  It was a game we

25   played that involved that red apron.

1    Q    Okay.  Was it a game that involved Mandy getting

2    undressed and walking around naked except for the red

3    apron?

4    A    It was a game that involved Mandy, me and Hannah,

5    all three of us walking around in that apron.

6    Q    Oh.  So you got undressed and put the red apron on?

7    A    Yes.

8    Q    Okay.  Now, do you recall Mandy testifying that a

9    couple times when you got angry at her when she -- well,

10   one time she had -- you had started packaging heroin

11   instead of in 10 separate ticket bundles, you had put

12   a -- the same amount of heroin in a single baggie and

13   that she had gotten that wrong and you reprimanded her?

14   A    I don't recall again.  I recall that incident, but

15   I didn't get angry at her.

16   Q    Okay.  So you didn't have to reprimand her?

17   A    No, there were -- not to reprimand.

18   Q    Okay.  Keisha also did whatever you asked, didn't

19   she?

20   A    No.

21   Q    Okay.  Well, wouldn't she do some pretty remarkable

22   things if you gave her heroin?

23   A    Like?

24   Q    Well, isn't it -- will you concede that you

25   sexually and physically abused her?

1    A    No.  Absolutely not.

2    Q    All right.  And Chrissy agreed to do pretty much

3    anything you asked or told you in texts that she would

4    do that, didn't she?

5    A    Yes, she did.

6    Q    But she's the one you called Alpo?

7    A    Say that again.

8    Q    Did you call Chrissy "Alpo"?

9    A    Not in a sense that you putting it.

10   Q    Well, did you or didn't you?

11   A    Not in a sense that you putting it.

12   Q    So you called her Alpo in some sense?

13   A    Yeah, in total different sense.  Yes.

14   Q    Okay.  And was that because she'd do whatever you

15   told her to do like a dog?

16   A    Absolutely not.

17   Q    All right.  Now, you recall at the end of her

18   testimony yesterday when she came -- she was called by

19   your team, she had a lot of trouble talking about

20   something that happened once, something that she'd never

21   talked about before?

22   A    Yes.

23   Q    And she said that it involved a sexual assault by

24   you in which she was left with bruises?

25   A    Yes.

```
1    Q    You think she was lying about that?

2    A    I know she was lying about that.

3    Q    Mr. Folks, do you understand that when you have

4    people that will do anything for you and they're under

5    your control, that you have to be careful with that

6    control?

7    A    I don't put nobody under my control, so I don't

8    understand that.  I don't want anybody under my control.

9    Q    Well, let's think about that for a sec.

10        Didn't you shoot these women with a BB gun?

11   A    Say that again.

12   Q    Didn't you shoot some of these women with a BB gun?

13   A    No.

14   Q    You didn't shoot Keisha with a BB gun?

15   A    No.

16   Q    You didn't shoot Chrissy with a BB gun?

17   A    No.

18   Q    They both testified falsely about that?

19   A    I don't remember Chrissy even saying that, but -- I

20   remember Keisha saying that, but not Chrissy.

21   Q    Okay.  Was Keisha testifying falsely about that?

22   A    Yes.

23   Q    Okay.  Do you recall Keisha and Mary testifying

24   that you urinated on them?

25   A    Yes.
```

1    Q    Was that true?

2    A    Yes.

3    Q    And the pictures that were introduced into

4    evidence, that's you urinating on those two women?

5    A    Yes.

6    Q    All right.  And do you recall testimony that

7    Keisha, Victoria and Ayla all allowed you to put walnuts

8    up their anuses?

9    A    Victoria and Ayla -- actually Ayla put them up

10   there herself.  And Victoria, I helped, yeah.

11   Q    And how about Keisha?

12   A    Keisha wasn't a part of that.

13   Q    Really?

14   A    Yeah.

15   Q    Because she testified that she was and she found it

16   so upsetting that she was crying and you criticized her

17   for being upset about it.

18   A    Well, you have the video.  She's not in it.

19   Q    Okay.  Do you remember her testimony?

20   A    Yes, I remember her testimony.

21   Q    And you think she got on the stand and lied about

22   that?

23   A    Among other things, yes.

24   Q    Isn't it fair to say that you amused yourself by

25   seeing how far you could degrade and humiliate those

```
 1    women?
 2    A    No.
 3    Q    Did you call yourself a walnut man?
 4    A    Yes, I did.
 5    Q    And didn't you say in Exhibit 128, "I'm just
 6    pissing on bitches, man.  I'm gonna see how far I can
 7    go," and giggle?
 8    A    Yes.
 9    Q    Okay.  So you weren't amused by that?
10    A    I was amused by the concept.
11    Q    But it wasn't just a concept.  You did it.
12    A    It was an R. Kelly concept.
13    Q    You did it, didn't you?
14    A    Yes, I did it.  I wasn't amused though.
15    Q    Do you want to play the video?
16    A    You can.
17              MR. DARROW:  Okay.  Let's play 128.
18              (A digital recording was played in open
19    court.)
20              MR. DARROW:  Stop that.
21    BY MR. DARROW:
22    Q    You're not amused there?
23    A    No.  "Pee on You" is a video that Dave Chappelle
24    made, and R. Kelly did --
25    Q    I apologize.  Are you --
```

1    MR. KAPLAN:  Objection, your Honor.  I think
2    the witness should be allowed to answer the question.
3    THE COURT:  The question called for a yes or
4    no, so let's go back to the original question.
5    MR. DARROW:  Okay.
6    BY MR. DARROW:
7    Q    The question --
8    THE COURT:  You can -- you can ask further
9    questions when you get a chance to ask him.
10   MR. DARROW:  Thanks.
11   BY MR. DARROW:
12   Q    And I apologize.  Maybe we're going around in a
13   circle here, but the question was, didn't you find it
14   amusing to be doing this video about peeing on bitches,
15   as you put it?
16   A    No.
17   Q    In addition to subjecting those women to the
18   degrading and humiliating acts we have been talking
19   about, you also videotaped yourself doing that stuff,
20   didn't you?
21   A    Say that again.
22   Q    Well, in other words, you didn't just urinate on
23   Keisha and Mary.  You videotaped yourself doing it,
24   right?
25   A    That was the purpose of it.  It was part of the

1    thing.

2    Q    Right.  And then you video'd yourself describing it

3    and talking about it?

4    A    It's part of the porn video.

5    Q    Okay.  And you also video'd yourself introducing

6    the so-called Walnut Challenge?

7    A    Part of the video series.

8    Q    Now, your attorney said in selecting the jury that

9    you and the young women that worked for you -- for you

10   benefit equally.  Do you believe that?

11   A    Depends on what you consider equally.

12   Q    Yeah, I guess it does.

13   A    Yeah.

14   Q    Did Keisha benefit equally from what you did to her

15   near the site depicted in Exhibit 42?

16   A    Again it depends on what you mean.  What is that?

17   Q    That's the dumpster that Keisha said you raped her

18   behind.

19   A    That didn't happen.

20   Q    That never happened?

21   A    No.

22   Q    Okay.  And how about 47B?  Was Hannah benefiting

23   equally in this picture?

24   A    Benefit equally to what?

25   Q    To what the benefit that you got out of it.

1    A    The benefit that I got out of it?  I got pictures
2    to add to my business; what she got out of it, she got
3    paid for the pictures.  So in that sense, yeah, it was
4    equal.  She wanted to get paid for the pictures; I
5    wanted the pictures.
6    Q    Okay.  And how about Mandy, did she benefit equally
7    in your relationship with her?
8    A    Benefit?  I don't think she -- I think Mandy
9    benefited more.
10   Q    Really.
11   A    Yeah.
12   Q    She's now facing a drug charge for conspiring with
13   you to distribute drugs and is looking forward to a
14   federal sentencing.  You think she benefited equally?
15   A    Well, I think she benefited more again because
16   Mandy's the only one that's only been locked up for six
17   days.  Everybody else was locked up.  Mandy was
18   released, so she had benefited more.
19   Q    Well, you don't know what her sentence is going to
20   be, do you?
21   A    I know she hasn't been in jail in the past three
22   years, so that's benefit enough.
23   Q    I apologize.  This is a yes or no to my question.
24   A    Excuse me?
25   Q    She hasn't been sentenced yet, has she?

```
 1    A    I don't know.
 2    Q    And pulling up 127C, was Mary benefiting equally
 3    here?
 4    A    Yes.
 5    Q    You're urinating on her, and you think she is
 6    benefiting equally?
 7    A    She got paid for that.  That's what she wanted.
 8    Q    And how about here in 49B?  If you look at the next
 9    page.  And the next page.  Do you know what all those
10    are?
11    A    Yes.
12    Q    Those are pictures that you took of her naked butt
13    in exchange for a cigarette, right?
14    A    Yes.
15    Q    And you think that was benefiting equally?
16    A    Yes.
17    Q    And how about 126C?  Is Keisha benefiting equally
18    here?
19    A    Again, she got paid for that.
20    Q    So you are peeing on her, and she's benefiting
21    equally?
22    A    She wanted to get paid, and I wanted to do a video,
23    a specific series.  She volunteered to do it.
24    Q    All right, Mr. Folks.  Now, how about Danielle?
25    She testified that during a -- a couple episodes of
```

1   unwanted sex with her, you forced her, during fellatio

2   until she was gagging and crying.  Did she benefit

3   equally?

4   A    That never happened.

5   Q    Oh, it didn't happen.  So she was testifying

6   falsely?

7   A    Like videos on the computer that you all have.

8   Q    Okay.  And do you remember Mandy testifying that

9   Danielle came to her and asked if there anything she

10  could do to reduce the pain of oral sex with you?

11  A    I remember Mandy saying that.

12  Q    Was that false testimony?

13  A    Exactly.

14  Q    Did you keep a list of your sexual acts with these

15  young women?

16  A    A list of my sexual acts?

17  Q    Yeah.

18  A    I don't -- no.  I don't even understand what

19  that -- like a list of everything --

20  Q    Well, let's take a look at this --

21        MR. DARROW:  136 in evidence?  No?

22  BY MR. DARROW:

23  Q    I'm showing you copies of one of the items that was

24  taken out of the apartment you were in, you lived in

25  when you were arrested.

```
 1    A    Can I open it?

 2    Q    Go ahead.

 3    A    You want me to look at it?  Can I look through it?

 4    Q    You can go ahead and look through it.

 5    A    Okay.  Yes.

 6    Q    Does that look familiar?

 7    A    Yes, all of these.

 8    Q    Are these notes that you took at the time about

 9   your activities?

10    A    That's -- these are videos.

11    Q    Videos --

12    A    Yes.

13    Q    -- of things, but these are notes that you took of

14   what was happening in the videos?

15    A    They are quick -- I was trying to organize them.

16   As you can see, they a time frame on the side, and

17   there's a note of what's going on in the video.

18              MR. DARROW:  Your Honor, we move for admission

19   of this.

20              THE COURT:  And what's the number?

21              MR. DARROW:  136.

22              THE COURT:  All right.  Any objection to 136?

23              MR. KAPLAN:  No, your Honor.

24              THE COURT:  So admitted.

25              (Government's Exhibit 136 was received in
```

1    evidence.)

2              MR. DARROW:  Okay, can we publicize on the

3    ELMO.

4    BY MR. DARROW:

5    Q    So "Good Things Come to Those Who Hustle."  Is this

6    a cover of a -- of a journal or booklet that you kept?

7    A    Yeah.  I bought it like that.  I didn't write that.

8    Q    Oh, I know.  Of course.  But this was yours?

9    A    Yes.

10   Q    Yes.  And looking at this page here, so you are

11   saying that these were videos that you made?

12   A    Actually, they're videos that -- there was cameras

13   in my house.

14   Q    I'm sorry.  It's just a yes-or-no question.

15   A    Okay, ask me again.

16   Q    Okay.  Is it your testimony that these -- these

17   are -- you made videos of these things you are

18   describing here?

19   A    I didn't make anything, no.

20   Q    You did not make videos?

21   A    There were cameras in my house --

22             MR. KAPLAN:  Your Honor, I mean, it's fine to

23   say it's a yes-or-no answer, but if it can't be answered

24   in a yes or no, then it's a problem.

25             THE COURT:  Well, no, I appreciate that, but

1    the questions have been yes or no.  So let's go back to

2    the initial question in this series.

3              MR. DARROW:  Okay.

4    BY MR. DARROW:

5    Q    And I apologize.  I was trying to understand what

6    these notations were.  And I thought you said that they

7    were videos that you had made.

8              MR. KAPLAN:  Judge, the reason the prosecutor

9    can't understand them is because he asks a question,

10   doesn't allow the witness to answer it so he can

11   understand it.

12             THE COURT:  Well, you are able to question the

13   witness when it's your turn.  So the question -- did you

14   hear the question?

15             THE WITNESS:  Yes.  Ask -- ask me again,

16   please.

17             MR. DARROW:  Okay.

18             THE COURT:  Okay.  You want to ask it again?

19   BY MR. DARROW:

20   Q    Let me try and do this a different way.  Mr. Folks,

21   is this your handwriting?

22   A    Yes.

23   Q    And the third one down there, it says, "5:31,

24   fucking in kitchen; 5:33, fucking Tori's friend; 24:26,

25   fucking; 2:56, talking about fucking; 1:18, fucking

1    Brianna; 0:35, fucking Brittany; 1:02, getting head from

2    Amber; 0:26, fucking Jess in the ass; 5:02, getting head

3    from Jess."

4        Why don't you tell us what you are talking about.

5    A    Those are videos.  There were cameras in my house,

6    and all of those are not me.

7    Q    Oh.

8    A    Those are what's going on in the video.

9    Q    So these are other people doing these things?

10   A    This -- I am in some of 'em, but these are a

11   whole -- everybody that came in and out of my house.

12   Q    Okay.  Which house was this?

13   A    103 North Union.

14   Q    That's the really small place you are talking

15   about?

16   A    Yes.

17   Q    Okay.  So who were the other people that were doing

18   these things besides the females?

19   A    Everybody that was in there.

20   Q    Really.  Everybody was doing it?

21   A    Everybody that came in there.  When I'm not

22   there --

23   Q    They were all allowed to do all these things with

24   the women working for you?

25   A    These are not the women that's working with me.

1    These are just women, and when I looked at the videos, I

2    see what's on the video, and I write it down.

3    Q    Okay.  They're not the women working with you;

4    they're just women.  Didn't Brittany come in and testify

5    yesterday?

6    A    Who?  Brittany?  Yeah, Brittany came in here.

7    That's not the same Brittany.

8    Q    It's a different Brittany?

9    A    That's Brittany Love.  That's a total different

10   person.

11   Q    Okay.  Let's look at another page here.

12        There's a 1:12, pissing on Mary.  Was that a

13   different person?

14   A    No.  That's the same Mary.  That's the picture you

15   just showed.

16   Q    Okay.  And Brittany sucking dick; is that the same

17   Brittany that testified yesterday?

18   A    Where?

19   Q    Down at --

20   A    No.

21   Q    That's a different Brittany?

22   A    Yeah.

23   Q    Quite a household.  Seen enough.

24        And it goes on for several pages, right?

25   A    Yeah.  And you have all those videos too.

1    Q    All right.

2              THE COURT:  All right.  It is quarter of.

3    This is usually our time for a break.  Let's take a

4    15-minute recess.

5              MR. DARROW:  Thank you, Judge.

6    (Court was in recess at 2:44 p.m.)

7    (The following was held in open court with the jury

8    present at 3:04 p.m.)

9              THE COURT:  Okay, Mr. Darrow?

10             MR. DARROW:  Thank you, your Honor.

11                  CONTINUED CROSS EXAMINATION

12   BY MR. DARROW:

13   Q    Mr. Folks, I wanted to drop back and ask you a

14   couple isolated questions before we jump back into the

15   mainstream of the cross.

16         Starting out, we talked a little bit about this, I

17   think, earlier.  Do you recognize that?

18   A    Yes.

19   Q    Okay.  Those are the -- that's the contents of the

20   rue21 bag, and you recall that Mary P. and Mandy both

21   testified that these were the things they used to bag

22   drugs during bagging-up sessions for you.  Do you

23   remember that testimony?

24   A    Yes, I remember.

25   Q    And you are telling the jury today that that was

1    false.  They never bagged drugs for you, right?

2    A    They bagged drugs with me, but this wasn't the

3    stuff that they were using.

4    Q    Okay.  But we may be making progress then.  So you

5    are now saying that they did bag drugs with you?

6    A    Yeah, I said that before.  I was there when the

7    drugs were being bagged up.

8    Q    Were they bagging drugs that were your drugs?

9    A    No.  They was bagging drugs that -- everybody that

10   had drugs in that house, they were bagging 'em.

11   Q    Were some of those drugs yours?

12   A    Yeah.  I had a portion.

13   Q    Okay.  So they were bagging drugs for you then too?

14   A    No.  I was mainly controlling my own.

15   Q    Okay.  And I'm confused now.  Were Mary and Mandy

16   bagging drugs for you or not?

17   A    No.  I didn't have enough drugs or enough money to

18   pay them to bag for me.

19   Q    Okay.  So was it your testimony that the packaging

20   of your drugs you did yourself?

21   A    For the most part.  Not always.  I didn't like

22   doing it.

23   Q    Okay.  So let me just ask one more time.  Did Mary

24   and Mandy bag drugs for you or not?

25   A    Not.

1    Q    Okay.  So who bagged your drugs?

2    A    At one point I had -- what's her name? -- Chelsea.

3    She would help me, because me and Chelsea was kind of

4    dating, so she would help me.  Who else helped me?  Um,

5    Amber helped me.  Um, basically anybody that -- if I was

6    dating somebody, I'll ask them to help me.

7    Q    Okay.  So you had young women bagging for you.  It

8    just wasn't Mary and Mandy.

9    A    Yeah.

10   Q    Okay.  Let me ask you a couple follow-up questions

11   from your direct.

12        Do you recall testifying that later in your

13   relationship with Keisha, that she'd call you once in a

14   while when she needed something but it was pretty

15   sporadic?

16   A    Yes.

17   Q    Okay.  Do you remember the phone call chart that

18   counsel showed you showing how many calls you had with

19   Keisha during a two-week period in 2016?

20   A    I believe so, yes.

21   Q    It was 65 calls.

22   A    Okay.

23   Q    Sounds like quite a bit of contact.  No?

24   A    That wasn't always with me, though.

25   Q    Oh.  Because other people had your phone sometimes?

1    A    That was the house phone.  If you look at that

2    list, my name is on that list too that got phone calls.

3    Me too.

4    Q    Okay.  That's the phone that you had on your person

5    when you were arrested --

6    A    Yes.

7    Q    -- and all four of the undercover buys were

8    negotiated through?

9    A    I believe so.

10   Q    Okay.  And do you remember testifying about the

11   time that the gun was seized from the Durango and you

12   were stopped?

13   A    Yes.

14   Q    Were you trying to say that you were framed?

15   A    I don't know what you want to call it.  I'm trying

16   to say that I never saw that gun; I never touched that

17   gun; I never handled that gun, anything.

18   Q    And I apologize.  I thought you -- I was unclear as

19   to how you were describing what happened.  You said that

20   they were following, that you got in front, and then you

21   were followed, and all these cars came in --

22   A    And converged in --

23   Q    -- and it sounded like you thought you were framed

24   somehow.

25   A    In a way I do feel like that.

1    Q    Okay.  How were you framed?

2    A    Somebody obviously put a gun in there if they found

3    a gun in there and told the police, and they came to get

4    me for it, and that's the first thing he asked me, not

5    my name, not "do you know what I am pulling you over

6    for."  Just, "Hey, Brian, got your gun on you today?"

7    That's not normal.  And we had a hearing on that, and he

8    agreed that that's what he did.

9    Q    Well, I can't agree with that, but you did have a

10   hearing on it.  But let me ask a different question.

11        You told the police at the time that night that

12   they weren't going to find any of your fingerprints on

13   the gun, right?

14   A    Yes.

15   Q    But you also said that you didn't know there was a

16   gun in the car.

17   A    Yes.

18   Q    Okay.  They didn't find the gun until they

19   exercised the search warrant later.

20   A    I don't know at what point they found it, but they

21   eventually found it, you see.

22   Q    Yeah, they found it when they exercised the search

23   warrant to search the car.

24   A    Yes.

25   Q    They seized the car, right?

1    A    Yes.

2    Q    All right.  But you told them that your prints

3    wouldn't be on the gun that same night that they stopped

4    the car.

5    A    No.  I told them that after I got charged for the

6    gun two years later.

7    Q    Ah, okay.

8         All right, let's move along.  Several witnesses --

9    let me strike that.

10        Did you ever use sex for revenge against these

11   women working for you, or punishment?

12   A    No.

13   Q    So did you have a video on your hard drive

14   depicting you and a young woman captioned "Fucking

15   Jessica for Revenge"?

16   A    Yeah.

17   Q    Okay.  But you weren't using sex for revenge?

18   A    No.  That was what we were doing.

19   Q    All right.  Several witnesses testified that you

20   told them, "If you violate me, I'll violate you."  Did

21   you tell them that?

22   A    No, not in that context.  No.

23   Q    Well, did you tell them that in any context?

24   A    No.  I've made statements about if somebody violate

25   me, I'm going to violate back.

1   Q    Okay.  So it sounds like it's a yes to my question?

2   A    No, it's not a yes to your question.

3   Q    When you talk about violating a woman, you mean

4   punishing, correct?

5   A    No.

6   Q    Did you ever threaten to expose people as part

7   of -- a woman as part of a violation?

8   A    Not to my knowledge, no.

9   Q    Let me see if I can refresh your memory, okay?

10  A    Um hum.

11  Q    I am approaching you with an exhibit marked 107B.9

12  reflecting a Facebook communication.

13  A    Which part?

14  Q    Just read the whole thing.

15  A    Okay.

16  Q    Between you and another woman.

17       MR. KAPLAN:  Judge, could I look at that,

18  please?  I don't know if -- if it's refreshing his

19  memory, I don't know what document it is that he is

20  looking at.

21       THE COURT:  Well, if he is going to testify

22  from the document, at that point you can see it.  But he

23  is just looking and refreshing recollection, which means

24  he will testify from his own memory at this point.  So

25  at this stage, you don't necessarily get to see the

1    exhibit.

2         So does that refresh any recollection that you may

3    have now about --

4              THE WITNESS:  This conversation, yes.

5              MR. KAPLAN:  Judge, may we --

6              THE COURT:  -- the subject matter?

7              MR. KAPLAN:  Judge, may we approach, please?

8              THE COURT:  Okay.

9    (The following was held at the bench.)

10             MR. KAPLAN:  My problem with not knowing what

11   it is, I don't know if it's been excluded before or not

12   or it's been admitted into evidence, and if it's been

13   excluded, I don't think it should be refreshing his

14   memory with it.

15             THE COURT:  You can refresh memory with

16   anything.

17             MR. KAPLAN:  No, I know, but --

18             THE COURT:  Right?  With a telephone.

19             MR. KAPLAN:  But I don't know if that's the

20   subject matter that the Court has said you cannot get

21   into, I guess is my point.

22             THE COURT:  Okay.  What's the subject matter?

23             MR. DARROW:  It's a -- it's the Facebook

24   communication exchange with a woman named Jen Francis in

25   which she -- she says -- she's basically saying, "Please

1     don't violate me," and he says, "You want to see

2     violation, say no more.  Now I will put your ass on full

3     blast."

4                 MR. KAPLAN:  I think this was --

5                 MR. DARROW:  And this was -- if I can just

6     finish?

7                 MR. KAPLAN:  Yes.

8                 MR. DARROW:  It was excluded as part of the

9     government's case as I understood it because Jen Francis

10    wasn't a witness or otherwise involved.  However, on

11    cross, I believe he just testified that he never

12    threatened to violate anyone like that.  So I wanted to

13    say, Well, didn't you do it here?

14                THE COURT:  Okay?

15                MR. KAPLAN:  Well --

16                THE COURT:  It was excluded because Jen

17    Francis was not called as a witness.  He then was asked

18    an open-ended question, did he ever react in that kind

19    of way, and it seems to me that he can be shown that

20    exhibit and --

21                MR. KAPLAN:  All right.

22                THE COURT:  -- testify from his current

23    memory.  If not, I don't think that you get it in.

24                MR. DARROW:  Yes.

25                THE COURT:  Okay?

```
1              MR. DARROW:  Thanks.
2    (The following was held in open court.)
3    BY MR. DARROW:
4    Q    Mr. Folks, does that document refresh your memory
5    as to whether you ever threatened to violate a woman by
6    exposing her?
7    A    The document refreshed my memory of that
8    conversation, but it's not what you insinuated.
9    Q    Okay.  Well, let me ask you about it.  Did the
10   woman in this conversation say --
11             MR. KAPLAN:  Objection, your Honor.
12             THE COURT:  Well, he has now said that he
13   remembers this conversation, so he can testify about the
14   conversation.
15        So go ahead.  You can ask the question.
16             MR. DARROW:  Thank you.
17   BY MR. DARROW:
18   Q    Is it correct that the woman, in a communication
19   with you, said, "I swear to God, Moe, you better not
20   violate me.  I'm not no Backpage where you better keep
21   those" --
22             MR. KAPLAN:  Judge, I don't think he can read
23   from the document unless he is reading something that my
24   client actually said.
25             THE COURT:  No, he --
```

1    MR. KAPLAN:  Maybe he is.

2    THE COURT:  He can read from the document to

3    ask the question, because the witness has said that

4    he -- his memory has been refreshed about this

5    particular exchange.

6    So go ahead.  You can ask the question.

7    MR. DARROW:  Thank you.

8    BY MR. DARROW:

9    Q    The woman's saying, "Don't violate me," and you

10   respond -- is this correct -- "Fuck you, Jen.  Get the

11   fuck off my page.  You're starting to really piss me the

12   fuck off.  You want to see violation, say no more.  Now

13   I will put your ass on full blast."

14   Aren't you threatening to violate her?

15   A    Can I put that on here so I --

16   Q    Sure.

17   A    -- can see that's what it says?

18   Thank you.

19   Okay, now what's your question?

20   THE COURT:  This is just to him.  It's not --

21   it has not been introduced into evidence, so --

22   MR. DARROW:  Should I just show it to him,

23   your Honor, instead?

24   THE COURT:  Pardon me?

25   MR. DARROW:  Should I just show it to him

1    instead?

2              THE COURT:  You should just show it to him.

3              MR. DARROW:  All right.  Sorry.

4              THE WITNESS:  What's your question?

5    BY MR. DARROW:

6    Q    I was asking if that doesn't indicate that you did,

7    in fact, threaten to violate a woman by exposing her

8    with pictures?

9    A    No.  Actually it was -- what I said is, "You want

10   to see violation, say no more.  I will put your ass on

11   full blast."

12   Q    Okay.  And what did you mean by putting her ass on

13   full blast?

14   A    I was going to tell everybody about this situation

15   because the situation that we're talking about, we spoke

16   about.  It's about Victoria.

17   Q    Okay.  Let's -- let me take that back.

18        Mr. Folks, after you received the government's

19   witness list in this case, didn't you send it to your

20   wife and direct that it be posted on the internet?

21   A    At one point --

22   Q    I'm sorry.  It's just a yes-or-no question.

23   A    No.

24   Q    You did not do that?

25        Okay.  So you didn't tell your wife in a recorded

1   phone call that you were going to send her the

2   government's papers and you wanted, quote, every fucking

3   page, close quote, posted?

4   A    That's a piece of what I said.

5   Q    So you did say that, but you are saying there's

6   more to it?

7   A    Yes, because I told her not to do it.

8   Q    Okay.  Let's follow this along.  So you did say

9   that, "I want you to post every fucking page"?

10  A    After they -- she told me they threatened her,

11  yeah.

12          MR. KAPLAN:  Your Honor, objection.

13          THE COURT:  What's the objection?

14          MR. KAPLAN:  On the relevancy.

15          THE COURT:  Objection overruled.  Go ahead.

16  BY MR. DARROW:

17  Q    Now, let's see if we can agree on the chronology

18  here.  You instructed your wife to post it, right?

19  A    After she told me she was threatened.

20  Q    It's just a yes-or-no question.

21  A    I can't answer it yes or no positively.

22          THE COURT:  Okay.

23          MR. DARROW:  Okay.

24          THE COURT:  If you can't answer a question yes

25  or no, you should say, "I can't answer that."

1           THE WITNESS:  Okay.

2           THE COURT:  Okay.  Go ahead.

3           MR. DARROW:  All right.

4    BY MR. DARROW:

5    Q    Do you admit that the government's witness list,

6    including the first and last names of the various women

7    that tested here -- testified here, was posted?

8    A    I don't know if it was posted or not.

9    Q    Did you ever retaliate against Hannah for

10   something?

11   A    Retaliate?  No.

12   Q    Violate?

13   A    Violate, no.  We had an argument, though.

14   Q    You didn't violate Hannah, Mr. Folks?

15   A    No.  What does "violate" mean in your sense?

16   Q    Well, why don't you tell us.  You are the one that

17   used the word.

18   A    It's slang.  You violate, you do something wrong to

19   me.  If we playing basketball and you go up for a shot

20   and I block it, I violated you because I blocked your

21   shot, and if your shot goes way back there, I violated

22   you with extreme prejudicy *[sic]*.

23   Q    Well, we are not in a basketball game.  How would

24   you use the term when you are talking about your

25   relations with the woman you know as Hannah?

1    A    It depends -- oh, with Hannah?

2    Q    Yeah.

3    A    Well, with Hannah, it was, "You violating me.  You

4    talk about me; I talk about you."

5    Q    Okay.  Do you remember the video that you made of

6    Hannah?

7    A    Yes, I do.

8    Q    We played it earlier in the case when Mandy was on

9    the stand, right?

10   A    Yes, you did.

11          MR. DARROW:  Could we please put up 47A.

12   BY MR. DARROW:

13   Q    Recognize that woman?

14   A    Yes, I do.

15   Q    Who is that?

16   A    That's Hannah.

17   Q    And in the video you made of her, did you call her

18   a little bird ass bitch, a dope fiend bitch that you

19   pulled up off the streets?

20   A    The bird part, yeah.  I don't think I called her

21   dope fiend.  I don't think I called her that.

22   Q    Well, we may need to take a look at it again, but

23   let me ask you a couple other questions.

24          Did you ask her -- did you call her a little fake

25   ass mermaid slut?

```
 1    A    Yes.
 2    Q    And did you brag that "I had to make the bitch walk
 3    around in a fucking apron"?
 4    A    Yes, I said that.
 5    Q    And you showed a picture of her naked in an apron?
 6    A    Yes, I showed a picture of her, one of many
 7    pictures of her in an apron.
 8    Q    Okay.
 9    A    The best one.
10    Q    Did you say -- did you say, "My whole team thinks
11    about her like this?" and show her with her legs spread?
12    A    Yes.
13    Q    And did you say that "Some of the bigger homies,
14    they know her more like this," and show her -- a picture
15    from her butt, showing her behind?
16    A    Yes.
17    Q    When you called Hannah a slut and a dope fiend in
18    that video, you don't think you were punishing and
19    humiliating her?
20    A    No.  Actually, I didn't call her dope fiend.  I
21    remember now.  I made the gesture as -- as like a needle
22    gesture, I believe.
23    Q    You didn't call her a fiend?
24    A    I don't think -- I don't think I did, but I know I
25    made the gesture as -- as if she was using the needle.
```

```
 1    Q    Right.  And she was using a needle?

 2    A    Yes, she was.

 3    Q    When you posted that video on Facebook, you know

 4    that -- you knew that other people would see it?

 5    A    Yes.

 6    Q    All right.  Now, you also sent a picture of Hannah

 7    giving you oral sex to Keisha, didn't you?

 8    A    No.

 9    Q    You never did that?

10    A    No.

11    Q    Okay.  Did you ever send that picture to Hannah

12    with a message about you threatening to violate her?

13    A    I believe I sent Hannah a couple of pictures.

14    Q    Well, the picture of her giving you oral sex?

15    A    I could have, if she had it.  I'm not sure if I

16    sent it to her or not.

17    Q    Okay.  Do you know -- do you recall whether or not

18    you sent her the text, a threatening text?

19    A    I don't re- -- I don't recall no threatening text.

20    Q    Would it refresh your memory to look at your text

21    exchange?

22    A    Sure.

23    Q    Okay.

24              MR. DARROW:  Can we get 47C.  Excuse me, your

25    Honor.
```

1          THE COURT:  Has 47B been introduced into

2     evidence?

3          MR. DARROW:  I apologize.  It's 47C,

4     your Honor.

5          THE COURT:  C?  Okay.

6          MR. DARROW:  And if memory serves, the picture

7     is in but not the accompanying texts.

8     BY MR. DARROW:

9     Q    Mr. Folks, I am asking you about 47C and drawing

10    your attention to the last page.  Or you can look at any

11    of it, of course.

12         MR. KAPLAN:  Your Honor, I believe when this

13    was admitted, the last page was excluded.

14         THE COURT:  Well, he is actually -- he has

15    indicated that this has not been introduced at all.  It

16    has not been admitted as evidence, so it's not going to

17    be shown to the jury.

18         MR. KAPLAN:  I thought the first two pages

19    were.

20         THE COURT:  Asking him to refresh his

21    recollection as to what he said?  Is that what you are

22    asking?

23         MR. DARROW:  Yes.

24         THE COURT:  Okay.

25         MR. DARROW:  And just to clarify, the photo

1    accompanying this text I think was admitted.

2              THE COURT:  Right.

3              MR. DARROW:  But the text that accompanied the

4    photo, as part of the government's case, was excluded,

5    but now we are on cross.

6              THE COURT:  Okay.

7              MR. DARROW:  Thank you.

8              THE COURT:  All right.

9              THE WITNESS:  What's the question?

10   BY MR. DARROW:

11   Q    Do you remember the text that you sent to Hannah

12   along with the photograph of what we are talking about?

13   A    No, I don't.

14   Q    So this did not refresh your memory?

15   A    That text came from me, but I don't know if that's

16   a text that I sent her with that picture you are talking

17   about.

18   Q    All right.  You know the picture that we are

19   talking about?

20   A    The one you showed in here?

21   Q    You don't think that text accompanied it?

22   A    No.  That's talking about a video.

23   Q    Okay.  Mr. Folks, you remember the Walnut

24   Challenge?

25   A    Yes, I do.

1    Q    And you remember your introduction to the Walnut

2    Challenge when you are standing there sipping and

3    talking about what you are about to do?

4    A    I think you got the videos screwed up.

5    Q    Let's just call it the Walnut Challenge video.  You

6    remember that?

7    A    I wasn't drinking in that video.

8    Q    Okay.  Do you remember the Walnut Challenge video?

9    A    Yes.

10   Q    All right.  Do you remember you have V with you?

11   A    Yes.

12   Q    And at one point you bend her over?

13   A    Yes.

14   Q    And a little while later she tries to stand up, and

15   you bend her back down, and you say, "I didn't tell you

16   to stand up yet"?

17   A    Yes.

18             MR. DARROW:  Could I have one moment,

19   your Honor?

20             THE COURT:  Yes.

21             MR. DARROW:  Thank you, your Honor.

22             THE COURT:  Okay.  Redirect?

23             MR. KAPLAN:  Thank you, Judge.

24                      REDIRECT EXAMINATION

25   BY MR. KAPLAN:

1   Q    Brian, you recall the prosecutor asked you a series

2   of questions about what women had said and acted

3   surprised when you said that they weren't telling the

4   truth?

5   A    Yes.

6   Q    And do you recall when these same women testified

7   in court they admitted that they had lied on numerous

8   occasions?

9   A    Yes.

10  Q    And that didn't seem to be as surprising?

11  A    Not to the government.

12  Q    So, for example, he asked you about Danielle saying

13  something when you two were together, and you said no,

14  that didn't happen, and he acted surprised?

15  A    Yes.

16  Q    But do you recall, when Danielle testified on

17  direct examination, she never said that she had sent you

18  nude pictures before you went to the hotel?

19               MR. DARROW:  Your Honor --

20  A    Yes.

21               MR. DARROW:  -- we held off on objections for

22  leading earlier, but we interpose them now.

23               THE COURT:  Well, can you open -- I know that

24  you need to ask a leading question to identify the

25  subject matter, but then can you follow that up with an

1    open-ended question?  Because it is your witness.

2    BY MR. KAPLAN:

3    Q    Do you recall discussion about her sending you nude

4    photographs?

5    A    Yes.

6    Q    And do you recall whether or not the prosecutor

7    brought that out on direct examination?

8    A    No, he didn't.

9    Q    And do you recall that I asked her about that?

10   A    Yes, I do.

11   Q    And what did she say initially when I asked her?

12   A    That she didn't send me any pictures.

13   Q    And then I showed her the seven or eight pictures

14   she had sent you.  Do you recall what she said?

15   A    Yeah.  She said, "I could've sent them when I send

16   a lot of pictures to a lot of people," something to that

17   effect.

18   Q    And do you recall that I asked Danielle -- do you

19   recall that she talked about some text messages that the

20   prosecutor showed her after the motel incident?

21   A    Yes.

22   Q    And do you recall I asked her if she had sent you

23   any Facebook messages prior to going to the motel?

24   A    I believe so, yes.

25   Q    And do you recall what she said?

1    A    Um, I believe she said she did.

2    Q    And that wasn't true, was it?

3    A    That she sent me messages?

4    Q    It wasn't true that she said she didn't.

5    A    Oh, but she did.

6    Q    In fact, do you remember that I showed her the

7    messages?

8    A    Yes.

9    Q    And she admitted it at that point?

10   A    Yes.

11   Q    Okay.  Do you recall when she sent you a Facebook

12   message in September of 2015 saying she wanted to come

13   back to work?

14   A    Yes.

15   Q    And do you recall what her explanation for that

16   was?

17   A    Um, not at the moment.  I just know she said she

18   wanted to come back to work as of tomorrow.

19   Q    Do you recall she testified that she wanted to sell

20   drugs?

21   A    Yes, I remember she said that up here.

22   Q    And had she ever sold drugs for you?

23   A    No.

24   Q    So what was your understanding of what she meant by

25   that?

1    A    She wanted to do Backpage.

2    Q    Okay.  And was there any question in your mind

3    about that?

4    A    Not at all.

5    Q    Do you recall the prosecutor a few moments ago

6    being surprised that you said Katelynn had lied about

7    something?

8    A    Yes.

9    Q    And do you remember hearing Katelynn testify in

10   court?

11   A    Yes.

12   Q    And do you recall what she said about how she --

13   how she met you to the grand jury?

14   A    She gave three different stories.

15   Q    What did she tell the grand jury under oath?

16   A    She -- one -- one, she says she met me -- I'm not

17   sure which one she told to the grand jury, but I know

18   there was three different stories.  One, she met me in

19   the street and she thought I was cute.  Another one, she

20   met me at a store, I think.  And then she met me as a

21   trick.

22   Q    Do you recall that she told the grand jury that she

23   had never worked as a prostitute before?

24   A    Yeah.

25   Q    And do you know if that's true or not?

```
1    A     That was false.

2    Q     And do you know, has she said that under oath to

3    the grand jury?

4    A     She said under oath that she didn't, but she also

5    testified here that she did.

6    Q     And, in fact, isn't that how you met her?

7    A     Yes.

8    Q     She was working as a prostitute?

9    A     Yes.

10   Q     Okay.  Do you recall what Ayla said about -- for

11   example, when she came into court and testified in this

12   case, do you recall what she said about her reaction

13   when you asked her if she wanted to prostitute?

14   A     Um, I can't remember what she said exactly, no.

15   Q     But did she -- did she indicate under oath in court

16   that she had never prostituted before she met you?

17   A     Yes, she did.

18   Q     And do you recall, did she say that on numerous

19   occasions during this trial?

20   A     I believe, yes, she did.

21   Q     And is it fair to say you now know she was lying

22   about that?

23   A     Well, I know she was lying when she first said it.

24   Q     But you have heard evidence introduced in this

25   trial that tells you it's not true?
```

```
1    A    Yes.

2    Q    Okay.  And did you hear her talk about other times

3    that she lied?

4    A    Yeah.

5    Q    Do you recall any of them?

6    A    I know she lied about her name.  I think she said

7    she lied about her name to police; she didn't want to

8    get in trouble.  Um, was it her that lied about the

9    check?

10   Q    And what about -- do you recall a conversation she

11   had with the victims' advocate in the U.S. Attorney's

12   Office?

13   A    Oh, about her brain cancer.  She --

14   Q    She told her she had brain cancer?

15   A    Yeah.  She lied about having brain cancer.

16   Q    And did you hear her testify that -- in fact, that

17   you had hit her and she went to the hospital?

18   A    Yes.

19   Q    And did you hear what was said about hospital

20   records?

21   A    Yes.  She said she don't know why the hospital

22   didn't have the records.

23   Q    There were no hospital records?

24   A    No.

25   Q    Did you ever tell any of these women that you loved
```

1    them?

2    A     No.

3    Q     Okay.  Did you love any of them?

4    A     No, not in the -- like the man/woman-type love, no.

5    As a friend, I love all my friends, but no.

6    Q     How would you describe your relationship with

7    Katelynn in terms of how you guys got along when you

8    did?

9    A     Me and Katelynn -- like, Katelynn was -- like, she

10   was a real bubbly person.  She liked to laugh and have

11   fun, and that's me.  I like to laugh.  I like to clown

12   around and have fun too.  We got along good with that,

13   like there's nothing to do, we sit around, we crack

14   jokes and we laugh and do stupid stuff and run around.

15   Q     And did you hear Danielle say that, in the five

16   days or so she was with you, her face changed?

17   A     I don't remember that part.

18   Q     Did it change in the five days that she --

19   A     Not to my knowledge.  She already looked -- well,

20   she looked different now.  I haven't seen her in years,

21   but at that point, no.

22   Q     And did you hear Danielle testify that her father

23   gave her the drugs when she overdosed?

24   A     Yes.

25   Q     Was that true?

1   A     No.

2   Q     Did she -- she lied under oath about that?

3   A     Yes.

4   Q     What did happen?

5   A     She went with a group of guys, and I don't know

6   what they did over -- who gave her the drugs or what,

7   but I know she went with a group of guys, and next thing

8   I know she called saying she overdosed, and when I took

9   her back from the hospital, she wanted to go back with

10  that same group of guys.

11  Q     So I want to ask you about your involvement with

12  respect to prostitution.  Do you remember several of the

13  women -- like Katelynn and Ayla -- saying that you lived

14  up to your promise with them?

15  A     Yes.

16  Q     So are you saying you weren't involved with them at

17  all?

18  A     No.

19  Q     So do you know what Katelynn and Ayla meant when

20  they said you lived up to the promise that you made

21  them?

22  A     Yeah.

23  Q     What was it?

24  A     Basically when we spoke about the whole Backpage

25  thing, I said I would be able to do certain things for

```
 1    them, and I did.  And they said they was going to do
 2    certain things, and they did it.
 3    Q    And what were those things?
 4    A    Well, they -- they said they were going to make
 5    sure I kept gas in the car, and they was going to give
 6    me some money here and there to make sure I was okay.  I
 7    said I would make sure that nobody was taking advantage
 8    of you, nobody was robbing you, and that you had
 9    everything that you needed.  So anything you needed,
10    they just call me.  I need some food; I bring it over.
11    Or I need some shirts; I bring them over.  No matter
12    what it was.  I need a phone; I bring it over.
13    Q    In fact, is it fair to say that Keisha did that
14    even in January of 2016, even when you weren't with her?
15    A    Yes.
16    Q    And how many times were you associated with Keisha
17    in the prostitution business?
18    A    Directly associated with her?
19    Q    Yes.
20    A    I want to say twice that we were directly
21    associated.
22    Q    One in 2013?
23    A    Yeah.
24    Q    And how did that come about?
25    A    She was -- she was hanging out at a house that I
```

1   used to hang out with Katelynn, and her and Katelynn

2   became buddies, and they started talking about it

3   because that's what Katelynn was doing already.

4   Q    Do you feel like you took advantage of Keisha?

5   A    No, absolutely not.

6   Q    And why did -- how did Keisha end up trying to work

7   as a prostitute?

8   A    I don't understand the question.

9   Q    Well, you said she was talking with Katelynn.  What

10  happened next?

11  A    Oh.  I guess they discussed what Katelynn was doing

12  and how Katelynn was making money, and she wanted to be

13  a part of that, and so she brought it to me.  They

14  both --

15  Q    So the first time around, did Keisha do that longer

16  than a day?

17  A    No.  She -- well, she took pictures -- see, the

18  thing is she took pictures on one day and then she did

19  it -- like, tried to do it, like, the next day.  So it

20  wasn't like --

21  Q    And what happened after?

22  A    -- she did it all in one -- one time.

23  Q    What happened?

24  A    It didn't happen.  It didn't work.  She didn't

25  appear to be into it really, like she was -- she wasn't

1    really sure that's what she wanted to do.  She said it,

2    but she wasn't really sure, in my opinion.  She wasn't

3    really sure --

4    Q    So what happened?

5    A    -- and it didn't work.

6    Q    So what happened?

7    A    She wanted to leave.  I asked her where she want to

8    go.  She said home, and that was to her grandmother's

9    house in Winooski, and I drove her home.

10   Q    Do you feel like you took unfair advantage of her

11   and forced her into prostitution?

12   A    No, absolutely not.

13   Q    And I think you testified about -- she was with you

14   for, like you said, a day or two in June of 2015?

15   A    Um-hum.

16   Q    And why did she leave then?

17   A    Because she was getting customers and getting

18   money, and she was using the hotel room that I had, and

19   she would use my car and drive, and she didn't even want

20   to put gas in the car, and she kept telling me to wait,

21   wait, wait, wait.  And I was telling her it's not part

22   of the deal, so go ahead, do your own thing.

23   Q    So you -- did you try and force her to stay?

24   A    No.  I asked her to leave.  I believe I left that

25   time, though.

1    Q    And a lot of the women that the prosecutor read to
2    you over and over again, you were associated with them
3    in the prostitution business?
4    A    Yeah.
5    Q    And would you do the same things with them that you
6    did with, like, Ayla and Keisha and Katelynn?
7    A    Yeah.  I felt like one hand washes the other.  I
8    help you, you help me.  You know I do these pictures.  I
9    need these pictures.  You giving me all these free
10   pictures, I help you when you need something.  Like, you
11   need a phone or whatever -- I have six kids, and all my
12   kids have phones, so when we upgrade our phones, I keep
13   the phones.  Like, I been on my phone contract for about
14   five years.  I keep the phones, so I get up -- I keep
15   the phones, and then when I get a phone, I'll just give
16   it to one of 'em.  Here, take this one.  I'll turn it on
17   for you.  And take this one.
18   Q    You said something about the fact that you asked
19   Ayla to leave because she was stealing drugs?
20   A    Yeah.  She was causing too many problems, and every
21   time they caused problems over there, they start calling
22   me at home, and my wife got tired of it, so it was
23   causing problems with me and my wife.
24   Q    Is that when you let her sleep in the car?
25   A    Yes.

1   Q    And did she keep coming back and talking to you

2   about that?

3   A    Yeah.  Me and Ayla was always cool.  Like, I

4   wasn't -- I didn't have no bad  -- no bad intentions

5   with none of them.  The only one that we, like, had a

6   little -- a bad fallout would be Hannah, and that's when

7   we just started talking about each other a lot, and I

8   wouldn't even consider that a real bad fallout, because

9   I knew where she was at; she knew where I was at.  And

10  it was nothing physical or anything like that.  It was

11  just -- for the most part, everybody that was involved,

12  we were all all right.

13  Q    And did it matter to you if a particular woman

14  wanted to engage in prostitution or not?

15  A    I mean, it didn't matter to me because the way that

16  I viewed it, like, whether -- whether I helped them or

17  not, they are going to do what they do.

18       So I -- the way I put it to them was I rather do it

19  with you and you do it for yourself and gain what you

20  set out to do it for as opposed to not getting it.

21       Because most of them set out to do Backpage to

22  supply a drug habit, whereas if they went with these

23  guys out here, not only was they not going to be able to

24  supply their drug habit, but they were going to get

25  disrespected and beaten.  All types of other stuff was

1    going to happen to them.

2         So I said if this is going to happen to you, if

3    you're going to be out there and chance get in trouble,

4    at least get what you get in trouble for, so I'll go

5    with you and I'll make sure you get what you're supposed

6    to get, and then what you do with it after that is your

7    business, but I am going to make sure you get what you

8    supposed to get.  You're not going to be out here doing

9    this for nothing.

10   Q    So when Keisha wanted to leave, that wasn't a

11   problem for you?

12   A    No.

13   Q    And when anyone wanted to leave, that wasn't a

14   problem for you?

15   A    No.  Actually I was quick to tell somebody to

16   leave.  I wasn't trying to hold nobody there, because I

17   felt like I'm doing you a favor.  I'm helping you be

18   safe and do what you supposed to do, so if you want to

19   do whatever, go ahead, leave.  I had no problem with

20   telling people to leave.

21   Q    And you didn't have a problem with Katelynn staying

22   in New York?

23   A    No.

24   Q    In fact, she stayed with your mother?

25   A    Yeah, she stayed with my mom.  Like, my mom would

1    ask me, say -- okay, at that time my mom was going

2    through some things.  Like, um, I wouldn't say I'm my

3    mom's favorite, but there's reason why my mom favors me

4    so much, and I'm -- you know, I'm the guy -- I call my

5    mom every day of my life, like, to check on, so me and

6    my mom is close.

7         So she was going through something at that

8    particular point in time, and I felt it was okay if

9    Katelynn stayed over there with her and wouldn't, you

10   know, mess up her things too much.  And eventually my

11   mom got through what she was going through.

12   Q    So all of these videos that you did, like -- I am

13   kind of tired of hearing the Walnut Challenge -- the

14   Walnut Challenge and all of those videos, what were you

15   trying -- first of all, did you force anyone to do any

16   of that?

17   A    No.  I came up with --

18   Q    What were you trying to accomplish?

19   A    I was trying to set up for my business.  Like, I

20   had this business.  Like, it would be better explained

21   if I could show you the blue -- the business plan that I

22   put together.  It's like 200 pages.  It's like I drew --

23   I drew the building.  I drew out everything for -- that

24   business can work for 10 years straight based on what I

25   wrote and that printup, and -- and like with any

1   business, if I'm going to sell something, if I am going

2   to sell these cups, I can't go into business selling

3   these cups if I don't have no cups made already.

4   Q    And with the porn videos that you were trying to

5   make sort of duplicate what goes on in the real world by

6   the porn fashion?

7   A    Right.  Whatever's popular in the street,

8   whatever's going on in the street -- as they say in the

9   street, whatever's hitting in the street, you duplicate

10  that.

11  Q    Who is Chappelle?

12  A    Dave Chappelle is a comedian.

13  Q    He is an African-American?

14  A    Yes.  He did a skit called "Pee on You," and it was

15  about R. Kelly, because R. Kelly was in the news for

16  urinating on a female.  And he did a skit.  It was a

17  funny skit.  It went -- well, it went all over the

18  place.  They actually put it on -- it started on the

19  internet, but they actually put it on TV, on one of

20  his -- he has a show, and it was like a music video, and

21  it was "Pee on You."

22  Q    So that's what gave you the idea to do that?

23  A    Yeah.  And that's what -- that's what it meant.

24  That's why every time I said "pee on you," I start

25  laughing, because if you ever seen it, it's a real funny

1    video.

2    Q     All right.  And Dave Chappelle's a comedian, right?

3    A     Yeah.

4    Q     Did you ever see Ghost use that BB gun to shoot --

5    shoot the women?  Not Ghost, but anyone else?

6    A     Um --

7    Q     All right.  I will withdraw the question.

8    A     Yeah.

9    Q     There was some discussion about Alpo.

10   A     Ah.

11   Q     Can you explain that?

12   A     When I said Alpo to her, I don't know what she --

13   we laughed actually, because I believe she said, "I'm

14   not a dog," and we bust out laughing.  Because I'm from

15   Harlem, New York, and when you -- again, it goes back to

16   slang.  Slang up here is different from slang in the

17   city.

18         But when you call somebody Alpo, you not referring

19   to the dog food.  It's referring to a famous dude.  His

20   name is Alpo Alonzo something -- Alfonso something.

21   Anyway, he is a famous rat, and he is from Harlem, and

22   he -- a lot of the slang that we use now, they come

23   from -- like, when people say, "Imma do me," that's a

24   Alpo slang, 'cuz that's what he said in the magazines.

25   Q     So Chrissy was using slang at some point?

1    A    No.  I was using slang, but I was talking to her.

2    Q    Okay.

3    A    We was talking about her phone, and I was like,

4    "Why you keep texting people?"  And I was like, "She no

5    Alpo bullshit," and everybody picked up on it except

6    her.  She was like, "I'm not a dog," and we bust out

7    laughing.  We found it funny, and she quickly associated

8    with being a dog.

9    Q    So can you tell the jury again, please, this thing

10    about violate.  Does it mean, like, to sexually assault

11    someone or beat them up or --

12    A    No.  Violate means basically, like, if you -- if

13    you disrespect me, I'm gonna disrespect you.  So if you

14    violate me, I'm gonna violate you.  Like I gave the

15    analogy about the basketball.

16        It can -- it depends on which context you are using

17    it in, but that's basically what it means.  It means if

18    you disrespect me, I'll disrespect you.  If you violate

19    me, I'll violate you.  Don't violate me, meaning don't

20    disrespect me.

21    Q    So let me ask you this, Brian.  You have lived in

22    several different worlds, right?

23    A    Yeah.

24    Q    Is it fair to say that -- let me ask you this --

25    that the world you lived in with these women is

1    different than maybe other people of the world they live

2    in?

3    A    Extremely different.

4    Q    Can you explain the difference?  Some of it's

5    obvious.

6    A    I mean, aside from the obvious, like it's just the

7    things you go through out here with these people is --

8    like, it's not something -- like, it's not an experience

9    that, like, let's say my mom would go through or, you

10   know, my sister or something like that.  It's -- you

11   have to be street oriented to go into.  When you

12   become -- when you live in the streets, you -- you

13   become subjected to the street rules and the street way

14   of doing different -- doing everything.  You know,

15   like --

16   Q    Is that the way that you interacted with the

17   women --

18   A    Yeah.

19   Q    -- on the street rules?

20   A    We were all in the streets.  It was -- well, we

21   termed it hustling.  Everybody was on a hustle.

22   Q    So you don't mean you are necessarily living on the

23   streets, but it's a different environment?

24   A    Yeah.  It's a different -- like they say, it's a

25   different world, like --

1    Q    So --

2    A    -- you seeing 'em do things you wouldn't do in

3    normal, regular society.

4    Q    So you said you wore the red apron too?

5    A    Yeah.

6    Q    I am hoping you didn't take a picture of it.

7    A    Unfortunately.  They have pictures of it.  What it

8    was is that only my computer got confiscated, so you

9    only seen the pictures that I took.  Of course I am not

10   going to take pictures of myself.

11          MR. KAPLAN:  I have nothing further,

12   your Honor.

13          THE COURT:  Okay.  Any recross, Mr. Darrow?

14          MR. DARROW:  No, your Honor.

15          THE COURT:  All right.  Thank you, Mr. Folks.

16          THE WITNESS:  Thank you.

17          (Witness excused.)

18          THE COURT:  All right.  Let's take a brief

19   recess.  I want to talk with the lawyers, so you can go

20   in the jury room.  You will be coming back in a few

21   minutes.

22   (The jury left the courtroom, after which the following

23   was held in open court at 3:44 p.m.)

24          THE COURT:  Okay.  I removed the jury so that

25   you can go back to your room, if you can just hold on

1    for a second.

2              DEFENDANT FOLKS:  To my room?

3              THE COURT:  Do you have any additional

4    witnesses?

5              MR. KAPLAN:  None, your Honor.  We would rest

6    when the jury comes back.

7              THE COURT:  Okay.  All right?

8              MR. DARROW:  No, your Honor.

9              THE COURT:  Okay.  So we will rest today,

10   and -- the government's going to rest?  And --

11             MR. DARROW:  Yes.

12             THE COURT:  -- that will be it.

13        Okay.  So you can go back.  I will actually

14   take a -- take a little bit of a break, and -- okay.

15   (Court was in recess at 3:45 p.m.)

16   (The following was held in open court without the jury

17   present at 3:50 p.m.)

18             THE COURT:  Okay.  Is everybody ready?  Okay.

19   Let's bring the jury back.

20   (The following was held in open court with the jury

21   present at 3:51 p.m.)

22             THE COURT:  All right.  Mr. Kaplan, does the

23   defense have any more witnesses?

24             MR. KAPLAN:  The defendant rests, your Honor.

25             THE COURT:  Okay.  Is there any rebuttal to be

1   called by the government?

2   　　　　　MR. DARROW:  There is not, your Honor.  The

3   government rests.

4   　　　　　THE COURT:  Okay.  All right.  Essentially

5   that means the evidence is closed.  That means that we

6   follow this with summations.  They will be early

7   tomorrow morning.  Then the charge will be given to you,

8   and then the jury will retire to deliberate.

9   　　　So we will start at nine o'clock with the

10  summations, and I assume by early in the afternoon you

11  will have the charge and beginning deliberations.

12  　　　Now, in regard to deliberations, essentially

13  tomorrow that means that you can go as late as you want

14  to go.  I want to tell you that I have a conflict on

15  Friday.  It's my decision not to have court on Friday,

16  and as a result, if you need more time, then you have

17  tomorrow in regard to deliberations, you would be coming

18  back on Monday, and I know -- is it Mr. Boesch?  Did you

19  have a conflict on Monday?  Is that right?

20  　　　　　JUROR NO. 14:  Yes.

21  　　　　　THE COURT:  Right.  You are an alternate, so

22  assuming that 12 jurors remain, you will be free to take

23  your trip.  If for any reason you are brought into the

24  pool of 12, then we will talk about that.  Okay?

25  　　　I bring that up only because I know that that's of

1    concern for you.

2         JUROR NO. 14:  Appreciate it.

3         THE COURT:  All right.  It is very important

4    now that the evidence has been closed.  You still have

5    not heard the charge, which is the definition part --

6    definition of the offenses.  You still have not heard

7    arguments of counsel.  Again, arguments of counsel are

8    not evidence, but they may help you in really evaluating

9    the evidence which has been submitted here.

10        So please don't make up your mind.  Don't talk with

11   anyone.  You will be asked the same question tomorrow

12   morning, and we should be starting the summations early.

13        I am going to actually stay and speak with the

14   lawyers, so have a good night, and we will see you

15   tomorrow.

16   (The jury was excused, after which the following was

17   held in open court at 3:53 p.m.)

18        THE COURT:  All right.  Does the defense have

19   motions?

20        MS. SEN:  Your Honor, we would renew our

21   motion under Rule 29.

22        THE COURT:  All right.  Do you want to renew

23   the motions that were submitted --

24        MS. SEN:  Exactly, your Honor.

25        THE COURT:  -- at the close of the

1    government's case?

2            MS. SEN:  Yes, your Honor.

3            THE COURT:  Okay.  And any other motions from

4    the defense or the government?

5            MS. SAVNER:  No, your Honor.

6            THE COURT:  Okay.  All right.  Let me address

7    the issues.

8       First, in regard to 11 and 12, it seems to me

9    there's sufficient evidence to go to the jury.

10       And then in looking at 15, I have thought long and

11    hard about that.  I have also asked both sides to submit

12    memoranda, which they did last night and this morning.

13    I have also done extensive memoranda on how advertising

14    was considered.

15       So first I am going to write an opinion -- or we

16    are going to write an opinion and I am going to sign the

17    opinion in regard to Count 15, because I will state on

18    the record this is a very close call.

19       It is very true that there were no witnesses who

20    described Hannah as being engaged in prostitution.  The

21    complex question is whether the taking of the

22    photographs of Hannah, with three other individuals, and

23    the taking of photographs herself, alone, those four

24    photographs that were shown a number of times during the

25    course of the trial, was sufficient to allow this case

1   to be submitted to the jury.

2        So you look at the statute.  I looked at the cases.

3   I'm convinced that the change in the law in 2015 really

4   did not have any purpose in changing the law.  There

5   were no cases which said that participation in

6   advertisement could not constitute this particular

7   offense.

8        Actually, the legislative history is fairly clear

9   on the change in that it is seeking to address what

10  Congress felt was an injustice, that's these companies

11  making a lot of money like the people at Backpage in

12  advertising for prostitution, and they wanted to stop

13  that.

14       So then the fundamental question in my mind is,

15  taking the evidence which has been submitted -- again,

16  no outside commercial sex acts by way of prostitution --

17  can a jury reasonably conclude that the photographing of

18  Hannah, both individually and also as a part of another

19  group -- can that constitute enticing her into

20  participation in prostitution?

21       That would, in fact, satisfy the statute.  Of

22  course she doesn't have to participate in prostitution.

23  The question is whether there is a -- an act.  In this

24  case, the act is the photographing of her, the requiring

25  her to disrobe, the getting her to participate in those

1    photographs.  Is that enough to determine for a jury

2    that the defendant is enticing her to participate in

3    commercial sex acts?

4         And then secondarily, there's another issue in

5    regard to aiding and abetting.  There are a number of

6    theories in which aiding and abetting may apply in this

7    particular case.  For instance, she's with various other

8    persons whose images are all going to be shown on

9    Backpage, and is she being used in that way to aid and

10   abet in the prostitution business or enterprise by

11   providing her image?

12        And that -- you know, that argument is, in fact,

13   enhanced by the testimony of the defendant here when

14   he's suggested that the image of her would be used in a

15   bait and switch because she's very attractive, and as a

16   result, she is being encouraged to participate in the

17   prostitution by sharing her image and then using it as a

18   substitute for somebody else.

19        And the government did, in fact, charge aiding and

20   abetting.  The question is whether that's aiding and

21   abetting.

22        I really appreciate that this is a close call, but

23   I am trying to determine whether a jury reasonably at

24   this stage could determine that -- from all of the

25   evidence here that she was being enticed in -- to

1    participate in the prostitution or that she is being

2    encouraged to aid and abet in the prostitution ring, and

3    as a result, it becomes confusing as to what is the --

4    what is the commercial act.  In fact, the photographing

5    could be the commercial act, as well as encouraging her

6    to participate in prostitution, and the prostitution

7    would be the commercial act.

8         In my view, a reasonable jury could conclude, based

9    upon all the evidence, that there was an effort to

10   entice her to participate in prostitution or there was

11   an effort to get her to share her image to aid in the

12   business enterprise of prostitution.

13        It's a close question, but I think a reasonable

14   jury could conclude that; and as a result, I am going to

15   submit Count 15 to the jury, deny the motion at this

16   particular point.

17        Clearly this is going to be raised at a later time

18   if the defendant is convicted of Count 15, but that's

19   what the Court's ruling is at this point.

20             MS. SEN:  Your Honor, I must have -- I just

21   wanted to bring to the Court's attention that in the

22   memorandum that I submitted, the other issue is the

23   element of age, and I did -- which the government has to

24   prove that the defendant -- and it can prove it in one

25   of three ways.  There is no evidence that he knew her

1      birth date.  There is no evidence that -- I mean, I

2      don't understand what the evidence is with respect to

3      age and how the government can meet that element.

4                  THE COURT:  Well, actually, I did anticipate

5      that particular issue as well.  First, it goes back to

6      the conjunctive/disjunctive statement that the

7      government has made.  It's "or."  And we're going to be

8      talking about what's the instruction here.

9           There is no evidence that somebody told the

10     defendant that she was under the age of 18, clearly.

11     There is, I suppose, some evidence to suggest that he

12     might be in reckless disregard, but I looked at the law

13     in regard to this very interesting element of sufficient

14     opportunity to evaluate her age, and the courts have --

15     the court has suggested that this is a wide-open element

16     and that all you have to show is that the defendant had

17     an opportunity to look at her, to work with her

18     sufficient for a determination as to her age.

19          Now, I mean, obviously he had a lot to deal -- to

20     do with Hannah.  A jury could conclude that he had a lot

21     to do with Hannah.  The question is whether a jury could

22     conclude that that is a sufficient opportunity to

23     inspect her and to evaluate her.  And in light of the

24     fact that this element, which is so unique, is very wide

25     open, it seems to me that that becomes a jury question

1    as well.

2              MS. SEN:  Well, your Honor, I think the

3    problem with that is that the way that Count 15 is

4    charged, it's charged for one day, and the problem is

5    that a lot of the testimony regarding Hannah and drugs

6    is from much later on when she actually is above the age

7    of 18.

8         So the issue becomes, you know, there's no

9    testimony -- there's not a stitch of evidence in this

10   case about her age except for her birth certificate.

11        The idea that the jury -- and that the government

12   can meet its burden -- and I understand.  I am aware of

13   the case law, your Honor, that this kind of evidence can

14   go to the jury, and I think that yesterday the

15   government was arguing and suggesting that because he

16   took the photograph, that was enough to give him a

17   reasonable opportunity to observe.

18        There is no evidence in this record how long he had

19   the opportunity to observe her, how much time he spent

20   with her.  It is complete -- there is just no evidence

21   whatsoever.  I just don't understand how the government

22   can meet its burden beyond a reasonable doubt to meet

23   that element on this record.

24              THE COURT:  Okay.

25              MS. SEN:  And the cases that I have seen,

1    your Honor, the witness has testified on the stand.

2    They have seen pictures of when the person is before the

3    age of 18 versus after the age of 18.  There is

4    testimony about the interaction of what was occurring

5    and the amount of time that the defendant spent with the

6    person.  There is just none of that here, and we can't

7    call that witness to talk about that.

8              THE COURT:  Well, I --

9              MS. SEN:  You know, the jury, I mean --

10             THE COURT:  I appreciate that.

11             MS. SEN:  I know that, your Honor.

12             THE COURT:  And I have read the same cases you

13   have read.  I have really been concerned about that

14   particular element, because it seems so loose, but the

15   interpretation by the courts has been consistent:  As

16   long as you have an opportunity to look at a person and

17   to make an evaluation, that's generally enough to get it

18   to the jury.

19        I -- I am not suggesting that I agree with that as

20   an element or don't agree with that as an element, but

21   if, in fact, you have case law which suggests just an

22   opportunity to look and talk with somebody and look at

23   the person and make an evaluation as to what age they

24   may be, that is enough to get to the jury as to whether

25   that is a reasonable interpretation of her age.

1          Anyway, I, you know, respect your -- you know, your

2     candid interpretation of the case law, because the case

3     law seems to suggest that you don't have to see much,

4     and it's a thing that's submitted to a jury.

5          So is there anything that the government wishes to

6     put on the record in response to that particular

7     question?

8               MS. SAVNER:  Well, the government agrees with

9     your interpretation, your Honor, that it is very

10    open-ended, and we are obviously relying on that prong

11    of that element.

12              THE COURT:  So are you seeking an instruction

13    just on that prong?  You are not going to seek an

14    instruction on the knowledge and reckless disregard?

15              MS. SAVNER:  May I consult with my co-counsel

16    before answering?

17              THE COURT:  Well, you don't have to consult at

18    this point.  We are going to have a bit of a charge

19    conference, unless you don't think a charge conference

20    is needed, in which case you should consult.

21              (Brief pause.)

22              MS. SAVNER:  We are comfortable with just

23    charging on reasonable opportunity to observe.

24              THE COURT:  Okay.

25              MS. SAVNER:  And I would note that Jasmine L.

1   testified that the defendant met Hannah on a certain

2   day, I believe also at the Motel 6, and it was on a

3   later occasion, days later -- I don't know how long

4   later -- that he met her again, a second time, and

5   that's when the pictures happened.

6        He was obviously in her presence for a sufficient

7   amount of time for multiple photographs to be taken of

8   her alone and with others, and it's -- both in various

9   states of dress and undress, and it's our belief that

10  that's sufficient.

11            THE COURT:  And those photographs, as I

12  recall, were taken of her prior to her turning 18, which

13  was in November.

14            MS. SAVNER:  Correct.

15            THE COURT:  Right?  Of 2013?

16            MS. SAVNER:  Yes.  And we obviously --

17            THE COURT:  Is that right?

18            MS. SAVNER:  Yes.

19            THE COURT:  And all of those photographs and

20  all of the meetings happened before she had, in fact,

21  turned 18.

22            MS. SAVNER:  That is the testimony and the

23  evidence from the data from images and in the Backpage

24  ad itself.

25            THE COURT:  Okay.  All right.  So tell me if

1    we need to meet over the charge.  You needed some time

2    to look at the charge as well?

3            MS. SEN:  We would appreciate time to look at

4    the charge, your Honor.

5            THE COURT:  Okay.  Do you want to meet

6    tomorrow morning early?

7            MS. SEN:  That would be fine, your Honor.

8            THE COURT:  Or do you want to meet this

9    afternoon?

10           MS. SEN:  Either way.  Whatever the government

11   would like.

12           MR. DARROW:  Either is fine with us.  I would

13   think it would be a fairly short charge conference,

14   given the history --

15           THE COURT:  So we'll meet tomorrow morning at

16   8:30?

17           MR. DARROW:  Done.

18           THE COURT:  Okay.

19           MS. SEN:  Your Honor, can I, just for purposes

20   of the record, state our objection to the ruling on --

21   the denial of the motion.

22       And then there's just one other point I wanted to

23   bring up, which our client would like to raise, is that,

24   you know, it's one thing when you have an opportunity to

25   observe and you can see someone who is -- for example,

1    who is clearly under the age of 18, but we are talking

2    about someone who is, you know -- well, I won't do the

3    math, but like within six months of being 18.

4         So the question of opportunity to observe in that

5    situation I think becomes all that much trickier.  It

6    also becomes tricky because there was a lot of

7    discussion about Hannah obviously when she was over the

8    age of 18 versus below.  So I think we would just state

9    our objection to that.

10             THE COURT:  Well -- and I appreciate that.  I

11   think it's a really close call.  You also add her

12   appearance, which is -- you know, she seems to be quite

13   mature, at least based upon the images that I have seen.

14   But isn't this just -- in light of the case law, isn't

15   this an issue for the jury?

16        I am not making a determination as to how the jury

17   should, you know, find on this count in all regards,

18   frankly, and I appreciate that if the jury were to

19   convict, that this issue is going to be coming up, and I

20   will be taking another review of it.  But in both --

21   both of these issues, you know, ultimately you have to

22   ask, could a reasonable jury determine, one, that that

23   element about under 18 could be established; and, two,

24   to the participation or enticement, or providing, which

25   is the -- another case that I reviewed, could a

1   reasonable jury determine, based upon all of the

2   evidence, that it's established, the conviction is

3   established.

4        So at this particular point, it seems to me it

5   should go to a jury, so.

6             MS. SEN:  Thank you, your Honor.

7             THE COURT:  Okay.

8             MR. DARROW:  Thanks.

9        Judge, I can't remember whether there's a pattern

10  instruction when a defendant testifies at a criminal

11  trial.

12            THE COURT:  Is there a pattern?  No.

13            MR. DARROW:  There isn't one?

14            THE COURT:  Not that I know of.

15            MR. DARROW:  Okay.

16            THE COURT:  I think perhaps I'll --

17            MR. DARROW:  Because I know there is --

18            THE COURT:  The defendant-not-testifying

19  instruction?

20            MR. DARROW:  Yeah.  Yeah.  I just -- I didn't

21  know if there was -- as there's an instruction for so

22  many other different types of interests, whether there

23  was one saying a defendant has an obvious interest in

24  the outcome.

25            THE COURT:  I would not --

1          MR. DARROW:  Don't think so.

2          THE COURT:  -- instruct that way.

3          MR. DARROW:  All right.

4          THE COURT:  I mean -- yeah, I wouldn't

5     instruct that way.

6          MR. DARROW:  Okay.

7          THE COURT:  Okay.  All right?  Anything else?

8        Okay.  All right, thank you.

9             (Court was in recess at 4:15 p.m.)

10                    *** ** ***

11

12

13             C E R T I F I C A T I O N

14      I certify that the foregoing is a correct
      transcript from the record of proceedings in the
15    above-entitled matter.

16

17    June 12, 2019                _____
      Date                        Anne Nichols Pierce
18

19

20

21

22

23

24

25