UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
BRIAN FOLKS                 * CRIMINAL FILE NO. 16-94



JURY TRIAL
Thursday, May 9, 2019
Burlington, Vermont



BEFORE:

       THE HONORABLE WILLIAM K. SESSIONS III
          District Judge


APPEARANCES:

       WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
          MATTHEW T. GRADY, ESQ., Assistant United States
          Attorneys, Federal Building, Burlington,
          Vermont; Attorneys for the United States

       MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
          Suite 405, 95 St. Paul Street, Burlington,
          Vermont; Attorney for the Defendant

       NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
          Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court Reporter - Retired
Post Office Box 5633
Burlington, Vermont  05402
(802) 793-9080

# I N D E X

**M I S C E L L A N E O U S**

|  | PAGE |
|---|---|
| Charge conference | 3 |
| **CLOSING ARGUMENTS** | |
| Mr. Grady | 11 |
| Mr. Kaplan | 48 |
| Mr. Darrow | 96 |
| Charge to jury | 122 |
| Verdict | 196 |
| Jury dismissed | 199 |

1    THURSDAY, MAY 9, 2019

2    (The following was held in chambers at 8:35 a.m.)

3         THE COURT:  So we are in a charge conference.

4    I indicated to all lawyers present that I was not

5    going to put a copy of the indictment in because it's

6    included within the jury charge.

7         The buyer-seller instruction was added because

8    clearly there was testimony from the defendant that he

9    had a buyer/seller relationship with McFarlan.

10        The opportunity to observe is highlighted because

11   the -- the knowledge of age and the reckless disregard

12   is struck.

13        Defendant not testify, I have removed that.

14        Okay.  So let's see, the first objection is?  From

15   the defense?

16        MS. SEN:  And this is regarding the

17   instruction for on or about or in or about where it

18   instructs that the government needs to prove that the

19   offense was committed precisely on the date charged.

20        My concern is with Count 15.  I think the only

21   evidence that the person who's charged as a minor was

22   under the age of 18 is actually on those dates.  I don't

23   know that there's any other evidence in the record

24   that's come in related to her age beyond that.

25        And everything else -- my understanding is

1    everything else involving her, and what's been coming in

2    as evidence regarding her, is related to a later time

3    period when she was, in fact, above 18, so I feel like

4    that count -- the government -- it would -- the jury

5    would have to find that it occurred on that particular

6    date because the evidence is tied to that.

7         THE COURT:  It's on or about that date.

8    That's the confusing part.

9         MS. SEN:  True.

10        THE COURT:  You have to instruct that it has

11   to be on or about that date.  What you are asking for is

12   a supplemental instruction that, in regard to her being

13   a minor, it involved -- the activities that she was

14   engaged in -- or the defendant was engaged in with

15   relationship to her is only significant up until the

16   date of her turning 18, which is in November of 2013.

17   That's what you are asking for as a supplemental

18   instruction.  Because on or about is a standard

19   instruction.

20        MS. SEN:  No.  I understand that.

21        THE COURT:  They got the date wrong by a day;

22   that's meaningless.

23        MS. SEN:  Well, given the nature of the

24   evidence and the way it's come in regarding her

25   activities, I just -- I mean, I think on or about is

1    fine.  I just don't know whether there's some way to --
2    to maybe reemphasize within the specific instruction
3    itself that this does -- this is tied to the date.
4              THE COURT:  I think that you can certainly
5    bring that up in summation.  The problem is, of course,
6    that I -- if I get into the --
7              MS. SEN:  No.  I understand.
8              THE COURT:  -- the facts, I run the risk of
9    trying to persuade them or taking a position one way or
10    another; and the other objection, of course, which was
11    made to on or about, is that they had asked for an
12    instruction on continuing offense.  I went back to the
13    indictment.  There's no mention of continuing offense
14    there.  I don't know where -- in your memo, you said
15    there's a mention of continuing offense.  I didn't see
16    it anywhere.  So as a result, it seems to me that I'd be
17    talking about your summation, which I don't think I
18    should be.  So I also think you're not prejudiced by
19    that.
20         Okay.  So I don't think I can do anything about
21    that.
22              MS. SEN:  I understand that, your Honor.
23              THE COURT:  What else do you have?
24              MS. SEN:  I think that we had both talked
25    about -- in Count 16 where the Court goes through in

1    great detail the Vermont Statutes, we were wondering

2    whether there was a way -- or whether the Court would

3    consider perhaps short-circuiting that a little bit.

4            THE COURT:  It's -- and just say prostitution?

5    Vermont law declares the prostitution illegal?

6            MS. SEN:  And just defining, as you do here,

7    prostitution.

8            MS. SAVNER:  Yeah.  I mean, one option would

9    be to just include numbers eight and nine on page 36.

10   So Vermont law -- and I don't know that we need to cite

11   Vermont statute, but Vermont law makes it unlawful to

12   engage -- and I think we can drop "lewdness," given that

13   the definition is so circular, but engage in

14   prostitution or assignation or aid or abet prostitution

15   or assignation by any means whatsoever, and then include

16   the definitions of prostitution and assignation.

17           THE COURT:  Okay.  Do you agree with that?

18           MS. SEN:  I think that would be fine,

19   your Honor.

20           THE COURT:  Okay.  Let's change it that way.

21           MS. SEN:  And I take out the next set of

22   Vermont Statutes.

23           THE COURT:  Yes.

24      Okay.  Anything else?

25           MS. SEN:  I think that's all I had,

1    your Honor.

2          THE COURT:  Okay.

3          MS. SAVNER:  Well, one just housekeeping issue

4    to the extent it matters.  Hannah does have an H at the

5    end of her name.

6          THE COURT:  That's very interesting because it

7    just was rotating back and forth, and the reason I am

8    sensitive to that is that my oldest child is named

9    Hannah.

10          MS. SAVNER:  With an H.

11          THE COURT:  With an H.  And I found this

12    without an H to be very -- I don't know.

13          MS. SAVNER:  Yeah.  I believe that came out

14    because that's how she is identified in some of the

15    files on the defendant's computer, but the name on the

16    birth certificate is Hannah with an H on the end.

17          THE COURT:  We could actually change that

18    quickly?

19          LAW CLERK:  Yes.

20          THE COURT:  Okay.

21          MS. SAVNER:  And with respect to Count 15 --

22    so I understand, based on the conversation yesterday,

23    that your Honor remove -- removed "knowing and in

24    reckless disregard."  However, that phrase in the

25    charging language I think modifies not only the age

1    component but also the "would be caused to engage in a

2    commercial sex act."  So -- I mean, there's -- the

3    second element is related to knowledge of the age.

4              THE COURT:  Yes.

5              MS. SAVNER:  And we are agreeing that

6    reasonable opportunity to observe is right there, but if

7    you look at the third element, the -- and in the charge

8    it says the defendant knew or recklessly disregarded the

9    fact that Hannah A. would be caused to engage in a

10   commercial sex act.

11             THE COURT:  Yes.

12             MS. SAVNER:  And we believe that is still

13   proper, but the way the charged language has been

14   amended, reference to reckless disregard has been

15   entirely removed.  So I think it should be --

16             THE COURT:  So the definition of reckless --

17   in reckless disregard -- it should be included within

18   the element, which -- the third element, which it is,

19   isn't it?

20             MS. SAVNER:  Yes, it is.  I just think it

21   should be put back in the charging language at the top.

22             THE COURT:  Oh, all right.  I think that both

23   should be -- the knowledge and -- and then we should

24   say, you know, the government is proceeding only on this

25   last theory because the opportunity to observe unto

```
1    itself is just -- if it's unrelated to knowledge of her
2    age, it just seems crazy.
3              MS. SAVNER:  So I did have another -- another
4    amendment to propose related to the second element.
5         So I believe that the jury still needs to find that
6    Hannah was, in fact, under the age of 18, which is not
7    sort of listed out in the elements.  So my suggestion
8    would be the second element be amended to say "Second,
9    that Hannah A. was under the age of 18 and the defendant
10   had a reasonable opportunity to observe her" and that
11   gets -- that sort of explains what that element is.
12             THE COURT:  Right.  Well, that helps,
13   actually.  Right.
14             MS. SEN:  Right.  I think that makes sense.
15             THE COURT:  Yes.  Okay.
16        You got that?
17             LAW CLERK:  Got that.
18             MS. SEN:  So that would go under -- on page 33
19   under the second element.
20             LAW CLERK:  And on page 32.
21             MS. SEN:  Yes.
22             THE COURT:  And I think it also goes in the
23   questionnaire -- the jury verdict form.
24             MS. SEN:  Oh, the special verdict form.
25             THE COURT:  Okay?
```

1                    MS. SAVNER:  That was it for the government.

2                    THE COURT:  That it for you?

3                    MS. SEN:  Yes, your Honor.

4                    THE COURT:  Okay.  We will start in 15

5       minutes.

6       (Chambers conference concluded at 8:45 a.m.)

7       (The following was held in open court with the jury

8       present at 9:05 a.m.)

9                    THE COURT:  Good morning.

10                   COURTROOM DEPUTY:  This is case number 16-94,

11      United States of America versus Brian Folks.   The

12      government is present through Assistant United States

13      Attorneys William Darrow, Emily Savner and Matthew

14      Grady.   The defendant is present in the courtroom with

15      his attorneys, Mark Kaplan and Natasha Sen.

16           The matter before the Court is trial by jury day

17      11.

18                   THE COURT:  Good morning and welcome again.

19           Has anyone spoken to you about the case, have you

20      learned anything about this case from outside of the

21      courtroom or have you communicated among yourselves

22      about the merits of this case?

23                   (The jury all indicate in the negative.)

24                   THE COURT:  Okay.  I have noticed that as the

25      days go on your responses become more vocal, which must

1     mean that you feel more comfortable, because now we get

2     "no, your Honor."

3         Okay, I think we are ready to go for summations and

4     turn first to the government.

5         Mr. Grady.

6             MR. GRADY:  Yes.  Thank you, your Honor.

7         Over the last three weeks you have heard about

8     buns, sleeves, and dope sickness.  You have heard about

9     beatings, rapes, and threats to violate.  You have heard

10    about BB gun shots, the Walnut Challenge and, to use the

11    defendant's own words, peeing on bitches.

12        In short, you have heard about a dark and

13    disturbing world where the defendant controlled and

14    manipulated women to peddle drugs and sex here in the

15    greater Burlington area.  His control and manipulation

16    was a product of two factors:  one, targeting society's

17    most vulnerable members and, two, using tactics to

18    exploit those vulnerabilities.

19        By now, you know the defendant wasn't over here on

20    campus recruiting women or seeking women from safe,

21    secure, loving homes.  No, he was seeking women who had

22    fallen down, women that had been abused and neglected,

23    homeless and addicted.

24        Now, this case isn't about them falling down or

25    making mistakes or making some bad decisions.  It's

1    about the defendant intentionally coming across them

2    when they are down and out, keeping them down and out,

3    and treating them like trash so they would do what he

4    wanted all so he could line his own pockets with money.

5        Probably some of the most remarkable -- the most

6    remarkable part of this case is, no matter who was on

7    the stand, you saw a pattern emerge, a pattern of the

8    vulnerability and different tactics the defendant used

9    to exploit those vulnerabilities.

10       First, think about the size.  All the women who

11   appeared in front of you were small in size and stature

12   as opposed to the defendant, the self-proclaimed fighter

13   who was twice the size that he is now, as he told you

14   yesterday.

15       Think about the different vulnerabilities that they

16   had.  All the women either had education levels that --

17   didn't finish high school, came from broken homes, DCF

18   custody, some sort of issue.  Many were homeless, and

19   some were in debt, and what tactics would the defendant

20   use?

21       You heard that he would sometimes tell people that

22   he loved them, he generally cared about them, and he

23   would take care of them.  But over time, he showed his

24   true colors come out with various tactics.

25       Many of the women had addictions, addictions to

1      heroin, which you know now is a Schedule I controlled

2      substance because of its addictive properties and

3      because it does not have recognized medical use that

4      outweighs its addictive properties.

5          We heard a lot about violating:  If you disrespect

6      the defendant, there's going to be consequences and

7      repercussions to deal with later.

8          Humiliation:  You heard about red aprons, BB guns,

9      the Walnut Challenge, peeing on women, all acts meant to

10     degrade and humiliate women, ultimately to control them.

11         You heard a lot about sexual violence, unwanted

12     oral, vaginal, anal sex.

13         And, finally, physical violence, to let them know

14     that you do not become -- you do not come in between the

15     defendant and his drugs or his money.

16         Now, of course the defendant didn't maybe use all

17     these tactics with each and every one of them.  And as

18     you think about it, it takes a lot of time, effort and

19     resources to put a gun to someone's head 24/7.  Instead,

20     you are going to use the least amount of tactics

21     necessary so you can control more women and ultimately

22     obtain more profits you put into your hand.

23         So keep that in mind when you go back to deliberate

24     about the remarkable similarity of all the government

25     witnesses who described these vulnerabilities and the

1    tactics the defendant used.

2         Now, because of the defendant's conduct, he faces

3    14 counts.  The government has divided those 14 counts

4    into four categories.  As you can see, the large

5    categories relate to sex trafficking and drug

6    trafficking.  And sex trafficking, you will notice,

7    there are five counts.  Those relate to what's called

8    adult sex trafficking, and there's one count dealing

9    with minor sex trafficking of Hannah.

10        You will also see there are six counts relating to

11   drug trafficking, one of them being conspiracy, four for

12   the controlled buys of heroin, and one for the traffic

13   stop where heroin and cocaine was found.  And what we

14   are going to do this morning is walk through the

15   elements of each and every count so you confirm what you

16   already know:  The defendant is guilty beyond a

17   reasonable doubt.

18        Now, first we are going to talk about sex

19   trafficking.  This is the first category.  And as a

20   reminder, the adult victims are Katelynn, Keisha,

21   Danielle and Ayla, and then Hannah is off to the side

22   because she is the count related to minor sex

23   trafficking.

24        And one note to keep in mind about the dates that

25   you will see involving these counts, it's a broad date

1    range, and the government only needs to show that it

2    occurred on one day at one time within that date range.

3    It obviously can't be outside the date range, but it

4    only needs to be one particular time within the date

5    range.

6         So first, here are the elements of sex trafficking.

7    And you don't need to write them down because the judge

8    is going to provide you these in his instructions, and

9    you will have a written copy when you go back to

10   deliberate.  But let's talk about the elements.  We are

11   going to focus on the first and third one at this time,

12   because certainly those there's no question about.

13        The first element is recruiting, enticing,

14   harboring, transporting, providing, obtaining or

15   maintaining.  Just think about that for a couple of

16   minutes.

17        As far as harboring, there's no doubt the defendant

18   gave his women places to stay or rented hotel rooms for

19   them to stay.

20        As far as transporting, you heard evidence that he

21   would drive them to out calls.

22        As far as providing, you heard about how he posted

23   Backpage ads for them to obtain clients.

24        And as far as maintaining, you heard about the

25   defendant would provide drugs, specifically heroin, to

1    help with them.  So you can check the first element off

2    right now.

3         We are going to go through the second element with

4    each and every woman to show how force, threats

5    of force, fraud, coercion and any combination was used

6    against each particular victim.

7         And as to the third element, you can check that off

8    right now as well, interstate commerce, because

9    interstate commerce includes things such as telephones,

10   the internet, hotels; and you certainly have multiple

11   evidence of that.  For example, you saw the YouTube

12   video of Katelynn.  That is certainly the internet.  And

13   you heard how Backpage was used.  That is certainly the

14   internet.

15        You also heard about drugs coming from New York,

16   out of state, where the defendant used part of his

17   scheme to keep the women connected to him.

18        So you can certainly go ahead and check the first

19   and third elements of sex trafficking right now.

20        So we are going to focus a little bit more on the

21   second element.  The second element, coercion, involves

22   this concept of serious harm, and this is an

23   important concept to think -- to keep in mind.  And,

24   again, you will have the jury instruction that will

25   explain this as well.

1      But serious harm goes beyond just physical harm.

2  It includes not just physical harm, and you have some

3  examples there of financial harm, reputational harm, and

4  psychological harm.

5      The other thing to keep in mind is that you will

6  notice that you consider it from the reasonable person

7  of the same background and same circumstances as the

8  victims.  So, again, you are not looking at it from the

9  perspective of anybody in this room who has a stable job

10  and has a place to go home tonight to sleep.  You are

11  looking at it from the background of a person in their

12  shoes at that moment, which is why we are going to spend

13  some time talking about the background of the charged

14  victim.

15      So let's first talk about Katelynn.  Remember,

16  Katelynn testified that she dropped out of school in

17  eighth grade.  She bounced around DCF custody.  She was

18  sexually assaulted when she was 13 years old.  She spent

19  some time being homeless.  And that when she was 16, 17

20  years old, she walked around with two pillow cases full

21  of all of her belongings, including her birth

22  certificate.  Those are the circumstances Katelynn was

23  in when the defendant came across her.  Let's talk about

24  the ways that he coerced her.

25      First of all, she told you about all of the false

1    things that he said to her, and she testified, looking

2    back, she got played by the defendant because he didn't

3    mean any of these promises of loving her and taking care

4    of her.

5        She also talked about what her size was relative to

6    the defendant back in this time period.  She testified

7    about the firearm the defendant had and that at one time

8    the defendant took the firearm out and put it to her

9    head, and you will remember she testified that was a low

10   point in her life.  She didn't care if she lived or died

11   in that moment.

12       She told you also about the firearm the defendant

13   pulled on C-Rock and how that, in her mind, was scary.

14   She talked about -- about the concept that you violate

15   the defendant, he is going to violate back, and that she

16   better not get mouthy or he will get physical.  And of

17   course he did get physical at times.

18       She told you about the time that he grabbed her

19   face and how it scared her and how she started to cry.

20   She also talked about the time when he punched her in

21   the butt.

22       Now, not only was the defendant physical against

23   Katelynn, he was also physical against others, what's

24   considered a climate of fear.  She talked about the time

25   that she saw the defendant take Jasmine, wrap her by her

1    hair, and whip her around.  She talked about the time

2    that the defendant chased down Jasmine, all because she

3    had the audacity to leave.  And finally, she talked

4    about the ways the defendant manipulated her with

5    cocaine.  She talked -- testified about an incident

6    where the defendant required her to give him oral sex,

7    and then he would give her cocaine.  And, of course, she

8    performed the oral sex, and he didn't give her the

9    cocaine.  Why?  As a way to show and reinforce that evil

10   control, when she gets what he allows her to get when he

11   decides it's time to do so.

12       And you heard a lot about the time where she got so

13   skinny, the defendant prevented her from using cocaine.

14   Now, is that because the defendant is some nice guy and

15   really concerned about her well-being?  Of course not.

16   He wants her to put on some weight, because she's a

17   commodity that he wants to sell over and over again to

18   the highest bidder and line his pockets full of money.

19   Ultimately, Katelynn told you that she never said no

20   because she was scared.

21       Now, how do you know that what Katelynn told you

22   was true?  Think about what Jasmine told you.  Jasmine

23   came and testified that -- let me remind you about

24   Jasmine.  She doesn't even live in Burlington anymore.

25   She came from out of state.  It's not like Jasmine and

1    Katelynn are best of friends.  Jasmine didn't even know

2    Katelynn's name.  She just knew her as Pinky.  So it's

3    not like they came in here and concocted a story and got

4    on the same page.

5         And another thing about credibility:  Think about

6    the demeanor of the women when they testified before you

7    and how they were crying during some of these traumatic

8    events that they recounted.  Contrast that with the

9    demeanor of the defendant yesterday, who was pretty glib

10   when he testified.  Also, who's been thinking about

11   their day in court for years?  The defendant.  Who heard

12   all the testimony before he testified and could

13   incorporate that into his testimony?  The defendant.

14   Who, at this point in time, has the greatest incentive

15   to lie?  The defendant.

16        So going back to Jasmine.  Jasmine gave you similar

17   account of how she saw the defendant violate against

18   Katelynn.  She talked about the time the defendant did

19   grab her by her hair and yank her around and about the

20   time he tried to chase her down when she tried to leave.

21        Jasmine corroborates Katelynn's account, and that's

22   why you can be confident beyond a reasonable doubt that

23   the defendant coerced Katelynn.  Let's turn next to

24   Keisha.

25        Now, Keisha involves two time periods, and again,

1    you just have to find at one -- some point in between,

2    in these time periods, that she was coerced.  We're

3    first going to cover the first time period in 2013.

4         Now, it's not very long, but if you remember

5    carefully as to what Keisha testified to, you will

6    remember that she -- in order to get heroin, in order to

7    get well, she would first have to see a client; then the

8    defendant would provide heroin.

9         She also testified that the defendant had sex with

10   her, not because this was some sort of loving

11   relationship.  Keisha testified it was because of

12   control.  You know that the defendant has to assert his

13   control and his dominance and to let the women know that

14   they're just property, whether they want to or not.

15   Let's talk about the second time period.

16        Keisha testified that she was homeless when she

17   came out of the Valley Vista rehab facility.  Who was

18   there?  Who was nice enough to pick her up?  It was the

19   defendant.  And within 24 hours, he brings her to the

20   hotel and is posting her on Backpage and feeding her

21   drugs.

22        Keisha testified that heroin was her biggest

23   problem, and that's what kept her coming back to the

24   defendant.  She also told you a lot about psychological

25   control.  Remember, she had to participate in the Walnut

1    Challenge, which of course the defendant said couldn't

2    even use that footage because it looked like she was

3    being raped.

4         She also talked about how the defendant urinated on

5    her, again, the ultimate sign of disrespect and control

6    in ownership of somebody.

7         Talked about reputational harm.  She testified

8    about that picture she received of Hannah performing

9    oral sex on the defendant.  What was her response?  She

10   testified that she was in fear, in fear because she knew

11   the defendant had lots of pictures of her that he could

12   send to anybody else.

13        And, finally, she talked about sexual violence that

14   occurred against her.

15        Now, how can you be confident what Keisha testified

16   to?  Remember the corroboration for these incidences

17   starting with the sexual violence.

18        You heard a lot of testimony about Keisha stealing

19   or robbing, taking five bundles of heroin from Chrissy.

20   The street value was $50.  What happened?  The defendant

21   put a bounty out on Keisha ranging from 100 to $200.

22        Remember, Lori Crawford even told you about that.

23   About within five minutes, Hannah had found Keisha and

24   contacted the defendant, and Lori brings the defendant

25   to where Keisha was, and Keisha was there being held by

1     two guys.

2          What happened next?  Keisha talked about --

3     testified to how the defendant brought her to this

4     dumpster, how it was dark out, she was scared, she

5     didn't know what was going to happen.  She didn't know

6     if the defendant was going to hurt her.  What did he do?

7     He bent her over behind that dumpster and had sex with

8     her even though she didn't want to.  And afterwards, he

9     told her that she's going to post up and that she owes

10    him money because that was his money he [sic] took from

11    Chrissy.

12         How do you know that the defendant peed on Keisha?

13    Again, he told you in his own words.  We don't need to

14    play this video again, but when you think back about the

15    video, remember what the defendant says?  "I'm going to

16    see how far I can go, how far I can go to show that I

17    own and control women."

18         You also saw 126C, which is a part of the video of

19    the defendant actually peeing on Keisha.  We don't need

20    to show that picture to you right now.  It was a picture

21    how the defendant sees Keisha as trash, but she's not.

22    She's a human being.

23         And while we are on the topic, you heard a lot from

24    Mr. Martino, the defense computer expert, who probably

25    went on for hours and hours because of his trial fees

1  being a lot higher than his consultation fee, but

2  ultimately what does he say?  Pictures were on the

3  defendant's hard drive.  There's no doubt about that.

4  And how did he know?  And how can you believe Keisha

5  when she testified that she was part of the Walnut

6  Challenge?  Once again, you have the defendant's own

7  words.

8          (A digital recording was played in open

9  court.)

10          MR. GRADY:  How else is Keisha's account

11  corroborated?  She told you about that picture you have

12  received.  And you have seen that picture of Hannah

13  performing oral sex on the defendant and the impact that

14  that had on her.

15      Let's think back again to the definition of serious

16  harm that you saw very early on in the slides.  How can

17  you prove reputational harm?  How, for Keisha, knowing

18  that the defendant has a large stock of pictures, and

19  her fear that those are sent to someone else, of course

20  that's going to have an impact on her and going to want

21  her to stay in the defendant's good graces so she --

22  what happened to Hannah does not happen to her.

23      Let's talk next about Danielle.  Danielle probably

24  had one of the most heart-breaking backgrounds of any

25  person you can imagine.  She testifies to the neglect by

her parents, how they were drug addicts, how she was
sexually abused growing up, how she bounced around from
foster home to foster home, and how ultimately she cut
herself, and she came down from the stand, and she
showed you her arms, keeping in mind that it's been four
years since she last cut, so they were in a little bit
worse shape four years ago.

What did Danielle testify to?  Again, she testified
that she was, at the most, a hundred pounds soaking wet.
And in comparison to the defendant, she was much -- much
smaller.  She talked about that first day when she
realized what was going to happen.  She turned around to
leave, and she saw the defendant with the firearm as he
moved up his shirt.

The defendant *[sic]* also talked about stabbing
someone and the impact it had on her and that she was
scared.  She talked about the time that Keisha violated
a rule and talked to a previous client.  She testified
how the defendant was upset, in Keisha's face, yelling
and screaming at Keisha, and that was scary for Danielle
and had an impact on her.

She testified to the three times the defendant had
sex with her and she did not want to.  And finally, she
told you all of the possible physical and nonphysical
symptoms associated with heroin withdrawal, probably

1   even more so than Dr. Higgins was able to tell you

2   about.  And, again, when you think back to that

3   definition of serious harm, how it included physical and

4   nonphysical harm, for a heroin addict going through

5   withdrawal, Dr. Higgins told you about that immediate

6   relief button.  You push that button, you inject that

7   drug, and you will feel better.

8        Of course the defendant knows that with his

9   background in opioids, and so he knows that -- to tell

10  Danielle, "Go see a client first, and then I will give

11  you access to that immediate relief button."

12       How has Danielle been corroborated?  How can you

13  believe Danielle?  Well, she told you that the defendant

14  took her to the North Star Hotel, and you saw records of

15  Mandy renting rooms at the North Star Hotel, and Mandy

16  told you about seeing Danielle, and she told you also

17  that Danielle asked if there was any way to make the

18  anal sex of the defendant less painful.

19       You saw pictures, pictures uploaded to the

20  defendant's Facebook account that week, and you heard

21  from Ms. Epp that this occurred at the North Star Hotel,

22  based upon the bedspread and the background.

23       How else has Danielle been corroborated?  She told

24  you that "next we went to the Ho Hum Hotel," and the

25  government introduced records from the Ho Hum showing

1   that Mandy did indeed rent the hotel.

2        Same with the Motel 6.  Danielle testified that she

3   overdosed on June 20th, but they're at the Motel 6

4   before that, and again hotel records support that and

5   also pictures support that as well, pictures found in

6   the defendant's Facebook account, and you all -- you

7   know by now that that certainly is the Motel 6 in

8   Colchester because of its distinctive background with

9   the orange bedspread and the orange colors on the wall.

10        Even the Facebook exchanges corroborate Danielle,

11   because what does the defendant talk about?  He talks

12   about debt distress.  Again, Danielle testified that

13   that's what began this all is her debt distress.  So

14   Danielle's account has been corroborated, and you can

15   believe her beyond a reasonable doubt.

16        Finally, there's Ayla.  Ayla testified that she

17   dropped out in high school when she became pregnant with

18   her son and that she ultimately developed a very bad

19   heroin addiction, in fact, probably had the worst heroin

20   addiction of all the witnesses in this case because you

21   heard about her physical appearance deteriorating over

22   time.  And she told you that her heroin use increased as

23   she lost custody of her son.  She ultimately lost her

24   job; her boyfriend, Brad, lost his job; and that she was

25   homeless and living in a truck, and she encountered the

1    defendant.

2            And what's the defendant do?  First, he threatens

3    to kick her out.  Remember Ayla testifying that part of

4    the reason that she stayed in line with the defendant's

5    rules is because -- that it, to use her words, "sucked"

6    being kicked out and having to sleep across the street

7    at the school on the steps.  So, again, thinking back to

8    the definition of serious harm, it's not necessarily

9    serious harm for any of us in this room who have a place

10   to sleep tonight, but for Ayla, a homeless heroin

11   addict, the threat that if you don't do something, you

12   are getting kicked out to the street, certainly

13   coercive.

14           Talked at length about heroin withholding.  She

15   does not have the access to that immediate relief button

16   until after she goes, sees a date.  First she sees a

17   date; then the defendant will give her access to heroin.

18           She talked about physical force the defendant did.

19   You will remember the time the defendant took her at

20   Lori's house and stuffed her in the bathroom, all

21   because he didn't like the fact that Brad was still

22   hanging around.

23           She talked about the other people that she saw the

24   defendant get violent with, including Victoria.  And the

25   reason that he got violent with Victoria is that --

1     because Ayla was paying off Victoria's debt.  You don't

2     come in between the defendant and his money.  Ayla was

3     his property, and his money.  And if someone interferes,

4     that's when violence comes out.

5          She told you about the psychological impact the

6     Walnut Challenge had on her.  She testified that it was

7     humiliating, and of course it was.  And finally, she

8     told you about the impact that it had when she saw the

9     defendant post these ads about Jerricka and how he would

10    out people online.  So let's walk through how Ayla --

11    Ayla's account has been corroborated.

12         First, think back to Exhibit 35.  These are text

13    messages between the defendant and Chrissy Tatro.  And

14    you see Chrissy letting the defendant know that Ashley

15    is crying; she doesn't understand why she is getting

16    kicked out.  And you see the defendant's response:

17    Drive -- "drive no one no place.  If she ain't got

18    money, she can't stay."

19         It's quite a contrast from yesterday's display

20    where the defendant seems to be Mr. Good Guy who would

21    just help out people whenever he could.  You see the

22    real defendant come out in these text messages.  "You

23    ain't got money, you ain't got a place to stay."  That's

24    how you can believe the financial harm that Ayla was

25    talking about.

1    As far as violence at Lori's house, remember the

2    testimony of Keisha.  Keisha talked about a time where

3    she saw the defendant bring Ayla into the bathroom, and

4    she saw Ayla coming out crying.  Also, think about the

5    testimony of Mary.  Mary told you about a time where the

6    defendant backslapped Ayla, knocked her out of the

7    chair, all because Ayla wanted to get well before seeing

8    a date.  The instances of violence against Ayla have

9    been corroborated by that testimony.

10    Again, you know that Ayla participated in the

11    Walnut Challenge beyond any doubt because of the videos

12    that were found in the defendant's computer.  And if you

13    think back about that video involving Victoria -- and

14    this is pretty subtle, but you might have seen it.  When

15    Victoria stood up, what did the defendant do?  He bent

16    her back over and said, "I didn't tell you to stand up,"

17    reinforcing the notion that the defendant's in charge,

18    he is in charge of those women, and they can stand up

19    when he tells them they can stand up.

20    And finally, as to the reputational harm, you know

21    the defendant did this because you saw Government's 36,

22    the ad where he says, "Watch out for Jerricka.  She will

23    rob you."

24    Now, if you look at the other pages -- the other

25    pictures associated with that ad, unlike ads where he

1    posted to get clients where he kind of obscures faces so

2    to preserve some level of anonymity, he blasts out

3    Jerricka's pictures.  He blasts out her pictures so

4    people know who he is talking about.  If you cross him,

5    he is going to put this out on the internet, and again,

6    for someone like Ayla, it's going to keep you staying in

7    line so that that doesn't happen to you.

8         So let's talk next about Hannah.  Hannah is the

9    minor, so there's different elements that apply to her

10   count.  And this involves a time period, that May 2013,

11   when she was 17 and a half years old, because you have

12   the birth certificate that was entered showing she

13   didn't turn 18 until November 2013.

14        So think back to 47B.  This was a Backpage ad found

15   on the defendant's computer, and let's pull out some

16   pertinent information.  First, I know it's hard to see,

17   but the ad was posted on May 18th at 12:06 a.m.  And

18   this is in the Burlington escorts part of the Burlington

19   Backpage, a place where you typically have commercial

20   sex activity occurring.

21        Remember the phone number.  That phone number was

22   described to you by Svetlana, otherwise known as Shorty.

23   And of course you heard Government's 119, which was a

24   recording between Shorty and the defendant.  In that

25   recording they talk about posting, and Svetlana says,

1    "If she's not being posted" or "she's not putting money

2    in our hands, she's not staying here."  And based upon

3    where the pictures were taken, you know that was the

4    Motel 6 in Colchester.

5        So let's talk a little bit more about the pictures,

6    and again, even Mr. Martino agreed that the powering on

7    of the computer did not impact when this photo was

8    taken.  And of course you know it was taken exactly 25

9    minutes before the Backpage post.  The post was at 12:06

10   a.m.  This picture that was in the Backpage ad was taken

11   exactly 25 minutes before.  And let's think about the

12   circumstances of this picture.

13       Remember, Jasmine?  Jasmine, who was present when

14   all these pictures were taken.  She testified that it

15   was the defendant who was taking those pictures.  It was

16   the defendant who was telling Hannah how to pose.

17       Again, these pictures were also in the Backpage ad

18   taken exactly 20 minutes before it was posted.  Jasmine

19   was present in there.  So was Svetlana.  People that're

20   known to engage in commercial sex acts for defendant.

21       Now, also think back to the video that you heard

22   early on the first week of trial.  That was introduced

23   through Mandy.  The video the defendant talks

24   disparagingly about Hannah.  In that video, he showed a

25   couple of pictures of Hannah.  He said that his homies

1    think about her like this and like this.

2         Now, I know that was a couple years after 2013, but

3    his friends probably think of Hannah in that fashion, in

4    a sexual manner, because perhaps she did engage in

5    sexual acts.

6         But in any event, here are the elements of minor

7    sex trafficking, and let's walk through them with the

8    evidence.

9         First, as far as this Backpage ad, there's any

10   number of verbs that that could be satisfied.  Most

11   easily, "provided."  Taking a picture, putting it in a

12   Backpage ad, where the defendant is providing Hannah to

13   others.  Or also "recruiting" and "enticing" her by

14   having her take part in these photo shoots with women --

15   other known women who engaged in prostitution.

16        Now, the second element just requires the defendant

17   has a reasonable opportunity to observe Hannah, and we

18   know that she was 17 years old -- 17 years old at the

19   time based upon her birth certificate and the dates

20   these photos were taken.  And we know that he was the

21   one actually observing her because he was taking the

22   pictures based upon Jasmine.  So that element has been

23   met.

24        As far as the third element, again, what's the

25   reason for posting the Backpage ad?  It's to solicit

1    clients and to link clients up with women.  So you know

2    that third element has been met.

3         And as far as the fourth element, Backpage, it's

4    obviously an internet website, so that's a piece of

5    facility of interstate commerce, and also this occurred

6    at the Motel 6, no doubt, based upon the bedspread and

7    the colorful walls, and that's a hotel that serves

8    out-of-state customers.  So all of the elements have

9    been met.

10        Let's talk about a few things that you don't need

11   to worry about.  First of all, whether Hannah actually

12   saw a crime or not does not matter.  It's not one of the

13   elements, so you don't have to consider it.

14        Also, whether Hannah actually consented or not is

15   irrelevant.  Under federal law, individuals under 18

16   cannot consent to sexual activity, including

17   prostitution.

18        The other thing you don't have to worry about is

19   Hannah didn't testify.  You are going to receive an

20   instruction from the judge telling you that she was

21   unavailable for this trial and to not consider that one

22   way or the other.

23        Now, for the second category, which is the Travel

24   Act count, an easy way to think of this is Backpage ad

25   plus something else; for example, Backpage ad and

renting the hotel room.  Here's the elements for that
particular count.

The first one is that the defendant used or caused
a facility of interstate interstate commerce which is
the internet, which is Backpage.  And he does so to
promote and manage the prostitution business.  I don't
think there's any debate about the defendant running the
prostitution business, and, in fact, I think his own
witness, Brittany Barber, talked about how the defendant
ran girls.  And after he posted a Backpage ad, what
happens?  Well, there's renting of a hotel room for sex
acts to occur in.  Well, let's provide a concrete
example for you.

Think back as to the pictures of Keisha and
Danielle from that week in June 2015 when they
overlapped.  These pictures were taken and found in the
defendant's Facebook account, and both of their
testimony is that was used to post a Backpage ad.  Also,
ironically, if you look carefully at the pictures, it
doesn't seem to be that the women are smiling or
particularly enjoying themselves, but again, these
pictures were taken at the Ho Hum and at the North Star
and then used in the Backpage ad.

And afterwards, you saw that Mandy had rented hotel
rooms, which makes sense because they hadn't been to

```
1    Lori's house yet, so they'd need a place for sex acts to
2    occur at.  So Backpage ad plus renting a hotel room
3    equals the Travel Act conviction.
4        Here's another example of a Backpage ad from
5    October 22nd, 2015.  What else do we know?  The
6    defendant was renting rooms at the Motel 6.  So, again,
7    you post an ad, and then you rent a hotel room for the
8    prostitution to occur.
9        The third category of counts for you to consider is
10   the drug trafficking counts.  That includes the
11   conspiracy, the four controlled buys, and the possession
12   with the intent to distribute.  We are going to first
13   talk about conspiracy.
14       Conspiracy is an agreement between two or more
15   people to accomplish an unlawful plan, and the thing to
16   keep in mind is that it does not require a formal
17   agreement.  It's not a contract where you have to divide
18   up your roles and responsibilities and sign off.
19       A conspiracy can be established just based upon
20   your actions.  And let's talk about the actions that
21   occurred in this case.
22       So we know the defendant was at the top, and we
23   will show the control of this conspiracy through the
24   controlled buys and his possession with the intent to
25   distribute.  But he's at the top, and one of his
```

1    suppliers is Donald McFarlan.  He testified that he

2    would bring up roughly 50 grams of heroin from New York,

3    dole them out in 10-gram increments, which the defendant

4    would then sell, pay him back, and then Mr. McFarlan

5    would give him 10 more grams to sell.

6         We know that Mandy was one of the big runners, and

7    you saw her on the four controlled buys, and she would

8    do the hand-to-hand exchanges with clients.

9         And you also heard that Ayla, Hannah, Mary, and

10   Chrissy were some of the people that bagged up the drugs

11   when they came in bulk, put them in the bags so that

12   they could be sold individually to clients.  How do you

13   know this?

14        Think back to the phone summary that Ms. Epp spoke

15   about in her testimony.  Look at all the calls between

16   the defendant and Mandy.  Certainly is consistent with

17   someone who was doing hand-to-hand transactions.

18        Same with the phone calls between -- with Hannah

19   and with Mary and with Chrissy.  That's consistent with

20   someone who is a consistent bagger and is bagging drugs

21   up for you.

22        And also you have the calls with Donald McFarlan,

23   consistent with the testimony that he would bring the

24   drugs from New York and give them -- sell them to Mr.

25   Folks to then distribute in the greater Burlington area.

1          Now, there's an issue of weight in this conspiracy,
2    whether it's over 28 grams of cocaine and a hundred
3    grams of heroin.  Now, that amount was met just based
4    upon the Froot Loops box.  The Froot Loops box had 73
5    grams of cocaine and 128 grams of heroin just in that
6    alone.  But even putting that to the side, think about
7    this:  Think about Mr. DiSarno's testimony, who was the
8    chemist.  He told you that five buns of heroin was
9    roughly one gram.  For a conspiracy that existed for 10
10   months, 300 days, if you sell one gram of heroin every
11   day in the course of that conspiracy, that's 300 grams
12   of heroin.  Even if you sell only one gram every other
13   day, that's 150 grams of heroin.  You can easily get
14   over 100 grams of heroin.

15         And even if you think with the traffic stop there
16   was seven grams of heroin and four grams of cocaine just
17   in that one incident in January 2016, so you certainly
18   get past the weight.  But again, the Froot Loops box
19   gets you that alone.

20         And how do you know that that Froot Loops box is
21   part of the conspiracy?  Think back to that reported
22   call that you heard between Chrissy and Donald McFarlan
23   and the defendant.  Who takes over that call?  It's the
24   defendant.  And what does he say?  "Chrissy's going to
25   take it on the chin.  We'll give her some cash.  She

1    ain't got no reason to turn no face on anybody."

2          Now, is the defendant really worried about Donald

3    McFarlan's criminal liability?  No.  He is worried about

4    his own liability.  He knows that this Froot Loops box

5    is part of the conspiracy, so he doesn't want Chrissy to

6    talk.  He doesn't want to be connected to it.

7          That call continued.  He says, "I'm going to give

8    you the money.  Keep your mouth shut."  Again, why is he

9    telling Chrissy to keep her mouth shut?  He's telling

10   her to keep her mouth shut because he knows that cereal

11   box can be connected to him.  If he had nothing to do

12   with the cereal box, then he shouldn't really care about

13   what Chrissy says or doesn't say, but he is specific:

14   "Keep your mouth shut."

15         And why does this conspiracy exist?  For money.

16   Again, here's Government's 35 where he texts Chrissy,

17   "Go ahead and deposit money in Don McFarlan's account."

18   Why?  It corroborates that Donald McFarlan provides the

19   drugs, he pays for them in bulk, and then he distributes

20   them out here in the greater Burlington area.

21         So the conspiracy has been met, and we're next

22   going to talk about the four controlled buys, which was

23   one theory yesterday, at some point it seemed like the

24   defendant was admitting that he was part of that or that

25   he arranged some, but regardless, you know what happened

beyond a reasonable doubt because you heard those phone
calls.

Here's the two elements.  You just have to
knowingly distribute a controlled substance and know
what it was at the time.  And of course it doesn't have
to be the defendant who is actually doing the
hand-to-hand sells.  It can be delivered through
another, like it was through others in this case.

So the first buy.  Look at the language the
defendant uses in these calls.  "I can have somebody."
"It's my peoples."  "I tell you."  "Call me."  What's
that show?  That shows control.  He is in charge.  These
are his drugs.  He can make it happen if they want
heroin or not.

And look further -- look what happens further on in
this transaction.  When Mandy comes out to do the hand
to hand, who's she talking about?  She is talking about
the defendant, because he's in control, and she
ultimately sells the six and a half bundles of heroin
for $500.  So you can go ahead and check that controlled
buy as being proved beyond a reasonable doubt.

So as to the next one, again, look at the language
the defendant uses:  "Meet me."  "What can I do?"  "I
have to put a sleeve."   "I ran out of bags."  "I get
somebody else to do it because I don't really like doing

1    it myself."

2        The defendant's in charge.  And what else does this

3    show?  It corroborates the testimony of Mary, Chrissy

4    and the others that they bagged up the drugs for the

5    defendant because he doesn't like to do it himself.

6        What's also interesting about that controlled buy

7    is look carefully at what Mandy asks.  She asks the

8    defendant, "I have to go to the kitchen to get them."

9    She has to get permission from the defendant to go in

10   and get the drugs to complete the sale.  And ultimately

11   she sells five bundles to Nikki, who was Michelle's name

12   at the time.  You know it was Michelle who testified.

13   She was using Nikki as her confidential informant name

14   at the time.

15       As to the third controlled buy, again, it's the

16   defendant saying, "I'm going to send her," as in Mandy,

17   "out right now, because I'm in charge.  These are my

18   drugs.  I'm going to send her out to complete the

19   transaction."  And that's when you have the sale of six

20   buns for $450.

21       And, finally, the fourth controlled buy, again, the

22   defendant's talking about "I started doing my sleeves

23   differently.  I put a bundle in a bag."  And of course

24   this was where there was an incident.  Nikki was looking

25   to buy a sleeve, or 10 bags -- 10 bundles of heroin,

1    excuse me, and the defendant can only provide four.  And

2    why was that?  Because there was this robbery of his

3    stash in the car outside 103 North Union.  And what

4    happened when he found out that his drugs were stolen?

5         He was upset.  He was pissed.  Remember what he did

6    to Mary?  He put a gun to Mary's head and tells her,

7    "What makes you think I won't kill you right here right

8    now?"  And this is after an earlier incident where Mary,

9    who was bagging up heroin while she was sick, thought

10   the defendant was in the other room and wanted to sneak

11   a little bit of heroin to make herself feel better.

12   What did she testify to happened next?

13        The defendant came out of nowhere, punched her in

14   the side of the head, knocked her out of her chair, and

15   caused her to see stars.  Because, again, you don't come

16   in between the defendant and his heroin or his money.

17        Now, you heard a little bit from Ms. Otero, a

18   defense witness, who said that nothing happened after

19   this incident.  But of course, according to Ms. Otero,

20   no drug activity ever happened while she was around,

21   which of course is just incredible, and you can't

22   believe that.  So you can take Ms. Otero's testimony and

23   throw it out the window.

24        What else do you know about Mary?  You saw those

25   pictures of her butt on the defendant's computer because

again he required her to give -- let him photograph her

butt for cigarettes.  And also you saw the photograph

from the video where the defendant was urinating on

Mary, showing that he treats his drug workers much the

same way and controls them in much the same way as his

sex workers.

Even the defendant's exhibits show the control that

the defendant had over Mary, defense Exhibit QQ3, where

Mary tells -- or asks the defendant, "Is it okay for a

guy to come over because Ayla let him in and I don't

want to get in trouble."  It's control.

And what did Mandy tell you about this incident

after the stash was stolen out of the car?  As

punishment, she had to wear a red apron.  How do you

know that that happened and how has that been

corroborated?  Again, the defendant tells you himself in

that video.  Remember back to that video with Hannah

where he talks about "I had to make the bitch walk

around in a fucking apron, dawg," and then what does he

show?  He shows that picture on his computer of Hannah

wearing a red apron, corroborating Mandy's account that

that's how the defendant humiliates people that get in

between drugs and money.

As to Count 7, possession with intent to

distribute, the defendant possessed a controlled

1    substance, knew what it was -- knew what it was and

2    distributed it.  And you will hear this instruction in

3    the concept of constructive possession, and what that

4    means is that you don't have to have it on you at the

5    time for it to be yours.  Here's an analogy that might

6    help out.

7         You probably own more than -- more clothes than

8    what you are wearing right now.  They are probably back

9    in your house or apartment in your closet.  Those are

10   still your clothes because you have control, ownership

11   over them.  Same thing applies with the concept of

12   constructive possession.

13        And how do you know those were the defendant's

14   drugs?  Again, he videotaped the entire thing, and that

15   videotape was found on his computer.  And look at the

16   language that he used telling Mandy to put the drugs

17   underneath the bag -- underneath the seat, and of course

18   why is Mandy asking the defendant where they should be?

19   Because those are his drugs.  He is in charge of them.

20        But even without the video, think for a minute

21   about the process of elimination as to the four people

22   in that car.  The driver, Mary, obviously was not her

23   drugs; she was the one who tipped off the police that

24   there's going to be drugs in this car.  It's not Mandy's

25   drugs because Mandy doesn't even use drugs, so they're

1    not hers.  As far as Mary, we know what happened when

2    Mary tried to use any of the defendant's drugs.  She got

3    cold-cocked across the head.

4         That leaves the defendant, and of course that's

5    consistent with the evidence that those were his drugs,

6    because he is setting up controlled buys the very same

7    month it happened in the stop.

8         And what -- you heard from Mr. DiSarno that seven

9    grams of heroin were found in that bag and four grams of

10   cocaine, more than needed for personal consumption

11   because that's -- the reason they're found in these

12   bundles and packages is to sell them individually to

13   people.

14        Brings us to the final category, and final count,

15   felon in possession.  You have the three elements in

16   front of you.  The first and the third element are very

17   easy.  Number one, the parties have already stipulated

18   that the defendant has been convicted of a crime

19   punishable by imprisonment for more than one year.  So

20   you can check that off.

21        As far as the third element, you heard from the ATF

22   Agent Scott Murray, who told you that the firearm was

23   manufactured in Maryland and, of course, has to come

24   from Maryland to Virginia [sic] across state lines.  So

25   we are going to talk a little bit more about the second

1      element, possession.

2           Again, the concept of constructive possession

3      applies.  So, again, for example, many of you may own

4      lawn mowers.  Of course the lawn mower is not here with

5      you right now, right?  They may be back in your shed or

6      your garage or somewhere on your property, but that's

7      still your lawn mower.

8           How do we know it's the defendant's gun?  He was

9      the sole occupant driving the car when it was pulled

10     over.  We know that he is involved in a cash business;

11     selling drugs and prostitution is a cash-based business.

12     We know that sometimes people will try to steal drugs as

13     what just happened when the car was broken into and

14     drugs were stolen.  And so perhaps you carry along

15     protection with you to prevent you from being robbed of

16     your drugs.

17          Now, defense may say that was not his car; that was

18     Lori Crawford's.  Yes, Lori testified that she

19     registered it for the defendant, never used it.  Also,

20     think back to 107B.12.  That's the Facebook

21     conversation, a couple months later, where the defendant

22     tells Natalie, "I got cars to sell, including a Dodge

23     Durango, my Dodge Durango."  And of course, defense

24     Exhibit UU6 is text messages from Chrissy saying that

25     the defendant had a gun in the car.

1          Let's also talk about fingerprints.  The defendant

2     may say, oh, there's no fingerprints on this -- on this

3     gun, so we don't know whose gun it is.  Think back to

4     ATF Agent Scott Murray.  He testified that very rarely,

5     under 10 percent of the time, can you recover

6     fingerprints from a firearm because of the service of

7     the firearm.  So you can take that argument and put it

8     to the side.

9          Remember the testimony of Katelynn and Danielle?

10    They talked about how the defendant would keep firearms

11    in his vehicles, and the testimony of many others who

12    saw the defendant with a firearm, including Mary, Ayla,

13    Chrissy and Donald McFarlan.

14         Ultimately, ladies and gentlemen, when you think

15    back again to that video with Hannah, to the defendant,

16    it's all about the green at the end of the day.  That's

17    what he said in that video.  We're not talking about gas

18    money like he was referencing yesterday.  We're talking

19    about money, money that he doesn't care who he has to

20    hurt or who his heroin hurts in order to line his

21    pockets.

22         Ladies and gentlemen, you have heard all the

23    evidence in this case.  The control is finally being

24    taken out of the defendant's hands, and that control is

25    being placed in your hands.  You have the power and

1    control to do what Katelynn, Keisha, Danielle, Ayla, and

2    the other women cannot do, and that is to stand up to

3    the defendant and hold him accountable for his crimes.

4        The government asks that you apply the law to the

5    facts and return the only verdict that the overwhelming

6    evidence supports, and that's a finding of the defendant

7    guilty on all counts.

8        Thank you, your Honor.

9            THE COURT:  All right.  Let's take just a --

10    would you like a brief recess before you give your --

11            MR. KAPLAN:  At least two minutes, Judge.

12    Thank you.

13            THE COURT:  All right.  So let's take a brief,

14    10-minute recess and have you come back after that.

15    (Court was in recess at 10:00 a.m.)

16    (The following was held in open court with the jury

17    present at 10:10 a.m.)

18            THE COURT:  Okay.  Mr. Kaplan?

19            MR. KAPLAN:  Thank you, Judge.

20        Good morning, ladies and gentlemen.  It's still

21    morning, right?

22        I'd like to just remind you of the awesome

23    responsibility that you have been chosen to perform.

24    You will, in a few minutes, be sitting in judgment of a

25    fellow citizen, and as I said to you, that is an awesome

1    responsibility, but it's exactly what our forefathers

2    intended, that there would not be a potentate-type

3    person or a king who would make this kind of decision,

4    but it would be fellow citizens like you who listen to

5    the evidence and then decide what's appropriate.

6        I'm convinced, after having watched you off and on

7    during the course of this trial, that you are an

8    extremely conscientious jury.  You clearly paid

9    attention.  No one fell asleep, and, believe it or not,

10   that happens on occasion.  And you wrote down just about

11   everything.  And so we're impressed.  On behalf of my

12   client, I would like to thank you for your

13   attentiveness, and we're convinced that you will

14   deliberate in the appropriate manner and come up with an

15   appropriate decision.

16       Before we review the evidence together, I would

17   like to talk to you about an issue that keeps sort of

18   raising itself coming up in this case, and that has to

19   do with the cultural differences between the way most of

20   us live our lives, what we consider to be morally

21   correct, and the way Brian and the women who testified

22   in this case led their lives.  I would suggest to you

23   that they lived in two separate worlds.  And the

24   difficulty that you have is trying to judge what took

25   place in this case from the perspective of your world

1    and not from the perspective of Brian and the girl --

2    the women's world.  Let me give you a couple of

3    examples.

4         You know, in this case, you heard a number of times

5    about women, for example, who gave oral sex in exchange

6    for drugs.  And most people, if not everyone, would

7    think, who would -- who would do that voluntarily?  And

8    yet in the world that Brian lived in, in the world that

9    these women lived in such as Danielle, that was common.

10   And not only it happened all the time, but it was -- it

11   was accepted.

12        You know, there's been a lot of talk about the

13   video of the Walnut Challenge, and, you know, you have

14   had people, for example, such as Chrissy, taking the

15   stand and cry about it.  By the way, I submit to you the

16   evidence will show she wasn't even involved in it; she

17   wasn't there.  So you need to look at that with respect

18   to the video.

19        But if you look at that video, you know, as

20   uncomfortable as it might be, you are going to see, and

21   you did see when it was played in court, a much

22   different image, a much different atmosphere than the

23   prosecutors are insisting took place in this case.  You

24   won't see any evidence in that video that anyone was

25   forced to do anything.

1      You won't see any evidence that when Brian asked

2  Victoria to bend over, that -- that she didn't want to

3  do that.  In fact, she was laughing.  She was joking.

4  Look at her in that video, and she's joking, and she is

5  laughing, and they were all paid, and they all had a

6  good time, and Brian testified that that was part of a

7  portfolio that he was building up for the porn industry.

8      And I guess that represents what I'm talking to you

9  about as much as anything.  I mean, you tell someone

10  what took place in that video, and it's unimaginable

11  that a young woman would agree to do that voluntarily.

12  So watch it, and you will see that they did.

13      And would that happen in your world?  No.  But it

14  happened frequently in Brian's world.

15      The other thing -- another example would be Mandy.

16  You know, Mandy testified that she fell in love with

17  Brian.  But way before that, within days of when she had

18  met him, she was having nude photographs of herself

19  taken in the back seat of her car for Brian.  Now, who

20  does that?  Who does that in your world?  Probably no

21  one.  But in this world, the one that Brian lived in,

22  not at all unacceptable or not at all uncommon.

23      So what is my point?  My point is that you can't

24  allow this kind of evidence to unduly influence your

25  decision.  Now, I am not saying you can't use it in your

1     decision, because you may think it's relevant, but if

2     you are going to, for example, talk about -- look at the

3     Hannah video and use that in your decision, I submit you

4     have to make sure that that video somehow impacted

5     someone's life, a witness in this case, that they

6     decided, based on that video, that they were being

7     forced, coerced or tricked into becoming a prostitute.

8          Or does that video of Hannah just stand alone and

9     has no -- absolutely no relevance to whether or not

10    anyone was forced to become a prostitute or was coerced

11    or was tricked?  And, in fact, with respect to the

12    Hannah video, that took place, I believe, sometime in

13    March of 2016, way after, for example, Chrissy, who

14    talked -- Keisha, who talked about it, ever had any

15    association with Brian with respect to prostitution.

16         So I submit it would be impossible to argue that

17    the Hannah video had an impact on Chrissy because she

18    was no longer working with Brian and never did again.

19         The same with the pictures that the prosecutor

20    talked to you about over and over again that were sent

21    to Keisha.  That was way after she ever worked with our

22    client, Brian.  So whatever you think about those

23    pictures, whatever you think about Brian doing that, you

24    need to ask yourself what -- how does that relate to

25    whether or not he forced Keisha or anyone else into

1    prostitution?

2        There's another point I'd like to make with you.

3    The prosecutor stood before you this morning and talked

4    about the horrible background these women had, and I

5    agree.  I mean, there's no one that couldn't listen to

6    the life that some of these young women had and feel

7    sympathy for them.  But -- and it's apparent that that's

8    what the prosecutor wanted you to do.  But, you know,

9    because you feel sorry for someone doesn't mean that

10   person doesn't have an obligation to tell the truth.

11       You can have the worst background in the world, and

12   some of these young women did, but that doesn't give you

13   the right to go to the grand jury and lie under oath.

14   And so -- and the judge will, I think -- you will

15   receive an instruction that you can't allow your

16   sympathies to affect -- to affect how you decide it.

17   It's gotta be based on the evidence.

18       And I'll tell you what strikes me about the

19   prosecutor's presentation from day one is they say to

20   you Brian committed all of these crimes because these

21   women say he did, with very little corroboration.

22       Remember when the prosecutor was cross examining my

23   client and just acted totally shocked that my client

24   would deny that these women would say something?  The

25   prosecutor said, "Are you saying they're lying?"  It's

1    like they can't comprehend the fact -- at least don't

2    want to talk about the fact that their witnesses lied

3    over and over and over again.

4         So they want you to convict my client based on the

5    testimony of witnesses who just don't have the ability

6    to tell the truth, never told the truth, and not only

7    didn't tell the truth, but lied over and over again

8    about extremely important information.  They weren't

9    lying about, you know, what school they went to or what

10   job they had.  They were lying about stuff that's so

11   crucial in this case that it would sway, I submit, your

12   decision one way or the other.

13        Let me ask you this:  Will you make any major

14   decision in your life based on the testimony of any one

15   of the prosecutors' witnesses?  Would you cross a river

16   if Ayla told you it was safe without checking first for

17   yourself?  And why is it that the prosecutor never

18   mentioned in his closing, never talked about the

19   credibility of his witnesses?  Is it because he just

20   assumed that they were young and they were vulnerable

21   and they had, in fact, horrible childhoods, that that

22   would be enough for you to believe everything they said

23   and disbelieve everything that Brian said?

24        It doesn't work that way.  You need to make a

25   decision based on the credibility of the witnesses, and

1    there's lots of different ways to do that.  And this

2    raises an interesting point, I submit, is that what I

3    say to you is not evidence, and what the prosecutors

4    said to you is not evidence.

5        What's evidence -- what the evidence is is what --

6    is what you remember it to be.  Not even necessarily

7    what you wrote down; it's just what your collective

8    memory is as to what took place or your own memory as to

9    what took place.  It's not what he said or I say.

10       But I do want to point out to you several instances

11   in which I think that what the prosecutor said in his

12   closing is not correct, but it's not for me to say that;

13   it's for you to determine that.

14       I don't believe, I submit, that Katelynn never said

15   that Brian punched her in the butt.  I never heard -- I

16   submit to you that Jasmine did not say that Brian pulled

17   her hair.  I submit to you that Jasmine did not say that

18   Brian posted that -- that ad on Backpage for -- for --

19   that Hannah was in, that that was posted by Jasmine.

20       I don't recall any testimony, I submit -- the

21   prosecutor said to you that Keisha said that she was

22   homeless.  I submit to you that that wasn't the case.

23   She wasn't even in the Walnut Challenge, as I mentioned

24   earlier.  Keisha -- Keisha did not steal five bundles of

25   heroin.  I submit to you that it was only five bags of

heroin.  I don't believe that Keisha said that she was

sexually assaulted behind the dumpster.  I believe she

said it was oral sex, however you want to define that,

but it's substantially -- if that is, in fact, her

testimony, it's substantially different than the way it

was portrayed to you by the prosecutor.

I submit to you that Danielle never said that she

saw Brian with a gun.

And that over and over again, the prosecutor talks

about certain acts of violence my client committed but

gives you no -- no corroboration.  There had to have

been other people there.  There's no evidence that

anyone saw anything along those lines.

Ayla never said -- and Ayla, in fact, frequently

called my client for -- for help when she needed it.

So my -- so my point is that you need to be very

careful when you listen to either the prosecutor's and

my version of what took place and ask yourself just how

credible the prosecution witnesses are.

Take Danielle, for instance.  Okay?  The prosecutor

stands up here and says to you -- just assumes that you

are going to believe everything she said, and yet it was

the prosecutor asking the questions of Danielle, and it

was the prosecutor who tells you that Danielle's telling

the truth, who asked her what her relationship with

1    Brian was and how they met, and then he showed her and

2    introduced Backpage messages between Danielle and my

3    client that occurred after she was in the motel, from

4    July and through the end of the year, but he never asked

5    her whether or not she ever sent nude photographs to

6    Brian before she went into the hotel.

7         He never showed her any Facebook messages that

8    he -- that Danielle may have had with my client before

9    she went to the motel.

10        Don't you think that if you are going to make a

11   decision on whether or not Danielle's telling the truth

12   it would be important that you understood the entire

13   relationship between Brian and Danielle?  Why did the

14   prosecution leave it up to the defense to bring out what

15   the truth was?  Otherwise, you wouldn't have had it.

16   Otherwise, you would have thought that Danielle bought

17   drugs from where Brian was staying for three or four --

18   three or four times when she went with some other guy

19   and Brian was there, and the next thing that happens is

20   she tells a guy named -- I don't know if I'm going to

21   remember his name, but she tells someone that knows

22   Brian that -- that she needs money, that she owes a drug

23   dealer $300.  This guy says, "Okay, I'll put someone

24   named Brian in touch with you," and she doesn't even

25   know, she says, when she gets in the car that Brian is

1    the person that she's bought the drugs from.

2         So in other words -- and doesn't know when she gets

3    -- well, when she first gets to the hotel that she is

4    going to be involved in prostitution.  In other words,

5    she wants you to believe the way that it was presented

6    to you on direct examination that she had an extremely

7    limited relationship with Brian.

8         And why?  Why lie about that?  I submit it's

9    because they know she knows that if she tells you the

10   truth, it's going to be far more difficult for you to

11   find beyond a reasonable doubt that Brian forced,

12   coerced or tricked her into being a prostitution --

13   being involved in prostitution during those five or six

14   days.

15        I mean, do you remember on cross examination I said

16   to her, "Did you ever send Brian any Facebook messages

17   before you went to the motel?"  And she said, "No."  And

18   do you remember I said to her, "Did you ever send Brian

19   any naked photographs of yourself before you went to the

20   motel?"  And she said, "No."  And I said, Isn't that --

21   she said -- in fact, she said, "Absolutely not."

22        And I said to her -- because I had them.  I knew

23   she had.  And I said to her, "Well, if you had sent him

24   naked photos of yourself, isn't that something you would

25   remember?"  And she said, "Yes."  And then I showed her

1  the Facebook messages that occurred prior to when she

2  went to the motel with Brian, and they're irrefutable.

3  You will see them.  They have been introduced into

4  evidence.

5       And if you look at the six or seven naked

6  photographs of her that she sent to Brian before she

7  went to the motel, you will see that they coincide with

8  the Facebook messages, same day, same everything.

9       So if Danielle takes this stand and lies to you

10 under oath -- that isn't anything the prosecutor told

11 you.  He didn't say a word about her credibility.  But

12 if she'll walk into this courtroom and lie to you under

13 oath about something as important as her relationship

14 with Brian before she went to the motel, how in the

15 world do you know when she's telling the truth and when

16 she isn't?  I mean, how do you make a major decision

17 based on her testimony?

18      I mean, think about it.  Think about the reasons

19 she gave as to why she went -- when she went to the

20 hotel and discovered there's prostitution going on,

21 couldn't leave.  She said she couldn't leave because she

22 didn't have a place to live, she didn't want to leave

23 Mandy, and she didn't think Brian would let her.

24      Well, I submit to you it's obvious that she lied

25 about not having a place to live.  The whole time she

1    was living with someone named Travis, and after she

2    overdosed, that's where she went back, to Travis's

3    house.  She clearly had a place to live.

4         And do you really believe she decided to engage in

5    prostitution because she didn't want to leave Mandy?

6    Who does that?  She'd only just met Mandy.  It just, I

7    submit, boggles the mind that someone is going to go out

8    and sell their body for sex because she didn't want to

9    leave a woman that she just met.

10        And you now know that her fear about Brian not

11   leave -- letting her go is just made up, I submit.  I

12   mean, she left at one point and went to McDonald's and

13   bought drugs and then came back.  And when she wanted to

14   leave on June 20th of 2015, she told Brian she was

15   leaving; brian didn't stand in her way.  He didn't do

16   anything to stop her from leaving.

17        And you heard Brian testify about what she actually

18   did as a prostitute and why he was so upset with her,

19   because she wouldn't use a condom.  She advertised

20   herself as someone who used drugs, and she would leave

21   with the guys that were her dates, and Brian wouldn't

22   know where they were.  He couldn't protect her.  And he

23   was concerned if something happened to her, he

24   wouldn't -- he wouldn't know where she was.  Doesn't

25   that make more sense than what she said?

1    You heard Brian talk about the attorney convention
2    that she went to.  Anything about that suggest to you
3    that -- that she was lying -- I mean that she was forced
4    into doing that?  And why didn't she tell you about
5    that?  She didn't tell you about it because they know
6    that if you got the full story, it's -- it would be
7    difficult for you to convict Brian of Count 13, that he
8    forced her to engage in prostitution by force, coercion
9    or trickery.

10   Do you really believe what she said in her Facebook
11   message on -- in September to Brian when she said, "I
12   want to come back to work for you tomorrow"?  Do you
13   really think Danielle was talking about selling drugs
14   like she testified?  She had never sold drugs for Brian
15   before.  She was talking about, as Brian said, coming
16   back to work in the prostitution, and she was the one
17   who was asking Brian if she could go to the bachelor
18   party.

19   Remember when she overdosed?  She testified here in
20   court under oath that she got the drugs from her father
21   and her father deserted her.  That isn't what happened.
22   She got into a car, according to Brian, with a group of
23   other people.  That's where she got the drugs most
24   likely.  And if Brian had forced her into prostitution,
25   made her do things she didn't want to do, why in the

1   world would he be the first person that she would call

2   from the hospital after she had overdosed?  Why would

3   Brian and Mandy go rushing up there to make sure she's

4   okay?  Why would Brian wait in the car for her to come

5   out and give her a ride back to Travis's where she

6   wanted to go?

7        Does any of this make any sense to you?  Does any

8   of this suggest that -- that Brian was forcing her into

9   doing anything?

10        You know, I submit to you that a lot of this

11   depends on how you look at the case.  And if you recall

12   when Brian was being cross examined, that the prosecutor

13   was having a lot of trouble getting Brian to admit that

14   he was involved in prostitution, and that was because he

15   was asking the wrong question.  It wasn't Brian's

16   feeling that these women worked for him, that he was

17   their boss, that he told them what to do.  In fact,

18   there's not a lot of evidence that he did do that.

19        Brian's concept of what was taking place was that

20   he had a relationship with these women, he promised them

21   certain things, they promised him certain things, and

22   they both had an agreement to live up to.  It wasn't

23   really that one was working for the other.  So to a

24   certain extent, and if you think that's true, it will

25   affect how you think about this.

1       In terms of credibility, I mean, take a look at

2   Katelynn.  The prosecutor in his closing just went

3   through all this stuff that Katelynn said, put it up on

4   the screen.  It was nice looking.  But where's the

5   corroboration of anything that she said?  And how in the

6   world can you believe anything Katelynn said based upon

7   the number of times that she has lied previously?  And

8   not only lied, but lied about extremely, I submit to

9   you, important issues.

10      Do you remember that Katelynn went to the grand

11  jury, and apparently she had used drugs that day, but

12  she went there and she raised her right hand and she

13  swore to tell the truth, and what is it that she told

14  the grand jury?  When they asked her -- when the

15  prosecutor asked her how she met Brian, she said, "Well,

16  he was walking down the street.  He seemed to be like an

17  interesting-looking guy, and so I went up and met him

18  and we started talking, and then we sort of had a period

19  of where we'd go out for dinners and stuff.  It was kind

20  of a romance, and then I fell in love with him, and then

21  he asked me to prostitute, and I said okay."

22      So if you were asked to make a decision just based

23  on that set of facts, that would be one thing, but you

24  now know none of that's true, that she made all of that

25  up.  She lied about all of that.  The fact of the matter

1    is -- and she admitted this when she testified in this

2    case -- that she had already been working as a

3    prostitute for this guy named C-Rock.

4         And Brian explained to you in quite a bit of detail

5    how he met her, what she was doing, how they developed a

6    relationship.  Is there any evidence in this case that

7    what Brian said to you about that is not true?  Anything

8    at all to suggest that Brian made that up?  No.  That's

9    how he met her.  She was working as a prostitute, and it

10   wasn't Brian that asked her to come work for him, as she

11   testified.  She was the one who asked Brian if she could

12   work with him because she trusted him more than the

13   people that she was working with.

14        Do you really believe that Brian, for whatever

15   reason, would put his hands on Katelynn?  He said,

16   "Look, I never told Katelynn that I loved her.  I think

17   probably she got really fond of me at some point, but we

18   were friends.  We had good times.  She had a great

19   personality.  We joked a lot.  But I had no reason.

20   Number one, I didn't have any reason.  I was never upset

21   with her."

22        So why, under those circumstances, would he put --

23   put his hands on her, even if he was inclined to do

24   that?  There isn't any reason.

25        And, you know, it's interesting; these -- all these

1    witnesses got ready for trial and started saying things

2    completely different than they had said before.  Do you

3    really think, do you really believe her story about

4    C-Rock coming over because he was upset with Ayla?  Ayla

5    wasn't the one that was working for him.  It was

6    Katelynn.  Isn't what Brian told you more credible

7    that -- that C-Rock came over, wanted to get money

8    from -- from Katelynn because he thought Katelynn still

9    owed him money?  Brian said, "She says she doesn't.

10   Leave.  It's time for you to leave."

11       Do you really think that Brian would need to pull

12   out a gun and point it at this skinny African-American

13   that -- the way Katelynn described him.  It looks like

14   not a lot of people messed with Brian, from the

15   testimony, as far as I can tell.  There would have been

16   no need for him to have done that, and Katelynn, for

17   whatever reason, I submit to you, made that up.

18       All Brian did was come to her defense and protect

19   her.  And you heard Brian talk about calling the people

20   that was associated with C-Rock and asking, "What do you

21   want me to do?" and they said, "Beat him up," and he

22   wouldn't fight, so he made up the story about Brian

23   pulling a firearm on him.

24       Doesn't that sound more credible than Katelynn

25   telling you that C-Rock came over because Ayla -- Ayla

1    never worked for him, and she did?

2          You know, Brian testified he knew that Katelynn was

3    seeing Brady.  He didn't -- it wasn't a problem for him.

4    And it was Brian, I submit to you, who drove Katelynn to

5    New York.  It was -- Brian had to stay down there for

6    several months, he had something to do, and when

7    Katelynn said she wasn't coming back, he said, "Fine.

8    You can stay at my mother's," which she did for a while.

9          Brian didn't do anything to prevent her from coming

10   back.  He didn't interfere with her in any way.  You

11   know, Brian testified that it never mattered to him if

12   someone stayed or didn't.  Brian's feeling, as he

13   testified, was that these women -- most of them were

14   prostitutes already.  They were going to go do whatever

15   it was they were going to do, and he felt he could give

16   them a safe environment.  He would benefit in several

17   different ways, and they would benefit.  He would take

18   them off the street, give them a place to live, and

19   protect them so they weren't involved with people like

20   C-Rock, who took all of their money and beat them up

21   whenever they -- when he thought he wanted to.

22         So Brian had no interest in preventing Katelynn

23   from coming back to Vermont.  I mean, had no interest in

24   trying to drag Katelynn back to Vermont if she wasn't

25   interested in coming back.

1    You know, if you listen to the testimony of several

2    of these witnesses, when they were telling the truth,

3    they told you -- Katelynn said this -- that Brian lived

4    up to responsibilities.  He lived up to his promises.

5    He promised he would provide protection, take care of

6    them, have drugs available for them so they know they

7    could buy safe drugs, take them to their appointments

8    when necessary, and help them get their rooms.

9        Three or four of these women all said that that was

10   true, that he did live up to his obligations.  I mean,

11   you talk about the credibility of the prosecutors'

12   witnesses and think about Ayla.  Can you think of one

13   instance when she testified that she told the truth?  I

14   mean, really.  She lied so many times and admitted to

15   it, but how in the world can you believe -- how would

16   you ever know when she is telling the truth and when she

17   isn't?

18       You heard Chrissy say that -- on that phone call

19   that she had with the two police in the car -- "Ayla

20   lies all the time.  You can't believe anything she

21   says."

22       Now, the prosecutor never spoke to you about Ayla's

23   credibility, but we did.  I mean, on cross examination

24   we made sure that the jury had an opportunity to hear

25   exactly what, I submit, should have been brought out on

1          direct examination, all of the lies that she told over

2          and over again.

3              You know, Ayla testified under oath that she met

4          with detective -- with a detective on December 10th of

5          2015, about six months after she met Brian.  And -- and

6          she told the detective, you know, "I never prostituted

7          before I met Brian.  Just didn't happen.  And I only

8          decided to do it because two or three days after, I

9          didn't have any drugs, he didn't have any drugs, so I

10         decided to prostitute to, you know, make some money so I

11         could buy drugs."

12             Then she goes to the grand jury, and she tells the

13         grand jury that she never -- under oath, that she never

14         prostituted before.  And she says that when Brian

15         suggested it to her, she was repulsed.  Those were the

16         words that she used.  She was repulsed.

17             And then she said, "The only reason I agreed to do

18         it was that he withheld drugs from me for three -- or

19         started reducing the drugs I got for three or four

20         weeks, so I had to go do it and make money so I could

21         buy drugs."

22             And then she came in this courtroom under oath and

23         said the same thing, said she had never prostituted

24         before and it was Brian who forced her into prostitution

25         because he withheld drugs from her.  You know, on cross

1       examination, I submit to you, I gave her a perfect
2       opportunity to admit that what she had said all along
3       was a lie.  I asked her two or three times if that was
4       the truth.  I even gave her the names of the people that
5       she knew that she had prostituted before she met Brian,
6       and she still didn't change her story.
7           I told her about Brittany Barber, and I told her
8       about Emily Lasell, and she knew that both these women
9       knew that she had been prostituting before she met
10      Brian, yet she didn't -- wouldn't change her story.  And
11      you heard those two women come in and testify.  Brittany
12      Barber said yes, Ayla was prostituting before -- before
13      the spring of 2015.  She had seen her in and out of all
14      those same hotels that we have heard so much about.
15      Probably no one will ever stay at a Motel 6 again
16      anyplace in the country.  But she had seen her in and
17      out of these hotels constantly prior to the spring of
18      2015.
19          And Emily Lasell came in and said, yes, Ayla was a
20      prostitute, that she did that before the spring of 2015.
21      She was an addict.  As Brittany said, Ayla was a serious
22      addict at that time.  And, yes, she knew that Ayla was
23      prostituting.
24          And then I -- and to impeach what Emily said, she
25      didn't tell the whole story, Jennifer Martin from our

1    investigative team testified that when she asked -- when

2    she asked Emily how she knew that Brian was prostituting

3    her, Emily had told my investigator, "I knew it because

4    I did it with her."

5         So now you have someone who comes in this courtroom

6    knowing that what she says probably will determine to a

7    large extent whether or not you convict Brian of a

8    serious crime, and she's lying the whole time.  Even

9    when she is given an opportunity to not lie, she keeps

10   lying.  And if that's not enough for you, she

11   acknowledged that she lied on so many other occasions.

12        I mean, she told the victims advocate who works in

13   this building in the U.S. Attorney's Office and whose

14   job it is really just to make her life easier, to help

15   Ayla through this, to give her the support that she

16   needs, she lied to her on two occasions.  She told her

17   that she had brain cancer when she didn't.  She told her

18   that she had a job at Northwest Medical Center when she

19   didn't.

20        Ayla testified that she had lied on a number of

21   occasions to the police by giving them a false name,

22   Amanda White, because she didn't want to be arrested.

23   You heard her talk about the time in 2017 that she --

24   that one of the dates that she had on Backpage called

25   the police, said that she was -- her and Bradley were

1    trying to rob her.

2         And look at the Backpage posts that were introduced

3    with respect to Ayla.  The defense introduced them all.

4    And they were Backpage posts that her and Bradley

5    Bordeaux posted because they were working by themselves,

6    not with -- not with Brian.

7         You know, Ayla said that Brian hit her, hit her,

8    like punched her in the face five or six times.  She had

9    to go to the hospital.  But she acknowledged there's no

10   hospital records.  Can you visualize going to the

11   hospital medical center for treatment and there's no

12   record that you were ever there?  That doesn't happen, I

13   would submit.

14        So if she lied about that, how do you know that she

15   wasn't lying about whether or not Brian -- you heard

16   Brian testify.  He's a pretty big person.  If he had hit

17   Ayla, I think it would be a lot more obvious than the

18   evidence that's been introduced in this case.

19        And this business about Brian kicking Ayla out of

20   the house when she had no place to go and she was out in

21   the cold?  You know that's not true.  Ayla testified

22   that Brian -- I mean, Brian asked her to leave because

23   she was stealing drugs and causing a lot of havoc at

24   Spring Street, so he asked her to leave.

25        And you heard -- you heard her testify that Brian

1    gave her and Bradley Bordeaux his car to sleep in at
2    night so they wouldn't be left out in the cold, and --
3    until they could find better arrangements.  Does that
4    sound to you like someone who would treat Ayla in a
5    cruel manner?
6        So I have talked to you a lot about the
7    credibility -- excuse me a minute.
8        I talked to you a lot about the credibility of the
9    witnesses and why is it only the defense that has to
10   raise that issue with you when you can see, I submit,
11   quite easily that that's maybe the most crucial issue in
12   this case.  Why doesn't anyone else talk to you about
13   why you should believe these witnesses, not just stand
14   up in front of you for an hour and say you need to
15   believe what Ayla said, you need to believe what Keisha
16   said?  Why not tell you why you need to believe it in
17   the face of all the lies that have been told?
18       Now, one way to judge the credibility of witnesses
19   is to ask yourself, do any of these witnesses have a
20   vested interest in the outcome of the case?  Obviously
21   Brian does.  But do any of the prosecution witnesses
22   have a reason to tailor their testimony to please the
23   prosecutors in this case?
24       And I submit to you that every single prosecution
25   witness, maybe with one exception, had more than enough

1     reasons to say whatever it was that the prosecutors

2     wanted them to say.  Certainly Mandy and McFarlan were

3     looking for a deal on a sentence.

4          I still am amazed by McFarlan's testimony where he

5     just couldn't get it out of his mouth that he wanted a

6     lower sentence and that's why he was -- even when he was

7     confronted with telephone calls he made where he kept

8     saying to his girlfriend, "I want to get as low a

9     sentence I can."  How do you do that?  You cooperate.

10    Why would he say that?  But anyway.

11         So clearly those two had a reason to come in and

12    say whatever it was the prosecutors wanted them to say

13    to get a lower sentence.  And the other witnesses,

14    prosecution witnesses, didn't want to be charged.  I

15    mean, take Chrissy, for example.

16         Chrissy, by her own testimony, had acknowledged

17    that she sold a lot of drugs, mostly for McFarlan, I

18    submit.  She helped out with the prostitution business,

19    would drive the girls back and forth or stay in their

20    rooms or whatever.  So she clearly could have been

21    charged, but she hasn't been charged.

22         And I submit to you that what's really interesting

23    about Chrissy's testimony is how different it was when

24    she was not meeting with the government, when she was

25    not preparing her testimony, compared to what she said

1   when she came into court and testified.  I mean, it's

2   like a -- you recall a phone call.  We called her in the

3   second time, put her on the stand, and we played that

4   phone call where she was in the police car with two

5   policemen from Essex.

6       And do you remember what she said in that call?

7   Ask yourself why in the world is that so different than

8   what she testified to when the prosecutor put her on the

9   stand in this case after having rehearsed her testimony

10  with her for who knows how long?  Why -- why wouldn't it

11  be the same if Chrissy's someone that tells the truth?

12      Chrissy told the police in that car that -- I mean,

13  think about this.  This is when she has no reason to

14  lie.  She is working with these guys.  I think she kind

15  of likes it.  She's getting paid, so she wouldn't -- she

16  wouldn't -- doesn't have any reason to not tell these

17  officers the truth, and what does she say?  She says

18  that she is not afraid of Brian.  She's really clear

19  about that, she's not afraid of Brian.

20      Not only did she say -- this must have been in

21  November, probably early December 2015.  Not only did

22  she say she's not afraid of Brian, but she says --

23  contrary to what the prosecution has dragged out of

24  their witnesses, she said that she has never seen Brian

25  hit any of the women and never seen Brian abuse any of

1     those women.  Never.

2         So what would be her reason for saying that to the

3     police if it wasn't true?  And she says that Ayla -- as

4     I said before, "Ayla lies all the time."  She

5     certainly -- and don't forget, this was after Brian

6     asked her to leave because she was stealing drugs.  And

7     she didn't mention, as she did on the first time that

8     she testified, that Brian had forced her to have oral

9     sex and wasn't doing it right so she asked Ayla to show

10    her.  Ayla said that didn't happen.  Ayla -- when Ayla

11    was asked that by the prosecution, she said, "No, that

12    didn't happen."

13        And so what does she say when she comes in the

14    second time four years later, when we called her?  All

15    of a sudden she remembers that Brian sexually assaulted

16    her.  I mean, she never said that to the police in the

17    car.  She never said that in all the meetings she had

18    with the police.  She didn't say that when she testified

19    the first time.

20        How come, all of a sudden, when she testifies the

21    second time, she's saying that?  You would have to

22    wonder what would she say if she came in the third time.

23        And so -- and don't be fooled by -- by Chrissy's

24    tears.  You heard Brian testify that the women used to

25    practice on Brian so that if they got in trouble, they

1    would have him help them get out of it.  But more than

2    that, think about the phone call that she was -- that he

3    was having -- Chrissy was having with McFarlan when the

4    drugs from that cereal box went missing.

5         She's making up all these reasons to McFarlan as to

6    why he should believe that the police aren't involved.

7    She's lying to him over and over again, and when he's

8    not buying it, she starts sobbing.  You know, she's

9    crying, you know, just like real tears.  And then after

10   she hangs up, she says to the police, "I should get an

11   Academy Award for that."  So maybe she should get an

12   Academy Award for some of the things she said during

13   this trial too.

14        I mean, if she was really afraid of Brian, and

15   Brian had done any one of these things to her, why would

16   she be texting Brian, texting Mandy and other people she

17   wanted to come back and work with them?  I mean, why --

18   who does that?  Someone sexually assaults you, forces

19   you to have oral sex, and you beg them to let me come

20   back and sell drugs for you?

21        I submit to you Jasmine was sort of in a similar

22   situation.  Jasmine never said, I submit, that Brian

23   ever physically touched her or hurt her.  And you heard

24   Brian talk about that Brian's problem with Jasmine was

25   he didn't want her to go with someone that had HIV.  And

1    she would -- she wouldn't not do that, so he says,

2    "Fine.  We're done.  You know, I just can't have that --

3    that disease prevalent in the people that I know."

4        And then take a look at the defense witnesses, and

5    ask yourself if any of them had any reason to lie, or if

6    any of them had any reason to manufacture the truth or

7    they had someone to please.

8        Certainly Brittany Barber did.  Brittany Barber and

9    Ariel Otero painted a much different picture of who

10   Brian is than all of the prosecution witnesses who were

11   looking for a favor.  And neither one of them received

12   any benefit.  I mean, Danielle was paid over $11,000,

13   Mary was paid almost 7,000, and Ayla was paid over

14   $10,000 over a year period.  And the year before that

15   they were given all kinds of help.  That's a lot of

16   money.

17       And Brittany Barber and Ariel Otero weren't paid

18   anything.  Brittany Barber described Brian as someone

19   who is -- who was respectful to her, treated her

20   properly.  She testified that she was the one who asked

21   him if she could work with him as a prostitute, and he

22   said sure.  And he gave her a place to stay for free out

23   on the North End, at Unc's place.  She paid, after what

24   she made, to Mandy.

25       And she only did this for two or -- two weeks or so

1    because she said she wanted to get clean, and when she

2    told Brian she wanted to get clean, he said fine.  You

3    know, words to the effect, "I think that's what you

4    should do," but she said when she was with him, he was

5    fine.  He didn't do anything disrespectful to her.

6         And Ariel Otero said essentially the same thing.

7    Ariel was with him from, like, the beginning of November

8    all the way through -- almost all the way up until July

9    when Brian was arrested.  And she also painted a very

10   different picture of Brian than the prosecutors'

11   witnesses.

12        The whole time she was with Brian, she said he was

13   respectful, he was courteous, he knew that she was in

14   the prostitution business, and he never asked her to

15   work for him.  He didn't solicit her to do that.  Not

16   only didn't he solicit her, but he encouraged her to get

17   out of the business.  He said she wasn't using drugs.

18   She didn't need to be a prostitute to buy drugs.  He

19   said, "Why are you doing this?  You could do much

20   better."

21        And I talked to you a little bit about none of

22   the -- almost none of the prosecution's evidence in this

23   case is corroborated.  They want you to just accept what

24   the witnesses said at face value.

25        Take Mary, for example.  Mary says that Brian

1    called her over, like on February 10th, pointed a gun at

2    her when she got there -- that's the first thing she

3    said.  The second time she was asked about it, she said

4    Brian -- in the bathroom, she said.  And the second time

5    she said Brian pointed a gun at her in the bedroom.  And

6    then the third time she talked about it, she said Brian

7    pointed a gun at her after he assaulted her.

8         So we don't really know exactly when the gun was

9    pointed at her, but she says that Brian dragged her

10   around the apartment, dragged her into the bedroom, and

11   Brian and someone else had -- sexually assaulted her.

12        And you will see -- we introduced a diagram of it,

13   and when she says that Mandy and Ariel were sitting on

14   the couch, they were hearing all this and they were

15   laughing.  And you will see a diagram of the apartment.

16   I submit to you, if a sexual assault was taking place,

17   they would have heard it.  And Ariel said that never

18   happened.  "I never saw or heard anything like that.

19   And I certainly wouldn't have allowed it.  It's

20   certainly something I would have interfered in."

21        And the important question, I would submit to you,

22   in that sense is why didn't Mandy say she heard it if

23   that's what happened?  I mean, Mandy was only too eager

24   to respond -- I submit, to respond to the prosecutor's

25   questions about all the bad things that Brian had done.

1    Well, don't you think if she -- if she was aware of the

2    fact that Brian was having -- making a sexual assault,

3    she would have said that to you?  Why didn't she say

4    that?

5         You know, when -- when the prosecutor said to you

6    that Brian hit Mary and she fell off the chair, why

7    didn't anyone else in this case say they saw that?  She

8    wasn't there alone, apparently.  So it's another example

9    of the prosecutor just wanting you to take at face value

10   what the witness is saying because they're young and

11   they have, you know, unpleasant childhoods, which -- I

12   am not even sure Brian knew that any of them did.  I

13   don't recall any evidence that he knew that, but I

14   submit to you that's not enough.  You know, you still

15   have an obligation to tell the truth.

16        There's been some -- I would submit that Lori

17   Crawford is someone that actually spoke in favor of

18   Brian, and she may be the one person who knew more about

19   him than anyone else.  She said that when she wanted to

20   go to rehab, it was Brian that encouraged her to.  It

21   was Brian that drove her over there.

22        She said that she would rely upon Brian to help

23   with her boys, to talk with the boys, get them to stop

24   doing some things they should not be doing.  Brian even

25   gave them a job babysitting for his son -- I think they

1    may have even been the same age -- because he wanted to

2    get them off the street.  Would Lori have done that with

3    someone that you didn't trust, you didn't like, you

4    didn't think was a respectful individual?

5        And, you know, another issue that you never heard

6    anything about in the prosecutor's closing is the fact

7    that McFarlan held a knife to Mandy.  Not Mandy; I'm

8    sorry.  To Lori Crawford.

9        Lori testified that in the middle of the night she

10   found someone in her room, and it was McFarlan who held

11   a knife to her throat, and she was scared.  She also

12   told you that McFarlan punched her in the chest, and she

13   told you that McFarlan was accusing her of stealing and

14   was going after her, and Brian stepped in and said,

15   "Wait a minute.  What's the problem?" and Brian gave

16   McFarlan some money so he would back off Lori Crawford.

17       You didn't hear that in the prosecutor's closing.

18   And, you know, when the prosecutor engaged in direct

19   examination of Lori Crawford, he never asked her about

20   that at all.  Never said -- because she had said that on

21   a number of occasions.  It was in all the reports, and

22   it was in the grand jury testimony that she did.  They

23   knew.

24       Why didn't they ask her that on direct so that all

25   of you could have all the information that you need to

1    make a reasonable and appropriate decision in this case?

2        You know, Count 15 deals with Hannah, and there

3    are -- I would submit to you there are several important

4    considerations.  The prosecutor's already given you the

5    law, but I still think, I'd submit, and you can take

6    this for what it's worth, that it's significant that

7    there's no evidence that she was a prostitute.  None.

8        And there's no evidence that that ad being

9    posted -- by the way, it wasn't posted by Brian.  It was

10   posted by Jasmine -- that that -- that picture was ever

11   intended for Hannah to prostitute.

12       You heard Brian testify that it was a bait and

13   switch, that she was so attractive that people would

14   call when they saw it.  They wouldn't get her; they

15   would get someone else.  So that's why.  So there wasn't

16   ever any intent for her to be a prostitute, and every

17   witness who walked into this courtroom, from the

18   prosecution's standpoint, when they named all the people

19   that were working prostituting, never once mentioned

20   Hannah.

21       Now, a significant issue in the case is that that

22   photo was taken about six months before she turned 18,

23   and if you look at pictures of Hannah back in 2013, she

24   was a very mature-looking young woman.  I submit to you

25   that no one ever could have known that she wasn't 18 at

 1    the time.  And I submit to you that Brian, back then in

 2    2013, never had an opportunity to know whether or not --

 3    I mean, it would be natural, I would submit, for him to

 4    assume that she was 18 because of the way she looked,

 5    but she had only -- he had only seen her on two

 6    occasions, and neither one of those was for a very long

 7    time.

 8         And so if you look at the charge, I would submit to

 9    you that someone that looks as mature as she did, six

10    months away from her 18th birthday, it's not readily

11    apparent that she's not 18.  In fact, I would submit to

12    you that the reverse is quite true.

13         I have to apologize for going so long.  I am a half

14    hour longer than I usually do, but there's a lot in this

15    case.

16         You know, one of the points that the prosecution

17    made in its opening and they made through this trial and

18    got the witnesses to say it was Brian didn't want the

19    women to leave.  If they wanted to quit prostituting, he

20    would do everything he could to keep them from doing

21    that.  Well, Keisha is a perfect example of why there's

22    no truth in that at all.

23         Keisha prostituted for one day in 2013, and I

24    believe the evidence is, I submit, that she never saw

25    anyone.  She was in a hotel room but nothing ever

1     happened.  And she said to Brian, "I don't want to do

2     this," and Brian -- you heard Brian testify she wasn't

3     ready.  He said fine.  He gave her a ride back to her

4     grandmother's.  Does that sound like someone to you that

5     would force women to prostitute if they didn't want to?

6          I would submit to you that what the prosecutor said

7     to you about what took place in June of 2015 with Keisha

8     and Brian is not at all, by a long shot, supported by

9     the evidence.  It was Keisha who called Brian and said

10    that "I just got out of rehab.  I want to come back to

11    work.  Will you pick me up?"

12         Don't forget between 2013 and 2015, Keisha was

13    working as a prostitute on her own, and she had built up

14    her own clientele.  Brian told you that he had seen

15    her all over the place at the different motels.  They

16    ran into each other at the beach, for example.  They had

17    a good relationship.  But she wasn't working with him.

18         So he says, "Sure.  Just take a cab and I'll pay

19    for it."  So she takes the cab from the bus terminal to

20    the motel that they're in.  Danielle's there at the

21    time.  And he said Keisha was there for a day, maybe

22    two, and Brian asked her to leave, and he asked her to

23    leave because she had her own clientele.  People were

24    calling.  She didn't want to pay Brian anything, not

25    even gas money.

1      He said, "Look, you don't need me.  This isn't

2  working.  I am driving you all over the place.  I'm not

3  getting any money.  You will do better on your own."

4  And she left.

5      Does that sound to you like Brian made it difficult

6  for these women to leave?

7      You know -- and the charge is that Brian somehow

8  coerced or forced, or by some trick, Keisha into working

9  as a prostitute in 2013 and, Count 12, between June of

10  2015 and, I don't know, January, February of 2016.

11  Where's the evidence that he did that?

12      I mean, you heard testimony that it was Keisha in

13  2013 who asked Brian if she could work as a prostitute.

14  She had been talking with Katelynn.  She saw the money

15  that Katelynn was making.  You remember I asked her on

16  cross examination, "What did you say to him?"  "I said

17  I'd give it a try because I was interested in making the

18  money."  And she said -- she decided to give it a try

19  but was there for less than a day.

20      So can you really convict Brian on the state of

21  this evidence beyond a reasonable doubt that he forced

22  Keisha into prostitution in 2013?

23      You know, after she left Brian in 2015, when she

24  was there for a day or two, she never worked for Brian

25  again.  That was her testimony.  On cross examination,

1    she said -- because I showed her some ads, Backpage ads,

2    in January and February of 2016.  She said, you know, "I

3    mostly worked for myself."  You know, "I did it with

4    Brian a few times.  Mostly myself."  And she said, "If I

5    ever needed help, I could call Brian."

6        And so that if you look at the phone calls, they

7    still had a number of phone calls between November and

8    February of -- or January of 2016, and I submit to you

9    if Brian had sexually assaulted Keisha back in November

10   of 2015, do you really think that she would stand up --

11   sit up here calmly and say, "I could call Brian whenever

12   I wanted.  If I ever needed anything, he would help me"?

13   I mean, who does that?  Because she didn't need Brian

14   really.  She had her own clientele, but she still stayed

15   in touch with Brian.

16       Brian brought her to another house, said, "Look,

17   you can't work with me anymore because you stole drugs,

18   and did the stuff you did."  He yelled at her.  He

19   tended to do that.  So, "You can go to this house.  They

20   are doing the same thing."  It's not like he left her

21   out -- he left her out in the cold.

22       How in the world can you convict him of forcing

23   Keisha or tricking her or pushing her into prostitution,

24   as Counts 11 and 12 indicate?

25       Count -- Count 1 is the conspiracy drug charge, and

1   the prosecutor explained to you that you need to find

2   that he sold at least 28 grams or more of crack -- or at

3   least 28 grams or more of crack in the conspiracy and

4   that it was more than a -- a hundred grams or more of

5   heroin in the conspiracy.  And so the prosecutor did

6   some fancy footwork by talking about, well, there was

7   this amount of sales in this amount of time, and, you

8   know, you get 300 grams; but there's no evidence that

9   any of that took place.

10      And you know from the four sales that did take

11  place they were really small quantities.  The only

12  amount of drugs that they physically had possession of,

13  that Brian may have been involved in, is like 11 grams

14  of heroin, a far shot from a hundred grams, and about

15  four grams of crack.  So the real --

16      I submit to you, the prosecution's right.  If you

17  find that that cereal box of -- drugs that were in the

18  cereal box was attributable to Brian, then, yeah, he

19  meets that; well, maybe not quite, but it's closer.

20      So the whole key, I submit to you, to whether or

21  not Brian's guilty of Count 1 is whether or not he was

22  in a conspiracy with others with McFarlan.  Because if

23  he wasn't in a conspiracy with McFarlan, then the drugs

24  that McFarlan brought up in January of 2016 that were in

25  the cereal box should not be attributable to Brian

1    because he had nothing to do with it.

2         And I submit to you it's clear that Brian was not

3    in a conspiracy with McFarlan.  The judge is going to

4    give you a charge on what a buyer/seller relationship

5    is.  That's different than a conspiracy.  I am not

6    saying Brian wasn't involved in a drug conspiracy with

7    maybe Amanda or others, but it wasn't -- I submit to you

8    it wasn't McFarlan.

9         Pay close attention to -- the charge will go in the

10   jury room, again, with you, and in that charge there's,

11   I don't know, seven, eight, nine different factors that

12   you look at to determine if someone is in a conspiracy

13   or just in a buyer/seller relationship, and I submit to

14   you that almost every one of those factors is in favor

15   of finding that Brian was not in a drug conspiracy.

16        McFarlan testified that he would bring up maybe 50

17   grams at a time but that Brian would only buy some of

18   it.  McFarlan said, "I thought of myself as -- as

19   Brian's drug dealer," not "I thought of myself as being

20   in business with Brian."  They didn't split the

21   proceeds.  McFarlan could have cared less what Brian did

22   with the drugs that he bought.  McFarlan never told

23   Brian who to sell to or how much to charge for them.

24        You go through those factors, you are going to see

25   that it's clearly, I submit, a buyer/seller

1     relationship.

2          And then on top of that you have the fact that

3     Chrissy's testifying in December and January of 2016

4     that Brian and McFarlan are not together.  They're not

5     working together.  And then you heard the phone calls

6     that the prosecutor keeps telling you about, where in

7     those phone calls Brian's saying -- saying to Chrissy,

8     when she's complaining about the fact that McFarlan's

9     giving her a rough time because the cereal box was

10    taken, Brian said, "I told you not to get involved with

11    him.  I told you I didn't want anything to do with that.

12    I don't want to be in the middle of this.  I wasn't

13    involved."  Does that sound like someone who was

14    expecting that those drugs were going to be delivered to

15    him?

16         And anyway, McFarlan testified that the drugs were

17    always his until Brian bought what he wanted.  Then

18    whatever Brian bought became his, and in the meantime,

19    they were all McFarlan's.  McFarlan had his own

20    customers.  He was -- he did undercover buys -- sale in

21    January, I think January 12th, in Winooski.  So he was

22    selling his own drugs himself up here.  So how do you

23    know who those drugs were for?  They clearly weren't for

24    Brian.

25         I would submit to you that if you look at all the

evidence with respect to the drug conspiracy, there's no way in the world you could find that that cereal box was attributable to Brian.

Count 2 has to do with the firearm that's found in the glove compartment.  What's the evidence that Brian possessed the firearm?  No fingerprints.  No one ever said they saw Brian with that particular gun.  In fact, no one ever said they saw Brian with the same gun. Everyone talked about different kinds of guns.  But no one ever said they saw Brian with that gun.

That car, even though it's clear that Brian considered it his -- I think he said that when he testified -- everybody drove that car.  He said, "That's why I had it.  Everybody drove it."  Lori drove it.  She even rode in it on occasion.  Mandy drove it.  A lot of people drove that vehicle.

You know, you heard Brian testify that every time he got in a car, about, the police stopped him and they searched the vehicle.  Do you really think that Brian would put a firearm in a glove compartment knowing that the chances of the car being stopped and searched are almost a hundred percent?

I mean, I don't know what the truth is here or not. Katelynn said Brian had a gun, that he would put the gun in the trunk and the clip in the glove compartment.

1     That's not what happened here.  But I would submit to

2     you that if you are going to convict someone of a

3     serious firearm crime, that you need more than just --

4     just the fact that Brian's in the same car, driving the

5     same car that a gun is found in the glove compartment

6     with no fingerprints.

7          Can you really find beyond a reasonable doubt that

8     that firearm belonged to Brian based on the state of the

9     evidence?

10         Now, I want to talk to you for a minute -- I

11    haven't kept track of the time, but you probably have,

12    but I want to talk to you for a minute about the quality

13    of the prosecution evidence, and I can't think of a

14    better example than Miss Epp.

15         I mean, think about it.  This is an important

16    federal criminal case.  You probably -- definitely have

17    a feel by now of all the time and effort that the

18    prosecutors put into putting this case together.  I

19    mean, I don't think I am out of turn saying there were

20    thousands and thousands of pages, hours of

21    investigations, and what do they do with the most

22    crucial piece of evidence in this case, the computer?

23         They hand it over to someone who's never searched

24    it before, never done a computer search, and they let

25    her go into the -- turn on the computer for, like, six

1    or seven hours and just go in and roam around.  Who does

2    that?  I mean, the agents had to know that you don't do

3    that.  I mean, you heard our expert testify about that.

4    Just -- if that ever happens to him and he gets a

5    computer, he knows it's been turned on, he can't -- he

6    can't certify it because it alters files, it changes

7    files, files get deleted.

8         Now, I know the prosecution's made a big point of,

9    well, none of the pictures they introduced were affected

10   by that.  Really?  I mean, there's some -- there's some

11   things in those pictures you can't explain.  And how do

12   you let a prosecution allow something like that?  Not

13   only that, she doesn't -- she doesn't write a report.

14        This is a chain-of-custody issue.  It's the fact

15   that she turned on the computer.  I wonder if Thornton

16   said to her, "What?  You turned on the computer?"  But I

17   don't think he cared either, because when he wrote his

18   report, he never said a word about the fact -- he never

19   told us that the computer had been turned on.

20        The defense never would have found out if we hadn't

21   hired our own expert who, within a half hour of looking

22   at the evidence, had discovered that the computer had

23   been turned on.  Why didn't Thornton tell us about that?

24   Why didn't he put that in the report?  Why didn't -- why

25   didn't Miss Epp write a report saying she had turned it

1    on?

2          I mean, she -- she talked about all the training

3    she had, like 12 weeks someplace in forensic analysis or

4    something.  No one ever said to her during those 12

5    weeks that you can't turn on a computer?  I would be

6    willing to bet that anyone who is involved with

7    computers knows that you can't do that.  A federal

8    prosecutor should have known, I submit, that you can't

9    do that.

10         And that goes along with the entire presentation

11   that the prosecution used.  How is it possible that they

12   put Ayla on the stand and let her say she never

13   prostituted before?  What kind of an investigation is

14   conducted if they don't know that but we know it?  Or if

15   they don't know that -- that Katelynn lied to the grand

16   jury until months later.  We knew what she had been

17   doing.

18         So you are being asked to make a decision just, I

19   submit to you, on faith.  The prosecutor says, you know,

20   it's -- this is the way I interpret it:  "That it's good

21   enough that we tell you this is what our witnesses say.

22   You should convict Brian because of that."  And I would

23   submit to you that Brian never withheld drugs from

24   anyone, never tricked anyone into prostitution, never

25   told anyone that he loved them, never created an

atmosphere where people would do stuff for him such as
prostitution for that reason.  That as both Katelynn and
Ayla testified, he lived up to his bargains with these
women.  He agreed to do what he did, and he did that.

And I would submit to you that I'm not sure why the
entire burden falls on Brian in the first place.  You
heard Dr. Higgins testify in that people have choices.

Now, obviously I understand if you are -- if you
are an addict, your impulse reactions are quicker than
if you are not an addict, and it's more difficult maybe
to make the right choice.  But Dr. Higgins said you
still have the ability to make choices, because --
addicts too.  I mean, at some point they always say,
"I'm not going to do this anymore.  I'm going to go to
rehab" and they don't.  Sometimes they are ready and
sometimes they're not.

But Brian's position was that "if these women are
going to prostitute and -- because they need money for
drugs, then I'm going to make sure they are in a safe
environment."  And you can believe that or not believe
that, but I haven't seen an awful lot in the evidence
that's been introduced by the prosecution that says
anything different than that.

I have already said to you that what I said and
what the prosecutor says is not evidence; it's how you

1    remember the testimony.

2         The other point I would make is that as you see my

3    client sitting in court here today, he is presumed to be

4    innocent, and that shroud of innocence stays with him

5    all the way through these proceedings and all the way

6    through your deliberations and only leaves him in the

7    event that you decide that he's guilty beyond a

8    reasonable doubt.  But I would submit to you, based on

9    the quality of the evidence that the prosecution

10   introduced in this case, that he should be found not

11   guilty on all counts.

12        Thank you.

13             THE COURT:  All right.  Let's take, again,

14   another 10-minute break, and then, the government wish

15   to make a rebuttal?

16             MR. DARROW:  Yeah, I think so.  Yes.

17             THE COURT:  Okay.  All right.  So let's take a

18   10-minute break and see you then.

19   (Court was in recess at 11:23 a.m.)

20   (The following was held in open court with the jury

21   present at 11:35 a.m.)

22             THE COURT:  Okay.  The government have

23   rebuttal?

24             MR. DARROW:  Yes.  Thank you, your Honor.

25             THE COURT:  Okay.

1          MR. DARROW:  I will try and keep it fairly

2     short.  I know it's been a long three weeks.

3          Yesterday Mr. Folks got on the witness stand and

4     testified that all of the witnesses in the government's

5     case, all seven of these women, were lying about

6     virtually all of his involvement.  And today his lawyer

7     came and did the same thing.  They're all liars.  You

8     can't believe anything they said.

9          Now, one of the questions Mr. Kaplan asked you is

10    along the lines of would you make an important decision

11    in your life based upon the testimony of any one of

12    these witnesses?

13         We don't want you to do that.  We're not asking you

14    to do that, because this isn't the case -- this is not a

15    case where it's just Mr. Folks and one witness for the

16    government.  It is all of the witnesses who told you the

17    same story over and over again about the abuse and

18    exploitation they were subjected to by Mr. Folks.  We

19    are relying on all of those witnesses together telling

20    that same story, and we are relying upon the

21    extraordinary images that Mr. Folks himself kept in

22    little encyclopedias of photographs of each woman in

23    sexually compromised positions, and those -- those

24    videotapes, which if Mr. Folks had not videotaped what

25    he did and kept it, it would be almost too incredible to

1    believe what happened.

2        Now, I want to follow up on a few of the points

3    made by Mr. Kaplan.  Mr. Kaplan said -- started out by

4    saying, well, part of this is a cultural thing.  It's a

5    cultural difference because of the world that Mr. Folks

6    and these women lived in is different from the world

7    that we live in.

8        First of all, the law says what you can do and what

9    you can't do, not the culture that you are in, and under

10   the law, Mr. Folks can't do the things he did to those

11   women.

12       Second of all, just because those various women who

13   came in here -- and they were not happy about having to

14   do it and told you about the low points in their lives.

15   Just because they had suffered and lived through bad

16   things before, and then, it doesn't mean that it's right

17   to make them continue to do that and to prolong that

18   suffering, because it's not right, no matter what

19   culture you're in.  You don't get peed on and have that

20   other stuff that Mr. Folks was doing.

21       Mr. Kaplan told you that Chrissy -- you couldn't

22   believe what she said about the walnut video because she

23   wasn't in it.  Well, that's wrong.  Chrissy is in the

24   walnut video, and you see it in one of the first images

25   that you look at in the video.  He said there's no

1    evidence of force in the video.  Well, apparently he

2    thinks the three women subjected to the Walnut Challenge

3    are just having a grand old time, but you saw, when he

4    is bending over Victoria, in the video that we

5    recovered, and she tries to stand up, he says, "I didn't

6    tell you to stand up yet."

7         Well, he doesn't need force because he has such

8    control that all he has to do is say bend over and she

9    complies, because that's the regime that he had

10   established.

11        Counsel told you, well, the walnut video, the

12   Hannah retaliation video, the urination video, they

13   should stand alone and have no relevance to the case.

14   Well, that's just nonsense, isn't it?  Because those

15   videos are paradigmatic examples of what he did to those

16   women.  He videotaped the control and manipulation he

17   had over them and their incredible willingness given the

18   way he treated them and had conditioned them and groomed

19   them to do those things.  They're right in the middle of

20   the case.  They show the pattern of conduct that you

21   heard about in many other ways as well.

22        Counsel said no one could not feel sympathy for

23   them.  Well, I'm sure that you all did hearing those

24   stories about how they grew up, the -- I mean, Mary's

25   arms were too -- Danielle's arms were too terrible to

1    think about and not feel sympathy for, and the other

2    stories about half a dozen foster homes, drug addict

3    parents, fathers teaching you how to shoot up heroin

4    intravenously and then bringing you to Donald McFarlan.

5    They're almost too tragic to think about.  However,

6    there is one person whom we submit there's really no

7    indication that he had any sympathy for them.

8         Counsel said, well, there's very little

9    corroboration.  And I mentioned before that we're not

10   counting on any one of these women.  This is not a he

11   said, she said and there's-one-on-each-side case.  And

12   you will -- you should regard the testimony of the women

13   carefully.

14        At the time this was happening, they were drug

15   addicts.  You should think carefully about their

16   credibility.  However, the pattern that you heard about

17   over and over from woman after woman was consistent and

18   concerning.

19        I mean, you heard as to whether the defendant ever

20   posted on Backpage; well, he said that never happened.

21   "I didn't post on Backpage.  They did all that."  Well,

22   Mandy testified that he posted her.  Keisha testified

23   that he posted her.  Katelynn testified that he posted

24   her.  Jasmine testified that he posted her.  Danielle

25   testified that he posted her.  And Ayla testified that

1    he posted her.  I mean --

2        Then as to the question of did he ask any of the

3    women to prostitute, well, he said no, he is just trying

4    to be sort of a helpful father figure.  "I wouldn't

5    teach them how to prostitute."

6        Mandy testified that he taught her how to

7    prostitute, and so did Keisha, Katelynn, Jasmine,

8    Danielle and Ayla.

9        And what about the 50/50 earnings?  Remember that?

10   He says, well, that never happened.  "I just -- all I

11   wanted was a little gas money."  I mean, right on the

12   face of it, why go through all this trouble for -- if

13   all you are getting out of it is gas money?  I mean, you

14   gotta be an awfully big Good Samaritan, but what kind of

15   Good Samaritan is peeing on women?

16       In any event, as to the 50/50 business, although he

17   said, well, that's not true, Mandy testified that it was

18   50/50, Keisha 50/50, Katelynn 50/50.  Jasmine said he

19   got all of her earnings.  Ayla said it was 50/50.  And

20   then the defense's own witness, Brittany Barber, when

21   she came in, said that she was prostituting for him, she

22   said, yeah, she gave him 50/50.  That was the deal they

23   had.

24       And then you also know, because Brittany Barber

25   told you, the defense witness, as well as the government

1    witnesses, that although it started out 50/50, it very

2    quickly became 0/100, because the 50 percent of the

3    prostitution earnings that the women were allowed to

4    keep they then turned around and gave to the defendant

5    to buy drugs.  And so he is getting a hundred percent.

6        The defense said that Mr. Folks would have no -- no

7    reason not to let them go and he could care less whether

8    the women were working for him or they went on their

9    own.

10       Really?  A hundred percent of their earnings,

11   multiple prostitutes having five, 10 or more dates a day

12   at a hundred of $200 apiece, and he is getting all the

13   money?  I think that's someone who doesn't want all

14   these people to just leave.

15       And, you know, the -- him getting a hundred

16   percent, testified woman after woman after woman,

17   including defense witness Brittany Barber.  So, you

18   know, that's gotta be corroboration, even setting aside

19   the digital and imagery evidence.

20       Now, the defense is relying heavily in claiming

21   that everyone's a liar in the testimony of Mr. Folks,

22   and my colleague touched on that briefly during his

23   closing, but I want to go into it a little more because

24   they're leaning on it so heavily.

25       A few things:  First of all, counsel, my colleague,

1    mentioned the difference in the demeanor between Mr.

2    Folks and the others, the other multiple women.  Folks

3    is a salesman.  He sells drugs.  He sells women.  And

4    now he is trying to sell you.  His demeanor was easy and

5    glib.  Counsel would say, "Well, tell me about Keisha,"

6    and he'd pause for a moment, and then you just get a

7    torrent of words about everything about Keisha which

8    neatly fit into his versions.  "She was a drug addict.

9    She was a prostitute.  She was a liar.  But not me, I

10   was -- I was a Good Samaritan."

11       So, remember, Keisha testified that -- and

12   consistent with other women who remembered it happening,

13   like Katelynn and Mandy, that she met the defendant

14   before her 18th birthday and was posted up and

15   photographed and whatnot, and in the defendant's

16   testimony, he says, "No.  Actually, I met her then, but

17   it wasn't until the day she turned 18.  It was on her

18   birthday when -- that's when she agreed to come and --

19   asked me to prostitute and took pictures."  An

20   astonishing coincidence.

21       Contrast that sort of glib, easy demeanor that you

22   saw from the defendant on the stand, who found it -- so

23   effortlessly described how he was innocent in all

24   regards, contrast that with some of these victims.  They

25   did not want to be here.  They were reluctant.  They

1    were frightened.  They were tearful.  I think every one
2    of them at some point, when we felt obligated to ask
3    them about some of the terrible things they went
4    through, shed tears.
5         You will recall Chrissy had always refused to talk
6    about one of the things that happened with her.  And
7    when the defense called her back, well, my colleague
8    raised that with her and said, "Isn't there something
9    you always wanted to talk about?"  Remember her demeanor
10   on that?  She did not want to talk about that.  It was
11   very emotional for her.  She, you know, eked out that it
12   had involved a sexual assault by the defendant.  She was
13   mortified.  And when pressed, she eked out that, yes, it
14   resulted in bruises on her body.  She didn't want to
15   tell you that.  It was not easy for her.  There was no
16   glibness in that testimony.
17        You contrast the defendant's demeanor on the stand
18   yesterday with some of the testimony that we have heard
19   from the victims, and they are a lot more credible than
20   he was.  So there's that.
21        Note that the defendant, in talking about his
22   interactions with the various women, corroborated
23   himself a lot of what they said about dates, times and
24   places.  So, you know, the indictment has got, you know,
25   2013 here and 2012 there and 2015.  He said, yeah, no,

he did have interactions with those women on that date.
He mentioned the motels.  The Motel 6.  He is at motels
a lot of the time.  So he corroborated a lot of what
they said about where they were when it happened and
that there was prostitution going on.  The only thing he
said they were lying about was any of his involvement.

The defendant, also on the stand, was inconsistent
on multiple things.  You know, he said initially on
direct examination by his lawyer -- he said, "Well, no
one -- no one bagged drugs for me.  Those were lies,"
that there were those bagging parties going on where
they had to bag up the heroin and crack for street-level
distribution.  "I did my own bagging."

But then later on cross examination, he had to
concede, well, no, women did.  He did have women bag for
him, just not those women, Mary and Mandy.  They didn't
bag.  They worked for him, but they didn't bag.

He also direct testified that he was not
responsible for those four undercover buys.  "Those were
something that Mandy was doing on her own because she
was selling drugs for all kinds of people, not me."  But
on cross examination, after considerable effort, he
conceded that, well, yes, he did arrange all four of
those buys after he heard his voice on the phone
arranging those buys.  Another inconsistency.

1          He also testified and his lawyer argued today that

2     he was always respectful to these women, and I just

3     submit to you that is just preposterous in view of the

4     things that he was doing to them and the things he

5     videotaped himself doing to them.

6          Mr. Folks on the stand also made a lot of just

7     improbable claims.  For example, his explanation of why

8     he had all these photographs was he was in the photo

9     business.  He was in the -- part of the pornography

10    industry, and that's why he had collected all these

11    photographs.  And he didn't have anything to do with

12    these Backpage ads.  He would just copy some of

13    the photographs into his computer and collecting these

14    photographs.

15         On cross examination, well, that didn't turn out

16    completely accurate, because you will recall Exhibit 141

17    is this menu of sex acts showing that that's what he had

18    in mind at the time, not just collecting photographs.

19    Blow job, pussy, anal, date, public, body rubs,

20    threesome, foursome, et cetera.  So that was improbable.

21         Also improbable was his claim that the drugs

22    recovered from that white van on the January 20, 2016,

23    car stop, those were not his.  As my colleague

24    mentioned, that doesn't make any sense because there are

25    only four people in the car.  The driver's the one that

1   told the police to stop them because there would be

2   drugs in the car.  The two others worked for Folks, so

3   Folks admitted that he was a drug dealer selling heroin

4   and crack cocaine.  They're not his drugs?  Really?

5        Generally, you know, Folks collected a harem of

6   troubled, desperate, young female drug addicts, and the

7   idea that them prostituting and him giving them heroin,

8   that nothing coercive was going on, and he was really

9   just trying to be helpful, we think that's very

10   improbable.

11        And then recall the testimony about whether they

12   benefited equally.  You know, Mr. Kaplan, as his

13   advocate, had urged in selecting the jury that everyone

14   benefited equally in this case, and one might have

15   thought that Folks would say, "Well, you know, not

16   really.  I just did some things I shouldn't have done,

17   and I'm sorry, but, you know, it wasn't -- wasn't

18   trafficking" or something like that, but, no.  He says,

19   "Oh, we did benefit equally.  Those -- those young women

20   that I was urinating on as I videotaped it happening,

21   they benefited equally.  And the women who -- who I made

22   bend over and stuff walnuts up their anuses, they

23   benefited equally.  Everyone benefited equally."  In

24   fact, I think he even said, "Some of them benefited more

25   than I did."  Well, that's crazy.

1    We talked -- counsel -- my associate talked very

2    briefly about the respective motives.  This defendant

3    has a strong motive to persuade you that he is a great

4    guy and completely innocent and all those women are

5    lying hussies, because he doesn't want to go to jail.

6        By contrast, a lot of those young women -- although

7    Mr. Kaplan said, geez, they were afraid of being

8    charged, they did not want to be here.  I don't know if

9    you remember the way Mary P. -- well, there's the -- the

10   tears that you saw, but I don't know if you remember

11   Mary P. walking in the courtroom.  Chrissy was the same

12   way.  This is the last thing they wanted to do.  It was

13   not easy for them, and they were brave to do it.

14       And lastly, the weight of the evidence in this

15   case:  As I said this is not a one-fellow he said,

16   one-woman she said case.  There is a long litany of

17   consistent testimony against this defendant, and, you

18   know, the defense can nitpick here or there things that

19   each one got wrong.  99 percent of it is consistent.

20       So we didn't think that Mr. Folks' testimony was

21   very credible, and because of that, the heavy reliance

22   on it that his lawyer is now using doesn't carry much

23   weight.

24       Now, I'm down to a few other things.  I am going to

25   try to wrap up before noon.

1          Folks's lawyer criticized my colleague, Miss

2     Savner, for getting with Keisha the wrong number of bags

3     that she stole.  Matt said it was five bundles.  Counsel

4     is correct; it was five bags, which makes it all the

5     more remarkable how upset Folks was by it and the

6     retribution he exacted from her.

7          You heard several witnesses describe that.  Even

8     Lori Crawford remembered that happening.  And Keisha

9     testified about it.  And you will recall she was not

10    that happy to see that picture of the dumpster by the

11    graveyard because that's where Folks bent her over and

12    made her pay for that theft and then told her, "You work

13    for me again until you earn me back that money."  The

14    fact he would do that over five bags is pretty

15    extraordinary.

16         Counsel said that Danielle never testified that she

17    saw a gun.  Well, she did.  I hope you remember that.

18    She said that she goes in the motel room and there's the

19    condom in the loo, and Mandy's waiting there, and she

20    turns around, Folks is in front of the door and flashes

21    the gun, the gun that so many other witnesses also saw

22    and described him keeping nearby.

23         Counsel says, well, why wouldn't Mandy just leave?

24    Really?  Folks, six-foot-four, athletic, a fighter as he

25    described it, he is the violent one, and he has got a

1    gun?  Mandy -- Danielle, what, is she about

2    five-foot-three, as Matt said, 90 pounds soaking wet.

3         Counsel said, well, what about that text afterwards

4    where Mandy -- where Danielle tested him, "I want to

5    work for you again"?  Well, I don't know what she meant

6    by that.  Maybe she was desperate enough to go back into

7    prostitution because she needed drugs.  What did she

8    say?  "I want to work for you."  She's the employee; he

9    is the boss.

10        Counsel said Katelynn was not corroborated, she

11   lied about everything.  That's one of the reasons we put

12   Jasmine on the stand is because she did corroborate

13   Katelynn.  Katelynn says she was working with a woman

14   named Mindy, didn't know her real name.  Mindy's

15   Jasmine.  She came in and testified about what was going

16   on back then.

17        Counsel said there was no testimony that his client

18   ever put his hands on Jasmine?  Yeah, there was.  She

19   said he grabbed her by the throat when he got mad at her

20   once.  He said that one of the -- she said that one

21   episode with anal sex -- it seems it's something he

22   wants to do with every female -- was so violent and

23   painful to her that she was bleeding and crying.  A

24   little physical force there too.

25        Counsel said that, well, Ayla lied about

1  everything.  Of course he says that everybody -- all the

2  witnesses lied about everything.  But on Ayla, you know,

3  one of the things she did was she gave a false name to

4  the police.  Well, I think we heard Mr. Folks yesterday

5  say that he gave a false name to the police.

6      Counsel said why does the defense have to bring out

7  these lies by Ayla?  You know, excuse me, the government

8  brought out those lies by Ayla, you know, the false

9  cancer lie, the false statement lie.  That was part of

10  the direct examination.

11      You know, counsel said Chrissy lied about

12  everything.  I thought that the cross examination of

13  Chrissy, when they called her yesterday, was pretty

14  compelling because most of what she told, almost all of

15  what she told the police during that initial stop way

16  back when was dead on; and, yes, she said she wasn't

17  afraid, but then you had that text, the last bagging

18  session she went to at Uncle Marty's house where Folks

19  is there, and she is like, "Oh, my God, Folks is here."

20  Well, she was scared.  She may not have wanted -- may

21  not have wanted to admit it at the time.  And then, as I

22  won't describe to you again, her testimony about what he

23  did to her.

24      Counsel said Ariel Otero was very credible.  Oh,

25  was she?  I mean, she is living with the defendant when

1    they're winding up at 103 North Union.  And then when

2    the defendant moves to Danielle Degenhardt's, she moves

3    with him.  She is living there when he is arrested.

4    She's then having all these phone calls with him from

5    jail.  I think that evidence suggests that those two

6    were pretty tight, and in any event, remember Ariel

7    testifying that she had no idea that drugs were being

8    trafficked out of the 103 North Union house.  And that,

9    yes, well, she went out for short walks with Mandy

10   regularly, but she didn't know what was happening, and

11   they would go their own way.  Well, that lacked

12   credibility.

13        And then recall that Mr. Folks yesterday testified

14   as to why he suspected Mary P. for stealing the drugs

15   out of the stash out of the car parked outside.  He

16   said, well, there were only a few people that knew about

17   that stash, and they were Mary and Mandy and Ariel.

18   Well, which is it?  Does she not know about the drug

19   dealing or, as Mr. Folks now says, she did know about

20   the drug stash?

21        Brittany Barber.  I think she was -- she was

22   credible in some of the things she said, because she

23   admitted on cross that she was prostituting for the

24   defendant, and he was getting a hundred percent of her

25   earnings because he was getting the 50 percent off the

1    top, and then he was getting the other 50 percent for

2    heroin.

3        Recall that she also said that -- that -- because

4    she finally got clean in 2018, says that when you are an

5    addict, you will do anything for drugs, something that

6    was echoed by the remaining defense witness, Emily

7    Lasell.  She said you're not really making decisions

8    when you are a heroin addict.

9        On Hannah, the defense counsel got several things

10   wrong, and you will know when you hear the judge's

11   instructions on this.  First, he said that -- that --

12   you know, that his client didn't know she was under 18.

13   Well, he doesn't have to know that she was under 18.

14       He also repeatedly said that she was fairly mature

15   in her physical development so that, you know, you

16   wouldn't suspect she was under 18.  Well, that's not the

17   law either.

18       The law is, as the Court will instruct you, that a

19   defendant dealing with a minor, if he had the

20   opportunity to observe her -- and this defendant had her

21   strip down to her panties and was telling her how to

22   pose in those photographs and I think admitted,

23   consistent with the testimony of Jasmine, that he took

24   pictures of her.  So on this issue of whether he knew

25   she was under 18 or not, refer to the judge's

1    instructions.

2         Now, as to the posting of that, counsel said, well,

3    it wasn't Mr. Folks that posted that.  Well, the other

4    three women in the room are all Folks's prostitutes, and

5    he has found -- he has got this new, young baby-sitter

6    that he has met because she showed up for a babysitting

7    gig with Jasmine.  Folks makes the pitch.  Second time

8    she comes over, he gets her to undress.  He gets her to

9    pose.  He gets her to let herself be photographed, and

10   then, within 30 minutes -- and he photographs her --

11   within 30 minutes, those photos are up on a Backpage

12   post.

13        Now, if he photographed her on his cell phone,

14   which must have been what was going on, or his tablet,

15   whatever digital device he had with him at the Motel 6

16   where this is happening, then he must have transferred

17   those photos -- either he posted her up, as he does with

18   everybody else, or he transferred those photos to

19   someone else who posted her up awfully fast, because she

20   is up on Backpage within 30 minutes.

21        You will recall that one of those Backpage posts,

22   the narrative said you could have any one of these four

23   women.  Well, one of those four women was Hannah.  She's

24   being offered up to prostitute.

25        Counsel urged that, well, there was no conspiracy

1    with McFarlan.  Well, seems unlikely since both McFarlan
2    and Folks said that McFarlan repeatedly came up from New
3    York with drugs -- bulk drugs to sell.  McFarlan says
4    five or six times; Folks says two or three times.
5         That sounds like a conspiracy, but set aside
6    McFarlan.  I mean, you have got all this -- described as
7    a harem, but all these women acting as runners for Folks
8    because he doesn't want to be actually on the streets
9    doing the hand-to-hands.  So they're doing it for him.
10   I mean, Mandy said she did it.  There was testimony that
11   Hannah did it.  There was testimony about that from
12   various witnesses, including Lori Crawford.
13        And so those runners are conspiring in this
14   drug-trafficking operation, and also the baggers.  I
15   mean, we heard over and over again about bagging-up
16   parties and the way you did it with the razor blades and
17   the straws and the folded cards and all the little
18   baggies.  Both Mary and Mandy described how that
19   operated.
20        The baggers are part of the conspiracy as well.
21   Now, Folks says in his testimony, "Well, Mandy and Mary
22   never bagged for me, but other people did."  Well, those
23   other people are conspirators bagging it up for resale.
24        You know, just briefly on the gun case, Folks --
25   Folks testified yesterday that when the police stopped

1   his vehicle, which he thought was some kind of setup,

2   maybe he had been framed, he told them that they

3   wouldn't find any fingerprints on that gun.  And he told

4   you that, well, he had no idea there was a gun in the

5   car.  Well --

6              MR. KAPLAN:  Judge, may we approach, please?

7              THE COURT:  I -- this is -- this is summation,

8   and unless you have something extraordinary, I think --

9              MR. KAPLAN:  I think --

10             THE COURT:  -- we should let him finish.

11             MR. DARROW:  Thank you, your Honor.

12        So that was a little inconsistent, because if you

13   don't even know there's a gun in the car, how do you

14   know your fingerprints aren't on the gun?  And when I

15   pressed him on cross, he said, "Oh, no, I told them that

16   later after they are all -- the search warrant was being

17   executed."  Tried to do a little quick step there.

18        But you heard testimony by witness after witness

19   after witness about Folks always having a handgun nearby

20   and using it when he wanted to intimidate somebody or

21   threaten somebody.

22        I'm trying to wrap up with some more thematic

23   issues here.

24        This fellow, we submit, located, recruited and

25   exploited the most vulnerable, marginal people in our

society.  Once he had them, he wrung out of them every
dollar and every advantage he could get.  The ones who
were allowed to leave were those that he was done with,
like Danielle who was so ravaged that she couldn't get a
john anymore; like Lori, who when she -- when he did her
the service of driving her to drug rehab, you know,
she's leaving her home, for him to turn into Lori's
place and operate out of for a month while she is down
at Valley Vista.

I won't go on about the fraud, force, coercion; you
have heard about that, and you have heard a lot of
evidence.  The fraud, the fake romancing, getting these
women to fall in love with him, the tattoos with his
name, the force, the beatings.  Many of those are
corroborated -- you heard one -- one person -- even Lori
said she saw Ayla with bruises; others said she saw --
they saw Ayla get hit, they saw Ayla come out of the
bathroom crying after the defendant had a one-on-one
with her.  The -- and the unwanted sex, too.

Mr. Folks weaponized sex.  This was not sex in the
"making love" sense of the word.  This was him having
his way with these women that didn't want to do it.  And
again and again you heard descriptions of the way that
went, from Jasmine bleeding to Danielle being told, as
she gagged and cried, to take it all.  You know, that

1    was something that he did.  It was one of the degrading

2    ways that he did to exercise control over these women

3    and to subjugate them.

4        In addition to the heroin addiction, we submit that

5    by the time Folks got you -- had found you, gets you to

6    take your clothes off, gets you photographed, gets you

7    up on Backpage, gets you selling yourself to others, and

8    gets you in these -- this -- these hard sexual

9    encounters with him, you don't have a lot left to push

10   back with, and that's one of the reasons why many of

11   these women never said no to him, because they were

12   afraid to and they'd seen others learn the hard way that

13   if you say no, there's going to be a problem.

14       You have heard all the evidence, and you have heard

15   the sad testimony of seven women about what happened

16   with him.  We hope you're not going to let this go by.

17   There's a lot of evidence in this case from the digital

18   evidence and the videotapes, which -- you know, counsel

19   even attacked Professor Epp for turning on the computer.

20   Well, you know, she is in the middle of the case.  From

21   the get-go, she gets a federal search warrant.  She

22   turns on the computer.  It has no effect on the walnut

23   video, the pee videos, all these images.  There's never

24   been any testimony that it affected that stuff.

25       We ask you to find this defendant guilty of all the

1  charges, as he is.  Thank you.

2         THE COURT:  All right.  I am going to turn the

3  husher on at this point and would invite counsel to come

4  forward.

5  (The following was held at the bench.)

6         THE COURT:  Okay.  You had some objection?

7         MR. KAPLAN:  Judge, I never interrupt anyone

8  when we are doing a closing.

9         THE COURT:  Yeah, I've seen you interrupt.

10        MR. KAPLAN:  But Mr. Darrow said some things

11 that concern me.  One, he kept referring to the women as

12 victims.

13        MS. SEN:  It was degrading.

14        MR. KAPLAN:  And we are not supposed to do

15 that.  These are not -- they're not victims.  They may

16 be complaining witnesses, but they are not victims.

17        THE COURT:  Yeah.  Okay.

18        MR. KAPLAN:  Secondly, and my law expert tells

19 me -- I don't want to take the blame for this if I'm

20 wrong, but my law expert tells me that Folks does have

21 to know that Hannah was 18 or not; in other words, he

22 had reasonable opportunity to observe that she was 18 or

23 not.  So is it true that he doesn't have to know that

24 she --

25        THE COURT:  He doesn't have to know.

1          MR. KAPLAN:  Just have a reasonable

2     opportunity?

3          THE COURT:  It is -- it is in the disjunctive.

4     It's either know or act in reckless disregard or if you

5     have a reasonable opportunity to see her.  And case

6     law -- cases really are very broad on that last

7     category.  So you have got an exception to that.  If you

8     think that that statute requires knowledge, then you are

9     in good shape because he is not being instructed on --

10    they are not being instructed on that.

11         MR. KAPLAN:  The other thing I remembered is

12    Mr. Darrow said that my client was stopped with the

13    firearm; he said, "You won't find any fingerprints on

14    it."  And he asked my client about that yesterday on

15    cross.  My client said, "Yes, I said that like 20 months

16    later.  It was way after the event."  He didn't know the

17    gun was in the glove compartment.

18         THE COURT:  I thought there had been some

19    earlier reference to that?  What is that?

20         MR. DARROW:  My memory -- I mean, of course

21    these are just arguing about facts which are left to the

22    jury, and the Court will instruct the attorneys'

23    arguments are not facts, but my memory was, as I said,

24    that he -- that Folks testified about that incident,

25    that he said, "I told them that those were not my

1    fingerprints on the gun," and then when I -- when I

2    pressed him, he -- as to how he could not know that

3    there were no fingerprints on the gun when he thought

4    there was no gun, he said, "Oh, oh, that was later," and

5    that's all I said.

6             THE COURT:  Well, it's facts to be determined

7    by the jury.

8         So the first reference to victim, clearly there's a

9    court order out that these were not to be referred to in

10   the counts as victims.  I don't think it's sufficient to

11   say that an argument, in a colloquial sense, he is

12   describing these individuals as being victims of the

13   defendant's --

14            MR. KAPLAN:  Yeah, but, I'm sorry, it's not

15   really colloquial.  When you are describing them as

16   victims, you are saying these are women who had

17   suffered, been abused by the defendant.  That's what

18   that word means.  I mean, that's what I would think of

19   if someone --

20            THE COURT:  Yeah, that's what their argument

21   is.

22            MR. KAPLAN:  I know --

23            THE COURT:  I mean, that's what -- that's what

24   he's arguing.

25            MR. KAPLAN:  Well, when you say they're

1    victims, then it's like a foregone conclusion.  He is

2    telling the jury that they're victims, that this is

3    what -- I mean, rather than he is saying they're

4    individuals who would say this is what happened.

5            THE COURT:  Well, he is describing these

6    individuals being treated horrendously; i.e.,

7    victimized.

8            MR. KAPLAN:  I don't want to -- I mean, I

9    don't want to go over the subject.

10           THE COURT:  I appreciate it.  Right.  So --

11           MR. DARROW:  Just briefly.  It hadn't occurred

12   to me that -- that not calling anyone a victim would

13   apply in argument.  And --

14           THE COURT:  It's -- I am not going to instruct

15   the jury to disregard it, so -- and there's nothing

16   improper about using that in argument, in light of the

17   context in which you are arguing; that is, they're being

18   subjected to abusive conduct.

19           MR. DARROW:  Thank you.

20           THE COURT:  All right.  So let's give them

21   until one o'clock?  Have them come back at one?  Okay?

22           MR. DARROW:  Okay.

23   (The following was held in open court.)

24           THE COURT:  All right.  Obviously the evidence

25   is closed.  The arguments are over.  It's my chance to

1    say something.  That's the charge.  I am going to read

2    to you the charge at one o'clock; give you 45 minutes --

3    almost 50 minutes for lunch.  I'd ask that you come back

4    at one.  We'll give you the charge, and then the case

5    will be submitted to the jury for consideration.

6         All right?  See you back at one o'clock.

7    (Court was in recess at 12:13 p.m.)

8    (The following was held in open court with the jury

9    present at 1:10 p.m.)

10            THE COURT:  Good afternoon and welcome back.

11   I think you all have a copy of the jury charge so that

12   you can read along with me.  I have learned in just a

13   few years of experience here that jurors absorb more if

14   you hear as well as read the instructions.

15        I have got an obligation to read the instructions

16   to you.  You just -- historically it used to be that the

17   judge would read the instructions, you would not have

18   instructions, you wouldn't even take the instructions

19   into the jury room, and you'd have to try and figure out

20   what the judge said.  And obviously it takes -- you

21   know, this will take approximately an hour.  So, please

22   read along with me.

23        Members of the jury:

24        Now that you have heard the evidence and arguments,

25   it is my duty to instruct you on the law.  It is your

1    duty to accept these instructions of law and apply them

2    to the facts as you determine them.

3        By the way, sometimes I read incorrectly, and if I

4    read incorrectly, follow what I wrote as opposed to what

5    I said.  It's a disability that I have developed.  But

6    anyway.  Just make sure that you follow what is written

7    as the instruction.

8        Mr. Folks is on trial here on 14 counts which are

9    set out in a written indictment.  I would like to remind

10   you again of the function of an indictment.  An

11   indictment is a formal way to accuse a defendant of a

12   crime prior to trial.  Mr. Folks is not on trial for any

13   act or any conduct not specifically charged in the

14   indictment.

15       An indictment is not evidence.  An indictment does

16   not create any presumption of guilt or permit an

17   inference of guilt.  It should not influence your

18   verdict in any way other than to inform you of the

19   charges against the defendant.  The defendant has

20   pleaded not guilty to the indictment.  You have been

21   chosen and sworn as jurors in this case to determine the

22   issues of fact that have been raised by the allegations

23   of the indictment and the denial made by the not guilty

24   plea of the defendant.  You are to perform this duty

25   without bias or prejudice against the defendant or the

1     prosecution.

2          I will now instruct you concerning the issues of

3     law which apply generally to the trial of this case.

4               REASONABLE DOUBT AND PRESUMPTION OF INNOCENCE

5          The law presumes that the defendant, Brian Folks,

6     is innocent of the charges against him.  The presumption

7     of innocence lasts throughout the trial and during your

8     deliberations.  The presumption of innocence ends only

9     if you, the jury, find beyond a reasonable doubt that

10    the defendant is guilty.  Should the government fail to

11    prove the guilt of the defendant beyond a reasonable

12    doubt, you must find the defendant not guilty.

13         The government must prove the defendant guilty

14    beyond a reasonable doubt.  A reasonable doubt is a

15    doubt that a reasonable person has after carefully

16    weighing all of the evidence.  It is a doubt that would

17    cause a reasonable person to hesitate to act in a matter

18    of importance in his or her personal life.  Proof beyond

19    a reasonable doubt must, therefore, be proof of such a

20    convincing character that a reasonable person would not

21    hesitate to rely and act upon it in the most important

22    of his or her own affairs.  A reasonable doubt is not a

23    whim, speculation or suspicion.  A reasonable doubt must

24    arise from a lack of evidence.  It is not an excuse to

25    avoid the performance of an unpleasant duty.  And it is

1    not sympathy.

2         In a criminal case, the burden is at all times upon

3    the government to prove guilt beyond a reasonable doubt.

4    The law does not require the government to prove guilt

5    beyond all possible doubt; proof beyond a reasonable

6    doubt is sufficient to convict.  This burden never

7    shifts to the defendant, which means that it is always

8    the government's burden to prove each of the elements of

9    the crime charged beyond a reasonable doubt.  The law

10   never imposes upon a defendant in a criminal case the

11   burden or duty of calling any witnesses or producing any

12   evidence.  A defendant is not even obligated to produce

13   any evidence by cross examining the witnesses for the

14   government.

15        If, after a fair and impartial consideration of all

16   the evidence against the defendant, you have a

17   reasonable doubt, it is your duty to find the defendant

18   not guilty.  On the other hand, if, after fair and

19   impartial consideration of all the evidence, you are

20   satisfied of the defendant's guilt beyond a reasonable

21   doubt, you must vote to convict.

22        JURORS' EXPERIENCE AND SPECIALIZED KNOWLEDGE

23        Anything you have seen or heard outside the

24   courtroom is not evidence and must be disregarded

25   entirely.  It would be a violation of your oath as

1    jurors to consider anything outside the courtroom in

2    your deliberations.  But in your consideration of the

3    evidence, you do not leave behind your common sense and

4    life experiences.  In other words, you are not limited

5    solely to what you see and hear as the witnesses

6    testify.  You are permitted to draw, from facts which

7    you find have been proved, such reasonable inferences as

8    you feel are justified in light of the evidence.

9    However, if any juror has specialized knowledge,

10   expertise or information with regard to the facts or

11   circumstances of this case, he or she may not rely upon

12   it in deliberations or communicate it to other jurors.

13                            EVIDENCE

14        You have seen and heard the evidence produced in

15   this trial, and it is the sole province of the jury to

16   determine the facts of this case.  The evidence consists

17   of the sworn testimony of the witnesses, any exhibits

18   that have been admitted into evidence, and all the facts

19   that have been admitted or stipulated.  You should weigh

20   all the evidence in the case.  After weighing all the

21   evidence, if you are not convinced of the defendant's

22   guilt beyond a reasonable doubt, you must find him not

23   guilty.  Your verdict must be based solely on the

24   evidence introduced at trial, or the lack thereof.

25        Evidence may be direct or it may be circumstantial

1       in nature.  An example of direct evidence is a statement

2       by a witness about his or her observation of an event.

3       Circumstantial evidence is evidence which permits a jury

4       to draw an inference relevant to the case.  For example,

5       if I ring my friend's doorbell and no one answers, I may

6       infer that she is not at home even though I have no

7       direct evidence of her whereabouts.

8                STRICKEN TESTIMONY, ATTORNEYS' STATEMENTS,

9                        AND THE COURT'S RULINGS

10           I caution you that you should not consider or base

11      your decision upon any testimony or exhibit that has

12      been excluded or stricken from the record.  Likewise,

13      the arguments of the attorneys and the questions asked

14      by the attorneys are not evidence in the case.  By the

15      rulings the Court made in the course of the trial, I did

16      not intend to indicate to you any of my own preferences

17      or to influence you in any manner regarding how you

18      should decide the case.  The attorneys have a duty to

19      object to evidence they believe is not admissible.  You

20      must not hold it against either side if an attorney made

21      an objection.

22                      CREDIBILITY OF WITNESSES

23           You as jurors are the sole judges of the

24      credibility of the witnesses and the weight of their

25      testimony.  You do not have to accept all the evidence

presented in this case as true or accurate.  Instead, it

is your job to determine the credibility or

believability of each witness.  You do not have to give

the same weight to the testimony of each witness,

because you may accept or reject the testimony of any

witness in whole or in part.  In weighing the testimony

of the witnesses you have heard, you should consider

their interest, if any, in the outcome of the case;

their manner of testifying; their candor; their bias, if

any; their resentment or anger, if any, toward the

defendant; the extent to which other evidence in the

case supports or contradicts their testimony; and the

reasonableness of their testimony.  You may believe as

much or as little of the testimony of each witness as

you think proper.  You may accept all of it, some of it

or reject it altogether.

The weight of the evidence is not determined by the

number of witnesses testifying.  You may find the

testimony of a small number of witnesses or a single

witness about a fact more credible than the different

testimony of a larger number of witnesses.  The fact

that one party called more witnesses and introduced more

evidence than the other does not mean that you should

necessarily find the facts in favor of the side offering

the most witnesses or the most evidence.  Remember, a

1    defendant in a criminal prosecution has no obligation to

2    present any evidence or call any witnesses.

3                        EXPERT WITNESSES

4         Certain witnesses testified as experts.  An expert

5    witness is someone who has a special knowledge or

6    training in a particular subject area.  An expert is

7    permitted to offer a professional opinion within his or

8    her field of expertise.  As in the case of other

9    witnesses, you are the sole judges of the credibility of

10   the expert witnesses.  You may consider the same factors

11   which guided your determination of the credibility of

12   other witnesses.  In the case of an expert witness, you

13   may also consider their professional training;

14   experience; publications and awards, if any; and

15   standing and accomplishment within his or her field of

16   expertise.

17                    LAW ENFORCEMENT WITNESSES

18        You have heard the testimony of law enforcement

19   officials in this case.  The fact that a witness may be

20   employed by the federal, state or local government as a

21   law enforcement official does not mean that his or her

22   testimony is deserving of more or less consideration or

23   greater or lesser weight than that of an ordinary

24   witness.

25        At the same time, it is proper for defense counsel

to try to attack the credibility of a law enforcement
witness on the grounds that his or her testimony may be
colored by a personal or professional interest in the
outcome of the case.

It is your decision, after reviewing all the
evidence, whether to accept the testimony of a law
enforcement witness and to give to that testimony
whatever weight, if any, you find it deserves.

UNAVAILABLE WITNESSES

There are persons whose names you have heard during
the course of the trial but who did not appear here to
testify, specifically Hannah A. and Victoria L.  These
witnesses were unavailable for trial.  You should not
draw any inferences or reach any conclusions as to what
they would have testified to had they been called.
Their absence should not affect your judgment in any
way.

WITNESSES AND DRUG USE

There has been testimony by at least one witness
who was using drugs when the events they observed took
place.  There is nothing improper about calling such a
witness to testify; however, testimony from such a
witness should be examined with greater care than the
testimony of witnesses who were not using drugs when the
events they observed took place because of the effect

the drugs may have had on that person's ability to
perceive or describe the events in question.

ACCOMPLICES CALLED BY THE GOVERNMENT

You have heard witnesses who testified that they
were actually involved in planning and carrying out the
crimes charged in the fourth superseding indictment.

The law allows the use of accomplice testimony.
The testimony of accomplices may be enough in itself for
conviction if the jury finds that the testimony
establishes guilt beyond a reasonable doubt.  However,
accomplice testimony is of such a nature that it must be
scrutinized with great care and viewed with a particular
caution when you decide how much of that testimony to
believe.

You should ask yourselves whether these alleged
accomplices would benefit more by lying or by telling
the truth.  Was their testimony made up in a way -- in
any way because they believed or hoped that they would
somehow receive favorable treatment by testifying
falsely?  Or did they believe that their interest would
be best served by testifying truthfully?  If you believe
that the witness was motivated by hopes of personal
gain, was the motivation one which would cause him to
lie, or was it one which would cause him to tell the
truth?  Did this motivation color his testimony?

WITNESSES' PLEA AGREEMENTS

In this case there has been testimony from government witnesses who pled guilty after entering into agreements with the government to testify.  There is evidence that the government has promised to bring the witnesses' cooperation to the attention of the sentencing court.

The government is permitted to enter into this kind of plea agreement.  You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone if it convinces you of the defendant's guilt beyond a reasonable doubt.

However, you should bear in mind that a witness who has entered into such an agreement has an interest in this case different than an ordinary witness.  A witness who realizes that he or she may be able to obtain his or her own freedom or receive a lighter sentence by giving testimony favorable to the government has a motive to testify falsely.  Conversely, a witness who realizes that he or she may benefit by providing truthful testimony has a motive to be honest.  Therefore, you must examine his or her testimony with caution and weigh it with great care.  If, after scrutinizing his or her testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

1                    FAILURE TO NAME A DEFENDANT

2          You may not draw any inference, favorable or

3     unfavorable, towards the government or the defendant on

4     trial, from the fact that certain persons who were not

5     named as defendants in the fourth -- let me start that

6     again.

7          You may not draw any inference, favorable or

8     unfavorable, towards the government or the defendant on

9     trial, from the fact that certain witnesses were not

10    named as defendants in the fourth superseding

11    indictment.  The fact that these persons are not on

12    trial must play no part in your deliberations.

13                          RECORDINGS

14         The government has offered evidence in the form of

15    audio recordings.  This information may have been

16    gathered without the knowledge of all the participants.

17    The use of these procedures to gather evidence is

18    lawful, and the government is entitled to use the

19    evidence in this case.  You should not consider the

20    method of gathering this evidence in your deliberations.

21                    STIPULATION OF FACTS

22         The parties have stipulated to certain facts.

23    Specifically, the parties have stipulated that the

24    defendant, Brian Folks, had been convicted of a crime

25    punishable by a term of imprisonment exceeding -- that's

one year, prior to December 25, 2015.  You should
consider this fact as established for purposes of the
trial.  Because the parties have stipulated or agreed to
this fact, it is not necessary for the prosecution to
produce evidence to prove the fact.

BIAS, PREJUDICE AND EQUALITY BEFORE THE COURT

You are to perform the duty of finding the facts
without bias or prejudice toward any party.  You are to
perform this duty in an attitude of complete fairness
and impartiality.  You must not allow any of your
personal feelings about the nature of the crimes charged
to interfere with your deliberations or influence the
weight given to any of the evidence.

You may not consider the race, religion, national
origin, sex or age of the defendant or any of the
witnesses in your deliberations over the verdict or in
the weight to be given to any evidence.

This case is important to the parties and the
court.  You must give it the fair and serious
consideration which it deserves.

The fact that the prosecution is brought in the
name of the United States of America entitles the
government to no greater consideration than that
accorded to any other party to a case.  By the same
token, it is entitled to no less consideration.  All

parties, whether government or individuals, stand as equals before the court.

The question of possible punishment of the defendant in the event of a conviction is not the jury's concern and should not influence your deliberations. Your function is to weigh the evidence in the case and to determine whether the defendant is guilty beyond a reasonable doubt solely upon the basis of such evidence. If the defendant is convicted, the Court will consider the issue of punishment in a separate phase of the case.

INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

Having explained the general guidelines by which you will evaluate the evidence in this case, I will now instruct you with regard to the law that is applicable to your determinations in this case.

It is your duty as jurors to follow the law as stated to you in these instructions and to apply the rules of law to the facts that you find from the evidence.  You will not be faithful to your oath as jurors if you find a verdict that is contrary to the law that I give to you.

However, it is the sole province of the jury to determine the facts in this case.  I do not, by any instructions given to you, intend to persuade you in any way as to any question of fact.

1        The parties in this case have a right to expect

2    that you will carefully and impartially consider all the

3    evidence in the case, that you will follow the law as I

4    state it to you, and that you will reach a just verdict.

5                    INTRODUCTION TO OFFENSES

6        The fourth superseding indictment charges 14

7    separate crimes, called counts, against the defendant.

8    Each count has a number.

9        Count 1 charges that the defendant knowingly and

10   willfully conspired with others between in or about May

11   2015 and March 2016 to distribute 100 grams or more of

12   heroin and 28 grams or more of cocaine base, which are

13   controlled substances.

14       Counts 3, 5, 8 and 9 charge the defendant on

15   various dates in January 2016 and February 2016

16   knowingly and intentionally distributed heroin.

17       Count 7 charges that on January 20, 2016, the

18   defendant knowingly and intentionally possessed heroin

19   or cocaine base with the intent to distribute it.

20       Count 2 charges that the defendant, who was

21   previously convicted of a crime punishable by a term of

22   imprisonment exceeding one year, knowingly possessed a

23   firearm, namely a Beretta Model 92FS nine-millimeter

24   pistol, in and affecting commerce.

25       Counts 10, 11, 12, 13 and 14 --

1          Let me just instruct you that's interstate commerce

2     on the previous paragraph in Count 2.

3          Next, Counts 10, 11, 12, 13 and 14 charge that the

4     defendant knowingly, in or affecting interstate

5     commerce, recruited, enticed, harbored, transported,

6     provided, obtained, and maintained by any means the

7     person identified in each count, knowing or in reckless

8     disregard of the fact that force, threats of force,

9     fraud, and coercion would be used to cause that person

10    to engage in commercial sex acts.

11         Count 10 charges that the defendant did so with

12    respect to Katelynn C.

13         Counts 11 and 12 charge that the defendant did so

14    with respect to Keisha W. during two different time

15    periods.

16         Count 13 charges that the defendant did so with

17    respect to Danielle M.

18         Count 14 charges that the defendant did so with

19    respect to Ayla L.

20         Count 15 charges that the defendant knowingly, in

21    and affecting interstate commerce, recruited, enticed,

22    harbored, transported, provided, obtained, and

23    maintained by any means Hannah A., having had a

24    reasonable opportunity to observe Hannah A., and that

25    Hannah A. had not attained the age of 18 years and would

1    be caused to engage in a commercial sex act.

2         Count 16 charges that the defendant knowingly used,

3    or caused to be used, one or more facilities in

4    interstate commerce, namely the internet and cellular

5    telephones, with the intent to promote, manage,

6    establish, carry on, and facilitate the promotion,

7    management, establishment, and carrying on of an

8    unlawful activity, that is, a business enterprise

9    involving prostitution offenses, in violation of the

10   laws of Vermont, and thereafter performed, and caused to

11   be performed, acts to promote, manage, establish, carry

12   on and facilitate the promotion, management,

13   establishment and carrying on of such unlawful activity.

14        You should draw no inference from and attach no

15   meaning to the absence of Counts 4 and 6 from the

16   superseding -- fourth superseding indictment.

17        "ON OR ABOUT" AND "IN OR ABOUT" EXPLAINED

18        Each of the counts in the fourth superseding

19   indictment charges that the offenses were committed in

20   or about or on or about certain dates.  Although it is

21   necessary for the government to prove beyond a

22   reasonable doubt that the offenses were committed on

23   dates reasonably near the dates alleged in the fourth

24   superseding indictment, it is not necessary for the

25   government to prove that the offense was committed

1     precisely on the dates charged.

2                              COUNT 1

3          Count 1 of the fourth superseding indictment reads

4     as follows:

5          Between in or about May of 2015 and in or about

6     March of 2016, in the District of Vermont and elsewhere,

7     the defendants, Brian Folks, a/k/a Moe, a/k/a Moet Hart;

8     Donald McFarlan, a/k/a "G," a/k/a Ghost, and others,

9     known and unknown to the grand jury, knowingly and

10    willfully conspired to distribute heroin, a Schedule I

11    controlled substance, and cocaine base, a Schedule II

12    controlled substance.

13         With respect to defendants Brian Folks, a/k/a Moe

14    and a/k/a Moet Hart, and Donald McFarlan, a/k/a "G" and

15    a/k/a Ghost, their conduct as members of the conspiracy,

16    including the reasonably foreseeable conduct of other

17    members of the conspiracy, involved 28 grams or more of

18    a mixture and substance containing a detectable amount

19    of cocaine base and 100 grams or more of a mixture and

20    substance containing a detectable amount of heroin.

21    ELEMENTS OF OFFENSE OF CONSPIRACY, 21 USC, SECTION 846

22         Count 1 charges that the defendant, Brian Folks,

23    engaged in a conspiracy with others to distribute heroin

24    and cocaine base.  Title 21 of the United States Code,

25    section 846, as charged in Count 1 of the fourth

1    superseding indictment, makes it a federal crime for

2    anyone to conspire or agree with someone else to do

3    something which, if actually carried out, would be a

4    violation of section 841(a)(1).  841(a)(1) makes it a

5    crime for anyone to knowingly or intentionally

6    distribute a controlled substance.  I instruct you that

7    heroin is a Schedule I controlled substance, and

8    cocaine base is a Schedule II controlled substance.

9         Under the law, a conspiracy is an agreement among

10   two or more persons to achieve an unlawful object, in

11   this case the carrying out of the crime of distribution

12   of heroin and cocaine base.

13        To prove the existence of a conspiracy, it is

14   sufficient to show that the conspirators came to a

15   mutual agreement to accomplish an unlawful act by means

16   of a joint plan or common design.  Because the essence

17   of a conspiracy offense is the making of the scheme

18   itself, it is not necessary for the government to prove

19   that the conspirators actually succeeded in

20   accomplishing their unlawful plan.

21        Although the government alleged that the conspiracy

22   involved both cocaine base and heroin, you should only

23   find that the conspiracy involved -- you need only find

24   that the conspiracy involved one of these controlled

25   substances to find the defendant guilty.  Please bear in

1  mind that your decision on this issue, as on all others,

2  must be unanimous.  In other words, you must find

3  unanimously that the purpose of the conspiracy was the

4  distribution of heroin or cocaine base or both.  If some

5  of you believe that the purpose of the conspiracy was

6  solely the distribution of heroin, and others of you

7  believe that the purpose was solely the distribution of

8  cocaine base, then you must find the defendant not

9  guilty of Count 1.

10      In order to return a verdict of guilty as to this

11  count, the government must prove each of the following

12  elements beyond a reasonable doubt:

13      First, that two or more persons, in some way or

14  manner, came to an agreement to try to accomplish a

15  common and unlawful plan, as charged in Count 1 of the

16  fourth superseding indictment; and

17      Second, that the defendant knowingly became a

18  member of such conspiracy.

19          FIRST ELEMENT - EXISTENCE OF AN AGREEMENT

20      The first element that the government must prove

21  beyond a reasonable doubt to establish the offense of

22  conspiracy is that two or more persons entered the

23  unlawful agreement charged in Count 1 of the

24  superseding -- fourth superseding indictment.

25      In order to prove this element, the government must

prove that there was a mutual agreement, either spoken
or unspoken, between two or more people to cooperate
with each other to accomplish an unlawful act.

You may find that the existence of an agreement to
violate the law has been established by direct proof.
However, since conspiracy may, by its very nature, be
characterized by secrecy, you may also infer its
existence from the circumstances of this case and the
conduct of the parties involved.  Co-conspirators need
not be charged with the crime of conspiracy in order for
you to find that the defendant had an agreement with
other individuals to commit the illegal act charged in
the indictment.

SECOND ELEMENT - MEMBERSHIP IN THE CONSPIRACY

The second element that the government must prove
beyond a reasonable doubt to establish the offense of
conspiracy is that the defendant knowingly became a
member of the conspiracy.

If you are satisfied that the conspiracy charged in
the fourth superseding indictment existed, you must next
ask yourselves who the members of that conspiracy were.
In deciding whether the defendant was, in fact, a member
of the conspiracy, you should consider whether the
defendant knowingly joined the conspiracy.  The
prosecution has the burden of proving that the defendant

participated in the conspiracy with the knowledge of its

unlawful purpose and with the specific intention of

furthering its business objective.

You are instructed that, while proof of a financial

interest in the outcome of a scheme is not essential, if

you find that a defendant had such an interest, that is

a factor which you may properly consider in determining

whether or not the defendant was a member of the

conspiracy charged in the fourth superseding indictment.

Before the defendant can be found to have been a

conspirator, you must first find that he knowingly

joined in the unlawful agreement or plan.  The key

question, therefore, is whether the defendant joined the

conspiracy with an awareness of at least some of the

basic aims and purposes of the unlawful agreement.

The defendant's knowledge is a matter of inference

from the facts proved.  In that connection, I instruct

you that to be a member of the conspiracy, the defendant

need not have known the identities of each and every

other member, nor need he have known about all the other

members' activities.  Moreover, the defendant need not

have been fully informed as to all of the details or the

scope of the conspiracy in order to justify an inference

of knowledge on his part.

The extent of the defendant's participation has no

1    bearing on the issue of the defendant's guilt.  A

2    conspirator's liability is not measured by the extent or

3    duration of his participation.

4         Indeed, each member may perform separate and

5    distinct acts and may perform them at different times.

6    Some conspirators play major roles while others play

7    minor parts in the scheme.  The law does not require

8    that each participant in the conspiracy play an equal

9    role.  Even a single act may be sufficient to draw a

10   defendant within the ambit of the conspiracy.

11        A conspiracy may continue for a long period of time

12   and may include the performance of many transactions.

13   It is not necessary that all members of the conspiracy

14   join it at the same time or leave it at the same time.

15   A member of the conspiracy may stop participating in the

16   conspiracy before the conspiracy ends and one may join a

17   conspiracy after it has already begun.  Moreover, one

18   may become a member of the conspiracy without full

19   knowledge of all the details of the unlawful scheme or

20   the names, identities or locations of all of the other

21   members.

22        I want to caution you, however, that a defendant's

23   mere presence at the scene of an alleged crime does not,

24   by itself, make him a member of the conspiracy.

25   Similarly, mere association with one or more members of

the conspiracy does not automatically make a defendant a

member.  A person may know or be friendly with a

criminal without being a criminal himself.  Mere

similarity of conduct or the fact that they may have

assembled together and discussed common aims and

interests does not necessarily establish proof of the

existence of a conspiracy.

I also want to caution you that mere knowledge or

acquiescence, without participation, in the unlawful

plan is not sufficient.  Moreover, the fact that the

acts of a defendant, without knowledge, merely happen to

further the purposes or objectives of the conspiracy

does not make the defendant a member.  More is required

under the law.  What is necessary is that the defendant

must have participated with the knowledge of at least

some of the purposes or objectives of the conspiracy and

with the intent of aiding in the accomplishment of those

unlawful ends.

"KNOWINGLY" AND "WILLFULLY" DEFINED

You have been instructed that to sustain a burden

of proof on Count 1, the government must prove that the

defendant acted knowingly and willfully.  A person acts

knowingly if he acts intentionally and voluntarily and

not because of ignorance, mistake, accident or

carelessness.  You may consider evidence of the

1    defendant's words, acts or omissions, along with all
2    other evidence, in deciding whether the defendant acted
3    knowingly.

4         Willfully means to act with knowledge that one's
5    conduct is unlawful and with the intent to do something
6    that the law forbids; that is to say, with the bad
7    purpose of disobeying or disregarding the law.  The
8    defendant's conduct was not willful if it was of
9    negligence, inadvertence or mistake.

10                        AMOUNT OF DRUGS

11        If you find that the government has not proven
12   beyond a reasonable doubt the elements that I have just
13   described to you, you will indicate that you find the
14   defendant not guilty of Count 1 on the special verdict
15   form I will provide you.  You will then answer no
16   further questions on Count 1.

17        If you find that the government has proven beyond a
18   reasonable doubt that the two elements that I have
19   described -- that the government has proven beyond a
20   reasonable doubt the two elements that I have described,
21   then there is another issue you must decide with regard
22   to Count 1.  The special verdict form will set forth the
23   questions you must answer.

24        Count 1 charges the defendant with conspiring to
25   distribute 28 grams or more of a mixture or substance

1    containing a detectable amount of cocaine base and 100

2    grams or more of a mixture or substance containing a

3    detectable amount of heroin.

4        You should assess the amount of cocaine base and

5    heroin involved in the conspiracy with regard to the

6    defendant.  The government does not have to prove that

7    the defendant directly handled or distributed the

8    particular quantities alleged, although you may consider

9    that evidence along with other evidence to assess the

10   quantity element.

11       The government can prove the defendant is

12   responsible for the quantity involved in a conspiracy in

13   three ways:

14       First, the government can offer evidence that

15   proves beyond a reasonable doubt that the defendant

16   personally and directly participated in the possession

17   or distribution of the drugs in question.  With regard

18   to this type of proof, the government need not prove

19   that the defendant knew the type or amount of drugs in

20   question as long as the government proves beyond a

21   reasonable doubt that the defendant knew the drugs in

22   question were a controlled substance.

23       Second, the government can offer evidence that

24   proves beyond a reasonable doubt that the defendant knew

25   that the conspiracy involved a particular quantity of a

controlled substance or controlled substances during the
time period that defendant participated in the
conspiracy.

Third, the government can offer evidence that
proves beyond a reasonable doubt that the conspiracy
involved a particular quantity of controlled substance
or substances during the time period the defendant
participated in the conspiracy and that, based on all of
the circumstances, it was reasonably foreseeable to the
defendant that the conspiracy involved the particular
quantity.

With regard to each of these types of proof, the
government must prove beyond a reasonable doubt that the
conspiracy at issue is the one described in Count 1.

Remember, you should address this issue and
complete the form only if you find the essential
elements of the conspiracy alleged in Count 1 have been
established.  If you decide that the government has
proven beyond a reasonable doubt that the charged
conspiracy involves 28 grams or more of cocaine base or
100 grams or more of heroin, then you are to indicate
that finding on the special verdict form.

                    BUYER-SELLER TRANSACTIONS

The fourth superseding indictment charges that the
defendant was a participant in a criminal conspiracy.

1    The defendant argues, alternatively, that the

2    transactions between him and others constituted a series

3    of buyer-seller transactions, in this case the buying

4    and selling of drugs.  The existence of a simple

5    buyer-seller transaction between a defendant and another

6    person, without more, is not sufficient to establish a

7    conspiracy even where the buyer might intend to resell

8    the drugs.  Moreover, contact with drug traffickers,

9    standing alone, is not sufficient to prove participation

10   in the conspiracy.

11       In considering whether a conspiracy or a series of

12   simple buyer-seller transactions existed with regard to

13   the defendant, you may consider the following factors

14   among others:

15       1.  Whether the transaction involved large

16   quantities of drugs;

17       2.  Whether the parties had a standardized way of

18   doing business;

19       3.  Whether the sales were on credit or

20   consignment;

21       4.  Whether the parties had a continuing

22   relationship;

23       5.  Whether the seller had a financial stake in a

24   resale by the buyer;

25       6.  Whether the parties had an understanding that

1    the drugs would be resold;

2        7.   Whether the individual alleged to have

3    participated in the conspiracy purchased the same drugs

4    from others not involved in the alleged conspiracy;

5        8.   Whether the parties placed limits on the

6    purchaser's ability to use or resell the product;

7        9.   Whether the individual alleged to have

8    participated in the conspiracy did not assist the

9    conspiracy's operation aside from being a customer or

10   purchaser of drugs;

11       10.   Whether the defendant's supplier of drugs also

12   sold to many different buyers.

13       All right.

14                        COUNT 2

15       The fourth superseding indictment charges the

16   defendant with being a person previously convicted of a

17   felony who possessed a weapon shipped in interstate

18   commerce.

19       The count reads as follows:

20       On or about December 25, 2015, in the District of

21   Vermont, the defendant, Brian Folks, a/k/a Moe, a/k/a

22   Moet Hart, having been convicted of a crime punishable

23   by a term of imprisonment exceeding one year, knowingly

24   possessed in and affecting commerce a firearm, namely a

25   Beretta Model 92FS nine-millimeter pistol, SN BER441412.

1      ELEMENTS OF THE OFFENSE OF UNLAWFUL POSSESSION

2          OF A FIREARM, 18 USC, SECTION 922(g)(1)

3      In order to return a verdict of guilty as to this

4  count, the government must prove each of the following

5  elements beyond a reasonable doubt:

6      First, that the defendant was convicted in any

7  court of a crime punishable by imprisonment for a term

8  exceeding one year;

9      Second, that the defendant knowingly possessed the

10  firearm; and

11      Third, that the possession charged was in or

12  affecting interstate commerce.

13      FIRST ELEMENT - DEFENDANT'S PRIOR CONVICTION

14      The first element of the offense is that before the

15  date the defendant is charged with possessing the

16  firearm, the defendant had been convicted of a crime

17  punishable by imprisonment for a term exceeding one

18  year.  The parties have stipulated and agreed that

19  defendant Brian Folks was convicted of a crime

20  punishable by a term of imprisonment exceeding one year

21  prior to December 25, 2015.

22      SECOND ELEMENT - POSSESSION OF FIREARM

23      The second element which the government must prove

24  beyond a reasonable doubt is that on or about the date

25  set forth in the indictment, the defendant knowingly

1    possessed a firearm.

2          A firearm is any weapon which will, or is designed

3    to, or may be readily converted to, expel a projectile

4    by the action of an explosive.

5          As I have instructed you, the government must prove

6    beyond a reasonable doubt that the defendant possessed

7    the firearm.  The legal concept of possession may differ

8    from the everyday usage of the term, so I will explain

9    it in some detail.

10          Actual possession is what most of us think of as

11    possession; that is, having physical custody or control

12    of an object.  For example, if you find that the

13    defendant had the firearm on his person, you may find

14    that he had possession of the firearm.  However, a

15    person need not have physical custody of the object in

16    order to be in legal possession of it; this is called

17    constructive possession.  If an individual has the

18    ability and intent to exercise substantial control over

19    an object that he does not have in his physical custody,

20    then he is in constructive possession of that item.

21          An example of this from everyday experience would

22    be a person's possession of items he keeps in the safe

23    deposit box of his bank.  Although the person does not

24    have physical custody of those items, he exercises

25    substantial control over them and so has legal

1    possession of them.

2         If you find that the defendant had such control

3    over the firearm but did not actually have physical

4    custody of the firearm, then he possessed the firearm

5    under this element just as if he had the firearm in his

6    physical custody.

7         To satisfy this element, you must also find that

8    the defendant knowingly and possessed -- knowingly

9    possessed the firearm.  This means that he possessed the

10   firearm purposely and voluntarily and not by accident or

11   mistake.  It also means that he knew that the weapon was

12   a firearm as we commonly use the word.  However, the

13   government is not required to prove that the defendant

14   knew that he was breaking the law.

15        THIRD ELEMENT - FIREARM IN OR AFFECTING COMMERCE

16        The third element that the government must prove

17   beyond a reasonable doubt is that the defendant -- is

18   that the firearm the defendant is charged with

19   possessing was in or affecting interstate commerce.

20        This means that the government must prove that at

21   some time prior to the defendant's possession, the

22   firearm had traveled in interstate commerce.  It is

23   sufficient for the government to satisfy this element by

24   proving that at any time prior to the date charged in

25   the fourth superseding indictment, the firearm crossed a

1    state line.  It is not necessary that the government

2    prove that the defendant himself carried it across a

3    state line, nor must the government prove who carried it

4    across or how it was transported.  It is also not

5    necessary for the government to prove that the defendant

6    knew that the firearm had previously traveled in

7    interstate commerce.

8         In this regard, there has been evidence that the

9    firearm in question was manufactured in a different

10   state than the state where the defendant is charged with

11   possessing it.  You are permitted to infer from this

12   fact that the firearm traveled in interstate commerce;

13   however, you are not required to do so.

14                    COUNTS 3, 5, 8 AND 9

15        Counts 3, 5, 8 and 9 of the fourth superseding

16   indictment charge the defendant with knowingly and

17   intentionally distributing a controlled substance.

18   Title 21, Section 841(a) makes it a federal crime for

19   any person to knowingly or intentionally distribute

20   controlled substances.

21        The counts read as follows:

22        Count 3:  On or about January 6th, 2016, in the

23   District of Vermont, the defendant, Brian Folks, a/k/a

24   Moe, a/k/a Moet Hart, knowingly and intentionally

25   distributed heroin, a Schedule I controlled substance.

1      Count 5:  On or about January 12, 2016, in the

2   District of Vermont, the defendant, Brian Folks, a/k/a

3   Moe, a/k/a Moet Hart, knowingly and intentionally

4   distributed heroin, a Schedule I controlled substance.

5      Count 8:  On or about January 22nd, 2016, in the

6   District of Vermont, the defendant, Brian Folks, a/k/a

7   Moe and a/k/a Moet Hart, knowingly and intentionally

8   distributed heroin, a Schedule I controlled substance.

9      Count 9:  On or about February 10, 2016, in the

10   District of Vermont, the defendant, Brian Folks, a/k/a

11   Moe and a/k/a Moet Hart, knowingly and intentionally

12   distributed heroin, a Schedule I controlled substance.

13         ELEMENTS OF THE OFFENSE OF DISTRIBUTION OF

14      A CONTROLLED SUBSTANCE, 21 USC, SECTION 841(a)(1)

15      To sustain its burden of proof for the crime of

16   distribution of a controlled substance, the government

17   must prove the follow two elements beyond a reasonable

18   doubt:

19      First, that the defendant knowingly and

20   intentionally distributed a controlled substance, as

21   charged in the fourth superseding indictment; and

22      Second, that at the time of the distribution, the

23   defendant knew that the substance distributed was a

24   controlled substance.

25      I instruct you again that heroin, as charged in the

1    distribution counts of the fourth superseding

2    indictment, is a Schedule I controlled substance.

3                 DEFINITION OF DISTRIBUTION

4        The word "distribute" means to deliver a controlled

5    substance.  Deliver is defined as the actual,

6    constructive or attempted transfer of a controlled

7    substance.  Simply stated, the word "distribute" means

8    to pass on, or to hand over to another, or to cause to

9    be passed on or handed over to another, or to try to

10   pass on or hand over to another, a controlled substance.

11       Distribution does not require a sale.  Activities

12   in furtherance of the ultimate sale, such as vouching

13   for the quality of the drugs, negotiating for or

14   receiving the price, and supplying or delivering the

15   drugs in person or through another person may constitute

16   distribution.  In short, distribution requires a

17   concrete involvement in the transfer of the drugs.

18             "KNOWINGLY" AND "INTENTIONALLY" DEFINED

19       With respect to Counts 3, 5, 8 and 9, you have been

20   instructed that in order to sustain its burden of proof,

21   the government must prove that the defendant acted

22   knowingly and intentionally.  A person acts knowingly if

23   he acts intentionally and voluntarily and not because of

24   ignorance, mistake, accident or carelessness.  You may

25   consider evidence of the defendant's words, acts, or

omissions, along with all other evidence, in deciding
whether the defendant acted knowingly.

A person acts intentionally if he acts deliberately
and purposefully and not because of mistake or accident.

KNOWLEDGE OF THE CONTROLLED SUBSTANCE

Although the government must prove that the
defendant knew that he possessed a controlled substance,
the government does not have to prove the defendant knew
the exact nature of the drugs he possessed.  It is
enough that the government proves that the defendant
knew that he possessed some kind of controlled
substance.

Your decision about whether the defendant knew the
materials he distributed were a controlled substance
involves a decision about the defendant's state of mind.
It is obviously impossible to prove directly the
operation of a defendant's mind, but a consideration of
all the facts and circumstances shown by the evidence
and the exhibits in this case may enable you to infer
what the defendant's state of mind was.  You may rely on
circumstantial evidence in determining the defendant's
state of mind.

COUNT 7

Count 7 of the fourth superseding indictment
charges Brian Folks with knowingly and intentionally

1    possessing heroin and cocaine base with the intent to

2    distribute these substances.  Title 21, section 841

3    makes it a federal crime for any person to possess with

4    the intent to distribute controlled substances.

5         The count reads as follows:

6         On or about January 20, 2016, in the District of

7    Vermont, the defendant, Brian Folks, a/k/a Moe, a/k/a

8    Moet Hart, knowingly and intentionally possessed with

9    the intent to distribute heroin, a Schedule I controlled

10   substance, and cocaine base, a Schedule II controlled

11   substance.

12              ELEMENTS OF THE OFFENSE OF POSSESSION

13   WITH THE INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE,

14                   21 USC, SECTION 841(a)

15        In order to prove this charge against the

16   defendant, the government must establish the following

17   three elements of the crime:

18        First, that the defendant possessed a controlled

19   substance; here, heroin or cocaine base;

20        Second, that the defendant knew that he possessed a

21   controlled substance; and

22        Third, that the defendant possessed the controlled

23   substance with the intent to distribute it.

24        I instruct you that heroin is a Schedule I

25   controlled substance and cocaine base is a Schedule II

1    controlled substance.

2                    DEFINITION OF "POSSESSION"

3         I have already instructed you as to the meaning of

4    possession when I instructed you on the law regarding

5    the possession of a firearm.  The term has the same

6    meaning here.

7      KNOWLEDGE THAT THE DRUGS WERE CONTROLLED SUBSTANCES

8         The second element the government must prove beyond

9    a reasonable doubt is that the defendant knew that he

10   possessed a controlled substance.

11        To establish this element, the government must

12   prove that the defendant knew that he possessed a

13   controlled substance and that his possession was not due

14   to carelessness, negligence, or mistake.  If you find

15   that the defendant did not know that he had controlled

16   substances in his possession or that he did not know

17   that what he possessed -- did not know that what he

18   possessed was, in fact, controlled substances, then you

19   must find the defendant not guilty.

20        Although the government must prove that the

21   defendant knew that he possessed controlled substances,

22   the government does not have to prove that the defendant

23   knew the exact nature of the drugs in his possession.

24   It is enough that the government proves that the

25   defendant knew that he possessed some kind of controlled

1    substances.

2                    INTENT TO DISTRIBUTE

3         To satisfy the third element, the government may

4    prove that the defendant possessed controlled

5    substances --

6         To satisfy the third element, the government may

7    prove -- must prove that the defendant possessed

8    controlled substances with the intent to distribute

9    them.  All right.  So that's just a "may" to a "must."

10        To prove the third element in this way, the

11   government must prove beyond a reasonable doubt that the

12   defendant had control over the drugs with the state of

13   mind or purpose of transferring them to another person.

14        The same considerations that apply to your

15   determination of whether the defendant knew he possessed

16   controlled substances apply to your decision concerning

17   the defendant's intention to distribute them.  You may

18   draw inferences from evidence concerning his behavior.

19   However, you may not convict the defendant on this count

20   unless these inferences convince you beyond a reasonable

21   doubt that the defendant intended to distribute the

22   controlled substances to others.

23                 DEFINITION OF "DISTRIBUTION"

24        I have already instructed you as to the meaning of

25   the word "distribution" when I instructed you on the law

1    regarding the distribution of a controlled substance.

2    The term has the same meaning here.

3         All right.  We have been going for about an hour.

4    Let's take about two minutes and stand and stretch.

5              (Brief pause.)

6              THE COURT:  All right.  Let's continue on.

7                   COUNTS 10 THROUGH 14

8         Counts 10 through 14 of the fourth superseding

9    indictment charge Brian Folks with sex trafficking by

10   force, fraud or coercion.

11        The counts read as follows:

12        Count 10:  Between in or about June 2012 and in or

13   about August of 2014, in the District of Vermont, the

14   defendant, Brian Folks, a/k/a Moe, a/k/a Moet Hart,

15   knowingly, in and affecting interstate commerce,

16   recruited, enticed, harbored, transported, provided,

17   obtained, and maintained by any means Katelynn C.,

18   knowing and in reckless disregard of the fact that

19   force, threats of force, fraud, and coercion would be

20   used to cause Katelynn C. to engage in a commercial sex

21   act.

22        Count 11:  In or about July 2013, in the District

23   of Vermont, the defendant, Brian Folks, a/k/a Moe and

24   a/k/a Moet Hart, knowingly, in and affecting interstate

25   commerce, recruited, enticed, harbored, transported,

1    provided, obtained, and maintained by any means Keisha

2    W., knowing and in reckless disregard of the fact that

3    force, threats of force, fraud, and coercion would be

4    used to cause Keisha W. to engage in a commercial sex

5    act.

6         Count 12:  Between in or about June 2015 and in or

7    about February of 2016, in the District of Vermont, the

8    defendant, Brian Folks, a/k/a Moe, a/k/a Moet Hart,

9    knowingly, in and affecting interstate commerce,

10   recruited, enticed, harbored, transported, provided,

11   obtained, and maintained by any means Keisha W., knowing

12   and in reckless disregard of the fact that force,

13   threats of force, fraud, and coercion would be used to

14   cause Keisha W. to engage in a commercial sex act.

15        Count 13:  In or about June 2015, in the District

16   of Vermont, the defendant, Brian Folks, a/k/a Moe, a/k/a

17   Moet Hart, knowingly, in and affecting interstate

18   commerce, recruited, enticed, harbored, transported,

19   provided, obtained, and maintained by any means Danielle

20   M., knowing and in reckless disregard of the fact that

21   force, threats of force, fraud, and coercion would be

22   used to cause Danielle M. to engage in a commercial sex

23   act.

24        Count 14:  Between in or about June 2015 and in or

25   about December of 2015, in the District of Vermont, the

1   defendant, Brian Folks, a/k/a Moe, a/k/a Moet Hart,

2   knowingly, in and affecting interstate commerce,

3   recruited, enticed, harbored, transported, provided,

4   obtained, and maintained by any means Ayla L., knowing

5   and in reckless disregard of the fact that force,

6   threats of force, fraud, and coercion would be used to

7   cause Ayla to -- Ayla L. to engage in a commercial sex

8   act.

9           ELEMENTS OF THE OFFENSE OF SEX TRAFFICKING

10       BY FORCE, FRAUD OR COERCION, 18 USC, SECTION 1591

11          In order to return a verdict of guilty as to Counts

12   10 through 14, the government must prove the following

13   elements beyond a reasonable doubt:

14          First, that the defendant knowingly recruited,

15   enticed, harbored, transported, provided, obtained, or

16   maintained by any means the person identified in each

17   count; and

18          Second, that the defendant did so knowingly and in

19   reckless disregard of the fact that force, threats of

20   force, fraud, or coercion, or any combination of those

21   means, would be used to cause that person to engage in a

22   commercial sex act; and

23          Third, that the defendant's conduct was in or

24   affected interstate commerce.

25              FIRST ELEMENT - RECRUITING, ENTICING,

HARBORING, TRANSPORTING, PROVIDING,

OBTAINING OR MAINTAINING A PERSON

The first element that the government must prove beyond a reasonable doubt to establish the offense of sex trafficking by force, fraud, or coercion is that the defendant recruited, enticed, harbored, transported, provided, obtained, or maintained the person identified in each count.  In considering whether the defendant did any of these things, I instruct you to use the ordinary, everyday definitions of these terms.

SECOND ELEMENT - KNOWLEDGE OR RECKLESS DISREGARD

THAT FORCE, FRAUD OR COERCION WOULD BE USED

The second element the government must prove beyond a reasonable doubt to sustain the offense of sex trafficking by force, fraud, or coercion is that the defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion or any combination of those means would be used to cause the person identified in each count to engage in a commercial sex act.

The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.  The thing of value may be money, or it may be any other tangible or intangible thing that has some value.  The government does not have

to prove that a commercial sex act occurred, only that the defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion would be used to cause a person to engage in a commercial sex act.

"Force" means any form of power, violence or physical pressure exercised upon another person.

"Fraud" means that the defendant knowingly made a misstatement or omission of a material fact to entice the victim.  A material fact is one that would reasonably be expected to be of concern to a reasonable person in relying upon the representation or statement in making the decision.

"Coercion" means a threat of serious harm or physical restraint against a person or any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or to a serious restraint against any person.  A threat is a serious statement expressing an intention to inflict harm, at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner.

The term "serious harm," which I just mentioned in the definition of coercion, means any harm, whether physical or nonphysical, including psychological,

financial or reputational harm, that is sufficiently
serious, under all the surrounding circumstances, to
compel a reasonable person of the same background and in
the same circumstances to perform or to continue
performing commercial sexual activity in order to avoid
incurring that harm.

"Reckless disregard" of a fact means a deliberate
indifference to the fact which, if considered in a
reasonable manner, indicates that there was a high
probability of the fact at issue.

In considering whether the defendant's actions
would cause a person to engage in a commercial sex act,
you may consider the cumulative effect of the
defendant's conduct on that person.  In this regard, you
may consider, for example, any aspect of the person's
age, background, station in life, physical or mental
condition, experience, education, socioeconomic status,
or any inequalities between the person and the
defendant.

The government does not need to show a link between
any specific commercial sex act performed by the victim
and any particular threat made, or any particular action
or act of fraud or coercion taken against her.  Rather,
it is sufficient if the defendant's actions give -- gave
rise to circumstances that would compel a reasonable

person in the victim's situation to comply with the
defendant's commands, in light of the totality of the
defendant's conduct, the surrounding circumstances, and
any vulnerabilities of the victim.

The government does not need to prove physical
restraint in order for you to find the defendant guilty
of sex trafficking by force, fraud, or coercion.  A
person who has been placed in such fear or circumstances
is under no affirmative duty to try to escape.

In considering whether a person's commercial sex
acts were caused by force, fraud, or coercion, the fact
that the person may have initially consented or
acquiesced, or previously engaged in commercial sex
acts, does not mean that the person has not later --
does not mean that the person was not later compelled to
engage in a commercial sex act.

The question is whether the defendant used force,
fraud, or coercion, or any combination of those means,
to cause the person to perform or to continue to perform
commercial sex acts.

Whether the person was given money, benefits, or
gifts, or was able to keep any earnings, is not
determinative of whether that person had been compelled
through force, fraud or coercion to engage in a
commercial sex act.

THIRD ELEMENT - IN OR AFFECTING INTERSTATE COMMERCE

The third and final element the government must prove beyond a reasonable doubt to establish the offense of sex trafficking by force, fraud, or coercion is that the defendant's conduct was in interstate commerce or affected interstate commerce.  The government does not have to prove both.

"Interstate commerce" means the movement of goods, services, money and individuals between two or more states, territories, and possessions of the United States, including the District of Columbia.

The government is not required to show that the defendant's activities actually crossed state lines to prove that his actions affected interstate commerce. Rather, if the defendant's conduct involved the use of goods that moved across state lines, or involved telephones, the internet, or other such facilities of interstate commerce, such as hotels that house out-of-state travelers or are part of a national or international chain, you may find that the acts affected interstate commerce.

To satisfy this element, the government must prove that the defendant's conduct was in or affected interstate commerce in any way, no matter how minimal. You do not have to find that the defendant's conduct

1    actually affected interstate commerce if you find that

2    the defendant's conduct would have affected interstate

3    commerce if the defendant had successfully and fully

4    completed his actions.

5         To show that the defendant's conduct affected

6    interstate commerce, it is not necessary for the

7    government to prove that the defendant specifically knew

8    or intended that his conduct would affect interstate

9    commerce.  It is only necessary that the natural

10   consequences of such conduct would be to affect

11   interstate commerce in some way, even if minor.

12                          COUNT 15

13        Count 15 of the fourth superseding indictment

14   charges Brian Folks with sex trafficking of a minor.

15        The count read as follows:

16        Between in or about May 17, 2013, and in or about

17   May 18, 2013, in the District of Vermont, the defendant,

18   Brian Folks, a/k/a Moe, a/k/a Moet Hart, knowingly, in

19   and affecting interstate commerce, recruited, enticed,

20   harbored, transported, provided, obtained, and

21   maintained by any means Hannah A., having had a

22   reasonable opportunity to observe Hannah A., that Hannah

23   A. had not attained the age of 18 years and, knowing or

24   in reckless disregard of the fact that Hannah A. would

25   be caused to engage in a commercial sex act.

1          ELEMENTS OF THE OFFENSE OF SEX TRAFFICKING

2              A MINOR, 18 USC, SECTION 1591

3          Title 18 of the United States Code, section 1591,

4      as charged in Count 15 of the fourth superseding

5      indictment, makes it a federal crime or offense for

6      anyone to knowingly, in and affecting interstate

7      commerce, recruit, entice, harbor, transport, provide,

8      obtain, or maintain by any means a person, having had a

9      reasonable opportunity to observe that person, and would

10     be caused to engage in a commercial sex act.

11         In order to return verdict of guilty as to this

12     count, the court [sic] must prove the following elements

13     beyond a reasonable doubt:

14         First, that the defendant knowingly recruited,

15     enticed, harbored, transported, provided, obtained, or

16     maintained by any means Hannah A;

17         Second, that Hannah A. was under the age of 18 and

18     that the defendant had a reasonable opportunity to

19     observe Hannah A.; and

20         Third, that the defendant knew or recklessly

21     disregarded the fact that Hannah A. would be caused to

22     engage in a commercial sex act; and

23         Fourth, that the defendant's conduct was in or

24     affecting interstate commerce.

25         FIRST ELEMENT - RECRUITING, ENTICING, HARBORING,

```
 1                TRANSPORTING, PROVIDING, OBTAINING, OR

 2                     MAINTAINING A PERSON

 3          The first element that the government must prove

 4     beyond a reasonable doubt to establish the offense of

 5     sex trafficking of a minor is that the defendant

 6     recruited, enticed, harbored, transported, provided,

 7     obtained, or maintained the minor.  As with Counts 10

 8     through 14, you should use the ordinary, everyday

 9     definitions of these terms.

10       SECOND ELEMENT - REASONABLE OPPORTUNITY TO OBSERVE

11          The second element the government must prove beyond

12     a reasonable doubt is to establish the offense of sex --

13     to establish the offense of sex trafficking of a minor

14     is that Hannah A. was under the age of 18 and that the

15     defendant had a reasonable opportunity to observe Hannah

16     A.

17            THIRD ELEMENT - COMMERCIAL SEX ACT

18          The third element the government must prove beyond

19     a reasonable doubt to establish the offense of sex

20     trafficking of a minor is that the defendant knew or

21     recklessly disregarded the fact that Hannah A. would be

22     caused to engage in a commercial sex act.

23          I previously defined the term "commercial sex act"

24     with respect to Counts 10 through 14.

25          You are to apply this definition as you consider
```

the evidence as to Count 15.  It is not required that

Hannah A. actually performed a commercial sex act as

long as the government has proved that the defendant

recruited, enticed, harbored, provided, obtained, or

maintained her knowing, and in reckless disregard of the

fact, that she would be caused to engage in a commercial

sex act.

Unlike with respect to Counts 10 through 14, you do

not need to find that force, threats of force, fraud,

coercion -- or coercion were used or would be used to

cause the victim in Count 15 to engage in a commercial

sex act.  Consent is not a defense to Count 15 because a

minor cannot legally consent.

FOURTH ELEMENT - IN OR AFFECTING INTERSTATE COMMERCE

The fourth and final element that the government

must prove beyond a reasonable doubt is to establish the

offense of sex trafficking -- beyond a reasonable doubt

to establish the offense of sex trafficking of a minor

is that the defendant's conduct was either in interstate

commerce or affected interstate commerce.  I previously

defined the terms "in interstate commerce" and

"affecting interstate commerce" with respect to Counts

10 through 14.  You are to apply those definitions as

you consider the evidence as to Count 15.

COUNT 16

1          Count 16 of the fourth superseding indictment

2     charges Brian Folks with using a facility in interstate

3     commerce to -- in aid of prostitution.

4          The count reads as follows:

5          Between in or about June 2012 to -- and in or about

6     February of 2016, the defendant, Brian Folks, a/k/a Moe,

7     a/k/a Moet Hart, together with others, knowingly used,

8     and caused to be used, one or more facilities in

9     interstate commerce, namely the internet and cellular

10    telephones, with the intent to promote, manage,

11    establish, carry on, and facilitate the promotion,

12    management, establishment, and carrying on of an

13    unlawful activity, that is, a business enterprise

14    involving prostitution offenses in violation of the laws

15    of Vermont, and thereafter performed and caused to be

16    performed acts to promote, manage, establish, carry on,

17    and facilitate the promotion, management, establishment

18    and carrying on of such unlawful activity.

19         All right.

20          ELEMENTS OF THE OFFENSE OF USING A FACILITY

21        OF INTERSTATE COMMERCE IN AID OF PROSTITUTION,

22                    18 USC, SECTION 1952

23         Title 18 of the United States Code, section 1952,

24    as charged in Count 16 of the fourth superseding

25    indictment, makes it a federal crime or offense for

1    anyone to use any facility in interstate commerce with

2    the intent to knowingly promote, manage, establish,

3    carry on, or facilitate the promotion, management,

4    establishment, or carrying on of any business enterprise

5    involving prostitution offenses in violation of the laws

6    of Vermont, and thereafter perform or attempt to perform

7    an act in furtherance of that unlawful activity.

8         In order to return a verdict of guilty as to this

9    count, the government must prove the following elements

10   beyond a reasonable doubt:

11        First, that the defendant used or caused to be used

12   any facility in interstate commerce;

13        Second, that the defendant's use of the facility in

14   interstate commerce was done with the intent to promote,

15   manage, establish, carry on or facilitate the promotion,

16   management, establishment, or carrying on of an unlawful

17   activity; and

18        Third, that after the use of the facility in

19   interstate commerce, the defendant performed or caused

20   to be performed an act in furtherance of this unlawful

21   activity.

22        FIRST ELEMENT - FACILITY IN INTERSTATE COMMERCE

23        The first element the government must prove beyond

24   a reasonable doubt to establish the offense of using a

25   facility in interstate commerce in aid of prostitution

is that the defendant used or caused to be used a
facility in interstate commerce.

A "facility in interstate commerce" means any
method of communication between one state and another,
for example, the internet or telephone.

The government need not prove that the defendant
knew that he was using a facility in interstate
commerce. Nor need the defendant *[sic]* prove that the
defendant intended to use a facility in interstate
commerce. All the government must prove with respect to
the first element is that the defendant did, in fact,
use a facility in interstate commerce.

SECOND ELEMENT - INTENTION TO PROMOTE, MANAGE,

ESTABLISH, OR CARRY ON AN UNLAWFUL ACTIVITY

The second element the government must prove beyond
a reasonable doubt to establish the offense of using a
facility in interstate commerce in aid of prostitution
is that the defendant used the facility in interstate
commerce with the intent to promote, manage, establish,
or carry on or facilitate the promotion, management,
establishment, or carrying on of an unlawful activity.

To satisfy this element, the government must prove
beyond a reasonable doubt that the defendant used the
facility in interstate commerce for the purpose of
facilitating the unlawful activity.

1          The unlawful activity the defendant is charged with
2     here is a business enterprise involving prostitution
3     offenses in violation of the laws of Vermont.
4          I now instruct you that under Title 13, section
5     2632 of the Vermont Statutes, it is unlawful for a
6     person to engage in prostitution or assignation or to
7     aid and abet prostitution or assignation by any means
8     whatsoever.
9          Under Vermont law, the term "prostitution" means
10    both the offering or receiving of the body for sexual
11    intercourse for hire.  The term "assignation" means the
12    making of an appointment or engagement for prostitution
13    or lewdness.
14         In order to prove the second element of Count 16,
15    the government does not have to prove that the
16    furtherance of the unlawful activity was the defendant's
17    sole purpose in using an interstate facility.  It is
18    sufficient if the government proves that one of the
19    defendant's reasons for using an interstate facility was
20    to further the unlawful activity, meaning to make the
21    unlawful activity easier or to facilitate it.
22         You are thus being asked to consider the
23    defendant's state of mind to determine his purpose in
24    using an interstate facility.  You may determine the
25    defendant's intent from all the evidence that has been

1    placed before you, including the statements of the

2    defendant and his conduct before and after use of the

3    interstate facility.

4         The government must also prove that the unlawful

5    activity was a business enterprise.  A business

6    enterprise is a continuous course of conduct or series

7    of transactions to make a profit, not a casual, sporadic

8    or isolated activity.  If you find that the unlawful

9    activity was an isolated incident and was not part of

10   the ongoing course of criminal conduct, you must find

11   the defendant not guilty.  The government must -- the

12   government does not have to show that the defendant

13   engaged in an unlawful activity for a particular length

14   of time.  Nor must the government prove that the

15   unlawful activity was defendant's primary pursuit or

16   occupation, or that it actually turned a profit.

17                THIRD ELEMENT - ACT IN FURTHERANCE

18                   OF THE UNLAWFUL ACTIVITY

19        The third element that the government must prove

20   beyond a reasonable doubt to establish the offense of

21   using a facility in interstate commerce in aid of

22   prostitution is that the defendant knowingly performed

23   or caused to be performed an act to promote, manage,

24   establish, carry on, or facilitate the promotion,

25   management, establishment, or carrying on of the

1    unlawful activity.  The act in furtherance of the

2    unlawful activity need not itself be illegal.  However,

3    you must find unanimously that this act came after the

4    use of an interstate facility.

5                        AIDING AND ABETTING

6                    COUNTS 3, 5 AND 7 THROUGH 16

7            Counts 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16

8    of the fourth superseding indictment charge the

9    defendant both with committing the crime as a principal

10   and with aiding and abetting the offense.

11        The aiding and abetting statute, section 2(a) of

12   Title 18 of the United States Code, provides that:

13        Whoever commits an offense against the United

14   States or aids, abets, counsels, commands, induces, or

15   procures its commission, is punishable as a principal.

16        I have already instructed you on the law regarding

17   the crimes as a principal.  Now I will instruct you what

18   it means to aid and abet the same crimes.

19                  AIDING AND ABETTING EXPLAINED

20                    COUNTS 3, 5 AND 7 THROUGH 16

21        Under the aiding and abetting statute, it is not

22   necessary for the government to show that a defendant

23   himself physically committed the crimes with which he is

24   charged in order for the government to sustain its

25   burden of proof.  A person who aids and abets another to

commit an offense is just as guilty of that offense as
if he had committed it himself.

Accordingly, you may find the defendant guilty of
the offense charged if you find beyond a reasonable
doubt that another person actually committed the offense
with which the defendant is charged and that the
defendant aided or abetted that person in the commission
of the offense.

As you can see, the first requirement is that you
find that another person has committed the crime
charged.  Obviously no one can be convicted of aiding
and abetting criminal acts of another if no crime was
committed by the other person in the first place.  But
if you do find that a crime was committed, then you must
consider whether the defendant aided or abetted the
commission of that crime.

In order to aid and -- or abet another to commit a
crime, it is necessary that the defendant knowingly
associate himself in some way with the crime and that he
participate in the crime by doing some act to help make
the crime succeed.  To establish that the defendant
participated in the commission of the crime, the
government must prove that the defendant engaged in some
affirmative conduct or overt act for the specific
purpose of bringing about the crime.

1        The mere presence of a defendant where a crime is

2   being committed, even coupled with knowledge by the

3   defendant that a crime has been committed, or merely

4   associating with others who were committing a crime is

5   not sufficient to sustain aiding and abetting.  One

6   has -- one who has no knowledge that a crime is being

7   committed or is about to be committed but inadvertently

8   does something that aids in the commission of that crime

9   is not an aider and abettor.  An aider and abettor must

10  know that the crime is being committed and act in a way

11  which is intended to bring about the success of the

12  criminal venture.  And that's aider and abettor.

13       To determine whether a defendant aided or abetted

14  the commission of a crime with which he is charged, ask

15  yourself these questions:

16       Did he participate in the crime charged as

17  something he wished to bring about?

18       Did he knowingly associate himself with the

19  criminal venture?

20       Did he seek by his actions to make the criminal

21  venture succeed?

22       If he did, then the defendant is an aider and

23  abettor and therefore guilty of the offense.  If, on the

24  other hand, your answer to any of these questions is no,

25  then the defendant is not an aider and abettor, and you

1    must find him not guilty.

2    All right.

3                    UNANIMOUS VERDICT REQUIRED

4    To return a verdict, it is necessary that every

5    juror agree to the verdict.  In order to find the

6    defendant guilty, your verdict must be unanimous

7    regarding each essential element of the offense alleged

8    in each count.  You should consider each count

9    separately and return a verdict on each count.  Your

10    verdict may be different on various counts, but you

11    should not return a verdict on a particular count unless

12    your decision is unanimous.

13    During this trial --

14                       JUROR NOTE-TAKING

15    During this trial, you have been provided with

16    pencil and paper, and some of you have taken notes.  As

17    I explained at the beginning of the trial, all jurors

18    should be given equal attention during the deliberations

19    regardless of whether or not they have taken notes.  Any

20    notes you have taken may only be used to refresh your

21    memory during deliberations.  You may not use your notes

22    as authority to persuade your fellow jurors as to what a

23    witness did or did not say.  In your deliberations, you

24    must rely upon your collective memory of the evidence in

25    deciding the facts of the case.  If there is any

difference between your memory of the evidence and your

notes, you may ask that the record of the proceedings be

read back.  If a difference still exists, the record

must prevail over your notes.

CONCLUSION

I caution you, members of the jury, that you are

here to determine whether the defendant before you today

is not guilty or guilty solely from the evidence in this

case.  I remind you that the mere fact that a defendant

has been indicted is not evidence against him.  Also, a

defendant is not on trial for any act or conduct or

offense not alleged in the indictment.  Nor are you

called upon to return a verdict as to the guilt or

innocence of any other person or persons not on trial as

a defendant in this case.

You should -- you should not consider the

consequences of a guilty or not guilty determination.

The punishment provided by law for the offenses charged

in the indictment is a matter exclusively within the

responsibility of the judge, and it should never be

considered by a jury in any way in arriving at an

impartial verdict.

It is your duty as jurors to consult with one

another and to deliberate.  Each of you must decide the

case for yourself, but only after an impartial

1   consideration of the evidence in the case with your

2   fellow jurors.  Do not hesitate to reexamine your own

3   views and change your opinion if you think you were

4   wrong.  Do not, however, surrender your honest

5   convictions about the case solely because of the opinion

6   of your fellow jurors or for the mere purpose of

7   returning a verdict.

8        Upon retiring to the jury room, your foreperson

9   will preside over your deliberations and will be your

10  spokesperson here in court.  If a vote is to be taken,

11  your foreperson will ensure that it is done.  A verdict

12  form has been prepared for your conclusions.  If the

13  verdict form varies in any way from the instructions

14  provided within this jury charge, I instruct you that

15  you are to follow the instructions provided within this

16  jury charge.

17       After you have reached an agreement, the foreperson

18  will record a verdict of guilty or not guilty.  Your

19  foreperson will then sign and date the verdict form, and

20  you will return to the courtroom.  In all other

21  respects, the foreperson is the same as any other juror.

22  His or her vote does not count more than any other

23  member of the jury.

24       If, during your deliberations, you should desire to

25  communicate with the Court, please put your message or

1     question in writing signed by the foreperson and pass

2     the note to the court officer, who will bring it to my

3     attention.  I will then confer with the attorneys, and I

4     will respond as promptly as possible, either in writing

5     or by having you return to the courtroom so I can speak

6     with you.  I caution you, however, with regard to any

7     message or question you might send, that you should

8     never state or specify your numerical division at the

9     time.  You should also never communicate the subject

10    matter of your note or your deliberations to any member

11    of the court's staff.

12         All right.  First, let me excuse the alternates,

13    and I think, perhaps, the most difficult job is to be an

14    alternate because you have to engage in the trial for,

15    in this case, three weeks but then don't have the

16    opportunity to resolve the issue with the other jurors.

17    But the alternates are Alexander Boesch, Theodore

18    Francis and Melissa Coviello, the last three numbers.

19    And I am going to excuse you.

20         When the jury goes back to the jury room, you can

21    get your things and then leave, but I really want to

22    express my appreciation for your service.  There was a

23    reasonable opportunity -- or reasonable risk that a

24    number of people would not be able to serve.  Obviously

25    we had -- one juror left as well.  And it's just

1    incredibly important that we have alternates in this

2    particular case.

3        So I thank you, with that, and once you are

4    excused, you are free to speak about the case, and --

5    all right.

6        And then, Ms. Murphy, I am going to appoint you as

7    the foreperson of the jury.

8        All right.  I am going to turn the husher on and

9    I'd ask the lawyers to come forward.

10   (The following was held at the bench.)

11          THE COURT:  Okay.  So first, objections from

12   the government?  Any objections?

13          MR GRADY:  No objections, your Honor.

14          THE COURT:  Okay.

15          MS. SEN:  One objection to the count -- in the

16   charges of Counts 10 to 14, 15, the word "victim" is

17   used in one of the elements, and I didn't catch it

18   reading through.

19          THE COURT:  Really?

20          MS. SEN:  Yes.

21          THE COURT:  Where is that?

22          MS. SEN:  On page 30, your Honor, is the first

23   time it's said.  Let me see here.

24        On page 30, the first full paragraph, "Rather, it's

25   sufficient the defendant's actions -- blah, blah, blah.

1    It's the last line in --

2              THE COURT:  The first full paragraph?

3              MS. SEN:  Yes, last sentence, and it's

4    actually the last phrase, "any vulnerabilities of the

5    victim."

6              LAW CLERK:  It's actually in the first as

7    well.

8              MS. SEN:  Oh, "by the victim."  Yes, it's

9    actually in the first sentence.

10             THE COURT:  Yeah, vulnerable -- okay.

11             MS. SEN:  And then the same thing in the Count

12   15, your Honor.  On page -- third element.

13             THE COURT:  Okay.  And where's that?

14             MS. SEN:  On page 33, the last paragraph:

15   "Unlike with respect to Counts 10 through 14, you

16   don't -- you do not need to -- you do not need to find

17   that force, threats of force, fraud or coercion were

18   used or would be used to cause the victim" in Count 15.

19             THE COURT:  All right.  So what I am going to

20   do is ask for all of the instructions to be returned.  I

21   am going to say that -- I am going to mention the

22   victim -- there is no victim.  I am striking that.  And

23   will be replaced with -- in this section?

24             MS. SEN:  Person?

25             THE COURT:  Yes.  Do you have any objection to

1    me saying I am striking the word -- the words "victim"

2    in a couple of places and replacing it with "persons"?

3                MR. KAPLAN:  Do I?

4                THE COURT:  Yeah.

5                MR. KAPLAN:  No.  I agree with it.

6                MS. SEN:  That's fine, your Honor.

7                MR. DARROW:  Our only concern is that we don't

8    want to make it seem like the Court --

9                THE COURT:  Pardon me?

10               MR. DARROW:  My only concern is we don't want

11   the jury to think that the Court thinks that anyone's

12   not a victim either.

13               THE COURT:  No, it --

14               MR. DARROW:  You just say it's entirely for

15   the jury.

16               THE COURT:  Just say return the forms and they

17   will get it back.

18               MR. DARROW:  So no new instruction; just the

19   change.

20               THE COURT:  I am just going to actually ask

21   them to turn to the charges; we are going to change it

22   and then give it back to them.  I am going to say the

23   change -- changing the word "victim" to "person."

24   That's it.

25         Okay, is there anything else?

```
1              MS. SEN:  Not that I can --

2              THE COURT:  Sorry.

3              MS. SEN:  -- find, your Honor.

4              THE COURT:  Sorry about that.

5              MS. SEN:  Well, I should have caught it.

6              THE COURT:  Yeah.  I should have caught it.

7   Okay.

8              MS. SEN:  Thank you.

9   (The following was held in open court.)

10             THE COURT:  All right.  First, when you leave,

11  I'd ask that you leave the jury charge I read with me on

12  your seat.  There's going to be one change.  I am going

13  to change -- there's a couple of words -- "victim" to

14  "person."  Again, "victim" to "person" is going to be

15  changed.  That's it, but I want to change those.  And

16  then you will get them back delivered pretty quickly.

17      Also, you will get a jury special verdict form

18  fairly quickly.

19      There's one other thing that I want to remind you:

20  Deliberate only when everyone is there.  So if somebody

21  has to leave, whether they're going outside or whatever,

22  you should stop deliberations because everybody should

23  be deliberating at the same time.

24      So someone has to leave to go to the bathroom or

25  anything, I'd ask you to stop, wait for that person to
```

1    be back, then you continue your deliberations.

2        I am going to stay with counsel and excuse you now.

3    You are now to address the case of United States versus

4    Brian Folks.  Okay.

5    (The jury was excused to deliberate upon their verdict,

6    after which the following was held in open court at 2:55

7    p.m.)

8            THE COURT:  All right.  Well, I apologize for

9    that error, but it's in the jury charge in such a way as

10   to not necessarily call these young women "victims."

11   Regardless, I am going to strike the word, have stricken

12   the word in their presence, replace it with "person,"

13   and then give them back their jury charge.

14       Next, the -- I have one other little change on the

15   special verdict form.  I think -- this will be delivered

16   to you within just a few minutes.  You can review it,

17   tell me if you want to make any changes to the special

18   verdict form.  That would be helpful.

19       Okay.  Is there anything else?

20       Okay.  Then I will go relax.

21   (Court was in recess at 2:57 p.m.)

22   (The following was held in chambers at 4:35 p.m.)

23           THE COURT:  We have everyone here.

24       The note reads, "Officer Brouillette testimony and

25   the Brian Folks video on January 20, 2016"--

1      MR. KAPLAN:  You gotta be kidding me.

2      THE COURT:  -- "stop."  And it's signed by

3 Nancy Murphy.

4   "And Brian Folks' testimony on January 30, 2016,

5 stop."

6      MR. DARROW:  January 30, 2016, stop.

7      THE COURT:  Oh, the stop at -- the police stop

8 on Brouillette testimony.

9      MR. DARROW:  So his testimony about the

10 January 20 stop.

11      THE COURT:  And also what he said.

12      MR. DARROW:  And what Folks said about the

13 January 20 stop.

14      THE COURT:  Now, here's where we are going to

15 have a real problem.

16      COURT REPORTER:  We don't, Judge.

17      THE COURT:  Okay.

18      COURT REPORTER:  Can we go off the record?

19      THE COURT:  Yes.

20     (An off-the-record discussion was held.)

21      MR. DARROW:  And we should go grab the laptop

22 with the video on it.

23      THE COURT:  And we should be all set.

24      MR. DARROW:  I will go do that.

25      THE COURT:  Okay.

1    (Chambers conference concluded at 4:40 p.m.)

2    (The following was held in open court with the jury

3    present at 4:55 p.m.)

4              THE COURT:  Okay.  I have got a note from the

5    foreperson:  "Officer Brouillette testimony and the

6    Brian Folks video on January 20, 2016, stop."

7         Is that what you would like?

8              JURY FOREPERSON:  Yes.

9              THE COURT:  You'd like the transcript of the

10   officer's testimony --

11             JURY FOREPERSON:  Yes.

12             THE COURT:  -- as well as the -- to play the

13   video?

14             JURY FOREPERSON:  The video.

15             THE COURT:  So, anyway.  So what we have

16   prepared is the officer's testimony, which is going to

17   be a readback, and then we will also play the video.

18   Okay?

19             (The testimony of Kyle Brouillette from April

20   26, 2019, Trial Day 3, commencing at Page 212, Line 6,

21   through Page 225, Line 17, was read back by the court

22   reporter.)

23             THE COURT:  All right.  Now, the second

24   request is the video?  And who's going to play the

25   video?

1          MR. DARROW:  (Indicating.)

2          (A video recording was played in open court.)

3          THE COURT:  All right.  I think that's the

4    end.  Is there a second video?  I think --

5          MR. DARROW:  We are not aware of the jury

6    asking for a second video.

7          JURY FOREPERSON:  No.

8          THE COURT:  No.  Related to this particular --

9    on January 20th, it's only one, right?

10          MR. DARROW:  No.  I was confused, if possible,

11    that when we were in chambers, that there was a third

12    request on the note relating to a readback, and I just

13    ask the court reporter to check.

14          THE COURT:  Well, maybe I should ask you

15    exactly what you mean by -- you have Officer Brouillette

16    testimony and the Brian Folks video of January 20th.

17          JURY FOREPERSON:  Yes.

18          THE COURT:  And then you sign it, and then you

19    have under that "Brian Folks' testimony on the January

20    20, 2016, stop."

21          JURY FOREPERSON:  Okay, yes.  Okay, I didn't

22    remember.  That would have been when he was being --

23          THE COURT:  That would be on the tape.

24          JURY FOREPERSON:  No.  That would be in his

25    testimony yesterday, if he --

1          THE COURT:  Oh, all right.  So that you are

2    asking for his testimony in regard to the January 20th

3    stop?

4          JURY FOREPERSON:  Yes.

5          THE COURT:  Okay.  Well, we haven't gotten

6    that together.

7          JURY FOREPERSON:  Okay.

8          THE COURT:  So, you know, we will excuse you

9    at this point and try to locate that transcript.  All

10   right?

11       Now it is 5:30.  Ordinarily if you continue on, we

12   get you dinner, which is not great.  It's pizza,

13   ordinarily, but -- at least I think it's pizza.  Maybe

14   it's something else.  But is that your wish to continue

15   on tonight, in which case we will get you dinner?

16         JURY FOREPERSON:  Yes.

17         THE COURT:  That's a yes?

18       Okay.  And you want -- you want his testimony in

19   regard to the 20th?

20         JURY FOREPERSON:  Yes.

21         THE COURT:  Okay.  All right.  So we will

22   locate that.  Okay.

23   (Court was in recess at 5:28 p.m.)

24   (The following was held in chambers at 6:46 p.m.)

25         THE COURT:  This is a note that we got from

1    the jury:

2        "The jury would like to hear Brian Folks's

3    testimony pertaining to the December 25th, 2015, traffic

4    stop; the prosecution cross only."

5        Now, I happened to sit on a Ninth Circuit case in

6    which this very issue came up.  The jury asked for one

7    side, not the other.  That was found to be improper, and

8    you can't do that.  So I have asked Anne to take a look

9    at what he may have testified to on direct examination

10   as well as cross examination in relationship to the gun,

11   the Durango or the stop, the December 25th stop, and she

12   has it all marked out.

13       Okay.  I just thought I'd tell you that that's what

14   they said, and I have expanded that to both sides.  You

15   agree with that or do you -- you think we should just

16   leave your cross in and not --

17           MR. DARROW:  We defer to your judgment,

18   your Honor.  I haven't read that Ninth Circuit case,

19   but --

20           THE COURT:  Yeah, I don't think I wrote it,

21   but -- yeah, I remember it very clearly.  Okay.

22   (Chambers conference concluded at 6:49 p.m.)

23   (The following was held in open court with the jury

24   present at 6:54 p.m.)

25           THE COURT:  Okay.  We received this note,

1    Exhibit B.  "Jury would like to hear Brian Folks's

2    testimony pertaining to the December 25th, 2015, traffic

3    stop; the prosecution cross only."

4         Actually, the law is that whenever jurors bring up

5    testimony on a particular topic, it -- they have to be

6    read back, both sides, to be fair.  And the reason for

7    that is that jurors could take things out of context, so

8    you need to get both sides.

9         So I have asked Anne to retrieve those things that

10   were said on direct examination by Mr. Folks and also

11   cross examination by Mr. Folks.  And so you will hear

12   both.

13        I actually was sitting on a court of appeals in San

14   Francisco, and this issue came up, and we decided that

15   you have to show both, so I'll be following that rule

16   forever.

17             JURY FOREPERSON:  Okay.

18             (The testimony of Brian Folks from May 8,

19   2019, Trial Day 10, commencing at Page 122, Line 3,

20   through Page 132, Line 13, and Page 218, Line 10,

21   through Page 220, Line 7, was read back by the court

22   reporter.)

23             THE COURT:  Okay.  All right.  That's what you

24   were asking for?

25             JURY FOREPERSON:  Yes.  Thank you.

1          THE COURT:  Okay.  Thank you.

2   (The jury was excused to further deliberate upon their

3   verdict and the court was in recess at 7:08 p.m.)

4   (The following was held in open court with the jury

5   present at 9:32 p.m.)

6          THE COURT:  Okay?

7          COURTROOM DEPUTY:  Madam Foreperson, has the

8   jury reached a verdict?

9          JURY FOREPERSON:  Yes, we have.

10          (Brief pause.)

11          COURTROOM DEPUTY:  In the case United States

12   of America versus Brian Folks:

13       As to Count 1, guilty.

14       The controlled substances that the government

15   proved beyond a reasonable doubt were involved with

16   respect to Brian Folks, meaning that Brian Folks

17   personally and directly possessed or distributed, that

18   he knew were possessed or distributed by other members

19   of the conspiracy, or were reasonably foreseeable to him

20   as part of the conspiracy:

21       Answer:  Both heroin and cocaine base.

22       What amount of cocaine base did the government

23   prove beyond a reasonable doubt that Brian Folks

24   personally and directly possessed or distributed, knew

25   was possessed or distributed by himself or other members

1   of the conspiracy, or could have reasonably foreseen as

2   part of the conspiracy:

3        Answer:  28 grams or more.

4        The amount of heroin the government proved beyond a

5   reasonable doubt that Brian Folks personally or directly

6   possessed or distributed, knew was possessed or

7   distributed by himself and other members of the

8   conspiracy, or could have reasonably foreseen as part of

9   the conspiracy:

10        Answer:  A hundred grams or more.

11        As to Count 2, not guilty.

12        As to Count 3, guilty.

13        As to Count 5, guilty.

14        As to Count 7, guilty.

15        As to Count 8, guilty.

16        As to Count 9, guilty.

17        As to Count 10, guilty.

18        As to Count 11, guilty.

19        As to Count 12, guilty.

20        As to Count 13, guilty.

21        As to Count 14, guilty.

22        As to Count 15, guilty.

23        As to Count 16, guilty.

24        Signed by the foreperson on this 9th day of May in

25   the year 2019.

1        So say you all, ladies and gentlemen?

2               (The jury all indicate assent with the verdict

3    as read.)

4               THE COURT:  All right.  Does either party wish

5    to have the jury polled?

6               MR. KAPLAN:  Yes, your Honor.

7               THE COURT:  Okay.

8               (The jury was individually polled as to their

9    verdict, and each juror indicated assent with the

10   verdict as read.)

11              THE COURT:  Well, I want to express my

12   appreciation, the appreciation of everyone at the court

13   for your dedicated service.  This was a very hard case.

14   It lasted three weeks.  You were extraordinarily

15   attentive.  We all started on time; we all finished on

16   time.  And I was extraordinarily impressed with the

17   dedication in which you followed your responsibilities.

18        So, again, I really appreciate your service.

19   Oftentimes I go and speak with the jurors.  At 10 -- or

20   9:30, I think probably you would all want to get on your

21   way.  So I won't do that today, but I just really

22   appreciate it, and so thank you very much.

23        So you now are excused.  I will stay on the bench

24   to speak with counsel.

25   (The jury was dismissed, after which the following was

```
1   held in open court at 9:38 p.m.)
2             THE COURT:  All right.  Do either counsel wish
3   to submit post-trial motions and memoranda?
4             MR. KAPLAN:  Yes, we do, Judge.
5             THE COURT:  How much time would you need?
6             MR. KAPLAN:  Would 30 days from when the
7   transcript is completed to submit --
8             THE COURT:  It was daily transcript, so do you
9   have it at this point or --
10            MR. KAPLAN:  Well, we need -- I think we would
11  need the official transcript.
12            THE COURT:  All right.  But I need a fairly
13  firm date here, so --
14            MR. KAPLAN:  Okay.
15            THE COURT:  How about 45 days from today's
16  date?
17            (Brief pause.)
18            THE COURT:  Okay.  How about 60 days?
19            MR. KAPLAN:  Thank you, Judge.
20            THE COURT:  Okay.
21            MR. DARROW:  Thirty days to respond?
22            THE COURT:  All right.  Thirty days to
23  respond.
24       Okay.  I appreciate the way all counsel approached
25  this case.  You really were respectful and very
```

1  talented.  It was a pleasure to watch you try a case,

2  and so I really want to express my appreciation for

3  that.

4       I sometimes miss being a trial lawyer, but it helps

5  a lot to see good trial work.  So thank you.

6            MR. DARROW:  Thank you, your Honor.

7            MR. KAPLAN:  Thank you, Judge.

8            (Concluded at 9:40 p.m.)

9                 *** ** ***

10

11

12

13            C E R T I F I C A T I O N

14       I certify that the foregoing is a correct
    transcript from the record of proceedings in the
15  above-entitled matter.

16

17  June 13, 2019            _____
    Date                      Anne Nichols Pierce

18

19

20

21

22

23

24

25