## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA      :
                                      :
              v.                    :              No. 2:16-CR-94
                                        :
BRIAN FOLKS                      :

### DEFENDANT'S *PRO SE* MOTION FOR RECONSIDERATION

Defendant in the above noted caption, hereby files this motion for reconsideration of Defendant's prior Motion for a Judgement or Acquittal and/or New Trial

The additional facts Defendant wishes to place before the Court are laid out in the following paragraphs. In regards to the Court's initial Opinion and Order (Doc. 520), Defendant wishes to first to highlight specific portions for purposes of reconsideration.

### EVIDENCE INTRODUCED AT TRIAL RELEVANT TO THE SEX TRAFFICKING COUNTS, AS QUOTED BY OPINION AND ORDER

### A.  Katelynn C.

On page six, third paragraph; It states that Katelynn C. testified that another woman who was working for Defendant taught her how to pose in pictures for advertisements on Backpage, and how to post advertisements on Backpage. Tr., Trial Day Six, Vol. 1 at 41.

First, if you go back one page (40. Lines 6 – 25), the Government asks Katelynn how did her relationship with the Defendant begin (In regards to the prostitution).  On line nine, Katelynn testified that Defendant took her to a hotel room where there was other girls present.  On lines 15-18, she further testified that a girl named Nikki was the only one she could remember by name (Note also she never identified any other female who was allegedly present on that day, by photo

or video).  She went on to testify that Nikki was "working" doing prostitution.  On page 41, line six, she goes on to say Nikki "pretty much taught me everything."

Lines 9-12, the Government elicits further testimony for Katelynn as to what she was taught, to which she responded; "Like how to pose for pictures.  How to post up."  She further explains in line 12 that post up means; "to put the ad on Backpage."

At no point during this entire exchange did Katelynn testify that the Defendant was the one who actually posted her ad.  In fact, she said that she was taught by Nikki how to post ads.  Also, when asked how she knows she was posted on that day, her response was, "I remember him taking the pictures." *Id*. at 42 lines 5-10.

Again, Katelynn testified that her first meeting with Defendant in regards to prostitution was this day when she met Nikki, who has been identified as Jasmine ███████.  *Id*. at 21-25, and 54 lines 1-2 and 21.  Thus, confirming, in regards to her testimony, that Jasmine ███████ worked with Defendant before her and taught her the fundamentals of prostitution.

However, later on that same day when Jasmine testified; Tr., Trial day six, Vol. 2. at 105 lines 20-25 and 106. Lines 1-4, she said that "Pinky" (Katelynn C.) was already working with Defendant at the time that she met her.  This testimony is in total conflict with Katelynn's testimony whereas she states the opposite.

Also stated in paragraph three, Katelynn C. testified that she had never used Backpage before.  Defendant maintains that if the Government would have released usable access to the Backpage material he had been asking, for over two years before trial, the jury would have been able to see that Katelynn C. was not telling the truth in that statement based on the fact that there are numerous Backpage ads of Katelynn that was posted way before she ever met the Defendant.

On Page eight, paragraph two, it states that Katelynn C. testified that Defendant one time, grabbed her by the face and held a firearm to her head, Tr., Trial Day six Vol. 1. page 52 and 53.

Defendant offers that this statement paints a total different picture for the records other than what Katelynn actually testified about.  She alleged that those were two separate incidents , and never said that Defendant grabbed her face and pointed a gun at her head while doing so.  On one day she claimed Defendant grabbed her face and on a separate day, pointed a gun at her.  She never specified that a gun was pointed at her head.

Within this same paragraph it stated, Katelynn also saw a Defendant become violent with other women who prostituted for him. Tr., Trial Day six, Vol. 1 at 53 and 58.

Defendant would like the court to note that on page 53, lines 10-15 of the mentioned transcript, Katelynn testified that the Defendant, "grabbed a girl by the hair and hit her."  She also identified that girl as Nikki (Jasmine ▮▮▮▮▮).  On page 55, lines 12-15, Katelynn was asked by the Government, "what happened after her hit her?" To which Katelynn replied Jasmine, "got in a car with all her stuff and her son's stuff and left with this guy and ended up getting in his car and chasing after her."

Defendant would like the court to note that Jasmine ▮▮▮▮▮ (Nikki) testified that same day, Tr., Trial Day six Vol. 2 at 71, lines 4-16.  When asked did the Defendant put his hands on her, she replied yes and stated; "There was an incident at the Econolodge when he grabbed me by my throat, and that was ---."  Jasmine claimed that was at the end of their relationship.  She goes on to say, after prompted by the Government, that there was one other incident in the Econolodge and Pinky (Katelynn C.) was there. She testified that the Defendant slapped her at that time.  "and that was it except for the last time."

Defendant maintains that this conflict in their testimonies is significant because there is absolutely no physical or concrete evidence at all supporting these allegations other than the testimony of these two women, which is in clear opposition of each other.

How do you view these testimonies in light most favorable to the Government when both of these witnesses are in fact the Government's witnesses.  Katelynn C. obviously did not see what she testified to based on jasmine ███████ testimony of that same day.  This also goes directly to Katelynn's allegation that she was "scared" of Defendant based on her witnessing him assault other women.

On page eight, paragraph three, Katelynn C. testified that, eventually, she ran away from Vermont when Folks was away.  *Id*. at 34-35.  It goes on into page nine paragraph one to state that "She had been frightened to run away before because she witnessed bad repercussions for another woman who had attempted to run away." Tr., Trial Day six, Vol. 2 at 34-35.

Defendant maintains that while he was in prison in New York, Katelynn was still in Vermont prostituting and only came to N.Y.  to be closer to him.  Also, Defendant's cousin did not reside with Defendant's mother.  he lived with his own mother in Brooklyn N.Y.  Defendant further asks the question, how do you run away from an abusive person by going to the state he's in and residing with the abusive person's mother? Also, because Defendant was incarcerated, his phone calls were recorded and are available for research.  They will prove that Katelynn C. was again lying.

Finally, on page nine, second paragraph; "Katelynn C. admitted that she had lied to the grand jury about multiple things. Tr., Trial Day six, Vol. 1 at 73-74.

To begin with, Katelynn C. admitted under oath that she lied to the Grand Jury.  On or about April 27, 2017, a Superseding indictment was filed with the courts charging Defendant on

Count 8 with Human Trafficking specifically, Katelynn C. (which later on January 16, 2018, DOC. 124, became Count 10), based off of the testimony she provided to the Grand Jury, which she admitted at Trial that she not only lied at but was also under the influence of drugs.  No hearing of any type was ever conducted to determine exactly how much she lied.  In fact, her only explanation during her trial testimony was that she was scared to go to jail.  Tr., Trial Day six, Vol. 1 at 82 lines 19-24.

On March 21, 2017 (Bates 002649) approximately four years after terminating contact with the Defendant, Katelynn C. was interviewed by Law Enforcement in regards to the Defendant. During this interview, Katelynn made numerous statements exonerating the Defendant of any wrongdoing during the course of their friendship.  At the conclusion of this interview, Katelynn was arrested.  The very next day on March 22, 2017 (Bates 002653), Katelynn C. made a second statement contradicting the one from the day before.  Miraculously, she was also released from prison on this day.  The following day after that, she testified before the Grand Jury.  Both of those statements changed in key portions of which the Defense had never before heard. Tr., Trial Day six, Vol. 1 at 87 lines 1-17.

Furthermore, Katelynn testified at trial that she did in fact speak to the Government about the key portions of her testimony, *Id*. lines 18-18., which the Government failed to turn over to the Defense.  Thereby putting the Defense at a disadvantage at trial because we were in no way prepared to combat and/or disprove that information.

Katelynn C. was afraid to go to prison and the two times she was arrested in regards to this case re-enforced that fear.  That fact coupled with her admitting that she lied because she was afraid to go to jail was proof that her interest in this case was not to tell the truth, but to say whatever she had to say not to go back to jail.

**B.  Keisha W.**

On pages 9-11, it states that Keisha W. testified about a number of things in regards to her first encounter with the Defendant.  All of which was directly in regards to charge 11 of the fourth and final superseding indictment.  Although this charge was dismissed by the court because Keisha W.'s testimony failed to prove that Defendant's actions caused her to engage in commercial sex acts; Which is an element of the crime of Sex Trafficking.

In regards to charge 12, the court ruled that there is sufficient evidence for a rational Jury to conclude her sexual activities were due to force.  To support this ruling, the court relied upon;

> 1). Keisha W. alleging that the Defendant shot her in the buttock with  a BB gun;

> 2). Defendant video taping himself urinating on her;

> 3). Keisha W. alleging that the Defendant had her participate in his "Walnut Challenge"; and

> 4). Keisha W. alleging that Defendant sexually assaulted her and ordered her to engage in further commercial sex to make up for her stealing five bags of Heroin from him.

Defendant points out that in regards to; **(1).** Not only was the BB gun incident an allegation unsupported by any physical evidence whatsoever, or even a corroborating statement from any one of the seven people in the house at that time, Tr., Trial Day five at 149 lines 7-8 (four of which testified at trial), there was absolutely no testimony from Keisha W. even suggesting that this alleged incident was done to force her to prostitute in any way.  In fact, she claimed this was something she was paid to do.  Tr., Trial Day five at 150, lines 5-17.

**(2).** Although there is video evidence to confirm this act did in fact happen, at no point did Keisha W. testify that this was done in any way, shape, form or fashion, to force her to prostitute. This was an act she was paid to perform (*Id*. at 149 lines 9-25) and in no way lead to prostitution.

**(3).** Again, although there was numerous people involved with making this video as well as being present at the time of filming, not one single person other than Keisha ever claimed she participated in this.  Nor did she appear in any of the videos including the behind the scenes footage.  Even if the court did take Keisha's testimony of her alleged participation in this event as truth, at no point in her testimony did she once claim any of this was done to force her or anyone else to prostitute.  Nor was prostitution involved with this situation at all.  Again, she claimed that this was something she was paid to do. *Id*. at 147 lines 12-25 and, 148, lines 15-16.

Although these acts may appear disturbing and/or distasteful to many, the facts are that they weren't exclusive to only Keisha nor were they forced upon her.  A group of people were asked to participate for payment and they agreed to do so.  There was absolutely no evidence or even an insinuation of force being used, nor was prostitution ever once mentioned and;

**(4).** The court stipulated to the allegation that the Defendant sexually assaulted Keisha W. and ordered her to engage in further commercial sex.  First, Defendant points out that the Vermont Supreme Court has consistently acknowledged the need to be vigilant in reviewing the admission of evidence of uncharged misconduct, because once jurors learn of uncharged misconduct, they tend to use an entirely different calculus of probabilities in deciding whether to convict.  Defendant further points out that this is evident in his trial situation as the jury convicted him on both counts 11 and 12 relating to Keisha W. based solely on her testimony alone, being as though there was no physical evidence or corroborating evidence of any kind to support either charge.  The court agreed with Defendant that there wasn't enough evidence to present a guilty verdict on count 11. So therefore, overturned that count.

But not having enough evidence didn't factor into the jury's decision to convict on that charge, nor any of the others for that matter. Defendant believes that once mention of all the

uncharged, unproven acts were heard, members of the jury did in fact develop an entire different calculus of probabilities to decide Defendant's fate.

Furthermore, there were no Backpage posts offered to show that Keisha W. actually prostituted at that point in time.  She claimed the Defendant posted her up after the alleged sexual assault, and further, she never made a statement saying she actually prostituted in regards to that incident for the Defendant.  All she said was that she was posted, which falls short of causing a victim to engage in commercial sex acts, which is a necessary element of the crime of sex trafficking.  Thus, must be proven in order to find the Defendant guilty.  She never said she actually prostituted and the Backpage records (that were missing) will further prove that she wasn't even posted.  In fact, when asked did she prostitute after the alleged assault, she stated, "No.  I took off."  *Id*. at 194 lines 6-10.

Defendant urges the court to reconsider their Opinion based on the record.  In regards to Keisha W. being fearful of reputational harm if she disobeyed Folks, given his past record of using compromising media to retaliate against other women; This was to have alleged to happen in only one incident.  The incident involving Hannah A.  The video of Hannah A., was posted on March 4, 2016 while Defendant was residing on north Union street, Approximately three months after Keisha W., said she was no longer working for Defendant.  Tr., Trial Day 5 at 192 lines 16-23; 193, and 194 lines 3-5.

Additionally, during the Court's own questioning of Keisha W., during trial, Exhibit 50-D which were Backpage photos of Keisha was not admitted into evidence because, "...that's all Backpage stuff and it could very well have been after she was no longer working for him."  Tr., Trial Day 5 at 188 lines 2-5.

The Court also established that the Backpage ads in Exhibit 50-D was posted on January 2, 2016. Tr., Trial Day 5 at 180 lines 17-20. **[Note in the Facebook records that was attained, on page 17317, Keisha W. on January 2, 2016, asked Defendant why she don't see him anymore.  This proves that Keisha was not working for Defendant on January 2, 2016.]**

Keisha W. also clarified in her testimony that she wasn't working for the Defendant at that time.  In fact, she stated that she was working "with" the Defendant "off and on."  *Id.* At 183 lines 5-10.  This "off and on" statement was made a number of times by Keisha when testifying as to if in fact she was working for the Defendant.  She explained "off and on" during her testimony; "Yeah.  I needed his help.  We had a lot of different things, the place, with posting, with phones because I didn't have a phone most of the time..."  *Id.* at 175 lines 3-10.  to further clarify this phrase "off and on", she was asked; "If you needed something you would call him and he would help you out; is that right?"  To which she responded; "Yes.  He would come -- he would help me out with posting or helping me with making that..." *Id.* at 175 lines 16-23.

She further testified that during this time of "off and on" she was not giving Defendant any money form what she was doing.  *Id.* at 185 lines 13-22.

Defendant maintains that none of these situations whether alleged or real, prevented her from "leaving the situation" as she claimed.  In fact, her own testimony in regards to working "off and on" with the Defendant shows that she came and went as she pleased without fear;  And she continuously chose to prostitute for herself.  She further elicited Defendant's help to do so when she felt a need to.  **[Note in Facebook records that were attained, on page 17312, Keisha asked Defendant can he post her on Backpage on or about September 13, 2015.];**

**<u>Tr., Day Five at 185 lines 4-10;</u>**

> Q. And I asked you something about working for Brian.  You said well if I needed something he would help me out?

A.  Yup.

Q.  What did you mean by that?

A.  If I needed to be posted, he would help me with that.  If I needed dope, like he would find me—like I would go out and steal for him or whatever,

***Id*. lines 13-22:**

Q.  But you weren't giving him any of the money that you made from prostitution at that point?

A.  At that point I brought him a girl.

Q. You mean Brittany?

A. Yeah.

Q. But you weren't -- if you made money –

A. And I don't remember if I was working with him like that exact time though.  It might not have been.

Q. Do you know when the pictures were taken?

A. No. I don't know the exact time. No.

***Id*. lines 24-25;**

The Court:  All right.  I want to ask some clarifying questions.  All right.  Aside from the pictures there is a

***Id*. at 186 lines 1-7;**

posting on Backpage on the 2nd.  Comes from your e-mail.  All right.  Did you – well first the general question do you know if you were working on your own at this point or were you working for Mr. Folks?

The Witness:  At this time I don't know exactly what I was doing.  No. I don't know exactly what I was doing; but I know I was on and off with him.

***Id*. lines 20-22;**

The Witness:  I mean I was getting help from him clearly because the pictures – because I had him take the pictures and it was his idea to take the pictures so --

_Id_. **at 187 lines 14-18**

The Court:  And that was later on in your relationship with him, but was that after you worked for him or was that still while you were working for him?

The Witness:  It may have been after because I didn't work with him a lot so –

## C.  Danielle M

In the Court's Order and Opinion (Doc. 520) at 41 paragraph two, the Court concluded that the evidentiary record reflects considerable support for the conviction (Count 13).  This was based solely on Danielle M.'s testimony of a number of events to which there was no physical evidence that the vents in question ever actually took place, nor was there any corroborating evidence or statements from the other people who were alleged to be present during these events, even though said people also testified at trial for the Prosecution as well.  So in essence, there was nothing to support and/or conclude that these events did in fact take place.

The Court also in its Opinion and Order, stated that a Rule 29 Motion does not allow the Court latitude to question credibility or assign weight to the evidence by substituting its judgement for that of the Jury.  The Court further quoted _Jackson_, 335 F3d at 180.  This Court may only overturn the verdict if there is meager evidence to support it.

Defendant questions whether testimonial evidence could be considered meager where as the specified circumstances of the trial testimony does not exist.  If so, in **_Carmell v. Tex_, 529 U.S. 513**, it states;  The alleged victim's uncorroborated testimony alone is not inadmissible, but rather is merely insufficient, where the specified circumstances do not exist **(Ginsburg, J., Rehnquist, Ch. J., and O'Connor and Kennedy, JJ., dissented from this holding)**.

In Defendant's case, while testifying at trial, Danielle was asked by the Prosecution to show her arms to the jury revealing cuts she claimed she inflicted on herself due to physical and mental abuse, and that the Defendant was aware of these cuts and abuse;  And as a result, took advantage of her mental state by pretending to care.  Tr., day six, Vol. 2 at 121.

Defendant points out however, that the photos presented to the Jury of the events from that day, clearly show Danielle's arms (She was nude) and there were no cuts at all on her arms.  So in essence, she presented this non-existent situation involving the Defendant to the Jury simply to invoke sympathy for something that never happened.  This in turn possibly helped the Jury come to a decision to convict.

Defendant further points out that the testimony that Danielle provided consisted primarily of uncharged "alleged" crimes perpetrated by the Defendant.  Furthermore, the alleged uncharged crimes presented to the Jury during her testimony was extremely prejudicial. Defendant asserts that those prejudicial issues alone were the basis for the Jury's guilty verdict. These alleged uncharged crimes amounted to; **Sexual Assault. Tr., Trial Day seven Vol. 1 at 8-10 and; Unlawful Imprisonment. *Id* at 121**.

The Court ruled that these incidents/uncharged crimes, amounted to clear cut threat of force leading Danielle M. to engage in commercial sex acts, Doc. 520 at 42, first paragraph.  And also clear cut threats of violence, use of force, and creation of a coercive environment that Danielle M. did not feel safe leaving, Doc. 520 at 42, first paragraph.

**Please take note** that I know the case I quoted *Carmell v. Tex*, deals with the corroboration of a statute procedurally.  That case is different than mine but, the only reason I put that in was because it deals with uncorroborated testimony.  This court allowed Danielle M. to make an

allegation that none of the other witnesses saw (there was other witnesses that were present at the time and none of them gave testimony that they these events or that they even happened).

How does these allegations or the others made like it, reach the standards of reasonable doubt  [**Blacks Law, edition 6** clearly states, **Beyond a reasonable Doubt:  In evidence means fully satisfied, entirely convinced, satisfied to a moral certainty; and phrase is the equivalent of the words clear, precise and indubitable**]. This evidence was introduced to show that Defendant had a propensity to commit a crime, and it shout have been excluded by Rule 403.

Finally, Defendant maintains that a number of things Danielle brought up in her testimony was not only false, but could be proven beyond a reasonable doubt that she was giving false testimony.  On April 30, 2019, An Ex Parte Motion was filed for the Defendant in regards to Brady material not being turned over to the defense to prepare for trial in regards to a rule 46 violation (Doc. 419 and 419-1).

The Court held an in Chambers hearing on the subject on May 1, 2019 from 9:48 a.m. until 9:52 am with defense counsel only.  Defendant didn't find out about this hearing until six months later (as evidenced by personal correspondence to his attorney).  Defendant never had a chance to verbally present his case to the court in regards to the Ex Parte motion, and could not rely on his attorneys to properly represent him in this presentation because as it was clearly written in the motion, defense attorneys did not agree with them all, Doc. 419-1 at 1, paragraph three.  Also, Defendant couldn't discuss fully what his issues were with his attorneys because they kept putting the conversation off, Doc. 419-1 at 1, paragraph three.

Within this Ex Parte Motion that the Court refused to read, Defendant expressed his disagreement with a potential Rule 16 Violation in regards some material that was given to his attorneys right before trial and was not shared with him.

Defendant also shared his desire to get both Backpage and Facebook material that was in the Government's possession but not being turned over to him in order to prepare for trial. This material turned out to be exculpatory in nature based on the "new" testimony presented by the Government's witnesses at trial. Testimony that the Defense never heard or saw before in any prior statements.

Defendant expressed in his Ex Parte Motion that these things amongst a few others, were 100% vital to proving his innocence, Doc. 419-1 at 2, line 1.

The evidence relied upon by the Court to deny Defendant's Motion for a new trial in regards to Daniell M. was her testimony, "when Danielle M. agreed to work for Folks, she did not know she would be engaging in sex work.", Doc. 520 at 41 last paragraph. This can be proven false through Danielle's own words in a conversation she had with Defendant over Facebook which was asked for but not given to Defendant as addressed in Doc. 419-1.

Further evidence relied upon was her testimony, "Emotionally and mentally I felt trapped" and Folks sexually assaulted Danielle M. on three occasions as a requirement before providing her with drugs; as explained by the Court, Doc. 520 at 42 first paragraph. This can be proven false through Danielle's own words in multiple conversations she had with Defendant over Facebook about having sex which was asked for but not given to Defendant as addressed in Doc. 419-1.

In Danielle's testimony she went so far as to describe a sexual assault on her by the Defendant that allegedly took place at the house on Spring Street, Government's Exhibit 97. In this description she stated that while she was performing fellatio on Defendant, he pushed her head down on his penis and held her like that with both hands and forcing her down, Tr., Trial Day seven Vol. 1 at 11 lines 6-13. Based on her testimony alone, the court labeled this encounter one

of three sexual assaults on Danielle committed by the Defendant. Tr., Doc. 520 at 43 paragraph one.

This sexual escapade was however being video taped by the Defendant at that time and is located on the Defendant's computer, which is in the Government's possession.  This video clearly shows that none of what Danielle testified to as far as the choking and holding/force was true.  The Government however, prevented the Defendant from producing that video and proving this at trial by (1) Not allowing the Defendant access to the material on his computer and (2) By not disclosing that statement to the defense prior to trial.

Danielle also states in her testimony that Moe had sex with her three times.  Tr., Trial Day Seven at 9 lines 15-18.  When asked to explain what happened three times, Danielle alleged (1) An incident involving her performing fellatio on the Defendant for drugs, *Id.* At 10 lines 1-21. (2) An incident involving her again performing fellatio on the Defendant for drugs on the steps of the house on East Spring Street, *Id.* Lines 22-25 and at 11 lines 1-13. (3) An incident again on Spring Street involving her performing fellatio on the Defendant for drugs, *Id.* Lines 17-25 and at 12 lines 1-10.

Not yet being satisfied with her testimony, the Government then asks her if the Defendant ever had vaginal sex with her to which she replies; "Anal." , *Id.*  lines 11-17. So due to the Government's prompting, she clearly indicates the Defendant in a fourth alleged sexual assault.

**D. Ayla L.**

In regards to Ayla L., the court decided that the record reflects considerable support for Jury's finding based solely on Ayla's testimony, Doc. 520 at 43 paragraph 1.  The Court further pointed out four key points to this testimony, *Id.*

(1) "In the beginning, Folks was Ayla's main heroin supplier, and he had reduced her supply while persuading her to begin seeing clients, which amounted to a form of physical pressure in light of Ayla's severe addiction.  Tr., Trial Day Seven, Vol. 2 at 34.

To begin with, Defendant notes that the cite quoted by the Court where that information can be found is not accurate.  No place on page 34 of the transcript does it say any of that.  In fact, in Ayla's testimony, she actually alleged that the reason Defendant started cutting back on the amount of heroin he was providing her was because she wasn't making as much as she was doing.  Tr., Trial Day 7 vol.2 at 20 line 25, and at 21 lines 1 and 2.

She further alleged her testimony that defendant suggested as a result that she could either sell more drugs or do dates. *Id.* Lines 11-15.  So, in essence, she stated she was given options to make money in order to support her growing habit.  How exactly does this amount to physical pressure to prostitute.  She could have just as well chosen to sell more drugs to support her sever addiction, or is the Court suggesting that because Ayla was alleged to have sold drugs for the Defendant despite the fact his profit in their joint venture began to dwindle  due to her excessive drug use; Defendant was somehow obligated to continue supplying her with drugs even at the risk of no profit.

(2) "Once she was working for him, Folks frequently threatened to cease his financial support, and to remove her from Lori's house, if she did not comply with his wishes. Tr., Trial Day seven, vol. 2 at 34."

Defendant asks the Court how is these alleged actions considered coercive or forceful. Ayla's testimony alleged,

Q. Did Moe kick you out of Lori's house sometimes?

A. Yes.

Q. Why?

A. If I did anything wrong or disrespected him or violated him and his terms." [Tr., Trial Day Seven, vol. 2 at 35.  Lines 5-9.]

So it's obvious that she's alleging Defendant gave her rules and/or terms, prerequisite to her moving in, that she agreed to and as a result, if and when she "violated" those terms, she would have to leave.  How is that unlike of the standard landlord/tenant agreement.  To further confirm this theory, Ayla continued in her testimony, "'you did me dirty or you – you did me dirty,' or you – I' keeping lies or I am doing things behind his back.  If I'm not going to stay true – or try to hide things from him, that he ain't going to  --  he's not going to take care of me, he's not going to help me out, I have to leave.  If I want to run my own show, then you can run it by myself."  Tr., Trial Day Seven vol. 2 at 35, Lines 13-18.

So it's clear that Ayla entered into agreement with Defendant in order to live at that residence she agreed to do whatever they agreed to even if it was prostituting of her own free will.  There was no force or coercion implicated.   And once these terms were violated, Defendant was well within his right to terminate their verbal contract.  Or is the Court suggesting that because of Ayla's addiction and Defendant's alleged role as her drug supplier, that he is in some was obligated to house, feed, clothe, and supply her drugs because of it, regardless to the actions she agreed to and apparently violated.

(3) The Court alleges, "Moreover, Folks utilized sexual abuse tactics (e.g. the walnut challenge) against Ayla, *Id.* at 50, had had sex with her against her will in exchange for drugs, *Id.* at 49."

Defendant maintains that the "walnut challenge" was again an option for anyone who was willing to participate could do so of their own free will.  And as a result of this challenge, everyone who participated was paid to do so.  There was no coercion whatsoever.  How does that

differ from any other local porn company when they hire actresses or actors to feature in their films?  Ayla confirms this in her testimony:

> Q. Did you participate in the walnut challenge?
>
> A. Yes.
>
> Q. Did you receive anything for it?
>
> A. Yes.
>
> Q. What?
>
> A. Dope." [Tr., Trial Day Seven, vol. 2 at 50, Lines 11-16.]

Defendant further claims that the Court's assessment of him having sex with her against her will in exchange for drugs is not only highly prejudicial, but inaccurate, and it didn't amount to force or coercive force. Ayla testified  "…if I was sick and I had no – no dates lined up or anything and I – I needed to get well, I would something got him to – as in a sexual act, so I could get dope in return and not feel like crap anymore." [Tr., Trial Day Seven, vol. 2 at 49, Lines 15-19.]  This is a clear indication of a bartering situation between Ayla and Defendant.  The Court need not that Defendant was not on trial for distasteful or unconventional sexual habits or acts because that would not be illegal.  The mere fact that Ayla claimed she did not want to engage in these sexual acts, but agreed to, in order to get what she wanted from the Defendant does not amount to force or sexual abuse in any way. It is the same as a garbage man not wanting to pick up crap off the streets but agrees to do it for a paycheck.  That doesn't mean his employers are violating him.

(4)  The Court claims, "Finally, Ayla described three occasions on which Folks physically assaulted her during her tenure working for him (see Facts section), creating an environment in which failing to engage in prostitution could result in violence, homelessness, and humiliation.

Tr., Trial Day Seven, Vol. II at 40. All of this testimony combined provides a significant evidentiary basis for a jury to have concluded Folks utilized coercive and forceful tactics against Ayla, which kept her in a position of continuing to prostitute for him." [Doc. 520 page 43, last paragraph – page 44, first paragraph.]

Defendant notes that there is no section in this 54-page Order and Opinion labeled "Facts." However, Defendant deferred to page 20 of said Motion where it described Ayla alleging Defendant assaulted her.

The first alleged incident was quoted as, "Folks slapped Ayla in the face and pushed her into a bathtub because he was upset that Brad came around the house after her forbid it." *Id.* at 40-41. It further goes on to describe the difference in sizes between the Defendant and Ayla and how she felt about the incident. Nowhere in her testimony to that allegation was prostitution mentioned. In fact, she testified that this assault occurred as a result of her attempting to sell drugs to an undesirable person. Also note that as Ayla testified earlier, she first sold drugs for the Defendant and when that stopped working, prostitution was suggested. Tr., Trial Day Seven, Vol. II at 21, lines 11-21.

Defendant points out that at the point of this alleged physical attack, Ayla had yet to engage in prostitution, as suggested by the Court's Order and Opinion that the three physical attacks created an environment in which failing to engage in prostitution could result in violence and homelessness. In fact, Ayla further testified the Defendant told her at one point if she wanted to run her own show then she could run it by herself and that he would not help her out and she would have to leave the residence he was paying for. This in no way enforces an environment of force to prostitute. Either she did what they agreed on or she was free to go off and do whatever she wanted to do on her own. The fact that she was homeless was not of the Defendant's doing, so

Defendant shouldn't be left to bear that burden.  She, in fact, lost her housing because of her drug use before she even met Defendant. Tr., Trial Day Seven, Vol II, at 6, Line 20-25 and at 7, Line 1-6.

The second alleged incident Ayla claims that after leaving Folks, he found her on the side of the road and assaulted her repeatedly during the ride home.  There was no factual basis to this claim whatsoever.  No one corroborated her chain of events or even acknowledged that that incident took place. There was no medical reports, no pictures, no anything to suggest that Ayla was assaulted by anyone ever.

The third alleged incident Ayla claimed that she again left Defendant and a couple of weeks later was found by Defendant somewhere in Burlington and was beaten unconscious.  In Ayla's testimony, she was asked, did she go to the hospital to which she responded:

>A: Yes.
>
>Q: And did you ever take a picture of your face?
>
>A.  No.
>
>Q. So there's no evidence of that happening?
>
>A.  No, not that I would have a phone from three years ago either."

Trial Day Seven, Vol II at 87, lines 16-23.

Defendant also points out that these stories were never told to anyone until she was being prepped for trial.  *Id.* at 89, 19-25 and at 90, 1-16.  Defendant questions whether the Court is saying that the mere fact that Ayla mentioned these assaults made them fact as well as reality whereas there is no evidence to prove any of it and in the last incident it was even attempted to be proven (no hospital records were able to be located).

Defendant questions again, not only how these alleged incidents came to be fact, but how did these situations as explained positively created an environment in which failure to engage in prostitution could result in violence as suggested by the Court.

Additionally, Defendant does not seek to attack Ayla's credibility based on her past record of lying to law enforcement officers.  Defendant does however question whether the Court should consider her outright contradictions of her story while testifying.

**E.   Hannah A.**

In regard to the charge involving Hannah A., the Court concluded that, "…there appears to be evidence in the record that Defendant knowingly recruited Hannah A. for commercial sex acts.  Jasmine L.  testified that Folks always wanted to know if somebody would prostitute for him upon meeting him for the first time."  Tr., Trial Day Six, Vol II.

Defendant notes that when this statement was offered during Jasmine's testimony it was promptly objected to by defense attorney Natasha Sen, to which a private bench conference took place between the Government, the Defense, and the Judge, excluding the Defendant.  The records reflect that this was the first time this witness had ever said this and also that it would be hearsay if she said statements that Hannah said. Trial Day Six, Vol II at 74, lines 12-25 and at 75, lines 1-9.

The Court states that, "Jasmine also testified that, later that day when Hannah came to the Motel 6, Folks took photographs of Hannah to this end, and he directed her as to how to pose in her underwear. *Id.*  at 91; Tr., Trial Day Ten at 168.   This along with the photographs of Hannah in the bathroom of Motel 6 found on Defendant's computer indicate Folks' circumstantial involvement in her recruitment, however it more so indicates Folks' involvement and recruitment of Hannah to take pictures for his business as he was known to do.   It was never proven that

Defendant was the one to post those pictures to Backpage. In fact, it was positively revealed that the photos on Backpage were actually posted from Jasmine's phone which is circumstantial to her posting the pictures to Backpage as opposed to Defendant who took his pictures with his own phone. So there is, in fact, another reasonable explanation for Folks photographing of Hannah A. with other sex workers as opposed to the Court claiming there wasn't. The Court also stated, "…besides that Folks was recruiting Hannah A. for sex work." In that context the Court offered that statement in a factual sense. [Doc. 520 at 46, Paragraph 1].

Although courts have frequently found a defendant's creation of prostitution advertisements for a minor to be evidence of trafficking under 18 U.S.C. 1591, this situation leans more towards Jasmine L. posting the advertisement as opposed to the Defendant so should not amount to trafficking in regard to the Defendant.

The Court claims, "…sufficient evident exists for a jury to have concluded that Folks had a reasonable opportunity to observe Hannah as to her age."

Although Defendant acknowledges taking pictures of Hannah A., there was no way possible for him to determine Hannah's age where as she was introduced to him as someone who went to high school with Jasmine L. who Folks knew to be of age, so logically one would assume that Hannah was as well. Also, considering the fact that this took place six months before her eighteenth birthday, she in no way looked underage. In fact, she looked older than what she actually was. Defendant maintains the only reason this element of the charge was proven to the jury was because during Jasmine's testimony, she blurted out that Defendant asked Hannah how old she was to which an objection was promptly made and defense attorneys approached the bench with the government where a private conversation ensued. According to the records, the Government at one point, agreed to exclude the statements upon prompting by the Court. Defense

attorneys then pointed out that Jasmine had already responded to the question about what she overheard and asked the Court to strike that.  The Court's response was, "Well, do you want me to instruct the jury that you just not think about what she said in the answer?  My – my reaction is just to leave it the way it is.  She did not say anything about what Mr. Folks said, so let's just leave it at that."

That was clearly in error because she did in fact speak about what Mr. Folks had alleged to have said. Tr., Trial Day Six, Vol II at 74, lines 22-25 and at 75-83, lines 1-5.

As found in Rules of Evidence, Rule 103, a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party…  In this instance, Jasmine blurted out hearsay statements as to Defendant learning Hannah's age presented a clear constitutional violation.  Furthermore, in 103D, **preventing the jury from hearing inadmissible evidence** to the extent practicable, the Court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means. In this case, not only was it suggested to the jury, it was promptly glossed over by the Court mistakenly saying that it didn't happen when the record reflect that it, in fact, did happen.

Third, the Court claims, "…the record contains sufficient evidence to show beyond a reasonable doubt that the Defendant knew or recklessly disregarded the fact that Hannah A. would be caused to engage in a commercial sex act.  Mainly, the photographs which Folks took of Hannah were posted on a Backpage advertisement, along with images of other women who prostituted for Folks.  The photographs that Folks took of Hannah A., which were posed with other sex workers, and which eventually made their way on a Backpage advertisement, were clearly intended to be used to facilitate prostitution."

This again was false because although the picture in question that was found on Backpage was also found in Defendant's computer, there was a number of like pictures from that day also present on his computer from the same file which was clearly marked for his picture business and not Backpage.  In fact, there also exists a file on Defendant's computer, entitled Backpage, containing Backpage ads which Defendant was either interested in or involve in.  This particular ad wasn't among that file which showed that the Defendant had no interest in it being on Backpage whatsoever.  That along with the testimony of the women involved with that picture who clearly state that they post ads themselves as well gives clear reasonable doubt to Defendant's involvement with that ad.  Anybody present could have posted it.

The four elements that must be proven in order to convict the Defendant of sex trafficking a minor, 1. Defendant knowingly recruited, harbored, transported, obtained or maintained an individual. There is no testimony claiming Defendant harbored, transported, provided, obtained or maintained Hannah A. in any way, shape, form, or fashion.   And the recruitment part of that element is in question. 2.  Defendant knew the individual was under the age of 18.  It was confirmed that there was no way the Defendant could have known Hannah was six months shy of her eighteenth birthday, nor could the jury have assessed that without the hearsay testimony provide by Jasmine L. and ruled against by the Court which was a clear prejudicial issue.  3. The Defendant knew and recklessly disregarded the fact that the individual would be caused to engage in a commercial sex act.  The Defendant maintains that there was no direct connection between himself and the posting of the Backpage ad.  At best, circumstantial evidence reveals that Defendant took the picture in question along with a number of others to advance his picture business and that anybody or anyone present had motive to involve Hannah with commercial sex acts as they were all already involved.  4. This conduct affected interstate commerce.  Again, there is no viable proof

the Defendant posted that ad on Backpage.  There is, however, conclusive evidence that that ad was posted from Jasmine's phone and not the Defendant's which eliminates a circumstantial connection.

### THE FACTS THAT THE DISTRICT COURT SHOULD CONSIDER IN ASSESSING THE TRUSTWORTHINESS OF HEARSAY TESTIMONY

To begin, Federal rules are complex, a mine field for lawyers not experienced in Federal practice.  So please bear in mind that I fit 100% into that for I am a layman at law.  In regards to Federal Rules of Evidence, Rule 804:

1. **The character of the witness for truthfulness and honesty and the availability of evidence on the issue.**

In regards to Katelynn C., Ayla L., and Keisha W. it was established that all three made statements to which there was absolutely no corroboration and/or evidence indicating that the events ever really happened except for their testimony.  It was also established that all three of them had a high propensity for not telling the truth in regards to this case.

2. **Whether the testimony was given voluntarily under oath subject to cross examination and a penalty for perjury.**

In regards to this, both Katelynn C. and Ayla L. admitted to perjuring themselves both to government investigators and the grand jury as well.  In regards to its voluntary nature, Katelynn was arrested twice.  First time because her story didn't fit within the realms of the picture the Government wanted to paint as evidenced by her immediate release the next day after making a second statement in opposition of her first.  Katelynn testified numerous times, both at the grand jury and the trial that she was afraid to go to prison, even to the point that she would lie to prevent that.  The second time she was arrested was because she failed to show up to be deposed by the Government, so they arrested her to hold her until the trial began to assure that she would be there.  Ayla L. outright refused to testify a number of times but mainly in a text message addressed to the

Government whereas she threatened to kill herself if they forced her to testify. I'm sure the Court will agree these circumstances prevent their testimony from being voluntary at all.

### 3. The witness relationship with both the Defendant and the Government and his motivation to testify.

Ayla's main motivation to testify stems from a promise made to her by the State's Attorneys to dismiss the three warrants that she had at the time in order to testify. This was evidence by a text message which can be found within the Bates of this case. Katelynn C. again had motivation to testify in order not to be placed in prison and she was also given back her children. Keisha W. was in trouble with the law during the three years Defendant waited to be brought to trial on numerous occasions therefore making her motivation not to be convicted of these other crimes evident in her decision to testify. Danielle M. as reflected in her statements in the record clearly stated that she had a problem with all black men and she feared them. Although this was kept from the jury, it clearly shows her motivation and willingness to testify against a black man she claimed to have feared. Not because he committed crimes against her but because she feared all black men.

### 4. The extent to which the witness's testimony reflects his personal knowledge.

Keisha W. was unsure of a plethora of issues during her testimony. She continually said she worked off and on with the defendant and could not clarify as to which time she did so. Therefore, her testimony was, at best, tainted by unclarity, indecisiveness, and speculation. Katelynn C. could not even recall what year it was she prostituted for the Defendant. Nor could she positively recall the time frame that she prostituted for. She further couldn't recall who she prostituted for before the Defendant. All she could give was a vague description. Out of all the people she claimed she prostituted with for the Defendant, she could only positively name two. Even the testimony about the Defendant striking Jasmine L. can be considered tainted or, at best,

unsure because Jasmine L. said something different.  Danielle M. also could not positively state when she was engaged in this sexual exploitation at the hands of the Defendant.  Nor could she remember in detail the facts of her overdose at that time. Nor was she even clear on the date and time she met and first dealt with the Defendant.  Her Facebook conversation proved that she was sending nude photos of herself to the Defendant before she claimed she first met him.

**5.  Whether the witness ever recants his testimony.**

In regards to Ayla L., Katelynn C., and Keisha W. none of the three actually recanted their testimonies.  However, Katelynn's second statement was 100% in opposition to her first as was her grand jury testimony.  This was the same for Ayla and Keisha as well.

**6.  The existence of corroborating evidence.**

The bulk of Ayla L.'s testimony was uncorroborated by any source at all.  This included, but was not limited to, the alleged assaults that took place, the forced prostitution, her fear of Defendant, and her witnessing Defendant being violent toward other females.  All of these issues were, in fact, what ultimately convicted Defendant on her charge. Keisha W. also gave uncorroborated testimony in regards to her participation in the walnut challenge video, the pellet gun incident, her living at Lori's residence, the sexual assault incident, and her selling drugs for the Defendant.  All of which made up the reason why the Defendant was found guilty of her charge. Danielle M. gave uncorroborated testimony as to Defendant brandishing a firearm to her, sexual assaults, and the multiple fear tactics performed by the Defendant (even though other people who testified at the trial were claimed to have been present during the acts alleged by all three of these witnesses) all of these allegations is what primarily caused Defendant to be found guilty on her charge. And finally, Katelynn C., also gave uncorroborated testimony in regards to how she met the Defendant, the incident with the gun in her mouth, alleged assaults, as well as promises of love,

all of which she claimed was witnessed by other people who testified at the trial as well and all of this eventually led to the Defendant being convicted of her charge.  In *United States v. Bradly*, 145 F.3d 889,894, (7th Cir. 1998) tests to determine whether a statement is not hearsay because it is offered to rebut a charge of recent fabrication, (a) declarant testifies at trial and is subjected to cross-examination, (b) the prior statement is consistent with the Declarants trial testimony, (c) the statement is offered to rebut an expressed or implied charge of recent fabrication or improper motive, and (d) the statement was made before the declarant had a motive to fabricate.  If the four requirements are not met then the testimony is presumed to be inadmissible hearsay.

   **7. The reason for the witnesses unavailability.**

   As far as the witnesses mentioned in this trial, none of the testifying witnesses were unavailable. However, there was at least 15 additional witnesses who were unavailable to testify for the Government for reasons unknown to the Defendant. Defendant notes that these witnesses would have shed much needed light on the case in the Defendant's favor. Therefore they should be considered exculpatory witnesses.  Their statements were all in fact in the Defendant's favor and miraculously wasn't made part of the trial. Defendant did not learn of this until he was at trial and noticed that these particular witnesses weren't being called. All throughout the three years the Defendant waited to go to trial, there was evidence prepared and made ready for Defendant to utilize these additional witnesses in his favor.

**REVIEW OF DENIAL OF MOTION FOR NEW TRIAL BASED ON PROSECUTORS ALLEGED USE OF PERJURED TESTIMONY, ABUSE OF DISCRETION**

   In *United States v. Vinas*, 910 F.3d 52; Overview: The denial of the Defendant's motion for a new trial was vacated because the Government's disclosure violated Fed. R. Crim. P. 16(a) (1) (A) and caused defendant substantial prejudice where the untimely disclosure of the statement adversely affected some aspect of the Defendant's trial strategy.

*United States v. Vinas* states that a violation of Fed. R. Crim. P. 16 does not automatically entitle a defendant to a new trial. A defendant seeking a new trial must show that the failure to disclose caused him substantial prejudice. To show substantial prejudice a defendant must demonstrate that the untimely disclosure of the statement adversely affected some aspect of the defendant's trial strategy. In assessing that question, the Court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for it's nonproduction, and the strength of the Government's untainted proof.

In Defendant's case the Government's failure to disclose statements from all four of the alleged victims directly affected Defendant's strategy at trial because the core statements of all four testimonies could have been refuted beyond a reasonable doubt had defendant known of these new statements prior to their testimonies. There exists evidence proving these statements to be false beyond a shadow of a doubt. And defendant's Facebook page, the Back Page servers, as well as the Defendant's personal computer, all of which has been in the Government's possession throughout the duration of this case. Because the Defendant was unaware of these new statements that were going to be presented to the jury, he had no way of proving them false or defending himself against them. The statements were all uncorroborated and mentioned to the Defense for the first time at the trial. The Defendant stands by his assumption that these statements were in fact the reason that the jury found him guilty of said charges, the reason for that being a lack of corroborated testimony from any of the Governments other witnesses in regards to these statements (statements discussed in Sections A, B, C, and D). The Government has no reason for not producing these statements prior to trial. The witnesses during their testimony testified that these statements were given to the government prior to trial / during preparation for trial. Defendant's conviction rests solely on these uncorroborated statements, as mentioned before.

In order to receive a new trial on the basis of the Government's use of allegedly perjured testimony, the defendant must establish that;

**1 .  The prosecution's case included perjured testimony**

In Kaitlynn C's testimony, she clearly states that her first meeting with Folks in regards to prostitution was the day when she met Nikki, who is identified as Jasmine ███████, Tr., Trial Day six, Vol.  1 at 53, lines 21 - 25; and 54, lines 1 - 2; and 21. In regards to that testimony, Kaitlynn testified that Jasmine ██████ worked with Folks before her and taught her the business.

Later on that same day, Jasmine ██████ testified, *Id.* Vol. 2 at 105, lines 20 – 25, that when she began working with Mr. Folks, she met Pinky, identified as Kaitlynn C., who she claimed was already working for Folks when she started. These two statements are in clear conflict of each other, which means one of them is undoubtably perjured testimony. Furthermore in this particular instance, Jasmine was able to concretely identify when she began working with Mr. Folks, as opposed to Kaitlynn who couldn't remember the day, month or year that she began associating with Mr. Folks, which leads Defendant to believe that Kaitlynn was the one actually perjuring herself. That, coupled with the fact that Kaitlynn C. additionally admitted under oath that she lied to the Grand Jury on or about April 27, 2017, causing Defendant to be charged with an additional charge of sex trafficking in regards to her additional statement to the Grand Jury, showed that Kaitlynn has a propensity to lie under oath. Tr., Trial Day six, Vol.  1 at 82, lines 19 – 24. Based on the records, it's clear that perjured testimony was in fact utilized in the prosecution's case.

**2.  The Prosecution knew or should have known of the perjury.**

Because the two testimonies were so much in opposition of each other, it was impossible for the prosecution not to realize that one or the other was not factual, yet they still chose to pursue both at trial and present them both to the jury as facts.

**3.  There is a likelihood that the false testimony affected the judgment of the jury.**

When considering the fact that there was no corroborated evidence to support any of Kaitlynn C's statements during her testimony at trial, it's safe to say that this testimony directly affected the jury's judgment in finding the Defendant guilty.

In closing, Defendant hereby submit that he does not have an opportunity to complete this Motion in totality because of the time restraint on when this must be submitted.  There are a number of additional perjury-based testimony on record that Defendant does not have time to point out in this document. Defendant further understands that the Court has already given him an extension of time to file this Motion but due to the Defendant's physical handicap and deteriorating medical condition as of late, Defendant is not only subjected to the rules of the facility he resides in, but also the fact that he is in an infirmary and is unable to fully use his right arm from fingertip to shoulder so writing is very painful for him.

In order to type, Defendant has to sign up for the law library and wait for an available space which has a time constraint of two hours a day for 3 days a week.

Additionally, Defendant has to pay for his own paper to type on as well as paper to write with as the facility does not supply any per their own internal rules.  In this instant, canteen is only once per week for when the Defendant could afford to purchase the necessary items.

There are no copy services available in the prison so that Defendant may retain copy of his work.

And finally, due to the continual restraints of an otherwise useless protective order, Defendant has no access to much of the legal documents he wishes to introduce in his Motion.  All he has are trial transcripts to rely upon.  No exhibits or other paper material that any other Prisoner/Defendant would be privy to without said protective order.

So, as a result, Defendant must prematurely end this Motion as is, in order to have it typed and presented as per his attorney's instructions.

Defendant's attorney, Mrs. Barth, has agreed to the portion of the Motion he has completed and transcribe it into a legal format to be presented to the Court.  She has also provided an Investigator to sit with me today in order to get a few more pages done and so it can be delivered promptly to her.

Finally, as a layman to the laws of this government, I do not know what, if any, further relief I can request in order to rectify this great list of restrictions placed on me.  I am under the impression, per my attorney, that another extension is not possible which is why she provided me the Investigator.

Therefore, I hereby request that the Court, taking all this into consideration, grant me any and all relief and or considerations I am entitled to or permitted to have upon request.  As this is an Ex Parte Motion, I understand that my attorneys cannot have input in its contents.


Dated 12/16/19                                                            Brian Folks

                                                                              Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 2:16-CR-94 |
| | : | |
| BRIAN FOLKS | : | |

**CERTIFICATE OF SERVICE**

I certify that on the 18th day of December, 2019, I electronically filed the **DEFENDANT'S PRO SE MOTION FOR RECONSIDERATION** using the CM/ECF system, which will provide notice to Assistant U.S. Attorney William Darrow via Bill.Darrow@usdoj.gov and Special Litigation Counsel Matthew Grady via Matthew.Grady@usdoj.gov.

By: s/Michelle Anderson Barth
Supplemental Counsel for Defendant

33