```
1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF VERMONT
2

3      UNITED STATES OF AMERICA

4           V.                    CASE NO: 2:16-CR-94-wks-1

5      BRIAN FOLKS               STATUS CONFERENCE

6

7      BEFORE:   HONORABLE WILLIAM K. SESSIONS, III
                 DISTRICT JUDGE
8

9      APPEARANCES:  WILLIAM DARROW, AUSA
                     EMILY M. SAVNER, AUSA
10                    MATTHEW T. GARDY, AUSA
                        U.S. Attorney's Office
11                      P.O. Box 570
                        Burlington, Vermont, 05402
12                      Representing the Government

13                    MARK A. KAPLAN, ESQ.
                     Kaplan and Kaplan
14                    95 St. Paul Street
                     Suite 405
15                    Burlington, Vermont 05401
                        and
16                    NATASHA SEN, ESQ.
                     P.O. Box 193
17                    Brandon, Vermont, 05733-0193
                     nsen@senlawvt.com
18                    Representing the Defendant, Brian Folks

19
       DATE:          April 10, 2019
20

21
                 TRANSCRIBED BY:  Cynthia Foster, RPR
22                                P.O. Box 1250
                                 New London, NH  03257
23

24

25
```

**Cynthia Foster, RPR, LCR**
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1         CLERK:  This is case number 16-94, United

2    States of America versus Brian Folks.  The

3    government is present through Assistant United

4    States Attorneys William Darrow, Emily Savner

5    and Matthew Grady.  The defendant is present in

6    the courtroom with his attorneys, Mark Kaplan

7    and Natasha Sen.  The matter before the court is

8    a hearing on pending motions and for argument on

9    outstanding issues.

10        THE COURT:  Okay.  This is a hearing on the

11   pending motions, but prior to actually

12   addressing the motions, I think we should make

13   clear that these hearings and also the motions

14   and objections should be public, and I'm

15   interested to hear from the parties as to how to

16   make sure that there can be disclosure of the

17   motions and the responsive pleadings because

18   this, you know, this clearly should be public in

19   my view.

20        So Mr. Kaplan, I was thinking about the

21   motions that you filed.  You included the names

22   of the various co-conspirators, women involved

23   in this particular case.  Is there any objection

24   to removing the last names so that they cannot

25   be identified, leaving the first names, and then

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    making those motions public?

2         MR. KAPLAN:  No.  None at all, Judge.  If

3    the Court wants us to, we can refile them.

4         THE COURT:  If you can redact those names

5    that would be, then you could, then those could

6    be public.

7         MR. KAPLAN:  Here's one other, I do have

8    one other concern along those lines which is the

9    government continuously refers to their

10   witnesses as "victims."

11        THE COURT:  We dealt with that, well, a

12   number of months ago.

13        MR. KAPLAN:  I thought we did.

14        THE COURT:  They at trial are not going to

15   be referring to them as victims.

16        MR. KAPLAN:  Okay.

17        THE COURT:  But I guess that's just an

18   identification.

19        MR. KAPLAN:  We're going to have the

20   indictment redacted, too, in that respect.

21        THE COURT:  Have the indictment redacted?

22        MR. KAPLAN:  The indictment speaks about

23   the witnesses and the counts as victims.

24        THE COURT:  Okay.  We'll deal with that

25   because they're not going to refer to victims.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

 1               All right.  As we address these particular
 2          motions, in light of the cavernous nature of
 3          this courtroom, I wonder if counsel would
 4          approach and speak from the podium as opposed to
 5          in left field.  Any objection to that?
 6               MR. DARROW:  That would be great.  It's
 7          hard to see you from way back here.
 8               THE COURT:  Right.  That's true.  All
 9          right.  So let's begin with the first motion in
10          limine.  That's the Government's Motion in
11          Limine to Preclude the Introduction of
12          Inadmissible Evidence.  That's Docket number
13          348.  Who's going to -- okay.  So it's
14          Mr. Grady.
15               MR. GRADY:  Yes, good morning, your Honor.
16               THE COURT:  Good morning.
17               MR. GRADY:  Your Honor, the motion really
18          goes into two camps.  One is those motions that
19          or those, information that results in
20          convictions which 609 governs, and then of
21          course anything that is not a conviction of
22          misconduct and certainly 608 would apply.  And
23          the way that the government sees things, the
24          only felony within the convictions that we've
25          listed in the motion is just the voyeurism

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       felony that is pertinent to Mandy.

2            THE COURT:  But 609 talks about over one

3       year.

4            MR. GRADY:  That's correct, your Honor, and

5       we've already, the government's view of all the

6       retail thefts, for example, those were all

7       misdemeanor retail thefts from the government's

8       review of the criminal records and --

9            THE COURT:  So what was the maximum penalty

10      of the various retail thefts?

11           MR. GRADY:  I think it was under a year,

12      your Honor.  That's why we categorized them as

13      misdemeanor retail thefts.

14           THE COURT:  Okay.

15           MR. GRADY:  Certainly if they are felony

16      retail thefts, then that would be a different

17      analysis, and they would be admissible under

18      609, but in the government's view the only one

19      that is a felony is the voyeurism conviction for

20      Mandy, and under a voyeurism conviction just the

21      essential facts is what comes into play as far

22      as impeachment is concerned.

23           THE COURT:  Okay.  So in regard to the

24      retail thefts, you're saying that all the retail

25      thefts with regard to who you refer to as Victim

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    B and Victim D.

2         MR. GRADY:  That's correct, your Honor, and

3    also I believe Jasmine also has a retail theft

4    the government is tracking though those are all

5    misdemeanor retail thefts.  So again, since

6    they're not felonies under 609, then they are,

7    and they're also not crimes of dishonesty under

8    609(a)(2), none of those are admissible for

9    impeachment purposes.

10        THE COURT:  That was one question that I

11   had.  The theft, the stealing is not a crime of

12   dishonesty?

13        MR. GRADY:  Not under Estrada.  Estrada

14   talks about larceny because that was the issue

15   in that case, and in Estrada they also cited to

16   Sellers which is a case out of the Eleventh

17   Circuit saying that shoplifting does not involve

18   dishonesty, and there's also other cases that we

19   cited to in our motion such as Glenn from the

20   Ninth Circuit which talks about how shoplifting

21   may be indicative of a lack of respect as to a

22   person or property but by itself is not

23   indicative of truthfulness.

24        And the other thing I would point out in

25   Estrada, they cited to a case Pagan here in the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    Second Circuit and in Pagan they again reiterate
2    that just stand-alone shoplifting where you're
3    just concealing an item and walking out does not
4    trigger anything involving truthfulness.  It's
5    only if you make a false statement in connection
6    with stealing, then that certainly triggers an
7    impact of one's veracity.  Because in Pagan the
8    person filled out a welfare application stating
9    that they were on welfare to get food stamps,
10   and of course, that was a false statement under
11   oath.
12        THE COURT:  So these retail thefts did not
13   involve any false statements; is that correct?
14   Because what you're suggesting is that the court
15   would have to go back through each one of the
16   retail thefts to see if there were related to
17   that theft a false statement.
18        MR. GRADY:  For a couple of them, your
19   Honor, as to Victim D, the government is
20   following that.  In some of the retail thefts
21   the, for example, that victim was stopped and
22   provided a false name to law enforcement.  Now,
23   that would certainly go to a witness's
24   truthfulness and so certainly that could come,
25   that could be questioned about on 608 because it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          does go to truthfulness, making a false

2          statement to a law enforcement officer.  So

3          there's a couple instances where the person

4          might have been stopped by a loss prevention

5          officer on the way out of the store, and of

6          course, if there was any false information

7          given, that would certainly be a proper basis

8          for impeachment.

9              THE COURT:  So the difficulty in my review

10         of your pleading is that I don't know if that in

11         fact involved cases in which the person who is

12         convicted of retail theft made those kinds of

13         oral statements.  It would be helpful if you

14         went through those convictions, added whether or

15         not each of those convictions involved false

16         statements to law enforcement, in which case

17         under 608 they would be more relevant.

18             MR. GRADY:  Right.  Okay.  Yes, your Honor.

19         I can certainly go ahead and re-go through that

20         list and identify those particulars for the

21         court to assist.

22             THE COURT:  Okay.  So there's a second

23         series of issues and that's related to arrests,

24         Mr. Grady.

25             MR. GRADY:  Yes, your Honor.  So again with

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          the arrest, the fact of the arrest itself is not

2          the impeaching event.  Arrest, again, by itself

3          without a conviction doesn't trigger 609 so 608

4          would apply, and of course the relevant fact is

5          not the arrest itself but the underlying

6          conduct.  So looking at the underlying conduct a

7          lot of it involves drug possession, retail

8          theft, disorderly conduct, DUIs, receiving

9          stolen property, trespassing, these are all

10         offenses that do not go to witnesses'

11         truthfulness.

12             Now, the one exception being false

13         statements to law enforcement.  That certainly

14         goes to truthfulness so that's a proper avenue

15         to impeach the witness under 608, but everything

16         else involving drug possession, again, goes to

17         truthfulness.

18             And the one point I would point out about

19         the defense pleading is the defense talked about

20         credibility.  Credibility is not the word that's

21         used in Rule 608.  608 talks about truthfulness.

22         So again, the offenses have to go to the

23         witness's truthfulness and not credibility which

24         is a more broader notion.  Specifically, you

25         have to provide that link between the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    nonconviction conduct and the witness's
2    truthfulness.
3         THE COURT:  All right.  So you are not
4    objecting to the use of retail theft if there
5    were false statements made to law enforcement
6    when they were stopped.
7         MR. GRADY:  That's correct, your Honor.
8    That would be improper under 608 to go to the
9    witness's truthfulness certainly.
10        THE COURT:  Okay, and you're objecting to
11   use of arrest unless it's for a particular false
12   statement which means false statement to a law
13   enforcement officer.  You have no objection to
14   the admission of that?
15        MR. GRADY:  That's correct, your Honor.
16   The final thing I would point out is just going
17   back to the voyeurism conviction with Mandy, it
18   seems like the defense wants to go into more
19   than the essential facts of the conviction, and
20   I would just point out that the witness, Mandy,
21   was not convicted of making false statements to
22   a law enforcement officer.  So they talk about
23   how when confronted with the information that
24   the witness lied at first, but, again, there's
25   no conviction for lying to the police.  So that

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1         fact has not been established beyond a

2         reasonable doubt.

3              So if you try to get beyond just the facts

4         of the conviction itself, you open up this

5         inquiry into matters that have not been resolved

6         and then you kind of, when the government may

7         have to try to rebut that and talk about was the

8         person forced to, you know, take these pictures

9         and provide them to the boyfriend.  So, again,

10        that's the government's view and seems like what

11        the Second Circuit, majority of the Second

12        Circuit's take is this notion that has to be

13        limited to the essential facts of the

14        conviction, the date of the conviction and the

15        sentence imposed and nothing else.

16             THE COURT:  So the next question is the

17        prostitution convictions.

18             MR. GRADY:  Yes, your Honor.

19             THE COURT:  Prior prostitution convictions

20        before the, this is May of 2015 to March of

21        2016, and you pointed out the Rivera case from

22        the Second Circuit which suggests that previous

23        convictions for prostitution are not relevant to

24        coercion; is that correct?

25             MR. GRADY:  That's correct, your Honor.  I

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          would actually say two things.  One is that

2          under 609 the prostitution arrests again are not

3          felonies.  So if it's not a felony, then it has

4          to be a crime of criminal fallacy and of course

5          criminal and fallacy.  So under 609 it's not

6          allowed proper impeachment --

7               THE COURT:  609 is to impeach.  This is

8          relevant to the question of coercion.  And if

9          somebody is engaged in prostitution

10         professionally before the conspiracy or this set

11         of facts happens, it would seem at first blush

12         that that's relevant to coercion.  But Rivera

13         says no.  Then it becomes, at least as I'm

14         thinking about this, becomes a little bit more

15         complicated when that person testifies, and

16         let's just say as an example that person says I

17         wasn't ever going to engage in prostitution but

18         then I was coerced by the defendant.  Then that

19         opens up the door to the use of the previous

20         conviction, I would assume, because it confronts

21         the statement that the witness just made.

22              MR. GRADY:  Sure.  Your Honor, I don't know

23         if that's really going to come into play in this

24         case because as we pointed out in our 412

25         response, the witnesses, majority of witnesses

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           if they engaged in prior prostitution and that's
2           how they met the defendant they will certainly
3           admit at least in preparation that yes, I met
4           the defendant through prior prostitution.  That
5           provides context to the jury, but what 412 and
6           Rivera state is the defense cannot then argue to
7           the injury that okay, because Victim A prior
8           prostituted that means that she consented to
9           prostituting for the defendant because those are
10          two separate inquiries.  Prior prostitution has
11          nothing to do with whether the defendant used
12          coercion to compel the victim to engage
13          prostitution for purposes of this case and
14          that's what --
15              THE COURT:  But so that means that you have
16          no objection to a discussion about the fact that
17          she engaged in, let's say, prior prostitution.
18          I thought you were saying well, of course they
19          should be ale to get in the Backpage because
20          that's how the defendant met some of these
21          women.  They advertised on Backpage.  You had no
22          objection to that to explain the nature of the
23          relationship, but that would necessarily bleed
24          into the fact that they engaged in prior
25          prostitution.  You have no objection to that.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          All you object to is the defense arguing that

2          because they were engaged in prostitution before

3          that does not prove or is in fact irrelevant to

4          the question of coercion.

5              MR. GRADY:  That's exactly right, your

6          Honor, and we believe that's a reasonable middle

7          ground because it provides some context to the

8          jury about how a particular witness or victim

9          met the defendant, and then again with Rivera in

10         412 foreclosed making the argument you just

11         pointed out to the jury.  So that's how the

12         government sees things.

13             THE COURT:  Okay.  All right.  Arrest for

14         false pretenses?  Prostitution and voyeurism

15         you've addressed.  Anything else?

16             MR. GRADY:  Nothing further from the

17         government, your Honor.  Thank you.

18             THE COURT:  All right.  Who wants to

19         respond for the defense?  Ms. Sen?

20             MS. SEN:  Yes.  Your Honor, I would just

21         point out that in Second Circuit case, Estrada,

22         one of the examples that it gives of the kinds

23         of convictions that you are supposed to look at

24         under the first part of 609 for truthfulness on

25         the, even though it's not a criminal fallacy

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    crime, but it mentions specifically theft.  So
2    the idea that the government is suggesting that
3    retail theft, unless it involves some kind of
4    false statement to a police officer in the
5    course of that conviction is not probative of
6    truthfulness or dishonesty, it seems to be
7    contrary to Second Circuit law.
8         THE COURT:  So what, you just heard the
9    government acknowledging that if there's any
10    false statement made to law enforcement as the
11    person was arrested for retail theft, then that
12    clearly can be admitted under 608, right?  So I
13    didn't see in the pleadings those particular
14    instances of false statements to law enforcement
15    at the time of the arrest.  That's refusal to
16    identify who they were or using false names or
17    anything of that sort.  Do you have those
18    identified?
19         MS. SEN:  Your Honor, we are still
20    receiving the criminal history convictions of
21    these witnesses.  So as we go through them --
22    we're only going to bring to the court one set
23    that involves dishonesty anyway.  We're not
24    interested in, you know, if someone is convicted
25    for shoplifting.  I mean, unless there's an

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     argument that it goes to their credibility, I

2     mean we will be looking at that certainly, but I

3     think the idea that somehow theft is not a crime

4     of dishonesty, I'm not sure that the Second

5     Circuit would necessarily agree with that.

6          THE COURT:  But you're not going to bring

7     retail thefts unless there was a false

8     statement; is that correct?

9          MS. SEN:  Well, I think the law is a little

10    bit unclear.  I don't think we have to show that

11    this is necessarily -- I think we have to look

12    at the context and the actual facts of each of

13    those convictions, your Honor, is what I'm

14    saying is that the court needs to look at and do

15    the 403 balancing test.  So if we bring a

16    conviction and we argue it is indicative of the

17    circumstances surrounding it showed that this

18    person engaged in dishonest behavior, you know,

19    some kind of, I can't think of anything right

20    off the top of my head, but some kind of, you

21    know, ruse situation in a store to steal

22    something, I think then it would sort of go to

23    that person's level of honesty or dishonesty.

24         THE COURT:  All right.  So the court is

25    going to reserve judgment on the retail theft

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           because you've got more to introduce, and there
2           seems to be a consensus that if the theft was
3           accompanied with false statements to law
4           enforcement, then it would be relevant and
5           admissible.
6                All right.  So the arrests in general.  Is
7           there any arrest that you seek to introduce
8           without a conviction --
9                MS. SEN:  Well, I think --
10               THE COURT:  -- under 608?
11               MS. SEN:  I apologize, your Honor.  I think
12          an arrest that one of the witnesses has for
13          false pretenses, I think that that would be
14          relevant.  I think that involves dishonesty.  I
15          also think, again, looking at the specific
16          circumstances with respect to arrests for things
17          like theft again, depending on the
18          circumstances.  I mean, I think that this is
19          something that we're going to have to raise with
20          the court at the time that we wish to use them
21          to impeach and that, if it looked to us like the
22          facts show that it involves an element of
23          dishonesty, we could ask the court to be able to
24          use it.
25               THE COURT:  All right.  So if I reserve

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           judgment, you can't bring this up in opening
2           statement.  You're going to use false presenses
3           arrest, right?
4                MS. SEN:  Yes.
5                THE COURT:  You understand that?
6                MS. SEN:  Yes, of course.
7                THE COURT:  We'll reserve judgment on that.
8           What about the prostitution convictions?
9                MS. SEN:  Well, in terms of, if a witness
10          were to get on the stand and talk about how the
11          only, that they only prostituted because of my
12          client and that they didn't prostitute before
13          and they didn't prostitute after, but it's clear
14          at least one of these witnesses has a later,
15          later convictions for prostitution, I think that
16          that would be relevant for purposes of
17          impeachment.  Because --
18                THE COURT:  Right.  So if the witness lies,
19          you want to use the convictions to show she
20          lies, not, that's not relevant to coercion,
21          that's use for impeachment, probably the
22          government would not object to that.  All right?
23                But how about the use of prostitution
24          conviction on questions of coercion.
25                MS. SEN:  Well, I wasn't quite

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     understanding the government's argument on that
2     point.  I understand that under Rivera the
3     conviction just can't come in to argue, to say
4     that this person, as evidence of not being
5     coerced, but I think that we can argue based on
6     the evidence whatever the evidence shows which
7     is this person was coerced or wasn't coerced.
8     You know, to me those cases really go to the
9     technical issue of whether or not the conviction
10    comes in, but, for example, if it were to come
11    in on some other evidentiary ground which is
12    admissible, then I don't see why the defense
13    wouldn't be able to argue it.  I mean, the
14    government seems to say that even, that you
15    can't even make the argument.
16         THE COURT:  If the conviction comes in to
17    impeach, you cannot argue that that conviction
18    was for a different purpose like to rebut
19    coercion.  It's only being introduced for
20    impeachment so you're restricted in that regard.
21    So the really clear question is whether a
22    conviction for prostitution, prior prostitution,
23    not post the offense, but prior prostitution is
24    relevant to coercion.
25         MS. SEN:  I would say under these

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1            circumstances I'm not aware of that issue coming
2            up.  I don't think that any of these witnesses
3            have prior convictions for prostitution.  I
4            think that most of them who are engaged in prior
5            prostitution, and I'm speaking just very
6            specifically about the named witnesses in the
7            indictment, and Mr. Kaplan may want to correct
8            me, but I believe that all of them have admitted
9            to being involved in prior prostitution.  So I
10            don't see this necessarily as an issue coming
11            up, but can I just consult with counsel for a
12            moment, your Honor, and get back to you?
13                    THE COURT:  Sure.
14                    MS. SEN:  If there are other issues you
15            wanted me to address and then --
16                    THE COURT:  No.  That in particular.  So
17            the question is whether that's to be used to
18            rebut coercion, and maybe I'm mistaken, but I
19            thought that there were a couple of convictions
20            of some of these witnesses prior to this series
21            of acts.
22                    MS. SEN:  That's why I don't want to
23            misspeak, your Honor, so let me just check with
24            Mr. Kaplan.  He might be ale to answer that
25            better than I can.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1              THE COURT:  You want to do that now?

2              MS. SEN:  If that's okay, your Honor.

3              THE COURT:  Sure.

4              MS. SEN:  Your Honor, I think that in

5      consulting with Mr. Kaplan it does appear that

6      another witness may have some prior convictions,

7      but I think that we would do what the laws

8      required, and under Rivera it doesn't look like

9      we would be able to argue that that was --

10             THE COURT:  Okay.  Let's now go to the

11     broader question.  Let's just assume that one of

12     the women who is going to testify met the

13     defendant on Backpage, prior to that was engaged

14     in prostitution.  Can you introduce that?  Do

15     you intend to introduce the fact that she was

16     engaged in prostitution prior to meeting the

17     defendant?

18             MS. SEN:  Well, I think that we would show,

19     and my understanding is that the government

20     wouldn't disagree with us, that the way our

21     client met this witness was via her Backpage ad.

22             THE COURT:  Correct.

23             MS. SEN:  So I think that it implies that

24     she was involved in prostitution in one way or

25     the other.  I don't know that we would get into,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           I think the law limits us into going much beyond
2           that.  So I think that it would be --
3                THE COURT:  Well, can you say, can you
4           question her about being engaged in prior
5           prostitution?  I mean, the government has
6           conceded that you can bring out the Backpage.
7           She's advertising on the Backpage.  That's how
8           she met the defendant.  Clearly, that's
9           relevant, but can you question her about being
10          engaged in prior prostitution?
11               MS. SEN:  I think under the law, I think
12          under Rivera, I think the government is right on
13          that.  I don't think that would come up.
14               THE COURT:  Okay.  All right.  Is there
15          anything else that you want to address on 349 or
16          348?
17               MS. SEN:  No, your Honor.
18               THE COURT:  Okay.  All right.  Can I get
19          the government's response to that hypothetical?
20          Let's just say one of the witnesses testifies
21          that they, that she met the defendant by way of
22          the Backpage advertisement.  She obviously was
23          engaged in prostitution.  Sort of obvious.  Can
24          they question her about, you were involved in
25          prostitution.  Can they ask the question?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           MR. GRADY:  No, your Honor.  Excuse me,
2      your Honor.  Under 412 and Rivera, any questions
3      as far as how long were you involved in
4      prostitution, how many clients did you see, what
5      specific acts did you do, all of this could
6      provide, you know, days, hours' worth of
7      testimony that is prohibited under 412, and I
8      think the government is reasonably coming to the
9      middle ground why it can provide context for how
10      a particular witness or victim met the
11      defendant, but 412 and Rivera bars any inquiry
12      into prior acts, and we would ask the court, and
13      I think it sounds like the defense will abide by
14      Rivera and not go into that tangential
15      information that is precluded by 412 and Rivera.
16           MR. KAPLAN:  Judge, could I comment on
17      that?
18           THE COURT:  Sure.
19           MR. KAPLAN:  I think it's an issue that I
20      was going to address anyway, but I think it
21      depends on the context.  In other words, I don't
22      think you can question someone who was involved
23      in prostitution just because they were involved
24      in prostitution, sort of out of context with the
25      case, but, for example, there's one witness in

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       this case who was working as a prostitute for a
2       group of guys and Brian was helping out with
3       that endeavor because they asked him to, and
4       then one of the witnesses decided that she'd
5       much rather work with Brian than work with these
6       other guys, and she came to him and said look,
7       I'd like to have you help me out.  I don't want
8       to deal with these people anymore.  I think you
9       can talk about what she was doing and how long
10      she was doing it and how Brian met her in that
11      context but not arguing that because she was a
12      prostitute before means so wasn't coerced later
13      on.
14          THE COURT:  So what you're trying to do is
15      take the government's lead and say you can talk
16      about prior prostitution or prior Backpage ads
17      to put context to the meeting between this
18      person and the defendant, and in that particular
19      context, she would have to say that she was
20      engaged in prostitution, she was being managed
21      by other individuals, and that for one reason or
22      another she engaged with the defendant.
23          MR. KAPLAN:  It's a little more involved,
24      but it also follows the same path that the
25      government has agreed to which is it gives

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       context.  I think the government misinterpreted

2       what our intention was when we mentioned that

3       particular witness.  It wasn't to show because

4       she was a prostitute she wasn't forced by our

5       client.  It was to show that while she was

6       working as a prostitute, she voluntarily asked

7       him to help her out.

8               THE COURT:  Mr. Grady, do you want to

9       respond to that?

10              MR. GRADY:  Yes, your Honor.

11              THE COURT:  You may have a different

12      version of the facts, but assuming that that's

13      what they want to show, that is that she was

14      working with these other guys and she preferred

15      working for him which goes right directly to the

16      issue of coercion, wouldn't they be able to do

17      that?

18              MR. GRADY:  Your Honor, there's a couple

19      things I'd like to point out.  Number one, in

20      the defense notice and what they just said here

21      in court, the witness has a slightly different

22      take on the facts as far as the leadup to

23      meeting the defendant.  So I think what the

24      defense just mentioned may not be what the

25      witness is going to testify to.  So I think,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          number one, we have a factual dispute as far as
2          the context is concerned.
3                THE COURT:  Can you tell us what the
4          witness is going to say?
5                MR. GRADY:  Sure.  I mean, essentially she
6          will say, talk about that she was on Backpage
7          working for another individual and that she met
8          the defendant and then began essentially working
9          for him for a variety of reasons that she can
10         talk about, but I don't think --
11               THE COURT:  Were some of those reasons her
12         antagonism toward previous persons who managed
13         her prostitution?
14               MR. GRADY:  Not necessarily, your Honor.
15         Some of it goes to the defendant having better
16         quality of drugs that she provided and better
17         access to drugs than a previous supplier or
18         person that was helping her on Backpage.
19               THE COURT:  But it's pretty clear that she
20         would have to acknowledge, if you're the
21         witness, that you were engaged in prostitution
22         if they're going from one manager to another
23         because the reasons why you're going from one
24         person to the other is essentially very
25         relevant, and that's relevant to coercion.  So

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           that is coming out.

2                MR. GRADY:  Yes, your Honor.  The

3           government will bring that out on direct, and I

4           think that will provide the necessary context

5           certainly to explain to the jury, but what seems

6           like the defense is putting forth is like, well,

7           we need to know exactly how many weeks, days,

8           months did you go with these three, group of

9           guys, and how exactly did they treat you, what

10          acts did you do, how is it different with my

11          client.  All of the pre-information they're

12          talking about is in our view barred by Rivera

13          and 412.  We will give that context to the jury

14          to understand how they met the defendant, but

15          certainly everything else should be barred under

16          412 and Rivera.

17               THE COURT:  Well, yeah, but when you also

18          ask the witness to explain why you moved from

19          one person to the defendant, that opens up the

20          door for them to explore what was it like with

21          this other person, and is this truthful, is this

22          accurate, et cetera.  So anyway.  At this

23          particular point there's clearly going to be an

24          acknowledgment that this witness engaged in

25          prostitution.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MR. GRADY:  Yes, your Honor.  The
2     government was concerned because in their 412
3     notice for this particular witness, they also
4     stated not only for context but to counter the
5     government's assertion that the defendant forced
6     her into coercion.  That's why the government
7     was concerned because that second part, that
8     argument is foreclosed by Rivera.
9          THE COURT:  Okay.  All right.  Next is 349.
10    Government's Motion for Reconsideration of 202,
11    and that's the mention of the Bloods.
12         MR. GRADY:  Yes, your Honor.
13         THE COURT:  I guess first is it true that
14    there's only one of the witnesses who would
15    refer to the defense as a member of the Bloods?
16         MR. GRADY:  Yes and no, your Honor.  Yes in
17    that for Victim C she's the only one that was
18    very impacted by the alleged membership in the
19    Bloods.  There's other victims that were aware
20    of it, they heard it, but it wasn't a big impact
21    on them.  So we do not intend to draw it out.
22    There may be an additional witness such as Mandy
23    or other drug runners who heard or may have been
24    impacted a little bit by the alleged gang
25    membership status, but as it applies to the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           charged victims, it is correct that Victim C is

2           the only one who will talk about it in much

3           detail because, again, it impacted her decision

4           as she drove down to the NorthStar for the one

5           week that she was with the defendant.

6                THE COURT:  How about the spillover

7           problem?  Once you allow Victim C, you refer to

8           her as Victim C, to be examined on the fact that

9           she was aware that he was a member of the Bloods

10          and she was frightened by that, that fact, the

11          fact that he was a member of the Bloods becomes

12          relevant not just to Victim C but to everybody

13          else.  And don't you have enough evidence

14          otherwise to show fear so that membership in the

15          Bloods becomes that much less crucial?

16               MR. GRADY:  Your Honor, I would say two

17          things.  One as to for any spillover effect, I

18          believe that can be quite appropriately handled

19          by a limiting instruction or curative

20          instruction to direct the jury that they can

21          only consider the evidence as it relates to

22          Victim C and how it relates to the statute where

23          it essentially asks them to step into the shoes

24          of a reasonable person of a victim's background

25          to assess everything --

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           THE COURT:  So how does that instruction
2      go?  The instruction would say to the jury,
3      you're allowed to consider the fact that he may
4      be a member of the Bloods in regard to what
5      Victim C is saying, but you're not allowed to
6      think about the fact that he was alleged to be a
7      member of the Bloods in regard to all of the
8      other victims.  You're asking a jury to do
9      somewhat of an impossible feat, aren't you?
10          MR. GRADY:  Not necessarily, your Honor.
11     We presume that the jury has listened and
12     followed the instructions, and, again, it's not
13     as if the government is trying to prove that he
14     is a gang member or has status.  This comes
15     solely from the defendant's statements to Victim
16     C.  So as opposed to the Lockhart case when the
17     government established expert testimony that the
18     defendant was a confirmed member of the Folk
19     Nation gang, certainly the evidence is less
20     prejudicial than what's been used in other sex
21     trafficking cases.  So we believe under the
22     circumstances because it's coming from the
23     defendant's own mouth as opposed to photos
24     showing gang symbols or things of that nature
25     that that's why it has relevance as to how it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        impacted Victim C.

2             In answer to your other question of don't

3        we think that we have enough, ultimately that's

4        the jury's consideration, and for this

5        particular victim, she was only there for a

6        week, there was no actual physical force, the

7        gang membership was certainly a factor, and,

8        again, the jury is going to be asked to consider

9        a reasonable person in her shoes whether this,

10       whether it's reasonable for her to fear him, and

11       certainly this is part of the story and big part

12       of her story and so to take that out is you're

13       taking out a piece of what the government

14       believes is crucial to its coercion argument as

15       to that victim, and certainly the jury may still

16       decide, but it's for the jury to decide and not

17       certainly us.

18            THE COURT:  But this is 403 analysis.

19            MR. GRADY:  Sure.

20            THE COURT:  And when you're talking about

21       spillover effect you're talking about the impact

22       upon all of the other persons who may not have

23       known that he was a member of the Bloods, but

24       that scenario that he's a member of the Bloods

25       is really prejudicial.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           MR. GRADY:  But, your Honor, it's more
2     probative than it is prejudicial, and I think
3     any concerns can be addressed in the spillover
4     effect, particularly because other victims that
5     were aware of it, for example, Victim D was
6     aware of the defendant's gang status, but it had
7     no impact on her.  So the government does not
8     intend on drawing that out and asking
9     unnecessary questions about it, because it
10    really is only probative as it relates to Victim
11    C and that car ride down, and particularly under
12    the circumstances of her owing a drug debt to
13    another reported gang member, and I think
14    Gardner in the Sixth Circuit opinion is correct
15    when it points out that it's important to the
16    1591 analysis because it shows or is some
17    evidence that the victim reasonably believed the
18    person was the kind of person who could hurt her
19    because of his alleged gang membership.
20          THE COURT:  But you're going to get the
21    rest of the conversation in, aren't you?  The
22    conversation between the defendant and the
23    Victim C in regard to the drug debt and in
24    regard to all of the other statements that he
25    made, aside from his affiliation in the Bloods

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          which you argue is quite threatening.

2               MR. GRADY:  Yes, your Honor, and it's a big

3          piece of the coercion piece.  Certainly we can

4          talk about the drug debt and maybe how the

5          defendant had a firearm, but a lot of the fear

6          was based upon the fact that I owe this drug

7          debt and now this person, you just told me that

8          you're supposedly a gang member and this person

9          I owe money to is also a gang member, it ramps

10         up that fear in the victim's mind, and that

11         certainly is reasonable under the circumstances

12         of a person in her position, and we're just

13         trying to convey that to the jury as to why she

14         felt compelled to prostitute for the defendant

15         knowing that he never put a firearm to her head

16         or never slapped her or punched or kicked her or

17         threatened that sort of physical violence.

18              So it's an important part of the story the

19         government believes to prove coercion, and we

20         just pointed out Lockhart and Gardner as other

21         cases where the Sixth Circuit and the Fifth

22         Circuit allow this type of information in saying

23         it's proper under the 403 balance, and that it

24         was necessary given the unique circumstances of

25         what the government has to prove in --

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1              THE COURT:  And in those cases, were there

2      a whole series of other persons in the same

3      position as this Victim C so that the spillover

4      effect of the mentioning of the gang affiliation

5      became that much more significant?

6              MR. GRADY:  So for Gardner, I would say no.

7      For Lockhart, yes.  Gardner from the

8      government's view was a single victim indictment

9      and so it was only the victim who testified

10     about her fear of the defendant based upon the

11     gang status, but in Lockhart that was four

12     different defendants, there was multiple

13     victims, there was expert testimony produced

14     that all four defendants are gang members.  So

15     presumably there would be more victims and there

16     would be more of a spillover concern for the

17     court to face that particular prosecution.

18             THE COURT:  Okay.  Okay.  All right.  Thank

19     you.  Someone want to respond to that?

20             MR. KAPLAN:  Thank you, Judge.  I think the

21     court's already touched on our major concerns.

22     Obviously, the major one is the spillover

23     effect.  People, the court has mentioned this

24     before.  People associate gang members with

25     violence and threats, drug dealing, use of

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     firearms.  I mean, whatever you can think of in
2     terms of violence, people associate that with
3     gang members.  And I think, apparently there's
4     going to be evidence introduced in this case
5     that suggests our client was involved in
6     threatening behavior, violence, possessed
7     firearms.  The fact that the jury knows that
8     he's a gang member is going to really taint, I
9     think, their ability to assess that evidence
10    fairly, and I don't see any way to cure that.  I
11    don't see how an instruction will cure --
12         THE COURT:  Well, the fact that in voir
13    dire you would have to ask about there may be
14    evidence that the defendant was a member of the
15    Bloods because you need to know whether that
16    fact alone would impact their judgment.  It
17    opens up a real risk, it seems to me, and if
18    there's sufficient ways for the government to
19    actually show coercion in regard to Victim C so
20    that they're not being hampered significantly,
21    the risk of mentioning the Bloods should be
22    avoided.
23         MR. KAPLAN:  I agree, and I think the court
24    already touched on this other aspect which is I
25    think it's really a minor part of the case when

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          you weigh in comparison the negative effect that
2          it would have on the defense.  There's only one
3          witness that is saying that.  And frankly, I
4          could give the court a little more context which
5          is I just don't think it's true.  I mean, if you
6          look at her statement, subsequent to when she
7          says she was forced to become a prostitute, it's
8          clear that she's not afraid of my client, she's
9          not worried about him being a Blood.  I have
10         Facebook emails that go from July of 2015 to
11         September of 2015 where she's constantly
12         communicating with my client.  At one point on
13         July 19th of 2015 she's writes to my client and
14         he writes to her and says I'd like to talk to
15         you and she says what do you want.  He says I
16         need a ride.  I'd like to pay someone $20 to
17         give me a ride to Wal-Mart.  She said sure, I'd
18         be happy to do that, and there's numerous
19         conversations like that, and then in September
20         of 2015 she emails my client and says I'd like
21         to come back and work with you tomorrow.
22             So I'm just saying when you look at the
23         entire picture with respect to this particular
24         witness, it doesn't, it's not really a credible
25         claim on her part, there's no evidence that it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        impacted her and nothing was said at the time to
2        suggest that she had these fears.  Everything
3        she did subsequent to that suggested that she
4        didn't have those fears.
5             So I think you weigh all that against the
6        negative impact, and it should not be --
7             THE COURT:  All right.  I'm going to deny
8        the Motion for Reconsideration.  I think the
9        spillover effect, frankly, is dramatic.  That
10       once membership in the Bloods is introduced, no
11       reasonable jury is going to limit that to this
12       one particular person, and I think there's, you
13       know, adequate other opportunities for the
14       government to show coercion which are much more
15       reliable than just membership in a gang.  I
16       think it's extraordinarily prejudicial, and
17       under 403 I'd exclude it.
18            Now, 350.  Government Proffer on Issues yet
19       to be Decided.
20            MS. SAVNER:  Good morning, your Honor.  I
21       don't know if you want to take these one by one
22       or --
23            THE COURT:  One by one is fine.
24            MS. SAVNER:   Okay.  So in terms of sort of
25       general overview, all of these specific pieces

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          of evidence that the defense has sought to

2          exclude fit into various ways into the

3          government's theory of the case and allegations

4          that the defendant used various means of

5          coercion to compel these young women to

6          prostitute for him.  So as explained in the

7          briefing, you know, the type of coercion and his

8          scheme of coercion ranged from acting in a

9          controlling manner, asserting his physical

10         dominance over the women by requiring them to

11         have sex with him as part of the conditions of

12         their employment.  It included controlling their

13         drug supply and manipulating their drug supply

14         so that they became dependent and more dependent

15         on him for the drugs they needed to avoid the

16         painful symptoms of heroin withdrawal.

17              His scheme of coercion also included the

18         implicit and explicit threat of reputational

19         harm.  The defendant had a library of

20         photographs and videos on each of the women he

21         prostituted, and the women knew that because

22         they were present when he was taking all these

23         videos and filming them.

24              THE COURT:  And you have one example of his

25         use of this series of videos or photographs that

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          was used to destroy reputational harm?  Or

2          destroy reputation.  Yes, destroy reputation?

3               MS. SAVNER:  Yes, there is one video that

4          he published that's of minor Victim E after she

5          did something that in his words violated him,

6          but so there's that one example of him carrying

7          the threat out, but the threat was existent

8          among all of the women even before this video

9          came out.

10              THE COURT:  And the women would verbally

11         testify to that threat?

12              MS. SAVNER:  Yes, your Honor.

13              THE COURT:  That if in fact you steal

14         drugs, I think that was the minor victim, but if

15         you in fact violate his rules, then he will use

16         these videos or these photographs to embarrass

17         them.

18              MS. SAVNER:  I can't speak for all of the

19         victims but for some of them certainly, and if I

20         can find the spot in the filing, Victim B said

21         that explicitly and she's testified to it in her

22         grand jury testimony that, you know, she knew he

23         had this library of material on him, and it was

24         a sort of constant refrain of the defendant that

25         if you violate me, I'll violate you back, and

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        that could have meant many things and did mean

2        many things to the witnesses and the victims,

3        one of which was this threat of exposing them to

4        their friends and families who often did not

5        know that they were engaged in prostitution or

6        even heroin use.

7            THE COURT:  So that's the general

8        background.  That's how you're going to prove

9        coercion.  There's specific issues that have

10       been raised in the pleadings, and the first is

11       any evidence alleging that the defendant

12       sexually assaulted ML in July of 2016.  July is,

13       of course, after the period of time for which

14       the defendant is charged.  Are you suggesting

15       that this is related in any way to this "I'll

16       get back at you" or -- and how is this relevant?

17           MS. SAVNER:  Yeah, I mean, I think it is

18       directly relevant to the "I'll get back at you"

19       sentiment that he put out to all the women that

20       worked for him, both in his drug business and in

21       his prostitution business.  When the defendant

22       learned that this woman, listed as ML, had taken

23       up with another man, he was angry about it and

24       told her he would violate her, and then he did

25       in fact carry out that threat to violate her by

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           coming to her house and sexually assaulting her.
2                   THE COURT:  Okay.  By this point, all of
3           the criminal acts that are subject to the
4           indictment have been over.
5                   MS. SAVNER:  Yes, your Honor.
6                   THE COURT:  And this is in response to her
7           deciding to go with another man?
8                   MS. SAVNER:  Yes, your Honor.
9                   THE COURT:  Okay.  All right.  The next one
10          is evidence related to the shooting of people
11          allegedly associated with the defendant in New
12          York City.
13                  MS. SAVNER:  Yes.  So as with the evidence
14          related to the defendant's quote, unquote,
15          murder of someone, this evidence, information
16          that the defendant had shot people, that he'd
17          been convicted of manslaughter which he himself
18          referred to as murder was part of the climate of
19          fear that the defendant created.  This implicit
20          threat of force.  That if they did not follow
21          his rules, if they did not prostitute for him,
22          if they didn't go out on the next date that he
23          wouldn't hesitate to use force against them, and
24          that was playing into multiple of the victims'
25          minds when they were faced with the choice of

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        whether to continue prostituting or not.

2                THE COURT:  So he would say to these women,

3        I've been convicted of murder?  What's the

4        proffer as to what he actually said to them?

5                MS. SAVNER:  Yes, so --

6                THE COURT:  And then the results, what

7        impact it has.

8                MS. SAVNER:  So some of the witnesses will

9        testify that they knew he had been previously

10       convicted of homicide.

11               THE COURT:  How would they know that?  I

12       mean, would he have said that?  Or is it the

13       rumor out there that he was convicted of murder

14       in New York State.  I mean, obviously if he said

15       that, it's a higher relevance because that's a

16       direct indication that he is coercing through

17       that statement or if it's just, did you know by

18       reputation that he had been convicted of murder

19       in New York, that's of less value, although you

20       would still say that's relevant.

21               MS. SAVNER:  Well, yes, your Honor.  It

22       relates, I think, most specifically to Victim B.

23       There was an incident where Victim B stole some

24       heroin from one of the defendant's drug runners,

25       and the defendant found out and brought her in,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          put out a bounty on her and brought her in, and

2          on page 10 of the filing and in her grand jury

3          testimony she talks about her fear in those

4          moments and what specifically she was afraid of,

5          what would happen to her, and she says, "and I

6          did know what he was capable of because I did

7          like I knew he went to jail for murder.  Like he

8          was expedited back to New York for a murder

9          charge like a while back.  So it just made me

10         really nervous."

11               THE COURT:  So how does she know that?

12               MS. SAVNER:  Well, he was, if I understand

13         his criminal history correctly, he was

14         incarcerated for a parole/probation violation on

15         the homicide charge while he was sort of in

16         Victim B's orbit so she was aware that he left

17         Vermont and was back in jail for a period of

18         time in 2013.

19               THE COURT:  But I guess the more direct

20         question is did he say that or did she hear that

21         from others.

22               MS. SAVNER:  I don't know how she knew he

23         was taken back to jail.

24               THE COURT:  Okay.  So these are the kind of

25         things that obviously you need to explore.  If

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        he's making representation that he was convicted
2        and he is using the fact that he was convicted
3        of a homicide as a level of coercion, then
4        that's clearly relevant and highly probative.
5             If on the other hand, this is learned from
6        these witnesses by hearsay or just by
7        reputation, that becomes a little less
8        probative.  So I think probably the issue of
9        whether you could use this conviction should
10       await factual exploration.  Would you agree with
11       that?
12            MS. SAVNER:  Yes, your Honor.  We don't
13       object to letting the witnesses explain how they
14       came to learn of the information and going from
15       there.
16            THE COURT:  All right.  Evidence related to
17       the walnut challenge.  Apparently, there are two
18       videos --
19            MS. SAVNER:  Yes, your Honor.
20            THE COURT:  -- of the walnut challenge.  Do
21       you seek to introduce those videos?
22            MS. SAVNER:  We do, and I'd like to make it
23       clear that those videos while they discuss the
24       challenge that's about to take place organized
25       by the defendant wherein various of the women

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          involved in his prostitution enterprise,

2          including two of the named victims, were to have

3          a contest to see how many walnuts could be

4          inserted into their anuses.  So that was the

5          nature of the contest, and that's what's sort of

6          discussed in the portions of the video that the

7          government seeks to introduce.  The videos that

8          the government has that it recovered from the

9          defendant's computer do not actually show the

10         act of the contest itself.  Just sort of

11         discussing it and it shows the defendant in the

12         second video sort of preparing one of the women

13         who worked for him as a prostitute for the

14         contest.

15              THE COURT:  So in reading both pleadings

16         from the defense and from the government, I sort

17         of came to the conclusion that you must have

18         looked at different videos.  You use the video

19         as coercion, that you are demeaning women in

20         this particular way.  The defense has said that

21         there were a number of people there, and other

22         people just said I don't want to participate in

23         this, and that was fine.  So I don't know what

24         it is.  Is it evidence of really threats or

25         coercion or is it demeaning?  Clearly, it's

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      demeaning.  But then the defense says everybody

2      else said no, I don't want to participate in

3      this, and they were allowed to do that.  Is that

4      what happened on the video?

5          MS. SAVNER:  So based on my recollection,

6      there are two other women present in the house

7      who can be seen in the video who are approached

8      by the defendant or his associates and say, you

9      know, can we get you in there, can we get you to

10     do this, and one of them will testify to that

11     fact that she was approached about participating

12     in the video and she said no.  I will note that

13     these two women were not prostituting for the

14     defendant at the time, based on the government's

15     knowledge.  They are not charged victims and

16     coercion as to them is irrelevant.  The fact

17     that the draw of participation which was getting

18     a few tickets of heroin in exchange for

19     participating was coercive, had a coercive

20     effect for the women that did participate, and

21     particularly two of the charged victims, I think

22     is highly relevant.

23         In addition to that is the fact that once

24     it was done, this video, the women believed this

25     video existed of them, and again, that's another

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    thing that Victim B talks about is leading to

2    her fear of reputational harm that this video

3    could be exposed.

4         THE COURT:  Did he ever threaten subsequent

5    to this video using the video in this kind of

6    intimidating way?

7         MS. SAVNER:  I don't believe he did so

8    explicitly, but as Victim B notes in her, she

9    explains in her grand jury testimony, you know,

10   the question was why were you concerned for

11   yourself that he had these pictures of you, and

12   she responds, "because if he got mad at me or if

13   I didn't go meet up with him, I'm sure he would

14   have done the same thing to me to get back at

15   me, knowing that everything I did I kept private

16   and I didn't want my family and friends to know

17   about."  And the question is, "Is this one of

18   the ways he was able to control you."  Answer,

19   "In a way, yes.  Like he's never personally ever

20   said this is what I'll do to you, but I knew he

21   had multiple pictures, dozens and dozens of

22   pictures of me, since I was young young, like

23   really young.  He had taken that video of me,"

24   and that's referring to the walnut video, "and

25   for him just me knowing that he had this video

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

Case 2:16-cr-00094-wks   Document 530   Filed 12/26/19   Page 48 of 165

48

1          like he could do anything with it."

2              So for that witness who will testify that

3          her experience participating in this challenge

4          was highly traumatizing to her.  In fact, she is

5          a witness who will say that after the defendant

6          filmed her participation in the contest that the

7          defendant told her I can't use this video.  It

8          looks too much like rape.  That's how miserable

9          and unhappy she was while she was participating

10         in it.  And the fact that he then had that video

11         posed yet another means that he had of coercing

12         her to engage in future prostitution by the

13         threat of exposing this humiliating and

14         embarrassing video.

15             THE COURT:  All right.  Any evidence

16         suggesting, alleging, and/or asserting that the

17         defendant had a prior murder conviction.  I

18         guess we've talked about that.

19             Evidence of any unlawful drug-related

20         activity outside the scope of the conspiracy

21         alleged in the indictment between May 2015 and

22         March of 2016 unless the government can

23         demonstrate that such evidence is relevant to

24         proving the alleged crime.

25             So your point is that continuing drug

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        activity afterwards is relevant.  So I'll hear

2        you on that.

3              MS. SAVNER:  More so, your Honor, that drug

4        activity before the charge of conspiracy is

5        relevant because -- so the prostitution and sex

6        trafficking counts range from 2012 to 2016 and

7        about the same time that the drug conspiracy is

8        alleged to have ended.  The drug conspiracy is a

9        shorter window occurring from 2015 to 2016 as

10       charged.  So it's really the period of 2012

11       through 2015 that the government seeks to

12       maintain this evidence related to the

13       defendant's involvement in drugs, in part

14       because that was how, one, he operated his

15       prostitution enterprise.  The women were

16       participating, many of them, because they were

17       drug addicts, heroin addicts, and he was their

18       supplier.

19             Additionally, it was for some of them, for

20       the charged victims, one of the means of

21       coercion that he used.  He manipulated their

22       drug addictions.  He was their supplier of

23       heroin.  He told them he wouldn't give them the

24       heroin that they needed to avoid withdrawal

25       until they went out on another date and came

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          back and gave him money, and when they did come

2          back, they split half the money with him.  That

3          was the deal at the start anyway.  They gave him

4          half their earnings to pay for his associated

5          expenses with his prostitution business, and

6          what in fact they did with the other half which

7          was supposed to be their half was pay him all of

8          that for the drugs that they needed to subsist

9          on and continue to do this work.

10              THE COURT:  So the drug dealing, although

11         not relevant necessarily to the drug charges,

12         the Counts 1 through 10, with the exception of

13         Count 2, is totally relevant to actually

14         understanding the relationship between the

15         defendant and the various women in particular

16         with regard to coercion.

17              MS. SAVNER:  Yes, your Honor.

18              THE COURT:  The video that depicts the

19         defendant urinating on other persons.

20              MS. SAVNER:  Yes, your Honor.  So there's

21         three videos related to this.  There's a video

22         in which the defendant announces that he's going

23         to, I believe, start a series of videos in which

24         he is, videos titled, quote, "pee on you," in

25         which he tells the audience, quote, "I'm just

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          pissing on bitches and going to see how far I

2          can go."  So this is, again, like the preamble,

3          so to speak, of the walnut video.  He's sort of

4          announcing his plans in advance of what he's

5          going to do, and then there are two videos of

6          the defendant, in fact, urinating on two of the

7          women that work for him.  One a charged victim

8          and one a worker in his drug business.

9               Again, these videos, the fact that they

10         were kept and maintained by him and catalogued

11         in his library among other embarrassing and

12         humiliating videos of these women contributed to

13         the fear of reputational harm that he posed to

14         them and that was part of the means of coercion.

15              These videos also demonstrate the sort of

16         just bodily control that he had over them which

17         was, you know, part of the coercion as well.  He

18         was dominant over them in every aspect and this

19         is certainly corroborative of that.

20              THE COURT:  Do you have the two women who

21         will testify to the episode?

22              MS. SAVNER:  Yes, your Honor.

23              THE COURT:  Okay.  Victim A's allegation

24         that the defendant sexually assaulted her after

25         he found out that she had stolen drugs from him.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          We've talked about this a little already.

2               MS. SAVNER:  Yes, and I would just point

3          out as we have in our response and this proffer

4          that from what I understand of the facts this

5          should be related to Victim B, not Victim A.

6               THE COURT:  Yes.  Right.

7               MS. SAVNER:  So, yes, there was this

8          instance that I mentioned that Victim B stole

9          some heroin from one of the defendant's drug

10         runners, he then put out a bounty for her.  She

11         was brought into him and he, you know, kind of

12         took her out back, in fact to a dumpster by a

13         cemetery, just him and her at night.  She was

14         very afraid of what he would do to her.  He

15         raped her at the cemetery, and then said you

16         work for me now and implying that she had to

17         prostitute for him to pay him back for the money

18         that she stole from him.

19              So that in and of itself is the fact that

20         the sexual assault is relevant because it shows

21         the reasonable fear that she had that if she

22         didn't thereafter go and work for him and pay

23         him back that she would suffer severe

24         consequences including the use of physical force

25         and potentially sexual violence again, and,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           again, this is during a charged period of
2           trafficking for this victim.
3                THE COURT:  Okay.  Victim C's explanation
4           about why she participated in commercial sex
5           acts where she's talking about her fear of black
6           people to begin with because she was molested
7           and beaten as a child by a black person.  That's
8           where she mentions the fact that he's in the
9           Bloods.
10               So do you seek to introduce this reason for
11          her fear?
12               MS. SAVNER:  You know, the government
13          doesn't really intend to elicit that she feared
14          him necessarily because he was black, but she
15          did say in this car ride which Mr. Grady has
16          discussed wherein the, that is sort of the main
17          piece of the coercion for this victim was this
18          car ride and her setup with the defendant.  She
19          did tell him about her history of trauma.  She
20          has scars on her arms of, you know, self-harm
21          and cutting that she showed him, that were
22          visible to him, and she talked about her history
23          of trauma, and given the fact that the defendant
24          then knew of it and was able to use it to compel
25          her to do what he wanted to do is relevant to

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          the coercion of Victim C and how she was
2          compelled to prostitute.
3               THE COURT:  But do you intend to use her
4          feelings about black people, Bloods we've talked
5          about already, is that coming in or do you want
6          to engage in the comments about self-harm and
7          his knowledge of self-harm?
8               MS. SAVNER:  I mean, I think most relevant
9          is what the defendant knew and what he was able
10         to seize on and use to compel her to prostitute,
11         right?  So to the extent that she told him about
12         her activity of sexual abuse and trauma and
13         self-harm which she will testify to on the
14         stand, that I believe is relevant and should
15         come in.  The government doesn't intend to
16         elicit the fact that she was afraid of black
17         people.  I mean, to the extent that she might
18         have said that to the defendant in that car
19         ride, I personally don't know if she did, it
20         might be more relevant, you know, then, but --
21              THE COURT:  Okay.  Then lastly, a video of
22         the defendant explaining why he was upset with
23         minor Victim E.
24              MS. SAVNER:  This is the video referenced
25         wherein the defendant does carry out his threat

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

```
1              to sort of violate the women who cross him in
2         this way of exposing them.  So he posted this
3         video publicly on his Facebook account in which
4         he calls out minor Victim E for stealing from
5         him, you know, kind of, it's a ten-minute video
6         where he sort of goes on a monologue about how
7         he brought her up from nothing, and she had the
8         audacity to steal from him, and then he shows
9         photos of her in sexually suggestive positions
10        and says, you know, I know her more like this.
11        And, you know, suggesting that she was
12        prostituting or that she was, you know, in some
13        other way sexually promiscuous.  And again,
14        these were photos.  He used photos in this video
15        that he kept in his library of photos and videos
16        that he kept on all of the women, and this
17        evidence of the video itself and the fact he
18        posted it, it was seen by victims and witnesses,
19        and they will testify to its effect on them.
20              THE COURT:  All right.  Let me ask you
21        whether you need pretrial rulings on a lot of
22        these issues.  I clearly understand that you
23        have the obligation to prove coercion.  I
24        understand that you're going to approach that
25        with those three different approaches, including
```

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           the regulation of drugs being given to women,

2           the force and threats.  Clearly, you should be

3           afforded the opportunity to use evidence of

4           force, evidence of coercion, to satisfy that

5           element.

6                The problem for me at this particular

7           juncture is ruling upon a particular video or a

8           particular photograph.  You've got 20,000

9           photographs apparently and you may introduce

10          obviously a small number of photographs, but to

11          actually rule on the use of a video, et cetera,

12          you really should be in possession of all of the

13          facts during the trial, but that necessarily

14          impacts opening statements.  You don't know

15          exactly whether it's coming in or whether it's

16          not coming in, and those things that are

17          particularly important and well established, you

18          may really want a ruling in advance.

19               MS. SAVNER:  Yes, your Honor.  And not to

20          mention that, but sort of the feasibility of how

21          we would decide these sort of things mid trial,

22          I don't know how your Honor envisions it going,

23          but it would seem time-consuming and require

24          many side bars to sort of get into it and also

25          sort of, I mean, we obviously can somewhat

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        anticipate what the witnesses will say in

2        response to any given question, but we can't

3        fully anticipate, you know, what tangents

4        they'll go down.  So I worry about being in the

5        position of them sort of coming out with

6        information about one of these things that's

7        sort of been reserved and not having a ruling.

8             And I also think that there can maybe be a

9        distinction made between, at least as to the

10       videos, so the urination videos, the walnut

11       videos, the video explaining why the defendant

12       was upset with minor Victim E, that discussion

13       of these videos by the witnesses is sort of the

14       middle ground where that your Honor could

15       determine that that was admissible at this point

16       given that they would be explaining the

17       relevance to them of these pieces of video

18       evidence in the context of their testimony, and

19       maybe reserve on the admission of the videos

20       themselves which is the more prejudicial piece

21       of it, depending on how the witnesses testify

22       about how it's affected them.

23            THE COURT:  Well, that's interesting.  So

24       just take as an example the urinating videos.

25       You would have the two women testify about that

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     experience.  That's less prejudicial.  It's

2     clearly probative.  And then reserve judgment on

3     the use of the video of that episode.

4          MS. SAVNER:  I mean, that certainly is not

5     the government's first preference.  The

6     government believes that the videos themselves

7     are extremely probative, corroborates what the

8     witnesses will say were their experiences, but I

9     think, you know, in my reading of the defense's

10    theory, the videos themselves are the more

11    prejudicial pieces of evidence than testimony

12    concerning what happened in them.  So to the

13    extent that the women testify about the

14    experience, testify about how the experience

15    affected them, and the court allows them to do

16    that in advance, then the matter of whether the

17    videos themselves can come in is something that

18    can be --

19          THE COURT:  Then if there's

20    cross-examination of those witnesses and the

21    cross-examination impeaches the reliability of

22    what they've said, then that becomes relevant to

23    whether or not the video can be introduced to

24    and substantiate the testimony of the witness

25    which is I suppose a third scenario.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

```
 1                 All right.  Okay.  All right.  So those are
 2          the specific things that I thought had not been
 3          addressed before.  Are there other issues that
 4          you want to address at this point?
 5                 MS. SAVNER:  No, your Honor.  Not based on
 6          the, I mean the defendant has another motion to
 7          exclude evidence that --
 8                 THE COURT:  We'll do that later.
 9                 MS. SAVNER:  Yes, your Honor.
10                 THE COURT:  Okay.  Why don't we take a
11          break.  Ten-minute break at this point.  Start
12          again at 11.
13                 (Recess taken 10:49 - 11:02 a.m.)
14                 THE COURT:  Okay.  So in regard to those
15          motions I just discussed with the government,
16          did the defense want to respond to 350?
17                 MS. SEN:  Yes, your Honor.
18                 THE COURT:  Okay.
19                 MS. SEN:  As your Honor pointed out, I'll
20          just start and go through the same list in the
21          same order.
22                 THE COURT:  Okay.
23                 MS. SEN:  With respect to the sexual
24          assault, I think the court had pointed out this
25          happened in July of 2016.  I think the
```

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      government admits that no one else was even

2      aware of it.  I don't understand how it's

3      relevant.  It has absolutely no relevance to the

4      drug trafficking.  The drug trafficking

5      conspiracy ended as of March 2016.  This was in

6      July, and --

7           THE COURT:  Well, the relevance from the

8      government's perspective is that if the

9      defendant feels that one of the women violated

10      his rule, then he responds with violence and in

11      particular, demeaning violence, and this is an

12      example of that, even though it's after the

13      conspiracy or after the charged offenses, but

14      what's also troubling about it is it's not

15      because ML violated his rule in regard to

16      prostitution, it's for another reason totally;

17      that is, she went with another guy.  And so

18      there's a little less relevance, it seems to me.

19      Just thinking off the top of my head here.

20           MS. SEN:  And your Honor, I would point out

21      that our client disputes that that ever

22      happened.  So this is an issue that has not been

23      established.  I haven't seen any police reports

24      about this.  I'm not sure that this, this is an

25      allegation, and for it to come in just suggests

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          that, you know, then our client is fighting this

2          allegation which is just this woman's word

3          against his because it fits into the government

4          narrative of our client, this is what he did

5          when he violated people.

6               I think the court is right in terms of its

7          relevance.  It's not, what I'm saying, it wasn't

8          relevant to the drug conspiracy.  There's no

9          indication here that she did do anything that

10         would have caused him to sort of perform this

11         act, and he disputes it all together.  So we

12         would argue that it is just not relevant to the

13         charges here.  No one else was aware of it.  I

14         mean, the government admits that.

15              So the idea that people were concerned and

16         that they felt like this could happen to them

17         and sort of was used as some kind of threat, I

18         don't think fits with, I just don't see how this

19         is relevant.

20              THE COURT:  Well, it's not relevant because

21         other people would have known or not known about

22         it.  It's relevant because it's a pattern of

23         conduct and its relevance is because it is that

24         pattern of conduct.

25              Okay.  I'll take that clearly under

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          advisement.

2                Evidence related to the people shooting of

3          people allegedly associated with the defendant

4          in New York City.

5                MS. SEN:  Again, your Honor, and I think I

6          sort of, in our response I put together this

7          idea of the murder conviction, shooting people

8          in New York.  I haven't seen anything from any

9          witness that they were afraid of our client

10         because they were aware, had heard about him

11         shooting anybody, and to allow that to come

12         in -- if a witness gets up and says this, it's

13         not something that has been stated in any

14         reports that we've seen of any witness, and not

15         only that, there's so much evidence, your Honor,

16         of these witnesses, I mean, the number of

17         photos, messages, friendly messages that these

18         witnesses have exchanged with our client outside

19         of the time period, during the time period, of

20         these alleged activities, it just completely

21         undermines any allegation.

22               THE COURT:  Well, have you received a

23         proffer from the government as to why they would

24         introduce or what they would actually introduce

25         about shooting of people in New York?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MS. SEN:  Only what they've provided in
2    this motion, your Honor.  Nothing more specific
3    than that.
4          THE COURT:  Do you know if there's any
5    statements of the defendant to any of the women
6    about his conviction for either manslaughter or
7    murder used in a coercive or threatening manner?
8          MS. SEN:  Our client disputes that, and
9    your Honor, our client has also pointed out to
10   us he was on parole for a manslaughter
11   conviction, and he was rearrested in Vermont and
12   that was all over the news.  It was in
13   newspapers, it was a publicly known fact.  So
14   our client says that he would have never, you
15   know, used, you know, mentioned it or used it in
16   that kind of a way.
17         THE COURT:  Well, but the relevant question
18   is whether or not there are witnesses out there
19   who heard him say, "I was convicted of
20   manslaughter or murder," and it was used in the
21   context of a coercive environment.
22         MS. SEN:  Your Honor, we haven't seen
23   anything that supports that.
24         THE COURT:  Okay.  Let me get back to the
25   government and just get a proffer as to what

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          exactly would be used there.

2              All right.  The walnut challenge.

3              MS. SEN:  Your Honor, as I stated in the

4      papers that we filed, the government's argument

5      that this is somehow indicative of coercion, it

6      is pretty clear if the government is talking

7      about the video itself that they are, this group

8      of people are going from room to room and asking

9      women whether or not they want to participate,

10      and they say no.  And the government's theory of

11      this whole case all along has about been that

12      Mr. Folks is alleged to have used coercive

13      tactics, both for the women who were involved in

14      prostitution as well as with the women who are

15      involved in distributing drugs.

16              So the idea that somehow now the government

17      is standing up and saying well, those women

18      weren't part of the prostitution and so they

19      weren't really feeling the coercive effect.  I

20      mean, frankly, the government's argument and its

21      theory of this case all along has been that

22      Mr. Folks has been coercing these women into

23      being involved in the drug business as well as

24      in the prostitution business.  So to say that

25      somehow this video, discounting the fact that it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          doesn't show coercion by suggesting somehow that
2          although those were people not involved in
3          prostitution and that they could say no whereas
4          the women involved in prostitution couldn't say
5          no, it's just not clear from the video itself,
6          and I think the only way for the court honestly
7          to evaluate the coercive nature of this video
8          and, frankly, all of the other videos is by
9          having the government submit them to the court
10         for the court's review because the defense does
11         not see these videos as coercive and that
12         they're not relevant, your Honor.
13              THE COURT:  What do you think about the
14         suggestion from the government that it be
15         permitted to ask the witnesses to describe what
16         happened, and the videos would be held in
17         abeyance and that would obviously be much less
18         prejudicial.  What do you think of that
19         suggestion?
20              MS. SEN:  Well, your Honor, I think that
21         that is almost even more prejudicial because I
22         don't think my, I anticipate that what these
23         witnesses are going to say is not going to
24         reflect what's on these videos because these
25         videos do not show coercion, and we feel very

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          strongly that they are not relevant, and

2          whatever probative value that they might have is

3          far outweighed by the prejudice of these videos.

4               So the idea that somehow you would allow

5          these witnesses, it means that the videos come

6          in ultimately, and I think that the court first

7          has to look at them to determine are these even

8          relevant because I don't see how they're

9          relevant.

10              THE COURT:  Okay.

11              MS. SEN:  That's our position, at least,

12         your Honor.

13              THE COURT:  It's a little bit of an

14         inconsistent position.  What you're basically

15         saying is that the videos are very prejudicial.

16         At the same time, you're suggesting that the

17         videos are not showing any coercion.  Is that

18         inconsistent?

19              MS. SEN:  I don't think so, your Honor.

20         They don't show coercion.  They're just not

21         relevant.  I mean, if the idea is that they're

22         relevant because they show this coercive line of

23         conduct, I mean at least for the walnut

24         challenge video for certain.  There is nothing

25         about that video that's coercive.  I think

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1     what's prejudicial about it is just the nature

2     of the activity going on is going to be

3     off-putting to a lot of people, and so that's

4     the prejudice.  I mean, if you look at this

5     video, your Honor --

6          THE COURT:  Okay.  Then tell me your

7     reaction to their suggestion that the defendant

8     engaged in demeaning activity as a control

9     mechanism to be able to control people who are

10     working for him.  That is, that he really

11     demeaned them as persons or sexually, et cetera,

12     and that is a part of a whole process by which

13     he gains control over them.  Should the

14     government, assuming that there's a video which

15     is not coercive but demeaning, should the

16     government be able to introduce that kind of

17     evidence to show this is a mechanism by which he

18     sought control.

19          MS. SEN:  Well, if there was something that

20     was evidence of that, we would need to see it,

21     and not only that, your Honor, but --

22          THE COURT:  But the walnut video is pretty

23     demeaning.  I mean, I haven't seen the video,

24     obviously, but at least the description of the

25     episode is quite demeaning.  And they would say

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          well, it's coercive, but if it's not coercive,
2          it at least is demeaning of these particular
3          women, and that was a way in which he gained
4          control over them.
5               MS. SEN:  Well, your Honor, I would point
6          out in that video that the women who are engaged
7          in this activity are laughing, and I would also
8          point out in that video that the women who won
9          the challenge were paid $500.  So the idea, I
10         mean, you know, so the thing is that you get
11         into these very -- yes, to you or me it may seem
12         demeaning, but there was a bargain that was made
13         there, and it doesn't show coercion.  To the
14         extent it shows that it was demeaning, I mean,
15         honestly, your Honor, you have to just look at
16         the video --
17              THE COURT:  All right.
18              MS. SEN:  -- to sort of get the sense of
19         how demeaning it was in terms of the entire
20         context.  I think that's really our point is
21         that the way a witness might describe it -- and
22         I would also point out that they are basing
23         their argument about, I mean, at least until now
24         the government has been basing its argument
25         about the coercive nature of this video on the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          one woman who didn't enjoy participating in it.

2               Now, the other women who actually engaged

3          in this, you can see them on the video.  They're

4          laughing, they're joking around, there's a kind

5          of lighthearted atmosphere, and if there was one

6          woman who was not happy about it and she was not

7          videoed or at least my understanding is any

8          video of her was deleted, then I think that that

9          also impacts sort of the relevance of it with

10         respect to the coercive element of the video as

11         well.

12              THE COURT:  Okay.  All right.  Any evidence

13         suggesting or asserting the defendant had a

14         prior murder conviction.  Again, I guess I'm

15         asking for clarification as to whether in fact

16         there's evidence of the defendant saying that as

17         opposed to other ways that people may have

18         learned about that because that obviously is

19         prejudicial, but if the defendant said to a

20         person, you know, "I've been convicted of

21         murder" and in a coercive way, then that is

22         highly probative.  Would you agree with that?

23              MR. SEN:  I think it depends on the context

24         in which it is stated, your Honor, and my

25         understanding and what I said before is that our

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      client has never used it as a coercive

2      threatening statement.

3          THE COURT:  Okay.  All right.  Evidence of

4      unlawful drug-related activity outside the scope

5      of the conspiracy, and in particular the

6      government seeks to introduce drug-related

7      activity from 2012 to 2016 as a part of Counts

8      10 through 14.  Essentially, they're arguing

9      that he used drugs as a coercive technique to

10     control the conduct of the people who are

11     working for him, and your motion has sought to

12     exclude all of that, but in fact it's quite

13     relevant, isn't it?  To the coercive nature of

14     the relationship between the defendant and

15     people working for him?

16         MS. SEN:  Your Honor, I guess what our

17     focus was on sort of other activities related to

18     the drug conspiracy that the government is

19     alleging.  I think with respect to the drug use

20     of the women themselves, I don't think anyone is

21     going to deny that there was drugs being used

22     and bartered for.  So with respect to -- I think

23     the only concern there is that there's not

24     evidence that there was drug distributing going

25     on.  I think the fact that these women were

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        using drugs is different from the conspiracy to

2        distribute drugs.

3            THE COURT:  But then I thought that the

4        relationship that existed between the defendant,

5        at least according to the government now, that

6        between the defendant and the women not only was

7        to control the use of drugs to require them to

8        be involved in prostitution but they also were

9        selling, and I don't know if the selling goes

10       back to 2012, but that's all part of the

11       relationship between these women and the

12       defendant, I thought.  And if you would allow

13       the government to introduce testimony of drug

14       activity to encourage coercion to prove coercion

15       for prostitution, it's sort of an artificial

16       distinction to also participate in small amounts

17       of drug activity, right?

18            So between 2012 and 2016, if there were

19       some women who were engaged in prostitution but

20       also were selling drugs, and they would get some

21       of the drug proceeds in terms of drugs for them,

22       wouldn't that be relevant to show the

23       relationship between the defendant and these

24       witnesses?

25            MS. SEN:  Your Honor, I think that my

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          understanding of the facts, and I could be wrong
2          about this, but my understanding is that the
3          selling of the drugs by the women is sort of
4          within the conspiracy time frame and that the
5          supplying of the drugs, there may have been
6          drugs that were being bought and provided to
7          women, but that the actual women going out and
8          selling is something that did not happen.
9               THE COURT:  Okay.  So before May of 2015
10          what you're saying is that the women didn't sell
11          drugs.  That was the drugs were only used as a,
12          well, the government would argue that they're
13          used as a coercive ploy.
14               MS. SEN:  I certainly don't think it goes
15          all the way back to 2012.  I'd have to go back
16          and look at the exact dates for each particular
17          witness, your Honor, but --
18               THE COURT:  So assuming that they've got
19          some evidence that some of these women were
20          selling drugs as well as engaging in
21          prostitution prior to May of 2015, that is prior
22          to the charged offenses, wouldn't that be
23          relevant to put context to the relationship
24          between the defendant and the witnesses?
25               MS. SEN:  If there are witnesses who

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          distributed before then, I think that we would
2          have to look at the context in terms of was it
3          part of the conspiracy, were they selling, were
4          they getting things, was it known, was it
5          something that they were doing on their own, is
6          it something they're doing at our client's
7          direction.  I mean, I think all of that at a
8          very detailed level would have to be looked at,
9          your Honor, so I don't want to say definitively
10         that we would agree to allowing that to come in,
11         but if there was evidence that they could show
12         that this was something they were doing on
13         behalf of our client or involved in a conspiracy
14         of some sort, I think that that would be
15         relevant, but I can't see how -- if they're
16         getting drugs from our client and then going off
17         on their own and selling them, I don't really
18         see how that would be relevant.
19              THE COURT:  Okay.  All right.  How about
20         the urination video?
21              MS. SEN:  Your honor, I think it's the same
22         issue as with the walnut video.
23              THE COURT:  Would you have any objection if
24         somebody is going to testify that the defendant
25         as a demeaning coercive act urinated on them,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    would you have any objection to holding back the
2    video and allowing that witness to testify what
3    that witness experienced to describe this
4    particular episode obviously without the video?
5        MS. SEN:  I think we would object to that,
6    your Honor.  I mean, either the information is
7    relevant and admissible or it isn't, and I think
8    that the court needs to evaluate and do the 403
9    balancing test as to whether or not the
10   probative, whatever probative value that video
11   might have is outweighed by the prejudice.
12       THE COURT:  What you're saying is that if I
13   look at the video, it becomes so noncoercive in
14   nature that this is basically an either
15   consensual or an irrelevant act.
16       MS. SEN:  That's what we would argue, your
17   Honor.
18       THE COURT:  Okay.  The allegation, Victim
19   B, allegation that she was sexually assaulted
20   after he found out that she had stolen drugs.
21       MS. SEN:  Your Honor, again, we would
22   object to this.  We would object and dispute
23   that this occurred.  Our client disputes that
24   this is what happened.  And again, we would
25   argue that any probative value that it may have

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       arguably is just not, is far too prejudicial to
2       be allowed in.
3            THE COURT:  Okay.  Victim C's explanation
4       as to why the person who said that she was
5       scared because she had been assaulted by black
6       persons, I think the government's not going to
7       introduce that particular language.  The Bloods
8       is a separate issue that the court will address.
9       Anything else to add to that?
10           MS. SEN:  I would just add that the case
11      law that the government relies on for that, I
12      mean, it's sort of talking about a fear of black
13      people as a vulnerability, and I just don't see
14      that equating to the same kind of vulnerability
15      as the case he cited that the government relies
16      on.
17           THE COURT:  Okay.  Then the last is the
18      video explaining why he was upset with minor
19      Victim E.
20           MS. SEN:  Your Honor, that video was
21      apparently posted in early March of 2016.  So
22      for any witness, the last claim regarding human
23      trafficking is February of 2016.  That anyone
24      who is involved in the human trafficking
25      endeavor says that they became worried about

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          their reputational harm based on the posting of
2          that video is impossible.  And similarly, it's
3          not clear to me that even with respect to the,
4          even though the drug conspiracy extends into
5          March, it's not clear to me that there's any
6          person who was working allegedly in the drug
7          business was aware of that video and that made
8          any difference to them in terms of reputational
9          harm.  So we would argue that that video is just
10         not relevant at all because it's, just from the
11         date that it was posted, there's no way that it
12         could have had relevance to anyone's state of
13         mind before it was posted.
14              THE COURT:  Okay.  All right.  So what
15         you're suggesting is that I ask the government
16         for the various videos.
17              MS. SEN:  Yes, your Honor.
18              THE COURT:  Okay.  Anything else in regard
19         to these issues?
20              MS. SEN:  No, your Honor.  Thank you, your
21         Honor.
22              THE COURT:  Okay.  The government, do you
23         want to respond?
24              MS. SAVNER:  Yes, your Honor.  Just
25         briefly, your Honor, touching on a few points on

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          some of these matters.  As to the first, the
2          rapes of ML, your Honor is correct that this in
3          the government's view is proof of the violation
4          that he threatened to inflict on many of the
5          women that worked for him.  The fact that it
6          wasn't directly related to a violation, a
7          perceived violation of her related to her
8          activities as a drug worker of his, I think is
9          irrelevant.
10              THE COURT:  But doesn't that make it less
11         probative?  I mean, the fact is the reason why
12         that he assaulted her was because she developed
13         a relationship with another person.
14              MS. SAVNER:  Yes, your Honor, but you'll
15         hear from the women who worked as prostitutes
16         for him, the women that worked as drug workers
17         for him, that he controlled all aspects of their
18         lives.  He didn't want his prostitutes buying
19         drugs from other people.  He didn't want them
20         seeing other people.  They weren't allowed to
21         have men in their hotel rooms.  All of that was,
22         would be considered a violation, and all of that
23         was one of the means he used to control all of
24         the aspects of their lives to limit their
25         contact with the outside and their resources and

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          also rely solely on him.

2               THE COURT:  That's a perfect example of why

3          a lot of these issues have to be resolved during

4          the course of the trial.  I mean, you didn't, I

5          did not know that you've got testimony, you've

6          got people coming in and saying that that

7          control was everywhere, and that level of

8          control you want to prove --

9               MS. SAVNER:  Yes, your Honor.

10              THE COURT:  -- by offering the testimony of

11         these various witnesses, and then the assault on

12         ML is just an example of the abusive control

13         that he demanded of the people who worked for

14         him, right?

15              MS. SAVNER:  Yes.

16              THE COURT:  Okay.  All right.

17              MS. SAVNER:  So as to the next, and I will,

18         as we've been doing, sort of group the evidence

19         related to him shooting people and the evidence

20         of the murder conviction, I will just point out

21         that this is the defendant's motion to exclude

22         evidence, and they specifically sought to

23         exclude evidence that the defendant had shot

24         people in New York without tying it to any

25         specific statement of any government witness or

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          any material provided in discovery.  So we too

2          don't know exactly what they're referring to

3          when they move to exclude evidence related to

4          the shooting of people allegedly associated with

5          the defendant in New York City.  But I think

6          we've, I believe we're somewhat on the same page

7          that it's a matter to be explored as to how the

8          witnesses knew, came about the information and

9          how it affected them.

10                  THE COURT:  Okay.

11              MS. SAVNER:  As to the walnut video,

12         Counsel suggested that, outright stated that the

13         videos don't show coercion, and that's just not

14         a matter to be decided at this point.  You know,

15         the matter of the coercive nature of the

16         defendant's activities is the central issue for

17         the jury to decide.

18                  THE COURT:  Well, what proffer would you

19         make as to what response the two women who went

20         through the walnut challenge had?  What was

21         their reaction to that?  Did they feel coerced

22         in particular?  Did they feel demeaned?

23              MS. SAVNER:  One of them, as I've mentioned

24         before, was so distraught during the video and

25         crying and looked unhappy that the defendant

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    immediately afterwards said to her, "I can't use
2    this video, it looks too much like rape."
3    That's how unhappy she was participating in it.
4    To hear her talk about it now, it's still one of
5    the most traumatizing things the defendant did
6    to her, one of the most degrading things she
7    experienced at his hand and the fact that she
8    knew because the defendant told her he had
9    video'd it that he could use the video made her
10   thereafter fear reputational harm.
11        With both her and other victim who
12   participated, they were both participating for
13   money or for money to use for drugs or directly
14   for drugs, and that also shows the level of
15   control that the defendant had over them, what
16   he could get them to do just to make money for
17   drugs or just to get drugs.
18        And that's also part of the government's
19   whole theory of this case is the element of the
20   drug coercion that the defendant used.  I mean,
21   if it weren't for these women's drug addictions,
22   many of them would not be in the position of
23   being possibly compelled to prostitute, right?
24   So the fact that their drug addictions were so
25   severe that their addictions could be

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          manipulated, their supply of heroin manipulated
2          so that they would or wouldn't participate in
3          prostitution at the defendant's hand is also
4          corroborated with the fact that they were
5          willing to participate in this objectively
6          degrading and humiliating experience just to
7          make a little money which they will thereafter
8          testify they immediately spent on drugs.
9                    THE COURT:  All right.
10                   MS. SAVNER:  As to the drug-related
11         activity predating the conspiracy, I think the
12         government does not intend to introduce evidence
13         that the women were selling drugs for the
14         defendant prior to the charged conspiracy.  That
15         the evidence related to drugs is related to the
16         defendant, from the 2012 to mid-2015 period, is
17         related to the defendant's access to heroin and
18         crack, the drugs that the women required to
19         engage in prostitution, and that he distributed
20         it to them and that he was their supplier of
21         heroin.
22                   THE COURT:  And they were engaged in
23         prostitution.
24                   MS. SAVNER:  Yes.
25                   THE COURT:  All right.  Okay.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1            MS. SAVNER:   Again, with respect to the
2       urination videos, the defense posits these as
3       consensual, showing that the video themselves
4       just like with the walnut videos shows some sort
5       of consensual act, but that's sort of taking the
6       image in a vacuum without testing the witness's
7       experience and without putting that experience
8       in their own words for the jury to hear and for
9       the jury to decide whether these acts
10      contributed to the coercion or were indicative
11      of the coercion that the defendant used.
12           So just because it is the defense's view
13      that these videos don't show coercion on their
14      face is I think a judgment that should not be
15      permitted to rule the day as to any of these
16      videos and the victim's experiences with them,
17      and to the extent the videos corroborate those
18      experiences, it's highly relevant.  All of the
19      videos.
20           THE COURT:  Any objection to submitting the
21      videos for in-camera review?
22           MS. SAVNER:  No objection, your Honor,
23      although as I've mentioned, what may be
24      coercive, you know, what may or may not appear
25      coercive on the face of something, you know, a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          smiling photograph doesn't necessarily imply
2          that the person was there happily, right?  So I
3          would still ask that if your Honor is at all on
4          the fence that you reserve until you hear the
5          testimony of the women who were involved in how
6          it affected them.
7                    THE COURT:  Okay.
8                    MS. SAVNER:  But we are happy to submit any
9          of these videos.
10               With respect to the assault of Victim B, I
11         mean, the defense's main argument at this point
12         seems to be that it's not admissible because it
13         didn't occur because their client says it didn't
14         occur whereas the government witness will say it
15         did occur, and that, again, seems to be a matter
16         of cross-examination and not a matter to be
17         decided ex-ante in the world of 403 balancing.
18               I think we've addressed the various
19         statements of Victim C.  The government will
20         elicit or won't elicit, obviously depending on
21         your Honor's ruling on this, on the gang
22         conviction so I won't get into that.
23               Lastly, as to the video of minor Victim E,
24         yes, the government does agree that the video
25         was posted in July of 2016, and therefore after

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           the charged conduct of sex trafficking.

2           However, this threat of reputational harm, this

3           threat to violate you if you violate me was one

4           that was ever present as the witnesses will

5           testify.

6                THE COURT:  So that you will have witnesses

7           who will say this is a constant pressure, he's

8           always threatening reputational harm, he's

9           always threatening to publish these embarrassing

10          photographs, and here in July of 2016 it

11          confirms what they said about what he would do,

12          the defendant.

13               MS. SAVNER:  Yes, your Honor.

14               THE COURT:  So it's not that all future

15          women would rely upon this fear because of this

16          video.  It's an example of the corroboration

17          essentially of what they say he said to them.

18               MS. SAVNER:  Yes.  What he either said to

19          them or what was just clear to them implicitly

20          given the fact that they were aware he had all

21          these photos and videos of them.

22               THE COURT:  Okay.

23               MS. SAVNER:  Thank you.

24               THE COURT:  All right.  So the defense

25          motion regarding witnesses' sexual behavior

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          under 412, I think we've addressed that already,
2          but tell me if you want --
3               MR. KAPLAN:  I don't think I have anything
4          to add to that.
5               THE COURT:  Think we've done that.  Okay.
6          You're seeking to exclude evidence related to
7          the deceased witnesses.  There are two deceased
8          witnesses, HA and BL.  My understanding is that
9          there's nothing which is going to be introduced
10         in regard to BL.  And what the government is
11         suggesting is an option here, they're not going
12         to introduce any records of the death of either
13         of these witnesses.  Obviously, the deaths were
14         unrelated to this particular conspiracy.
15              What the government wants is an instruction
16         that the jury cannot consider the fact that
17         these two witnesses were not available to
18         testify.  Say they're not available to testify
19         and you're not allowed to consider that in any
20         way which is, I think, a good solution.  Tell me
21         what the defense's reaction to that is.  They're
22         not going to introduce any evidence of the
23         deaths.  This is only just don't consider the
24         fact that they did not testify.
25              MS. SEN:  Your Honor, I think that we're

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          fine with that instruction.

2                    THE COURT:  Okay.  All right.  Now, in 353,

3          the motion to exclude Backpage and Facebook

4          records.

5                    MS. SEN:  Thank you, your Honor.

6                    THE COURT:  Just before you start, you've

7          been in discussions with the FBI about the

8          availability of records that you are seeking and

9          you sort of left your memo suggesting that

10         progress is being made.  Has it been made?

11                   MS. SEN:  No, your Honor.  I got an email

12         from the FBI website yesterday, and I can

13         explain to your Honor in a moment, but

14         Mr. Kaplan, can I consult with him for just a

15         moment, please?

16                   THE COURT:  Sure.

17                   MS. SEN:  Your Honor, our motion is really

18         focused on the Backpage, and I think to the

19         extent that it was, we were moving --

20                   THE COURT:  Facebook self-authenticating,

21         are you --

22                   MS. SEN:  I think they still have to be

23         properly authenticated, but I don't believe we

24         would be moving to exclude the Facebook the same

25         way that we are moving to exclude the Backpage

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          on various reasons.  So I can update the court

2          with respect to my communications with

3          counsel --

4               THE COURT:  That self-authenticating rule,

5          the change in the rule?

6               MS. SEN:  Yes, your Honor.

7               THE COURT:  Did you notice who was the

8          chair of the committee that changed the rule?

9               MS. SEN:  Could it have been you, your

10         Honor?

11              THE COURT:  Yes.  Yes.  Yes, I was.

12              MS. SEN:  So I think the rule worked in

13         just the manner you had envisioned.

14              THE COURT:  I have no doubt it would.  But

15         anyway, the government has also said that they

16         don't need to rely upon self-authentication in

17         the Facebook they've got so many links to that

18         Facebook account.  Defendant using that account,

19         et cetera.

20              All right.  So the Backpage.

21              MS. SEN:  So to answer the court's first

22         question I received -- so as the government had

23         represented, we've had these communications back

24         and forth.  We had issued a trial subpoena.  I

25         had spoken to Attorney Bubb at the FBI regarding

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    having that request run, and at that point

2    that's when we submitted the Declaration of the

3    FBI agent or Special Agent Childress who

4    explained that they weren't able to do it.

5        So in January it appears that they were

6    starting to look at this issue, although I

7    wasn't aware of that until some time in March.

8    At that point, Attorney Bubb reached out to me

9    and said if you have a more specific request,

10   please let me have that.  And so on March 19th,

11   I sent a followup request with a specific phone

12   number that we had wanted the FBI to search for

13   on the server, and I hadn't received any

14   response.  And yesterday I got sort of a form

15   response, and I had also asked the FBI to run

16   the search as we had requested in the original

17   subpoena, and the response I got yesterday said

18   that they were not responding to subpoenas

19   because they were providing the information

20   voluntarily so resubmit the request by letter or

21   by email.  So it's a little bit confused because

22   I did submit a letter separately at Mr. Bubb's

23   request in March.  So at this point I don't

24   think that there's been any forward movement in

25   terms of running that search.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           THE COURT:  Okay.

2           MS. SEN:  And it's not, I don't have any

3      sense and maybe the government can speak to this

4      as to what sort of time frame they have or if

5      that could even occur.

6           But with respect to the Backpage records,

7      so there's basically a couple of grounds on

8      which we're challenging them.  The first ground

9      is this issue of not being able to access them,

10      and the government makes a lot of

11      representations in its opposition about what

12      Backpage's retention policies are, what kind of

13      records it would keep.  I don't think there's

14      anyone except for someone who is at Backpage who

15      can speak to how long the records were kept, who

16      can speak to what kind of data was kept.

17           So, for example, just because in response

18      to a subpoena Backpage may only provide you an

19      ad with some limited administrative data doesn't

20      mean it doesn't have in its records the actual

21      image that was submitted that would have

22      contained metadata and other information about

23      the image that was submitted to be uploaded.

24           So the scope of what Backpage actually held

25      and retained and how long it retained it for, I

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           think that the government sort of speculates as
2           to what information it would have.  Not only
3           that, the government suggests that because we
4           cannot identify what exact exculpatory
5           information might be available, we're not
6           entitled to it.  And I don't think that's quite
7           the rule, your Honor, and I think we have argued
8           that there may be exculpatory information in the
9           form of ads related to women posting, you know,
10          witnesses in this case posting ads with IP
11          addresses that are clearly not related to our
12          client during the same time period.  There would
13          be exculpatory information, we believe, if the
14          search was able to be run.  That's really our
15          main point with respect to that.
16              Mr. Kaplan and I were appointed at the end
17          of April.  At that point when we were appointed
18          Backpage had already been seized.  I understand
19          the government is arguing that we're having this
20          windfall sort of argument about how just because
21          Backpage got seized, we should be, our client
22          shouldn't have any kind of benefit in that those
23          records were never requested before.
24              I can only speak to what Mr. Kaplan and I
25          can do once we were appointed.  At that point,

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1                the servers had been seized by the FBI and

2                clearly we felt like it was something that was

3                necessary to go after and to request.

4                     THE COURT:  All right.  So I mean, you're

5                seeking to prevent the introduction of the

6                Backpage records.  Right?  Because you may have

7                been denied exculpatory information.  That's a

8                really pretty severe request, obviously.  The

9                Backpage records, pretty fundamental to the

10               government's case, and there's no question they

11               got the records in a good faith exercise of its

12               subpoena power so they got the records lawfully.

13               Those have been turned over to you.

14                    So what are alternative remedies that you

15               would seek absent the exclusion of the Backpage

16               records?  Are there instructions that you may

17               seek or is there something less dramatic or less

18               draconian or some remedy that would be more fair

19               in light of the fact that there's no real proof

20               that you have been denied exculpatory

21               information?

22                    MS. SEN:  I would have to think about that,

23               your Honor, in terms of a sort of a thoughtful

24               remedy short of exclusion.  I don't know that

25               there would be, but I would have to think about

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        that a little bit.  Can we get back to the court
2        on that?
3             THE COURT:  Yes.  Okay.  I mean, seeking
4        exclusion of the records really when the
5        government has acted in good faith, frankly, and
6        there is no showing that you've been denied
7        exculpatory information.  It's speculative at
8        this point.  It's a very dramatic remedy.
9             MS. SEN:  I appreciate that, your Honor,
10        but it is something that we may come back to the
11        court with a request for some kind of remedy to
12        deal with that situation short of exclusion.
13             THE COURT:  Okay.  All right.  Government
14        want to respond?
15             MS. SAVNER:  Yes, your Honor.
16             MS. SEN:  Your Honor?  Well, I did have two
17        other -- so with respect to specific Backpage
18        ads, I don't know if you want to hear from the
19        government broadly about the Backpage words.
20             THE COURT:  No, go ahead.  If you've got
21        more Backpage.
22             MS. SEN:  Just specifically and we may be
23        doing this on an advertisement-by-advertisement,
24        record-by-record challenge, there are issues
25        with respect to, for example, the administrative

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          information that we do have with respect to the
2          records that have been produced in terms of not
3          being tied to our defendant, to our client.
4                  THE COURT:  Well, you've asked for all
5          metadata.
6                  MS. SEN:  Well, records that don't contain
7          metadata, that contain IP addresses.  I mean,
8          the administrative data that Backpage has
9          provided does contain an IP address, and
10         apparently from the government's response the
11         government never intended, I mean, typically,
12         the reason why we were looking at it from that
13         standpoint is because typically when the
14         government has evidence related to computers,
15         cell phones, you know, you see subpoenas for IP
16         addresses.  There's a close tie between this
17         kind of technical evidence, and there's none of
18         that in this case, and it's clear that the
19         government isn't intending to proceed in that
20         way.  So that's an issue that we can certainly
21         address through our expert.
22                 But to the extent that some of these
23         records are being represented in a way that
24         there is not evidence to prove, you know, I
25         don't think you can say simply by putting up a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

```
1        record and saying, you know, this was created by
2        Mr. Folks.  I think there has to be more than
3        that.  So I think that that's where we're going
4        to be coming in with challenges, specific
5        challenges to each record.
6              THE COURT:  Okay.  All right.
7              MS. SAVNER:  So I would like to clarify one
8        thing, and I think that Ms. Sen has sort of
9        acknowledged this, but there's an underlying
10       issue of the authenticity of both the Facebook
11       records and the Backpage records as authentic
12       records of those two companies, and I think
13       that's not in dispute.  And so part of the
14       hurdle of authentication is proving that the
15       records are authentic Backpage and Facebook
16       records, and I believe that's what the
17       certifications that accompanied the returns
18       accomplished, and so I don't hear any objection
19       at this point to us seeking to cross the other
20       hurdles of authentication and admissibility --
21             THE COURT:  Linking to the defendant.
22             MS. SAVNER:  Right.  Without a live witness
23       from Facebook or Backpage.  But with that
24       understanding, yes.
25             THE COURT:  So let me make sure that that's
```

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      right.  Ms. Sen, are you going to be objecting

2      to that question about whether those records are

3      authentic from Facebook and Backpage or will you

4      accept the documentary submission of the

5      government on that question of authenticity of

6      the records; that is, the fact of they're coming

7      from Backpage and they're coming from Facebook?

8           MS. SEN:  Well, your Honor, the government

9      has submitted an updated certification for its

10     Backpage records, but it seems pretty clear what

11     their custodian of records had done is just say

12     that the previous certification was authentic,

13     and I don't think that will be sufficient.  I

14     don't know why the government felt that it

15     needed to go out and sort of recertify the

16     authenticity of the records because I don't

17     think they can do that because all the records

18     custodian from my understanding from speaking

19     with counsel, and correct me if I'm wrong, is

20     simply that the Backpage custodian went back and

21     looked at the previous record and said that that

22     was authentic, and I don't think they can do

23     that.  I think that we would object to that

24     certification, but to the extent there's an

25     actual records custodian when Backpage existed

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           that they received those records in the course

2           of this business, I think --

3                THE COURT:  If the custodian says that they

4           go back and review what was distributed by the

5           government to you and reconfirms that those

6           records are in fact records of Backpage, right?

7           Why can't you rely upon that?

8                MS. SEN:  Because the custodian wasn't

9           looking at the actual records in Backpage's

10          servers because they don't have access to it.

11          So they were just looking, they were just

12          relying on the previous certification to say

13          they were certified.  They don't do any

14          comparison of the actual records of what was

15          actually contained in Backpage's files.

16               THE COURT:  Okay.

17               MS. SEN:  So I don't see how without going

18          and looking at the actual records in Backpage's

19          files they could certify.  I mean, they could

20          certify that they were previously provided in

21          response to a subpoena, I suppose, but I don't

22          think that that satisfies that

23          self-authentication requirement.

24               THE COURT:  No.  They have to be able to

25          say that these are records of Backpage kept in

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          the normal course of business.  And what you're

2          saying is that that second, that second review

3          is only a review of the first disclosure which

4          is not necessarily reliable.

5               MS. SEN:  Exactly, your Honor.

6               THE COURT:  So what you're suggesting is

7          that the government has to call somebody from

8          Backpage to come here to introduce those

9          records; is that right?

10              MS. SEN:  Well, they have provided

11         certifications previously.  So I don't know what

12         the updated certification does.  To the extent

13         that the prior certification related to the same

14         records, is someone, their custodian of records,

15         going to their servers and saying yes, these are

16         records from Backpage, I think it would satisfy

17         that.

18              THE COURT:  All right.  Well, this has to

19         get cleared up because if you're going to take a

20         position that they need to bring somebody from

21         Backpage here to testify to authenticate the

22         records, they need to know that way in advance.

23              MS. SEN:  Well, I have informed counsel

24         that the second authentication we didn't agree

25         with.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          THE COURT:  Okay.  You want to respond?
2          MS. SAVNER:  Yes, your Honor.  So to
3     clarify, the records were originally sought and
4     subpoenaed by the government from Backpage while
5     Backpage was still in operation.  The records
6     were returned and included what Ms. Sen has
7     noted was sort of the first round of
8     certificates that accompanied them which did
9     state while Backpage was still in operation and
10    had access to these records that they were
11    Backpage records and true and authentic copies
12    produced in the regular course of business and
13    otherwise met the requirements of 803(6).
14         The government sought a second
15    certification from Backpage since Backpage has
16    been seized by the government to comply with the
17    added and new requirement of 902(13).  So the
18    records have been established as meeting the
19    requirements of 902(11) and 803(6) under the
20    first set of certificates that were produced
21    while Backpage was still on in operation.
22         When the government went back to Backpage
23    and said can you verify and can you create a new
24    certification that complies with 902(13), the
25    issue that the defense is facing with its

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    request is also an issue we're facing now

2    because the custodian of records who is still

3    employed, the one remaining Backpage employee,

4    she doesn't have access to the servers.  Just

5    like other parts of the government don't have

6    access to the servers to respond to the

7    defendant's subpoena or other request.

8        So she verified by looking at the records

9    that we had received from them previously and

10   that were disclosed to the defense that these

11   appear to be true and accurate Backpage records,

12   and that they were kept in the normal course of

13   business.  Yes, she didn't look back at the

14   servers to confirm because she didn't have

15   access to the servers at that point, and based

16   on her knowledge of the processes that Backpage

17   used when it was in operation, she is someone

18   who worked at Backpage while it was in operation

19   as a custodian of records and continues on to

20   this day, confirmed that those records were

21   generated from a process, an automated process,

22   that met the requirements of 902(13).

23       So even if the court isn't satisfied with

24   her ability to authenticate that the records as

25   to 902(11) and 803(6), the prior certifications

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1 should suffice for that purpose, and the new

2 records custodian's knowledge of how the system

3 operated while Backpage was in operation and

4 when these records were produced should suffice

5 to make the 902(13) portion of the

6 authentication.

7   THE COURT:  Basically, you're relying on

8 the first disclosure to actually show that the

9 records were authentic, and then in regard to

10 the electronic upgrade to 11 and 13, she can

11 testify about or she has by certification

12 testified that this appears according to her own

13 knowledge of how things work valid.

14   MS. SAVNER:  Yes.

15   THE COURT:  And she can't look at the

16 records because the records have been seized,

17 but based upon her experience that should be

18 enough.  Question is whether that requires a

19 hearing.  And where does she live?  Florida?

20   MS. SAVNER:  I don't know.  She's certainly

21 not local to Vermont.

22   THE COURT:  There's some connection to the

23 Netherlands.

24   MS. SAVNER:  Yes.  I believe she is in the

25 United States.  I don't know where -- she is in

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          Texas.

2                THE COURT:  Okay.

3                MS. SAVNER:  So I hear the defense's

4          argument which is that she in fact did not go

5          back and look at the records on the server,

6          but --

7                THE COURT:  But she can't do that.

8                MS. SAVNER:  She can't do that.  And if we

9          brought her up here to testify, she would

10         testify that yeah, she can't do that, but she

11         knows how the business works.

12               THE COURT:  Okay.

13               MS. SAVNER:  And I don't think that's being

14         contested at this point.  So I don't see the

15         need for a hearing.

16               THE COURT:  Okay.  So I suggest counsel get

17         together and figure whether or not we need a

18         hearing.  If the defense is objecting to the

19         introduction of those records, we need a hearing

20         which means either that she has to come here or

21         that she has to be available by video, but there

22         has to be a hearing because, obviously, I mean,

23         the records come in anyway because that was

24         valid.  Anyway.

25               Do you think that we need a hearing?  If

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       you're going to object to the introduction of
2       the records, do you think we need a hearing?
3              MS. SEN:  Your Honor, I need to consider
4       it.  I don't know that we necessarily do, but I
5       need to consult with Mr. Kaplan and my client.
6              THE COURT:  Okay.  So this is going to be
7       obviously under consideration.  So I'd ask that
8       both sides get together.  Do we need a hearing.
9       If we do need a hearing, we need to get this
10      moving quickly so that it is completed before
11      jury selection.  All right?
12             MS. SEN:  Thank you, your Honor.
13             THE COURT:  Okay.  I don't know if you need
14      a hearing or not, but this needs to get resolved
15      quickly.
16             MS. SAVNER:  I would just note that, I
17      mean, obviously, we can give defense counsel
18      time to think about the issues, but they have no
19      objection to the first set of certifications and
20      their only objection to the second set is that,
21      the only additional value of the second
22      certification is that the witness, the records
23      custodian's testimony or statement under penalty
24      of perjury that she's familiar with how the
25      system operated and it was functioning at all

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      times Backpage was in operation and during the

2      time the subpoenas were responded to.  So unless

3      defense counsel can sort of proffer some

4      information that they want to seek from this

5      hearing, we would ask that to be the requirement

6      for setting a hearing as opposed to just an

7      additional burden for the government.

8          THE COURT:  What you're looking for is a

9      ruling from the court that you do not have to

10     actually have access to the records to be able

11     to confirm what you know to be the truth when

12     you are an employee.  Okay.  No, I understand

13     that.  So I'd ask to know whether we're going to

14     have a hearing in this because we need to set

15     that up.

16         MS. SAVNER:  Okay.  I can get into the

17     specific issues as to the specific Backpage ads

18     and the remedy of the lack of access to the

19     defense's lack of access to Backpage records at

20     this point if you'd like.

21         THE COURT:  Yes.

22         MS. SAVNER:  In terms of the defense's

23     request, again, they said that it contains

24     potentially material that's exculpatory without

25     identifying what's exculpatory, and I would just

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          note that it is this prosecution team's position

2          that these Backpage records are not in the

3          possession of the prosecution team.  I mean,

4          they are at this point seized and held by the

5          FBI, but for purposes of this sort of analysis

6          that the prosecution team is not considered to

7          be the United States --

8               THE COURT:  Are you in communication with

9          the FBI that controls these particular, controls

10         access to these particular records?

11              MS. SAVNER:  So if your Honor has it, we

12         have the, I attached along with the motion or

13         with the response to the motion the

14         communications that I have had with the sort of

15         formal system that those who are in possession

16         of the Backpage service have set up, and that's

17         attached as Exhibit B to the government's

18         response.

19              There was a point in the end of January of

20         this year where an internal email was sent to

21         DOJ staff saying that in order to obtain

22         historical information from Backpage, email the

23         request to a certain address and include all

24         available identifiers, and the sort of cover to

25         that email was FBI is triaging responses to

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      accommodate only law enforcement requests.  So
2      if a defendant in one of your cases wants to
3      obtain historical Backpage information, your law
4      enforcement agent will need to submit the
5      request on his or her behalf, including the
6      pertinent information.
7           So based on that information that the FBI
8      was now triaging requests for this information,
9      I followed and provided the email address listed
10     and followed the procedure listed and forwarded
11     along the previous defense subpoena and didn't
12     get any substantive response back.  We've had
13     this, this is the same, the nature of the
14     communications between us and the keepers of
15     Backpage servers are the same as those of the
16     defense counsel has had at this point which is
17     well, we're sort of starting to search through
18     them, but there's been no actual substantive
19     response to the request that we've submitted on
20     the defense's behalf or obviously to the
21     defense's own request.
22          They've specifically said that the defense
23     noted that they're looking, when they heard back
24     from Mr. Bubb who is like General Counsel for
25     the FBI, I believe, he asked for a more pared

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      down and sort of specific set of records that
2      they are looking for, and they sent, forwarded
3      along a letter requesting information as to
4      specific phone numbers.  We don't, this
5      prosecution team doesn't know how that
6      information would be exculpatory.  We don't know
7      the defense's theory about it.  If we --
8           THE COURT:  But you know exactly what the
9      defense is asking for.
10          MS. SAVNER:  Yes.
11          THE COURT:  Would it be helpful to have the
12     court issue an order requiring them to conduct
13     this particular investigation?
14          MS. SAVNER:  I mean, that was what the
15     subpoena was, and they responded with the
16     affidavit saying that they weren't able to
17     complete the request at this time.  They're not,
18     you know, a party to this case.  So I don't know
19     the practicalities of issuing them an order
20     aside from another subpoena which they're not
21     responding to at this time, it appears.
22          So in terms of a remedy to this issue, one,
23     you know, that I don't believe that the defense
24     has identified any clearly exculpatory material
25     or even potentially exculpatory material to the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          extent that they believe there are Backpage

2          records on the servers that show that the women

3          who are charged victims were prostituted from

4          some other IP addresses.  You know, if we could

5          get more information from them, from the

6          defense, we could discuss it.

7              But based on the government's theory of the

8          case, that wouldn't be exculpatory.  First, you

9          know, it isn't our supposition that the

10         defendant was sitting at his home computer, you

11         know, day and night posting ads from one

12         location which would be the relevance of an IP

13         address analysis, you know.  He had multiple

14         mobile devices where he could have and likely

15         did post on Backpage or check Backpage ads, but

16         also the witnesses will explain that they too at

17         times posted their own ads under the defendant's

18         permission and under their, under his direction,

19         but they also used their own phones or

20         electronic devices to post ads on occasion, too.

21         So I don't know the relevance of any IP

22         addresses that would be associated.  I mean,

23         maybe they're relevant, but they're not

24         necessarily exculpatory what IP addresses were

25         used as the witnesses will say that ads were

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          posted from all over and not just in any IP
2          address that can be specifically linked to the
3          defendant and his residence.
4              THE COURT:  Okay.  So I guess it's
5          obviously speculative as to whether anything is
6          going to be exculpatory, but this is the FBI.  I
7          mean, I would think they'd be able to run the
8          check here.  Would it be helpful to have a
9          hearing with the lawyer for the FBI calling in
10         and explaining why they have not responded to
11         this subpoena or -- well?
12             MS. SAVNER:  Again, I don't believe it's
13         necessary.  I mean, either they, it seems from
14         their various representations that they're
15         working on a system to make these records
16         accessible and have been since the day the
17         servers were seized, and they don't have it up
18         and running yet sufficient to be able to comply
19         with these requests.  I mean, we can follow up
20         and see if there's any update.
21             THE COURT:  So can you follow up?  Because
22         I think if there's not some progress here, then
23         we have to make a decision as to whether or not
24         we have a hearing and try to find out what
25         progress can be made.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           MS. SAVNER:  Yes.  I would just note that

2      the only remedy that the defense seeks in its

3      motion is the preclusion of the government's

4      properly subpoenaed and disclosed Backpage ads.

5      So to the extent that that is an unjustified

6      remedy given the circumstances, which I believe

7      it is, I don't see where a hearing would get us,

8      right?  Either the records are accessible or

9      not, and obviously if they are, then the defense

10     requests should be responded to, but the remedy

11     sought is the exclusion of the government's

12     records --

13          THE COURT:  Well, right.  That's what I

14     brought up with Ms. Sen.  Are there other

15     remedies which are less dramatic.

16          MS. SAVNER:  And I don't know if we've had

17     these communications directly with this set of

18     defense counsel, but we've discussed with the

19     prior defense counsel there was certain

20     information that they were seeking, facts that

21     they wanted to corroborate through ads, if they

22     proposed it to us we could discuss potential

23     stipulations after consulting with the witnesses

24     and determining from their perspective the

25     veracity of the claims of any sort of Backpage

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      ads were being posted from "X" location or "Y"

2      location, but again, I don't have the specifics

3      of what the defense -- exculpatory --

4           THE COURT:  What I suggest is both sides

5      meet here again, and come up with either with

6      other remedies, but more than that, come up with

7      a joint proposal of going to the FBI and seeing

8      exactly what the status is at this point, and if

9      it's not progressing, then perhaps talk about

10     whether we're going to have a hearing and ask

11     counsel for the FBI to explore exactly what the

12     status is of those records and whether in fact

13     there's a remedy that, whether they in fact are,

14     could come across the records that are being

15     sought.

16          MS. SAVNER:  We will confer with defense

17     counsel.

18          THE COURT:  I appreciate the fact this is a

19     dramatic remedy that the defense is requesting.

20     Wipe out all the records on Backpage.  That is

21     not likely.  But I'm also really perplexed as to

22     why they can't comply with what the defense is

23     requesting.  It doesn't seem that warranted.  So

24     anyway, if you can all meet and consult and then

25     if we need a hearing, then let me know how that

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    would work.  Okay.

2         MS. SAVNER:  Thank you.

3         THE COURT:  So it's now ten after.  Can we

4    start at quarter after 1, and we have left 533

5    and 539 and then also I've gotten a list from

6    the parties about things that they want to

7    address.  Is that all we have left today?

8         MR. KAPLAN:  I believe so, Judge.

9         MR. DARROW:  I believe so.  I'm just

10   wondering about a list.  Did you receive a list

11   from --

12        THE COURT:  It was on the bench.  It's

13   outstanding issues April 10, 2019.  Topics.

14   There's nine topics listed.

15            (Discussion at the bench between

16             Clerk Muir and Judge Sessions)

17        THE COURT:  This is not a list that you

18   have.  Joanne wrote out a list of nine topics

19   that were to be covered at today's hearing after

20   the last hearing.

21        MR. DARROW:  Thank you.

22        THE COURT:  So maybe we should show you

23   that list and tell us whether in fact we need to

24   address all of these.  Okay?  So we'll be back

25   at quarter after 1.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          (Lunch recess taken 12:12 - 1:20 p.m.)

2              THE COURT:  Good afternoon.  All right.

3      This is a continuation of the hearing that

4      started this morning.  What's left is 359.

5      That's the Defendant's Motion in Limine to

6      exclude certain statements, documents and other

7      evidence.  Mr. Darrow, you're not, you're not

8      the defense, are you?

9              MR. DARROW:  I'm not, and I apologize, but

10     there was a logistical matter I want to bring to

11     your attention.

12             THE COURT:  Oh, all right.

13             MR. DARROW:  Mr. Grady is scheduled to meet

14     one of the government's witnesses at 2 and we

15     wanted to suggest if it was okay with the court

16     that the court perhaps take the matters that

17     he's been designated to handle at the front.

18             THE COURT:  That's fine.  All I've got left

19     is 359 and some of those have already been

20     talked about.

21             MR. DARROW:  Right.

22             THE COURT:  There's not much left.

23             MR. DARROW:  The motion to sever count 15.

24     Is that on the schedule?

25             THE COURT:  No.  That was not on the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        schedule.  I guess that I was not aware of that.

2              MR. DARROW:  If you wanted to hear our

3        argument on it, that was one thing that the

4        government thought we'd chat about.

5              THE COURT:  Okay.

6              MR. DARROW:  And then of perhaps lesser

7        note, the issue of summary charts, and then

8        lastly there were three things, the last one was

9        one of the witnesses whom the government has

10       been referring to as a victim witness, we

11       received a letter from her -- I can't remember

12       if it was a psychologist or psychiatrist --

13       going on in some detail about her deficits and

14       suggesting that perhaps some accommodations

15       could be made while she was testifying and

16       Mr. Grady was going to address that as well.

17             THE COURT:  All right.  Do you have any

18       objections to Mr. Grady going first?

19             MS. SEN:  No, your Honor.

20             THE COURT:  Okay.

21             MR. GRADY:  Thank you, your Honor, and I

22       think I'll start with the two matters that seems

23       like there's some agreement with the defense.

24       The first being the summary charts.  We provided

25       the summary charts to the defense, and I believe

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      today was the day for any objections that they

2      had to those summary charts, and they have

3      indicated they do not have any objections to

4      that.  So seems to be that matter is resolved.

5      Exactly, your Honor.

6           The second thing as far as the

7      accommodation, it is by Victim C.  So what I'll

8      do is I'll provide the court the letter from her

9      psychiatrist.  I have met with Victim C and

10     after meeting with her in preparation for this

11     trial, I do not believe that she will need all

12     the accommodations that are listed in here.

13     Some of them wouldn't apply anyway because one

14     of them is not have someone sit behind her at

15     the witness chair, and of course, there will not

16     be anybody behind the witness chair and things

17     of that nature.  So I'll just provide this for

18     the court's background.  I believe this was

19     provided to Judge Crawford, but I don't believe

20     it has been provided to your Honor yet.  And

21     again, the only accommodation that she may need

22     is if there is a particular traumatic event and

23     she needs a break, certainly, and ask for a

24     break, I'm sure the court would accommodate her

25     appropriately.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           THE COURT:  Yes.

2           MR. GRADY:  So I'll leave that, and I've

3      spoken with the defense and they were just

4      curious as to what if any accommodations we were

5      seeking, and again, we're not seeking any of the

6      accommodations in here at this time.

7           THE COURT:  Okay.

8           MR. GRADY:  And then finally, your Honor,

9      as to severing Count 15.  I believe that is

10     still an issue.  One of defense motions argue

11     that it was ripe for the court to review, and

12     they also submitted a supplemental case filing

13     talking about this Davis case.  And so briefly,

14     we believe that joinder of Count 15 with the

15     other counts is proper because it arises from

16     the same series of transactions, and as far as

17     the date is concerned, Count 15 overlaps with

18     not only Count 10, Count 11, but also Count 16

19     which is the Travel Act violation as well.

20          Davis is a different situation.  In that

21     case, 12 years went in between the different

22     charged trafficking or Mann Act violations, and

23     again, we do not have such a gap in this case.

24     In fact, there is no gap time-wise because Count

25     15 goes along the same dates as Count 10 and

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          Count 11.  So because they --
2               THE COURT:  And if 15 were severed, that
3          would require duplication of evidence almost
4          exclusively.
5               MR. GRADY:  Exactly, your Honor, because
6          we'll have the same issue of calling law
7          enforcement who seized the defendant's hard
8          drive.  We'll have the same witness to talk
9          about the forensic analysis of the hard drive.
10         Same witness will talk about yes, I was there
11         when this photography session occurred, et
12         cetera.  So it would be, we'd have to duplicate
13         significant portions of the trial.  So again,
14         for economy purposes it makes sense to have them
15         joined, and there's no miscarriage of justice
16         that would result which of course is the
17         standard to have severance under Rule 8, I
18         believe it is.
19              THE COURT:  Okay.
20              MR. GRADY:  Thank you, your Honor.
21              THE COURT:  Okay.  First of all, defense
22         want to respond to that argument?
23              MS. SEN:  Yes, your Honor.
24              THE COURT:  And then we'll take you right
25         into 359 as well.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1                    MS. SEN:  Thank you, your Honor.

2                    THE COURT:  So the summary charts are okay?

3                    MS. SEN:  Yes, your Honor.

4                    THE COURT:  And severance?

5                    MS. SEN:  Well, your Honor, prior counsel

6            had filed a motion to sever, and in all honesty

7            I had overlooked the Davis case so that's why I

8            had filed it out of time, but I think that the

9            prior counsel had made a little bit different

10           than the argument about, I would like to focus

11           more on the prejudice of trying that count

12           together with the others because one of the

13           issues with that count, that count is based on

14           an act that took place on one day between May I

15           think 17th and 18th of 2013.  The basis for that

16           count is one photo.  The details and

17           circumstances surrounding that photo are in

18           dispute, to say the least.  The person who is

19           the focus of that photo is not here to talk

20           about the circumstances of that photo, and while

21           there may be others, that whole count relies on

22           one piece of evidence related to one witness who

23           is dead.

24                Not only that, this witness is charged as

25           the count the government is referring to as the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          minor, and that count carries of course a

2          mandatory minimum penalty if our client is

3          convicted of it.  Given the stakes, what's at

4          stake with that particular count, your Honor --

5              THE COURT:  What's the mandatory minimum?

6              MS. SEN:  15 years.  And your Honor, the

7          other point with that is that I understand

8          there's no big time gap because according to the

9          government all of this activity was occurring

10         during that time, but what's interesting about

11         that count, it's based on what is purportedly an

12         advertisement, but as the government's response

13         points out, advertising the minor for this

14         purpose was not illegal at the time.  And the

15         argument that the government is making with

16         respect to the women who were the focus of

17         Counts 10 to 14 all involve coercive sort of via

18         advertising and posting.

19             So the concern is how is the jury going to

20         separate out sort of the coercive element

21         because this is, of course, a strict liability

22         count where the government doesn't have to prove

23         coercion with respect to one photo of someone

24         who isn't here to speak about the circumstances,

25         and our own belief about that photo is very

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          different from the government using that as sort
2          of the basis to argue that this person was
3          prostituted.
4              You know, there's no evidence in this case,
5          quite honestly, your Honor, showing that this
6          woman prostituted.  There's no question that,
7          well, there may be some question as to whether
8          she was involved in drug activity related to the
9          charges here, but there's nothing that
10         definitively comes in to state that this woman
11         was prostituted or prostituted herself for that
12         matter.  In fact, there may be evidence that she
13         did, but that would not be related to our
14         client.
15             So the idea that this count which is so,
16         it's just, to try it together with the other
17         counts I think is going to create so much
18         prejudice and so much confusion with respect to
19         how you charge the jury with this because the
20         very activity that the government is basing the
21         count on is something that actually wasn't
22         illegal at the time, but the government is
23         arguing that it doesn't have to show that it
24         advertised this person but that this is yet some
25         evidence that our client prostituted this

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          person, but advertising the person for

2          prostitution wasn't illegal.

3               I think it just creates tremendous

4          confusion, and I think it would be tremendously

5          prejudicial to try all these counts together.  I

6          understand that there's an element of

7          duplicative evidence that would be involved were

8          the count to be severed, but I think the

9          prejudice and the potential risk of very severe

10         penalties to our client is significantly

11         concerning that it should be severed.

12              THE COURT:  Well, I mean, double-edged

13         sword, isn't it?  I mean, you request severance.

14         That means that if the jury came back after

15         considering Counts 1 through 14 and 16 and

16         acquit the defendant, then the government has a

17         second chance and, using the same evidence, go

18         through it again.  So in that situation, who's

19         harmed?  In fact, you're prejudiced by severing

20         the two.

21              More than that, if you say that you're

22         prejudiced because of the confusion about

23         intention, the coercion, et cetera, you don't

24         have to show coercion at Count 15, if there is

25         confusion about Count 15 and in terms of

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      coercion there may be confusion about that, and

2      people may think you have to prove coercion,

3      then essentially the government is being

4      prejudiced by having them all together.

5           So I mean, I don't mean to put myself in

6      the position of advocates trying to figure out

7      who is prejudiced by one form or another, but

8      the fact is you might also be prejudiced by

9      severance really.  You think that could be true?

10          MS. SEN:  Well, I don't know, your Honor.

11     I think if we got an acquittal on all counts, I

12     would wonder if the government would put the

13     jury through another trial on the last count.

14     So it's hard for me to sort of imagine that

15     scenario at this point.  I certainly see the

16     court's point, but I still --

17          THE COURT:  How about the confusion?  I

18     mean, you've got, in Counts 10 through 14 you've

19     got a really rigorous element.  They've got to

20     prove coercion, et cetera, and it does seem that

21     it would be confusing in regard to Count 15, but

22     that confusion, I guess to some extent, is to

23     your benefit because people would start to think

24     oh, my goodness, you've got to have coercion in

25     regard to this one photograph taken earlier.  I

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          don't know.  I mean, it just, it seems to me

2          that the prejudice may go both ways.

3                 MS. SEN:  I'll leave it to the court.

4                 THE COURT:  All right.  Okay.

5                 MS. SEN:  With respect to our motion to

6          exclude various pieces of evidence.

7                 THE COURT:  Yes.

8                 MS. SEN:  I'll just start with, I'll just

9          go through them, your Honor.

10                THE COURT:  Okay.

11                MS. SEN:  The first is the assault of --

12                THE COURT:  Kaitlynn Charbonneau.

13                MS. SEN:  Yes, your Honor.

14                THE COURT:  Right.

15                MS. SEN:  In New York City, and I still

16         don't understand how this is relevant.  The

17         government is proffering that she's going to

18         testify that she was prostituting for our

19         client, but there's no, and the government

20         admits there's no evidence that he was aware of

21         it or directed it.

22                THE COURT:  There's no question she's, as I

23         understand it from the pleadings, and obviously

24         you know better than I, but she's down in New

25         York, she's being a prostitute.  She's working

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          technically for the defendant, she says.  She's

2          assaulted by this customer, but the reason that

3          is relevant is it explains why she quit.  One of

4          the questions that jurors may have during the

5          course of the trial is why would she quit, and

6          this explains why she quit.  She got assaulted

7          by somebody else, and that's the answer to the

8          question why would she not quit, et cetera.

9          Anyway, it explains that last decision.  And

10         tell me if you think that's irrelevant.

11              MS. SEN:  I do at some level, your Honor,

12         because the question is whether our client

13         coerced her into prostituting.  I think our

14         client would dispute that she was even

15         prostituting for him, but if that's what she

16         says, even taking what she says at face value,

17         our client obviously, I just don't understand

18         how arguing that he coerced her into

19         prostituting has anything to with her being

20         independently unknown to our client assaulted by

21         someone.

22              THE COURT:  That's not the relevance.  The

23         relevance is her decision to quit.

24              MS. SEN:  But again, in the big picture of

25         things, her decision whether or not she

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          continued or she quit, I mean my understanding
2          of the facts here is that she also met someone
3          else and decided to have a relationship with
4          them, and that's part of also why she left.  So
5          the idea that this is sort of the defining
6          moment.  I mean, it doesn't seem to me that the
7          evidence reads that way, your Honor.  Seems like
8          there were many factors that contributed to why
9          she left.  That may have been one of them, but
10         the fact, it's very prejudicial evidence, your
11         Honor, and I think it has very tangential
12         relevance.
13              THE COURT:  Again, it's how you interpret
14         it.  It could very well be evidence which is
15         helpful for you.  I mean, the fact is, she would
16         testify that she quit, and apparently, she would
17         not testify to any ramifications as a result of
18         her quitting which is the opposite of coercion.
19         So to some extent, that evidence may be helpful
20         to you.  Am I wrong about that?
21              MS. SEN:  I don't know about that, your
22         Honor.  I don't see that as being helpful to my
23         client in the broader picture.
24              THE COURT:  Well, it shows that she has the
25         free will to quit and that there were no

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          ramifications as a result of that, and you don't
2          think that you'd use that on cross-examination?
3               MS. SEN:  Well, I also think that the
4          government can use it to argue about how our
5          client created this situation where she got, I
6          mean, I think the reason the government wants to
7          use it is for this argument that sort of because
8          our client got this woman into prostitution,
9          this is one of the horrible things that happened
10         to her.  So I think it has a very negative
11         overall impact.
12              I would also note, your Honor, that the
13         government just disclosed to us last Friday that
14         this particular witness lied to the grand jury
15         under oath about her activities in prostitution
16         and other things.  So to the extent that we're
17         relying on the accuracy of this information, I
18         think it's a little bit concerning because the
19         government has already told us that this woman
20         has lied under oath.
21              THE COURT:  Tell me.  Is she one of the
22         subjects of the 10 to 14?
23              MS. SEN:  Yes, your Honor.
24              THE COURT:  All right.  Well, I don't mean
25         to debate your evidence, but anyway.  Okay.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           So the next thing is statements of Keisha
2       Willard.  Government doesn't intend to use
3       those?  Is that right?
4               MS. SEN:  Yes, your Honor.
5               THE COURT:  Okay.  Then statements of Ms.
6       Lang?
7               MS. SEN:  Again, I think that the timing of
8       these statements is important.  We have sort of
9       these vague general statements about -- and the
10      statements are hearsay statements.  I think Ms.
11      Lang is saying that she's heard from other
12      people that our client uses these photos to
13      blackmail people.  I mean, A, it's hearsay.  B,
14      I'm not clear in terms of the timing.  So, for
15      example, the issue with the posting of that
16      video of Ms. Ackley, which was in March, you
17      know, the government is saying oh, everybody
18      knew about that video and everyone was concerned
19      about it except that all of the charges were for
20      the time period before that.
21              You know, I think without more detail about
22      these sorts of statements, they're just vague
23      statements, and they're entirely hearsay.  So to
24      that extent we would ask that --
25              THE COURT:  Just as a matter of sort of

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          principle, I agree with you.  I think that if

2          the government seeks to introduce all of these

3          hearsay statements, speculative statements,

4          under the theory that it creates a reasonable

5          fear on the part of these witnesses, then I

6          think that's a slippery slope, and it seems to

7          me in light of what the government has said the

8          evidence they have, that's a slippery slope that

9          you don't have to slide down.

10              If you have evidence of direct observations

11         of violence, I want to say to you that I believe

12         the government can introduce that as a general

13         matter.  Anything related to violence which can

14         create fear from the person who observed it is

15         relevant and extremely important, and that gets

16         diminished by evidence that gee, I heard from

17         this person that he was abusing women, I just

18         think -- and they seek to do this, introduce

19         this, because that's what the reasonable fear is

20         that the state of mind of the victims, and I

21         just think that's mistaken in this context.

22              So as a general matter I think there's

23         probably I should say a couple of things as to

24         my approach having read all of this stuff that

25         you've submitted.  I think the government is

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          going to able to introduce testimony in regard

2          to violence, demeaning nature of his activities

3          in regard to women because it creates that fear,

4          and it's direct.  I think that when there's a

5          reliance upon hearsay which is used to explain

6          why they fear the defendant, I think that will

7          be excluded as a general matter, and I think

8          that you generally would be able to look into

9          prostitution convictions, although I've just

10         started exploring this Rivera case, and I don't

11         know what the limits of the Rivera case are, I

12         think that's really an interesting question.

13              If somebody is engaged in prostitution,

14         they have a knowledge of prostitution, they have

15         a knowledge of the business, as it were, which

16         they talk about in Rivera, but I think it's much

17         more likely that they would be less subject to

18         coercion than a person who has not been involved

19         in prostitution.

20              So therefore, perhaps I disagree with the

21         Second Circuit.  If the Second Circuit made a

22         blanket rule or did they say in this particular

23         circumstance the Sixth Amendment right of

24         confrontation was not violated during the

25         cross-examination but in other circumstances it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           may be violative?  Or does the court have

2           discretion in any way to permit that area of

3           cross-examination as an evidentiary question?  I

4           think there's just a lot to think about in that

5           decision.

6               Okay.  So I'm extemporanizing, but I think

7           perhaps the best thing coming out of this

8           hearing is for you to get a sense of this is

9           what's likely to happen.  I mean, all this

10          violence is likely to come in or all this

11          demeaning behavior in regard to woman because

12          that took previous to coercion is likely to come

13          in.  Also I think you should be accorded the

14          opportunity to explore past prostitution,

15          although I have to figure this out in terms of

16          whether -- okay.  That's what I've learned about

17          the way I would approach this at this point.

18               MS. SEN:  Thank you, your Honor.

19               THE COURT:  Is there any questions about

20          that?

21               MS. SEN:  No.  I think that was very clear,

22          your Honor.  I think we have a couple of more

23          issues.

24               THE COURT:  Yes.

25               MS. SEN:  One of these issues of these

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          phone calls between a witness named Chrissy
2          Tatro and a codefendant.
3               THE COURT:  So that's -- okay, yes.
4               MS. SEN:  So I've listened to these phone
5          calls, your Honor, and they are calls made by
6          Ms. Tatro at the behest with law enforcement,
7          and the nature of these calls is basically
8          trying to convince Mr. McFarlan that she is not
9          cooperating with law enforcement.  Obviously,
10         she is.  So the entire nature of the discussion
11         here is about I'll get you my paperwork.  Show
12         me your paperwork.  I don't believe you.
13         There's a lot of drama.  You know, she tells
14         them that her grandmother is in the hospital, I
15         mean, all kinds of things.
16              There is nothing here in these calls that I
17         have heard that involves a conspiracy to
18         distribute drugs.  I mean, these are calls,
19         controlled calls made with law enforcement.
20         They don't, they're not setting up a controlled
21         buy.  They're not talking about the drugs
22         themselves except for very peripherally.
23              The only call, I know that the government
24         represents that at one point there's a call
25         where Mr. Folks can be heard and there's some

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          acknowledgment of his stake in the drug

2          business, but I have not seen that call.  It may

3          very well be that I have not, I've overlooked

4          it, but in what I have reviewed, I haven't seen

5          that phone call.

6               The one phone call I have seen is Ms. Tatro

7          calling my client, and at the very outset of

8          that call my client says to her, why are you

9          calling me?  This has nothing to do with me.

10         This was between you and Mr. McFarlan.  And she

11         says because I want your help, I want you to

12         talk to him for me, and my client says I'll talk

13         to him for you, but this has nothing to do with

14         me.  So and even that conversation, I don't see

15         how it involves conspiracy to distribute drugs.

16         So we would request that those calls be

17         excluded.

18              THE COURT:  So can I ask you about

19         801(d)(2)(E), scope of the conspiracy, and I

20         don't know the answer to that.  I wish the, all

21         the statements among coconspirators in

22         furtherance of the conspiracy aren't admitted

23         under the conspiracy exception.  What about

24         calls by an informant at the direction of the

25         government or law enforcement to a member of the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1      conspiracy when in fact that statement that that
2      member of the conspiracy makes is to be used
3      against all the other coconspirators.  Certainly
4      it could be used against Mr. McFarlan as an
5      admission, right?  But is that the exception
6      under 801(d)(2)(E)?  Is that in furtherance of
7      the conspiracy when in fact one of the parties
8      is the government?
9            MS. SEN:  Well, your Honor, I would say, I
10     mean --
11           THE COURT:  I just don't know the answer to
12     the question.
13           MS. SEN:  I think that the recorded calls
14     from the CIs often come in under that exception
15     because they're actually purchasing drugs, but
16     what I am sort of arguing is a little different
17     point here.  The purpose of that call was not in
18     furtherance of the conspiracy.
19           THE COURT:  Then it wouldn't be admissible.
20           MS. SEN:  Right.  I mean, I don't see how
21     they're furthering the conspiracy.  They were
22     conversations between people who are
23     coconspirators, but I don't think they had
24     anything to do with furthering this conspiracy,
25     and I think there is a burning question when you

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          have codefendants whose statements are coming in
2          against each other, and I'd have to go back and
3          look.  I know there is some case law on, your
4          Honor, on this issue of if a statement were to
5          come in in the course of the conspiracy where
6          the codefendant is not testifying, and there's a
7          possible issue with respect to the confrontation
8          clause issues that comes in, but I'm not sure
9          that that was where the court wanted to go, but
10         I am aware that there is some concern, for
11         example, if Mr. McFarlan were not going to
12         testify and then have his statements come in, if
13         there are statements different from these
14         related to the conspiracy, does that implicate
15         some confrontation clause issues, but that
16         isn't, I'm not arguing that here at all.
17              THE COURT:  That's not exactly the point.
18              MS. SEN:  No.
19              THE COURT:  The question is is the
20         exception to the hearsay rule for statements of
21         co-conspirators, actually it's not your cite,
22         but when it's prompted by the government.  Could
23         that be, is that really a statement in
24         furtherance of the conspiracy.  I mean, I don't
25         know the answer to the question.  That's, it

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1       certainly would not be a conspiracy exception in
2       regard to Mr. McFarlan because that's an
3       admission.  But it becomes a confrontation, it
4       becomes a conspiracy question when you try to
5       apply the statements that Mr. McFarlan makes in
6       the phone call to the cooperating witness
7       against other people, and I just don't know the
8       answer to the question.  Of course, Mr. McFarlan
9       probably, well, I don't know.  He's going to be
10      testifying.  So I don't know if he would be able
11      to make statements in regard to what was said in
12      that phone call but anyway.
13           So do you have an opinion as to whether the
14      801(d)(2)(E) applies in situations in which a
15      cooperating individual calls a member of the
16      conspiracy against the other members of the
17      conspiracy?
18           MS. SEN:  I would argue it should be kept
19      out, your Honor.
20           THE COURT:  Oh, really?  The deductive
21      logic was great.  Okay.  All right.
22           MS. SEN:  That would be my position.
23           THE COURT:  I'll ask for the government's
24      response later.  Okay.
25           MS. SEN:  I think the court has been clear

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          on how it would handle evidence of assaults.
2          That was the general issue that we brought up.
3              THE COURT:  Yes.  Okay.  So we've already
4          resolved how the deaths are going to be handled.
5          People agree to that instruction.  The assaults
6          are taken care of.
7              Drug activity related to the coconspiracy,
8          I think that that's also covered by our
9          discussion with regard to drug activity prior to
10         the beginning of the drug conspiracy.  That's
11         all related to coercion in sections for Counts
12         10 through 14.
13             The Fruit Loops cereal box.  Government now
14         says that the drugs were kept in the Fruit Loops
15         box.
16             MS. SEN:  And our argument is that those
17         drugs were not related to our client.  That Mr.
18         McFarlan and Ms. Tatro were involved in their
19         own conspiracy to distribute.  Our client wasn't
20         aware of that box.  So the idea that that would
21         be attributed to him, it shouldn't be.
22             THE COURT:  Mr. McFarlan is going to
23         testify that that is all related to your client
24         as a much larger conspiracy, and that they had
25         coordinated efforts to go to New York and

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

```
 1            select, pick up drugs, et cetera.  So Mr.
 2            McFarlan according to the government will
 3            testify that it's a much broader conspiracy and
 4            that your client was a part of it.  You may have
 5            a defense to that.  But as least as far as them
 6            introducing evidence, they should be able to do
 7            that.
 8                 MS. SEN:  Okay.
 9                 THE COURT:  Sexually explicit photographs?
10                 MS. SEN:  That is an issue I would like to
11            address, your Honor.
12                 THE COURT:  Okay.
13                 MS. SEN:  So one of, the category I'm
14            really thinking about is that in addition to the
15            women who are Counts 10 to 15, there are, as my
16            motion states, probably about ten more
17            witnesses, and there are loads of pictures of
18            those witnesses, and it is unclear how any of
19            photos related to those women are related in any
20            way to showing that our client forced the women
21            who are named in Counts 10 to 15 into
22            prostitution.
23                 I mean, these are just pictures, and the
24            government's response, it seems to be on the one
25            hand they're arguing that they want to offer
```

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          those photos because they're going to

2          authenticate other photos using them or devices

3          and that just, I don't quite understand it.

4               THE COURT:  I thought the government's

5          response was they wanted to be able to show,

6          they want to be able to link the defendant to

7          the actual devices that were used, but that's

8          less significant than the scenario that I would

9          imagine.  So you have, let's say, a nonincluded

10         witness in 10 through, I guess, 15 or 14.

11         Right?  So somebody else.  You say there's ten

12         other people.  Are those ten others going to

13         testify?

14              MS. SEN:  They are on the government's

15         witness list, your Honor.

16              THE COURT:  Okay.  Let's just assume that

17         they testify, and they say embarrassing

18         photographs were taken of me, and I know that or

19         he said that he would use them if ever I

20         violated his rules.  Would you then not be able

21         to introduce the photographs to show exactly why

22         she feels the way she does?

23              MS. SEN:  But how does that go to prove

24         that anybody else was forced, your Honor?  I

25         mean, this is sort of the flip side of 412.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          Because under FRE 412, the government is saying

2          you can't talk about any of these women's past

3          acts of prostitution, that they prostituted for

4          anyone else, I mean that's sort of the

5          government's, what it's offering.  The court is

6          obviously within the bounds of Rivera, and we'll

7          have a discussion about that.

8               But generally, the government's position is

9          for those witnesses you can't really go into

10         much beyond the fact to provide some context of

11         how they met the defendant.  Okay.

12              How is what our client did with any, this

13         isn't conspiracy for human trafficking.  These

14         are individual counts that our client coerced

15         these women in Counts 10 to 14 to prostitute.

16         How he, you know, what any other woman says

17         about what he did, I don't understand how that

18         would possibly be relevant to showing that he

19         coerced or forced someone else, a specific

20         person to engage in prostitution.

21              You know, time period?  You know, these are

22         all over the map.  They're from all kinds of

23         time periods.  Some of these women didn't know

24         each other, some of them did, but I just don't

25         understand all these photographs.  I mean, it's

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1         one thing theoretically, let's say, it's one

2         thing that Witness A says I saw Witness B, I saw

3         this and I observed that.  But how is a photo of

4         Witness A relevant to anything about Witness B?

5              THE COURT:  Well, I would suppose the

6         government would say this establishes a pattern

7         of activity which then leads to a conclusion

8         about coercion.  What they're basically saying

9         is that there's three approaches to coercion.

10        One of them is to take an embarrassing

11        photograph, a compromising photograph of women,

12        and then using them to coerce involvement in

13        prostitution.  Okay?

14             So if a witness who is not listed in the

15        indictment but can testify that she, number one,

16        had embarrassing photographs taken; number two,

17        he confronted her with saying if you don't obey

18        me in terms of cooperating with my business,

19        then I'm going to disclose all of this to the

20        public which is going to embarrass you.  And so

21        they establish a pattern of threats, and they

22        use not only the 10 through 14 but they also use

23        other people who are working, but not charged,

24        to show the same pattern of activity.  That's

25        the relevance of it.  If they can show that

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    similar approach to both people in 10 through 14

2    and also people who just generally work in his

3    business.  That's the relevance.  The question

4    is whether or not it's overly prejudicial, but

5    that's the relevance, I think.

6        MS. SEN:  Well, your Honor, I read the

7    element of a pattern, I mean, is it that the

8    government is allowed to bring in as many

9    witnesses as it wants to establish that pattern

10    or does it have to be limited in some way and

11    one way is a pattern with respect to each

12    particular witness.

13        THE COURT:  They're trying to establish the

14    existence of this modus operandi, right?  So why

15    should they be limited, you know, unless

16    duplication becomes an issue, but generally why

17    should they be limited in proving the modus

18    operandi that was used by the defendant arguably

19    to just people who were in the indictment?  Why

20    can't they include what happened to everybody

21    within the business?

22        MS. SEN:  Well, I mean, I think with

23    respect to each witness I think if there's a

24    different reason, your Honor, and I think that

25    part of this to me it seems like this should be

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1              really a 404(B) issue at some level.

2                   THE COURT:  Could be a 404(B) issue as

3              well.

4                   MS. SEN:  And the fact is that the timing

5              of these photos and when they were taken and if

6              there's really a pattern with respect to,

7              because the timing in all of these is so

8              different and these women were prostituting as

9              alleged in the indictment at very different

10             times, all of that is going to become relevant.

11             I mean, it may be that we have to, you know, a

12             lot of these photographs, I mean, I've seen what

13             the government at least in its last exhibit list

14             had offered as exhibits with respect to the

15             other witnesses.

16                  You know, a lot of these photos are, for

17             example, selfie photos.  So they're photos the

18             women themselves took and then sent to our

19             client, loads and loads of those from all the

20             women in this case.  There are all kinds of

21             photos that it's quite clear from forensic

22             evidence, for example, that our client

23             downloaded from other websites on the internet

24             that were freely and publicly available.

25                  So there's, I mean, it may be that we wind

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          up having to just challenge the introduction of
2          each photograph as it comes in.
3               THE COURT:  Well, it's a fairly
4          straightforward question.  If the government can
5          establish, number one, that this person is a
6          part of the prostitution business; number two,
7          this person had photographs taken of them or
8          within the possession of the defendant; and
9          number 3, that the defendant theoretically
10         coerced them into doing what he wanted them to
11         do by threatening, directly or indirectly,
12         threatening to reveal those to the public, that
13         doesn't take a whole lot of evidence.
14              But that's the pattern, that's the pattern
15         that they're trying to establish, and just as a
16         general principle, the more they can show that,
17         the more reliable it is.  The more victims,
18         theoretically.  I don't know.  That, I'm
19         speculating as to whether the government is
20         approaching this issue this way, but that's, I
21         think that's what they want to show is that
22         everybody had these photographs in his
23         possession, and that he was using that as a
24         coercive tool to get them to work and do things
25         that he wanted them to do.  And why is that not

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        totally relevant even if they're not subject to
2        a count in the indictment?
3            MS. SEN:  Well, your Honor, based on the
4        evidence that we've seen to date, I'm not sure
5        that they can meet that standard for those
6        photographs.  It may be that we have to take
7        that out.
8            THE COURT:  As a general principle, it
9        seems, I think that's the issue.  We'll find out
10       from the government whether that's exactly what
11       the issue is.  And then obviously as we get into
12       trial, if there's some nuance here that oh, this
13       person was never threatened or this person
14       didn't have an image or whatever, then we can
15       address that.
16           MS. SEN:  I think the only other issue left
17       to talk about are the videos, and I think we've
18       talked about that already.
19           THE COURT:  You want me to watch all the
20       videos.
21           MS. SEN:  That's what we're requesting,
22       your Honor.
23           THE COURT:  Right.  Okay.  So for the
24       government?
25           MR. DARROW:  Your Honor, may Mr. Grady

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          address the motion to sever if you want more on

2          that, and also as to the motion in limine the

3          last part of it that talked about the photos is

4          within his charge.

5                    THE COURT:  All right.  Mr. Grady.  I don't

6          think you need to respond, well, you can respond

7          on the sever.

8                    MR. GRADY:  Unless you need anything

9          further, your Honor, I'm not planning on

10         mentioning anything more about the motion to

11         sever.

12                   As far as the photos, I would also just

13         point out that they also are relevant for a

14         couple different points as well in addition to

15         what you just discussed with defense counsel.

16         One point being for Count 15 to the extent that

17         there are photos in the defendant's hard drive

18         that are also showing up in either Backpage

19         returns or Backpage screenshots found on the

20         defendant's hard drive as well, those are

21         relevant to Count 15 and shows that he was

22         involved in violating the Travel Act by using

23         the internet for prostitution activity.

24                   So we would also point out that part of the

25         photos are relevant for that reason and also

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          they also corroborate different witness

2          accounts.  So one witness I'm thinking of will

3          talk about how the defendant required her to

4          allow him to take pictures of her buttocks in

5          order to get a cigarette.  So the fact that such

6          photographs were found in the hard drive also go

7          to corroborating the victim, and again, showing

8          examples of how he would demean and control his

9          drug --

10              THE COURT:  So you are going to call a

11         number of women who are part of this activity

12         who are not the subject of the indictment.

13              MR. GRADY:  That's correct, your Honor, and

14         so for a couple of reasons.  One of them goes to

15         they have observations about charge victims.

16         Also they have conduct that would help us prove

17         the ITA count which is Count 16.  If I said

18         Count 15, I misspoke, but Court 16 is the Travel

19         Act account that they have observations and

20         photographs that help the government prove that

21         aspect of the indictment.

22              THE COURT:  Okay.  But will they testify

23         that, one, they were a part of the activity;

24         two, that they had embarrassing photographs or

25         sexually related photographs taken of them;

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    third, that they were confronted by the
2    defendant and the defendant threatened use of
3    those photographs if they violated any of his
4    directions?
5         MR. GRADY:  As to the reputational harm you
6    just mentioned, your Honor, my recollection is
7    that it would be a subset of the ones that we
8    call if they do, in fact, did experience that it
9    would just be a small portion of that.  In other
10   words, it's not going to be all of the ones.
11   We're actually narrowing down our list anyway to
12   streamline for trial.  So I don't imagine, I
13   can't think of one right now that will exactly
14   say that, but of course, that's why we're
15   conducting trial prep, and certainly if that is
16   the case, then that would be relevant to
17   reputational harm experienced by the charge
18   victims.
19        THE COURT:  Right, but you're trying to
20   show a pattern of activity on the part of the
21   defendant, are you not?
22        MR. GRADY:  Yes, your Honor.
23        THE COURT:  Right?  So these particular
24   witnesses are being offered to show or to
25   corroborate that pattern of activity?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1            MR. GRADY:  In one aspect, yes, to the

2       extent that they experience that with the

3       defendant as far as threats to release photos

4       for reputational harm certainly, and I just want

5       to point out that it does go to Travel Act if

6       there are pictures that are directly found in

7       Backpage advertisements as well.  So there's

8       dual usage to the photos in addition to just the

9       reputational.

10           THE COURT:  In addition to what they have

11      observed in regard to his treatment of others.

12           MR. GRADY:  Exactly.  Correct.

13           THE COURT:  All right.  Who is going to

14      respond to the other issues?

15           MR. DARROW:  Fortunately for me, there's

16      not a lot left, your Honor, when we take in the

17      videos and the photos, but briefly, you know,

18      your Honor, we think you have a bead on the

19      issue of the young woman who was engaged as a,

20      working as a prostitute for Mr. Folks in

21      Vermont.  At some point I think a concern for

22      all of them was Vermont's kind of a small town,

23      and this can get, particularly for women who

24      grew up here and went to school here and have a

25      lot of family here, this reputational harm is a

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          problem.  This one was concerned about word

2          getting out because she'd been in the business

3          for a while, and she was placed with Mr., she

4          will testify that she was placed with

5          Mr. Folks's mother in New York, and she'll tell

6          the story that we proffered in our pleading, and

7          at the end of the day, as you point out, the

8          ultimate relevance is the time when she said

9          this is it for me.

10              THE COURT:  Why is that relevant?  Why do

11         you want to get in the fact that she quit the

12         business?

13              MR. DARROW:  We think it's mostly

14         significant because it's her story.  It shows

15         the trajectory of her experience in the world of

16         Folks and prostitution, and we think it's

17         relevant because she says this is why I stopped,

18         and that was it for me, and I did meet a fellow

19         and then I quit using drugs, too.  And I don't

20         do those things anymore.  So I think it's just a

21         way that she explains what happened to her, and

22         she'll start, you know, I met Mr. Folks when

23         thus and such happened, and these are my

24         experiences along the road, and then I was down

25         in New York and then that happened and I was

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          out.

2                THE COURT:  Do you have any evidence to

3          suggest that the defendant reacted in a

4          particular way to her voluntary termination of

5          involvement?

6                MR. DARROW:  Not that I know of.  I didn't

7          ask her that.  I think that's an interesting

8          question because as you brought up there's a

9          double-edged sword there, but our sense was that

10         there's probative value to her telling her story

11         and how she got out, and if you weigh it under

12         403, it's not substantially outweighed by

13         prejudicial value because she's not going to say

14         that she was being assaulted at the direction of

15         the defendant.  She's just going to say, well, I

16         was working, this happened one night.  I was

17         doing the thing I've done hundreds of times

18         before, but you know, I got out when this

19         happened.  So I don't think it's that

20         prejudicial, particularly when there will also

21         be testimony from others about actual assaults

22         by the defendant so why --

23               THE COURT:  I mean, I suppose it is

24         prejudicial to the extent that it suggests that

25         this is a violent activity or could lead to

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          violence and the defendant put her in this
2          position but, regardless, double-edged sword.
3               MR. DARROW:  With that instance and with a
4          couple subjects we're going to discuss next,
5          some or one of the complaints of the defense is
6          they don't see how this is tied to how there's
7          an evidentiary connection to the defendant, and
8          we'd like the opportunity to make that
9          connection at trial, and if we fail to do so,
10         they can raise the objections then.
11              And then briefly, on the phone call issue.
12         Both Chrissy, the drug worker who ended up
13         cooperating and who's on one end of the phone
14         and Donald McFarlan, the codefendant in the drug
15         conspiracy, will testify.  The call that was of
16         particular interest, and it's been provided to
17         counsel and maybe we can point it out to her if
18         she's having trouble finding it, but it's one of
19         the calls where at the direction of her law
20         enforcement handlers Chrissy is explaining what
21         happened to the drugs because the back story is
22         and McFarlan will testify that since the summer
23         of 2015, he's been the fellow who brings drugs
24         from his home in New York up to Folks in
25         Burlington, Vermont, where the Folks

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          organization will distribute them.  He comes up
2          every so often, few weeks, every month or so,
3          stays for a few days, is paid for the drugs,
4          goes back to New York.
5               On what would ultimately turn out to be the
6          last trip up in January 2016 he's coming up with
7          a bulk package with a significant amount of
8          heroin, crack cocaine and some other stuff, and
9          that stuff ends up getting seized because he
10         puts it in a cereal box and has Chrissy hold it.
11         Chrissy previously had been a trusted drug
12         worker.
13              As it turned out, Chrissy at that point had
14         been entered into a cooperation relationship so
15         she contacts her law enforcement people and says
16         I have a box of drugs here, and they come over
17         and get it, and then the problem of course is
18         what is Chrissy going to say about the fact that
19         a lot of valuable drugs have disappeared, and
20         the ruse is the police came and got them, and I
21         got cited.
22              So she calls McFarlan with that story and
23         the call that we think has particular
24         evidentiary value for the defendant's
25         statements, not Chrissy or McFarlane's, is when

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        she calls McFarlan, he's with the defendant.
2        The defendant after a little while takes the
3        phone and intervenes and starts jumping in and
4        saying this is what we're going to do.  That's
5        why we want it in there.
6             Now, the last call sometime later as
7        Counsel indicated, Chrissy calls Folks again and
8        he says what are you talking about?  I don't
9        know anything about it, and that's, we're
10        putting that in to be fair because he did say
11        that, but that's that earlier call where the
12        call to MacFarlane and Folks takes the phone.
13             THE COURT:  This is not an 801(d)(2)(E)
14        question because you've got a statement right
15        from the defendant.  That's an admission.
16             MR. DARROW:  Exactly.  Correct.
17             THE COURT:  So it's not in furtherance of
18        the conspiracy.  That becomes, I guess that
19        becomes essentially irrelevant.
20             MR. DARROW:  Well, I mean, it sounds like
21        an admission of an opposing party, but it's, I
22        mean, MacFarland and Folks are in a conspiracy
23        to move drugs from New York to Vermont and
24        distribute them, and some of those drugs which
25        came up as part of that conspiracy have

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1    disappeared, and they're talking about what to
2    do.  So maybe it's both.
3         THE COURT:  Right.  Okay.  I was not aware
4    that Mr. Folks had actually taken the phone
5    and --
6         MR. DARROW:  It's what he says is what
7    we're interested in.
8         THE COURT:  Right.  So you're not taking
9    what Mr. McFarlan says about the fact that he
10   was working with Mr. Folks in this call as
11   evidence.  You're using directly his statements,
12   and that's different.  Okay.
13        MR. DARROW:  Any other piece of that motion
14   in limine you want --
15        THE COURT:  No.
16        MR. DARROW:  Thanks, Judge.
17        MR. KAPLAN:  I think this discussion about
18   the witness who said she was in New York and she
19   was beaten and she quit, I don't really have a
20   problem with that, but I think it does open the
21   door because our understanding is that after
22   that she went back to working as a prostitute,
23   and that she's now in Vermont and has been doing
24   that back and forth since 2016.  So I mean, I
25   would put the government on notice if she's

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          going to come in and testify that she quit that

2          we're going to be able to, of course, with the

3          court's approval, to cross-examine her on the

4          fact that she didn't quit.  That she's still

5          doing it.  Not with our client but with others.

6                THE COURT:  Well, you certainly would be

7          able to do that.

8                MR. KAPLAN:  Right.

9                THE COURT:  If she makes a statement that

10         says she quit and explains exactly why, and then

11         you have evidence to suggest that she's not

12         telling the truth, you certainly would be able

13         to cross-examine her on that.

14               MR. KAPLAN:  The other issue, Judge, is I'm

15         a little confused about the discussion between

16         the videos and the demeaning conduct.  As I

17         understand, the court is going to review the

18         videos and is that to see if they're relevant,

19         and if the court thinks they're relevant,

20         whether they're overly prejudicial?  My stance

21         would be if they're not relevant, then it

22         wouldn't be appropriate for the witnesses to

23         talk about it.

24               THE COURT:  If they're not relevant, if the

25         videos are not relevant?

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           MR. KAPLAN:  Not relevant, because they

2       don't show coercion or they don't show demeaning

3       conduct.  And the other thing is what we might

4       consider demeaning people in the video might not

5       consider demeaning or it might not bother them.

6           THE COURT:  You can ask a witness certainly

7       about how they were treated.  Demeaning,

8       coerced, et cetera.  Forget the video.  They

9       certainly have the opportunity to say to these

10       witnesses, you know, what did he do, how did he

11       treat you, and what did it mean to you.  I mean,

12       that's, isn't that pretty straightforward?  I

13       mean the problem with the video is that it tends

14       to be, it can be prejudicial.

15           MR. KAPLAN:  The problem is if a witness

16       takes the stand and starts talking about how

17       that was demeaning to her, and she didn't want

18       to do it and on and on, we're going to be forced

19       to play the video because the video is going to

20       show something different in our opinion, and we

21       wanted to keep the video out because we thought

22       it was overly prejudicial, but of course, we'd

23       be in a situation, I think, of being forced to

24       play it at that point.

25           THE COURT:  Don't you think it's pretty

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          clear that the women, whether they're in Counts
2          1 or 10 through 14, were the women who are part
3          of this, who were testifying about coercion in
4          general, don't you think they'd be allowed to
5          explain exactly what they mean by coercion?
6          That is, they were demeaned and threatened with
7          reputational harm or et cetera, whatever they
8          say.
9               MR. KAPLAN:  But it's not what the videos
10         show, I guess is my point.
11              THE COURT:  It's not what?
12              MR. KAPLAN:  It's not what the videos will
13         show.
14              THE COURT:  Then I guess we'd be in a
15         situation of you having to use the videos to
16         contradict the testimony of these witnesses.
17         But the government's got to prove -- this is
18         pretty straightforward and you know it.  The
19         government has to prove coercion, and to prove
20         coercion they can call these witnesses to
21         describe the defendant's statements and that is
22         being used to show coercion.  So they've got to
23         have leeway to be able to show what the
24         defendant said and what he acted and what he did
25         to make them feel they were coerced into

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           participating in this prostitution activity.  So
2           they're going to get quite a bit of leeway to do
3           that.
4                MR. KAPLAN:  I don't really disagree with
5           that.  I'm just concerned, I don't think that
6           video really is great for anyone.  It's not
7           something the jurors are going to enjoy
8           watching, at least most of them, I would think.
9                THE COURT:  But I do, you know, I do think
10          that the government should be able to ask
11          witnesses what happened and you should be able
12          to cross-examine and you make the decision as to
13          whether --
14                MR. KAPLAN:  I understand.  Okay.
15                MR. DARROW:  I apologize.  I know it's been
16          a long day, but can I --
17                THE COURT:  No.  It's okay.  It's only
18          2:30.
19                MR. DARROW:  On these videos, you're going
20          to get a CD from us which will probably have all
21          of them on it.  There are five.  There are three
22          associated with the urination, and there are two
23          associated with the walnut.
24                THE COURT:  I thought there were two
25          associated with urination.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          MR. DARROW:  There are three.

2          THE COURT:  One was a different, discussion

3     about urination.

4          MR. DARROW:  Yes.

5          THE COURT:  And the two were the actual

6     urination.

7          MR. DARROW:  Exactly.  So as to, on the

8     urination side, there's the video which the

9     defendant appears to have taken of himself, but

10    in any event, he's in it saying what he's about

11    to do, you know, we're going to have, I'm going

12    to do this.  And then there are two videos of

13    him doing that.  As to those two videos, one of

14    the young women is a trafficking victim and the

15    other is a drug worker.

16         Now, so let's just talk about the universe

17    of videos.  So those are the three videos;

18    introductory and two actuals on the urination.

19         On the walnut challenge, the evidence

20    indicates that there were three young women who

21    participated in that.  Two of them are charged

22    trafficking victims and one is a deceased woman

23    who acted as a prostitute but is not a charged

24    trafficking victim.

25         As to the two trafficking victims, the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1           government does not have those videos.  The

2           evidence is that it happened, it was videotaped,

3           the witnesses obviously remember it.  It's very

4           hard for them to talk about, but we don't have

5           those videos.  One of the possible reasons is a

6           couple of the digital devices that were seized

7           we've been unable to access notwithstanding a

8           search warrant because they're encrypted, and we

9           just can't get into them.

10              So there's one, the videos that we do have

11          concern the noncharged woman acting as a

12          prostitute is now dead, and those two videos do

13          not show the actual pornographic act.  They are

14          just introductory by nature, sort of like the

15          introductory urinating video.  In those two

16          videos they're preparing for this to happen, and

17          Folks is saying what he's about to do.

18              Now, I think probably what, one of the

19          reasons why the defense has repeatedly indicated

20          that there's not a lot of evidence of coercion

21          on the videos is that you'll see a lot of

22          giggling and chuckling going on, and as we've

23          argued, we don't think that necessarily means

24          the situation wasn't coercive.  I mean, the

25          now-deceased woman who is preparing for the

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1            walnut challenge isn't protesting, and in one of

2            the actual urination videos, the girl who is a

3            drug worker is giggling.

4                Now, she will testify, I think, that she'd

5            just been, used a sample of some new heroin, and

6            it was very hot, and she said it blew her away,

7            and she got in the shower, and next thing she

8            knew the defendant was urinating on her, and she

9            said I was completely out of it which is why I

10           was laughing.  But needless to say, looking back

11           on it, she doesn't consider it a laughing

12           matter.

13               So I wanted you to understand what the

14           videos, the five total that are coming to you

15           are, and then you will see giggling and --

16               THE COURT:  Well, no, I appreciate that,

17           and I think the point that you made was these

18           are addicts.  They're offered $500 to

19           participate if they, I guess, win, and driven by

20           their addiction and the thought of money.

21               MR. DARROW:  Exactly.

22               THE COURT:  Your argument is that's

23           coercion.  That's using their illness to coerce

24           their behavior.  No, I appreciate it.

25               MR. DARROW:  Okay.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          THE COURT:  I appreciate there can be mixed
2     signals there.
3          MR. DARROW:  All right.  Thank you, Judge.
4          THE COURT:  Okay.  So that I think that's
5     it for the motions.  Now, is there anything else
6     that we need to talk about at this point?
7          MR. DARROW:  We wanted to mention a couple
8     things.  When we were last together, you gave
9     the defense until today, April 4th, to file any
10    objections they might have to Judge Crawford's
11    instructions.  So we're assuming that the
12    defense is good with that.  In conversations
13    with the defense regarding the transcripts
14    associated with the videos and video and audio
15    recordings, we're informed that the accuracy of
16    the transcripts won't be contested, although the
17    defense said they may want to play more of the
18    videos than we had proposed, but the transcripts
19    won't be a problem.
20         We mentioned last time the parties will be
21    stipulating as to the felony possession count
22    about the prior conviction for a gentleman in
23    prison, not to exceed one year, we hope to get
24    that filed some time soon.  May I have a moment?
25         THE COURT:  Yes.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1        MR. DARROW:  The last thing we wanted to
2    bring to your attention is when we were before
3    you back in March there was a motion and some
4    discussion regarding whether the cocospirator
5    statements by Mandy who was involved in the four
6    undercover drug buys could come in.  Mandy will
7    be a witness, but at the time she was a runner
8    for the defendant, and when the four drug buys
9    take place in January and February 2016, they're
10   set up by the CS calling Mr. Folks and he tells
11   them, you know, park in thus and such a place,
12   and the CS, and Mandy comes out of the crack
13   house and delivers the drugs.  They're, in a
14   couple of cases, I think, they're delivered
15   inside, but in each case Mandy is the
16   intermediary between Mr. Folks and the
17   cooperator in the drugs distribution.  She's the
18   one that actually hands the drugs over and takes
19   the money, and we had hoped to play the audio of
20   those undercover buys before Mandy testifies.
21   So the government was concerned that the audio
22   including Mandy's statements would be
23   admissible, and we wanted to ensure that you had
24   that in mind.
25        THE COURT:  All right.

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1            MR. DARROW:  Thank you.

2            THE COURT:  Mr. Kaplan?

3            MR. KAPLAN:  I mean, as long as they can

4      link that up, I don't think we're going to

5      object.

6            THE COURT:  As long as they have a good

7      faith basis to believe they're going to be able

8      to get that testimony in, they can use that in

9      advance.

10           MR. KAPLAN:  Yes.

11           THE COURT:  All right.  Okay.  Is there

12     anything else that you think we have to address

13     at this point?

14           MR. KAPLAN:  I don't think so, Judge.

15     Anything else?  I don't think so, Judge.  Thank

16     you.

17           THE COURT:  All right.  So you'll submit

18     this exhibit with five films, and I'm going to

19     study the various motions.  You'll get an order

20     in writing, but I think that I've made myself

21     pretty clear about the general approach to the

22     case, I think.  I think the government should be

23     able to prove coercion and will be given leeway

24     to do that just that.  I mean, obviously within

25     boundaries.  And also, you know, the defense

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

1          certainly can cross-examine witnesses about

2          previous experience, and I just want to research

3          this Rivera case to see what its limits and

4          restrictions are.  Okay?  All right.  Thank you.

5                    (Hearing ended at 2:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157

C E R T I F I C A T E

    I, Cynthia Foster, Registered Professional Reporter, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


*Cynthia Foster*
Cynthia Foster, RPR

*Cynthia Foster, RPR, LCR*
d/b/a North Country Court Reporters
northcountrycr@gmail.com
(603) 443-1157