UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
              V              *
                             *
BRIAN FOLKS                  * CRIMINAL FILE NO. 16-94



***CHAMBERS CONFERENCE***

JURY TRIAL
Monday, April 22, 2019
Burlington, Vermont



BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
       Senior District Judge



APPEARANCES:

    WILLIAM B. DARROW, ESQ., EMILY M. SAVNER, ESQ. and
       MATTHEW T. GRADY, ESQ., Assistant United States
       Attorneys, Federal Building, Burlington,
       Vermont; Attorneys for the United States

    MARK J. KAPLAN, ESQ., Kaplan & Kaplan, Park Plaza,
       Suite 405, 95 St. Paul Street, Burlington,
       Vermont; Attorney for the Defendant

    NATASHA SEN, ESQ., P.O. Box 193, Brandon, Vermont;
       Attorney; Attorney for the Defendant




ANNE NICHOLS PIERCE
United States District Court Reporter (retd.)
*fortherecordinvermont@gmail.com*

1    MONDAY, APRIL 22, 2019

2    (The following was held in chambers at 10:00 a.m.)

3              THE COURT:  This is United States versus

4    Folks.  This is a conference with counsel.  The

5    defendant is not present.

6         We are not going over any substantive issues.  We

7    are actually going over procedural questions.  It seems

8    to me there have been a number of questions that I have,

9    and then I will open it up for whatever questions you

10   have as well.

11        So first of all, the voir dire:  What I was

12   thinking is that it is very likely that many people will

13   just say they cannot serve on a case like this, and so I

14   was thinking that if I began to ask my questions, which

15   I -- are standard, and get a number of responses, then I

16   will explore with them potential challenges for cause.

17        And then rather than turn to the lawyers and have

18   you go through your voir dire with probably half the

19   panel or maybe even more of people who are going to be

20   challenged for cause, why not just call you up, go

21   through the challenges for cause, replace them with

22   other jurors, and then ultimately move on until you have

23   30 people who are at least, according to the first round

24   of questioning, not subject to challenges for cause.  I

25   thought that was faster.

1          Anyway, it's a little complicated because how you

2     move one juror -- I mean, you have to sort of re-seat

3     everybody, and it becomes a little bit complicated, but

4     it seems to me that's much faster so that ultimately

5     when you start asking questions, you have got a panel of

6     30 in front of you who reasonably could be qualified.

7               MR. KAPLAN:  So you will focus on questions

8     about the case -- I mean the nature of the case and the

9     videos and the pictures and things?

10              THE COURT:  So we go through that five-minute

11    statement from the lawyers.  So that would still be

12    presented.  So right after I introduce the case, then I

13    turn to the government and ask the government to make a

14    five-minute statement about the nature of the case, and,

15    in particular, you know, I think it should be disclosed

16    what they're likely to see or hear during the course of

17    the trial, and then you have five minutes or Natasha has

18    five minutes to actually also make your statement.

19         And then once you have done that statement, then I

20    will turn to the panel and say is there any reason why

21    any of you feel that you cannot serve on this particular

22    jury?

23         And my guess is there will be a few hands.  And

24    then I would go through the very standard questions,

25    including presumption of innocence, standard of beyond a

1    reasonable doubt, defendant not testifying, et cetera.

2    And usually there's some responses of jurors to those

3    questions:  Can they in this particular case presume Mr.

4    Folks to be innocent?  Can they apply the standard of

5    proof beyond a reasonable doubt?

6         So I would go through all of those just to make

7    sure we have weeded out exactly those jurors who really

8    could never sit, and then replace them with the next

9    round until we eventually end up with 30.

10        So, anyway, that's the thought.  The only

11   difference between the standard jury selection and this

12   one is that at the close of my questioning, I'd have you

13   come up and move for challenges for cause; not

14   peremptory challenges, just challenges for cause.

15        So, anyway, that's the thought.  So tell me what

16   you think about that.

17             MR. DARROW:  So the subject matters that you

18   would be covering with the jury would be the same sort

19   of generic stuff that you do with the regular jury?

20             THE COURT:  Yes.  "Have you read anything

21   about the case?"  Clearly I will do that.  I mean, there

22   was the article in Seven Days.  If someone has read that

23   article, my guess is that they probably would be

24   challenged for cause.  I wouldn't want to get into the

25   details of that article, but if somebody's read that

1    article, then there's a problem with that juror.  Aside

2    from that, I don't think there has been any publicity, I

3    don't think.  You tell me.  Has there been any

4    publicity?

5              MR. KAPLAN:  No.  But that article was

6    significant, and I -- for the record, my -- our client

7    is quite upset about it, and I agree that I think the

8    U.S. Attorney's Office -- not these folks, but it was

9    very inappropriate for the comments that were made that

10   close to trial, and the nature of the comments, and he

11   wants me to put that on the record.  I don't know if he

12   wants me to do that again in public, but we are

13   concerned about it.

14             THE COURT:  Well -- and you are not going to

15   do that in front of the jury?

16             MR. KAPLAN:  No, of course not.

17             MR. DARROW:  For what it's worth, I don't know

18   a lot, but -- about it, but I think that she -- the

19   author worked on that article for a long time, and I

20   think that interview with Abby might have been, I don't

21   know, what -- well, I know it was months ago.  And she

22   was the only one at the U.S. Attorney's Office that was

23   quoted.  But I share your concern.

24             THE COURT:  Okay.  So, anyway, tell me about

25   what you think about this process.

1           MR. DARROW:  It's fine with us.  Counsel had

2    raised a question about -- the e-mail that came around

3    from Elizabeth had suggested an outline what you have

4    described and said that the parties would have an hour

5    and a half each.  Counsel had raised a question whether

6    that would be enough, thinking that if we were in the

7    thick of things, you might give us a little more time.

8           THE COURT:  Um hum.  Well, I'd like to work it

9    out that going through this pool of 30, once we have

10   identified the 30, and then you have gone into your voir

11   dire, it seems to me that we should be ending after the

12   first day.  And tell me if -- that's three hours.  An

13   hour and a half times two is three hours.  Or four

14   hours?

15       I mean, the fact is, I'm going to be going through

16   a lot of the challenges-for-cause questioning, so I

17   thought that you didn't need as much time necessarily,

18   but you are going to get more -- I don't feel

19   comfortable going into questions about facts in this

20   particular case because I don't think the judge

21   describing facts is a good thing generally because

22   jurors may think that I'm making an assessment of what

23   is likely to happen.  So you certainly will be going

24   into the facts, and you will need plenty of time.

25       Well, what's the consensus here?  Do you have a

1    consensus?

2            MR. KAPLAN:  Maybe the thing to do, Judge, is

3    sort of play it by ear, and if you think at some point

4    we are just asking questions for the sake of asking them

5    or it's taking too long or repetitive, you can certainly

6    let us know that.

7            THE COURT:  If you have got an hour and a half

8    and you have got an hour and a half, you can ask each

9    juror a whole lot of questions.

10            MR. KAPLAN:  Sure.  It's just a different

11    case, that's all, than we normally have.

12            MR. DARROW:  We were thinking of talking about

13    some of the usual stuff, like -- I don't know, talk

14    about you are in federal court.  Any of you have such

15    strong feelings about the federal government in these

16    polarized times that's a problem for you?  There's

17    federal laws about guns and drugs, for example, that's

18    different from Vermont law, and any of you have a

19    problem with that?

20        But in this case I was thinking also of chatting a

21    little bit about the law that applies to the trafficking

22    stuff like saying this is -- there's a difference

23    between prostitution, on the one hand -- a prostitution

24    ring, on the one hand, and trafficking, the other, even

25    trafficking requires this additional element, and

1   talking about that a little bit.

2                THE COURT:  Well, and then are you going to be

3   talking about the minor.  So coercion is not required in

4   terms of the trafficking involving the minor?

5                MR. DARROW:  Yes, that there's one -- there

6   are a number of trafficking counts.  One of them is as

7   to a minor.  It's not required as to that, but as to

8   these other counts, there's something about coercion and

9   let's talk about what that means.

10               MR. KAPLAN:  What does that mean?

11               MR. DARROW:  That's everybody's question.  I

12   was hoping you would tell me.

13               THE COURT:  I think that's really helpful.

14   And I think the more you talk about the nature of the

15   facts here, the more likely it is that you are going to

16   get some response from jurors who really cannot serve.

17   So I think -- I think that's fine.

18        You tell me whether you would object to that --

19               MR. KAPLAN:  No.

20               THE COURT:  -- discussion.

21               MR. KAPLAN:  No.

22               THE COURT:  And you are going to be talking

23   about the facts in detail as well to explore whether, in

24   fact, people are biased or prejudiced?

25               MR. KAPLAN:  Sure.  I think our questions may

1    be more general as opposed to specific facts about the

2    case, but we touch all the subjects that the case deals

3    with, you know.

4         The other issue, Judge, is if both Natasha and

5    myself want to do some of the questions, is that

6    possible?  Like I would ask questions and then defer to

7    Natasha, she could come up and finish.

8              THE COURT:  Yeah, I think that's fine.

9         And you can do that as well, split them up.  But if

10   you are talking about a voir dire for an hour and a half

11   or two hours, that's a long time, and you might want to

12   change it around.

13             MR. DARROW:  If I understand the difference

14   between when, during voir dire, counsel -- a lawyer can

15   veer into the unacceptable, it's when you start asking

16   so-called stakeout questions.

17             THE COURT:  Yes.

18             MR. DARROW:  So --

19             THE COURT:  Right.  If you are asking people

20   to commit themselves.  If you heard this --

21             MR. DARROW:  Would you vote that?

22             THE COURT:  -- would you vote that?

23             MR. DARROW:  Yeah.

24             THE COURT:  Yeah.  That's completely improper.

25             MR. DARROW:  The question is could you keep an

1    open mind and weigh impartially the evidence if you

2    heard this -- actually we are not going to be asking

3    questions like that, but if this -- if the judge tells

4    you something like this is the law, is that a law you

5    could apply?  Or would you find that, no, someone's a

6    drug-addicted prostitute, I wouldn't believe a word she

7    said?

8              THE COURT:  Yes.  Absolutely.

9              MR. DARROW:  Okay.

10             THE COURT:  You just can't get them to commit

11   to a vote.

12             MR. KAPLAN:  But you can ask them how a

13   particular witness who said or done something would

14   affect their view of their credibility.

15             THE COURT:  You can ask it in the general

16   sense, right.

17             MR. KAPLAN:  Yes.

18             THE COURT:  Yes.  In fact, you are going to

19   have pretty free rein here.  I am hoping that the most

20   obvious jurors who are going to be biased will be

21   removed quickly.

22             MR. KAPLAN:  Right.

23             THE COURT:  But it would be really helpful to

24   get through the first round by the end of the day so

25   then you are starting with, you know, a pretty good

1      sense of where you are going.

2              MR. DARROW:  How do you mean the first round

3      by the end of the day?

4              THE COURT:  Well, you start with 30 -- 30 who

5      will get through my questioning.

6              MR. DARROW:  Okay.

7              THE COURT:  And then you have got your voir

8      dire, and you have got your voir dire, and then we come

9      up, do challenges again and peremptory challenges at

10     that point, and a lot of people will be excused.

11         I assume that you will be back down to 12, so 18

12     people will be excused.  They won't have to come back

13     the following day.  So then you are talking about 18

14     being excused at that point and as well as whoever is

15     challenged for cause initially.  So you might be able to

16     reduce the pool by 30.

17             MR. DARROW:  So are you envisioning that after

18     we did a round, is what you have talked about, you have

19     been through them, you put in another 30, you have got

20     30 in there that have been through your voir dire, then

21     the parties do their voir dire, then we do some

22     peremptories, and you are saying that's a round, and

23     then if we need to do it again, we do it at all over

24     again the next day?

25             THE COURT:  Correct.  Clearly we will be doing

1    it all over again.  And my guess is if you start with a

2    round of 30, some of those will be challenged for cause

3    based upon their answers to your questions.  And then

4    assuming challenges for cause are through, and you still

5    got at least 12 jurors there, then you start using

6    peremptories.

7              MR. DARROW:  Okay.  So the only prospective

8    jurors in the courtroom during this is the 30 that you

9    brought in.  There're not going to be any in the

10   gallery --

11             THE COURT:  Oh, no, they will be in the

12   gallery and listening.  Absolutely.  You are telling

13   them to listen to all the questions because when they

14   are called --

15             MR. DARROW:  You don't have to repeat them

16   all.

17             THE COURT:  Right.  My standard question is,

18   Are there any responses?

19             MR. DARROW:  Okay.

20             THE COURT:  One thing I am concerned about is

21   if you have these people in the back, and it becomes

22   obvious that all you have to do is say "I can't be fair

23   and impartial in this particular case," and then they

24   get excused, you know, that seems to be almost a

25   get-out-of-jail-free card.  It doesn't take a brain

1    surgeon -- I always use brain surgery as an analogy at

2    this point.

3            MR. DARROW:  As opposed to cardiac surgeon.

4    Sorry.

5            THE COURT:  Yeah.  I haved the cardiac and

6    brain surgery.  I have just had all of the -- yeah.

7        Of course you can explore with a juror who says

8    that.

9            MR. KAPLAN:  I mean, they might.

10           THE COURT:  Oh, absolutely.  And I will do

11   that --

12           MR. KAPLAN:  Right.

13           THE COURT:  -- for sure.

14       So is there any objection to this process?

15           MR. KAPLAN:  No.

16           MR. DARROW:  Not from us.

17           THE COURT:  Okay?  Okay.

18           MR. DARROW:  Judge, will you do hardships too?

19           THE COURT:  Are we going to do hardships?  I

20   have been doing hardships forever.

21           MR. DARROW:  No.  I mean, the jurors that say

22   "I am going to my kid's graduation on April 26th" or

23   something.

24           THE COURT:  They have had an opportunity to do

25   that with me first.

1      MR. DARROW:  Okay, so we think we are past

2 that?

3      THE COURT:  We are past that, although we got

4 six more today and there will be more coming, but -- 114

5 people are coming.

6      MR. DARROW:  All right.  Can we hope that

7 after we have been through round one, we will be able to

8 get from the clerk's office one of those charts with

9 names and whatnot?

10     THE COURT:  Yes.

11     MR. DARROW:  Good.

12     THE COURT:  Yes.

13   All right.  So the videos I have not looked at yet.

14 I plan to look at the videos today so that you get a

15 ruling on that fairly soon.  And I thought it was sort

16 of left with the defense that if you wanted a hearing on

17 the Backpage or Facebook, you'd let us know, but you

18 didn't let us know.

19     MS. SEN:  Well, your Honor, actually the

20 government has actually done the Backpage search for us.

21 We got the results of that last week.

22     THE COURT:  Oh, really?

23     MS. SEN:  Yes.

24     THE COURT:  Oh, good.

25     MR. KAPLAN:  Just happen to know the right

1    people.

2              MR. DARROW:  Or say would they like a hearing.

3    Perhaps we should get counsel for the FBI.

4              THE COURT:  I love it.

5              MS. SEN:  I think that worked, your Honor.

6              THE COURT:  Oh, you think you thought of the

7    counsel -- good.  So that's resolved.

8              MS. SEN:  That is resolved.  And we already

9    talked about the Backpage space will not be called to

10   court.

11             MR. KAPLAN:  Can I ask on the Facebook, you

12   received -- all the Facebook we have came from your

13   opinion.  So we're just in agreement that those can be

14   introduced without a problem?  Because we don't have a

15   problem with you introducing the -- any Facebook stuff

16   that you want to introduce, other than pictures maybe.

17             MR. GRADY:  Well, I think it depends on --

18   obviously the ones that we intend to admit are -- some

19   of them are statements of the defendant, and obviously

20   the other party to it would put context to it, or there

21   will be conversations certainly between witnesses and

22   the defendant that we'll be introducing.

23        You will probably want to sample it -- if you have

24   specific ones that you are seeking to introduce, you

25   know, for the ones that you are seeking to introduce, it

1    wouldn't be party-opponent as to Folks because that's

2    his statement.  So it just depends.  I guess it just

3    depends on which ones exactly you are seeking to

4    introduce and which rule you are seeking to introduce.

5            MS. SEN:  But you are not going to object to

6    the authenticity of the record?

7            MR. GRADY:  Right.

8            MR. KAPLAN:  We would show them to the

9    witness.

10           MR. GRADY:  Sure.

11           MS. SEN:  Yes.

12           THE COURT:  It's only a question of relevance

13   at this point.

14           MR. KAPLAN:  Right.

15           THE COURT:  Okay.  So you will be getting an

16   order on convictions and arrests, the relevance of

17   those, fairly soon.

18       Does either party intend to file any motions *in*

19   *limine* that have not been filed yet?

20           MR. KAPLAN:  I don't think we did.

21           MS. SEN:  Not at this time, your Honor.

22           THE COURT:  Okay.  And from the government?

23           MR. DARROW:  (Shakes head.)

24           THE COURT:  And I have heard rumor that the

25   government's pared down its list of witnesses.  And I am

1  interested to know what the length of time you

2  anticipate taking to put on your case.

3       MR. DARROW:  We have.  We have pared down both

4  the exhibit list and the witness lists significantly and

5  forwarded copies to counsel last week.  We went through

6  this process a while ago.  What was it, two and a half

7  weeks?

8       MR. GRADY:  No.  I think we still estimate

9  that we will do Thursday and Friday of this week and

10  then Monday through Thursday of next week.  I think we

11  will be probably close towards the end of next week.

12  And certainly I think we would finish up early the third

13  week, which would be that Monday or Tuesday, because our

14  final -- go ahead, your Honor.

15       THE COURT:  That's to the 2nd or the --

16  actually the 2nd?

17       MR. GRADY:  Right.

18       THE COURT:  So you will go through the end of

19  this week; you will go through the next week.

20       MR. GRADY:  Yes.

21       THE COURT:  Takes you to the 2nd, and you may

22  have a carryover into the following week.  But now the

23  defense is on notice that you really have to be calling

24  your witnesses on --

25       MR. GRADY:  I think our final witness will be

1    very -- will be somewhat lengthy, and she's planning on

2    coming that Friday the 3rd, because she is in Maine,

3    upper Maine, right now, and I anticipate she will

4    probably go on the 6th, that Monday.  And she would

5    probably be our final witness.  But if we move quicker,

6    who knows?  We will see what happens.

7                THE COURT:  All right.  Good.  So when I talk

8    to the jurors, I usually say how long the trial is going

9    to be, and this is obviously probably distressing for a

10   lot of jurors to think they are looking at three weeks

11   or a month.

12       I'm not asking the defense whether you are going to

13   call witnesses or call the defendant, but it would be

14   nice to be able to say how long the trial we expect

15   would last.  So you might want to talk with the

16   government and figure out, you know, reasonably the

17   trial's going to end approximately when.  Any objection

18   to that?

19                MR. KAPLAN:  No.

20                THE COURT:  Okay.  So probably, you know,

21   unless you are putting on a whole lot of witnesses, you

22   are starting on Monday of the third week, the case turns

23   over to you.

24                MR. KAPLAN:  So we would be done within two or

25   three days of that at the most.

1          THE COURT:  Oh, okay.  So that is the 9th,

2     10th, 11th, 12th.  Somewhere around the 12th.

3          MR. KAPLAN:  The 11th I have to leave town for

4     the weekend, for graduation, but -- so I think that's a

5     Friday.

6          THE COURT:  Is that Friday?

7          MR. GRADY:  I think that's a Saturday.  The

8     11th is Mother's Day?

9          MR. DARROW:  We will give you Mother's Day

10    off.

11         MR. KAPLAN:  I am leaving on the 10th then.

12         THE COURT:  That's fine.  Okay.  So if the

13    jury begins to deliberate, then we will just continue

14    it.

15         It's a cousin or --

16         MR. KAPLAN:  No.  My son's -- my grandson's

17    graduating from Rice University.

18         THE COURT:  Oh, that's great.

19         MR. DARROW:  Geez, you have a grandson

20    graduating from college?

21         MR. KAPLAN:  I was only 10 when he was born.

22         THE COURT:  There's an unwritten rule in

23    Vermont that somebody's got anything to do with family,

24    the court comes second.

25         MR. GRADY:  It's a nice rule to have.

1      THE COURT:  Yes.  So we got the witnesses

2  scheduled, no other motions *in limine*, you get an order

3  on convictions and arrests, and you will get an order on

4  videos fairly soon.  The Backpage and Facebook issues

5  are withdrawn, and we are set on voir dire.  Those are

6  the things that I really wanted to talk about.

7      So tell me if there's something the government

8  wants to talk about.

9      MS. SAVNER:  Yes, your Honor.  Just in terms

10  of the videos, we saw from your order that you thought

11  that the video concerning minor victim E was sort of off

12  the table because the government wasn't planning on

13  introducing it.  Sorry if we gave you that impression,

14  but we didn't submit a copy of that one video to you,

15  but we have one for you now.

16      THE COURT:  Great.

17      MR. DARROW:  And, your Honor, if I could

18  supplement that:  We are intending to introduce that

19  video.  That's the -- what's been referred to as the

20  Hannah video, I don't know, variously, the weighty

21  treatment video.  But that's an important part of the

22  government's case relating to coercion by serious harm

23  by reputational injury where he gets angry at a female

24  worker, Hannah, and creates this video, demeaning video,

25  about her and posts it on his Facebook page, and that's

1    that video.  We certainly do want to introduce that.

2              THE COURT:  Okay.

3              MR. DARROW:  Thanks.

4              THE COURT:  All right.  Anything else from the

5    government?

6         Okay.  Anything from you?

7              MR. KAPLAN:  No, Judge.  Thank you.

8              THE COURT:  Okay.  Well, it's been lovely.

9         (Chambers conference concluded at 10:25 a.m.)

10                        *** ** ***

11

12

13

14                   C E R T I F I C A T I O N

15         I certify that the foregoing is a correct
     transcript from the record of proceedings in the
16   above-entitled matter.

17                              _Anne Nichols Pierce_

18   January 7, 2020          _____
     Date                     Anne Nichols Pierce
19

20

21

22

23

24

25