**UNITED STATES DISTRICT COURT**

**FOR THE**

**DISTRICT OF VERMONT**

UNITED STATES OF AMERICA          :

              v.          :          Case No. 2:16-cr-00094

BRIAN FOLKS,          :

        Defendant.          :

<u>**OPINION AND ORDER RE OBJECTIONS TO THE PRESENTENCE REPORT**</u>

(ECF 554)

Defendant Brian Folks and two codefendants were charged in a fourteen count Indictment (conspiracy to distribute heroin and cocaine base; being a felon in possession of a firearm; interstate travel in aid of racketeering; multiple counts of distribution of, and possession with intent to distribute, narcotics; and multiple counts of sex trafficking). **ECF 124.** On May 9, 2019, after an 11-day trial, the jury returned guilty verdicts on 13 of the 14 counts in the Fourth Superseding Indictment.

Folks now files this motion making a number of objections to the draft Presentence Report (PSR) submitted by U.S. Probation on February 13 and 14, 2020. The Court **grants** his request to file the motion under seal. For the reasons set forth

1

below, Defendant's motion objecting to the PSR is **granted** in part and **denied** in part.

## DISCUSSION

### Offense Conduct

The Defendant objects to a number of statements of fact within the PSR pertaining to offense conduct, as follows:

Paragraph 17: First, Folks argues that there is no evidence that he used any of the listed residences to store guns, and that Chrissy T.'s testimony is not credible. This objection is denied. This information was gathered from a law enforcement investigation. Moreover, Defendant has not pointed to a factual basis upon which to question Chrissy T.'s credibility as to the gun storage locations. **Denied**.

Paragraph 18: Folks objects to the inclusion of this paragraph on grounds that it does not contain evidence of his conduct, and that neither Keisha, Katelynn, nor Danielle withheld cocaine base from them (only heroin). Folks also argues that there is no evidence that he withheld drugs from Hannah.

Insofar as Paragraph 18 is based on testimonial evidence from trial, it may be properly admitted as a part of the PSR. Keisha testified that Folks withheld heroin from her until she engaged in prostitution. Danielle testified that Folks withheld crack cocaine from her before she took photographs for Backpage. Tr., Trial Day Six, Vol II at 131. Finally, Katelynn testified that Folks withheld crack cocaine from her. Tr., Trial Day Six, Vol I. Hence, Folks' argument that he did not withhold crack cocaine from any of these individuals is belied by the record. As to Hannah, however, trial evidence did not establish that Folks ever withheld drugs from her during the course of their interactions.

Thus, Defendant's objection is **granted** in part and **denied** in part. The Court orders Paragraph 18 be edited to reflect that the Defendant only withheld drugs from Keisha, Katelynn, and Danielle.

Paragraph 19: First, Folks objects to the inclusion of the January 12, 2016 controlled purchase involving McFarlan, arguing

that the controlled purchase was entirely arranged by McFarlan. This argument lacks merit, as the jury has already found that the Defendant is accountable for this purchase as a co-conspirator, and there is sufficient evidence showing Folks' involvement to include it in the PSR.

Second, Folks objects to the inclusion of the January 13, 2016 cereal box of drugs for the reasons described in his post-trial motion under Fed. R. Crim. P. 29. The Court has already addressed this argument in the Defendant's post-trial motion, upholding the jury's finding that Folks was accountable for this delivery in light of the ongoing conspiratorial activities between him and McFarlan. As such, this information is properly included here in the PSR. **Denied.**

Paragraph 20: Folks objects that the specified drug quantities (80 grams heroin and 7.5 grams cocaine base) were not supported by Chrissy T.'s testimony. These numbers originate from a valid evidentiary source. **Denied.**

Paragraph 21: Folks now objects to this paragraph, asserting that neither Chrissy T., Mandy L., or Mary P. testified that (1) he expressed frustration for not being armed; (2) that he would have Hightower deal with Hannah; (3) that Hannah was outside during the robbery; and (4) that he met with an unnamed male outside Cumberland Farms  to discuss trading guns.

This paragraph is in fact based in both testimonial evidence and information from law enforcement investigations. **Denied.**

Paragraphs 24-32: Next, Folks makes a number of objections regarding the information within these paragraphs, arguing that it is based in information from unsworn interviews or proffer sessions, and that it is inconsistent with McFarlan's trial testimony. The Court finds that these paragraphs are not inconsistent with McFarlan's trial testimony.

First, Folks objects to the PSR ¶ 25 statement that McFarlan was a watchdog who oversaw drug bagging for the Defendant on grounds that this is inconsistent with McFarlan's testimony that he was not a watchdog. McFarlan's full testimonial statement was, "it was like I was some sort of a – not a watchdog, I won't put it like that, but making sure everything was all right when I was there." Tr., Trial Day Four at 143. Hence, McFarlan's testimony was that he held an oversight role over Folks' drug bagging enterprise, which is

3

what this paragraph of the PSR seeks to communicate. The inclusion of this statement is therefore proper. Folks' objection to PSR ¶ 30's mention of Mandy L. lacks merit for a similar reason: there is sufficient testimonial evidence that McFarlan occupied a supervisory role to support this statement.

Folks also objects to statements in ¶ 25 regarding Folks asking McFarlan to bring heroin rather than cocaine base, to Lori C.'s residence, and Mr. Folks' secondary location. Again, all of this information was derived from trial evidence or law enforcement investigation, and is properly incorporated here for sentencing purposes.

Next, Folks objects to the PSR's statement that McFarlan made seven trips to Vermont. This number is based on the total trips evidenced by both testimonial and investigation evidence, and is thus proper in usage here. The same is true of the $10,000 figure derived in Paragraph 28.

Folks also objects to McFarlan's statement that he knew that Mr. Folks obtained four guns and had others prior to his involvement. This evidence is credible – the mere fact that McFarlan only made specific mention of two handguns while testifying is not inconsistent with this other more general statement, and is properly included.

Folks then objects to the statement in ¶ 32 regarding McFarlan's potential transfer of MDMA to Folks, arguing that there was no evidence that McFarlan or Folks trafficked MDMA at any point in this case. Defendant's assertion is correct; however, the PSR makes no claim that he was responsible for MDMA trafficking, and simply reflects McFarlan's testimony that he believed himself to be bringing MDMA to Folks during his last trip to Vermont. Hence, this statement is properly included.

Finally, Folks' objection that the PSR lacks mention of McFarlan's testimony that he threatened Chrissy T. lacks merit, as this information bears to relevance to sentencing in this case. **Denied.**

Paragraphs 40-52: Next, Folks makes a number of objections to the information contained in these paragraphs, arguing that the statements are either inconsistent with Mandy L.'s testimony or that they lack exact citations to her trial testimony. The Court finds, however, that each of these paragraphs is based in proper evidence for the purposes of sentencing, and it reflects the

record as accepted by the jury with no manifest contradictions. **Denied.**

Paragraphs 68-75: Next, Folks makes a number of objections to these paragraphs based on Keisha's testimony. The Court finds, however that these statements are consistent with Keisha's testimony regarding her work with Folks, her drug addiction, her observations at Lori C.'s home, Folks' possession of a gun, and the walnut challenge. Keisha also testified regarding an incident during which Hannah A. stole drugs from Folks, and Folks sent Keisha sexually explicit materials featuring Hannah A. which "kind of put fear" in her. Tr., Trial Day Five at 151-161. The PSR may properly include this information based on this testimony. **Denied.**

Paragraphs 92-95: Folks objects to the information contained in these paragraphs from witnesses who were never called at trial, and he claims that he has conflicting reports from defense investigators' interviews of these witnesses. This argument lacks merit, as non-testimonial evidence may be properly included in a PSR, and Defendant already had the opportunity to present conflicting reports at trial. **Denied.**

Paragraph 96: Folks objects to ¶ 96, arguing that the paragraph does not reflect the efforts he took to remove the witness list from Facebook. Because the Defendant's subsequent mitigating actions are a relevant factor to sentencing, the Court orders this paragraph be edited to mention Folks' attempt to take down the list. **Granted.**

Paragraph 99: Folks objects to this paragraph because he denied posting prostitution advertisements on Backpage, and he avers that there is no forensic evidence that definitively shows that Folks uploaded those images. This argument lacks merit. This paragraph is based on significant testimonial evidence, as well as statements from cooperating law enforcement agencies, and is properly included in the PSR. **Denied.**

Paragraph 105: Defense counsel request that the PSR include statements from Cheryl Gonyea (Ayla's mother) and Tracy Crawford (a client of Ayla's) which detail Ayla's history of "substance abuse, deceit, dishonesty, and engagement in prostitution." The requested statements bear no relevance to Folks' sentencing calculations. **Denied.**

## Count Groups 1-5: Adjustment for Obstruction

Folks objects to the application of the obstruction of justice adjustment in the Presentence Report for mailing the witness list to his wife and allegedly authorizing her to publicize the list during a recorded phone call. PSR 24. Folks objects on the basis that he did not authorize his wife to post the witness list, and that the drugs seized during the 2016 traffic stop were not his. Folks also objects to the application of this enhancement based on the evidence that witnesses posted their own advertisements on Backpage. Defendant's objection lacks merit.

Under U.S.S.G. § 3C1.1, a two-level obstruction of justice enhancement applies where "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

First, the obstruction of justice enhancement applies to Group 1 of the offenses ("The Drug Offenses") in this case, as the Defendant testified falsely at trial regarding multiple issues implicated in these Counts. Second, Folks **denies that the**

6

drugs found in the January 2016 search of the Mercedes-Benz belonged to him, despite overwhelming evidence to the contrary (including the testimony of Mandy L. and Mary P). Folks also denies posting advertisements on Backpage and being involved in prostitution activities, splitting the proceeds of prostitution activities 50/50, being involved in the walnut challenge, and sexually assaulting Keisha at the cemetery.

Folks' testimony clearly contradicted victim testimony and other evidence presented at trial, and was inconsistent with the jury's verdict. As such, his testimony regarding the Drug Offenses attempted to obstruct or impede the administration of justice as to these matters. The obstruction of justice enhancement is thereby applicable to Group 1. In light of this finding, the Court need not address whether Folks' disclosure of the witness lists amounted to an obstruction of justice.

Second, the obstruction of justice enhancement also applies to Groups 2-6 of the offenses (hereafter "the Human Trafficking Offenses"). The Defendant testified falsely at trial that he did not post advertisements on Backpage.com for any of the individuals who had prostituted for him despite substantial testimonial evidence to the contrary. While Folks testified that he was solely in the pornography business and did not post any advertisements to facilitate human trafficking, Katelynn,

7

Keisha, Danielle, and Ayla all testified to Folks having taken photographs and / or having posted them to Backpage for the purposes of prostitution. Tr., Trial Day Six, Vol I. at 41; Tr., Trial Day Five at 122-23.; Tr., Trial Day Six, Vol II at 131-134; Tr., Trial Day Seven, Vol. II at 22-23. As such, Folks' testimony regarding the Human Trafficking Offenses attempted to obstruct or impede the administration of justice as to his involvement in human trafficking. The obstruction of justice enhancement is thereby applicable to Group 1.

### Count Group 1: Base Level Offense (Drug Quantity)

Folks also objects to the drug quantity calculated within the PSR. The Probation Office estimated that McFarlan supplied Folks with a total of 805.73 kilograms for trafficking purposes, and that Folks also had three other drug sources in addition to that. PSR 26-27. Based on these numbers, the Probation office found that there is a preponderance of evidence that the offense involved at least 700 kilograms but less than 1,000 kilograms of converted drug weight, resulting in a base offense level of 28. PSR 27.

First, Folks objects to the quantities derived from McFarlan's testimony, arguing that he only testified to making "about" five trips and sold some of those drugs on his own. He also argues that some of McFarlan's trips to Vermont were

unrelated to drug selling activity. However, this argument lacks
merit. McFarlan testified to coming to Vermont "around five
times," bringing about "50 grams" on each occasion. Tr., Trial
Day Four at 96-98. He also testified to bringing approximately
20 grams of cocaine base to Vermont on two occasions. *Id.* at 98.
On McFarlan's last trip to Vermont, he transported the heroin
and cocaine base in a cereal box, which was later seized by law
enforcement and tested by the Drug Enforcement Administration's
Northeast Laboratory. The cereal box contained 128.3 kilograms
of heroin and 73.6 grams of cocaine base.

    The Court may estimate drug quantity when precise amounts
are not clear. Following a conservative estimate in favor of the
Defendant, the Court will assume that McFarlan took five, rather
than seven trips to Vermont. As noted in Section A, the Court
finds McFarlan's testimony regarding the approximate quantities
of drugs he brought to Vermont on these occasions to be
reliable. Based on this testimony and the known drug amounts
found in the cereal box, the total amount of drugs that McFarlan
brought to Folks amounts to slightly less than 700 kilograms of
converted weight.

    Moreover, other witness testimony establishes substantial
additional quantities of drugs. Mandy L. testified to travelling
with Folks to New York to bring additional drug shipments to

9

Vermont. Tr., Trial Day Two at 156-157. Numerous witnesses, including Mandy L., Mary P., and Chrissy T., testified about engaging in packaging drugs, oftentimes every day or every other day. Tr., Trial Day Two at 142-155; Tr., Trial Day Three at 118-132; Tr., Tr., Trial Day Four at 254-256. Mandy L. further testified that she made as many as 10-20 sales per day, all at Folks' direction. *Id*. at 159-163. Similarly, Chrissy T. testified that she would make 25-30 drug sales per day. Tr., Trial Day Four at 200. This consistent testimony bolsters McFarlan's statement that Folks had other suppliers and the Court finds it credible. As a result, trial evidence clearly establishes a base offense quantity of over 700 grams of converted weight, and the Court will apply base offense level 28.

### Count Group 1: Enhancement for use of threats or violence

The Defendant objects to the PSR's application of a two-level enhancement for use or threats of violence. First, he objects to the application of the enhancement for using the phrase "if you violate me, I will violate you," contending that street slang usage of this terminology did not amount to a threat of violence. Second, Folks objects to the application of the enhancement based on reports from Mandy L., Ayla, and Mary P. on grounds that these reports are not credible. Finally, he

10

objects to the application of the enhancement based on
Danielle's testimony because she was only involved in
prostitution for a week and there is no evidence that she
distributed drugs for him. Defendants' objections are denied.

Under U.S.S.G. § 2D1.1(b)(2), a two-level sentencing
enhancement may apply if "the defendant used violence, made a
credible threat to use violence, or directed the use of
violence." Here, the testimony presented at trial clearly showed
strong evidence of both threat and use of violence, which the
jury determined credible in reaching its verdict. First,
Katelynn testified that the Defendant's statement, "if you
violate me, I will violate you," was made in the context of
other violent acts that he took to discipline the women who
prostituted for him. Tr., Trial Day Six, Vol. I at 47-58. Even
if this phrase has other uses, trial evidence demonstrates that
it was deployed as a threat of violence in this context.

Second, multiple witnesses at trial attested to Folks' use
of violence. Ayla described three occasions on which Folks
physically assaulted her. Tr., Trial Day Seven, Vol. II at 40.
Keisha testified that Folks sexually assaulted her in
retaliation for stealing five bags of heroin from him, and that
he engaged in a variety of sexually abusive behavior while she
relied on him for heroin (e.g. shooting her in the buttocks

11

with a BB gun, videotaping himself urinating on her, and having her participate in the "walnut challenge"). Tr., Trial Day Five at 147-150. Katelynn attested that Folks had threatened her with violence on multiple occasions, and witnessed him become violent with other women who prostituted for him. Tr., Trial Day Six, Vol. I at 51-58. Mandy L. also testified that Folks sexually assaulted her, and that she had witnessed him sexually assault other women to punish and enforce his will. Finally, Mary also testified that Folks raped her. Tr., Trial Day Three, Vol. I at 135-141.

While Folks questions the credibility of some of this testimony, the jury has already made a credibility determination at trial; moreover, the overwhelming amount of testimonial evidence of acts and threats of violence from different sources suggests that this enhancement does apply. Hence, the Court denies the Defendants' objection and will apply a two-level enhancement for use or threats of violence as to Count Group 1.

## Count Group 2: Enhancement for involvement of a "vulnerable victim"

Folks objects to the application of a U.S.S.G. § 3A1.1 "vulnerable victim" two-level enhancement for the Human Trafficking Offenses related to victims Katelynn, Keisha, Danielle, and Ayla. The Court denies the enhancement as to all four victims.

According to Application Note 2 of U.S.S.G. § 3A1.1, a "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." The Government, which bears the burden of proof to show that the enhancement applies, must establish that the victims in question were *more vulnerable* than the typical victim of sex trafficking offenses, which would thereby render the Defendant's conduct worse than the typical instance of the crime. *See United States v. Sabatino*, 943 F.2d 94, 102 (1st Cir. 1991).

The Government argues that Katelynn, Keisha, Danielle, and Ayla were "unusually vulnerable victims" due to their drug addiction, poverty, age, difficult family backgrounds, and overall socioeconomic condition. The Second Circuit has thus far never found drug addicted individuals in poverty to be "unusually vulnerable" to sexual trafficking crimes. Moreover, sister circuits have largely found that individuals suffering from drug addiction and socioeconomic affliction are "typical victims" of prostitution under the Trafficking Victims Protection Act. *See United States v. Castenada*, 239 F.3d 978, 980 (9th Cir. 2001) (holding that poverty and lack of financial resources are typical characteristics of prostitution victims under the Mann Act); *United States v. Volkman*, 736 F.3d 1013,

13

1030 (6th Cir. 2013) (finding that drug addiction is not a sufficient basis for applying the enhancement).

In other statutory contexts, the Second Circuit has reserved application of the "vulnerable victim" enhancement to situations involving victims dislocated from their home communities abroad, without proficiency and comfort in the English language, and with a particular inability to extricate themselves from oppressive circumstances due to disability or physical detention. *See United States v. Sabhnani*, 599 F.3d 215, 253-54 (2d Cir. 2010) (finding Indonesian foreign domestic workers to be unusually vulnerable victims of forced labor crimes compared to potential victims who are U.S. citizens, able-bodied, and English speaking); *United States v. Irving*, 554 F.3d 64, 75 (2d Cir. 2009) (finding that homeless children in Mexico and Honduras were more vulnerable than a typical potential victim of criminal sexual abuse). In these cases, the Second Circuit has reasoned that it is membership within these groups that rendered those victims' vulnerability "unusual." Because none of the four sex trafficking victims at issue here exhibit similar characteristics, the "vulnerable victim" enhancement is inapplicable.

**I.   Katelynn**

14

First, the Government submits that Katelynn was unusually susceptible to the Defendant's criminal conduct due to her challenging background and serious drug addiction. Katelynn grew up in foster care, was homeless between the ages of 10 and 15, and was sexually assaulted by a cousin at age 13. Tr., Trial Day Six, Vol. I at 35-36. She began using drugs at age 13, and she began prostituting to support her drug habit at age 17. *Id.* at 36-37. She became involved with the Defendant while drug addicted and homeless. *Id.* at 46. While Katelynn's drug addiction and difficult life circumstances certainly rendered her vulnerable to the criminal activity at issue in this case, Katelynn was within the typical class of victims of trafficking under the T.V.P.A. Katelynn was able-bodied, English-speaking, a U.S. citizen, and native to Vermont – factors which protected her from unusual susceptibility to victimhood. Hence, the vulnerable victim enhancement does not apply with regard to Katelynn.

**II.  Keisha**

Next, the Government contends that Keisha was an unusually vulnerable victim on account of her drug addiction and difficult life circumstances. Keisha grew up in foster care, and struggled with drug addiction from an early age, having attended Woodside Juvenile Rehabilitation Center, Brattleboro Retreat's Adolescent

15

Inpatient Program, and NFI Vermont's DAP program. Tr., Trial Day Five at 114. Keisha suffered physical abuse by a boyfriend, and her father was a heroin addict who introduced her to Folks when she was drug addicted. *Id.* at 115. Once again, Keisha's drug addiction and challenging family situation rendered her a typical victim of prostitution. Keisha, too, was able-bodied, English-speaking, a U.S. citizen, and native to Vermont. The vulnerable victim enhancement therefore does not apply.

### III. Danielle

The Government submits that Danielle was an unusually vulnerable victim for similar reasons: she grew up in foster care, was sexually abused as a child, suffered from mental illness, and became addicted to heroin at a young age. Tr., Trial Day Six, Vol. II at 109. According to her trial testimony, Danielle became involved with Folks and the commercial sex industry after he expressed concern regarding her history of self-harm. *Id.* at 120. However, while Danielle's background of affliction and drug addiction clearly rendered her vulnerable to become a victim of the crimes at issue, she does not have the characteristics of an "unusually vulnerable" individual on account of her status as an English-speaking U.S. citizen with ties to the local community. Hence, the vulnerable victim enhancement does not apply.

### IV.  Ayla

Finally, the Government posits that Ayla should be
considered an unusually vulnerable victim under the T.V.P.A.
Ayla dropped out of high school after becoming pregnant and
became severely addicted to heroin soon thereafter. Tr., Trial
Day Seven, Vol. II at 5-8. Ayla lost custody of her child and
the support of her family as a result; she began working for the
Defendant while drug addicted and homeless. Ayla, too, does not
have the characteristics of an "unusually vulnerable" individual
on account of her status as an English-speaking U.S. citizen
with ties to the local community, despite her susceptibility as
a member of the typical victim class. As such, the vulnerable
victim enhancement does not apply.

### Count Group 1: Enhancement based on leadership or organizing role

Next, Folks objects to the four-level enhancement based on
his leadership and organizing role on grounds that he was not
the leader of five or more participants. Folks avers that he did
not have a supervisory or leadership role over Mr. McFarlan,
Hightower, Keisha, or Danielle. He further argues that the
individuals who worked with him to distribute drugs (Mandy L.,
Chrissy T., Lori C., Ayla, and Mary) did not all work for him at
the same time, rendering the enhancement inapplicable.

The Court denies the Defendant's objection. The evidence presented at trial demonstrates that Folks was in charge of a network of packers, sellers, packagers, and runners. He acted as the kingpin of the operation. Witness testimony establishes that Mr. McFarlan assisted Folks to facilitate his activities (by supervising bagging and providing security), as did Hightower. Tr., Trial Day Seven, Vol. IV at 101-103. As such, the Court finds that Folks was in a leadership capacity over five or more individuals, and the enhancement applies to Count Group 1 of the offenses.

### Count Group 1: Possession of a firearm

The next issue before the Court is whether a two-level enhancement for possession of a firearm during commission of a drug offense should be applied to Folks' sentence for Count Group 1. The Court finds in the affirmative.

Under U.S.S.G. §2D1.1(b), two offense levels are added if a firearm was possessed during a drug trafficking offense. Section 2D1.1(b)(1) applies where the defendant possesses a firearm in connection with unlawful drug activities.  At trial, multiple witnesses provided testimony indicating the presence of firearms throughout the drug conspiracy. McFarlan testified to seeing the Defendant in possession of a 9mm semi-automatic handgun. Tr., Trial Day Four at 113-115. Danielle testified to seeing Folks

with a gun, Tr., Trial Day Six, Vol II at 122, and Katelynn
stated that she would sometimes carry his gun for him. Tr.,
Trial Day Six, Vol. I at 60. Danielle Mary P. testified that,
once, when the Defendant's drugs were stolen, Folks threatened
her with a gun and pointed it to her head. Tr., Trial Day Three
at 137-138. Based on the plethora of trial evidence establishing
that the Defendant possessed a firearm while carrying out the
drug trafficking offenses herein, the Court finds that a two-
level enhancement for possession of a firearm clearly applies in
this case.

### Count Group 2: Use of a Minor

Next, Folks objects to the two-level enhancement for use of
a minor on the grounds that Katelynn was 18, not 17, at the time
of the offense. The Court grants this objection. According to
her testimony at trial, Katelynn was born on March 11, 1995.
Tr., Trial Day Six, Vol I. at 35. Katelynn testified that she
met Folks in the spring of 2012 without providing a more exact
time frame. *Id.* at 37.

Because Katelynn turned eighteen on March 11, 2012, her
testimonial evidence does not necessarily establish that she was
still a minor at the time that she met and began working for the
Defendant; Katelynn's prior statement that she had been
seventeen at the time of beginning work with Folks may have been

19

in error. Hence, the Court grants the Defendant's objection and will not apply a two-level enhancement for use of a minor.

## CONCLUSION

For the aforementioned reasons, Defendant's motion is **granted** in part and **denied** in part. The Court finds that Folks' total offense level is as follows:

As to Group 1 of the offenses, the Court finds a Level 28 offense level for at least 700 kilograms of trafficked drug quantity. The Court further finds a two-level enhancement for possession of a firearm, a two-level enhancement for use or threats of force, a four-level enhancement for the Defendants' role in the offense, and a two-level enhancement for obstruction of justice, resulting in a total offense level of thirty-eight.

As to Count Group 2, Count 10 (Katelynn), the Court finds a base offense level of 34, a four-level enhancement for his aggravating role in the offense, and a two-level enhancement for obstruction of justice. The total adjusted offense level for Count 10 is 40.

As to Count Group 2, Count 12 (Keisha), the Court finds a base offense level of 34, a four-level enhancement for his aggravating role in the offense, and a two-level enhancement for obstruction of justice. The total adjusted offense level for Count 12 is 40.

As to Count Group 2, Count 13 (Danielle), the Court finds a base offense level of 34, a four-level enhancement for his aggravating role in the offense, and a two-level enhancement for obstruction of justice. The total adjusted offense level for Count 13 is 40.

As to Count Group 2, Count 14 (Ayla), the Court finds a base offense level of 34, a four-level enhancement for his aggravating role in the offense, and a two-level enhancement for obstruction of justice. The total adjusted offense level for Count 14 is 40.

As to Count Group 6, Count 15 (Hannah), the Court finds a base offense level of 30, a four-level enhancement for his aggravating role in the offense, and a two-level enhancement for obstruction of justice. The total adjusted offense level is 36.

Parties are hereby ordered to address the applicability of the multiple offenses adjustment under 18 U.S.C. 3553(a) at the next sentencing hearing which is now scheduled to take place on Monday, September 21, 2020 at 10:00 a.m.

DATED at Burlington, in the District of Vermont, this 20th day of August, 2020.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge

21