1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA *
        V.                  *    Case No: 2:16-cr-wks-1
BRIAN FOLKS           *

MOTION TO LIFT OR MODIFY THE AMENDED PROTECTIVE ORDER
MAY 4, 2020
BURLINGTON, VERMONT

BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William B. Darrow, Esq. and Matthew T. Grady, Esq., Assistant United States Attorneys, United States Attorney's Office, 11 Elmwood Avenue, P.O. Box 570, Burlington, VT 05402-0570; Attorney for the Plaintiff.
    Mark A. Kaplan, Esq., Kaplan & Kaplan, 95 St. Paul Street, Burlington, VT 05401; Attorney for the Defendant.
    Natasha Sen, Esq., P.O. Box 193, Brandon, VT 05733; Attorney for the Defendant.
    Michelle A. Barth, Esq., P.O. Box 4240, Burlington, VT 05401; Attorney for the Defendant.

Court Reporter: JoAnn Q. Carson, RMR, CRR

CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT 05402-0329
(802/800) 863-6067
E-MAIL: Info@capitolcourtreporters.com

1  [Beginning at 2:30 p.m.]
2           COURTROOM DEPUTY:  This is Case Number 16-94 United
3  States of America versus Brian Folks.  The Government is
4  present through Assistant United States Attorney William Darrow
5  and Matthew Grady.  Mr. Folks is present with his attorneys
6  Mark Kaplan, Natasha Sen, and Michelle Barth.  The matter
7  before the Court is a hearing on the motion to lift or modify
8  the amended protective order, and all parties and the Court are
9  present via telephone.
10          THE COURT:  Okay.  So this hearing is limited to the
11 discussion of the protective order and the motion has been
12 filed by the Defendant to lift the protective order in --
13 frankly in response by the Government.  The Government has
14 raised a matter of real concern and that is whether the
15 discovery, which was on a hard drive, has been lost or
16 disappeared.  So I would like to -- I would like to also
17 address that question as well.  So, first from defense counsel
18 who is going to argue on behalf of Mr. Folks for the
19 elimination of the protective order or at least the limit of
20 the protective order -- the changes that you want?
21          MS. BARTH:  Your Honor, Michelle Barth on behalf of
22 the defendant.  I'm going to start and co-counsel may jump in,
23 but we're asking the Court to consider modifying or lifting the
24 current protective order.  Also just to follow the Court's
25 concerns I hope, but in order to put this request in context I

1  wanted to talk to the Court a little bit about the volumes of
2  material we're talking about.  There are over 26,000 pages of
3  materials in several banker's boxes.
4           THE COURT:  Let me interrupt.  I know that very well.
5  There are thousands upon thousands upon thousands of pages.  We
6  developed a system by which Mr. Folks would have access through
7  a computer -- a specific computer for his purposes, and I had
8  thought that all of those pages were put on the computer and he
9  would have access to that, and so frankly with him being moved
10 from Northwest down to Springfield he would be -- it would be a
11 relatively easy thing to move his computer which had, of
12 course, all of this material on the computer to follow him to
13 Springfield.  Apparently, at least according to your pleadings,
14 the Springfield superintendents said that could easily be done
15 assuming that there was a computer which had all of this
16 discovery on it.  So anyway.
17          MR. KAPLAN:  I was just going to indicate that is --
18 certainly that can be done.  We can put all the discovery on a
19 laptop.
20          THE COURT:  Mr. Kaplan, what happened to this hard
21 drive?
22          MR. KAPLAN:  Well, you know, it's kind of a mystery.
23 I think we had set up a procedure with the jail whereby this
24 could not happen.  The way -- the way it operated for months
25 was the hard drive and the computer were kept in a computer bag

1  together, and what would happen is a guard would check it out
2  of the main office, bring it to Brian, Brian would check to see
3  if everything was there.  He was not allowed to leave his room
4  while he was using the hard drive on the computer.  When he was
5  done he would hand it back to an official and the official at
6  that point was supposed to check to make sure the hard drive
7  and the computer were together.  It would go back to the office
8  under lock and key.  So I don't understand how the hard drive
9  could end up being missing unless conceivably it was lost in
10 the office and -- because when Brian reported it missing, the
11 minute he reported it missing they thoroughly searched his
12 room.  They had him step out and they thoroughly searched him
13 and the room and they didn't find anything.
14           THE COURT:  So I have a number of questions.  The
15 first thing when did they recognize -- or when did Mr. Folks
16 say that the hard drive had disappeared?  Was that before the
17 trial?
18           MR. KAPLAN:  No.  It was after the trial.  It was
19 after the trial.
20           THE COURT:  So this was -- this was post trial.  He's
21 had access to the computer all the way through the trial?
22           MR. KAPLAN:  Yes.
23           THE COURT:  And was there a process by which the
24 Department of Corrections would check off a box to say yes
25 indeed we have the computer back and then we have the hard

1  drive back as well?
2           MR. KAPLAN: I don't know if they had an official
3  checklist, but I believe every time Brian handed it to the
4  guard they were supposed to check it to make sure the computer
5  and the hard drive were there. I don't know what they did when
6  they got back to the office or what happened when -- I assume
7  when they checked it out of the office they had to write
8  something down.
9           THE COURT: Well all right. So -- well that raises a
10 question about whether there could actually be use of a
11 computer by Mr. Folks in advance of the sentencing that would
12 be secure; i.e. it would not be on hard drive. It would be
13 incorporated right into the computer so that it could not be
14 taken apart and removed. Is that possible? Because I saw -- I
15 saw in the defendant's pleadings that the fact that there --
16 the fact that the discovery went onto a hard drive was by
17 error.
18          MR. KAPLAN: It was clearly actually on my part. My
19 office apparently put it on the hard drive thinking that it
20 would be an awful lot easier to keep adding on it than to put
21 it on the computer, and when I was told that I didn't make the
22 distinction which I should have.
23          THE COURT: All right. So now there's a possibility
24 of having all of this discovery in the community frankly.
25          MR. KAPLAN: As far as I know it hasn't been. No one

1  has ever indicated that it has been.  Sure it's a possibility.
2  There's no question about that.
3         THE COURT:  Well I thought that the Government was
4  suggesting that, at least according to some of the overheard
5  conversations with Mr. Folks, that there may have been some
6  implicit language about the hard drive or the possibility of
7  the hard drive being distributed outside of the correctional
8  facility.
9         MR. KAPLAN:  That's apparently -- I'm sorry.
10        MR. DARROW:  Thank you, Your Honor.  Can I make a few
11 observations about this --
12        THE COURT:  Sure.
13        MR. DARROW:  -- at the outset?  As I think both you
14 and Mr. Kaplan recognized your order authorized the discovery
15 to go on a laptop not a hard drive, and in fact the order
16 specifically said no external devices.  So that brings us to
17 the hard drive.
18     When we first -- when the Government first learned that
19 the hard drive had vanished we were concerned about what was on
20 it, and in a communication with Mr. Kaplan we were told that
21 consistent with the Court's order -- protective order of I'm
22 thinking it was September or October 2019 there were no
23 photographs, images, or videos or Grand Jury transcripts on the
24 hard drive.  You will recall that the Court distinguished
25 between sensitive and so-called nonsensitive materials, and my

1  understanding from Mr. Kaplan had been even though there wasn't
2  a table of contents of what was on the hard drive that the
3  materials on it complied with the Court's order.  So the
4  materials that the Government's most concerned about today with
5  the motion to lift the protective order are those sensitive
6  materials which I don't think -- I understand from the defense
7  were not on that hard drive.  So that I wanted to make that
8  point.
9       Going to your question as to what happened to the hard
10 drive, I believe it was on or about April 24th when Mr. Folks
11 told Northwest that the hard drive was missing.  I believe
12 there was a log that Northwest kept of the computer bag going
13 in and out, but that log did not distinguish between a hard
14 drive and a computer because I don't think Northwest knew there
15 was a hard drive.  They thought it was just a computer in a bag
16 with a C cord, and finally the reason why the Government thinks
17 that the hard drive was spirited out of Northwest by Mr. Folks,
18 or at least that's what the information suggests, is that on I
19 believe it was April 11, which I think was the -- on or around
20 the day after the trial, Mr. Folks put together a bag of
21 materials for his wife to pick up and called her to have them
22 picked them up and she did pick them up, and when asked what
23 was in the bag DOC said well we don't check outgoing packages.
24 We check incoming packages.  We're not concerned about security
25 on what leaves the prison, and so no one looked in the bag, but

1  Mr. Folks, you know, created this description of legal
2  materials and this that and the other, but we think that's
3  probably when the hard drive left the prison was in that bag,
4  and that's what you heard in the Marshal's Office investigative
5  report looking into that and following up with phone calls.
6       In addition, both the U.S. Marshal Service and the
7  officials at Northwest searched high and low for that hard
8  drive and couldn't find it anywhere, and so it appeared to the
9  Government that the most likely explanation of where it went to
10 was in that bag of materials leaving the prison.  I hope that
11 responded to your question.
12           THE COURT:  Well right.  Was there any overheard
13 conversations between Mr. Folks and anyone else which suggested
14 that he was advising people to look in particular places for
15 the hard drive?  You're not aware of that?
16           MR. DARROW:  Well there are the phone calls and
17 interviews that the Marshal's Office did which were
18 memorialized in that report which is attached to the
19 Government's opposition.  Beyond that we have had some
20 concerning phone calls -- recorded phone calls from Mr. Folks,
21 but they didn't -- they didn't refer to the hard drive.
22           THE COURT:  All right.  Okay.  So well that's a
23 totally separate issue.  My question is whether Mr. Folks could
24 be given a computer with access to discovery that would be in a
25 secure manner, that is as a part -- as a part of the computer.

9

1  I appreciate it, Mr. Kaplan, suggesting, you know, there was a
2  mistake and I'm sure it was a mistake and those of us of our
3  generation would make that mistake a lot.  So I just want to
4  make sure that going forward if in fact Mr. Folks is given a
5  computer with access to the discovery it's not -- it's not the
6  classified discovery with the images, but it's the same
7  discovery that he had before, but it would not be on a
8  severable hard drive.
9              MR. KAPLAN:  I would hope we would not do that twice,
10 Judge.
11             MS. BARTH:  Your Honor, Michelle Barth.  I had spoken
12 to the facility before I filed the motion.  I had spoken to two
13 different superintendents about the issue and they suggested
14 that they could set up the same system with a laptop and also a
15 laptop is pretty easy to keep track of.  So I think it would be
16 an easy task to load up the discovery on a large laptop to take
17 to the Southern State Correctional.
18             THE COURT:  Mr. Kaplan, what do you think of that as
19 a resolution at least temporarily to go forward?  We want to
20 get -- I think the Court's going to open up on the 18th of May.
21 I'm hoping to have a hearing on the various sentencing issues
22 soon thereafter.  We're going to proceed to sentencing
23 relatively quickly.  So it would be important that Mr. Folks
24 had access to the discovery in light of the fact that the
25 sentencing is going to be fairly soon, but anyway so the

**Capitol Court Reporters, Inc. (800/802) 863-6067**

                                                                  10

1     question is whether the Government has any objection to this
2     process.
3              MR. DARROW:  Well a couple points, Your Honor.  Thank
4     you.  First of all, if we went down that road, this time the
5     Government would like to see -- would like to look at the
6     computer and get a table of contents of its -- of what's on it
7     before it went out the door.  We would also like -- is it
8     Southeast where Mr. Folks is now?
9              THE COURT:  In Springfield.
10             MR. DARROW:  Right.  We would like Springfield to do
11    a better job, to be very careful with this stuff and maybe do a
12    better job of signing it in and out.  I think things were a
13    little -- a little informal up at Northwest.  So that's by way
14    of preface, but to your question does the Government have a
15    problem with this, I think we do and there are a couple reasons
16    for that.
17         One is, you know, the posture of the case.  We're on the
18    eve of sentencing.  I call it a second PSR has come out.  I
19    don't know if it will be the final one because I think we're
20    going to have an objections hearing, but there's been
21    considerable back and forth between the parties and probation
22    about the PSR.  The PSR is driven by the trial evidence.  This
23    isn't a case where there's a significant enhancement in the PSR
24    which was coming from, you know, evidence that the Government
25    had and the defense needed to see it in order to evaluate its

1   vitality prior to a sentencing hearing.  I think the various
2   enhancements and offense characteristics and whatnot in the PSR
3   are driven by the trial evidence which Mr. Folks sat and
4   listened to and saw come in.  So it's not like there are a lot
5   of mysteries out there in the discovery.  So that adds to the
6   posture of the case.
7       The second reason why we're -- that's sort of why we don't
8   think it's necessary; that and the fact that Mr. Folks has
9   three lawyers all of whom know the evidence and are very
10  capable.  The second reason is, you know, the history of Folks
11  driven discovery problems in this case going back to mailing
12  out defense witnesses -- the defense witness list when Judge
13  Crawford had the case to this problem with the hard drive more
14  recently.  You know frankly we're pretty distrustful at this
15  point, and we think Mr. Folks had access to the discovery for
16  several years leading up to the trial, including three
17  continuances of trial, at least two of which were driven by the
18  fact that he hadn't had enough access to the discovery, and to
19  add to that his penchant for being vindictive comes to mind.
20  We don't think he should have more access to discovery even if
21  it's not, you know, compromising sexual images of the various
22  victims and witnesses and Grand Jury.  It's still, you know,
23  police reports about what they said and when they said it and
24  family members and details about who they are that we don't --
25  we think that he's had a day and we should move to sentencing

1  and he shouldn't have more access to discovery when he's
2  already had plenty and he's abused what he's gotten.
3           MS. BARTH:  Your Honor, if I could address that
4  point.
5           THE COURT:  Sure.
6           MS. BARTH:  Michelle Barth.  I think with respect to
7  ongoing discovery review Mr. Folks's trial is over, but his
8  challenges to his conviction and the sentence that will
9  eventually be imposed is not, and it is difficult, if not
10 impossible, to recall the contents of every document and it's
11 the review and comparison between various documents that's a
12 key part of both preparing an appeal, preparing for a
13 sentencing or preparing a collateral attack.  So as it stands
14 right now Mr. Folks is unable to meaningfully review any of
15 this discovery as he moves forward towards his sentencing and
16 beyond.
17     As far as the Government's earlier points about inspecting
18 the laptop and getting the table of contents to go along with
19 the discovery, I obviously haven't had a chance to talk to
20 co-counsel about that, but I don't see that as being
21 problematic.
22     As far as the other points about potential retaliation, I
23 believe it's been four years since Mr. Folks' arrest and there
24 is no evidence of him attempting to retaliate or intimidate any
25 of the witnesses in any way, and Mr. Folks knows all of their

1  names and he knows who they are and has known since the trial,
2  and the Government had also mentioned the incident with the
3  Facebook listing of the witnesses.  I think it's a bit more
4  nuanced how the Government has described it.  I think that
5  there is evidence in the form of phone calls in which Mr. Folks
6  asked that not be posted and when he heard -- he heard that
7  from other people, he asked that it be taken down.  So I think
8  that with a single laptop being loaded with these materials,
9  the Government's opportunity to inspect it, and double-checking
10 with Southern State Correctional regarding their procedures for
11 checking in and out the laptop, that would at least satisfy our
12 concerns.
13         One last thing.  Just a little point.  The Government was
14 discussing -- Mr. Darrow was discussing the procedural -- he
15 mentioned some dates in April related to this disappearance of
16 the hard drive.  That actually happened in May.  In my notes I
17 have May 10th at the end -- close to the end or right after the
18 trial and May 23rd is when the hard drive was reported missing.
19 Those are my comments.
20              THE COURT:  All right.  So well this -- what I'm
21 going to do is give you a general directive and it should be
22 followed up with an order, and I guess I would ask -- well when
23 I get back into the building I'll get the order sent, but
24 here's -- here's what I think would be smart.
25         Hence, by way of background, access to discovery is an

1  extraordinarily important constitutional right that I've tried
2  to protect all along in Mr. Folks' case.  That's the reason why
3  he had access to a computer under what I thought were
4  sufficient safeguards so that he would actually have the
5  ability to review the discovery, prepare, help his lawyers
6  prepare for the defense, prepare for the defense, et cetera,
7  and I think it would be a mistake to say at this particular
8  point he's lost that right.  There's no proof that he did
9  anything wrong in the first place, but more than that, this is
10 a fundamental right that he's got access to discovery as a part
11 of his defense and that extends from the beginning of criminal
12 prosecution until the end and it certainly includes sentencing.
13 So he should have assess to that discovery.
14      So the best way to approach this it seems to me is, number
15 one, get a laptop computer.  The discovery would be put on that
16 laptop computer without a hard drive which is severable from
17 the laptop computer so that there is a higher level of
18 security.  That this would be administered by the corrections
19 officials at the Southern Correctional Facility in Springfield,
20 and that prior to that laptop being given to Mr. Folks, which I
21 think should be done very quickly, that the Government should
22 have access to that computer to see what the contents are, the
23 list of topics, to make sure that there are no classified
24 material or sensitive classified material, and also that the
25 computer has a level of security that the material could not be

1 taken off the computer and then distributed by anyone. So that
2 could be done relatively quickly.
3 　　So I'm going to grant the motion to modify the protective
4 order substituting obviously the Southern Correctional Facility
5 in Springfield for the Northwest Correctional Facility in
6 Swanton, and have it -- a laptop that does not use a hard drive
7 that has the same definitions that were included within the
8 original protective order, and then also provides the
9 Government the ability to inspect it prior to its being given
10 to the defendant, and this should be done really quickly
11 because we're -- we're going to be addressing all of the issues
12 for sentencing relatively soon after the Court reopens in May.
13 I mean hopefully it's going to reopen in May.
14 　　　　　MR. DARROW: Your Honor.
15 　　　　　THE COURT: Yes. Go ahead.
16 　　　　　MR. DARROW: Bill Darrow. Just a couple caveats. We
17 hope, and these may be things that we can work out -- the
18 parties can work out, but we hope that Springfield will not
19 allow -- well that Springfield will limit Mr. Folks' access to
20 his laptop to his cell because Springfield allows inmates
21 access to the internet for purposes of emails and so they have
22 some computer access, and we wouldn't want the laptop
23 authorized by the Court anywhere near any other computer. So I
24 assume he doesn't have that other computer access in his cell,
25 but we want to keep --

1          MS. BARTH:  I want to jump in again.  Sorry.
2  Michelle Barth.  So I understand -- I had a conversation with
3  someone at Southern State that all inmates have access to a
4  tablet.  I don't think that they would then be able to, you
5  know, use the tablet in conjunction with a computer.  Are you
6  concerned, Bill, about internet -- Mr. Darrow, about internet
7  access?
8          MR. DARROW:  Yes.  Our concern is that Mr. Folks is
9  an extremely intelligent and resourceful fellow and we don't
10 want the laptop anywhere near any other electronic devices.  A
11 tablet, now that you mention it, that sounds familiar.  I had
12 heard -- I had forgotten, but I heard inmates had tablets.  The
13 tablets could be used, for example, to take a photograph of a
14 screen from the laptop and conceivably attach it to an e-mail.
15 I'm not terribly savvy about such things, but I don't think the
16 tablet should be in the same room with the laptop.
17         MS. BARTH:  This sounds like a conversation that we
18 could have outside of the hearing.
19         MR. DARROW:  That could very well be.
20         THE COURT:  I think that you should work those
21 details out.  I mean I just want to make sure that there's no
22 way that any of the material on the computer which has any of
23 the discovery material can be copied or transmitted to another
24 device and then sent out of the facility.  The whole point is
25 to make sure that he's looking at the discovery himself without

1  the ability of reproducing that and sending it to others.
2          MS. BARTH:  Your Honor, I think we can come to an
3  agreement that addresses the concerns.  One last thing you had
4  mentioned --
5          THE COURT:  May I suggest that both of you work on an
6  order that I can sign to make sure that everything is covered.
7          MS. BARTH:  Yes, Your Honor.
8          THE COURT:  Okay.
9          MR. KAPLAN:  Thank you, Judge.
10         MS. BARTH:  Thank you, Judge.
11         MR. DARROW:  Thank you, Judge.
12         THE COURT:  Okay.  Is that it?  All right.  Well
13  thank you very much.
14  [Adjourned at 3 p.m.]
15
16                    C E R T I F I C A T I O N
17
18     I certify that the foregoing is a correct transcript
19  from the record of proceedings in the above-entitled matter.
20
21
22
23  _____                      _____
24  November 12, 2020                     JoAnn Q. Carson, RMR,CRR
25

**Capitol Court Reporters, Inc. (800/802) 863-6067**