1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
           V.           *   Case No:  2:16-cr-wks-1
BRIAN FOLKS         *




HEARING TO ADDRESS OBJECTIONS TO THE PRESENTENCE REPORT
JUNE 18, 2020
BURLINGTON, VERMONT


BEFORE:
    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    William B. Darrow, Esq. and Matthew T. Grady, Esq.,
Assistant United States Attorneys, United States Attorney's
Office, 11 Elmwood Avenue, P.O. Box 570, Burlington, VT
05402-0570; Attorney for the Plaintiff.
    Mark A. Kaplan, Esq., Kaplan & Kaplan, 95 St. Paul Street,
Burlington, VT  05401; Attorney for the Defendant.
    Natasha Sen, Esq., P.O. Box 193, Brandon, VT  05733;
Attorney for the Defendant.
    Michelle A. Barth, Esq., P.O. Box 4240, Burlington, VT
05401; Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

2

1    [Beginning at 1:30 p.m.]

2            DEPUTY CLERK:  This is case number 16-94 United

3    States of America versus Brian Folks.  The Government is

4    present through Assistant United States Attorneys William

5    Darrow and Matthew Grady.  The Defendant is present in the

6    courtroom with his attorneys Mark Kaplan, Natasha Sen, and

7    Michelle Barth.  The matter before the Court is a hearing on

8    the objections to the presentence report.

9            THE COURT:  All right.  The defense has raised a

10   number of objections to the presentence report and also the

11   Government has raised a couple of objections as well.  So,

12   first of all, let's talk about how we're going to proceed.  I

13   would ask that the persons who are going to argue on behalf of

14   their case come up to the podium and you can take the mask off

15   and I can hear you clearly.  Any objection to that?

16           MR. DARROW:  No, Your Honor.

17           MR. KAPLAN:  No, Your Honor.

18           THE COURT:  All right.  Okay.  So turn to the defense

19   first.  You have had -- you've raised a number of objections.

20   First, objections generally speaking related to some factual

21   inclusions within the presentence report, but also then to

22   various, well, drug quantity together with the application of a

23   number of offense characteristics.  So who's going to argue on

24   behalf of the defense?

25           MS. SEN:  I will, Your Honor.

**Capitol Court Reporters, Inc. (800/802) 863-6067**

3

1          THE COURT:  Okay.  So let's make sure we're on the

2     same page, Ms. Sen.  All right.  My review of your objections

3     -- they came by way of objections to the probation officer --

4     raised a number of questions.  The first, obstruction of

5     justice enhancement.  Second, you objected to drug quantity

6     and, in particular, you object to the inclusion of testimony

7     from Mr. McFarlan, the cereal box which includes that, self

8     reporting, Ms. L. and Chrissy, as well as inclusion of drug

9     quantity under MDMA.  That's drug quantity.

10         Next related to group one you object to an enhancement for

11    threats or violence.  Also you object to the vulnerable victim,

12    and, finally, you object to leadership role.  That's all within

13    one, right, group one?

14         MS. SEN:  That's correct, Your Honor.

15         THE COURT:  Okay.  Are we correct so far and is that

16    where you're going to start?

17         MS. SEN:  Sure, Your Honor.

18         THE COURT:  And then let me just make sure that I

19    understand as well in regard to group 2 you object to the use

20    of a minor, and also the Government is seeking enhancements

21    under 3A1.1 and 3B1.1 and you object to that?

22         MS. SEN:  Yes, Your Honor.

23         THE COURT:  Okay.  Are we set?  Is that --

24         MS. SEN:  Yes, Your Honor.  Well I broke -- when I

25    was going back to review for this hearing I actually broke it

4

1  down by each count.  So in terms of I think that the

2  enhancements -- we do object to the enhancements for each of

3  the sex trafficking counts.  They are a little bit different in

4  terms of the argument for each of them so I can address each of

5  those separately, but I'll start with the drug quantity, Your

6  Honor.

7           THE COURT:  Okay.  So you're going to start with the

8  drugs in general which means that you're also going to be

9  dealing with obstruction of justice and various other issues?

10          MS. SEN:  Yes.

11          THE COURT:  Okay.  Great.  I will say that as you've

12  raised some objections to whether the Court should consider,

13  for instance, Mr. McFarlan's testimony or Chrissy's testimony

14  and you have raised general attacks on those, the Court's

15  intention is to review the transcript, review any more

16  supplemental submissions from both sides.  I'm not so sure that

17  that's helpful necessarily to go over each one of those

18  objections.  The more important thing to discuss regards the

19  various enhancements, the drug quantity, the impacts upon how

20  the guidelines work seems to me, but --

21          MS. SEN:  So in terms of the drug quantity, Your

22  Honor, I think the issue based on the chart that probation had

23  provided in terms of the quantities that were being counted I

24  think that -- and I think we can meet a lot of these arguments

25  in our Rule 29 submission as well.  So I understand the Court's

5

1    position with some of these arguments, but Mr. Folks feels

2    strongly that, for example, the January 12, 2016 controlled buy

3    that was entirely arranged by Mr. McFarlan in January.  At that

4    point in time our review of the testimony and our view of --

5    the defense's view of the evidence is that at that point Mr.

6    McFarlan and Mr. Folks were not working together.  That this

7    was a separate controlled buy.  As you might recall, Your

8    Honor, that Chrissy was the -- was sort of working undercover

9    for the law enforcement for the purpose of that buy, and that

10   was something that was entirely set up by Mr. McFarlan, and the

11   Court will also recall Mr. McFarlan testified that not only did

12   he bring up quantities that he would parcel out to Mr. Folks in

13   5 and 10 gram quantities --

14           THE COURT:  Ordinarily 10 gram quantities and then he

15   testified that this last time was going to be the last time,

16   and that everything was different because he had seen all these

17   different persons who were involved in the conspiracy.  He was

18   very concerned about who he could actually speak with.  This is

19   what he testified to, as I remember, and then he picked out

20   Chrissy because he felt she was somebody he had known from

21   before and trusted her because that would be the way that he

22   would get the drugs to your client.  That's essentially what he

23   testified to.

24       So I appreciate the fact that you are -- you are

25   requesting that the Court basically sever Mr. McFarlan from the

6

1   conspiracy in a broader sense, but also in that last one --
2   particular one because if there's no conspiracy, then there's
3   no involvement with your client, but that's a factual question
4   that the Court needs to address.

5           MS. SEN:  Well I guess I think that I was thinking
6   about specifically this one controlled buy from January 12,
7   Your Honor, and Mr. McFarlan also testified that he would sell
8   a certain amount of the quantity he brought up on his own.
9   That was not something that he was part of and it wasn't
10  something that Mr. Folks at the time was aware of to be a part
11  of the conspiracy, and so that was one of the reasons why we
12  were objecting to the inclusion of that particular quantity.
13  I'm sure it's not a huge quantity, but whatever the quantity
14  was for that January 12th controlled buy, and I think what the
15  Court was addressing too there was the general argument we have
16  related to the cereal box which is, of course, the greater
17  quantities.

18          THE COURT:  Sure, and you would agree, would you not,
19  that if two people are engaged in a conspiracy and they are
20  conspiring to distribute drugs, if one of those persons got a
21  hold of drugs pursuant to the conspiracy and then went off and
22  sold it to other buyers without the knowledge of the other
23  conspirator, that still would be within the reasonable
24  foreseeability of the conspiracy, would it not?

25          MS. SEN:  I think given the Court's hypothetical,

1   yes, but I think the view -- the defense's view of the evidence
2   in this case is that by the time of that January 12th
3   controlled buy that they were not working together any more,
4   and I think in fact Chrissy testified that they were not
5   working together; that they had not -- she had not seen them
6   together, and so at that point when that particular purchase
7   occurred.  So that would be the defense view of that particular
8   controlled buy.
9       I think the Court is familiar with the arguments we made
10   -- the same arguments related to the cereal box of drugs, Your
11   Honor.  One thing that I would note is that without the cereal
12   box of drugs -- well the way the PSR currently calculates the
13   drug quantity, and I understand that under the guidelines there
14   is no one-to-one ratio between crack and cocaine, powder
15   cocaine, but if the Court were to vary downward to using an
16   one-to-one ratio, even with the current -- at the current drug
17   quantity calculation in the PSR it would come down to level 26.
18   It would be between 400 and 700 kilograms of converted drug
19   weight.  Without the cereal box that would come down to level
20   24 and that's using the one-to-one ratio.  So we're talking
21   about a drug quantity of, you know, a couple of levels.
22       I don't think that the PSR relied on Chrissy's description
23   of the quantities of drugs that were bagged, although there was
24   a description in the PSR, but I would suggest that any
25   testimony she had about golf ball sized bags of drugs, you

8

 1    know, the Government had the opportunity at trial to prove the

 2    actual quantity, and I don't know that you can figure out a

 3    quantity based on a brick of heroin, a golf ball, a softball

 4    size of crack powder or crack cocaine or powder cocaine, and so

 5    I would argue that is just insufficiently precise to allow the

 6    Court to really make a drug quantity determination even for

 7    purposes of sentencing where we're talking about, you know, a

 8    lower standard of proof that the Government has to meet, but I

 9    would suggest any sort of just descriptors about what witnesses

10    saw in terms of quantity should not be included, and I don't

11    believe that the PSR includes those quantities.

12              THE COURT:  But you would agree that the relationship

13    of Mr. McFarlan is at the heart of your argument that the drug

14    quantity was overstated?

15              MS. SEN:  Yes, Your Honor.

16              THE COURT:  Okay.

17              MS. SEN:  Going on to the -- well there are several

18    enhancements related to the drug charge.  There's what amounts

19    to a six level enhancement for firearm possession, for use or

20    threats of violence, and for sort of taking an aggravating role

21    in having a vulnerable victim.  So I would just like to take

22    each of those, Your Honor.

23         In terms of the firearms my memory may be incorrect, but

24    having reviewed the trial transcript several times I think that

25    the only actual firearm in this case is the firearm that was in

9

1    the glove compartment of the vehicle in which Mr. Folks was

2    stopped and which the jury acquitted him of being a felon in

3    possession.  It was the basis of that felon in possession

4    charge, Your Honor.  We have had other witnesses who talked

5    about seeing firearms.  So, for example, Mr. McFarlan's

6    testimony was he was aware that Mr. Folks had come into

7    possession of four firearms, but he never -- he says he never

8    saw him with the firearm.  I think Chrissy is the one person

9    who says that she was involved in a transaction where Mr. Folks

10   exchanged drugs for a gun with someone and the gun was in a bag

11   or backpack at Lori's house on Spring Street.

12       There is Danielle who testified that when she wanted to

13   leave the motel room that she -- when she was trying to leave

14   that she saw Mr. Folks with a gun, although Mandy L. was also

15   in that room.  The Government either never asked her or never

16   brought out or that there was ever a gun there and, in fact, I

17   don't think Mandy ever talked about there being a gun.

18       So various other witnesses in this case at trial talked

19   about seeing guns, but all of them were one off incidents.  It

20   was one witness.  In some situations the witnesses stated that

21   there were other witnesses who were called at trial who were

22   present at the time.  Those witnesses -- and I'm sure that if

23   the Government could, it would have corroborated those

24   witnesses' statements.  It did not.  So, for example, with

25   Danielle it did not ask Mandy or Mandy did not testify to

10

1    whether or not she also saw Mr. Folks with a gun at that point

2    in time.

3        The Court may recall Mary P.'s testimony where she talked

4    about Mr. Folks holding a gun to her head in what every witness

5    described is a very small apartment.  If I'm recalling this

6    correctly, she and Mr. Folks were in the bedroom and Ms. O.

7    who testified on behalf of the defense, and Ms. L. -- sorry,

8    Mandy were sitting right outside in the living room, Mandy was

9    never asked about this.  Never talked about any violent episode

10    with Mary, and when Ms. O. was directly asked about it she said

11    nothing like that had ever happened in her presence.  So this

12    issue about these guns flying around I don't think that all of

13    this testimony -- the defense's view is that there's not enough

14    there to include a gun enhancement for this particular case.

15        In terms of use and threats of violence with respect to

16    the drug trafficking charge, Your Honor, again, first of all, I

17    think one of the things that the Government repeatedly brought

18    out through witnesses is this phrase about if you violate me I

19    will violate you, and witnesses say that they heard Mr. Folks

20    say this and that, but Mr. Folks testified and he explained

21    what that phrase meant, and he explained that this was a form

22    of street slang.  It was common, and it wasn't so much driven

23    by the idea that he will become violent with someone, but that

24    it was if you disrespect me I will disrespect you, and so using

25    that as a threat I think is not supported at least by my own

11

 1    client's testimony.  Now whether or not the Court finds that

 2    testimony credible we submit that is really what the intention

 3    was.  He was the person using the phrase.  He explained that

 4    that was a very common phrase and I think that the Court should

 5    give credit to that.

 6         In terms of the other issues with respect to -- at least

 7    cited in the PSR for use or threats of violence, I think

 8    there's -- the PSR cites Mandy's statement.  She did not

 9    testify to this at trial because the Court had found that this

10    happened outside the time period of the conspiracy, but she

11    claimed that she was raped by Mr. Folks, and if the Court, of

12    course, probably recalls that it excluded this testimony at

13    trial because it was well outside the time period involving any

14    of these charges, and it was not sufficiently reliable and the

15    defense would submit that this information is insufficiently

16    reliable to have the Court rely on it for an enhancement on

17    that basis.

18              THE COURT:  But you do have a number of circumstances

19    in which co-conspirators were thought by your client to have

20    stolen drugs and that he would get them brought back to him and

21    they were submitted, according to their testimony, to a

22    physical assault or sexual assault and that all stemmed I

23    thought almost exclusively by out of theft of drugs.  Is that

24    not -- is that not right?

25              MS. SEN:  Well, Your Honor, I think the only one that

1  I can recall right off is Keisha with the theft of drugs.

2         THE COURT:  Right.

3         MS. SEN:  And I think that the testimony on that,

4  given Keisha's entire testimony and then given my client's

5  testimony, I think that whether or not he raped her, which is

6  what I think the language in the PSR is, or whether or not that

7  was consensual I think -- I think that my client would dispute

8  that he raped her, and I think that in terms of using violence

9  in that situation I don't think -- my client's position is that

10  he was not threatening her.

11         THE COURT:  Your client's position is it did not

12  happen, but did not -- at least according to the victim -- I

13  thought it was Kayla, but maybe it's Keisha at the cemetery,

14  right?

15         MS. SEN:  Right.  That was Keisha.

16         THE COURT:  So she said that that assault occurred as

17  a result of your client thinking that she stole drugs out of

18  the conspiracy and the violence happened as a result.

19         MS. SEN:  I think that's --

20         THE COURT:  You agree that testimony stemmed out of

21  theft of drugs.  You object to the Court finding that it in

22  fact happened because you think it's not credible, but that's

23  what she testified to.

24         MS. SEN:  I think, Your Honor, is that that was her

25  testimony and I think my client's position is that that was not

1  a non-consensual sexual act.  So not that it never happened,

2  but that I believe if the transcript -- if I remember the

3  transcript correctly, my client's position is that that was not

4  something that was non-consensual.

5              THE COURT:  Okay.

6              MS. SEN:  And I think actually this issue, and I

7  might ask Ms. Anderson Barth to address this because I think

8  she addressed it a little bit more in response to the

9  Government, the issue of the vulnerable victim.  So I'm happy

10  to address it and allow her to address it further.

11              THE COURT:  You can have her address it further and

12  then --

13              MS. SEN:  Great, and I think the general argument

14  here with respect to each of these victims is that these women

15  who are witnesses is that they were not particularly

16  vulnerable.  So I think that Ms. Anderson Barth's letter cites,

17  for example, a study and some other cases that talk about how

18  just because you are drug addicted does not make you a

19  particularly vulnerable victim to, for example, sex

20  trafficking.

21      I think that there also -- that in fact people who are

22  drug addicts are sort of the typical people who are involved in

23  these kinds of crimes, and so that you would need to show

24  something other than just, for example, the Government's cites

25  their drug addiction.  In terms of a lot of these witnesses'

1  childhoods that the Government relies on it has to be something

2  that Mr. Folks was aware of at the time, and so for some of

3  them, you know, Mr. Folks met most of these women as they were

4  prostituting, and so does that make them more vulnerable to

5  this than others?  I don't think so, Your Honor.  I mean it

6  seems like they are the typical type of person who is involved

7  in this kind of an offense.

8           THE COURT:  Well, but there was one -- I think it's

9  Danielle -- she's in the car with the defendant.  Defendant

10  sees her arms have been scarred because of cutting.  She then

11  describes the history of sexual abuse, the efforts to take her

12  life, her emotional difficulties, et cetera, and this is all in

13  the vehicle on the way to essentially the motel room.  Is that

14  the stronger case for vulnerable victim because the defendant

15  would have been told that she suffered from sexual abuse as a

16  child and had varying emotional problems?

17           MS. SEN:  She may have said that in the vehicle, Your

18  Honor, and that was her testimony, but I would also note that

19  this is a witness who was sending naked pictures of herself to

20  Mr. Folks which she admitted very reluctantly on the stand

21  after being confronted by those pictures on cross examination.

22  She's also someone who engaged in a sexual act with Mr. Folks

23  before she could ever start.  Before that incident happened

24  when she first met him she says that she went to buy drugs at

25  this house and that he was there and that he helped her and

1   then they had this sexual act behind the house, and so the idea

2   that somehow presenting herself and admitting to all of those

3   things and yet then saying she's particularly vulnerable

4   because of this information she provided in the car I would

5   have to go back and look and see.  I don't quite recall what my

6   client testified to about that car.

7             THE COURT:  Well in terms of other courts using 3A1.1

8   in these kinds of cases, the sex group two, it is true that the

9   2nd Circuit has never used the vulnerable victim enhancement in

10  situations like this.  Is that correct or is that not correct?

11            MS. SEN:  That is based on my understanding and that

12  is based on the research of Ms. Anderson Barth, I would say

13  that I would rely on her to answer that, but based on what she

14  has submitted I would find that to be the case, Your Honor.

15            THE COURT:  Okay.

16            MS. SEN:  And I think also, Your Honor, looking at

17  these issues I think -- and you sort of see it when it gets to

18  each particular individual count, that there are different

19  enhancements that clearly can't, for example, apply in some

20  situations.  So, for example, just to jump a head a little bit

21  when we have Katelynn, all of that incident conduct happened in

22  2013 and in fact by her testimony she believes it happened in

23  2012, but there's an issue with that.  The thing is the basis

24  for the enhancement, for example, the role enhancement that the

25  PSR assigns in every charge here is based on drug trafficking

16

1    with McFarlan, and the problem is that -- is that did not

2    occur, and according to the PSR itself the first trip that Mr.

3    McFarlan made to Vermont was in September of 2015.  There's no

4    way that Katelynn prostituting two years earlier than that

5    could possibly have anything to do with the drug trafficking

6    conspiracy and it's only charged from 2015.  So there are

7    issues like that, that are specific to each individual woman in

8    these sex trafficking counts that I think get clarified as you

9    go through.

10         The drug quantity is a little bit different.  The drug

11   count just because it is a little bit broader, but I would also

12   argue there you have to look in terms of the time period and

13   who was involved and what their involvement was.  So, for

14   example, Danielle, who was only involved for one week in June

15   of 2015, was far before Mr. McFarlan was on the scene and there

16   was any conspiracy involving the drugs.  So I don't know how

17   her being a vulnerable victim -- if the Court were to say she

18   was a vulnerable victim how that would apply to the drug

19   trafficking count when she didn't really begin until McFarlan

20   came up here and started distributing and conspiring with my

21   client.  So that's another argument I would make, Your Honor,

22   with respect to using Danielle, in particular, as a vulnerable

23   victim to enhance the drug charge, and then again in terms --

24         THE COURT:  So you're suggesting McFarlan joining the

25   conspiracy would be a prerequisite to vulnerable victim

1    enhancement?  Does that mean that could not have been a

2    conspiracy between your client and others, not McFarlan, until

3    2015 if that's -- if that's accurate, but it could very well

4    have been an existing conspiracy.  McFarlan joins later.

5            MS. SEN:  Well, Your Honor, I think the evidence, as

6    far as I see it, is that the drug -- Mr. Folks was not drug

7    trafficking really until Mr. McFarlan came up here.  I don't

8    know who he would have been selling and distributing drugs to

9    before that and dealing with that before that.  I don't think

10   there's evidence that he was actually selling drugs before

11   McFarlan came up and so -- and my understanding -- I was just

12   looking at the indictment -- the drug trafficking charge is

13   from 2015 and I don't know -- I think it's actually charged as

14   May 2015, but I haven't seen any evidence of drug trafficking

15   between May and September of 2015.  I just -- I may have

16   overlooked it, there's no question about it, but as far as my

17   review of the trial transcript goes I don't see all of the

18   controlled buys, everything, was after that period of time,

19   Your Honor.  So my argument is that Danielle, for example, or

20   Katelynn cannot be used -- their status, if the Court decides

21   they are in fact a vulnerable victim, should not be used with

22   respect to the drug charge because they weren't involved in

23   drug dealing.  I don't think they talked about drug dealing.

24   Katelynn was years before.  She was 2013.  So that's the

25   defense position in terms of that, and I think this also bleeds

18

1  over into the issue of role in the offense.

2       So the PSR uses role in the offense, someone who is a

3  leader/organizer of five or more people, and for every count it

4  cites Mr. McFarlan and others like Hightower and then various

5  groups.  The thing is for the drug trafficking charge I think

6  that -- let's say there's Mr. McFarlan, but I think the

7  evidence in terms of also being a leader or organizer, if

8  you're going to include Mr. Hightower that I think several

9  witnesses, including -- I'm not sure if McFarlan testified to

10 this or not, but Hightower was brought up here by McFarlan.  He

11 had nothing to do with Mr. Folks.  He was not directed or

12 organized or Mr. Folks was not leading or organizing here or

13 doing anything with him.  He was someone who was separately

14 brought up to Vermont by Mr. McFarlan.  So I don't think that

15 he should be counted as one of those five people that Mr. Folks

16 was leading or organizing with respect to the drug conspiracy.

17          THE COURT:  How about all of the people who are

18 packaging the drugs?  Aren't they all members of a conspiracy

19 or aren't they theoretically under the direction of the person

20 who is in charge of the drug operation?

21          MS. SEN:  Well I think -- I'm trying to tease out who

22 those people are, Your Honor.  So let's say there was Mr.

23 McFarlan, let's say there was Mandy, Chrissy, Mary.  I'm not

24 sure who the fifth person would be, and I'm not sure that they

25 overlapped and I don't think -- he should have never talked

1  about drug trafficking.  She bought drugs.  There's no question

2  about that.  In fact, when we get to her count we can talk a

3  little bit more in detail about what she was doing in 2015, but

4  in terms of the enhancement for -- role enhancement for drug

5  quantity I'm not sure that there were five or more people that

6  Mr. Folks was leading and organizing.

7       So that would be the defense's position, Your Honor, and,

8  finally, Your Honor in terms of obstruction the Court has

9  already heard argument from us before trial actually on this

10 issue of the witness list, and I think that I have detailed in

11 our objections to the PSR our position with respect to that

12 witness list and how, while Mr. Folks may have in a moment of

13 not thinking talked to his wife about posting that witness

14 list, it's pretty clear from the additional recordings of

15 telephone calls that Mr. Folks said after that phone call that

16 he did not want the witness list posted.  He instructed people

17 to take it down when he learned it was posted, and I don't

18 think that is enough to meet the obstruction of justice

19 enhancement, Your Honor.  I know that the Government has talked

20 a lot about this obstruction of justice enhancement and posting

21 of the witness list, but I think when you really dig into the

22 weeds with respect to what happened at that incident, and if

23 the Court wants more on that I'm happy to provide it, but I

24 think that we have briefed it and the Court is aware of our

25 position with respect to that.

1        THE COURT:  Well the alternative theory is that your

2    client was not truthful on the witness stand in trial.

3    Obviously his testimony was inconsistent with the position of

4    the jury, so that's an alternative obstruction of justice

5    argument.

6        MS. SEN:  And there were two things that at least

7    were cited as basis in my client's testimony for the

8    obstruction enhancement.  One was the drugs in the car and that

9    my client would admit to that, and I think there's an

10   explanation for that which is that direct stop occurred

11   sometime I believe in December of 2015, and if the Court

12   recalls Mr. McFarlan talked about how in January he came up

13   with this cereal box because he had lost all these drugs and he

14   had to recoup his money, and so it could be that my client was

15   not being dishonest on the stand, but that those drugs weren't

16   my client's in that they were Mr. McFarlan's.  That is one

17   alternative explanation for that, and yet another one, Your

18   Honor, is this issue about posting to Backpage.  Your Honor, in

19   this case there is not one Backpage post that is related to my

20   client's e-mail address that he directly posted, and in fact

21   witness -- multiple witnesses testified about how they

22   themselves posted their own pictures and advertisements on

23   Backpage.  Chrissy testified that the women she saw would take

24   their own photos and do their own posts to Backpage.  Keisha

25   testified she was basically working on her own and she would

1    ask Mr. Folks for help if she needed help posting ads to

2    Backpage.  Every single advertisement on Backpage for Ayla is

3    related and done by, and she admitted this, by her boyfriend

4    Bradley Bordeaux and using his e-mail address.  So there may be

5    other things had the Court might find that they felt that my

6    client testified falsely about.

7         THE COURT:  I thought Ayla was one of the two women

8    who actually went to the professional photographer for photos

9    which went on the Backpage and as a result she had sex with

10   this photographer to pay for her photo.  I thought Ayla was one

11   of them.  Is that not right?

12        MS. SEN:  I think it was Katelynn, Your Honor.

13        THE COURT:  There were two. Oh well, okay.

14        MS. SEN:  And Jasmine, and Jasmine didn't talk about

15   having sex with the photographer, but she talked about having

16   her picture taken, and I know the testimony was Katelynn and

17   Jasmine were together, but again if we're talking about

18   obstruction related to the drug trafficking charge, Katelynn

19   was never involved in drug trafficking.  She was involved with

20   Mr. Folks two years before any of the drug trafficking

21   occurred.  So it may be that the Court would -- it may be that

22   there are other issues related to Katelynn that the Court can

23   find for enhancement, but I don't think that they can be

24   related to the drug trafficking charge, Your Honor.  I think it

25   has to be related to drug trafficking.  I think that's it for

22

1    the drug count, Your Honor.

2              THE COURT:  Okay.

3              MS. SEN:  And so going to Katelynn, again, and Ms.

4    Anderson Barth can address this with some more detail, so there

5    is a vulnerable victim enhancement for her, and I don't believe

6    that drug addiction alone -- standing alone, which is one of

7    the reasons that the Court gave, and, in fact, I think the

8    Government wanted the PSR to be amended to reflect that each of

9    the women were drug addicts.  I don't think that in and of

10   itself is enough to establish the standard for the vulnerable

11   victim.

12       I don't think there's any evidence either that Mr. Folks

13   was aware of Katelynn's background when he met her and, in

14   fact, she was one of the women that he met working as a

15   prostitute.  She was working as a prostitute, and again in

16   terms of aggravating role, Katelynn worked with Mr. Folks in

17   2013, and at least as far as the PSR goes this leadership role

18   enhancement that Mr. Folks is receiving here is based on at

19   least, you know, five other people that he was leading.  I

20   don't think there's any evidence that he was in charge of or a

21   leader or organizer of five or more people at the time that

22   Katelynn was working.  I know that Katelynn and Jasmine worked

23   together and Jasmine testified as well, but I don't see that

24   there were five other -- that there were at least five women

25   that he was leading and organizing, and then the other issue

 1  here is there is a 2 level enhancement for Katelynn as use of a

 2  minor.  Your Honor, I don't have her exact birthday, but she

 3  was born in 1995.  In 2013 she was 18, and in fact she

 4  testified at trial on direct that she knew that she worked for

 5  Mr. Folks when it was in 2012 and she was a minor and she

 6  insisted on it, and in fact the Government tried to correct her

 7  testimony on this, and she would not admit that she was working

 8  a year later.  We know that she was working a year later

 9  because she was working when Jasmine was working with Mr.

10  Folks.  Jasmine testified that her son was born in October of

11  2012 and that she only started working with Mr. Folks after her

12  son was born.  Katelynn testified when she met Mr. Folks she

13  also met Jasmine and Jasmine -- in fact her testimony,

14  Katelynn's testimony, Jasmine showed her everything.  So the

15  likelihood that Jasmine was actually 17 the entire time she

16  worked with Folks, of course it depends on what her exact birth

17  date is, I didn't have her exact birth date, but I don't think

18  that should be used as an enhancement in this case.  There was

19  no evidence she was a minor, and in fact the evidence suggests

20  she was not, and of course the Government probably has her

21  actual birth date and can clarify this easily.

22      And then again the obstruction enhancement that applies in

23  this particular count is the posting of the witness list which

24  I've commented on already.  The 2015 drug stop with the drugs

25  in the car, which happened two years after Katelynn was working

24

and then posts to Backpage, and I think that given the evidence
that many of these women were posting on their own I don't know
how you -- I don't know how Mr. Folks' testimony with respect
to Katelynn was necessarily an obstruction of justice or that
he testified falsely about what happened with Katelynn.

Going on to Keisha, again if the Court recalls her
testimony, so the count related to any activity in 2013 the
Court granted.  So in terms of focusing on what she was doing
in 2015 her testimony, and this came out on cross, is that she
had been in rehab.  She called Mr. Folks from the bus station
because she left and she wanted help and she wanted to work.
She called him and this was some time in the summer around June
of 2015, and then she only worked for a day or two and she left
and the other people testified that she would come and go as
she pleased.  She didn't -- she didn't -- she was not there
consistently.  When the group was at, for example, Lori's house
on Spring Street she would come and go, and she testified that
she was not -- that she would call Mr. Folks and ask for help
posting her ads.  So the idea that she was a vulnerable victim
I don't think fits with her own testimony.

Again she was also not part -- in terms of looking at the
leadership role enhancement here she was not part of the drug
trafficking.  I don't see any evidence that she was involved in
the drug distribution business at all.  That's based on my
memory.  If it's incorrect, then there's a different argument,

1  but I don't recall any evidence.  I know that she bought drugs
2  from Mr. Folks, but I don't think she was involved in the drug
3  trafficking business side of anything, and again I don't think
4  on the bases that the PSR provides for the enhancement apply in
5  Keisha's case.  If we're talking about posting to Backpage, she
6  was asking Mr. Folks to help her post to Backpage.  So the fact
7  that Mr. Folks testified -- well the PSR claims that he
8  testified falsely about doing that, actually there are
9  witnesses who testified that they posted their own ads.  So I
10  don't see that as a basis.
11      Again coming back to Danielle that we spoke about earlier,
12  the Court was asking about whether she's a vulnerable victim or
13  not, and I have already responded to the Court about what her
14  behavior was before she ever started working for the one week
15  when she prostituted in June of 2015, and again she was never
16  involved in drug trafficking.  She was there for one week in
17  2015 and it is unclear -- I don't believe there's any evidence
18  that she was involved in drug trafficking.  In fact, the whole
19  drug trafficking conspiracy had to have started after her.
20  There's no evidence that I'm aware of or that I recall right
21  this moment that she was involved in any drugs happening.
22          THE COURT:  And what was her timing?
23          MS. SEN:  I think it was June 10th to the 15th of
24  2015.  She's the one who she left and then she overdosed and
25  she was in the hospital and then she called Mr. Folks.

1           THE COURT:  Right.  It's count -- okay.  Go ahead.

2           MS. SEN:  And then again the same reasons for the

3     obstruction -- why the obstruction applies there as well.  Then

4     the question is of Ayla, and again there's a vulnerable victim

5     enhancement for Ayla.  Ayla denied in her testimony that she

6     had ever prostituted, but the defense put on a witness who

7     talked about working in a hotel room and prostituting with Ayla

8     years ago when they were both just out of high school.

9        Also the way that Ayla met Mr. Folks she and what she

10    calls her boyfriend, Bradley Bordeaux, were living out of his

11    truck.  They were drug addicted.  They asked him for help.  He

12    helped them find a place to stay.  He paid them.  The idea was

13    that she was somehow uniquely vulnerable as a victim here does

14    not play out here, Your Honor.  It's not supported by the

15    evidence.  The same argument with respect to the leadership

16    role that Mr. Folks had.  It's not clear at all that he was --

17    that Ayla was involved at that time when there were five or

18    more people involved here.  I think one of the issues is that

19    there are a number of witnesses who testified about things that

20    they did, but none of them were necessarily all overlapped.

21    Some of them did, but not all of them, Your Honor, and so I

22    think that has to be parsed out.

23          THE COURT:  Well let me ask you a broader legal

24    question.  Let's say a conspiracy exists.  The person is in

25    charge, a leader in the conspiracy.  The conspiracy begins with

1  two people then one person goes.  Another replaces that person.

2  Then another person goes and then two more come in.  In other

3  words, do you have to have a leadership of five individuals at

4  the same time?

5          MS. SEN:  Well I think it might be different for a

6  conspiracy.  So the conspiracy is the drug charge, but this is

7  the sex trafficking account that only involves Ayla.

8          THE COURT:  Right.  I was talking about the drug

9  charge at this particular point.

10          MS. SEN:  Oh well I guess I don't know what the

11  actual legal -- I don't know the case law off the top of my

12  head, Your Honor, but my guess is that from what I do know

13  conspiracy people can come in and out, but I think the question

14  is if there's some question as to how many people were involved

15  altogether at any time, whether or not it amounts to having a

16  real leadership role and whether there were people sort of

17  independently operating maybe loosely together whether it

18  qualifies as an aggravating role.

19          THE COURT:  It would not be logical to limit it to

20  five people at the same time.  So essentially the leadership

21  role, a 4 point enhancement in particular, is a design that's

22  impacting five individuals.  That is this person should be held

23  accountable more severely because they controlled five

24  individuals.  Doesn't make any difference whether it was at the

25  same time or at some extended period of time.  It's not -- it's

1  not penalizing the size of the conspiracy.  It's penalizing the

2  individual control over five individuals.  I would think,

3  although I don't know the case law frankly either at this

4  point.

5          MS. SEN:  Your Honor, maybe that's --

6          THE COURT:  Just speculating.

7          MS. SEN:  Perhaps I can get you an answer on that,

8  Your Honor --

9          THE COURT:  Okay.

10          MS. SEN:  -- that's a little more satisfactory, and

11  again in terms of the last count, which is the minor count

12  related to Hannah, again I don't see the role in the offense

13  there because the Hannah account is based on one picture taken

14  on May 16th or 17th of 2013.  I don't know -- there may have

15  been four women in that picture, but, first of all, there's no

16  evidence, no evidence at all, that Hannah ever prostituted.

17  Mr. Folks described what was going on in that picture and the

18  reason why the picture was taken, and the Government -- or at

19  least there's no evidence that there were five or more people

20  involved.  So I don't think that he should have received a role

21  -- an enhancement based on his role for that count.

22          THE COURT:  Well that's interesting because in the

23  opinion that the Court wrote denying the request for new trial

24  and judgment I focused in upon providing that language about

25  provided in regard to Hannah, and so her picture is a part of

 1    three other pictures -- it's one picture, three other persons,

 2    all to advertise for Backpage, and is that not providing?

 3                MS. SEN:  Well the Court certainly had plenty of

 4    briefing on that from us earlier on.

 5                THE COURT:  Yes.  Right.

 6                MS. SEN:  I guess the question, though, Your Honor,

 7    even if that picture was taken, there was no evidence at trial

 8    about in what capacity any of these women were working or not

 9    working with Mr. Folks, and that, first of all, that picture

10    only has one woman in it.  So it doesn't even meet the

11    threshold for five people.  So there has to be evidence that

12    there was actually five people he was leading, organizing, and

13    providing them in order for that enhancement to apply and I

14    just don't see that in the trial transcript.

15                THE COURT:  Okay.

16                MS. SEN:  I think that's all I have for the moment,

17    Your Honor, unless you have any further questions.

18                THE COURT:  All right.

19                MS. SEN:  I know that Ms. Anderson Barth has a couple

20    issues to address as well.

21                THE COURT:  Okay.  I think Mr. Kaplan has some issues

22    as well.  Oh I think he has issues with you.

23                MS. SEN:  Probably.  Mr. Kaplan wanted me to add on

24    behalf of our client in terms of specific sex trafficking

25    counts, so in terms of Keisha, again I think that I had

1    indicated that that issue was not -- the defense does not think

2    of it as an assault, Your Honor, and in fact the testimony

3    showed that Mr. Folks gave her drugs after that incident, and

4    in fact he told her not to tell anyone that he didn't beat her

5    up because he was concerned that if word got out that someone

6    could steal drugs from him and there was no repercussion then

7    other people would feel free to steal drugs as well, and that

8    he also had found a place for her to live right after -- right

9    after that incident.  So, again, the idea that that particular

10   issue -- that's the defense's position with it.

11        In terms of Danielle, Your Honor, there was no indication

12   from the pictures that she had posted before -- that were at

13   trial none of the pictures showed her arms were scarred.  They

14   didn't.  I realize when she was in the courtroom here she did

15   show the jury her arms and they were scarred, but if you look

16   at the pictures, there are no scars on her arm from that time

17   period, and in terms of the pictures taken by the photographer

18   it was -- I've been corrected it was Keisha and Katelynn and

19   now those are pictures that were never posted.  They were

20   simply pictures that were taken.

21             MS. SEN:  Let me just ask the defense table if

22   there's anything else.  Otherwise, I'll turn it over to Ms.

23   Barth.

24             THE COURT:  Okay.  All right.

25             MR. DARROW:  Good afternoon, Your Honor.

1          THE COURT:  I was thinking that Ms. Anderson Barth

2    has got --

3          MS. ANDERSON BARTH:  Ms. Sen handled most all of the

4    issues so thoroughly.  You had asked a question about the 2nd

5    Circuit and vulnerable victims.  That has not been applied in

6    this Circuit.  So that's really my very limited comment on

7    that.  She covered all of the points very thoroughly in her

8    presentation.

9          THE COURT:  Okay.  All right.  Mr. Darrow.

10         MR. DARROW:  Thank you, Your Honor, and thank you for

11   not -- for letting us take the masks off when we're at the

12   podium.  It makes it so much easier.

13         THE COURT:  Yes.

14         MR. DARROW:  Mr. Grady and I --

15         THE COURT:  Must be uncomfortable with a beard.

16         MR. DARROW:  It is a little bit.

17         THE COURT:  Really.

18         MR. DARROW:  You know the beard it's kind of like

19   I've been at deer camp for a while --

20         THE COURT:  Right.

21         MR. DARROW:  -- but it's good to be back in your

22   courtroom.  Mr. Grady and I have divided up the issues to

23   address.  He took the what we perceive to be the hard ones and

24   so he will be talking about aggravating role and vulnerable

25   victim and some other things, and I'll be talking about

1    obstruction and drug weight and the drug related use of

2    violence and the firearm if that's okay.

3                    THE COURT:  Yup.

4                    MR. DARROW:  If I could start with obstruction I

5    suppose, we saw the presentence report obstruction enhancement

6    I think consistent with Your Honor's based --

7                    MR. KAPLAN:  Excuse me, Judge.  I'm wondering if Mr.

8    Darrow could speak a little bit louder.

9                    THE COURT:  Okay.

10                   MR. DARROW:  That's the first time I've ever been

11    asked to speak louder.

12                   THE COURT:  Is the microphone -- you increased the

13    volume.  Okay.  Your volume is increased.

14                   MR. DARROW:  Thank you.  So as to obstruction we

15    thought that there's sort of a portfolio for grounds for

16    obstruction under the obstruction enhancement, but the easiest

17    one and most basic one is Mr. Folks' trial testimony.  When Mr.

18    Folks took the stand on my side of the courtroom we didn't know

19    what he would be talking about.  We thought he might try and

20    limit it to drugs and not human trafficking, or you can imagine

21    a case where there's, let's say, a felon in possession firearms

22    count and drug counts, and if the defendant was maybe arguably

23    a career criminal, he might have just talked about the gun

24    count and not said anything about the rest to try and reduce

25    the scope of his direct and cross, but Mr. Folks chose to get

1  on the stand and address every aspect of every charge.  All the

2  witnesses.  I mean he talked about -- he went through one

3  victim witness after another who had testified and pretty much

4  said that she had been untruthful about all sorts of things.

5      The clearest example of what we think is false testimony

6  concerned the January 20, 2016 car stop.  You will recall that

7  that was the stop of a white Mercedes Benz by a municipal

8  police officer.  The driver of the Mercedes had contacted

9  police shortly before the stop and indicated that there would

10 be drugs in the car, and so an officer who testified at trial,

11 I think named Kyle Brouilette, testified about making the stop,

12 in addition to Brouilette's testimony where he described the

13 stop and who was in the car and what he did, and the seizure of

14 a bag of a significant amount of packaged for street

15 distribution heroin and crack cocaine, in addition to the

16 driver, a woman named Mary who was taken out of the car early

17 on who essentially cooperated by calling in the tip, in the car

18 was Mandy L. and Mary P. and Mr. Folks, and recall also that

19 there was a video of what was going on in the car because Mr.

20 Folks had gotten out his cell phone and was sort of live

21 feeding events.

22     There was testimony from Mr. -- Officer Brouilette about

23 the seizure of the drugs and who was in the car.  Mandy L.

24 testified about what was in the car and Mary P. testified about

25 what was in the car.  They also -- Mary P. also testified that

34

1    Folks had quietly instructed them to hide the bag of drugs up

2    near the front and that was audible barely on the video --

3    audio video of the stop.

4        Mandy L. and Mary P. described that they had just -- they

5    were returning from a bagging session.  Bagging up session was

6    often called at Unc's house as they called it, the brick

7    residence in North Burlington where there were frequently

8    bagging up parties, and they were headed back and the -- most

9    of the drugs they had bagged were in this black satchel, and

10   both Mary P. and Mandy L. testified that they were Folks'

11   drugs.  They had been in one of his bagging sessions, they were

12   bagging drugs for him, they both participated, and the bagged

13   drugs which were coming back in the car was the drugs of Mr.

14   Folks.

15       Mr. Folks testified that wasn't true and that they were

16   not his drugs and he had no idea whose they were, and I'm

17   referring to the testimony of the jury trial on Wednesday, May

18   8, 2019 on page 150 the Government asked Mr. Folks was that

19   your bag of drugs, and before that we had talked about who was

20   in the car and that it was the stop of January 20, 2016, and he

21   said yes Mandy L. was there, Mary P., he was there.  He knew

22   what we were talking about.

23       So the question was that your bag of drugs.  Answer:  No.

24   He said he didn't know whose drugs they were.  Question:  So

25   you just had no idea whose they were?  Answer:  No.  I think

35

1  that that testimony was false.  The jury convicted him of

2  possession with intent to distribute based on the drugs seized

3  that night.  Beyond that, however --

4        THE COURT:  Which count was that?

5        MR. DARROW:  I wish I could tell you.  May I consult?

6        THE COURT:  I can find that.

7        MR. DARROW:  I apologize.  I should have written it

8  down.  In addition to that, in describing his interactions in

9  considerable detail with each of the women who have testified

10  against him about human trafficking, he testified that there

11  had been no coercion whatsoever, that each of them had come to

12  him and asked him to do the things -- to assist them, do the

13  things that they wound up doing.  In other words, engaging in

14  sex trading.  For example, as to Katelynn on page 23 of the

15  transcript that was mentioned counsel asked did she end up

16  working with you at some point?  Yes.  How did that come about?

17  And Mr. Folks said well at one point like I took her out and we

18  was hanging out and she told me well you're always taking me

19  around.  You helping me out.  Why don't you just do it for me.

20  Take me around.  You got the car.  I'll just give you half the

21  money as opposed to giving it to them.  She wanted me to drive

22  her around.  She wanted me to sit with her in the hotels and

23  make sure these dudes didn't come back after her, and she

24  wanted me to make sure that when she had dates nobody tried to

25  hurt her.  So he describes it as she's asking for help.  She

36

1  wants him to do all these things which the jury found it

2  coerced her.

3       Similarly when it came time for Keisha, from page 37 of

4  that transcript he described how Keisha initiated the business

5  with Folks.  He said well at one point she asked -- she wanted

6  to be a part of it.  She wanted to make some money and what was

7  your response.  Answer:  So if that's what you want me to do,

8  if that's what you want to do, I'll help you.  And similarly

9  with Danielle he describes that it was initiated by her.  She

10  asked him to assist her with prostitution.  Danielle gave some

11  difficult testimony about being forced into sexual acts with

12  Mr. Folks.  He denied that that ever happened.  Counsel asked

13  him did you ever -- did you force her to have oral sex with

14  you?  No.  And then you'll recall Danielle testified that he

15  drove her to the motel where she would spend the week working

16  as a prostitute, but that she didn't discover what was going to

17  happen to her until she got into the room and saw prophylactics

18  and things around.  She was quickly figuring out where she was

19  and that she tried to leave, but Folks barred the door and

20  showed her he had a gun.  Counsel asked on the way to the motel

21  did she know what she was getting into?  Yeah.  How do you know

22  that?  We spoke about it.

23       So consistently with each one of the human trafficking

24  victims that was -- testified against Mr. Folks he rebutted in

25  detail what they had to say.  The human trafficking victims

37

1    consistently said that in pitching them to work for him as

2    prostitutes they testified he told them there will be a 50/50

3    split, you get to keep half and I get half, but they all

4    consistently testified that quickly within weeks he wound up

5    getting a hundred percent because he required that they buy the

6    drugs they needed as addicts from him and that that's where

7    their 50 percent went.  So they --

8            THE COURT:  And their addiction increased?

9            MR. DARROW:  Exactly and he ended up getting all the

10    money and they are just prostituting multiple times a day and

11    getting nothing but heroin.  He denied that.  Now counsel's

12    right that some of the women testified as to posting their own

13    Backpage ads sometimes, but they also testified other times

14    Folks posted for them, particularly when business was getting

15    underway and he was showing them how do it.

16            THE COURT:  So let me just ask you a little bit about

17    timing.  Ms. Sen raised this question as to whether there was

18    any drug activity prior to Mr. McFarlan coming up in 2015.  Was

19    there?

20            MR. DARROW:  Of course.  I mean Katelynn testified

21    she was a -- a crack cocaine addict and that Folks supplied her

22    with crack cocaine and more and more as she was working as a

23    prostitute.  She said until she got so thin that the business

24    suffered and Folks wanted her to fatten up.

25            THE COURT:  That's a little different.  That's

 1   providing drugs to the women who were being prostitutes as

 2   opposed to having a network of buyers in the community and him

 3   using some of the women and others to furnish those buyers.

 4            MR. DARROW:  Okay.

 5            THE COURT:  Were there sales prior to 2015, that's

 6   prior to Mr. McFarlan coming up, from the defendant?

 7            MR. DARROW:  Okay and if you will allow me, the

 8   Government thinks that when Folks is selling drugs to the

 9   prostitutes working for him in exchange for 50 percent of the

10   sex trade proceeds they are supposed to keep that.  That is

11   drug distribution he's getting paid for it, but I appreciate

12   your question.  I don't remember when -- what the start times

13   for these persons were.  My memory is that when Keisha came in

14   I thought it was June 2015 and the heroin is involved there

15   because she's introduced to Folks by her father who is also a

16   heroin addict, but I don't have those dates in mind.

17            THE COURT:  All right.

18            MR. DARROW:  I don't want to belabor Mr. Folks'

19   testimony for purposes of obstruction.  The Government thought

20   it was -- lacked credibility in all regards.  The last point

21   noted by the probation officer was his explanation of all the

22   photographs of the women -- of the victim witnesses that he had

23   from his computer were -- had nothing to do with prostitution

24   of the sex trade.  That was just because he was working with an

25   adult pornography business because he wasn't engaged in the sex

1    trade at all.  It was just blatantly inconsistent with the

2    testimony of the women.  There are other examples.  I don't

3    want to belabor it, and similarly you have heard about the two

4    non-testimonial types of obstructive conduct that the

5    Government is concerned about.  We don't think they are

6    necessary for the 3B1.1 enhancement, but they are concerning.

7         Counsel touched on the one -- on the posting of the full

8    names of the victims, and we'll note that Folks at one of the

9    hearings in the year before the trial, would have been in the

10   fall of 2018, told the Court that he wanted McFarlan's name

11   posted because he wanted it clear that people should know that

12   McFarlan was a rat, and I mention that -- we mention that in

13   one of the filings we made on this.  It's concerning, and then,

14   in addition, the presentence report describes the business with

15   the missing hard drive of Government discovery that Mr. Folks

16   had in the prison.

17             THE COURT:  So is there going to be some evidence in

18   regard to that missing hard drive?  How it -- how it could have

19   been removed from, you know, the computer in the correctional

20   facility?

21             MR. DARROW:  We -- the matters described we think in

22   sufficient detail in paragraphs 97 and 98 and, you know, we

23   have had discussions with counsel about it.  In fact, it was

24   Mr. Kaplan that alerted me to the fact that the hard drive was

25   missing last summer a few months after the trial.  We would

40

1  have to check with the attorneys, but I don't think there is a

2  dispute as to these facts.  I may not have picked up on it.  If

3  the Court wanted evidence, the person that did the

4  feet-on-the-ground investigation of this was Carl Staley,

5  Deputy U.S. Marshal in this district, and we would be happy to

6  have Mr. Staley come in and describe his efforts to figure out

7  what happened to that hard drive.

8          THE COURT:  All right.  I'm not sure I need that, but

9  --

10          MR. DARROW:  Thank you.  Your Honor, turning to drug

11  quantity, the objections to the offense on drug quantity set

12  forth in the -- identified in the presentence report largely --

13  and I think today largely quarrel with the trial testimony,

14  and, in addition, to the extent they quarrel with Mr.

15  McFarlan's testimony, they quarrel with your opinion -- of your

16  54-page opinion and order filed November 4, 2019 post trial.

17          THE COURT:  I appreciate that I wrote that opinion.

18  Of course that particular opinion is essentially focused in

19  upon a slightly different issue.  That's whether a jury had

20  reasonable cause to conclude guilt, et cetera.  It's a little

21  bit different than making the factual determination, you know,

22  in regard to any of these enhancements.  You know I've read

23  this again this morning actually.

24          MR. DARROW:  It's a good opinion.

25          THE COURT:  Well it's worth a second read.

41

1           MR. DARROW:  Thank you.

2           THE COURT:  But there is a distinction there.

3           MR. DARROW:  I appreciate that, and just --

4           THE COURT:  My question was there are various

5    objections in the presentence report by the defense.  My

6    question is whether I actually answered any of those factual

7    determinations that are in dispute in that opinion and order,

8    and I don't think that I did because essentially I was focused

9    in upon whether a reasonable jury could conclude guilt or --

10   well conclude guilt and making some reasonable assessments of

11   the facts --

12          MR. DARROW:  And --

13          THE COURT:  -- supporting that.

14          MR. DARROW:  -- I apologize if I'm missing something

15   here.  My memory is that the defense post trial motion

16   contested the jury's weight findings but for purposes of a

17   mandatory minimum on heroin and crack cocaine, and in so doing

18   they argued that Mr. McFarlan's last trip to Vermont with the

19   cereal box the larger quantities of drugs should not be counted

20   because that was outside the scope of the conspiracy.  It was a

21   significant deviation from the prior one.

22          THE COURT:  All right.  So that would have been a

23   factual determination.

24          MR. DARROW:  I thought you did.

25          THE COURT:  I thought I would have made that factual

42

 1    determination because that was included.

 2            MR. DARROW:  Just so -- and in doing that you cited

 3    the 2nd Circuit decision United States v. Pauling P-A-U-L-I-N-G

 4    924 F3rd 649 on page -- well I apologize for not having the

 5    page number.  I think it's in your opinion, but in any event

 6    the Pauling Court in discussing drug quantity said the drug

 7    quantity attributable to defendant knowingly participating in a

 8    drug conspiracy includes, one, transactions in which he

 9    participated directly; two, transactions in which he did not

10    participate -- personally participate but where he knew of the

11    transaction or they were reasonably foreseeable to him; and,

12    three, quantity he agreed to distribute or possess or intend to

13    distribute regardless of whether he ultimately committed the

14    subsequent act, and there's not a reference to the relevant

15    conduct provision in 1B1.3 of the guidelines there, but

16    there's, you know, that reasonable foreseeability I think

17    that's important to you and --

18            THE COURT:  Well it's not relevant conduct.  It's

19    conspiracy.

20            MR. DARROW:  Exactly, but for purposes of today

21    perhaps it's relevant conduct or perhaps that analysis also

22    applies because we're at sentencing and they are claiming the

23    PSR put too big a number on him.

24            THE COURT:  Well right.  I mean it sounds like it's

25    correct.  I made a decision that at least in terms of that last

43

1    trip for Mr. McFarlan in which he gave those drugs to Chrissy

2    that was all part of the conspiracy.  Not relevant conduct.  It

3    is part of the conspiracy.  It was intended and reasonably

4    intended for the defendant and reasonably foreseeable to the

5    defendant that he would be coming up with drugs.  He may not

6    know that it's 128 grams of heroin.  Okay.

7         MR. DARROW:  Thank you.  Now, however, recall that

8    the cereal box that had three different types of drugs in it.

9         THE COURT:  Right.

10        MR. DARROW:  The heroin and crack cocaine.

11        THE COURT:  I only remembered the quantity of the

12   heroin which is 128 grams.

13        MR. DARROW:  I think that's right.

14        THE COURT:  Was it 50 grams of crack cocaine?  I

15   can't remember.

16        MR. DARROW:  In that area.  Counsel urged at

17   sentencing that the third drug, MDMA or bath salts, I'm

18   uncertain, shouldn't be included in the PSR's drug calculation

19   because that was an amount that was different, and Mr. McFarlan

20   was indicating that he was going to use that or give it to a

21   friend or a little party or something else, but it was outside

22   -- it was not reasonably foreseeable to Mr. Folks who was a

23   heroin and crack cocaine guy not a MDMA/bath salts guy and --

24        THE COURT:  Do you remember if Mr. McFarlan testified

25   about that MDMA?

44

1          MR. DARROW:  Yes.  My memory is -- and I apologize

2     for not having his testimony in front of me.  My memory is that

3     it was -- that the defense may have a better memory on this in

4     that he was clear that the heroin and the crack cocaine were

5     coming up for Folks, but he was not clear about the latter and

6     there may have been something about that not going to Folks.

7          THE COURT:  Including bath salts?

8          MR. DARROW:  Exactly.

9          THE COURT:  Okay.

10          MR. DARROW:  If that amount were -- I think it was

11     equivocal and, therefore, some proffers by McFarlan which moved

12     it closer to Mr. Folks, but the long and short of this we're

13     willing to concede on that.

14          THE COURT:  Okay.

15          MR. DARROW:  On page 27 of the -- well the

16     presentence report which I have, I think it's what we consider

17     the final PSR now, it's the revised one or amended one, amended

18     May 29, 2020, the bath salts are attributed 45 kilograms of

19     converted drug weight.  If that were subtracted, we would be

20     down to about 760 kilograms total of converted drug weight

21     which would still, you know, readily exceed the 700 kilograms.

22          THE COURT:  That's the bath salts.  What about MDMA?

23          MR. DARROW:  Oh I think we're talking about the same

24     thing.  I think they are bath salts not MDMA.  I think there

25     was all -- I was a little confused about what it was, but the

45

 1   PSR describes it as synthetic cathinone aka bath salts.  So the

 2   same thing there.

 3            THE COURT:  Okay.

 4            MR. DARROW:  So I wanted to get that out there.

 5            THE COURT:  Yes.

 6            MR. DARROW:  Okay.  Now going back to the objections

 7   we talked about -- and I would add I thought Mr. McFarlan's

 8   testimony seemed perfectly credible on these drug weight

 9   quantities as the Court has found he was.  So most of the

10   objections here went -- to MDMA went to Mr. McFarlan.  Right

11   here the defense describes it as MDMA.  Understandable

12   confusion.

13            THE COURT:  Right.

14            MR. DARROW:  They also object to the reliance on Ms.

15   L's or Chrissy T's description of golf ball size quantities of

16   heroin and crack cocaine.  You'll recall that several witnesses

17   testified at trial about these bagging up parties and Chrissy

18   L. -- Mandy L. testified about them.  Chrissy T. testified

19   about them.  Mary P. testified about them.  They all gave

20   consistent testimony about these bagging up parties that would

21   happen -- bagging up sessions that would happen at different

22   locations in Burlington when Mr. Folks would bring in drugs and

23   the drugs would be weighed and parceled out into small street

24   distribution amounts.

25            THE COURT:  And there were various times when they

46

1    were in their underwear because they were --

2              MR. DARROW:  Exactly.

3              THE COURT:  Because the defendant was concerned that

4    they could steal.

5              MR. DARROW:  That's right.  I think Mary P.

6    testified.

7              THE COURT:  Tell me how many people were baggers?

8              MR. DARROW:  Well the ones we heard about -- we heard

9    from were Mandy L. described these bagging sessions.  Chrissy

10   T. described bagging sessions.  Mary P. described bagging

11   sessions.  I think the three of them also said that there were

12   other women who participated in the bagging sessions.  I'm not

13   sure we have their identities.  In any event, they didn't

14   testify.  The three of them consistently testified that these

15   -- not only would these bagging sessions happen regularly,

16   sometimes every few days, but that they were distributing.

17   They had to have the bagging up sessions because they were

18   running these drugs on the streets and regularly and using up

19   the supply such that there had to be another bagging session.

20   So that some of the runners like Mary P. and Mandy testified

21   about working 24/7 distributing drugs, and the four undercover

22   buys from the distributions that were in the indictment from

23   January of 2016 were consistent with that when Mandy went out

24   with Mr. Folks and delivered drugs to the witness who testified

25   waiting in her car.  So there was a -- there was a regular --

 1    it was a significant amount of drugs.  They describe golf ball

 2    sized amounts of --

 3            THE COURT:  But in terms of the four level assessment

 4    -- the four level increase based upon the 5 or more

 5    participants in the conspiracy, so you have those three young

 6    women, you have Mr. McFarlan, and who else do you have?

 7            MR. DARROW:  Your Honor, if you'll forgive me, I

 8    could be subject to rebuke by Mr. Grady if I wade into that

 9    subject with you because he's handling that issue.  I

10    apologize.

11            THE COURT:  Okay.

12            MR. DARROW:  In any event, you may recall from the

13    trial there was an -- one of the Government exhibits was a

14    photograph of package paraphernalia that had been recovered

15    from the house where Mr. Folks was living at the time of his

16    arrest, and there were razor blades and little glassine baggies

17    and little plastic baggies and straws and cards and some

18    scales, and Government witnesses testified that those were the

19    implements that were being used at the bagging sessions when we

20    bag up drugs for Mr. Folks.  That's how we did it.  They were

21    in a blue cookie tin which was in a Rue 21 shopping bag.  Too

22    much information, but the Government submission is there was

23    consistent testimony about bagging and about distribution about

24    this going on all hours.  In fact, Mary P. said, if memory

25    serves, that Mr. Folks promised to pay her $500 a week to do

48

this.  Those persons also recalled Hannah, the deceased person
who showed up several times in the trial because, well, she was
the subject of a video that Mr. Folks made which came into
evidence, she was also described as someone who acted as a drug
runner at the time.

Our sense is that the PSR did a careful job and a
conservative job of coming up with the drug weight.  Indeed,
paragraph 114 of the PSR, although the evidence may suggest a
higher quantity, they went with the 700 to 1000
notwithstanding, and along those lines you'll recall Mandy L.
testifying that she three times went down to New York City with
Mr. Folks and body packed drugs back for him, and Mr. McFarlan
testified that there were two or three other sources besides
himself who was also selling drugs.

As to firearms and violence, Your Honor, there were --
witnesses were -- we felt they were consistent in various
regards.  There was also consistent testimony from a number of
witnesses about firearms.  Now granted the only recovered
firearm, the 9 millimeter Beretta, from the vehicle Mandy L.
testified Mr. Folks had her register for him, that firearm
which was Mr. Folks was charged with possessing with a prior
felony conviction, the jury did not convict him of that, but
that was the sole firearm that was recovered.  Witnesses
described a series of other firearms and the presentence report
in paragraph 115 summarized that where they say according to

1    Christina, McFarlan and Folks had handguns.  When there was a

2    problem with another drug dealer they retrieved handguns from

3    the house on North Avenue.  That's Unc's place where the

4    bagging up often occurred.

5        McFarlan testified that Folks possessed firearms and gave

6    detailed testimony about seeing Folks disassemble one of them,

7    and Danielle, as we mentioned, reported Folks possessing a

8    firearm, and Katelynn described Mr. Folks having a firearm and

9    her transporting them for him sometimes, and also Mary P.

10   described an assault after Folks's stash of drugs outside his

11   apartment, the Union Street apartment, were stolen and he

12   decided she did it and assaulted her, and it was a firearm she

13   described that time.  So that's, you know, four different

14   people who describe -- or five who describe Folks with

15   firearms.  So we think the PSR was good on that.

16       And then, lastly, the violence.  You recall Keisha's

17   testimony about being sexually assaulted by Mr. Folks at the

18   cemetery not too far from the courthouse here.  There was a

19   photograph introduced through her of a green dumpster in the

20   cemetery and she told the story of how she had stolen five bags

21   of heroin from Chrissy T., that Folks learned of it, and

22   directed other of the women working for him to bring her in,

23   and they did and they brought her to Folks, and he told her

24   that he can't have someone stealing drugs and there's going to

25   be a consequence, and she said she was very frightened and she

1  said that he took her out by the dumpster in the cemetery and

2  raped her and then beat her up again.

3      So that was an example of violence, but there was -- the

4  case was rife with examples of violence because Folks

5  consistently used violence with the women working with him to

6  ensure that they complied with his protocols and didn't violate

7  him.  So counsel said that -- pointed out correctly that the

8  time that L. described being raped by Folks the Court excluded

9  that.  Counsel said it was because it was outside the scope of

10 the conspiracy and unreliable.  My memory was that it was

11 outside the scope of the conspiracy, but in any event for

12 sentencing purposes L. described being raped by Folks when she

13 got a different boyfriend.  Folks didn't approve of that.  Ayla

14 described being assaulted by Folks several times.  Once I

15 recall he heard her talking about him taking her into the

16 bathroom of the Spring Street house where he was basing his

17 operations, Lori Crawford's place, and he assaulted her there.

18 Mary P. described being assaulted, as I mentioned, when the

19 drugs were stolen from the stash outside the Union Street

20 apartment, and Danielle describes Folks flashing a gun to her.

21 Katelynn described being assaulted by Folks, and I think

22 Jasmine also recalled that episode early on.  So our memory,

23 Your Honor, is that each -- well most of the young women who

24 testified at the trial described force as one of the means

25 which -- by which Folks coerced their compliance and

51

1   participation.  Did I cover those things?

2              THE COURT:  Yes.

3              MR. DARROW:  Yes.  Thank you.

4              MR. GRADY:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6              MR. GRADY:  First I just want to set the record

7   straight.  I have never, nor would I ever, rebuke Mr. Darrow.

8   So I just want the Court to be aware of that, right.  Okay.

9        First, Your Honor, I would like to give you a road map of

10  what I intend to cover and then we'll go from there.  So first

11  I'll address the enhancement for using a minor with Katelynn,

12  and then second I'll talk about the enhancements for the

13  vulnerable victims as it applies to the sex trafficking

14  victims.  Third, we'll talk about the leader/organizer

15  enhancement, again, as it relates to the sex trafficking

16  victims, and then finally I'll go back and talk about the

17  vulnerable victim enhancement and the leader/organizer

18  enhancement as it relates to group one which is the drug

19  trafficking.

20       So I'll start first with the -- with Katelynn and the use

21  of a minor, and to clarify her birthday is March 11, 1995 and

22  there is a way to reconcile her testimony on when she began to

23  work with Mr. Folks and Jasmine's testimony, and that's this.

24  Jasmine testified that her child was born in October of 2012

25  and that a couple months later she was prostituting for the

1    defendant and that she met Pinkie.  So, again, that couple

2    months later would be December 2012.  Maybe January 2013.  That

3    is prior to Katelynn turning 18 in March of 2013, and of course

4    there was pictures showing Katelynn photographed in various

5    hotels.  We recovered them, exhibit 51B, as early as April of

6    2013.  So when you put all of the picture together the

7    Government believes that there is a factual support for

8    Katelynn's testimony that she began work for the defendant when

9    she was 17, and you may remember, Your Honor, probably the

10   haunting imagery that she talked about when she was carrying

11   all of her possessions in two pillow cases including her birth

12   certificate.

13            THE COURT:  Well was there testimony of her birthday

14   at the trial?

15            MR. GRADY:  There was, Your Honor.  I pulled the date

16   from her trial transcript this morning.  It's on either the

17   first or one of the early pages of her transcript so the Court

18   can find that.  Now where the confusion comes, Your Honor, is

19   she testified that she met the defendant in spring 2012.  Now

20   again when you put everything together perhaps she was

21   mistaken.  Maybe it was spring 2013.  Again we're going seven

22   -- six, seven years after the fact, but you put Jasmine

23   together, you put the photographic evidence together, and you

24   just put her memory of the birth certificate to the defendant,

25   all that should lead the Court to support there's factual

53

1    support for use of a minor prior to turning 18.

2         So with that being said, Your Honor, I'll turn next to the

3    next enhancement vulnerable victim, and what I would like the

4    Court to do is to take a step back and remember the guidance

5    from Sabhnani which is, of course, a forced labor case in the

6    2nd Circuit.  Sabhnani had two guiding principles for

7    application of this enhancement.  It says that vulnerable

8    victims are less likely to thwart crime and there's a greater

9    need for societal protection, and when you think about the

10   forced sex trafficking victim those two overriding principles

11   should be in the Court's mind, and the other thing to take

12   stock of globally, Your Honor, is that this is an assessment

13   based upon the totality of the circumstances.  It's not one

14   factor in isolation just being drug addicted, but consider all

15   of the circumstances, and again the standard is the defendant

16   has to know or should have known, and we'll talk about how

17   that's important as it relates to Katelynn, and I'll start with

18   Katelynn.

19        So again the testimony from trial is that, you know, she's

20   got these two pillow cases.  She hands the defendant her birth

21   certificate.  Now normally a reasonable person when they are

22   given an important document from a minor they may ask why isn't

23   your mom or your dad, you know, in charge of your birth

24   certificate, and of course the response here is, you know, she

25   met her dad when she was 5 because he was incarcerated.  She

54

 1   didn't like -- she didn't have a lot of family support

 2   particularly after she reported her cousin for rape when she

 3   was 15 and how her dad discouraged her from participating in

 4   the process, and just thinking back again to those two pillow

 5   cases, the financial condition that she's in at that point.

 6   She's essentieally a homeless vagabond and the Borst (phonetic)

 7   case from the 2nd Circuit talks a lot about the financial

 8   situation victims may be in and what that calculus does to the

 9   vulnerable victim enhancement.

10        Next is Keisha.  Again thinking back to Keisha, who is the

11   person that introduced Keisha to the defendant?  It was her

12   very own father.  It was her very own father who introduced her

13   to the defendant and to heroin.  Again, when she was about 17,

14   18 years old is when her father introduced her to the

15   defendant.  So again if you look at Irving from the 2nd

16   Circuit, also Royal from the 4th Circuit, and Evans from the

17   8th Circuit, one of the factors contributing to vulnerable

18   victim is the lack of, as they deemed it, parental or

19   appropriate guidance, refers to dysfunctional family

20   background.  Again, Your Honor, there can't be anything more

21   dysfunctional than one's own father introducing them to

22   intravenous heroin use and also to someone selling drugs and

23   selling women.

24        THE COURT:  Of course the difficulty you have with

25   that is that you don't know that the defendant knew that.

1          MR. GRADY:  Well he certainly was introduced by

2    Keisha's father.  Now again I think it's pretty -- I don't

3    think it takes a lot of logical leap, Your Honor, to say that

4    one's own father, you know, introducing to the defendant to

5    obtain drugs or as a source of drugs because remember they were

6    going out stealing clothes to shoplift to support their drug

7    habit.  They introduced the defendant as another drug source.

8    So again that just shows you the dysfunction or lack of

9    appropriate guidance, and again from the defendant's

10   perspective here's someone -- I think this came up at trial

11   too, I could be mistaken.  Even from the defendant's testimony

12   wow this father is, you know, bringing his daughter to meet me.

13   Again it just kind of highlights the dysfunctional situation,

14   and that again 17, 18 year olds shouldn't be introduced by

15   their father to a heroin dealer.  So, again, I think that shows

16   again another contributing factor in addition to her drug

17   addiction itself.

18        Moving next to Danielle, again, in addition to Danielle's

19   drug addiction, which led the state to take away her child, in

20   this instance it was very obvious from the trial testimony

21   about talking about her background and her sexual abuse and

22   showing the defendant the scars from her self mutilation in

23   that very first trip going to the hotel where he expected her

24   to prostitute, and that's why the Government pointed out Star,

25   Hagan, and Hayes for the proposition that victims struggling

56

1    with mental health issues, struggling with self-mutilation is

2    another contributing factor to the totality leading application

3    of the vulnerable victim enhancement, and this whole thing

4    about the pictures is really simply a misnomer.  Of course if

5    you're taking pictures of someone to post and try to attract

6    clients you're going to take pictures of the outside of the

7    arms.  You're not going to show all the self-mutilation because

8    that's probably not going to attract a whole lot of clients.

9    So that's a whole misnomer that the defense brought up earlier,

10   and then finally, Your Honor, that turns us to Ayla.  So again

11   I think it's clear probably from the Court that of anyone in

12   this case Ayla probably had the most significant heroin

13   addiction.  Of course that led to the state to take away

14   custody of her child as well and if you think back --

15              THE COURT:  I thought actually during Ayla's

16   participation in this offense her drug use I think she said

17   quadrupled.

18              MR. GRADY:  That's correct, Your Honor.  I think I'm

19   mistaken.  She probably lost custody early on and then by the

20   time that it was starting to spiral and she became homeless and

21   then obviously her interaction with the defendant it spiraled,

22   and I think she said it quadrupled is my memory as well, but

23   the critical juncture, in addition to her drug use, is the very

24   first moment when she met the defendant you may recall that she

25   was homeless.  She was homeless with her boyfriend.  They were

57

 1    living out of a truck.  Again if you look at the Borst case

 2    from the 2nd Circuit, that's another contributing factor which

 3    may be homeless in isolation is not enough, but when you

 4    combine that with drug usage that certainly is enough to get

 5    you --

 6                THE COURT:  Let me ask you about the defense's

 7    approach to vulnerable victim.  They were suggesting that it's

 8    very common for people who engage in prostitution in systems

 9    like this to be drug addicts with severe -- who have severe

10    emotional damage, et cetera, and somehow the common nature of

11    the person who participates in this particular offense impacts

12    the application of vulnerable victim.  Your argument is you

13    just look at the person to make a determination as to whether

14    this is a vulnerable victim by adding up totality of

15    circumstances.  You don't look to the standard average

16    prostitute.

17                MR. GRADY:  That's exactly right, Your Honor.

18    There's a couple of things.  Number one, the defense support

19    for that proposition was -- is lacking in the Government's

20    view.  We pointed out the legislative history with regards to

21    the TVPA and how none of these circumstances was ever

22    referenced as sort of the typical victim.  In Congress's mind a

23    typical victim was a minor lured from some other country

24    brought here to the United States, disoriented because they are

25    away from their support network, and that's the typical victim

58

1    that Congress talked about when they passed the TVPA back in

2    2000.  They also relied on Castaneda and Sabatino, none of

3    which talked about drug addiction.  For example, in Sabatino it

4    talks about mothers with small children and they were out of

5    work.  Of course we're not talking about that.  We're talking

6    about mothers who lost the custody of their children because of

7    their drug addictions and they are not just out of work, but

8    they are without homes.

9         What I would ask the Court to do is think -- again you're

10   talking about not sort of who the average victim is, but what

11   made this person unusually susceptible because, again, you can

12   commit a sex trafficking against someone who is not addicted to

13   drugs.  If you put a -- hold a gun to my head and say go out

14   and argue here in Vermont, I may do that because I don't want

15   the physical harm or harm to a loved one.  That doesn't make me

16   unusually vulnerable to do this type of offense.  That's why I

17   think you got to look back to the overarching guidance in

18   Sabatino, are you less likely to thwart the crime and are you

19   in greater need of societal protection, and that relates to

20   these four victims that we just detailed.  As we said, when you

21   add them all up in their totality the answer is yes and not

22   just peck away at each isolating contributing factor.

23        So with that being said, Your Honor, I'll go ahead and

24   move on to the third category which is leader/organizer as it

25   relates to the sex trafficking victims, and here in the

1    Government's view it becomes a matter of counting, right.  You

2    have to have five or more participants in order for the plus

3    four enhancement to apply, and of course right now we have the

4    plus two is what the probation officer found.  So essentially

5    we have to find four other people in addition to the defendant

6    who their activities played some role in bringing about human

7    trafficking, and so the Government can point out to quite a

8    few.  First think about Lori Crawford.  Lori Crawford housed

9    Ayla in her house and also drove her to prostitution dates.

10   Theoretically she could be liable for harboring and

11   transporting a victim knowing that the defendant is

12   manipulating the heroin use to do that.  So now we've got two

13   people.

14       Three.  Think about Mandy L.  Think back to Mandy L.'s

15   involvement with Danielle.  She explained how she worked with

16   Danielle.  She also drove -- she might have drove, but she

17   certainly reserved hotel rooms and collected proceeds.  Again

18   she is a participant, could be liable for a contributing

19   factor.

20       So, four, think about Chrissy.  Chrissy also was doling

21   out heroin before dates for people in order for them to get

22   well.  So she is contributing to the defendant's enterprise in

23   this regard, and then four or five think back to Donald

24   McFarlan, think back to Shay.  You might recall, Your Honor,

25   you saw them on the preamble to the walnut challenge.  They

1   were there, and again remember this is what Ayla and Keisha

2   testified to about this challenge to get heroin, you know to

3   basically see how many acorns or walnuts in their anus in order

4   to get heroin, and just sort of how humiliating that is and it

5   was kind of a stamp of the defendant's degradation and

6   humiliation of his human trafficking victims.  You saw them on

7   that preamble.  In fact, Mr. McFarlan said he was security.

8   Why is he security?  Again he's looking after to make sure the

9   money the defendant has is not taken away and otherwise things

10  are looked after.

11       The same could be said for Shay and Hightower.  Again they

12  were there to guard the safe, make sure no one was stealing

13  from the defendant, and also, Your Honor, another participant

14  is think back to the ad involving Hannah.  Count 15.  The

15  defendant's view is that he did not post any of these Backpage

16  ads himself.  That means he had someone go ahead and do that,

17  and think back to the provision from 2G1.1 note 3 that says you

18  can be a participant if you are assisting in the promotion of a

19  commercial sex act with respect to another victim.  So say

20  Jasmine or Shorty posted that Backpage ad.  They are a

21  participant because they promoted a commercial sex act with

22  respect to another victim.

23            THE COURT:  Let me ask you about the practical impact

24  of your argument.  So the probation officer recommended two

25  level increase for leadership role.  Just didn't find the five

61

1    persons involved in the operation.  So I note that the final

2    offense level is 47.  That's when you add up all of the

3    cumulative charges, et cetera.  So if you had a two level

4    increase, if you had a four level increase, what does that do

5    to you because eventually anything above 43 is reduced to 43?

6              MR. GRADY:  Yes.  That's right, Your Honor.  Of

7    course the Government doesn't know how you may rule or how the

8    Court may rule on some of these other enhancements so maybe

9    some of them come off.  So the Government is just pointing out

10   that there's definitely a basis for the four level enhancement.

11   Certainly a basis for the probation officer's finding of two

12   levels.  Of course if we're over 43, then it is all academic as

13   you just pointed out, Your Honor, but depending on how the

14   Court may rule, it may impact.

15             THE COURT:  All right.

16             MR. GRADY:  Without further question as to that, Your

17   Honor, I'll turn briefly to the enhancements as it relates to

18   group one which is the drug trafficking, and again if you go

19   through the counting exercise for leader/organizer, it should

20   take not a lot of time.  We've obviously got the defendant.

21   We've got Mandy who is going out doing hand-to-hand sales.

22   You've got Mary P. who was doing similar things.  She was also

23   in on that traffic stop when she was hiding the defendant's

24   drugs on her.  We've already got three people.  We have Chrissy

25   who talked about bagging drugs for the defendant.  We have Ayla

1  who testified running drugs for the defendant.  We had Hannah

2  who is bagging and running drugs for the defendant.  We've got

3  Shay.  We've got Hightower.  We don't need to count any more,

4  Your Honor.  We have five or more participants for that and

5  same thing for vulnerable victim.  We have also talked about

6  Ayla who was a drug runner and why the Government believes she

7  was a vulnerable victim.  Other ones you can look at in regards

8  to this question is Mary P. and sort of the background and the

9  extent of her drug use and her involvement in this and

10  packaging and distributing drugs for the defendant.

11      So with that being said, Your Honor, that is what I have

12  for vulnerable victim, leadership/organizer, and anything else

13  unless you have further questions.

14          THE COURT:  All right.  So is there a response from

15  the defense?

16          MR. KAPLAN:  Yes.

17          MS. ANDERSON BARTH:  So, Your Honor, if I may address

18  --

19          THE COURT:  Do you want to take your mask off?

20          MS. ANDERSON BARTH:  Is it okay if I keep it on, Your

21  Honor?

22          THE COURT:  That's fine.

23          MS. ANDERSON BARTH:  Thank you.

24          THE COURT:  If the court reporter is having trouble,

25  she will let you know.

1          MS. ANDERSON BARTH:  I've been told I'm a loud person

2    so I will speak up.  With respect to the Government's argument

3    regarding vulnerable victim, I think in order to identify who

4    is susceptible, meaning to know what the typical victim is, the

5    Government is tasked with the responsibility.  It has the

6    burden of identifying for the Court the class of victims and

7    then proving to the Court by a preponderance that the victim

8    involved is atypical of that class, and thereby demonstrating

9    --

10          THE COURT:  So is that a prerequisite?  Is it a

11    prerequisite that you have to be atypical from the general

12    person who participates in this kind of criminal enterprise?

13          MS. ANDERSON BARTH:  I think so, Your Honor, because

14    it requires an unusually susceptible victim and in order to

15    figure that out courts look at the Congressional intent.  Now

16    the Government does not delve into the Congressional findings

17    too deeply, but women who are poor, undereducated, unemployed,

18    discriminated against, lacking in economic opportunities, lured

19    away from their home communities, often internationally, those

20    are the -- that's the victim class, and the evidence here

21    supports a finding that the victims here are not atypical.  In

22    fact, they are considerably less vulnerable than the typical

23    victim class.

24        So when we look at the legislative passages it appears

25    that the women in this case were far less vulnerable than the

1    average victim because they were U.S. citizens.  They speak,

2    read, and write english.  Some have formal education, were

3    native to Vermont, had family in the area, and were engaged in

4    prostitution prior to their involvement with Mr. Folks.  So I

5    don't think the Government has met its burden here.

6        THE COURT:  So essentially your argument is that

7    Congress, when they were addressing this kind of human

8    trafficking offense, looked to what is the common offense and

9    it's the importation of poor people from all across the world

10   who have really nothing by way of a positive life, and that's

11   the -- that's the typical person engaged or subjected to this

12   human trafficking, and comparatively these four individuals are

13   much better off than the average human trafficking victim.

14       MS. ANDERSON BARTH:  That's exactly right, Your

15   Honor, and it's a two-part problem for the Government because

16   the Government also has to prove that Mr. Folks sought out

17   people based on their vulnerabilities, and as Miss Sen pointed

18   out earlier, that was simply not the case here.  I wanted to

19   point out the testimony of Jasmine who testified that Mr. Folks

20   always wanted to know if somebody would be willing to

21   prostitute whenever he first met somebody new and it didn't

22   matter what their backgrounds were.

23     Now Miss Sen also mentioned there is an empirical data out

24   there about typical prostitution, people who engage in

25   prostitution, and all of the factors listed by the Government

1  are covered by that.  The Government mentioned family,

2  dysfunctionality, struggling with mental health issues,

3  homelessness, and drug use, all of which is typical and the

4  Government cited no empirical data to the contrary.  So the

5  Government just has not met even a preponderance standard here

6  that the victims involved are atypical of the victim class, and

7  as Your Honor stated so well, they are considerably less

8  vulnerable than the average victim.

9           THE COURT:  Okay.  All right.  Okay.  Mr. Kaplan, do

10  you want to add something?

11          MR. KAPLAN:  Briefly, Judge.  Your Honor, I just

12  wanted to make a few general comments I think that are relevant

13  to the issue of obstruction and some of the other issues that

14  have been raised.  So obviously Brian stands convicted of these

15  crimes.  We're not disputing that.  We're approaching it from

16  the standpoint of someone who has been convicted and is facing

17  sentencing, but as I listen to the prosecutor's presentation

18  today, the thought occurred and -- the thought occurred to me

19  that I had consistently throughout the trial, and that was that

20  in prosecuting this case and preparing for sentencing the

21  Government seems to see everything in extremes.  In other

22  words, everything was a hundred percent Brian's fault and their

23  witnesses in this case were a hundred percent correct, didn't

24  do anything inappropriate, didn't participate, have no personal

25  responsibility for this, and I say that keeping in mind that I

1    understand these people are victims.  I'm not disputing that at

2    the least, but I think when you take that approach what happens

3    is when you see everything in black and white, when you take

4    that approach you miss the subtleties because from my

5    standpoint this is an extremely complicated case.  The

6    relationship between Brian and these women was not the same all

7    the time, and I think that's why, for example, the Government's

8    kind of missed the fact that how Brian met these women and what

9    he did for them and what he didn't do for them and how he

10   mistreated them and how he treated them when he wasn't

11   mistreating them.

12        Katelynn C. -- Katelynn is a perfect example.  Mr.

13   Darrow's position was when Brian testified that he had done

14   some work for her before and she came to him that was just

15   nonsense.  You know that what Katelynn said at trial is

16   actually what took place even though clearly she admitted to

17   lying to the Grand Jury under oath about how she met Brian.

18   The real story is that she was working for other individuals

19   from New York City who were prostituting her and these

20   individuals would call Brian on occasion and say can we use

21   your car.  So Brian would go over, they would borrow his car or

22   he would drive the women for them and get paid $25, 50 bucks or

23   whatever for having done that; and at some point Katelynn says

24   to him you know you're driving me around, you're taking me to

25   buy drugs for myself, drive her some place where she knew to

go, and why don't I just come stay with you anyway and work for
you.  I'll work with you as opposed to these people.  That's
how the relationship was established.  So was she vulnerable at
the time?  Did he take advantage of that?  I don't have an
answer for that necessarily, but that was the relationship.  He
was helping her.  She felt protected.  She had someone driving
her places.  Someone to take care of her if someone was not
behaving properly.  That's what she thought she was getting out
of it.  Maybe the relationship went south at some point, but I
think it's important to understand that he didn't recruit her.
She came to him and the same is true of Keisha.

It was Keisha's father, as has been said here today, that
introduced her to Brian when she was only 17.  Brian said I
don't want anything to do with that.  She's a minor.  So when
she turned 18 she called him, and at some point she said I
would like to try this prostitution thing, and she did it for a
day or two and didn't like it, and I don't even think she went
out with any customers and Brian took her home and that's the
count the Court dismissed.

The second time she had something to do with Brian was
when she went to rehab she called and said I want to get out of
here, I'm going to come stay with you, and she did that, but
she only was there a day and that was in June and after June
she never, ever worked for Brian again or worked with Brian.
In fact, she testified that she was working on her own mostly

68

1    and that she would call Brian if she needed help.  So what

2    Brian -- Brian didn't exert any pressure on her when she said I

3    don't want to do this and I want to go home he agreed and he

4    gave her a ride I believe it was to her mother's or to her

5    grandmother's.

6         Kayla, who the prosecution describes as a vulnerable

7    victim and I think she is, I mean I think she was for years,

8    way before she ever met Brian, didn't change when she met

9    Brian, but before she met Brian she was prostituting.  There's

10   credible testimony on that point.  She was a horrible drug

11   addict.  Her and her boyfriend were robbing individuals.  They

12   would set up these jobs, they would come take their money and

13   rob them, and there was credible testimony on that point.  This

14   was all before she met Brian.  So what Brian did was provide

15   her a place to live and some security and made drugs available

16   for her when she could buy them.  Brian didn't keep a hundred

17   percent of these womens' drug money.  He kept 50 percent, and

18   if they wanted to use the other 50 percent to buy drugs from

19   him, he did that or they could go out some place else and buy

20   drugs from someone else.

21        Danielle is someone who before she ever went to that motel

22   sent Brian nude photographs of herself, and if you look at

23   those photographs, you don't see track marks, and when I asked

24   her on cross examination why she did that she said well doesn't

25   everyone send nude photographs, and she had sex with Brian

69

1  before she went to the hotel.

2          THE COURT:  I thought she had said many addicts will

3  send -- I thought that's what she said, many addicts will send

4  nude photographs of themselves over the internet to invite

5  interest.

6          MR. KAPLAN:  Most people don't do that.  So it's

7  reasonable to assume it's addicts or someone else that's

8  involved in it, but my point is -- and by the way she left the

9  hotel when she was with Brian, on at least one occasion went

10  back voluntarily, and when she finally did leave after a week

11  and she needed help who was it she called.  She called Brian.

12  So my point is not that Brian's not guilty, not that he hasn't

13  been convicted, not that he's not going to be punished for what

14  he did, but it's a more complicated scenario than I think the

15  Government's pointed out throughout the trial and today's

16  proceedings, and there's a relationship between him and these

17  women that I think needs to be understood in order to get a

18  true picture of what took place.

19          THE COURT:  Well it seems to me that 3553(a) seems to

20  be the logical place for you to make that argument.

21          MR. KAPLAN:  I was going to add that to my sentencing

22  argument.

23          THE COURT:  Oh this is going to be your argument and

24  forget the written form.  I certainly appreciate the fact that

25  any criminal case is complex.  Any -- well for that matter any

70

1   engagement in human stories is complex and the logical place to

2   make that argument is in 3553(a), although actually vulnerable

3   victim is -- it is relevant to vulnerable victim.

4           MR. KAPLAN:  The real issue, Judge, not to prolong

5   it, and I argued this to the jury without much success, these

6   people live in a world that's so different than the world in

7   which we live in and that the jurors live in, and I think the

8   Government's failed to understand that world.  I didn't

9   understand it for a long time, although I spent several years

10  with Brian, but it's a different relationship.  They operate

11  differently.  It's a different code.  It doesn't make it right.

12  It doesn't make it legal, but you need to understand that world

13  I think before you can understand what Brian did or didn't do.

14  That's my point.

15          THE COURT:  Okay and the point is that I probably

16  will see that in a motion for an adjustment.

17          MR. KAPLAN:  Possibly.

18          THE COURT:  Do you think?

19          MR. KAPLAN:  Possibly.

20          THE COURT:  Well okay.  All right.  Is there anything

21  else at this point?

22          MS. ANDERSON BARTH:  Your Honor, there is the issue

23  of restitution.  I don't know if that's something that Your

24  Honor wants to take up today or not.

25          THE COURT:  Well I know that the Government is

1    suggesting that restitution is required here.  It's a little

2    difficult because they are not in contact with any of the four

3    women, although they have some contact with one as I remember,

4    but I thought they were going to be pursuing that.  So that

5    before we start talking about restitution we'll look closer to

6    sentencing and they can put forward what demands they have.  Do

7    you want to argue there is no mandatory right of restitution?

8             MS. ANDERSON BARTH:  No I don't want to argue that.

9    The Government did submit a pleading.  It's document number 550

10   where it lays out its methodology for restitution in this case.

11   I'm happy to respond in writing a little closer to sentencing

12   if that makes sense.

13             THE COURT:  Yes you can respond in writing closer to

14   sentencing.  That would be helpful.  So let me ask you what

15   you're anticipating from the Court.  There have been various

16   demands from the defendant that the Court should not consider

17   like Mr. McFarlan's testimony because he's unreliable.  I'm not

18   so sure at this particular point I go through all of the

19   objections to credibility, et cetera.  Rather it seems to me

20   that I should address the questions of drug quantity, of the

21   enhancements that are appropriate, and that's what you need to

22   know before you get into sentencing and 3553(a).  Is that what

23   you're looking for at this point because most of these issues

24   are raised at the time of a sentencing hearing.  I thought that

25   you really wanted to get some of these enhancements addressed

72

1  in advance so that you know how you're going forward and then

2  we get into sentencing with arguments for adjustment; is that

3  correct?

4          MS. ANDERSON BARTH:  I think that is mostly correct,

5  Your Honor.  We want a sentence that we should be asking for at

6  sentencing and that does depend on a number of issues being

7  resolved by the Court, but related to that some of the factual

8  disputes may play into the Court's analysis of how these issues

9  should be decided.  So it's a little bit of both, Your Honor.

10          THE COURT:  Well I can see that in regard to Mr.

11  McFarlan.  I can see that in regard to the credibility of

12  Chrissy.  So you're looking for guidance as to whether

13  McFarlan's testimony is sufficiently reliable to form the basis

14  of the drug quantity, et cetera.  That's what you're looking

15  for?

16          MS. ANDERSON BARTH:  Yes, Your Honor.  Any fact that

17  is disputed that the Court intends to rely on at sentencing it

18  would be helpful if we had a ruling ahead of time.  If there

19  are certain facts that are irrelevant to the Court's sentencing

20  calculations, then I don't know that the Court would have to

21  rule on it as long as the Court is not considering that as part

22  of its sentencing decision, but those facts that would impact

23  your sentencing decision that are disputed we would need a

24  ruling on those facts.

25          THE COURT:  All right, and from the Government is

73

1    that your request?

2            MR. DARROW:  We were unsure of what an objections

3    hearing was, Your Honor.  I've never had one -- participated in

4    one before.  It had been, I think, our understanding that the

5    gist of today's hearing was to try -- and there would be so

6    many issues at sentencing that by having an advance hearing on

7    the sentencing guidelines issues that would streamline us going

8    into the 3553(a) restitution, victim impact portion of the

9    sentencing.  So it is really sort of a bifurcated sentencing

10   with the guideline issues being handled upfront so that

11   everyone could focus on the remaining issues at the second

12   hearing.

13       As to whether you want to rule on those -- the guidelines

14   issues in advance with a written opinion or wait until the

15   final sentencing or tell the parties from the bench what you

16   want to do, I mean we don't have strong feelings about that.

17           THE COURT:  Let me think about that.  I'm not -- I

18   mean this is pretty extraordinary to actually render an opinion

19   about a particular enhancement in advance, but this is such a

20   complicated case, such an extensive case, it probably would be

21   helpful to the parties, for you, to know what my general

22   assessment is and then you can focus in upon what's left, and

23   what's left is really the 3553(a) questions and the fairness of

24   the appropriate sentence.

25           MR. KAPLAN:  Judge, I was under the impression that

1  the Court would rule prior to sentencing so that we could just

2  deal with 3553(a) factors and not have to deal with any of

3  these individual issues.  We would know what they are.

4           THE COURT:  Well yes I'm going to actually look at

5  that, and my guess is that I probably will rule on the

6  enhancements and the drug quantity in advance based upon the

7  pleadings.  The pleadings are very thorough, and then you'll

8  know exactly what you're facing and then the next phase.  Now

9  in advance then of the ruling on the enhancements does either

10 party have a wish or need to supplement their pleadings?

11          MR. DARROW:  We do not, Your Honor.

12          MR. KAPLAN:  I think we might present an one or two

13 page on the issue of Katelynn's birthday.

14          THE COURT:  On the birthday.

15          MR. KAPLAN:  Yes.

16          THE COURT:  Okay.  All right.

17          MR. KAPLAN:  Judge, my client would like to address

18 the Court.

19          THE COURT:  Okay.  All right.

20          MS. ANDERSON BARTH:  There was one other housekeeping

21 matter.  I think there is a motion to reconsider that was filed

22 pro se.

23          THE COURT:  It's still pending.

24          MR. DARROW:  Your Honor, I apologize.  I had one

25 housekeeping matter as well.  I'm concerned the Government is

75

1   -- we get this case to sentencing hopefully sooner rather than

2   later, and our only concern is if a comprehensive written

3   opinion as to all the guideline issues was going to be under

4   preparation, our concern was that we may still be months away

5   from sentencing and it had been our hope --

6             THE COURT:  We're not going to be months away from

7   sentencing.  No.  I'm going to move -- I've been working on

8   this for a little while here.

9             MR. DARROW:  Thank you very much.

10            THE COURT:  So I think I need to get this done.

11            MR. DARROW:  Is there any chance we can get a date

12  for the sentencing today?

13            THE COURT:  Not yet.

14            MR. DARROW:  Okay.  Thank you.

15            THE COURT:  Okay.  All right.  Mr. Folks.

16            THE DEFENDANT:  I just want to speak about discovery.

17  The discovery that you ruled that I was allowed to have

18  discovery, but the discovery that I got is absolutely useless.

19  For instance, it is 25,000 pages and the Facebook alone I only

20  got 6,000 of those pages and it was terrible.  Like you can't

21  tell who is speaking to who.  You can't figure out which date

22  that the conversation is taking place on.  It's chopped up to a

23  point that it makes no sense and it's 90 percent of the stuff

24  that I was given is on the witness MN and I have no desire to

25  learn anything about her.  She serves no purpose to the case,

1    and a lot of the other stuff that's in the computer that I was

2    given is on people that never even came to trial.  In other

3    words, I'm being stymied again because of stuff I was actually

4    given on a laptop.  It's useless to me.

5              THE COURT:  Well the question is I guess a little

6    less whether the material that you have got is useless.  The

7    better question is whether there's material out there by way of

8    discovery which would be helpful to you that you have not

9    gotten.

10             THE DEFENDANT:  Yes.  There's five different areas

11   that I kept requesting for the past three years now and there's

12   the Facebook issue.  There was a Backpage issue which I know I

13   can't get because of the pictures, that's the law, but I told I

14   want the metadata from the pictures to get the metadata, set a

15   time frame to when everything was happening, everything was

16   going on, and it conflicts everything.  There was things that

17   was given to my attorneys days before trial that I never --

18   discovery that I never got to look at until the -- to this day

19   I don't know what it is.  The trial exhibits -- I was never

20   able to see the trial exhibits.  They were put on the screen

21   and snatched off the screen before I could really get a good

22   look at what was going on with the trial exhibits.  I asked to

23   see those or review those because at one point -- at one point

24   there was one trial exhibit that was conversation between

25   myself and Danielle, and yet in the computer those same

1  conversations were deleted.  So I wanted to see what they were

2  saying and why they were deleted when they were given to me,

3  yet they were used against me at trial and none of this stuff

4  came with this computer that I just recently got, and, lastly,

5  the fifth thing was the data from the regular pictures.  There

6  was a conflict with a lot of the pictures inside this case.

7  All have metadata on them and those metadata serve as a time

8  frame.  A lot of the stuff that I've been convicted of and

9  charged with I was locked up in New York State at some portions

10 of this time and it's a conflict.  I couldn't be in New York

11 State in prison and at the same time up here doing some of the

12 things they said I was doing.  I couldn't be in both places at

13 the same time and I wanted to show that with the metadata on

14 these pictures, but I can't get any.  I can't get any of the

15 Facebook conversation.

16        THE COURT:  So focus your objection to what you are

17 missing and you should submit something in writing either with

18 the assistance of counsel or you do that directly.  I just

19 would want to see something in writing about literally what

20 you're suggesting you are missing, where that material would

21 be, and whether it in fact is discoverable.

22        MR. KAPLAN:  So, Judge, I think there is one issue we

23 can clear up.  That's the Facebook.  I had assumed when we put

24 all the discovery on the new computer that everything was there

25 that was there before and apparently it's not, and one of the

78

1    things that's not there is the 25,000 Facebook pages.  So I

2    emailed the Government and asked them if they would be willing

3    to agree that we could put the 25,000 pages on the computer.  I

4    haven't heard back.  I don't know.

5                MR. DARROW:  I responded.

6                MR. KAPLAN:  You did?  What did you say?  No?

7                MR. DARROW:  I said that our concern was that there

8    were a lot of photographs in the Facebook account that was

9    outside of the things Mr. Folks should retain at trial, and I

10   referenced the Danielle naked photographs.

11               THE COURT:  Okay.  So I guess since you're both

12   conversing with each other maybe you can try to work this out

13   and see if there can be some progress.  I appreciate the fact

14   that the photographs are a matter of concern, and so narrow the

15   issue so that this is -- this is the problem so that I can take

16   a look at it, but other than that it's very difficult for me to

17   make an assessment of what you're missing when it's not framed

18   -- the issue is not framed in that kind of way.  So if the

19   sides can attempt to work it out.  If not, then send something

20   to me and I'll look at it, but this is I shouldn't say the fast

21   track, but this is moving along here at this point.  Okay.  All

22   right.  Thank you.

23

24

25

79

1                    C E R T I F I C A T I O N

2

3

4

5        I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8                                          _____

9

10

11    November 12, 2020              _____

12    Date                          JoAnn Q. Carson, RMR,CRR

13

14    [Adjourned at 3:45 p.m.]

15

16

17

18

19

20

21

22

23

24

25