UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                          Civil Action No. 2:16–cr–94-1

Brian Folks

## REPORT AND RECOMMENDATION
(Doc. 609, 618, 619, 620, 629)

On May 9, 2019, Brian Folks was convicted after a jury trial on multiple counts of distribution of heroin and cocaine base, sex trafficking by force, fraud, or coercion, sex trafficking of a minor, and using the facilities of interstate commerce to promote prostitution. (*See* Doc. 455.) Proceeding *pro se*, Folks has filed an Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct his Sentence. (Docs. 609, 609-6.) The Amended Motion asserts ineffective-assistance-of-counsel claims against trial counsel Mark Kaplan and Natasha Sen and appellate counsel Michelle Barth. He also asserts a prosecutorial misconduct claim based on the allegation that the prosecutor "allowed perjured testimony during [g]rand [j]ury proceedings." (*See* Doc. 609-6 at 28.) The government opposes Folks's Amended Motion. (Doc. 631.)

Folks has also filed a Motion for Evidentiary Hearing and Motion to Appoint Counsel During That Hearing (Doc. 618) and a Motion to Remove Protection Order, which requests that the Court "lift[] the protection order that is currently in place so he can analyze protected material for the purpose of using it in aid of his § 2255 [Motion]." (Doc. 619 at 1.) He further requests "leave to conduct discovery" to support his claims, and appointment of counsel to assist him in the discovery process. (Doc. 620 at 1–2.) Finally, Folks has filed a "Motion Requesting Leave of Court to Amend Section 2255 Motion to Add Exhibits to Existing Motion." (Doc. 629.) The government also opposes these Motions.

For the reasons set forth below, I recommend that the Amended Motion for § 2255 relief (Doc. 609) be DENIED. I also recommend that the Motion for Evidentiary Hearing and Motion to Appoint Counsel (Doc. 618), Motion to Remove Protection Order (Doc. 619), and Motion for Discovery (Doc. 620) be DENIED. As this Report and Recommendation considered the documents included in Folks's Motion to Amend to Add Exhibits, I recommend that the Motion to Amend (Doc. 629) be GRANTED.

## Factual and Procedural Background

### I.    Indictments

On July 14, 2016, Folks and two codefendants were charged in a seven-count Indictment. (*See* Doc. 1.) Folks was charged with one count of conspiracy to distribute heroin, cocaine, and cocaine base, and four counts of distribution of heroin. (*See id.*) He was arrested on July 19, 2016, and arraigned on July 20, 2016.

On April 27, 2017, a First Superseding Indictment was filed, which added four counts of sex trafficking involving four women and one count of sex trafficking of a minor. (Doc. 60.) A Second Superseding Indictment filed on June 12, 2017, charged Folks with an additional count of sex trafficking. (Doc. 71.) On November 14, 2017, a Third Superseding Indictment further charged Folks with one count of felon in possession of a firearm and one count of distribution of heroin and cocaine base. (*See* Doc. 104.) The Fourth Superseding Indictment, filed on January 16, 2018, added a charge of using the facilities of interstate commerce to promote prostitution. (*See* Doc. 124.) In total, the Fourth Superseding Indictment charged Folks with fourteen crimes.

### II.    Substitution of Counsel and History of Protective Agreement/Orders

In January 2017, Attorney William Kraham was appointed to represent Folks. Attorney David Williams was appointed as co-counsel in November 2017. Pursuant to a Protective Agreement between Folks, his counsel, and the government, dissemination of discovery

materials and the names of witnesses and victims was prohibited. (*See* Doc. 156-1.) On February

26, 2018, the government filed an emergency motion for a hearing based on suspected violations

of the Protective Agreement due to the online publication of discovery materials and names of

witnesses and victims. (*See* Doc. 156.) Following the hearing, the Court granted the

government's unopposed Motion for Protective Order (Protective Order), broadening the scope

of the agreement to include all materials previously produced to Folks and preventing Folks from

retaining discovery materials. (*See* Doc. 165.) The Court granted Attorney Kraham's motion to

withdraw as co-counsel (ECF Minute Entry 180) and appointed Craig Nolan as replacement

co-counsel.

In April 2018, Attorneys Nolan and Williams moved to withdraw as counsel based on a

conflict of interest. (ECF Minute Entry 234.) The Court granted the motion and appointed Mark

Kaplan and Natasha Sen as replacement counsel.[1] In June 2018, Attorney Sen moved to amend

the Protective Order "to allow [Folks] to retain certain discovery materials so that he can

adequately assist in preparing his defense for trial." (Doc. 255 at 1.) The government agreed to

amend the Protective Order to identify certain non-sensitive documents and to propose a process

for reviewing any disputed documents. (*See* Doc. 256). The Court entered the proposed

Amended Protective Order (First Amended Protective Order), allowing Folks to retain copies of

"non-sensitive discovery material" and directing the parties to follow a specific procedure for

distinguishing between sensitive and non-sensitive discovery material. (Doc. 258 at 3–4.)

During an October 2018 discovery conference, Folks's counsel requested further

modification of the First Amended Protective Order (Doc. 258) to allow Folks to retain certain

categories of discovery. (*See* Doc. 274 ("Defendant's Motion to Retain Certain Documents

Prohibited Under the Current Protective Order").) Having received assurances from defense

---

[1]  Attorneys Kaplan and Sen represented Folks through trial and posttrial proceedings.

counsel that Northwest State Correctional Facility (NWSCF)—where Folks was detained—had the capacity to supervise Folks's review of documents, the Court entered a modified Protective Order (First Amended Protective Order as Modified) permitting Folks to access and review discovery materials using a laptop computer stored securely at NWSCF. (*See* Doc. 294.) The First Amended Protective Order as Modified remained in place for the remainder of the pretrial proceedings and through trial.

After the trial and prior to Folks's sentencing, Attorney Michelle Barth (acting as Folks's supplemental trial counsel) filed a Motion to Lift or Modify the Amended Protective Order. (*See* Doc. 552.) The Court held a hearing on the motion to address the government's allegation that defense counsel violated the First Amended Protective Order as Modified by loading discovery materials for Folks's review on a hard drive rather than on a laptop, and that "Folks arranged for the hard drive to be transferred out of NWSCF to an associate." (*See* Doc. 555 at 9–10.) Without determining whether Folks was responsible for the missing hard drive, the Court entered a Second Amended Protective Order, permitting Folks to review certain discovery materials pre-loaded onto a laptop provided by defense counsel and controlled and monitored by personnel at Southern State Correctional Facility where Folks was detained. (*See* Doc. 560.) The Second Amended Protective Order remained in place throughout Folks's sentencing, posttrial proceedings, and appeal, and remains in place currently.

## III. Trial and Jury Verdict

On April 23, 2019, Folks's trial commenced on the Fourth Superseding Indictment.[2] The government called over twenty witnesses and introduced over one hundred exhibits; the defense

---

[2] In summary, Count One charged conspiracy to distribute heroin, cocaine, and cocaine base. Count Two charged Folks with possession of a firearm as a convicted felon. Counts Three, Five, Seven, Eight, and Nine pertained to distribution of heroin, cocaine, and cocaine base. Counts Ten through Fifteen charged Folks with sex trafficking women by force, threats of force, fraud, and coercion. Count Sixteen charged that Folks used the facilities of interstate commerce to promote prostitution. (*See* Doc. 124.)

called seven witnesses and introduced twenty-four exhibits. After an eleven-day trial, the jury returned guilty verdicts on thirteen of the fourteen counts in the Fourth Superseding Indictment. The jury found Folks guilty of the drug conspiracy charged in Count One; the drug distribution charges in Counts Three, Five, Seven, Eight, and Nine; the forced sex trafficking charges in Counts Ten, Eleven, Twelve, Thirteen, and Fourteen; the sex trafficking of a minor charged in Count Fifteen; and the use of facilities of interstate commerce to promote prostitution charged in Count Sixteen. (*See* Doc. 455.) The jury acquitted Folks of the felon-in-possession-of-a-firearm charge in Count Two. The Court granted Folks's motion for acquittal on Count Eleven, a sex trafficking charge.

As further detailed below, Folks's Amended Motion primarily raises challenges to the integrity of evidence derived from a computer—an issue that was the subject of suppression litigation and further challenged to varying degrees during trial and on appeal—and witness testimony related to the sex trafficking charges in Counts Ten through Sixteen.

### A.    Computer Evidence

As relevant to Folks's Amended Motion, the integrity of the computer evidence was a contested issue before, during, and after trial. When the government sought at trial to admit evidence derived from the computer, Attorneys Kaplan and Sen raised a chain-of-custody challenge during direct examination of the government's expert, Frank Thornton, who testified about the data extracted from the computer. (*See* Doc. 429 at 80–93, 100–102.) Mr. Thornton explained that he received the computer from DEA Intelligence Analyst Marilyn Epp. Anthony Martino, the defense digital forensics expert, examined a mirror image of the computer's hard drive and determined, as confirmed by the government, that Ms. Epp powered on the computer and attached a keyboard, display, and mouse. (Doc. 436 at 2.) According to Mr. Martino, 820 files were created and 1458 files were modified while the computer was powered on. (*Id.*)

5

Attorneys Kaplan and Sen moved to exclude all evidence extracted from the computer on the basis that such evidence was compromised when Ms. Epp turned the computer on contrary to established forensic protocol. (*See* Doc. 429 at 101; Doc. 440 at 75–79; Doc. 436 ("Defendant's Memorandum Regarding the Computer Seized During the Execution of a Search Warrant at 96 Ethan Allen Parkway on July 19, 2016").)

Defense counsel and the government submitted memoranda on the issue, and the Court held a hearing to determine whether to exclude the computer evidence. (*See generally* Doc. 441.) The government called Ms. Epp and the defense called Mr. Martino to testify to the integrity of the computer. Based on Mr. Martino's testimony, Attorneys Kaplan and Sen argued that Ms. Epp's powering on of the computer compromised its integrity, rendering the computer-related evidence inadmissible. The Court denied the motion, finding "no evidence to suggest that the specific images the Government intends to introduce were impacted." (Doc. 447 at 4; *see also* Doc. 441 at 36–38.) However, with Court permission, the defense "attack[ed] the integrity of the computer as a whole through cross-examination." (Doc. 447 at 4.) (*See* Doc. 441 at 76–77 (cross-examination of Mr. Thornton); Doc. 444 at 12–25 (cross-examination of Ms. Epp).) Further, as part of the defense case, Attorneys Kaplan and Sen called Mr. Martino to testify regarding the integrity of the data extracted from the computer. (*See* Doc. 448 at 31–76.)

Although the Court did not exclude the computer evidence on the ground that it was compromised, defense counsel challenged the government's efforts to link Folks to the images found on his computer and elsewhere. The government attempted to connect Folks to the hard drive through Mr. Thornton and Ms. Epp by reference to evidence from Facebook and Backpage, testimony from the sex trafficking witnesses, and data extracted from the hard drive. (*See, e.g.*, Doc. 442 at 28–82, 91–105, 109–136 (direct examination of Ms. Epp); *see also*, Doc. 441 at 98:3–9 ("[S]ome of the photos of the defendant [from Facebook] match what's in the hard drive

again to show that . . . he is the user of the hard drive . . . . we certainly have a right to make that connection for the jury as to user attribution . . . ."); *id.* at 105:4–13 ("Our belief is that they are photographs of the defendant on his Facebook page [and] these photographs were found on the Me Folder on the hard drive. [W]e're going to make th[e] connection that . . . this is his Facebook account because he has photos in the hard drive that match what's uploaded on Facebook[,] [and it] shows the user attribution for the hard drive[,] that he's in fact the one who uses it and not . . . anybody else who is theoretically possible based on what the jury has seen so far.").)

Attorney Sen's cross-examination of Mr. Thornton emphasized that his forensic examination of the computer lacked any analysis on the origin source of various media that he found on the computer, rendering him unable to confirm that the images extracted from the computer were "taken from devices that were actually seized in this case[.]" (*See* Doc. 441 at 81:22–23.) Mr. Thornton conceded that his report "[did not] contain any information about when [the computer files] were either saved or modified," and that he could not "identify whether [the computer] images were downloaded from a web site or uploaded from a camera or cell phone." (*Id.* at 82: 4–5, 7–9.) Further, Attorney Sen's cross-examination of Ms. Epp probed the limited information gleaned from the metadata of the files extracted from the computer and the media derived from Facebook and Backpage. (*See* Doc. 444 at 25–39.) Finally, in an effort to undermine the government's attempt to connect Folks with the evidence extracted from the computer, Facebook, and Backpage, Attorney Sen elicited testimony from the defense forensic expert on the permissible inferences that may be drawn from metadata. (*See* Doc. 448 at 60–76.)

### B.    Witness Testimony

The government called several women to testify about their experiences working as prostitutes for Folks: Mandy L., Katelynn C., Keisha W., Danielle M., Ayla L., and Jasmine L.

Folks testified in his own defense and disputed the testimony of all the sex trafficking witnesses. The defense called as witnesses two women who worked for Folks as prostitutes during the relevant period, Ariel Otero and Brittany Barber, and another woman, Emily Lasell, who provided adverse testimony about Ayla L. The testimony of Katelynn C. and Ayla L. is central to the claims Folks raises in his habeas motion.

Katelynn C., the victim associated with Count Ten, testified that she was seventeen years old when Folks persuaded her to work for him as a prostitute. (Doc. 423 at 38–39.) She explained that she had never used Backpage before working for Folks, and that Folks used his cell phone to take pictures of her and post her advertisements on Backpage. (*Id.* at 41.) Katelynn testified that she engaged in prostitution at motels in the Burlington area and that Folks drove her to and from these motels. (*Id.* at 42–43.) She also testified that she split the money she earned evenly between herself and Folks, but that she used her share of the money from prostitution to buy drugs from Folks. (*Id.* at 46.) Katelynn explained that over time her addiction to crack cocaine increased and Folks began taking all the money she earned working for him. (*Id.* at 43–44.) Eventually, Folks began withholding drugs from her until she either had sex with him or made money for him through prostitution. (*Id.* at 46–47, 66.) Katelynn also testified that Folks told her he was a "gorilla pimp," and that he would hit her if she crossed him. (*Id.* at 49, 72.) She also testified about one occasion when Folks grabbed her by the face and held a firearm to her head. (*Id.* at 52–53.) Katelynn testified that she never refused when Folks asked her to do something because she was "scared" of him. (*Id.* at 59, 67.)

Ayla L., the victim associated with Count Fourteen, testified that she began working for Folks by packaging and delivering drugs for him in exchange for a place to stay and a steady supply of heroin. (Doc. 440 at 5–7.) Ayla L. explained that eventually Folks began reducing the amount of heroin he provided to her, resulting in withdrawal. (*Id.* at 20–21.) Ayla testified that

8

Folks suggested she prostitute for him and, in return, he would give her the same amount of heroin she received before. (*Id.* at 21–22.) She initially declined, but eventually agreed due to the severity of her withdrawal symptoms. (*Id.* at 23.) Ayla L. testified that she met with clients at various hotels in Colchester and Burlington. (*Id.* at 28–29.) She explained that initially Folks arranged her "dates," posted her advertisements on Backpage, drove her to the clients, and collected half her earnings. (*Id.* at 20–22, 30–31.) She bought heroin from Folks with her earnings. (*Id.* at 31.) After a few months, Folks directed Ayla to arrange her own "dates." (*Id.* at 32.) Ayla's heroin usage "quadrupled" when she was working for Folks, but he withheld heroin from her until she "finished a job." (*Id.* at 37, 39.) She testified that Folks assaulted her on three occasions. (*Id.* at 40.) On one occasion, he slapped her and pushed her into a bathtub, which left her "terrified." (*Id.* at 40–41.) The second assault occurred after Ayla tried to leave Folks and he subsequently located her on the side of the road, put her in his car, drove her back to the house, and repeatedly hit her in the face. (*Id.* at 44.) The third assault occurred under similar circumstances. (*Id.* at 45.) Ayla also testified that she had sex with Folks against her will in exchange for drugs. (*Id.* at 49.) She also participated in the "challenge," a sexual act that Folks videotaped, in order to receive heroin from Folks. (*Id.* at 49–50.) Ayla testified that Folks attempted to blackmail her by reminding her that he possessed sexually explicit photographs and videos of her. (*Id.* at 50.)

The government corroborated Katelynn C. and Ayla L.'s testimony—and the testimony of the other sex trafficking witnesses—through documentary evidence obtained from Backpage and Facebook, motel and phone records, and photographs and videos obtained from the computer and Folks's cell phone.

On both direct and cross-examination, Katelynn admitted that she lied in her testimony before the grand jury. (Doc. 423 at 73–74, 79, 81–82.) For example, she falsely told the grand

jury that she had not engaged in prostitution before meeting Folks. (*Id.* at 83.) She also lied about the extent of her drug use and about having relapsed prior to her grand jury testimony. (*Id.* at 82, 85.) She told the grand jury that Folks had never hit her, which conflicted with her testimony on direct examination. (*Id.* at 86.) Katelynn explained that she lied to the grand jury because she was afraid of going to jail. (*Id.* at 83.) Further, on both direct and cross-examination, Ayla admitted to lying to law enforcement about working as a prostitute. (Doc. 440 at 27–28.) She further testified that she lied to law enforcement about her name. (*Id.* at 68–69.) She also admitted to lying to the victim advocate in the U.S. Attorney's Office about where she worked and about having brain cancer. (*Id.* at 68.)

## IV.    Posttrial Motions, Sentencing, and Direct Appeal

After his convictions at trial, Folks filed a Motion for Judgment of Acquittal and/or New Trial under Rule 29 of the Federal Rules of Criminal Procedure, specifically with respect to Counts Eleven, Twelve, and Fifteen. (*See* Doc. 485.) Through counsel, Folks also requested permission to file a *pro se* brief in support of his Motion for Judgment of Acquittal and/or New Trial (Doc. 516), which the Court granted (Doc. 520). The Court granted his Motion for Acquittal on Count Eleven, denied the Motion with respect to the other counts, and denied the Motion for a new trial. (*Id.*) Folks's *pro se* Motion for Reconsideration was denied and the case proceeded to sentencing. (Docs. 528, 571.)

The Court granted Folks's request for a downward variance (*see* ECF Minute Entry 574) and imposed concurrent sentences of 270 months on Count One, 240 months on Counts Three, Five, Seven, Eight, and Nine, 270 months on Counts Ten, Twelve, Thirteen, Fourteen, and Fifteen, and 60 months on Count Sixteen. (Doc. 576.)

Attorney Barth filed a notice of appeal on September 25, 2020. The Court of Appeals affirmed the judgment on December 17, 2021. *See United States v. Folks*, 20-3267-cr, 2021 WL

5987009 (2d Cir. 2021). On April 25, 2022, the Supreme Court denied Folks's petition for writ of certiorari. *See Folks v. United States*, 142 S. Ct. 2659 (Apr. 25, 2022).

## V.     Folks's Amended Motion Under 28 U.S.C. § 2255

Folks's § 2255 Motion was docketed in this Court on May 4, 2023.[3] (Docs. 609, 609-1.) The Court granted Folks's request to amend his § 2255 Motion (Doc. 612; *see also* Doc. 609-6 (Amended Motion).) Folks generally contends that he and his trial counsel had "conflicting interests" that resulted in deficient performance by his attorneys at trial. (Doc. 609-6 at 22–24.) He further contends that his trial counsel were constitutionally ineffective by failing to object to the admission of evidence derived from his computer and failing to effectively impeach witness testimony. (*Id.*) Folks also contends that his trial counsel were ineffective for failing to investigate and/or call certain witnesses at trial and failing to object to certain photographic and video evidence. (*See id.*) With respect to the alleged ineffective assistance of appellate counsel, Folks asserts that he was "unable to participate in his appeal" because "he was never able to communicate with [Attorney Barth]." (*Id.* at 13; *see also id.* at 25–27.)

To aid in the disposition of Folks's ineffective-assistance-of-counsel claims, the Court ordered trial and appellate counsel to submit affidavits addressing the substance of Folks's claims. (Doc. 616.) Attorneys Kaplan, Sen, and Barth have each filed an Affidavit/Declaration. (Docs. 622, 624, 625.)

---

[3] Folks certified under penalty of perjury that he placed his § 2255 Motion in the prison mailing system on April 24, 2023. (Doc. 609 at 12.) His Motion appears timely under the prison mailbox rule. *Hardy v. Conway*, 162 F. App'x 61, 62 (2d Cir. 2006) (noting that under the prison mailbox rule, "a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials"). "When there is no indication when a *pro se* petitioner handed his petition over to prison officials for mailing, courts in this Circuit have assumed that it was filed on the date it was signed." *Graham v. Piccolo*, 1:20-CV-01684 EAW, 2024 WL 3552787, at *5 (W.D.N.Y. July 26, 2024). Folk's § 2255 Motion reflects that it was signed on April 24, 2023. (Doc. 609 at 12.) The government does not raise a timeliness challenge to Folks's Motion.

## Discussion

I.    **Legal Standards**

A.    **Motions Under 28 U.S.C. § 2255**

A person serving a sentence in federal custody may seek to vacate the sentence if (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," (3) "the sentence was in excess of the maximum authorized by law," or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Review under § 2255 is "narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks omitted). Generally, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice" or actual innocence. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011). A movant shows cause and prejudice where the "claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (internal quotation marks omitted). However, "requiring a criminal defendant to bring ineffective-assistance-of-counsel claims on direct appeal does not promote these objectives," and therefore a movant may raise ineffective-assistance-of-counsel claims for the first time in a § 2255 motion. *Massaro*, 538 U.S. at 504.

B.    **Legal Standards Governing Ineffective Assistance of Counsel**

The Sixth Amendment guarantees criminal defendants the right to be "assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Critically, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The

Sixth Amendment protects the right to effective assistance of counsel at all critical stages of the proceedings, *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013), including various pretrial proceedings, *see, e.g.*, *Kimmelman v. Morrison*, 477 U.S. 365, 384–85 (1986) (pretrial suppression motion), and representation on appeal, *Smith v. Murray*, 477 U.S. 527, 535–36 (1986).

To prevail on an ineffective-assistance-of-counsel claim, a claimant must establish two elements under *Strickland*:

> (1) he "must show that counsel's performance was deficient," so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (internal citations omitted) (quoting *Strickland*, 466 U.S. at 687, 690, 694. "The [ineffective-assistance-of-counsel] claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett*, 663 F.3d at 85. The movant bears the burden of proving both elements of a *Strickland* claim. *Byrd v. Evans*, 420 F. App'x 28, 30 (2d Cir. 2011) (citing *Kimmelman*, 477 U.S. at 381).

In considering the performance element, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011). The movant must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction," *id.* at 689, reviewing courts should be "highly deferential" in assessing

counsel's performance. *See Pratt v. Greiner*, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). The determinative question is not whether counsel "deviated from best practices or most common custom," but whether the "representation amounted to incompetence under prevailing professional norms." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Stickland*, 466 U.S. at 690). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Therefore, a movant will not satisfy the deficient performance prong based solely on disagreements with counsel's strategy or advice. *United States v. Yeagley*, Case Nos. 13-CV-2561 (KMK), 08-CR-707 (KMK), 2017 WL 76903, at *7 (S.D.N.Y. Jan. 3, 2017).

In assessing the prejudice element, courts consider "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To establish prejudice, a movant must demonstrate that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When considering prejudice, the court determines "whether, but for counsel's deficient performance, there is a reasonable probability that . . . the result of the proceeding would have been different,"

14

for an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Henry*, 409 F.3d at 63 (omission in original) (internal citation omitted) (quoting *Strickland*, 466 U.S. at 691, 694). Further, "[t]he likelihood of a different result must be substantial, not just conceivable." *United States v. Thornhill*, 34 F. Supp. 3d 334, 361 (S.D.N.Y. 2014) (internal quotation marks omitted). "This inquiry is closely tied to the question of how strong the government's case would have been in the absence of counsel's errors." *Vargo v. United States*, 309 F. App'x 485, 487 (2d Cir. 2009) (summary order) (citing *United States v. Abad*, 514 F.3d 271, 276 (2d Cir. 2008).

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700. Thus, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

As Folks is proceeding *pro se*, the Court liberally construes his submissions and interprets them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (internal quotation marks omitted)); *Petrucelli v. United States*, Nos. 14 Civ. 9310, 02 CR 99, 2015 WL 5439356, at *2 (S.D.N.Y. Sept. 15, 2015) (applying *Erickson's* liberal construction standard in the context of a *pro se* § 2255 motion). Nevertheless, a *pro se* litigant is not exempt "from compliance with relevant rules of procedural and substantive law." *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

## II.    The § 2255 Motion

The Court liberally interprets Folks's Motion to raise the following claims: (1) trial counsel failed to challenge the admission of various images recovered from Folks's computer, and relatedly, failed to adequately challenge the forensic integrity of the evidence derived from the computer; (2) trial counsel failed to adequately challenge the credibility of government witnesses; (3) trial counsel's alleged conflicts of interest caused them not to call certain witnesses and fail to object to photographic and video evidence. Folks further contends that the appointment of Attorney Barth as supplementary counsel did not avert the alleged deficient performance of Attorneys Kaplan and Sen because Attorney Barth was similarly conflicted due to her friendship with trial counsel; and (4) through both failure to communicate with Folks and her friendship with trial counsel, Attorney Barth provided inadequate representation on appeal that was presumptively prejudicial. Folks also asserts that the government engaged in prosecutorial misconduct by allegedly obtaining the indictment knowing that witness Katelynn C. had given perjured testimony in the grand jury. (*See* Doc. 609-6.)

In the analysis of Folks's ineffective-assistance-of-counsel claims, the undersigned is mindful that all defense counsel in this case are experienced attorneys in this Court. Indeed, in denying defense counsel's posttrial motion to withdraw as counsel, Judge Sessions noted that Attorneys Kaplan and Sen are "extraordinarily skilled advocates. Both are recognized to be among the most qualified criminal defense counsel in Vermont. The Court chose them to represent Folks because of their skill and dedication in light of the complexity of the case. Moreover, Folks expressed no complaints in their representation until the jury verdict." (Doc. 512 at 3–4.)

As discussed in detail below, Folks's trial and appellate counsel's representation was constitutionally adequate. Folks's trial counsel vigorously challenged the credibility of

16

government witnesses in cross-examination and in closing argument, called defense witnesses to testify on Folks's behalf, including a digital forensics expert, and raised vigorous objections to the admission of evidence Folks identifies in his § 2255 Motion. Further, given the overwhelming evidence of Folks's guilt presented at trial, the challenged actions by his counsel do not undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694; *see also Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (noting that habeas relief on the ground of ineffective assistance of counsel is generally not warranted where a conviction is "supported by overwhelming evidence of guilt").

## A.    Trial Counsel's Alleged Failure to Challenge Computer Evidence

Folks alleges that his trial counsel was constitutionally ineffective by failing to challenge the admission of evidence obtained from the computer. (Doc. 609-6 at 15.) In particular, Folks asserts that his trial counsel: (a) failed to challenge the admission of images found on his computer on the grounds that the images were "compromised" and displayed "different timestamps on seemingly identical photos" (*id.* at 6, 18); and (b) failed to challenge the admission of images found on the computer on the ground that "[Folks] was not connected to them in any way." (*id.* at 7, 15).[4]

As an initial matter, these claims are flatly contradicted by his counsel's Affidavits. (Kaplan Aff., Doc. 625 at 1, ¶ 1 ("It is important to note that [the admission of electronic evidence] was litigated extensively both prior to trial and during the course of the trial. Numerous motions in limine to exclude certain documents, videos, and images were filed by Defense Counsel. Of particular importance is Ms. Sen and myself filed a motion in limine to

---

[4] Folks also asserts that defense counsel should have called Folks's then-wife Cassandra Folks to "testify to the fact that[] [m]ost of the exhibits shown to the grand jury to acquire the sex trafficking charges[] were found in her private folder[] on [their] computer." (Doc. 609-6 at 7 (citing Doc. 609-2).) The Court addresses this allegation and Folks's other allegations regarding uncalled witnesses in Part C.1 below.

exclude any evidence from the [B]ackpage website . . . .")); (Sen Aff., Doc. 624 at 1, ¶ 1 ("The admission of electronic evidence generally and of other specific images/video recordings was litigated before and during trial. In advance of trial, prior defense counsel and trial counsel filed multiple motions *in limine* to exclude images, documents, and video recordings from being presented at trial.").) As explained further below, counsel's recollection of computer evidence-related litigation finds ample support in the record.

> 1. **Failure to challenge the admission of images found on the computer based on "compromised" computer data and "different timestamps on seemingly identical photos"[5]**

Folks contends that his trial counsel "failed to adequately follow up with the court" regarding the introduction of "compromised" computer data. (Doc. 609-6 at 18; *see also id.* at 6.) He asserts that during trial his counsel raised a concern with the Court regarding the metadata of certain images that the government admitted into evidence. (*Id.* at 18.) Specifically, Folks alleges that while his trial counsel notified the court that "two identical images were offered into evidence that had different timestamps," counsel ultimately "failed to present the full impact of the compromised data." (*Id.*) According to Folks, "[o]nce the discovery was made[] that the timestamps differed in seemingly [identical] photographs, further investigation should have been made to determine if they were identical images." (*Id.*) He argues that his trial counsel were ineffective with respect to this particular issue because, "beyond bringing this issue up one time, and failing to follow through, counsel failed to argue the images[' ] integrity and their introduction into evidence." (*Id.* at 19.) In his Response to the government's Opposition (Doc.

---

[5]  To the extent Folks asserts that his trial counsel did not attempt to exclude the computer evidence on the basis that it was "corrupt" and therefore "forensically unsound," (*see* Doc. 609-6 at 15), the record does not support this claim. (*See, e.g.*, Doc. 436 (defense memorandum moving to exclude all computer evidence on the ground that the computer was compromised); ECF 443 (minute entry memorializing defense argument at hearing that all computer evidence should be excluded).) In any event, Folks clarifies that he does not base his allegations of ineffective assistance of counsel on his trial counsel's "initial attempt to challenge the computer as a whole," but rather on the "new issue regarding the meta data that came to light." (Doc. 638 at 2.) The Court addresses this issue in Part II.A.1.

638), Folks contends that "[d]efense counsel's failure to ask [the defense's expert witness, Mr. Martino] the pertinent question as to whether or not two exact photos could retain different creation dates was paramount to counsel's lack of performance." (*Id.* at 4.)

Folks has not established deficient performance by trial counsel with respect to the metadata of the images. The record evidence and attorney affidavits reflect Attorneys Kaplan and Sen's thorough effort to challenge the introduction of this computer evidence on the basis of the differing metadata. For example, during Ms. Epp's testimony on the eighth day of trial, counsel asked to "renew the challenge to the general issue of the files being corr[upted] on his computer" based on the differing metadata between two seemingly identical photos in government's Exhibit 50B. (Doc. 442 at 90:19–20.) The court noted defense counsel's objection and determined that the issue need not be addressed at that time. (*See id.* at 91.)

Moreover, given that Attorneys Kaplan and Sen renewed their challenge following the conclusion of Ms. Epp's testimony, Folks is incorrect that his trial counsel "failed to adequately follow up with the court" regarding the metadata issue. (Doc. 609-6 at 18.) (*See* Doc. 442 at 139:15; 139:25–140:3 (explaining that based on the "metadata for the photo," Folks "is renewing the issue of the fact that it is impossible to detect with certainty what sorts of files were corrupted when the computer was powered on.").) In its Opinion and Order, the Court denied counsel's objection to the admission of the computer evidence and their renewed objection based on the metadata issue.[6] (*See* Doc. 447 at 4 ("[T]here is no evidence to suggest that the specific images the Government intends to introduce were impacted. Defendant is free to attack the integrity of

---

[6] Prior to issuance of the Court's Opinion and Order, Judge Sessions held an evidentiary hearing on day eight of the trial regarding the integrity of the computer and the admissibility of the images the government sought to introduce. (*See* Doc. 441.) The Court heard testimony from the government's witness, Ms. Epp, and the defense expert, Mr. Martino. (*Id.* at 37–38 ("The defense certainly can attack the systems-wide approach that the Government has taken, but essentially the question is when an image that the Government seeks to introduce is to be introduced, if there's really no evidence to suggest that turning on the computer modified that particular image, these images are not modified, then they are as legitimate as they were prior to the turning on of the computer.").)

the computer as a whole through cross-examination, but the specific images and videos are admissible.").) Defense counsel also probed the issue during cross-examination of Ms. Epp, specifically inquiring about the metadata regarding Government's Exhibit 50B. (*See* Doc. 444 at 34–36 ("How do two identical pictures have different dates taken?" (*Id.* at 35:11.)).) In posttrial briefing, Folks's counsel again challenged the computer evidence, including the metadata issue. (*See* Doc. 485 at 27–29, 55.) The Court denied that portion of the posttrial motion. (*See* Doc. 520 at 53–54.)

Folks also appears to assert that his counsel was ineffective by failing to specifically ask the defense expert "whether it was possible for two exact pictures to have two separate creation dates." (Doc. 638 at 2.) Defense counsel's alleged failure to ask Mr. Martino this particular question does not constitute deficient performance given the ample evidence in the record that metadata issues were repeatedly raised by counsel. Further, it is evident that the metadata issue pertaining specifically to Exhibit 50B came to counsel's attention after the evidentiary hearing. (Doc. 442 at 90–91.)[7] It was therefore appropriate for defense counsel to renew their objection to the admission of the computer data on this basis. (*See id.* at 90, 139–40.)

Even after the Court denied defense counsel's initial objection to the computer evidence and the renewed objection based on the differing metadata (*see* Doc. 441 at 37; Doc. 447 at 1), Attorney Sen elicited testimony on the differing metadata of Government Exhibit 50B during cross-examination of Ms. Epp (*see* Doc. 444 at 35). Attorney Sen again challenged the computer

---

[7] Folks contends that "[t]he purpose of the hearing was 'not' to determine whether or not turning on the computer impacted the photographs presented," but rather "whether a pair of identic[al] photos could have two different creation dates, and if so, what would have been the cause." (Doc. 638 at 4.) Folks is incorrect regarding the purpose of the hearing. The hearing was initially prompted by defense counsel's objection to the admission of files taken from a computer seized pursuant to a search warrant. (*See* Doc. 447 at 1.) As Judge Sessions explained, the hearing was necessary to determine "the issue of good faith or bad faith on the part of the investigating officer when she turned on the computer" and to address defense counsel's objection "to the introduction of various exhibits taken from the computer based upon perhaps a corruption of those particular exhibits." (Doc. 441 at 11:20–22; *id.* at 11:24–12:1.)

evidence at the conclusion of Ms. Epp's testimony, effectively requesting that the Court reconsider its prior ruling. (*See id*. at 50:12–13 ("I think [the differing metadata is] a concern and my client would like to revisit it.").) The Court denied this objection, noting that "this witness just testified that it is possible that you can have different dates on the same photos because she has been taught that the photo date is on or before, and that in fact if one of those photographs is modified in any particular way, it creates a different date." (*Id.* at 50:15–19.) During direct examination of forensic expert Mr. Martino, Attorney Sen specifically asked about the differing metadata for the two identical images in Government's Exhibit 50B, and he opined that the differing metadata indicated that the information was corrupted and could not be relied on. (*See* Doc. 448 at 68:14–70:7.)

Therefore, Folks has not established counsel's deficient performance with respect to the alleged failure to challenge the admission of images based on "compromised" computer data and "different timestamps on seemingly identical photos." (Doc. 609-6 at 6, 18; *see generally* Doc. 638 at 2–5.) Counsel's approach to the metadata issue did not "fall outside the range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The record and attorney affidavits undermine Folks's assertions and demonstrate counsel's efforts to challenge the computer evidence not only with respect to the integrity of the computer as a whole but also based on the differing metadata in Government's Exhibit 50B. (Doc. 625 at 1–2; Doc. 624 at 1–2.) To the extent Folks challenges his counsel's specific approach in objecting to the computer evidence, his disagreement with counsel's strategy is insufficient to establish constitutionally deficient performance. *Yeagley*, 2017 WL 76903, at *7; *see also United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) ("As with trial decisions to offer or stipulate to certain evidence, decisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics,' and thus are 'virtually unchallengeable' absent exceptional grounds for

21

doing so." (citation omitted)). As Folks's deficient-performance claim on this issue is clearly without merit—indeed, the record documents counsel's repeated engagement with the Court on this issue—the Court declines to address prejudice.[8] *Strickland*, 466 U.S. at 697.

### 2.    Failure to challenge the admission of images found on the computer because "[Folks] was not connected to them in any way"

Folks asserts that his trial counsel was ineffective because "no rational trier of fact . . . could have supported a connection between the images and [Folks] and they should have been excluded." (Doc. 609-6 at 15.) Folks maintains that the images on the computer did not belong to him. (*Id.* at 5.) He also alleges that "defense couns[e]l never so much as challenged the fact that [Folks] was not connected to [the images] in any way. The forensic expert was present, yet no attempt was made to prove that [Folks] had no access [to] them, nor did he ever have access to them." (*Id.* at 7.) Folks asserts that his counsel was ineffective for not alerting the jury to the fact that he did not have access to the other user accounts on the computer (*id.* at 15), that "the pictures obtained from the computer were found to be present only in the accounts belonging to the [other users]" (*id.* at 16), and that "there was no evidence to support the contention that he even knew of the existence of the images, beyond having anything to do with them" (*id*).

Trial counsel were not ineffective with respect to this issue. Regarding the claim that counsel did not challenge Folks's connection to the images, counsel did in fact seek in pretrial motions to exclude the evidence on that basis. (*See, e.g.*, Doc. 359 at 7 ("Similarly, many of the photographs on the computer attributed to Mr. Folks appear to have been downloaded images

---

[8]  Folks attaches to his § 2255 Motion the Affidavit of Patrick Falte, who appears to be incarcerated with Folks at FCI Butner. (Doc. 609-5.) The Affidavit generally addresses "how user accounts and file permissions work" with Microsoft Windows. (*Id.* at 1, ¶ 4.) Folks relies on the Falte Affidavit to question his counsel's efforts to challenge the admission of images from the computer. (*See, e.g.*, Doc 609-1 at 4–5, 16–17; Doc. 609-6 at 6–7, 18–19.) The Falte Affidavit does not raise a controverted issue of fact as to counsel's handling of the evidentiary issue Folks raises, much less demonstrate deficient performance by counsel. Not only are his qualifications to opine on the technical claims at issue not established, but as Mr. Falte concedes, his affidavit is "mostly academic, not analytic," (Doc. 609-5 at 1, ¶ 4), and therefore not based on the actual evidence in this case.

from various websites. There is no evidence linking Mr. Folks to the creation of these photographs."); *id.* at 8–9 ("Mr. Folks further moves to exclude sexually explicit photographs of individuals that the Government claims are minors that cannot be linked to Mr. Folks via metadata.").) The Court reserved judgment on defense counsel's motion to exclude photographs and videos taken from the computer. (Doc. 389 at 9 ("Judgment reserved for trial. . . . [M]any of these photos are indicative of the control that Defendant allegedly had over the lives of the women engaging in prostitution on his behalf. However, a blanket rule prior to trial is not appropriate. Decision on the photos will be made during trial, when the Court has the context of further evidence.").)

At trial, defense counsel repeatedly objected to the introduction of photos and videos extracted from the hard drive, in part on the basis that the government had not sufficiently connected the hard drive to Folks. For example, Attorney Sen objected when the government sought to connect Folks and the images on the computer through Ms. Epp's testimony. (*See, e.g.*, Doc. 442 at 42:11–13 ("[Ms. Epp] can't describe when these photos came onto the computer, how they got there, whether they have been modified.").) As Attorney Sen explains in her Affidavit, "[t]he Court overruled our objection and permitted the Government to argue that the images came from a computer to which Mr. Folks had access." (Doc. 624 at 2–3; *see also* Doc. 442 at 42:15–23.) Further, counsel's cross-examination of the government's forensic expert emphasized his inability to connect the data extracted from the computer with Folks's other seized devices. (*See* Doc. 441 at 81–82.) Attorney Sen also elicited testimony from Ms. Epp that appeared intended to undermine the government's attempt to connect Folks to the images extracted from the hard drive. (*See* Doc. 444 at 25–39.) Defense counsel further challenged Folks's connection to the images on the computer through the testimony of their expert, Mr. Martino, who observed that the government did not show how the images arrived on the

computer. (*See* Doc. 448 at 58:10–15.) Therefore, contrary to Folks's assertion that his alleged lack of access to the images on the hard drive was not "properly brought up in front of [the] jury" (Doc. 609-6 at 15), trial counsel elicited testimony related to the claimed lack of connection between Folks and the images on the hard drive.

To the extent Folks alleges his counsel were ineffective because they did not explicitly raise his lack of access to the various user profiles, this decision "fall[s] squarely within the ambit of trial strategy" and was "reasonably made," *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (internal quotation marks omitted), especially given that during his testimony Folks acknowledged his use of the computer and his saving images to it. (*See* Doc. 472 at 107, 139.) In light of the clear record that his counsel mounted vigorous challenges to Folks's purported lack of demonstrated connection to the computer evidence, his disagreement with counsel's strategy on this issue is not a basis to find ineffective assistance of counsel. *Yeagley*, 2017 WL 76903, at *7; *Cohen*, 427 F.3d at 170.

Finally, as the government correctly notes, the evidence at trial included videos and photographic evidence of Folks himself, as well as pictures of several sex trafficking victims from Folks's hard drive, some of which also appeared on Backpage. Victim testimony, and Folks's own testimony, corroborated Folks's connection to the images and to the Backpage postings. (Doc. 631-1 at 29–30 (table summary of admitted evidence).)

Folks has not overcome the strong presumption that his trial counsel's conduct with respect to challenging the computer evidence "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, I recommend that Folks's ineffective-assistance-of-counsel claim be denied with respect to the computer evidence admitted at trial.

**B.    Trial Counsel's Alleged Failure to Challenge Witness Credibility**

Folks asserts that government witness Katelynn C.'s false testimony before the grand jury constituted prosecutorial misconduct. (Doc. 609-6 at 8, 28.) He further contends that his trial counsel were ineffective because they failed to "make the jury aware" of allegedly inconsistent statements Katelynn C. made before and after her arrest.[9] (*Id.* at 9.) Specifically, Folks contends that Katelynn "was arrested shortly after giving a statement that could be construed favorabl[y] to [Folks]," and "[s]he was then released after making her second statement." (*Id.*) According to Folks, the second statement—which she testified to at trial—"negatively impact[ed] [Folks]." (*Id.*) Folks contends that Katelynn C.'s inconsistent statements "w[ere] never brought in front of the [j]ury, and paints the picture that the prosecutor incentivized the witness to testify against [Folks] after she made positive statements." (*Id.* at 28–29.) He asserts that "[t]his fact[] could have very well . . . shown the jury the level of coercion and misrepresentation of the facts of [Folk's] case by this very same witness." (*Id.* at 9.) Other than his assertion that Katelynn C.'s initial statements were "positive" and later "negative" as to him, Folks does not explain the precise nature of the purportedly inconsistent statements. Nevertheless, it is clear that Folks's trial counsel were not ineffective on this issue. *Bennett*, 663 F.3d at 84.

---

[9]  Folks references Katelynn C.'s allegedly inconsistent statements to law enforcement in two separate places in his Motion. (*See* Doc. 609-6 at 8–9, 28–29.) Earlier in his Motion, Folks references Katelynn C.'s statements to support his ineffective-assistance-of-counsel claim. (*See id.* at 9 ("My lawyer failed to make the jury aware of [Katelynn C.'s statements].").) Subsequently, he again references Katelynn C.'s statements under the following heading: "The prosecutor allowed perjured testimony during Grand Jury proceedings which amounted to prosecutorial misconduct." (*Id.* at 28.) It is unclear whether Folks separately and directly challenges the grand jury process based on perjury during grand jury proceedings, or whether he asserts an ineffective-assistance-of-counsel claim based on Folks's trial counsel's alleged failure to apprise the jury of Katelynn C.'s inconsistent statements. To the extent Folks's claim constitutes a direct challenge to the grand jury process, his claim is not cognizable on a § 2255 motion. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (explaining that, after jury's return of guilty verdict, claims of deficiencies in grand jury proceedings are not cognizable on direct appeal or in collateral attack on conviction); *see also United States v. Mechanik*, 475 U.S. 66, 70 (1986) (explaining that even if indictment was potentially tainted by an error in the grand jury process, the defendant's subsequent conviction at trial renders any grand jury error harmless). Therefore, the Court construes Folks's claim as asserting ineffective assistance of counsel based on his trial counsel's alleged failure to apprise the jury of Katelynn C.'s inconsistent statements to law enforcement.

### 1.    Deficient Performance

"Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (omission in original) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (no ineffective assistance based on failure to adequately impeach government witnesses where defense counsel vigorously cross-examined witnesses and could have reasonably concluded that further questioning on relatively unimportant matters would confuse or fatigue the jury), *cert. denied*, 507 U.S. 1029 (1993).

Attorney Kaplan employed an objectively reasonable trial strategy to impeach Katelynn C.'s credibility. He attests that he "extensively cross examined [Katelynn C.] about the conflicting statements that she made to both the Government and to the Grand Jury[] and during trial." (Doc. 625 at 2, ¶ 2.) The trial record confirms Attorney Kaplan's recollection. For example, Attorney Kaplan impeached Katelynn C.'s credibility by eliciting testimony as to the conflicting statements she made to the grand jury and during trial. (*See* Doc. 423 at 79, 81, 82, 83, 85; Doc. 425 at 4.) Although Attorney Kaplan did not specifically cross-examine Katelynn C. about inconsistent statements she made before and after her arrest, his impeachment of Katelynn C. reasonably focused on those inconsistent statements relevant to whether Folks coerced Katelynn C. into prostitution. Attorney Kaplan also impeached Katelynn C.'s credibility more generally. He confirmed that she lied to Folks about her age (*see* Doc. 423 at 82), highlighted the untruthful statements she made before the grand jury (*see id.* at 79, 81, 82, 83, 85), and pointed out that it was implausible she could not remember the name of a person with whom she was in a previous relationship (*see* Doc. 425 at 4–5, 9).

Given his extensive effort to impeach Katelynn C.'s credibility on both germane and collateral matters, Attorney Kaplan's alleged failure to pursue cumulative impeachment on speculative and hypothetical issues pertaining to Katelynn C.'s credibility was not objectively unreasonable. *See Love v. McCray*, 165 F. App'x 48, 49–50 (2d Cir. 2006) (finding attorney's performance was not objectively unreasonable because he failed to pursue cumulative impeachment); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."). The record reflects that Attorney Kaplan conducted a thorough cross-examination of Katelynn C. that challenged key aspects of her testimony. Attorney Kaplan's alleged failure to impeach Katelynn C. with the inconsistent statements she made to law enforcement simply does not rise to such a level that it represents a "breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696.

### 2.   Prejudice

Even assuming Attorney Kaplan's performance was objectively unreasonable, Folks has not demonstrated prejudice. Given the credibility issues raised during cross-examination, the inconsistent statements Folks claims Attorney Kaplan should have explored do not demonstrate "a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different." *See Henry*, 409 F.3d at 63.

Attorney Kaplan elicited testimony suggesting that Katelynn C.'s inconsistent statements before the grand jury and at trial were motivated by a desire to avoid prosecution. (*See* Doc. 423 at 82–83.) That Attorney Kaplan did not inquire into a specific set of inconsistent statements did not prejudice Folks, as Attorney Kaplan's cross-examination thoroughly explored Katelynn C.'s

veracity, bias, and motivation to lie. Folks has not shown that apprising the jury of Katelynn C.'s inconsistent statements to law enforcement before and after her arrest would have resulted in a different outcome because Attorney Kaplan's cross-examination presented the jury with ample evidence to question Katelynn C.'s credibility. It is not reasonably probable that the outcome of Folks's trial would have been different had Attorney Kaplan impeached Katelynn C. with her inconsistent statements to law enforcement before and after her arrest. *Henry*, 409 F.3d at 63.

As Folks has not satisfied the deficient performance or prejudice elements under *Strickland*, he has not met the standard for ineffective assistance of counsel.

### C. Trial Counsel's Alleged Conflict of Interest and Deficient Performance Based on "Conflicting Interests"

Folks asserts that his counsel were conflicted "to [such] an extent that [he] requested hybrid counsel." (Doc. 609-6 at 9.) To substantiate this claim, he references counsel's request to be "removed from the case 'due to a conflict of [interest,]' and that they 'couldn't work together because of it.'" (*Id.*) In their Ex Parte Motion to Withdraw as Counsel, Attorneys Kaplan and Sen explained that "[d]efense counsel and Mr. Folks have reached irreconcilable differences and Mr. Folks refuses to accept counsels' advice." (Doc. 502.) At the time of their request to withdraw, counsel further explained that Folks "recently filed a complaint against Attorney Kaplan with the Professional Review Board," and that although "the PRB dismissed the complaint, Mr. Folks may appeal this decision, and this places counsel and Mr. Folks in an adversarial relationship." (*Id.*) Noting that "there are a number of compelling reasons to deny efforts to substitute counsel at this late date on account of the disruption a major change in counsel would cause," Judge Sessions denied the Motion and appointed Attorney Barth "to share in the representation of Folks." (Doc. 512 at 3, 4.) As the Court explained, "[n]ew counsel can

assist in communicating with Folks in preparing any supplemental motions and/or sentencing, while having trial counsel available to share knowledge of what happened at trial." (*Id*. at 4.)[10]

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998). A conflict of interest may take three forms: "(1) a per se conflict requiring automatic reversal without a showing of prejudice; (2) an actual conflict of interest that carries a presumption of prejudice; and (3) a potential conflict of interest that requires a finding of both deficient performance by counsel and prejudice, under the standard established in *Strickland*." *United States v. John Doe No. 1*, 272 F.3d 116, 125 (2d Cir. 2001) (citing *Armienti v. United States*, 234 F.3d 820, 823–24 (2d Cir. 2000)). A per se conflict occurs: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which the defendant is on trial. *See Armienti*, 234 F.3d at 823. Neither circumstance is present in this case. An actual conflict arises "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." !*Id.* at 824 (internal quotation marks omitted). "When counsel is burdened by an actual conflict that adversely affects performance, the defendant is not required to demonstrate prejudice; prejudice is presumed." *Id.* (citing *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994)). "To prove adverse effect, the defendant must 'demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Id.* (quoting *Levy*, 25 F.3d at 157).

---

[10]  In denying the Motion, Judge Sessions reasoned that "present counsel has a crucially thorough understanding of the evidence at trial," and "[t]here is no way that replacement counsel can match their understanding of the factual and legal issues presented by this case without dedicating many months to review of the record." (Doc. 512 at 4.) Judge Sessions further determined that the appointment of Attorney Barth would effectively "address counsel and Defendant's concerns about continuing the attorney-client relationship." (*Id.*)

Folks has not demonstrated an actual conflict of interest because he has not shown how his and counsel's interests "diverge[d] with respect to a material factual or legal issue or to a course of action" after his postconviction filing of his complaint against Attorney Kaplan with the Professional Review Board. *Id.* at 824. Moreover, Folks does not explain how his complaint "adversely affect[ed]" Attorney Kaplan's performance in posttrial proceedings. *Id.* Unable to show any conflict of interest from which to infer a *per se* or actual violation of his Sixth Amendment rights, Folks must demonstrate a "potential conflict of interest." *Id.* In order to prevail on such a claim, the movant "must establish both that counsel's conduct fell below an objective standard of reasonableness and that but for this deficient conduct, the result of the trial would have been different, under the familiar standard established by *Strickland*." *Id.* (citation omitted).

Folks asserts that he and his trial counsel disagreed on how best to defend the case and "counsel ended up going against [his] wishes." (Doc. 609-6 at 10.) He contends that "[a]t every stage there were conflicting interests in how to handle the case." (*Id.* at 22.) Folks points to the following acts or omissions that in his view demonstrated ineffective assistance of counsel based on a conflict of interest: (a) trial counsel's failure to investigate and call certain witnesses; (b) trial counsel's failure to object to video and photographic evidence pertaining to Victoria L. and Hannah A; and (c) Attorney Barth's inadequate performance as supplemental counsel.

### 1.    Failure to Call Witnesses

Folks alleges that his trial counsel was constitutionally ineffective by failing to call five witnesses to testify at trial. (*See* Doc. 609-6 at 10–11; Doc. 609-2 at 3–4; Doc. 638 at 8–9.) He asserts that "[b]eyond the neglect of key issues surrounding the case, one major issue [Folks] had that counsel failed to cure, despite protests by [Folks], was in the handling of several witnesses."

(Doc. 609-6 at 22.) Folks alleges that these witnesses "most likely would have greatly influenced the jury's decision." (*Id.* at 10.)

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *Smith*, 198 F.3d at 386 (internal quotation marks omitted). Such a judgment call "fall[s] squarely within the ambit of trial strategy and, if reasonably made, cannot support an ineffective assistance claim." *Id.* (internal quotation marks omitted). "[A]n attorney's decision 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *United States v. Betancur*, 84 F. App'x 131, 135 (2d Cir. 2004) (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000)); *see also United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam) ("The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.").

### a.    Cheryl Gonyea

Folks contends that Attorneys Kaplan and Sen were ineffective for failing to call Ayla L.'s mother, Cheryl Gonyea, as a witness. (*See* Doc. 609-6 at 10; Doc. 609-2 at 3.) Folks alleges that Ms. Gonyea informed defense investigators that Ayla L. "was a huge li[a]r" (Doc. 609-2 at 3), that Ayla L. was not honest "about her involvement with [Folks]" (Doc. 609-6 at 10), and that Ms. Gonyea knew the individual that engaged Ayla L. in prostitution prior to her relationship with Folks (Doc. 609-2 at 3). In their respective affidavits, Attorneys Kaplan and Sen affirm that they subpoenaed Ms. Gonyea to testify and that she appeared at court during the trial. (*See* Doc. 624 at 3; Doc. 625 at 2.) Attorney Kaplan asserts that, during a break in the trial, he discussed with Ms. Gonyea in detail the issues that "[he and Attorney Sen] thought she could be helpful with." (Doc. 625 at 2.) He recalls that Ms. Gonyea's "statements were substantially

different from what she had previously told [their] investigator[,] which caused [Attorneys Kaplan and Sen] to make a judgment call that she would not be helpful as a witness." (*Id.*; *see also Attorney Sen Affidavit*, Doc. 624 at 4 ("[W]e determined that it would not advance [Folks's] position to call [Ms. Gonyea].").) Consistent with their common practice, Attorneys Kaplan and Sen "discussed with Mr. Folks the benefits and downsides of calling Ms. Gonyea," and "Mr. Folks agreed with [their] recommendation not to call her." (Doc. 624 at 4.)

Folks has not demonstrated that the decision not to call Ms. Gonyea amounted to deficient performance under *Strickland*. Given that Ms. Gonyea's prior statements to the investigator and her statements to Attorneys Kaplan and Sen during the trial break were substantially different, Attorneys Kaplan and Sen reasonably concluded that Ms. Gonyea's testimony—even if it had some impeachment value—would have been unhelpful to Folks's case. Indeed, it was reasonable for counsel to conclude that Ms. Gonyea's impeachment testimony would itself be subject to impeachment on cross-examination based on her prior inconsistent statements. *See Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (noting that a court must "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside" (internal quotation marks omitted)). Other than asserting that he "does not recall [Ms. Gonyea] not testifying as a topic of discussion with him during trial" (Doc. 638 at 8), Folks does not rebut Attorneys Kaplan and Sen's recollection of the pertinent events. Even assuming Attorneys Kaplan and Sen did not confer with Folks on the decision not to call Ms. Gonyea as a witness, Folks has not overcome the presumption that counsel's decision not to call Ms. Gonyea "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if Folks could establish deficient performance in counsel's strategic choice not to call the witness, he has not shown prejudice because he has not demonstrated a reasonable

32

probability that the jury's verdict on Count Fourteen—the Count related to Ayla L.—would have been different had Ms. Gonyea testified. *See id.* at 694. Folks asserts that Ms. Gonyea would have contradicted Ayla L.'s testimony that she did not engage in prostitution prior to meeting Folks. (*See* Doc. 609-2 at 3; *see also* Doc. 609-6 at 10 ("This testimony could have been used to impeach the testimony of Ayla L[.] and would therefore have provided a viable defense for Count Fourteen.").) However, not only did Attorney Kaplan cross-examine Ayla L. on whether she was engaged in prostitution before she met Folks (*see* Doc. 440 at 97), he also elicited testimony undermining her honesty and credibility more generally (*see* Doc. 440 at 63–64, 67–68, 90, 96).

Moreover, Attorney Kaplan also called Emily Lasell to impeach Ayla L.'s credibility. (*See* Doc. 444 at 104.) Ms. Lasell testified that she believed Ayla L. engaged in prostitution prior to meeting Folks. (*Id.* at 110.) Further, Attorney Kaplan elicited testimony from defense investigator Jennifer Martin that Ms. Lasell and Ayla L. engaged in prostitution together before Ayla L. met Folks. (*See* Doc. 448 at 8:18–20.) Ms. Gonyea's testimony was not the exclusive avenue to impeach Ayla L. or reveal the inconsistencies in her testimony. As a matter of record, counsel did in fact elicit testimony that Ayla L. engaged in prostitution prior to meeting Folks. Further, whatever prejudice he claims on this issue is immaterial as a legal matter because "[e]vidence of victims' prior acts of commercial sex is irrelevant to whether those victims were coerced into working as prostitutes." *United States v. Rivera*, 799 F.3d 180, 185 (2d Cir. 2015) (emphases omitted).

The record reflects that counsel exercised reasonable professional judgment in determining how to impeach Ayla L.'s testimony. Reasonably determining not to rely on Ms. Gonyea given her inconsistent statements, counsel elected to attack Ayla L.'s credibility through cross-examination of Ayla L. and presentation of Ms. Lasell and the defense

investigator. These judgment calls are well within the scope of reasonable assistance of counsel. Folks has not shown that his trial counsel's decision not to call Ms. Gonyea "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### b.    Defense Investigator Jennifer Martin

Folks also alleges that his trial counsel was ineffective by failing to call defense counsel's investigator, Jennifer Martin, to testify to Ms. Gonyea's statements on Ayla L.'s credibility. (*See* Doc. 609-6 at 10; Doc. 609-2 at 3.) Attorneys Kaplan and Sen affirm—and the record reflects— that Ms. Martin was called to testify at trial. (*See* Doc. 624 at 5; Doc. 625 at 2; *see also* Doc. 448 at 7–9 (Ms. Martin's testimony on day nine of the trial).) Folks responds that "[a]lthough [Ms. Martin] testified as to what her report said, she did not get questioned about the sta[t]ements made to her by [Ms. Gonyea] that w[ere] favorable to [Folks]."[11] (Doc. 638 at 8.) As discussed above, Folks appears to refer to Ms. Gonyea's statements that Ayla L. was a "huge li[a]r" and that she was engaged in prostitution before she met Folks. (Doc. 609-2 at 3.)

Folks's counsel asked Ms. Martin to meet with Ms. Lasell as part of Ms. Martin's investigative responsibilities. (*See* Doc. 448 at 8.) Counsel called Ms. Martin to testify at trial regarding the inconsistency between Ms. Lasell's statements during direct examination and her prior statements to Ms. Martin during their meeting. (*See id.* at 5–9.) Ms. Martin testified that, during their meeting, Ms. Lasell stated that "Ayla [L.] was prostituting before she met [Folks],"

---

[11]   The Court ordinarily does not consider new arguments raised in a reply brief. *See Simpson v. Oakes*, 640 F. App'x 86, 88 (2d Cir. 2016) (deeming waived arguments first raised in a *pro se* reply brief); *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) (declining to consider argument raised for first time in *pro se* litigant's reply brief). However, the Court construes Folks's argument in his reply brief as an elaboration of the argument in his Amended Motion. Therefore, although raised for the first time in his reply brief, the Court considers Folks's claim to the extent he asserts that his trial counsel was deficient for failing to impeach Ayla L. with Ms. Martin's testimony and that he suffered prejudice as a result.

and Ms. Lasell had personal knowledge of that fact because "she was [prostituting] with Ayla
[L.]" before Ayla L. met Folks. (*Id.* at 8:18–19, 24–9:3.)

With respect to the deficient performance prong, it was objectively reasonable for
Attorney Kaplan not to elicit testimony from Ms. Martin about Ms. Gonyea's prior statements to
Ms. Martin. Defense counsel called Ms. Martin to impeach Ms. Lasell. (*See id.* at 5–6 (Attorney
Kaplan explaining to the court and the government that he will be calling Ms. Martin to impeach
Ms. Lasell with her inconsistent statements).) Because Ms. Martin was permitted to testify for
the purpose of impeaching Ms. Lasell, it is unlikely that Ms. Martin's testimony as to
Ms. Gonyea's statement would have been admissible in any event. Therefore, Folks has not
demonstrated deficient performance in Attorney Kaplan's alleged failure to question Ms. Martin
about Ms. Gonyea's statements. *See Feliciano v. United States*, No. 01 Civ. 9398(PKL), 95 CR.
941(PKL), 2004 WL 1781005, at *5 (S.D.N.Y. Aug. 10, 2004) ("Just as the failure to file
frivolous motions cannot constitute ineffective assistance of counsel, defense counsel has no
duty to make offerings of inadmissible evidence." (citing *United States v. Nersesian*, 824 F.2d
1294, 1321–22 (2d Cir. 1987))).

Even if Folks could establish deficient performance, he has not shown that, had
Ms. Martin testified regarding Ms. Gonyea's statements, "there is a reasonable probability
that . . . the result of the [trial] would have been different" such that "the trial cannot be relied on
as having produced a just result." *Henry*, 409 F.3d at 63 (first alteration in original). Folks asserts
that "[t]his testimony could have been used to impeach the testimony of Ayla L[.] and would
therefore have provided a viable defense for Count Fourteen." (Doc. 609-6 at 10.) The Court's
analysis above regarding defense counsel's decision not to call Ms. Gonyea applies with equal
force here—it was not necessary for Ms. Martin to testify about statements Ms. Gonyea made in
order for counsel to effectively impeach Ayla L. or otherwise contradict Ayla L.'s testimony.

Folks's counsel provided the jury with adequate reason to doubt Ayla L.'s testimony regarding whether she engaged in prostitution before meeting Folks. Therefore, Folks has not shown that his trial counsel's decision not to pursue an impeachment strategy relying on potentially inadmissible and cumulative testimony was objectively unreasonable, much less prejudicial.

### c.    Violet Guerra

Folks contends that his trial counsel was constitutionally ineffective for failing to investigate and call Violet Guerra as a witness to "bolster[] the defense that [Ayla L.] was not a credible witness and that she was engaging in sexual activities, before ever meeting [Folks], for the purpose of supporting her drug habit." (*Id.* at 10–11.) According to Folks, Ms. Guerra "introduced [Folks] to Ayla L[.], for the purpose of helping her get on Backpage." (Doc. 609-2 at 3.) Folks asserts that Ms. Guerra would have "exposed Ayla [L.]'s lies in front of the jury." (*Id.*) He contends that Ms. Guerra "would have contradicted the narrative that Ayla L. presented when she said she only began [engaging in prostitution] due to [Folks] requesting her to do so," which Folks claims "might have altered the jury's decision on that charge." (Doc. 638 at 8.) Attorneys Kaplan and Sen do not recall Folks requesting that Ms. Guerra be investigated or called to testify. (*See* Doc. 624 at 4; Doc. 625 at 3.) The government responds that whether Ayla L. engaged in prostitution previously is irrelevant to whether she was coerced to engage in prostitution subsequently.

Even assuming that Folks did request that counsel call Ms. Guerra, he has not offered any basis to conclude that the substance of her testimony would have been as Folks describes. *See McCarthy v. United States*, No. 02Civ.9082(LAK)(GWG), 2004 WL 136371, at *17 (S.D.N.Y. Jan. 23, 2004) ("Courts have viewed claims of ineffective assistance of counsel skeptically when the only evidence of the import of a missing witness' testimony is from the petitioner." (internal quotation marks omitted)), *report and recommendation adopted*, 2004 WL

1535577; *Skinner v. Duncan*, No. 01 Civ.6656 DAB AJP, 2003 WL 21386032, at \*39 (S.D.N.Y. June 17, 2003) (denying ineffective-assistance-of-counsel claim based on failure to call a witness because defendant "fail[ed] to offer any support for his speculation that [the uncalled witness] would have testified as such"). Given that Ms. Guerra was originally listed as a witness for the prosecution (*see* Doc. 624 at 4), Folks's speculation as to the substance of Ms. Guerra's testimony—and that it would have been favorable to him—is insufficient to support an ineffective-assistance-of-counsel claim. (*See* Doc. 609-6 at 10–11; Doc. 609-2 at 3; Doc. 638 at 8.) The Court cannot credit this speculation to conclude that Ms. Guerra's testimony would have aided the defense, or that her absence assisted the prosecution. Even assuming Attorneys Kaplan and Sen did not investigate Ms. Guerra's potential testimony and call her as a witness, contrary to Folks's request, and further assuming this omission was objectively unreasonable, Folks has not demonstrated the requisite prejudice under *Strickland*.

Folks asserts that Ms. Guerra's testimony would have "contradicted the narrative that Ayla L. presented when she said she only began [engaging in prostitution] due to [Folks] requesting her to do so, thereby increasing her narcotic intake and not being able to remove herself from the situation due to her drug dependency being held over her head." (Doc. 638 at 8.) However, Folks does not explain how Ms. Guerra's hypothetical testimony would have accomplished this end. "A defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice." *United States v. Green*, 104 F.3d 354, 1996 WL 665719, at \*3 (Table) (denying ineffectiveness claim where petitioner did not "describe in detail the testimony [uncalled witnesses] might have given, or substantiate the claim that they would in fact testify as proffered"). Further, as explained above regarding Ms. Gonyea and Ms. Martin, Folks's counsel thoroughly explored the inconsistencies in Ayla L.'s testimony, both through cross-examination of Ayla L. and through the testimony of Ms. Lasell and Ms. Martin.

Moreover, even crediting Folks's assertion that Ms. Guerra "was the person who actually introduced [Folks] to Ayla L[.] for the purpose of helping [Ayla L.] get on Backpage," Ms. Guerra's testimony would have been generally *consistent* with Ayla L.'s testimony on direct examination. (*See* Doc. 440 at 11–12 (Ayla L. testifying on direct examination that her friend Violet introduced her to Folks so that he could "help [her] out and get [her] back on [her] feet."); *id.* at 21 (Ayla L. testifying that it was Folks's idea that she engage in prostitution).) As relevant to Count Fourteen, Ms. Guerra's testimony actually may have further substantiated the prosecution's theory that Folks helped women post advertisements for prostitution on Backpage. (*See id.* at 25.) Folks has not shown a reasonable probability that the jury would have returned a not guilty verdict on Count Fourteen had Ms. Guerra testified. *Henry*, 409 F.3d at 63.

Therefore, because Folks has not demonstrated that he was prejudiced by the lack of Ms. Guerra's testimony, counsel's decision not to call Ms. Guerra as a witness does not constitute ineffective assistance of counsel, particularly given the evidence adduced at trial with respect to Count Fourteen. (Doc. 520 at 43–44); *see Strouse v. Leonardo*, 715 F. Supp. 1170, 1180–81 (E.D.N.Y. 1989) (even assuming truth of petitioner's allegations about content of potential witnesses' testimony, and assuming that counsel's alleged failure to interview these witnesses was objectively unreasonable, petitioner was not prejudiced given overwhelming evidence of guilt adduced at trial), *aff'd in part and vacated on other grounds in part*, 928 F.2d 548 (2d Cir. 1991).

### d.    Tori Jackson

Folks contends that his trial counsel was ineffective for failing to investigate and call Tori Jackson as a witness to "attack[] the credibility of [Katelynn C.]." (Doc. 609-6 at 11; *see also* Doc. 609-2 at 3–4.) He asserts that Ms. Jackson was Katelynn C.'s "close friend" and was "present for approximately 95% of the situations spoken about by Katelynn [C.]." (Doc. 609-6 at

11.) According to Folks, "[d]espite [his] wishes, defense counsel never contacted her, and even lied about doing so." (*Id.*) Folks asserts that "Ms. Jackson attempted to contact Mr. Kaplan to no avail." (*Id.*) Attorneys Kaplan and Sen attest that they attempted to locate Ms. Jackson through their investigator, but they were ultimately unable to do so. (*See* Doc. 624 at 4; Doc. 625 at 3.)

As explained below, counsel's conduct relating to Tori Jackson was not objectively unreasonable. Assuming reasonable diligence under the circumstances, the inability to locate a potential trial witness does not establish ineffective assistance of counsel. Folks makes the conclusory assertion that counsel made no effort to contact Ms. Jackson, speculating that Attorney Kaplan "never even sent the investigators to try to contact [Ms. Jackson]." (Doc. 609-2 at 4.) However, he offers no evidence to substantiate the alleged lack of diligence by his attorneys. For example, he has not submitted an affidavit from Ms. Jackson to substantiate the assertion that she "attempted to contact" Attorney Kaplan. (Doc. 609-6 at 11.) By contrast, Attorney Sen attests to a May 2019 memo in her file in which the defense investigators "outlin[ed] the steps that they had taken to locate Ms. Jackson," but without success. (Doc. 624 at 4.) Similarly, Attorney Kaplan attested to "spend[ing] a considerable amount of time with [their] investigator trying to locate Tori Jackson but we were unable to do that." (Doc. 625 at 3.) To Folks's charge that counsel lied to him about contacting Ms. Jackson, Attorney Kaplan attests that he "can certainly assure the court that [he] did not lie to Mr. Folks about [his] efforts to locate Tori Jackson." (*Id.*) In the absence of evidence from Folks to the contrary, the attorney affidavits demonstrate that there is no dispute of fact on this issue. The record evidence is that Folks's trial counsel did attempt, unsuccessfully, to locate Ms. Jackson, and their failure to do so does not constitute objectively unreasonable conduct. *Strickland*, 466 U.S. at 687–88.

In his Response to the government's Opposition, Folks asserts that his statements about Ms. Jackson's testimony are "far from speculative." (Doc. 638 at 9.) However, without an

39

affidavit or similarly reliable evidence from Ms. Jackson confirming the substance of the evidence she might have provided, Folks's assertions that she would have appeared at trial, and that she would have offered impeachment evidence, are conclusory and speculative at best. *See McCarthy*, 2004 WL 136371, at \*53; *Skinner*, 2003 WL 21386032, at \*39.

Folks also cannot demonstrate prejudice. He contends that Ms. Jackson's testimony would have undermined Katelynn C.'s credibility. (*See* Doc. 609-2 at 4 (explaining that Jackson "would have, more than likely, been able to question the accuracy of Katelynn[] [C.'s] statements against [Folks], in the mind of the jurors.").) Folks does not describe with particularity how Ms. Jackson's testimony would have undermined Katelynn C.'s credibility. Courts decline to find ineffective assistance of counsel based on the claim that a certain witness should have been called, particularly where the claimed likely testimony is speculative, cumulative, or both. *See, e.g.*, *Barnes v. United States*, Nos. 13–CIV–9105 (LAP), 04–CR–186 (LAP), 2015 WL 5854030, at \*7 (S.D.N.Y. Aug. 31, 2015) (characterizing as "speculative" defendant's unsupported assertions regarding the impeachment value of an uncalled witness's testimony and finding that the testimony would have "only gone to [another witness's] credibility, which was already effectively challenged at trial"); *White v. Keane*, 51 F.Supp.2d 495, 505 (S.D.N.Y. 1999) (rejecting petitioner's claim that counsel was ineffective for failing to call witnesses where their testimony was speculative, repetitive, vague, or "related solely to the issue of credibility of one of the [government's] many witnesses").

In the absence of any evidence substantiating Folks's vague argument for the relevance of Ms. Jackson's testimony, the impeachment value of Ms. Jackson's testimony is wholly

speculative.[12] Moreover, even crediting Folks's assertion that Ms. Jackson's testimony would have challenged Katelynn C.s credibility, Ms. Jackson's testimony would have been cumulative because, as explained in Part B above, Folks's trial counsel effectively challenged Katelynn C.'s credibility on cross-examination and recross. (*See* Doc. 423 at 78–83, 85–88; Doc. 425 at 4–9, 12, 18, 19–20, 38–40.)

Therefore, Folks has not demonstrated an ineffective-assistance-of-counsel claim with respect to Ms. Jackson.

### e.    Cassandra Folks

Folks contends his trial counsel were ineffective for failing to call his then-wife, Cassandra Folks, who "could have proven that the images derived from the computer that [Folks] used, did not belong to [him]," and that he had nothing "to do with them." (Doc. 609-6 at 11.) He asserts that Ms. Folks would have testified that she, not Folks, "had been saving [the images] and humiliating the women by posting them to their Facebook pages, and outing them, because she felt that [Folks] had been sleeping with all of these women." (Doc. 609-2 at 4.) Attorney Kaplan attests that he and the defense investigator "met with Cassandra at her home prior to trial and concluded that her testimony would not be helpful." (Doc. 625 at 3.) According to Attorney Sen's Affidavit, "[her] notes reflect numerous discussions about what Ms. Folks knew and did not know about the case and the witnesses in the case." (Doc. 624 at 4.) "There are, however, no notes reflecting Mr. Folks'[s] request that she be called as a defense witness, and that is consistent with [Attorney Sen's] recollection." (*Id.*)

---

[12] Folks appears to attempt to substantiate his arguments by general reference to "prison phone calls" and "notes from the investigators" and his "personal correspondence." (Doc. 609-2 at 4.) However, these vague references without production of the relevant evidence is insufficient to create a factual issue as to his claims related to Ms. Jackson.

Assuming Folks in fact requested that Ms. Folks be called as a witness, Attorneys Kaplan and Sen together clearly spent considerable time determining the extent of her knowledge on the relevant issues, ultimately deciding that her testimony would not assist Folks's defense. (Doc. 625 at 3; Doc. 624 at 4.) The decision not to call Ms. Folks was "a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also Strickland*, 466 U.S. at 690–91 (explaining that "strategic choices made by counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Barnes*, 2015 WL 5854030, at *7 ("[T]hat counsel contacted [the potential witness] and investigated his account of th[e] day suggests that the alleged 'failure' to call him as a witness was in fact a deliberate strategic decision".). Counsel's decision not to call Ms. Folks falls squarely within the realm of trial strategy and does not rise to the level of constitutionally deficient representation. *See Nersesian*, 824 F.2d at 1321.

Folks also cannot demonstrate prejudice by the decision not to call Ms. Folks at trial. Folks essentially contends that his wife's testimony would have challenged the government's theory that he used Backpage to facilitate the trafficking of the women, using the images and videos on the computer to coerce them into prostitution. However, even if Ms. Folks had testified that she had saved the images to the computer, this testimony likely would not have changed the outcome of the trial given that there was ample evidence corroborating the government's theory and such testimony would not have necessarily negated that theory. Even crediting Folks's contention that the photos and videos were found in Ms. Folks's private folder on the computer, and that she used the media to humiliate or blackmail the women by posting them, these facts would not be inconsistent with the government's theory that Folks helped the women take pictures for Backpage ads and that he himself posted them to Backpage. Nor would these facts

negate the theory that Folks used the existence of these photos and videos—among other means—to coerce the women.

Therefore, Folks has not established ineffective assistance of counsel with respect to these five witnesses.

### 2. Alleged Failure to Object to the Introduction of Video of Victoria L. and a Photo of Hannah A.

According to Folks, "because of the inactions of defense coun[se]l . . . highly prejudicial images were allowed at trial and were used against [Folks]." (Doc. 609-6 at 7; *see also id.* at 11.) Folks specifically asserts that counsel "neglected to object to the introduction of both a video of Victoria [L.], and a photo of Hannah A." (*Id.* at 11.) The Kaplan and Sen Affidavits squarely refute this claim. Both counsel assert that they did object to the introduction of the photograph of Hannah A. and the video of Victoria L. (Doc. 625 at 3; Doc. 624 at 4.) According to Attorney Sen, "[t]he video and photograph were among the materials that we challenged in connection with the computer-related litigation. . . , and the Court overruled our objections to their introduction." (*See* Doc. 624 at 4; Doc. 359 at 6–10.) In its response to Folks's § 2255 Motion, the government confirms that "photographs of Hannah A (*see, e.g.*, Doc. 442 at 95) and a video of Victoria L. concerning the sex act referred to as the "challenge" (*see, e.g., id.* at 129–131) were recovered from the computer, the admission of which the defense objected to and challenged with its own expert." (Doc. 631 at 14 n.4.)

As to the video of Victoria L., the record does not support Folks's claim that counsel "failed to object" to the video on the ground that the evidence was not "indicative of someone controlling another." (Doc. 609-6 at 12.) Counsel sought *in limine* to exclude the video of the "challenge" and videos depicting Folks urinating on individuals. Counsel specifically argued that "[t]hese videos are not relevant to showing that Mr. Folks forced, coerced, or threatened to force any women to engage in commercial sex acts." (Doc. 359 at 10.) Moreover, counsel

subsequently renewed their challenge to the admissibility of the videos on the ground that they were highly prejudicial, had little probative value, and were not relevant to show force, threat, or coercion. (*See* Doc. 375 at 4–5.) Although the Court declined to exclude the videos (*see* Doc. 403), defense counsel again challenged their admission during trial. (*See* Doc. 444.) The record and attorney affidavits clearly reflect counsel's efforts to exclude the video of Victoria L. as not probative of coercion, force, or threat. Therefore, Folks has not demonstrated that counsel performed deficiently regarding the Victoria L. video.

With respect to the photograph of Hannah A., Folks asserts that his trial counsel "failed to raise a viable defense against the use of the image, as the image was produced without any evidence to support the claim that she was actually prostituting."[13] (Doc. 609-6 at 12.) The record does not support this claim. Attorneys Kaplan and Sen confirm in their Affidavits that they challenged the admission of the photograph of Hannah A. (*See* Doc. 624 at 4; Doc. 625 at 3; Doc. 631 at 14 n.4 (government brief confirming that "[a]s Ms. Sen provides, 'the . . . photograph w[as] among the materials that [she] challenged in connection with the computer-related litigation . . . and the Court overruled [counsel's] objections.'").) Moreover, during the government's direct examination of Jasmine L., Folks's counsel objected to the admission of the photograph of Hannah A. that formed the basis for Count Fifteen. (*See* Doc. 425 at 85–93.) Further, counsel moved under Rule 29 for a judgment of acquittal with respect to Count Fifteen, in part arguing that "[a]side from these photos and the screenshot of the Backpage ad, there is no evidence that Hannah A. was ever involved in prostituting with Mr. Folks." (Doc. 446 at 2.)

Accordingly, the record and attorney affidavits document counsel's repeated objections to the admission of the Hannah A. photograph. There is no basis to conclude that counsel were

---

[13] Although Folks's Amended Motion does not describe the specific photograph to which he refers, the Court construes his claim to refer to the photograph taken of Hannah A. and subsequently posted on Backpage. The government introduced this photograph in connection with Count Fifteen—the Count related to Hannah A.

constitutionally deficient on this issue. To the extent that Folks asserts ineffective assistance because his counsel's efforts to exclude the image were unsuccessful, this is insufficient for an ineffective-assistance-of-counsel claim. *See Rodriguez v. United States*, 94 Cr. 313 (CSH), 2017 WL 6404900, at *23 (S.D.N.Y. Dec. 13, 2017) ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . ." (quoting *Strickland*, 466 U.S. at 689)).

Folks has not overcome the presumption that his trial counsel's conduct with respect to the video and photographic evidence fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, I recommend that Folks's ineffective-assistance-of-counsel claim be denied to the extent he claims Attorneys Kaplan and Sen were ineffective in their efforts to exclude the video of Victoria L. and the photo of Hannah A.

### 3.    Attorney Barth's Alleged Failure to Serve as a "Buffer"

Several months after Folks's trial, Attorneys Kaplan and Sen filed a motion to withdraw as counsel based on irreconcilable differences and Folks's complaint against Attorney Kaplan with the Professional Responsibility Board. (*See* Doc. 502.) Judge Sessions assigned Attorney Barth as Folks's "supplementary counsel . . . to assist Defendant with any supplemental motions and/or sentencing matters." (Doc. 512 at 2.) Folks appears to assert that Attorney Barth was ineffective because she allegedly failed to perform her intended role due to a conflict of interest. (Doc. 609-6 at 10, 24; Doc. 609-2 at 2.)

Folks has not demonstrated that Attorney Barth's performance as his supplementary counsel "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. He contends that Attorney Barth "never made an appearance and [he] never saw her after [their] initial meeting." (Doc. 609-6 at 12.) After this initial meeting, Folks asserts that "he never saw or heard from her again, until after [his] conviction." (Doc. 609-2 at 2.) Attorney Barth has

submitted a Declaration addressing Folks's claims. Attorney Barth attests that she "met with [Folks] more than once, for face-to-face consultations including on: October 6, 2019, November 11, 2019, and January 9, 2020." (Doc. 622 at 8.) She also "spoke with [Folks] by telephone on several occasions including on: October 2, 2019, October 29, 2019, December 10, 2019, December 12, 2019, May 4, 2020, May 19, 2020, June 27, 2020, and July 8, 2020." (*Id.*) Further, Attorney Barth attests that she "assisted [Folks] with *pro se* supplemental motions he wished to file at the district court level prior to his sentencing."[14] (*Id.* at 7.) The record substantiates Attorney Barth's recollection. After Judge Sessions appointed Attorney Barth as supplementary counsel, she filed numerous posttrial motions on his behalf, including requests for Folks to file *pro se* motions and briefs. (*See, e.g.*, Docs. 521, 527, 528, 552, 563, 566, 570.) Attorney Barth also appeared at hearings as supplementary counsel. (*See, e.g.*, ECF Minute Entries 559, 562, 574.) Other than his wholly conclusory and unsupported assertion that Attorney Barth never met with him after their first meeting, Folks does not explain how Attorney Barth's performance was deficient.

Nor has Folks demonstrated any prejudice resulting from Attorney Barth's performance as his supplemental counsel. He alleges that "[t]he problems [with his trial counsel] persisted and she did nothing to help smooth them over." (Doc. 609-6 at 24.) However, the "problems" Folks identifies with respect to his trial counsel are related to his trial counsel's "handling of several witnesses" and alleged failure to object to certain computer evidence, which occurred before Attorney Barth was assigned as supplemental counsel. (*See* Doc. 609-6 at 9–12.) Folks has not explained how posttrial proceedings were prejudiced as a result of Attorney Barth's conduct.

---

[14] Attorney Barth "obtained permission for [Folks] to file supplemental *pro se* motions, *via* hybrid representation, despite government opposition." (Doc. 622 at 7.) Folks provided Attorney Barth with "the content for his *pro se* motions and [she] formatted them in a professional manner for filing with the district court." (*Id.*)

Therefore, he cannot establish that, but for Attorney Barth's alleged failure to remedy "problems" existing before she was assigned as supplementary counsel, there is a reasonable probability that the outcome of the trial and any posttrial proceedings would have been different. *See Henry*, 409 F.3d at 63.

### D.    Attorney Barth's Alleged Failure to Communicate During the Appeal Process

*Strickland* applies to claims of ineffective assistance by appellate counsel. "Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *see also Smith v. Robbins*, 528 U.S. 259, 289 (2000) ("Robbins must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel."). To establish a claim of ineffective assistance of counsel in this context, the movant must demonstrate that "appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and absent counsel's deficient performance, there was a reasonable probability that petitioner's appeal would have been successful." *Anderson v. Keane*, 283 F. Supp. 2d 936, 941 (S.D.N.Y. 2003). "[C]ounsel has no duty to raise every non-frivolous issue that could be raised. Nevertheless, appellate counsel's performance must meet prevailing professional norms." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (citations omitted). A claimed error of appellate counsel must be "of such magnitude that it rendered counsel's performance constitutionally deficient under [*Strickland*]." *Smith v. Murray*, 477 U.S. 527, 535 (1986).

Folks asserts that he was unable to communicate with Attorney Barth during his direct appeal.[15] (Doc. 609-6 at 13; Doc. 609-2 at 5–6.) He appears to claim that he was unable to contact Attorney Barth until after she filed his direct appeal, which resulted in her failure to raise certain issues on appeal, including "problems stemming from the performance of [Folks's] trial counsel." (Doc. 609-6 at 13.) Folks states that his placement in segregation and other obstacles prevented him from contacting Attorney Barth and therefore he was "[unable] to assist in [his] appeal." (Doc. 609-2 at 5.)

The record does not support Folks's claim that Attorney Barth failed to communicate with him during his appeal. "Although it may be desirable and productive, the Constitutional right to effective assistance of counsel does not encompass the requirement that an attorney consult with his client to discuss the alleged trial errors that his client wishes to pursue." *McIntyre v. Duncan*, No. 03-CV-0523 (ADS), 2005 WL 3018698, at *3 (E.D.N.Y. Nov. 8, 2005); *see also Campbell v. Greene*, 440 F. Supp. 2d 125, 152 (N.D.N.Y. 2006) (holding that petitioner did not establish ineffective assistance where appellate counsel failed to consult with petitioner prior to filing appellate brief or incorporate petitioner's suggested arguments in appellate brief).

Nevertheless, Attorney Barth asserts in her sworn Declaration that she did in fact communicate with Folks regarding his appeal. Attorney Barth explains that "[w]hile Mr. Folks was housed at SSCF, [they] discussed his appeal by telephone and in writing." (Doc. 622 at 5.) She further asserts that before filing his opening brief, she spoke with Folks over the phone on several occasions, "including: October 18, 2020, November 12, 2020, November 17, 2020, November 23, 2020, January 21, 2021, and March 27, 2021." (*Id.*) According to Attorney Barth,

---

[15] To the extent Folks alleges ineffective assistance of appellate counsel based on an alleged conflict of interest, the Court determined in Part C.1 above that Folks has not demonstrated a *per se* or actual conflict. Therefore, the Court applies the *Strickland* standard to his ineffective-assistance-of-appellate-counsel claim.

"[a]t least three of these phone calls were dedicated to discussing his opening brief." Folks explained that he desired his appeal to focus on errors that "would result in his convictions being overturned." (*Id.*) Attorney Barth also attests that on March 18, 2021, she sent Folks a draft of the opening brief "for his review and comment." (*Id.*; *see also* Doc. 622-1 (copy of correspondence with Folks).) During their March 27, 2021 phone conversation, Folks confirmed his receipt of the draft and "shared how pleased he was with [her] work and expressed his gratitude."[16] (Doc. 622 at 6.) Attorney Barth explains that the draft brief she sent Folks and the version she filed with the Second Circuit Court of Appeals "largely mirror each other . . . though the final [version] added one additional issue not in the draft." (*Id.* at 5–6 n. 2.) Although Attorney Barth explained to Folks that she could request the Second Circuit's permission for him to file a *pro se* supplemental brief should he wish to raise additional issues on appeal, "he never asked to exercise [this] option." (*Id.* at 6–7.) The record evidence clearly demonstrates that Attorney Barth's communication with Folks was more than adequate.

With respect to the prejudice element, Folks appears to contend that Attorney Barth failed to raise ineffective-assistance claims as to his trial counsel. (*See* Doc. 609-6 at 13.) Given the recommendation that trial counsel were not ineffective, it is not reasonably probable that Folks would have prevailed on his ineffective-assistance-of-trial-counsel claims on appeal. *See Anderson*, 283 F.Supp.2d at 941. Moreover, Folks cannot show prejudice because, as he concedes, ineffective-assistance-of-counsel claims are properly raised in a § 2255 Motion, not in a direct appeal. (Doc. 609 at 4 (Folks acknowledging in § 2255 Motion that "ineffective assistance of counsel claims are best raised in 2255 Motions")); *See Dominguez v. United States*,

---

[16] In a March 17, 2022 email attached to the Barth Declaration, Folks expresses his gratitude to Attorney Barth after receiving the draft appellate brief: "Ms. Barth, I thank you tremendously for all that you have done for me thus far in regards to helping me regain my freedom. [I] know you've gone above and beyond your duties on this case and I just wanted you to know that I recognize it and I'm grateful, as is my family." (Doc. 622 at 8; Doc. 622-2 at 3.)

No. 09-CV-05757 (RMB) (MHD), 2011 WL 1044585, at *7 (S.D.N.Y. Feb. 23, 2011) (finding

no prejudice where petitioner was able to challenge trial counsel's performance by means of

§ 2255 motion), *report and recommendation adopted*, 2011 WL 1044593 (S.D.N.Y. Mar. 17,

2011).

Because Folks has not demonstrated deficient performance and prejudice under

*Strickland*, I recommend that the Court deny his ineffective-assistance-of-appellate-counsel

claim.

### III.    Motions for an Evidentiary Hearing and Discovery

In his Motion for Evidentiary Hearing and Appointment of Counsel During That Hearing,

Folks requests an evidentiary hearing "to properly develop[]" the claims he raises in his § 2255

Motion. (Doc. 618 at 1.) He asserts that a hearing is necessary "especially considering several

facts would presumably be contested by both trial and appellate counsel." (*Id*.) He also requests

leave to conduct discovery on his claims. (Doc. 620.) Folks seeks "any and all communications

between himself, trial counsel, and appellate counsel (including, but not limited to letters, e-

mails, recorded phone-calls, etc.) as well as any notes and work products developed by counsel

throughout the course of [his] criminal case." (*Id.* at 1.) The government responds that the

request for an evidentiary hearing should be denied because Folks's § 2255 Motion "can be

determined on the written record." (Doc. 631 at 20.) The government further asserts that Folks's

request for discovery should be denied because he has not shown the requisite "good cause" to

obtain discovery in a habeas proceeding. (*Id.*)

Motions for relief under § 2255 require a hearing "[u]nless the motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C.

§ 2255(b); *see also Gonzalez v. United States*, 722 F.3d 118, 130–31 (2d Cir. 2013) ("To warrant

a hearing, the motion must set forth specific facts supported by competent evidence, raising

detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."); *see also* Rule 8(a) of the Rules Governing Section 2255 Proceedings ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."). Courts frequently "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" *Rosario v. United States*, No. 17-CR-0027-LTS, No. 18-CV-9066-LTS, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003)).

With respect to discovery in habeas proceedings, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) of the Rules Governing Section 2255 Proceedings. "This 'good cause' standard is satisfied 'where specific allegations before the court show reason to believe that the [movant] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Ferranti v. United States*, 480 F. App'x 634, 638 (2d Cir. 2012) (omission in original) (quoting *Bracy*, 520 U.S. at 908–09).

To aid in the determination of the issues Folks raises in his § 2255 Motion, the Court requested Affidavits from Attorneys Kaplan, Sen, and Barth addressing Folks's allegations of ineffective assistance of counsel. (Doc. 616.) Based on the extensive record in this case, including the trial record and affidavits of counsel, the Court has adopted the "middle road" approach, recommending a disposition based on the written submissions and case record. An evidentiary hearing would add "little or nothing" to the determination of Folks's § 2255 Motion.

*Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001). Folks's claims of ineffective assistance by both trial and appellate counsel rest largely on conclusory assertions of deficient performance and descriptions without substantiation as to the likely testimony of uncalled witnesses. As his claims do not "set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact" that might entitle him to relief if proven, *Gonzalez*, 722 F.3d at 130–31, I recommend that an evidentiary hearing is not warranted.

Folks asserts that "an evidentiary hearing would be necessary in this case as there is conflicting testimony between [Folks] and his defense counsel that supplied affidavits . . . ." (Doc. 638 at 10.) While it is true that Folks and his trial counsel present conflicting factual accounts on some issues, the resolution of his claims is not simply a matter of the Court crediting one sworn statement over another. As explained above, courts may consider an array of materials bearing on the asserted issues, including affidavits, the trial record, exhibits, and letters. *See Rosario*, 2019 WL 5260784, at *3. Folks's claims have been considered with reference to the affidavits on file, certainly, but also by consideration of his claims in conjunction with the case record. As this Report and Recommendation explains, where Folks has characterized the factual record differently from his counsel, the record fully supports counsel's positions on the disputed events. Further, in those instances where the record may not conclusively establish the facts in dispute—for example, whether trial counsel was aware that Folks had requested that Ms. Guerra be called as a witness—Folks has not demonstrated resulting prejudice for the reasons explained in this Report and Recommendation.

Accordingly, because "the motion and files and records of the case conclusively show that [Folks] is entitled to no relief," 28 U.S.C. § 2255(b), I recommend that his Amended Motion under § 2255 be decided on the existing record and that his Motion for Evidentiary Hearing and Appointment of Counsel During That Hearing (Doc. 618) be denied. Further, as this Report and

Recommendation recommends that Folks's § 2255 Motion be denied because it is without merit, Folks necessarily has not shown good cause for the voluminous discovery he requests. Therefore, I recommend that Folks's Motion Requesting Leave of Court to Request Discovery (Doc. 620) be denied.

## IV.    Motion to Remove Protective Order

Folks requests that the Court "lift[] the protecti[ve] order that is currently in place so he can analyze protected material for the purposes of using it in aid of his § 2255 [motion]." (Doc. 619 at 1.) Folks asserts that "[w]hile [the protective order] made sense before trial began, it no longer makes sense now that the witnesses have all come forth and now that Mr. Folks has all their names." (*Id.* at 2.) He contends that "[the witness'] identities and participation during trial is a matter of public record making this protective order moot," and that the protective order "sever[e]ly limits [his] ability to effectively develop[] the various claims alleged in his § 2255 [motion]." (*Id.*) The government responds that because Folks is not entitled to discovery, there is no reason to modify or lift the protective order. (Doc. 631 at 20.)

As the Court recommends that Folks is not entitled to discovery, it further recommends that lifting or otherwise modifying the Second Amended Protective Order is not warranted. Further, the Second Amended Protective Order was entered on May 14, 2020, which was after the conclusion of Folks's trial. (*See* Doc. 560.) Therefore, contrary to Folks's assertion, the protective order did not become moot when the trial ended. Rather, the Second Amended Protective Order remained in place through his sentencing and appeal, and remains in place currently. As Folks has not shown good cause for discovery, I recommend that Folks's Motion to Remove Protection Order (Doc. 619) be denied.

### V.    Motion to Amend § 2255 Motion to Add Exhibits

Folks requests leave of court to add exhibits that he contends further substantiate his ineffective-assistance-of-counsel claims. (Doc. 629.) These exhibits consist of a series of letters he sent to Attorney Kaplan pertaining to requests for discovery and to have certain witnesses interviewed. The exhibits also include the defense investigator's reports of interviews with individuals who Folks asserts were helpful to his defense. Folks appears to offer these exhibits to further substantiate his claims that counsel performed deficiently with regard to choice of defense witnesses at trial.

The correspondence reflects that Folks actively participated in his defense, frequently suggesting to counsel weaknesses in the government's witnesses, directing counsel to speak with an array of individuals that Folks believed would assist in his defense, and requesting access to discovery items. (*See, e.g.*, Docs. 629-1, 629-2.) In other letters dating to after his trial, he inquires about posttrial motions, requests to access materials for purposes of appeal, and demands interview reports for witnesses that his counsel did not call at trial. (Doc. 629-9.) The interview reports memorialize meetings the defense investigator had with potential witnesses for Folks. (Docs. 629-10, 629-11.)

None of these materials alter the recommended disposition on Folks's § 2255 Motion. As explained above, counsel's decision "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *Betancur*, 84 F. App'x at 135 (internal quotation marks omitted). Folks does not demonstrate deficient performance simply by citing witness statements favorable to him. As counsel's affidavits demonstrate, Attorneys Kaplan and Sen devoted considerable time and effort to locating witnesses and determining which witnesses to call at trial. As the affidavits further demonstrate, counsel consulted the defense investigator during trial about witnesses and made

reasonable professional judgments about whether particular witnesses would be more likely to aid or hinder the defense. Folks offers no basis for the Court to conclude that counsel was ineffective for not calling the witnesses identified in the additional exhibits, or that the witnesses' testimony would have changed the outcome of his trial. The record demonstrates highly proficient attorney performance during the pretrial, trial, and appellate stages of litigation. Decisions as to trial witnesses are particularly within the professional purview of counsel and should not be second-guessed on collateral review absent a clear basis to conclude that counsel did not act within the wide range of reasonable professional assistance permitted under *Strickland*.

To ensure that Folks's pro se § 2255 Motion receives comprehensive consideration of all asserted claims and evidence, I recommend that the Motion to Amend to add exhibits (Doc. 629) be GRANTED. I further recommend that, notwithstanding the supplemental exhibits, the § 2255 Motion be denied.

## Conclusion

Based on the foregoing, I recommend that Folks's Amended Motion Under § 2255 (Doc. 609-6) be DENIED. I further recommend that Folks's Motion for Evidentiary Hearing and Appointment of Counsel During That Hearing (Doc. 618), Motion to Remove Protecti[ve] Order (Doc. 619), and Motion Requesting Leave of Court to Request Discovery (Doc. 620) be DENIED. I also recommend that the Motion to Amend to add exhibits (Doc. 629) be GRANTED.

I recommend that the Court decline to issue a certificate of appealability because Folks has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Generally, a movant meets this burden by demonstrating that "reasonable jurists could debate whether . . . the [motion] should have been resolved in a different manner or that

the issues presented [a]re adequate to deserve encouragement to proceed further." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). As Folks has not

satisfied this burden, I recommend that a certificate of appealability be DENIED.

     Dated at Burlington, in the District of Vermont, this 7th day of March 2025.

*/s/ Kevin J. Doyle*       
Kevin J. Doyle
United States Magistrate Judge

     Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).